## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FREDERICK KLORCZYK, JR., as co-administrator :   CIVIL ACTION NO.
of the Estate of Christian R. Klorczyk, et al., :
            :   3:13-cv-00257-JAM
           *Plaintiffs*, :
            :
vs.             :
            :
SEARS, ROEBUCK AND CO., et al.,    :
            :
           *Defendants*. :   NOVEMBER 1, 2016

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>MOTION TO PRECLUDE TESTIMONY OF ROGER CLAYPOOL</u>

The Plaintiffs paid the Defendant SFA's[1] Product Safety & Compliance Manager, Roger Claypool, over $10,000 this year alone to testify as a fact witness and to provide them with confidential and privileged, information about the claims that he worked with SFA's legal team to investigate and resolve. Mr. Claypool's $10,000 fee is more than his total income this year from his "day job" as a community college teacher, and the money obviously biased his testimony. In the most glaring example, Mr. Claypool testified that investigating a claim by ███████████ made him believe in "false engagement," the purported product defect that the Plaintiffs claim happened in this case, despite the fact that ████████████████████ ██████████████████████████████████. The Plaintiffs' arrangement with Mr. Claypool violates both the Connecticut Rules of Professional Conduct and the Federal Antigratuity Statute, Section 201 of Title 18 of the United States Code.

Further, Mr. Claypool readily admitted that he worked intimately with SFA's general counsel in investigating and resolving claims, and that he had access to extensive attorney-client privileged communications and work product. Yet in all of Plaintiffs' counsel's communications

---

[1] The Defendant Shinn Fu Company of America, Inc. is referred to herein as "SFA."

**ORAL ARGUMENT REQUESTED**

with Mr. Claypool, they never once told him not to disclose privileged information.  In fact, Mr. Claypool admitted that he had never heard of "materials prepared in anticipation" of litigation before his deposition, and his testimony made it clear that he disclosed privileged information to Plaintiffs' counsel.  Second Circuit precedent indicates that Mr. Claypool should be disqualified simply because he had access to SFA's confidential and privileged information, even ignoring the more disturbing fact that he was paid to disclose that information to Plaintiffs' counsel.

Improper payment of a fact witness merits the preclusion of his testimony, and paying a witness to disclose privileged information also warrants sanctions including the preclusion of the witness's testimony.  Here, we have both.  This situation is literally unprecedented — the undersigned counsel has not been able to find a single instance where a party has been permitted to pay for fact testimony and information from a former employee of an opponent who had regular access to the opponent's privileged documents and communications.  In the single factually analogous case that was located, the witness at issue was disqualified.  *See Rocheux International of New Jersey, Inc. v. United States Merchants Financial Group, Inc.*, No. 06-6147, 2009 U.S. Dist. LEXIS 93082 (D.N.J. Oct. 5, 2009).  Under no circumstances should Mr. Claypool be permitted to take the witness stand and testify when he has been paid thousands of dollars by the Plaintiffs to provide biased testimony and disclose SFA's privileged information.

I.    **Mr. Claypool Was Paid Thousands Of Dollars To Serve As  Friendly Fact Witness, Predisposing Him To Give Biased Testimony**

The Plaintiffs' decision to pay Mr. Claypool merits his disqualification for three reasons:

(1) The payment of fact witnesses is disfavored by the Connecticut Rules of Professional Conduct and prohibited by federal statute and case law from across the country;

(2) The amount paid to Mr. Claypool was well beyond reasonable, where it far exceeded compensation for expenses and missed work, and actually exceeded his total earnings from his day job; and

(3) The payment clearly influenced Mr. Claypool to cooperate with the Plaintiffs and affected the content of his testimony.

**A. Payment Of Fact Witnesses Is Disfavored by The Connecticut Rules Of Professional Conduct And Prohibited By Federal Statute And Case Law From Across The Country**

The official commentary to Rule 3.4 of the Connecticut Rules of Professional Conduct states that "[t]he common law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying[.]"[2]  In his deposition, Roger Claypool made it clear that he is an occurrence witness and not an expert witness.  Mr. Claypool was directly asked: "Do you plan to offer any expert testimony in this action?"  He responded:  "No.  No.  I'm -- I'm here as a fact witness."  (Claypool Dep. Tr. p. 221:8-9, Ex. A.)[3]  Nonetheless, Mr. Claypool made it clear that he was paid a fee of $120 per hour for the time he spent reviewing documents provided by Plaintiffs' counsel, speaking with Plaintiffs' counsel on the phone, meeting with Plaintiffs' counsel to prepare for his deposition, and testifying in his deposition.  (Claypool Dep. Tr. pp. 151:4-22, 156:4-157:3, Ex. A.)  This was not a reimbursement of expenses or compensation for time that he missed at work — it was a fee for cooperation and testimony. This is exactly what the Rules of Professional Conduct prohibit, and what courts across the country have held to merit disqualification of the paid fact witness.

This arrangement is also barred by federal statute.  Section 201(c)(3) of Title 18 of the United States Code states that it is illegal for a fact witness to be compensated for testimony:

---

[2] The District Court for the District of Connecticut has adopted the Connecticut Rules of Professional Conduct.  *See MMR/Wallace Power & Indus., Inc. v. Thames Assoc.*, 764 F. Supp. 712, 717-18 (D. Conn. 1991).

[3] The deposition transcript of Roger Claypool was requested by SFA to be marked confidential because it is rife with testimony that is potentially privileged, subject to work product protection, and discusses trade secret or proprietary information,  and is therefore being filed under seal in accord with Rule 5(e) of the Local Rules of Civil Procedure for the District of Connecticut, though Mr. Claypool's testimony regarding information that is not privileged, a trade secret, or proprietary in nature is not being redacted from this memorandum.

> Whoever . . . demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of the testimony under oath or affirmation given or to be given by such person as a witness . . . shall be fined under this title or imprisoned for not more than two years, or both.

Section 201(d) clarifies that the foregoing section is not meant to prohibit "fees provided by law, or the payment, by the party upon whose behalf a witness is called . . . of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding."  Here, Mr. Claypool was reimbursed for his travel and his hotel expenses appearing for a deposition in Hartford, in addition to his $120 per hour fee.  (Claypool Dep. Tr. p.160:15-23.)  His $120 hourly fee cannot be characterized as the "reasonable value of time lost" either, where the Plaintiffs subsequently provided discovery responses showing that Mr. Claypool did not miss any scheduled work to attend the deposition, and $120 per hour is much more than he earns as a community college teacher, where he is paid $322.50 every two weeks.  (Pls.' Supplemental Response to Supplemental Interrog. No. 1, Ex. B.)  In fact, the Plaintiffs have paid him $10,312.50 so far this year in connection with this case, and his total earnings from the community college this year total only $7,202.50.  (Pls.' Response to Supplemental Interrog. Nos. 4-5, Ex. C.)  It is apparent that Mr. Claypool has "received" and "accepted" something of "value" — $120 per hour — "for or because of" his "testimony under oath," which is exactly what the Antigratuity statute prohibits.

