# EXHIBIT A

SUBJECT TO MOTION TO SEAL

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

------------------------------------------------------

| | |
|---|---|
| FREDERICK KLORCZYK, JR., as ) <br> co-administrator of the Estate of Christian R ) <br> Klorczyk and LYNNE KLORCZYK, as ) <br> co-administrator of the Estate of Christian ) <br> R. Klorczyk, ) <br>           Plaintiffs ) <br> ) <br>    v.   ) <br> ) <br> SEARS, ROEBUCK & CO., SHINN FU ) <br> CORPORATION, SHINN FU COMPANY ) <br> OF AMERICA, INC., MVP (HK) ) <br> INDUSTRIES, LTD., and WEI FU ) <br> (TAISHAN) MACHINERY & ELECTRIC ) <br> CO., LTD., ) <br>           Defendants. ) | CIVIL ACTION NO.: <br> 3:13-CV-00257-JAM <br><br><br><br><br><br><br><br><br><br><br><br><br><br> September 30, 2016 |

------------------------------------------------------

### FREDERICK KLORCZYK, JR.'S AND LYNNE KLORCZYK'S AMENDED OBJECTIONS AND ANSWER TO DEFENDANT SHINN FU COMPANY OF AMERICA. INC'S SUPPLEMENTAL INTERROGATORY NUMBER 1

Plaintiffs, Frederick Klorczyk, Jr. and Lynne Klorczyk, as co-administrators of the Estate of Christian R. Klorczyk ("Plaintiffs"), hereby submit their amended objections and response to Supplemental Interrogatories of Defendant Shinn Fu Company of America, Inc. ("SFA") dated August 23, 2016, Number 1.

### INTERROGATORIES

**Interrogatory No. 1:**

The name and address of the community college where Roger Claypool currently works and his current rate of compensation.

**OBJECTION:**

Plaintiffs object to this Interrogatory on the grounds that it seeks information that is not relevant to the subject matter of this action. Plaintiffs also object to this Interrogatory as seeking information not in the possession, custody, or control of plaintiffs.

1

**RESPONSE:**

Subject to and without waiving their objections, and after making good faith efforts to inquire of Mr. Claypool, Plaintiffs state that the name and address of the Community College is Metropolitan Community College, 3200 Broadway, Kansas City, Missouri 64111.

**AMENDED RESPONSE:**

Subject to and without waiving their objections, and after making good faith efforts to inquire of Mr. Claypool, Plaintiffs respond as follows: the name and address of the Community College is Metropolitan Community College, 3200 Broadway, Kansas City, Missouri 64111. Mr. Claypool is paid by the Community College on a biweekly basis.  For the period 8/28/16 to 9/10/16 his gross pay was $322.50.

PLAINTIFFS,
FREDERICK KLORCZYK, JR., as co-administrator of the Estate of Christian R. Klorczyk, and LYNNE KLORCZYK, as co-administrator of the Estate of Christian R. Klorczyk
By: _____
    Howard S. Edinburgh
    Howard L. Wexler
    Joseph E. Donat
    Michael E. Gallub
    HERZFELD & RUBIN, P.C.
    125 Broad Street
    New York, New York 10004
    (212) 471-8529
    (212) 344-3333 (fax)
    hedinburgh@herzfeld-rubin.com
    hwexler@herzfeld-rubin.com
    jdonat@herzfeld-rubin.com
    mgallub@herzfeld-rubin.com

-and-

2

Paul D. Williams
David J. Elliott (ct04301)
Bryan J. Orticelli (ct28643)
Kaitlin A. Canty (ct29074)
DAY PITNEY LLP
242 Trumbull Street
Hartford, Connecticut 06103-1212
(860) 275-0100
(860) 275-0343 (fax)
pwilliams@daypitney.com
djelliott@daypitney.com
borticelli@daypitney.com
kcanty@daypitney.com

Their Attorneys

## **CERTIFICATION**

I HEREBY CERTIFY that on the 30th day of September, 2016 the foregoing was served by regular mail and by electronic mail to the following:

Dennis O. Brown (ct04598)
Steven J. Zakrzewski (ct28934)
Gordon & Rees LLP
95 Glastonbury Boulevard, Suite 206
Glastonbury, CT 06033
dbrown@gordonrees.com
szakrzewski@gordonrees.com

Eric W. Todd (ct 13897)
Trotta, Trotta & Trotta
900 Chapel Street, 12th Floor
New Haven, CT. 06503
etodd@trottalaw.com

By: _____
Howard S. Edinburgh, Esq.

VERIFICATION

STATE OF CONNECTICUT    )
                                      ) ss: WATERFORD
COUNTY OF NEW LONDON)


Before me, the undersigned Notary Public, on this day personally appeared Lynne Klorczyk and Frederick Klorczyk, Jr., known to me to be the persons whose names are subscribed hereto, who, upon their oaths, stated that they have reviewed the foregoing AMENDED OBJECTIONS AND ANSWER TO DEFENDANT SHINN FU COMPANY OF AMERICA, INC'S SUPPLEMENTAL INTERROGATORY NO. 1, which were prepared with the assistance of counsel, and that the responses are true and accurate to the best of their knowledge and belief.


_____
Lynne Klorczyk


_____
Frederick Klorczyk, Jr.


SUBSCRIBED AND SWORN TO BEFORE ME by Lynne Klorczyk and Frederick Klorczyk, Jr. on this
_30_ day of _SEPTEMBER_, 2016.


_____
NOTARY PUBLIC

**CASSANDRA CANNAMELA**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES JULY 31, 2017

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------

| | | |
|---|---|---|
| FREDERICK KLORCZYK, JR., as | ) | CIVIL ACTION NO.: |
| co-administrator of the Estate of Christian R | ) | 3:13-CV-00257-JAM |
| Klorczyk and LYNNE KLORCZYK, as | ) | |
| co-administrator of the Estate of Christian | ) | |
| R. Klorczyk, | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SEARS, ROEBUCK & CO., SHINN FU | ) | |
| CORPORATION, SHINN FU COMPANY | ) | |
| OF AMERICA, INC., MVP (HK) | ) | |
| INDUSTRIES, LTD., and WEI FU | ) | |
| (TAISHAN) MACHINERY & ELECTRIC | ) | |
| CO., LTD., | ) | |
| Defendants. | ) | September 23, 2016 |

---------------------------------------------------------

**FREDERICK KLORCZYK, JR.'S AND LYNNE KLORCZYK'S OBJECTIONS AND
ANSWERS TO DEFENDANT SHINN FU COMPANY OF AMERICA. INC'S
SUPPLEMENTAL INTERROGATORIES**

Plaintiffs, Frederick Klorczyk, Jr. and Lynne Klorczyk, as co-administrators of the Estate of Christian R. Klorczyk ("Plaintiffs"), hereby submit their objections and responses to Supplemental Interrogatories of Defendant Shinn Fu Company of America, Inc. ("SFA") dated August 23, 2016.

**INTERROGATORIES**

**Interrogatory No. 1:**

The name and address of the community college where Roger Claypool currently works and his current rate of compensation.

**OBJECTION:**

Plaintiffs object to this Interrogatory on the grounds that it seeks information that is not relevant to the subject matter of this action.  Plaintiffs also object to this Interrogatory as seeking information not in the possession, custody, or control of plaintiffs

**RESPONSE:**

Subject to and without waiving their objections, and after making a good faith effort to inquire of Mr. Claypool, Plaintiffs state that the name and address of the Community College is Metropolitan Community College, 3200 Broadway, Kansas City, Missouri 64111.

**Interrogatory No. 2:**

State whether Roger Claypool was scheduled to work at the community college from any point from August 15, 2016 through August 19, 2016.

**RESPONSE:**

Subject to and without waiving their objections, plaintiffs state, upon information and belief, that Roger Claypool was not scheduled to work at the Community College between August 15, 2016 through August 19, 2016.

**Interrogatory No. 3:**

State the total amount of money that Roger Claypool reported as income on his federal income tax return for tax year 2015.

**OBJECTION:**

Plaintiffs object to this Interrogatory as seeking information which is irrelevant to the subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence.  Plaintiffs also object to this Interrogatory as seeking information not in the possession,

2

custody or control of plaintiff. Plaintiffs also object to this Interrogatory as being overly broad, unduly burdensome, oppressive and harassing.

**RESPONSE:**

Subject to and without waiving their objections, and after making a good faith effort to inquire of Mr. Claypool, Plaintiffs state, upon information and belief, that Mr. Claypool's earned employment income for 2015 was $13,506.09.

**Interrogatory No. 4:**

State the total amount of money that Roger Claypool has earned in the year 2016, not including income earned as a consultant in connection with this action.

**OBJECTION:**

Plaintiffs object to his Interrogatories as seeking information, which is irrelevant to the subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs also object to this Interrogatory as seeking information not in the possession, custody or control of plaintiffs. Plaintiffs also object to this Interrogatory because it incorrectly presupposes that Mr. Claypool is a consultant in this action.

**RESPONSE:**

Subject to and without waiving their objections, and after making a good faith effort to inquire of Mr. Claypool, plaintiffs state, upon information and belief, that Mr. Claypool to date has earned $7,202.50, all from Metropolitan Community College.

**Interrogatory No. 5:**

State the total amount of money that Roger Claypool has earned as a consultant in this action, broken down by the year in which the money was earned.

**OBJECTION:**

Plaintiffs also object to this Interrogatory because it incorrectly presupposes that Mr. Claypool is a consultant in this action.

**RESPONSE:**

Subject to and without waiving their objections, plaintiffs state, upon information and belief, that Mr. Claypool in 2016 through the end of August is believed to have billed $10,312.50 for his time. Mr. Claypool's time for 2015 has been billed in the sum of $6,187.50.

**Interrogatory No. 6:**

State the amount of money that Roger Claypool has earned each month in the year 2016, not including money earned as a consultant in connection with this action.

**OBJECTION:**

Plaintiffs also object to this Interrogatory because it incorrectly presupposes that Mr. Claypool is a consultant in this action.

**RESPONSE:**

Subject to and without waiving their objections, and after making a good faith effort to inquire of Mr. Claypool, Plaintiffs refer SFA to their response to Interrogatory No. 4.

**Interrogatory No. 7:**

Identify all jack stand cases and/or claims in which, as a result of investigations performed by Roger Claypool while he was an employee of SFA, Mr. Claypool determined that the cause of the incident was "false engagement" or "false loading."

**RESPONSE:**

Subject to and without waiving their objections, plaintiffs state that the specific cases were testified to by Mr. Claypool at his deposition.

4

**Interrogatory No. 8:**

For any cases or claims listed in response to Interrogatory No. 7 state all of the factors that caused Roger Claypool to conclude that the incident was caused by "false engagement" or "false loading."

**RESPONSE:**

Subject to and without waving their objections, plaintiffs state the "factors" leading to Mr. Claypool's conclusions concerning "false engagement' were discussed by Mr. Claypool at his deposition and we refer SFA to Mr. Claypool's deposition testimony.

**Interrogatory No. 9:**

List on all dates on which Roger Claypool attempted to reproduce "false engagement" or "false loading" conditions on a jack sand and the results of each attempt.

**RESPONSE:**

Subject to and without waiving their objections, plaintiffs refer SFA to Mr. Claypool's deposition testimony for the dates requested.  Upon information and belief, Plaintiffs do not have any further information as to specific dates as requested in this Interrogatory. The "results" of the "attempt," as requested in this Interrogatory, were testified to by Mr. Claypool and plaintiffs refer SFA to said deposition testimony.

**Interrogatory No. 10:**

List all dates on which Roger Claypool attempted to reproduce "false engagement" or "false loading" conditions on a jack stand under normal operating conditions for use of the jack stand.

**RESPONSE:**

Subject to and without waiving their objections, plaintiffs refer SFA to Mr. Claypool's deposition testimony for the dates requested.  Plaintiffs do not have any further information as to specific dates as requested in this Interrogatory.

**Interrogatory No. 11:**

State the current residence address, business address and telephone number for Roger Claypool.

**RESPONSE:**

Roger Claypool's home address is as testified to by him at his deposition: 5365 North White Avenue, Kansas City, Missouri 64119.   Mr. Claypool's home phone number is 816-454-5144.

PLAINTIFFS,
FREDERICK KLORCZYK, JR., as co-administrator of the Estate of Christian R. Klorczyk, and LYNNE KLORCZYK, as co-administrator of the Estate of Christian R. Klorczyk,

By: _____
Howard S. Edinburgh
Howard L. Wexler
Joseph E. Donat
Michael E. Gallub
HERZFELD & RUBIN, P.C.
125 Broad Street
New York, New York 10004
(212) 471-8529
(212) 344-3333 (fax)
hedinburgh@herzfeld-rubin.com
hwexler@herzfeld-rubin.com
jdonat@herzfeld-rubin.com
mgallub@herzfeld-rubin.com
                    -and-

Paul D. Williams
David J. Elliott (ct04301)
Bryan J. Orticelli (ct28643)
Kaitlin A. Canty (ct29074)
DAY PITNEY LLP
242 Trumbull Street
Hartford, Connecticut 06103-1212
(860) 275-0100
(860) 275-0343 (fax)
pwilliams@daypitney.com
djelliott@daypitney.com
borticelli@daypitney.com
kcanty@daypitney.com

Their Attorneys

## **CERTIFICATION**

I HEREBY CERTIFY that on the 23rd day of September, 2016 the foregoing was served by overnight mail and by electronic mail to the following:

Dennis O. Brown (ct04598)
Steven J. Zakrzewski (ct28934)
Gordon & Rees LLP
95 Glastonbury Boulevard, Suite 206
Glastonbury, CT 06033
dbrown@gordonrees.com
szakrzewski@gordonrees.com

Eric W. Todd (ct 13897)
Trotta, Trotta & Trotta
900 Chapel Street, 12th Floor
New Haven, CT. 06503
etodd@trottalaw.com

By: _____
       Howard S. Edinburgh

8

VERIFICATION

STATE OF CONNECTICUT    )
                          ) ss:  WATERFORD
COUNTY OF  NEW LONDON)


Before me, the undersigned Notary Public, on this day personally appeared Lynne Klorczyk and
Frederick Klorczyk, Jr., known to me to be the persons whose names are subscribed hereto, who,
upon their oaths, stated that they have reviewed the foregoing OBJECTIONS AND ANSWERS
TO DEFENDANT SHINN FU COMPANY OF AMERICA. INC'S SUPPLEMENTAL
INTERROGATORIES, which were prepared with the assistance of counsel, and that the
responses are true and accurate to the best of their knowledge and belief.


_____
Lynne Klorczyk


_____
Frederick Klorczyk, Jr.


SUBSCRIBED AND SWORN TO BEFORE ME by Lynne Klorczyk and Frederick Klorczyk, Jr. on this
30 day of September , 2016.


_____
NOTARY PUBLIC


**CASSANDRA CANNAMELA**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES JULY 31, 2017

# EXHIBIT D

SUBJECT TO MOTION TO SEAL

# EXHIBIT E

 Gmail

**Roger Claypool <purplmcgil@gmail.com>**

## Roger Claypool subpoena
1 message

**Howard S. Edinburgh** <HEdinburgh@herzfeld-rubin.com>                    Mon, Jul 18, 2016 at 2:01 PM
To: "purplmcgil@gmail.com" <purplmcgil@gmail.com>
Cc: "'Elliott, David J.' (djelliott@daypitney.com)" <djelliott@daypitney.com>, "Orticelli, Bryan J."
<borticelli@daypitney.com>, "Howard L. Wexler" <HWexler@herzfeld-rubin.com>

Hi Roger: attached are your deposition notice and subpoena. Regards. Howard.

Howard S. Edinburgh

Herzfeld & Rubin, P.C.

125 Broad Street

New York, New York 10004

hedinburgh@herzfeld-rubin.com

Phone: (212) 471-8529

Fax: (212) 344-3333

**2 attachments**

 **Notice of Deposition of Roger Claypool.pdf**
162K

 **Subpoena upon Roger Claypool.pdf**
336K

KLORCZY006412

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FREDERICK KLORCZYK, JR., as co-administrator :
of the Estate of Christian R. Klorczyk, et al., : CIVIL ACTION NO:
 :
       *Plaintiffs,* : 3:13-cv-00257-JAM
 :
  *vs.* :
 :
SEARS, ROEBUCK AND CO., et al., :
 :
        *Defendants.* :
 :
 : July 18, 2016
 :

## NOTICE OF DEPOSITION OF ROGER CLAYPOOL

PLEASE TAKE NOTICE that, pursuant to Rule 45 of the Federal Rules of Civil Procedure, plaintiffs will take testimony by deposition, upon oral examination, before a person authorized by the laws of the State of Missouri to administer oaths, of Roger Claypool, at the law offices of Day Pitney, LLP, 242 Trumbull Street, Hartford, CT 06103 on August 10, 2016 at 9:30 a.m. The deposition will be recorded by stenographic and/or audiovisual (videographic or digital recording) means and will continue from day to day until completed.

This deposition is being taken for the purpose of discovery, for use at trial, and for such other purposes as are permitted by the Federal Rules of Civil Procedure. The deponent is a non-party witness and former employee of defendant Shinn Fu Company of America, Inc. To the best of plaintiffs' knowledge, the deponent's name and address are:

KLORCZY006413

Roger Claypool
5365 North White Avenue
Kansas City, Missouri 64119

PLAINTIFFS,
FREDERICK KLORCZYK, JR. as co-
administrator of the Estate of Christian R.
Klorczyk, and LYNNE KLORCZYK, as co-
administrator of the Estate of Christian R.
Klorczyk

By:

Howard S. Edinburgh
Howard L. Wexler
Joseph E. Donat
Michael Gallub
Herzfeld & Rubin, P.C.
125 Broad Street
New York, NY 10004
(212) 471-8529
(212) 344-3333 (fax)
hedinburgh@herzfeld-rubin.com
hwexler@herzfeld-rubin.com
jdonat@herzfeld-rubin.com
mgallub@herzfeld-rubin.com


David J. Elliott (ct04301)
Bryan J. Orticelli (ct28643)
Kaitlin A. Canty (ct29074)
DAY PITNEY LLP
242 Trumbull Street
Hartford, Connecticut 06103
(860) 275-0100
(860) 275-0343 (fax)
djelliott@daypitney.com
borticelli@daypitney.com
kcanty@daypitney.com

Their Attorneys

KLORCZY006414

## CERTIFICATION

I HEREBY CERTIFY that on the 18th day of July, 2016 a copy of the foregoing was

served by first class mail, postage prepaid, and by electronic mail to the following:

Dennis O. Brown (ct04598)
Steven J. Zakrzewski (ct28934)
Gordon & Rees Scully & Mansukhani, LLP
95 Glastonbury Boulevard, Suite 206
Glastonbury, Ct. 06033
*dbrown@gordonrees.com*
*szakrzewski@gordonrees.com*

Erica W. Todd (ct13897)
Trotta, Trotta & Trotta
900 Chapel Street, 12th Floor
P.O. Box 802
New Haven, CT 06503
etodd@trottalaw.com

By: _____
Howard S. Edinburgh

KLORCZY006415

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Connecticut

| | |
|---|---|
| Frederick Klorczyk, Jr. et al. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 3:13-cv-00257(JAM) |
| Sears, Roebuck & Co., et al | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  Roger Claypool

*(Name of person to whom this subpoena is directed)*

*Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.

| Place: Day Pitney, LLP<br>242 Trumbull Street, Hartford, CT. 06103 | Date and Time: August 10, 2016 at 9:30 a.m. |
|---|---|

The deposition will be recorded by this method:  stenographic and/or audiovisual means

*Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:  Please see attached Exhibit A.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  July 18, 2016

|  |  |
|---|---|
| *CLERK OF COURT* | OR  _Howard S. Edinburgh_ |
| _____<br>*Signature of Clerk or Deputy Clerk* | _____<br>*Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* all Plaintiffs

Frederick and Lynne Klorczyk as co-administrators, who issues or requests this subpoena, are: Howard S. Edinburgh,

Herzfeld & Rubin, P.C., 125 Broad Street, New York, NY 10004; hedinburgh@herzfeld-rubin.com; (212)471-8500

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

KLORCZY006416

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 3:13-cv-00257(JAM)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

       I served the subpoena by delivering a copy to the named individual as follows: _____

_____

on *(date)* _____ ; or

       I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

KLORCZY006417

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    (i) disclosing a trade secret or other confidential research, development, or commercial information; or
    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

KLORCZY006418

# EXHIBIT F

# Roger D. Claypool

5365 N. White
Kansas City, Mo. 64119
(816) 454-5144
purplmcgil@gmail.com

## Work History

- Metropolitan Community College- Business & Technology Campus
- 1775 Universal Avenue
- Kansas City, MO 64120
- Time Frame: 2013 – current

### Job Title: INTE Adjunct Faculty

- Teaching a variety of Electrical / Electronics classes, course numbers INTE 112 thru INTE 230. These classes prepare students for entry level positions in the field of Photovoltaics, Industrial Maintenance, HVAC, and Stationary Engineering. Many of these course are prerequisites for the Lineman and Electrician / Electronic Technician programs.

- Show Me Shooters Indoor Range
- 287 NE 69 HWY
- Claycomo, MO 64119
- Time Frame: 2013 – 06/2016

### Job Title: Regulatory Specialist

- Responsible for all aspects of Federal, State and local LE regulatory compliance
- Created ANSI 535.4, 535.6 compliant work station instructions, trained employees on proper work station procedures
- ATFE contact for audit and abatement issues



# Roger D. Claypool

5365 N. White
Kansas City, Mo. 64119
(816) 454-5144
purplmcgil@gmail.com

- AP Productions, LLC
- 1 Action Road, Odessa MO 64076
- Time Frame: 03/2009 ~ 03/2011

**Job Title: Quality Assurance / Safety & Compliance Manager**

- Supervised the daily work of QA technicians on 3 shifts
- Performed product testing per customer specifications/drawings, collaborated with customer engineering & quality departments to ensure customer requirements were met
- Responded to customer complaints of non-conformance with corrective action plans
- Gathered and analyzed production data in order to identify trends in shift performance, cycle time, material usage, tool wear/maintenance issues, press condition, rejects/scrap
- Created ANSI 535.4, 535.6 compliant work station instructions, trained employees on proper work station procedures
- Conducted safety training and maintained training record data base
- Completed & maintained SWPPP, Tier II Title 3, SPCC Plan, OSHA 300, 300A records
- OSHA contact for inspections and abatement issues
- Created ANSI compliant work place signage

- Shinn Fu Company of America, Inc
- 10939 North Pomona Avenue, KCMO 64153
- Time Frame: *04/1987 ~ 12/2008 (detail provided as attachment)

**Job Title: Product Safety & Compliance Manager / Technical Writer**

- Drafted ANSI compliant user manuals, product labels and collateral materials
- Collaborated with customer and third party test labs on product projects
- Supervised and performed incoming product inspections to applicable industry standards
- Investigated and processed Product Liability claims, advised retail customers and SFA upper management on methods of mitigating risk, represented company at trial as subject matter expert
- Developed product testing, inspection, acceptance criteria for use by vendors, customers based upon ASME, Mil., SAE, EPA, OSHA Standards
- Traveled to overseas factories for inspection, testing of products and training of personnel
- Developed corrective action responses as needed in response to customer complaints
- Performed Patent Research, investigated and provided evidence of infringement of SFA intellectual property, represented company as subject matter expert

# Roger D. Claypool
5365 N. White
Kansas City, Mo. 64119
(816) 454-5144
purplmcgil@gmail.com

- Nu-Wind Auto Electric Service
- 1617 Swift Ave., NKC MO, 64116
- Time Frame: 04/1971 ~ 09/1986

**Job Title/Responsibility:**

'76 - '86, Service Manager
Duties: Oversee the daily operations of the shop. Design and install custom electrical, electronic, and mechanical systems. Assess cost of upgrading shop equipment and purchase assets.

'74 - '76, Repair Technician
Duties: Diagnose and Repair of various automotive components and assemblies. Counterman and Customer Service.

'71 - '74, Service Technician
Duties: Removed and replaced various automotive components and assemblies such as starters, flywheels, transmissions, axle assemblies, alternators, water pumps etc.

# Roger D. Claypool

5365 N. White
Kansas City, Mo. 64119
(816) 454-5144
purplmcgil@gmail.com

## Education and Experience

Education: Metropolitan Community College 1988-1993 / 2011-2012
Degree Awarded: Certificate in Photovoltaics; 3.8 GPA
Internships with Worldwide Energy: included rooftop 'start to finish' PV installations at 2 local downtown businesses
Successful completion of NABCEP Entry Level Exam: 2011
C.E.U.'s: through Schuco USA for Solar Thermal Training course (included an installation) 2012
C.E.U.'s through the University of Wisconsin, Madison for Product Liability training courses 1998, 1999, 2001, 2002
Currently working as Consultant for Heath & Associates, Louisville, KY (see References)

## Volunteer work

- Served three terms as elected Vice Chair of ASME Safety & Performance Standards Committee on Portable Automotive Lifting Devices where I served to develop testing, performance and specification requirements of PALDs to ensure safety and regulatory requirements were met, and prepared same for publication by ASME
- Volunteered as Route Driver for UpLift Organization, Inc., an organization which delivers basic survival items to the homeless of Kansas City

## Misc. Skills & Hobbies

- I do my own automotive work at home and have become proficient in the use of hand tools, power tools, garage equipment, volt/ohm/ammeters
- Restoration projects include a 1937 Buick Special "8", 1963 Buick LeSabre
- I do my own home repairs, updates, and remodeling that includes design and construction, roofing, electrical, flooring, painting, sheetrock and appliances
- I have Lay Minister training through the United Methodist Church and am often called to lead services at my local church
- I am an avid outdoorsman and enjoy camping, fishing, and hunting with family and friends
- I enjoy building and distributing portable solar PV power stations for folks in the local homeless community, these low wattage systems provide power for communications and lighting systems in remote locations in the Metropolitan area

References:
Mr. Don Alexander, P.E., (870) 926-1407
Mr. Rick Heath, Heath & Associates (502) 425-2385
Joe Roche, MCCKC B&T Division Chair, (816) 604-5417
Rick Bellington, AP Productions LLC (816) 591-9176
Joseph Wendler, P.E. ASME (212) 591-8524

**\*Detail of SFA Employment History**
1987 – 2009, Shinn Fu Company of America, Inc.
10939 North Pomona Avenue
Kansas City, Mo. 64153 (816) 891-6390

January 2008 – December 31, 2008, Product Safety & Compliance Manager, Technical Writer
Duties: Evaluate product and collateral materials for compliance to ASME, SAE, EPA, OSHA,
Mil., State, Municipal and supplier performance & safety standards.
Responsible for signing off on Safety & Compliance issues as part of the ISO process.
Draft compliant OIPMs, labels.
Assist Legal Dept. and Claims Dept.

June 2003 –December 2007, Product Safety & Compliance Manager / Claims Manager
Duties: Investigate and process Property Damage and Personal Injury Claims.
Work with Defense lawyers both in taking and giving depositions as well as acting as Shinn Fu's
representative at trial.
Patent Research, investigate and provide evidence of infringement of Shinn Fu intellectual
property.
Provide Product Orientation and Training to employees and customers on product use,
maintenance, and repair. Responsible for signing off on Safety & Compliance issues as part of the
ISO process.

1998 – 2003, Engineering Manager, Claims Manager
Duties: Oversee the daily work of both the Automotive and Sporting Goods Division engineers.
Technical writer for new product OIPMs.
Work with customer Engineering Depts. and third party test labs; Snap-On, Gray Automotive,
Lincoln, OTC, W.W. Grainger, Sears, K-Mart, Target, Wal-Mart / Sam's Clubs, DTL, MTL and
CTL toward the completion of hydraulic jack and automotive accessory projects. Details of
projects included design requirements, development of testing, inspection, acceptance criteria,
production scheduling, review component pricing, supplier Material Requirements Planning
(MRP) and/or Quality System audit, review supplier QC activities.
Overseas travel with buyers, product inspection, testing, sourcing facilities.
Investigate and process Property Damage and Personal Injury Claims, advise on mitigating and
handling safety risk. Work with Defense lawyers both in taking and giving depositions as well as
acting as Shinn Fu's representative at trial. Oversee and perform incoming product inspection and
QA through testing to applicable industry standards, develop CAR's for products as needed, and
follow up with supplier concerning corrective action.

1993 -'98, Sales Engineer, Technical Services Manager, Claims Manager
Duties: Technical assistance, Trade Show duties, oversee the daily work of engineering teams in
Kansas City and Seattle. Overseas travel with buyers, product inspection and sourcing.
Setup nationwide network of Authorized Service Centers, upgrade in-house Testing Lab, new
product development, prototype testing. Responsible for working with UL Northbrook, IL
location and the successful completion of two electrical device listings, AC powered buffer
(Model I-4500) and an AC powered air compressor (Model W-2000). Technical writer for new
product Operator Instruction and Parts Manuals (OIPMs).
Investigate and process property damage claims, advise on mitigating and handling safety risk.

**\*Detail of SFA Employment History –cont.**

1991 -'93, Sales Engineer
Duties: Technical assistance to retail buyers, accompany buyers to overseas factories, sourcing of facilities and product, perform pre-award surveys in an effort to determine  manufacturer's ability to meet Contract required scheduling objectives, assess cost of tooling and any required tooling, process costs. Review vendor QC, inspection procedures, determine adequacy of test equipment, check calibration certificates. Review vendor production planning to determine realistic ability to provide product in timely and continuous fashion and avoid cost overruns. New product development, responsible for development of Shinn Fu's joint venture factory Q.C. testing program & techniques. Monitor sub-contractor performance through incoming product inspection and testing per applicable Government, company, industry standards, review of manufacturer's blueprints and Bill of Materials.

1989 -'91, Customer Service Manager
Duties: Technical assistance to customers, performed incoming product inspection and testing per applicable industry standards. Trade Show duties, travel to overseas factories with buyers as well as continuing factory training and sourcing.

1987 - 1989, Parts Dept. & Receiving Dept.
Duties: UPS Shipping & Receiving, Test Lab assistant, parts inventory control. Travel to overseas factories for product orientation and training sessions.

# EXHIBIT G

# GENERAL RELEASE AND SEPARATION AGREEMENT

Employee Name:      Roger Claypool
Presentation Date: December 31, 2008

## NOTICE TO EMPLOYEE:

This important General Release and Separation Agreement ["Agreement"] governs the terms of your voluntary separation from Shinn Fu Company of America, Inc. ["SFA"].  You have 21 days from December 31, 2008 ["Presentation Date"] to consider it and 7 days after signature to revoke it.  The Agreement becomes effective and the Separation thereby becomes effective 7 days after the date this Agreement is executed ["Effective Date"].  Therefore, Employee's last day of work will be the Effective Date.  This offer expires 21 days after the Presentation Date [Expiration: January 21, 2009 at Midnight, Central Time].

**Please be advised that you should consult with an attorney with regard to your rights pursuant to this Agreement.**

General Release Agreement::

        This GENERAL RELEASE AND SEPARATION AGREEMENT is entered into this __ day of January, 2009 by and between Shinn Fu of America, Inc. ("SFA") and Roger Claypool ("Employee").

        In consideration of the consideration and covenants undertaken and releases contained in this Agreement, SFA and the Employee agree as follows:

1.  SFA agrees to provide Employee special Separation Benefits set forth in Exhibit A to this Agreement.  Employee acknowledges and agrees that some or all of the benefits set forth in Exhibit A represent benefits to which Employee would not have been entitled absent this Agreement and are valid consideration to support this Agreement.

2.  These benefits are not provided to a class of employees and are not part of any general lay-off or other force reduction program.  This is a voluntary separation.

3.  In consideration of the Separation Benefits, Employee, for himself and his attorneys, heirs, executors, administrators, successors and assigns, does release and discharge SFA and its affiliates from all claims, liabilities, demands, and causes of action known or unknown, fixed or contingent, which Employee may have or claim to have against SFA and its affiliates, their Officers, Directors, Employees, Agents, Successors or Assigns, arising out of or relating to Employee's employment at SFA or termination of employment with SFA.  This includes, but is not limited to, claims arising under the Fair Labor Standards Act 0f 1993, the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, ERISA, any claims or rights

1



under the Employee Handbook, all other federal, state, or local laws prohibiting age, sex, race, disability, or any other forms of discrimination, or claims growing out of any legal restrictions on SFA's right to terminate its employees.

4.  Employee and SFA agree that neither Party admits any liability, fault, or inadequacy as a result of entering into this Agreement.  This Separation is voluntary and mutually agreed to by the Parties.

5.  Employee acknowledges that this Agreement is entered into freely and without coercion and that, in fact, Employee understands that if he does not sign this Agreement, he may continue employment with Company.

6.  Employee releases and waives any and all rights or claims Employee may have to re-employment with SFA.  Employee agrees not to apply for re-employment with SFA.

7.  Employee acknowledges that the payments and benefits provided by this Agreement and Exhibit A substitute for any other payments to which Employee may be entitled and Employee discharges, waives, and releases SFA from any other payments to which Employee may be entitled.

8.  Employee has 21 days to consider this Agreement ["Consideration Period"] and seven (7) days from the date of signature to revoke the Agreement ["Revocation Period"].  The Agreement must be executed before the end of the Consideration Period or it expires and becomes null and void and Employee will remain in his current position with full seniority, salary and benefits.  If Employee executes the Agreement and then revokes it during the Revocation Period, Employee will remain in his current position with full seniority, salary and benefits.  If Employee fails to accept the Agreement or revokes the Agreement during the Revocation Period, any consideration that Employee receives from Company under the Agreement will be returned and Employee will be returned to normal job duties, seniority and rank as if the Agreement were never executed.  This Agreement and the underlying Separation become Effective upon the expiry of the Revocation Period [7 days after execution], and this Effective Date will be the Employee's final day of work.

9.  If Employee wishes to accept this Agreement, an executed Agreement must be received during the consideration period by:

Arthur Chaykin, Esq.
General Counsel
SFA, Inc.
10939 N. Pomona Ave.
Kansas City, MO  64153
Fax:  816.410.5687

2

CONFIDENTIAL

Any Notices, including Notice of Revocation during the Revocation Period should also be sent to Arthur Chaykin, Esq., as indicated in this Section.

10. Employee will not consult with any Party to litigation against the Company or testify as an expert against Company for two years starting January 1, 2009 or for six months after Employee's last consulting arrangement with Company is completed, whichever is later. However, Employee may testify in any litigation in which Employee has received a subpoena or similar compulsory process requiring Employee's testimony. If Employee receives such process within two [2] years of the Effective Date or within six [6] months of Employee's last consulting assignment with Company, Employee will notify Company that it he has received such Process as soon as practicable.

11. At Company's discretion and with Employee's agreement to such retention [arm's length agreement], Company will retain Employee on a consulting basis. Each consulting retention will include a "Scope of Work" and estimated hours. Employee's initial consulting rate will be $40 per hour. All payments pursuant to a specific consulting retention shall be in addition to other compensation provided in this Agreement.

12. Employee is vested to certain rights in the SFA, Inc. Profit Sharing Plan. The proceeds of Employee's account, including the Company contribution for Year 2008, will be made available to Employee on the Effective Date.

13. Upon Separation, Company will not disparage Employee to any third parties. Employee will not disparage Company to any third parties. Employee and Company will truthfully inform any third parties that Employee and Company consensually separated in good faith and goodwill.

14. Employee will retain confidential and proprietary information of the Company as required by the SFA Employee Handbook.

15. Employee will return all Company materials and files to Company before departure.

16. The Agreement may not be construed as an admission by SFA of any wrongdoing, liability or violation of any federal state, or local law or regulations whatsoever.

17. Employee agrees that if any provision of this Agreement is found illegal or unenforceable or such provision is otherwise nullified, the remainder of the Agreement continues in full force and effect.

18. Employee has carefully read and fully understands all the provisions of this General Release Agreement which sets forth the entire Agreement between Employee and SFA relating to the subject matter of this Agreement. Employee has or has had the opportunity to consult an attorney and, in fact, Company has advised Employee to consult an attorney. Employee acknowledges that

3

CONFIDENTIAL

Employee has not relied upon any representation or statement, written or oral, not set forth in this Agreement.

19. This Agreement may not be modified in any way without the express, written agreement executed by both Employee and an Officer of SFA.

20. Any claims or disputes arising out of or relating to this Agreement will be resolved by Missouri law, wherever there is a choice of law.  Any claims arising out of or relating to this Agreement may be brought only in a court of competent jurisdiction sitting in the greater Kansas City, MO metropolitan area.

To signify their acceptance, the parties have signed this Agreement on the dates indicated below:

Roger D. Claypool
Employee
Date of Execution 12-31-2008

For SFA, Inc.
Title: President
Date of Execution: 12-31-2008

4

**Exhibit A**

<u>Standard Benefit</u>

If you Company and Employee were to Separate without any Agreement, you would receive the following standard benefit:

1. Access to COBRA benefits (employee has right to pay for benefits under SFA medical plan) for 18 months after termination.
2. Accrued vacation plus two weeks severance pay.
3. 100% vested profit sharing payout for all contributions through 2008 contribution year [including Company contribution for 2008].

<u>Enhanced Benefit</u>

If you sign and submit the Release Agreement during the 21 days after the Presentation Date (during the Consideration Period) [with an additional 7-day period from the time of signature to revoke the Agreement], you will receive the following Enhanced Benefit <u>in addition</u> to the Standard Benefit.  The cash elements of the Benefit will be paid to you on full upon the Effective Date [7 days after your execution of the Agreement].

1. Payment for any accrued vacation pay;
2. Fifty [50] weeks of full pay at your current salary plus the two weeks "standard benefit" pay for a total pay-out of one year's full salary;
3. A cash payment equivalent to:
   The sum of 52 weeks of Employee contribution to the SFA Family Medical Plan + 52 weeks of SFA contribution to Employee's SFA Family Medical Plan [meaning the Company will pay for your entire cost of medical coverage] for one year from the Effective Date.  Employee may exercise COBRA rights and pay back into the SFA Plan [COBRA allows Employees to continue in their medical plan for <u>18</u> months from Separation; Employee will receive the cash equivalent of <u>12</u> months benefit].
4. Opportunity for consulting on a case-by-case basis [without obligation of Company to offer specific consulting projects and without obligation by Employee to accept them] at $40 per hour with a defined scope of work for each project.
5. Employee is receiving a lump-sum payment in advance of (1) through (3) above and will be responsible for paying any taxes due.

CONFIDENTIAL

# EXHIBIT H



Alternate groove configuration

Knurled fastener or similar

CONFIDENTIAL

KLORCZY004882

Alternative hand lever brake
bar design.

Lever & pivot positions approx....for reference only.



Spring biased engaged

07-18-05

**CONFIDENTIAL**

KLORCZY004884

# EXHIBIT I

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------

| | |
|---|---|
| FREDERICK KLORCZYK, JR., as ) <br> Co-administrator of the Estate of Christian R) <br> Klorczyk and LYNNE KLORCZYK, as ) <br> Co-administrator of the Estate of Christian ) <br> R. Klorczyk, ) <br>            Plaintiffs ) <br> ) <br>     v. ) <br> ) <br> SEARS, ROEBUCK & CO., SHINN FU ) <br> CORPORATION, SHINN FU COMPANY ) <br> OF AMERICA, INC., MVP (HK) ) <br> INDUSTRIES, LTD., and WEI FU ) <br> (TAISHAN) MACHINERY & ELECTRIC ) <br> CO., LTD., ) <br>            Defendants. ) | CIVIL ACTION NO.: <br> 3:13-CV-00257-JAM <br><br><br><br><br><br><br><br><br><br><br> September 23, 2016 |

-------------------------------------------------------

## FREDERICK KLORCZYK, JR.'S AND LYNNE KLORCZYK'S OBJECTIONS AND RESPONSES TO DEFENDANT SHINN FU COMPANY OF AMERICA. INC'S SUPPLEMENTAL REQUESTS FOR PRODUCTION OF DOCUMENTS

Plaintiffs, Frederick Klorczyk and Lynne Klorczyk, as co-administrators of the Estate of Christian R. Klorczyk ("Plaintiffs"), hereby submit their objections and responses to the Supplemental Requests for Production of Documents ("Requests") of Defendant Shinn Fu Company of America, Inc. ("SFA"), dated August 23, 2016.

### REQUEST FOR PRODUCTION OF DOCUMENTS

### REQUEST FOR PRODUCTION NO. 1

Produce all documents in the possession, custody, or control of Roger Claypool concerning the two alternative jack stand designs to which he testified in his August 17, 2016 deposition.

**OBJECTION:**

Plaintiffs object to this Request as seeking documents not in the possession, custody or control of Plaintiffs.

**RESPONSE:**

Without waiving their objections, and after making a good faith effort to inquire of Mr. Claypool, see KLORCZYK 004882-KLORCZYK 004885.

**REQUEST FOR PRODUCTION NO. 2**

Produce all documents in the possession, custody or control of Roger Claypool concerning the American Society of Mechanical Engineers and/or the Portable Automotive Lifting Device committee of the American Society of Mechanical Engineers, including meeting minutes, agendas, documents distributed at meetings, and handwritten notes.

**OBJECTION:**

Plaintiffs object to this Request as seeking documents not in the possession, custody or control of plaintiffs. Plaintiffs also object to this Request on the grounds that it seeks documents that are not relevant to the subject matter of this action and as being overly broad and unduly burdensome, in that it does not have any time limitation and is not limited to jack stands.

**RESPONSE**:

Subject to and without waiving their objections, and after making good faith efforts to inquire of Mr. Claypool, see KLORCZYK 004886 – KLORCZYK 006269.

**REQUEST FOR PRODUCTION NO. 3**

Produce all documents in the possession, custody, or control of Roger Claypool concerning any jack stand claims or complaints regarding any of the Defendants of which he is aware.

2

**OBJECTION**:

      Plaintiffs object to this Request as seeking documents not in the possession, custody or control of Plaintiffs.

**RESPONSE:**

      Subject to and without waiving their objections, and after making good faith efforts to inquire of Mr. Claypool, see KLORCZYK 006270 – KLORCZYK 006271.

**REQUEST FOR PRODUCTION NO. 4**

      Produce all documents, including communications and electronically stored communications such as emails (including any enclosures or attachments), between Rick Heath or any other employee, agent, or representative of Heath & Associates and Roger Claypool.

**OBJECTION:**

      Plaintiffs object to this Request as seeking documents not in the possession, custody or control of Plaintiffs.

**RESPONSE:**

      Subject to and without waiving their objections and after making good faith efforts to inquire of Mr. Claypool, see KLORCZYK 006272 – KLORCZYK 006288.

**REQUEST FOR PRODUCTION NO. 5**

      Produce all documents, including communications and electronically stored communications such as emails (including any enclosures or attachments), between the Plaintiffs and/or the Plaintiffs' counsel and/or any employee, agent, or representative of the Plaintiffs and/or their counsel and Roger Claypool.

**RESPONSE**:

Subject to and without waiving their objections, and after making good faith efforts to inquire of Mr. Claypool, the emails between Mr. Claypool and Plaintiffs' attorneys are produced as KLORCZYK 006289 – KLORCZYK 006440.

**REQUEST FOR PRODUCTION NO. 6**

Produce all documents in the possession, custody, or control of Roger Claypool concerning the business or inter-corporate relationship(s) between the Defendants in this action.

**RESPONSE:**

Subject to and without waiving their objections, and after making good faith efforts to inquire of Mr. Claypool, Plaintiffs state, upon information and belief, that Roger Claypool does not have any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 7**

Produce all documents in the possession, custody or control of Roger Claypool concerning product testing jack stands that he performed while working at Shinn Fu Company of America, Inc. or subsequent to his employment there.

**RESPONSE:**

Subject to and without waiving their objections, and after making good faith efforts to inquire of Mr. Claypool, Plaintiffs state that Mr. Claypool does not have any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 8**

Produce all documents in the possession, custody, or control of Roger Claypool concerning communications with any Defendant in this action or any employee, agent or representative of any Defendant in this action.

4

**RESPONSE:**

Subject to and without waiving their objections, and after making good faith efforts to inquire of Mr. Claypool, Plaintiffs state that Mr. Claypool does not have any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 9**

Produce all documents in the possession, custody or control of Roger Claypool concerning any allegation in the operative Complaint in this action that were not already produced in response to one of the foregoing requests for production.

**RESPONSE:**

Subject to and without waiving their objections, and after making good faith efforts to inquire of Mr. Claypool, Plaintiffs state that Mr. Claypool does not have any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 10**

Produce all documents concerning payments to Roger Claypool in connection with this action, whether by the Plaintiffs, Plaintiffs' counsel, or Heath & Associates.

**RESPONSE:**

Heath & Associates invoices concerning Roger Claypool for 2015 and 2016 to date are produced as KLORCZYK 006441 – KLORCZYK 006446.

**REQUEST FOR PRODUCTION NO. 11**

Produce all documents in the possession, custody, or control of Roger Claypool that were created as a part of Mr. Claypool's work at SFA that were not produced in response to one of the foregoing requests.

**OBJECTION:**

Plaintiffs object to this Request as seeking documents not in the possession, custody or control of Plaintiffs.  Plaintiffs also object to this Request on the grounds that it seeks documents that are not relevant to the subject matter of this action and is being overly broad and unduly burdensome, in that it does not have any time limitation and is not limited to jack stands.

**RESPONSE**:

Subject to and without waiving their objections, and after making good faith efforts  to inquire of Mr. Claypool, Plaintiffs state that Mr. Claypool does not have any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 12**

Produce all documents in the possession, custody, or control of Roger Claypool that originative from the work of Roger Claypool at SFA, including all documents created by other SFA employees who were working with Mr. Claypool at the time and all documents created by Mr. Claypool himself, that were not produced in response to one of the foregoing requests.  This request includes, but is not limited to, all reports, examinations, designs, sketches and other documents.

**OBJECTIONS:**

Plaintiffs object to this Request as seeking documents not in the possession, custody or control of Plaintiffs.  Plaintiffs also object to this Request on the grounds that it seeks documents that are not relevant to the subject matter of this action and as being overly broad and unduly burdensome, in that it does not have any time limitation and is not limited to jack stands.

**RESPONSE:**

Subject to and without waiving their objections, and after making good faith efforts to inquire of Mr. Claypool, Plaintiffs state that Mr. Claypool does not have any documents responsive to this Request.

> PLAINTIFFS,
> FREDERICK KLORCZYK, JR., as co-administrator of the Estate of Christian R. Klorczyk, and LYNNE KLORCZYK, as co-administrator of the Estate of Christian R. Klorczyk
> By: _____
> Howard S. Edinburgh
> Howard L. Wexler
> Joseph E. Donat
> Michael E. Gallub
> HERZFELD & RUBIN, P.C.
> 125 Broad Street
> New York, New York 10004
> (212) 471-8529
> (212) 344-3333 (fax)
> hedinburgh@herzfeld-rubin.com
> hwexler@herzfeld-rubin.com
> jdonat@herzfeld-rubin.com
> mgallub@herzfeld-rubin.com
>               -and-
>
> Paul D. Williams
> David J. Elliott (ct04301)
> Bryan J. Orticelli (ct28643)
> Kaitlin A. Canty (ct29074)
> DAY PITNEY LLP
> 242 Trumbull Street
> Hartford, Connecticut 06103-1212
> (860) 275-0100
> (860) 275-0343 (fax)
> pwilliams@daypitney.com
> djelliott@daypitney.com
> borticelli@daypitney.com
> kcanty@daypitney.com
>
> Their Attorneys

7

## CERTIFICATION

I HEREBY CERTIFY that on the 23rd day of September, 2016 the foregoing was served by overnight mail and by electronic mail to the following:

Dennis O. Brown (ct04598)
Steven J. Zakrzewski (ct28934)
Gordon & Rees LLP
95 Glastonbury Boulevard, Suite 206
Glastonbury, CT 06033
dbrown@gordonrees.com
szakrzewski@gordonrees.com

Eric W. Todd (ct 13897)
Trotta, Trotta & Trotta
900 Chapel Street, 12th Floor
New Haven, CT. 06503
etodd@trottalaw.com

By:_____
       Howard S. Edinburgh

# EXHIBIT J

| From: | Howard S. Edinburgh <HEdinburgh@herzfeld-rubin.com> |
|---|---|
| Sent: | Saturday, September 24, 2016 11:00 AM |
| To: | Steven Zakrzewski; Dennis Brown; Williams, Paul D.; Orticelli, Bryan J.; 'etodd@trottalaw.com' (etodd@trottalaw.com); Canty, Kaitlin A. (kcanty@daypitney.com) |
| Cc: | Howard L. Wexler; Zachary Kuperman; 'SHINN_1097376 _ Klorczyk v_ Shinn Fu Corporation _Correspondence _ E_Mail' |
| Subject: | RE: Klorczyk |

Hi Steve: we have not withheld any responsive documents. I will confirm with Roger Claypool next week his current rate of compensation at Metropolitan Community College. I believe he is paid as a part time faculty member on a monthly basis. Howard.

**From:** Steven Zakrzewski [mailto:szakrzewski@gordonrees.com]
**Sent:** Saturday, September 24, 2016 10:33 AM
**To:** Howard S. Edinburgh; Dennis Brown; Williams, Paul D.; Orticelli, Bryan J.; 'etodd@trottalaw.com' (etodd@trottalaw.com); Canty, Kaitlin A. (kcanty@daypitney.com)
**Cc:** Howard L. Wexler; Zachary Kuperman; 'SHINN_1097376 _ Klorczyk v_ Shinn Fu Corporation _Correspondence _ E_Mail'
**Subject:** RE: Klorczyk

Hi Howard, Thank you for sending these along. I note that the objections to requests for production do not state whether any documents are being withheld pursuant to the objections, as required by FRCP 34(b)(2)(C). For each request, please advise whether any documents are being withheld pursuant to the objections asserted. Also, in response to interrogatory number one, you have omitted Mr. Claypool's current rate of compensation at the community college where he works. It seems that the omission was unintentional, as you have provided the total amount that he earned there in 2015 and 2016, and have only forgotten to include his pay rate. Please let me know when you will be able to provide that information. – Steve

**STEVEN J. ZAKRZEWSKI** | Associate
**GORDON & REES**
**SCULLY MANSUKHANI**

95 Glastonbury Blvd, Suite 206
Glastonbury, CT 06033
P: 860-278-7448 | F: 860-560-0185
**szakrzewski@gordonrees.com**

Alabama • Arizona • California • Colorado • Connecticut • Florida • Georgia
Illinois • Maryland • Massachusetts • Missouri • Nevada • New Jersey • New York
North Carolina • Ohio • Oregon • Pennsylvania • South Carolina • South Dakota
Texas • Virginia • Washington • Washington, D.C. • West Virginia
www.gordonrees.com

**From:** Howard S. Edinburgh [mailto:HEdinburgh@herzfeld-rubin.com]
**Sent:** Friday, September 23, 2016 4:51 PM
**To:** Steven Zakrzewski; Dennis Brown; Williams, Paul D.; Orticelli, Bryan J.; 'etodd@trottalaw.com' (etodd@trottalaw.com); Canty, Kaitlin A. (kcanty@daypitney.com)
**Cc:** Howard L. Wexler; Zachary Kuperman
**Subject:** Klorczyk

Dear Counsel: attached are plaintiffs' Response to SFA's Supplemental Interrogatories and RFPs concerning Roger Claypool.  We have also mailed copies  by UPS. The mailed copies also  have enclosed a computer disc containing responsive documents which are Bates numbered and stamped KLORCZYK 004882 – KLORCZYK 006446. Regards. Howard.

Howard S. Edinburgh
Herzfeld & Rubin, P.C.
125 Broad Street
New York, New York 10004
hedinburgh@herzfeld-rubin.com
Phone: (212) 471-8529
Fax: (212) 344-3333

Alabama * Arizona * California * Colorado * Connecticut * Florida * Georgia * Illinois * Maryland * Massachusetts * Missouri * Nevada * New Jersey * New York * North Carolina * Ohio * Oregon * Pennsylvania * South Carolina * South Dakota * Texas * Virginia * Washington * Washington, DC * West Virginia

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEG/ALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON & REES LLP**
http://www.gordonrees.com

# EXHIBIT K

 Gmail

Roger Claypool <purplmcgil@gmail.com>

---

## Klorczyk- Rick Heath Report

5 messages

---

**Howard S. Edinburgh** <HEdinburgh@herzfeld-rubin.com>                    Mon, May 4, 2015 at 3:49 PM
To: "purplmcgil@gmail.com" <purplmcgil@gmail.com>

Dear Mr. Claypool: annexed is Rick Heath's report in this case. Thanks. Howard.

Howard S. Edinburgh

Herzfeld & Rubin, P.C.

125 Broad Street

New York, New York 10004

hedinburgh@herzfeld-rubin.com

Phone: (212) 471-8529

Fax: (212) 344-3333

📄 **plaintiffs' disclosure of expert witnesss (heath Assocs).pdf**
1442K

---

**Roger Claypool** <purplmcgil@gmail.com>                    Mon, May 4, 2015 at 9:15 PM
To: "Howard S. Edinburgh" <HEdinburgh@herzfeld-rubin.com>

Good Evening Howard,

Just got home and recvd Rick's report. I will go through it and see what I can come up with respect to the incident product and other products containing redundant locking devices. Also, I will try to put together a list of potential deponents that may have knowledge of claims and complaints during the time the incident product was out in the stream of commerce and after my departure.

Have a great evening and will talk again soon.

Best Regards, Roger
[Quoted text hidden]

---

**Howard S. Edinburgh** <HEdinburgh@herzfeld-rubin.com>                    Thu, May 7, 2015 at 8:17 AM
To: Roger Claypool <purplmcgil@gmail.com>

KLORCZY006365

Thanks Roger. Sorry I haven't gotten back to you sooner. I understand that you are traveling over the next several days and are unavailable to talk until next Tuesday. We definitely wish to talk to you on Tuesday ( if we can talk sooner please let me know although from what you have said I realize that will likely not be possible). Is there anything you can send today before you go? When on Tuesday are you available to talk? I leave for Kansas City next Wednesday for SFA deps beginning on Thursday. Regards. Howard.

**From:** Roger Claypool [mailto:purplmcgil@gmail.com]
**Sent:** Monday, May 04, 2015 10:15 PM
**To:** Howard S. Edinburgh
**Subject:** Re: Klorczyk- Rick Heath Report

[Quoted text hidden]

---

**Roger Claypool** <purplmcgil@gmail.com>                    Thu, May 7, 2015 at 11:20 AM
To: "Howard S. Edinburgh" <HEdinburgh@herzfeld-rubin.com>

Good Morning Howard,

The serial number found on each stand tells us that the stands were made at the Taishan Factory (GT), in the year 2010 (10), in the month October (10), and have sequence numbers (...009618 & 009619) indicating that the base sections were labeled one after the other. The ratchet bars would have been "added" to the base sections at the end of the assembly line process...from a tote (container) housing several hundred painted and 'finished' ratchet bars.

I left in January (first week, as I recall) of 2009 and turned over all my claims files to a Mark Papas (sp). However, at the time of my departure, Sarah Sunderman was handling the Loss Run Reports (directed to our Product Liability Insurance Carrier) for Steven Huang (do not recall his title at the time, he signed my paychecks). My boss at the time was Arthur Chaykin, the corporate Lawyer.

We can talk more on Tuesday morning. I may have some time this weekend if we get our birds early (we can only hope). I will call or e-mail when I get back in town.

Best Regards,

Roger

[Quoted text hidden]

---

**Howard S. Edinburgh** <HEdinburgh@herzfeld-rubin.com>          Fri, May 8, 2015 at 5:29 PM
To: Roger Claypool <purplmcgil@gmail.com>

Thanks.

**From:** Roger Claypool [mailto:purplmcgil@gmail.com]
**Sent:** Thursday, May 07, 2015 12:20 PM

[Quoted text hidden]

[Quoted text hidden]

KLORCZY006366

# EXHIBIT L

SUBJECT TO MOTION TO SEAL

# EXHIBIT M

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| FREDERICK KLORCZYK, JR., as co-administrator of the Estate of Christian R. Klorczyk, et al., | : : | CIVIL ACTION NO. |
| | : | 3:13-cv-00257-JAM |
| *Plaintiffs,* | : : | |
| vs. | : : | |
| SEARS, ROEBUCK AND CO., et al., | : : | |
| *Defendants.* | : : | December 8, 2014 |

**PLAINTIFFS' DISCLOSURE OF EXPERT WITNESS**

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, Plaintiffs, Frederick

Klorczyk, Jr., as co-administrator of the Estate of Christian R. Klorczyk, and Lynne Klorczyk, as

co-administrator of the Estate of Christian R. Klorczyk (collectively, the "Plaintiffs"), hereby

disclose the following witness who may offer expert testimony in support of their claims in this

action:

**Eric J. Boelhouwer, Ph.D, CSP, CPE**
**Dorris and Associates International, LLC**
**1075 Peachtree Street, NE Suite 3750**
**Atlanta, Georgia 30309**
**Tel: (770) 487-2138**
**Fax: (770) 487-0106**

Dr. Boelhouwer is expected to offer opinions consistent with his report in this action,

which is attached hereto as Exhibit A and is incorporated in its entirety in this pleading pursuant

to Rule 10(c) of the Federal Rules of Civil Procedure.

Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, Exhibit A contains

the following information: (i) a complete statement of all opinions that the witness will express

and the basis and reasons therefor; (ii) the facts or data considered by the witness in forming his

opinions; (iii) the witness's qualifications; (iv) a list of cases in which the witness has testified as

an expert at trial or by deposition during the previous four (4) years; and (v) a statement of the

compensation to be paid for the witness's study and testimony in this case.

PLAINTIFFS,

FREDERICK KLORCZYK, JR., as co-
administrator of the Estate of Christian R.
Klorczyk, and LYNNE KLORCZYK, as co-
administrator of the Estate of Christian R.
Klorczyk

By:   */s/ David J. Elliott*
David J. Elliott (ct04301)
Bryan J. Orticelli (ct28643)
Kaitlin A. Canty (ct29074)
DAY PITNEY LLP
242 Trumbull Street
Hartford, Connecticut 06103-1212
(860) 275-0100
(860) 275-0343 (fax)
*djelliott@daypitney.com*
*borticelli@daypitney.com*
*kcanty@daypitney.com*

Howard S. Edinburgh
Howard L. Wexler
Joseph E. Donat
Michael Gallub
Herzfeld & Rubin, P.C.
125 Broad Street
New York, NY 10004
(212) 271-8529
(212) 344-3333 (fax)
*hedinburgh@herzfeld-rubin.com*
*hwexler@herzfeld-rubin.com*
*jdonat@herzfeld-rubin.com*
*mgallub@herzfeld-rubin.com*

Their Attorneys

## CERTIFICATION

I HEREBY CERTIFY that on this date a copy of the foregoing was served by first class mail, postage prepaid, and by electronic mail to the following:

Sean P. Flynn (phv05949)
Steven J. Zakrzewski (ct28934)
Gordon & Rees LLP
2211 Michelson Drive, Suite 400
Irvine, CA 92612
*sflynn@gordonrees.com*
*szakrzewski@gordonrees.com*

Thomas O. Anderson (ct03451)
Michael R. Keller (ct29284)
Morrison Mahoney, LLP
One Constitution Plaza, 10th Floor
Hartford, CT 06103
*mkeller@morrisonmahoney.com*
*tanderson@morrisonmahoney.com*

Erica W. Todd (ct13897)
Trotta, Trotta & Trotta
900 Chapel Street, 12th Floor
P.O. Box 802
New Haven, CT 06503
*etodd@trottalaw.com*

By:＿＿/s/ David J. Elliott＿＿＿＿＿＿
　　　David J. Elliott (ct04301)

-3-

# Exhibit A



DORRIS AND ASSOCIATES INTERNATIONAL, LLC

1075 Peachtree Street, NE   Suite 3750   Atlanta, GA 30309   P 770.487.2138   F 770.487.0106   W www.dorrisassociates.com

December 5, 2014

Herzfeld & Rubin, P.C.
125 Broad Street
New York, NY 10004

Day Pitney, LLP
242 Trumbull Street
Hartford, CT 06103

<u>Re:   Klorczyk v. Sears Roebuck and Company, et al.</u>

Dear Counsel:

As requested, the following is a report pertaining to opinions that I will offer in the litigation referenced above.

### <u>QUALIFICATIONS</u>

My background, publications and professional certifications are provided on my attached curriculum vitae. Briefly, my area of experience and expertise, pertinent to this litigation, is warnings and communications pertaining to product safety. I hold a Ph.D. and a Master of Industrial and Systems Engineering from Auburn University where my area of specialization was Human Factors Engineering (HFE), including advanced courses in Human Factors, Safety Engineering and Ergonomics. My graduate studies were funded by the National Institute for Occupational Safety and Health (NIOSH) Deep South Education and Research Center (ERC). I also hold a Master of Business Administration degree from Tulane University and a Bachelor of Chemical Engineering degree from the Georgia Institute of Technology. I have been certified by the Board of Certified Safety Professionals (BCSP) and by the Board of Certification in Professional Ergonomics (BCPE).

During my professional work experience, I have routinely performed evaluations of the design and development of warnings, product instructions and similar precautionary information for consumer products. I also have led safety reviews for industrial processes and worked for over seven years in manufacturing environments. Dorris and Associates International, LLC provides product safety

1

**Confidential**

services to a wide variety of entities. Clients include corporations, non-profit organizations, trade associations, state and federal governmental agencies, as well as defense and plaintiffs' attorneys. Client services have been performed in the U.S., Canada, U.K., France, Germany, Spain, Belgium, Australia and Japan.

I have given numerous presentations and authored various articles on the design of warnings and behavioral responses to safety messages. Dorris and Associates International, LLC charges $185 per hour plus expenses for my services in this litigation. Attached is a list of trial and deposition testimony I have given over the past four years.

## MATERIALS REVIEWED

In my analysis of this matter, I have reviewed the following materials specific to this case:

- Amended Complaint
- Craftsman Professional Heavy Duty Jack Stands Operators Manual
- Sears, Craftsman Professional 4-Ton Jack Stands, One Pair, Web, 2 Dec. 2014, http://www.sears.com/4-ton-jack-stands-one-pair/p-00950163000P
- 2001 BMW Owner's Manual
- ASME PALD-2009 Safety Standard for Portable Automotive Lifting Devices
- Photographs of subject Craftsman Professional Heavy Duty Jack Stands

- Sealy Quality Machinery, Instructions for Axle Stand 3 Tonne Ratchet Type, Model No: VS1003
- Pro-Lift SUV/Truck Jack Stands Operating Instructions & Parts Manual, Model Number T-9621, 2003
- Exemplar Manuals for Other Brands of Jack Stands
- Deposition of Lynne Klorczyk, 11/13/14
- Deposition of Frederick Klorczyk, 11/14/14

In addition to the above materials, my opinions are based upon my education and training in the fields of Human Factors Engineering (HFE) and product safety, my familiarity with the safety aspects of the published literature and standards in these fields.

## WARNINGS RESEARCH

Over the past quarter of a century there has developed a sizable body of literature on behavioral responses to warnings. Since the design of safety communications and the systematic analysis of responses to those communications is an aspect of HFE, many of the studies are reported in the HFE literature. The fact that warning analysis has developed into an empirical scientific field of behavioral study is evidenced by:

- Existence of a substantial amount of literature, much of it refereed evidencing a range of research methodologies;

- Empirical evidence that lay persons are not able to predict with statistical reliability the effectiveness of safety signs or labels.

2

**Confidential**

Significant reviews of this literature can be found in McCarthy et al. (1984), DeJoy (1989), Ayres et al. (1998) and Rogers et al. (2000).

### USE OF WARNINGS

A commonly cited definition of a warning is "...a message intended to reduce the risk of personal or property damage by inducing certain patterns of behavior and discouraging or prohibiting certain other patterns of behavior" (Dorris & Purswell, 1978). There is broad agreement that warnings should endeavor to communicate:

1. Nature of the hazard;

2. Means of avoiding the hazard;

3. Consequences of failing to avoid the hazard.

Not all of these elements will be necessary in all circumstances and need not be explicitly included in the warning.

### FACTS AND OPINIONS

On the basis of my education and experience as outlined above and on the attached curriculum vitae, the literature on human factors and warnings including but not limited to those referenced above, and the materials reviewed for this case as listed above, I have reached the following opinions that I hold to a reasonable degree of scientific certainty:

1. *Not an Obvious Hazard*

   As it relates this matter, it is my understanding that a hazardous condition exists if the locking pawl is not fully engaged with the ratchet bar, including if the tip of the locking pawl is in contact with the tip of one of the ratchet teeth (tip to tip), on the subject Craftsman Professional Heavy Duty Jack Stands and that this condition may not prevent movement of the ratchet bar after the load has been applied to the jack stand. The base frame limits the ability of users to observe if the locking pawl is fully engaged with the ratchet bar or is tip to tip. Therefore, the potential hazard that may exist if the locking pawl is not fully engaged with the ratchet bar would not be obvious to users.

2. *Unreasonably Dangerous for Lack of Adequate Warnings and Instructions*

   From a human factors engineering perspective, the subject Craftsman Professional Heavy Duty Jack Stands are unreasonably dangerous because they lack adequate and appropriate warnings and instructions for a number of reasons:

   - There is no warning that addresses the hazardous condition that may exist if the locking pawl is not fully engaged with the ratchet bar as discussed earlier in this report. Based on my survey of product

3

**Confidential**

literature for similar jack stands that use a ratchet bar mechanism, several manufacturers provide safety messages related to this hazard and suggests manufacturers of similar products were aware of the potential for harm to result if the locking pawl is not fully engaged with the ratchet bar. One example was a warning provided by Sealey Quality Machinery in the "Operation" section of their instructions (Sealy Quality Machinery, Instructions for Axle Stand 3 Tonne Ratchet Type, Model No: VS1003).

- Neither the on-product markings nor the Operators Manual for the Craftsman Professional Heavy Duty Jack Stands identifies how to distribute the load between the jack stands or the potential crush hazard.

The subject Craftsman Professional Heavy Duty Jack Stands Operators Manual states "[b]efore using this product, read this operator's manual completely and familiarize yourself thoroughly with the product and the hazards associated with its improper use" (Craftsman Professional Heavy Duty Jack Stands Operators Manual, pg. 3). The manual does not identify the crush hazards associated with the subject jack stands or how to distribute the weight of the vehicle between the jack stands.

It is my understanding that the non-Sears defendants manufactured and distributed the subject jack stands and that the non-Sears defendants manufacture jack stands for several brands, including Pro-Lift. The crush hazard is discussed as early as 2003 in a Pro-Lift manual that includes a warning and a pictogram to inform users of the potential crush hazard (Pro-Lift SUV/Truck Jack Stands Operating Instructions & Parts Manual, Model Number T-9621).

- As shown in figure 1, the "Safety Instructions" section of the subject Craftsman Professional Heavy Duty Jack Stands Operators Manual states to "[a]lways check the vehicle owners manual for location of proper lift and support points" (Craftsman Professional Heavy Duty Jack Stands Operators Manual, pg. 3).

4

**Confidential**

> ### SAFETY INSTRUCTIONS
>
> **⚠ WARNING**
>
> - Study, understand, and follow all instructions with and on this device before use.
> - **Rated capacity is per pair!** Do not exceed rated capacity.
> - Use only on hard, level surfaces capable of sustaining rated capacity loads.
> - One pair per vehicle only!
> - Use as a matched pair to support one end of a vehicle only.
> - Support only on areas of the vehicle as specified by the vehicle manufacturer.
> - No alterations shall be made to this product.
> - Failure to heed product markings or warnings may result in personal injury or property damage.
>
> - Before using this product, read this operator's manual completely and familiarize yourself thoroughly with the product and the hazards associated with its improper use.
> - Install ratchet bar into frame with ratchet area of bar aligned with locking pawl (stopper).
> - Move the ratchet bar to its lowest position by raising the locking handle, thereby releasing the stopper, and guiding the bar downward.
> - Insert roll pin into the bottom hole of the ratchet bar to prevent inadvertent loss of the ratchet bar. (refer to Fig. 1)
> - Always check the vehicle owners or service manual for location of proper lift and support points.
>
> **BEFORE USING**
>
> - Inspect stands before each use. Do not use if bent, broken or cracked components are noted. Ensure that all parts move freely.
> - Verify that the product and the application are compatible.
>
> **DAMAGE TO JACK STANDS**
>
> If you think jack stand has been subjected to an abnormal load or shock, have it inspected for damage at a Sears Service Center before using it again.

"Support only on areas of the vehicle as specified by the vehicle manufacturer."

"Always check the vehicle owners or service manual for location of proper lift and support points."

Figure 1.   Excerpt from subject Craftsman Professional 4 -Ton Jack Stands Operators Manual, pg. 3.

It is not reasonable for the manufacturer of the subject jack stands to rely on others to provide information regarding the proper lift and support points and not to provide additional guidance to users. As it relates to this matter, the Owner's Manual for the 2001 BMW does not discuss the proper support points for jack stands.

3. *Potential for Confusion Related to Rated Capacity*

From a human factors engineering perspective, it is not clear to the reader if the rated capacity messages relate to the capacity for the jack stands as a pair or the capacity for a single jack stand and these messages are likely to result in confusion for anticipated users.

The rated capacity messages on both the subject jack stands and in the subject Craftsman Professional Heavy Duty Jack Stands Operators Manual are contradictory and are likely to result in confusion for users based on the following:

- The casting imprint of "4 TON" on the ratchet bars for each of the subject Craftsman Professional Heavy Duty Jack Stands does not indicate if the phrase "4 TON" relates to the capacity for a pair of jack stands or for an individual jack stand as shown in figure 2.

5

**Confidential**



Figure 2.   Photograph of one of the ratchet bars from the subject Craftsman Professional
Heavy Duty Jack Stands.

- As shown in figure 3, the Sears website states: "[f]eaturing solid
  welded construction, these **professional 4 ton jack stands** stand up
  to 8,000 pounds of weight a piece, and equipped with a wide saddle, it
  delivers a solid hold you can count on" (emphasis original).

6

**Confidential**



"Featuring solid welded construction, these **professional 4 ton jack stands** stand up to 8,000 pounds of weight a piece, and equipped with a wide saddle, it delivers a solid hold you can count on." (emphasis original)

"8,000 lb. capacity"

Figure 3.   Excerpt from Sears website, http://www.sears.com/4-ton-jack-stands-one-pair/p-00950163000P, retrieved 12/2/2014.

- The "Specifications" section of the Operators Instructions for the Craftsman Professional Heavy Duty Jack Stands shown in figure 4 only contains a single jack stand in the illustration and does not indicate if the "4 Ton" capacity in the table relates to a single jack stand or a pair of jack stands as shown in figure 4.

7

**Confidential**



Figure 4.    Excerpt from subject Craftsman Professional 4 -Ton Jack Stands Operators
Manual, pg. 2.

Even though the rated capacity messages are contradictory, it is my
understanding that even if a single jack stand is only intended to support 2
tons that capacity would have been greater than the curb weight of the 2001
BMW 325xi (2001 BMW Owner's Manual, pg. 194).


4.  *Appropriate and Adequate Warnings Would Have Changed Behavior*

It is more likely than not appropriate and adequate warnings and
instructions regarding the hazardous condition that exists if the locking pawl
is not fully engaged with the ratchet bar would have been noticed, read and
followed by Mr. Klorczyk and his son, Christian Klorczyk.  Mr. Klorczyk
testified that he reviewed the manual and the labels (F. Klorczyk deposition,
pgs. 125 & 172) and he discussed the content with his son, Christian
Klorczyk, prior to the incident (F. Klorczyk deposition, pgs. 173, 326 & 327).
Therefore, if appropriate and adequate warnings and instructions had been
provided, it is more likely than not that Mr. Klorczyk and his son, Christian
Klorczyk, would have been informed and alerted of this hazard and would
have changed their behavior as to prevent the harm suffered by Christian
Klorczyk.


<u>*CONCLUSION*</u>

The warning system associated with the subject Craftsman Professional Heavy Duty
Jack Stands, including the precautionary information provided in the Operators
Manual, was inappropriate, inadequate and made the product unreasonably
dangerous for ordinary users for the reasons discussed above.

8

**Confidential**

In the event that additional information is made available to me, I reserve the right to supplement or amend my opinions.

Sincerely,

Eric J. Boelhouwer, Ph.D.
Consultant

Attachments

Confidential

## REFERENCES

Ayres, T., Wood, C., Schmidt, R., Young, D. & Murray, J. (1998).  Effectiveness of warning labels and signs: An update on compliance research.  *Proceedings of the Silicon Valley Ergonomics Conference and Exposition,* 199-205.

DeJoy, D.M. (1989).  Consumer product warnings: Review and analysis of effectiveness research.  *Proceedings of the Human Factors Society 33rd Annual Meeting,* 936-940.

Dorris, A.L. & Purswell, J.L. (1978).  Human factors in the design of effective product warnings.  *Proceedings of the Human Factors Society 22nd Annual Meeting,* 343-346.

McCarthy, R.L., Finnegan, J.P., Krumm-Scott, S. & McCarthy, G.E. (1984).  Product information presentation, user behavior and safety.  *Proceedings of the Human Factors Society 28th Annual Meeting,* 81-85.

Rogers, W.A., Lamson, N. & Rousseau, G.K. (2000).  Warning research: An integrative perspective.  *Human Factors, 42,* 102-139.



1075 Peachtree Street, NE   Suite 3750   Atlanta, GA 30309   P 770.487.2138

## Eric J. Boelhouwer, PhD, CSP, CPE
**Consultant**

### Professional Profile:

Eric Boelhouwer is a human factors specialist (ergonomist) with professional experience in product safety and the evaluation of instructions, warnings and other safety communications. Dr. Boelhouwer is a Consultant for Dorris and Associates International, LLC. His primary responsibilities include the design and implementation of product safety research, including evaluations of human-machine interfaces, as well as the usability and effectiveness of precautionary information.

Dorris and Associates has a wide variety of clients including private and public corporations, non-profit organizations, trade associations, state and federal governmental agencies, as well as defense and plaintiff's attorneys. Client services have been performed in the U.S., Canada, U.K., France, Germany, Spain, Belgium, Australia and Japan. Products manufactured and/or distributed by these clients range from automobiles and airplanes to everyday consumer products and children's toys.

### Education:

PhD, Industrial and Systems Engineering, Auburn University; Auburn, AL (2010)

MISE, Industrial and Systems Engineering, Auburn University; Auburn, AL (2008)

MBA, Business Administration, Tulane University; New Orleans, LA (2004)

BChE, Chemical Engineering, Georgia Institute of Technology; Atlanta, GA (1998)

### Professional Affiliations & Service:

Certified Safety Professional (CSP)

Certified Professional Ergonomist (CPE)

American Institute of Chemical Engineers (AIChE), Senior Member

American Society of Safety Engineers (ASSE), Professional Member

Human Factors and Ergonomics Society (HFES)

Last updated July 2014

E. J. Boelhouwer, PhD, CSP                                                                 Page 2

National Safety Council (NSC)

Society of Automotive Engineers (SAE)

Society for Chemical Hazard Communication (SCHC), Board of Directors, 2013-Present

The Institute of Industrial Engineers (IIE)

## Grants, Honors, & Awards:

National Institute for Occupational Safety and Health (NIOSH) Graduate Fellowship

Boelhouwer, E.J. and Davis, G.A. (2009). Improving Comprehension of GHS Safety Data Sheets. Submitted to NIOSH, DSCOHS, Pilot Project Research Training Program. Funded for $12,000.

Alpha Pi Mu Industrial Engineering Honor Society

2009 INFORMS Doctoral Colloquium Participant

## Publications & Reports:

Boelhouwer, E. J., Davis, J., Franco-Watkins, A., Dorris, N. T., and Lungu, C. (2013). Comprehension of hazard communication: Effects of pictograms on safety data sheets and labels. *Journal of Safety Research, 46,* September, 145-155.

Boelhouwer, E. J. and Davis, J. (2010). Effects of GHS Hazard Category, Signal Words, and Pictograms on an Individual's Assessment of Perceived Risk. In *Proceedings of the Human Factors and Ergonomics Society 54th Annual Meeting,* Santa Monica, CA: The Human Factors and Ergonomics Society.

Piper, A.K., Davis, J. and Boelhouwer, E.J. (2010). Converging International Safety Symbol Designs Using Distributed Interactive Evolutionary Computation. In *Proceedings of the 2010 Industrial Engineering Research Conference,* Norcross, GA: Institute of Industrial Engineers.

Boelhouwer, E. J. and Sullivan M. R. (2010). GHS in the USA: Past, Present and Future. In *Safety 2010: ASSE Professional Development Conference Proceedings,* Baltimore, MD: American Society of Safety Engineers.

Boelhouwer, E. J., Piper, A.K., and Davis, J. (2009). The Use of Hazard and Precautionary Symbols on Safety Data Sheets. In *Proceedings of the Human Factors and Ergonomics Society 53rd Annual Meeting,* Santa Monica, CA: The Human Factors and Ergonomics Society.

Piper, A.K., Boelhouwer, E. J., Davis, G.A., Holman, G.T., and Montgomery, L.S. (2008) Using Hand Drawn Images to Determine Warning Symbol Design Parameters within Interactive Evolutionary Computation Software. In *Proceedings of the Human Factors and Ergonomics Society 52nd Annual Meeting,* Santa Monica, CA: The Human Factors and Ergonomics Society.

E. J. Boelhouwer, PhD, CSP                                                    Page 3

Dorris, N.T., Valimont, R.B., and Boelhouwer, E.J.  (2007).  Eye Movements While Reading Degraded On-Product Warnings.  In *Proceedings of the Human Factors and Ergonomics Society 51st Annual Meeting,* Santa Monica, CA:  The Human Factors and Ergonomics Society.

## Presentations & Seminars:

"Twenty-first Century Warnings in a Global World."  Defense Research Institute Product Liability Conference, Washington, D.C.  April 2013.

"HAZCOM 101: Comprehensibility."  Society for Chemical Hazard Communication webinar. February 2011.

"Comprehension of Chemical Product Labels: Effects of Hazard and Precautionary Pictograms." Society for Chemical Hazard Communication Fall Meeting.  Washington, D.C.  October 2010.

"Putting the Tool Kit into Practice: A Study at Auburn University."  Invited panel member. American Industrial Hygiene Conference and Exposition (AIHce).  Toronto, Canada.  June 2009.

## Previous Four Years of Deposition and Trial Testimony by Dr. Eric Boelhouwer

This information may not be complete and is based upon best available information and recollection

| Case Name | Court | Case # | Deposition Date | Trial Date |
|---|---|---|---|---|
| Blake Capital Corporation v. Electrolux Home Products, Inc. | United States District Court for the Western District of Wisconsin | 3:12-cv-00015 | 04/2014 | |
| Brossard v. Electrolux Home Products, Inc. | | | | |
| Donahue v. Electrolux Home Products, Inc. | | | | |
| Freeman v. Electrolux Home Products, Inc. | | | | |
| Holt v. Electrolux Home Products, Inc. | | | | |
| Kucharski v. Electrolux Home Products, Inc. | | | | |
| Larson v. Electrolux Home Products, Inc. | | | | |
| McCants v. Electrolux Home Products, Inc. | | | | |
| Satterfield, et al. v. The Fresh Market, Inc., et al. | United States District Court District of South Carolina Spartanburg Division | 7:11-1514 JMC | 07/2014 | |
| Williams v. Cannonball Engineering, LLC | Circuit Court of Washington County, Arkansas Civil Division | 13-cv-001208 | 07/2014 | |

# EXHIBIT N

# Rocheux Int'l of N.J., Inc. v. United States Merchs. Fin. Group, Inc.

United States District Court for the District of New Jersey

October 5, 2009, Decided; October 5, 2009, Filed

Civ. No. 06-6147

**Reporter**

2009 U.S. Dist. LEXIS 93082

ROCHEUX INTERNATIONAL OF NEW JERSEY, INC., Plaintiff, v. U.S. MERCHANTS FINANCIAL GROUP, INC., U.S. MERCHANTS, INC. (a division of U.S. Merchants Financial Group, Inc., and/or d/b/a U.S. Merchants), THE MERCHANT OF TENNIS INC., and DIVERSIFIED REPACKAGING CORP., Defendants.

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Summary judgment granted by, in part, Summary judgment denied by, Motion denied by, Dismissed without prejudice by Rocheux Int'l of N.J., Inc. v. U.S. Merchs. Fin. Group, Inc., 2010 U.S. Dist. LEXIS 104445 (D.N.J., Sept. 29, 2010)

**Counsel:** [*1] For Plaintiff: Brian William McAlindin, Esq., BATHGATE, WEGENER & WOLF, P.C., Lakewood, New Jersey.

For Defendants: Brian J. McMahon, Esq., GIBBONS, PC, Newark, New Jersey.

**Judges:** Hon. Garrett E. Brown, Jr., U.S.D.J.

**Opinion by:** Garrett E. Brown, Jr.

# Opinion

## <u>MEMORANDUM OPINION</u>

### <u>BROWN,</u> **Chief Judge:**

This matter comes before the Court upon Defendants' motion (Doc. No. 52) to exclude Plaintiff's designated expert witness Jorge Gutierrez as an improperly paid fact witness. In addition to the exclusion of Mr. Gutierrez as a witness, Defendants seek an order excusing them from paying the deposition fee charged by Mr. Gutierrez, permitting supplemental discovery into the events precipitating this arrangement, and imposing sanctions in the form of attorneys' fees and costs incurred in responding to the misconduct of Plaintiff's counsel. This Court held oral argument on September 16, 2009. For the following reasons, the Court will grant Defendants' motion, but the Court will only grant part of the relief sought by Defendants at this time.

## I. BACKGROUND

This case involves a contract dispute between Plaintiff Rocheux International of New Jersey, Inc. ("Rocheux"), a distributor of raw plastic materials, and Defendants, providers [*2] of plastic product-packaging services, concerning invoices billed in 2006, but the instant dispute concerns Rocheux's retention and subsequent payment of Mr. Gutierrez as an expert witness. Defendants essentially allege that Mr. Gutierrez, a disgruntled former employee of Defendant The Merchant of Tennis Inc., contacted Plaintiff and eventually Plaintiff's counsel Brian McAlindin during the discovery period of this case in 2008, offering allegedly damaging testimony regarding that Defendant's business practices in exchange for a fee, and that Mr. McAlindin arranged for payment of more than $ 4,000 to Mr. Gutierrez for his testimony.

Although Plaintiff's counsel initially identified Mr. Gutierrez as a witness "possess[ing] knowledge regarding SAP Accounting Modules, specifically

those employed by Merchant of Tennis," in an August 26, 2008 letter to defense counsel (Subervi Certif., Ex. B), he subsequently notified defense counsel by letter of October 31, 2008, that "Plaintiff w[ould] rely on Mr. Gutierrez as an expert witness regarding Edwards Software Modules and as a fact witness regarding business records and calculations regarding materials utilized by Merchants of Tennis in their [*3] manufacturing process," (Subervi Certif., Ex. C). That notification, which included Mr. Gutierrez's sworn affidavit, came well after the September 30, 2008 deadline for affirmative expert reports set by Magistrate Judge Esther Salas in the July 24, 2008 Revised Scheduling Order. (Doc. No. 41 P 3.) The Gutierrez Affidavit indicated that Mr. Gutierrez worked for The Merchant of Tennis in or about March 2008 and contained the following allegations: (1) that the Defendant's JD Edwards accounting software worked properly; (2) that Mr. Gutierrez's supervisor there asked him to change data in the software system; and (3) that the Defendant engaged in unethical business practices at the direction of its CEO. (See Subervi Certif., Ex. C, Gutierrez Aff. PP 4-10.)

Upon receipt of the affidavit, defense counsel noticed Mr. Gutierrez for a deposition that would take place on January 16, 2009. In November prior to the deposition, Mr. McAlindin notified Defendants that Mr. Gutierrez would charge a $ 1,500 fee for his deposition testimony. (Subervi Certif., Ex. K.) During the deposition, Mr. Gutierrez revealed that he had been paid more than $ 4,000 [1] by Plaintiff's counsel, but that he understood [*4] the fee to compensate him for his consulting services (specifically, his communications with counsel and time reviewing the affidavit) rather than his expected expert testimony, and he admitted that he submitted no expert reports to Plaintiff's counsel regarding the

operation of the JD Edwards software system. (See Subervi Certif., Ex. E ("Gutierrez Dep.") at 54-59.) Defendants also deposed Plaintiff's Vice President of Operations Robert Stephanoff, who had been Mr. Gutierrez's initial point-of-contact with Rocheux. Mr. Stephanoff disclaimed any knowledge regarding why Mr. Gutierrez first contacted Rocheux, whether he requested payment for his testimony, and whether he was in fact paid by counsel, but noted that he referred Mr. Gutierrez to Mr. McAlindin, whom he thought would know what to do. (See Subervi Certif., Ex. F at 16-21, 44.) When defense counsel probed into conversations between Mr. Stephanoff and Mr. McAlindin regarding whether Mr. Gutierrez qualified as an expert witness that could be paid for his services, Mr. McAlindin instructed Mr. Stephanoff not to answer those questions, ostensibly on grounds of attorney-client privilege. (See id. at 30-32.)

During his deposition, Mr. Gutierrez explained that he had originally contacted Rocheux to inform them that he had information that might be helpful to their lawsuit. (See Gutierrez Dep. at 29:4-12.) He also noted that he first discussed compensation with Mr. McAlindin at the October 24, 2008 meeting where he signed the affidavit (see id. at 25, 56), because prior to that time, it was "up in the air" whether his testimony would be used in the lawsuit (see id. at 53). When asked about the specifics of his allegations about changing data at the request of his supervisor and unethical business practices, Mr. Gutierrez conceded that he did not know whether he was being asked to correct or falsify the data, and he pointed to a handful of instances where customers informed him that his employer had been late on making payments to other vendors. (See id. at 77-80, 85-94.)

On March 27, 2009, Defendants moved to exclude Mr. Gutierrez as an improperly paid fact witness, arguing that Plaintiff's [*6] counsel wrongfully listed Mr. Gutierrez as an expert witness, despite the lay factual basis of his testimony, in order to bypass the legal bar to payment of fact witnesses

---

[1] Plaintiff does not contest [*5] that Mr. Gutierrez was paid more than $ 4,000 for his time working on this case. (See Subervi Certif., Ex. H, Invoice (indicating that Mr. Gutierrez billed Plaintiff's counsel $ 4,275 for his services).)

and obtain testimony damaging to Defendants. In addition to exclusion of the witness, Defendants seek an order: (1) excusing their payment of Mr. Gutierrez's expert witness deposition fee, (2) requiring additional deposition testimony from Plaintiff's representatives and Plaintiff's counsel regarding the retention of Mr. Gutierrez, and (3) imposing appropriate sanctions for the unethical behavior of Plaintiff's counsel.

## II. DISCUSSION

It is well established that courts have "*inherent* authority to impose sanctions upon those who would abuse the judicial process." *Republic of the Philippines v. Westinghouse Elec.,* 43 F.3d 65, 73 (3d Cir. 1994) (emphasis in original) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43-44, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)). These powers are "'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers,* 501 U.S. at 43 (quoting *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630-31, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962)).

The Supreme **[*7]** Court has cautioned, however, that "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers,* 501 U.S. at 44. Towards this end, the Third Circuit has required that district courts make certain findings to "ensure that the sanction is tailored to address the harm identified." *Republic of the Philippines,* 43 F.3d at 74. First, the court must examine the conduct at issue and explain why a sanction is justified. *See id.* Specifically, the court should consider whether the conduct is part of a pattern of wrongdoing, the severity of the infraction, and the level of harm or prejudice to the adversary. *See id.* Second, the court must consider the range of available sanctions and explain why it has chosen the particular sanction. *See id.*

Rule 3.4(b) of the New Jersey Rules of Professional Conduct provides in pertinent part that "[a] lawyer shall not . . . offer an inducement to witness that is prohibited by law[.]" Typically, lawyers may only compensate fact witnesses for: (1) reasonable expenses incurred by a witness to attend the trial, and (2) reasonable compensation for the loss of the witness's time in attending the trial to testify. *In re PMD Enters.,* 215 F. Supp. 2d 519, 529-30 (D.N.J. 2002) **[*8]** (citation omitted). Congress codified this common law principle at 18 U.S.C. § 201, the criminal statute prohibiting bribery of public officials and witnesses. *See* 18 U.S.C. § 201(b)(3), (d) (generally prohibiting payment of witnesses, but permitting payment "by the party upon whose behalf a witness is called . . . , of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding"). Courts have reinforced this rule by deeming non-conforming agreements to compensate fact witnesses unenforceable for lack of consideration and being contrary to public policy. *See In re PMD Enters.,* 215 F. Supp. 2d at 530 (citing *Hamilton v. Gen. Motors Corp.,* 490 F.2d 223, 227-29 (7th Cir. 1973); *Alexander v. Watson,* 128 F.2d 627, 630 (4th Cir. 1942)).

Here, it is clear that Mr. Gutierrez is a fact witness, and that Plaintiff's counsel improperly procured payment for Mr. Gutierrez's factual testimony. During oral argument, when the Court asked Mr. McAlindin to identify the portion of the Gutierrez Affidavit that contained Mr. Gutierrez's anticipated expert testimony, Mr. McAlindin pointed to paragraphs 4 and 5, which **[*9]** contained Mr. Gutierrez's assertions that, while working for The Merchant of Tennis in or about March 2008, he accessed and downloaded information from their JD Edwards Software Accounting Module regarding purchase orders, accounts, and data about thermoformed products and part production, and he observed the software system "to operate as designed without any problems, bugs, or defect." (Subervi Certif., Ex. C, Gutierrez Aff. PP 4, 5.) The Court must reject the position of Plaintiff's counsel.

Not only do the observations about the software

system contained in these paragraphs lack the factual basis and reliable methodology required by Federal Rule of Evidence 702 for expert opinion testimony, *see Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 592-95, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741-42 (3d Cir. 1994), but they are irrelevant, because: (1) they would serve no purpose other than collateral impeachment, because Defendants do not appear to present a defense to the contract claims based upon the functionality of the JD Edwards Software Accounting Module, and (2) these observations concern the operation of the software system more than a year after the events that **[*10]** precipitated this lawsuit. (*See generally* Answer; *see also* Oral Argument Tr. at 31:11-32:4 (representation of defense counsel that Defendants would not interpose a defense based on the software system); Compl. PP 19-22 (alleging that Defendants failed to pay invoices over the course of several months in 2006).) Furthermore, it is quite clear that the allegations of data manipulation and unethical business practices contained in subsequent paragraphs of the Gutierrez Affidavit constitute factual evidence based on lay observation. (*See* Subervi Certif., Ex. C, Gutierrez Aff. PP 6-10.)

Mr. McAlindin has failed to present a cogent explanation for treating Mr. Gutierrez as an expert witness, and the fee paid to Mr. Gutierrez most certainly did not compensate for his costs of attending trial or time lost during trial. Mr. Gutierrez was a fact witness, and his payment by Plaintiff's counsel clearly runs afoul of the longstanding prohibition against payment of fact witnesses. Witnesses brought before a court are duty-bound to tell the truth, and the payment of witnesses for their testimony "leans toward the procurement of perjury; toward the raising up of a class of witnesses who, for a sufficient **[*11]** consideration, will give testimony that shall win or lose the lawsuit, toward the perversion of justice; and toward corruption in our courts." *Hamilton,* 490 F.2d at 228 (quoting *Wright v. Somer's,* 125 Ill. App. 256, 256 (1906)).

Mr. McAlindin's decision to pay Mr. Gutierrez for factual testimony has cast a cloud over the legitimacy of that testimony, and the Court must prevent this suspect evidence from contaminating future proceedings. Federal Rule of Evidence 403 permits this Court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice," and other courts have recognized that the proper sanction for the wrongful payment of fact witnesses is the exclusion of the tainted witnesses. *See, e.g., Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n,* 865 F. Supp. 1516, 1526-27 (S.D. Fla. 1994) (excluding "testimony given in this action by any of the fact witnesses who received monetary compensation from [counsel]"), *rev'd in part on other grounds,* 117 F.3d 1328, 1335 n.2 (11th Cir. 1997) (approving of the district court's exclusion of paid fact witnesses). Because this Court finds such a sanction necessary to **[*12]** protect the integrity of these proceedings, the Court will exclude the testimony of Mr. Gutierrez. The Court will further excuse Defendants from payment of Mr. Gutierrez's expert deposition fee, which Mr. Gutierrez based on his internet research of fees charged by expert witnesses (Subervi Certif., Ex. E at 8:17-25), because such payment would only validate the wrongful payment of a fact witness.

In addition to the exclusion of Mr. Gutierrez and exemption from his expert deposition fee, Defendants seek additional deposition testimony from Mr. Stephanoff and Mr. McAlindin regarding the retention of Mr. Gutierrez, as well as the payment of defense counsel's expenses relating to their investigation and presentation of this matter to the Court. In light of the Court's ruling, there does not appear to be a need to further depose Mr. Stephanoff or to depose Mr. McAlindin at this time. However, the Court will grant Defendants reasonable attorneys' fees and costs incurred as a result of the misconduct underlying the instant motion. Defendants will have 30 days from the entry of the accompanying Order to submit descriptive time entries and supporting

documentation from its billing records relating [*13] to reasonable attorneys' fees and costs arising from this motion and the precipitating misconduct.

At this time, Defendants do not seek the more severe sanction of disqualifying Mr. McAlindin, and this Court is satisfied for the time being that exclusion of the witness, exemption from the expert deposition fee, and monetary compensation for the expense incurred by Defendants in bringing and prosecuting this motion will properly address this infraction. The Court will reserve judgment on the need for additional sanctions or disciplinary action pending further application.

## III. CONCLUSION

For the aforementioned reasons, the Court will grant Defendants' motion and exclude Mr. Gutierrez as an improperly paid fact witness. Accordingly, the Court will excuse Defendants from paying the expert deposition fee sought by Mr. Gutierrez. Defendants will have 30 days to submit for the Court's *in camera* review descriptive time entries from its billing records and other documentation relating to reasonable attorneys' fees and costs incurred in investigating this misconduct and prosecuting this motion. The Court will reserve judgment on the propriety of additional sanctions for the misconduct of Plaintiff's [*14] counsel pending further application. An appropriate order form accompanies this Memorandum Opinion.

Dated: October 5, 2009

/s/ Garrett E. Brown, Jr.

GARRETT E. BROWN, JR., U.S.D.J.

# Ward v. Nierlich

United States District Court for the Southern District of Florida

September 18, 2006, Submitted; September 20, 2006, Filed

CASE NO. 99-14227-CIV-PAINE

**Reporter**
2006 U.S. Dist. LEXIS 97373; 2006 WL 5412626

DAVID A. WARD, RESERVE MANAGEMENT, INC., MMC OF THE TREASURE COAST, INC., RESERVE REALTY SALES, INC., RESERVE BUILDERS, INC., and ML BUILDERS, INC., Plaintiffs, vs. JOHN K. NIERLICH, RICHARD A. PUZZITIELLO, SR., CAROL CHANDLER, RESERVE DEVELOPERS, L.L.P., PARK GROUP EAST, INC., PARK SOUTHERN BUILDERS OF PINELLAS, INC., THE PARK GROUP COMPANIES OF AMERICA, INC., and BANYON LAKES C. CORP., as successor by merger to Bridlewood Development Corp., Defendants.

**Subsequent History:** Motion denied by Ward v. Nierlich, 2008 U.S. Dist. LEXIS 13493 (S.D. Fla., Feb. 22, 2008)

**Counsel:** [*1] For David A. Ward, Plaintiff: Gladys C. LaForge, LEAD ATTORNEY, Goshen, NY; Guy Bennett Rubin, LEAD ATTORNEY, Stuart Mitchell Address, LEAD ATTORNEY, Rubin & Rubin, Stuart, FL; Karen D. Walker, LEAD ATTORNEY, Holland & Knight, Tallahassee, FL; Martin John Alexander, LEAD ATTORNEY, Holland & Knight, West Palm Beach, FL.

For Reserve Management, Inc., MMC of the Treasure Coast, Inc., Reserve Realty Sales, Inc., Reserve Builders, Inc., ML Builders, Inc., Plaintiffs: Guy Bennett Rubin, LEAD ATTORNEY, Stuart Mitchell Address, LEAD ATTORNEY, Rubin & Rubin, Stuart, FL; Karen D. Walker, LEAD ATTORNEY, Holland & Knight, Tallahassee, FL; Martin John Alexander, LEAD

ATTORNEY, Holland & Knight, West Palm Beach, FL.

For John K. Nierlich, Richard A. Puzzitiello, Sr., Reserve Developers, L.L.P., Park Group East, Inc., Park Southern Builders of Pinellas, Inc., The Park Group Companies of America, Inc., Banyon Lakes C. Corp., successor by merger to Bridlewood Development Corporation, Defendants: Charles Edward Cartwright, LEAD ATTORNEY, Schwed McGinley & Kahle, Palm Beach Gardens, FL; David Knight, LEAD ATTORNEY, Hubert S. McGinley, LEAD ATTORNEY, Kubicki Draper, United National Bank Building, West Palm [*2] Beach, FL; Eric Rowland Hoecker, LEAD ATTORNEY; John Michael Kops, LEAD ATTORNEY, John Michael Kops, Jesen Beach, FL; Michael John McHale, LEAD ATTORNEY, Michael John McHale, Jensen Beach, FL; Maria Kayanan, Kubicki Draper, Miami, FL.

For Carol Chandler, Defendant: Charles Edward Cartwright, LEAD ATTORNEY, Schwed McGinley & Kahle, Palm Beach Gardens, FL; David Knight, LEAD ATTORNEY, Kubicki Draper, United National Bank Building, West Palm Beach, FL; Jerome Wayne Hoffman, LEAD ATTORNEY, Holland & Knight, Tallahassee, FL; John Michael Kops, LEAD ATTORNEY, John Michael Kops, Jesen Beach, FL; Michael John McHale, LEAD ATTORNEY, Michael John McHale, Jensen Beach, FL.

For All Defendants, Defendant: Charles Edward Cartwright, LEAD ATTORNEY, Schwed McGinley & Kahle, Palm Beach Gardens, FL; David Knight, LEAD ATTORNEY, Kubicki

Draper, West Palm Beach, FL; Eric Rowland Hoecker, LEAD ATTORNEY; Maria Kayanan, Kubicki Draper, Miami, FL.

For KUBICKI DRAPER, Defendant: James Kellogg Green, LEAD ATTORNEY, James K. Green, West Palm Beach, FL.

For John K. Nierlich, Richard A. Puzzitiello, Sr., Reserve Developers, L.L.P., Park Group East, Inc., Park Southern Builders of Pinellas, Inc., The Park Group Companies [*3] of America, Inc., Counter Claimants: Charles Edward Cartwright, LEAD ATTORNEY, Schwed McGinley & Kahle, Palm Beach Gardens, FL; David Knight, LEAD ATTORNEY, Hubert S. McGinley, LEAD ATTORNEY, Kubicki Draper, United National Bank Building, West Palm Beach, FL; Eric Rowland Hoecker, LEAD ATTORNEY; John Michael Kops, LEAD ATTORNEY, John Michael Kops, Jesen Beach, FL; Lloyd R. Schwed, LEAD ATTORNEY, Schwed McGinley & Kahle LLC, Palm Beach Gardens, FL; Michael John McHale, LEAD ATTORNEY, Michael John McHale, Jensen Beach, FL.

For Banyon Lakes C. Corp., Counter Claimant: Charles Edward Cartwright, LEAD ATTORNEY, Schwed McGinley & Kahle, Palm Beach Gardens, FL; David Knight, LEAD ATTORNEY, Hubert S. McGinley, LEAD ATTORNEY, Kubicki Draper, United National Bank Building, West Palm Beach, FL; Eric Rowland Hoecker, LEAD ATTORNEY; John Michael Kops, LEAD ATTORNEY, John Michael Kops, Jesen Beach, FL; Michael John McHale, LEAD ATTORNEY, Michael John McHale, Jensen Beach, FL.

For David A. Ward, Counter Defendant: Guy Bennett Rubin, LEAD ATTORNEY, Stuart Mitchell Address, LEAD ATTORNEY, Rubin & Rubin, Stuart, FL; Karen D. Walker, LEAD ATTORNEY, Holland & Knight, Tallahassee, FL; Martin John Alexander, [*4] LEAD ATTORNEY, Holland & Knight, West Palm Beach, FL.

**Judges:** LINNEA R. JOHNSON, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** LINNEA R. JOHNSON

# Opinion

## REPORT AND RECOMMENDATION

**THIS CAUSE** is before the Court on Lead Defendants' Motion for Order to Show Cause Why Plaintiffs' Pleadings Should Not be Stricken and to Disqualify Plaintiffs' Counsel and Award Defendants Attorney's Fees (D.E. # 411). This matter was referred to the undersigned United States Magistrate Judge by the Honorable James C. Paine, United States District Judge, for Report and Recommendation. A hearing on this motion took place before the undersigned on September 5, 2006. For the following reasons the undersigned respectfully recommends Defendants' Motion be granted in part and denied in part as more fully set forth herein.

## BACKGROUND

The instant action filed in 1999 involves a suit by Plaintiffs, David Ward ("Ward"), and companies owned and/or controlled by him including ML Builders, Inc. (collectively "Plaintiffs") against Defendants, John K. Nierlich ("Nierlich") and Richard A. Puzzitiello ("Puzzitiello") [*5] and companies owned and/or controlled by them (collectively "Defendants") for Federal RICO and related state law claims. The instant motion filed by Defendants seeks sanctions against Plaintiffs and their attorneys for allegedly corrupting the judicial process and committing a fraud on this Court by paying witnesses, who are judgment creditors of ML Builders, a lump sum $ 5,000 payment [1] and a promised stake in the outcome of this RICO litigation in exchange for the witnesses' release of

---

[1] The subject $ 5,000 payment was paid from the trust account of Guy Bennet Rubin, counsel for plaintiffs. See Check attached as Exhibit "B" to Lead Defendants' Motion (D.E. # 411)

ML Builders and a promise by the witnesses to "provide testimonial cooperation by providing truthful information in connection with claims by the Defendants in their Federal RICO lawsuit against Nierlick (sic), Puzzitiello, Reserve Developers LLP and others." [2]

The relevant facts are as follows. On or about July 17, 1997 Richard and Marilyn DeBeradini sued ML Builders, Inc., Edgehill, Inc., David Ward, individually, Matthew [*6] Ward, individually, and Lynne Chappel, individually, for breach of contract, failure to disclose, fraud and misrepresentation, conversion, equitable lien, and intentional interference with contractual relations. [3] The DeBeradinis alleged that they had entered into a contract with ML Builders to purchase a fully constructed home on a certain lot for the total sum of $ 142,686.30. According to the DeBeradinis they had paid the purchase price of the home in question in full by March 1997, and discovered later that ML Builders did not, contrary to claims made by ML Builder Representatives, own the lot in question.

Thereafter, on or about December 27, 1999, after the filing of the instant RICO action, ML Builders agreed to the entry of a stipulated judgment in favor of the DeBeradinis for $ 211,686.30 on one count of their Complaint, on the condition that the DeBeradinis "dismiss with prejudice all allegations against ML Builders, Inc., regarding fraud or misrepresentation." [4] The Stipulated Final Judgment was entered by the Circuit Court of the Nineteenth Judicial Circuit on February 8, [*7] 2000. [5]

Under the terms of the Stipulated Final Judgment the DeBeradinis received a lump sum payment of $

5,000.00 to be paid upon "execution of this settlement agreement by the Plaintiffs [the DeBeradinis] **and** the first meeting at which [the DeBeradinis] provide testimonial cooperation by providing truthful information in connection with claims by the Defendants in their Federal RICO lawsuit against Nierlick (sic), Puzzitiello, Reserve Developers LLP and others." (emphasis in original). The Stipulated Final Judgment also contained a contingent portion. Thus, in addition to the lump sum payment, the DeBeradinis were promised a stake in the underlying RICO litigation between the Plaintiffs herein and the Lead Defendants in this case. In this respect the Settlement Agreement provides, in relevant part, as follows:

> 6. If Plaintiffs fulfill their obligation to cooperate with The Defendants by providing truthful information and testimony, The Plaintiffs will be entitled to up to the full amount of their judgment [*8] against ML BUILDERS INC. from any jury award in favor of the Plaintiffs in the RICO action for compensatory damages directly related to The Plaintiffs' judgment against ML BUILDERS, INC. The amount paid to the Plaintiffs would be reduced by attorneys fees and expenses proportionately related to recovery of that amount….

> * * *

> 7. The cooperation required by this agreement, includes a first meeting of up to five (5) hours initially, wherein the Plaintiffs [the DeBeradinis] shall provide information regarding their observation of, and involvement with, Nierlick (sic), Puzzitiello and Reserve Developers LLP and other related persons and entities, during their lifetimes, without limitation, and to sign written statements based upon the information disclosed at this meeting by the Plaintiffs [DeBeradinis], if requested to do so by counsel for the Defendants [the Plaintiffs herein]. This meeting will take place

---

[2] P 1 of Settlement Agreement and Release, attached as Exhibit "A" to Lead Defendants' Motion (D.E. # 411).

[3] Complaint in Case No. 97-1048-CA-03, attached as Exhibit "C" to Lead Defendants' Motion (D.E. # 411).

[4] P3 of Settlement Agreement and Release, attached as Exhibit "A" to Lead Defendants' Motion (D.E. # 411).

[5] Final Judgment, attached as Exhibit "D" to Lead Defendants' Motion (D.E. # 411).

in Martin County at the office of counsel for the Defendants [the Plaintiffs herein]. This meeting shall be considered part of settlement discussions and therefore privileged. The fact that the meeting occurred, and the discussions therein, shall remain strictly confidential unless compelled **[*9]** by court order. Subsequent requests for cooperation may be made as the Federal RICO case proceeds towards trial and is mandatory under this agreement and may include attendance at depositions, court hearings, or other proceedings, and/or providing sworn statements in the form of affidavits. In any event, request for cooperation meetings shall be made on a reasonable basis with appropriate advance notice.

PP 6-7 of Settlement Agreement and Release, attached as Exhibit "A" to Lead Defendants' Motion (D.E. # 411).

## LEGAL ANALYSIS

By the instant motion Defendants seek sanctions against Plaintiffs and their counsel for allegedly corrupting the judicial process and committing a fraud on this Court by paying defense witnesses for their testimony. [6] As sanctions Defendants request

that Plaintiffs' pleadings be stricken and this action be dismissed or, alternatively, that Plaintiffs' counsel, the law firm of Rubin & Rubin, be disqualified. Additionally, Defendants ask that they be awarded attorney's fees for the seven plus years of defending this suit.

Defendants seek sanctions based on this Court's inherent authority as reaffirmed by the Supreme Court in the leading case of Chambers v. NASCO, 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). It is beyond cavil that federal courts have the inherent authority to protect the integrity of the judicial process and to sanction Plaintiffs and their counsel for the abuse of that process. Id. at 43-45. This inherent power vests in the court independent of Rule 11, Federal Rules of Civil Procedure, and 28 U.S.C. §§ 1927 and 1928. Id. at 46-47. Under its inherent power a federal court may "dismiss an action for misconduct that abuses the judicial process and threatens the integrity of that process." Vargas v. Peltz, 901 F.Supp. 1572, 1579 (S.D. Fla. 1995). Courts may also assess attorneys fees as a sanction. Chambers, 501 U.S. at 45. "Because of their very potency, federal courts' inherent powers must be exercised with great restraint and discretion." Id. at 44. **[*12]** In exercising this discretion a court should be mindful of its obligation "to fashion an appropriate sanction for conduct which abuses the judicial process." Id. at 44-45. Thus, outright dismissal of a case, which is the severest sanction possible, should be resorted to only when the district court specifically finds that lesser sanctions will not suffice. Betty K. Agencies, Ltd. v. M/V Monada, 432 F.3d 1333, 1337-38 (11th Cir. 2005)(noting that "a dismissal *with prejudice,* whether on motion or *sua sponte,* is an extreme sanction that may be properly imposed *only* when: '(1) a party engages in a clear pattern of delay or willful contempt (contumacious conduct); and (2) the district court specifically finds that lesser sanctions would not suffice.'")(emphasis in original).

---

[6] Defendants' also seek sanctions against Plaintiffs and their counsel for what they claim was an intentional concealment of the agreement in question **[*10]** and alleged violation of Plaintiffs' discovery obligations. Specifically, Defendants argue that Plaintiffs and their counsel attempted to conceal the Settlement Agreement and Release by incorporating therein a confidentiality clause, and further claim that Plaintiffs and their counsel violated their discovery obligations by failing to disclose the existence of the agreement in response to Defendants October 11, 2004 Interrogatory Request, which asked whether Reserve Management, Inc. had "assigned any of the claims contained in this lawsuit to any person or entity," and November 17, 2004 Production Request, in which Plaintiffs were asked to produce "all agreements assigning any claims in the present lawsuit by any to or from any entity." See Exhibits "E" and "G" attached to Lead Defendants' Motion (D.E. # 411). Both arguments are rejected. First, the fact the release contains a confidentiality agreement is not in any way unusual and certainly does not amount to an attempt at concealment necessitating sanctions. Second, the discovery requests in question ask for "assigned claims." The Settlement Agreement and Release does not assign any claim to the DeBeradinis, but instead provides **[*11]** a mechanism for recovery of the DeBeradini's judgment against ML Builders. As there is no aspect to the

agreement which assigns a claim, the agreement itself was not fairly encompassed within the subject discovery requests and sanctions on this basis are not warranted.

The first issue is whether sanctions in this case are warranted as a result of Plaintiffs' agreement to pay defense witnesses for their testimony. Inasmuch as the Court finds that Plaintiffs and their counsel have in fact corrupted the judicial process and committed a fraud on this Court by paying defense witnesses for their testimony, this question must be answered in the affirmative. It is undisputed that Plaintiffs **[*13]** and defense witnesses, the DeBeradinis, entered into a written agreement whereby the DeBeradinis received a lump sum payment in return for their anticipated testimony in this case and were promised a substantial stake in this litigation based on a favorable judgment or settlement for Plaintiffs. This agreement is in violation of Rule 4-3.4(b) of the Rules of Professional Conduct, as adopted in Florida, as well as the case of <u>The Florida Bar v. Jackson,</u> 490 So.2d 935 (Fla. 1986).

Rule 4-3.4(b) of the Rules of Professional Conduct, governing members of the Florida Bar provides, in relevant part, as follows:

A lawyer shall not:

* * *

**(b)** fabricate evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness, except a lawyer may pay a witness reasonable expenses incurred by the witness in attending or testifying at proceedings; a reasonable, noncontingent fee for professional services of an expert witness; and reasonable compensation to reimburse a witness for the loss of compensation incurred by reason of preparing for, attending, or testifying at proceedings

The prohibition applies with equal force to payment for *truthful* testimony as to payment for false **[*14]** testimony. <u>Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n,</u> 865 F.Supp. 1516, 1525 (S.D. Fla. 1994)(noting that "'The payment of a sum of money to a witness to 'tell the truth' is as clearly subversive of the proper

administration of justice as to pay him to testify as to what is not true.'") (quoting <u>In re Robinson,</u> 151 A.D. 589, 600,136 N.Y.S. 548, 555 (1912), <u>aff'd,</u> 209 N.Y. 354,103 N.E. 160 (1913)). Moreover, the fact that Plaintiffs provided the lump sum payment and under the terms of the agreement will be the ones responsible for any recovery that may come out of the litigation, rather than their counsel, does not defeat the application of Rule 4-3.4(b). <u>Golden Door,</u> 865 F.Supp. at 1525.

In <u>Golden Door,</u> Lloyds of London had paid substantial sums of money to multiple witnesses to testify truthfully in a civil action to recover insurance proceeds. The district court held that Lloyds' payment of money to their witnesses to provide truthful testimony "with the active assistance of its counsel . . . was egregious and constituted willful and repetitive violations of Rule 4-3.4(b) of the Rules of Professional Conduct." 865 F.Supp. at 1524. The court sanctioned **[*15]** Lloyds by excluding "all evidence tainted by the ethical violations," <u>Id.</u> at 1526, but declined to strike the pleadings and dismiss the case as requested by the defendants therein. <u>Id.</u> In so ruling, the court relied on Rule 4-3.4(b) and <u>The Florida Bar v. Jackson,</u> 490 So.2d 935 (Fla. 1986), noting that both "clearly prohibit a lawyer from paying or offering to pay money or other rewards to witnesses in return for their testimony, be it truthful or not, because it violates the integrity of the justice system and undermines the proper administration of justice. Quite simply, a witness has the solemn and fundamental duty to tell the truth. He or she should not be paid a fee for doing so." <u>Golden Door,</u> 865 F.Supp. at 1526.

It is clear from the foregoing that Plaintiffs and their counsel violated Rule 4-3.4(b) of the Rules of Professional Conduct by making a lump sum payment to the DeBeradinis in return for their anticipated testimony in this case and by promising the DeBeradini's a stake in this litigation based on a favorable judgment or settlement for Plaintiffs. At oral argument on this matter Plaintiffs' counsel attempted to make a distinction between the instant

case and Golden Door **[*16]** by arguing that unlike in Golden Door, where the money was paid incident to an investigation, in this case the payment of money to witnesses was made incident to a settlement agreement. This is a distinction without a difference. Plaintiffs have cited no authority to support their novel argument and independent research by the undersigned has uncovered none. What's more, whether the money is paid incident to a settlement agreement, or simply to assure witness cooperation, the effect is the same: the witness has an incentive to testify favorably for the party paying him. This is especially true in this case, where there is additional money down the road for these witnesses should Plaintiffs obtain success in their suit against the Defendants. Even Plaintiffs' attorney acknowledged at the hearing before the undersigned that the DeBeradinis have an incentive to testify in a way beneficial to the Plaintiffs by virtue of the contingent nature of the agreement.

As the Florida Supreme Court so eloquently stated:

> The very heart of the judicial system lies in the integrity of the participants . . . Justice must not be bought or sold. Attorneys have a solemn responsibility to assure that not even **[*17]** the taint of impropriety exists as to the procurement of testimony before courts of justice. It is clear that the actions of the respondent in attempting to obtain compensation for the testimony of his clients . . . violates the very essence of the integrity of the judicial system and the disciplinary rule and code of professional responsibility, the integration of the Florida Bar and the oath of his office.

The Florida Bar v. Jackson, 490 So.2d at 936. There can be no doubt that Plaintiffs' lump sum payment to defense witnesses for their testimony and the promise of a financial stake in the outcome of this litigation violated the integrity of the judicial system and Rule 4-3.4(b) of the Rules of Professional Conduct. Accordingly, sanctions in

this case are warranted: the question is, what sanctions should be imposed?

The Court agrees with Plaintiffs that the actions undertaken in this case by Plaintiffs and their counsel are even more egregious than those in Golden Door in that unlike Lloyds, Plaintiffs and their counsel did not simply pay their own witnesses, but paid critical witnesses for the defense. It does not follow from this, however, that the most draconian sanction available **[*18]** in the Court's arsenal, that of striking the pleadings and dismissing the case, is warranted. Outright dismissal of a case as a sanction should be resorted to only when the district court specifically finds that lesser sanctions will not suffice. Betty K. Agencies, Ltd., 432 F.3d at 1337-38.

Having given careful consideration to the arguments and demonstrative exhibits presented at the hearing, the pleadings filed in this case, the history of these proceedings, and all relevant case law and applicable rules, the Court finds the severe sanction of dismissal to be out of proportion to the conduct complained of and the prejudice suffered, and that lesser sanctions will instead suffice. The prejudice in this case is not as great as Defendants make out. While the DeBeradinis were listed by the defense as witnesses, there are many other witnesses listed by the defense who have the same or substantially same information as that possessed by the DeBeradinis. There are after all numerous other homeowners who unfortunately fell into the same circumstance as the DeBeradinis. And while Defendants make much of the fact that Mr. DeBeradini is in a unique position because of his brief employment with **[*19]** David Ward and ML Builders, the fact remains his employment was limited in duration to a mere three months. Furthermore, Mr. DeBeradini's deposition testimony makes clear that most of what he "knew" about financial difficulties of David Ward and ML Builders was hearsay coming from others, minimizing the weight and materiality of his potential testimony, see generally Mr. DeBeradini Deposition, attached as Exhibit "20" to Proffer

Binder submitted at September 5, 2006 hearing. For example, ML Builder's inability to complete a pool (Id. at p. 222); inability to complete retention pond (Id. at 83-84); and cabinet maker comments (Id. at p.68), all of which occurred in early 1997, and all of which was gleaned from information obtained from others, not personal knowledge. Finally, it became clear at the hearing on this matter, and a review of the time line demonstrative exhibit proffered, that most if not all of the taint created by the witness payment can be removed by showing the jury, through early press release statements and the like, the discrepancy between the DeBeradini's negative statements and attitude towards Ward prior to execution of the settlement agreement, and more positive **[*20]** statements and attitude towards Ward after payment had been received and a stake in the outcome of the litigation assured.

In Golden Door the court sanctioned Lloyds by excluding all evidence tainted by the ethical violations. 865 F.Supp. at 1526. The effect in that case was to disallow testimony and information favorable to Lloyds, the Plaintiff in the case. In this case, the taint can not be cured as easily. Defendants' counsel made clear at the hearing before the Court that should the undersigned reject their request for dismissal, Defendants would ask that the DeBeradinis' testimony not be stricken and that Defendants be allowed wide latitude in their cross-examination of the DeBeradinis at trial. The Court recognizes that Defendants' desire in this regard is not binding and that the task of maintaining the integrity of the judicial process is solely and exclusively a judicial function. Based on careful consideration, however, the Court agrees that Defendants' desire in this regard is the best course under the circumstances, and additionally recommends that should it become necessary, the District Court consider either calling the DeBeradinis as witnesses under F.R.E. 614 or permitting **[*21]** Defendants to call the DeBeradinis as hostile witnesses under F.R.E. 611. In any event wide latitude should be granted Defendants in dealing with these witnesses both during the pre-trial phase of this case and at trial.

As additional sanctions the undersigned recommends that Plaintiffs' counsel, the law firm of Rubin & Rubin, be disqualified from the case. This was the sanction imposed in the case of Wagner v. Lehman Brothers Kuhn Loeb, Inc., 646 F.Supp. 643, 656 (N.D. Ill. 1986), and is likewise apt here. In Wagner, as in this case, Plaintiffs' counsel knew that their client had promised witnesses a stake in the litigation in return for their testimony. Id. at 656. The district court held that even though the client and attorney claimed they never intended to make good on their promise to pay, "the effect on the potential witness is the same: he is influenced by the promise of potential payment to give testimony he otherwise might not have given." Id. As sanctions, the court disqualified counsel, ruling that "'[w]e will not tolerate payments of any sum of money by an attorney to witnesses for the opposition to secure or influence testimony, whether it be for the purpose of securing **[*22]** truthful testimony or otherwise.'" Id. (quoting In re Kien, 69 Ill. 2d 355, 372 N.E.2d 376, 379, 14 Ill. Dec. 365 (Ill. 1977)).

In recommending disqualification the undersigned recognizes the court's obligation to "be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely chosen counsel." Woods v. Covington County Bank, 537 F.2d 804, 810 (5th Cir. 1976). Disqualification of one's chosen counsel is a drastic remedy that should be resorted to sparingly and only when absolutely necessary. Concerned Parents of Jordan Park v. The Housing Authority of the City of St. Petersburg, Florida, 934 F.Supp. 406, 408 (M.D. Fla. 1996). Courts view such motions with extreme caution, recognizing that "depriving a party of the right to be represented by the attorney of his or her choice is a penalty that must not be imposed without careful consideration." F.D.I.C. v. U.S. Fire Ins. Co., 50 F.3d 1304, 1313 (5th Cir. 1995). See also Contant v. Kawasaki Motors Corp., 826 F. Supp. 427, 428 (M.D. Fla. 1993) (recognizing that the right to counsel of one's

choice is an important **[*23]** element of our judicial system and the denial of that right an extremely serious matter not to be taken lightly); Mallard v. M/V "Germundo", 530 F.Supp. 725, 727-728 (S.D. Fla. 1982)(same), aff'd., 746 F.2d 813 (11th Cir. 1984). Nonetheless when disqualification is warranted courts should not shrink from their duty to order a party's attorney disqualified. Thus, while the moving party bears the burden of establishing grounds for disqualification, in determining whether disqualification is warranted, all doubts must be resolved in favor of disqualification. Contant, 826 F.Supp. at 429. The district court has responsibility for controlling the conduct of attorneys appearing before it and, as such, has broad discretion in determining motions for disqualification. Rentclub, Inc. v. Transamerica Rental Finance Corp., 811 F.Supp. 651, 654 (M.D. Fla. 1992), aff'd, 43 F.3d 1439 (11th Cir. 1995). Hence, determination by the District Court on the issue of disqualification will not be reversed absent abuse of discretion. Id.

In the instant case disqualification is warranted and outweighs any interest Plaintiffs had in retaining counsel of their own choosing. By paying defense witnesses for their **[*24]** testimony Plaintiffs and their counsel violated Rule 4-3.4(b) of the Rules of Professional Conduct, and in so doing corrupted the judicial process and committed a fraud on this Court. Once Plaintiffs became aware of and indeed assisted with the financial arrangement between themselves and the DeBeradinis, any interest Plaintiffs had in retaining the law firm of Rubin and Rubin dissipated. Accordingly, if Plaintiffs are deprived of counsel of their own choice, it is their own fault for engaging in a scheme to purchase the testimony of witnesses. See Wagner, 646 F.Supp. at 660 (disqualifying counsel where client with counsel's assistance paid for witnesses testimony and noting, "[a]ny interest Wagner had in retaining Gomberg, however, was rendered nonexistent at the outset when Wagner became aware of and indeed helped orchestrate the financial arrangement with Travis. Gomberg thereafter became involved in the scheme. If Wagner is deprived of counsel of his

own choice, it is his own fault for engaging in a scheme to purchase the testimony of a witness whom he later turned upon and sued as a defendant. If ever a case reeked of "the appearance of impropriety," this is the case."). Here, **[*25]** the integrity of the judicial system has been compromised and it can only be cured with counsel's disqualification.

Defendants have also asked that as additional sanctions the court award them attorney's fees for the seven plus years of defending this suit. While the undersigned finds such sanction disproportionate to the conduct complained of, she does believe Defendants should be awarded attorney's fees incurred incident to the filing of the motion. Specifically, the undersigned recommends that Plaintiffs' counsel be ordered to pay to Defendants as sanctions, all attorney's fees incurred incident to the filing the motion, the reply, and appearance at the hearing on this matter. In this regard counsel for Plaintiffs and Defendants are ordered to immediately confer in an attempt to resolve the issue of amount. If, within fifteen (15) days from the date hereof, Plaintiffs and Defendants are unable to resolve the issue of amount by agreement, Defendants are ordered to file within ten (10) days from the date hereof an affidavit of attorney's fees identifying in detail the hours spent incident to the filing of the motion. Plaintiffs shall thereafter have ten (10) days within which to file **[*26]** a response to the affidavit, specifically detailing therein the areas taken issue with. Defendants shall thereafter have five (5) days in which to file a reply.

In accordance with the above and foregoing it is hereby,

**RECOMMENDED** that Lead Defendants' Motion for Order to Show Cause Why Plaintiffs' Pleadings Should Not be Stricken and to Disqualify Plaintiffs' Counsel and Award Defendants Attorney's Fees (D.E. # 411) be **GRANTED IN PART AND DENIED IN PART** in accordance with the terms hereof. Specifically, the undersigned recommends

as follows:

(1) that Plaintiffs' pleadings not be stricken and this case not be dismissed;

(2) that in accordance with Defendants' request, the DeBeradinis' testimony not be stricken, but instead Defendants be allowed wide latitude in their cross-examination of the DeBeradinis at trial. It is further recommended that should it become necessary, the District Court consider either calling the DeBeradinis as witnesses under F.R.E. 614 or permitting Defendants to call the DeBeradinis as hostile witnesses under F.R.E. 611. **[\*27]** In any event wide latitude should be granted Defendants in dealing with these witnesses both during the pre-trial phase of this case and at trial;

(3) that as a sanction, Plaintiffs' counsel, the law firm of Rubin & Rubin, be disqualified from this case;

(4) that as an additional sanction, the law firm of Rubin & Rubin, be made to reimburse Defendants their attorney's fees incurred incident to the filing of the instant motion, as more specifically detailed herein.

The parties have ten (10) days from the date of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable James C. Paine, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958, 109 S. Ct. 397, 102 L. Ed. 2d 386 (1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

**RESPECTFULLY SUBMITTED,** this 18th day of September, 2006, in Chambers at Ft. Pierce, Florida.

/s/ Linnea R. Johnson

LINNEA R. JOHNSON

UNITED STATES MAGISTRATE JUDGE

TO: THE HONORABLE DANIEL T. K. HURLEY

UNITED STATES DISTRICT JUDGE

RE: UNITED STATES OF AMERICA v. **[\*28]** DEREK DIXON

CASE NO. 05-80107 CR-HURLEY

THIS CAUSE set for Pre-Trial Status Conference on September 18, 2006.

The parties report as follows

_ There are no pending motions for pre-trial determination

X The following motions are pending before the assigned Magistrate Judge:

.  Motion to Dismiss /Supp Re: illegal interception

. various other motions to be filed

_ The following motions are pending and appropriate for resolution by the District Court at time of trial:

X There are no discovery problems. (US Atty providing discovery as required)

_ The case is likely to settle by plea.

X The case is ready for trial and not likely to settle by plea. Expect to be ready for trial Jan. 07

_ The parties estimate trial will take no less than 4 weeks (and probably more) days to complete.

_ Other comments:

Respectfully submitted,

2006 U.S. Dist. LEXIS 97373, *28

/s/ Linnea R. Johnson                      UNITED STATES MAGISTRATE JUDGE

LINNEA R. JOHNSON

**End of Document**

# United States v. Cinergy Corp.

United States District Court for the Southern District of Indiana, Indianapolis Division

December 18, 2008, Decided; December 18, 2008, Filed

1:99-cv-1693-LJM-JMS

**Reporter**
2008 U.S. Dist. LEXIS 123516; 2008 WL 7679914

UNITED STATES OF AMERICA, Plaintiff, STATE OF NEW YORK, STATE OF NEW JERSEY, STATE OF CONNECTICUT, HOOSIER ENVIRONMENTAL COUNCIL, and OHIO ENVIRONMENTAL COUNCIL, Plaintiff-Intervenors, vs. CINERGY CORP., PSI ENERGY, INC., and THE CINCINNATI GAS & ELECTRIC COMPANY, Defendants.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part United States v. Cinergy Corp., 2008 U.S. Dist. LEXIS 104928 (S.D. Ind., Dec. 30, 2008)

**Prior History:** United States v. Cinergy Corp., 582 F. Supp. 2d 1055, 2008 U.S. Dist. LEXIS 81493 (S.D. Ind., 2008)

**Counsel:** [*1] For UNITED STATES OF AMERICA, Plaintiff: Crissy Lyn Pellegrin, ENVIRONMENTAL PROTECTION AGENCY, Chicago, IL; Cynthia Marie Ferguson, US DEPARTMENT OF JUSTICE - ENVIRONMENT & NATURAL RESOURCES, Washington, DC; Gaylene Vasaturo, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Chicago, IL; James A. Lofton, Jeffrey K. Sands, Jennifer Anne Lukas-Jackson, Katherine Lynn Vanderhook, Myles E. Flint, II, Richard Mark Gladstein, U.S. DEPARTMENT OF JUSTICE, Washington, DC; Jason A. Dunn, Justin Aaron Savage, UNITED STATES DEPARTMENT OF JUSTICE, Environment & Natural Resources Division, Washington, DC; Jill Z. Julian, Thomas E. Kieper, UNITED STATES ATTORNEY'S OFFICE, Indianapolis, IN; Larry Martin Corcoran, ENVIRONMENTAL AND NATURAL RESOURCES DIVISION, UNITED STATES DEPT OF JUSTICE, Washington, DC; Loren A. Remsberg, U.S. DEPARTMENT OF JUSTICE/ENRD/EES, Washington, DC; Phillip Brooks, Thomas Andrew Benson, US DEPARTMENT OF JUSTICE, Environmental Enforcement, Washington, DC; Steven David Ellis, ENVIRONMENTAL & NATURAL RESOURCES, Division U S Dept of Justice, Washington, DC.

For CINERGY CORPORATION, PSI ENERGY, INC., CINCINNATI GAS & ELECTRIC CO, Defendants: Dean M. Moesser, PRO HAC VICE, DUKE ENERGY [*2] CORPORATION, Houston, TX; Frank R. Volpe, Meghan Delaney Berroya, Roger Martella, Ryan C. Morris, Samuel B. Boxerman, Thomas Echikson, Thomas Charles Green, PRO HAC VICE, Mark D. Hopson, SIDLEY AUSTIN LLP, Washington, DC; James A. King, PRO HAC VICE, PORTER WRIGHT MORRIS & ARTHUR LLP, Columbus, OH; Jayna Morse Cacioppo, John D. Papageorge, Robert R. Clark, Scott R. Alexander, TAFT STETTINIUS & HOLLISTER LLP, Indianapolis, IN; Julie L. Ezell, DUKE ENERGY LEGAL DEPARTMENT, Plainfield, IN.

For STATE OF NEW YORK, Intervenor Plaintiff: Eugene J. Kelly, Jr., PRO HAC VICE, NEW YORK STATE ATTORNEY GENERAL, Albany, NY; J. Jared Snyder, PRO HAC VICE, OFFICE OF THE ATTORNEY GENERAL, Albany, NY; Joseph M. Kowalczyk, PRO HAC VICE, NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL, New York, NY; Michael Joseph Myers, PRO HAC VICE, NEW YORK STATE

DEPARTMENT OF LAW, Environmental Protection Bureau, Albany, NY; R. Keith Guthrie, ATTORNEY AT LAW, Elizabethtown, IN; Robert T. Rosenthal, PRO HAC VICE, NEW YORK ATTORNEY GENERAL'S OFFICE, Albany, NY.

For STATE OF CONNECTICUT, Intervenor Plaintiff: Kimberly P. Massicotte, Scott N. Koschwitz, PRO HAC VICE, OFFICE OF THE ATTORNEY GENERAL, Hartford, CT; R. Keith **[\*3]** Guthrie, ATTORNEY AT LAW, Elizabethtown, IN.

For STATE OF NEW JERSEY, Intervenor Plaintiff: Jon C. Martin, STATE OF NEW JERSEY, Trenton, NJ; Jung W. Kim, PRO HAC VICE, NEW JERSEY OFFICE OF THE ATTORNEY GENERAL, Trenton, NJ; Kevin P. Auerbacher, PRO HAC VICE, STATE OF NEW JERSEY, DEPT. OF LAW & PUBLIC SAFETY, Trenton, NJ; Keith Guthrie, ATTORNEY AT LAW, Elizabethtown, IN.

For HOOSIER ENVIRONMENTAL COUNCIL, OHIO ENVIRONMENT COUNCIL, Third Party Plaintiffs: Jonathan F. Lewis, PRO HAC VICE, CLEAN AIR TASK FORCE, San Luis Obispo, CA; Keith Guthrie, ATTORNEY AT LAW, Elizabethtown, IN.

**Judges:** LARRY J. McKINNEY, United States District Judge.

**Opinion by:** LARRY J. McKINNEY

# Opinion

## ORDER ON PLAINTIFFS' MOTION FOR NEW TRIAL

This cause is before the Court on plaintiff's, the United States of America, and plaintiff-intervenors', the State of New York, the State of New Jersey, the State of Connecticut, the Hoosier Environmental Council, and the Ohio Environmental Council (all plaintiffs, collectively, "Plaintiffs"), Motion for a

New Trial Due to Party Misconduct, or, in the Alternative, for Expedited Discovery and an Evidentiary Hearing. Plaintiffs contend that pursuant to Federal Rule of Civil Procedure 59 ("Rule 59") they are **[\*4]** entitled to a new trial on defendants', Cinergy Corp., PSI Energy, Inc., and the Cincinnati Gas & Electric Company (collectively, "Cinergy"), liability for violations of the New Source Recovery ("NSR") provisions of the Clean Air Act ("CAA"), at certain Cinergy facilities. Plaintiffs assert that under a signed consulting agreement (the "Agreement"), which was not disclosed to Plaintiffs prior to the liability trial, Cinergy promised to pay fact witness Robert Batdorf ("Batdorf"), $200.00 per hour for his testimony at that trial. Plaintiffs contend that the agreement was responsive to at least one discovery request and, in addition, that this amount is above that necessary to reasonably compensate Batdorf for "lost time." Moreover, Cinergy misled the jury and the Court when it contrasted Plaintiffs' paid expert witnesses' testimony with that of Cinergy's unpaid current and former employees, including Batdorf, numerous times during the liability trial. All of these facts, Plaintiffs argue, prejudiced Plaintiffs and may have effected the outcome of the liability trial. As a result, Plaintiffs request a new trial on liability.

In contrast, Cinergy asserts that Plaintiffs' failure to discover **[\*5]** the Agreement or to properly cross-examine Batdorf at trial led to the jury's verdict. Furthermore, Cinergy contends that $200.00 per hour is reasonable compensation to Batdorf for lost time. Even if the Court disagrees with Cinergy about Plaintiffs' responsibility for properly examining Batdorf at trial or about the nature of the Agreement, Cinergy contends that the content of the Agreement and/or the fact that Batdorf was paid merely goes to Batdorf's credibility, which is insufficient reason to order a new trial.

For the reasons stated herein, the Court **GRANTS** Plaintiffs' Motion for a New Trial.

I.     FACTUAL     &     PROCEDURAL

## BACKGROUND

The United States of America ("USA") initiated this lawsuit against Cinergy alleging, *inter alia*, that Cinergy violated the NSR[1] provisions of the CAA when it made physical changes to units at various power plants that constitute "major modifications" as defined by the CAA. A major modification consists of any physical change that would result in a significant net emissions increase of a pollutant covered by the CAA. *See* 40 C.F.R. § 52.21. USA contends that Cinergy was required to obtain permits for installing pollution controls as required by the NSR provisions [*6] of the CAA prior to modifying its plants. The states of New York, New Jersey, and Connecticut, along with the Hoosier Environmental Council and the Ohio Environmental Council, intervened and joined in this lawsuit.

Batdorf was employed by Cinergy and its predecessor companies for thirty-four years. (Trial Tr. at 1291-96.) Eventually, Batdorf became station manager at the Wabash River, Cayuga, and Gibson power plants. (*Id.*) By 2005, Batdorf had retired. (Batdorf July 6, 2005, Dep. at 6.) At no time did Cinergy offer Batdorf as an expert witness in this case. (Docket No. 1257, Cinergy Witness List, Apr. 14, 2008.) Rather, Cinergy offered Batdorf as a fact witness. (*Id.*)

Pursuant to the Case Management Plan in this cause, in Phase I of the case, in May 2008, the parties tried the issues of liability to a jury. Specifically, the Court and the parties asked the jury to assess Cinergy's liability for violation of the NSR provisions of the CAA for the following projects: condensor retubing at Beckjord unit 5 from January 1991 to February 1991; condensor [*7] retubing at Beckjord unit 6 from September 1994 to November 1994; replacement of the front wall radiant superheater at Wabash River unit 2 from June 1989 to July 1989; replacement of the

high temperature finishing superheater tubes and upper reheater tubing assemblies at Wabash River unit 2 from May 1992 to September 1992; replacement of the finishing, intermediate, and radiant superheater tubes and upper reheat tube bundles at Wabash River unit 3 from June 1989 to October 1989; replacement of the boiler pass and heat recovery actions at Wabash River unit 5 from February 1990 to May 1990; life extension project at Beckjord unit 1 from November 1987 to February 1988; life extension project at Beckjord unit 2 from October 1987 to January 1988; life extension project at Beckjord unit 3 from October 1985 to January 1986. Replacement of the pulverizers at Gallagher unit 1 from April 1998 to July 1998; condensor retubing at Gallagher unit 2 from August 1990 to December 1990; replacement of the pulverizers at Gallagher unit 3 from February 1999 to April 1999; replacement of the reheater tube section at Gibson unit 2 from February 2001 to May 2001; and replacement of the slope tubes and lower [*8] headers at Miami Fort unit 5, January 1995 to March 1995.

At trial, Cinergy pressed a theme that included positioning its fact witnesses as ordinary working men who were more trustworthy and believable than Plaintiffs' paid expert witnesses. For example, in its opening statement, Cinergy stated: "During the years covered by this case, the people that were making the predictions for Cinergy were its engineers, not hired experts; and they were our engineers because they were the people most familiar with the company's generation units and the repair projects that were about to take place." (Trial Tr. at 67.)

Consistent with that theme, Cinergy closely examined each of Plaintiffs' expert witnesses regarding their compensation. Specifically, Cinergy asked Mike Hekking ("Hekking") if his only paying work over the last ten years had been as an expert testifying on behalf of the U.S. Department of Justice ("USDOJ") and Environmental Protection Agency ("EPA"). (*Id.* at 375-76.) Cinergy's cross-examination of Hekking continued in the same

---

[1] NSR includes both the Prevention of Significant Deterioration ("PSD") provisions and the Nonattainment New Source Review ("NNSR") provisions.

vein:

Q Now, sir, I need to ask you this. I presume that you've been compensated for your efforts, have you not?

A Yes.

Q Can you tell us the total amount of the [*9] compensation you've received since the time you went to work for the Government in this endeavor up and through today?

A No.

Q Well, can you give me an estimate?

***

A I would say on the order of $250,000. No more than that.

(*Id*. at 427-28.)

Similarly, Robert Koppe ("Koppe"), another Plaintiffs' expert who testified on the effects of major component replacement on unit availability, was asked: "So your methodology for predicting an increase in availability now linked with what we are going to hear from Dr. [Richard] Rosen [("Dr. Rosen")], an increase in emissions, that's never been done before, before you came to work for the Government, right?" (*Id*. at 738.) And, Dr. Rosen was asked, "Well, when you were first hired in this case to give your opinion, you discovered that the NSR rules didn't require any particular methodology or formula to make a prediction or to analyze whether emissions will increase; isn't that correct?" (*Id*. at 1008.) Cinergy repeated this point with respect to Dr. Rosen's testimony when it asked: "Before you were hired in this case, you had never given any opinion on the applicability of NSR or any other environmental regulation to a utility; isn't that correct?" (*Id*. at 1010.)

At [*10] the conclusion of Cinergy's cross-examination of Dr. Rosen, the following discussion about compensation ensued:

Q And you can confirm for us that the total amount of payment you or the Tellus Institute has received for your participation in the NSR cases is about $500,000?

A I would say that's roughly correct, yes.

Q Could it be more than $500,00?

A It could be more by now because there are other cases that I haven't appeared in yet that I'm starting to work on. So it could be more, yes.

Q Could it be $600,000?

A It is a possibility. I really haven't made an estimate.

Q Could it be $700,000?

A I don't think it's that much yet, no.

(*Id*. at 1079.)

Notably, Cinergy declined to call any of its expert witnesses to testify at trial; rather, it called Batdorf and three current Cinergy employees. (*Id*. at 1110, 1141, 1291, 1423-24.) With respect to its examination of Batdorf on direct, Cinergy began with an inquiry into his current employment status:

Q Are you currently employed, Mr. Batdorf?

A No, sir, I am currently retired

Q Where did you work before you retired?

A Immediately prior to my retirement, I worked for the Cinergy Company.

(*Id*. at 1291.) Cinergy proceeded to inquire about Batdorf's employment [*11] history at Cinergy, but did not inquire into Batdorf's post-retirement activities. (*Id*. at 1291-96.) Likewise, Plaintiffs did not inquire about Batdorf's employment activities post-retirement.

During direct examination, Batdorf testified:

Q If you, sir, generally, and we'll get to the

specific projects in a minute, but if you generally replace something like the front wall radiant superheater tubes, are you going to expect running that unit to have fewer outages from that component in the future?

A Any time we do any project like that, whether it be the radiant superheater tube or any other component replacement, we fully expect that we will have less tube leaks in that section that was replaced.

Q Is that always true?

A Most times; but like anything, there's always exceptions.

Q When you replace a component or a section of the tubes in the boiler, to what extent did you expect fewer outages from the unit over the next two years?

A We didn't. The fact that we replaced a component did not cause us to expect any difference in the performance of that unit. All's we did was address one component. There's too many other factors that influence the unit.

Q Well, if you didn't expect an increase in [*12] unit availability when you replace component like front wall radiant superheater tubes, why do you spend the money and the time to do those pro[jects]

A We spent the money to do those projects in an effort to maintain the availability of that unit.

Q Did you believe, based on your 31 years of experience, when you were approving and supervising these projects, that it was possible to predict the number or extent of forced outages that would occur in the two years after you replaced a component or a number of components?

A No, sir. Forced outages are random, unexpected events. You have no idea when

they're going to occur or what the duration will be; and I have 34 years of experience.

(*Id.* at 1322-23.)

In addition, Batdorf testified generally about the purpose of Plaintiffs' Exhibit 1592. Plaintiffs' Exhibit 1592 was PSI Energy's[2] "Instruction Project Evaluation Guide" (the "Cinergy Project Evaluation Guide"), dated March 1, 1999. (*Id.* at 915.) Dr. Rosen, one of Plaintiffs' experts, explained to the jury the model contained therein for evaluating the costs and benefits of a proposed project. (*Id.* at 915-22.) Dr. Rosen opined that the method in the Cinergy Project Evaluation Guide for calculating [*13] "generation" was the same as his method for calculating "generation," which substantiated Dr. Rosen's formula for calculating emissions. (*Id.* at 925.)

However, Batdorf testified that the purpose of the guide was only to evaluate a project's economics, not to calculate a unit's predicted future generation. (*Id.* at 1363-64.) Specifically, Batdorf testified:

> Q If we walked through this guide and looked page by page, would we find anything related to using these project evaluation tools to predict or plan unit operations for future generation?
>
> A No, sir. It would be using the guide for purposes other than what it was intended. It was strictly to do the economic evaluation, nothing to do with future predictions.
>
> Q And to what extent, if any, do the cost/benefit analysis or project evaluations done with this guide fold into the rankings we just saw?
>
> A That's what leads to the ranking process.

(*Id.* at 1363-64.).

When Batdorf left the stand after his testimony and

---

[2] There is no dispute that Cinergy utilized this model to evaluate projects. (Trial Tr. at 1363-64.)

while the jury was present, Cinergy inquired of the Court: "Mr. Batdorf, I assume because he's retired, would like to know if he could sit [*14] in the courtroom and observe the proceedings going forward?" (*Id.* at 1423.) Plaintiffs did not object; the Court responded, "No problem." (*Id.*) Batdorf sat in the gallery for the rest of the trial.

Again, consistent with its opening statement and its examination of witnesses during trial, Cinergy returned to its theme of paid versus unpaid witness testimony at the beginning of its closing argument:

> The case really does come down to two different versions of the world. It would not be clearer, and it could not have been clearer in [Plaintiffs'] opening statement. The [Plaintiffs'] view of the world is one that is built on after the fact, artificial formulas, expert testimony paid for and brought to you in this courtroom.
>
> We didn't rely on experts. We brought you the men who made these decisions in real time to sit in this witness stand and to tell you the process they followed and what they thought.
>
> ***
>
> Here are a few other things we know about [Plaintiffs' experts' formula] besides the history of its creation. We know it's never been used outside this and similar lawsuits. We know it's never been recommended or supported by anybody who wasn't a paid Government expert.

(*Id.* at 1525, 1529.) [*15] It further highlighted this theme later in its closing argument:

> Let's talk about the real world for a minute. Let's talk about Bob Batdorf and Barry Pulskamp. The longest witnesses we put on the stand which I hope were not too long by comparison were Bob Batdorf and Barry Pulskamp. They didn't come to you with advanced degrees in physics. They didn't come to you with presentation graphics that had 6-foot high boilermakers. They didn't come to you with formulas.

All they did is come to the stand and tell you, look you in the eye and tell you what they thought, what they expected and what they believed and what they predicted at the time they did these projects.

They told you what they understood and what they believed based on their reasonable, common-sense engineering judgment. And contrary to what you heard from [Plaintiffs'] this morning, they told you there was a process in place. No one was ignoring the law. No one was pretending to be above the law. They were making good-faith judgments. And Mr. Batdorf told you if he had a question, he called the environmental engineers. If he had a question, he called the [S]tate of Indiana.

That is not a bad-faith approach. That is a reasonable, [*16] common-sense, good-faith approach to this issue. They admitted to you they didn't write it down. He admitted to you he didn't do a memo to the file. If [Plaintiffs] had a rule that said do a memo to the file, you can be assured Bob Batdof would have done a memo to the file. So would Barry Pulskamp.

They told you about some cases where they thought there might be an emissions increase where they got an NSR permit because they looked at the project that was proposed and they said, "Wait a minute. That might change capacity. It might change functionality. It might change how the unit will be operated in the future. We better get some people involved here. We better actually do a calculation and take a closer look."

And when there was a reasonable view that a project would result in an increase in emissions, they got an NSF permit. Where there wasn't, they didn't do formulas. They didn't do calculations. They proceeded under their process and under their reasonable judgment.

Reasonable is the byword here. If you're not

2008 U.S. Dist. LEXIS 123516, *16

changing anything about unit operations, if you're not changing the capacity of the boiler, it's tubes in, tubes out. You can mock that phrase if you want to; but it reflects **[*17]** a common-sense, real-world judgment that whether the front reheater tubes are old or whether the front reheater tubes are new and shiny doesn't cause emissions from the unit.

You also heard the following things from Mr. Batdorf and Mr. Pulskamp: They told you that based on their long experience and their real-world view, you cannot predict and they didn't predict that changes to a single component would impact the availability of the unit.

I already showed you the availability of degraders. You heard Mr. Batdorf talk about Excedrin Headache 57 or 58 or 59 or whatever one it was. That was a reasonable way of approaching these predictions.

(*Id.* at 1551-53.)

On May 22, 2008, the jury returned a verdict in favor of Plaintiffs on four of the fourteen alleged NSR violations at the Wabash River plant, and a verdict in favor of Cinergy on the ten remaining claims at Cinergy's other coal-fired power plants. (Docket No. 1339, Verdict Form.)

No judgment has entered on the jury's verdict.

Thereafter, the parties proceeded with discovery on Phase II, or the remedy phase, of the case. During the remedy phase discovery period, on its initial witness list, Cinergy listed Batdorf as a former employee and **[*18]** potential fact witness. (Docket No. 1391.) Subsequently, Cinergy listed Batdorf on three other witness lists, including a list of its "Top 10" fact witnesses. (Pls.' Ex. 7; Pls.' Ex. 8; Pls.' Ex. 9.) In addition, Cinergy proffered dates for Batdorf's deposition, like it had for its other "Top 10" fact witnesses. (Pls.' Ex.10.)

Further, Plaintiffs' Second Set of Requests for Production of Documents in Remedy Phase of Case, Requests No. 1, 9, 10, and 12, served on Cinergy on August 15, 2008, requested all documents relating to "compensation" of former employees who were on Cinergy's witness lists, including consulting contracts, billing records, and invoices relating to payment of such witnesses. (Pls.' Ex. 11.) In its response to this discovery request, dated September 18, 2008, Cinergy stated: "Subject to and without waiving any of these objections, Cinergy responds that, to date, no witnesses other than expert witnesses are being compensated for testimony related to the remedy phase of this case." (Pls.' Ex. 12, at 11).

In the mean time, Cinergy refused to provide Plaintiffs with contact information for Batdorf claiming that he was under contract with Cinergy, as a consultant; therefore, **[*19]** Plaintiffs must contact Batdorf through counsel. Specifically, Cinergy responded: "With respect to Mr. Batdorf, he is a former Cinergy employee who consults with Cinergy on a variety of matters related to his prior employment with the company. He has asked that any contacts with him be made through Cinergy counsel." (Pls.' Ex. 13.) At that point, Plaintiffs requested a copy of Batdorf's consulting agreement or agreements, if more than one existed. (Pls.' Ex. 14.) By letter dated September 22, 2008, Cinergy agreed to produce responsive documents. (Pls.' Ex. 15.)

During a September 30, 2008, phone call, Cinergy informed Plaintiffs that it was withdrawing Batdorf from all witness lists and that, therefore, all discovery related to him would be irrelevant.[3] (Pls.' Ex. 16.) Plaintiffs disputed Cinergy's view of the relevance of Batdorf's consulting agreement, in part, because "[h]e was one of a handful of Cinergy witnesses at the liability trial and the only one with personal knowledge about the operations at the Wabash River plant." (*Id.*) Plaintiffs also disputed Cinergy's view, in part, because Cinergy's witness lists would not control the appropriate discovery in the remedy phase. (*Id.*) **[*20]** In response, Cinergy

_____

[3] Cinergy did, in fact, remove Batdorf from its remedy phase witness list on October 2, 2008. (Pls.' Ex. 17.)

stated: "In light of the revisions to our witness list (served earlier today [October 2, 2008]), Cinergy has no responsive documents to produce." (Pls.' Ex. 18.)

Immediately upon receiving Cinergy's response, Plaintiffs notified Cinergy of their intent to file a motion to compel the next day. (Pls.' Ex. 19.) On the same day, Cinergy provided a copy of Batdorf's consulting agreement to Plaintiffs, but refused other discovery on the issue. (Pls.'s Ex. 20.) Plaintiffs responded:

> Cinergy has not produced all of the responsive information regarding Cinergy/Duke's consulting contract for Mr. Batdorf "for advice and live testimony" in this case. Please produce the invoices, billing records, and any other documents relating to the payment of Mr. Batdorf under this consulting agreement. If [Plaintiffs] do not have a copy of the requested documents by 9:00 am tomorrow, we will file our motion to compel to obtain the balance of the responsive information.

(*Id.*) In response, Cinergy indicated that it would produce the requested documents on or before Monday, October 6, [*21] 2008. (Pls.' Ex. 22.) However, by letter dated October 6, 2008, Cinergy stated:

> After careful consideration of your request for the production of Batdorf compensation documents and further consultation with the client, Cinergy has determined that it will not produce any additional documents concerning Mr. Batdorf's compensation, nor will it produce Mr. Batdorf for a deposition in this case.

(Pls.' Ex. 23.)

By letter dated October 14, 2008, Plaintiffs informed Cinergy's counsel, in part, that:

> On October 2, Cinegy produced an agreement between Cinergy's parent, Duke Energy, and Cinergy to pay Mr. Robert Batdorf $200 *per hour* for his "live testimony" at the liability trial

and the time spent providing "advice" in this case. This agreement was not previously disclosed in the liability phase. Indeed, the agreement was signed only a month before the liability trial, well after the discovery cut off in that phase of the case.

> You subsequently promised in writing to produce on October 6 the billing invoices and records regarding the Batdorf agreement. When that deadline arrived, however, you informed me that Cinergy would not be producing that information, and it would not produce Mr. Batdorf [*22] for deposition.

> We have now had the benefit of reviewing, analyzing and deliberating upon these unusual circumstances, including the fact that Duke Energy contracted to pay an hourly rate to a fact witness, Mr. Batdorf, that exceeds the rate paid to several experts in this case. We believe these circumstances raise substantial questions regarding the fairness and integrity of the liability trial. We also continue to believe that this discovery is relevant to the remedy phase.

> To that end, if all billing records, invoices, and other documents relating to the agreement are not produced immediately — and witnesses, such as Mr. Batdorf, made available for deposition — on Thursday, October 16, the United States will file a motion to compel discovery relating to these issues, including the billing records and invoices under the agreement with Mr. Batdorf, Mr. Batdorf's deposition, and the deposition of persons with knowledge of any payments to Mr. Batdorf by Cinergy, or its parent, Duke Energy.

(Pls.' Ex. 24 (emphasis added by Plaintiffs).)

By letter dated October 15, 2008, Cinergy replied:

> As previously indicated, none of the information that you seek through document production or deposition [*23] is responsive to any discovery request in the remedy phase, and none of the information was sought by

Plaintiffs — through formal discovery or cross-examination — during the liability phase. Moreover, as we have explained, Cinergy will not call Mr. Batdorf as a witness at the remedy trial. In addition, Mr. Batdorf has not provided any advice to Cinergy in connection with the remedy phase of this case nor been consulted with respect to any fact or legal aspect of the remedy phase. For all of these reasons, the discovery you seek is not relevant to the remedy phase of this case or likely to lead to the discovery of admissible evidence at trial in December.

Likewise, the information which Plaintiffs request has no relevance to the liability phase of this case, which conclude in May. Contrary to your suggestion, an employee's compensation, or former employee's compensation, as part of a consulting agreement does not raise questions about the fairness of the liability proceedings. Indeed, there is nothing controversial about a consulting agreement for a highly trained former employee like Mr. Batdorf. Moreover, to the extent that Plaintiffs were interested in Bob Batdorf's compensation (or **[*24]** the compensation of any other witness called during the liability trial), Plaintiffs' counsel were free to explore those issues on cross-examination. Presumably, Plaintiffs' counsel made the strategic decision not to so inquire. Regardless, no discovery request during the liability phase called for the disclosure of current or former employee compensation, and Plaintiffs never sought to elicit such information from Mr. Batdorf during any of his six depositions or at trial. The record for the liability phase is now closed, and that is the end of the matter.

(Pls.' Ex. 2.)

By email, also dated October 15, 2008, Cinergy's counsel Frank R. Volpe ("Volpe") wrote:

I have been reading the correspondence related

to discovery on Mr. Batdorf's consultancy agreement and I am sure you have now read Katie Thompson's responding letter sent earlier tonight.

I must confess that I am quite surprised that you continue to pursue this irrelevant issue. I am further surprised that you have decided to interject rhetoric calling into question the fairness and integrity of the liability trial based on this nonissue. But you have and you now seem determined to file some sort of motion. That is, of course, your **[*25]** prerogative. I write separately only to add that if you do file a motion seeking further discovery of this issue, it had better be supported with some authority. The fact that, in hindsight, you want to second-guess the strategic judgments of Plaintiffs' experienced trial team not to question witnesses in a certain matter on certain topics is not authority. Please consider this our notice under Rule 11 and Rule 26(g) that any such unsupported pleading will be met with a request for sanctions.

(Pls.' Ex. 4.)

In later correspondence, Cinergy indicated to Plaintiffs that it would accept service on behalf of Mr. Batdorf only if the Court granted Plaintiffs' Motion to Compel. (Pls.' Ex. 25.)

The content of the Agreement is important for purposes of the background in this case. By letter dated April 3, 2008, approximately one month prior to the start of the trial on the liability issues in this case, Cinergy sent a letter agreement to Batdorf that, in pertinent part, states the following:

I understand that while you were employed by Cinergy and its predecessor companies, you dealt with issues that are relevant to the above-referenced litigation. Because of your personal knowledge and expertise **[*26]** regarding those matters, Cinergy Corp. ("Cinergy") would like to engage you as a independent consultant in the above-referenced litigation. This letter will evidence our agreement (hereafter referred to

as the "Agreement") for the provision of those consulting services (the "Services") as an independent contractor. This Agreement will remain in effect until December 31, 2008, unless extended by written agreement between you and Cinergy or unless terminated sooner as provided below.

During the term of this Agreement, you agree to provide such time to perform the Services as may be reasonably requested by Cinergy. You will be required to provide advice and live testimony in the above-referenced litigation. Cinergy will provide you with reasonable advance notice of any hearing, trial or other proceeding that may require your attendance and you agree to assist Cinergy in adequately preparing for and attending such proceedings as requested. In performing your consulting services under this Agreement, you will receive assignments from Dean Moesser, Julie Ezell and/or their designees, which shall include outside counsel at the Sidley & Austin law firm in Washington D.C.

You will be paid $200 [*27] per hour for time spent in performance of the Services contemplated herein. . . In addition, you will be reimbursed for any and all actual reasonable expenses incurred by you in connection with the Services rendered hereunder. . .

. . . You will provide [Cinergy] with an invoice on at least a quarterly basis detailing the number of hours you have provided Services. Such invoice shall also detail reimbursable reasonable expenses, if any, incurred by you in connection with the Services rendered during such period, including, but not limited to, business travel, hotel accommodations, and meals . . .

. . . It is understood and agreed that you will be an independent contractor rather than an employee, servant, or agent of Cinergy or any of its affiliates in the performance of the Services undertaken to be performed hereunder

and you will have the authority and responsibility to select the means, manner, and method of performing the obligations assumed hereunder, provided that such means, manner, and methods comply with all federal, state, and local laws, rules, and regulations and conform with Cinergy's rules and policies that are now or may be in the future become applicable to the performance [*28] of Services under this Agreement or the business practices of those who act on behalf of or perform services for Cinergy. You will be responsible for payment of all taxes, including federal, state, and local taxes arising out of your activities under this Agreement, including but not limited to, income tax, social security tax, and unemployment insurance tax that might be due.

* * *

Unless or until a conflict arises, a Cinergy attorney or its outside legal counsel will act as your attorney in any proceeding relating to this engagement. . .

* * *

**This Agreement constitutes and expresses the complete understanding of the parties hereto and there are no understandings or commitments not expressly stated herein. No revision, modification or amendment of this Agreement shall be valid unless in writing and signed by both parties thereto. None of the rights or obligations of this Agreement may be assigned without prior written consent of the non-assigning parting. The Agreement shall be governed and construed in accordance with the laws of the State of Texas**.

(Pls.' Ex. 1 (emphasis in original).) The letter is signed by Dean Moesser ("Moesser") on behalf of Cinergy; Batdorf signed and dated the [*29] Agreement on April 7, 2008, which, by its terms, made the Agreement effective on April 7, 2008. (*Id.*)

2008 U.S. Dist. LEXIS 123516, *29

## II. DISCUSSION

Plaintiffs contend that Cinergy's failure to disclose that it had a consulting agreement with Batdorf, its misrepresentation of Batdorf's relationship to Cinergy during the trial, and its reliance on this misrepresentation as a key strategy in its defense rendered the liability trial unfair.

Cinergy argues that Plaintiffs bore the burden of discovering the Batdorf agreement at trial and their failure to properly question Batdorf about potential sources of bias is their own responsibility. In other words, Cinergy committed no error in failing to disclose the Agreement, or in allowing Batdorf and its lawyers to create the impression at trial that Batdorf was retired. Even if the Court disagrees with Cinergy's assessment of its responsibilities vis-a-vis disclosure of the Agreement, Cinergy asserts that the only relevance of the Batdorf agreement at the liability trial would have been to impeach Batdorf, which has never been grounds for a new trial.

Generally, a motion for a new trial on the grounds of misconduct of the opposing party is brought pursuant to Rule 60(b)(3) and **[*30]** not Rule 59(a).[4] *See Lonsdorf v. Seefeldt*, 47 F.3d 893, 896-97 (7th Cir. 1995) (discussing a motion under Rule 59(a) under an evidentiary standard and a motion under Rule 60(b)(3) under a misconduct standard); *but see Wharf v. Burlington N.R. Co*., 60 F.3d 631, 637 (9th Cir. 1995) (stating that "[t]he standards for granting new trials are essentially the same under both rules, although a Rule 59 motion, because it may be made within [ten] days, may require a slightly lower showing than a motion under Rule

60"). The distinction is an important one to Cinergy because it contends that Plaintiffs cannot meet the clear and convincing standard of proof appropriate for motions under Rule 60(b)(3). The Seventh Circuit has not specifically addressed the issue of what standard might apply to a party's claim under Rule 59(a) that misconduct of the other party is grounds for a new trial; however, the Court concludes that it does not matter in this case which burden of proof applies because Plaintiffs have ample evidence of misconduct to support their request for a new trial.

With that in mind, to obtain relief here Plaintiffs "must prove that: (1) [they] maintained a meritorious claim at trial; and (2) because of the fraud, misrepresentation or misconduct of [Cinergy]; (3) [Plaintiffs were] prevented from fully and fairly presenting [their] case at trial." *Lonsdorf*, 47 F.3d at 897 (citing *Green v. Foley*, 856 F.2d 660, 665 (4th Cir. 1988), *cert. denied*, 490 U.S. 1031, 109 S. Ct. 1769, 104 L. Ed. 2d 204 (1989)). In making its determination, the Court "must weigh the competing policy interests of the finality of judgment against fundamental fairness in light of all the facts."[5] *Id*. (citing *Square Constr. Co. v. Wash. Metro. Area Transit Auth*., 657 F.2d 68, 71 (4th Cir. 1981)). "A determination of whether the alleged misrepresentation altered the result of the **[*32]** case is unnecessary because Rule 60(b)(3) protects the fairness of the proceedings, not necessarily the correctness of the verdict." *Id*. (citing *Plattner v. Strick Corp*., 102 F.R.D. 612, 614 (N.D. Ill. 1984)).

Plaintiffs easily satisfy their burden to show that they had meritorious claims on the projects upon which the jury rendered a verdict against them. Plaintiffs used the same experts and the same methodology to prove that Cinergy violated the NSR provisions of the CAA for all of the projects

---

[4] Rule 60(b)(3) states, in pertinent part: "On motion and just terms, the court may relieve a party . . . from a final judgment, **[*31]** order, or proceeding for the following reasons: . . . "fraud . . ., misrepresentation, or misconduct by an opposing party. . . " Fed. R. Civ. P. 60(b)(3).

Rule 59(a) states, in pertinent part: "The court may . . . grant a new trial on all or some of the issues—and to any party—. . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a)(1)(A).

---

[5] The Court notes that the standard under Rule 59(a) similarly focuses on whether there are "other reasons the trial was not fair to the moving party.'" *Shick v. Ill. Dep't of Human Servs*., 307 F.3d 605, (7th Cir. 2002) (quoting *Briggs v. Marshall*, 93 F.3d 355, 360 (7th Cir. 1996)) (further citation omitted).

at issue. Plaintiffs' experts opined that for all of the projects at issue, the relevant modifications resulted in a significant net emissions increase of a pollutant covered by the CAA.

Plaintiffs also have satisfied their burden to show that Cinergy's failure to disclose the Batdorf agreement, its misrepresentation of Batdorf's relationship to Cinergy during the trial, and its reliance [*33] on this misrepresentation as a theme during the jury trial resulted in an unfair trial. Cinergy claims that it was Plaintiffs' responsibility to elicit testimony from Batdorf at trial to challenge his assertion that he was retired. But, the Court is at a loss as to how Plaintiffs should have known that Batdorf's answer to the question, "Are you currently employed, Mr. Batdorf?," which was, "No, sir, I am currently retired," was incorrect. There had been no disclosure of Batdorf as a paid expert and no attempt by Cinergy to correct the impression left by this testimony that Batdorf was not employed. This impression was emphasized by Cinergy multiple times. Specifically, Cinergy represented to the Court that Batdorf would like to stay in the courtroom, because he was retired, which clearly implied that he was unemployed, yet interested in the outcome of the case. Furthermore, it was clear that Cinergy's defense was grounded in a paid versus unpaid testimony theme. The second paragraph of Cinergy's closing argument highlighted the theme by focusing attention on "two different versions of the world . . . ." [*34] This theme was only made possible if Cinergy's witnesses were, in fact, not paid.

The existence of the Agreement belies Cinergy's view of the world. According to the Agreement, at the time of trial, Batdorf was self-employed as a consultant for Cinergy on the very matters for which he would testify. In other words, Batdorf perverted the truth when he answered Cinergy's direct question about the status of his employment. *Accord Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1191 (Fed. Cir. 1993) ("We need not quibble about whether a 'consultant' is or is not 'employed' by a company. The representation

to the PTO that the affiants were not employed presents a classic example of a half truth, and the explanation that the [affiants] understood no remuneration was paid for their statements is nonresponsive."). That Batdorf claims he did not intend to mislead the Court is not dispositive because the standard under Rule 60(b)(3) "applies to both intentional and unintentional misrepresentations." *Lonsdorf*, 47 F.3d at 897 (citing *Plattner v. Strick Corp.*, 102 F.R.D. 612, 614 (N.D. Ill. 1984) (relying on a Fifth Circuit case)).

Cinergy's argument that federal statutes allow for [*35] payment of witness fees and that the Agreement was nothing more than a promise to pay such fees is specious. The Agreement itself sets forth its purpose: Batdorf was to provide "advice and live testimony" as assigned by Moesser, Julie Ezell, and/or outside counsel at Sidley & Austin, in exchange for $200.00 per hour, plus reasonable expenses. (Pls.' Ex. 1.) The relevant statute and ethical rules that allow for compensation of fact witnesses never contemplated the hiring of a consultant, who is to be directed by the party's counsel, to provide "advice and live testimony." Rather, the relevant federal statute allows for reimbursement to a fact witness "of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding, or in the case of expert witnesses, a reasonable fee for time spent in the preparation of such opinion, and in appearing and testifying." 18 U.S.C. § 201(d). A $200.00 per hour fee is beyond "the reasonable value of time lost" for a person who purports to be "retired." This is particularly true when compared to Batdorf's compensation in a 2005 consultant agreement between Cinergy and Batdorf [*36] in which Batdorf received $88.00 per hour for his services based on his base salary at the time he retired. (Defs.' Ex. 5, ¶¶ 9, 12.)

Furthermore, the ethical rules state that "[a] lawyer shall not: . . . counsel or assist a witness to testify falsely: or offer an inducement to a witness that is

prohibited by law . . . ." Ind. R. Prof. Conduct 3.4(b). Here, Cinergy's counsel may have counseled or assisted Batdorf to testify falsely about his employment status. At the very least, Cinergy's lawyers offered an inducement for Batdorf to testify that is beyond that which is contemplated by 18 U.S.C. § 201(d). Furthermore, the Seventh Circuit has held that witness compensation agreements are against public policy. *Hamilton v. Gen. Motors Corp*., 490 F.2d 223, 229 (7th Cir. 1973) (discussing the predecessor to 18 U.S.C. § 201(d), 18 U.S.C. § 201(j)). According to the *Hamilton* court, allowing payment for fact witness testimony is against the spirit of the Constitution to allow citizens to obtain "justice freely and without being obligated to purchase it." *Id*. (quoting *Wright v. Somers*, 125 Ill. App. 256, 257-58 (1906) (quoting Ill. Const. Sec. 19, Art. II)). The *Hamilton* court also expressed **[*37]** concern with such practices because they "lean toward the procurement of perjury," "the perversion of justice," and the "corruption in our courts." *Id*. (quoting *Wright*, 125 Ill. App. at 257-58). In addition, the *Hamilton* court stated,

> the services of non-expert witnesses are not analogous to lawyers or even to expert witnesses. Inasmuch as the kinds and amount of reimbursement to which such witnesses are entitled are so severely circumscribed . . . [to] "reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance."

*Id*. (quoting 18 U.S.C. § 201(j), now codified at 18 U.S.C. § 201(d)). The Agreement in the instant case cannot be said to have followed this dictate that a party "severely circumscribe" the amount of reimbursement given to a fact witness.

Cinergy claims that the existence of the Agreement would have merely amounted to impeachment evidence; however, Cinergy mischaracterizes its reliance on Batdorf's status as a "retired" and "unpaid" former employee as a defense theme at trial. Cinergy's opening statement set the stage for a

paid versus unpaid testimony theme by pointing to the "hired experts" of Plaintiffs and contrasting them with **[*38]** its own "engineer" witnesses. (Trial Tr. at 67.) It continued this theme by allowing Batdorf to testify that he was not currently employed, knowing that this testimony was at least misleading because the Agreement made Batdorf an independent contractor. (*Id*. at 1291.) Furthermore, Cinergy refocused attention on Batdorf's employment status when it requested that the Court allow Batdorf to remain in the courtroom for the remainder of the trial, "because he's retired."(*Id*. at 1423.) The Court's grant of the request put a gloss of truth on the misrepresentation that Batdorf was retired and reinforced Cingery's paid experts versus unpaid witnesses theme. By integrating the Court into its duplicity about Batdorf's employment status Cincery prejudiced the fairness of the trial.

Moreover, this was not an inconsequential theme as Cinergy seems to suggest. Rather, it was central to Cinergy's defense. Cinergy pointed to "two different versions of the world" in its closing argument painting Plaintiffs' paid expert witnesses' picture on one canvas and its "real world" "reasonable, common-sense engineering" men's picture on the other.[6] This is particularly troubling in light of Batdorf's testimony **[*39]** regarding, generally, the effect of any improvements on unit performance, (Trial Tr. at 1322-23), and regarding, generally, the way engineers at Cinergy used the Cinergy Project Evaluation Guide. (Trial Tr. at 915-25.) Both pieces of testimony were used by Cinergy to contradict Plaintiffs' experts' opinions. Further, the jury verdict was split with respect to the specific projects for which Batdorf provided testimony. Therefore, it is difficult to determine the extent of the unfairness in the process. Nevertheless, the Court agrees with the Federal Circuit when it opined that "[a] litigant who engages in misconduct should 'not be permitted the

---

[6] Cinergy never said that its witnesses were unpaid; but it clearly implied that its witnesses were not similarly paid extra **[*40]** like Plaintiffs' experts.

benefit of calculation, which can be little better than speculation, as to the extent of the wrong inflicted upon his opponent.'"*Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1206 (Fed. Cir. 2005) (quoting *Fraige v. Am.-Nat'l Wattermattress Corp.*, 996 F.2d 295, 299 (Fed. Cir. 1993) (quoting *Minneapolis, St. Paul & Sault Ste. Marie Ry. Co. v. Moquin*, 283 U.S. 520, 521-22, 51 S. Ct. 501, 75 L. Ed. 1243 (1931))) (applying Seventh Circuit law).

Despite Cinergy's many protestations to the contrary, the Court concludes that Cinergy's failure to disclose the Agreement also flies in the face of the automatic disclosures required under Rule 26. Under the automatic disclosure provision of Rule 26(a)(1)(A) a party is required to "provide to the other parties . . . the name, and if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment . . . ."Furthermore, Rule 26(e) states that

> [a] party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . . .

Fed. R. Civ. P. 26(e)(1)(A). Here, Batdorf's personal information **[*41]** had changed in a material way on April 7, 2008, when the Agreement became effective: he became a witness represented by counsel. In the same way that in the remedy phase Cinergy's counsel refused to allow Plaintiffs to contact Batdorf unless it was through counsel because of the Agreement, Cinergy

withheld material information about Batdorf's new contact information once the Agreement was signed. Cinergy's disclosure of the Agreement in April 2008 surely would have prompted Plaintiffs to request additional discovery on the content of the Agreement and the extent of Batdorf's services as a "consultant."

Moreover, it appears to the Court that the Agreement triggered Cinergy's obligation to supplement its discovery under Rule 26(e) for another reason: it might lead to discoverable information regarding Plaintiffs' document requests regarding communication between Cinergy and its consultants regarding NSR. (Pls.' Ex. 28, at 13.) In early discovery requests in the liability phase, the United States requested all documents relating to such communications. The Agreement clearly makes Batdorf a consultant. There is no dispute that Cinergy called Batdorf to testify regarding whether the NSR **[*42]** provisions applied to Cinergy's plants and to testify, generally, about the applicability of the provisions to Cinergy's units. It follows, then, that Plaintiffs' discovery request covered the Agreement because it is a communication about the Batdorf's expertise on the relevant subject matter of the law suit: the application of the NSR provisions to Cinergy's plants.

In summary, the Court concludes that Cinergy's misrepresentations about payment of one of its fact witnesses, Batdorf, amounts to misconduct. Because of such misconduct, the liability trial in this matter was tainted and Plaintiffs' request for a new trial on liability is **GRANTED**. The Court will issue a separate scheduling order regarding said new trial.

## III. CONCLUSION

For the reasons stated herein, the Court **GRANTS** plaintiff's, the United States of America, and plaintiff-intervenors', the State of New York, the State of New Jersey, the State of Connecticut, the Hoosier Environmental Council, and the Ohio Environmental Council, Motion for a New Trial

2008 U.S. Dist. LEXIS 123516, *42

Due to Party Misconduct.

Defendants, Cinergy Corp., PSI Energy, Inc., and the Cincinnati Gas & Electric Company, are hereby **ORDERED to SHOW CAUSE on or before Monday, December [*43] 22, 2008, why Plaintiffs' Motion for a New Trial Due to Party Misconduct, the related briefing, and this Order should not be made public**.

The remedy phase Bench Trial **REMAINS SET** for Monday, February 2, 2009. The parties shall proceed as directed in further orders to be issued by the Court.

IT IS SO ORDERED this 18th day of December, 2008.

/s/ Larry J. McKinney

LARRY J. McKINNEY, JUDGE

United States District Court

Southern District of Indiana

---

**End of Document**

# In re Grand Jury Proceedings

United States District Court for the Southern District of New York

October 3, 2001, Decided ; October 3, 2001, Filed

M-11-189

**Reporter**
2001 U.S. Dist. LEXIS 15646; 2001 WL 1167497

IN RE GRAND JURY PROCEEDINGS

**Disposition:** [*1] Government's motion to compel granted in part and denied in part.

**Judges:** LORETTA A. PRESKA, United States District Judge.

**Opinion by:** LORETTA A. PRESKA

# Opinion

MEMORANDUM AND ORDER

LORETTA A. PRESKA, United States District Judge:

This case arises out of an ongoing grand jury investigation into allegedly illegal sales of firearms and other contraband by the John Doe Corporation ("Doe Corp."). [1] On December 19, 2000, the government filed a Post-Remand Memorandum of Law in Support of Motion to Compel Production of Materials Designated as Privileged. Doe Corp. responded by filing a Notice of Motion for Leave to File Ex Parte, In Camera Declarations in support of its opposition to the government's motion to compel. The schedule for the original motion was

---

[1] This case concerns proceedings currently before the grand jury. No indictments have been issued. Proceedings before this Court were held in a closed courtroom, and the record and briefs are under seal. In order to preserve the anonymity of the parties, I will use pseudonyms and will reveal only the facts necessary to my decision. To the extent pseudonyms have been used in prior rulings in this matter, those pseudonyms are consistent with this decision. Information that is under seal has been redacted from the published decision.

suspended and the parties briefed the issue of whether Doe Corp. could file ex parte, in camera declarations from certain of its in-house counsel and an investigator whose company worked with Doe Corp.'s legal department. On January 23, I ordered the parties to complete the briefing on the issue of waiver, stayed briefing on the issue of whether Doe Corp.'s documents were privileged, and deferred ruling on Doe Corp.'s motion to file [*2] ex parte, in camera declarations.

On March 2, 2001, I found that a voluntary submission by Doe Corp. to the government (the "June 2 submission") waived Doe Corp.'s work-product protection as to communications with the Bureau of Alcohol, Tobacco and Firearms ("ATF") prior to June 2, 1999. In re Grand Jury Proceedings, 2001 U.S. Dist. LEXIS 2425, M-11-188, 2001 WL 237377 (S.D.N.Y. March 2, 2001). On March 16, I granted Doe Corp.'s motion for leave to file ex parte, in camera declarations [*3] in support of Doe Corp.'s opposition to the government's motion to compel production of materials designated as privileged. Doe Corp. submitted a memorandum of law ("Doe Corp. Opp. Br."), ex parte, in camera declarations from Doe Corp.'s Associate General Counsel (Declaration of "Counsel No. 1" dated March 17, 2001 ("Counsel No. 1 Decl.")), Deputy General Counsel (Declaration of "Counsel No. 2" dated January 12, 2001 ("Counsel No. 2 Decl.")), General Counsel (Declaration of "Counsel No. 3" dated March 15, 2001 ("Counsel No. 3 Decl.")) and from an investigator (Declaration of "Investigator" dated January 17, 2001 ("Investigator Decl.")) from a private investigative firm ("Inves. Co.") hired by Doe Corp., and three ex parte, in camera binders of allegedly privileged documents in opposition to the

2001 U.S. Dist. LEXIS 15646, *3

government's motion to compel. The government submitted a reply memorandum of law ("Gov. Reply. Br.") and Affirmation of Andrea Likwornik Weiss (Sealed Ex Parte Reply Affirmation of Andrea Likwornik Weiss dated March 28, 2001 ("Reply Weiss Aff.")) which were served on Doe Corp. in redacted forms, an ex parte, in camera affirmation of Daniel Cronin (Sealed Ex Parte Affirmation [*4] of Daniel Cronin dated March 28, 2001 ("Cronin Aff.")), an ATF official, an expert affirmation (Sealed Affirmation of "Expert" dated March 30, 2001 ("Expert Aff.")), and ex parte, in camera excerpts from the grand jury proceedings in further support of its motion to compel. After additional briefing challenging the government's ex parte, in camera affirmations, I ordered the government to justify its ex parte submission of the Cronin Affirmation, to disclose it to Doe Corp., or to withdraw it. The government elected to re-submit a revised Cronin Affirmation to Doe Corp. and to the Court.

On May 24 the government submitted a Supplemental Reply Affirmation of Andrea Likwornik Weiss ("Supplemental Reply Weiss Aff."). Based on the information contained in that affirmation and on Investigator's grand jury testimony, I scheduled a hearing to inquire into certain inconsistencies between the information contained in the government's submissions and Investigator's ex parte, in camera declaration in support of Doe Corp.'s opposition to the motion to compel. I ordered that Investigator be subjected to direct and cross examination with counsel for the government and Doe Corp. [*5] present and Counsel No. 1 be subjected to direct examination with the government excluded from the proceeding in consideration of Counsel No. 1's Fifth Amendment rights. On June 4, Investigator moved for access to the transcripts of his grand jury testimony and the government accounts of his prior statements that had been filed with the Court. On June 5, by written order, I denied Investigator's request for the documents. Also on June 5, a Curcio hearing was held to advise Investigator that because his own counsel was being paid for by Doe Corp.,

there existed the potential for a conflict of interest. Investigator testified that he understood the potential for conflict and that he wished to continue to be represented by his attorney, and I found his waiver to be knowing and voluntary. The hearing to resolve the inconsistencies between Investigator's statements to the government and the grand jury and his submissions to the Court was held on June 6. The parties subsequently submitted post-hearing briefing. [2]

[*6] In its motion to compel, the government challenges Doe Corp.'s assertion of privilege for three categories of documents: (1) communications related to Inves. Co., [3] (2) communications between the ATF and Doe Corp., and (3) documents relating to Doe Corp.'s "[corporate] review" in response to the government subpoena in January 1999.

For the reasons set forth below, the government's motion to compel is granted in part and denied in part.

I. Documents Relating To Inves. Co.

Doe Corp. asserts that documents consisting of communications between Doe Corp.'s counsel and/or Doe Corp. employees and Inves. Co. are protected by the attorney-client privilege and/or work-product doctrine. (Doe Corp. Opp. Br. at 11).

A. Attorney-Client Privilege

To establish the attorney-client privilege, a party must show that:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication [*7] was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this

---

[2] A fuller account of the facts surrounding this proceeding is set forth in In re Grand Jury Proceedings, 219 F.3d 175 (2d Cir. 2000) and 2001 U.S. Dist. LEXIS 2425, 2001 WL 237377 (S.D.N.Y. March 2, 2001), and only some of the essential facts will be repeated herein.

[3] Inves. Co. and Investigator are used interchangeably throughout this opinion.

communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and . . . (4) the privilege has been (a) claimed and (b) not waived by the client.

Colton v. United States, 306 F.2d 633, 637 (2d Cir. 1962) (quoting United States v. United Shoe Machinery Corp., 89 F. Supp. 357, 358-59 (D. Mass. 1950)). A party claiming an "attorney-client privilege has the burden of establishing all the essential elements thereof." von Bulow v. von Bulow, 811 F.2d 136, 146 (2d Cir. 1987). The "burden must be met by an evidentiary showing based on competent evidence," Golden Trade v. Lee Apparel Co., 143 F.R.D. 514, 523 (S.D.N.Y. 1992), and cannot be "discharged by mere conclusory or ipse dixit assertions," von Bulow, 811 F.2d at 146 (internal citations omitted). See generally [*8] In re Six Grand Jury Witnesses, 979 F.2d 939, 944 (2d Cir. 1992) (holding that whether privilege exists requires "common sense . . . in light of reason and experience" and should be determined "on a case-by-case basis"). The attorney-client privilege is unqualified, so that if a communication is "found to be within the privilege, it is not discoverable." In re Grand Jury Subpoena, 599 F.2d 504, 510 (2d Cir. 1979).

Doe Corp. claims that in late 1998, it was threatened with substantial civil litigation relating to certain misconduct by Doe Corp. customers. (Doe Corp. Sur-reply Ltr. dated April 6, 2001 ("Doe Corp. Ltr.") at 5 (citing Counsel No. 1 Aff. P 33)). Doe Corp. asserts that in December 1998, Counsel No. 1 hired Inves. Co. "to assist counsel in providing legal advice to the company," and "to perform services to attempt to avoid and prepare for anticipated litigation." (Doe Corp. Opp. Br. at 12; see id. at 11 (noting that Inves. Co.'s services were paid for by legal department budget); Counsel No. 1 Decl. PP 35, 39-49). Doe Corp. argues that Inves.

Co. "essentially 'translated' or 'interpreted' information from [Doe Corp.] employees for [Counsel [*9] No. 1], in order to allow counsel to legally advise the company" on customer activity that Doe Corp. believed to be problematic. (Doe Corp. Ltr. at 8 (quoting United States v. Ackert, 169 F.3d 136, 139-40 (2d Cir. 1999))). Doe Corp. claims that Inves. Co. "acted at all times as an agent of [Doe Corp.'s] corporate counsel." (Doe Corp. Opp. Br. at 12; Counsel No. 1 Decl. P 37; Investigator Decl. P 7). [REDACTED]

Doe Corp. thus contends that because communications between Inves. Co. and Doe Corp. employees "were made in confidence for the purpose of assisting [Doe Corp.'s] in-house counsel in the rendering of legal advice to the company," those communications are protected by the attorney-client privilege. (Doe Corp. Opp. Br. at 14 (citing Counsel No. 1 Decl. PP 33-50, Investigator Decl. PP 3-23)).

The government challenges Doe Corp.'s attorney-client privilege claims for communications between Inves. Co. and Doe Corp. on four grounds. First, the government argues that communications between Doe Corp. and Inves. Co. were never intended to be confidential. Second, the government states that "absent the occasional circumstance where [Inves. Co.] was asked by [*10] [Doe Corp.'s] counsel to research statutes, [Inves. Co.'s] function was not assisting [Doe Corp.'s] counsel in providing legal advice," but rather was to review whether Doe Corp. was facilitating potentially illegal sales and to report that information to law enforcement for public relations reasons. (Gov. Reply Br. at 2 (citing Affirmation of Andrea Likwornik Weiss dated December 8, 2000 ("First Weiss Aff."), Ex. 6 at 24)). Third, the government argues that the communications between Inves. Co. and Doe Corp. are not protected by the attorney-client privilege under an agency theory. Fourth, the government argues that any attorney-client privilege "has been waived to the extent that [Inves. Co.], with the knowledge of [Doe Corp.], disclosed the substance

of those communications to various law enforcement agencies and other third parties." (Gov. Reply Br. at 9 (citing Reply Weiss Aff. PP 10-11)). Finally, the government contends that if certain communications are protected by the attorney-client privilege, it is only those communications that are protected, and not the underlying factual information, and accordingly, Investigator must be directed to testify to facts he learned [*11] while working for Doe Corp.

1. The Communications Between Inves. Co. And Doe Corp. Were Not Always Intended To Be Confidential

The government alleges that it is clear from Investigator's grand jury testimony and statements to several Assistant United States Attorneys ("AUSAs" or "AUSA") that Investigator was not informed by Doe Corp.'s counsel that Investigator's communications with Doe Corp. were protected by any privilege. (Gov. Reply Br. at 3). The government contends that because the information that Investigator obtained from Doe Corp. was not intended to be confidential, but rather was intended to be disseminated, it cannot be subject to the attorney-client privilege.

Doe Corp. has submitted several ex parte declarations in support of its privilege application. Doe Corp. argues that the government's ex parte submissions regarding Investigator's grand jury testimony and government interview memoranda are "'after the fact' and less reliable than [Doe Corp.'s] declarations because [they were] elicited by the government -- a party 'with an obvious interest in the outcome' -- outside the presence of [Investigator's] counsel, a disinterested third-party." (Doe Corp. [*12] Ltr. at 7). Additionally, Doe Corp. notes that "several contemporaneous documents from [Inves. Co.] contain headers such as 'CONFIDENTIAL,' 'ATTY WORK PRODUCT PRIVILEGE,' [citing documents 751-752 and 711-12], or 'ATTORNEY WORK PRODUCT PRIVILEGE' [citing document 748-49]" which evidence the parties' intent to keep the communications privileged. (Doe Corp. Ltr. at 7).

In August 1999, Investigator telephoned David Finn ("Finn"), the AUSA who was then responsible for the Doe Corp. investigation. Investigator identified himself as "Bob" (not his real name) and stated that he worked at Inves. Co. [REDACTED][4]

In August 2000, Investigator testified before the grand jury charged with investigating Doe Corp. Investigator's counsel and counsel for Doe Corp. remained available for consultation outside the grand jury room. (Grand Jury Testimony of Investigator dated August 8, 2000 ("Invest. [*13] Tr.") at 3-4). [REDACTED][5]

In March 2001, Investigator submitted an ex parte, in camera declaration in support of Doe Corp.'s opposition to the government's motion to compel. Investigator's statements in his declaration differ significantly from the government's notes summarizing alleged conversations with Investigator and his grand jury testimony regarding privilege issues. Similarly, information contained in Counsel No. 1's declaration contains information that is inconsistent with Investigator's prior alleged statements to the government and his grand jury testimony. [6]

[REDACTED]

On June 6, 2001, Investigator testified at a hearing to inquire into the inconsistencies regarding the privilege issues. During the hearing, Investigator stated that either at his [*14] initial meeting with Counsel No. 1 or during a subsequent phone call, Counsel No. 1 informed Investigator that their

---

[4] Both parties agree that the Mutual Non-Disclosure Agreement only demonstrates that the parties could exchange confidential information and is not applicable to the attorney-client privilege or work-product doctrine. (Gov. Reply Br. at 4-5 (citing Expert Aff. PP 3-5); Doe Corp. Ltr. at 7 n.9).

[5] [REDACTED]

[6] Counsel No. 1 testified once before the grand jury and asserted his Fifth Amendment privilege on a second occasion. During his first time before the grand jury, Counsel No. 1 was not questioned about the privilege issues.

communications would be covered under the attorney-client privilege or work-product doctrine. (June 6, 2001 Hearing Transcript of Investigator ("Hrg. Tr.") at 9). Investigator testified that when Counsel No. 2 commenced working at Doe Corp., he informed Investigator that "basically the status quo would remain and that communications with him would remain under the initial agreement of confidentiality and attorney-client privilege." (Hrg. Tr. at 15). Investigator stated that Counsel No. 2 instructed him not to speak to the government without first notifying Doe Corp. because Doe Corp. planned to assert the attorney-client privilege. (Hrg. Tr. at 35). Investigator also testified that he "told the government [that] prior to [Counsel No. 2's] statement that [Investigator] was advised that [his] work was covered under the privilege." (Hrg. Tr. at 38).

Investigator affirmed that he informed Finn "about conversations that [he] had with [Counsel No. 1] regarding gun sales [at Doe Corp.]" (Hrg. Tr. at 39). During the hearing, the government read a portion of Investigator's [*15] grand jury testimony to Investigator which consisted of the following colloquy:

"Q: Now with respect to the information that you provided Mr. Finn relating to firearms dealings [at Doe Corp.], would you have disclosed that if you had been told that to do so would violate [Doe Corp.'s] attorney-client privilege?

A: If I was told that, no, I would not disclose it."

(Hrg. Tr. at 87). The government asked Investigator if that statement was true, and Investigator responded:

A: I presumed it to have been true at the time.

Q: Are you saying that it's no longer true?

A: I have had, obviously, ample time to reflect.

Q: And to discuss it with [Doe Corp.'s counsel,] correct?

. . .

Q: The question is, when you answered the question that I just read to you, did you give a truthful answer?

A: As I believed it to be true at the time.

Q: Is that answer true as you sit here today or is it a lie?

. . .

A: It's not a lie. I believed it to be true at the time that I made that statement. It's not a question of truth or lie. I mean you make certain determinations based on information that you have. At the time, you know, that's what I answered. One discovers other [*16] things as time goes by, but at that time -

Q: Would you like to tell us what those are that you have discovered?

A: I think part of it was the way the question was formatted. As you were reading it back to me, I didn't recall that question so it's hard to put myself back in front of that grand jury being asked that same question. I was trying to figure out why did I answer that question in that way, and I either - something tells me I must have misinterpreted that question because it's not making sense to me.

Q: [Investigator], I will read you the question again and you tell me if there is anything unclear about it.

A: It's clear, but I don't understand why I answered it in the fashion that I did at that point in time.

. . .

Q: I am going to ask you one more time . . . . When you answered that question, was it true?

. . .

A: At that point in time I answered it truthfully

as I thought it to be.

Q: Have you learned any information since that time that leads you to believe the answer was not a truth?

. . .

A: The information I found out subsequently was that I had no power to waive [Doe Corp.'s] privilege.

. . .

Q: For how many years has it been your understanding that [*17] generally you cannot disclose privileged information without the client's consent?

A: Generally, probably better than 20 years.

Q: You knew that when you spoke to Mr. Finn, correct?

A: Generally.

. . .

Q: Have you learned anything that you didn't know at the time that leads you to believe you did not give truthful testimony?

A: I have learned more about attorney-client privilege than is probably in books since that time.

Q: Can you tell us specifically what information you have acquired since your testimony that might possibly change your view that you gave a truthful answer?

A: That only [Doe Corp.] or the client can actually waive the privilege. I was under the presumption that you could - you had a certain discretion on waiving the privilege, but since you're not the client, you can't do that.

(Hrg. Tr. at 88-93).

During the hearing, Investigator testified that he had no authorization from Doe Corp. to disclose his communications with Doe Corp. to AUSA Finn. (Hrg. Tr. at 76-77). Additionally, Investigator testified that pursuant to the terms of his retention with Doe Corp., he "believed that it would have been inappropriate" to disclose such conversations to Finn. [*18] (Id. at 77). Investigator testified that he believed he was violating all of Doe Corp.'s instructions and the attorney-client privilege or work-product doctrine when he had his discussions with AUSA Finn. (Id.). When asked by Doe Corp.'s counsel about his motive for speaking to the government without informing Doe Corp. that he was doing so, Investigator indicated that he wanted to make sure that the government knew that he personally did not engage in any wrongdoing. (Hrg. Tr. at 79, 84-85). During cross-examination, however, Investigator admitted that he only identified himself under the pseudonym "Bob" during his initial call to the government. (Hrg. Tr. at 85).

Counsel No. 1 testified ex parte during the hearing. [REDACTED]

In post-hearing briefing Doe Corp. argues that to the extent there are contradictions in Investigator's testimony, the Court should credit his testimony at the hearing and his declaration over his alleged statements to the government and grand jury testimony for three reasons. (Doe Corp. Post-Hrg. Br. at 11). First, Doe Corp. argues, Investigator's testimony is fully supported by Counsel No. 1's testimony. (Doe Corp. Post-Hrg. Br. at 12). Second, [*19] Doe Corp. claims that the Doe Corp. documents submitted to the Court corroborate Investigator's hearing testimony and provide contemporaneous evidence that Investigator was instructed by Counsel No. 1 about the privilege before Counsel No. 2 first spoke to Investigator on March 29, 1999. (Doe Corp. Post-Hrg. Br. at 12-13). Specifically, Doe Corp. notes that certain Inves. Co. documents created prior to March 29, 1999 contain privilege legends. Third, Doe Corp. argues that Investigator's hearing testimony is inherently more reliable than his prior statements because the hearing testimony was "against his

interest." (Doe Corp. Post-Hrg. Br. at 13). Doe Corp. alleges that Investigator's testimony was "against his pecuniary interest and could expose him to civil litigation and the loss of his private investigator's license" because he "testified that he violated [Doe Corp.'s] instructions to keep his work confidential by disclosing information that he knew to be privileged to ex-AUSA Finn." (Doe Corp. Post-Hrg. Br. at 13-14 (citing Hrg. Tr. at 47-48, 77, 85-86 (Investigator affirming that he knew that it would be bad for his business if he disclosed privileged information and that he [*20] might get sued))). Doe Corp. argues that Investigator's "uncounseled, unsworn supposed statements to ex-AUSA Finn in Fall 1999" should be dismissed "as untrustworthy and prone to inaccuracies" because of the "selectivity inherent in note taking." (Doe Corp. Post-Hrg. Br. at 15 (citing Hickman v. Taylor, 329 U.S. 495, 512-13, 91 L. Ed. 451, 67 S. Ct. 385 (1947) (finding that attorney notes of witness statements "give rise to grave dangers of inaccuracy and untrustworthiness") and United States v. Trujillo, 136 F.3d 1388, 1395-96 (10th Cir. 1998) (finding FBI interview memorandum inadmissible because it had "no self-evident, particularized guarantees of trustworthiness")). Additionally, Doe Corp. contends that "where a witness has given 'conflicting statements, it is most likely that the falsehood should precede the truth,' particularly where 'a credible explanation for why the witness would have initially lied exist[s].'" (Doe Corp. Post-Hrg. Br. at 16 (quoting United States v. Ziperstein, 601 F.2d 281 (7th Cir. 1979))). Doe Corp. alleges that when Counsel No. 2 told Investigator about the grand jury investigation but failed to keep [*21] him informed, Investigator contacted the AUSA because he was upset that Inves. Co.'s work had been reduced and was concerned that Inves. Co. might be blamed for any wrongdoing. (Doe Corp. Post-Hrg. Br. at 16 (citing Hrg. Tr. at 73-75, 77-79)). Doe Corp. claims that under these circumstances, Investigator "had an incentive not to inform the government that [Doe Corp.] had instructed him that his work was privileged, because he surely knew that the

government -- if it acted properly -- could not continue speaking with him if it was intruding upon privileged areas." (Doe Corp. Post-Hrg. Br. at 16). Thus, given this motive "to provide incorrect information to ingratiate himself with the government," Doe Corp. argues that the Court should decline to give Investigator's prior statements any weight. (Doe Corp. Post-Hrg. Br. at 16). Finally, Doe Corp. argues that if the Court were to find that Investigator's inconsistent statements have damaged his credibility, it should disregard his statements entirely and instead rely on Counsel No. 1's testimony, the declarations of other Doe Corp. attorneys and the contents of documents submitted to the Court.

The attorney-client privilege is limited [*22] to confidential communications. See In re Grand Jury Subpoena, 482 F.2d 72, 81-82 (2d Cir. 1973) (noting that "it is vital to a claim of privilege that the communications between client and attorney were made in confidence and have been maintained in confidence" for purpose of obtaining legal advice from lawyer). For the privilege to attach, the communication must be "intended to be confidential at the time [it is] made." In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1037 (2d Cir. 1984). The party asserting the attorney-client privilege has the burden of establishing that the communication was in fact made in confidence. See In re Grand Jury Subpoena, 482 F.2d at 82. Whether a "communication was intended to be confidential is to be determined from the circumstances." Solomon v. Scientific American, Inc., 125 F.R.D. 34, 36 (S.D.N.Y. 1988); see also In re Modell, 171 B.R. 510, 513 (S.D.N.Y. 1994).

Excluded from the attorney-client privilege are communications that were intended to be passed on to a third party. See, e.g., Bowne of New York City, Inc. v. Ambase, 150 F.R.D. 465, 470-71 (S.D.N.Y. 1993) [*23] (holding that "to sustain a claim of privilege, the party invoking it must demonstrate that . . . it was intended to be and was in fact kept confidential"). Thus, the mere relationship between an attorney and a client does

not imply confidentiality. See id. (finding that privilege does not apply when intention of client is that communication be made known to third parties either in form of offering brochure or income tax return). Indeed, although communications between a client and an attorney may have been made privately, they are not privileged if the information was intended to be passed on to third parties. See United States v. Tellier, 255 F.2d 441, 447 (2d Cir. 1958) (holding that attorney's advice to client was not privileged from disclosure as it was clear that advice was not understood by either party to be confidential because client expected his attorney to forward advice to third parties); see also In re Grand Jury Proceedings, 727 F.2d 1352, 1355 (4th Cir. 1984) (noting that "the 'essence' of the privilege is the protection of what was 'expressly made confidential' or should have been 'reasonably assumed . . . by the attorney as so [*24] intended'" and finding no privilege for information that was intended to be published and made available to others) (quoting United States v. Jones, 696 F.2d 1069 (4th Cir. 1982)); United States v. Rockwell Int'l, 897 F.2d 1255, 1265 (3d Cir. 1990) ("The attorney-client privilege does not apply to communications that are intended to be disclosed to third parties or that in fact are so disclosed.").

In Solomon, the client prepared a memorandum at the attorney's request regarding a conversation during which fraudulent representations allegedly were made. 125 F.R.D. at 36. Despite the client's failure to "expressly refer to confidential intent" when questioned about the communications during a deposition, the court found that the client met the burden of demonstrating that the communication was intended to be confidential. Id. at 36. The court noted that "lay witnesses are seldom able to describe their specific intent in the conclusory terminology of applicable legal principles; conduct is a more reliable guide to intent and plaintiff's conduct was that of a client seeking confidential legal advice." Id. at 37. [*25] The court noted, however, that the burden of a party claiming a privilege cannot be satisfied by conclusory assertions and thus declined to credit plaintiff's

statements in his affidavit in opposition to the motion to compel. See id. at 36 n.2. The court found that the affidavit "was obviously drafted by counsel after the dispute arose" and failed to "cast[] any light on the underlying facts which determine whether that conclusion can be drawn." Id.; see also United States v. Adlman, 68 F.3d 1495, 1500 (2d Cir. 1995) (finding that communications were not protected by attorney-client privilege where proponent relied upon "litigation affidavits prepared by interested persons four years after the fact and lacking any support in contemporaneous documentation"). So also in this case do I find conduct to be a more reliable guide than after-the-fact affidavits drafted by counsel based on Investigator's attitude and demeanor while testifying at the hearing and the nature and number of inconsistencies in his testimony.

It is evident that Investigator has been less than consistently forthright about Doe Corp.'s privilege. Because I decline to rely in any [*26] part on Investigator's hearing testimony and declaration for the reasons set forth below, I find that based on all the circumstances, the intent of Doe Corp. was not to maintain confidentiality over its communications with Inves. Co.

First, I specifically note that Investigator's demeanor during the hearing was evasive and defensive. Investigator was unable to give straight, logical or forthright answers to questions. Investigator's claimed selective lack of memory during the government's cross-examination regarding his prior conversations with the government [7] further undermined Investigator's credibility because the "pattern and substance of those answers convinces [me] that the answers are inherently incredible." In re Grand Jury Witness, 703 F.2d 653, 670 (2d Cir. 1983) (internal quotations and citations omitted). Having observed Investigator's attitude and demeanor, I expressly find that Investigator was not a credible witness.

---

[7] (See, e.g., Hrg. Tr. at 23, 54-55).

Second, the inconsistencies [*27] in Investigator's testimony are not nuanced. While Investigator's grand jury testimony was fairly consistent with the statements he allegedly made approximately one year earlier to the AUSAs, his declaration and hearing testimony differed substantially from his grand jury testimony. For example:

. [REDACTED]

Yet, almost one year after that testimony, and over two years after the alleged conversation with Counsel No. 1 occurred, Investigator's memory somehow was jogged to recall that Counsel No. 1 indicated "either at the first meeting or the subsequent telephone call [that Investigator's work] would also be covered under the attorney work product privilege or attorney privilege." (Hrg. Tr. at 9).

. [REDACTED]

Yet, during the hearing Investigator emphatically answered the question, "What, if any, belief did you personally have as you were having your discussions with AUSA Finn as to whether you were violating [Doe Corp.'s] instructions and the attorney-client privilege or work-product privilege," that he "believed [he] was violating all of them." (Hrg. Tr. at 77).

. [REDACTED]

Yet, during the hearing, when Investigator was asked about "what information [*28] [he had] acquired since [his grand jury] testimony that might possibly change [his] view that [he] gave a truthful answer," Investigator answered that "only [Doe Corp.] or the client can actually waive the privilege." (Hrg. Tr. at 92-93).

. [REDACTED]

Yet, during the hearing he claimed that he told AUSA Finn that Counsel No. 2 told Investigator not to contact the government and, if contacted, not to respond without notifying Doe Corp. "because they planned to utilize the

attorney-client privilege." (Hrg. Tr. at 35, 38).

Third, I note that the inconsistencies in Investigator's testimony are not reflective of confusion or misinterpretation on Investigator's part. The grand jury transcript shows that the questions were clear, [8] [*30] and Investigator's answers evidenced a meaningful understanding of the proceedings. Additionally, it does not appear that Investigator felt pressured to provide answers to the prosecutor or quickly respond when the meaning of a question was unclear: the grand jury transcript demonstrates that Investigator requested that questions be repeated or clarified when he was confused as to the meaning of a question, (see, e.g., Invest. Tr. at [*29] 45, 64, 85, 89), exercised his right to confer with counsel [9] regarding, inter alia, his Fifth Amendment privilege and Doe Corp.'s privilege, (see, e.g., Invest. Tr. at 19, 27-28, 30-31, 32, 39, 71-73), and repeatedly responded to questions with answers such as "I don't recall" or "I don't know," (Invest. Tr. passim). Further, I note that although Investigator was a lay witness, and thus not expected to understand the "terminology of applicable legal principles," Solomon, 125 F.R.D. at 37, he was a fairly sophisticated witness [10] who demonstrated at least a cursory understanding of the attorney-client privilege and work-product doctrine. [REDACTED]

He testified at the hearing that even prior to working for Doe Corp., he understood fully what the attorney-client privilege and work-product doctrine entailed and acknowledged that he could

_____

[8] Indeed, Investigator acknowledged that the questions were clear. After Investigator provided testimony during the hearing which was inconsistent with his grand jury testimony, the government asked Investigator whether there was anything unclear about the grand jury question; Investigator responded "It's clear, but I don't understand why I answered it in the fashion that I did at that point in time." (Hrg. Tr. at 89).

[9] Counsel for both Investigator and Doe Corp. were outside the grand jury room. (Invest. Tr. at 3-4).

[10] Investigator has extensive experience in law enforcement, taught ethics, has a degree in police science and criminal justice and currently sits on the boards of several professional organizations. (Hrg. Tr. at 4-5).

not disclose such information to any third party. (Hrg. Tr. at 38-39). Later, Investigator admitted that for "better than 20 years" he has understood that he cannot disclose privileged information without a client's consent. (Hrg. Tr. at 92). At both the hearing and grand jury proceedings, Investigator affirmed that he had "never once disclosed attorney-client privileged information without the consent of the client." (Hrg. Tr. at 47; Invest. Tr. at 63).

Similarly, Investigator's attempt to blame his inconsistent statements on overwhelming fear during his grand jury appearance also [*31] fails the test of credibility. [11] Investigator stated that he "never experienced in [his] 25 years anything - or since - as terrifying as [his] session in front of that grand jury," (Hrg. Tr. at 94), and thus he "may have made an error in judgment or perception regarding one or two questions, but [that] as far as [his] integrity or honesty, or desire to be honest and truthful, that was the bottom line - the essence of [his] testimony to the grand jury," (id.).

It certainly [*32] is understandable that a witness before a grand jury would be uncomfortable or experience some fear while testifying. However, while it is impossible to judge Investigator's demeanor based solely on the grand jury transcript, it is inconceivable that Investigator was so scared while testifying that he was incapable of correctly understanding the prosecutor's questions or that he was unable to answer as he intended to. [REDACTED]

Additionally, the implication that Investigator was overcome by fear and thus incapable of testifying accurately loses credibility when viewed in light of the fact that the government had granted

Investigator immunity from prosecution early on during his grand jury testimony. (Invest. Tr. at 21-23). If anything, it appears as if Investigator's incentive for testifying accurately would have been increased during his grand jury appearance in an effort to avoid perjury charges by the government.

Fourth, while I do not speculate as to Investigator's motive for providing varying testimony in different fora, [12] [*34] it is clear that Investigator was aware of Doe Corp.'s legal position in this case when he testified during the hearing. For example, Investigator's [*33] response to the question, "Is it correct that, in fact, you viewed the work that you were doing for [Doe Corp.] particularly with respect to firearms investigations as acting as a surrogate police department," he responded, "no, I was acting as a translator for [Counsel No. 1] interpreting U.S. title and state codes for his benefit." [13] (Hrg. Tr. at 66). Those terms come directly from controlling case law on the issue of whether Investigator served as an "agent" of Doe Corp., an issue which has been vigorously contested by the parties in their briefs regarding the motion to compel. See United States v. Ackert, 169 F.3d 136, 140 (2d Cir. 1999) (finding that because individual's "role was not as a translator or interpreter of client communications," there was no basis for privilege based on agency concept). Similarly, Investigator testified that the "primary" reason Inves. Co. was initially hired by Doe Corp. was in "anticipation of this class action suit." (Hrg. Tr. at 54). Again, Investigator's language parallels a legal issue disputed in this case regarding work-

---

[11] Investigator testified that when he appeared before the grand jury he felt as if he had become a "snitch." Investigator asserted that although he had been "assured by the government that [his] participation would never be revealed, . . . in fact during the grand jury hearings it was revealed, that [he] was so-called deep throat." (Hrg. Tr. at 93-94). Investigator declared that he did not know if Doe Corp. would continue to stand by him after such a revelation and that he "was one scared puppy." ( Id. at 94).

[12] I do find plausible, however, the government's theory that Investigator testified untruthfully during the hearing because Doe Corp. controls Investigator by continuing to pay Inves. Co., (Hrg. Tr. at 15-17), and because Doe Corp. may sue Inves. Co. and Investigator if he did not testify according to Doe Corp.'s wishes. (Gov. Post-Hrg. Br. at 11-12 (arguing that Doe Corp. would not sue and risk disclosure of its own conduct in this case if it can succeed in its motion to deny the grand jury incriminating documents and testimony)). Such a theory does not necessarily imply wrongdoing on Doe Corp.'s part, but rather indicates Investigator's independent motivation to tailor his testimony based on the presence of Doe Corp. attorneys during the hearing.

[13] [REDACTED]

product protection.

Fifth, Doe Corp.'s argument that contemporaneous Inves. Co. documents support its claim of privilege loses its persuasiveness when the number of documents containing confidentiality legends is compared to the overall number of documents submitted by Doe Corp. Investigator understood how to mark documents as privileged; [REDACTED]

[REDACTED]

During the hearing, Investigator stated that the absence of a notation that a document was privileged did not in any way reflect his belief that it was not privileged, but rather reflected a "screw-up that it didn't get posted on every single document" because in some situations he forgot to add the notation. (Hrg. Tr. at 14). Yet, out of the approximately 50 individual Inves. Co. documents submitted as attorney-client privileged for in camera review, [14] only six are marked with any kind of confidentiality legend. [15] Of those six documents, three specifically mention the work-product doctrine, but none mentions the attorney-client privilege. And of those three documents, only two were created prior to Counsel No. 2's employment [*35] by Doe Corp. [REDACTED]

_____

[14] This number includes both Doe Corp. and Investigator's documents and excludes all duplicates.

[15] See document 544-48 (2/3/99) ("The following information is confidential and sensitive and is directed only to the recipient. The information is not for third party release and is to be appropriately handled and disposed of at the completion of its use."); document 690 (3/2/99) ("Confidential/Internal Use Only!!"); document 711-12 (3/15/99) ("Internal Use Only//Atty Work Product Privilege. The following information is confidential and sensitive and is directed only to the recipient."); document 751-52 (3/5/99) ("Internal Use Only//Atty Work Product Privilege. The following information is confidential and sensitive and is directed only to the recipient. The information is not for third party release."); document 936-39 (12/9/98) ("This proposal and memorandum is protected under our mutual non-disclosure agreement"); document 745-47 (4/23/99) ("The following information is confidential and sensitive and is directed only to the recipient. The information is not for third party release and is to be appropriately handled as internal use only. This information is considered protected under the attorney work product privilege and non-disclosure agreement(s).").

[*36] The two documents created prior to Counsel No. 2's employment were created in March 1999, months after Inves. Co. was retained by Doe Corp. [16]

While the determination of whether a document is privileged does not depend upon the technical requirement of a privilege legend, the existence of such a legend may provide circumstantial evidence that the parties intended certain communications to be privileged. See, e.g., Music Sales Corp. v. Morris, 1999 U.S. Dist. LEXIS 16433, *17, 98 Civ. 9002, 1999 WL 974025, at *6 (S.D.N.Y. Oct. 26, 1999) ("It also bears mention that none of the allegedly privileged . . . documents contain a legend indicating that the documents are protected by the attorney-client privilege."); In re Pfohl Brothers Landfill Litig., 175 F.R.D. 13, 23 (W.D.N.Y. 1997) (applying New York common law) (noting that "none of the documents [*37] for which the attorney-client privilege is asserted is marked 'confidential' nor contains any indication that the communication included legal advice or was to remain confidential between clients and attorneys" and concluding for this and other reasons that plaintiffs failed to establish that documents warranted protection from disclosure). Here, although Doe Corp. has asserted that contemporaneous documents containing privilege legends support its claim that the communications were intended to be attorney-client privileged, no contemporaneous documents contain such legends. Finally, the sheer number of documents created by Investigator which lack a privilege legend (as well as the fact that Doe Corp. attorneys did not provide their own privilege legend when responding to email communications from Investigator) belie Investigator's assertion that the absence of such a legend was merely a "screw-up that it didn't get posted on every such document." (Hrg. Tr. at 14).

Accordingly, I find that Investigator's hearing

_____

[16] Additionally, marking the documents "confidential" or with "a similar legend" is required pursuant to the Mutual Non-Disclosure Agreement. (Expert Aff. Exh. A P 2).

2001 U.S. Dist. LEXIS 15646, *37

testimony and supporting declaration lack credibility and therefore I reject the hearing testimony and declaration.

Having determined that Investigator's hearing testimony [*38] and declaration regarding the intended confidentiality of the parties lack credibility, I must examine the testimony of Counsel No. 1. Counsel No. 1's declaration contains conclusory terminology and is an after-the-fact document drafted by counsel. Counsel No. 1's conclusory testimony during the hearing also fails to provide any useful insight into whether the parties intended their communications to be privileged. Solomon, 125 F.R.D. at 36. Because Counsel No. 1's submissions and testimony are inadequate to support Doe Corp.'s claim of privilege, I must analyze any remaining factors surrounding the communications to determine the privilege status.

Doe Corp.'s claims of confidentiality are undermined by the fact that it allowed Inves. Co. to inform law enforcement of certain Doe Corp. activities. Doe Corp. admits that Inves. Co. contacted hundreds of state and federal law enforcement officials at Doe Corp.'s request regarding law enforcement-related projects, (First Weiss Aff., Ex. 6 at 24), but claims that Inves. Co. only provided law enforcement with publicly available information and not any confidential or client communications, (Doe Corp. Ltr. at 8).

[REDACTED]

Additionally, [*39] reviewing the ex parte, in camera Inves. Co. documents, it is evident that certain communications which might otherwise be privileged were disclosed to law enforcement officials, including documents 544-58 (duplicate copies 975-79, 1336-40, 1380-84, 1541-45), 690 (duplicate copies 742, 1341, 1344), and 711-12 (duplicate copies 815, 1064-65, 1609-10).[17]

[*40] [18]

Because it is "vital to a claim of privilege that the communications between client and attorney were made in confidence and have been maintained in confidence," In re Grand Jury Subpoena, 482 F.2d at 81-82, any voluntary disclosure of an attorney-client communication to a third party for purposes inconsistent with maintaining confidentiality waives the attorney-client privilege as to that disclosure, [19] United States v. International Brotherhood of Teamsters, 961 F. Supp. 665, 673 [*41] (S.D.N.Y.) (noting that privilege is waived if holder "'voluntarily discloses or consents to disclosure of any significant part of the matter or communication' over which the privilege is claimed") (internal citations omitted), aff'd, 119 F.3d 210 (2d Cir. 1997). See Bowne of New York City, Inc., 150 F.R.D. at 478 (noting that if privilege-holder undertakes actions that will

have eliminated the prefix of the bates numbers for all Doe Corp. documents. To avoid confusion, I have included the prefix "BS" to refer to Investigator's documents.

Occasionally, I have included parentheticals after the document numbers. Parentheticals containing entries with the terms "top," "bottom," "redacted," etc., are derived from Doe Corp.'s "Fourth Amended Privilege Log" and indicate that only that portion of the document is being considered for protection from discovery. Other parentheticals contain references to the Doe Corp. declarations which support the alleged claims of attorney-client privilege or work-product protection for that document. Finally, there are parentheticals which reference duplicate copies of a document as indicated by Doe Corp. throughout its submissions.

[18] Reviewing the documents in camera, it is evident that certain of these documents (e.g., emails attaching statutes) most likely were not in fact disclosed to third parties. Investigator may have been mistaken as to which specific documents were disclosed to third parties because neither the government nor Investigator had the benefit of viewing the documents during the grand jury proceedings. Which specific documents were actually disclosed, however, is not the issue. Rather, the important factor is that Investigator provided the communications to third parties on numerous occasions and did so on his own initiative, and I credit his testimony to that effect.

[19] Because I find that the sharing of Inves. Co. documents is further evidence that the Inves. Co. documents were not intended to be confidential, there is no need to determine whether Doe Corp. waived its privilege by "'actually disclosing'" the contents of the Inves. Co. communications to law enforcement officials, United States v. Jacobs, 117 F.3d 82, 90 (2d Cir. 1997).

---

[17] In opposition to the government's motion to compel, Doe Corp. has submitted ex parte two binders of Doe Corp. documents and one binder of Investigator's documents. For purposes of this decision, I

predictably lead to disclosure of documents, then waiver will follow).

Doe Corp. points to the testimony of Counsel No. 2 as further evidence that the communications between Inves. Co. and Doe Corp. were intended to be [**42] attorney-client privileged. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

However, several factors indicate that Investigator was not informed of the attorney-client privilege until the summer of 1999. First, Doe Corp. relies on contemporaneous notes by Counsel No. 2 as evidence that Investigator was informed of the privilege. (Counsel No. 2 Decl. P 8). [REDACTED]

However, the fact that Investigator had his duties curtailed in that he would no longer be permitted to disclose Doe Corp. information to third parties, does not demonstrate that Investigator was informed that his communications with Doe Corp. were attorney-client privileged. [REDACTED]

[REDACTED][20]

If Inves. Co. had been hired to assist Doe Corp.'s lawyers in providing legal advice and thus necessarily participate in attorney-client privileged communications, it would be expected that Counsel No. 2, the lawyer responsible for litigation at Doe Corp., would have been so informed by Counsel No. 1 or Investigator.

Third, approximately seven Inves. Co. documents designated as attorney-client privileged were created after Counsel No. 2 started working at Doe Corp. [21] No documents contain [**43] attorney-client privileged legends, and only one document [22]

contains a header stating that the information contained therein is "confidential and sensitive" and "protected under the attorney work product privilege and non-disclosure agreement(s)." [23]

A finding that Investigator was not informed of the attorney-client privilege until the summer of 1999 is not contrary to Counsel No. 2's testimony. [REDACTED]

However, even if Counsel No. 2's declaration were determined to be contrary to such a holding, because Counsel No. 2's declaration "was obviously drafted by counsel after the dispute arose" it fails to "cast[] any light on the underlying facts which determine whether that conclusion can be drawn." Solomon, 125 F.R.D. at 36 n.2. [**44] I decline to credit such "litigation affidavits prepared by interested persons . . . after the fact and lacking any support in contemporaneous documentation." Adlman, 68 F.3d at 1500; In re Grand Jury Subpoena, 484 F. Supp. 1099, 1106 (S.D.N.Y. 1980) (noting that "associate's conclusory, after-the-fact assertions that an attorney-client . . . privilege existed are insufficient to carry the burden").

Accordingly, Doe Corp. has failed to satisfy its "burden of establishing all the essential elements" of the attorney-client privilege for the Inves. Co. documents. von Bulow, 811 F.2d at 146. Because Doe Corp. has also asserted work-product protection for all Inves. Co. documents that it has claimed the attorney-client privilege, I must now examine Doe Corp.'s claims of work-product protection.

B. Work-Product Protection

Doe Corp. also argues that certain communications between Inves. Co. and Doe Corp. are protected by the work-product doctrine. Doe Corp. contends that Inves. Co. was hired to work with Doe Corp.

---

[20] [REDACTED]

[21] (See documents 700-06, 707, 709, 710, 745-47, 750, and 1069).

[22] (Document 745-47).

[23] Although there are documents designated as work product throughout June 2000, there are no Inves. Co. documents designated as attorney-client privileged after April 24, 1999.

counsel in anticipation of litigation that Doe Corp. foresaw as a result of fraud or improper conduct by Doe Corp. customers. **[*45]** (Doe Corp. Opp. Br. at 17 (citing Counsel No. 3 Decl. PP 5-7, 12; Counsel No. 1 Decl. PP 13-14)). Doe Corp. claims that these concerns were evidenced when, not long after Inves. Co. was retained, Doe Corp. was informed that it would be sued as a result of customer conduct, (Doe Corp. Br. at 17 (citing Counsel No. 3 Decl. P 12), and that since then, a number of suits have been pursued against Doe Corp. for similar conduct. Doe Corp. asserts that Inves. Co. acted as an agent of Doe Corp.'s corporate counsel by "performing investigative functions and gathering information that was provided to counsel to allow counsel to advise the company and take any necessary action to prepare for or avoid litigation." (Doe Corp. Opp. Br. at 17 (citing Investigator Decl. PP 10-17; Counsel No. 1 Decl. PP 42-44); see also Doe Corp. Opp. Br. 12, 16-18).

The government argues that most of the Inves. Co. documents are not protected by the work-product doctrine. The government asserts that Doe Corp. did not hire Inves. Co. to gather information, particularly information about firearms, in "anticipation of litigation." Because the ATF allegedly assured Doe Corp. that it was in full compliance with all **[*46]** firearms laws, the government contends that the real purpose of Inves. Co.'s work was related to customer relations. (Gov. Reply Br. at 11 (citing First Weiss Aff., Ex. 6 at 16-19)). The government also claims that Investigator was not an agent of Doe Corp.'s counsel. (See Gov. Reply. Br. at 12 n.7 (noting that Investigator informed legal and non-legal Doe Corp. staff about certain illegal activities without direction or guidance from counsel and was free to disclose that information at his discretion)). Additionally, the government argues that even if the documents do constitute work product, that protection is waived because Inves. Co. repeatedly disclosed the information it gathered to law enforcement agencies with Doe Corp.'s knowledge and acquiescence and such disclosure is inconsistent with maintaining secrecy. (Gov. Reply Br. at 13 (citing Weiss Reply Aff. PP 10 a-c)). Furthermore, the government contends that even if Investigator's work for Doe Corp. is work product, he still must testify about the factual information he acquired. Finally, the government states that it has made a showing of substantial need to overcome any work-product protection.

Federal Rule of Criminal **[*47]** Procedure 16 codifies work-product protection for documents prepared "in connection with the investigation or defense of the case" in criminal proceedings. Because Rule 16 refers to proceedings in which there is a named defendant, it does not specifically apply to investigatory procedures of a grand jury. In re Grand Jury Subpoena, 599 F.2d 504, 509 (2d Cir. 1979). Nevertheless, the work-product protection rule "has been applied to grand jury proceedings." Id.; In re Grand Jury Subpoena, 484 F. Supp. 1099, 1102 (S.D.N.Y. 1980).

Work-product protection applies to "materials obtained or prepared . . . with an eye toward litigation." Hickman v. Taylor, 329 U.S. 495, 511, 91 L. Ed. 451, 67 S. Ct. 385 (1947). The work-product doctrine "protects 'work product of the lawyer' by prohibiting 'unwarranted inquiries into the files and the mental impressions of an attorney' . . . in criminal litigation." In re Grand Jury Subpoenas, 959 F.2d 1158, 1166 (2d Cir. 1992) (internal citations omitted). A party relying on work-product protection must demonstrate its applicability. In re Pfizer Inc. Sec. Litig., 1993 U.S. Dist. LEXIS 18215, 90 Civ. 1260, 1993 WL 561125, **[*48]** at *2 (S.D.N.Y. Dec. 23, 1993).

1. "In Anticipation of Litigation"

Documents and materials prepared "in anticipation of litigation" are granted limited protection against discovery. United States v. Adlman, 134 F.3d 1194, 1194-95 (2d Cir. 1998). A document is prepared in anticipation of litigation if there is the threat of some adversary proceeding, the document was prepared because of that threat and the document was created after that threat became real.

A lawsuit need not already have been filed for the "in anticipation of litigation" requirement to be met. Thus, a document may be protected even if it was "created prior to the event giving rise to litigation" because "in many instances, the expected litigation is quite concrete, notwithstanding that the events giving rise to it have not yet occurred." Adlman, 68 F.3d at 1501. For example, in Upjohn v. United States, 449 U.S. 383, 386-87, 397-402, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981), the Court applied work-product protection even though no proceedings against the company were threatened when the documents were prepared. See id. at 386-87 (involving documents [*49] created during internal investigation of "'possibly illegal' payments to foreign government officials"). "The party asserting the privilege must demonstrate that a 'substantial probability' of litigation existed at the time the material was created." Garrett v. Metropolitan Life Ins. Co., 1996 U.S. Dist. LEXIS 8054, *9, 95 Civ. 2406, 1996 WL 325725, at *3 (S.D.N.Y. June 12, 1996), report and recommendation adopted, 1996 U.S. Dist. LEXIS 14468, 1996 WL 563343 (S.D.N.Y. Oct. 3, 1996); Fustok v. Conticommodity Servs., Inc., 106 F.R.D. 590, 591-92 (S.D.N.Y. 1985) (denying work-product protection because "at the time the report was commissioned or prepared the prospect of litigation was not 'identifiable' because 'specific claims [had not] already arisen'"); Gould Inc. v. Mitsui Mining & Smelting Co., Ltd., 825 F.2d 676, 680 (2d Cir. 1987) (finding that work-product rule requires "existence of a real, rather than speculative, concern").

It is not enough that a document is created after the threat of litigation becomes real, but it is also necessary that the motivation for creating that document be the litigation. That is, a document is prepared "in anticipation of litigation" if "'in [*50] light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation.'" Adlman, 134 F.3d at 1202 (emphasis in original) (quoting Wright et al., 8 Federal Practice & Procedure § 2024, at

343 (1994)). The "because of" standard does not require that the event giving rise to litigation to have actually occurred, Adlman, 134 F.3d at 1203; Adlman, 68 F.3d at 1501 (noting that "non-occurrence of events giving rise to anticipated litigation is factor that can argue against application of work-product doctrine"), and it is not necessary that the document "be created in anticipation of the current litigation," Garrett, 1996 WL 325725, at *4; see Fine v. Facet Aerospace Prods. Co., 133 F.R.D. 439, 445 (S.D.N.Y. 1990) (citing FTC v. Grolier, 462 U.S. 19, 25, 76 L. Ed. 2d 387, 103 S. Ct. 2209 (1983)) (finding it immaterial whether document was created for another litigation, as long as it was created in anticipation of some litigation).

A document will not be protected [*51] if it is created in the ordinary course of business, even if it will also be useful in the event of litigation. Garrett, 1996 WL 325725, at *5 (quoting Bowne, 150 F.R.D. at 471); Adlman, 134 F.3d at 1202 (finding that work-product protection is unavailable for "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation"); Tejada Fashions Corp. v. Yasuda Fire & Marine Ins. Co., 1984 U.S. Dist. LEXIS 15815, 83 Civ. 5512, 1984 WL 500, at *4 (S.D.N.Y. June 18, 1984) (finding that documents prepared by investigator employed by insurance company were not work-product related even if litigation was expected). A document will not lose protection, however, "merely because it is created in order to assist with a business decision." Adlman, 134 F.3d at 1202; see also Garrett, 1996 WL 325725, at *4 (finding that work-product doctrine will apply if document was created with more than one purpose in mind "'if the "primary motivating purpose" behind the performance of the work was to assist in the pending or impending litigation'") [*52] (internal citations omitted).

Finally, I note that Doe Corp.'s argument that "the work product doctrine applies with equal force to material prepared to avoid litigation" is misplaced. (Doe Corp. Post-hrg. Br. at 23). The cases relied

upon by Doe Corp. do not hold that the mere avoidance of litigation constitutes "in anticipation of" litigation; rather, the cases support the position that no lawsuit need already have been filed for the "in anticipation of litigation" requirement to be met. See, e.g., Adlman, 68 F.3d at 1501 (finding that district court erred in rejecting work-product protection for sole reason that at time of creation of document, "neither the litigation nor the events giving rise to it . . . had yet occurred"). Indeed, to find that "avoidance of litigation" without more constitutes "in anticipation of litigation" would "represent an insurmountable barrier to normal discovery" and could subsume all compliance activities by a company as protected from discovery. In re William L. Derienzo, 1998 Bankr. LEXIS 635, *15, 5-96-01186, 1998 WL 283201, at *5 (Bankr. M.D. Pa. April 28, 1998) (noting that to say that all actions taken by party "were done in an effort [*53] to comply with the law to avoid litigation is, at best, convenient"); see Upjohn Co. v. Mova Pharmaceutical Corp., 936 F. Supp. 55, 57 (D. P.R. 1996) (finding that while "it is true, in a gross sense, that the formulations were prepared 'in anticipation of litigation,'" and that "goal is to avoid litigation," formulations are not protected from discovery as work product "because the information would be generated . . . regardless of the attorney's involvement").

Doe Corp. claims that it was concerned with potential litigation from two distinct groups: third parties and regulatory agencies.

a. Third-party Litigation

Doe Corp. alleges that in late 1998 and early 1999, it was threatened with litigation and anticipated the filing of civil suits by Doe Corp. customers or third parties arising out of fraudulent conduct or transactions involving illegal items. (See Doe Corp. Opp. Br. at 17). Doe Corp. relies on its counsel's declarations, contemporaneous documents, and the hearing testimony as evidence that it prepared documents in anticipation of litigation with third parties.

[REDACTED]

Although Doe Corp.'s declarations evidence general concerns regarding [*54] civil litigation by private third parties arising out of the conduct of certain Doe Corp. customers, the declarations do not demonstrate that Doe Corp. specifically anticipated litigation arising out of firearms transactions (as compared to, e.g., transactions involving other property).

[REDACTED][24]

Counsel No. 1's after-the-fact, conclusory assertions are not credible and fail to demonstrate that the documents were created in anticipation of litigation with third parties. Also, as noted above, a generalized desire to avoid litigation is insufficient to meet the "in anticipation of litigation" requirement.

Out of 119 documents [25] (or 70 excluding invoices) submitted as work-product protected, only eight have any kind of confidentiality legend, [26] and only five specifically contain work-product legends [27]. The fact that Doe Corp. designated only five documents with a work-product legend is another indicium that the primary motivation of Doe Corp. was the ordinary course of business and not anticipation of litigation. See United States v. IBM, 71 F.R.D. 376, 379 (S.D.N.Y. 1976) (treating as outside work-product protection "all documents [*55] which do not disclose that they were prepared for use in this litigation").

Counsel No. 2's grand jury testimony further indicates that the Inves. Co. documents were not

---

[24] [REDACTED]

[25] This number includes both Doe Corp. and Investigator's documents and excludes all duplicates.

[26] (See supra n. 15 listing confidentiality legends for documents 544-48, 690, 711-12, 745-47, 748-49, 751-52, and 936-39; see also document 1471 (fax cover indicating that "Information contained herein is deemed confidential, and is afforded protection under the attorney work product privilege.").

[27] (See documents 711-12, 745-47, 748-49, and 751-52).

created in anticipation of litigation. [REDACTED]

Doe Corp.'s evidence falls short of satisfying the Adlman requirement that documents be created with the "focus on a specific claim, rather than on the abstract possibility . . . of some as-yet unidentified claim." Adlman, 68 F.3d at 1502. The facts alleged by Doe Corp. differ from the Upjohn case [*56] in which litigation was almost certain to develop. See Upjohn, 449 U.S. at 386-87, 397-402. Here, Doe Corp.'s obscure references to unspecified threats of civil litigation (and particularized references to another type of litigation) do not satisfy Doe Corp.'s burden to demonstrate that, at the very least, it had a concrete anticipation of litigation from private third parties arising out of firearms transactions.

b. Regulatory Agencies

Doe Corp. also alleges that it was concerned about potential litigation with certain regulatory agencies, [28] particularly with the ATF. It is appropriate to address this argument within the context of activities prior to the government subpoena and subsequent to the government subpoena.

i. Pre-Government Subpoena

In March 1998, the ATF contacted Doe Corp. to discuss [*57] firearms transactions. (Counsel No. 1 Decl. P 15). [REDACTED]

Doe Corp. alleges that its concerns were considerable enough that it obtained a memorandum from outside counsel prior to the ATF meeting to be able to address fully legal issues that might be raised by the ATF inquiry. (Doe Corp. Ltr. at 12 (citing document 807-814)). [REDACTED]

On April 9, 1998, Counsel No. 1 and other Doe Corp. employees met with ATF officials. Clearly,

the documents created from the time that Doe Corp. was notified of the ATF inquiry on March 18, 1998 through the period leading up to and during the ATF meeting in April 1998 satisfy the temporal element of anticipation of litigation with the ATF. See, e.g., Garrett, 1996 WL 325725, at *3 ("Regulatory investigations by outside agencies present more than a mere possibility of future litigation, and provide reasonable grounds for anticipating litigation."). [29]

[*58] After the April meeting, Counsel No. 1 states that he remained in contact with the ATF to ensure that it was satisfied with Doe Corp.'s practices. (Counsel No. 1 Decl. P 21). [REDACTED][30]

While these documents evidence that Doe Corp. had conversations with the ATF related to transactions involving firearms, they do not demonstrate that Doe Corp. anticipated regulatory litigation by the ATF (or any other agency) after the April 1998 meeting. Indeed, in Doe Corp.'s own words, "at the time of the ATF meeting, [Counsel No. 1] reasonably anticipated a potential ATF regulatory investigation," but that "as it turned out, the ATF officials identified no concerns with the legality of [Doe Corp.'s] conduct [and] a full-blown ATF investigation did not materialize." (Doe Corp. Opp. Br. at 25 n.23; see also First Weiss Aff., Ex. 6 (Doe Corp. stating that ATF officials regarded Doe Corp. as a model for other companies and that ATF repeatedly advised Doe Corp. that its operations were lawful and proper); Cronin Aff. P 3 ("At no time, however, did ATF state that it believed that [Doe Corp.] had committed any crimes, or that ATF was commencing an investigation of [*59] Doe [Corp.]")).

Inves. Co. was not hired by Doe Corp. until December 1998, approximately eight months after Doe Corp. met with the ATF. While it is reasonable

---

[28] Doe Corp. makes only vague references to other regulatory agencies which might litigate against Doe Corp. - an insufficient basis on which to make a finding that Doe Corp. anticipated litigation.

[29] The facts in Garrett, in which several state regulators had already commenced investigations of the defendant and the defendant had been sued in a class action, led to the inescapable conclusion that the documents were created in anticipation of litigation.

[30] [REDACTED]

to accept that Doe Corp. anticipated litigation with the ATF in the days, weeks and even first few months subsequent to the April 1998 meeting, [31] at some point after the ATF officials advised Doe Corp. that the agency had no concerns with the legality of Doe Corp.'s conduct, Doe Corp. no longer reasonably anticipated litigation. Yet, Doe Corp. appears to be asking me to find that once a specific threat of litigation is identified, that threat can extend work-product protection ad infinitum. Doe Corp. cannot have it both ways -- it cannot submit on the one hand that the ATF consistently informed Doe Corp. that it was the model of legal behavior while on the other hand that it hired Doe Corp. in anticipation of litigation with the ATF. While it may be difficult to specify exactly when Doe Corp. no longer reasonably anticipated litigation, it is apparent that once the perceived threat of impending litigation dissipates, so does work-product protection. Certainly by December 1998, the threat of litigation had disappeared. [*60]

Indeed, it is evident that Inves. Co. initially was hired for a business purpose. Doe Corp. was greatly concerned about the legality of certain transactions for public relations reasons. Not only did Doe Corp. want to help safeguard consumer transactions, but it also wanted to avoid vilification in the press for facilitating illegal or fraudulent activity. While these are worthy business motivations, they do not warrant work-product protection; the pre-government subpoena Inves. Co. documents were created in the ordinary course of business. Adlman, 134 F.3d at 1202. Accordingly, all Inves. Co. documents created before January 29, 1999 are not protected by the work-product doctrine and must be produced.

ii. Post-Government Subpoena

On January 29, 1999, however, Doe Corp. received its first government subpoena, and the situation changed [*61] again. [32] As the government acknowledges, Doe Corp. "may have legitimately expected litigation relating to firearms after the first . . . subpoena was issued on January 29, 1999." (Gov. Reply Br. at 12 n.7). The government argues, however, that even if Inves. Co. "was given some additional tasks because of anticipated litigation, it also continued performing the same function of policing . . . and reporting information to law enforcement." (Gov. Reply at 12 n.7).

[*62] With two exceptions, Doe Corp. does not distinguish between Inves. Co.'s activities before the United States Attorney's Office issued the first subpoena and after. Rather, it appears that public relations and business purposes continued to be the motivating factors behind Doe Corp.'s use of Inves. Co.'s services. [REDACTED]

[REDACTED]

These documents were created in anticipation of litigation:

> 713-40 [33] (duplicate copies 1022-50 and 1577-1605); 743-44 (top) (duplicate copy 1345); 994 (duplicate copy 1566); 996; 1486-87; 1511 (duplicate copies BS130, BS132, BS197, BS199, BS202); 1516-17 (duplicate copies BS 133-134); 1524-26; 1554-61 (duplicate copy 1615-22); 1562-65 (duplicate copy BS188-191); 1568; and 1611 (duplicate copy 1612).

---

[31] During the immediate time period after the April 1998 meeting, it appears that Doe Corp. was working to implement certain recommendations made by the ATF.

[32] Doe Corp. asserts that the occurrence of this litigation further demonstrates that documents were created in anticipation of litigation. However:

> "the mere fact that litigation does eventually ensue does not, by itself, cloak materials" with work product immunity. The document must be prepared because of the prospect of litigation when the preparer faces an actual claim or potential claim following an actual event or series of events that could result in litigation.

Bank Brussels Lambert v. Credit Lyonnais (Suisse), 160 F.R.D. 437, 448-49 (S.D.N.Y. 1995) (internal citations omitted).

[33] The middle of page 740 through page 741 contains a communication between a Doe Corp. customer service representative and a customer and therefore must be produced.

The second category of documents that Doe Corp. links to the grand jury investigation are documents **[*63]** that Counsel No. 2 requested from Inves. Co. relating to the subject of the grand jury investigation. (Counsel. No. 2 Decl. PP 6-13). These documents were created in anticipation of litigation and include:

> 700-06; 707; 709; 710; 745-47 (duplicate copy of first page 1346); 748-49; 750; 1398-1405 (duplicate copies BS96-102); 1407-08 (duplicate copy BS109); 1436 (duplicate copy BS115); 1440 (duplicate copy BS116); 1443 (duplicate copy BS118); 1458 (duplicate copy BS119); 1471; 1476 (duplicate copy BS123); 1503; and 1629 [34].

Accordingly, these documents may be eligible for work-product protection.

Although Doe Corp. links document 995 (duplicate copy 1567) to the grand jury investigation, the document was created for purely public relations purposes and demonstrates no need for or understanding of confidentiality. Therefore, it is not eligible for work-product protection and must be produced.

Doe Corp. **[*64]** has failed to meet its burden in demonstrating that the following Inves. Co. documents were created in anticipation of litigation:

> 544-48 (duplicate copies 975-79, 1336-40, 1380-84, 1541-45, BS180-85); 690 (duplicate copies 742, 1341, 1344); 711-12 (duplicate copies 815, 1064-65); 751-52 (duplicate copies 1017-18; BS178-79); 920 (top redacted) (duplicate copies 1348, 1528); 921 (duplicate copies 1349, 1531); 922 (duplicate copies 1350, 1527); 923 (redacted) (duplicate copy 1351); 924 (redacted) (duplicate copy 1352); 925 (redacted) (duplicate copy 1353); 926 (top) (redacted) (duplicate copy 1354); 927 (top redacted) (duplicate copy 1355); 936-39

---

[34] Document 1629 contains Counsel No. 2's notes summarizing conversations with Investigator.

(duplicate copy 1386-89); 940 (duplicate copy 1363); 941-42 (top and bottom) (duplicate copies 943-44, 1364-65, 1366-67, 1532-33); 950 (duplicate copy 1368); 951-61 (top redacted) (duplicate copy 1369-79); 980-81 (top and middle) (duplicate copy 1546-47); 982-83 (top redacted); 984-987 (duplicate copy 1548-51); 991-92 (top) (duplicate copies 1552-53, 1623-24, BS192, 194-95); 1006-07 (bottom); 1009-10 (top) (duplicate copy 1575-76; BS30); 1020-21 (top); 1053 (top and bottom); 1062; 1063 (duplicate copy 1608); 1069-70 (duplicate copy **[*65]** 1613-14); 1534; 1535-37; and 1569-74.

Accordingly, these documents must be produced.

2. Agent

In United States v. Nobles, 422 U.S. 225, 238-39, 45 L. Ed. 2d 141, 95 S. Ct. 2160 (1975), the Court extended work-product protection to include the work product of an attorney's agents:

> At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

The government argues that Investigator did not act as an agent for Doe Corp.'s counsel but rather performed his work without direction or guidance from counsel. (Gov. Reply at 12 n.7). Doe Corp. alleges that Inves. Co. and Investigator were agents of Doe Corp.'s counsel in assisting **[*66]** counsel in preparing for anticipated litigation, such as investigating customer complaints and performing special projects relating to fraud or illegality. (Doe Corp. Ltr. at 5 (citing Counsel No. 1 Decl. P 39)).

Documents which were created under counsel's direction and control include:

> 700-06; 709; 710; 713-40 (duplicate copies 1022-50 and 1577-1605); 743-44 (top) (duplicate copy 1345); 745-47 (duplicate copy of first page 1346); 748-49; 750; 994 (duplicate copy 1566); 996; 1398-1405 (duplicate copies BS96-102); 1407-08 (duplicate copies BS107, BS109); 1436 (duplicate copy BS115); 1440 (duplicate copy BS116); 1443 (duplicate copy BS118); 1458 (duplicate copy BS119); 1471; 1476 (duplicate copy BS123); 1486-87 (duplicate copy BS136-37); 1503; 1511 (duplicate copies BS130, BS132, BS197, BS199, BS202); 1516-17 (duplicate copies BS133-34); 1524-26 (duplicate copy BS136-38); 1554-61 (duplicate copy 1615-22); 1562-65 (duplicate copy BS188-91); 1568; 1611 (duplicate copy 1612); and 1629.

These documents reflect research or investigatory efforts by Investigator on behalf of counsel to Doe Corp. Accordingly, the documents may be protected by the work-product doctrine.

It [*67] is clear, however, that Investigator periodically acted independently rather than under any attorney's direction and control. Rather than acting as an agent of counsel, Investigator was making his own decisions regarding the legality of certain activities by Doe Corp. users. Document 707 demonstrates that Investigator acted without control or guidance from counsel. Accordingly, this document is not protected by the work-product doctrine.

3. Waiver

The government also argues that even if certain documents are protected by the work-product doctrine, Doe Corp. waived that privilege. The government contends that Inves. Co.'s function was to disclose information that it gathered to law enforcement agencies. (Gov. Reply Br. at 13 (citing Weiss Reply Aff. P 10 a-c)). The government argues that such disclosures to law enforcement were inconsistent with maintaining secrecy from

Doe Corp.'s potential adversary, the government, in any criminal proceeding.

Doe Corp. does not directly address the waiver issue in the work-product context. I assume that Doe Corp. intended its arguments related to attorney-client waiver to apply to work product; that is, that Inves. Co. never disclosed any confidential [*68] information or client communications to law enforcement, but rather only periodically provided law enforcement with publicly available information. (Doe Corp. Ltr. at 8).

A waiver of work-product protection occurs "if the party has voluntarily disclosed the work-product in such a manner that it is likely to be revealed to his adversary." Bowne, 150 F.R.D. at 479; accord In re Steinhardt, 9 F.3d 230, 235 (2d Cir. 1993); Tribune v. Purcigliotti, 1997 U.S. Dist. LEXIS 228, *28-29, 93 Civ. 7222, 1997 WL 10924, at *6 (S.D.N.Y. Jan. 10, 1997) (noting that "work product doctrine is intended to protect against invasion and exploitation of work product by an adversary, and is therefore waived only when disclosed to an adversary"), order modified, 1998 U.S. Dist. LEXIS 5155, 1998 WL 175933 (S.D.N.Y. Apr. 14, 1998); Bank Brussels Lambert v. Credit Lyonnais (Suisse), 160 F.R.D. 437, 448 (S.D.N.Y. 1995) (noting that because purpose of work-product doctrine is to prevent adversary from taking advantage of attorneys' preparation for litigation, waiver only occurs where disclosure to third party substantially increases likelihood that work product will fall into hands of adversary). [*69]

Reviewing the documents that may be protected work product, none appears to have been shared with an adversary. Thus, the following documents may be eligible for work-product protection:

> 700-06; 709; 710; 713-40 (duplicate copies 1022-50 and 1577-1605); 743-44 (top) (duplicate copy 1345); 745-47 (duplicate copy of first page 1346); 748-49; 750; 994 (duplicate copy 1566); 996; 1398-1405 (duplicate copies BS96-102); 1407-08 (duplicate copies BS107,

BS109); 1436 (duplicate copy BS115); 1440 (duplicate copy BS116); 1443 (duplicate copy BS118); 1458 (duplicate copy BS119); 1471; 1476 (duplicate copy BS123); 1486-87 (duplicate copies BS136-37); 1503; 1511 (duplicate copies BS130, BS132, BS197, BS199, BS202); 1516-17 (duplicate copy BS133-34); 1524-26 (duplicate copies BS136-138); 1554-61 (duplicate copy 1615-22); 1562-65 (duplicate copy BS188-91); 1568; 1611 (duplicate copy 1612); and 1629.

4. Substantial Need and Undue Hardship

Work-product protection "is qualified and not absolute." In re Grand Jury Subpoena Dated November 9, 1979, 484 F. Supp. 1099, 1102 (1980). Production of work-product materials may be compelled when the party seeking discovery has demonstrated **[*70]** a substantial need for the material and an undue hardship in obtaining the material by alternative means. See Adlman, 134 F.3d at 1203 (noting that court can order production of portions of documents for which litigant has made adequate showing). The principles underlying work-product protection "must be considered in the context of the importance of the ability of the parties to an adversarial criminal proceeding to obtain needed evidence" as well as the recognition "that the public . . . has a right to every man's evidence." In re Grand Jury Subpoena, 484 F. Supp. at 1105 (internal quotations and citations omitted).

Opinion work product, which contains "the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of the party," Softview Company Products Corp. v. Haworth, Inc., 2000 U.S. Dist. LEXIS 4254, *15, 97 Civ. 8815, 2000 WL 351411, at *4 (S.D.N.Y. Mar. 31, 2000), is afforded greater protection than ordinary work product. See Upjohn, 449 U.S. at 400-02 (finding that "while we are not prepared to say at this juncture that . . . material [consisting of attorney's notes and memoranda incorporating oral **[*71]** statements of witnesses] is always

protected by the work-product rule, we think a far stronger showing of necessity and unavailability by other means . . . would be necessary to compel disclosure"); Adlman, 134 F.3d at 1197.

The Hickman Court found that substantial need is satisfied:

> Where relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had. Such written statements and documents might, under certain circumstances, be admissible in evidence or give clues as to the existence of location of relevant facts. Or they might be useful for purposes of impeachment or corroboration.

329 U.S. at 511 (emphasis added). A finding of undue hardship may be appropriate "where the witnesses are no longer available or can be reached only with difficulty." Id. at 511-12. For example, in Carter-Wallace, Inc. v. Hartz Mountain Indus., Inc., 553 F. Supp. 45, 50-51 (S.D.N.Y. 1982), the defendant corporation's principal executives all claimed a privilege against self-incrimination at deposition. **[*72]** The court found that the plaintiff was unable to obtain needed information about the case and ordered the defendant corporation to disclose work product detailing factual findings of an internal investigation.

In In re Grand Jury Subpoena, 484 F. Supp. at 1103, the court noted that:

> The few courts that have considered this issue with respect to grand jury matters have not articulated a definitive standard as to 'how much' good cause or necessity is sufficient to overcome the work product protection. Instead, the courts have examined a number of factors, such as the uses to which the subpoenaed material will be put, the nature of the material requested, the availability of alternative means of obtaining the information sought, and the extent to which the Government's asserted need

for the requested information is substantiated.

The government relies on the Sealed Ex Parte Affirmation of David Finn dated October 1, 1999 (the "First Finn Aff.") to demonstrate its compelling need for the Inves. Co. work-product documents. [35] The government claims that it has no alternative means for acquiring the Inves. Co. documents: calling Doe Corp. employees to testify [*73] about matters believed to be in the Doe Corp. documents would be unavailing, because Doe Corp. has and will invoke a "privilege to prevent them from testifying about information that they received from [Doe Corp.]" and calling Doe Corp. customers who conducted firearms transaction "may reveal evidence of illegal firearms transactions, but it will not necessarily prove [Doe Corp.'s] knowledge of the illegal nature of transactions." (Gov. Reply Br. at 25).

Doe Corp. alleges that the government [*74] has failed to demonstrate a compelling need for Doe Corp.'s work product. Doe Corp. claims that the government has plenty of information at its disposal with which to conduct its investigation, including thousands of pages of Doe Corp. documents about firearms and the testimony of four Doe Corp. witnesses who have testified about firearms transactions. Additionally, Doe Corp. argues that the government could subpoena other Doe Corp. employees and members of the public who conducted firearms transactions. Finally, Doe Corp. asserts that if the government wanted information from any of the witnesses who have claimed a Fifth Amendment privilege, "it could easily compel their testimony by obtaining use immunity under 18 U.S.C. §§ 6001 et seq. -- as it did with [Investigator]." (Doe Corp. Opp. Br. at

28).

Although Investigator has testified before the grand jury, he has never been questioned about substantive matters regarding firearms transactions at Doe Corp. (Gov. Reply Br. at 10 n.5). Because Doe Corp. has failed to establish that the Inves. Co. documents are protected by the attorney-client privilege and the majority of the Inves. Co. documents are not [*75] eligible for work-product protection, Investigator may now be questioned about such matters. Investigator has already been granted immunity [36] and thus is available for questioning. Without determining whether the government had demonstrated sufficient need for the documents, I find that the government has an alternative means of acquiring the information detailed in the First Finn Affirmation. Accordingly, the government's request for production of those documents is denied and the following documents need not be produced:

> 700-06; 709; 710; 713-40 (duplicate copies 1022-50 and 1577-1605); 743-44 (top) (duplicate copy 1345); 745-47 (duplicate copy of first page 1346) (see Counsel No. 2 Decl. P 9); 748-49 (see Counsel No. 2 Decl. P 9); 750; 994 (duplicate copy 1566); 996; 1398-1405 (duplicate copies BS96-102); 1407-08 (duplicate copies BS107, BS109); 1436 (duplicate copy BS115); 1440 (duplicate copy BS116); 1443 (duplicate copy BS118); 1458 (duplicate copy BS119); 1471; 1476 (duplicate copy BS123); 1486-87 (duplicate copies BS136-37); 1503; 1511 (duplicate copies BS130, BS132, BS197, BS199, BS202); 1516-17 (duplicate copy BS133-34); 1524-26 (duplicate copies BS136-138); [*76] 1554-61 (duplicate copy 1615-22); 1562-65 (duplicate copy BS188-91); 1568; 1611 (duplicate copy 1612); and 1629.

C. Investigator Documents

In addition to the Inves. Co. documents contained

---

[35] I note that the government has a legitimate interest in the secrecy of the grand jury proceedings and the in camera submission of David Finn affords a reasonable method of resolving these claims. See John Doe Corp. v. United States, 675 F.2d 482, 490 (2d Cir. 1982) (finding that "where conflicting claims about the confidentiality of evidentiary materials arise in preliminary proceedings, in camera submissions provide a method of judicial resolution which preserves confidentiality when justified").

[36] [REDACTED]

in the two binders submitted by Doe Corp., Doe Corp has submitted a binder of Investigator's own documents for the Court's review. Some of these documents are duplicates of Doe Corp. documents and are indicated as such (with the prefix "BS") throughout this decision. Investigator's declaration contains Doe Corp.'s support for its assertions of attorney-client privilege and work-product protection for Investigator's documents.

Many of Investigator's documents are instant message communications between Investigator and Doe Corp. employees. [37] [*77] These communications do not involve counsel for Doe Corp. One document contains an email from a Doe Corp. employee. [38] Counsel is not copied on this communication. The remainder of documents are Inves. Co. invoices. [39]

For the reasons set forth above and because I decline to credit Investigator's declaration (see Section I(A)(1)), Doe Corp. has failed to satisfy its "burden of establishing all the essential elements" of the attorney-client privilege and/or work-product protection for Investigator's documents. von Bulow, 811 F.2d at 146. Accordingly, these documents must be produced.

## II. Documents Relating To The ATF

In March 1998, ATF officials contacted Doe Corp. about transactions involving the sale of firearms. On April 9, 1998, Counsel No. 1, Doe Corp.'s Chief Financial Officer ("CFO"), and a Doe Corp. employee ("Employee") met with Mr. Cronin and other ATF officials to discuss this issue. (Counsel No. 1 Decl. P 20). Counsel No. 1 and Employee took notes during the meeting. (Counsel No. 1 Decl. P 20). Doe [*78] Corp. claims that these notes and certain other communications concerning the ATF are protected by the attorney-client privilege and/or work-product doctrine.

### A. Attorney-Client Privilege

Doe Corp. asserts that confidential communications between Counsel No. 1 and certain Doe Corp. employees before and after the ATF meeting are protected by the attorney-client privilege. [REDACTED]

The government contends that Doe Corp.'s communications with the ATF are not protected by the attorney-client privilege because they were not between lawyer and client and because they were not communications made primarily for the purpose of providing legal advice.

### 1. Information From Third Parties

The government asserts that Doe Corp.'s privilege assertion for documents which summarize communications with the ATF is contrary to settled law. Principally relying upon United States v. United Shoe Machinery Corporation, 89 F. Supp. 357 (D. Mass. 1950), the government argues that information received by a lawyer from a third party is not protected by the attorney-client privilege, even if the lawyer incorporates that information obtained from a third party into a document for the purpose [*79] of giving legal advice to the client. (Gov. Reply Br. at 15).

The United Shoe court found that "in so far as the subject of [certain] communications was the giving of legal or other advice upon the basis of facts disclosed to the attorney by a person outside the organization of a defendant . . . the communication is not privileged." 89 F. Supp. at 359. The Court of Appeals appeared to follow the United Shoe rule in United States v. Silverman, 430 F.2d 106, 120-22 (2d Cir. 1970) where the court found that the admission of a portion of an attorney's report that

---

[37] (See documents BS28; BS31-32; BS62-63 (duplicates BS84-85, BS86-87, BS88-89); BS64-65; BS66-67; BS68; BS69; BS70-71; BS74; BS75-77; BS78; BS79; BS80; BS81; BS82; BS90-91; BS92; BS93; and BS176).

[38] (See document BS186-87).

[39] (See documents BS94; BS95; BS103; BS104; BS105; BS106; BS108; BS110; BS111; BS112; BS113; BS114; BS117; BS120; BS121; BS122; BS124; BS125; BS126; BS127; BS128; BS129; BS132 (duplicate copy BS131); BS135; BS139; BS140; BS203; BS204).

contained a description of public union minutes was not erroneous because the minutes were not confidential communications between an attorney and a client. On rehearing, however, the court noted that it did not intend to create "an exception to the attorney-client confidential communication rules" and deleted its discussion of the United Shoe case from the original decision, but still found (without further elaboration) that under the circumstances, the attorney's report was properly received into evidence. United States v. Silverman, 439 F.2d 1198, 1198-99 (2d cir. [*80] 1970). In United States v. IBM, 66 F.R.D. 206, 211-12 (S.D.N.Y. 1974), a subsequent decision cited by the government, the district court, relying upon the language in the older version of the Silverman case that was later deleted by the Court of Appeals, found that "communications are privileged only to the extent that they reveal confidential information communicated by the client to the lawyer." The IBM court subsequently modified its decision to delete the older Silverman language, but found that the deletion had no substantive effect on the court's decision and determined that "the law remains clear that a communication from an attorney to a client is privileged only insofar as it has the effect of revealing a confidential communication from the client." IBM, 66 F.R.D. at 215; see also SCM Corp. v. Xerox Corp., 70 F.R.D. 508, 515 (D. Conn. 1978) (finding that public information is not protected simply because it is incorporated in document which contains legal advice); Rogers v. Grimaldi, 1986 U.S. Dist. LEXIS 17828, 86 Civ. 1851, 1986 WL 13459, at *1 (S.D.N.Y. Nov. 17, 1986) (stating that documents which merely reflect attorney's [*81] own thoughts or notes that reflect conversations with third party are not attorney-client privileged but finding those notes impossible to separate from notes that represent communications from client); Carte Blanche (Singapore) PTE, Ltd. v. Diners Club Int'l, 130 F.R.D. 28, 33 (S.D.N.Y. 1990) ("Although cases do not address whether documents which memorialize factual information gathered by the attorney should receive attorney-client protection, both parties

agree that the privilege gives way when the attorney merely communicates information obtained from independent sources."); ECDC Environmental, L.C. v. New York Marine & General Ins. Co., 1998 U.S. Dist. LEXIS 8808, *26, 96 Civ. 6033, 1998 WL 614478, at *9 (S.D.N.Y. June 4, 1998) ("An attorney's communication to a client reporting facts learned by the attorney from a third party is not within the attorney-client privilege unless the information is included in legal analysis or advice communicated to the client."). Thus, the government argues that Doe Corp. may not withhold documents which summarize its communications with the ATF.

Doe Corp. contends that the government is wrong for two reasons. First, Doe Corp. alleges, "a significant [*82] number of the attorney-client communications relating to the ATF do not convey information received from the ATF, and are not implicated by the government's argument." (Doe Corp. Ltr. at 10-11 and n.12). Second, Doe Corp. argues that the government's claim that the Court of Appeals follows the narrowly constricted view of the attorney-client privilege taken by United States v. United Shoe Machinery Corp., 89 F. Supp. 357 (D. Mass. 1950) is incorrect. Doe Corp. states that "although the government cites one dated, non-binding case from a different district that adhered to the narrow United Shoe standard, see SCM Corp. v. Xerox Corp., 70 F.R.D. 508, 515 (D. Conn. 1976), more recent authority holds that all attorney-client communications for the purpose of obtaining legal advice are privileged." (Doe Corp. Ltr. at 11 (citing In re Ford Motor Co., 110 F.3d 954, 965 n.9 (3d Cir. 1997))). Doe Corp. contends that "a court in this district has recognized that the privilege protects communications that do not necessarily contain client confidences." (Doe Corp. Ltr. at 11 (citing Martin v. Valley Nat'l Bank, 140 F.R.D. 291, 306 (S.D.N.Y. 1991)). [*83] Thus, Doe Corp. argues, the "attorney client privilege extends to all [Doe Corp.] attorney-client communications related to the ATF -- even those from lawyer-to-client." (Doe Corp. Ltr. at 11).

The Ford Motor Co. court, applying Pennsylvania and Michigan law, found that "the law makes no distinction between communications made by a client and those made by an attorney, provided that the communications are for the purpose of providing legal advice." 110 F.3d at 965 n.9 (finding that entire discussion between client and attorney undertaken to secure legal advice is privileged, no matter whether attorney or client is speaking). The Ford holding is not inconsistent with the United Shoe decision. [40] The government does not appear to object to the Ford holding, but rather argues that communications from third parties to an attorney are not covered by the attorney-client privilege.

 [*84] The following documents are not attorney-client privileged either because they do not contain communications between an attorney and client [41] [*85] or because they contain information that an attorney received from "an independent source[]," Carte Blanche, 130 F.R.D. at 33, [42] the ATF, and do not contain any legal analysis or legal advice:

---

[40] Similarly, the Martin case noted the uncontroversial position that the attorney-client "privilege encompasses communications between attorneys that are designed to facilitate the rendition of legal advice to the client." 140 F.R.D. at 306. Again, this decision is not contrary to the principle that public information is not protected simply because it is incorporated in document which contains legal advice.

[41] For example, document 854 is a message directed specifically to a non-legal Doe Corp. employee from another non-legal Doe Corp. employee regarding an ATF communication. The fact that a Doe Corp. attorney is copied on the document (as well as other Doe Corp. employees) does not transform the document into a confidential communication between an attorney and client. See United States Postal Serv. v. Phelps Dodge Refining Corp., 852 F. Supp. 156, 163-64 (E.D.N.Y. 1994) ("A corporation cannot be permitted to insulate its files from discovery simply by sending a 'cc' to in-house counsel.").

[42] See also Bank Hapoalim, B.M. v. American Home Assurance Co., 1993 U.S. Dist. LEXIS 1300, *4, 92 Civ. 3561, 1993 WL 37506, at *2 (S.D.N.Y. Feb. 8, 1993) ("The attorney-client privilege does not protect the attorney's communication to the client of information obtained from independent sources."); Standard Chartered Bank v. Ayala Int'l Holdings Inc., 111 F.R.D. 76, 80 (S.D.N.Y. 1986) ("The [attorney-client] privilege does not protect facts which an attorney obtains from independent sources and then conveys to his client.").

854; 865; 866; 873; and 874-76.

With the exception of document 854, Doe Corp. also has asserted the work-product doctrine for these documents. Accordingly, document 854 must be produced.

However, the following documents related to the ATF contain communications that do not convey information received from the ATF and may be attorney-client privileged in whole or in part: [43]

> 855 (the portion of the "Original Message" from "Hello" through the phone number listed is not privileged); 856; 859 (the first two sentences are not privileged); 860 (the first two sentences after the word "Gentleman" are not privileged); 861 (the first two sentences after the word "Gentleman" are not privileged); 862 (the first two sentences after the word "Gentleman" are [*86] not privileged); 863 (the first two sentences after the word "Gentleman" are not privileged); 868 (the first two sentences of the communication are not privileged); 871-72 (the first two entries and the entry titled "BBB" are not privileged); 877; and 907.

## 2. Legal Advice

The government also argues that the attorney-client privilege does not apply to certain ATF-related documents because they were not communications made primarily for the purpose of obtaining legal advice. The government argues that if a document is distributed for simultaneous legal and non-legal review, the document is not privileged. (Gov. Reply Br. at 16 (citing United States v. IBM, 66 F.R.D. at 213 [*87] ("If the document was prepared for purposes of simultaneous review by legal and non-legal personnel, it cannot be said that the primary purpose of the documents is to secure legal advice.

---

[43] Although some of these documents also contain notes that reflect communications with the ATF, some of "those notes are impossible to separate from the notes that represent communications from" Doe Corp. and thus may be attorney-client privileged. Rogers v. Grimaldi, 1986 U.S. Dist. LEXIS 17828, 86 Civ. 1851, 1986 WL 13459, at *1 (S.D.N.Y. 1986).

Therefore, one of the critical elements of the attorney-client privilege is absent at the outset."))).

[REDACTED]

Thus, Doe Corp. asserts that the ATF communications were not non-privileged "'business' communications." (Doe Corp. Ltr. at 12). Doe Corp. states that its in-house counsel was functioning as an attorney by providing legal, as opposed to business, advice. (Doe Corp. Ltr. at 12). Doe Corp. argues that because the advice given was predominantly legal advice, the privilege should attach. (Doe Corp. Ltr. at 12; Doe Corp. Opp. Br. at 23 (citing Counsel No. 1 Decl. P 16)).

The attorney-client privilege only protects disclosures "that are necessary to obtain informed legal advice and that would not be made without the privilege." Golden Trade, 143 F.R.D. at 518 (noting that privilege "should be strictly confined within narrowest possible limits underlying its purpose'") (internal quotations and citations omitted)). "If what is sought is not legal advice but [some other] [*88] service, . . . no privilege exists." Adlman, 68 F.3d at 1499-1500 (finding that evidence supported conclusion that client consulted accounting firm for tax advice, rather than that in-house counsel consulted with accounting firm to help attorney reach understanding needed to furnish legal advice); see also Armstrong v. Brookdale Hospital, 98 Civ. 2416, 1999 WL 690149, at *2 (E.D.N.Y. Aug. 28, 1999) (finding that "privilege claimant must show that the communication at issue 'relate[s] to a fact of which the attorney was informed by his client . . . for the purpose of securing primarily an opinion of law or legal services or assistance in a legal proceeding'") (quoting Hydraflow, Inc. v. Enidine, Inc., 145 F.R.D. 626, 630 (W.D.N.Y. 1993)).

The following documents contain communications between Doe Corp. employees and Doe Corp. counsel seeking or providing legal assistance regarding the ATF contact:

855 (the portion of the "Original Message"

from "Hello" through the phone number listed is not privileged) (see Counsel No. 1 Decl. P 15); 856; 859 (the first two sentences are not privileged) (see Counsel No. 1 Decl. P [*89] 19); 860 (the first two sentences after the word "Gentleman" are not privileged) (see Counsel No. 1 Decl. P 19); 861 (the first two sentences after the word "Gentleman" are not privileged) (see Counsel No. 1 Decl. P 19); 862 (the first two sentences after the word "Gentleman" are not privileged) (see Counsel No. 1 Decl. P 19); 863 (the first two sentences after the word "Gentleman" are not privileged) (see Counsel No. 1 Decl. P 19); 868 (the first two sentences of the communication are not privileged); 871-72 (the first two entries and the entry titled "BBB" are not privileged); 877; and 907 [44].

These documents contain communications protected by the attorney-client privilege, and accordingly, Doe Corp. is not required to produce these documents. Some of these documents also contain statements made by the ATF. Those documents must be produced to the government in redacted form as indicated in the parentheticals above. See, e.g., Resolution Trust Corp. v. Diamond, 773 F. Supp. 597, 601 (S.D.N.Y. 1991) (noting that if non-privileged material is in otherwise privileged document, non-privileged material must be disclosed).

[*90]  B. Work-Product Protection

Doe Corp. also claims that documents relating to the ATF inquiry are protected by the work-product doctrine.

1. Anticipation Of Litigation

The government argues that because Doe Corp. could not have "anticipated litigation" with the ATF, none of the ATF communications are protected by the work-product doctrine.

_____

[44] Document 907 is not directly related to the ATF inquiry, but satisfies the requirements of attorney-client privilege.

2001 U.S. Dist. LEXIS 15646, *90

As stated above in Section I(B)(1)(a)(i), Doe Corp. treated the ATF investigation as a legal priority and believed that the inquiry posed a significant potential for litigation. (Counsel No. 1 Decl. P 16). Thus, the following documents were created in anticipation of litigation with the ATF and may be eligible for work-product protection: [45]

102-03; 851; 865; 866; 873; 874-76; and 1625.

As stated in Section I(B)(1)(a)(i), documents 816 and 817 were created months [*91] after the ATF meeting. Doe Corp. has failed to demonstrate that these documents were created in anticipation of litigation. These documents are not eligible for work-product protection.

2. Agency

The government argues that Employee's notes, (document 102-03), should not be protected by the work-product doctrine because Employee, who is not a lawyer, was not acting as Counsel No. 1's agent in taking notes during the ATF meeting. While she may have been a paralegal at a previous job, the government states that Employee was in marketing at Doe Corp. (Gov. Reply Br. at 18-19). Additionally, the government claims that Employee did not give her notes to Counsel No. 1 after the conclusion of the meeting, and they were never reviewed by any lawyer until they were reviewed for privilege in connection with the grand jury subpoenas. (Gov. Reply Br. at 19). The government argues that Counsel No. 1 would have asked for these notes if he needed them to provide legal advice or because of anticipated litigation.

Although Doe Corp. emphasizes the fact that Employee was a former paralegal, (see Doe Corp. Opp. Br. at 24-25), that fact has no significance in determining whether she was acting as [*92] counsel's agent during the ATF meeting. [REDACTED]

Employee was thus acting as Counsel No. 1's agent when taking notes during the meeting; [46] Employee's notes may be eligible for work-product protection.

[*93] 3. Substantial Need And Undue Hardship

The government argues that it has demonstrated a compelling need for the ATF documents. The government's assertion is belied by the fact that, as noted by the government, both CFO and Counsel No. 1 testified before the grand jury and "answered virtually every question asked of them about the meeting and provided a step-by-step account of what they recalled, including what the [Doe Corp.] representatives said and what the ATF officials said." (Gov. Post-Remand Br. at 34). Additionally, the government has failed to demonstrate that it is unable to obtain the information regarding Doe Corp.'s communications with the ATF from other sources. Indeed, the government can interview or subpoena ATF officials who communicated with Doe Corp. regarding firearms transactions. See Horn & Hardart Co. v. Pillsbury Co., 888 F.2d 8, 12 (2d Cir. 1989) (finding no compelling need for attorney notes of meeting because movant could depose other attendees).

4. Redaction

On March 2, 2001, I found that Doe Corp. waived any applicable work-product protection for its non-opinion portions of notes of all contacts with the ATF prior to June 2, 1999. [*94] In re Grand Jury Proceedings, 2001 U.S. Dist. LEXIS 2425, M-11-188, 2001 WL 237377, at *19 (S.D.N.Y. March 2,

---

[45] Because I have already found that documents 856, 860, 861, 862, 863, 868, 871-72, 877, and 907 are protected by the attorney-client privilege, I do not rule on their eligibility for work-product protection.

[46] Under Federal Rule of Civil Procedure 26(b), Employee's notes would also be protected as work product of Doe Corp. Here, however, because the common law applies, it is not clear that work-product protection would extend beyond the agents of the attorney. Compare Adlman, 68 F.3d at 1500 ("The work-product rule shields from disclosure materials prepared 'in anticipation of litigation' by a party, or the party's representative, absent a showing of substantial need.") (quoting Fed. R. Civ. P. 26(b)(3)), with In re Grand Jury Subpoena, 599 F.2d at 510 ("To the extent that an internal corporate investigation is made by management itself, there is no attorney client-privilege, and by the same token, no work-product protection.") (internal citations and quotations omitted).

2001). Accordingly, Doe Corp. is ordered to produce all non-opinion portions [47] of the following documents:

102-03; 851; 865; 866; 873; 874-76; and 1625.

III. Corporate Review

Doe Corp. alleges that certain confidential communications between Doe Corp. employees and in-house counsel concerning a corporate review conducted at the direction of Doe Corp.'s litigation department are attorney-client privileged and/or work-product protected. (Doe Corp. Opp. Br. at 18). Doe Corp. asserts that in early 1999, it was threatened with litigation related to the conduct of Doe Corp. customers. (Counsel No. 3 Decl. P 12). [REDACTED]

The government argues that with few exceptions, the Court should closely scrutinize Doe Corp.'s claims of privilege related to Doe Corp. [*95] 's corporate review. The government asserts that Doe Corp. has withheld information related to recommendations by non-lawyers that were influenced by counsel's advice, yet has failed to cite any authority to support a claim of privilege based on "'actions undertaken at the direction of counsel.'" (Gov. Reply Br. at 21). The government further contends that some of the corporate review documents do not contain legal advice, but rather concern business information. [48]

[*96] A. Attorney-Client Privilege

Doe Corp. states that Counsel No. 3 was

"functioning as an attorney when he directed and supervised the [corporate] review, and engaged in confidential communications with the [Doe Corp.] Team concerning their activities." (Doe Corp. Opp. Br. at 19 (citing Counsel No. 3 Decl. PP 12-13, 15)). [REDACTED]

Doe Corp. alleges that "many of the privileged documents relating to the [corporate] review and the decision to terminate firearms [transactions] consist of reports and recommendations prepared by the [Doe Corp.] Team that contain both factual information gathered at the request of counsel and recommendations influenced by counsel's guidance." (Doe Corp. Opp. Br. at 19 (citing Counsel No. 3 Decl. P 16)). Doe Corp. maintains that some of the documents are emails between [Doe Corp.] Team members "concerning their actions undertaken at the direction of counsel" and that "although a small portion of these communications were not sent to counsel, each reflects the legal advice rendered by [Doe Corps's] counsel concerning this project." (Doe Corp. Opp. Br. at 20 n.18).

The results of internal corporate reviews, whether undertaken at the direction [*97] of in-house counsel or outside counsel, may be protected from disclosure under the attorney-client privilege and/or the work-product doctrine. United States v. Davis, 131 F.R.D. 391, 405 and n.9 (S.D.N.Y.), reconsideration granted in part, 131 F.R.D. 427 (S.D.N.Y. 1990). The attorney-client privilege applies to communications between corporate counsel and corporate employees when the communications were made "in order to secure legal advice from counsel" and "concerned matters within the scope of the employees' corporate duties." Upjohn, 449 U.S. at 394; Davis, 131 F.R.D. at 401 (noting that communications between in-house counsel and corporate employees may be protected by attorney-client privilege if in-house counsel was "functioning as an attorney"). The attorney-client "privilege protects from disclosure communications among corporate employees that reflect advice rendered by counsel to the

---

[47] Doe Corp. may only redact those portions of the documents that contain the mental impressions, conclusions, opinions, or legal theories of an attorney.

[48] The government also asserts that if any Doe Corp. or Inves. Co. documents are privileged, the Court should order that Doe Corp. may not invoke either the attorney-client privilege or work-product doctrine to prevent the employees who participated in the creation of these documents from testifying about the factual information they learned while creating those documents. (See, e.g., Gov. Reply Br. at 22 n.14 (citing In re Six Grand Jury Witnesses, 979 F.2d 939 (2d Cir. 1992))). In light of the previous orders in this case and the orders of production herein, I decline to enter such a blanket order at this time.

corporation." Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 442 (S.D.N.Y. 1995). Privileged communications will not lose "protection if an executive relays legal advice to another who shares responsibility [*98] for the subject matter underlying the consultation." Id. (quoting SCM Corp. v. Xerox Corp., 70 F.R.D. 508, 518 (D. Conn.), appeal dismissed, 534 F.2d 1031, 1032 (2d Cir. 1976)). "This follows from the recognition that since the decision-making power of the corporate client may be diffused among several employees, the dissemination of confidential communications to such persons does not defeat the privilege." Bank Brussels Lambert, 160 F.R.D. at 442.

Documents summarizing factual information are attorney-client privileged if it is "sufficiently clear that the [documents] would not have been created had plaintiff not needed the assistance of counsel." See AFP Imaging Corp. v. Philips Medizin Sys., 1993 U.S. Dist. LEXIS 18234, *5, 92 Civ. 6211, 1993 WL 541194, at *2 (S.D.N.Y. Dec. 28, 1993) (finding that chronology summarizing factual information related to case prepared by plaintiff's employee in response to request from counsel to be protected by attorney-client privilege); Davis, 131 F.R.D. at 405 n.9 (finding that factual investigations merit attorney-client privilege if "conducted . . . 'for the purpose of rendering legal [*99] advice'" to company); First Chicago Int'l v. United Exchange Co., 125 F.R.D. 55, 58 (S.D.N.Y. 1989) (finding documents created during investigation to provide factual background to attorney privileged where "each document was created at counsel's request, to provide counsel with the facts concerning the [investigation], so that counsel would be able to render a legal opinion").

It is evident from the documents that Counsel No. 3 was "functioning as an attorney," Davis, 131 F.R.D. at 401, in providing legal advice to Doe Corp. The documents created by the Doe Corp. Team assisted Counsel No. 3 in providing legal advice to Doe Corp. AFP Imaging Corp., 1993 WL 541194, at *2. The communications related to the corporate

review were disseminated only among the employee members of the Doe Corp. Team, the individuals charged with acting upon counsel's advice. (Doe Corp. Opp. Br. at 20 n.18). A few documents created by the Doe Corp. Team submitted by Doe Corp. as privileged do not copy counsel. Those communications were shared between and among members of the Doe Corp. Team tasked with providing reports and recommendations to counsel. Because [*100] I find that those documents "would not have been created had [the team] not needed the assistance of counsel," AFP Imaging Corp., 1993 WL 541194, at *2, I find these documents to be privileged. Accordingly, the following documents were created at counsel's request to supply counsel with information necessary to provide legal advice and need not be disclosed:

> 47-50; 57; 79; 188-89 (top and bottom); 190-91 (bottom); 192; 193; 196-97 [49]; 283 (bottom only); 291 (bottom only); 302-03 (fourth email only); 308; 309; 310; 398-99; 400; 401-03; 413-17; 418-21; 422-51; 452-59; 460-66 [50]; 486-515; 516-17; 518-19; 520-22; 523-24; 552-54; 555; 556; 557-86; 587; 588-89 (top); 1270; 1273; and 1298. [*101]

These documents are privileged and need not be produced. [51]

Documents 74 and 83-84 do not contain legal advice and are therefore not privileged. See Adlman, 68 F.3d at 1499-1500 (finding that "if what is sought is not legal advice but [some other] service, . . . no privilege exists").

---

[49] Although Doe Corp. failed to include this document in its brief in the attorney-client privilege section, (see Doe Corp. Opp. Br. at 19 and nn.15-16), I have treated the omission as an oversight.

[50] In finding pages 460-62 privileged, I rely on the privilege log which indicates that these documents are "draft . . . notice[s]" -- i.e., they were not released to the public.

[51] Further evidencing the privileged nature of these documents is that a majority of the communications are marked with a privilege legend. (See, e.g., documents 47-50, 188-89, 302-03, 398-99, 400, 401-03, 413-17, 418-21, 322-51, 452-59, 460-66, 486-515, 516-17, 518-19, 520-27, 523-24, 552-54, 555, 556-86, 587, and 1298).

## B. Work-Product Protection

Doe Corp. alleges that the corporate review documents which are attorney-client privileged are also protected by the work-product doctrine. With the exception of documents 74 and 83-84, I have determined that those documents are privileged; thus, there is no need to rule on work-product protection for those documents.

Documents 74 and 83-84 were created in mid-February 1999. These documents were created in anticipation of litigation under counsel's direction and control and contain conclusions influenced [*102] by legal advice and summaries of factual information supporting those conclusions. (See Counsel No. 3 Decl. PP 12-16). These documents are eligible for work-product protection. The government has not made an adequate showing of substantial need to overcome that protection. Accordingly, documents 74 and 83-84 need not be produced.

## IV. Corporate Review As Result Of Grand Jury Investigation

Doe Corp. states that after it received its first grand jury subpoena in January 1999, it took action to respond and defend itself. [REDACTED]

Counsel No. 2's responsibilities included gathering information to respond to the subpoenas, advising the company in the investigation, and coordinating with outside counsel. (Doe Corp. Opp. Br. at 9 (citing Counsel No. 2 Decl. P 6)). Doe Corp. contends that Counsel No. 2 conducted an internal review to gather information necessary to respond to the grand jury subpoena and to advise Doe Corp. during the investigation.

## A. Internal Review

The following documents which were prepared by or for counsel are protected by the attorney-client privilege and/or work-product doctrine and need not be produced:

336 (duplicate copy 1008) (Doe Corp. Opp.

[*103] Br. at 10 (citing Counsel No. 2 Decl. P 19 and Counsel No. 1 Decl. P 53)); 541-43 (duplicate copy 846-49) (Doe Corp. Opp. Br. at 11 n.8 (citing Counsel No. 1 Decl. P 54)); and 761 (see Counsel No. 2 Decl. P 17). [52]

## B. Witness Interviews

Doe Corp. also asserts that Counsel No. 2 conducted interviews of potential witnesses, including ATF officials, to assist outside counsel with Doe Corp.'s defense in connection with the grand jury investigation. (Doe Corp. Opp. Br. at 10 (citing Counsel No. 2 Decl. PP 14-15)). The government, apparently acknowledging that "forcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored," Upjohn, 449 U.S. at 399, [53] "does not dispute that documents memorializing [Counsel No. 2's] interview of Dan Cronin, which was [*104] conducted after the service of the first grand jury subpoena, apparently for purposes of making the June 2 submission, are work product." (Gov. Reply Br. at 19 n.12). Rather, the government states that it does not have sufficient information to know whether these documents were made in anticipation of litigation. The following documents were created in anticipation of litigation and thus are eligible for work-product protection:

699; 764; 765; and 766 (Counsel No. 2 Decl. PP 14-15).

Because [*105] the government has available to it alternative means of obtaining the information in the memoranda (e.g., interviewing the ATF

---

[52] The government withdraws its motion to compel documents 763 and 1155-56 (top and bottom). (See Gov. Reply at 20 n.13). Accordingly, Doe Corp. is not required to produce these documents.

[53] See also Robinson v. Time Warner, 187 F.R.D. 144, 145 (S.D.N.Y. 1999) (finding that attorney-client privilege and work-product doctrine protected notes of interviews conducted by outside counsel in internal investigation); Carter v. Cornell Univ., 173 F.R.D. 92, 94-95 (S.D.N.Y. 1997) (finding that attorney-client privilege and work-product doctrine protect notes of interviews conducted by associate dean at direction of counsel), aff'd mem., 159 F.3d 1345 (2d Cir. 1998).

2001 U.S. Dist. LEXIS 15646, *105

officials), there has been no showing of undue hardship. Accordingly, these documents need not be produced.

## V. Doe Corp. Communications With Outside Counsel

The government withdraws its motion to compel certain Doe Corp. communications with its outside counsel, including:

153-54; 172-73; 805-14 (duplicate copy 824-31); 776-804 (duplicate copy 834-45); 857-58; 864; 913-14; 930-35 (duplicate copy 1357-62); 997-98; 1076-77 (top); 1078-79; and 1630-31.

(See Gov. Reply at 20 n.13; Doe Corp. Opp. Br. at 7 n.5). Accordingly, these documents may be withheld from production.

Additionally, document 867 is a communication between Doe Corp. and outside counsel; it is protected by the attorney-client privilege and need not be produced. (Doe Corp. Opp. Br. at 7 n.5 (citing Counsel No. 1 Decl. P 28)).

## VI. Miscellaneous Documents

Doe Corp. alleges that certain other "miscellaneous" documents also warrant protection from disclosure. These documents are described throughout Doe Corp.'s ex parte declarations. The following documents are [*106] protected by the attorney-client privilege and/or work-product doctrine and need not be produced:

199-200 (Counsel No. 1 Decl. P 65); 467-85 (Counsel No. 2 Decl. P 21); 708 (Counsel No. 2 Decl. P 18); 753 (Counsel No. 2 Decl. P 20); 869-70 (Counsel No. 1 Decl. P 58); 906 (Counsel No. 1 Decl. P 60); 909 (Counsel No. 1 Decl. P 61); 910 (Counsel No. 1 Decl. P 61); 911-12 (Counsel No. 1 Decl. P 61); 974 (Counsel No. 1 Decl. P 64); 980-81 (bottom); 988-90; 991-92 (bottom) (duplicate copies 1152-53, 1623-24, BS192, BS194-95); 1000 (duplicate copy 1385) (Counsel No. 1 Decl. P 66); and 1005 (Counsel No. 1 Decl. P 66).

The following documents contain communications which are not privileged or protected and must be produced in redacted form:

100 (Counsel No. 3 Decl. PP 11, 18) - must produce email dated 9/16/98 17:04;

143 (duplicate copy 888) - must produce the middle email dated 9/16/98 17:04;

144 (duplicate copies 889 and 1275) - must produce the middle email dated 9/16/98 17:04;

158-59 - must produce the final email [54] dated October 19, 1998 12:52 pm;

266 (top and bottom) (duplicate copies 890, 1274-75) (Counsel No. 3 Decl. PP 11, 18) - must produce [*107] email dated 9/16/98 17:04;

590-95 (Counsel No. 2 Decl. P 19) - must produce 591 (relating third party contact), newspaper articles on 592-93 but not the handwritten notes, and entries on 594-595 but not the handwritten notes;

596-601 (duplicate copy 755-757) (Counsel No. 2 Decl. P 19) - must produce communication dated 4/29/99 6:08 which starts on the bottom of 596 and ends on 598 and repeats on 599 through 601;

852-53 (Counsel No. 1 Decl. P 57) - must produce the final email dated 2 Nov. 1997 20:52;

878-81 (Counsel No. 1 Decl. P 59) - must produce the final email dated July 22, 1998 9:55 AM;

882-85 (Counsel No. 1 Decl. P 59) - must produce the final email dated July 22, 1998 9:55 AM;

894 - must produce the final email;

---

[54] The final email is actually the initial email temporally.

895 - must produce the final email;

945-46 (Counsel No. 1 Decl. P 62) - must produce from "Original message follows:" to the end;

962-64 (Counsel No. 1 Decl. P 63) - must produce entry dated 12/24/98 7:45 which begins and ends on 963;

965-73 (Counsel No. 1 Decl. P 63) - must produce entry dated 12/24/98 7:45 which begins and ends on the bottom of 970 and ends on the top of 971;

999 - must produce the communication [*108] that begins with the word "Posted";

1003 (Counsel No. 1 Decl. P 66) - must produce email dated 22 Feb. 1999 22:49 (missing the following page);

1060 (top) - produce everything except last sentence of second paragraph and entire third paragraph; and

1071-72 (top) - produce everything from "Original message follows:" to the end.

CONCLUSION

For the reasons set forth above, the government's motion to compel is granted in part and denied in part.

SO ORDERED.

Dated: New York, New York

October 3, 2001

LORETTA A. PRESKA, U.S.D.J.

---

End of Document

# Lagace v. New Eng. Cent. R.R.

United States District Court for the District of Connecticut

September 28, 2007, Decided; September 28, 2007, Filed

CASE NO. 3:06CV1317 (RNC)

**Reporter**
2007 U.S. Dist. LEXIS 72540; 2007 WL 2889465

JAMES LAGACE, Plaintiff, v. NEW ENGLAND CENTRAL RAILROAD, Defendant.

**Prior History:** Lagace v. New Eng. Cent. R.R., 2007 U.S. Dist. LEXIS 16933 (D. Conn., Mar. 9, 2007)

**Counsel:** [*1] For James Lagace, Plaintiff: Charles C. Goetsch, George J. Cahill, Jr., LEAD ATTORNEY'S, Cahill, Goetsch & Maurer, P.C., New Haven, CT; Scott E. Perry, Cahill & Goetsch, New Haven, CT.

For New England Central RR, Defendant: Michael B. Flynn, LEAD ATTORNEY, Flynn & Associates, Quincy, MA.

For Connecticut Department of Labor, Defendant: Thadd A. Gnocchi, LEAD ATTORNEY, Attorney General's Office, Hartford, CT.

**Judges:** Donna F. Martinez, United States Magistrate Judge.

**Opinion by:** Donna F. Martinez

# Opinion

SECOND ORDER ON PLAINTIFF'S MOTION TO COMPEL

Pending before the court is the plaintiff's Motion to Compel, doc. # 22. [1] The plaintiff seeks to compel

the disclosure of fourteen items listed on the defendant's Amended Privilege Log (doc. # 26, App. D at 6). The defendant claims that these items are protected by the work product doctrine. The plaintiff's motion is granted in part and denied in part, as set forth herein.

I. Factual Background

The defendant operates a railroad between New London, Connecticut and East Alburg, Vermont. (Compl., P 5.) The plaintiff was employed by the defendant as a conductor and was injured at the defendant's facility in Palmer, Massachusetts on November 28, 2005,. (Id., PP 7-8, 10.) According to plaintiff's Motion to Compel, the plaintiff suffered a crush injury to his left foot and is permanently disabled from his occupation as a conductor. (Doc. # 23 at 2.) The plaintiff brings this action under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51, *et seq.* and certain other statutory provisions. [2]

The documents at issue were created by and/or were communications among the defendant's employees, defense counsel, [*3] and/or an entity called Railroad Risk Management, Inc. ("RRMI"). The defendant has submitted an affidavit from its

---

[1] The court heard oral argument on the plaintiff's motion on April 10, 2007 and subsequently entered a partial ruling as to some of the disputed requests (namely Production Requests # 6, 7, 12, 18, 19, 21, 32, 35 and 41 and Interrogatory # 1). The defendant represented at oral argument that it objects to [*2] the remaining disputed items only insofar as they seek production of documents on the defendant's Amended Privilege Log (doc. # 26, App. D at 6). The parties were ordered to file supplemental briefs specifically discussing the applicability of the work product doctrine to the documents on the Amended Privilege Log.

[2] In addition to FELA, the complaint references the Boiler Inspection Act, 49 U.S.C. § 20701, and the Safety Appliance Act, 49 U.S.C. § 20302.

in-house counsel, Daniel A. Hershman. [3] (Doc. 26, App. J.) Mr. Hershman states that when an accident occurs, he has primary responsibility for deciding whether the accident or injury may give rise to litigation. (Id., P7.) Mr. Hershman avers that on November 28, 2005, the day of plaintiff's injury, he hired defense counsel to protect the defendant's interests and prepare for litigation. (Id., P9.) On that same date, defense counsel hired RRMI to assist in preparing for litigation. (Id., P10.) According to the affidavit, RRMI is "only hired to investigate accidents or injuries when there is a strong likelihood that litigation will occur and RRMI is hired solely to assist defense counsel in preparing for litigation. (Id., P11.) Mr. Hershman further states that the documents in the Amended Privilege Log were not created in the ordinary course of business but in anticipation of litigation. (Id., PP12-13.)

The documents include emails regarding the status of the plaintiff's medical condition, witness statements, and other communications. Perhaps most significant is an investigative report which includes the results of a reenactment of the accident conducted by the defendant and RRMI the day after the accident occurred. This reenactment was apparently conducted using the same locomotive and boxcar, at the same site, and with some of the same personnel involved. The plaintiff contends that he has no ability to conduct a similar reenactment of his own, because the defendant did not own the boxcar at issue and therefore cannot produce it to the plaintiff for investigation.

## II. Work Product Doctrine

Work product issues are governed by federal law. [4] EDO Corp. v. Newark Ins. Co., 145 F.R.D. 18, 21 (D. Conn. 1992). "The work product doctrine is

distinct from and broader than the attorney-client privilege." United States v. Nobles, 422 U.S. 225, 238 n. 11, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975) (citing Hickman v. Taylor, 329 U.S. 495, 508, 67 S. Ct. 385, 91 L. Ed. 451 (1947)). The work product doctrine shields from disclosure documents and other materials prepared in anticipation of litigation or trial by [*5] a party or a party's representative, absent a showing of substantial need and the inability to obtain the substantial equivalent without undue hardship. Fed. R. Civ. P. 26(b)(3); see also In re Grand Jury Subpoenas Dated Oct. 22, 1991 and Nov. 1, 1991, 959 F.2d 1158, 1166 (2d Cir. 1992). The doctrine extends to notes, memoranda, correspondence, witness interviews, and other materials, whether they are created by an attorney or by an agent for the attorney. See United States v. Nobles, 422 U.S. 225, 238-39, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975); Carter v. Cornell Univ., 173 F.R.D. 92, 95 (S.D.N.Y. 1997).

"Three conditions must be met to earn work product protection. The material must (1) be a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for his representative." Sicurelli v. Jeneric/Pentron Inc., No. 03-CV-4934 (SLT)(KAM), 2006 U.S. Dist. LEXIS 29813, *5 (E.D.N.Y. May 16, 2006) (internal citations and quotation marks omitted). The burden of establishing all three elements of the work product privilege rests with [*6] the party invoking the privilege. Id.

"Where a document was created because of anticipated litigation, and would not have been prepared in substantially similar form but for the prospect of that litigation, it falls within Rule 26(b)(3)." United States v. Adlman, 134 F.3d 1194 (2d Cir. 1998).

"Even where the applicability of the work product doctrine has been established, factual material may be ordered produced upon a showing of substantial need and inability to obtain the equivalent without undue hardship." Sicurelli, 2006 U.S. Dist. LEXIS

---

[3] Mr. Hershman is actually employed by RailAmerica, Inc., a holding company whose subsidiaries include the defendant. (Hershman Aff., P 5.) RailAmerica, Inc. provides legal [*4] services to its constituent companies. (Id., P6.)

[4] The defendant does not claim that the attorney-client privilege applies to any of the documents on the privilege log.

29813 at *7 (internal citations and quotation marks omitted). [5] "A substantial need for work product materials exists where the information sought is 'essential' to the party's defense, is 'crucial' to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative value on contested issues." Strauss v. Credit Lyonnais, S.A., 242 F.R.D. 199, 237 (E.D.N.Y. 2007) (internal citation and quotation marks omitted). "Substantial need is not evaluated in a vacuum, and in order to overcome work product protection, [the movant] must demonstrate that it cannot obtain the substantial equivalent of the information [*7] it seeks." Sicurelli, 2006 U.S. Dist. LEXIS 29813 at *8. "Because the work product privilege does not protect the facts in that document (the privilege protects documents, not facts), the party seeking those facts may obtain them through other means of discovery, such as through depositions and interrogatories." Id., *9-10.

"Undue hardship does not mean that the movants must prove that obtaining the information elsewhere is absolutely impossible. . ." Strauss, 242 F.R.D. at 237 (internal citation omitted). All they must show is that "it is likely to be significantly more difficult, time-consuming or expensive to obtain the information from another source than from the factual [*8] work product of the objecting party." Id. "[A]lthough expense may be considered in determining undue hardship, in the ordinary case, the cost of one or a few depositions is not enough to justify discovery of work product." Sicurelli, 2006 U.S. Dist. LEXIS 29813, *10.

### III. Discussion

The plaintiff's FELA claim requires him to prove:

the traditional common law elements of negligence: duty, breach, foreseeability, and causation. At the same time, the plaintiff's burden in making a showing of causation and negligence is lighter under FELA than it would be at common law because the theory of FELA is that where the employer's conduct falls short of the high standard required of him by the Act and his fault, in whole or in part, causes injury, liability ensues. Thus, under FELA, an employer has a duty to provide its employees with a safe workplace, which it has breached if it knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees. Accordingly, . . . an employer may be held liable under FELA for risks that would otherwise be too remote to support liability at common law.

Tufariello v. Long Island R.R., 458 F.3d 80, 87 (2d Cir. 2006) [*9] (internal citations and quotation marks omitted). Under this standard, it is apparent that investigations of how the accident occurred are relevant within the meaning of Fed. R. Civ. P. 26(b)(1). The condition of the equipment is also relevant, as are the plaintiff's medical records.

Having made a threshold determination that the discovery sought is relevant, the court turns to an item-by-item discussion of the disputed production requests and interrogatories to decide whether the materials on the privilege log are shielded from disclosure by the work product doctrine.

### Production Request # 9:

The court begins with the most hotly contested issue, which is the claimed work product protection of RRMI's reenactment the day after the accident. Plaintiff's Production Request  # 9 seeks, among other things, the production of all inspection, maintenance and repair records for the equipment involved in the accident. The plaintiff argues that Item # 11 on the Amended Privilege Log, RRMI's Investigation Report, is responsive to this request and is not work product because it was not prepared

---

[5] As to opinion work product, "which shows the mental impressions, conclusions, opinions or legal theories of an attorney or other representative," the Second Circuit has held that "at a minimum, such material is to be protected unless a highly persuasive showing is made." United States v. Adlman, 134 F.3d 1194, 1204 (2d Cir. 1998). See also In re Grand Jury Proceedings, 219 F.3d 175 (2d Cir. 2000). The defendant has not argued that any of the items on the Amended Privilege Log are subject to this higher standard.

2007 U.S. Dist. LEXIS 72540, *9

in anticipation of litigation. Plaintiff also argues that, even if the work product protection applies, he [*10] has substantial need for it and cannot obtain the equivalent information without undue hardship.

The defendant contends that the document was prepared in anticipation of litigation. The defendant argues that its counsel hired RRMI to conduct an investigation in anticipation of litigation.

The plaintiff argues that the investigation was not conducted in anticipation of litigation but for routine business purposes. He argues that the defendant investigates accidents as a routine matter in order to improve safety practices. Plaintiff has submitted deposition testimony suggesting that reenactments are "standard practice." (Pl's Second Suppl. Mem., Doc. # 54, App. A at 18.)

A document is protected by the work product doctrine if "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998) (internal citations and quotation marks omitted). A document does not lose protection simply because it was created both in anticipation of litigation and to assist with business decisions. Id.

The court concludes [*11] that the defendant anticipated litigation immediately in this case. The plaintiff was seriously injured, counsel was retained immediately, and counsel immediately retained RRMI for investigative purposes. The defendant's in-house counsel affirms that RRMI is hired only when there is a strong likelihood that litigation will occur. The court therefore finds that the investigative report was created in anticipation of litigation and is protected by the work product doctrine.

The analysis does not end there, however. The plaintiff contends that he has substantial need for the report because he cannot observe the boxcars as they were 24 hours after the accident and has no

way of reenacting the accident with the same train cars and with the same loads contained on each car. He also argues that it is impossible for him to inspect the actual boxcar to find out if it is defective. The plaintiff has not, however, made a showing as to why any of that information is essential to his case, crucial to a liability determination or highly probative on contested issues. See, e.g., Strauss v. Credit Lyonnais, S.A., 242 F.R.D. 199 (E.D.N.Y. 2007). Plaintiffs frequently must prosecute their cases without [*12] access to information that might have been more readily available 24 hours after the incident. The fact that the defendant happened to collect that information does not automatically entitle the plaintiff to a copy of the defendant's work product. [6]

Even if the plaintiff could make a showing of substantial need, moreover, he has failed to demonstrate his inability to obtain the information from other sources without undue hardship. Although the plaintiff argues that the defendant is unable to produce the boxcar for testing purposes, there is no record as to any efforts made by the plaintiff to obtain it. Nor is there any evidence about any logistical or financial barriers to obtaining it. Most significantly, the plaintiff has not presented any evidence that he cannot obtain substantially the same information via interrogatories or by deposing individuals involved in the reenactment. Although the report is protected by the work-product doctrine, the facts contained in it are not protected. Because the plaintiff has failed to establish both "substantial [*13] need and the inability to obtain the substantial equivalent without undue hardship," Fed. R. Civ. P. 26(b)(3), item # 11 of the defendant's Amended Privilege Log need not be disclosed as it is protected by the work product doctrine. Put another way, the plaintiff's motion to compel is granted as to Request # 9 except for Amended Privilege Log item # 11.

_____

[6] Of course, if the defendant or its experts intend to rely on the report at trial, they will have to disclose it. See Fed. R. Civ. P. 26(a).

Production Requests # 1 and # 4:

The plaintiff's Production Requests # 1 and # 4 seek production of documents relating to the plaintiff's medical records. The defendant objects to the requests to the extent that they seek production of items # 3, 4, and 5 on the Amended Privilege Log, which are email discussions among the defendant, RRMI and counsel regarding the plaintiff's medical condition. The defendant argues that those items are work product because they were communications among the defendant's employees and RRMI employees created in anticipation of litigation. The plaintiff argues that the emails might instead constitute routine tracking of injured employees.

According to the Amended Privilege Log, items # 3, 4, and 5 are dated between August 1, 2006 and October 10, 2006. The complaint was filed on August 23, 2006. In light of [*14] the court's conclusion that RRMI was hired in anticipation of litigation the day of the accident, the court finds that these emails also were created in anticipation of litigation and are therefore protected. Furthermore, the plaintiff cannot show substantial need for these items, as he has access to his own medical records.

The plaintiff's motion to compel is granted as to Production Requests # 1 and 4, except that Items # 3, 4 and 5 on the Amended Privilege Log are protected by the work product doctrine and need not be produced.

Production Requests # 13, 15 and 16:

These production requests seek, among other things, the trainmaster's complete file, any injury and accident investigative and inspection reports, and emails or memoranda pertaining to investigation of the accident. The defendant objects to these requests insofar as they seek production of items on the Amended Privilege Log. Specifically, it appears that items 1, 2, 6, 7, 8, 9, 11, 12, 13 and 14 on the Amended Privilege Log could be responsive. (The plaintiff's supplemental brief states, however, that he does not seek to compel item # 14.) The Amended Privilege Log states that all of these items were generated by and/or [*15] exchanged among the defendant, its counsel and/or RRMI in anticipation of litigation. As such, and for the reasons previously discussed, the court finds that the items are protected by the work product privilege.

The plaintiff argues that he has substantial need as to documents 1, 11, 12 and 13 because they are based on observations made within a day after the accident. For the same reasons discussed above, the plaintiff has not established both "substantial need and the inability to obtain the substantial equivalent without undue hardship." Fed. R. Civ. P. 26(b)(3).

The plaintiff next argues that he has substantial need for the statement of Jim Rivers, item # 8, because when plaintiff's counsel deposed Mr. Rivers, he did not recall certain details such as what the train engineer told him about how the accident happened. The plaintiff speculates that Mr. Rivers might have had a better recollection when his statement was taken the day after the accident than he had when he was deposed. [7] Plaintiff has failed to explain, however, why the forgotten details are so crucial that the court should disregard the work product protection. Nor has the plaintiff made any showing that the information [*16] cannot be obtained from other sources.

To the extent that the plaintiff claims to have substantial need for other employees' witness statements taken shortly after the accident, he has not established that the information cannot be obtained by deposing the witnesses.

The plaintiff's motion to compel is granted as to Requests 13, 15 and 16, except that items on the defendant's Amended Privilege Log are protected by the work product doctrine and need not be

---

[7] The defendant's second supplemental brief states that "[defense] counsel has examined Mr. Rivers's statement and can definitively represent to the court that Mr. Rivers['] statements mirror his deposition testimony." (Doc. # 57 at 7.)

produced.

Production Requests # 28 and # 30:

Plaintiff's Production Requests # 28 and 30 seek, among other things, statements taken by the defendant including notes or memoranda about such statements. The defendant objects to these requests to the extent that they seek production of items 3, 4 and 5 on the Amended Privilege Log, the emails concerning plaintiff's medical condition. The court has held that those items are protected by the work product doctrine.

The plaintiff's motion to compel is granted as [*17] to Requests 28 and 30, except that items on the defendant's Amended Privilege Log are protected by the work product doctrine and need not be produced.

Request # 29:

Plaintiff's production request # 29 seeks copies of any statements taken by the defendant. The defendant objects to the extent that these seek the witness statements listed as items 6, 7, 8 and 9 on the Amended Privilege Log. The court has already held that those items are protected by the work product doctrine and that the plaintiff has failed to establish substantial need for them.

The plaintiff's motion to compel is granted as to Request

# 29, except that items on the defendant's Amended Privilege Log are protected by the work product doctrine and need not be produced.

Interrogatory # 7:

Plaintiff's interrogatory # 7 asks the defendant to "identify and describe all inspections, maintenance and repairs made to the train car and equipment involved in the alleged accident and give the names, addresses, and job classifications of the persons making each inspection" for two years before and one year following the accident. [8]

The defendant objects to this interrogatory insofar as it seeks production of items on the Amended Privilege Log. The court has held that the items on the Amended Privilege Log are protected by the work product doctrine and need not be produced.

However, this is not a request for production but an interrogatory. "The interrogatories seek facts, not documents or tangible objects, and the proper form of response is a narrative answer, not a reference to documents or objects where the answers might be found." In re Savitt/Adler Litig., 176 F.R.D. 44, 48 (N.D.N.Y. 1997). The work product doctrine protects documents, not facts. The defendant must therefore respond to this interrogatory and must "identify and describe" all inspections, including the ones conducted by RRMI.

The plaintiff's motion to compel is granted as to Interrogatory # 7, except that any documents on the defendant's Amended Privilege Log need not be produced.

SO ORDERED at Hartford, Connecticut this 28th day of September, 2007.

/s/ Donna F. Martinez

United States Magistrate Judge

---

[8] The request originally sought information for a longer period, but the plaintiff has limited the request [*18] to this period.

**End of Document**

# Go Med. Indus. Pty., Ltd. v. C. R. Bard, Inc.

United States District Court for the District of Connecticut

August 14, 1998, Decided ; August 14, 1998, Filed

MISC DOCKET NO. 3:95 MC 522 (DJS)

**Reporter**

1998 U.S. Dist. LEXIS 22919; 1998 WL 1632525

GO MEDICAL INDUSTRIES PTY, LTD., A.C.N. 009 018 339, GO MEDICAL USA, INC., and ALEXANDER G. B. O'NEIL, Plaintiffs, v. C. R. BARD, INC., Defendant.

**Prior History:** **[*1]** United States District Court, Northern District of Georgia. Pendent Case No. 1:95-CV-2307-HTW.

**Disposition:** Go Medical's motion for protective order (doc. # 1) granted in part and denied in part and C.R. Bard's cross-motion for order compelling discovery (doc. # 4) granted in part and denied in part.

**Counsel:** For GO MEDICAL INDUSTRIES PTY. LTD., A.C.N. 009 018 339, GO MED USA, INC, ALEXANDER G.B. O'NEIL, Plaintiffs: James E. Alix, L. James Ristas, Alix, Yale & Ristas, Hartford, CT.

For GO MEDICAL INDUSTRIES PTY. LTD., A.C.N. 009 018 339, GO MED USA, INC, ALEXANDER G.B. O'NEIL, plaintiffs: B.J. Powell, Law Offices of B.J. Powell, Atlanta, GA.

For C.R. BARD, INC, defendant: Ian E. Bjorkman, Wiggin & Dana, New Haven, CT.

For C.R. BARD, INC, defendant: Thomas L. Casagrande, Arnold, White & Durkee, Houston, TX.

For C.R. BARD, INC, defendant: Steven F. Meyer, Morgan & Finnegan, New York, NY.

**Judges:** DONNA F. MARTINEZ, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** DONNA F. MARTINEZ

# Opinion

RULING ON MOTION FOR PROTECTIVE ORDER AND CROSS-MOTION FOR ORDER COMPELLING DISCOVERY

This discovery dispute concerns the attorney-client privilege and the work product doctrine in the context of insurance coverage **[*2]** for patent enforcement litigation expenses. Currently pending before the court is the plaintiffs' motion for protective order and the defendant's cross-motion for order compelling discovery. For the reasons stated below, the motion for protective order (doc. # 1) is granted in part and denied in part and the cross-motion for order compelling discovery (doc. # 4) is granted in part and denied in part.

I. Background

This case is ancillary to a patent infringement action pending in the district court for the Northern District of Georgia. The plaintiffs in the Georgia action, Go Medical Industries Pty., Ltd., Go Medical USA, Inc., and Alexander G. B. O'Neil (collectively "Go Medical"), are insured by Connecticut Indemnity Company ("CIC") under a patent enforcement litigation expense insurance policy. The insurance policy provides that CIC will reimburse Go Medical for legal expenses Go Medical incurs in lawsuits to prevent or recover for infringement on Go Medical's patent, U.S. Patent No. 4,652,259 ("the '259 patent").

On April 1, 1992 Go Medical submitted a claim to

1998 U.S. Dist. LEXIS 22919, *2

CIC for authorization to pursue a patent infringement action against C.R. Bard, Inc. Under the terms of the [*3] policy, CIC is entitled to investigate the merits of Go Medical's infringement claim before authorizing coverage of litigation expenses. Accordingly, CIC retained patent counsel, Attorney John C. Linderman, to review the insured's patent and to provide a recommendation as to the merits of the proposed lawsuit against C.R. Bard to enforce Go Medical's patent. As part of this investigation, Attorney Linderman communicated with Go Medical's in-house counsel regarding the merits of the proposed lawsuit. After completing its investigation, CIC authorized Go Medical's claim for litigation expenses related to a patent infringement action against C.R. Bard. Go Medical thereafter commenced the underlying litigation.

In the course of the litigation, C.R. Bard served a third-party subpoena duces tecum on CIC. The subpoena commanded production of all documents and things relating to:

  1. Any request by Go Medical for authorization to litigate pursuant to the insurance policy;

  2. CIC's granting, withholding, delaying or denying authorization to litigate pursuant to the insurance policy;

  3. CIC's reasons for withholding, delaying or denying authorization to litigate pursuant to [*4] the insurance policy;

  4. Any beliefs stated by CIC that the '259 patent is invalid or not infringed by the Bard Touchless Plus (R) assemblies;

  5. Any facts or circumstances adversely affecting the validity of the '259 patent; and

  6. Any notification by CIC to Go Medical made pursuant to Section III(A)(2) of the insurance policy. [1]

Go Medical has moved for a protective order prohibiting disclosure of certain documents, or portions thereof, and other information in the possession of CIC which are responsive to the subpoena and which Go Medical claims are protected under the attorney-client or work product privileges. C.R. Bard has filed a cross-motion to compel the disclosure of the documents which Go Medical has withheld as protected. Go Medical and CIC have both opposed C.R. Bard's motion to compel.

II. Discussion

A. The Attorney-Client Privilege

Both Go Medical and CIC contend [*5] that many of the documents which are responsive to the subpoena served on CIC are protected from disclosure under the common interest rule of the attorney-client privilege. In addition, CIC contends that the attorney-client privilege protects certain documents which contain confidential communications between it and its attorney.

The court begins its analysis with a review of the definition of the attorney-client privilege under federal common law. [2] The commonly accepted definition of the privilege was articulated by Judge Wyzanski in United States v. United Shoe Machinery Corp., 89 F. Supp. 357 (D. Mass 1950):

  The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers

---

[1] This description of the requested documents paraphrases the description contained in the subpoena.

[2] Questions of privilege that arise in the adjudication of federal rights, as in this case, are governed by federal common law. Fed. R. Evid. 501, United States v. Zolin, 491 U.S. 554, 562, 105 L. Ed. 2d 469, 109 S. Ct. 2619 (1989); von Bulow by Auersperg v. von Bulow, 811 F.2d 136, 141 (2d Cir.), cert. denied, 481 U.S. 1015, 95 L. Ed. 2d 498, 107 S. Ct. 1891 (1987).

1998 U.S. Dist. LEXIS 22919, *5

(c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and [*6] not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

Id. at 358-59.

The oldest rule of privilege known to the common law, the attorney-client privilege "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client." United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989) (quoting Upjohn Co. v. United States, 449 U.S. 383, 389, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981)). [*7] "The privilege is intended to encourage clients to be forthcoming and candid with their attorneys so that the attorney is sufficiently well-informed to provide sound legal advice." United States v. Adlman, 68 F.3d 1495, 1499 (2d Cir. 1995). Legal advice, however, is protected only when disclosure would reveal the confidential information given to the lawyer by the client. Walsh v. Northrop Grumman Corp., 165 F.R.D. 16, 18 (E.D.N.Y. 1996). "Unless the legal advice reveals what the client has said, no legitimate interest of the client is impaired by disclosing the advice." SCM Corp. v. Xerox Corp., 70 F.R.D. 508, 522 (D. Conn.) (Newman, J.), appeal dismissed, 534 F.2d 1031 (2d Cir. 1976).

The party asserting the privilege has the burden to demonstrate that the privilege applies to the information in question. United States v. Construction Products Research, Inc., 73 F.3d 464, 473 (2d Cir. 1996).

1. Go Medical and CIC's Claim of Privilege Under the Common Interest Rule

Go Medical and CIC contend that documents which Go Medical provided to CIC as part of Go Medical's claim for coverage of its litigation [*8] expenses are protected from disclosure under the common interest rule of the attorney-client

privilege. The court disagrees.

The common interest rule extends the application of the attorney-client privilege in circumstances where the parties are represented by separate counsel but join in a legal defense or enterprise. United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989). Under the common interest rule, parties and counsel involved in a joint defense or enterprise may disclose privileged information to each other without destroying the privileged nature of those communications. Griffith v. Davis, 161 F.R.D. 687, 692 (C.D. Cal. 1995). The rule protects only "those communications made in the course of an ongoing common enterprise and intended to further the enterprise . . . ." United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989). In addition, the parties claiming protection under the common interest rule "must show that they had a common legal, as opposed to commercial, interest, and that they cooperated in formulating a common legal strategy." Walsh v. Northrop Grumman Corp., 165 F.R.D. 16, 18 (E.D.N.Y. 1996). [*9]

At issue in this litigation are documents containing communications between Go Medical and CIC or CIC's attorneys and documents that Go Medical provided to CIC which contain privileged communications between Go Medical and Go Medical's attorneys. Go Medical and CIC assert that all of these documents were provided to CIC in confidence and in furtherance of Go Medical and CIC's common interest in an effective and efficient lawsuit to stop infringement of Go Medical's patent. C.R. Bard responds that the interest of Go Medical and CIC are not sufficiently compatible to fall within the common interest rule because CIC's interest is limited to insuring coverage of Go Medical's litigation expenses. C.R. Bard goes on to argue that the common interest rule is not available to Go Medical and CIC because CIC is not a party to this action. Finally, C.R. Bard argues that a prior decision in this case by Georgia District Court, in which that court found that the requisite common interest does not exist between Go Medical and CIC, collaterally estops Go Medical and CIC from

reasserting their claim that documents are protected from disclosure under the common interest rule of the attorney-client privilege.

This court holds that the interests of Go Medical and CIC are not sufficiently compatible for the common interest rule to apply. The documents at issue were provided by Go Medical to CIC in connection with Go Medical's claim under the litigation expense insurance policy. Go Medical's purpose in providing these documents to CIC was to try to obtain coverage from CIC for expenses Go Medical would incur in litigation to stop the alleged infringement of its patent. However, whereas Go Medical's interest is in protecting its patent, CIC has no interest in the '259 patent. CIC's interest in Go Medical's infringement claim is limited to CIC's coverage of Go Medical's litigation expenses. An insurer's contractual obligation to pay its insured's litigation expenses does not, by itself, create a common interest between the insurer and the insured that is sufficient to warrant application of the common interest rule of the attorney client privilege. In re Pfizer Inc. Securities Litigation, 1993 U.S. Dist. LEXIS 18215, No. 90 Civ. 1260(SS), 1993 WL 561125 at *8 (S.D.N.Y., Dec. 23, 1993) (rejecting argument that an insured and its insurer share common interest about a legal matter and holding that disclosure by insured to insurer waived the attorney-client privilege); In re Imperial Corp. of America, 167 F.R.D. 447, 451-53 (S.D. Ca. 1995) [*10] (joint defense privilege generally does not protect communications between insured party to litigation and non-party insurer).

This court holds that the documents which Go Medical submitted to CIC as part of its claim for insurance coverage are not protected under the common interest rule of the attorney-client privilege. [3] The court does not reach the other

arguments raised by C.R. Bard on this issue.

## 2. CIC's Claim of Privilege

In addition to the documents which Go Medical and CIC seek to protect from disclosure, [*11] CIC also opposes C.R. Bard's motion to compel with respect to documents that CIC claims contain privileged communications between CIC and its attorneys. Because the burden of proving the privilege rests on the person or entity claiming the privilege, United States v. Construction Products Research, Inc., 73 F.3d 464, 473 (2d Cir. 1996), it is incumbent on CIC to establish that these documents reveal communications made by CIC to its attorney in confidence for the purpose of securing legal advice. See SCM Corp. v. Xerox Corp., 70 F.R.D. 508, 522 (D. Conn.) (Newman, J.), appeal dismissed, 534 F.2d 1031 (2d Cir. 1976).

CIC has submitted a privilege log that lists thirty-three documents. See CIC's Submission of Corrected Exhibit 3 dated February 8, 1996 (doc. # 15), Exhibit 3A. Based on a review of this privilege log, the court determines that CIC has sustained its burden of showing that the elements of the privilege are satisfied with respect to the document listed at number 1 on the log. Based on the log, the court further determines that the attorney-client privilege does not protect documents listed at numbers 2, 6, 9, 10, 21 [*12] and 23.

The record before the court is insufficient to permit the court to determine whether the remaining documents listed on the log contain client confidences so as to fall within the scope of the privilege. In order for the court to reach the merits of the privilege claim, CIC shall first reevaluate its claims of privilege in light of this ruling with respect to the documents listed at numbers 3, 4, 5, 7, 8, 11 through 20, 22, and 24 through 33 on CIC's log. After this reevaluation, CIC shall produce all documents as to which CIC does not maintain its claim of privilege. To the extent that CIC maintains

---

[3] This court's holding is in accord with the decision by the Georgia District Court in a prior action between the same parties. See Go Medical Industries Pty., Ltd. v. C.R. Bard, Inc., 1995 U.S. Dist. LEXIS 22248, No. 1:93 CV1538-HTW, 1995 WL 605802 (N.D. Ga., July 6, 1995). In that case, court held that the common interest rule did not apply to communications between Go Medical and CIC

because both Go Medical and CIC had their own counsel and CIC did not control Go Medical's relationship with its attorneys.

a claim of privilege as to any of these documents, CIC shall submit such documents to the chambers of the undersigned within ten days of the date of this ruling for in camera inspection.

## B. The Work Product Doctrine

Go Medical and CIC also claim that several documents responsive to C.R. Bard's subpoena are protected from disclosure under the work product doctrine. C.R. Bard argues that the documents at issue do not constitute work product and, in the alternative, that any work product protection that may be applicable either has been waived by Go Medical's actions or [*13] is subordinated to C.R. Bard's need for the documents. Before addressing the specific arguments of the parties, the court reviews the work product doctrine.

Federal law governs the protection afforded under the work product doctrine in federal courts. EDO Corp. v. Newark Insurance Co., 145 F.R.D. 18, 21 (D. Conn. 1992). First articulated by the United States Supreme Court more than 50 years ago in Hickman v. Taylor, 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385 (1947), the work product doctrine since has been substantially incorporated into Rule 26(b)(3) of the Federal Rules of Civil Procedure, which provides, in pertinent part:

> a party may obtain discovery of documents and tangible things . . . prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other [*14] means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party

concerning the litigation.
Fed. R. Civ. P. 26(b)(3).

The Second Circuit has adopted the formulation of the work product rule set forth in the Wright & Miller treatise:

> Documents should be deemed prepared 'in anticipation of litigation,' and thus within the scope of [Rule 26(b)(3)], if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation.'

United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998) (quoting Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 Federal Practice and Procedure § 2024, at 343 (1994)). Although materials assembled in the ordinary course of business are not protected under the work product doctrine, the fact that a document is business-related is irrelevant to the question of whether it should be protected under [*15] Rule 26(b)(3). Id. at 1200. "Where a document is created because of the prospect of litigation, analyzing the likely outcome of that litigation, it does not lose protection under [the work product doctrine] merely because it is created in order to assist with a business decision." Id. at 1202.

The work product doctrine shields from disclosure documents and other materials prepared in anticipation of litigation or trial by a party or a party's representative, absent a showing of substantial need and the inability to obtain the substantial equivalent without undue hardship. Fed. R. Civ. P. 26(b)(3); see also In re Grand Jury Subpoenas Dated Oct. 22, 1991 and Nov. 1, 1991, 959 F.2d 1158, 1166 (2d Cir. 1992). "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." United States v. Nobles, 422 U.S. 225, 238, 45 L. Ed. 2d 141, 95 S. Ct. 2160 (1975). By establishing a zone of privacy for strategic litigation planning, the work product doctrine

prevents one party from piggybacking on the adversary's preparation. **[\*16]** <u>United States v. Adlman</u>, 68 F.3d 1495, 1501 (2d Cir. 1995).

The degree of protection afforded under the work product doctrine is dependent upon whether the work product is *ordinary* or *opinion* work png tct. A party can obtain discovery of ordinary work product materials by demonstrating substantial need and the inability to obtain the substantial equivalent of the materials without undue hardship. Fed. R. Civ. P. 26(b)(3); <u>Upjohn Co. v. United States</u>, 449 U.S. 383, 400, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981). Opinion work product, which reflects the mental impressions, conclusions or opinions of an attorney, receives greater protection. <u>Id.</u> at 401-02. Disclosure of opinion work product is particularly disfavored by the courts and requires a far stronger showing of necessity and unavailability by other means. <u>Id. See also United States v. Adlman</u>, 134 F.3d 1194, 1204 (2d Cir. 1998) ("highly persuasive" showing required for opinion work product); <u>S.N. Phelps & Co. v. Circle K. Corp.</u>, 1997 U.S. Dist. LEXIS 713, No. 96 CV 5801 (JFK), 1CV 5WL 31197, at *7 (S.D.N.Y., Jan. 28, 1997) (party seeking discovery of opinion work **[\*17]** product must demonstrate "extraordinary justification" (citation omitted)).

The party invoking the protection of the work product doctrine has the burden of establishing that the documents at issue were prepared in anticipation of litigation. <u>Helt v. Metropolitan District Commission</u>, 113 F.R.D. 7, 12 (D. Conn. 1986). The burden of proving that the need for the documents overrides the protection of the work product doctrine rests with the party seeking disclosure. <u>Id.</u>

Both Go Medical and CIC assert claims that documents responsive to C.R. Bard's subpoena are protected under the work product doctrine. The court addresses Go Medical and CIC's claims separately.

1. <u>CIC's Claims of Work Product</u>

CIC contends that its activities with respect to the Go Medical insurance claim were conducted in anticipation of trial and are therefore entitled to work product protection. This court has already determined, in the context of a prior discovery dispute between these C.R. Bard and CIC, that CIC "is not in a sound position to resist discovery . . . under Rule 26(b)(3)" because it is not a party to the patent infringement lawsuit. <u>Go Medical Industries Pty, Ltd. v. C.</u> **[\*18]** <u>R. Bard, Inc.</u>, No. 3:94MC383 (TPS), Discovery Ruling and Order at 9 (December 7, 1994) (citing <u>Gomez v. City of Nashua</u>, 126 F.R.D. 432, 434 n.1 (D. N.H. 1989)). In <u>Gomez</u>, the court held that the State of New Hampshire, which was not a party to the litigation, could not resist discovery under Rule 26(b)(3). <u>See also In re California Public Utilities Commission</u>, 892 F.2d 778, 781 (9th Cir. 1989) (work product doctrine does not protect documents prepared for one who is not a party to the litigation). Accordingly, CIC cannot prevail on its claims of work product because it is not a party to the patent infringement litigation. [4]

**[\*19]** 2. <u>Go Medical's Claims of Work Product</u>

Go Medical contends that several documents responsive to C.R. Bard's subpoena are protected from disclosure under the work product doctrine. The documents are identified in Go Medical's privilege log and are further described in the papers submitted by Go Medical in connection with its motion for protective order. The documents include (1) communications from Go Medical attorneys to CIC attorneys, (2) communications from CIC attorneys to Go Medical attorneys, (3) Go Medical attorney notes, and (4) communications between Go Medical employees. All the documents are in the possession of CIC.

---

[4] The fact that CIC cannot press a claim of work product does not mean that the documents in CIC's possession are not work product. The work product doctrine applies to documents prepared by or for a party's insurer. Fed. R. Civ. P. 26(b)(3). Because CIC insures Go Medical's patent, Go Medical has standing to seek protection of work product documents in CIC's possession.

1998 U.S. Dist. LEXIS 22919, *19

a. Whether the Documents Constitute Work Product

The work product privilege attaches to documents that are prepared because of the prospect of litigation. United States v. Adlman, 134 F.3d 1194, 1202-03 (2d Cir. 1998). Conversely, documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the prospect of litigation are not work product. Id. at 1202.

C.R. Bard argues that responsive documents in CIC's possession do not constitute protected [*20] work product because they were prepared by or for CIC in the regular course of CIC's business. The court disagrees. Unlike the majority of cases where the regular course of business may be distinguished from circumstances involving the prospect of litigation, the facts of this case present the unusual situation where the regular course of CIC's business--at least insofar as it pertains to the evaluation of litigation expense policy claims--is conducted precisely because of the prospect of litigation.

The responsive documents are described by Go Medical as containing either legal impressions of Go Medical's counsel, material developed by Go Medical's counsel alone or with CIC's counsel in connection with possible issues in the anticipated litigation, legal opinions and impressions of counsel regarding issues based on information supplied by Go Medical, and counsel's strategies for the manner in which to bring suit. These documents were created as part of or as a result of Go Medical's claim for coverage of litigation expenses that Go Medical expected to incur in bringing suit against C.R. Bard. These documents were therefore created because of anticipated litigation, and would not [*21] have been prepared but for the prospect of that litigation.

Based on the information provided, the court finds that the documents identified by Bates Nos. 400363-400368, 400356-400362A, 400332, 400333-400335, 400335A, 400336, 400337-400341A, 400342-400344A, 400345-400346 and 400347-400355 were prepared because of the prospect of litigation by either Go Medical or its insurer and therefore constitute work product. Moreover, because the documents contain the mental impressions, conclusions, opinions or legal theories of counsel, the court further determines that the work product at issue is not simply ordinary work product but is opinion work product and therefore deserving the highest degree of protection. See United States v. Adlman, 134 F.3d 1194, 1204 (2d Cir. 1998).

b. Whether Work Product Protection Was Waived

C.R. Bard contends that Go Medical waived any work product protection applicable to these documents by submitting them to CIC. The court disagrees. Unlike the attorney-client privilege, "the work product privilege is not automatically waived by any disclosure to third persons." In re Pfizer Inc. Securities Litigation, 1993 U.S. Dist. LEXIS 18215, No. 90 Civ. 1260 (SS), 1993 WL 561125 [*22] at *6 (S.D.N.Y., Dec. 23, 1993). Instead, courts generally find waiver of work product protection only when "the disclosure 'substantially increases the opportunity for potential adversaries to obtain the information.'" Id. (quoting In re Grand Jury Subpoenas Dated Dec. 18, 1981 and Jan. 4, 1982, 561 F. Supp. 1247, 1257 (E.D.N.Y. 1982)). See also In re Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir. 1993) ("voluntary disclosure of work product to an adversary waives the privilege as to other parties"); Stix Products, Inc. v. United Merchants & Mfrs., Inc., 47 F.R.D. 334, 338 (S.D.N.Y. 1969)("The work-product privilege should not be deemed waived unless the disclosure is inconsistent with maintaining secrecy from possible adversaries."). Go Medical submitted its work product to CIC for the purpose of obtaining insurance coverage to pursue its claims against C.R. Bard. This disclosure did not substantially increase the opportunity for C.R. Bard to obtain its work product. The court therefore holds that Go Medical did not waive the work product protection available to the documents

at issue by sharing them with its insurer.

C.R. **[*23]** Bard next argues that Go Medical waived its claim of work product by relying on the fact that CIC authorized payment of Go Medical's litigation expenses as a defense to C.R. Bard's counterclaim that Go Medical filed the infringement suit with knowledge that it was baseless. In support of its contention that Go Medical is affirmatively relying on CIC's authorization of the insurance claim, C.R. Bard cites to a portion of Go Medical's argument and to a request for admission which Go Medical served on C.R. Bard.

The court agrees that Go Medical cannot rely on CIC's approval of the insurance claim as a defense to the counterclaim and simultaneously withhold documents on which that approval is based. However, the excerpt from Go Medical's argument and a single discovery request are insufficient to permit the court to find that Go Medical is relying on CIC's authorization as a defense to C.R. Bard's counterclaim. Accordingly, the court finds no waiver based on the record before it.

c. Whether C.R. Bard's Need for Documents Overrides Work Product Protection

C.R. Bard argues that it is entitled to the documents even if they are work product because it has substantial need for them. The **[*24]** court disagrees.

The documents at issue contain opinion work product. Rule 26(b)(3) of the Federal Rules of Civil Procedure makes clear that a showing of "substantial need" sufficient to compel disclosure of ordinary work product is not sufficient to compel disclosure of opinion work product. United States v. Adlman, 134 F.3d 1194, 1204 (2d Cir. 1998). Opinion work product is to be protected unless, at a minimum, a highly persuasive showing is made. Id. Indeed, there is some authority that the protection afforded opinion work product may be absolute. ECDC Environmental, L.C. v. New York Marine and General Ins. Co., 1998 U.S. Dist. LEXIS 8808

at *34, No. 96CIV6033 (BSJ)(HBP) (S.D.N.Y. 1998) (citing cases).

C.R. Bard contends that it needs the documents to show that Go Medical commenced the patent litigation with knowledge that the '259 patent is invalid or not infringed and that Go Medical knew the infringement suit was baseless as a result of communications with CIC. Because CIC and Go Medical are the only sources of this information, C.R. Bard contends that it has established substantial need.

The court is not persuaded that C.R. Bard's need **[*25]** for the documents should override the work product privilege. The defendant cannot gain access to the plaintiff's work product simply by claiming that the litigation was commenced with knowledge that the suit was baseless. C.R. Bard has not established the highly persuasive showing required for disclosure of attorney opinion work product, and, therefore, disclosure of these documents is not compelled.

## Conclusion

Go Medical's motion for protective order (doc. # 1) is granted in part and denied in part and C.R. Bard's cross-motion for order compelling discovery (doc. # 4) is granted in part and denied in part as stated herein.

1. As to the documents listed on Go Medical's privilege log, it is hereby ordered that:

(a) documents that are identified by Bates Nos. 400363-400368, 400356-400362A, 400332, 400333-400335, 400335A, 400336, 400337-400341A, 400342-400344A, 400345-400346 and 400347-400355 are protected from disclosure;

(b) all other documents listed on the privilege log shall be produced within ten days of the date of this ruling.

2. As to the documents listed on CIC's privilege log (Exhibit 3A), it is hereby ordered that:

(a) document number **[*26]** 1 is protected from disclosure; (b) documents numbers 2, 6, 9, 10, 21 and 23 shall be produced; and

(c) all non-privileged documents listed at numbers 3, 4, 5, 7, 8, 11 through 20, 22, and 24 through 33 shall be produced. To the extent that CIC maintains its claim of privilege as to any of these documents in light of this ruling,

CIC shall submit such documents to the chambers of the undersigned within ten days of the date of this ruling for <u>in camera</u> inspection.

SO ORDERED this <u>14th</u> day of August, 1998 at New Haven, Connecticut.

DONNA F. MARTINEZ

UNITED STATES MAGISTRATE JUDGE

---

**End of Document**

# Feacher v. Intercontinental Hotels Group

United States District Court for the Northern District of New York

October 22, 2007, Decided; October 22, 2007, Filed

Civ. Action No. 3:06-CV-0877 (TJM/DEP)

**Reporter**

2007 U.S. Dist. LEXIS 78262; 69 Fed. R. Serv. 3d (Callaghan) 372; 2007 WL 3104329

REVEREND ANTHONY FEACHER, et al., Plaintiffs, vs. INTERCONTINENTAL HOTELS GROUP, et al., Defendants.

**Subsequent History:** Claim dismissed by Feacher v. Intercontinental Hotels Group, 2008 U.S. Dist. LEXIS 978 (N.D.N.Y, Jan. 7, 2008)

**Counsel:** [*1] FOR PLAINTIFFS: RAYMOND L. HAMLIN, ESQ., HUNT, HAMLIN LAW FIRM, Newark, NJ; KECIA M. CLARKE, ESQ., CLARK LAW FIRM, East Orange, NJ.

FOR DEFENDANTS: CHRISTOPHER FUSCO, ESQ., CALLAHAN, FUSCO LAW FIRM, Roseland, NJ; MATTHEW STOCKWELL, ESQ., CALLAHAN, FUSCO LAW FIRM, New York, NY.

**Judges:** David E. Peebles, U.S. Magistrate Judge.

**Opinion by:** David E. Peebles

# Opinion

## DECISION AND ORDER

This action, which was commenced in the District of New Jersey but subsequently transferred to this court, involves civil rights claims asserted by the plaintiffs growing out of defendants' refusal to permit them to enter a public restaurant for the purpose of eating breakfast during a bus ski trip, allegedly on the basis of their race. Currently pending before the court in connection with the matter is a dual-pronged application by the plaintiffs to compel discovery. In their motion,

plaintiffs seek to elicit the court's assistance in scheduling depositions, and for the purpose of obtaining access to a statement taken from a non-party witness by an investigator retained by the defendants' attorney.

## I. DEPOSITION SCHEDULING

The first portion of plaintiffs' motion centers around the parties' inability to schedule depositions of the plaintiffs [*2] and several present or past employees of the Binghamton, New York Holiday Inn, the hotel and restaurant facility at which the discriminatory acts are alleged to have occurred, and to reach agreement as to whether those depositions should be taken in Binghamton, New York, where the relevant events occurred, or instead in New Jersey, where plaintiffs reside and their attorneys practice. [1] Because it appears from the parties' written communications with the court, as confirmed during oral argument, that they have now resolved their differences and have been able to schedule the depositions in issue, I am treating this portion of plaintiffs' motion as having been withdrawn, without prejudice to their right to renewal in the event the scheduled depositions do not occur as planned.

## II. WITNESS STATEMENT

The second component [*3] of plaintiffs' motion concerns a statement taken by an investigator,

---

[1] One of the individuals whose deposition the parties were at one time attempting to schedule is defendant Timothy Brown, who at the relevant times was the manager of the Binghamton Holiday Inn at the relevant times. Brown, who earlier had been in treatment for a serious medical condition, thereby making it difficult to schedule and conduct his deposition, has since died.

retained by defendants' counsel to investigate plaintiffs' allegations in this matter, from Pamela Cantres, a potential witness who is not a party to the action. According to defendants' submissions, that statement was taken on May 9, 2007 -- several months after commencement of suit.

In defense of their refusal to disclose the disputed statement, defendants argue that it represents classic work product which is not discoverable absent circumstances not presented. In response, plaintiffs assert that the statement is strictly factual in nature, without revealing litigation strategy or attorney thought process, and thus does not constitute work product. Plaintiffs further maintain that in any event they have demonstrated substantial need for the statement, additionally contending that by not including it in an appropriate privilege log, the defendants have waived their right to claim work product protection of the disputed statement, thus providing two independent bases for the court to order its disclosure notwithstanding the work product doctrine.

## A. Whether The Statement Constitutes Work Product [2]

---

[2] During the course **[*4]** of briefing in connection with plaintiffs' motion the parties have also addressed the attorney-client privilege. The contours of the attorney-client privilege are defined by Rule 501 of the Federal Rules of Evidence, which in a case such as this provides that matters of privilege are informed by decisional authority of the federal courts "in the light of reason and experience." Fed. R. Evid. 501; *see also United States v. Goldberger & Dubin, P.C.,* 935 F.2d 501, 505 (2d Cir. 1991). Although variously stated, depending upon the context in which it has been presented, the attorney-client privilege is generally thought to encompass eight distinct elements, applying in instances

> (1) where legal advice of any kind is sought (2) from a professional legal adviser [sic] in his capacity as such, (3) the communications relating to that purpose (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser [sic], (8) except the protection be waived.

*Golden Trade, S.r.L. v. Lee Apparel Co.,* 143 F.R.D. 514, 517 (S.D.N.Y. 1992) (quoting 8 J. Wigmore, Evidence § 2292 at 554 (McNaughton Rev. 1961)). It has been noted, moreover, **[*5]** that while this formulation is obviously limited to communications from client to attorney, "courts appear to hold that the same protection

Materials prepared in anticipation of litigation are protected from disclosure under Rule 26(b)(3) of the Federal Rules of Civil Procedure, which memorializes a doctrine having its roots in the Supreme Court's decision in *Hickman v. Taylor,* 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947). [3] To warrant protection under this provision, a document must comprise 1) a document or tangible thing which 2) was prepared in anticipation of litigation 3) by or for a party, or by or for its representative. *United States v. Adlman,* 68 F.3d 1495, 1500-01 (2d Cir. 1995); *Tayler v. Travelers Ins. Co.,* 183 F.R.D. 67, 69 (N.D.N.Y. 1998) **[*6]** (Hurd, M.J.) (citations omitted). As is the case with regard to other discovery exemptions, the burden of establishing entitlement to work product protection rests squarely with the party seeking to avoid disclosure. *Tayler,* 183 F.R.D. at 69; *see also Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 470 (S.D.N.Y. 1993) (citations omitted).

Although the rule itself is not so limited in its

---

should extend to legal advice rendered by the attorney, at least if it might reflect or reveal the client's confidential communications." *Lee Apparel Co.,* 143 F.R.D. at 517-18 (collecting cases). Because there is no indication of any attorney-client relationship between defendants' counsel and Pamela Cantres, the attorney-client privilege is not implicated, even assuming its extension to cover a statement taken by a non-attorney investigator retained by counsel.

[3] That rule provides, in pertinent part, that

> [s]ubject to the provisions of subdivision (b)(4) of this rule [related to expert discovery], a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure **[*7]** of the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning the litigation.

Fed. R. Civ. P. 26(b)(3).

application, by its express terms Rule 26(b)(3) pays particular deference to the work product of an attorney. Attorney work product is best described as encompassing the mental impressions and legal opinions made by a lawyer, the governing rule in essence creating "a zone of privacy for an attorney's preparation to represent a client in anticipation of litigation." *In re Grand Jury Subpoena Dated Oct. 22, 2001,* 282 F.3d 156, 160 (2d Cir. 2002) (citing *Hickman,* 329 U.S. at 510-11, 67 S. Ct. at 393 and *United States v. Adlman,* 134 F.3d 1194, 1196 (2d Cir. 1998)).

At issue in this instance is a statement taken by an investigator retained by defendants' counsel, following the commencement of litigation, and tasked by the attorney with investigating the plaintiffs' claims. Ordinarily, the product of such an investigation would be regarded as quintessential work product. *See United States v. Nobles,* 422 U.S. 225, 238-39, 95 S. Ct. 2160, 2170, 45 L. Ed. 2d 141 (1975) ("It is . . . necessary that **[*8]** the [work product] doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself [or herself].") *see also Lopez v. City of New York,* No. 05-CV-3624, 2007 U.S. Dist. LEXIS 19694, 2007 WL 869590, at *2 (E.D.N.Y. Mar. 20, 2007) (finding that witness statements secured by an investigator working at the request of plaintiff's counsel and prepared in anticipation of litigation qualified as attorney work product). To require the disclosure of such matters would significantly erode the effectiveness of an attorney's legal representation, and in turn do substantial injury to the values upon which the work product doctrine is predicated.

In their submissions, and during oral argument, plaintiffs have attempted to draw a distinction between a mere verbatim witness statement taken by an investigator on the one hand, and a report or analysis, generated based upon such statements, which may include within it mental impressions or clues regarding litigation strategy. The work product doctrine, however, does not readily admit of such a distinction.

Undeniably, the paramount concern serving as the foundation upon which the work product doctrine rests, particularly when invoked to **[*9]** protect attorney-generated materials, is the preservation of an attorney's mental impressions and litigation strategies. *See Hickman,* 329 U.S. at 510-11, 67 S. Ct. at 393; *see also Abdell v. City of New York,* No. 05 Civ. 8453, 2006 U.S. Dist. LEXIS 66114, 2006 WL 2664313, at *3 (S.D.N.Y. Sept. 14, 2006) (concluding that "'?[c]ore' work product [consisting of attorney mental impressions] . . . [is] subject to more stringent protection" than purely factual work product). Such attorney thought processes, however, can manifest themselves in many ways, some more subtle than others. Thus, by way of example, a request for the production of documents gathered and retained by an attorney during the course of his or her investigation, while seemingly benign, may well implicate work product, since "[t]he very decision of counsel to retain particular documents involves the exercise of an attorney's judgment." *Herbert v. Lando,* No. 74 Civ. 434, 1982 U.S. Dist. LEXIS 10934, at *5 (S.D.N.Y. Jan. 11, 1982). By the same token, analysis of the questions asked when securing an otherwise purely factual account from a potential witness could indirectly provide enlightenment as to the litigation strategy being developed or explored. **[*10]** To attempt to divine pure facts from mental impressions in such statements and parse out for discoverability purposes the purely factual portions is not always an easy task, since oftentimes such distinguishing features are not so easily discerned. [4]

The response of the courts to the question of whether purely factual witness statements constitute work product has been far from uniform.

_____

[4] One could argue that at least to some degree, this is a concern which could be monitored through *in camera* inspection. In this instance I have reviewed the disputed statement, which appears to be a verbatim transcript of a tape-recorded interview conducted in question and answer format. Although, as noted above, it is often difficult to determine whether such a statement discloses litigation strategy, either directly or implicitly, at least on its face the Cantres statement does not appear to implicate legal strategy or attorney thought processes.

Some, supporting plaintiffs' argument in this regard, have attempted to differentiate between purely factual statements obtained from witnesses and reports embodying mental impressions, and finding the former to be discoverable, while preserving the sanctity [*11] of the latter. *See, e.g., Johnson v. Bryco Arms,* No. 03 CV 2582, 02 CV 3029, 2005 U.S. Dist. LEXIS 48587, 2005 WL 469612, at *5 (E.D.N.Y. Mar. 1, 2005) (finding that statement from non-party witness, taken by investigator employed by investigative agency, not by defendants' attorneys, containing only facts, did not constitute work product); *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties LLC,* No. 01 Civ. 9291, 2002 U.S. Dist. LEXIS 11949, 2002 WL 1455346, at *7 (S.D.N.Y July 3, 2002) (indicating that notes taken by individuals at the direction of attorney were not subject to work product privilege because the notes "merely set forth the facts that were reported to the attorney"). Others, on the other hand, have taken a more restrictive approach and have instead flatly excluded access to such statements, regardless of their character. *See, e.g., Kagan v. Langer Transport Corp.,* 43 F.R.D. 404, 405 (S.D.N.Y. 1967); *Snyder v. United States,* 20 F.R.D. 7, 8-9 (E.D.N.Y. 1956); *see also Garnier v. Illinois Tool Works, Inc.,* No. 04-CV-1825, 2006 U.S. Dist. LEXIS 28370, 2006 WL 1211201, at *2 (E.D.N.Y. May 4, 2006) (considering as work product a certification provided by employee of defendant regarding plaintiff's discrimination and harassment allegations, despite the lack [*12] of mental impressions of counsel contained therein, and denying plaintiff's motion to compel production of the certification); *cf. Lopez,* 2007 U.S. Dist. LEXIS 19694, 2007 WL 869590, at *2-4 (holding that purely factual witness statements are entitled to "at least minimal work product protection" but finding a waiver of the privilege by virtue of a failure to properly list and describe them on a privilege log, and additionally finding substantial need outweighing work product considerations).

Importantly, the arguments now raised by plaintiffs, and accepted by those courts which have permitted disclosure of purely factual witness statements as not constituting work product, honor only one of the considerations which serve as foundation for the doctrine, losing sight of another important justification for the protection which the doctrine offers. The work product doctrine serves to encourage vigorous investigation of disputed claims, unfettered by fear that the products of such efforts will be compromised and fall into an adversary's hands. *See Adlman,* 134 F.3d at 1196 (emphasizing that the zone of privacy enveloping the work product doctrine permits an attorney to prepare for litigation "free from unnecessary intrusion [*13] by his [or her] adversaries"). As one court has noted,

> [t]he effect of requiring production of such attorney's work product would be to destroy counsel's incentive diligently to prepare for trial and to carry out his [or her] professional duties, since otherwise he [or she] could, merely by sitting back and doing nothing, avail himself [or herself] of the work product and professional diligence of counsel for the other side.

*Kagan,* 43 F.R.D. at 405.

In order to preserve the integrity of the work product doctrine and the zone of privacy surrounding an attorney's preparation of a case on behalf of his or her client, I respectfully reject those cases which make the distinction between purely factual witness accounts and reports revealing mental impressions, and find instead that the witness statement in question, however factual in nature it may be, is worthy of at least some degree of work product protection. [5] *Kagan,* 43 F.R.D. at

---

[5] Naturally, the witness statement in issue will likely have to be made available to the plaintiffs' counsel if Ms. Cantres is called upon by the defendants to testify at trial. *Cf. Whitfield v. Ricks,* No. 01 Civ. 11398, 2006 U.S. Dist. LEXIS 96936, 2006 WL 3030883, at *19 (S.D.N.Y. Oct. 24, 2006) (recognizing, in the realm of criminal proceedings, the prosecution's obligation to provide the defense with any non-confidential written or recorded statements of prosecution witnesses related to the witness' testimony for use during cross-examination).

405; *Lopez,* 2007 U.S. Dist. LEXIS 19694, 2007 WL869590, at *2-3; *see also Abdell,* 2006 U.S. Dist. LEXIS 66114, 2006 WL 2664313, at *5 (while recognizing, *inter alia,* that one of the underlying purposes of the work product doctrine is to prevent "a windfall for indolent attorneys", that factor was found not to apply to **[*14]** the question of providing district attorney fact sheets prepared in connection with criminal prosecutions to attorneys engaged in civil litigation).

Because the work product doctrine, as embodied in Rule 26(b)(3), does not stop at protecting mere litigation strategy, but instead goes further to insure that, by affording protection to the results of investigations into litigated claims, the adversary system upon which our civil judicial system is predicated the interests of justice will best be served, the distinction between litigation strategy and matters of pure fact does not control the work product analysis. [6] As the Second Circuit has observed, in response to the **[*15]** suggestion that a court should attempt to dissect pure fact from mental impressions in such circumstances,

> [w]hile it may well be that work product is more deeply concerned with the revelation of an attorney's opinions and strategies, and that the burden of showing substantial need to overcome the privilege may be greater as to opinions and strategies than as to facts, *see* Fed. R. Civ. P. 26(b)(3), we see no reason why work product cannot encompass facts as well. It is helpful to remember that the work product privilege applies to preparation not only by lawyers but also by other types of party representatives including, for example, investigators seeking factual information. *See* Fed. R. Civ. P. 26(b)(3). If an attorney for a suspect, or an investigator hired for the suspect, undertakes a factual investigation, examining

*inter alia,* the scene of the crime and instruments used in the commission of the crime, we see no reason why a work product objection would not properly lie if the Government called the attorney or investigator before the grand jury and asked "What facts have you discovered in your investigation?"

*In re: Grand Jury Subpoena,* 282 F.3d at 161. Accordingly, I find that **[*16]** the statement in issue constitutes work product and is subject to the provisions of Rule 26(b)(3).

### B. Substantial Need

The finding that the witness statement now in question constitutes work product does not end the inquiry. Like the attorney-client privilege, the work product doctrine is not without exception. The type of conduct which would trigger the crime fraud exception to the attorney-client privilege, for example, likewise serves to preempt the work product doctrine and its immunity. *Madanes v. Madanes,* 199 F.R.D. 135, 151 (S.D.N.Y. 2001); *see also Craig v. A.H. Robins Co., Inc.,* 790 F.2d 1, 4 (2d Cir. 1986). Similarly, as the governing rule itself provides, production of material prepared in anticipation of litigation may be ordered if the requesting party can demonstrate "substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the **[*17]** materials by other means." Fed. R. Civ. P. 26(b)(3); *see Brock v. Frank V. Panzarino, Inc.,* 109 F.R.D. 157, 159 (E.D.N.Y. 1986). Under appropriate circumstances, disclosure under this provision may be ordered unless it would invade the "mental impressions, conclusions, opinions, or legal theories of an attorney[.]" Fed. R. Civ. P. 26(b)(3). A "trial court has wide discretion in determining the existence of substantial need and undue hardship. *Brock,* 109 F.R.D. at 159 n.4 (citing *Ross v. Bolton,* 106 F.R.D. 22, 23 (S.D.N.Y. 1985)).

In this instance, plaintiffs' efforts to show substantial need for the Cantres statement are

---

[6] This distinction is relevant, however, in determining the extent of the work product protection to be afforded, with attorney strategy and impressions generally being accorded a higher degree of protection. *See Lopez,* 2007 U.S. Dist. LEXIS 19694, 2007 WL 869590, at *2.

woefully insufficient. It appears from the record that plaintiffs' attorneys have been provided with the identity and address of the witness in question, and thus have been afforded the same opportunity to contact that individual and obtain a statement as did the defendants' investigator. [7] Accordingly, I find the plaintiffs have not carried their burden of proving substantial need for the work product materials in question. *See, e.g., Gargano v. Metro-North,* 222 F.R.D. 38, 40 (D. Conn. 2004) (finding that plaintiff failed to establish substantial need for witness statements **[*18]** made to claim investigator immediately following accident where witnesses were available for questioning by plaintiff); see also *Garnier,* 2006 U.S. Dist. LEXIS 28370, 2006 WL 1211201, at *2 (finding that substantial need was not demonstrated where other discovery devices, including depositions, provided alternative means for a party to obtain the substantial equivalent of the requested discovery) (collecting cases).

## C. Waiver

Plaintiffs further argue that notwithstanding a finding of work product and their inability to satisfy the court of a substantial need for the disputed materials, the defendants have nonetheless waived their right to claim work product protection of the statement in question, and they are therefore nonetheless entitled to an order compelling disclosure of the disputed witness statement. In their submission addressing the witness statement issue, defendants have not responded to this argument.

The Federal Rules of Civil Procedure require the preparation of an index of all documents withheld from discovery under claim of attorney-client **[*19]** privilege, work product doctrine, or some other recognized privilege. [8] *See* Fed. R. Civ. P.

26(b)(5)(A); *see also Scanlon v. Bricklayers and Allied Craftworkers, Local No. 3,* 242 F.R.D. 238, 245 (W.D.N.Y. 2007). This is no salutary requirement, instead serving the purpose of alerting litigants to the existence of documents being withheld under claim of privilege in order to permit any such claim to be challenged, and, if necessary, determined by the court. *See* Fed. R. Civ. P. 26(b)(5)(A), Advisory Committee Notes.

The failure of a party to list a document withheld during the course of discovery on a privileged log, or to **[*20]** provide a privilege log altogether, ordinarily results in a finding that the privilege otherwise asserted as been waived. *Lopez,* 2007 U.S. Dist. LEXIS 19694, 2007 WL 869590, at *3 (collecting cases); *Lugosch v. Congel,* No. Civ. 00-CV-0784, 2006 U.S. Dist. LEXIS 53116, 2006 WL 931687, at *15 (N.D.N.Y. Mar. 7, 2006) (failure to timely provide the privilege log or objection constitutes a waiver of any of the asserted privileges."); *see also Johnson,* 2005 U.S. Dist. LEXIS 48587, 2005 WL 469612, at *6. In this instance, while the disputed statement was obtained after suit was filed, and it does not appear that defendants have gone to any great lengths to hide the fact that they have within their possession the disputed witness statement, I nonetheless find that by virtue of not producing an index of documents withheld on the basis of privilege and listing the Cantres statement on that log, defendants have waived their right to work product protection with respect to that statement.

## III. SUMMARY AND ORDER

One of the major objectives to be served by the

---

[7] Indeed, from the statement reviewed by me *in camera* it appears that the witness may have previously been contacted by the plaintiffs or someone else acting on their behalf.

[8] The rule governing privilege indices provides, in relevant part, that

[w]hen a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial-preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege and protection.

Fed. R. Civ. P. 26(b)(5)(A).

2007 U.S. Dist. LEXIS 78262, *20

work product doctrine is to foster thorough and zealous representation of a client during the course of a litigated or otherwise disputed legal matter. In furtherance of this goal, the work product doctrine serves not only to **[*21]** protect attorney impressions and guard against disclosure of litigation strategies, but also encourages thorough investigation of disputed claims by insuring that an adversary will not gratuitously benefit from the results of such an investigation. This objective would be significantly undermined by permitting an opposing party to benefit from a litigant's labor in investigating a disputed claim. Accordingly, I find that the disputed statement is entitled to work product protection, and further conclude that plaintiffs have failed to establish a substantial need for the disputed statement sufficient to overcome work product protection. Despite these findings, because defendants have failed to prepare and serve a proper index of materials withheld under claim of privilege and work product, and to include the disputed witness statement on that log, it is hereby

ORDERED as follows:

1) Plaintiffs' motion for an order compelling discovery and specifically requiring defendants' production of a statement taken from Pamela Cantres, a non-party witness, see Dkt. No 19, is hereby GRANTED. Defendants shall produce to plaintiffs' counsel, within twenty calendar days of the date of this order, the **[*22]** witness statement in question.

2) Plaintiffs' motion for an order compelling discovery addressing the scheduling of depositions is deemed WITHDRAWN, without prejudice, based upon the parties apparent agreement on this issue.

3) The clerk is directed to promptly forward copies of this order to counsel for the parties pursuant to this court' s local rules.

Dated: October 22, 2007

Syracuse, NY

David E. Peebles

U.S. Magistrate Judge

# Robbins v. Chase Manhattan Bank, N.A.

United States District Court for the Southern District of New York

March 9, 1998, Decided ; March 9, 1998, Filed

97 Civ. 0676 (DAB)

**Reporter**

1998 U.S. Dist. LEXIS 2680; 76 Fair Empl. Prac. Cas. (BNA) 802

LINDA ROBBINS, Plaintiff, - against - CHASE MANHATTAN BANK, N.A., Defendant.

**Disposition:** [*1] Plaintiff's application for protective order denied.

**Counsel:** For LINDA ROBBINS, plaintiff: Cynthia Rollings, Beldock Levine & Hoffman, New York, NY.

For CHASE MANHATTAN BANK N.A., defendant: Tara A. Griffin, The Chase Manhattan Bank Legal Department, New York, NY.

**Judges:** JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** JAMES C. FRANCIS IV

## Opinion

*MEMORANDUM AND ORDER*

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

This is an employment discrimination action in which the plaintiff, Linda Robbins, alleges that the Chase Manhattan Bank, N.A. ("Chase") failed to promote her because of her race and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as well as state and local law. Ms. Robbins now moves for a protective order permitting her to withhold from discovery handwritten notes that she made during the course of her employment on the ground that they are protected by the work product doctrine.

The plaintiff has submitted her notes for my *in camera* inspection. She has also presented an affidavit setting forth the circumstances under which the notes were created. She states that she began recording her recollection [*2] of her experiences on the job after Ralph Ventura became her supervisor in 1992 "because I was afraid and I wanted to protect myself by writing down my thoughts about what was happening." Affidavit of Linda Robbins dated Feb. 18, 1998 ("Robbins Aff.") P 3. Ms. Robbins further indicates that when she filed a complaint with the New York State Division of Human Rights (the "SDHR") in October 1993, an SDHR representative told her that the agency was representing her and that she should keep notes of what happened to her at work. Robbins Aff. PP 4-5. She has asserted the work product doctrine with respect to notes that she made after her first contact with the SDHR representative, but she has turned over notes created prior to that date. Robbins Aff. PP 7-8.

In light of these facts, the work product doctrine does not shield Ms. Robbins' notes from discovery. "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238, 45 L. Ed. 2d 141, 95 S. Ct. 2160 (1975). The notes at issue were, of course, not prepared by an attorney and do [*3] not reflect an attorney's strategies or thought processes. Even assuming that a *pro se* litigant may be equated with an attorney for purposes of this analysis, Ms. Robbins' notes do not indicate her strategic thinking, but are instead a diary of her factual

1998 U.S. Dist. LEXIS 2680, *3

observations. Thus, they are not "core" work product.

The doctrine also extends to the acquisition by a party or its representative of factual information in anticipation of litigation. Fed. R. Civ. P. 26(b)(3). The rationale of this prong of the work product analysis is to "preclude one litigant from preparing his case through the efforts of the adversary." *In re Pfohl Brothers Landfill Litigation*, 175 F.R.D. 13, 26 (W.D.N.Y. 1997). In the instant case, however, there was no gathering of information by the plaintiff; she simply recorded her daily experiences on the job. In similar circumstances, one court has observed that "[a] contemporaneous factual memorandum memorializing the circumstances of the termination does not become attorney work product solely because the termination may thereafter lead to litigation." *Smith v. Harmon Group, Inc.*, 1992 U.S. Dist. LEXIS 242, No. 90

Civ. 3348, 1992 WL 8176, at *4 (S.D.N.Y. Jan. 13, 1992).

Thus, **[*4]** neither of the purposes underlying the work product doctrine are implicated in this case. Even if Ms. Robbins had begun recording her experiences at the suggestion of her attorney rather than either at the behest of the SDHR representative or on her own initiative, her notes would not have been protected. Accordingly, the plaintiff's application for a protective order is denied, and she shall produce the notes at issue.

SO ORDERED.

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York

March 9, 1998

---

**End of Document**

# Colgan Air, Inc. v. Aircraft Serv. Int'l, Inc.

United States District Court for the District of Connecticut

December 7, 2007, Decided; December 7, 2007, Filed

CIV. NO. 3:06CV444 (WWE)

**Reporter**
2007 U.S. Dist. LEXIS 90083

COLGAN AIR, INC. v. AIRCRAFT SERVICE INTERNATIONAL, INC. and BARNSWELL O. JONES

**Prior History:** Colgan Air, Inc. v. Aircraft Serv. Int'l, 2007 U.S. Dist. LEXIS 84858 (D. Conn., Nov. 15, 2007)

**Counsel:** [*1] For Colgan Air Inc, Plaintiff: Albert M. Orgain, IV, John G. Butler, III, LEAD ATTORNEYS, Sands Anderson Marks & Miller, PC, Richmond, VA; Garrett F. O'Keefe, Richard J. Kenny, LEAD ATTORNEYS, Kenny, O'Keefe & Usseglio, Hartford, CT.

For Aircraft Svc Intl Inc doing business as ASIG, Defendant: Alison L. McKay, LEAD ATTORNEY, Law Offices of Paul A. Lange, Stratford, CT; Ford C. Ladd, LEAD ATTORNEY, Law Offices of Ford C. Ladd, Alexandria, VA; John M. Murray, LEAD ATTORNEY, Murray Marin & Herman, PA-FL, Tampa, FL; Mark Edward Dumas, LEAD ATTORNEY, Law Offices of Paul A. Lange - Ferry Blvd, Stratford, CT; Michael E. Beck, LEAD ATTORNEY, Murray Marin & Herman, PA-FL, Tampa, FL; Paul A. Lange, Law Offices of Paul A. Lange, Stratford, CT.

For Barneswell O. Jones, Defendant: Alison L. McKay, LEAD ATTORNEY, Law Offices of Paul A. Lange, Stratford, CT; Mark Edward Dumas, Law Offices of Paul A. Lange - Ferry Blvd, Stratford, CT; Michael E. Beck, Murray Marin & Herman, PA-FL, Tampa, FL; Paul A. Lange, Law Offices of Paul A. Lange, Stratford, CT.

**Judges:** HOLLY B. FITZSIMMONS, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** HOLLY B. FITZSIMMONS

# Opinion

*FOLLOW-UP RULING ON DISCOVERY MOTIONS*

This case is a property damage action brought [*2] by Colgan Air, Inc., ("Colgan"), against Aircraft Service International, Inc., and Barnswell O. Jones (the "defendants"), for damages sustained as a result of an incident that occurred at around 6:30 p.m. on April 1, 2004, at the Bradley International Airport in Windsor Locks, Connecticut. The plaintiff alleges that the defendant Jones negligently drove a truck into the side of plaintiff's plane, causing substantial property damage.

On November 17, 2007, the Court ordered defendants to submit certain documents for *in camera* review. Colgan moves for an order compelling the defendants to produce copies of an insurance carrier's investigative claim file and a safety audit report claimed to be protected by the attorney-client privilege and/or work product doctrine. **[Doc. # # 45, 68].**

*Work Product Privilege*

Our Court of Appeals has observed that,

[w]hile it may well be that work product is more deeply concerned with the revelation of an attorney's opinions and strategies, and that the burden of showing substantial need to

overcome the privilege may be greater as to opinions and strategies than as to facts, *see* Fed. R. Civ. P. 26(b)(3), we see no reason why work product cannot encompass facts **[*3]** as well. It is helpful to remember that the work product privilege applies to preparation not only by lawyers but also by other types of party representatives including, for example, investigators seeking factual information. *See* Fed. R. Civ. P. 26(b)(3). If an attorney for a suspect, or an investigator hired for the suspect, undertakes a factual investigation, . . . we see no reason why a work product objection would not properly lie if the Government called the attorney or investigator before the grand jury and asked "What facts have you discovered in your investigation?" . . . . Broad categorical statements about the scope of the work product privilege are risky, as individual applications are highly fact specific. In our view, analysis should proceed cautiously, case by case.

*In re Grand Jury Subpoena Dated Oct. 22, 2001,* 282 F.3d 156, 161 (2d Cir. 2002).

### Insurance Carrier's Investigative Claim File

Defendants argue that the narrative report and statement prepared by the insurance carrier which are contained in the investigative claims file were prepared in anticipation of litigation and are protected under Fed. R. Civ. P. 26(b)(3). Pursuant to the Court's order dated November 17, **[*4]** 2007, defendants provided a copy of the insurance carrier's investigative claims file for *in camera* review. Upon review, the Court finds that the report should be produced, subject to a confidentiality agreement. Defendants have not shown that the insurance carrier's investigation was done at the direction of counsel or on behalf of counsel. Rather, it appears that the insurance investigation was performed in the normal course of business. "To invoke [the work product] privilege, a party generally must show that the documents were prepared principally or exclusively to assist in anticipated or ongoing litigation." *U.S. v.*

*Construction Products Research, Inc.,* 73 F.3d 464, 473 (2d Cir. 1996) (citing Fed. R. Civ. P. 26(b)(3); *Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 471 (S.D.N.Y. 1993)).

Accordingly, plaintiff's motion to compel **[Doc. # 45]** production of the remainder of the insurance carrier's investigative claims file is **GRANTED**. Defendant will produce the claims file within ten (10) days.

### Plaintiff's Motion to Compel *[Doc. # 68]*

Plaintiff's Second Request for Production No. 1, dated June 13, 2007, seeks a "copy of any documents or reports(s) completed following [a] **[*5]** safety audit that was conducted by or for Aircraft Service International, Inc. on April 1, 2004, at Bradley Airport." Pursuant to the Court's ruling dated November 17, 2007, defendants submitted the report with attachments to the Court for *in camera* review. Similarly, defendants have not shown that the safety audit was performed at the direction of counsel or on behalf of counsel. Rather, it appears that the safety audit and report were prepared in the normal course of business. *U.S. v. Construction Products Research, Inc.,* 73 F.3d 464, 473 (2d Cir. 1996).

Upon review, the Court finds that the report should be produced to plaintiff, subject to a confidentiality agreement, within ten (10) days. Accordingly, plaintiff's motion to compel **[Doc. # 68]** is **GRANTED.**

### CONCLUSION

Accordingly, plaintiff's Motion to Compel **[Doc. # 45]** production of the remainder of the insurance carrier's investigative claims file is **GRANTED**.

Plaintiff's Motion to Compel **[Doc. # 68]** is **GRANTED.**

This is not a recommended ruling. This is a discovery ruling and order which is reviewable pursuant to the "clearly erroneous" statutory standard of review. 28 U.S.C. § 636 (b)(1)(A); Fed.

R. Civ. P. 6(a), 6(e) and 72(a); and **[\*6]** Rule 72.2 of the Local Rules for United States Magistrate Judges. As such, it is an order of the Court unless reversed or modified by the district judge upon motion timely made.

ORDERED at Bridgeport this 7th day of December 2007.

/s/

HOLLY B. FITZSIMMONS

UNITED STATES MAGISTRATE JUDGE

---

# Rubis v. Hartford Fire Ins. Co.

United States District Court for the District of Connecticut

April 16, 2012, Decided; April 16, 2012, Filed

CIV. NO. 3:11CV796 (WWE)

**Reporter**
2012 U.S. Dist. LEXIS 52982; 2012 WL 1288483

GEORGE RUBIS, ET AL v. HARTFORD FIRE INSURANCE CO.

**Subsequent History:** Motion granted by Rubis v. Hartford Fire Ins., 2013 U.S. Dist. LEXIS 5753 (D. Conn., Jan. 15, 2013)

**Prior History:** Rubis v. Hartford Fire Ins. Co., 2012 U.S. Dist. LEXIS 40005 (D. Conn., Mar. 23, 2012)

**Counsel:** [*1] For George Rubis, Henry W. Barletta, Jr., David S. Evans, Plaintiffs: Jacques J. Parenteau, LEAD ATTORNEY, Madsen, Prestley & Parenteau, LLC-NL, New London, CT; Kera L. Paoff, Todd D. Steigman, LEAD ATTORNEYS, Madsen, Prestley & Parenteau, LLC-HTFD, Hartford, CT; William G. Madsen, LEAD ATTORNEY, Madsen, Prestley & Parenteau, LLC, Hartford, CT.

For Hartford Fire Insurance Company, Defendant: Miguel A. Escalera, Jr., Sheldon D. Myers, LEAD ATTORNEYS, Kainen, Escalera & McHale, PC, Hartford, CT.

**Judges:** HOLLY B. FITZSIMMONS, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** HOLLY B. FITZSIMMONS

# Opinion

RULING ON PLAINTIFFS' EMERGENCY MOTION FOR PROTECTIVE ORDER [DOC. #56]

Plaintiffs George Rubis, David Evans and Henry Barletta are three former employees of The Hartford. The allege discriminatory discharge, claiming that The Hartford laid them off because of their age. Plaintiffs' employment with the The Hartford was terminated effective March 27, 2010.

Background

Before the Court is defendant's Motion to Disqualify **[doc. #24]** plaintiffs' counsel, the law firm of Madsen, Prestley & Parenteau, LLC, from representing plaintiffs in this case because the firm allegedly violated Rule 4.2 of the Connecticut Rules of Professional Conduct [*2] by having ex parte communications with one of the former managers at The Hartford, Gary Kemp, who was involved in the process that led to the elimination of the three plaintiffs' positions. [1] The firm of Madsen, Prestley & Parenteau represented Gary Kemp in a separate administrative complaint of age and race discrimination that Mr. Kemp has filed against The Hartford at the Connecticut Commission on Human Rights & Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC"). Mr. Kemp's employment with The Hartford was terminated on July 5, 2011.

A hearing on the Motion to Disqualify was scheduled for March 28, 2012. On March 20, 2012, plaintiffs filed an Emergency Motion to Quash Subpoenas [doc. #43], served on plaintiffs' counsel to appear and testify at the evidentiary hearing. Oral argument was held on March 21, 2012, and a

_____

[1] The Motion to Disqualify was referred to the undersigned by Judge Eginton on February 15, 2012.

ruling was issued on March 23, 2012, granting the Motion to Quash. [Doc. #45]. The hearing on the Motion to Disqualify was postponed to April 27, 2012, to permit defendant to depose Mr. Kemp. [Doc. ##47, 50]. The deposition is scheduled for Tuesday, **[*3]** April 17, 2012.

On April 6, 2012, plaintiffs filed an Emergency Motion for Protective Order to Protect Against Disclosure of Attorney Work Product. **[Doc. #56]**. Oral argument was held on April 11, 2012.

Specifically, plaintiffs seek an order prohibiting defendant's counsel from asking questions during the deposition of Gary Kemp that will require Mr. Kemp to disclose information that is protected under the attorney work product doctrine.

Motion to Disqualify

The disqualification of an attorney in order to forestall violation of ethical principles is a matter committed to the sound discretion of the district court. Cresswell v. Sullivan & Cromwell, 922 F.2d 60, 72 (2d Cir. 1990); Hogan v. Magana, No. HDSP134296, 2006 Conn. Super. LEXIS 1429, 2006 WL 1321282 at *2 (Conn. Super. May 9, 2006) ("The trial court has the authority to regulate the conduct of attorneys and has a duty to enforce the standards of conduct regarding attorneys.") (citing State v. Jones, 180 Conn. 443, 448, 429 A.2d 936 (1980)). When deciding a motion to disqualify counsel, a court must balance "the need to maintain the highest standards of the profession" against "a client's right freely to choose his counsel." Hempstead Video, Inc. v. Inc. Vill. of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005) **[*4]** (citations omitted).

In view of their potential for abuse as a tactical device, motions to disqualify opposing counsel are subject to particularly strict scrutiny. Scantek Medical, Inc. v. Sabella, 693 F. Supp. 2d 235, 2008 WL 5210562 at *1-2 (S.D.N.Y. 2008) (internal citations omitted). Courts are reluctant to grant motions to disqualify because such motions may be tactically motivated and impinge on a party's right

to employ the counsel of its choice. Id. (internal quotation and citations omitted). Finally, courts are also reluctant to grant motions to disqualify because they inevitably result in delay and added expense. Id. (citations omitted). For all these reasons, the Second Circuit requires a high standard of proof on the part of the party seeking to disqualify an opposing party's counsel. Id. (citations omitted).

The Hartford moves to disqualify the law firm of Madsen, Prestley & Parenteau, LLC pursuant to District of Connecticut Local Rule 83.2(a) and Connecticut Rules of Professional Conduct, Rule 4.2 ("Communication with Person Represented by Counsel"). [2] Mr. Kemp was allegedly involved in the reduction in force that led to the termination of plaintiffs' employment in March 2010. Kemp's employment **[*5]** was terminated in July 2011 and he later retained Madsen, Prestley & Parenteau, LLC., who no longer represent him. Mr. Kemp has retained new counsel who will be present during his April 17 deposition.

Interviewing Former Corporation Employees

Although an adverse attorney has a right to interview former employees **[*6]** of a corporation, the attorney is obliged voluntarily to stop short of any inquiry into matters that he or she, as an attorney, knows may be privileged

---

[2] Rule 4.2 of the Rules of Professional Conduct states,

> In representing a client, lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

The commentary to Rule 4.2 addresses its application with respedct to organizational parties, and provides, in relevant part,

> In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.

but that the lay employee may not. Most courts have found that Rule 4.2 does not generally bar ex parte contacts with former employees; however, it proscribes inquiry by opposing counsel into matters subject to the attorney-client privilege.

1 Edna Selan Epstein, The Attorney-Client Privilege and the Work Product Doctrine, at 785 (5th Ed. 2007) (emphasis added). The language of Rule 4.2 does not expressly prohibit ex parte contact with former employees of a corporate party. The comment to the Rule prohibits communications by a lawyer for one party concerning the matter in representation with: (a) "persons having a managerial responsibility on behalf of the organization," and (b) "with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil . . . liability;" or (c) "whose statement may constitute an admission on the part of the organization." "The first and third characteristics do not apply to former employees since, by definition, they no longer have managerial responsibility [*7] and their current statements would not constitute admissions . . . of the former employer." Serrano v. Cintas Corp., Civil Action No. 04-40132, 2009 U.S. Dist. LEXIS 120068, 2009 WL 5171802, at *1 (E.D. Mich. Dec. 23, 2009). One court has held, however, that "the second classification is not expressly limited to present acts or omissions, and may well include former employees." Id.

The ABA, in ABA Formal Opinion 91-359, issued March 22, 1991, concluded that Rule 4.2 does not prohibit communications with former employees of a defendant corporation as long as the former employees are not in fact represented by the corporation's attorney. ABA Formal Opinion 91-359 (March 22, 1991) ("[I]t is the opinion of the committee that a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating model Rule 4.2, communicate about the subject of the representation with an unrepresented

former employee of the corporate party without consent of the corporation's lawyer."). It is undisputed here that Mr. Kemp is not represented by The Hartford and was not employed when he retained the law firm of Madsen, Prestley & Parenteau, LLC.

> The opinion recognized that although [*8] persuasive policy arguments can be and have been made for extending the ambit of Model Rule 4.2 to cover some former corporate employers, the fact remains that the text of the Rule does not do so and the comment gives no basis for concluding such coverage was intended.
>
> . . .
>
> Most courts thus allow ex parte interviews of former employees and do not mandate proceeding either by way of deposition or with notice to an adversary.

1 Edna Selan Epstein, The Attorney-Client Privilege and the Work Product Doctrine, at 785 (5th Ed. 2007) (citing cases); see Bryant v. Yorktowne Cabinetry, Inc., 538 F. Supp. 2d 948, n.2 (W.D. Va. 2008) (noting criticism of cases holding that "contacts should be prohibited where the former employees' acts or omissions may be imputed to the corporation" in favor of the March 1991 ABA formal opinion regarding Model Rule 4.2 that does not bar ex parte communication with former employees.)(citing cases); United States v. W.R. Grace, 401 F. Supp. 2d 1065, 1069 (D. Mont. 2005) ("[n]either the text nor the comments of Model Rule 4.2 make any effort to distinguish between former managerial employees and former 'lower echelon' employees.").

A minority of courts, however, have [*9] applied Rule 4.2 to former employees in certain situations, such as where the former employee was a member of an organization's management or control group, or where the former employee had privileged or confidential information, or where the conduct of the former employee could have been imputed to

the employer. Serrano, 2009 U.S. Dist. LEXIS 120068, 2009 WL 5171802 at *2-3 (internal citations omitted). The Court in Serrano acknowledged that, "the majority of courts have accepted the ABA Committee position that Rule 4.2 simply does not apply to ex parte contacts with an opposing party's former agents, despite the Committee's admission that persuasive policy arguments exist for extending it to at least some former employees." In Serrano, counsel for the Equal Employment Opportunity Commission ("EEOC") filed a Motion for Leave to Interview the Former Decision Makers Outside the Presence of Defense Counsel, but refused to identify the former defendant employees. The Magistrate Judge wrote, "In the absence of a showing that the potential witnesses were not members of [defendant's] management group, and that they were not privy to confidential or privileged information, I am unable to conclude that Rule 4.2 is totally [*10] inapplicable." 2009 U.S. Dist. LEXIS 120068, [WL] at *2 (emphasis added). The court then granted the EEOC's motion, but stated that the ex-parte interviews were to be conducted in accordance with certain guidelines. This "more nuanced approach" directed counsel to, among other things, advise the former employee to avoid disclosure of privileged materials; not solicit privileged information and terminate the conversation should it appear that the interviewee might reveal privileged matters; and instruct the former employee not to disclose information covered by defendant's attorney client privilege, or matters subject to confidentiality agreements between the former employee and defendant. 2009 U.S. Dist. LEXIS 120068, [WL] at *4-5; but see Clemons v. City of Detroit, (distinguishing Serrano on its facts, where both parties knew the identity of the former employee and former position and, during oral argument, both parties conceded that she was an "important" official, and the defendant did not allege that the former employee was involved with Clemons' termination, or that she possessed any confidential or privileged information regarding Clemons' termination. The

Court found that under these facts, the ex parte interview did not violate Rule 4.2).

Plaintiffs [*11] seek an order prohibiting defendant's counsel from asking questions during the deposition of Gary Kemp that will require Mr. Kemp to disclose information that is protected under the attorney client work product doctrine. Plaintiffs emphasize that Mr. Kemp did not make the decisions to terminate plaintiffs' employment and does not possess any privileged information or work product regarding defendants' defense against plaintiffs' claims. They further argue that defendant has not demonstrated that trial of this matter will be tainted as a result of any communication between plaintiffs' counsel and Mr. Kemp. Moreover, The Hartford is now an adversary to Mr. Kemp in his employment discrimination claims.

Without deciding the motion to disqualify at this time, and considering the nuanced approach counseled in Serrano at the deposition stage, the Motion for Protective Order [Doc. #56] is GRANTED, to the extent that counsel may not inquire at the deposition about communications Mr. Kemp had with Madsen, Presley & Parenteau, LLC, concerning his involvement in the termination of these plaintiffs. There is no claim that Mr. Kemp possesses either privileged or confidential information concerning [*12] plaintiffs' claims. The Hartford may inquire whether its former employee Gary Kemp has communicated to plaintiffs' counsel knowledge that may support a claim of discriminatory pattern and practice beyond his involvement in the termination of plaintiffs. A fair subject of inquiry includes Mr. Kemp's past involvement in reduction in force initiatives and/or termination of others' employment, conversations with The Hartford's lawyers, his access to confidential and/or privileged materials, and specific litigation strategies in other cases. The Hartford's counsel may inquire by naming employees and/or the lawsuit, or describe the litigation so that Mr. Kemp will be able to recall his involvement and counsel can determine whether Kemp has specific privileged and/or confidential

2012 U.S. Dist. LEXIS 52982, *12

information that could prejudice The Hartford in this lawsuit. At this time, defendant has only speculated that Mr. Kemp was exposed to privileged/confidential information during his employment that could prejudice The Hartford in this lawsuit.

This case is complicated by the fact that Mr. Kemp is now an adverse party to The Hartford, bringing his own wrongful discharge claim against his former employer. Fortunately, **[*13]** his own counsel will be present at the deposition. Counsel are encouraged to contact chambers if there is an objection to a question that requires clarification or guidance from the Court.

This is not a recommended ruling. This is a discovery ruling and order which is reviewable pursuant to the "clearly erroneous" statutory standard of review. 28 U.S.C. § 636 (b)(1)(A); Fed. R. Civ. P. 6(a), 6(e) and 72(a); and Rule 2 of the Local Rules for United States Magistrate Judges. As such, it is an order of the Court unless reversed or modified by the district judge upon motion timely made.

SO ORDERED at Bridgeport this 16th day of April 2012.

/s/ HOLLY B. FITZSIMMONS

UNITED STATES MAGISTRATE JUDGE

---

**End of Document**

# Serrano v. Cintas Corp.

United States District Court for the Eastern District of Michigan, Southern Division

December 23, 2009, Decided; December 23, 2009, Filed

CIVIL ACTION NO. 04-40132

**Reporter**

2009 U.S. Dist. LEXIS 120068; 2009 WL 5171802

MIRNA E. SERRANO, et al., Plaintiffs, v. CINTAS CORPORATION, Defendant.

**Subsequent History:** Motion granted by, Judgment entered by Serrano v. Cintas Corp., 2010 U.S. Dist. LEXIS 10960 ( E.D. Mich., Feb. 9, 2010)

**Prior History:** Serrano v. Cintas Corp., 2009 U.S. Dist. LEXIS 111404 ( E.D. Mich., Dec. 1, 2009)

**Counsel:** [*1] For Mirna E. Serrano, Plaintiff: Bill Lann Lee, LEAD ATTORNEY, Lewis, Feinberg, Oakland, CA; James K. Fett, Lawrence A. Fields, LEAD ATTORNEYS, Fett & Fields, Pinckney, MI; William G. Tishkoff, LEAD ATTORNEY, Jennifer L. Brant, Tishkoff & Assoc., Ann Arbor, MI; Heather Mills, Goldstein, Demchak, Oakland, CA; Richard Talbot Seymour, Richard T. Seymour Assoc., Washington, DC; Sarah E. Siskind, Miner, Barnhill, Madison, WI.

For Stephanie L. McVay, Linda D. Allen, Plaintiffs: William G. Tishkoff, LEAD ATTORNEY, Jennifer L. Brant, Tishkoff & Assoc., Ann Arbor, MI; Bill Lann Lee, LEAD ATTORNEY, Lewis, Feinberg, Oakland, CA; James K. Fett, LEAD ATTORNEY, Fett & Fields, Pinckney, MI; Richard Talbot Seymour, Richard T. Seymour Assoc., Washington, DC.

For Osbaldo Mundo, Edward Fitch, Dimitri Mack, Jose Picorelli, Aundre Graham, Plaintiffs: Bill Lann Lee, Lewis, Feinberg, Oakland, CA; Judson H. Miner, Miner, Barnhill & Galland, Chicago, IL; Sarah E. Siskind, Miner, Barnhill, Madison, WI.

For Sharon Rose Wilborn, Bennita Shiffer, Plaintiffs: Bill Lann Lee, Lewis, Feinberg, Oakland, CA; Judson H. Miner, Miner, Barnhill & Galland, Chicago, IL; Rachel J. Geman; Sarah E. Siskind, Miner, Barnhill, Madison, [*2] WI.

For Tanesha Davis, Cindy Patterson, Plaintiffs: Bill Lann Lee, Lewis, Feinberg, Oakland, CA; Sarah E. Siskind, Miner, Barnhill, Madison, WI.

For Blanca Nelly Avalos, Consolidated Plaintiff, Civil Action 06-12311, Consol Plaintiff: Heather Mills, LEAD ATTORNEY, Goldstein, Demchak, Oakland, CA; Nancy L. Maldonado, Scott A. Entin, LEAD ATTORNEYS, Miner, Barnhill, Chicago, IL; Roberta L. Steele, LEAD ATTORNEY, Goldstein, Demchak, Oakland, CA; Judson H. Miner, Miner, Barnhill & Galland, Chicago, IL; Rachel J. Geman; Sarah E. Siskind, Miner, Barnhill, Madison, WI.

For Anthony Jones, Consolidated Plaintiff, Civil Action 06-12311, Consol Plaintiff: Nancy L. Maldonado, Scott A. Entin, LEAD ATTORNEYS, Miner, Barnhill, Chicago, IL; Judson H. Miner, Miner, Barnhill & Galland, Chicago, IL; Sarah E. Siskind, Miner, Barnhill, Madison, WI.

For Equal Employment Opportunity Commission, Intervenor Plaintiff: Erica D. White-Dunston, Kenneth J. Kryvoruka, Robert D. Unitas, LEAD ATTORNEYS, Equal Employment Opportunity Commission, Washington, DC; Kenneth L. Bird, Equal Employment Opportunity Commission, Indianapolis, IN.

For Cintas Corporation, an Ohio corporation, Defendant: Elena R. Baca, Jon A. Geier, [*3] Nancy L. Abell, LEAD ATTORNEYS, Paul, Hastings, Los Angeles, CA; Gregory M. Utter, LEAD ATTORNEY, Keating, Muething, Cincinnati, OH; Heather A. Morgan, LEAD ATTORNEY, Paul, Hastings, Los Angeles, CA; Maureen E. O'Neill, LEAD ATTORNEY, Paul, Hastings, Atlanta, GA; Theodore R. Opperwall, Kienbaum, Opperwall, Birmingham, MI.

For Equal Employment Opportunity Commission, Movant: Kenneth L. Bird, Equal Employment Opportunity Commission, Indianapolis, IN; Laurie Young, Michelle Eisele, LEAD ATTORNEYS, Equal Employment Opportunity Commission, Indianapolis, IN; Omar Weaver, Equal Employment Opportunities Commission, Detroit, MI.

For Equal Employment Opportunity Commission, ThirdParty Plaintiff: Jo Ann Farnsworth, LEAD ATTORNEY, Equal Employment Opportunity Commission, Indianapolis, IN; Kenneth L. Bird, Equal Employment Opportunity Commission, Indianapolis, IN; Laurie Young, Michelle Eisele, LEAD ATTORNEYS, Equal Employment Opportunity Commission, Indianapolis, IN.

For Cintas Corporation, an Ohio corporation, ThirdParty Defendant: Gregory M. Utter, LEAD ATTORNEY, Keating, Muething, Cincinnati, OH.

**Judges:** DONALD A. SCHEER, UNITED STATES MAGISTRATE JUDGE. DISTRICT JUDGE SEAN F. COX.

**Opinion by:** DONALD A. SCHEER

## Opinion

### **ORDER**

This [*4] matter is before the magistrate judge on Order of Reference for hearing and determination of EEOC's Motion for Leave to Interview Former

Decision Makers Outside the Presence of Defense Counsel. The parties appeared for hearing on December 3, 2009. Having reviewed the Motion, together with the Defendant's Response and Plaintiffs' Reply, and having had the benefit of oral argument, I find that the Motion should be granted in part.

Plaintiff-Intervenor, the Equal Employment Opportunity Commission ("EEOC") seeks leave to interview certain former management level employees of Defendant Cintas Corporation ("Cintas"), outside the presence of defense counsel. The Motion was filed pursuant to the court's guidance in Victory Lane Quick Oil Change, Inc. v. Hoss, 2009 U.S. Dist. Lexis 22579 at *6 (E.D. Mich. 2009) that it would be prudent for counsel who wishes to interview a former employee of a party to contact counsel for that party for consent, or to seek direction from the court. Counsel for EEOC wishes to interview former employees of Cintas who made, or may have made, hiring decisions on behalf of the corporation. Movant cites the obligation of its counsel to make a thorough investigation [*5] in preparation for trial, and observes that interviews of potential witnesses typically occur outside the presence of opposing counsel. That general rule is subject to the limitations imposed by Rule 4.2 of the Michigan Rules of Professional Conduct, which has been incorporated into this court's rules through Local Rule 83.22. Rule 4.2 provides as follows:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party whom the lawyer knows to be represented in the matter by another lawyer, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

MRPC 4.2. The commentary following the Rule addresses its application with respect to organizational parties, and provides, in pertinent part, as follows:

> In the case of an organization, this Rule

prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on [*6] the part of the organization. If an agent or employee of the organization is represented in the matter by separate counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule.

Commentary to MRPC 4.2. In the case at bar, Cintas opposes the EEOC's proposed interview of its former decision makers outside the presence of defense counsel.

The language of Rule 4.2 does not expressly prohibit ex parte contact with former employees of a corporate party. In fact, the text of the Rule does not differentiate between individual and corporate parties. Nonetheless, the comments to the Rule recognize that the status of an organization as a party raises serious questions as to which of the organization's various members may, or may not, be contacted without the consent of the organization's counsel or leave of court. In an effort to resolve those questions, the comment declares that the Rule prohibits communications by a lawyer for one party concerning the matter in representation with: (a) "persons having a managerial responsibility on behalf of the organization," and (b) "with any other person whose act or omission in connection with that matter may be imputed [*7] to the organization for purposes of civil . . . liability" or (c) "whose statement may constitute an admission on the part of the organization." Unfortunately, the committee's effort to explain the sweep of the Rule leaves important questions unanswered. The first and third characteristics do not apply to former employees since, by definition, they no longer have managerial responsibility, and their current statements would not constitute admissions on the part of the former employer. The second classification, however, is not expressly limited to present acts or omissions, and may well include former employees.

The majority of court decisions dealing with efforts to interview a corporate party's former employees ex parte have held that Rule 4.2 does not prohibit such contacts. Valassis v. Samelson, 143 F.R.D. 118 (E.D. Mich. 1992). That view was adopted as well in ABA Formal Opinion 91-359 (March 22, 1991) ("[I]t is the opinion of the committee that a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating model Rule 4.2, communicate about the subject of the representation with an unrepresented former employee [*8] of the corporate party without consent of the corporation's lawyer."). The cases and ABA opinion relied upon by EEOC, while supportive of its position in this suit, do not appear to address precisely the question raised under the facts of this case. EEOC candidly declares that it wishes to interview Defendant's former employees "who made, or may have made, hiring decision for Cintas." It is logical to conclude that the particular "hiring decisions" to be scrutinized are those which form the basis of EEOC's Complaint in this case. To the extent that this is true, they form the very heart of the case and controversy before this court. The comments to Rule 4.2 declare that the Rule "prohibits communication by a lawyer for one party concerning the matter in representation with . . . any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil . . . liability . . .." The past acts and omissions of former employees, during and in the course of their employment by a corporate party, clearly may be imputed to the corporation for purposes of civil liability. That is precisely why EEOC is interested in exploring them. The defense [*9] of such acts or omissions is central to Cintas' case. The ABA Committee's assertion that nothing in its comments gives a basis for concluding that Rule 4.2 was intended to cover former employees is simply inaccurate. Indeed, the plain language of the comments indicates

otherwise, and the Committee concedes that "persuasive policy arguments can and have been made for extending the ambit of Model Rule 4.2 to cover some former employers." (sic) If the purpose of the Rule is truly "to preserve the proper functioning of the legal system and shield [] the adverse party from improper approaches," as ABA Formal Opinion 91-359 declares, then Cintas' former decision makers, whose acts and omissions with regard to the claims in issue here may be imputed to the Corporation, may reasonably be considered agents of the Defendant for purposes of Rule 4.2.

There is case law supporting the proposition that former corporate employees fall within the ambit of Rule 4.2 under various circumstances. Those circumstances include the former employees' membership during their employment in the corporation's management or control group. Curley v. Cumberland Farms, Inc., 134 F.R.D. 77 (D. N.J. 1991); Prudential Ins. Co. of America Sales Practices Litigation, 911 F.Supp. 148 (D. N.J. 1995). [*10] Another circumstance under which the Rule has been applied to former employees is involvement in litigation or other events leading to their exposure to privileged or confidential information during their employment status. See Lang v. Maricopa County Superior Court, 170 Ariz. 602, 826 P.2nd 1228 (1992); MMR/Wallace Power and Indus., Inc. v. Thames Associates, 764 F.Supp. 712 (D. Conn. 1991). EEOC's Motion does not identify the particular decision makers whom it seeks to contact. In the absence of a showing that the potential witnesses were not members of Cintas' management group, and that they were not privy to confidential or privileged information, I am unable to conclude that Rule 4.2 is totally inapplicable.

Case law also supports the proposition that former employees whose conduct during their employment by a corporate party may be imputed to the employer are entitled to Rule 4.2 protection. Lang v. Superior Court, supra; Rentclub, Inc. v. Transamerica Rental Fin. Corp., 811 F.Supp. 651, 656-57 (M.D. Fla. 1992); In re: Opinion 668 of

Advisory Committee on Professional Ethics, 134 N.J. 294, 633 A.2d 959 (1993). In the latter case, the court stated in an interim decision that the [*11] ex parte contact with an opposing party's former employee whose conduct would establish the organization's liability could take place only with prior notice to the organization's attorney and an opportunity for such counsel to be present at the interviews. I believe that holding to be fully consistent with the spirit of the Rule, the language of the commentary and the essential principles of the adversary system of litigation. [1]

The decisions which have extended "party" status to former employees of [*12] corporate litigants are based upon the language of the comment to Rule 4.2 and not the Rule itself. It is also true that informal investigation and fact finding are normal, and important, functions of attorneys in representing their clients. Formal discovery is more restrictive and more costly than ex parte contacts with potential witnesses who may, or may not, have relevant information. As stated above, the majority of courts have accepted the ABA Committee position that Rule 4.2 simply does not apply to ex parte contacts with an opposing party's former agents, despite the Committee's admission that persuasive policy arguments exist for extending it to at least some former employees. The simplest course for this court would be to follow the general rule and ignore the contrary arguments. But I am persuaded that the circumstances of the present case require a more nuanced approach.

Total denial of EEOC's ex parte access to Cintas' former employees is not required by the plain

---

[1] EEOC argues that, because it is the federal agency charged with administration, enforcement and interpretation of Title VII, it would violate public policy to preclude it from speaking with Cintas' former employees ex parte. I have no quarrel with that position, so long as EEOC was acting in its role as an unbiased and impartial entity. The instant motion, however, was filed by EEOC in its capacity as a litigant. It is apparent that the agency has reached a determination, and now seeks factual support for its contentions in this case. In that capacity, I am satisfied that EEOC's counsel is bound by the provisions of Rule 4.2 to the same extent as counsel for any other party to a lawsuit.

language of Rule 4.2, and would undermine the well established legal policy of "just, speedy and inexpensive determination of every action or proceeding." See, Fed.R.Civ.P. 1. At the same time, Defendant's former [**13]** decision makers are almost certain to be persons "whose acts or omissions in connection with [the subject matter of EEOC's representation here] may be imputed to the [Defendant's] organization."

> [C]ourt authorization or opposing counsel's consent to ex parte contact should be required if the former employee was highly placed in the company (such as a former officer or director) <u>or if the former employee's actions are precisely those sought to be imputed to the corporation</u>.

<u>Rentclub, Inc. v. Transamerica Rental Finance Corp.</u>, 811 F.Supp. 651, 657-58 (M.D. Fla. 1992) (quoting Miller and Calfo, *Ex Parte Contact with Employees and Former Employees of a Corporate Adversary: Is It Ethical?*, 42 Bus. Law. 1053 at 1072-73 (1987) (emphasis added). The court noted that the interest of a corporation in protecting privileged matter acquired by a former employee during the course of employment remains after the employee leaves the corporation. Similarly, the acts or omissions of former corporate employees prior to the termination of their agency relationship may be imputed to a corporate employer. This is especially true of former managers and decision makers. I am satisfied that, in cases presenting [**14]** such circumstances, the former agents of an organizational party should be considered parties as well with respect to actions taken by them during their employment.

In a thoughtful decision rendered in a gender discrimination case, the court in <u>Lang v. Reedy Creek Improvement Dist.</u>, 888 F.Supp. 1143 (M.D. Fla. 1995), weighed the competing interests and concluded that allowing ex parte contacts under specific, court ordered restrictions, protected the important interests of both parties and satisfied the letter, spirit and intent of the ethical rule.

Access to an organizational party's employees should be regulated on the basis of a balancing of interests affecting in the particular case. See, e.g. <u>New York State Assn. for Retarded Children, Inc. v. Carey</u>, 706 F.2d 956, 960-61 (2nd Cir.), <u>cert. denied</u>, 464 U.S. 915, 104 S. Ct. 277, 78 L. Ed. 2d 257 (1983). Proof of wrongdoing, and especially of discrimination, is difficult to establish, and plaintiff must be afforded the opportunities to discovery all factual information pertinent to their case. <u>Goff v. Wheaton Industries</u>, 145 F.R.D. 351, 356, n.3 (D. N.J. 1992). The <u>Goff</u> court favored flexibility in the discovery process, a position with [**15]** which this court concurs. The ability to informally interview former employees of the defendants would materially assist plaintiff's preparation of their case at both the summary judgment and trial stages and reduce the cost of litigation for both parties.

<u>Lang</u>, 888 F.Supp. at 1148. The court entered an Order permitting ex parte contacts with specific restrictions. I conclude that a similar disposition is appropriate in this case.

IT IS THEREFORE ORDERED that EEOC's Motion for Leave to Interview Former Decision Makers Outside the Presence of Defense Counsel is granted, in part. Plaintiffs' counsel may initiate ex parte communications with former "decision maker" employees of the Defendant, subject to the following restrictive guidelines:

> 1. Upon contacting any former employee of Cintas, Plaintiffs' counsel shall immediately identify him/herself as the attorney representing Plaintiffs in this action and specify the purpose of the contact.

> 2. Plaintiffs' counsel shall ascertain whether the former employee is currently associated with the Defendant or is represented by counsel. If either is so, the contact must terminate immediately.

> 3. Plaintiffs' counsel shall advise the former

employee **[*16]** that (a) participation in the interview is not mandatory and that (b) he or she may choose not to participate or to participate only in the presence of personal counsel or counsel for the Defendant. Counsel for Plaintiff must immediately terminate the interview if the former employee does not wish to participate, or elects to do so only in the presence of personal counsel or counsel for Defendant.

4. Plaintiffs' counsel shall advise the former employee to avoid disclosure of privileged materials. In the course of the interview, Plaintiffs' counsel shall not attempt to solicit privileged information and shall terminate the conversation should it appear that the interviewee may reveal privileged matters.

5. Plaintiffs' counsel shall instruct the former employee not to disclose information covered by Defendant Cintas' attorney client privilege, or matters subject to confidentiality agreements between the interviewee and the Defendant. The interview shall be terminated immediately if it appears that the former employee has erroneously volunteered such information.

6. Plaintiffs' counsel shall create and preserve a list of all former employees contacted and the dates of contacts and shall **[*17]** maintain and preserve any and all statements or notes resulting from such contacts. Counsel for Defendant shall be entitled to review the lists and notes within seven (7) days of demand, subject to work product protections. Work product shall not be deemed to extend to any factual statements or information obtained from the former employee.

7. Should counsel for Defendant have reason to believe that a violation of this Order or of any applicable ethical rule, has occurred, the Defendant shall file an appropriate Motion with this court. Appropriate sanctions or remedial measures will be imposed if a violation is found by the court. If the violation is revealed at trial, the Defendant shall make such motion in open court, outside the presence of the jury, and the court will take the matter under consideration at that time.

All of which is Ordered at Detroit, Michigan this 23rd day of December, 2009.

/s/ Donald A. Scheer

DONALD A. SCHEER

UNITED STATES MAGISTRATE JUDGE

---

**End of Document**

# Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc.

United States District Court for the District of Connecticut

December 30, 2011, Decided; December 30, 2011, Filed

Civil No. 3: 10cv60(JBA)

**Reporter**

2011 U.S. Dist. LEXIS 157362

Tyco Healthcare Group LP and United States Surgical Corp., Plaintiffs, v. Ethicon Endo-Surgery, Inc., Defendant.

**Subsequent History:** Dismissed without prejudice by Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc., 2012 U.S. Dist. LEXIS 131982 (D. Conn., Sept. 17, 2012)

**Prior History:** Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc., 587 F.3d 1375, 2009 U.S. App. LEXIS 26568 (Fed. Cir., 2009)

**Counsel:** [*1] For Tyco Healthcare Group LP, United States Surgical Corp., Plaintiffs, Counter Claimants, Counter Defendants: Airina Rodrigues, PRO HAC VICE, Drew M. Wintringham, III, Francis W. Ryan, IV, PRO HAC VICE, Mark W. Rueh, Melissa Reinckens, PRO HAC VICE, LEAD ATTORNEYS, DLA Piper US LLP-NY, New York, NY; David L. Belt, LEAD ATTORNEY, Hurwitz Sagarin Slossberg & Knuff LLC, Milford, CT; Erica J. Pascal, LEAD ATTORNEY, PRO HAC VICE, DLA Piper LLP-CA, San Diego, CA; Joanna Sykes-Saavedra, LEAD ATTORNEY, PRO HAC VICE, DLA Piper US LLP (US) - NJ, Atlantic City, NJ.

For Ethicon Endo-Surgery Inc, Defendant: Amanda R. Johnson, LEAD ATTORNEY, PRO HAC VICE, Akin, Gump, Strauss, Hauer & Feld — Wash DC, Washington, DC; Aron R. Fischer, William F. Cavanaugh, LEAD ATTORNEYS, PRO HAC VICE, Patterson, Belknap, Webb & Tyler, New York, NY; Barbara L. Mullin, Danielle L. Letting, PRO HAC VICE, Dianne B. Elderkin, Matthew A. Pearson, LEAD ATTORNEYS, PRO HAC VICE, Steven D. Maslowski, PRO HAC VICE, Akin Gump Strauss Hauer & Feld LLP, Philadelphia, PA; James T. Shearin, LEAD ATTORNEY, Pullman & Comley, Bridgeport, CT; R. Laurence Macon, LEAD ATTORNEY, PRO HAC VICE, Akin, Gump, Strauss, Hauer & Feld — San Antonio [*2] TX, San Antonio, TX; William C. Rooklidge, LEAD ATTORNEY, PRO HAC VICE, Jones Day, Irivine, CA.

For Ethicon Endo-Surgery Inc, Counter Claimant: Amanda R. Johnson, LEAD ATTORNEY, PRO HAC VICE, Akin, Gump, Strauss, Hauer & Feld — Wash DC, Washington, DC; Aron R. Fischer, LEAD ATTORNEY, PRO HAC VICE, Patterson, Belknap, Webb & Tyler, New York, NY; Danielle L. Letting, Matthew A. Pearson, LEAD ATTORNEYS, PRO HAC VICE, Akin Gump Strauss Hauer & Feld LLP, Philadelphia, PA; James T. Shearin, LEAD ATTORNEY, Pullman & Comley, Bridgeport, CT; William C. Rooklidge, LEAD ATTORNEY, PRO HAC VICE, Jones Day, Irivine, CA.

For Tyco Healthcare Group LP, Counter Defendant: Airina Rodrigues, PRO HAC VICE, Drew M. Wintringham, III, Francis W. Ryan, IV, PRO HAC VICE, Melissa Reinckens, PRO HAC VICE, LEAD ATTORNEYS, Mark W. Rueh, DLA Piper US LLP-NY, New York, NY; David L. Belt, LEAD ATTORNEY, Hurwitz Sagarin Slossberg & Knuff LLC, Milford, CT; Erica J. Pascal, LEAD ATTORNEY, PRO HAC VICE, DLA Piper LLP-CA, San Diego, CA; Joanna Sykes-Saavedra, LEAD ATTORNEY, PRO HAC VICE, DLA Piper US LLP (US) - NJ, Atlantic City, NJ.

For United States Surgical Corp., Counter Defendant: Airina Rodrigues, PRO HAC VICE, Drew **[*3]** M. Wintringham, III, Francis W. Ryan, IV, PRO HAC VICE, Melissa Reinckens, PRO HAC VICE, LEAD ATTORNEYS, DLA Piper US LLP-NY, New York, NY; David L. Belt, LEAD ATTORNEY, Hurwitz Sagarin Slossberg & Knuff LLC, Milford, CT; Erica J. Pascal, LEAD ATTORNEY, PRO HAC VICE, DLA Piper LLP-CA, San Diego, CA; Joanna Sykes-Saavedra, LEAD ATTORNEY, PRO HAC VICE, DLA Piper US LLP (US) - NJ, Atlantic City, NJ.

**Judges:** Janet Bond Arterton, United States District Judge.

**Opinion by:** Janet Bond Arterton

## Opinion

### RULING ON PLAINTIFFS' MOTION TO DISQUALIFY COUNSEL FOR DEFENDANT ETHICON ENDO-SURGERY, INC.

Plaintiffs Tyco Healthcare Group and United States Surgical Corporation move to disqualify Defendant Ethicon Endo-Surgery's attorneys of record, the law firm of Akin, Gump, Strauss, Hauer & Feld LLP ("Akin Gump"). Plaintiffs argue that Akin Gump had improper access to privileged and confidential information concerning this case as a result of its hiring and use of a former TrialGraphix employee—Michael Greer—who had served as the lead trial presentation technology consultant for Plaintiffs and their counsel during the related trial of *Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc.*, 3:04cv1702(JBA) (the "'1702 action" or "*Tyco* **[*4]** *I*") on the same patents four years ago. [1] Akin Gump trial counsel advised Plaintiffs'

counsel on September 22, 2011 that Mr. Greer had been added to its trial team for the trial scheduled to commence October 18, 2011, and Plaintiffs moved on October 7, 2011 for Akin Gump's immediate disqualification from further representation of Defendant Ethicon Endo-Surgery in this action. For the reasons discussed below, Plaintiffs' Motion to Disqualify is granted in part.

### I. Factual Background

In 2007, the law firm of Clifford Chance, counsel for Plaintiffs in the '1702 Action, hired TrialGraphix, Inc. to provide trial consulting services to assist Plaintiff's counsel prepare for and present their witnesses and exhibits in the December 2007 bench patent trial in that action. (October 7, 2011 Declaration of Mark Rueh [Doc. # 99] ¶ 4.) As a result, Mr. Greer, an employee of TrialGraphix, became the principal TrialGraphix Presentation Technology Trial Consultant for Plaintiffs and their attorneys Drew Wintringham, Mark Rueh, and Frank Ryan (now at the law firm of DLA Piper) in the '1702 Action. (*Id.* ¶ 5.)

TrialGraphix is in the business of providing trial consulting services for attorneys and specializes in graphic design, presentation technology, and litigation counseling. (*See* Declaration of James Watkins, Director of Operations, TrialGraphics New York Office [Doc. # 100] ¶ 4.) Presentation Technology Consultant/Multimedia Consultants like Mr. Greer "are expected to travel to the trial site a week or more before trial begins to immerse themselves in the facts (and documents) of the case and **[*6]** develop a relationship with the trial team." (*Id.* ¶ 11.) [2] Mr. Greer moved into the Plaintiffs'

---

[1] After two weeks of bench trial, that case was dismissed when it became apparent that the patent owner was not a plaintiff. Dismissal was affirmed, *Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc.*, 587 F.3d 1375 (Fed. Cir. 2009), but this case, alleging the same infringement of the same patents, was begun with the correct Plaintiffs and counsel have stipulated that the Court's summary judgment ruling in the earlier action applies equally to the newly

accused ACE23E, ACE 36E, and ACE 45E products. (*See* Stipulation and Ord. [Doc. # 66].) The parties also stipulate that for purposes of this action, Defendant will not contest Plaintiff's position that Tyco Healthcare is the owner of the patents-in-suit by virtue of the April **[*5]** 1, 1999 asset-transfer agreement. (*See* Stipulation [Doc. # 43].)

[2] TrialGraphix personnel in Mr. Greer's position are "expected to and do develop a strong working knowledge of the facts and circumstances of the client's case and position" (Watkins Dec. ¶ 11), are expected "to fully understand the cases on which they work" (*id.*

trial team's hotel headquarters five days prior to the commencement of trial and remained until the case was dismissed mid-trial. (Rueh Dec. ¶ 7.)

In his capacity as principal presentation technology consultant, Mr. Greer "interface[d] with the presentation technology for the trial team on-site." (Declaration of Michael Greer [Doc. # 108-2] ¶ 2.) Mr. Greer describes this work as "highly technical in nature, with a view to operating computer and other equipment in a courtroom smoothly, accurately, and without delay [*7] or interruption in presenting graphic material." (*Id.*) Mr. Greer describes his responsibilities while on-site with the Tyco trial team as including "presentation database maintenance and updating, courtroom presentation equipment setup and testing, war room equipment setup, testing, configuration and end-user IT support, in-court display services, and presentation system operation during witness preparation sessions." (*Id.* ¶ 4.)

During the time leading up to the '1702 trial and throughout trial, Mr. Greer worked closely with Tyco's counsel, staying with the trial team at the New Haven hotel where Tyco's counsel was preparing its case, and working "side-by-side with Tyco's Counsel in the same conference room." (Rueh Dec. ¶¶ 7-8.) Mr. Greer was "privy to and received Tyco's confidential information" as well as "numerous confidential and privileged discussions" concerning "trial tactics and strategy," and worked on mock examinations and cross examinations of Tyco's witnesses, "including preparatory work with Mr. Philip Roy (Senior Director, Tyco Global Marketing—Vessel Sealing & Dissection) and Dr. William Durfee (Tyco's technical expert in the '1702 action)." Both Mr. Roy and Dr. Durfee [*8] are expected to testify at the trial in this action. (*See* Joint Pre-Trial Memorandum, [Doc. # 89].) Mr. Greer also participated in at least one mock

cross-examination of Ethicon witness Dr. Mark Tsonton, in which a Clifford Chance attorney played Tsonton's role. In addition, Mr. Greer participated in mock cross-examinations of and in the development of cross-examination strategies for Ethicon's witnesses, including Mr. Thomas Davison, Mr. Gary Whipple and Dr. Joseph Amaral. (Rueh Dec. ¶ 10.) During these sessions, "Tyco's counsel engaged in detailed discussions about the case, including refining its examination and cross-examination strategies." (*Id.* ¶ 11.) On a "daily basis," Mr. Greer participated in the "preparation of Tyco's trial demonstratives" in *Tyco I.* This involved participation in and "observance of discussions by Tyco's counsel regarding trial tactics and strategy in the course of preparing witnesses and cross examination," and "in the course of this work, Mr. Greer was privy to privileged discussions including conversations about which issues to emphasize or de-emphasize during trial." (*Id.* ¶ 12.) In all, Mr. Greer billed over 220 hours of time to the '1702 case. (Ex. [*9] K to October 7, Ryan Dec. [Doc. # 98].)

During his October 6, 2011 deposition, Mr. Greer acknowledged that he had access to Plaintiffs' attorney trial team's confidential and privileged information as a TrialGraphix consultant working on the '1702 action on behalf of Tyco. (*See* Greer Tr., Ex. A to Ryan Dec. at 82:7-15.) Mr. Greer also testified that he "most definitely was in the room for witness prep sessions," and that it was "highly likely" that he was present during trial strategy discussions. (*Id.* at 102:9-113:9.)

In his post-deposition affidavit dated October 11, 2011, Mr. Greer describes his participation during these preparatory sessions before the Tyco trial in the '1702 action as "solely for the purpose of introducing the witness to the presentation technology and to simulate the use of presentation technology as it would be in the courtroom setting." (Greer Dec. ¶ 6.) His focus during these sessions "was to listen for exhibit numbers or deposition transcript references so that I could display the corresponding image files on a computer display

---

¶ 5), and "are adept at identifying key concepts and translating these concepts into visual courtroom presentations and legal graphics" (*id*). TrialGraphix describes its professionals as "providing a helpful 'layperson' perspective" in learning the intricacies of their clients' cases. (*See* Ex. A [Doc. # 100-1] to Watkins Dec.)

for the witness and presenting attorney at the appropriate time." (*Id.*) Mr. Greer was not the TrialGraphix employee involved in the [**10**] creation of Plaintiff's trial graphics, in the development of any case themes, in the analysis of any documents, or in the generation of content for any graphics for the Tyco trial team, and recalls that these responsibilities fell solely to Ryan Flynn, the TrialGraphix graphic artist on-site in New Haven for the duration of trial. (*Id.* ¶ 8.) Mr. Greer also stated that "[o]ther members of the TrialGraphix graphic design staff were likely involved in assisting the Tyco team with their graphic needs prior to Mr. Flynn and I going on-site in November of 2007," and "[t]o the best of my recollection, I was not involved and did not participate in any substantive conversations regarding the graphic design and concepts that may have occurred between Mr. Flynn and the Tyco trial team." (*Id.* ¶ 8.) Upon completion of Mr. Greer's work for the Tyco trial team, all Tyco-related information was returned either to the Tyco team or to TrialGraphix, and upon leaving TrialGraphix in April 2011, he did not take any confidential or privileged information with him, and does not now have any such information in his possession. (*Id* ¶ 10.) He was able to assist Plaintiffs' attorneys to locate a degraded file [**11**] at their request in 2010. (Ex. I to Ryan Dec.)

Mr. Greer left TrialGraphix in April 2011 to join Akin Gump as a Trial Presentation Specialist. (*Id.* ¶ 11.) Mr. Greer states that his job responsibilities at Akin Gump include "all of those that I was responsible for at TrialGraphix, plus coordinating on-site logistics such as hotel arrangements, copier rental, presentation technology equipment rental . . , graphic layout design and additional technical production-related tasks." (*Id.* ¶ 11.) Mr. Greer writes that in late August 2011, he was assigned to this case to assist the Ethicon trial team with their trial preparation. (*Id.* ¶ 12.) During his involvement with the Ethicon team, Mr. Greer worked with Attorney Ruben Munoz, paralegal Marisa Browndorf, and Joe Ficocello, Director of Trial Services and Mr. Greer's supervisor. (*Id.*) He worked on presentation database creation and production, and graphic layout tasks. (*Id.* ¶ 13.)

On September 22, about three weeks before trial, Plaintiffs' trial team received an email from Dianne Elderkin, Ethicon's lead trial counsel at Akin Gump. This email notified Plaintiffs' counsel for the first time that Akin Gump had hired Mr. Greer and intended to use [**12**] him to assist at trial in this case:

> Michael Greer is an employee of Akin Gump in our trial support group. We plan to have him assist at trial next month. He was formerly employed by TrialGraphix and, in that capacity, assisted the Clifford Chance team on-site at the December 2007 trial. We obviously see no problem with using Michael, or we wouldn't be planning to do so, but we did want to make you aware of this so that you will not be surprised when you see him in the courthouse next month.

(Ex. A to Rueh Dec.) Mr. Greer was hired in early April 2011, and time records show that Mr. Greer had been assigned to the *Tyco v. Ethicon* matter by August 24, 2011, nearly a month prior to Ms. Elderkin's disclosure of his involvement. (*See* Exs. E, H to Ryan Dec.) An email from Joseph Ficocello to Mr. Greer shows that Ethicon contemplated using him on this case and advising Plaintiffs' counsel of his involvement as early as August 8, 2011. This email states:

> I spoke with the Ethicon team on Friday regarding your assistance on that case. It may be fruitful for one of [sic] lead attorneys to contact the other side to let them know you are no longer affiliated with TrialGraphix and are now working for [**13**] Akin full time in-house. . . From there we can decide how best to proceed, and if there are any conflicts or objections from opposing counsel then it will be better to have that known earlier than later.

(Ex. I to Ryan Dec.) In that email, Mr. Ficocello posed several questions to Mr. Greer:

1. Are there any specific provisions in your employment contract with TrialGraphix which would preclude you from assisting a previously opposing party on the same matter? Are there any conflicts or dated term limits in place?

2. Were you involved in any key strategy meetings in advance of your in-court involvement at trial? Do you possess any knowledge of information which opposing counsel would determine to be an unfair or conflicting advantage to Akin or the client?

3. Did you sign, agree to, or otherwise confirm, any separate non-TrialGraphix related agreement with Tyco? (i.e. a separate confidentiality agreement or document of any kind).

4. Since the case ended in December 2007, have you had any further communication with any members of the trial team, or participated in any confidential conversations related, but not limited to, case strategy, theory development or a similar topic?

(*Id.*) Mr. Greer [*14] responded to the email promptly, and in his response to the second question, he wrote,

> Once on-site I was involved in numerous prep sessions with witnesses and experts. I don't remember any details regarding strategy or testimony. I do remember the Clifford Chance team members and their general presentation styles, but nothing case specific other than it was a patent case involving a surgical cutting and cauterizing device.

(*Id.*)

An August 14, 2011 Email from Mr. Ficocello to Ms. Elderkin followed up on Greer's involvement. Mr. Ficocello writes:

> I wanted to follow up on our ETHI discussion and Mike's involvement at trial. I'd asked him a few pointed questions (Q&A's below) on his

experience on the case, involvement/arrangement with [Trial Graphix] and what his exposure had been beyond trial. I thought it covered our bases and the range of what we'd need to know, but if you think of other questions we can also ask them too. I suppose the email to Drew [Plaintiffs' Attorney] would just highlight that Mike has joined our team and we believe he's clear of any conflict, however if they wish to voice an objection to his technical assistance that they should in a timely manner. If they do object [*15] we can always pivot and Jamey and I can work together to support as needed. I've blocked it out on my calendar though so I'm planning on being there the whole time.

(August 14, 2011 Email from Joseph Ficocello to Dianne Elderkin, Ex. A to Ryan Supp. Dec. [Doc. #123].)

On September 22, 2011, Mr. Greer sent an email to Mr. Ficocello asking, "[d]o you know if anyone has mentioned to [Plaintiffs' counsel] that I now work for Akin?" (Ex. A to Ryan Supp. Dec.) Mr. Ficocello responded, "I had emailed the issue forwarding your responses but never heard back." (*Id.*) At 5:15PM that day, Mr. Greer responded to Mr. Ficocello informing him, "I emailed Ruben [Munoz]. He will [be] contacting Tyco. He is also going to bring up the other issue with the team." (*Id.*) Later that day, Ms. Elderkin notified Plaintiffs' counsel that Ethicon planned to use Mr. Greer at trial. (Ex. A to Rueh Dec.)

In spite of Defendant's counsel's knowledge at the time Akin Gump hired him that Mr. Greer had worked for Plaintiffs during trial in the '1702 action, no steps were taken to wall him off from the Ethicon matter, he was instead assigned to work on the same case and Defendant's attorneys waited nearly seven weeks, until [*16] the eve of trial, to inform Plaintiffs' trial counsel of this fact, and inaccurately described the scope of Mr. Greer's role to Plaintiffs' counsel and to the Court. Ms. Elderkin's September 22 email that Ethicon "planned" to have Mr. Greer assist at trial in

October, did not disclose that Mr. Greer had already been working on the case for several weeks. (*See* Ex. A to Rueh Dec.) Further, during the Court's telephonic pre-trial conference on September 27, 2011, Ms. Elderkin told the Court and Plaintiffs's counsel that "Mr. Greer is not experienced with the case" (Pretrial Conf. Tr. 23:11-12), that "Akin Gump planned to bring Mr. Greer to trial solely 'as a training experience'" (*id.* 23:7); and that Mr. Greer had only "prepared one or two slides based on our damages expert report and he's had some involvement in calling the hotel to make trial arrangements. That's the extent of his involvement" (*id.* 23:22-25).

Mr. Greer's subsequent deposition revealed that he understood that his role in the upcoming trial was to provide "logistics, trial preparation, graphics, potentially video or audio editing and possibly hot seat support." (Greer Tr. 71:6-8.) He was never informed that his role would [**17**] be a "training exercise," nor did he expect it to be (*id.* at 72:5-24), and he did not know who made the New Haven hotel reservations, but that "I know it wasn't me" (*id.* at 72:25-72:5). Mr. Greer also testified that his access to Akin Gump's litigation database for this case was removed on September 27, 2011. (*Id.* at 142:3-1; 143:23-144:5; 145:22-23; *see also* Greer Dec. ¶ 17.)

Mr. Greer internally billed nearly 80 hours of work on this case to Ethicon, involving three separate areas: preparation of the opening PowerPoint slide presentation, the damages PowerPoint slide presentation, and the reformatting of a timeline for use in the opening PowerPoint presentation. (Greer Supp. Dec. [Doc. # 128-5] ¶ 1.) He worked on over 100 slides for a damages presentation, prepared a timeline presumably related to Ethicon's invalidity defense (*see* Ruling Denying Summary Judgment on Wilful Infringement [Doc. # 91]) for use in connection with the opening at trial, [3] and drafted

"time bars" and slides to counter evidence offered by Plaintiffs' damages expert. [4] (Ex. C to Ryan Supp. Dec.; Greer Supp. Dec. [Doc. # 128-5] ¶¶ 1-2.) The record contains numerous emails and references to telephone calls between [**18**] Mr. Greer and Attorney Munoz, Marisa Browndorf, a paralegal working on this case, and Ethicon's damages expert. (Exs. C-D of Ryan Supp. Dec.)

During Mr. Greer's deposition, Mr. Munoz, counsel of record for Ethicon and one of Mr. Greer's supervisors in this matter, defended the deposition on behalf of Mr. Greer. (Greer Tr. 4:13-19.) Although apparently Plaintiffs' counsel lodged no objection, Mr. Greer testified that Mr. Munoz had spent approximately three hours preparing him for his deposition. (*Id.* at 4:7-12.) Mr. Greer also testified that Akin Gump never suggested or pointed out to him that the interests of the firm might not be aligned with his own interests, or that he may wish to retain his own counsel. (*Id.* at 91:24-92:11.)

## II. Discussion

The authority of [**19**] federal courts to disqualify attorneys derives from their inherent power to "preserve the integrity of the adversary process."*Hempstead Video, Inc. v. Incorporated Village of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (citing *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979)). In exercising this power, the Court must attempt to balance "a client's right freely to choose his counsel" against "the need to maintain the highest standards of the profession." *Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir.1978); *see also Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 564-65 (2d Cir.1973).

Disqualification is disfavored in the Second Circuit, and is only warranted in the rare circumstance where an attorney's conduct "poses a significant

---

[3] In a supplemental affidavit, Mr. Greer states that during his involvement with the Ethicon matter "the placeholder text [on the timeline slides] was never updated with actual testimony text." (Greer Supp. Dec. ¶ 2.)

[4] The majority of the slides that Mr. Greer worked on for Ethicon that were turned over to Plaintiffs during disqualification discovery were redacted for attorney work product privilege. (*See* Ex. C to Ryan Supp. Dec.)

risk of trial taint." *Arista Records LLC v. Lime Group LLC*, 2011 U.S. Dist. LEXIS 17434, 2011 WL 672254 (S.D.N.Y. Feb. 22, 2011); *see also Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981) ("Recognizing the serious impact of attorney disqualification on the client's right to select counsel of his choice, we have indicated that such relief should ordinarily be granted only when a violation . . . poses a significant risk of trial taint."). **[\*20]** Consequently, the moving party's burden of proof is a high one, *see Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791-92 (2d Cir. 1983), though the Second Circuit has admonished that "in the disqualification situation, any doubt should be resolved in favor of disqualification." *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975).

The Second Circuit appears to have been presented with only two types of situations in which an attorney's misconduct will taint the trial sufficiently to require disqualification. *Nyquist*, 590 F.2d at 1246. The first is where a law firm concurrently represents parties with adverse interests and is inapplicable here. The second type—that of "successive representation"—arises where the attorney places him or herself in a position where that attorney could use in litigation against a former client relevant, privileged information obtained during the prior representation. *Id.* Under these circumstances, disqualification is appropriate if

> (1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; **[\*21]** and (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Evans*, 715 F.2d at 791. Outside of these situations, courts "have shown considerable reluctance to disqualify attorneys despite misgivings about the attorney's conduct." *Nyquist*, 590 F.2d at 1246.

That the representation may create an appearance of impropriety generally is insufficient on its own to merit disqualification. "[T]he appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases." *Id.* at 1247. In a successive representation situation, "conflicts are ordinarily imputed to [the] firm based on the presumption that 'associated' attorneys share client confidences." *Hempstead*, 409 F.3d at 135. The presumption of confidence sharing within a firm can be rebutted, and according to the Second Circuit there is "no categorical rule against considering practices and structures that protect client confidences within a firm in determining whether an attorney or firm should be disqualified." *Id.* at 137.

If the elements of the three-part **[\*22]** *Evans* analysis are demonstrated, a court must balance three competing interests: (1) the client's interest in freely selecting counsel of its choice, (2) the adversary's interest in the trial free from the risk of even inadvertent disclosures of confidential information, and (3) the public's interest in the scrupulous administration of justice. *Hull v. Celanese Corp.*, 513 F.2d 568, 570 (2d Cir.1975).

**A. Former Client**

This case involves a non-lawyer [5] exposed to

---

[5] Non-lawyers who have acquired confidential information also are held to the same conflict of interest provisions as applicable to attorneys. *See MMR/Wallace*, 764 F.Supp. 712, 725 n.19 (D. Conn. 1991) ("The fact that [the conflicted employee] was not an attorney is irrelevant to the court's consideration of his ability to assist Plaintiff's counsel in the preparation for litigation" and "it cannot be seriously disputed that [he] possessed confidential and privileged information"); *cf. In re Tevis*, 347 B.R. 679, 693 (9th Cir. 2006) ("A communication with a nonlawyer employee of a law firm can also give rise to a disqualifying conflict of interest, especially where confidential information is disclosed."); *Lamb v. Pralex Corp.*, 333 F.Supp.2d 361, 361, 46 V.I. 213 (D.V.I. 2004) ("a trial court has the authority, in a litigation context, to disqualify counsel based on the conduct of a nonlawyer assistant that is incompatible with a lawyer's ethical obligations," and "such disqualification may be imputed to the entire law firm"); *Rodriguez v. Montalvo*, 337 F. Supp. 2d 212, 218 (D. Mass. 2004) ("if a non-lawyer paralegal established a confidential relationship with a client, that relationship **[\*24]** may be imputed to the attorney supervisor and consequently to the firm as a

attorney confidences and trial strategies of one side switching sides, thus satisfying the first prong of *Evans*, that the movant be the former client. *See Evans*, 715 F.2d at 791. The situation here is analogous to that of a contract attorney, brought in to work on a specific aspect of trial, and switching sides during the pendency of the litigation. Mr. Greer was deployed by TrialGraphix in 2007 during *Tyco I*, on contract with Plaintiffs who were the "clients" that used Mr. Greer's services for trial preparation and presentation. (*See* Watkins Dec. ¶ 11 (describing the work of a TrialGraphix trial consultant and referring to the relationship as one with a "client"); Greer Dec. ¶ 4.) Therefore, prong one of the *Evans* test **[*23]** is satisfied.

## B. Substantial Relationship

Next, there must be a "'substantial relationship' between the subject matter of the prior representation and the issues involved in the current action." *Cablevision Lightpath, Inc. v. Verizon NY Inc.*, No. 11-CV-2457(CBA)(JMA), 2011 U.S. Dist. LEXIS 96872, 2011 WL 3845504, * 3 (E.D.N.Y. Aug. 30, 2011). This element is satisfied only "upon a showing that the relationship between issues in the prior and present cases is 'patently clear' . . . or when the issues involved have been 'identical' or 'essentially the same.'" *Id.* (citing *Gov't of India v. Cook Industries*, 569 F.2d at 739-40.)

Here, the trial at issue is not merely substantially related, but is in fact a continuation four years later, with updating, of the same claims. Plaintiffs maintain that this initely requires disqualification under *Hull v. Celanese Corp.*, 513 F.2d 568 (1975) ("[h]ere, the matter at issue is not merely 'substantially related' to the previous representation, rather, it is exactly the same litigation. . . . [t]his **[*25]** is, in short one of those cases in which disqualification is a necessary and desirable remedy . . . to enforce the lawyer's duty of absolute fidelity and to guard against the danger of inadvertent use of confidential information.") (internal citations

whole."); *Richards v. Jain*, 168 F.Supp. 2d 1195, 1202 (W.D. Wa. 2001) (conduct and knowledge of nonlawyer is imputed to firm).

omitted). In *Hull*, the firm's attestations that "they never had direct access to any confidences" and that they "carefully cautioned [the conflicted person] not to reveal any information received in confidence as an attorney for Celanese," were not deemed dispositive: "*Emle* makes it clear that the court need not inquire whether the lawyer did, *in fact*, receive confidential information" *id.* at 572 (citing *Emle Industries, Inc.*, 478 F.2d at 571), and affirmed the district court's decision to disqualify plaintiff's counsel:

> The Rabinowitz firm had notice that Delulio had worked on the defense of the *Hull* case and should have declined representation when approached. Had Delulio joined the firm as an assistant counsel in the *Hull* case, they would have been disqualified. Here she joined them, as it were, as a client. The relation is no less damaging and the presumption in *Emle* should apply.

*Id.* at 572. [6]

Given the identity of trial issues in the 2007 trial involving Mr. Greer and the forthcoming trial, with Mr. Greer now on the Defendant's side, the second *Evans* prong is satisfied.

## C. Likelihood of Access to Relevant Privileged Information

The final prong requires that "during the former representation, the attorney sought to be disqualified had, or likely had, access to relevant privileged information." *Cablevision Lightpath*, 2011 U.S. Dist. LEXIS 96872, 2011 WL 3845504, at *4. Given the nature and substance of Mr. Greer's work in his prior trial presentation services and work, and the similar type of in-house work on the issues to be tried in this case, Plaintiffs are

[6] The Second Circuit cautioned that "the **[*26]** novel factual situation presented here dictates a narrow reading of this opinion" and that "the scope of this opinion must, of necessity, be confined to the facts presented and not read as a broad-brush approach to disqualification." *Id.* at 572.

entitled to a rebuttable presumption that this element has been met. *Id.* (citing *Cook Indus.*, 569 F.2d at 741). Mr. Greer testified that during his time working for Plaintiffs on *Tyco I*, he was privy to confidential and privileged information (*see* Greer Tr., Ex. A to Ryan Dec. at 82:7-15), and Defendant does **[*27]** not dispute that Plaintiff had access to relevant privileged information and for the purposes of this motion does not dispute the applicability of this presumption.

What remains, therefore, is determining whether Defendant has rebutted the presumption of shared confidences that are imputed to members of a firm once the three prongs of *Evans* are satisfied. *See Hempstead*, 409 F.3d at 135. The parties muster a panoply of cases to support their respective arguments: Defendants assert that their uncontroverted affidavits are sufficient to rebut the presumption, while Plaintiffs argue that the obvious opportunity for disclosure of confidential information, even inadvertently or subconsciously, creates the significant risk of taint and warrants disqualification.

*1. Whether Uncontroverted Affidavits Are Sufficient to Rebut the Presumption*

In determining whether a party has provided sufficient evidence to rebut the presumption of shared confidences, courts require clear, competent, and effective evidence. *See, e.g., Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 723 (7th Cir. 1982) ("Accordingly, if an attorney can clearly and effectively show that he had no knowledge of the confidences **[*28]** and secrets of the client, disqualification is unnecessary "); *Hamilton v. Dowson Holding co.*, Civ. No. 2008/02, 2009 U.S. Dist. LEXIS 57715, 2009 WL 2026327, *4 (D.V.I. Jul. 2, 2009)("[W]here a nonlawyer employee has learned the confidences of an adversary, a rebuttable presumption arises that the nonlawyer employee will disclose the confidential information to the new employer. . . . [o]nce the presumption arises, it must be rebutted by competent evidence that the nonlawyer

employee has not shared any confidential evidence with the new firm."). In addition, an absolute finding of no possible inadvertent sharing is not required to successfully rebut the presumption. Applying Seventh Circuit law, the Federal Circuit has stated that "[a]n *absolute* finding of no *possible* inadvertent sharing of confidences is not required to establish an effective rebuttal. The proof of a negative renders certainty virtually impossible." *Panduit Corp. v. All States Plastic Mfg. Co., Inc.*, 744 F.2d 1564, 1580 (Fed. Cir. 1984) (emphasis in original). *Panduit* also notes that "nowhere in Seventh Circuit opinions has proof of *formal screening* been delineated as the *sine qua non* of establishing the nonexistence of the presumed fact that **[*29]** confidences have been shared." *Id.*

Under some circumstances, significant weight may be given to uncontroverted affidavits that "unequivocally state that [the conflicted employee] did not provide the affiants with any confidential information" concerning the prior matter. *Reilly v. Computer Associates Long-Term Disability Plan*, 423 F. Supp. 2d 5, 11 (E.D.N.Y. 2006). However, even in those cases, the courts have looked to more than just the affidavits, including the context in which the affidavits are offered, and the manner in which the information has been corroborated, to determine whether or not the presumption has been sufficiently rebutted. In *1210 Colvin Ave., Inc. v. Tops Markets, L.L.C.* No. 03CV0425E, 2006 U.S. Dist. LEXIS 93689, 2006 WL 3827429, *9 (W.D.N.Y. Dec. 28, 2006), while the court concluded that the presumption was sufficiently rebutted where affidavits from the attorneys at issue had been provided, denying any improper disclosure such that the law firm disqualification was denied, the court granted the defendant's motion to disqualify the plaintiff's trial consultants, Bridgepoint Partners, LLC, because certain employees of Bridgepoint had been former employees of Defendant:

> [N]o one would seriously **[*30]** contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the

consultant was previously retained as an expert by the adverse party in the same litigation and received confidential information from the adverse party pursuant to the earlier retention."

2006 U.S. Dist. LEXIS 93689, [WL] at *5. In addition, the law firm at issue in *1210 Colvin Ave.* had addressed the potential conflict immediately with Bridgepoint Partners, ensuring that no confidential information would be transferred or discussed. Here, in contrast, Mr. Greer was neither screened off nor advised by his employer to not share any information pertaining to *Tyco I*; rather, he was specifically assigned to the Ethicon matter.

More recently, Judge Wood found that disqualification of a law firm was not warranted because there was "no real risk that the trial will be tainted." *Arista Records*, 2011 U.S. Dist. LEXIS 17434, 2011 WL 672254, *5-6. There, Wilkie Farragher, the law firm whose disqualification was sought, submitted "a declaration from [the conflicted attorney] attesting to the fact that he has never disclosed Plaintiffs' confidential information to anyone" and "declarations from every member of Wilkie's LimeWire team who has billed [*31] 50 hours or more to the LimeWire matter attesting to the fact that [he] has not disclosed confidential information to them." 2011 U.S. Dist. LEXIS 17434, [WL] at *6. Significantly, the conflicted attorney in *Arista Records* had never been assigned to the LimeWire matter, and the court noted several other factors that led to its decision to deny disqualification: "Defendants are not relying solely on attorney affidavits, but are also relying on electronic audits showing that Korn has never accessed any Limewire documents. . . Wilkie is a large law firm, with more than 600 lawyers worldwide. . . [which] makes the risk of inadvertent disclosure of confidences less likely. . . . [and] Finally, approximately 32 months has elapsed.") [7]

---

[7] Judge Wood cited a number of factors which contributed to her denial of disqualification, but emphasized that "Korn's statement that he has not shared confidences" was one of the "most significant[]." *Arista Records*, 2011 U.S. Dist. LEXIS 17434, 2011 WL 672254, *7.

In *Panduit*, a patent case which Defendant relies on as support for its argument that "the presumption of sharing between partners of a firm can be overcome by testimonial evidence, despite the absence of screening," Mr. Conte, the conflicted employee, had [*32] worked at a firm that had filed approximately 170 patent applications on behalf of Panduit, the plaintiff, and then in 1976, Mr. Conte left that firm to start his own firm, which ended up on the opposite side of Panduit's litigation. *Id.* at 1568-69. While with his former employer, Mr. Conte had never been assigned to or worked on any Panduit matters, and was never "consulted informally on any Panduit matter." *Id.* In reversing the District Court's disqualification ruling, the Federal Circuit reasoned that the conflicted employee at issue was "not shown to have any confidences," and that "his taint [was] vicarious." 744 F. 2d at 1580.

Thus, even in the instances where courts conclude that affidavits attesting to the absence of shared confidences were credible, more was required. *See, e.g., Simons v. Freeport Mem. Hosp.*, No. 06CV50134, 2008 U.S. Dist. LEXIS 98450, 2008 WL 5111157, *7 (N.D. Ill. 2008) (plaintiff's attorney who spoke with opposing counsel's expert twice before realizing she had been retained by opposing counsel, who promptly ceased all communication with the expert and provided two uncontradicted affidavits, was found to have sufficiently rebutted the presumption) (quoting *Cromley v. Bd. of Educ. Of Lockport Twp. High Sch. Dist. 205*, 17 F.3d 1059, 1065 (7th Cir. 1994)); [*33] *MMR/Wallace*, 764 F. Supp. at 726 ( "[i]n support of its claim that no confidential information was ever disclosed by Willett or received by Forstadt, Thames relies solely upon Willett's deposition testimony and affidavits submitted by attorney Forstadt and a Thames technical consultant . . . self-serving protestations [which] fail to clearly and effectively rebut the presumption that confidential information was exchanged").

## 2. Whether Opportunity of Disclosure is Sufficient to Establish a Risk of Trial Taint

Because "[e]ven the most rigorous self-discipline might not prevent a lawyer from unconsciously using or manipulating a confidence acquired in an earlier representation and transforming it into a telling advantage in the subsequent litigation," *Emle*, 478 F.2d at 571, "[w]here it can reasonably be said that . . . the attorney *might* have acquired information related to the subject matter of his subsequent representation . . . it is the court's duty to order the attorney disqualified." *Id.*, 478 F.2d at 571. In *MMR/Wallace*, the court concluded "[e]ven if, as defendant maintains, no confidential information was actually disclosed, Forstadt's alliance with Willett creates a "nagging [*34] suspicion" that Thames' preparation and presentation have already been unfairly benefitted. At the very least, Forstadt's contact with Willett has likely stripped MMR of a valuable litigation resource whose services to the plaintiff are not likely to be easily replaced." 764 F. Supp. at 727. Though Attorney Forstadt contended that he was unaware at the time of the interview that [the conflicted employee, Willett] had performed any work for plaintiff's attorneys or was important to the preparation of their case in any way, *id.* at 715 n.4, Judge Burns found that "Forstadt's continued representation of Thames Associates threatens to taint the integrity of this case." *Id.* at 727.

In *Williams v. Trans World Airlines*, 588 F. Supp. 1037, in which a non-lawyer had worked for one party and then communicated with the other party's counsel, the court granted the motion for disqualification, and emphasizing the "potential for unfair discovery":

> [T]he potential for unfair discovery of information through private consultation rather than through normal discovery procedures threatens the integrity of the trial process. The Linde, Thomson firm has direct access to confidential information because of [*35] its representation of [the conflicted employee, Campell Schanck]. No effort has been made to prevent the Linde, Thomson attorneys representing Williams and Boeing from

having access to Campbell Schanck and any information she may furnish to her Linde, Thomson attorney.

*588 F. Supp. at 1045* (internal citations omitted).

In contrast, other cases conclude that the "appearance of impropriety" standard, or a "nagging suspicion," are not sufficient to demonstrate taint. *See 1210 Colvin Ave.*, 2006 U.S. Dist. LEXIS 93689, 2006 WL 3827429, *9 (where the only "threat of taint" is a "lingering nagging suspicion" that one side has been unfairly disadvantaged, and the court has already disqualified the conflicted trial consultants, disqualification of counsel is unwarranted); *Panduit*, 744 F.2d at 1581 (where confidential information may have been received "at some remote time in the past," the "probability that any such revival of memory would materially assist the opposing party is "very small").

As rebuttal evidence, Defendant has provided the affidavits of Mr. Greer himself, Ms. Dianne Elderkin, Trial Counsel for Ethicon and partner at Akin Gump, Mr. Ruben Munoz, an associate, Ms. Marisa Browndorf, a paralegal, and Mr. Joseph [*36] Ficocello, Director of Trial Services at Akin Gump. Each affiant states that Mr. Greer did not share any confidential information with him or her. In addition, Defendant asserts that as soon as Plaintiffs objected to Mr. Greer's work on the Ethicon matter, Mr. Greer was then immediately walled off and instructed to stop working on the case. (*See* Ficocello Dec. ¶ 29; Greer Dec. ¶ 18.) At oral argument on November 15, 2011 Counsel for Defendant represented that Mr. Greer was both removed from the case and that all of the files that he had worked on or created in the Ethicon matter were going to be destroyed.

After careful consideration of these affidavits and attestations, the Court concludes that the presumption of sharing has not been sufficiently rebutted here. Though the affidavits of Mr. Munoz, Ms. Browndorf, and Mr. Ficocello are technically uncontroverted, they are nonetheless "self-serving

protestations" that, viewed with the rest of the evidence of record in the context of Mr. Greer's 80 hours working on this case with counsel, staff, and experts, do not "clearly and effectively rebut the presumption that information was exchanged" at some level. *MMR/Wallace*, 764 F. Supp. at 726. [*37] Akin Gump's handling of Mr. Greer's employment in April, assignment to the Ethicon matter and delay in notifying Plaintiffs' counsel reflect a rather astonishing tone deafness, compounded by Akin Gump's resistance to allowing Mr. Greer to be deposed. (*See* Pretrial Tr. at 24:1-4 ("So, the idea that counsel wants to now take a deposition and get into all our work product in this case I think is entirely overblown and we think the matter should be put to rest.").) When the deposition did eventually take place pursuant to this Court's order, Mr. Greer was represented by Mr. Munoz. That Mr. Greer, as a new Akin Gump employee, was deposed on the issue of the scope of his involvement in *Tyco I* and subsequent involvement with Ethicon on the same case, with his new employer in the room, creates cause for concern that the information forthcoming in his deposition may have been less than fulsome. Further, it is hard to see what weight should be given to Ms. Elderkin's affidavit, given her unsubstantiated minimization of the role that Mr. Greer had had, stating, "it was and is still my understanding that Mr. Greer had no substantive involvement in the case, before being removed." (Elderkin Dec. [*38] ¶ 16.) The record clearly shows that Mr. Greer had substantive involvement, working on slide creation and layout on at least three different presentation areas in preparation for trial, had "review session[s]" with damages expert Jeffrey Press and telephone conferences with Mr. Munoz, the substance of which the record is silent on, and expended nearly 80 hours on this work over nearly four weeks.

During the course of his work on Ethicon, Mr. Greer's billing records and his affidavit show that he worked on three distinct areas of Ethicon's trial presentation: he assisted with slides for the opening statement, worked on a timeline for the "section 102(g) defense," and worked on the damages section. In particular, the Court finds that his work on the timeline and the damages segment are both causes for concern. Ethicon's timeline presentation is directed to one of Ethicon's affirmative defenses—that of non-infringement by prior invention—as well as its rebuttal to Tyco's claim of willfulness.

His work on the damages portion of Ethicon's presentation involved working with both Attorney Munoz and Ethicon's damages expert. During *Tyco I*, even if Mr. Greer had not himself prepared slides pertinent [*39] to Tyco's damages presentation, he was present when they were preparing their damages expert, Dr. Phillip Beutel, to testify. Thus, Mr. Greer has had the opportunity to work on both sides of the damages issue, which, unlike some other, more complicated aspects of this patent infringement case, is not as technical.

Further, that Ethicon knowingly placed Mr. Greer on the very same matter that he had worked on four years ago creates more than a nagging suspicion of taint. The record shows that TrialGraphix had a strict conflicts-checking policy: According to James Watkins, the Director of Operations at TrialGraphix, should TrialGraphix provide services for multiple parties to any proceeding, TrialGraphix "will implement internal screening processes to address the confidentiality concerns of all parties involved and would not staff a Presentation Technology/Multimedia Consultant on a matter if there were any concerns." (Watkins Dec. ¶ 13.) TrialGraphix, as an outside vendor, would never have staffed Mr. Greer on the opposite side of the same litigation. The record shows that Mr. Greer himself seemed uncomfortable with being placed on the same matter, as he wrote a follow up email to Mr. [*40] Ficocello asking if Tyco had been notified of his assignment. (*See* Sept. 22, 2011 Email from Michael Greer to Joseph Ficocello, Ex. I to Ryan Dec.) In spite of this, Akin incomprehensibly insisted on staffing him on their trial team and delayed disclosure to opposing counsel. In fact, it was only at oral argument that

Defendant's counsel finally acknowledged the obvious, that "We made a mistake." From this alone, the Court finds, at minimum, a negative inference of taint.

In addition, although Mr. Greer states that he cannot remember anything of substance pertaining to his time with Tyco, there are several indications that his memory is not completely blank. He remembers the names of the Plaintiffs' trial attorneys that he worked with in 2007, he accurately remembers that the case involved "a cutting and cauterizing device," and he recalls that he was involved in "numerous prep sessions with witnesses and experts." While Mr. Greer appears to be sensitive to the need to protect confidences, his answers to Mr. Ficocello's four questions do not contain the type of detail to make a credible determination of the existence of conflict, i.e., to determine "any unfair or conflicting advantage" **[*41]** (*see* August 8, 2011 Email from Michael Greer to Joseph Ficocello, Ex. I to Ryan Dec.). Moreover, Ms. Elderkin was satisfied to have two non-attorneys review this critical question and delved no deeper. As the court stated in *Williams*,

> the fact that [the conflicted employee] is not an attorney does not make it less likely that she would reveal confidential information . . . . In fact, a persuasive argument can be made that a non-lawyer would be more likely to reveal confidential information. . . . A non-lawyer might not be as sensitive to the need to safeguard the confidences of his or her previous employer gained while working with an attorney.

588 F. Supp. 1037, 1043.

## D. Prejudice to Parties

Finally, the Court must balance (1) the client's interest in freely selecting counsel of her choice, (2) the adversary's interest in the trial free from the risk of even inadvertent disclosures of confidential information, and (3) the public's interest in the scrupulous administration of justice in making its determination on disqualification. See *Vincent v.*

*Essent Healthcare of Connecticut*, 465 F.Supp. 2d 142, 145.

The Court recognizes that here, the prejudice to Ethicon in being deprived of Akin **[*42]** Gump, the counsel of its choice, is substantial. As counsel for Ethicon argued, "[t]he loss to Ethicon would be devastating. This trial team has been the trial team for Ethicon for over seven years. . . . To try to resurrect that, to try to get somebody up to speed in this case would be—would take years to do because theoretically these lawyers at Akin Gump couldn't even help the new counsel." *Cf. Panduit,* 744 F.2d at 1581. ("the prejudice to All States is catastrophic. Its long standing counsel, a relationship established before this case began, is no longer available and could not even consult on transfer of the case to another firm.") The Court notes that at least some of the prejudice is reduced by the fact that half of the case was previously tried and the record incorporated by agreement of counsel.

However, the Court also recognizes Tyco's interest in a trial free from the risk of even inadvertent disclosures. As Plaintiffs' counsel stated at oral argument, this is a high stakes case, "with market share at issue and much more." If Tyco prevails on all of its infringement claims, including its claim of willful infringement, Tyco believes it could be awarded upward of $600 million **[*43]** in damages.

It is worth remembering that both parties here are sophisticated and large corporations. In fact, counsel for Tyco described them as the "Coke and Pepsi of the medical device market," or the "Hattfields and the McCoys," at oral argument. Whatever prejudice these parties face, these are corporate clients with large litigation budgets, as compared to the party in *Reilly v. Computer Associates Long-Term Disability Plan,* 423 F.Supp.2d at 13 (E.D.N.Y. 2006), a case in which disqualification was denied, which Defendants have cited to extensively in their briefing, where the court emphasized that "Plaintiff here is not a large corporate client with a litigation budget; rather she

is an unemployed individual attempting to recover long-term disability insurance payments. . . . The lost time and money associated with this transition is of particular importance here."

The Court must also consider the public's interest in a trial free from taint and the scrupulous administration of justice, as well as the Court's role in enforcing "the lawyer's duty of absolute fidelity . . . to guard against the danger of inadvertent use of confidential information," *Hull*, 513 F.2d at 571, pertaining **[*44]** to an adversary's trial preparation and tactics. The Court concludes that, given the important, heightened role that Trial Presentation specialists play as the use of Courtroom technology has become more and more widespread, *see, e.g.*, "Effective Use of Courtroom Technology," Federal Judicial Center (2001), having such technology specialists properly screened and checked for conflicts is of the great importance. While the Court acknowledges that Ethicon will be prejudiced even by the partial disqualification of certain members of its trial team which the Court will order, "the loss of services of knowledgeable counsel is the type of prejudice implicated in any disqualification motion and is not the type of extreme prejudice contemplated by the courts in denying a motion on those grounds." *Actel Corp. v. Quicklogic Corp.*, 1996 U.S. Dist. LEXIS 11815, *28 (N.D. Ca. April 23, 1996). Further, though the Court is aware that disqualification motions are often brought for tactical reasons, "[e]ven if tactical advantages attend the motion for disqualification, that alone does not justify denying an otherwise meritorious motion." *Id.*

### E. Order of Disqualification

Having thoroughly reviewed the **[*45]** record, briefing and arguments presented on the issue of whether Akin Gump should be disqualified from further representation of Ethicon in this case, Plaintiffs' motion to disqualify will be granted in part. Taking guidance from the medical devices at issue in this case, the Court finds that a minimally invasive surgical approach is appropriate to reduce Plaintiffs' pain at the prospect of disclosure of its trial strategies and tactics, lower the risk of Ethicon's hemorrhaging from total loss of its seven-year litigation relationship with the trial partners, and lessen the recovery time for the established trial schedule.

Specifically, all members of the Ethicon trial team that worked directly with Mr. Greer, i.e., Ms. Browndorf, Mr. Munoz, and the damages expert team are disqualified from any further work on this case and from any contact regarding this case with the Akin Gump trial partners Dianne Elderkin, Barbara Mullin and Steven Maslowsky, or any other attorneys working on their trial team.

By this laparoscopic approach to excising risk of transmittal of tainted information, the interests of the parties, public and the Court are put in tolerable balance. With respect to the additional **[*46]** fees and costs which will be incurred by Plaintiffs in relation to a deposition of Ethicon's new damages expert, Ethicon will be responsible for such reasonable costs and fees. With respect to plaintiff's request for fees and costs related to its motion preparation and deposition of Mr. Greer, they are invited to file their application, after which defendant will have 21 days for opposition to any fee award or to aspects of what plaintiffs seek.

### III. Conclusion

For the reasons discussed above, Plaintiffs' Motion to Disqualify [Doc. # 97] is GRANTED in part. Marisa Browndorf, Ruben Munoz, and Ethicon's Damages Expert Team are disqualified immediately from this matter.

IT IS SO ORDERED.

/s/ Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 30th day of December, 2011.

2011 U.S. Dist. LEXIS 157362, *46

**End of Document**

# 1210 Colvin Ave., Inc. v. Tops Markets, L.L.C.

United States District Court for the Western District of New York

December 27, 2006, Decided ; December 28, 2006, Filed

03-CV-0425E(F)

**Reporter**

2006 U.S. Dist. LEXIS 93689; 2007-1 Trade Cas. (CCH) P75,548

1210 COLVIN AVENUE, INC., Now Known As Dash Markets, Inc., Plaintiff, -vs- TOPS MARKETS, L.L.C., Defendant.

**Prior History:** 1210 Colvin Ave., Inc. v. Tops Mkts., L.L.C., 2003 U.S. Dist. LEXIS 18487 (W.D.N.Y., Sept. 26, 2003)

**Counsel:** [*1] For 1210 Colvin Avenue, Inc. Now known as Dash Markets, Inc., Plaintiff: Michael R. McGee, LEAD ATTORNEY, McGee & Gelman, Buffalo, NY.

For Tops Markets, L.L.C., Defendant: Benjamin M. Zuffranieri, Jr., LEAD ATTORNEY, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, NY.

**Judges:** John T. Elfvin, S.U.S.D.J.

**Opinion by:** John T. Elfvin

## Opinion

MEMORANDUM and ORDER [1]

## INTRODUCTION

In this action, the plaintiff 1210 Colvin Avenue, Inc. ("Colvin") alleges that the defendant, Tops Markets L.L.C. ("Tops") [2], violated various provisions of the Robinson-Patman Anti-Discrimination Act, 15 U.S.C. § 13 *et seq.,* by selling goods to Colvin for Colvin's resale at prices substantially higher than those charged to other retailers ("Favored Purchasers") in that Tops passed along to Favored Purchasers discounts and allowances received by Tops from its suppliers but failed to pass along to Colvin the same discounts and allowances. [3] Colvin also alleges [*2] that Tops paid money and/or provided services to Favored Purchasers selling certain goods supplied by Tops, while failing to provide proportionally equal sums or assistance to Colvin for its sales of the same or equivalent products. Colvin alleges that Tops's conduct impaired its ability to compete with other local retailers including the Favored Purchasers. Currently pending before the Court is Tops's Motion to Disqualify Colvin's trial consultants Bridgepoint Partners, LLC ("Bridgepoint") and Colvin's counsel, the law firm of McGee & Gelman. [4]

## [*3] BACKGROUND

Beginning in 1975, Colvin entered into several agreements with Tops whereby Colvin operated two B-Kwik retail grocery stores. Thereafter, Colvin opened a third store and all three Colvin stores -- as of the Fall of 2002 -- were subject to License Agreements, Bookkeeping and Administrative Services Agreements, Supply Agreements and Scanning Agreements (collectively

---

[1] This decision may be cited in whole or in any part.

[2] Tops is a subsidiary of Dutch company Koninklijke Ahold N.V., d/b/a Royal Ahold, Inc. ("Ahold").

[3] In addition to its Robinson-Patman claims, Colvin also asserts claims of breach of contract and for an accounting.

[4] This Motion was initially made in September 2004 and was denied without prejudice in November 2004 so that the parties could conduct discovery to determine whether and to what extent privileged information had been communicated to Bridgepoint's owners Daniel Fulham and Michael Casciano during their previous employment with Tops and the extent to which any such information may have been disclosed by Bridgepoint to McGee & Gelman.

"Operating Agreements") with Tops. Pursuant to the Operating Agreements, Colvin deposited money into an account with Tops ("the Code Account") and Tops would utilize those funds in order to satisfy certain financial obligations of Colvin including payments to suppliers and payroll. [5]

Colvin alleges that Tops -- in order to increase its profitability and bolster the flagging finances of its corporate parent, Ahold -- began to withhold from Colvin certain price discounts and allowances it had previously provided and failed [*4] to provide money payments and/or services for the sale of certain goods, but that Tops continued to provide the discounts and allowances, money payments and/or services to Favored Purchasers. Thereby, Tops's profitability increased and Colvin's profitability decreased. Colvin alleges that such conduct took place from on or before August 2002 until on or about July 2003, when Colvin's affiliation with Tops was terminated.

Colvin first brought this dispute to Tops's attention by a March 2003 letter from its counsel, McGee & Gelman. Upon receipt of Colvin's letter, Tops began an internal investigation of the claims. In April 2003 the parties engaged in negotiations in an effort to resolve the dispute, but such efforts failed and Colvin commenced this lawsuit on May 30, 2003.

On May 6, 2004, Colvin retained Bridgepoint Partners, LLC ("Bridgepoint") to assist Colvin in this litigation. Bridgepoint is a consulting firm owned in part or in whole by Michael Casciano ("Casciano") and Daniel Fulham ("Fulham"), two former Tops employees. Both Casciano and Fulham worked at Tops at the time the dispute came to light and Casciano continued to work at Tops after this lawsuit was commenced and until [*5] January 2004. [6] In September 2004, Tops filed a motion to disqualify both Bridgepoint and

McGee & Gelman. By Order dated November 26, 2004, this Court denied the motion without prejudice and directed the parties to undertake discovery as to the extent of Casciano's and Fulham's exposure, if any, to Tops's privileged information while employed there and the extent of Bridgepoint's work for Colvin. Upon completion of that discovery, Tops re-filed the instant Motion.

## FACTS

Tops employed Fulham from August 1996 to May 2003. [7] At the time of the relevant events, Fulham was Director of Category Management. [8] From November 1993 to January 2004, Tops employed Casciano as, among other things, Senior Director of Category Management Support. (Casciano 2005 Dec. P 9.) In his position, Casciano performed analyses of "billbacks" and other pricing issues relevant to the relationship between Tops and B-Kwik grocery store [*6] owners, including Colvin. Casciano routinely provided both the bases for his analyses and the results thereof to B-Kwik owners, including Colvin. (Casciano 2005 Dec. P 16, 18.)

Even after this dispute came to light, Casciano continued to perform such analyses and continued to share his results with Colvin. For example, sometime after the dispute came to light, Casciano informed Colvin that his analyses showed that Tops owed one of Colvin's stores more than $ 31,000 -- significantly more than the $ 12,000 Colvin claimed it was owed. (Casciano 2005 Dec. P 12, 25.) Not all such information continued to be shared, however. Casciano declined to share with Colvin an analysis of billbacks in July 2003, noting that he was doing so "per John Mineo" [9] and that all communications concerning the [*7] billbacks were being funneled through Mineo. [10] (Casciano 2005

---

[5] Colvin alleges that the funds deposited into the Code Account were co-mingled with Tops's general funds.

[6] Fulham left Tops's employ in May, 2003, the same month as this litigation was commenced.

[7] At the time the dispute at issue arose, both Casciano and Fulham reported to Tom Heine, a Senior Vice President of Tops.

[8] Fulham's position involved "merchandising and contracts with vendors." (Fulham Oct. Aff. P 10.)

[9] At that time, John Mineo was Tops's General Counsel.

[10] It is unclear whether the analysis Casciano declined to share with

Dec. P 33.) Casciano believed he was instructed not to share the results either because the results were not complete or because in-house counsel wanted a single point of contact with Colvin in light of the litigation. (Casciano 2005 Dec. P 34.)

Casciano and Fulham participated in Tops's efforts to investigate Colvin's complaints and in Tops's efforts to resolve the dispute short of litigation. At their supervisor's request, both Casciano and Fulham reviewed Colvin's March 2003 letter outlining its complaints. (Casciano 2005 Dec. P 13; Casciano Depo. at 22-23.) Both Casciano and Fulham were the recipients of several e-mails pertaining to the dispute from Tops's General [*8] Counsel John Mineo. [11] [*9] In late March or early April 2003 Casciano and Fulham attended a meeting of certain Tops executives and Tops's in-house and litigation counsel in preparation for a negotiation meeting with Colvin and its representatives, including McGee & Gelman. (Casciano 2005 Dec. P 13, 30.) Both Casciano and Fulham attended that negotiation meeting on April 1, 2003. [12] (Casciano 2005 Dec. P 13.) Casciano also attended a follow-up meeting after the negotiation. At the meetings, Tops's counsel discussed the facts of the case and divulged their mental impressions, strategy and theories of defense. [13] Casciano did not consider any

information divulged at those meetings to be protected by the attorney-client privilege and stated that he has no general understanding of the parameters of that privilege. [14]

Casciano was asked to investigate a portion [*10] of Colvin's claims regarding pricing and to provide information to Tops's executives and to counsel regarding the matters in dispute. Casciano asserts that he provided only "factual" information, that he was neither asked for nor did he provide his opinion as to the matters in issue and that he did not recall being present at any time in which legal advice was being dispensed to Tops's executives. (Casciano 2005 Dec. P 31, 43.) [15] Casciano spoke with Tops's litigation counsel by telephone on at least one occasion and reviewed at counsel's request a declaration or affidavit in support of a motion to dismiss to be filed with the Court. (Casciano Depo. pp. 117-119.)

 [*11] Casciano had no further contact with Tops's counsel regarding this matter and performed no task with respect to this litigation after September 2003. Casciano continued to work for Tops until January 2004. [16]

---

Colvin in July 2003 was specifically performed at the request of counsel or was prepared in the ordinary course of business but simply not disclosed.

[11] Tops has attached a log of such e-mails to Mineo's affidavit. Tops asserts that the e-mails themselves are protected by the attorney-client privilege and has not disclosed them to Colvin. Tops has, however, submitted the e-mails to the Court -- without prior authorization -- *ex parte* for the Court's *in camera* consideration. Not surprisingly, Colvin strenuously objects to the submission of such materials. The Court will discuss the disposition of such materials *infra*.

[12] Fulham asserts that his participation in the April 1, 2003 meeting was not extensive -- perhaps consisting of a verbal response to a question by Heine. Fulham claims no responsibility for any strategic decision-making with respect to the claim, or even significant factual input. He asserts that he attended no meetings after April 1, 2003 with respect to this matter and that he left Tops in May 2003. Fulham Oct. Aff. PP 13-16.

[13] Casciano does not dispute that strategy may have been divulged but argues rather that he has no recollection of that which may have been discussed. Casciano 2005 Dec. P 43.

[14] At his deposition, Fulham explained that his "understanding of what would be privileged is specific things that happened that would have been in a one-on-one or a closed-door meeting with Tops' general counsel, specifically the case that it was absolutely not to be shared, a confidentiality agreement signed, a statement having been made before the meeting started that it was attorney/client privilege * * *." Fulham Depo. at 78, lns. 1-9.

[15] In paragraph 43 of his declaration, Casciano states "I do not remember discussing 'litigation strategy' with any of the lawyers who worked on the case. It was not part of my job to craft or direct Tops's strategy for dealing with the plaintiff's claim and lawsuit. * * *. No one asked my opinion as to whether the case should be settled or defended vigorously, or about legal tactics. Nor were the Tops lawyers giving advice to *me*." Casciano 2005 Dec. P 43 (emphasis in original).

[16] There is no suggestion that Tops sought or required Casciano's assistance with its defense of this action after September 2003 or at any time after Casciano's departure from Tops in January 2004.

After Casciano left Tops's employ in January 2004, he formed Bridgepoint together with Fulham. (Casciano 2005 Dec. P 10.) In the Spring of 2004, Bridgepoint solicited Colvin through McGee & Gelman to provide consulting services regarding the instant matter because Casciano and Fulham believed their experience in the industry generally and with Tops in particular would be useful to Colvin. (Casciano Dec. P 49.) Bridgepoint's retention letter of May 6, 2004 indicates that it would provide various services to Colvin and McGee & Gelman, including:

"identify business process and controls prior to 2001; [*12] identify changes to B-Kwik with MICS Pricing System in 2000; identify changes to B-Kwik with conversion to BIB bill back System 2001; identify changes to B-Kwik with initial transition from Wilson Farms Division to Supermarket Division in 2002; identify changes to B-Kwik with transition from Tops Super Distribution Center to C&S Wholesale/Erie Logistics 2002; map process changes and impact to each area of B-Kwik; provide detailed analysis of impact to cost, margin and shrink; provide expert testimony as required."

Bridgepoint Retention Letter (internal numbering omitted).

Casciano and Fulham were repeatedly warned by McGee & Gelman not to disclose any communications they may have had with Tops's counsel. (Fulham Oct. Aff. P 5, 23, 24; Casciano 2005 Dec. P 50-53; McGee 2004 Dec. PP 5-9.) [17] Casciano and Fulham were given such warning at every or nearly every meeting with Colvin's counsel. (Casciano 2005 Dec. P 54.) Casciano and

Fulham deny that they have ever disclosed to Colvin or to McGee & Gelman any communications they may have had with counsel for Tops. (Fulham Oct. Aff. P 4, 22; Casciano 2005 Dec. P 1(a), 55.) Likewise, McGee & Gelman denies that Casciano or Fulham ever [*13] revealed any communications they may have had with Tops's counsel. (McGee 2004 Dec. PP 5-9; McGee 2005 Dec. P 16.) McGee states:

"No disclosures of any communications between Casciano and/or Fulham and any Tops attorneys or any of [litigation strategy, settlement position or any other related information] were ever made to me by Casciano or Fulham, nor did I ever hear any such disclosures being made to any other person or persons. Specifically, no one at Bridgepoint has ever disclosed any privileged or non-discoverable information or document to McGee & Gelman or to anyone employed by Colvin or working on behalf of Colvin, either as an attorney, consultant or otherwise."

McGee 2004 Dec. P 9.

[*14] Since being retained, Bridgepoint has, among other things, made various PowerPoint presentations to Colvin and McGee & Gelman concerning Tops's pricing structure and operations. Bridgepoint has assisted in reviewing and categorizing thousands of documents provided by Tops in discovery. Bridgepoint also has given Colvin the names of other individuals at Tops who might have information relevant to the litigation and has referred to Colvin individuals who may be able to serve as expert witnesses with respect to the issue of "relevant geographic market." Finally, Bridgepoint has performed various mathematical analyses in order to verify Colvin's claimed damages.

Fulham states that his assistance to Colvin has included

"providing factual information about the business relationships and pricing issues that underlie this dispute, and *** providing

---

[17] McGee advised Casciano and Fulham that "no disclosure should be made of any discussions or other communications which Casciano and/or Fulham might have had with the litigation attorneys and/or in-house counsel for Tops." McGee 2004 Dec. P 5. McGee also "expressly told Casciano and Fulham that there should be no disclosure of Tops'[s] litigation strategy, settlement position or any other related information which either or both of them might have had exposure to during their tenure at Tops." *Id.* at P 7.

technical assistance so that its attorneys can understand the documents that have been produced during discovery and the financial impact of the transactions between the parties." Fulham Oct. Aff. P 25.

As partners of Bridgepoint, Casciano and Fulham have, after receipt of an initial retainer of $ 7,500, billed for their services [**15**] at an hourly rate of $ 225. (Casciano Dec. P 63.) Bridgepoint has been paid approximately $ 70,000 thus far for the services it has rendered to Colvin.

## DISCUSSION

### A. Motion to Disqualify Bridgepoint Partners, LLC

Tops seeks to disqualify Bridgepoint from any further participation in this matter because Bridgepoint's owners Casciano and Fulham are former employees of Tops and, as such, received confidential and privileged information regarding Tops's factual and legal position in this litigation. Colvin argues that Bridgepoint cannot and should not be disqualified because Bridgepoint has provided only factual information to Colvin, that Casciano and Fulham are at most fact witnesses and that neither Bridgepoint, Casciano nor Fulham is Colvin's expert witness.

The Court notes that its authority to disqualify an attorney from further participation in a pending matter, as well as its authority to disqualify a party's expert witness, stems from its inherent power to preserve the integrity of the adversary process. *See Hempstead Video, Inc.* v. *Village of Valley Stream,* 409 F.3d 127, 132 (2d Cir. 2005); *see also Eastman Kodak Co.* v. *Agfa-Gevaert N.V.,* 2003 U.S. Dist. LEXIS 23260, 2003 WL 23101783 (W.D.N.Y. 2003) [**16**] (*citing Popular, Inc.* v. *Popular Staffing Servs. Corp.,* 239 F. Supp. 2d 150, 152 (D.P.R. 2003)). While the relevant questions differ somewhat depending on whether it is counsel or a witness against whom disqualification is sought, in both situations the crucial issue is whether the individual or entity against whom disqualification is sought has obtained or been exposed to confidential or privileged information belonging to the adversary in the litigation.

### 1. Can Bridgepoint be disqualified?

Colvin argues, as an initial matter, that Casciano and Fulham are fact witnesses and neither they nor Bridgepoint can be disqualified from further participation in this case. Colvin asserts that Casciano and Fulham have provided no information that could not be elicited in a standard deposition. Tops agrees that Casciano and Fulham may have knowledge of the facts relevant to this case, but argues that Casciano and Fulham -- and hence, Bridgepoint -- have provided litigation services to Colvin, not simply factual information. The Court agrees.

Bridgepoint has functioned more as a trial consultant for Colvin, rather than as a fact witness. [18] Bridgepoint has been [**17**] retained, in part, to provide general background and insight into the manner in which the grocery business is conducted. Bridgepoint has also provided analysis of how events at Tops affected B-Kwik stores in general and Colvin in particular. Bridgepoint has also done far more than identify and explain documents obtained in discovery. Bridgepoint has discussed and developed a strategy for Colvin to utilize in combing through the documents provided by Tops in discovery -- in an effort to concentrate the search for the most relevant and persuasive documents for Colvin's version of the events. Finally, more than simply identifying others who may have relevant knowledge, Bridgepoint has provided the names of potential witnesses and identified the areas in which the potential witnesses' knowledge could be helpful to Colvin. Such information and assistance is not normally provided by fact witnesses at deposition. Accordingly, Bridgepoint is subject to possible disqualification.

---

[18] It also bears noting that, as a corporate entity, Bridgepoint itself is obviously not a fact witness. Only Casciano and Fulham, Bridgepoint's principals, are witnesses to some of the facts in this case.

[*18]  2. Should Bridgepoint be disqualified?

"[N]o one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and received confidential information from the adverse party pursuant to the earlier retention." *Wang Labs, Inc.* v. *Toshiba Corp.,* 762 F. Supp. 1246, 1248 (E.D. Va. 1991). Even when the witness's prior relationship with the adversary was not necessarily that of an expert witness, courts seek answers to the following two questions: "(1) Did the adversary have a confidential relationship with the expert [against whom disqualification is sought]?; (2) Did the adversary disclose confidential or privileged information to the expert [against whom disqualification is sought] relevant to the current litigation?" *Eastman Kodak,* 2003 U.S. Dist. LEXIS 23260, 2003 WL 23101783 at *1.

Colvin argues that Tops has failed to prove that (1) it had a confidential relationship with Casciano and/or Fulham and/or (2) that Tops disclosed to them information relevant to this litigation as to which Tops had not waived [*19] privilege or confidentiality as against Colvin. [19] Colvin also asserts that only communications are privileged and that facts, whether they are conveyed to counsel in privileged communications or otherwise, are not privileged. Finally, Colvin argues that any fear of future disclosure of privileged or confidential communications can be eliminated by the entry of a protective order.

Casciano and Fulham both were employees of Tops. As employees they were required to complete and did complete a conflict of interest questionnaire which notified employees that they were not to

disclose Tops's confidential information. [20] Furthermore, while they argue that they do not recall the substance [*20] of such conversations, both Casciano and Fulham were present at meetings with Tops's executives and counsel in which the matters in dispute were discussed. Casciano was present at meetings in which the strengths and weaknesses of Tops's position were discussed. Thus, it cannot be reasonably disputed that confidential information was disclosed to Casciano and Fulham during their employment at Tops.

[*21] Instead, Colvin argues that to the extent such information was disclosed, the same information was also routinely disclosed to Colvin such that there was no confidential information as between Tops and Colvin. In support, Colvin asserts that Casciano routinely provided information to Colvin concerning pricing issues and continued to do so even after this litigation was commenced.

Colvin fails to address, however, the undisputed fact that both Casciano and Fulham were present in meetings with Tops's counsel in which litigation strategy was discussed. The fact that they claim to have no recall of the specifics of that information is of no moment. Tops has shown that it had a confidential relationship with Casciano and Fulham and that confidential and/or privileged information was disclosed to them in the course of that relationship. Accordingly, Tops's Motion to Disqualify Bridgepoint Partners LLC is granted.

B. Motion to Disqualify McGee & Gelman

---

[19] In other words, Colvin argues that any allegedly confidential and/or privileged information allegedly disclosed by Tops to Casciano and/or Fulham had already been disclosed by Tops to Colvin in the ordinary course of business such that it may have been confidential as to outsiders but was not confidential as between Tops and Colvin.

[20] Tops has also submitted -- *in camera* -- various e-mails which allegedly demonstrate that Casciano and Fulham received confidential and/or privileged information regarding this litigation. Colvin objects to the Court's consideration of such materials, arguing that Tops failed to properly place the materials before the Court by seeking permission to supply the same or to file the same under seal. Colvin alleges that consideration of the *in camera* materials would run contrary to Due Process. The Court has not and need not consider the *in camera* submission because other evidence -- including Casciano and Fulham's own statements -- makes clear that confidential information was disclosed to them by Tops.

"The authority of federal courts to disqualify attorneys derives from their inherent power to preserve the integrity of the adversary process." *Hempstead Video, Inc.* v. *Village of Valley Stream,* 409 F.3d 127, 132 (2d Cir. 2005). **[*22]** "In a technical sense the only truly binding authority on disqualification issues is Second Circuit precedent, because our authority to disqualify an attorney stems from the Court's inherent supervisory authority." *Occidental Hotels Mgmt. B.V.* v. *Westbrook Allegro L.L.C.,* 440 F. Supp. 2d 303, 308 (S.D.N.Y. 2006) (*quoting Skidmore* v. *Warburg Dillon Read L.L.C.,* 2001 U.S. Dist. LEXIS 6101, 2001 WL 504876 at *2 (S.D.N.Y. 2001)). On disqualification motions, courts look to the state's disciplinary rules but "such rules merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification." *Hempstead Video,* at 132.

Motions for attorney disqualification "are generally viewed with disfavor in this Circuit" and "a party seeking disqualification must meet a high standard of proof before disqualification will be granted." *Marshall* v. *State of New York Div. of State Police,* 952 F. Supp. 103, 106 (N.D.N.Y. 1997). The burden must be high because disqualification impacts "a client's right freely to choose his counsel -- a right which of course must be balanced against the need to maintain the highest standards of **[*23]** the profession." *Evans* v. *Artek Systems Corp.,* 715 F.2d 788, 791 (2d Cir. 1983) (internal citation and quotation omitted). The court must also consider disqualification motions cautiously because such "are often interposed for tactical reasons." *Board of Education* v. *Nyquist,* 590 F.2d 1241, 1246 (2d Cir. 1979).

Attorney disqualifications generally occur only in cases where an attorney's conflict of interest undermines the Court's confidence in counsel's representation of his client or where an attorney is in a position, potentially, to use privileged information gained from the other side, for example through prior representation. *Nyquist,* at 1246. When counsel's conduct "threatens to affect the

integrity of the adversarial process, [the court] should take appropriate measures, including disqualification, to eliminate such taint." *MMR/Wallace Power & Industrial, Inc.* v. *Thames Associates,* 764 F. Supp. 712, 718 (D.Conn. 1991) (*citing Papanicolaou* v. *Chase Manhattan Bank, N.A.,* 720 F. Supp. 1080, 1083 (S.D.N.Y. 1989)).

Tops argues that McGee & Gelman must be disqualified because it has violated **[*24]** New York Disciplinary Rule 7-107 in that counsel has had *ex parte* communications with a party known to be represented by counsel. [21] Tops also argues that Canon 9 has been violated because McGee & Gelman's retention of Bridgepoint Partners creates the appearance of impropriety. Finally, Tops argues that the nature of the work performed by Bridgepoint demonstrates that Tops's confidential information has been disclosed to Colvin and that -- based on the rationale of *MMR/Wallace, supra,* -- even if Tops has not shown actual disclosure, disclosure should be presumed under the circumstances of this case.

The Court will not focus on whether or not there has been a violation of New York's ethical rules. That question can be addressed in a more appropriate **[*25]** forum, if necessary. This Court's primary function is not to discipline attorneys but rather to maintain the integrity of the adversary process. The real issue for this Court is whether McGee & Gelman's conduct -- whether or not it comports with New York's ethical rules -- impermissibly taints these proceedings.

As noted, Tops relies heavily on the rationale of *MMR/Wallace* and argues that the Court should adopt the *MMR/Wallace* framework in determining this motion. The *MMR/ Wallace* court sought the answers to three questions, which, as tailored to the instant case are as follows: Did Casciano and/or Fulham have confidential or privileged information

---

[21] Tops argues that such contact also violates Rule 4.2 of the American Bar Association's ("ABA's") Model Rules of Professional Conduct. Neither New York State nor this Circuit has adopted the ABA's Model Rules as the standard of professional conduct.

pertaining to Tops's trial preparation or strategy? Assuming that at least one of them had such information, did they disclose it to McGee & Gelman? If such information was disclosed, does it threaten to taint all further proceedings in the case?

Here, it is undisputed that Casciano was present at three meetings between Tops's executives and Tops's counsel. At those meetings, counsel discussed their mental impressions of the claims and possibly discussed Tops's strategy in defending this matter. Casciano and Fulham were both [*26] copied on numerous confidential and/or privileged e-mails concerning this dispute while at Tops. Casciano prepared a financial analysis of some or all of the issues involved in this litigation for Tops. Finally, Casciano had some conversations with Tops's litigation counsel and reviewed at least one document to be filed with the Court in this litigation. Accordingly, the Court finds that Casciano and Fulham possessed confidential or privileged information belonging to Tops.

The Court next considers whether Casciano or Fulham may have disclosed such information to McGee & Gelman. Tops first argues that its evidence shows that privileged information has in fact been disclosed to McGee & Gelman. In support of that argument, Tops asserts that a damages analysis performed by Bridgepoint for Colvin is similar to the one performed by Casciano for Tops. [22] Tops also points to the fact that Bridgepoint referred Colvin to experts in the area of "relevant geographic market" and that Bridgepoint identified Tops employees according to the category of damages in which their testimony would be helpful to Colvin. Tops also argues that, even if its evidence does not demonstrate actual disclosure [*27] of Tops's information to Colvin, Bridgepoint should be presumed to have done so by the nature of its relationship -- *i.e.,* that of a paid consultant -- to Colvin.

Tops contends that, because an analysis of Colvin's

claimed damages prepared by Bridgepoint includes an analysis of "billbacks" for the time period encompassed by Casciano's July 2003 analysis for Tops, Bridgepoint's analysis must contain privileged and/or confidential work product belonging to Tops and therefore Casciano must have disclosed Tops's work product to Colvin. The Court does not find such argument persuasive. Both Casciano and Fulham assert that they took no Tops documents with them upon their respective departures from Tops. Tops has no evidence contradicting such representations. Accordingly, there is no indication that Bridgepoint used any documents protected by the attorney-client privilege or the attorney work product doctrine in preparing any analysis [*28] for Colvin. Tops's argument is further contradicted by the fact that Bridgepoint's analyses for Colvin were clearly works in progress. Tops attached three analyses provided to Colvin -- one on June 24, 2004 and two on June 25, 2004. The total amount of damages is different in each such analysis, albeit by small sums. The indication, however, is that analysis was ongoing and not simply based on the analysis Casciano performed for Tops the prior year.

Tops further argues that actual disclosure of its privileged and/or confidential information is demonstrated by the fact that Bridgepoint referred Colvin to certain experts in the field of "relevant geographic market." [23] [*30] The concept of "relevant geographic market" is crucial to the success of Colvin's price discrimination claims under 15 U.S.C. § 13(a). That section states in pertinent part:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such

---

[22] The similarity Tops asserts is that both analyses concern the same time period.

[23] This argument was presented in a footnote in Tops's reply memorandum. Other than stating the assertion, Tops provided no explanation as to how such fact indicates that its confidential information was disclosed to Colvin.

2006 U.S. Dist. LEXIS 93689, *30

discrimination are in commerce, * * * and where **[*29]** the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them * * *."

15 U.S.C. § 13(a). In order to demonstrate an injury to commerce caused by the alleged price discrimination, Colvin must show that it was in competition with the Favored Purchasers. *See Best Brands Beverage* v. *Falstaff Brewing Corp.,* 842 F.2d 578 (2d Cir. 1987) (stating that in order to establish a competitive nexus between purchasers it must be shown that as of time of imposition of price differential purchasers competed at same functional level -- *i.e.,* all wholesalers or all retailers -- and within the same geographic market). [24] Accordingly, the Court does not find that Bridgepoint's involvement in the referral of such experts demonstrates that Bridgepoint disclosed Tops's confidential information to Colvin.

Finally, Tops argues that, even if its evidence does not demonstrate actual disclosure of its privileged or confidential information, such disclosure should be presumed in light of the nature of Bridgepoint's relationship with Colvin. In support of its argument, Tops relies heavily on the case of *MMR/Wallace, supra,* in which defense counsel was disqualified after retaining plaintiff's former project manager -- who was extensively involved in plaintiff's preparation of the subject litigation -- as a trial consultant. The *MMR/Wallace* court concluded that a presumption arose that the employee had disclosed plaintiff's privileged information to defense counsel and -- assuming that such presumption was rebuttable -- the presumption had

not been rebutted. [25] **[*32]** The court discounted both defense counsel's and the employee's affidavits denying disclosure of any privileged information **[*31]** because the attorney could have been motivated to preserve any unfair advantage he had obtained [26] and because the employee testified that he did not know what information was and was not protected by attorney-client privilege. [27] Tops argues that the Court should likewise disqualify McGee & Gelman because neither Casciano nor Fulham fully understands the parameters of the attorney-client privilege such that any warning not to disclose privileged information was ineffective, and both were involved in the preparation of Tops's defense.

The Court concludes that -- even if a presumption arises that Casciano and/or Fulham disclosed privileged or confidential information to McGee & Gelman -- such presumption has been sufficiently rebutted in this case. The Court has been presented with affidavits from Casciano, Fulham and McGee denying any disclosure. Such affidavits have been held sufficient to rebut a presumption of disclosure. *See e.g., In re Methyl Tertiary Butyl Ether Products Liability Litigation,* 438 F. Supp. 2d 305, 309 (S.D.N.Y. 2006); *Team Obsolete Ltd.* v.

---

[24] In *Texaco, Inc.* v. *Hasbrouck,* 496 U.S. 543, 567, 110 S. Ct. 2535, 110 L. Ed. 2d 492 (1990), the Supreme Court rejected the contention that price discrimination between wholesalers and retailers is exempt from the Act.

[25] In recognizing a presumption of disclosure, the *MMR/Wallace* court relied on cases including *Hull* v. *Celanese Corp.,* 513 F.2d 568 (2d Cir. 1975), and *Williams* v. *Trans World Airlines, Inc.,* 588 F. Supp. 1037 (W.D. Mo. 1984). In both *Hull* and *Williams* the court presumed that the defendant's former employee had disclosed privileged or confidential information to plaintiff's counsel. Importantly, however, both of those former employees approached each plaintiff's counsel for the purpose of retaining that counsel to represent them against their former employers. It is rational to presume that those former employees would have disclosed all of the relevant information in their possession -- regardless of its confidential nature -- when seeking representation for themselves.

[26] The evidence in *MMR/Wallace* supports the conclusion that defense counsel had obtained an unfair advantage and intended to use it in that the employee admitted to defense counsel that he retained computer discs belonging to plaintiff and defense counsel had instructed the employee to copy the computer discs and return the originals to plaintiff's counsel.

[27] Defense counsel and the employee affirmed that counsel had instructed the employee not to reveal any privileged information.

*A.H.R.M.A. Ltd.,* 464 F. Supp. 2d 164, 2006 U.S. Dist. LEXIS 89230, 2006 WL 2013471, at *4 (E.D.N.Y. 2006) .

[*33] Moreover, these affidavits -- unlike those in *MMR/Wallace* -- affirm that Casciano and Fulham made *no* disclosures of *any* communications they may have had with Tops's counsel. Thus Casciano's and Fulham's ability, or lack thereof, to distinguish privileged communications from non-privileged communications is irrelevant as they were instructed not to disclose any communications and they affirm that they complied with that instruction.

*MMR/Wallace* is further distinguishable on the facts. The MMR/Wallace employee had significantly more involvement with MMR/Wallace's litigation preparation than did Casciano or Fulham in this case. In fact, the MMR/Wallace employee's exclusive function for nearly a year prior to his termination had been to organize plaintiff's documents for litigation, review and digest materials provided by the defense and to assist plaintiff's counsel in responding to discovery demands, taking depositions and preparing pleadings. Even after he had been transferred to another work location, that employee continued to assist plaintiff's counsel and had been approached by plaintiff to consider a position as a trial consultant. Casciano's [*34] and Fulham's involvement in Tops's preparation was, in comparison, peripheral at best and had concluded even prior to Casciano's departure from Tops.

Finally, the Court concludes that -- even if the presumption has not been effectively rebutted -- McGee & Gelman's continued representation does not threaten to taint the integrity of these proceedings and disqualification is not required. The only threat of taint to which Tops points is a lingering "nagging suspicion" that Colvin has been unfairly advantaged. Under the circumstances of this case, however, disqualification of counsel would not provide any remedy beyond that already provided by the disqualification of Bridgepoint.

In support of this Motion, Tops has attached

exhibits consisting of extensive portions of the work product produced by Bridgepoint for Colvin. Contained in such exhibits are: the list of services to be performed by Bridgepoint, copies of PowerPoint presentations explaining the pricing processes employed by Tops, copies of damages analyses -- including those allegedly based on Tops's work product and/or privileged information -- performed by Bridgepoint for Colvin, correspondence regarding potential expert witnesses [*35] in the area of "relevant geographic market," correspondence from at least one such potential expert witness in which he outlines the type of analysis he would perform, and a document in which Bridgepoint identifies contents of boxes of discovery materials provided by Tops and outlines its strategy for culling through such documents. While such exhibits certainly do not represent all of the work performed by Bridgepoint for Colvin, they represent a significant amount of such work -- work which, according to Tops, is tainted.

Tops has placed those documents into the public domain. Even if the Court were to disqualify McGee & Gelman, any successor counsel would be entitled to access and use the information contained in that work. Thus, even if the Court were to conclude -- which it does not -- that McGee & Gelman should be disqualified from further representing Colvin because of the appearance of taint, any successor counsel would be entitled to utilize certain of these purportedly tainted documents. Accordingly, disqualification of counsel, in this case, would not serve to eliminate any potential taint.

## CONCLUSION

For the above stated reasons, it is accordingly **ORDERED** [*36] that Tops's Motion to Disqualify Bridgepoint Partners LLC is granted and Tops's Motion to Disqualify McGee & Gelman is denied.

DATED: Buffalo, N.Y.

December 27, 2006

2006 U.S. Dist. LEXIS 93689, *36

*/s/ John T. Elfvin*                                          S.U.S.D.J.

---

**End of Document**

# Eastman Kodak Co. v. Agfa-Gevaert N.V.

United States District Court for the Western District of New York

December 4, 2003, Decided

02-CV-6564

**Reporter**

2003 U.S. Dist. LEXIS 23260; 2003 WL 23101783

EASTMAN KODAK COMPANY, Plaintiff, v. AGFA-GEVAERT N.V. and AGFA CORPORATION, Defendants.

**Subsequent History:** Partial summary judgment granted by, in part, Partial summary judgment denied by, in part Eastman Kodak Co. v. Agfa-Gevaert N.V., 2004 U.S. Dist. LEXIS 12945 (W.D.N.Y., July 2, 2004)

**Disposition:** [*1] Plaintiff's motion to preclude disclosure of confidential material to defendant's expert granted.

**Counsel:** For Eastman Kodak Company, PLAINTIFF: Michael F Orman, Richard D Rochford, Nixon Peabody LLP, Rochester, NY USA.

For Agfa-Gevaert NV, Agfa Corp, DEFENDANTS: H Michael Hartmann, Jeffrey B Burgan, Jeremy C Lowe, Leydig, Voit & Mayer, Ltd, Chicago, IL USA.

For Agfa-Gevaert NV, Agfa Corp, DEFENDANTS: Stephen G Schwarz, Faraci & Lange LLP, Rochester, NY USA.

For Agfa Corp, Agfa-Gevaert NV, Counter CLAIMANTS: Stephen G Schwarz, Faraci & Lange LLP, Rochester, NY USA.

For Eastman Kodak Company, Counter DEFENDANT: Michael F Orman, Richard D Rochford, Nixon Peabody LLP, Rochester, NY USA.

**Judges:** JONATHAN W. FELDMAN, United States Magistrate Judge.

**Opinion by:** JONATHAN W. FELDMAN

# Opinion

## DECISION AND ORDER

<u>Relevant Factual Background</u>

This is a patent infringement case brought by Eastman Kodak Company ("Kodak") against Agfa-Gevaert ("Agfa"). Pursuant to a Stipulation and Protective Order agreed to by the parties, certain information produced during discovery may be designated as "Confidential" or "Highly Confidential." Under the terms of the stipulated agreement (Docket # 12), materials that are subject to this designation may not be disclosed [*2] to an outside expert or consultant without first identifying the expert or consultant to the other side and allowing opposing counsel the opportunity to object.

Agfa served notice on July 18, 2003 that it intended to disclose confidential and highly confidential information to Richard Hailstone, a former Kodak employee who has been retained by Agfa as a consultant for purposes of this litigation. Pursuant to the terms of the Stipulation and Protective Order, Kodak objected and brought the instant motion pursuant to Federal Rule of Civil Procedure 26(c)(7) seeking to preclude Agfa from disclosing confidential material to Hailstone.

Oral argument was heard on October 31, 2003 and following that proceeding, the parties requested an evidentiary hearing. The Court conducted a hearing

on November 17, 2003. Thereafter, the parties submitted additional briefing. (Docket # # 22, 25). Having considered the testimony adduced at the hearing as well as the parties' respective submissions, I hereby **grant** Kodak's motion.

Discussion

Federal courts have the inherent power to disqualify an expert from participating in litigation. [1] Popular, Inc. v. Popular Staffing Servs. Corp., 239 F. Supp.2d 150, 152 (D.P.R. 2003). **[*3]** Expert disqualification may be appropriate when "a party retains expert witnesses who previously worked for an adversary and who acquired confidential information during the course of their employment." Space Systems/Loral v. Martin Marietta Corp., 1995 U.S. Dist. LEXIS 22305, 1995 WL 686369 at *2 (N.D. Cal. Nov. 15, 1995). In determining whether to disqualify an expert based on a prior relationship with the adversary, a court must undertake the following two-step inquiry: (1) Did the adversary have a confidential relationship with the expert; (2) Did the adversary disclose confidential or privileged information to the expert that is relevant to the current litigation? Greene, Tweed of Delaware v. DuPont Dow Elastomers, LLC, 202 F.R.D. 426, 428 (E.D. Pa. 2001). The burden is on the party who seeks disqualification of an expert to establish that a confidential relationship exists and that the

confidentiality has not been waived. Id., 202 F.R.D. at 429 ("The party who seeks disqualification of an expert has the burden of showing the existence of confidentiality and its non-waiver").

**[*4]** 1. Existence of a Confidential Relationship: There is no question (and indeed the parties do not dispute) that the first element has been satisfied here. While Hailstone is currently an RIT professor, he previously worked at Kodak for eighteen (18) years during which time he unquestionably had access to confidential proprietary information belonging to Kodak. Thus, Kodak had a "confidential relationship" with Hailstone and, in fact, even today Hailstone is obligated to abide by the terms of an employment agreement he entered into with Kodak that prevents him from disclosing to the outside world any classified company confidential information acquired during his employment with Kodak. [2]

**[*5]** 2. Disclosure of Confidential Information Relevant to the Lawsuit: The critical question then is whether Hailstone received confidential information "that is relevant" to the current patent litigation during his lengthy employment with Kodak. See Wang Laboratories, Inc. v. CFR Assocs., 125 F.R.D. 10, 13 (D. Mass. 1989) (emphasis added). Without getting too technical, three of the patents at issue here, the '425, '426 and '520 patents, relate to tabular grain film emulsions. (For ease of reference, these patents will be referred to as the "T-Grain" patents). During the time period that Hailstone worked for Kodak, Kodak scientists were developing and perfecting film emulsions which utilized tabular microcrystals or tabular grains to absorb light during the film exposure process. The tabular shaped crystals had several advantages over other types of film emulsion grains

---

[1] Kodak's moving papers do not expressly move to disqualify Hailstone as an expert but rather seek a protective order precluding confidential documents being disclosed to him. However, both Kodak and Agfa agree that the legal analysis applicable to expert disqualification controls the issuance of the protective order Kodak seeks here. Moreover, it seems apparent that, as a practical matter, an order precluding Hailstone from receiving confidential materials in this case would severely limit, if not nullify his usefulness as a consultant or expert to Agfa. Nevertheless, in it's post-hearing brief (Docket # 22), Kodak argued that "the lack of candor displayed by Mr. Hailstone in connection with this motion" requires his "complete disqualification" from this case. Because complete disqualification of Hailstone was not sought in Kodak's initial moving papers and is being raised for the first time in Kodak's post-hearing brief, this Court declines to order such relief. If Kodak wants the Court to order the complete disqualification of Hailstone, it should file a supplemental motion and allow Agfa to properly respond.

[2] In his employment agreement, Hailstone promised, in relevant part, that "I will not, either during my employment by Kodak or thereafter, disclose to anyone or make any use of classified company information which I have acquired, or may acquire during my employment relating to any of the business of Kodak, except as such disclosure or use may be required in connection with my work as an employee of Kodak". See Exhibit A, Docket 15.

including: (1) improved image quality, (2) better image sharpness in radiological films and (3) reduced production costs due the need for less silver in film coatings. Kodak alleges that its research and development efforts resulted in obtaining the three T-Grain patents in 1982.

Hailstone worked [*6] at Kodak from 1972 to 1990. The portion of Hailstone's *Curriculum Vitae* ("CV") pertaining to his Kodak employment substantiates Kodak's claim that he was involved with the development of T-Grain technology. (Exhibit B, Docket # 15). According to his CV, between 1981 and 1982 Hailstone worked in Kodak's London, England laboratories conducting "studies of the mechanism of latent image formation in <u>tabular photographic microcrystals.</u>" (emphasis added). Between 1982 and 1990; Hailstone's CV specifies that he was a Kodak senior scientist and was involved in evaluating "<u>photographic emulsions having tabular microcrystals.</u>" (emphasis added). During his eighteen year career, Hailstone's CV asserts that he was involved with the issuance of "over 50 technical reports." Some of the reports Hailstone co-authored specifically pertained to silver halide tabular grain technology and, indeed, are among the confidential and highly confidential documents being produced by Kodak in response to <u>Agfa's</u> discovery requests.

Despite the foregoing, Agfa unshakably maintains that Hailstone "<u>did not learn of confidential information pertaining to the patents in suit during his tenure at Kodak.</u> [*7] " <u>See</u> Agfa's Memorandum of Law at page 2 (Docket # 17) (emphasis supplied). Hailstone himself submitted an affidavit in which he represented that "none of the work [he did during his eighteen years at Kodak] is the subject of any of the patents in suit." <u>See</u> Affidavit of Richard K. Hailstone (Docket # 18) at PP 14, 15, 16 and 19. Hailstone further stated that during his tenure with Kodak he "was not involved with or privy to <u>any activity</u> with respect to the patent application that resulted in the patents in suit." <u>Id.</u> at P 22. (emphasis added).

3. Summary of Hearing Testimony: In order to sort out these conflicting claims, a factual hearing was held on November 17, 2003. Hailstone testified, as did Robert Booms, one of the inventors of the '520 patent and a current director of research and development at Kodak. While much of the hearing testimony necessarily concerned technical aspects of tabular grain emulsions, as explained below, at the end of the day Agfa's insistence that Hailstone "did not learn of confidential information pertaining to the patents in suit during his tenure at Kodak" (Docket # 17 at page 2) was simply not credible.

During the [*8] mid 1970's, Kodak decided to pursue the development of high aspect ratio silver emulsions. A research group within Kodak consisting of approximately 100 scientists was formed to develop and test new film emulsions, including tabular silver halide emulsions. The research group was described by Booms as a "closed community" within Kodak and there were "steep" confidentiality restrictions applicable to the work the research community performed. Those working in the group were known as "working behind the silver curtain." While the research group itself was very closed, there was "very open sharing within that community." (Tr. [3] At 77).

Richard Hailstone was an active member of the "silver curtain" research group. Hailstone testified that at the time he began his tabular grain work at Kodak, he did not believe anyone had yet "developed a commercial tabular grain product." (Tr. 55). To be sure, Hailstone's primary responsibility was not in the [*9] creation of the emulsions, but rather in studying and measuring the efficiency of emulsions provided by other members of the research group. Nevertheless, the proof at the hearing demonstrated that as an active member of the research project, Hailstone had access to and received confidential scientific data from other members of the groups regarding the tabular grain

---

[3] Transcript of factual hearing held on November 17, 2003, Docket # 24.

emulsions he was testing, including information regarding the ingredients in the emulsions, the precipitation of the emulsions and the sensitization of the emulsions. Hailstone's access to Kodak's confidential scientific data regarding the particulars of the tabular grain emulsions directly contradicted Agfa's pre-hearing contention that Hailstone "was not privy to confidential information about how these [tabular grain] emulsions were made." See TOA [4] at 31.

Indeed, on cross-examination Hailstone was shown two confidential technical reports he authored concerning tabular grain emulsions. The [*10] first, prepared in March 1983, concerned emulsion studies Hailstone conducted in 1981 and 1982 while working at Kodak's Harrow Laboratory in England. One of the emulsions tested was precipitated by Francis Evans, one of the inventors of the '520 patent. (Tr. 58). Hailstone conceded that the report was classified at the highest level of confidentiality for emulsion research at Kodak and contained confidential details about Evans' prototype "T-Grain" emulsion. (Tr. 60-63). Hailstone also conceded that during the 1981-82 time period he was provided confidential information from Kodak about the size and coverage of the grains used in the "T-Grain" emulsions as well as confidential information on how the emulsions were sensitized. (Tr. 67-68).

The second report was co-authored by Hailstone in 1985 and also was classified at Kodak's highest level of emulsion confidentiality. Hailstone's 1985 report concerned studies of two tabular grain emulsions and contained drawings, details and descriptions of some of the precipitation procedures used to make the "T-Grain" emulsions. (Tr. 64-67). Hailstone testified that during last six months he was employed at Kodak, he attended a training course [*11] and "learned about" Kodak's procedures to make emulsions, but the training concerned cubic grain and not tabular grain emulsions. (Tr. 53). Hailstone specifically denied

that he "went through any type of training with regard to tabular grain emulsions" while employed by Kodak. (Tr. 42). However, Hailstone's testimony about his training was directly and credibly contradicted by Boom, who was the supervisor of the Kodak training course Hailstone took. Boom testified that the portion of the Kodak training program Hailstone attended provided "in depth" confidential information on Kodak's "T-Grain" emulsions, including laboratory work on actually creating tabular emulsions. (Tr. 81, 114).

4. The Need for a Protective Order: Relying on Greene, Tweed of Delaware v. Dupont Dow Elastomers, L.L.C., 202 F.R.D. 426 (E.D. Pa. 2001), Agfa argues that "everybody at Kodak" has some connection to photography and in order to be disqualified Kodak must do more than demonstrate that Hailstone had "general knowledge" of photographic science. (TOA at 32). This Court agrees. But the record here demonstrates far more than *ipse dixit* assertions by Kodak. Hailstone was not a part-time [*12] cashier in Kodak's company store. He was a senior scientist employed by Kodak for eighteen years who was an active member of a closed group of researchers charged with developing, creating and testing "T-Grain" photographic emulsions. The work of this research group involved the use and sharing of highly confidential information about high aspect ratio silver halide tabular grains and the utilization of such tabular grains in making photographic emulsions. The record here certainly supports a finding that the work of the "Silver Curtain" research group, of which Hailstone was a member, concerned "the specific technology at issue in this lawsuit," as the court in Greene demanded. Id. at 430 (internal citation omitted). See also Wang, 125 F.R.D. 10, 11 (D. Mass. 1989) (court barred defendant from retaining former Wang employee who had developed software covered by patent in issue); cf. Viskase Corp. v. W.R. Grace & Co., 1992 U.S. Dist. LEXIS 619, 1992 WL 13679 at *2-3 (N.D. Ill. January 24, 1992) (court refused to disqualify expert where he had general experience from working with defendant but no experience

---

[4] Transcript of October 31, 2003 oral argument.

2003 U.S. Dist. LEXIS 23260, *12

specific to the patented products or process). **[\*13]** See generally, Brian Burke, Disqualifying an Opponent's Expert When the Expert is Your Client's Former Employee, 66 Def. Couns. J. 69, (January 1999) (Where the "consultant's expertise is based on information he gained during his employment and that information will be used to assist the adversary, the consultant should be enjoined … from assisting any adversary in litigation of his former employer").

The development of the scientific technology that resulted in the "T-Grain" patents was not an instantaneous "eureka!" type discovery. Rather, as Boom's hearing testimony made clear, developing the T-Grain technology was an extended process involving a body of scientific work, with each research step providing a "building block" for the next. See generally Kofron and Boom, Kodak T-Grain Emulsions in Color Films, 49 J. Soc. Photographic Science Technology (1986) (Hearing Exhibit 9). Even after the "T-Grain" patents were applied, Kodak's "silver curtain" research group, including Hailstone, continued to study, test and analyze the tabular grains in order to improve upon this specific emulsion technology. As a member of the research group charged with developing "T-Grain" **[\*14]** photographic emulsions, Hailstone had access to, knowledge of and training in many of the "building blocks" that produced Kodak's "T-Grain" patents. To expect Hailstone to somehow suppress that knowledge by not revealing confidential information encompassed by his employment agreement with Kodak when he has been retained by Agfa to evaluate the validity of patents pertaining to the specific technology he spent over a decade studying for Kodak is unworkable if not quixotic. Moreover, given Hailstone's extended participation in the research group that generated the tabular grain technology at issue in this action, allowing Hailstone current access to confidential Kodak information in order to evaluate the patents in issue would give an unfair advantage to Agfa.

That Hailstone's primary role within the research group was to test the performance of the "T-Grain" emulsions and not generate the emulsion itself, does not immunize him from having to account for the confidential nature of his work at Kodak. The issue in the present dispute is not whether Hailstone directly worked on the patents in issue or singlehandedly created the technology that was ultimately patented. This Court has no **[\*15]** reason to doubt Hailstone's assertion that he never acquired sufficient confidential information while working for Kodak to "go into the laboratory and reproduce [a "T-Grain"] emulsion." (Tr. 61, 65). But the material questions are (1) whether Hailstone's work at Kodak involved confidential proprietary information that is relevant to the current litigation and (2) if so, whether use of that confidential knowledge would give him an unfair advantage in acting as a patent expert for Agfa? Based on the testimony at the hearing, the credibility of the witnesses, the documents received in evidence as part of the record and giving deference to the legal standard as set forth in this Decision and Order, the Court finds Kodak to have met its burden on both issues. [5]

**[\*16]** Conclusion

There is little doubt that Richard Hailstone would be a knowledgeable and valuable witness for Agfa

---

[5] Agfa's claim that by granting Kodak's motion "scores" of people "who had any relationship whatsoever to T-grain technology at Kodak" would also be prevented from consulting with Agfa strikes this Court as a bit hyperbolic. See Agfa's Post-Hearing Memorandum of Law at page 10 (Docket # 22). This decision is, of course, fact specific. The Court's holding is limited to Agfa retaining a patent expert who (1) spent almost two decades working as a senior scientist for a litigation adversary; (2) signed a confidentiality agreement with his former employer promising never to "disclose" or "make any use" of classified company information acquired during his employment; (3) was an active member of a closed research group that was charged with developing, analyzing and testing a very specific scientific technology that ultimately resulted in that specific technology being patented; (4) was trained in, had access to and utilized confidential scientific information in performing his duties as part of the research group; and (5) now wants to serve as a patent consultant in litigation against his former employer with respect to issues relevant to the very technology he worked on for his former employer. The Court respectfully disagrees that such a holding would "be a major break from prior case law." Id.

2003 U.S. Dist. LEXIS 23260, *16

with respect to the patents in suit involving Kodak's "T-Grain" film emulsions. But in retaining Hailstone, Agfa assumed the risk that his knowledge of tabular grain technology was based, at least in part, on an 18 year career with Kodak during which he was a member of a closed research group charged with developing new tabular grain film emulsions. The hearing testimony confirmed that Hailstone was a member of the "silver curtain" research group, actively participated in the group's efforts to study and develop tabular grain film emulsion technology and had access to and relied upon confidential information belonging to Kodak pertaining to "T-Grain" technology. While Hailstone may not have directly worked on the patents themselves, there is a sufficient connection between the confidential information Hailstone had

access to and the technology at issue in the "T-Grain" patents to mandate the issuance of a protective order. Because I find that (1) Agfa would gain an unfair advantage by providing Hailstone access to confidential and highly confidential Kodak documents [*17] in order to render an expert opinion on the validity of the "T-Grain" patents, and (2) allowing Hailstone such access would violate Hailstone's confidentiality agreement with Kodak, Kodak's motion to preclude is **granted.**

**IT IS SO ORDERED.**

JONATHAN W. FELDMAN

United States Magistrate Judge

Dated: December 4, 2003

---

End of Document

# A&A Elec. Contractors v. C.H. Nickerson & Co.

Superior Court of Connecticut, Judicial District of Hartford - New Britain, at Hartford

December 8, 1993, Decided ; December 9, 1993, Filed

NO. CV89 0369686S

**Reporter**

1993 Conn. Super. LEXIS 3279

A&A ELECTRICAL CONTRACTORS, INC. v. C.H. NICKERSON & CO. INC. ET AL

**Notice:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**Judges:** Wagner

**Opinion by:** WAGNER

## Opinion

*MEMORANDUM OF DECISION ON MOTIONS TO PRECLUDE TESTIMONY AND TO DISQUALIFY ATTORNEY*

This case arises from a dispute concerning the construction of a wastewater treatment plant located in Bristol, Connecticut. The defendant in this action, C.H. Nickerson & Co., Inc. [Nickerson] , served as the general contractor on the project, and the plaintiff, A&A Electrical Contractors, Inc. [A&A], was the electrical subcontractor.

During the course of construction, problems arose in connection with the electrical work. Nickerson retained Howard Wexler [Wexler] to serve as a consultant in connection with the various electrical problems. As a result of these electrical problems, Nickerson made claim against the City of Bristol for additional costs. Wexler, among other services, met with Nickerson's attorneys and assisted them in presenting their claim to Bristol. It appears from his deposition that Wexler was involved in setting up the claim file concerning the work now in dispute between Nickerson [*2] and A&A and attended meetings at which Nickerson's attorneys were present, including a formal pre-claims counseling session where Wexler signed in as a representative of Nickerson. In addition, Wexler acknowledges that he was present when strategy concerning Nickerson's claim against Bristol was discussed.

After the dispute concerning the electrical wiring of the project was settled between Nickerson and the City of Bristol, A&A, Nickerson's electrical subcontractor, filed this action against Nickerson. A&A disclosed Wexler, Nickerson's former expert consultant, as its expert witness. At the time Wexler was hired by A&A, both A&A and its attorneys knew that Wexler had previously been retained by Nickerson to work on the same issues now in dispute in the *A&A Electrical Contractors, Inc. v. C.H. Nickerson & Co., Inc.* litigation. Nickerson now moves to disqualify the expert testimony of Wexler and to disqualify Rogin, Nanam, Caplan, Lassuan & Hirtle as counsel for the plaintiff in this case.

I. *Motion to Disqualify Expert*

As a general rule, the attorney client privilege extends to all persons who act as the attorney's agents. See *State v. Hanna,* 150 Conn. 457, 465, 191 [*3] A.2d 124 (1963); 8, *Wigmore on Evidence* § 2301, at 583 (1961). The Connecticut Supreme Court has recognized that the attorney-client privilege extends to expert witnesses. See *State v. Toste,* 178 Conn. 626, 628, 424 A.2d 293 (1979) (where an expert "is retained by a criminal defendant . . . for the sole purpose of aiding the

accused and his counsel in the preparation of his defense, the attorney-client privilege bars the state from calling the expert as a witness").

Although Connecticut case law has not explicitly addressed the issue, federal case law has developed a two-step analysis to determine whether an expert should be disqualified based on a previous relationship with the opposing party. Under that analysis the court should determine:

> First, was it objectively reasonable for the first party who claims to have retained the [expert] to conclude that a confidential relationship existed? Second, was any confidential or privileged information disclosed by the first party to the [expert]?

*Mayer v. Dell,* 139 F.R.D. 1, 3 (D.D.C. 1991); *Wang Laboratories, Inc. v. Toshiba Corp.,* 762 F. Supp. 1246, 1248 (ED. Va. 1991); *Paul v. Rawlings Sporting* [*4] *Goods Co.,* 123 F.R.D. 271, 278 (S.D. Ohio 1988); see also *Marvin Lumber & Cedar Co. v. Norton Co.,* 113 F.R.D. 588 (D.Minn. 1986) (expert disqualified since expert had been engaged as consulting engineer for opposing party in the past and matters involved in pending suit were substantially related to prior relationship). "If the answers to both inquiries are affirmative, then disqualification is compelled; if, on the other hand, the answers to either inquiry is negative, disqualification may not be warranted." *Mayer v. Dell,* supra. Of course, the party seeking disqualification bears the burden of establishing both the existence of a privilege and its non-waiver. *Mayer v. Dell,* supra; *Wang Laboratories, Inc. v. Toshiba Corp.,* supra.

In making the two-step inquiry, we find that it was objectively reasonable for Nickerson to conclude that a confidential relationship did exist between Nickerson and Wexler. Wexler met with Nickerson's attorneys on several occasions and assisted them in presenting the claim against the City of Bristol for additional expenses relative to the electrical work on the project. Wexler was involved in setting up the claim file against the [*5]

City of Bristol, attended meetings with Nickerson's attorneys, and signed in as a representative of Nickerson at a formal pre-claims counseling session with the City of Bristol. In addition, although his actual participation is disputed, Wexler acknowledges that he was present when strategy concerning Nickerson's claims against the City of Bristol was discussed.

In considering the second component, we find that confidential and privileged information was disclosed in the presence of the expert Wexler. During Wexler's deposition, the following interchange took place:

> Q. But during that meeting, it was strategy about how to present Nickerson's claims to the city of Bristol?
>
> A. Yes, I believe it was; yes, sir.
>
> Q. And you were in the room when that occurred?
>
> A. Yes.

Courts in other states have precluded individuals in circumstances similar to those of Wexler from giving expert testimony. In *Conforti & Eisele, Inc. v. New Jersey,* 170 N.J.Super. 64, 405 A.2d 487 (1979), a technical consultant was precluded from testifying, the court holding that the attorney-client privilege prohibited disclosure of confidences revealed during the time when the expert was [*6] retained by the defendant, and that the privilege also applied to confidences revealed with regard to other phases of litigation. In addition to the attorney-client privilege, the court felt compelled to restrain the expert's testimony on the ground that it would be fundamentally unfair to the defendant to permit such a situation to occur, stating "Just as a former employee should be prevented from disclosing that which took time and expertise to develop, so too should a litigant be prevented from reaping similar benefits within the context of a lawsuit."

The attorney-client privilege, however, does not

extend beyond communications. See *State v. Manning,* 162 Conn. 112, 120, 291 A.2d 750 (1971); *Trumpold v. Besch,* 19 Conn. App. 22, 28, 561 A.2d 438 (1989). "Thus, an attorney is not bound to remain silent as to all information regarding his client, but only as to that information born of confidential communication." *State v. Manning,* supra, 121; *Trumpold v. Besch,* supra, 28. In *Barksdale v. Harris,* supra, the appellate court held that "once a physician examines a plaintiff, the physician then possesses firsthand knowledge as to the extent and nature of the plaintiff's **[*7]** injuries, and can be called upon by either party to testify as to that knowledge. Id., 761. In *Wang Laboratories, Inc. v. CFR Associates, Inc.,* 125 F.R.D. 10, 13-14 (D.Mass. 1989), a federal district court held that even though a former employee could not serve as an expert witness as to information obtained while employed by the opposing party, the former employee could testify as a fact witness. Accordingly, although we disqualify Wexler from giving expert testimony, he may appear as a factual witness able to testify as to his observations of the project in his capacity as a technical consultant.

## II. *Motion to Disqualify Counsel*

"Disqualification of counsel is a remedy that serves to enforce the lawyer's duty of absolute fidelity and to guard against the danger of inadvertent use of confidential information." *Bergeron v. Mackler,* 225 Conn. 391, 397, 623 A.2d 489 (1993). This court has "broad discretionary power to determine whether an attorney should be disqualified for an alleged breach of confidentiality or conflict of interest." *State v. Jones,* 180 Conn. 443, 448, 429 A.2d 936 (1980). Where issues of disqualification arise, however, the court must be "'solicitous **[*8]** of a client's right freely to choose his counsel'; mindful of the fact that a client whose attorney is disqualified may suffer the loss of time and money in finding new counsel and 'may lose the benefit of its longtime counsel's specialized knowledge of its operations.'" *Bergeron v. Mackler,* supra, 397-98. The party seeking disqualification has the burden of proving that such an action is justified. *Evans v.*

*Artek Systems Corp.,* 715 F.2d 788, 792 (2d Cir. 1983).

Defendant argues the Rogin firm must be disqualified under the rule of *Goldenberg v. Corporate Air, Inc.,* 189 Conn. 504, 296, 457 A.2d 296 (1983), overruled on other grounds, *Burger & Burger, Inc. v. Murren,* 202 Conn. 660, 522 A.2d 812 (1987). In Goldenberg the Supreme Court affirmed a trial court's decision to disqualify a law firm representing a defendant which had retained an accident investigation from employing a lawyer formerly employed by another defendant, stating a staff attorney employed by one of the defendants played a role in the preparation of that defendant's case. Prior to trial, the staff attorney left the defendant's firm and joined an accident investigation and insurance adjusting firm. **[*9]** Subsequently, an attorney for a co-defendant retained this accident investigation and insurance adjusting firm and consulted with his co-defendants' former counsel in connection with the litigation. The trial court disqualified the law firm. In affirming the trial court's decision, our Supreme Court declared: "Where the opportunity for disclosure of confidential information to an adversary is shown, the breach of confidence would not have to be proved; it is presumed in order to preserve the spirit of the Code." Id., 512.

In *MMR/Wallace Power & Industrial, Inc. v. Thames Associates,* 764 F. Supp. 712 (D. Conn. 1991), the court disqualified a law firm based on the firm's retention of a non-lawyer former employee of their adversary. The court, relying on *Goldenberg,* stated:

> There is nothing in the Goldenberg opinion to suggest that the court's finding of an irrebuttable presumption of shared confidences turned on Flaherty's having been an attorney, or that such a presumption would not also apply to an individual who had obtained confidential information as a result of having been employed in some other "substantial relationship."

1993 Conn. Super. LEXIS 3279, *9

Id., 726 n. 24.

We are unable [*10] to find the kind of factors in this case that warranted the court's presumptions of shared confidences resulting from a "substantial relationship" in *MMR/Wallace* and *Goldenberg.* Moreover, since we have barred the employment of Nickerson as an expert witness, we do not believe retention of the Rogin firm is likely to result in further danger of misuse of confidential information. Finally, we are unable to find sufficient indications of "pirating" by the Rogin firm or other breaches of the Code of Professional Ethics sufficient to justify its disqualification as an attorney for the plaintiff.

Motion to Preclude Wexler as Expert Witness granted.

Motion to disqualify Rogin firm denied.

No costs taxed to either party.

Wagner, J.