Caution
As of: December 30, 2016 12:02 PM EST

## *Rocheux Int'l of N.J., Inc. v. United States Merchs. Fin. Group, Inc.*

United States District Court for the District of New Jersey

October 5, 2009, Decided; October 5, 2009, Filed

Civ. No. 06-6147

**Reporter**
2009 U.S. Dist. LEXIS 93082 *

ROCHEUX INTERNATIONAL OF NEW JERSEY, INC., Plaintiff, v. U.S. MERCHANTS FINANCIAL GROUP, INC., U.S. MERCHANTS, INC. (a division of U.S. Merchants Financial Group, Inc., and/or d/b/a U.S. Merchants), THE MERCHANT OF TENNIS INC., and DIVERSIFIED REPACKAGING CORP., Defendants.

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Summary judgment granted by, in part, Summary judgment denied by, Motion denied by, Dismissed without prejudice by *Rocheux Int'l of N.J., Inc. v. U.S. Merchs. Fin. Group, Inc., 2010 U.S. Dist. LEXIS 104445 (D.N.J., Sept. 29, 2010)*

**Counsel:** [*1] For Plaintiff: Brian William McAlindin, Esq., BATHGATE, WEGENER & WOLF, P.C., Lakewood, New Jersey.

For Defendants: Brian J. McMahon, Esq., GIBBONS, PC, Newark, New Jersey.

**Judges:** Hon. Garrett E. Brown, Jr., U.S.D.J.

**Opinion by:** Garrett E. Brown, Jr.

## Opinion

### <u>MEMORANDUM OPINION</u>

<u>BROWN,</u> **Chief Judge:**

This matter comes before the Court upon Defendants' motion (Doc. No. 52) to exclude Plaintiff's designated expert witness Jorge Gutierrez as an improperly paid fact witness. In addition to the exclusion of Mr. Gutierrez as a witness, Defendants seek an order excusing them from paying the deposition fee charged by Mr. Gutierrez, permitting supplemental discovery into the events precipitating this arrangement, and imposing sanctions in the form of attorneys' fees and costs incurred in responding to the misconduct of Plaintiff's counsel. This Court held oral argument on September 16, 2009. For the following reasons, the Court will grant Defendants' motion, but the Court will only grant part of the relief sought by Defendants at this time.

## I. BACKGROUND

This case involves a contract dispute between Plaintiff Rocheux International of New Jersey, Inc. ("Rocheux"), a distributor of raw plastic materials, and Defendants, providers [*2] of plastic product-packaging services, concerning invoices billed in 2006, but the instant dispute concerns Rocheux's retention and subsequent payment of Mr. Gutierrez as an expert witness. Defendants essentially allege that Mr. Gutierrez, a disgruntled former employee of Defendant The Merchant of Tennis Inc., contacted Plaintiff and eventually Plaintiff's counsel Brian McAlindin during the discovery period of this case in 2008, offering allegedly damaging testimony regarding that Defendant's business practices in exchange for a fee, and that

Mr. McAlindin arranged for payment of more than $ 4,000 to Mr. Gutierrez for his testimony.

Although Plaintiff's counsel initially identified Mr. Gutierrez as a witness "possess[ing] knowledge regarding SAP Accounting Modules, specifically those employed by Merchant of Tennis," in an August 26, 2008 letter to defense counsel (Subervi Certif., Ex. B), he subsequently notified defense counsel by letter of October 31, 2008, that "Plaintiff w[ould] rely on Mr. Gutierrez as an expert witness regarding Edwards Software Modules and as a fact witness regarding business records and calculations regarding materials utilized by Merchants of Tennis in their [*3] manufacturing process," (Subervi Certif., Ex. C). That notification, which included Mr. Gutierrez's sworn affidavit, came well after the September 30, 2008 deadline for affirmative expert reports set by Magistrate Judge Esther Salas in the July 24, 2008 Revised Scheduling Order. (Doc. No. 41 P 3.) The Gutierrez Affidavit indicated that Mr. Gutierrez worked for The Merchant of Tennis in or about March 2008 and contained the following allegations: (1) that the Defendant's JD Edwards accounting software worked properly; (2) that Mr. Gutierrez's supervisor there asked him to change data in the software system; and (3) that the Defendant engaged in unethical business practices at the direction of its CEO. (See Subervi Certif., Ex. C, Gutierrez Aff. PP 4-10.)

Upon receipt of the affidavit, defense counsel noticed Mr. Gutierrez for a deposition that would take place on January 16, 2009. In November prior to the deposition, Mr. McAlindin notified Defendants that Mr. Gutierrez would charge a $ 1,500 fee for his deposition testimony. (Subervi Certif., Ex. K.) During the deposition, Mr. Gutierrez revealed that he had been paid more than $ 4,000 [1] by Plaintiff's counsel, but that he

understood [*4] the fee to compensate him for his consulting services (specifically, his communications with counsel and time reviewing the affidavit) rather than his expected expert testimony, and he admitted that he submitted no expert reports to Plaintiff's counsel regarding the operation of the JD Edwards software system. (See Subervi Certif., Ex. E ("Gutierrez Dep.") at 54-59.) Defendants also deposed Plaintiff's Vice President of Operations Robert Stephanoff, who had been Mr. Gutierrez's initial point-of-contact with Rocheux. Mr. Stephanoff disclaimed any knowledge regarding why Mr. Gutierrez first contacted Rocheux, whether he requested payment for his testimony, and whether he was in fact paid by counsel, but noted that he referred Mr. Gutierrez to Mr. McAlindin, whom he thought would know what to do. (See Subervi Certif., Ex. F at 16-21, 44.) When defense counsel probed into conversations between Mr. Stephanoff and Mr. McAlindin regarding whether Mr. Gutierrez qualified as an expert witness that could be paid for his services, Mr. McAlindin instructed Mr. Stephanoff not to answer those questions, ostensibly on grounds of attorney-client privilege. (See id. at 30-32.)

During his deposition, Mr. Gutierrez explained that he had originally contacted Rocheux to inform them that he had information that might be helpful to their lawsuit. (See Gutierrez Dep. at 29:4-12.) He also noted that he first discussed compensation with Mr. McAlindin at the October 24, 2008 meeting where he signed the affidavit (see id. at 25, 56), because prior to that time, it was "up in the air" whether his testimony would be used in the lawsuit (see id. at 53). When asked about the specifics of his allegations about changing data at the request of his supervisor and unethical business practices, Mr. Gutierrez conceded that he did not know whether he was being asked to correct or falsify the data, and he pointed to a handful of instances where customers informed him that his employer had been late on making payments to other vendors. (See id. at 77-80, 85-94.)

---

[1] Plaintiff does not contest [*5] that Mr. Gutierrez was paid more than $ 4,000 for his time working on this case. (See Subervi Certif., Ex. H, Invoice (indicating that Mr. Gutierrez billed Plaintiff's counsel $ 4,275 for his services).)

On March 27, 2009, Defendants moved to exclude Mr. Gutierrez as an improperly paid fact witness, arguing that Plaintiff's [*6] counsel wrongfully listed Mr. Gutierrez as an expert witness, despite the lay factual basis of his testimony, in order to bypass the legal bar to payment of fact witnesses and obtain testimony damaging to Defendants. In addition to exclusion of the witness, Defendants seek an order: (1) excusing their payment of Mr. Gutierrez's expert witness deposition fee, (2) requiring additional deposition testimony from Plaintiff's representatives and Plaintiff's counsel regarding the retention of Mr. Gutierrez, and (3) imposing appropriate sanctions for the unethical behavior of Plaintiff's counsel.

## II. DISCUSSION

It is well established that courts have "*inherent* authority to impose sanctions upon those who would abuse the judicial process." *Republic of the Philippines v. Westinghouse Elec., 43 F.3d 65, 73 (3d Cir. 1994)* (emphasis in original) (citing *Chambers v. NASCO, Inc., 501 U.S. 32, 43-44, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991))*. These powers are "'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers, 501 U.S. at 43* (quoting *Link v. Wabash R.R. Co., 370 U.S. 626, 630-31, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962))*.

The Supreme [*7] Court has cautioned, however, that "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers, 501 U.S. at 44*. Towards this end, the Third Circuit has required that district courts make certain findings to "ensure that the sanction is tailored to address the harm identified." *Republic of the Philippines, 43 F.3d at 74*. First, the court must examine the conduct at issue and explain why a sanction is justified. *See id.* Specifically, the court should consider whether the conduct is part of a pattern of wrongdoing, the severity of the infraction, and the level of harm or

prejudice to the adversary. *See id.* Second, the court must consider the range of available sanctions and explain why it has chosen the particular sanction. *See id.*

*Rule 3.4(b) of the New Jersey Rules of Professional Conduct* provides in pertinent part that "[a] lawyer shall not . . . offer an inducement to witness that is prohibited by law[.]" Typically, lawyers may only compensate fact witnesses for: (1) reasonable expenses incurred by a witness to attend the trial, and (2) reasonable compensation for the loss of the witness's time in attending the trial to testify. *In re PMD Enters., 215 F. Supp. 2d 519, 529-30 (D.N.J. 2002)* [*8] (citation omitted). Congress codified this common law principle at *18 U.S.C. § 201*, the criminal statute prohibiting bribery of public officials and witnesses. *See 18 U.S.C. § 201(b)(3), (d)* (generally prohibiting payment of witnesses, but permitting payment "by the party upon whose behalf a witness is called . . . , of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding"). Courts have reinforced this rule by deeming non-conforming agreements to compensate fact witnesses unenforceable for lack of consideration and being contrary to public policy. *See In re PMD Enters., 215 F. Supp. 2d at 530* (citing *Hamilton v. Gen. Motors Corp., 490 F.2d 223, 227-29 (7th Cir. 1973)*; *Alexander v. Watson, 128 F.2d 627, 630 (4th Cir. 1942))*.

Here, it is clear that Mr. Gutierrez is a fact witness, and that Plaintiff's counsel improperly procured payment for Mr. Gutierrez's factual testimony. During oral argument, when the Court asked Mr. McAlindin to identify the portion of the Gutierrez Affidavit that contained Mr. Gutierrez's anticipated expert testimony, Mr. McAlindin pointed to paragraphs 4 and 5, which [*9] contained Mr. Gutierrez's assertions that, while working for The Merchant of Tennis in or about March 2008, he accessed and downloaded information from their JD Edwards Software Accounting Module regarding purchase orders, accounts, and data about

thermoformed products and part production, and he observed the software system "to operate as designed without any problems, bugs, or defect." (Subervi Certif., Ex. C, Gutierrez Aff. PP 4, 5.) The Court must reject the position of Plaintiff's counsel.

Not only do the observations about the software system contained in these paragraphs lack the factual basis and reliable methodology required by *Federal Rule of Evidence 702* for expert opinion testimony, *see Daubert v. Merrell Dow Pharms., 509 U.S. 579, 592-95, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-42 (3d Cir. 1994)*, but they are irrelevant, because: (1) they would serve no purpose other than collateral impeachment, because Defendants do not appear to present a defense to the contract claims based upon the functionality of the JD Edwards Software Accounting Module, and (2) these observations concern the operation of the software system more than a year after the events that **[*10]** precipitated this lawsuit. (*See generally* Answer; *see also* Oral Argument Tr. at 31:11-32:4 (representation of defense counsel that Defendants would not interpose a defense based on the software system); Compl. PP 19-22 (alleging that Defendants failed to pay invoices over the course of several months in 2006).) Furthermore, it is quite clear that the allegations of data manipulation and unethical business practices contained in subsequent paragraphs of the Gutierrez Affidavit constitute factual evidence based on lay observation. (*See* Subervi Certif., Ex. C, Gutierrez Aff. PP 6-10.)

Mr. McAlindin has failed to present a cogent explanation for treating Mr. Gutierrez as an expert witness, and the fee paid to Mr. Gutierrez most certainly did not compensate for his costs of attending trial or time lost during trial. Mr. Gutierrez was a fact witness, and his payment by Plaintiff's counsel clearly runs afoul of the longstanding prohibition against payment of fact witnesses. Witnesses brought before a court are duty-bound to tell the truth, and the payment of witnesses for their testimony "leans toward the

procurement of perjury; toward the raising up of a class of witnesses who, for a sufficient **[*11]** consideration, will give testimony that shall win or lose the lawsuit, toward the perversion of justice; and toward corruption in our courts." *Hamilton, 490 F.2d at 228* (quoting *Wright v. Somer's, 125 Ill. App. 256, 256 (1906))*.

Mr. McAlindin's decision to pay Mr. Gutierrez for factual testimony has cast a cloud over the legitimacy of that testimony, and the Court must prevent this suspect evidence from contaminating future proceedings. *Federal Rule of Evidence 403* permits this Court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice," and other courts have recognized that the proper sanction for the wrongful payment of fact witnesses is the exclusion of the tainted witnesses. *See, e.g., Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n, 865 F. Supp. 1516, 1526-27 (S.D. Fla. 1994)* (excluding "testimony given in this action by any of the fact witnesses who received monetary compensation from [counsel]"), *rev'd in part on other grounds, 117 F.3d 1328, 1335 n.2 (11th Cir. 1997)* (approving of the district court's exclusion of paid fact witnesses). Because this Court finds such a sanction necessary to **[*12]** protect the integrity of these proceedings, the Court will exclude the testimony of Mr. Gutierrez. The Court will further excuse Defendants from payment of Mr. Gutierrez's expert deposition fee, which Mr. Gutierrez based on his internet research of fees charged by expert witnesses (Subervi Certif., Ex. E at 8:17-25), because such payment would only validate the wrongful payment of a fact witness.

In addition to the exclusion of Mr. Gutierrez and exemption from his expert deposition fee, Defendants seek additional deposition testimony from Mr. Stephanoff and Mr. McAlindin regarding the retention of Mr. Gutierrez, as well as the payment of defense counsel's expenses relating to their investigation and presentation of this matter to the Court. In light of the Court's ruling, there does

not appear to be a need to further depose Mr. Stephanoff or to depose Mr. McAlindin at this time. However, the Court will grant Defendants reasonable attorneys' fees and costs incurred as a result of the misconduct underlying the instant motion. Defendants will have 30 days from the entry of the accompanying Order to submit descriptive time entries and supporting documentation from its billing records relating [*13] to reasonable attorneys' fees and costs arising from this motion and the precipitating misconduct.

At this time, Defendants do not seek the more severe sanction of disqualifying Mr. McAlindin, and this Court is satisfied for the time being that exclusion of the witness, exemption from the expert deposition fee, and monetary compensation for the expense incurred by Defendants in bringing and prosecuting this motion will properly address this infraction. The Court will reserve judgment on the need for additional sanctions or disciplinary action pending further application.

## III. CONCLUSION

For the aforementioned reasons, the Court will grant Defendants' motion and exclude Mr. Gutierrez as an improperly paid fact witness. Accordingly, the Court will excuse Defendants from paying the expert deposition fee sought by Mr. Gutierrez. Defendants will have 30 days to submit for the Court's *in camera* review descriptive time entries from its billing records and other documentation relating to reasonable attorneys' fees and costs incurred in investigating this misconduct and prosecuting this motion. The Court will reserve judgment on the propriety of additional sanctions for the misconduct of Plaintiff's [*14] counsel pending further application. An appropriate order form accompanies this Memorandum Opinion.

Dated: October 5, 2009

/s/ Garrett E. Brown, Jr.

GARRETT E. BROWN, JR., U.S.D.J.

**End of Document**

 Caution

As of: December 30, 2016 12:02 PM EST

## *1210 Colvin Ave., Inc. v. Tops Markets, L.L.C.*

United States District Court for the Western District of New York

December 27, 2006, Decided ; December 28, 2006, Filed

03-CV-0425E(F)

**Reporter**

2006 U.S. Dist. LEXIS 93689 *; 2007-1 Trade Cas. (CCH) P75,548

1210 COLVIN AVENUE, INC., Now Known As Dash Markets, Inc., Plaintiff, -vs- TOPS MARKETS, L.L.C., Defendant.

**Prior History:** *1210 Colvin Ave., Inc. v. Tops Mkts., L.L.C., 2003 U.S. Dist. LEXIS 18487 (W.D.N.Y., Sept. 26, 2003)*

**Counsel:** [*1] For 1210 Colvin Avenue, Inc. Now known as Dash Markets, Inc., Plaintiff: Michael R. McGee, LEAD ATTORNEY, McGee & Gelman, Buffalo, NY.

For Tops Markets, L.L.C., Defendant: Benjamin M. Zuffranieri, Jr., LEAD ATTORNEY, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, NY.

**Judges:** John T. Elfvin, S.U.S.D.J.

**Opinion by:** John T. Elfvin

## Opinion

MEMORANDUM and ORDER [1]

## INTRODUCTION

In this action, the plaintiff 1210 Colvin Avenue, Inc. ("Colvin") alleges that the defendant, Tops Markets L.L.C. ("Tops") [2], violated various provisions of the Robinson-Patman Anti-

Discrimination Act, *15 U.S.C. § 13 et seq.,* by selling goods to Colvin for Colvin's resale at prices substantially higher than those charged to other retailers ("Favored Purchasers") in that Tops passed along to Favored Purchasers discounts and allowances received by Tops from its suppliers but failed to pass along to Colvin the same discounts and allowances. [3] Colvin also alleges [*2] that Tops paid money and/or provided services to Favored Purchasers selling certain goods supplied by Tops, while failing to provide proportionally equal sums or assistance to Colvin for its sales of the same or equivalent products. Colvin alleges that Tops's conduct impaired its ability to compete with other local retailers including the Favored Purchasers. Currently pending before the Court is Tops's Motion to Disqualify Colvin's trial consultants Bridgepoint Partners, LLC ("Bridgepoint") and Colvin's counsel, the law firm of McGee & Gelman. [4]

## [*3] BACKGROUND

Beginning in 1975, Colvin entered into several agreements with Tops whereby Colvin operated two B-Kwik retail grocery stores. Thereafter,

---

[1] This decision may be cited in whole or in any part.

[2] Tops is a subsidiary of Dutch company Koninklijke Ahold N.V., d/b/a Royal Ahold, Inc. ("Ahold").

---

[3] In addition to its Robinson-Patman claims, Colvin also asserts claims of breach of contract and for an accounting.

[4] This Motion was initially made in September 2004 and was denied without prejudice in November 2004 so that the parties could conduct discovery to determine whether and to what extent privileged information had been communicated to Bridgepoint's owners Daniel Fulham and Michael Casciano during their previous employment with Tops and the extent to which any such information may have been disclosed by Bridgepoint to McGee & Gelman.

Colvin opened a third store and all three Colvin stores -- as of the Fall of 2002 -- were subject to License Agreements, Bookkeeping and Administrative Services Agreements, Supply Agreements and Scanning Agreements (collectively "Operating Agreements") with Tops. Pursuant to the Operating Agreements, Colvin deposited money into an account with Tops ("the Code Account") and Tops would utilize those funds in order to satisfy certain financial obligations of Colvin including payments to suppliers and payroll. [5]

Colvin alleges that Tops -- in order to increase its profitability and bolster the flagging finances of its corporate parent, Ahold -- began to withhold from Colvin certain price discounts and allowances it had previously provided and failed [*4] to provide money payments and/or services for the sale of certain goods, but that Tops continued to provide the discounts and allowances, money payments and/or services to Favored Purchasers. Thereby, Tops's profitability increased and Colvin's profitability decreased. Colvin alleges that such conduct took place from on or before August 2002 until on or about July 2003, when Colvin's affiliation with Tops was terminated.

Colvin first brought this dispute to Tops's attention by a March 2003 letter from its counsel, McGee & Gelman. Upon receipt of Colvin's letter, Tops began an internal investigation of the claims. In April 2003 the parties engaged in negotiations in an effort to resolve the dispute, but such efforts failed and Colvin commenced this lawsuit on May 30, 2003.

On May 6, 2004, Colvin retained Bridgepoint Partners, LLC ("Bridgepoint") to assist Colvin in this litigation. Bridgepoint is a consulting firm owned in part or in whole by Michael Casciano ("Casciano") and Daniel Fulham ("Fulham"), two former Tops employees. Both Casciano and Fulham worked at Tops at the time the dispute came to light and Casciano continued to work at

Tops after this lawsuit was commenced and until [*5] January 2004. [6] In September 2004, Tops filed a motion to disqualify both Bridgepoint and McGee & Gelman. By Order dated November 26, 2004, this Court denied the motion without prejudice and directed the parties to undertake discovery as to the extent of Casciano's and Fulham's exposure, if any, to Tops's privileged information while employed there and the extent of Bridgepoint's work for Colvin. Upon completion of that discovery, Tops re-filed the instant Motion.

