# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| FREDERICK KLORCZYK, JR., as co-administrator : | CIVIL ACTION NO. |
| of the Estate of Christian R. Klorczyk, et al., : | |
| : | 3:13-cv-00257-JAM |
| *Plaintiffs*, : | |
| : | |
| vs. : | |
| : | |
| SEARS, ROEBUCK AND CO., et al., : | |
| : | |
| *Defendants*. : | JULY 27, 2018 |

## MEMORANDUM IN SUPPORT OF MOTION TO PRECLUDE FREDERICK HEATH

In Plaintiffs' counsel's own words, in a recent case where their opposition disclosed Frederick Heath as an expert, "**Mr. Heath is precisely the kind of hired gun that *Daubert* and its progeny are intended to stop at the gate.**"[1] Courts across the country have likewise criticized, scrutinized, and disavowed Mr. Heath's opinions for lacking valid methodology, and for valuing personal opinion over scientific principles. As one federal court recently held, "Without any identifiable method of reasoning, Heath's testimony is facially unreliable." *Vaughn v. Konecranes, Inc.*, 2015 U.S. Dist. LEXIS 47855, *13 (E.D. Ky. Apr. 13, 2015) (granting motion to preclude Mr. Heath from testifying at trial), *aff'd*, 642 Fed. Appx. 568 (6th Cir. 2016). Nonetheless, Mr. Heath believes that he can serve as an accident reconstructionist in this case because, as he puts it, "**It's not rocket science**."

Here, Mr. Health's deposition testimony and written report show his complete failure to employ any reliable or objective methodology in reaching his opinion about the supposed "defect" in the jack stand at issue.  Furthermore, his qualifications as an accident reconstruction

---

[1] Memorandum in Support of Motion to Preclude Testimony, *Wasilewski v. Abel Womack, Inc.*, No. 3:10 CV 1857 WWE, Dkt. 116-1, p.13 (hereinafter "Wasilewski Motion").

expert are woefully deficient, as was his accident reconstruction methodology or lack thereof. As a whole, he designed his work to reach the conclusion that the decedent's injury was caused by a defective jack stand.  He fit all of his information to that conclusion, rather than evaluating information and *then* reaching a conclusion.  Even in that framework, there is no documented process for the Court or jury to follow and understand how Mr. Heath reached his conclusions, let alone a sufficiently reliable process.  This court should accordingly preclude Mr. Heath because (1) he is fundamentally unqualified to offer expert testimony on failure analysis or accident reconstruction; (2) his opinions are based on speculation rather than facts and data; (3) his opinions are based on non-existent or facially unreliable methodology involving backyard "experiments" in an uncontrolled environment with worn and damaged exemplar jack stands; and (4)  both the Plaintiffs' own counsel and other courts nationwide have criticized Mr. Heath for offering opinions with no valid supporting methodology or qualifications.  His opinions are unmoored from facts and physical evidence, and therefore have no value to a jury.

I.    **FACTUAL BACKGROUND**

   A.    **Overview of Plaintiffs' Claims**

The Plaintiffs Frederick and Lynne Klorczyk ("Plaintiffs") brought this wrongful death action against Defendants under Connecticut's products liability statute ("CPLA"). The operative complaint is the Plaintiffs' Second Amended Complaint dated April 10, 2014 (ECF No. 99) — its only cause of action is a claim under the Connecticut Product Liability Act ("CPLA"), Connecticut General Statutes Section 52-572m, et seq., against the five Defendants in this action: Sears, Roebuck and Co., MVP (HK) Industries, Ltd., Wei Fu (Taishan) Machinery & Electric Co., Ltd., Shinn Fu Company of America, Inc., and Shinn Fu Corporation.  The product claimed to be defective is a "Craftsman Heavy Duty Jack Stand, Model No. 50163."  Compl. ¶ 17.  The

Plaintiffs allege that the decedent was performing an oil change on a vehicle at the Plaintiffs' home on March 11, 2011 while he was using the jack stand to support the vehicle and the jack stand failed, causing the vehicle to fall on him.  Compl. ¶¶ 20-22.  The Plaintiffs assert that the Defendants are liable for the decedent's injuries pursuant to the CPLA because they designed, manufactured, imported, wholesaled, distributed, or retailed the jack stand.  Compl. ¶ 17.

The Plaintiffs claim that the jack stand was defective because of its propensity for unstable engagement — essentially, the jack stand would look like it was fully engaged and ready to support a load, when it was not.  *Id.* at ¶ 25.  This is the theory of liability in both the Plaintiffs' Complaint and in their primary liability expert Frederick Heath's report, where he described "false engagement" as "tip to tip contact" between the jack stand's ratchet bar and the locking pawl that could be "disrupted" by an external force.  (*See* Disclosure of Frederick G. Heath, Dec. 8, 2014, pp. 16-17 **Ex. A**.)  Ultimately, Mr. Heath concluded that "false engagement of the support stand is more likely than not the cause of the incident at issue."  *Id.* at p. 13.  The Plaintiffs' June 25, 2018 supplemental discovery responses confirmed that their case is based on this false engagement theory, where they stated that the jack stand was defective because its "ratchet-and-pawl design . . . was capable of supporting weight under load without being fully engaged . . . the condition known as false engagement." Pls.' June 25, 2018 Supp. Disc. Responses p. 3, **Ex. B**.  Importantly, neither the Plaintiffs nor Mr. Heath have identified any defect that makes Craftsman 50163 jack stands particularly susceptible to false engagement. Rather, their theory seems to be that *all* ratchet-and-pawl style jack stands are defective.

### B.     Summary of Frederick Heath's Opinions

To establish that the jack stand was the cause of the decedent's death, the Plaintiffs disclosed Frederick Heath as an expert on liability, and then later disclosed him as a rebuttal

expert in response to the Defendants' accident reconstruction expert.[2,3] Mr. Heath's stated qualifications include a B.S. in Mechanical Engineering, his membership in multiple organizations, his "extensive background and experience in lifting and material handling equipment," and his "life long experience in product manufacturing, product engineering, design, development, improvement, sales, distribution, service, and repair." **Ex. A**, at pp. 7, 20-26.

Mr. Heath does not list any particular qualifications regarding accident reconstruction or a product failure analysis. Neither his accident reconstruction rebuttal report nor his CV contain any discussion of qualifications as an accident reconstructionist. His CV lists no certifications, courses, or training in accident reconstruction. He holds no memberships with organizations for accident reconstruction professionals, and he is not a licensed professional engineer. His CV simply states that as the principal of Heath and Associates, he conducts "litigation support in the field of forensic engineering, product liability, accident investigation, reconstruction and expert testimony involving such devices. . . [.]" **Ex. A**, at p. 20. In his rebuttal deposition he stated that he was qualified to determine the causes of the marks on the decedent's body and his body position based on "[m]y life experience," during which he "exercise[s] common sense on a regular basis." (Dec. Dep Tr. p. 83:23-85:10, **Ex. E**.)

### i.  Frederick Heath's Initial Expert Report

#### a.  Summary of Opinions From The Initial Report

In his initial report, the crux of Mr. Heath's opinion is that — assuming the decedent was using a jack stand to support his car — when the decedent raised the jack stand into position, the

---

[2] Mr. Heath's initial disclosure and report, dated December 8, 2014, and its attachments are attached hereto as **Exhibit A**. His second report, dated November 10, 2017, and its attachments are attached hereto as **Exhibit C**.

