# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FREDERICK KLORCZYK, JR., as co-administrator : CIVIL ACTION NO.
of the Estate of Christian R. Klorczyk, et al.,   :
                                      : 3:13-cv-00257-JAM
                  *Plaintiffs,*    :
                                        :
vs.                                      :
                                        :
SEARS, ROEBUCK AND CO., et al.,        :
                                        :
                *Defendants.*   : December 8, 2014

## PLAINTIFFS' DISCLOSURE OF EXPERT WITNESS

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, Plaintiffs, Frederick

Klorczyk, Jr., as co-administrator of the Estate of Christian R. Klorczyk, and Lynne Klorczyk, as

co-administrator of the Estate of Christian R. Klorczyk (collectively, the "Plaintiffs"), hereby

disclose the following witness who may offer expert testimony in support of their claims in this

action:

      **Frederick G. Heath**
      **3316 Springcrest Drive**
      **Louisville KY 40241**
      **Tel: (502) 425-2385**
      **Fax: (502) 339-0729**

Mr. Heath is expected to offer opinions consistent with his report in this action, which is

attached hereto as Exhibit A and is incorporated in its entirety in this pleading pursuant to Rule

10(c) of the Federal Rules of Civil Procedure.

Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, Exhibit A contains

the following information: (i) a complete statement of all opinions that the witness will express

and the basis and reasons therefor; (ii) the facts or data considered by the witness in forming

them; (iii) the witness's qualifications; (iv) a list of cases in which the witness has testified as an

expert at trial or by deposition during the previous four (4) years; and (v) a statement of the

compensation to be paid for the witness's study and testimony in this case.

PLAINTIFFS,

FREDERICK KLORCZYK, JR., as co-
administrator of the Estate of Christian R.
Klorczyk, and LYNNE KLORCZYK, as co-
administrator of the Estate of Christian R.
Klorczyk

By:       /s/ David J. Elliott
          David J. Elliott (ct04301)
          Bryan J. Orticelli (ct28643)
          Kaitlin A. Canty (ct29074)
          DAY PITNEY LLP
          242 Trumbull Street
          Hartford, Connecticut 06103-1212
          (860) 275-0100
          (860) 275-0343 (fax)
          djelliott@daypitney.com
          borticelli@daypitney.com
          kcanty@daypitney.com

          Howard S. Edinburgh
          Howard L. Wexler
          Joseph E. Donat
          Michael Gallub
          Herzfeld & Rubin, P.C.
          125 Broad Street
          New York, NY 10004
          (212) 271-8529
          (212) 344-3333 (fax)
          hedinburgh@herzfeld-rubin.com
          hwexler@herzfeld-rubin.com
          jdonat@herzfeld-rubin.com
          mgallub@herzfeld-rubin.com

          Their Attorneys

## CERTIFICATION

I HEREBY CERTIFY that on this date a copy of the foregoing was served by first class mail, postage prepaid, and by electronic mail to the following:

Sean P. Flynn (phv05949)
Steven J. Zakrzewski (ct28934)
Gordon & Rees LLP
2211 Michelson Drive, Suite 400
Irvine, CA 92612
*sflynn@gordonrees.com*
*szakrzewski@gordonrees.com*

Erica W. Todd (ct13897)
Trotta, Trotta & Trotta
900 Chapel Street, 12th Floor
P.O. Box 802
New Haven, CT 06503
*etodd@trottalaw.com*

Thomas O. Anderson (ct03451)
Michael R. Keller (ct29284)
Morrison Mahoney, LLP
One Constitution Plaza, 10th Floor
Hartford, CT 06103
*mkeller@morrisonmahoney.com*
*tanderson@morrisonmahoney.com*

By:___ /s/ David J. Elliott_____
      David J. Elliott (ct04301)

# Exhibit A



3316 Springcrest Drive
Louisville, KY 40241-2737
(502)425-2385
(502)339-0729 fax
fgheath@bellsouth.net

December 8, 2014

Mr. David J. Elliott, Esq.
Day Pitney, LLP
242 Trumbull Street
Hartford, CT 06103

and

Mr. Howard S. Edinburgh, Esq.
Herzfeld & Rubin, PC
125 Broad Street
New York, NY 10004

      Re: Civil Action Number 3:13-cv-0257-RNC, in the United States District
Court for the District of Connecticut; Frederick Klorczyk, Jr., as co-
administrator of the Estate of Christian R. Klorczyk and Lynne Klorczyk, as
co-administrator of the Estate of Christian R. Klorczyk, Plaintiffs: vs. Sears,
Roebuck & Co., Shinn Fu Corporation, Shinn Fu Company of America, Inc.,
MVP (HK) Industries, Ltd., and Wei Fu (Taishan) Machinery and Elec. Co.,
Ltd., Defendants.

Gentlemen:

In response to your request I have reviewed certain documents, and conducted
research relating to the circumstances surrounding the incident that is the subject
of the referenced action.  I offer herewith, within a reasonable degree of scientific
and engineering probability, my preliminary evaluation and opinion regarding the
captioned matter. My hourly rate for this work is $275.00 per hour for preparation,
study, travel, field work and testimony at deposition and trial. Payment for my
work is not contingent upon the outcome of this action.

In the interest of simplification, acronyms will be used throughout the balance of
this report to identify the parties as follows:
- (FK) Frederick Klorczyk (father);
- (LK) Lynne Klorczyk (mother);
- (FK3) Frederick Klorczyk (eldest son);

**Confidential**

- (CK) Christian Klorczyk (middle son, decedent);
- (PK) Parker Klorczyk (youngest son);
- (SEARS) Sears, Roebuck & Co.;
- (SFT) Shinn Fu Corporation;
- (SFA) Shinn Fu Company of America, Inc.;
- (MVP) MVP (HK) Industries, Ltd.; and
- (WFT) Wei Fu (Taishan) Machinery and Elec. Co., Ltd..

