

3316 Springcrest Drive
Louisville, KY 40241-2737
(502)425-2385
(502)339-0729 fax
fgheath@bellsouth.net

November 10, 2017

Mr. Bryan J. Orticelli, Esq.
Day Pitney, LLP
242 Trumbull Street
Hartford, CT 06103

and

Mr. Howard S. Edinburgh, Esq.
Herzfeld & Rubin, PC
125 Broad Street
New York, NY 10004

     Re: Civil Action Number 3:13-cv-0257-JAM, in the United States District
     Court for the District of Connecticut; Frederick Klorczyk, Jr., as co-
     administrator of the Estate of Christian R. Klorczyk and Lynne Klorczyk, as
     co-administrator of the Estate of Christian R. Klorczyk, Plaintiffs: vs. Sears,
     Roebuck & Co., Shinn Fu Corporation, Shinn Fu Company of America, Inc.,
     MVP (HK) Industries, Ltd., and Wei Fu (Taishan) Machinery and Elec. Co.,
     Ltd., Defendants.

Gentlemen:

On December 8, 2014 I submitted a report of my evaluation and opinion
regarding the captioned matter. In the period of almost three years since my
December 2014 report I have had an opportunity to continue to review certain
other documents and conduct further research relating to the circumstances
surrounding the incident that is the subject of the referenced action.

It should be understood that I continue to stand by my earlier report.

In this current report, I offer, within a reasonable degree of scientific and
engineering probability, my rebuttal evaluation and opinion regarding the defense
accident reconstruction performed and reported by defense expert James
Sprague. My hourly rate for this work is $275.00 per hour for preparation, study,

travel, field work and testimony at deposition and trial. Payment for my work is not contingent upon the outcome of this action.

In the interest of simplification the same acronyms used in my December 2014 report will be used throughout the balance of this report to identify some of the parties as follows:
- (FK) Frederick Klorczyk (father);
- (LK) Lynne Klorczyk (mother);
- (CK) Christian Klorczyk (middle son, decedent);

My rebuttal evaluation and opinion are based upon materials referenced in my December 2014 report and the following additional materials that have been furnished to me:
1. Defendant's Expert Disclosure of Joseph Arruda (ESI);
2. Defendant's Expert Disclosure of Robyn Brinkerhoff (EXPONENT)
3. Defendant's Expert Disclosure of Ryan Jorgenson (SFA);
4. A Certain ESI Protocol styled "Laser Scanning Protocol" purported to cover the electronic collection of three dimensional data relating to the incident garage, vehicle, right front wheel, floor jack, jack stand and creeper;
5. A USB drive purported to contain the electronic photographs and three dimensional data relating to the incident garage, vehicle, right front wheel, floor jack, jack stand and creeper (mostly illegible);
6. Deposition before trial of Geoffrey Hausman taken December 2, 2014;
7. Deposition before trial of Meghann O'Connor taken May 24, 2016;
8. Deposition before trial of Ryan A. Jorgenson taken May 25, 2016;
9. Deposition before trial of Frederick Klorczyk (father); taken July 12, 2016;
10. Deposition before trial of Lynne Klorczyk (mother); taken July 12, 2016;
11. Deposition before trial of Parker Klorczyk (youngest son); taken August 23, 2016;
12. Deposition before trial of James K. Sprague taken August 21, 2017; and
13. A report styled "Investigative Report, Klorczyk (Frederick) et al. v. Sears Roebuck and Co. et al." ESI Project 46615D, submitted by James K. Sprague.

In addition, my rebuttal evaluation and opinion are based upon the following additional materials:
1. Technical Report ISO/TR 7250-2, Basic Human Body Measurements for Technological Design, Part 2: Statistical summary of body measurements from individual ISO populations;

In addition to my review of the documents listed above, I visited Waterford, CT on October 9, 2017 where I conducted a further inspection of the artifact BMW model 325xi vehicle at City Tire, and inspected the artifact creeper, wrench and socket, and FK dimensions.

Heath and Associates in response to the Sprague report has conducted laboratory testing of an exemplar support stand, an exemplar service jack, an exemplar creeper, and an exemplar vehicle at 4917 Macmont Circle, Powell, TN 37849.

OVERVIEW

In response to the Sprague report and deposition testimony, Heath and Associates undertook to perform a reconstruction of the events surrounding the demise of CK. We have also performed certain testing related to and in rebuttal to the opinions and testimony of Sprague. The results of the reconstruction and the testing reconfirm my December 2014 opinions and conclusions and demonstrate that the opinions of Sprague are incorrect.

