**Page 1**

1    UNITED STATES DISTRICT COURT
2    DISTRICT OF CONNECTICUT
3
4  FREDERICK KLORCZYK, JR. As co-administrator of the
5  Estate of Christian r. Klorczyk, et al.
6
7              PLAINTIFFS
8
9  V.
10       CIVIL ACTION NO. 3:13-CV-00257-JAM
11
12  SEARS ROEBUCK & CO., et al.
13
14              DEFENDANTS
15  _____
16
17    VIDEO DEPOSITION FOR THE DEFENDANTS,
18       SEARS ROEBUCK & CO., et al.:
19
20    The Video Deposition of Frederick G. Heath,
21  taken in the above-styled matter at Court Reporting
22  Services, Inc., 6013 Brownsboro Park Boulevard, Suite
23  A, Louisville, Kentucky, on the 22nd day of
24  March, 2017, beginning at 10:24 a.m.
25

**Page 2**

1         A P P E A R A N C E S
2
3  FOR THE PLAINTIFFS, FREDERICK KLORCZYK, JR.
4  AS CO-ADMINISTRATOR OF THE ESTATE OF
5  CHRISTIAN R. KLORCZYK, et al.:
6    HOWARD S. EDINBURGH, ESQUIRE
7    HERZFELD & RUBIN, PC
8    125 Broad Street
9    NEW YORK, NEW YORK  10004
10
11    BRYAN J. ORTICELLI, ESQUIRE
12    DAY PITNEY, LLP
13    242 Trumbull Street
14    HARTFORD, CONNECTICUT  06103
15
16  FOR THE DEFENDANTS, SEARS ROEBUCK & CO., et
17  al.:
18    STEVEN ZAKRZEWSKI, ESQUIRE
19    GORDON REES SCULLY MANSUKHANI, LLP
20    95 Glastonbury Boulevard
21    Suite 206
22    GLASTONBURY, CONNECTICUT  06033
23    [BY DENNIS O. BROWN, ESQUIRE]
24
25

**Page 3**

1       A P P E A R A N C E S (CONT.)
2
3  FOR THE DEFENDANT, SEARS ROEBUCK & CO.:
4    ERICA TODD-TROTTA, ESQUIRE
5    TROTTA, TROTTA & TROTTA
6    900 Chapel Street
7    12th Floor
8    NEW HAVEN, CONNECTICUT  06503
9    [VIA TELEPHONE]
10
11  FOR THE DEFENDANT, SHINN-FU:
12    ARTHUR A. CHAYKIN, ESQUIRE
13    ERICKSON, KERNELL, DERUSSEAU & KLEYPAS,
14    LLC
15    8900 State Line Road,
16    Suite 500
17    LEAWOOD, KANSAS  66206
18
19  ALSO PRESENT:
20    JULIUS ROBERTS, PE
21
22  VIDEOGRAPHER:
23    MARK WHOBREY
24
25

**Page 4**

1       INDEX TO EXAMINATION
2
3                           PAGE
4  EXAMINATION BY MR. BROWN              6
5  EXAMINATION BY MS. TROTTA           180
6
7
8
9       INDEX TO EXHIBITS
10
11                           PAGE
12  EXHIBIT 1                    7
13  EXHIBIT 2
14       There is no exhibit 2 mentioned
15  EXHIBIT 3                   12
16  EXHIBIT 4                   85
17  EXHIBIT 5                   93
18  EXHIBIT 6                   94
19  EXHIBIT 7                  171
20  EXHIBIT 8                  176
21  EXHIBIT 9                  179
22
23
24
25

Page 5

1  VIDEO DEPOSITION OF FREDERICK G. HEATH
2        MARCH 22, 2017
3     THE VIDEOGRAPHER:  Okay.  We are
4  now on video record.  This begins video cassette
5  Number 1 to the deposition of Frederick G. Heath
6  in the matter of Frederick Klorczyk, Jr., as the
7  Co-Administrator of the Estate of Christian R.
8  Klorczyk, et al., v. Sears Roebuck & Company
9  [sic], et al.  The Case Number for this
10  is 3:13-CV-00257-JAM.
11     We are on record at approximately 10:24 a.m.
12  Today's date is the -- is March the 22nd, 2017.
13     Counsel could you please identify yourself for
14  the record.
15     MR. BROWN:  Dennis Brown of Gordon &
16  Rees representing the SFA entities.
17     MS. TROTTA:  Erica Todd-Trotta for the
18  Defendant, Sears Roebuck.
19     MR. CHAYKIN:  Arthur Chaykin, in-house
20  counsel, Shinn Fu Company of America.
21     MR. EDINBURGH:  Howard Edinburgh,
22  Herzfeld & Rubin, representing the Plaintiffs.
23     MR. ORTICELLI:  Bryan Orticelli, Day
24  Pitney, also for the Plaintiffs.
25     MR. BROWN:  Good morning.

Page 6

1     THE REPORTER:  You want me --
2     MR. BROWN:  Can you --
3     THE REPORTER:  -- to swear him in?
4     MR. BROWN:  -- swear the witness.
5  FREDERICK G. HEATH, called on behalf of the
6  Defendants, Sears Roebuck & Co., et al., after
7  being first duly sworn, is examined and testifies as
8  follows:
9  EXAMINATION
10  BY MR. BROWN:
11     Q.  Good morning, sir.
12     A.  Good morning.
13     Q.  Can you state your full name for the
14  record.
15     A.  Frederick G. Heath.
16     Q.  And --
17     A.  Go by Rick.  If you want to call me Rick,
18  I'd be happy to respond.
19     Q.  Rick.  I'd love to call you Rick.
20     A.  Great.
21     Q.  Take me off my plan to call you Fred,
22  but --
23     A.  Okay.
24     Q.  -- we can --
25     A.  Well --

Page 7

1     Q.  -- live with that.
2     A.  -- I'll answer to Fred.  Just don't call me
3  Fritz.
4     Q.  Do you have relatives who call you Fritz?
5     A.  Occasionally.
6     MR. BROWN:  Let's just mark a few
7  things for the record.  I guess maybe we should
8  mark his notice.
9  [WHEREUPON, document referred to is marked
10  Exhibit 1 for identification.]
11     MR. BROWN:  I'm sorry; I don't have
12  unlimited copies, but. . .
13     MR. EDINBURGH:  That's all right.  We
14  can share them if we have to.
15  [WHEREUPON, counsel confers inaudibly.]
16  BY MR. BROWN:
17     Q.  You have been retained to give opinion
18  testimony in this case; is that your understanding?
19     A.  Yes, sir.
20     Q.  And you're aware of the fact we've
21  marked as Exhibit 1 a notice of your deposition
22  here today?
23     A.  [examines document] Correct.
24     Q.  And I'm sure Steve will think I should've
25  done. . .

Page 8

1     And you have [sic] also understand that
2  there's been a request for inspection?
3     A.  Yes, sir.
4     Q.  And you've come today with one jack
5  stand; is that correct?
6     A.  That's correct.
7     Q.  And is it your testimony that in all the
8  testing done in connection with this case that
9  there has only been one jack stand used?
10     A.  Yes, sir.
11     Q.  And is it your testimony that the jack
12  stand that's been produced here for inspection
13  today is the one that's been depicted in all of the
14  digital videos that have been produced in
15  connection with this case as relating to your work?
16     A.  Yes, sir.
17     Q.  Okay.  And to the best of your
18  knowledge --
19     A.  Well, to the extent that -- let me modify
20  that response, if you don't mind.  I -- I'm not
21  familiar with every frame of every video in my
22  memory bank, but there may have been exemplar
23  stands used in trying to develop a particular set up
24  for testing.  But to the extent that those exemplar
25  stands -- stand or stands were used for that

Page 9

1 purpose, no testing was performed upon them.  I
2 don't know if they show up in a video or not.  May
3 have had -- may have had a set up video; I'm not
4 sure.
5    Q.  We can go through specific videos later.
6 But so I'm clear, there are some videos that show
7 a jack stand being used with a red BMW of similar
8 model to the one the Klorczyks owned?
9    A.  Yes, sir.
10    Q.  Were you present when that testing was
11 done?
12    A.  Some of it; yes, sir.
13    Q.  Is it you who's climbing around the
14 vehicle in those videos?
15    A.  No.
16    Q.  Who is that?
17    A.  Glenn Felpel.
18    Q.  I think we have his name in the file.
19    A.  I'm sure you do.
20    Q.  How would one looking at the video know
21 whether you were there or not?
22    A.  Well, I don't know.
23    Q.  Was there any sort of recom -- or
24 documentation kept as to who was present?  The
25 videos looked like they were shot from a camera

Page 10

1 set on a tripod or something because the camera is
2 still.  Were you there as a silent observer; is that
3 your testimony?
4    A.  I was there as a silent observer.
5    Q.  Do you know for a fact that you were
6 there for every one that a video has been produced
7 on?
8    A.  Oh, I'm sure I was not there for every one
9 of the videos that was produced.
10    Q.  How I would know which ones you were
11 there for?
12    A.  I guess I'd have to look at the videos
13 carefully and refer to my time sheets and try and
14 figure out if that's one I saw or didn't see.  I'm not
15 sure we even videoed when I was watching.
16    Q.  Well, I -- am I understanding you
17 correctly that there were tests done that weren't
18 videotaped?
19    A.  I'm sure there were.
20    Q.  Is there documentation of how those tests
21 were done and what the result was?
22    A.  Well, there were set up experimentation
23 as to how to set up the equipment to do the
24 testing.  As far as -- that's what I was talking
25 about earlier, about using an exemplar jack stand

Page 11

1 for developing the set up.
2    Q.  Well, do you consider the testing to only
3 be what you videotaped or is the testing every time
4 you put a vehicle on a jack stand and saw what
5 happened?  I'm -- I'm a little confused.
6    A.  There was -- there were tests that weren't
7 videoed.
8    Q.  Are those tests documented somehow?
9    A.  Not that I can recall.
10    Q.  Were notes taken of -- of how those tests
11 were set up and what was done?
12    A.  I think verbal reporting was -- was
13 prepare -- was delivered to me by Mr. Felpel on
14 the results of such testing that was not videoed.
15 As to whether or not Mr. Felpel took any notes, I
16 would strongly doubt it.  To the extent that I took
17 any notes on Mr. Felpel's verbal reporting to me,
18 they would be in my file, which has been produced.
19    Q.  Were any audio records made during any
20 of this testing?
21    A.  Just as part of the videos.
22    Q.  Okay.
23    A.  I think some of the videos have sound.
24 [WHEREUPON, counsel confers inaudibly.]
25       MR. BROWN:  We'll return to that.  Well,

Page 12

1 I guess I'll do this first.  What number is this, 3?
2       THE REPORTER:  M-hm.
3 [WHEREUPON, document referred to is marked
4 Exhibit 3 for identification.]
5 BY MR. BROWN:
6    Q.  Showing you what's been marked as
7 Exhibit 3.
8    A.  [examines document] Yes, sir.
9    Q.  This is Plaintiff's Disclosure of Expert
10 Witness in the caption case that we're here on.
11 Have you seen this before?
12    A.  I'm sure I have.
13    Q.  Well, you say that a little like I say
14 sparkling.
15    A.  Well, I have a -- I have a mountain of
16 materials that I reviewed, and I -- I'm sorry, but I
17 don't --
18    Q.  That -- that's okay.
19    A.  -- don't have a photographic memory.
20    Q.  Certainly the Exhibit A to this is
21 something you've seen before; correct?
22    A.  Which is what, my report?  [examines
23 document]
24    Q.  Yeah.
25    A.  Yeah; certainly.

---

Page 13

1   Q. I'm sorry; could you just -- we didn't go
2 through all the basics, but let me ask: Have you
3 been deposed before?
4   A. Of course.
5   Q. Yeah. So you know to speak up and to
6 answer yes and no, and -- because I just --
7   A. Am I not doing that?
8   Q. Well, I kind of heard a, yeah, something
9 at the end of that one, and maybe it's my ear.
10 But --
11   A. Oh.
12   Q. -- but have you seen your report before;
13 correct?
14   A. Yes, sir --
15   Q. Okay.
16   A. -- I prepared it.
17   Q. And who hired you?
18   A. Herzfeld Rubin [sic], I believe. I don't
19 know what their arrangements are within Herzfeld
20 Rubin, but my payments come from Herzfeld Rubin.
21   Q. Okay. Who first contacted you about
22 being retained as an expert in this case?
23   A. I'd have to look in my file, which I believe
24 you have here somewhere.
25   Q. Do you have any memory at all of how it

Page 14

1 is that you became involved?
2   A. I'm sure by telephone; that's usually the
3 way I'm contacted. And I think the first thing that
4 happened was somebody sent me a sup -- support
5 stand to look at, then there were phone
6 conversations. And then I would've -- typ --
7 typically what happens is I -- then I send an
8 engagement letter and a rate sheet and a CV.
9 And then I get hired. And then I believe the
10 next thing that transpired was some period after
11 that I went to Connecticut to inspect the premises
12 and the vehicle and the -- I looked at the stands.
13   Q. This report is dated December 8th, 2014?
14   A. Yes, sir.
15   Q. Have you done an updated report since --
16   A. No, sir.
17   Q. -- this one?
18   A. No, sir.
19   Q. Is it your intention to do an updated
20 report?
21   A. Not unless requested.
22   Q. To the best of your knowledge, is
23 everything that you are going to testify about
24 encompassed within this report?
25   A. As I sit here today, I believe so.

Page 15

1 Obviously, if there's testimony from your expert's
2 report, I may have discussions with counsel about
3 re -- rebuttal activities that may transpire down
4 the road. But I can't sit here and tell you
5 positively one way or the other if I'll do more work
6 or not.
7   Q. Can you turn to the first page of your
8 report.
9   A. Sure.
10   Q. It's the first page of Exhibit A to
11 Defendant's Exhibit 3 in this case. This is to Mr.
12 Elliott at Day Pitney and Mr. Edinburgh at Herzfeld
13 & Rubin; is that correct?
14   A. Yes, sir.
15   Q. And your report begins: [reads] In
16 response to your request I have reviewed certain
17 documents and conducted research relating to the
18 circumstances surrounding the incident is the
19 subject -- that is the subject of the referenced
20 action. Have I read that correctly?
21   A. Yes, sir.
22   Q. Was there a specific request made to
23 you?
24   A. Yes. I don't always get a -- requested to
25 make a report. I don't prepare a report unless

Page 16

1 requested.
2   Q. And that request refers to preparing --
3 just the preparation of a report?
4   A. Yes, sir.
5   Q. Okay. Do you have any kind of
6 recollection of -- of what you were hired to offer
7 an opinion on, what -- what you were to do?
8   A. I was asked to examine the circumstances
9 and -- and to review certain documentation that
10 was furnished to me, such as the discovery and the
11 pleadings, and to perform testing on exem -- an
12 exemplar stand to make a determination of the
13 causation of the demise of Mr. Christian Klorczyk.
14 And I exercised my best efforts to do so.
15 And then I was requested to write a report
16 expressing my opinions in the causation of Mr.
17 Klorczyk's demise. And I did that. And then
18 your -- my report of December 8th, 2014, is the
19 document that puts my opinions forth.
20   Q. Okay. If you turn to Page 2 of your
21 report. Well, first, you have a number of acronyms
22 for everyone involved?
23   A. Yes, sir. I had a hard time typing
24 Klorczyk 100 million times, so I -- I gave him
25 initials. I hope that's to your satisfaction.

Page 17

1   Q.  That's absolutely fine.
2   A.  Okay.
3   Q.  There's nothing wrong with that at all.
4   A.  Okay.
5   Q.  Lawyers are big on defining [phonetic]
6 terms.
7   You note that:  [reads] My evaluation and
8 opinion are based upon the following materials
9 that have been furnished to me.
10   A.  Yes, sir.
11   Q.  Do you see that?
12   A.  Yeah; sure.
13   Q.  And are your opinions reflect -- any other
14 materials other than these?
15   A.  Well, sure.  My report so states on the
16 next page.
17   Q.  Well, let me ask it this way:  There's a
18 section that begins and it has a list before 19
19 items; is that correct?
20   A.  Yes, sir.
21   Q.  And then there's a list of other materials
22 you reviewed, and there's ten items there, correct?
23   A.  Yes.
24   Q.  And then you have several paragraphs
25 saying that you went, visited Waterford, did some

Page 18

1 various things?
2   A.  Correct.
3   Q.  And -- and it goes down to where
4 there's a new section report called "Specific
5 Qualifications"; do you see that?
6   A.  Yes, sir.
7   Q.  Well, on these two pages, down to that
8 Specific Qualifications is this a complete stating
9 of everything you considered in reaching your --
10 your opinions?
11   A.  I believe so.
12   Q.  Okay.  And if you look back on Page 2 --
13   A.  M-hm.
14   Q.  -- in -- go down your list, Number 13?
15   A.  Yes, sir.
16   Q.  [reads] Numerous screen shots of
17 websites offering support stands and alleging
18 support stand failures as collected by FK, that's
19 Frederick Klorczyk; correct?
20   A.  Yes, sir.
21   Q.  Did you do any of your own research
22 about background on jack stand failures?
23   A.  Specifically for this case?
24   Q.  Yeah.
25   A.  No.

Page 19

1   Q.  And you looked at the deposition of Lynn
2 Klorczyk -- Klorczyk; is that correct?
3   A.  Yes, sir.
4   Q.  It's Number 18 on your list?
5   A.  Yes, sir.
6   Q.  And Number 19, the deposition of -- of
7 Fred Klorczyk?
8   A.  Yes, sir.  By the way, I think there were
9 subsequent depositions of both Lynn and Frederick
10 that I've also reviewed that aren't on this list.
11   Q.  You have seen the transcripts of the
12 subsequent depositions?
13   A.  Yes, sir.
14   Q.  Did anything in those transcripts change
15 any of your opinions?
16   A.  Nope, they reinforced my opinions.
17   Q.  Have you seen the transcript of Parker
18 Klorczyk?
19   A.  Yes, sir.
20   Q.  Did anything in it change your opinions?
21   A.  No, sir.
22   Q.  Let me ask you a rather broad question.
23 Are you aware of any physical evidence that
24 Christian Klorczyk was using a jack stand when
25 this accident occurred?

Page 20

1   A.  No.  I wasn't at the accident scene at the
2 time of the accident.
3   Q.  In your inspection of the scene, the
4 actual jack stand used, the vehicle that was
5 involved in the accident, have you seen
6 documented -- is there any physical evidence
7 you've seen in reviewing those things which would
8 prove to that you a jack stand was being used that
9 day?
10   A.  Gosh.  I don't remember what was in the
11 police photographs.  There may've been some -- a
12 shot of a -- a jack stand in police photographs, but
13 I honestly don't recall.  But that's about the only
14 place I would have had access to such to -- in -- in
15 response to your question.
16   Q.  Have for purposes of your opinion you
17 assumed that a jack stand was being used that
18 day?
19   A.  Yes, sir.  I --
20   Q.  And --
21   A.  -- I -- I relied on the testimony that was
22 offered, and that's about all I had to go on.
23   Q.  And that testimony is the testimony of
24 Fred and Lynn Klorczyk?
25   A.  Yes, sir.

Page 21

1  Q.  Have you done any kind of research or
2  measurements or testing to determine if Christian
3  Klorczyk would've been killed if there had been a
4  jack stand under the car?
5  A.  I don't know how it would do that.
6  Q.  Do you have --
7  A.  You know, do you want me to try and
8  clarify your question so I could make an
9  intelligent --
10  Q.  No.
11  A.  -- response?
12  Q.  You know, no --
13  A.  I mean, it --
14  Q.  -- no --
15  A.  -- I mean --
16  Q.  -- no; I don't.
17  A.  Okay.  Fine.
18  Q.  We'll -- we'll take it that you think my
19  question required clarification, and your re --
20  response wasn't necessarily intelligent.
21  A.  Yeah.
22  Q.  But --
23  A.  Yeah.
24  Q.  I'm sorry; I'm just, you know, --
25  A.  That's okay.

Page 22

1  Q.  I asked the question I wanted to ask --
2  A.  Sure.
3  Q.  So that's fine.
4  Do you have any physical evidence of where
5  the jack stand would've been placed if one was
6  being used?
7  A.  Physical evidence?
8  Q.  Yeah.
9  A.  No, sir.
10  Q.  I mean, there's no photograph, is there?
11  A.  No.  And --
12  Q.  Have you --
13  A.  -- and --
14  Q.  -- observed anything on the underbody of
15  that car which suggests where the jack stand was?
16  A.  No, sir.
17  Q.  You're making an assumption; correct?
18  A.  I am going by the testimony offered.
19  Q.  And -- well, okay.
20  And does this fellow who actually did the
21  testing, is he an employee?
22  A.  No, sir; he's one of my associates.
23  Q.  And what exactly does that mean to be
24  one of your associates?
25  A.  That means that he performs tasks on a

Page 23

1  pay-as-you-go basis, on a contract basis for me
2  from time to time on various projects.  We design
3  products; we perform stress analysis; we
4  investigate product failure situations.  His facility
5  includes a machine shop environment and -- with
6  some testing equipment.  And we have been
7  associates for many years.
8  Q.  So you would have paid him --
9  A.  I --
10  Q.  -- in essence --
11  A.  -- I --
12  Q.  -- a 1099 basis per hour?
13  A.  Yes -- yes, sir; that's correct.
14  Q.  Was he involved at all in preparing your
15  report?
16  A.  No.
17  Q.  Did he review your --
18  A.  Well --
19  Q.  -- report?
20  A.  -- to the extent that he did the testing, he
21  was -- he was involved with preparing --
22  Q.  Well --
23  A.  -- my report.
24  Q.  -- and I mean the physical preparation of
25  the --

Page 24

1  A.  No.
2  Q.  -- report, did --
3  A.  No.
4  Q.  -- he review drafts; did he comment on
5  things?
6  A.  No.
7  Q.  Okay.  Would he have ever been shown
8  the report?
9  A.  I don't believe he's ever seen the report.
10  Q.  And if you could turn to Page 3, towards
11  the end of your section on the materials reviewed?
12  A.  Yes, sir.
13  Q.  It says:  [reads] Heath and Associates
14  has also undertaken the laboratory testing of
15  exemplar support stands at 4917 Macmont Circle,
16  Powell, Tennessee, in 2012 and  13, as well as
17  testing exemplar support stands with an exemplar
18  vehicle, BMW model 325xi.  Do you see that
19  paragraph?
20  A.  I do.
21  Q.  Now is your associate, is that address his
22  machine shop?
23  A.  Yes, sir; that's his office and machine
24  shop.  M-hm.
25  Q.  I'm curious, because twice in this

Page 25

1 paragraph you talk about multiple support stands?
2 A. Yes, sir.
3 Q. You've come here today with one that you
4 say was the only one used in testing?
5 A. Correct.
6 Q. So is it your report that's incorrect?
7 A. Well, to the extent that -- that other
8 stands may have been used for test set up without
9 having performed tests on them, I would argue that
10 it's not necessarily incorrect. But I will restate
11 that all the testing that you have seen photographs
12 and videos of was performed on one stand.
13 Now to the extent that Mr. Felpel may have
14 manually manipulated one or more other stands, to
15 demonstrate the phenomenon that, indeed, it is
16 possible to achieve point to point contact between
17 the pawl and the teeth on the saddle, I can't sit
18 here and say whether he did that or not.
19 But to the extent that he may have done that,
20 he may very well have done that. But were any
21 loads placed on those other stands, no.
22 Q. And you know that for certain?
23 A. I do.
24 Q. How do you know that for certain?
25 A. Mr. Felpel told me.

