Page 1

1          UNITED STATES DISTRICT COURT
2            DISTRICT OF CONNECTICUT
3
4   FREDERICK KLORCZYK, JR., as co-administrator of the
5   Estate of Christina R. Klorczyk, et al.
6
7                    PLAINTIFFS
8
9   V.
10          CIVIL ACTION NO. 3:13-CV-00257-JAM
11
12   SEARS ROEBUCK & CO., et al.
13
14                   DEFENDANTS
15   _____
16
17      VIDEO DEPOSITION FOR THE DEFENDANTS,
18         SHINN FU CORPORATION, et al.:
19
20     The Video Deposition of Frederick G. Heath, taken
21   in the above-styled matter at Court Reporting Services,
22   Inc., 6013 Brownsboro Park Boulevard, Suite A,
23   Louisville, Kentucky, on the 14th day of December, 2017,
24   beginning at 10:03 p.m.
25

Page 2

1            A P P E A R A N C E S
2
3   FOR THE PLAINTIFFS, FREDERICK KLORCZYK, JR., as
4   CO-ADMINISTRATOR OF THE ESTATE OF CHRISTINA
5   R. KLORCZYK, et al.:
6     HOWARD S. EDINBURGH, ESQUIRE
7     HERZFELD & RUBIN, PC
8     125 Broad Street
9     NEW YORK, NEW YORK  10004
10
11     BRIAN J. ORTICELLI, ESQUIRE
12     DAY PITNEY, LLP
13     242 Trumbull Street
14     HARTFORD, CONNECTICUT  06103
15
16   FOR THE DEFENDANTS, SHINN FU CORPORATION;
17   SHINN FU COMPANY OF AMERICA, INC.; MVP (HK)
18   INDUSTRIES, LTD; WEI FU (TAISHAN) MACHINERY &
19   ELECTRIC CO., LTD; and SEARS ROEBUCK & CO.:
20     DENNIS O. BROWN, ESQUIRE
21     GORDON & REES, LLP
22     95 Glastonbury Boulevard
23     Suite 206
24     GLASTONBURY, CONNECTICUT  06033
25

Page 3

1          A P P E A R A N C E S (CONT.)
2
3   FOR THE DEFENDANT, SHINN FU COMPANY OF
4   AMERICA, INC.:
5     ARTHUR CHAYKIN, ESQUIRE
6     SHINN FU COMPANY OF AMERICA, INC.
7     10939 North Pomona Avenue
8     KANSAS CITY, MISSOURI  64153
9     [VIA TELEPHONE]
10
11   VIDEOGRAPHER:
12     TIFFANY HAYNIE
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            INDEX TO EXAMINATION
2
3                     PAGE
4   EXAMINATION BY MR. BROWN               7
5
6
7
8            INDEX TO EXHIBITS
9                     PAGE
10   EXHIBIT 1                           7
11   EXHIBIT 2                          16
12   EXHIBIT 3                          42
13   EXHIBIT 4                          46
14   EXHIBIT 5                          64
15   EXHIBIT 6                          64
16
17
18
19
20
21
22
23
24
25

Page 5

1  VIDEO DEPOSITION OF FREDERICK G. HEATH
2  DECEMBER 14, 2017
3  THE VIDEOGRAPHER:  We are now on the
4  video record.
5  My name is Tiffany Haney.  I am the court
6  reporter with Court Reporting Services and the
7  videographer with Court Reporting Services.
8  Today is the 14th day of December 2018 and the
9  time is approximate --
10  MR. BROWN:  No.   17.
11  THE VIDEOGRAPHER:  2017, thank you, and
12  the time is approximately 10:03 a.m.
13  We're at the offices of Court Reporting
14  Services to take the deposition of Frederick Heath
15  in the Matter of Frederick Klorczyk, Jr. as
16  co-administrator of the Estate of Christian R.
17  Klorczyk, et al, vs. Sears, Roebuck and Company,
18  et al pending in the United States District Court,
19  District of Connecticut.
20  Civil Action #3:13-CV-00257-JAM.
21  Will counsel please identify yourselves for the
22  record, stating your name and who you represent.
23  Dennis Brown of Gordon & Reese, representing
24  the defendants through the action.
25  Howard Edinburgh, Herzfeld & Rubin,

Page 6

1  representing Plaintiffs.
2  Brian Orticelli, Day Pitney, also for the
3  Plaintiffs.
4  THE VIDEOGRAPHER:  On the telephone?
5  THE REPORTER:  Mr. -- oh.
6  MR. BROWN:  Arthur, can you identify
7  yourself for the record as present.
8  THE REPORTER:  Did we lose him?
9  THE VIDEOGRAPHER:  Perhaps not.
10  MR. ORTICELLI:  Maybe he --
11  MR. BROWN:  He might have gone mute.
12  He's a party.  He's not an attorney of record, so. . .
13  THE VIDEOGRAPHER:  Oh.  Okay.  Thank
14  you.
15  The notary public and court reporter, Barbie
16  Hennessey, also with the firm Court Reporting
17  Services, will stenographically record the testimony
18  and swear in the witness today.
19  FREDERICK G. HEATH, called on behalf of the
20  Defendants, Shinn Fu Corporation, Shinn Fu
21  Company of America, Inc., MVP (H.K.) Industries,
22  Ltd., Wei Fu (Taishan) Machinery & Electric Co.,
23  Ltd. And Sears, Roebuck & Co., after having first
24  been duly sworn, is examined and testifies as
25  follows:

Page 7

1  EXAMINATION
2  BY MR. BROWN:
3  Q.  Good morning, Mr. Heath.
4  A.  Good morning, sir.
5  Q.  Let me just get this out of the way.  We
6  can get your notice marked as Exhibit 1.  I'm sure
7  you guys need copies.  I have extra if you want to
8  take one home.
9  MR. EDINBURGH:  Yes.
10  Q.  I always have things to carry.  I always
11  feel good when I have less to carry.
12  I'm showing you what's been marked as
13  Exhibit 1, Mr. Heath.  That's your notice of
14  deposition for today.  Do you recognize that?
15  A.  I do.
16  Q.  Have you seen this document?
17  A.  I have.
18  [WHEREUPON, document referred to is marked
19  Exhibit 1 for identification.]
20  Q.  And you are here today as a result of this
21  notice being served?
22  A.  Correct.
23  Q.  And is it correct sir -- well, first let me --
24  you go by Rick?
25  A.  I do.

Page 8

1  Q.  Is it okay if I respond to you today and call
2  you Rick --
3  A.  I prefer it.
4  Q.  -- as I question?
5  A.  Sure.
6  Q.  Okay.  All right.
7  You're here today because of this notice;
8  correct?
9  A.  Correct.
10  Q.  And you have been designated as a
11  rebuttal expert in this matter; is that correct?
12  A.  That's correct.
13  Q.  And just so the record is clear, previously
14  you were designated and
15  provided testimonies as an informative expert?
16  A.  I guess that's true.  I'm not familiar with
17  the nuances of some of the legal terminology.
18  Q.  You and I have met before.
19  A.  I'm serving as an expert for the plaintiff.
20  Q.  Sir, you and I met before on this case;
21  correct?
22  A.  Absolutely.
23  Q.  And that was after you rendered an expert
24  report?
25  A.  Correct.

**Page 9**

1  Q.  Okay.  And you were deposed about that
2  report?
3  A.  I was.
4  Q.  Okay.  And did you give an updated CV in
5  connection with this report?
6  A.  I did.
7  Q.  Well let's go through those for a little bit.
8  Steve has a 9A, B, C, D.  It doesn't look like fun at
9  all.
10  A.  You lost me there somewhere.
11  Q.  That's all right.  There's no question
12  pending.
13  A.  Okay.
14  Q.  Do you have any particular education or
15  experience related to the field of accident
16  reconstruction?
17  A.  Most of the cases I'm involved with, I end
18  up doing a reconstruction. Yes, sir.
19  Q.  And do you consider yourself to have done
20  a reconstruction in this case?
21  A.  Yes.
22  Q.  Now, in giving your rebuttal report, was
23  your methodology to refute Jim Sprague's opinion,
24  or to offer your own competing accident
25  reconstruction to show what you believe are the

**Page 10**

1  faults in his methodology, or both?
2  At this point, you believe you know what
3  happened.
4  A.  I believe that in considering the evidence
5  before me that I have reviewed and the work that I
6  have done on the product at issue that it's more
7  likely than not that my reconstruction reflects the
8  events that took place in the Klorczyk garage on the
9  date of the incident.
10  Q.  And can you -- run through for me what
11  evidence it is that has informed your reconstruction
12  of those events.
13  A.  The testimony of those responders, plus
14  the various documents that are more particularly
15  described in my earlier report and my current
16  report.  And my extensive background and
17  experience in the automotive service tool industry,
18  and my education and experience, more particularly
19  described in my CV.
20  Q.  When you say, "testimony of responders,"
21  who are you referring to?
22  A.  Well, the first responders were Fred
23  Klorczyk, Sr., the father, and Lynn Klorczyk, the
24  mother of the decedent.
25  Then there were other responders; emergency

**Page 11**

1  medical services people, fire department, police
2  department and a fellow named Houseman, who, I
3  believe, is an EMS person who happens to live
4  close by.  I believe he was one of the first
5  non-family responders on site.
6  Q.  And when you're using the word,
7  "responder" in this context, I want to be clear
8  because I'm used to first responder meaning
9  policemen, firemen, EMT.  You just mean a person
10  who was there?
11  A.  Yes, sir.
12  Q.  Now, I have your transcript from your last
13  deposition so we can refer to it if we need to.  You
14  previously testified there was no physical evidence
15  of a jack stand use.  Does that sound familiar?
16  A.  Well, that was in the evidence of a jack
17  stand being there.  I think you asked me if -- was
18  there -- do I know if a jack stand -- I don't know
19  how you asked me.  My -- my deposition -- earlier
20  deposition question and response will speak for
21  itself.
22  Q.  Okay.  Since -- and understand the
23  distinction I'm making between physical evidence
24  and testimony -- testimonial evidence.  Since that
25  deposition, has any physical evidence come to your

**Page 12**

1  attention that a jack stand was actually in use that
2  day?
3  A.  No.
4  Q.  At this point, your opinions in that regard
5  are based primarily on the testimony of Mr. and
6  Mrs. Klorczyk?
7  A.  And Mr. Houseman.
8  Q.  In your mind was the -- I'm sorry, this
9  chair just -- that's a little better.
10  A.  You don't want to fall over backwards.
11  Q.  No.  In your mind and reconstruction of the
12  events, was the pump jack helping hold the vehicle
13  at the time of the accident?
14  A.  No.
15  Q.  So in your -- well, let me ask you this.
16  Based on your auto service tool industry experience
17  and personal experience and education, is it safe to
18  use one jack stand by itself?
19  MR. EDINBURGH:  Objection.
20  A.  I think we covered that pretty thoroughly in
21  my first deposition.
22  BY MR. BROWN:
23  Q.  I think I can ask the question.  You've
24  made your objection.  I'm trying to set up a train of
25  thought, so. . .

Page 13

1    MR. EDINBURGH: Just -- just know that I
2  think it was covered and asked beyond the scope of
3  rebuttal. He can answer.
4    A.  It can be safe. It depends on the
5  circumstances.
6  BY MR. BROWN:
7    Q.  Would it be safe to use a pump jack as the
8  sole source of support?
9    MR. EDINBURGH: Objection, same --
10  same grounds. Previously covered beyond the
11  scope of rebuttal.
12    THE VIDEOGRAPHER: Can we please
13  take a break for a moment?
14  [WHEREUPON, a brief recess is taken.]
15  BY MR. BROWN:
16    Q.  Well, let me ask you this, Rick. While you
17  identify them as first responders, do you believe
18  that Mr. and Mrs. Klorick -- Klorczyk were objective
19  observers of events they came upon their son
20  in the garage?
21    A.  I think they paid attention to the
22  circumstances and did their -- their best on -- on
23  the multiple depositions that were -- they -- they
24  delivered to explain what the conditions that they --
25  as they found them.

Page 14

1    Q.  And you are aware that they have given
2  some inconsistent testimony; aren't you?
3    A.  Yeah. Doesn't everybody?
4    Q.  And -- well that's a nice editorial
5  commentary. I think it would probably be more
6  appropriate for the circumstances if you'd restrain
7  from that and answer the question I asked you.
8    Q.  Would you read the question back?
9    THE VIDEOGRAPHER: Sure. And you are
10  aware that they have given some inconsistent
11  testimony; aren't you?
12    A.  Yes.
13  BY MR. BROWN:
14    Q.  Now you made an editorial comment that
15  everybody gives inconsistent testimony. Have you
16  given inconsistent testimony?
17    A.  My experience is, it's not unusual.
18    Q.  And in your experience is it usual to have
19  a witness admit that he made false statements
20  about an accident after the fact?
21    MR. EDINBURGH: Objection.
22    A.  I don't know.
23  BY MR. BROWN:
24    Q.  Are you aware that Mr. Klorczyk has
25  admitted that he made statements about this

Page 15

1  accident and the scene he came upon that he now
2  admits were false?
3    MR. EDINBURGH: Objection.
4    A.  Were they false or incorrect?
5  BY MR. BROWN:
6    Q.  I can't make a distinction between false or
7  incorrect. I am not accusing him of lying, I'm
8  asking if --
9    A.  It sure sounds like it to me.
10    Q.  -- the statements he made were false or
11  incorrect.
12    MR. EDINBURGH: Objection.
13    A.  I believe he admitted making incorrect
14  statements.
15  BY MR. BROWN:
16    Q.  He, in fact, claimed there were two jack
17  stands being used; didn't he?
18    MR. EDINBURGH: Objection.
19    A.  I don't recall. His testimony will stand on
20  it's own two feet.
21  BY MR. BROWN:
22    Q.  When you considered the testimony of the
23  various people who were there that day; Mr.
24  Houseman, the Klorczyks, did you give any different
25  weight to the more objective professional

Page 16

1  responders or to the Klorczyks?
2    MR. EDINBURGH: Objection as to form.
3    A.  I considered the circumstances under
4  which the observations were made by both of those
5  classes of people and established tendered
6  conclusion in my own mind as to what was the more
7  likely course of events.
8  BY MR. BROWN:
9    Q.  In connection with your report, you
10  produced some time records; does that sound
11  familiar?
12    A.  Of course.
13    MR. BROWN: Let's mark this as Exhibit 2.
14    Q.  Let me show you what's been marked as
15  Exhibit 2.
16  [WHEREUPON, document referred to is marked
17  Exhibit 2 for identification.]
18  BY MR. BROWN:
19    Q.  Do you recognize these as the time
20  records you produced?
21    A.  I believe so.
22    Q.  And is this the time that Heath and
23  Associates incurred in preparation of this rebuttal
24  report?
25    A.  Well, part of it is.

**Page 17**

1  Q.  What part of it is not?
2  A.  Well, the time reports will speak for
3  themselves as to what was being accomplished.  Are
4  we missing a record?
5  Q.  Well, if there's some portion of this that
6  doesn't refer to work on the rebuttal report, you
7  could identify that for the record, yes.
8  A.  Okay.  Shall I refer to the Bates numbers
9  at the back here?
10 Q.  That would probably be most useful.
11 A.  Okay.  Well, there was no work on the --
12 on the rebuttal report.  Well, I mean -- this is a
13 question that has no particularly accurate answer.
14 All of this work was done in preparation of
15 understanding Mr. Sprague's position and then
16 preparing our own approach to doing a
17 reconstruction.  Only part of it was done physically
18 working on preparation of a rebuttal report in terms
19 of developing the text.
20 Q.  Does it all relate to the rebuttal report?
21 A.  It all relates to understanding the position
22 of Mr. Sprague and preparing a rebuttal report
23 which included a reconstruction.
24 Q.  Do you consider this all time that was
25 incurred in relation to your retention as a rebuttal

**Page 18**

1  expert in this case?
2  A.  Yes.
3  Q.  And go ahead and look -- look at all the
4  pages, make sure.  You seem to think there was
5  something there.  You're confident.
6  A.  Yes.  Okay.
7  Q.  The first few pages are hand written time
8  entries?
9  A.  Yes, sir.
10 Q.  Is that your hand writing?
11 A.  It is.
12 Q.  And those would be your personal time
13 entries?
14 A.  Yes.
15 Q.  And the second group of pages have typed
16 up entries?
17 A.  Yes.
18 Q.  Those all -- all appear to be the entries
19 from Mr. Glenn D. Felpel?
20 A.  That's correct.
21 Q.  Can you remind me who Glenn D. Felpel
22 is?
23 A.  One of my associates.
24 Q.  If you look at Mr. Felpel's --
25 A.  Which page number?

