# Vaughn v. Konecranes, Inc.

United States District Court for the Eastern District of Kentucky, Central Division

April 13, 2015, Decided; April 13, 2015, Filed

Civil Action No. 5: 14-136-DCR

**Reporter**
2015 U.S. Dist. LEXIS 47855 *; 2015 WL 1636431

GEORGE VINCENT VAUGHN, Plaintiff, v. KONECRANES, INC., Defendant/Third Party Plaintiff v. DEMAG CRANES AND COMPONENTS CORP.; HETRONIC USA, INC.; and CENTRAL MOTOR WHEEL OF AMERICA, INC., Third Party Defendants.

**Subsequent History:** Reconsideration denied by *Vaughn v. Konecranes, Inc., 2015 U.S. Dist. LEXIS 67485 (E.D. Ky., May 26, 2015)*

Affirmed by *Vaughn v. Konecranes, Inc., 642 Fed. Appx. 568, 2016 U.S. App. LEXIS 4061 (6th Cir.), 2016 FED App. 117N (6th Cir.) (6th Cir. Ky., 2016)*

**Prior History:** *Vaughn v. Konecranes, Inc., 2014 U.S. Dist. LEXIS 141115 (E.D. Ky., Oct. 2, 2014)*

## Core Terms

reliable, discovery, expert testimony, requirements, conclusions, principles, facts of a case, parties, initial report

**Counsel:** **[*1]** For George Vincent Vaughn, Plaintiff: David Rollins Marshall, LEAD ATTORNEY, Marshall Law Office, Lexington, KY.

For Konecranes, Inc., Defendant: Jane C. Higgins, Jennifer Maria Jabroski, LEAD ATTORNEYS, Phillips Parker Orberson & Arnett PLC - Lexington, Lexington, KY.

For Konecranes, Inc., ThirdParty Plaintiff: Jane C. Higgins, LEAD ATTORNEY, Jennifer Maria Jabroski, Phillips Parker Orberson & Arnett PLC - Lexington, Lexington, KY.

For Demag Cranes and Components Corp, ThirdParty Defendant: Catherine Amanda Stivers, Christopher Rennie Cashen, Christopher Lyle Jackson, LEAD ATTORNEYS, Dinsmore & Shohl LLP - Lexington, Lexington, KY.

For Hetronic USA, Inc., ThirdParty Defendant: Matthew T. Lockaby, LEAD ATTORNEY, Reminger & Reminger Co., LPA - LEXINGTON, Lexington, KY.

For Central Motor Wheel of America Inc., ThirdParty Defendant: Theodore Roberts Martin, LEAD ATTORNEY, Licha H. Farah, Jr., Ward, Hocker & Thornton - Lexington, Lexington, KY.

**Judges:** Danny C. Reeves, United States District Judge.

**Opinion by:** Danny C. Reeves

## Opinion

### MEMORANDUM OPINION AND ORDER

This matter is pending for consideration of the Defendant Konecranes, Inc.'s motion to preclude Frederick G. Heath from testifying during trial in a manner consistent **[*2]** with the matters outlined in his expert reports. [Record no. 96] For the reasons discussed below, the defendant's motion will be granted.

### I.

As discussed in prior orders, this action arises from a warehouse accident involving an industrial overhead crane. On May 8, 2012, while working at Central Motor Wheel of America, Inc. ("CMWA"), Plaintiff George Vincent Vaughn was injured when a crane pinned his foot. [Record No. 1-2, p. 21] Vaughn brought suit against Konecranes in the Bourbon Circuit Court under various theories of negligence and product liability. Thereafter, the action was removed to this Court. [Record No. 1] The Court entered a Scheduling Order, assigning deadlines for discovery and dispositive motions and setting the case for trial to begin on August 18, 2015. [Record No. 12] Under that Scheduling Order, the parties were to complete discovery and supplement disclosures by February 2, 2015. [*Id.*]

2015 U.S. Dist. LEXIS 47855, *2

The plaintiff hired Heath as a liability expert and expects him to testify regarding "why and how Mr. Vaughn was hurt," including offering opinions on Konecranes' alleged violation of a Crane Manufacturing Association of America Standard and the cause of the crane's malfunction. [Record [*3] No. 129-1, p. 4] On November 17, 2014, Heath issued his initial report. [Record No. 90-3] After the close of discovery, the plaintiff notified the Court of the necessity to supplement Heath's report based on newly-discovered information. [Record No. 91] The supplemental report was tendered on March 18, 2015. [Record No. 120-1] The defendant has raised objections to Heath's testimony based on *Rule 702 of the Federal Rules of Evidence* and the principles set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*. Konecranes attacks the reliability of Heath's initial report and argues that the supplemental report was untimely and should be excluded.

II.

Any challenge to expert testimony must begin with *Rule 702 of the Federal Rules of Evidence* which was modified in December 2000 to reflect the Supreme Court's holdings in *Daubert and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)*. *Rule 702* states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods [*4] to the facts of the case.

*Fed. R. Evid. 702*.

Based on the foregoing, for an expert's opinion to be admissible, it must satisfy three requirements. "First, the witness must be qualified by knowledge, skill, experience, training, or education. Second, the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to

determine a fact in issue. Third, the testimony must be reliable." *In re Scrap Metal Antitrust Litigation, 527 F.3d 517, 529-30 (6th Cir. 2006)*. When a party's expert witness is challenged, the Court assumes the role of a gatekeeper to determine whether the proposed testimony may be presented to the fact-finder. *Daubert, 509 U.S. at 587*.

The Court need not hold a *Daubert* hearing to determine the admissibility of expert testimony, but nonetheless must ensure that the disputed testimony is both relevant and reliable. *See Nelson v. Tennessee Gas Pipeline Co., 243 F.3d 244, 249 (6th Cir. 2001)*; *Clay v. Ford Motor Co., 215 F.3d 663, 667 (6th Cir. 2000)*. In the case at hand, the admissibility of the expert testimony under *Daubert* has been fully briefed by the parties. This Court finds that the record is sufficient to perform its role under *Daubert* and a hearing would not be helpful in exercising that duty.

III.

**A. March 2015 Report**

The defendant's motion to strike Heath as an expert is based largely on the initial report dated November 17, 2014. [Record No. 90-3] However, the plaintiff [*5] has supplemented Heath's initial report with another, dated March 20, 2015,[1] following the discovery of new information. [Record No. 120-1] Because Heath's March 2015 report was produced after the close of discovery and the deadline for expert testimony, Konecranes argues that it is untimely and testimony based on the report would be prejudicial. [Record No. 124] Conversely, the plaintiff maintains that this report should not be excluded because the defendant did not make its witnesses available for deposition at an earlier time. [Record No. 129-1]

*Rule 26(a)(2)(A)* directs a party to "disclose to the other parties the identity of any witness it may use at trial to present evidence under *Federal Rule of Evidence 702*, *703*, or *705*." *Fed. R. Civ. P. 26(a)(2)(A)*. These disclosures must be made "at the times and in the sequence that the court orders." *Fed. R. Civ. P. 26(a)(2)(D)*. *Rule 26(a)(2)(B)* requires a written report be disclosed that "contain[s] a complete statement of all opinions to be expressed and the basis and reason

---

[1] This date appears to be in error, as the plaintiff submitted the report on March 18, 2015. [Record No. 120-1]

therefor." *Fed. R. Civ. P. 26(a)(2)(B). Rule 26(e)* requires that a party who has made a disclosure under *Rule 26(a)* supplement that expert report in a timely manner if the party learns that a material part of the disclosure is incomplete **[*6]** or incorrect and if the information has not been known to the other party during discovery. *Fed. R. Civ. P. 26(e).*

The circumstances of this case underscore the importance of adhering to the Court's Scheduling Order and proceeding with timely discovery. It appears that counsel for several parties contributed to discovery delays and postponed key witness depositions. [Record Nos. 133-2, 133-3] These parties will not now be permitted to gain strategic advantage from the delays and induce technical violations rather than proceed on the merits of the case. Apparently, the defendant was aware that Heath's initial report would be supplemented following the deposition of Konecranes' employees, but counsel scheduled these depositions for the final business day of discovery. [*Id.*] Under these circumstances, the Court will accept the plaintiff's otherwise untimely expert report because it does not appear to result from a dilatory motive and purportedly relies on information disclosed only at the end of discovery. [Record No. 133] The Court finds the plaintiff's explanation reasonable and substantially justified. *See Fed. R. Civ. P. 37(c)(1)*; *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transport, 596 F.3d 357, 370 (6th Cir. 2010)*. Accordingly, the Court will include Heath's March 2015 report in its *Daubert* determination.

## B. [*7]  Reliability Requirement for Expert Testimony

In addition to requirements that a witness qualify as an expert and that the opinions he wishes to express be relevant, *Rule 702* requires that the opinions be reliable. *In re Scrap Metal, 527 F.3d at 529*. District courts consider the basis of an expert's opinion by evaluating: (i) whether the theory or technique can be and has been tested; (ii) whether it has been subjected to peer review and publication; (iii) its known or potential error rate and the existence and maintenance of standards controlling the technique's operation; (iv) whether it has attracted widespread acceptance in a particular field; and (v) whether the experts propose to testify about matters "growing naturally and directly out of the research they have conducted independent of the litigation" or have developed their opinions expressly for trial. *Smelser v. Norfolk Southern R. Co., 105 F.3d 299, 303 (6th Cir. 1997)*.

When assessing the reliability of opinions a witness seeks to provide as expert testimony, "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire, 526 U.S. at 142*. Generally, opinions meet the reliability threshold when an expert "employs in the courtroom the same level **[*8]** of intellectual rigor that characterizes the practice in the relevant field." *Jahn v. Equine Servs., PSC, 233 F.3d 382, 388 (6th Cir. 2000)* (citing *Kumho Tire, 526 U.S. at 152*)

In this case, Konecranes' major criticism of Heath's report — that it lacks any methodology at all — is well-taken. [Record No. 96-1] Without any identifiable method of reasoning, Heath's testimony is facially unreliable. *See Reynolds v. Freightliner LLC, 2006 U.S. Dist. LEXIS 97244, at *27 (E.D. Ky. June 21, 2006)*. Heath fails to explain how, given the facts and data he relied upon, he reached the conclusions outlined in his report. His report simply concludes, *inter alia*: (i) "either the bridge drive relay in the receiver stuck or the bridge drive contactor fused"; (ii) "[it] is more likely than not that the cause of the incident at issue was a fused contactor"; (iii) "[it] is clear that a sticking relay in the radio control receiver did not initiate the unintended motion of the crane"; (iv) "Konecranes actions and inactions were the major contributing causes of the incident that resulted in the injuries to Mr. Vaughn"; and (v) "[if] Konecranes had followed the guidelines set forth in CMAA [Specifications] it is more likely than not that the bridge drive contactor(s) would have been replaced prior to the incident, the incident would not have occurred, and [Vaughn] would not have been **[*9]** injured." [Record No. 120-1, pp. 12, 15-16]

In determining whether a particular methodology is reliable, this Court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *See Kumho Tire Co., 526 U.S. at 158*. The party seeking to have the testimony admitted bears the burden of showing "that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology," and "the expert's bald assurance of validity is not enough." *Daubert* (on remand), *43 F.3d at 1316*. Here, Heath's opinion is simply insufficient. Absent some process or testable principle, the Court is unable to determine whether Heath's conclusions are "the product of reliable principles and methods" or whether he "reliably applied the principles and methods to the facts of the case." *Fed. R. Evid. 702*. These are the threshold requirements for the admission of expert

testimony.

Heath's report identifies certain documents that he reviewed in forming his opinions. [Record No. 120-1, pp. 1-2] However, it is unclear which documents were actually used by him in formulating his opinions, and explanation of how his experience informed his conclusions is completely absent. **[\*10]** It is the absence that makes Heath's testimony patently unreliable. Without such an explanation, there is simply too great an analytical gap between the facts of the case and the opinion proffered to permit Heath's testimony to go to the jury.

Vaughn attempts to premise Heath's testimony on his extensive training and experience with "lifting heavy things." [Record No. 129-1, p. 3] The plaintiff argues that Heath's experience is sufficient to support his opinions in this case. It is well-established that an expert's experience may be the basis for reliable testimony. The Advisory Committee Notes to _Rule 702_ specifically contemplate such a situation:

> Nothing in this amendment is intended to suggest that experience alone — or experience in conjunction with other knowledge, skill, training, or education — may not provide a sufficient foundation for expert testimony. To the contrary, the text of _Rule 702_ expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.

_Fed. R. Evid. 702_ advisory committee's note (2000). However, it is not sufficient for an expert merely to cite to his experience **[\*11]** without further explanation. Rather, an expert must be able to articulate the connection between his experience and his conclusions in a particular case:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."

_Id._

Heath's report describes his credentials and experiences, which include membership in the American Society of Safety Engineers, the Automotive Life Institute, the Society of Automotive Engineers, the Scaffold and Access Industry Association, the Specialized Carriers and Riggers Association, Underwriter's Laboratories, and the Material Handling Industry of America. [Record No. 120-1, p. 3] In addition, Heath serves on the consensus body for Specifications for Cable-less Controls for Electric Overhead Traveling Cranes and committees within the American Society of Mechanical Engineering for Overhead Hoists; Jacks, Industrial Rollers, Air Casters, and Hydraulic Gantries; and Below-the-Hook **[\*12]** Lifting Devices. [_Id._] In the past, Heath has served as chief executive officer of a lift manufacturing company and chief operating officer of a pressure vessel manufacturing company. Regardless, nothing in the record or the expert report describes how his experience led to his conclusions or explains how he reliably applied his experience to the facts of the case. Heath's report does not articulate a reliable connection between his experience and his conclusions in any way, much less to the extent described in the Advisory Committee Notes to _Rule 702_.

Moreover, contrary to the plaintiff's assertion that "Mr. Heath's opinions is [sic] based on published standards that were created to be representative of generally accepted industry custom and practice," [Record No. 129-1, p. 4] the reports do not discuss these standards. Apart from conclusorily stating that, "[there] is no evidence that Konecranes followed the specific instructions of CMAA Specification #78, Paragraph 4.4.4 and Table 4.4.2 that the Quarterly inspections of the CMWA cranes cover electrical components (including contactors and relays) for pitting or deterioration," [Record No. 120-1, p. 10] the reports do not articulate the proper **[\*13]** inspection procedure or apply the industry-accepted specifications to the facts of the case. Although a qualified expert may testify regarding the customs and standards of an industry, Heath has not done so here. _See McGowan v. Cooper Industries, Inc., 863 F.2d 1266, 1272-73 (6th Cir. 1988)_. As a result, his testimony is not "the _product of_ reliable principles and methods" and Heath has not "_reliably applied_ the principles and methods to the facts of the case," as required by _Rule 702_. [Record No. 120-1, p. 16]

**IV**.

Heath's conclusions are unreliable because he has failed to explain his reasoning, verify his methods, or point to others who have done so. _See, e.g., Smelser, 105 F.3d at 304_. The reliability of Heath's opinions has

2015 U.S. Dist. LEXIS 47855, *13

not been established by a preponderance of evidence and his opinions do not meet the admissibility requirements of *Rule 702*. Accordingly, it is hereby

**ORDERED** that Defendant Konecranes' motion to preclude Frederick G. Heath from testifying as an expert witness during trial [Record No. 96] is **GRANTED**.

This 13th day of April, 2015.

**Signed By**:

/s/ DCR

*Danny C. Reeves*

**United States District Judge**

---

# *Kuzmech v. Werner Ladder Co.*

United States District Court for the District of Connecticut

December 7, 2012, Decided; December 7, 2012, Filed

CIVIL ACTION NO. 3:10-cv-266 (VLB)

**Reporter**
2012 U.S. Dist. LEXIS 174082 *; 90 Fed. R. Evid. Serv. (Callaghan) 50; 2012 WL 6093898

RUTH J. KUZMECH, ET AL, Plaintiff, v. WERNER LADDER COMPANY, ET AL, Defendants,

## Core Terms

ladder, buckling, testing, strut, expert testimony, reliable, engineering, quotation, marks, conclusions, alternative design, implied warranty, calculations, measurements, principles, drawings, warnings, leg, expert report, side rail, causation, citations, aluminum, theories, warranty, summary judgment motion, product liability, manufacturing, deposition, scientific

## Case Summary

### Overview
The court found that although plaintiffs' expert was qualified by experience, training and education, his testimony was neither grounded on sufficient facts or data, the product of reliable principles and methods nor was there any indication that the expert applied those principles and methods reliably to the facts. Plaintiffs failed to satisfy any of the four factors identified in Daubert with respect to the expert's testimony. The expert's conclusions that the ladder was defective were based on nothing more than his cursory visual inspection of the ladder and rough measurements.

### Outcome
The motions were granted.

## LexisNexis® Headnotes

Evidence > Admissibility > Expert Witnesses

*HN1*[⬇] **Admissibility, Expert Witnesses**

*Fed. R. Evid. 702* provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Evidence > Admissibility > Expert Witnesses > Daubert Standard

Evidence > Admissibility > Expert Witnesses

*HN2*[⬇] **Expert Witnesses, Daubert Standard**

District courts have a "gatekeeping" role under *Fed. R. Evid. 702* and are charged with the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. The district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered. This inquiry is conducted with reference to *Rule 702*, and involves considering whether (1) the testimony is grounded on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.

Evidence > Admissibility > Expert Witnesses > Daubert Standard

*HN3*[⬇] **Expert Witnesses, Daubert Standard**

While the Daubert inquiry is fluid and will necessarily vary from case to case, the United States Supreme Court in Daubert identified factors bearing on reliability that district courts may consider: (1) whether a theory or technique can be (and has been) tested; (2) whether the

theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. However, nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. The burden is on the party proffering the expert testimony to lay a foundation for its admissibility.

Evidence > ... > Testimony > Expert Witnesses > Qualifications

*HN4*[ ] **Expert Witnesses, Qualifications**

A court must consider the totality of a witness's background when evaluating the witness's qualifications to testify as an expert. *Fed. R. Evid. 702* does not require expertise to be so exacting. *Rule 702* requires a witness only be qualified by knowledge, skill, experience, training or education and permits that witness to testify if that expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

Evidence > Admissibility > Expert Witnesses > Daubert Standard

Evidence > Admissibility > Expert Witnesses

*HN5*[ ] **Expert Witnesses, Daubert Standard**

Nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.

Evidence > Admissibility > Expert Witnesses

*HN6*[ ] **Admissibility, Expert Witnesses**

Expert testimony should be precluded where there is no indication in the expert report of the engineering protocols and methods employed in arriving at the normative conclusions embodied within the claims.

Evidence > Admissibility > Expert Witnesses

*HN7*[ ] **Admissibility, Expert Witnesses**

An expert, regardless of how sterling his credentials, must make clear in his proffer the methods and standards he proposes to apply in arriving at his opinions and evaluations, and must make clear in doing so that those methods and standards are reliable, and subject to objective evaluation by the expert's peers.

Evidence > ... > Testimony > Expert Witnesses > General Overview

Torts > Products Liability > General Overview

*HN8*[ ] **Testimony, Expert Witnesses**

Courts have repeatedly emphasized the importance of having an expert in a product liability case perform appropriate tests on his and the defendant's designs. The importance of testing both an expert's theory of causation and alternative design is usually critical to show that an expert adhered to the same standards of intellectual rigor that are demanded in their professional work and ensures that the focus of the jury's deliberation is on whether the manufacturer could have designed a safer product, not on whether an expert's proposed but untested hypothesis might bear fruit. Indeed the United States Court of Appeals for the Second Circuit has acknowledged that expert testimony regarding a safer alternative design should be excluded where the expert fails to conduct any testing, perform calculations or create drawings and testimony regarding a theory of causation should be excluded absent testing. This is not to say that testing of alternative designs is always necessary. An expert may, in some cases, provide drawings and calculations that would allow a trier of fact to infer that his theory that the product was defective and that alternative designs would have prevented the accident without sacrificing utility were supported by valid engineering principles.

Evidence > Admissibility > Expert Witnesses

Torts > Products Liability > General Overview

*HN9*[ ] **Admissibility, Expert Witnesses**

The United States Court of Appeals for the Second Circuit holds hat district courts are not required to accept an expert's testimony regarding speculative and untested theories concerning the cause of an accident in a products liability case.

Civil Procedure > Discovery & Disclosure > Disclosure > Mandatory Disclosures

Civil Procedure > Discovery & Disclosure > Disclosure > Sanctions

## HN10[⬇] Disclosure, Mandatory Disclosures

*Fed. R. Civ. P. 26* guards against the presentation of sketchy and vague expert reports that provide little guidance to the opposing party as to an expert's testimony, *Fed. R. Evid. 702* guards against the presentation of insufficiently reliable evidence to the finder of fact. *Rule 26* requires that an expert report contain (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; and (iii) any exhibits that will be used to summarize or support them. *Fed. R. Civ. P. 26(a)(2)(B).* Feb. R. Civ. P. 37(c)(1) provides that a party who fails to provide information required by *Rule 26(a)* is not permitted to use that information to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless. The advisory notes to *Rule 26* make clear that *Rule 26(a)(2) (B)*, added as part of the 1993 amendments to the federal rules, requires that an expert prepare a detailed and complete written report, stating the testimony the witness is expected to present during direct examination, together with the reasons therefore.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

## HN11[⬇] Summary Judgment, Entitlement as Matter of Law

Summary judgment should be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a).* The moving party bears the burden of proving that no factual issues exist. In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought. If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

## HN12[⬇] Burdens of Proof, Nonmovant Persuasion & Proof

A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, the plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient. Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.

Torts > Products Liability > General Overview

## HN13[⬇] Torts, Products Liability

The Connecticut Products Liability Act (CPLA), *Conn. Gen. Stat. § 52-572m et seq.*, enacted in 1979, is intended to merge the various common law theories of products liability into a single cause of action in order to simplify pleadings and procedures. However, the CPLA certainly retains the plaintiff's right to allege the traditional theories of recovery along with the statutory basis for recovery under one unified count denominated as a product liability claim.

Torts > Products Liability > Types of Defects > Design Defects

Torts > Products Liability > Types of Defects > Manufacturing Defects

Torts > Products Liability > Theories of Liability > Strict Liability

## HN14[⤓] Types of Defects, Design Defects

Connecticut law provides for civil damages actions grounded in strict liability for defective products. *Conn. Gen. Stat. § 52-572n*. In general, Connecticut courts have adopted the strict liability test established in *§ 402A of the Restatement (Second) of Torts*. *Section 402A* imposes liability only when the product is "unreasonably dangerous" to the ordinary consumer who purchases it. A product may be defective due to a flaw in the manufacturing process, a design defect or because of inadequate warnings or instructions. A manufacturing defect is a mistake in the assembly process, which results in a product that differs from the manufacturer's intended result. A design defect exists when the product is otherwise properly manufactured, but is nonetheless unreasonably dangerous because its attributes can cause unexpected injury while a warning defect exists when a product is unreasonably dangerous because it lacks adequate warnings or instructions concerning the product's dangerous propensities.

Torts > Products Liability > Types of Defects > Marketing & Warning Defects

Torts > Products Liability > Theories of Liability > Strict Liability

## HN15[⤓] Types of Defects, Marketing & Warning Defects

In order to recover under the doctrine of strict liability in tort a plaintiff must prove that: (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition. A product is unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it. Proper warnings, however, may prevent a product from being unreasonably dangerous. In a products liability action, the plaintiff must plead and prove that the product was

defective and that the defect was the proximate cause of the plaintiff's injuries.

Evidence > ... > Testimony > Expert Witnesses > General Overview

Torts > Products Liability > General Overview

## HN16[⤓] Testimony, Expert Witnesses

Connecticut Supreme Court has made it clear that in product liability actions, a jury may, under appropriate circumstances, infer a defect from the evidence without the necessity of expert testimony. Expert testimony is unnecessary if all the primary facts can be accurately and intelligibly described to the jury, and if they are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation. Where, however, the nexus between the injury and the alleged cause would not be obvious to the lay juror, expert evidence is often required to establish the causal connection between the accident and some item of physical or mental injury.

Evidence > ... > Testimony > Expert Witnesses > General Overview

Torts > Products Liability > Types of Defects > Design Defects

## HN17[⤓] Testimony, Expert Witnesses

Courts have recognized that putting forth expert testimony or evidence of some kind to establish a genuine issue of material fact is especially important when the plaintiff attempts to assert a design defect claim. Expert testimony with reference to proximate causation is not always required for example, when a jury could find proximate causation from its consideration of the product and the plaintiff's description of how the accident happened. However, an expert opinion as to proximate causation is required when the subject-matter to be inquired about is presumed not to be within common knowledge and experience and when legal inference predominates over statement of fact. A defendant in a products liability may be entitled to judgment as a matter of law when the plaintiff lacks admissible expert testimony on the issue

of causation.

Torts > Products Liability > General Overview

**_HN18_[⬇]  Torts, Products Liability**

The Connecticut Products Liability Act (CPLA), _Conn. Gen. Stat. § 52-572m et seq._, creates a consolidated cause of action for all product liability claims, which shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product. _Conn. Gen. Stat. § 52-572n(a)_. Although the CPLA provides the exclusive remedy for product liability claims, it was not meant to alter the substance of a plaintiff's rights and it does not preempt all common law theories of product liability; rather, the CPLA bars separate common law causes of action in product liability cases. A plaintiff bringing a cause of action under the CPLA therefore retains the right to allege traditional theories of recovery under one unified CPLA claim like breach of express and implied warranty.

Torts > Products Liability > Theories of Liability > Breach of Warranty

**_HN19_[⬇]  Theories of Liability, Breach of Warranty**

Because the Connecticut Products Liability Act (CPLA), _Conn. Gen. Stat. § 52-572m et seq._, is silent as to the elements of a cause of action for breach of warranty, plaintiffs may rely on the Connecticut Uniform Commercial Code, Title 42a of the Connecticut General Statutes (CUCC). The CUCC defines implied warranties in two provisions. _Conn. Gen. Stat. § 42a-2-315_ provides: where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under _Conn. Gen. Stat. § 42a-2-316_ an implied warranty that the goods shall be fit for such purpose. _Conn. Gen. Stat. § 42a-2-314_ provides: unless excluded or modified as provided by _Conn. Gen. Stat. § 42a-2-316_, a warranty that the goods shall be merchantable is implied in a contract with respect to goods of that kind. This implied warranty of merchantability acts as a guarantee by the seller that his goods are fit for the ordinary purposes for which they are to be used and will pass in the trade without objections.

Business & Corporate Compliance > ... > Contracts Law > Types of Contracts > Express Warranties

Torts > Products Liability > Theories of Liability > Breach of Warranty

**_HN20_[⬇]  Types of Contracts, Express Warranties**

An express warranty is defined under _Conn. Gen. Stat. § 42a-2-313(1)_ as: (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain, creates an express warranty that the goods shall conform to the affirmation or promise; (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description; (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the good shall conform to the sample or model.

Business & Corporate Compliance > ... > Contracts Law > Types of Contracts > Express Warranties

Contracts Law > Contract Conditions & Provisions > Implied Warranties > General Overview

Torts > Products Liability > Theories of Liability > Breach of Warranty

**_HN21_[⬇]  Types of Contracts, Express Warranties**

For both express and implied warranties, a plaintiff has the burden of proving causation. In a breach of warranty action, a plaintiff may recover only after demonstrating that a warranty existed, that defendant breached the warranty, and that the breach was the proximate cause of the loss sustained.

Torts > Products Liability > General Overview

**_HN22_[⬇]  Torts, Products Liability**

The Connecticut Products Liability Act (CPLA), _Conn. Gen. Stat. §52-572m et seq._, exclusivity provision bars Connecticut Unfair Trade Practices Act (CUTPA), _Conn. Gen. Stat. § 42-110a, et. seq._, claims that assert that a

defendant's product is defectively designed or that the defendant failed to warn properly about a defective product.

