UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FREDERICK KLORCZYK, JR., as co-administrator | : | CIVIL ACTION NO. |
| of the Estate of Christian R. Klorczyk, et al., | : | |
| | : | 3:13-cv-00257-JAM |
| *Plaintiffs*, | : | |
| | : | |
| vs. | : | |
| | : | |
| SEARS, ROEBUCK AND CO., et al., | : | |
| | : | |
| *Defendants*. | : | JULY 27, 2018 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' CPLA CLAIMS**

**"It's all speculation."**  These were the Plaintiff Frederick Klorczyk's own words when asked to explain whether and how the jack stand at issue failed, and why it was found near the scene of the decedent's accident.  In fact, there is no physical evidence that the accident was caused by a jack stand at all.  An article published just three days after the decedent was found beneath the Plaintiffs' BMW in their garage quoted Mr. Klorczyk as saying that "a floor jack likely failed," while his son was changing the oil.  In the accident's immediate aftermath, co-Plaintiff Lynn Klorczyk told police that "a pump jack had, which was initially holding the vehicle had moved," and the police seized that jack as evidence.  The police observed the jack was missing the "cup" normally located on the lifting arm, leaving only a smooth metal surface covered in condensation, and they concluded that the decedent was supporting the BMW with the jack while changing its oil, and the jack, which is on wheels, slipped out.  Police photographs of the jack show that it was missing the retaining clip that kept the support arm connecting its lifting arm to its base in place — this was either caused by the accident itself, or was a pre-existing condition that could have contributed to the accident.  Physical inspections then revealed a scrape mark on the side of the BMW that is exactly consistent with contact against the pump

1

jack's metal plate as the car fell.  All of the physical evidence, and witness statements around the time of the accident, point to the jack, and not a jack stand, as the accident's cause.

The crucial issue in this case is accordingly whether the Plaintiffs can produce sufficient evidence for a jury to find that the accident was caused by the jack, which is designed to lift a vehicle but not to serve as the primary support while a person is working under a vehicle, or by a jack stand, which is designed only to support a vehicle.

This is a photo of the jack at issue:                    This is a photo of the jack stand at issue:



The Plaintiffs' only claim is that the subject jack stand was defective — the Plaintiffs did not make any claim about the jack because they altered a key safety feature, a ridged saddle cup designed to help hold a car on the jack, which was removed so that it would not scratch one of Mr. Klorczyk's other cars, a DeLorean. The jack was also most likely outside of its useful life. Using the jack in this condition to support a vehicle while working underneath would constitute

misuse.  Yet *all* of the non-speculative evidence in this case points to the pump jack, and not the jack stand, as the cause of the decedent's accident.  The Plaintiffs have nothing but their own conjecture and unreliable, inadmissible testimony from an unqualified expert to try to show that the accident was caused by a defective jack stand.  The expert's primary sources of information on the accident were statements by Mr. Klorczyck which best fit the Plaintiffs' theory of the case, chosen from among Mr. Klorczyk's many inconsistent statements.

Furthermore, throughout the history of this five year-old case, the Plaintiffs have never identified a specific defect with the Craftsman model number 50163 jack stand at issue, which undisputedly complies with all applicable standards and regulations.  Their theory of liability is exceedingly general and essentially charges that every single ratchet-and-pawl jack stand — an overwhelmingly popular and time-tested design that complies with all relevant standards — has a secret design defect due to a propensity for "false engagement," where the jack stand looks stable but really is not.  Yet the Plaintiffs have no concrete evidence of even one "false engagement" incident, including their own, nor can they cite a single article or study on the subject.  Even if "false engagement" is theoretically possible under contrived circumstances, this does not make all jack stands unreasonably dangerous.  In this case, there is insufficient evidence that would allow any reasonable jury to find (a) that a jack stand was in use during the decedent's accident or (b) that the jack stand spontaneously collapsed because of false engagement, both of which are necessary elements of the Plaintiffs' claim.

Finally, the Plaintiffs readily admit that if the decedent was using a jack stand at the time of his accident, he was using only one single jack stand by itself.  This is obvious misuse, because the jack stands are sold in pairs and both the operators manual and on-product warnings direct users to "Use as a **matched pair** to support one end of a vehicle only" in order to avoid

injury.  (Emphasis added.)   Indeed, *the Plaintiffs' own expert on warnings and instructions agreed that using a single jack stand by itself was contrary to this warning*.

While the decedent's premature death was unquestionably tragic and the Plaintiffs' loss is not to be diminished, the fact remains that there is nothing but speculation to show that the incident was caused by a jack stand, or that the decedent was even using a jack stand at the time of the accident.  They also have insufficient evidence to show that the subject jack stand's time-tested and extremely popular design was defective and unreasonably dangerous.  Even if they could clear these two hurdles, by their own admission the decedent was misusing the jack stand, if he was using it at all.  The essential elements of the Plaintiffs' case cannot pass the *Celotex* standard, and summary judgment is accordingly merited for the defense.

## I.   STATEMENT OF FACTS

### A.  Immediately After The Accident, The Plaintiffs' Service Jack Was Identified As The Cause, And the Plaintiffs Described The Circumstances Much Differently Than Their Subsequent Complaint And Depositions

On March 11, 2011, the Waterford Police Department was called to the Plaintiffs' home because their son, Christian Klorczyk, was found unresponsive beneath their BMW.  (Officer N. Surdo Incident Report Narrative, **Ex. A**.)  He had just finished changing the vehicle's oil, and had gone back under the vehicle, possibly to make sure he had tightened the drain plug properly, when the vehicle fell on him.  (F. Klorczyk Dep. Tr. pp. 163:2-165:8, **Ex. B**.)

The Plaintiff, Lynne Klorczyk, told Officer Tadeusz Krysztofiak that she entered the garage and saw the BMW on top of the decedent, "and a pump jack had, which was initially holding the vehicle had moved."  (Officer T. Krysztofiak Incident Report Narrative, **Ex. C**.)  The jack was seized as evidence, with Lieutenant Brett Mahoney observing that the "cup" portion typically located on the jack's lifting arm was missing, and that only a smooth metal plate

remained.   (Lieutenant B. Mahoney Incident Report Narrative, **Ex. D**.)   He noted that the weather was foggy, leaving condensation on the bare metal plate, and he concluded that the decedent was supporting the BMW with the jack while changing its oil and the jack slipped. (*Id.*)  This photograph of the jack, above, shows that its "cup" was missing.  This is a photograph of an exemplar "saddle cup" as it would fit onto the lifting arm:

 

Frederick Klorczyk testified that he removed the saddle cup from the jack that the decedent was using for fear that it would scratch another car that he owned, a DeLorean. (F. Klorczyk Dep. Tr. pp. 35:20-41:15, **Ex. B**.)   The Plaintiffs' son and the decedent's brother, Parker Klorczyk, testified that it was unsafe to use a service jack without the saddle "because that helps keep the vehicle secure while on the jack -- so it doesn't fall off the jack . . . it would have a more easier time falling off a flat surface than it would a cupped surface."  (P. Klorczyk Dep. Tr. pp. 43:18-45:12, **Ex. E**.)

