UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FREDERICK KLORCZYK, JR., as co-administrator of the Estate of Christian R. Klorczyk, et al., | : : : | CIVIL ACTION NO. 3:13-cv-00257-JAM |
| *Plaintiffs*, | : : | |
| vs. | : : | |
| SEARS, ROEBUCK AND CO., et al., | : : | |
| *Defendants*. | : | JULY 27, 2018 |

**DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT FOR
MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' CLAIMS IN THEIR ENTIRETY**

The Defendants, Sears, Roebuck and Co., MVP (HK) Industries, Ltd., Wei Fu (Taishan) Machinery & Electric Co., Ltd., Shinn Fu Company of America, Inc., and Shinn Fu Corporation hereby submit this concise statement of material facts as to which they contend there is no genuine issue to be tried pursuant to Rule 56(a)(1) of the Local Rules of Civil Procedure for the District of Connecticut:

1. The Plaintiffs filed this case on February 25, 2013.

2. The operative complaint is the Plaintiffs' Second Amended Complaint dated April 10, 2014 (ECF No. 99), which includes one cause of action under the Connecticut Product Liability Act ("CPLA"), Connecticut General Statutes Section 52-572m, et seq., against the five Defendants.

3. The allegedly defective product is a "Craftsman Heavy Duty Jack Stand, Model No. 50163" (the "jack stand"). Compl. ¶ 17.

4. The Plaintiffs allege that the decedent was performing an oil change on a BMW sedan at the Plaintiffs' home on March 11, 2011, using "one of the Jack Stands" to support the vehicle,

1

when the jack stand "failed and collapsed," causing the vehicle to fall on the decedent. Compl. ¶¶ 20-22.

5. The decedent was using, at most, one jack stand at the time of his accident. F. Klorczyk Dep. Tr. p. 430:3, **Ex. B** ("He only used one.").

6. Mr. Klorczyk testified that he and Lynn Klorczyk were the first people to enter the garage and find the decedent, and that he found a jack stand laying on its side beneath the vehicle, but he does not know how it ended up there, and testified that "it's all speculation." F. Klorczyk Dep. Tr. pp. 420:17-421:6, **Ex. B**.

7. Mr. Klorczyk testified that he turned the jack stand upright almost immediately upon entering the garage, right after he used the jack to lift the BMW off of the decedent. F. Klorczyk Dep. Tr. pp. 207:9-209:16, 385:7-391:24, **Ex. B**.

8. On the day of the accident, the Waterford Police Department was called to the Plaintiffs' home in response to the Plaintiffs' discovery of the decedent. Officer N. Surdo Incident Report Narrative, **Ex. A**.

9. The Plaintiff, Lynne Klorczyk, told Officer Tadeusz Krysztofiak that she entered the garage and saw the BMW on top of the decedent, "and a pump jack had, which was initially holding the vehicle had moved." Officer T. Krysztofiak Incident Report Narrative, **Ex. C**.

10. The pump jack was seized as evidence, with Lieutenant Brett Mahoney observing that the "cup" portion typically located on the jack's lifting arm was missing, and that only a smooth metal plate remained. Lieutenant B. Mahoney Incident Report Narrative, **Ex. D**.

11. Lieutenant Brett Mahoney noted that the weather was foggy, leaving condensation on the bare metal plate of the pump jack, and he concluded that the decedent was supporting the

BMW with the jack while changing its oil and the jack slipped. Lieutenant B. Mahoney Incident Report Narrative, **Ex. D**.

12. A photograph of the pump jack provided by the Plaintiffs also shows that its "cup" was missing. *See* the Memorandum of Law in Support of Summary Judgment, at p. 2.

13. Frederick Klorczyk testified that he removed the saddle cup from the jack that the decedent was using for fear that it would scratch another car that he owned, a DeLorean. F. Klorczyk Dep. Tr. pp. 35:20-41:15, **Ex. B**.

14. The Plaintiffs' son and the decedent's brother, Parker Klorczyk, testified that it was unsafe to use a service jack without the saddle "because that helps keep the vehicle secure while on the jack — so it doesn't fall off the jack . . . it would have a more easier time falling off a flat surface than it would a cupped surface." P. Klorczyk Dep. Tr. pp. 43:18-45:12, **Ex. E**.

15. An article that was published in Waterford's local paper, The Day, three days after the accident, recounted Mr. Klorczyk's statement "that a floor jack likely failed" while the decedent was changing the car's oil. The Day Article, **Ex. F**.

16. Police photographs show a fresh scrape mark on the BMW's driver side rocker panel. *See* the Memorandum of Law in Support of Summary Judgment, at p. 5.

