1            UNITED STATES DISTRICT COURT

2              DISTRICT OF CONNECTICUT

3

  FREDERICK KLORCZYK, JR.,

4  as co-administrator of the

5  Estate of Christian R. Klorczyk,

6  FREDERICK KLORCZYK, JR.,

7  Individually, LYNNE KLORCZYK,

8  as co-administrator of the

9  Estate of Christian R. Klorczyk

10 and LYNNE KLORCZYK, individually,

11    PLAINTIFFS,

  VS.                    Case 3:13-cv-00257-RNC

12 SEARS, ROEBUCK AND COMPANY,

13 SHINN FU CORPORATION, SHINN FU

14 COMPANY OF AMERICA, INC.,

15 and MVP (HK) INDUSTRIES, LTD.,

16    DEFENDANTS.

17

18       Deposition of LYNNE KLORCZYK, taken at Gordon,

19    & Rees, L.L.P., 95 Glastonbury Boulevard, Suite 206,

20    Glastonbury, Connecticut, by Sabina Lohr, Licensed

21    Shorthand Reporter and Notary Public in and for the

22    State of Connecticut, on November 13, 2014,

23    at 10:14 a.m.

24

25 PAGES 1 - 295

                                          Page 1

1     Q.     And dialed 911?

2     A.     Yeah.

3     Q.     Then what happened?

4     A.     So as I was being connected with 911, I watched

5     my husband, who was also calling to Christian.  And I

6     watched my husband pick up the handle to the jack

7     stand -- no -- to the hydraulic jack, insert it into the

8     opening, put it in and turn it and then pump up the car

9     off of Christian.

10          I didn't realize that, at the time, that

11     Christian was holding the car up.  And then, once Fred

12     had the car raised, he put the jack stand underneath the

13     car.  And then I was able -- I was talking to the -- to

14     the girl at 911, the dispatcher.

15          And I told her that my son was under the car.

16     And she asked me if I had a pulse.  And I believe I

17     said, I don't know yet.  And I went under -- through the

18     wheel well and my husband went under through the front

19     of the car.  And I went straight for his carotid on

20     the -- his right side.  And I -- and I had a pulse.  So

21     I said to 911, yes, I have a pulse.

22     Q.     Okay.  Now, when you first opened the door

23     before you went back to the staircase, you saw the

24     halogen lights, the garage lights, the car and

25     Christian's legs.

Page 128

1      A.     (Nods head.)

2      Q.     Did you see a jack stand?

3      A.     No.

4      Q.     Did you see a pump jack?

5      A.     No.

6      Q.     Okay.  Did you see any tools, other than the

7  halogen lights?

8      A.     No.

9      Q.     Okay.

10     A.     I didn't stand there very long.

11     Q.     When you returned and you were on the phone

12  with 911, you saw Mr. Klorczyk grab the pump jack, put

13  it under the car, insert the handle pull --

14     A.     Yeah.

15     Q.     -- turn the handle pull --

16     A.     Yeah.

17     Q.     -- and then start to pump the car up?

18     A.     Yes, because when he -- once he started to grab

19  it, then I realized it was stand -- it was right there

20  parallel to the -- to the car.

21     Q.     Okay.

22     A.     It was down on the floor.  It was standing.

23  When I opened the door the first time, I was standing up

24  high enough all -- I missed all -- everything that was

25  on the floor, except, you know, I could see Christian's

Page 129

1    legs, but I couldn't see what was right directly below

2    me on the floor.

3        Q.    So if we're in the middle bay and we have the

4    BMW in the middle bay, the front end towards the back of

5    the garage wall --

6        A.    Yes.

7        Q.    -- the trunk by the garage door --

8        A.    Yes.

9        Q.    -- where is the pump jack?

10       A.    It was right -- sitting right parallel, both

11   the parts, two -- two separate pieces, parallel to the

12   front wheel well.

13       Q.    And which end was facing that back garage wall,

14   the part where you put the pawl or the part that lifts

15   up?

16       A.    The part where you put the pawl.

17       Q.    Okay.  So the pawl end is facing the back end

18   of the garage wall?

19       A.    Yeah, facing the (pointing).

20       Q.    Where was the pawl?

21       A.    Right next to it.

22       Q.    Which side of the jack stand?  In between the

23   car and the jack stand or the jack stand and then the

24   pawl closest to the house door?

