

**User Name:** Mark Bouchard
**Date and Time:** Friday, July 27, 2018 8:24:00 AM PDT
**Job Number:** 70697706

## Documents (14)

1. _Northeast Utils. Serv. Co. v. St. Paul Fire & Marine Ins. Co. 2012 U.S. Dist. LEXIS 96641, at *8_
   **Client/Matter:** -None-
   **Search Terms:**
   **Search Type:**
2. _477 U.S. 249, 249_
   **Client/Matter:** -None-
   **Search Terms:**
   **Search Type:**
3. _Gill v. Teva Respiratory, LLC 2017 U.S. Dist. LEXIS 212072, at *7_
   **Client/Matter:** -None-
   **Search Terms:**
   **Search Type:**
4. _Garrett v. Crown Equip. Corp. 2017 U.S. Dist. LEXIS 96974, at *6_
   **Client/Matter:** -None-
   **Search Terms:**
   **Search Type:**
5. _Graham v. Fireline, Inc. 2006 U.S. Dist. LEXIS 39185_
   **Client/Matter:** -None-
   **Search Terms:**
   **Search Type:**
6. _Simjian v. Bayer Corp. 2012 U.S. Dist. LEXIS 50198, at *1_
   **Client/Matter:** -None-
   **Search Terms:**
   **Search Type:**
7. _Gold v. Dalkon Shield Claimants Trust 1998 U.S. Dist. LEXIS 22413_
   **Client/Matter:** -None-
   **Search Terms:**
   **Search Type:**
8. _Kuzmech v. Werner Ladder Co. 2012 U.S. Dist. LEXIS 174082, at *36_
   **Client/Matter:** -None-
   **Search Terms:**
   **Search Type:**
9. _Koger v. Synthes N. Am., Inc. 2009 U.S. Dist. LEXIS 117829, at *8_
   **Client/Matter:** -None-
   **Search Terms:**

**Search Type:**

10.  *Water Pollution Control Auth. of Norwalk v. Flowserve US Inc. 2018 U.S. Dist. LEXIS 52168, at *75*

   **Client/Matter:** -None-

   **Search Terms:**

   **Search Type:**

11.  *Perez v. Toyota Motor Sales U.S.A., Inc. 2013 U.S. Dist. LEXIS 96764*

   **Client/Matter:** -None-

   **Search Terms:**

   **Search Type:**

12.  *White v. Mazda Motor of Am. Inc. 2011 Conn. Super. LEXIS 1620, at *10*

   **Client/Matter:** -None-

   **Search Terms:**

   **Search Type:**

13.  *Elliot v. Sears, Roebuck & Co. 229 Conn. 500, 506*

   **Client/Matter:** -None-

   **Search Terms:**

   **Search Type:**

14.  *Norrie v. Heil Co. 203 Conn. 594, 600*

   **Client/Matter:** -None-

   **Search Terms:**

   **Search Type:**

⚠ Caution
As of: July 27, 2018 3:24 PM Z

## *Northeast Utils. Serv. Co. v. St. Paul Fire & Marine Ins. Co.*

United States District Court for the District of Connecticut

July 11, 2012, Decided; July 12, 2012, Filed

3:08-CV-01673 (CSH)

### Reporter

2012 U.S. Dist. LEXIS 96641 *; 2012 WL 2872810

NORTHEAST UTILITIES SERVICE COMPANY and THE CONNECTICUT LIGHT AND POWER COMPANY, Plaintiffs, v. ST. PAUL FIRE AND MARINE INSURANCE COMPANY and UTICA MUTUAL INSURANCE COMPANY, Defendants.

**Subsequent History:** Motion denied by, Clarified by *Northeast Utils. Serv. Co. v. St. Paul Fire & Marine Ins. Co., 2012 U.S. Dist. LEXIS 178608 (D. Conn., Dec. 18, 2012)*

## Core Terms

omissions, coverage, underlying action, insured's, additional insured, duty to defend, parties, exhausted, vicarious liability, settlements, Indemnity, injuries, services, summary judgment motion, excess carrier, Endorsement, complaints, Policies, independent act, employees, explosion, Electric, decedent's, affirmative defense, duty to indemnify, summary judgment, Memorandum, own act, themselves, Vault

## Case Summary

### Overview

In a coverage dispute, defendant was entitled to summary judgment because plaintiffs were not "additional insureds" under the primary policy; the "additional insured" provision only applied to liability for the insured's acts or omissions arising out of the insured's work for plaintiffs but the underlying complaints based liability on plaintiffs' acts or omissions.

### Outcome

Motion granted.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

### *HN1*[⤓] **Summary Judgment, Entitlement as Matter of Law**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

### *HN2*[⤓] **Summary Judgment, Burdens of Proof**

For purposes of a motion for summary judgment, the moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. In moving for summary judgment against a party which will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if it can point to an absence of evidence to support an essential element of the non-moving party's claim. The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in its favor.

Insurance Law > Claim, Contract & Practice Issues > Policy Interpretation > Ordinary & Usual Meanings

Insurance Law > ... > Policy Interpretation > Ambiguous Terms > Unambiguous Terms

Insurance Law > Claim, Contract & Practice Issues > Policy Interpretation > Plain Language

*HN3*[⬇] **Policy Interpretation, Ordinary & Usual Meanings**

Under Connecticut law, unambiguous terms in an insurance contract are given their plain and ordinary meaning.

Insurance Law > ... > Commercial General Liability Insurance > Persons Insured > Additional Parties

*HN4*[⬇] **Persons Insured, Additional Parties**

Provisions extending an additional insured's coverage only to the insured's acts, rather than to its own acts, have been enforced.

Insurance Law > ... > Commercial General Liability Insurance > Persons Insured > Additional Parties

*HN5*[⬇] **Persons Insured, Additional Parties**

One of the primary functions of the additional insured endorsement is to protect the additional insured from vicarious liability for acts of the named insured.

Insurance Law > ... > Commercial General Liability Insurance > Persons Insured > Additional Parties

Insurance Law > ... > Commercial General Liability Insurance > Exclusions > General Overview

*HN6*[⬇] **Persons Insured, Additional Parties**

An "independent acts" exclusion limits coverage to instances in which the additional insured's alleged liability is based on vicarious liability for the insured's acts, excluding instances in which the additional insured's alleged liability is based solely on its own conduct.

Insurance Law > ... > Commercial General Liability Insurance > Persons Insured > Additional Parties

Insurance Law > ... > Commercial General Liability Insurance > Obligations of Parties > General Overview

*HN7*[⬇] **Persons Insured, Additional Parties**

Some courts have held that when the complaint against the additional insured includes counts alleging liability for its own independent acts or omissions and also counts for which its liability would be vicarious, the insurer has a duty to defend, and possibly to indemnify.

Insurance Law > ... > Obligations of Parties > Insurers > Allegations in Complaints

Insurance Law > ... > Business Insurance > Commercial General Liability Insurance > Duty to Defend

Insurance Law > ... > Business Insurance > Commercial General Liability Insurance > Indemnification

*HN8*[⬇] **Insurers, Allegations in Complaints**

The duty to defend is broader than the duty to indemnify.

Insurance Law > ... > Obligations of Parties > Insurers > Allegations in Complaints

Insurance Law > ... > Business Insurance > Commercial General Liability Insurance > Duty to Defend

*HN9*[⬇] **Insurers, Allegations in Complaints**

The Connecticut Supreme Court has established that an insurer's duty to defend may arise either from the pleadings in the underlying action or from other facts known to it. If an allegation of the underlying complaint falls even possibly within the coverage, then the insurer must defend the insured. The pleadings to be examined to determine coverage may include pleadings filed by

2012 U.S. Dist. LEXIS 96641, *96641

the defendants. The duty to defend can arise from facts outside the allegations in the complaint if the insurer has actual knowledge of facts establishing a reasonable probability of coverage.

Insurance Law > ... > Excess
Insurance > Obligations > Duty to Defend

**HN10**[↧]  **Obligations, Duty to Defend**

No Connecticut court has held that an excess carrier has a duty to defend regardless of policy language. A Connecticut Superior Court has found that an excess carrier does not have, in general, a duty to defend before exhaustion of the underlying policy limit.

**Counsel:**  **[*1]** For Northeast Utilities Svc Co, Connecticut Light & Power Co, Plaintiffs: Jason Ronald Gagnon, LEAD ATTORNEY, Carmody & Torrance - WTBY, Waterbury, CT; Maureen Danehy Cox, Richard L. Street, LEAD ATTORNEYS, Carmody & Torrance, Waterbury, CT.

For St Paul Fire & Marine Ins Co, Defendant: James V. Somers, Jeffrey F. Gostyla, LEAD ATTORNEYS, Halloran & Sage, Hartford, CT; Tracy L. Montalbano, LEAD ATTORNEY, Halloran & Sage LLP, Hartford, CT.

For Utica Mutual Insurance Company, Defendant: Keith R. Rudzik, Steven J. Barber, LEAD ATTORNEYS, Howard, Kohn, Sprague & Fitzgerald, Hartford, CT; William P. Rose, LEAD ATTORNEY, PRO HAC VICE, Tucker, Helfetz & Saltzman, LLP, Boston, CT.

**Judges:** Charles S. Haight, Jr., Senior United States District Judge.

**Opinion by:** Charles S. Haight, Jr.

# Opinion

**RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

HAIGHT, Senior District Judge:

**I. INTRODUCTION AND RELEVANT FACTS**

In the present action, plaintiffs Northeast Utilities Service Company and The Connecticut Light & Power Company seek declaratory judgments and compensatory damages for breach of contract against defendants St. Paul Fire & Marine Insurance Company ("St. Paul") and Utica Mutual Insurance Company ("Utica"). This dispute arises from a **[*2]** tragic explosion in an underground vault which injured two men working there, Elias Anchundia and Scott Schmukler, bringing about Anchundia's death. What is at issue in this action is whether Plaintiffs are entitled to indemnity and defense from Defendants for their liabilities in connection with these injuries. Plaintiffs filed a Motion for Summary Judgment [Doc. 39] on all counts of the Third Amended Complaint, while Utica and St. Paul each filed its own cross-Motion for Summary Judgment [Docs. 45, 49 respectively] against all of Plaintiffs' claims.

All three Motions raise the same issues, so they may be dealt with as a group in this Ruling. The parties do not disagree about the facts relevant to this action; they disagree only on whether coverage exists under two insurance policies. Those are questions of law. In consequence, the case is appropriate for summary disposition.

The relevant facts are set forth in detail in the parties' briefs, and only a summary is provided here. Plaintiffs, public utilities, are wholly owned subsidiaries of Northeast Utilities ("NU"). They entered into a Master Services Agreement (the "Contract") with American Electrical Testing Co. ("AET"), under which **[*3]** AET agreed to furnish supervision, labor, material, and equipment to perform network protector maintenance in the Waterbury, Connecticut area. The Contract required AET to acquire Comprehensive or Commercial General Liability Coverage to cover bodily injury and property damage and to endorse the relevant policies to include Plaintiffs as additional insureds. Contract ¶ 17.1. [1]

AET complied with this contractual insurance requirement by acquiring two policies (collectively, the "Policies") from Defendants. The primary policy, issued by Utica to AET for the period from August 1, 2006 to August 2, 2007 (the "Utica Policy"), included coverage for certain bodily injury or property damage up to $1 million per occurrence. [2] It included coverage for additional insureds, that is, entities or individuals

---

[1] A copy of the Contract is attached to the Affidavit of Linda G. Bennett [Doc. 48] as Continued Exhibit A.

[2] A copy of the Utica Policy is attached to Plaintiffs' *Local Rule 56(a)(1)* Statement ("Pl. L.R. Stmt.") [Doc. 41] as Exhibits 5, 5.1, 5.2 and 5.3.

different from and in addition to AET, but such coverage attaches only if one of two conditions is satisfied. General Liability Extension Endorsement § 11(a)(1). [3] The interpretation of one of those conditions is the most important point of dispute between the parties. That provision establishes **[*4]** coverage for an additional insured, to the extent that such additional insured is held liable for AET's acts or omissions arising out of its work for the additional insured. *Id.* § 11(a)(1)(a). The Utica Policy also excludes coverage for the "independent acts or omissions of such additional insured." *Id.* § 11(c)(1).

The excess policy, issued by St. Paul for the period from August 1, 2006 to August 1, 2007 (the "St. Paul Policy"), covers the insured for liability for certain bodily injury and property damage that is in excess of the Retained Limit (in this case, the coverage limit of the Utica Policy) up to $5 million per occurrence. [4] Coverage is available only if the primary policy applies. St. Paul Policy I-A, I-B and I-C. The St. Paul Policy contains a provision establishing St. Paul's duty to defend when the Retained Limit has been exhausted by payment of covered judgments or settlements. *Id.* II-A and II-B. Under that provision, St. Paul has no **[*5]** duty to defend against any claim not covered by the policy. *Id.* II-C.

On February 21, 2007, two of AET's employees, Anchundia [5] and Schmukler, provided maintenance at an electrical vault in Waterbury, Connecticut owned by Plaintiffs (the "Vault"). For reasons that cannot be determined from the record in the present action, an explosion occurred, injuring both employees and bringing about the death of Anchundia. Anchundia's widow Marlyn Anchundia filed a federal action against Plaintiffs in the Eastern District of New York, alleging that the explosion was caused by Plaintiffs' negligence. *Anchundia v. N.E. Utils. Serv. Co.*, No. 2:07-cv-04446 (E.D.N.Y.) (the "Anchundia Action"). Schmukler filed an action against Plaintiffs in Connecticut Superior Court making the same allegation. *Schmukler v. N.E. Utils.*, No. HHB-CV-09-5011836 (the "Schmukler Action") (collectively, the "Underlying Actions"). In neither action did the plaintiff allege negligence or acts by AET; rather,

they alleged that the explosion was caused by Plaintiffs' acts and omissions. In each action, Plaintiffs filed **[*6]** affirmative defenses alleging the negligence of others, including Anchundia and Schmukler.

Plaintiffs demanded that Defendants provide defense and indemnity in the Underlying Actions. Defendants, however, responded that Plaintiffs' losses from the Underlying Actions are not covered by the Policies.

Plaintiffs initially filed the present action in Connecticut Superior Court. Defendants removed it to this Court on November 4, 2008, on the basis of the complete diversity of the parties. On May 20, 2009, Plaintiffs filed the Third Amended Complaint, which is the operative complaint, seeking declarations that the subject losses are covered by the Policies and damages for breach of contract. The parties subsequently filed the present cross-motions for summary disposition.

The Anchundia Action was settled on or about January 4, 2011 for $8 million. Plaintiffs assert that the total legal expenses that they incurred in the Anchundia Action came to $1,546,458.47. The Schmukler Action was settled on or about June 20, 2011for $55,000. Plaintiffs assert that their total legal **[*7]** expenses in that action were $14,811.51. Affidavit of Duncan Ross MacKay [Doc. 70] ¶¶ 4-9. Between June 5 and June 8, 2012, the parties filed supplemental briefs at the Court's request [Docs. 72, 74, 76], which, *inter alia*, informed the Court about the settlement of the Underlying Actions.

As a result of Plaintiffs' settlements of the Underlying Actions, the present posture of the case is as follows: (1) by reason of Defendants' duties to defend Plaintiffs as stated in the Policies, Plaintiffs assert that they are entitled to recover from Defendants the legal expenses they incurred in connection with the two Underlying Actions; and (2) by reason of Defendants' duties to indemnify Plaintiffs as stated in the Policies, Plaintiffs are entitled to recover from Defendants the amounts they paid to settle the two Underlying Actions.

Defendants assert that they owe Plaintiffs nothing under the Policies, because the incidents and events giving rise to the Underlying Actions are not covered by the primary policy (Utica) and consequently cannot be covered by the excess policy (St. Paul).

These questions of coverage lie at the heart of this action, and form the basis for the parties' cross-motions **[*8]** for summary judgment.

---

[3] A copy of the General Liability Extension Endorsement constitutes Pl. L.R. Stmt. Exhibit 5.3.

[4] A copy of the St. Paul Policy is attached to St. Paul's *Local Rule 56(a)(1)* Statement [Doc. 42] as Exhibit 1.

[5] Throughout, "Anchundia" refers to decedent Elias Anchundia. His widow, Marlyn Anchundia, is referred to as "Marlyn Anchundia."

2012 U.S. Dist. LEXIS 96641, *8

## II. LEGAL STANDARD

*HN1*[↑] Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. *HN2*[↑] The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. In moving for summary judgment against a party which will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if it can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex at 322-23*. The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in its favor. *Anderson v. Liberty Lobby, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

The Court will first consider the parties' arguments about the duty to indemnify, and then consider their arguments about the duty to defend. Because the resolution of these issues renders judgment as a matter of law appropriate on all claims in this action, the Court will **[*9]** then rule on all three Motions for Summary Judgment.

## III. DUTY TO INDEMNIFY

### A. Utica

### 1. Existence of Coverage Under the "Additional Insureds" Provision

The central issue between the parties is whether Plaintiffs' liability in the Underlying Actions falls within the "additional insureds" provision of the Utica Policy. The Utica Policy states that "[w]e will pay those sums that the insured [AET] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Utica Policy, Commercial General Liability Coverage Form, § I(A)(1)(a). [6] As noted *supra*, the Utica Policy extends this coverage to additional insureds by Section 11 of a

General Liability Extension Endorsement (the "Endorsement"). [7] Since the dispute between the parties turns largely on that provision, it is worth quoting the relevant part of Section 11 in full:

> Any person or organization with whom you [AET] have entered into a written contract, agreement or permit requiring you to provide insurance such as is afforded by this Commercial General Liability Coverage Form will be an additional insured, but only:
>
>> (a) To the extent that such additional insured is held liable for **[*10]** your acts or omissions arising out of and in the course of ongoing operations performed by you or your subcontractors for such additional insured; or
>> (b) With respect to property owned or used by, or rented or leased to, you.

Endorsement § 11a(1).

The parties are in agreement that Plaintiffs are organizations with which AET entered into a contract requiring it to provide insurance such as that provided by the Utica Policy. Thus far, Plaintiffs appear to be "additional insureds" and entitled to coverage. However, they are "additional insureds" only if either condition (a) or condition (b) applies. Plaintiffs do not claim that condition (b) applies. Their argument is exclusively that they are covered under condition (a). Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment on All Counts of the Third Amended Complaint ("Pl. Supp. Memo.") at 11-14.

Condition (a) applies to liability for AET's acts or omissions arising out of AET's work for Plaintiffs. To establish **[*11]** that they are covered under condition (a), Plaintiffs argue that any liability that may attach to them in the Underlying Actions would necessarily be the result of AET's "acts or omissions arising out of and in the course of" AET's work for them. *Id.* at 11. Defendants, however, argue that the Underlying Actions had nothing to do with AET's acts and omissions, but rather alleged acts and omissions by Plaintiffs themselves. *See, e.g.*, Memorandum of the Defendant, Utica Mutual Insurance Company, in Support of its Motion for Summary Judgment ("Utica Supp. Memo."), sixth and seventh pages. [8]

---

[6] The Commercial General Liability Coverage Form can be found near the end of Pl. L. R. Ex. 5. Neither of the Policies is paginated as a whole.

[7] The General Liability Extension Endorsement constitutes Pl. L. R. Ex. 5.3.

[8] Utica's brief in support of its Motion is not paginated.

*HN3*[↑] Under Connecticut law, unambiguous terms in an insurance contract are given their plain and ordinary meaning. *Metro. Life Ins. Co. v. Aetna Cas. & Sur. Co., 255 Conn. 295, 305, 765 A.2d 891 (2001)*. The plain and ordinary meaning of "for your acts or omissions," in a policy in which the word "you" refers to AET, is "for AET's acts or omissions" rather than for any other party's acts or omissions.

Thus, the primary dispute between the parties turns on a single, simple question: when Plaintiffs settled with Marlyn Anchundia and Schmukler, did they pay that $8,055,000 **[*12]** based on their liability for AET's acts or omissions? If so, there is coverage. If those payments were based on Plaintiffs' own acts or omissions, there is no coverage.

Plaintiffs, in their memorandum describing the settlements, do not state that the settlement agreements established that Plaintiffs were paying based on anything other than the liability claimed in the Underlying Actions. Plaintiffs' Supplemental Memorandum in Support of Plaintiffs' Position on Three Pending Motions for Summary Judgment ("Pl. Supplemental Memo.") *passim*. They do not provide any basis for the settlement payments other than their alleged liability in the Underlying Actions. The Court must proceed on the assumption that the basis for the settlement payments was the liability alleged in the Underlying Actions.

The complaints in the Underlying Actions allege that Plaintiffs were liable for their own acts and omissions. The Amended Complaint in the Anchundia Action contains three causes of action, for (1) Anchundia's injuries, (2) Anchundia's wrongful death, and (3) Marlyn Anchundia's loss of Anchundia's services. [9] All three are based on allegations of Plaintiffs' own acts or omissions. "The aforesaid accident **[*13]** was caused solely and wholly through the negligence of the defendant, NORTHEAST UTILITIES and/or CT LIGHT & POWER, its agents, servants, and/or employees, in that it was careless and negligent in its operation, control, custody, charge, supervision, management and maintenance of the aforementioned Job Site, as well as the work being performed thereat ..." Anchundia Comp. ¶ 33. The Anchundia Complaint proceeds to list sixteen other ways in which Plaintiffs were allegedly negligent. *Id.* "By reason of the foregoing carelessness and negligence of

the defendants, their agents and/or servants and/or employees, the defendants caused, precipitated and/or hastened the death of plaintiff's decedent on February 21, 2007." *Id.* at ¶ 40. "As a result of the negligence of defendants, plaintiff, MARLYN L. ANCHUNDIA, has sustained damage in the loss of services, companionship, consortium and affection of her husband, decedent, ELIAS JOSEPH ANCHUNDIA ..." *Id.* at ¶ 46.

The Complaint in the Schmukler Action likewise alleges that Plaintiffs are liable **[*14]** for their own acts or omissions. [10] The Complaint starts its description of the cause of Schmukler's injuries by stating that "Plaintiff's injuries and losses were caused by the carelessness and negligence of Defendants in one or more of the following ways: ... a. In that they used, permitted and/or allowed a hazardous, defective and unlawful condition to be, continue and remain on the Job Site." Schmukler Comp. at 9. It proceeds to list eighteen further ways in which Plaintiffs' negligence allegedly caused Schmukler's injuries. *Id.*

Neither complaint alleges that Plaintiffs are liable for AET's acts or omissions. The Anchundia Complaint does allege that Plaintiffs' negligence may include the negligence of their "agents," along with their "servants," "employees" and themselves. Anchundia Comp. ¶ 33. This raises the question of whether AET could be considered to be Plaintiffs' "agent" for the purposes of the Anchundia Action. The Anchundia Complaint does not allege so, on the face of it. The closest it comes to doing so is in the allegation **[*15]** that Plaintiffs "managed the work, labor and services being performed by [AET] at the Job Site and the Electric Project, which led to and caused plaintiff's decedent's accident ..." *Id.* ¶ 21. But the Anchundia Complaint goes to great lengths to make it clear that it is alleging Plaintiffs' own acts, as opposed to acts of AET that might be imputed to Plaintiffs. For example, Paragraphs 25-32 read as follows:

> 25. At all times and places hereinafter mentioned defendants NORTHEAST UTILITIES and/or CT LIGHT & POWER, directed the work, labor and services being performed by [AET] at the Job Site and the Electric Project, which led to and caused plaintiff's decedent's accident, the injuries he sustained therein and ultimately his death.
>
> 26. At all times and places hereinafter mentioned

---

[9] A copy of the Amended Complaint in the Anchundia Action ("Anchundia Comp.") is attached to the Third Amended Complaint in this action [Doc. 29] as Exhibit A.

[10] A copy of the Complaint in the Schmukler Action ("Schmukler Comp.") is attached to the Third Amended Complaint in this action [Doc. 29] as Exhibit C.

defendants NORTHEAST UTILITIES and/or CT LIGHT & POWER, supervised the work, labor and services being performed by [AET] at the Job Site and the Electric Project, which led to and caused plaintiff's decedent's accident, the injuries he sustained therein and ultimately his death.

27. At all times and places hereinafter mentioned defendants NORTHEAST UTILITIES and/or CT LIGHT & POWER, controlled and/or managed the **[*16]** work, labor and services being performed by [AET] at the Job Site and the Electric Project, which led to and caused plaintiff's decedent's accident, the injuries he sustained therein and ultimately his death.

28. At all times and places hereinafter mentioned defendants NORTHEAST UTILITIES and/or CT LIGHT & POWER, had a presence at the Job Site, and more particularly, at the Electric Project, on a continual basis.

29. At all times and places hereinafter mentioned defendants NORTHEAST UTILITIES and/or CT LIGHT & POWER, had its supervisory personnel, laborers and other employees performing work, labor, services and other functions at the Job Site.

30. At all times and places hereinafter mentioned defendants NORTHEAST UTILITIES and/or CT LIGHT & POWER, had the authority and the degree of control over the work which produced the accident, plaintiff's decedent's injuries and ultimate death, to enable it to take the action necessary to correct or avoid the unsafe condition.

31. Prior to the date of the aforesaid action defendants NORTHEAST UTILITIES and/or CT LIGHT & POWER, either had knowledge, or should have had knowledge, that the subject Job Site and Electric Project, including the transformer **[*17]** maintenance and sampling of insulating fluids from energized high voltage primary switch compartments was dangerous under the circumstances then and there presenting.

32. The defendants NORTHEAST UTILITIES and/or CT LIGHT & POWER, were aware of similar prior instances of accidents and/or explosions, as well as problems and/or issues obtain [sic.] insulating fluid samples from the energized high voltage primary switch compartment, which occurred under the same or similar circumstances, and the defendants failed to take appropriate precautionary measures to prevent and/or minimize the subject accident.

Marlyn Anchundia could hardly have done more to make it clear that she was alleging that the negligence at issue was that of Plaintiffs themselves, rather than being the negligence of AET acting as Plaintiffs' agent. The Anchundia Complaint alleged no acts or omissions on AET's part, other than the general assertion that it "was performing work, labor and services as to the aforementioned Electric Project." Anchundia Comp. ¶ 17. The only employee of AET mentioned is Anchundia himself. *Id.* ¶¶ 18-20. The Anchundia Complaint certainly does not allege that AET's acts or omissions caused the **[*18]** explosion via Anchundia's acts or omissions, for it specifically denies that Anchundia's acts or omissions played any role: "Said accident was the result of the negligence of [Plaintiffs] and occurred without any negligence on the part of plaintiff's decedent contributing thereto." *Id.* ¶ 34.

Plaintiffs have advanced two arguments for treating the liability in the Underlying Actions as liability for AET's acts or omissions. First, they assert that "[i]f [Plaintiffs] are held 'liable' ... it will necessarily be for AET's acts or omissions because the accident arose when AET workers were performing (or not performing) certain work in conjunction with AET's contract with [Plaintiffs]." Plaintiffs' Reply Brief Responding to Defendant Utica Mutual Insurance Company's Opposition to Plaintiff's Motion for Summary Judgment ("Pl. Reply Memo.") at 2.

That statement makes one wonder if Plaintiffs doubt the intelligence of the Court. The fact that the accident arose when AET workers were performing work under the Contract does not "necessarily" mean that Plaintiffs' liability must be for AET's acts or omissions. Plaintiffs seem to expect the Court to believe that because AET workers were present **[*19]** at the Vault at the time of the explosion, it was impossible for Marlyn Anchundia or Schmukler to allege that acts or omissions of any party other than AET caused the explosion. But that is exactly what they alleged. Marlyn Anchundia, for example, alleged that Plaintiffs had their own "presence" and their own "supervisory personnel, laborers and other employees" at the Vault. Anchundia Comp. ¶¶ 28-29. As another example, she alleged that Plaintiffs— not AET but Plaintiffs— "caus[ed] and permitt[ed] electric current to flow into and out of the area occupied by [Anchundia]." Anchundia Comp. ¶ 33. Schmukler made essentially the same allegations. Schmukler Comp. ¶ 9.

Second, Plaintiffs argue that the Underlying Actions are covered because Plaintiffs filed affirmative defenses that alleged that the explosion was caused by the acts or omissions of AET, Anchundia, Schmukler, and others.

2012 U.S. Dist. LEXIS 96641, *19

Pl. Reply Memo. at 5-6. But Anchundia and Schmukler could not have obtained damages from Plaintiffs for vicarious liability for AET's acts based solely on Plaintiffs' own affirmative defenses. If Plaintiffs' argument were correct, by filing those affirmative defenses they would have been creating vicarious **[*20]** liability for themselves where it did not otherwise exist. In any event, the Underlying Actions have been settled. Plaintiffs do not suggest to the Court that they paid those settlements because of liability they imposed on themselves through their affirmative defenses, rather than because of the claims that Marlyn Anchundia and Schmukler brought against them.

Plaintiffs might argue that although the Underlying Actions did not allege AET's acts or omissions or contain any causes of action seeking to impose on Plaintiffs vicarious liability for AET's acts or omissions, the ultimate resolution of those actions might have imposed liability on them based on such vicarious liability, after one or both of the Anchundia and Schmukler complaints was amended. But now that the Underlying Actions have been terminated by settlements, that danger no longer exists.

For the most part, Plaintiffs focus on another issue: the "arising out of" language in Section 11a(1)(a) of the Endorsement. Under that section, an additional insured is covered only if both (1) such additional insured is held liable for AET's acts or omissions and (2) AET's acts or omissions arose out of and in the course of ongoing operations **[*21]** performed by AET or its subcontractors for such additional insured. Plaintiffs focus attention on the "arising out of" condition. Pl. Supp. Memo. at 11-14. And indeed, if Plaintiffs faced liability for AET's acts or omissions, it would likely be true that those acts or omissions "arose out of" ongoing operations that AET performed for Plaintiffs. But Plaintiffs did not face liability for AET's acts or omissions.

For that reason, Plaintiffs' reliance on the Connecticut Superior Court's decision in the *Royal Indemnity* matter is unavailing. *See* Pl. Supp. Memo. at 13-14. In that case, the Superior Court found coverage under somewhat similar circumstances in a decision that was explicitly affirmed and adopted by the Connecticut Supreme Court. *Royal Indem. Co. v. Terra Firma, 50 Conn. Supp. 563, 948 A.2d 1101 (Conn. Super. Ct. July 25, 2006)*; *Royal Indem. Co. v. Terra Firma, 287 Conn. 183, 189, 947 A.2d 913 (2008)*. [11] However, the policy

at issue in *Royal Indemnity* differed in a crucial respect from the Utica Policy. The coverage in the *Royal Indemnity* policy extended to "liability arising out of ... [the insured's] work." *Royal Indemnity, 50 Conn. Supp. at 569*. Under that policy, as long as the liability arose out of **[*22]** the insured's work for the additional insured, it did not matter whose acts or omissions caused the accident. In the Utica Policy, on the other hand, the coverage extends only to liability arising out of AET's acts or omissions. *Royal Indemnity* did not deal with language limiting coverage to liability for the insured's acts or omissions. [12]

The point that *Royal Indemnity* establishes is that if Plaintiffs *were* held liable for AET's acts or omissions, those acts or omissions would meet the criterion of "arising out of" AET's work for Plaintiffs. Connecticut law, as the *Royal Indemnity* court observed, defines "arising out of" broadly to cover any case **[*23]** in which the injury "was connected with, had its origins in, grew out of, flowed from, or was incident to" the occurrence in question. *QSP v. Aetna Cas. & Surety Co., 256 Conn. 343, 373-74, 773 A.2d 906 (2001)*. But that point has no significance here, because Plaintiffs' liability, as alleged in the Underlying Actions, was not liability for AET's acts or omissions.

This is not a matter of adhering to the precise language of a policy in defiance of fairness or common sense. The restriction of coverage to AET's acts or omissions simply fits the fact that the Utica Policy was AET's policy, not Plaintiffs' policy. AET included additional-insured coverage in the Utica Policy to meet its undertaking in the Contract to protect Plaintiffs, but AET was not obliged to purchase insurance to protect Plaintiffs against their own conduct.

Likewise, public policy does not ban enforcement of the plain language of the Utica Policy. **HN4** Provisions extending an additional insured's coverage only to the insured's acts, rather than to its own acts, have been enforced. *See, e.g., Smurfit-Stone Container Enters., Inc. v. Nat'l Interstate Ins. Co., No. 3:08CV093, 2008*

---

are governed by Connecticut law.

[12] In other decisions that have found that additional insureds were covered under "arising out of" clauses, the courts confronted provisions like the one in *Royal Indemnity*: they spoke of "liability arising out of" the insured's work rather than liability "for the insured's acts or omissions arising out of" such work. *See Town of Manchester v. Vermont Mut. Ins. Co., No. CV044004859, 2006 Conn. Super. LEXIS 13, 2006 WL 164886 (Conn. Super. Ct. Jan. 3, 2006)* (collecting cases).

---

[11] The parties are in agreement that the issues in this action

_U.S. Dist. LEXIS 67645, 2008 WL 4153762, at *3-5 (E.D.Va. Sept. 5, 2008)_ (Missouri law);  **[*24]** _Cleveland v. Vandra Bros. Constr., Inc., 192 Ohio App. 3d 298, 2011 Ohio 821, 948 N.E.2d 1027, 1032-33 (Ohio App. Ct. 2011)_ (Ohio law). As the _Smurfit-Stone_ court explained, that limitation suits the purpose of additional-insured coverage:

> Courts in Missouri and elsewhere have recognized that a common purpose of an additional-insured provision is to "provide ... protection from vicarious liability and to provide "specialized protection rather than all-encompassing coverage." _U.S. Fidelity & Guar. v. Drazic, 877 S.W.2d 140, 143 (Mo. Ct. App. 1994)_; _accord Northbrook Ins. v. American States Ins., 495 N.W.2d 450, 453 (Minn. Ct. App. 1993)_ (recognizing that _HN5_[⬆] "One of the primary functions of the additional insured endorsement is to protect the additional insured from vicarious liability for acts of the named insured"); _Harbor Ins. Co. v. Lewis, 562 F.Supp. 800, 803 (E.D.Pa. 1983)_ (concluding that "In the insurance industry, additional insureds provisions have a well established meaning. They are intended to protect parties who are not named insureds from exposure to vicarious liability for acts of the named insured").

_Smurfit-Stone 2008, U.S. Dist. LEXIS 67645, [WL] at *3_. Here, the plain language of Section 11(a)(1)(a) is consistent with the common purpose of  **[*25]** such policies: protecting the additional insured against vicarious liability.

The Utica Policy thus, by its terms, does not provide indemnity for Plaintiffs' liability in the Underlying Actions. Although this alone would be enough to decide the indemnity issue, the Court addresses the very similar issue of the independent acts exclusion.

## 2. The "Independent Acts" Exclusion

The Utica Policy contains an exclusion for "independent acts or omissions" by the additional insured, as noted above. The courts have not supplied an interpretation of that language under Connecticut law. (There was no "independent acts" exclusion in the policy at issue in _Royal Indemnity._) However, the law of other states consistently supports the position that _HN6_[⬆] the "independent acts" exclusion limits coverage to instances in which the additional insured's alleged liability is based on vicarious liability for the insured's acts, excluding instances in which the additional

insured's alleged liability is based solely on its own conduct. _Edwards v. Travelers Indem. Co., 75 Fed. Appx. 929, 932 (5th Cir. 2003)_ (Louisiana law); _United Constr. Ent. Co. of St. Louis v. Am. Contractors Ins. Grp., Inc., No. 10-CV-81, 2011 U.S. Dist. LEXIS 34443, 2011 WL 1258557, at *5-7 (S.D.Ill. Mar. 31, 2011)_  **[*26]** (Illinois law); _St. Paul Fire & Marine Ins. Co. v. Hanover Ins. Co., 187 F.Supp.2d 584, 594-95 (E.D.N.C. 2000)_ (North Carolina law).

_HN7_[⬆] Some courts have held that when the complaint against the additional insured includes counts alleging liability for its own independent acts or omissions and also counts for which its liability would be vicarious, the insurer has a duty to defend, and possibly to indemnify. _Greyhound Lines, Inc. v. Travelers Prop. Cas. Co. of Am., 81 Mass. App. Ct. 1123, 964 N.E.2d 368, 2012 WL 987515, at *2-3 (2012)_ (Massachusetts law); _Amerisure Mut. Ins. Co. v. Travelers Lloyds Ins. Co., No. H-09-663, 2010 U.S. Dist. LEXIS 27066, 2010 WL 1068087, at *7 (S.D.Tex. Mar. 22, 2010)_ (Texas law). However, in the present case the Underlying Actions sought to impose liability on Plaintiffs exclusively for their independent acts and omissions.

Plaintiffs argue that a holding that the "independent acts" language excludes coverage "requires a finding regarding the acts and omissions that might have caused or contributed to the accident." Plaintiffs' Memorandum in Opposition to Defendant Utica Mutual Insurance Company's Motion for Summary Judgment ("Pl. Utica Opp. Memo.") at 8. While that might be true in some  **[*27]** cases, it is not true here. None of the causes of action in the Anchundia or Schmukler complaints could have resulted in Plaintiffs being held vicariously liable for AET's acts or omissions, no matter what finding was made about the acts or omissions that contributed to the accident. Now that the Underlying Actions have been settled, there is no possibility that the Anchundia or Schmukler complaint will be amended to allege vicarious liability, or that a court will make a factual finding of vicarious liability. Thus, even if liability in the Underlying Actions was covered by the insuring agreement, it would have been excluded by the independent acts exclusion. [13]

---

[13] Utica's argument that _Connecticut General Statutes § 52-572k_ bars coverage here ignores the fact that _Section 52-572k_ does not extend to insurance contracts, as Plaintiffs observe. Utica Supp. Memo., ninth and tenth pages; Pl. Reply Memo. at 17-19.

## B. St. Paul

Because Utica does not have a duty to indemnify, neither does St. Paul, the excess carrier. The St. Paul Policy contains the following provision: "There is no coverage under this policy for Bodily Injury ... unless a Retained Limit applies." St. Paul Policy, Insuring **[*28]** Agreements I(A). The Retained Limit here is the limit of Utica's primary insurance coverage, so the absence of coverage under the Utica Policy establishes the absence of coverage under the St. Paul Policy. There is one exception to the requirement that a Retained Limit apply, at I(B)(3). But the Policy provides that "[i]f coverage for the Bodily Injury ... does not exist under any (1) Scheduled Underlying Insurance ... because of a specific exclusion or other specific coverage limitation, then paragraph I Coverage B.3 above does not apply, unless such coverage is specifically provided by endorsement to this policy." *Id.* at I(C). Here, as noted *supra*, there is no coverage under the Utica Policy under a specific exclusion and a specific coverage limit. The St. Paul Policy contains no endorsement specifically providing coverage under I(B)(3). Thus St. Paul has no duty to indemnify. [14]

## IV. DUTY TO DEFEND

### A. Utica

Plaintiffs argue that even if Utica does not have a duty to indemnify them, it did have a duty to defend them in

----

[14] St. Paul makes two additional arguments, both of which are unpersuasive. First, it argues that no "occurrence" is alleged as required by the St. Paul Policy because the last event in the causal chain that led to the explosion was the "transformer switch by CL&P." Memorandum of Law of St. Paul Fire & Marine **[*29]** Insurance Company in Opposition to Plaintiffs' Motion for Summary Judgment ("St. Paul Opp. Memo.") at 17. However, the parties have not presented the Court with evidence upon which it could make such a factual finding. Second, it argues that the St. Paul Policy contains two provisions which exclude from coverage injury arising out of the rendering or failure to render of professional services, and that the Underlying Actions alleged that Plaintiffs failed to provide such services. *Id.* at 19-20. But the complaints in the Underlying Actions alleged several bases for Plaintiffs' liability, including, for example, strict liability for engaging in an "ultrahazardous activity." Anchundia Comp. ¶¶ 49-62. The Court cannot conclude that nothing was at issue other than failure to render professional services.

----

the Underlying Actions. Pl. Supp. Memo. at 15-18. They argue further that because Utica breached its duty to defend them, it is liable for their defense costs and the amount of the settlements in the Underlying Actions. *Id.* at 18-19.

As courts often observe, **[*30]** *HN8*[⬆] the duty to defend is broader than the duty to indemnify. *See, e.g., Vermont Mut. Ins. Co. v. Walukiewicz, 290 Conn. 582, 602 n. 21, 966 A.2d 672 (2009)*. Unlike Utica's duty to indemnify, its duty to defend must be determined by considering the facts it knew at the time it refused to defend, regardless of later events.

The Connecticut Supreme Court has established that *HN9*[⬆] an insurer's duty to defend may arise either from the pleadings in the underlying action or from other facts known to it. "If an allegation of the [underlying] complaint falls even possibly within the coverage, then the [insurer] must defend the insured." *Wentland v. Am. Equity Ins. Co., 267 Conn. 592, 600, 840 A.2d 1158 (2004)*. The pleadings to be examined to determine coverage may include pleadings filed by the defendants. *Vermont Mut. Ins. Co. at 602 n. 21*. The duty to defend can arise from facts outside the allegations in the complaint if the insurer has actual knowledge of facts establishing a reasonable probability of coverage. *Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co., 274 Conn. 457, 466-67, 876 A.2d 1139 (2005)*.

The Anchundia and Schmukler complaints did not allege any causes of action that might have fallen within the coverage of the Utica **[*31]** Policy. As discussed *supra*, those complaints were based entirely on Plaintiffs' own acts rather than AET's. Plaintiffs emphasize the fact that Plaintiffs' affirmative defenses in the Anchundia and Schmukler Actions alleged other parties' negligence. Pl. Reply Memo. at 5-6. That fact, however, does not bear on this analysis. Utica's obligation was not to determine if some other party was negligent, but to determine if there was a possibility that Plaintiffs would be held liable for AET's acts or omissions. Plaintiffs could not create otherwise nonexistent claims against themselves by pleading affirmative defenses.

Since the complaints in the Underlying Actions did not allege vicarious liability, the remaining question is whether Utica had "actual knowledge" of facts establishing a "reasonable probability" of coverage. *See Hartford Cas. Ins. Co. at 466-67*. That is, did it have reason to believe that the complaint in either of those actions might be amended to add claims against Plaintiffs based on vicarious liability for AET's conduct,

and that Plaintiffs might be held liable under those claims?

To make that case, Plaintiffs would at a minimum have to show that there exists some cause [*32] of action under which such vicarious liability might have been imposed on them. Nowhere in their six memoranda on the three Motions do Plaintiffs identify a cause of action that Marlyn Anchundia or Schmukler might have added to their complaints that would require Plaintiffs to pay for AET's acts or omissions. Plaintiffs cannot establish that Utica had "actual knowledge" of such a potential cause of action when they themselves cannot identify one, even in retrospect.

Plaintiffs' argument on this subject is not easy to understand, but their fullest statement of that argument occurs in their memorandum in opposition to Utica's summary judgment motion. Pl. Utica Opp. Memo. at 10, 14-16. Plaintiffs argue that Utica knew of facts that showed that the claims were covered:

> By the underlying complaints, Utica knows that several AET workers allege that they were performing work in the vault at the time of the accident. In their answers to the Anchundia and Schmukler complaints, [Plaintiffs] deny that they were negligent and assert the negligence of others as affirmative defenses.

*Id.* at 10. The phrase "several AET workers" is misleading, because in fact the complaints establish only that one AET [*33] worker, Schmukler, alleges that he was performing work in the Vault, and only one more, Anchundia, is alleged by others to have been there. Later, expanding on this argument, Plaintiffs add the following:

> Utica states that there are only three possible outcomes to the Anchundia and Schmukler cases: first, that [Plaintiffs] are found solely negligent; second, that Anchundia and/or Schmukler are found to have caused their own injuries either entirely or in a greater percentage than [Plaintiffs]; or third, that Anchundia and Schmukler and [Plaintiffs] are both found to be negligent ... under two of the three possible outcomes that Utica cites, the acts or omissions of AET's employees would have led to the injuries complained of. Surely if two out of the three possible outcomes would include findings regarding the negligence of AET's employees, Utica has a duty to defend this action.

*Id.* at 15.

Although Plaintiffs are not clear about this, the situation

they envision seems to be the following: (1) Anchundia and Schmukler are found to have caused their own injuries, (2) since Anchundia and Schmukler were employees of AET, their negligence is attributed to AET, (3) AET is held liable to Marlyn [*34] Anchundia and Schmukler, and (4) Plaintiffs are held vicariously liable to Marlyn Anchundia and Schmukler in place of AET. In effect, they argue that Utica should have anticipated that Plaintiffs would be held liable to Anchundia and Schmukler for Anchundia and Schmukler's own negligence. But Plaintiffs do not explain how that could come about. In particular, they do not explain why Utica would anticipate that Plaintiffs would be held liable for AET's acts. If there is an argument to be made here, Plaintiffs do not make it.

When Utica declined to provide Plaintiffs with a defense, it had no reason to believe that they might be held liable for AET's acts or omissions. Consequently, Utica had no duty to defend.

## 2. St. Paul

As noted *supra*, the St. Paul Policy did not extend coverage beyond the coverage of the Utica Policy. Thus, if Utica had no duty to defend, neither did St. Paul.

In addition, St. Paul argues that, as the excess carrier, it had no duty to defend until the $1 million coverage under the Utica Policy was exhausted. Memorandum of Law in Support of Summary Judgment ("St. Paul Supp. Memo.") [Doc. 46] at 25-26. The relevant language in the St. Paul Policy reads as follows: "Prior [*35] to the exhaustion of the Retained Limit we shall have the right, but not the duty, to participate in the investigation, settlement or defense of any Claim or Suit seeking damages that would be covered by this policy." St. Paul Policy, Insuring Agreements II(B). Exhaustion occurs when "the Retained Limit has been exhausted by payment of judgments or settlements that would be covered by this policy." *Id.*, II(A). Thus, any duty to defend that St. Paul might have would arise only after the $1 million limit in the Utica Policy was exhausted.

Plaintiffs might argue that this limitation is impermissible under Connecticut law. However, *HN10*[⬆] no Connecticut court has held that an excess carrier has a duty to defend regardless of policy language. One Superior Court decision found no such duty. "Underwriters, as an excess carrier, did not have a duty to defend." *Liberty Mut. Ins. Co. v. Lone Star Indus., Inc., No. X-02-CV-044001208, 2007 Conn. Super.*

*LEXIS 251, 2007 WL 447957, at *12 (Conn. Super. Ct. Jan. 25, 2007)*. Another Superior Court decision also found that the excess carrier did not have, in general, a duty to defend before exhaustion of the underlying policy limit. *Fortin v. Hartford Underwriters Ins. Co., No. X-04-CV-030103483, 2005 Conn. Super. LEXIS 1019, 2005 WL 1083800, at *10-11 (Conn. Super. Ct. Apr. 6, 2005)* **[*36]** . The court held that the excess carrier had the duty to defend the insured during a period when the primary insurer was not providing a defense, but that duty was based on a provision of the subject policy under which the excess carrier was obligated to provide a defense for occurrences not covered by the primary policy. The St. Paul Policy does not contain such a provision. In fact, it contains the opposite provision: "We have no duty to defend, investigate or settle any Claim or Suit seeking damages not covered by this policy." St. Paul Policy, Insuring Agreements II(C).

Courts have also held that, under the law of other states, an excess carrier does not have a duty to defend before the retained limit has been exhausted. *See* Allen D. Windt, *Insurance Claims & Disputes* § 4:11 (5th ed. 2012) (collecting cases). For example, under New York law, the primary insurer has a duty to defend "without any entitlement to contribution from an excess insurer," and while an excess carrier may protect its interests by participating in a defense, "there is no obligation to do so." *Gen. Motors Acceptance Corp. v. Nationwide Mut. Ins. Co., 4 N.Y.3d 451, 828 N.E.2d 959, 961, 796 N.Y.S.2d 2 (N.Y. 2005)*. *See also* *Liberty Surplus Ins. Corp. v. Segal Co., 420 F.3d 65, 69 (2d Cir. 2005)* (ruling that under New York law excess carrier did not have a duty to defend where the retained limit was not exhausted).

In the absence of contrary authority, the Court concludes that this limitation on the duty to defend is not impermissible under Connecticut law. Consequently, if St. Paul had a duty to defend, it came into existence only when the Retained Limit was exhausted.

Plaintiffs have not established that any defense costs were incurred after the exhaustion of the Retained Limit. Plaintiffs provide an affidavit from their deputy general counsel showing that their defense costs in the Underlying Actions were $1,512,471.28. MacKay Aff. ¶¶ 5-9. However, that affidavit does not assert that any of those costs were incurred after exhaustion of the Retained Limit. Nor do Plaintiffs assert that, after exhaustion, they asked St. Paul to provide a defense.

Plaintiffs have not presented to the Court any

explanation or argument about the date of exhaustion under the terms of the St. Paul Policy. Does exhaustion occur only when Utica pays $1 million to Plaintiffs (which of course it has not)? Does it occur when **[*38]** Plaintiffs have paid out the millionth dollar in defense costs? Or does it occur when Plaintiffs pay the first $1 million in settlement to the plaintiffs in the Underlying Actions? In the absence of such argument, even if the Court were to conclude that Plaintiffs' losses were covered, it could not conclude that the Retained Limit was ever exhausted and the excess carrier's duty to defend triggered.

Thus, both because of the absence of coverage under the St. Paul Policy, and because of St. Paul's status as an excess carrier, St. Paul did not breach a duty to defend.

## IV. CONCLUSION

For all the foregoing reasons, Defendants had neither a duty to indemnify Plaintiffs nor a duty to defend them. Plaintiffs cannot prevail on any of the eight counts in the Third Amended Complaint, each of which is based on the assertion that Defendants had such duties. Thus, Defendants have shown that there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law on all of Plaintiffs' claims.

Plaintiffs' Motion for Summary Judgment [Doc. 39] is DENIED, Utica's Motion for Summary Judgment [Doc. 45] is GRANTED, and St. Paul's Motion for Summary Judgment [Doc. 49] is GRANTED. **[*39]** The Clerk is directed to enter judgment for Defendants and close the case.

It is SO ORDERED.

Dated: New Haven, Connecticut

July 11, 2012

*Charles S. Haight, Jr.*

Charles S. Haight, Jr.

Senior United States District Judge

End of Document

⚠️ Caution
As of: July 27, 2018 3:24 PM Z

# *Anderson v. Liberty Lobby, Inc.*

Supreme Court of the United States

December 3, 1985, Argued ; June 25, 1986, Decided

No. 84-1602

**Reporter**
477 U.S. 242 *; 106 S. Ct. 2505 **; 91 L. Ed. 2d 202 ***; 1986 U.S. LEXIS 115 ****; 54 U.S.L.W. 4755; 4 Fed. R. Serv. 3d (Callaghan) 1041; 12 Media L. Rep. 2297

ANDERSON ET AL. v. LIBERTY LOBBY, INC., ET AL.

**Prior History: [****1]** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT.

**Disposition:** *241 U.S. App. D.C. 246, 746 F.2d 1563*, vacated and remanded.

## Core Terms

summary judgment, summary judgment motion, inferences, actual malice, conspiracy, cases, present evidence, genuine issue, directed verdict, trial court, trial judge, convincing, genuine, weight of the evidence, evidentiary standard, clear and convincing evidence, return a verdict, material fact, public figure, articles, parties, preponderance of evidence, factual dispute, district court, matter of law, asserting, one-sided, requires, libel, court of appeals

## Case Summary

### Procedural Posture
Petitioners, a publisher and a magazine, sought writ of certiorari to review the decision of the United States Court of Appeals for the District of Columbia Circuit, which held that the clear and convincing evidence standard did not apply to petitioners' motion for summary judgment in a libel suit filed by respondents, a nonprofit corporation and its founder.

### Overview
Respondents filed a libel suit against petitioners following the publication of two articles portraying respondents as racists. Vacating and remanding the partial grant of petitioners' motion for summary judgment, the Court found that the court of appeals erred in holding that, for the purposes of summary judgment in a libel case, the standard of evidence required to prove actual malice was irrelevant. Because the threshold inquiry on a motion for summary judgment revolved around whether any genuine factual issues existed which could have been resolved in favor of either party, the Court held that the determination of whether a given factual dispute required submission to a jury had to be guided by the same substantive evidentiary standards that applied to the case. Where the libel suit involved a limited-purpose public figure, the Court held that the factual dispute involved the issue of actual malice so that the appropriate summary judgment standard required a determination of whether the evidence in record could support a reasonable jury finding that respondent had shown actual malice by clear and convincing evidence.

### Outcome
The Court vacated the grant of partial summary judgment in petitioners' favor and remanded the case because the incorrect standard of review was applied. A clear and convincing standard of evidence was required to determine whether actual malice existed in respondents' libel suit.

## LexisNexis® Headnotes

Torts > ... > Defamation > Public Figures > Actual Malice

Constitutional Law > ... > Freedom of Speech > Defamation > General Overview

Constitutional Law > ... > Freedom of Speech > Defamation > Public Figures

Torts > Intentional Torts > Defamation > Libel

477 U.S. 242, *242; 106 S. Ct. 2505, **2505; 91 L. Ed. 2d 202, ***202; 1986 U.S. LEXIS 115, ****1

Torts > ... > Defamation > Public Figures > Clear & Convincing Evidence

Torts > ... > Defamation > Public Figures > Voluntary Public Figures

### *HN1*[⬇] Public Figures, Actual Malice

In a libel suit brought by a public official, the *First Amendment* requires the plaintiff to show that in publishing the defamatory statement the defendant acted with actual malice, with knowledge that it was false or with reckless disregard of whether it was false or not. Such actual malice must be shown with "convincing clarity." These requirements extend to libel suits brought by public figures as well.

Torts > Intentional Torts > Defamation > Libel

Torts > ... > Defamation > Public Figures > Limited Purpose Public Figure

Torts > ... > Defamation > Public Figures > Voluntary Public Figures

### *HN2*[⬇] Defamation, Libel

In a libel action, the public figure designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case, such persons assume special prominence in the resolution of public questions.

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Motions for Summary

Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

Civil Procedure > ... > Summary Judgment > Supporting Materials > Discovery Materials

### *HN3*[⬇] Summary Judgment, Opposing Materials

Fed. R. Civ. P 56(c) provides that summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

### *HN4*[⬇] Entitlement as Matter of Law, Materiality of Facts

Mark Bouchard

477 U.S. 242, *242; 106 S. Ct. 2505, **2505; 91 L. Ed. 2d 202, ***202; 1986 U.S. LEXIS 115, ****1

Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN5*[⬇] **Entitlement as Matter of Law, Genuine Disputes**

Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

*HN6*[⬇] **Summary Judgment, Opposing Materials**

*Fed. R. Civ. P. 56(e)* provides that a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN7*[⬇] **Summary Judgment, Burdens of Proof**

The issue of material fact required by *Fed. R. Civ. P. 56(c)* to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > ... > Summary Judgment > Evidentiary Considerations > Scintilla Rule

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

*HN8*[⬇] **Entitlement as Matter of Law, Appropriateness**

At the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.

477 U.S. 242, *242; 106 S. Ct. 2505, **2505; 91 L. Ed. 2d 202, ***202; 1986 U.S. LEXIS 115, ****1

Civil Procedure > Judicial Officers > Judges > General Overview

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN9*[⬇] **Judicial Officers, Judges**

*Fed. R. Civ. P. 56(e)* provides that, when a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial. *Fed. R. Civ. P. 56(c)* provides that the trial judge shall then grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. There is no requirement that the trial judge make findings of fact. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

Civil Procedure > Trials > Judgment as Matter of Law > Directed Verdicts

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Procedure > ... > Summary

Civil Procedure > Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

*HN10*[⬇] **Judgment as Matter of Law, Directed Verdicts**

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

*HN11*[⬇] **Summary Judgment, Entitlement as Matter of Law**

A determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case. This is true at both the directed verdict and summary judgment stages.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

477 U.S. 242, *242; 106 S. Ct. 2505, **2505; 91 L. Ed. 2d 202, ***202; 1986 U.S. LEXIS 115, ****1

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > General
Overview

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > Genuine
Disputes

Torts > Intentional Torts > Defamation > Libel

Torts > Intentional Torts > Defamation > Procedural
Matters

*HN12*[↧] **Entitlement as Matter of Law,
Appropriateness**

Where the "clear and convincing" evidence requirement
applies in libel case, the trial judge's summary judgment
inquiry as to whether a genuine issue exists will be
whether the evidence presented is such that a jury
applying that evidentiary standard could reasonably find
for either the plaintiff or the defendant. Thus, where the
factual dispute concerns actual malice, the appropriate
summary judgment question will be whether the
evidence in the record could support a reasonable jury
finding either that the plaintiff has shown actual malice
by clear and convincing evidence or that the plaintiff has
not.

# Lawyers' Edition Display

## Decision

Court, in ruling on motion for summary judgment in
public-figure libel action, held required to consider clear
and convincing evidence standard in determining
whether there is genuine issue of actual malice.

## Summary

Plaintiffs, a lobbying corporation and its founder, filed a
diversity libel action in the United States District Court
for the District of Columbia against the publishers of a
magazine which had allegedly libelled the plaintiffs by
printing three articles which portrayed them as neo-
Nazi, anti-Semitic, racist, and fascist. The author of two
of the articles, on which the third had been based,
stated in an affidavit that he had engaged in extensive
research and had derived his facts from several
sources. Relying on that affidavit, the publishers moved
for summary judgment, asserting that the plaintiffs were
required under the *First Amendment* to show that the

publishers had acted with "actual malice," that is, with
deliberate or reckless disregard for the truth, and that
such malice was absent in this case as a matter of law;
but the plaintiffs contended that several of the author's
sources were patently unreliable, and that this raised an
issue as to actual malice. The District Court granted
summary judgment in favor of the publishers, holding (1)
that the plaintiffs were limited-purpose public figures; (2)
that the actual malice rule was therefore applicable; and
(3) that the author's stated conduct precluded a finding
of such malice. The United States Court of Appeals for
the District of Columbia Circuit affirmed as to some of
the allegedly libellous statements and reversed and
remanded as to others, holding that, in such actions, the
constitutional requirements of "clear and convincing"
proof and independent judicial determination of the
ultimate issue of actual malice are not to be applied on a
motion for summary judgment, but only after the plaintiff
has had an opportunity to present his evidence (*746
F2d 1563*).

On certiorari, the United States Supreme Court vacated
the decision of the Court of Appeals and remanded for
further proceedings. In an opinion by White, J., joined by
Marshall, Blackmun, Powell, Stevens, and O'Connor,
JJ., it was held (1) that on a motion for summary
judgment under *Rule 56 of the Federal Rules of Civil
Procedure*, or on a motion for a directed verdict under
*Rule 50(a)* of those Rules, the determination whether a
given factual dispute requires submission to a jury must
be guided by the substantive evidentiary standards that
apply to the case; and, in particular, (2) that in ruling on
a motion for summary judgment, in a libel action to
which the actual malice rule applies, the appropriate
question for the trial judge is whether the evidence in
the record could support a reasonable jury finding either
that the plaintiff has shown actual malice by clear and
convincing evidence or that the plaintiff has not.

Brennan, J., dissented, expressing the view that if a
plaintiff presents evidence which, either directly or by
permissible inference, supports all of the elements he
needs to prove in order to prevail on his legal claim, that
plaintiff has made out a prima facie case, and a
defendant's motion for summary judgment must fail
regardless of the burden of proof that the plaintiff must
meet.

Rehnquist, J., joined by Burger, Ch. J., dissented,
expressing the view that trial courts should not be
required to apply the "clear and convincing evidence"
standard in deciding motions for summary judgment in
libel cases, and that the court's opinion was deficient in

477 U.S. 242, *242; 106 S. Ct. 2505, **2505; 91 L. Ed. 2d 202, ***202; 1986 U.S. LEXIS 115, ****1

that it failed to provide any guidance as to how such a requirement would be applied.

# Headnotes

CONSTITUTIONAL LAW §948 > EVIDENCE §176 > SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §5 > libel action -- malice -- application of evidentiary standard -- > Headnote:
*LEdHN[1A]*[⬇] [1A]*LEdHN[1B]*[⬇] [1B]*LEdHN[1C]*[⬇] [1C]*LEdHN[1D]*[⬇] [1D]

In a libel action brought by a "public figure," who is required under the *First Amendment* to prove by clear and convincing evidence that the defendant acted with "actual malice," that is, with knowing or reckless disregard of the truth, a trial judge ruling on a motion for summary judgment under *Rule 56 of the Federal Rules of Civil Procedure* must be guided by the "clear and convincing evidence" standard in determining whether a genuine issue of actual malice exists; thus, the appropriate summary judgment question for the judge will be whether the evidence in the record would allow a reasonable finder of fact to determine either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not. (Brennan and Rehnquist, JJ., and Burger, Ch. J., dissented from this holding.)

CONSTITUTIONAL LAW §948 > free speech and press -- defamation -- public figure -- > Headnote:
*LEdHN[2A]*[⬇] [2A]*LEdHN[2B]*[⬇] [2B]

The designation of a "public figure," who, as the plaintiff in a libel action, will be required under the *First Amendment* to prove that the defendant acted with "actual malice," may rest on either of two alternative bases: in some instances, individuals may achieve such pervasive fame or notoriety that they become public figures for all purposes and in all contexts; more commonly, individuals voluntarily inject themselves or are drawn into a particular public controversy and thereby become public figures for a limited range of issues; in either case, such persons assume special prominence in the resolution of public questions.

SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §5 > genuine issue of material fact -- > Headnote:
*LEdHN[3]*[⬇] [3]

Under *Rule 56(c) of the Federal Rules of Civil Procedure*, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no "genuine" issue of "material" fact.

SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §5 > materiality -- > Headnote:
*LEdHN[4]*[⬇] [4]

Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment under *Rule 56(c) of the Federal Rules of Civil Procedure*; it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs the materiality determination, and any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §5 > genuine issues -- > Headnote:
*LEdHN[5A]*[⬇] [5A]*LEdHN[5B]*[⬇] [5B]*LEdHN[5C]*[⬇] [5C]

Summary judgment will not lie under *Rule 56(c) of the Federal Rules of Civil Procedure* if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party; if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted; the inquiry performed is the threshold inquiry of determining whether there is the need for a trial-- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of

477 U.S. 242, *242; 106 S. Ct. 2505, **2505; 91 L. Ed. 2d 202, ***202; 1986 U.S. LEXIS 115, ****1

fact because they may reasonably be resolved in favor of either party.

SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §5 > determination -- judge's function -- > Headnote:
*LEdHN[6][* *]* [6]

Under *Rule 56(c) of the Federal Rules of Civil Procedure*, the judge's function at the summary judgment stage is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.

SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §5 > findings of fact -- > Headnote:
*LEdHN[7][* *]* [7]

There is no requirement that the trial judge make findings of fact in ruling on a motion for summary judgment under *Rule 56(c) of the Federal Rules of Civil Procedure*.

TRIAL §194 > directed verdict -- reasonable disagreement -- > Headnote:
*LEdHN[8][* *]* [8]

Under *Rule 50(a) of the Federal Rules of Civil Procedure*, a trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict; if reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.

SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §5 > TRIAL §194 > similarity of summary judgment and directed verdict -- > Headnote:
*LEdHN[9][* *]* [9]

The inquiries on a motion for summary judgment and on a motion for a directed verdict are essentially the same:

whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §5 > TRIAL §194 > application of evidentiary standards -- > Headnote:
*LEdHN[10A][* *]* [10A]*LEdHN[10B][* *]* [10B]

The inquiry involved in a ruling on a motion for summary judgment, or on a motion for a directed verdict, as to whether a given factual dispute requires submission to a jury, must be guided by the substantive evidentiary standards that apply to the case. (Brennan, J., dissented from this holding.)

EVIDENCE §176 > TRIAL §194 > libel action -- malice -- application of evidentiary standard -- > Headnote:
*LEdHN[11][* *]* [11]

Where the *First Amendment* mandates a "clear and convincing" evidence standard, the trial judge, in disposing of a motion for a directed verdict, should consider whether a reasonable factfinder could conclude, for example, that the plaintiff has shown actual malice with convincing clarity.

SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §5 > TRIAL §46 > summary judgment and directed verdict -- jury determinations -- > Headnote:
*LEdHN[12][* *]* [12]

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether the judge is ruling on a motion for summary judgment or on a motion for a directed verdict.

SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §5 > inferences -- > Headnote:

477 U.S. 242, *242; 106 S. Ct. 2505, **2505; 91 L. Ed. 2d 202, ***202; 1986 U.S. LEXIS 115, ****1

LEdHN[13][↓] [13]

On a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor.

SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §5 > judicial caution -- > Headnote:
LEdHN[14][↓] [14]

Trial courts should act with caution in granting summary judgment, and may deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.

EVIDENCE §88 > SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §5 > burdens of proof -- > Headnote:
LEdHN[15][↓] [15]

A defendant moving for summary judgment has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn affirmative evidence that would support a jury verdict in his favor.

EVIDENCE §872 > discredited testimony -- opposite conclusion -- > Headnote:
LEdHN[16][↓] [16]

Discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion.

APPEAL §1692.3 > remand -- improper standard for summary judgment -- > Headnote:
LEdHN[17][↓] [17]

Where a Federal Court of Appeals does not apply the correct standard in reviewing a Federal District Court's grant of summary judgment in a libel action, the decision of the Court of Appeals, affirming summary judgment as to some of the allegedly defamatory statements and reversing as to others, will be vacated, and the case will be remanded for further proceedings.

## Syllabus

In *New York Times Co. v. Sullivan, 376 U.S. 254*, it was held that, in a libel suit brought by a public official (extended by later cases to public figures), the *First Amendment* requires the plaintiff to show that in publishing the alleged defamatory statement the defendant acted with actual malice. It was further held that such actual malice must be shown with "convincing clarity." Respondents, a nonprofit corporation described as a "citizen's lobby" and its founder, filed a libel action in Federal District Court against petitioners, alleging that certain statements in a magazine published by petitioners were false and derogatory. Following discovery, petitioners moved for summary judgment pursuant to *Federal Rule of Civil Procedure 56*, asserting that because respondents were public figures they were required to prove their case under the *New York Times* standards and that summary judgment was proper because actual malice was absent as a matter of law in view of an affidavit **[****2]** by the author of the articles in question that they had been thoroughly researched and that the facts were obtained from numerous sources. Opposing the motion, respondents claimed that an issue of actual malice was presented because the author had relied on patently unreliable sources in preparing the articles. After holding that *New York Times* applied because respondents were limited-purpose public figures, the District Court entered summary judgment for petitioners on the ground that the author's investigation and research and his reliance on numerous sources precluded a finding of actual malice. Reversing as to certain of the allegedly defamatory statements, the Court of Appeals held that the requirement that actual malice be proved by clear and convincing evidence need not be considered at the summary judgment stage, and that with respect to those statements summary judgment had been improperly granted because a jury could reasonably have concluded that the allegations were defamatory, false, and made with actual malice.

*Held*: The Court of Appeals did not apply the correct standard in reviewing the District Court's grant of summary judgment. Pp. 247-257.

(a) Summary **[****3]** judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence

477 U.S. 242, *242; 106 S. Ct. 2505, **2505; 91 L. Ed. 2d 202, ***202; 1986 U.S. LEXIS 115, ****3

is such that a reasonable jury could return a verdict for the nonmoving party. At the summary judgment stage, the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. There is no such issue unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Pp. 247-252.

(b) A trial court ruling on a motion for summary judgment in a case such as this must be guided by the *New York Times* "clear and convincing" evidentiary standard in determining whether a genuine issue of actual malice exists, that is, whether the evidence is such that a reasonable jury might find that actual malice had been shown with convincing clarity. Pp. 252-256.

(c) A plaintiff may not defeat a defendant's properly supported motion for summary judgment in a libel case **[****4]** such as this one without offering any concrete evidence from which a reasonable jury could return a verdict in his favor and by merely asserting that the jury might disbelieve the defendant's denial of actual malice. The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict. Pp. 256-257.

**Counsel:** David J. Branson argued the cause for petitioners. With him on the briefs was David O. Bickart.

Mark Lane argued the cause for respondents. With him on the brief were Linda Huber and Fleming Lee. *

**[****5]**

**Judges:** WHITE, J., delivered the opinion of the Court,

---

* Briefs of amici curiae urging reversal were filed for the American Newspaper Publishers Association et al. by Robert D. Sack, Robert S. Warren, W. Terry Maguire, Richard M. Schmidt, Jr., R. Bruce Rich, Lawrence Gunnels, Harvey L. Lipton, Peter C. Gould, and Jane E. Kirtley; and for the Reader's Digest Association, Inc., by Walter R. Allan and Karen J. Wegner.

Briefs of amici curiae urging affirmance were filed for the American Legal Foundation by Daniel J. Popeo; and for the Synanon Church et al. by Jonathan W. Lubell, Philip C. Bourdette, David R. Benjamin, and Andrew J. Weill.

in which MARSHALL, BLACKMUN, POWELL, STEVENS, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, post, p. 257. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., joined, post, p. 268.

**Opinion by:** WHITE

# Opinion

**[*244]  [***209]  [**2508]** JUSTICE WHITE delivered the opinion of the Court.

In *New York Times Co.* v. *Sullivan, 376 U.S. 254, 279-280 (1964)*, we held that, *HN1*[↑] in a libel suit brought by a public official, the *First Amendment* requires the plaintiff to show that in publishing the defamatory statement the defendant acted with actual malice -- "with knowledge that it was false or with reckless disregard of whether it was false or not." We held further that such actual malice must be shown with "convincing clarity." *Id., at 285-286.* See also *Gertz v. Robert Welch, Inc., 418 U.S. 323, 342 (1974).* These *New York Times* requirements we have since extended to libel suits brought by public figures as well. See, *e. g., Curtis Publishing Co.* v. *Butts, 388 U.S. 130 (1967).*

*LEdHN[1A]*[↑] [1A]This case presents the question whether the clear-and-convincing-evidence **[****6]** requirement must be considered by a court ruling on a motion for summary judgment under *Rule 56 of the Federal Rules of Civil Procedure* in a case to which *New York Times* applies. The United States Court of Appeals for the District of Columbia Circuit held that that requirement need not be considered at the summary judgment stage. *241 U. S. App. D. C. 246, 746 F. 2d 1563 (1984).* We granted certiorari, *471 U.S. 1134 (1985)*, because that holding was in conflict with decisions of several other Courts of Appeals, which had held that the *New York Times* requirement of clear and convincing evidence must be considered on a motion for summary judgment.[1] We now reverse.

**[****7]** I

---

[1] See, *e. g., Rebozo v. Washington Post Co., 637 F.2d 375, 381* (CA5), cert. denied, *454 U.S. 964 (1981)*; *Yiamouyiannis v. Consumers Union of United States, Inc., 619 F.2d 932, 940* (CA2), cert. denied, *449 U.S. 839 (1980)*; *Carson v. Allied News Co., 529 F.2d 206, 210 (CA7 1976).*

Respondent Liberty Lobby, Inc., is a not-for-profit corporation and self-described "citizens' lobby." Respondent Willis Carto is its founder and treasurer. In October 1981, **[*245]** The Investigator magazine published two articles: "The Private World of Willis Carto" and "Yockey: Profile of an American Hitler." These articles were introduced by a third, shorter article entitled "America's Neo-Nazi Underground: Did *Mein Kampf* Spawn Yockey's *Imperium*, a Book Revived by Carto's Liberty Lobby?" These articles portrayed respondents as neo-Nazi, anti-Semitic, racist, and Fascist.

Respondents filed this diversity libel action in the United States District Court for the District of Columbia, alleging that some 28 statements and 2 illustrations in the 3 articles were false and derogatory. Named as defendants in the action were petitioner Jack Anderson, the publisher of The Investigator, petitioner Bill Adkins, president and chief executive officer of the Investigator Publishing Co., and petitioner Investigator Publishing Co. itself.

Following discovery, petitioners **[***210]** moved for summary judgment pursuant to *Rule 56*. In their motion, petitioners asserted that because respondents **[****8]** are public figures they were required to prove their case under the standards set forth in *New York Times*. Petitioners also asserted that summary judgment was proper because actual malice was absent as a matter of law. In support of this latter assertion, petitioners submitted the affidavit of Charles Bermant, an employee of petitioners and the author of the two longer articles.[2] In this affidavit, Bermant stated that he had spent a substantial amount of time researching **[**2509]** and writing the articles and that his facts were obtained from a wide variety of sources. He also stated that he had at all times believed and still believed that the facts contained in the articles were truthful and accurate. Attached to this affidavit was an appendix in which Bermant detailed the sources for each of the statements alleged by respondents to be libelous.

**[*246]** Respondents opposed **[****9]** the motion for summary judgment, asserting that there were numerous inaccuracies in the articles and claiming that an issue of actual malice was presented by virtue of the fact that in preparing the articles Bermant had relied on several sources that respondents asserted were patently unreliable. Generally, respondents charged that petitioners had failed adequately to verify their information before publishing. Respondents also presented evidence that William McGaw, an editor of The Investigator, had told petitioner Adkins before publication that the articles were "terrible" and "ridiculous."

**LEdHN[2A]** ] [2A]In ruling on the motion for summary judgment, the District Court first held that respondents were limited-purpose public figures and that *New York Times* therefore applied.[3] The District Court then held that Bermant's thorough investigation and research and his reliance on numerous sources precluded a finding of actual malice. Thus, the District Court granted the motion and entered judgment in favor of petitioners.

**LEdHN[2B]** ] [2B]

**[****10]** On appeal, the Court of Appeals affirmed as to 21 and reversed as to 9 of the allegedly defamatory statements. Although it noted that respondents did not challenge the District Court's ruling that they were limited-purpose public **[*247]** figures and that they were thus required to prove their case under *New York* **[***211]** *Times*, the Court of Appeals nevertheless held that for the purposes of summary judgment the requirement that actual malice be proved by clear and convincing evidence, rather than by a preponderance of the evidence, was irrelevant: To defeat summary judgment respondents did not have to show that a jury could find actual malice with "convincing clarity." The court based this conclusion on a perception that to

_____

[3] In *Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974)*, this Court summarized who will be considered to be a public figure to whom the *New York Times* standards will apply:

**HN2** ] "[The public figure] designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions."

The District Court found that respondents, as political lobbyists, are the second type of political figure described by the *Gertz* court -- a limited-purpose public figure. See *Waldbaum v. Fairchild Publications, Inc., 201 U. S. App. D. C. 301, 306, 627 F.2d 1287, 1292*, cert. denied, **449 U.S. 898 (1980)**.

_____

[2] The short, introductory article was written by petitioner Anderson and relied exclusively on the information obtained by Bermant.

impose the greater evidentiary burden at summary judgment "would change the threshold summary judgment inquiry from a search for a minimum of facts supporting the plaintiff's case to an evaluation of the weight of those facts and (it would seem) of the weight of at least the defendant's uncontroverted facts as well." *241 U. S. App. D. C., at 253, 746 F.2d, at 1570*. The court then held, with respect to nine of the statements, **[****11]** that summary judgment had been improperly granted because "a jury could reasonably conclude that the . . . allegations were defamatory, false, and made with actual malice." *Id., at 260, 746 F.2d, at 1577*.

II

A

*LEdHN[3]*[⬆️] [3]Our inquiry is whether the Court of Appeals erred in holding that the heightened evidentiary requirements that apply to proof of actual malice in this *New York Times* case need not be considered for the purposes of a motion for summary judgment. *HN3*[⬆️] *Rule 56(c) of the Federal Rules of Civil Procedure* provides that summary judgment "shall be rendered forthwith if **[**2510]** the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported **[*248]** motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*LEdHN[4]*[⬆️] [4]As to materiality, the substantive law will identify **[****12]** which facts are material. *HN4*[⬆️] Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for

categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

*LEdHN[5A]*[⬆️] ] [5A]More important for present purposes, *HN5*[⬆️] ] summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the **[***212]** evidence is such that a reasonable **[****13]** jury could return a verdict for the nonmoving party. In *First National Bank of Arizona v. Cities Service Co., 391 U.S. 253 (1968)*, we affirmed a grant of summary judgment for an antitrust defendant where the issue was whether there was a genuine factual dispute as to the existence of a conspiracy. We noted *Rule 56(e)*'s *HN6*[⬆️] ] provision that a party opposing a properly supported motion for summary judgment "'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" We observed further that

"[it] is true that *HN7*[⬆️] the issue of material fact required by *Rule 56(c)* to be present to entitle a party to proceed to **[*249]** trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *391 U.S., at 288-289*.

We went on to hold that, in the face of the defendant's properly supported motion for summary judgment, the plaintiff could **[****14]** not rest on his allegations of a conspiracy to get to a jury without "any significant probative evidence tending to support the complaint." *Id., at 290*.

Again, in *Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)*, the Court emphasized that the availability of summary judgment turned on whether a proper jury question was presented. There, one of the issues was whether there was a conspiracy between private persons and law enforcement officers. The District Court granted summary judgment for the defendants, stating that there was no evidence from which reasonably minded jurors might draw an inference of conspiracy. We reversed, pointing out that the moving parties' submissions had not foreclosed the possibility of the existence of certain facts from which "it would be open to a jury . . . to infer from the circumstances" that there had been a meeting of the minds. *Id., at 158-159*.

*LEdHN[5B]*[↑] [5B]*LEdHN[6]*[↑] [6]Our prior decisions may not have uniformly recited the same language in describing genuine factual issues under *Rule [**2511] 56*, but it is clear enough from our recent cases that *HN8*[↑] at the summary judgment stage the judge's function is not [****15] himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. As *Adickes, supra,* and *Cities Service, supra,* indicate, there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Cities Service, supra, at 288-289.* If the evidence is merely colorable, *Dombrowski v. Eastland, 387 U.S. 82 (1967)* (*per curiam*), or is not significantly probative, [*250] *Cities Service, supra, at 290,* summary judgment may be granted.

*LEdHN[5C]*[↑] [5C]*LEdHN[7]*[↑] [7]That this is the proper focus of the inquiry is strongly suggested by the Rule itself. *Rule 56(e) HN9*[↑] provides that, when a properly supported motion for summary judgment [***213] is made,[4] the adverse party "must set forth specific facts showing that there is a genuine issue for trial."[5] And, as we noted above, *Rule 56(c)* provides that the trial judge shall then grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. There is no [****16] requirement that the trial judge make findings of fact.[6] The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

---

[4] Our analysis here does not address the question of the initial burden of production of evidence placed by *Rule 56* on the party moving for summary judgment. See *Celotex Corp.* v. *Catrett, post,* p. 317. Respondents have not raised this issue here, and for the purposes of our discussion we assume that the moving party has met initially the requisite evidentiary burden.

[5] This requirement in turn is qualified by *Rule 56(f)*'s provision that summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition. In our analysis here, we assume that both parties have had ample opportunity for discovery.

[6] In many cases, however, findings are extremely helpful to a reviewing court.

[****17] *LEdHN[8]*[↑] [8]Petitioners suggest, and we agree, that this standard mirrors the standard for a directed verdict under *Federal Rule of Civil Procedure 50(a)*, which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Brady v. Southern R. Co., 320 U.S. 476, 479-480 (1943)*. If reasonable minds could differ as to the import of the evidence, however, [*251] a verdict should not be directed. *Wilkerson v. McCarthy, 336 U.S. 53, 62 (1949)*. As the Court long ago said in *Improvement Co.* v. *Munson, 14 Wall. 442, 448 (1872)*, and has several times repeated:

"Nor are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a *scintilla* of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable [****18] rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." (Footnotes omitted.)

See also *Pleasants v. Fant, 22 Wall. 116, 120-121 (1875)*; *Coughran v. Bigelow, 164 U.S. 301, 307 (1896)*; *Pennsylvania R. Co.* v. *Chamberlain, 288 U.S. 333, 343 (1933)*.

[**2512] *LEdHN[9]*[↑] [9]The Court has said that summary judgment should be granted where the evidence is such that it [***214] "would require a directed verdict for the moving party." *Sartor v. Arkansas Gas Corp., 321 U.S. 620, 624 (1944)*. And we have noted that the "genuine issue" summary judgment standard is "very close" to the "reasonable jury" directed verdict standard: "The primary difference between the

two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence [****19] that has been admitted." *Bill Johnson's Restaurants, Inc.* v. *NLRB, 461 U.S. 731, 745, n. 11 (1983)*. In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission **[*252]** to a jury or whether it is so one-sided that one party must prevail as a matter of law.

B

*LEdHN[10A][↑]* [10A]Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, **[****20]** therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Munson, supra, at 448*.

*LEdHN[11][↑]* [11]In terms of the nature of the inquiry, this is no different from the consideration of a motion for acquittal in a criminal case, where the beyond-a-reasonable-doubt standard applies and where the trial judge asks whether a reasonable jury could find guilt beyond a reasonable doubt. See *Jackson v. Virginia, 443 U.S. 307, 318-319 (1979)*. Similarly, where the *First Amendment* mandates a "clear and convincing" standard, the trial judge in disposing of a directed verdict motion should consider whether a reasonable factfinder could conclude, for example, that the plaintiff had shown actual malice with convincing clarity.

**[*253]** The case for the proposition that a higher burden of proof should have a corresponding effect on

the judge when deciding whether to send the case to the jury was well made by the Court of Appeals **[****21]** for the Second Circuit in *United States v. Taylor, 464 F.2d 240 (1972)*, which overruled *United States v. Feinberg, 140 F.2d 592 (1944)*, a case holding that the standard of evidence necessary for a judge to send a case to the jury is the same in both civil and criminal cases even though the standard that the jury must apply in a criminal case is more demanding than in civil **[***215]** proceedings. Speaking through Judge Friendly, the Second Circuit said: "It would seem at first blush -- and we think also at second -- that more 'facts in evidence' are needed for the judge to allow [reasonable jurors to pass on a claim] when the proponent is required to establish [the claim] not merely by a preponderance of the evidence but . . . beyond a reasonable doubt." *464 F.2d, at 242*. The court could not find a "satisfying explanation in the *Feinberg* opinion why the judge should not place this higher burden on the prosecution in criminal proceedings before sending the case to the jury." *Ibid.* The *Taylor* court **[**2513]** also pointed out that almost all the Circuits had adopted something like Judge Prettyman's formulation **[****22]** in *Curley v. United States, 160 F.2d 229, 232-233 (1947)*:

"The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion must be granted. If he concludes that either of the **[*254]** two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter."

This view is equally applicable to a civil case to which the "clear and convincing" standard applies. Indeed, the *Taylor* court thought that it was implicit in this Court's adoption of the clear-and-convincing-evidence standard for certain kinds of cases that there was a "concomitant duty on the judge to consider **[****23]** the applicable burden when deciding whether to send a case to the jury." *464 F.2d, at 243*. Although the court thought that this higher standard would not produce different results in many cases, it could not say that it would never do so.

477 U.S. 242, *254; 106 S. Ct. 2505, **2513; 91 L. Ed. 2d 202, ***215; 1986 U.S. LEXIS 115, ****23

*LEdHN[1B]*[⬆] ] [1B]Just as the "convincing clarity" requirement is relevant in ruling on a motion for directed verdict, it is relevant in ruling on a motion for summary judgment. When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times.*  For example, there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.

Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.  This conclusion is mandated by the nature of this determination.  The question here is whether a jury could reasonably find *either* that the plaintiff proved his **[****24]** case by the quality and quantity of evidence required by the governing law *or* that he did not. Whether a jury could reasonably find for either party, however, cannot be defined **[***216]** except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some **[*255]** benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

*LEdHN[12]*[⬆] ] [12] *LEdHN[13]*[⬆] ] [13] *LEdHN[14]*[⬆] ] [14]Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury.  It by no means authorizes trial on affidavits. *HN10*[⬆] Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Adickes, 398 U.S., at 158-159.*  **[****25]** Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. *Kennedy v. Silas Mason Co., 334 U.S. 249  [**2514] (1948).*

*LEdHN[1C]*[⬆] ] [1C]*LEdHN[10B]*[⬆] ] [10B]In sum, we conclude that *HN11*[⬆] ] the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case.  This is true at both the directed verdict and summary judgment stages.  Consequently, *HN12*[⬆] where the *New York Times* "clear and convincing" evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant.  Thus, where the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding **[*256]** either **[****26]** that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.[7]

III

*LEdHN[15]*[⬆] ] [15]*LEdHN[16]*[⬆] ] [16]Respondents argue, however, that whatever may be true of the applicability of the "clear and convincing" standard at the summary judgment or directed verdict stage, the defendant should seldom if ever be granted summary judgment where his state of mind is at issue and the jury might disbelieve him or his witnesses as to his state of mind.  They rely on *Poller v. Columbia Broadcasting Co., 368 U.S. 464 (1962),* for this proposition.  **[****27]** We do not understand **[***217]** *Poller,* however, to hold that a plaintiff may defeat a defendant's properly supported motion for summary judgment in a conspiracy or libel case, for example, without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and by merely asserting that the jury might, and legally could, disbelieve the defendant's denial of a conspiracy or of legal malice.  The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would

---

[7] Our statement in *Hutchinson v. Proxmire, 443 U.S. 111, 120, n. 9 (1979),* that proof of actual malice "does not lend itself to summary disposition" was simply an acknowledgment of our general reluctance "to grant special procedural protections to defendants in libel and defamation actions in addition to the constitutional protections embodied in the substantive laws." *Calder v. Jones, 465 U.S. 783, 790-791 (1984).*

support a jury verdict. _Rule 56(e)_ itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. Based on that Rule, _Cities Service, 391 U.S., at 290_, held that the plaintiff could not defeat the properly supported summary judgment motion of a defendant charged with a conspiracy without offering "any significant probative evidence tending to support the complaint." As we have recently said, **[****28]** "discredited testimony **[*257]** is not [normally] considered a sufficient basis for drawing a contrary conclusion." _Bose Corp._ v. _Consumers Union of United States, Inc., 466 U.S. 485, 512 (1984)_. Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery. We repeat, however, that the plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial.

IV

_LEdHN[1D]_[⬆] [1D] _LEdHN[17]_[⬆] [17]In sum, a court ruling on a motion for summary judgment must be guided by the _New York Times_ "clear and convincing" **[**2515]** evidentiary standard in determining whether a genuine issue of actual malice exists -- that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity. Because the Court of Appeals did not apply the correct standard in reviewing the District **[****29]** Court's grant of summary judgment, we vacate its decision and remand the case for further proceedings consistent with this opinion.

_It is so ordered_.

**Dissent by:** BRENNAN; REHNQUIST

# Dissent

JUSTICE BRENNAN, dissenting.

The Court today holds that "whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case," _ante_, at 255.[1] In my view, the Court's analysis **[***218]** is deeply flawed, **[*258]** and rests on a shaky foundation of unconnected and unsupported observations, assertions, and conclusions. Moreover, I am unable to divine from the Court's opinion _how_ these evidentiary standards are to be considered, or what a trial judge is actually supposed to do in ruling on a motion for summary judgment. Accordingly, I respectfully dissent.

**[****30]** To support its holding that in ruling on a motion for summary judgment a trial court must consider substantive evidentiary burdens, the Court appropriately begins with the language of _Rule 56(c)_, which states that summary judgment shall be granted if it appears that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court then purports to restate this Rule, and asserts that "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." _Ante_, at 248. No direct authority is cited for the proposition that in order to determine whether a dispute is "genuine" for _Rule 56_

---

[1] The Court's holding today is not, of course, confined in its application to **First Amendment** cases. Although this case arises in the context of litigation involving libel and the press, the Court's holding is that "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." _Ante_, at 254. Accordingly, I simply do not understand why JUSTICE REHNQUIST, dissenting, feels it appropriate to cite _Calder v. Jones, 465 U.S. 783 (1984)_, and to remind the Court that we have consistently refused to extend special procedural protections to defendants in libel and defamation suits. The Court today does nothing of the kind. It changes summary judgment procedure for _all_ litigants, regardless of the substantive nature of the underlying litigation.

Moreover, the Court's holding is not limited to those cases in which the evidentiary standard is "heightened," _i. e._, those in which a plaintiff must prove his case by more than a mere preponderance of the evidence. Presumably, if a district court ruling on a motion for summary judgment in a libel case is to consider the "quantum and quality" of proof necessary to support liability under _New York Times, ante, at 254_, and then ask whether the evidence presented is of "sufficient caliber or quantity" to support that quantum and quality, the court must ask the same questions in a garden-variety action where the plaintiff need prevail only by a mere preponderance of the evidence. In other words, today's decision by its terms applies to all summary judgment motions, irrespective of the burden of proof required and the subject matter of the suit.

purposes a judge must ask if a "reasonable" jury could find for the nonmoving party. Instead, the Court quotes from *First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-289 [*259] (1968)*, to the effect that a summary judgment motion will be defeated if "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' [****31] differing versions of the truth at trial," *ante*, at 249, and that a plaintiff may not, in defending against a motion for summary judgment, rest on mere allegations or denials of his pleadings. After citing *Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)*, for the unstartling proposition that "the availability of summary judgment [turns] on whether a proper jury question [is] presented," *ante*, at 249, the Court then reasserts, again with no direct authority, that in determining whether [**2516] a jury question is presented, the inquiry is whether there are factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Ante*, at 250. The Court maintains that this summary judgment inquiry [***219] "mirrors" that which applies in the context of a motion for directed verdict under *Federal Rule of Civil Procedure 50(a)*: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Ante*, at 251-252.

Having thus decided that a "genuine" dispute is one which is not "one-sided," [****32] and one which could "reasonably" be resolved by a "fair-minded" jury in favor of either party, *ibid.*, the Court then concludes:

"Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards." *Ante*, at 254-255.

[*260] As far as I can discern, this conclusion, which is at the heart of the case, has been reached without the benefit of any support in the case law. Although, as noted above, the Court cites *Adickes* and *Cities Service*, those cases simply do not stand for the proposition that in ruling on a summary judgment motion, the trial court is to inquire into the "one-sidedness" of the evidence presented by the parties. *Cities Service* involved the

propriety of a grant of summary judgment in favor of a defendant alleged [****33] to have conspired to violate the antitrust laws. The issue in the case was whether, on the basis of the facts in the record, a jury could *infer* that the defendant had entered into a conspiracy to boycott. No direct evidence of the conspiracy was produced. In agreeing with the lower courts that the *circumstantial* evidence presented by the plaintiff was insufficient to take the case to the jury, we observed that there was "one fact" that petitioner had produced to support the existence of the illegal agreement, and that that single fact could not support petitioner's *theory* of liability. Critically, we observed that "[the] case at hand presents peculiar difficulties because the issue of fact crucial to petitioner's case is also an issue of law, namely the existence of a conspiracy." *391 U.S., at 289*. In other words, *Cities Service* is at heart about whether certain facts can support inferences that are, as a matter of antitrust law, sufficient to support a particular theory of liability under the Sherman Act. Just this Term, in discussing summary judgment in the context of suits brought under the antitrust laws, we characterized both *Cities Service* [****34] and *Monsanto Co.* v. *Spray-Rite Service Corp., 465 U.S. 752 (1984)*, as cases in which "*antitrust law* [limited] the range of permissible inferences from ambiguous evidence. . . ." *Matsushita Electric Industrial Co.* v. *Zenith Radio Corp., 475 U.S. 574, 588 (1986)* (emphasis added). *Cities Service* thus provides no authority for the conclusion that *Rule 56* requires a trial court to consider whether direct evidence produced by the parties is "one-sided." To the contrary, in *Matsushita*, the most [***220] recent [*261] case to cite and discuss *Cities Service*, we stated that the requirement that a dispute be "genuine" means simply that there must be more than "some metaphysical doubt as to the material facts." *475 U.S., at 586*.[2]

_____

[2] Writing in dissent in *Matsushita*, JUSTICE WHITE stated that he agreed with the summary judgment test employed by the Court, namely, that "'[where] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *475 U.S., at 599*. Whether the shift, announced today, from looking to a "reasonable" rather than a "rational" jury is intended to be of any significance, there are other aspects of the *Matsushita* dissent which I find difficult to square with the Court's holding in the present case. The *Matsushita* dissenters argued:

". . . [The] Court summarizes *Monsanto Co.* v. *Spray-Rite Service Corp., supra*, as holding that 'courts should not permit factfinders to infer conspiracies when such inferences are implausible. . . .' *Ante*, at 593. Such language suggests that a judge hearing a defendant's motion for summary judgment in

[****35] [**2517] Nor does *Adickes*, also relied on by the Court, suggest in any way that the appropriate summary judgment inquiry is whether the evidence overwhelmingly supports one party. *Adickes*, like *Cities Service*, presented the question of whether a grant of summary judgment in favor of a defendant on a conspiracy count was appropriate. The plaintiff, a [*262] white schoolteacher, maintained that employees of defendant Kress conspired with the police to deny her rights protected by the *Fourteenth Amendment* by refusing to serve her in one of its lunchrooms simply because she was white and accompanied by a number of black schoolchildren. She maintained, among other things, that Kress arranged with the police to have her arrested for vagrancy when she left the defendant's premises. In support of its motion for summary judgment, Kress submitted statements from a deposition of one of its employees asserting that he had not communicated or agreed with the police to deny plaintiff service or to have her arrested, and explaining that the store had taken the challenged action not because of the race of the plaintiff, but because it was fearful of the reaction of some of its [****36] customers if it served a racially mixed group. Kress also submitted affidavits from the Chief of Police and the arresting officers denying that the store manager had requested that petitioner be arrested, and noted that in the plaintiff's own deposition, she conceded that she had no knowledge of any communication between the police and any Kress employee and was relying on circumstantial evidence to support her allegations. In opposing defendant's motion for [***221] summary

_____

an antitrust case should go beyond the traditional summary judgment inquiry and decide for himself whether the weight of the evidence favors the plaintiff. *Cities Service* and *Monsanto* do not stand for any such proposition. Each of those cases simply held that a particular piece of evidence standing alone was insufficiently probative to justify sending a case to the jury. These holdings in no way undermine the doctrine that all evidence must be construed in the light most favorable to the party opposing summary judgment.

"If the Court intends to give every judge hearing a motion for summary judgment in an antitrust case the job of determining if the evidence makes the inference of conspiracy more probable than not, it is overturning settled law. If the Court does not intend such a pronouncement, it should refrain from using unnecessarily broad and confusing language." *Id., at 600-601* (footnote omitted).

In my view, these words are as applicable and relevant to the Court's opinion today as they were to the opinion of the Court in *Matsushita*.

judgment, plaintiff stated that defendant in its moving papers failed to dispute an allegation in the complaint, a statement at her deposition, and an unsworn statement by a Kress employee all to the effect that there was a policeman in the store at the time of the refusal to serve, and that it was this policeman who subsequently made the arrest. Plaintiff argued that this sequence of events "created a substantial enough possibility of a conspiracy to allow her to proceed to trial. . . ." *398 U.S., at 157*.

We agreed, and therefore reversed the lower courts, reasoning that Kress "did not carry its burden because of its failure to foreclose the possibility that there was a policeman in the Kress [****37] store while petitioner was awaiting service, and that this policeman reached an understanding with some [*263] Kress employee that petitioner not be served." *Ibid.* Despite the fact that *none of the materials relied on by plaintiff* met the requirements of *Rule 56(e)*, we stated nonetheless that Kress failed to meet its initial burden of showing that there was no genuine dispute of a material fact. Specifically, we held that because Kress failed to negate plaintiff's materials suggesting that a [**2518] policeman was in fact in the store at the time of the refusal to serve, "it would be open to a jury . . . to infer from the circumstances that the policeman and a Kress employee had a 'meeting of the minds' and thus reached an understanding that petitioner should be refused service." *Id., at 158*.

In *Adickes* we held that a jury might permissibly infer a conspiracy from the mere presence of a policeman in a restaurant. We never reached and did not consider whether the evidence was "one-sided," and had we done so, we clearly would have had to affirm, rather than reverse, the lower courts, since in that case there was no admissible evidence submitted [****38] by petitioner, and a significant amount of evidence presented by the defendant tending to rebut the existence of a conspiracy. The question we did reach was simply whether, as a matter of conspiracy law, a jury would be entitled, again, as a matter of law, to infer from the presence of a policeman in a restaurant the making of an agreement between that policeman and an employee. Because we held that a jury was entitled so to infer, and because the defendant had not carried its initial burden of production of demonstrating that there was no evidence that there was not a policeman in the lunchroom, we concluded that summary judgment was inappropriate.

Accordingly, it is surprising to find the case cited by the majority for the proposition that "there is no issue for trial

unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Ante*, at 249.   There was, of course, *no* admissible evidence in *Adickes* favoring the nonmoving plaintiff; there was only an **[*264]** unrebutted assertion that a Kress employee and a policeman were in the same room at the time of the alleged constitutional violation.   Like *Cities Service,* **[****39]** *Adickes* suggests that on a defendant's motion for summary judgment, a trial court must consider whether, as a matter of the substantive law of the plaintiff's cause of action, a jury will be permitted to draw inferences supporting the **[***222]** plaintiff's legal theory.   In *Cities Service* we found, in effect, that the plaintiff had failed to make out a prima facie case; in *Adickes* we held that the moving defendant had failed to rebut the plaintiff's prima facie case.   In neither case is there any intimation that a trial court should inquire whether plaintiff's evidence is "significantly probative," as opposed to "merely colorable," or, again, "one-sided."   Nor is there in either case any suggestion that once a nonmoving plaintiff has made out a prima facie case based on evidence satisfying *Rule 56(e)* that there is any showing that a defendant can make to prevail on a motion for summary judgment.   Yet this is what the Court appears to hold, relying, in part, on these two cases.[3]

**[****40]** As explained above, and as explained also by JUSTICE REHNQUIST in his dissent, see *post*, at 271, I cannot agree that the authority cited by the Court supports its position.   In my view, the Court's result is the product of an exercise **[*265]** akin to the child's game of "telephone," in which a message is repeated from one person to another and then another; after some time, the message bears little resemblance to what was originally spoken.   In the present case, the

---

[3] I am also baffled by the other cases cited by the majority to support its holding.   For example, the Court asserts that "[if] . . . evidence is merely colorable, *Dombrowski v. Eastland, 387 U.S. 82 (1967)* (per curiam), . . . summary judgment may be granted." *Ante*, at 249-250.   In *Dombrowski*, we reversed a judgment granting summary judgment to the counsel to the Internal Security Subcommittee of the Judiciary Committee of the United States Senate because there was "controverted evidence in the record . . . which affords more than merely colorable substance" to the petitioners' allegations. *387 U.S. at 84*. *Dombrowski* simply cannot be read to mean that summary judgment may be *granted* if evidence is merely colorable; what the case actually says is that summary judgment will be *denied* if evidence is *"controverted,"* because when evidence is controverted, assertions become colorable for purposes of motions for summary judgment law.

Court purports to restate the summary judgment test, but with each repetition, the original understanding is increasingly distorted.

**[**2519]** But my concern is not only that the Court's decision is unsupported; after all, unsupported views may nonetheless be supportable.   I am more troubled by the fact that the Court's opinion sends conflicting signals to trial courts and reviewing courts which must deal with summary judgment motions on a day-to-day basis.   This case is about a trial court's responsibility when considering a motion for summary judgment, but in my view, the Court, while instructing the trial judge to "consider" heightened evidentiary standards, fails to explain what that means.   In other words, **[****41]** how does a judge assess how one-sided evidence is, or what a "fair-minded" jury could "reasonably" decide?   The Court provides conflicting clues to these mysteries, which I fear can lead only to increased confusion in the district and appellate courts.

The Court's opinion is replete with boilerplate language to the effect that trial courts are not to weigh evidence when deciding summary judgment motions:

"[It] is clear enough from our recent cases that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter . . . ." *Ante*, at 249.

"Our holding . . . does not denigrate **[***223]** the role of the jury. . . .   Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.   The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Ante*, at 255.

**[*266]** But the Court's opinion is also full of language which could surely be understood as an invitation -- if not an instruction -- to trial **[****42]** courts to assess and weigh evidence much as a juror would:

"When determining if a genuine factual issue . . . exists . . . , a trial judge must *bear in mind the actual quantum and quality* of proof necessary to support liability . . . .   For example, *there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity* to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Ante*, at 254 (emphasis added).

"[The] inquiry . . . [is] whether the evidence presents a

*sufficient* disagreement to require submission to a jury or whether *it is so one-sided* that one party must prevail as a matter of law." *Ante*, at 251-252 (emphasis added).

"[The] judge must ask himself . . . whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Ante*, at 252.

I simply cannot square the direction that the judge "is not himself to weigh the evidence" with the direction that **[****43]** the judge also bear in mind the "quantum" of proof required and consider whether the evidence is of sufficient "caliber or quantity" to meet that "quantum." I would have thought that a determination of the "caliber and quantity," *i. e.*, the importance and value, of the evidence in light of the "quantum," *i. e.*, amount "required," could *only* be performed by weighing the evidence.

If in fact, this is what the Court would, under today's decision, require of district courts, then I am fearful that this new rule -- for this surely would be a brand new procedure -- will transform what is meant to provide an expedited "summary" **[*267]** procedure into a full-blown paper trial on the merits. It is hard for me to imagine that a responsible counsel, aware that the judge will be assessing the "quantum" of the evidence he is presenting, will risk either moving for or responding to a summary judgment motion without coming forth with *all* of the evidence he can muster in support of his client's case. Moreover, if the judge on motion for summary judgment really is to weigh the evidence, then **[**2520]** in my view grave concerns are raised concerning the constitutional right of **[****44]** civil litigants to a jury trial.

It may well be, as JUSTICE REHNQUIST suggests, see *post*, at 270-271, that the Court's decision today will be of little practical **[***224]** effect. I, for one, cannot imagine a case in which a judge might plausibly hold that the evidence on motion for summary judgment was sufficient to enable a plaintiff bearing a mere preponderance burden to get to the jury -- *i. e.*, that a prima facie case had been made out -- but insufficient for a plaintiff bearing a clear-and-convincing burden to withstand a defendant's summary judgment motion. Imagine a suit for breach of contract. If, for example, the defendant moves for summary judgment and produces one purported eyewitness who states that he was present at the time the parties discussed the possibility of an agreement, and unequivocally denies

that the parties ever agreed to enter into a contract, while the plaintiff produces one purported eyewitness who asserts that the parties did in fact come to terms, presumably that case would go to the jury. But if the defendant produced not one, but 100 eyewitnesses, while the plaintiff stuck with his single witness, would that case, under the Court's holding, **[****45]** still go to the jury? After all, although the plaintiff's burden in this hypothetical contract action is to prove his case by a mere preponderance of the evidence, the judge, so the Court tells us, is to "ask himself . . . whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Ante*, at 252. Is there, in this hypothetical example, "a sufficient disagreement to require submission **[*268]** to a jury," or is the evidence "so one-sided that one party must prevail as a matter of law"? *Ante*, at 251-252. Would the result change if the plaintiff's one witness were now shown to be a convicted perjurer? Would the result change if, instead of a garden-variety contract claim, the plaintiff sued on a fraud theory, thus requiring him to prove his case by clear and convincing evidence?

It seems to me that the Court's decision today unpersuasively answers the question presented, and in doing so raises a host of difficult and troubling questions for which there may well be no adequate solutions. What is particularly unfair is that the mess we make is not, at least in the first instance, our own to deal with; it is the district courts and courts **[****46]** of appeals that must struggle to clean up after us.

In my view, if a plaintiff presents evidence which either directly or by permissible inference (and these inferences are a product of the substantive law of the underlying claim) supports all of the elements he needs to prove in order to prevail on his legal claim, the plaintiff has made out a prima facie case and a defendant's motion for summary judgment must fail regardless of the burden of proof that the plaintiff must meet. In other words, whether evidence is "clear and convincing," or proves a point by a mere preponderance, is for the factfinder to determine. As I read the case law, this is how it has been, and because of my concern that today's decision may erode the constitutionally enshrined role of the jury, and also undermine the usefulness of summary judgment procedure, this is how I believe it should remain.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

The Court, apparently moved by concerns for

477 U.S. 242, *268; 106 S. Ct. 2505, **2520; 91 L. Ed. 2d 202, ***224; 1986 U.S. LEXIS 115, ****46

intellectual tidiness, mistakenly decides that the "clear and convincing evidence" standard governing finders of fact in libel [***225] cases must be applied by trial courts in deciding a motion for summary [****47] judgment in such a case.  The Court refers to this as a "substantive standard," but I think it is actually a procedural [*269] requirement engrafted onto *Rule 56*, contrary to our statement in *Calder v. Jones, 465 U.S. 783 (1984)*, that

"[we] have already declined in other contexts to grant special procedural protections to defendants in libel and defamation actions in addition to the constitutional [**2521] protections embodied in the substantive laws." *Id., at 790-791*.

The Court, I believe, makes an even greater mistake in failing to apply its newly announced rule to the facts of this case.  Instead of thus illustrating how the rule works, it contents itself with abstractions and paraphrases of abstractions, so that its opinion sounds much like a treatise about cooking by someone who has never cooked before and has no intention of starting now.

There is a large class of cases in which the higher standard imposed by the Court today would seem to have no effect at all.  Suppose, for example, on motion for summary judgment in a hypothetical libel case, the plaintiff concedes that his only proof of malice is the testimony of witness [****48] A.  Witness A testifies at his deposition that the reporter who wrote the story in question told him that she, the reporter, had done absolutely no checking on the story and had real doubts about whether or not it was correct as to the plaintiff.  The defendant's examination of witness A brings out that he has a prior conviction for perjury.

May the Court grant the defendant's motion for summary judgment on the ground that the plaintiff has failed to produce sufficient proof of malice?  Surely not, if the Court means what it says, when it states: "Credibility determinations . . . are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.  The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Ante*, at 255.

The case proceeds to trial, and at the close of the plaintiff's evidence the defendant moves for a directed verdict on the [*270] ground that the plaintiff has failed to produce sufficient evidence of malice.  The only evidence of malice produced by the plaintiff is the same testimony of witness A, who is duly impeached by the defendant for the prior perjury [****49] conviction.  In addition, the trial judge has now had an opportunity to observe the demeanor of witness A, and has noticed that he fidgets when answering critical questions, his eyes shift from the floor to the ceiling, and he manifests all other indicia traditionally attributed to perjurers.

May the trial court at this stage grant a directed verdict?  Again, surely not; we are still dealing with "credibility determinations."

The defendant now puts on its testimony, and produces three witnesses who were present at the time when witness A alleges that the reporter said she had not checked the story and had grave doubts about its accuracy as to plaintiff.  Witness A concedes that these three people were present at the meeting, and that the statement of the reporter [***226] took place in the presence of all these witnesses.  Each witness categorically denies that the reporter made the claimed statement to witness A.

May the trial court now grant a directed verdict at the close of all the evidence?  Certainly the plaintiff's case is appreciably weakened by the testimony of three disinterested witnesses, and one would hope that a properly charged jury would quickly return a verdict [****50] for the defendant.  But as long as credibility is exclusively for the jury, it seems the Court's analysis would still require this case to be decided by that body.

Thus, in the case that I have posed, it would seem to make no difference whether the standard of proof which the plaintiff had to meet in order to prevail was the preponderance of the evidence, clear and convincing evidence, or proof beyond a reasonable doubt. But if the application of the standards makes no difference in the case that I hypothesize, one may fairly ask in what sort of case *does* the difference in standards [*271] make a difference in outcome? Cases may be posed dealing with evidence that is essentially documentary, rather than testimonial; but the Court has held in a related context involving *Federal Rule of Civil Procedure 52(a)* that inferences from documentary evidence are as much the prerogative [**2522] of the finder of fact as inferences as to the credibility of witnesses.  *Anderson v. Bessemer City, 470 U.S. 564, 574 (1985)*. The Court affords the lower courts no guidance whatsoever as to

what, if any, difference the abstract standards that it propounds would make **[****51]** in a particular case.

There may be more merit than the Court is willing to admit to Judge Learned Hand's observation in *United States v. Feinberg, 140 F.2d 592, 594* (CA2), cert. denied, *322 U.S. 726 (1944)*, that "[while] at times it may be practicable" to "distinguish between the evidence which should satisfy reasonable men, and the evidence which should satisfy reasonable men beyond a reasonable doubt[,] . . . in the long run the line between them is too thin for day to day use." The Court apparently approves the overruling of the *Feinberg* case in the Court of Appeals by Judge Friendly's opinion in *United States v. Taylor, 464 F.2d 240 (1972)*. But even if the Court is entirely correct in its judgment on this point, Judge Hand's statement seems applicable to this case because the criminal case differs from the libel case in that the standard in the former is proof "beyond a reasonable doubt," which is presumably easier to distinguish from the normal "preponderance of the evidence" standard than is the intermediate standard of "clear and convincing evidence."

More important for purposes of analyzing the present case, **[****52]** there is no exact analog in the criminal process to the motion for summary judgment in a civil case. Perhaps the closest comparable device for screening out unmeritorious cases in the criminal area is the grand jury proceeding, though the comparison is obviously not on all fours. The standard for allowing a criminal case to proceed to trial is not whether the government has produced prima facie evidence of guilt beyond **[*272]** a reasonable doubt for every element of the offense, but only whether it has established probable cause. See *United **[***227]** States v. Mechanik, 475 U.S. 66, 70 (1986)*. Thus, in a criminal case the standard used prior to trial is much more lenient than the "clear beyond a reasonable doubt" standard which must be employed by the finder of fact.

The three differentiated burdens of proof in civil and criminal cases, vague and impressionistic though they necessarily are, probably do make some difference when considered by the finder of fact, whether it be a jury or a judge in a bench trial. Yet it is not a logical or analytical message that the terms convey, but instead almost a state of mind; we have previously said:

"Candor **[****53]** suggests that, to a degree, efforts to

analyze what lay jurors understand concerning the differences among these three tests . . . may well be largely an academic exercise. . . . Indeed, the ultimate truth as to how the standards of proof affect decisionmaking may well be *unknowable*, given that factfinding is a process shared by countless thousands of individuals throughout the country. We probably can assume no more than that the difference between a preponderance of the evidence and proof beyond a reasonable doubt probably is better understood than either of them in relation to the intermediate standard of clear and convincing evidence." *Addington v. Texas, 441 U.S. 418, 424-425 (1979)* (emphasis added).

The Court's decision to engraft the standard of proof applicable to a factfinder onto the law governing the procedural motion for a summary judgment (a motion that has always been regarded as raising a question of law rather than a question of fact, see, *e. g.,* *La Riviere v. EEOC, 682 F.2d 1275, 1277-1278 (CA9 1982)* (Wallace, J.)), will do great mischief with little corresponding benefit. The primary effect of the Court's opinion **[****54]** today will likely be to cause the decisions of trial judges on summary judgment motions in libel cases to be **[*273]** more erratic and inconsistent than before. This is largely because the Court has **[**2523]** created a standard that is different from the standard traditionally applied in summary judgment motions without even hinting as to how its new standard will be applied to particular cases.

## References

*50 Am Jur 2d, Libel and Slander 125- 136*, *174*, *175*, *441*, *442*, *454- 462*; *73 Am Jur 2d, Summary Judgment 26- 32*

28 Federal Procedure, L Ed, Pleadings and Motions 62:535-62:556, 62:632

1 Federal **[****55]** Procedural Forms, L Ed, Actions in District Court 1:1731-1:1812

14 Am Jur Proof of Facts 2d 649; Defamation with Actual Malice

7 Am Jur Trials 223, Libel Actions by Public Officials; 19 Am Jur Trials 499, Defamation

USCS *Constitution, 1st Amend.*; USCS *Federal Rules of Civil Procedure, Rule 56*

US L Ed Digest, Constitutional Law 948; Evidence 176; Summary Judgment and Judgment on the Pleadings 5

477 U.S. 242, *273; 106 S. Ct. 2505, **2523; 91 L. Ed. 2d 202, ***227; 1986 U.S. LEXIS 115, ****55

Index to Annotations, Freedom of Speech and Press;
Libel and Slander; Malice; New York Times Rule;
Summary Judgment

Annotation References :

 Progeny of New York Times v Sullivan in the Supreme
Court. *61 L Ed 2d 975*.

Reviewability of federal court's denial of motion for
summary judgment.  *17 L Ed 2d 886.*

Defamation: application of New York Times and related
standards to nonmedia defendants.  *38 ALR4th 1114*.

Libel and slander: who is "public figure" in the light of
*Gertz v Robert Welch, Inc. (1974) 418 US 323, 41 L Ed
2d 789, 94 S Ct 2997*.  *75 ALR3d 616*.

Libel and slander: what constitutes actual malice, within
federal **[****56]** constitutional rule requiring public
officials to show actual malice.  *20 ALR3d 988.*

---

**End of Document**

Mark Bouchard

No *Shepard's* Signal™
As of: July 27, 2018 3:24 PM Z

# *Gill v. Teva Respiratory, LLC*

United States District Court for the District of Connecticut

December 27, 2017, Decided; December 27, 2017, Filed

No. 3:16-cv-00299 (JAM)

**Reporter**
2017 U.S. Dist. LEXIS 212072 *; CCH Prod. Liab. Rep. P20,237; 2017 WL 6614228

SHAKEEMA GILL, Plaintiff, v. TEVA RESPIRATORY, LLC, et al., Defendants.

## Core Terms

inhaler, thumbtack, defendants', summary judgment, summary judgment motion, contradiction, manufacturing, aspirated

**Counsel: [*1]** For Shakeema Gill, Plaintiff: Guy Phillip Soares, LEAD ATTORNEY, Czepiga & Soares, LLC, Bridgeport, CT.

For Teva Respiratory, LLC, doing business as Teva Pharmaceuticals USA, Inc., Defendant: Jeffrey F. Peck, Megan B. Gramke, LEAD ATTORNEYS, PRO HAC VICE, Ulmer & Berne LLP, Cincinnati, OH; Robert J. Chomiak, Jr., LEAD ATTORNEY, Goldberg Segalla LLP - CT, Hartford, CT.

For CVS Pharmacy, Inc., Defendant: Michael J. Dugan, LEAD ATTORNEY, Litchfield Cavo LLP-Simsbury, Simsbury, CT; Eric Charles Shinaman, Litchfield Cavo LLP, Simsbury, CT.

**Judges:** Jeffrey Alker Meyer, United States District Judge.

**Opinion by:** Jeffrey Alker Meyer

## Opinion

### RULING GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Shakeema Gill uses an inhaler for her asthma. One day while using the inhaler she breathed in a thumbtack that had somehow become lodged inside her inhaler. She has filed this product liability lawsuit against both the manufacturer of the inhaler (defendant Teva Respiratory, LLC) and the retailer (defendant CVS Pharmacy, Inc.). Because no genuine issue of fact remains to show that the thumbtack could have entered plaintiff's inhaler at any time that it was within the possession or control of either of the defendants, I will **[*2]** grant defendants' motions for summary judgment.

### BACKGROUND

On January 28, 2014, plaintiff purchased a ProAir HFA inhaler for her asthma from a CVS pharmacy in Ansonia, Connecticut. The inhaler was assembled and packaged by Teva Respiratory, LLC, in Ireland.

According to plaintiff's deposition, she put the new inhaler into the glove compartment of her car. About one week later, on February 6, 2014, she retrieved the inhaler from the glove compartment, at which time it was still in its original packaging and had not been opened or used. She removed the cap and shook the inhaler and then tried to spray it into her mouth. She felt that medication had not entered into her lungs, so she shook and sprayed the inhaler a couple of times. On the final spray, she aspirated what turned out to be a thumbtack that had been inside the inhaler. Several days later, plaintiff sought medical treatment at the Griffin Hospital, and a surgeon at Yale New Haven Hospital eventually removed the thumbtack from plaintiff's lungs.

Although defendants do not dispute that plaintiff aspirated a thumbtack from within her inhaler, both defendants dispute that the thumbtack could have been introduced into the inhaler while **[*3]** it was under their possession or control. Teva has introduced evidence about its manufacturing and inspection process to preclude any inference that it could have allowed the thumbtack to enter the inhaler. According to Teva's properly supported statement of material facts, "The manufacturing, quality control, and quality assurance processes and procedures for the production of ProAir HFA inhalers in 2013 were such that a push pin like the

one inhaled by Ms. Gill could not have been in the mouthpiece of (or any other part) of a ProAir HFA inhaler, including a product in lot DAA69A, at the time it left Teva Respiratory's control." Doc. #45 at 2.

Similarly, CVS in turn relies on plaintiff's admission that the inhaler was still in its original packaging just before she used it, a contention that is inconsistent with any tampering by CVS with the inhaler during the time that it was in CVS's control. For her part, plaintiff did not conduct any discovery, and she has neither disputed defendants' evidence nor even submitted a statement of material facts as required under the Court's local rules. Accordingly, the Court deems the factual statements as set forth in defendants' local rule statements **[*4]** to be true. *See D. Conn. L. Civ. R. 56(a)(1).*

Beyond defendants' evidence that negates their responsibility for the thumbtack having entered the inhaler while in their possession or control, defendants also point to evidence that quite devastatingly contradicts plaintiff's own account of what happened before she breathed in the thumbtack. Several notes in the medical records recount plaintiff's statements to medical personnel that the inhaler had been in her purse (not her glove compartment), that the cap had fallen off, and that her children had put the thumbtack inside the inhaler. For example, the medical records notes from Griffin Hospital state in part that "4 days ago while using inhaler p[atien]t thinks she aspirated 'something' which had gotten into her inhaler mouthpiece [illegible] the cap fell off in her purse." Doc. #45-7 at 2. Similarly, the notes from Yale New Haven Hospital (where plaintiff later had the thumbtack removed) state that plaintiff "aspirated pushpin when using inhaler from purse." *Id.* at 4. The surgeon "advised [plaintiff] to keep inhaler separate from other belong[ing]s." *Id.* at 7. A later follow-up note from Griffin Hospital recites plaintiff's statement that "her children had put the thumbtack in **[*5]** her albuterol inh[aler] and she didn't see it before she used her inhaler." *Id.* at 3. When plaintiff was deposed in connection with this lawsuit, she had no explanation for these statements as reported in her medical records.

Teva also introduced evidence that every inhaler that left its plant had a mechanical counter that was set to a level of 200 doses and that counted down each time that the inhaler was used. At plaintiff's deposition, she was asked to produce the inhaler. She did so and testified that she had not used the inhaler again since the day that she had aspirated the thumbtack. Yet the inhaler as produced by plaintiff showed a count of 166,

reflecting that the inhaler had been used 34 times. When asked whether this meant that she had used the inhaler on occasions before she had breathed in the thumbtack, plaintiff responded: "You would have to ask somebody else because I never used it before. So—and I didn't look at the number beforehand, so that is not something I did before this." Doc. #28-6 at 7.

> Q. So you would have no idea how the number went down from 200 to 166?
> A. Same thing I don't know how the thumbtack got in there.
>
> Q. I am not sure I understand what you mean by that answer. **[*6]**
> A. I don't know how the thumbtack got in there. So the same reason it got in there would have been the same reason the numbers were down.

Doc. #28-6 at 7.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(a).* I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. A court's role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014)* (*per curiam*); *Pollard v. New York Methodist Hosp., 861 F.3d 374, 378 (2d Cir. 2017).*

Here, plaintiff has failed to rebut evidence from defendants that they could not have been responsible for the thumbtack entering the inhaler while it was in their possession or control. When a defendant moves for summary judgment and introduces supporting evidence, **[*7]** a plaintiff may no longer rest on the bare allegations of the complaint but must introduce affirmative evidence to suggest that a genuine fact issue still remains in dispute. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* Although plaintiff relies on her own account of the inhaler while in her possession, she does nothing to contradict defendants' evidence with respect

2017 U.S. Dist. LEXIS 212072, *7

to the handling of the inhaler while in their possession and control.

Moreover, in rare circumstances a court must necessarily undertake some evaluation of a plaintiff's credibility at the summary judgment stage. The Second Circuit has held that "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account." *Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 105 (2d Cir. 2011)* (quoting *Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005))*.

As the Second Circuit has cautioned, "we do not suggest that district courts should routinely engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment," and "if there is a plausible explanation **[*8]** for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because an earlier account was ambiguous, confusing, or simply incomplete." *Id. at 106* (quoting *Jeffreys, 426 F.3d at 555 n.2*). Still, there may be "certain extraordinary cases, where 'the facts alleged are so contradictory that doubt is cast upon their plausibility, [for which] the court may pierce the veil of the complaint's factual allegations and dismiss the claim.'" *Ibid.* (quoting *Jeffreys, 426 F.3d at 555*).

An exception is made for these kinds of extraordinary cases, because "[t]o hold otherwise, and require district courts to allow parties to defeat summary judgment simply by testifying to the allegations in their pleadings ... would license the mendacious to seek windfalls in the litigation lottery." *Ibid.* (citation and internal quotation marks omitted). Accordingly, "where, as here, the relevant contradiction is not only unequivocal but is left unexplained—indeed, is inexplicable—a district court may determine that a plaintiff has manufactured a sham issue of fact" that may not stand in the way of a defendant's motion for summary judgment. *In re Fosamax Prods. Liab. Litig., 707 F.3d 189, 194 (2d Cir. 2013)*.

This is the type of rare and extraordinary case that warrants a rejection **[*9]** of plaintiff's account. It is not simply that plaintiff has failed to rebut defendants' evidence that the thumbtack could not have been

introduced into the inhaler at any point during the manufacturing, distribution, or retail sales process. It is that plaintiff's own account of the facts—which is the only evidence relied on by plaintiff to sustain her claim—is rife with irreconcilable contradiction. Plaintiff has no explanation for the multiple medical notes from both Griffin Hospital and Yale New Haven Hospital reflecting that the inhaler was in her purse with the cap off and accessible to her children, rather than in its original packaging in her glove compartment as plaintiff claimed. Nor does plaintiff have any explanation for why the inhaler's dosage count reflected its prior use 34 times, rather than her initial use of a new inhaler as plaintiff self-servingly claimed.

In the face of defendants' evidence as well as the manifest contradictions and discrepancies in plaintiff's own account, no reasonable jury could conclude that the thumbtack entered the inhaler at any time that the inhaler was in the possession or control of either one of the defendants. Indeed, plaintiff herself **[*10]** repeatedly admitted at her deposition that "I don't know how the thumbtack got in there." Doc #28-6 at 7. Because plaintiff herself disavows knowing how the thumbtack came to be inside her inhaler, she is in no position to claim or to prove at trial that defendants are responsible or liable.

## CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment (Doc. #43 and Doc. #46) are GRANTED. The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 27th day of December 2017.

/s/ *Jeffrey Alker Meyer*

Jeffrey Alker Meyer

United States District Judge

---

**End of Document**



Cited
As of: July 27, 2018 3:24 PM Z

## *Garrett v. Crown Equip. Corp.*

United States District Court for the District of Connecticut

June 22, 2017, Decided; June 23, 2017, Filed

No. 3:15-cv-00942 (JAM)

**Reporter**

2017 U.S. Dist. LEXIS 96974 *; CCH Prod. Liab. Rep. P20,093; 2017 WL 2727086

DORSEY GARRETT, Plaintiff, v. CROWN EQUIPMENT CORPORATION, Defendant.

## Core Terms

truck, coast, activated, handle, summary judgment, alleged defect, switch, ignition switch, genuine, arm, expert testimony, platform, snapped, pallet, selector switch, defense motion

**Counsel:** [*1] For Dorsey Garrett, Plaintiff: Audrey Danica Medd, LEAD ATTORNEY, Lynch Schwab & Gasparini PLLC, Brewster, NY.

For Crown Equipment Corp, Defendant: Sarah L. Scott, Thomas J. Cullen, Jr., LEAD ATTORNEYS, PRO HAC VICE, Goodell, DeVries, Leeach & Dann, LLP, Baltimore, MD; Kevin M. Smith, Wiggin & Dana, New Haven, CT.

**Judges:** Jeffrey Alker Meyer, United States District Judge.

**Opinion by:** Jeffrey Alker Meyer

## Opinion

### RULING GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

One evening while working at a warehouse distribution center, plaintiff Dorsey Garrett was injured after his foot slipped from the platform of a pallet truck that was manufactured by defendant Crown Equipment Corporation. Plaintiff has now brought this products liability claim against defendant, alleging that the truck was defectively designed.

Plaintiff's claim depends on expert testimony about two alleged defects of the truck. Defendant has moved to preclude the expert's testimony and also for summary judgment. Even assuming the defects existed that plaintiff claims, I conclude that the record does not show a genuine issue of fact that any of these claimed defects caused plaintiff's injuries. Accordingly, I will grant defendant's motion for summary judgment [*2] and will otherwise deny defendant's motion to exclude the expert's testimony as moot.

### BACKGROUND

Plaintiff was hired in June 2013 at Bozzuto's, Inc., a wholesale distributor in Connecticut. Doc. #39-2 at 15. After a few days of orientation and safety training, he began work as a goods "selector." *Id.* at 16-20. This work required him to use a pallet truck that was manufactured by defendant to move around the freezer area of the Bozzuto's warehouse, picking up loads of items and moving them to the warehouse bay doors, where they could be transferred to trucks for distribution. *Id.* at 23-28.

The model of pallet truck operated by plaintiff was a Crown Equipment Corporation PE 3540-80. The key features of this truck are shown in the diagram below:

2017 U.S. Dist. LEXIS 96974, *2

The truck has a pair of forks that extend to carry a pallet load. On the opposite side of the truck from these forks is a platform on which the truck's operator may stand. Facing that platform is the "control handle," which is used to operate the truck and to apply power by means of a hand-controlled throttle, which can be rotated in either direction to propel the truck forward or backward. The "control arm" in turn connects the control handle to the body of the truck.

Next [*3] to the base of the control arm on the body of the truck is a "coast selector" switch. This is a manually activated switch for a "coasting" feature that allows the truck to coast or glide along without further application of power by the operator at the control handle. If the "coast selector" switch is not activated, then the truck will not glide or coast once an operator stops applying power.

Also on the main body of the truck, to the left of the control arm, is the "key switch," which is an ignition switch that uses a key in order to turn the truck "on" or "off" for operation. The truck is battery powered, and it has a "power disconnect" handle on the main body of the truck to the right of the control arm that can be used to cut the power to the battery. If the truck has been turned on at the key ignition switch, then its power can still be controlled by means of either plugging in or pulling out the power disconnect handle.

On June 20, 2013, approximately two weeks into his employment at Bozzuto's, plaintiff had an accident that gave rise to the present litigation. Plaintiff parked his pallet truck outside the break room in the warehouse. After taking a break, plaintiff returned to [*4] the truck, and he reconnected the truck's battery using the "power disconnect" handle. According to plaintiff, the truck was already turned on, because the key had been snapped off while in the "on" position on the ignition switch. As plaintiff then attempted to mount the platform, his left foot slipped off, and he started to fall. To catch himself he grabbed the control handle and pulled at it in such a way that the truck suddenly moved toward him and hit into his right leg, crushing it against the wall.

Plaintiff's expert, Paul L. Dreyer, submitted a report alleging two defects in the design of the truck. The first alleged defect was that the key in the truck could be removed from the ignition switch while the ignition was still in the "on" position. Supposedly, this defect caused plaintiff's accident, because it resulted in the truck already being turned on before plaintiff could safely mount the operator's platform.

The second alleged defect was that the "coast activator" switch was designed and located in a way that made it too easy to activate by accident. Supposedly, this defect caused the accident because plaintiff may have accidentally activated the coast feature during his [*5] fall, allowing the truck to move freely and hit him.

## DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; *see also Tolan v. Cotton, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014)* (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013)* (quoting *Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007))*. The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g., Tolan, 134 S. Ct. at 1866*; *Caronia v. Philip Morris USA, Inc., 715 F.3d 417, 427 (2d Cir. 2013)*. All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan, 134 S. Ct. at 1866* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))*.

Under Connecticut law, a plaintiff seeking to recover under a strict-liability theory of products liability "must prove that: (1) the defendant was engaged in the business of selling the product; (2) the product [*6] was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition." *Metropolitan Property and Cas. Ins. Co. v. Deere and Co., 302 Conn. 123, 25 A.3d 571, 579 (Conn. 2011)*. The parties agree that expert testimony is required in order to sustain plaintiff's burden at trial to show a product design defect. *See, e.g., Wasilewski v. Abel Womack, Inc., 2014 U.S. Dist. LEXIS 26616, 2014 WL 819498, at *4 (D. Conn. 2014)* (holding expert testimony required to show defect in a

case involving a forklift).

I have considered the two alleged defects identified by plaintiff's expert and conclude that there is no genuine fact issue to support a conclusion that either of the alleged defects caused plaintiff's injury. As to the first alleged defect (that the truck's key could be removed from the ignition switch while the truck was still turned on), plaintiff testified in his deposition that the key had been snapped off in the ignition switch of the truck he was driving on the day of the accident, and indeed that keys had been snapped off in the ignition of every truck he could remember using at Bozzuto's. Doc. #39-2 at 106-107. Taking plaintiff at his word, then, it does not **[*7]** matter if his expert is right that the key could be removed from the ignition switch while the truck was turned on, because—as plaintiff insisted—the key had *not* been so removed when he operated the truck.

In an effort to salvage plaintiff's claim, plaintiff's counsel cites the deposition testimony of other employees to suggest that a reasonable jury could conclude that the key in plaintiff's truck had been removed rather than being snapped off. But none of the cited testimony provides a firm enough basis for a reasonable jury to discredit plaintiff's own testimony.

For example, one employee, Gary Titus, testified as follows:

> Q Do you know if anyone snapped off this key on Mr. Garrett's machine?
> A No. There is no key.
> Q What would the key, what would be the function of the key on this machine?
> A In a different environment I think if people used it for an eight-hour shift, parked it and went home, they might key it off and keep the key with them.
> Q So what do you mean by a different environment?
> A Well, in an environment that we're not using the equipment 24 hours a day, or each piece of equipment might be used by two or three different people during the course of their day.

> Q So the key turns **[*8]** on and off the machine?
> A If you used that function, yes. We don't use that function.
> Q Do you know if that function was used at the time of Mr. Garrett's—
> A It was not. We don't use the function.
> Q So then how does the equipment get turned on and off if you don't use that function?
> A It's plugged in, the battery is charged, the

equipment stays on. If the coast is taken off and it's parked appropriately, it stays on waiting for the next associate to come in and use it.

Doc. #39-4 at 45-46. Although Titus insisted that "there is no key" and "we don't use that function," Titus never said that the key had been or could be removed while the ignition was turned on (much less did Titus purport to have firsthand knowledge of the condition of plaintiff's truck at the time that plaintiff was injured).

Another employee relied on by plaintiff's counsel could not even remember if there was a key. Doc. #39-3 at 46-48. Yet a third employee relied on by plaintiff's counsel stated that the keys were kept "within the shop maintenance" rather than in the pallet trucks, that the function of the key was to turn the trucks on and off, and that without the key it would have to be turned on by a switch. Doc. #39-5 **[*9]** at 37. This testimony falls well short of stating that any of the keys were or could be removed while the truck was still turned on. Accordingly, in light of plaintiff's sworn testimony that the key was snapped off in his machine, there is no genuine issue of fact to support his expert's claim that the accident was caused by a design defect in the truck that allowed the key to be removed while the truck was still turned on.

As to the second alleged defect (that the coast selector switch was mal-designed such that it could be accidentally activated), the evidence is similarly lacking to support any conclusion that this claimed defect caused plaintiff's injury. As is shown in the truck diagram above, the coast selector switch is located on the body of the truck near the base of the control arm. According to defendant's account of the design of the truck, which plaintiff does not contest, the operator must first pull the control handle down from a vertical position to a diagonal or even horizontal one and *then* flip the activation switch in order to activate the coast feature. Doc. #32 at 9, 61. The control arm is significantly longer than one hand-span, and this means that activating the **[*10]** coast feature is necessarily a two-handed operation: one hand to hold the control arm in the proper position and one to flip the switch.

There is nothing in the record to suggest that plaintiff performed (or could possibly have performed) this two-handed operation while momentarily flailing to grab hold of something to stop his fall after his foot slipped from the truck's platform. Indeed, plaintiff's own deposition testimony again dooms his theory of liability, because plaintiff never claimed that he did or could have accidentally activated the coast selector switch. To the contrary, he repeatedly insisted that he had not

activated the coast feature, Doc. #39-2 at 67-68, 72, and he testified that he did not know why Bozzuto's post-accident incident report indicated that his truck had been left in "coast" mode after the accident, *id.* at 95. Nor does any other evidence of record create a genuine fact issue that plaintiff accidentally activated the coast selector switch.[1]

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment (Doc. #33) is GRANTED. Defendant's motion to exclude plaintiff's expert's testimony (Doc. #31) is DENIED as moot.

The Clerk of Court shall close **[*11]** this case. It is so ordered.

Dated at New Haven this 22d day of June 2017.

/s/ *Jeffrey Alker Meyer*

Jeffrey Alker Meyer

United States District Judge

---

End of Document

---

[1] Defense counsel also made the point at oral argument that, if the control handle is pulled down and the throttle is turned as seems to have happened during the accident, the truck would move whether or not the coast function had been engaged. Plaintiff did not dispute this point, and this additional reason suffices to defeat causation from the alleged defect involving the coast selector switch.

Mark Bouchard

ⓘ Cited
As of: July 27, 2018 3:24 PM Z

# *Graham v. Fireline, Inc.*

United States District Court for the District of Connecticut

June 14, 2006, Decided ; June 14, 2006, Filed

Civil No. 3:03CV00990 (AWT)

**Reporter**

2006 U.S. Dist. LEXIS 39185 *; 2006 WL 1646165

ALEXANDER GRAHAM and JOSE CUEVAS v. FIRELINE, INC., Defendant.

## Core Terms

casting, metal, cup, billet, molten, bottom, summary judgment, tank, box, explosion, Station, expert testimony, nonmovant, cooling, pouring, proffered, injuries, alloy, proximate, furnace, stress, proximate cause, manufactured, plaintiffs', causation, flash, molds, genuine issue of material fact, summary judgment motion, underside

**Counsel:** [*1] For Alexander Graham, Plaintiff: Thomas A. Virgulto, Madison, CT.

For Jose Cuevas, Plaintiff: Thomas A. Virgulto, Madison, CT.

For Fireline Inc, Defendant: Charles Francis Gfeller, Mark B. Seiger, Edwards & Angell, Hartford, CT.

**Judges:** Alvin W. Thompson, United States District Judge.

**Opinion by:** Alvin W. Thompson

## Opinion

### *RULING ON MOTION FOR SUMMARY JUDGMENT*

The plaintiffs bring this products liability action, alleging violations of the Connecticut Products Liability Act (the "CPLA"), *Conn. Gen. Stat. § 52-572m, et seq.*. Specifically, the plaintiffs contend that they suffered injuries as a result of a flash explosion that was directly and proximately caused by a defective pour cup manufactured by the defendant. In support of their claims and pursuant to *Fed. R. Civ. P. 26(a)(2)*, the plaintiffs disclosed Raymond J. Erikson as an expert

whose testimony they intend to offer at trial. The defendant has moved (1) to preclude Erikson's proffered expert testimony and (2) for summary judgment. Because the court concludes that the defendant is entitled to summary even if the plaintiffs' proffered expert testimony [*2] is admissible, the defendant's motion for summary judgment is being granted, and the motion to preclude Erikson's proffered expert testimony is being denied as moot in a separate order.

### I. Factual Background

The defendant is an Ohio company that manufactures and sells pour cups made of fused silica for use in the metal casting process. At the time of the events that gave rise to the complaint, Ansonia Copper & Brass, Inc. ("AC&B"), a foundry that manufactures wires and rods, used the defendant's pour cups in its manufacturing process. As part of this process at AC&B, metal casters pour molten metal into molds to create metal billets from which wires and rods are ultimately cut; a billet is a long, solid, metal cylinder which, when completed, looks like a small, metal telephone pole. The casting of the metal billets occurs at various casting stations in AC&B's plant.

On June 3, 2000, plaintiff Jose Cuevas ("Cuevas") was employed by AC&B as a metal caster, operating casting Station No. 21. On the same date, plaintiff Alexander Graham ("Graham") was employed by AC&B as a supervisor, and his duties included supervising the casting process at Station No. 21. The plaintiffs [*3] contend that at some point during the casting process at Station No. 21, the bottom of the pour cup installed at the south end of the running box failed because it was defective and it broke. They also contend that this failure of the pour cup caused a mal-distribution of the molten metal within the billetmold, such that the molten metal collected at the center of the mold rather than the outer portion as intended. The plaintiffs further contend that the pooling of the molten metal caused the billet to

leak, which resulted in molten metal leaving the billet and entering the cooling tank, and that when the leaked molten metal came into contact with the water in the cooling tank a flash explosion occurred. As a result of the flash explosion, the plaintiffs suffered, *inter alia*, severe burn injuries and permanent scarring.

On June 5, 2000, two days after the incident, AC&B informed the Bridgeport area office of the Occupational Safety Hazard Administration ("OSHA") of the explosion. OSHA visited the AC&B plant to investigate the explosion and to conduct a plain view assessment of any hazards. OSHA prepared a report (the "OSHA Report"), which has been submitted by the plaintiffs. **[*4]** (*See* Pls.' Mem. in Obj. to Def.'s Mot. for Summ. J. (Doc. No. 27), Ex. B.) The OSHA Report describes the casting process at Station No. 21 as follows:

> The employer manufactured rod and wire of various copper alloys. The employer's casting shop had 1 automated rod casting station and 6 billet casting stations. By either static casting or semicontinuous direct chill casting (DC casting) billets of various copper alloys were made and taken to other departments to be extruded into rod or wire. Copper alloys were said to be cast by direct chill to prevent the alloy from cracking.
>
> In direct chill casting molten metal was slowly poured into a water cooled mold that had a mold base which slowly descended into a water filled casting tank as themetal hardened to obtain the desired length of the casting. In this type of casting the downward movement of the bottom of the mold and the flow of metal into the mold were controlled by the caster to make long billets of various alloys. Standing at the casting tank, the employee manipulated devices (screw-downs) to control the flow of molten metal into the mold. At the control panel of the casting tank, the employee mechanically controlled **[*5]** the downcast speed of the mold base and the tilt of the furnace to a pour position. This process was used to cast billets approximately 11 inches in diameter and approximately 129 inches in length. 2 billets were cast per heat or pour. A billet of alloy 651 weighed around 3000 pounds.
> . . . .
> At casting station # 21, the furnace was tilted by rotating a knob at the control panel . . . to pour molten metal into a running box. The knob did not have to be manually held into position for the furnace to remain tilted for pouring. The pour temperature was 1140 - 1150 deg C (2084 - 2102

deg F). The running box was "T" shaped with 2 orifices on either side. A "screw down" was installed into each orifice of the running box. At the underside of each orifice a cup was installed. Each cup had 4 holes that directed the flow of molten metal to the outer portion of the mold. The cups and the orifices were made of fused silica. The caster manually adjusted each screw down to control the rate of flow of molten metal from the running box into each mold. The manual manipulation of the screw down required the caster to stand directly at the casting tank when molten metal was being poured.

> The **[*6]** mold plugs formed the bottom of the billet molds. The billet molds were situated over a water-filled casting tank which provided direct chilling to the newly formed billets. At the start of the pour, the bottom of the molds sat about 8 inches above the water of the casting tank. From the bottom of the mold to the top of the casting tank, the shell of the newly formed portion of the billet was air cooled. The casting tank was about 170 inches deep.
> The billet molds sat within the frame of the oscillator above the casting tank. The oscillator rocked back and forth slowly about 1 inch per min to help provide evencooling. The billet molds incorporated copper water jackets that provided indirect cooling of the molten metal to form the billet wall. Water feed lines were attached to each side of the mold so each mold had 2 water feed pipes and 2 water discharge pipes. The water from the mold jacket discharged into the casting tank. Water flowed through the jacket of the mold at a rate of about 12-15 gallons per minute.

(Pls.' Mem., Ex. B, at section e.)

The OSHA inspectors also examined equipment that had been removed from Station No. 21, and their findings included the following: **[*7]**

> Running Box (aka T-box) - 1 screw down was still attached at the south orifice (right side) of the box. The other screw down was not present. . . . The south underside (right underside) of the box had a lot of metal around the cup area as compared to the north underside. Only the top portions of the cups were present in the running box. The top portion of the cup in the north underside of the running box matched a bottom cup portion found by the employer on 6/3/00. There were no cracks around the holes of the 1 cup found. The bottom cup portion for the south side of the running box was not found. This was of note since the cups directed

2006 U.S. Dist. LEXIS 39185, *7

the metal towards the mold wall to form the billet wall. If the cup did not direct the metal to the mold wall but rather allowed the metal to collect in the middle, the sump of [the] billet may have been too long.

(*Id.*, at section g.)

The OSHA Report stated that employees were interviewed and no one saw the accident. (*See id.*, at section f.) Cuevas testified at his deposition that he has no knowledge as to whether the pour cup broke before the explosion; he simply guessed that it broke before the explosion. (*See* Cuevas **[*8]** Dep., at 60-1.) Similarly, Graham has no knowledge as to whether the pourcup broke before the explosion; he simply based his conclusion as to what had happened on what Cuevas told him. (*See* Graham Dep., at 63.)

The complaint alleges, *inter alia*, that the defendant manufactured and sold a defective and unreasonably dangerous pour cup in violation of the CPLA, and that the defective cup was the direct and proximate cause of the plaintiffs' injuries. The plaintiffs have disclosed Raymond J. Erikson as an expert witness whose testimony they intend to offer at trial. Erikson is a material systems engineer with a Masters of Science degree in Mechanical Engineering, Materials Specialization from Northwestern University. (*See* Pls.' Mem. Obj. to Def's. Mot. to Preclude Proffered Expert Test. of Raymond J. Erikson (Doc. No. 26), Ex. C.) Erikson's professional experience includes providing consulting services in system design and analysis; material selection, application and process development; reliability and failure analysis; and stress analysis of flight structures, antennaes, randomes and optical systems. He has published several articles in his field.

Erikson prepared an expert's **[*9]** report containing his analysis of the alleged failure of the pour cup. In the report, he concluded that the pour cup in use at the time of the incident was not made of material suitable to withstand the thermal stress of the casting process at Station No. 21. Erikson based hisopinion on information provided to him from several sources [1] **[*10]** and his

own analysis of an exemplar pour cup, which he assumed had failed on May 7, 2003 and caused leakage similar to that which occurred during the June 3, 2000 incident. According to Erikson, his analysis, which was conducted in accordance with mathematical principles set forth in a treatise [2] and in consultation with ASTM Standards, revealed that the pour cup was made of a low-density, clay-based refractory ceramic, which can fracture due to thermal stress during the billet casting process at the AC&B plant.

In his report, Erikson identified seven ways in which a direct-chill billet casting operation can go awry:

1. The molten metal in the furnace can be too hot; i.e., too far above the lower freezing point of the alloy. This can allow some of the metal near the sides of the billet to remain liquid after it leaves the bottom of the mold, causing billet leaks.

2. The molten metal in the furnace can be too cool; i.e., too close to the upper freezing point of the alloy. This can allow some of the metal to solidify before it passes into the mold, blocking the flow through the pouring cup and causing the billet to tear away from the mold for lack of metal.

3. The flow rate through the pouring cups can be too high. The flow rate is normally controlled by the pouring rate from the furnace into the running box, and by control valves directly above the pouring cups. An excessive flow rate would allow molten metal to overflow the mold.

4. The flow rate through the pouring cups can be too low. As with a too-low temperature, **[*11]** this can cause the billet to form incompletely or separate from the mold.

5. The rate at which the bottom block (called the "plug" by Mr. Cuevas) is drawn downward by the hydraulic ram of the casting machine can be too high. This rate needs to match the rate of billet creation exactly. If the bottom block descends too quickly, the billet will be unsupported at the bottom and subjected to large tensile stresses at the top, where it is very weak. This, in turn, would result in

---

[1] Erikson reviewed (1) Statement from Jose Cuevas on OSHA Form 181A taken July 31, 2000, (2) Excerpts from OSHA Report for June 3, 2000 incident, (3) Sketches of plant arrangement and furnace setup, and static photos of casting station # 21 (not in operation), (4) AC&B's website, (5) the website of Wagstaff, Inc., a maker of casting equipment, (6)

Investment Casting Institute online profile for Fireline, Inc., maker of pouring cup, (7) ASTM C401. Standard Classification of Alumina and Alumina-Silicate Castable Refractories. West Conshohocken: American Society for Testing and Materials, (8) ASTM C416. Standard Classification of Silica Refractory Brick. West Conshohocken: American Society for Testing Materials.

[2] R.J. Roark, *Formulas for Stress and Strain* 585 (5th ed. 1975).

separation of the billet from the mold and release of molten metal.

6. The bottom block rate could be too low. If the bottom block does not descend fast enough, the excess metal will overflow the top of the mold.

7. The cooling water could be insufficient in quantity or of the wrong specific composition (i.e., with the wrong types or amounts of additives necessary to control the heat transfer coefficient of the water). Insufficient cooling would allow the billet to remain closer to the freezing/melting point as it leaves the mold, and thus be more susceptible to tearing, with resulting leakage of molten metal from the side of the billet.

(Pls.' Mem., Ex. F., at 3.) Erikson's report then continues **[\*12]** as follows:

Separation of the bottom of the pouring cup from its body would not produce a significantly different flow rate, since the holes in the bottom have the same total surface area as the central passage. However, the distribution of molten metal in the mold would change significantly, since four separate streams of metal previously directed to the sides of the mold would become a single large stream directed to the middle of the mold.

With less of the molten metal exposed to the cooling sidewalls of the mold, more of the metal in the mold could remain above the freezing point. This could conceivably lead to excessive heat buildup in the billet, and result in the observed billet leakage.

(*Id.*)

## II. Legal Standard

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. *Fed. R. Civ. P. 56(c)*. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).* **[\*13]** *Rule 56(c)* "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." See *Celotex Corp., 477 U.S. at 322*.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, maynot try issues of fact. *See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Donahue v. Windsor Locks Board of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987)*; *Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)*. It is well-established that "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Anderson, 477 U.S. at 255*. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does **[\*14]** not extend to issue-resolution." *Gallo, 22 F.3d at 1224*.

Summary judgment is inappropriate only if the issue to be resolved is *both* genuine *and* related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248* (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Anderson, 477 U.S. at 248*. As the Court observed in *Anderson*: "The materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id. at 248*. Thus, only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses **[\*15]** at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. See *Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990)*.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)*(quoting *Delaware & H. R. Co. v. Conrail, 902 F.2d 174, 177 (2d Cir. 1990)*). Because credibility is not an issue on summary judgment, the nonvant's evidence must be accepted as true for purposes of the motion.

Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "Mere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trs. of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997)* (*quoting W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)*). Moreover, the "mere existence of a **[*16]** scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson, 477 U.S. at 252.*

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. *See Celotex Corp., 477 U.S. at 324.* "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," *Weinstock, 224 F.3d at 41,* if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." *Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d. Cir. 1993)* (quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." *Weinstock, 224 F.3d at 41.* **[*17]** If the nonmovant fails to meet this burden, summary judgment should be granted. The question then becomes whether there is sufficient evidence to reasonably expect that a jury could return a verdict in favor of the nonmoving party. *See Anderson, 477 U.S. at 248, 251.*

## III. Discussion

The defendant has filed a separate motion to preclude Erikson's proffered expert testimony but argues that, even if Erikson's testimony is admissible, the defendant is entitled to summary judgment because the plaintiffs have failed to create a genuine issue of material fact as to the proximate cause of the flash explosion. The court agrees.

Alleging violations of the CPLA, the plaintiffs advance several theories of liability including failure to warn, inadequate warnings, misrepresentation as to the safety of the pour cup, failure to disclose the dangerous propensities of the pour cup, failure to adequately test the product, and breach of implied and express warranties. Because each of these theories requires the plaintiffs to prove causation, the analysis below applies to the plaintiffs' entire cause of action.

Under the CPLA, a plaintiff must plead and prove that the defendant's **[*18]** product was defective and that the defect proximately caused his injuries. *See Sharp v. Wyatt, Inc., et al., 31 Conn. App. 824, 833, 627 A.2d 1347 (Conn. App. 1993).* "A requisite element of proximate cause is 'cause in fact'." *Gold v. Dalkon Shield Claimants Trust, 1998 U.S. Dist. LEXIS 22413, 1998 WL 351456, at *2 (D. Conn. June 15, 1998)* (*citing Fitzgerald v. Manning, 679 F.2d 341, 348 (4th Cir. 1982)*). "Expert testimony with reference to proximate causation is not always required . . . .," for example, when a jury couldfind "proximate causation from its consideration of . . . the [product] and the plaintiff's description of how the accident happened." *Fane v. Zimmer, Inc., 927 F.2d 124, 131 (2d Cir. 1991).* However, an expert opinion as to proximate causation "is required[] when the subject-matter to be inquired about is presumed not to be within common knowledge and experience and when legal inference predominates over statement of fact . . ." *Id.*

"Questions regarding the existence of a causal link classically are reserved for determination by the trier of fact. Proximate cause 'becomes a question of law only when the mind of a fair **[*19]** and reasonable person could reach only one conclusion . . . .'" *Battistoni v. Weatherking Products, Inc., et al., 41 Conn. App. 555, 563, 676 A.2d 890 (Conn. App. 1996)* (*quoting Hall v. Winfrey, 27 Conn. App. 154, 604 A.2d 1334,* cert. denied, 222 Conn. 903, 606 A.2d 1327 (1992) (internal citations omitted). Where expert testimony is necessary to establish a causal link and none is proffered, "a reasonable jury [cannot] find that the plaintiff has proved that the defect caused [his] injuries." *Gold, 1998 U.S. Dist. LEXIS 22413, 1998 WL 351456, at *3.*

To meet their burden of proof as to cause in fact, the plaintiffs must establish a causal link between the defect in the pour cup and their claimed injuries. Specifically, at the summary judgment stage, the plaintiffs have the burden of producing evidence that could establish that it is more probable than not that a defective pour cup failed, causing a maldistribution of molten metal within the billet mold that in, turn, caused the billet to leak, which resulted in molten metal leaving the billet and entering the cooling tank. Cuevas and Graham testified that they cannot describe how the accident happened **[*20]** based on what they saw, and there is no other witness who can do so. Thus, this is not a case

where a jury could find proximate causation from its consideration of the product and a witness' description of how the accident happened.

Moreover, the court concludes that the factual predicate necessary to establish such causation is outside the common knowledge of a layperson and, therefore, must be established by expert testimony. See *Zuchowicz v. United States, 140 F.3d 381, 389 (2d Cir. 1998)*; *Fane, 927 F.2d at 131-32* (expert testimony required where there were two possible causes of complex injury); *Gold, 1998 U.S. Dist. LEXIS 22413, 1998 WL 351456, at *3* (citing *Connecticut v. McClary, 207 Conn. 233, 541 A.2d 96 (Conn. 1998)*. Erikson's highly technical analysis of why the pour cup is capable of failing under the thermal stress of the casting process and the explanations in his report as to how the casting process can go awry demonstrates the need for expert testimony on what went awry in the casting process during the incident in question and caused the flash explosion that resulted in the plaintiffs' injuries.

The plaintiffs have not produced **[*21]** evidence that could establish that the chain of events that they contend happened actually occurred. The plaintiffs could not establish proximate cause based on Erikson's limited testimony that the pour cup is capable of failing under the thermal stress of the casting process because Erikson can proffer expert testimony only as to certain qualities of the product. Erikson's proffered testimony could not establish that the pour cup actually failed during the incident in question because of a defect. Such a failure is simply Erikson's hypothesis. In his report, Erikson lists seven ways the billet casting process can go awry and lead to a flash explosion, including failure of the pour cup, but he did not reach a conclusion as to which of the seven possibilities actually occurred.

Q: So as you sit here today, you have nothing more than just a hypothesis that a broken cup may have brought about this injury or may have been the proximate cause of the injury?
A: Yes, that's one possibility.
Q: And there are several other possibilities?
A: There are other possibilities.

Q: Did anybody ever ask you to determine which would be the more likely possibility of the other **[*22]** possibilities you've come up with?
A: No, I don't think so.
(Erikson Dep., at 107:7-17.)
Q: My question is very simple. You were never asked to determine whether or not a broken pour

cup was a proximate cause of the plaintiffs' injuries; is that correct?
A. That's correct.

(Erikson Dep., at 108:4-8.) Thus, even if Erikson's proffered testimony is sufficient to establish the existence of a defect in the pour cup, it is not sufficient to establish a causal link between that defect and the plaintiffs' injuries.

Accordingly, the court concludes that the plaintiffs have failed to demonstrate a genuine issue of fact as to cause in fact, and the defendant is entitled to summary judgment.

## III. Conclusion

For the reasons set forth above, the defendant's Motion for Summary Judgment (Doc. No. 24) is hereby GRANTED.

The Clerk shall enter judgment in favor of the defendant and close this case.

It is so ordered.

Dated this 14th day of June 2006 at Hartford, Connecticut.

Alvin W. Thompson

United States District Judge

---

*End of Document*

🛈 Cited
As of: July 27, 2018 3:24 PM Z

## *Simjian v. Bayer Corp.*

United States District Court for the District of Connecticut

April 9, 2012, Decided; April 10, 2012, Filed

Case No. 3:10-CV-1263(RNC)

**Reporter**
2012 U.S. Dist. LEXIS 50198 *

CAROL SIMJIAN, Plaintiff, v. BAYER CORPORATION, Defendant.

## Core Terms

expert testimony, summary judgment, tendon, summary judgment motion, entitled to judgment, issue of causation, defense motion, matter of law, pain, tear

**Counsel:** **[*1]** For Carol Simjian, Plaintiff: Joel Thomas Faxon, Michael A. Stratton, LEAD ATTORNEYS, Stratton Faxon, New Haven, CT.

For Bayer Corporation, also known as Bayer AG and its Subsidiaries, Defendant: Alan G. Schwartz, James O. Craven, LEAD ATTORNEYS, Wiggin & Dana, New Haven, CT; Renee N Sewchand, Thomas J. Cullen, Jr., LEAD ATTORNEYS, PRO HAC VICE, Goodell, DeVries, Leeach & Dann, LLP, Baltimore, MD.

**Judges:** Robert N. Chatigny, United States District Judge.

**Opinion by:** Robert N. Chatigny

## Opinion

### RULING AND ORDER

This is a products liability case involving Avelox, an FDA-approved prescription antibiotic used to treat bacterial infections. The complaint alleges that plaintiff Carol Simjian sustained a rotator-cuff tear and pain in an Achilles tendon due to ingestion of Avelox. Defendant Bayer Corporation has moved for summary judgment on the ground that plaintiff lacks expert testimony to sustain her burden of proving that Avelox can cause tendon tears and pain. In support of its motion for summary judgment, defendant has filed a Local Rule 56(a)(1) Statement in which it states: "There

is no expert opinion evidence in the record or that may be presented by plaintiff at trial that Avelox can cause tendon-related injury." **[*2]** Plaintiff has not responded to the motion.

Under *Federal Rule of Civil Procedure 56*, summary judgment may be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. A defendant in a products liability case may be entitled to judgment as a matter of law when the plaintiff lacks admissible expert testimony on the issue of causation. See *Fane v. Zimmer, 927 F.2d 124, 131 (2d Cir. 1991)*(affirming directed verdict for medical device manufacturer). In a previous ruling in this case, defendant's motion to exclude the testimony of plaintiff's expert witness on medical causation was granted. The Court ruled that plaintiff's proffered expert is not qualified to provide expert testimony regarding a causal link between Avelox and tendon injury.

Plaintiff's failure to respond to the motion for summary judgment does not itself provide a basis for granting the motion. In the absence of opposition, however, defendant's statement, quoted above, that plaintiff lacks expert testimony on the issue of causation is deemed to be true. It is undisputed that without such testimony, plaintiff cannot prove her case. Summary judgment is therefore proper.

Accordingly, **[*3]** the defendant's motion for summary judgment is hereby granted (doc. 64). The Clerk will enter judgment in favor of the defendant dismissing the complaint.

So ordered this 9th day of April 2012.

/s/ RNC

Robert N. Chatigny

United States District Judge

2012 U.S. Dist. LEXIS 50198, *3

---

**End of Document**

⚠️ Caution
As of: July 27, 2018 3:24 PM Z

## *Gold v. Dalkon Shield Claimants Trust*

United States District Court for the District of Connecticut

June 15, 1998, Decided ; June 15, 1998, Filed

No. B-82-383 (EBB)

### Reporter
1998 U.S. Dist. LEXIS 22413 *; 1998 WL 351456

LYNN GOLD v. DALKON SHIELD CLAIMANTS TRUST

**Disposition: [*1]** Defendant's Motion for Summary Judgment GRANTED.

## Core Terms

summary judgment, causation, burden of proof, injuries

## Case Summary

### Procedural Posture
Defendant claimant's trust filed a motion for summary judgment, in a case where plaintiff IUD user brought an action against the manufacturer alleging personal injury caused by the IUD. The trust was created after the manufacturer's bankruptcy to handle the many claims filed against it. The bankruptcy court had certified the user to reopen her previous litigation in district court after she failed to resolve her claims to her satisfaction.

### Overview
The dispositive issue for the resolution of defendant claimant's trust's motion for summary judgment was whether a reasonable jury could find that plaintiff IUD user had met her burden of proof as to causation without the benefit of expert testimony, which was recently declined by the court. To meet her burden of proof as to cause in fact, she was required to establish a causal link between a defect in the IUD device and her claimed injuries. Specifically, she was required to demonstrate that it was more probable than not that a defective tail string in the device caused her to contract a condition that led to her infertility. The court found that expert medical testimony was the sole means by which she could carry this burden of proof. Even assuming that the she could show that the device was defective, and that she suffered the injuries she claimed, without a proffer of expert medical testimony as to causation to link the defect to the injury, a reasonable jury could not find that she had proved that the defect caused her specific injuries. She, therefore, failed to demonstrate the existence of a triable issue of fact to go to a jury.

### Outcome
The court granted defendant IUD manufacturer's Motion for Summary Judgment.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Supporting Materials > Discovery Materials

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

*HN1*[⬇️]  **Supporting Materials, Discovery Materials**

1998 U.S. Dist. LEXIS 22413, *1

In a motion for summary judgment the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. A court must grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact. A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

*HN2*[↓]   **Entitlement as Matter of Law, Appropriateness**

After discovery, if the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, then summary judgment is appropriate. As a corollary, the moving party is entitled to summary judgment if it can show that there is an absence of evidence to support the nonmoving party's case.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN3*[↓]   **Summary Judgment, Entitlement as Matter of Law**

The court is mandated to resolve all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide. Hence, only when reasonable minds could not differ as to the import of the evidence is summary judgment

proper.

Torts > ... > Elements > Causation > General Overview

Torts > Products Liability > Theories of Liability > Strict Liability

*HN4*[↓]   **Elements, Causation**

Under the Connecticut Product Liability Act, *Conn. Gen. Stat. Ann. § 52-572m et seq.*, a plaintiff must prove that the product was defective and that the defect proximately caused her injuries. A requisite element of proximate cause is cause in fact.

Evidence > ... > Testimony > Expert Witnesses > General Overview

Torts > Products Liability > Theories of Liability > Negligence

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

Civil Procedure > Trials > Judgment as Matter of Law > Directed Verdicts

Torts > Products Liability > General Overview

Torts > Products Liability > Theories of Liability > Strict Liability

*HN5*[↓]   **Testimony, Expert Witnesses**

Expert testimony is required when the factual content of the underlying issues is not found within the laypersons' common knowledge and experience.

Evidence > ... > Testimony > Expert Witnesses > General Overview

*HN6*[↓]   **Testimony, Expert Witnesses**

Medical evidence relating to causes of injury to the human body is not normally considered to dwell within the common knowledge of a layperson.

**Counsel:** LYNN GOLD, plaintiff, Pro se, Southport, CT.

1998 U.S. Dist. LEXIS 22413, *1

For DALKON SHEILD CLAIMANTS TRUST, defendant: R. Cornelius Danaher, Jr., Nancy K. Roux, Danaher, Tedford, Lagnese & Neal, Hartford, CT.

For DALKON SHEILD CLAIMANTS TRUST, defendant: Paul F. Strain, Elizabeth C. Honeywell, Venable, Baetjer & Howard, Baltimore, MD.

**Judges:** ELLEN BREE BURNS, SENIOR JUDGE, UNITED STATES DISTRICT COURT.

**Opinion by:** ELLEN BREE BURNS

# Opinion

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In 1982, the plaintiff, Lynn Gold, brought an action against A.H. Robins Company, alleging personal injury caused by the Dalkon Shield, an intrauterine contraceptive device ("IUD"), designed, manufactured, and sold by the defendant company. After A.H. Robins Company declared bankruptcy, a Plan of Reorganization ("Plan") was created in 1988 that established the Dalkon Shield Claimants' Trust ("Trust") to handle the many claims filed against the company in relation to the Dalkon Shield. Ms. Gold attempted to resolve her claim through the settlement procedure detailed in the Plan. When this process failed to resolve the matter to her satisfaction, the plaintiff was certified [*2] on December 13, 1996 by the United States Bankruptcy Court for the Eastern District of Virginia to reopen her previous litigation, filed in this court. On January 30, 1998, the plaintiff filed her second amended complaint in the reopened litigation. Now the defendant moves the Court for summary judgment pursuant to _FED.R.CIV.P. 56_. For the reasons set forth below, the defendant's motion (Doc. No. 68) is **GRANTED.**

## I. Statement of Relevant Facts

The Court summarizes only those facts believed necessary to an understanding of the issues in, and the decision rendered on, this motion. The facts are culled from the affidavits, depositions and other exhibits submitted by both parties. Unless otherwise indicated, these facts are not in dispute between the parties.

The plaintiff's medical records show that she had a

Lippes Loop IUD inserted in September, 1970. This IUD was later removed due to partial expulsion from the uterus. On May 3, 1972 a Dalkon Shield IUD was inserted into the plaintiff's uterus. The next month the plaintiff complained of heavy menses and cramping. The Dalkon Shield was checked and evaluated as "O.K." On January 31, 1978 the plaintiff had a pelvic exam [*3] which led to a diagnosis of endometriosis. On February 8, 1979 the Dalkon Shield was removed. Throughout the time the Dalkon Shield was in place the plaintiff's medical records reflect that she intermittently complained of abdominal discomfort. [1]

On July 8, 1980, Dr. Theodore Reed performed a hysterosalpingogram on the plaintiff. This procedure involves injection of a radiopaque material after which the fallopian tubes and uterus can be visualized by roentgenography (x-ray). The radiologist concluded that the plaintiff suffered from bilateral hydrosalpinx, i.e. distension of the fallopian tubes by clear fluid. The same procedure was performed by Dr. Reed again on April 2, 1981. A different radiologist concluded that [*4] the plaintiff had persistent hydrosalpinx "presumably due to past PID" (pelvic inflammatory disease).

In 1994, the plaintiff had blood samples sent by the Stamford Department of Health to the Centers for Disease Control to rule out chlamydia as a cause of the presumed PID. Her clinical diagnosis on the blood test order forms is listed as infertility. The blood tests were negative for chlamydia.

## II. Legal Analysis

### A. The Standard of Review

_HN1_[↑] In a motion for summary judgment the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. _FED.R.CIV.P. 56(c); Anderson v. Liberty Lobby, 477 U.S. 242, 256, 106 S. Ct. 2505, 2518, 91 L. Ed. 2d 202_, (1986); _Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995)_. A court must grant summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file,

---

[1] The plaintiff also testified in her deposition that she experienced a recurrent fever beginning in the late fall of 1978 and proceeding into January of 1979. In addition, she recounts having experienced an episode of acute abdominal pain which probably coincided with the fever. Pl.'s Dep. at 73.

together with affidavits, if any, show that there is no genuine issue of material fact.'" *Miner v. City of Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993)*(citation omitted). "A dispute [*5] regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523* (2d Cir.), *cert. denied*, 506 U.S. 965, 113 S. Ct. 440, 121 L. Ed. 2d 359, (1992) (quoting *Anderson, supra, 477 U.S. at 248*).

*HN2*[↑] After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265*, (1986). As a corollary, the moving party is entitled to summary judgment if it can show that there is an absence of evidence to support the nonmoving party's case. *Id. at 325*.

*HN3*[↑] The Court is mandated to resolve "all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich, supra, 963 F.2d at 523*. Hence, "only when reasonable minds could not differ as to the import of the evidence is summary judgment proper. [*6] " *Bryant v. Maffucci, 923 F.2d 979, 982* (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S. Ct. 152, 116 L. Ed. 2d 117 (1991). *See also Suburban v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992)*.

B. The Connecticut Product Liability Act Claim

The Court has jurisdiction over this action pursuant to 18 U.S.C. § 1332 (conferring diversity jurisdiction). Therefore, the plaintiff's cause of action lies under Connecticut law, specifically, the Connecticut Product Liability Act ("CPLA"), *Conn. Gen. Stat. § 52-572m et seq.* She claims damages based on the theories of strict liability in tort, negligence, failure to warn, breach of warranty, and fraudulent misrepresentation. [2] Because each of these theories requires the plaintiff to prove causation, the following analysis applies to the plaintiff's entire cause of action.

[*7] As just intimated, the deficiency in the plaintiff's

case is found in her inability to meet her burden of proof as to causation. *HN4*[↑] Under the CPLA a plaintiff must prove that the product was defective and that the defect proximately caused her injuries. *Sharp v. Wyatt, Inc., 31 Conn. App. 824, 627 A.2d 1347, 1352 (Conn. App. 1993)*. A requisite element of proximate cause is "cause in fact." *See e.g. Fitzgerald v. Manning, 679 F.2d 341, 348 (4th Cir. 1982)*(defining proximate cause in a medical malpractice action); *Sharp, 627 A.2d at 1354* (explicating the requirements for proximate cause under *Conn. Gen. Stat. § 52-572q(c)*).

The defendant maintains that the plaintiff cannot demonstrate cause in fact because she has failed to retain an expert to testify to the causal link between any defects in the Dalkon Shield and her injuries. Def.'s Mem. in Supp. of Mot. for Summ. J. at 5. The plaintiff argues that she will prove causation with the testimony of a court-appointed expert, written reports, and affidavits. Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 13.

The Court has recently declined to appoint an independent expert as requested by the [*8] plaintiff. [3] The dispositive issue for the resolution of this motion for summary judgment is, therefore, whether a reasonable jury could find that the plaintiff has met her burden of proof as to causation without the benefit of expert testimony.

*HN5*[↑] Expert testimony is required when the factual content of the underlying issues is not found within the [*9] laypersons' common knowledge and experience. *Fane v. Zimmer, 927 F.2d 124, 131 (2d Cir. 1991)* (affirming the trial court's directed verdict for the defendant in a product liability case because, absent expert medical testimony on the issue of causation, the plaintiffs could not prove the elements of strict liability or negligence); *In re Flanagan, 240 Conn. 157, 690 A.2d 865, 876 (Conn. 1997)*(applying this standard in the

---

[2] The plaintiff also alleges "civil conspiracy" in her Second Amended Complaint. Because no such tort lies under the CPLA, either explicitly, *see Conn. Gen. Stat. § 52-572m(b)*, or implicitly under the common law, the Court need not address this allegation.

[3] *See* Ruling on Plaintiff's Petition to have the Court Appoint Expert Witnesses, dated June 3, 1998. The Court concluded that the plaintiff failed to make a strong enough showing that the issues involved were so highly technical that it is necessary to interfere with the adversarial process by appointing an independent expert for which the defendant would have to bear the expense. That decision however, does not contradict the Court's finding in this Ruling that a jury of laymen do need expert guidance in determining causation. The Court simply places the burden of proving the plaintiff's case on the plaintiff, where it properly belongs in our adversarial system.

context of an alleged ethical violation by a state court judge).

*HN6*[↑] Medical evidence relating to causes of injury to the human body is not normally considered to dwell within the common knowledge of a layperson. *Connecticut v. McClary, 207 Conn. 233, 541 A.2d 96, 100 (Conn. 1988)* (citing *Collette v. Collette, 177 Conn. 465, 418 A.2d 891, 894 (Conn. 1979)*.

To meet her burden of proof as to cause in fact, the plaintiff must establish a causal link between a defect in the Dalkon Shield and her claimed injuries. Specifically, she must demonstrate that it is more probable than not that a defective tail string in the Dalkon Shield caused her to contract PID which then led to her infertility. The plaintiff **[*10]** cannot make this showing from articles and clinical studies which conclude that a defective tail string in the Dalkon Shield tends to cause PID which often leads to infertility. She must prove by a preponderance of the evidence that this series of events that she alleges actually occurred in her case. The Court finds that expert medical testimony is the sole means by which she can carry this burden of proof.

Even assuming that the plaintiff can show that the Dalkon Shield was defective and that she suffered the injuries she claims, without a proffer of expert medical testimony as to causation to link the defect to the injury, a reasonable jury could not find that the plaintiff has proved that the defect caused her specific injuries. She, therefore, fails to demonstrate the existence of a triable issue of fact to go to a jury. Given the absence of evidence to prove the plaintiff's case, the defendant trust is entitled to summary judgment. *Cavallo v. Star Enterprise, 892 F. Supp. 756, 774 (E.D. Va. 1995)*(granting summary judgment for defendant in a toxic tort case when the plaintiffs failed to offer admissible expert testimony in opposition to defendant's summary judgment **[*11]** motion), *aff'd*, *100 F.3d 1150 (4th Cir. 1996)*.

## II. Conclusion

For the foregoing reasons, the defendant's Motion for Summary Judgment (Doc. No. 68) is **GRANTED.**

SO ORDERED

ELLEN BREE BURNS, SENIOR JUDGE

UNITED STATES DISTRICT COURT

Dated at New Haven, Connecticut, this 15th day of June, 1998.

_____

**End of Document**

Mark Bouchard

 Positive
As of: July 27, 2018 3:24 PM Z

# Kuzmech v. Werner Ladder Co.

United States District Court for the District of Connecticut

December 7, 2012, Decided; December 7, 2012, Filed

CIVIL ACTION NO. 3:10-cv-266 (VLB)

**Reporter**
2012 U.S. Dist. LEXIS 174082 *; 90 Fed. R. Evid. Serv. (Callaghan) 50; 2012 WL 6093898

RUTH J. KUZMECH, ET AL, Plaintiff, v. WERNER LADDER COMPANY, ET AL, Defendants,

## Core Terms

ladder, buckling, testing, strut, expert testimony, reliable, engineering, quotation, marks, conclusions, alternative design, implied warranty, calculations, measurements, principles, drawings, warnings, leg, expert report, side rail, causation, citations, aluminum, theories, warranty, summary judgment motion, product liability, manufacturing, deposition, scientific

## Case Summary

### Overview

The court found that although plaintiffs' expert was qualified by experience, training and education, his testimony was neither grounded on sufficient facts or data, the product of reliable principles and methods nor was there any indication that the expert applied those principles and methods reliably to the facts. Plaintiffs failed to satisfy any of the four factors identified in Daubert with respect to the expert's testimony. The expert's conclusions that the ladder was defective were based on nothing more than his cursory visual inspection of the ladder and rough measurements.

### Outcome

The motions were granted.

## LexisNexis® Headnotes

Evidence > Admissibility > Expert Witnesses

**HN1**[ ] **Admissibility, Expert Witnesses**

_Fed. R. Evid. 702_ provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Evidence > Admissibility > Expert Witnesses > Daubert Standard

Evidence > Admissibility > Expert Witnesses

**HN2**[ ] **Expert Witnesses, Daubert Standard**

District courts have a "gatekeeping" role under _Fed. R. Evid. 702_ and are charged with the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. The district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered. This inquiry is conducted with reference to _Rule 702_, and involves considering whether (1) the testimony is grounded on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.

Evidence > Admissibility > Expert Witnesses > Daubert Standard

**HN3**[ ] **Expert Witnesses, Daubert Standard**

While the Daubert inquiry is fluid and will necessarily

2012 U.S. Dist. LEXIS 174082, *174082

vary from case to case, the United States Supreme Court in Daubert identified factors bearing on reliability that district courts may consider: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. However, nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. The burden is on the party proffering the expert testimony to lay a foundation for its admissibility.

Evidence > ... > Testimony > Expert Witnesses > Qualifications

*HN4*[⬇] **Expert Witnesses, Qualifications**

A court must consider the totality of a witness's background when evaluating the witness's qualifications to testify as an expert. *Fed. R. Evid. 702* does not require expertise to be so exacting. *Rule 702* requires a witness only be qualified by knowledge, skill, experience, training or education and permits that witness to testify if that expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

Evidence > Admissibility > Expert Witnesses > Daubert Standard

Evidence > Admissibility > Expert Witnesses

*HN5*[⬇] **Expert Witnesses, Daubert Standard**

Nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.

Evidence > Admissibility > Expert Witnesses

*HN6*[⬇] **Admissibility, Expert Witnesses**

Expert testimony should be precluded where there is no

indication in the expert report of the engineering protocols and methods employed in arriving at the normative conclusions embodied within the claims.

Evidence > Admissibility > Expert Witnesses

*HN7*[⬇] **Admissibility, Expert Witnesses**

An expert, regardless of how sterling his credentials, must make clear in his proffer the methods and standards he proposes to apply in arriving at his opinions and evaluations, and must make clear in doing so that those methods and standards are reliable, and subject to objective evaluation by the expert's peers.

Evidence > ... > Testimony > Expert Witnesses > General Overview

Torts > Products Liability > General Overview

*HN8*[⬇] **Testimony, Expert Witnesses**

Courts have repeatedly emphasized the importance of having an expert in a product liability case perform appropriate tests on his and the defendant's designs. The importance of testing both an expert's theory of causation and alternative design is usually critical to show that an expert adhered to the same standards of intellectual rigor that are demanded in their professional work and ensures that the focus of the jury's deliberation is on whether the manufacturer could have designed a safer product, not on whether an expert's proposed but untested hypothesis might bear fruit. Indeed the United States Court of Appeals for the Second Circuit has acknowledged that expert testimony regarding a safer alternative design should be excluded where the expert fails to conduct any testing, perform calculations or create drawings and testimony regarding a theory of causation should be excluded absent testing. This is not to say that testing of alternative designs is always necessary. An expert may, in some cases, provide drawings and calculations that would allow a trier of fact to infer that his theory that the product was defective and that alternative designs would have prevented the accident without sacrificing utility were supported by valid engineering principles.

Evidence > Admissibility > Expert Witnesses

Torts > Products Liability > General Overview

*HN9*[⬇] **Admissibility, Expert Witnesses**

The United States Court of Appeals for the Second Circuit holds hat district courts are not required to accept an expert's testimony regarding speculative and untested theories concerning the cause of an accident in a products liability case.

Civil Procedure > Discovery & Disclosure > Disclosure > Mandatory Disclosures

Civil Procedure > Discovery & Disclosure > Disclosure > Sanctions

*HN10*[⬇] **Disclosure, Mandatory Disclosures**

*Fed. R. Civ. P. 26* guards against the presentation of sketchy and vague expert reports that provide little guidance to the opposing party as to an expert's testimony, *Fed. R. Evid. 702* guards against the presentation of insufficiently reliable evidence to the finder of fact. *Rule 26* requires that an expert report contain (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; and (iii) any exhibits that will be used to summarize or support them. *Fed. R. Civ. P. 26(a)(2)(B).* Feb. R. Civ. P. 37(c)(1) provides that a party who fails to provide information required by *Rule 26(a)* is not permitted to use that information to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless. The advisory notes to *Rule 26* make clear that *Rule 26(a)(2) (B),* added as part of the 1993 amendments to the federal rules, requires that an expert prepare a detailed and complete written report, stating the testimony the witness is expected to present during direct examination, together with the reasons therefore.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

*HN11*[⬇] **Summary Judgment, Entitlement as Matter**

of Law

Summary judgment should be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. The moving party bears the burden of proving that no factual issues exist. In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought. If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

*HN12*[⬇] **Burdens of Proof, Nonmovant Persuasion & Proof**

A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, the plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient. Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.

Torts > Products Liability > General Overview

*HN13*[⬇] **Torts, Products Liability**

The Connecticut Products Liability Act (CPLA), *Conn. Gen. Stat. § 52-572m et seq.,* enacted in 1979, is intended to merge the various common law theories of products liability into a single cause of action in order to simplify pleadings and procedures. However, the CPLA certainly retains the plaintiff's right to allege the traditional theories of recovery along with the statutory basis for recovery under one unified count denominated as a product liability claim.

Torts > Products Liability > Types of Defects > Design Defects

Torts > Products Liability > Types of Defects > Manufacturing Defects

Torts > Products Liability > Theories of Liability > Strict Liability

**HN14**[⬇] **Types of Defects, Design Defects**

Connecticut law provides for civil damages actions grounded in strict liability for defective products. *Conn. Gen. Stat. § 52-572n*. In general, Connecticut courts have adopted the strict liability test established in *§ 402A of the Restatement (Second) of Torts. Section 402A* imposes liability only when the product is "unreasonably dangerous" to the ordinary consumer who purchases it. A product may be defective due to a flaw in the manufacturing process, a design defect or because of inadequate warnings or instructions. A manufacturing defect is a mistake in the assembly process, which results in a product that differs from the manufacturer's intended result. A design defect exists when the product is otherwise properly manufactured, but is nonetheless unreasonably dangerous because its attributes can cause unexpected injury while a warning defect exists when a product is unreasonably dangerous because it lacks adequate warnings or instructions concerning the product's dangerous propensities.

Torts > Products Liability > Types of Defects > Marketing & Warning Defects

Torts > Products Liability > Theories of Liability > Strict Liability

**HN15**[⬇] **Types of Defects, Marketing & Warning Defects**

In order to recover under the doctrine of strict liability in tort a plaintiff must prove that: (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition. A product is unreasonably dangerous if it is dangerous to an extent

beyond that which would be contemplated by the ordinary consumer who purchases it. Proper warnings, however, may prevent a product from being unreasonably dangerous. In a products liability action, the plaintiff must plead and prove that the product was defective and that the defect was the proximate cause of the plaintiff's injuries.

Evidence > ... > Testimony > Expert Witnesses > General Overview

Torts > Products Liability > General Overview

**HN16**[⬇] **Testimony, Expert Witnesses**

Connecticut Supreme Court has made it clear that in product liability actions, a jury may, under appropriate circumstances, infer a defect from the evidence without the necessity of expert testimony. Expert testimony is unnecessary if all the primary facts can be accurately and intelligibly described to the jury, and if they are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation. Where, however, the nexus between the injury and the alleged cause would not be obvious to the lay juror, expert evidence is often required to establish the causal connection between the accident and some item of physical or mental injury.

Evidence > ... > Testimony > Expert Witnesses > General Overview

Torts > Products Liability > Types of Defects > Design Defects

**HN17**[⬇] **Testimony, Expert Witnesses**

Courts have recognized that putting forth expert testimony or evidence of some kind to establish a genuine issue of material fact is especially important when the plaintiff attempts to assert a design defect claim. Expert testimony with reference to proximate causation is not always required for example, when a jury could find proximate causation from its consideration of  the product and the plaintiff's description of how the accident happened. However, an expert opinion as to proximate causation is required when the subject-matter to be inquired about is

2012 U.S. Dist. LEXIS 174082, *174082

presumed not to be within common knowledge and experience and when legal inference predominates over statement of fact. A defendant in a products liability may be entitled to judgment as a matter of law when the plaintiff lacks admissible expert testimony on the issue of causation.

Torts > Products Liability > General Overview

### *HN18*[🔽] **Torts, Products Liability**

The Connecticut Products Liability Act (CPLA), *Conn. Gen. Stat. § 52-572m et seq.*, creates a consolidated cause of action for all product liability claims, which shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product. *Conn. Gen. Stat. § 52-572n(a)*. Although the CPLA provides the exclusive remedy for product liability claims, it was not meant to alter the substance of a plaintiff's rights and it does not preempt all common law theories of product liability; rather, the CPLA bars separate common law causes of action in product liability cases. A plaintiff bringing a cause of action under the CPLA therefore retains the right to allege traditional theories of recovery under one unified CPLA claim like breach of express and implied warranty.

Torts > Products Liability > Theories of Liability > Breach of Warranty

### *HN19*[🔽] **Theories of Liability, Breach of Warranty**

Because the Connecticut Products Liability Act (CPLA), *Conn. Gen. Stat. § 52-572m et seq.*, is silent as to the elements of a cause of action for breach of warranty, plaintiffs may rely on the Connecticut Uniform Commercial Code, Title 42a of the Connecticut General Statutes (CUCC). The CUCC defines implied warranties in two provisions. *Conn. Gen. Stat. § 42a-2-315* provides: where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under *Conn. Gen. Stat. § 42a-2-316* an implied warranty that the goods shall be fit for such purpose. *Conn. Gen. Stat. § 42a-2-314* provides: unless excluded or modified as provided by *Conn. Gen. Stat. § 42a-2-316*, a warranty that the goods shall be merchantable is implied in a

contract with respect to goods of that kind. This implied warranty of merchantability acts as a guarantee by the seller that his goods are fit for the ordinary purposes for which they are to be used and will pass in the trade without objections.

Business & Corporate Compliance > ... > Contracts Law > Types of Contracts > Express Warranties

Torts > Products Liability > Theories of Liability > Breach of Warranty

### *HN20*[🔽] **Types of Contracts, Express Warranties**

An express warranty is defined under *Conn. Gen. Stat. § 42a-2-313(1)* as: (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain, creates an express warranty that the goods shall conform to the affirmation or promise; (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description; (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the good shall conform to the sample or model.

Business & Corporate Compliance > ... > Contracts Law > Types of Contracts > Express Warranties

Contracts Law > Contract Conditions & Provisions > Implied Warranties > General Overview

Torts > Products Liability > Theories of Liability > Breach of Warranty

### *HN21*[🔽] **Types of Contracts, Express Warranties**

For both express and implied warranties, a plaintiff has the burden of proving causation. In a breach of warranty action, a plaintiff may recover only after demonstrating that a warranty existed, that defendant breached the warranty, and that the breach was the proximate cause of the loss sustained.

Torts > Products Liability > General Overview

### *HN22*[🔽] **Torts, Products Liability**

The Connecticut Products Liability Act (CPLA), *Conn. Gen. Stat. §52-572m et seq.*, exclusivity provision bars Connecticut Unfair Trade Practices Act (CUTPA), *Conn. Gen. Stat. § 42-110a, et. seq.*, claims that assert that a defendant's product is defectively designed or that the defendant failed to warn properly about a defective product.

Torts > Negligence > General Overview

*HN23*[⬇] Torts, Negligence

Loss of consortium is a derivative cause of action, meaning that it is dependent on the legal existence of the predicate action.

**Counsel:** **[*1]** For Ruth J. Kuzmech, John M. Kuzmech, Plaintiffs: Jonathan Lane, LEAD ATTORNEY, Mariani & Reck, LLC, New London, CT; Leslie Gold McPadden, LEAD ATTORNEY, Leslie Gold McPadden, LLC, Cheshire, CT; Ralph J. Monaco, LEAD ATTORNEY, Conway, Londregan, Sheehan & Monaco, P.C., New London, CT; Tracey E. Hardman, The Hardman McPadden Law Offices, Middletown, CT.

For Werner Ladder Co, Lowes Home Center Inc, Defendants: Mark J. Claflin, Howd & Ludorf, LLC, Hartford, CT.

**Judges:** Hon. Vanessa L. Bryant, United States District Judge.

**Opinion by:** Vanessa L. Bryant

# Opinion

MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION TO PRECLUDE EXPERT WITNESS [DKT. #57] AND MOTION FOR SUMMARY JUDGMENT [Dkt. #45]

Before the Court is Defendants Werner Co. (DE) [1] ("Werner") and Lowe's Home Centers, Inc.'s ("Lowe's") motion to preclude Plaintiffs Ruth J. Kuzmech and John Kuzmech's expert witness and motion for summary judgment. Plaintiffs allege that a ladder manufactured by Werner and distributed by Lowe's was defectively

designed and sold without proper or adequate warnings, labels and instructions in violation of the Connecticut Products Liability Act ("CPLA"), *Conn. Gen. Stat. §52-572m et seq.* Plaintiffs also bring claims for breach of express **[*2]** warranty, breach of implied warranty, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), *Conn. Gen. Stat. §42-110a, et. seq.* and loss of consortium on behalf of Plaintiff John Kuzmech. Defendants argue that the Court should preclude the Plaintiffs' expert's testimony as unreliable and that absent expert testimony Plaintiffs' CPLA claims fail as a matter of law as the Plaintiffs cannot demonstrate that the ladder was defective. The Defendants also argue that Plaintiffs' other claims are preempted by the CPLA. For the foregoing reasons, the Court grants both Defendants' motion to preclude and motion for summary judgment.

Background and Facts

The following background and facts relevant to Defendants' motion to preclude and motion for summary judgment are undisputed unless otherwise noted. On July 14, 2009, Ruth Kuzmech, age seventy, was using a stepladder to trim hedges along her driveway when both she and the ladder fell to the ground. [Dkt. #45, Defs. Local Rule 56(a)1 Statement, ¶1]. At the time, Ruth Kuzmech was using an eight-foot Werner aluminum stepladder. *Id.* at ¶2. Mrs. Kuzmech's son, Clifford **[*3]** Hoxie, purchased the ladder at Lowe's sometime in April 2009, where he was employed, with his employee discount, for Mrs. Kuzmech and her husband, John Kuzmech. *Id.* at ¶3. The ladder was a 1-A ladder with a 250 pound duty rating. *Id.* at ¶5. Hoxie did not observe any damage to the ladder when it was purchased. *Id.* at ¶4. Mr. and Mrs. Kuzmech did not observe any damage to the ladder when Hoxie presented it to them. *Id.* at ¶¶9-10.

The ladder at the time of purchase had warning labels on it, including the following: one with duty rating on it, one on the side pertaining to the setup of the ladder, one cautioning to use it only on level surfaces, and one on a top step that advises not to stand beyond that point. *Id.* at ¶6.

At the time of her fall, Mrs. Kuzmech was trimming the side of the hedges facing her lawn, and the ladder was placed on a grassy dirt surface. *Id.* at ¶11. Mrs. Kuzmech had climbed up to the third rung of the ladder and was trimming the hedges when she "just went." *Id.* at ¶12. She doesn't know what happened to cause her

---

[1] Plaintiffs improperly sued Werner Ladder Company and Werner Company.

2012 U.S. Dist. LEXIS 174082, *3

to fall. *Id.* Mrs. Kuzmech recalls falling over to the left and the next thing she knew she was on the ground. She lost consciousness for a period of time. **[*4]** *Id.* at ¶13. When Mrs. Kuzmech regained consciousness, her dog was licking her face. She observed that one of her legs was sticking through the rungs of the ladder and her other leg was underneath the left front side rail. She also observed that the ladder was now bent and damaged. *Id.* at ¶14.

At the time of the fall, the ladder was positioned in an area of a gradual downward slope which Mrs. Kuzmech describes as "not bad." [Dkt. #55, Pl. Local Rule 56(a) 2 Statement, ¶17]. Mrs. Kuzmech is certain that the ladder's four feet did not move at all. They did not sink into the ground or come off of the ground, until the moment the ladder fell over. [Dkt. #45, Defs. Local Rule 56(a)1 Statement, ¶18]. Both of Mrs. Kuzmech's hands were holding the trimmers when the ladder fell over. *Id.* at ¶19.

Mrs. Kuzmech had used the ladder prior to the date of her fall, without incident. *Id.* at ¶21. Mrs. Kuzmech's daughter also used the ladder twenty to twenty-five times before without incident. *Id.* at ¶22.

Plaintiffs allege in their complaint that the ladder was defective in several ways. First, Plaintiffs allege that the stepladder's rear legs were no longer lined up with the front-legs, leaving the ladder **[*5]** racked and unstable. [Dkt. #1, Compl., ¶9]. In the racked position, the stepladder had only three legs on the ground, the fourth leg was off of the ground causing the ladder's support to cave in. *Id.* Plaintiffs also allege that one of the bolts that held the upper frame of the ladder came out, which contributed to the caving in of the ladder. *Id.* at ¶10. Plaintiffs also allege that the Defendants breached the express warranty that the ladder was safe for its intended uses and the implied warranty of merchantability because Mrs. Kuzmech was injured as a result of the ladder's defects. *Id.* at ¶¶14-16. Plaintiffs further allege that Defendants violated CUTPA by failing to correct the defect and to accurately, completely and truthfully warn that the ladder's defects posed a danger to the public at large. *Id.* at ¶30. Plaintiffs contend that as a direct and proximate result of the deceptive acts or practices of the Defendants, Mrs. Kuzmech suffered severe painful and serious injuries. *Id.* at ¶32. Lastly, Mr. Kuzmech alleges that he has suffered a loss of affection, care, companionship and consortium of his wife as a result of the carelessness and negligence of Defendant Werner. *Id.* **[*6]** at p.17.

Plaintiffs have offered the testimony of Dr. Harold Larson as an expert witness in support of their opposition to Defendants' motion for summary judgment. Based on the testimony of Dr. Larson, Plaintiffs contend in opposition to summary judgment that the ladder was defectively designed such that the diagonal strut which connects to the side rail was not strong enough to support the load of the ladder during a reasonably foreseeable use and such that the diagonal strut should have connected to the side rail at a lower point, offering more support for the load of the ladder. [Dkt. #55, Pl. Local Rule 56(a) 2 Statement, Disputed Issue of Material fact, ¶¶1-2].

Dr. Larson is a metallurgical engineer. He holds a bachelors of science in chemical engineering from Tufts University and a doctorate in metallurgy from the Massachusetts Institute of Technology ("MIT"). [Dkt. #62, Ex. A, Larson CV]. He was employed as a Superintendent of Process Metallurgy Research by ASARCO INC. from 1966-1980. *Id.* After ASARCO, Dr. Larson worked as a Manager of Metals Research and Headquarters Staff Engineer at Exxon Mineral Company from 1980-1984 and then as a General Manager and Director of Engineering **[*7]** at Prototech Inc. from 1984-1988. *Id.* From 1989-2006, Dr. Larson was employed as a Research Associate at MIT and then as a Research Affiliate at MIT from 2006-present. *Id.* Dr. Larson has authored several peer reviewed articles in the fields of chemical and metallurgical engineering. Dr. Larson is not a licensed engineer in any state.

Dr. Larson's expert report submitted pursuant to *Fed. R. Civ. P. 26(a)(2)* consists of a four paragraph letter dated September 7, 2011 addressed to Plaintiffs' counsel. In that letter, Dr. Larson writes:

> I have examined the incident Ladder which you delivered to me. Mrs. Kuzmech's sworn deposition establishes that the ladder was set up properly, the side braces were engaged, and the ladder was on stable relatively flat ground. She climbed up to the ladder to only the third step from the bottom and reached over the top of the ladder to trim her bushes. Therefor her center of mass was always between the side rails of the ladder. Her weight was well below the weight rating of this ladder.
>
> The ladder failed and collapsed sideways when the left front rail buckled and folded inward. The ladder was being used properly, therefore the ladder failed. The step ladder **[*8]** is made of extruded Aluminum alloy. There are four diagonal Aluminum support struts riveted to each of the bottom three

steps of the ladder to stiffen and strengthen it. In this failure the two support struts between the bottom step and the left rail failed by buckling. Of these, the rear strut buckled the most. Once the struts bent, they could not support or stiffen the left rail and strut. The root cause of the collapse of the ladder was the buckling of the lower rear support strut. This is a flimsy, poorly designed ladder and failure was foreseeable.

The weakest components of the design were the lower support struts which failed. At minimal or no extra cost a light gage extrude channel piece could have been substituted for the two struts on each side. The channel geometry would provide much greater resistance to buckling. In addition, the connection points on the side rails would perform better if they were closer to the foot of the ladder. A ladder with these simple modifications, likely would not have failed. A company interested in consumer safety would recall this model ladder and make these changes.

In my opinion, with a reasonable degree of engineering certainty, the incident **[*9]** ladder failed because it was poorly designed and defective for its rated service.

[Dkt. # 57, Att. 1, Ex. A].

Defendants have submitted a complete copy of Dr. Larson's deposition transcript for this Court's review. Dr. Larson testified that while he doesn't claim to be a ladder expert nor has he designed a ladder, he has examined and worked on several ladder cases in collaboration with MIT Professor Tom Eagar. [Dkt. #57, Ex. B., Larson Dep., p. 30-32]. In those past cases, Dr. Larson has completed testing on ladders including determining the kind of force it takes to break something loose on the subject ladder as well as some "analytical work on the type of aluminum from an aluminum ladder, hardness measurements, chemical analysis, SEM work, and grain structure measurements." *Id.* at 32-33.

Dr. Larson testified that he did not undertake any testing on the ladder at issue in this case and that "all I've done is a visual inspection" of the ladder. *Id.* at 34. He testified that he did not take any measurements that he recorded and kept but used a micrometer to measure wall thickness to get a rough judgment on the various strengths of various components. *Id.* at 45. He also took a tape measure **[*10]** and measured the distance between the various steps on the ladder. *Id.* at 48. Dr. Larson did not ask for any design drawings before he prepared his report nor did know whether the

measurements he made met manufacturing specifications. *Id.* at 47-48.

Dr. Larson testified that he observed several deformations of the ladder during his visual inspection which he deemed to be significant. He testified that "I would place a lesser level of significance on the side brace that broke fee from one leg. I don't think that was causative. I think that was post event but not an initiator. To me the main damage I saw on the bottom left front rail which had buckled and the support struts or brackets that go between that rail and the lowest step of the ladder." *Id.* at 51. Dr. Larson also indicated that one end of one of the spreader bars had pulled loose from the rail and bent which in his opinion was the result of the accident and not its cause. *Id.* at 52. Dr. Larson did not take any measurement of any of the deformations to the ladder. *Id.* at 54.

Dr. Larson indicated that it was his belief that had the diagonal struts not bent the side rail would not have bent. *Id.* at 69. Dr. Larson testified that he **[*11]** did not "attempt to quantify what forces are required to cause this type of deformation to the ladder components given the set up and use of the ladder at that time." *Id.* He stated that "it's testing that could be done. I've not been requested to do that." *Id.* Dr. Larson explained "[o]ne thing that I would [have] like[d] to test that could be tested would be what I'm calling the strut, the knee brace, could test that as to what force does it take compression to get it to buckle. That knee brace is made out of 14 gage steel, has a dimple in it, if you would, which strengthens it somewhat but is almost 10 inches long and is subject to buckling...There is an issue of the thickness of the material and length of the material. If the length of the material is over 50 times the thickness of the material it's prone to buckling. That would be the case here. If it's short and stubby, if it was either less length or more thickness to it, it would not have buckled." *Id.* at 70- 71.

Dr. Larson testified that "I believe the design of the whole ladder is - I use the word flimsy. That includes that left side rail ... You want a ladder to be the lightest weight possible and just strong enough to do the **[*12]** job. Both side rails could have been made out of stronger material generally thicker...and that to make this ladder non-defective [they should] make the strut stronger and [] move the connection point of the strut to the side rail lower." *Id.* at 77-78. Dr. Larson attested that he did not make any drawings of such an alternative design nor did he create any sketches. *Id.* at 78-79. When asked if his opinion was untested and subjective

based on the accident that was described by the Plaintiff, he answered that "[t]his is an educated opinion. It's unsubstantiated." *Id.* at 79. He once again indicated that he did not do any calculations in connection with his opinion. *Id.*

Dr. Larson also explained that in his opinion the strut should have been made out of a channel configuration as opposed to the configuration that it was. *Id.* Dr. Larson brought to the deposition a U shaped channel made out of aluminum that he explained would be close to the size and the shape of his proposed design alternative. *Id.* at 79-80. Dr. Larson purchased this piece of aluminum which was commercially available. *Id.* at 130. Dr. Larson testified that the channel he brought is an example of the concept of the alternative **[*13]** design but that he did not do "any drawings, sketches, calculations or any other work to transform that alternative design concept into any type of prototype that could actually be used with that ladder" although he indicated that it would "not [be] difficult to do" so. *Id.* at 80.

Although Dr. Larson admittedly did not build any prototype or do any calculations such as to determine the load bearing characteristics of the alternative diagonal brace he proposed, he explained that he could demonstrate his design concept with cardboard. *Id.* at 81-83. At his deposition, Dr. Larson used cardboard to demonstrate a U shape is stronger and less prone to buckling. *Id.* at 83-84.

When asked "is there any testing of the ladder as a whole that you could envision that could be done to test your opinion that the left front rail and diagonal braces were bent by normal loading within the center of gravity of the ladder with the ladder placed on a firm level surface," Dr. Larson indicated that "[t]here are tests that could be done. But I would not expect it to fail those tests...[b]ecause a **[*14]** normal loading of a ladder straight down would tend to cause the legs to buckle outward. This leg buckled inward." *Id.* at 71-72. Dr. Larson indicated that his opinion was not premised on the assumption that the ladder was on a firm surface and the forward force consisted of the Plaintiff and the hedge trimmer as Plaintiff had testified. *Id.* Instead, Dr. Larson explained that he had "a couple of hypotheses, certainly not prove, a couple of things that could cause the failure" which he did not include in the report. *Id.* at 72. Dr. Larson further explained that a "person is not necessarily stationary with straight down forces. But they could be a body moving side to side that can put additional horizontal forces on the ladder. There can be

some racking or twisting of the ladder that occurs." *Id.* at 74.

Dr. Larson opined that in order for the inward buckling to have occurred there must have been horizontal force on the ladder despite the fact the Plaintiff has testified that she was centered on the ladder on essentially flat ground. *Id.* at 84. Dr. Larson explained that he had a couple of hypotheses as to how there could be lateral movement when Plaintiff didn't do anything to tip the ladder **[*15]** to one side or the other. *Id.* at 86. He declared that "I have, as I said previously, a couple of hypotheses that would cause that to happen, neither one of which I can prove. There is no evidence that I'm aware of." *Id.* at 84-85. "One hypothesis we know there was a dog in the yard. If Ms. Kuzmech is standing on the third step of the ladder and the dog comes and jumps onto the ladder, the side of the ladder, puts his paws up against it, he can create just the direction and type of force that is needed to cause the buckling. I don't know that happened. It's just a hypothesis." *Id.* at 85-86. Dr. Larson admits that he did not attempt to quantify the force that would be at play in this hypothesis. *Id.* at 86. His second hypothesis "which has to do with the buckling of the strut is that while the ladder is on its side either in storage in the storage shed or possibly even when it was in the store before it was purchased somebody could have inadvertently kicked against the strut. It could happen... I think it's possible that a strut was damaged before the ladder was used." *Id.* at 87.

Dr. Larson agrees that "if the ladder was set up on relatively firm level ground and a person such as the Plaintiff **[*16]** having her body centered between the rails that an inward buckling of one of the front legs is not to be expected" and that ""unless one of [his] two hypotheses or some other manner that [he] can't envision currently was in place, then [he] can't envision how the inward buckling would occur given the stated use of the ladder." *Id.* at 88-89. "For the buckling to have occurred in this case given the Plaintiff's stated use of the ladder" there must have been "some other force to cause the inward buckling."

Dr. Larson agrees that "if someone reached far enough outward to the left or the right to cause a ladder to tip over that that force would also cause a leg to buckle." *Id.* at 94. Dr. Larson also agrees that if the ladder "simply tipped over for whatever reason, whether it's because it was on a slope, whether it was because the Plaintiff lost her balance for whatever reason, if the ladder simply tipped over and the Plaintiff fell on it" her body weight could cause the buckling of the left rear rail.

2012 U.S. Dist. LEXIS 174082, *16

*Id.* at 96. Although Dr. Larson points out that Mrs. Kuzmech testified that when she regained consciousness the ladder was on top of her. *Id.* at 97.

Dr. Larson further testified that he believed **[*17]** that the side braces were flimsy and the side rails were of the absolute minimum thickness to function and should be heavier but neither of these two weaknesses contributed to the accident. *Id.* at 98-99. Dr. Larson attested that he did not consult with anybody regarding his work on this case nor was his work reviewed by any other engineer or scientific expert. *Id.* at 104. Lastly, Dr. Larson attested that he isn't familiar with any literature or materials in the public domain that speak directly to ladder design or manufacture although he is aware those sources exist. *Id.* at 107-108.

A. Motion to Preclude

**HN1**[⬆️] *Federal Rule of Evidence 702* provides: A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *Fed. R. Evid. 702*.

**HN2**[⬆️] "District **[*18]** courts have a 'gatekeeping' role under *Federal Rule of Evidence 702* and are charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Lynch v. Trek Bicycle Corp., 374 F. Appx. 204, 206 (2d Cir. 2010)* (quoting *Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002))*. "The district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered. This inquiry is conducted with reference to *Rule 702*, and involves considering whether (1) the testimony is grounded on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.* (internal quotation marks and citations omitted).

**HN3**[⬆️] "While the *Daubert* inquiry is fluid and will necessarily vary from case to case, the Supreme Court in *Daubert* identified factors bearing on reliability that district courts may consider: "(1) whether a theory or technique can be (and has been) tested, (2) whether the

theory or technique has been subjected to peer review and publication, **[*19]** (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation, and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. However, nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* (internal quotation marks and citations omitted). "The burden is on the party proffering the expert testimony to lay a foundation for its admissibility." *Smith v. Herman Miller, Inc., No.CV-03-5358 (CPS), 2005 U.S. Dist. LEXIS 46112, 2005 WL 2076570, at *2 (E.D.N.Y. Aug. 26, 2005)*.

Defendants argue that the Plaintiffs should be precluded from offering Dr. Larson's testimony and report because his opinions have not been subjected to scientific method, are not reliable and express a legal conclusion. Defendants also appear to suggest that Dr. Larson is not qualified to testify concerning the appropriate design of ladders. Defendants point out that Dr. Larson is not a professional licensed engineer, has never designed a ladder, is admittedly not a ladder expert and billed **[*20]** very few hours on this case. [Dkt. #57, p. 11-12]. "**HN4**[⬆️] A court must consider the 'totality of a witness's background when evaluating the witness's qualifications to testify as an expert.'" *Smith, 2005 U.S. Dist. LEXIS 46112, 2005 WL 2076570, at *3* (quoting 29 Wright & Gold, Federal Practice and Procedure § 6265, at 246 (1997)). "An expert must be limited to opinion testimony in the area of expertise in which the proffering party can qualify the expert." *Id.* Although Dr. Larson is not a ladder designer, *Rule 702* does not require expertise to be so exacting. *Rule 702* requires a witness only be qualified by knowledge, skill, experience, training or education and permits that witness to testify if that expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. Here, Dr. Larson's extensive education and research background in metallurgy and engineering more than indicate that he is qualified to opine on whether the aluminum ladder in this case was defectively designed and that his opinion is being offered to help the trier of fact determine the central fact in issue in this case. The fact that Dr. Larson was not a ladder designer **[*21]** or ladder expert goes only to the weight of his testimony not his qualifications.

Although Dr. Larson is qualified by experience, training and education, his testimony is neither grounded on

sufficient facts or data, the product of reliable principles and methods nor is there any indication that Dr. Larson applied those principles and methods reliably to the facts of this case. Moreover, the Plaintiffs had failed to satisfy any of the four factors identified in *Daubert* with respect to Dr. Larson's testimony. Dr. Larson's conclusions that the ladder was defective are based on nothing more than his cursory visual inspection of the ladder and rough measurements. Dr. Larson admittedly did not undertake any testing of the defective ladder despite acknowledging that such testing was not only feasible but not difficult to accomplish. Indeed, Dr. Larson noted that in past ladder cases he has done such analytical work including hardness measurements, chemical analysis, SEM work, and grain structure measurements. In fact, Dr. Larson testified that he would have liked to have done some testing in this case on the diagonal knee brace to determine what compressive load caused buckling but had not [*22] been requested to do so. In both his report and his deposition testimony, Dr. Larson fails to identify what principles and methods he relies upon in coming to his conclusions besides his conclusory statement that such conclusions were based on a "reasonable degree of engineering certainty." As the Supreme Court has made clear *HN5*[↑] "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)*. Without any explanation of the reasoning, any calculations or other type of scientific evidence supporting Dr. Larson's conclusions, his testimony is opinion evidence that is mere *ipse dixit* of the expert. See *Smith, 2005 U.S. Dist. LEXIS 46112, 2005 WL 2076570, at *4* (holding that "lack of calculations, alternative design, testing, or supporting research material renders it nearly impossible to discern precisely what [the expert's] methodology in coming to his conclusion was. The expert report consists almost exclusively of his observations concerning the physical characteristics of the chair without supporting measurements, and the conclusion that the chair [*23] could not withstand a rocking motion ... leav[ing] the Court with mere *ipse dixit*, or say so of the witness.") (internal quotation marks and citations omitted).

Another district court in this circuit has cogently explained that *HN6*[↑] expert testimony should be precluded where there is no indication in the expert report "of the engineering protocols and methods" employed "in arriving at the normative conclusions embodied within the claims." *Borgognone v. Trump*

*Plaza, No.98-CV-6139(ILG), 2000 U.S. Dist. LEXIS 4081, 2000 WL 341135, at *5* (E.D.N.Y. Mar. 9, 2000)*. In *Borgognone*, the plaintiff's expert opined that the shower in the defendant hotel was "very slippery" and "excessively sloped." The *Borgognone* court noted that although "[c]ivil engineers presumably have objective methods and scientific standards that may be brought to bear in the assessment of such familiar, lay categories as the "slipperiness" of tile flooring, or the construction of shower stalls with tiered floor levels," the expert made "no mention of these methods or standards in opining on these matters, appearing to rest solely on his laurels as a civil engineer, whose opinions just by virtue of that fact are admissible as relevant expertise." *Id.* The *Borgognone* [*24] court therefore concluded that "this manner of proceeding is precisely what *Daubert* ... will not countenance." *HN7*[↑] An expert, regardless of how sterling his credentials, must make clear in his proffer the methods and standards he proposes to apply in arriving at his opinions and evaluations, and must make clear in doing so that those methods and standards are reliable, and subject to objective evaluation by the expert's peers." *Id.* Here as was the case in *Borgognone*, Dr. Larson fails to proffer the methods and standards he proposes to apply in arriving at his normative conclusions that the ladder was "flimsy" and "poorly designed" nevertheless demonstrate that those methods and standards were reliable. Instead, Dr. Larson appears to rest on his laurels as an MIT metallurgist.

*HN8*[↑] Courts have also "repeatedly emphasized the importance of having an expert in a product liability case perform appropriate tests on his and the defendant's designs." *Smith, 2005 U.S. Dist. LEXIS 46112, 2005 WL 2076570, at *4* (collecting cases). The importance of testing both an expert's theory of causation and alternative design "is usually critical to show that an expert adhere[d] to the same standards of intellectual rigor that are demanded in [*25] their professional work" and "ensures that the focus of the jury's deliberation is on whether the manufacturer could have designed a safer product, not on whether an expert's proposed but untested hypothesis might bear fruit." *Colon ex rel. Molina v. BIC USA, Inc., 199 F.Supp.2d 53, 76-77 (S.D.N.Y. 2001)* (internal quotation marks and citation omitted). Indeed the Second Circuit has acknowledged that expert testimony regarding a safer alternative design should be excluded where the expert fails to conduct any testing, perform calculations or create drawings and testimony regarding a theory of causation should be excluded absent testing. *Zaremba v. Gen. Motors Corp., 360 F.3d 355, 358 (2d Cir. 2004)*

("Numerous courts have excluded expert testimony regarding a safer alternative design where the expert failed to create drawings or models or administer tests.") (collecting cases); *Brooks v. Outboard Marine Corp., 234 F.3d 89, 92 (2d Cir. 2000)* ("The failure to test a theory of causation can justify a trial court's exclusion of the expert's testimony."); *see also Rabozzi v. Bombardier, Inc., No. 5:03-CV-1397 (NAM/DEP), 2007 U.S. Dist. LEXIS 21724, 2007 WL 951569, at *6 (N.D.N.Y. Mar. 27, 2007)* (excluding expert report **[*26]** where report failed to explain reasoning or calculations behind expert's opinion and failed to test proposed design "much less built and tested a prototype."). "This is not to say that testing of alternative designs is always necessary. An expert may, in some cases, provide drawings and calculations that would allow a trier of fact to infer that his theory that the [product] was defective and that alternative designs would have prevented the accident without sacrificing utility were supported by valid engineering principles." *Smith, 2005 U.S. Dist. LEXIS 46112, 2005 WL 2076570, at *4* (internal quotation marks and citations omitted). It is undisputed that Dr. Larson did not build a prototype, create any drawings or sketches, or perform any calculations or conduct testing on his alternative design nor did he test any of his theories of causation. The fact that Dr. Larson did demonstrate at his deposition that a U shape design is stronger with some cardboard and brought to his deposition a U shaped aluminum channel rod similar in size and shape to his proposed design concept fall far short of a comprehensive drawing or sketch supported by calculations that would allow a trier of fact to infer that his theory that **[*27]** the ladder was defective and his alternative design would have prevented the accident were supported by valid and reliable engineering principals and methods.

*HN9*[⬆] The Second Circuit has also emphasized that district courts are not required to accept an expert's testimony regarding speculative and untested theories concerning the cause of an accident in a products liability case. *Lynch, 374 F. Appx. at 206*. In *Lynch*, the Second Circuit affirmed the district court's decision to preclude an expert who testified how the product failure could have happened to his untested conjecture and to how certain testing might be conducted as unreliable under *Rule 702* and *Daubert* factors. *Id.* In the instant case, Dr. Larson admits that his theories as to the cause of accident are untested and unsubstantiated hypotheses. He speculates that the inward buckling on the ladder might have been caused by a dog jumping on the ladder or by pre-existing damage that occurred

sometime during storage. Dr. Larson repeatedly testified that these two hypotheses were unsubstantiated and could not be proved as he was aware of no evidence to support them. It is axiomatic that expert testimony '"must be based on actual knowledge **[*28]** and not subjective belief or unaccepted speculation.'" *Smith, 2005 U.S. Dist. LEXIS 46112, 2005 WL 2076570, at *4* (quoting *Mitchell v. Gencorp, Inc., 165 F.3d 778, 780 (10th Cir.1999))*.

Because Dr. Larson fails to identify the engineering protocols or methods he employed to arrive at his conclusions, this Court cannot find that his testimony satisfies the *Daubert* factors which ask the Court to examine the reliability of those protocols and methods. Here, Dr. Larson has not tested his design; neither his design nor the theory or technique behind the design has been subjected to peer review or publication; there is no known rate of error because his design has not been tested; and Dr. Larson has not shown that his design or the theory or technique behind the design has gained general acceptance in the relevant scientific community. In sum given *Rule 702* factors and the *Daubert* factors bearing on reliability, this Court finds it appropriate to preclude Dr. Larson's report and testimony as unreliable and therefore inadmissible under *Rule 702*.

The Court notes that Dr. Larson's "report" also fails to meet *Rule 26 of the Federal Rules of Civil Procedure*'s requirements concerning expert reports. Although the inquiry under **[*29]** *Rule 26* is distinguishable from *Rule 702*, the fact that Dr. Larson's report also fails to meet Rule 26's threshold underscores the conclusion that his testimony is insufficient under *Rule 702*. *HN10*[⬆] "*Rule 26* guards against the presentation of sketchy and vague expert reports that provide little guidance to the opposing party as to an expert's opinions, *Rule 702* guards against the presentation of insufficiently reliable evidence to the finder of fact." *Conte v. Newsday, Inc., No. CV 06-4859(JFB)(ETB), 2010 U.S. Dist. LEXIS 143368, 2011 WL 2671216, at *4 (E.D.N.Y. July 7, 2011)* (citation omitted). *Rule 26* requires that an expert report contain "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; [and] (iii) any exhibits that will be used to summarize or support them." *Fed. R. Civ. P. 26(a)(2)(B)*. *Rule 37(c)(1)* provides that a party who fails to provide information required by *Rule 26(a)* is not permitted "to use that information ... to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." *Fed. R. Civ.*

*P. 37(c)(1)*. "The Advisory Notes to *Rule 26* [*30] make clear that *subsection (a)(2) (B)*, added as part of the 1993 amendments to the Federal Rules, requires that an expert "prepare a detailed and complete written report, stating the testimony the witness is expected to present during direct examination, together with the reasons therefore." *Jinghong Song v. Yao Bros. Grp. LP, No. 10 Civ. 04157(RKE), 2012 U.S. Dist. LEXIS 62235, 2012 WL 1557372, at *1 (S.D.N.Y. May 2, 2012)* (internal quotation marks and citation omitted); *see also Salgado by Salgado v. Gen. Motors Corp., 150 F.3d 735, 742 n.6 (7th Cir.1998)* ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions."); *Koppell v. New York State Bd. of Elections, 97 F.Supp.2d 477, 481 (S.D.N.Y. 2000)* (excluding expert report because defendants "failed to provide sufficiently detailed information regarding the bases of [the expert's] opinion."). As discussed above, Dr. Larson's four paragraph "letter-report" does not provide a complete statement of the basis and reasons for his conclusions nor does it adequately identify the facts and data considered. Dr. Larson's bald conclusions that the ladder was "flimsy, poorly designed," "failure [*31] was foreseeable" and that at little to no extra cost a channel piece could have been substituted to provide "much greater resistance to buckling" fail to indicate how and why Dr. Larson reached these conclusions. Moreover, Dr. Larson's deposition testimony fails to cure any of the deficiencies of his "report." Although not raised by Defendants, Dr. Larson's report would also be subject to exclusion based on *Rule 26* and *Rule 37(c)(1)* . For the all of the aforementioned reasons, the Court grants Defendants' motion to preclude and will not consider Dr. Larson's testimony as part of the record on Defendants' motion for summary judgment.

B. Motion for Summary Judgment

Legal Standard

**HN11**[⬆] Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Fed.R.Civ.P. 56(a)*. The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir.2010)*. "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom [*32] summary judgment is sought." *Id.,* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)*; *Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986))*. "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315-16 (2d Cir.2006)* (internal quotation marks and citation omitted).

**HN12**[⬆] "A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp., No.3:03cv481, 2004 U.S. Dist. LEXIS 22112, 2004 WL 2472280, at *1 (D.Conn. Oct. 20, 2004)* (internal quotation marks and citations omitted); *Martinez v. State of Connecticut, 817 F. Supp. 2d 28, 2011 WL 4396704 at *6 (D. Conn. 2011)*. [*33] Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co., 604 F.3d 712 (2d Cir. 2010)*.

Analysis

i. CPLA Claim

"**HN13**[⬆] ] The CPLA, enacted in 1979, was intended to merge the various common law theories of products liability into a single cause of action in order to simplify pleadings and procedures. However, the CPLA certainly retains the plaintiff's right to allege the traditional theories of recovery along with the statutory basis for recovery under one unified count denominated as a product liability claim." *Moss v. Wyeth Inc., No.3:04cv1511(SRU), 872 F. Supp. 2d 162, 2012 U.S. Dist. LEXIS 72569, 2012 WL 1899876, at *2 (D.Conn. May 24, 2012)* (internal quotation marks and citations omitted).

**HN14**[⬆] ] "Connecticut law provides for civil damages actions grounded in strict liability for defective products." *Id.* (citing *Conn. Gen. Stat. §52-572n*). "In general, Connecticut courts have adopted the strict liability test

established in *section 402A of the Restatement (Second) of Torts*. **[\*34]** *Section 402A* imposes liability only when the product is 'unreasonably dangerous' to the ordinary consumer who purchases it." *Id.* (citing *Garthwait v. Burgio, 153 Conn. 284, 289- 90, 216 A.2d 189 (1965)* and *Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 211, 694 A.2d 1319 (1997)* (quoting *§ 402A, cmt. (i)*)). "A product may be defective due to a flaw in the manufacturing process, a design defect or because of inadequate warnings or instructions." *Vitanza v. Upjohn Co., 257 Conn. 365, 373, 778 A.2d 829 (2001)*. A manufacturing defect "is a mistake in the assembly process, which results in a product that differs from the manufacturer's intended result." *Moss, 2012 U.S. Dist. LEXIS 72569, 2012 WL 1899876, at \*2*. A design defect "exists when the product is otherwise properly manufactured, but is nonetheless unreasonably dangerous because its attributes can cause unexpected injury" while a "warning defect exists when a product is unreasonably dangerous because it lacks adequate warnings or instructions concerning the product's dangerous propensities." *Id.*

"*HN15*[↑]] In order to recover under the doctrine of strict liability in tort the plaintiff must prove that: (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective **[\*35]** condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition." *Giglio v. Connecticut Light & Power Co., 180 Conn. 230, 234, 429 A.2d 486 (1980)*. "A product is unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it ... Proper warnings, however, may prevent a product from being unreasonably dangerous." *Vitanza, 257 Conn. at 374* (internal quotation marks and citations omitted). "In a products liability action, the plaintiff must plead and prove that the product was defective and that the defect was the proximate cause of the plaintiff's injuries." *Haesche v. Kissner, 229 Conn. 213, 218, 640 A.2d 89 (1994)* (internal quotation marks and citation omitted).

Defendants argue that without any expert evidence Plaintiffs cannot establish a genuine issue of material fact in dispute that the ladder was unreasonably dangerous. As the Second Circuit observed the "*HN16*[↑]] Connecticut Supreme Court has made it clear that in product liability **[\*36]** actions, 'a jury may, under appropriate circumstances, infer a defect from the evidence without the necessity of expert testimony.'" *Sanders v. Fireline, Inc., 295 F. Appx. 373, 374 (2d Cir. 2008)* (quoting *Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 218, 694 A.2d 1319 (1997)*). "Expert testimony is unnecessary 'if all the primary facts can be accurately and intelligibly described to the jury, and if they ... are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation.'" *Id.* (quoting *Salem v. U.S. Lines Co., 370 U.S. 31, 35, 82 S. Ct. 1119, 8 L. Ed. 2d 313 (1962)*). "'Where, however, the nexus between the injury and the alleged cause would not be obvious to the lay juror, expert evidence is often required to establish the causal connection between the accident and some item of physical or mental injury.'" *Id.* (quoting *Wills v. Amerada Hess Corp., 379 F.3d 32, 46 (2d Cir. 2004)*).

*HN17*[↑]] Courts have recognized that "[p]utting forth expert testimony or evidence of some kind to establish a genuine issue of material fact is especially important when, as is the case here, **[\*37]** the plaintiff attempts to assert a design defect claim." *Walters v. Howmedica Osteonics Corp., 676 F.Supp.2d 44, 50 (D. Conn. 2009)*; *Koger v. Synthes North America, Inc., No. 3:07-CV-01158 (WWE), 2009 U.S. Dist. LEXIS 117829, 2009 WL 5110780, at \*2 (D. Conn. Dec. 17, 2009)* (holding that since implanted medical screws was not a subject matter within common knowledge plaintiff needed expert evidence to establish screw was defective and the existence of a causal link); *Graham v. Fireline, Inc., 3:03CV00990 (AWT), 2006 U.S. Dist. LEXIS 39185, 2006 WL 1646165, at 6 (D. Conn. June 14, 2006)* ("Expert testimony with reference to proximate causation is not always required .... for example, when a jury could find proximate causation from its consideration of ... the [product] and the plaintiff's description of how the accident happened. However, an expert opinion as to proximate causation "is required[ ] when the subject-matter to be inquired about is presumed not to be within common knowledge and experience and when legal inference predominates over statement of fact.") (internal quotation marks and citations omitted); *Simjian v. Bayer Corp., No. 3:10-CV-1263 (RNC), 2012 U.S. Dist. LEXIS 50198, 2012 WL 1194283, at \*1 (D. Conn. April 10, 2012)* ("A defendant in a products liability **[\*38]** may be entitled to judgment as a matter of law when the plaintiff lacks admissible expert testimony on the issue of causation.").

Here given that the Plaintiffs' CPLA claim turns on the physical conditions and engineering principles of when a

ladder buckles, the jury is not as capable as an expert witness in "comprehending the primary facts and of drawing correct conclusions from them." *Sanders, 295 F. Appx. at 374* (internal quotation marks and citations omitted). Expert evidence is necessary because the engineering principles behind ladder buckling are clearly not within common knowledge. Moreover the causal nexus between the injury and the claimed defects would not be obvious to a lay juror. In fact they are not obvious to the Plaintiff's experts who posits alternative theories for the ladder collapse other than an inherent defect. Because this Court has excluded Plaintiffs' expert for the reasons discussed above, the Plaintiffs have failed to proffer admissible expert evidence to establish a genuine issue of material fact as to their CPLA claim. The Court therefor grants summary judgment on Plaintiffs' CPLA claim.

ii. Breach of express and implied warranty

Defendants argue that Plaintiffs' **[*39]** breach of express and implied warranty claims fail as a matter of law as the CPLA provides the Plaintiffs with their exclusive remedy. *HN18*[⬆] The CPLA creates a consolidated cause of action for all product liability claims, which "shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product." *Conn. Gen. Stat. §52-572n(a)*. "Although the CPLA provides the exclusive remedy for product liability claims, it was not meant to alter the substance of a plaintiff's rights and it does not preempt all common law theories of product liability; rather, the CPLA bars separate common law causes of action in product liability cases." *Fraser v. Wyeth, Inc., 857 F.Supp.2d 244, 252 (D. Conn. 2012)*. "A plaintiff bringing a cause of action under the CPLA therefore retains the right to allege traditional theories of recovery under one unified CPLA claim" like breach of express and implied warranty. *Id.* Therefore although the Plaintiffs pled their breach of warranty claims as separate counts, the Court will treat those claims as a single cause of action under the CPLA with multiple theories. "Such sub-claims are addressed **[*40]** independently, and retain their character as they existed at common law even when brought as a single CPLA claim." *Certain Underwriters, Subscribing To Policy Numbers DG055707, DG061908, 4N65010001, No.3:10-cv-00915(VLB), 2011 U.S. Dist. LEXIS 33516, 2011 WL 1217169, at *6 (D. Conn. Mar. 30, 2011)*. Therefore the Court will examine whether there is a genuine issue of material fact in dispute as to whether Defendants breached either the express or implied warranty.

Courts have held that "*HN19*[⬆]] because the CPLA is silent as to the elements of a cause of action for breach of warranty," plaintiffs may rely on the Connecticut Uniform Commercial Code, Title 42a of the Connecticut General Statutes ("CUCC"). *Walters, 676 F.Supp.2d at 55*; *Johnson v. Sears Roebuck & Co., No.3:05-cv-139(JCH), 2007 U.S. Dist. LEXIS 63657, 2007 WL 2491897, at *4 (D. Conn. Aug. 29, 2007)*. "The CUCC defines implied warranties in two provisions. *Connecticut General Statute section 42a-2-315* provides: '[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under *section 42a-2-316* **[*41]** an implied warranty that the goods shall be fit for such purpose.'" *Walters, 676 F.Supp.2d at 55* (quoting *Conn. Gen. Stat. §42a-2-315*). "*Connecticut General Statute section 42a-2-314* provides: '[u]nless excluded or modified as provided by *section 42a-2-316*, a warranty that the goods shall be merchantable is implied in a contract with respect to goods of that kind.'" *Id.* (quoting *Conn. Gen. Stat. §42a-2-314*). "This implied warranty of merchantability 'acts as a guarantee by the seller that his goods are fit for the ordinary purposes for which they are to be used and will pass in the trade without objections.'" *Id.* (quoting *Blockhead, Inc. v. Plastic Forming Co., Inc., 402 F.Supp. 1017, 1025 (D.Conn.1975))*.

*HN20*[⬆] An express warranty is defined under *Conn.Gen.Stat. § 42a-2-313(1)* as: "(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain, creates an express warranty that the goods shall conform to the affirmation or promise. (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. (c) Any sample or model which **[*42]** is made part of the basis of the bargain creates an express warranty that the whole of the good shall conform to the sample or model." *Conn.Gen.Stat. § 42a-2-313(1)*; *Johnson, 2007 U.S. Dist. LEXIS 63657, 2007 WL 2491897, at *4*.

"*HN21*[⬆] For both express and implied warranties, a plaintiff has the burden of proving causation." *Johnson, 2007 U.S. Dist. LEXIS 63657, 2007 WL 2491897, at *4* (citing *Conn.Gen.Stat. § 52-572n(a)*); *Blockhead, 402 F.Supp. at 1024* ("In a breach of warranty action, a plaintiff may recover only after demonstrating that a warranty existed, that defendant breached the warranty, and that the breach was the proximate cause of the loss

sustained.").

As Defendants argue there is no record evidence in this case that the ladder in question was unfit for its known or ordinary purpose. As discussed above, Plaintiffs have failed to offer any admissible expert evidence to support the conclusion that the ladder was defective or unfit for its ordinary or known use. Furthermore, Plaintiffs fail to provide evidence that the alleged injuries were caused by the ladder being unfit for its purpose. Plaintiffs have therefore failed to establish a material issue of fact in dispute as to breach of implied warranty. There is likewise no evidence that **[*43]** Defendants breached any express warranty as Plaintiffs have failed to demonstrate that the ladder was defective and have failed to present any evidence that such breach was the proximate cause of the loss sustained. Plaintiffs' claims for breach of express and implied warranty are directly premised on the alleged ladder's defects. Because Plaintiffs have failed to create a genuine issue of material fact in dispute as to the ladder's defects, they likewise cannot create a genuine issue of material fact in dispute as to either their breach of express or implied warranty claims. Plaintiffs therefore fail to set forth any facts demonstrating a genuine issue for trial with respect to these claims and the Court grants summary judgment.

iii. CUTPA

The Plaintiffs have argued that the Defendants have violated CUTPA by attaching inaccurate and deceiving warning labels on the ladder. Defendants argue that the Plaintiffs' CUTPA claims fail as a matter of law as the CPLA provides the Plaintiffs with their exclusive remedy. In response, Plaintiffs contend their claims are not barred on the basis of the Connecticut Supreme Court's decision in *Gerrity v. R.J. Reynolds Tobacco Company, 263 Conn. 120, 818 A.2d 769 (2003)*. **[*44]** [Dkt. #55, p.2, 7]. However Plaintiffs' reliance on *Gerrity* is misplaced. *Gerrity* instructs that claims are not precluded by the exclusivity provision of the CPLA where plaintiffs seek a remedy for an injury that was not caused by the defective product. The Connecticut Supreme Court stated that "the language of the exclusivity provision makes clear that the product liability act was intended to serve as the exclusive remedy for a party who seeks recompense for those injuries caused by a product defect. The language of the exclusivity provision, however, suggests that it was not designed to serve as a bar to additional claims, including one brought under CUTPA, either for an injury not caused by the defective product, or if the party is not

pursuing a claim for "personal injury, death or property damage...." *Gerrity, 263 Conn. at 128*. Unlike the claims asserted by the Plaintiffs in this case, "In *Gerrity*, the plaintiff's CUTPA claim was preserved because plaintiff alleged financial—not personal or property—injury based upon the increased cost of cigarettes that plaintiff had to pay as a result of defendant's wrongful conduct." *Town of Sprague v. Mapei Corp., 3:11cv890, 11cv1033 (WWE), 2012 U.S. Dist. LEXIS 72578, 2012 WL 1900120, at *2 (D. Conn. May 24, 2012)* **[*45]** (citing *Gerrity, 263 Conn. at 128*).

Here, Plaintiffs seek damages for personal injuries caused by the allegedly defective ladder under their CUTPA claims. *See* [Dkt. 1, Compl., p.14]. Because Plaintiffs have not brought a CUTPA claim for an injury that was not caused by the defective product as was the case in *Gerrity* and are clearly pursuing claims for personal injury, their claim do not fall within the exception enunciated in *Gerrity* and accordingly the exclusivity provision bars their claims.

Moreover, courts routinely hold that **HN22**[↑] the CPLA's exclusivity provision bars CUTPA claims that "assert that a defendant's product is defectively designed or that the defendant failed to warn properly about a defective product." *Fraser, 857 F.Supp.2d at 258* (citing *Hurley v. Heart Physicians, P.C., 278 Conn. 305, 324, 898 A.2d 777, (2006))*. The Court therefore grants summary judgment on Plaintiffs' CUTPA claims as those claims are barred by the CPLA. Even if Plaintiffs' CUTPA claims were not barred, there would be no genuine dispute as to any material fact for the reasons discussed above because Plaintiffs have not established a fact in dispute as to the ladder's defectiveness. A reasonable juror could therefore **[*46]** not conclude that the Defendants violated CUTPA by failing to warn about the defective ladder.

iv. Loss of Consortium

As Defendants argue, it is appropriate to grant summary judgment as to Plaintiff John Kuzmech's loss of consortium claim as it is a derivative claim. *Musorofiti v. Vlcek, 65 Conn.App. 365, 375, 783 A.2d 36 (2001)* ("**HN23**[↑]) Loss of consortium is a derivative cause of action, meaning that it is dependent on the legal existence of the predicate action."). Because the Court has granted summary judgment as to all the claims in the predicate action, Plaintiff John Kuzmech's loss of consortium claim also fails as a matter of law. The Court therefore grants summary judgment as to John Kuzmech's loss of consortium claim.

Conclusion

For the foregoing reasons, the Court GRANTS Defendants' [Dkt. #57] motion to preclude and [Dkt. #45] motion for summary judgment. The Clerk is directed to enter judgment in favor of Defendants and close the case.

IT IS SO ORDERED.

/s/ Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: December 7, 2012

---

**End of Document**

 Positive
As of: July 27, 2018 3:24 PM Z

# *Koger v. Synthes N. Am., Inc.*

United States District Court for the District of Connecticut

December 15, 2009, Decided; December 17, 2009, Filed

NO. 3:07-CV-01158 (WWE)

**Reporter**
2009 U.S. Dist. LEXIS 117829 *; 2009 WL 5110780

LEIGH KOGER, Plaintiff, v. SYNTHES NORTH
AMERICA, INC., Defendant,

## Core Terms

summary judgment, screw, consumer, expert testimony,
nonunion, common knowledge, malfunction, causation,
implanted, nonmoving

**Counsel:** [*1] For Leigh Koger, Plaintiff: Daniel S.
DiBartolomeo, LEAD ATTORNEY, Joseph J.
Romanello, Jr., Attorney at Law, Danbury, CT.

For Synthes NA, Inc, Defendant: Christopher A.
Callanan, LEAD ATTORNEY, Campbell, Campbell,
Edwards & Conroy, Boston, MA; James M. Campbell,
LEAD ATTORNEY, Campbell, Campbell, Edwards &
Conroy, P.C. -MA, Boston, MA; W. Kennedy Simpson,
LEAD ATTORNEY, Thompson Miller & Simpson, PLC,
Louisville, KY.

**Judges:** Warren W. Eginton, Senior United States
District Judge.

**Opinion by:** Warren W. Eginton

## Opinion

### MEMORANDUM OF DECISION ON DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

In this action, plaintiff Leigh Koger alleges that certain
orthopedic screws manufactured and sold by defendant
Synthes North America, Inc. ("Synthes"), that had been
implanted in her pelvis, were defective and thereby
caused her injury. [1] Defendant Synthes moves for
summary judgment. For the following reasons, the

motion for summary judgment will be granted.

### Factual Background

The parties have submitted statements of undisputed
facts with supporting exhibits, which reveal the following
factual background.

Plaintiff suffered multiple trauma, including posterior
pelvic fracture at [*2] the sacrum, as a result of a
motorcycle accident on September 24, 2003. Michael
Miranda, M.D., surgically repaired the sacral fracture at
Hartford Hospital on September 25, 2003. As part of the
surgery, two Synthes fully-threaded cannulated screws
were implanted at the site of the sacral fracture.

An orthopedic implant screw will fail, even if not
defective, when subjected to sufficient stresses due to
failure of a fracture to heal, a condition known as
delayed union or nonunion.

On August 17, 2005, x-rays revealed that one of the two
screws had broken.

On October 17, 2005, plaintiff was examined by David
Aspirinio, M.D., an orthopedic surgeon. He referred
plaintiff to have CT Scans taken of her pelvic area. In
his deposition, Dr. Aspirinio testified that the CT Scan
findings were consistent with a partial non-union.

### Discussion

A motion for summary judgment must be granted if the
pleadings, discovery materials before the court and any
affidavits show that there is no genuine issue as to any
material fact and it is clear that the moving party is
entitled to judgment as a matter of law. *Fed. R. Civ. P.
56(c)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106
S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*.

A dispute regarding a material [*3] fact is genuine if

---

[1] Defendant asserts that its correct name is Synthes (U.S.A.).

2009 U.S. Dist. LEXIS 117829, *3

there is sufficient evidence that a reasonable jury could return a verdict for the nonmoving party. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. *Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981)*.

If a nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, then summary judgment is appropriate. *Celotex Corp., 477 U.S. at 323*. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Liberty Lobby, 477 U.S. at 249*. The mere of existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for her. See *Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004)*.

On summary judgment, the court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party. See *Patterson v. County of Oneida, 375 F.3d 206, 218 (2d Cir. 2004)*. [*4] If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. See *Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004)*.

Plaintiff's products liability action is brought under the Connecticut Products Liability Act, *Connecticut General Statutes § 52-572m*, which provides for a statutory action in damages grounded in strict liability for a product defect. *Johannsen v. Zimmer, Inc., 2005 U.S. Dist. LEXIS 5348, 2005 WL 756509 (D. Conn. March 31, 2005)*.

A plaintiff must also prove that the product was in a defective condition rendering the product unreasonably dangerous and thereby proximately causing the injuries alleged. *Morris v. Viking Pools Northeast, Inc., 492 F. Supp. 2d 90, 92 (D. Conn. 2007)*. Defendant asserts that plaintiff lacks the expert testimony to prove both defective condition and causation.

Connecticut courts have adopted the consumer expectation test for strict liability as articulated by the Restatement (Second) of Torts. *Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 211, 694 A.2d 1319 (1997)*. Thus, a manufacturer is strictly liable [*5] for injuries suffered if the product has a defective "condition not contemplated by the ultimate consumer that will be unreasonably dangerous to the consumer." *Restatement (Second) of Torts § 402A*. However, the Connecticut Supreme Court has provided that a "modified consumer expectation test" should be applied where the product involves complex designs, in which case an ordinary consumer may not be able to form expectations of safety. *Potter, 241 Conn. at 219*. Under the modified consumer expectation test, the fact-finder must consider the usefulness of the product, the likelihood and severity of the danger posted by the design, the feasibility of alternative designs, the cost of improvements, the ability to alter the design without harming the product's usefulness or price, and the possibility of spreading potential loss by increasing the product's price. *Id. at 221*.

In this instance, the implanted medical screws are medical devices that are outside of the ordinary consumer's common knowledge; thus, the modified consumer expectation test applies. *Johannsen, 2005 U.S. Dist. LEXIS 5348, 2005 WL 756509, at *8* (hip prosthesis outside common knowledge). Generally, expert evidence is necessary where the subject [*6] matter is not within common knowledge. *Fane v. Zimmer, Inc., 927 F.2d 124, 131 (2d Cir. 1991)* (implantation device was not within common knowledge and required expert testimony). Plaintiff has provided no evidence, expert or otherwise, relevant to an assessment of whether the screw presented an unreasonably dangerous condition.

Even if plaintiff could establish that the screw was defective, plaintiff's lack of expert testimony is fatal to her proof of causation. Expert opinion is necessary to establish a causal link where such causation is outside the common knowledge of a layperson. *Graham v. Fireline, Inc., 2006 U.S. Dist. LEXIS 39185, 2006 WL 1646165, at *7 (D. Conn. June 14, 2006)* (citing cases). Plaintiff does point out that Michael Craig, M.D., who reviewed x-rays of the injured area, opined that a nonunion had not occurred and that corrosion could be the cause of the breakage. However, at the summary judgment stage, plaintiff must produce evidence establishing that it is more probable than not that the screw broke due to its defective condition. See *2006 U.S. Dist. LEXIS 39185, [WL] at *7*. Dr. Craig stated that corrosion could present a "possible" cause of the breakage, and his testimony indicates that he did not review a more sensitive [*7] test of the area such as a

Mark Bouchard

2009 U.S. Dist. LEXIS 117829, *7

CT Scan. Such evidence does not establish that it is more probable than not that a defect caused the injury. Further, defendant has provided expert testimony that the screw broke due to a nonunion after review of a CT Scan, a more sensitive test.

Plaintiff argues that the doctrine of *res ipsa loquitur* should bar summary judgment. However, plaintiff's proof of defect and causation involves complex issues, requiring expert testimony. Plaintiff cannot rely upon application of the "malfunction doctrine," which is an approach similar to that of *res ipsa loquitur* that has been adopted in products liability cases. *Hartford Fire Ins. v. Dent-X Intern., Inc., 2007 U.S. Dist. LEXIS 20858, 2007 WL 911841, at *4 (D. Conn. March 23, 2007)*. Under the malfunction doctrine, a defect may be inferred by circumstantial evidence that (1) the product malfunctioned, (2) the malfunction occurred during proper use, and (3) the product had not been altered or misused in a manner that probably caused the malfunction. *Id.* In *Dent-X*, this Court held that a jury should be allowed to infer causation from the circumstances that an x-ray machine caught fire over a weekend while no one was in the office. The Court reasoned **[*8]** that the case involved no technical facts requiring expert testimony, and there was no outside factor other than the defect that could be the cause of injury. In this case, plaintiff's case requires complex medical and technical expert testimony to determine whether the breakage occurred as a result of a defect or a nonunion. According to the record, it appears more probable than not that a nonunion occurred. Thus, absent expert testimony, plaintiff cannot adduce sufficient proof of her claim to survive summary judgment.

### *Conclusion*

For the foregoing reasons, the motion for summary judgment (Doc. # 41) is GRANTED. The clerk is instructed to close this case.

Dated at Bridgeport, Connecticut, this 15th day of December, 2009.

/s/

Warren W. Eginton

Senior United States District Judge

Mark Bouchard

 Cited
As of: July 27, 2018 3:24 PM Z

# *Water Pollution Control Auth. of Norwalk v. Flowserve US Inc.*

United States District Court for the District of Connecticut

March 28, 2018, Decided; March 28, 2018, Filed

3:14-cv-00549 (VLB)

**Reporter**
2018 U.S. Dist. LEXIS 52168 *; 2018 WL 1525709

WATER POLLUTION CONTROL AUTHORITY OF THE CITY OF NORWALK, Plaintiff, v. FLOWSERVE US INC., Defendant, v. GILBANE BUILDING CO., Third-Party Defendant

## Core Terms

Pumps, warranty, seals, asserts, specifications, bid, summary judgment, admissible, replace, manufacturer, negotiate, damages, summary judgment motion, methodology, limitation of liability, opined, consumer, deposition, reliable, surveys, expert opinion, parties, dry, design defect, inspection, wastewater, calculations, installation, mechanical, materials

**Counsel:** **[*1]** For Water Pollution Control Authority of the City of Norwalk, Plaintiff: Martha C. Gaythwaite, Mathew J. Todaro, LEAD ATTORNEYS, PRO HAC VICE, Verrill Dana, LLP - ME, Portland, ME; Matthew R. Shindell, LEAD ATTORNEY, PRO HAC VICE, Goldberg Segalla, LLP, Philadelphia, PA; Scott S. Orenstein, LEAD ATTORNEY, Calvin K. Woo, Troy A Bataille, Goldberg Segalla LLP - CT, Hartford, CT.

For Flowserve US Inc., Defendant: Jason Eckerly, William F. Mahoney, LEAD ATTORNEYS, PRO HAC VICE, Segal McCambridge Singer & Mahoney, Ltd. - IL, Chicago, IL; Madina Axelrod, Steven R. Rosenblatt, LEAD ATTORNEYS, PRO HAC VICE, Segal, McCambridge, Singer & Mahoney, Ltd., New York, NY; Matthew M. Horowitz, LEAD ATTORNEY, Andrew P. Dwyer, II, Eric D. Eddy, Wolf Horowitz & Etlinger LLC, Hartford, CT; Stephanie Abra DeVos, LEAD ATTORNEY, Segal, McCambridge, Singer & Mahoney, Ltd - NJ, Jersey City, NJ.

For Flowserve US Inc., ThirdParty Plaintiff, Counter Defendant, Counter Claimant: Madina Axelrod, LEAD ATTORNEY, PRO HAC VICE, Segal, McCambridge, Singer & Mahoney, Ltd., New York, NY; Matthew M. Horowitz, LEAD ATTORNEY, Andrew P. Dwyer, II, Wolf Horowitz & Etlinger LLC, Hartford, CT; William F.

Mahoney, LEAD ATTORNEY, **[*2]** PRO HAC VICE, Segal McCambridge Singer & Mahoney, Ltd. - IL, Chicago, IL; Jason Eckerly, Segal McCambridge Singer & Mahoney, Ltd. - IL, Chicago, IL.

For Gilbane Building Company, ThirdParty Defendant: Jared Cohane, Hinckley Allen Snyder LLP-Htfd, Hartford, CT; Jeffrey J. Mirman, Hinckley, Allen & Snyder, LLP, Hartford, CT.

For Water Pollution Control Authority of the City of Norwalk, ThirdParty Plaintiff: Scott S. Orenstein, LEAD ATTORNEY, Troy A Bataille, Goldberg Segalla LLP - CT, Hartford, CT; Calvin K. Woo, Verrill & Dana LLP - CT, Westport, CT; Martha C. Gaythwaite, Mathew J. Todaro, Verrill Dana, LLP - ME, Portland, ME.

For Gilbane Building Company, ThirdParty Defendant, Counter Claimant: Jared Cohane, Hinckley Allen Snyder LLP-Htfd, Hartford, CT; Jeffrey J. Mirman, Hinckley, Allen & Snyder, LLP, Hartford, CT.

**Judges:** Hon. Vanessa L. Bryant, United States District Judge.

**Opinion by:** Vanessa L. Bryant

## Opinion

### MEMORANDUM OF DECISION ON MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERTS

I. Introduction

Plaintiff Water Pollution Control Authority of the City of Norwalk ("WPCA") brings claims of products liability, breach of contract, and violation of the *Connecticut Unfair Trade Practice Act* action against Defendant **[*3]** Flowserve US Inc. ("Flowserve"), and also asserts breach of contract against Third-Party Defendant Gilbane Building Co. ("Gilbane"). Flowserve and

Gilbane have both moved for summary judgment against WPCA. [Dkts. 119 (Gilbane MSJ against WPCA); 128 (Flowserve MSJ against WPCA).] In addition, Flowserve brought claims against third-party defendant Gilbane asserting breach of contract and seeking indemnification. [Dkt. 30 (Third-Party Complaint).] Flowserve seeks summary judgment in its favor as to its breach of contract claim, and Gilbane seeks summary judgment as to Flowserve's indemnification claim. [Dkt. 123 (Flowserve MSJ against Gilbane).] Gilbane also asserted counterclaims against Flowserve seeking contribution and negligence, and Flowserve seeks summary judgment as to both. [Dkt. 123 (Flowserve MSJ against Gilbane).] Finally, Flowserve has moved to exclude two of WPCA's experts. [Dkts. 121 (Motion to Exclude Hodgson); 126 (Motion to Exclude Dickson).] All motions are opposed. For the reasons set forth herein, Flowserve's motions to exclude experts Hodgson and Dickson are GRANTED, Flowserve and Gilbane's motions for summary judgment against WPCA are GRANTED, and Flowserve and **[*4]** Gilbane's motions for summary judgment against each other are found as moot.

## II. Factual Background

In 2008, Camp Dresser McKee, Inc. ("CDMS") designed the headworks portion of a wastewater treatment plant upgrade (the "Project") for WPCA. [Dkt. 130-4 at 14, 251.] The headworks included machinery to conduct the first stage of wastewater treatment, including "the preliminary treatment, the screening, the pumping, and grit removal." *Id.* at 13. When designing the headworks, CDMS began by identifying a pump design which would meet WPCA's operational needs, and then designed the rest of the headworks system upgrade. *Id.* The pump design CDMS chose was based on the Flowserve MSX series 3 pumps. *Id.* at 21.

On June 25, 2009, WPCA engaged Gilbane, a construction management company, to serve as Construction Manager for the Project. [Dkt. 120-4 (Agreement) at 2.] Gilbane's contract with WPCA required it to act as WPCA's fiduciary in soliciting bids for subcontractors for the Project. [Dkt. 146-2 at 2.] Among other subcontracts, Gilbane solicited bids for vertical non-clog dry pit submersible pumps. [Dkt. 120-6 (Deposition of Patrick Delany) at 36.]

The pumps were required to meet certain specifications set forth by CDMS. [Dkt. 130-4 **[*5]** at 21.] The design specifications were based on the Flowserve MSX series 3 pumps. Id. Among other specifications, the design specifications required that each pump operate at a

capacity of 19 million gallons per day and have motors with a maximum 215 horsepower rating. [Dkt. 130-11.] The specifications did not call for venting. Id.

Flowserve, a pump designer, manufacturer, and supplier, submitted the lowest bid. Id. The bid required Flowserve to manufacture the Pumps, but excluded offloading, storage, handling, installation, temporary dunnage, field piping, field wiring, and interfacing with the control system. [Dkt. 130-15 at 8-9.] Flowserve's bid expressly warranted that the Pumps would comply with CDMS's pump specifications, based on the Flowserve MSX series 3 pump, and would be free from defects in workmanship and material. [Dkt. 130-15 at 16.]

Flowserve also provided a six-year, limited, pro-rated warranty covering a pro-rated portion of any repair or replacement covered by the warranty over six years. Id. The warranty excluded coverage if the Pumps were exposed to:

> (1) maintenance, repair, installation, handling, packaging, transportation, storage, operation or use which is improper **[*6]** or otherwise not in compliance with Vendor's instructions; (2) alteration, modification or repair by anyone other than Vendor or those specifically authorized by Vendor, (3) accident, contamination, foreign object damage, abuse, neglect or negligence after shipment to Gilbane Building Company; (4) damage caused by failure of a Vendor supplied Product not under warranty or by any hardware or software not supplied by Vendor; (5) use of counterfeit or replacement parts that are neither manufactured nor approved by Vendor for use in the Equipment; or (6) Equipment which is normally consumed in operation or which have normal life inherently shorter than the warranty period including, but not limited to, consumables (e.g. gaskets, o -rings, etc.).

Id. Flowserve also provided, in all capital letters, "THESE WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER WRITTEN, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE." Id. Flowserve also limited its liability, stating:

> Limitation of Liability: The remedies set forth herein are exclusive, and the total liability of the Vendor **[*7]** with respect to this Contract, or any breach thereof, whether based on contract,

warranty, tort (including negligence), indemnity, strict liability or otherwise, shall not exceed the Contract Price of the specific equipment or service which gives rise to the claim. IN NO EVENT, WHETHER ARISING BEFORE OR AFTER COMPLETION OF ITS OBLIGATIONS UNDER THE CONTRACT, SHALL VENDOR BE LIABLE FOR SPECIAL, CONSEQUENTIAL, INCIDENTAL OR PENAL DAMAGES OF ANY KIND (INCLUDING BUT NOT LIMITED TO LOSS OF USE, REVENUE OR PROFITS, INVENTORY OR USE CHARGES, COST OF CAPITAL, OR CLAIMS OF CUSTOMERS) INCURRED BY GILBANE BUILDING COMPANY OR ANY THIRD PARTY.

Id.

Flowserve's bid and proposed warranties were discussed at a June 23, 2009 scope review meeting, in which WPCA declined to participate. [Dkt. 130-16 (Scope Review Meeting Minutes).]

WPCA submitted the combined package of all winning bids for Project subcontracts to the Clean Water Fund for approval. [Dkt. 120-38.] In that submittal, Harold Alvord, WPCA's representative, certified that "the information contained above and in any attached statements and materials in support thereof is true and correct to his/her knowledge." Id. Flowserve's limitation of liability [*8] and warranty language was in the Clean Water Fund application. [Dkt. 150 at 6-7.]

The Connecticut Department of Environmental Protection ("DEP") authorized Gilbane to award the subcontract for six vertical dry pit pumps (the "Pumps") to Flowserve on October 9, 2009. [Dkt. 120-3 at 4.] The final purchase order, which was executed on December 2, 2010, included the same warranty and limited liability language which was included in its bid and discussed at the scope review meeting. [Dkt. 120-19 at 1-3; Dkt. 125-10 at 1.]

Flowserve shipped the Pumps to the WPCA plant in August 2011. [Dkt. 130-22 at 190.] Multiple contractors were involved in installing the Pumps, including Electrical Energy Systems (which installed power and control wiring), Ferguson Mechanical (which conducted the pipe to Pump fitting), NIC Systems (which installed supervisory control and data acquisition systems), and Aqua Solutions (which certified that the Pumps were satisfactorily installed and tested). [Dkt. 130-3 at 144-46.] Final start-up and testing of all equipment took place on March 12, March 13, and March 15, 2012. [Dkt. 130-3 at 144-145.] By March 22, 2012, installation

and testing of the six Pumps was completed. [*9] [Dkt. 120-5 at 154-55.] Nothing out of the ordinary was identified, and the Pumps were commissioned after the March 2012 testing. Id. at 155. Another performance test, on April 18, 2012, revealed that Pump 1 was operating at 50% of expected flow. [Dkt. 130-24.] Pump 1 was disassembled, a large wooden block was found and removed, and Pump 1 was returned to full capacity. Id. On April 30, 2012, CDMS and Gilbane accepted the Pumps and purchase order terms. [Dkt. 130-52.]

On July 15, 2012, the plant experienced a heavy storm and ran all six Pumps simultaneously. [Dkt. 130-9 at 121, 126.] The Project specifications did not state that all six pumps should be able to run at the same time, but rather that the system should be able to handle 95 million gallons of sewage per day, which would require five Pumps to run and allow the sixth to serve as a spare. Id. at 126-27. Nevertheless, for 30 minutes during the storm, the Pumps kept up with the flow. [Dkt. 130-32 at 2.] However, the system "blew wastewater out of the top of the grit tanks which [are] immediately downstream of the Pumps" because the grit tanks, which were not manufactured by Flowserve, "couldn't handle the flow" produced by all six Pumps. [Dkt. 130-9 [*10] at 126-27; Dkt. 120-19; Dkt. 130-32.] During this event, the variable frequency drives[1] ("VFD") for Pumps 2 and 6 overheated and failed. [Dkt. 120-7 at 123.]

Flow Tech, the subcontractor that supplied the VFDs, investigated the VFD failure. [Dkt. 130-14 at 70.] Flow Tech's investigation revealed that, at WCPA's request, the VFD cooling fans had been modified to operate off of thermostats rather than continuously, and that Pump 6 was set to run at 110%. [Dkt. 130-32.] The VFDs were repaired at no cost to WPCA. [Dkt. 120-7 at 123; Dkt. 120-9 at 123.]

On August 4, 2013, OMI, Inc. ("OMI"), a third-party contracted by WPCA to operate and maintain the facility, bled air from Pump 5. [Dkt. 120-10 at 6.] On August 6, 2013, OMI reported that Pump 5 had no influent flow, and was running but not pumping.[2] [Dkt.

---

[1] Flowserve did not manufacture the VFDs to be used in the system. [Dkt. 130-14 at 70.] Rather, WPCA selected VFDs manufactured by another company, ABB, which subsequently supplied through Flow Tech. Id.

[2] WPCA asserts that the OMI daily maintenance reports (Dkt. 120-10) are inadmissible and may not be considered on summary judgment, because they are unauthenticated copies of an unidentified author's daily calendar. [Dkt. 147 at 5.] Shawn Jennings, OMI's maintenance manager, testified

120-10 at 8.] Shawn Jennings, OMI's maintenance manager, testified that when a pump is pumping but not running, that may indicate that the pump is airbound, and that the air needs to be bled out of the pump. [Dkt. 130-6 (Deposition of Shawn Jennings) at 118.] When a pump becomes airbound, the pump seals are not cooled properly and can fail. [Dkt. 130-3 at 157.]

On August 12, 2013, an OMI **[*11]** pump operator noted that Pump 1 was, in fact, airbound. Jennings Dep. at 118-19. On August 13, 2013, Pump 1 reached a high temperature and the primary mechanical seal on Pump 1 failed. [Dkt. 120-11 at 1; Dkt. 130-38.] Pump 1 was replaced. [Dkt. 120-12 (invoice for Pump repair.)] Associated Electro Mechanics, Inc. ("AEM"), a Flowserve servicer that inspects and maintains Flowserve equipment, repaired Pump 1 and concluded that the Pump 1 failure occurred due to thermal shock caused by running the pump dry. [Dkt. 120-11 (invoice stating "primary seal failed due to overheated [sic] from running pump dry"); Dkt. 130-8 at 7.] Inspection revealed wastewater in the coolant system, indicating that four of the six Pumps had experienced a primary mechanical seal failure. [Dkt. 130-54.]

AEM also evaluated Pump 5 and concluded that the primary mechanical seal in Pump 5 also failed due to thermal shock from running dry. [Dkt. 120-17 at 1.] Pump 5 was repaired on December 30, 2013 and experienced no subsequent catastrophic failures. [Dkt. 120-18 (invoice for Pump repair; Dkt. 120-8 at 44.]

On September 6, 2013, Flowserve denied WPCA's warranty claim for coverage for the seal inspections and repairs **[*12]** of Pumps 1 and 5, explaining that "it is apparent" from AEM's inspection that Pump 1 "ran dry for an extended period which caused the primary mechanical seal to catastrophically fail and allowed the coolant system to be contaminated with sewage." [Dkt. 120-13 (Denial Letter) at 5.] Flowserve further stated that "[b]ased on the information provided on the other pump failures, it is highly likely that the cause is the same for all of the failed units." Id. Flowserve found WPCA's claim not warrantable and declined to cover the charges for the inspection and repair of the Pumps. Id.

Ms. Burns, a Principal Engineer for the City of Norwalk Engineering Division, submitted a sworn affidavit stating

---

regarding OMI's log books at his deposition (confirming that they were indeed OMI's maintenance log books, but stating he was not personally involved in creating the records), and confirmed that it was reported to him that Pump 1 was run airbound. Jennings Dep. at 120.

she attempted multiple times to contact Flowserve after the denial of the warranty claim, and that Flowserve would not return her calls. [Dkt. 146-2 at 4-5 (stating Ms. Burns sent letters to Flowserve on October 8, 2013 and October 30, 2013).] William Wantz, a Flowserve customer service employee, testified at his deposition that he did not respond Ms. Burns' attempts to contact Flowserve because his manager, Sam Moore, told him to let Flowserve management "handle it." [Dkt. 146-36 at 63.]

On October 31, 2013, Flowserve **[*13]** manager Nicholas Kipe sent a letter to Ms. Burns stating that Flowserve was "working to identify the root cause" of the problems the pumps had experienced in August. [Dkt. 146-2 at 5; Dkt. 146-21.] Mr. Kipe explained that, based on inspection of Pump 1, "the reason for failure is a catastrophic failure of the lower (primary) mechanical seal," caused by "dramatic temperature swings that typically can only occur when the pump is running dry for a period of time." [Dkt. 146-21.] Mr. Kipe stated if evidence arose during inspection that the failures were due to defects in materials or workmanship, "then Flowserve will of course honor its warranty." Id. Ms. Burns never heard back from Flowserve about its identification of the root cause of the problem. [Dkt. 146-2 at 5.]

In November 2013, Flowserve Senior Electrical Engineer Mohamed Ngayenga conducted a simulation of the Pumps and confirmed that they reacted appropriately when there was low pressure discharge. [Dkt. 146-26 at 103.]

After a February 2014 inspection, Flowserve employee Ryan Malooly stated "the thought was that the seals ran dry to produce this type of failure, but upon examination of the pump station this seems highly unlikely. **[*14]** What else could cause the seals to fail this catastrophically?" [Dkt. 146-23 at 3.] Fellow Flowserve employee Mark Brewster responded that he was "very adamant" that the seals were run dry. Id. at 2. Ms. Burns received a letter from Samuel Moore dated February 14, 2014, which stated that Flowserve believed the pumps had "run dry." [Dkt. 146-2.]

On May 10, 2014, WPCA reported that Pump 1 experienced a "catastrophic failure." [Dkt. 120-14.] However, AEM inspected Pump 1 on May 30, 2014, found no problems, and affirmed that the Pumps' mechanical seals were in good condition. [Dkt. 130-6 at 133.]

On December 1, 2014, WPCA reported that Pump 1

had another failure. [Dkt. 130-6 at 135.] AEM inspected Pump 1, found that the stator was grounded, and replaced it. [Dkt. 130-48.] This repair was covered under Flowserve's prorated warranty. [Dkt. 120-15; Dkt. 120-20 at 120.]

At some point in December 2014, Flowserve and AEM inspected the Pumps and discovered that five low discharge sensors,[3] which were set to stop the Pumps after a certain period of low discharge pressure, had been reset. [Dkt. 130-51 at 2; Dkt. 146-3 at 4; Dkt. 146-23 at 3.] The sensors were intended to stop the Pumps after 45 seconds of [*15] low discharge pressure, but five of the sensors were not set to stop the Pumps until two minutes of low discharge pressure, and the sensor on Pump 1 was not set to stop that Pump until four minutes of low discharge pressure. Id. at 3. Those settings were high enough that they could have caused catastrophic events such as the prior overheating of Pump 1. Id.

In April 2015, Flowserve Senior Electrical Engineer Mohamed Ngayenga returned to the WPCA facility with AEM employee William Andrejczyk to "set up 6 low discharge pressure switches, verify and validate the proper operation of each pump." [Dkt. 146-27 at 1.] After they completed their work, they reported that they reset the sensors to shut down the Pumps after 45 seconds of low pressure. Id.

There have been no documented catastrophic failures of Pumps 2, 3, 4, or 6. [Dkt. 120-2 at 115-119, 127.]

WCPA contracted with Arcadis U.S., Inc. to replace the Pumps on January 8, 2015. [Dkt. 120-34.] CDMS, the Project designer, conducted a technical evaluation for WCPA and determined it was not necessary to replace the Flowserve Pumps. [Dkt. 120-2 at 289.] OMI likewise did not recommend that the Pumps be replaced. [Dkt. 120-26 at 213.]

### III. Motions [*16] to Exclude Experts

WPCA has disclosed two experts for trial: Judith Hodgson, a licensed professional engineer who opines as to whether the Pumps were defectively designed, and Bonneau Dickson, a professional consulting sanitary engineer who opines as to WPCA's damages.

Flowserve has moved to exclude both experts. The Court describes each expert's reports and the motions to exclude them below.

### A. Standard of Review

In order to prevail on a motion for summary judgment, the moving party must present admissible evidence tending there is no genuine issue as to material fact and that it instilled to judgment as a matter of law. ." *Fed. . Civ. P. 56(c)*("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." *Fed. . Civ. P. 56(c)(4)*. "Because the purpose of summary judgment is to weed out cases in which 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law,' it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment." *Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)* (quoting *Fed. R. Civ. P. 56(c)*). An expert report is not a "talisman against summary judgment." [*17] *Id.* If the expert testimony is excluded as inadmissible, the court must make the summary judgment determination without that evidence. *Id. at 66-67*. Accordingly, the Court must examine the admissibility of WPCA's experts' testimony before ruling on the motions for summary judgment. *See, e.g., Rexall Sundown, Inc. v. Perrigo Co., 651 F. Supp. 2d 9, 25 (E.D.N.Y. 2009)* (discussing the summary judgment standard and noting that the court must examine the admissibility of plaintiff's expert testimony in ruling on defendant's motion for summary judgment).

A motion to exclude evidence "calls on the Court to make a preliminary determination on the admissibility of the evidence under *Rule 104 of the Federal Rules of Evidence.*" *Highland Cap. Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005)*. Evidence should be excluded if it is inadmissible. *Id.* "Under *Rules 701* and *702*, opinions must be helpful to the trier of fact," in order to be admissible. *Hygh v. Jacobs, 961 F.2d 359, 363-64 (2d Cir. 1992)*. In addition, "*Rule 403* provides for exclusion of evidence which wastes time." *Id.* "These provisions afford ample assurances against the admission of opinions which would merely tell the jury what results to reach." *Id.*

*Rule 702* requires a valid scientific connection to the inquiry as a prerequisite to admission. *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*. Expert witness testimony is admissible only if: (1) "the expert's

---

[3] Flowserve contracted to purchase and supply the low discharge sensors, but did not manufacture or install the sensors. [Dkt. 130-55 at 272.] Rather, Ferguson Mechanical was responsible for installing the sensors, and they were purchased from a third-party manufacturer. *Id.*

scientific, technical, or other specialized knowledge will help the trier of fact to understand **[*18]** the evidence or to determine a fact in issue;" (2) "the testimony is based upon sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods;" and (4) "the expert has reliably applied the principles and methods to the facts of the case." *Fed. R. Evid. 702*; *Amorgianos v. Nat'l R. R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002)*. Although *Rule 702* embodies a "liberal standard of admissibility for expert opinions," *Nimely v. City of N.Y., 414 F.3d 381, 395 (2d Cir. 2005)*, it also "establishes a standard of evidentiary reliability" for "all scientific, technical, or other specialized matters within its scope." *Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 148, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)*. What constitutes a "reasonable measure[] of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id. at 153*.

"Although *Rule 702* sets forth specific criteria for the district court's consideration, the *Daubert* inquiry is fluid and will necessarily vary from case to case." *Amorgianos, 303 F.3d at 266*. District courts may consider a number of factors when assessing an expert's reliability, such as (1) whether a theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation," **[*19]** and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community. *Daubert, 509 U.S. at 593-94*; *see also Amorgianos, 303 F.3d at 266*; *Fed. Deposit Ins. Corp. v. Suna Assocs., Inc., 80 F.3d 681, 687 (2d Cir.1996)*.

The *Daubert* analysis is flexible and dependent on the facts of the particular case; the above factors "do not constitute a definitive checklist or test." *Daubert, 509 U.S. at 593*; *Kumho Tire, 526 U.S. at 150* ("the gatekeeping inquiry must be tied to the facts of a particular case"); *Amorgianos, 303 F.3d at 266*. "In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos, 303 F.3d at 266* (citing *Daubert, 509 U.S. at 595*). An expert's opinion is not admissible unless a "rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and

methods to the case at hand" reveals that the opinion is "reliable at every step." *Amorgianos, 303 F.3d at 266*.

An expert's opinion is not reliable if it "simply rehash[es] otherwise admissible evidence about which he has no personal knowledge." *Schneider, 379 F. Supp. 2d at 468-69* (citing *Fed. R. Evid. 703*). "While an expert must of course rely on facts or data in formulating an expert opinion, an expert cannot be presented **[*20]** to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Id.* Such an opinion would lack the "level of intellectual rigor [which] would be expected in the scientific community," and which is required in the courtroom. *Amorgianos, 303 F.3d at 269*.

In addition to the standard for admission of expert testimony set forth in *Rules 702* and *703*, the court may also "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Fed. R. Evid. 403*. "These circumstances entail risks which range all the way from inducing decision on a purely emotional basis, at one extreme, to nothing more harmful than merely wasting time, at the other extreme. Situations in this area call for balancing the probative value of and need for the evidence against the harm likely to result from its admission." Notes of Advisory Committee on Proposed Rules. Accordingly, under *Rule 403*, an expert's opinion may be excluded if it risks "an undue tendency to suggest decision on an improper basis," in addition to the bases for exclusion under *Rules 702* and *703*. Id. **[*21]**

B. Summary of Judith Hodgson's Report

Ms. Hodgson, a licensed professional engineer, has a bachelor's degree in mechanical engineering from Penn State. [Dkt. 122-2 at 7.] She served as an engineer at DuPont for ten years; while there she served as a maintenance and reliability engineer, as well as a project engineer specifying and sizing equipment for a $90 million chemical plant. Id. She also spent ten years as a corporate pump consultant, trouble-shooting pumps and seals within DuPont, including at several wastewater facilities. Id. She also worked in the Reactor Coolant Pump (RCP) Services group at Westinghouse for six years, where she focused on the three-stage seal for RCP vertical pumps. Id.

Hodgson concluded that the Pumps had eight design defects which "were the cause of the pump failures and operational problems that plagued WPCA's operation of

2018 U.S. Dist. LEXIS 52168, *21

its treatment plant since at least August 2013." Id. at 13. In light of those defects, Hodgson concludes that it was "in WPCA's best interest" to replace the Pumps. Id. The defects Hodgson identifies include the following.

First, Hodgson found that the 200 horsepower Pump motors were undersized, and provided only 1% above what was calculated to **[*22]** be required, whereas the "rule-of-thumb margin is at least 10 to 15% to allow for unknowns and/or unaccounted-for differences." Id. at 13. Hodgson explained that smaller motors run hotter than larger motors, which raised the temperature of the coolant, which caused the lower seal to leak. Id. Once coolant leaked out of the lower seal, the remaining coolant and motor became hotter, and caused an explosion when the liquid ultimately vaporized. Id. Hodgson asserts this explosion caused both seals to fail. Id.

Second, Hodgson found the Pumps defective because they did not include vents, and also asserted Flowserve should have alerted WPCA that it would need to add vents to the Pumps. Id. Hodgson explained that the Pumps are prone to filling with gas while off, and once a pump is full of gas, when it is turned on, the sewage will churn but will not flow. Id.

Third, Hodgson found the Pump shafts not strong enough to render the seals and bearings reliable. Id. at 14. Hodgson opined that the Pumps lacked necessary stiffness, and that stiffness prevented the lower mechanical seals from sealing properly. Id. In addition, Hodgson asserts the Pumps were less bend-resistant than other pump manufacturers' shafts, and **[*23]** that they were inadequate for the exceptional demands of the WPCA system. Id.

Fourth, Hodgson found that the lip seal for the lower bearings was defective, and had a useful life of only about three months, after which it provided no protection against contaminants entering the bearing or grease exiting the bearing. Id. At that point, fluid leaking from the pump seals could have reached the motor and caused a short circuit. Id.

Fifth, Hodgson found Flowserve's suction elbow design defective because it caused gas bubbles to form, which blocked the flow of wastewater into the impeller and made the wastewater flow erratically. Id. This erratic flow increased the force exerted on the impeller and threatened to cause a "pump trip." Id.

Sixth, Hodgson found the Pump design's lack of indicators to monitor the coolant was a defect. Id. at 15.

If the Pumps had included coolant monitors, Hodgson reasoned it would have been easier to address issues like a low coolant level or contaminated coolant. Id. Without monitors, Hodgson asserted the "only indication WPCA received" when coolant overheated and became contaminated for these problems "was that the motor automatically shut off due to high temperature." **[*24]** Id.

Seventh, Hodgson found that the Pump design lacked the ability to provide proper warning about a leaking seal. Id. The Pumps were designed to alert the pump operator to a seal problem if the upper seal leaked. Id. The Pumps did not include an alert when the lower seals leaked, and the only indication WPCA received of the lower seal leaks was that the motor automatically shut off due to high temperature. Id. In addition, Hodgson explained that the upper seals failed catastrophically, but grease from the thrust bearings stopped the resultant leakage from entering the barrier chamber where the moisture meter is located. Id. As a result, no alarm was triggered and WPCA was not alerted that their seals had failed. Id.

Eighth, Hodgson found the design of the sensors for the low pressure monitors defective. Id. While Flowserve did not manufacture or design the monitors, Hodgson included them in her analysis because Flowserve supplied them. Id. Hodgson asserted the low pressure discharge sensors were supposed to automatically stop the pump when the pump could not generate enough pressure. Id. Hodgson opined that the pressure sensors failed to provide that protection, and in fact "did not **[*25]** provide any protection for the first 3 years that [the Pumps] were in operation." Id.

In addition to asserted defects, Hodgson opined that the Pumps failed to meet three Project specifications. First, the specifications required the Pumps to include a suction elbow that provided equal flow distribution to the impeller; Hodgson asserted the provided elbows allowed erratic flow. Id. at 16. Second, the specifications required the Pumps' upper seals to be in an oil-filled chamber; Hodgson asserts the upper seals provided were in an air-filled chamber. Id. Third, the specifications required the bearings to be permanently lubricated; Hodgson asserts the supplied bearings eventually lost their lubrication. Id.

Lastly, Hodgson opined that Flowserve delivered equipment that did not match the description in its purchase order submittal. Id. at 16. Specifically, Flowserve represented that it would provide common

cartridge seals to be used as lower seals, but in actuality they provided component seals. Id. Hodgson explained that cartridge seals are pre-set and pre-tested, whereas component seals are not pre-tested and require adjustments upon installation. Id.

Hodgson advised that the cost of replacing the Pumps' **[\*26]** motors with larger Flowserve motors would be too expensive, and would also be ineffective because the Pumps would still be "too sensitive" after the motor replacement. *Id.* at 17. For these reasons, she recommended replacing the Pumps with pumps from another manufacturer. *Id.*

Hodgson also concluded that Flowserve should not have denied WPCA's warranty claim, because the Pumps' failure was due to a design defect rather than improper operation. Id. Hodgson concluded the Pumps' inability to run dry without failing was due to the aforementioned design defects, including inadequately lubricated seals, a lack of vents, an improperly sized motor, poorly designed elbows, and inadequate sensors. Id. Hodgson asserts the Pumps failed because of those design defects, rather than an operational issue. Id.

### C. Analysis: Motion to Exclude Hodgson

Defendant moves to exclude Hodgson's testimony because Hodgson lacks the qualifications required to testify and because Hodgson's conclusions are not supported by acceptable methodology. [Dkt. 66.] The Court addresses each challenge to Hodgson's report below.

### i. Hodgson's Credentials

Flowserve asserts Hodgson is unqualified to opine on whether the Pumps were defective because **[\*27]** she does not have the requisite experience with the type of pump at issue in this case. [Dkt. 122.]

"District courts are accorded considerable discretion to determine an expert's qualifications." *United States v. Diallo, 40 F.3d 32, 34 (2d Cir. 1994)*. A witness is qualified where he or she has "superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Vale v. U.S., 673 Fed. Appx. 114, 2016 WL 7435909, at \*1 (2d Cir. 2016)* (summary order) (finding an expert unqualified to testify as to plaintiff's medical diagnosis where expert was trained in a different medical discipline, had no a valid license to practice medicine, and had not practiced medicine in 16 years).

"The expert's qualifications . . . must be relevant to the opinions she offers. Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Diallo, 40 F.3d at 34* (finding expert qualified who had never been to Benin but had advised neighboring African countries about their gold export policies relying on their gold export regulations, reasoning that experience meant the expert was able to evaluate the effect Benin's regulations had on exporting gold from Benin); see also **[\*28]** *Duchimaza v. U.S., 211 F. Supp. 3d 421, 2016 WL 5799295, \*5 (D. Conn. 2016)* (finding expert's 22 years of experience in retailer compliance before the EBT program was implemented insufficient to qualify him as an expert in identifying EBT fraud).

Flowserve asserts Hodgson is unqualified to opine on whether the Pumps were defective because she based many of her opinions on her experience with nuclear pumps, rather than wastewater pumps. [Dkt. 122.] To further support its position that Hodgson does not have the requisite knowledge for this case, Flowserve cites Hodgson's admission that she consulted with fellow engineers before rendering her opinion. Id.

WPCA responds that Hodgson is qualified to testify in this case because she has worked as an engineer in pump design or inspection for twenty years. WPCA states the argument that Hodgson is not qualified to testify about problems with mechanical seals and pumps at the WPCA facility because she worked on mechanical seals and pumps at nuclear power plants is "akin to suggesting that an engineer who gained her knowledge working for Chevrolet could not testify about combustion engines, or a particular engine at issue, in a vehicle manufactured by Ford." [Dkt. 141 at 2-3.]

Hodgson was responsible for inspecting and **[\*29]** troubleshooting problems with pumps for DuPont's pump division for over 15 years. Hodgson Report at 1. Hodgson also worked for Westinghouse as a lead development and design engineer for seals of reactor cooler pumps. Hodgson Dep. at 24. Hodgson described her experience with wastewater facilities in her deposition:

> We were on the same floor as the civil engineers [at DuPont], the pump consultants, and when they came asking us about, you know, the pump, I had just been trained on the Hydraulic Institute standard on how to design a pump, designing the pumping system for wastewater. And they, they weren't

aware of that standard, so I helped with -- with that by following the HI standard and setting up a spreadsheet for them. But I didn't have to go out and then do anything more than 'here are the equations, here are the drawings, here's the spreadsheet.'

Id. at 37.

Flowserve has failed to explain why Hodgson's experience designing and troubleshooting pumps is not applicable to this case. For example, the Court notes that Hodgson has never worked with wastewater pumps in the context of a municipal wastewater treatment facility, and has never worked with dry pit submersible pumps. [Dkt. 122-3 (Hodgson Dep.) at 31-37.] However, [*30] she has designed a seal to prevent a leak from reaching a nuclear reactor and causing the nuclear reactor to melt down. Id. at 32-34. While Flowserve posits that the radioactivity of a nuclear reactor would impact the type of seal required to prevent a leak, Flowserve offers no evidence supporting its conclusion that Hodgson's experience with nuclear reactor pumps has not equipped her with relevant skills and expertise. Nor has Flowserve explained why Hodgson's experience in DuPont's pump division is inapplicable.

Likewise, while Hodgson has never worked for a pump manufacturer and has never performed hands-on maintenance on a pump, her training at DuPont required her to install mechanical seals on pumps. Id. at 32, 35-36. Flowserve again fails to establish why Hodgson's experience is inadequate. While an expert witness's qualifications must be within the subject matter of the witness's testimony, the expert's experience need not be identical to the case at hand. See *Diallo, 40 F.3d at 34*.

In addition, Flowserve's assertion that Hodgson's consultation with fellow engineers renders her unqualified is unavailing. Hodgson explained at her deposition that she spoke with a retired pump consultant, Robert Hart, who "told [her] how pumps [*31] are designed," and opined that the Flowserve pump design "looks like they were picking existing parts so, you know, not -- it is not their own motor, that sort of thing. They didn't design the motor." Hodgson Dep. at 127. She also testified she spoke with William Livoti, a motor and drive expert, who is her "go-to person . . . when it comes to motors." Id. at 141. Hodgson explained that while:

I know about motors and motors that drive pumps and so forth, I didn't want to make any conclusions

based on just my knowledge. I wanted to make sure that I wasn't overlooking something or misunderstanding something. So he as an expert looked at it after I had looked at it and tried to understand it. And then I would explain to him what I saw and what I understood, and then he would tell me what he saw and what he understood and what I should further dig into.

Id. at 142.

Unlike Dickson, discussed below, Hodgson did not adopt the opinions of other experts. She consulted fellow engineers to assure the validity of her analysis and conclusion. Peer consultation and review is a customary and appropriate means of conducting and validating the delicacy of scientific research. *Rules 702* and *703* do not prohibit experts from consulting [*32] with other experts in their field. *See Fed. R. Evid. 703* (allowing experts to rely on any facts or data upon which other experts in that field would reasonably rely). Flowserve's argument that Hodgson is unqualified on this basis is unavailing. The Court finds Hodgson qualified to render an expert opinion in this case.

ii. <u>Hodgson's Analysis</u>

Flowserve also challenges Hodgson's analysis. Under Daubert, courts determine the reliability of an expert's analysis by considering "the theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the 'known or potential rate of error,' and the 'degree of acceptance' within the 'relevant scientific community.'" *Restivo v. Hessemann, 846 F.3d 547, 575-76 (2d Cir. 2017)* (citing *U.S. v. Romano, 794 F.3d 317, 330 (2d Cir. 2015)*; *Daubert, 509 U.S. at 593-94*.

If an expert "wants to testify to an opinion or conclusion that has not been established to a degree of scientific certainty . . . the court must still assess whether the expert employs "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," and may consider the Daubert factors in making this determination or other relevant factors. *Kumho Tire Co., 526 U.S. at 152*. Whether expert analysis is [*33] based on experience or training as opposed to a methodology or technique, the "trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.,*

*LLC, 571 F.3d 206, 214 (2d Cir. 2009)*; *Duchimaza v. United States, 211 F. Supp. 3d 421, 2016 WL 5799295, at *5 (D. Conn. 2016)*. Expert opinions must likewise be excluded where the court "conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)*; see also *Restivo, 846 F.3d at 576*.

Flowserve asserts Hodgson's opinion is unreliable for three reasons: (i) she relied on inadequate surveys; (ii) she failed to consider all relevant evidence; and (iii) she relied on undisclosed materials. The Court addresses each argument below.

1. Reliance on Inadequate Surveys

First, Flowserve asserts Hodgson unilaterally conducted user and manufacturer surveys that should be excluded as methodologically flawed. Hodgson's report indicates that she relied on the results of these surveys to conclude that (1) the Pumps' suction pipe had more volume per length than other pipes, which caused WPCA more problems than is typical; (2) the Pumps were defectively designed **[*34]** because they lacked vents, based on the fact that competitors in the market believe venting is necessary; and (3) Flowserve pumps are unreliable as compared to Flygt, a competitor. Id. at 9 (citing Hodgson Report at 14, 38, 40, 89).

In *Schering Corp. v. Pfizer, 189 F.3d 218 (2d Cir. 1999)*, the Second Circuit clarified the standards governing the admissibility of survey evidence. As the Second Circuit explained, the "great majority of surveys admitted in this Circuit" fall into the *Federal Rule of Evidence 803(3)* hearsay exception because "they poll individuals about their presently-existing states of mind to establish facts about the group's mental impressions." *Id. at 227-28*; *Drs. Assocs., Inc. v. QIP Holder LLC, 3:06-cv-1710, 2010 U.S. Dist. LEXIS 14687, 2010 WL 669870, at *9 (D. Conn. Feb. 19, 2010)* (VLB). Surveys of this type qualify "for a traditional hearsay exception," which "obviates the need to examine methodology before overruling a hearsay objection." *Schering, 189 F.3d at 227-28*. In cases where the survey evidence meets the hearsay exception for presently-existing states of mind, "errors in methodology thus properly go only to the weight of the evidence—subject, of course, to *Rule 403*'s more general prohibition against evidence that is less probative than prejudicial or confusing." Id.

In so holding, the Second Circuit expressed its agreement with the "modern view" that such surveys **[*35]** should be admitted as a general rule, and

their weight should be determined by whether they employed proper methodology, which is characterized as follows:

> (1) the universe was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise, and non-leading manner, (4) sound interview procedures were followed by the competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles, and (7) the objectivity of the entire process was ensured.

*Schering Corp., 189 F.3d at 225*. "These factors derive from accepted principles of survey methodology and help define when a survey has been properly conducted." Id. While surveys are most often admitted in trademark and false advertising cases, they are not limited to that purpose, and have been used in other contexts. Id. (citing *Keith v. Volpe, 858 F.2d 467, 479-81 (9th Cir. 1988)* (admitting survey to show statistics concerning respondents' race, income and housing preferences); *Debra P. v. Turlington, 730 F.2d 1405, 1408, 1412-14 (11th Cir. 1984)* (admitting survey to show "whether the teacher[s] [surveyed] had provided instruction during **[*36]** 1981-82 relating to the skills tested on the SSAT—II and if so, whether that instruction had been sufficient for a student to master the skills").

Where a survey does not fit within the *Rule 803(3)* hearsay exception, it may still be admissible under *Federal Rule of Evidence 807*'s residual hearsay rule. *Schering, 189 F.3d at 231*. *Rule 807* allows admission of a statement which has "circumstantial guarantees of trustworthiness" which are "equivalent" to the trustworthiness of statements falling within the hearsay exceptions in *Rules 803* and *804*. Id. A statement is admissible under *Rule 807* if:

> (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent

of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name [*37] and address of the declarant.

Id. "To be admissible under this exception, the evidence must, in other words, fulfill five requirements: trustworthiness, materiality, probative importance, the interests of justice and notice." Id. (quoting *United States v. Harwood, 998 F.2d 91, 98 (2d Cir.1993)*).

Proper methodology, as described above, can ensure the trustworthiness of a survey. *Id. at 233*. A survey is admissible under the residual exception of *Rule 807* if it employed proper methodology and does not otherwise lack circumstantial guarantees of trustworthiness. *Id. at 233-34*.

Flowserve asserts Hodgson's survey of other Flowserve customers and her review of user manuals for competitors' pumps did not use proper methodology and are accordingly inadmissible. WPCA does not dispute that Hodgson's conversations with customers and review of user manuals do not abide by the Schering standard. [Dkt. 141 at 8-9.] Rather, WPCA responds that Hodgson did not conduct scientific "surveys" subject to the Schering standard, but merely sought to "properly and fully investigate the nature of the product at issue." [Dkt. 141 at 8-9.]

Although WPCA concedes the point, the Court notes that Hodgson's "surveys" of Flowserve customers and competitor user manuals do not abide by the Schering standard. [*38] Here, Hodgson's survey did not "poll individuals about their presently-existing states of mind," but rather purported to collect data about the performance of Flowserve pumps based on the truth of the matter asserted in survey respondents' answers. Hodgson's survey does not meet the *Fed. R. Evid. 803(3)* hearsay exception, and accordingly errors in methodology would render the survey inadmissible. *Schering, 189 F.3d at 230*.

First, Hodgson did not properly define the universe for the survey and did not conduct her survey on a representative sample of any such universe. Rather, Hodgson testified that she determined which Flowserve customers to contact by starting with Flowserve's list of references provided to WPCA. Hodgson Dep. at 73-74. In addition to those customers, Hodgson asked "contacts in engineering firms that do sewage plants"

whether they had additional contacts, and "that led to other people that led to other people." Id. at 77. Hodgson does not know the exact number of Flowserve pump users surveyed, and does not assert that all customers surveyed use the same Flowserve pumps under substantially the same conditions as the WPCA facility. Id. Hodgson's universe is not sufficiently defined, and her survey respondents are not sufficiently [*39] representative to be methodologically sound. See, e.g., *CSL Silicones, Inc. v. Midsun Grp., Inc., 3:14-cv-1897, 2017 U.S. Dist. LEXIS 201499, 2017 WL 6055380, at *7 (D. Conn. Dec. 7, 2017)* (finding a survey lacked an adequate universe and representative sample, where the "universe for the subject survey was culled from a list of individuals identified as potentially responsible for using, purchasing, specifying, or recommending" the product at issue, but not exclusively that product).

Next, Hodgson's survey questions were not clear or precise, as required under the Schering standard. Rather, while the interviewer began by asking the same questions of each survey participant, she eventually altered the survey questions based on the information she had already gained. Id. at 71, 84 ("[B]ecause she was learning as she went, other questions were added."). The failure to ask survey questions "in identical fashion" constitutes flawed methodology. See, e.g., *Lion Oil Trading & Transp., Inc. v. Statoil Marketing & Trading, 08-cv-11315, 2011 U.S. Dist. LEXIS 24516, 2011 WL 855878, at *3 (S.D.N.Y. Feb. 28, 2011)* (noting failure to ask identical questions of each survey respondent was flawed, but finding that flaw went to weight rather than admissibility because the survey, unlike the survey in this case, fit within *Federal Rule of Evidence 803(3)*'s hearsay exception).

In addition, the [*40] survey did not abide by sound interview procedures. Rather, when the interviewer conducted surveys, she "posed as a person . . . considering buying [Flowserve] pumps," and asked if the person contacted recommended Flowserve pumps. Id. at 85. Although Hodgson noted that writing down the introduction to ensure consistency in each call would be the "best practice," Hodgson and her interviewer did not write down the introduction used in each call. Id. at 86. See, e.g., *Lion Oil Trading & Transp., 2011 U.S. Dist. LEXIS 24516, 2011 WL 855876 at *3*.

Finally, Hodgson did not conduct a meaningful scientific analysis of her survey results, but rather reiterated answers from various interviews in her report without analysis. [Dkt. 122-4 (handwritten notes).] Hodgson's survey of Flowserve customers did not abide by proper

2018 U.S. Dist. LEXIS 52168, *40

methodology and lacks indicia of trustworthiness sufficient for admission under *Federal Rule of Evidence 807* and Schering.

Even if the customer and user manual "surveys" were not analyzed under Schering, as WPCA asserts they should not be, they would be inadmissible. While an expert may rely on inadmissible hearsay in forming opinions, the expert may not simply repeat information she read or heard without analysis. *United States v. Mejia, 545 F.3d 179, 197 (2d Cir. 2008)* (finding expert testimony improper where it merely transmitted the contents of interviews to **[*41]** the jury without analysis). Rather, an expert must form her own opinions by "applying [her] extensive experience and a reliable methodology" to the inadmissible materials. Id. Without an analysis, the "expert is simply repeating hearsay evidence without applying any expertise whatsoever." Id; *Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002)* ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Hodgson's survey of pump manufacturers is similarly flawed. Id. Hodgson reviewed pump manuals from "four or five" companies to "see what they said about venting" because "everybody seemed to have had vents on [their pumps]." Hodgson Dep. at 171-72. Hodgson found that "they all said if it is a dry well you need to vent." Id. at 172. However, WPCA has offered no evidence that the competitor user manuals were a representative sample of an appropriately defined universe; the Court finds they were not. See *Vista Food Exchange, Inc. v. Vistar Corp., 2005 U.S. Dist. LEXIS 42541, 2005 WL 2371958, at *7 (E.D.N.Y. Sept. 27, 2005)* (finding universe of 75 respondents too small and insufficiently defined to provide reliable survey results). **[*42]** In addition, Hogdson has offered no qualitative analysis she used to determine the similarities or differences between the Flowserve Pumps and other pumps whose manuals she reviewed. Rather, it appears Hodgson reviewed competitor pump manuals, identified differences between the pumps, and concluded that the Flowserve Pumps should have been more similar to competitor pumps. Hodgson's discussion of competitor user manuals lacks analysis and is insufficiently scientific to be admissible as an expert opinion. *Mejia, 545 F.3d at 197.*

Accordingly, to the extent Hodgson's report is based on

inadmissible surveys, or simply "transmit[s] . . . hearsay to the jury," Hodgson's report must be excluded. *Mejia, 545 F.3d at 197.* Hodgson's report indicates that she relied on the results of these surveys to reach three conclusions. Because the surveys were not scientifically sound, the Court rejects her conclusions that (1) the Pumps' suction pipe had more volume per length than other pipes, which caused WPCA more problems than is typical; (2) the Pumps were defectively designed because they lacked vents, based on the fact that competitors in the market believe venting is necessary; and (3) Flowserve pumps are unreliable as compared to Flygt, **[*43]** a competitor.

2. Failure to Consider All Relevant Facts

Flowserve next asserts Hodgson did not base her opinions on sufficient data and facts. An expert opinion must be based on "sufficient facts and data" in order to be admissible. *Fed. R. Evid. 702*; see also *Wills v. Amerada Hess Corp., 379 F.3d 32, 48 (2d Cir. 2004)*; see also *Amorgianos, 303 F.3d at 265-66* (requiring a "sufficiently reliable foundation" to admit an expert opinion). The emphasis on sufficient facts and data is not intended to allow exclusion of an expert on the basis that a court believes one version of the facts rather than another. *Fed. R. Evid. 702*, Notes of Advisory Committee on 2000 amendments. Indeed, an expert may employ her expertise to draw conclusions in the face of conflicting evidence. *Cellular Phone Taskforce v. F.C.C., 205 F.3d 82, 90 (2d Cir. 2000).* However, an expert may not disregard relevant information in conducting her analysis. *Amorgianos, 303 F.3d at 268; Faulkner, 46 F. Supp. 3d 365, 383 (S.D.N.Y. 2014)* ("To ignore contradictory testimony in order to arrive at a desired conclusion highlights the unreliability of [an expert's] methodology.").

Here, Flowserve asserts Hodgson disregarded two categories of evidence: evidence that the Flowserve Pumps were not based on an old Worthington pump design, and evidence of how the Flowserve Pumps were maintained and operated. WPCA disputes both arguments.

First, the Court considers Hodgson's determination that the Flowserve **[*44]** Pumps were based on an old design. Hodgson testified at her deposition that she based that conclusion on multiple factors. First, Hodgson reviewed "cross-sectional drawings of the two" pumps, as well as "brochures that were showing all the submersible pumps." Hodgson Dep. at 124, 129-30. Hodgson noted that "the [Flowserve Pump] has a, what I consider a unique looking impeller which makes me go,

I wonder why, and I looked to the right and there was one just like it [on the Worthington pump] and the other ones on that brochure did not have a similar look to them." Hodgson Dep. at 129-30.

In addition, Hodgson testified Robert Hart, whom she consulted about pump design, noted that the Flowserve Pump design did not look like all of the components were designed to work together, but rather that the design used "existing parts." Hodgson Dep. at 127. Hodgson stated that information bolstered her "suspicion" that the Pumps were based on an old design. Id. at 127.

Hodgson also stated she considered testimony from William Wantz, a former Flowserve employee, when determining that the Flowserve Pumps were based on the Worthington design. Hodgson Dep. at 125. Wantz worked at Flowserve and its predecessor companies **[*45]** for over forty years. [Dkt. 141-9 (Wantz Dep.) at 16-20.] As an employee, Wants worked as a machinist, "designed the tooling and fixturing . . . that was needed to machine the parts," worked as a pump assembler, inspected parts and completed pumps, and also worked in warranty customer service during his tenure at Flowserve and its predecessors. Id. Wantz testified that, based on his experience at the company, he "know[s] they based [the Flowserve Pumps] off of the [Worthington pump] and made it so that it could be used dry pit or wet pit. . . . They changed the hydraulics on it, I believe. But I'm not an engineer." Id. at 28.

However, Ryan Malooly, Flowserve's designated corporate representative, testified at his deposition that the Flowserve pumps did not use the same design as the Worthington pumps. Hodgson Dep. at 126. Hodgson explained that she found Malooly's testimony not credible because he "vehemently denied" that the Pumps used the old Worthington model. Id. at 128. She explained that when Malooly gave that testimony, he was "animated" and "sp[oke] louder" and "repeat[ed] himself," which she interpreted as "little red flags." Id. Hodgson testified that other deponents also testified "vehemently" that the Flowserve **[*46]** Pumps did not use the Worthington model. Id. at 128-29. By contrast, Hodgson credited Wantz's testimony because, as an ex-Flowserve employee, she found he "would feel more free[] than someone that still works there." Id. at 126. Hodgson also found persuasive that Wantz, unlike Malooly, worked at Flowserve when the Pump was designed. Id.

The Court finds that Hodgson did not simply disregard Malooly's testimony in order to arrive at her conclusion that the Pumps were based on a Worthington design. Rather, in addition to considering testimony from Flowserve employees and representatives, Hodgson employed her expertise to compare cross-sectional drawings of the two pumps. Hodgson did not impermissibly fail to consider relevant evidence; her conclusion was based on her own observations, and was merely bolstered by the testimony of Wantz and Deluca. Flowserve's argument that this was impermissible is unpersuasive. Hodgson decided whose statements she would credit based on her professional judgment, which is wholly proper. *See, e.g., Zuchowicz v. United States, 140 F.3d 381, 385-87 (2d Cir. 1998).* To the extent, if at all, her judgment was flawed, such flaws go to the weight the trier of fact would give to her opinion, not its admissibility.

Flowserve's second argument fares **[*47]** better. Flowserve asserts Hodgson failed to consider all relevant facts and data because she admitted she did not review the deposition transcripts of most witnesses in this case, the daily log books recording Pump operation, the preventative maintenance records, or OMI's daily round checklists before rendering her opinions. [Dkt. 122 at 18]; Hodgson Dep. at 251-54 (stating she reviewed portions of Shawn Jennings and Lisa Burns' deposition testimony and attended all Flowserve depositions, and that she received information from Ms. Burns and Mr. Kolb about "what the operators said and what Flowserve's responsibilities were").

WPCA disputes Flowserve's argument that Hodgson did not review adequate evidence in preparing her report. [Dkt. 141 at 5.] WPCA points out that, while Hodgson did not review all deposition transcripts in this case, she attended all "critical" depositions in person or by phone. Id. (citing Hodgson Dep. at 253 (stating she attended all Flowserve depositions). WPCA also notes that "literally tens of thousands of documents" were produced in this case, and asserts the fact that Hodgson did not review all of them goes to the weight of her opinions, not their admissibility. **[*48]** Id. While Hodgson did not review the daily operation and maintenance records for the Pumps, WPCA notes that she reviewed the WPCA facility's operating procedures, toured the WPCA facility, and asked a pump operator about the difference between the pipes at the facility and the "troubles that were had." Hodgson Dep. at 135-38. She did not memorialize that conversation. Id.

A key issue in this case is whether the Pumps' failure was the result of a design defect or whether WPCA negligently operated or maintained the Pumps. [Dkt. 122.] Hodgson gathered some information relating to Pump operation, including reviewing applicable operating procedures and interviewing a pump operator, Hodgson failed to review however evidence of actual daily Pump operation and maintenance. Without such information, Hodgson cannot render a reliable opinion that the Pumps were not negligently operated or maintained. Hodgson's conclusion, absent consideration of this data, lacks a "sufficiently reliable foundation" to be admissible under *Federal Rule of Evidence 702*. See *Amorgianos, 303 F.3d at 265-66*; *Innis Arden Golf Club v. Pitney Bowes, Inc., 629 F. Supp. 2d 175, 189 (D. Conn. 2009)* (excluding expert who did not consider alternative explanations and failed to review evidence which may have supported an alternative explanation, finding that failure **[*49]** constituted a flawed methodology). Hodgson's opinion is based on an analysis which failed to consider all relevant facts and data; accordingly, the Court will not credit her conclusion that the Pumps failed as a result of a design defect rather than WPCA's negligent operation or maintenance of the system.

3. Reliance on Undisclosed Facts

Finally, Flowserve asserts Hodgson relied on facts and calculations not disclosed to Flowserve as the basis for her conclusions. The Supreme Court has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation," and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community. *Daubert, 509 U.S. at 593-94*; see also *Fed. Deposit Ins. Corp. v. Suna Assocs., Inc., 80 F.3d 681, 687 (2d Cir. 1996)* (discussing Daubert factors).

"In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert **[*50]** relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Id. In order for a Court to determine the admissibility of expert opinions, the party offering the expert must disclose the bases for

those opinion. *United States v. Ulbricht, 858 F.3d 71, 115 (2d Cir. 2017)* (upholding exclusion of an expert where the offering party failed to disclose the basis for experts' opinions or the methods used to arrive at their conclusions).

Here, Flowserve notes that, while Hodgson's initial and rebuttal reports refer to calculations, she presents no actual calculations in support of her findings. [Dkt. 122 at 22.] WPCA does not dispute that Hodgson did not include calculations in her report, but asserts that Hodgson "has analyzed the data Flowserve provided" and "applied the same principles and followed the same methodology she used when performing forensic pump evaluations for DuPont and Westinghouse for over twenty years." [Dkt. 141 at 8.]

As WPCA asserts, Hodgson testified that there are no calculations in her report because "Flowserve's expert opinion report has the numbers in there. Also we were provided the drawings that you use to make th[ese] calculations from Flowserve." **[*51]** Hodgson Dep. at 178. Hodgson's failure to disclose the calculations and data on which her opinions are based renders her opinions inadmissible. *Ulbricht, 858 F.3d at 115*; *Innis Arden Golf Club, 629 F. Supp. 2d at 190* (excluding expert who did not disclose analytical data relied upon in reaching his conclusion, finding that omission rendered the expert's methods and opinions unverifiable). Without those calculations, the Court cannot determine whether her analysis is generally accepted in the scientific community, nor can Flowserve rebut Hodgson's conclusions, and Hodgson's opinion must be excluded. See *Daubert, 509 U.S. at 593-94*; *Innis Arden Golf Club, 629 F. Supp. 2d at 190*. For the reasons stated above, Flowserve's motion to exclude Hodgson's report and testimony is GRANTED.

D. Summary of Bonneau Dickson's Report

WPCA also offers the expert report of Bonneau Dickson, which Flowserve moves to exclude. Mr. Dickson, a professional consulting engineer, has "over forty years of professional engineering experience on water and wastewater pump stations, treatment plants and water distribution and sewage collection systems." [Dkt. 127-2 (Dickson Report) at 3.] He has a bachelor's degree in civil engineering from Georgia Tech, master's degrees in sanitary engineering from Georgia Tech and Harvard University, and an MBA from the Harvard Business School. **[*52]** Id. He has been a registered civil engineer in California since 1970. Id.

Dickson has "participated in the design of approximately

300 water, wastewater and stormwater projects, ranging in size from a single septic tank or well to a 120 MGD pure oxygen wastewater treatment plant," and was the project manager for "many" of those projects. Id. at 16. Among those projects, he has worked on 50 wastewater treatment facilities. Id. at 20. He has also participated in the construction of approximately 20 water and wastewater projects, and served as resident engineer on an unidentified number of those projects. Id. He has also been the project manager for approximately 175 projects, was the operations manager for a 150-person engineering firm. Id. at 17. Dickson has served as a forensic technical consultant, expert witness, or claims analyst on over 100 projects. Id. He has been self-employed as an independent consulting sanitary engineer since 1993. Id. at 18.

Dickson's expert opinions are: (1) the decision to replace the Pumps was justified; (2) WPCA sustained damages as a result of replacing the Pumps; and (3) even if the Pumps did not warrant replacement, there would have been significant additional maintenance and operating [*53] costs to keep them running. Id. at 4. WPCA clarifies in its opposition to Flowserve's motion for summary judgment that Dickson's opinion "explained that the WPCA would have incurred additional costs if it had kept operating the Flowserve pumps," which was "one of the factors the WPCA had to consider in deciding whether to replace the pumps." [Dkt. 145 at 24.]

Dickson asserted WPCA was justified in fearing that the Flowserve Pumps would fail in the future and deciding to replace them. In support, Dickson summarized prior issues with the Pumps, including: (i) the 2012 storm, during which all six Pumps ran simultaneously and the WPCA facility experienced a sewage overflow; (ii) the 2013 incident when Pump One was run dry, "tripped out on high motor temperature" and required maintenance; (iii) the 2013 discovery that some of the Pumps had contaminated coolant, indicating a seal failure; (iv) the 2014 discovery that the pressure sensors were improperly set; and (v) the 2014 incident when Pump One failed because the stator was grounded and required replacement. Id. at 4-5.

Dickson also asserted, like Hodgson, that the Pumps were modeled after older Worthington Pumps. Id. at 6. Dickson came to this conclusion based on the fact that Worthington [*54] is a predecessor of Flowserve as well as unidentified Flowserve employees' statements that the Pumps were Worthington pumps. Id. Based on this information, Dickson concluded that "the Flowserve

pumps are of a very old design and the Flowserve technology has not been upgraded for decades." Id. Dickson opined this older design further justified WPCA's decision to replace the Pumps.

In addition, Dickson asserted he reviewed a cutaway drawing of a Flowserve pump and discovered that the positioning of the pump casing could allow a gas pocket to form in the pump, which "might not allow the liquid in the pump to cool the lower (primary) seal, [which] might allow the seal to become very hot." Id. at 7. If the pump were started and cold water suddenly came into contact with the hot seal, it "might . . . cause [the seal] to fail catastrophically." Id. at 7-8. Dickson opined this design suggested the Flowserve Pumps would fail again in the future and further justified WPCA's decision to replace them. Id

Dickson also opined that WPCA was justifiably concerned that Flowserve would provide inadequate customer assistance in the future. Id. at 9. In support of that assertion, Dickson summarized 2013 and 2014 communications between [*55] Flowserve and WPCA in which Flowserve asserted the Pumps failed because they ran dry and then "in essence abandoned the project and provided little or no meaningful further assistance to the WPCA in attempting to understand and remedy the problems." Id. at 8. Dickson opined that Flowserve's "lack of technical support increased the WPCA's concern that the pumps would continue to have problems that would not be addressed and would result in more pump failures." Id. at 9.

In addition, Dickson opined that "WPCA is extremely sensitive to the risk of a sewage spill and justifiably so." Id. at 9. Dickson explained the WPCA facility's proximity to the Norwalk River and Maritime Aquarium and Oyster Shell Park, the annual revenue of the local commercial shell fishing industry, and the potential impact of a sewage spill on other recreational marinas nearby. Id. Dickson opined that, if a sewage spill occurred, WPCA would face a "significant risk of major fines." Id. at 10. Accordingly, Dickson found WPCA justified in its decision to replace the Pumps. Id.

Dickson also opined that WPCA sustained damages in having to replace the Pumps. Id. In support, Dickson cited a report by CDMS dated November 14, 2014, which estimated that the [*56] cost of continuing to use the Pumps would be $2,269,000. Id. at 10. However, Dickson noted that CDMS's calculation did not consider extra operating costs for the Pumps to remedy issues that were "just beginning to be discovered at the time

that CDMS wrote the 11/14/2014 report." Id. By contrast, the cost of replacing the Pumps was estimated to be $2,797,000. Id. In fact, a report estimated the total construction cost of the replacement project to be $4,306,500, which "included some betterments, such as HVAC improvements." Id. at 10. Dickson noted that WPCA decided to replace the Flowserve pumps despite the higher cost of doing so, "because of the risks and uncertainties of continuing with the Flowserve pumps." Id.

Finally, Dickson opined that if WPCA had not replaced the Pumps, it would have sustained significant additional maintenance and operating costs to keep them running. Dickson opined that maintenance costs for the Pumps would include overhauls performed by AEM every two years, the potential addition of pump motor monitoring sensors to reduce the potential for pump damage, the advisability of purchasing extra Pumps as "spares" in case of Pump failure, and the installation of air release systems. Id. at 12.

In addition, [*57] Dickson calculated that operating costs for the Flowserve Pumps would include weekly checks of the coolant level and inspections for contamination. Id. Dickson also assumed the Pumps' glycol would have to be refilled every other month, assumed the coolant would be contaminated and require replacement every other month, assumed the bearings would need to be re-greased, air would need to be bled out of the Pumps, and that Pumps would need to be taken out of service once per week for inspection upon signs of trouble. Id. at 13. Dickson estimated that these extra maintenance and operational needs would raise the cost of continuing to use the Pumps to $2,750,123 over a twenty-year lifespan. Id.

### E. Analysis: Motion to Exclude Dickson

Flowserve moves to exclude Dickson's expert report for lack of an analysis rooted in acceptable methodology. [Dkt. 127.] As stated above, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Amorgianos, 303 F.3d at 267.* If an expert opinion inefficiently explains the basis for its conclusion, a "court may conclude that there is simply too great an analytical gap between [*58] the data and the opinion proffered." Id.

Here, Flowserve asserts Dickson's opinions impermissibly rely on assumptions with no factual support or expert analysis. [Dkt. 127.] WPCA responds that Dickson's opinions are based on his expertise

weighing the environmental and financial risk associated with leaving the Pumps in place. [Dkt. 144.] Specifically, WPCA asserts Dickson's calculation of anticipated future maintenance and operating costs for the Pumps "used his specialized knowledge to provide information that the jury would otherwise not be able to deduce." Id. at 7-8.

The Court finds that Dickson's expert report lacks a sufficient explanation of reliable methodology. It is conceivable that Dickson, who has spent decades in the field of wastewater treatment facility design, is familiar with the general costs of maintenance and operation of wastewater treatment pumps. However, Dickson's report does not explain how he arrived at his calculations concerning what maintenance the Pumps would require, how often, and how much that maintenance would cost. In fact, Dickson's report is rife with assumptions and estimates without any explanation of their basis. Dickson's estimates regarding the future [*59] cost of keeping the Flowserve Pumps are based on speculation and conjecture, and lack the "level of intellectual rigor that characterizes the practice of an expert." *Kumho Tire Co., 526 U.S. at 152;* see also, e.g. *Duchimaza, 211 F. Supp. 3d 421, 2016 WL 5799295 at *5* (excluding an expert who drew conclusions based on a review of the record and failed to conduct an analysis of that evidence beyond the ability of a layperson with basic mathematical skills).

In addition, when Dickson was questioned about how he arrived at his total calculation of the damages incurred by replacing the Pumps, and why that total was higher than the damages he concluded were caused by the Pumps, he explained that the date he finalized his report, "somebody telephoned me, perhaps Mr. Orenstein [one of WPCA's attorneys], and said there was another $13,994.20 in the betterments [provided by the replacement pumps], and so I got this number based off somebody telling me that that much should be added to it." [Dkt. 127-3 (Dickson Dep. at 165.] Dickson testified he did not conduct any calculations or research to confirm that number, and does not know what is included in that number. Id. Dickson's reliance on Mr. Orenstein's opinion as to the total value of betterments, absent any expert analysis [*60] by Dickson, is a mere transmission of hearsay which cannot constitute an admissible expert opinion. *Mejia, 545 F.3d at 197* (excluding an expert who simply "transmit[ted] . . . hearsay to the jury" without conducting any expert analysis of those hearsay statements).

Dickson's opinion regarding the potential environmental

impact of keeping the Pumps is equally devoid of acceptable basis. Dickson testified at his deposition that he learned of the "risk" of sewage spills from WPCA representatives and internet research. [Dkt. 127-3 (Dickson Dep.) at 87.] Specifically, Dickson testified that his conclusion that the WPCA was justifiably sensitive to the risk of a sewage spill was based on "conversations with Ms. Burns and Mr. Kolb," who "talked about the importance of the environmental quality of Norwalk Harbor." Id. Dickson testified he thought WPCA's concern was justified "because of the damage that could be done, potential for large fines, bad publicity." Id. Dickson testified that his discussion in his report about the Norwalk River and Harbor "came from online . . . I think the shellfish thing was -- they told me it was a shellfish industry and I believe I found that online as well." Id. at 88.

Dickson does not purport to be an expert **[*61]** in environmental impact, and offers no acceptable scientific analysis supporting his environment-related opinions. Dickson's admitted internet research is not an acceptable basis for an expert opinion. *Andrews v. Metro N. Commuter R. Co., 882 F.2d 705-708 (2d Cir. 1989)* ("expert testimony is inadmissible when it addresses lay matters which a jury is capable of understanding and deciding without the expert's help."). Nor is his admitted reliance on WPCA representatives' statements. *Mejia, 545 F.3d at 197* (stating an expert may not simply "transmit . . . hearsay to the jury").

For the reasons set forth above, Dickson's report is not based in acceptable methodology or analysis, and is inadmissible. Flowserve's motion to exclude Dickson's expert report is GRANTED.

IV. Motions for Summary Judgment

The Court next considers the Motions for Summary Judgment.

A. Standard of Review

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." *Fed. R. Civ. P. 56(a)* **[*62]** . In order to prevail, the moving party must sustain the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse, 611 F.3d 98,*

*106 (2d Cir. 2010)*. "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought. Id. (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315-16 (2d Cir. 2006)* (quotation omitted). In addition, "the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury." *Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996)*.

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.' At the summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp., No. 3:03-cv-481, 2004 U.S. Dist. LEXIS 22112, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004)* (quoting *Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996))*. "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim." *Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 726 (2d Cir. 2010)* (quoting *Anderson, 477 U.S. at 251*).

A court must make the threshold determination of whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *Anderson, 477 U.S. at 250*. Judges are not required "to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would **[*63]** warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a scintilla of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a

preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson, 477 U.S. at 251* (citing *Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 343, 53 S. Ct. 391, 77 L. Ed. 819 (1933)*; *Coughran v. Bigelow, 164 U.S. 301, 307, 17 S. Ct. 117, 41 L. Ed. 442 (1896))*.

"A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." *Fed. R. Civ. P. 56(c)(1)*. A party may also support their assertion by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Id. Cited documents must consist of either "(1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that **[*64]** would be admissible at trial." *Local R. Civ. P. 56(a)*3; see also *Fed. R. Civ. P. 56(c)(4)*.

The Court need not consider any materials that the parties have failed to cite, but may in its discretion consider other materials in the record. *Fed. R. Civ. P. 56(c)(3)*. If a party fails to properly support an assertion of fact, or fails to properly address another party's assertion on fact, the Court may grant summary judgment on the basis of the undisputed facts. *D. Conn. L. Rule 56(a)(3)* (stating that "failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with [Local] *Rule 56(a)(1)* or in the Court imposing sanctions, including . . . an order granting the motion if the undisputed facts show that the movant is entitled to judgment as a matter of law").

### C. Analysis: Flowserve's Motion for Summary Judgment against WPCA

Flowserve moves for summary judgment as to all seven of WPCA's claims against it. The Court addresses each in turn.

### i. Counts One and Two: Strict Products Liability and Negligence Arising out of Products Liability

Flowserve moves for summary judgment as to Counts One and Two of WPCA's Third Amended Complaint, which allege liability due **[*65]** to defective Pump design. [Dkt. 129 at 12.]

"All [products liability] claims, whether alleging a design defect, manufacturing defect or failure to warn defect, are governed by the same elements that this court has applied since it adopted *§ 402A*:

> (1) the defendant was engaged in the business of selling the product;
> (2) the product was in a defective condition unreasonably dangerous to the consumer or user;
> (3) the defect caused the injury for which compensation was sought;
>
> (4) the defect existed at the time of the sale; and
>
> (5) the product was expected to and did reach the consumer without substantial change in condition."

*Bifolck v. Philip Morris, 324 Conn. 402, 433-36, 152 A.3d 1183 (2016)* (citing *Izzarelli v. R.J. Reynolds Tobacco Co., supra, 321 Conn. at 184-85, 136 A.3d 1232*).

Step two of the analysis, the "unreasonably dangerous" test, requires the application of either (1) the risk-utility test (formerly called the modified consumer expectation standard) or (2) the consumer expectation standard. Id. Connecticut determined which test applies in *Izzarelli v. Reynolds Tobacco Co., 321 Conn. 172, 136 A.3d 1232 (2016)*: "The [risk-utility or] modified consumer expectation test is our primary test. The ordinary consumer expectation test is reserved for cases in which the product failed to meet the ordinary consumer's minimum safety expectations, such as res ipsa type cases. *Id. at 194*.

Connecticut elaborated on what is required **[*66]** of the two tests a few months later in *Bifolck v. Philip Morris, 324 Conn. 402, 433-36, 152 A.3d 1183 (2016)*: "For a strict liability claim alleging design defect, the plaintiff may prove this element under the risk-utility test or under the consumer expectation test. Under the risk-utility test, which will govern most cases, a product is in a defective condition unreasonably dangerous to the consumer or user if:

> (1) A reasonable alternative design was available that would have avoided or reduced the risk of harm and the absence of that alternative design renders the product unreasonably dangerous. In considering whether there is a reasonable alternative design, the jury must consider the feasibility of the alternative. Other relevant factors that a jury may consider include, but are not limited to, the ability of the alternative design to reduce the

product's danger without unreasonably impairing its usefulness, longevity, maintenance, and esthetics, without unreasonably increasing cost, and without creating other equal or greater risks of danger; or

(2) The product is a manifestly unreasonable design in that the risk of harm so clearly exceeds the product's utility that a reasonable consumer, informed of those risks and utility, would not purchase the [*67] product. The factors that a jury may consider include, but are not limited to, the magnitude and probability of the risk of harm, the instructions and warnings accompanying the product, the utility of the product in relation to the range of consumer choices among products, and the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing.

Under either approach to the risk-utility test, the fact finder considers whether the risk of danger inherent in the challenged design outweighs the benefits of that design. *Id. at 433-36*.

Alternatively, in res ipsa loquitor cases, where the consumer expectation test applies, a product is in a defective condition unreasonably dangerous to the consumer or user only if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Id. (citing *2 Restatement (Second), supra, § 402A, comment (i), p. 352*). The product must fail to meet legitimate, commonly held, minimum safety expectations of that product when used in an intended or reasonably foreseeable manner. Those expectations may be informed by consumers' [*68] experience with the product, the seller's express representations, and product safety laws. Id.

As the Second Circuit observed, the "Connecticut Supreme Court has made it clear that in product liability actions, a jury may, under appropriate circumstances, infer a defect from the evidence without the necessity of expert testimony." *Sanders v. Fireline, Inc., 295 F. App'x 373, 374 (2d Cir. 2008)* (quoting *Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 218, 694 A.2d 1319 (1997)*). "Expert testimony is unnecessary if all the primary facts can be accurately and intelligibly described to the jury, and if they . . . are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation

in respect of the subject under investigation." Id. (quoting *Salem v. U.S. Lines Co., 370 U.S. 31, 35, 82 S. Ct. 1119, 8 L. Ed. 2d 313 (1962)*).

"Where, however, the nexus between the injury and the alleged cause would not be obvious to the lay juror, expert evidence is often required to establish the causal connection between the accident and some item of physical or mental injury." Id. (quoting *Wills v. Amerada Hess Corp., 379 F.3d 32, 46 (2d Cir.2004)*). "Putting forth expert testimony or evidence of some kind to establish a genuine issue of material fact is especially important when, as is the case here, the plaintiff attempts to assert a design defect claim." *Walters v. Howmedica Osteonics Corp., 676 F. Supp. 2d 44, 50 (D. Conn. 2009)*; *Koger v. Synthes North America, Inc., No. 3:07-CV-01158 (WWE), 2009 U.S. Dist. LEXIS 117829, 2009 WL 5110780, at *2 (D. Conn. Dec.17, 2009)* [*69] ; *Kuzmech v. Werner Ladder Co., 3:10-cv-266 (VLB), 2012 U.S. Dist. LEXIS 174082, 2012 WL 6093898, at *11 (D. Conn. Dec. 7, 2012)*.

Flowserve first asserts WPCA cannot assert products liability without its expert, Hodgson. [Dkt. 129 at 16.] Flowserve next asserts the defects WPCA identifies are issues with the design of the WPCA plant and the pump specifications created by project engineer CDMS, rather than issues with the design of the Pumps. Id. Finally, Flowserve asserts WPCA does not offer an alternative design within the scope of the WPCA Project specifications, and accordingly offers no feasible alternative. Id. at 17 (citing *Bifolck, 152 A.3d at 1203*).

WPCA does not address each of Flowserve's arguments, but rather responds that Flowserve should have advised WPCA if the pumps required under the Project specifications were insufficient, and should have provided pumps that did not bear the alleged defects Hodgson identified. [Dkt. 145 at 20.]

First, the Court agrees with Flowserve that this is the type of complex case which requires an expert opinion as to defect and as to feasible alternative design. This case, involving the requirements of a pump for a wastewater treatment facility, is not one in which a jury would be "as capable of comprehending the [*70] primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training." *Sanders, Inc., 295 F. App'x at 374*; see also, e.g., *Koger, 2009 U.S. Dist. LEXIS 117829, 2009 WL 5110780 at *2* (holding that since implanted medical screws were not within common knowledge plaintiff needed expert evidence to establish screw was

defective and the existence of a causal link); *Kuzmech, 2012 U.S. Dist. LEXIS 174082, 2012 WL 6093898 at *11* (finding expert evidence required to establish the "physical conditions and engineering principles of when a ladder buckles:"). Accordingly, absent admissible expert testimony, WPCA's claim must fail.

Second, the Court finds compelling Flowserve's argument that the Pumps complied with Project specifications. While the Connecticut Supreme Court has not yet decided the question, the Connecticut Superior Court has determined that a "manufacturer is not liable for a design defect that causes injury to the consumer if the product is manufactured according to the designer/buyer's specifications, unless the specifications are obviously dangerous and should not be followed." *Rogers v. Budget Truck Rental, LLC, No. HHBCV075003950, 2008 Conn. Super. LEXIS 2715, 2008 WL 4926698, at *2-3 (Conn. Super. Ct. Oct. 30, 2008)* (noting that no other Connecticut court had yet discussed the issue). The Connecticut Superior Court explained that "no public policy can be served **[\*71]** by imposing a civil penalty on a manufacturer of specialized parts for a highly technical machine according to the specifications supplied by one who is expert at assembling these technical machines . . . The effect of such a decision on component parts manufacturers would be enormous." Id. (citing *Orion Ins. Co. Ltd. v. United Techs. Corp., 502 F. Supp. 173, 178 (E.D. Pa. 1980)*. Other courts have likewise found that "when a product is manufactured in accordance with plans and specifications provided by the purchaser, the manufacturer is not liable for an injury caused by an alleged design defect in the product, unless the specifications are so patently defective that a manufacturer of ordinary prudence would be placed on notice that the product is dangerous and likely to cause injury." *Dalton v. Stedman Machine Co., 2008 U.S. Dist. LEXIS 9305, 2008 WL 351676, at *4 (N.D.N.Y. Feb. 7, 2008)* (discussing New York law); see also *Thompson v. Hirano Tecseed Co., Ltd., 456 F.3d 805, 809 (8th Cir. 2006)* (collecting cases establishing that the same principle is applied in Virginia, Kentucky, Pennsylvania, Maryland, Delaware, Idaho, Michigan, Missouri, and Nebraska).

The evidence indicates that, even considering Hodgson's opinion, WPCA's asserted defects concern the overall wastewater treatment facility design and CDMS's pump specifications rather than the Pumps themselves. For example, Hodgson opines that the Pumps were defective because the **[\*72]** motors were too small. Hodgson Report at 13. However, the Project

design specifications required that the motors be no larger than 215 horsepower. [Dkt. 130-11 (CDMS Specifications) at 6.] The specifications include no minimum horsepower. Id. The Pumps had 200 horsepower, and thus abided by the Project specifications. Hodgson Report at 13. Similarly, Hodgson's opinion that the Pumps were defective for failing to provide air vents does not take into account that the Project specifications did not call for those additions. Hodgson Report at 13; CDMS Specifications at 6.

Hodgson asserted the Pumps failed to meet project specifications because they failed to provide equal flow distribution, and because the upper seals and bearings were not adequately lubricated. Hodgson Report at 83-84. However, for the reasons set forth previously, Hodgson's report is inadmissible, and there is no admissible evidence that Flowserve failed to meet the project specifications. Rather, despite Hodgson's opinion, WPCA admitted in its *Rule 56(a)(2)* statement that CDMS's design specifications were based on Flowserve's MSX Series 3 pumps, and states those specifications "allowed for pumps from Flowserve, Flygt or similar." [Dkt. 146 at 4.] In addition, WPCA's *Rule 56(a)(2)* statement **[\*73]** does not admit that "Flowserve submitted its bid to supply six MSX Series 3 pumps in compliance with CDM Smith's specifications," but rather states "Flowserve did not accept the terms and conditions in the bid package but attempted to negotiate terms not in the bid package." Id. at 7. However, WPCA's summary judgment briefing states WPCA believes Flowserve negotiated its warranty and limitation of liability provisions, and at no point asserts Flowserve "attempted to negotiate" technical specifications. Moreover, the recommended design of the wastewater treatment plant was based on the Flowserve MSX Series 3 pumps. [Dkt. 130-4 at 21.]

Further, the specifications in Flowserve's bid state Flowserve will provide six MSX Series 3 pumps, and that "Flowserve will not be responsible for the design, arrangement, and operation of the supporting structure for the assembled pumping unit." [Dkt. 130-15 at 12-13.] Even if Flowserve had not disclaimed responsibility for the design of the structure which would surround the Pumps, there is no evidence that Flowserve was provided with CDMS's specifications for the entire WPCA facility. Rather, the specifications Flowserve received concerned only the vertical **[\*74]** non-clog dry pit submersible pumps. [Dkt. 130-11.]

WPCA had an opportunity to discuss Flowserve's bid,

which contemplated the use of MSX Series 3 pumps, at a scope of review meeting in which Gilbane and Flowserve participated, but WPCA chose not to attend that meeting. [Dkt. 130-14 at 113-16.] WPCA ultimately certified Flowserve's bid to provide MSX Series 3 pumps (Dkt. 120-38 at 1) and WPCA accepted the Pumps upon installation and testing in 2012. [Dkt. 120-5 at 154-55.] Admissible record evidence indicates Flowserve's Pumps met WPCA's design specifications, and that WPCA cannot defeat summary judgment on its products liability claim.

Finally, WPA has not established that a reasonable alternative pump design was available. Hodgson's report, even if admitted, does not identify a reasonable alternative. Rather, Hodgson's report opines that WPCA should have used Flygt pumps, which have larger motors. However, the Flygt motors would have required an expensive reworking of the system as a whole, and were considered and rejected by WPCA during the bidding process. [Dkt. 130-3 at 33 (stating WPCA did not choose Flygt pumps because they would have required "hundreds of thousands of dollars' [*75] worth of changes in order to bring them to the point where [those pumps] could be installed on the project").] WPCA has offered no evidence that a "reasonable alternative design was available" for pumps that would meet the WPCA system specifications "that would have avoided or reduced the risk of harm" without "unreasonably increasing cost." *Bifolck, 324 Conn. at 433* (explaining that a plaintiff in a design defect case must "proffer sufficient evidence from which a jury could reasonably conclude that any increase in cost would not materially affect the desirability of the product in light of the benefit derived"); *Izzarelli v. R.J. Reynolds Tobacco Co., 321 Conn. 172, 208, 136 A.3d 1232 (Conn. 2016)* (stating the jury must weigh the mechanical feasibility and cost of an alternative design); *White v. Mazda Motor of Am., Inc., 313 Conn. 610, 99 A.3d 1079 (Conn. 2014)* (same).

WPCA has failed to offer admissible expert testimony in support of its products liability claims, and has not raised a material question of fact as to whether Flowserve met CDMS's design specifications and whether a feasible alternative design was available. Accordingly, Flowserve's motion for summary judgment as to Counts One and Two of WPCA's Third Amended Complaint is GRANTED.

## ii. Count Three: Breach of Express Warranty Arising out of Products Liability

Flowserve also moves for summary judgment on [*76]

WPCA's breach of express warranty claim. [Dkt. 129 at 34.]

Courts have held that "because the CPLA is silent as to the elements of a cause of action for breach of warranty," plaintiffs may rely on the Connecticut Uniform Commercial Code, Title 42a of the Connecticut General Statutes ("CUCC"). *Kuzmech, 2012 U.S. Dist. LEXIS 174082, 2012 WL 6093898, at **12-13; Johnson v. Sears Roebuck & Co., No.3:05-cv-139(JCH), 2007 U.S. Dist. LEXIS 63657, 2007 WL 2491897, at *4 (D. Conn. Aug. 29, 2007)*.

An express warranty is created as follows: "(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain, creates an express warranty that the goods shall conform to the affirmation or promise; (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description; (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the good shall conform to the sample or model." *Conn. Gen. Stat. § 42a-2-313(1); Johnson, 2007 U.S. Dist. LEXIS 63657, 2007 WL 2491897, at *4*.

"For both express and implied warranties, a plaintiff has the burden of proving causation." *Johnson, 2007 U.S. Dist. LEXIS 63657, 2007 WL 2491897, at *4* (citing *Conn. Gen. Stat. § 52-572n(a)*); *Blockhead, 402 F. Supp. at 1024* ("In a breach of warranty action, a plaintiff may recover only after demonstrating that a warranty existed, that defendant breached the warranty, and that [*77] the breach was the proximate cause of the loss sustained.").

"[P]arties are . . . free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect." *Comind, Companhia de Seguros v. Sikorsky Aircraft Div. of United Techs. Corp., 116 F.R.D. 397, 412 (D. Conn. Jan. 14, 1987)* (citing comment to *Conn. Gen. Stat. § 42a-2-719*)). Clauses restricting a party's remedies are enforceable unless unreasonable. *Latham & Assoc., Inc. v. William Raveis Real Estate, Inc., 218 Conn. 297, 308, 589 A.2d 337 (Conn. 1991)*; see also *Conn. Gen. Stat. § 42a-2-302(1)* (stating the court may refuse to enforce a contract only if its terms are unconscionable); *Comind, Companhia de Seguros v. Sikorsky Aircraft Div. of United Techs. Corp., 116 F.R.D. 397, 412 (D. Conn. Jan. 14, 1987)* (explaining that a restriction on warranties is unenforceable "where the

remedy agreed to be the sole remedy cannot yield the relief it purports to give, and thus cannot accomplish its essential purpose of providing at least a minimum adequate remedy"). "[B]oth express and implied warranties may be effectively disclaimed by sufficiently specific language." *Beech Aircraft Corp. v. Flexible Tubing Corp., 270 F. Supp. 548, 561 (D. Conn. 1967)*.

WPCA asserts that Flowserve breached the Certification of Functionality in its initial bid submittal, which states:

> Flowserve certifies that the pumps being supplied on the subject order shall function properly, as long as the discharge and suction piping being supplied by the contractor is coordinated properly with the pumps being supplied.

[Dkt. 146-12 at 25.] WPCA asserts that Flowserve does not argue the discharge **[*78]** and suction piping were coordinated improperly, and asserts it is undisputed that at least some of the Pumps suffered a catastrophic failure in August 2013. WPCA asserts this failure constitutes a genuine issue of material fact as to whether the Pumps were able to function properly within the WPCA system. [Dkt. 145 at 26-27.]

Flowserve replies that the only express warranty Flowserve made "warrants at time of shipment to Gilbane Building Company its Equipment will comply with applicable [Flowserve] drawings and will be free from defects in workmanship and material." [Dkt. 130-19 (Purchase Order) at 1.]

The final agreement, dated December 2, 2010, includes the warranty against defects in workmanship and material which Flowserve cites. [Dkt. 130-19 (Purchase Order) at 1.] The agreement also states "any equipment and parts supplied by [Flowserve] but manufactured by third parties carry the warranty that the manufacturer of such equipment and parts conveyed to [Flowserve] which can be passed on to Gilbane Building Company." Id. The agreement also states, in all capital letters, "THESE WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER WRITTEN, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING BUT NOT LIMITED **[*79]** TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE." Id. at 3. The certification of functionality appearing in Flowserve's earlier submittal, dated July 9, 2010, is not included among the express warranties in the final agreement, and is disclaimed under the plain terms of the final agreement. Id.; [Dkt. 146-12 at 2 (showing date of prior submittal).]

The final agreement included pro-rated warranties to repair and replace the Pumps if any injury arose due to a defect in workmanship or materials, and accordingly does not leave WPCA without a "minimum" remedy. Purchase Order at 4; compare with *Comind, Companhia de Seguros, 116 F.R.D. at 412* (finding a limitation of liability unreasonable where it only allowed for recovery of 1/16th of the cost of the product in question). The disclaimer in the final agreement is clear, conspicuous, and enforceable. *Latham & Assoc., Inc.., 218 Conn. at 308 (Conn. 1991)*. Flowserve's motion for summary judgment on Count Three of WPCA's Third Amended Complaint is GRANTED.

### iii. Counts Four and Five: Breach of Implied Warranties of Merchantability and Fitness

Similarly, Flowserve moves for summary judgment as to Counts Four and Five of WPCA's Third Amended Complaint because the executed purchase order contract for the Pumps expressly **[*80]** excluded any and all implied warranties. [Dkt. 129 at 11.]

"The CUCC defines implied warranties in two provisions. *Connecticut General Statute section 42a-2-315* provides: '[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under *section 42a-2-316* an implied warranty that the goods shall be fit for such purpose." *Walters, 676 F.Supp.2d at 55* (quoting *Conn. Gen. Stat. § 42a-2-315*). In addition, "*Connecticut General Statute section 42a-2-314* provides: '[u]nless excluded or modified as provided by *section 42a-2-316*, a warranty that the goods shall be merchantable is implied in a contract with respect to goods of that kind." Id. (quoting *Conn. Gen. Stat. § 42a-2-314*). "This implied warranty of merchantability 'acts as a guarantee by the seller that his goods are fit for the ordinary purposes for which they are to be used and will pass in the trade without objections." Id. (quoting *Blockhead, Inc. v. Plastic Forming Co., Inc., 402 F. Supp. 1017, 1025 (D. Conn. 1975))*.

However, an implied warranty may be disclaimed, and such disclaimer is enforceable if it is "conspicuously placed in large type." See, e.g., *Web Press Servs. Corp. v. New London Motors, Inc., 203 Conn. 342, 353, 525 A.2d 57 (Conn. 1987)*. "To exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing

must be conspicuous, **[\*81]** and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'" *Conn. Gen. Stat. § 42a-2-316(2)*.

The relevant language in the final purchase order in this case states:

> These warranties are exclusive and in lieu of all other warranties, whether written, express, implied, statutory, or otherwise, including but not limited to the implied warranties of merchantability, and fitness for a particular purpose.

[Dkt. 130-15 at 16.] Flowserve asserts this language is adequately conspicuous and specific to be enforceable under *Conn. Gen. Stat. § 42a-2-316(2)*. See, e.g., *Web Press Servs. Corp. v. New London Motors, Inc., 203 Conn. 342, 525 A.2d 57, 63 (Conn. 1987)* (finding no implied warranty of merchantability existed where the purchase order explicitly disclaimed such a warranty). WPCA does not dispute that the disclaimer language is adequately conspicuous, but rather asserts it did not authorize Gilbane to enter into an agreement with such a disclaimer, and thus the disclaimer must be void. The Court must accordingly consider whether Gilbane was authorized to enter into the agreement with Flowserve.

"[I]t is a general rule **[\*82]** of agency law that the principal in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal, and within the scope of the agent's employment. . . . An agent's authority may be actual or apparent. . . . Actual authority exists when [an agent's] action [is] expressly authorized . . . or . . . although not authorized, [is] subsequently ratified by the [principal]." *Ackerman v. Sobol Family P'ship, LLP, 298 Conn. 495, 508-09, 4 A.3d 288 (2010)* (citing *Maharishi School of Vedic Sciences, Inc. v. Connecticut Constitution Assocs. Ltd. P'ship, 260 Conn. 598, 606-607, 799 A.2d 1027 (2002)).*

In contrast, "[a]pparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses. . . . Consequently, apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal. . . . The issue of apparent authority is one of fact to be determined based on two criteria. . . . First, it must appear from the principal's conduct that the principal

held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority. . . . Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, **[\*83]** that the agent had the necessary authority to bind the principal to the agent's action." *Ackerman, 298 Conn. at 498-99*.

The evidence indicates WPCA engaged Gilbane to act as its agent in conducting the bidding process for the wastewater facility Project. [Dkt. 120-4 (Construction Management Contract) at 5 (stating Gilbane "shall obtain competitive bids" for the WPCA Project).] WPCA has not asserted there is any language in that agreement saying Gilbane may not negotiate certain contract terms with prospective subcontractors, nor has the Court identified such a term. In fact, while the Construction Management Contract states WPCA will provide "draft bid documents that include all contractual terms and other requirements governing the hiring of labor and purchasing of materials in connection with the Work," the agreement also states Gilbane "is responsible for supplementing the bidding documents and making any and all necessary revisions in order for such documents to be appropriate in form and content for public bidding purposes." Id. at 5. The agreement specifically contemplates Gilbane "analyzing" bids and making "any and all necessary revisions." Id. The Court reads the Construction Management Contract to "expressly authorize" Gilbane to negotiate the terms **[\*84]** of Flowserve's contract. *Ackerman, 298 Conn. at 508-09*.

Even if the Construction Management Contract did limit Gilbane's actual authority to negotiate, there is no evidence that Gilbane did not have apparent authority to negotiate with Flowserve. Rather, evidence shows that WPCA acted as if Gilbane had authority to negotiate with Flowserve and abstained from opportunities to engage in the negotiations. For example, WPCA could have attended the scope review meeting at which Gilbane and Flowserve discussed Flowserve's bid, including the proposed warranties and limitation of liability. [Dkt. 130-16 (Scope Review Meeting Minutes); Dkt. 130-14 at 113-1.] However, WPCA declined to do so. Id. WPCA, through its actions, held Gilbane out to be authorized to negotiate with Flowserve, and there is no record evidence that Gilbane did not in fact believe it was authorized to so negotiate. There is no question of fact that Gilbane had apparent authority, if not actual authority, to negotiate Flowserve's warranty and limitation of liability clauses. *Ackerman, 298 Conn. at*

*498-99*.

Not only did WPCA grant Gilbane the authority to negotiate the contract with Flowserve, but WPCA's authorized agent also certified Flowserve's warranty and limitation of liability **[*85]** language in the Clean Water Fund application package. That certification states: "the undersigned representative of the applicant certifies that the information contained above and in any attached statements and materials in support thereof is true and correct to his/her knowledge." *Id. at 20-21* (citing Dkt. 120-38 (Clean Water Fund Application) at 1). It is signed by Harold Alvord, who had authority to grant approvals on behalf of WPCA. See Construction Management Agreement, Art. 1, ¶ C (stating Harold Alvord has authority to grant approval and authorization on behalf of WPCA). Even if Gilbane did not have authority to negotiate those terms, WPCA ratified the negotiated contract. *Young v. Data Switch Corp., 231 Conn. 95, 102, 646 A.2d 852 (1994)* ("[a] corporation may ratify an unauthorized act of its agent by passive acquiescence as well as by affirmative action"); *Cmty. Collaborative of Bridgeport, Inc. v. Ganim, 241 Conn. 546, 560-62, 698 A.2d 245, 254-55 (1997)* (explaining that, as a general rule, "[r]atification is defined as the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account.).

For the reasons set forth above, WPCA has not offered a material question of fact as to whether Flowserve's disclaimer of implied warranties was authorized, such that Flowserve should be held liable for breaching those disclaimed warranties. Summary **[*86]** judgment is GRANTED as to Counts Four and Five of WPCA's Third Amended Complaint.

iv. Counts Six and Seven: Third-Party Breach of Contract and Breach of Connecticut's Unfair Trade Practice Act

Flowserve asserts it is entitled to summary judgment on counts Six and Seven because a "product liability claim . . . may be asserted and shall be in lieu of all other claims against product sellers." *Conn. Gen. Stat. § 52-572n(a)*. *Connecticut's Products Liability Act* is an exclusive remedy, and bars other claims against the product seller unless those other claims allege damages outside the scope of the CTPLA. *Gerrity, 818 A.2d 772*. For example, a plaintiff may not bring a CUTPA claim where the alleged harm was caused by the defective product, rather than the defendants' misrepresentations. *Hubbard-Hall, Inc. v. Monsanto Co., 98 F. Supp. 3d 480, 491 (D. Conn. 2015)*. Flowserve asserts WPCA's

alleged damages arise only out of the Pumps' repair and replacement, and are not distinct from the alleged product defect claim.

WPCA argues its third-party breach of contract and CUTPA claims are not barred by the CTPLA exclusivity provision. [Dkt. 145 at 29.] WPCA asserts Flowserve did not just provide a defective product - it also failed to provide services, training, and reliable customer service. Id.

*Section 52-572n(a)*, the exclusivity provision of the **[*87]** CPLA, provides that a product liability claim "as provided" for in the CPLA "may be asserted and shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product." The CPLA defines "product liability claims" as "all claims or actions brought for personal injury, death or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, or labeling of any product . . ." and "shall include, but is not limited to, all actions based on the following theories: Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent." *Conn. Gen. Stat. § 52-572m(b)*.

The Connecticut Supreme Court has instructed that the CPLA is "the exclusive means by which a party may secure a remedy for an injury caused by a defective product." *Gerrity v. R.J. Reynolds Tobacco Co., 263 Conn. 120, 126, 818 A.2d 769 (2003)*. "The legislature clearly intended to make our products liability act an exclusive remedy for claims falling within its scope." *Winslow v. Lewis-Shepard, Inc., 212 Conn. 462, 471, 562 A.2d 517 (1989)*.

In determining **[*88]** whether a specific cause of action falls within the scope of the CPLA, the Court should examine the nature of the injury alleged and the alleged act that caused the harm. *Gerrity, 263 Conn. at 128* (exclusivity provision was not designed to serve as a bar to additional claims for an injury not caused by the defective product or a claim that is not for personal injury, death or property damage). In Gerrity, for example, the plaintiff's CUTPA claim was preserved because plaintiff alleged financial injury based upon the increased cost of cigarettes that plaintiff had to pay as a result of defendant's wrongful conduct.

Here, WPCA's CPLA claim is alleged according to the product liability theories of strict liability, negligence, and breach of warranty; plaintiff seeks damages attributable to the defective product including the cost of the use of the product, investigation, and replacement. In its contract and CUTPA claims, plaintiff also seeks damages for "injury to its property as a result of [Flowserve's] defective product." *Town of Sprague v. Mapei Corp., 2012 U.S. Dist. LEXIS 72578, 2012 WL 1900120, at \*2 (D. Conn. May 24, 2012).* Those claims are barred by the CPLA's exclusivity clause. *Conn. Gen. Stat. 52-572n(a)* (stating the CPLA's definition of product liability claims includes all claims for property damage caused by, among other things, **[\*89]** design, testing, warnings, and instructions); *Fraser, 857 F. Supp. 2d at 258* (citing *Hurley v. Heart Physicians, P.C., 278 Conn. 305, 324, 898 A.2d 777 (2006))* (stating courts routinely hold that the CPLA's exclusivity provision bars CUTPA claims that "assert that a defendant's product is defectively designed or that the defendant failed to warn properly about a defective product").

Moreover, even if Plaintiffs' CUTPA and third-party breach of contract claims were not barred, there would be no genuine dispute as to any material fact because, as discussed above, Plaintiffs have not established a fact in dispute as to the Pumps' defectiveness. See, e.g., *Kuzmech, 2012 U.S. Dist. LEXIS 174082, 2012 WL 6093898, at \*\*13-14* (finding CUTPA claim excluded under the CPLA's exclusivity clause and stating even if it were not excluded, no viable CUTPA claim would exist as plaintiff did not sufficiently assert the product's defectiveness).

### v. WPCA's Damages

Finally, Flowserve asserts that if any of WPCA's claims against it survive, the Court should give effect to its limitation of liability clause, and WPCA's damages should be capped at the cost of the six Pumps. [Dkt. 129 at 37-38.] Although the Court has found, for the reasons set forth above, that WPCA's claims against Flowserve are not viable, the Court finds the limitation of liability clause would be enforceable **[\*90]** to limit any judgment against Flowserve.

As discussed above with respect to Flowserve's warranty provisions, "parties are . . . free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect." *Comind, Companhia de Seguros, 116 F.R.D. at 412* (citing comment to *Conn.*

*Gen. Stat. 42a-2-719*)). Parties may contract to limit available damages for breach, "but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility or otherwise obtaining an adequate remedy." *Conn. Gen. Stat. 42a-2-718(1)*; see also *Conn. Gen. Stat. 42a-2-719* (stating consequential damages may be limited or excluded unless that limitation or exclusion is unconscionable).

Here, the contract limits Flowserve's liability to the "contract price of the specific equipment or service which gives rise to the claim," whether the claim is based on "contract, warranty, tort (including negligence), indemnity, strict liability or otherwise" and whether the damage is "incurred by Gilbane Building Company or any third party." [Dkt. 120-19 at 3.] WPCA again asserts it did not give Gilbane authority to negotiate this contract term. For the reasons set forth above, the **[\*91]** Court finds Gilbane did have such authority. Moreover, the Court finds the limitation of liability clause reasonable and enforceable, as the clause provides for liability up to the full price of the Pumps. Compare with *Comind, Companhia de Seguros, 116 F.R.D. 397, 415* (finding a limitation of liability unreasonable where it only allowed for recovery of 1/16th of the cost of the product in question).

### D. Analysis: Gilbane's Motion for Summary Judgment against WPCA

Count Eight of WPCA's Third Amended Complaint alleges breach of contract against Gilbane; Gilbane seeks summary judgment on that count. [Dkt. 119.] Count Eight alleges that the Construction Management Contract between Gilbane and WPCA created a fiduciary relationship between the parties, and asserts Gilbane breached that fiduciary duty by allowing Flowserve to negotiate beneficial warranty and limitation of liability terms. [Dkt. 72 (Third Amended Complaint).]

"Under Connecticut law, the elements of a breach of contract action are: (a) the formation of an agreement, (b) performance by one party, (c) breach of the agreement by one party, and (d) damages." *SV Special Situations Master Fund Ltd. v. Knight Libertas, LLC, No. 3:08-CV-1769 SRU, 2011 U.S. Dist. LEXIS 73608, 2011 WL 2680832, at \*10 (D. Conn. July 8, 2011)* **[\*92]** (citing *Steward Mach. Co., v. White Oak Corp., 462 F.Supp.2d 251, 265 (D. Conn. 2006)).* The party alleging the breach must also establish that the breach caused its damages. *Collins v. Anthem Health Plans, Inc., 275 Conn. 309, 333, 880 A.2d 106 (2005).*

2018 U.S. Dist. LEXIS 52168, *92

Any contract "must be construed to effectuate the intent of the parties, which is determined from the language used and interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *Murtha v. City of Hartford, 303 Conn. 1, 7-8, 35 A.3d 177 (2011)* (quoting *Remillard v. Remillard, 297 Conn. 345, 355, 999 A.2d 713 (2010)*); *Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc., 300 Conn. 254, 260, 14 A.3d 284 (2011)* ("In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction."). Where the language of a contract is unambiguous, a court "must give the contract effect according to its terms." *Harbour Pointe, 300 Conn. at 260* (quoting *Cantonbury Heights Condominium Ass'n Inc. v. Local Land Dev., LLC, 273 Conn. 724, 734-35, 873 A.2d 898 (2005)*).

Here, the contract term allegedly breached created a fiduciary duty between Gilbane and WPCA. "The essential elements [of] a cause of action for breach of fiduciary duty under Connecticut law are: 1. That a fiduciary relationship existed which gave rise to (a) a duty of loyalty on the part of the defendant to the plaintiff, (b) an obligation on the part of the defendant to act in the best interests of the plaintiff, and (c) an obligation on the part of the defendant to **[*93]** act in good faith in any matter relating to the plaintiff; 2. That the defendant advanced his or her own interests to the detriment of the plaintiff; 3. That the plaintiff sustained damages; 4. That the damages were proximately caused by the fiduciary's breach of his or her fiduciary duty." *Godina v. Resinall Int'l, Inc., 677 F. Supp. 2d 560, 575 (D. Conn. 2009)* (VLB). "[A] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Sherwood v. Danbury Hosp., 278 Conn. 163, 195, 896 A.2d 777 (2006)* (quoting *Biller Assocs. v. Peterken, 269 Conn. 716, 723, 849 A.2d 847 (2004)*).

Here, the Construction Management Contract created the following fiduciary duty:

> By virtue of entering this agreement, the parties hereto enter a fiduciary relationship characterized by a unique degree of trust and confidence between the parties based upon [Gilbane's] superior knowledge, skill and expertise in the Project's design and construction. [Gilbane] accepts the relationship of trust and confidence established

by this Agreement and covenants to perform its services in cooperation with [CDMS] in order to further the Project and the interests of the WPCA.

[Dkt. 120-4 at 4.] The Construction Management Contract also outlines Gilbane's duty **[*94]** to negotiate bids from subcontractors:

> [Gilbane] shall obtain competitive bids . . . as needed, for the Work in accordance with all applicable bidding procedures, requirements, laws and regulations. It is the responsibility of [Gilbane] to prepare and package all . . . bid documents. These documents shall include, but not be limited to, drawings and specifications, a phasing plan, a safety plan, all state and local bid requirements and state prevailing wage rates. Draft bid documents that include all contractual terms and other requirements governing the hiring of labor and purchasing of materials in connection with the Work that must be included within the Trade Contract will be provided by the City of Norwalk Purchasing Department. [Gilbane] is responsible for supplementing the bidding documents and making any and all necessary revisions in order for such documents to be appropriate in form and content for public bidding purposes. After receiving and analyzing such bids, [Gilbane] shall deliver all of the bids to the WPCA and [CDMS]. [Gilbane] shall then determine, with the reasonable advice of the WPCA and the Engineer, which bids will be accepted for the Project as being the lowest, **[*95]** responsive and responsible bid.

[Dkt. 120-4 at 5.]

The Construction Management contract satisfies the first element of a claim for breach of fiduciary duty: Gilbane owed WPCA a duty of trust and confidence, and was obligated to act in a way that furthered WPCA's interests. [Dkt. 120-4 at 4]; *Godina, 677 F. Supp. 2d at 575*. However, WPCA has offered no evidence as to the second element of breach of fiduciary duty; there is no evidence that Gilbane advanced its own interests by negotiating Flowserve's contract terms. WPCA posits that Gilbane may have negotiated for Flowserve to provide sensors not originally included in its bid package in exchange for warranty and limitation of liability terms, but cites no record evidence in support of that theory. Such speculative assertions do not create a material question of fact precluding summary judgment. *Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996)* (stating a party may not rely on conclusory assertions to defeat summary judgment); see also, e.g., *Stevens v.*

*Landmark Partners, Inc., 2012 U.S. Dist. LEXIS 199040, 2012 WL 13026653, at \*10 (D. Conn. July 27, 2012)* (finding no breach of fiduciary duty where the plaintiff asserted, without factual support, that the defendant acted in a way that furthered his own personal interests). Accordingly, as WPCA has not provided evidentiary support for its claim that Gilbane breached its contracted-for **[\*96]** fiduciary duty, WPCA cannot establish its breach of contract claim, and Gilbane's motion for summary judgment must be granted.

Further, even if WPCA had offered evidence that Gilbane advanced its own interests by negotiating Flowserve's contract terms, which it has not, WPCA certified Flowserve's bid to the Clean Water Fund, and that certified bid included Flowserve's limitation of liability and warranty language. [Dkts. 120-38; 150 at 6-7.] The limitation of liability and warranty language was clear and conspicuous. *Id.* As such, WPCA has not offered evidence that Gilbane had "superior knowledge" of Flowserve's limitation of liability and warranty language, and has not established that it reasonably relied on Gilbane to negotiate terms other than what WPCA certified. *Sherwood, 278 Conn. at 195* (explaining that a fiduciary duty must be characterized by a "unique degree of trust and confidence" which is created when a party has "superior knowledge, skill or expertise") (quoting *Biller Assocs., 269 Conn. at 723*); *Conte v. U.S. Alliance Fed. Credit Union, 303 F. Supp. 2d 220, 227 (D. Conn. 2004)* (finding a fiduciary duty exists where a party "reposed confidence in another and reasonably relied on the other's superior knowledge"). Gilbane was not in a "dominant" position with "great opportunity for abuse of the confidence reposed **[\*97]** in him," rather, the terms Gilbane negotiated were reviewed by WPCA. Moreover, it was WCPA and not Gilbane which made the ultimate decision to accept the terms. *Cadle Co. v. D'Addario, 268 Conn. 441, 455, 844 A.2d 836 (Conn. 2004)*. The lack of evidence that Gilbane possessed superior knowledge of the contract terms, as well as the lack of evidence that Gilbane negotiated the terms in its own interests, compels the Court to grant Gilbane's motion for summary judgment.

E. Analysis: Gilbane and Flowserve's Motions for Summary Judgment as to Indemnity and Contribution

Gilbane and Flowserve have also each moved for summary judgment as to contribution and indemnification claims against each other, in the event that WPCA's claims against either entity were found meritorious. These claims are moot in light of the Court's rulings above dismissing WPCA's claims against

Gilbane and Flowserve. *Russman v. Bd. of Ed. of Enlarged City Sch. Dist. of Watervliet, 260 F.3d 114, 118-19 (2d Cir. 2001)* (explaining that a dispute before a court must be "real and live, not feigned, academic, or conjectural," and if a "dispute should dissolve at any time due to a change in circumstances, the case becomes moot"). Even so, the Court notes that under the contract between Gilbane and Flowserve, Flowserve agreed to:

> indemnify and save Gilbane Building Company ("Indemnitee") harmless from any and all liability, **[\*98]** expense, costs, damages, and/or losses of any kind ("Claims") arising out of injuries to any person or persons (including death) or loss of or damage to property including the property of Indemnitee, arising out of the purchase of the goods and/or services, to the extent caused by [Flowserve's] negligence or willful misconduct.

[Dkt. 125-10 at 2.]

WPCA alleged that Flowserve negligently designed the Pumps. Under the parties' indemnification clause, Flowserve would have been required to indemnify Gilbane for any judgment against it arising out of that alleged negligence. See *Comind, Companhia de Seguros, 116 F.R.D. at 412* (stating courts give effect to parties' reasonable agreements limiting or modifying remedies). However, as previously stated, as the Court has dismissed WPCA's claims against Flowserve and Gilbane, Flowserve and Gilbane's motions for contribution and indemnification as to any judgment rendered in WPCA's favor are moot.

F. Analysis: Flowserve's Motion for Summary Judgment against Gilbane for Breach of Contract

Lastly, Flowserve asserts summary judgment should be granted in its favor as to Count One of its Third-Party Complaint against Gilbane, which claims breach of contract. [Dkt. 30 (Third-Party Complaint); Dkt. 124 **[\*99]** (Motion for Summary Judgment).]

As stated above, the elements of a breach of contract action are (1) the formation of an agreement; (2) performance by one party; (3) breach of the agreement by the other party; and (4) damages. *Empower Health LLC, 2011 U.S. Dist. LEXIS 60142, 2011 WL 2194071 at \*4*. The party alleging the breach must also establish that the breach caused its damages. *Collins, 275 Conn. at 333*. Where the language of a contract is unambiguous, a court "must give the contract effect according to its terms." *Harbour Pointe, 300 Conn. at 260*.

2018 U.S. Dist. LEXIS 52168, *99

Flowserve bases its breach of contract argument on the limitation of liability clause in its contract with Gilbane, which states "the total liability of [Flowserve] with respect to this Contract, or any breach thereof, whether based on contract, warranty, tort (including negligence), indemnity, strict liability or otherwise, shall not exceed the Contract Price of the specific equipment or service which gives rise to this claim." Dkt. 120-19 at 1-3.] Flowserve argues that if it is found liable to WPCA for anything beyond the contract price of the Pumps, Gilbane has breached the limitation of liability provision and is responsible for the excess amount. [Dkt. 124 at 9.]

Gilbane responds that Flowserve has offered no evidence in support of its claim that the limitation **[*100]** of liability clause created an agreement for Gilbane to repay Flowserve for damages it might incur in the lawsuit brought by WPCA. [Dkt. 139 at 9.] To the contrary, Gilbane notes that the agreement requires Flowserve to defend, indemnify, and hold Gilbane harmless from any claims arising out of Flowserve's negligence, errors, acts, or omissions in the performance of design services required under the purchase order. [Dkt. 125-10 (Purchase Order) at 2.]

As a preliminary matter, Flowserve's motion asserts that Gilbane is liable to Flowserve for breach of contract if Flowserve is found liable to WPCA in an amount above the cost of the Pumps. Because the Court has granted Flowserve's motion for summary judgment against WPCA, the liability Flowserve contemplated as a predicate to its breach of contract claim against Gilbane has not come to fruition, and this motion is moot. *Russman, 260 F.3d at 118-19*.

Second, even if this claim were not rendered moot, the Court finds that Flowserve has not established the elements of breach of contract with respect to Gilbane. First, the plain meaning of the limitation of liability clause does not create an agreement for Gilbane to repay Flowserve for its potential damages. Rather, in light of the clause **[*101]** discussed previously which contemplates Flowserve indemnifying Gilbane, the Court would have to "torture" the plain meaning of the contract in order to find Flowserve's proposed agreement. *Harbour Pointe, 300 Conn. at 260* ("The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . [T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous.").

Third, even if the Court were to adopt Flowserve's reading of the limitation of liability clause, Flowserve has not offered any evidence purporting to establish that, if Flowserve were found liable to WPCA, it would be the result of a breach by Gilbane. Flowserve has not pointed to any action by Gilbane which constituted a breach of their agreement, but rather asserts in a backward manner that if Flowserve is found liable to WPCA in excess of the amount of the cost of the Pumps, that liability must be the result of an unspecified breach by Gilbane. Such a conclusory assertion not backed by evidence is insufficient to state a viable claim at summary judgment. *Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996)* (stating a party may not rely on conclusory assertions to prevail **[*102]** on summary judgment). Flowserve has not established the third element of breach of contract, that Gilbane has breached their agreement, nor has Flowserve asserted that any breach by Gilbane "naturally and directly" caused Flowserve's contemplated injuries. See *East Point Sys. v. Maxim, 2016 U.S. Dist. LEXIS 36613, 2016 WL 1118237, at *8 (D. Conn. Mar. 22, 2016)* (explaining the causation element of breach of contract). Accordingly, if Flowserve's motion for summary judgment in its favor on its breach of contract claim against Gilbane were not moot, it would be DENIED.

II. Conclusion

For the foregoing reasons, Flowserve's motions to exclude experts Hodgson and Dickson are GRANTED, Flowserve and Gilbane's motions for summary judgment against WPCA are GRANTED, and Flowserve and Gilbane's motions for summary judgment against each other are found as moot. The Clerk is directed to close this file.

IT IS SO ORDERED.

/s/ Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: March 28, 2018

---

**End of Document**

Mark Bouchard



Neutral
As of: July 27, 2018 3:24 PM Z

# *Perez v. Toyota Motor Sales U.S.A., Inc.*

United States District Court for the District of Connecticut

July 11, 2013, Decided; July 11, 2013, Filed

3: 11cv1112 (WWE)

**Reporter**
2013 U.S. Dist. LEXIS 96764 *; 2013 WL 3540508

FREDDY PEREZ and JONATHAN PEREZ, Plaintiff, v. TOYOTA MOTOR SALES U.S.A., INC., CARMEL AUTO SALES, INC., Defendants.

**Subsequent History:** Later proceeding at *Perez v. Toyota Motor Sales U.S.A., 2013 U.S. App. LEXIS 26372 (2d Cir., Dec. 11, 2013)*

## Core Terms

brake, summary judgment, manufacture, summary judgment motion, moving party, genuine

**Counsel: [*1]** For Freddy Perez, Jonathan Perez, Plaintiffs: Thomas P. Cella, LEAD ATTORNEY, Howard, Kohn, Sprague & Fitzgerald, Hartford, CT.

For Toyota Motor Sales U.S.A., Inc., Defendant: James M. Campbell, LEAD ATTORNEY, Michelle I. Schaffer, Campbell, Campbell, Edwards & Conroy, P.C. -MA, Boston, MA.

For Carmel Auto Sales, Inc., Defendant: Richard A. Lord, Jr., LEAD ATTORNEY, Litchfield Cavo LLP-Simsbury, Simsbury, CT.

For Christopher Rink, Witness: Timothy M. Herring, LEAD ATTORNEY, Chipman, Mazzucco, Land & Pennarola, Danbury, CT.

**Judges:** Warren W. Eginton, Senior United States District Judge.

**Opinion by:** Warren W. Eginton

## Opinion

### MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The genesis of this action is a single car accident that occurred when plaintiff Freddy Perez was driving his Toyota Tacoma with his son, plaintiff Jonathan Perez. Plaintiffs allege that defendants Toyota Motor Sales, U.S.A., Inc. and Carmel Auto Sales, Inc. are liable to them under the Connecticut Product Liability Act ("CPLA") § 52-572m through 52-572q. The defendants Toyota Motor Sales, U.S.A. and Carmel Auto Sales have filed motions for summary judgment.

For the following reasons, the motions for summary judgment will be granted.

### BACKGROUND

The **[*2]** parties have submitted statements of facts not in dispute along with supporting materials, including exhibits and affidavits, which reveal the following factual background.

Plaintiff is a resident of Danbury, Connecticut, who purchased a 2002 Toyota Tacoma in April 2006.

Defendant Toyota Motor Sales, U.S.A. is a corporation with its principal place of business in California that is in the business of selling, marketing and distributing motor vehicles, including the Toyota Tacoma. Defendant Carmel Auto Sales, Inc., is a corporation in Brewster, New York, that sells and repairs new and used motor vehicles.

On April 12, 2010, plaintiff Freddy Perez was driving in the northbound lane on Federal Road in Danbury, Connecticut. He was operating a 2002 Toyota Tacoma with his son, Jonathan, in the right front passenger seat. Freddy Perez reports that he heard the engine getting louder and the engine speed increase as he approached the intersection of Federal Road and Hardscrabble Road. He states that he applied the brakes in order to slow down and made a right turn onto Hardscrabble Road. He represents that, as he applied the brakes to stop on Hardscrabble Road, the engine "just took off." He asserts **[*3]** that the vehicle would not

slow down despite his use of the emergency brake and the fact that he kept his foot firmly on the brake pedal. Plaintiff turned left onto Old State Road, which is uphill and has two speed bumps leading to a parking lot. Plaintiff drove into the parking lot and eventually struck the curb and traversed onto a grassy area. The car came to a stop after it rolled on to the driver's side of the vehicle. Jonathan Perez recalled that he saw his father attempt to engage the emergency brake but that the car did not respond by slowing down.

At the time of the accident, the car had approximately 82,000 miles on the odometer.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. *American International Group, Inc. v. London American International Corp., 664 F. 2d 348, 351 (2d Cir. 1981)*. In determining whether a genuine factual issue exists, the court must resolve all ambiguities **[*4]** and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci, 923 F. 2d 979, 982 (2d Cir.)*, cert. denied, *502 U.S. 849, 112 S. Ct. 152, 116 L. Ed. 2d 117 (1991)*.

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. *American International Group, Inc., 664 F.2d at 351*. In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson, 477 U.S. at 255*.

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. *Celotex Corp., 477 U.S. at 323*. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Anderson, 477 U.S. at 249*.

Defendants argue that plaintiffs cannot prove that the vehicle was defective without expert evidence.

To bring an action pursuant to the CPLA, a plaintiff **[*5]** must prove (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition. *Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 214, 694 A.2d 1319 (1997)*. Thus, plaintiffs must prove that the product was defective, that the defect was the proximate cause of their injuries, and that the defect existed at the time that the car was first distributed.

However, under the malfunction theory, a plaintiff need not establish by direct evidence a specific product defect so long as evidence of some unspecified dangerous cause or condition that is related to the product's design or manufacture is present. *Potter, 241 Conn. at 225*. The purpose of the malfunction doctrine is to allow proof by circumstantial evidence where no direct evidence of how or why a product failed exists. *Fallon v. Matworks, 50 Conn. Supp. 207, 217, 918 A.2d 1067 (2007)*. A plaintiff may use circumstantial evidence of a non-specific defect where **[*6]** all other identifiable causes of the alleged malfunction have been eliminated. *Metropolitan Prop. & Cas. Ins. Co. v. Deere, 302 Conn. 123, 131, 25 A.3d 571 (2011)*.

Plaintiffs have not identified a specific defect that caused the accident and have not proffered expert evidence to support the assertion of such defect. Expert testimony is of particular import to cases involving automobiles due to the complex technical issues integral to such cases. *White v. Mazda Motor of America, Inc., 139 Conn. App. 39, 49, 54 A.3d 643 (2012)*. When lay witnesses and common experience are not sufficient to remove a case from the realm of speculation, the plaintiff needs to present expert testimony to establish a prima facie case. *Metropolitan Prop. & Casualty Ins. Co., 302 Conn. at 141*.

Plaintiffs maintain that their circumstantial evidence concerning the accident is sufficient to survive summary judgment. Plaintiffs have submitted their witness accounts that plaintiff Freddy Perez did not press the accelerator and attempted to slow the vehicle by using the emergency brake and the brake pedal. Plaintiffs have not explained why they have not retained an

expert to examine the car, which was available for defense expert evaluation.

However, **[*7]** even assuming that plaintiffs may avail themselves of the malfunction doctrine, plaintiffs' claim cannot survive summary judgment without some evidence to support an inference that the defect is attributable to the manufacturer or the seller of the product. Plaintiff must present sufficient evidence to allow the fact finder to determine that the accident did not result from causes other than a product defect existing at the time of sale or distribution. See *Hirschbeck v. Wright Medical Technology, Inc., 2011 Conn. Super. LEXIS 416, 2011 WL 1086942, * 7-9 (Conn. Super. 2011)*.

In this instance, the accident occurred at least eight years after the car was manufactured in 2002, and approximately four years after it was purchased from Brewster. Plaintiffs bear the burden to establish an "evidential bridge between the condition of the product at the time of sale until the defect manifests itself." *Hunter v. Mazda of Milford, 1999 Conn. Super. LEXIS 695, 1999 WL 179642, *4 (Conn. Super.).* To allow a speculative inference solely from the fact of an accident, after manufacturers and sellers have lost exclusive control of the product, would convert the manufacturers and sellers into insurers of their products. *Metropolitan Property and Cas. Ins. Co., 302 Conn. at 138*. **[*8]** Plaintiffs have not sustained their burden to raise an inference that the asserted defect existed at the time of the manufacture and sale of the car. Summary judgment will enter because the law does not permit juries to rely on speculation. *Paranto v. Piotrkowski, 2010 Conn. Super. LEXIS 2373, 2010 WL 4226765, *4 (Conn. Super. 2010)*.

**CONCLUSION**

For the foregoing reasons, the motions for summary judgment [docs. # 49 and 53] are GRANTED. The motion for hearing [doc. # 52] is MOOT. The clerk is instructed to close this case.

/s/ Warren W. Eginton

Senior United States District Judge

Dated this 11 day of July, 2013 at Bridgeport, Connecticut.

---

*End of Document*

Mark Bouchard


Caution
As of: July 27, 2018 3:24 PM Z

# *White v. Mazda Motor of Am. Inc.*

Superior Court of Connecticut, Judicial District of Hartford At Hartford

June 22, 2011, Decided; June 22, 2011, Filed

HHDCV086003322S

**Reporter**

2011 Conn. Super. LEXIS 1620 *; 2011 WL 3211221

Roland White v. Mazda Motor of America Inc. dba Mazda North American Operations, et al.

**Notice:** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**Subsequent History:** *Affirmed by White v. Mazda Motor of Am., Inc., 139 Conn. App. 39, 54 A.3d 643, 2012 Conn. App. LEXIS 517 (Conn. App. Ct., Nov. 1, 2012)*

## Core Terms

summary judgment, manufacture, expert testimony, fuel line, genuine issue of material fact, consumer, product liability, design defect, investigations, automobiles, inspection, installed, fuel

## Case Summary

### Overview

Plaintiff consumer said defendants, a vehicle manufacturer and seller, were liable for the defective design of the consumer's vehicle that caught on fire. The consumer's design defect claim under *Conn. Gen. Stat. § 52-572m et seq.* had to be dismissed on summary judgment because he had no expert testimony on the defective design of the vehicle, as his expert had no expertise outside of origin and cause fire investigations and had no opinion that the vehicle was defectively designed, so a jury could not find if the vehicle's allegedly defective condition proximately caused the consumer's harm.

### Outcome
Motion granted.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Need for Trial

*HN1*[ ] **Summary Judgment, Entitlement as Matter of Law**

According to *Conn. Gen. Prac. Book, R. Super. Ct. § 17-49*, summary judgment must be granted if the pleadings, affidavits and other documentary evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The party seeking summary judgment has the burden of showing the absence of any genuine issue of material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. A material fact is one which will make a difference in the result of the case. A court's function is not to decide issues of material fact, instead, it is to determine whether any issues exist.

2011 Conn. Super. LEXIS 1620, *1620

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

*HN2*[⬇] **Summary Judgment, Evidentiary Considerations**

Although a party seeking summary judgment has the burden of showing the nonexistence of any material fact, a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. It is not enough, however, for the opposing party to merely assert the existence of such a disputed issue. Mere assertions of fact are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to a court (in support of a motion for summary judgment). In order to successfully oppose a motion for summary judgment, the nonmoving party must recite specific facts which contradict the facts stated in the movant's affidavits and documents. In deciding a motion for summary judgment, a trial court must view the evidence in the light most favorable to the nonmoving party.

Evidence > ... > Testimony > Expert Witnesses > General Overview

Torts > Products Liability > Types of Defects > Design Defects

Torts > Products Liability > Types of Defects > Manufacturing Defects

*HN3*[⬇] **Testimony, Expert Witnesses**

Under the Connecticut Product Liability Act (CPLA), *Conn. Gen. Stat. § 52-572m et seq.*, a plaintiff must prove that: (1) the defendant was engaged in the business of selling, distributing, or manufacturing the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3)

the defect caused the injury for which compensation is sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition. Additionally, the plaintiff is required to provide some form of evidence, including expert testimony, to quantify the precise product defect. In sum, under the CPLA, a plaintiff must prove that the product was defective and that the defect proximately caused the injuries sustained.

Evidence > ... > Testimony > Expert Witnesses > General Overview

Torts > Products Liability > Types of Defects > Design Defects

Torts > Products Liability > Types of Defects > Manufacturing Defects

*HN4*[⬇] **Testimony, Expert Witnesses**

A product is defective when it is unreasonably dangerous to a consumer or user. Where an ordinary consumer may not be able to form their own expectations of the safety of a given product based on everyday experience, what is referred to as a "modified consumer expectation test" has been adopted. Connecticut's general rule requires competent expert evidence where the issues involve a question beyond the field of ordinary knowledge and experience of judges and jurors. In particular, in cases involving automobiles, expert testimony is particularly essential due to the highly technical, complex and specialized questions raised by such claims. Putting forth expert testimony or evidence of some kind to establish a genuine issue of material fact is especially important when a plaintiff attempts to assert a design defect claim.

**Judges:** **[*1]** Antonio C. Robaina, J.

**Opinion by:** Antonio C. Robaina

# Opinion

MEMORANDUM OF DECISION RE MOTION FOR SUMMARY JUDGMENT

I. Introduction

The defendants, Mazda Motor of America, Inc. d/b/a Mazda North American Operations ("MNAO") and

Cartwright Auto, LLC d/b/a Central Mazda ("Central Mazda") (collectively "Defendants"), filed a motion for Summary Judgment asserting that the Plaintiff's claims under the Connecticut Product Liability Act, *Connecticut General Statutes §52-572m et seq.* (2010) ("CPLA") must fail because he has failed to establish a prima facie case. Specifically, the defendants claim the plaintiff has adduced no evidence, expert or otherwise, to establish that (i) the vehicle at issue was defectively designed or manufactured, or (ii) that the alleged defect caused the plaintiff's injuries. The plaintiff asserts that he has provided sufficient evidence that the vehicle at issue harbored a defective design and/or improper installation of automotive parts that ultimately caused a car fire and, subsequently, the plaintiff's injuries. Thus, he claims that he has set forth a prima facie case for his claim under the CPLA.

II. Factual Background and Procedural History

MNAO is engaged in the business of distributing **[*2]** Mazda brand vehicles in the State of Connecticut, with its principal place of business in Irvine, California. Central Mazda is an automobile dealership in the business of selling Mazda brand vehicles in Connecticut, with a location in Plainfield, Connecticut.

On October 16, 2006, White purchased a new 2007 Mazda 3 ("Vehicle") from Central Mazda in Plainfield, Connecticut. White used the Vehicle to drive back and forth from his home in Brooklyn, Connecticut to his place of employment in Westborough, Massachusetts. White testified that this was a 60 mile trip that he had made about 40 times with the Vehicle prior to the date of the incident in question. Additionally, he testified that he had put approximately 2,800 miles on the Vehicle and had no problems with the Vehicle, never made any complaints to anyone concerning the Vehicle, nor had he smelled or experienced anything unusual prior to November 15, 2006.

On the morning of November 15, 2006, White left his place of employment to return home and, at the time, did not notice any difference in how the Vehicle started, or any differences in the lighting, gauges, or switches in the occupant compartment. However, after driving south on 1-395 **[*3]** for approximately 45 miles, White "smelled a strong odor of gasoline come through the vents and [he] immediately pulled over to the side" of the highway. When he stopped the Vehicle, he did not feel any heat or see any smoke or flames. He then released the hood latch with the intention of opening the Vehicle's hood upon exiting the occupant compartment. White testified that when he opened the hood, he saw a

flame, and there was a small explosion. He testified that the explosion threw him back about five or ten feet and he landed on the ground. White also testified that he was "sent airborne from a standing position" and that the next thing he knew he was on the ground, but remembers his "knee snapping as [he] went to the ground and [he] heard a popping."

White subsequently asserted CPLA causes of action against the defendants claiming that, as a result of the alleged defects with the Vehicle, he suffered injuries to his left knee and leg, as well as damages in the form of medical care and attention, physical pain and suffering, increased risk of future medical problems, and lost wages and earning capacity.

White's allegations against MNAO and Central Mazda are set forth in materially **[*4]** identical counts asserting claims for strict products liability under the CPLA. The counts allege that the Vehicle was defective in one or more of the following ways: a) the fuel line(s) on the fuel rail was pressed onto the fitting at the fuel rail in such a way that a fuel leak occurred in the Vehicle and caused the fire; b) the fuel line(s) were improperly installed and/or secured with clamps, causing damage to the fuel line(s) which resulted in a fuel leak in the Vehicle and caused the fire; c) MNAO/Central Mazda negligently installed the fuel line on the Vehicle incorrectly; d) MNAO/Central Mazda negligently failed to design, test, or inspect the Vehicle and components so that the Vehicle would not be a hazard to a consumer who purchased the Vehicle; e) MNAO/Central Mazda manufactured or sold the Vehicle with defective components parts; f) MNAO/Central Mazda failed to warn of the above conditions; and g) MNAO/Central Mazda breached the statutory warranty of merchantability in that the Vehicle was not fit for the ordinary purposes for which it was sold.

Pursuant to the requirements of the CPLA, and the CT Practice Book, the plaintiff disclosed Richard E. Morris, Certified Fire Investigator **[*5]** (CFI), as his sole liability expert. Morris has conducted origin and cause fire investigations for insurance companies through his company, REM Co. Fire Investigations since 1998, and currently works for the Town of East Lyme as the Public Safety Director/Fire Marshal. Morris conducted two separate inspections on White's Vehicle. In December of 2006, Morris conducted a cause and origin investigation of the fire in the Vehicle. In March of 2007, Morris conducted a second inspection of the Vehicle, accompanied by a representative of MNAO, Paul D. Beauchamp. In conducting their inspection, Beauchamp

and Morris examined another exemplar vehicle in order to identify and determine the parts involved in the fire. They both focused on the engine compartment as the origin area of the fire. After completion of both inspections, Mr. Morris opined that "either the clip was improperly installed on the gas line which allowed it to loosen or that a gasket was improperly installed allowing gasoline to seep through and drop onto the engine manifold." He further stated, "this fire is still a result of the gas lines, the plastic and rubber fittings and gas lines associated with the fuel rail of this **[*6]** vehicle and that the fire appears to be from the cause of a mechanical failure and this investigator feels the fire is the direct result of gasoline leaking on a hot surface causing the vehicle to catch fire." At his deposition, Morris testified that he had not found any history of fires like the one involved in this case, nor was he aware of any other fires on Mazda vehicles that had been caused by this fuel line design, and he could not rule out arson as a cause of the Vehicle fire. Morris also testified that he is not an expert in automobile mechanics, automobile electronics, the design or manufacture of any automobile components related to fuel lines, the design of automobiles or the manufacture of automobiles. Furthermore, Morris did not offer an opinion that the Vehicle was defective.

III Legal Analysis

a. Standard of Review

**HN1**[⬆️] According to *Connecticut Practice Book §17-49*, summary judgment must be granted if the pleadings, affidavits and other documentary evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. "The party seeking summary judgment has the burden of showing the absence of any genuine issue **[*7]** [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. *Mytech v. May Department Stores Co., 260 Conn. 152, 164 n. 8, 793 A.2d 1068 (2002)*. A material fact is one which will make a difference in the result of the case. (Internal quotation marks omitted.) *H.O.R.S.E. of Connecticut, Inc. v. Washington, 258 Conn. 553, 560, 783 A.2d 993 (2001)*. The court's function is not to decide issues of material fact, instead, it is to determine whether any issues exist. *Nolan v. Borkowski, 206 Conn. 495, 500, 538 A.2d 1031 (1988)*.

In elaborating on this subject, the Connecticut Supreme Court has stated, "we emphasize the important point, that **HN2**[⬆️] although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue . . . it is not enough, however, for the opposing **[*8]** party to merely assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court (in support of a motion for summary judgment)." (Internal quotation marks omitted.) *Buell Industries, Inc. v. Greater New York Mutual Ins. Co., 259 Conn. 527, 550, 791 A.2d 489 (2002)*. In order to successfully oppose a motion for summary judgment, the nonmoving party must recite specific facts which contradict the facts stated in the movant's affidavits and documents. *Medina v. Boisvert, et al., CV970143, 125, 2001 Conn. Super Lexis 867 (2001)*. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party.

b. The Connecticut Product Liability Act Claim

**HN3**[⬆️] Under the CPLA, a plaintiff must prove that: (1) the defendant was engaged in the business of selling, distributing, or manufacturing the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation is sought; (4) the defect existed at the time of the sale; **[*9]** and (5) the product was expected to and did reach the consumer without substantial change in condition. *Giglio v. Connecticut Light and Power Co., 180 Conn. 230, 234, 429 A.2d 486 (1980)* (citing *Restatement (Second), Torts §402A* (1965). Additionally, the plaintiff is required to provide some form of evidence, including expert testimony, to quantify the precise product defect. *Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 219, 694 A.2d 1319 (1997)*. In sum, under the CPLA, a plaintiff must prove that the product was defective and that the defect proximately caused the injuries sustained. *Predom v. Hadfield, Superior Court, judicial district of New Haven, Docket No. 419156, 2001 Conn. Super. LEXIS 280 (January 26, 2001, Levin, J.)*.

**HN4**[⬆️] A product is defective when it is unreasonably dangerous to the consumer or user. Where an ordinary consumer may not be able to form their own expectations of the safety of a given product based on

everyday experience, the Supreme Court has adopted what is referred to as a "modified consumer expectation test." *Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 220, 694 A.2d 1319 (1997).* Connecticut's general rule requires competent expert evidence where the issues involve a question beyond the field of ordinary **[*10]** knowledge and experience of judges and jurors. In particular, in cases involving automobiles, expert testimony is particularly essential due to the highly technical, complex and specialized questions raised by such claims. *Predom v. Hadfield, supra.*

"Putting forth expert testimony or evidence of some kind to establish a genuine issue of material fact is especially important when, as is the case here, the plaintiff attempts to assert a design defect claim. See *Lisella v. Ford Motor Co., No. 97-CV-2001, 1999 U.S. Dist. Lexis 23321, at *7-8 (D.Conn. Oct. 26, 1999)* ("[I]n products liability cases . . . 'where the issue concerns a product's design . . . it would seem that expert opinion is the only available method to establish defectiveness, at least where the design is not patently defective'") (citation omitted). *Walters v. Howmedica Osteonics Corp. (Conn. 2009) 676 F. Supp. 2d 44.* United States District Court, D. Connecticut.

The defendants claim that the plaintiff cannot meet this burden of proof because the plaintiff has failed to retain expert testimony. The plaintiff, in opposition to summary judgment, argues that a qualified expert witness has been disclosed: Mr. Morris. **[*11]** The plaintiff further argues that even assuming arguendo that Mr. Morris did not qualify as an expert witness, there still exists a genuine issue of material fact as to whether the defective condition of the vehicle was the proximate cause of the plaintiff's harm.

The defendants argue that Mr. Morris is not a qualified expert witness and furthermore, because he is the only disclosed witness, the plaintiff has not proffered sufficient expert evidence to support his claims under the CPLA. In his deposition, Mr. Morris only offered an opinion as to how the fire in the vehicle may have started. He did not offer an opinion that the vehicle was defectively designed or manufactured and he specifically testified that he is not an expert in automobile mechanics, automobile electronics, the design or manufacture of any automobile components related to fuel line designs of automobiles or the manufacture of automobiles. In another Connecticut case involving CPLA claims, the sole expert witness pertaining to the elements of proof of product liability disclosed by the plaintiff refused to testify, yet the plaintiff claimed that the possibility that he would change his mind was sufficient to overcome **[*12]** a motion for summary judgment. The court rejected this suggestion. However stated "presuming that [the expert] would testify, his deposition testimony reveals that he holds no opinion that the brake system on the KIA was defective at or before the time of the collision . . . also, he expressly disavows harboring any conclusion that a defective braking system caused the accident in question . . . consequently there is no genuine dispute that the plaintiff lacks proof from an expert regarding those elements of his case which require such expertise, and the defendant is entitled to judgment as a matter of law." *Izquierdo v. Kia Motors America*, Superior Court, Complex Litigation Docket at Tolland, Docket No. X07 CV 00 0075599, *2003 Conn. Super. LEXIS 1751* (June 16, 2003, Sferrazza, J.).

Because Mr. Morris expressly disavows any expertise in any area outside of origin and cause fire investigations and does not offer an opinion that the vehicle in question was defectively designed or manufactured, the plaintiff has failed to proffer sufficient expert testimony as required pursuant to CPLA. Without this expert testimony, a jury would be unable to determine whether the allegedly defective condition of the vehicle was the **[*13]** proximate cause of the plaintiff's harm.

Therefore, due to the plaintiff's failure to produce expert testimony concerning the allegedly defective design or manufacture of the vehicle, the court finds that the defendant has carried its burden of showing that the record reveals no genuine issue of material fact as to the plaintiff's products liability claim.

Accordingly, the motion for summary judgment is granted.

Robaina, J.

**End of Document**

 Positive
As of: July 27, 2018 3:24 PM Z

# *Elliot v. Sears, Roebuck & Co.*

Supreme Court of Connecticut

January 13, 1994, Argued ; May 31, 1994, Released

14764

**Reporter**

229 Conn. 500 *; 642 A.2d 709 **; 1994 Conn. LEXIS 158 ***; CCH Prod. Liab. Rep. P14,011

STEVEN ELLIOT ET AL. v. SEARS, ROEBUCK AND COMPANY

**Prior History: [***1]**   Action to recover damages for personal injuries sustained by the named plaintiff as a result of a fall from an allegedly defective ladder sold by the defendant brought to the Superior Court in the judicial district of New London and tried to the jury before Hendel, J., verdict and judgment for the plaintiffs, from which the defendant appealed to the Appellate Court, Daly, Landau and Freedman, Js., which affirmed the trial court's judgment and the defendant, on the granting of certification, appealed to this court.

**Disposition:** Affirmed.

# Core Terms

claimant, alteration, ladder, modification, misuse, seller, comparative, damages, Statutes, product liability, common law, third party, parties, modified, provides, defective condition, jury instructions, instructions, descended, trial court, changes, fault, caps, special defense, model act, attributed, vetoed, floor, edge, proportionately

# Case Summary

### Procedural Posture

Plaintiff injured party filed an action against defendant product seller for injuries sustained as a result of a fall from a ladder that he purchased from the seller. The Appellate Court (Connecticut) affirmed the trial court's judgment for the injured party, and the product seller appealed.

### Overview

A man brought an action for damages under the Product Liability Act (Act), *Conn. Gen. Stat. 52-572m et seq.,* against defendant product seller as a result of injuries he received in a fall from an allegedly defective ladder he bought from the product seller. The seller claimed that the injuries were due to the injured party's misuse of the ladder because he fell while descending with his back to the ladder. The trial court instructed the jury on the defense of misuse under common law, and the damages were reduced by 25 percent as a result of the injured party's comparative responsibility. The court held that based on the statutory language and legislative history of the Act, the product seller was not entitled to an additional jury instruction on the defense of alteration or modification by misuse under *Conn. Gen. Stat. § 52-572o.* The comparative responsibility under *§ 52-572o* was applicable to the common law misuse defense, and thus the trial court's instruction was correct and appropriate.

### Outcome

The court affirmed the judgment for the injured party.

# LexisNexis® Headnotes

Governments > Courts > Common Law

Torts > Products Liability > Defenses > Plaintiff Conduct

*HN1*[]   **Courts, Common Law**

In adopting the Product Liability Act (Act), *Conn. Gen. Stat. § 52-572m et seq.,* the legislature incorporates in a single cause of action an exclusive remedy for all claims falling within its scope. In doing so, the legislature is merely recasting an existing cause of action and is not creating a wholly new right for claimants harmed by a product. The intent of the legislature is to eliminate the complex pleading provided at common law. The Act,

Case 3:13-cv-00257-JAM   Document 296-34   Filed 07/27/18   Page 114 of 142

Page 2 of 10

229 Conn. 500, *500; 642 A.2d 709, **709; 1994 Conn. LEXIS 158, ***1

however, is no model of clarity; an example is its ambiguous treatment of the defense of misuse.

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

Torts > Products Liability > Defenses > Plaintiff Conduct

*HN2*[⬇] **Jury Trials, Jury Instructions**

*Conn. Gen. Stat. § 52-572p* provides in pertinent part: (a) A product seller shall not be liable for harm that would not have occurred but for the fact that his product was altered or modified by a third party unless: (1) The alteration or modification was in accordance with the instructions or specifications of the product seller; (2) the alteration or modification was made with the consent of the product seller; or (3) the alteration or modification was the result of conduct that reasonably should have been anticipated by the product seller. (b) For the purposes of this section, alteration or modification includes changes in the design, formula, function or use of the product from that originally designed, tested or intended by the product seller.

Torts > Products Liability > Defenses > Plaintiff Conduct

*HN3*[⬇] **Defenses, Plaintiff Conduct**

Misuse under the common law occurs when a product is not used in a manner which should have been foreseen by the defendant.

Governments > Legislation > Interpretation

*HN4*[⬇] **Legislation, Interpretation**

If the language of the statute is clear and unambiguous, it is assumed that the words themselves express the intention of the legislature and there is no room for judicial construction.

Governments > Legislation > Interpretation

Torts > Products Liability > Defenses > Plaintiff

Conduct

*HN5*[⬇] **Legislation, Interpretation**

By its own terms, *Conn. Gen. Stat. § 52-572p* limits its application to alterations and modifications made by a "third party." The term "third party" is not defined in the Product Liability Act, *Conn. Gen. Stat. § 52-572m et seq.* Where a statute does not define a term, it is appropriate to focus upon its common understanding as expressed in the law and upon its dictionary meaning.

Torts > Products Liability > Defenses > Plaintiff Conduct

*HN6*[⬇] **Defenses, Plaintiff Conduct**

The Product Liability Act, *Conn. Gen. Stat. § 52-572m et seq.*, provides the following definition of "claimant": A person asserting a product liability claim for damages incurred by the claimant or one for whom the claimant is acting in a representative capacity. *Conn. Gen. Stat. § 52-572m (c)*.

Business & Corporate Compliance > ... > Negotiable Instruments > Enforcement > Joint & Several Instruments

Torts > Products Liability > Defenses > Plaintiff Conduct

*HN7*[⬇] **Enforcement, Joint & Several Instruments**

Even if it can be argued that "third party" as set out in *Conn. Gen. Stat. § 52-572p* is ambiguous, the Supreme Court of Connecticut determines that the "claimant" is not within its scope for several reasons.

Torts > Products Liability > Defenses > Plaintiff Conduct

*HN8*[⬇] **Defenses, Plaintiff Conduct**

The conclusion that the *Conn. Gen. Stat. § 52-572p* alteration/modification defense does not apply to the conduct of a claimant is reinforced by its plain language that, with certain exceptions, provides for a complete bar to recovery when the product has been altered or modified. That statute provides that the product seller

229 Conn. 500, *500; 642 A.2d 709, **709; 1994 Conn. LEXIS 158, ***1

shall not be liable for harm that would not have occurred but for the fact that his product was altered or modified by a third party. The argument that the absolute bar of *§ 52-572p* is applicable to the conduct of a claimant is inconsistent with *Conn. Gen. Stat. § 52-572o*, which provides that the claimant's right to recover is based on pure comparative responsibility. In other words, a partial recovery is allowed even if the claimant's injury is attributable mostly to his or her conduct.

Governments > Legislation > Interpretation

### *HN9*[ ]  **Legislation, Interpretation**

A statute should be read as a whole and interpreted so as to give effect to all of its provisions. The purpose of this rule is to avoid construing the statutes in such a way as to create a conflict between statutes; such reconciliation is especially important in dealing with provisions that are enacted as part of the same legislation.

Torts > Products Liability > Defenses > Plaintiff Conduct

### *HN10*[ ]  **Defenses, Plaintiff Conduct**

See *Conn. Gen. Stat. § 52-572o.*

Governments > Courts > Common Law

Governments > Legislation > Interpretation

### *HN11*[ ]  **Courts, Common Law**

In determining whether or not a statute abrogates or modifies a common-law rule the construction must be strict, and the operation of a statute in derogation of the common law is to be limited to matters clearly brought within its scope.

Governments > Courts > Common Law

Torts > ... > Defenses > Comparative Fault > Apportionment of Fault

Torts > ... > Defenses > Comparative

Fault > General Overview

Torts > Products Liability > Defenses > Plaintiff Conduct

### *HN12*[ ]  **Courts, Common Law**

Under Connecticut common and statutory law, misuse by the claimant is a defense to a product liability action. Conn. Gen. Stat. *§ 52-572l. Conn. Gen. Stat. § 52-572o(a)* contains broad language requiring the trier of fact to consider the comparative responsibility of, or attributed to, the claimant, which shall not bar recovery but shall diminish the award of compensatory damages proportionately, according to the measure of responsibility attributed to the claimant. It is reasonable to construe this broad language to incorporate the defense of misuse of a product by a claimant. Accordingly, the Supreme Court of Connecticut concludes that the legislature did not intend to abrogate this common law defense, but rather the Product Liability Act, *Conn. Gen. Stat. § 52-572m et seq.*, incorporates misuse as part of the consideration of pure comparative fault.

Torts > ... > Defenses > Contributory Negligence > General Overview

Torts > ... > Defenses > Comparative Fault > General Overview

Torts > ... > Defenses > Comparative Fault > Intentional & Reckless Conduct

Torts > Products Liability > Defenses > Plaintiff Conduct

### *HN13*[ ]  **Defenses, Contributory Negligence**

See *Conn. Gen. Stat. § 52-572l.*

**Counsel:** Philip T. Newbury, Jr., for the appellant (defendant).

John J. Nazzaro, with whom, on the brief, was Robert I. Reardon, Jr., for the appellees (plaintiffs).

**Judges:** BORDEN, BERDON, NORCOTT, KATZ and PALMER, Js.

**Opinion by:** BERDON

229 Conn. 500, *500; 642 A.2d 709, **709; 1994 Conn. LEXIS 158, ***1

# Opinion

[*501]

[**710] BERDON, J. In this product liability claim brought pursuant to the Product Liability Act (act); *General Statutes § 52-572m et seq.*; the dispositive issue is whether the defendant product seller was entitled to a jury instruction on the defense of alteration or modification predicated on misuse under *General Statutes § 52-572p*, in addition to an instruction on misuse under the common law.

[***2] [*502] The plaintiff Steven Elliot [1] [***3] brought this action for damages as a result of injuries he received in a fall from a ladder sold by the defendant, Sears, Roebuck and Company. The jury, in finding the issue of liability in favor of the plaintiff, also found that the damages sustained by the plaintiff totaled $ 136,050, and that those damages were to be reduced by 25 percent as a result of the plaintiff's comparative responsibility. The trial court accordingly reduced the plaintiff's award, and rendered judgment for the plaintiff in the amount of $ 102,037.50. After the trial court denied the defendant's motion to set aside the verdict, [2] the defendant appealed to the Appellate Court. The Appellate Court affirmed the trial court's judgment; *Elliot v. Sears, Roebuck & Co., 30 Conn. App. 664, 621 A.2d 1371 (1993)*; and we granted the defendant's petition for certification. [3] Although we affirm the judgment of the

_____

[1] The plaintiff Robin Elliot, the wife of the named plaintiff, joined this action claiming damages for loss of consortium. See *Lynn v. Haybuster Mfg., Inc., 226 Conn. 282, 627 A.2d 1288 (1993)*. The jury found that her damages totaled $ 10,000, and that those damages should be reduced by 25 percent as a result of her husband's comparative responsibility. The trial court accordingly rendered judgment in her favor in the amount of $ 7500. Because, for the purpose of the issues involved in this appeal, the merits of her case are dependent upon her husband's case, we make reference only to the plaintiff Steven Elliot in this appeal.

[2] The defendant also filed other postverdict motions, none of which are relevant to this appeal.

[3] We certified for review the following questions: "1. Where the defense of alteration/modification of a product is asserted as a defense to a product liability claim, and there is evidence to support that defense, is the defendant entitled to a jury instruction on that defense separate and apart from any instruction on the issue of misuse of the product?

Appellate Court, we base our decision on an analysis of the statutory language not relied upon by that court.

[*503] The jury could reasonably have found the following facts. In April, 1987, the plaintiff and his wife, with the assistance of a contractor, were adding a full second floor to their A-frame house in Waterford. As a means of access to the new floor under construction, they borrowed a sixteen foot aluminum [***4] extension ladder, constructed with rounded rungs, belonging to the plaintiff's father-in-law. The ladder had been purchased from the defendant in 1985.

The plaintiff set up the ladder in the following manner. The base of the ladder was secured against a board that was nailed into the floor framing. The "fly" of the ladder, the moving part which extends its length, was extended one or two feet and tied to a [**711] two-by-four affixed to a partition on the second floor. The plaintiff set up the ladder in this manner so that it would not move or slip during use. The ladder was set at approximately a sixty degree angle, so that it would function as a staircase. At the top of the fly of the ladder, there was a sharp metal edge that was exposed when the ladder was extended. The plaintiff had not noticed this exposed edge prior to his injury.

The plaintiff often descended the ladder with his back to the rungs. A label on the ladder warned users "always [to] face ladder when climbing, working or descending." The label also contained the warning that users should always maintain a firm grip on the ladder. The plaintiff had not read any of the labels on the ladder prior to his accident.

[***5] On April 17, 1987, the plaintiff was visited by a friend. They each climbed the ladder to the second floor so the plaintiff could show him the progress made on the addition. After fifteen to twenty minutes, the telephone, which was located in the kitchen on the first floor, rang. In order to answer the telephone, the plaintiff descended the ladder, with his back to it, and about [*504] half way down he lost his balance and slipped. [4] As he fell, he reached out with his left hand to grab something to steady himself. He was wearing his

_____

"2. Where it is claimed that misuse of a product is the proximate cause of an injury, and there is evidence to support that defense, is the defendant entitled to an instruction that if the jury so finds, the plaintiff is barred from recovery?" *Elliot v. Sears. Roebuck & Co., 225 Conn. 925, 625 A.2d 826 (1993)*.

[4] The parties agreed that the plaintiff probably would not have fallen had he been facing the ladder as he descended it.

229 Conn. 500, *504; 642 A.2d 709, **711; 1994 Conn. LEXIS 158, ***5

wedding ring on his left hand ring finger. As he attempted to break his fall, the ring snagged on the exposed sharp metal edge at the top of the extension ladder. This caused the plaintiff to suffer a degloving injury to the finger, leaving him with an exposed bone and tendon without any skin or soft tissue. His finger was eventually amputated.

[***6] Eric Jordan, an associate professor of mechanical engineering at the University of Connecticut, testified as an expert witness for the plaintiff. Jordan testified that it is generally recognized that metal ladders should include end caps and end closures or equivalent protection against sharp edges and snagging. He testified that although the ladder did include end caps, there was an exposed sharp upper edge of the ladder that was not capped. In his opinion, this presented a significant hazard of snagging, and therefore the end caps included with the ladder did not "fulfill the intended purpose of the end cap with regards to preventing snagging and sharp edge injury." In Jordan's opinion, the ladder was unreasonably dangerous due to the defectively designed end caps. Jordan also testified that the top of the ladder could have been fully capped without impairing the function of the ladder and without incurring a significant cost. Finally, he testified that although it is a misuse of the ladder to descend with one's back to the ladder, it is a common and foreseeable misuse that could reasonably be anticipated by the seller.

_HN1_[↑] In adopting the act, the legislature intended to incorporate [***7] in a single cause of action an exclusive remedy for all claims falling within its scope. _Winslow v. Lewis-Shepard,_ [*505] _Inc., 212 Conn. 462, 471, 562 A.2d 517 (1989)._ In doing so, "the legislature was merely recasting an existing cause of action and was not creating a wholly new right for claimants harmed by a product. The intent of the legislature was to eliminate the complex pleading provided at common law. . . . 22 S. Proc., Pt. 14, 1979 Sess., pp. 4637-38; 22 H.R. Proc., Pt. 20, 1979 Sess., pp. 7021-22." _Lynn v. Haybuster Mfg., Inc., 226 Conn. 282, 292, 627 A.2d 1288 (1993)._ The act, however, is no model of clarity; an example is its ambiguous treatment of the defense of misuse that has resulted in this appeal.

One point of confusion regarding the act, as demonstrated by the briefs of the parties before us and by members of the bar, [5] is the belief that it was

patterned after the Model Uniform Product Liability Act (model act), _44 Fed. Reg. 62714-50_ (1979), recommended by the United States Department of Commerce on October 31, 1979. As we have previously stated, however, the act is based on the Draft Uniform Product Liability Law (draft act), published [***8] by the Department [**712] of Commerce on January 12, 1979 in _44 Fed. Reg. 2996_ et seq. for public comment. See _Freeman v. Alamo Management Co., 221 Conn. 674, 681 n.7, 607 A.2d 370 (1992);_ _Winslow v. Lewis-Shephard, Inc., supra, 212 Conn. 469._ This origin of our act is indicated by the date of its adoption, [6] [***9] its language, [7] and its legislative [*506] history. [8] There are substantial differences between the model act and the draft act. This is particularly so in regard to § 112 of the model act, upon which the defendant relies, as indicated below in this opinion.

The defendant, in addition to denying liability, raised two special defenses that are relevant to this appeal. In the first special defense, upon which the trial court instructed the jury, it alleged misuse of the product under the common law. The defendant based this claim on its allegations that the plaintiff descended the ladder as though it were a staircase, facing away from the ladder, and failed to read and follow the instructions and warnings concerning the use of the ladder. In the second special defense, predicated upon _General Statutes § 52-572p,_ the defendant alleged [***10] that the "ladder was altered or modified by the plaintiffs or a third-party from the condition in which it was sold." The trial court refused to instruct the jury on the second

---

[5] See, e.g., R. Yules, "An Analysis of Connecticut's New Product Liability Law," 56 Conn. B.J. 269, 269 and n.1 (1982).

---

[6] "The [product liability] act . . . was effective on October 1, 1979. The House of Representatives approved the final version of the act on May 11, 1979, and the Senate approved the act on May 29, 1979. 22 H.R. Proc., Pt. 21, 1979 Sess., p. 4306; 22 S. Proc., Pt. 14, 1979 Sess., p. 4650." _Lynn v. Haybuster Mfg., Inc., supra, 226 Conn. 291._ The model act was published for the first time in the Federal Register on October 31, 1979. Department of Commerce, Office of the Secretary, **44 Fed. Reg. 62714**-50 (1979).

[7] See Public Acts 1979, No. 79-483, as amended by Public Acts 1979, No. 79-631, § 106.

[8] See 22 H.R. Proc., Pt. 20, 1979 Sess., p. 7021, remarks of Representative John A. Berman ("the bill is based upon a Department of Commerce draft in the area of product liability"); 22 S. Proc., Pt. 14, 1979 Sess., p. 4636, remarks of Senator Salvatore C. DePiano; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1979 Sess., p. 568, remarks of John Anderson, member of the governor's product liability task force.

229 Conn. 500, *506; 642 A.2d 709, **712; 1994 Conn. LEXIS 158, ***10

special defense, [9] but did instruct on the first. The defendant claims that, although the trial court satisfactorily instructed the jury on the common law defense of misuse, it was also entitled to an instruction on the second special defense predicated on statutory alteration/modification *[*507]* by misuse under § 52-572p. HN2[↑] Section 52-572p provides in pertinent part: "(a) A product seller shall not be liable for harm that would not have occurred but for the fact that his product was altered or modified by a third party unless: (1) The alteration or modification was in accordance with the instructions or specifications of the product seller; (2) the alteration or modification was made with the consent of the product seller; or (3) the alteration or modification was the result of conduct that reasonably should have been anticipated by the product seller. (b) For the purposes of this section, alteration or modification includes changes in the design, formula, function or *use* of the product from that **[***11]** originally designed, tested or intended by the product seller." (Emphasis added.)

The defendant argues that the defense of misuse under the common law and the defense of alteration/modification **[***12]** by "changes in the . . . use of the product" under § 52-572p are separate and distinct defenses. The distinction drawn by the defendant is as follows: common law misuse is the failure to use a product in the manner intended by or reasonably foreseeable to the seller, while alteration/modification by misuse under § 52-572p "changes some essential characteristic of the product so that the user no **[**713]** longer views the product as it was intended by the manufacturer. It makes the user behave differently than he or she would have behaved if the product was not altered." This is certainly a fine line distinction and would appear, in this case, to be a distinction without a difference.

We agree with the defendant that HN3[↑] misuse under the common law "occurs when a product is not used 'in a manner which should have been foreseen by the defendant.'" *Norrie v. Heil Co., 203 Conn. 594, 600, 525 A.2d 1332 (1987)*, quoting *Hoelter v. Mohawk Service, Inc., 170 Conn. 495, 517, 365 A.2d 1064 (1976)*. We also determine in this opinion that the common law *[*508]* defense of misuse by a plaintiff may be asserted in a claim brought under the act. We disagree, however, with **[***13]** the claim that the § 52-572p alteration/modification by misuse defense has any application to conduct by a plaintiff.

In reaching our conclusion, we begin with the plain language of the act. "This court has consistently stated that HN4[↑] if the language of the statute is clear and unambiguous, it is assumed that the words themselves express the intention of the legislature and there is no room for judicial construction." (Internal quotation marks omitted.) *Vaillancourt v. New Britain Machine/Litton, 224 Conn. 382, 395, 618 A.2d 1340 (1993)*. HN5[↑] By its own terms, § 52-572p limits its application to alterations and modifications made by a "third party." The term "third party" is not defined in the act. "Where a statute . . . does not define a term, it is appropriate to focus upon its common understanding as expressed in the law and upon its dictionary meaning." (Internal quotation marks omitted.) *AirKaman, Inc. v. Groppo, 221 Conn. 751, 756-57, 607 A.2d 410 (1992)*. The dictionary definition of "third party" is "one not a party . . . to . . . an action"; Black's Law Dictionary (6th Ed. 1990); and therefore does not include a plaintiff.

This conclusion is further reinforced **[***14]** by analyzing § 52-572p within the context of the act as a whole. HN6[↑] The act provides the following definition of "claimant": "[A] person asserting a product liability claim for damages incurred by the claimant or one for whom the claimant is acting in a representative capacity." [10] **[***15]** *General Statutes § 52-572m (c)*. Accordingly, the plaintiff in this case is clearly a "claimant." If the legislature had intended to include a plaintiff's conduct under *[*509]* § 52-572p, it would have made the provision expressly applicable to "claimants" as it did with other provisions in the act. See, e.g., *General Statutes §§ 52-572o (a)* and *52-572q (a)* and *(b)*; see also *New Haven v. United Illuminating Co., 168 Conn. 478, 485, 362 A.2d 785 (1975)* (in

---

[9] In an articulation, the trial court gave its reasons for not instructing the jury under the special defense of alteration or modification as follows. "The court refused to charge as requested by the defendant on the issue of alteration or modification of the product because, in descending the ladder with his back to the ladder, [the] plaintiff . . . did not alter or modify the ladder as contemplated by *General Statutes § 52-572p*. Subsection (b) of *[§ ] 52-572p* defines alteration or modification to include 'changes in the design, formula, function or use of the product from that originally designed, tested or intended by the product seller.' The ladder was used by the plaintiff to ascend to, and descend from, one location to another location, which was the function or use intended by the product seller for the ladder."

---

[10] "The definition of claimant is based on the definition in the draft uniform product liability law" 22 S. Proc., Pt. 14, 1979 Sess., p. 4636, remarks of Senator Salvatore C. DePiano.

229 Conn. 500, *509; 642 A.2d 709, **713; 1994 Conn. LEXIS 158, ***15

determining the meaning of a word or designation, it is appropriate to look to related statutory provisions). Therefore, the legislature appears to have unambiguously crafted an alteration/modification defense that is not applicable to the conduct of a claimant. [11]

**[***16]** *HN7*[⬆]

**[**714]** Even if it can be argued that "third party" as set out in *§ 52-572p* is ambiguous, we determine that the "claimant" is not within its scope for several reasons. First, because our Product Liability Act is modeled on the draft act, we look for guidance to Commentaries on the draft act. *Maloney v. Pac, 183 Conn. 313, 326-27, [*510] 439 A.2d 349 (1981)*. More specifically, we consult the commentary to § 110 of the draft act because *§ 52-572p* adopted the language of that provision nearly verbatim. [12] **[***17]** The commentary states that § 110 of the draft act "deals with the situation where a third party -- *one other than* the product seller or *the claimant* -- has altered or modified the product and this has led to [the] claimant's harm." [13] (Emphasis

added.) 44 Fed. Reg. 3010 (1979).

**[***18]** Second, *HN8*[⬆] our conclusion that the *§ 52-572p* alteration/modification defense does not apply to the conduct *[*511]* of a claimant is further reinforced by its plain language that, with certain exceptions, provides for a complete bar to recovery when the product has been altered or modified. That statute provides that the product seller *"shall not be liable* for harm that would not have occurred but for the fact that his product was altered or modified by a third party . . . ." [14] (Emphasis added.) Of course, the defendant's argument that the absolute bar of *§ 52-572p* is applicable to the conduct of a claimant is inconsistent with *§ 52-572o*, [15] **[***20]** which provides **[**715]** that *[*512]* the claimant's right to recover is based on pure comparative responsibility. In other words, a partial recovery is allowed even if the claimant's injury is attributable mostly to his or her

---

[11] The legislature's first attempt to enact a comprehensive product liability act; Public Acts 1978, No. 78-380; was vetoed by Governor Ella Grasso. Conn. Senate Journal, Pt. 2, Veto Message (June 7, 1978). Substantial differences between the product liability act and its vetoed predecessor provide additional evidence that the legislature's omission of "claimant" from *General Statutes § 52-572p* was intentional. The vetoed bill contained the following open-ended language: "In any products liability action, the manufacturer shall not be liable for any injury, death or property damage caused by a product *which has been substantially altered or modified."* (Emphasis added.) Public Acts 1978, No. 78-380, § 4. It would appear that this broad language would apply to the conduct of a claimant as well as the conduct of third parties. In her veto message, Governor Grasso stated that one of the fatal flaws of the 1978 bill was an overly broad production alteration or modification defense. Conn. Senate Journal, Pt. 2., Veto Message June 7, 1978). The 1979 bill; Public Acts 1979, No. 79-483, § 5, enacted as our Product Liability Act, is limited expressly to conduct third parties. John Anderson, who served on the governor's product liability task force, testified before the judiciary committee in support of the 1979 bill: "Last year . .

. . [the product modification section was] basically framed in terms of [an] absolute [defense].' This year, our approach is quite different and it's modeled very much after the United States Commerce Department document. With respect to modification, it's a very qualified and conditioned defense." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1979 Sess., p. 569.

[12] Section 110 of the draft act provides: "(a) A product seller shall not be liable for harm that would not have occurred but for the fact that his product was altered or modified by a third party unless: (1) The alternation or modification was in accordance with the product seller's instructions or specifications; (2) The alteration or modification was made with the *express* consent of the product seller; or (3) The alteration or modification was the result of conduct that reasonably should have been anticipated by the product seller. (b) For the purposes of this section, alteration or modification includes changes in the design, formula, function or use of the

229 Conn. 500, *512; 642 A.2d 709, **715; 1994 Conn. LEXIS 158, ***20

conduct. [16] *HN9*[⬆] "A statute should be read as a whole and interpreted so as to give effect to all of its provisions." *Pintavalle v. Valkanos, 216 Conn. 412, 418, 581 A.2d 1050 (1990)*. The purpose of this rule is to avoid construing the statutes in such a way as to create a conflict between **[***19]** statutes; "such . . .

---

product from that originally designed, tested or intended by the product seller. *It includes failure to observe routine care and maintenance, but does not include ordinary wear and tear."* (Emphasis added.) 44 Fed. Reg. 3000. Except for the omission of the emphasized language, *General Statutes § 52-572p* is identical to § 110.

[13] Section 112 of the model act, on which the defendant claims that *General Statutes § 52-572p* was based, contains language substantially different than that of § 110 of the draft act. Section 112 provides in relevant part: "(D) Alteration or Modification of a Product. (1) 'Alteration or modification' occurs when a *person or entity other than the product seller* changes the design, construction, or formula of the product, or changes or removes warnings or instructions that accompanied or were displayed on the product. . . . (2) When the product seller proves, by a preponderance of the evidence, that an alteration or modification of the product *by the claimant,* or by a party other than the claimant or the product seller, has caused the claimant's harm, the claimant's damages shall be subject to reduction or apportionment to the extent that the alteration or modification was a cause of the harm. Under this Subsection, the trier of fact may determine that the harm arose solely because of the product alteration or modification." (Emphasis added.) 44 Fed. Reg. 62737. The emphasized language demonstrates a clear intent to reach the conduct of a claimant, and to apply the principle of comparative fault to the conduct of a claimant. Therefore, § 112 of the model act bears little resemblance to *§ 52-572p.*

[14] The commentary to the draft act explains the considerations underlying the rule of § 110 that the product seller is not liable when a third party's alterations or modifications of the product cause the plaintiff's injury. To impose liability in such cases would 'border on absolute liability" and would "fail to place the incentive for risk prevention on the party or parties who have engaged in the wrongful conduct." 44 Fed. Reg. 3010 (1979).

[15] *HN10*[⬆] *General Statutes § 52-572o* provides: "(a) In any claim under sections 52-240a, 52-240b, 52-572m to 52-572r, inclusive, or 52-577a, the comparative responsibility of, or attributed to, the claimant, shall not bar recovery but shall diminish the award of compensatory damages proportionately, according to the measure of responsibility attributed to the claimant.

"(b) In any claim involving comparative responsibility, the court may instruct the jury to give answers to special interrogatories, or if there is no jury, the court may make its own finding, indicating (1) the amount of damages each claimant would

---

reconciliation is especially important in dealing with provisions that are enacted as part of the same legislation." *Malerba v. Cessna Aircraft Co., 210 Conn. 189, 195, 554 A.2d 287 (1989)*.

Third, construing *§ 52-572p* to apply only to the conduct of persons or entities other than the claimant whose modifications or alterations of the product cause the claimant's injury is consistent with our common law. Prior to the enactment of the act, we adopted a cause of action in strict tort liability based on the *Restatement (Second) of Torts § 402* A. *Rossignol v. Danbury School of Aeronautics, Inc., 154 Conn. 549, 559-60, 227 A.2d 418 (1967)*. *Section 402* A shields defendants from liability for products altered or modified by providing that the product seller can be liable only when the seller's product "was expected to and did *reach the user*

---

receive if comparative responsibility were disregarded, and (2) the percentage of responsibility allocated to each party, including the claimant, as compared with the combined responsibility of all parties to the action. For this purpose, the court may decide that it is appropriate to treat two or more persons as a single party.

"(c) In determining the percentage of responsibility, the trier of fact shall consider, on a comparative basis, both the nature and quality of the conduct of the party.

"(d) The court shall determine the award for each claimant according to these findings and shall enter judgment against parties liable on the basis of the common law joint and several liability of joint tortfeasors. The judgment shall also specify the proportionate amount of damages allocated against each party liable, according to the percentage of responsibility established for such party.

"(e) If a judgment has been rendered, any action for contribution must be brought within one year after the judgment becomes final. If no judgment has been rendered, the person bringing the action for contribution either must have (1) discharged by payment the common liability within the period of the statute of limitations applicable to the right of action of the claimant against him and commenced the action for contribution within one year after payment, or (2) agreed while action was pending to discharge the common liability and, within one year after the agreement, have paid the liability and brought an action for contribution."

[16] Representative John A. Berman, in the debate in the House of Representatives regarding the act, pointed out that under pure comparative responsibility, "if an individual is 10 percent at fault, then he would recover 90 percent, and . . . if he were 60 percent at fault, he would recover 40 percent. If he were 100 percent at fault, of course, he would recover nothing under this proposal." 22 H.R. Proc., Pt. 20, 1979 Sess., p. 7021.

229 Conn. 500, *512; 642 A.2d 709, **715; 1994 Conn. LEXIS 158, ***19

**[\*\*\*21]** *or consumer without substantial change in the condition in which it was sold."* (Emphasis added.) *Prokolkin v. General Motors Corp., 170 Conn. 289, 299, [\*513] 365 A.2d 1180 (1976)*; *Rossignol v. Danbury School of Aeronautics, Inc., supra, 559*. In other words, the defendant would be absolved of liability under *§ 402* A if the plaintiff's injury was the result of an alteration or modification to the product made by a third party. See 2 *Restatement (Second), Torts § 402* A, comment (g)(1965). **HN11**[⬆] "In determining whether or not a statute abrogates or modifies a common-law rule the construction must be strict, and the operation of a statute in derogation of the common law is to be limited to matters clearly brought within its scope." *Willoughby v. New Haven, 123 Conn. 446, 454, 197 A. 85 (1937)*.

Our conclusion leaves the defense of misuse on the part of the claimant without an express statutory basis in the act. Although *§ 52-572o*, the comparative responsibility provision, is based on and mirrors the first part of § 111 of the draft act, the second part of § 111 extends beyond *§ 52-572o* by expressly delineating the specific types of conduct that are chargeable **[\*\*\*22]** to the claimant, including misuse. [17] The legislative history of

---

[17] Section 111 of the draft act provides the following: "(a) General Rule. In any claim under this Act, the comparative responsibility of, or attributed to, the claimant, shall not bar recovery but shall diminish the award of compensatory damages proportionately, according to the measure of responsibility attributed to the claimant.

"(b) Apportionment of Damages. In any claim involving comparative responsibility, the court, unless otherwise requested by all parties, shall instruct the jury to give answers to special interrogatories, or the court shall make its own findings if there is no jury, indicating --

"(1) The amount of damages each claimant would have received if comparative responsibility were disregarded, and

"(2) The percentage of responsibility allocated to each party, including the claimant, as compared with the combined responsibility of all parties to the action. For this purpose, the court may decide that it is appropriate to treat two or more persons as a single party.

"(3) In determining the percentage of responsibility, the trier of fact shall consider, on a comparative basis, both the nature and quality of the conduct of the party.

"(4) The court shall determine the award for each claimant according to these findings and shall enter judgment against parties liable on the basis of the common law joint and several liability of joint tortfeasors. The judgment shall also specify the proportionate amount of damages allocated against each party liable, according to the percentage of responsibility

**[\*\*716]** our act is silent as to the reason why this part of § 111 was not adopted.

**[\*\*\*23]** **[\*514]** Nevertheless, it is apparent that the legislature did not intend to eliminate consideration of the claimant's conduct in determining liability or the amount of damages. Otherwise, there would be no purpose for adopting the principle of comparative responsibility under *§ 52-572o*. **[\*515]** "In construing a statute, common sense must be used, and courts will assume that the legislature intended to accomplish a reasonable and rational result." (Internal quotation marks omitted.) *State v. Hinton, 227 Conn. 301, 320, 630 A.2d 593 (1993)*.

Furthermore, **HN12**[⬆] under our common and statutory law, misuse by the claimant is a defense to a product

---

established for that party.

"(5) Upon a motion made not later than one year after judgment is entered, the court shall determine whether all or part of a party's share of the obligation is uncollectible from that party, and shall reallocate any uncollectible amount among the other parties, including a claimant at fault, according to their respective percentages of fault. A party whose liability is reallocated is still to be subject to contribution and to any continuing liability to the claimant on the judgment.

"(c) Conduct Affecting Claimant's Responsibility.

"(1) Failure to Discover a Defective Condition.

"(i) A claimant is not required to have inspected the product for defective condition. Failure to have done so does not render the claimant responsible for the harm caused.

"(ii) Where a claimant using a product is injured by a defective

---

Case 3:13-cv-00257-JAM   Document 296-34   Filed 07/27/18   Page 122 of 142

Page 10 of 10

229 Conn. 500, *515; 642 A.2d 709, **716; 1994 Conn. LEXIS 158, ***23

liability action. *General Statutes § 52-572l*; [18] *Norrie v. Heil Co., supra, 203 Conn. 594*. We will not interpret a statute to have the effect of altering prior statutory or common law unless the language of the statute clearly expresses an intent to have such an effect. *Lynn v. Haybuster Mfg., Inc., supra, 226 Conn. 290*. No language of the act expresses such an intent. To the contrary, *§ 52-572o (a)* contains broad language requiring the trier of fact to consider "the comparative responsibility of, or attributed **[***24]** to, the claimant, [which] shall not bar recovery but shall diminish the award of compensatory damages proportionately, according to the measure of responsibility attributed to the claimant." It is reasonable to construe this broad language to incorporate the defense of misuse of a product by a claimant. Accordingly, we conclude that the legislature did not intend to abrogate this common law defense, but rather the act incorporates misuse as part

_____

condition that would have been apparent to an ordinary prudent person, the claimant's damages are subject to reduction according to the principles of subsections (a) and (b).

"(2) Using a Product With a Known Defective Condition.

"(i) A claimant who knew about a product's defective condition, but who voluntarily and unreasonably used the product, shall be held solely responsible for injuries caused by that defective condition.

"(ii) in circumstances where a claimant knew about a product's defective condition and voluntarily used the product, but where the reasonableness of doing so was uncertain, claimant's, damages shall be subject to reduction according to the principles of subsections (a) and (b).

"(3) Misuse of a Product.

"(i) Where a claimant has misused a product by using it in a manner that the product seller could not have reasonably anticipated, the claimant's damages shall be reduced according to the principles of subsections (a) and (b).

"(ii) Where the injury would not have occurred but for the misuse defined in subsection (3)(i), the product is not defective for purposes of liability under this Act."

[18] *HN13*[↑] *General Statutes § 52-572l* provides: "In causes of action based on strict tort liability, contributory negligence or comparative negligence shall not be a bar to recovery. The provisions of this section shall apply to all actions pending on or brought after June 7, 1977, claiming strict tort liability notwithstanding the date on which the cause of action accrued. Nothing in this section shall be construed as barring the defense of misuse of the product or the defense of knowingly using the product in a defective condition in an action based on strict tort liability."

of the consideration of pure comparative fault.

 **[***25]** With this statutory construction in mind, we now turn to the trial court's instructions on misuse. With regard to the first certified **[**717]** question, although our conclusion is based on reasoning not relied upon by the **[*516]** Appellate Court, we agree with that court that the defendant was not entitled to a jury instruction on the defense of alteration/modification by misuse under *§ 52-572p*. The trial judge did instruct on misuse under the common law and the defendant does not raise any claim of error in this respect.

In regard to the second certified question, we conclude, and the defendant conceded at oral argument, that comparative responsibility under *§ 52-572o* is applicable to the common law misuse defense. The defendant's claim that comparative responsibility is not applicable to misuse has reference solely to *§ 52-572p*.

The judgment is affirmed.

In this opinion the other justices concurred.

_____

**End of Document**

 Positive
As of: July 27, 2018 3:24 PM Z

## *Norrie v. Heil Co.*

Supreme Court of Connecticut

March 5, 1987, Argued ; May 26, 1987, Decided

No. 12851

### Reporter

203 Conn. 594 *; 525 A.2d 1332 **; 1987 Conn. LEXIS 852 ***; CCH Prod. Liab. Rep. P11,450

James G. Norrie et al. v. The Heil Company

**Prior History: [***1]**   Action to recover damages for personal injuries sustained by the named plaintiff as a result of allegedly defective machinery manufactured and sold by the defendant, and for other relief, brought to the Superior Court in the judicial district of Middlesex and tried to the jury before *Byrne, J.*; verdict and judgment for the defendant, from which the plaintiffs appealed.

**Disposition:** *No error.*

## Core Terms

trailer, door, unload, misuse, special defense, special interrogatory, injuries, defective condition, foreseeable, opening, loading, warnings, contributory negligence, interrogatories, trash, instructions, knowingly, packer, proximate cause of plaintiff's injury, unreasonable danger, proximate cause, fail to warn, encounter, trained, rear, plaintiff's claim, product liability, manufacturer, responses, defenses

## Case Summary

### Procedural Posture

Plaintiff, a driver and unloader of a waste disposal truck, appealed a judgment from the Superior Court in the judicial district of Middlesex (Connecticut), in favor of defendant manufacturer, in the driver's action to recover damages for personal injuries sustained as a result of allegedly defective machinery and for other relief under a product liability statute, *Conn. Gen. Stat. § 52-572l et seq.*

### Overview

First, the driver claimed that the trial court erred in effectively charging the jury that contributory negligence was a defense to an action in strict tort liability. The court concluded that the trial court's charge did not include contributory negligence as a special defense. The language did not refer to the kind of contributory negligence that consisted of a failure to discover or guard against a defect. Further, although the trial court erroneously used the language "knew or should have known" in the instruction referring to the defense of voluntarily and knowingly encountering a risk, the error was not harmful. Thus, the jury probably was not misled or confused. Second, the driver claimed that the trial court erred in using special interrogatories which inaccurately described the applicable law and confused the jury. The court held that even if the driver's claim was correct, the error was rendered harmless because the jury found that the product was defective in design, and the defect was a proximate cause of the driver's injuries. The driver was denied recovery because the manufacturer proved that the driver misused or failed to unload the equipment properly.

### Outcome

The court affirmed the trial court's judgment in favor of the manufacturer.

## LexisNexis® Headnotes

Torts > ... > Defenses > Contributory Negligence > General Overview

Torts > ... > Defenses > Comparative Fault > General Overview

Torts > ... > Defenses > Comparative Fault > Intentional & Reckless Conduct

Torts > Products Liability > General Overview

203 Conn. 594, *594; 525 A.2d 1332, **1332; 1987 Conn. LEXIS 852, ***1

Torts > Products Liability > Theories of Liability > Negligence

Torts > Products Liability > Defenses > Plaintiff Conduct

Torts > Products Liability > Theories of Liability > Strict Liability

### HN1[] Defenses, Contributory Negligence

Conn. Gen. Stat. § 52-572l provides in part that in causes of action based on strict tort liability, contributory negligence or comparative negligence shall not be a bar to recovery. Nothing in this section shall be construed as barring the defense of misuse of the product or the defense of knowingly using the product in a defective condition in an action based on strict tort liability.

Torts > ... > Defenses > Contributory Negligence > General Overview

Torts > Negligence > Defenses > General Overview

Torts > ... > Assumption of Risk > Elements & Nature > Voluntariness

Torts > Products Liability > General Overview

Torts > Products Liability > Theories of Liability > Negligence

Torts > Products Liability > Defenses > Plaintiff Conduct

### HN2[] Defenses, Contributory Negligence

Conn. Gen. Stat. § 52-572l eliminated contributory negligence as a defense to product liability actions, while expressly allowing the defenses of misuse of the product and knowingly using the product in a defective condition. Knowingly using the product in a defective condition has been defined narrowly. It is narrower than the common-law defense of assumption of the risk, which bars recovery when a person knows or as a reasonable person should know that in pursuing a certain course he will expose himself to the risk of injury, comprehends or ought as a reasonable person to comprehend the nature and extent of the risk and voluntarily subjects himself to it. In other words, the risk must be assumed knowingly and voluntarily. Mere negligence will not be sufficient to deny recovery. The

other valid defense under § 52-572l is misuse of the product. "Misuse" occurs when a product is not used in a manner which should have been foreseen by the defendant.

Civil Procedure > Appeals > Standards of Review > General Overview

Torts > ... > Defenses > Contributory Negligence > General Overview

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

### HN3[] Appeals, Standards of Review

A jury charge must be read in its entirety and judged by its total effect. The charge must be examined as a whole to determine whether it fairly presents a case to a jury so that no injustice results and is not to be examined with a legal microscope, to search for technical flaws, inexact, inadvertent or contradictory statements.

Civil Procedure > Appeals > Standards of Review > General Overview

### HN4[] Appeals, Standards of Review

The trial court's refusal to set aside a verdict is entitled to great weight in the court's assessment of the claim that its decision is erroneous. The evidence and record must be given the most favorable construction in support of the verdict which is reasonable.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

### HN5[] Jury Trials, Province of Court & Jury

It is not the function of a court to search the record for conflicting answers in order to take the case away from the jury on a theory that gives equal support to inconsistent and uncertain inferences. When a claim is made that the jury's answers to interrogatories in returning a verdict are inconsistent, the court has the duty to attempt to harmonize the answers.

**Counsel:** *Robert J. Sweeney*, with whom, on the brief,

203 Conn. 594, *594; 525 A.2d 1332, **1332; 1987 Conn. LEXIS 852, ***1

were *James F. Early* and *James D. Horwitz*, for the appellants (plaintiffs).


*Joseph A. Moniz*, with whom was *Sally R. Moore*, for the appellee (defendant).

**Judges:** Peters, C. J., Healey, Shea, Hull and L. Dorsey, Js.

**Opinion by:** HULL

## Opinion

[*595] [**1333]   After a trial to a jury in this strict liability action, judgment was rendered for the defendant.   From this judgment, the plaintiffs have appealed, claiming that the trial court erred: (1) in effectively charging the jury that contributory negligence is a defense to an action in strict tort liability; (2) in using special interrogatories which inaccurately described the applicable law and confused the jury; and (3) in accepting a jury verdict finding the conduct [***2] of the named plaintiff both foreseeable and not foreseeable.

[*596]   The jury could reasonably have found the following facts.   The plaintiff, James G. Norrie, [1] began working at Connecticut Waste Processing, Inc. (Connecticut Waste), as a driver and unloader of a waste disposal truck in September, 1977.   Prior to working for Connecticut Waste, the plaintiff had enrolled in and completed the course at New England Tractor Trailer Training School in Somers to become a licensed tractor trailer truck driver.   In addition to this training, the plaintiff had other experience operating tractor trailers.   Upon being hired by Connecticut Waste, the plaintiff was trained for two consecutive days in the operation and unloading of a transfer trailer manufactured by the defendant, the Heil Company (Heil), which he was to drive.     The training program included, inter alia, instructions on the proper method of unloading the Heil transfer trailer.

[***3]   The Heil transfer trailer was used to haul trash.   The trailer contained two doors at its rear end, a small lower door which was used for loading, and a larger door which was used for unloading trash. The Heil

transfer trailer was loaded with trash by first opening the small door and backing the trailer up to a trash compactor, which fit or hitched onto the opening of the small door.   The compactor then would push the trash through the small door opening into the empty trailer.   The latch mechanism for opening the small door was located in the middle of the rear end of the trailer.   This door was properly used only for loading the trash into an empty transfer trailer.

Connecticut Waste did not instruct the plaintiff as to any use for the small door other than for loading the trailer.   The plaintiff was instructed by Connecticut Waste that the Heil transfer trailer was unloaded [*597] by first opening the large door and then engaging a ram mechanism to push the trash out of the trailer.   The large door was opened by pushing down a lever located at the rear end of the trailer, on the passenger's side.   Once the lever was in the down position, the driver would then engage the [***4] ram mechanism from the cab of the trailer.   The ram, which is located at the front end of the trailer, would then push the load out of the large door of the trailer by hydraulic pressure.   The load could not be pushed out of the small door.

The plaintiff's exclusive duties at Connecticut Waste consisted of hauling trash [**1334] from a transfer station in New Haven to various landfill dump sites.   Depending upon the location of the dump site, the plaintiff would make three to six trips daily.   On each trip the plaintiff would load and then unload the Heil transfer trailer.

The plaintiff was aware of the proper method of loading and unloading the Heil transfer trailer as described above.   He claimed, however, that there were times when he found it difficult to release, or shift, the lever for the large door. When this occurred, he sometimes would use a two-by-four to pound at the latch mechanism on top of the large door to force the door open.   At other times, he would open the small door to relieve the pressure on the large door, and then he would open the large door in the normal fashion.

On October 17, 1978, the plaintiff had made three trips before the accident occurred.   [***5] On the fourth trip, the plaintiff was unable to release the latch for the large door and thus opened the small door to relieve the pressure.   He claimed that when he opened the small door it sprang out, hitting him in the neck and upper shoulder areas.   He then opened the large door by the latch and proceeded to unload the trailer.

The   plaintiff   completed   unloading   the   trailer   and

[1] The plaintiffs in this action are James G. Norrie and his wife, Susan J.A. Norrie.  The term "plaintiff" as used in this opinion refers to James G. Norrie.

Case 3:13-cv-00257-JAM   Document 296-34   Filed 07/27/18   Page 126 of 142

Page 4 of 7

203 Conn. 594, *597; 525 A.2d 1332, **1334; 1987 Conn. LEXIS 852, ***5

returned to Connecticut Waste.  He did not seek medical **[*598]** treatment for his injuries until almost six weeks later, when he was treated for neck injuries.  The plaintiff underwent surgery in October, 1979, for a fusion of his cervical spine.  He was operated on again for the same condition in June, 1980, because the initial fusion "did not take."

The plaintiff subsequently brought suit under our product liability statutes, *General Statutes § 52-572l*, et. seq.  He alleged that the defendant was strictly liable to him because the Heil transfer trailer was defective, unsafe and unreasonably dangerous, and the defects were a direct and proximate cause of his injuries.  The defendant raised five special defenses, including product misuse and knowingly using the product in a defective condition.  **[***6]** The trial court charged the jury as to the claim of strict product liability and the special defenses. [2]  The jury returned a verdict for

_____

[2] The court instructed the jury on the special defenses as follows: "The first special defense says, 'Any injuries or losses or damages the plaintiff sustained as alleged in their complaint were directly and proximately caused by the fault of the plaintiff James G. Norrie in that he unloaded the packer trailer improperly although he was trained and operates a packer trailer, but failed to follow instructions for unloading the packer trailer.' Basically, that special defense -- the defendant claims that [in] unloading this packer trailer the operator should have stood on the side of the trailer and used the lever to open the entire door. I think it's the defendant's claim that the lower inner door was only supposed to be used for loading the transfer trailer, and that when you are unloading it the whole tailgate was supposed to come open. Now the question being as again it gets into the area of -- I told you about foreseeability.  Was it foreseeable or not foreseeable by the manufacturer that some operator would get behind it.  Again, those are the two things you've got to consider.

"And now the second special defense. 'If the plaintiff sustained injuries, losses and damages as alleged in the complaint, said injuries, losses and damages were directly [and] proximately caused by the plaintiff James G. Norrie by misuse of the product in question, which misuse was to bar the plaintiff's claim.' Well, all it says [is that] he's making a claim of misuse. That's one of the claims that I see would be incorporated from what I said before.

"Number three.  Third special defense. 'Any injuries, losses or damages the plaintiff sustained as a result of the failure to warn were directly and proximately caused by the carelessness of the plaintiff James Norrie in one or more of the following respects. He opened the rear door of the packer trailer improperly although he knew the proper way of opening said door. He failed to follow instructions for properly unloading the packer trailer when he was trained and

**[**1335]** the **[*599]** defendant.  Through the use of special interrogatories, it was shown that the jury found that the defendant had proved "that the misuse or failure to properly load the transfer trailer by the plaintiff was a proximate cause of the plaintiff's injuries." The plaintiff's motion to set aside the verdict was denied.

**[***7]** I

The plaintiff's first claim is that the trial judge erroneously charged the jury on contributory negligence, which is not a defense to a product liability action.  In order to understand the subtle distinction raised in this issue, it is helpful to look briefly at the history of defenses to products liability actions in Connecticut.

Prior to 1977, this court held that contributory negligence in the use of a product, as distinguished from failure to discover a defect, was a defense to a strict product liability claim.  See *Hoelter v. Mohawk Service, Inc., 170 Conn. 495, 505-506, 365 A.2d 1064 (1976)*.  In 1977, however, the legislature enacted **HN1**[⬆] *General Statutes § 52-572l*.  Public Acts 1977, No. 77-335.  The following is the pertinent language of the statute: "In causes of action based on strict tort liability, contributory negligence **[*600]** or comparative negligence shall not be a bar to recovery. . . .  Nothing in this section shall be construed as barring the defense of misuse of the product or the defense of knowingly using the product in a defective condition in an action based on strict tort liability."

**HN2**[⬆] This statute, therefore, eliminated contributory negligence **[***8]** as a defense to product liability actions, while expressly allowing the defenses of "misuse of the product" and "knowingly using the product in a defective condition." "[K]nowingly using the product in a defective condition" has been defined

_____

experienced in the proper way to unload the packer trailer.' So again, it's basically the defendant's claim that you're not supposed to unload this truck -- trailer -- that way, and again it's a question of whether or not it was, first of all, a defect unreasonably dangerous and whether or not on the warnings whether or not it was foreseeable by Heil that somebody would get back there and try and open the trailer that way.  So that's for you to decide.

"Now the fourth special defense basically only applies to the claim of whether or not the trailer at the time of the injury was in substantially the same condition when it left the defendant's hands, and I've already described that to you so I'm not going to describe that any more.

"Now the fifth special defense was as to the second count of the complaint, and I'll get to that a little later on."

Mark Bouchard

203 Conn. 594, *600; 525 A.2d 1332, **1335; 1987 Conn. LEXIS 852, ***8

narrowly. It "is narrower than the common-law defense of assumption of the risk, which bars recovery when a person knows *or as a reasonable person should know* that in pursuing a certain course he will expose himself to the risk of injury, comprehends *or ought as a reasonable person to comprehend* the nature and extent of the risk and voluntarily subjects himself to it. *Nally v. Charbonneau, 169 Conn. 50, 53, 362 A.2d 494 (1975).*" (Emphasis in original.) *Kelly v. Deere & Co., 627 F. Sup. 564, 565 (D. Conn. 1986).* In other words, the risk must be assumed knowingly and voluntarily. Mere negligence will not be sufficient to deny recovery.

The other valid defense under *General Statutes § 52-572I* is misuse of the product. "Misuse" occurs when a product is not used "in a manner which should have been foreseen by the defendant." *Hoelter v. Mohawk Service, Inc., supra, 517.*

We now turn to the jury instruction **[***9]** in question. After reading to the jury the special defenses, the court instructed in relevant part: "[I]t's basically the defendant's claim that you're not supposed to unload this truck -- trailer -- that way, and again it's a question of whether or not it was, first of all, a defect unreasonably dangerous and whether or not on the warnings **[*601]** whether or not it was foreseeable by Heil that somebody would get back there and try and open the trailer that way. So that's for you to decide. . . .

"Now, basically, as I said, the special defenses are a claim of the misuse of the product. If you find that the plaintiff was misusing the product at the time of his injury, then as I said before your verdict would have to be for the defendant. Misuse of a product has been defined as 'use in a manner not reasonably foreseen by the manufacturer. A manufacturer or seller is entitled to expect a normal use of his product.' This special defense also incorporates the plaintiff's, again, I suppose, voluntarily proceeding to encounter a known danger. That's the defendant's claim. He'd been dumping these trailers for a long time. He should have known that there was a potential hazard."

**[***10]** The court charged further: "If you find that the plaintiff knew or should have known of a hazard to which he was exposing himself by unloading it as set forth in the third count of the special defense, or again by failing to follow -- you know -- the **[**1336]** instructions that he was given, that's for you to determine what instructions he was given, if any, again, then he may not recover under this complaint.

"If you find that he moved to encounter a known danger, and this moving to encounter a danger which he knew or should have known was a proximate cause either of the initial incident or of a subsequent injury, then obviously he's [not] entitled to recover." [3]

We conclude that the trial court's charge did not include contributory negligence as a special defense. When the court charged the jury that misuse is use "'in a manner not reasonably foreseen by the manufacturer,'" **[*602]** this **[***11]** charge accorded with well established legal principles. See *Hoelter v. Mohawk Service, Inc., supra* (Bogdanski, J., dissenting); 2 *Restatement (Second), Torts § 402A, comment h*; R. Yules, "Defenses in a Connecticut Product Liability Case," 57 Conn. B.J. 441, 441-42 (1983); D. Epstein, "Products Liability: Defenses Based on Plaintiff's Conduct," 1968 Utah L. Rev. 267, 270. The language cannot be considered to refer to the kind of contributory negligence that consists of a failure to discover or guard against a defect. Further, although the court erroneously used the language "knew or should have known" in the portion of the instruction referring to the defense of voluntarily and knowingly encountering a risk, the error was not harmful.

*HN3* ] A jury charge must be read in its entirety and judged by its total effect. *Herb v. Kerr, 190 Conn. 136, 138, 459 A.2d 521 (1983).* The charge must be examined as a whole to determine whether it fairly presents a case to a jury so that no injustice results and is not to be examined "'with [a] legal microscope, to search for technical flaws, inexact, inadvertent or contradictory statements.'" *Ubysz v. DiPietro, 185 Conn. [***12] 47, 57, 440 A.2d 830 (1981).* While the language "knew or should have known" is somewhat suggestive of the concept of contributory negligence, we conclude that the charge, when read as a whole, could not have misled the jury regarding the proper definition of the defense of "voluntarily encountering a known danger." The court charged correctly on the special defenses, stating no less than three times that one defense was "voluntarily proceeding to encounter a known danger." We conclude that even though certain portions of the court's instructions were incorrect, when read in the context of the entire charge, the jury probably was not misled or confused.

**[*603]** II

The plaintiff's second claim is that the court erred in using special interrogatories which inaccurately

---

[3] The defendant objected and excepted to this charge on several grounds, including the one we now address.

Case 3:13-cv-00257-JAM   Document 296-34   Filed 07/27/18   Page 128 of 142

Page 6 of 7

203 Conn. 594, *603; 525 A.2d 1332, **1336; 1987 Conn. LEXIS 852, ***12

described the applicable law and confused the jury. The trial court submitted seven special interrogatories to the jury, which read as follows: [4] "(1) Did the plaintiff prove that the design of the lower rear door fastening and release mechanism was in a defective condition unreasonably dangerous for use by the plaintiff in that it required the plaintiff to be in front of the door when opening it? If the answer [***13] to this question is yes, go on to the next question. [Yes.] If the answer is no, you must render a verdict for the defendant. (2) Did the plaintiff prove that when the transfer trailer left the possession of the defendant that it was in the defective condition as referred to in Question 1 above? [Yes.] If the answer to this question is yes, go on to the next question. If the answer is no, you must render a verdict for the defendant. (3) Did the plaintiff prove that the defective condition of the transfer trailer as referred to in Question 1 was a proximate cause of (i.e., substantial factor) the plaintiff's injuries? [Yes.] If the answer to this question is yes, go on to the next question. If the answer is no, you must render a verdict for the defendant. (4) Did the plaintiff prove that the lower rear door fastening and release mechanism was defective and unreasonably dangerous in that adequate warnings [**1337] were not provided? [Yes.] (5) Did the plaintiff prove that the failure to give adequate warning by the defendant was a proximate cause (i.e., a substantial factor) of the plaintiff's injuries? [No.] (6) Did the defendant prove that the plaintiff misused [***14] or failed to properly unload the transfer trailer? [Yes.] (7) Did the defendant prove that the misuse or failure to properly unload the transfer trailer by the plaintiff was a proximate [*604] cause (i.e., substantial factor) of the plaintiff's injuries? [Yes.] If the answers to questions 6 and 7 are yes, you must render a verdict for the defendant."

The plaintiff claims that these interrogatories incorrectly stated the law and confused the jury in that they created the incorrect impression that in order for there to be a duty to warn, there must first be a finding that the product is defective. According to the plaintiff, the directions to special interrogatories Nos. 1, 2 and 3 informed the jury that it need not consider the failure to warn if it did not first find that the defective design was the proximate cause of the plaintiff's injuries. The plaintiff stresses that this is an incorrect statement of law, inasmuch as a failure [***15] to warn can be a defect by itself, not requiring a finding of any other

defect. *Giglio v. Connecticut Light & Power Co., 180 Conn. 230, 236, 429 A.2d 486 (1980)*.

In reaching its verdict and in responding to the special interrogatories submitted to it, the jury concluded that the design of the small lower door created an unreasonably dangerous, defective condition, that it was in that condition when it left the defendant, that the defective condition was the proximate cause of the plaintiff's injuries, and that adequate warnings were not provided. The jury, however, also found that the failure of those warnings was not the proximate cause of the plaintiff's injuries, that the defendant proved that the plaintiff misused or failed to unload the trailer properly, and that the misuse or failure to unload properly was the proximate cause of the plaintiff's injuries. In summary, the jury concluded that a warning of the defective condition would not have prevented the plaintiff's injuries as the plaintiff was already aware of the condition which would have been the subject of the warning. These findings are consistent with one another. The jury's response to the special interrogatories [***16] is a strong indication that it understood the issues [*605] presented to it. Even if the plaintiff's claim were correct, the error is rendered harmless by the fact that the jury did find that the product was defective in design, and that the defect was a proximate cause of the plaintiff's injuries. [5] Moreover, the jury's response to special interrogatory No. 4 indicates a finding that there was a failure to warn regarding this alleged defective condition. Consequently, the plaintiff could not have been harmed by these interrogatories; the jury found for the plaintiff on the very interrogatories in question.

The plaintiff was denied recovery because, as is shown by the response to special interrogatory No. 6, the defendant proved that the plaintiff misused or failed to unload the transfer trailer properly. Further, the interrogatories must be considered in conjunction with the court's instruction. The interrogatories are not vacuous [***17] words, but words which are amplified and defined in the charge. *Ubysz v. DiPietro, supra, 59-60; Gaulton v. Reno Paint & Wallpaper Co., 177 Conn. 121, 125, 412 A.2d 311 (1979)*. In light of our decision on the plaintiff's first claim of error and the finding that the special interrogatories are consistent, we find no merit to the plaintiff's second claim of error.

III

---

[4] The jury's responses are shown in brackets after each interrogatory.

[5] See responses to special interrogatories numbers three and four.

203 Conn. 594, *605; 525 A.2d 1332, **1337; 1987 Conn. LEXIS 852, ***17

The plaintiff's final claim is that the court erred in accepting a jury verdict that found that the conduct of the plaintiff was both foreseeable and not foreseeable. He asserts that in its responses to the special interrogatories, the jury found that the defendant failed to warn him about a *foreseeable* risk, while also coming to the contradictory result that the plaintiff's *unforeseeable* misuse of the product proximately **[**1338]** caused his injuries. He argues that the jury's responses to those specific interrogatories are inconsistent. We disagree.

**[*606]** Our role in addressing this claim is extremely limited. *HN4*[⬆] The trial court's refusal to set aside the verdict is entitled to great weight in our assessment of the claim that its decision is erroneous. *Kalleher v. Orr [***18]   , 183 Conn. 125, 126, 438 A.2d 843 (1981)*; *Waldron v. Raccio, 166 Conn. 608, 618, 353 A.2d 770 (1974)*. The evidence and record must be given the most favorable construction in support of the verdict which is reasonable. *Kalleher v. Orr, supra, 127*; *Murteza v. State, 7 Conn. App. 196, 203, 508 A.2d 449 (1986)*.

The plaintiff's claim takes into account only one of the two valid defenses to a products liability action. If "misuse of the product" were the only available defense to the plaintiff's action, the responses would appear to be inconsistent, as unforeseeability is an element of that defense. The plaintiff, however, has failed to take into account the "knowingly using the product in a defective condition" defense. Foreseeability has no effect on that defense. Special Interrogatory No. 7, to which the jury responded in the affirmative, read as follows: "Did the defendant prove that the misuse *or* failure to properly unload the transfer trailer by the plaintiff was a proximate cause (i.e., substantial factor) of the plaintiff's injuries?" (Emphasis added.)

*HN5*[⬆] It is not the function of a court to search the record for conflicting answers in order to **[***19]** take the case away from the jury on a theory that gives equal support to inconsistent and uncertain inferences. When a claim is made that the jury's answers to interrogatories in returning a verdict are inconsistent, the court has the duty to attempt to harmonize the answers. *Gallick v. Baltimore & Ohio R. Co., 372 U.S. 108, 119, 83 S. Ct. 659, 9 L. Ed. 2d 618 (1963)*; *Kalleher v. Orr, supra*; *Shenefield v. Greenwich Hospital Assn., 10 Conn. App. 239, 247, 522 A.2d 829 (1987)*.

The results of the special interrogatories on the present case are easily harmonized. The jury did find **[*607]**

that the defendant failed to warn the plaintiff about a foreseeable risk. It also found that the plaintiff knowingly used a product in a defective condition. These conclusions are not inconsistent, and consequently the plaintiff's claim of error must fail.

There is no error.

---

**End of Document**



**User Name:** Mark Bouchard
**Date and Time:** Friday, July 27, 2018 8:43:00 AM PDT
**Job Number:** 70699309

## Document (1)

1. *Northeast Utils. Serv. Co. v. St. Paul Fire & Marine Ins. Co., 2012 U.S. Dist. LEXIS 96641*

   **Client/Matter:** SHINN-1097376

   **Search Terms:** N.E. Utils. Serv. Co., 2012 U.S. Dist. LEXIS 96641, at *8

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |

 Caution
As of: July 27, 2018 3:43 PM Z

# *Northeast Utils. Serv. Co. v. St. Paul Fire & Marine Ins. Co.*

United States District Court for the District of Connecticut

July 11, 2012, Decided; July 12, 2012, Filed

3:08-CV-01673 (CSH)

**Reporter**

2012 U.S. Dist. LEXIS 96641 *; 2012 WL 2872810

NORTHEAST ***UTILITIES*** ***SERVICE*** ***COMPANY*** and THE CONNECTICUT LIGHT AND POWER ***COMPANY***, Plaintiffs, v. ST. PAUL FIRE AND MARINE INSURANCE ***COMPANY*** and UTICA MUTUAL INSURANCE ***COMPANY***, Defendants.

**Subsequent History:** Motion denied by, Clarified by *Northeast **Utils. Serv. Co.** v. St. Paul Fire & Marine Ins. Co., 2012 U.S. Dist. LEXIS 178608 (D. Conn., Dec. 18, 2012)*

## Core Terms

omissions, coverage, underlying action, insured's, additional insured, duty to defend, parties, exhausted, vicarious liability, settlements, Indemnity, injuries, ***services***, summary judgment motion, excess carrier, Endorsement, complaints, Policies, independent act, employees, explosion, Electric, decedent's, affirmative defense, duty to indemnify, summary judgment, Memorandum, own act, themselves, Vault

## Case Summary

### Overview

In a coverage dispute, defendant was entitled to summary judgment because plaintiffs were not "additional insureds" under the primary policy; the "additional insured" provision only applied to liability for the insured's acts or omissions arising out of the insured's work for plaintiffs but the underlying complaints based liability on plaintiffs' acts or omissions.

### Outcome

Motion granted.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN1*[ ] **Summary Judgment, Entitlement as Matter of Law**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN2*[ ] **Summary Judgment, Burdens of Proof**

For purposes of a motion for summary judgment, the moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. In moving for summary judgment against a party which will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if it can point to an absence of evidence to support an essential element of the non-moving party's claim. The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in its favor.

Mark Bouchard

2012 U.S. Dist. LEXIS 96641, *96641

Insurance Law > Claim, Contract & Practice Issues > Policy Interpretation > Ordinary & Usual Meanings

Insurance Law > ... > Policy Interpretation > Ambiguous Terms > Unambiguous Terms

Insurance Law > Claim, Contract & Practice Issues > Policy Interpretation > Plain Language

*HN3*[⬇] **Policy Interpretation, Ordinary & Usual Meanings**

Under Connecticut law, unambiguous terms in an insurance contract are given their plain and ordinary meaning.

Insurance Law > ... > Commercial General Liability Insurance > Persons Insured > Additional Parties

*HN4*[⬇] **Persons Insured, Additional Parties**

Provisions extending an additional insured's coverage only to the insured's acts, rather than to its own acts, have been enforced.

Insurance Law > ... > Commercial General Liability Insurance > Persons Insured > Additional Parties

*HN5*[⬇] **Persons Insured, Additional Parties**

One of the primary functions of the additional insured endorsement is to protect the additional insured from vicarious liability for acts of the named insured.

Insurance Law > ... > Commercial General Liability Insurance > Persons Insured > Additional Parties

Insurance Law > ... > Commercial General Liability Insurance > Exclusions > General Overview

*HN6*[⬇] **Persons Insured, Additional Parties**

An "independent acts" exclusion limits coverage to instances in which the additional insured's alleged liability is based on vicarious liability for the insured's acts, excluding instances in which the additional insured's alleged liability is based solely on its own

conduct.

Insurance Law > ... > Commercial General Liability Insurance > Persons Insured > Additional Parties

Insurance Law > ... > Commercial General Liability Insurance > Obligations of Parties > General Overview

*HN7*[⬇] **Persons Insured, Additional Parties**

Some courts have held that when the complaint against the additional insured includes counts alleging liability for its own independent acts or omissions and also counts for which its liability would be vicarious, the insurer has a duty to defend, and possibly to indemnify.

Insurance Law > ... > Obligations of Parties > Insurers > Allegations in Complaints

Insurance Law > ... > Business Insurance > Commercial General Liability Insurance > Duty to Defend

Insurance Law > ... > Business Insurance > Commercial General Liability Insurance > Indemnification

*HN8*[⬇] **Insurers, Allegations in Complaints**

The duty to defend is broader than the duty to indemnify.

Insurance Law > ... > Obligations of Parties > Insurers > Allegations in Complaints

Insurance Law > ... > Business Insurance > Commercial General Liability Insurance > Duty to Defend

*HN9*[⬇] **Insurers, Allegations in Complaints**

The Connecticut Supreme Court has established that an insurer's duty to defend may arise either from the pleadings in the underlying action or from other facts known to it. If an allegation of the underlying complaint falls even possibly within the coverage, then the insurer must defend the insured. The pleadings to be examined to determine coverage may include pleadings filed by

2012 U.S. Dist. LEXIS 96641, *96641

the defendants. The duty to defend can arise from facts outside the allegations in the complaint if the insurer has actual knowledge of facts establishing a reasonable probability of coverage.

Insurance Law > ... > Excess
Insurance > Obligations > Duty to Defend

**HN10[⬇]** **Obligations, Duty to Defend**

No Connecticut court has held that an excess carrier has a duty to defend regardless of policy language. A Connecticut Superior Court has found that an excess carrier does not have, in general, a duty to defend before exhaustion of the underlying policy limit.

**Counsel:** **[*1]** For Northeast *Utilities* Svc Co, Connecticut Light & Power Co, Plaintiffs: Jason Ronald Gagnon, LEAD ATTORNEY, Carmody & Torrance - WTBY, Waterbury, CT; Maureen Danehy Cox, Richard L. Street, LEAD ATTORNEYS, Carmody & Torrance, Waterbury, CT.

For St Paul Fire & Marine Ins Co, Defendant: James V. Somers, Jeffrey F. Gostyla, LEAD ATTORNEYS, Halloran & Sage, Hartford, CT; Tracy L. Montalbano, LEAD ATTORNEY, Halloran & Sage LLP, Hartford, CT.

For Utica Mutual Insurance *Company*, Defendant: Keith R. Rudzik, Steven J. Barber, LEAD ATTORNEYS, Howard, Kohn, Sprague & Fitzgerald, Hartford, CT; William P. Rose, LEAD ATTORNEY, PRO HAC VICE, Tucker, Helfetz & Saltzman, LLP, Boston, CT.

**Judges:** Charles S. Haight, Jr., Senior United States District Judge.

**Opinion by:** Charles S. Haight, Jr.

# Opinion

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

HAIGHT, Senior District Judge:

## I. INTRODUCTION AND RELEVANT FACTS

In the present action, plaintiffs Northeast *Utilities Service Company* and The Connecticut Light & Power *Company* seek declaratory judgments and compensatory damages for breach of contract against defendants St. Paul Fire & Marine Insurance *Company* ("St. Paul") and Utica Mutual Insurance *Company* ("Utica"). This dispute arises from a **[*2]** tragic explosion in an underground vault which injured two men working there, Elias Anchundia and Scott Schmukler, bringing about Anchundia's death. What is at issue in this action is whether Plaintiffs are entitled to indemnity and defense from Defendants for their liabilities in connection with these injuries. Plaintiffs filed a Motion for Summary Judgment [Doc. 39] on all counts of the Third Amended Complaint, while Utica and St. Paul each filed its own cross-Motion for Summary Judgment [Docs. 45, 49 respectively] against all of Plaintiffs' claims.

All three Motions raise the same issues, so they may be dealt with as a group in this Ruling. The parties do not disagree about the facts relevant to this action; they disagree only on whether coverage exists under two insurance policies. Those are questions of law. In consequence, the case is appropriate for summary disposition.

The relevant facts are set forth in detail in the parties' briefs, and only a summary is provided here. Plaintiffs, public *utilities*, are wholly owned subsidiaries of Northeast *Utilities* ("NU"). They entered into a Master *Services* Agreement (the "Contract") with American Electrical Testing *Co.* ("AET"), under which **[*3]** AET agreed to furnish supervision, labor, material, and equipment to perform network protector maintenance in the Waterbury, Connecticut area. The Contract required AET to acquire Comprehensive or Commercial General Liability Coverage to cover bodily injury and property damage and to endorse the relevant policies to include Plaintiffs as additional insureds. Contract ¶ 17.1. [1]

AET complied with this contractual insurance requirement by acquiring two policies (collectively, the "Policies") from Defendants. The primary policy, issued by Utica to AET for the period from August 1, 2006 to August 2, 2007 (the "Utica Policy"), included coverage for certain bodily injury or property damage up to $1 million per occurrence. [2] It included coverage for additional insureds, that is, entities or individuals

_____

[1] A copy of the Contract is attached to the Affidavit of Linda G. Bennett [Doc. 48] as Continued Exhibit A.

[2] A copy of the Utica Policy is attached to Plaintiffs' *Local Rule 56(a)(1)* Statement ("Pl. L.R. Stmt.") [Doc. 41] as Exhibits 5, 5.1, 5.2 and 5.3.

different from and in addition to AET, but such coverage attaches only if one of two conditions is satisfied. General Liability Extension Endorsement § 11(a)(1). [3] The interpretation of one of those conditions is the most important point of dispute between the parties. That provision establishes **[*4]** coverage for an additional insured, to the extent that such additional insured is held liable for AET's acts or omissions arising out of its work for the additional insured. *Id.* § 11(a)(1)(a). The Utica Policy also excludes coverage for the "independent acts or omissions of such additional insured." *Id.* § 11(c)(1).

The excess policy, issued by St. Paul for the period from August 1, 2006 to August 1, 2007 (the "St. Paul Policy"), covers the insured for liability for certain bodily injury and property damage that is in excess of the Retained Limit (in this case, the coverage limit of the Utica Policy) up to $5 million per occurrence. [4] Coverage is available only if the primary policy applies. St. Paul Policy I-A, I-B and I-C. The St. Paul Policy contains a provision establishing St. Paul's duty to defend when the Retained Limit has been exhausted by payment of covered judgments or settlements. *Id.* II-A and II-B. Under that provision, St. Paul has no **[*5]** duty to defend against any claim not covered by the policy. *Id.* II-C.

On February 21, 2007, two of AET's employees, Anchundia [5] and Schmukler, provided maintenance at an electrical vault in Waterbury, Connecticut owned by Plaintiffs (the "Vault"). For reasons that cannot be determined from the record in the present action, an explosion occurred, injuring both employees and bringing about the death of Anchundia. Anchundia's widow Marlyn Anchundia filed a federal action against Plaintiffs in the Eastern District of New York, alleging that the explosion was caused by Plaintiffs' negligence. *Anchundia v. **N.E**. **Utils**. **Serv**. **Co**.*, No. 2:07-cv-04446 (E.D.N.Y.) (the "Anchundia Action"). Schmukler filed an action against Plaintiffs in Connecticut Superior Court making the same allegation. *Schmukler v. **N.E**. **Utils**.*, No. HHB-CV-09-5011836 (the "Schmukler Action") (collectively, the "Underlying Actions"). In neither action did the plaintiff allege negligence or acts by AET; rather,

they alleged that the explosion was caused by Plaintiffs' acts and omissions. In each action, Plaintiffs filed **[*6]** affirmative defenses alleging the negligence of others, including Anchundia and Schmukler.

Plaintiffs demanded that Defendants provide defense and indemnity in the Underlying Actions. Defendants, however, responded that Plaintiffs' losses from the Underlying Actions are not covered by the Policies.

Plaintiffs initially filed the present action in Connecticut Superior Court. Defendants removed it to this Court on November 4, 2008, on the basis of the complete diversity of the parties. On May 20, 2009, Plaintiffs filed the Third Amended Complaint, which is the operative complaint, seeking declarations that the subject losses are covered by the Policies and damages for breach of contract. The parties subsequently filed the present cross-motions for summary disposition.

The Anchundia Action was settled on or about January 4, 2011 for $8 million. Plaintiffs assert that the total legal expenses that they incurred in the Anchundia Action came to $1,546,458.47. The Schmukler Action was settled on or about June 20, 2011 for $55,000. Plaintiffs assert that their total legal **[*7]** expenses in that action were $14,811.51. Affidavit of Duncan Ross MacKay [Doc. 70] ¶¶ 4-9. Between June 5 and June 8, 2012, the parties filed supplemental briefs at the Court's request [Docs. 72, 74, 76], which, *inter alia*, informed the Court about the settlement of the Underlying Actions.

As a result of Plaintiffs' settlements of the Underlying Actions, the present posture of the case is as follows: (1) by reason of Defendants' duties to defend Plaintiffs as stated in the Policies, Plaintiffs assert that they are entitled to recover from Defendants the legal expenses they incurred in connection with the two Underlying Actions; and (2) by reason of Defendants' duties to indemnify Plaintiffs as stated in the Policies, Plaintiffs are entitled to recover from Defendants the amounts they paid to settle the two Underlying Actions.

Defendants assert that they owe Plaintiffs nothing under the Policies, because the incidents and events giving rise to the Underlying Actions are not covered by the primary policy (Utica) and consequently cannot be covered by the excess policy (St. Paul).

These questions of coverage lie at the heart of this action, and form the basis for the parties' cross-motions **[*8]** for summary judgment.

---

[3] A copy of the General Liability Extension Endorsement constitutes Pl. L.R. Stmt. Exhibit 5.3.

[4] A copy of the St. Paul Policy is attached to St. Paul's *Local Rule 56(a)(1)* Statement [Doc. 42] as Exhibit 1.

[5] Throughout, "Anchundia" refers to decedent Elias Anchundia. His widow, Marlyn Anchundia, is referred to as "Marlyn Anchundia."

## II. LEGAL STANDARD

HN1[⬆] Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. HN2[⬆] The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. In moving for summary judgment against a party which will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if it can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex at 322-23*. The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in its favor. *Anderson v. Liberty Lobby, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

The Court will first consider the parties' arguments about the duty to indemnify, and then consider their arguments about the duty to defend. Because the resolution of these issues renders judgment as a matter of law appropriate on all claims in this action, the Court will [*9] then rule on all three Motions for Summary Judgment.

## III. DUTY TO INDEMNIFY

### A. Utica

### 1. Existence of Coverage Under the "Additional Insureds" Provision

The central issue between the parties is whether Plaintiffs' liability in the Underlying Actions falls within the "additional insureds" provision of the Utica Policy. The Utica Policy states that "[w]e will pay those sums that the insured [AET] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Utica Policy, Commercial General Liability Coverage Form, § I(A)(1)(a). [6] As noted *supra*, the Utica Policy extends this coverage to additional insureds by Section 11 of a

General Liability Extension Endorsement (the "Endorsement"). [7] Since the dispute between the parties turns largely on that provision, it is worth quoting the relevant part of Section 11 in full:

> Any person or organization with whom you [AET] have entered into a written contract, agreement or permit requiring you to provide insurance such as is afforded by this Commercial General Liability Coverage Form will be an additional insured, but only:
>
>> (a) To the extent that such additional insured is held liable for [*10] your acts or omissions arising out of and in the course of ongoing operations performed by you or your subcontractors for such additional insured; or
>> (b) With respect to property owned or used by, or rented or leased to, you.

Endorsement § 11a(1).

The parties are in agreement that Plaintiffs are organizations with which AET entered into a contract requiring it to provide insurance such as that provided by the Utica Policy. Thus far, Plaintiffs appear to be "additional insureds" and entitled to coverage. However, they are "additional insureds" only if either condition (a) or condition (b) applies. Plaintiffs do not claim that condition (b) applies. Their argument is exclusively that they are covered under condition (a). Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment on All Counts of the Third Amended Complaint ("Pl. Supp. Memo.") at 11-14.

Condition (a) applies to liability for AET's acts or omissions arising out of AET's work for Plaintiffs. To establish [*11] that they are covered under condition (a), Plaintiffs argue that any liability that may attach to them in the Underlying Actions would necessarily be the result of AET's "acts or omissions arising out of and in the course of" AET's work for them. *Id.* at 11. Defendants, however, argue that the Underlying Actions had nothing to do with AET's acts and omissions, but rather alleged acts and omissions by Plaintiffs themselves. *See, e.g.*, Memorandum of the Defendant, Utica Mutual Insurance **Company**, in Support of its Motion for Summary Judgment ("Utica Supp. Memo."), sixth and seventh pages. [8]

---

[6] The Commercial General Liability Coverage Form can be found near the end of Pl. L. R. Ex. 5. Neither of the Policies is paginated as a whole.

[7] The General Liability Extension Endorsement constitutes Pl. L. R. Ex. 5.3.

[8] Utica's brief in support of its Motion is not paginated.

_HN3_[ ] Under Connecticut law, unambiguous terms in an insurance contract are given their plain and ordinary meaning. _Metro. Life Ins. Co. v. Aetna Cas. & Sur. Co., 255 Conn. 295, 305, 765 A.2d 891 (2001)._ The plain and ordinary meaning of "for your acts or omissions," in a policy in which the word "you" refers to AET, is "for AET's acts or omissions" rather than for any other party's acts or omissions.

Thus, the primary dispute between the parties turns on a single, simple question: when Plaintiffs settled with Marlyn Anchundia and Schmukler, did they pay that $8,055,000 **[*12]** based on their liability for AET's acts or omissions? If so, there is coverage. If those payments were based on Plaintiffs' own acts or omissions, there is no coverage.

Plaintiffs, in their memorandum describing the settlements, do not state that the settlement agreements established that Plaintiffs were paying based on anything other than the liability claimed in the Underlying Actions. Plaintiffs' Supplemental Memorandum in Support of Plaintiffs' Position on Three Pending Motions for Summary Judgment ("Pl. Supplemental Memo.") _passim_. They do not provide any basis for the settlement payments other than their alleged liability in the Underlying Actions. The Court must proceed on the assumption that the basis for the settlement payments was the liability alleged in the Underlying Actions.

The complaints in the Underlying Actions allege that Plaintiffs were liable for their own acts and omissions. The Amended Complaint in the Anchundia Action contains three causes of action, for (1) Anchundia's injuries, (2) Anchundia's wrongful death, and (3) Marlyn Anchundia's loss of Anchundia's **_services_**. [9] All three are based on allegations of Plaintiffs' own acts or omissions. "The aforesaid accident **[*13]** was caused solely and wholly through the negligence of the defendant, NORTHEAST **_UTILITIES_** and/or CT LIGHT & POWER, its agents, servants, and/or employees, in that it was careless and negligent in its operation, control, custody, charge, supervision, management and maintenance of the aforementioned Job Site, as well as the work being performed thereat ..." Anchundia Comp. ¶ 33. The Anchundia Complaint proceeds to list sixteen other ways in which Plaintiffs were allegedly negligent. _Id._ "By reason of the foregoing carelessness and

negligence of the defendants, their agents and/or servants and/or employees, the defendants caused, precipitated and/or hastened the death of plaintiff's decedent on February 21, 2007." _Id._ at ¶ 40. "As a result of the negligence of defendants, plaintiff, MARLYN L. ANCHUNDIA, has sustained damage in the loss of **_services_**, companionship, consortium and affection of her husband, decedent, ELIAS JOSEPH ANCHUNDIA ..." _Id._ at ¶ 46.

The Complaint in the Schmukler Action likewise alleges that Plaintiffs are liable **[*14]** for their own acts or omissions. [10] The Complaint starts its description of the cause of Schmukler's injuries by stating that "Plaintiff's injuries and losses were caused by the carelessness and negligence of Defendants in one or more of the following ways: ... a. In that they used, permitted and/or allowed a hazardous, defective and unlawful condition to be, continue and remain on the Job Site." Schmukler Comp. at 9. It proceeds to list eighteen further ways in which Plaintiffs' negligence allegedly caused Schmukler's injuries. _Id._

Neither complaint alleges that Plaintiffs are liable for AET's acts or omissions. The Anchundia Complaint does allege that Plaintiffs' negligence may include the negligence of their "agents," along with their "servants," "employees" and themselves. Anchundia Comp. ¶ 33. This raises the question of whether AET could be considered to be Plaintiffs' "agent" for the purposes of the Anchundia Action. The Anchundia Complaint does not allege so, on the face of it. The closest it comes to doing so is in the allegation **[*15]** that Plaintiffs "managed the work, labor and **_services_** being performed by [AET] at the Job Site and the Electric Project, which led to and caused plaintiff's decedent's accident ..." _Id._ ¶ 21. But the Anchundia Complaint goes to great lengths to make it clear that it is alleging Plaintiffs' own acts, as opposed to acts of AET that might be imputed to Plaintiffs. For example, Paragraphs 25-32 read as follows:

> 25. At all times and places hereinafter mentioned defendants NORTHEAST **_UTILITIES_** and/or CT LIGHT & POWER, directed the work, labor and **_services_** being performed by [AET] at the Job Site and the Electric Project, which led to and caused plaintiff's decedent's accident, the injuries he sustained therein and ultimately his death.

---

[9] A copy of the Amended Complaint in the Anchundia Action ("Anchundia Comp.") is attached to the Third Amended Complaint in this action [Doc. 29] as Exhibit A.

[10] A copy of the Complaint in the Schmukler Action ("Schmukler Comp.") is attached to the Third Amended Complaint in this action [Doc. 29] as Exhibit C.

2012 U.S. Dist. LEXIS 96641, *15

26. At all times and places hereinafter mentioned defendants NORTHEAST *UTILITIES* and/or CT LIGHT & POWER, supervised the work, labor and *services* being performed by [AET] at the Job Site and the Electric Project, which led to and caused plaintiff's decedent's accident, the injuries he sustained therein and ultimately his death.

27. At all times and places hereinafter mentioned defendants NORTHEAST *UTILITIES* and/or CT LIGHT & POWER, controlled and/or managed the [*16] work, labor and *services* being performed by [AET] at the Job Site and the Electric Project, which led to and caused plaintiff's decedent's accident, the injuries he sustained therein and ultimately his death.

28. At all times and places hereinafter mentioned defendants NORTHEAST *UTILITIES* and/or CT LIGHT & POWER, had a presence at the Job Site, and more particularly, at the Electric Project, on a continual basis.

29. At all times and places hereinafter mentioned defendants NORTHEAST *UTILITIES* and/or CT LIGHT & POWER, had its supervisory personnel, laborers and other employees performing work, labor, *services* and other functions at the Job Site.

30. At all times and places hereinafter mentioned defendants NORTHEAST *UTILITIES* and/or CT LIGHT & POWER, had the authority and the degree of control over the work which produced the accident, plaintiff's decedent's injuries and ultimate death, to enable it to take the action necessary to correct or avoid the unsafe condition.

31. Prior to the date of the aforesaid action defendants NORTHEAST *UTILITIES* and/or CT LIGHT & POWER, either had knowledge, or should have had knowledge, that the subject Job Site and Electric Project, including the transformer [*17] maintenance and sampling of insulating fluids from energized high voltage primary switch compartments was dangerous under the circumstances then and there presenting.

32. The defendants NORTHEAST *UTILITIES* and/or CT LIGHT & POWER, were aware of similar prior instances of accidents and/or explosions, as well as problems and/or issues obtain [sic.] insulating fluid samples from the energized high voltage primary switch compartment, which occurred under the same or similar circumstances, and the defendants failed to take appropriate precautionary measures to prevent and/or minimize the subject accident.

Marlyn Anchundia could hardly have done more to make it clear that she was alleging that the negligence at issue was that of Plaintiffs themselves, rather than being the negligence of AET acting as Plaintiffs' agent. The Anchundia Complaint alleged no acts or omissions on AET's part, other than the general assertion that it "was performing work, labor and *services* as to the aforementioned Electric Project." Anchundia Comp. ¶ 17. The only employee of AET mentioned is Anchundia himself. *Id.* ¶¶ 18-20. The Anchundia Complaint certainly does not allege that AET's acts or omissions caused the [*18] explosion via Anchundia's acts or omissions, for it specifically denies that Anchundia's acts or omissions played any role: "Said accident was the result of the negligence of [Plaintiffs] and occurred without any negligence on the part of plaintiff's decedent contributing thereto." *Id.* ¶ 34.

Plaintiffs have advanced two arguments for treating the liability in the Underlying Actions as liability for AET's acts or omissions. First, they assert that "[i]f [Plaintiffs] are held 'liable' ... it will necessarily be for AET's acts or omissions because the accident arose when AET workers were performing (or not performing) certain work in conjunction with AET's contract with [Plaintiffs]." Plaintiffs' Reply Brief Responding to Defendant Utica Mutual Insurance *Company*'s Opposition to Plaintiff's Motion for Summary Judgment ("Pl. Reply Memo.") at 2.

That statement makes one wonder if Plaintiffs doubt the intelligence of the Court. The fact that the accident arose when AET workers were performing work under the Contract does not "necessarily" mean that Plaintiffs' liability must be for AET's acts or omissions. Plaintiffs seem to expect the Court to believe that because AET workers were present [*19] at the Vault at the time of the explosion, it was impossible for Marlyn Anchundia or Schmukler to allege that acts or omissions of any party other than AET caused the explosion. But that is exactly what they alleged. Marlyn Anchundia, for example, alleged that Plaintiffs had their own "presence" and their own "supervisory personnel, laborers and other employees" at the Vault. Anchundia Comp. ¶¶ 28-29. As another example, she alleged that Plaintiffs— not AET but Plaintiffs— "caus[ed] and permitt[ed] electric current to flow into and out of the area occupied by [Anchundia]." Anchundia Comp. ¶ 33. Schmukler made essentially the same allegations. Schmukler Comp. ¶ 9.

Second, Plaintiffs argue that the Underlying Actions are covered because Plaintiffs filed affirmative defenses that alleged that the explosion was caused by the acts or omissions of AET, Anchundia, Schmukler, and others. Pl. Reply Memo. at 5-6. But Anchundia and Schmukler could not have obtained damages from Plaintiffs for vicarious liability for AET's acts based solely on Plaintiffs' own affirmative defenses. If Plaintiffs' argument were correct, by filing those affirmative defenses they would have been creating vicarious **[*20]** liability for themselves where it did not otherwise exist. In any event, the Underlying Actions have been settled. Plaintiffs do not suggest to the Court that they paid those settlements because of liability they imposed on themselves through their affirmative defenses, rather than because of the claims that Marlyn Anchundia and Schmukler brought against them.

Plaintiffs might argue that although the Underlying Actions did not allege AET's acts or omissions or contain any causes of action seeking to impose on Plaintiffs vicarious liability for AET's acts or omissions, the ultimate resolution of those actions might have imposed liability on them based on such vicarious liability, after one or both of the Anchundia and Schmukler complaints was amended. But now that the Underlying Actions have been terminated by settlements, that danger no longer exists.

For the most part, Plaintiffs focus on another issue: the "arising out of" language in Section 11a(1)(a) of the Endorsement. Under that section, an additional insured is covered only if both (1) such additional insured is held liable for AET's acts or omissions and (2) AET's acts or omissions arose out of and in the course of ongoing operations **[*21]** performed by AET or its subcontractors for such additional insured. Plaintiffs focus attention on the "arising out of" condition. Pl. Supp. Memo. at 11-14. And indeed, if Plaintiffs faced liability for AET's acts or omissions, it would likely be true that those acts or omissions "arose out of" ongoing operations that AET performed for Plaintiffs. But Plaintiffs did not face liability for AET's acts or omissions.

For that reason, Plaintiffs' reliance on the Connecticut Superior Court's decision in the *Royal Indemnity* matter is unavailing. *See* Pl. Supp. Memo. at 13-14. In that case, the Superior Court found coverage under somewhat similar circumstances in a decision that was explicitly affirmed and adopted by the Connecticut Supreme Court. *Royal Indem. Co. v. Terra Firma, 50 Conn. Supp. 563, 948 A.2d 1101 (Conn. Super. Ct. July*

*25, 2006)*; *Royal Indem. Co. v. Terra Firma, 287 Conn. 183, 189, 947 A.2d 913 (2008)*. [11] However, the policy at issue in *Royal Indemnity* differed in a crucial respect from the Utica Policy. The coverage in the *Royal Indemnity* policy extended to "liability arising out of ... [the insured's] work." *Royal Indemnity, 50 Conn. Supp. at 569.* Under that policy, as long as the liability arose out of **[*22]** the insured's work for the additional insured, it did not matter whose acts or omissions caused the accident. In the Utica Policy, on the other hand, the coverage extends only to liability arising out of AET's acts or omissions. *Royal Indemnity* did not deal with language limiting coverage to liability for the insured's acts or omissions. [12]

The point that *Royal Indemnity* establishes is that if Plaintiffs *were* held liable for AET's acts or omissions, those acts or omissions would meet the criterion of "arising out of" AET's work for Plaintiffs. Connecticut law, as the *Royal Indemnity* court observed, defines "arising out of" broadly to cover any case **[*23]** in which the injury "was connected with, had its origins in, grew out of, flowed from, or was incident to" the occurrence in question. *QSP v. Aetna Cas. & Surety Co., 256 Conn. 343, 373-74, 773 A.2d 906 (2001)*. But that point has no significance here, because Plaintiffs' liability, as alleged in the Underlying Actions, was not liability for AET's acts or omissions.

This is not a matter of adhering to the precise language of a policy in defiance of fairness or common sense. The restriction of coverage to AET's acts or omissions simply fits the fact that the Utica Policy was AET's policy, not Plaintiffs' policy. AET included additional-insured coverage in the Utica Policy to meet its undertaking in the Contract to protect Plaintiffs, but AET was not obliged to purchase insurance to protect Plaintiffs against their own conduct.

Likewise, public policy does not ban enforcement of the plain language of the Utica Policy. **HN4**[↑] Provisions

_____

[11] The parties are in agreement that the issues in this action are governed by Connecticut law.

[12] In other decisions that have found that additional insureds were covered under "arising out of" clauses, the courts confronted provisions like the one in *Royal Indemnity*: they spoke of "liability arising out of" the insured's work rather than liability "for the insured's acts or omissions arising out of" such work. *See Town of Manchester v. Vermont Mut. Ins. Co., No. CV044004859, 2006 Conn. Super. LEXIS 13, 2006 WL 164886 (Conn. Super. Ct. Jan. 3, 2006)* (collecting cases).

2012 U.S. Dist. LEXIS 96641, *23

extending an additional insured's coverage only to the insured's acts, rather than to its own acts, have been enforced. *See, e.g., Smurfit-Stone Container Enters., Inc. v. Nat'l Interstate Ins. Co., No. 3:08CV093, 2008 U.S. Dist. LEXIS 67645, 2008 WL 4153762, at *3-5 (E.D.Va. Sept. 5, 2008)* (Missouri law); **[\*24]** *Cleveland v. Vandra Bros. Constr., Inc., 192 Ohio App. 3d 298, 2011 Ohio 821, 948 N.E.2d 1027, 1032-33 (Ohio App. Ct. 2011)* (Ohio law). As the *Smurfit-Stone* court explained, that limitation suits the purpose of additional-insured coverage:

> Courts in Missouri and elsewhere have recognized that a common purpose of an additional-insured provision is to "provide ... protection from vicarious liability and to provide "specialized protection rather than all-encompassing coverage." *U.S. Fidelity & Guar. v. Drazic, 877 S.W.2d 140, 143 (Mo. Ct. App. 1994); accord Northbrook Ins. v. American States Ins., 495 N.W.2d 450, 453 (Minn. Ct. App. 1993)* (recognizing that **HN5[↑]** "One of the primary functions of the additional insured endorsement is to protect the additional insured from vicarious liability for acts of the named insured"); *Harbor Ins. Co. v. Lewis, 562 F.Supp. 800, 803 (E.D.Pa. 1983)* (concluding that "In the insurance industry, additional insureds provisions have a well established meaning. They are intended to protect parties who are not named insureds from exposure to vicarious liability for acts of the named insured").

*Smurfit-Stone 2008, U.S. Dist. LEXIS 67645, [WL] at *3.* Here, the plain language of Section 11(a)(1)(a) is consistent with the common purpose of **[\*25]** such policies: protecting the additional insured against vicarious liability.

The Utica Policy thus, by its terms, does not provide indemnity for Plaintiffs' liability in the Underlying Actions. Although this alone would be enough to decide the indemnity issue, the Court addresses the very similar issue of the independent acts exclusion.

## 2. The "Independent Acts" Exclusion

The Utica Policy contains an exclusion for "independent acts or omissions" by the additional insured, as noted above. The courts have not supplied an interpretation of that language under Connecticut law. (There was no "independent acts" exclusion in the policy at issue in *Royal Indemnity*.) However, the law of other states consistently supports the position that **HN6[↑]** the

"independent acts" exclusion limits coverage to instances in which the additional insured's alleged liability is based on vicarious liability for the insured's acts, excluding instances in which the additional insured's alleged liability is based solely on its own conduct. **[\*24]** *Edwards v. Travelers Indem. Co., 75 Fed. Appx. 929, 932 (5th Cir. 2003)* (Louisiana law); *United Constr. Ent. Co. of St. Louis v. Am. Contractors Ins. Grp., Inc., No. 10-CV-81, 2011 U.S. Dist. LEXIS 34443, 2011 WL 1258557, at *5-7 (S.D.Ill. Mar. 31, 2011)* **[\*26]** (Illinois law); *St. Paul Fire & Marine Ins. Co. v. Hanover Ins. Co., 187 F.Supp.2d 584, 594-95 (E.D.N.C. 2000)* (North Carolina law).

**HN7[↑]** ] Some courts have held that when the complaint against the additional insured includes counts alleging liability for its own independent acts or omissions and also counts for which its liability would be vicarious, the insurer has a duty to defend, and possibly to indemnify. *Greyhound Lines, Inc. v. Travelers Prop. Cas. Co. of Am., 81 Mass. App. Ct. 1123, 964 N.E.2d 368, 2012 WL 987515, at *2-3 (2012)* (Massachusetts law); *Amerisure Mut. Ins. Co. v. Travelers Lloyds Ins. Co., No. H-09-663, 2010 U.S. Dist. LEXIS 27066, 2010 WL 1068087, at *7 (S.D.Tex. Mar. 22, 2010)* (Texas law). However, in the present case the Underlying Actions sought to impose liability on Plaintiffs exclusively for their independent acts and omissions.

Plaintiffs argue that a holding that the "independent acts" language excludes coverage "requires a finding regarding the acts and omissions that might have caused or contributed to the accident." Plaintiffs' Memorandum in Opposition to Defendant Utica Mutual Insurance *Company*'s Motion for Summary Judgment ("Pl. Utica Opp. Memo.") at 8. While that might be true in some **[\*27]** cases, it is not true here. None of the causes of action in the Anchundia or Schmukler complaints could have resulted in Plaintiffs being held vicariously liable for AET's acts or omissions, no matter what finding was made about the acts or omissions that contributed to the accident. Now that the Underlying Actions have been settled, there is no possibility that the Anchundia or Schmukler complaint will be amended to allege vicarious liability, or that a court will make a factual finding of vicarious liability. Thus, even if liability in the Underlying Actions was covered by the insuring agreement, it would have been excluded by the independent acts exclusion. [13]

---

[13] Utica's argument that *Connecticut General Statutes § 52-572k* bars coverage here ignores the fact that *Section 52-572k*

## B. St. Paul

Because Utica does not have a duty to indemnify, neither does St. Paul, the excess carrier. The St. Paul Policy contains the following provision: "There is no coverage under this policy for Bodily Injury ... unless a Retained Limit applies." St. Paul Policy, Insuring [*28] Agreements I(A). The Retained Limit here is the limit of Utica's primary insurance coverage, so the absence of coverage under the Utica Policy establishes the absence of coverage under the St. Paul Policy. There is one exception to the requirement that a Retained Limit apply, at I(B)(3). But the Policy provides that "[i]f coverage for the Bodily Injury ... does not exist under any (1) Scheduled Underlying Insurance ... because of a specific exclusion or other specific coverage limitation, then paragraph I Coverage B.3 above does not apply, unless such coverage is specifically provided by endorsement to this policy." *Id.* at I(C). Here, as noted *supra*, there is no coverage under the Utica Policy under a specific exclusion and a specific coverage limit. The St. Paul Policy contains no endorsement specifically providing coverage under I(B)(3). Thus St. Paul has no duty to indemnify. [14]

## IV. DUTY TO DEFEND

### A. Utica

---

does not extend to insurance contracts, as Plaintiffs observe. Utica Supp. Memo., ninth and tenth pages; Pl. Reply Memo. at 17-19.

[14] St. Paul makes two additional arguments, both of which are unpersuasive. First, it argues that no "occurrence" is alleged as required by the St. Paul Policy because the last event in the causal chain that led to the explosion was the "transformer switch by CL&P." Memorandum of Law of St. Paul Fire & Marine [*29] Insurance **Company** in Opposition to Plaintiffs' Motion for Summary Judgment ("St. Paul Opp. Memo.") at 17. However, the parties have not presented the Court with evidence upon which it could make such a factual finding. Second, it argues that the St. Paul Policy contains two provisions which exclude from coverage injury arising out of the rendering or failure to render of professional **services**, and that the Underlying Actions alleged that Plaintiffs failed to provide such **services**. *Id.* at 19-20. But the complaints in the Underlying Actions alleged several bases for Plaintiffs' liability, including, for example, strict liability for engaging in an "ultrahazardous activity." Anchundia Comp. ¶¶ 49-62. The Court cannot conclude that nothing was at issue other than failure to render professional **services**.

Plaintiffs argue that even if Utica does not have a duty to indemnify them, it did have a duty to defend them in the Underlying Actions. Pl. Supp. Memo. at 15-18. They argue further that because Utica breached its duty to defend them, it is liable for their defense costs and the amount of the settlements in the Underlying Actions. *Id.* at 18-19.

As courts often observe, [*30] *HN8*[⬆] the duty to defend is broader than the duty to indemnify. *See, e.g., Vermont Mut. Ins. Co. v. Walukiewicz, 290 Conn. 582, 602 n. 21, 966 A.2d 672 (2009).* Unlike Utica's duty to indemnify, its duty to defend must be determined by considering the facts it knew at the time it refused to defend, regardless of later events.

The Connecticut Supreme Court has established that *HN9*[⬆] an insurer's duty to defend may arise either from the pleadings in the underlying action or from other facts known to it. "If an allegation of the [underlying] complaint falls even possibly within the coverage, then the [insurer] must defend the insured." *Wentland v. Am. Equity Ins. Co., 267 Conn. 592, 600, 840 A.2d 1158 (2004).* The pleadings to be examined to determine coverage may include pleadings filed by the defendants. *Vermont Mut. Ins. Co. at 602 n. 21.* The duty to defend can arise from facts outside the allegations in the complaint if the insurer has actual knowledge of facts establishing a reasonable probability of coverage. *Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co., 274 Conn. 457, 466-67, 876 A.2d 1139 (2005).*

The Anchundia and Schmukler complaints did not allege any causes of action that might have fallen within the coverage of the Utica [*31] Policy. As discussed *supra*, those complaints were based entirely on Plaintiffs' own acts rather than AET's. Plaintiffs emphasize the fact that Plaintiffs' affirmative defenses in the Anchundia and Schmukler Actions alleged other parties' negligence. Pl. Reply Memo. at 5-6. That fact, however, does not bear on this analysis. Utica's obligation was not to determine if some other party was negligent, but to determine if there was a possibility that Plaintiffs would be held liable for AET's acts or omissions. Plaintiffs could not create otherwise nonexistent claims against themselves by pleading affirmative defenses.

Since the complaints in the Underlying Actions did not allege vicarious liability, the remaining question is whether Utica had "actual knowledge" of facts establishing a "reasonable probability" of coverage. *See Hartford Cas. Ins. Co. at 466-67.* That is, did it have reason to believe that the complaint in either of those

actions might be amended to add claims against Plaintiffs based on vicarious liability for AET's conduct, and that Plaintiffs might be held liable under those claims?

To make that case, Plaintiffs would at a minimum have to show that there exists some cause **[*32]** of action under which such vicarious liability might have been imposed on them. Nowhere in their six memoranda on the three Motions do Plaintiffs identify a cause of action that Marlyn Anchundia or Schmukler might have added to their complaints that would require Plaintiffs to pay for AET's acts or omissions. Plaintiffs cannot establish that Utica had "actual knowledge" of such a potential cause of action when they themselves cannot identify one, even in retrospect.

Plaintiffs' argument on this subject is not easy to understand, but their fullest statement of that argument occurs in their memorandum in opposition to Utica's summary judgment motion. Pl. Utica Opp. Memo. at 10, 14-16. Plaintiffs argue that Utica knew of facts that showed that the claims were covered:

> By the underlying complaints, Utica knows that several AET workers allege that they were performing work in the vault at the time of the accident. In their answers to the Anchundia and Schmukler complaints, [Plaintiffs] deny that they were negligent and assert the negligence of others as affirmative defenses.

*Id.* at 10. The phrase "several AET workers" is misleading, because in fact the complaints establish only that one AET **[*33]** worker, Schmukler, alleges that he was performing work in the Vault, and only one more, Anchundia, is alleged by others to have been there. Later, expanding on this argument, Plaintiffs add the following:

> Utica states that there are only three possible outcomes to the Anchundia and Schmukler cases: first, that [Plaintiffs] are found solely negligent; second, that Anchundia and/or Schmukler are found to have caused their own injuries either entirely or in a greater percentage than [Plaintiffs]; or third, that Anchundia and Schmukler and [Plaintiffs] are both found to be negligent ... under two of the three possible outcomes that Utica cites, the acts or omissions of AET's employees would have led to the injuries complained of. Surely if two out of the three possible outcomes would include findings regarding the negligence of AET's employees, Utica has a duty to defend this action.

*Id.* at 15.

Although Plaintiffs are not clear about this, the situation they envision seems to be the following: (1) Anchundia and Schmukler are found to have caused their own injuries, (2) since Anchundia and Schmukler were employees of AET, their negligence is attributed to AET, (3) AET is held liable to Marlyn **[*34]** Anchundia and Schmukler, and (4) Plaintiffs are held vicariously liable to Marlyn Anchundia and Schmukler in place of AET. In effect, they argue that Utica should have anticipated that Plaintiffs would be held liable to Anchundia and Schmukler for Anchundia and Schmukler's own negligence. But Plaintiffs do not explain how that could come about. In particular, they do not explain why Utica would anticipate that Plaintiffs would be held liable for AET's acts. If there is an argument to be made here, Plaintiffs do not make it.

When Utica declined to provide Plaintiffs with a defense, it had no reason to believe that they might be held liable for AET's acts or omissions. Consequently, Utica had no duty to defend.

## 2. St. Paul

As noted *supra*, the St. Paul Policy did not extend coverage beyond the coverage of the Utica Policy. Thus, if Utica had no duty to defend, neither did St. Paul.

In addition, St. Paul argues that, as the excess carrier, it had no duty to defend until the $1 million coverage under the Utica Policy was exhausted. Memorandum of Law in Support of Summary Judgment ("St. Paul Supp. Memo.") [Doc. 46] at 25-26. The relevant language in the St. Paul Policy reads as follows: "Prior **[*35]** to the exhaustion of the Retained Limit we shall have the right, but not the duty, to participate in the investigation, settlement or defense of any Claim or Suit seeking damages that would be covered by this policy." St. Paul Policy, Insuring Agreements II(B). Exhaustion occurs when "the Retained Limit has been exhausted by payment of judgments or settlements that would be covered by this policy." *Id.*, II(A). Thus, any duty to defend that St. Paul might have would arise only after the $1 million limit in the Utica Policy was exhausted.

Plaintiffs might argue that this limitation is impermissible under Connecticut law. However, **HN10** no Connecticut court has held that an excess carrier has a duty to defend regardless of policy language. One Superior Court decision found no such duty.

"Underwriters, as an excess carrier, did not have a duty to defend." *Liberty Mut. Ins. Co. v. Lone Star Indus., Inc., No. X-02-CV-044001208, 2007 Conn. Super. LEXIS 251, 2007 WL 447957, at *12 (Conn. Super. Ct. Jan. 25, 2007)*. Another Superior Court decision also found that the excess carrier did not have, in general, a duty to defend before exhaustion of the underlying policy limit. *Fortin v. Hartford Underwriters Ins. Co., No. X-04-CV-030103483, 2005 Conn. Super. LEXIS 1019, 2005 WL 1083800, at *10-11 (Conn. Super. Ct. Apr. 6, 2005)* **[*36]** . The court held that the excess carrier had the duty to defend the insured during a period when the primary insurer was not providing a defense, but that duty was based on a provision of the subject policy under which the excess carrier was obligated to provide a defense for occurrences not covered by the primary policy. The St. Paul Policy does not contain such a provision. In fact, it contains the opposite provision: "We have no duty to defend, investigate or settle any Claim or Suit seeking damages not covered by this policy." St. Paul Policy, Insuring Agreements II(C).

Courts have also held that, under the law of other states, an excess carrier does not have a duty to defend before the retained limit has been exhausted. *See* Allen D. Windt, *Insurance Claims & Disputes* § 4:11 (5th ed. 2012) (collecting cases). For example, under New York law, the primary insurer has a duty to defend "without any entitlement to contribution from an excess insurer," and while an excess carrier may protect its interests by participating in a defense, "there is no obligation to do so." *Gen. Motors Acceptance Corp. v. Nationwide Mut. Ins. Co., 4 N.Y.3d 451, 828 N.E.2d 959, 961, 796 N.Y.S.2d 2 (N.Y. 2005)*. **[*37]** *See also Liberty Surplus Ins. Corp. v. Segal Co., 420 F.3d 65, 69 (2d Cir. 2005)* (ruling that under New York law excess carrier did not have a duty to defend where the retained limit was not exhausted).

In the absence of contrary authority, the Court concludes that this limitation on the duty to defend is not impermissible under Connecticut law. Consequently, if St. Paul had a duty to defend, it came into existence only when the Retained Limit was exhausted.

Plaintiffs have not established that any defense costs were incurred after the exhaustion of the Retained Limit. Plaintiffs provide an affidavit from their deputy general counsel showing that their defense costs in the Underlying Actions were $1,512,471.28. MacKay Aff. ¶¶ 5-9. However, that affidavit does not assert that any of those costs were incurred after exhaustion of the Retained Limit. Nor do Plaintiffs assert that, after

exhaustion, they asked St. Paul to provide a defense.

Plaintiffs have not presented to the Court any explanation or argument about the date of exhaustion under the terms of the St. Paul Policy. Does exhaustion occur only when Utica pays $1 million to Plaintiffs (which of course it has not)? Does it occur when **[*38]** Plaintiffs have paid out the millionth dollar in defense costs? Or does it occur when Plaintiffs pay the first $1 million in settlement to the plaintiffs in the Underlying Actions? In the absence of such argument, even if the Court were to conclude that Plaintiffs' losses were covered, it could not conclude that the Retained Limit was ever exhausted and the excess carrier's duty to defend triggered.

Thus, both because of the absence of coverage under the St. Paul Policy, and because of St. Paul's status as an excess carrier, St. Paul did not breach a duty to defend.

## IV. CONCLUSION

For all the foregoing reasons, Defendants had neither a duty to indemnify Plaintiffs nor a duty to defend them. Plaintiffs cannot prevail on any of the eight counts in the Third Amended Complaint, each of which is based on the assertion that Defendants had such duties. Thus, Defendants have shown that there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law on all of Plaintiffs' claims.

Plaintiffs' Motion for Summary Judgment [Doc. 39] is DENIED, Utica's Motion for Summary Judgment [Doc. 45] is GRANTED, and St. Paul's Motion for Summary Judgment [Doc. 49] is GRANTED. **[*39]** The Clerk is directed to enter judgment for Defendants and close the case.

It is SO ORDERED.

Dated: New Haven, Connecticut

July 11, 2012

*Charles S. Haight, Jr.*

Charles S. Haight, Jr.

Senior United States District Judge

Mark Bouchard