The closest case on point is *Rocheux International of New Jersey, Inc. v. United States Merchants Financial Group, Inc.*, No. 06-6147, 2009 U.S. Dist. LEXIS 93082 (D.N.J. Oct. 5, 2009),[4] where the nearby District Court for the District of New Jersey excluded the testimony of a defendant's former employee who was paid over $4,000 by plaintiff's counsel to consult with counsel and provide testimony.  The *Rocheux* court first observed that lawyers can only typically

---

[4] All unreported decisions cited in this motion are collectively attached as Exhibit N.

compensate fact witnesses for reasonable expenses incurred in attending trial and for loss of the witnesses' time in attending trial.  *Id.* at *7-8.  This is codified in the Federal Antigratuity Statute, excerpted above.  *See Id.* at *8 (*citing* 18 U.S.C. § 201).  The court then observed that "[c]ourts have reinforced this rule by deeming non-conforming agreements to compensate fact witnesses unenforceable for lack of consideration and being contrary to public policy."  *Id.* at *8 (citations omitted).  The court went on to hold that under the facts before it, the paid witness's testimony would be excluded because it was "necessary to protect the integrity of these proceedings," and classified the arrangement as "wrongful payment of a fact witness."  *Id.*  The same result is merited here, where Mr. Claypool was paid over four times as much — more than $16,000 in total — as the witness at issue in *Rocheux*.  (*See* Pls.' Response to Supplemental Interrog. No. 5, Ex. C.)

Other courts across the country have also condemned the practice of paying for the testimony of fact witnesses and paying for the cooperation of hostile witnesses.  In *Golden Door Jewelry Creations v. Lloyds Underwriters Non-Marine Ass'n*, 865 F. Supp. 1516, 1517 (S.D. Fla. 1994), the Southern District of Florida held that the defendants violated Rule 3.4(b) of the Model Rules of Professional Conduct — which mirrors Rule. 3.4(2) of the Connecticut Rules of Professional Conduct — by paying fact witnesses.  The court held that these payments were improper whether the testimony at issue was truthful or false, and also sanctioned the defendant's attorneys because they knew about the arrangement and negotiated the amount of money paid to the fact witnesses. *Id.* at 1525-26.  The Seventh Circuit has held that fact witness compensation agreements are against public policy, because they violate the spirit of the Constitution to allow citizens to obtain "justice freely and without being obligated to purchase

it," and they "lean toward the procurement of perjury . . . the perversion of justice," and "corruption in our courts." *Hamilton v. Gen. Motors Corp.*, 490 F.2d 223, 229 (7th Cir. 1973).

In *The Florida Bar v. Jackson*, 490 S0. 2d 935, 936 (Fla. 1986), the court succinctly explained the impropriety of paying fact witnesses for their testimony: "The very heart of the judicial system lies in the integrity of the participants . . . Justice must not be bought or sold. Attorneys have a solemn responsibility to assure that not even the taint of impropriety exists as to the procurement of testimony before courts of justice." In New York, an attorney was disbarred for the payment of fact witnesses, as the court reasoned that payment of a witness "to make him sympathetic" was "absolutely indefensible," and that "[t]he payment of a sum of money to a witness to 'tell the truth' is as clearly subversive of the proper administration of justice as to pay him to testify to what is not true." *In re Robinson*, 151 A.D. 589, 600 (1912), *aff'd*, 103 N.E. 160 (1913); *see also Ward v. Nierlich*, No. 99-14227-CIV, 2006 U.S. Dist. LEXIS 97373, at *12-13 (S.D. Fla. Sept. 20, 2006) (disqualifying plaintiffs' counsel for entering into an agreement to pay defense witnesses and offering them a stake in any favorable judgment or settlement).

In another New Jersey case, the District Court revoked an attorney's pro hac vice admission for paying $100 per hour for a member of an opposing party's litigation control group to review documents and assist him in litigating the case. *In re PMD Enters.*, 215 F. Supp. 2d 519, 529-32 (D.N.J. 2002). That is exactly what Plaintiffs' counsel have done in this case, except they have compensated Mr. Claypool at a higher rate.

In yet another similar case, the Southern District of Indiana held that an agreement for a fact witness to provide "advice and live testimony" for $200 per hour plus reasonable expenses was contrary to both the Federal Antigratuity Statute and Rule 3.4(b) of the Indiana Rules of

Professional Conduct, which mirrors Rule 3.4(2) of the Connecticut Rules.  *United States v. Cinergy Corp.*, No. 1:99-CV-1693-LJM-JMS, 2008 U.S. Dist. LEXIS 123516, at *34-36 (S.D. Ind. Dec. 18, 2008).  The court held that $200 per hour was beyond "the reasonable value of time lost" by the witness, who was retired and had most recently been paid $88 per hour as a consultant.  *Id.* at 35-36.  Here, the disparity between Mr. Claypool's $120 per hour fee for advice and live testimony and his $322.50 bi-weekly paycheck from his community college is even greater.

Overall, all of the foregoing cases bear a striking resemblance to this case — a fact witness was paid for cooperation and testimony, just as Mr. Claypool was paid for cooperation and testimony.  And in all of the cases, the result is the same — at the very least compromised witness's testimony must be precluded.  In fact, the undersigned counsel has not located a single case where the court stood by and allowed compensation of a fact witness from an ostensibly-adverse party to secure cooperation and testimony.  This should not be the first such case, and the Plaintiffs should be barred from offering any testimony from Mr. Claypool, whether live or from his deposition, at trial.

**B. The Amount Paid To Mr. Claypool Was Well Beyond Reasonable, Where It Far Exceeded Compensation For Expenses And Missed Work, And Actually Exceeded His Total Earnings From His Day Job**

Mr. Claypool testified that he currently teaches industrial technologies courses at the Metropolitan Community College in Kansas City, Missouri.  (Claypool Dep. Tr. pp. 16:24-17:8.) Mr. Claypool is paid approximately $322.50 every two weeks.  (Pls.' Supplemental Response to Supplemental Interrog. No. 1, Ex. B.)  In 2015, he earned $7,318.59 as a teacher.[5]  As of

---

[5] This number was calculated by taking Mr. Claypool's total reported income for 2015 of $13,506.09 and subtracting the $6,187.50 that he was paid by the Plaintiffs in that same year.  (*See* Pls.' Responses to Supplemental Interrog. Nos. 3, 5, Ex. C.)