## FACTS

Tops employed Fulham from August 1996 to May 2003. [7] At the time of the relevant events, Fulham was Director of Category Management. [8] From November 1993 to January 2004, Tops employed Casciano as, among other things, Senior Director of Category Management Support. (Casciano 2005 Dec. P 9.) In his position, Casciano performed analyses of "billbacks" and other pricing issues relevant to the relationship between Tops and B-Kwik grocery store [*6] owners, including Colvin. Casciano routinely provided both the bases for his analyses and the results thereof to B-Kwik owners, including Colvin. (Casciano 2005 Dec. P 16, 18.)

Even after this dispute came to light, Casciano continued to perform such analyses and continued to share his results with Colvin. For example, sometime after the dispute came to light, Casciano informed Colvin that his analyses showed that Tops owed one of Colvin's stores more than $ 31,000 -- significantly more than the $ 12,000 Colvin claimed it was owed. (Casciano 2005 Dec. P 12, 25.) Not all such information continued to be shared, however. Casciano declined to share with Colvin an analysis of billbacks in July 2003, noting

---

[5] Colvin alleges that the funds deposited into the Code Account were co-mingled with Tops's general funds.

[6] Fulham left Tops's employ in May, 2003, the same month as this litigation was commenced.

[7] At the time the dispute at issue arose, both Casciano and Fulham reported to Tom Heine, a Senior Vice President of Tops.

[8] Fulham's position involved "merchandising and contracts with vendors." (Fulham Oct. Aff. P 10.)

that he was doing so "per John Mineo" [9] and that all communications concerning the [*7] billbacks were being funneled through Mineo. [10] (Casciano 2005 Dec. P 33.) Casciano believed he was instructed not to share the results either because the results were not complete or because in-house counsel wanted a single point of contact with Colvin in light of the litigation. (Casciano 2005 Dec. P 34.)

Casciano and Fulham participated in Tops's efforts to investigate Colvin's complaints and in Tops's efforts to resolve the dispute short of litigation. At their supervisor's request, both Casciano and Fulham reviewed Colvin's March 2003 letter outlining its complaints. (Casciano 2005 Dec. P 13; Casciano Depo. at 22-23.) Both Casciano and Fulham were the recipients of several e-mails pertaining to the dispute from Tops's General [*8] Counsel John Mineo. [11] [*9] In late March or early April 2003 Casciano and Fulham attended a meeting of certain Tops executives and Tops's in-house and litigation counsel in preparation for a negotiation meeting with Colvin and its representatives, including McGee & Gelman. (Casciano 2005 Dec. P 13, 30.) Both Casciano and Fulham attended that negotiation meeting on April 1, 2003. [12] (Casciano 2005 Dec. P 13.) Casciano

also attended a follow-up meeting after the negotiation. At the meetings, Tops's counsel discussed the facts of the case and divulged their mental impressions, strategy and theories of defense. [13] Casciano did not consider any information divulged at those meetings to be protected by the attorney-client privilege and stated that he has no general understanding of the parameters of that privilege. [14]

Casciano was asked to investigate a portion [*10] of Colvin's claims regarding pricing and to provide information to Tops's executives and to counsel regarding the matters in dispute. Casciano asserts that he provided only "factual" information, that he was neither asked for nor did he provide his opinion as to the matters in issue and that he did not recall being present at any time in which legal advice was being dispensed to Tops's executives. (Casciano 2005 Dec. P 31, 43.) [15] Casciano spoke with Tops's litigation counsel by telephone on at least one occasion and reviewed at counsel's request a declaration or affidavit in support of a motion to dismiss to be filed with the Court. (Casciano Depo. pp. 117-119.)

[*11] Casciano had no further contact with Tops's counsel regarding this matter and performed no task with respect to this litigation after September

---

[9] At that time, John Mineo was Tops's General Counsel.

[10] It is unclear whether the analysis Casciano declined to share with Colvin in July 2003 was specifically performed at the request of counsel or was prepared in the ordinary course of business but simply not disclosed.

[11] Tops has attached a log of such e-mails to Mineo's affidavit. Tops asserts that the e-mails themselves are protected by the attorney-client privilege and has not disclosed them to Colvin. Tops has, however, submitted the e-mails to the Court -- without prior authorization -- *ex parte* for the Court's *in camera* consideration. Not surprisingly, Colvin strenuously objects to the submission of such materials. The Court will discuss the disposition of such materials *infra*.

[12] Fulham asserts that his participation in the April 1, 2003 meeting was not extensive -- perhaps consisting of a verbal response to a question by Heine. Fulham claims no responsibility for any strategic decision-making with respect to the claim, or even significant factual input. He asserts that he attended no meetings after April 1, 2003 with respect to this matter and that he left Tops in May 2003. Fulham Oct. Aff. PP 13-16.

[13] Casciano does not dispute that strategy may have been divulged but argues rather that he has no recollection of that which may have been discussed. Casciano 2005 Dec. P 43.

[14] At his deposition, Fulham explained that his "understanding of what would be privileged is specific things that happened that would have been in a one-on-one or a closed-door meeting with Tops' general counsel, specifically the case that it was absolutely not to be shared, a confidentiality agreement signed, a statement having been made before the meeting started that it was attorney/client privilege * * *." Fulham Depo. at 78, lns. 1-9.

[15] In paragraph 43 of his declaration, Casciano states "I do not remember discussing 'litigation strategy' with any of the lawyers who worked on the case. It was not part of my job to craft or direct Tops's strategy for dealing with the plaintiff's claim and lawsuit. * * *. No one asked my opinion as to whether the case should be settled or defended vigorously, or about legal tactics. Nor were the Tops lawyers giving advice to *me*." Casciano 2005 Dec. P 43 (emphasis in original).

2003. Casciano continued to work for Tops until January 2004. [16]

After Casciano left Tops's employ in January 2004, he formed Bridgepoint together with Fulham. (Casciano 2005 Dec. P 10.) In the Spring of 2004, Bridgepoint solicited Colvin through McGee & Gelman to provide consulting services regarding the instant matter because Casciano and Fulham believed their experience in the industry generally and with Tops in particular would be useful to Colvin. (Casciano Dec. P 49.) Bridgepoint's retention letter of May 6, 2004 indicates that it would provide various services to Colvin and McGee & Gelman, including:

> "identify business process and controls prior to 2001; [*12] identify changes to B-Kwik with MICS Pricing System in 2000; identify changes to B-Kwik with conversion to BIB bill back System 2001; identify changes to B-Kwik with initial transition from Wilson Farms Division to Supermarket Division in 2002; identify changes to B-Kwik with transition from Tops Super Distribution Center to C&S Wholesale/Erie Logistics 2002; map process changes and impact to each area of B-Kwik; provide detailed analysis of impact to cost, margin and shrink; provide expert testimony as required."

Bridgepoint Retention Letter (internal numbering omitted).

Casciano and Fulham were repeatedly warned by McGee & Gelman not to disclose any communications they may have had with Tops's counsel. (Fulham Oct. Aff. P 5, 23, 24; Casciano 2005 Dec. P 50-53; McGee 2004 Dec. PP 5-9.) [17]

Casciano and Fulham were given such warning at every or nearly every meeting with Colvin's counsel. (Casciano 2005 Dec. P 54.) Casciano and Fulham deny that they have ever disclosed to Colvin or to McGee & Gelman any communications they may have had with counsel for Tops. (Fulham Oct. Aff. P 4, 22; Casciano 2005 Dec. P 1(a), 55.) Likewise, McGee & Gelman denies that Casciano or Fulham ever [*13] revealed any communications they may have had with Tops's counsel. (McGee 2004 Dec. PP 5-9; McGee 2005 Dec. P 16.) McGee states:

> "No disclosures of any communications between Casciano and/or Fulham and any Tops attorneys or any of [litigation strategy, settlement position or any other related information] were ever made to me by Casciano or Fulham, nor did I ever hear any such disclosures being made to any other person or persons. Specifically, no one at Bridgepoint has ever disclosed any privileged or non-discoverable information or document to McGee & Gelman or to anyone employed by Colvin or working on behalf of Colvin, either as an attorney, consultant or otherwise."

McGee 2004 Dec. P 9.

[*14] Since being retained, Bridgepoint has, among other things, made various PowerPoint presentations to Colvin and McGee & Gelman concerning Tops's pricing structure and operations. Bridgepoint has assisted in reviewing and categorizing thousands of documents provided by Tops in discovery. Bridgepoint also has given Colvin the names of other individuals at Tops who might have information relevant to the litigation and has referred to Colvin individuals who may be able to serve as expert witnesses with respect to the issue of "relevant geographic market." Finally, Bridgepoint has performed various mathematical analyses in order to verify Colvin's claimed damages.

---

[16] There is no suggestion that Tops sought or required Casciano's assistance with its defense of this action after September 2003 or at any time after Casciano's departure from Tops in January 2004.

[17] McGee advised Casciano and Fulham that "no disclosure should be made of any discussions or other communications which Casciano and/or Fulham might have had with the litigation attorneys and/or in-house counsel for Tops." McGee 2004 Dec. P 5. McGee also "expressly told Casciano and Fulham that there should be no

disclosure of Tops'[s] litigation strategy, settlement position or any other related information which either or both of them might have had exposure to during their tenure at Tops." Id. at P 7.

Case 3:13-cv-00257-JAM  Document 247-1  Filed 12/30/16  Page 10 of 53

Page 5 of 11
2006 U.S. Dist. LEXIS 93689, *14

Fulham states that his assistance to Colvin has included

> "providing factual information about the business relationships and pricing issues that underlie this dispute, and *** providing technical assistance so that its attorneys can understand the documents that have been produced during discovery and the financial impact of the transactions between the parties." Fulham Oct. Aff. P 25.

As partners of Bridgepoint, Casciano and Fulham have, after receipt of an initial retainer of $ 7,500, billed for their services [*15] at an hourly rate of $ 225. (Casciano Dec. P 63.) Bridgepoint has been paid approximately $ 70,000 thus far for the services it has rendered to Colvin.

## DISCUSSION

A. Motion to Disqualify Bridgepoint Partners, LLC

Tops seeks to disqualify Bridgepoint from any further participation in this matter because Bridgepoint's owners Casciano and Fulham are former employees of Tops and, as such, received confidential and privileged information regarding Tops's factual and legal position in this litigation. Colvin argues that Bridgepoint cannot and should not be disqualified because Bridgepoint has provided only factual information to Colvin, that Casciano and Fulham are at most fact witnesses and that neither Bridgepoint, Casciano nor Fulham is Colvin's expert witness.

The Court notes that its authority to disqualify an attorney from further participation in a pending matter, as well as its authority to disqualify a party's expert witness, stems from its inherent power to preserve the integrity of the adversary process. *See Hempstead Video, Inc. v. Village of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005); see also Eastman Kodak Co. v. Agfa-Gevaert N.V., 2003 U.S. Dist. LEXIS 23260, 2003 WL 23101783 (W.D.N.Y. 2003)* [*16]  (*citing Popular, Inc. v. Popular Staffing Servs. Corp., 239 F. Supp. 2d 150,*

*152 (D.P.R. 2003))*. While the relevant questions differ somewhat depending on whether it is counsel or a witness against whom disqualification is sought, in both situations the crucial issue is whether the individual or entity against whom disqualification is sought has obtained or been exposed to confidential or privileged information belonging to the adversary in the litigation.

1. Can Bridgepoint be disqualified?

Colvin argues, as an initial matter, that Casciano and Fulham are fact witnesses and neither they nor Bridgepoint can be disqualified from further participation in this case. Colvin asserts that Casciano and Fulham have provided no information that could not be elicited in a standard deposition. Tops agrees that Casciano and Fulham may have knowledge of the facts relevant to this case, but argues that Casciano and Fulham -- and hence, Bridgepoint -- have provided litigation services to Colvin, not simply factual information. The Court agrees.

Bridgepoint has functioned more as a trial consultant for Colvin, rather than as a fact witness. [18] Bridgepoint has been [*17]  retained, in part, to provide general background and insight into the manner in which the grocery business is conducted. Bridgepoint has also provided analysis of how events at Tops affected B-Kwik stores in general and Colvin in particular. Bridgepoint has also done far more than identify and explain documents obtained in discovery. Bridgepoint has discussed and developed a strategy for Colvin to utilize in combing through the documents provided by Tops in discovery -- in an effort to concentrate the search for the most relevant and persuasive documents for Colvin's version of the events. Finally, more than simply identifying others who may have relevant knowledge, Bridgepoint has provided the names of potential witnesses and identified the areas in

---

[18] It also bears noting that, as a corporate entity, Bridgepoint itself is obviously not a fact witness. Only Casciano and Fulham, Bridgepoint's principals, are witnesses to some of the facts in this case.

which the potential witnesses' knowledge could be helpful to Colvin. Such information and assistance is not normally provided by fact witnesses at deposition. Accordingly, Bridgepoint is subject to possible disqualification.

[*18]   2. Should Bridgepoint be disqualified?

"[N]o one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and received confidential information from the adverse party pursuant to the earlier retention." *Wang Labs, Inc. v. Toshiba Corp., 762 F. Supp. 1246, 1248 (E.D. Va. 1991)*. Even when the witness's prior relationship with the adversary was not necessarily that of an expert witness, courts seek answers to the following two questions: "(1) Did the adversary have a confidential relationship with the expert [against whom disqualification is sought]?; (2) Did the adversary disclose confidential or privileged information to the expert [against whom disqualification is sought] relevant to the current litigation?" *Eastman Kodak, 2003 U.S. Dist. LEXIS 23260, 2003 WL 23101783 at *1*.

Colvin argues that Tops has failed to prove that (1) it had a confidential relationship with Casciano and/or Fulham and/or (2) that Tops disclosed to them information relevant to this litigation as to which Tops had not waived [*19]  privilege or confidentiality as against Colvin. [19] Colvin also asserts that only communications are privileged and that facts, whether they are conveyed to counsel in privileged communications or otherwise, are not privileged. Finally, Colvin argues that any fear of future disclosure of privileged or confidential communications can be eliminated by the entry of a

protective order.

Casciano and Fulham both were employees of Tops. As employees they were required to complete and did complete a conflict of interest questionnaire which notified employees that they were not to disclose Tops's confidential information. [20] Furthermore, while they argue that they do not recall the substance [*20]  of such conversations, both Casciano and Fulham were present at meetings with Tops's executives and counsel in which the matters in dispute were discussed. Casciano was present at meetings in which the strengths and weaknesses of Tops's position were discussed. Thus, it cannot be reasonably disputed that confidential information was disclosed to Casciano and Fulham during their employment at Tops.

[*21]  Instead, Colvin argues that to the extent such information was disclosed, the same information was also routinely disclosed to Colvin such that there was no confidential information as between Tops and Colvin. In support, Colvin asserts that Casciano routinely provided information to Colvin concerning pricing issues and continued to do so even after this litigation was commenced.

Colvin fails to address, however, the undisputed fact that both Casciano and Fulham were present in meetings with Tops's counsel in which litigation strategy was discussed. The fact that they claim to have no recall of the specifics of that information is of no moment. Tops has shown that it had a confidential relationship with Casciano and Fulham and that confidential and/or privileged information

---

[19] In other words, Colvin argues that any allegedly confidential and/or privileged information allegedly disclosed by Tops to Casciano and/or Fulham had already been disclosed by Tops to Colvin in the ordinary course of business such that it may have been confidential as to outsiders but was not confidential as between Tops and Colvin.

[20] Tops has also submitted -- *in camera* -- various e-mails which allegedly demonstrate that Casciano and Fulham received confidential and/or privileged information regarding this litigation. Colvin objects to the Court's consideration of such materials, arguing that Tops failed to properly place the materials before the Court by seeking permission to supply the same or to file the same under seal. Colvin alleges that consideration of the *in camera* materials would run contrary to Due Process. The Court has not and need not consider the *in camera* submission because other evidence -- including Casciano and Fulham's own statements -- makes clear that confidential information was disclosed to them by Tops.

was disclosed to them in the course of that relationship. Accordingly, Tops's Motion to Disqualify Bridgepoint Partners LLC is granted.

B. Motion to Disqualify McGee & Gelman

"The authority of federal courts to disqualify attorneys derives from their inherent power to preserve the integrity of the adversary process." *Hempstead Video, Inc. v. Village of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005).* **[\*22]** "In a technical sense the only truly binding authority on disqualification issues is Second Circuit precedent, because our authority to disqualify an attorney stems from the Court's inherent supervisory authority." *Occidental Hotels Mgmt. B.V. v. Westbrook Allegro L.L.C., 440 F. Supp. 2d 303, 308 (S.D.N.Y. 2006)* (quoting *Skidmore v. Warburg Dillon Read L.L.C., 2001 U.S. Dist. LEXIS 6101, 2001 WL 504876 at \*2 (S.D.N.Y. 2001)).* On disqualification motions, courts look to the state's disciplinary rules but "such rules merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification." *Hempstead Video, at 132.*

Motions for attorney disqualification "are generally viewed with disfavor in this Circuit" and "a party seeking disqualification must meet a high standard of proof before disqualification will be granted." *Marshall v. State of New York Div. of State Police, 952 F. Supp. 103, 106 (N.D.N.Y. 1997).* The burden must be high because disqualification impacts "a client's right freely to choose his counsel -- a right which of course must be balanced against the need to maintain the highest standards of **[\*23]** the profession." *Evans v. Artek Systems Corp., 715 F.2d 788, 791 (2d Cir. 1983)* (internal citation and quotation omitted). The court must also consider disqualification motions cautiously because such "are often interposed for tactical reasons." *Board of Education v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979).*

Attorney disqualifications generally occur only in cases where an attorney's conflict of interest

undermines the Court's confidence in counsel's representation of his client or where an attorney is in a position, potentially, to use privileged information gained from the other side, for example through prior representation. *Nyquist, at 1246.* When counsel's conduct "threatens to affect the integrity of the adversarial process, [the court] should take appropriate measures, including disqualification, to eliminate such taint." *MMR/Wallace Power & Industrial, Inc. v. Thames Associates, 764 F. Supp. 712, 718 (D.Conn. 1991)* (citing *Papanicolaou v. Chase Manhattan Bank, N.A., 720 F. Supp. 1080, 1083 (S.D.N.Y. 1989)).*

Tops argues that McGee & Gelman must be disqualified because it has violated **[\*24]** New York Disciplinary Rule 7-107 in that counsel has had *ex parte* communications with a party known to be represented by counsel. [21] Tops also argues that Canon 9 has been violated because McGee & Gelman's retention of Bridgepoint Partners creates the appearance of impropriety. Finally, Tops argues that the nature of the work performed by Bridgepoint demonstrates that Tops's confidential information has been disclosed to Colvin and that -- based on the rationale of *MMR/Wallace, supra,* -- even if Tops has not shown actual disclosure, disclosure should be presumed under the circumstances of this case.

The Court will not focus on whether or not there has been a violation of New York's ethical rules. That question can be addressed in a more appropriate **[\*25]** forum, if necessary. This Court's primary function is not to discipline attorneys but rather to maintain the integrity of the adversary process. The real issue for this Court is whether McGee & Gelman's conduct -- whether or not it comports with New York's ethical rules -- impermissibly taints these proceedings.

As noted, Tops relies heavily on the rationale of

---

[21] Tops argues that such contact also violates Rule 4.2 of the American Bar Association's ("ABA's") Model Rules of Professional Conduct. Neither New York State nor this Circuit has adopted the ABA's Model Rules as the standard of professional conduct.

2006 U.S. Dist. LEXIS 93689, *25

*MMR/Wallace* and argues that the Court should adopt the *MMR/Wallace* framework in determining this motion. The *MMR/ Wallace* court sought the answers to three questions, which, as tailored to the instant case are as follows: Did Casciano and/or Fulham have confidential or privileged information pertaining to Tops's trial preparation or strategy? Assuming that at least one of them had such information, did they disclose it to McGee & Gelman? If such information was disclosed, does it threaten to taint all further proceedings in the case?

Here, it is undisputed that Casciano was present at three meetings between Tops's executives and Tops's counsel. At those meetings, counsel discussed their mental impressions of the claims and possibly discussed Tops's strategy in defending this matter. Casciano and Fulham were both **[*26]** copied on numerous confidential and/or privileged e-mails concerning this dispute while at Tops. Casciano prepared a financial analysis of some or all of the issues involved in this litigation for Tops. Finally, Casciano had some conversations with Tops's litigation counsel and reviewed at least one document to be filed with the Court in this litigation. Accordingly, the Court finds that Casciano and Fulham possessed confidential or privileged information belonging to Tops.