[3] Mr. Heath was deposed on each of his two reports. His first deposition was on March 22, 2017 in connection with his initial report, and his rebuttal deposition occurred on December 14, 2017. The corresponding transcripts for those depositions and are attached hereto as **Exhibit D** ("Mar. Dep. Tr.") and **Exhibit E** ("Dec. Dep. Tr."), respectively.

tooth of the jack stand's ratchet bar did not meet the pawl in the interlocking manner intended. *Id*. at 8. Instead, the ratchet tooth and jack stand's pawl happened to touch end-to-end, such that they appeared engaged, but would actually fall given some intervening force. *Id*. at 8, 12.

In the report, Mr. Heath "presumes" the entire process that the decedent supposedly used to perform the oil change based on secondhand information from the Plaintiff Frederick Klorczyk. *Id.* at 8. He presumes, all based on Mr. Klorczyk's testimony about events that Mr. Klorczyk did not witness, that the decedent raised the car using the service jack, lowered the service jack to transfer the weight of the car onto the jack stand so that the jack stand falsely engaged, withdrew the service jack, finished draining and filling the oil, and then attempted to tighten the drain plug.  *Id*. at 9. The action of tightening the plug supposedly created enough force to release the jack stand — which was successfully supporting the vehicle to this point — and cause its column to fully retract. *Id*. at 9. When the column retracted, the weight of the car shifted onto the decedent, asphyxiating him. *Id*. The jack stand then "tipped over as a result of the collapse, or the movement of [the decedent], or some combination thereof." *Id*. at 9. Mr. Heath's conclusion was that the jack stand's "false engagement" therefore "more likely than not" causes the incident. *Id*. at 13. The report does not address any of the physical evidence supporting the conclusion that the accident was caused by the service jack and not the jack stand.

Mr. Heath claims that false engagement occurred because the rough surface finish of the pawl and column makes them "prone to sticking when exposed to sliding one upon the other," though "microscopy was not employed" in reaching this conclusion. *Id*. at 12. The report does not indicate that any part of this particular model of jack stand was defective. *Id*. at 13.

    **b.**  **Methodology of the Initial Report's Failure Analysis — The Jack Stand Was Intentionally Set Up To Fail**

Mr. Heath testified that he did not perform an accident reconstruction for the initial report. (Mar. Dep. Tr. p. 60:9-18.) Rather, he performed three sets of "tests" on an exemplar jack stand to see whether he could achieve false engagement, then determined solely by "deductive reasoning" that false engagement was the cause. *Id*. His method was to repeatedly manipulate the jack stand until he finally achieved "point-to-point engagement," then try to get the jack stand to disengage. (Mar. Dep. Tr. p. 65:19-66:7, **Ex. D**.)  In other words, he intentionally set the jack stand up to fail, rather than seeking to simulate real-world conditions and then observing the failure rate.

Mr. Heath's report describes his testing only in very general terms, and does not set out any details describing the steps taken, or even who took them. This is the totality of his testing methodology:

1.  "False engagement of the pawl and a column tooth was first demonstrated with an exemplar support stand through manipulation of the column within the rectangular guide." **Ex. A**, at p. 16.

2.  Using an exemplar jack stand, Heath and Associates manually demonstrated that the falsely engaged jack stand could support a weighted load without collapsing until being disturbed by an external force. *Id*.

3.  After the testing described in (2), an exemplar support stand was set up with an exemplar BMW "and the incident was reconstructed based upon the existing evidence," though "arrangement had to be made to catch the load when the support stand collapse occurred to prevent damage to the vehicle the support stand or the concrete surface upon which the vehicle was parked." *Id*. at 16-17.

The report does not describe how he "manipulated" or "set up" the jack stands to make them collapse, but Mr. Heath testified that they achieved false engagement in many, if not most, cases by manual manipulation rather than the ordinary means of raising the saddle on the jack

stand. (Mar. Dep. Tr. p. 65:19-25.) Mr. Heath testified that he either did not take or did not keep any video footage, field notes, lab notes, or other documentation saying how many trials he undertook to recreate "point-to-point engagement," what the results of each test showed, or what changes they made from test to test. (Mar. Dep. Tr. p. 101:6-22; 11:2-18.)

        **c.**     **Mr. Heath's Information Came From Secondhand Testing On A Single Badly-Worn Exemplar Jack Stand With No Documented Methodology**

Mr. Heath testified that his independent contractor, Mr. Glenn Felpel, performed most all his jack stand tests and conveyed those results to Mr. Heath by phone, photograph, or video. (Dec. Dep. Tr. p. 21:8-13.) Incredibly, Mr. Felpel used one jack stand for *all* of the tests. (Mar. Dep. Tr. p. 137:14-19.) To conduct the first test, they altered the test jack stand by cutting a window into it to help them see the jack stand's pawl and teeth when they manually manipulated it to falsely engage. (*Id.* at p. 29:9-24.) Throughout the testing, the jack stand became worn and "deformed by repeated high contact loading" — and forced disengagement — such that "it can no longer be used" for testing purposes. (*Id.* at p. 137:8-12.) Nevertheless, Mr. Heath instructed Mr. Felpel to use this jack stand for the vehicle load tests. (*Id.* at pp. 139:5-9; 137:20-23.) These are photographs of the jack stand that the decedent used, and the exemplar product that Mr. Felpel used to perform the vehicle load tests:



Fig. 1. Heath's Exemplar Jack Stand          Fig. 2. Jack Stand Used By Decedent



Zoom-In on Ratchet Teeth from Fig. 1



Fig. 3. Pawl of Mr. Heath's Exemplar Jack Stand

These photographs show clearly that Mr. Heath's exemplar was far more worn than the decedent's jack stand. Unlike the decedent's jack stand, which appears new, the exemplar jack stand is visibly tarnished on the saddle, ratchet teeth, and pawl. The damage to the ratchet teeth and rounding of the pawl obviously made it harder to engage, and easier to disengage, the pawl and the ratchet teeth.

### d.   Mr. Heath Admitted There Was No Physical Evidence Of Jack Stand Use

For the facts that assumed in the "reconstruction" portion of his report, **Mr. Heath admitted that he was not aware of any physical evidence that the decedent was even using a jack stand at the time of his death**, and that he assumed the jack stand was in use based only on the Plaintiffs' testimony. (Mar. Dep. Tr. p. 19:22-20:25; Dec. Dep. Tr. p. 11:24-12:3.) He selectively ignored all of the Plaintiffs' prior inconsistent statements, first saying that the service jack caused the accident, then that the decedent was using more than one jack stand. Mr. Heath went on to say that he did not know details about where the jack stand would have been positioned if it were in use, and had no opinion as to how high the jack stand would have been set other than what the decedent's father testified. (Mar. Dep Tr. 167:5-23.) His opinion of where

the decedent placed the jack stand was based on "where I would've put it," (*Id.* at p. 89:2-6), and he dismissed concerns about the factual foundation for his opinion because "we didn't try to reconstruct the—the—the set up to that degree." (*Id.* at p. 168:2-3.)

> ### e.   Mr. Heath Could Not Explain Why The Falsely Engaged Jack Stand Did Not Collapse Immediately, And Had To Use Spring And Pieces Of Rubber To Reach His Desired Test Results

During Mr. Felpel's tests attempting to show that a falsely engaged jack stand could hold a load without immediately collapsing, Mr. Felpel first had trouble getting the falsely engaged jack stand to bear weight up to 1,900 pounds, and then had trouble getting the loaded, falsely-engaged jack stand to release and collapse. (Mar. Dep. Tr. 121:1-11;128:18-129:10.) To fix this problem, Mr. Felpel supplemented the setup with a spring so that he could create false engagement at lower weight levels. Mr. Heath testified that "I don't believe any spring existed in the frame" of the vehicle, but explained the use of the spring by explaining that the spring made the setup more akin to an actual vehicle frame, which is "not a rigid body." (*Id.* at p. 123:2-17.)