My evaluation and opinion are based upon the following materials that have been furnished to me:

1. The Second Amended Complaint;
2. Third Party Complaint, Sears v. MVP;
3. Plaintiff's first set of Interrogatories to SFT and SFA;
4. Plaintiff's first set of Requests for Production to SFT and SFA;
5. Waterford, CT Police report of incident including photographs;
6. CK Death Certificate;
7. CK Post Mortem Report;
8. Document production from SFT comprising; engineering drawings, ASME PALD-2009, comments on revisions thereto, operating manuals and labels for Westward and Steelman support stands and, SFT email strings relating to quality and delivery issues;
9. Document production from SFA comprising; WFT, SFT and Intertek inspection documents, operating manuals and labels for Craftsman, Pro-Lift, Westward and Steelman support stands and, SFA email strings relating to quality and delivery issues;
10. Document production from MVP comprising; ASME PALD-2009, MVP inspection flow chart, WFT, Sears and Intertek inspection documents, operating manuals and labels for Craftsman support stands and, MVP email strings relating to quality and delivery issues;
11. Document production from WFT comprising; WFT inspection documents, engineering drawings, ISO 9001 registration and email strings relating to quality and delivery issues;
12. March 15, 2013 and May 30, 2013 letters from Foley and Mansfield to Day Pitney, LLP;
13. Numerous screen shots of websites offering support stands and alleging support stand failures as collected by FK;
14. Numerous photographs of the incident vehicle and an exemplar support stand;
15. Digital photographs of the artifact support stands GT1010009618 and GT1010009619;
16. Exemplar Craftsman operating manuals;
17. Literature from Norco, Performance Tool, Bend-Pak, Auto XS, Stealy and OTC describing support stands;
18. Deposition before trial of LK taken November 13, 2014; and
19. Deposition before trial of FK taken November 14, 2014.

**Confidential**

In addition to my review of these materials, I have also reviewed the materials listed below:

1. Various catalogs for SFA Companies including, Road Xpedition, Pro-Lift, BVA Hydraulics, Omega Lift Equipment, Hein-Werner Automotive, Black Hawk Automotive and Porto-Power Collision Repair Equipment;
2. The 2000 Shinn Fu Group Management Directory;
3. The owner's manual for an exemplar 2001 BMW 325xi;
4. March 2001 weather report for the Waterford, CT area;
5. The websites of Pellican Parts and Aerostich;
6. Various editions of ANSI/ASME PALD Safety Standard for Portable Automotive Lifting Devices;
7. ANSI Z535 Series of Standards governing safety signs, labels, instructions and manuals;
8. Product Safety Sign and Label System, a reference book published by FMC Corporation;
9. The Clarion Guide to Product and Machinery Labels; and
10. The Safety Professional's Handbook, published by the American Society of Safety Engineers.

In addition to my review of the documents listed above, I visited Waterford, CT on May 30, 2012 where I inspected the incident site at 55 Westwood Drive along with the artifact vehicle, a BMW model 325xi, VIN WBAAV33481EE26612, at the same location and at City Tire.

Heath and Associates has also undertaken the laboratory testing of exemplar support stands at 4917 Macmont Circle Powell, TN 37849 in 2012 and 2013 as well as testing exemplar support stands with an exemplar vehicle, a BMW model 325xi, VIN WBAAV33441EE79548, also at Powell, TN in 2014.

I have arrived at specific opinions and conclusions that I will discuss in this report. These opinions and conclusions are based upon my review of the materials set forth above, my inspections and testing referenced herein, my extensive background and experience in lifting and material handling equipment, my long standing participation in standards development activities, and my life long experience in product manufacturing, product engineering, design, development, improvement, sales, distribution, service, and repair, all more particularly described in my c.v. attached hereto.

SPECIFIC QUALIFICATIONS

I have included my C.V. with this report. Please note that I have served on various committees whose charter included the development of standards governing design, construction, installation, use and care of many types of lifting equipment, including the Automotive Lift Institute (ALI), the American Society of Mechanical Engineers (ASME), the Society of Automotive Engineers (SAE), Underwriter's Laboratories (UL), the Material Handling Industry of America (MHIA), the

3

**Confidential**

International Powered Access Federation (IPAF) and, the Scaffold and Access Industry Association (SAIA).

I was chief executive officer of an automotive lift manufacturing company from 1971 through 1992. I routinely participated in and approved decisions in the areas of product design, manufacturing, quality control, sales and distribution. This company manufactured 2 and 4 post, surface mounted lifts; parallelogram, short rise and heavy duty surface mounted lifts; single, double and multiple post in-ground lifts and high reach, fixed, support stands. These products were electric, hydraulic or mechanically powered and employed scissors, parallelogram, direct and hybrid lifting mechanisms.

I am familiar with lifting and supporting products both domestic and foreign, the manufacturers of these products, their design features, instructional materials, labeling and warnings.

I served on the Safety and Standards Technical Committee of the Automotive Lift Institute from 1975 through 1992 and, as a consultant to the industry since 1992. One of the responsibilities of this committee is to maintain the American National Standards covering automotive lifts.

I am a member of the American Society of Mechanical Engineers (ASME), where I am currently Chairman of the ANSI/ASME PALD committee (recently renamed PASE committee) covering Portable Automotive Lifting Devices and other automotive service tools and equipment. In addition, I serve on the ASME B30.1 Committee which covers jacks and other industrial, construction and millwright tools. I am also a Professional Member of the American Society of Safety Engineers (ASSE).

Since the inception of Heath and Associates in 1992 I have provided consultation for litigation involving automotive lifting and supporting equipment relating to Do-It-Yourself (DIY) automotive service equipment such as the products covered by the PALD (PASE) standard including the vehicle support stand at issue, along with numerous other of the devices covered by this standard.

NARRATIVE

Before setting forth my observations and opinions in the captioned matter it is important to understand the task undertaken, the means and methods employed, the conditions peculiar to the project and the relationship of the parties.

Parties

Sears is a large retailer of household goods, clothing, appliances and tools. Craftsman is a brand name used by Sears for its tool products, some of which are offered to the DIY market for automotive repair and maintenance. Sears

4

**Confidential**

marketed and sold the vehicle support stand automotive service tool that is the subject of this action. As with many retailers today, Sears contracts for the supply of many of the products it sells from overseas suppliers. It is the practice of Sears to receive proposals from potential suppliers of such tools and to evaluate such products in the Sears facilities before entering into a supply contract and placing the tools into the stream of commerce through the Sears retail operations. Upon knowledge and belief, Sears purchased the vehicle support stand at issue from MVP.

MVP is a Hong Kong company that markets, sells and otherwise distributes automotive service tools under its brand name Omega and under other brand names owned by the customers of MVP. The MVP organization is part of the SFT group of companies. Upon knowledge and belief, MVP sold the vehicle support stand at issue to Sears.

SFT is a Taiwanese (ROC) company that designs, manufactures, and distributes automotive service tools and other manufactured products. SFT forms the center of the SFT group of affiliated companies and has affiliates in many countries around the world including the United States.

SFA is an American company located in Kansas City, MO and it serves as a receiving point, inspection station, warehouse and shipping point for automotive service products designed, manufactured, or contracted for purchase by the affiliates of SFT. Resident at SFA is a technical staff that monitors the US market and attempts to respond to changes in automotive service tool designs and market trends. This technical staff also monitors the quality of goods coming into the US from affiliated companies.