In referring to my December 2014 report, and due to discoveries made in my subsequent investigations I will make a few minor adjustments to that report to wit:

1. Page 8, Sequence of Events, Paragraph 3, line 3. The artifact vehicle comprises a manual transmission and therefore it would have been in gear and not in "P" for Park.
2. Page 8, Sequence of Events, Paragraph 3, line 8. The jack may or may not have been placed perpendicular to the vehicle for raising the vehicle depending upon the position of the vehicle with respect to the ceiling support columns resident in the garage. We have tested the jack position both perpendicular and at angular relationship to the vehicle.
3. Page 8, Sequence of Events, Paragraph 3, line 9 and 10. The jack would have been more appropriately placed on the rocker panel lifting pad in order to allow more room under the vehicle for CK and the various tools. In this regard I agree with Sprague.
4. Page 8, Sequence of Events, Paragraph 5, second sentence. A further refinement of the position of the vehicle support stand is that it would have been placed under the right (passenger) side longitudinal cradle member close to the front.

INCIDENT RECONSTRUCTION

Approach Taken by ESI, Mr. Sprague (Sprague)

The approach taken by Sprague in performing his reconstruction relies entirely on photographically measured, geometric dimensions of the articles involved in the incident coupled with two theories relating to the author's reconstruction. The first theory is that the support stand was not used, and that the service jack was the only support of the vehicle. The second theory is that CK would not fit beneath the vehicle in the position as described in Heath's December 2014 report.

Edinberg2

3

Sprague rejects much of the testimony, and points to a small scrape mark located on the passenger side rocker panel of the BMW. It appears that no attempt was made by Sprague to reconcile his reconstruction theory with the testimony, but rather to invent a convenient scenario to absolve the defective support stand as the cause of the BMW collapse by opining that there was no stand being used at the time of the incident and that the cause of the collapse was that the service jack lost contact with the vehicle and, somehow in doing so, made the mark on the rocker panel.

Specifically, Sprague rejects the testimony from the first responders FK and LK that the support stand was under the vehicle and laying on its side. Also, Sprague offers no reason for CK to have placed the support stand under the vehicle if he had not been using it. Further, due to CK's prior experience, it is not reasonably likely that CK would rely solely on the service jack to support the vehicle.

Sprague rejected the testimony of FK and LK that the jack was lowered and stored beside the vehicle with the handle removed. Geoffrey Hausmann, admittedly unfamiliar with automotive service tools, testified that he saw FK manipulating what appeared to be a crowbar in an attempt to extricate CK from beneath the BMW. It is apparent from Mr. Hausmann's testimony that he was referring to FK trying to raise the lowered service jack by pumping the service jack handle (which Mr. Hausmann referred to as the "crowbar"). Sprague rejected the Hausmann testimony.

Sprague's placement of CK under the BMW appears to be based primarily on the mark on CK's sternum. Sprague claims that the sternum mark was caused by an elastomeric grommet located at approximately the midpoint of the power steering line which extends transversely across the underside of the BMW just forward of the front most structural transverse cradle member. This particular line is comprised partly of rigid steel tubing and partly of flexible tubing or hose. It is a simple matter for anyone to use their finger to push this entire line upward for several inches above the nearby structural member. It is therefore not possible, to conclude that this flexible element caused the mark on CK's sternum.

Refer to Power Steering Line photos (attachment-5).

It appears the only explanation for Sprague opining that this was the position of CK when the vehicle fell on him is that this position would support Sprague's theory that there was not enough clearance for CK under the vehicle for CK to have been able to apply the wrench to the crankcase drain plug with his right hand at a position below his shoulder as opined in my December 2014 report. The position of CK as described in my December 2014 report supports the theory that CK knocked over the support stand after the ratchet bar of the support stand collapsed causing the BMW to fall onto CK's body/chest.

Sprague performed no testing to support his theory but rather relied upon oblique measurements taken from the Medical Examiner's photographs of CK's body to determine CK's chest dimension. Apparently Sprague believed that such artificial and unreliable dimensions were accurate enough to show that there was not enough room for CK to be in the position as described in Heath's December 2014 report.  My December 2014 report and my rebuttal reconstruction demonstrate that when the support stand was extended and achieved false engagement, the elevation of the vehicle was close to the full extension of the service jack, close to the same elevation in the reconstruction performed by Sprague.  Further, testing to confirm my rebuttal reconstruction shows that CK could indeed fit in the position presented and further is consistent with the testimony and the injury marks on CK's body.

Refer to Comparative Access photos (attachment-6).

Rebuttal Presented by Heath and Associates

As stated, I reject the theory advanced by Sprague that CK relied on the service jack as the sole support of the vehicle.  My rebuttal analysis, as shown herein, demonstrates that it was not possible for the BMW, as posited by Sprague, to have slipped off the service jack as Sprague allows.