Page 26

1 Q. When did he tell you this?
2 MS. TROTTA: Can you put -- can you put
3 the telephone a little closer to him because he's
4 coming in jarbled.
5 [WHEREUPON, off-the-record remarks are
6 made.]
7 MR. BROWN: We'll try that. See if
8 that's better.
9 THE WITNESS: How's that?
10 MS. TROTTA: You're good. How about
11 Mr. Heath?
12 THE WITNESS: Yep. That's me.
13 MS. TROTTA: Oh. Then you're better.
14 Yep. Thank you.
15 THE WITNESS: Okay.
16 THE VIDEOGRAPHER: Hold on guys. I
17 have a microphone problem. I'm sorry.
18 MR. BROWN: That's all right.
19 THE VIDEOGRAPHER: I need to go off
20 the record for a second.
21 MR. BROWN: All right.
22 THE VIDEOGRAPHER: Time is 10:51.
23 We need to go off the video record.
24 [WHEREUPON, a brief recess is taken.]
25 THE VIDEOGRAPHER: Time is -- sorry.

Page 27

1 We're back on video record. Time is 10:52 a.m.
2 Go ahead, please.
3 THE WITNESS: I believe there's a
4 question pending. Didn't you ask me when did Mr.
5 Felpel tell me that?
6 BY MR. BROWN:
7 Q. Yeah.
8 A. On a regular basis Mr. Felpel and I speak
9 on the phone, sometimes multiple times a day.
10 We're intimately conversant about testing
11 protocols, testing procedures, and what he's doing
12 with what equipment. And to the best of my
13 knowledge and belief, no load was ever put on any
14 other stand in the point to point configuration than
15 the stand we brought here today.
16 Q. And is this something that you've talked
17 to him about recently?
18 A. I haven't talked to him since yesterday.
19 And -- and did I ask him that specific question
20 yesterday, no.
21 Q. Okay. At some point, since you knew that
22 you were going to have to provide the exemplar
23 jack stand for inspection here today, did you talk
24 to him to make sure that only that one was used?
25 A. Yes.

Page 28

1 Q. Okay. And that would've been some time
2 in the last month or so?
3 A. I -- I -- I don't know if it was in the last
4 month or so. It -- it was recently --
5 Q. Okay.
6 A. -- as opposed to five years ago. We only
7 had one stand that's similar to the accident
8 stands.
9 Q. The stand that's been produced here has
10 had a little, I'll call it a "window" machined into
11 the side?
12 A. Yes, sir.
13 Q. Who did that?
14 A. Glenn Felpel.
15 Q. And did he talk to you before he did that?
16 A. I think I directed him to do it.
17 Q. And do you remember approximately when
18 that was?
19 A. Early on.
20 Q. And why did you instruct him to do it?
21 A. So we could see through the side of the
22 collar on the stand when we had point to point
23 contact, rather than have him to fiddle around with
24 a manual manipulation to try to achieve it.
25 Q. Did you go out and buy this jack stand?

Page 29

1  A.  No, sir; it was furnished it me by counsel.
2  **Q.  Okay.  And they furnished you just that --**
3  **I mean, they're usually sold in pairs; they**
4  **furnished you just this one?**
5  A.  Just furnished me one like this and then
6  the next version of the model, which I -- I have at
7  my office that is not identical to this one.
8  Apparently the design was changed somewhere
9  along the line between the -- stand that was
10  involved in the accident and the stands that are
11  now available under the same part number from
12  Sears.
13  **Q.  When I -- I just went downstairs and --**
14  **and looked at it, and you can tell me if you know**
15  **and you may not know.  When I look at that jack**
16  **stand, the pawl that comes in contact with the**
17  **teeth on the ratchet bar --**
18  A.  Yes, sir.
19  **Q.  -- one corner of it seems to have been**
20  **removed.  Do you know if that was --**
21  **Q.  Removed?**
22  **Q.  Yeah; it looks like it's been ground off.**
23  A.  I don't know.
24  **Q.  It's -- it's not square anymore.**
25  A.  I --

Page 30

1  **Q.  It's rounded off on one side.**
2  A.  I don't know about it.
3  **Q.  Do you know how that happened?**
4  A.  I don't.  And if I -- I was to look at the
5  stand, I might hazard a -- an opinion on how it
6  happened.
7  **Q.  Well, I -- I -- I'm not asking for your**
8  **opinion on that.**
9  A.  Yeah.
10  **Q.  I'm asking --**
11  A.  I do --
12  **Q.  -- if you do --**
13  A.  -- not --
14  **Q.  -- have any personal knowledge?**
15  A.  -- I do not.
16  **Q.  Okay.  And on the top of the ratchet bar it**
17  **looks like there's something that might've been a**
18  **little sticky, that's a dark substance that's on**
19  **there,  doesn't appear to be rust, appears to**
20  **actually be something that's on there.  Do you**
21  **know what that is?**
22  A.  I -- and when you say "on there," on what,
23  on the saddle?
24  **Q.  Yes.**
25  A.  The yellow part?

Page 31

1  **Q.  Right.**
2  A.  Which part of the yellow part?
3  **Q.  The top of the saddle on --**
4  A.  Oh.  On the --
5  **Q.  -- ratchet bar --**
6  A.  -- on the top?
7  **Q.  -- on the -- on the flat surface of it --**
8  A.  Uh-huh.
9  **Q.  -- there seems to be a -- a substance**
10  **that's there been, obviously, squished out?**
11  A.  May have been glue from the rubber.
12  That was part of the testing that you have in --
13  videos of.  And that's speculation on my part.  I
14  don't know if it's glue or not without looking at it
15  or analyzing it.
16  **Q.  And what rubber was glued on there for**
17  **the testing?**
18  A.  Well, if you looked at the videos you saw
19  some testing being accomplished in a -- in an
20  arbor press where a rubber block was placed
21  between the hydraulic cylinder and the saddle.
22  And then there were tests where a rubber block
23  was placed between the hydraulic cylinder and
24  then a piece of sheet metal was placed on top of
25  the saddle to separate the rubber from the saddle.

Page 32

1  **Q.  Was the piece of rubber used in the**
2  **testing that was done with the car?**
3  A.  No.
4  **Q.  And is it documented somewhere which**
5  **test had rubber, exactly what was rubber was that**
6  **other tests didn't have the rubber?**
7  A.  It's in the videos you have.
8  **Q.  Well, the videos of the car, I can't really**
9  **see the jack stand.**
10  A.  Well --
11  **Q.  So I'm asking you --**
12  A.  -- I have seen the jack stands --
13  **Q.  -- if the --**
14  A.  -- and I --
15  **Q.  -- protocols are --**
16  A.  -- I have --
17  **Q.  -- are documented somewhere?**
18  A.  -- I have seen the contact between the
19  jack stands and the car, and there is no rubber
20  used in that test.
21  A.  Well, I --
22  **Q.  Any of them.**
23  **Q.  -- I haven't seen a test with the car where**
24  **I can see you checking anything, so I'm asking the**
25  **questions factually.**

Page 33

1   A.  And I'm trying to answer them as best --
2   Q.  Good.
3   A.  -- I can.
4   Q.  And I -- I want to ask again --
5   A.  Sure.
6   Q.  -- Now, generally, when I have lawsuits
7   and engineers involved, I have protocols, I have
8   photographs of everything, I have measurements, I
9   have -- would have photographs under the car
10  where things were placed.  I don't seem to have
11  any of that in this case.
12  A.  M-hm.
13  Q.  So I'm asking you:  Was -- was any of
14  that done; were there protocols, was it written
15  down, were there photographs of the set up, is
16  there anything other than the videos when there's
17  supposed to be a jack stand under the car and we
18  see a side of a car with blocks of wood?
19  A.  I believe there are photographs still --
20      MR. EDINBURGH:  Just objection.  You
21  can answer, although objection.  Objection as to
22  form.
23  A.  I believe there are stills of those same
24  scenes.  But again, there are hundreds of
25  photographs and videos.  But I'm -- and I'm going

Page 34

1   by memory.
2       Now, as far as the testing protocol, was -- the
3   preparation of method of the testing protocols was
4   verbally transmitted between myself and Mr.
5   Felpel.  Mr. Felpel and I have discussions -- had
6   discussions on a regular basis about how to
7   approach the testing.  And Mr. Felpel followed my
8   instructions.
9       And when the testing was -- when he was
10  satisfied that the set up wa -- had been achieved
11  and in -- in accordance with my instructions and
12  our discussions, he would ask me to stop by and
13  witness what he was able to -- to have produced
14  with the testing.
15      Now, my visitation to Powell, Tennessee, was
16  on a regular basis.  There may or may not be
17  records of such visitation because it's right on the
18  way to a second home that I have in Asheville,
19  Tenn -- North Carolina.  And I frequently stop in
20  Powell, Tennessee, both coming and going from my
21  home in Asheville.
22  BY MR. BROWN:
23  Q.  Where is the rubber that was glued on top
24  of it?
25  A.  Where is it?

Page 35

1   Q.  Yeah.
2   A.  It's in Powell, Tennessee.
3   Q.  Is that something that can be retrieved
4   and sent to counsel so it can be inspected?
5   A.  Sure.  I say sure; I'm -- I'm pretty -- I'm
6   pretty sure.  I don't see any reason why it's still
7   not in Powell, Tennessee.  Mr. Felpel, however, is
8   in Florida.  And as to what effort has to be
9   expended to -- for him to go to Powell, Tennessee,
10  and find the rubber blocks that he tried, I mean,
11  I'd think there were more than one durometer block
12  of rubber that he used in the testing.
13  Q.  And why did you have to use a rubber
14  block?
15  A.  Well, we were lab testing the phenomenon
16  of point to point contact of the jack stand.  And
17  when there was no rubber block used, we got one
18  result and when a rubber block was used to try to
19  emulate the flexibility or lack of rigidity of a
20  vehicle being supported by the jack stand, we
21  were -- we used the rubber block to try to
22  represent that springiness, if you will.
23      We were trying to determine what kind of
24  perturbation is required to allow the point to point
25  contact to be lost and the load to -- to coll -- to

Page 36

1   collapse the jack stand.
2   Q.  What springiness is there in a car frame?
3   A.  Plenty.
4   Q.  Well, am I understanding you correctly
5   that it's your opinion or belief that if a -- a frame
6   member of a vehicle is lowered on to a jack stand,
7   once the weight of the vehicle is put on the jack
8   stand there is a springiness there?
9   A.  No.  We were trying to investigate how
10  much force or effort or what would release -- what
11  would release the load from the point to point
12  contact.
13  Q.  So you assume that a jack stand was
14  being used; correct?
15  A.  No, sir; I was -- I was relying upon Mr.
16  Klorczyk's testimony that a jack stand was being
17  used.
18  Q.  So you assume that Mr. Klorczyk is
19  factually correct when he tells you that a jack
20  stand was being used?
21  A.  That's all I had to go on.  That's correct.
22  I didn't imagine it.
23  Q.  And you assume that when that jack stand
24  was used, that there was a point to point
25  engagement; correct?

Page 37

1  A.  Yes, sir.
2  Q.  And you assume that the full weight of
3  the vehicle was put on that point to point
4  engagement and -- and it held there; correct?
5  A.  Yes, sir.
6  Q.  And you assume that wherever the jack
7  stand was placed in that situation, there would've
8  been an up and down flexibility?
9  A.  There could've been flexibility in any
10 direction.  There were certain procedures being
11 accomplished on the vehicle while it was in that
12 support mode.  And I didn't assume any of this
13 stuff; I came to these conclusions by my review of
14 the evidence.
15 Q.  And by "review of the evidence," it's the
16 material that we went through in that section of
17 your report; correct?
18 A.  Yes; and our testing.
19 Q.  I'd like to go few [sic] a few things.
20 Page 5 of your report.
21 A.  Yes, sir.
22 Q.  The final paragraph on that page begins
23 with:  [reads] The Klorczyk family, including Fred,
24 Lynn, Fred, III, Christian, Parker --
25 A.  Yes, sir.

Page 38

1  Q.  -- and the anagrams typifies a successful,
2  close-knit American family.
3  A.  Is there a question in there somewhere?
4  Q.  Well, I'm getting to a question.
5  A.  Okay.
6  Q.  Do you see the sentence that I'm --
7  A.  I certainly --
8  Q.  -- bringing to --
9  A.  -- yes, I --
10 Q.  -- your attention?
11 A.  -- certainly see it.
12 Q.  Thank you.  This is based on their
13 testimony?
14 A.  It's best of my -- based on -- on -- on my
15 reading of the depositions, my observation of the
16 interaction of the -- Lynn and Fred Klorczyk when I
17 visited Connecticut, and my interviews with -- my
18 interview with Mr. Klorczyk upon that visit.
19 Q.  Okay.  And is this opinion that you have
20 here -- I mean, this is your personal opinion,
21 that -- that they typify that; right?
22 A.  Yes, sir.
23 Q.  It's not really relevant to any of the
24 issues as to whether -- what happened with the
25 jack stand; is it?

Page 39

1     MR. EDINBURGH:  Objection.  You can
2  answer.
3  A.  I -- when I write reports on -- on issues
4  that I'm involved with, I try to give a flavor of my
5  understanding of the circumstances involved with
6  the parties that are named in the lawsuit, and
7  that's what I tried to do here.
8  BY MR. BROWN:
9  Q.  Well --
10 A.  If it isn't relevant to you, ignore it.
11 Q.  Well, it seems in my opinion to be a
12 direct attempt to try to be sympathetic --
13    MR. EDINBURGH:  Objection.
14 BY MR. BROWN:
15 Q.  -- to somebody that's removed from the
16 proper course of engineering opinion making.  And
17 I'm trying to figure out if that was your intent or
18 not of why you would put that here?
19    MR. EDINBURGH:  Objection; he -- he
20 answered why.
21    MR. BROWN:  He answered the basis of
22 it.
23 BY MR. BROWN:
24 Q.  I mean, you're not an expert on American
25 families, are you, sir?

Page 40

1     MR. EDINBURGH:  Objection.
2  A.  No -- well, I've had a couple.  No, sir.
3  BY MR. BROWN:
4  Q.  And certainly the Klorczyk's appear to
5  have money; you would agree with that wouldn't
6  you?
7  A.  I certainly would.  They have a lovely
8  home.
9  Q.  And you've read the deposition testimony
10 of their drug and alcohol use, haven't you?
11    MR. EDINBURGH:  Objection.
12 A.  I'm not aware of drug and alcohol use.  I
13 am aware that Mr. Klorczyk testified that after his
14 son died, he was distraught and was drinking
15 heavily at the time.  But I don't know anything else
16 about any drug or alcohol use, unless he was on
17 anti-depressants of some sort.  I -- I have no idea
18 what -- what his medical situation was.
19 [WHEREUPON, a cell phone rings.]
20 BY MR. BROWN:
21 Q.  If you could turn to Page 6.
22 A.  Sure.  What is that?
23 Q.  Are we there?
24 A.  Ye -- yeah.  I'm trying to figure out what
25 the noise is.  Well, whatever it is it stopped.

Page 41

1  Okay.
2       MR. BROWN:  Is that that flip phone
3  buzzing?
4       MR. SPEAKER:  No; I'm off.
5       MR. BROWN:  I know mine is off.
6  A.  I'm on 6.
7  BY MR. BROWN:
8  Q.  Okay.  And you run through here the
9  circumstances?
10  A.  Yes, sir.
11  Q.  In your use of adoption of car buffs,
12  that's just because that's how they talk about
13  themselves or talked about Christian; is that right?
14  A.  Yes, sir.  I think they own numerous
15  vehicles, way more than there were people in the
16  family.  Some were quite expensive.
17  Q.  He owns a DeLorean, I believe; right?
18  A.  Yes, sir.
19  Q.  You note here -- you talk about
20  equipment; you see that?
21  A.  I see equipment, yes.
22  Q.  And the second paragraph you talk about
23  the service jack?
24  A.  Yes.
25  Q.  And you note that the saddle dish

Page 42

1  furnished with the jack had been removed?
2  A.  Yeah.  Yes, sir.
3  Q.  And you say because it would damage
4  vehicles.  I think because it would scratch the --
5  was concerned about it scratching the door; and
6  am I remembering that correctly?
7  A.  I don't know; you could be.
8  Q.  Do you think it's safe to remove the
9  saddle dish from this kind of jack?
10      MR. EDINBURGH:  Objection.
11  A.  Well, I guess it depends on what it is
12  you're trying to lift and how you're lifting it.  But
13  a -- a direct answer to your question is, no, I don't
14  consider it unsafe and it depends on the
15  circumstances that -- where the -- where the
16  service jack is being used, how it's being used.
17  BY MR. BROWN:
18  Q.  So in your expert opinion that jack wasn't
19  rendered inherently dangerous to use because that
20  saddle jack had come off it?
21      MR. EDINBURGH:  Objection.
22  BY MR. BROWN:
23  Q.  The saddle dish?
24  A.  Again, it wasn't rendered unsafe to use
25  for circumstances un -- well, I don't know how it

Page 43

1  was being used.  I don't know where it was placed.
2  Put it this way.  I don't have a problem with using
3  that floor jack without the dish, if there had
4  been -- if it had been lifting on a designated lifting
5  point.
6       MR. ORTICELLI:  Do you want to pause
7  and get him on the record?
8       MR. BROWN:  Sure.
9       MR. ORTICELLI:  If he's going to stay.
10      MR. BROWN:  Yeah; he can stay.
11      MR. BROWN:  Why don't we go off the
12  record for a couple minutes.
13      THE VIDEOGRAPHER:  Stand by, please.
14      MR. BROWN:  So we can get situated.
15      THE VIDEOGRAPHER:  Time is 11:16
16  a.m.  We are going off video record.
17  [WHEREUPON, a brief recess is taken.]
18  [WHEREUPON, Mr. Roberts enters the
19  proceedings.]
20      THE VIDEOGRAPHER:  Okay.  We're
21  returning from a short break.  We are back on the
22  video record.  Time is 11:26 a.m.  You may
23  proceed.
24  BY MR. BROWN:
25  Q.  If you could turn to Page 8 of your report.

Page 44

1  A.  Okay.
2  Q.  And near the top there is a sequence of
3  events section that starts; do you see that?
4  A.  Yes, sir.
5  Q.  Okay.  And you say that:  [reads] The
6  description of events that transpired on
7  March 11th, 2011, follows from the evidence with
8  the presumption that Christian Klorczyk formed the
9  oil chance in accordance with the custom and
10  practice he had learned from working previously
11  with Fred Klorczyk; is that right?
12  A.  Yeah; to the extent that he did.
13  Q.  And you could do no better than make a
14  presumption that did he because there's no
15  witness to what he actually did; correct?
16  A.  Correct.
17  Q.  And even as to what --
18  A.  I can rely on the evidence however, Mr.
19  Klorczyk's testimony as to the scene that he
20  discovered, and that's what I've relied on.
21  Q.  And if Mr. Klorczyk's testimony is correct,
22  then you're reliance is misplaced; would you agree
23  with me?
24      MR. EDINBURGH:  Okay.
25  A.  If --

**Page 45**

1    MR. EDINBURGH:  Let me --
2  A.  -- it's correct?
3    MR. EDINBURGH:  -- I --
4  BY MR. BROWN:
5  Q.  If -- if it's not correct.
6  A.  Ahh.
7    MR. EDINBURGH:  I just -- the first time
8  you said -- I heard you say if it was correct.
9    MR. BROWN:  Oh.
10    THE WITNESS:  Yeah.
11    MR. EDINBURGH:  You want to --
12    MR. BROWN:  My apologies.
13    MR. EDINBURGH:  -- clean it up and ask
14  it again, please.
15    MR. BROWN:  Sure.  Let's ask it again.
16  BY MR. BROWN:
17  Q.  If Mr. Klorczyk's testimony is not correct,
18  then your reliance on his -- in making
19  presumptions based on that testimony is
20  misplaced; would you agree with --
21    MR. EDINBURGH:  Objection.
22  BY MR. BROWN:
23  Q.  -- me?
24  A.  Perhaps, but not necessarily in total.  It
25  depends on what the determination is that --

**Page 46**

1  that -- of Mr. Klorczyk's testimony is determined to
2  be incorrect.
3  Q.  Have you ever spoken -- strike that.
4  Let me ask it this way:  You've met Mr.
5  Klorczyk; right?
6  A.  Yes.
7  Q.  Is your report at all based on
8  conversations you had with Mr. Klorczyk?
9  A.  Of course.  It has to be.  It's all part of
10  the -- part of -- I interviewed Mr. Klorczyk on the
11  time of my inspection.  And then I read his two
12  depositions.
13  Q.  Have you seen the things that Mr.
14  Klorczyk posted online after the accident?
15  A.  Some of that material was furnished to
16  me, I believe.  I don't know that I've seen it all or
17  not.
18  Q.  There are some things in there that in his
19  testimony he's admitted were incorrect, like saying
20  two jack stands were used.  Are you familiar with
21  that?
22  A.  I think so; yes.
23  Q.  In your private discussions with him did
24  you talk to him at all about why he put false
25  information out about the accident?

**Page 47**

1    MR. EDINBURGH:  Objection.
2  A.  I would've had no knowledge of any false
3  information or -- or alleged false information at
4  the time I interviewed Mr. Klorczyk.
5  BY MR. BROWN:
6  Q.  And for purposes of your opinion, do you
7  accept Mr. Klorczyk as being accurate in
8  everything he said and truthful?
9  A.  All I can tell you is that the -- the -- what
10  I considered to be important points about the
11  accident and the scene, he has been consistent
12  with from my interview through both of his
13  depositions.
14  Q.  And particularly apropos to this sentence
15  at the start of sequence of events, you rely that
16  you have received accurate information from Fred
17  Klorczyk about the custom and practices he taught
18  his son; right?
19  A.  I -- can we read that back?
20  Q.  Sure.
21    THE REPORTER:  And particularly
22  apropos to this sentence at the start of sequence
23  of events, you rely that you have received
24  accurate information from Fred Klorczyk about the
25  custom and practices he taught his son; right?

**Page 48**

1  A.  I -- well, I'm not sure I consider it
2  important.  Yes, Mr. Klorczyk told me that -- what
3  he taught his son.  I have no reason to believe
4  that he would lie about it.  I'm not sure it makes
5  any difference one way or the other what he taught
6  his son and how his son performed the work.  That
7  wasn't what I was interested in.  What I'm
8  interested in was the performance of the particular
9  jack stand.
10  BY MR. BROWN:
11  Q.  Well, the second paragraph of this it
12  says:  [reads] The support stand was to be used by
13  CK to support the BMW after using the service jack
14  to raise the vehicle such that there was sufficient
15  room for CK to enter the space under the vehicle
16  to gain access to the oil drain plug.  You -- you
17  don't really even know that that happened, do you?
18  A.  I do not know that that happened.  The oil
19  drain plug probably could've been loosened
20  without going under the car.  To the extent that
21  where the -- where the decedent was found after
22  the -- in -- after the tightening operation.
23  Q.  Did you speak with Mr. Klorczyk at all
24  about why he would go in from the front of the
25  vehicle to loosen that nut?