**Page 19**

1  Q.  It ends with 6460, Klorczyk 006460.
2  A.  Got it.  Got it.
3  Q.  I was just looking, for example, 9/21 the
4  conference call was R. H.
5  A.  Yes.
6  Q.  Is that you?
7  A.  That's me.
8  Q.  H. E.?
9  A.  That would be Howard Edinburgh.
10 Q.  B. O.?
11 A.  That would be Bryan Orticelli.
12 Q.  Discussed reconstruction 1.5 hours?
13 A.  Yes.
14 Q.  Now if we can go to the page that's Bate
15 stamped 6457 -- Klorczyk 006457?  And Klorczyk is
16 spelled K-l-o-r- --
17 A.  I know how to spell it.
18 Q.  -- c-z-y-k.  It's for the court reporter.
19 A.  I can spell that one -- oh, I'm sorry -- in
20 my sleep.
21 Q.  That's -- that is for her to have the record
22 clean.
23 A.  That's why they called him F.K.  I'm
24 sorry.  57, okay I'm on 57.
25 Q.  Do you have a time entry for 9/21?

**Page 20**

1  A.  I do indeed.
2  Q.  And it's .25 hours; correct?
3  A.  Yes.
4  Q.  And you have it as a conference with
5  Howard?
6  A.  Yes.
7  Q.  Were you part of this call on that date, do
8  you know, with Howard and Bryan and Glenn?
9  A.  I don't believe so.
10 Q.  All right.  This would have been a different
11 conference call?
12 A.  I believe so.  I mean that's the conclusion
13 I would come to by the time sheets.  Do I have a
14 specific recoll -- recollection of last note of
15 September's phone call?  No.
16 Q.  And if we can go to the Klorczyk 006459
17 page?
18 A.  Okay.
19 Q.  Glenn indicates, if you look at 10/20/17 --
20 A.  Yes.
21 Q.  -- he was working on const --
22 reconstruction for 2.25; do you see that?
23 A.  I do.
24 Q.  And if you go back to 6456, which is your
25 time sheet --

Page 21

1   A.  Yes.
2   Q.  I believe you have no time for that day; is
3   that right?
4   A.  Oh, I'm sure I had no time for that day if
5   it's not on here.
6   Q.  So you wouldn't have been present when
7   Mr. Felpel was doing this work?
8   A.  Mr. Felpel is in Powell, Tennessee and I
9   am domiciled in Louisville, Kentucky and Mr. Felpel
10  and I spend our lives on the telephone.  I direct his
11  activities in -- in what he does.  That's where the
12  exemplar vehicle is housed and he has a shop with
13  a voluminous amount of industrial equipment.
14  Q.  Well, when you do have telephone
15  conferences with Mr. Felpel, you both write time
16  down?
17  A.  Sometimes.  Depends how long the phone
18  call was, is it worth making a record of it or not?
19  Q.  So your testimony is your time records are
20  not complete and accurate as to involvement in this
21  case?
22      MR. EDINBURGH:  Objection.
23  A.  As to the minutes and the seconds, no,
24  they're not.
25  BY MR. BROWN:

Page 22

1   Q.  Okay.
2   A.  I round everything off to the quarter of an
3   hour.  Probably like you do on your time sheets.
4   Q.  Oh, we all wish they'd let us round off to
5   a quarter of an hour.  I used to be at a law firm like
6   that.
7       MR. EDINBURGH:  See what it got you.
8       MR. BROWN:  Well, I know what it got
9   them.  Bankruptcy.
10  BY MR. BROWN:
11  Q.  And again on 10/21 Mr. Felpel shows he
12  had forter -- a quarter hour?  I don't see any entry
13  on your time sheet.
14  A.  Well -- well, it's the same answer.
15  Q.  You've got quite a lot of those.
16  Did you ever go down to Powell, Tennessee for
17  any of this testing?
18  A.  Powell, Tennessee is right on the way to
19  my house in Asheville, North Carolina.  I visit
20  there, but on my way to Asheville and back from
21  Asheville -- by wife lives in Asheville, North
22  Carolina, I live in Louisville.  So I travel to
23  Asheville very frequently.
24  And yes, I stop there on a regular basis.  And
25  yes, I have witnessed the testing performed by Mr.

Page 23

1   Felpel.  He prepares it, does some dry runs, says,
2   "I'm ready."  I go and look at it.
3   Q.  And would there be a time entry that would
4   tell me what day you went and looked at it?
5   A.  Maybe.
6   Q.  Well, can you look and point me that
7   direction?
8   A.  Okay.  Ready?
9   Q.  Yeah.
10  A.  I would say that the likelihood of -- of
11  those events would have been where I show a
12  conference with Mr. Felpel, if it was of significant
13  duration.
14  Q.  And can you point me to a date?
15  A.  Well, here's just an example, here's one
16  on 6457 on 9/4/17, conference Glenn Felpel.  I don't
17  know if I was at -- at Powell then or not, but I'll just
18  point that out as a potential example.  9/28 would
19  be another one, so would 9/24.
20  Q.  Do you have a CV from Mr. Felpel?
21  A.  Probably.
22  Q.  Do you know what -- what his educational
23  background is?
24  A.  Yes.  He's a mechanical engineer and he's
25  professionally licensed in Tennessee.

Page 24

1   Q.  Do you know if he has had any special
2   training in accident reconstruction?
3   A.  Do I know if he's had. . .
4   Q.  Yeah.
5   A.  No.  I haven't had any special training in
6   accident reconstruction either.  I didn't know there
7   was such a thing except in the car crash industry.
8   Q.  When Mr. Felpel is doing testing work for
9   you, does he keep notes?
10  A.  I don't know.  I've asked him to produce
11  everything that we were asked -- been asked to
12  produce.  Whatever he's produced to me, has been
13  produced.
14  Q.  There was some testing done where they
15  hooked up a tie down to the top of a pump jack
16  underneath your BMW that's apparently in Powell,
17  Tennessee and it was pulled out.  We have some
18  pictures we'll go through; does that sound familiar?
19  A.  Yes.
20  Q.  Were you there when any of that testing
21  was done?
22  A.  I don't remember.
23  Q.  Did you come up with the idea of doing
24  that test?
25  A.  Yes, sir.

Page 25

1  Q.  Is there any sort of written protocol or
2  guidance that you provided to Mr. Felpel on how to
3  do that?
4  A.  No.  There was discussion with Mr. Felpel
5  on how to accomplish it.
6  Q.  So there would have been a discussion
7  between the two of you in person  or on the
8  telephone that was his instructions on how to do it?
9  A.  Am I supposed to pick between in person
10 or telephone, or just answer the question as it's
11 posed?
12 Q.  Why don't you take one at a time?  Do you
13 remember discussing it by telephone?
14 A.  Absolutely.
15 Q.  Do you remember discussing it in person?
16 A.  Probably.
17 Q.  Probably is an answer that suggests to me
18 that you can't say you did that for sure.
19 A.  I've already said that I can't remember
20 what was in what conversation, what day, when.
21 Mr. Felpel and I spend on the -- on the telephone on
22 a regular basis discussing how to do this
23 reconstruction.
24 Mr. Felpel had infut -- input and I had input.
25 We came to a conclusion as to what to -- what to --

Page 26

1  how to proceed and then he accomplished it and I
2  witnessed it.
3  Q.  What to do you mean when you say you,
4  "witnessed?"
5  A.  I either witnessed the photographs,
6  depending upon the extent of the undertaking, or
7  witnessed the actual set up in person.
8  Q.  As you sit here today do you have a
9  memory of seeing this actual set up in person?
10 A.  Which one?
11 Q.  The test of pulling the pump jack out from
12 underneath your exemplary vehicle.
13 A.  I believe I did.  I don't believe I saw the
14 pull out, but I saw the set up.
15 Q.  Do you agree with me when you're doing
16 testing it's important to document and record
17 everything you're doing?
18 A.  That's why we took photographs.
19 Q.  You believe photographs are standard and
20 sufficient documentation?
21 A.  Well, in terms of this pull out test we're
22 talking about, the pull out forces were recorded, the
23 set up was set up as described in my report.  It's
24 not rocket science, this was pretty simple.
25 Q.  Who made the decision to put up the tie

Page 27

1  down at the top of the jack?  We'll go through the
2  pictures, but it's actually right up by the cup of the
3  jack; correct?
4  A.  Of course.  That's -- that's where the --
5  any kind of a horizontal force would be applied to
6  the jack.
7  Q.  Now did you do experiments to try pulling
8  on the bottom of the jack, the middle of the jack,
9  different parts of the jack to see if there would be a
10 different result?
11 A.  Well, it's a nonsensical idea because it's
12 like pulling the foot of the ladder out from
13 underneath somebody standing on the ladder.  It's
14 not what -- the way a jack would -- would -- would
15 experience or receive any forces from the
16 automobile.  There's no forces between the floor
17 and the jack
18 Q.  Well --
19 A.  It's nuts.
20 Q.  -- is it possible that there would be a force
21 applied to the bottom portion of the jack that sits on
22 the wheels and the frame?
23 A.  They -- there would -- if there were any,
24 they would be introduced at the -- at the point of
25 contact between the car and the jack.  Period.

Page 28

1  Q.  Actually, the force of the car would be
2  swinging in sort of an arc, I guess, if we measured
3  from the two wheels on the ground, pressing
4  downward; correct?
5  A.  No.  The force -- the force between the car
6  and the jack actually is strictly vertical.
7  Q.  So if it's strictly vertical, then the force --
8  well, the force of it -- let me put it this way.  Am I
9  understanding you to say that the jack puts a
10 vertical force on the car?
11 A.  You could look at it that way because it's
12 an equal and opposite force.
13 Q.  So the car puts a downward vertical force
14 on the jack.
15 A.  Correct.
16 Q.  Then why did you decide to pull
17 horizontally?
18 A.  Because Mr. Sprague said the car pushed
19 the jack from out -- out from underneath the car or
20 the car slid off the jack.  So we wanted to
21 demonstrate what kind of forces would be required
22 to accomplish that.  And as my recollection serves
23 me, they're, like, 450 and 420 pounds which blew
24 Mr. Sprague's idea right out the window.
25 Q.  Well, certainly given your education and

Page 29

1 experience, you seem to have that belief.
2     MR. EDINBURGH: Objection
3 A.  I do, indeed
4     MR. EDINBURGH: Objection.
5 BY MR. BROWN:
6   Q.  That's good.
7   Is the jack that you used for the -- the pump
8 jack that you used for the testing, the same model
9 as the one that was used by the Klorczyks?
10 A.  It's equivalent.  I don't know if it's the
11 exact same model or not, but it raises the same
12 height.
13   Q.  I can't really tell from the pictures.  Did
14 the cup come off of that for these tests?
15 A.  We took it off, yes.
16   Q.  How do you know that?
17 A.  Because that was my instruction to Mr.
18 Felpel and Mr. Felpel confirmed that he did that.
19 And then I actually saw it, and the photographs,
20 best I can tell, would represent that.
21   Q.  Now you have a specific memory of
22 actually seeing it?
23     MR. EDINBURGH: Objection.
24 A.  Well, I don't know if it's from the
25 photographs or in person.  And why would I not

Page 30

1 reproduce -- reproduce the situation as closely as I
2 could in doing a reconstruction?  I mean, the
3 question is nonsensical.  Pardon me, but it is.
4   Q.  What would the measurements of the --
5 what would you call it -- the saddle where the cup
6 goes?
7 A.  Yes.
8   Q.  Is that -- am I getting the language right?
9 A.  You could call it a saddle, sure.
10   Q.  Sure.  We'll say the saddle.
11 A.  Okay.
12   Q.  What were the dimensions of the saddle on
13 the Klorcyzk's jack?
14 A.  I don't know.
15   Q.  What were dimensions of the saddle of this
16 jack?
17 A.  I don't know.  They're roughly equivalent.
18   Q.  Now --
19 A.  Does it make a difference to you somehow?
20 Sorry, I'm not supposed to ask you a question.
21   Q.  That's all right.  Nothing makes a
22 difference.  How's that?
23     MR. EDINBURGH: Objection.
24 BY MR. BROWN:
25   Q.  Now was any care taken and, you know I --

Page 31

1 I've been looking at this, I wondered why I didn't
2 see a picture with a level or something.  How -- how
3 were you sure that you had exactly horizontal
4 pulling force?  Having decided that horizontal
5 pulling force was the way to go?
6 A.  I expect Mr. Felpel would have put a level
7 on the -- on the chain when it was under tension,
8 the chain, or cable, or whatever the heck the
9 picture shows.
10   Q.  There's no picture with the level there is
11 there?
12 A.  No.
13   Q.  Do you know for certain that he put a level
14 there?
15 A.  No.
16   Q.  Did you instruct him to put a level there?
17 A.  No.  Did I say it need to be level?  Yes.
18 Does it look level in the photograph?  Yes.  Am I
19 confident that it was close enough to level to
20 demonstrate the whole concept?  Yes.
21   Q.  And as part of your reconstruction testing,
22 what did you do to consider the possible impact of
23 the pump jack losing one of the retaining clips on
24 the lifting arm?
25 A.  It's totally inconsequential.

Page 32

1   Q.  And why do you believe that it's
2 unconsequential [sic]?
3 A.  Because there's no evidence the axle came
4 out.  The retain -- the fact that the retaining clip
5 isn't there doesn't make any difference.
6   Q.  Well, in fact, are you trying to criticizing
7 [sic] the free use of the word, "crowbar?"  I'm not
8 sure that there wasn't.  Mr. Houseman testified on
9 multiple parts of his deposition that Fred Klorczyk
10 couldn't lift because he was busy trying to put the
11 jack together, didn't he?
12     MR. EDINBURGH: Objection.  It's
13 characterization of testimony.
14 A.  I can't quote you what Mr. Houseman says.
15 Mr. Houseman readily admits he was totally
16 unfamiliar with automotive service equipment and
17 that's why he called the handle of the -- of the --
18 the service jack a crowbar, because that's what it
19 looks like.
20 BY MR. BROWN:
21   Q.  Well, in fact we don't know that that's what
22 he was referring to, do we?
23     MR. EDINBURGH: Objection.
24   Q.  That's your assumption.
25 A.  That is my conclusion.

## Page 33

1  BY MR. BROWN:
2  **Q. If a retaining clip had caused the lifting**
3  **arm to come off, would it have to be put back**
4  **together to lift with the jack?**
5  A. Yes.
6  **Q. If a pump jack alone would. . .**
7  A. Wait a minute. Let me hear that question
8  again, please.
9  **Q. Sure.**
10  THE REPORTER: [reads] If a ra -- if a
11  retaining clip had caused the lifting arm to come
12  off, would it have to be put back together to lift
13  with the jack?
14  A. In answer to your question, yes. There's
15  no evidence that the lifting arm came off. Never
16  mind.
17  BY MR. BROWN:
18  **Q. Do you have anything else you wanted to**
19  **say?**
20  A. Yeah. I have plenty I want to say, but I'm
21  going to -- I'm going to wait for a question.
22  **Q. Well, was there anything else you wanted**
23  **to say is a question, but you don't have to answer if**
24  **you don't --**
25  A. I did answer. I did answer. I said, yes,

## Page 34

1  but I'm going to wait for a question.
2  MR. EDINBURGH: Objection. Objection.
3  BY MR. BROWN:
4  **Q. In the automotive service industry, it is**
5  **considered -- well, strike that. I think we have**
6  **enough of that on the record.**
7  **If a pump jack was being used to hold the**
8  **vehicle up with no saddle --**
9  THE VIDEOGRAPHER: With no what?
10  **Q. With no cup on the saddle.**
11  THE VIDEOGRAPHER: Oh, okay.
12  **Q. It's okay. I misspoke myself. And one of**
13  **the lift arms slid off the post that it goes on, the**
14  **retaining clip sprung off or was missing, could that**
15  **cause the jack to dislodge and come out from under**
16  **the vehicle?**
17  MR. EDINBURGH: Objection.
18  A. You'd have to tell me what's a lift arm.
19  BY MR. BROWN:
20  **Q. Well, you know parts of a jack and the**
21  **names you want to use --**
22  A. I do, indeed know what the name --
23  **Q. What -- what does the retaining clip hold?**
24  A. -- know what a lift arm is. I know what a
25  lift arm is.