Torts > Negligence > General Overview

*HN23*[🔗] **Torts, Negligence**

Loss of consortium is a derivative cause of action, meaning that it is dependent on the legal existence of the predicate action.

**Counsel:** [*1] For Ruth J. Kuzmech, John M. Kuzmech, Plaintiffs: Jonathan Lane, LEAD ATTORNEY, Mariani & Reck, LLC, New London, CT; Leslie Gold McPadden, LEAD ATTORNEY, Leslie Gold McPadden, LLC, Cheshire, CT; Ralph J. Monaco, LEAD ATTORNEY, Conway, Londregan, Sheehan & Monaco, P.C., New London, CT; Tracey E. Hardman, The Hardman McPadden Law Offices, Middletown, CT.

For Werner Ladder Co, Lowes Home Center Inc, Defendants: Mark J. Claflin, Howd & Ludorf, LLC, Hartford, CT.

**Judges:** Hon. Vanessa L. Bryant, United States District Judge.

**Opinion by:** Vanessa L. Bryant

# Opinion

MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION TO PRECLUDE EXPERT WITNESS [DKT. #57] AND MOTION FOR SUMMARY JUDGMENT [Dkt. #45]

Before the Court is Defendants Werner Co. (DE) [1] ("Werner") and Lowe's Home Centers, Inc.'s ("Lowe's") motion to preclude Plaintiffs Ruth J. Kuzmech and John Kuzmech's expert witness and motion for summary judgment. Plaintiffs allege that a ladder manufactured by Werner and distributed by Lowe's was defectively designed and sold without proper or adequate warnings, labels and instructions in violation of the Connecticut Products Liability Act ("CPLA"), *Conn. Gen. Stat. §52-572m et seq.* Plaintiffs also bring claims for breach of

express [*2] warranty, breach of implied warranty, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), *Conn. Gen. Stat. §42-110a, et. seq.* and loss of consortium on behalf of Plaintiff John Kuzmech. Defendants argue that the Court should preclude the Plaintiffs' expert's testimony as unreliable and that absent expert testimony Plaintiffs' CPLA claims fail as a matter of law as the Plaintiffs cannot demonstrate that the ladder was defective. The Defendants also argue that Plaintiffs' other claims are preempted by the CPLA. For the foregoing reasons, the Court grants both Defendants' motion to preclude and motion for summary judgment.

Background and Facts

The following background and facts relevant to Defendants' motion to preclude and motion for summary judgment are undisputed unless otherwise noted. On July 14, 2009, Ruth Kuzmech, age seventy, was using a stepladder to trim hedges along her driveway when both she and the ladder fell to the ground. [Dkt. #45, Defs. Local Rule 56(a)1 Statement, ¶1]. At the time, Ruth Kuzmech was using an eight-foot Werner aluminum stepladder. *Id.* at ¶2. Mrs. Kuzmech's son, Clifford [*3] Hoxie, purchased the ladder at Lowe's sometime in April 2009, where he was employed, with his employee discount, for Mrs. Kuzmech and her husband, John Kuzmech. *Id.* at ¶3. The ladder was a 1-A ladder with a 250 pound duty rating. *Id.* at ¶5. Hoxie did not observe any damage to the ladder when it was purchased. *Id.* at ¶4. Mr. and Mrs. Kuzmech did not observe any damage to the ladder when Hoxie presented it to them. *Id.* at ¶¶9-10.

The ladder at the time of purchase had warning labels on it, including the following: one with duty rating on it, one on the side pertaining to the setup of the ladder, one cautioning to use it only on level surfaces, and one on a top step that advises not to stand beyond that point. *Id.* at ¶6.

At the time of her fall, Mrs. Kuzmech was trimming the side of the hedges facing her lawn, and the ladder was placed on a grassy dirt surface. *Id.* at ¶11. Mrs. Kuzmech had climbed up to the third rung of the ladder and was trimming the hedges when she "just went." *Id.* at ¶12. She doesn't know what happened to cause her to fall. *Id.* Mrs. Kuzmech recalls falling over to the left and the next thing she knew she was on the ground. She lost consciousness for a period of time. [*4] *Id.* at ¶13. When Mrs. Kuzmech regained consciousness, her

---

[1] Plaintiffs improperly sued Werner Ladder Company and Werner Company.

2012 U.S. Dist. LEXIS 174082, *4

dog was licking her face. She observed that one of her legs was sticking through the rungs of the ladder and her other leg was underneath the left front side rail. She also observed that the ladder was now bent and damaged. *Id.* at ¶14.

At the time of the fall, the ladder was positioned in an area of a gradual downward slope which Mrs. Kuzmech describes as "not bad." [Dkt. #55, Pl. Local Rule 56(a) 2 Statement, ¶17]. Mrs. Kuzmech is certain that the ladder's four feet did not move at all. They did not sink into the ground or come off of the ground, until the moment the ladder fell over. [Dkt. #45, Defs. Local Rule 56(a)1 Statement, ¶18]. Both of Mrs. Kuzmech's hands were holding the trimmers when the ladder fell over. *Id.* at ¶19.

Mrs. Kuzmech had used the ladder prior to the date of her fall, without incident. *Id.* at ¶21. Mrs. Kuzmech's daughter also used the ladder twenty to twenty-five times before without incident. *Id.* at ¶22.

Plaintiffs allege in their complaint that the ladder was defective in several ways. First, Plaintiffs allege that the stepladder's rear legs were no longer lined up with the front-legs, leaving the ladder [*5] racked and unstable. [Dkt. #1, Compl., ¶9]. In the racked position, the stepladder had only three legs on the ground, the fourth leg was off of the ground causing the ladder's support to cave in. *Id.* Plaintiffs also allege that one of the bolts that held the upper frame of the ladder came out, which contributed to the caving in of the ladder. *Id.* at ¶10. Plaintiffs also allege that the Defendants breached the express warranty that the ladder was safe for its intended uses and the implied warranty of merchantability because Mrs. Kuzmech was injured as a result of the ladder's defects. *Id.* at ¶¶14-16. Plaintiffs further allege that Defendants violated CUTPA by failing to correct the defect and to accurately, completely and truthfully warn that the ladder's defects posed a danger to the public at large. *Id.* at ¶30. Plaintiffs contend that as a direct and proximate result of the deceptive acts or practices of the Defendants, Mrs. Kuzmech suffered severe painful and serious injuries. *Id.* at ¶32. Lastly, Mr. Kuzmech alleges that he has suffered a loss of affection, care, companionship and consortium of his wife as a result of the carelessness and negligence of Defendant Werner. *Id.* [*6] at p.17.

Plaintiffs have offered the testimony of Dr. Harold Larson as an expert witness in support of their opposition to Defendants' motion for summary judgment. Based on the testimony of Dr. Larson,

Plaintiffs contend in opposition to summary judgment that the ladder was defectively designed such that the diagonal strut which connects to the side rail was not strong enough to support the load of the ladder during a reasonably foreseeable use and such that the diagonal strut should have connected to the side rail at a lower point, offering more support for the load of the ladder. [Dkt. #55, Pl. Local Rule 56(a) 2 Statement, Disputed Issue of Material fact, ¶¶1-2].

Dr. Larson is a metallurgical engineer. He holds a bachelors of science in chemical engineering from Tufts University and a doctorate in metallurgy from the Massachusetts Institute of Technology ("MIT"). [Dkt. #62, Ex. A, Larson CV]. He was employed as a Superintendent of Process Metallurgy Research by ASARCO INC. from 1966-1980. *Id.* After ASARCO, Dr. Larson worked as a Manager of Metals Research and Headquarters Staff Engineer at Exxon Mineral Company from 1980-1984 and then as a General Manager and Director of Engineering [*7] at Prototech Inc. from 1984-1988. *Id.* From 1989-2006, Dr. Larson was employed as a Research Associate at MIT and then as a Research Affiliate at MIT from 2006-present. *Id.* Dr. Larson has authored several peer reviewed articles in the fields of chemical and metallurgical engineering. Dr. Larson is not a licensed engineer in any state.

Dr. Larson's expert report submitted pursuant to *Fed. R. Civ. P. 26(a)(2)* consists of a four paragraph letter dated September 7, 2011 addressed to Plaintiffs' counsel. In that letter, Dr. Larson writes:

I have examined the incident Ladder which you delivered to me. Mrs. Kuzmech's sworn deposition establishes that the ladder was set up properly, the side braces were engaged, and the ladder was on stable relatively flat ground. She climbed up to the ladder to only the third step from the bottom and reached over the top of the ladder to trim her bushes. Therefor her center of mass was always between the side rails of the ladder. Her weight was well below the weight rating of this ladder.

The ladder failed and collapsed sideways when the left front rail buckled and folded inward. The ladder was being used properly, therefore the ladder failed. The step ladder [*8] is made of extruded Aluminum alloy. There are four diagonal Aluminum support struts riveted to each of the bottom three steps of the ladder to stiffen and strengthen it. In this failure the two support struts between the bottom step and the left rail failed by buckling. Of these, the rear strut buckled the most. Once the

struts bent, they could not support or stiffen the left rail and strut. The root cause of the collapse of the ladder was the buckling of the lower rear support strut. This is a flimsy, poorly designed ladder and failure was foreseeable.

The weakest components of the design were the lower support struts which failed. At minimal or no extra cost a light gage extrude channel piece could have been substituted for the two struts on each side. The channel geometry would provide much greater resistance to buckling. In addition, the connection points on the side rails would perform better if they were closer to the foot of the ladder. A ladder with these simple modifications, likely would not have failed. A company interested in consumer safety would recall this model ladder and make these changes.

In my opinion, with a reasonable degree of engineering certainty, the incident **[*9]** ladder failed because it was poorly designed and defective for its rated service.
[Dkt. # 57, Att. 1, Ex. A].

Defendants have submitted a complete copy of Dr. Larson's deposition transcript for this Court's review. Dr. Larson testified that while he doesn't claim to be a ladder expert nor has he designed a ladder, he has examined and worked on several ladder cases in collaboration with MIT Professor Tom Eagar. [Dkt. #57, Ex. B., Larson Dep., p. 30-32]. In those past cases, Dr. Larson has completed testing on ladders including determining the kind of force it takes to break something loose on the subject ladder as well as some "analytical work on the type of aluminum from an aluminum ladder, hardness measurements, chemical analysis, SEM work, and grain structure measurements." *Id.* at 32-33.

Dr. Larson testified that he did not undertake any testing on the ladder at issue in this case and that "all I've done is a visual inspection" of the ladder. *Id.* at 34. He testified that he did not take any measurements that he recorded and kept but used a micrometer to measure wall thickness to get a rough judgment on the various strengths of various components. *Id.* at 45. He also took a tape measure **[*10]** and measured the distance between the various steps on the ladder. *Id.* at 48. Dr. Larson did not ask for any design drawings before he prepared his report nor did know whether the measurements he made met manufacturing specifications. *Id.* at 47-48.

Dr. Larson testified that he observed several

deformations of the ladder during his visual inspection which he deemed to be significant. He testified that "I would place a lesser level of significance on the side brace that broke fee from one leg. I don't think that was causative. I think that was post event but not an initiator. To me the main damage I saw on the bottom left front rail which had buckled and the support struts or brackets that go between that rail and the lowest step of the ladder." *Id.* at 51. Dr. Larson also indicated that one end of one of the spreader bars had pulled loose from the rail and bent which in his opinion was the result of the accident and not its cause. *Id.* at 52. Dr. Larson did not take any measurement of any of the deformations to the ladder. *Id.* at 54.

Dr. Larson indicated that it was his belief that had the diagonal struts not bent the side rail would not have bent. *Id.* at 69. Dr. Larson testified that he **[*11]** did not "attempt to quantify what forces are required to cause this type of deformation to the ladder components given the set up and use of the ladder at that time." *Id.* He stated that "it's testing that could be done. I've not been requested to do that." *Id.* Dr. Larson explained "[o]ne thing that I would [have] like[d] to test that could be tested would be what I'm calling the strut, the knee brace, could test that as to what force does it take compression to get it to buckle. That knee brace is made out of 14 gage steel, has a dimple in it, if you would, which strengthens it somewhat but is almost 10 inches long and is subject to buckling...There is an issue of the thickness of the material and length of the material. If the length of the material is over 50 times the thickness of the material it's prone to buckling. That would be the case here. If it's short and stubby, if it was either less length or more thickness to it, it would not have buckled." *Id.* at 70- 71.

Dr. Larson testified that "I believe the design of the whole ladder is - I use the word flimsy. That includes that left side rail ... You want a ladder to be the lightest weight possible and just strong enough to do the **[*12]** job. Both side rails could have been made out of stronger material generally thicker...and that to make this ladder non-defective [they should] make the strut stronger and [] move the connection point of the strut to the side rail lower." *Id.* at 77-78. Dr. Larson attested that he did not make any drawings of such an alternative design nor did he create any sketches. *Id.* at 78-79. When asked if his opinion was untested and subjective based on the accident that was described by the Plaintiff, he answered that "[t]his is an educated opinion. It's unsubstantiated." *Id.* at 79. He once again indicated that he did not do any calculations in connection with his

opinion. *Id.*

Dr. Larson also explained that in his opinion the strut should have been made out of a channel configuration as opposed to the configuration that it was. *Id.* Dr. Larson brought to the deposition a U shaped channel made out of aluminum that he explained would be close to the size and the shape of his proposed design alternative. *Id.* at 79-80. Dr. Larson purchased this piece of aluminum which was commercially available. *Id.* at 130. Dr. Larson testified that the channel he brought is an example of the concept of the alternative **[*13]** design but that he did not do "any drawings, sketches, calculations or any other work to transform that alternative design concept into any type of prototype that could actually be used with that ladder" although he indicated that it would "not [be] difficult to do" so. *Id.* at 80.

Although Dr. Larson admittedly did not build any prototype or do any calculations such as to determine the load bearing characteristics of the alternative diagonal brace he proposed, he explained that he could demonstrate his design concept with cardboard. *Id.* at 81-83. At his deposition, Dr. Larson used cardboard to demonstrate that a U shape is stronger and less prone to buckling. *Id.* at 83-84.

When asked "is there any testing of the ladder as a whole that you could envision that could be done to test your opinion that the left front rail and diagonal braces were bent by normal loading within the center of gravity of the ladder with the ladder placed on a firm level surface," Dr. Larson indicated that "[t]here are tests that could be done. But I would not expect it to fail those tests...[b]ecause a **[*14]** normal loading of a ladder straight down would tend to cause the legs to buckle outward. This leg buckled inward." *Id.* at 71-72. Dr. Larson indicated that his opinion was not premised on the assumption that the ladder was on a firm surface and the forward force consisted of the Plaintiff and the hedge trimmer as Plaintiff had testified. *Id.* Instead, Dr. Larson explained that he had "a couple of hypotheses, certainly not prove, a couple of things that could cause the failure" which he did not include in the report. *Id.* at 72. Dr. Larson further explained that a "person is not necessarily stationary with straight down forces. But they could be a body moving side to side that can put additional horizontal forces on the ladder. There can be some racking or twisting of the ladder that occurs." *Id.* at 74.

Dr. Larson opined that in order for the inward buckling to have occurred there must have been horizontal force on the ladder despite the fact the Plaintiff has testified that she was centered on the ladder on essentially flat ground. *Id.* at 84. Dr. Larson explained that he had a couple of hypotheses as to how there could be lateral movement when Plaintiff didn't do anything to tip the ladder **[*15]** to one side or the other. *Id.* at 86. He declared that "I have, as I said previously, a couple of hypotheses that would cause that to happen, neither one of which I can prove. There is no evidence that I'm aware of." *Id.* at 84-85. "One hypothesis we know there was a dog in the yard. If Ms. Kuzmech is standing on the third step of the ladder and the dog comes and jumps onto the ladder, the side of the ladder, puts his paws up against it, he can create just the direction and type of force that is needed to cause the buckling. I don't know that happened. It's just a hypothesis." *Id.* at 85-86. Dr. Larson admits that he did not attempt to quantify the force that would be at play in this hypothesis. *Id.* at 86. His second hypothesis "which has to do with the buckling of the strut is that while the ladder is on its side either in storage in the storage shed or possibly even when it was in the store before it was purchased somebody could have inadvertently kicked against the strut. It could happen... I think it's possible that a strut was damaged before the ladder was used." *Id.* at 87.

Dr. Larson agrees that "if the ladder was set up on relatively firm level ground and a person such as the Plaintiff **[*16]** having her body centered between the rails that an inward buckling of one of the front legs is not to be expected" and that ""unless one of [his] two hypotheses or some other manner that [he] can't envision currently was in place, then [he] can't envision how the inward buckling would occur given the stated use of the ladder." *Id.* at 88-89. "For the buckling to have occurred in this case given the Plaintiff's stated use of the ladder" there must have been "some other force to cause the inward buckling."

Dr. Larson agrees that "if someone reached far enough outward to the left or the right to cause a ladder to tip over that that force would also cause a leg to buckle." *Id.* at 94. Dr. Larson also agrees that if the ladder "simply tipped over for whatever reason, whether it's because it was on a slope, whether it was because the Plaintiff lost her balance for whatever reason, if the ladder simply tipped over and the Plaintiff fell on it" her body weight could cause the buckling of the left rear rail. *Id.* at 96. Although Dr. Larson points out that Mrs. Kuzmech testified that when she regained consciousness the ladder was on top of her. *Id.* at 97.

Dr. Larson further testified that he believed **[*17]** that the side braces were flimsy and the side rails were of the absolute minimum thickness to function and should be heavier but neither of these two weaknesses contributed to the accident. *Id.* at 98-99. Dr. Larson attested that he did not consult with anybody regarding his work on this case nor was his work reviewed by any other engineer or scientific expert. *Id.* at 104. Lastly, Dr. Larson attested that he isn't familiar with any literature or materials in the public domain that speak directly to ladder design or manufacture although he is aware those sources exist. *Id.* at 107-108.

A. Motion to Preclude

**HN1**[↑] *Federal Rule of Evidence 702* provides: A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *Fed. R. Evid. 702*.

**HN2**[↑] "District **[*18]** courts have a 'gatekeeping' role under *Federal Rule of Evidence 702* and are charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Lynch v. Trek Bicycle Corp., 374 F. Appx. 204, 206 (2d Cir. 2010)* (quoting *Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002))*. "The district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered. This inquiry is conducted with reference to *Rule 702*, and involves considering whether (1) the testimony is grounded on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.* (internal quotation marks and citations omitted).

**HN3**[↑] "While the *Daubert* inquiry is fluid and will necessarily vary from case to case, the Supreme Court in *Daubert* identified factors bearing on reliability that district courts may consider: "(1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, **[*19]** (3) a technique's known or potential rate of error, and the existence and

maintenance of standards controlling the technique's operation, and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. However, nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* (internal quotation marks and citations omitted). "The burden is on the party proffering the expert testimony to lay a foundation for its admissibility." *Smith v. Herman Miller, Inc., No.CV-03-5358 (CPS), 2005 U.S. Dist. LEXIS 46112, 2005 WL 2076570, at *2 (E.D.N.Y. Aug. 26, 2005)*.

Defendants argue that the Plaintiffs should be precluded from offering Dr. Larson's testimony and report because his opinions have not been subjected to scientific method, are not reliable and express a legal conclusion. Defendants also appear to suggest that Dr. Larson is not qualified to testify concerning the appropriate design of ladders. Defendants point out that Dr. Larson is not a professional licensed engineer, has never designed a ladder, is admittedly not a ladder expert and billed **[*20]** very few hours on this case. [Dkt. #57, p. 11-12]. "**HN4**[↑] A court must consider the 'totality of a witness's background when evaluating the witness's qualifications to testify as an expert.'" *Smith, 2005 U.S. Dist. LEXIS 46112, 2005 WL 2076570, at *3* (quoting 29 Wright & Gold, Federal Practice and Procedure § 6265, at 246 (1997)). "An expert must be limited to opinion testimony in the area of expertise in which the proffering party can qualify the expert." *Id.* Although Dr. Larson is not a ladder designer, *Rule 702* does not require expertise to be so exacting. *Rule 702* requires a witness only be qualified by knowledge, skill, experience, training or education and permits that witness to testify if that expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. Here, Dr. Larson's extensive education and research background in metallurgy and engineering more than indicate that he is qualified to opine on whether the aluminum ladder in this case was defectively designed and that his opinion is being offered to help the trier of fact determine the central fact in issue in this case. The fact that Dr. Larson was not a ladder designer **[*21]** or ladder expert goes only to the weight of his testimony not his qualifications.

Although Dr. Larson is qualified by experience, training and education, his testimony is neither grounded on sufficient facts or data, the product of reliable principles and methods nor is there any indication that Dr. Larson applied those principles and methods reliably to the

facts of this case. Moreover, the Plaintiffs had failed to satisfy any of the four factors identified in *Daubert* with respect to Dr. Larson's testimony. Dr. Larson's conclusions that the ladder was defective are based on nothing more than his cursory visual inspection of the ladder and rough measurements. Dr. Larson admittedly did not undertake any testing of the defective ladder despite acknowledging that such testing was not only feasible but not difficult to accomplish. Indeed, Dr. Larson noted that in past ladder cases he has done such analytical work including hardness measurements, chemical analysis, SEM work, and grain structure measurements. In fact, Dr. Larson testified that he would have liked to have done some testing in this case on the diagonal knee brace to determine what compressive load caused buckling but had not  [*22] been requested to do so. In both his report and his deposition testimony, Dr. Larson fails to identify what principles and methods he relies upon in coming to his conclusions besides his conclusory statement that such conclusions were based on a "reasonable degree of engineering certainty." As the Supreme Court has made clear *HN5*[ ⬆ ] "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)*. Without any explanation of the reasoning, any calculations or other type of scientific evidence supporting Dr. Larson's conclusions, his testimony is opinion evidence that is mere *ipse dixit* of the expert. See *Smith, 2005 U.S. Dist. LEXIS 46112, 2005 WL 2076570, at *4* (holding that "lack of calculations, alternative design, testing, or supporting research material renders it nearly impossible to discern precisely what [the expert's] methodology in coming to his conclusion was. The expert report consists almost exclusively of his observations concerning the physical characteristics of the chair without supporting measurements, and the conclusion that the chair  [*23] could not withstand a rocking motion ... leav[ing] the Court with mere *ipse dixit*, or say so of the witness.") (internal quotation marks and citations omitted).

Another district court in this circuit has cogently explained that *HN6*[ ⬆ ] expert testimony should be precluded where there is no indication in the expert report "of the engineering protocols and methods" employed "in arriving at the normative conclusions embodied within the claims." *Borgognone v. Trump Plaza, No.98-CV-6139(ILG), 2000 U.S. Dist. LEXIS 4081, 2000 WL 341135, at 5* (E.D.N.Y. Mar. 9, 2000)*. In *Borgognone*, the plaintiff's expert opined that the shower in the defendant hotel was "very slippery" and "excessively sloped." The *Borgognone* court noted that although "[c]ivil engineers presumably have objective methods and scientific standards that may be brought to bear in the assessment of such familiar, lay categories as the "slipperiness" of tile flooring, or the construction of shower stalls with tiered floor levels," the expert made "no mention of these methods or standards in opining on these matters, appearing to rest solely on his laurels as a civil engineer, whose opinions just by virtue of that fact are admissible as relevant expertise." *Id.* The *Borgognone* [*24] court therefore concluded that "this manner of proceeding is precisely what *Daubert* ... will not countenance. *HN7*[ ⬆ ] An expert, regardless of how sterling his credentials, must make clear in his proffer the methods and standards he proposes to apply in arriving at his opinions and evaluations, and must make clear in doing so that those methods and standards are reliable, and subject to objective evaluation by the expert's peers." *Id.* Here as was the case in *Borgognone*, Dr. Larson fails to proffer the methods and standards he proposes to apply in arriving at his normative conclusions that the ladder was "flimsy" and "poorly designed" nevertheless demonstrate that those methods and standards were reliable. Instead, Dr. Larson appears to rest on his laurels as an MIT metallurgist.

*HN8*[ ⬆ ] Courts have also "repeatedly emphasized the importance of having an expert in a product liability case perform appropriate tests on and the defendant's designs." *Smith, 2005 U.S. Dist. LEXIS 46112, 2005 WL 2076570, at *4* (collecting cases). The importance of testing both an expert's theory of causation and alternative design "is usually critical to show that an expert adhere[d] to the same standards of intellectual rigor that are demanded in  [*25] their professional work" and "ensures that the focus of the jury's deliberation is on whether the manufacturer could have designed a safer product, not on whether an expert's proposed but untested hypothesis might bear fruit." *Colon ex rel. Molina v. BIC USA, Inc., 199 F.Supp.2d 53, 76-77 (S.D.N.Y. 2001)* (internal quotation marks and citation omitted). Indeed the Second Circuit has acknowledged that expert testimony regarding a safer alternative design should be excluded where the expert fails to conduct any testing, perform calculations or create drawings and testimony regarding a theory of causation should be excluded absent testing. *Zaremba v. Gen. Motors Corp., 360 F.3d 355, 358 (2d Cir. 2004)* ("Numerous courts have excluded expert testimony regarding a safer alternative design where the expert failed to create drawings or models or administer tests.")

(collecting cases); *Brooks v. Outboard Marine Corp., 234 F.3d 89, 92 (2d Cir. 2000)* ("The failure to test a theory of causation can justify a trial court's exclusion of the expert's testimony."); *see also Rabozzi v. Bombardier, Inc., No. 5:03-CV-1397 (NAM/DEP), 2007 U.S. Dist. LEXIS 21724, 2007 WL 951569, at *6 (N.D.N.Y. Mar. 27, 2007)* (excluding expert report **[\*26]** where report failed to explain reasoning or calculations behind expert's opinion and failed to test proposed design "much less built and tested a prototype."). "This is not to say that testing of alternative designs is always necessary. An expert may, in some cases, provide drawings and calculations that would allow a trier of fact to infer that his theory that the [product] was defective and that alternative designs would have prevented the accident without sacrificing utility were supported by valid engineering principles." *Smith, 2005 U.S. Dist. LEXIS 46112, 2005 WL 2076570, at *4* (internal quotation marks and citations omitted). It is undisputed that Dr. Larson did not build a prototype, create any drawings or sketches, or perform any calculations or conduct testing on his alternative design nor did he test any of his theories of causation. The fact that Dr. Larson did demonstrate at his deposition that a U shape design is stronger with some cardboard and brought to his deposition a U shaped aluminum channel rod similar in size and shape to his proposed design concept fall far short of a comprehensive drawing or sketch supported by calculations that would allow a trier of fact to infer that his theory that **[\*27]** the ladder was defective and his alternative design would have prevented the accident were supported by valid and reliable engineering principals and methods.

*HN9*[⬆]] The Second Circuit has also emphasized that district courts are not required to accept an expert's testimony regarding speculative and untested theories concerning the cause of an accident in a products liability case. *Lynch, 374 F. Appx. at 206*. In *Lynch*, the Second Circuit affirmed the district court's decision to preclude an expert who testified how the product failure could have happened to his untested conjecture and to how certain testing might be conducted as unreliable under *Rule 702* and *Daubert* factors. *Id.* In the instant case, Dr. Larson admits that his theories as to the cause of accident are untested and unsubstantiated hypotheses. He speculates that the inward buckling on the ladder might have been caused by a dog jumping on the ladder or by pre-existing damage that occurred sometime during storage. Dr. Larson repeatedly testified that these two hypotheses were unsubstantiated and could not be proved as he was aware of no evidence to

support them. It is axiomatic that expert testimony "'must be based on actual knowledge **[\*28]** and not subjective belief or unaccepted speculation.'" *Smith, 2005 U.S. Dist. LEXIS 46112, 2005 WL 2076570, at *4* (quoting *Mitchell v. Gencorp, Inc., 165 F.3d 778, 780 (10th Cir.1999))*.