An article that was published in Waterford's local paper, The Day, three days after the accident, recounted Mr. Klorczyk's own statement "that a floor jack likely failed" while the decedent was changing the car's oil.  (The Day Article, **Ex. F**.)  Consistent with that statement, police photographs show a fresh scrape mark on the BMW's driver side rocker panel that aligns

perfectly with where the jack slid out from the vehicle, which the Defendants' expert also subsequently photographed:



The Defendants' expert, James Sprague, performed an accident reconstruction based on physical inspections, measurements, and laser scan data, and concluded that the incident occurred because the jack was supporting the BMW and it slid out, creating this scrape mark in the process.  (J. Sprague Expert Report pp. 33-37, **Ex. G**.)

Also consistent with the explanation that the jack caused the accident, Mr. Klorczyk himself admitted that the jack was damaged when he got it back from the police department, as it was missing one of its "clip rings" and he did not know whether the clip ring came off before, during, or after the decedent's accident.  (F. Klorczyk Dep. Tr. pp. 361:23-362:10, **Ex. B**.) Interestingly, the very first responder who came to the scene, Geoffrey Hausmann, testified that he saw Mr. Klorczyk "trying to put the jack together" when he arrived.  (G. Hausmann Dep. Tr. pp. 20:2-14, 22:18-23:5, 26:3-27:5, **Ex. H**.)  Further to this point, the police photographs of the jack after the accident show that it was damaged — one of the metal rods connecting its lifting arm to its base, on the right side of the photo below, appeared bent out of place:



After Mr. Klorczyk retrieved the jack from the police, he replaced the clip ring, and ultimately replaced the jack itself.  (F. Klorczyk Dep. Tr. at pp. 169:6-171:23.)  In fact, when the decedent went out and purchased the subject jack stand three months before his accident, he was actually supposed to have replaced the jack as well, because the jack was "getting old," but he did not end up buying a new jack.  (*Id.* at pp. 121:10-124:11.)

In the days following the accident, Mr. Klorczyk offered several differing accounts of what happened and what he observed.  In a March 22, 2011 article for The Patch, he refused to explain how the car came down onto the decedent, stating "[n]o one in the world knows but me," and stated that it was caused by a "one in a billion" freak accident and not a product defect:  "To recreate it would take a tsunami and earthquake . . . one in a billion chances."  (The Patch Article p.2, **Ex. I**.)  On an internet forum called garagejournal.com, he wrote a post on March 29, 2011

stating that the decedent was using two jack stands at the time of the accident, one under each side of the vehicle, and that the jack stand on the passenger side of the vehicle was found upright and not on its side as he later claimed.  (Garagejournal.com Post p. 6, **Ex. J**.)  On two other forums, he posted that the decedent was using two four-ton Craftsman "jackstands" — plural — and that either the decedent's body or one of his tools "tripped" the lever of the jack stand on the right side of the vehicle, causing it to release.  (Bimmerforums.com Post p. 10, **Ex. K**; Luxury4play.com Post p. 4, **Ex. L**.)  Mr. Klorczyk subsequently testified that these accounts of the incident were incorrect and that the decedent was actually only using one single jack stand when the accident happened, which he says he found tipped over on its side after the accident — he testified that his multiple statements that there was a second jack stand under the vehicle simply were "not true at all."  (F. Klorczyk Dep. Tr. pp. 424:4-430:17, 437:1-440:21, **Ex. B**.)

### B. Nearly Two Years After The Incident, The Plaintiffs Brought This Case, Alleging And Testifying That The Jack Stand Was To Blame

Nearly two years after the decedent's accident, the Plaintiffs commenced this action.[1] The operative complaint is the Plaintiffs' Second Amended Complaint dated April 10, 2014 (ECF No. 99) — its only cause of action is a claim under the Connecticut Product Liability Act ("CPLA"), Connecticut General Statutes Section 52-572m, et seq., against the five Defendants in this action.[2]  The alleged defective product  is a "Craftsman Heavy Duty Jack Stand, Model No. 50163."  (Compl. ¶ 17.)  A photograph of the jack stand from the accident scene is copied in the introduction, above.  The Plaintiffs allege that the decedent was changing the oil on a BMW

---

[1] According to Pacer, this case was filed on February 25, 2013.

[2] The five Defendants are Sears, Roebuck and Co., MVP (HK) Industries, Ltd., Wei Fu (Taishan) Machinery & Electric Co., Ltd., Shinn Fu Company of America, Inc., and Shinn Fu Corporation

sedan[3] at the Plaintiffs' home on March 11, 2011, using "one of the Jack Stands" to support the vehicle, when the jack stand "failed and collapsed," causing the vehicle to fall on the decedent. (*Id.* at ¶¶ 20-22.)  Importantly, it is undisputed that the decedent was using, at most, one jack stand at the time of his accident.  (F. Klorczyk Dep. Tr. 430:3, **Ex. B** ("He only used one.").)

Frederick Klorczyk testified that he and Lynn Klorczyk were the first people to enter the garage and find the decedent, and that he found a jack stand laying on its side beneath the vehicle, but he does not know how it ended up there, and admitted that "it's all speculation."  (*Id.* at pp. 420:17-421:6, **Ex. B**.)  He testified that he turned the jack stand upright almost immediately upon entering the garage, right after he used the jack to lift the BMW off of the decedent.  (*Id.* at 207:9-209:16, 385:7-391:24.)  This, however, conflicts with his wife Lynne Klorczyk's testimony that she did not see any jack stands when she first arrived at the accident scene.

When Lynn Klorczyk was first deposed in November of 2014, she disavowed her statement from the police report that "a pump jack had, which was initially holding the vehicle had moved," while confirming that other aspects of the same part of the report were accurate. (L. Klorczyk Dep. Tr. pp. 169:3-171:19, **Ex. N**.)  She testified that when she entered the garage with Frederick she did not see any tools other than halogen lights, and that her husband grabbed a jack stand from "somewhere under the car" where she "couldn't see it" and placed it under the BMW after he lifted it with the pump jack.  (*Id.* at pp. 128:22-133:13.)  When she was deposed again in July of 2016 she initially testified that she did not remember seeing a jack stand when she entered the garage, but did see the service jack next to the BMW.  (*Id.* at pp. 333:17-335:5.)

---

[3] The Complaint does not identify the vehicle by make and model, but subsequent discovery has undisputedly shown that it was a BMW 3-series sedan.  (*See, e.g.*, Police Photograph, Ex. 13 to Dep. of Frederick Klorczyk, **Ex. M** hereto.)

After an off-the-record break, she was examined by her own attorney and testified that she *did* see a jack stand under the BMW, but not until *after* multiple responders already arrived at the scene and the garage was getting "crowded."  (*Id.* at 361:12-361:24, 362:22-370:10.)

The Plaintiffs' primary expert, Frederick Heath, disclosed to testify regarding the cause of the decedent's accident, admitted that he was not aware of any physical evidence that a jack stand was in use when the incident took place, and that his all of his work and analysis accepted and assumed that Frederick Klorczyk's testimony was fact, without regard to Mr. Klorczyk's several prior inconsistent statements.  (F. Heath Mar. 22, 2017 Dep. Tr. p. 19:22-20:25, **Ex. O**.) He was deposed a second time after he was disclosed as a rebuttal expert regarding accident reconstruction, and once again confirmed that he had no physical evidence at all that a jack was in use on the day of the decedent's accident:

> Q:     Okay.  Since -- and understanding the distinction I'm making between physical evidence and testimony -- testimonial evidence.  Since that deposition, has any physical evidence come to your attention that a jack stand was actually in use that day?
>
> A:     **No.**

(F. Heath. Dec. 14, 2017 Dep. Tr. pp. 11:22-12:3, **Ex. P** (emphasis added).)