17. The Defendants' expert, James Sprague, performed an accident reconstruction based on physical inspections, measurements, and laser scan data, and concluded that the incident occurred because the jack was supporting the BMW and it slid out, creating the scrape mark on the BMW's driver side rocker panel in the process. J. Sprague Expert Report pp. 33-37, **Ex. S**.

18. Mr. Klorczyk admitted that the pump jack was damaged when he got it back from the police department, as it was missing one of its "clip rings," and he did not know whether the clip

ring came off before, during, or after the decedent's accident.  F. Klorczyk Dep. Tr. pp. 361:23-362:10, **Ex. B**.

19. The first responder who came to the scene, Geoffrey Hausmann, testified that he saw Mr. Klorczyk "trying to put the jack together" when he arrived.  G. Hausmann Dep. Tr. pp. 20:2-14, 22:18-23:5, 26:3-27:5, **Ex. H**.

20. After Mr. Klorczyk retrieved the pump jack from the police, he replaced the clip ring, and ultimately replaced the jack itself.  F. Klorczyk Dep. Tr. pp. 169:6-171:23, **Ex. B**.

21. When the decedent purchased the subject jack stand three months before his accident, he was actually supposed to have replaced the jack as well, because the jack was "getting old," but he did not end up buying a new jack.  F. Klorczyk Dep. Tr. pp. 121:10-124:11, **Ex. B**.

22. In a March 22, 2011 article for The Patch, Mr. Klorczyk refused to explain how the car came down onto the decedent, stating "[n]o one in the world knows but me," and stated that it was caused by a "one in a billion" freak accident and not a product defect:  "To recreate it would take a tsunami and earthquake . . . one in a billion chances."  The Patch Article p.2, **Ex. I**.

23. On an internet forum called garagejournal.com, Mr. Klorczyk wrote a post on March 29, 2011 stating that the decedent was using two jack stands at the time of the accident, one under each side of the vehicle, and that the jack stand on the right side was found in the downward position, upright.  Garagejournal.com Post p. 6, **Ex. J**.

24. On two other forums, Mr. Klorczyk posted that the decedent was using two four-ton Craftsman "jackstands," and that either the decedent's body or one of his tools "tripped" the lever of the jack stand on the right side of the vehicle, causing it to release. Bimmerforums.com Post p. 10, **Ex. K**; Luxury4play.com Post p. 4, **Ex. L**.

25. Mr. Klorczyk subsequently testified that these accounts of the incident were incorrect and that the decedent was actually only using one single jack stand when the accident happened, which was found tipped over on its side after the accident — he testified that his multiple statements that there was a second jack stand under the vehicle simply were "not true at all." F. Klorczyk Dep. Tr. pp. 424:4-430:17, 437:1-440:21, **Ex. B**.

26. When Lynn Klorczyk was first deposed in November of 2014, she denied her statement from the police report that "a pump jack had, which was initially holding the vehicle had moved," while confirming that other aspects of the same part of the report were accurate. L. Klorczyk Dep. Tr. pp. 169:3-171:19, **Ex. N**.

27. Mrs. Klorczyk testified that when she entered the garage with Frederick she did not see any tools other than halogen lights, and that her husband grabbed a jack stand from "somewhere under the car" where she "couldn't see it" and placed it under the BMW after he lifted it with the pump jack. L. Klorczyk Dep. Tr. pp. 128:22-133:13, **Ex. N**.

28. When Mrs. Klorczyk was deposed again in July of 2016, she initially testified that she did not remember seeing a jack stand when she entered the garage, but did see the service jack next to the BMW. L. Klorczyk Dep. Tr. pp. 333:17-335:5, **Ex. N**.

29. After an off-the-record break, Mrs. Klorczyk was examined by her own attorney and testified that she did see a jack stand under the BMW, but not until after multiple responders already arrived at the scene and the garage was getting "crowded." L. Klorczyk Dep. Tr. pp. 361:12-361:24, 362:22-370:10, **Ex. N**.

30. The Plaintiffs' primary expert, Frederick Heath, disclosed to testify regarding the cause of the decedent's accident, admitted that he was not aware of any physical evidence that a jack stand was in use when the incident took place, and that his assumption on this point was

based solely on the Plaintiffs' testimony.  F. Heath Mar. 22, 2017 Dep. Tr. pp. 19:22-20:25, **Ex. O**.

31. Mr. Heath was deposed a second time after he was disclosed as a rebuttal expert regarding accident reconstruction, and again testified that he had no physical evidence at all that a jack was in use on the day of the decedent's accident.  F. Heath. Dec. 14, 2017 Dep. Tr. pp. 11:22-12:3, **Ex. P**

32. The Plaintiffs argue that the jack stand was defective because of its propensity for "false engagement" — essentially, the jack stand would look like it was fully engaged and ready to support a load, when it actually was not.  Compl. at ¶ 25.