25       A.    No, it was the pawl and then the jack stand.

Veritext National Deposition & Litigation Services
866 299-5127

1      Q.     It was the pawl -- you okay down there?

2             THE VIDEOGRAPHER:  Yeah.

3   BY MR. FLYNN:

4      Q.     All right.  So the pawl was in between the BMW

5   and the pump jack --

6      A.     I believe so.

7      Q.     -- correct?

8      A.     (Nods head.)

9      Q.     Okay.  So you see Mr. Klorczyk take the pump

10  jack, put it under the car, lift the car and then he

11  puts a jack stand under the car?

12     A.     Yes.

13     Q.     Where did he get the jack stand?

14     A.     It was under the car.

15     Q.     Okay.  Where was it under the car?

16     A.     I don't know exactly where it was under the

17  car, but I couldn't -- it was a place where I couldn't

18  see it.

19     Q.     Okay.  Do you know if it was laying on its

20  side?

21     A.     I'm not sure.

22     Q.     Do you know if it was standing on all four

23  legs?

24     A.     I don't think so.

25     Q.     Okay.  So if it wasn't standing on all four

Page 131

1  legs --

2      A.    It had to be on its side.

3      Q.    It probably was on its side?

4      A.    Yes.

5      Q.    Okay.  And you don't recall if it tipped

6  towards the garage wall or if it tipped towards the

7  garage door?

8      A.    No, because as soon as he had -- as soon as he

9  put it up, I was under there.  I was -- I was trying to

10 get to Christian.

11     Q.    Okay.  So Mr. Klorczyk puts the pump jack

12 under, pumps the car up.  And my recollection from the

13 photos is that the pump jack was close to the right

14 front rear well -- I'm sorry -- right front wheel well,

15 but slightly behind it.

16          So if Mr. Klorczyk goes under the car from the

17 front end, he gets up at some point then; correct?

18     A.    He had moved it out of the way after he put

19 the...

20     Q.    Oh, so he put the jack stand under, then he

21 removed the pump jack?

22     A.    So I could get under there.

23     Q.    And then you go under the right front wheel

24 well?

25     A.    Yeah.

Page 132

 1      Q.     As he's standing up, he's moving the pump jack?

 2      A.     Yeah.   And he went...

 3      Q.     He steps in front of the car and then gets down

 4   and goes under the front of the car?

 5      A.     Yeah.

 6      Q.     Okay.   So it's just the one jack stand that's

 7   holding the car up at that point in time?

 8      A.     I believe so.

 9      Q.     Okay.   Were there any other jack stands under

10   the car at that point in time?

11      A.     I didn't see any.

12      Q.     Did you see any other jack stands in the garage

13   at that time?

14      A.     I wasn't looking.

15      Q.     Okay.   At a later point in time, did you find

16   out that there were more jack stands in the garage?

17      A.     There were.   There were.

18      Q.     Okay.   How many other jack stands?

19      A.     Three.

20      Q.     And the jack stand that Mr. Klorczyk used, can

21   you describe it or identify it.

22      A.     I wouldn't be able to tell one from the next.

23      Q.     Okay.   So you don't have an idea of what load

24   capacity?

25      A.     No.

                                               Page 133

```
 1      A.    One was at the house briefly, and then the
 2   other one was at the hospital.
 3      Q.    Okay.  Now, somewhere about the middle of the
 4   page, there's a sentence that reads, Mrs. Klorczyk
 5   stated, as she entered the garage, she observed the red
 6   BMW was on top of Christian and a pump jack had -- which
 7   was initially holding the vehicle, had moved.
 8             You see that sentence?
 9      A.    I do see that sentence.
10      Q.    Okay.  Do you disagree with this sentence?
11      A.    Absolutely.  I did not say that because I never
12   saw that.
13      Q.    Okay.
14      A.    I never thought that.
15      Q.    Now, when I first handed you Exhibit 7, you
16   said that you had seen it recently.
17      A.    Yes.  This week.
18      Q.    Had you seen this document before then?
19      A.    No.
20      Q.    Okay.  So the first time you were aware --
21   well, is it correct that the time first time you were
22   aware of this statement, that an officer said you said a
23   pump jack was lying on the floor, was within the last
24   week or so?
25             MR. ELLIOTT:  Before you answer that, can I
```

Page 169

1    just see this document?

2              THE WITNESS:  Yes.

3              MR. ELLIOTT:  Where's the reference to lying

4    on the floor?

5              MR. FLYNN:  Oh.  Excuse me.  That's from the

6    depo.  I'm sorry about that.