September 23, 2016, the community college has paid Mr. Claypool $7,202.50.  (Pls.' Response to Supplemental Interrog. No. 4, Ex. C.)

The fees that Plaintiffs' counsel paid Mr. Claypool in connection with this action over the course of the past two years exceed his earnings at the community college.  As stated above, Mr. Claypool testified that he was paid a fee of $120 per hour for the time he spent reviewing documents for Plaintiffs' counsel, speaking with Plaintiffs' counsel on the phone, meeting with Plaintiffs' counsel to prepare for his deposition, and testifying in his deposition.  (Claypool Dep. Tr. pp. 151:4-22, 156:4-157:3, Ex. A.)  In 2015, he earned $6,187.50 this way.  (Pls.' Response to Supplemental Interrog. No. 5, Ex. C.)  As of September 23, 2016, he had earned $10,312.50 year-to-date, which is more than his income from the community college.  (Pls.' Response to Interrog. No. 5, Ex. C.)  His total earnings from this case for the last two years total $16,500, while he has earned only $14,521.09 from his regular job during the same period.

These numbers paint a clear picture — Mr. Claypool's work providing advice and testimony for the Plaintiffs is far more lucrative than his day job, and therefore his payment at $120 per hour cannot be classified as "reasonable value of time lost," the only compensation that the Federal Antigratuity Statute allows.  Indeed, Mr. Claypool did not even lose any time working when he met with Plaintiffs' counsel and attended his deposition in Hartford, as he was not scheduled to work during that period.  (Pls.' Response to Supplemental Interrog. No. 2, Ex. C.)  Plaintiffs' counsel also separately reimbursed Mr. Claypool for all of his travel expenses and lodging, so the fees cannot be characterized as simply offsetting his expenses.  (Claypool Dep. Tr. p. 160:15-23, Ex. A.)  Further, there is no argument that Mr. Claypool was being paid his "standard" litigation consulting rate, because this case is the one and only litigation consulting engagement he has had in his entire life.  (Claypool Dep. Tr. pp. 213:19-214:1, 214:17-24, Ex.

A.) The Plaintiffs' payments to Mr. Claypool were simply indefensible, as they were in addition to expense reimbursements and were not meant to compensate him for the reasonable value of lost time. Clearly, Mr. Claypool was paid to secure his cooperation and his favorable testimony, which is expressly forbidden by all of the legal authorities cited above.

### C. Mr. Claypool's Compensation Clearly And Demonstrably Influenced Him To Cooperate With The Plaintiffs And Affected The Content Of His Testimony

Mr. Claypool's payment clearly predisposed him and biased his memory and his in favor of the Plaintiffs and against the Defendants. As a prime example, he claimed that he concluded that one accident he investigated at SFA was caused by "false engagement" and that SFA was aware of the "false engagement" problem, when in actuality ███████████████████████

████████████████████████████████████████████████████

██ Mr. Claypool's testimony regarding false engagement was the single most significant aspect of his deposition. Throughout this case, the Plaintiffs have claimed that the jack stands at issue failed due to "false engagement," where it appeared that the jack stand's locking mechanism was fully engaged when it really was not, causing the vehicle that the jack stand was holding to fall on the Plaintiffs' decedent. (*See* Second Am. Compl. ¶ 25(a)-(b).) The Defendants deny that there is a "false engagement" problem with the jack stands, and assert that they have never previously encountered a credible false engagement claim. This is a very significant dispute in the context of this case, and Mr. Claypool's testimony on this key point was clearly designed to aid the Plaintiffs' case and damage the defense.

Specifically, Mr. Claypool testified that he initially "didn't really put any merit" in the idea that ratchet and pawl jack stands had a problem with sudden and unintended loss of ratchet

height — another way of referring to false engagement[6] — until he investigated a claim by ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Claypool Dep. Tr. pp. 62:9-65:5, Ex. A.)  Mr.

Claypool testified that, after investigating the ▮▮▮▮▮▮, false engagement "turned out not to

be a phantom condition."  (Claypool Dep. Tr. pp. 70:10-71:2, Ex. A.)

In fact, while he was working for SFA Mr. Claypool concluded, in writing, ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Attached as Exhibit D[7] is an

email from Roger Claypool dated January 13, 2005 discussing the ▮▮▮▮▮ To put this in

context, Mr. Claypool is writing to key managers at MVP(HK) Industries, Ltd., which were the

manufacturers of the particular product involved which, at the time, was sold by SFA to Sears.[8]

Mr. Claypool is trying to persuade the MVP managers to provide him with authority to settle the

case. If Mr. Claypool thought there was a fault with the jack stand, it would have greatly aided

his efforts to persuade MVP to provide settlement authority. Instead, Mr. Claypool initially

stated that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮. After he had three more days to assess the situation, he was emphatic that: ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In short, Roger's "last word" on

the ▮▮▮ case — the case that was supposed to be the blockbuster that demonstrated that SFA

and some of its affiliates had knowledge of false engagement — was a clear email from their

senior safety engineer stating:  "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This is

---

[6] Mr. Claypool testified that he used the terms "false engagement" interchangeably with other phrases describing a sudden loss of load or ratchet height.  (Claypool Dep. Tr. 238:22-240:19, Ex. A.)

[7] Exhibit D is an attorney client privileged and work product communication to which SFA's in-house counsel Arthur Chaykin was a party, and is therefore being filed under seal along with a motion to seal in accord with Rule 5(e) of the Local Rules of Civil Procedure for the District of Connecticut.

[8] SFA discontinued sales to Sears soon thereafter and SFA was not in the stream of commerce with Sears with regard to the product involved in this case.

irreconcilable with his deposition testimony, where he stated that the ███ claim made him believe that the false engagement phenomenon was a real problem.

Mr. Claypool also testified that the ███ claim prompted him to conduct tests substantiating his belief that false engagement as possible.  (*See* Claypool Dep. Tr. pp. 71:2-74:8, 207:13-213:18, Ex. A.)   SFA, however, after searching all of Mr. Claypool's electronic and physical files, could find no records of any such testing.