The Court next considers whether Casciano or Fulham may have disclosed such information to McGee & Gelman. Tops first argues that its evidence shows that privileged information has in fact been disclosed to McGee & Gelman. In support of that argument, Tops asserts that a damages analysis performed by Bridgepoint for Colvin is similar to the one performed by Casciano for Tops. [22] Tops also points to the fact that Bridgepoint referred Colvin to experts in the area of "relevant geographic market" and that Bridgepoint identified Tops employees according to the category of damages in which their testimony would be helpful to Colvin. Tops also argues that,

even if its evidence does not demonstrate actual disclosure **[*27]** of Tops's information to Colvin, Bridgepoint should be presumed to have done so by the nature of its relationship -- *i.e.,* that of a paid consultant -- to Colvin.

Tops contends that, because an analysis of Colvin's claimed damages prepared by Bridgepoint includes an analysis of "billbacks" for the time period encompassed by Casciano's July 2003 analysis for Tops, Bridgepoint's analysis must contain privileged and/or confidential work product belonging to Tops and therefore Casciano must have disclosed Tops's work product to Colvin. The Court does not find such argument persuasive. Both Casciano and Fulham assert that they took no Tops documents with them upon their respective departures from Tops. Tops has no evidence contradicting such representations. Accordingly, there is no indication that Bridgepoint used any documents protected by the attorney-client privilege or the attorney work product doctrine in preparing any analysis **[*28]** for Colvin. Tops's argument is further contradicted by the fact that Bridgepoint's analyses for Colvin were clearly works in progress. Tops attached three analyses provided to Colvin -- one on June 24, 2004 and two on June 25, 2004. The total amount of damages is different in each such analysis, albeit by small sums. The indication, however, is that analysis was ongoing and not simply based on the analysis Casciano performed for Tops the prior year.

Tops further argues that actual disclosure of its privileged and/or confidential information is demonstrated by the fact that Bridgepoint referred Colvin to certain experts in the field of "relevant geographic market." [23] **[*30]** The concept of "relevant geographic market" is crucial to the success of Colvin's price discrimination claims under *15 U.S.C. § 13(a)*. That section states in pertinent part:

---

[22] The similarity Tops asserts is that both analyses concern the same time period.

[23] This argument was presented in a footnote in Tops's reply memorandum. Other than stating the assertion, Tops provided no explanation as to how such fact indicates that its confidential information was disclosed to Colvin.

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, * * * and where **[*29]** the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them * * *."

15 U.S.C. § 13(a). In order to demonstrate an injury to commerce caused by the alleged price discrimination, Colvin must show that it was in competition with the Favored Purchasers. See Best Brands Beverage v. Falstaff Brewing Corp., 842 F.2d 578 (2d Cir. 1987) (stating that in order to establish a competitive nexus between purchasers it must be shown that as of time of imposition of price differential purchasers competed at same functional level -- i.e., all wholesalers or all retailers -- and within the same geographic market). [24] Accordingly, the Court does not find that Bridgepoint's involvement in the referral of such experts demonstrates that Bridgepoint disclosed Tops's confidential information to Colvin.

Finally, Tops argues that, even if its evidence does not demonstrate actual disclosure of its privileged or confidential information, such disclosure should be presumed in light of the nature of Bridgepoint's relationship with Colvin. In support of its argument, Tops relies heavily on the case of MMR/Wallace, supra, in which defense counsel was disqualified after retaining plaintiff's former project manager -- who was extensively involved in

---

[24] In Texaco, Inc. v. Hasbrouck, 496 U.S. 543, 567, 110 S. Ct. 2535, 110 L. Ed. 2d 492 (1990), the Supreme Court rejected the contention that price discrimination between wholesalers and retailers is exempt from the Act.

plaintiff's preparation of the subject litigation -- as a trial consultant. The MMR/Wallace court concluded that a presumption arose that the employee had disclosed plaintiff's privileged information to defense counsel and -- assuming that such presumption was rebuttable -- the presumption had not been rebutted. [25] **[*32]** The court discounted both defense counsel's and the employee's affidavits denying disclosure of any privileged information **[*31]** because the attorney could have been motivated to preserve any unfair advantage he had obtained [26] and because the employee testified that he did not know what information was and was not protected by attorney-client privilege. [27] Tops argues that the Court should likewise disqualify McGee & Gelman because neither Casciano nor Fulham fully understands the parameters of the attorney-client privilege such that any warning not to disclose privileged information was ineffective, and both were involved in the preparation of Tops's defense.

The Court concludes that -- even if a presumption arises that Casciano and/or Fulham disclosed privileged or confidential information to McGee & Gelman -- such presumption has been sufficiently rebutted in this case. The Court has been presented

---

[25] In recognizing a presumption of disclosure, the MMR/Wallace court relied on cases including Hull v. Celanese Corp., 513 F.2d 568 (2d Cir. 1975), and Williams v. Trans World Airlines, Inc., 588 F. Supp. 1037 (W.D. Mo. 1984). In both Hull and Williams the court presumed that the defendant's former employee had disclosed privileged or confidential information to plaintiff's counsel. Importantly, however, both of those former employees approached each plaintiff's counsel for the purpose of retaining that counsel to represent them against their former employers. It is rational to presume that those former employees would have disclosed all of the relevant information in their possession -- regardless of its confidential nature -- when seeking representation for themselves.

[26] The evidence in MMR/Wallace supports the conclusion that defense counsel had obtained an unfair advantage and intended to use it in that the employee admitted to defense counsel that he retained computer discs belonging to plaintiff and defense counsel had instructed the employee to copy the computer discs and return the originals to plaintiff's counsel.

[27] Defense counsel and the employee affirmed that counsel had instructed the employee not to reveal any privileged information.

with affidavits from Casciano, Fulham and McGee denying any disclosure. Such affidavits have been held sufficient to rebut a presumption of disclosure. *See e.g., In re Methyl Tertiary Butyl Ether Products Liability Litigation, 438 F. Supp. 2d 305, 309 (S.D.N.Y. 2006); Team Obsolete Ltd. v. A.H.R.M.A. Ltd., 464 F. Supp. 2d 164, 2006 U.S. Dist. LEXIS 89230, 2006 WL 2013471, at *4 (E.D.N.Y. 2006)* .

[*33] Moreover, these affidavits -- unlike those in *MMR/Wallace* -- affirm that Casciano and Fulham made *no* disclosures of *any* communications they may have had with Tops's counsel. Thus Casciano's and Fulham's ability, or lack thereof, to distinguish privileged communications from non-privileged communications is irrelevant as they were instructed not to disclose any communications and they affirm that they complied with that instruction.

*MMR/Wallace* is further distinguishable on the facts. The MMR/Wallace employee had significantly more involvement with MMR/Wallace's litigation preparation than did Casciano or Fulham in this case. In fact, the MMR/Wallace employee's exclusive function for nearly a year prior to his termination had been to organize plaintiff's documents for litigation, review and digest materials provided by the defense and to assist plaintiff's counsel in responding to discovery demands, taking depositions and preparing pleadings. Even after he had been transferred to another work location, that employee continued to assist plaintiff's counsel and had been approached by plaintiff to consider a position as a trial consultant. Casciano's [*34] and Fulham's involvement in Tops's preparation was, in comparison, peripheral at best and had concluded even prior to Casciano's departure from Tops.

Finally, the Court concludes that -- even if the presumption has not been effectively rebutted -- McGee & Gelman's continued representation does not threaten to taint the integrity of these proceedings and disqualification is not required. The only threat of taint to which Tops points is a lingering "nagging suspicion" that Colvin has been

unfairly advantaged. Under the circumstances of this case, however, disqualification of counsel would not provide any remedy beyond that already provided by the disqualification of Bridgepoint.

In support of this Motion, Tops has attached exhibits consisting of extensive portions of the work product produced by Bridgepoint for Colvin. Contained in such exhibits are: the list of services to be performed by Bridgepoint, copies of PowerPoint presentations explaining the pricing processes employed by Tops, copies of damages analyses -- including those allegedly based on Tops's work product and/or privileged information -- performed by Bridgepoint for Colvin, correspondence regarding potential expert witnesses [*35] in the area of "relevant geographic market," correspondence from at least one such potential expert witness in which he outlines the type of analysis he would perform, and a document in which Bridgepoint identifies contents of boxes of discovery materials provided by Tops and outlines its strategy for culling through such documents. While such exhibits certainly do not represent all of the work performed by Bridgepoint for Colvin, they represent a significant amount of such work -- work which, according to Tops, is tainted.

Tops has placed those documents into the public domain. Even if the Court were to disqualify McGee & Gelman, any successor counsel would be entitled to access and use the information contained in that work. Thus, even if the Court were to conclude -- which it does not -- that McGee & Gelman should be disqualified from further representing Colvin because of the appearance of taint, any successor counsel would be entitled to utilize certain of these purportedly tainted documents. Accordingly, disqualification of counsel, in this case, would not serve to eliminate any potential taint.

## CONCLUSION

For the above stated reasons, it is accordingly **ORDERED** [*36] that Tops's Motion to Disqualify Bridgepoint Partners LLC is granted and Tops's

2006 U.S. Dist. LEXIS 93689, *36

Motion to Disqualify McGee & Gelman is denied.

DATED: Buffalo, N.Y.

December 27, 2006

*/s/ **John T. Elfvin***

S.U.S.D.J.

**End of Document**

ⓘ Cited
As of: December 30, 2016 12:02 PM EST

## *A&A Elec. Contractors v. C.H. Nickerson & Co.*

Superior Court of Connecticut, Judicial District of Hartford - New Britain, at Hartford

December 8, 1993, Decided ; December 9, 1993, Filed

NO. CV89 0369686S

**Reporter**
1993 Conn. Super. LEXIS 3279 *

A&A ELECTRICAL CONTRACTORS, INC. v. C.H. NICKERSON & CO. INC. ET AL

**Notice:** **[\*1]** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

## LexisNexis® Headnotes

Civil Procedure > ... > Discovery > Privileged Communications > General Overview

Evidence > Privileges > General Overview

Evidence > ... > Testimony > Expert Witnesses > General Overview

*HN1* The attorney-client privilege extends to all persons who act as the attorney's agents, including expert witnesses.

Evidence > ... > Testimony > Expert Witnesses > General Overview

*HN2* To determine whether an expert should be disqualified based on a previous relationship with the opposing party, the court should determine first whether it was objectively reasonable for the first party who claims to have retained the expert to conclude that a confidential relationship existed, and second, whether any confidential or privileged information was disclosed by the first party to the expert. If the answers to both inquiries are affirmative, then disqualification is compelled; if, on the other hand, the answer to either inquiry is negative, disqualification may not be warranted. The party seeking disqualification bears the burden of establishing both the existence of a privilege and its non-waiver.

Civil Procedure > ... > Discovery > Privileged Communications > General Overview

Legal Ethics > Client Relations > Duties to Client > Duty of Confidentiality

*HN3* The attorney-client privilege does not extend beyond communications. An attorney is not bound to remain silent as to all information regarding his client, but only as to that information born of confidential communication.

Civil Procedure > Attorneys > General Overview

Criminal Law & Procedure > Counsel > Right to Counsel > General Overview

*HN4* Disqualification of counsel is a remedy that serves to enforce the lawyer's duty of absolute fidelity and to guard against the danger of inadvertent use of confidential information. The court has broad discretionary power to determine whether an attorney should be disqualified for an alleged breach of confidentiality or conflict of interest. Where issues of disqualification arise, however, the court must be solicitous of a client's right freely to choose his counsel; mindful of the fact that a client whose attorney is disqualified may suffer the loss of time and money in finding new

counsel; and may lose the benefit of its longtime counsel's specialized knowledge of its operations. The party seeking disqualification has the burden of proving that such an action is justified.

**Judges:** Wagner

**Opinion by:** WAGNER

## Opinion

*MEMORANDUM OF DECISION ON MOTIONS TO PRECLUDE TESTIMONY AND TO DISQUALIFY ATTORNEY*

This case arises from a dispute concerning the construction of a wastewater treatment plant located in Bristol, Connecticut. The defendant in this action, C.H. Nickerson & Co., Inc. [Nickerson], served as the general contractor on the project, and the plaintiff, A&A Electrical Contractors, Inc. [A&A], was the electrical subcontractor.

During the course of construction, problems arose in connection with the electrical work. Nickerson retained Howard Wexler [Wexler] to serve as a consultant in connection with the various electrical problems. As a result of these electrical problems, Nickerson made claim against the City of Bristol for additional costs. Wexler, among other services, met with Nickerson's attorneys and assisted them in presenting their claim to Bristol. It appears from his deposition that Wexler was involved in setting up the claim file concerning the work now in dispute between Nickerson [*2] and A&A and attended meetings at which Nickerson's attorneys were present, including a formal pre-claims counseling session where Wexler signed in as a representative of Nickerson. In addition, Wexler acknowledges that he was present when strategy concerning Nickerson's claim against Bristol was discussed.

After the dispute concerning the electrical wiring of the project was settled between Nickerson and the City of Bristol, A&A, Nickerson's electrical subcontractor, filed this action against Nickerson. A&A disclosed Wexler, Nickerson's former expert

consultant, as its expert witness. At the time Wexler was hired by A&A, both A&A and its attorneys knew that Wexler had previously been retained by Nickerson to work on the same issues now in dispute in the *A&A Electrical Contractors, Inc. v. C.H. Nickerson & Co., Inc.* litigation. Nickerson now moves to disqualify the expert testimony of Wexler and to disqualify Rogin, Nanam, Caplan, Lassuan & Hirtle as counsel for the plaintiff in this case.

### I. *Motion to Disqualify Expert*

As a general rule, **HN1** the attorney client privilege extends to all persons who act as the attorney's agents. See *State v. Hanna, 150 Conn. 457, 465, 191 [*3] A.2d 124 (1963)*; 8, *Wigmore on Evidence* § 2301, at 583 (1961). The Connecticut Supreme Court has recognized that the attorney-client privilege extends to expert witnesses. See *State v. Toste, 178 Conn. 626, 628, 424 A.2d 293 (1979)* (where an expert "is retained by a criminal defendant . . . for the sole purpose of aiding the accused and his counsel in the preparation of his defense, the attorney-client privilege bars the state from calling the expert as a witness").

Although Connecticut case law has not explicitly addressed the issue, federal case law has developed a two-step analysis **HN2** to determine whether an expert should be disqualified based on a previous relationship with the opposing party. Under that analysis the court should determine:

> First, was it objectively reasonable for the first party who claims to have retained the [expert] to conclude that a confidential relationship existed? Second, was any confidential or privileged information disclosed by the first party to the [expert]?

*Mayer v. Dell, 139 F.R.D. 1, 3 (D.D.C. 1991)*; *Wang Laboratories, Inc. v. Toshiba Corp., 762 F. Supp. 1246, 1248 (ED. Va. 1991)*; *Paul v. Rawlings [*4] Goods Co., 123 F.R.D. 271, 278 (S.D. Ohio 1988)*; see also *Marvin Lumber & Cedar Co. v. Norton Co., 113 F.R.D. 588 (D.Minn.*

*1986)* (expert disqualified since expert had been engaged as consulting engineer for opposing party in the past and matters involved in pending suit were substantially related to prior relationship). "If the answers to both inquiries are affirmative, then disqualification is compelled; if, on the other hand, the answers to either inquiry is negative, disqualification may not be warranted." *Mayer v. Dell, supra.* Of course, the party seeking disqualification bears the burden of establishing both the existence of a privilege and its non-waiver. *Mayer v. Dell, supra*; *Wang Laboratories, Inc. v. Toshiba Corp., supra.*

In making the two-step inquiry, we find that it was objectively reasonable for Nickerson to conclude that a confidential relationship did exist between Nickerson and Wexler. Wexler met with Nickerson's attorneys on several occasions and assisted them in presenting the claim against the City of Bristol for additional expenses relative to the electrical work on the project. Wexler was involved in setting up the claim file against the **[*5]** City of Bristol, attended meetings with Nickerson's attorneys, and signed in as a representative of Nickerson at a formal pre-claims counseling session with the City of Bristol. In addition, although his actual participation is disputed, Wexler acknowledges that he was present when strategy concerning Nickerson's claims against the City of Bristol was discussed.

In considering the second component, we find that confidential and privileged information was disclosed in the presence of the expert Wexler. During Wexler's deposition, the following interchange took place:

Q. But during that meeting, it was strategy about how to present Nickerson's claims to the city of Bristol?

A. Yes, I believe it was; yes, sir.

Q. And you were in the room when that occurred?

A. Yes.

Courts in other states have precluded individuals in circumstances similar to those of Wexler from giving expert testimony. In *Conforti & Eisele, Inc. v. New Jersey, 170 N.J.Super. 64, 405 A.2d 487 (1979)*, a technical consultant was precluded from testifying, the court holding that the attorney-client privilege prohibited disclosure of confidences revealed during the time when the expert was **[*6]** retained by the defendant, and that the privilege also applied to confidences revealed with regard to other phases of litigation. In addition to the attorney-client privilege, the court felt compelled to restrain the expert's testimony on the ground that it would be fundamentally unfair to the defendant to permit such a situation to occur, stating "Just as a former employee should be prevented from disclosing that which took time and expertise to develop, so too should a litigant be prevented from reaping similar benefits within the context of a lawsuit."

*HN3* The attorney-client privilege, however, does not extend beyond communications. See *State v. Manning, 162 Conn. 112, 120, 291 A.2d 750 (1971)*; *Trumpold v. Besch, 19 Conn. App. 22, 28, 561 A.2d 438 (1989)*. "Thus, an attorney is not bound to remain silent as to all information regarding his client, but only as to that information born of confidential communication." *State v. Manning, supra, 121*; *Trumpold v. Besch, supra, 28*. In *Barksdale v. Harris,* supra, the appellate court held that "once a physician examines a plaintiff, the physician then possesses firsthand knowledge as to the extent and nature of the plaintiff's **[*7]** injuries, and can be called upon by either party to testify as to that knowledge. *Id., 761*. In *Wang Laboratories, Inc. v. CFR Associates, Inc., 125 F.R.D. 10, 13-14 (D.Mass. 1989)*, a federal district court held that even though a former employee could not serve as an expert witness as to information obtained while employed by the opposing party, the former employee could testify as a fact witness. Accordingly, although we disqualify Wexler from giving expert testimony, he

may appear as a factual witness able to testify as to his observations of the project in his capacity as a technical consultant.

II. *Motion to Disqualify Counsel*

*HN4* "Disqualification of counsel is a remedy that serves to enforce the lawyer's duty of absolute fidelity and to guard against the danger of inadvertent use of confidential information." *Bergeron v. Mackler, 225 Conn. 391, 397, 623 A.2d 489 (1993)*. This court has "broad discretionary power to determine whether an attorney should be disqualified for an alleged breach of confidentiality or conflict of interest." *State v. Jones, 180 Conn. 443, 448, 429 A.2d 936 (1980)*. Where issues of disqualification arise, however, the court must be "'solicitous [*8] of a client's right freely to choose his counsel'; mindful of the fact that a client whose attorney is disqualified may suffer the loss of time and money in finding new counsel and 'may lose the benefit of its longtime counsel's specialized knowledge of its operations.'" *Bergeron v. Mackler, supra, 397-98*. The party seeking disqualification has the burden of proving that such an action is justified. *Evans v. Artek Systems Corp., 715 F.2d 788, 792 (2d Cir. 1983)*.

Defendant argues the Rogin firm must be disqualified under the rule of *Goldenberg v. Corporate Air, Inc., 189 Conn. 504, 296, 457 A.2d 296 (1983)*, overruled on other grounds, *Burger & Burger, Inc. v. Murren, 202 Conn. 660, 522 A.2d 812 (1987)*. In Goldenberg the Supreme Court affirmed a trial court's decision to disqualify a law firm representing a defendant which had retained an accident investigation from employing a lawyer formerly employed by another defendant, stating a staff attorney employed by one of the defendants played a role in the preparation of that defendant's case. Prior to trial, the staff attorney left the defendant's firm and joined an accident investigation and insurance adjusting firm. [*9] Subsequently, an attorney for a co-defendant retained this accident investigation and insurance adjusting firm and consulted with his co-

defendants' former counsel in connection with the litigation. The trial court disqualified the law firm. In affirming the trial court's decision, our Supreme Court declared: "Where the opportunity for disclosure of confidential information to an adversary is shown, the breach of confidence would not have to be proved; it is presumed in order to preserve the spirit of the Code." *Id., 512*.