At higher weights, the spring was not enough to achieve false engagement (*Id.* at p. 130:1-6.), so Mr. Felpel switched to using increasingly firm pieces of rubber until the jack stand could hold 1,900 pounds in a "false engagement" position. (*Id.* at pp. 132:21-133:7.) There was no testing or calculation to show that the springs or rubber had the same give or flexibility as the subject BMW's frame. Rather, Mr. Heath testified that he was only concerned with finding material that would make the load on the jack stand more likely to release. (Id. at pp. 126:15-127:3.)

> ### f.   Mr. Heath Kept Little To No Testing Records But It Is Clear That The Tests Did Not Simulate Real-World Conditions

Mr. Heath generally did not make any measurements in reaching his conclusions. Neither Mr. Heath nor Mr. Felpel measured the force that Mr. Felpel used in the "successful"

disengagement tests, nor did they measure the force required to tighten the oil drain plug on the bottom of the vehicle.   Mr. Heath did not take any measurements to evaluate whether the decedent would have had enough room to survive even if the jack stand had fully retracted, claiming that he did not try "to reconstruct the circumstances other than through deductive reasoning."  (Mar. Dep. Tr. p. 59:23-25.)

For the tests that Mr. Felpel performed in order to replicate the "false engagement" with an actual car and jack stand, Mr. Felpel noted in his report that "many small adjustments were performed," but  does not state what those adjustments were. (*Id*. at p. 117:8-21.) For the vehicle tests, Mr. Heath testified that he and his associate modified the vehicle configuration to avoid damage to the associate's patio, even though doing so made the test conditions less similar to the circumstances of the actual incident. (*Id*. at p. 97:4-12.)

> **g.    Mr. Heath's Testing Videos Showcase His Decidedly Un-Scientific Methods**

To give the Court a better understanding of Mr. Heath's tests, a CD and flash drive with two of the testing videos he produced are being submitted with this memorandum of law.

In the first video, Mr. Felpel climbs down on all fours to inspect the jack stand, and declares that it is situated on the fourth tooth of the column in a falsely engaged position. Mr. Felpel explains that the motion the decedent allegedly used to disengage the car is best simulated by going to the front of the car and pushing, but performs his simulation by pulling on the back of the car instead. The frame of the video does not show Mr. Felpel's body as he pulls on the car, but it is clear that he was doing nothing to measure the force exerted. When he pulls the car, the jack stand fails to disengage, and instead slides toward Mr. Felpel.

In the second video, Mr. Felpel states "I'm not sure that the jack was set up properly that last take, so. Pretty sure it is this time. It's a little hard to tell. I should get a flashlight." He does

not explain what he meant by "properly." Upon inspecting the jack stand again (without first going to get a flashlight), he states "Looks more like it this time," without explaining why or how. Mr. Felpel returns to the back of the car and pulls on it. When it disengages, he exclaims in surprise. He concludes by saying, "Ok, that looks pretty good." In both videos, Mr. Felpel does not show nor does he explain how he set up the jack stand and the vehicle.

### ii.     Frederick Heath's Rebuttal Expert Report And Accident Reconstruction

#### a.     Summary of Opinions Offered in the Rebuttal Report

The second report is a rebuttal of defense expert Dr. James Sprague's opinion that (1) the decedent was using a service jack rather than a jack stand to support the BMW at the time of the incident; and (2) that the decedent would not have fit beneath the vehicle in the position described in Mr. Heath's initial report. *See Generally*, **Ex. A**. The report makes "a few minor adjustments" to the original report due to "discoveries" made in unexplained "subsequent investigations," including a change as to where the jack stand would have been placed at the vehicle, a crucial point in the analysis.. **Ex. C** at p. 3.

The testing in the rebuttal report was purportedly an "accident reconstruction" designed not to understand the incident based on the evidence, but instead to confirm Mr. Heath's opinion from his original report. (Dec. Dep. Tr. p. 41:14-19.). The report itself does not indicate that Mr. Heath relied on any particular resources in formulating the reconstruction.

Mr. Heath responds to Mr. Sprague's opinion that the horizontal forces of the vehicle against the service jack resulted in the service jack slipping out from beneath the vehicle by arguing that no such horizontal forces existed. **Ex. C** at p. 5. According to the rebuttal report, if the service jack had been used, the decedent "could not possibly" have caused or generated the

force necessary to dislodge it. *Id*. at 6. With respect to the decedent's body position beneath the vehicle, Mr. Heath doubled down on his original opinion.

### b.        Methodology of the Rebuttal Report – Service Jack Reconstruction

To rebut Dr. Sprague's opinion, Mr. Heath first used the service jack to raise the BMW, then did nothing, let the jack stand still, and observed that there was no movement.  Mr. Heath then used a tractor to pull the jack out from under the vehicle from the outside, at two different angles. **Ex. C** at p. 5-6. (Dec. Dep. Tr. 105:24-25.) Mr. Heath's design for this test was to tell Mr. Felpel "which direction to pull and — and how to orient the jack," but did not include any specific instruction on the methodology that Mr. Felpel should use to complete this experiment. (Dec. Dep. Tr. 105:25-106:2.)  The report states that they measured forces of 450 and 420 pounds to pull the service jack out from beneath the vehicle, but Mr. Heath does not explain the significance of these numbers or how Mr. Felpel measured them. They did not calculate the strength or direction of forces during the incident, did not account for the difference between the Plaintiffs' smooth concrete garage floor and the rough asphalt at Mr. Felpel's condominium complex, and did not account for the significant wear on the subject service jack's wheels. *Compare* the police photograph attached as **Exhibit F** and test surfaces depicted in **Exhibit C**, at pp 12-14. In his deposition, Mr. Heath confirmed that the service jack used for this rebuttal may not be sufficiently similar to validate the results, and he admittedly did not know whether the service jack used in his tests was the same model, but he believed them to be "equivalent" because the two jacks can lift to the same height. (Dec. Dep. Tr. p. 29:7-12.)

Mr. Felpel performed the tests involving the service jack, and Mr. Heath did not know the final methodology for the "successful" tests. He does not know whether Mr. Felpel takes or keeps notes of his work (*Id*. at p. 24:8-13); he did not require written work product from Mr.

Felpel (*Id*. at p. 38:16-19);  he does not maintain a written protocol or guidance for the tests (*Id*. at p. 25:1-5.); he never confirmed that Mr. Felpel took certain measurements that they discussed, such as ensuring that the testing surface was level or that it had a similar coefficient of friction to the Plaintiffs' garage floor (*Id*. at p. 31:2-20); and he could not recall whether he was present for the tests. (*Id*. at p. 24:20-22.)

In fact, when Mr. Heath states that he "witnessed" Mr. Felpel's successful tests, he means that he may have just seen photographs. (*Id*. at p. 26:3-7). He testified that he is not actually present for most of the testing that Mr. Felpel performs, and *he does not even actually review Mr. Felpel's work until Mr. Felpel successfully achieves the desired test result*. (*Id*. at p. 22:16-22:2.) When asked why he believes photographs are sufficient documentation of a complicated test result upon which he bases his entire rebuttal opinion, Mr. Heath simply responded that "**It's not rocket science[.]**" (*Id*. at p. 26:19-24) (emphasis added).