WFT is a Chinese (PRC) company located in Taishan. WFT is a large manufacturing operation of different products including the vehicle support stand at issue. The factory is modern and utilizes state of the art manufacturing methods and equipment. The staff includes engineering or technical support that provides manufacturing drawings, methods analysis and quality assurance for the factory. WFT manufactured the vehicle support stand at issue.

The Klorczyk family including FK, LK, FK3, CK and PK, typify the successful, close knit, American family. FK is a successful business man who is an owner/executive of a local company that provides non-destructive testing services. LK manages the family home and teaches school. FK3 is a lawyer working in New York City. PK attends a regional boarding school. CK was a senior finance major at the University of Connecticut. The scene of the incident was the Klorczyk family home located in the affluent neighborhood of Waterford, CT.

**Confidential**

Circumstances

The evidence suggests that most of the male family members are self professed
"car buffs" and learned how to perform certain automotive maintenance tasks by
working together on the numerous cars owned from time to time by the family.
The maintenance activities were limited in scope to simple tasks such as oil
changes, brake jobs, tire rotation, fluid replenishment, wiper blades and the like.
It was understood that complicated tasks requiring special knowledge, skill or
ability would be subcontracted to service providers possessing these attributes.
The circumstances that gave rise to the incident of March 11, 2011 were that CK
was attempting to change the oil in the family BMW.  This activity was to take
place in the family garage, with family owned tools.

Site

The site of the incident was the three car garage attached to the Klorczyk home.
The left and right bays of the garage were occupied with family goods including a
collector car, sporting equipment, tools and an accumulation of other family items
too numerous to itemize. Suffice to say the left and right bays were not
accessible for parking a vehicle. The usable space in the center bay was defined
by the goods stored in the other two bays and along the front wall of the garage
and, by two steel pipe columns placed such that they resided in the space
between the bays midpoint between the garage doors and the front wall of the
garage.  The center bay is the bay in which the incident occurred.

Equipment

The equipment used to perform the BMW oil change included a service jack, a
support stand, a lug wrench, a socket wrench, a screw driver, an oil drain pan
and a creeper.

The service jack involved in this oil change activity was a Craftsman, 7,000
pound capacity jack commonly used in automotive service for lifting a portion of a
vehicle.  The jack is mounted on casters and comprises a long handle such that
the jack can be rolled into position under the area of the vehicle to be lifted (such
as the frame adjacent to a wheel) so that the wheel can be removed to allow
either tire or brake service.  The jack is actuated by closing a valve in the
hydraulic circuit and pumping the handle. This extends a hydraulic cylinder which
raises a pivoting arm comprising a load engaging saddle located on the end of
the arm.  The saddle dish furnished with this jack had been removed purportedly
because it damaged the lifting points on the vehicles serviced. The load is
lowered by carefully opening the same valve in the hydraulic circuit which allows
the hydraulic cylinder to retract thereby lowering the pivoting arm.

The equipment at issue is one of two Craftsman, model 50163, four ton, vehicle
support stands S/N GT1010009618 and GT1010009619 purchased at Sears

6

**Confidential**

shortly before March 11, 2011 by CK in response to a request from FK. The particular vehicle support stand mechanism comprises a rack and pawl (sometimes called ratchet and pawl) type of latch. The assembly consists of several parts including a base, a column, a saddle and a latching device. The base constitutes a welded, sheet metal assembly formed into a four sided pyramid with a rectangular guide sleeve welded into the apex of the pyramid. This guide sleeve is large enough to accommodate the latching device (pawl) articulation and the ratchet column. The column comprises a rack, ratchet or toothed, vertical member with an integral saddle designed to contact the load forming its top end.

The pawl is a small pointed member attached to a horizontally disposed formed cylindrical rod.  This formed rod with attached pawl comprises the latching device.  The rectangular guide has opposing horizontal, holes through which one end of the formed rod passes.  The pawl that is attached to the formed rod resides within the rectangular guide while the remainder of the rod extends outwardly to form a horizontal handle.  The column passes vertically through the rectangular guide such that the teeth on the column (rack) face the pawl. The pawl is positioned so as its pointed end faces the column and can sequentially engage the teeth in the column as the column is manually extended (raised) or retracted (lowered).

It is important to note that the handle is shaped in such a way that its own weight provides a small rotational force to the pawl so that when the stand is upright, the pawl's natural position is toward the column (rack), or the latched position.

When the column is at rest, theoretically the pawl is engaged with one of the teeth of the rack thereby preventing downward movement of the column (rack) and furnishing support to whatever load has been applied to the saddle. When the column (rack) is manually raised from the base, the handle, with the pawl attached, will rotate upward to a point where the next tooth of the rack can pass the pawl.  As the column continues to be extended, the handle will move slightly up and down (approximately ¾ inch) as each progressive tooth passes the pawl. When the desired height is achieved, the column theoretically can be released and the pawl will engage the tooth of the rack immediately above the point of the pawl and lock the column in position as above described. When it is desired to lower the column, any applied load must first be removed. The column and the handle can then be raised a slight amount thereby disengaging the pawl from the rack. The column can then be manually lowered as long as the handle is raised. Alternatively, if the handle is raised without holding the column, the column will free fall downward of its own weight.

In addition to the jack and the support stand: the lug wrench was needed to remove the right front wheel; the screw driver was needed to remove the cover or shroud covering the crank case to access the oil drain plug; the socket wrench was needed to remove the oil drain plug and the oil filter; the oil drain pan was

7

**Confidential**

needed to catch the dirty oil; and, the creeper was needed to provide rolling access to the underside of the BMW.

Sequence of Events

The description of events that transpired on March 11, 2011 follows from the evidence with the presumption that CK performed the oil change in accordance with the custom and practice he had learned from working previously with FK performing similar tasks.

The support stand was to be used by CK to support the BMW after using the service jack to raise the vehicle such that there was sufficient room for CK to enter the space under the vehicle to gain access to the oil drain plug.

The evidence suggests that CK had placed the BMW front first in the center bay of the garage three to five feet from the front wall. The transmission had been placed in "P", and the emergency brake had been set. The garage door was closed (because the weather in the area was rainy, foggy and misty with temperatures in the mid forties). CK raised the hood of the BMW and, using the socket wrench, replaced the oil filter with a new one. He used the lug wrench to loosen the lug nuts on the right front wheel, then rolled the service jack under the right side of the vehicle, behind the right front wheel and perpendicular to the vehicle center line. He positioned the jack saddle under the right side frame member and raised the right front corner of the car enough to remove the right front wheel.

The evidence suggests that CK then removed the right front wheel and placed it under the exposed brake rotor to provide a means of secondary support for the BMW. He placed the lug nuts in the tray at the rear of the jack.