I reject Sprague's theory of the service jack being the sole support of the raised BMW and then having the BMW slip off the service jack because both of the left driver's side tires of the BMW would have successfully resisted any leftward movement of the vehicle.  I considered Sprague's theory that if the support stand was not used and the service jack was the sole support of the vehicle, the service jack was expelled from under the vehicle due to the horizontal force component exerted on the jack contact surface by the vehicle contact surface.

My analysis shows  Sprague's theory is unreliable and inconsistent with principles of automotive engineering and physical laws, because the service jack is mounted on wheels the purpose of which is to horizontally adjust its position as a vehicle is raised, thereby eliminating any horizontal force components imparted by the vehicle to the jack lifting surface. It should be a matter of common automotive knowledge that as the vehicle is raised, the lifting point travels through an arc thereby also moving the lifting point horizontally with respect to the floor.  For this reason, there is little if any horizontal force developed as a result of lifting a part of a vehicle with a service jack.

To further disprove any validity to Sprague's theory we tested the theory by first repeatedly lifting the exemplar BMW by the exemplar service jack at the position favored by Sprague and allowing the exemplar BMW to rest in the raised position for various periods throughout all of our testing endeavors.  No relative motion was observed between the jack contact surface and the vehicle contact surface so it was decided to measure the force required to pull the jack out from under

the vehicle.  Two tests were undertaken to establish the required force, one test with the jack perpendicular to the vehicle, and one test with the jack at 30 degrees from the perpendicular line. The forces measured were 450 pounds and 420 pounds respectively.  Forces of such magnitude between the vehicle and the service jack could not possibly have been caused or generated by any activity by CK when he was under the vehicle. Therefore, this theory was dismissed.

Refer to Measurement Group 3 for information relating to the pullout test (attachment-3).

I next considered in my rebuttal the space available under the vehicle for CK to occupy.  We have demonstrated that if CK could fit under the vehicle in the position indicated, that it would account for three of the marks on the body and face and conforms to and is consistent with the testimony.

With the vehicle supported by the support stand, the lowest portion to be cleared by CK would be the rear most transverse cradle member. In order for CK to fit under this member when the vehicle was supported by the stand in the false engagement position, the elevation of the chest of CK while laying on the creeper would therefore have been nominally equal to or less than 12-5/16 inches.

Refer to Measurement Group 1 for information relating to stand supported clearance (attachment-1).

When the support stand collapsed and the vehicle weight was transferred onto the body of CK, the rear most transverse cradle member came to rest in proximity of the lower end of CK's sternum.  In this area of the lower chest the ribs slope down and away from the lower end of the sternum.  The center abdomen area is soft and the transverse cradle member spanned the rib cage closely adjacent to the lower end of CK's sternum.

The elevation of CK's chest area or rib cage would have been required to be high enough such that the area at the lower end of his sternum while lying on the broken creeper would have been equal to or greater than 10-13/16 inches. This is the dimension required for the support stand to have clearance to tip over after collapse.  This tip over was caused by contact with CK's right knee, thigh, leg, hip or the creeper.

Refer also to the Author's Rough Sketch (attachment-4).

Just to the rear of this cradle member is the manual transmission housing which comprises a longitudinally disposed raised feature.  This is the feature that applied a significant portion of the weight of the vehicle to CK and made the mark on CK's sternum. This contact would have been made after the support stand tip over as the cradle member slipped down CK's rib cage toward his abdomen.

Edinberg2                                                                                                   6

Further yet to the rear on the bottom of the manual transmission housing is a protruding transmission oil drain plug.  My opinion is that this drain plug contacted CK's right cheek and caused the wound shown in the Medical Examiner's photos.  It is also my opinion that the wounds evident under CK's right arm were caused by the deformed heat shield material shown in the undercar photos attached.

> Refer to Undercar photos and Measurement Group 2 for information relating to CK supported clearance (attachment-2).

My research led to a statistical summary of body measurements from individual ISO populations. Germany was selected because it is relatively close to the Klorczyk ancestry location, and because of the reliability of the German data. This data indicated that the 95th percentile of men exhibited a height and weight similar to CK.  The chest dimension for this group was 10.6 inches measured while standing.  It is reasonable to conclude that CK's chest dimension would have been nominally in this range.

There is no information relating to chest expansion and/or contraction under load so all that can be accomplished is to make a dimensional calculation and see if it is reasonable. We do know however, that CK had no broken ribs.  We can calculate CK's nominal supine chest dimension from the false engagement elevation as follows:

> 12-5/16" (clearance) minus 3" (creeper) = 9-5/16" (chest).