Page 49

1    A.   You -- you -- you know, you -- my
2  conversation with Mr. Klorczyk was on -- upon my
3  investigation.  I hadn't seen any discovery by
4  that -- at that point, okay.
5    Q.   And -- and I didn't ask you if you had
6  seen discovery --
7    A.   Well, I -- well, then I would have no
8  reason to follow a line of questioning like that
9  with -- with Mr. Klorczyk, nor --
10    Q.   Well --
11    A.   -- nor -- nor do I see what difference it
12  makes.  But that's for you to decide obviously.
13    Q.   Right.  But with -- or without discovery,
14  you at least knew that it appears he had come in
15  from the front of the vehicle on a creeper; right?
16    A.   That was my understanding.
17    Q.   And --
18    A.   Certainly had gone in from the front of
19  the vehicle on a creeper at the -- at the point of
20  tightening -- the final tightening of the oil drain
21  plug.  To the extent that he was under the vehicle
22  on a creeper for the loosening of the drain plug, I
23  don't know that.  I guess I concluded that he would
24  have done it that way since he di -- he used that
25  method for tightening the drain plug.

Page 50

1    Q.   Do you have any experience with
2  changing oils in cars?
3    A.   Sure.  You can go online and say change
4  the oil in a BMW, and you'd get about four
5  different methods.
6    Q.   I'm curious, because I grew up on car lots
7  and places, and I've never seen anybody do
8  anything except stick their arm -- either have it on
9  a lift or stick there arm out from the side to take
10  the drain plug out of a vehicle.  Usually there's
11  one side or the other you can get your arm under
12  there without putting your whole body.
13    A.   Depends on --
14        MR. EDINBURGH:  Obje -- excuse me.
15  BY MR. BROWN:
16    Q.   But --
17        MR. EDINBURGH:  Objection.
18  BY MR. BROWN:
19    Q.   -- but --
20        MR. EDINBURGH:  I -- is that a
21  question --
22        MR. BROWN:  That --
23        MR. EDINBURGH:  -- or a --
24        MR. BROWN:  -- it --
25        MR. EDINBURGH:  -- comment?

Page 51

1  BY MR. BROWN:
2    Q.   Well, I am leading as to why I'm asking
3  the question and -- and why I asked the other
4  question, whether or not you had any discussions
5  at any time with Mr. Klorczyk about any other thing
6  he might've been doing under the car or why he
7  would've been coming in from the front?
8        MR. EDINBURGH:  Objection as to form.
9    A.   I -- I had no discussions with mister --
10  Mr. Klorczyk about any of those things.  To the
11  extent of my con -- conversation with Mr. Klorczyk,
12  they're memorialized in my hand notes in my file.
13  BY MR. BROWN:
14    Q.   [reads] And put the evidence suggest that
15  CK placed the BMW front and first in the center
16  bay of the garage three to five feet from the front
17  wall, the transmission had been placed in P.  Do
18  you see that?
19    A.   Yes, sir.
20    Q.   You are aware that that car is a manual
21  transmission, are you?
22    A.   I don't.  All -- I don't know whether it's a
23  manual or -- or -- or an automatic transmission.
24    Q.   You would've just taken this from Mr.
25  Klorczyk or someone else's accounts of what

Page 52

1  happened?
2    A.   I believe so or I came to that conclusion
3  myself.  I think Mr. Klorczyk -- I think Mr.
4  Klorczyk's testimony was that the transmission was
5  in park and that the emergency brake had been
6  set.
7    Q.   And when you --
8    A.   But obviously, his testimony will speak
9  for itself.
10    Q.   Now, some of this in this paragraph you
11  say he raised the hood and then did certain --
12  using the socket wrench, replaced the oil filter
13  with a new one; he used the lug wrench.  Is this
14  sequence based on just you -- you're looking up
15  and getting instructions on how one goes about
16  changing the oil a BMW?
17    A.   No.
18        MR. EDINBURGH:  Objection.
19    A.   No, sir; it's not.  I never looked up to
20  look at how to change the oil on a BMW until very
21  recently.  And when I wrote this report, I had
22  never changed the oil on a BMW, but I had
23  inspected the car in question in my inspection in
24  Connecticut.
25  BY MR. BROWN:

Page 53

1   Q.   And having visited the scene, was there
2   enough room in the front of the vehicle to use the
3   service jack in the front of the vehicle?
4   A.   I don't recall.  I remember walking around
5   the front of the vehicle, but I saw the vehicle
6   placed in the garage a year after the accident.
7   Q.   And to just go back to something before
8   the last break --
9   A.   I will comment in further response to the
10  last question is that Mr. Klorczyk's testimony,
11  when he entered the garage, was that he saw
12  Christian's feet sticking out from the front of the
13  car.  So there must've been enough room for a
14  person to get down onto a creeper and slide under
15  the car.  Now to the extent is that enough room to
16  place a jack?  Probably.
17  Q.   Did you make measurements of the space
18  from the rear garage door to the front?
19  A.   The front of what?
20  Q.   That middle bay of the garage.
21  A.   I took some measurements that are in
22  my -- that are in my -- my file, which you have.
23  Q.   And before we took the break, we were
24  talking about the jack itself.
25  A.   The jack itself?

Page 54

1   Q.   The jack.
2   A.   Okay.
3   Q.   And the saddle had been removed from
4   the jack --
5   A.   Ye --
6   Q.   -- correct?
7   A.   -- yes, sir.
8   Q.   And I believe you said as long as the jack
9   was used on a lifting point, you would still find
10  that safe?
11  A.   I'm not sure how you couched the
12  question, but if you would like to reframe the
13  question and ask me again, I'll try to respond to
14  it --
15  Q.   Sure.
16  A.   -- best I can.
17  Q.   Well, let's just try to go through it
18  because we got interrupted, and I want to make
19  sure --
20  A.   Sure.
21  Q.   -- I understand.
22  There seems to be no question at all that the
23  saddle cup was removed from the end of the jack;
24  correct?
25  A.   Agreed.

Page 55

1   Q.   And do you consider that to be a
2   modification of that jack?
3   A.   Not necessarily.  When you say "a
4   modification," it depends on what you're lifting.
5   If -- if you were to say to me that this jack is
6   only -- can be used for lifting a certain vehicle,
7   and you tell me that in order to do that it has to
8   have this engagement device or -- or cup on it or
9   adapter, whatever you want to call it, then I could
10  respond to that question, perhaps if I was familiar
11  with the vehicle.
12  If I'm -- if I'm lifting a vehicle that is so low
13  that the jack won't fit underneath it, and it's
14  necessary to remove the cup from the end of the
15  jack, then in order to use the jack to lift the
16  vehicle, there's not much choice other than to go
17  buy another jack just for that vehicle.
18  So to the extenting -- you're asking me cou --
19  can it be done safely, yes, it can be done safely.
20  Q.   Do you believe it was safe to use that
21  jack under the side rail of a BMW to lift it?
22  A.   I guess none of us knows where the jack
23  was actually placed.
24  Q.   You don't know, do you?
25  A.   No.

Page 56

1   Q.   Did you inspect that side rail and look for
2   any physical evidence of where it had been
3   placed?
4   A.   I did.  There's -- there's rubber lifting
5   pads on a BMW is -- which is where you place the
6   tire changing jack that comes with the vehicle.
7   Q.   And do you believe it was safe to use that
8   jack with the saddle removed on those rubber
9   lifting pads?
10  A.   I would say so; yes, sir.  But we have no
11  idea where the jack was placed.  Well, I shouldn't
12  say we have no idea.  From Mr. Klorczyk's
13  testimony, it was placed underneath the vehicle on
14  the passenger side because that's where he found
15  it after it having been removed and set parallel to
16  the automobile.
17  So I concluded from that that Christian wou --
18  if he removed the -- the jack from underneath the
19  car and arranged it in line -- parallel to the
20  automobile, that it had been placed under the car
21  at that point.
22  Q.   At which point?
23  A.   On the passenger side of the vehicle.
24  Q.   And you assume that because Mr.
25  Klorczyk reports that the jack was parallel to the

Page 57

1  vehicle with its handle removed?
2  A.  Yes, sir.
3  Q.  So you -- is it possible it could've been
4  used in the front of the vehicle and moved around
5  to the side?
6  A.  Sure.
7  Q.  Have you done any research on the way
8  BMW recommends that its vehicles be jacked up?
9  A.  I have not.
10  Q.  Have you looked at the jack that comes
11  with a BMW to see how it engages with the vehicle
12  to lift?
13  A.  Yes; I have.  It's a great -- it's a -- one
14  of the -- probably one of the best tire changing
15  jacks I've ever seen.
16  Q.  The next paragraph you say:  [reads] The
17  evidence suggests that CK then removed the right
18  front wheel and placed it under the exposed brake
19  rotor to provide a means of secondary support for
20  the BMW.  He placed the lug nuts in the tray at the
21  rear of the jack.
22    That first sentence that he placed the front
23  wheel under the brake rotor, what's that based on?
24  A.  Mr. Klorczyk's testimony.
25  Q.  Fred Klorczyk's testimony?

Page 58

1  A.  Yes, sir.
2  Q.  Is it based on anything else?
3  A.  No; not that I can think of.
4  Q.  And is it true, do you remember, that Mr.
5  Klorczyk says when he came in, he pulled that tire
6  out from under there?
7  A.  Yes, sir.
8  Q.  Did you do any -- attempt to do any
9  measurements to see how high the vehicle would
10  have to be in the air before you could actually pull
11  the tire out from under the rotor without it having
12  weight on the wheel or being engaged?
13  A.  Well, I don't think there ever was any
14  contact between the drum and the wheel when
15  the -- after the wheel was removed from the car.
16  The vehicle was raised.
17  Q.  Well, I think we're both in agreement
18  that the vehicle came down on top of Christian
19  Klorczyk; right?
20  A.  Yes, sir.
21  Q.  Okay.  So at that point the vehicle wasn't
22  raised; right?
23  A.  That's correct, but it was being supported
24  by Christian Klorczyk.
25  Q.  And --

Page 59

1  A.  And Mr. Klorczyk's -- Mr. Fred Klorczyk's
2  testimony was that there was clearance between
3  the drum and the wheel.  It's not a drum actually,
4  it's a rotor.
5  Q.  I was going say, it's --
6  A.  Yeah.
7  Q.  But --
8  A.  It's a disk brake.
9  Q.  -- you started with cars when I did, so
10  you say drum, don't you?
11  A.  Yeah; I used to change the oil by using a
12  bumper jack.
13  Q.  And I'm asking you:  Did you try to do any
14  measurements or things and see whether as a
15  matter of basic measurements and math and
16  physics it's possible that that car was on Christian
17  Klorczyk on his creeper with the front wheel
18  smashed and would still be up high enough that
19  you could have that tire under that rotor and be
20  able to just pull it out?
21  A.  I --
22    MR. EDINBURGH:  Objection.
23  A.  -- I have not tried to reconstruct the
24  circumstances other than through deductive
25  reasoning.

Page 60

1  BY MR. BROWN:
2  Q.  Do you consider yourself an accident
3  reconstructionist?
4  A.  Yes, sir.
5  Q.  Is it your typical practice to use nothing
6  in accident reconstruction other than you're
7  deductive reasoning?
8    MR. EDINBURGH:  Objection.
9  A.  I -- I have not performed an accident
10  reconstruction other than through deductive
11  reasoning.  I have not done it physically.  I have
12  not been asked to do so.
13  BY MR. BROWN:
14  Q.  Am I understanding correctly you haven't
15  asked to be [sic] an accident reconstructionist in
16  this case?
17  A.  I'm -- we haven't -- I don't think the
18  discussion was ever raised.  I was asked for my
19  opinions surrounding the circumstances to give my
20  opinions based on my background and experience
21  and my life-long participation in the automotive
22  service equipment industry and with a review of
23  the materials listed in my report, and I have --
24  that's what I have done.
25  Q.  Will you go to the next paragraph, starts

1 with CK, do you see that?
2 A. I see a paragraph that starts with CK.
3 [reads] CT then raised, is --
4 **Q. The --**
5 A. -- that the --
6 **Q. -- vehicle --**
7 A. -- one you --
8 **Q. -- further so that he could reach under**
9 **the vehicle and position the support stand. What's**
10 **the basis for that -- that statement of facts?**
11 A. Well, because when you loosen the lug
12 nuts on the tire, the -- you want the tire to be in --
13 in contact with the floor so that you don't spin the
14 wheel with the wrench. So you loosen the lug nuts
15 while the tire is still on the floor, and then you
16 raise the vehicle and take off the wheel.
17 **Q. Well, I think we're actually chronol -- as**
18 **a matter of chronology and the way this set out,**
19 **the wheel is already off and under --**
20 A. Okay.
21 **Q. -- the right front rotor.**
22 A. Okay. I'm -- I'm -- I'm -- I'm off --
23 **Q. Yeah. Take -- just take you a minute**
24 **and -- and -- and -- and sort of walk through the**
25 **chronology we have that you've set out here.**

1 A. [examines document] Okay. Now, what's
2 the question?
3 **Q. So he's got -- your belief is that --**
4 A. He's got --
5 **Q. -- he had the --**
6 A. -- he's got the wheel off and he's got it
7 under the rotor; okay.
8 **Q. And at that point, you believed he raised**
9 **the vehicle further so --**
10 A. Right.
11 **Q. -- he could reach under --**
12 A. Right.
13 **Q. -- and position the support stand?**
14 A. Yes, sir.
15 **Q. And I'm asking: Why is it that you think**
16 **at that point he had to raise the vehicle further to**
17 **reach under and position the support stand?**
18 A. Well, he might not have. I mean, we
19 don't know.
20 **Q. Do you --**
21 A. Depends --
22 **Q. -- know if he --**
23 A. -- it depends on whether he wanted to
24 remove the wheel at a high elevation or at a low
25 elevation. If he wanted to -- if he -- if he wanted

1 to remove the wheel most easily, he would've just
2 got it clear to the floor to remove the wheel, and
3 then he would've raised it the rest of the way to
4 place the jack stand.
5 **Q. Do you know if he came in from the front**
6 **of the vehicle or the side of the vehicle to place**
7 **the jack stand?**
8 A. I don't.
9 **Q. Now you say: [reads] He then positioned**
10 **support stand inboard of the wheel well and under**
11 **the right side of the frame member?**
12 A. Yes, sir.
13 **Q. How do you know that to be true?**
14 A. That's the only logical place to put it
15 from Mr. -- where Mr. Klorczyk said he found it.
16 When I say Mr. Klorczyk, I mean Fred. You -- we
17 understand that?
18 A. Yeah.
19 A. Yeah. Okay.
20 **Q. Now, this issue of the -- the jack stand**
21 **being falsely engaged. It's your belief that he**
22 **pulled up the ratchet bar and it falsely engaged to**
23 **hold itself up?**
24 A. Yes, sir.
25 **Q. Now if you can see the handle on a jack**

1 **stand, you -- you know whether it's falsely**
2 **engaged or not, right? The handle is at a different**
3 **place.**
4 A. Yeah; it's abou -- it -- it's about
5 three-quarters of an inch different place. That's
6 it.
7 **Q. It's your testimony --**
8 A. That --
9 **Q. -- that that's --**
10 A. -- that --
11 **Q. -- the difference --**
12 A. -- that -- well --
13 **Q. -- three-quarters --**
14 A. -- that's wha --
15 **Q. -- of an inch?**
16 A. -- that's what we measured. And no, I
17 don't agree with you that it's obvious.
18 **Q. So I think there's about three different**
19 **things happening here. You -- you have opinions**
20 **about the fact that he could pull the jack stand**
21 **up -- the ratchet bar up and let go of it and it**
22 **would falsely engage; correct?**
23 A. Yes, sir.
24 **Q. And there's then the issue of whether you**
25 **can load a falsely engaged jack stand and have it**

Page 65

1  still be holding weight; correct?
2  A.  Correct.
3  Q.  And -- and you have opinions about that;
4  right?
5  A.  Well, yeah; that's what we tested -- that's
6  what all the test testing was about.  I don't make
7  this stuff up.
8  Q.  And then you also have opinions that if
9  you have a falsely engaged jack stand and it is
10  actually holding weight that would be typical of the
11  front end of a BMW in the air that you could jostle
12  it or use a wrench underneath and that would make
13  it let go; right?
14  A.  Well, yes and no; sometimes it will,
15  sometimes it won't.  Depends on the magnitude
16  and direction of the jostling.  My opinion is that it
17  didn't let go until the final tight -- the -- until the
18  final tightening of the oil drain plug.
19  Q.  Now did your testing include just pulling
20  up ratchet bars and letting them go to see how
21  often they would falsely engage?
22  A.  Well, our testing included manual
23  manipulation to see if you -- you -- just by hand
24  you could get the thing to falsely engage.  And Mr.
25  Felpel can demonstrate that very nicely.

Page 66

1  And then we decided that we would build a
2  fixture with an adjustable height, finely adjustable
3  height and then to pull up the jack stand under
4  certain circumstances and see if it would stay in
5  place.  And sometimes it will and sometimes it
6  won't.  And then after having done that, we applied
7  load to it, depending upon the load.
8  Q.  Does this fixture that you created still
9  exist?
10  A.  I'm sure it does.  It's probably in the
11  photographs you've got.
12  Q.  Would Mr. Felpel and yourself kept
13  everything that you made or created or used in
14  connection with this testing?
15  A.  Yes, sir.  Well, I say yes; I don't know if
16  he's still got the pieces of rubber we dis -- we
17  didn't use.
18  Q.  Well, you tried --
19  A.  And I'm not --
20  Q.  -- various --
21  A.  -- I'm not sure --
22  Q.  -- kind --
23  A.  -- and I'm not sure -- I'm not sure he still
24  has the -- the fake foot and the -- and the Levi's
25  that he used in the photograph to kick the handle

Page 67

1  with.  And there's some discrepancy about whether
2  it was a fake foot or not.  I -- we'll have to ask
3  Mr. -- I'll have to ask Mr. Felpel that question,
4  whether it was his foot or whether it was a fake
5  foot.  It was a shoe, nevertheless.
6  Q.  Turn to Page 9.  The third paragraph
7  down starts with:  [reads] After the oil had drained
8  from the crank case.
9  A.  Yes, sir.
10  Q.  [reads] CK replaced the oil drain plug and
11  tightened it finger tight plus a light tightening the
12  wrench.  How do you know that?
13  A.  Because that's the way you do it.  It has
14  a crush gasket on it.
15  Q.  Is it the way you do it given the --
16  A.  I mean, it --
17  Q.  -- crush gasket to put that drain plug
18  back in, put the oil in, and then go back and
19  tighten again?
20  A.  Well, that's the only way I can explain
21  why he was back there tightening it again.
22  Q.  You are aware that the oil was in -- had
23  already been replaced in the car before he went
24  back under; right?
25  A.  Yeah.

Page 68

1  Q.  Do you know is there -- is there any
2  evidence that the oil drain plug was leaking?
3  A.  No.  Might be one of those little tricks
4  that Fred Klorczyk taught him.  I don't know.
5  Q.  Well, you say it might be.  I mean, we
6  don't really know -- you don't have personal
7  knowledge --
8  A.  We --
9  Q.  -- as to what Fred taught him; right?
10  A.  -- we -- all I know is what Fred Klorczyk
11  testified to and what he told me during our
12  interview.  And we don't know that the oil drain
13  plug was not leaking either.
14  MR. BROWN:  And so everybody knows, I
15  was going to go to around 12:30 --
16  MR. EDINBURGH:  That's fine.
17  MR. BROWN:  -- because I have a call
18  at 12:30.
19  MR. EDINBURGH:  Can we go --
20  MR. BROWN:  So I don't --
21  MR. EDINBURGH:  -- off record --
22  MR. BROWN:  -- know if there's --
23  MR. EDINBURGH:  -- for one --
24  MR. BROWN:  -- lunch --
25  MR. EDINBURGH:  -- second?

Page 69

1    MR. BROWN: -- coming in.  Sure.
2    THE VIDEOGRAPHER:  Yeah.  Hang on
3  one second, please.  I'll take us off record.  Time
4  is 12:01 p.m.  We are going off the video record.
5  [WHEREUPON, a brief recess is taken.]
6    THE VIDEOGRAPHER:  Okay.  We are
7  back on video record.  Time is 12:02 p.m.  Go
8  ahead, please.
9  BY MR. BROWN:
10   Q.  All right.  Lower down in this paragraph
11  we were just looking at, third paragraph down on
12  Page 9 of your report.
13   A.  Yes, sir.
14   Q.  You say:  [reads] While CK was in the
15  process of pulling on the wrench handle, this
16  disturbance to the vehicle supported by the
17  support stand caused the tooth in the rack that
18  was supporting the vehicle to slip off the pawl and
19  lose what engagement theretofore existed.  Do you
20  see that?
21   A.  Yes, sir.
22   Q.  And it goes on say:  [reads] The column
23  then full retracted which transferred the weight of
24  the vehicle to CK; correct?
25   A.  Yes, sir.