## Page 35

1  **Q. What -- what -- what --**
2  A. And the retaining clip you're talking about
3  didn't hold the lift arm.
4  **Q. What did it hold?**
5  A. It held the parallelogram strut that runs
6  the yellow bar, to the best of my understanding,
7  that runs along beside the lift arm. The lift arm is a
8  heavy structural member that actually does the
9  lifting.
10  **Q. If the retaining clip came off and that,**
11  **whatever you want to call it, strut came off the end**
12  **and fell down, could that cause the jack to come out**
13  **from under the vehicle?**
14  MR. EDINBURGH: Objection.
15  A. I don't -- don't know.
16  BY MR. BROWN:
17  **Q. Did you do any tests to see that?**
18  A. No.
19  MR. EDINBURGH: Objection.
20  BY MR. BROWN:
21  **Q. Did you do any tests to refute the**
22  **possibility that that could happen?**
23  MR. EDINBURGH: Objection.
24  A. Why would I do that? I mean the evidence
25  suggests and teaches that the jack was found

## Page 36

1  collapsed, withdrawn -- lowered -- arranged parallel
2  to the side of the automobile with it's handle
3  removed, laying on the floor.
4  BY MR. BROWN:
5  **Q. And the evidence of that is Mr. Klorczyk**
6  **and Mrs. Klorczyk say so.**
7  A. I never saw the jack with -- in any degree
8  of disassembly that you describe in any of the
9  photographs, nobody commented on it. Why would I
10  invent work to do other than the run up a bill for the
11  lawyers that I'm working for, which is
12  unconscionable in my mind.
13  **Q. Well, you do know that the police took the**
14  **jack stand into evidence that day; correct?**
15  A. Yes, sir.
16  **Q. And you do know that as they took that**
17  **jack into evidence, and they gave it back, the**
18  **retaining clip was gone. You know that; don't you?**
19  MR. EDINBURGH: Objection.
20  A. There's testimony that the retaining clip
21  was missing. Is that what you're asking me?
22  I admitted that the testimony indicated the
23  retaining clip was missing. You asked me would
24  that effect the operation of the jack, and I said no.
25  Now you want to invent that maybe some other part

Page 37

1  came off, would that -- would that effect the
2  operation of the jack?  And I'm saying why -- why
3  would I be concerned with that when there's no
4  evidence to suggest it.
5    I mean, I could totally disassemble a jack piece
6  by piece and test it under every circumstance and
7  run up a huge bill just to disprove all the
8  nonsensical charges that you're asking me.
9    **Q.  So Mr. Houseman's testimony that Fred**
10 **was fumbling around trying to use something to pry**
11 **something and was trying to put the jack back**
12 **together, you think that is wholly inconsequential to**
13 **the possibility that the jack may, to some degree,**
14 **have come apart?**
15    MR. EDINBURGH:  Objection to
16 characterization of Houseman.
17   A.  No.  The conclusion I received of reading
18 Mr. Houseman's testimony was Mr. Klorczyk,
19 because the jack was lowered, was trying to get the
20 handle into the jack socket so that he could then
21 raise the jack by placing it under the car and
22 raising the -- raising the car, so that he could get
23 the car off of his son's body.
24 BY MR. BROWN:
25   **Q.  Without going to the original report, we'll**

Page 38

1  **look at your review report in a minute.  You did look**
2  **at the police photos in this case, didn't you?**
3    A.  Yes, sir.
4    **Q.  And those photos of the jack and the**
5  **condition at the time of the accident are part of**
6  **what you considered in reaching your opinions?**
7    A.  The general answer would be yes.
8  Everything I reviewed contributed to my reaching my
9  opinions.
10   **Q.  Was Mr. Felpel an author of any of the**
11 **written part of your report?**
12   A.  No.
13   **Q.  And did he provide you any rough draft or**
14 **anything for your report?**
15   A.  No.
16   **Q.  Did he re -- provide you any written work**
17 **product at all?**
18   A.  Written work -- again, no.  Well, to the
19 extent that he did, we produced it.
20   **Q.  To the extent there's photos included with**
21 **your report?  He took those photos?**
22   A.  Yes.
23   **Q.  And we have sent those to you**
24 **electronically?**
25   A.  Yes.

Page 39

1    **Q.  Do you know if those are all the photos he**
2  **took?**
3    A.  I believe so.
4    **Q.  Do you know for certain?**
5    A.  I'd have to go, no.
6    **Q.  Do you know if he selected certain photos**
7  **to send you?**
8    A.  He sent me the photos that I asked him to
9  take; okay?  Now, did he take several to get one?  I
10 don't know, I would doubt it.  And if he did, my
11 guess is he would have discarded them because he
12 wasn't happy with them.
13   **Q.  So you believe that there could have been**
14 **photos taken during your reconstruction testing that**
15 **were discarded?**
16    MR. EDINBURGH:  Objection.
17   A.  I don't know.
18 BY MR. BROWN:
19   **Q.  Do you instruct Mr. Felpel to keep anything**
20 **written or photographic that he creates in**
21 **connection with this work?**
22   A.  He knows to do that.  He works with me on
23 numerous cases.
24   **Q.  Has Mr. Felpel ever testified in court for**
25 **Heath and Associates?**

Page 40

1    A.  No.  I don't think so.  I can't remember.
2    **Q.  It's your belief that the weight of the**
3  **vehicle was being held by one jack stand when this**
4  **accident occurred?**
5    A.  That's correct.
6    **Q.  And --**
7    A.  Well, and his tires -- the tires that were in
8  contact with him.
9    **Q.  -- the driver's side tires?**
10   A.  Yeah.  Yes.
11   **Q.  Do you have an opinion about the height**
12 **that the jack stand was at?**
13   A.  Yes.
14   **Q.  And is that something you know off the top**
15 **of your head, you need to look that up?**
16   A.  No.  It's in my report.
17   **Q.  Was, in your opinion, the front of the**
18 **vehicle lifted so high that the rear passenger side**
19 **tire would have been lifted off the ground as well as**
20 **the front?**
21   A.  I believe so, but the photographs will show
22 it.  It's all in my report.
23   **Q.  Okay.  We'll get to that.**
24   **And at the time this incident occurred, would**
25 **you agree with me the oil was already in the car?**

Page 41

1   A.  Yes.
2   Q.  So the oil drain plug had previously
3   already been put in?
4   A.  Yes.  Now we went over all of this in my
5   first deposition, ad nauseam.
6   Q.  I don't think you had considered yourself
7   to have done a reconstruction at that point; did
8   you?
9   A.  I had done a mental reconstruction based
10  on the evidence that I had reviewed to that point in
11  time.  Had I done any testing to verify my
12  reconstruction?  No.  That's what I accomplished in
13  the second reconstruction.
14  Q.  So the testing you did in your second
15  reconstruction was aimed at verifying your mental
16  reconstruction from the first time around; do I have
17  that right?
18      MR. EDINBURGH:  Objection.
19  A.  Generally speaking, that's correct and
20  to rebut the -- or to demonstrate, that the
21  reconstruction performed by magic by Mr. Sprague
22  was incorrect.
23  BY MR. BROWN:
24  Q.  You believe Mr. Sprague's methodology
25  was magic?

Page 42

1   A.  Yes.
2   Q.  You're very firm in that opinion.
3   A.  I am.  I see no evidence that he did
4   anything to confirm any of this photographic
5   manipulations.
6   Q.  Let me ask you again, sir.  You seem to
7   like to talk.  At this point, is there anything else
8   that you'd like to put on the record?
9       MR. EDINBURGH:  Objection.
10  A.  I can't thing of anything, but I may -- I may
11  later.
12      MR. BROWN:  Mark this as 3.
13  [WHEREUPON, document referred to is marked
14  Exhibit 3 for identification.]
15  [WHEREUPON, a brief recess is taken.]
16  BY MR. BROWN:  Do you have a copy of that with a
17  Exhibit sticker on it?
18  A.  Yeah, it's here.  You want me to use that
19  one?
20  Q.  I wanted you to have it available to refer
21  to if you need to.  We'll go through it --
22  A.  Okay.
23  Q.  -- in a bit but I have a few more
24  meandering questions you before we got there.
25  A.  Shoot.

Page 43

1   Q.  How high -- strike that.
2   How did you decide how high to pump the car
3   up with the jack when you were doing the testing?
4   A.  You mean for doing the reconstruction?
5   Q.  Yeah.
6   A.  Well, you would want to pump it up as high
7   as the -- as the jack would raise it when placed in
8   the -- the place where Mr. Sprague says it was
9   placed.  We used that height then to determine the
10  false engagement height for the vehicle support
11  stand placed where it's, in my opinion, it was
12  placed.
13  Q.  And what's the basis of your opinion of
14  where it was placed?
15  A.  Well, it's the logical place to place it -- is
16  on the longitudinal engine support beam.
17  Q.  And how did you decide where along the
18  beam you believe the jack stand had been placed?
19  A.  Well, primarily by where would it need to
20  have been for Mr. -- for the -- for the decedent to
21  knock it over after it had collapsed.
22  Q.  And in your mental reconstruction there
23  was a failure of the jack stand and it dropped --
24      MR. EDINBURGH:  Objection.
25  Q.  -- is that correct?

Page 44

1   A.  Yes, sir.
2   BY MR. BROWN:
3   Q.   And after it dropped, then it was kicked over --
4       MR. EDINBURGH:  Objection.
5   Q.  -- by Christian Klorczyk?
6   A.  Yes, sir.
7   BY MR. BROWN:
8   Q.  In your mental and tested reconstruction,
9   is there any weight of the vehicle on the jack stand
10  when it gets kicked over?
11      MR. EDINBURGH:  Objection as to from.
12  A.  No.
13  BY MR. BROWN:
14  Q.  And why is that?
15  A.  Because the weight of the vehicle had
16  been assumed transferred to the decedent.
17  Q.  And did you study how much force it takes
18  to kick over -- knock over, a jack stand with a base
19  the size of the jack stands that the Klorczyk's own?
20  A.  No.
21  Q.  Did you see any evidence in the autopsy
22  photos -- I take it from when you were saying,"kick
23  over," you positioned it where you believe his lights
24  were?
25  A.  I believe I said, "knock over."  I don't know

Page 45

1 whether it was knocked over. It's pretty well
2 described in my report how it got tipped over and I
3 don't know exactly what part of Christian's body
4 knocked it over. It was either his, as I suggested,
5 several parts of his body, or the creeper itself.
6 **Q. The creeper that was under him.**
7 A. Yes.
8 **Q. Well, did you do any test of the various**
9 **forces that were required to tip the jack stand over,**
10 **depending on the height at which those forces were**
11 **applied?**
12 A. The answer is still no.
13 **Q. Now it seems logical to me, and it may not**
14 **to you, but given the base on the bottom of the jack**
15 **stand, force applied an inch above the floor would**
16 **have to be far different than force applied at the**
17 **top of the jack stand, if we're talking about tipping**
18 **it over.**
19 A. Certainly.
20 **Q. Do you think that the creeper hit the top of**
21 **the jack stand to knock it over?**
22 A. No.
23 **Q. Is there any physical evidence on Mr.**
24 **Klorczyk's body or the creeper that's consistent**
25 **with hitting into a jack stand hard enough to tip it**

Page 46

1 **over?**
2 A. I don't know.
3     MR. BROWN: What are we up to, 4?
4 [WHEREUPON, document referred to is marked
5 Exhibit 4 for identification.]
6 **Q. I'm showing you what's been marked as**
7 **Exhibit 4.**
8 A. Yes.
9 **Q. Do you recognize these?**
10 A. I do.
11 **Q. Can you describe for the record what it is**
12 **that we're looking at?**
13 A. My notes from the visit to the Klorczyk
14 home and City Tire Company on the 9th of
15 October 2017. And stuck on the back of those notes
16 are my test results from the reconstruction testing
17 that was performed by Mr. Felpel and myself.
18 **Q. These are measurements of the BMW**
19 **exemplary vehicle and some draft dimensions; is**
20 **that correct?**
21     MR. EDINBURGH: Objection. Talking
22 about 6455?
23 BY MR. BROWN:
24 **Q. Are you looking at 6455?**
25 A. Yes. And I apologize.

Page 47

1 **Q. Okay. Bates number Klorczyk 46006455,**
2 **the last pages of these. This is your hand writing?**
3 A. Yes.
4 **Q. Are these measurements you yourself**
5 **made?**
6 A. These are measurements that were trans --
7 that were communicated to me by Mr. Felpel by
8 telephone.
9 **Q. Do you have any other notes that you made**
10 **relating to your retention as a rebuttal expert?**
11 A. If I do, you've got them.
12 **Q. Okay. Well, the first two pages,**
13 **Klorczyk 006453 and Klorczyk 006454, these are the**
14 **notes you made while you were in Connecticut?**
15 A. I believe I made them in Connecticut. Yes,
16 sir.
17 **Q. And is it your standard practice if you're**
18 **actually engaged in looking at items; meeting with**
19 **people, that you make notes like this?**
20 A. These notes       -- there were likely some
21 hand scribbles on a business card or something that
22 I -- that I took. And I -- from memory, I prepared
23 these notes subsequent to my visit. Now whether I
24 was sitting in the airport waiting to return to the
25 office, or whether it was after I returned to the

Page 48

1 **office, I honestly don't remember.**
2 **Q. Would you have kept the original hand**
3 **scribbles or notes that you prepared this later**
4 **memorization or memorial was prepared?**
5     MR. EDINBURGH: Objection.
6 A. No.
7 BY MR. BROWN:
8 **Q. And we'll go through them later, but you**
9 **took some pictures this day also; is that correct?**
10 A. Yes, sir.
11 **Q. If you could look at your report in Group 3.**
12 **It's dated November 10th, 2017; is that correct?**
13 A. Yes, sir.
14 **Q. Look on the first page. You note that you**
15 **continue to stand by your earlier report; is that**
16 **right?**
17 A. Yes, sir.
18 **Q. On Page 3 you do actually make some**
19 **corrections to your original report?**
20 A. Yes, sir.
21 **Q. In your original report you believe that the**
22 **car was an automatic transmission; is that right?**
23 A. Yes, sir.
24 **Q. Look at the top of Page 3.**
25 A. Okay.

Page 49

1  Q.  We're going to come back to this list.  I
2  was curious about this.  You say Heath and
3  Associates response to the Sprague report he's
4  conducted a laboratory testing?
5  A.  Yes, sir.
6  Q.  What did you mean when you said,
7  "laboratory?"
8  A.  At the facility where we have the
9  equipment to do such testing which is -- would be at
10 Mr. Felpel's place of business in Powell,
11 Tennessee.
12 Q.  If you could look, there's some
13 photographs at the back of your report.
14 A.  Yes.
15 Q.  I mean, for example, if you look at
16 Figure 1.1 or Figure 1.4 they appear to be your
17 exemplar car.  It looks like it's on the cement slab
18 or somebody's patio.  Is that his place of business?
19 A.  Yes, sir.
20 Q.  Then you, I'll have to apologize, because
21 it looks like a condo or something to me.
22 A.  Yes.  It is in -- it is his office.  It was -- it
23 is in a residential neighborhood.  You can't see
24 from this picture his machine's separate out
25 buildings comprising a machine shop and a large

Page 50

1  warehouse area.
2  Q.  So this itself is not a residential building?
3  A.  No.  He has -- he has his office there.
4  Q.  Okay.  He doesn't live here?
5  A.  No.  He lives in Farragut.
6  Q.  I believe behind the vehicle I can see a
7  gas grill, so I was just curious to try to understand
8  how --
9  A.  Oh, I'm sure he's sleeps -- I'm sure he
10 sleeps there from time to time.
11 Q.  Is it all office space inside?  Is this the
12 door to his office space behind the BMW in
13 Figure 1.1?
14 A.  Well, it's in -- it's in a sort of a state of
15 being renovated.  Mr. Felpel's idea is to ultimately
16 move into this residence, but currently his office is
17 here.  His computers, printers and all that good
18 stuff are here.  And on the rest of the property as I
19 already described, his machine shop is there and
20 his warehouse is there.
21 He and his wife life in an -- another suburb on
22 Knoxville, which is on the other side of town.  And
23 he's in the process of renovating this place so that
24 they can ultimately move into this residence.
25 So there's some disrepair in there in terms of

Page 51

1  dwelling, the lower level, he's totally refinished into
2  a new kitchen.  The upper level now he's working
3  on.  And  upstairs there's multiple bedrooms.
4  Q.  So he's got a machine shop and some
5  storage area behind here, but this basically has a
6  kitchen -- bedrooms, and this would be like the
7  patio area?
8  A.  This is a patio in back of his -- yes.  Well,
9  yes.
10 Q.  And is this that you describe as your
11 laboratory?
12 A.  That's what I described as my laboratory.
13 Yes, sir.  I'm sorry if you're disappointed in it.
14 Q.  Did the pump jack you used in your
15 laboratory testing lift to the same height as the jack
16 that the -- Christian Klorczyk was using the date of
17 the accident?
18 A.  To the best of our knowledge and belief.
19 Q.  Did you make measurement to confirm that
20 fact?
21 A.  Yes.
22 Q.  As you were making those measurements
23 again, and maybe this will spark your memory, did
24 you measure the actual size of the saddle?
25 A.  Did not.