Because Dr. Larson fails to identify the engineering protocols or methods he employed to arrive at his conclusions, this Court cannot find that his testimony satisfies the *Daubert* factors which ask the Court to examine the reliability of those protocols and methods. Here, Dr. Larson has not tested his design; neither his design nor the theory or technique behind the design has been subjected to peer review or publication; there is no known rate of error because his design has not been tested; and Dr. Larson has not shown that his design or the theory or technique behind the design has gained general acceptance in the relevant scientific community. In sum given *Rule 702* factors and the *Daubert* factors bearing on reliability, this Court finds it appropriate to preclude Dr. Larson's report and testimony as unreliable and therefore inadmissible under *Rule 702*.

The Court notes that Dr. Larson's "report" also fails to meet *Rule 26 of the Federal Rules of Civil Procedure*'s requirements concerning expert reports. Although the inquiry under **[\*29]** *Rule 26* is distinguishable from *Rule 702*, the fact that Dr. Larson's report also fails to meet Rule 26's threshold underscores the conclusion that his testimony is insufficient under *Rule 702*. *HN10*[⬆]] "*Rule 26* guards against the presentation of sketchy and vague expert reports that provide little guidance to the opposing party as to an expert's testimony, *Rule 702* guards against the presentation of insufficiently reliable evidence to the finder of fact." *Conte v. Newsday, Inc., No. CV 06-4859(JFB)(ETB), 2010 U.S. Dist. LEXIS 143368, 2011 WL 2671216, at *4 (E.D.N.Y. July 7, 2011)* (citation omitted). *Rule 26* requires that an expert report contain "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; [and] (iii) any exhibits that will be used to summarize or support them." *Fed. R. Civ. P. 26(a)(2)(B)*. *Rule 37(c)(1)* provides that a party who fails to provide information required by *Rule 26(a)* is not permitted "to use that information ... to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." *Fed. R. Civ. P. 37(c)(1)*. "The Advisory Notes to *Rule 26* **[\*30]** make clear that *subsection (a)(2) (B)*, added as part of the 1993 amendments to the Federal Rules, requires that

an expert "prepare a detailed and complete written report, stating the testimony the witness is expected to present during direct examination, together with the reasons therefore." *Jinghong Song v. Yao Bros. Grp. LP, No. 10 Civ. 04157(RKE), 2012 U.S. Dist. LEXIS 62235, 2012 WL 1557372, at *1 (S.D.N.Y. May 2, 2012)* (internal quotation marks and citation omitted); *see also Salgado by Salgado v. Gen. Motors Corp., 150 F.3d 735, 742 n.6 (7th Cir.1998)* ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions."); *Koppell v. New York State Bd. of Elections, 97 F.Supp.2d 477, 481 (S.D.N.Y. 2000)* (excluding expert report because defendants "failed to provide sufficiently detailed information regarding the bases of [the expert's] opinion."). As discussed above, Dr. Larson's four paragraph "letter-report" does not provide a complete statement of the basis and reasons for his conclusions nor does it adequately identify the facts and data considered. Dr. Larson's bald conclusions that the ladder was "flimsy, poorly designed," "failure **[*31]** was foreseeable" and that at little to no extra cost a channel piece could have been substituted to provide "much greater resistance to buckling" fail to indicate how and why Dr. Larson reached these conclusions. Moreover, Dr. Larson's deposition testimony fails to cure any of the deficiencies of his "report." Although not raised by Defendants, Dr. Larson's report would also be subject to exclusion based on *Rule 26* and *Rule 37(c)(1)* . For the all of the aforementioned reasons, the Court grants Defendants' motion to preclude and will not consider Dr. Larson's testimony as part of the record on Defendants' motion for summary judgment.

B. Motion for Summary Judgment

Legal Standard

**HN11**[⬆️] Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Fed.R.Civ.P. 56(a)*. The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir.2010)*. "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom **[*32]** summary judgment is sought." *Id.*, (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)*; *Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538*

*(1986))*. "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315-16 (2d Cir.2006)* (internal quotation marks and citation omitted).

**HN12**[⬆️] "A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp., No.3:03cv481, 2004 U.S. Dist. LEXIS 22112, 2004 WL 2472280, at *1 (D.Conn. Oct. 20, 2004)* (internal quotation marks and citations omitted); *Martinez v. State of Connecticut, 817 F. Supp. 2d 28, 2011 WL 4396704 at *6 (D. Conn. 2011)*. **[*33]** Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co., 604 F.3d 712 (2d Cir. 2010)*.

Analysis

i. CPLA Claim

"**HN13**[⬆️]] The CPLA, enacted in 1979, was intended to merge the various common law theories of products liability into a single cause of action in order to simplify pleadings and procedures. However, the CPLA certainly retains the plaintiff's right to allege the traditional theories of recovery along with the statutory basis for recovery under one unified count denominated as a product liability claim." *Moss v. Wyeth Inc., No.3:04cv1511(SRU), 872 F. Supp. 2d 162, 2012 U.S. Dist. LEXIS 72569, 2012 WL 1899876, at *2 (D.Conn. May 24, 2012)* (internal quotation marks and citations omitted).

**HN14**[⬆️] "Connecticut law provides for civil damages actions grounded in strict liability for defective products." *Id.* (citing *Conn. Gen. Stat. §52-572n*). "In general, Connecticut courts have adopted the strict liability test established in *section 402A of the Restatement (Second) of Torts*. **[*34]** *Section 402A* imposes liability only when the product is 'unreasonably dangerous' to

2012 U.S. Dist. LEXIS 174082, *34

the ordinary consumer who purchases it." *Id.* (citing *Garthwait v. Burgio, 153 Conn. 284, 289- 90, 216 A.2d 189 (1965)* and *Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 211, 694 A.2d 1319 (1997)* (quoting *§ 402A, cmt. (i)*)). "A product may be defective due to a flaw in the manufacturing process, a design defect or because of inadequate warnings or instructions." *Vitanza v. Upjohn Co., 257 Conn. 365, 373, 778 A.2d 829 (2001).* A manufacturing defect "is a mistake in the assembly process, which results in a product that differs from the manufacturer's intended result." *Moss, 2012 U.S. Dist. LEXIS 72569, 2012 WL 1899876, at *2.* A design defect "exists when the product is otherwise properly manufactured, but is nonetheless unreasonably dangerous because its attributes can cause unexpected injury" while a "warning defect exists when a product is unreasonably dangerous because it lacks adequate warnings or instructions concerning the product's dangerous propensities." *Id.*

"*HN15*[↑]] In order to recover under the doctrine of strict liability in tort the plaintiff must prove that: (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective [*35] condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition." *Giglio v. Connecticut Light & Power Co., 180 Conn. 230, 234, 429 A.2d 486 (1980).* "A product is unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it ... Proper warnings, however, may prevent a product from being unreasonably dangerous." *Vitanza, 257 Conn. at 374* (internal quotation marks and citations omitted). "In a products liability action, the plaintiff must plead and prove that the product was defective and that the defect was the proximate cause of the plaintiff's injuries." *Haesche v. Kissner, 229 Conn. 213, 218, 640 A.2d 89 (1994)* (internal quotation marks and citation omitted).

Defendants argue that without any expert evidence Plaintiffs cannot establish a genuine issue of material fact in dispute that the ladder was unreasonably dangerous. As the Second Circuit observed the "*HN16*[↑]] Connecticut Supreme Court has made it clear that in product liability [*36] actions, 'a jury may, under appropriate circumstances, infer a defect from the evidence without the necessity of expert testimony.'" *Sanders v. Fireline, Inc., 295 F. Appx. 373, 374 (2d Cir. 2008)* (quoting *Potter v. Chicago Pneumatic Tool Co.,*

*241 Conn. 199, 218, 694 A.2d 1319 (1997)).* "Expert testimony is unnecessary 'if all the primary facts can be accurately and intelligibly described to the jury, and if they ... are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation.'" *Id.* (quoting *Salem v. U.S. Lines Co., 370 U.S. 31, 35, 82 S. Ct. 1119, 8 L. Ed. 2d 313 (1962)).* "'Where, however, the nexus between the injury and the alleged cause would not be obvious to the lay juror, expert evidence is often required to establish the causal connection between the accident and some item of physical or mental injury.'" *Id.* (quoting *Wills v. Amerada Hess Corp., 379 F.3d 32, 46 (2d Cir. 2004)).*

*HN17*[↑]] Courts have recognized that "[p]utting forth expert testimony or evidence of some kind to establish a genuine issue of material fact is especially important when, as is the case here, [*37] the plaintiff attempts to assert a design defect claim." *Walters v. Howmedica Osteonics Corp., 676 F.Supp.2d 44, 50 (D. Conn. 2009); Koger v. Synthes North America, Inc., No. 3:07-CV-01158 (WWE), 2009 U.S. Dist. LEXIS 117829, 2009 WL 5110780, at *2 (D. Conn. Dec. 17, 2009)* (holding that since implanted medical screws was not a subject matter within common knowledge plaintiff needed expert evidence to establish screw was defective and the existence of a causal link); *Graham v. Fireline, Inc., 3:03CV00990 (AWT), 2006 U.S. Dist. LEXIS 39185, 2006 WL 1646165, at 6 (D. Conn. June 14, 2006)* ("Expert testimony with reference to proximate causation is not always required .... for example, when a jury could find proximate causation from its consideration of ... the [product] and the plaintiff's description of how the accident happened. However, an expert opinion as to proximate causation "is required[ ] when the subject-matter to be inquired about is presumed not to be within common knowledge and experience and when legal inference predominates over statement of fact.") (internal quotation marks and citations omitted); *Simjian v. Bayer Corp., No. 3:10-CV-1263 (RNC), 2012 U.S. Dist. LEXIS 50198, 2012 WL 1194283, at *1 (D. Conn. April 10, 2012)* ("A defendant in a products liability [*38] may be entitled to judgment as a matter of law when the plaintiff lacks admissible expert testimony on the issue of causation.").

Here given that the Plaintiffs' CPLA claim turns on the physical conditions and engineering principles of when a ladder buckles, the jury is not as capable as an expert witness in "comprehending the primary facts and of drawing correct conclusions from them." *Sanders, 295*

*F. Appx. at 374* (internal quotation marks and citations omitted). Expert evidence is necessary because the engineering principles behind ladder buckling are clearly not within common knowledge. Moreover the causal nexus between the injury and the claimed defects would not be obvious to a lay juror. In fact they are not obvious to the Plaintiff's experts who posits alternative theories for the ladder collapse other than an inherent defect. Because this Court has excluded Plaintiffs' expert for the reasons discussed above, the Plaintiffs have failed to proffer admissible expert evidence to establish a genuine issue of material fact as to their CPLA claim. The Court therefor grants summary judgment on Plaintiffs' CPLA claim.

ii. Breach of express and implied warranty

Defendants argue that Plaintiffs' **[*39]** breach of express and implied warranty claims fail as a matter of law as the CPLA provides the Plaintiffs with their exclusive remedy. *HN18*[↑] The CPLA creates a consolidated cause of action for all product liability claims, which "shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product." *Conn. Gen. Stat. §52-572n(a)*. "Although the CPLA provides the exclusive remedy for product liability claims, it was not meant to alter the substance of a plaintiff's rights and it does not preempt all common law theories of product liability; rather, the CPLA bars separate common law causes of action in product liability cases." *Fraser v. Wyeth, Inc., 857 F.Supp.2d 244, 252 (D. Conn. 2012)*. "A plaintiff bringing a cause of action under the CPLA therefore retains the right to allege traditional theories of recovery under one unified CPLA claim" like breach of express and implied warranty. *Id.* Therefore although the Plaintiffs pled their breach of warranty claims as separate counts, the Court will treat those claims as a single cause of action under the CPLA with multiple theories. "Such sub-claims are addressed **[*40]** independently, and retain their character as they existed at common law even when brought as a single CPLA claim." *Certain Underwriters, Subscribing To Policy Numbers DG055707, DG061908, 4N65010001, No.3:10-cv-00915(VLB), 2011 U.S. Dist. LEXIS 33516, 2011 WL 1217169, at *6 (D. Conn. Mar. 30, 2011)*. Therefore the Court will examine whether there is a genuine issue of material fact in dispute as to whether Defendants breached either the express or implied warranty.

Courts have held that "*HN19*[↑] because the CPLA is silent as to the elements of a cause of action for breach of warranty," plaintiffs may rely on the Connecticut Uniform Commercial Code, Title 42a of the Connecticut General Statutes ("CUCC"). *Walters, 676 F.Supp.2d at 55*; *Johnson v. Sears Roebuck & Co., No.3:05-cv-139(JCH), 2007 U.S. Dist. LEXIS 63657, 2007 WL 2491897, at *4 (D. Conn. Aug. 29, 2007)*. "The CUCC defines implied warranties in two provisions. *Connecticut General Statute section 42a-2-315* provides: '[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under *section 42a-2-316* **[*41]** an implied warranty that the goods shall be fit for such purpose.'" *Walters, 676 F.Supp.2d at 55* (quoting *Conn. Gen. Stat. §42a-2-315*). "*Connecticut General Statute section 42a-2-314* provides: '[u]nless excluded or modified as provided by *section 42a-2-316*, a warranty that the goods shall be merchantable is implied in a contract with respect to goods of that kind.'" *Id.* (quoting *Conn. Gen. Stat. §42a-2-314*). "This implied warranty of merchantability 'acts as a guarantee by the seller that his goods are fit for the ordinary purposes for which they are to be used and will pass in the trade without objections.'" *Id.* (quoting *Blockhead, Inc. v. Plastic Forming Co., Inc., 402 F.Supp. 1017, 1025 (D.Conn.1975))*.

*HN20*[↑] An express warranty is defined under *Conn.Gen.Stat. § 42a-2-313(1)* as: "(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain, creates an express warranty that the goods shall conform to the affirmation or promise. (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. (c) Any sample or model which **[*42]** is made part of the basis of the bargain creates an express warranty that the whole of the good shall conform to the sample or model." *Conn.Gen.Stat. § 42a-2-313(1)*; *Johnson, 2007 U.S. Dist. LEXIS 63657, 2007 WL 2491897, at *4*.

"*HN21*[↑] For both express and implied warranties, a plaintiff has the burden of proving causation. *Johnson, 2007 U.S. Dist. LEXIS 63657, 2007 WL 2491897, at *4* (citing *Conn.Gen.Stat. § 52-572n(a)*); *Blockhead, 402 F.Supp. at 1024* ("In a breach of warranty action, a plaintiff may recover only upon demonstrating that a warranty existed, that defendant breached the warranty, and that the breach was the proximate cause of the loss sustained.").

As Defendants argue there is no record evidence in this case that the ladder in question was unfit for its known or ordinary purpose. As discussed above, Plaintiffs have failed to offer any admissible expert evidence to support the conclusion that the ladder was defective or unfit for its ordinary or known use. Furthermore, Plaintiffs fail to provide evidence that the alleged injuries were caused by the ladder being unfit for its purpose. Plaintiffs have therefore failed to establish a material issue of fact in dispute as to breach of implied warranty. There is likewise no evidence that **[*43]** Defendants breached any express warranty as Plaintiffs have failed to demonstrate that the ladder was defective and have failed to present any evidence that such breach was the proximate cause of the loss sustained. Plaintiffs' claims for breach of express and implied warranty are directly premised on the alleged ladder's defects. Because Plaintiffs have failed to create a genuine issue of material fact in dispute as to the ladder's defects, they likewise cannot create a genuine issue of material fact in dispute as to either their breach of express or implied warranty claims. Plaintiffs therefore fail to set forth any facts demonstrating a genuine issue for trial with respect to these claims and the Court grants summary judgment.

### iii. CUTPA

The Plaintiffs have argued that the Defendants have violated CUTPA by attaching inaccurate and deceiving warning labels on the ladder. Defendants argue that the Plaintiffs' CUTPA claims fail as a matter of law as the CPLA provides the Plaintiffs with their exclusive remedy. In response, the Plaintiffs contend their claims are not barred on the basis of the Connecticut Supreme Court's decision in *Gerrity v. R.J. Reynolds Tobacco Company, 263 Conn. 120, 818 A.2d 769 (2003)*. **[*44]** [Dkt. #55, p.2, 7]. However Plaintiffs' reliance on *Gerrity* is misplaced. *Gerrity* instructs that claims are not precluded by the exclusivity provision of the CPLA where plaintiffs seek a remedy for an injury that was not caused by the defective product. The Connecticut Supreme Court stated that "the language of the exclusivity provision makes clear that the product liability act was intended to serve as the exclusive remedy for a party who seeks recompense for those injuries caused by a product defect. The language of the exclusivity provision, however, suggests that it was not designed to serve as a bar to additional claims, including one brought under CUTPA, either for an injury not caused by the defective product, or if the party is not pursuing a claim for "personal injury, death or property damage...." *Gerrity, 263 Conn. at 128*. Unlike the claims

asserted by the Plaintiffs in this case, "In *Gerrity*, the plaintiff's CUTPA claim was preserved because plaintiff alleged financial—not personal or property—injury based upon the increased cost of cigarettes that plaintiff had to pay as a result of defendant's wrongful conduct." *Town of Sprague v. Mapei Corp., 3:11cv890, 11cv890 (WWE), 2012 U.S. Dist. LEXIS 72578, 2012 WL 1900120, at *2 (D. Conn. May 24, 2012)* **[*45]** (citing *Gerrity, 263 Conn. at 128*).

Here, Plaintiffs seek damages for personal injuries caused by the allegedly defective ladder under their CUTPA claims. *See* [Dkt. 1, Compl., p.14]. Because Plaintiffs have not brought a CUTPA claim for an injury that was not caused by the defective product as was the case in *Gerrity* and are clearly pursuing claims for personal injury, their claim do not fall within the exception enunciated in *Gerrity* and accordingly the exclusivity provision bars their claims.

Moreover, courts routinely hold that **HN22**[⬆] the CPLA's exclusivity provision bars CUTPA claims that "assert that a defendant's product is defectively designed or that the defendant failed to warn properly about a defective product." *Fraser, 857 F.Supp.2d at 258* (citing *Hurley v. Heart Physicians, P.C., 278 Conn. 305, 324, 898 A.2d 777, (2006))*. The Court therefore grants summary judgment on Plaintiffs' CUTPA claims as those claims are barred by the CPLA. Even if Plaintiffs' CUTPA claims were not barred, there would be no genuine dispute as to any material fact for the reasons discussed above because Plaintiffs have not established a fact in dispute as to the ladder's defectiveness. A reasonable juror could therefore **[*46]** not conclude that the Defendants violated CUTPA by failing to warn about the defective ladder.

### iv. Loss of Consortium

As Defendants argue, it is appropriate to grant summary judgment as to Plaintiff John Kuzmech's loss of consortium claim as it is a derivative claim. *Musorofiti v. Vlcek, 65 Conn.App. 365, 375, 783 A.2d 36 (2001)* ("**HN23**[⬆] Loss of consortium is a derivative cause of action, meaning that it is dependent on the legal existence of the predicate action."). Because the Court has granted summary judgment as to all the claims in the predicate action, Plaintiff John Kuzmech's loss of consortium claim also fails as a matter of law. The Court therefore grants summary judgment as to John Kuzmech's loss of consortium claim.

### Conclusion

2012 U.S. Dist. LEXIS 174082, *46

For the foregoing reasons, the Court GRANTS Defendants' [Dkt. #57] motion to preclude and [Dkt. #45] motion for summary judgment. The Clerk is directed to enter judgment in favor of Defendants and close the case.

IT IS SO ORDERED.

/s/ Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: December 7, 2012

---

**End of Document**

# *DeBartolo v. Daimler Chrysler Corp.*

Superior Court of Connecticut, Judicial District of New Haven, At New Haven

December 22, 2005, Decided ; December 22, 2005, Filed

X10NNHCV030482725S(CLD)

**Reporter**

2005 Conn. Super. LEXIS 3579 *

Janice Debartolo v. Daimler Chrysler Corporation et al.

**Notice:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

## Core Terms

airbag, seatbelt, expert testimony, collision, deploy, malfunctioned, air bag, wearing, defendants', court concludes, summary judgment motion, circumstances, deceleration, injuries, restrain, infer, expert witness, steering wheel, engineering, teeth, upper, belt

## Case Summary

**Procedural Posture**

Plaintiff, an injured driver, filed a products liability action claiming that defendants, an automobile manufacturer and dealership, placed a defective air bag and a defective seat belt into the stream of commerce in violation of *Conn. Gen. Stat. § 52-572m et seq.*, as a result of which she suffered injuries. Defendants filed motions to preclude expert testimony, and for summary judgment.

**Overview**

The injured party drove her vehicle into the rear of another vehicle. The air bag allegedly did not deploy. The driver claimed that she was wearing her seat belt, and that it failed to restrain her. Defendants claimed that both restraints worked properly. In the motion to preclude, defendants argued that a witness offered by the driver lacked qualifications to offer expert testimony. The court precluded the witness from testifying on the subject of vehicle deceleration, as the testimony did not explain how the rate of deceleration related to barrier equivalent velocity. The court allowed the witness to testify as to the damage to the subject vehicle in the context of the severity of the collision, as the witness's engineering background and experience in accident reconstruction qualified him as an expert. As to the motion for summary judgment, the court held that under the facts, the injured party was entitled to have her air bag claim heard by the jury without the benefit of expert testimony regarding the air bag itself. The owners' manual and other information concerning the vehicle could permit a jury to draw an inference that the air bag failed to deploy.

**Outcome**

Defendants' motion to preclude expert testimony was granted only as to the subject of vehicle deceleration. The expert was allowed to testimony on all other matters. Defendants' motion for summary judgment was denied.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

***HN1***[⬇] **Summary Judgment, Entitlement as Matter of Law**

*Conn. Gen. Prac. Book, R. Super. Ct. § 17-49* provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party.

Evidence > ... > Testimony > Expert Witnesses > Qualifications

2005 Conn. Super. LEXIS 3579, *1

*HN2*[↓] **Expert Witnesses, Qualifications**

An expert witness is competent to express an opinion, even though he or she may be unwilling to state a conclusion with absolute certainty, so long as the expert's opinion, if not stated in terms of the certain, is at least stated in terms of the probable, and not merely the possible. While the term "probability" is not to be treated as a talisman in evaluating whether testimony is sufficiently certain, the substance of the expert's testimony, when taken as a whole, must advise the jury that the proffered opinion is more likely correct than incorrect.

Evidence > ... > Testimony > Expert Witnesses > General Overview

Torts > Products Liability > General Overview

*HN3*[↓] **Testimony, Expert Witnesses**

A plaintiff may, under proper circumstances, prove the existence of a product defect without the benefit of expert testimony.

Evidence > ... > Testimony > Expert Witnesses > General Overview

Torts > Products Liability > General Overview

*HN4*[↓] **Testimony, Expert Witnesses**

Connecticut courts have consistently stated that a jury may, under appropriate circumstances, infer a defect from the evidence without the necessity of expert testimony.

Evidence > ... > Testimony > Expert Witnesses > General Overview

Torts > Products Liability > General Overview

*HN5*[↓] **Testimony, Expert Witnesses**

Connecticut courts have permitted product defects involving automobiles to be presented to a jury in the absence of expert testimony where the fact of a defect is within the common knowledge of ordinary consumers.

Evidence > ... > Testimony > Expert Witnesses > General Overview

Torts > Products Liability > General Overview

*HN6*[↓] **Testimony, Expert Witnesses**

The general workings of a seat belt (if not seat belt engineering and construction) are within the common knowledge of an average juror. Put another way, it is within the experience of an average juror that both the upper and lower portions of a seat belt are supposed to lock upon collision to prevent occupants from moving forward.

**Judges:** Lynda B. Munro, Judge.

**Opinion by:** Lynda B. Munro

# Opinion

*MEMORANDUM OF DECISION*

Before the court are two motions for summary judgment and a motion to preclude filed by the defendants. The underlying action is a products liability claim brought by the plaintiff, Janice DeBartolo, claiming that the defendants Daimler Chrysler Corporation and Linder Motors, Inc. placed a defective air bag and a defective seatbelt into the stream of commerce in violation of *Connecticut General Statutes § 52-572m et seq.*, as a result of which she suffered injuries. The defendants have denied these allegations and filed special defenses (some of which have been previously stricken, but others remain). While not relevant to these proceedings, there is also an intervening plaintiff, the State of Connecticut, the plaintiff's employer which claims reimbursement for monies paid to or on behalf of the plaintiff as a result of the motor vehicle accident which is the genesis of this litigation.

The following is not in dispute. On June 5, 2001, the plaintiff **[*2]** was the operator of a 2000 Dodge Neon that she had purchased in new condition from the defendant Linder. The plaintiff was proceeding in a northerly direction on Litchfield Turnpike in Woodbridge, Connecticut when she drove the 2000 Dodge Neon into the rear of another motor vehicle which was stationary at the time. The plaintiff does not dispute that the

2005 Conn. Super. LEXIS 3579, *2

collision was caused by her conduct in the operation of her motor vehicle. The plaintiff's mouth hit her steering wheel and she experienced injuries from that impact. The driver's front air bag did not deploy in the collision.

It is the plaintiff's factual assertion that she was wearing her seatbelt with its shoulder restraint at the time of the accident. She claims that the seatbelt should have, but failed to restrain the upper portion of her body and that the air bag should have deployed, and, if either or both of these had occurred she would not have suffered the injuries she did in the accident. She claims that both the seatbelt and the air bag malfunctioned, resulting in her injuries. The defendants refute those assertions, claiming that neither restraint device malfunctioned. The plaintiff has disclosed Michael Shanok as her [*3] expert witness to testify as to his opinions, and the bases therefore, that the air bag malfunctioned. The plaintiff has disclosed no expert witness as to the malfunction claim regarding the seatbelt. The defendant has disclosed three expert witnesses regarding their assertion that both the seatbelt and the air bag were not malfunctioning at the time of the plaintiff's collision.

In their motion to preclude, the defendants seek to preclude Shanok, claiming that he lacks qualifications to offer expert testimony on accident reconstruction and air bag deployment. Further, the defendants seek preclusion of Shanok's testimony on the grounds that his opinions are not based upon reliable engineering practices and that they do not meet the criteria enunciated in *State v. Porter, 241 Conn. 57, 698 A.2d 739 (1997)*. The plaintiff opposes and resists these assertions. The defendants' motion to preclude was coupled with a motion for summary judgment based upon the assumption of a court granting the preclusion. The parties submitted supporting documentation for their respective positions on the motions, including the entire deposition testimony of Shanok. At argument, the court [*4] offered the parties the opportunity for additional evidence to be elicited in support and opposition to the preclusion argument under the *Porter* hearing on Shanok's testimony. Both parties declined to offer any additional evidence.

The defendants also filed a separate motion for summary judgment on October 31, 2005 surrounding the same issues, as well as any claims that the seat belt or brakes of the Dodge Neon malfunctioned. At argument, the plaintiff abandoned any claim that the brakes malfunctioned. Therefore that issue need not be addressed by the court. The balance of the memorandum in support of the motion for summary

judgment argues that there is no justiciable issue of law or fact as to the products liability claims on the seatbelt and air bag, even if Shanok is permitted to testify at trial. The defendants argue that Shanok offered no probative opinions and their experts provide conclusive factual evidence as to the proper operation of the air bag and the conclusion of defense experts that the plaintiff was not wearing her seat belt at the time of the accident. The plaintiff resists these arguments, claiming there are issues of fact, pointing to Shanok's testimony which [*5] will be discussed herein, the police report concluding the plaintiff was wearing her seatbelt, the plaintiff's own statements under oath as to the speed her motor vehicle was traveling at, that she was wearing her seatbelt, and finally the owner's manual of the Dodge Neon as to when the air bag should deploy if it is operating properly. Further facts at issue will be discussed as needed.

"*Practice Book § 17-49* **HN1**[⬆] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Citation omitted; internal quotation marks omitted.) *Davies v. General Tours, Inc., 63 Conn.App. 17, 20-21, 774 A.2d 1063*, cert. granted on other grounds, *256 Conn. 926, 776 A.2d 1143 (2001)* (appeal withdrawn October 18, 2001).