### C.  The Plaintiffs' Theory Of Defect Applies To All Ratchet-And-Pawl Jack Stands

The Plaintiffs argue that the jack stand was defective because of its propensity for "false engagement" — essentially, the jack stand would look like it was fully engaged and ready to support a load, when it actually was not.  (*Id.* at ¶ 25.)  This is the theory of liability in both the Plaintiffs' Complaint and in their primary liability expert Frederick Heath's report, where he described "false engagement" as "tip to tip contact" between the jack stand's ratchet bar and the locking pawl that could be "disrupted" by an external force.  (*See* Initial Report of Frederick G. Heath, Dec. 8, 2014, pp. 12, **Ex. Q**.)  Although Mr. Heath's report contains measurements of the

surface of the subject jack stand's pawl tip and the ratchet teeth, the report contains no comparison of how these measurements relate to other models of jack stands and no opinion that the area of engagement is unusually small or defective.  (*Id.* at pp. 12-13.)

Ultimately, Mr. Heath concluded that "false engagement of the support stand is more likely than not the cause of the incident at issue."  (*Id.* at p. 13.)  He reached this conclusion without performing an accident reconstruction, after performing a series of "tests" with no documented procedures and no measurements taken, where the jack stand was intentionally set up so that it would release under load.  (*See* Mot. to Disqualify F. Heath. pp. **Ex. R**.)

## II.     LEGAL STANDARD

### A.  Summary Judgment is Merited Where the Plaintiffs Lack Sufficient Evidence on a Required Element of Their Claim

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When ruling on a motion for summary judgment, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.  *Dalberth v. Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014).  The movant bears the initial burden of showing the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant satisfies its initial burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  A fact is "material" if it might affect the outcome of the case under substantive law, and a dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In moving for summary judgment against a party which will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if it can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex*, 477 U.S. at 322-23; *N.E. Utils. Serv. Co. v. St. Paul Fire & Marine Ins. Co.*, No. 3:08-CV-01673(CSH), 2012 U.S. Dist. LEXIS 96641, at *8 (D. Conn. July 11, 2012).   The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *N.E. Utils. Serv. Co.*, 2012 U.S. Dist. LEXIS 96641, at *8.   Disputes concerning immaterial facts do not prevent summary judgment. *See id.*; *see also Howard v. Gleason Corp.*, 901 F.2d 1154, 1159 (2d Cir. 1990) ("summary judgment cannot be avoided by immaterial factual disputes").   Further, although all inferences are to be drawn in favor of the nonmoving party, "mere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs. v. Inc. Vill. or Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

## B.  Necessary Elements of a Product Liability Claim

In order to prove a strict liability claim under the Connecticut Product Liability Act ("CPLA"), a plaintiff must show that: (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition. *See Izzarelli v. R.J. Reynolds Tobacco Co.*, 731 F.3d 164, 167 (2d Cir. 2013) (*citing Giglio v. Conn. Light & Power Co.*, 180 Conn. 230 (1980)).   The Connecticut Supreme Court recently held that these elements apply to all product

liability claims, "whether alleging a design defect, manufacturing defect, or failure to warn defect." *Bifolck v. Phillip Morris, Inc.*, 324 Conn. 402, 434 (2016).

## III.    LEGAL ARGUMENT

### A. The Plaintiffs' And Their Expert Admittedly Lack Any Evidence That The Decedent Was Using A Jack Stand At The Time Of His Accident

The sum total of evidence that the decedent's accident was caused by a jack stand is Frederick Klorczyk's own testimony that he found a jack stand on its side in the vicinity of the accident scene, and first responder Geoffrey Hausmann's testimony that he saw a jack stand on its side but that he was "not positive." (G. Hausmann Dep. Tr. pp. 33:16-34:10, **Ex. H**.)  Even on this fundamental point the Plaintiffs' testimony is contradictory.  Mr. Klorczyk testified that he saw the jack stand on its side and righted it almost immediately after he entered the garage and raised the vehicle. Mrs. Klorczyk, on the other hand, initially testified that she did not see a jack stand, and only after an off-the-record break and further questioning by her own counsel did she testify that she saw a jack stand on its side after the garage was "crowded" with first responders — by which time Mr. Klorczyk, by his own account, had already set the jack stand upright.

Mr. Klorczyk readily admitted, in his own words, that "it's all speculation" regarding how the jack stand came to be in the position where he found it.  There is no evidence to support the Plaintiffs' allegation that the jack stand was "falsely engaged" and released under load. The Plaintiffs' allegation is complete speculation unsupported and unsupportable by any admissible evidence at all.  In fact, the physical evidence makes it far more likely that the jack stand was not involved in the accident.

Nonetheless, the Plaintiffs' disclosed expert, Frederick Heath, concluded without performing an accident reconstruction that the Plaintiff's incident was caused by a defective jack

stand, while admittedly having no physical evidence of jack stand failure or even jack stand use. At its core, his opinion is just more speculation based on Mr. Klorczyk's speculation. Mr. Heath's initial report did not even address any of the physical evidence supporting the conclusion that the accident was caused by a service jack and not a jack stand. Mr. Heath, who is not a professional engineer and has no accident reconstruction credentials, was then asked to perform an accident reconstruction so that he could be disclosed as a rebuttal expert. He delegated this task to an independent contractor who performed some backyard experiments on the patio of his condominium with little to nothing in the way of written protocols or records, and purportedly confirmed Mr. Heath's initial conclusion, which was reached before he ever even attempted to perform an accident reconstruction, that the decedent's incident was caused by a defective jack stand and not the Plaintiffs' altered, damaged service jack. This memorandum will not repeat the myriad reasons why Mr. Heath's lack of qualifications and any semblance of reliable methodology render his opinions inadmissible, but instead incorporates the detailed factual recitations and legal arguments contained in the Defendants' Memorandum in Support of Motion to Preclude Frederick Heath. Even if his opinions were admissible, which they are not, they are entirely hypothetical, speculative, lacking any scientific basis, and insufficient to support a finding that a jack stand was actually in use and failed during the decedent's accident.

Mr. Klorczyk identified exactly one reason why he thinks the accident must have been caused by a jack stand and not the jack — because the jack was placed "meticulously" next to the BMW with its handle removed when he walked into the garage, as he had trained his children to do after transferred a vehicle's weight from the jack to jack stands. (*See* F. Klorczyk Dep. Tr. pp. 217:12-219:10, **Ex. B**.) Mr. Klorczyk's son Parker, however, testified that this was ***not*** how he was taught at all — in fact, Parker repeatedly stated his father taught him to "leave the jack

14

under the car"   (P. Klorczyk Dep. Tr. pp. 25:19-26:25, 47:4-18, **Ex. E**), and that he personally saw the decedent jack up vehicles and leave the jack in place "10 to 15 times," (*Id.* at pp. 28:24-29:13).

   As shown above, *all* of the non-speculative evidence points to the Plaintiffs' service jack as the cause of the accident.  The service jack was undisputedly altered by having its saddle cup removed, and it was undisputedly damaged in that it was missing a clip ring.  Immediately after the accident, the police identified that jack as the cause, noting that its metal lifting plate was moist with condensation, and seized it as evidence.  Then there were statements attributed to both of the Plaintiffs that the jack was to blame.  Perhaps most importantly, the police photographs showed a fresh scrape mark on the side of the BMW aligned perfectly with where the jack's lifting plate slid out from the side of the vehicle.