33. The "false engagement" theory is the theory of liability in both the Plaintiffs' Complaint and in their primary liability expert Frederick Heath's report, where he described "false engagement" as "tip to tip contact" between the jack stand's ratchet bar and the locking pawl that could be "disrupted" by an external force.  Disclosure of Frederick G. Heath, Dec. 8, 2014, pp. 16-17 **Ex. Q**.

34. Both SFA's current Engineering Manager and Wei Fu's Assistant Vice President and Manager of the Engineering from the time when the jack stands were produced testified that the subject jack stands complied with controlling regulations, which were set forth in Part 4 of the "Safety Standard for Portable Automotive Lifting Devices" promulgated by the Portable Automotive Lifting Devices Committee of the American Society of Mechanical Engineers.  Jorgensen Dep. Tr. p. 29:4-16, **Ex. T**;  Su Chien Chi Dep. Tr. pp. 134:2-11, 161:6-11, **Ex. U**; ASME-PALD 2009 Standards Excerpt, **Ex. V**.

35. There are six warnings set forth in the ASME-PALD Guidelines: (1) Do not exceed rated capacity; (2) Use only on hard level surface; (3) Center load on saddle; (4) Use as a matched

pair only; (5) Failure to heed these markings may result in personal injury and/or property damage; and (6) Stands are not to be used to simultaneously support one side of a vehicle. ASME-PALD 2009 Standards Excerpt. **Ex. V**.

36. The ASME-PALD Guidelines expressly describe "ratchet and pawl" jack stands as a type of "typical vehicle support stands," and state that they contain directives regarding the stands' base, column, locking device, operating controls, saddle, stability, safety markings and messages, and required testing.  ASME-PALD 2009 Standards Excerpt, at pp. 3- 5, **Ex. V**.

37. Both the Plaintiffs' paid fact witness, Roger Claypool, and their liability expert, Frederick Heath, were on the Standards Committee responsible for the controlling regulations.  ASME-PALD 2009 Standards Excerpt p. 2, **Ex. V**.

38. The subject Craftsman 50163 jack stands were manufactured at the Wei Fu Factory, which a third-party certified as being ISO-compliant.  Su Chien Chi Dep. Tr. pp. 90:3-14, 93:24-94:1, 165:18-166:25, **Ex. U**.

39. Wei Fu's Vice President and Manager of the Engineering when the jack stands were produced testified that the factory followed ISO 9001, an international quality control system that controlled all quality control activities, including product measurement, analysis, and improvement.  Su Chien Chi Dep. Tr. pp. 165:18-166:8, **Ex. U**.

40. Wei Fu's third-party certification required significant effort and documentation of all Wei Fu's processes, followed by third-party verification that the factory and its procedures complied with the ISO standard.  Su Chien Chi Dep. Tr. p. 166:9-18, **Ex. U**.

41. Wei Fu's compliance was verified annually, and its certification was renewed every three years.  Su Chien Chi Dep. Tr. p. 166:19-25, **Ex. U**.

42. The Wei Fu factory also fulfilled Sears' vendor accreditation program, which was based on Sears' review of its quality and safety processes.  K. Guerra Dep. Tr. pp. 234:22-237:7, **Ex. W**; Vendor Factory Accreditation Report, **Ex. X**.

43. Wei Fu's Vice President and Manager of Engineering testified that the Craftsman 50163 jack stands were tested and approved for production as a new design at the factory, and also tested and approved by the client, Sears.  Su Chien Chi Dep. Tr. p. 167:1-23, **Ex. U**.

44. During production, every single ratchet bar was tested before it got to the production line, and every single unit was tested to make sure that the ratchet bar fully engaged with the pawl.  Su Chien Chi Dep. Tr. pp. 167:24-169:3, **Ex. U**.

45. Once the units were packaged, they were subjected to spot-testing.  Su Chien Chi Dep. Tr. p. 169:4-6, **Ex. U**.

46. A random sample of packaged products was then selected for center and off-center load testing.  Su Chien Chi Dep. Tr. pp. 169:7-170:11, **Ex. U**.

47. The batch containing the subject jack stands was subjected to spot-testing, with every single unit passing the test. Spot-Testing Results, **Ex. Y**;  Function & Loading Test Document, **Ex. Z**;  Su Chien Chi Dep. Tr. pp. 170:12-171:25, **Ex. U**.