7              MR. DONAT:  Withdrawn?

8              MR. FLYNN:  So withdraw that, and I'll

9    restate it.  Thank you.

10       Q.   So is it correct -- hang on a second.  Waiting

11   for the court reporter.

12             THE COURT REPORTER:  I'm sorry.

13             MR. FLYNN:  No, no, no.

14       Q.   Is it correct, then, that the first time you

15   were aware of Officer Krystofiak's statement that you

16   had said a pump jack had initially been holding the

17   vehicle and moved was when you first saw this document a

18   week or so ago?

19       A.   Earlier this week --

20       Q.   Earlier?

21       A.   -- is when I first saw it.  Yes.

22       Q.   Okay.

23       A.   There was no way I would have known that.

24       Q.   Did you -- what, if anything, did you do in

25   response to reading this for the first time, other than

                                        Page 170

1    anything you said to your attorneys?

2        A.    I didn't do anything because I knew we were

3    meeting this week.  I don't know how he came up with

4    that because there was -- there was -- I could not have

5    made that statement because I wouldn't have known that.

6        Q.    Not the next sentence, but the one after that

7    reads, Mrs. Klorczyk said Christian remained

8    unresponsive, and she called 911.  Mrs. Klorczyk stated,

9    as she was on 911, Mr. Klorczyk jacked the BMW up and

10   placed a jack stand underneath.  Is that accurate?

11       A.    Yes.

12       Q.    Okay.  Now, the last paragraph starting

13   three -- three lines from the bottom --

14       A.    Yes.

15       Q.    -- Dr. Diane Marini, M-a-r-i-n-i, pronounced

16   Christian Klorczyk deceased at 16:58 hours.

17             Was that the first time you were informed

18   that Christian had passed away?

19       A.    Yes.

20             MR. FLYNN:  We'll mark this as Number 8.

21             (Defendants' Exhibit 8 was marked for

22             identification.)

23       Q.    Have you seen this document before?

24       A.    Yes.

25       Q.    When was the first time you saw it?

```
 1              C E R T I F I C A T E
 2          I hereby certify that I am a Notary Public in,
 3      and for the State of Connecticut, duly commissioned and
 4      qualified to administer oaths.
 5           I further certify that the deponent named in
 6      the foregoing deposition was by me duly sworn and
 7      thereupon testified as appears in the foregoing
 8      deposition; that said deposition was taken by me
 9      stenographically in the presence of counsel and reduced
10      to typewriting under my direction, and the foregoing is
11      a true and accurate transcript of the testimony.
12           I further certify that I am neither of counsel
13      nor attorney to either of the parties to said suit, nor
14      am I an employee of either party to said suit, nor of
15      either counsel in said suit, nor am I interested in the
16      outcome of said cause.
17           Witness my hand as Notary Public this 19th day
18      of November, 2014.
19
20
21
22                              Sabina Lohr
                               Notary Public
23      License #0000131
        My License Expires December 31, 2016
24      My Notary Certification Expires July 31, 2017
25
```

                                              Page  293

Page 296

1                UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT
2

    ----------------------------x
3                                :
    FREDERICK KLORCZYK, JR., as  :
4   Co-Administrator of the      :
    Estate of Christian R.       :
5   Klorczyk, et al.,            :
                                 :
6          Plaintiffs,           :   Civil Action No.
                                 :   3:13-cv-00257-JAM
7       -vs-                      :
                                 :
8   SEARS, ROEBUCK & CO., et al.,:
                                 :
9          Defendants.           :
                                 :
10  ----------------------------x
11
12              VOLUME II - PAGES 296-386
13
14
                VIDEOTAPE DEPOSITION OF:
15              LYNNE KLORCZYK
16              DATE:  JULY 12, 2016
                HELD AT:  GORDON REES SCULLY MANSUKHANI,
17              LLP, 95 GLASTONBURY BOULEVARD,
                SUITE 206, GLASTONBURY, CONNECTICUT
18
19
20
21      Reporter:  JILL I. HUDON, RPR, LSR #00082
22
23
24
25  Job No. CS2332250

1              (The last question was repeated

2               by the reporter.)

3

4         MR. ELLIOTT:  And note my objection.

5    Thank you.

6              THE WITNESS:  Yes.

7    Q    (By Mr. Brown)  Okay.  Now, you were able to

8    reach 911, and then you went back to the garage

9    yourself; is --

10   A    I was --

11   Q    -- that correct?

12   A    -- calling and talking and walking at the

13   same time.