The Plaintiffs not only paid Mr. Claypool for his deposition testimony, but also for his cooperation leading up to the deposition.  He testified that he provided Plaintiffs' counsel with information via phone, document exchanges, and an in-person meeting before the deposition, and he was paid for all of it.  (Claypool Dep. Tr. pp. 151:4-22, 154:11-157:3, 158:5-169:6, Ex. A.)   Further, Mr. Claypool lives in Missouri and, pursuant to Federal Rule of Civil Procedure 45(c)(1)(A), could only be commanded by subpoena to appear for a deposition within one hundred miles of his residence or place of employment.   Mr. Claypool testified that he understood he had no obligation to appear in Hartford, yet did so anyway at the behest of Plaintiffs' counsel.  (Claypool Dep. Tr. pp. 160:24-161:8, Ex. A.)[9]  Even more significantly, after Mr. Claypool's deposition notice was issued both the undersigned counsel and SFA's in-house counsel Attorney Arthur Chaykin attempted to contact him, and but he did not respond because he thought it would be "unethical," since he was working with Plaintiffs' counsel, and "it didn't seem right" to have "ex parte communications with the other side."  (Claypool Dep. Tr. p. 161:9-23, Ex. A.)  This showcases Mr. Claypool's mentality after being retained by the Plaintiffs — he was working for them to support their case, and could no longer serve as an unbiased fact witness.

---

[9] Indeed, there is no evidence that Mr. Claypool's subpoena was ever properly served on him — it was simply emailed to him by Plaintiffs' counsel.  (Howard Edinburgh Email July 18, 2016, Ex. E.)

Another important instance of biased testimony occurred when Mr. Claypool stated that he will often change his own oil using only one jack stand to support his vehicle. (Claypool Dep. Tr. 217:4-220:5, Ex. A.)  This is relevant because the Defendants have asserted defenses of product misuse and comparative negligence based on the uncontested allegation that the Plaintiffs' decedent was using, at most, a single jack stand at the time of the accident at issue. Mr. Claypool admitted that the product instructions and warnings that he drafted himself and that were recommended by the Portable Automotive Lifting Device standards committee directed users to always use jack stands in pairs, (Claypool Dep. Tr. pp.216:1-217:1, Ex. A). Nevertheless, Mr. Claypool apparently felt that by testifying that he would sometimes use only a single jack stand himself, he would help the Plaintiffs' case.  In other words, after serving numerous years on the standards committee that promulgated and recommended these warnings to the industry and then devoting most of his professional life at SFA to advocating, supporting, and insisting on the application of these standards, Mr. Claypool admitted that his purported use of a single jack stand did not comply with the warnings written on the product and in the instruction manual, but he claimed that he did it anyway. (Claypool Dep. Tr. pp. 218:21-220:5, Ex. A.)  The fact that a former Product Safety & Compliance Manager would testify to such obviously unsafe product use highlights Mr. Claypool's willingness to say anything to help the Plaintiffs' case.

Overall, it is apparent that the Plaintiffs' bought Mr. Claypool's cooperation and therefore his loyalty.  He refused to speak with SFA's counsel before the deposition because he apparently understood that he owed a duty of loyalty to the Plaintiffs.  He provided Plaintiffs' counsel with information, met with them to prepare for his deposition, and provided only Plaintiff-favorable testimony throughout his deposition.  The only way to remedy the severe

unfair prejudice that SFA has suffered because of the Plaintiffs' improper retention of Mr. Claypool is to bar the Plaintiffs from offering either live testimony or deposition testimony from Mr. Claypool in this case.

## II.     Mr. Claypool Was Paid To Disclose SFA's Confidential And Privileged Information To Plaintiffs' Counsel

The Plaintiffs' "retention" of Mr. Claypool is especially problematic because, by his own testimony, he had extensive access to SFA's attorney-client privileged information, work product material, and materials prepared in anticipation of litigation.  Mr. Claypool was a member of SFA's management and control group, serving as the Product Safety & Compliance Manager and Claims Manager over five years, from 2003 to 2008.[10]  (Claypool Resume, Ex. F.)  His resume indicates that he would "[w]ork with Defense lawyers both in taking and giving depositions as well as acting as Shinn Fu's representative at trial," and that he would "[i]nvestigate and process Property Damage and personal Injury Claims."  Mr. Claypool testified that, at one point, he "went to work basically assisting the legal department, and Arthur [the general counsel] and I shared an area and worked together."  (Claypool Dep. Tr. p. 86:5-7, Ex. A.)

Importantly, his access to attorney-client privileged information and work product regarding jack stand claims is beyond dispute.  He testified that he worked "very closely with SFA's in-house counsel," that he "shared space" with counsel, and that he was "privy to a number of attorney-client conversations with [counsel]."  (Claypool Dep. Tr. pp. 138:14-139:10, Ex. A.)  He also admitted that he was regularly exposed to the in-house attorney's work product, where they "regularly shared documents" related to jack stand claims, including documents that the attorney created.  (Claypool Dep. Tr. pp. 139:13-140:2, Ex. A.)  He worked with in-house

---

[10] He also served as Engineering Manager and Claims Manager for an additional five years, from 1998 through 2003.  (Claypool Resume Ex. F.)

counsel on claims that resulted in litigation, as well as claims that he thought might result in litigation but ultimately did not — in fact, he involved in-house counsel on all claims over $10,000.  (Claypool Dep. Tr. pp. 140:4-142:4, Ex. A.)  He testified that he would perform investigations for counsel and create documents for counsel on those claims as well.  (Claypool Dep. Tr. p. 5-9, Ex. A.)

Furthermore, Mr. Claypool knew that he was prohibited from disclosing privileged information. Attached is a termination agreement between SFA and Roger Claypool that was carefully and rigorously negotiated at the time of Mr. Claypool's departure. The Agreement makes it clear to Mr. Claypool that although he was free to work for and even testify for other parties after his termination, his obligation not to disclose privileged information was ongoing and would continue indefinitely after his termination.  Specifically, he was required to "retain confidential and proprietary information of the Company" and "return all Company materials and files to Company before departure."  (Separation Agreement, Ex. G.)[11]  In breach of his obligations under the agreement, he shared confidential and proprietary information with Plaintiffs' counsel, and provided them with design sketches that he purportedly kept after leaving SFA.  (*See* Design Sketches, Ex. H.)

At the deposition, Plaintiffs' counsel agreed not to elicit attorney-client privileged information from Mr. Claypool, and the undersigned counsel objected to Mr. Claypool testifying about information that would be covered by the privilege attaching to materials prepared in anticipation of litigation, but it was apparent that Mr. Claypool had already shared extensive privileged information with Plaintiffs' counsel leading up to the deposition, where counsel frequently prompted him with the names of claims he had worked on for SFA.  (Claypool Dep.