In *MMR/Wallace Power & Industrial, Inc. v. Thames Associates, 764 F. Supp. 712 (D. Conn. 1991)*, the court disqualified a law firm based on the firm's retention of a non-lawyer former employee of their adversary. The court, relying on *Goldenberg,* stated:

> There is nothing in the Goldenberg opinion to suggest that the court's finding of an irrebuttable presumption of shared confidences turned on Flaherty's having been an attorney, or that such a presumption would not also apply to an individual who had obtained confidential information as a result of having been employed in some other "substantial relationship."

*Id., 726 n. 24*.

We are unable [*10] to find the kind of factors in this case that warranted the court's presumptions of shared confidences resulting from a "substantial relationship" in *MMR/Wallace* and *Goldenberg.* Moreover, since we have barred the employment of Nickerson as an expert witness, we do not believe retention of the Rogin firm is likely to result in further danger of misuse of confidential information. Finally, we are unable to find sufficient indications of "pirating" by the Rogin firm or other breaches of the Code of Professional Ethics sufficient to justify its disqualification as an attorney for the plaintiff.

Motion to Preclude Wexler as Expert Witness granted.

Motion to disqualify Rogin firm denied.

No costs taxed to either party.

Wagner, J.

---

**End of Document**



Neutral

As of: December 30, 2016 12:02 PM EST

## *Huaman v. Town of E. Hartford*

United States District Court for the District of Connecticut

September 12, 2016, Decided; September 12, 2016, Filed

No. 3:13-cv-484 (MPS)

**Reporter**

2016 U.S. Dist. LEXIS 122783 *

HUAMAN, Plaintiff, v. TOWN OF EAST HARTFORD, ET AL., Defendants.

**Prior History:** *Huaman v. Sirois, 2015 U.S. Dist. LEXIS 51873 (D. Conn., Apr. 20, 2015)*

**Counsel:** **[*1]** For Karla Huaman, on behalf of J. M., Plaintiff: James S. Brewer, LEAD ATTORNEY, James S. Brewer, Attorney at Law, Hartford, CT.

For Mark Sirois, Chief of Police, In His Individual and Official Capacity, Woodrow Tinsley, III, Police Officer, In His Individual and Official Capacity, Steven Syme, Police Sergeant, In His Individual and Official Capacity, Kenneth Sulliva, Police Officer, In His Individual and Official Capacity, Town of East Hartford, Defendants: Dennis M Durao, James Newhall Tallberg, Scott M. Karsten, LEAD ATTORNEYS, Karsten & Tallberg LLC, Rocky Hill, CT.

For Scott M Sansom, Witness: Thomas R. Gerarde, Howd & Ludorf, Hartford, CT.

For State of CT Board of Mediation and Arbitration, Witness: Maria C. Rodriguez, State of Connecticut, Office of the Attorney General, Hartford, CT.

**Judges:** Michael P. Shea, United States District Judge.

**Opinion by:** Michael P. Shea

## Opinion

### Ruling on Motions in Limine

### I. Introduction

The Court assumes familiarity with the underlying facts of the dispute. The Joint Trial Memorandum included three motions in limine. (ECF No. 110.) Defendants seek to exclude (1) evidence of internal affairs and criminal investigations concerning Plaintiff's arrest and Officer Tinsley, (2) opinion **[*2]** testimony as to certain medical conditions, and (3) statements made in emergency room medical records. (*Id.*) The Court held a hearing on the motions on September 7, 2016.

### II. Evidence of Internal Affairs and Criminal Investigations

Defendants seek to exclude evidence regarding the internal affairs and criminal investigations into Plaintiff's arrest as well as evidence regarding prior, subsequent, and unrelated internal affairs investigations. Based on the representations of Plaintiff's counsel at the hearing that he will not seek to introduce such evidence in his case-in-chief, the motion is GRANTED. The Plaintiff shall not introduce any evidence, testimony, or argument regarding (1) the Internal Affairs and criminal investigations conducted by the East Hartford Police Department into Plaintiff's arrest of November 15, 2012, (2) prior, subsequent, and unrelated internal affairs investigations, or (3) the

initial imposition of discipline and the eventual settlement of Officer Tinsley's labor dispute arising from the incident. Should Plaintiff's counsel believe that Defendants have opened a door relating to any of these items, or otherwise that Defendants have waived the protection of [*3] this ruling, he shall raise any such assertions outside the presence or hearing of the jury.

## III. Opinion Testimony by Dr. Julie Goslee and Krista Kulpa, LPC

Defendants seek to exclude the testimony of Dr. Julie Goslee and Krista Kulpa, LPC, as it relates to an opinion with regard to the Plaintiff's mental health and the effects of the incident. Defendants argue that these witnesses were not properly disclosed as experts under _Fed R. Civ. P. 26_. Defendants argue that neither Dr. Goslee nor Kulpa were acting as treating physicians and that Plaintiff was required to provide disclosures under _Rule 26_. There are two problems with this argument. First, the rule does not depend on whether the doctor was a treating physician. Under _Fed. R. Civ. P. 26(a)(2)(B)_, only a witness "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony" must provide a written report. Regardless of whether Dr. Goslee and Kulpa are treating physicians, they were not retained to provide expert testimony in the case and neither is the employee of a party.

I do find, however, as Judge Melancon did in _Barack v. Am. Honda Motor Co._, that "a party seeking to use a treating [*4] physician must disclose more than just the identity of the treating physician." _293 F.R.D. 106, 108 (D. Conn. 2013)_. In particular, I find that parties seeking to elicit opinions based on scientific or other specialized knowledge, including from treating physicians, must at least comply with _Rule 26(a)(2)(C)_, which requires witnesses who do not provide a written report to be disclosed along with "**(i)** the subject matter on which the witness is expected to present evidence under _Federal Rule of Evidence 702_, _703_,

or _705_; and **(ii)** a summary of the facts and opinions to which the witness is expected to testify." In this case, Plaintiff provided Defendants with reports of both witnesses that satisfy these requirements. The reports outline the subject matter and the facts and opinions they would testify to. Thus, the witnesses were disclosed properly and will be allowed to testify to the opinions expressed in their reports. Therefore, the motion is DENIED.

## IV. Hearsay Statements in Medical Records

### A. The Emergency Room Records

Defendants also seek to exclude statements in the emergency room records that state that the Plaintiff was "physically assaulted" or "physically harmed."

In particular, they want the following "assessment paragraph" redacted from the emergency room records: [*5]

> ASSESSMENT: Pain level 3, using numeric pain scoring. Pt with complaints of pain in stomach and head after physical incident with an east hartford police officer. Per Mom "The police officer was supposed to escort him to court where he was suppose to have a psychological assessment ordered by court, and the officer threw him after taking him off the couch. First, he grabbed him and took him outside the apt and then took him back in the apartment. He put him on the ground onto his stomach, handcuffed him and then kept punching him in the stomach and the head, stepped on his back with his knee. I was asking the police office to stop and the DCF office got right next to the PO and told him to stop.

Defendants also seek to exclude the "Chief Complaint" paragraph:

> CHIEF COMPLAINT: 12yo male was to be escorted to court this morning. Per pt, mother, and father he was physically assaulted by the police officer. This consisted of restraining him punching him and throwing him to the ground.

Finally, the defendants want to exclude a line in the

report that says "Complaint: Physical Assault."

Under *Fed. R. Evid. 803(4)*, a statement made in a medical record is admissible when it "(A) is made for--and is reasonably pertinent [**6**] to--medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." The Advisory Notes elaborate:

> Statements as to fault would not ordinarily qualify under this latter language. Thus a patient's statement that he was struck by an automobile would qualify but not his statement that the car was driven through a red light. Under the exception the statement need not have been made to a physician. Statements to hospital attendants, ambulance drivers, or even members of the family might be included.

*Fed. R. Evid. 803* Advisory Comm. Notes. All of the statements made in the report are admissible under the rule. The reference to "physical assault" in the medical records is not a statement of fault, but rather a description of the cause of the Plaintiff's injuries, and the description of the incident also goes to cause. At least two trial courts in this Circuit have agreed with this analysis. *See Kokoska v. City of Hartford, 2014 U.S. Dist. LEXIS 133262, 2014 WL 4724879, at *2 (D. Conn. Sept. 23, 2014)* ("[R]eferences in the medical records to Plaintiff's having been 'assaulted' or 'beaten' fall within *Rule 803(4)*'s medical treatment or diagnosis exception to the hearsay rule. However, where the medical records indicate that Plaintiff was assaulted or beaten [**7**] by the police, those references must be excluded."); *Johnson v. Tuffey, No. 9:01-CV-1907, 2011 U.S. Dist. LEXIS 104550, 2011 WL 4345285, at *5 (N.D.N.Y. Sept. 15, 2011)* ("Statements referencing assault support an inference of cause more than fault and are consistent with the purposes of providing treatment and are properly admitted.").

The only sentence that will be redacted from the records under 803(4) is the last one of the "assessment paragraph," which states "I was asking

the police office to stop and the DCF office got right next to the PO and told him to stop." This sentence goes entirely to fault, and is not "reasonably pertinent" to medical diagnosis or treatment. While the references to the East Hartford Police Department, police officer, and police arguably do suggest fault, the Court will not exclude them. This language, while suggesting fault, also informed the physician about the injuries of the Plaintiff and helped in diagnosing and treating him. Furthermore, in this particular case, the redaction of the words East Hartford Police, police officer, or police would be ineffective because there is no dispute that the child was taken to the emergency room after an incident with an East Hartford Police Officer. The jurors will easily be able to deduce that the [**8**] redactions refer to "East Hartford Police Officer" or a similar description and thus the proposed redactions would only draw attention to this evidence.

Even though the statements in the medical record are admissible under *Fed. R. Evid. 803(4)*, I must still consider whether any of them should be excluded under *Fed. R. Evid. 403*. I find that the "Chief Complaint" paragraph and the line that states "Complaint: Physical Assault" are inadmissible under that rule, which provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Fed. R. Evid. 403*. Because the Court will allow the admission of the "assessment" paragraph, which discusses a "physical incident" and a reasonably detailed description of that incident, the probative value of the remaining language, including references to "physical assault," is minimal. The two words "physical assault" under "Chief Complaint" will not add to the jury's understanding of the events because they are cumulative of and less informative than the statements in the "assessment" paragraph. [**9**] Furthermore, give the legal connotations of the word "assault," allowing the

reference could easily mislead the jury by suggesting that the hospital employee who created the record was expressing a judgment of fault. Thus, the minimal probative value is "substantially outweighed" by the danger of unfair prejudice to the Defendants and the danger of misleading the jury.

Thus the motion is GRANTED in part. The "assessment" paragraph, with the exception of the last line, is admissible. The "Chief Complaint" paragraph and the other reference to "physical assault" shall be redacted from the emergency room records should the Plaintiff wish to introduce those records.

### B. Krista Kulpa's Reports

Defendants also seek to preclude the admission of Krista Kulpa's report into evidence. Based on the representations of Plaintiff's counsel at the hearing that he will not seek to introduce the report as a full exhibit, the motion is GRANTED.

### C. Dr. Goslee's Report

Defendants similarly seek to exclude any reference in Dr. Goslee's report to the incident on November 15, 2012, particularly the description on Page 2 of an "alleged violent interaction with police" and the list of "Trauma/Abuse" on Page 3 that **[*10]** states that Plaintiff was "allegedly assaulted by a police officer in November 2012." Because the report does not make clear who the declarant is — it is unclear whether Dr. Goslee heard this from the child or his mother, rendered her own interpretations of what she heard, or read this in other reports — the motion is GRANTED but without prejudice to the Plaintiff's right to establish a foundation for admissibility under *Rule 803(4)*.

### V. Conclusion

For the reasons discussed above and at the pretrial conference, the Court GRANTS the motion to exclude evidence of internal affairs and criminal investigations concerning Plaintiff's arrest and

Officer Tinsley, DENIES the motion to exclude opinion testimony the substance of which is disclosed in the reports from Kulpa and Goslee, and GRANTS in part the motion to exclude statements made in emergency room medical records. (ECF No. 110.)

IT IS SO ORDERED.

/s/ Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut

September 12, 2016

---

**End of Document**

 Neutral

As of: December 30, 2016 12:02 PM EST

## *BAE Sys. Info. & Elec. Sys. Integration v. Lockheed Martin Corp.*

Court of Chancery of Delaware, Kent

May 23, 2011, Submitted; August 10, 2011, Decided

C.A. No. 3099-VCN

**Reporter**

2011 Del. Ch. LEXIS 117 *

BAE Systems Information and Electronic Systems Integration Inc. v. Lockheed Martin Corporation

**Notice:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**Prior History:** *BAE Sys. Info. & Elec. Sys. Integration v. Lockheed Martin Corp., 2011 Del. Ch. LEXIS 93 (Del. Ch., June 30, 2011)*

## LexisNexis® Headnotes

Evidence > ... > Testimony > Lay Witnesses > General Overview

*HN1* The prohibition against paying fact witnesses for their testimony protects the integrity of the adversary process: compensating a fact witness for her testimony creates the perception that, but for the compensation, the witness might not offer testimony consistent with the proponent's interest. Del. Law. R. Prof. Conduct 3.4(b). Nonetheless, although fact witnesses may not be paid for their testimony, the rules of ethics do not, in all cases, prohibit individuals, who happen also to be fact witnesses, from receiving compensation from parties for services performed in other capacities.

Legal Ethics > Professional Conduct > General Overview

Legal Ethics > Professional Conduct > Tribunals

*HN2* Del. Law. R. Prof. Conduct 3.4(b) provides that lawyers may not falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law. Fair competition in the adversary system is secured by the prohibitions against destruction or concealment of evidence, improperly influencing witnesses, obstructive tactics in discovery procedure, and the like. It is not improper to pay a witness's expenses or to compensate an expert witness on terms permitted by law. The common law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying. The payment of a sum of money to a witness to "tell the truth" is as clearly subversive of the proper administration of justice as to pay him to testify to what is not true.

**Counsel:** [*1] Kevin R. Shannon, Esquire, Potter Anderson & Corroon LLC, Wilmington, DE.

Samuel A. Nolen, Esquire, Richards, Layton & Finger, P.A., Wilmington, DE.

**Judges:** John W. Noble.

**Opinion by:** John W. Noble

## Opinion

Plaintiff BAE Systems Information and Electronic Systems Integration Inc. ("BAE") has filed a motion seeking approval of its appointment of James Gallagher ("Gallagher") as its "Designated

Consultant" pursuant to the Stipulation and Order for the Production and Exchange of Proprietary Information (the "Order") entered by the Court on February 22, 2010. [1] Defendant Lockheed Martin Corporation ("Lockheed") objects to Gallagher's designation, and the Court now addresses its objections.

## I. BACKGROUND

### A. *"Designated Consultants" under the Order*

Because the documents at issue in this case are, in many instances, of a technical and sensitive nature, the Order provides that each party may designate one "employee or agent" who is familiar with the technology involved to "assist [it] in the conduct of this Litigation (the 'Designated Consultants')." [2] A party seeking to designate such a consultant must provide the other party with the proposed Designated Consultant's identity and curriculum vitae before [*2] any Competition Sensitive information is disclosed to the proposed Designated Consultant. [3] A party may withhold its consent to the other party's choice of a Designated Consultant "on the ground" that the proposed Designated Consultant is:

> involved in any capacity (other than advising with regard to this litigation) including but not limited to competitive decisionmaking, relating to the Automated Test Systems . . . opportunities covered or purported by either party to be covered by Memorandum of

Agreement dated November 27, 2000 [the "New MOA"], with any Party or any other firm that could gain a competitive advantage from access to the Competition Sensitive Discovery Material, unless the proposed Designated Consultant agrees to cease any such involvement prior to receiving Competition Sensitive Discovery Material. [4]

Once approved as a Designated Consultant by the other party (or, in the case that party maintains an objection to the selection, by court order), the Designated Consultant must, before being permitted to review Competition Sensitive information, commit to complying with the terms of the Order for two years after the conclusion of this action and agree to notify the other [*3] party of any change in the Designated Consultant's employment if the change is related to Automated Test Systems ("ATS") work. [5]

### B. *Gallagher*

BAE notified Lockheed that that it had selected Gallagher as its Designated Consultant by letter dated May 10, 2010; included with the letter were Gallagher's curriculum vitae and an Agreement to be Bound by Protective Order signed by Gallagher. [6]

Gallagher was employed by, and performed ATS work on behalf of, Sanders Associates (from 1983 to 1986, when Sanders was purchased by Lockheed), Lockheed (from 1986 to 2000) and BAE (from 2000 to 2008). [7] BAE asserts that Gallagher, through his employment, became knowledgeable of the facts underlying its claims in this litigation; Lockheed describes Gallagher as a

---

[1] *See* Order at ¶ 12(f).

[2] *Id.* at 12(f). The Order provides that "Competition Sensitive" discovery materials may not be disclosed except to the parties' legal counsel; the Court and its employees; the authors, addressees, or copy recipients shown on particular Competition Sensitive documents; expert witnesses; and Designated Consultants. *Id.* at ¶¶ 12-13. These Paragraphs do not refer to fact witnesses, except that, in authorizing the authors, recipients, and copy recipients of Competition Sensitive documents, ¶ 12(c) requires that "such witness or deponent shall pledge to abide by the terms and conditions of [the Order]" by signing a confidentiality agreement.

[3] *Id.*

[4] *Id.* at ¶ 12(f)(i).

[5] *Id.* at ¶ 12(f)(ii). The party receiving such notification may then object to the Designated Consultant's new job responsibilities.

[6] Pl.'s Mot. to Approve [*4] Designated Consultant ("Mot."), Ex. B.

[7] *Id.* at 2 (Gallagher CV).

key fact witness. [8] After he retired, Gallagher became an employee of Hepco, Inc. and, in addition to consulting on other matters, provides consulting services to BAE and its counsel in connection with this litigation; he is paid $73.75 per hour, a rate that is significantly lower than the effective hourly rate he was paid during his employment at BAE. [9] Gallagher indicated that serving as BAE's Designated Consultant would require a substantial time commitment and would prevent him from taking on other consulting projects, whether for BAE or others; it would additionally prevent him from accepting ATS-related consulting work for two years following the completion of this litigation. [10]

## II. DISCUSSION

Lockheed objects to the choice of Gallagher as BAE's Designated Consultant on two grounds. It contends that, because Gallagher will be a fact witness in this action: (i) allowing him to serve as a Designated Consultant would violate the Order by exposing him to information that would unfairly inform his testimony and (ii) paying him to serve as a Designated Consultant would violate the Delaware Lawyers' Rules of Professional Ethics' prohibition on paying fact witnesses in order to influence their testimony.

### A. *The Order*

As to Lockheed's first argument, the Order generally limits access to Competition Sensitive materials, but specifically provides that Designated Consultants may have [*6] access to such materials. The Order does not provide that Lockheed may object to Gallagher's designation on the basis that he is a fact witness, and neither does it provide that Lockheed may object on the basis that Gallagher is not the only person with the knowledge needed to assist BAE in connection with this litigation. Instead, the Order, which was negotiated and stipulated by the parties, provides that a party may object to another party's proposed Designated Consultant only on the basis that the proposed Designated Consultant is involved with a firm that would gain an advantage from exposure to Competition Sensitive information.

Gallagher currently has no such involvement, except in connection with advising BAE on this litigation (an exception expressly allowed under Paragraph 12(f)(i)). [11] Further, he has agreed to be bound by the terms of the Order for two years following completion of this litigation. The Court understands Lockheed's concern that, if Gallagher serves as BAE's Designated Consultant, his recollection of the facts underlying BAE's claims may be affected. Although Lockheed may impeach Gallagher's credibility as a fact witness on that basis, Lockheed has no grounds, [*7] under the Order, to object to Gallagher's selection as BAE's Designated Consultant.

---

[8] *Id.* ¶ 5; Def.'s Opp. to Pl.'s Mot. to Approve Designated Consultant ("AB") at [*5] 7; *Id.* Ex. 1, BAE Responses to Def.'s First Set of Interrogatories (listing Gallagher as a person with knowledge of the "[n]egotiation and performance of Original MOA and New MOA; [Lockheed]'s breach of the New MOA. Involved in presentations to BAE Systems regarding the extent and nature of work covered by the Original MOA.").

[9] Mot. ¶ 3; Pl.'s Reply in Further Supp. of its Mot. to Approve Designated Consultant, Ex. A, Aff. of James Gallagher ("Gallagher Aff.") ¶¶ 6-8.

[10] Gallagher Aff. ¶¶ 10-11.