### c.        Methodology of the Rebuttal Report – Body Position Reconstruction

The methodology behind Mr. Heath's body position reconstruction involved (1) measuring vehicle's height off the ground on a fully extended jack stand; (2) estimating the decedent's body dimensions based upon assumptions about his ancestry; and (3) determining which parts of the car could have caused the various wounds on the decedent's body by looking at photographs. **Ex. C** at pp. 6-7.

Mr. Heath's testified that his methodology was to assume that the jack stand had tipped, and that it had adequate clearance to do so, then calculate backward from there. (Dec. Dep. Tr. p. 104:16-20.)  Mr. Heath estimated the decedent's chest width based his "statistical summary of body measurements" of German data. (**Ex. C**, at p. 7), but did not explain his statistical research methodology, and did not consult any external sources to determine the difference in chest width

when compressed. (Dec Dep Tr. pp. 102:4-10; 99:3.) Mr. Heath concluded that one-half inch compression was a reasonable amount of compression "judging by the rest of the dime—the—the dimensions" because he had "no basis to think that it wasn't unreasonable," and ***because it "fit the theory"*** that the jack stand had enough room to tip over after disengagement. (emphasis added) (*Id*. at p. 99:4-24.)  He assumed the height of the mechanics creeper that the decedent was using based on his conclusion about the one-half inch compression, neither measuring the actual creeper, nor inspecting the bottom of the creeper to verify that it was not crushed in the fall — which it was. (*Id*. at pp. 102:19-104:5.) He decided where the jack stand was placed "by where it would need to have been for… the decedent to knock it over after it had collapsed." (*Id*. at p. 43:17-21.)

The report does not describe how Mr. Felpel lifted the vehicle onto the jack stand, but the images attached to the report show that he raised the jack stand to its full height, such that the rear passenger tire of the vehicle lifted off the ground. (**Ex. C**, at p. 14.)  The calculation about the elevation of the jack stand was "[b]ecause that's the way we designed the reconstruction, is to raise the car to the elevation that it would've been at for a false engagement of the jack stand[.]" (Dec Dep Tr. p. 92:2-13.) As Mr. Heath testified, he is not aware of any physical evidence that when the vehicle fell, the decedent's body or the mechanics creeper knocked over the jack stand. (*Id*. at p. 45:23-26:2.) Mr. Heath conducted no study to determine how much force would be needed to knock over the jack stand (*Id*. at p. 44:17-20; 45:8-19), and was not aware of any physical evidence supporting this assumption other than "I believe his right leg was bent when—in the photographs of the—in the medical examiners' office." (*Id*. at p. 60:5-12; 45:23-46:2.)

Finally, Mr. Heath used common sense and "deductive reasoning" to determine which parts of the vehicle left which marks on the decedent's body.  (*Id*. at p. 87:1-9.) Mr. Heath estimated the size of the marks on the decedent's body based on their "very similar" appearance to the dimensions and size of the transmission casting. (*Id*. at p. 108:9-15.) He dismisses as impossible Mr. Sprague's conclusion that the marks on the decedent's sternum were caused by contact with an elastomeric grommet beneath the car because one can push the line attached to the grommet with a finger, though he did not take any measurements of the grommet and line other than lifting it with his finger. (**Ex. C** at p. 4; Dec. Dep. Tr. p. 81:14-82:4.) Similar logic helped him reach his conclusion that the manual transmission housing made the mark on the decedent's sternum. (**Ex. C** at p. 6.)

## II.   LEGAL STANDARD — THE COURT SERVES AN IMPORTANT GATE-KEEPING FUNCTION

Rule 702 of the Federal Rules of Evidence has a threshold requirement that a proposed expert be "qualified as an expert by knowledge, skill, experience, training, or education" in the topic of testimony. Even if a proposed expert has the requisite knowledge and expertise, expert testimony is admissible only if: (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based upon sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods;" and (4) "the expert has reliably applied the principles and methods to the facts of the case." Rule 702 "establishes a standard of evidentiary reliability" for "all scientific, technical, or other specialized matters within its scope." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that the district court serves an important gatekeeping function by "ensuring that an expert's testimony

both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597 (1993). *See also Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2002). To evaluate reliability, "the district court should consider the indicia of reliability identified in Rule 702," though these criteria are not exhaustive. *Wills v. Amerada Hess Corp*., 379 F.3d 32, 48 (2d Cir. 2004) (precluding an expert who admitted that the theory was the product of his own "background experience and reading" rather than scientific testing or peer review, did not state a known or potential error rate, and failed to account for variables). The district court may also consider additional non-exhaustive factors identified in *Daubert*, including (1) whether the theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review or publication; (3) the known or potential rate of error and the standards controlling the technique's operation; and (4) whether a particular technique or theory has gained "general acceptance" in the scientific community. *Daubert*, 509 U.S. at 593-94. The district court has "the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co*., 526 U.S. at 139, 142.

This flexibility does not require a district court "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *GE v. Joiner*, 522 U.S. 136, 146 (1997); s*ee also Amorgianos*, 303 F.3d at 266 (*citing Joiner*). In other words, expert testimony is inadmissible if the testimony does not rise above "subjective belief or unsupported speculation." *Joiner*, 522 U.S. at 140 (internal citation omitted.). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* at 146. The Second Circuit similarly instructs district courts to exclude expert testimony that is "speculative or conjectural," *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996), since it is "axiomatic that expert testimony must be based on actual knowledge and not subjective belief or

unaccepted speculation." *Kuzmech v. Werner Ladder Co.*, 2012 U.S. Dist. LEXIS 174082 (D. Conn. Dec. 7, 2012) (internal citation and quotation marks omitted.). The reason for this critical eye is the requirement that evidence be both relevant and reliable. *Joiner*, 522 U.S. at 142 (citing *Daubert*, 509 U.S. at 589).The burden is on the party proffering the expert to demonstrate that the expert testimony is admissible. *Daubert*, 509 U.S. at 592.

## III.   ARGUMENT — FREDERICK HEATH'S OPINIONS SHOULD BE PRECLUDED ENTIRELY

Under any standard, Mr. Heath's testimony is deficient. He lacks the threshold qualifications to offer an expert opinion in this case, and his "expert" opinions amount to personal opinion evidence devoid of any effort to apply the scientific method. Overall, his reports and opinions in this action are a paradigm of outcome-determinative reasoning, and this court should preclude them because: (1) he is fundamentally unqualified as an expert on accident reconstruction, so his opinions have no value to a trier of fact; (2) his opinions are based on speculation instead of facts or data; (3) his opinions are based on information and methods that are either non-existent or facially unreliable — he either parrots the Plaintiffs' own statements or relies on amateurish backyard "experiments," and, lastly, (4) both the Plaintiffs' own counsel in this case and other courts across the country have recognized Mr. Heath's propensity to opine on topics for which he is unqualified, without any basis in scientifically valid methodology.

### A.   Mr. Heath Is Not Qualified To Render Accident Reconstruction Testimony

Rule 702 of the Federal Rules of Evidence contains a threshold requirement that a proposed expert be "qualified as an expert by knowledge, skill, experience, training, or education" in the topic of testimony. A witness is qualified where he or she has "superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Vale v. United States*, 673 Fed. Appx. 114, 116 (2d Cir. Dec. 21, 2016) (summary order) (finding

an expert unqualified to testify as to plaintiff's medical diagnosis where expert was trained in a different medical discipline, had no a valid license to practice medicine, and had not practiced in 16 years.) The standard for expert testimony also requires that an expert's qualifications "must be relevant to the opinions she offers." *Karavitis v. Makita U.S.A., Inc*., 243 F.Supp.3d 235, 242 (D. Conn. Mar. 20, 2017) (internal citation omitted).