CK then raised the vehicle further so that he could reach under the vehicle and position the support stand. He then positioned the support stand inboard of the wheel well and under the right side frame member. He manually raised the column of the support stand until the saddle came in contact with the right side frame member. As CK released his grip on the column of the support stand it maintained its position. Thinking that the support stand was stable, CK got up and carefully lowered the service jack thereby transferring the weight of the BMW to the saddle of the support stand. The support stand accepted the load without problem thereby providing a false indication that it was properly engaged.

The evidence suggests that CK then withdrew the service jack, positioned it parallel to the vehicle center line, adjacent to the passenger door and facing the rear of the vehicle. He then removed the handle and placed the handle along side the jack between the jack and the BMW. CK then slid the oil drain pan under the car so he could reach it when he got into position.

8

**Confidential**

At this point CK went to the front of the car, collected the screw driver and the wrench, got down on his back on the creeper and rolled under the vehicle, head first to a position where he could remove the oil drain plug with the wrench that he planned to use for that purpose.

The evidence suggests that CK removed the cover or shroud covering the crank case with the screw driver, placed the screws on the shroud and pushed the shroud toward the rear of the vehicle. He then placed the oil drain pan in position to collect the dirty oil and applied the socket wrench to the oil drain plug. Since the oil drain plug was facing the right side of the car, the force applied to the wrench handle in removing the oil drain plug was toward the front of the vehicle. He successfully removed the oil drain plug and allowed the dirty oil to drain from the crankcase and collect in the drain pan.

After the oil had drained from the crankcase, CK replaced the oil drain plug and tightened it finger tight plus a light tightening with the wrench. CK then rolled out from under the BMW and filled the engine with fresh oil to the correct level as indicated by the dipstick. CK returned to the creeper and rolled back under the BMW to apply the wrench once again to the oil drain plug. His orientation was parallel the center line of the car and slightly to the left of center with his feet facing the front wall of the garage. While CK was in the process of pulling on the wrench handle, this disturbance to the vehicle supported by the support stand caused the tooth in the rack that was supporting the vehicle to slip off of the pawl and lose what engagement theretofore existed. The column then fully retracted which transferred the weight of the vehicle to CK. The support stand tipped over as a result of the collapse, or the movement of CK, or some combination thereof. The evidence suggests that the weight of the vehicle was sufficient to cause traumatic asphyxia and death.

Discovery

CK had been home from school on spring break. LK had gone to work. PK was at school. FK was in New York City with FK3 and was to return home by train at 3:00 PM.

CK was home alone and had at some point in time decided to change the oil in the BMW.

LK had been trying to contact CK by text during the day without success and travelled directly from work to meet the train, picked up FK and returned home at 3:30 PM. They went to the bedroom to rest and got into a discussion as to the whereabouts of CK. Phone calls were made and text messages sent in search of CK to no avail when it was remembered that CK's car was at the house, whereupon LK went to the garage and discovered the scene. LK called to FK who immediately responded. LK called 911 and FK attempted to resuscitate CK until the first responders arrived.

9

**Confidential**

FK described the scene in his testimony as follows:

- The garage door was closed;
- The halogen work lights were set up and turned on;
- CK's feet were visible underneath the front of the BMW;
- The right front corner of the BMW was tipped downward;
- The right front wheel had been removed and placed under the brake rotor;
- The right front brake rotor was suspended above the wheel;
- The vehicle support stand was located under a frame member inboard of the right front wheel well, fully retracted and laying on its side with the saddle facing the garage door;
- The weight of the BMW was being supported by the body of CK;
- The service jack was arranged neatly facing the garage door and parallel to the vehicle with its handle placed alongside between the jack and the car;
- CK was oriented parallel to the center line of the BMW and slightly to the left of center, his right leg was slightly bent at the knee and his right hand was gripping the handle of the socket wrench which was engaged with the oil drain plug;
- The vehicle frame cross member was bearing upon CK's breast bone and the rear of the BMW transmission was pressing into the left side of CK's face near the eye socket;
- CK's head was supported by the creeper pillow;
- The head end casters were broken off of the creeper;
- The oil pan was located near CK to his right side;
- The crankcase shroud was located on the floor to the rear of the vehicle under the fuel tank; and
- CK was unresponsive.

FK and LK undertook numerous actions to attempt to revive CK and generally changed and modified the scene. The first responders further changed the scene appreciably in their extrication of CK from beneath the BMW.

Testimony indicates that subsequent to the incident, it was discovered that the BMW emergency brake had been set, the transmission had been placed in either first or second gear or "P", and the crankcase was filled with oil. FK testified that he moved the vehicle out of the garage and in so doing dragged the oil drain pan down the driveway. There is no information as to the disposition of the crankcase shroud.

10

**Confidential**

Scene Inspections

Scene inspections performed include the following:

1. FK and LK observed the undisturbed scene after the incident on March 11, 2011;
2. The Waterford Police Department observed the scene on March 11, 2011 after the attempts by FK to revive CK and after the Fire Department had removed CK to the hospital; and
3. Heath and Associates inspected the scene, the vehicle, the artifact stands and the exemplar stands, on May 30, 2012.

Prospective Causation—Metal Failure

Visual examination of the artifact support stands revealed no evidence of metal fracture, buckling or permanent deformation.  Therefore, structural failure of the support stands must be eliminated as a cause.

Prospective Causation—Tip Over

Visual examination of the floor of the garage has produced no evidence that a tip over of the artifact support stand had occurred. If a tip over had occurred there would have been large forces transmitted through the edges of one side of the base of the support stand which would have left marks or gouges in the concrete floor. Likewise, if a tip over had occurred, these same large forces would have left witness marks on the bottom edge of one side of the base and the opposite top edge of the saddle of the support stand. No witness marks consistent with a tip over were observed.

Horizontal rearward translation of the vehicle would have been required for a tipping event. It is more likely than not that the emergency brake being applied and the transmission being in gear would have prevented such translation.

If a tip over had occurred an increase in elevation would have been required of the saddle due to the geometry of a tipping stand. Therefore the weight of the vehicle would have to be raised by that amount before final tipping could occur. This would require a significant rearward force to be applied to the vehicle which would be resisted by the emergency brake and the transmission as above described. In addition, the only source of such a force would have been from CK pulling rearward on the handle of the wrench when tightening the oil drain plug. This is not likely because CK was lying on his back, on a wheeled creeper that would have moved toward the front of the car as he pulled on the handle of the wrench. There was not room enough for CK to raise his knees and place his feet on the floor to resist movement if such resistance would have retarded movement.  Further, if tip over had occurred, the support stand column would have still been extended.

11

**Confidential**

For these reasons, tip over of the support stand must be eliminated as a cause.