Likewise we can calculate CK's nominal supine chest dimension from the stand tip over dimension as follows:

> 10-13/16" minus 2" (creeper) = 8-13/16" (chest)

The foregoing shows that the space available for CK to gain access to the underside of the vehicle to perform the oil drain plug final tightening was reasonably adequate with the vehicle supported by the stand in the false engagement position.  It also shows that when the stand collapsed and the weight of the vehicle was transferred to CK, CK's chest, sternum, rib cage and skull provided support for the vehicle sufficient to allow support stand tip over after collapse with a reasonable diminution of supine chest dimension.

A sketch showing the salient features of the underside of the BMW and how these features related the CK and the tasks undertaken is appended to this report.

> Refer to Undercar photos and Author's Rough Sketch for information relating to CK positioning (attachment-4).

Edinberg2

7

The foregoing constitutes my rebuttal reconstruction and rebuttal opinions. On a related matter I respond to Sprague's explanation of his finding of a scrape mark on the BMW rocker panel. It is my opinion that this scrape mark could have been made by contact with any number of objects, such as EMS rescue tools, during the confusion surrounding the scramble to extricate CK from his position under the vehicle.  This scrape mark was not made by the jack being expelled.

Respectfully Submitted,
Heath and Associates

Frederick G. Heath
Principal

Attachments:

1. Measurement Group 1; information relating to stand supported clearance.
2. Measurement Group 2; information relating to CK supported clearance.
3. Measurement Group 3; information relating to the pullout test.
4. Author's Rough Sketch
5. Undercar photos and Power Steering Line photos
6. Comparative Access photos

# *ATTACHMENT 1*

Measurement Group 1
Jack Stand False Engagement Elevation





Figure 1.2 - Post 1-A



Figure 1.3 - Post 1-B

Figure 1.1
Passenger Side Elevation View





Figure 1.5 - Post 1-C



Figure 1.6 - Post 1-D

Figure 1.4
Front Elevation View



Figure 1.7
Elevation Post Measurement View

| Post 1-A | 17 1/16 | Jack Lifting Pad |
| Post 1-B | 5 15/16 | Wheel to Rotor |
| Post 1-C | 14 13/16 | Passenger Side Front of Longitudinal Cradle Member |
| Post 1-D | 12 5/16 | Center of Rear Transverse Cradle Member |

# *ATTACHMENT 2*

Measurement Group 2
Jack Stand Tip-Over Elevation





Figure 2.2  -  Post 2-A



Figure 2.3  -  Post 2-B

Figure 2.1
Passenger Side Elevation View





Figure 2.5  -  Post 2-C



Figure 2.6  -  Post 2-D

Figure 2.4
Front Elevation View



Figure 2.7
Elevation Post Measurement View

| Post 2-A | 14 3/8 | Jack Lifting Pad |
| Post 2-B | 3 1/4 | Wheel to Rotor |
| Post 2-C | 13 1/8 | Passenger Side Front of Longitudinal Cradle Member |
| Post 2-D | 10 13/16 | Center of Rear Transverse Cradle Member |

*ATTACHMENT 3*

Measurement Group 3
Service Jack Pull Out Resistance Force Measurement



Figure 3.1
Farm Tractor used as Pull-Out Anchor
Load Applied Perpendicular to Vehicle

Figure 3.2
Farm Tractor Drawbar Positioned
to Provide a
Level Pulling Anchorage



Figure 3.3
Dial Indicator used to
Determine when Movement
Initiates



Figure 3.4
Service Jack Oriented 90 Degrees
To Longitudinal Axis of Vehicle
Pull-Out Resistance  450 LB.



Figure 3.5
Service Jack Oriented 30 Degrees
From Perpendicular
Pull-Out Resistance  420 LB.

*ATTACHMENT 4*



AUTHOR'S ROUGH SKETCH

*ATTACHMENT 5*

Under Car Photos
and
Power Steering Line Photos



Transmission Oil Drain Plug

Rear Transverse Cradle Member

Metal Heat Shield

Engine Oil Drain Plug

PS Longitudinal Cradle Member

Figure 1
BMW Bottom View



Figure 2
Power Steering Line and Grommet



Figure 3
Power Steering Line Retracted

# *ATTACHMENT 6*

Comparative Access Photos



Figure 1  -  Mannequin in Heath Position
Consistent with Autopsy Photograph
Exhibit 13, BATES NO. KOLORCZYK000148



Figure 2  -  Mannequin in Sprague Position
Not Consistent with Autopsy Photograph
Exhibit 13, BATES NO. KOLORCZYK000148