Page 70

1    Q.  And it's your belief that that is how this
2  accident occurred?
3    A.  Yes, sir.
4    Q.  All right.  You then go on to say:  [reads]
5  The support stand tipped over as a result of the
6  collapse or the movement of CK or some
7  combination thereof.  Do you see that?
8    A.  I do.
9    Q.  What is that based on?
10   A.  That's based on -- that's my opinion.
11   Q.  Yeah; I know it's opinion --
12   A.  Well --
13   Q.  -- but --
14   A.  -- well, it's ba -- it's based on the fact
15  that Mr. Klorczyk, upon discovery of the body,
16  testified numerous times that the jack was tipped
17  over, the saddle was fully retracted, and it was
18  pointing at the back -- at the rear garage door.
19    Now, if the jack collapsed, how do I get to it
20  being tipped over?  Well, it had to have tipped
21  over either as part of the collapse or in some sort
22  of a knee jerk or -- or arm flailing or some other
23  reaction by Christian Klorczyk; otherwise, I can't
24  explain that it's tipped over and fully retracted.
25    Q.  How much time is there involved --

Page 71

1  assuming your theory is correct, how much time
2  before that jack disengages and it's come all way
3  down?
4    A.  It's instantaneous.
5    Q.  Instantaneous?
6    A.  Well, you know, instantaneous has a
7  measurement and --
8    Q.  Vir -- virtually instantaneously?
9    A.  Well, yeah.  A very short time.  Okay.
10   Q.  Probably milliseconds?
11   A.  Yeah; perhaps.
12   Q.  And is it your belief that when that
13  ratchet bar was falling, that it was during that time
14  that the jack stand got tipped over?
15   A.  I -- I don't know.  It could've been that
16  time, could've been some sort of a spasm created
17  by -- by the decedent immediately when the weight
18  came down on his face and his -- and his chest.  It
19  could've happened while he was in the process of
20  expiring and trying to flail his leg around.
21    I know the testimony -- or his arm, for that
22  matter.  Although it's my understanding the -- from
23  the testimony that his -- that his arm was -- his
24  hand was still on the wrench.  So the testimony
25  also indicates that his right leg was -- or knee was

Page 72

1  bent.  So, I don't know.  That's the only way I can
2  account for the stand being tipped over.
3    Q.  Is it possible that the stand was on its
4  side because he had placed it on its side and it
5  wasn't in use when that car fell down?
6    A.  You mean it was being held up by that
7  jack --
8    Q.  Yeah.
9    A.  -- is that what you're saying?
10   Q.  Exactly.
11   A.  Well, how could that be?  I mean, the jack
12  was found outside from underneath the car during
13  the accident.
14   Q.  Let's go back to my question:  Is it
15  possible that the jack had been placed on its side
16  by Christian Klorczyk?
17   A.  The jack stand.
18   Q.  The jack stand.  Sorry.
19   A.  No.
20   Q.  And you believe it's not possible?
21   A.  Well, it's based on the evidence it's not
22  possible.
23   Q.  And what part of the evidence?
24   A.  The testimony of Mr. Klorczyk.
25   Q.  Okay.  And what part of the testimony of

Page 73

1  Mr. Klorczyk says it's impossible that the jack
2  stand was laying on its side and not in use at the
3  moment this accident occurred?
4    A.  Because there was nothing else
5  supporting the vehicle.  The jack had been
6  removed and neatly arranged parallel to the car
7  with its handle removed and laying on the floor.
8    Q.  And the fact that drives your analysis is
9  Mr. Klorczyk's testimony that the jack was lined up
10  parallel to the vehicle with the handle removed; is
11  that -- am I understanding that's --
12    A.  You -- you --
13    Q.  -- the fact that makes it impossible?
14    A.  Once again, yes, that's the fact that
15  makes it impossible.
16    Q.  Well, I -- you --
17    A.  I didn't make my --
18    Q.  -- I don't think you --
19    A.  -- didn't make --
20    Q.  -- had identified that fact?
21    A.  Didn't I make myself clear?  I'm sorry.
22    Q.  Is it possible that the jack stand --
23  excuse me; strike that.
24    Is it possible that the jack could have been
25  under the car and slid out and ended up next to

Page 74

1  the vehicle?
2    A.  And lowered itself and turned itself 90
3  degrees, no.
4    Q.  So the decisive fact in your opinions as
5  to what happened factually at the moment of this
6  accident is based on where Mr. Klorczyk says the
7  jack and the jack handle were; is that right?
8    A.  That is correct.  And the jack stand.
9    Q.  Did you do any testing to see what it
10  would take for a jack stand that was under this
11  vehicle if it was so low to be on Christian
12  Klorczyk's chest what it -- what would be involved
13  in tipping the jack stand on its side?
14    A.  I'm not sure I understand the question.
15    Q.  Well, you seem to indicate when you talk
16  about spasms that after the vehicle came down on
17  Christian Klorczyk, that he might have been having
18  a spasm or something and knocked the jack stand
19  over at that point; did I --
20    A.  Yeah.
21    Q.  -- am I getting that wrong?
22    A.  No; you're -- you're correct.  That's what
23  I said.
24    Q.  And I'm asking you:  Given where you
25  believe he had the jack stand placed, did you see

Page 75

1  if it's possible that it could've been lowered down
2  and -- and tipped over and still had -- had room to
3  tip over underneath that vehicle?
4    A.  Well, I'm sure it did.
5    Q.  Why are you sure it did?
6    A.  Because I can't account for it being
7  tipped over any other way.  There had to be room
8  for it to tip over when it was fully collapsed and
9  the vehicle was supported by Christian Klorczyk.
10    Q.  Well, let me ask you this:  Does it change
11  your opinions at all if it's demonstrated that there
12  isn't room for it to be tipped over with the vehicle
13  all way down on Christian Klorczyk's chest?
14    A.  I'd have to see the evidence.
15    Q.  Well, wouldn't such evidence change your
16  opinion as to what happened?
17    A.  It might change my opinion as to the
18  sequence of events.  Does it change my opinion as
19  to the collapse of the jack stand, no.  I don't see
20  any circumstance where the jack stand would tip
21  ove -- would tip over except for there being
22  enough clearance for it to do so.
23    Q.  And having said that, if there is not
24  enough clearance for it to tip over, can we only
25  conclude that it was on its side before this vehicle

Page 76

1  came down?
2      MR. EDINBURGH:  Objection.
3    A.  No; I think my -- if you -- careful reading
4  my report covers the impossibility that it tipped
5  over during the collapse.
6  BY MR. BROWN:
7    Q.  And your report says that couldn't have
8  happened, doesn't it?
9    A.  No; it doesn't --
10      MR. EDINBURGH:  Objection.
11    A.  -- say that.  It may have been a cause of
12  the collapse, not -- I'm sorry; a result of the
13  collapse but not a cause of the collapse.
14  BY MR. BROWN:
15    Q.  If you turn to Page 11 of your report.
16  You first talk about metal failure as perspective
17  causation; correct?
18    A.  Where are we?  Prospective causation
19  with me -- metal failure?
20    Q.  Yeah.  We're going start and --
21    A.  Ok --
22    Q.  -- go through.
23    A.  -- okay.  Yes.
24    Q.  You ruled out structural failure of the
25  support jack stands; you -- you ruled that out as a

Page 77

1  cause?
2   A.   Right.
3   Q.   Okay.
4   A.   The pawl was intact and then no teeth
5  were broken off in the jack stand.
6   Q.   And then you went to tip over; am I right?
7   A.   Yes, sir.
8   Q.   And you state:  [reads] Visual
9  examination of the floor of the garage has
10  produced no evidence that the tip over of the
11  artifact support stand had occurred; is that
12  correct?
13   A.   That's correct.
14   Q.   And that's based on your visual
15  examination of the floor?
16   A.   Yes, sir.
17   Q.   And your examination of the pictures
18  taken at the time of the accident?
19   A.   Well, I -- yes; I examined those, but my
20  examination of the floor was the important thing.
21   Q.   [reads] If a tip over had occurred, there
22  would have been large forces transmitted to the
23  edges of one side of the base of the support stand
24  which would've left marks or gouges in the
25  concrete floor.  That's your statement; correct?

Page 78

1   A.   That -- you're reading very well.
2   Q.   Well, I do my best.  And that not only --
3  that -- that's your opinion, right, as to what
4  would've happened?
5   A.   That's absolutely correct.
6   Q.   And you also in the next sentence, if I
7  can paraphrase, you note there would've been
8  some type of witness marks on the jack stand itself
9  if this had happened; correct?
10   A.   Yes, sir.
11   Q.   And you say:  [reads] No witness marks
12  consistent with a tip over were observed; right?
13   A.   That is correct.
14   Q.   It's your belief that horizontal rearward
15  translation of the vehicle would've been required
16  for a tipping event; correct?
17   A.   Correct.
18   Q.   And that's because the actual saddle on
19  top of the ratchet bar was pointing to the rear of
20  the car; it would've had to have fallen in that
21  direction; am I understanding you right?
22   A.   Well, yes, to the ext -- yes; but the -- but
23  the rearward translation when the -- when the
24  accident occurred, Christian Klorczyk was
25  tightening the drain plug by applying a force to a

Page 79

1  wrench handle in a rearward direction on the
2  automobile.  So that would have provided a
3  rearward force on the automobile and at the same
4  time a forward force on the creeper he was laying
5  on.
6   Q.   Why do you say horizontal rearward
7  translation of the vehicle would've been required
8  for a tipping event?
9   A.   Because of the geometry of the stand.
10   Q.   Does that have anything to do with the
11  observation of which side of it the stand was
12  laying on and which direction it was pointing?
13   A.   [no response]
14   Q.   If it doesn't --
15   A.   Does what --
16   Q.   -- it doesn't.
17   A.   -- does what --
18   Q.   -- I'm trying to understand.
19   A.   -- does what have any -- I -- I mean, I --
20  I'm sorry; I just -- I'm having trouble with your
21  questions.
22   Q.   We'll just -- we'll move on
23   A.   Okay.
24   Q.   I think the look on your face gave me all
25  the answer I needed for that.

Page 80

1   A.   What are you talking about?  The thing is
2  for you -- it -- the geometry of the stand is such
3  that it's -- if you tip it over, it -- it has to raise the
4  load.
5   Q.   And that's a measurable amount it
6  would -- you would have to raise the load; right?
7   A.   Sure.
8   Q.   It would be, you know from the edge of
9  that jack stand to the center, whatever that radius
10  is of --
11   A.   Whatever the dimensions of the jack
12  stand are.
13   Q.   Yeah.  You could you measure that; right?
14   A.   Yes; I could.
15   Q.   In that last paragraph on Page 11, and
16  you conclude that sufficient rearward force was
17  unlikely; right?
18   A.   Yes, sir.  I also conclude that if it had
19  been a tip over, the saddle would not have been
20  retracted.
21   Q.   If one disengages -- one use as jack and
22  lifts the vehicle off a jack stand, you can then lift
23  the jack stand bar up and let it drop down and
24  disengage it; correct?
25   A.   Is this a hypothetical of some sort?

Page 81

1   Q.   It -- it's a basic statement of fact about
2  jack stands.  If we go to that one standing over
3  there and raise the bar up and it stays up, we can
4  lift it slightly and then drop the bar down; right?
5   A.   If you hold the handle up.
6   Q.   Yeah.  And then if you go to the top of
7  Page 12, you conclude:  [reads] Tip over the
8  support stand must be eliminated as a cause;
9  right?
10  A.   Yes, sir.
11  Q.   If you turn to Page 13.
12  A.   Okey-doke.
13  Q.   Say:  [reads] The possibility of
14  encountering false engagement with pawl and
15  ratchet support stands is not only foreseeable but
16  apparently not uncommon.  Now what's the basis of
17  that opinion?
18  A.   Well, I had a number of -- of
19  contemporaneous operating instructions from other
20  jack stands in the market at the time.  And a large
21  number of them included a warning consistent with
22  making assurance that the pawl was appropriately
23  engaged with the ratchet teeth before utilizing --
24  before applying the load.
25    So that's how I come to the conclusion, it was

Page 82

1  apparently not uncommon, because I don't know
2  whether people would -- or -- or I would conclude
3  that people wouldn't put that warning in their -- in
4  their operation manual if either (1) it was
5  foreseeable to them that that such could happen,
6  or that (2) they've already had experience with
7  such happening, and therefore decided to add a
8  warning to that effect.
9   Q.   Is there any other basis for that opinion
10  that it's not uncommon?
11  A.   Oh.  I've heard scuttlebutt about this
12  happening in the -- in the -- in the industry for a
13  long time.  But I've never seen it, never witnessed
14  it, never investigated a case where it had
15  happened before.  And quite frankly, was skeptical
16  of this case when I first got involved, and became
17  a believer through my investigation and testing.
18  Q.   Who did you hear this scuttlebutt from?
19  A.   Oh, gosh.  I mean, I go to shows
20  regularly; I talk to people who make these things.
21  I've been in the automotive lift industry where
22  such kind of equipment is common in shops.  I've
23  been in literally hundreds if not thousands of
24  automotive service facilities.  I spent 21 years
25  manufacturing automotive lifts.  And since that

Page 83

1  time, I've spent another -- gosh, since 1992 as a
2  consultant to the automotive lift industry.  I serve
3  as secretary to their standards writing
4  undertakings and. . .  Anyway, that's it.
5   Q.   You've been chairman of some committee
6  on that --
7   A.   I'm --
8   Q.   -- haven't you?
9   A.   -- chairman of the -- currently of the
10  Portable Automotive Services Equipment
11  Committee.  I've been on that committee since, oh,
12  gosh, I'm going to say  93 or  94, something like
13  that.  I don't get involved with such discussions in
14  that committee because it's inappropriate.
15  Q.   Why is it inappropriate?
16  A.   Because we're there to represent our own
17  interests and develop a standard to promote safety
18  of the users of the products that the thing -- that
19  the standards cover.
20    And I don't -- I mean, I'm -- my -- my
21  background is well-known in -- in this group.  I'm
22  an independent engineer and -- and expert.  We --
23  manufacturers are certainly not prone to discuss
24  their, for one want of a better term, "dirty laundry"
25  in such venues where insurance companies are

Page 84

1  listening and expert witnesses --  potential expert
2  witnesses are listening, and it doesn't happen.
3    From time to time I might bring up a -- a
4  subject that either is accepted or not accepted.
5  And to the extent that the ASME standards writing
6  activity is involved, we have to pledge that those
7  discussions stay within the ASME confines.  So it's
8  not for public consumption.
9   Q.   And you feel no, what I would refer to as
10  a, moral obligation as chair of this committee if
11  you think there's a safety issue that you're hearing
12  scuttlebutt about not to bring it up and resolve it?
13    MR. EDINBURGH:  Objection.
14  A.   Of course, I do, but because this case is
15  ongoing.  As soon as it's resolved, I'm going make
16  that discu -- that recommendation loud and clear.
17  Count on it.  But while this case is going on, I
18  don't talk to anybody about it except counsel.
19  BY MR. BROWN:
20  Q.   Well, how long ago did you start hearing
21  this scuttlebutt?
22  A.   Well, it was just scuttlebutt.  What do I
23  do about scuttlebutt?
24  Q.   I -- I don't know.  What do --
25  A.   Yeah.

## Page 85

1    **Q. -- you do about --**
2    A. Well, I --
3    **Q. -- scuttlebutt?**
4    A. -- I didn't take it seriously.
5    **Q. Why didn't you take it seriously?**
6    A. Because I have a lot of things on my
7 mind. I work every day.
8    MR. BROWN: Well, it's 12:26. Why don't
9 we go ahead and break for lunch.
10    THE VIDEOGRAPHER: Stand by, please.
11    MR. EDINBURGH: I don't know --
12    THE REPORTER: Hang on.
13    MR. EDINBURGH: -- how --
14    THE VIDEOGRAPHER: Time is 12:26.
15 We're going off the video record.
16 [WHEREUPON, a lunch recess is taken.]
17    THE VIDEOGRAPHER: We are back on
18 video record. The time is 1:20 p.m. You may
19 proceed.
20    MR. BROWN: All right. Are we up to 4?
21    THE REPORTER: Yes.
22    MR. BROWN: Okay. Let's mark this 4.
23 [WHEREUPON, off-the-record remarks are
24 made.]
25 [WHEREUPON, document referred to is marked

## Page 86

1 Exhibit 4 for identification.]
2    MS. TROTTA: What's Number 4?
3    MR. BROWN: Number 4 is --
4    THE REPORTER: Hold on.
5    MR. BROWN: -- a picture of the
6 underside of the BMW?
7    MS. TROTTA: Thank you.
8    THE WITNESS: Thanks.
9 BY MR. BROWN:
10    **Q. This, sir, is a photograph taken of the**
11 **underside of the BMW?**
12    A. [examines document] I'll have to take
13 your word for that; I don't recognize it.
14    **Q. All right. Have you ever seen the BMW**
15 **lifted and looked at it from the bottom like this?**
16    A. Yes. I don't believe this is one of the
17 pictures I took.
18    **Q. I don't think it is either.**
19    A. Well, that's why I say, I have to take your
20 word for it.
21    **Q. All right. Let me ask you: Where is it**
22 **your understanding that the jack stand was**
23 **placed?**
24    A. On this beam.
25    **Q. And for the sake --**

## Page 87

1    A. At --
2    **Q. -- of --**
3    A. -- the passenger's side, longitudinal
4 beam comprising the frame of the BMW.
5    **Q. Do you have a pen there?**
6    A. I do.
7    **Q. Can you mark on the picture an "X" where**
8 **you understand it to have been?**
9    MR. EDINBURGH: Can we wait a minute?
10 May -- may I, before the witness goes --
11    MR. BROWN: Sure.
12    MR. EDINBURGH: -- could I look?
13    THE REPORTER: Don't forget your
14 booklet there [phonetic].
15    MR. EDINBURGH: I -- wait. I'm going
16 to -- I'm going to --
17    MR. BROWN: You want to look and --
18    MR. EDINBURGH: -- kill myself.
19    MR. BROWN: -- tell him where to make
20 the "X"; that's fine.
21    MR. EDINBURGH: No. I'm not going to
22 do. That's -- that's not my job. But I object to
23 the -- to placing an "X"; I'd prefer if he can circle
24 the area where he thinks it is.
25    MR. BROWN: Well, that's fine. I'll -- I'll

## Page 88

1 live with a circle.
2    MR. EDINBURGH: But I'd just like to --
3    MR. BROWN: He -- he wants --
4    MR. EDINBURGH: -- look at it.
5    MR. BROWN: -- he wants to --
6    A. Is -- this isn't going to --
7    MR. EDINBURGH: I'm not --
8    A. -- show up.
9 BY MR. BROWN:
10    **Q. Well, we'll have to -- maybe we can find**
11 **something that will. We have a Sharpie.**
12    A. Well, I can't see squat there.
13    MR. EDINBURGH: Yeah.
14 BY MR. BROWN:
15    **Q. Well, try this.**
16    MR. EDINBURGH: Should we put the
17 light on; is that mark get better?
18 BY MR. BROWN:
19    **Q. I don't think he wants to see.**
20    A. This ought to work. [draws] How's that?
21 That good?
22    **Q. All right.**
23    A. Here's your Sharpie.
24    **Q. Great. And do you have any set idea**
25 **where exactly on that -- the member that you have**

Page 89

1  circled?
2  A.  I don't even know if it was on there.  You
3  asked me where was it my opinion that it was.
4  That's where I think he wou -- I would've put it;
5  and therefore, I think perhaps Christian would've
6  put it.  Now as to whether it was far forward or far
7  back, I don't know.  We tested the stand in both
8  positions.
9  Obviously, if it was far forward, it -- the stand
10  would've been extended further than it would have
11  if it were far back.
12  Q.  And why is that?
13  A.  Because the way the car slopes when it's
14  raised.
15  Q.  And I don't think we need the picture for
16  this, but do you have an understanding of how the
17  jack stand was oriented under that?
18  A.  Well, again, we don't know.  But were it
19  placed on -- on this structural shape, which is
20  where I would've placed it, that would've been
21  oriented such that the saddle would've cradled the
22  beam.
23  Q.  And --
24  A.  And after reading Mr. Klorczyk's
25  testimony, I would've placed the handle toward the

Page 90

1  front of the automobile.  Because when it was
2  discovered by Mr. Klorczyk laying down, he
3  described it in a -- in a kind of a funny way, like it
4  was on its natural side or something like that.  I --
5  I don't recall his exact words.  But I took that to
6  mean that handle was up.
7  Q.  Okay.
8  A.  So that's the best I can do for you.
9  Q.  And -- and I'm not trying to be pedantic;
10  I'm trying to make sure I understand.
11  A.  Sure.
12  Q.  So the handle would have been with -- if
13  the jack stand was raised, it would've been facing
14  the front of the vehicle and it would've fell toward
15  the back and then the handle would've been on top
16  in essence?
17  A.  Correct.
18  Q.  All right.  Sometimes you've got to break
19  it down and make it real easy --
20  A.  That's --
21  Q.  -- for me.
22  A.  -- okay.  We'll break it down as far as you
23  want.
24  MS. TROTTA:  Can we put the phone next
25  to Mr. Heath again?

Page 91

1  MR. SPEAKER:  It is.
2  MR. EDINBURGH:  I -- I think, Erica, we
3  just have a problem with the cord.
4  MR. SPEAKER:  Hold on.  We will --
5  THE WITNESS:  Yeah.  You can't move
6  that thing.
7  MS. TROTTA:  Or if Mr. Heath can keep
8  his voiced raised.
9  THE WITNESS:  I -- I don't want to run
10  out of energy.  But I could get a megaphone I
11  guess.
12  MR. EDINBURGH:  Can we move it any
13  closer or is --
14  THE VIDEOGRAPHER:  No.
15  MR. EDINBURGH:  -- that it?  That's it?
16  THE VIDEOGRAPHER:  That's the extent.
17  MR. EDINBURGH:  Erica, we've extent --
18  extended the cord as far as --
19  THE WITNESS:  I --
20  MR. EDINBURGH:  -- it will go.
21  THE WITNESS:  -- I --
22  MS. TROTTA:  Okay.
23  THE WITNESS:  How is --
24  MS. TROTTA:  All right.
25  THE WITNESS:  -- this?

Page 92

1  MS. TROTTA:  Thank you.
2  THE WITNESS:  If -- if I look at the
3  phone, how about -- how about this tone can you
4  hear me better?  See, I've been --
5  MS. TROTTA:  I can hear you much
6  better --
7  THE WITNESS:  -- I've been --
8  MS. TROTTA:  -- that way.
9  THE WITNESS:  -- looking at Dennis
10  because that's the polite thing to do when you're
11  having a conversation.  But I'll look at the phone,
12  if it makes you happy.
13  MR. EDINBURGH:  All right.
14  MS. TROTTA:  You can still look at
15  Dennis, just put your mouth towards the phone.
16  THE WITNESS:  Well, boy, that would
17  really be --
18  MR. EDINBURGH:  Look at Dennis but
19  move your mouth the other direction.  All right.
20  THE WITNESS:  Okay.
21  MR. BROWN:  And -- all right.  Not
22  enough room for this all this paper.  Let's mark
23  this Number 5.
24  THE WITNESS:  Should I be keeping a
25  stack of these for --

Page 93

1    THE REPORTER: Yeah.
2    THE WITNESS: -- for you.
3    THE REPORTER: You can leave them
4 there.
5    THE WITNESS: Okay.
6    MR. BROWN: She should be keeping a
7 stack of those, so. . .
8 [WHEREUPON, document referred to is marked
9 Exhibit 5 for identification.]
10    MS. TROTTA: Denis, what is Number 5?
11    MR. BROWN: Is an email dated
12 December 24th, 2014, from Glenn D. Felpel to Rick
13 Heath.
14    MS. TROTTA: Thank you.
15    MR. EDINBURGH: Do you want to put the
16 Bates Number, too?
17    MR. BROWN: It's Bates Number
18 K-l-o-r-c-z-y-k 003777.
19 BY MR. BROWN:
20    Q.   And I just want -- I -- I just wanted to ask
21 you sir, is this the Mr. Felpel who did the testing?
22    A.   [examines document] It is, indeed.
23    Q.   And is Clear Solve like a -- like -- local
24 Internet company, is that a company of his?
25    A.   I think --

Page 94

1    Q.   See his email at the top is like
2 GDFelpel@clearsolve?
3    A.   I honestly don't know what Clear Solve is,
4 but I think it's some sort of a -- an address that he
5 gets through his brother or another -- or a son,
6 perhaps, who lives in Pennsylvania, and he uses
7 that for an email address because he can transmit
8 sizeable file -- I believe he -- he can transmit
9 sizeable files through that address.
10   Is that it for this one?
11    Q.   It is.
12    MR. BROWN: 6.
13 [WHEREUPON, document referred to is marked
14 Exhibit 6 for identification.]
15    MR. BROWN: Erica?
16    MS. TROTTA: Yes.
17    MR. BROWN: 6 is -- starts with
18 K-l-o-r-c-z-y-k 003763, a sheet which has the
19 words "Heath Job File" written on it, looks like, in
20 pencil and circled.
21    MS. TROTTA: Thank you.
22    MR. BROWN: And runs up through -- I
23 don't think this is actually the whole Heath Job
24 File, but. . .
25    THE WITNESS: Nope. It's my time

Page 95

1 sheets.
2    MR. BROWN: Runs up through
3 K-l-o-r-c-z-y-k 003776.
4    THE WITNESS: Well, it's part of my time
5 sheets, put it that way.
6 BY MR. BROWN:
7    Q.   And the page that ends with Bates
8 stamp 3764, this would be an example of how you
9 did your time?
10    A.   [examines document]
11    Q.   Is this your hand --
12    A.   Yeah; that's my handwriting.
13    Q.   And you would typically keep track of
14 your time in this fashion?
15    A.   Yes, sir.
16    Q.   And there's a number of entries for draft
17 report, and that would've all been the same
18 report?
19    A.   Yes, sir.
20    Q.   Did anybody else have a role in revising
21 or writing any portion of your report?
22    A.   I pa -- yeah; when I was through with my
23 report, I passed it to counsel for comment. And as
24 the best of my recollection, there were none;
25 might've been some spelling and punctuation or