Page 52

1  Q.  When you made measurements of the
2  Klorczyk's pump jack, given the age and the use of
3  the jack, did you do anything to make sure the
4  saddle itself, as it sat without the cup on it, was
5  actually horizontal to the floor?
6  A.  You mean parallel to the floor?
7  Q.  Yeah.  Thank you for that question.
8  A.  No.
9  Q.  The pictures I've seen of the Klorczyk's
10 jack it appears that the paint had been scraped --
11 worn off the top of the saddle?
12   MR. EDINBURGH:  Objection.
13 Q.  Does that sound familiar to you?
14 A.  Sure.
15 BY MR. BROWN:
16 Q.  Did your exemplar pump jack have paint on
17 the saddle?
18 A.  I don't know.
19 Q.  Through the emergency responder records
20 we know what the weather was in Connecticut the
21 day of this accident; would you agree with me?
22   MR. EDINBURGH:  Objection.
23 A.  Yes.
24 BY MR. BROWN:
25 Q.  Do you know what the temperature and the

Page 53

1  conditions, the humidity, anything was the day that
2  Mr. Felpel did this testing?
3  A.  No.
4  Q.  Do you know what all kind of equipment
5  Mr. Felpel has available for his work at his location
6  where the pictures were taken?
7  A.  Yes.
8  Q.  Can you give me sort of a rundown on the
9  kinds of equipment he has?
10  A.  No.  It's voluminous.
11  Q.  Anything?
12  A.  He has a totally equipped machine shop,
13  okay?  I mean, you really want me to go through
14  this?
15  A.  Yeah.
16  A.  He has lathes, drilling machines, milling
17  machines, all kinds of hand tools, quality control
18  equipment, Johansen box, micrometers, inside mics,
19  outside mics, anything you'd need in a -- in a
20  typical machine shop in order to produce machine
21  parts.
22     He also has built in the warehouse, a large
23  amount of farm machinery such as tractors, a
24  forklift, an aerial work platform, a Genie boom lift.
25     Oh, gosh.  I mean, I've never taken an

Page 54

1  inventory --
2  Q.  Sure.
3  A.  -- of his warehouse, but it's -- it's very
4  large.  I couldn't give you the dimensions but it's --
5  it's substantial.  It's not like a garden shed , it's a
6  substantial metal building.
7  Q.  Does he -- does he make machine parts for
8  people?
9  A.  He did -- operated a business on his
10  property at one time.  Was a -- he was a small
11  business set aside government contractor.
12  Q.  Do you know the make and model of the
13  pump jack you used in the testing?
14  A.  No.  Not off the top of my head, but from
15  my own knowledge and experience, it was virtually
16  identical to the artifact pump jack, as you want to
17  call it.
18  Q.  Sorry, is there an industry term I should
19  be using?
20  A.  Service jack.
21  Q.  Service jack.
22  A.  M-hm.
23  Q.  My apologies.  My dad always called that
24  particular kind, a pump jack.
25     MR. EDINBURGH:  Voraciously accepted.

Page 55

1  BY MR. BROWN:
2  Q.  To you knowledge, does Mr. Felpel still
3  have this service jack?
4  A.  Of course.
5  Q.  So we could find out the make and model?
6  A.  Sure.
7  Q.  We can get the serial number and -- or how
8  old it is?
9  A.  Perhaps.
10  Q.  And he still has possession of the
11  exemplary vehicle he used?
12  A.  Yes, sir.
13  Q.  And presumably, you could get the VIN
14  number off that vehicle if you went and looked at it?
15  A.  Well, I've got the title in my office in
16  Louisville.
17  Q.  So you could get the VIN number without
18  even calling him?
19  A.  Sure.
20  Q.  Look down, and again, we're on Page 3.
21  It's a list of corrections to your first report?
22  A.  Yes, sir.
23  Q.  Number 2?  States [reads] the jack may or
24  may not have been placed perpendicular to the
25  vehicle for raising the vehicle, depending upon the

Page 56

1  position of the vehicle with respect to ceiling
2  support columns resident in the garage.
3  A.  Do I see that?
4  Q.  Yeah.
5  A.  Yes.
6  Q.  Based on your mental reconstruction and
7  your testing, do you have an opinion as to
8  how -- what's more likely how it was used;
9  perpendicular, 90 degree angle, 45 degree angle?
10  A.  I think it was more likely that it was
11  perpendicular, but since Mr. Sprague seemed to
12  think it was at an angle, we decided to test it at an
13  angle as well.
14  Q.  And the evidence that you have considered
15  in the case, is that reflective of what -- why is it
16  that you think it's more likely that it was
17  perpendicular?
18  A.  I don't think -- why do I think it's more
19  likely?
20  Q.  Yeah.
21  A.  I don't know, just probably that's the way I
22  would have done it.
23  Q.  Again, here you use, "the jack" but we're
24  talking about a service jack here?
25  A.  You can call it whatever you want.

Page 57

1  Q.  I'm trying --
2  A.  When you say, "jack" I know what you're
3  talking about.
4  Q.  Okay.  But when you yourself in this report
5  use the word, "jack", you -- you mean service jack
6  as we've discussed it.
7  A.  Right.
8  Q.  Okay.
9  A.  I shortened it to,"jack" and "stand."
10  Q.  Okay.  So in your report it's," jack" and
11  "stand."
12  A.  Sometimes.
13  Q.  Okay.
14  A.  My report is what it is.
15  Q.  And you have no opinion upon when --
16  where you think the service jack was placed on the
17  vehicle at the time of the accident, because you
18  believe it was not in use; correct?
19  Is that a double negative?  Did I say it right?
20  A.  I'm -- I'm -- I'm not sure.
21  Q.  Can you read that back?
22  MR. EDINBURGH:  Yeah.  I think -- I think
23  I understood it, but let him listen.
24  THE REPORTER:  And you have no opinion
25  of when -- where you think the service jack was

Page 58

1  placed on vehicle at the time of the accident,
2  because you believe it was not in use; correct?
3  A.  Correct.
4  BY MR. BROWN:
5  Q.  Okay.  And Number 4 -- do you see that?
6  A.  Yes.
7  Q.  I won't read it to you.  How's that?
8  A.  Sure.  I see it.
9  Q.  You get impatient when I read to you.
10  A.  Oh, let the excitement continue.
11  Q.  I mean, we talked about this a minute ago.
12  You have opinions about where Mr. Klorczyk's body
13  was under the vehicle; correct?
14  A.  Yes., sir.
15  Q.  Okay.  And you said you believe the jack
16  stand was where it would need to be for his body to
17  knock it over?
18  A.  Well, I didn't say it quite that way, but
19  that's the general idea.
20  Q.  I believe I got the gist, but did the -- you
21  don't identify a particular part of his body that you
22  say did it; correct?
23  MR. EDINBURGH:  Objection.
24  A.  I identified several parts of his body in my
25  report.

Page 59

1  BY MR. BROWN:
2  Q.  Well, why don't you show me that list and
3  we'll talk about those?
4  MR. EDINBURGH:  Page 6.
5  MR. BROWN:  Don't make it easy for the
6  witness, no coaching.  It's appreciated though.
7  MR. EDINBURGH:  I'm trying to help you.
8  MR. BROWN:  I'm teasing.
9  A.  Okay.  It's in the first full paragraph from
10  the bottom.  [reads] The tip over was caused by
11  contact with C. K.'s right knee, thigh, leg, hip, or
12  the creeper.
13  BY MR. BROWN:
14  Q.  Depending on if it was his knee or his hip,
15  that would alter where the stand was; correct?
16  A.  No.
17  Q.  Would it alter your opinion of where his
18  body was?
19  A.  Would it alter my opinion as to where his
20  body was?  I don't believe his body was absolutely
21  fixed when the car fell on him.  I think he was
22  wretching [phonetic] around trying to get the hell
23  out from underneath the car.  Don't ask me how to
24  spell wretch.
25  Q.  I'll leave that to her.

Page 60

1  A.  It's a colloquialism.
2  Q.  I'm just trying to think of another word to
3  use besides that one.
4  A.  Ah, take your time.
5  Q.  To your knowledge, is there any physical
6  evidence that the lower portion of his body was
7  making -- let's say, frantic movements, under the
8  vehicle -- let's say the car came down on his chest.
9  A.  Well, the only evidence I can think of is
10  that I believe his right leg was bent when -- in the
11  photographs of the -- in the medical examiners'
12  office.
13  Q.  So as rigor mortis set in, there was a
14  bend -- a bend in his right leg; is that. . .
15  A.  I think -- it's my understanding.
16  Q.  Do you remember if there were any scrape
17  marks or injuries on his leg?
18  A.  I don't.
19  Q.  His hip?
20  A.  I don't.
21  Q.  Now if you'll look lower down on Page 3 of
22  your report?  It says, "incident reconstruction."  Do
23  you see that section?
24  A.  I do.
25  Q.  Okay.  And you first address the approach

Page 61

1  taken by ESI, Mr. Sprague?
2    A.  Yes, sir.
3    Q.  Okay.  You say here, [reads] "the approach
4  taken by Sprague in performing his reconstruction
5  relies entirely on photographically measured
6  geometric dimensions of the articles involved in the
7  incident, coupled with two theories relating to the
8  author's reconstruction,"  Do you see that?
9    A.  I do.
10    Q.  Is that what you think that the entire thing
11  he did was measure photographs?
12      MR. EDINBURGH:  Objection.
13    A.  I don't think he measured any
14  photographs.
15  BY MR. BROWN:
16    Q.  Why do you say he relies entirely on
17  photographically measured geometric dimensions?
18    A.  Because that's what that program's all
19  about
20    Q.  Which program are you referring to?
21    A.  His computer program that he never
22  furnished to us.
23    Q.  Did you do research on his computer
24  program?
25    A.  Tried to.  I hired a specialist -- or

Page 62

1  consulted a specialist in that program, and was
2  told -- and he also was unable to open the files.
3    Q.  Who was the specialist you consulted with?
4    A.  I don't remember his name.
5    Q.  You say, "hired him."  Did you pay him?
6    A.  I think so.  A nominal amount.
7    Q.  And is he the one that told you the
8  program relies entirely on. . .
9    A.  No.
10    Q.  Who told you that?
11    A.  That's my conclusion from looking at how
12  this was done.
13    Q.  Have you ever used 3D laser scanners --
14    A.  No.
15    Q.  -- to measure things?
16    A.  No.
17    Q.  Would you know how to?
18    A.  No.
19    Q.  Would you know how accurate the
20  measurements are that you can get with that kind of
21  equipment?
22    A.  I imagine it depends upon the
23  circumstances and the settings in the -- in the
24  program.  And the way the -- the -- the program is
25  used and the physical markings on the elements

Page 63

1  that are being theoretically reconstructed --
2    Q.  Well --
3    A.  -- like photographic measurements.
4    Q.  Other than your imagination, do you have
5  any first hand knowledge?
6      MR. EDINBURGH:  Objection.
7    A.  I'm just trying to think.  The only
8  knowledge I would have would be this application.
9  I've never run up against this particular
10  reconstruction equipment before.
11    And to the extent that we've demonstrated that
12  Mr. Klorczyk would fit under the vehicle, whereas
13  Mr. Sprague says he wouldn't, I would say that what
14  we've done is probably more accurate than what he
15  did.
16  BY MR. BROWN:
17    Q.  Explain to me what you mean when you say
18  it's Mr. Sprague's opinion that he wouldn't fit under
19  the vehicle?
20    A.  I believe it is, in the -- in the position
21  that -- where we placed him.  It's right here in the
22  paragraph you're looking at.
23    Q.  Yep.  What -- what -- what are you pointing
24  me to that you'd like me to read?
25    A.  Well, the answer to the question you just

Page 64

1  asked me.  [reads] The second theory that C. K.
2  would not fit beneath the vehicle in the position as
3  described in Heath's -- Heath's December 2014
4  report.
5    I think that's the question you just asked me.
6    Q.  That's your description of his theory;
7  correct?
8    A.  Yes.  It is.
9    Q.  Your December 2014 report doesn't really
10  provide a detailed analysis of his body position;
11  does it?
12      MR. EDINBURGH:  Objection.
13    A.  The report will speak for itself.
14  BY MR. BROWN:
15    Q.  Okay.  Let's let it talk, how about that?
16    What are we up to now, 5?
17  [WHEREUPON, document referred to is marked
18  Exhibit 5 for identification.]
19      MR. EDINBURGH:  Yep.
20      MR. BROWN:  Let's go ahead and mark
21  this as 6.
22  [WHEREUPON, document referred to is marked
23  Exhibit 6 for identification.]
24  BY MR. BROWN:
25    Q.  Have you located the portion of your report

Page 65

1  that you believe Mr. Sprague's theory was aimed at,
2  and second theory, as you describe it?
3       MR. EDINBURGH: Objection.
4   A.  Yes.
5  BY MR. BROWN:
6   Q.  What page?
7   A.  Page 9.
8   Q.  Okay.
9   A.  The large paragraph right in the middle of
10  the page, and right in the middle of that paragraph
11  the sentence beginning [reads] while C. K. was in
12  the process of pulling on the wrench handle. . .
13  Q.  Okay.
14  And now you've got in front of you Exhibit 6.
15  Do you see that? In your report, which is Exhibit 3,
16  you describe his theory that it would not fit -- C. K.
17  would not fit beneath the vehicle in the position as
18  described in the report. So --
19  A.  Yes.
20  Q.  -- the position is [reads] while he was in
21  the process of pulling on the wrench handle --
22  A.  Yes.
23  Q.  -- that sentence? You believe that's what
24  you're referring to?
25  A.  Yes, sir.

Page 66

1   Q.  What position is this that you're describing
2  in this sentence?
3   A.  The only way he could be pulling on the
4  wrench handle is if he's in the position that we --
5  that -- that I have opined. Were he in the position
6  Mr. Sprague opines, he would have been pushing on
7  the wre -- wrench handle.
8   Q.  Okay. Where in his first report does it
9  show where that position is, or describes it?
10      MR. EDINBURGH: Objection.
11  A.  It's right there. I just told you.
12  BY MR. BROWN:
13  Q.  Is there anywhere else in this report that
14  additional information --
15  A.  I -- I don't know. That's the first place I
16  found that told you what -- why -- where I placed
17  Mr. Klorczyk.
18  Q.  Well, assuming the vehicle is on a jack
19  stand -- on a stand, or a service jack, would you
20  agree with me there's a lot of places he could be
21  under the vehicle where he'd be able to pull on a
22  wrench handle.
23      MR. EDINBURGH: Objection.
24  A.  No. I wouldn't.
25  BY MR. BROWN:

Page 67

1   Q.  All right. If you could look at Exhibit 6
2  and identify for me the portion of this report that
3  you label as the second theory?
4   A.  Well, it's the whole concept of -- of the
5  mar -- what created the mark on Mr. -- on the
6  decedent's sternum. You know, if you follow Mr. --
7  Mr. Sprague's theory that the mark on Mr.
8  Klorczyk's sternum was made by the plastic or
9  rubber grommet that's on the power steering line in
10  front of the transverse engine support member, that
11  would place Mr. Klorczyk not very far under the car.
12  And in the position of having to reach over his
13  head with his right hand and push on the wrench
14  handle to tighten the drain plug.
15      THE REPORTER: To tighten the --
16  A.  Drain plug.
17      THE REPORTER: -- plug. Thank you
18  BY MR. BROWN:
19  Q.  And it's possible to tighten a plug by
20  pushing it or pulling it; isn't it?
21  A.  Sure.
22  Q.  Okay.
23  A.  It depends on which way it's threaded.
24  Which side of the wrench you're on. Whether your
25  feet first under the car or head first under the car.