The court first addresses the defendants' motion to preclude the expert testimony of Shanok. According to the expert disclosure submitted for [*6] the plaintiff, Shanok, if permitted to testify, will opine that "the airbag on the Dodge Neon was defective in that it should have deployed as a result of its collision with the Crisci automobile, and that had the restrain system properly deployed, it is more probable than not that Mrs. Sanders [1] would have emerged uninjured from the collision." The defendants have argued that Shanok should be precluded from testifying for two reasons. First, the defendants argue that Mr. Shanok lacks the qualifications to provide expert testimony on the accident and the airbag system of the subject vehicle. The defendants further argue that, even if Shanok is qualified, his opinions regarding the accident and the airbag should be precluded as unreliable under the principles enunciated in *State v. Porter, supra.*

---

[1] Now known as the Plaintiff, Ms. DeBartolo.

The court agrees with the defendants that Shanok should be precluded from testifying regarding the airbag system in the subject vehicle, but not necessarily **[*7]** for the reasons proffered by the defendants. [2] Upon reviewing the complete deposition testimony of Shanok, which was provided as an exhibit to the defendants' moving papers, the court concludes that Shanok has failed to establish a sufficient factual foundation for providing testimony regarding the airbag system in the subject vehicle. Shanok testified, among other things, that he did not know the speed at which the airbag in the subject vehicle was designed to deploy; that he had never seen any structural or crash test data concerning the vehicle; and that he is not familiar with the specifications or calibrations of the airbag components and sensors as installed on the vehicle in question. Although Shanok testified that it was his "informed suspicion" that the airbag did not deploy because the sensor "has no tolerance for angular displacement during deceleration," Shanok admitted that he did not know if the sensor in fact did or did not have any tolerance for angular displacement. Under these circumstances, Shanok simply does not have an adequate factual foundation to support his opinions regarding the failure of the airbag to deploy.

**[*8]** Further, the court concludes that Shanok's "informed suspicion" with respect to the malfunction of the airbag was not rendered with the requisite degree of certainty under Connecticut law. _HN2_[↑] "An expert witness is competent to express an opinion, even though he or she may be unwilling to state a conclusion with absolute certainty, so long as the expert's opinion, if not stated in terms of the certain, is at least stated in terms of the probable, and not merely the possible." _Vickers v. Jessup, 32 Conn.App. 360, 363, 629 A.2d 457 (1993)._ While the term "probability" is not to be treated as a talisman in evaluating whether testimony is sufficiently certain, see _Struckman v. Burns, 205 Conn. 542, 555, 534 A.2d 888 (1987),_ the substance of the expert's testimony, when taken as a whole, must advise

the jury that the proffered opinion is more likely correct than incorrect. See _Healy v. White, 173 Conn. 438, 443-46, 378 A.2d 540 (1977)._ In the present case, Shanok's "informed suspicion" regarding the airbag malfunction, viewed in light of the foundational deficiencies discussed above (in particular, his utter lack of familiarity with the airbag **[*9]** system of the Neon) does not suffice to take his opinion out of the realm of conjecture and speculation.

For similar reasons, the court precludes Shanok from testifying at this time on the subject of deceleration of the plaintiff's vehicle. At his deposition, Shanok testified that the collision resulted in a deceleration of 20-22 mph. His testimony, however, does not explain how the rate of deceleration relates to barrier equivalent velocity ("BEV"), which apparently is the critical calculation in determining whether the airbag should deploy in the subject Neon. See Affidavit of Dennis Guenther, submitted in support of defendants' Motion for Summary Judgment. Indeed, Shanok testified that he had no idea how to calculate BEV, and that he was only familiar with the term from publications such as automobile magazines. Thus, Shanok's testimony with regard to deceleration, without a factual foundation of how the rate of deceleration relates to the deployment of airbags in general, and the airbag on the subject Neon in particular, is speculative and cannot be helpful to a jury.

The court will, however, permit Shanok to testify to his findings with respect to damage to the subject vehicle **[*10]** in the context of the severity of the collision. Shanok testified that, based upon wheelbase measurements taken during his inspection of the Neon, the frame of the vehicle buckled as a result of the collision. He also testified about other damage to the vehicle. The court concludes that Mr. Shanok is qualified to testify regarding the condition of the vehicle in this limited context based upon his engineering background and many years of inspecting vehicles as a consultant in accident reconstruction. The court further concludes that Shanok is entitled to rely upon his experience and engineering background in opining on the buckling of the wheelbase and the import of frame buckling in terms of the severity of the collision. Concerns regarding the method used by Shanok to determine the measurements of the wheelbase go to the weight, rather than the admissibility, of Shanok's testimony.

The court now turns to the issues raised by the defendants' Motion for Summary Judgment. The defendants argue that the plaintiff's claims that the

---

[2] The court need not reach the issue of Shanok's qualification to testify as to his proffered opinions with regard to the airbag at this time. The court further notes that it is not entirely clear that the subject of Shanok's testimony is of a "scientific" nature such that the standards of _State v. Porter, supra,_ come into play. See generally _State v. West, 274 Conn. 605, 638 n.37, 877 A.2d 787 (2005)_ (Declining to decide whether to adopt holding of _Kumho Tire v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)_ and extend trial court's "gatekeeping" function under _State v. Porter_ to all expert testimony).

2005 Conn. Super. LEXIS 3579, *10

airbag and seat belt systems in the subject vehicle both must fail in the absence of expert testimony establishing a defect in each.

With respect to the plaintiff's **[*11]** airbag claim, the defendants contend that, without expert testimony regarding the presence of a defect in the subject vehicle, the plaintiff's airbag claim may not be submitted to the jury. According to the defendants, the workings of an airbag system are beyond the ken of an average juror. The plaintiff disagrees, contending that her allegations regarding the airbag are such that a jury should be permitted to infer a defect from circumstantial evidence even without the benefit of expert testimony pointing to a specific defect in the airbag system of the Neon.

It is now well established under Connecticut law that _HN3_[⬆] a plaintiff may, under proper circumstances, prove the existence of a product defect without the benefit of expert testimony.

> _HN4_[⬆] ] Connecticut courts . . . have consistently stated that a jury may, under appropriate circumstances, infer a defect from the evidence without the necessity of expert testimony. See, e.g., _Standard Structural Steel Co. v. Bethlehem Steel Corp., 597 F. Supp. 164, 183 (D.Conn. 1984)_ (recognizing Connecticut law permits fact finder to draw inference of defect from circumstantial evidence); _Living & Learning Centre, Inc. v. Griese Custom Signs, Inc., 3 Conn.App. 661, 664, 491 A.2d 433 (1985)_ **[*12]** ("It is not necessary that the plaintiff in a strict tort action establish a specific defect as long as there is evidence of some unspecified dangerous condition. In the absence of other identifiable causes, evidence of malfunction is sufficient evidence of a defect under _§ 402A of the Second Restatement of Torts_."); _Kileen v. General Motors Corp., 36 Conn.Sup. 347, 349, 421 A.2d 874 (1980)_ ("the fact finder can find, where other identifiable causes are absent, that the mere evidence of a malfunction is sufficient evidence of a defect"); see also annot., _65 A.L.R.4th 346, 354-58 (1988)_ (listing twenty-eight states that allow establishment of prima facie case of design defect based upon inferences from circumstantial evidence).

_Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 217, 694 A.2d 1319 (1997)_.

Although there apparently are no Connecticut cases

addressing the precise issue at hand, _HN5_[⬆] ] courts have permitted product defects involving automobiles to be presented to a jury in the absence of expert testimony where the fact of a defect is within the common knowledge of ordinary consumers. **[*13]** _See Vaccarelli v. Ford Motor Corp._, 2001 WL 862643 (Conn.Super. July 6, 2001) (Doherty, J.) (Holding that plaintiff was entitled to present defect claim to jury without expert testimony where airbag deployed without impact); _Kroll v. Mazda Motor of North America, 2000 Conn. Super. LEXIS 936, 2000 WL 486834 (Conn.Super. March 28, 2000) (Grogins, J.) (26 Conn. L. Rtpr. 472)_ (Same in case involving failure of braking system); _Woods v. General Motors Corp., 1996 Conn. Super. LEXIS 185, 1996 WL 57016 (Conn.Super. Jan. 24, 1996) (Wagner, J.) (16 Conn. L. Rptr. 63)_ (Same in case where car allegedly went out of control).

The court concludes, under the particular facts and circumstances of the present case, that the plaintiff is entitled to have her airbag claim heard by the jury without the benefit of expert testimony regarding the airbag itself. The owner's manual for the Neon, which was submitted by the plaintiff in her opposition papers, indicates that the airbag is designed to deploy "in a moderate to severe frontal collision." The evidence before the court would permit (though by no means require) a jury to draw an inference that the Neon was involved in a moderate frontal collision and that **[*14]** the airbag utterly failed to deploy, with the result that the plaintiff's head struck the steering wheel of the Neon. The plaintiff testified that, at the time of impact, she believed that she was traveling at approximately 30-35 miles per hour. [3] As a result of the collision, the plaintiff testified that her teeth punctured her chin, requiring 35 internal and 35 external stitches, that her four lower center front teeth were pushed in, and that she sustained one broken tooth, a contusion on her knee and a sprained right ankle. The plaintiff further testified that the Neon was "totaled" as a result of the accident, and that the front of the vehicle, the hood, the engine block, and the dashboard were pushed in as a result of the accident.

These facts, coupled with Shanok's testimony that the frame of the vehicle **[*15]** was buckled and the damage that he observed to other areas of the vehicle, are

---

[3] Lay witnesses are generally competent to testify as to the speed of an automobile, though only as to observed facts. _See Acampora v. Asselin, 179 Conn. 425, 427, 426 A.2d 797 (1980)_.

sufficient to permit a jury to infer that the severity of the collision was such that a "moderate" frontal impact had occurred, and that the airbags should have deployed as a result. The court concludes that a jury may infer the existence of a defect in the Neon's airbag under these circumstances without expert testimony, particularly in light of the representation in the owner's manual of the Neon that the airbag should deploy upon a "moderate" frontal impact. *See Silvestri v. General Motors Corp., 210 F.3d 240, 245 (4th Cir. 2000)* (Holding that plaintiff need not provide expert testimony of a specific defect on claim involving failure of airbag to deploy where circumstantial evidence permitted inference that airbag should have deployed, including evidence of representations made in the owner's manual of the plaintiff's vehicle regarding the airbag.) [4]

 **[\*16]** Next, the court considers defendants' motion for summary judgment with regard to the plaintiff's seatbelt claims. The plaintiff has alleged that the seatbelt in the Neon failed in that the upper portion of the seatbelt, apparently known as the shoulder harness, did not restrain her upper body, permitting her face and/or chin to strike the steering wheel of the Neon upon collision. At her deposition, the plaintiff testified that she was wearing her seatbelt at the time of the collision and that the bottom, or lap harness, of the seatbelt restrained her upon impact but that the shoulder harness did not.

The plaintiff has not proffered any expert testimony with regard to the seatbelt in the Neon. The defendants again argue that, in the absence of expert testimony identifying a specific defect, the plaintiff's seatbelt claim should not be submitted to a jury. The court disagrees.

*HN6*[⬆] ] The general workings of a seatbelt (if not seatbelt engineering and construction) are within the common knowledge of an average juror. *See Vaccarelli v. Ford Motor Corp., supra*, 2001 WL 862643 at \*4 (Holding that "the purpose and operation of a seat belt is within the ordinary knowledge of **[\*17]** a judge and jury.") Put another way, it is within the experience of an average juror that both the upper and lower portions of a seatbelt are supposed to lock upon collision to prevent occupants from moving forward. The plaintiff testified that she was wearing her seatbelt at the time of the

accident and that the upper portion of the seatbelt failed to restrain her. This testimony is sufficient to submit the matter to a jury for consideration.

In support of their motion, the defendants point to the affidavit of Dennis Guenther, who is one of the defendants' disclosed expert witnesses. Guenther attested therein that, in his opinion, the circumstances of the collision and the plaintiff's injuries were such that the plaintiff could not have been wearing her seatbelt. According to Guenther, if the plaintiff had been wearing her seatbelt, "she could not have made contact with the steering wheel with her teeth or chin." The court concludes that Guenther's testimony does no more than create a triable issue of fact as to whether the plaintiff was wearing her seatbelt, and whether the seatbelt malfunctioned. A reasonable jury would be permitted to infer that the plaintiff was wearing her seatbelt, **[\*18]** but that the shoulder harness portion of the belt failed to restrain the plaintiff.

Finally, the defendants have argued that the plaintiff cannot prove that, but for the failure of the airbag and/or seatbelt systems, the plaintiff would not have suffered the alleged injuries to her teeth and jaw. The court concludes that it is within the province of the jury to conclude that, had the airbag and/or the seatbelt been working properly, the plaintiff's chin and teeth would not have struck the steering wheel, based upon common knowledge regarding the basic operation of these safety systems.

The defendants' Motion to Preclude the Plaintiff's Expert, Michael Shanok, is granted in part, to the extent set forth hereinabove. The defendants' Motion for Summary Judgment is denied.

Munro, Judge.

---

**End of Document**

---

[4] The Court notes that New York law, which the Fourth Circuit applied in *Silvestri*, is similar to Connecticut law in that a plaintiff is not required in every circumstance to provide expert testimony of a specific defect to prevail on a products liability claim. *See Silvestri v. General Motors Corp., supra, 210 F.3d 243-44*.

# *N.K. v. Abbott Labs.*

United States Court of Appeals for the Second Circuit

April 23, 2018, Decided

17-1777-cv

**Reporter**

2018 U.S. App. LEXIS 10094 *

N.K., an infant by his mother and natural guardian, TANJA BRUESTLE-KUMRA, Plaintiffs-Appellants, v. ABBOTT LABORATORIES, Defendant-Appellee.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History:** Appeal from a judgment of the United States District Court for the Eastern District of New York (Ramon E. Reyes, Jr., Magistrate Judge). **[*1]** †

*N.K. v. Abbott Labs., 2017 U.S. Dist. LEXIS 77461 (E.D.N.Y., May 22, 2017)*

## Core Terms

district court, causation, genetic, expert testimony, witnesses, tests, expert witness, reliable

## Case Summary

**Overview**

HOLDINGS: [1]-The district court did not err when it applied *Fed. R. Evid. 702* to determine whether the treating physician was qualified to offer testimony on causation because, if plaintiffs proffered the physician as a non-expert factual witness, she could not provide the expert testimony required to establish causation. The district court correctly determined that the physician had to be admitted as a *Rule 702* expert witness to provide expert testimony on specific causation; [2]-The district court did not abuse its discretion when it determined that the treating physician was not qualified

to testify as a *Rule 702* expert witness because, based in part on the absence of additional genetic testing, the physician could not reliably eliminate the possibility that the injuries were caused by genetic defects.

**Outcome**

Judgment affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Evidence > Admissibility > Expert Witnesses

Evidence > Types of
Evidence > Testimony > Expert Witnesses

*HN1*[⤓] **Standards of Review, Abuse of Discretion**

The appellate court reviews the district court's decision to admit or exclude expert testimony under a highly deferential abuse of discretion standard. A district court's *Fed. R. Evid. 702* ruling will be reversed only for manifest error. That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion.

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > Genuine Disputes

Evidence > Inferences & Presumptions > Inferences

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

Civil Procedure > ... > Summary

---

† The parties consented to the referral of the case to a United States magistrate judge to conduct all proceedings and order the entry of a final judgment in accordance with **28 U.S.C. § 636(c)** and *Federal Rule of Civil Procedure 73*.

2018 U.S. App. LEXIS 10094, *1

Judgment > Entitlement as Matter of Law > Materiality of Facts

**HN2**[↓] **Entitlement as Matter of Law, Genuine Disputes**

The appellate court reviews de novo a district court's award of summary judgment, construing the evidence in the light most favorable to the losing party and drawing all reasonable inferences and resolving all ambiguities in its favor. The appellate court will affirm only when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > Pleading & Practice > Pleadings > Amendment of Pleadings

**HN3**[↓] **Standards of Review, Abuse of Discretion**

The appellate court ordinarily reviews a district court's denial of a motion to amend the pleadings for abuse of discretion.

Evidence > Admissibility > Expert Witnesses

Torts > Negligence > Elements > Causation

Evidence > ... > Testimony > Expert Witnesses > Qualifications

**HN4**[↓] **Admissibility, Expert Witnesses**

Under New York law, expert medical opinion evidence is required, when the subject-matter to be inquired about is presumed not to be within common knowledge and experience. Expert medical opinion evidence is thus required to establish causation. To establish causation, plaintiffs must offer admissible expert testimony regarding both general causation and specific causation.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships

Evidence > Types of

Evidence > Testimony > Expert Witnesses

Torts > Negligence > Elements > Causation

**HN5**[↓] **Preliminary Considerations, Federal & State Interrelationships**

State law controls where it makes a precondition to recovery the proffer of expert testimony to prove an element of the substantive-law claim, such as standard of care or causation.

Evidence > Types of
Evidence > Testimony > Expert Witnesses

Evidence > Admissibility > Expert Witnesses

Evidence > ... > Testimony > Lay Witnesses > Opinion Testimony

**HN6**[↓] **Testimony, Expert Witnesses**

The Federal Rules of Evidence provide that only *Fed. R. Evid. 702* expert witnesses may provide expert medical opinions. *Fed. R. Evid. 701(c)*. If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is not based on scientific, technical, or other specialized knowledge within the scope of *Fed. R. Evid. 702*.

Evidence > Admissibility > Expert Witnesses > Daubert Standard

Evidence > Relevance > Relevant Evidence

**HN7**[↓] **Expert Witnesses, Daubert Standard**

When parties seek to introduce expert testimony under *Fed. R. Evid. 702*, the district court must play a gatekeeping role, ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. As gatekeeper, the district court has significant discretion to consider numerous factors, including 1) the theory's testability, 2) the extent to which it has been subjected to peer review and publication, 3) the extent to which a technique is subject to standards controlling the technique's operation, 4) the known or potential rate of error, and 5) the degree of acceptance within the relevant scientific community. The appellate court recognizes that a district court's

2018 U.S. App. LEXIS 10094, *1

application of these factors will necessarily vary from case to case.

Evidence > Admissibility > Expert Witnesses

Torts > Negligence > Elements > Causation

Evidence > Types of Evidence > Testimony > Expert Witnesses

*HN8*[⤓] **Admissibility, Expert Witnesses**

New York law requires expert witnesses to establish specific causation.

**Counsel:** FOR PLAINTIFFS-APPELLANTS: STUART L. FINZ (Ameer Benno, on the brief), Finz & Finz, P.C., Mineola, NY.

FOR DEFENDANT-APPELLEE: JOHN A. MCCAULEY (Matthew T. McLaughlin and Adam Possidente, Venable LLP, New York, NY; Paul F. Strain, Christina L. Gaarder, and Stephen E. Marshall, Venable LLP, Baltimore, MD, on the brief), Venable LLP, Baltimore, MD.

**Judges:** PRESENT: JOSÉ A. CABRANES, RAYMOND J. LOHIER, JR., Circuit Judges, RICHARD M. BERMAN, District Judge.*

# Opinion

## SUMMARY ORDER

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the September 1, 2017 judgment of the District Court be and hereby is **AFFIRMED.**

Plaintiffs-appellants Tanja Bruestle-Kumra and her infant child N.K. (jointly, "Plaintiffs") appeal from a September 1, 2017 judgment of the District Court granting defendant-appellee Abbott Laboratories' ("Abbott Labs") motion to strike the specific causation testimony of two of Plaintiffs' witnesses, and granting summary judgment in favor of Abbott Labs. On appeal, Plaintiffs argue that the District Court erred when it (1)

---

* Judge Richard M. Berman, of the United States District Court for the Southern District of New York, sitting by designation.

applied the *Federal Rule of Evidence 702* standard **[*2]** to the testimony of N.K.'s treating physician; (2) excluded the testimony of Plaintiffs' two expert witnesses on specific causation; (3) granted summary judgment in favor of Abbott Labs; and (4) denied Plaintiffs' motion to amend their pleadings. Upon review, we affirm the District Court's judgment.

We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

## STANDARD OF REVIEW

*HN1*[⤒] ] This Court "review[s] the district court's decision to admit or exclude expert testimony under a highly deferential abuse of discretion standard." *Zuchowicz v. United States, 140 F.3d 381, 386 (2d Cir. 1998).* A district court's *Rule 702* ruling "will be reversed only for manifest error." *United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004).* "That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion." *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).*

*HN2*[⤒] ] This Court reviews *de novo* a district court's award of summary judgment, "constru[ing] the evidence in the light most favorable to the [losing party]" and "drawing all reasonable inferences and resolving all ambiguities in [its] favor." *Darnell v. Pineiro, 849 F.3d 17, 22 (2d Cir. 2017)* (internal quotation marks omitted). We "will affirm only when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of **[*3]** law.'" *In re 650 Fifth Ave. & Related Props., 830 F.3d 66, 86 (2d Cir. 2016)* (quoting *Fed. R. Civ. P. 56(a)*).

*HN3*[⤒] ] "We ordinarily review a district court's denial of a motion to amend the pleadings for abuse of discretion." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d 699, 725 (2d Cir. 2010).*

## DISCUSSION

### I.

Plaintiffs first argue that the District Court erred when it applied *Rule 702* to determine whether Dr. Lewis, N.K.'s treating physician, was qualified to offer testimony on

causation. Specifically, Plaintiffs contend that the District Court should have considered Dr. Lewis as a *factual* witness—as opposed to an *expert* witness—because she developed her opinions in the course of treating N.K. And fact witnesses, Plaintiffs note, are not subject to *Rule 702* scrutiny.

Plaintiffs' attempt to circumvent *Rule 702* by proffering Dr. Lewis as a non-expert factual witness is self-defeating. **HN4**[⬆] Under New York law,[1] "expert medical opinion evidence . . . is required, when the subject-matter to be inquired about is presumed not to be within common knowledge and experience." *Meiselman v. Crown Heights Hosp., 285 N.Y. 389, 34 N.E.2d 367, 370 (N.Y. 1941)*; *see also Fiore v. Galang, 64 N.Y.2d 999, 478 N.E.2d 188, 189, 489 N.Y.S.2d 47 (N.Y. 1985)*. Plaintiffs wisely do not suggest that identifying the etiology of N.K.'s constellation of congenital anomalies is within common knowledge and experience. Expert medical opinion evidence is thus required to establish causation. *See Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 268 (2d Cir. 2002)* ("[T]o establish causation, [Plaintiffs] must offer admissible *expert testimony* [*4] regarding both general causation . . . and specific causation." (emphasis added)).

**HN6**[⬆] The Federal Rules of Evidence provide that only *Rule 702* expert witnesses may provide expert medical opinions. *See Fed. R. Evid. 701(c)* ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . not based on scientific, technical, or other specialized knowledge within the scope of *Rule 702*."). Accordingly, if Plaintiffs proffered Dr. Lewis as a non-expert factual witness, she could not provide the expert testimony required to establish causation.

In short, the District Court correctly determined that Dr. Lewis had to be admitted as a *Rule 702* expert witness to provide expert testimony on specific causation.

**II**.

---

[1] *See* 29 Charles Alan Wright & Victor James Gold, Federal Practice & Procedure: Evidence § 6263 (2d ed.) (**HN5**[⬆] "[S]tate law controls where it makes a precondition to recovery . . . the proffer of expert testimony to prove an element of the substantive-law claim, such as standard of care or causation."); *see also Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 268 (2d Cir. 2002)*.

Plaintiffs next argue that the District Court abused its discretion when it determined that Dr. Lewis, N.K.'s treating physician, and Dr. Stodgell, a teratologist and toxicologist, were not qualified to testify as *Rule 702* expert witnesses. We disagree.

**HN7**[⬆] When parties seek to introduce expert testimony under *Rule 702*, the district court must play a "gatekeeping role," *Amorgianos, 303 F.3d at 265*, "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*. As gatekeeper, [*5] the district court has significant discretion to consider numerous factors, including "[1] the theory's testability, [2] the extent to which it has been subjected to peer review and publication, [3] the extent to which a technique is subject to standards controlling the technique's operation, [4] the known or potential rate of error, and [5] the degree of acceptance within the relevant scientific community." *United States v. Romano, 794 F.3d 317, 330 (2d Cir. 2015)* (internal quotation marks omitted). We recognize that a district court's application of these factors "will necessarily vary from case to case." *Amorgianos, 303 F.3d at 266*.

The District Court here determined that, to lay a reliable foundation for their specific causation testimony, Plaintiffs' witnesses had to perform an adequate "differential diagnosis." That is, the witnesses had to "assess the patient's symptoms, create a list of possible causes, and then seek to eliminate possible causes to identify the most likely cause." Special App'x at 14 (internal quotation marks and alterations omitted). The District Court found particularly wanting the method that the witnesses employed to eliminate the possibility that genetic defects caused N.K.'s injuries.

In 2005, when N.K. was twelve days old, Dr. Lewis determined that N.K.'s [*6] injuries were likely caused by either exposure to Depakote or genetic defects. In an attempt to rule out genetic defects, Dr. Lewis referred N.K. for genetic testing. While the initial tests for genetic abnormalities came back negative, the geneticist recommended that N.K. "be re-evaluated in Genetics in six months or earlier if his tests are positive." App'x at 1397. We do not know from the record whether Dr. Lewis followed the geneticist's 2005 recommendation to have N.K. re-evaluated. *Id.* at 1366, 94:4-96:6 (Dr. Lewis's deposition testimony in which she is unable to find record of re-evaluation). But we do know that since 2005 at least four other physicians recommended or suggested additional genetic testing, and no additional

genetic tests were ever conducted. *See, e.g., id.* at 1371 (Dr. Morel); *id.* at 1373 (Dr. Engel); *id.* at 1288 (Dr. Wells); *id.* at 1295 (Dr. Mandel).

Based in part on the absence of additional genetic testing, the District Court determined that Dr. Lewis could not reliably eliminate the possibility that N.K.'s injuries were caused by genetic defects. We agree with the District Court. The District Court had more than adequate reason to find, under the circumstances of this case, that a reliable differential diagnosis required the performance of additional **[*7]** genetic tests.

Dr. Stodgell did not conduct an independent differential diagnosis on N.K., but relied upon the same medical records as Dr. Lewis. Accordingly, the District Court also had adequate reason to exclude Dr. Stodgell's testimony on specific causation.

In short, we conclude that the District Court did not abuse its discretion when it excluded the testimony of Drs. Lewis and Stodgell on specific causation.

**III**.

*HN8*[⬆] New York law requires expert witnesses to establish specific causation. *Meiselman, 34 N.E.2d at 370*; *see also Fiore, 478 N.E.2d at 189*. With the testimony of Drs. Lewis and Stodgell excluded, Plaintiffs could not proffer any expert witness testimony on specific causation. We therefore conclude that the District Court properly granted summary judgment in favor of Abbott Labs.

**IV**.

Finally, Plaintiffs appeal the District Court's denial of their motion to amend their pleadings. Plaintiffs filed their motion over two years after their initial complaint and after the close of discovery. We affirm the District Court's denial principally for the reasons set forth in its February 28, 2017 Memorandum and Order.

**CONCLUSION**

We have reviewed all of the arguments raised by Plaintiffs on appeal and find them to be without merit. For the foregoing **[*8]** reasons, we **AFFIRM** the September 1, 2017 judgment of the District Court.

**End of Document**

## *Pitterman v. GM LLC*

United States District Court for the District of Connecticut

April 29, 2016, Decided; April 29, 2016, Filed

CIVIL ACTION NO. 3:14-CV-00967 (JCH)

**Reporter**
2016 U.S. Dist. LEXIS 57165 *

BERNARD PITTERMAN, et al., Plaintiffs, v. GENERAL MOTORS LLC, Defendant.