   Additionally, after reviewing all of the testimony and physical evidence, including two inspections, laser scans, and physical measurements, the Defendants' eminently qualified accident reconstructionist,[4] Dr. James Sprague, definitively reached the same conclusion — that the jack caused the accident.  (*See* J. Sprague Expert Report pp. 33-37, **Ex. G**.)  No evidence pointed to the jack stand, which was in serviceable conditions with light wear marks and no damage, as the cause of the accident.  (*See id.* at p. 10.)  Dr. Sprague was able to determine the decedent's location beneath the vehicle by mapping the marks and abrasions on his body to the components under the vehicle and the mechanic's creeper he was laying on, and concluded that Mr. Heath's posited explanation of the accident was physically impossible based on objective

---

[4]  Dr. Sprague's qualifications as an accident reconstructionist are unimpeachable.  He had three degrees in mechanical engineering, including a Ph.D. from the University of Michigan, and he is a licensed professional engineer in four states.  He has completed multiple continuing education programs in accident reconstruction, authored several publications and presentation on accident reconstruction topics, and has over twenty years of experience as an accident reconstructionist.  He has testified at many trials on accident reconstruction and failure analysis, and has never once been disqualified or precluded.  (*See* J. Sprague CV, **Ex. S**.)

measurements regarding the decedent's body position and the dimensions of the pieces of equipment at issue.  (*See id.* at pp. 10-11, 19-25.)  He also identified additional flaws in Mr. Heath's conclusions, including his failure to account for the fact that the even a disengaged and fully depressed jack stand would provide enough clearance for the decedent to have survived, and would have continued to bear the vehicle's load such that it could not have tipped over.  (*See id.* at pp. 19-25.)

In other product liability cases where the supporting evidence was incomplete or contradictory, as it is here, this court properly granted summary judgment for the defendants. *See Gill v. Teva Respiratory, LLC*, No. 3:16-cv-00299 (JAM), 2017 U.S. Dist. LEXIS 212072, at *7-10 (D. Conn. Dec. 27, 2017) (granting summary judgment in product liability suit regarding an inhaler, where the defendants' evidence supported an alternative cause of the alleged defect and the plaintiff's own account was contradictory); *Garrett v. Crown Equip. Corp.*, No. 3:15-cv-00942 (JAM), 2017 U.S. Dist. LEXIS 96974, at *6-10 (D. Conn. June 23, 2017) (granting summary judgment for pallet truck manufacturer where evidence that the plaintiff's injury was caused by a product defect was lacking).    Indeed, absent competent expert evidence to establish that the plaintiffs' damages were caused by a product defect, summary judgment is regularly granted.  For example, in *Graham v. Fireline, Inc.*, 3:03CV00990 (AWT), 2006 U.S. Dist. LEXIS 39185 (D. Conn. June 14, 2006), the court held that a non-speculative expert opinion as to causation "is required[ ] when the subject-matter to be inquired about is presumed not to be within common knowledge and experience and when legal inference predominates over statement of fact." *Id.* at *18 (internal quotation marks and citations omitted).  Like Mr. Heath in this case, the plaintiff's expert in *Graham* essentially tried to prove that the plaintiff's incident **could** have been caused by a product defect, but failed to establish that this chain of events

*actually occurred*, and the court granted summary judgment for the defendant. *Id.* at \*20-22; *see also Simjian v. Bayer Corp.*, No. 3:10-CV-1263 (RNC), 2012 U.S. Dist. LEXIS 50198, at \*1-3 (D. Conn. April 10, 2012) (granting summary judgment for pharmaceutical manufacturer where the plaintiff lacked expert evidence to establish causation); *Gold v. Dalkon Shield Claimants Trust*, No. B-82-383 (EBB), 1998 U.S. Dist. LEXIS 22413 (D. Conn. Jun. 15, 1998) (same holding in a case regarding a birth control device).  Here, the Plaintiffs lack sufficient evidence to create an issue of material fact as to both but-for causation and proximate cause, and Mr. Heath's wholly speculative opinion cannot satisfy their burden.  In fact, the Plaintiffs here do not even have adequate evidence to create an issue regarding whether there was a jack stand in use at all during the decedent's accident.

The most analogous decision is *Kuzmech v. Werner Ladder Co.*, No. 3:10-cv-266 (VLB), 2012 U.S. Dist. LEXIS 174082, at \*36-38 (D. Conn. Dec. 7, 2012), where the court held that competent expert evidence was needed to establish that a ladder buckled in a product liability action.  In that case, the court precluded the plaintiffs' expert because his opinion regarding how and why the subject ladder buckled were speculation based on unsound and untested methods — these are the same exact reasons why Mr. Heath's opinions should be precluded in this case. With Mr. Heath's conjecture precluded, summary judgment should be granted for the Defendants here just as it was in *Kuzmech*.  Even if his testimony is allowed, his purely conjectural theories are insufficient to support a jury finding that the decedent was using a jack stand at the time of his accident, or that the decedent's accident was caused by a defective jack stand.

## B. There Is No Non-Speculative Evidence That The Subject Jack Stand Was Defective

Even if the Plaintiffs could prove that the jack stand was in use during the accident and that it released, which they cannot, there is no competent evidence that the jack stand was

defective and unreasonably dangerous.  The jack stand complied with all applicable standards and regulations, and neither the Plaintiffs nor their experts have even attempted to point out a flaw specific to Craftsman model 50163 jack stands.  Instead, their theory is that every ratchet-and-pawl jack stand ever made without a redundant safety feature — which is the vast majority of them — is defective because of a hidden propensity for "false engagement," a phenomenon that they likewise have no admissible evidence to substantiate.

Importantly, the Plaintiffs allege that the jack stand had a design defect, and manufacturing defect, and a failure-to-warn defect.  (Compl. ¶¶ 23-25.)  The Plaintiffs never pled a "malfunction" theory, encompassing an unspecified defect, and they could not raise such an argument for the first time now in the face of summary judgment.  *See White v. Mazda Motor of Am. Inc.*, 313 Conn. 610 (2014) (holding that the elements of the "malfunction theory" must be pled in the complaint and cannot be raised for the first time in opposition to summary judgment).  Further, the Plaintiffs have not disclosed one shred of evidence to support their manufacturing defect theory, which would require proof that the Craftsman 50163 jack stand at issue deviated from the product's intended design in some way.  *See Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199, 211 (1997).

The failure-to-warn claim is belied by undisputed evidence that the jack stand manual and warnings complied with all applicable regulations, and that the decedent did not follow them anyway since he used, at most, one jack stand where the instructions require the jack stands to be used as a matched pair only.  *See* Section III(C), *infra*.  In the face of clear evidence that the decedent did not follow the product instructions, it is impossible to prove that his accident would not have occurred if the instructions were different.  Further, the failure-to-warn claim is premised on the idea that "false engagement" is a real hazard that requires a warning — and

18

there is no admissible evidence of that — so if the "false engagement" claim fails, the failure-to-warn claim must fail as well.