48. Craftsman 50163 jack stands also repeatedly passed multi-point third-party testing administered by Intertek, on behalf of Sears Holdings Global Sourcing.  K. Guerra Dep. Tr. pp. 111:21-117:4, **Ex. W**; Intertek Test Reports, **Ex. AA.**

49. Plaintiffs do not dispute that the subject jack stands were accompanied by an Operators Manual, which they produced in discovery, containing product warnings and instructions. Operators Manual, **Ex. BB**.

50. The manual instructs users "to ensure ratchet bar is secure before loading" and "to ensure vehicle is secure before working on, around or under," and warned that "[f]ailure to heed product markings or warnings may result in personal injury or property damage." Operators Manual, **Ex. BB**.

51. Both the operators manual and on-product warnings direct users to "Use as a matched pair to support one end of a vehicle only," and warn that "Failure to heed product markings or warnings may result in personal injury or property damage." Operators Manual, **Ex. BB**; Police Photograph of Subject Jack Stand, **Ex. CC**.

52. Both the manual and the on-product warnings encompass all of the warnings required by the ASME-PALD standard, which are set forth in Part 4-3, entitled SAFETY MARKINGS AND MESSAGES, as well as additional warnings that are not required by ASME-PALD. ASME-PALD 2009 Standards Excerpt pp. 3, 6, **Ex. V**.

53. Plaintiffs' warnings and instructions expert, Dr. Eric Boelhouwer, testified that the product manual essentially complied with the standard set forth in ANSI Z535.6. E. Boelhouwer Dep. Tr. pp. 143:3-144:13, **Ex. DD**.

54. Dr. Boelhouwer opined that if the manual contained a different warning or instruction, the decedent "would have noticed, read and followed" that directive, and the accident would not have happened, though he testified that this opinion was based solely on Mr. Klorczyk's testimony that Mr. Klorczyk reviewed the manual and labels and discussed them with the decedent. Boelhouwer Report p. 8, **Ex. EE**; E. Boelhouwer Dep. Tr. 167:18-168:16; 172:6-173:7, **Ex. DD**.

55. Dr. Boelhouwer testified that in the absence of Mr. Klorczyk's testimony, he "could not render an opinion one way or the other whether [the decedent] would have read, followed –

read and followed the warnings and instructions." E. Boelhouwer Dep. Tr. pp. 168:17-171:4, **Ex. DD**.

56. Dr. Boelhouwer testified that he had no evidence that the decedent read the jack stands' instructions or warnings. E. Boelhouwer Dep. Tr. pp. 177:20-22, **Ex. DD**.

57. Dr. Boelhouwer testified that the decedent failed to heed the warning that jack stands are to be used in match pairs only. E. Boelhouwer Dep. Tr. pp. 177:23-178:8, **Ex. DD**.

58. Dr. Boelhouwer testified that the decedent's use of a single jack stand was contrary to both the on-product warnings and the warnings contained in the manual. E. Boelhouwer Dep. Tr. pp. 91:2-95:16; 177:23-178:8, **Ex. DD**

59. Defendants' expert Ryan Jorgensen and the Plaintiffs' expert Eric Boelhouwer both testified that a single jack stand has sufficient rated capacity to hold up the BMW. R. Jorgensen Aug. 3, 2017 Dep. Tr. 31:1-32:1, 36:25-38:3 (testifying that Craftsman 50163 jack stands were individually tested with eight-ton loads), **Ex. T**; E. Boelhouwer Dep. Tr. pp. 135:5-136:1 (testifying that the curb weight of the subject vehicle was approximately 1,900 pounds and he believed that a single jack stand was rated for 2,000 pounds), 161:14-162:1, **Ex. DD**.

                                                                DEFENDANTS,

                                                                 SHINN FU CORPORATION and
                                                                 SHINN FU COMPANY OF AMERICA, INC.,

                                                                 By: /s/ Steven J. Zakrzewski
                                                                 Dennis O. Brown, Esq. (ct04598)
                                                                Steven J. Zakrzewski, Esq. (ct28934)
                                                                Gordon & Rees, LLP
                                                                95 Glastonbury Blvd., Suite 206
                                                                Glastonbury, CT 06033
                                                                (860) 278-7448
                                                                (860) 560-0185 (fax)
                                                                *dbrown@gordonrees.com*
                                                                *szakrzewski@gordonrees.com*

**CERTIFICATE OF SERVICE**

    I hereby certify that on July 27, 2018, the foregoing was electronically filed and served by mail on anyone unable to receive notice of electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to receive notice of electronic filing as indicated in the Notice of Electronic Filing. Parties may access this document through the Court's CM/ECF System.

                                                                /s/ Steven J. Zakrzewski
                                                                 Steven J. Zakrzewski