14   Q    When you went back and -- got back to the

15   garage, what did you observe?

16             MR. ELLIOTT:  The same objection.

17             THE WITNESS:  My husband was calling to

18   Christian.  I saw him pick up the handle to the floor

19   jack, put it in, screw it in or tighten it in, and

20   then I watched as he jacked the car off of my son.

21   Q    (By Mr. Brown)  And where was the floor

22   jack?

23   A    The floor jack was parallel to the car,

24   right -- right about -- right -- right between kind of

25   the doors, close to -- the wheel well was parallel --

Page 334

1    the jack, and the handle.

2            MR. BROWN:   And the witness has pointed

3    to a spot parallel to the passenger's side doors of

4    the car.   I'll just draw a nonscale representation.

5        Q    (By Mr. Brown)  Is that approximately where

6    the floor jack was where I've made this --

7        A    Yes.

8        Q    -- drawing?

9            And do you know if the lifting end -- which

10   end was pointing which way?

11       A    The lifting end was towards the -- the

12   outside garage doors, and the part where the handle

13   goes was facing the door where I was standing, or

14   facing the back wall of the garage.

15       Q    Was there a tire placed on the ground under

16   the passenger front side of the car when you came

17   back?

18       A    I don't --

19            MR. ELLIOTT:   The same objection.

20            THE WITNESS:   -- recall.   I don't

21   recall.

22       Q    (By Mr. Brown)  And was the jack setting on

23   its wheels, the pump jack?

24       A    Can you repeat that?

25       Q    Was it setting on its wheels?

Page 335

1      A    Yes.

2      Q    Okay.

3      A    It was flat on the floor.

4      Q    Do you remember seeing a jack stand?

5      A    Not at that time.

6      Q    Okay.  So your husband took -- put the

7   handle in the pump jack and raised the car up off your

8   son?

9      A    He did.

10     Q    Okay.  Where were you standing while he was

11  doing that, approximately?

12     A    I was -- I went down to the -- to the bottom

13  step.  I was still standing.  I was -- had moved down

14  a couple of steps.

15     Q    Okay.  You were still near the door into the

16  garage?

17     A    Yeah.  That staircase is in -- in the

18  doorway.  I was not standing on the garage floor.

19     Q    Oh.  You were still on the stairs?

20     A    I was, but I was on the bottom step.

21     Q    Okay.  That's --

22     A    I had moved down.

23     Q    Okay.  At that point as he lifted the car,

24  could you see Christian more clearly?

25     A    I could.

Page 361

1    Q    -- his well-being, essentially.

2    A    Yes.

3    Q    And you at some point reached for his pulse.

4    A    Yes.

5    Q    Okay.  And you felt a pulse.

6    A    I did.

7    Q    Okay.  As of the time that those events

8  occurred in the garage while you were under the

9  vehicle, was the pump jack still elevating the

10 vehicle?

11   A    Yes.

12   Q    You were asked a question -- and I

13 apologize.  I forget the time frame, but let's just

14 take it this way.

15        At any time that you were in the garage,

16 from the time that you gained access to the underside

17 of the BMW to the time that you withdrew from that

18 position, remained in the garage for a while, and then

19 exited the garage, did you see a jack stand?

20   A    Yes.

21   Q    And approximately where did you see that

22 jack stand?

23   A    It was on the passenger's side in the front

24 of the car, under -- under the car.

25        MR. ELLIOTT:  Do you want to just write

1   it down, or do you want to take a break?

2                    MR. WEXLER:  One second.

3                    THE VIDEOGRAPHER: Your microphone.

4            Do you want to stay on the record?

5                    MR. WEXLER:  No.

6                    MR. ELLIOTT:  No.

7                    THE VIDEOGRAPHER:  Going off the

8   record.  The time would be approximately 11:03.

9

10                           (A brief recess was taken from

11                           11:03 to 11:05 a.m.)

12

13                    THE VIDEOGRAPHER:  We are back on the

14   record.  The time is approximately 11:05.

15            You may continue.

16                    MR. ELLIOTT:  I have no further

17   questions.

18

19                    REDIRECT EXAMINATION

20

21   BY MR. BROWN:

22       Q    Okay.  Lynne, I asked you, I think, three

23   different questions about seeing a jack stand, and the

24   record will speak for itself, but you were focused on

25   your son, didn't see one.  Now you say you saw a jack

Page 363

1    stand.