---

[11] The attached copy of the Separation Agreement was authenticated as Exhibit 3 at Mr. Claypool's deposition. (Claypool Dep. Tr. p. 87:6-13, Ex. A.)

Tr. pp. 168:14-169:6, Ex. A.)  Mr. Claypool testified that he was paid for extensive phone calls, document review, and email exchanges with Plaintiffs' counsel.  (Claypool Dep. Tr. pp. 152:19-156:23, Ex. A.)  He was also paid for a lengthy deposition-preparation meeting with Plaintiffs' counsel, and pointed out SFA discovery responses that he thought were incomplete based on his inside information.  (Claypool Dep .Tr. pp. 165:11-169:6, Ex. A.)  He admitted that the information he shared with counsel included purported prior instances of "false engagement" that he investigated while working at SFA, and information regarding his jack stand cases generally. (Claypool Dep. Tr. pp. 160:8-14, 162:13-19, 168:14-169:6, Ex. A.)

Mr. Claypool discussed two distinct jack stand claims where he testified on behalf of SFA — the ▮▮▮▮ case and the ▮▮▮▮ or ▮▮▮▮ case.[12]  (Claypool Dep. Tr. pp. 10:16-14:2, Ex. A.)  He also testified that it was his job to "investigate" jack stand claims, "and then make a recommendation to settle the claim or – deny the claim altogether."  (Claypool Dep. Tr. pp. 48:13-49:13, Ex. A.)  He testified about several such jack stand claims that he investigated for SFA.  (Claypool Dep. Tr. pp. 62:9-67:6, Ex. A.)  While Mr. Claypool initially testified that he was being supervised by nonlawyers at one point in time, he later testified that Plaintiffs' counsel may have been asking him about claims that he investigated after SFA's legal counsel Arthur Chaykin began working with Mr. Claypool — it was apparent throughout the deposition that Mr. Claypool did not have a clear recollection of when SFA's in-house counsel was hired, and which claims he worked on with the attorney.  (*See* Claypool Dep. Tr. pp. 58:3-59:6, 138:4-139:3; Ex. A.)  He also testified that he "performed factual investigations at the direction of an in-house attorney," and "worked with an in-house attorney," with "an eye toward the company's resolution litigation strategy[.]"  (Claypool Dep. Tr. p. 56:8-20, Ex. A.)  Mr. Claypool also

---

[12] Mr. Claypool testified that there was an alleged "loss of load height" in the ▮▮▮▮ case, and that he did not recall the failure mode alleged in the ▮▮▮▮ or ▮▮▮▮ case.  (Claypool Dep. Tr. pp. 10:16-14:2, Ex. A.)

actually testified that he held a "power of attorney" to make certain claims decisions, and the undersigned counsel attempted follow-up questioning, but Plaintiffs' counsel quickly changed the subject.  (Claypool Dep. Tr. 49:11-49:25, Ex. A.)  Mr. Claypool then testified regarding a 2006 lawsuit about an alleged jack stand failure, and it was apparent that he had provided Plaintiffs' counsel with information about that case, which he had worked on for SFA. (Claypool Dep. Tr. pp. 129:7-131:23, Ex. A.)

Further, while the Plaintiffs claim to have produced all of their correspondence with Mr. Claypool, there is not a single piece of correspondence advising Mr. Claypool not to disclose SFA's attorney-client privileged information, work product information, or confidential information.  (See Pls.' Response to Req. for Prod. No. 5, Ex. I; Email by Howard Edinburgh Sept. 24, 2016, Ex. J.)  This is egregious in light of the fact that Mr. Claypool expressly advised Plaintiffs' counsel that his "boss at the time was Arthur Chaykin, the corporate Lawyer," (Claypool Email May 7, 2015, Ex. K), and that his "duties included claim investigation, trial work as company representative, and subject matter expert," (Claypool Email July 16, 2015, Ex. L).  Mr. Claypool even provided a list of his notes with confidential information regarding claims that he worked on with SFA, including party names, part numbers, serial numbers, and settlement amounts.  (Claypool Email July 16, 2015, Ex. L.)[13]

Precedent from the District of Connecticut indicates that Mr. Claypool should be disqualified based on his access to SFA's confidential and privileged information alone.  In fact, precedent also indicates that it was improper for Plaintiffs' counsel to have contacted Mr. Claypool at all, let alone to have paid him to disclose SFA's confidential information and to provide favorable testimony.  This constitutes a second, independently-sufficient reason why his

---

[13] SFA asserts that these claims notes contain information protected as materials prepared in anticipation of litigation, and are therefore being filed under seal in accord with Rule 5(e) of the Local Rules of Civil Procedure.

testimony should be precluded from this action, and the Plaintiffs should be ordered to refrain from any further communication with him.

### A.  Mr. Claypool Had Extensive Access To SFA's Privileged Materials

As stated above, Mr. Claypool admittedly had extensive access to SFA's privileged information, work product, and performed investigations that constituted materials prepared in anticipation of litigation.  He worked closely with in-house counsel, exchanged materials with counsel, investigated claims with "an eye toward the company's resolution litigation strategy," and even held a "power of attorney" to make certain claims decisions.  It is beyond dispute that the information that he possessed, which he shared with Plaintiffs' counsel, fits squarely within the legal standard for privileged information in the Second Circuit. The contours of attorney-client privilege, work product protection, and materials prepared in anticipation of litigation are set forth below, and it is clear that the information that Mr. Claypool admittedly possessed and shared with Plaintiffs' counsel fit squarely within these categories.

#### i.        Attorney-Client Privilege

It is well-settled that information protected by the attorney-client privilege is not discoverable, and the privilege protects any communication that: "(1) concerned the seeking of legal advice; (2) was between a client and an attorney acting in his professional capacity, (3) was related to legal matters; and (4) is at the client's instance permanently protected."  *In re Perrier Bottled Water Litig.*, 138 F.R.D. 348, 351-52 (D. Conn. 1991).   In the corporate context, communications between employees and in-house counsel in the role of attorney-advisor related to the provision of legal advice are privileged.  *See, e.g., Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981); *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984); *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 70 (S.D.N.Y. 2010); *In re*

*Grand Jury Proceedings*, No. M-11-189, 2001 U.S. Dist. LEXIS 15646, at *96-97 (S.D.N.Y. Oct. 3, 2001).