---

[11] Lockheed has not argued that Gallagher's potential role as a fact witness in this litigation falls within the definition of "involvement in any capacity" with BAE of the type that would provide a basis for Lockheed to object to his designation. *See* Order ¶ 12(f)(i) ("The Producing Party may withhold consent on the ground that a Designated Consultant is involved in any capacity, . . . , including but not limited to competitive decisionmaking, related to [ATS] opportunities . . . with any Party . . . .").

Although one heading in Lockheed's brief reads "Mr. Gallagher's Role as a Witness Precludes Him From serving as a Designated Consultant," the paragraphs under that heading do not argue that Gallagher's role as a witness amounts to "involvement" with BAE, but instead that the Order excludes witnesses and deponents from the category of persons who can review Competition Sensitive information, and that allowing Gallagher to serve as a Designated Consultant would "allow a provision intended to assist the education of counsel to be used as a means to educate a key fact witness[]." *See* AB ¶¶ 5-10.

## B. *The  [*8] Ethics*

Lockheed's second objection is to BAE's compensation of Gallagher in his role as a Designated Consultant; Lockheed contends that such compensation is tantamount to paying Gallagher for his testimony as a fact witness. BAE argues that Gallagher is not being paid for the time he actually spends testifying, and that, even if he were being compensated for the time he would lose while testifying or preparing to testify, Rule 3.4(b) of the Delaware Lawyers' Rules of Professional Conduct does not prohibit reimbursement of expenses reasonably incurred by a witness and for the loss of time incurred in connection with preparing for testimony, attending proceedings, or testifying.

**HN1** The prohibition against paying fact witnesses for their testimony protects the integrity of the adversary process: compensating a fact witness for her testimony creates the perception that, but for the compensation, the witness might not offer testimony consistent with the proponent's interest. [12] Nonetheless, although fact witnesses may not be paid for their testimony, the rules of ethics do not, in all cases, prohibit individuals, who happen also to be fact witnesses, from receiving compensation

from parties  [*9] for services performed in other capacities. For example, as counsel for Lockheed observed:

> [C]ertainly employees of corporations can testify on behalf of corporations. Nobody doubts that, and they're going to be paid. And their credibility is going to be questioned, because they're giving testimony that presumably is consistent with their employer's interest. The ethical rules don't prohibit that. [13]

Here, the Court is satisfied that the compensation BAE proposes to pay to Gallagher relates to his work as a Designated Consultant, and not to his willingness to testify as to the facts underlying BAE's claims. Gallagher has been paid at a fixed hourly rate for consulting for BAE, and others, since 2008. [14] Lockheed concedes that, had Gallagher been BAE's employee during that time, continuing to pay him as an employee now would not present a problem under the ethics rules. Paying Gallagher what is, in effect, his standard consulting fee does not seem functionally different.  [*11] So long as he is paid for his time in connection with his work as a Designated Consultant, and not for his time as a fact witness, [15] Gallagher is not precluded by the rules of ethics from attempting to wear two hats. [16] Again, Lockheed, if it believes

---

[12] *See HN2* Del. Lawyers' Rules of Prof'l Conduct R. 3.4(b) (providing that lawyers may not "falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law."); *id.* at R. 3.4, cmt. 1 ("Fair competition in the adversary system is secured by the prohibitions against destruction or concealment of evidence, improperly influencing witnesses, obstructive tactics in discovery procedure, and the like"); *id.* at cmt. 3 ("[I]t is not improper to pay a witness's expenses or to compensate an expert witness on terms permitted by law. The common law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying . . . ."); *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n, 865 F. Supp. 1516, 1525-26 (S.D. Fla. 1994),*  [*10] *aff'd in part, 117 F.3d 1328 (11th Cir. 1997)* ("'The payment of a sum of money to a witness to "tell the truth" is as clearly subversive of the proper administration of justice as to pay him to testify to what is not true.'") (applying *Florida Rules of Prof'l Conduct R. 4-3.4(b)*, which, like Del. Lawyers' Rules of Prof'l Conduct R. 3.4(b), tracks the Model Rules of Prof'l Conduct R. 3.4(b)) (quoting *In re Robinson, 151 A.D. 589, 600, 136 N.Y.S. 548 ( N.Y. App. Div. 1912)*, *aff'd, 209 N.Y. 354, 103 N.E. 160 (N.Y. 1913)*.

[13] May 23, 2011 Hr'g on Pl.'s Mot. to Approve Designated Consultant, Cross Motions to Compel, Def.'s Mot. to Bifurcate, Tr. at 96.

[14] Gallagher Aff. ¶ 10.

[15] *See id.* at ¶ 12 ("I understand that any compensation I receive in connection with this case is for the time I spend acting as a litigation consultant, and that I will not be compensated for the time I spend testifying at a deposition or at trial in this case.").

[16] *See, e.g., Barrett Indus. Trucks, Inc. v. Old Republic Ins. Co., 129 F.R.D. 515 (N.D. Ill. 1990)*; *In re Gulf Oil/Cities Serv. Tender Offer Litig., 1990 U.S. Dist. LEXIS 9082, 1990 WL 108352 (S.D.N.Y. 1990)* (each allowing a party to hire, as a litigation consultant, a former employee who was also a fact witness); *but see State of N.Y. v. Solvent Chem. Co., Inc., 166 F.R.D. 284, 290-91 (W.D.N.Y. 1996)* (holding that the work of a fact witness as a litigation consultant was not  [*12] protected under the work product doctrine where (1) the witness had previously been viewed as a hostile witness by the hiring party, and (2) the hiring party attempted to use the employment

that Gallagher's fact testimony has been affected by his exposure to Competition Sensitive material while acting as BAE's Designated Consultant, is free to attempt to impeach his credibility on that basis. [17]

---

agreement with the witness to avoid production of otherwise discoverable material). Indeed, *Solvent Chemical Company* demonstrates that the question as to whether one person may function both as a fact witness and as a litigation consultant may be answered differently in view of the particular circumstances of the case.

[17] The parties both contend that an opinion of the Delaware State Bar Association's Committee on Professional Ethics (Del. Ethics Op. 2003-3 ("Op. 2003-3")) supports their respective positions on Gallagher's compensation. With regard to that matter, the Committee on Professional Ethics considered whether a client should have been allowed to compensate two fact witnesses ("Witnesses A and B"), both retirees, for their expenses and lost time. The Committee considered that Witness A was presently unemployed, but that Witness B had started an independent consulting business. *Id.* at 1. The client proposed to compensate Witness A for his lost time at the same rate as he had been paid as the [*13] client's employee immediately before his retirement more than three years before; Witness B would be compensated for his lost time at the same rate as he then received when consulting for others. *Id.* at 2. The Committee concluded that:

> (1) Witness B may be reimbursed for his out of pocket expenses, and for the reasonable value of his lost time; and (2) Witness A may be reimbursed for his out of pocket expenses. However, insufficient facts have been presented to the Committee to conclude that Witness A may be compensated for the loss of his time or to determine what rate of compensation would be appropriate under the circumstances.

*Id.* The distinction drawn by the Committee between the two witnesses was that, in the case of Witness B, participation as a fact witness would "result in a substantial lost economic opportunity, and, moreover, that loss can be reasonably measured," (*Id.* at 9) while, in the case of Witness A, the Committee had "no facts to suggest that Witness A will lose an economic opportunity in spending time preparing for his testimony and testifying at the Delaware Trial." *Id.* at 10.

Because BAE proposes to compensate Gallagher as a Designated Consultant and not in his capacity [*14] as a fact witness, Op. 2003-3 is not precisely on point here. If the Court were to consider a portion of Gallagher's time as preparation for giving fact testimony, then the reasoning expressed in Op. 2003-3 would tend to support BAE's position, because Gallagher's situation is more closely analogous to Witness B's situation than it is to Witness A's. Gallagher appears to have worked as a consultant for the past three years (for which he is paid by Hepco at a fixed hourly rate), and he has agreed to act as BAE's Designated Consultant in lieu of seeking other consulting work with BAE or other clients. Thus, like Witness

## III. CONCLUSION

Because the terms of the Order do not prevent the selection of a likely fact witness as a Designated Consultant—and the Order does not otherwise prevent Gallagher's designation—and because compensating Gallagher as a Designated Consultant (and not as a fact witness) would not [*15] violate the Delaware Lawyers' Rules of Professional Conduct, BAE's Motion to Approve Designated Consultant is granted.

## IT IS SO ORDERED.

*/s/ John W. Noble*

---

---

B, Gallagher, unless compensated, will suffer a substantial, and measurable, financial loss if he has to testify for the party proposing to compensate him. Compensating Gallagher for his lost time under such circumstances would be consistent with the reasoning expressed in Op. 2003-3.

 Caution
As of: December 30, 2016 12:02 PM EST

# *Chi. Ins. Co. v. Capwill*

United States District Court for the Northern District of Ohio, Western Division

December 13, 2011, Filed

Case No. 1:01cv2588

**Reporter**
2011 U.S. Dist. LEXIS 143333 *

Chicago Ins. Co., Plaintiff v. James A. Capwill, et al., Defendants

**Subsequent History:** Summary judgment granted by *Chi. Ins. Co. v. Capwill, 2011 U.S. Dist. LEXIS 147086 (N.D. Ohio, Dec. 21, 2011)*

**Prior History:** *Chi. Ins. Co. v. Capwill, 2010 U.S. Dist. LEXIS 68228 (N.D. Ohio, July 8, 2010)*

**Counsel:** [*1] For Chicago Insurance Company, Plaintiff: Jeffrey A. Goldwater, LEAD ATTORNEY, Bollinger, Ruberry & Garvey, Chicago, IL; Robert A. Chaney, LEAD ATTORNEY, Beth Ann Berger, Michael L. Shacter, Lewis Brisbois Bisgaard & Smith - Chicago, Chicago, IL; Bethany K. Culp, Hinshaw & Culbertson - Minneapolis, Minneapolis, MN; George J. Manos, Lewis Brisbois Bisgaard & Smith, Chicago, IL; James B. Tobin, PRO HAC VICE, Lewis Brisbois Bisgaard & Smith, Chicago, IL; Terri M. Tegtman, PRO HAC VICE, Bollinger, Ruberry & Garvey, Chicago, IL; Thomas F. Naughton, Todd M. Raskin, Mazanec, Raskin, Ryder & Keller - Cleveland, Cleveland, OH.

For James A. Capwill, Defendant: Robert F. DiCello, LEAD ATTORNEY, Mentor, OH; William T. Wuliger, Wuliger, Fadel & Beyer, Cleveland, OH.

For CWN Group, Inc., Viatical Escrow Services, LLC, Capwill & Company, Defendants: William T. Wuliger, LEAD ATTORNEY, Amy A. Wuliger, Wuliger, Fadel & Beyer, Cleveland, OH.

For William T Wuliger, Defendant, Counter-Claimant: William T. Wuliger, Amy A. Wuliger, Wuliger, Fadel & Beyer, Cleveland, OH.

For Anne DiLeo, Intervenor, Counter-Claimant: William T. Wuliger, LEAD ATTORNEY, Wuliger, Fadel & Beyer, Cleveland, OH.

For Alpha Capital Group, [*2] LLC, Movant, Counter-Claimant: William T. Wuliger, LEAD ATTORNEY, Wuliger, Fadel & Beyer, Cleveland, OH; Reginald S. Jackson, Jr., Timothy P. Nackowicz, Connelly, Jackson & Collier, Toledo, OH.

For William T Wuliger, CWN Group, Inc., Viatical Escrow Services, LLC, Counters-Claimants: Amy A. Wuliger, Wuliger, Fadel & Beyer, Cleveland, OH.

For Capwill & Company, Counter-Claimant: William T. Wuliger, LEAD ATTORNEY, Amy A. Wuliger, Wuliger, Fadel & Beyer, Cleveland, OH.

For Victor Javitch, Counter-Claimant: Amy A. Wuliger, William T. Wuliger, Fadel & Beyer, Cleveland, OH.

For Chicago Insurance Company, Interstate Insurance Group, Counter-Defendant: Beth Ann Berger, Lewis Brisbois Bisgaard & Smith - Chicago, Chicago, IL; Robert A. Chaney, LEAD ATTORNEY, Beth Ann Berger, Michael L. Shacter, Lewis Brisbois Bisgaard & Smith -

Chicago, Chicago, IL; Bethany K. Culp, Hinshaw & Culbertson - Minneapolis, Minneapolis, MN; George J. Manos, Lewis Brisbois Bisgaard & Smith, Chicago, IL; James B. Tobin, Lewis Brisbois Bisgaard & Smith, Chicago, IL; Jeffrey A. Goldwater, Bollinger, Ruberry & Garvey, Chicago, IL; Terri M. Tegtman, Bollinger, Ruberry & Garvey, Chicago, IL; Thomas F. Naughton, Todd M. Raskin, [*3] Mazanec, Raskin, Ryder & Keller - Cleveland, Cleveland, OH.

For Alpha Capital Group, LLC, Counter-Claimant: Reginald S. Jackson, Jr., Timothy P. Nackowicz, Connelly, Jackson & Collier, Toledo, OH.

For Chicago Insurance Company, Interstate Insurance Group, Counter-Defendant: Bethany K. Culp, Hinshaw & Culbertson - Minneapolis, Minneapolis, MN; George J. Manos, Lewis Brisbois Bisgaard & Smith, Chicago, IL; James B. Tobin, Lewis Brisbois Bisgaard & Smith, Chicago, IL; Jeffrey A. Goldwater, Bollinger, Ruberry & Garvey, Chicago, IL; Robert A. Chaney, Michael L. Shacter, Lewis Brisbois Bisgaard & Smith - Chicago, Chicago, IL; Terri M. Tegtman, Bollinger, Ruberry & Garvey, Chicago, IL; Thomas F. Naughton, Todd M. Raskin, Mazanec, Raskin, Ryder & Keller - Cleveland, Cleveland, OH.

For Alpha Capital Group, LLC, Counter-Claimant: William T. Wuliger, LEAD ATTORNEY, Wuliger, Fadel & Beyer, Cleveland, OH; Timothy P. Nackowicz, Connelly, Jackson & Collier, Toledo, OH.

For Viatical Escrow Services, LLC, Counter-Claimant: William T. Wuliger, LEAD ATTORNEY, Wuliger, Fadel & Beyer, Cleveland, OH.

**Judges:** James G. Carr, Senior United States District Judge.

**Opinion by:** James G. Carr

# Opinion

**ORDER**

This is a motion to disqualify the law firm [*4] of Lewis, Brisbois, Bisgaard & Smith, LLP ("Lewis"), as counsel for plaintiff. Movant, counsel for the defendants (acting as reciever), alleges that the firm improperly paid a witness and attempted to influence his testimony in violation of *18 U.S.C. §§ 201(b)(3)*, *(c)(2)*, *O.R.C. § 2921.02(E)*, and *Rule 3.4 of the Ohio Rules of Professional Conduct*.

I deny the motion, seeing no indication of unethical conduct, let alone the criminal conduct that the state and federal laws prohibit.

Defendants' counsel sought to depose Gregory Schrom, plaintiff's former employee, for testimony relating to his time as an underwriter working for plaintiff. Schrom was not employed as an underwriter when plaintiff issued the policy in question; he was only an underwriter when the plaintiff did not renew the policy. Defendants' counsel requested plaintiff's counsel to arrange for Schrom's voluntary appearance without need for a subpoena.

Plaintiff's counsel did not object to this request, and went about securing Schrom's presence. Schrom ask to be paid at the rate of $175/hour for his time spent preparing for the deposition and being deposed. He based his request on the hourly equivalent of his income as a senior [*5] vice president of a different insurance company.

Plaintiff (rather than plaintiff's counsel) agreed; it ultimately paid Schrom $2,187.50 for eight and a half hours of preparation, review and transportation, and four hours of deposition testimony. Plaintiff's counsel also represented Schrom at the deposition.

The purpose of the ethical rules and criminal statutes with whose violation the defendants charge plaintiff's counsel is to prevent attorneys from soliciting and purchasing testimony, whether that testimony be truthful or false. *Holmes v. U.S. Bank, 2009 U.S. Dist. LEXIS 49766, 2009 WL 1542786,*

*at *6 (S.D.Ohio)* (holding the proposed payment of an undetermined amount of money in exchange for truthful testimony can be sanctionable). Defendants ask me to interpret *28 U.S.C. § 1821*, which sets $40 per day plus travel costs as a statutory witness fee, as an ironclad restriction on all other witness payments. This would turn any additional payment into a *de facto* attempt to solicit witness testimony.

Defendants' requested interpretation is incorrect, and against both the doctrine of our Circuit and established ethical boundaries of witness compensation. Payments to former employees for their time preparing for depositions **[*6]** are unquestionably proper so long as the payment is not pretext for an inducement to testify. *See Michigan First Credit Union v. Al Long Ford, Inc., 2010 Mich. App. LEXIS 2394, 2010 WL 5129890 (Mich. App.)* (holding such payments proper for preparatory work relating to lay witness testimony). That pretext would be apparent where, for instance, a complaint from the opposing party led to a reduction in payment without explanation or a change in the witness's duties relative to the party providing payment. *See Nissan N. Am., Inc. v. Johnson Elec. N. Am., 2011 U.S. Dist. LEXIS 51115, 2011 WL 1812505 (E.D.Mich.)* (disqualifying counsel for paying a witness $350 per hour, subsequently reduced to $175 per hour after opposing counsel complained, with no explanation for the reduction in pay).

It was unquestionably proper for plaintiff's counsel to provide payment equivalent to Schrom's salary for his time spent preparing for his deposition, reviewing his testimony and traveling to and from deposition-related appointments. The payment for Schrom's time being deposed is also proper. Compensating a witness's time for preparatory work but then failing to compensate that witness for their time spent in deposition would have the perverse effect of making **[*7]** an above-the-board arrangement seem like the one in *Nissan*: a pretextual arrangement terminated fearing discovery of that pretext — whether actual or potential — by opposing counsel.

The hourly salary for the senior vice president of an insurance company with years of experience could reasonably be set at $364,000 per year ($175 per hour annualized, presuming a forty-hour work week and fifty-two weeks of work per year). There is no indication that the $2,187.50 Lewis compensated Schrom for his time is an amount of money that would be "life-changing", *Holmes, supra, at *5*, or that the fee was paid to accomplish any goal other than covering the reasonable expense of Schrom's lost time.

Plaintiff's counsel representing Schrom at his deposition was also proper. It is not uncommon that a party will provide counsel to deposed employees, whether present or former. There is no indication that plaintiff provided counsel to Schrom as an inducement to testify. *See, e.g., Biocore Med. Techs., Inc. v. Khosrowshahi, 181 F.R.D. 660 (D. Kan. 1998)*. The actions that defendants allege were a "hijacking" of its witness and an effort to obstruct their access to evidence were, in fact, the normal actions **[*8]** of counsel ethically representing a client during a legal proceeding.

Plaintiff's counsel acted ethically in its dealings with Schrom, and acted properly in compensating him for his time spent preparing for deposition and being deposed.

It is, therefore, ordered that defendants' motion for disqualification (Doc. 359) be, and the same hereby is denied.

So ordered.

/s/ James G. Carr

Sr. United States District Judge



Neutral

As of: December 30, 2016 12:02 PM EST

## *SRI Int'l, Inc. v. Cisco Sys.*

United States District Court for the District of Delaware

April 11, 2016, Decided; April 11, 2016, Filed

Civ. No. 13-1534-SLR/SRF

**Reporter**

2016 U.S. Dist. LEXIS 48090 *; 2016 WL 1444593

SRI INTERNATIONAL, INC., Plaintiff, v. CISCO SYSTEMS, INC., Defendant.

**Prior History:** *SRI Int'l, Inc. v. Dell Inc., 2015 U.S. Dist. LEXIS 63022 (D. Del., May 14, 2015)*

**Counsel:** **[*1]** For SRI International Inc., a California Corporation, Plaintiff: Thomas Lee Halkowski, LEAD ATTORNEY, Susan Morrison Coletti, Fish & Richardson, P.C., Wilmington, DE; David M. Hoffman, David B. Kuznick, Howard G. Pollack, Phillip W. Goter, PRO HAC VICE.

For Cisco Systems Inc., a California Corporation, Defendant: Jack B. Blumenfeld, LEAD ATTORNEY, Michael J. Flynn, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE.

For Cisco Systems Inc., a California Corporation, Counter Claimant: Jack B. Blumenfeld, LEAD ATTORNEY, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE.

SRI International Inc., a California Corporation, Counter Defendant: Thomas Lee Halkowski, LEAD ATTORNEY, Fish & Richardson, P.C., Wilmington, DE; David M. Hoffman, Howard G. Pollack, Phillip W. Goter.