Mr. Heath has no knowledge or experience in accident reconstruction other than his own history as a paid expert witness. (Dec Dep Tr. p. 9:14-18.)  His "opinions are based upon his review of file materials and his 'experience,' which is insufficient under *Daubert* and Fed. R. Evid. 702." Wasilewski Motion, at p. 18.   Such unqualified testimony is categorically inadmissible. The court in *Karavitis*, supra, 243 F.Supp.3d at 243, held that a purported expert in saw safety was not qualified despite his career "concerned with the safe performance of products, processes, operations, and services," his history "in full professional practice as a private consulting engineer for over 25 years," and his experience in teaching courses involving saw safety. In that case, the court held that the expert's affiliations were either irrelevant to the product at hand, or were too vague for the court to be able to weigh their relevance. *See also Rotman v. Progressive Inc. Co*., 955 F.Supp.2d 272 (D. Vt. 2013) (holding that where an accident reconstruction expert's testimony did not depend on specialized knowledge or experience, he could not testify as an expert).  Mr. Heath's accident reconstruction qualifications here are actually far more deficient than the expert who was disqualified in *Karavitis*.

Mr. Heath's testimony and report make it clear that he bases his opinion on his engineering experience in fields unrelated to accident reconstruction and wound analysis. Accident reconstruction involves detailed measurements, and the effort to recreate the physical evidence of a case to evaluate possible causes and outcomes. Yet Mr. Heath's testimony shows

that he lacks basic accident reconstruction knowledge, and has no appreciation for the process of accurately recreating an accident scene. His listed credentials have nothing to do with accident reconstruction, and his experience is therefore irrelevant to the issues in this case. As Plaintiffs' own counsel previously argued, "[w]ithout biomechanical training or any form of testing to provide the requisite foundation, [Mr. Heath's] opinions amount to nothing more than supposition or speculation." Wasilewski Motion, at p. 5. *See also Dreyer v. Ryder Automotive Carrier Group, Inc.*, 367 F.Supp.2d 413, 417 (W.D.N.Y. 2005) (holding that the accident reconstruction expert's failure to explain why his training and experience led him to his conclusion, without explaining the reasoning behind his conclusion, rendered his opinion inadmissible). Despite Mr. Heath's misguided statement that "it's not rocket science," accident reconstruction is a rigorously scientific and technical discipline requiring thorough understanding of physics, much like rocket science, and he is simply not a qualified expert in the field.

### B.     Mr. Heath Does Not Base His Speculative Opinions On Facts Or Data

In *Daubert*, the Supreme Court recognized that the Rules of Evidence require "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. To be relevant to the fact finder, expert testimony requires a basis in "sufficient facts and data." Fed. R. Evid. 702. Thus, expert opinions that are too "speculative or conjectural" fail to satisfy the Federal Rules of Evidence, and should be precluded. *Boucher*, 73 F.3d at 21. Mr. Heath bases all of his opinions on questionable fact testimony, and fills in the gaps with his own conjecture, rendering his entire opinion inadmissible.

### i.    Mr. Heath's Opinions Lack Factual Foundation

Because the opinions that Mr. Heath offers in both of his reports are not meaningfully related to any known facts of the case, they are neither relevant nor helpful to the fact-finder.

"Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (citing 3 Weinstein & Berger P702[02], p. 702-18).

Mr. Heath testified that (1) the factual basis for his opinions came from the Plaintiffs' testimony; (2) he was not aware of any physical evidence that the decedent was using a jack stand at the time of his death; and (3) he did not know where the jack stand would have been placed if the decedent had used it.  (Mar Dep Tr. p. 36:13-17; 19:22-20:25; 167:5-23.) He even admitted to premising his report's irrelevant sociological depiction of the Klorczyk family on conjecture aimed to give a "flavor" to his opinions. (*Id.* at p. 38:1, 39:3-7.)

The conclusions in both of Mr. Heath's reports depend upon a series of assumptions that must all be true in order to reach his desired result. (*Id.* at p. 36:13-37:5.) Mr. Heath ignored physical evidence pointing toward the decedent's use of a service jack rather than a jack stand, and assumed the facts that would have to be true in order for jack stand failure to occur — including the decedent's use of a jack stand, his entire process for completing the oil change, his body position beneath the vehicle, and even the precise motion that the decedent made to disengage the jack stand. (**Ex. A**, at p. 8-9). Mr. Heath also declined to consider that if the jack stand had collapsed and remained upright sufficient clearance would have remained for the decedent to survive. (Mar. Dep. Tr. p. 59:13-25.)

The Plaintiffs' testimony is not a proper basis for Mr. Heath's opinion, which impermissibly relies on his assessment of their credibility.[4] *See Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) (Disapproving "the practice of expert witnesses basing their conclusions on the in-court testimony of fact witnesses, out of concern that such expert testimony may improperly bolster the account given by the fact witnesses.") Mr. Heath's reliance

---

[4]  Mr. Heath stated that he read the depositions of the various fact witnesses, "considered the circumstances under which the observations were made by [the Klorczyk deponents and the professional responders] and established tendered conclusion in my own mind as to what was the more likely course of events." (Dec. Dep. Tr. p. 16:3-7.)

on Plaintiffs' testimony both undermines the foundation of his expert opinion, and comments directly, "under the guise of expert opinion, on the credibility of trial testimony from crucial fact witnesses." *Id.*

An expert opinion grounded in conjecture is not sufficiently reliable to make the opinions "relevant to the task at hand." The Second Circuit has emphasized that district courts are "not required" to accept an expert's testimony regarding speculative and untested theories concerning the cause of an accident in a products liability case. *Lynch v. Trek Bicycle Corp.*, 374 Fed. Appx. 204, 207. In *Lynch*, supra, the Second Circuit affirmed the district court's preclusion of an expert who testified "how the failure 'could have happened,' to his untested 'conjecture,' and to how certain testing 'might' be conducted." *Id.* at 206. The result here should accordingly be the same as in *Lynch*, and as in *J.B. Hunt transport, Inc. v. General Motors Corp.*, 243 F.3d 441, 444-45 (8th Cir. 2001), where the Eighth Circuit affirmed the district court's exclusion of an accident reconstructionist where the expert's theory was premised only upon his own impressions, and where he conceded that he had insufficient evidence to completely reconstruct the accident. The result was the same in *Kuzmech*, 2012 U.S. Dist. LEXIS at *9, where the proposed expert based his entire opinion on a visual inspection and deposition testimony. Like Mr. Heath, the expert in that case failed "to identify what principles and methods he relie[d] upon in coming to his conclusions besides his conclusory statement that such conclusions were based on a 'reasonable degree of engineering certainty.'" *Id.* at *21. The court accordingly found that his testimony was not grounded on sufficient facts or data, and did not apply reliable principles and methods, and precluded his testimony. *Id.* at *22, *28. The same is true in this case.

### ii.  Mr. Heath's Conclusions Are Too Speculative To Be Admissible

Taking his assumed facts as true, Mr. Heath "proffers a number of 'bottom line' conclusions regarding the cause of Plaintiff's accident and injuries, but has not made any showing as to how those opinions were formed, beyond pointing to few untested and unsubstantiated assumptions he decided fit his speculative conclusions." Wasilewski Motion, at pp. 17-18.  Because his conclusions are based solely on the assumptions described above, they lack the "good grounds" necessary for admission. *Amorgianos*, 303 F.3d. at 267.