Prospective Causation—False Engagement

The remaining causal condition for the support stand collapse is that there was a false engagement of the pawl and a tooth in the rack or, point contact between the pawl tip and a tooth tip. This phenomenon can also be thought of as point to point or tip to tip contact. This served to support the load successfully until disturbed by some force external to the support stand that was significant enough to release the engagement. This causal possibility was pursued to prove the concept through testing as described below.

The pawl and the column are both cast metal parts and exhibit a surface finish consistent with sand casting. Although microscopy was not employed it is visually obvious that the surface finish of both parts is rough and comprises small high spots and low spots which will increase sliding friction between the surfaces. The tips of the tooth forms therefore are prone to sticking when exposed to sliding one upon the other. The pawl tip has a width of 1.06 inches and the column tooth tips have a width of 0.98 inches therefore the maximum engagement of pawl tip to tooth tip would be 0.98 inches. This presumes that the tip to tip contact constitutes full width line contact. If the pawl tip and the tooth tip are not parallel but instead skewed, full width line contact will not exist.

False engagement of the pawl and a column tooth was first demonstrated with an exemplar support stand through manipulation of the column within the rectangular guide. It was discovered that the column can be manipulated in such a way that the pawl catches a tooth edge and gives the impression that the pawl is fully engaged with the tooth and thereby fully supporting the column whereas the support is a false support because the pawl is only engaged with the edge of the tooth.

After this false engagement phenomenon was manually demonstrated an exemplar support stand was set up in the laboratory in a fixture that would allow the column to be extended upward by hand until it contacted an adjustable stop. The stop was adjusted in such a way that when the column was manually raised in much the same way that it would be raised in actual practice, a column tooth was caused to barely engage the pawl thereby creating this condition of false engagement. After this false engagement was achieved a load was applied to the saddle of the support stand in various amounts up to approximately 1,900 pounds force. The column did not collapse due to load at the various loading levels but, when the support stand was externally disturbed, the engagement of the pawl with the tooth was lost and the column collapsed and released the load.

After this false engagement phenomenon was demonstrated successfully in the laboratory an exemplar support stand was set up with an exemplar BMW and the incident was reconstructed based upon the existing evidence. In this case

12

**Confidential**

arrangement had to be made to catch the load when the support stand collapse occurred to prevent damage to the vehicle, the support stand or the concrete surface upon which the vehicle was parked. Once again, when the support stand was externally disturbed, the engagement of the pawl with the tooth was lost and the column collapsed and released the load.

For these reasons, false engagement of the support stand is more likely than not the cause of the incident at issue.

<u>OBSERVATIONS AND CONCLUSIONS</u>

The possibility of encountering false engagement with pawl and ratchet support stands is not only foreseeable but apparently not uncommon. Many suppliers of these support stands suggest in their printed materials that the user somehow assure that the pawl is fully engaged with a tooth in the column before applying a load. Few if any of these suppliers explain the phenomenon, describe exactly how to make such a determination or describe the potential consequences. The suggestions offered are to shake the support stand which infers that the stand is not loaded. Alternatively the suggestion is to push on the raised load which would likely deliver an impact load to the latching components and damage the support stand the vehicle and the floor, if a marginal false engagement were to release the load. A problem with these devices is that custom and practice as well as many instructions dictate that the column be raised to meet the load which is what transpired in this case.  If the column is raised to meet the load and false engagement occurs, it appears to the user that the stand is secure and positive engagement has been achieved.

There is no evidence that any suppliers including the SFT group have made any studies or conducted any tests to evaluate the numerous parameters that affect or could possibly reduce the incidence of this false engagement phenomenon. Further, it seems that no one including the SFT group has thought that if the engagement point was clearly visible then perhaps the user would be able to easily see when true engagement was achieved or when false engagement was encountered.

There is a moral doctrine of product stewardship that should obligate product designers and manufacturers to exercise their best efforts to continue to improve the safety of the products they distribute into the stream of commerce. Furthermore, it is simply good business practice to do so. Most of the support stand designs reviewed exhibit little difference and appear to be copied one from the other.

Turning to the warnings and labeling issue, there is no labeling on the support stand relating to the potential for false engagement of the pawl with the column. Likewise the manual contains no reference to the issue at hand within the list of "Warnings" offered.

13

**Confidential**

A review of the ANSI Z535 series of standards referenced in the applicable PALD standard will reveal that there are important criteria for the development of effective warning labels and instructional materials. Labels should contain a signal word that indicates the level of potential consequence if the label message is not followed. Labels should try to convey the message without words and through pictograms if possible. If words are necessary, the message should be simple, direct, concise and to the point. The recommendation is also made to validate the effectiveness of label communication through user testing. And, there are specific colors, font sizes and label arrangements to be followed. The label on the artifact support stand is not in compliance with the ANSI Z535 series and, to the extent that the manual attempts to deliver warnings it also is non compliant.

There is a well known hierarchy of hazard mitigation as follows: the first preferred method is to eliminate the hazard by design; the second preferred method is to provide engineering controls such as guards or barriers to prevent exposure to the hazard; the third preferred method is to provide administrative controls such as warnings and instruction as to hazard avoidance; and, the fourth preferred method is to provide avoidance training to those who may become exposed to the hazard.

First preferred method: The current design of the support stand at issue could very well be changed to improve the safety of the product and eliminate the potential for false engagement. Such an undertaking would require prototyping, testing and optimization of several parameters.

There is no evidence that the support stand designer has investigated the many factors that have some affect on the propensity of the pawl tip sticking to a column tooth tip, such as; pawl and tooth profile, surface finish, coating adhesion, contour, hardness, strength, toughness and creep. Other factors affecting the propensity of the pawl tip sticking to a column tooth tip will be the applied load and the fit between the column and the rectangular guide. Loose fit of the column within the guide will allow varying degrees of fore and aft motion as well as varying degrees of side to side motion. A loose fit will also allow the column to be rotated somewhat within the guide which will skew the lines of contact resident on the pawl and any column tooth.

Second preferred method: The current design of the support stand at issue could very well incorporate a redundant locking pin "guard" feature which would prevent exposure to the hazard.

Third preferred method: The current design of the support stand at issue could certainly incorporate better written warning and instructions to promote hazard avoidance. In addition to written warnings, physical changes could be made to provide visual warning on the support stand itself such as: clear plastic window(s) in the side(s) of the rectangular guide to provide a clear view of the mating pawl and rack teeth; or, a tab welded to the handle with red and green areas that show

14

**Confidential**

through a simple window cut out that indicates when the pawl is engaged and when it is not.

<u>Fourth preferred method:</u> The current design of the support stand at issue does not lend itself to training those who might become exposed to the hazard.