Page 96

1 places and names and things, but I -- I -- I have no
2 clear recollection of any substantive changes.
3    Q.   Then go to the page this ends 3767.
4    A.   Okay.
5    Q.   It says in the top: [reads] Time report for
6 Glenn D. Felpel?
7    A.   Yes, sir.
8    Q.   And is it typical for him to give you typed
9 up versions of his time sheets?
10    A.   Yeah. I'm still an old-fashioned pencil
11 and paper guy, and -- and he uses living Excel
12 spreadsheet. And I don't edit his -- his spelling
13 errors.
14    Q.   And as far as you know, are these all
15 accurate as to the work that he performed?
16    A.   Yes, sir; I have no reason to believe that
17 they wouldn't be.
18    Q.   If you look at the entry for 12/3/14.
19    A.   Yes.
20    Q.   [reads] Finalized preparing the jack stand
21 operations, drawings, re-photographed the
22 measurements to document the procedure
23 corrected, finalized report and photographs, and
24 sent on to R. Heath, worked on vehicle set up to
25 produce jack stand drop test, had trouble getting

Page 97

1 the vehicle in a stable configuration to test. Do
2 you see that?
3   A.  Yes; I do.
4   Q.  Do you know what kind of problem he had
5 getting the vehicle in a stable configuration?
6   A.  Specifically?
7   Q.  Yeah.
8   A.  Not -- not off the top of my head; no.
9 Probably had to do with the fact that they the
10 vehicle on his back patio and was trying to figure
11 a way to keep from destroying his back patio when
12 the -- when the vehicle dropped.
13   Probably had to do with arranging cribbing to
14 catch the vehicle when it started to drop so that
15 we didn't end up dropping the vehicle onto its
16 rotor, it's front -- front right rotor.  But that's
17 what -- that's what I would take that to mean.
18   Q.  He says:  [reads] Finalized report and
19 photographs and sent on to R. Heath.  Did Mr.
20 Felpel prepare written reports for you?
21   A.  He prepared a report on the dimensions
22 of the -- of the stand.  That's where he says up
23 here at the top:  [reads] Finalized preparing the
24 jack stand operations drawings.
25   I had asked him what the exertion of the

Page 98

1 handle was from engaged to disengaged, and that
2 there -- there -- that report is in my -- in the same
3 file you got this out of.  It's a -- I think it's a
4 one-page drawing with dimensions and angles on
5 it.
6   Q.  Okay.  Have you produced any written
7 material you received from Mr. Felpel about this
8 work that was done?
9   A.  Well, you're looking at it.
10   Q.  Well --
11   A.  His time sheets.  Yeah.
12   Q.  Yeah.
13   A.  That's -- that's it.
14   Q.  All right.  So other than this one-page
15 thing, some photographs, these time sheets, that's
16 what have you from him?
17   A.  Yeah.
18   Q.  Okay.
19   A.  Or yes.  I should say yes, not yeah.
20 Sorry.
21       MR. EDINBURGH:  Can we just take a
22 quick bathroom break?
23       MR. BROWN:  Yeah.
24       THE VIDEOGRAPHER:  Stand by, please.
25 The time is 1:36 p.m.  We're going off the video

Page 99

1 record.
2 [WHEREUPON, a brief recess is taken.]
3       THE VIDEOGRAPHER:  We are back on
4 video record.  Time is 1:38 p.m.  You may proceed.
5 BY MR. BROWN:
6   Q.  Okay.  We're on the page that says 3767.
7   A.  Yes, sir.
8   Q.  On the bottom.
9   A.  Uh-huh.
10   Q.  12/5 notes:  [reads] Works on test set up
11 and made adjustments, performed trial runs.
12   A.  Yes.
13   Q.  Were these trial runs videotaped?
14   A.  I doubt it.
15   Q.  What exactly do you think is meant by
16 saying "trial runs"?
17   A.  Well, he was probably trying to figure out
18 how to catch the car, the -- the -- you know, I -- I
19 can't sit here and speculate what trial runs went.
20 To me that means he -- he -- he set up the car
21 and --
22   Q.  If you don't know --
23   A.  Yeah.
24   Q.  -- we don't want to you speculate.
25   A.  Okay.

Page 100

1   Q.  So the -- 12/6 it says:  [reads] Prepared
2 for front position testing for a demonstration for
3 Rick Heath -- R. Heath.  Do you know what's meant
4 by "front position testing"?
5   A.  Yes; that's with the jack farthest forward
6 on that structural shape that I drew the circle
7 around for you.
8   Q.  And you said "jack," but I think you meant
9 jack stand?
10   A.  Jack stand; correct.
11   Q.  It says:  [reads] Perform a successful
12 test, meeting with R. Heath at the PALD office;
13 this is 12/7, R. Heath witnessed test.  What's a
14 successful test?
15   A.  It's to demonstrate the theory of false
16 engagement.
17   Q.  Did you do any test where -- well, let me
18 ask you this first:  What-all is encompassed when
19 you say "the theory of false engagement"; what-all
20 are you referring to?
21   A.  Well, I -- the tip to tip contact, being able
22 to support a load.  And actually the tip to tip
23 contact being able to support the saddle with no
24 load.
25   Q.  Anything else?

Page 101

1 A. No; that's the whole basis of -- of -- of
2 my report.
3 Q. Now, did you only consider it a
4 successful test if it did what you wanted it to do?
5 A. Yes.
6 Q. Did you have unsuccessful tests?
7 A. I'm sure we did. This doesn't -- as I've
8 said before, this didn't happen every time.
9 Q. Did you document those unsuccessful
10 tests?
11 A. Document?
12 Q. Yeah; do you have video --
13 A. No.
14 Q. -- you have videotapes --
15 A. No.
16 Q. -- of the one -- those?
17 A. No.
18 Q. Do you have any kind of field notes, lab
19 notes, whatever kind of notes you'd want to call
20 them, saying how many times you did it and what
21 the results were?
22 A. No.
23 Q. So it was only really a test if it gave you
24 the result you wanted?
25 A. That's not true.

Page 102

1 MR. EDINBURGH: Object.
2 A. A test -- a test is a test. And either
3 demonstrated the -- and either validated the theory
4 or it didn't validate the theory. At the end of the
5 day, it's not easy to balance -- necessarily easy to
6 balance and get the -- the balance achieved. And
7 the more testing we did, the more difficult it
8 became.
9 BY MR. BROWN:
10 Q. Why is that?
11 A. Base the characteristics of the two tips of
12 the pawl and the tip of the teeth were -- were
13 altered, became burnished, more smooth. They'd
14 had contact stresses applied to them. They were
15 harder. They were more blunt.
16 Q. And for the sake of the record, because I
17 want to be clear about this, when it notes on time
18 sheets here in this December 2014 time frame,
19 trial runs on the rear position, that's with the jack
20 stand on that support member further toward the
21 rear of the vehicle?
22 A. Yes, sir.
23 Q. It notes here on 12/13: [reads] Had
24 successful trial?
25 A. Yes, sir.

Page 103

1 Q. Okay. Who's D. Roland --
2 A. Where --
3 Q. -- Robson Engineering?
4 A. -- where are you?
5 Q. Page 3 -- well, I just asked you if you
6 know who that is?
7 A. Yeah; I think he's a -- a consultant to
8 somebody in Connecticut. I -- I met him -- I met
9 him when I was doing the inspection. And he
10 shared with me the photographs he had taken
11 whenever he had done an inspection. And he was
12 in possession of some exemplar, and I believe the
13 artifact support stands at the time. I ha -- I
14 looked at them. They were in the rear of his
15 vehicle; I -- I believe that was his vehicle.
16 Q. Did he give you copies of the pictures
17 and things he had done?
18 A. He gave me a set of his photographs.
19 Yeah; I just said that.
20 Q. I'm sorry. I -- I -- I --
21 A. That's okay.
22 Q. -- I thought you'd said you looked at
23 them. I didn't quite get that --
24 A. No. No.
25 Q. -- he gave you --

Page 104

1 A. He gave me --
2 Q. -- a set.
3 A. Yeah; I have a set. And then that's -- I
4 believe they've been produced to you.
5 Q. Okay. Well, we are now on the page that
6 ends with the 3768.
7 A. 68. Okay.
8 Q. And of course, we're going backwards
9 through these time records, so we're --
10 A. I realize that.
11 Q. -- we are going chronologically
12 backwards.
13 A. You're just trying to confuse me. I know
14 how it is.
15 Q. Well, I -- you know, to the extent I can.
16 A. That's okay.
17 Q. In November 2014 you were locating
18 a 2001 BDum -- BMW 235xi; correct?
19 A. Yes, sir.
20 Q. All right. Now 11/22/14 was apparently a
21 stand-in Ford vehicle that was used?
22 A. Yeah; I believe it was one of his family
23 cars.
24 Q. He notes: [reads] Adjusted the test area
25 by adding a steel plate due to jack stand cutting

Page 105

1  into the floor area when a release was
2  accomplished.  Do you see that?
3    A.  Yes; I do.
4    Q.  What was the nature of the cuts into the
5  floor when the jack stand was released?
6    A.  I don't know, but he was concerned about
7  the longevity of his patio.
8    Q.  Do you know if he ever --
9    A.  It must've been --
10   Q.  -- took photographs or documented in any
11 way this cutting into the floor?
12   A.  Do I know if he did?
13   Q.  Yeah.
14   A.  I would -- I -- I -- I -- in my best
15 judgment, he would have not have documented it in
16 any way, other than in the time sheet here to
17 explain what he's been doing.
18   Q.  Why would you have not documented
19 that?
20   A.  What for?  Has nothing to do with the
21 whole problem.
22   Q.  Well, apparently the jack stand itself,
23 when released and under a car, cuts into the floor;
24 would you --
25   A.  Well --

Page 106

1    Q.  -- agree with me?
2    A.  -- sure.  When the whole weight of the
3  vehicle follows the jack stand down, instead of
4  landing on Christian Klorczyk's chest and face.
5  The -- so when this was happening, he -- this
6  must've been before he put in the -- the -- the
7  catching cribbing to catch the car to prevent this
8  from happening.
9    Q.  And he put a steel plate under the jack
10 stand; correct?
11   A.  Yeah.  Correct.
12   Q.  And even when he put blocks up to catch
13 the car, he still used the steel plate; right?
14   A.  I believe he did.  I don't know for what
15 purpose other than -- other than -- I -- I -- I think
16 some of the video shows that the steel plate
17 moved.
18   Q.  And am I understanding your response to
19 me correctly that you believe that this wouldn't
20 have happened at the Klorczyk's home on their --
21 their garage floor because it would've been
22 Christian's body catching the falling weight of the
23 vehicle before the bottom of the jack stand
24 would've hit ground, the bottom of the ratchet bar?
25   A.  My -- my point is that -- that if the

Page 107

1  collapse of the jack stand occurred, when the jack
2  stand collapse occurred in the Klorczyk garage,
3  that the saddle collapsed to its full down position
4  and the weight of the vehicle was assumed by
5  Christian Klorczyk.  Transferred to Christian
6  Klorczyk would be a better phraseology.
7    Q.  Well, and given your long history in
8  engineering and automotive parts and accident
9  reconstruction, did you do measurements as to
10 whether or not that would've been the case?
11   MR. EDINBURGH:  Objection.
12   A.  Well, Mr. Klorczyk testified that when he
13 found Christian, there was still space between the
14 rotor and the tire.  So the car was supported -- the
15 weight of the car was supported by Christian.
16 [WHEREUPON, counsel confers inaudibly.]
17   MR. BROWN:  Yeah.  Well --
18   A.  Had it --
19   MR. BROWN:  -- can you --
20   A.  -- not been --
21   MR. BROWN:  -- can you read back --
22   A.  -- he might --
23   MR. BROWN:  -- the last --
24   A.  -- be here.
25   MR. BROWN:  -- question?

Page 108

1    A.  I'm sorry?
2    MR. BROWN:  I -- I -- I -- can you as --
3  read it -- back the last question for me?
4    THE REPORTER:  [reads] Well, given
5  your long history in engineering and automati --
6  and automotive parts and accident reconstruction,
7  did you do measurements as to whether or not that
8  would have been the case?
9  BY MR. BROWN:
10   Q.  Is the answer, no, you did --
11   A.  What --
12   Q.  -- no such --
13   A.  -- what --
14   Q.  -- measurement?
15   A.  -- whether what would've been the case?
16   Q.  That the body would have -- the weight of
17 the vehicle would have transferred to the body
18 before the ratchet bar would be completely down to
19 the ground?
20   A.  I didn't -- that's not what I said.  I said
21 the ratchet bar would drop all the way to the -- to
22 its lowest position and the weight of the car
23 would've been assumed by Mr. Klorczyk.
24   Q.  And that answer assumes that the weight
25 of the car is no longer on the ratchet bar; correct?

Page 109

1  A.  Well, it -- it would've been on the ratchet
2  bar as -- as far as it --
3  **Q.  Until it transferred?**
4  A.  -- until it transferred to Christian
5  Klorczyk.
6  **Q.  But once it transferred to Christian**
7  **Klorczyk, the weight would no longer be on the**
8  **ratchet bar in your theory; correct?**
9  A.  Correct.
10  **Q.  Now I'm asking:  Did you take the human**
11  **dimensions of Christian Klorczyk, like an accident**
12  **reconstructionist might, and see at what point --**
13  **how high that would be and how that compared to**
14  **the ratchet bar, how high the vehicle would have to**
15  **be to have the rotor not on the wheel.  Did you do**
16  **any of that?**
17  A.  No.
18  **Q.  Okay.  And if I understood the way you**
19  **responded to that question, the fact that Mr.**
20  **Klorczyk said that the rotor was not down to the**
21  **wheel would've suggested to you you don't need to**
22  **make those measurements because the body**
23  **would've been holding the car that high?**
24      MR. EDINBURGH:  Objection.
25  A.  That's correct.

Page 110

1  BY MR. BROWN:
2  **Q.  Now the time sheets if you go -- look**
3  **from 3768 to 3769 --**
4  A.  Yes.
5  **Q.  -- we go from November of 2014 back to**
6  **August of 2013; correct?**
7  A.  Yes, 68 is November of 2014, and 69 is
8  August of 2013.
9  **Q.  Would Mr. Felpel have done any work on**
10  **this retention between August 31, 2013, and**
11  **November of 2014?**
12  A.  Everything Mr. Felpel did is in these time
13  sheets.  If there's something in these time sheets
14  that is confusing to you, could you ask me about
15  it, perhaps, instead of asking me some question I
16  can't answer?
17  **Q.  Do you accept that you've given us all the**
18  **time sheets?**
19  A.  Yes.
20  **Q.  And if in fact, you have given us all the**
21  **time sheets, it is fair for us to assume that he had**
22  **no involvement between August 27th, 2013, and**
23  **November 2014?**
24  A.  If you have presented to me copies of all
25  of my time sheets that I furnished to counsel and

Page 111

1  this gap exists, then this gap exists.
2  **Q.  And that --**
3  A.  And --
4  **Q.  -- means --**
5  A.  -- and --
6  **Q.  -- he didn't --**
7  A.  -- he didn't do --
8  **Q.  -- do anything?**
9  A.  -- didn't do anything between there.
10  **Q.  That's all I was asking.**
11  A.  Okay.  Well, it sure was difficult.
12      MR. EDINBURGH:  I -- I --
13      THE VIDEOGRAPHER:  Do we need to go
14  off record?
15      MR. EDINBURGH:  My bladder is acting
16  up, if I could take another break.
17      MR. BROWN:  Yeah, that's no. . .
18      MR. EDINBURGH:  Stand by, please.  The
19  time is -- the time is 1:54 p.m.  Again, we're going
20  off video record.
21  [WHEREUPON, a brief recess is taken.]
22      THE VIDEOGRAPHER:  And we are back
23  on video record.  The time is 1:58 p.m.  You may
24  proceed.
25  BY MR. BROWN:

Page 112

1  **Q.  In the 2013 time frame that's when you**
2  **were doing the testing in Mr. Felpel's shop there?**
3  A.  Whi -- which?
4  **Q.  Well, I'm now look -- I'm just asking --**
5  A.  You talking about --
6  **Q.  -- as a --**
7  A.  -- the whole --
8  **Q.  -- general --**
9  A.  -- ye -- the --
10  **Q.  -- proposition?**
11  A.  -- whole -- well, I -- I mean, the time
12  sheet speak for themselves.
13  **Q.  Okay.  For example, talks about:**
14  **[reads] 8/02/13 meeting with R. Heath**
15  **concerning --**
16  A.  Yeah.
17  **Q.  -- test set up?**
18  A.  Well, the only thing we've done in Mr.
19  Felpel's shop is -- is -- is validate the -- the
20  theory of false engagement.  So to the extent that
21  that's what Mr. Felpel was doing, that's -- that's
22  what he's been doing for me since the beginning of
23  this en -- engagement.  And there were several
24  phases.
25  **Q.  On 8/7 he says:  [reads] Finalizing set up**

Page 113

1 and testing procedure --
2  A.  What -- what --
3  Q.  -- correct?
4  A.  Hold on.  What page are we on now?
5  Q.  Ends with 3769.
6  A.  69.  And the date?
7  Q.  8/7.
8  A.  8/7.  [reads] Finalizing set up and testing
9 procedure.  Yes.
10  Q.  8/8, it's revising?
11  A.  Yes.
12  Q.  8/9 he says he's testing and
13 demonstrating the release action?
14  A.  Yes.
15  Q.  8/19 he's got five hours.  [reads]
16 Demonstrations of release action using items other
17 than a hammer --
18  A.  Yes.
19  Q.  -- to impact the release handle?
20  A.  Yes.
21  Q.  Discussions with you concerning
22 procedures to be used?
23  A.  Yes.
24  Q.  These are verbal discussions?
25  A.  Yes, sir.

Page 114

1  Q.  And again, confirming you're earlier
2 testimony, there -- there's no write-up of this?
3  A.  If I had any write-ups or correspondence
4 in writing from Mr. Felpel, you -- it would be in
5 your possession.
6  Q.  And so I take it that confirms that it
7 wasn't the procedure that you used to have such
8 write-ups --
9  A.  Correct.
10  Q.  -- is that an unfair --
11  A.  We -- we --
12  Q.  -- assumption?
13  A.  -- communicate verbally.  Correct.
14  Q.  Okay.  By 8/23 he's trying to set up trials
15 which are more realistic as to the use the jack
16 stands were subjected to; do you see that?
17  A.  Yes; I do.
18  Q.  And do you know -- have any
19 recollections, did you talk to him about what was
20 more realistic or not?
21  A.  Well, the -- the first testing that we
22 worked on was -- as I said earlier, was his manual
23 manipulation of the saddle assembly within the
24 base of the jack stand to see if he could achieve
25 false engagement.  And that was successful.

Page 115

1   The second series of tests we demonstrated
2 was to build a fixture so that you could raise the
3 jack stand saddle up against a fixed stop and let
4 it -- let go of it and see if it would stay.  And that
5 was successful sometimes and sometimes it
6 wasn't.  It dep -- was dependent upon how you
7 adjusted the space between the support surface
8 and the overhead stop surface.
9   After that series of tests, then we went to
10 applying a load after false engagement was
11 achieved.  And that was accomplished in his arbor
12 press, and you've got all kinds of videos on that
13 undertaking.
14   And then after that, we started doing
15 experiments with a set up while it was in the arbor
16 press to try to simulate or more closely
17 approximate the conditions if it were under a
18 vehicle by adding a spring, a rub -- and rubber
19 pads, and -- and then a piece of -- of steel plate
20 with fasteners on it.
21   And then the idea was to see what did it take
22 to dislodge the false engagement while under load.
23 And that's whole series of videos you've got,
24 where he -- I think he hits the handle with a
25 hammer this way or that way and then he does it

Page 116

1 by hand or maybe it's -- I got it backwards.
2   And then he -- you've got some videos where
3 it shows a -- a shoe and a -- and a pants leg.  And
4 with -- there's some -- some curiosity about
5 whether it's really his foot or whether he was
6 using a -- some sort of a 2-by-4 with a shoe on it
7 and his -- and a pair of jeans on the 2-by-4, and
8 we don't know.  I'd have to ask Mr. Felpel.
9   Okay.  So through all that exercise, we were
10 trying to demonstrate that, yes, can you achieve
11 false achie -- engagement; yes, the false
12 engagement wi -- will, under certain
13 circumstances, as -- assume a load and resist a
14 load and hold a load; and yes, it's -- it's released
15 under certain circumstances when disturbed.
16   So having proved all that to ourselves in the
17 laboratory, we said, "Okay.  Let's do it on the car."
18 And I think we've been over the -- what did we do
19 on the car already, so I won't go any further into
20 that.  And you've got videos of all those test
21 results.  And as I've said repeatedly today,
22 sometimes it happens and sometimes it doesn't.
23  Q.  If you'll look here at 8/24/13, it talks
24 about: [reads] These trial runs were not
25 successful -- there's a little typo there -- for

## Page 117

1 various practical reasons, set up a different
2 approach?
3    A. I see that.
4    Q. Do you know specifically what that was
5 about?
6    A. I don't. I may have at one time, but I
7 don't recall sitting here.
8    Q. On 8/27: [reads] Finishing the setting up
9 and performing demonstrations, many small
10 adjustments were performed during the I-S, IS
11 process -- I don't know what that exactly means?
12    A. Well, it's Mr. Felpel's verbiage.
13    Q. And again, other than --
14    A. It --
15    Q. -- he --
16    A. -- it's a typo.
17    Q. -- he might've verbally talked to you
18 about it, there would be no record kept of what all
19 these small adjustments were that he's talking
20 about?
21    A. Yes, sir. I think -- I -- I -- well, never
22 mind; I answered your question I think.
23    Q. Yeah. I -- if -- if you know something, I'll
24 be glad to hear about it. But if you --
25    A. Well, if you --

## Page 118

1    Q. -- you're trying to guess
2    A. -- gi --
3    Q. -- at something, I think that it's
4 probably --
5    A. Give me a minute.
6    Q. -- your lawyer and I would both rather
7 you -- have you not guess.
8    A. Now -- okay. We done with two -- no,
9 we're not.
10    Q. If you can go to Page 3772, end with
11 those numbers.
12    A. 3772, okay.
13    Q. This is April time -- April 2013 time.
14    A. Yes, sir.
15    Q. Okay. It says: [reads] Testing
16 experiments at Universal Engineering and Testing
17 of Ft. Meyers, Florida?
18    A. That -- yes, sir; that's what it says.
19    Q. Who -- who's Universal Engineering and
20 Testing?
21    A. It was a small test lab in Ft. Meyers.
22 Glenn was at his winter home in Florida at the
23 time. And he was trying to find somebody who
24 could put a load on the false engagement
25 condition, and he went to Universal Engineering

## Page 119

1 and Testing. I -- I believe there's a bill for that
2 services somewhere in the pile of materials that
3 were furnished to you. The sum and substance of
4 the results were that their testing capabilities
5 were unsatisfactory.
6    Q. And if you look at 4/25: [reads]
7 Completed the new base and performed several
8 experimental -- I guess that's supposed to be "test
9 loads," actually many test load attempts,
10 discovered problems with test fixture. Do you see
11 that?
12    A. I do.
13    Q. Is that something that he talked to you
14 about?
15    A. I'm sure he did.
16    Q. Do you have any memory of -- of what
17 that was about?
18    A. Well, give me a minute here. I'm trying
19 to -- since we're going backwards here, it makes
20 me think backwards, which is -- if we'd gone the
21 other way around, this would've been easy. But I
22 guess that's your plan. [examines document] Oh.
23 Let's see.
24    Q. Well, I guess you could've always put
25 them in chronological order and then when I went

## Page 120

1 through the Bates numbers --
2    A. I did --
3    Q. -- numerically --
4    A. -- they were --
5    Q. -- they would be --
6    A. -- furnished in chronological order.
7    Q. Okay.
8    A. I -- I honestly don't know which problem
9 this is. It -- it -- it -- thi -- this may have been the
10 test fixture where it was a pull up and stop. And it
11 may be the test fixture where it was in the arbor
12 press. I know we had problems in both areas
13 because parts were flying out of the arbor press,
14 and we had to tether the darn parts. But I don't
15 know whether that's what he's talking about here.
16    Q. Right. Look at 4/27/13.
17    A. Okay.
18    Q. Take a second and read it if you want.
19    A. [examines document] Yeah, this is where
20 we went to the spring.
21    Q. And he notes that they performed several
22 test runs at 400 to 500 pounds of force --
23    A. Yes --
24    Q. -- correct?
25    A. -- yes, sir.