Page 68

1   Q.  And I guess, maybe I'm just having trouble
2  understanding exactly what you meant by, "would
3  not fit beneath the vehicle." Everybody agrees he
4  was under the vehicle; right?
5   A.  Yes, sir.
6   Q.  What did you have in mind when you use
7  that expression in your report, "would not fit
8  beneath the vehicle?"
9   A.  I took it from Mr. Sprague's report in
10  general terms. And if you ask me to point to some
11  specific language, I probably could sit here all day
12  and have difficulty finding it. But it's my
13  impression that he was of the opinion that with the
14  vehicle raised with the jack and solely supported by
15  the jack, that Mr. Klorczyk wouldn't fit under the
16  vehicle.
17  Q.  I'm sorry, could you read that back? I
18  think I'm having trouble following it.
19      THE REPORTER: I took it from Mr.
20  Sprague's report in general terms. And if you ask
21  me to point to some specific language, I probably
22  could sit here all day and have difficulty finding it.
23  But it's my impression that he was of the opinion
24  that with the vehicle raised with the jack and solely
25  supported by the jack, that Mr. Klorczyk wouldn't fit

Page 69

1 under the vehicle.
2    A.  In the position that I placed him.
3 BY MR. BROWN:
4    Q.  Turn to Page 4 of your report.  The very
5 top of the page.  You say that Sprague rejects much
6 of the testimony.  Do you see that?
7    A.  I do.
8    Q.  What -- what do you mean by, "much?"
9    A.  Well, he ignores the testimony of the first
10 people on the scene, who are in the best vantage
11 point to know what the circumstances or what the
12 arrangement of the various devices at issue were
13 before any other folks got there that's -- the main
14 purpose was to get Mr. Klorczyk out from under his
15 vehicle.
16    He ignored the testimony of Mr. and Mrs.
17 Klorczyk and Mr. Houseman.
18    Q.  Do you -- you're certainly welcome to look
19 in the report, but do you remember if Mr. Sprague
20 made an analysis of which testimony contradicted
21 itself or not from various witnesses?
22        MR. EDINBURGH:  Objection.
23    A.  Do I recall that he did that?  Yeah, I think
24 generally I have that recollection.
25 BY MR. BROWN:

Page 70

1    Q.  And he provided an analysis of why he did
2 or didn't credit certain testimony.  Do you remember
3 that?
4    A.  I don't remember that but I'll take your
5 word for it.  I mean, his report speaks for itself.
6    Q.  Well, you're here to rebut his report;
7 correct?
8    A.  That's correct.
9    Q.  When you say, "much," does that mean
10 some, does that mean more than half?  Does that
11 mean most?  What does "much" mean to you?
12    A.  I told you what "much" meant.  You just
13 asked me and I told you Mr. and Mrs. Klorczyk and
14 Mr. Houseman.
15    Q.  And what part of Mr. Houseman's testimony
16 does he ignore?
17    A.  The whole business about Mr. Klorczyk
18 trying to re-raise the -- the lowered jack with the,
19 quote/unquote "crowbar" which was the handle of
20 the jack.
21    Q.  And you believe that's what Mr. Houseman
22 testified as you sit here today?  That's your
23 understanding?
24    A.  I -- that's the way I interpreted Mr.
25 Houseman's testimony.

Page 71

1    Q.  And it's that interpretation of Mr.
2 Houseman's testimony that informs your mental
3 reconstruction that you devised tests to verify; is
4 that right?
5    A.  Yes, sir.
6        MR. EDINBURGH:  Objection.
7 BY MR. BROWN:
8    Q.  Is Mr. Sprague's report consistent with any
9 of the testimony of statements given by Fred
10 Klorczyk?
11    A.  [Laughs] I can't answer that question.
12    Q.  Look at the start of the next paragraph.
13 Specifically, Sprague rejects the testimony from the
14 first responders, F.K. and L.K., that's the Klorczyk
15 parents; correct?
16    A.  Correct.
17    Q.  That the support stand was under the
18 vehicle laying on it's side?
19    A.  Yes.
20    Q.  Can you look at Exhibit 6 and show me
21 where Sprague rejects that testimony?  Or do you
22 just -- can you tell me, based on your preparation
23 and knowledge?
24    A.  He may have -- he may have of -- of -- of
25 admitted that it -- it was under the vehicle laying on

Page 72

1 it's side, but had the opinion that it was never
2 used.  I don't recall, however, Mr. Sprague couched
3 that in his report.
4    Q.  Have you ever changed the oil in a car?
5    A.  Not in many years.
6    Q.  I'll take that as a "yes."
7    A.  Yes.
8    Q.  Once you've drained the oil and replaced
9 the oil filter --
10        THE REPORTER:  It's okay -- it's okay.  It
11 can be on the floor.
12 BY MR. BROWN:
13    Q.  Are you with me?
14    A.  Once I've drained and replaced the oil
15 filter --
16    Q.  That had happened, Christian Klorczyk had
17 done that; correct?
18    A.  Yes.
19    Q.  Is it common to lower the vehicle to more
20 of it's natural position to put the oil in the vehicle?
21        MR. EDINBURGH:  Objection.
22    A.  Not if you plan to go back under the
23 vehicle.  I mean, it's -- it's the operator's choice.  I
24 can't sit here and prognosticate about how different
25 people changed oil in their car --

**Page 73**

1 BY MR. BROWN:
2 Q. Oh.
3 A. -- or whether which car it is. Where the
4 oil filter is. You know, this is -- I don't know where
5 we're going here, but I'm confused.
6 BY MR. BROWN:
7 Q. Well, do you know if this partic -- for this
8 particular vehicle that the oil could be properly put
9 in the vehicle to fill it to what would be considered
10 full, if the car was raised up at the level you
11 believe it was raised up on a jack stand?
12     MR. EDINBURGH: Objection.
13 A. I see no reason why it couldn't have been
14 filled up. Now, to whether that was precisely the
15 correct level, you can always check it with the dip
16 stick when you done with the oil change.
17 BY MR. BROWN:
18 Q. In that same paragraph you say, [reads]
19 further to C.K.'s prior experience, it is not
20 reasonably likely that C. K. would rely solely on the
21 service jack to support the vehicle. Do you see
22 that?
23 A. I do.
24 Q. That's your opinion.
25 A. Yes.

**Page 74**

1 Q. What prior experience do you find relative
2 to reaching this conclusion?
3 A. To the prior experience that it was
4 explained by his father.
5 Q. Any other basis?
6 A. No.
7 Q. Do you know if there was any other
8 evidence that Christian Klorczyk at times would go
9 under a vehicle that was held with nothing other
10 than a service jack with no cup in the saddle?
11     MR. EDINBURGH: Objection.
12 A. Not that I know of.
13 BY MR. BROWN:
14 Q. To your knowledge, is this the first time
15 that Christian Klorczyk ever changed oil without his
16 father being present?
17     MR. EDINBURGH: Objection.
18 A. Don't know.
19 BY MR. BROWN:
20 Q. And is there something you have in mind in
21 particular that his father testified, or told you,
22 about his prior experience?
23     MR. EDINBURGH: Objection.
24 A. I don't -- I don't know. I'd have to go back
25 and look at Mr. Klorczyk's depositions; both of

**Page 75**

1 them. It seems to me he went into length about
2 instruction he had given Christian on the use of
3 various tools.
4 BY MR. BROWN:
5 Q. Does this opinion of yours about his prior
6 experience rest on a belief that Christian wouldn't
7 do anything that was unsafe?
8     MR. EDINBURGH: Objection.
9 A. I don't know what Christian considered
10 safe or unsafe.
11 Q. Do you believe Christian would have done
12 something he considered unsafe?
13     MR. EDINBURGH: Objection.
14 A. I don't believe anybody would do anything
15 they'd considered unsafe.
16 BY MR. BROWN:
17 Q. So in your opinion, Christian believed
18 using a single jack stand was safe?
19     MR. EDINBURGH: Objection. Same
20 reasons earlier.
21 A. Yes.
22 BY MR. BROWN:
23 Q. Do you believe using a single jack stand is
24 safe?
25     MR. EDINBURGH: Objection. Same

**Page 76**

1 reasons given earlier.
2 A. Yeah. Asked and answered in my first
3 deposition, ad nauseam. I would not advise
4 anybody to do anything that was a counter to the
5 instructions that came with the equipment, and to
6 use it in accordance with those instructions. I know
7 too much about this kind of equipment to be in the
8 business of advising anybody to do anything.
9     THE REPORTER: Can we take a restroom
10 break?
11 BY MR. BROWN:
12 Q. Yeah.
13     THE REPORTER: I'm sorry.
14     THE VIDEOGRAPHER: The time is 12:12.
15 Please stand by.
16 [WHEREUPON, a brief recess is taken.]
17     THE VIDEOGRAPHER: Please stand by.
18 The time is 1:11, and we are back on the video
19 record.
20     MR. BROWN: We up to 7 now?
21     THE REPORTER: Yes, sir.
22 [WHEREUPON, document referred to is marked
23 Exhibit 7 for identification.]
24     MR. BROWN: Those are color?
25     MR. SPEAKER: Yes.

Page 77

1    MR. SPEAKER:  They are.
2    THE VIDEOGRAPHER:  Please stand by.
3  [WHEREUPON, a brief recess is taken.]
4    THE VIDEOGRAPHER:  Please stand
5  by.  1:13 and we are back on the record.
6  BY MR. BROWN:
7    Q.  If you could take a look at what's been
8  marked as Exhibit 7.  It's a collection of photos; do
9  you see that?
10   A.  I do.
11   Q.  And do you recognize these as the photos
12 that were produced in connection with your
13 retention as a rebuttal expert?
14   A.  Produced by me or produced by you?
15   Q.  Produced by your counsel.
16   A.  Oh, okay.
17   Q.  Presumably having obtained them from
18 you.
19   A.  Do I recognize the photos?  Yes.
20   Q.  Are these photos that you provided to
21 Howard and Bryan?
22   A.  I believe so.
23   Q.  If you look at the first of these, it's
24 Klorczyk006523 is the Bates number.
25   A.  Yes.

Page 78

1    Q.  This is a picture you took?
2    A.  I believe so.
3    Q.  And this is a picture of the lift that you
4  used to inspect the vehicle that was involved in the
5  accident; is that why it's here?
6    A.  Yeah.  These were all from my first
7  inspection; yes, sir.  Well, I say they're all.  No,
8  they're not.  There's a whole bunch of the photos.
9  Anyway, go ahead.  This one is.
10   Q.  And when would this photo have been
11 taken?
12   A.  Well, I don't know whether it was taken the
13 fir -- first trip or the second trip.  You know, just
14 handing them to me out of context is -- I recognize
15 them, certainly.
16   Q.  So, you took photos on both trips?
17   A.  Yes.  I --
18   Q.  Did you keep every photo you took?
19   A.  Yeah, I believe so; yes.
20   Q.  You don't know for sure?
21   A.  To my best knowledge and belief, I kept all
22 my photos.
23   Q.  To your best knowledge and belief, did
24 every photo you personally take in -- took yourself,
25 was it provided to Howard and Bryan?

Page 79

1    A.  To the best of my knowledge and belief,
2  yes.
3    Q.  And if you could turn to the photo with the
4  Bates Stamp  6525.
5    A.  Okay.
6    Q.  It's the third one in.
7    A.  Yes.
8    Q.  This is a picture you took?
9    A.  I believe so.
10   Q.  And this is a picture of the Klorczyks'
11 vehicle that was involved in the accident; do I
12 understand that correctly?
13   A.  Yes.
14   Q.  Okay.  Did you have something you wanted
15 to say?
16   A.  I said "yes."
17   Q.  Okay.  I thought I heard something coming.
18   A.  I don't know what you're talking about.
19   Q.  And if you could turn to the
20 Klorczyk006527.
21   A.  Okay.
22   Q.  And this is a picture of the underside of a
23 vehicle?
24   A.  Yes.
25   Q.  Is this the vehicle that the Klorczyks

Page 80

1  owned that was involved in the accident?
2    A.  Yes.
3    Q.  Is that your hand in the picture?
4    A.  I don't -- I don't know whether it's my hand
5  or Bryan Orticelli's hand.
6    Q.  And --
7    A.  I think it's probably Bryan's hand.  I
8  believe I was laying on the floor.
9    Q.  You were laying on the floor with the
10 camera looking up?
11   A.  That's correct.
12   Q.  And what's the orange thing in Bryan's
13 hand?
14   A.  A flashlight.
15   Q.  Okay.  And this is a picture of the
16 transmission of the car in the center of the picture?
17   A.  What are we looking at now?
18   Q.  Same --
19   A.  Same --
20   Q.  -- photo.
21   A.  Same picture?
22   Q.  Yeah.
23   A.  27?  Yes.
24   Q.  Okay.  And you believe the transmission
25 drain plug in the almost center of the -- this photo

Page 81

1  is wha -- what was on Christian's face; is that
2  right?
3  A.  That's right.
4  Q.  Now if you could go to Klorczyk006533.
5  A.  Okay.
6  Q.  Again, this is a picture you took, to the
7  best of your knowledge?
8  A.  Yes.
9  Q.  And what does this picture depict?
10 A.  This depicts the power-steering line and
11 the grommet disposed in front of the forward
12 transverse engine-support beam that Mr. Sprague
13 opines made the mark on Christian's sternum.
14 Q.  And you disagree with that conclusion?
15 A.  Yes, sir.
16 Q.  And why is that?
17 A.  Because that line is flexible.  In fact,
18 there's pictures in here showing Bryan's finger
19 pushing that line.  On the next one, 6535, you can
20 see that Bryan pushed that line up so I could
21 photograph it pushed up above the transverse beam.
22 Q.  Did you measure how much force it takes
23 to push that line up?
24 A.  I didn't.  I judged it with my finger.
25 Virtually nothing.

Page 82

1  Q.  Besides judging with your finger, did you
2  take any actual measurements of the force
3  required?
4  A.  No.
5  Q.  When you press it up with your finger and
6  you let go, would it come back down?
7  A.  Yes.
8  Q.  Did it?  And inside this housing there's
9  actually a metal pipe --
10 A.  Inside what --
11 Q.  -- tube?
12 A.  -- housing?
13 Q.  Well, if we look at your photo, go back
14 to --
15 A.  this --
16 Q.  -- 6533, there's a grommet.
17 A.  33.
18 Q.  It looks like it's around the rubbing casing
19 that has a --
20 A.  It's a piece of ho --
21 Q.  -- line in it.
22 A.  It's a piece of hose.
23 Q.  Is that a metal line that runs into the
24 hose?
25 A.  Yeah, I believe so.  It's a steel metal line.