**Subsequent History:** Summary judgment granted, in part, summary judgment denied, in part by *Pitterman v. GM LLC, 2016 U.S. Dist. LEXIS 63242 (D. Conn., May 11, 2016)*

Motion denied by, Motion granted by, in part, Without prejudice, Motion dismissed by, in part, As moot *Pitterman v. GM LLC, 2016 U.S. Dist. LEXIS 64436 (D. Conn., May 16, 2016)*

Motion denied by *Pitterman v. GM LLC, 2018 U.S. Dist. LEXIS 12607 (D. Conn., Jan. 25, 2018)*

Motion denied by *Pitterman v. General Motors LLC, 2018 U.S. Dist. LEXIS 89587 (D. Conn., Apr. 17, 2018)*

## Core Terms

Accessory, expert testimony, warnings, defective product, argues, brake, causation, engine, reliable, summary judgment motion, transmission, deposition testimony, positions, unreliable, concludes, factors, alternative design, shifted, summary judgment, manufacturing, accidents, rollaway, investigations, interrogatory, inadmissible, assessing, vehicle's, measures, manual, retrofit

**Counsel:** **[*1]** For Bernard Pitterman, Administrator of the Estate of Margaret Rose O'Connor, Bernard Pitterman, Guardian of the Estate of Grant O'Connor, Rose O'Connor, James O'Connor, Plaintiffs: Robert B. Adelman, LEAD ATTORNEY, Joram Hirsch, Adelman, Hirsch & Newman, Bridgeport, CT; Etan Hirsch, Adelman, Hirsch & Connors, LLP, Bridgeport, CT.

For General Motors LLC, Defendant: Kent B. Hanson, Paul E.D. Darsow, LEAD ATTORNEYS, PRO HAC VICE, Hanson Marek Bolkcom & Greene Ltd, Minneapolis, MN; Mark J. Claflin, LEAD ATTORNEY, Emily E Holland, Howd & Ludorf, LLC, Hartford, CT.

**Judges:** Janet C. Hall, United States District Judge.

**Opinion by:** Janet C. Hall

## Opinion

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 59); MOTION TO PRECLUDE EXPERT TESTIMONY OF SGT. MICHAEL R. O'BRIEN (DOC. NO. 63); MOTION TO PRECLUDE PRIMARY EXPERT TESTIMONY OF L. WAYNE MCCRACKEN, JR. (DOC. NO. 65); MOTION TO STRIKE PLAINTIFFS' EXHIBIT O (ECF 95-15) ON SUMMARY JUDGMENT MOTION (DOC. NO. 103)**

### I. INTRODUCTION

This case arises out of events that occurred on July 13, 2011, when M.R.O, an 8-year-old child, died in connection with an automobile accident involving a 2004 Chevrolet Suburban, which is manufactured by the defendant General Motors LLC ("GM"). **[*2]** The plaintiffs in this case are: (1) Bernard Pitterman, as administrator of the Estate of M.R.O.; (2) Bernard Pitterman, as guardian of the Estate of G.O., who is the victim's brother; and, (3) Rose O'Connor, who is the victim's mother (plaintiffs will be referred to, collectively, as "Pitterman").

The initial Complaint (Doc. No. 1) ("Compl.") was filed in Connecticut state court and subsequently timely removed by GM. See Notice of Removal (Doc. No. 1). On October 5, 2015, Pitterman filed a six-count Amended Complaint (Doc. No. 88) ("Am. Compl."). Pitterman subsequently withdrew Counts 4, 5, and 6 of the Amended Complaint.[1] The three remaining counts

---

[1] Both the Complaint and the Amended Complaint identified James O'Connor, who was M.R.O.'s father, as a plaintiff.

— one per plaintiff — allege that GM violated *C.G.S.A. §§ 52-572m et seq.*, by distributing the 2004 Suburban in a defective condition and by not providing adequate instructions or warnings regarding the alleged defect.

Pitterman seeks to introduce expert testimony from Detective Sergeant Michael R. O'Brien of the Brookfield Police Department, who Pitterman asserts is an expert is the field of "Accident Investigation / Reconstruction." See Affidavit of Paul E.D. Darsow Ex. N (Doc. No. 62-14). Pitterman also seeks to introduce expert testimony from L. Wayne McCracken, Jr., an engineer who would testify "with respect to his reconstruction of the collision and his opinions regarding the design and function of the Brake Transmission Shift Interlock on the [2004 Suburban]." Id. Ex. Q (Doc. No. 62-17).

GM has moved to exclude both O'Brien and McCracken's expert testimony. See Motion of GM to Exclude Expert Testimony by Detective Sergeant Michael R. O'Brien (Doc. No. 63); GM's Motion to Exclude Primary Expert Testimony by L. Wayne McCracken, Jr. (Doc. No. 65). GM has also moved for summary judgment as to all of Pitterman's claims. See Motion for Summary Judgment (Doc. No. 59).

## II. FACTUAL BACKGROUND[2]

Although a case's underlying facts generally play a significant role in the court's assessment of a Motion for Summary Judgment, this case presents a somewhat unusual situation in which there are numerous facts in dispute, none of which impacts the court's resolution of GM's Motion for Summary Judgment. This is because GM's Motion for Summary Judgment rests on its assertion that O'Brien and McCracken's expert testimony is inadmissible, see GM's Memorandum in Support of Its Motion for Summary Judgment (Doc. No. 61) ("GM's MFSJ Mem. in Supp."), which is a question of law. See *Fed. R. Evid. 104(a)*; *Daubert v. Merrell Dow*

*Pharms., Inc., 509 U.S. 579, 592, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*; *Strauss v. Credit Lyonnais, S.A., 925 F.Supp.2d 414, 437 (E.D.N.Y. 2013)* ("*Federal Rule of Evidence 104(a)* provides that the admissibility of expert testimony is a preliminary question of law for the court to determine"). GM argues that, if the expert testimony proffered by Pitterman is inadmissible, Pitterman will be, as a matter of law, incapable of proving "the product defect and causation elements of [his] product liability claims." GM's MFSJ Mem. in Supp. at 2. Pitterman, on the other hand, argues that expert testimony is not required to prove his product liability claims and that, even if expert [*5] testimony is required, both O'Brien and McCracken's testimony is admissible. See Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment at 1 (Doc. No. 95) ("Pls.' MFSJ Opp'n").

The following facts are relevant to the instant Ruling. O'Brien was the officer placed "in charge of the investigation into M.R.O.'s death." GM's *Local Rule 56(a)(1)* Statement ¶ 69 (Doc. No. 60) ("GM's *L.R. 56(a)(1)* Stmt."); see also Plaintiffs' *Local Rule 56(a)(2)* Statement ¶ 69 (Doc. No. 96) ("Pls.' *L.R. 56(a)(2)* Stmt."). O'Brien authored a "Supplemental Report" in which he concluded what was the "most likely scenario" in the incident that resulted in M.R.O.'s death. See Affidavit of Paul E.D. Darsow Ex. M at 4 (Doc. No. 62-13) ("O'Brien Report").

McCracken authored two reports, the latter of which amended and supplemented his original report. See id. Ex. Q (Doc. No. 62-17) ("McCracken Report"); id. Ex. R (Doc. No. 62-18) ("Am. McCracken Report"). The Amended McCracken Report is divided into two sections: "Accident Reconstruction" (henceforth referred to as the "causation opinion") and "Brake Shift Interlock"[3] (henceforth referred to as the "product defect opinion"). Neither of McCracken's Reports touches on or includes opinions regarding the adequacy [*6] of any warnings GM might have provided about the allegedly defective condition. See GM's *L.R. 56(a)(1)* Stmt. ¶ 93; see also Pls.' *L.R. 56(a)(2)* Stmt. ¶ 93.

## III. LEGAL STANDARD

### A. Motion for Summary Judgment

---

However, James O'Connor was only a party to Counts 5 and 6 of the Amended Complaint. See Am. Compl. at 7-8. Because the court granted Pitterman's Motion to Withdraw Counts 4, 5, and 6 of the Amended Complaint (Doc. No. 113), see Doc. [*3] No. 115, James O'Connor is no longer a party to this case.

[2] In connection with a motion for summary judgment, the court relies on the undisputed facts or, if a fact is disputed, the court views the evidence in the [*4] light most favorable to the party opposing summary judgment. Except where noted, the facts are not in dispute.

---

[3] The "brake shift interlock" is also referred to as the "brake transmission shift interlock" ("BTSI"). In accordance with the parties' practice, the court will use BTSI.

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000)*. Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," *Anderson, 477 U.S. at 256*, and present such evidence as would allow a jury to find in his favor, see *Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000)*.

In assessing the record to address questions of fact, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *Graham, 230 F.3d at 38*. Summary judgment "is properly granted only when no rational finder of fact could find in favor of the non-moving party." *Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000)*. "When reasonable persons, applying the proper legal standards, could differ in their responses **[*7]** to the question" raised, on the basis of the evidence presented, the question must be left to the finder of fact. *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000).

B. Motion to Exclude Expert Testimony

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

*Fed. R. Evid. 702*. The Supreme Court has articulated four factors courts may look to when assessing the reliability of an expert: (1) "whether a theory or technique . . . can be (and has been) tested"; (2) "whether a theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error" of a technique; and, (4) the "general acceptance" of a theory within the "relevant scientific community." *Daubert, 509 U.S. at 593-94*. However, these factors "do not constitute a definitive checklist or test." *Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137,*

*150, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)* (emphasis in the original). **[*8]** Rather, the court's "gatekeeping inquiry must be tied to the facts of a particular case," and "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony." *Id.* (internal quotation marks and citations omitted).

IV. DISCUSSION

A. Motion to Exclude O'Brien's Expert Testimony

GM seeks to exclude O'Brien's testimony because it is unreliable. See Memorandum in Support of GM's Motion to Exclude Expert Testimony by Detective Sergeant Michael R. O'Brien at 5-8 (Doc. No. 64) ("GM's O'Brien Mem. in Supp."). At the outset, the court notes that O'Brien, as a member of an accident investigation team, has investigated and written reports on hundreds of, if not over a thousand, accidents. See Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude Expert Testimony of Detective Sergeant Michael O'Brien Ex. A at 13:3-10 (Doc. No. 93-1) ("O'Brien Dep."). He has also received specialized training in investigating motor vehicle accident scenes and on writing accident reports. See id. at 13:17-14:1. Although GM disputes the reliability of O'Brien's report, and any testimony based on the report, GM does not argue that O'Brien is unqualified to serve as an expert in the field **[*9]** of accident investigations. Nor does GM argue that the process O'Brien undertook to investigate and report on the accident in this case differed in any way from the process O'Brien has used for the hundreds of other investigations he has conducted and reports he has written.

Rather, GM argues that O'Brien's testimony is unreliable because there "is too great an analytical gap between the data and the opinion proffered." GM's O'Brien Mem. in Supp. at 4 (quoting *Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)*). This "analytical gap" is too great, GM argues, because O'Brien, inter alia: (1) did not interview G.O.; (2) assumed, rather than concluding based on measurements, that M.R.O. could not reach the brake pedal; and, (3) assumed that M.R.O. did not turn on the engine, without adequately considering the possibility that she did turn on the engine. See id. at 5-8. GM does not argue that any single one of these alleged deficiencies renders O'Brien's testimony inadmissible,

but rather that the cumulative effect of these deficiencies renders O'Brien's report and testimony unreliable. See generally id.

With regard to the first alleged deficiency, O'Brien admits that he did not interview G.O. as part of his investigation. See O'Brien Dep. at 45:12-14. **[\*10]** This is relevant, GM asserts, because the therapist who met with G.O. after the accident wrote in her notes that G.O. told her that, in an effort to aid M.R.O turn on the car, he "'got on the floor to release the brake and get to the pedals.'" See Affidavit of Paul E.D. Darsow Ex. P at 28:2-29:11 (Doc. No. 62-16) ("Fleming-Sherman Dep."). O'Brien has testified that he was unaware of G.O.'s comments and that, if he had been alerted to those comments while he was writing his report, he "would have considered some further possibilities" as to what caused the victim's death. See O'Brien Dep. at 46:1-12. Pitterman argues that the fact that O'Brien was not aware of G.O.'s conversation with the therapist until after O'Brien finished his report "goes to the weight the jury may place on [O'Brien's] testimony," rather than to its admissibility. Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude Expert Testimony of Detective Sergeant Michael O'Brien at 7 (Doc. No. 93) ("Pls.' O'Brien Mem. in Opp'n").

With regard to the second alleged deficiency, Pitterman does not claim that O'Brien actually measured the length of M.R.O.'s legs as part of his investigation. Rather, Pitterman argues that O'Brien's failure to measure the length of M.R.O.'s legs does not disqualify him from concluding that she would not **[\*11]** have been able to reach the brake because O'Brien "had an opportunity to view the interior of the Suburban and an opportunity to view [the victim's] body." Id. at 6. Further, Pitterman argues that GM's expert also did not measure the length of M.R.O.'s legs, but rather "relied on anthropomorphic data regarding 8 year old children" to conclude that the victim could have reached the brake pedal. Id. In so noting, Pitterman implicitly argues that, because GM's expert also did not take an actual measurement of M.R.O.'s legs, O'Brien's failure to take such a measurement cannot be viewed as a deficiency in his investigative methodology. See id.

With regard to the third alleged deficiency, Pitterman argues that GM mischaracterizes O'Brien's Report and his deposition testimony by claiming that he "assumed" that M.R.O. only turned the key to the Accessory position and did not turn the engine on. See id. at 4. Rather, Pitterman argues that O'Brien "conclude[d]" that M.R.O. only turned the key to the Accessory position. Id.

at 5. In his report, O'Brien noted, based on photographs and another officer's report, "that the automatic transmission was in 'Neutral' and the keys were in the 'on' position, without the engine running (the **[\*12]** key had been turned enough to turn on the electrics, but not all the way so as to start the engine.)" O'Brien Report at 2. Although O'Brien uses the phrase "'on' position," his description corresponds to the "Accessory" position. O'Brien's Report also notes that he tested two other Suburbans and found that, when the key was in the Accessory position, the transmission could be shifted without application of the brake. See id. at 3. He also notes in the Report that, based upon his research, if the engine of the 2004 Suburban were on, then the transmission could not be shifted unless the brake was pressed. See id. O'Brien proceeds to conclude that the "most likely scenario" in this case was that M.R.O. turned the keys to the Accessory position and, while standing or sitting in the front seat, "inadvertently pulled the lever to move the transmission from Park to Neutral." Id. at 4.

In his deposition, O'Brien testified that he considered the possibility that M.R.O. had turned the engine on and then off, but that he ultimately "didn't think it was probable or possible" that she did so. O'Brien Dep. at 42:15-19. When asked why he did not think it was possible that M.R.O. turned the engine on, O'Brien replied **[\*13]** that his conclusion was driven by the fact that she "wouldn't have been able to reach the brake." Id. at 42:20-22. Later in his deposition, O'Brien agreed that, in the 2004 Suburban, one could start the engine without being able to reach the brake. See id. at 44:20-22. O'Brien also testified that part of the reason he did not think M.R.O. turned the engine on was because M.R.O.'s mother told him that she did not believe that M.R.O. was actually going to turn the engine on, even though M.R.O. had told her mother that, "she was going to start the car." See id. at 44:9-19.

GM seizes on O'Brien's reliance on M.R.O.'s inability to reach the brake as indicative of O'Brien's faulty reasoning, as one need not press the brake in order to turn on the engine of the 2004 Suburban. See GM's O'Brien Mem. in Supp. at 6-7. Pitterman, however, argues that O'Brien did not dismiss the possibility that M.R.O. turned the engine on solely on the basis of his earlier conclusion that she could not reach the brake. Rather, Pitterman argues that O'Brien's conclusion that M.R.O. only turned the key to the Accessory position was derived from a combination of three facts: (1) that M.R.O. could not reach the brake; **[\*14]** (2) that if the engine had been turned on, one would need to press

the brake in order to shift the transmission from Park to Neutral; and, (3) that the key was found in the Accessory position. See Pls.' O'Brien Mem. in Opp'n at 7. Thus, because O'Brien concluded that the transmission was shifted from Park to Neutral, and because he concluded that M.R.O. could not reach the brake, he concluded that the transmission must have been shifted without application of the brake, which can only occur if the key is in the Accessory position and cannot occur if the engine has been turned on.

Upon review of O'Brien's Report and his deposition testimony, the court concludes that, because O'Brien's Report is based on sufficient facts / data, because his report is the product of the same methods O'Brien has used in countless other accident investigations (which methods GM does not challenge), and because O'Brien applied his methods reliably to the facts of this case, O'Brien may testify as an expert and provide his opinion as to what the "most likely scenario" surrounding the accident was. The court does not believe that O'Brien's failure to measure M.R.O.'s legs and his failure to interview G.O. render **[*15]** his report so unreliable as to disqualify him from testifying. Rather, the court believes that these omissions go to the weight of O'Brien's testimony, which GM will be to attack on cross-examination.[4] GM's Motion to Exclude O'Brien's

_____

[4] The court does not believe that either _Wills v. Amerada Hess Corp., 379 F.3d 32 (2d Cir. 2004)_ or _Perkins v. Origin Medysstems, Inc., 299 F.Supp.2d 45 (D. Conn. 2004)_, both of which GM has cited in support, requires a different conclusion. In _Wills_, the proposed causation expert "conceded that cigarette smoking and alcohol consumption were major risk factors for the development of squamous cell carcinoma," the illness in question, yet "fail[ed] to account for decedent's smoking habit and alcohol consumption as possible causes of decedent's squamous cell carcinoma." _Wills, 379 F.3d at 50._ In _Perkins_, the court admitted the expert's testimony after noting that, "[a]lthough an expert is not required to eliminate every potential cause in order for his or her opinion to be admissible under _Daubert_, the expert is required to employ either standard diagnostic techniques to eliminate obvious alternative causes or, if the defendant suggests some likely alternative cause of the plaintiff's condition, the expert is required to offer a reasonable explanation why he or she still believes that the defendant's **[*16]** action or product was a substantial factor in bringing about the plaintiff's condition." _Perkins, 299 F.Supp. 2d at 61_.

In the case at bar, G.O.'s involvement in the events preceding the accident was not the type of "obvious alternative cause" that is contemplated in _Wills_ or _Perkins_. GM has not suggested any reason why O'Brien would or should have been

testimony is denied.

B. Motion to Exclude McCracken's Expert Testimony

The Amended McCracken Report contains **[*17]** two sections, which are independent of one another. Accordingly, the court will address the causation opinion and the product defection opinion separately.

1. Product defect opinion

GM argues that the court should preclude McCracken's product defect opinion because it is "contrary to applicable legal standards." Memorandum in Support of GM's Motion to Exclude Primary Expert Testimony by L. Wayne McCracken Jr. at 6 (Doc. No. 66) ("GM's McCracken Mem. in Supp."). It is "contrary to applicable legal standards," GM claims, because "it is inconsistent with Connecticut's substantive product liability law." Id. at 7. Specifically, GM claims that McCracken's conclusion — as characterized by GM — that "emerging technology in motor vehicle design renders defective all vehicles which do not have the technology," is contrary to "Connecticut's substantive product liability law." Id. Assuming, arguendo, that such a view were contrary to Connecticut product liability law,[5] GM's argument fails because McCracken's product defect opinion does not stand for the proposition that GM claims it does.

Nowhere in his product defect opinion does McCracken claim that the **[*18]** 2004 Suburban was defective solely on the basis that new technology was emerging, or has subsequently emerged, that could have made the 2004 model safer. Rather, McCracken concludes that the 2004 Suburban was defective because earlier versions of GM automobiles, including the 2002 Suburban, contained a BTSI function that was active in the

_____

on notice of G.O.'s possible involvement while he was conducting his investigation. To the contrary, O'Brien testified that he had been told that G.O. was outside the car and had tried to run after the car as it rolled backwards. See O'Brien Dep. at 44:23-45:2.

The record also indicates that O'Brien did not ignore the "obvious alternative cause" of the rollaway: that M.R.O. turned the engine on, depressed the brake, and shifted the car into neutral, before ultimately turning the key back to the Accessory position. Rather, he considered this possibility but concluded that it was not possible or probable. While GM is entitled to attack O'Brien's conclusion on cross-examination, there is no ground to exclude O'Brien's testimony on the basis that he did not consider this possibility.

[5] GM has not cited a single Connecticut state court case, or a single case from a federal court within the Second Circuit, that stands for that proposition.

Accessory ignition position and, because the automobile industry was, by 2004, "aware that serious injuries and fatalities occurred as a result of children shifting the transmission from park to neutral when a vehicle is parked on a slanted surface and the vehicle then rolls away injuring or killing a child inside or outside the vehicle." Am. McCracken Report at 7.

Further, GM's argument is not advanced by the two cases that GM cites in support. Those cases stand for the proposition that it is inappropriate to apply modern sensibilities and notions of safety to products that were created in an earlier era. See *Robinson v. Brandtjen & Kluge, Inc., 500 F.3d 691, 694-95 (8th Cir. 2007)*; *Sexton By and Through Sexton v. Bell Helmets, Inc., 926 F.2d 331, 336-37 (4th Cir. 1991)*. Rather, "[t]o determine what was defective in an earlier period, we look to evidence of the industry practice at the time, any direct evidence of what reasonable purchasers expected, and other evidence concerning injuries or knowledge of the [*19] dangers of the product in that time." *Robinson at 695*. There is nothing in McCracken's product defect opinion that indicates he applied latter-day sensibilities or notions of safety to 2004, when the Suburban in question was distributed. Rather, his opinion indicates that his conclusion that the 2004 Suburban was defective is based on industry knowledge and capabilities that existed in 2004. See Am. McCracken Report at 7-8. Therefore, McCracken's product defect opinion is not precluded on the ground that it is contrary to Connecticut substantive product liability law.

GM also argues that McCracken's product defect opinion should be precluded because it "conflicts with applicable federal law." GM's McCracken Mem. in Supp. at 7. GM concedes that it "does not argue that federal law preempts Plaintiffs' state law claims." GM's Reply to Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude Primary Expert Testimony by L. Wayne McCracken, Jr. at 3 (Doc. No. 107) ("GM's McCracken Reply") (emphasis in original). Rather, it argues that, because federal regulations in place in 2004 did not require that automobiles include a BTSI function that is active in all ignition positions, "[p]ermitting McCracken to opine that a vehicle becomes defective the moment one perceives a way to change its design conflicts with both common law and federal law [*20] by extension." Id. at 4. However, as just discussed, the court does not read McCracken's product defect opinion as standing for the proposition that the 2004 Suburban was defective because the industry was starting to perceive at the time, or subsequently

perceived, that it could make cars safer by including a BTSI function that is active in all positions. Rather, the court reads McCracken's opinion as standing for the proposition that the 2004 Suburban was defective at the time it was distributed because the industry was aware of the risk of rollaway accidents to children, and because GM had the capability in 2004, at the time it distributed the Suburban in question, of including a BTSI function that was active in all positions.

Finally, GM argues that McCracken's product defect opinion should be excluded because "[t]o the extent McCracken's product defect opinion rests on GM's effort to expand BTSI design and function, it rests on subsequent remedial measures which are inadmissible under *Rule 407 of the Federal Rules of Evidence*." Id. at 4. However, with regard to improvements to the BTSI function, McCracken's opinion only references GM's internal discussions from 2003 — which, McCracken states, occurred prior to the production of the 2004 Suburban [*21] — regarding making the BTSI active in all positions. See Am. McCracken Report at 8. Thus, McCracken's product defect opinion is not premised on subsequent remedial measures that GM advocated or took. Rather, it is, in part, premised on measures that GM had contemplated prior to manufacturing the 2004 Suburban, not subsequent. Therefore, McCracken's product defect opinion is not excluded on the ground that it is contrary to federal law.[6]

Alternatively, GM argues that McCracken's product defect opinion should be excluded because it is unreliable. See GM's McCracken Mem. in Supp. at 8-11. As already discussed, see supra, § III.B, the Supreme

---

[6] The court notes that allowing McCracken to testify will in no way prevent GM from arguing that "its vehicles pass federal muster and [inviting] the jury to conclude that a vehicle that complies with all federal rules is safe enough to be on the road." GM's McCracken Reply at 3 (quoting *DePaepe v. Gen. Motors Corp., 141 F.3d 715, 718 (7th Cir. 1998)*). McCracken's product defect opinion does not claim that the 2004 Suburban was noncompliant with then-applicable federal regulations.

Similarly, allowing McCracken to testify will in no way prevent GM from objecting to trial testimony that is inadmissible under *Rule 407 of the Federal Rules of Evidence*. The court's decision to allow McCracken to testify is premised on the conclusion that his product defect opinion, as discussed, is not itself inadmissible under *Rule 407*. Of course, if the oral testimony that McCracken, [*22] or anyone else, provides at trial is inadmissible under *Rule 407*, the court will exclude such testimony.

Court has articulated four factors courts may look to when assessing the reliability of an expert: (1) "whether a theory or technique . . . can be (and has been) tested"; (2) "whether a theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error" of a technique; and, (4) the "general acceptance" of a theory within the "relevant scientific community." *Daubert, 509 U.S. at 593-94*. However, these factors "do not constitute a definitive checklist or test." *Kumho Tire, 526 U.S. at 150* (emphasis in the original). Rather, the court's "gatekeeping inquiry must be tied to the facts of a particular case," and "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony." *Id.* (internal quotation marks and citations omitted).

The court reads McCracken's product defect **[*23]** opinion as standing for three distinct opinions: (1) that the automobile industry was aware, by 2004, of the risk posed to children of rollaway accidents when children shift the transmission from park to neutral while the vehicle is parked; (2) that GM was capable of manufacturing the 2004 Suburban with a BTSI function that was active in the Accessory position; and, (3) that GM was capable of retrofitting the 2004 Suburban so as to make the BTSI function active in the Accessory position. The court will assess whether there exists a reliable basis for each of these propositions.

With regard to the first opinion, McCracken's conclusion that the automobile industry was aware of the risk to children of rollaway accidents is premised on the fact that the National Highway Traffic Safety Administration ("NHTSA") published a report in 1990 which highlighted this risk. See Am. McCracken Report at 7. McCracken references this report in his product defect opinion, but he does not reproduce the NHTSA report as part of his opinion. However, Pitterman has included a full copy of the NHTSA report in its briefing. *See* Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude Primary Expert **[*24]** Testimony of L. Wayne McCracken, Jr. Ex. O (Doc. No. 94-15) ("NHTSA Report"). The court has reviewed the NHTSA report and concludes that it supports the conclusion that McCracken drew from it. See id. at 7 ("Based on the accident data, [NHTSA] concludes that, with respect to the rollaway type of accident, there is a significant enough safety problem, since children are the primary victims of these transmission lever shifting accidents, to justify amending the Standard. NHTSA recognizes the special obligation it has to reduce accidents involving

children, and it believes this action is consistent with that obligation"); id. at 18 ("an estimated 400-800 child-injuring rollaway accidents occurring annually, nationwide"). Further, the court agrees with Pitterman that the court can presume that GM was aware of the contents of the 1990 NHTSA report.[7] Accordingly, the court finds that McCracken's opinion that the automobile industry was aware of the risk to children of rollaway accidents is based on sufficient data, is the product of a reliable methodology, and is the result of a reliable application of this methodology to the facts of this case. Therefore, McCracken will not be precluded from testifying about **[*25]** the first opinion.

With regard to the second opinion, McCracken's conclusion that GM was capable of manufacturing the 2004 Suburban with a BTSI function that was active in the Accessory position is based on his review of various discovery materials, interrogatory responses, and deposition testimony. See Am. McCracken Report at 8. In his product defect opinion, he specifically references testimony by Victor Hakim, who is the Department Head / Sr. Technical Consultant in charge of Engineering Analysis for GM. Id. McCracken also references information that he gleaned from GM's responses to interrogatories, although he does not identify which interrogatories he relies upon. Id. However, Pitterman has identified specific portions of Hakim's deposition testimony, specific portions of William Sultze's deposition testimony, and specific interrogatory responses, all **[*26]** of which McCracken had access to when drafting his opinion and all of which, Pitterman claims, support McCracken's conclusion. See Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude Primary Expert Testimony of L. Wayne McCracken, Jr. at 17-27 (Doc. No. 94) ("Pls.' McCracken Mem. in Opp'n"). Specifically, McCracken's conclusion that GM was capable of manufacturing the 2004 Suburban with a BTSI function that was active in the Accessory position is based on the following facts: (1) GM had manufactured other cars with a BTSI function that was active in the Accessory position prior to 2004; and, (2) the GM Safety Integration Council decided in September 2003 to make the BTSI function active in all positions. See Am. McCracken Report at 8.