At its core, the crux of the Plaintiffs' case is a design defect claim that ratchet-and-pawl jack stands are defective because of their propensity for "false engagement."  The Connecticut Supreme Court has explained that "[a] design defect theory typically is based on a claim that a product harbored a *specific* problem due to its design, and such a claim is proven through a review of the plans of a product and its exemplars."  *White v. Mazda Motor of Am., Inc.*, 313 Conn. 610, 632 n.9 (2014) (emphasis in original).  Here, the Plaintiffs did not identify any specific problem with Craftsman 50163 jack stands through review of product plans or exemplars — their theory of "false engagement" applies to all ratchet and pawl jack stands. Plaintiffs have no evidence, however that ratchet-and-pawl jack stands have a history of failure due to false engagement. They have provided no evidence as to previous and similar accidents involving false engagement or even studies or publications establishing false engagement and spontaneous release under real-world conditions as a concern. Their only evidence of false engagement at all consists of speculative tests performed under contrived conditions in which the test products were modified and then effectively broken as part of the testing process so they could no longer function properly.  (*See* F. Heath Mar. 22, 2017 Dep. Tr. pp. 137:8-139:9, Ex. O.)  All of this is insufficient to establish a material issue of fact regarding defect under Connecticut law.  They cannot, however, prove that this extremely popular and time-tested design is defective and unreasonably dangerous.

**1. The Defendants' Evidence Establishes That The Jack Stand Complied With The Applicable Regulations, Underwent Safety Testing, And Carried Appropriate Warnings**

Throughout this case, the Plaintiffs have never asserted that the subject jack stands failed to comply with any applicable regulation.  Both SFA's current Engineering Manager and Wei Fu's Assistant Vice President and Manager of the Engineering from the time when the jack stands were produced testified that the subject jack stands complied with controlling regulations, which were set forth in Part 4 of the "Safety Standard for Portable Automotive Lifting Devices" promulgated by the Portable Automotive Lifting Devices Committee of the American Society of Mechanical Engineers. (Jorgensen Dep. Tr. p. 29:4-16, **Ex. T**; Su Chien Chi Dep. Tr. 134:2-11, 161:6-11, **Ex. U**; ASME-PALD 2009 Standards Excerpt, **Ex. V**.) Notably, both the Plaintiffs' paid fact witness, Roger Claypool, and their liability expert, Frederick Heath, were on the Standards Committee responsible for creating these regulations.  (*See* ASME-PALD 2009 Standards Excerpt p. 2, **Ex. V**.)  These regulations expressly describe "ratchet and pawl" jack stands as a type of "typical vehicle support stands," (*Id.* at p. 4), and they contain directives regarding the stands' base, column, locking device, operating controls, saddle, stability, safety markings and messages, and required testing, (*Id.* at pp. 3, 5).  The Plaintiffs have no documents or testimony to controvert the Defendants' showing that the jack stands in this case complied with all relevant regulations.

The subject Craftsman 50163 jack stands were manufactured at the Wei Fu Factory, which a third-party certified as being ISO[5]-compliant. (Su Chien Chi Dep. Tr. pp. 90:3-14, 93:24-94:1, 165:18-166:25, **Ex. U**.)  Wei Fu's Vice President and Manager of the Engineering when the jack stands were produced testified that the factory followed ISO 9001, an international

---

[5] ISO is short for the International Organization for Standardization, which develops and publishes international standards. *See generally* www.iso.org.

quality control system that controlled all quality control activities, including product measurement, analysis, and improvement. (*Id.* at pp. 165:18-166:8.) Wei Fu's third-party certification required significant effort and documentation of all Wei Fu's processes, followed by third-party verification that the factory and its procedures complied with the ISO standard. (*Id.* at p. 166:9-18.) Wei Fu's compliance was verified annually, and its certification was renewed every three years. (*Id.* at p. 166:19-25.) The Wei Fu factory also fulfilled Sears' vendor accreditation program, which was based on Sears' review of is quality and safety processes. (Guerra Dep. Tr. p. 234:22-237:7, **Ex. W**; Vendor Factory Accreditation Report, **Ex. X**.)

The Vice President and Manager of Engineering went on to testify that the Craftsman 50163 jack stands were tested and approved for production as a new design at the factory, and also tested and approved by the client, Sears. (Su Chien Chi Dep. Tr. p. 167:1-23, **Ex. U**.) During production, every single ratchet bar was tested before it got to the production line, and every single unit was tested to make sure that the ratchet bar fully engaged with the pawl. (*Id.* at pp. 167:24-169:3.) Once the units were packaged, they were subjected to spot-testing. (*Id.* at p. 169:4-6.) A random sample of packaged products was then selected for center and off-center load testing. (*Id.* at pp. 169:7-170:11.) Documentation showing that the batch containing the subject jack stands was subjected to this spot-testing, with every single unit passing the test, is attached as **Exhibit Y**. (*See also* Su Chien Chi Dep. Tr. pp. 170:12-171:25; Function & Loading Test Document, **Ex. Z**.) Craftsman 50163 jack stands also repeatedly passed multi-point third-party testing administered by Intertek, on behalf of Sears Holdings Global Sourcing. (Guerra Dep. Tr. pp. 111:21-117:4, **Ex. W**; Intertek Test Reports, **Ex. AA**.[6])

---

[6] These Intertek test reports are authenticated by the affidavit of Nora Lee submitted herewith.

Furthermore, the Plaintiffs do not dispute that the subject jack stands were accompanied by an Operators Manual, which they produced in discovery, containing product warnings and instructions.  The manual instructs users "to ensure ratchet bar is secure before loading" and "to ensure vehicle is secure before working on, around or under," and warned that "[f]ailure to heed product markings or warnings may result in personal injury or property damage."  (Operators Manual, **Ex. BB**.)  The jack stands also had an on-product warning that "[f]ailure to heed product markings or warnings may result in personal injury or property damage."  (*See* Police Photograph of Subject Jack Stand, **Ex. CC**.)  It cannot be disputed that both the manual and the on-product warnings encompass all of the warnings required by the ASME-PALD standard, which are set forth in Part 4-3, entitled SAFETY MARKINGS AND MESSAGES, as well as additional warnings that are not required by ASME-PALD.[7]  (*See* ASME-PALD 2009 Standards Excerpt pp. 3, 6, **Ex. V**.)

### 2. The Plaintiffs' Theory Of Defect Is Untenable — It Implicates Every Single Ratchet-And-Pawl Jack Stand Ever Made

The Plaintiffs and their experts never attempted to identify any defect specific to the model of jack stand that is actually at issue, but instead claim a secret flaw existing in every single model of ratchet-and-pawl jack stand that does not include a secondary locking mechanism, which encompasses the overwhelming majority of these stands.  If this claim is allowed, then every single manufacturer, distributor, and seller of ratchet-and-pawl jack stands — an extremely popular and time-tested design — could be liable for failing to remediate a defect which has never been the subject of a professional publication and which has never been

---

[7] There are six warnings set forth in the ASME-PALD Guidelines:  (1) Do not exceed rated capacity; (2) Use only on hard level surface; (3) Center load on saddle; (4) Use as a matched pair only; (5) Failure to heed these markings may result in personal injury and/or property damage; and (6) Stands are not to be used to simultaneously support one side of a vehicle.  *See* **Ex. V**.

established by a research study or documented testing, *and* this liability would exist even where the jack stands complied with all applicable safety standards.