2              Did something happen to refresh your memory?

3         A    After I came out -- you didn't ask me about

4    what I was doing -- well, you did ask me about after I

5    came out.

6              But it was after I was out waiting for

7    somebody to do something, the responders, that I was

8    able to really take a better look underneath the car.

9         Q    And where did you see this jack stand?

10        A    The jack stand was in the -- was in the

11   front section, passenger's section, of the car.

12        Q    Go ahead and --

13        A    Can I --

14        Q    -- make an "X" where you saw it.

15        A    Oh, it was kind of where the -- where the --

16   where the -- now, wait a minute.

17             It would have -- it would have just been in

18   the -- in the front, passenger's side.

19             This wheel well, now that I'm looking at it,

20   is -- is back kind of far, but -- that was, like, the

21   back of the wheel well, but the -- the jack stand was

22   more up here.

23             I didn't really look -- didn't even notice

24   it until I got back out from under the car, when the

25   responders were there and we were just kind of

Page 364

1    standing around.

2         Q    The responders were there and standing --

3         A    They were --

4         Q    -- around --

5         A    They were kind of filtering in, you know,

6    coming in, and I was just kind of standing there,

7    saying, you know, "Is somebody going to do something?"

8              And that's when I had the opportunity to

9    really take a look at it.  Everything else --

10        Q    Can you make an "X," to the best of your

11   ability, where you saw the jack stand?

12                  THE WITNESS:  Mr. Elliott?

13                  MR. ELLIOTT:  Yeah.  Again, this is not

14   to scale, and it's -- it's --

15                  THE WITNESS:  I would say --

16                  MR. ELLIOTT:  -- it's a guess, as far

17   as --

18                  THE WITNESS:  I would say --

19                  MR. ELLIOTT:  -- I'm concerned.

20                  THE WITNESS:  -- kind of here, which is

21   where the wheel well was.

22              I know I told you it was back there further,

23   but it's not.  The wheel well was up closer.  Couldn't

24   have been in the middle of the car.  I don't know what

25   I was thinking.  But it's closer up here.

1       Q    (By Mr. Brown)  And you've made a very small

2    "X."  I'll draw a circle around it and --

3       A    So I don't know if you want to adjust --

4       Q    "JS" for "jack stand."

5       A    I don't know if you want to adjust, like,

6    where the -- the wheel well wasn't quite back that

7    far.

8       Q    Well, this is where you thought you had

9    crawled under --

10      A    Right.

11      Q    -- the car.

12      A    Well, I did crawl --

13      Q    You think it was --

14      A    -- into the wheel well.

15      Q    -- more forward?

16      A    I think it was -- it was more forward than

17   that, yeah.

18      Q    Okay.  Was it more towards, like, where the

19   mirror would be --

20      A    But I --

21      Q    -- on the car?

22      A    I don't remember the -- you know, the mirror

23   being in my way, or anything like that, but it could

24   not have been in the middle of the car.  That doesn't

25   make sense.  So it would have had to have been further

Page 366

1    up.

2                     MS. TODD-TROTTA:  Can I just have

3    clarification as to the "it"?

4                     MR. ELLIOTT:  What?

5                     MR. BROWN:  The point where she crawled

6    under the car.

7                     THE WITNESS:  Where -- the part where I

8    crawled under.

9                     MS. TODD-TROTTA:  She referred to it as

10   "it," and I wasn't --

11                    THE WITNESS:  The "wheel well," "it."

12                    MR. ELLIOTT:  Hold on a second.

13           Is this on the -- are you mic'd up?  Are you

14   on the record?

15                    MS. TODD-TROTTA:  There's -- no.

16                    MR. ELLIOTT:  Was any of that on the

17   record?

18                    THE VIDEOGRAPHER:  I could hear it.

19                    MR. ELLIOTT:  Yeah.  Okay.

20      Q    (By Mr. Brown)  And you have no recollection

21   if the pump jack was to your left or your right as you

22   crawled under the car?

23      A    The pump jack was -- was more to the --

24   was -- had to have been in front of me.  I mean --

25      Q    In front of you?

1     A    To the right to me -- to the right of me.

2     Q    Towards the front of the car.

3     A    Towards the front of the car, yeah, as it

4  was pumped up.

5     Q    Okay.  So it would have been to your right,

6  towards the front of the car.

7     A    Yes.

8     Q    Okay.  And the jack stand was beneath the

9  car, but to the right of the pump jack when you saw

10  it?