### ii.        Work Product

The work product privilege attaches to documents that are prepared because of the prospect of litigation. *United States v. Adlman*, 134 F.3d 1194, 1202-03 (2d Cir. 1998). Traditionally, work product protection extends to documents and tangible things prepared in anticipation of litigation by or for a party or its representative. *See Lagace v. New Eng. Central R.R.*, No. 3:06CV1317(RNC), 2007 U.S. Dist. LEXIS 72540 (D. Conn. Sept. 28, 2007).  A party can obtain discovery of "ordinary" work product by demonstrating a substantial need and the inability to obtain the substantial equivalent of the materials without an undue hardship, but opinion work product reflecting the mental impressions, conclusions, or opinions of an attorney receives greater protection. *Go Med. Indus. Pty., Ltd. v. C.R. Bard, Inc.*, No. 3:95-MC-522(DJS), 1998 U.S. Dist. LEXIS 22919 (D. Conn. Aug. 14, 1998).

### iii.       Materials Prepared In Anticipation Of Litigation

Courts within the Second Circuit have held that the protection afforded by Rule 26(b)(3)[14] of the Federal Rules of Civil Procedure is not limited to the information traditionally thought of as "work product," described in the preceding section, but extends more broadly to materials prepared in anticipation of litigation and information gathered at the behest of counsel with an eye toward potential litigation.  The Second Circuit Court has stated:  "[W]e see no reason why work product cannot encompass facts . . . ***It is helpful to remember that the work product privilege applies to preparation not only by lawyers but also by other types of party representatives including, for example, investigators seeking factual information***."   *In re*

---

[14] Rule 26(b)(3) provides, in pertinent part:  "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by another party or its representative[.]"

*Grand Jury Subpoena*, 282 F.3d 156, 161 (2002).  The Second Circuit Court went on to explain that the privilege would attach to the findings of an investigator retained to make a factual investigation of a claim, though it did not extend protection to the documents before it because there was no showing that the information was acquired in anticipation of litigation.  *Id.*; *see also United States v. Davis*, 131 F.R.D. 391 (S.D.N.Y. 1990) (holding that a defendants' communications with employees and reports made by those assisting in conducting an internal investigation were privileged material where the investigation was performed in anticipation of litigation).

While the Second Circuit Court was addressing a criminal case, other courts within the Second Circuit, including the Connecticut District Court, have applied this same reasoning in the civil context.  The Northern District of New York has held that protection is afforded to "the results of investigations into litigated claims."  *Feacher v. Intercont'l Hotels Group*, No. 3:06-CV-0877 (TJM/DEP), 2007 U.S. Dist. LEXIS 78262 (N.D.N.Y. Oct. 22, 2007).  The Southern District of New York similarly held that the doctrine extends to the acquisition by a party or its representative of factual information in anticipation of litigation.  *Robbins v. Chase Manhattan Bank, N.A.*, No. 97-CIV-0676(DAB), 1998 U.S. Dist. LEXIS 2680, at *3 (S.D.N.Y. Mar. 9, 1998).   The Connecticut District Court has likewise stated that "[t]he doctrine extends to notes, memoranda, correspondence, witness interview, and other materials, whether they are created by an attorney or an agent for the attorney."  *Lagace v. New Eng. Central R.R.*, No. 3:06CV1317(RNC), 2007 U.S. Dist. LEXIS 72540 (D. Conn. Sept. 28, 2007) (*citing United States v. Nobles*, 422 U.S. 225, 238-39 (1975); *Carter v. Cornell Univ.*, 173 F.R.D. 92, 95 (S.D.N.Y. 1997)).

In *Colgan Air, Inc. v. Aircraft Service International, Inc.*, No. 3:06-CV44(WWE), 2007 U.S. Dist. LEXIS 90083, at *2-3 (D. Conn. Dec. 7, 2007), the Connecticut District Court considered whether to extend work product protection to investigative materials.  The court approvingly quoted the Second Circuit decision discussed above holding that protective applies to factual information acquired by non-attorney party representatives with an eye toward potential litigation.  *Id.* (*citing In re Grand Jury Subpoena*, 282 F.3d at 161).  The court ultimately held that the investigative materials at issue had to be disclosed, but only because they were not prepared to assist with anticipated litigation. *Id. at *3-5*.  In reaching this holding the court noted that "individual applications [of the protection afforded to materials prepared in anticipation of litigation] are highly specific," and that "analysis should proceed cautiously, case by case." *Id.* at *3.

## B. Precedent From The District Of Connecticut Indicates That It Was Improper For Plaintiffs' Counsel To Even Contact Mr. Claypool

There are two decisions from the District of Connecticut indicating that it was not even proper for Plaintiffs' counsel to have contacted Mr. Claypool in the first place.  This issue implicates Rule 4.2 of the Connecticut Rules of Professional Conduct,[15] which states, in pertinent part:  "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."  The official commentary provides important additional guidance, advising that:

> In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with (1) persons having a managerial responsibility on behalf of the organization, and (2) with any other person whose act or omission in connection with

---

[15] As stated above, the District Court for the District of Connecticut has adopted the Connecticut Rules of Professional Conduct.  *See MMR/Wallace Power & Indus., Inc. v. Thames Assoc.*, 764 F. Supp. 712, 717-18 (D. Conn. 1991).

that matter may be imputed to the organization for purposes of civil or criminal liability or (3) whose statement may constitute an admission on the part of the organization.

(Numerals added.)   The Connecticut District Court has observed that the second enumerated category could encompass an organization's former employees, since their conduct during employment may potentially be attributed to the organization in litigation.  *Rubis v. Hartford Fire Ins. Co.*, No. 3:11-CV-796 (WWE), 2012 U.S. Dist. LEXIS 52982 (D. Conn. Apr. 16, 2012) (granting protective order to preclude questioning at former employee's deposition regarding attorney-client communications the employee may have had regarding the plaintiffs' termination).   The *Rubis* court was persuaded by the reasoning of a decision adopting the position that Rule 4.2 can apply to former employees in certain situations, "such as where the former employee was a member of an organization's management or control group, or where the former employee had privileged or confidential information, or where the conduct of the former employee could have been imputed to the employer." *Id.* at *8-9 (*citing Serrano v. Cintas Corp.*, No. 04-40132, 2009 U.S. Dist. LEXIS 120068 (E.D. Mich. Dec. 23, 2009)).  Here, Mr. Claypool was clearly a member of member of SFA's management and control group, as stated above, where he served as the Product Safety & Compliance Manager and worked closely with SFA's legal counsel.