**Judges:** Sue L. Robinson, United States District Judge.

**Opinion by:** Sue L. Robinson

## Opinion

## MEMORANDUM ORDER

At Wilmington this 11th day of April, 2016, having reviewed defendant's motion for sanctions and plaintiff's response thereto;

IT IS ORDERED that said motion (D.I. 280) is denied, for the reasons that follow:

1. **Background**.[1] I understand that the fact of compensation is not in dispute, rather, how to characterize such compensation is at the crux of **[*2]** the motion. In order to resolve that issue, some background information is required. SRI is a non-profit research institute spun off from Stanford University. As such, it has no stockholders and no stock options to help recruit employees in Silicon Valley. In lieu of stock, SRI has established a royalty and equity sharing program for inventors and other employees. In addition, since SRI's research is federally funded, it is required by the Bayh-Dole Act to share royalties with inventors. *See 35 U.S.C. § 202(c)(7)(B)*. The current version of SRI's royalty-sharing program has been in effect since 2008, and includes all revenue SRI generates from commercialization of all of its technology, whether by licensing, settlement, or litigation.

2. The specifics of SRI's program are contained in the documents included at D.I. 282, exhibit 5, and can be summarized as follows: (a) SRI's royalty

---

[1] Taken from the parties' briefs and declarations. (D.I. 281, 282, 289, and 290)

sharing program distributes funds only if they exceed the expenses associated with commercialization; (b) the program compensates more than just inventors and direct contributors - every employee gets a share; (c) a fixed percentage of the proceeds over [*3] expenses goes back to SRI to fund internally sponsored research; (d) the program distributes funds from "commercialization" in whatever form without even mentioning testimony; (e) there is a three-year vesting schedule for participants such as inventors and direct contributors to receive any amounts allocated; and (f) SRI's Compensation Committee is tasked with ensuring that the amounts allocated to individuals, when added to their regular compensation, constitute reasonable compensation for services rendered.[2]

3. Cisco contends in its motion that SRI "paid its key fact witnesses for their testimony in prior litigation involving the patents-in-suit," and has "promised witnesses who are schedule to testify against Cisco at the upcoming trial substantial additional sums contingent on the outcome of this case." (D.I. 281 at 1) More specifically, there is internal documentation that demonstrates distributions to certain individuals for [*4] their "litigation efforts," e.g.:

> Over the last months we have received more information about the reasons why the court decided in favor of SRI. Our distribution request in December did not adequately reflect these reasons and we ask to make a few revisions to better reflect the contributions of key individuals. . . .
>
> • Al Valdez, who left SRI and is forfeiting his share, received 18.8%. However, his patents were invalidated, reducing the significance of his role. We would reduce

his share to 12%.

> • Pat Lincoln, Director, Computer Science Lab, was key to our success at trial, both in front of the judge and jury as well as holding together his team throughout the trial process. We would like to increase his share from 20% to 25%.

(D.I. 282, ex. 8) Another internal document illustrates the roles played by each recipient and the allocations associated with such, e.g., Mr. Porras (one of the named inventors) is listed as contributing both pre-litigation and during litigation (discovery and trial), while Dr. Lincoln is listed as contributing to SRI's litigation efforts (discovery, trial, and damages) and in terms of "team management." (*Id.*, ex. 13) In total, SRI has paid millions of dollars [*5] to witnesses for their "litigation efforts." (*Id.*, ex. 16)

4. SRI maintains that the payments highlighted by Cisco "have been made pursuant to SRI's royalty and equity sharing program; no payments were made for or because of testimony." The memo described above nowhere mentions testimony, and the author of the memo has averred that "success at trial did not meant the content of testimony." (D.I. 289 at 3-4; D.I. 290, ex. 3 at 60-63, 90-93) Indeed, the June 6, 2012 memo itself better explains the request for compensation:

> In December 2011, the [Compensation] Committee approved a distribution under the Royalty Sharing Policy for the settlement of SRI's litigation against Symantec Corporation, for patent infringement of a technology called Emerald. SRI recently received income from this settlement which will be distributed to our staff and management. This memo requests [that] the Committee allow us to make a revision to the Inventor and Direct Contributor pool based on a reassessment of contribution. In addition, this memo confirms for the Committee that compensation received to date under this settlement is "reasonable" and not excessive, per IRS Intermediate Sanctions

---

[2] SRI explains as well that employee compensation by non-profit organizations is regulated by the IRS, and that any royalty allocations for specific employees under SRI's program must be proposed by a vice president and approved by the Compensation Committee.

guidelines.

(D.I. **[*6]** 282, ex. 8)

5. **Standard of review**. There can be no dispute that a fact witness may be compensated for "the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any . . . trial, hearing, or proceeding."[3] However, public policy forbids compensation of a fact witness for the "substance or efficacy of the witness's testimony."[4] The question presented by the pending motion is how one can discern when a witness' compensation is designed to induce testimony so as to violate public policy and, thus, impugn the integrity of the judicial system. *See Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Assoc., 865 F. Supp. 1516, 1525-26 (S.D. Fla. 1994)*.

6. **Analysis**. There are no cases with facts identical to the ones at bar. Looking at the range of cases that have addressed this issue, there are those where the witnesses in fact were being paid **for their testimony**. *See, e.g., Golden Door*, where an attorney asked the defendant to pay his clients substantial sums of money for their testimony in a pending insurance claim case. *Id. at 1525*. *See also Rocheux International of New Jersey, Inc. v. U.S. Merchants Financial Group, Inc., 2009 U.S. Dist. LEXIS 93082, 2009 WL 3246837 (D.N.J. Oct. 5, 2009)* (discussed in *Consolidated Rail Corp. v. CSX Transp., Inc., 2012 U.S. Dist. LEXIS 19467, 2012 WL 511572, at *9 (E.D. Mich. Feb. 16, 2012)* (the proposed witness was a disgruntled former employee of the defendant who contacted the plaintiff during discovery to offer "allegedly damaging testimony regarding that [defendant's business practices **[*7]** in exchange for a fee")). Towards the other end of the spectrum are cases like *Securities and Exhange Commission v. Nadel, 2012 U.S. Dist. LEXIS 53173, 2012 WL 1268297 (E.D.N.Y. April 16, 2012)*, in which the court

addressed the situation where the witness was a full time salaried employee of the sponsoring party, and whose testimony was being offered as the opinion of an expert. In concluding that the sponsoring party/employer was not required to disclose the witness' specific salary or benefit information, the court explained that "the amount of the expert-employee's salary - as opposed to the mere fact the expert is an employee - would make no difference regarding bias so long as the salary and benefits are not tied in any way to the opinions offered by the employee-expert." *2012 U.S. Dist. LEXIS 53173, [WL] at *2. Armenian Assembly of America, Inc. v. Cafesjian, 924 F. Supp. 2d 183 (D.D.C. 2013)* involves the most analogous fact pattern. In that case, defendant allegedly promised his employee (an attorney) that the employee would receive a bonus if the litigation were successful. According to the court, the employee "did more than simply testify. . . . [H]e spent countless hours assisting Cafesjian's counsel in preparing for depositions, summarizing the depositions for Cafesjian, reviewing pleadings, and assisting with the trial." *Id. at 194*. The court concluded that, "[a]bsent any evidence Cafesjian paid Waters [the employee] **for [*8] his testimony**, the [plaintiffs' reliance on *Section 201(c)(3)* and the general public policy against compensating fact witnesses for their testimony is unavailing." *Id.* (emphasis in original).

7. The facts presented at bar compel the same conclusion. The payments made to SRI's employees were made in the ordinary course of business as part of SRI's pre-existing compensation program. Although the employees surely were aware of how the program worked, the program is not litigation-driven except for the fact that revenues are generated when an invention is commercialized, and commercialization can occur through successful litigation.[5] While the distributions reflect SRI's evaluation of each employee's contribution to

---

[3] *18 U.S.C. § 201(d)*.

[4] ABA Formal Op. 96-402.

[5] Licenses for the use of inventions can be the product of business negotiations or the product of litigation, either through settlement agreements or court-entered judgments.

the commercialization efforts,[6] the distributions are not made until after the commercialization efforts have been realized; i.e., there are no quid pro quo arrangements implemented during litigation to induce specific testimony.

8. **Conclusion**. Based on the reasoning above, Cisco's motion **[*9]** for sanctions is denied. However, under the unusual compensation program sponsored by SRI,[7] the court will consider giving Cisco the opportunity to confirm with each employee-witness the fact that he/she stands to gain a percentage distribution of any monetary award made through this litigation.

/s/ Sue L. Robinson

United States District Judge.

---

---

[6] Which can include litigation efforts.

[7] The court recognizes that every employee who testifies on behalf of his employer benefits generally if the employer is ultimately a successful litigant. SRI's royalty and equity sharing program goes beyond a general benefit to one that is specifically calculated to account for the employee's contribution to that success.

 Neutral

As of: December 30, 2016 12:02 PM EST

## *SurfCast, Inc. v. Microsoft Corp.*

United States District Court for the District of Maine

March 7, 2014, Decided; March 7, 2014, Filed

2:12-cv-00333-JAW

**Reporter**

2014 U.S. Dist. LEXIS 29398 *

SURFCAST, INC., Plaintiff, v. MICROSOFT CORPORATION, Defendant.

**Subsequent History:** As Amended March 24, 2014.

**Prior History:** *SurfCast, Inc. v. Microsoft Corp., 2013 U.S. Dist. LEXIS 140590 (D. Me., Sept. 30, 2013)*

## LexisNexis® Headnotes

Civil Procedure > Judicial Officers > Magistrates > Standards of Review

*HN1* When a magistrate judge issues an order on a non-dispositive matter, the court reviews factual findings for clear error and legal findings de novo. Because legal issues will often be entwined with factual issues that are in turn tinged with aspects of discretion, there should customarily be little question that a district judge retains authority to modify an unwarranted action by a magistrate judge even after assigning a matter to the magistrate judge for decision.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

Evidence > ... > Testimony > Expert Witnesses > General Overview

*HN2* The decision to disqualify an expert is discretionary.

Civil Procedure > Judicial Officers > Magistrates > Objections

*HN3* D. Me. R. 72.1 does not permit a party objecting to the order of a magistrate judge to file a reply in response to the non-moving party's opposition brief. A party desiring to reply to an opposition brief must move the court for leave to do so. D. Me. R. 72.1.

Civil Procedure > Judicial Officers > Magistrates > Standards of Review

Evidence > ... > Testimony > Expert Witnesses > General Overview

*HN4* *Fed. R. Civ. P. 72(a)* requires the court to modify or set aside any part of the Recommended Decision if it is clearly erroneous or contrary to law. The "clearly erroneous" standard applies to questions of fact; the "contrary to law" standard is functionally identical to de novo review, and applies to questions of law. A magistrate judge is entitled to substantial discretion in his decisions regarding non-dispositive issues, but the district court retains the authority to review every such decision under the clearly erroneous or contrary to law standard. The legal standard to apply when a court is asked to disqualify an expert is an issue of pure law; the application of that standard to the facts of the case is a mixed question of fact and law.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

Evidence > ... > Testimony > Expert Witnesses > General Overview

**_HN5_** The Ninth Circuit and at least a handful of district courts have decided that disqualification is an appropriate remedy for disclosure of confidential information to an expert by adversarial counsel. The Ninth Circuit stated that a district court has broad discretion to exclude or admit expert testimony and to exclude testimony of witnesses whose use at trial is in bad faith or would unfairly prejudice the other party.

Evidence > ... > Testimony > Expert Witnesses > General Overview

**_HN6_** There are some policy considerations that support the disqualification of expert witnesses for certain kinds of contact with adversarial counsel, at different stages of the litigation process. These included protecting an expectation of confidentiality by the lawyers, protecting the integrity of the adversary process, and promoting public confidence in the legal system. Another consideration is the need for the courts to discourage counsel from engaging in potentially disqualifying conversations when there are a limited group of expert witnesses.

Evidence > ... > Testimony > Expert Witnesses > General Overview

**_HN7_** Policy goals may support, in some limited, egregious cases, disqualification of an expert who has "switched sides." This decision must be based on a weighing of fundamental fairness and prejudice to the other party, and will inevitably be fact-bound. To protect the integrity of the adversary process, or achieve fundamental fairness, the rule must be narrowly drawn and the party seeking exclusion must justify its application.

Evidence > ... > Testimony > Expert Witnesses > General Overview

**_HN8_** In determining the disqualification of an expert who has "switched sides" the following

basic factors should guide the inquiry: First, has the moving party demonstrated that it was objectively reasonable for it to conclude that a confidential relationship existed between it and the expert? That is, did the confidential relationship develop into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate? Second, did the moving party disclose confidential information to the expert during such a confidential relationship that is relevant to the current litigation? Third, will the court's decision be prejudicial or fundamentally unfair to either of the parties? Fourth, to what extent do the policies of allowing experts to pursue their trade, allowing parties to select their own experts, and preventing parties from creating conflicts solely for the purposes of preventing their adversary from using the services of the expert outweigh the policy of preventing conflicts implicated on the particular facts of the case? Finally, considering all of the above factors together, would disqualification of the expert promote the integrity of the legal process?

Evidence > ... > Testimony > Expert Witnesses > General Overview

**_HN9_** In determining the disqualification of an expert who has "switched sides" the first factor—whether it was objectively reasonable to conclude that a confidential relationship existed—must include an explicit finding that the relationship was "sufficiently substantial" to justify disqualification. A mere passing conversation in which counsel casually discusses thoughts and strategy should not disqualify an expert. A confidential relationship is not necessarily established just because some information concerning the litigation is shared.

Civil Procedure > ... > Equity > Maxims > Clean Hands Principle

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

Civil Procedure > Sanctions > General Overview

**_HN10_** The maxim of "he who comes into equity

must come with clean hands" of necessity gives wide range to a court's use of discretion to withhold punishment of behavior which it considers not to warrant so severe a sanction.

**Counsel:** **[\*1]** For SURFCAST INC, Plaintiff, Counter Defendant: BENJAMIN S. PIPER, LEAD ATTORNEY, PRETI, FLAHERTY LLP, PORTLAND, ME; GIANNI MINUTOLI, LEAD ATTORNEY, DLA PIPER LLP (US), WASHINGTON, DC; TIMOTHY J. BRYANT, LEAD ATTORNEY, PRETI, FLAHERTY, BELIVEAU, & PACHIOS, LLP, PORTLAND, ME; ERICA JUDITH PASCAL, JOHN ALLCOCK, KATHRYN RILEY GRASSO, TIFFANY CAROL MILLER, DLA PIPER LLP (US), SAN DIEGO, CA; JAMES M. HEINTZ, DLA PIPER LLP (US), RESTON, VA.

For MICROSOFT CORPORATION, Defendant, Counter Claimant: PETER J. BRANN, LEAD ATTORNEY, STACY O. STITHAM, BRANN & ISAACSON, LEWISTON, ME; RISHI PREET CHHATWAL, LEAD ATTORNEY, JOSEPH A. MICALLEF, WONJOO SUH, SIDLEY AUSTIN LLP, WASHINGTON, DC; HERMAN FITZGERALD WEBLEY, JR., JOHN WEATHERBY MCBRIDE, RICHARD ALAN CEDEROTH, SIDLEY AUSTIN LLP, CHICAGO, IL.

**Judges:** JOHN A. WOODCOCK, JR., CHIEF UNITED STATES DISTRICT JUDGE.

**Opinion by:** JOHN A. WOODCOCK, JR.

## Opinion

**AMENDED ORDER VACATING THE MAGISTRATE JUDGE'S DISQUALIFICATION OF DR. MARK ACKERMAN AS AN EXPERT WITNESS FOR MICROSOFT CORPORATION**[1]

In this patent infringement suit over U.S. Patent No. 6,724,403 (issued Apr. 20, 2004), SurfCast, Inc. (SurfCast) sought to preclude Microsoft Corporation (Microsoft) from using Dr. Mark Ackerman as a retained expert **[\*2]** witness. The Magistrate Judge disqualified Dr. Ackerman on the ground that SurfCast established a confidential relationship with him in a single twenty-three minute telephone call one year before Microsoft retained him as an expert witness. Before the Court is Microsoft's objection to the Magistrate Judge's disqualification order. The Court, concluding that the legal standard for disqualification applied by the Magistrate Judge was too lenient to SurfCast, vacates the disqualification and remands for the Magistrate Judge to determine in the first instance whether SurfCast established a relationship with Dr. Ackerman sufficiently substantial to make disqualification an appropriate remedy.

## I. LEGAL STANDARD

*HN1* When the Magistrate Judge issues an order on a non-dispositive matter, the Court reviews factual findings for clear error and legal findings de novo. *See PowerShare, Inc. v. Syntel, Inc., 597 F.3d 10, 15 (1st Cir. 2010)*; CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, 12 FEDERAL PRACTICE AND PROCEDURE § 3069, at 350-56 (2d ed. 1997 & Supp. 2013).

> Because legal issues will often be entwined with factual issues that are in turn tinged with aspects of discretion, there should **[\*3]** customarily be little question that a district judge retains authority to modify an unwarranted action by a magistrate judge even after assigning a matter to the magistrate judge for decision.

WRIGHT, MILLER & MARCUS, *supra*, at 355.*HN2* "The decision to disqualify an expert is discretionary." *Thompson, I.G., L.L.C. v. Edgetech*

---

[1] The original Order on Microsoft's objection incorrectly stated on page 4 that the disputed conversation between Dr. Ackerman and

Attorneys Pascal and Miller took place on August 29, 2013. The actual date of the conversation was August 29, 2012 and the Court is therefore amending this Order to reflect the correct date.

*I.G., Inc., 11-12839, 2012 U.S. Dist. LEXIS 126808, 2012 WL 3870563, at \*2 (E.D. Mich. Sept. 6, 2012)*.

## II. FACTS

### A. Procedural Posture

On August 27, 2013, the Magistrate Judge presided over a hearing on certain discovery disputes between SurfCast and Microsoft. *Report of Hr'g and Order re: Disc. Disputes* (ECF No. 111). At that hearing, SurfCast objected to Microsoft's use of Dr. Ackerman as an expert witness. *Id.* at 2. The Magistrate Judge, over Microsoft's objection, ordered SurfCast to produce sworn statements from Attorney Pascal and Dr. Ackerman, as well as certain notes that the SurfCast attorneys took during their 2012 conversation with Dr. Ackerman. *Id.* The Magistrate Judge considered these documents in camera and ordered both parties to submit letter briefs on the disqualification issue. *Id.* The Magistrate Judge issued a memorandum decision on September 30, 2013, disqualifying Dr. Ackerman **[\*4]** as an expert witness for Microsoft. *Memorandum Decision on Mot. to Disqualify Expert Witness* (ECF No. 121) (*Mem. Dec.*).

Microsoft filed an objection to the Magistrate Judge's decision on October 10, 2013. *Def. Microsoft's Objection to Mem. Dec.* (ECF No. 128) (*Def.'s Objection*). With this objection, Microsoft submitted an affidavit by Dr. Ackerman describing his version of his communication with SurfCast. *Def.'s Objection* Attach. 1 *Decl. of Dr. Mark S. Ackerman* (ECF No. 128) (*Ackerman Decl.*). SurfCast replied to Microsoft's opposition on October 28, 2013. *Pl. Surfcast's Resp. to Def.'s Objection to Mem. Dec.* (ECF No. 134) (*Pl.'s Reply*). On October 30, 2013, Microsoft moved for leave to file a reply in support of its objection.[2] *Def.*

*Microsoft's Mot. for Leave to File a Reply* (ECF No. 136) (*Def.'s Mot for Leave to File Reply*). SurfCast responded in opposition to this motion on October 31, 2013. *Pl.'s Objection to Def.'s Mot for Leave to File Reply* (ECF No. 137). The Court granted Microsoft's motion, *Order Granting Mot. for Leave to File Reply* (ECF No. 147), and Microsoft filed its reply on November 27, 2013. *Def.'s Reply in Support of Its Objection to Mem. Dec. to Disqualify Expert Witness* **[\*5]** (ECF No. 148) (*Def.'s Reply*). SurfCast filed a sur-reply on December 11, 2013. *Pl.'s Sur-Reply to Def.'s Objection to Def.'s Objection to Mem. Dec. to Disqualify Expert Witness* (ECF No. 149) (*Pl.'s Sur-Reply*).

### B. Historical Facts

The Court adopts the Magistrate Judge's recital of the facts of this matter. Dr. Ackerman had only one substantive conversation with counsel for SurfCast, Erica Pascal, Esq., and Tiffany Miller, Esq. *Mem. Dec.* at 1. That conversation took place on August 29, 2012, and lasted twenty-three minutes. *Id.* Before that telephone conversation, on August 23 or 24, 2012, Attorney Pascal sent Dr. Ackerman via email a confidentiality agreement that she asked him to sign before they could engage in any specific discussion. *Id.* at 1-2. Dr. Ackerman signed the agreement and returned it to Attorney Pascal that same day. *Id.* at 2.