Although Mr. Heath testified that he did not perform a reconstruction for his first report (Mar. Dep. Tr. p. 60:9-18), and that he did not try to set up the vehicle tests to replicate the actual incident (Mar Dep Tr. 168:2-3), that report not only concluded that false engagement is theoretically possible, but that it was "more likely than not" the cause of the decedent's death. Ex. A, at p. 17. However, Mr. Heath admitted that his conclusions have no basis other than deductive reasoning, and his opinion of how he himself would have acted. (Mar. Dep. Tr. pp. 59:23-25; 89:2-6.) He is also uncertain about the key elements of his liability claim. For instance, Mr. Heath's concludes that the jack stand tipped over, but when asked to justify this conclusion, he replied "I don't know," and conceded that he "can't explain that it's tipped over and fully retracted" unless his assumption about the decedent's movement was correct. (*Id*. at pp. 70:19-24; 71:15-72:2.) It is obvious from his testimony that **Mr. Heath never even considered the possibility that the jack stand was found on its side and retracted because it was not supporting the weight of the vehicle when the accident happened.**

Mr. Heath's opinion on product defect is as conclusory as his accident reconstruction opinion. While he says the jack stand is defective, the initial report does not indicate that any part

of this model jack stand was defective[5] — he does not, for example, claim the ratchet bar was too small, or the collar too large, or the pawl too weak, or the base too narrow, or the materials inadequate. Instead, his opinion would apply to all ratchet-and-pawl jack stands, calling them defective because of a propensity to stick together and create false engagement. Ex. A, at p. 16-17. He bases this opinion on his simple observation that "the surface finish of both [the pawl and metal column] is rough and comprises small high spots and low spots which will increase sliding friction between the surfaces." *Id*. at 16.  In that same paragraph, Mr. Heath admits that he did not employ microscopic analysis or measure the "sliding friction" of the parts. *Id*.  Nor did he conduct any study to determine the failure rates of such jack stands, or how common false engagement is under normal use conditions.  In fact, he did not point to a single known instance of false engagement, or even an article or publication about the phenomenon. Mr. Heath identifies the painted finish of the pawl as the reason for "sticking" that causes false engagement, but the exemplar jack stand that he used for the actual vehicle was so worn down by the time Mr. Felpel performed these tests that the surface finish of the pawl was gone. *See* Fig. 3.  These inconsistencies within the report are not surprising, given Mr. Heath's statement that it is "not unusual" for him to give inconsistent testimony. (Dec Dep Tr. p. 14:14-17.)

The rebuttal report demonstrates more of the same conclusory opinions. Without verifying that his exemplar service jack is the same as the subject service jack, measuring the horizontal movement of the service jack, or accounting for the weather conditions at the time of the incident, Mr. Heath concludes that the service jack could not have possibly slipped out from beneath the vehicle. (**Ex. C**, at p. 6.) Similarly, without taking any measurements of the actual

---

[5] To the extent that he claims the manual for the jack stands contained insufficient warnings (**Ex. A**, at p. 19), the jack stands complied with the controlling regulations promulgated by a committee on which Mr. Heath serves. See ASME-PALD 2009 Standards Excerpt, **Ex. G**.  Further, the Plaintiffs' own warnings and instructions expert, Dr. Eric Boelhouwer, also testified that the product manual complied with the standard set forth in, ANSI Z535.6.  (E. Boelhouwer Dep. Tr. pp. 143:3-144:13, **Ex. H**.)

scene, or the subject creeper, or the decedent's dimensions, Mr. Heath concludes that the decedent's position beneath the vehicle was exactly where it needed to be for his theory to work.

The *J.B. Hunt* case, supra, similarly involved a product liability claim in which the plaintiff's expert was unable to scientifically reconstruct the accident. 243 F.3d at 443.  The district court excluded his testimony, and the Court of Appeals affirmed, because his theory lacked adequate factual foundation or scientific support. *Id*. at 443-44. Thus, the Eighth Circuit Court of Appeals held that "[b]ecause of the deficiencies at the core of his opinion, including his own admission concerning his inability to scientifically reconstruct the accident, [the expert]'s resulting conclusion. . . was mere speculation and pure conjecture." *Id*. at 444. In another case, *DeBartolo v. Daimler Chrysler Corp.*, 2005 Conn. Super. LEXIS 3579, at *7 (Conn. Super. Ct. Dec. 22, 2005), the court granted a motion to preclude an expert who merely had an "informed suspicion" with respect to the cause of the malfunction of an airbag. In that case, the expert testified that he did not know the speed at which the airbag in the subject vehicle was designed to deploy; that he had never seen any structural or crash test data concerning the vehicle; and that he was not familiar with the specifications or calibrations of the airbag components and sensors as installed in the vehicle in question — all of which, the court held, was insufficient to "take his opinion out of the realm of conjecture and speculation." *Id*. Like the experts in *J.B. Hunt* and *DeBartolo*, Mr. Heath's testimony is a perfect example of the speculative and conjectural opinions that this court must exclude. *Boucher*, 73 F.3d at 21.

## C.      Mr. Heath's Opinions Lack The Requisite Indicia Of Reliability

"To warrant admissibility. . . it is critical that an expert's analysis be reliable at every step," and to that end, "**any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible**." *Amorgianos*, 303 F.3d at 267 (emphasis

in the original). Throughout his reports and depositions, Mr. Heath conceded the many shortcuts, assumptions, and failures that render his analysis unreliable and inadmissible. Applying the *Daubert* factors:  (1) his testing technique has no known error rate, and no standards controlling its operation; (2) his theory of false engagement has not been reliably tested; (3) neither his theory nor his technique have been subjected to peer review or publication; and (4) his theory has not gained "general acceptance," or any acceptance, within the scientific community.

### i.    Mr. Heath's Testing Methodology Lacks Standards Or Any Basis In Science

The *Daubert* analysis requires a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

Here, Mr. Heath does not base his opinions on scientific principles or reproducible methodology. In both his initial opinion and his rebuttal reconstruction, Mr. Heath failed to support any of his opinions with physical evidence, failed to take measurements in conducting his experiments, failed to adequately control his testing conditions, and failed to conduct any supporting research.

Mr. Heath also kept no record of his (or Mr. Felpel's) methodology, or of any evidence that would undermine his results, despite his testimony that he had multiple unsuccessful test results. As Plaintiffs' counsel previously concluded, the reason for Mr. Heath's "failure to disclose the methods or principles he has applied in reaching his opinions is simple: he did not employ any reliable or objective methodology in rendering those opinions." Wasilewski Motion, at p. 17. The same is true in this case, where the sloppy methods show that Mr. Heath and his associate were more concerned about avoiding damage to the associate's patio than the quality of their testing conditions. (Mar. Dep. Tr. p. 97:4-12.)

### a.       Methodology Specific To The Initial Report's Failure Analyses

In plain terms, Mr. Heath's tests involving the jack stand used springs and rubber to achieve "false engagement," intentionally set the jack stand to fail, failed to account for the height of a fully retracted jack stand, and paid no mind to the strength or direction of the forces at work during the actual accident.  He made no effort at all to replicate normal conditions of use.

Critically, the jack stand that Mr. Felpel used in the vehicle tests bore little functional resemblance to the one that the decedent allegedly used (See Figures 1 through 3, above).  It was admittedly too worn to use in the tests, and "very well might" have made disengagement occur more easily. (Mar. Dep. Tr. pp. 139:5-9; 137:20-23.)   The exemplar's condition effectively invalidates Mr. Felpel's test results, making it clear that Mr. Heath's results do not exemplify the way the actual jack stand at issue would have operated in this case. In a similar matter, *Withrow v. Spears*, 967 F.Supp.2d 982, 996-97 (D. Del. Aug. 22, 2013), the district court precluded an accident reconstructionist's "mock-up" test where the test itself bore little resemblance to the actual incident. There, the test did not pass muster under *Daubert's* reliability prong, making it inadmissible. *Id*. at 997. In particular, the mock-up test had several deficiencies that rendered it inadmissible, including that the expert made no attempt to correlate: "(1) the measurements, contents or weight of the mock-up door to Withrow's door; (2) the wind conditions at the testing site to those at the time of the accident; (3) the size of the tractor-trailers that passed by the mock-up door to that of Spears' truck; or (4) the speed of the tractor-trailers as compared to that of Spears' truck on the day of the accident." *Id*. Mr. Heath's lacking methodology echoes the deficiencies in the *Withrow* methodology, and this court should preclude Mr. Heath's failure analysis for the same reasons.