<u>OPINIONS</u>

1. The design of the Sears Craftsman, model 50163, four ton, vehicle support stands S/N GT1010009618 and GT1010009619 is defective for the reasons hereinabove stated.

2. The warnings, labels and instructions furnished with the Sears Craftsman, model 50163, four ton, vehicle support stands S/N GT1010009618 and GT1010009619 are defective for the reasons hereinabove stated.

3. The Sears Craftsman, model 50163, four ton, vehicle support stands S/N GT1010009618 and GT1010009619 are not suitable for the intended purpose because of the reasons hereinabove stated.

4. The Sears Craftsman, model 50163, four ton, vehicle support stands S/N GT1010009618 and GT1010009619 are unreasonably dangerous because of the reasons hereinabove stated.

5. I am aware of no change in the condition of the S/N GT1010009618 and GT1010009619 vehicle support stands from the time of manufacture to the time of the incident.

This is my preliminary evaluation and opinion as of this date. I reserve the right to modify or supplement this report as more information becomes available to me through continued investigation or discovery. If you have questions or wish to discuss any of this report in more detail, please contact me at your convenience.

Respectfully Submitted,
Heath and Associates

Frederick G. Heath
Principal

Enclosures:
Current c.v.
Rule 26

15

**Confidential**

# FREDERICK G. HEATH

**3316 Springcrest Drive**
**Louisville KY 40241-2737**
TEL:   (502) 425-2385
FAX:   (502) 339-0729
E-MAIL:   fgheath@bellsouth.net



## EDUCATION:

- B.S. Mechanical Engineering
  Lehigh University – Bethlehem, PA
- Graduate Study – Space Technology
  University of California – Los Angeles, CA
- Diploma in Management Studies
  American Graduate School of International Management – Glendale, AZ
- Certificate in Mobile Crane and Rigging Considerations
  Crane Inspection and Certification Bureau, Inc. – Orlando, FL
- Certificate in Basic Reliability and Maintainability Analysis
  Illinois Valley Community College – Oglesby, IL
- Various Courses in Regulatory Compliance
  EPA, OSHA and DOT
- Various Courses in Standards Compliance

## PROFESSIONAL EXPERIENCE:

### Consulting Engineering and Expert Testimony
(20 + Years)

### Heath and Associates - Principal
Consulting in the field of design, manufacturing and testing of hydraulic, pneumatic and electro-mechanical lifting and load bearing devices including automotive, light construction, industrial and material handling applications. Litigation support in the field of forensic engineering, product liability, accident investigation, reconstruction and expert testimony involving such devices with respect to design, manufacture, environmental, health and safety considerations including warnings, instructions and training; and, conformity with recognized standards, codes, industry practices and government regulations.

## Corporate Management, Manufacturing of Engineered Products
## (25 + Years)

### VBM Corporation - President and Chairman
Function as chief executive and chief operating officer. Responsible for technical and administrative direction of all operations of this manufacturer of automotive lifting equipment. VBM manufactured 2 and 4 post, surface- mounted lifts; parallelogram, short rise and heavy duty surface-mounted lifts; single, double and multiple-piston in-ground lifts.

### Ryan Industries– Vice President and General Manager
(Subsidiary of Cosmodyne Corporation) Chief operating officer responsible for technical and administrative direction of all operations of this multi-plant manufacturer of cryogenic storage, transportation and dispensing equipment.

### Cosmodyne Corporation - Manager of Manufacturing
Responsible for all manufacturing operations for this multi-plant manufacturer of cryogenic and heat transfer equipment.

### Cosmodyne Corporation - Manager of Engineering
Responsible for technical administration of consulting activities in various military I.C.B.M. programs including design, construction and operation.

## Project Engineering

### AiResearch Mfg. Co. - Preliminary Design Engineer
Design and develop systems for environmental control of military aircraft and space capsules.

### PUBLICATIONS:

Authored many in-house documents covering a wide range of subject matter including:
- Technical proposals
- Technical performance evaluations
- Technical training manuals
- Quality control manuals
- Design specifications
- Process specifications
- Performance specifications
- Administrative policies and procedures
- Equipment installation, operation and maintenance manuals
- Industry standards
- Failure analyses

Edited chapters 8-General Shop Equipment, 10-Lifting Equipment and Air Compressors, and 11-Shop Safety for "Automotive Service-Inspection, Maintenance and Repair," a book authored by Tim Gilles and published in 1998 by Delmar (ITC) Publishers.

Authored chapter 10, section 10.3.1, Automotive Lifts, and section 10.3.2, Other Lifting Equipment, for "The Shop Safety/OSHA Compliance Guide for Managers of Motor Vehicle/Equipment Maintenance and Refueling Operations," a standard industry reference on OSHA compliance and recommended safety practice, published in 2000 by Automotive Environmental & Safety Engineering of Findlay, Ohio.

Authored appendix C, Jacking and Hoisting, for "Serviceability Best Practices," a guide for engineers and designers, published in 1998 and 2000 by General Motors Corporation.

Authored chapter 9, for "Auto Repair Shop Safety," a book published by the National Safety Council in 2000.

Authored "What Good are Standards," an article appearing in Volume 22, Number 7, August 2003 issue of Utility Fleet Management.

Authored "Lift Accidents, a Case Study," an article appearing in Chapter 10, Equipment and Tool Safety, The Shop Safety/OSHA Compliance Guide, a subscription compliance service published in 2004 by Automotive Environmental & Safety Engineering.

Authored "What Good are Standards," an article appearing in Volume 73, Number 12, December 2004 issue of Occupational Health and Safety.

Authored "Accident Waiting To Happen," an article appearing in the Volume 3, Issue 4, May-June 2006 issue of Lift and Access.

Authored "The Importance of Vehicle Lifting Points" an article appearing in the May 25, 2007 issue of Fleetmag.com, a web based automotive magazine.

Authored "Vehicle Lifting Points: Whom Do You Trust" an article appearing in the July, 2007 issue of Gears, a magazine for the transmission rebuilding industry.

Authored "Vehicle Lifting: Points to Remember" an article appearing in an insert titled "Service Bay Safety" in the April 2008 issue of Professional Tool and Equipment News.

Project Contributor: "Forklift Safety"; "Forklifts-Reducing Product Damage"; "Hydraulic Fluid Safety"; "Overhead Industrial Cranes"; all DVD training

productions of Convergence Training, a Division of Capstone Technology Corporation.

Authored "Don't Be An Accident Statistic: Lift It Right" an article appearing in an insert titled "Vehicle Lift Inspection: Your Safety Is Riding On It" in the April 2013 issue of Professional Tool and Equipment News.