Page 121

1   Q.   And he -- he writes here:  [reads] Not
2   good results, still some factor was not allowing the
3   jack stand to release: correct?
4   A.   Yes, sir.
5   Q.   And a good result would be one that
6   showed something that was matched up with your
7   hypothesis?
8   A.   Well, you realize that when he says it
9   wouldn't release, that it's in point to point
10   contacted.  It just demonstrated -- just further
11   demonstrates the validity of the theory.
12   Q.   [reads] At the beginning a bit of shifting
13   of the ram caused the jack stand to disengage.
14   Correct; is that what he says?
15   A.   Yes, sir.
16   Q.   [reads] Now, it never disengages?
17   A.   Uh-huh.
18   Q.   [reads] Later in the day -- late in the day
19   had an idea; introduced a spring between the jack
20   stand and the press ram.
21   So there was actually a spring put on the
22   saddle of the ratchet bar; is that what he means?
23   A.   No; there was a spring placed between
24   the ram of the arbor press and the saddle where
25   the load was applied.  And I believe in one of the

Page 122

1   photographs or videos there's -- shows a die
2   spring that looks to me in the picture a -- about an
3   inch-and-a-half in diameter by maybe an inch high
4   sitting on the top frame of the arbor press not far
5   from the pressure gauge.  I believe that's the
6   spring he's talking about.   Again, he was at
7   testing the theory.
8   Q.   And with the spring put in there, he could
9   get repeatable disengagement?
10   A.   Yes, sir.
11   Q.   [reads] Was a lot more repeatable,
12   reliable, slight --
13   A.   Well --
14   Q.   -- perturbations --
15   A.   -- whatever --
16   Q.   -- what --
17   A.   -- what --
18   Q.   -- he says?
19   A.   -- whatever he says; yes, sir.
20   Q.   [reads] Experimenting with and locating
21   proper spring rates and spring samples to use in
22   the fixture.  Do you see that?
23   A.   I do.
24   Q.   Now, was some effort made to get a
25   spring that would actually replicate the spring that

Page 123

1   you believe existed in that frame you have --
2   A.   I don't believe any --
3   Q.   -- circled?
4   A.   I don't believe any spring existed in
5   the frame.
6   Q.   Well where did the springing exist?
7   A.   The spring comes from the fact that an
8   automobile is not a rigid body.
9   Q.   I must be dense.  Explain to me what you
10   mean when you say that.
11   A.   Well, we -- we had a little conversation
12   before about you -- you -- you seem to think that
13   if -- if I put a -- a jack under one corner of a
14   vehicle, that it would lift up in a perfectly rigid
15   way.  And I would say to you, no, it doesn't.  The
16   vehicle deforms, it flexes, it -- it deflects, frame is
17   not rigid.
18   Now, all this is -- testing -- well, never mind;
19   I've been through it 100 times already.
20   Q.   Well, explain to it me.  If there's
21   something you wanted to tell me, go ahead and tell
22   me.
23   A.   No; I've already told you.  Ask me
24   another question.
25   Q.   Well, I'm trying to understand.

Page 124

1   A.   But --
2   Q.   When you --
3   A.   -- I can't --
4   Q.   -- were picking up --
5   A.   -- I can't help you there.
6   Q.   -- when you're --
7   MR. EDINBURGH:  Quiet.
8   A.   But --
9   MR. EDINBURGH:  There's no --
10   A.   -- I'll tr --
11   MR. EDINBURGH:  -- question pending.
12   A.   -- I'll try.
13   BY MR. BROWN:
14   Q.   Well, when you're picking out springs, to
15   locate the proper spring rates and spring samples
16   to use in the future, are you picking out a spring
17   that gives the test result you want or are you
18   picking out a spring that you believe replicates
19   having the saddle of the jack stand on this frame
20   member connected to the engine of this BMW?
21   MR. EDINBURGH:  Objection.
22   A.   We are trying to make the rigid arbor
23   press be more closely attuned to the reaction of a
24   vehicle when held up by a jack stand.
25   BY MR. BROWN:

Page 125

1  Q.  And how would one go about doing that?
2  Explain it to me.  How do you --
3    A.  We put a spring between the ram of the
4  hydraulic cylinder in the arbor press --
5  Q.  Yeah.
6  A.  -- and the saddle.  And it's all shown very
7  neatly in the videos.
8  Q.  [reads] Experimenting with and locating
9  proper spring rates and spring samples to be used
10  in the fixture.  Did you test the car at all to try to
11  decide what -- you were experimenting to locate
12  the proper spring rates.  What are those
13  experiments?
14    A.  They're shown in the videos.  And I've
15  described them to you already, where we put the
16  stand up, applied -- and got it in false
17  engagement, applied a load, and then tried to get
18  the load to release.
19  Q.  And that --
20  A.  And --
21  Q.  -- is my --
22  A.  -- and --
23  Q.  -- question.
24  A.  Will you let me finish?
25  Q.  Please --

Page 126

1  A.  And --
2  Q.  -- go on.
3  A.  -- and --
4  Q.  I didn't realize that you weren't.
5  A.  -- and at that point in time, we hadn't
6  even got a vehicle yet, I don't believe.  We were
7  doing it in an arbor press.  And trying to find out
8  how much perturbation it would take and in what
9  way to get the false engagement to release.
10  BY MR. BROWN:
11  Q.  So --
12  A.  This is a test in an arbor press.
13  Q.  I understand.
14  A.  Okay.
15  Q.  And when you are experimenting with
16  different springs --
17  A.  Yeah.
18  Q.  -- are you experimenting to try to
19  replicate the vehicle or are you experimenting to
20  see what spring weight, what spring configuration,
21  what kind of rubber makes it more likely to
22  release?
23  A.  Yes.
24       MR. EDINBURGH:  Objection.
25  A.  Yes.

Page 127

1  BY MR. BROWN:
2  Q.  The second one?
3  A.  Yes.
4  Q.  Is there a record or document that show
5  the different types of springs?  And I think you
6  actually --
7  A.  I think we've been over this.
8  Q.  -- mention here in rubber.  Well, we're
9  going to mention it every time to make sure I'm
10  clear on it.
11  A.  Okay.
12  Q.  Okay?
13  A.  Sure.
14  Q.  You're getting paid to answer; I'm getting
15  paid to ask.
16  A.  I got --
17  Q.  We good?
18  A.  I gotcha.  We're good.
19  Q.  All right.  I'm not trying to be rude.  I'm
20  trying to be thorough.
21  A.  I know.
22  Q.  In doing this experimenting to see what
23  kind of spring rate was necessary to get that en --
24  disengagement to incur [sic] after engagement, did
25  you keep track of all different springs that were

Page 128

1  looked at and the different rubbers that were
2  used?
3    A.  I think the time sheets describe them.
4  There was a spring and there was two different
5  rubber -- pieces of rubber tube, pieces of rubber
6  with different durometer, d-u-r-o-m-e-t-e-r.
7  Q.  If you'll look at 4/29/13.
8  A.  Oh.  Yep.
9  Q.  [reads] Working with the springs at hand
10  in the shop and checking with the local hardware
11  supplier for springs with a higher spring rate.  Is
12  there something in -- that in that, that I, in my
13  non-technical, non-engineering state, have missed
14  that would allow me to know exactly what springs
15  were tested?
16    A.  Well, looks like he tested a -- a --
17  [WHEREUPON, counsel confers inaudibly.]
18    A.  Do you under -- well, do -- do -- do you --
19  do you understand that what was going on here
20  was we were trying to get the daggone point to
21  point engagement -- false engagement to release?
22  We weren't trying to achieve it.  It had been
23  achieved.  Now we're trying to get it to release.
24  And we're trying to figure out so what made it
25  release.

Deposition of Frederick G. Heath

Page 129

1  And so we thought we'd put some -- try some
2  different springs and see if it got easier to
3  release, since it made no sense to keep testing it
4  when it wouldn't release.  So we finally came up
5  with a piece of rubber that would allow the place --
6  that would allow the types of perturbation to the
7  vehicle support stand while holding the car that
8  were -- might have been present during the
9  accident to cause the release.  That's what this
10 was all about.
11 BY MR. BROWN:
12 **Q.  Okay.**
13 A.  Okay.  And --
14 **Q.  For the sake of our record --**
15 A.  And --
16 **Q.  -- I think I know what it means as the**
17 **context you use it, but can you tell us what you**
18 **mean by perturbation?**
19 A.  Disturbance.  For instance, we were
20 puzzled that it -- that the false engagement didn't
21 release when Christian first tightened the drain
22 plug.  And these tests helped us understand that
23 sometimes the daggone false engagement is so
24 good that it's so darn difficult to get it to release.
25 **Q.  4/29/13, [reads] Working with the springs**

Page 130

1  **at hand in the shop and checking with the local**
2  **hardware supplier for springs with a higher**
3  **spring rate.  The idea is working just fine in**
4  **the 4- to 600-pound even up to around 700-pounds**
5  **but the spring rates are too low.  Discussed**
6  **problem at length with Rick Heath.**
7  A.  Yes.
8  **Q.  Do you remember that discussion?**
9  A.  Sure.
10 **Q.  And --**
11 A.  Well, I -- in general terms --
12 **Q.  -- what --**
13 A.  -- I can remember it.
14 **Q.  -- what was the general nature of that**
15 **discussion?**
16 A.  He said, What do you want to do now?"
17 I said, "We've got to keep -- we've got to find
18 a harder piece of rubber."  Because we had to get
19 up to 1900 pounds of false engagement.
20 **Q.  Look under 4/30.**
21 A.  Yeah.  Well, you could -- there's the
22 results of the discussion with R. Heath.
23 **Q.  Trying rubber material --**
24 A.  Yeah.
25 **Q.  -- right?**

Page 131

1  A.  Yeah; that's what it says.
2  **Q.  Certain loads works better than a spring;**
3  **right?**
4  A.  Well, it says -- that's what it says.
5  [reads] This works even better than a spring, in
6  that, the disengagement of the tooth-to-tooth pert.
7  is repeatable.
8  **Q.  Again, here we see a sentence:  [reads]**
9  **We can only reach about a 900- to 950-pound load**
10 **until the rubber material on had become so much**
11 **compressed that it is no longer in spongy action**
12 **necessary to duplicate the actual conditions of**
13 **use.  See that?**
14 A.  Yes.
15 **Q.  And I'm asking you again:  You haven't**
16 **tested a vehicle; you've done nothing with the**
17 **test -- with a vehicle.  How is it that you're trying**
18 **to duplicate the actual conditions of use here?**
19     MR. EDINBURGH:  Objection.
20 A.  Well, because that's what engineers do.
21 You don't go right to the end test without having
22 any clue as to the build up or the confirmation of
23 the false engagement.
24     MR. BROWN: Could you read that answer
25 back to me?

Page 132

1     THE REPORTER:  Well, because that's
2  what engineers do.  You don't go right to the end
3  test without having any clue as to the build up or
4  the confirmation of the false engagement.
5  [WHEREUPON, counsel confers inaudibly.]
6  BY MR. BROWN:
7  **Q.  Well, isn't what engineers do to be**
8  **looking at different materials to duplicate the**
9  **actual conditions of use when they have done no**
10 **work to figure out what the actual conditions of**
11 **use were?**
12     MR. EDINBURGH:  Objection.
13 A.  We were trying to duplicate or replicate,
14 as close as we could in the laboratory without the
15 vehicle, the conditions of use.  And we were trying
16 to get to a point where we had point to point
17 support, false disengagement at a force applied
18 of 1900 pounds, which we had calculated was the
19 weight of the -- the front axle weight of the
20 vehicle.  Okay.
21   We started out at low pounds, and we couldn't
22 get a release at all.  So we said, well, maybe we
23 need to have something between the force applied
24 and the jack stand that allows a little flexibility.
25 So we went with springs, and we got up a little

Page 133

1  higher in weight.  And then we went with rubber,
2  and we got up a little higher in weight.  And then
3  we went with a harder piece of rubber, and got up
4  to 1900 pounds, I believe.
5     And then we're able to, by various means,
6  demonstrate that a -- a disturbance to the jack
7  stand could make it release.
8  BY MR. BROWN:
9     Q.   The notes here:  [reads] Without a small
10  amount of flexibility in the system the jack stand
11  tooth-to-tooth contact will not disengage.  Do you
12  agree with that?
13     A.   Yeah.
14     Q.   It says:  [reads] It just sets there and will
15  not disengage.  I take it you --
16     A.   And --
17     Q.   -- agree with that?
18     A.   -- at -- at that. . .
19     Well, that's what he's telling me.  Why would I
20  disagree with it?
21     Q.   And apparently, Rick, you and Glenn had
22  a discussion and you decided to buy some harder
23  rubber and get an industrial die spring; is that
24  right?
25     A.   No; the die spring, I believe, was --

Page 134

1  was -- well, I don't know, where is the die spring;
2  is that here?  Yeah, I guess so.
3     Q.   It says:  [reads] We also decided to
4  purchase an industrial die spring with properties
5  which will be suitable to replace the rubber
6  material if that becomes necessary?
7     A.   Yeah; that's probably the die spring that I
8  said was sitting on the -- on the arbor press.  I
9  don't think we ever used the die spring.
10     Q.   Look they next page, 3771.  It's May
11  of 13.
12     A.   That's just going backwards in my set.
13     Q.   Well, I -- you know --
14     A.   Anyway.
15     Q.   -- I would organize them --
16     A.   Go -- go ahead.
17     Q.   -- and try to keep both of us puzzled, to
18  tell you the truth.
19     A.   Okay.
20     Q.   But --
21     A.   Now we're in May of --
22     Q.   -- but understand the master mind
23  that's --
24     A.   Now we're --
25     Q.   -- involved here.

Page 135

1     A.   We're in May of 2013.
2     Q.   All right.
3     A.   Okay.
4     Q.   [reads] Cut the rubber material for use in
5  the load transfer cushion.
6     A.   Where are you?
7     Q.   The 5/2/13 entry.
8     A.   [reads] Received other materials more
9  suitable for use, also received a heavy die spring,
10  cut the -- yeah.  Okay.
11     Q.   And the load transfer cushion, that's
12  actually between the press and --
13     A.   The saddle.
14     Q.   -- the saddle?
15     A.   Yes, sir.
16     Q.   And the test ran well with the
17  disengagement repeatable?
18     A.   Yes, sir.
19     Q.   And this new softer rubber worked well?
20     A.   Okay.
21     Q.   That's what it says; right?
22     A.   That's what it says.
23     Q.   Didn't have to try the spring; right?
24     A.   Yep; that's what it says.
25     Q.   All right.  Now, we get down and it says

Page 136

1  that -- if you look at 5/3, that  you made run up
2  to 1900; right, pounds?
3     A.   Yes, sir.
4     Q.   And with this softer rubber there, it does
5  disengage; correct?
6     A.   Yes.
7     Q.   It notes that --
8     A.   I -- I don't -- you know, I don't -- I'm --
9  I'm not sure if this softer rubber is -- is correct or
10  whether it's harder rubber because the first
11  sample he used di -- got too squishy, if you -- do
12  you recall that, so this may be a typo.  Anyway,
13  it's a different durometer of rubber.
14     Q.   So maybe he meant new, harder rubber?
15     A.   He may have.
16     Q.   But we don't know for sure?
17     A.   I -- no, and it really doesn't make a damn
18  bit of difference.
19     Q.   The important thing is it got it to do what
20  you wanted to do; right?
21  We got it -- we got it --
22     MR. SPEAKER:  Objection.
23     A.   -- to release under a 1900-pound load
24  where we could show then how to demonstrate
25  disturbances to the support stand to get it to

Page 137

1  release within a realm of -- of predictable or -- or
2  possible release mechanisms?
3  BY MR. BROWN:
4   Q.  And there is a comment there:  [reads] To
5  continue this testing, it will require a new jack
6  stand.
7   A.  Right.
8   Q.  [reads] The pawl tooth on the exemplar
9  jack stand has become deformed by the repeated
10  high contact loading the [sic] 1900-pound level
11  and it no longer can be used for this test.
12   Do you see that?
13   A.  I do.
14   Q.  So I've got to you again to start out
15  where we began this morning:  Are you certain that
16  that one jack stand you brought here today is the
17  same one that was used in all these tests and the
18  later tests with the automobile?
19   A.  Yes.
20   Q.  Okay.  So despite this comment by Glenn
21  that it shouldn't be used any longer, did you make
22  a conscious decision to keep using it?
23   A.  Yes.
24   Q.  Why was that?
25   A.  Because that's the jack stand we had that

Page 138

1  was similar to the other -- to the accident jack
2  stand.  The problem with continuing using it was it
3  was much more difficult to achieve point to point
4  contact because the surfaces had become -- which
5  I've already testified to today -- the surfaces had
6  become hardened from contact stresses and
7  smooth because of repeated loading.
8   And so I -- once we got engagement, after all
9  this wear had taken place, we could get it, but it's
10  just more difficult to achieve in the first place.
11   Q.  Sufficient tests were run at
12  the 1900-pound level that it caused damage to the
13  jack stand?
14   A.  Where are you looking?
15   Q.  I -- I'm asking.
16   A.  Oh.  What?
17   MR. EDINBURGH:  Objection as to form.
18   A.  Caused damage to the jack stand.  I
19  wouldn't call it damage; I'd call it wear.
20  BY MR. BROWN:
21   Q.  It's become deformed?
22   A.  Well, that's Glenn's term.  The too -- the
23  tooth tips were deformed, in that, the
24  discontinuities in the surface from the casting
25  process were smoothed out and the surface

Page 139

1  became smoothed and burnished and hardened.
2   Q.  And that made it more difficult for to you
3  get false engagement?
4   A.  Yes.
5   Q.  Wouldn't that also, then, logically make it
6  easier to get it to disengage the way you wanted?
7   A.  It very well might.  But we didn't have
8  that situation in the accident anyway.  We had new
9  jack stands.
10   Q.  So --
11  [WHEREUPON, counsel confers inaudibly.]
12  BY MR. BROWN:
13   Q.  Did you make an attempt to find another
14  exemplar jack stand that was similar to the one
15  that was involved in this accident?
16   A.  Early on we did.  And Sears doesn't sell
17  them anymore.  The replacement stand under the
18  same part number has got little square feet on the
19  bottom and the saddle is smaller and, therefore,
20  the neck of the pyramid is smaller.
21   Q.  Was all the set up and testing and -- you
22  did at these various pound levels all that one jack
23  stand subjected to all of that?
24   A.  Yes.
25   Q.  Now look at the one that's 3775.  This is

Page 140

1  a monthly time sheet for Roger Claypool?
2   A.  [examines document] Yes, sir.
3   Q.  And you were talking to Mr. Claypool
4  about this as early as May of 2013?
5   A.  Yeah; I was trying to get him to decipher
6  the serial numbers for me and to -- I think I was
7  trying to find out what ever happened to Sara
8  Sunderman [phonetic].  I don't know -- I don't know
9  who Bill Allen is, so. . .
10   Q.  Do you have any communications from Mr.
11  Claypool about conversations with Bill Allen?
12   A.  I -- I may have, but I don't recall, though,
13  with anything significant.
14   Q.  Well, you knew Mr. Claypool from the
15  committee you were on; right?
16   A.  Sure; I've known Mr. Claypool for a long
17  time.
18   Q.  And you knew he worked at Shinn Fu
19  Company of America for a long time?
20   A.  Sure.
21   Q.  And you knew he had been involved in
22  defending lawsuits against Shinn Fu Company of
23  America; right?
24   A.  Yes.
25   Q.  And in fact, he had been involved in

Page 141

1 hiring you to work for Shinn Fu Company of
2 America in defending lawsuits; right?
3   A.   I never was hired by Shinn Fu to do
4 anything other than they reimbursed me for part of
5 a trip to the Taishan factory.  I was always hired
6 by a law firm.  That's the best of my knowledge
7 and belief.  In most cases it was specified by
8 Sears in the first place.
9   Q.   Was the law firms that you did work for
10 you were aware they were defending Shinn Fu
11 Company?
12   A.   Of course.
13       MR. BROWN:  Now it's my turn to need a
14 break, Howard.
15       THE VIDEOGRAPHER:  Okay.
16       MR. EDINBURGH:  We're in a special
17 club.
18       THE VIDEOGRAPHER:  Please stand by.
19 I will take us off record, please.  Time is 2:37 p.m.
20 We're going off the video record.
21 [WHEREUPON, a brief recess is taken.]
22       THE VIDEOGRAPHER:  Okay.  We are
23 now back on the video record.  The time is 2:48
24 p.m.  You may proceed.
25 BY MR. BROWN:

Page 142

1   Q.   Having trouble keeping track of my pieces
2 of paper.
3   What would you have to physically do to put
4 the jack stand in a -- in a state of false
5 engagement, as you call it, its tooth-to-tooth
6 state?
7   A.   What would you have to do?
8   Q.   Yeah.
9   A.   You have to lift up the saddle and set it
10 down on the Have you to lift of the up saddle
11 and set it down on the -- on the -- set a tooth down
12 on the pawl so that it's point to point.  Now, can --
13 and you can do that manually.  I'm not real good at
14 it; in fact, I stink.
15   You can also do that by raising it up against
16 the stop.  If the stop were in the -- precisely the
17 right place, it would stay.  And that was the first
18 test we provided -- that we undertook was to
19 demonstrate the validity of that process.
20   Q.   Well, in the normal course, I've got the
21 jack stand -- and we can bring it over if you want
22 because we've got a video camera here.
23   A.   I don't care.
24   Q.   Do -- do you have to pull it up, do you got
25 to play with the handle, do you have to do anything

Page 143

1 in particular?  Can you just pull it up and if you
2 stop it at the right place, you're fine?
3   A.   A reserved yes; it depends upon the --
4 the precise local orientation of the parts.
5 Sometimes that will work; sometimes it won't.  It
6 helps if you twist the saddle within the -- within
7 the collar because then the two lines of contact
8 are skewed instead of parallel.
9   Q.   And I take it from your previous answer
10 that -- that you found both that you could
11 physically manipulate to do it, but you believed if
12 you stopped -- at just pulling you up in the normal
13 course, maybe twisting it, if you stopped at just
14 the right place, you could get it to happen?
15   A.   Yes.
16   Q.   Okay.  Did you do that at the lab?
17   A.   Yeah.
18   Q.   Is there actual videotape of you doing
19 that?
20   A.   I believe there are.  There's certainly
21 photographs because it's showing the fixture.
22   Q.   And what did you -- when did you the test
23 with the BMW, do you know if Glenn manipulated it
24 by hand and then set the VW -- BMW down on it?
25   A.   Yes.