Page 83

1  I'm not sure it runs through the hose, but it
2  connects to the hose.
3  Q.  And what's the grommet made of?
4  A.  It's -- it's some kind of an -- of a
5  non-metallic material.  I don't know whether it's
6  plastic or rubber.
7  Q.  Do you have any medical training?
8  A.  Only through my own experience.
9  Q.  Do you have any medical training?
10 A.  Only through my own experience.
11 Q.  Okay.  And by that you mean because
12 you --
13 A.  Maladies that I have contracted.
14 Q.  Okay.  Do you have any forensic
15 experience in judging how long something has to
16 apply pressure on a body, how much rubbing there
17 would have to be, what that pressure would have to
18 be, for it to leave a discernible collection of blood
19 or a mark as rigor mortis sets in?
20    MR. EDINBURGH:  Objection.
21 A.  No.
22 BY MR. BROWN:
23 Q.  You consider yourself qualified to have
24 opinions about the amount of pressure, stress,
25 rubbing, you think the body was thrashing around,

Page 84

1  what would be necessary for there to be left a
2  discernible mark upon the body after death.
3     MR. EDINBURGH:  Objection.
4  A.  Yes.
5  BY MR. BROWN:
6  Q.  And what is the basis of you considering
7  yourself qualified for that?
8  A.  My life experience.
9  Q.  How many times have you been asked to
10 determine the cause of marks on a corpse?
11    MR. EDINBURGH:  Objection.
12 A.  Never until today.
13 BY MR. BROWN:
14 Q.  Well, in your report you have opinions
15 about it.
16 A.  Yes, I do.
17 Q.  So you obviously considered the issue and
18 came to findings before today.
19 A.  Yes, sir.
20 Q.  And what experience is it in your life that
21 gave you in your mind the qualification to make that
22 determination?
23 A.  My general life experience and being able
24 to judge a pressure and the efficacy of -- of making
25 a mark on somebody's chest with some totally

Page 85

1 flexible device that wouldn't even have been
2 bearing on the -- on the decedent.
3    Q.  Do you have any kind of education in
4 looking at the marks on a corpse and determining
5 their causation?
6    A.  No.
7    Q.  Do you have any kind of biometric
8 training?
9    A.  No.  But I exercise common sense on a
10 regular basis.
11    Q.  That, sir, is news to me.
12        MR. BROWN:  You can object, Howard.
13        MR. EDINBURGH:  Object to your
14 commentary.
15        MR. BROWN:  I'll strike that.
16 BY MR. BROWN:
17    Q.  If you could look at the photo marked
18 Klorczyk006538.
19        MR. EDINBURGH:  Can we go off the
20 record?  My copy jumps from 37 to 41.  Do you
21 have that?
22        THE WITNESS:  So does mine.
23        MR. ORTICELLI:  Yeah.  This one does.
24        MR. BROWN:  Well, obviously, they got
25 stuck in the copier.

Page 86

1        MR. EDINBURGH:  You can chomp
2 something --
3        MR. BROWN:  Well, that's all right.
4        MR. EDINBURGH:  -- out.  I'm okay with
5 that.  Just, I just -- he doesn't have it.
6        MR. BROWN:  Yeah.
7        THE VIDEOGRAPHER:  Do we want to go
8 off the record?
9        MR. EDINBURGH:  Yeah.  Let's go off for
10 a second until we can sort this out.
11        THE VIDEOGRAPHER:  The time is 1:25.
12 Please stand by.
13 [WHEREUPON, a brief recess is taken.]
14        THE VIDEOGRAPHER:  The time is 1:29,
15 and we are back on the video record.
16 BY MR. BROWN:
17    Q.  If you'd look at Exhibit 8 --
18    A.  Yes.
19    Q.  -- this is a photo you took?
20 [WHEREUPON, document referred to is marked
21 Exhibit 8 for identification.]
22    A.  Yes.
23 BY MR. BROWN:
24    Q.  And what am I seeing here in this photo?
25    A.  The transmission drain plug.

Page 87

1    Q.  And you believe that this transmission
2 drain plug made the mark on Christian Klorczyk's
3 face?
4    A.  Yes.
5    Q.  And is that through application of your
6 common sense?
7    A.  Yes.
8        MR. EDINBURGH:  Objection.
9    A.  My deductive reasoning.
10 BY MR. BROWN:
11    Q.  In your inspection of the vehicle, do you
12 believe there's anything else on the underside of it
13 that could've made such a mark on his face?
14    A.  I don't think so.  I -- I mean, anything's
15 possible, but this is the most likely.
16    Q.  And why do you believe it's the most
17 likely?
18    A.  Because it fits.  It comports with the other
19 marks on his body.
20        MR. BROWN:  Okay.  We'll come back to
21 that.
22 BY MR. BROWN:
23    Q.  If you can look at -- do you have  541,
24 Klorczyk006541?
25    A.  Yes.

Page 88

1    Q.  What's this a picture of?
2    A.  A heat shield.
3    Q.  And it's the -- this is taken looking
4 towards the front of the vehicle; is that correct?
5    A.  Yes.
6    Q.  And this is the front part of the
7 transmission that's in the left-upper part of this
8 picture; is that correct?
9    A.  Yes.
10    Q.  And that drain plug we saw would be
11 behind here towards the rear of the vehicle?
12    A.  Yes.
13    Q.  And the oil drain plug that the wrench was
14 on is just forward from this heat shield; is that
15 correct -- the -- the bit of the heat shield that dips
16 down?
17    A.  Well, it's quite --
18    Q.  Is that what I'm looking at there?
19    A.  It's -- it's quite a -- well, it's -- yes, it's
20 forward of the heat shield.
21        THE REPORTER:  It's forward?
22        THE WITNESS:  It is forward of the heat
23 shield.
24        THE REPORTER:  Thank you.  Sorry.
25        THE WITNESS:  Dadgummit.  You said we

Page 89

1  can leave this on the floor; right?
2      THE REPORTER:  M-hm.
3      THE WITNESS:  Okay.
4  BY MR. BROWN:
5      Q.  And if you could look at Klorczyk006544.
6      A.  Okay.
7      Q.  It's, again, a picture you took of the
8  Klorczyks' vehicle that was involved in the
9  accident?
10     A.  Yes.
11     Q.  And this shows the scrape on the side of
12  the vehicle; correct?
13     A.  Yeah.  On the plastic rocker panel; yes.
14     Q.  And it looks like that scrape is located
15  above -- well -- well, let me ask you this:  What's
16  the black thing that I'm looking at that protrudes
17  below the rocker panel there?
18     A.  It's the passenger-side front pad used for
19  using the onboard emergency tire-changing jack.
20     Q.  And that jack actually has, I'm not quite
21  sure what you'd call it, a protrusion that sticks up
22  into that pad, doesn't it?
23     A.  I believe it does.
24     Q.  So it -- rather than a cup, that particular
25  jack has a -- a design that would sit up in here so it

Page 90

1  can't slide either direction; is that right?  Do I
2  understand how it works?
3      A.  I believe you're right.  I wasn't particularly
4  interested in the tire-changing jack since it had
5  nothing to do with the case.
6      Q.  Okay.  If you could go forward to
7  Klorczyk006556.
8      A.  Okay.
9      Q.  Now, this is not a picture you took; is that
10  correct?
11     A.  That's correct.
12     Q.  This is a picture that Mr. Felpel -- is that
13  how you say his name?
14     A.  Yes.
15     Q.  -- Felpel took?
16     A.  Yes.
17     Q.  And do you know what this picture is trying
18  to illustrate?
19     A.  Well, tell -- looking at these pictures,
20  they're going to look very similar, and they're all
21  explained carefully in my report, and this picture is
22  likely in my report.  So I mean, you -- you -- are
23  you asking me to line this up with a picture that's in
24  my report?  I'd be happy to do that.
25     Q.  Well, I'm asking you if you can just explain

Page 91

1  to me wha -- what you believe is illustrated by this
2  picture.
3      A.  We're showing the clearances under the
4  vehicle.  And in which condition, I can't answer
5  without going back to my report.
6      Q.  Well, go back to your report, then.
7      A.  Why don't we ju. . .
8      Q.  I'm sorry.  What did you say?
9      A.  I said, "Holy moly."
10     Q.  Well, that's good, because that's not what
11  I thought I heard, so. . .
12     A.  Well, I can't help what you heard.  I don't
13  even know if this is one of the photos, anyway.
14     MR. EDINBURGH:  Are you good with me
15  [phonetic] or would you want me to say anything?
16     MR. BROWN:  I -- I -- I'd rather let him.
17     THE WITNESS:  It looks like the same
18  photo labeled Figure 1.1 in Measurement Group 1,
19  styled, "Jack Stand False Engagement Elevation."
20  BY MR. BROWN:
21     Q.  And how did --
22     A.  And --
23     Q.  -- you decide --
24     A.  -- as you can see, it's very similar to
25  Figure 2.1 in Measurement Group 2, styled, "Jack

Page 92

1  Stand Tip-Over Elevation."
2      Q.  Looking at your Measurement Group 1, how
3  did you determine that this was the elevation of the
4  vehicle when it was on a jack stand that you
5  believed had false engagement and dropped?
6      A.  Because that's the way we designed the
7  reconstruction, is to raise the car to the elevation
8  that it would've been at for a false engagement of
9  the jack stand if it was placed at the front end of
10  the longitudinal beam, which is where we think it
11  was placed, and the false-engagement position
12  would've been determined by how high the car was
13  raised by the service jack.
14     Q.  Is your assumption that the service jack
15  would've been jacked up the full amount it could
16  go?
17     A.  Yes.
18     Q.  Okay.  And your Measurement Group 2 that
19  you wanted to point to, "Jack Stand Tip-Over
20  Elevation," you believe that this is the height that
21  his body would've been holding the car to; do I
22  understand that correctly?
23     A.  Ye -- yes.
24     Q.  In your mental reconstruction that you've
25  done testing on now --

Page 93

1   A.  I'm sorry.  But this report is my rebuttal
2   reconstruction.  Any reference to my mental
3   reconstruction was my conclusions from reading all
4   of the materials in -- set forth in my first report and
5   then coming forth with my opinion of the sequence
6   of events now.
7   Q.  Okay.  As you sit here today --
8   A.  Yes.
9   Q.  -- it is your belief that with the full weight
10  of the car on his body, on the creeper, his body
11  would've held the car to this height; is --
12  A.  Cor --
13  Q.  -- that correct?
14  A.  That's correct.
15  Q.  And part of that is based on information
16  you came up with about the chest width of German
17  people?
18      MR. EDINBURGH:  Objection.
19  A.  It came up -- well, it's based upon the
20  demonstration of the reasonableness of the chest
21  dimensions of -- of Christian if you follow the -- the
22  reconstruction that we performed.
23    Now, there was a basis for using dimensions
24  from the ISO technical report, which is what you are
25  referring to about the Germans.  I was looking for,

Page 94

1   not necessarily so much chest depth, but I was
2   looking for body dimensions so that I could make a
3   sketch showing Christian in the position that's my
4   opinion he was in underneath the car when the
5   accident occurred.  And there was a series of
6   events, which I'm sure we'll get to.
7   BY MR. BROWN:
8   Q.  And -- well, me may or we may not.  I --
9   we'll never be sure of anything when I'm involved.
10      MR. EDINBURGH:  I can --
11  A.  Is that --
12      MR. EDINBURGH:  -- vouch for that.
13  A.  -- some kind of a confession?
14  BY MR. BROWN:
15  Q.  In -- your ISO report -- yeah.  A
16  confession that I don't organize my questions based
17  on what I think your expectations will be.  In the
18  ISO report, you took various information about
19  chest-depth measurements of individuals in the
20  standing position; is that correct?
21  A.  Well, there was a dimension, but the
22  more -- more -- the more important dimensions were
23  the dimensions of the -- of the other -- the rest of
24  the body configuration.
25  Q.  Okay.  Length of the arms, length of the

Page 95

1   legs, that sort of thing?
2   A.  Yes.
3   Q.  Do you have some education and expertise
4   in human physiology?
5   A.  Just what I've learned in my life
6   experience.
7   Q.  Just your common sense --
8   A.  Just --
9   Q.  -- your past --
10  A.  -- my --
11  Q.  -- experience.
12  A.  -- common sense; yes.
13  Q.  How did you determine the thickness to
14  ascribe to his chest as he laid on the creeper with
15  the feet flattened out beneath the car?
16  A.  I didn't ascribe to any thickness.  I came
17  to that calculation of what the thicknesses would be
18  under these conditions and then asked myself, "Are
19  these dimensions, chest dimensions, reasonable?"
20    And my answer to my -- my hypothetical
21  question to myself was, "Yes, they're reasonable."
22  And are they within the -- within the general vicinity
23  of the same dimensions that Mr. Sprague came up
24  with, and were they fairly close to wha -- what was
25  produced in the -- in the -- or what's stated in the

Page 96

1   German report, as you like to call it.
2   Q.  Well, I -- I -- I hope I didn't use the word
3   "German" that way, because I'm German.  So -- but
4   you can certainly feel free to use it that.  They were
5   measurements of people with German heritage done
6   in Germany, I believe.
7     In your mind, is a person's thickness through
8   his chest when he is in a standing position the same
9   as it is if he's laying prone and horizontal on a hard
10  surface?
11  A.  I don't think so.
12  Q.  How much change is there?
13  A.  I don't know.
14  Q.  Did you --
15  A.  I'd say it probably varies from individual to
16  individual.
17  Q.  Did you try to do any testing to find that
18  out?
19  A.  No.
20  Q.  Did you try and consult with anybody who's
21  actually an expert in human physiology?
22  A.  No.
23  Q.  How much would the weight of this BMW --
24  if we assume the body's where you think it was and
25  two of the wheels were on the ground, how much

Page 97

1  would that weight compress an average human
2  chest?
3      A.  I don't know.  But we calculated a
4  compression distance, and it seemed reasonable to
5  me.
6      Q.  What compression distance did you
7  calculate?
8      A.  Well, it's in my report.  Let me find it.
9      Q.  Thank you.
10     A.  My calculations indicated that his chest
11  depth was 9-5/16 inches and then it was
12  compressed to 8-13/16 inches.  And obviously we
13  don't know whether he was on inhale or exhale.
14     Q.  Did you read the autopsy report?
15     A.  Yes.  Such as it was.
16     Q.  Well, I just don't understand what you just
17  said, that -- you -- you do know that he died of
18  asphyxiation; right?
19     A.  I do know that.  Yes, sir, I do.
20     Q.  Well, do you believe that he was inhaling
21  and lifting the weight of the car at some point?
22          MR. EDINBURGH:  Objection.
23     A.  Do -- I'm sorry.
24  BY MR. BROWN:
25     Q.  You -- you --

Page 98

1      A.  Do -- do I believe --
2      Q.  -- said you don't know if he was on --
3      A.  Do I believe --
4      Q.  -- inhale or exhale, and I'm --
5      A.  Do I --
6      Q.  -- confused.
7      A.  I'm talking about the dimensions.  I'm --
8  I'm -- I'm asking you -- you what your question was
9  again.  Maybe you -- you could help me and read it
10  back.  I -- I didn't get your question.
11     Q.  Well, why don't we just strike it and move
12  on, because I think --
13     A.  Okay.
14     Q.  -- we can all agree he had died of
15  asphyxiation.
16     A.  No question about that.
17     Q.  I think we can agree that when the weight
18  of the car was preventing him from breathing, he
19  was not expanding his chest with inhalation.
20          MR. EDINBURGH:  Ob -- objection.
21     A.  I guess we don't know that, do we?
22  BY MR. BROWN:
23     Q.  Did you consult with anybody with a
24  medical background, forensic medical background,
25  physiology background, anything, about the

Page 99

1  expected compression that the weight of this
2  vehicle would've caused in his chest?
3      A.  No.
4      Q.  You believe that a 1/2 inch is the correct
5  answer; is that right?
6      A.  I believe that a 1/2 inch, judging by the
7  rest of the dime -- the -- the dimensions is
8  reasonable.
9      Q.  And what is it in your mind that makes
10  a 1/2 inch of chest compression reasonable?
11     A.  I have no basis to think that it wasn't
12  unreasonable.
13     Q.  Well, do you think it's reasonable because
14  otherwise the rest of your calculations, if it was
15  actually 2", some of them don't work; is that right?
16          MR. EDINBURGH:  Objections.  Objection.
17     A.  It fit.
18  BY MR. BROWN:
19     Q.  It fit the rest of your theory?
20     A.  The dimensions fit.
21          MR. EDINBURGH:  Objection.
22  BY MR. BROWN:
23     Q.  What did they fit?
24     A.  They fit the theory.  The marks on the body
25  fit the theory.  The clearances fit the theory.