_____

[7] Beyond the fact that it is a reasonable inference that GM, as one of the country's largest automobile manufacturers, would be aware of a NHTSA report, the NHTSA actually contacted GM in connection with the publication of the NHTSA Report, which further supports the conclusion that GM was aware of the Report. See NHTSA Report at 8-9.

2016 U.S. Dist. LEXIS 57165, *26

The court has reviewed the interrogatory responses and the deposition testimony of Hakim and Sultze that Pitterman has provided to the court, and the court concludes that they generally support McCracken's conclusion. Specifically, in its response to Interrogatory 4, GM acknowledged that "some implementations of BTSI did apply to the accessory key position prior to the date of manufacture of the 2004 Chevrolet Suburban, but not to the implementation used in the 2004 Chevrolet Suburban." See Pl.'s McCracken Mem. in Opp'n Ex. A at 2 (Doc. No 94-1). In its response [*27] to Interrogatory 9, GM conceded that it would have been feasible to design the 2004 Suburban with a BTSI function that was active in the Accessory position. See id. Ex. J at 1-2 (Doc. No. 94-10). Along these lines, Hakim testified that the Geo Prism, a GM car, had a BTSI function that was active in all key positions as of 1990 and 1992. See id. Ex. B at 97:23-98:7 (Doc. No. 94-2) ("Hakim Dep."). Sultze also testified that, as of 2003, there were some GM vehicles that had a BTSI function that was active in all key positions. See id. Ex. D at 45:11-14 (Doc. No. 94-4). Hakim also testified that it was his belief that GM could have made the BTSI function in all key positions in 2003. See id. Ex. P at 46:15-23 (Doc. No. 94-16).

However, the record less clearly supports McCracken's assertion that, "the GM Safety Integration Council in September 2003 decided to make BTSI active in all key positions." Am. McCracken Report. at 8. Sultze's deposition testimony indicates that, in September 2003, he made a presentation to the Safety Integration Council in which he proposed that GM make the BTSI function active in all key positions. See Plaintiffs' Memorandum in Opposition to Defendant's Motion [*28] for Summary Judgment Ex. C at 29:15-19 (Doc. No. 95-3; see also id. Ex. D (Doc. No. 95-4). However, the record does not indicate that the GM Safety Integration Council decided, in September 2003, to adopt Sultze's proposal and make the BTSI function active in all key positions. Nevertheless, the court still concludes that McCracken's opinion that GM was capable of designing the 2004 Suburban with a BTSI function that was active in the Accessory position is based on sufficient data, is the product of a reliable methodology — i.e. McCracken's review GM's interrogatory responses, his review of Hakim's deposition testimony, and his review of Sultze's proposal — and is the result of a reliable application of this methodology to the facts of this case. Therefore, McCracken will not be precluded from testifying about the second opinion.

With regard to the third opinion — that GM could retrofit the 2004 Suburban to make the BTSI function active in the Accessory position — McCracken does not indicate in his product defect opinion on what basis he drew that conclusion. In his briefing, Pitterman asserts that McCracken, at his deposition, produced an electrical schematic showing how GM could [*29] retrofit the 2004 Suburban to make the BTSI function active in the Accessory position. See Pl.'s McCracken Mem. in Opp'n at 18-19; see also id. Ex. L (Doc. No. 94-12) (McCracken's schematic). GM argues that McCracken's testimony on this point is unreliable because McCracken never tested his alternative design, never subjected it to peer review, and because the rate of error of McCracken's design is unknown. See GM's McCracken Mem. in Supp. at 9. In response, Pitterman argues that McCracken did not need to test his alternative design because GM, through its employee Hakim, "has agreed that the design proposed by Mr. McCracken either would work or could be made to work." Pl.'s McCracken Mem. in Opp'n at 21.

However, the court does not believe that Hakim unequivocally indicated that McCracken's alternative design was feasible, as Pitterman claims he did. Upon reviewing McCracken's schematic, Hakim did testify that McCracken's redesign would make the BTSI active in the Accessory position. See Hakim Dep. at 146:19-21. However, Hakim went on to testify that he did not know what other effects McCracken's redesign would have on the 2004 Suburban's other functions, and he specifically stated [*30] that, "[t]his is one of those things you'd actually have to try it and see what other circuits it interrupts." Id. at 147:24-148:1.

Although, as discussed earlier, the court is not required to consider the _Daubert_ factors when assessing an expert's reliability, the _Daubert_ factors are especially appropriate when the purported expert seeks to testify about a safer alternative design. See, e.g., _Zaremba v. Gen. Motors Corp., 360 F.3d 355, 358-59 (2d Cir. 2004)_ (applying _Daubert_ factors to proposed safer alternative design). Applying the _Daubert_ factors, the court concludes that McCracken did not test his alternative design, did not subject it to peer review, did not calculate its rate of error, and has not indicated that it is generally accepted in the automobile industry. Thus, the methodology upon which McCracken based his finding that GM was capable of retrofitting the 2004 Suburban, i.e. his alternative design and Hakim's deposition testimony, do not provide a reliable basis for McCracken's conclusion. Therefore, McCracken will not be permitted to testify about his proposed alternative design or GM's capability of retrofitting the 2004

Suburban to include a BTSI function that was active in the Accessory position.[8]

2. Causation opinion

GM seeks to exclude McCracken's causation opinion on the ground that it is unreliable. See GM's McCracken Mem. in Supp. at 12-13. McCracken's causation opinion relies on a number of sources: O'Brien's Report; police measurements; deposition testimony; photos of the vehicle and accident scene; his own field investigation of the vehicle and accident scene; his testing of vehicles similar to the 2004 Suburban; and, a report of the download of the Sensing and Diagnostic Module ("SDM") performed on the subject vehicle. See Am. McCracken Report at 2-7. GM advances a number of arguments as to why McCracken's causation opinion is unreliable, which the court will address [*32] in turn.

First, GM argues that, "McCracken's opinion about what caused the Suburban to roll rests on the same incomplete information available to the Brookfield Police." GM's McCracken Mem. in Supp. at 12. However, as already determined, the information available to O'Brien when he wrote his report was sufficient to allow a conclusion to be drawn with regard to the "most likely scenario" surrounding the accident. It follows, then, that McCracken's reliance on O'Brien's Report, and on the data that O'Brien relied upon when investigating the accident, does not render McCracken's causation opinion unreliable.

GM also argues that McCracken's causation opinion is unreliable because McCracken "has no information as to what M.R.O. may have done with her feet once she entered the Suburban, meaning that McCracken cannot rule out the possibility that M.R.O. operated the vehicle's service brake." Id. at 12. However, "[e]xperts are not required to conclusively rule out every possibility." Adel v. Greensprings of Vermont, Inc., 363 F.Supp.2d 683, 689 (D. Vt. 2005) (citing cases). Nevertheless, Pitterman argues that McCracken, through his review of

Rose O'Connor's deposition testimony, did consider what M.R.O. was doing with her feet. Pitterman notes that, "McCracken had available to him [*33] the deposition testimony of Rose O'Connor in which she testified that G.O. told her that M.R.O. was 'kneeling in the front seat' and G.O. 'was like kneeling on the back and leaning forward between the seats.'" Pls.' MFSJ Opp'n at 19. GM attempts to undermine the legitimacy of McCracken's reliance on Rose O'Connor's testimony on the ground that Pitterman "offer[s] no explanation for how an accident reconstruction expert can reliably form a causation opinion based on the second-hand hearsay statements of an emotionally traumatized child, as reported by a parent with a clear motive to slant the facts." GM's McCracken Reply at 8. However, GM's arguments about the credibility of Rose O'Connor's testimony and, concomitantly, of McCracken's report, speak to the weight of McCracken's causation opinion, not its admissibility.[9]

Further, [*34] McCracken does consider the possibility that the key had been turned to the "Run" position (i.e. the position in which the engine is running and application of the brake is required to shift gears) rather than the Accessory position, and ultimately concludes based on technical analysis that the key had not been turned to the Run position. McCracken bases this conclusion in part on his analysis of the report of the SDM download. Specifically, McCracken concludes that, because the "topography of the accident scene and the nature of damage to the subject vehicle is significant enough to trigger a near deploy event on an SDM," and because the "[r]eport of SDM download performed on the subject vehicle showed no event recorded," the SDM on the subject car must not have been powered when the accident occurred. See Am. McCracken Report at 6. And, because the SDM is powered when the key is in the Run position, but is not powered when the key is in the Accessory position, McCracken concludes that the key was in the Accessory position, and not the Run position, at the time of the rollaway. Id. Accordingly, McCracken's causation opinion is not rendered unreliable for failure to consider the possibility [*35] that M.R.O. operated the vehicle's brake.

---

[8] The court notes that Pitterman correctly [*31] points out that he does not need to prove that a safer alternative design existed in order to prevail on his claim that the 2004 Suburban was unreasonably dangerous when it was designed. See Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 217-219, 694 A.2d 1319 (1997) ("in some instances, a product may be in a defective condition unreasonably dangerous to the user even though no feasible alternative design is available. In such instances, the manufacturer may be strictly liable for a design defect notwithstanding the fact that there are no safer alternative designs in existence").

[9] In a similar vein, GM relies on G.O.'s therapist's notes to prove what G.O. said during his meeting with the therapist. Just as McCracken's reliance on Rose O'Connor's deposition testimony as evidence of M.R.O's positioning within the car is subject to attack, so is GM's reliance on the therapist's notes as evidence of G.O.'s involvement in the events preceding the accident.

Lastly, GM offers a number of critiques of McCracken's causation opinion that are premised primarily on GM's assertion that McCracken did not consider certain possibilities, account for certain facts, or conduct certain tests / calculations. See GM's McCracken Mem. in Supp. at 12-13. Some of GM's assertions, such as its assertion that McCracken "fail[ed] to consider the possibility that M.R.O. actually started the vehicle," id. at 12, and its assertion that McCracken "[d]id not attempt to explain how the vehicle's driver's side door came to be open," id. at 13, are patently rebuked by McCracken's causation opinion, see Am. McCracken Report at ¶¶ 8 (door), 9-10 (starting the vehicle). As for GM's assertion that McCracken did not plot the car's travel path or trajectory, or calculate its speed as it rolled, beyond stating that McCracken did not conduct these analyses, GM does not articulate how such analyses would be relevant to McCracken's causation analysis, nor does it articulate how McCracken's causation opinion is, on account of these omissions, faulty. Further, GM does not cite any case indicating that analyses of a car's travel path, trajectory, or speed are relevant [*36] to a causation opinion such as McCracken's, or necessary to render such an opinion reliable. Accordingly, these omissions are not significant enough to render his causation opinion unreliable. Rather, they speak to the weight of McCracken's causation opinion, which GM will have the opportunity to undermine on cross-examination. Thus, GM's Motion to Exclude McCracken's testimony is granted in part, and denied in part. It is granted to the extent that McCracken will not be permitted to testify about GM's ability to retrofit the 2004 Suburban. In all other respects, it is denied.

C. Motion for Summary Judgment

1. Product defect claim

GM argues that, because Pitterman cannot prevail on his product defect claim without expert testimony, and because the expert testimony that Pitterman has proffered is inadmissible, the court should grant its Motion for Summary Judgment. However, because the court has concluded that the expert testimony of O'Brien and McCracken is, predominantly, admissible, GM's Motion for Summary Judgment as to the product defect claim is denied.[10]

---

[10] The portion of McCracken's product defect opinion that the court has excluded does not affect Pitterman's ability to prevail on his [*37] product defect claim, for the precise reason already explained in footnote 8.

2. Failure to warn / inadequate warning claim

GM has also moved for summary judgment of Pitterman's failure to warn / inadequate warning claim. In support, GM argues that the "owner's manual that came with the [2004] Suburban plainly warned about the fact that the vehicle's BTSI did not cover the Accessory key position." GM's MFSJ Mem. in Supp. at 6. As to the adequacy of those warnings, GM argues that summary judgment should be granted in its favor because Pitterman has "not identified a single expert who has rendered a professional opinion about the sufficiency of [the] warnings" contained in the 2004 Suburban's owner's manual. Id. at 6. In response, Pitterman argues that, under Connecticut law, expert testimony is not required to prevail on an inadequate warning claim. See Pls.' MFSJ Opp'n at 14.

Under Connecticut law, "[e]xpert testimony is generally required in cases in which . . . the issues involved go beyond the field of the ordinary knowledge and experience of the trier of fact." *D'Ascanio v. Toyota Indus. Corp., 309 Conn. 663, 674, 72 A.3d 1019 (2013)* (internal quotation marks omitted). Here, the issue is whether what GM characterizes as "warnings" contained in the owner's manual were [*38] sufficient to adequately warn drivers that the BTSI was not active in the Accessory position and that, as a result, the transmission could be shifted without application of the brake, if the key is in the Accessory position. The parties have not cited, nor is the court aware of, any case in which a court applying Connecticut law has held that expert testimony is required, as a matter of law, in order for a plaintiff to prevail on an inadequate warning claim.

GM has not carried its burden of proving that expert testimony is required for Pitterman to prove that the "warnings" contained in the owner's manual were inadequate. There is no dispute that the BTSI was not active in the Accessory position in the 2004 Suburban. It is not complicated for a layperson to understand what the BTSI does. Nor is it complicated for a layperson to understand that, in cars in which the BTSI function is not active in the Accessory position, the transmission can be shifted without application of the brake if the key is in the Accessory position. Given these easily comprehensible concepts, asking a layperson to determine whether the "warnings" contained in the owner's manual adequately warned against the possibility [*39] of the transmission being shifted without application of the brake while the key was in the Accessory position does not go "beyond the field of the ordinary knowledge and experience." *Id.*

The two cases cited by GM in support of its argument that expert testimony is required for Pitterman to prove his inadequate warning do not require a different conclusion. In *White v. Mazda Motor of America, Inc., 139 Conn.App. 39, 54 A.3d 643 (Conn. App. Ct. 2012)*, the court mentions the plaintiff's failure to warn claim, but does not discuss it substantively, nor does the court substantively discuss the need for expert testimony to prove that claim. The lower court also did not substantively discuss this issue. See *White v. Mazda Motor of America, Inc., No. HHDCV086003322S, 2011 Conn. Super. LEXIS 1620, 2011 WL 3211221, (Conn. Super. Ct. June 22, 2011)*.

The other case cited in support by GM — *Montagnan v. Pfizer, Inc., 584 F.Supp.2d 459 (D. Conn. 2008)* — is easily distinguishable from this case. In Montagnan, the plaintiff claimed that the warning accompanying the drug Depo-Provera was inadequate because it did not incorporate the results of studies conducted in 1991 and 1999. See *id. at 462*. However, in Montagnan it was unclear, as a threshold matter, whether the results of the 1991 and 1999 studies should have been incorporated in the first place. See *id. at 463* ("neither the Court nor a lay jury is capable of assessing the credibility of the **[*40]** 1991 and 1999 Studies, synthesizing the results of the studies (which do not plainly state any of the proposed warnings), or comparing the results of these studies with other studies that came to contrary conclusions"). That is not the case here. There is no argument made by GM that the 2004 Suburban's owner's manual did not need to include a warning against the risks associated with having a BTSI function that was not active in the Accessory position on the ground that those risks were unfounded. The 1990 NHTSA Report clearly established the link between a BTSI function that was not active in all positions and the risk of rollaway accidents.

Rather, the question here is much more straightforward: given the known risks associated with having a BTSI function that was not active in the Accessory position, did the "warnings" included in the owner's manual adequately warn users against those risks. The court concludes that it would not go "beyond the field of the ordinary knowledge and experience" to ask a layperson — who has been informed of the risks associated with a BTSI function that was not active in the Accessory position — to look at the "warnings" contained in the owner's manual **[*41]** and determine if those "warnings" were sufficient. Accordingly, Pitterman is not required to proffer expert testimony regarding the adequacy of the warnings, and GM's Motion for Summary Judgment as

to the failure to warn / inadequate warning claim is denied.

## V. CONCLUSION

For the above-stated reasons, GM's Motion to Exclude O'Brien's expert testimony (Doc. No. 63) is **DENIED**. GM's Motion to Exclude McCracken's expert testimony (Doc. No. 65) is **GRANTED IN PART AND DENIED IN PART**. It is granted to the extent that McCracken cannot testify about GM's ability to retrofit the 2004 Suburban. In all other respects, it is denied. GM's Motion for Summary Judgment (Doc. No. 59) is **DENIED**.

Because the court did not rely on Exhibit O to Doc. No. 95 in reaching any of the decisions discussed in this Ruling, GM's Motion to Strike Plaintiffs' Exhibit O (ECF 05-15) on Summary Judgment Motion (Doc. No. 103) is **TERMINATED AS MOOT**.

**SO ORDERED**.

Dated at New Haven, Connecticut this 29th day of April 2016.

/s/ Janet C. Hall

Janet C. Hall

United States District Judge

---

**End of Document**

## *Sanders v. Fireline, Inc.*

United States District Court for the District of Connecticut

March 12, 2007, Decided ; March 12, 2007, Filed

Civil No. 3:02CV00498 (AWT)

**Reporter**

2007 U.S. Dist. LEXIS 17068 *; CCH Prod. Liab. Rep. P17,707; 2007 WL 6874460

WILLIE SANDERS, Plaintiff, v. FIRELINE, INC., Defendant.

**Subsequent History:** Reconsideration denied by *Sanders v. Fireline, Inc., 2007 U.S. Dist. LEXIS 92904 (D. Conn., Dec. 17, 2007)*

Affirmed by *Sanders v. Fireline, Inc., 2008 U.S. App. LEXIS 20961 (2d Cir. Conn., Sept. 30, 2008)*

## Core Terms

defense motion, summary judgment, Deposition

**Counsel:** **[*1]** For Willie Sanders, Plaintiff: Robert J. Sweeney, LEAD ATTORNEY, Early, Ludwick & Sweeney, New Haven, CT.

For Ansonia Copper & Brass, Inc., Intervenor Plaintiff: Timothy D. Ward, LEAD ATTORNEY, McGann, Bartlett & Brown, Vernon, CT.

For Fireline Inc, Defendant: Charles Francis Gfeller, LEAD ATTORNEY, Edwards Angell Palmer & Dodge-HTFD-CT, Hartford, CT; Janet Marie Helmke, LEAD ATTORNEY, Northeast Utilities-Htfd, Hartford, CT; Mark B. Seiger, LEAD ATTORNEY, Edwards Angell Palmer & Dodge-HTFD-CT, Hartford, CT; William E. Murray, LEAD ATTORNEY, Edwards & Angell, Hartford, CT.

For Fireline Inc, Intervenor Defendant: Charles Francis Gfeller, LEAD ATTORNEY, Edwards Angell Palmer & Dodge-HTFD-CT, Hartford, CT; Janet Marie Helmke, LEAD ATTORNEY, Northeast Utilities-Htfd, Hartford, CT; Mark B. Seiger, LEAD ATTORNEY, Edwards Angell Palmer & Dodge-HTFD-CT, Hartford, CT; William E. Murray, LEAD ATTORNEY, Edwards & Angell, Hartford, CT.

For Willie Sanders, Intervenor Defendant: Robert J. Sweeney, LEAD ATTORNEY, Early, Ludwick & Sweeney, New Haven, CT.

**Judges:** Alvin W. Thompson, United States District Judge.

**Opinion by:** Alvin W. Thompson

## Opinion

### *RULING ON PENDING MOTIONS*

The defendant **[*2]** has moved to preclude the testimony of the plaintiff's expert and has also moved for summary judgment. Oral argument on the defendant's motions was held today, after which the court granted each motion.

As an initial matter, the court agrees with the defendant that this is a case where the plaintiff must establish causation through expert testimony in order to establish liability under the Connecticut Product Liability Act, *Conn. Gen. Stat. § 52-572m, et seq.*. This is not a case where the fact of a defect is within the common knowledge of an average juror. Nor is it a case where there is an absence of other identifiable causes. *See DeBartolo v. Daimler Chrysler Corp., No. X10NNHCV030482725S(CLD), 2005 Conn. Super. LEXIS 3579, 2005 WL 3665602, at *4 (Conn. Super. Ct. Dec. 22, 2005)*; *see also Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 218, 694 A.2d 1319 (1997)* (under proper circumstances, finder of fact can infer liability from circumstantial evidence).

The plaintiff contends that its expert, Michael Shanok, qualifies as an expert by virtue of specialized knowledge based on his experience. However, Shanok's responses to questioning during **[*3]** his deposition reflect that he has no experience in conducting failure analysis for the product at issue in this case. In addition, Shanok undertook no failure analysis of the product at issue. In addition, Shanok's report reflects impermissible reliance on his assessment of the plaintiff's credibility. *See Nimely v. City of New York, 414 F.3d 381, 399 (2d Cir. 2005)*. Moreover, his report and his testimony reflect a failure on his part to make any effort to validate through scientific methodology the hypotheses set forth in his

2007 U.S. Dist. LEXIS 17068, *3

report as to why the south pour cup was defective because of its manufacture or design. *See* Shanok Deposition II, at 110. Thus, the court concluded that Shanok's testimony would not be the product of reliable principles and methods.

Accordingly, Defendant's Motion to Preclude Testimony (Doc. No. 59) and Defendant's Motion for Summary Judgment (Doc. No. 57) are hereby GRANTED.

The Clerk shall close this case.

It is so ordered.

Dated this 12th day of March 2007 at Hartford, Connecticut.

/s/ Alvin W. Thompson

United States District Judge

---

End of Document

## *Bridgeman v. Deere & Co.*

United States District Court for the Eastern District of Virginia, Norfolk Division

February 13, 2009, Decided; February 13, 2009, Filed

Civil Action No. 2:07cv613

**Reporter**
2009 U.S. Dist. LEXIS 57250 *; 2009 WL 1344948

TERRY BRIDGEMAN, Plaintiff, v. DEERE & CO., et al, Defendants.

## Core Terms

deposition, excavator, argues, discovery, expert testimony, documents, motions, interrogatories, accidents, manufacture, responses, rules of evidence, car accident, scientific, notice, motion to exclude, admissibility, conditions, injuries, screen

**Counsel:** **[\*1]** For Terry Bridgeman, Plaintiff: Andrew Michael Sacks, Stanley Elliot Sacks, LEAD ATTORNEYS, Sacks & Sacks, Norfolk, VA.

For Deere & Company, trading as John Deere & Company, Defendant: Brickford Y. Brown, LEAD ATTORNEY, Moran Kiker Brown PC, Richmond, VA; Jana Pruitt Roemmich, LEAD ATTORNEY, Carl Dewayne Lonas, Moran Brown PC, Richmond, VA.

For Hertz Equipment Rental Corporation, Defendant, Cross Claimant: Michael James Garnier, LEAD ATTORNEY, Garnier & Garnier, P.C., Falls Church, VA.

For Deere & Company, Cross Defendant: Brickford Y. Brown, LEAD ATTORNEY, Moran Kiker Brown PC, Richmond, VA; Jana Pruitt Roemmich, LEAD ATTORNEY, Carl Dewayne Lonas, Moran Brown PC, Richmond, VA.

**Judges:** Raymond A. Jackson, United States District Judge.

**Opinion by:** Raymond A. Jackson

## Opinion

### *ORDER*

Before the Court are the following motions: (1) Plaintiff's Motion to Compel and for Sanctions; (2) Defendants' (separate) Motions to Exclude Frederick Heath; (3) Defendants' (separate) Motions to Exclude Dr. Jewell; and (4) Defendants' (separate) Motions in Limine. These matters have been fully briefed, and the Court conducted a hearing on February 12, 2009.

## I. MOTION TO COMPEL AND FOR SANCTIONS (# 22)

Plaintiff argues that Deere has failed to **[\*2]** cooperate in discovery by (1) failing to answer interrogatories, (2) answering other interrogatories incompletely, (3) failing to produce documents relevant to the manufacturing of the particular excavator, (4) failing to identify a single knowledgeable person involved in the manufacturing of the particular excavator, (5) failing to produce an appropriate *30(b)(6)* corporate representative, and (6) failing to produce documents at the *30(b)(6)* witness examination. Accordingly, Plaintiff requests an order compelling answers to interrogatories and providing sanctions, including (1) exclusion of the *30(b)(6)* designated corporate witness as either a corporate witness or an expert witness, (2) barring Deere from calling any witnesses besides individuals identified in the December 2008 interrogatory answers, (3) stripping Deere of all defenses, and/or (4) awarding attorney's fees to Plaintiff in connection with this Motion.

Deere argues that this Motion should be denied. First, Deere argues that the Motion is untimely, as it was filed two weeks after the close of discovery and less than a month before the scheduled trial date. Second, Deere argues that Plaintiff's assertions are without merit. **[\*3]** In sum, Deere argues that it has complied with all applicable rules and has not violated any discovery order. Deere further argues that Plaintiff has provided no evidence of bad faith by Defendant or prejudice to Plaintiff that would support such severe sanctions. Deere points out that Plaintiff has identified no specific prejudice, and that despite Plaintiff's general claim of prejudice, Plaintiff's expert was able to form opinions about alleged manufacturing and design defects before Deere was even notified by Plaintiff that its discovery responses were inadequate. Deere also notes that although Plaintiff relies on the federal law of spoliation,

Plaintiff has provided no evidence that Deere destroyed or concealed anything of relevance to this case. Deere also notes that Plaintiff filed this Motion just after Deere notified Plaintiff that it would be filing a *Daubert* motion to exclude Plaintiff's liability expert and seeking to exclude much of Plaintiff's medical evidence. Deere argues that the timing of this Motion, along with Plaintiff's admission that any responses cannot be made sufficiently in advance of the trial date to be of any value to Plaintiff's case, makes it clear that **[*4]** Plaintiff is simply "lashing out" and is not primarily interested in discovery responses.

Deere also specifically addresses all of Plaintiff's allegations. Regarding the interrogatories, Deere avers that Plaintiff's requests were overly broad and vague. Deere timely responded to the first and second sets of discovery in September and early October of 2008. Deere states that it did not receive notice that Plaintiff was dissatisfied with any responses until Plaintiff's deposition in late October, but that Plaintiff's counsel did not identify any specific discovery requests he would like supplemented until early November. Deere sent a status update in mid-November and submitted supplemental responses in early December. Deere was unaware that Plaintiff was dissatisfied with the supplemental response until Plaintiff filed this Motion on December 30th. Regarding the unproduced documents, Deere asserts that it cannot produce documents it does not have. Deere argues that it undertook every effort to locate all relevant documents, and that it produced drawings, specifications, and standards for the windshield of the subject excavator. Regarding the knowledgeable persons, Deere asserts that it **[*5]** identified all persons whom Deere knew to have direct knowledge of the facts and information at issue. Defendant asserts that Plaintiff overlooks the fact that his claims do not relate to any piece of equipment included in the manufacture of the excavator, but rather in the *exclusion* of an optional safety screen.

Regarding the corporate representative, Deere designated Dan Griswold in response to Plaintiff's *30(b)(6)* notice. Griswold is the current Manager of Product Safety, and during his 30+ years with Deere, he has been involved in the design, engineering, and manufacture of excavators, research, development, product safety, and market analysis. Deere argues that Griswold was able to testify at length about the relevant topics in Plaintiff's notice and he was properly designated. Regarding the documents at the *30(b)(6)* examination, Deere contends that Plaintiff did not request documents until December 2nd for the

deposition scheduled for December 5th, and included 11 categories of documents to be produced. Deere was unable to agree due to the short notice, and informed Plaintiff's counsel of such on December 4, 2008. Plaintiff's counsel nonetheless elected to proceed with the deposition.