The popularity of the classic ratchet-and-pawl jack stand design cannot be overstated. A search for "jack stands" on Home Depot's web site yields 211 results, and nine of the first twenty results are for ratchet-and-pawl jack stands with no redundant safety features (such as a secondary pin), including brands that are not affiliated with any of the Defendants in this action, like Husky and Big Red.[8] The first three results for "jack stands" on Lowes.com show ratchet-and-pawl jack stands without redundant safety features, including jack stands by unaffiliated brand Sunex. A search for "jack stands" on Amazon.com yields 244 results and eleven of the first twenty-one non-sponsored results are for ratchet-and-pawl jack stands without redundant safety features, including unaffiliated brands Strongway, Powerzone, Tonda, Performance Tool, and Baishite. "Jack Stand" searches on the websites for Walmart, O'Reilly Auto Parts, Autozone, and Pep Boys generate the same results, with unaffiliated brands including Ktool, Hiltex, Powerbuilt, Duralast, Ranger, TCE, ESCO, AC Delco, Bendpak, and Chicago Pneumatic. Further, as set forth above, the ASME-PALD regulations that Plaintiffs' witnesses Frederick Heath and Roger Claypool drafted expressly describe "ratchet and pawl" jack stands as one of only two types of "**typical vehicle support stands**." (Emphasis added.)

Though the Plaintiffs' expert Frederick Heath concluded that the subject jack stand is defective, neither of his reports identified any defect specific to this jack stand or even this model of jack stands.[9] He did not, for example, claim the ratchet bar was too small, or the collar too

---

[8] The facts set forth in this paragraph are not subject to reasonable dispute and are capable of accurate and ready determination through sources whose accuracy cannot be reasonably questioned, and therefor judicial notice can be taken of them. *See* Fed. R. Evid. 201(b)(2); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 129-30 (2007) (*citing Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

[9] To the extent that he claims the manual for the jack stands contained insufficient warnings (**Ex. Q** at p. 19), the jack stands complied with the controlling regulations promulgated by a committee on which he served. (See ASME-PALD 2009 Standards Excerpt p. 2, **Ex. V**.) The Plaintiffs' own warnings and instructions expert, Dr. Eric

large, or the pawl too weak, or the base too narrow, or the materials inadequate. Instead, he opined that all ratchet-and-pawl jack stands are defective because they have the propensity to stick together and create false engagement. (**Ex. Q** at p. 17.)  While Mr. Heath's report contains measurements of the size of the surface of the subject jack stand's pawl tip and ratchet teeth, there is (a) no comparison of how these measurements relate to other models of jack stands and (b) no opinion that the area of engagement is unusually small or defective.  (*Id.* at pp. 16-17.)

Instead, Mr. Heath based his opinion regarding "false engagement" not on scientific analysis of these jack stands or a statistical study, but on his simple observation that "the surface finish of both [the pawl and metal column] is rough and comprises small high spots and low spots which will increase sliding friction between the surfaces." (*Id.* at 16.) In that same paragraph, Mr. Heath admitted that he did not employ microscopic analysis nor did he measure the "sliding friction" of the parts. (*Id.*)  Nor did he conduct any study to determine the failure rates of such jack stands, or how common false engagement is under normal use conditions.  In fact, he did not even point to a single known instance of false engagement, or even an article or publication about the phenomenon.  His opinion was based solely on the fact that he was able to crudely re-create some purported form of "false engagement" while intentionally trying to do so, and admittedly not trying to replicate real-world conditions or the specific circumstances of the decedent's incident.[10] While Mr. Heath claimed that the painted finish of the pawl was the reason for "sticking" that caused false engagement, the exemplar jack stand that he used in his "testing" to show that false engagement exists was so worn from the destructive testing performed on it that the pawl's surface finish was gone:

---

Boelhouwer, also testified that the product manual essentially complied with the applicable standard set forth in ANSI Z535.6. (E. Boelhouwer Dep. Tr. pp. 143:3-144:13, **Ex. DD**.)

[10] This argument is set forth at length in the Defendants' Memorandum in Support of Motion to Preclude Frederick Heath, and is incorporated here by reference.



(**Ex. Q**, at p. 16.)  It is impossible to prove that the painted finish on the pawl was the problem by testing the hypothesis with a jack stand that was degraded to the point that its pawl no longer had any paint on it.

Again, rather than reciting the myriad deficiencies in Mr. Heath's opinions and methodology, the Defendants incorporate the arguments contained in their Memorandum in Support of Motion to Preclude Frederick Heath.  Ultimately, Mr. Heath's speculative statements regarding "false engagement," are inadmissible because they lack any scientific basis, are based on erroneous assumptions, and rely on testing exemplars that were corrupted, modified, and damaged to the point that they no longer resembled the subject product.  Even if his testimony was admissible, it could not support a finding that each and every single ratchet-and-pawl jack stand is defective and unreasonably dangerous, as the Plaintiffs' argument would require, nor can it establish that the jack stand in this case spontaneously collapsed.

### 3.  The Plaintiffs Cannot Prove A Defect Without Competent Expert Evidence, And They Have None

Without admissible evidence establishing that the decedent's Craftsman model 50163 jack stand was defective and unreasonably dangerous, the Plaintiffs' claim cannot be presented to the jury.  This Court has repeatedly held that similar product defect claims could not pass the

summary judgment stage.  For example, the decision in *Kuzmech v. Werner Ladder Co.*, No. 3:10-cv-266 (VLB), 2012 U.S. Dist. LEXIS 174082 (D. Conn. Dec. 7, 2012), discussed above, granted summary judgment for the product liability defendants on a design defect claim where the plaintiff's expert, although qualified, did not employ reliable principles or methods, and instead conducted only a visual inspection and rough measurements of the subject ladder.  The court reasoned that "[c]ourts have recognized that '[p]utting forth expert testimony or evidence of some kind to establish a genuine issue of material fact is especially important when, as is the case here, the plaintiff attempts to assert a design defect claim.'"  *Id.* at *-37-38 (*quoting Walters v. Howmedica Osteonics Corp.*, 676 F.Supp.2d 44, 50 (D. Conn. 2009) (granting summary judgment for surgical tray manufacturer where the evidence did not show that the trays were unreasonably dangerous).  The court in *Koger v. Synthes North America, Inc.*, No. 3:07-CV-01158 (WWE), 2009 U.S. Dist. LEXIS 117829, at *8 (D. Conn. Dec. 17, 2009), similarly held that since implanted medical screws was not a subject matter within common knowledge of lay jurors, the plaintiff needed expert evidence to establish that the screw at issue was defective and caused the plaintiff's injuries, and granted summary judgment in the absence of expert evidence. *See also Water Pollution Control Auth. of Norwalk v. Flowserve US Inc.*, No. 3:14-cv-00549 (VLB), 2018 U.S. Dist. LEXIS 52168, at *75  (D. Conn. Mar. 28, 2018) (precluding plaintiff's expert and granting summary judgment in the same opinion where the plaintiff "failed to offer admissible expert testimony in support of its products liability claims, and has not raised a material question of fact as to whether Flowserve met CDMS's design specifications and whether a feasible alternative design was available.").