11     A    Please repeat that.

12     Q    Well, you crawled out from under the car --

13     A    Uh-huh.

14     Q    -- opened the garage door; correct?

15     A    Yes.

16     Q    And you were waiting for people to come, and

17  people started coming.

18     A    Yes.

19     Q    Well, at some point you walked back to where

20  these people were standing around, and that's when you

21  could see --

22     A    That's when I finally noticed it.

23     Q    -- the jack stand.

24          Okay.  And was the jack stand between the

25  pump jack and the front of the car?

Page 368

1      A     I don't know, but I could see it clearly.

2      Q     What can you see clearly --

3      A     I mean, I could see the --

4      Q     -- in your --

5      A     I could see the -- I could see the jack

6   stand under there, under the right, front passenger's

7   side of the car.

8      Q     Was the jack stand lifted up at all, the bar

9   that comes up in the center?

10     A     No.

11     Q     Was the jack stand sitting flat on its

12  four feet?

13     A     No.

14     Q     What --

15     A     It was tilted over.

16     Q     The jack stand was on its side?

17     A     Yeah.

18     Q     Was the bar in the middle all the way in or

19  partway out?

20     A     I believe it was all the way down.

21     Q     Is that how you see it in your mind?

22     A     Yeah.

23     Q     And how many people were in the garage when

24  you could see it?

25     A     Five, six.  I mean, it was -- it was getting

1   crowded.  That's when people would start coming in,

2   and I was kind of --

3        Q    And had you been back by the open garage

4   door as the people came in?

5        A    I was, and then I kept moving back into the

6   garage as they were coming in.

7        Q    And was there a time where you stood around

8   with all these people wandering, or did they pretty

9   promptly ask you to go --

10        A    Well, I was waiting --

11        Q    -- in the house?

12        A    -- for them -- for somebody to take a look

13   at Christian and see what -- see what was going on,

14   and they were just kind of -- I don't know who they

15   were waiting for, but it didn't take very long for the

16   officer to ask me to go inside and put my shoes on.

17        Q    So where at least the policeman was there by

18   then --

19        A    Policeman was -- oh, yeah.  The ambulance

20   was there.

21        Q    Mr. Chapman and his son were there?

22        A    They were there, or they may have gone to

23   the back and somebody else was -- I was really

24   expecting an EMT to just come rushing in and -- and go

25   under, but nobody was doing that.

1      Q    There were EMTs there.

2      A    There were EMTs there.  There was an

3  ambulance there.  There was a fire truck there and

4  police cars there.

5      Q    So there were also firemen in the garage?

6      A    There was -- everybody -- I don't -- I can't

7  tell you how many of -- who -- or who exactly was in

8  the garage, but I know that there were -- I could see

9  the vehicles outside, and people were coming in from

10  the outside.

11      Q    I assume in day-to-day life there's been a

12  number of occasions that your husband has been alone

13  in your bedroom and could have took the phone and

14  you'd have no personal knowledge?

15                MR. ELLIOTT:  Objection to the form.

16                THE WITNESS:  Probably.  Possibly.

17      Q    (By Mr. Brown)  Have there been a number of

18  occasions where either of your sons could have

19  accessed that room and nobody would have known it and

20  took the phone?

21      A    I would say possibly, but doubtful.

22      Q    Did your sons know the phones were under the

23  bed?

24      A    I don't even know.

25      Q    And is there anyone other than your husband

```
 1                    STATE OF CONNECTICUT

 2             I, Jill I. Hudon, a notary public duly

 3   commissioned and qualified in and for the State of

 4   Connecticut, do hereby certify that pursuant to notice

 5   there came before me on the 12th day of July, 2016,

 6   the following named person, to wit:  LYNNE KLORCZYK,

 7   who was by me duly sworn or affirmed to testify to the

 8   truth and nothing but the truth; that she was

 9   thereupon carefully examined upon her oath and her

10   examination reduced to print under my supervision;

11   that this deposition is a true record of the testimony

12   given by the witness.

13             I further certify that I am neither attorney

14   nor counsel for nor related to nor employed by any of

15   the parties to the action in which this deposition is

16   taken, and further, that I am not a relative or

17   employee of any attorney or counsel employed by the

18   parties hereto, or financially interested in this

19   action.

20             IN WITNESS THEREOF, I have hereunto set my

21   hand this 22nd day of July, 2016.

22

23   _____
              Jill I. Hudon, Notary Public
24            LSR #00082
     My Commission Expires:
25   October 31, 2016
```