Further, he testified that he had unfettered access to SFA's privileged and confidential information.  As the court observed in *Dubois v. Gradco Systems, Inc.*, 136 F.R.D. 341, 347 (D. Conn. 1991), "the privilege does not belong to, and is not for the benefit of, the former employee; rather, it belongs to, and is for the benefit of [the defendant corporation]."   The *Dubois* court therefore held that "efforts by plaintiff's counsel to induce or listen to privileged communications may violate Rule 4.4. of the Model Rules of Professional Conduct, which requires respect for the rights of third persons." *Id.*

-21-

Perhaps most importantly, the Plaintiffs are indeed seeking to impute Mr. Claypool's conduct to his former employer SFA — both his purported knowledge of the "false engagement" phenomenon, and his admission that SFA's warning materials did not include a warning for false engagement, which he would have been in charge of drafting.   (Claypool Dep. Tr. p. 44:1-21, Ex. A (where Mr. Claypool testified that he was the technical writer for jack stand instruction manuals warnings).)   In pertinent part, Mr. Claypool was asked:   "did SFA warn about this phenomenon in its warning materials or product material -- product description materials that accompanied the jack stand?"  He answered "[n]o," and was then asked:  "Who would have been in charge of making that decision?"  To which he responded:  "I was in charge[.]"  (Claypool Dep. Tr. pp. 83:21-85:1, Ex. A.)  This line of questioning makes it clear that the Plaintiffs intend to impute Mr. Claypool's failure to draft a warning addressing the risk of false engagement to SFA.  This is especially apparent where the operative complaint contains a failure to warn claim, (Second Am. Compl. ¶ 25(d),) and where the Plaintiffs have already disclosed an expert witness, Eric Boelhouwer, to testify regarding the purported inadequacy of product warnings for the jack stands at issue.[16]  As the *Rubis* court observed, it was inappropriate for Plaintiffs' counsel to have contacted Mr. Claypool knowing that his conduct could be imputed to SFA for the purposes of this action.

### C. Second Circuit Precedent Supports The Disqualification Of Experts And Even Counsel Tainted By The Potential Disclosure Of Privileged Information

The Connecticut District Court has disqualified counsel for the same tactics that Plaintiffs' counsel are employing in this case.  The leading cases on the issue deal with retention of a conflicted expert witness, but there is no logical basis to treat the retention of a conflicted fact witness any differently — in fact, retaining a conflicted fact witness is even *worse* than

---

[16] A copy of Mr. Boelhouwer's expert disclosure is attached as Exhibit M.

retaining a conflicted expert, since fact witnesses are not supposed to be paid for their testimony. In *Tyco Healthcare Group LP v. Ethicon Endo-Surgery*, No. 3:10-CV-60(JBA), 2011 U.S. Dist. LEXIS 157362, at *18-38 (D. Conn. Dec. 30, 2011), the court analogized the hiring of a conflicted expert to a former conflict of interest in representation, and held that counsel could be disqualified if the movant was a former client of the adverse party's consultant, there is a substantial relationship between the consultant's prior involvement with the movant and the subject matter of the present lawsuit, and the consultant likely had access to relevant privileged information because of his prior relationship with the movant. *Id.* at *21. If those conditions were satisfied, the court would balance three factors to determine whether to disqualify counsel: (1) the client's interest in freely choosing its counsel; (2) the adversary's interest in avoiding the risk of even inadvertent disclosures of confidential information; and (3) the public's interest in the scrupulous administration of justice. *Id.* at *38. In that case, defense counsel hired one of the plaintiff's audio-visual and trial presentation experts from an earlier trial regarding the same issues. *Id.* at *3-4. The plaintiff was entitled to a rebuttable presumption that the expert had access to relevant privileged information. *Id.* at *26-33. The court then held that "where it can reasonably be said that the attorney *might* have acquired information related to the subject matter of his subsequent representation it is the court's duty to order the attorney disqualified." *Id.* at *33 (*citing Emle Indus., Inc. v. Pantentex, Inc.*, 478 F.2d 562, 571 (2d Cir. 1973)). In other words, if improper disclosure of privileged information potentially occurred, disqualification was *mandatory*. The *Tyco* court ultimately disqualified all of the defense attorneys who had any direct contact with the plaintiff's prior consultant. *Id.* at *44-46. Here, it cannot be disputed that the disclosure of privileged information *potentially* occurred, where it appears clear that such improper disclosure *actually* occurred, and, at the very least, Mr. Claypool should not be

permitted to offer testimony in this case — especially where his disqualification does not implicate the Plaintiffs' interest in freely choosing their own counsel, as the disqualification of counsel did in the *Tyco* case.

The Connecticut District Court reached a substantially similar result in another case, where the plaintiff moved to disqualify the defendant's counsel for hiring the plaintiff's former litigation assistant as a consultant for the trial. *MMR/Wallace Power & Indus., Inc. v. Thames Assoc.*, 764 F. Supp. 712, 717-28 (D. Conn. 1991). The court noted that "[e]ven an appearance of impropriety may, under the appropriate circumstances, require prompt remedial action by the court." *Id.* at 718 (*citing Emle Indus., Inc.*, 478 F.2d at 565). Considering the facts, the court found that the conflicted consultant obtained confidential information about the case while assisting the plaintiff's attorneys, and held that this created a presumption that these confidences were shared with defense counsel. *Id.* at 726. The court held that disqualifying defendant's counsel was the only way to remove the risk of tainting the litigation. *Id.* at 728. In support of this holding, the court quoted the Second Circuit's admonition that: "The dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case." *Id.* (*citing Emle Indus., Inc.*, 478 F.2d at 571). Mr. Claypool's retention in this case not only creates an "appearance" of impropriety — it is an actual impropriety, where he is being paid to disclose SFA's confidential and privileged information and to provide biased testimony.