On August 29, 2012, Attorney Pascal emailed Dr. Ackerman the patent at issue in this action. **[\*6]** *Id.* Approximately one-half hour later, the twenty-three minute call began. *Id.* Attorney Pascal and Dr. Ackerman discussed his background. *Id.* Beyond that, they differ in their recollections of the conversation. *Id.* They do agree that Dr. Ackerman was not paid, nor was he retained, by SurfCast. *Id.* It is undisputed that Dr. Ackerman was not asked to work on the case, to perform services in the future, or to decline to perform services for others. *Id.* There has been no further contact between Dr. Ackerman and any lawyer from Attorney Pascal's firm or from any other representative of SurfCast. *Id.*

---

[2] *HN3* District of Maine Local Rule 72.1 does not permit a party objecting to the order of a Magistrate Judge to file a reply in response to the non-moving party's opposition brief. A party desiring to reply to an opposition brief must move the Court for leave to do so. D. ME. LOC. R. 72.1.

Dr. Ackerman insists that during the August 29th phone call, Attorneys Pascal and Miller did not discuss litigation strategy or the strengths or weaknesses of either party's case. *Ackerman Decl*. ¶ 8. He further denies that the attorneys revealed any data about the case, suggested that any fact was of particular significance, or otherwise conveyed their views on the case. *Id*. He further asserts that on August 22, 2013, attorneys for Microsoft, who had by that time retained him as an expert, informed him that they had learned of the non-disclosure agreement, and cautioned him not to disclose any [*7] confidential information or any details of his communications with Attorney Pascal's firm. *Id*. ¶ 11. Dr. Ackerman swears he has complied with the terms of the non-disclosure agreement. *Id*.

The Magistrate Judge performed an in camera review of the notes of Attorneys Pascal and Miller from their conversation with Dr. Ackerman, as well as a sworn declaration of Attorney Pascal. *Mem. Dec*. at 5-6. He concluded that Attorneys Pascal and Miller reasonably believed that they had established a confidential relationship with Dr. Ackerman and that they had in fact disclosed confidential information to him. *Id*. In addressing Microsoft's objection, this Court has not reviewed either the notes or the declaration.

## III. DISCUSSION

### A. Position of the Parties

#### 1. Microsoft

Microsoft advances three arguments as to why the Court should reverse the decision of the Magistrate Judge. First, it argues, the legal test for expert disqualification requires both a confidential relationship between the adversary attorney and the expert and that the adversary disclosed sufficient confidential information, relevant to the current litigation, to warrant disqualification. *Def.'s Objection* at 5 (citing *Hewlett-Packard Co. v. EMC Corp., 330 F. Supp. 2d 1087, 1092 (N.D. Cal. 2004))*. [*8] The first prong, Microsoft further argues, has two sub-parts: first, that it was

reasonable to believe that a confidential relationship existed; and, second, that the relationship "developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate." *Id*. (citing *Hewlett-Packard, 330 F. Supp. 2d at 1093*). Microsoft contends that the Magistrate Judge erred by failing to consider whether SurfCast's relationship with Dr. Ackerman was "sufficiently substantial" to warrant disqualification. *Id*. at 6.

Microsoft also contends that no "sufficiently substantial" relationship could be found on the facts of this matter. *Id*. This is so, it claims, because the telephone call was short, was substantially devoted to Dr. Ackerman's credentials and experience, and was not preceded by any relationship between SurfCast and Dr. Ackerman. *Id*. Furthermore, the only document they provided to Dr. Ackerman was a public patent. *Id*. at 6-7. In its view, the non-disclosure agreement is not sufficient, on its own, to find a sufficiently substantial relationship. *Id*. at 7.

Microsoft next contends that SurfCast has failed to demonstrate that it disclosed any confidential [*9] information to Dr. Ackerman. As a preliminary matter, Microsoft insists it was wrong for the Magistrate Judge to review the attorney's notes and their sworn explanations of those notes in camera; it views this as permitting ex parte argument. *Id*. at 8. Acknowledging that it is common to review privileged documents in camera to determine whether a privilege exists, Microsoft maintains that it is error to perform such review for the purpose of disqualifying the other side's expert; it characterizes this as "using the privilege as a sword and a shield." *Id*. at 8 n.3 (citing *United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991))*.

Microsoft also contends that even the Magistrate Judge's findings based on the in camera review are improper because the Memorandum Decision does not show that SurfCast proved "*specific* and *unambiguous* disclosures that would be

2014 U.S. Dist. LEXIS 29398, *9

prejudicial." *Id*. at 9 (citing *Hewlett-Packard, 330 F. Supp. 2d at 1097*) (emphasis in Microsoft objection). It argues that the Memorandum Decision's reference to "several specific issues, both informational and strategic, that were discussed with Dr. Ackerman" and "litigation strategy and theories of recovery" are insufficient to  **[*10]** meet this requirement. *Id*. (quoting *Mem. Dec*. at 6).

Finally, Microsoft advances a "public policy" argument, contending that it would be harmful to the "integrity of the legal process" to permit such a brief exchange between counsel and an expert to disqualify the expert from use by the other side. *Id*. at 10 (citing *Hewlett-Packard, 330 F. Supp. 2d at 1098*).

## 2. SurfCast

On the standard of review, SurfCast argues that the Court should only reverse the non-dispositive decision of a Magistrate Judge if it is "clearly erroneous or is contrary to law." *Pl.'s Reply* at 3 (quoting *Fed. R. Civ. P. 72(a)* and citing *PowerShare, Inc. v. Syntel, Inc., 597 F.3d 10, 13-14 (1st Cir. 2010))*. It further argues that "'[w]hen evidence gives rise to competing interpretations, the choice between them cannot be clearly erroneous.'" *Id*. (quoting *Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3 (1st Cir. 1999)* (internal quotations omitted)). It characterizes the Magistrate Judge's decision to disqualify an expert as an exercise in discretion, entitled to "great deference" and reversible only for abuse of discretion. *Id*. (citing *Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery, 177 F.R.D. 205, 213-14 (D.N.J. 1997))*.  **[*11]** It urges this Court to "'refrain from second guessing the magistrate on his pre-trial discovery rulings.'" *Id*. (quoting *Pub. Interest Res. Grp. v. Herclues, Inc., 830 F. Supp. 1525, 1547 (D.N.J. 1993))*.

SurfCast agrees with Microsoft that it is legally correct to disqualify an expert when it was objectively reasonable for a party to believe it had a confidential relationship with the expert and the party disclosed confidential information to the expert. *Compare id*. at 4 *with Def.'s Objection* at 5. However, SurfCast disagrees with Microsoft's argument that *Hewlett-Packard* established a two-part sub-test for the existence of a confidential relationship. *Pl.'s Reply* at 4. They insist, instead, that *Hewlett-Packard* sets out a factors test, of which a "sufficiently substantial relationship" is but one factor. *Id*. at 4-6. SurfCast contends that the Magistrate Judge correctly applied the factors test, or at least that it was not clearly erroneous. *Id*.

SurfCast next defends the Magistrate Judge's finding that Attorneys Pascal and Miller disclosed confidential information to Dr. Ackerman. *Id*. at 6-7. Furthermore, it disputes Microsoft's contention that an in camera review of the notes and declaration  **[*12]** was improper. *Id*. at 7-8. They view in camera review as necessary to preserve the confidentiality of their own disclosures, and a practice routinely employed by courts to decide whether to disqualify an expert. *Id*. at 7 (citing *Astrazeneca Pharms., LP v. Sandoz Inc., CIV.A. 07-1632JAP, 2008 U.S. Dist. LEXIS 109460, 2008 WL 6582595 (D.N.J. Mar. 7, 2008)*; *Demouchette v. Dart, 09 C 6016, 2012 U.S. Dist. LEXIS 17762, 2012 WL 472917, at *3-4 (N.D. Ill. Feb. 10, 2012)*; and *Life Techs. Corp. v. Biosearch Techs., Inc., No. C-12-00852, 2012 U.S. Dist. LEXIS 63975, 2012 WL 1607410, at *7 (N.D. Cal. May 7, 2012))*. It further argues that any more specific fact-finding by the Magistrate Judge on the nature of the confidential information would defeat the very purpose of confidentiality. *Id*. at 8.

SurfCast disputes Microsoft's characterization of the Magistrate Judge's review as using the privilege as both sword and shield. *Id*. It distinguishes *Bilzerian* as being about a criminal defendant using "a good faith defense for a securities action while attempting to shield the basis for his belief in the legality of his actions under attorney-client privilege." *Id*. at 8 (citing *Bilzerian, 926 F.2d at 1292*). It characterizes its own use of the privilege as "defensive," meant to "protect" SurfCast's

 [*13] "confidential attorney work-product information from disclosure to Microsoft." *Id.* They dispute that the issue is mooted by the parties' briefing for their *Markman* hearing. *Id.* at 9. Finally, they dispute Microsoft's public policy argument, contending instead that fundamental fairness weighs in favor of disqualification: "SurfCast would be greatly prejudiced if Microsoft were to proceed with Dr. Ackerman and gain access to SurfCast's confidential and attorney work-product information, whereas no meaningful prejudice will result to Microsoft." *Id.* at 10.

### 3. The Supplemental Reply and Sur-Reply

In reply, Microsoft makes three points. First, it argues that the Magistrate Judge committed an error of law by neglecting to make a finding that the relationship between SurfCast and Dr. Ackerman was "sufficiently substantial to justify disqualification." *Def.'s Reply* at 1. Second, Microsoft disputes that the Magistrate Judge's decision is reviewed under an abuse of discretion standard; Microsoft argues instead of de novo review. *Id.* at 2 (citing *PowerShare, 597 F.3d at 15*. Third, Microsoft repeats and expands on its argument that SurfCast is attempting to use expert disqualification as a "sword," [*14] because SurfCast, not Microsoft, moved to disqualify Dr. Ackerman and then used "secret declarations and documents in support of that request." *Id.* at 3 (citing *Nationwide Payment Systems v. Plunkett, 831 F. Supp. 2d 337, 338-40 (D. Me. 2011))*. Microsoft vigorously objects to SurfCast's use of these "secret, self-serving declarations expounding on the contents of the[] notes." *Id.* at 4.

SurfCast, in sur-reply, disagrees that the "sufficiently substantial" analysis is required under *Hewlett-Packard*; it characterizes this analysis as just one factor in the overall inquiry, and insists that the Magistrate Judge did not commit error by failing to address it explicitly. *Pl.'s Sur-Reply* at 1. SurfCast repeats its earlier assertion that non-dispositive decisions by the magistrate judge should be reviewed under an abuse of discretion standard.

*Id.* at 2. Finally, SurfCast disputes Microsoft's use of *Nationwide Payment Systems* to support its sword/shield theory, claiming that Microsoft has taken the case out of context. *Id.* at 3. SurfCast insists that in camera review of the notes was necessary to preserve its confidentiality. *Id.* at 4. It also clarifies, for the first time, that the "declaration"  [*15] of Attorney Pascal "served to simply render the handwritten attorney work product notes taken during the conversation with Dr. Ackerman by DLA attorney Ms. Pascal into a typed format." *Id.*

### B. Analysis

### 1. The Parties' Dispute Over the Standard of Review

*HN4* *Rule 72(a)* requires the Court to "modify or set aside any part" of the Recommended Decision if it is "clearly erroneous or . . . contrary to law." The "clearly erroneous" standard applies to questions of fact; the "contrary to law" standard is functionally identical to de novo review, and applies to questions of law. *PowerShare, 597 F.3d at 14-15*. A magistrate judge is entitled to substantial discretion in his decisions regarding non-dispositive issues, but the district court retains the authority to review every such decision under the "clearly erroneous or . . . contrary to law" standard. WRIGHT, MILLER & MARCUS, *supra*, at 350-56. The legal standard to apply when a court is asked to disqualify an expert is an issue of pure law; the application of that standard to the facts of the case is a mixed question of fact and law. The Magistrate Judge's resolution of the mixed question in this non-dispositive matter would be entitled to deference  [*16] even under the "contrary to law" standard of review, but the Court need not look past the pure question of law to rule on Microsoft's objection.

### 2. The Disqualification of Dr. Ackerman

The norms protected by disqualifying an expert who has been given confidential information by

adversarial counsel are decidedly murky. If the Court disqualifies Dr. Ackerman, he can still be subpoenaed to testify for Microsoft. He can still consult with and advise counsel for Microsoft on the technical aspects of the case (within the limits of his non-disclosure agreement). SurfCast characterizes its motion to disqualify as being about protecting "confidential attorney work-product information from disclosure to Microsoft," *Pl.'s Reply* 8, but disqualifying Dr. Ackerman as an expert witness will not protect any such information. The only result will be that Microsoft may not submit an expert opinion from Dr. Ackerman in its motion for summary judgment, and if Dr. Ackerman takes the stand he may not opine as an expert witness. SurfCast's twenty-three minute conversation with Dr. Ackerman implicates neither the scientific basis for his testimony nor whether his testimony will assist the trier of fact. *See* [*17] *Daubert v. Merrell Dow Pharms., 509 U.S. 579, 592-93, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).*

*HN5* The Ninth Circuit and at least a handful of district courts have nonetheless decided that disqualification is an appropriate remedy for disclosure of confidential information to an expert by adversarial counsel. *See Erickson v. Newmar Corp., 87 F.3d 298, 300 (9th Cir. 1996); Campbell Indus. v. M/V Gemini, 619 F.2d 24, 27 (9th Cir. 1980); Hewlett-Packard, 330 F. Supp. 2d at 1092* (collecting cases). In *Campbell Indus.*, the Ninth Circuit stated that a district court has "broad discretion" to "exclude or admit expert testimony . . . and to exclude testimony of witnesses whose use at trial is in bad faith or would unfairly prejudice the other party." *619 F.2d at 27.* In that case, the Ninth Circuit found no abuse of discretion where the district court disqualified an expert who had been improperly contacted by adversarial counsel in violation of *Federal Rule of Civil Procedure 26(b)(4). Id. at 26-27.* By contrast, the Ninth Circuit in *Erickson* noted the existence of a handful of cases in which district courts disqualified experts who had "switched sides" during the course of litigation, but the appellate court did not reach

[*18] the question on the facts before it. *87 F.3d at 300-01.* Its acknowledgment of the practice is at best a dictum.

The district courts which have adopted this remedy typically phrase it as disqualification for a "conflict of interest." *E.g., Hewlett-Packard, 330 F. Supp. 2d at 1095; Demouchette, 2012 U.S. Dist. LEXIS 17762, 2012 WL 472917, at *3.* An expert witness, however, is not a lawyer; his or her role in the courtroom, notwithstanding receipt of payment by one side, is to explain difficult concepts to the fact-finder and opine on how the facts of the case fit into an analytic framework. However, the *Hewlett-Packard* Court described *HN6* some policy considerations that support the disqualification of expert witnesses for certain kinds of contact with adversarial counsel, at different stages of the litigation process. These included protecting an expectation of confidentiality by the lawyers, *Hewlett-Packard, 330 F. Supp. 2d at 1093-94;* "protecting the integrity of the adversary process," *id. at 1095;* and "promoting public confidence in the legal system." *Id.* These are certainly commendable goals. *See, e.g., id. at 1095* (discussing policy concerns).

Another consideration is the need for the courts to discourage counsel [*19] from engaging in potentially disqualifying conversations when there are a limited group of expert witnesses. The *Hewlett-Packard* Court explained this concern:

> [W]ithout speculating as to EMC's underlying motivations, the Court notes that if an expert could be disqualified on the facts of this case, parties in other cases might be tempted to create a purported conflict solely for the purpose of preventing their adversaries from using the services of a particular expert. This concern is especially important in high-technology patent infringement cases, in which the courts, as well as the public, rely on experts to explain complicated technologies. Permitting one party to lock up all or most of the best experts might interfere with the proper

interpretation of claim language—a[] task that potentially has preclusive effect with respect to future litigation—as well as fair evaluation of the merits of claims of infringement.

*Id. at 1098*. The difficulty is applying these principles to a specific case and determining whether the exclusion remedy promotes legitimate policy concerns.

The Court assumes that these **HN7** policy goals may support, in some limited, egregious cases, disqualification of an **[*20]** expert who has "switched sides." This decision must be based on a weighing of fundamental fairness and prejudice to the other party, and will inevitably be fact-bound. To "protect[] the integrity of the adversary process," *Hewlett-Packard, 330 F. Supp. 2d at 1095*, or achieve fundamental fairness, the rule must be narrowly drawn and the party seeking exclusion must justify its application. The Court agrees that the basic factors outlined in *Hewlett-Packard* should guide the inquiry:

> **HN8** First, has the moving party demonstrated that it was objectively reasonable for it to conclude that a confidential relationship existed between it and the expert? That is, did the confidential relationship develop into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate? Second, did the moving party disclose confidential information to the expert during such a confidential relationship that is relevant to the current litigation? Third, will the Court's decision be prejudicial or fundamentally unfair to either of the parties? Fourth, to what extent do the policies of allowing experts to pursue their trade, allowing parties to select their own experts, and preventing **[*21]** parties from creating conflicts solely for the purposes of preventing their adversary from using the services of the expert outweigh the policy of preventing conflicts implicated on the particular facts of the case? Finally, considering all of the above factors together,

would disqualification of the expert promote the integrity of the legal process?

*Hewlett-Packard Co., 330 F. Supp. 2d at 1095-96*.

The Court also agrees with Microsoft, however, that **HN9** the first factor—whether it was objectively reasonable to conclude that a confidential relationship existed—must include an explicit finding that the relationship was "sufficiently substantial" to justify disqualification. A mere passing conversation in which counsel casually discusses thoughts and strategy should not disqualify an expert. *See, e.g., Paul v. Rawlings Sporting Goods Co., 123 F.R.D. 271, 278 (S.D. Ohio 1988)* ("[T]here may be situations where, despite the existence of a formal contractual relationship, so little of substance occurs during the course of the relationship that neither the integrity of the trial process, nor the interests of the party who retained the expert, would be served by blanket disqualification"). "[A] confidential **[*22]** relationship is not necessarily established just because some information concerning the litigation is shared." *Hewlett-Packard Co., 330 F. Supp. 2d 1094*. Among other things, this criterion addresses the *Hewlett-Packard* Court's concern about the use of attorney or party consultations as a tactic to disqualify potential opposing experts.

Another consideration under this rubric is that Microsoft's use of an expert who has previously consulted, however briefly, with SurfCast, contains its own sanction. The facts surrounding the prior consultation, the implication that Microsoft's expert's favorable opinion is available to the highest bidder, and other similar issues would be fair questions on cross-examination and may affect the convincing power of his opinions. In this context, the exclusion of the expert may be a more draconian additional sanction than necessary. **HN10** "The maxim of 'he who comes into equity must come with clean hands' of necessity gives wide range to a court's use of 'discretion to withhold punishment of behavior which it considers not to warrant so severe a sanction.'" *Codex Corp. v.*

*Milgo Elec. Corp., 717 F.2d 622, 633 (1st Cir. 1983)* (quoting *Norton Co. v. Carborundum Co., 530 F.2d 435, 442 (1st Cir. 1976))*.

The **[*23]** Court also agrees with Microsoft that disqualifying an expert on these grounds requires a finding of "specific and unambiguous disclosures that if revealed would prejudice the party." *Id.* Given this requirement, however, it will be necessary for the Magistrate Judge to review the evidence of confidential disclosure in camera. This will ensure that confidential information remains confidential and also make the proper legal determination. The Magistrate Judge was right not to disclose the allegedly confidential information in his Memorandum Decision, and it should not be disclosed on remand. The correct course is to review this information and make appropriate findings.[3]

### 3. Disposition

The law of expert disqualification in **[*24]** the District of Maine contemplates a standard more challenging for the movant than that applied by the Magistrate Judge. Thus, it is necessary to remand the case to the Magistrate Judge for reconsideration of the evidence in light of this standard.

### IV. CONCLUSION

The Court VACATES the Memorandum Decision on Motion to Disqualify Expert Witness (ECF No. 121). It REMANDS the matter to the Magistrate Judge to consider (1) whether SurfCast established a sufficiently substantial relationship with Dr. Ackerman to justify disqualifying him as Microsoft's expert witness, and (2) whether attorneys Pascal and Miller made specific and

unambiguous disclosures that would be prejudicial to SurfCast if Dr. Ackerman testified as an expert for Microsoft.