### b. Methodology Of The Service Jack Reconstruction

The purpose of Mr. Heath's reconstruction with the service jack is to rebut Mr. Sprague's opinion that the decedent was using a service jack at the time of the incident, but the "tests" that Mr. Felpel performed for this rebuttal opinion bear no resemblance to the incident.

The first test merely involved Mr. Felpel's visual observations of the jack, with no standards or written reports. (Dec. Dep. Tr. p. 120:1-121:10.) The latter "test" involved rigging the service jack to a tractor, driving the tractor away from the service jack, and yanking the service jack out from beneath the vehicle. The test used a different service jack than the model used by the decedent, did not account for the difference between the Plaintiffs' smooth concrete garage floor and the rough asphalt at Mr. Felpel's condominium complex, did not account for the significant wear on the subject service jack's wheels, did not even attempt to approximate the strength or direction of forces during the critical event, and paid no regard to the statement in the police report that the lifting plate of the service jack was moist with condensation on the day of the incident. (*Id.* at p. 29:7-12.) *See also* the police report attached as **Exhibit I**, at p. 2.

Essentially, Mr. Heath ignored the circumstances of the actual incident and fabricated tests that would prove his "false engagement" theory. Mr. Heath cannot even stand by his methodology, since (1) he was not present during this testing, (2) Mr. Felpel integrated additional methods that Mr. Heath did not prescribe, and (3) Mr. Felpel took no measurements or notes to validate his methods. Mr. Heath did not even ask follow-up questions when Mr. Felpel gave him photographs of the tractor testing, even though Mr. Heath had no idea that Mr. Felpel planned on using a tractor for the test. (Dec. Dep. Tr. 105:24-25;106:18-21.)

### c.       Methodology Of The Body Position Reconstruction

Mr. Heath designed his body position reconstruction around vindicating his conclusions from the initial report, and admitted that he chose calculations because they "fit his theory." (Dec. Dep. Tr. p. 11:24-12:3; 41:14-19; 99:4-24.)    Mr. Heath had already opined in his initial report that the jack stand became tipped over due to "the result of the collapse, or the movement of CK, or some combination thereof," (**Ex. A**, at p. 13.), so he really had no choice but to reach that same conclusion in his rebuttal report.

Thus, all of his figures involved in the accident reconstruction — including the height of the jack stand, the size and positioning of the decedent's body, where the decedent held the wrench beneath the car, the height of the creeper, and the amount of chest compression on the decedent — were calculated to achieve this result. (Dec. Dep. Tr. pp. 66:3-7; 99:3-24; 102:4-10; 102:19-104:5; 104:16-20.) In reality, Mr. Heath made no calculations at all, instead basing his "statistical summary" of the decedent's body on assumptions. (**Ex. C**, at p. 7.) He chose the amount of compression on the decedent's chest because it "fit his theory" and did not seem "unreasonable," in light of his other assumptions, even though variation of this figure "might very well affect" the rest of his calculations on the theory of jack stand tip-over. (Dec Dep Tr. p. 99:4-24; 100:25-101:3). Also, he neither measured nor inspected the actual creeper to verify that it had not been crushed in the fall (which it had). (*Id*. at p. 102:19-104:5.)

Unfortunately for Mr. Heath, accident reconstruction requires more precision than guesstimates and the methodology he employed here lacks any basis other than his desire to prove himself right. His methodology is so utterly bereft of scientific value.

### ii.   Mr. Heath Has Not Reliably Tested False Engagement Theory

Mr. Heath's opinions also fail the prong of *Daubert* that evaluates the testability of an expert's theory. This prong concerns "the generation of testable hypotheses that are then subjected to the real world crucible of experimentation, falsification/validation, and replication," and gives greater weight to theories that have survived over time. *Innis Arden Golf Club v. Pitney Bowes, Inc.*, No. 3:06cv1352 (JBA), 629 F. Supp. 2d 175, 190 (D. Conn. Jun. 26, 2009) (granting motions to preclude experts from testifying at trial based upon their unreliability, holding "[a]n inquiry with a preordained conclusion is neither scientific nor legally reliable.") The testability of "false engagement" and jack stand failure in a controlled environment remains unknown, as Mr. Heath certainly did not accomplish it here. Mr. Heath's opinion relies on results-oriented methods, but without adequate testing, his theory is not reliable enough to submit to a jury.

In *N.K. v. Abbott Labs.*, 2018 U.S. App. LEXIS 10094 (2d Cir. 2018), the Second Circuit upheld the district court's decision to preclude an expert whose methods were inadequate to eliminate an alternative theory of causation.   Here, Mr. Heath's methods were obviously inadequate to eliminate the theory that the decedent's accident was caused by a service jack instead of a jack stand, and his testimony should similarly be precluded.

### iii.  Mr. Heath's Methodology And Opinion Have Not Faced Peer Review

The peer review factor of the *Daubert* analysis highlights that "submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." *Daubert*, 509 at 593. Although an expert eye is not needed to see the numerous flaws in Mr. Heath's methodology, the

lack of any peer-reviewed research or publications supporting his unorthodox accident reconstruction methods weigh heavily against admitting his opinions.

### iv.  Mr. Heath's Theory Is Not Generally Accepted By The Scientific Community

The final *Daubert* factor evaluates the relevance of an expert's opinion based upon its general acceptance in the scientific community, which affects admissibility to the extent that "a known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594.

To start, it is impossible for Mr. Heath's methods to be generally accepted by the scientific community, because the absence of written records means that his methodology is essentially unknown.   Mr. Heath's report contains no background on the proof of false engagement as a theory, and Mr. Heath notably failed to cite a single professional publication or even another known instance of false engagement. Of course, this absence is explained by Mr. Heath's failure to conduct any research whatsoever on jack stand failures in preparation for his expert work. (Mar. Dep. Tr. p. 19:21-25).

Mr. Heath's report states that "[t]he possibility of encountering false engagement with pawl and ratchet support stands is not only foreseeable but apparently not uncommon," (**Ex. A**, at p. 17), but Mr. Heath testified that he had no basis for that statement beyond his own reasoning. (Mar. Dep. Tr. p. 81:13-83:4.) Indeed, the only source to which Mr. Heath could point as support for his false engagement theory was the "scuttlebutt" he supposedly heard in the industry, though he could not name any specific instances or sources of this "scuttlebutt." (*Id.* at p. 82:9-83:4) The lack of general acceptance of Mr. Heath's theory reflects negatively on his opinion's validity.  His inability to point to even one expert who has come out in agreement with

his theory at any point means that his theory and technique "may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594.