**PROFESSIONAL AFFILIATIONS:**
**(Past and Present)**

Alliance Hazardous Materials Professionals, (Member-Retired)
- National Chairman, Government Affairs Committee

American College of Forensic Examiners, (Member 18093)
- Certified Forensic Consultant (CFC)
- Diplomate of the American Board of Forensic Engineering and Technology
- Fellow of the American College of Forensic Examiners Institute

American National Standards Institute, (Member 106650)
- Board of Standards Review
- Vice Chairman, Board of Standards Review
- Chairman, Board of Standards Review
- Subcommittee on Accreditation

American Society of Mechanical Engineers, (Member 4467254)
- Standards Committee for Portable Automotive Service Equipment, (Member LO 1800000, Vice Chairman and Chairman)
- Technical Subcommittee for Portable Automotive Lifting Devices, (Member LO 1800100)
- Standards Committee HST, Hoists-Overhead, (Member C83000000)
- Standards Committee B30.1, Jacks, (Member LO 1200100)
- Standards Committee B30.20, Below the Hook Lifting Devices, (Member LO 1201900)
- Board on Safety Codes and Standards, Contributing Member

American Society of Safety Engineers, (Professional Member 45963)
- Z 15 Committee, American National Standard covering Safety Requirements for Motor Vehicle Fleet Operations
- A 10.29 Committee, American National Standard covering Safety Practices for the Use of Aerial Platforms in Construction
- A 10.41 Committee, American National Standard covering Operator and Operator Supervisor's Qualifications and Responsibilities in the Construction Industry

American Society of Testing and Materials, (Member 1685340)
- Standards Committee F18, Main Committee on Electrical Protective Equipment for Workers

American Welding Society, (Member 167829)

American Wood Preservers Institute, (Member)
- Regulatory Affairs Committee
- Legislative Affairs Committee

Automotive Lift Institute, (Member)
- Chairman
- Chairman, Safety Committee
- Member, Engineering Committee
- Subject Matter Expert, Lift Inspector Certification Program
- Secretary, Standards Development Activities

Construction Industry Manufacturers Association, (Member) now AEM

Equipment and Tool Institute, (Member)
- Technical Chairman, Lifting Equipment Group

International Powered Access Federation, (Member Certificate 1507)

Institute of Hazardous Materials Management, (Member)
- Certified Hazardous Materials Manager (024200)

Kentucky Chapter of Hazardous Materials Managers, (Member)
- Board of Directors
- Chairman, Government Affairs Committee

Material Handling Industry of America
- Vice President, Association of Professional Material Handling Consultants
- MH16.1, Specification for the Design, Testing and Utilization of Industrial Steel storage Racks, (Consensus Body)
- MH16.2, Code of Safety Practices for the Use of Industrial and Commercial Steel Storage Racks, (Consensus Body)
- MH16.3, Specification for the Design, Testing and Utilization of Industrial Steel Cantilevered Storage Racks (Consensus Body)
- MH24.1, Standard for Horizontal Carousel Material Handling and Associated Equipment (Consensus Body)
- MH24.2, Standard for Power-Operated Vertical Carousels and Vertical Lift Modules, (Consensus Body)
- MH26.2, Design, Testing and Utilization of Welded Wire Rack Decking, (Consensus Body)

- MH28.1, Design, Testing, Utilization and Application of Industrial Grade Steel Shelving, (Consensus Body)
- MH28.2, Design and Testing of Boltless Metal Wood Shelving-Specifications, (Consensus Body)
- MH28.3, Design, Manufacture and Installation of Industrial Steel Work Platforms, (Consensus Body)
- MH29.1, Safety Requirements for Industrial Scissors Lifts, (Consensus Body)
- MH29.2, Safety Requirements for Industrial Tilters, (Consensus Body)
- MH30.2, Performance and Testing of Portable Dock Leveling Devices (Consensus Body)
- MH30.3, Trailer Restraint Devices, Safety, Performance and Testing, (Consensus Body)
- ECMA15, Specifications for Cable-Less Controls for Electric Overhead Traveling Cranes. (Consensus Body)

National Association of Trailer Manufacturers, (Member)

National Mobility Equipment Dealers Association, (Member)

National Safety Council, (Member)
- Automotive, Tooling & Metalworking Section
- Utilities Division, Certified Utility Safety Administrator, (616)

North American Die Casting Association, (Member)

Scaffold and Access Industry Association, (Member)
- A92 Main Committee on Aerial Platforms
- A92.7 Committee, American National Standard covering Airline Ground Support Vehicle-Mounted Vertical Lift Devices
- A92.22 Committee, American National Standard covering Aerial Work Platform Safe Use
- US TAG for ISO/TC 214, Elevating Work Platforms
- Council Member for; Mast Climbing Work Platforms, Aerial Work Platforms, Construction Hoists and Fall Protection

Service Technicians Society, (Member 3890)

Small Business Administration
- Advisory Council (Atlanta Region)

Society of Automotive Engineers, (Member 6102684593)
- Sponsor of SAE Standard J 2184, Vehicle Lift Points for Service Garage Lifting
- Chairman of the Standards Committee for SAE Standard J 2184,

Vehicle Lift Points for Service Garage Lifting
- Chairman of the Standards Committee for SAE Standard J 1884, Vehicle Jack Requirements and Test Procedure
- Vehicle Service Development Division (Member)
- Adaptive Devices Standards Committee (Member)
- Subcommittee for Wheelchair Lifts and Hoists (Member)

Specialized Carriers and Riggers Association, (Member 28242)

Standards Engineering Society, (Member)

Trucking Industry Defense Association, (Member)

Underwriters Laboratories, Inc.
- Standards Technical Panel, UL 201-Garage Equipment
- Standards Technical Panel, UL 1323-Scaffold Hoists
- Standards Technical Panel, UL 1340-Hoists
- Standards Technical Panel, UL 2334-Material Lifts

World Safety Organization, (Member 016584)
- Certified Safety Specialist (852)

**AWARDS:**
- Metro 100 largest privately owned companies
- Small Business Administration Exporter of the Year (Atlanta Region)

**CIVIC ACTIVITIES:**
- Rotary Club of Louisville; Board of Directors, Sergeant-at-Arms and Treasurer
- Louisville Visual Arts Association; Board of Directors
- Kentucky Museum of Arts + Craft; Board of Directors
- Glassworks Foundation; Chairman, Board of Directors
- Art Alliance for Contemporary Glass, Board of Directors
- International Glass Art Society, Board of Directors



3316 Springcrest Drive
Louisville, KY 40241-2737
(502)425-2385
(502)339-0729  fax
fgheath@bellsouth.net

November 13, 2014

To whom it may concern:

Following is a listing of cases in which the undersigned has testified as an expert at trial or by deposition within the four-year period preceding the effective date shown above, (Rule 26 Disclosure).