Page 144

1   Q.   Is that what he did?
2   A.   Yeah.  He had to do.
3   Q.   Why did you have to do that?
4   A.   Because the older the -- the -- the older
5 the -- the test sample got, the harder it was to
6 engage.  So he could've done it by pulling it up
7 against the stop, except then have you to ad -- try
8 to adjust the vehicle and place the saddle in
9 precisely the right place to -- to get the
10 phenomenon to happen.  It's way easier to do in a
11 fixture.  And even in the fixture, doesn't happen
12 every time.
13   Q.   Were you there when -- and you think you
14 said -- you told me I were morning you were, when
15 some of those videotape tests were done, with --
16   A.   With --
17   Q.   -- the BMW?
18   A.   -- with the car?
19   Q.   Yes.
20   A.   Yeah.
21   Q.   Why didn't you take the camera and show
22 what had to be done to set it up?
23   A.   I don't believe I was there when the
24 camera was -- when the videos were being made.
25   Q.   Do you know why there's no video that,

Page 145

1 like, take the camera and look down and show
2 exactly where the jack stand is placed on the
3 vehicle?
4 A. Do I know why there are not? .
5 Q. Yeah.
6 A. We didn't do that.
7 Q. Do you know if any of the pictures that
8 you've produced are pictures showing exactly
9 where it was before this?
10 A. Well, I think there's numerous pictures
11 that show looking through the -- the hole we
12 machined in the side of the collar to show that --
13 the two point to points.
14 Q. Well, what I'm asking is: Are there
15 pictures to show exactly how that jack stand was
16 set up underneath that vehicle as the weight was
17 put on it and before the vehicle was shaken or
18 pushed from the back or the front or anything?
19 A. Yeah; it was set on the side rail, the --
20 where you had me draw the picture -- the circle.
21 Q. And my question is: Is there a reason
22 there's -- that there's no documentation or
23 pictures showing that, in -- it's, in fact, on that
24 side rail?
25 A. No there's no reason.

Page 146

1 Q. [examines document]
2 [WHEREUPON, counsel confers inaudibly.]
3 [WHEREUPON, off-the-record remarks are
4 made.]
5 BY MR. BROWN:
6 Q. Did you talk with Glenn that he should put
7 it on that frame rail, that engine support rail?
8 A. Well, we put it on there because if you
9 put it somewhere else, the -- it's not a rigid -- it's
10 not a rigid structure. I mean, you wouldn't want to
11 put it under the crank case, for instance, because
12 it might break the crank case. You don't want to
13 put it under the floorboards because it would
14 deform the floorboards. We put it where it made
15 sense.
16 Q. And this is something that you and he
17 talked about?
18 A. Yes.
19 Q. Okay. Because all the videos we've
20 gotten you weren't there for all of them; right?
21 A. Right.
22 Q. And to the extent you relied upon it, it's
23 based on these conversations with Glenn; right?
24 A. Well --
25 Q. And understanding --

Page 147

1 A. And my --
2 Q. -- what the --
3 A. -- observa --
4 Q. -- set up was?
5 A. -- and my observation of having and
6 watched him do such, when I was there.
7 Q. And I just -- to make sure. I know it's
8 tedious. That -- that -- I understand.
9 A. No.
10 Q. Was he actually under the vehicle when
11 he would get it -- it balanced tooth-to-tooth?
12 A. He would have the vehicle supported with
13 a screw jack, and he would place the stand
14 underneath where, either at the one end or the
15 other end, which is where we tested at the both
16 ends of that -- of that structure that I drew the
17 circle around, so that we covered the possibilities
18 of where it would have been if it was on that
19 structure in the first place.
20 Then he engaged the -- the stand in the point
21 to point configuration; and then he lowered the
22 load, using the screw jack, on to the stand; and
23 then he removed the screw jack; and then he
24 disturbed the vehicle, generally, by going around
25 to the front and pushing rearward, which would

Page 148

1 have emulated the force application that Christian
2 would've been applying in pulling on the wrench
3 handle to tighten the drain plug.
4 Q. Were there times when you tried to lower
5 the vehicle on to the raised jack stand that it
6 would just come down?
7 A. That -- you mean that it wouldn't engage?
8 Q. Right.
9 A. I believe there were.
10 Q. Or if it was engaged without --
11 A. I mean, I --
12 Q. -- weight --
13 A. -- I mean --
14 Q. -- it would --
15 A. -- there were --
16 Q. -- disengage --
17 A. -- there were numerous times when he
18 couldn't do it manually under the car before he
19 even tried to apply a load. As I -- as I've said now
20 three or four times, the older this thing got, the
21 harder it was to establish false engagement.
22 Q. Because --
23 A. Because of the --
24 Q. -- the more and more --
25 A. -- repeated --

Page 149

1   Q.  -- wear --
2   A.  -- loading on point to point.
3   Q.  And it was only when it would stay point
4 to point and hold up the weight of the vehicle that
5 the camera was then turned on?
6   A.  Yeah.  Well, I say yeah; you know, you're
7 asking me did -- did -- did we know it was going to
8 hold the load point to point and then turn the
9 camera on, well, no.
10   Q.  I haven't seen any video of anybody
11 lowering the car on to a jack stand.  Was that ever
12 videotaped?
13   A.  Yeah; every ti -- every one of those cases
14 where you -- where you see Glenn underneath
15 there with a bar in his hand, he's unscrewing a
16 screw jack.  It's about this big in diameter and
17 about that high.  And it's -- the screw top -- the
18 top screws up.
19   Reason you can't see under there very well is
20 because of all the -- the cribbing we've got to
21 catch the vehicle.
22   Q.  Is there any reason you used a screw jack
23 instead of a hydraulic jack?
24   A.  Well, I don't know, I think probably
25 because Glenn had a screw jack, and he has a

Page 150

1 hydraulic jack, but I don't know why he selected a
2 screw jack.
3   What difference does it make?
4   Q.  I don't know.
5   A.  Well, I don't either.
6   Q.  Okay.
7 [WHEREUPON, counsel confers inaudibly.]
8 BY MR. BROWN:
9   Q.  Christian did use a hydraulic jack; right?
10   A.  Yes.
11   Q.  And in, at least, some small degree, the
12 way that a hydraulic jack lifts is it's being
13 scissored up is little different than the cylinder
14 coming straight up out of a screw jack; right?
15   A.  Sure.
16   Q.  When did you first contact Mr. Claypool
17 to talk to him about this case?
18   A.  Whatever the date is on that time sheet
19 we just looked at is my only recollection of talking
20 to him about this case, unless there's other entries
21 he made.  I was trying to find Sara Sunderman.
22   Q.  Why were you trying to find Sara --
23   A.  Well --
24   Q.  -- Sunderman?
25   A.  -- counsel had -- had told me that -- that

Page 151

1 you guys had requested that I give you all kinds of
2 information on every case I ever did for Shinn Fu.
3 And my practice, as is every other expert that I
4 know, is when a case is over, you get permission
5 from the attorney and you throw everything away,
6 which I what I do.
7   And I must've turned the damned office inside
8 out trying to find information on old Shinn Fu
9 cases.  At best of my ability, I provided that to
10 counsel, and I believe they provided it to you.
11   And I -- I probably had a conversation with
12 Roger about this case or that case.  I have no
13 recollection whatsoever.  I've done -- I did jack
14 stand cases on behalf of Shinn Fu, representing
15 Shinn Fu.  But to the best of my knowledge and
16 belief, I had never done any kind of a false
17 engagement ratchet and pawl type jack stand case,
18 whether it was for Shinn Fu or anybody else.
19 [WHEREUPON, counsel confers inaudibly.]
20 BY MR. BROWN:
21   Q.  Did you ever talk to Sara Sunderman?
22   A.  Yes; I did.
23   Q.  She still an employee of Shinn Fu at that
24 time?
25   A.  I talked to Sara Sunderman regularly

Page 152

1 when I was doing cases for Shinn Fu because
2 that's who would engage me, or at least give me
3 the name of the lawyer I was supposed to call.
4 Roger never had any input to that, other than
5 perhaps, unbeknownst to me, he might've
6 recommended to Sara that she call me, that the
7 case was not going to settle easily, and ma --
8 maybe we better get Rick involved; I -- I don't
9 know; I'm just speculating.  You'd have to ask
10 Roger those questions.
11   Q.  Well, when you decided you wanted to
12 contact her, you knew she was an employee?
13   A.  When?
14   Q.  For this case.
15   A.  No.  I -- she worked for an insurance
16 agency in St. Joe.  I knew -- of course, I knew that
17 she had been an employee of Shinn Fu.  And I
18 was -- called her, I think, to ask if -- if she had
19 any knowledge of how I could put together this
20 information for counsel.
21   And she said, "I don't want to get involved.  I
22 don't want anything to do with it."  That was the
23 end of the conversation.
24   Q.  [examines document]
25     MR. SPEAKER:  Let's go off the record.

Page 153

1 THE VIDEOGRAPHER: Yeah. We need
2 to go off the record for a second. I'm sorry.
3 [WHEREUPON, off-the-record remarks are
4 made.]
5 THE VIDEOGRAPHER: The time is 3:06
6 p.m. We're going off the video record.
7 [WHEREUPON, a brief recess is taken.]
8 THE VIDEOGRAPHER: Time is 3:06 p.m.
9 We are back on video record. You may proceed.
10 BY MR. BROWN:
11 Q. Were the lawyers who hired you in this
12 case aware that you were talking to Roger and
13 trying to contact Sara in connection with this
14 case?
15 A. Which lawyer? You mean the -- the
16 Hurstbourne business [phonetic] --
17 Q. Yeah.
18 A. -- folks? Yeah. Sure.
19 Q. Did you talk to them about that?
20 A. I believe I did.
21 Q. Well, you could've talked to them or you
22 could've sent them something in writing. So I'm
23 asking how it was that you know that they knew
24 about it, that's. . .
25 A. I think we had a conversation about it.

Page 154

1 Q. And again, not to annoy you but to be
2 clear, before this engagement, it -- you had not
3 been involved in any effort to test or study false
4 engagement, how it might or might not happen,
5 how it did or did not work?
6 A. No; I've always been curious about the
7 process. And -- and was -- and -- and -- you --
8 you know, from a strictly scientific or technical
9 standpoint, I was delighted to have an opportunity
10 to find out if the da -- if -- if -- if it worked or it
11 didn't work.
12 Q. And do you know if Glenn had ever done
13 any work or anything on this before?
14 A. Oh, I don't think so.
15 Q. I mean, he did most of the testing that's
16 been --
17 A. I mean --
18 Q. -- done --
19 A. -- I've -- I've --
20 Q. -- right?
21 A. -- well, I've known. . . Yes; he di -- has
22 done most of the testing. But I've known Glenn for
23 decades. And to the best of my knowledge, he --
24 he doesn't do independent expert witness work; he
25 does design work, primarily stress analysis, which

Page 155

1 is what I -- my primary activity is with him.
2 Now it happens to -- to have -- have the
3 machine shop on his property, where at one time
4 he ran a business doing small business set aside
5 government contracting work. It's no longer
6 operative.
7 Q. And have you, yourself, ever raised any
8 issues concerning false engagement with the ASME
9 PALD Committee?
10 A. No.
11 Q. But it's your intention, when this case is
12 over, to do so?
13 A. Yeah. It's my understanding that there's
14 a -- a -- an order in place by the court that it --
15 that I can't discuss any of this stuff. As a matter
16 of practice, I don't any way.
17 Q. I'm sorry; could you say that --
18 A. I said --
19 Q. -- again?
20 A. -- as a matter of practice, I don't discuss
21 any case with other people that I'm working on at
22 the time until the matter is resolved. Sometimes
23 I'm furnished proprietary material that I have to
24 demonstrate has been destroyed or I return it to
25 whoever furnished it to me.

Page 156

1 Q. Are all your opinions contained in your
2 report?
3 A. As of today, but I haven't seen any --
4 Q. You haven't seen our reports?
5 A. -- I haven't seen report from your side,
6 and I -- I may have more work assigned, and I may
7 have rebuttals to make. I mean, I don't know. But
8 as of today, those are my opinions.
9 Q. Okay. And to the extent it refercs --
10 reflects the work that you had Glenn do and your
11 discussions with Glenn and looking at the
12 deposition, all those opinions, there aren't
13 rebuttal or addressing anything done by experts
14 for the defendants, all those opinions are in your
15 report; correct?
16 A. I thought that's what you just asked me
17 before.
18 Q. Well, you know, you -- you kind of made it
19 carve out and a squish, so I'm trying to make sure
20 that we're -- the record is clear what the carve out
21 is?
22 A. I stand by my report as of today; how's
23 that.
24 Q. That's good.
25 A. Okay.

Page 157

1  Q.  And as of the opinions you've formed as
2  of today, if you had other opinions, they'd be in
3  your report?
4   A.  Yeah; I -- I wouldn't come up with any
5  new theories today, if that's what you are asking
6  me.
7   Q.  Or --
8   A.  Or -- or since I wrote the report.
9   Q.  Perfect.
10  A.  Good.  Shazam.
11  Q.  Did you recommend to Plaintiffs' counsel
12 that they reach out and talk to Roger Claypool?
13  A.  No.
14  Q.  Did you have any discussions with them
15 about what you believed Roger Claypool knew?
16  A.  I told them -- yeah; I di -- I told counsel
17 what Roger Claypool's job function was as I knew
18 it, which was not to manage the product liability
19 lawsuits, as you couched it.
20  Q.  Well, I'm not sure I've ever couched it,
21 but. . .
22  A.  Okay.  You're not sure, either.
23  Q.  Be -- be that as it may, you were aware
24 that was involved in defense of product liability
25 lawsuits as part of his duties?

Page 158

1   A.  I -- I have no knowledge of him doing a
2  damn thing with respect to defense of product lil --
3  liability lawsuits, other than what I asked him to
4  do when hired by counsel.  At -- what I would ask
5  Roger to do, because he seemed to be the go
6  between betw -- between the SFA, which was the
7  Kansas City operation, and whoever else in that --
8  in the Shinn Fu family would have a meaningful
9  answer to the question I asked.
10  Typically, I would ask:  Can I get -- if it was
11 germane, I would ask for things like drawings,
12 quality control records, look up the serial number,
13 send me the -- is the -- is Shinn Fu ISO 9000
14 approved, what's the structure of Shinn Fu, who
15 works for who, how did this work, how the hell did
16 the Republic of China people ever get to do
17 business in the People's Republic of China, and
18 found out it was through -- through a Canadian
19 connection.  And those are the kinds of things I
20 had discussions with Roger about.
21  Q.  Anything else that you had discussions
22 with him about?
23  A.  Oh.  He and I talked about products in the
24 industry because we'd -- we would see each other
25 at shows.  And we would see each other in the

Page 159

1  PALD Committee, of course, and we'd talk about
2  PALD issues at that time.  Typically, Roger knew --
3  knew, pretty much, who made what brand names
4  in -- in what arena.  And I've called Roger from
5  time to time on subsequent cases I've had for
6  other similar devices to what Shinn Fu makes to
7  see if Roger knows who the hell makes this.  And
8  sometimes he knows; sometimes he doesn't.
9   MR. BROWN:  All right.  You guys need
10 to pack up?
11  MR. SPEAKER:  Yep.
12  MR. BROWN:  Sorry; we need to take a
13 brief break, while we. . .
14  THE VIDEOGRAPHER:  Stand -- stand by,
15 please.  Time is 3:14 p.m.  We're going off the
16 video record.
17 [WHEREUPON, a brief recess is taken.]
18 [WHEREUPON, Mr. Chaykin and Mr. Roberts exit
19 the proceedings.]
20  THE VIDEOGRAPHER:  Okay.  We are
21 back on video record.  Time is 3:25 p.m.  You may
22 proceed.
23  MR. BROWN:  I don't really have a whole
24 lot more, just in case, Erica, or anybody wants to
25 know.

Page 160

1   MR. EDINBURGH:  Famous last words.
2   THE WITNESS:  That's --
3   MR. EDINBURGH:  He said two hours
4  ago.
5   THE WITNESS:  -- that's what they say
6  before they get to the good stuff.
7   MR. BROWN:  Yeah.
8  BY MR. BROWN:
9   Q.  Can you take up the photo again --
10  A.  Yeah.
11  Q.  -- Exhibit 4 I think it was --
12  A.  Yep.
13  Q.  -- or 3?
14  A.  Yep.
15  MR. EDINBURGH:  4.
16 BY MR. BROWN:
17  Q.  Exhibit 4.
18  A.  M-hm.
19  Q.  And you have circled that framing member
20 underneath the engine --
21  A.  Yes.
22  Q.  -- as --
23  A.  Yes.
24  Q.  -- the most logical place to have put the
25 jack stand?

Page 161

1  A.  Yes, sir.
2  Q.  And that's because it's the most solid
3  place here?  I mean --
4  A.  Yes, sir.
5  Q.  -- if we look outboard of it, it's really part
6  of the suspir -- the suspension --
7  A.  The suspension.
8  Q.  -- of the tire it would move?
9  A.  Correct.
10  Q.  Inward we actually have the crank case of
11  the vehicle?
12  A.  Yes.
13  Q.  If we tried to go much forward of that
14  brace, you're actually into the tie rods and
15  suspension of the car again; right?
16  A.  Well, and further than that, the -- this --
17  this structural member actually has a radius on it.
18  Then you can't -- you'd want to stay away from
19  that radius.
20  Q.  All right.  Do the instructions that come
21  with jack stands suggest that it's acceptable to
22  use only one?
23  A.  No.
24  Q.  Is standard practice to use two?
25  A.  Well, standard practice is -- is in the eye

Page 162

1  of the beholder.  I mean, people use jack stands
2  for other than working on their automobile.
3  Q.  Would you hold up in au -- front of an
4  automobile with one jack stand and get under it?
5  A.  No.
6  Q.  Would you consider that to be risky?
7      MR. EDINBURGH:  Objection.
8  A.  I -- I -- I would not get under a -- a -- a
9  car, no matter what, at this age and physical
10  condition.
11  BY MR. BROWN:
12  Q.  At a different age and physical condition,
13  did you ever get under cars yourself to work on
14  them?
15  A.  Yes.
16  Q.  Would you use jack stands?
17  A.  No; I used a bumper jack.  Talk about
18  crazy.
19  Q.  Would you go under the car with only the
20  bumper jack on it?
21  A.  I did.
22  Q.  My dad --
23  A.  Let's put --
24  Q.  -- would've fired you so fast.
25  A.  Well, I -- I --

Page 163

1  Q.  How old were you then?
2  A.  -- I was in high school.  I was putting a
3  cut out in a  47 Ford convertible, so other than -- I
4  could bypass the muffler.  Ended up getting a
5  piece of rust in my eye -- stuck in my -- embedded
6  in my eyeball, so I had to go to the doctor and get
7  it removed.  So I learned my lesson.
8  Q.  And you didn't use safety glasses --
9  A.  Use --
10  Q.  -- either, I assume?
11  A.  -- safety, no.
12  Q.  Do you believe it's safe to use one jack
13  stand to hold up the front end of a car, such as a
14  BMW 325?
15  A.  Under certain conditions, yes.
16  Q.  What are those conditions?
17  A.  Positive engagement, a solid contact
18  point, proper positioning relative to what's
19  available underneath the vehicle, and assuring
20  yourself that you didn't have false engagement.
21  Q.  So you would advise --
22  A.  And --
23  Q.  -- some --
24  A.  -- and that -- and that the surface from
25  which you were lifting was hard and flat, and level

Page 164

1  would be helpful.  And of course, the question of
2  hard is always amazingly interpreted.
3  Q.  Soft?
4  A.  Well, people lift -- put a jack stand on
5  asphalt, which I would not recommend.  But I
6  certainly am comfortable with concrete.  And,
7  actually, I had a case for Shinn Fu where they put
8  the jack stand on caliche, c-a-l-i-c-h-i [sic].
9  Q.  In your opinion, if it was on a flat, hard
10  enough surface, and you knew there was no false
11  engagement, you would tell somebody they were
12  fine to use one jack stand?
13  A.  No; you asked me what I would do.  I
14  wouldn't tell anybody to do anything but follow the
15  instructions.
16  Q.  Okay.  The instructions say that safe
17  practice is to use two jack stands; correct?
18  A.  Yes, sir.
19      MR. EDINBURGH:  Objection.
20  A.  Yes, sir.
21  [WHEREUPON, off-the-record remarks are
22  made.]
23      MR. BROWN:  Some of these are really
24  good questions Steve wrote.  They're really good
25  questions, Erica, but I don't need to ask them.

Page 165

1  Just wanting you to know.
2      MR. EDINBURGH:  I -- I -- yeah, I -- I
3  would concur that Steve asks very decisive
4  questions.
5      MR. BROWN:  Very good.
6      MR. EDINBURGH:  But don't tell him I
7  said that.
8      MR. BROWN:  All right.  He's going to
9  read this.  He's going to find out.
10     MR. EDINBURGH:  Delete that from the
11 record.
12     MS. TROTTA:  Don't worry.  I'll tell him.
13 BY MR. BROWN:
14  **Q.   Your opinions are about the jack stand;**
15 **correct?**
16  A.  Yes.
17  **Q.   You didn't study and make conclusions**
18 **about the hydraulic jack that was in the family**
19 **garage; correct?**
20  A.  There was no issue with the hydraulic
21 jack, to my knowledge.
22 [WHEREUPON, off-the-record remarks are
23 made.]
24 [WHEREUPON, a brief recess is taken.]
25     THE VIDEOGRAPHER:  Stand by, please.

Page 166

1  Time is 3:34 p.m.
2  We are back on video record.  Go ahead, please.
3  BY MR. BROWN:
4  **Q.   In the various test procedures that Glenn**
5  **did trying to get the loaded tooth -- tooth**
6  **engagement to disengage --**
7  A.  M-hm.  Yes.
8  **Q.   -- in every instance when disengagement**
9  **was succeeded, did the ratchet bar go all the way**
10 **to the ground?**
11  A.  No.  Sometimes it does; sometimes it
12 doesn't.  We made no statistical analysis, but I
13 will say to you that it -- that sometimes it does and
14 sometimes it doesn't, is all I can say.
15 [WHEREUPON, off-the-record remarks are
16 made.]
17 BY MR. BROWN:
18  **Q.   Do you think Christian hit the handle on**
19 **the jack stand or it was just him pulling on the**
20 **wrench that was attached to the drain plug that**
21 **caused the disengagement you believe happened?**
22  A.  I mean, I don't know.  But I'm a mu -- but
23 I ha -- in my head, it's more likely that -- that it
24 was pulling on the wrench to get that extra last bit
25 of yank to tighten the drain plug.  And the way I

Page 167

1  account of the jack stand being reported as being
2  tipped over with the saddle retracted is that
3  Christian hit it subsequent to the weight of the
4  vehicle being transferred to his body in some sort
5  of an involuntary movement of his right leg.  And
6  that's best I could do, right, because there's so
7  much finite detail that we really don't know about
8  where things were placed and so on.
9  **Q.   And what things did you just have in mind**
10 **when you're saying so much detail we don't have**
11 **[sic] where things were placed; are you talking**
12 **about the jack stand?**
13  A.  Well, yeah, I'm talking about the jack
14 stand.  I don't know whether it was all the way
15 forward, which would've made it fully ex -- or
16 closer to fully extended, or all way back, where it
17 would've been just extended just a little bit.
18  **Q.   You have any kind of opinion or estimate**
19 **of how high the vehicle was in the air at the time?**
20  A.  Not really, other -- other than the -- the
21 Fred's -- Mr. Klorczyk's testimony about there was
22 clearance between the break rotor and the -- and
23 the tire.  But we didn't reconstruct -- try to
24 recon. . .
25     THE WITNESS:  Can you hear me or not?