Page 100

1  Everything fits the theory in my reconstruction.  The
2  testimony fits the theory.
3      Q.  Which testimony are you thinking of
4  exactly when you say that?
5      A.  The whole concept of whether or not the
6  jack stand was being used.
7      Q.  Well, I'm talking --
8      A.  The pla -- the placement of the -- of the
9  decedent.
10     Q.  How do they fit the theory that the weight
11  of the car on his chest caused a 1/2 an inch of
12  compression?
13          MR. EDINBURGH:  Objection.
14     A.  Well, if you ask it that way, there's no
15  answer to that question.
16  BY MR. BROWN:
17     Q.  Why is there no answer?
18     A.  Com -- well, I calcul -- I went through the
19  exercise and calculated a compression.
20     Q.  Well, what was the basis -- you say you
21  calculated a compression.
22     A.  Yeah.  Based on what we -- what we think
23  we know; yes, sir.
24     Q.  And how does it affect your calculations if
25  the chest compression was actually more than a 1/2

Page 101

1  inch?
2       MR. EDINBURGH:  Objection.
3   A.  It might've -- might very well affect it.
4  BY MR. BROWN:
5   Q.  If the chest compression, and we'll use,
6  for example, was 2 inches, could that affect your
7  calculation of whether there would be room for a
8  stand to tip over?
9       MR. EDINBURGH:  Objection.
10  A.  Well, it depends on what the starting point
11  was.
12  BY MR. BROWN:
13  Q.  Well, what does that mean?  I mean, that's
14  a nice way not to answer the question.
15      MR. BROWN:  Could you read my question
16  back?
17      THE REPORTER:  M-hm.
18  [reads] If the chest compression, we'll use, for
19  example, was 2 inches, could that affect your
20  calculation of whether there would be room for a
21  stand to tip over?
22  A.  It might, depending upon what the
23  condition of the creeper was.
24  BY MR. BROWN:
25  Q.  And how would the condition of the creeper

Page 102

1  affect that calculation?
2   A.  Has to do with the overall height of the
3  chest.
4   Q.  Did you try to look at any anthropomorphic
5  studies or physiology information just to see what
6  the difference in chest height was in compression
7  just from normal inhalation of a person not being
8  squished by a car?
9       MR. EDINBURGH:  Objection.
10  A.  No.
11  BY MR. BROWN:
12  Q.  In making the calculations that you've
13  done, you do make an assumption as to the height
14  of the creeper, don't you?
15  A.  Yes.
16  Q.  And if we assume that that --
17  A.  Well, I measured a creeper.  We have an
18  exemplar creeper.
19  Q.  Did you actually measure the creeper that
20  was used by Christian Klorczyk?
21  A.  No.  But I looked at it.
22  Q.  And the wheels of that creeper were sort
23  of splayed out.  It was flattened to the ground,
24  wasn't it?
25  A.  They were off.  We don't know whether

Page 103

1  they were under the creeper or not under the
2  creeper.
3   Q.  Did you look at the bottom of the creeper?
4   A.  I've looked at the bottom of the exemplar
5  creeper.
6   Q.  Did you look at the bottom of the creeper
7  that Mr. Klorczyk used in the accident?
8   A.  No.
9   Q.  Do you know if there's any marks on the
10  bottom of the creeper that would be consistent with
11  the wheels being under the creeper and crushed
12  into it?
13  A.  Oh, wheels are broken off.  I -- I'm --
14  I'm -- you -- you lost me here.  The wheels were
15  broken off.  They could've been under the creeper,
16  and they could not have been under the creeper.
17  Q.  And I'm saying:  Did you look at the bottom
18  of the creeper to see if there's marks that you'd
19  find consistent with the wheels breaking off and
20  being under the creeper?
21  A.  Well, I answered the question, did I look at
22  the bottom of the creeper, and your answer was
23  "no."
24  Q.  Okay.  Sorry if I missed that.  But you did
25  make calculations showing the body would hold it up

Page 104

1  high enough for the jack stand to tip over; correct?
2   A.  Yes.
3   Q.  And that calculation made an assumption
4  about creeper height, didn't it?
5   A.  Yes.
6   Q.  And it made an assumption about chest
7  height, which you've identified from 9-5/16
8  to 8-13/16, which I think's a 1/2 an inch, isn't it?
9   A.  I -- no, I didn't assume the chest height.  I
10  calculated the chest height based on the other
11  dimensions.
12  Q.  So you calculated what the chest height
13  must have been for there to be room for the jack
14  stand to fall over?
15  A.  Yes.
16  Q.  Okay.  So, you started from the assumption
17  that the jack stand fell over, and you calculated
18  backward from there to what must have been for
19  that to have happened.
20  A.  Correct.
21  Q.  Okay.  If you could go back to Exhibit 7.
22      MR. EDINBURGH:  If you'll just bear with
23  me.  That -- that's --
24      MR. BROWN:  Yeah.
25      MR. EDINBURGH:  -- collectively --

**Page 105**

1      MR. BROWN:  The pictures.
2      MR. EDINBURGH:  -- the photographs.
3      MR. BROWN:  Yeah.
4      MR. EDINBURGH:  Okay.
5   A.  Which -- which is which one?
6   BY MR. BROWN:
7   **Q.  It's the bunch of pictures.  I'm -- I'm**
8   **looking at Klorczyk006574.**
9   A.  6574?
10  **Q.  Yep.**
11     MR. EDINBURGH:  74; okay.
12  A.  Okay.
13  BY MR. BROWN:
14  **Q.  And this is a picture Mr. Felpel took?**
15  A.  Yes.
16  **Q.  And did you talk to him about what this is**
17  **a picture of?**
18  A.  I don't need to talk to him about what this
19  is a picture of.  I directed that he do this test, and
20  it's obvious to me that he wa -- took pictures of the
21  test that I had asked him to do.
22  **Q.  Okay.  So, you're the one who came up**
23  **with the design of this test?**
24  A.  Well, I didn't know he was going to use a
25  tractor, but, yes, I designed the test.  I told him

**Page 106**

1   which direction to pull and -- and how to orient the
2   jack.
3   **Q.  And does your exemplar vehicle, do you**
4   **know, does it have the same rubber pads under it to**
5   **lift with?**
6   A.  Yes.
7   **Q.  Do you know if -- if, in this picture, the**
8   **jack is under that rubber pad or not?**
9   A.  Yes.
10  **Q.  It is?**
11  A.  Yes.
12  **Q.  And if you could look at  86,  6586,**
13  **Klorczyk006586.**
14  A.  Okay.
15  **Q.  This one, is -- is this the jack stand when**
16  **it was twisted at an angle?**
17  A.  I think so.
18     MR. EDINBURGH:  Can I just -- did you
19  mean jack stand or jack?
20     MR. BROWN:  Jack.  I'm sorry.
21  A.  You -- you mean the jack and --
22  BY MR. BROWN:
23  **Q.  Jack.**
24  A.  -- and --
25  **Q.  Yeah.**

**Page 107**

1   A.  -- you meant was it --
2      MR. EDINBURGH:  probably [phonetic] --
3   A.  -- oriented 30 degrees off the
4   perpendicular to the center line of the --
5   BY MR. BROWN:
6   **Q.  Correct.**
7   A.  -- vehicle.
8   **Q.  And do you know here if the saddle is up**
9   **against the rubber holder for the normal service**
10  **jack that comes with the vehicle?**
11  A.  Yes.
12  **Q.  You can put that one in the pile.**
13  A.  Is this whole stack marked -- marked?
14  **Q.  7.**
15  A.  Oh, yeah.  Okay.  I didn't know you marked
16  the whole stack.
17  **Q.  Well, there was that one that was missing**
18  **from the copies that --**
19  A.  Oh, right.
20  **Q.  -- that I marked --**
21  A.  Right.  Right.  Right.  Right.  Sorry.
22  **Q.  Number 8.  All right, got to find my place**
23  **in my notes here.**
24     MR. EDINBURGH:  Take a quick, what,
25  two-minute break while --

**Page 108**

1      MR. BROWN:  Sure.
2      MR. EDINBURGH:  -- you're looking?
3      THE VIDEOGRAPHER:  The time is 2:02.
4   Please stand by.
5   [WHEREUPON, a brief recess is taken.]
6      THE VIDEOGRAPHER:  We are back on the
7   video record.  The time is 2:09.
8   BY MR. BROWN:
9   **Q.  Mr. Heath, do you know what the**
10  **dimensions of the mark on the decedent's sternum**
11  **are?**
12  A.  The -- the precise measurements, no, sir.
13  I could estimate them.  They look very similar to the
14  dimensions and size of the raised portion of the
15  casting of the transmission.  That's why it was my
16  opinion that that's what caused the mark on his
17  sternum.
18  **Q.  Do you know what the dimensions of the**
19  **grommet are that you say couldn't have made those**
20  **marks?**
21  A.  I measured the grommet.  I believe they're
22  in my notes.  But when I discovered that all you had
23  to do was take your finger and push it out of the
24  way, I thought they didn't make the -- it didn't make
25  any marks on the decedent.

Page 109

1  Q.  Do you know if the grommet is the same
2  size as the marks on his sternum?
3  A.  I don't.
4  Q.  On your report you criticize Mr.
5  Sprague because you think he's saying that the
6  passenger-side tires of the car had to move; is that
7  right?
8  A.  I think in his deposition that he said he
9  didn't care whi -- which way it happened, whether
10 the jack was expelled from under the car or the car
11 slid off the jack.  He said in his mind it didn't make
12 any difference, which I would, of course, disagree
13 with.
14 Q.  Do we have your notes where you
15 measured the grommet?
16 A.  I believe so, but I couldn't tell you where
17 to look.  They're -- if you do, they're in -- they're in
18 the first pile of stuff we produced from my first
19 deposition.
20 Q.  Well, not to bedraggle a point but to just
21 be clear:  All notes that you have, you did turn over
22 to counsel.
23 A.  Absolutely.
24 Q.  Or copies of your notes you turned over to
25 counsel.

Page 110

1  A.  Yes.  Well, correct.
2  Q.  If you'll look at Page 5 of your report.
3  A.  Okay.
4  Q.  At the top you say that Mr. Sprague
5  performed no testing, he relied upon oblique
6  measurements.
7  A.  Yes.
8  Q.  What do you mean when you say "oblique
9  measurements"?
10 A.  They're taken from an angular perspective.
11 Q.  Did you make any attempt to try to figure
12 out how much of an angle the -- the pictures were
13 taken --
14 A.  No.
15 Q.  -- from?
16 A.  Didn't -- didn't matter to me.
17 Q.  Do you have any awareness of what the
18 error rate of the measurements would be based on
19 the angle of the obliqueness?
20 A.  Why, no.
21 Q.  And you believe that these kind of
22 measurements made from the photos, which
23 themselves have scale markings on them, are -- are
24 artificial; is that right?
25 A.  Yeah.  Well, scale markings aren't even --

Page 111

1  aren't even that reliable.
2  Q.  Why not?
3  A.  Because they're angular.
4  Q.  If they're --
5  A.  It's called parallax.
6  Q.  If they're angular at all, that makes it
7  completely unreliable?
8  A.  Well, if you knew the precise angles and
9  all that nonsense, you could go through some
10 mumbo jumbo and calcula -- probably calculate
11 something, but at the end of the day, if you look at
12 what Mr. Sprague's idea of the chest dimensions
13 were and my idea of what the chest dimensions
14 were, they're pretty darn close.
15 Q.  But the whole nature of your opinions
16 about unreliability concern the angle of the body in
17 the photograph, nothing else?
18 A.  Ye --
19 Q.  Do you think the coroner --
20 A.  Ye -- the --
21 Q.  -- put a false --
22 A.  The short answer would be "yes."
23 Q.  Okay.  Well, I'm trying to understand.  Do
24 you say the --
25 A.  Right.

Page 112

1  Q.  -- coroner don't use -- doesn't use an
2  accurate --
3  A.  Well, I mean, I've scaled --
4  Q.  -- scale he puts on them?
5  A.  -- I've scaled photographs myself in the
6  past, and, in effect, that's what you're doing,
7  scaling a photograph.
8  Q.  Have you relied on scaled photographs in
9  your opinions --
10 A.  Yeah.
11 Q.  -- in the past?
12 A.  Within -- within reasonable parameters.
13 And I just got through telling you that Mr. Sprague
14 and I are pretty much on the same page with the
15 thi -- thickness of Mr. Klorczyk's chest.
16     MR. BROWN:  Let me ask you to do this
17 before I give you -- I think we're up to Number 9.
18     THE REPORTER:  M-hm.
19 [WHEREUPON, document referred to is marked
20 Exhibit 9 for identification.]
21 BY MR. BROWN:
22 Q.  Exhibit 9 is a picture of the underside of
23 the Klorczyk vehicle; do you recognize it in
24 general?
25 A.  Yeah, it looks like it could be.  I will take

**Page 113**

1 your representation that it is. But I see Mr.
2 Sprague's little marks on here, so I presume that --
3 that that's what it is; yes.
4 **Q. Well, as part of your reconstruction and**
5 **opinions, you've now come to a -- with your common**
6 **sense and elimination of alternatives, an opinion of**
7 **where you believe it's most likely that the stand**
8 **was?**
9     MR. EDINBURGH: Objection.
10 BY MR. BROWN:
11 **Q. Is that right?**
12 A. Yes, sir.
13 **Q. Can you mark on this photograph exactly**
14 **where that would be?**
15     MR. EDINBURGH: I -- I'm going to object.
16 In marking, I -- he can draw a circle, but I don't --
17 I'm not going to allow him to draw an "X"
18 specifically as. . . I mean, I think he drew the
19 circle last time.
20     THE WITNESS: I did. I may have already
21 done this.
22 BY MR. BROWN:
23 **Q. Well, I --**
24     MR. EDINBURGH: You -- do it again. I
25 don't care. I just --

**Page 114**

1 BY MR. BROWN:
2 **Q. I -- I don't remember seeing it, and I'm not**
3 **trying to trick you by having you doing it twice,**
4 **and --**
5 A. Oh --
6 **Q. -- you've done more work now, but --**
7 A. -- can't tell you --
8     MR. EDINBURGH: I can --
9 A. -- what comfort that gives me.
10     MR. EDINBURGH: Can we take --
11 A. What I would draw a -- a circle with? Is
12 there a mar -- a Sharpie or something?
13 BY MR. BROWN:
14 **Q. How about a pen?**
15 A. Well, a pen wou -- a pen will work, I
16 guess, but you ca -- you probably won't see it.
17     MR. EDINBURGH: Well, wait -- wait a
18 second. Just wait. I -- just -- I don't mean to delay
19 this at all, but I just want to find the photo we
20 previously marked when you asked exactly the same
21 question.
22 Can you give me one second to find it, please?
23     THE WITNESS: Yeah.
24     MR. BROWN: Sure.
25     THE WITNESS: I. . .

**Page 115**

1     MR. EDINBURGH: Yeah. Don't mark
2 anything yet.
3     THE WITNESS: I'm not marking anything
4 yet. I want to compare --
5     MR. EDINBURGH: Just wait a second.
6     THE WITNESS: -- it to my own
7 photograph.
8     MR. EDINBURGH: Let me see if I brought
9 it with me. It is [phonetic] -- I had it, i had it, if I
10 did I did, i thought I did [phonetic].
11     THE WITNESS: The photograph I had the
12 vellum on top of.
13     MR. EDINBURGH: This was it. You do
14 have the folder for these when we come back
15 [phonetic] from his first deposition.
16 BY MR. BROWN:
17 **Q. Well, I'm showing you what's been marked**
18 **as Exhibit 4 --**
19 A. M-hm.
20 **Q. -- from the first deposition, which seems to**
21 **have circled the entire brace; is that correct?**
22 A. Yes.
23 **Q. Do you now have a more refined opinion**
24 **other than just somewhere on that brace where you**
25 **believe the stand was?**

**Page 116**

1 A. Yes.
2 **Q. Could you --**
3     MR. BROWN: I -- would you prefer him to
4 mark it on this?
5 A. Why don't I just say to the front?
6     MR. EDINBURGH: I --
7 A. Will that make you happy?
8     MR. EDINBURGH: You -- I -- you -- you
9 want to -- however you want to do it. I'll allow
10 the -- I'll allow him to do it. I -- just let's agree on
11 how he's going to do it.
12     MR. BROWN: Yeah.
13 BY MR. BROWN:
14 **Q. Well, let's do it this way: When you say**
15 **"to the front," do you mean someone generally in**
16 **the first 6 inches, 4 inches, somewhere in there?**
17 A. Yes.
18 **Q. Okay. Well, then, wa -- we won't mark it,**
19 **but we'll understand that you believe from the very**
20 **front of that brace that's within the circle from your**
21 **prior deposition that would be towards the front,**
22 **probably somewhere in the first 4 to 6 inches?**
23 A. Yeah. It's right where I showed in my
24 sketch.
25     MR. EDINBURGH: Just I -- if you want to

| Page 117 | Page 119 |
|---|---|

**Page 117**

1 use a term other than "brace," because we've been
2 using a different term all along [phonetic].
3      MR. BROWN:  Well, what term have we
4 been using?
5      MR. EDINBURGH:  Longitudinal cradle
6 member or longitudinal.
7      MR. BROWN:  Longitudinal frame number;
8 is that called it?
9   A.  Well, it's the engine support.
10 BY MR. BROWN:
11   Q.  The longitudinal engine-support number.
12   A.  Good.  That's --
13   Q.  You believe it was within the first 4 to 6
14 inches of that number?
15   A.  It was toward the front end; yes, sir.
16   Q.  Okay.
17   A.  In accordance to my sketch.
18   Q.  And that's the sketch in your report?
19   A.  Yes, sir.
20   Q.  Why don't we look at that just so we're all
21 clear.
22      MR. EDINBURGH:  Can I take it?
23      MR. BROWN:  Yeah.  Please do.  I've got
24 enough pieces of paper.
25      MR. EDINBURGH:  Sketch mark?