In **[*6]** accordance with the Court's ruling at the hearing, because this Motion is untimely and there appears to be no meritorious grievance, this Motion is **DENIED**.

## II. MOTIONS TO EXCLUDE FREDERICK HEATH (# 23 & # 24)

Defendants argue (in separate motions) that Plaintiff's liability expert, Frederick Heath, should be excluded under *Rule 702 of the Federal Rules of Evidence* and *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*, because he is not qualified to offer expert testimony, his opinions are not grounded in any objective standard, and his opinions are not relevant or helpful to the fact-finder. Mr. Heath is Plaintiff's liability expert, and his opinions pertain to the alleged design defect in the excavator. Specifically, Mr. Heath opines that Deere should have installed a protective screen on the windshield of the excavator, and that the warnings were not adequate to advise the operator that screens should be used when conducting demolition work.

Deere and Hertz make essentially the same arguments. First, Defendants argue that Mr. Heath is unqualified. Defendants argue that he is an expert-for-hire, a litigation consultant with a bachelors degree in mechanical engineering **[*7]** earned approximately fifty years ago. He is not a licensed or registered professional engineer. His professional background is almost exclusively in the automotive service industry, specifically in the manufacture of aerial lifts. He has never designed, manufactured, or operated an excavator. He cannot define the primary purpose of an excavator, has no knowledge of variations between different models, and cannot define the construction industry in general. He has no education, training, or experience in construction equipment. He has not taught any classes or written any articles relevant to this case. Never before this case had he addressed, in any context, the subject of protective screens on excavators.

Second, Defendants argue that Mr. Heath's opinions lack foundation, in that they are not grounded in an objective standard or methodology, but instead are

merely personal opinions. His opinions have not been subjected to any testing to determine whether his alternative designs are safe or technologically or economically feasible. He has submitted no explanations, models, drawings, or calculations to allow anyone else to test his ideas. He has not proposed a specific screen for use **[*8]** on the excavator, or any type of structural dimension, material composition, or mechanical configuration. Furthermore, he has not developed a single warning that he would deem acceptable, and he has not conducted any risk assessment. In support of his propositions, he has not presented evidence on customs in the trade or referred to literature in the field, and the materials he has cited are not relevant. Defendants argue that Mr. Heath's opinions are based on pictures he found on the internet and some excavators he once saw engaged in demolition work at a job site. Finally, Defendants argue that because Mr. Heath is not qualified and his opinions are not reliable, Mr. Heath's opinions are also therefore not relevant or helpful to the fact-finder.

In response, Plaintiff briefly outlines Mr. Heath's credentials, but does not provide any additional evidence to rebut Defendants' arguments. In fact, Plaintiff's statement of Mr. Heath's credentials confirms that his professional experience has been primarily in the automotive industry. Plaintiff also makes the untenable argument that *Daubert* does not apply to this case.

In *Daubert*, the United States Supreme Court established the standard **[*9]** for the admissibility of expert testimony pursuant to *Federal Rule of Evidence 702*. *Rule 702* states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The *Daubert* decision rejected the prior rigid "general acceptance" test of *Frye v. United States, 293 F. 1013 (D.C. Cir. 1923)*, and established a new two-part test for the admissibility of expert testimony. *See Daubert, 509 U.S. at 589, 592-93*. Under *Daubert*, when a court is

"[f]aced with a proffer of expert scientific testimony," the court "must determine at the outset... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id. at 592*. In *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)*, **[*10]** the Supreme Court held that the *Daubert* test applies to all expert testimony falling under *Rule 702*.

In determining whether the "scientific knowledge" prong is satisfied, a court may consider four factors: (1) ability to test the theory or technique; (2) peer review and publication; (3) error rate; and (4) degree of acceptance within the relevant scientific community. *See United States v. Dorsey, 45 F.3d 809, 813 (4th Cir. 1995)* (citing *Daubert, 509 U.S. at 593-94*). An additional factor to consider is whether the expert testimony was prepared solely for purposes of litigation, or whether it flowed naturally from the expert's research or technical work. *See Wehling v. Sandoz Pharmaceuticals Corp., 162 F.3d 1158 (4th Cir. 1998)* ("Another significant fact weighing against admitting the testimony is where, as here, the expert developed his opinions expressly for the purposes of testifying"); *Daubert v. Merrell Dow Pharmaceuticals, 43 F.3d 1311 (9th Cir. 1995)* ("*Daubert II*") ("If **[*11]** the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles'"). However, this list of factors is not exclusive and "the trial judge must have considerable leeway in determining whether particular expert testimony is reliable." *Kumho Tire, 526 U.S. at 152*.

In determining whether the evidence will be helpful to the trier of fact, the United States Court of Appeals for the Fourth Circuit has stated that "a judge must be mindful of other evidentiary rules," specifically *Federal Rule of Evidence 403*. *Dorsey, 45 F.3d at 813*. *Rule 403* permits the exclusion of evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury…." The Supreme Court has stated that a trial judge must be particularly concerned with *Rule 403* with regard to expert testimony because of the difficulty in evaluating expert evidence. *Daubert, 509 U.S. at 595*. Expert testimony has potential to mislead the jury, since the jury may attach more significance to the testimony than is reasonably **[*12]** warranted. *United States v. Lester, 254 F. Supp. 2d 602, 607 (E.D. Va. 2003)*.

The proponent of expert testimony has the burden of

establishing admissibility by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001)*. "In making its [admissibility] determination [a court] is not bound by the rules of evidence except those with respect to privileges." *Fed. R. Evid. 104(a)*. In addition, "a trial judge has a great deal of discretion in deciding whether to admit or exclude expert testimony." *Dorsey, 45 F.3d at 814*.

Considering these principles and in accordance with the Court's ruling at the hearing, these Motions are **GRANTED**. It is abundantly clear that Mr. Heath is not qualified as an expert in the relevant field and that his opinions are grounded in nothing except his personal views. Mr. Heath admitted as much in his own deposition. Plaintiff has the burden of showing its expert is qualified, and it has not done so. Applying *Daubert* and *Rule 702*, the Court finds that Mr. Heath cannot be permitted to testify.

## III. MOTIONS TO EXCLUDE DR. JEWELL (# 32 & # 35)

Defendants also argue (in separate motions) that the deposition testimony of Plaintiff's treating **[*13]** physician, Dr. Neal Jewell, should be excluded, in whole or in part, on two bases: (1) as a discovery sanction under *Rules 37* and *26 of the Federal Rules of Civil Procedure*, and (2) under *Rule 702 of the Federal Rules of Evidence* and *Daubert*.

Defendants assert that Plaintiff has been involved in at least one motor vehicle accident [1] since the 2005 construction accident that is the subject of this case. Defendants also allege that the injuries resulting from the April 2007 accident are remarkably similar to the injuries that Plaintiff is claiming in the instant lawsuit. Defendants further allege that Plaintiff has actively concealed, from both Defendants and from Dr. Jewell, the accident(s), the extent of injuries suffered, and the treatments received for said accident(s). Defendants allege that they discovered the occurrence of such

accident(s) only because Plaintiff's counsel inadvertently produced documents relating to emergency room and chiropractic treatment for said accident(s). Even though Defendants put Plaintiff's counsel on notice that the discovery responses provided were incorrect and incomplete, Plaintiff has not produced a single bill, medical record, invoice, or document **[*14]** related to his treatment for such accident(s). Defendants argue that their deposition of Dr. Jewell was frustrated by the fact that they did not have access to the relevant information about these accidents before the deposition. Defendants also assert that throughout the entire discovery period, Plaintiff has generally been evasive to any inquiry regarding his past medical history.

Defendants argue that Dr. Jewell relied on Plaintiff's self-disclosure, and that his diagnosis did not account for car accidents as potential alternate causes of his symptoms. Because of a lack of information and because Plaintiff had stated in his October 27, 2008 deposition that the only recent accident **[*15]** was in June 2006 and involved only minor bruises to the hip area, Defendants made only a brief inquiry at Dr. Jewell's November 28, 2008 deposition regarding an intervening car accident. Dr. Jewell stated that he did not know of any accidents involving Plaintiff, and that the pain Plaintiff complains of could be related to an intervening car accident. Defendants concede that Dr. Jewell is otherwise qualified but argue that his opinion has been tainted by Plaintiff's conduct.

Accordingly, Deere argues that as a result of Plaintiff's failure to cooperate in discovery, i.e. failure to disclose and failure to supplement, Deere has been prejudiced, and the Court should exclude Dr. Jewell's deposition testimony as a discovery sanction. Both Deere and Hertz argue argue that Dr. Jewell's testimony about Plaintiff's injuries and their cause is unreliable and should be excluded under *Rule 702* and *Daubert*.

Plaintiff argues that the Motions are without merit. Plaintiff argues that Defendants had knowledge of the accident by October, well before Dr. Jewell's November deposition. Plaintiff also avers that Defendants did not object to Plaintiff's interrogatory responses relating to the accidents or **[*16]** object to the deposition of Dr. Jewell for lack of information. Plaintiff notes that Defendants have not sought an independent medical evaluation of Plaintiff. Plaintiff states that he disclosed the June 2006 accident in his deposition, as well as an accident from about 40 years ago, but was not asked about other accidents.

---

[1] Initially, Defendants argued that Plaintiff had been involved in two accidents. At the hearing, however, Plaintiff's counsel argued that there was only one accident in April 2007, even though Plaintiff mistakenly stated this accident occurred in June 2006 during his deposition and that there was an emergency room bill from June 2006. Defendants agreed that the June 2006 emergency bill appeared to be related to an insect bite, but would not stipulate that it was certain that there was only one accident.

Plaintiff states that Dr. Jewell arrived at his opinions after the construction accident but before the automobile accidents, and that his opinions have not been changed. Plaintiff also argues that his injuries claimed in this lawsuit were not caused by the car accidents, and explains that these accidents were minor. Thus, Plaintiff argues that Defendants' objections go to the weight of Dr. Jewell's testimony rather than its admissibility.

At the hearing, the timeline of these events was clarified. Plaintiff was involved in an accident in April 2007, and his June 2006 emergency room visit was related to a venomous spider bite. Dr. Jewell was apparently not informed of any intervening automobile accidents before arriving at his opinions. Before Dr. Jewell's November 2008 deposition, Defendants only had the following information to put them on notice of an automobile **[*17]** accident: the medical bills inadvertently produced by Plaintiff, knowledge of a lawsuit between Plaintiff and a chiropractor, and Plaintiff's incomplete and mistaken account of the car accident at Plaintiff's deposition in October 2008. In December, Plaintiff responded to an interrogatory asking for names of past medical providers: "A physician after the automobile accident after the subject casualty; plaintiff will supplement." When Defendants had previously sent that interrogatory in August/September, Plaintiff had not included any information about a recent car accident. Also in December, Defendants received records from Plaintiff's chiropractor.

Accordingly, the Court finds that Dr. Jewell's testimony regarding Plaintiff's condition since April 2007 is unreliable, because his opinion is not based upon sufficient data and he has not ruled out alternative causes. Therefore, Defendants' Motions are **GRANTED** in part and **DENIED** in part. Dr. Jewell may not testify about any of Plaintiff's treatment, conditions, or symptoms from April 2007 to present, or the cause of such conditions. Furthermore, Dr. Jewell may not opine or in any way suggest that Plaintiff's current condition was caused **[*18]** by the 2005 excavator accident. Thus, Dr. Jewell may only testify about Plaintiff's treatment and conditions prior to April 2007.

## IV. MOTIONS IN LIMINE (# 32 & # 37)

Defendants argue (in separate motions) that certain evidence and testimony should be excluded for various reasons, including lack of relevance and risk of unfair prejudice and confusion of the issues. Such evidence

and testimony includes: (1) Hertz's private rules, practices or internal polices as evidence of a standard of care; (2) Hertz's advertising of training and equipment familiarization programs for equipment; (3) any claim for lost wages; (4) various medical conditions where no linkage has been demonstrated between the conditions and the accident at issue; (5) prescriptions and/or prescription costs after July 2006; (6) details of Plaintiff's neck surgery; and (7) photographs of excavators other than the subject excavator.

As the Court stated at the hearing, the Court declines to rule on these motions at this time, and these issues are deferred until trial.

The Court declines to award any of the attorneys' fees or costs requested in these several motions.

The Court **DIRECTS** the Clerk to send copies of this Order to counsel **[*19]** for the parties.

**IT IS SO ORDERED**.

Norfolk, Virginia

February 13, 2009

/s/ Raymond A. Jackson

**Raymond A. Jackson**

**United States District Judge**

---

End of Document

## *Holzman v. GMC*

Superior Court of Massachusetts, At Middlesex

November 6, 2007, Decided

Opinion No.: 100291, Docket Number: 02-1368

### Reporter

2007 Mass. Super. LEXIS 462 *; 2007 WL 4098913

Herbert S. Holzman v. General Motors Corporation

## Core Terms

jacks, load, testing, channels, warranty, vehicles, issues, predominance, commonality, models, tire, class action, class certification, requirements, steel, proposed class, manufacturers, brake, wheel, class member, manual, lift, conditions, repeated, roll-off, trunnion, chocked, surface, holes, upper

## Case Summary

### Procedural Posture

Plaintiff, an owner of a vehicle, alleged that the vehicle came with a defective jack; i.e., a jack whose design was such that it was subject to failure during normal use, and as such was unreasonably dangerous. The complaint asserted claims under *Mass. Gen. Laws ch. 93A, §§ 9* and *11*, and for breach of warranties express and implied, of merchantability, and of fitness for a particular purpose. The owner moved for class certification.

### Overview

It seemed highly unlikely that the question of whether the jacks in the class were, or were not, unmerchantable could have been addressed on a class-wide basis. Thus, the court found that the proposed class lacked commonality, under *Mass.R.Civ.P. 23(a)*. The court was unable to find that the issues common to the class as a whole predominated, in number, complexity, or necessary trial time, over individual issues because, inter alia, there was a reasonable likelihood of different findings as to the merchantability of different jack models or jack-vehicle combinations. The proposed class also lacked superiority because the multitude of uncommon issues would cause the presentation of evidence, the jury charge, and even the verdict form to be, if not unmanageable, certainly inferior to individual

proceedings for any class members who chose to assert claims outside defendant corporation's warranty procedure. Because the members of the class had not made the necessary preliminary showing that they were similarly situated, and that they had suffered similar injury at the hands of the corporation, class certification would have been inappropriate under *Mass. Gen. Laws ch. 93A, § 9(2)*.

### Outcome

The motion for class certification was denied. The case was dismissed.

## LexisNexis® Headnotes

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

**HN1[ ]** Class Actions, Prerequisites for Class Action

See *Mass.R.Civ.P. 23(a)*.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Maintainability

**HN2[ ]** Prerequisites for Class Action, Maintainability

See *Mass.R.Civ.P. 23(b)*.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

Evidence > Burdens of Proof > Allocation

**HN3[ ]** Class Actions, Prerequisites for Class

**Action**

A court's task at a stage of a proceeding concerning a motion for class certification is to determine preliminarily whether the requirements of numerosity, commonality, typicality, adequacy, predominance, and superiority are satisfied. Plaintiffs bear the burden of providing information sufficient to enable the motion judge to form a reasonable judgment that the class meets the requirements of *Mass.R.Civ.P. 23*; they do not bear the burden of producing evidence sufficient to prove that the requirements have been met. Neither the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies the Rule. The standard defies mathematical precision. A motion for class certification should not turn on the court's evaluation of the merits of the parties' legal or factual claims. The court may find it necessary, however to analyze elements of the parties' substantive claims and review such facts as are available at this preliminary stage, in order to evaluate whether the requirements of *Rule 23* have been satisfied.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Commonality

*HN4*[⤓]   **Prerequisites for Class Action, Commonality**

The commonality requirement dictates that plaintiffs seeking class certification must demonstrate that all the persons whom they profess to represent have a common interest in the subject matter of the suit and a right and interest to ask for the same relief. The commonality test is qualitative rather than quantitative, that is, there need only be a single issue common to all members of the class. Where a proposed class is comprised of owners of a number of different models of a certain product with differing characteristics, commonality is often the hurdle not overcome.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Maintainability

*HN5*[⤓]   **Prerequisites for Class Action, Maintainability**

In the context of a motion for class certification, the predominance inquiry asks whether, if common questions of law and fact do exist, those common issues predominate over questions affecting only individual members. *Mass.R.Civ.P. 23(b)*. That common issues must be shown to "predominate" does not mean that individual issues need be nonexistent. All class members need not be identically situated upon all issues, so long as their claims are not in conflict with each other. The individual differences, however, must be of lesser significance, and they must be manageable in a single class action. The predominance requirement cannot be satisfied where there are a greater number of questions peculiar to the several categories of class members, and to individuals within each category, where such uncommon questions are significant.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Maintainability

*HN6*[⤓]   **Prerequisites for Class Action, Maintainability**

Closely related to the commonality and predominance issues is *Mass.R.Civ.P. 23(b)*'s requirement that a class action be superior to other available methods for the fair and efficient adjudication of the controversy. As a general rule, the greater the number of individual issues that exist among putative plaintiffs in a class, the less likely it is that superiority can be established.

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

*HN7*[⤓]   **Deceptive & Unfair Trade Practices, State Regulation**

The statutory language governing certification of a *Mass. Gen. Laws ch. 93A* class action differs from that of *Mass.R.Civ.P. 23*. *Mass. Gen. Laws ch. 93A, § 9(2)* allows a consumer injured by an unfair or deceptive act or practice to bring a class action, but only where the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if a court finds in a preliminary hearing that the consumer adequately and

2007 Mass. Super. LEXIS 462, *462

fairly represents such other persons. *Section 9(2)* thus expressly incorporates numerosity and adequacy requirements that parallel those of *Mass.R.Civ.P. 23.* Caselaw has implied as well the requirements of commonality and typicality, but has eschewed importing the highly discretionary elements of predominance and superiority. These cases find in *Mass. Gen. Laws ch. 93A, § 9(2)* a more mandatory tone than in *Mass.R.Civ.P. 23.*

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Commonality

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

*HN8*[⬇] **Deceptive & Unfair Trade Practices, State Regulation**

While neither *Mass. Gen. Laws ch. 93A, § 9(2)* nor the caselaw specifies how much commonality is enough to satisfy *§ 9(2)*, it does invest in a court a degree of discretion in determining whether certain plaintiffs adequately have alleged that they are "similarly situated" and have suffered a "similar injury" as members of the class they seek to represent--taking care, of course, to ensure that the remedial purposes of *Mass. Gen. Laws ch. 93A* and the accomplishment of substantial justice do not fall prey to the traditional technicalities.

**Judges:** [*1] Thomas P. Billings, Associate Justice.

**Opinion by:** Thomas P. Billings

# Opinion

MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

For the following reasons, the Plaintiff's Motion for Class Certification is DENIED.

INTRODUCTION

The plaintiff, [1] owner of a 1999 Cadillac DeVille Concours, alleges that the vehicle came with a defective jack; i.e., a jack whose design is such that it is subject to failure during normal use, and as such is unreasonably dangerous. The Complaint asserts claims under *G.L.c. 93A, §§9* and *11*, and for breach of warranties express and implied, of merchantability and fitness for a particular purpose. [2]

The plaintiff seeks certification of a class of Massachusetts owners and lessees of GM automobiles. The definition of the proposed class has been somewhat elastic, **[*2]** but in the weeks and days leading up to the evidentiary hearing on the motion (held on October 11 and 12, 2007), it was narrowed to include only the purchasers and lessees of vehicles equipped with 23 specific models of jacks which are alleged--as explored in more detail below--to share certain design characteristics that contribute to an unacceptably high risk of failure. Only economic damages are claimed; it is not alleged, for example, that any member of the proposed class has suffered personal injury due to a jack failure.

The requirements for certification of a class in this Court are found in *Mass.R.Civ.P. 23(a)* and *(b)*:

*HN1*[⬆] (a) Prerequisites to Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

*HN2*[⬆] (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites **[*3]** of subdivision (a) are satisfied, and the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual

---

[1] There were originally five named plaintiffs. Four have been voluntarily dismissed, leaving only Mr. Holzman.

[2] Two additional counts, for intentional and implied misrepresentation, were dismissed for failure to plead with the specificity required by *Rule 9(b)*, but with leave to re-plead. These counts have not re-surfaced, eliminating one significant area of potential non-commonality among members of the class.

2007 Mass. Super. LEXIS 462, *3

members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Thus, the familiar checklist--numerosity, commonality, typicality, adequacy, predominance, and superiority-- which the Massachusetts rule shares with its federal counterpart, *Fed.R.Civ.P. 23(a)* and *(b)(3).* (There are also some differences between the state and federal rules, and also between both *Rules 23* and *G.L.c. 93A, §9(2),* all of which will be explored as necessary in the Discussion section, below.)

FACTS

The following is a description of such of the evidence presented at the hearing seems relevant to the class certification decision. That evidence consisted of documentary materials submitted by both sides, together with testimony from one expert witness called by each--Frederick Heath for the plaintiff and Devinder Grewal for the defendant.

The proposed class consists of 23 jacks. [3] Each was sold with one or more GM vehicles over one or more model year. There are 80 discreet **[*4]** pairs of jack and vehicle model sold together. If each vehicle is counted separately for each model year in which it was sold with a particular jack, there would be 178 pairs. (See Ex. D77A.)

The plaintiff's expert witness, Heath, is an engineering consultant who devotes a substantial part of his practice to forensic issues, but who also participates in the work of committees who establish industry standards, including those concerning "portable automotive lifting devices," which include jacks used for emergency tire changes. His credentials on paper are impressive; his work in connection with this motion, somewhat less so.

Heath has rendered four reports in this action, each signed under oath, and dated August 24, 2006; September 17, 2006; December 8, 2006; and July 31, 2007, respectively.

In the August 2006 report, Heath stated that he had tested eight jacks of the 25,695,287 model; inspected twenty more GM scissor jacks as well as two GM mechanical screwjacks **[*5]** and several

jacks of other manufacturers; and reviewed a large number of documents, mostly GM documents produced in discovery and various industry and government standards. He was "familiar" with the jack models owned by the two named plaintiffs then in the action (but had tested neither), and was "generally familiar" with 49 models (including the plaintiffs'), which he enumerated by part number. All were scissors jacks and were, in Heath's opinion, "substantially the same in design, manufacture and function." All 49 were defective because they regularly fail in use; they will not survive a roll-off; they have open clevises, narrow channels, and light-gauge steel weakened by weight-reducing holes; and because the design failed to consider forces experienced in real-world conditions.

The September 2006 report covered much the same ground, except that now the list of defective jacks had grown to 59.

By the time of the July 31, 2007 report, the list had shrunk to 29 jacks, and as of the hearing six more were eliminated, reducing the final list to 23. [4]

These jacks, Heath testified at the hearing, share the following common physical characteristics:

All are scissor jacks with six pivot points: two at the base, one at each "elbow" joint (my term, not Heath's); and one at each side of the load rest or "saddle" (Heath's term) at the top where the jack contacts the car.

All are light in weight.

All have narrow **[*7]** struts or "channels" (the latter term being that appearing in GM engineering documents).

---

[4] So matters stood as of an August 13, 2007 status conference, at which I scheduled the class action hearing and allowed GM an additional **[*6]** deposition of Mr. Heath to cover his most recent work. Evidently sometime after this, Heath also performed two "finite element analyses," using a computer to model forces on a jack he believed to be similar in construction to those in the proposed class. On October 5, 2007 GM--which had received Heath's additional work days before--filed an emergency motion seeking various relief, most prominently exclusion of Heath's post-July 31 work or a continuance of the evidentiary hearing on class certification scheduled for October 11-12. I held a hearing, and ordered that the evidentiary hearing proceed as scheduled the next week; that the class be limited to the 29 jacks then proposed; and that Heath's testimony be limited to the work disclosed up to and including his July 31 report. The evidence and my findings herein are so delimited.

---

[3] More precisely, the class as proposed would of course be the purchasers and lessees of vehicles equipped with these jacks. For convenience, however, I will be referring to a class of jacks, not jack purchasers and lessees.

2007 Mass. Super. LEXIS 462, *6

All have "open clevises." This refers to the joints at which the upper and lower channels rotate on the pin that joins them--the aforementioned elbows. Each channel is a piece of stamped steel, formed (very roughly speaking) on a U-shaped cross-section. At the elbow, each lower channel has two holes stamped--one at each side of the "U." Through this goes a pin or "trunnion." Each upper channel fits outside the corresponding lower channel, and likewise has a hole for the trunnion. The trunnion is secured by virtue of having a greater diameter outside the holes than inside, like a nail with a head on either end. The holes in the channels were referred to at the hearing as "clevises." Some jack channels have holes surrounded by an unbroken circle of steel. Others--including all of those in the class--are cut so that instead of a continuous circle, the hole is bounded by two ears that don't quite touch, rather as if one had used a knife to slice a section out of one side of a doughnut, or (more consistent with the scale and materials here) a washer. This open clevis design, Heath testified, was likely **[*8]** a cost-saving measure, enabling the trunnion to be manufactured with a head on either end and the clevis-ears bent or snapped into place during assembly, rather than beating one end of the trunnion into a head after it is in place.

Other physical characteristics differ as among jacks in the proposed class. Some are long, others short. Some have screw extensions, other don't. There are a number of different designs for the load rest, the piece at the top that makes contact with the jacking point on the car. None of these points of distinction, in Heath's opinion, materially affects what he sees as the basic flaw of the design: the tendency of the jack to collapse when the jack experiences horizontal forces of the type that can occur in real-world situations, such as where the jack is deployed on an uneven or unevenly compacted surface.

Heath described at length two "GMUTS" [5] documents prescribing test protocols to determine the performance of jacks (GMUTS R2-14E-2; Ex. P8) and the effects of jack use on vehicles (GMUTS R1-14E-2; Ex. P7). The R2 covers numerous tests of jacks, six of which Heath considered relevant to the issues in this case. These are, in summary:

3.3.1. Jack/Jacking **[*9]** Point Durability Test: vehicle loaded to GVM (the Gross Vehicle Mass for which it is rated); level surface; parking brake set; wheels chocked; tire deflated; car jacked by hand seven times; test repeated at all four jacking points; condition of jack, handle, and lifting points recorded.

3.3.2. Jacking Load Measurement Test: vehicle loaded to GVM; level surface; parking brake set; wheels chocked; tire deflated; jack fitted with load cell fixture; car jacked to two-inch clearance height; vertical, fore-aft, and lateral loads on jack measured position; test repeated at all four jacking points. [6]

3.3.4.1. Jack-Vehicle Clearance Test: vehicle at curb weight (i.e., unloaded) and GVM; minimum diameter released wheel (no tire) installed; clearances recorded between vehicle jacking point and (a) surface and (b) top of jack in full down position; test repeated at all four jacking points.

3.3.4.2. Tire-Ground Clearance Test: vehicle at curb weight and GVM; car raised to maximum height of jack; largest diameter wheel installed and tire inflated; clearance recorded between tire and ground.

3.3.9. Jack/Vehicle Stability Test--Level Surface: vehicle at curb weight; level surface; vehicle in neutral **[*10]** with brake off and no chocks; vehicle raised at front jacking point to full jack height; 100 pounds static force applied from rear, then front, then laterally; tests repeated with vehicle raised at rear jacking point. Test is then repeated with vehicle in park, brake on, wheels chocked (if chocks are standard equipment), using 200 pounds force. If the vehicle falls off during any portion of test, maximum load input to vehicle and any damage are recorded.

3.3.10. Jack/Vehicle Stability Test--7% Compound Slope: same as preceding test, except that vehicle is positioned at a 45% angle on a 10% slope, making a 7% compound slope, and only the second (park/brake/chock/200 lbs.) set of tests is performed.