The decision in *Perez v. Toyota Motor Sales U.S.A., Inc.*, No. 3: 11cv1112 (WWE), 2013 U.S. Dist. LEXIS 96764 (D. Conn. Jul. 11, 2013), highlights the appropriateness of summary

judgment in speculative product liability cases where the plaintiffs fail to identify a "specific defect" that caused the accident and lack admissible expert evidence to prove the defect.  The *Perez* court invoked the well-settled principle that "[w]hen lay witnesses and common experience are not sufficient to remove a case from the realm of speculation, the plaintiff needs to present expert testimony to establish a prima facie case."  *Id.* at *6 (*citing Metro Prop. & Cas. Ins. Co. v. Deere & Co.*, 302 Conn. 123, 141 (2011)).  The court held that even if the plaintiffs were claiming an unspecified defect, their claim could not survive summary judgment without evidence to support the inference that there was a defect attributable to the product's manufacturer or seller.  *Id.* at *5-7.  The court went on to reason that allowing a "speculative inference solely from the fact of an accident" — which is exactly what the Plaintiffs seek in this case — would convert manufacturers and sellers into "insurers of their products," and ultimately granted summary judgment "because the law does not permit juries to rely on speculation."  *Id.* at *7-8 (*citing Deere & Co.*, 302 Conn. at 138.).

Connecticut state courts handle this issue the same way — the decision granting summary judgment in *White v. Mazda Motor of Am. Inc.*, No. HHD-CV086003322-S, 2011 Conn. Super. LEXIS 1620, at *10-13 (Conn. Super. Ct. June 22, 2011), which was affirmed by the Connecticut Appellate Court, 139 Conn. App. 39 (2012), and the Connecticut Supreme Court, 313 Conn. 610 (2014), with the Plaintiffs' attorney Paul Williams representing the defendants, is a case in point.  In *White*, the plaintiff had expert testimony that the subject fire started in his vehicle, but no competent expert evidence that the fire started because the vehicle was defectively manufactured or designed.  2011 Conn. Super. LEXIS 1620, at *10-11.  The court accordingly granted the defendants' motion for summary judgment, because the plaintiff could not meet his burden of proof without expert testimony to establish a defect.  *Id.* at *12-13.

The Plaintiffs' claim here cannot pass summary judgment for the same reason identified in all of these decisions.  There is no competent expert evidence — no analysis of product design plans, no failure analysis, no statistical study, and no admissible testing of any kind — to establish that the subject jack stand was defective and unreasonably dangerous.

### 4.   The Plaintiffs' Failure-To-Warn Claim Is Too Speculative To Be Submitted To A Jury

At the outset, in the absence of sufficient evidence to show that the decedent was even using a jack stand when his accident occurred, the failure-to-warn claim cannot be submitted to a jury.  Regardless, the failure-to-warn claim is belied by undisputed evidence that the jack stand manual and warnings complied with all applicable regulations.  There is no evidence that the warnings and instructions failed to comply with ASME-PALD 2009 Part 4,[11] and the Plaintiffs' own warnings and instructions expert, Dr. Eric Boelhouwer, testified that the product manual essentially complied with the standard set forth in ANSI Z535.6.  (E. Boelhouwer Dep. Tr. pp. 143:3-144:13, **Ex. DD**.)   Furthermore, it is undisputed that the decedent did not follow the warnings and instructions anyway, since he used, at most, one jack stand while the instructions require them to be used as a matched pair only.  *See* Section III(C), *infra*.

Nonetheless, Dr. Boelhouwer opined that if the manual contained a different warning or instruction, the decedent "would have noticed, read and followed" that directive, and the accident would not have happened.  (Boelhouwer Report p. 8 , **Ex. EE**.)   In his testimony, he conceded that although this was an "extremely important" part of his opinion, it was based only on Frederick Klorczyk's hearsay testimony that Mr. Klorczyk reviewed the manual and labels and discussed them with the decedent, without any other support at all.  (E. Boelhouwer Dep. Tr. pp.

---

[11] Based on a simple comparison of the product manual (**Ex. BB**) to the controlling ASME-PALD Standard (**Ex. V**) even a lay person can see that the manual contains all of the warnings mandated by ASME-PALD in substantially identical language.

167:18-168:16, **Ex. DD**.)   Indeed, he admitted that he was not relying on testimony that the decedent himself read the warnings and instructions, but rather on testimony that Mr. Klorczyk read them and discussed them with the decedent.  (*Id.* at pp.  172:6-173:7.)  He even went so far as to concede that in the absence of Mr. Klorczyk's testimony, "I could not render an opinion one way or the other whether [the decedent] would have read, followed -- read and followed the warnings and instructions."  (*Id.* at pp. 168:17-171:4.)

In fact, the product manual already contained an instruction directing users to "Check to ensure ratchet bar is secure before loading."  (Operators Manual p. 3, **Ex. BB**.)  Dr. Boelhouwer did not even specify the warning or instruction that he thinks should have been included instead of or in addition to this existing statement, nor could he coherently explain why changing this instruction would have altered the decedent's behavior and prevented his accident.

It is readily apparent that Dr. Boelhouwer's line of reasoning was quite attenuated — he assumed that if an unspecified additional warning existed, Mr. Klorczyk would have read it, understood it, discussed it with the decedent, and the decedent would have understood the warning and acted differently in some undefined way.  (E. Boelhouwer Dep. Tr. pp.173:20-177:2, **Ex. DD**.)  Yet in the face of clear evidence that the decedent did not follow the product instructions, Dr. Boelhouwer's speculative assumption cannot be submitted to the jury — it is impossible to prove that his accident would not have occurred if the instructions were different, because the evidence conclusively establishes that the decedent failed to follow the instructions in using one jack stand by itself.[12]

---

[12] Dr. Boelhouwer's report also contains an opinion that there was potential confusion regarding the jack stands' rated capacity, but this is a complete red herring as Dr. Boelhouwer testified that the curb weight of the subject vehicle was approximately 1,900 pounds and he believed that a single jack stand was rated for 2,000 pounds, (E. Boelhouwer Dep. Tr. p. 135:5-136:1, 161:14-19 **Ex. DD**), and there is absolutely no evidence that an overload occurred in this case.

29

Ultimately, Dr. Boelhouwer was forced to concede that he had no evidence that the decedent actually read the jack stands' instructions or warnings. (*Id.* at p. 177:20-22.) He even acknowledged that the decedent failed to heed the warning that jack stands are to be used in match pairs only. (*Id.* at pp. 177:23-178:8.) When asked to explain how or why he would opine that the decedent would have followed a warning about false engagement where the decedent clearly failed to heed the warning to use the jack stands in pairs, Dr. Boelhouwer's testimony devolved into incomprehensible jargon and word soup — he simply could not come up with a sensible answer. (*Id.* at pp. 178:9-184:19.)

As a final point, Dr. Boelhouwer's opinion is predicated on secondhand information from Frederick Heath that "false engagement" is a real danger that merits a product warning. (*Id.* at pp. 58:20-62:8.)[13] This renders Dr. Boelhouwer's entire opinion fundamentally unsound since Mr. Heath's opinion regarding "false engagement" is itself speculative and inadmissible. In sum, without proof that the jack stand had a design defect, the Plaintiffs' case cannot be presented to the jury based only on the tenuous theory that the decedent's accident would not have occurred if the jack stand's warnings or instructions were slightly different, where there is admittedly no evidence that the decedent read the warnings or instructions and where the evidence conclusively shows that he did not follow them.