In another case, the Western District of New York disqualified two consultants retained by the plaintiff who were the defendant's former employees because they had access to the defendant's privileged and confidential information, without any finding that they actually

shared privileged or confidential information with plaintiff's counsel. *1210 Colvin Ave., Inc. v. Top Mkts., L.L.C.*, No. 03-CV-0425E(F), 2006 U.S. Dist. LEXIS 93689, at* 15 (W.D.N.Y. Dec. 27, 2006). In that case, the former employees analyzed the billing issues that gave rise to the litigation, participated in underlying investigation of the plaintiff's claims, assisted in trying to resolve the dispute, received emails related to the dispute from the defendant's general counsel, and attended a meeting to prepare to negotiate with the plaintiff. *Id.* While the consultants claimed that they did not believe that they possessed any attorney-client privileged information, it was also apparent that they did not understand the scope of the privilege. *Id.* at *10. Shortly after the consultants left the defendant's employment, they formed their consulting firm. They worked with the plaintiff because they "believed their experience in the industry generally and with [the defendant] in particular would be useful to [the plaintiff]," and they were paid $225 per hour. *Id.* at *11. The court applied a two-pronged analysis to determine whether to disqualify the consultants: "(1) Did the adversary have a confidential relationship with the expert [against whom disqualification is sought]?; [and] (2) Did the adversary disclose confidential or privileged information to the expert [against whom disqualification is sought] relevant to the litigation?" *Id.* at *18 (*citing Eastman Kodak Co. v. Afga-Gevaert N.V.*, No. 02-CV-6564, 2003 U.S. Dist. LEXIS 23260 (W.D.N.Y. Dec. 4, 2003)). The court employed this analysis even though the consultants at issue were not being offered as experts. The court ultimately disqualified the consultants, reasoning that "the crucial issue is whether the individual or entity against whom disqualification is sought has obtained or been exposed to confidential or privileged information belonging to the adversary in litigation." *Id.* at *16. Again, access to confidential or privileged information is the key, regardless of whether there is proof that the information was actually shared with the other side. Here, Mr. Claypool has not even denied that he had access to

privileged and confidential information, unlike the consultants who were disqualified in the *Top Markets* case — in fact, he has actually *admitted* his extensive access to privileged communications and work product while working closely with SFA's in-house counsel.

Lastly, the Connecticut Superior Court has employed the same analysis as the federal courts, focusing on the tainted witness's access to confidential information.  In *A&A Electrical Contractors v. C.H. Nickerson & Co.*, No. CV89-0369686-S, 1993 Conn. Super. LEXIS 3279, at *3-6 (Conn. Super. Ct. Dec. 8, 1993), the court, relying on federal precedent, defined the analysis as:  "First, was it objectively reasonable for the first party who claims to have retained the [expert] to conclude that a confidential relationship existed?  Second, was any confidential or privileged information disclosed by the first party to the [expert]?"  (*Citing, e.g.*, *Mayer v. Dell*, 139 F.R.D. 1, 3 (D.D.C 1991); *Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248 (E.D. Va. 1991)).  The court further held that disqualification was ***mandatory*** if both questions were answered in the affirmative.  *A&A Electrical Contractors*, 1993 Conn. Super. LEXIS 3279, at *4.  The court held that the witness at issue had a confidential relationship with the defendant at one time, and that confidential information was disclosed to the witness, so the witness had to be disqualified.  Here, Mr. Claypool testified clearly about his prior confidential relationship with SFA, working with SFA's in-house counsel to resolve disputed claims, and the volume of confidential and privileged information the he received in that capacity.  In fact, he actually promised in writing in his termination agreement to retain SFA's confidential information.  Yet he failed to keep that promise, and his improper relationship with Plaintiffs' counsel is now tainting this case.  Accordingly, Mr. Claypool, like the witness at issue in *A&A Electrical Contractors*, should be disqualified.

In sum, all of the foregoing authorities support the disqualification of a tainted consultant, and even counsel, under the present circumstances.

### D. It Is Apparent That Mr. Claypool Has Disclosed Privileged Information To Plaintiffs' Counsel, The Taint Cannot Be Removed, And Disqualification Is Merited

Mr. Claypool readily admitted that he had never heard that "materials prepared in anticipation of litigation" might be privileged until the undersigned counsel argued it at his deposition. (Claypool Dep. Tr. pp. 169:25-170:4, Ex. A.) As such, he shared information with Plaintiffs' counsel regarding all of his investigations of jack stand claims, even those that occurred after he was working with SFA's in-house counsel. (Claypool Dep. Tr. pp. 170:5-171:8, Ex. A.) Mr. Claypool's access to confidential and privileged information alone, even without proof that he shared the information with Plaintiffs' counsel, would be sufficient to disqualify him from testifying, and even to potentially disqualify Plaintiffs' counsel under the authorities set forth above in sections (B) and (C). But this case is clearer than those cases, because here there *is* evidence that Mr. Claypool shared confidential and privileged information with Plaintiffs' counsel that counsel intended to use in prosecuting the Plaintiffs' claim against the Defendants — information about jack stand cases he testified in and settled, such as the ███████and ███████ cases, among others. He also shared materials prepared in anticipation of litigation in the form of confidential information regarding claims that he investigated for SFA, such as the ███████ claim, and other claims that he investigated at the behest of counsel. He even shared information regarding his own purported deficiencies in drafting product instructions and warnings that Plaintiffs' counsel apparently intends to impute to SFA to establish liability. Under the precedent cited above, Mr. Claypool's disqualification is clearly merited. Witnesses and counsel have been disqualified with far less proof of access to confidential and privileged

information, and less evidence of improper involvement in the case.  This case is not even close, and the complete preclusion of Mr. Claypool's testimony is necessary to avoid improperly and irreparably tainting this litigation.

**III.     Conclusion**

The Plaintiffs' payment of SFA's former Product Safety & Compliance Manager to testify as a fact witness and to disclose SFA's confidential and privileged information is beyond inappropriate.  The Plaintiffs cannot be rewarded for this misconduct by offering Mr. Claypool's testimony to support their case.  At the very least, Mr. Claypool's deposition should be stricken from the record and he should be barred from testifying at trial.  To be clear, this is the absolute minimum sanction merited, and this Court is, of course, free to order more severe sanctions as it deems appropriate.

DEFENDANTS,

SEARS, ROEBUCK & CO.,
SHINN FU CORPORATION,
SHINN FU COMPANY OF AMERICA,
INC.,
MVP (HK) INDUSTRIES, LTD., and
WEI FU (TAISHAN) MACHINERY &
ELECTRIC CO., LTD.

By:_____

    Dennis O. Brown, Esq. (ct04598)
    Steven J. Zakrzewski, Esq. (ct28934)
    Gordon & Rees, LLP
    95 Glastonbury Blvd., Suite 206
    Glastonbury, CT 06033
    (860) 278-7448
    (860) 560-0185 (fax)
    *dbrown@gordonrees.com*
    *szakrzewski@gordonrees.com*

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2016, the foregoing was electronically filed and served by mail on anyone unable to receive notice of electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to receive notice of electronic filing as indicated in the Notice of Electronic Filing.  Parties may access this document through the Court's CM/ECF System.


_____
Steven J. Zakrzewski