SO ORDERED.

/s/ John A. Woodcock, Jr.

JOHN A. WOODCOCK, JR.

CHIEF UNITED STATES DISTRICT JUDGE

Dated this 24th day of March, 2014

**End of Document**

---

[3] The Court cautions that any sworn declarations submitted by Attorneys Pascal and Miller must be non-argumentative and non-conclusory, tied to the historical facts of the conversation with Dr. Ackerman. Conclusions such as whether the conversation was "confidential" or "substantial" or otherwise "central to their case" are for the Magistrate Judge, not the affiants. On remand, the Magistrate Judge may wish to clarify whether the sworn declarations meet these criteria.


Neutral
As of: December 30, 2016 12:02 PM EST

*Data Capture Solutions - Repair & Remarketing, Inc. v. Symbol Techs., Inc.*

United States District Court for the District of Connecticut

October 17, 2008, Decided

CIVIL ACTION NO. 3:07-cv-0237 (JCH)

**Reporter**

2008 U.S. Dist. LEXIS 83595 *; 2008 WL 4681676

DATA CAPTURE SOLUTIONS - REPAIR & REMARKETING, INC., Plaintiff, v. SYMBOL TECHNOLOGIES, INC, Defendant.

**Prior History:** *Data Capture Solutions - Repair & Remarketing, Inc. v. Symbol Techs., 2008 U.S. Dist. LEXIS 119098 (D. Conn., May 20, 2008)*

**Counsel:** [*1] For Data Capture Solutions - Repair & Remarketing Inc, Plaintiff: David S. Golub, LEAD ATTORNEY, Silver, Golub & Teitell, Stamford, CT; Eliot B. Gersten, LEAD ATTORNEY, Gersten & Clifford, John Joseph Robaczynski, John Henry Van Lenten, LEAD ATTORNEYS, Gersten, Clifford & Rome, LLP - Htfd, Hartford, CT; Jonathan M. Levine, LEAD ATTORNEY, Silver, Golub & Teitell, Stamford, CT.

For Symbol Tech Inc, Consol Plaintiff: Jonathan M. Sobel, Victoria Zaydman, LEAD ATTORNEYS, Hogan & Hartson, New York, NY.

For Symbol Tech Inc, Defendant: Allison J. Schoenthal, Eric J. Lobenfeld, Rachel Strom, LEAD ATTORNEYS, Bart Van de Weghe, Eric J. Stock, Nicole Civita, LEAD ATTORNEYS, PRO HAC VICE, Hogan & Hartson, New York, NY; Hugh F. Keefe, Nicole M. Fournier, LEAD ATTORNEYS, Lynch, Traub, Keefe & Errante, New Haven, CT.

For Data Capture Solutions - Repair & Remarketing Inc, Consol Defendant, Consol

Counter Claimant: David S. Golub, LEAD ATTORNEY, Silver, Golub & Teitell, Stamford, CT; Eliot B. Gersten, LEAD ATTORNEY, Gersten & Clifford, John Joseph Robaczynski John Henry Van Lenten, LEAD ATTORNEYS, Gersten, Clifford & Rome, LLP - Htfd, Hartford, CT; Jonathan M. Levine, LEAD ATTORNEY, Silver, Golub & Teitell, [*2] Stamford, CT.

**Judges:** Janet C. Hall, United States District Judge.

**Opinion by:** Janet C. Hall

## Opinion

**RULING ON PLAINTIFF'S MOTION FOR DISQUALIFICATION (Doc. No. 123)**

### I. INTRODUCTION

This action consolidates two actions. Data Capture Solutions-Repair & Remarketing, Inc. ("Data Capture") brings its claims against Symbol Technologies, Inc. ("Symbol"), alleging that Symbol engaged in anti-competitive behavior in violation of state and federal law. In its claims, Symbol alleges that Data Capture engaged in, *inter alia*, deceptive business practices, copyright infringement, and false advertising in violation of federal and state law.

Data Capture now moves to disqualify the law firm of Hogan & Hartson, LLP ("Hogan") and its attorneys from continuing to represent Symbol. In support of its Motion for Disqualification (Doc. No.

123), Data Capture claims that Hogan violated the Rules of Professional Conduct when it represented a former employee of Data Capture in the instant matter. In further support of its Motion, Data Capture argues that Hogan violated the Connecticut Rules of Professional Conduct when it engaged in *ex parte* communications with Data Capture's Chief Financial Officer. Symbol opposes the Motion for Disqualification, [*3] arguing that disqualification is not called for on either of the two grounds that Data Capture asserts.

## II. FACTS

A. Hogan's Representation of James Mulligan

James Mulligan is a former employee of Data Capture. Starting in 1998, Mulligan worked as a Vice President until he was fired in 2004. Data Capture subsequently sued Mulligan for allegedly breaching a non-competition agreement. Mulligan is now the President of Secure Mobile Solutions, which is one of Symbol's customers. Data Capture alleges that, during his time with Data Capture, Mulligan "participated in conference calls with [Data Capture's] counsel concerning the company's legal strategy in response to Symbol's new policies." Teixeira Aff. P 3.

At a time he was not represented by counsel (mid-2007), Mulligan contacted Symbol regarding the instant action. Sobel Decl. P 6. As counsel for Symbol, Hogan had discussions with Mulligan about Data Capture's relationship with Symbol. Hogan claims it never asked Mulligan to reveal privileged information, nor did Mulligan reveal any privileged information. *Id.* P 8. In August 2007, in a discovery disclosure, Data Capture indicated that Mulligan was one of its three "most knowledgeable" former [*4] employees. This statement alerted Hogan that Mulligan would probably be subpoenaed, and Symbol offered to have Hogan represent him. *Id.* P 10.

In September 2007, representatives of Data Capture began contacting Mr. Mulligan. *Id.* P 11. Hogan then alerted Data Capture that it represented

Mulligan and any requests to speak with Mulligan should come through his counsel. *Id.* P 12. According to Hogan, even after having given notice that Mulligan was represented, Data Capture (but not its counsel) continued to contact him. *Id.* P 14.

In March 2008, Symbol received a letter from Data Capture that attached an email from Mark Barnes, a former Symbol employee, to Mulligan ("Mulligan Email"). [1] According to Data Capture, the Mulligan Email "goes to the core of Symbol's claim." Sobel Aff P 17, Exh. E. Data Capture claims that the Mulligan Email "gives [Data Capture] permission to engage in the precise conduct that Symbol now claims was unlawful." Mem. in Supp. at 3. It was around the time of Symbol's receipt of the Mulligan Email that Hogan withdrew from its representation of Mulligan. On April 3, 2008, Symbol issued a subpoena to Mulligan for documents and testimony.

B. Document Review at Data Capture

Pursuant to agreement of counsel, on June 3, 2008, two associates from Hogan went to Data Capture to review two hundred boxes of documents produced in discovery. Schoenthal Decl. P 13. Prior to the scheduled document review, Hogan's attorneys received an email from Eliot Gersten, attorney for Data Capture, stating that Robert Esposito would meet the associates on the morning of the document review to escort them to the documents. *Id.* P 6, Exh. H. Attorney Gersten did not mention that Mr. Esposito was the Chief Financial Officer of Data Capture. [2] Schoenthal and Civita arrived at Data

---

[1] Symbol has questioned the authenticity [*5] of the Mulligan Email. Sobel Decl. P 18.

[2] While Data Capture's attorney did not have an affirmative duty to inform Hogan that Mr. Esposito was a high level executive at Data Capture, it bears noting the highly unusual circumstances here. It is the court's experience that it is uncommon for an executive to supervise a document review, especially without an attorney present.

Furthermore, Mr. Esposito did not mention that he worked at Data Capture when he first met the associates on June 3; it was not until later that he revealed he worked at Data Capture. Schoenthal Decl. P 15, 19.

Capture at 8 a.m. on June 3, where Mr. Esposito met them and led them to the attic of a garage, where the boxes were stored. *Id.* P 13-15. When they arrived in the attic, Mr. Esposito explained how the boxes were organized and pointed out where various records were located. *Id.* P 19. At a later point when walking across the attic, Schoenthal noticed a video camera resting on a ceiling beam. *Id.* P 27. The camera was covered with a towel in an apparent effort hide it, exposing only the lens. *Id.* Mr. Esposito stated that the camera was **[*6]** "for his protection." [3]

Mr. Esposito remained in the attic while the associates sorted through the documents. At some point, Schoenthal asked **[*7]** Mr. Esposito where the box containing the "Mulligan Email" was located so she locate and review other documents related to it. *Id.* P 24. Mr. Esposito responded by saying that he did not know where it was located, but then he volunteered that he had only known about it by way of a conversation he overheard between the CEO of Data Capture, Joseph Teixeira, and Attorney Gersten the previous day. Esposito Aff. P 3.

At lunchtime, Mr. Esposito offered to drive the associates, who did not have access to a car, to pick up some lunch. On the way to lunch, Mr. Esposito claims the three engaged in conversations regarding instructions he received from his counsel and his familiarity with Data Capture's day-to-day operations. *Id.* P 7. The Hogan attorneys deny these conversations ever happened. Schoenthal Decl. P 36.

## III. DISCUSSION

---

[3] There is dispute among the parties regarding whether or not Mr. Esposito affirmatively made the associates aware of the camera or whether they discovered it first. It is undisputed, however, that, although Mr. Esposito claimed the camera was there for his protection, it was removed in the afternoon.

The court concludes that the camera was placed to surreptitiously record Hogan's activities and when discovered, its purpose was defeated, and it was removed. The court finds this surreptitious recording unseemly.

### A. Applicable Law

District of Connecticut Local Rule 83.2(a) states that the Rules of Professional Conduct as approved by the Judges of the Connecticut Superior Court shall govern the standards of professional conduct for attorneys practicing in the District of Connecticut. D. Conn. L. Civ. R. 83.2(a). [4] *Rule 4.2 of the Rules of Professional Conduct* provides that:

> in representing **[*8]** a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter unless the lawyer has the consent of the other lawyer or is authorized to do so by law.

Data Capture moves for disqualification on the grounds that Hogan's attorneys violated *Rule 4.2*, among other Rules of Professional Conduct. [5]

"The objective of the disqualification rule is to preserve the integrity of the adversary process." *Evans v. Artek Sys. Corp, 715 F.2d 788, 791 (2d Cir. 1983)*(citing *Bd. of Educ. of City of N.Y. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979)*(internal quotations omitted)). The party moving for disqualification bears the heavy burden of proving the facts required for disqualification. *Evans, 715 F.2d at 794* (citing *Gov't of India v. Cook Indus., Inc., 569 F.2d 737, 739 (2d Cir. 1978))*. According to the **[*9]** Second Circuit, disqualification is only warranted in two kinds of cases, with rare exceptions. *Nyquist, 590 F.2d at 1246*. First, when violations of the Rules of Professional Conduct violate the court's confidence in the vigor of the attorney's representation of his client. *Id.* Second, where the attorney is in a position to use privileged information concerning the opposing party, thereby giving his client an

---

[4] This District did not, however, adopt *Rules 3.6* and *3.7(b) of the Rules of Professional Conduct*. *See* D. Conn. L. Civ. R. 83.2 (a)2. However, those particular Rules do not pertain to the instant Motion.

[5] Data Capture also asserts violations of *Rules 1.16*, *1.6*, *1.7*, *4.3*, and *4.4(a)*. *See* Pl.'s Mem. at 8-9.

unfair advantage. *Id*. In fact, disqualification should only be granted "when a violation of the [Rules of Professional Conduct] poses a significant risk of trial taint." *Glueck v. Jonathan Logan, Inc., 653 F.2d 746 (2d Cir. 1981)*(citing *Armstrong v. McAlpin, 625 F.2d 433, 444-46 (2d Cir. 1980)*(en banc)).

The heavy burden and "considerable reluctance" to grant motions for disqualification derives from the notion that "disqualification motions are often interposed for tactical reasons and that even when made in the best of faith, such motions inevitably cause delay." *Evans, 715 F.2d at 791* (quoting *Nyquist, 590 F.2d at 1246*.). Further, "disqualification has an immediate adverse effect on the client by separating him from counsel of his choice." *Nyquist, 590 F.2d at 1246*.

B. Hogan's  [*10] Representation of James Mulligan

Data Capture argues that Hogan's representation of James Mulligan warrants disqualification because the representation violates *Rules of Professional Conduct 1.7*, *1.16*, and *4.2*. With respect to its alleged violation of *Rule 4.2*, Data Capture argues that Mulligan was a "represented" party within the meaning of *Rule 4.2*, and therefore Hogan was prohibited from having any *ex parte* contact with him.

Symbol counters by stating that *Rule 4.2* does not apply to former employees. Symbol is correct: *Rule 4.2* does not apply to former employees. *See e.g., Dubois v. Gradco Sys., Inc., 136 F.R.D. 341, 343-4 (D. Conn. 1991)*; *Polycast Tech. Corp., v. Uniroyal, Inc., 129 F.R.D. 621, 625-628 (S.D.N.Y. 1990)*. Thus, this ground would not support granting the Motion for Disqualification. However, even if this representation was a violation of the Rules, Data Capture is still required to prove that the representation would result in "trial taint" in order to justify a motion for disqualification, which the court finds Data Capture has not proven.

Data Capture argues further that, even if *Rule 4.2*

did not pertain to former employees, Hogan's representation of Mulligan "gives  [*11] rise to a presumption that Mulligan disclosed [Data Capture's] confidential and privileged information." Mem in Supp. at 13. This presumption, if it exists, [6] only arises if Data Capture can prove that Mulligan obtained confidential information about the present matter while working for Data Capture. *MMR/Wallace Power and Industrial, Inc. v. Thames Associates, 764 F. Supp. 712, 726 (D. Conn. 1991)*. Data Capture does not identify specific, privileged information to which Mulligan was privy with respect to the present litigation. Moreover, it fails to assert what privileged information Hogan may have obtained in representing Mulligan. Its only contention is that Mulligan "participated in conference calls . . .with Data Capture's counsel regarding the company's legal strategy in responding to Symbol's implementation of the PartnerSelect program." Teixeira Aff. P 3. It further contends that Teixeira consulted with Mulligan on "Data Capture's legal and business strategies based on counsel's legal advice." *Id*. These contentions do not assist the court in determining whether privileged information was divulged, especially in light of the fact that Mulligan was fired in 2004, three years before  [*12] this action was filed. Because of this, there is no clear evidence of "trial taint" or "unfair advantage," which is required in order to grant a motion for disqualification. *See e.g., Glueck, 653 F.2d at 748, 750*; *Nyquist, 590 F.2d at 1246*.

Data Capture also argues that Hogan violated *Rules 1.7* and *1.16* when it undertook the representation of Mulligan. The court finds both of these arguments fail.

*Rule 1.7* provides that,

> a lawyer shall not represent a client if the representation involves a concurrent conflict of

---

[6] It is unclear from the caselaw whether such a presumption exists and whether that presumption is rebuttable. *See MMR/Wallace, 764 F. Supp. at 725-726*.

interest. A concurrent conflict of interest exists if: . . . (2) there is significant risk that the representation of one or more clients will be materially limited by the lawyers responsibility to another. . . ."

*Modern Rules of Prof' l Conduct R. 1.7*. Data Capture argues that the fact that Hogan terminated its relationship with Mulligan (and then serviced upon him a subpoena) is evidence that Hogan's representation of Mulligan was limited by its representation of Symbol. Mem. in Supp. at 11. This is the extent of Data Capture's **[*13]** argument with respect to Hogan's violation of *Rule 1.7*. Hogan responds that it did not violate the ethical rules because "there was no adversity between Symbol and Mulligan during the time that Hogan represented them concurrently." [7] Mem. in Opp. at 22 n. 7.

Data Capture also alleges that Hogan violated *Rule 1.16*, which governs the circumstances in which a lawyer may withdraw from representation. Data Capture alleges that Hogan did not comply with that Rule when it "dropped [Mulligan] like a hot potato." Mem. in Supp. at 12. Hogan argues that it is not in violation of this Rule because, as soon as it became apparent that it would have to depose Mulligan, it withdrew from representation in order to avoid any potential conflict. Mem. in Opp. at 22 n.7.

The court finds that Data Capture failed to carry its heavy burden in making these arguments with respect to Hogan's alleged violations of *Rules 1.7* and *1.16*. First, it fails to show that the interests of Symbol conflict with those of Mulligan during the short time that Hogan represented both parties. Second, **[*14]** even if these arguments were meritorious, which this court does not find, a "violation of the rules of ethics does not alone trigger disqualification." *Trimper v. Terminix Int'l Co., 82 F. Supp. 2d 1, 5 (N.D.N.Y. 2000)*(citing

---

[7] Hogan also asserts that Data Capture may not have standing to raise this claim because Data Capture's interests are not implicated.

*W.T. Grant Co. V. Haines, 531 F.2d 671, 677 (2d Cir. 1976))*. Disqualification should only be granted when violation of the Rules poses "a significant risk of trial taint." *Glueck, 653 F.2d at 748*. The court finds nothing that could support a conclusion that there is a risk of trial taint. The court declines to grant the Motion for Disqualification on these grounds. [8]

C. Hogan's Document Review at Data Capture

Data Capture further argues that Hogan engaged in *ex parte* communications with Mr. Esposito, who, as Chief Financial Officer of Data Capture, is a "represented party." This, according to Data Capture, is a clear violation of *Rule 4.2* and therefore justifies the disqualification of Hogan and its attorneys. While the court finds that Schoenthal, at one moment in the otherwise one-sided, rambling "conversation" of Mr. Esposito, did ask a question, it concerned the document review. Unfortunately, Mr. Esposito then added an unexpected comment concerning a conversation that Mr. Esposito had with Attorney Gersten. Mr. Esposito's response went beyond where were documents/boxes to be reviewed.

Data Capture appears to suggest that, having arranged for Mr. Esposito to conduct the document review for the Hogan attorneys, it would have this **[*16]** court believe that the Hogan associates should have ceased all conversation with Mr. Esposito as soon as he introduced himself on the

---

[8] It bears noting that Data Capture was aware of this alleged violation of the Rules of Professional Conduct since September 2007, yet chose not to file this Motion until June 2008. During oral argument, counsel's only explanation for Data Capture's failure to raise this issue until eight months after it received notice of the potential conflict was that he was "giving Hogan the benefit of the doubt." The court is not persuaded by this excuse and concludes the perceived "conflict" in the fall of 2007 was not one. Moreover, the court suggests that a motion for disqualification was not the appropriate **[*15]** remedy in this case. It could have requested a protective order to prevent disclosure of any potentially privileged information. See *Dubois v. Gradco Sys., Inc., 136 F.R.D. 341, 347 (D. Conn. 1991)*(noting that a motion for a protective order is appropriate when there is a risk of disclosure of privileged information).

morning of the document review and avoid even mere pleasantries regardless of the fact that Mr. Esposito was freely, and without prompt, speaking to them. While the court agrees that it would have been better if the particular question referenced above had not been asked, it notes that Data Capture's attorney should have either found someone else (*e.g*., a secretary or paralegal) to be present during the document review or, at the very least, identified Mr. Esposito in advance to Hogan and instructed Mr. Esposito to refrain from conversation with the associates without him present. While Mr. Esposito has no duty to refrain from speaking, it strikes this court as odd that an attorney would put his client in a room with opposing counsel and apparently not advise him to refrain from discussions with opposing counsel that the attorney now views as inappropriate. The court finds that counsel for Data Capture consented to the one-sided "conversation" of Mr. Esposito concerning the documents in the attic.

Almost all of the "conversation" between Mr. Esposito  [*17] and the Hogan attorneys involved Mr. Esposito explaining, *e.g*., what was in the boxes, how documents were filed, the types of documents in the files, and what documents the company scanned. While many attorneys would likely make the judgment not to allow his client to make even these, non-privileged, statements without his attorney present, the court does not view these statements as revealing any privileged information.

The court also finds that the communication was harmless and did not result in "trial taint" because no privileged or confidential information was shared. *See Nyquist, 590 F.2d at 1246*. Mere violation of the rules is not enough to warrant disqualification, especially without proof of trial taint. *See Trimper, 82 F. Supp. 2d at 5*; *Glueck, 653 F.2d at 748*. The court thus declines to grant the Motion for Disqualification on these grounds.

## V. CONCLUSION

Because Data Capture failed to carry its burden of proving facts that warrant disqualification, the court DENIES the Motion for Disqualification (Doc. No. 123).

**SO ORDERED**

Dated at Bridgeport, Connecticut this 17th day of October, 2008.

/s/ Janet C. Hall

Janet C. Hall

United States District Judge

---