> **v.  Precluding Mr. Heath's Opinions Based Upon His Lacking Methodology And Reliability Is Consistent With Federal Precedent**

District courts routinely disqualify experts whose methods and conclusions lack the requisite indicia of reliability identified in Rule 702, and, in fact, often do so for opinions grounded in greater fact and science than Mr. Heath's. For instance, in *Pitterman v. GM LLC*, No. 3:14-CV-00967, 2016 U.S. Dist. LEXIS 57165, at *30 (D. Conn. Apr. 29, 2016), the district court evaluated a proposed expert's testimony regarding the alternative design of a product.  Like Mr. Heath, that expert did not perform sufficient testing (he performed no testing of the alternative design), did not subject his opinion to peer review of any kind, and did not calculate an error rate. *Id.* Applying the *Daubert* factors, the court held that the methodology was not a reliable basis for that conclusion, and precluded the expert from testifying about the proposed alternative design. *Id. See also Karavitis*, supra, 243 F.Supp.3d at 241.

Similarly, in *Sanders v. Fireline, Inc*., 3:02CV00498, 2007 U.S. Dist. LEXIS 17068, at *2 (D. Conn. March 12, 2007), aff'd, 295 Fed. Appx. 373 (2d Cir. 2008), the district court disqualified a proposed expert in a CPLA case, finding that (1) the expert had no experience in conducting failure analysis for the subject product; (2) the expert undertook no failure analysis; and (3) the expert impermissibly relied on his own assessment of the plaintiff's credibility.  This led the court to hold that the testimony "would not be the product of reliable principles and methods," and was therefore inadmissible.  *Id*. at *3. On appeal, the Second Circuit affirmed, holding that the district court was well within its discretion to conclude that the "analytical gap" between the data and opinion offered was too great. *Sanders*, 295 Fed. Appx. at 375.  *See also Kuzmech*, supra, 2012 U.S. Dist. LEXIS at *22.  Here, in addition to having no experience in

accident reconstruction, and in addition to lacking a basis in any established fact, Mr. Heath's entire opinion relies on unsubstantiated, undocumented, and unreliable methodology.   As in *Sanders*, the analytical gap between Mr. Heath's so-called "data" and his ultimate opinion is far too wide.

### D.      Precluding Mr. Heath's Testimony In This Case Is Consistent With Other Decisions Precluding His Testimony

Mr. Heath has faced attack in multiple jurisdictions, all for similar reasons: his inconsistent methodology and speculative opinions. For example, in *Bridgeman v. Deere & Co*., 2009 U.S. Dist. LEXIS 57250, *4 (E.D. Va. Feb. 13, 2009), the court excluded Mr. Heath's opinions, finding that it was "abundantly clear that Mr. Heath is not qualified as an expert in the relevant field and that his opinions are grounded in nothing except his personal views."   Mr. Heath had opined that Deere should have installed a protective screen on the windshield of the subject excavator, and that the warnings were not adequate to advise the operator that screens should be used when conducting demolition work. *Id*. at *6. In that case, the grievances against Mr. Heath's testimony were similar to those here — he lacked the requisite knowledge and experience in the area where he sought to opine, and he lacked any objective standards or methodology. *Id*. at *7. Absent any factual foundation for his personal opinion, the court found that Mr. Heath's testimony was inadmissible under *Daubert* and Rule 702. *Id*. at *12.

In another case, *Holzman v. GMC*, 2007 Mass. Super. LEXIS 462, *16, *20 (Nov. 6, 2007), the court broadly criticized Mr. Heath's expert opinions, describing his methods as "result-oriented" and noting that "Heath's credibility — already suffering from the very limited extent of his actual testing in relation to the sweeping conclusions drawn therefrom, and from the sometimes stark contrast between the information in the documents on which he relied and the conclusions he drew from them — was further tarnished on cross examination." In relevant part,

the court pointed out that Mr. Heath is not a licensed engineer in any jurisdiction, that he tested only one of the products that were relevant to the case, and that he tested them using the wrong car. *Id*. at *17.   The court also observed that much like in the present matter, Mr. Heath's inattention to detail "infected numerous other aspects of Heath's work and testimony as well," causing the court to criticize and question his reliability. *Id*. at *18, *21.

More recently, the Sixth Circuit Court of Appeals affirmed a district court's decision to preclude Mr. Heath from testifying at trial, finding that Mr. Heath's report was conclusory. *Vaughn v. Konecranes, Inc*., 642 Fed. Appx. 568, 577 (6th Cir. 2016). In the underlying opinion, 2015 U.S. Dist. LEXIS 47855, *7, *13 (E.D. Ky. Apr. 13, 2015), the district court called Mr. Heath's report "facially unreliable" due to his failure to explain how, given the facts and data he relied upon, he reached his conclusions. The problems with Mr. Heath's report closely mirrored those in this case. For instance, Mr. Heath's testimony lacked "any identifiable method of reasoning," and his report did not describe which documents were actually used in formulating his opinions. *Id*. at *8-9. Worst of all, the report did not explain how his experience informed his conclusions, or even how he applied his experience to the facts of the case. *Id*. at *9, 12. This absence of explanation posed too great of an "analytical gap" to allow him to testify. *Id*. at *10.

Here, Mr. Heath's testimony and report are inadmissible for many of the same reasons described by the district court in *Konecranes*: his "conclusions are unreliable because he has failed to explain his reasoning, verify his methods, or point to others who have done so." *Id*. at *13. As in *Bridgeman*, Mr. Heath lacks any knowledge and experience with accident reconstruction, and thus has no business testifying about how the accident occurred or what caused it. As in *Holzman*, Mr. Heath's inattention to detail and vague basis for his conclusions undermine his credibility. Mr. Heath's methods are notoriously sloppy, fueled by an outcome-

determinative drive to please his paying client, and more grounded in personal opinion than verifiable fact. He must be precluded as an expert witness.

As Plaintiff's counsel once stated regarding Mr. Heath's methods, "Mr. Heath has utterly failed to ground his testimony in facts or data, utilize reliable and objective principles and methods, and apply those principles and methods reliably to the facts of this case through design, development, and/or testing." Wasilewski Motion, at p. 2.  Those same critiques apply here. Mr. Heath has once more demonstrated, "whether by willfulness or sloth," *id.*, a failure to develop his opinion upon any reliable, scientific basis. In addition to lacking the requisite qualifications to opine on the jack stand, he draws his conclusions from an uncontrolled set of experiments in which he failed to take any measurements, make any calculations, or record any test results that did not favor him. The opinions he offers are merely "based upon his unadorned personal views." *Id.* at 21. In short, "[i]t is difficult to <u>under</u>state the quality and extent of Mr. Heath's work in this case," and his testimony is "mere *ipse dixit* from an unqualified witness and must be excluded by the Court." *Id.* at 2 (emphasis in original).

## III.    CONCLUSION

For all of the foregoing reasons, this Court must preclude the Plaintiffs from offering Mr. Heath's reports or testimony at trial.

DEFENDANTS,

SEARS, ROEBUCK & CO.,
SHINN FU CORPORATION,
SHINN FU COMPANY OF
AMERICA, INC.,
MVP (HK) INDUSTRIES, LTD.,
and
WEI FU (TAISHAN) MACHINERY
& ELECTRIC CO., LTD.


By: */s/ Steven J. Zakrzewski*
    Dennis O. Brown, Esq. (ct04598)
    Steven J. Zakrzewski, Esq.
    (ct28934)
    Gordon & Rees, LLP
    95 Glastonbury Blvd., Suite 206
    Glastonbury, CT 06033
    (860) 278-7448
    (860) 560-0185 (fax)
    dbrown@gordonrees.com
    szakrzewski@gordonrees.com


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been served upon all counsel of record via U.S. mail and via electronic transmission, pursuant to Rule 5(b), Fed. R. Civ. P., on this 27th day of July, 2018.


    */s/ Steven J. Zakrzewski*
    Steven J. Zakrzewski