(6-11) Civil Action Number 07 L 003827, in the Circuit Court of Cook County, Illinois, County Department, Law Division, Jose Sepulveda and Guillerminda Sepulveda, Plaintiffs; vs. TCL Industries, Inc., a domestic corporation, TCL Services, Inc., a domestic corporation, Fairmont Sign Company a foreign corporation, Beacon Sign Company, a corporation, and Elliott Equipment Company, a foreign corporation, Defendants.

(7-11) Civil Action Number 03 L 10249, in the Circuit Court of Cook County, Illinois, County Department, Law Division, U.S. Food Service, Inc. as Subrogee of Michael Milan and Michael Milan individually, Plaintiff; vs. United Steel Products and Felix Loeb, Inc., Defendants.

(12-11) Civil Action Number 09-009296(25), in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, Olit Gerardo Romero, Plaintiff; vs. Dov Israel, Alu Israel, Prestige Home Development, JCR Construction Services, Inc., SAZ Construction Group, Inc., American Truss, PL Construction and Ray Anthony International Crane Company, Defendants.

(3-12) Civil Action Number 7:10-cv-00161-KKC: in the United States District Court for the Eastern District of Kentucky, Southern Division at Pikeville: Harold Gregory Horn, Plaintiff; vs. Schiller Grounds Care, Inc., Home Depot, U.S.A., Inc., and the Unknown Defendant Benjamin S., Defendants.

(4-12) Claim Number 2010-73355, before Honorable Douglas Gott, ALJ; Commonwealth of Kentucky, Department of Workers' Claims: Anthony Smith, Plaintiff; v. Southern Coal Corporation, Defendant.

(5-12) Civil Action Number 1105-05745, in the Circuit Court for the State of Oregon, for the County of Multmomah: Sandra Salyer, Plaintiff; vs. Les Schwab Tire Centers of Portland, Inc,; Defendant.

(5-12) Civil Action Number 090901211, in the Third Judicial District Court of Salt Lake County, State of Utah: Nathan Garrison, Trish Garrison and Andrew A. May; Plaintiffs: vs. Whip Industries, Chic & Jack Repair and Distributing, Inc., Rich's Shop Equipment, Inc., Rich Simons, Mike Schooley dba Automotive Equipment Repair Sales & Service, Porterbilt Equipment Service and John Does 1 through 10; Defendants.

(6-12) Civil Action Number 3:10-CV-01857(WWE) in the United States District Court, District of Connecticut: Terry Wasilewski; Plaintiff, vs. The Raymond Corporation, and Abel Womack, Inc.; Defendants.

(11-12) Civil Action Number 07-C1-814, in the Commonwealth of Kentucky, Scott County Circuit Court, Donna L. Reed on her own behalf and as Personal Representative and Administrator of the Estate of Ricky Reed, Plaintiff; v. City of Georgetown, Kentucky, Georgetown-Scott County Recycling Center, Lear Corporation and Buckhorn, Inc., Defendants.

(12-12) Civil Action Number 10-C1-03197, in the Commonwealth of Kentucky, Jefferson County Circuit Court, Division Nine, Roger Shillingburg, Plaintiff; vs. Lay's Custom Stone, Inc., et al., Defendants.

(12-12) Civil Action Number CJ-2009-2143 in the District Court of Oklahoma County, State of Oklahoma; Alejandra Castillo, as Personal Representative of the Estate of Efren Garcia, Deceased, Plaintiff; vs. Waco of Oklahoma, Inc., a/k/a Waco of Oklahoma, an Oklahoma Corporation; Terex Corporation, a Delaware Corporation; and Genie Industries, Inc., a Washington Corporation; Defendants; and, Waco of Oklahoma, Inc., a/k/a Waco of Oklahoma, an Oklahoma Corporation, Third Party Plaintiff; vs. Vilcast Remodeling, LLC, Vilgar Remodeling, LLC, and Sergio M. Anaya, an Individual; Third Party Defendants.

(5-13) Claim Number 2011-97146, before Honorable Chris Davis, ALJ; Commonwealth of Kentucky, Department of Workers' Claims: Parker M. Hines, Jr., Plaintiff; v. SJ Earth Boring, Inc., Defendant.

(9-13) Civil Action Number 11-CV-965 in the Court of Common Pleas, Mahoning County, Ohio: Stephen Russell, Plaintiff; vs. TLD-2 Ltd., Lerakis Enterprises, Inc., dba Rental Corral, UpRight, Inc., UI Distribution North America, Inc., CI Residential Management, Corp., John Does #1 through #10, and XYZ Corporations or Other Business Entities #1 through #6, Defendants.

(10-13) Civil Action Number 5:11-344-JMH; and, Civil Action Number 09-C1-00671; in the United States District Court, Eastern District of Kentucky, Central Division at Lexington; Billie Jean Wilson and Sentry Insurance, Plaintiffs; vs. Engel Canada, Inc., and Unknown Defendants, Defendants.

(2-14) Civil Action Number 10-CI-00205, in the Gallatin County Circuit Court, Commonwealth of Kentucky: Herschel Moore, Plaintiff; vs. Sterling Enterprises, Inc., Fayette Trucking, LLC, Bramco, Inc., Brandeis Machinery and Supply Co., Inc., Komatsu America, Corp., Rudd Equipment Company, Inc., Ohio Machinery Company, d/b/a Ohio Cat, Whayne Supply Company, Mississippi Lime Company, John Doe Dealer, John Doe Manufacturer, and John Doe Designer; Defendants.

(3-14) Civil Action Number 3:12-cv-01387 in the United States District Court, District of Connecticut: Graeme G. Keeping, Plaintiff; vs. Watson's Manufacturing, LLC, Defendant.

(5-14) Civil Cause Number 2012-246C, in the Circuit Court of Covington County, Mississippi: Timothy Lee Sanford, Plaintiff v. Mississippi Department of Agriculture and Commerce, et al, Defendant.

(10-14) Civil Action Number 2:13-cv-0024 in the United States District Court, for the Eastern District of Tennessee: Alvin Smith, Plaintiff; v. Jarden Zinc Products, LLC, Jarden Corporation, and Jarden Zinc Products, LP; Defendants.

(11-14) Civil Action Number RIC1216135 in the Superior Court of California for the County of Riverside: Tyler Remsen, Plaintiff; v. Norco Industries, Inc.; Top-Line Industrial Products, Inc.; and Does 1 through 100 Inclusive, Defendants.

Respectfully submitted,
HEATH AND ASSOCIATES


Frederick G. Heath
Principal