Page 168

1      THE REPORTER:  [no audible response]
2  A.  We didn't try to reconstruct the -- the --
3  the -- the set up to that degree.
4  BY MR. BROWN:
5  **Q.   Well, and -- and I'm asking before the car**
6  **came down, not when it was resting on him, but do**
7  **you have any estimate of whether it was in the**
8  **front or the back, exactly how high it was?**
9  A.  No; I have no idea.  Well, I shouldn't
10 have said I have no idea; I -- I -- I would estimate
11 that it was between. . .
12     MR. EDINBURGH:  Now he's got the
13 blower.
14     MR. SPEAKER:  Sorry.
15     MS. TROTTA:  Just keep going.
16     MR. BROWN:  What?
17     MS. TROTTA:  Just keep going.
18     MR. BROWN:  Okay.
19  A.  I would estimate -- well, I was going to
20 finish the answer to my question.  I would estimate
21 it was, you know, between the two parameters,
22 however the jack stand would've been all way
23 forward or how -- where it would've been all the
24 way back.  So that's why we tested it at both ends
25 of the spectrum to try to cover the bases, so to

Page 169

1 speak.
2 BY MR. BROWN:
3   Q.  [examines document] All this room I have
4 now. [examines document]
5   Well, let me ask you this:  And as you
6 continued doing testing with the one jack stand
7 that's been produced here today for ex --
8 inspection, did you take any photographs or
9 measurements or anything after every time you did
10 tests with it to document these changes in
11 deformations which ended up occurring to the jack
12 stand?
13   A.  No.  All you have to do is look at the ti --
14 at the tooth tips.
15   Q.  And, as we see it here today, it's been
16 used in numerous lab tests and lab tests going up
17 to 1900 pounds on the press and then tests under
18 Fords and then tests under BMW automobiles;
19 correct?
20   A.  No; it was never under the Ford.
21   Q.  What was under the Ford?
22   A.  One of -- I presume one of Glenn's jacks
23 or the -- or the other one that was furnished to me,
24 which is not the -- is not the same design.
25   Q.  Do you know that for sure?

Page 170

1   A.  No; but there would've been no reason to
2 put the -- test jack under the Ford because
3 they weren't testing it under the Ford.  He was
4 trying to figure out how to make this test set up.
5   Q.  Do you have any opinions about what kind
6 of damage is done by false engagement, as you
7 define it, and release of that false engagement?
8     MR. EDINBURGH:  Objection.  Did
9 damage to the stand itself are you --
10     MR. BROWN:  Yeah.
11     MR. EDINBURGH:  -- talking about.
12     MR. BROWN:  Damage to the stand itself.
13   A.  Yeah; I -- I've explained it a couple times
14 to you already, is that the -- the tooth tips, due to
15 the contact stresses, get hardened, smoothed, and
16 burnished.  I mean, you look at the -- you can see
17 the teeth, both at the high end and low end, where
18 we tested it, the tooth tips are shiny in those
19 areas.
20   And again, as I said earlier already a couple
21 of times, it makes it hard to -- to achieve false
22 engagement when they are in that condition.
23     MR. BROWN:  [examines document] I'm
24 going mark this as whatever we're up to.
25     THE REPORTER:  7.

Page 171

1 [WHEREUPON, document referred to is marked
2 Exhibit 7 for identification.]
3 [WHEREUPON, off-the-record remarks are
4 made.]
5     MR. EDINBURGH:  This is Exhibit 7?
6     THE REPORTER:  M-hm.
7     MR. EDINBURGH:  Thank you.
8 BY MR. BROWN:
9   Q.  Showing you Exhibit 7.  It's Bates
10 stamped C -- C -- K-l-o-r-c-z-y-k 003330.
11   A.  Through 3374?
12   Q.  Through 3375.
13   A.  75.  Oh.  I missed the last page.  Okay.
14   Q.  And the first page is an email from you,
15 Rick, to Glenn; is that right?
16   A.  [examines document] Yes, sir.
17   Q.  This is when you asked them to measure
18 the handle excursion on the --
19   A.  Right.
20   Q.  -- exemplar stand?
21   A.  Right.
22   Q.  And these pages are the measurements
23 he did that follow?
24   A.  [examines document]
25   Q.  Drawings with measurements --

Page 172

1   A.  Well --
2   Q.  -- put on?
3   A.  -- yeah.  Yes.  The short answer is yes.
4 And I'm going unclip this, if that's okay.
5   Q.  Go ahead.  Get it right order.
6   A.  That -- that's true of the first four pages.
7 And then there's another -- well, here's a repeat of
8 the same email.  And then it looks like a repeat of
9 the same few pages, al -- although I'm -- I'm -- I'm
10 not going take time to compare these, but it looks
11 like it's redundant.  And then there's a bunch of
12 photographs.
13   Q.  These drawings that have markings put on
14 them with measurements, is -- is that Glenn's
15 handwriting?
16   A.  Yes.  And then the photographs are the
17 way he did the measurement.  [examines
18 document] And I think they're also redundant,
19 several sets here.
20   And now here's another memo on 3347.  This
21 is the same memo again.  And we're back to
22 more -- more copies of the same thing, and then
23 photographs again.  So what you've got here is --
24 and then there's an -- yet another redundant set it
25 appears, beginning at 3360.  So I don't know why

Page 173

1 all these are here.
2 Q.  Yeah.  And if you go to 3373.
3 A.  3373.  Well, is that a photograph?
4 Q.  Yes.
5 A.  Okay.  My photos don't have any Bates on
6 them, I don't have.
7 Q.  Well, if you go to the back of the packet.
8 A.  Yeah.  Show me photograph, and I -- and
9 I can find it.
10 Q.  It's one of the last pages.
11    MR. EDINBURGH:  The third from the
12 bottom.
13 A.  [examines document] I got to go all the
14 way to the back.  [examines document] Thi -- this
15 one?
16 BY MR. BROWN:
17 Q.  Yeah.
18 A.  Okay.
19 Q.  Do you have any idea what that's a
20 picture of?
21 A.  Well, it's a picture of the exemplar jack
22 stand engaged with, I don't know what, it looks
23 like a rounded surface of some sort.  That's about
24 all I can tell you because -- well, I presume that
25 rounded surface is part of a vehicle.  And since

Page 174

1 the follow on -- oh, hey, there's Bates on these
2 last three -- few copies.  I would conclude that
3 because the -- the next photograph is of the BMW,
4 then that is a -- a location on a BMW, but I don't
5 know where it is.
6 Q.  Yeah.  The next one seems to be a
7 picture taken in the Klorczyk's --
8 A.  Oh.  Wait a minute.  May --
9 Q.  -- garage?
10 A.  -- maybe that -- maybe that is -- no; I
11 don't know what that is, to tell you the truth.
12 Q.  Me neither.
13 A.  I'm beginning to think that maybe these
14 aren't Glenn's photos.  Well, the one in the garage
15 is the -- is a post -- right post-accident
16 photograph.
17 And -- and I don't know what this -- this may
18 have -- be also.  I -- I mean, who knows?  This
19 could be where the fire department put a jack
20 stand for all I know.  You can certainly ask Glenn
21 if he knows what it is.
22 Q.  Okay.
23 A.  Well, he -- well, wait.  Look in -- look in
24 this -- into this post-accident photograph here,
25 there's -- there's the -- there's a jack stand placed

Page 175

1 underneath what loo -- what appears to be the
2 rocker panel of the accident car, and it's certainly
3 the same model jack stand from looking at the
4 picture.  I don't know if it's the identical jack
5 stand or whether this is that jack stand from a
6 different angle.  So I don't think these are Glenn's
7 pictures.
8 Q.  Okay.  But the page after that is where
9 he's answering some of your questions, right,
10 where he's actually --
11 A.  Which page?  Oh.  This -- the written
12 page?
13 Q.  3375 would be the ending Bates numbers.
14 This -- this is --
15 A.  Yeah.
16 Q.  -- Glenn's handwriting?
17 A.  Yes.
18 Q.  And this is where he has seen the -- put a
19 scale --
20 A.  Right.
21 Q.  -- or something to measure underneath
22 jack stands in different positions?
23 A.  Yeah; we -- we -- we have a -- we own a
24 couple of scales that we've used for other cases
25 that we used for this.

Page 176

1 Q.  Okay.
2 A.  So what he's -- what he's giving me
3 there is -- is the -- depending upon -- well, you
4 can read it.  It speaks for itself.
5 Q.  Yeah.
6    MR. BROWN:  [examines document]
7 Well. . . [examines document] We can mark
8 that as 8.
9 [WHEREUPON, document referred to is marked
10 Exhibit 8 for identification.]
11 BY MR. BROWN:
12 Q.  And this is part of your document
13 production.  It's --
14 A.  [examines document] Yes, sir.
15 Q.  -- Bates stamped Klorczyk 003639.
16 A.  Yes.
17 Q.  It looks like somebody has labeled it
18 on --
19 A.  That's my handwriting.
20 Q.  -- the outside in your handwriting --
21 A.  Yeah.
22 Q.  -- "old drawing from Heath files"?
23 A.  Yes.
24 Q.  And how is it that you had this drawing?
25 A.  Well, it must've been from a case I

Deposition of Frederick G. Heath

Page 177

1  handled for Shinn Fu on a jack stand.
2  **Q.  So having told me earlier that you don't**
3  **keep files from old cases, are there sometimes**
4  **when you do keep files?**
5  A.  Well, yeah, there's sometimes when I do
6  keep files.  I keep -- I keep sales brochures and
7  drawings, if I think I'm going to do -- work on
8  similar products in the future.
9  And if I notice there's Bates -- different Bates
10  stamps here, so one has got an SR on it, which
11  probably came from some case where somebody
12  was -- had an SR, and there's -- there's a WFT on
13  the second one, which is Wei Fu Taishan
14  [phonetic].
15  And then there's another Wei Fu and another
16  Wei Fu, another Wei Fu, rest of these appear to be
17  all Wei Fu.  [examines document] Yeah.  Well, wait
18  a minute.  [examines document] Yeah.  It looks
19  like the last one -- well, it's still in sequence, but
20  I couldn't figure out why the font was a different
21  size.  Anyway. . .
22  **Q.  You did have these in your files?**
23  A.  Yes, sir.
24  **Q.  And -- and you used them to at least look**
25  **at and begin to get ideas of something in this**

Page 178

1  **case?**
2  A.  Well, I was looking for the -- the -- how
3  the dimensioning of the parts.  I don't believe I did
4  much with this other than to -- other than to look
5  at them.  And I sent one of them to Glenn in order
6  for him to take the measurements, which I believe
7  was -- well, I don't see it in here.  It would've
8  been the one that has the -- see, there -- if you
9  notice, there's -- on -- on the 3639, the -- the
10  shape of the PALD is different than the shape of
11  the PALD on the 3645.
12  **Q.  Is that something that you took into**
13  **account when you were reaching your own**
14  **conclusions --**
15  A.  Well --
16  **Q.  -- in this --**
17  A.  -- it was --
18  **Q.  -- case?**
19  A.  -- it was just of interest that they had
20  changed the sape -- shape of the PALD for some
21  reason; I -- I don't know what it was.  I mean,
22  wha -- what I tested was what -- what we had,
23  which is what -- what the best of my knowledge
24  and belief was what -- what's involved with the
25  case.

Page 179

1  Now if you look at 3650, which is second one
2  from the rear, that little piece there looks like the
3  feet that they added to the next generation of -- of
4  stands un -- un -- that Sears was selling under the
5  part number.  That little triangle.
6  So this is a mi -- mix and match stuff here
7  that I'm -- found somewhere.
8  **Q.  That's okay.  I don't have any more**
9  **questions about it.**
10  A.  Okay.  Okay.
11  **Q.  And Number 9 is the Shinn Fu Group**
12  **Management Directory 2000?**
13  A.  Yeah.
14  [WHEREUPON, document referred to is marked
15  Exhibit 9 for identification.]
16  BY MR. BROWN:
17  **Q.  Is this something that was in your files?**
18  A.  Yes, sir.
19  **Q.  And why was it in your files?**
20  A.  Oh.  Somebody must've given it to me
21  when I was at -- visited the factory in Taishan.
22  That's all I can conclude.  I don't know where else
23  I would've gotten it.
24  **Q.  Is 2000 about the time you visited the**
25  **factory?**

Page 180

1  A.  I believe it was in 1997, but I'm not
2  positive.  I -- I -- I believe that's the -- the year
3  that my wife and I did the -- our first China tour.
4  MR. BROWN:  I don't have any further
5  questions.
6  MR. EDINBURGH:  Thank you.  I might --
7  THE REPORTER:  Ms. Trotta, do you
8  have any questions?
9  MR. EDINBURGH:  Oh.  I'm sorry.  My
10  apologies.
11  MS. TROTTA:  Yeah.
12  MR. BROWN:  Well you probably --
13  MS. TROTTA:  Good aft --
14  MR. BROWN:  -- would.
15  EXAMINATION
16  BY MS. TROTTA:
17  **Q.  Can you hear me, Mr. Heath?**
18  A.  Sure.
19  **Q.  Good afternoon.  I just have a few**
20  **follow-up questions.**
21  **Do you know Kathy Guerra from --**
22  A.  Su --
23  **Q.  -- Sears?**
24  A.  -- yes; I do.
25  **Q.  And how do you know her?**

Page 181

1  A.  She was on the P-A-L-D Committee with
2  me for many years.
3  **Q.  Okay.  And what --**
4  A.  Until --
5  **Q.  -- do you --**
6  A.  -- you moved --
7  **Q.  -- think of --**
8  A.  -- her to the --
9  **Q.  -- of her --**
10  A.  -- legal department.
11  **Q.  Okay.  And what do you think of her**
12  **reputation?**
13  A.  I'm sorry?
14  **Q.  What do you think of her reputation --**
15      MR. EDINBURGH:  Objection.
16  BY MS. TROTTA:
17  **Q.  -- with --**
18  A.  Reputation with respect to what?
19  BY MS. TROTTA:
20  **Q.  With respect to jack stands and her**
21  **knowledge relative to when she was on the PALD**
22  **Committee?**
23  A.  Well, as it was my understanding that she
24  was in charge of Sears testing when they tested all
25  the products that they bought from the Chinese

Page 182

1  manufacturers.  And to that extent, she ran the
2  test lab.  And I would say that she must've had
3  some capability in doing a good job or Sears
4  wouldn't have kept her in the job and then moved
5  her to the legal department.
6  **Q.  Okay.  How is it your knowledge that she**
7  **got moved to the legal department?**
8  A.  Scuttlebutt.
9  **Q.  How do you base your knowledge on that**
10  **she got moved to the legal department?**
11  A.  Scuttlebutt.
12  **Q.  When you "scuttlebutt," scuttlebutt from**
13  **where?**
14  A.  Oh, idle conversation, either at a trade
15  show or -- or through, gosh, I don't know, maybe it
16  was reading her deposition.  I'm not sure.
17  **Q.  Okay.  When was the last time you spoke**
18  **to Ms. Guerra?**
19  A.  I don't recall; couple years ago, I think.
20  She was a -- a --
21  **Q.  Did you call [phonetic] --**
22  A.  -- she was a -- a -- dog fancier and came
23  to Louisville occasionally for big dog sho --
24  regional dog shows.  And I would always kid with
25  her about we should have dinner or something

Page 183

1  when you're in Louisville, and tried to make it
2  happen but it never happened.
3  **Q.  Okay.  Have you ever been to Sears in**
4  **the Hoffman Estates?**
5  A.  Hoffman Estates Sears, no.
6  **Q.  Okay.**
7  A.  I don't think so.  We may -- we -- I'm just
8  trying to remember if we had a PALD meeting there
9  once.  If we did, tha -- that would've been the
10  circumstances under which I would've been there.
11  But I -- I honestly don't recall.
12      And she had a fellow named Swanson or
13  something like that worked for her, and I think he
14  was on the PALD Committee for short period of
15  time.  I don't know whether he's still with Sears or
16  not.
17  **Q.  Did you ever visit the Sears testing lab, if**
18  **one did exist?**
19  A.  Well, if -- if I did, it was -- it would've
20  been at the time we had a PALD meeting there.
21  And -- and again, my memory is foggy about
22  whether or not that ever happened; I -- I can't
23  recall.
24  **Q.  And while on the PALD Committee could**
25  **you have put on the agenda items that were of**

Page 184

1  **interest to you, such as false engagement?**
2  A.  Ye -- certainly.
3  **Q.  The jackstand.**
4  A.  Well, certainly, as chairman I could.  And
5  I guess any member could request to be put on the
6  agenda, but it would have -- it would have to be
7  approved by the chairperson and the secretary
8  at -- for ASME.  But I don't see any impediment --
9  **Q.  And that --**
10  A.  -- I don't see any impediment for that
11  happening.
12  **Q.  Okay.  And that was never done while you**
13  **were chair?**
14  A.  I am still chair.
15  **Q.  Okay.**
16  A.  No.
17  **Q.  And that's --**
18  A.  No.  I never did it because I'm -- because
19  I'm under a -- the court order not to disclose
20  anything about this case.
21  **Q.  Okay.  Prior to this case, did you ever**
22  **consider putting on the agenda anything about**
23  **false engagement of jack stands?**
24  A.  Prior to this case I was skeptiwil --
25  skeptical of the whole concept.  I am no longer

Page 185

1 skeptical.
2    **Q.   Okay.  And even being skeptic --**
3 **skeptical, you would not think of putting it on the**
4 **agenda to see what other board members might**
5 **have come --**
6 A.  I did not.
7    **Q.   -- to learn or not learn?**
8 A.  I did not.
9    **Q.   And I believe at one point in your**
10 **testimony today you said that you would**
11 **recommend that the individual who was either**
12 **using the jack stands to actually read the manual?**
13 A.  Yes, ma'am.  But you've --
14     MR. EDINBURGH:  Objection.
15 A.  -- got -- you've got to understand that
16 you're talking to an expert witness who is very
17 familiar with the -- the way the legal system works.
18 And I wouldn't recommend to anybody do anything
19 that wasn't in accordance with the recommendation
20 of the manufacturer or some other legitimate
21 authority having jurisdiction.
22 BY MS. TROTTA:
23    **Q.   Okay.  And so you're aware that the**
24 **manual did call for wheel chocks to be used?**
25     MR. EDINBURGH:  Objection.

Page 186

1 A.  Yes.
2 BY MS. TROTTA:
3    **Q.   And are you aware, sir, that wheel chocks**
4 **were not used?**
5     MR. EDINBURGH:  Objection.
6 A.  It's my understanding that wheel chocks
7 were not used.
8 BY MS. TROTTA:
9    **Q.   And the manual also recommends that the**
10 **jack stands be used in pairs?**
11 A.  Yes.
12    **Q.   And is it your understanding, sir, that the**
13 **jack stands were not used in pairs?**
14 A.  Yes.
15     MS. TROTTA:  I have no further
16 questions.
17     MR. EDINBURGH:  Thank you, Erica.
18 Thank you --
19     MS. TROTTA:  You're welcome, Howard.
20     THE VIDEOGRAPHER:  Any further
21 questions?
22     MR. BROWN:  No.
23     THE VIDEOGRAPHER:  Okay.  Stand --
24 stand by and I'll take us off record and end the
25 deposition.

Page 187

1    The time is 4:05 p.m., and this concludes the
2 video deposition of Frederick G. Heath.  We're now
3 going off record.
4 [WHEREUPON, the Video Deposition of
5 Frederick G. Heath concludes at 4:05 p.m.]
6 .
7 .
8 .
9 .
10 .
11 .
12 .
13 .
14 .
15 .
16 .
17 .
18 .
19 .
20 .
21 .
22 .
23 .
24 .
25 .

Page 188

1         C A P T I O N
2    The Video Deposition of Frederick G.
3 Heath, taken in the matter, on the date, and at the
4 time and place set out on the title page hereof.
5    It was requested that the deposition be
6 taken by the reporter and that same be reduced to
7 typewritten form.
8    It was agreed by and between counsel
9 and the parties that the Deponent will read and
10 sign the transcript of said deposition.
11 .
12 .
13 .
14 .
15 .
16 .
17 .
18 .
19 .
20 .
21 .
22 .
23 .
24 .
25 .

### Page 189

```
1         C E R T I F I C A T E
2  STATE OF_____:
3  COUNTY/CITY OF_____:
4       Before me, this day, personally appeared
5  Frederick G. Heath, who, being duly sworn, states
6  that the foregoing transcript of his/her Deposition,
7  taken in the matter, on the date, and at the time
8  and place set out on the title page hereof,
9  constitutes a true and accurate transcript of said
10 deposition.
11      _____
12           Frederick G. Heath
13
14     SUBSCRIBED and SWORN to before me this
15 _____day of_____,
16 2017, in the jurisdiction aforesaid.
17 .
18 .
19 _____    _____
20 My Commission Expires       Notary Public
21 .
22 .
23 .
24 .
25 .
```

### Page 190

```
1         DEPOSITION ERRATA SHEET
2  .
3  RE:   Court Reporting Services, Inc.
4  FILE NO.: 30076
5  CASE CAPTION:  Frederick Klorczyk, Jr. as
6  Co-administrator of the Estate of Christian R.
7  Klorczyk, et al.  v. Sears Roebuck & Co., et al.
8
9  DEPONENT:  Frederick G. Heath
10 DEPOSITION DATE:  March 22, 2017
11 .
12 To the Reporter:
13 I have read the entire transcript of my Deposition
14 taken in the captioned matter or the same has
15 been read to me.  I request that the following
16 changes be entered upon the record for the
17 reasons indicated.  I have signed my name to the
18 Errata Sheet and the appropriate Certificate and
19 authorize you to attach both to the original
20 transcript.
21 .
22 _____
23 _____
24 _____
25 _____
```

### Page 191

```
1  _____
2  _____
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 .
24 SIGNATURE:_____DATE:_____
25 .
```

### Page 192

```
1         CERTIFICATE OF REPORTER
2  STATE OF KENTUCKY AT LARGE:
3     I, CAROLA G. CASON, RPR, Notary Public
4  for the State of Kentucky at Large, do hereby
5  certify that the foregoing was reported by
6  stenographic and mechanical means, which matter
7  was held on the date, and at the time and place
8  set out in the caption hereof and that the
9  foregoing constitutes a true and accurate
10 transcript of same.
11    I further certify that I am not related to any of
12 the parties, nor am I an employee of or related to
13 any of the attorneys representing the parties, and
14 I have no financial interest in the outcome of this
15 matter.
16    GIVEN under my hand and Notarial seal this
17 _____ day of _____, 2017.
18 .
19 My Commission Expires:       Notary Public
20 .
21 SEPTEMBER 27, 2020 _____
22 .
23 Notary ID: 474950
24 .
25 .
```