**Page 118**

1      THE WITNESS:  Oh yes, pardon me.
2 BY MR. BROWN:
3   Q.  Can you direct me to the sketch you're
4 referring to?
5   A.  Yeah.  It's the one that looks like it was
6 drawn by hand by me, because it was.
7      MR. EDINBURGH:  Attachment 4.
8   A.  This thing; okay.
9 BY MR. BROWN:
10   Q.  Well, this thing is a depiction of, as I
11 understand it, the body as if we're looking up
12 through the floor?
13   A.  Yes.
14   Q.  It doesn't show the car, does it?
15   A.  No.
16   Q.  Now --
17   A.  It shows features on the car.
18   Q.  There's a box with an "X" in it and it says
19 "Support stand"; that's what you're referring to?
20   A.  Well, there's a support stand.  Here's the
21 wrench.  Here's the heat shield.  Here's the
22 transmission oil drain plug.  Here's the front
23 bumper.  This is the rear-most transverse member.
24 This is the mark on his chest.  And because we're
25 looking up, this is his right side; okay?

**Page 119**

1   Q.  And is this rectangle here meant to be the
2 longitudinal engine-frame support?
3   A.  Yeah.
4   Q.  Okay.  And to the best of your knowledge,
5 that's drawn to scale and the placing of the stand is
6 drawn to scale?
7   A.  Yes.  It's not all the way at the end, but
8 it's drawn to scale.
9   Q.  So, you believe it was adjacent his hip at
10 the time the car fell on him?
11   A.  Yes, sir.
12   Q.  If you'll look at the bottom of Page 5 of
13 your report.
14   A.  Okay.
15   Q.  Notes that you use the exemplar jack --
16   A.  Where -- where are you?  Which
17 paragraph?
18   Q.  Bottom paragraph.  I am --
19   A.  Oh --
20   Q.  -- sorry, sir.
21   A.  Okay.
22   Q.  [reads] Repeatedly lifting the exemplar
23 BMW with the exemplar jack and allowing the BMW
24 to sit; is that correct?
25   A.  Yes.

**Page 120**

1   Q.  You say, "No relative motion was observed
2 between the jack contact surface and the vehicle
3 contact surface"; is that right?
4   A.  Yes.
5   Q.  Okay.  Now, was that testing actually done
6 before you decided to try to pull the jack out from
7 under the car?
8   A.  This testing was while we were using the
9 jack.  We used the jack hundreds of times during
10 this reconstruction exercise and we never found any
11 evidence of the jack changing its relationship to the
12 vehicle while it was raised.
13   Q.  Now, is this in -- when you say the
14 hundreds of times, is this in preparation of your
15 first report and the second report?
16   A.  No.  It was for this reconstruction report.
17   Q.  Were you present when the jack was used
18 hundreds of times to raise the vehicle?
19   A.  No.
20   Q.  Okay.  So, when you say "we," you mean
21 Mr. Felpel.
22   A.  When -- when I say "we," we -- I mean
23 Heath and Associates.
24   Q.  Well, let's dig under Heath and Associates.
25 Who actually did it -- Mr. Felpel?

Page 121

1  A.  Who actually raised the jack?
2  Q.  Yeah.
3  A.  Yes.  Mr. Felpel.
4  Q.  Okay.  And it was Mr. Felpel who verbally
5  reported to you that there was no movement.
6  A.  Yes.
7  Q.  And that's not written down.  There was no
8  equipment looking at the car.  That's based on
9  observations with his eye?
10  A.  Yes.
11  Q.  Okay.  And it was only after you and he
12  discussed that you could jack the car up without it
13  moving that you developed this idea of pulling on
14  it?
15  A.  Anybody that's ever used a floor jack
16  knows that floor jacks adjust themselves so that the
17  saddle positions itself directly under the contact
18  point of lifting.  That's why it's got wheels on it.
19    So there are no horizontal forces between the
20  car and the jack.  The jacks are designed so there
21  aren't any, because the lifting point travels through
22  an arc and it translates in the horizontal plane.
23  Q.  Well, in fact, there's some horizontal
24  forces the jack re-positions itself under and that's
25  why they put a cup on it; correct -- so the wheels

Page 122

1  will move horizontally on the jack; correct?
2  A.  Yeah.
3  Q.  Because I've used a floor jack hundreds of
4  times --
5  A.  Well, then --
6  Q.  -- and I know they move.
7  A.  -- then you know what I'm talking about.
8    MR. EDINBURGH:  Objection.
9  BY MR. BROWN:
10  Q.  Well, I don't know why you say there's no
11  horizontal force.  I know that they are recommended
12  only to be used with a cup, and I've never used one
13  without a cup, because the cup grabs into it and
14  there's horizontal movement of the jack itself on
15  those wheels as it rotates up with the scissoring
16  action; correct?
17    MR. EDINBURGH:  Objection.
18  A.  Yeah, pretty much correct; yeah.
19  BY MR. BROWN:
20  Q.  And part of the design to these jacks is
21  that there will be horizontal movement of those
22  wheels and the jack body as the jack lifts higher;
23  correct?
24  A.  Exactly.
25    MR. EDINBURGH:  Objection.

Page 123

1  A.  I think you -- you paraphrased what I said
2  very well.
3  BY MR. BROWN:
4  Q.  Well, returning to your report.  It's only
5  after that was done that you decided that you would
6  do this pull test?
7  A.  What?
8  Q.  When did you determine that you would do
9  the pulling test?
10  A.  Oh --
11  Q.  What is -- where did I put my --
12  A.  -- upon ma -- reading Mr. Sprague's
13  report.
14  [WHEREUPON, off-the-record remarks are made.]
15  BY MR. BROWN:
16  Q.  Is Mr. Felpel an employee of Heath and
17  Associates?
18  A.  No.  Heath and Associates has no
19  employees.
20  Q.  Is he an independent contractor?
21  A.  Is Mr. Felpel an in --
22  Q.  Yeah.
23  A.  Yes.
24  Q.  Okay.
25    MR. EDINBURGH:  Just objection.  We --

Page 124

1  we did cover this the last time.
2    MR. BROWN:  Yes, we did.
3  [WHEREUPON, off-the-record remarks are made.]
4  BY MR. BROWN:
5  Q.  Does Heath Associates have a contract
6  with Mr. Felpel?
7  A.  Yes.
8    MR. EDINBURGH:  Objection.
9  BY MR. BROWN:
10  Q.  And it will just go to show you, if we talked
11  about this, I don't remember.  Do you have a
12  contract with Heath and Associates?
13  A.  No.  I am Heath Associates.  It's a sole
14  proprietorship.
15    MR. BROWN:  Let's do this before I
16  forget.  10, I think.
17  [WHEREUPON, document referred to is marked
18  Exhibit 10 for identification.]
19    MR. EDINBURGH:  Is this 10?
20    THE REPORTER:  Yes.
21    THE WITNESS:  What's that?  Oh, my
22  Rule 26?
23  BY MR. BROWN:
24  Q.  Let me just ask you:  It says "Heath and
25  Associates," but really Heath and Associates is just

Page 125

1  you?
2  A.  It's a d/b/a; yeah, you could say.
3  Q.  What -- who are the associates?  I don't --
4  A.  Well, Glenn Felpel --
5      MR. EDINBURGH:  Objection.
6  A.  -- is an associate.  I see no reason to tell
7  you who all my associates are.  Have nothing to do
8  with this case.
9  BY MR. BROWN:
10 Q.  Oh, we recently received an update, a
11 Rule 26 disclosure relating to this rebuttal work.
12 A.  Yes.
13 Q.  Some additional cases and testimony.
14 A.  Yes.
15 Q.  I wanted to go through these with you.  Do
16 you have --
17 A.  Again?
18 Q.  Well, how many of these were on the last
19 one?  I -- I assumed --
20     MR. EDINBURGH:  Up until --
21 BY MR. BROWN:
22 Q.  -- it was an update.
23     MR. EDINBURGH:  Up until Klorczyk,
24 because --
25 A.  Because one --

Page 126

1      MR. EDINBURGH:  -- there's two.
2  A.  There's one new one.
3  BY MR. BROWN:
4  Q.  What's the new one?
5  A.  The last one.
6  Q.  Each of these entries has some -- a
7  parentheses and then a -- like a 6-17 -- 6-17,
8  and 11-17.
9  A.  Yes.
10 Q.  Was that the date when --
11 A.  That's the month and the year.
12 Q.  Of your testimony?
13 A.  Of my testimony.
14 Q.  Okay.
15 A.  Correct.
16 Q.  And you have your prior deposition on here
17 from March of  17; correct?
18 A.  Yes.
19 Q.  So, new since that deposition is 6/17;
20 correct?
21 A.  [no response]
22 Q.  The first one, it says --
23 A.  Oh --
24 Q.  -- [reads] 6-17.
25 A.  -- okay.

Page 127

1  Q.  Circuit Court of Cook County, Illinois.
2  A.  Yeah.
3  Q.  Civil Action Number 08 --
4  A.  Yeah.
5  Q.  -- L --
6  A.  Yeah.  You're --
7  Q.  -- 12334.
8  A.  Right.
9  Q.  Sabrina Minonne as Administrator of the
10 Estate of Mark Minonne, deceased, versus Complete
11 Hydraulic Services.
12 A.  Yes.
13 Q.  Who were you the expert for in that case?
14 A.  The plaintiff.
15 Q.  And what's the nature of the case?
16 A.  The car fell off an automotive lift.
17 Q.  And was this a deposition?
18 A.  Yes.
19 Q.  Okay.
20 A.  The case never went to trial.
21 Q.  Has the case been settled?
22 A.  Yes.
23 Q.  The next one is Civil Action
24 Number 16CV289, which also says June of  17;
25 Dodge County Circuit Court, State of Wisconsin;

Page 128

1  Bruce Meitner and Darla M. Meitner; is that correct?
2  A.  Yes.
3  Q.  Who were you an expert for in that case?
4  A.  Plaintiff.
5  Q.  And what's the nature of this case?
6  A.  It was a failure of a hydraulic cylinder rod
7  end connection pin in an aerial -- scissors-type
8  aerial work platform, manufactured by JLG
9  Industries.
10 Q.  And was this a deposition testimony?
11 A.  Yes.
12 Q.  Has there been a trial in the case?
13 A.  No.
14 Q.  Is a trial scheduled?
15 A.  I don't know.  I expect so.  It's not settled.
16 Q.  And then there's an 11/17 entry, Civil
17 Action Number 14-CV-765; Circuit Court of the State
18 of Wisconsin; walls [phonetic] the Estate of Kevin
19 Ryan; do you see that?
20 A.  I do.
21 Q.  Who were you an expert for in that case?
22 A.  Defense.
23 Q.  All the defendants or just one particular?
24 A.  Well, let me look.  Well, the -- well, the --
25 thi -- thi -- this is the -- the -- the def -- the

**Page 129**

1  defendants named are all related.  Dover
2  Corporation, Dover Corporation Solutions, LLC,
3  Dover Engineering, Vehicle Service Group, Rotary
4  Lift Export Company, Rotary Lift International,
5  Rotary Lift Company, those -- those are all part of
6  Dover Corporation, and at the end of the day, the
7  lift was manufactured, distributed -- sold and
8  distributed by Rotary -- under the brand name
9  Rotary Lift.
10  I can't -- Dover Corporation changes their
11  corporate structure so frequently I can't keep track
12  of it.
13  **Q.  All right.  Well, what's the nature of the**
14  **case?**
15  A.  Car fell off a lift.
16  **Q.  Was this a deposition testimony?**
17  A.  Yes.
18  **Q.  This is fairly recently, so I assume it's not**
19  **gone to trial?**
20  A.  It's certainly not gone to trial yet.
21  **Q.  Is this case still pending, to the best of**
22  **your knowledge?**
23  A.  Yep.
24  **Q.  All right.**
25  A.  Is this the exhibit pile?

**Page 130**

1  **Q.  Yep.**
2  MR. BROWN:  Can we take a quick break?
3  MR. EDINBURGH:  Sure.
4  MR. BROWN:  I didn't make the bathroom
5  last time.
6  THE WITNESS:  I was going to --
7  beginning to think you were related to a camel.
8  THE VIDEOGRAPHER:  Time is 2:39.
9  Please stand by.
10  [WHEREUPON, a brief recess is taken.]
11  THE VIDEOGRAPHER:  Please stand by.
12  The time is 2:54, and we are back on the video
13  record.
14  MR. BROWN:  I don't have any further
15  questions.
16  [WHEREUPON, off-the-record remarks are made.]
17  THE VIDEOGRAPHER:  So, the time
18  is 2:54 p.m. and this --
19  [WHEREUPON, off-the-record remarks are made.]
20  THE VIDEOGRAPHER:  -- concludes the
21  deposition of Frederick Heath.  Please stand by.
22  [WHEREUPON, the Video Deposition of Frederick
23  G. Heath concludes at 2:54 p.m.]
24  .
25  .

**Page 131**

1          C A P T I O N
2      The Video Deposition of Frederick G.
3  Heath, taken in the matter, on the date, and at the
4  time and place set out on the title page hereof.
5      It was requested that the deposition be
6  taken by the reporter and that same be reduced to
7  typewritten form.
8      It was agreed by and between counsel and
9  the parties that the Deponent will read and sign the
10  transcript of said deposition.
11  .
12  .
13  .
14  .
15  .
16  .
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  .
25  .

**Page 132**

1          C E R T I F I C A T E
2  STATE OF_____:
3  COUNTY/CITY OF_____:
4      Before me, this day, personally appeared
5  Frederick G. Heath, who, being duly sworn, states
6  that the foregoing transcript of his/her Deposition,
7  taken in the matter, on the date, and at the time
8  and place set out on the title page hereof,
9  constitutes a true and accurate transcript of said
10  deposition.
11  _____
12          Frederick G. Heath
13
14  SUBSCRIBED and SWORN to before me this
15  _____day of_____,
16  2017, in the jurisdiction aforesaid.
17  .
18  .
19  _____    _____
20  My Commission Expires          Notary Public
21  .
22  .
23  .
24  .
25  .

DEPOSITION ERRATA SHEET

RE:   Court Reporting Services, Inc.

FILE NO.:  30952

CASE CAPTION:  Frederick Klorczyk, Jr., as Co-administrator of the Estate of Christina R. Klorczyk, et al, v. Sears Roebuck & Co., et al.

DEPONENT:  Frederick G. Heath

DEPOSITION DATE:  December 14, 2017

To the Reporter:

I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me.  I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the Errata Sheet and the appropriate Certificate and authorize you to attach both to the original transcript.

_____

_____

_____

_____

_____

CERTIFICATE OF REPORTER

STATE OF KENTUCKY AT LARGE:

I, BARBIE A. HENNESSEY, Notary Public for the State of Kentucky at Large, do hereby certify that the foregoing was reported by stenographic and mechanical means, which matter was held on the date, and at the time and place set out in the caption hereof and that the foregoing constitutes a true and accurate transcript of same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

GIVEN under my hand and Notarial seal this _____ day of _____, 2017.

My Commission Expires:          Notary Public

JANUARY 13, 2021  _____.

Notary ID: 571496

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

SIGNATURE:_____DATE:_____