The R1 GMUTS evaluates the effects of various jacking procedures on the vehicle. Heath considered relevant only two of these tests:

3.3.2. Vehicle Body Damage During and After Jacking: vehicle loaded to GVWR and axle being tested to GAWR; jack raised to maximum height or so that tire-ground clearance is 2 inches; vehicle

[5] General Motors Uniform Test Standard.

[6] Heath mistakenly testified that only vertical loads were measured; the R2 GMUTS says otherwise.

2007 Mass. Super. LEXIS 462, *10

inspected for various types of deformation **[*11]** and damage while raised and after lowered.

3.32. Vehicle Damage from Falling Off Jack. vehicle loaded as in preceding test; vehicle in neutral with brake off and no chocks; vehicle as in preceding test; force applied to rear of vehicle sufficient to push it off jack (and push-off force is recorded); vehicle inspected for damage. Test repeated with rearward force, and at all four jacking positions. Heath noted that only the vehicle--not the jack--is inspected for damage.

Heath testified that the test procedures outlined above compared unfavorably with the analysis performed in four "NAO Evaluation Reports" from August 1999 (Ex. P10-P13). These reported on computer simulations which evaluated the loads on the car body and the jack when a GMX270 body (that of the Cadillac Seville) was jacked in various "worst case scenarios" from each of the four jack points. The scenarios evaluated were:

   a) raising the jack base vertically by 25 mm.

   b) jack resting on uneven ground at different corners of the base of the jack.

   c) tilting of the jack base +/- 4 degrees in side view.

   d) tilting of the jack base +/- 4 degrees in rear view.

   e) top channel contact position moved longitudinally (forward, center, **[*12]** aft).

These were considered separately, and together ("stacked"), with the proviso:

> Assuming all of these variables are at their maximum results in extremely conservative load estimates. It seems unlikely that all of these would be at the worst possible stack up simultaneously. Since a worst case condition is not really fully defined in the referenced GMUTS test procedures relative to lateral and longitudinal loads, it is suggested that Validation [i.e., GM's product testing function] better characterize a set of worst case conditions.

In Heath's view, these conditions are likely to occur in the real world, and are likely not to be appreciated by the consumer. Most importantly, tilting the jack by four degrees caused it to incur significant horizontal loads not tested in the GMUTS procedures--not even those using a 7% compound slope, since the jack in that procedure is placed in the "nominal" position (i.e., flat relative to the slope but tilted relative to the earth).

Next, Heath discussed a chart prepared by DURA Product Engineering (Ex. D68), comparing the jack specifications of various auto manufacturers. DURA is

an OEM that manufactures jacks for sale with GM cars and, it would **[*13]** appear, those of other manufacturers. Heath pointed to several GM specifications which are more forgiving than those of other manufacturers, while noting others in which GM's requirements meet or exceed those of other manufacturers.

Heath next described his own testing of several jacks of the same part number ("P/N") 25,695,287. He understood (see below) that this was the jack supplied with the 1999 Cadillac DeVille Concours. He had acquired the jacks for a personal injury case titled *Jasiak v. General Motors*, in which he consulted for the plaintiff's counsel in this case.

Initially, Heath jacked a Concours up to see how the jack performed during jacking and in a push-off. Later, he devised a test stand in which a hydraulic cylinder exerted a calculated force vertically on the jack's load rest, and in which horizontal forces could be applied to the base of the jack. Generally speaking, he found that the jack was capable of withstanding the vertical force exerted by the car, but that it was damaged in a roll-off such that it failed in a second roll-off. In the test stand, the jack collapsed when sufficient horizontal force was applied to it. [7] Most commonly, the failures occurred at the **[*14]** clevises where the bottom channels engage the trunnions.

Next, Heath described a report (Ex. P21) by Joni Grob, a GM engineer, of push-off tests she performed on some jacks supplied with Cadillacs. The tests were inspired by customer complaints, the common thread of which was that the customer, having neglected to set the parking brake, jacked the car up to change a flat tire; the car rolled off the jack; and the jack thereupon failed at the "elbow" or trunnion joint, rendering it unusable (i.e., incapable of completing the tire change). Grob looked at 40 jacks that GM had collected from warranty returns, 25 of which had the aforedescribed failures. Grob designed a push-off test

> to see what it would take to design the jack to withstand a roll-off. This would allow the customer to be able to recover from a mistake of forgetting the parking brake, and prevent a potential walk home.

In December 1997, Grob tested five examples of each

---

[7] This was done by tilting the base and then moving it horizontally while the jack was fully extended and under a 1920-pound load.

2007 Mass. Super. LEXIS 462, *14

of jack designs: P/N 25,642,873, in which the channels were made entirely of .060-inch steel; P/N 25,677,974, a redesign of P/N **[*15]** 25,642,873 in which the lower channel was increased to .075-inch steel; an experimental redesign of P/N 25,677,974 in which both the upper and lower channels were made of the heftier .075-inch steel; and two jacks manufactured by Seeburn and sold with larger GM cars.

Grob found that all of the P/N 25,642,873 jacks were unusable after push-off due to separations at the channel ends (i.e., failure of the open clevises). The same was true of the 25,677,974 jacks, though the deformation was less than with the first set. All five of the fully-beefed-up experimental design were reusable, with minor damage to two of them at the base and load rest, respectively, not affecting the elbow joints. Of the large-car Seeburn jacks, an older model was reusable but a current model was not, though the failure was due to deformation of the channels rather than separation at the joints.

Grob repeated the test on three of the experimental jacks, this time on a rough asphalt surface. In this test the car was very difficult to push off; "[a]t one point the jack was at approximately 45 degrees relative to the ground and it was not deforming, and it was not slipping." One of the jacks suffered a separated load **[*16]** rest; none was damaged at the elbow joints. Grob determined that increasing the thickness of the upper channel would cost six cents per jack--"a small price to pay to eliminate a significant number of walk homes and angry customers"--and recommended the change. Her recommendation was implemented (see Ex. P56), and the fully-fortified jack became P/N 25,695,288.

Rather than seeing Grob's work as a success story, however, Heath noted that the push-off test replicated conditions likely to be encountered in the field, and that the old-model Seeburn jack was the only one that survived the test in every instance fully intact. Nor did Grob's testing--which Heath did not replicate--dissuade him from including all three models--P/Ns 25,642,873, 25,677,974, and 25,695,288--on his list of 23 "defective" jacks that ought to be included in the class. [8]

---

[8] I note here, in partial defense of Heath on this point, that the Jasiak jack was the result of a similar re-engineering process, in which the original model (P/N 25,653,436) was fortified in its bottom struts (P/N 25,677,978) and then in its top struts to become P/N 25,695,287, the model that Heath tested. See Ex. D76 and Grewal's testimony explaining **[*17]** it, which is briefly summarized below.

As noted above, it is Heath's opinion that all jacks in the class share the common characteristics of having six pivots, open clevises, relatively narrow channels, and relatively light weight, and that all are defective (i.e., will fail in reasonably foreseeable field conditions), notwithstanding differences in load rest designs, other design details such as channel length and presence or absence of crew extender, and weight/length/width of the vehicle with which the jack is sold.

Heath's credibility--already suffering from the very limited extent of his actual testing in relation to the sweeping conclusions drawn therefrom, and from the sometimes stark contrast between the information in the documents on which he relied and the conclusions he drew from them--was further tarnished on cross examination.

Heath, for example, is not a licensed engineer in any jurisdiction and never has been. He has only tested one GM jack model, the P/N 25,695,287 jacks that he acquired for the *Jasiak* case. Even these, it turns out, he tested with the wrong car. Jasiak (like plaintiff Holzman) had a 1999 DeVille Concours. Heath thought he was testing the jack model **[*18]** that came with this car (in part, by jacking up Jasiak's car with the test jacks), but in fact the assistant whom Heath had sent to a Kansas City dealer to do the buying had procured the wrong one, a fact of which Heath was unaware until cross examination in the evidentiary hearing in this case. What effect (if any) the mismatch may have had on the validity of Heath's field testing, which employed a vehicle for which the jack was not designed, was not explored further at the hearing; nor did Heath analyze how the weight or dimensions of any of the vehicles with which the "class" jacks were sold might affect their performance. In his view all of the jacks are underdesigned, period.

Inattention to detail infected numerous other aspects of Heath's work and testimony as well. For example:

> Although Heath broadly characterized the "defective" jacks proposed for the class as being light in weight and having narrow channels, he has never weighed or measured them.
> In his test stand, Heath applied horizontal forces which he regarded as real-world, but which he did not measure; he merely applied force until the jack failed.
>
> His test equipment was not calibrated (i.e., he measured the hydraulic pressure **[*19]** and then calculated the loads applied to the jack, but did not

measure those loads with a scale of known reliability).

Heath's original lists of 49, then 59 defective six-pivot jacks--with which he professed to be "generally familiar"--included at least one *five-*pivot jack (P/N 21,011,868) and one part that was not a jack at all, but a wrench (P/N 14,036,400).

Heath's 2007 reports were critical of GM's validation procedures on the ground that the GMUTS tests "presume that the vehicle Owner's Manual instructions are followed to the letter," when in fact they include testing with the brake off, the transmission in neutral, and the vehicle on a slope, all of which the 1999 Cadillac Seville manual (Ex. D81 at p. 5-18) strongly cautions against. [9]

Although he criticized the R2 GMUTS for testing under less adverse conditions than those analyzed in the simulations (Ex. P 10-13), Heath conceded that he knew nothing about why or by whom the simulated conditions had been proposed, and admitted that they exceed anything required by any manufacturer's, supplier's, or industry standard of which he is aware.

Heath even seemed vague on some of the terminology of the trade, testifying that "GAWR" as **[*20]** used in the R1 GMUTS (Ex. P7) stands for "Gross Axle Weight-Rear," when in fact the GMUTS itself defines GAWR as the Gross Axle Weight Rating. Moreover, Heath--who presented as the centerpiece of his qualifications his service on the PALD (Portable Automotive Lifting Devices) Committee of the American Society of Engineers (ASME) and his participation in that committee's development of ASME's Safety Standard for Portable Automotive Lifting Devices--was unaware that this Standard, too (Ex. D86 at 19) uses this terminology.

All of these issues, and the generally result-oriented character of Heath's testing and analysis (e.g., applying unmeasured loads to the Jasiak jacks until they

**[*21]** collapsed, then declaring them "failed"), would cause me to question the reliability of his opinions on the issue chiefly before me: are the "class" jacks sufficiently similar to one another in the relevant particulars that *Rule 23*'s commonality, typicality, and predominance requirements, and/or the commonality and typicality requirements of c. 93A, §9(2), are satisfied? Even granting the intuitively obvious point that, all else being equal, an open-clevis design is not as strong as a closed-clevis design, this does not prove that a particular jack, mated with a particular vehicle, is unfit for its intended use--let alone that all twenty-three are.

GM's own testing, moreover--specifically, Grob's work--suggests that a jack's fitness depends on more than the clevis. Grob worked (in part) with three iterations of the same jack. The original iteration (P/N 25,642,873) had light-gauge steel in both upper and lower channels, and did not survive a roll-off. A redesign with heavier-gauge lower channels (P/N 25,677,974) did better, but not well enough, still not being reusable after roll-off. Finally, Grob tested a further redesign using the heavier steel in both lower and upper channels; this **[*22]** model survived a roll-off every time. Grob recommended the change; GM implemented; and the new jack is P/N 25,695,288. All three models are nonetheless lumped indiscriminately into Heath's proposed class.

GM also presented expert testimony at the hearing, through Devinder Grewal. Grewal is a licensed engineer (in California) with impressive academic credentials and a consulting practice that focuses on failure analysis, sometimes for the purpose of product improvement but usually in connection with litigation or other claims. He inspected, but did not test, all but two or three of the jacks in the proposed class.

The focus of Grewal's testimony was the differences among their designs, and those of the vehicles with which they are sold. The raised height of the class jacks (a significant contributor to load instability) ranges from 13 inches to 15 1/4 inches, a variation of nearly 20%. There are numerous differences in design of the load rest, the area of interface between the jack and the vehicle, which also can fundamentally affect stability.

Channel designs and material differ across the class, evolving in some cases (including those studied in Grob's report) from lighter to heavier **[*23]** steel. Grewal's analysis of GM Engineering Work Orders (summarized in Ex. D76) shows, for example, that fully ten jacks out of the 23 in the class are actually a family,

---

[9] There were also excerpts from the jacking instructions in five other Cadillac, Pontiac and Buick manuals in evidence as Ex. D53-58. These excerpts all start with the instructions on removing the wheel with the flat tire and do not contain this caution--which, in the 1999 Seville manual, comes first, several pages before the instructions on removing the flat. Given the standardized nature of the six manuals submitted or excerpted, I infer that each of them included the caution appearing in the Seville manual.

stemming from three ancestral designs that have gone through the same or related redesigns affecting their size and/or structure (steel thickness, raised height, avoidance of gear tooth bypass, load rest design).

Vehicle characteristics, too, can affect jack performance and safety. An obvious factor is the vehicle's weight and its distribution; vehicles in the class range from 3600 to 5600 pounds gross vehicle weight, a variation of over 55%. Less obviously to a layperson, the stiffness of the suspension will affect how high the vehicle must be raised to change a tire, and thus the degree to which the other three tires--which should remain in contact with the ground--will contribute to stability. The tire and wheel types also affect how far the vehicle must be raised.

The location and design of jacking (lift) points can also be significant. Among vehicles in the class, the distance of the lift point from the end of the rocker panel varies from 6 to 18 inches in the front and from 2 1/2 to 18 inches in the rear. This **[*24]** matters because the nearer the lift point is to the axle, the smaller the load on the jack and the more securely the other three wheels remain planted and able to contribute to stability. Several test reports involving vehicles in the class (Ex. D53, D69, D83, D84) illustrate the point that GM has moved and/or reconfigured lift points as necessary to prevent damage to rocker panels during jacking.

That these variables have in fact led to significant variation in real-world jack performance is suggested, at least, by warranty data. [10] In Ex. D79, Grewal calculated

---

[10] Grewal's analysis of these data necessarily involved some judgments concerning which among 83 warranty codes applied by dealers to jack-related claims represented structural failures, as opposed to such things as paint, rust, rattles, etc. Ultimately, he selected 16 codes as presumptively structural; these accounted for 10,447 out of a total of 17,350 jack-related claims. I assume the **[*25]** obvious: that there likely is imperfect uniformity among dealers and their employees in the coding of warranty claims, and that some nonstructural defects may thereby have been included--and some structural claims missed--in Grewal's analysis. I note also that the apparently low failure rates may reflect a low usage rate (flats are infrequent occurrences, and many people prefer to call AAA), and jack usage may be non-uniform across the class--for example, there may be a correlation between tire wear and flats, and some vehicles may wear tires more quickly than others; it's even possible that owners of some vehicle models are more likely to be do-it-yourselfers than owners of other models. Still, the warranty data provide one more piece of evidence suggesting that some jacks, or

the number of warranty claims apparently involving jack failures per 50 million miles driven. For the 23 jacks in the class, claim rates ranged from a low of 0.1131 to a high of 3.3548 claims per 50 million miles, a variation of over 2900%.

For all of these reasons, Grewal opined--credibly, to me--that the question of whether a jack is suitable for its intended use cannot be answered on a class-wide basis, but necessitates analysis and testing of each jack model, used in conjunction with each model vehicle it is sold with. I assume, for purposes of analysis, that the 178 discrete **[*26]** jack-vehicle pairs (see p. 3, *supra* ) could be reduced to a smaller number--likely, a substantially smaller number--with the exercise of reasonable engineering judgment concerning which jack models, and which vehicle models and years, are substantially similar in the relevant particulars. No witness, however, has attempted anything like this. The closest thing to it is the Grob report, which analyzed just two related variables (steel thickness in the lower and upper channels) in three otherwise identical jack models included in the class, and found substantial dissimilarities in the way these jacks performed.

DISCUSSION

A. Certification Under *Rule 23*.

HN3[↑] The Court's task at this stage of the proceeding is to determine preliminarily whether the requirements of numerosity, commonality, typicality, adequacy, predominance, and superiority are satisfied.

> The plaintiffs bear the burden of providing information sufficient to enable the motion judge to form a reasonable judgment that the class meets the requirements of *rule 23*; they do not bear the burden of producing evidence sufficient to prove that the requirements have been met . . . "[N]either the possibility that a plaintiff will be unable **[*27]** to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies the Rule."

*Weld v. Glaxo Wellcome, Inc., 434 Mass. 81, 87, 746 N.E.2d 522 (2001)* (footnote and citation omitted). "The standard defies mathematical precision." *Id. at 85*.

---

some jack-vehicle combinations, perform markedly better than others.

2007 Mass. Super. LEXIS 462, *27

A motion for class certification should not turn on the court's evaluation of the merits of the parties' legal or factual claims. The court may find it necessary, however--as I have--to analyze elements of the parties' substantive claims and review such facts as are available at this preliminary stage, in order to evaluate whether the requirements of *Rule 23* have been satisfied. *In re Ford Motor Co. Ignition Switch Prod. Liab. Litig., 174 F.R.D. 332, 339 (D.N.J. 1997)*.

Although I find that the plaintiff has satisfactorily established numerosity and adequacy, [11] the proposed class cannot be certified for lack of commonality, predominance, and superiority.

1. Commonality.

*HN4*[↑]] The commonality requirement dictates that plaintiffs seeking class certification must demonstrate that "all the persons whom they profess to represent have a common interest in the subject matter of the suit and a right and interest to ask for the same relief." *Spear v. H.V. Greene Co., 246 Mass. 259, 266, 140 N.E. 795 (1923)*. The commonality test is "qualitative rather than quantitative, that is, there need only be a single issue common to all members of the class." *In re American Medical Systems, Inc., 75 F.3d 1069, 1080 (6th Cir. 1996)* quoting 1 H. Newberg & A. Conte, Newberg on Class Actions, §3.10 at 3-50 (3rd ed. 1992).

Where a proposed class is comprised of owners of a number of different models of a certain product with differing characteristics, commonality is often the hurdle not overcome. See, *e.g.*, *In re Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 214 (E.D.La. 1998)* (class certification denied in case involving fraudulent concealment of two-step paint process's tendency to prematurely peel and flake off automobiles, where there was no single uniform paint process applied to the three models of trucks [*29] and utility vehicles over the four model years in question, therefore issue of product defect was vehicle-specific); *In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.* (denying class certification in case involving same ignition switch in different model vehicles); *In re Ford Motor Co. Bronco II Prod. Liab. Litig., 177 F.R.D. 360, 372 (D.La. 1997)* (denying class certification where plaintiff alleged design

defect in seven model years of Ford Bronco IIs that allegedly made them likely to roll over; vehicle was sold in varying configurations which would affect stability including two-and four-wheel drive, different tire and wheel sizes, different track width, and variances in mechanical configuration); *Walsh v. Ford Motor Co., 257 U.S. App. D.C. 85, 807 F.2d 1000, 1017 (D.D.C. 1996)* ("Appellees have not identified in support of the alleged breach of warranty claims, and we have not found in the record, any indication of evidence common to all the transmission configurations swept into the class definition"); *In re American Medical Systems, Inc., 75 F.3d at 1080-81* (commonality not established where the class included owners of ten different models of penile implants, including ones which had been modified [*30] over the years).

In this case, the common denominator among all class members and claims is the allegation that the jacks are unmerchantable, not fit for their intended purpose. Based on the evidence presented, I conclude that this question will hinge on facts that defy broad-brush, class-wide treatment. It seems, at this stage, highly unlikely that the question of whether the jacks in the class were, or were not, unmerchantable can be addressed on a class-wide basis. Nor does the proffered evidence suggest any principled basis at this stage for certifying cohesive subclasses, even assuming this were permissible under the Massachusetts version of *Rule 23*. [12]

The problem is well illustrated if one attempts to visualize the verdict form that the judge presiding over the trial of a class action in this case would employ. Were the warranty claim susceptible of a single, class-wide special question--"Were the 23 jack models owned or leased by members of the class unmerchantable?"-- the attractions of class-action treatment would be apparent.

On the evidence I have heard, however, one might

---

[11] Typicality is another question, which I do not reach. In the absence of a finding of commonality (see below), one can only say that the named plaintiff's claims [*28] will likely be typical of those of some class members and not others.

[12] No Massachusetts case I have been able to find explicitly addresses this question. A negative answer is pretty strongly implied, however, by a comparison of *Fed.R.Civ.P. 23(c)(4)(B)* (which expressly allows for subclasses) with *Mass.R.Civ.P. 23* (which does not). See *Fletcher v. Cape Cod Gas Co., 394 Mass. 595, 602, 477 N.E.2d 116 (1985)* (similarly concluding that limited-issue class actions, which are authorized by the terms of *Fed.R.Civ.P. 23(c)(4)(A)*, may not be maintained under *Mass.R.Civ.P. 23* or under *G.L.c. 93A, §9(2)*, neither of which contains [*31] such an express authorization.)

2007 Mass. Super. LEXIS 462, *31

reasonably predict a question from the jury shortly after it retired to deliberate, along the lines of "To answer 'yes' or 'no' on unmerchantability, must we find that *all* of the 23 jacks were, or were not, unmerchantable?" To answer affirmatively would presume what the evidence before me did not suggest: that the answer is *necessarily* the same for all 23 jacks, or for all 80 jack-vehicle combinations. A negative answer would leave this judge, at least, wondering why the case was certified as a class action in the first place.

## 2. Predominance

*HN5*[↑] ] The predominance inquiry asks whether, if such common questions of law and fact do exist, those common issues "predominate over questions affecting only individual members." *Mass.R.Civ.P. 23(b)*. [*32] That common issues must be shown to "predominate" does not mean that individual issues need be non-existent. All class members need not be identically situated upon all issues, so long as their claims are not in conflict with each other. The individual differences, however, must be of lesser significance, and they must be manageable in a single class action. *In re Ford Motor Co. Ignition Switch Prod. Liab. Litig., 174 F.R.D. at 340* (citations omitted).

The predominance requirement cannot be satisfied where there are "a greater number of questions peculiar to the several categories of class members, and to individuals within each category, where such uncommon questions are significant." *In re Ford Motor Co. Ignition Switch Prod. Liab. Litig., 174 F.R.D. at 332*. See also, e.g., *Fletcher v. Cape Cod Gas Co., 394 Mass. 595, 603-04, 477 N.E.2d 116 (1985)* (plaintiffs could not establish predominance where "the issue of liability could not be decided on a class-wide basis").

The reasonable likelihood, in this case, of different findings as to the merchantability of different jack models or jack-vehicle combinations would be reason enough to conclude that the common issues across the class do not predominate. [*33] There are other reasons as well. For example, although this discussion has focused on the implied warranty of merchantability, Count III actually asserts three claims: breach of express warranty, and of the implied warranties both of merchantability and of fitness.

The express warranties for GM vehicles vary in terms and duration. See Ex. D72 (1999 Cadillac, 4 years/50,000 miles) and D73 (2000 Pontiac, 3

years/36,000 miles). [13] The warranty manuals ( *id.* ) prescribe the procedure for making a claim, and require certain informal dispute resolution efforts before litigation. The record does not say how many class members made express warranty claims related to their jacks; one might reasonably suppose that some probably did, but that these would be a tiny fraction of the class as a whole. (See discussion at p. 16 and n. 10, *supra*.)

Some aspects of the implied warranty claims, as well, require distinctions among class members. Any [*34] claim for breach of the implied warranty of fitness for a particular purpose requires individualized factfinding concerning the dealer's knowledge of the intended use (e.g., off-road on sand in pursuit of striped bass) and the buyer's or lessor's reliance on the dealer's skill and judgment. With respect to any implied warranty of fitness or merchantability, there will be a distinction between class members who purchased or leased their vehicles for personal, family, or household purchasers, and commercial purchasers or lessees; the latter are limited, by the terms of the warranty manual, to the period of the express warranty, a limitation that would not apply to consumer purchasers and lessees. *G.L.c. 106, §2-316A*.

For all of these reasons, I am unable to find that the issues common to the class as a whole predominate, in number, complexity, or necessary trial time, over individual issues.

## 3. Superiority

*HN6*[↑] ] Closely related to the commonality and predominance issues is *Rule 23(b)*'s requirement that a class action be superior to other available methods for the fair and efficient adjudication of the controversy. As a general rule, the greater the number of individual issues that exist among [*35] putative plaintiffs in a class, the less likely it is that superiority can be established. *In re Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 224*; *In re American Medical Systems, 75 F.3d at 1084-85*. In this case the multitude of uncommon issues would cause the presentation of evidence, the jury charge, and even the verdict form to be, if not unmanageable, certainly inferior to individual

---

[13] These are the warranties for the vehicles owned by the two named plaintiffs at the time the motion for class certification was brought, Mr. Holzman (the sole remaining named plaintiff) and Ms. Fallentowne (who sold her Pontiac and was voluntarily dismissed).

2007 Mass. Super. LEXIS 462, *35

proceedings for any class members who may choose to assert claims outside GM's warranty procedure.

B. *Chapter 93A*

*HN7*[↑] The statutory language governing certification of a *Chapter 93A* class action differs from that of *Rule 23*. *Section 9(2)* of the statute allows a consumer injured by an unfair or deceptive act or practice to bring a class action, but only where

> the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that [the consumer] adequately and fairly represents such other persons.

*Section 9(2)* thus expressly incorporates numerosity and adequacy requirements that parallel those of *Rule 23*. Caselaw has implied as well the requirements of commonality and typicality, but has **[*36]** eschewed importing the "highly discretionary element[s]" of predominance and superiority. *Baldassari v. Public Fin. Trust, 369 Mass. 33, 40, 337 N.E.2d 701 (1975)*; accord, *Fletcher, 394 Mass. at 605*. These cases find in *section 9(2)* "a more mandatory tone" than in *Rule 23*. *Id.*

Even under the more generous standards for certifying a class action under *Chapter 93A*, however, this one falls short. I do not find, even in the "more mandatory tone" of *section 9(2)*, a complete disregard of the practicalities. The same factual issues that counsel against treating the warranty issues on a class-wide basis are just as central to the *Chapter 93A* claim. Although the members of the proposed class do enjoy a loose commonality on both the warranty and the closely related [14] *Chapter 93A* claims, it is not such as would prevent the proceeding from disintegrating into a series of mini-trials of the fact issues already identified in the discussion of *Rule 23*.

Nor could the problem be ameliorated by use of sub-classes **[*37]** and/or limited-issue classes under *Chapter 93A* any more than under *Rule 23*. See footnote 12, *supra* and *Fletcher, 394 Mass. at 602*. And *HN8*[↑] while neither the statute nor the caselaw

specifies how much commonality is enough to satisfy *section 9(2)*, it does invest in the Court "a degree of discretion in determining whether certain plaintiffs adequately have alleged that they are 'similarly situated' and have suffered a 'similar injury' as members of the class they seek to represent"--taking care, of course, to ensure that the remedial purposes of *Chapter 93A* and "the accomplishment of substantial justice" do not fall prey to the "traditional technicalities." *Id. at 605*.

The impediments to class certification in this case are far from "technicalities"; they go to the very feasibility of the procedure itself. Because the members of the class have not made the necessary preliminary showing that they are similarly situated, and that they have suffered similar injury at the hands of the defendant, class certification would be inappropriate under *c. 93A, §9(2)*.

ORDER

For the foregoing reasons, the Plaintiff's Motion for Class Certification is DENIED. Because it is apparent that this action, tried **[*38]** as an individual claim, does not meet the jurisdictional amount for this Court, the case is DISMISSED, *sua sponte* and without prejudice, pursuant to St. 1996, c. 358, *§5* and *Mass.R.Civ.P. 12(b)(1)*.

Thomas P. Billings, Associate Justice

Dated: November 6, 2007

---

End of Document

---

[14] See, among many cases holding that a breach of warranty is a *per se* violation of *G.L.c. 93A, §2*, *Maillet v. ATF-Davidson Co., 407 Mass. 185, 193, 552 N.E.2d 95 (1990)* and authorities cited, particularly *940 CMR 3.08(2)*.