## C. Even If The Decedent's Accident Was Caused By A Jack Stand, He Was Admittedly Misusing The Jack Stand — By Using Only A Single Stand Instead Of A Matched Pair — Contrary To Its Written Warnings And Instructions

The Plaintiffs readily admitted, both in the Complaint and in Mr. Klorczyk's testimony, that if the decedent was using a jack stand at the time of his accident, he was using only one single jack stand by itself. This is a clear example of misuse. Not only are the jack stands sold

---

[13] The expert also admitted that there is no duty to warn if there is no hazard actually exists. (Boelhouwer Dep. Tr. p. 67:7-13, **Ex. DD**.)

in pairs, but both the operators manual and on-product warnings direct users to "Use as a **matched pair** to support one end of a vehicle only," and warn that "Failure to heed product markings or warnings may result in personal injury or property damage."  (Operators Manual, **Ex. BB**; Police Photograph of Subject Jack Stand, **Ex. CC**.)

Perhaps most significantly, *the Plaintiffs' own expert on warnings and instructions agreed that use of a single jack stand was contrary to these warnings*.  (E. Boelhouwer Dep. Tr. pp. 91:2-95:16, **Ex. DD**.)  First, he testified that using a single jack stand went against the warnings in the product manual:

> A:      Generally I would agree with you, yes, sir, that if an individual chose to use one, it would not be in agreement with the safety instructions provided on page 3 in the boxed warning.

(*Id.* at p. 94:1-5.)  Then he agreed that using a single jack stand would also violate the on-product warnings:

> A:      I would generally agree with you that using one jack stand does not conform to the bullet point we have discussed on the label that's been represented by this exemplar jack stand.

(*Id.* at p. 95:13-16.)  Later in the deposition, he expressly agreed that the decedent's use of a single jack stand ignored both of these warnings.  (*Id.* at pp. 177:23-178:8.)

The decedent's undisputed failure to follow these clear warnings and instructions is a textbook example of misuse.  In the case of *Elliot v. Sears Roebuck & Co.*, 229 Conn. 500, 506 (1994), the Supreme Court held that common law misuse of a product could be asserted as a special defense to a CPLA claim. The court defined the common law defense of misuse as occurring "when a product is not used in a manner which should have been foreseen by the defendant." (Internal quotation marks omitted); *see also Norrie v. Heil Co.*, 203 Conn. 594, 600 (1987) ("Misuse occurs when a product is not used in a manner which should have been foreseen

by the defendant.") (internal quotation marks omitted).  In a similar case, involving a decedent who failed to follow the warnings and instructions that came with his BMW's jack, the Eighth Circuit affirmed the lower court's decision to grant summary judgment on the defendant's misuse defense.  *See Lindholm v. BMW of N. Am., LLC*, 862 F.3d 648, 651-53 (Eighth Cir. 2017).  In *Lindholm*, the decedent used the jack that came with his BMW to lift and support the car while he went underneath to work on its exhaust system.  *Id.* at 650.  The court noted that, although the jack was intended to lift the car, the car's owner's manual said that the jack was designed only for changing tires and that one should "[n]ever lie beneath the vehicle . . . while the car is supported by the jack - risk of fatal injury!"  *Id.* at 651-52.  The court cited comment j to the Restatement (Second) of Torts § 402A, a section cited repeatedly in Connecticut state courts, which states that "[w]here warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous," and held that the decedent's failure to heed the jack's warnings constituted unforeseeable misuse.  *Id.* at 652.

This is similarly a clear case of misuse.  The Defendants could not anticipate that the decedent would ignore both the product manual and on-product warnings by using a single jack stand instead of a matched pair.  If the decedent was using two jack stands to support the BMW, one jack stand would have remained in place even if the other collapsed — the Defendants' expert Ryan Jorgensen and the Plaintiffs' expert Eric Boelhouwer both testified that a single jack stand has sufficient rated capacity to hold up the BMW.  (*See* R. Jorgensen Aug. 3, 2017 Dep. Tr. 31:1-32:1, 36:25-38:3 (testifying that Craftsman 50163 jack stands were individually tested with eight-ton loads), **Ex. T**; E. Boelhouwer Dep. Tr. pp. 135:5-136:1 (testifying that the curb weight of the subject vehicle was approximately 1,900 pounds and he believed that a single jack

stand was rated for 2,000 pounds), 161:14-162:1, **Ex. DD**)  The decedent's misuse of the jack

stand, in direct contravention of clear and unambiguous warnings and instructions, is a third,

independently-sufficient reason that summary judgment should enter for the Defendants.

## IV.   CONCLUSION — SUMMARY JUDGMENT SHOULD BE GRANTED FOR THE DEFENDANTS

The evidence overwhelmingly shows that the decedent's accident was caused by an

altered and damaged service jack — this is the conclusion the Plaintiffs themselves reached

immediately after the accident, as did the police, and the Defendants' eminently-qualified

accident reconstructionist.   There is no non-speculative evidence, and no admissible expert

testimony, to show that the accident was actually caused by a jack stand — Mr. Klorczyk even

admitted that he could only speculate regarding how the subject jack stand came to be near the

scene of the accident where he purportedly found it. Further, the Plaintiffs' expert Frederick

Heath is not remotely qualified to perform an accident reconstruction, nor did he follow any

documented methodology at all in doing so, let alone sufficiently reliable methodology to

generate an admissible opinion.   The Plaintiffs likewise have no admissible evidence to show

that the subject jack stand was defective and unreasonably dangerous — they have not even

asserted that it is any different than the hundreds if not thousands of other models of ratchet-and-

pawl jack stands, and have not disputed that it complied with all applicable guidelines and

regulations in all relevant respects.   Lastly, the decedent was undisputedly using only one jack

stand at the time of his accident, if he was using any jack stands at all, and this constitutes misuse

in violation of the product manual and on-product warnings.

In short, based on all of the facts and evidence, no reasonable jury could conclude:  (a)

that a jack stand was in use, bearing a load, when the decedent's accident occurred; (b) that the

jack stand was defective; (c) that the jack stand failed because of its defect and caused the

accident; and (d) that the decedent as not misusing the jack stand, if he was using it at all.  In fact, a ruling for the Defendants on even one of these points forecloses the Plaintiffs' claims.

For all of these reasons, summary judgment should enter for the Defendants.


DEFENDANTS,

SEARS, ROEBUCK AND CO.,
SHINN FU CORPORATION,
SHINN FU COMPANY OF AMERICA,
INC.,
MVP (HK) INDUSTRIES, LTD., and
WEI FU (TAISHAN) MACHINERY &
ELECTRIC CO., LTD.,


By:___/s/  Steven J. Zakrzewski_____
    Dennis O. Brown, Esq. (ct04598)
    Steven J. Zakrzewski, Esq. (ct28934)
    Gordon & Rees, LLP
    95 Glastonbury Blvd., Suite 206
    Glastonbury, CT 06033
    (860) 278-7448
    (860) 560-0185 (fax)
    *dbrown@gordonrees.com*
    *szakrzewski@gordonrees.com*

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2018, the foregoing was electronically filed and served by mail on anyone unable to receive notice of electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to receive notice of electronic filing as indicated in the Notice of Electronic Filing. Parties may access this document through the Court's CM/ECF System.


　　　　　　　　　　　　　　　　　/s/  Steven J. Zakrzewski
　　　　　　　　　　　　　　　　Steven J. Zakrzewski