# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FREDERICK KLORCZYK, JR., as co-administrator of the Estate of Christian R. Klorczyk, et al., | : | CIVIL ACTION NO. |
| | : | |
| | : | 3:13-cv-00257-JAM |
| *Plaintiffs*, | : | |
| | : | |
| vs. | : | |
| | : | |
| SEARS, ROEBUCK AND CO., et al., | : | |
| | : | |
| *Defendants*. | : | JULY 27, 2018 |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY SFC AND SFA ON THE GROUNDS THAT THEY WERE NOT IN THE STREAM OF COMMERCE FOR THE SUBJECT PRODUCT

This case is about one product — a jack stand — and neither Shinn Fu Corporation ("SFC") nor Shinn Fu Company of America, Inc. ("SFA") was in the chain of distribution for that jack stand. The Defendants' Rule 30(b)(6) depositions unanimously confirmed the chain of distribution: Wei Fu[1] designed and manufactured them, MVP[2] distributed them directly to Sears,[3] and Sears sold them to the Plaintiffs' decedent. SFA was not distributing any products to Sears when these jack stands were sold, and SFC *never* distributed any products to Sears. The stream of commerce for these jack stands is also documented by their purchase order, waybill, and receipt. In response, the Plaintiffs have zero evidence to implicate SFA or SFC, now well over five years into the case,[4] with all depositions and document production complete. In fact, the Plaintiffs' July 18, 2016 discovery responses make it perfectly clear that they have no evidence at all to show that SFC or SFA were in the stream of commerce, which is unsurprising because none exists. Summary judgment should therefore enter for both SFC and SFA.

---

[1] The Defendant Wei Fu (Taishan) Machinery & Electric Co., Ltd. is referred to herein as "Wei Fu."
[2] The Defendant MVP (H.K.) Industries, Ltd. is referred to herein as "MVP."
[3] The Defendant Sears, Roebuck and Co. is referred to herein as Sears.
[4] According to Pacer, this case was filed on February 25, 2013.

## I.   STATEMENT OF FACTS

### A.   The Plaintiffs' Claim Is For Product Liability Based On The Sale Of A Jack Stand

The operative complaint is the Plaintiffs' Second Amended Complaint dated April 10, 2014 (ECF No. 99) — its only cause of action is a claim under the Connecticut Product Liability Act ("CPLA"), Connecticut General Statutes Section 52-572m, et seq., against the five Defendants in this action: Sears, MVP, Wei Fu, SFA, and SFC.  The alleged defective product is a "Craftsman Heavy Duty Jack Stand, Model No. 50163."  (Compl. ¶ 17.)  The Plaintiffs allege that the decedent, Christian R. Klorczyk, purchased the jack stand from a Sears department store in Waterford, Connecticut, (Compl. ¶ 19), and the Plaintiffs produced a receipt showing that the jack stand was purchased on January 1, 2011, (Receipt, Ex. A).

The Plaintiffs go on to allege that the decedent was changing a car's oil at the Plaintiffs' home when the jack stand failed, causing the vehicle to fall on him.  (Compl. ¶¶ 20-22.)  The Plaintiffs claim the Defendants are liable for the decedent's injuries under the CPLA because they designed, manufactured, imported, wholesaled, distributed, or retailed the jack stand:

> At all times relevant to this Complaint, Defendants were the designers, manufacturers, importers, wholesalers, distributors and/or retailers of a product known as a "Craftsman Heavy Duty Jack Stand, Model No. 50163." (the "Jack Stand").

(Compl. ¶ 17.)

### B.   The Three Non-Moving Defendants — Sears, MVP And Wei Fu — Are The Entities That Manufactured, Distributed And Sold The Jack Stand

The Purchase Order attached as Exhibit B shows that Sears ordered the jack stand at issue directly from MVP (HK) Industries, Ltd. on June 1, 2010, specifying the factory of Wei Fu Taishan Machinery & Electric Co, Ltd. — the "50163" model number is listed on pages two and three of the Purchase Order.  The Purchase Order lists a revised ship date of September 29, 2010

and an in-store date of November 22, 2010.  Exhibit C is a Sea Waybill showing that MVP later shipped the 50163 jack stands, listed on page 4, directly to Sears on October 21, 2010 via UPS.[5] Exhibit A, discussed above, is a January 1, 2011 receipt showing that Christian Klorczyk then purchased the 50163 jack stand from Sears.  This straightforward set of documents establishes the entire chain of distribution for the subject jack stand, from the manufacturer (Wei Fu) to the distributor (MVP) to the retailer (Sears) to Christian Klorczyk.

### C.   The Defendants' Depositions Likewise Show That SFC And SFA Did Not Manufacture, Sell, Distribute, Or Otherwise Participate In The Stream Of Commerce For The Jack Stands

All of the Defendants' Rule 30(b)(6) witnesses testified uniformly that SFC and SFA were not in the chain of distribution for the subject jack stands.  SFC never sold products for the do-it-yourself (DIY) market and never sold any Craftsman branded products, while SFA was not selling any jack stands to Sears during the relevant period.

1.   Sears' Rule 30(b)(6) witness, Kathryn Guerra, testified that the model number 50163 jack stands were designed and manufactured by MVP for Sears. (Kathryn Guerra Dep. Tr. pp. 105:12-106:2, 107:2-7, Ex. E.)   She later specified that MVP was the vendor and Wei Fu was the producing factory. (*Id.* at p. 116:12-4, Ex. E.)

2.   SFC's Rule 30(b)(6) witness, Chang Chin He, testified clearly that SFC did not manufacture, test, sell, distribute, or sell model number 50163 jack stand. (Chang Chin He Dep. Tr. pp. 88:14-89:5, Ex. F.)  In fact, during the witness's

---

[5] These documents are authenticated as business records by the Affidavit of Nora Lee, submitted herewith as Exhibit D.  Nora Lee was MVP's sales manager from 2009 to 2014, and was in charge of United States clients, including Sears, Roebuck and Co.

time at SFC, from 2008 to 2017, SFC did not sell any products at all for the automotive do-it-yourself market, nor did it sell any Craftsman branded products.  (*Id.* at p. 90:1-11, Ex. F.)

3.  SFA's Rule 30(b)(6) witness, Ryan Jorgensen, testified that SFA did not sell jack stands to Sears during the relevant time frame, as Sears bought them from MVP, and SFA was not in the "sales chain."  (Ryan Jorgensen Dep. Tr. pp. 29:3-6, 33:3-14, Ex. G.)  He also testified that SFA did not design ratchet-and-pawl jack stands, as designs were handled by the respective factories that made the jack stands.  (*Id.* at pp. 29:16-30:8, Ex. G.)

4.  Wei Fu's Rule 30(b)(6) witness, Su Chien Chi, testified that model number 50163 jack stands were designed by a Wei Fu engineer, with Sears' approval and without any involvement form Shinn Fu Corporation.  (Su Chien Chi Dep. Tr. pp. 92:22-93:23, Ex. H.)   Wei Fu manufactured these jack stands throughout the entire period relevant to this action, from 2007 to 2011, (*Id.* at pp. 90:3-14, 93:24-94:1, Ex. H), and Wei Fu worked with MVP to obtain all necessary content and to print the product manuals, (*Id.* at pp. 106:16-107:25, Ex. H).

5.  MVP's Rule 30(b)(6) witness, Nora Lee, testified unequivocally that MVP bought the subject jack stands from another distributor, MVP International, which is not a party to this case, and sold them directly to Sears.  (Nora Lee

Dep Tr. pp. 110:24-111:16, Ex. I.)  MVP designer Addy Law was responsible
for drafting the product manual, which would then be given to MVP engineer
Ivan Chan for review.  (*Id.* at pp. 80:13-81:25, Ex. I.)  Sears issued purchase
orders directly to MVP, and issued payment directly to MVP.  (*Id.* at pp.
111:17-23, Ex. I.)  She also testified explicitly that SFA was not a party to the
transaction, and SFA did not buy or sell model number 50163 jack stands
during the relevant time period.  (*Id.* at pp. 112:2-113:17, Ex. I.)

In sum, all of the witnesses testified consistently with the documents that Wei Fu
manufactured the jack stands, MVP distributed them, and Sears retailed them, without any
involvement by SFC or SFA.

### D.  The Plaintiffs' Discovery Responses Establish That They Have No Evidence To Demonstrate That SFC Or SFA Were In The Stream Of Commerce

 In response to this Court's Order (ECF No. 205 p. 3) the Plaintiffs issued supplemental
responses on July 18, 2016 to SFA and SFC's interrogatories and requests for production
regarding the Plaintiffs' claims that SFA and SFC were in the stream of commerce for the
subject jack stand, which are collectively attached as Exhibit J.  While the Plaintiffs vigorously
attempted to spin the available information into an argument for keeping SFA and SFC in this
litigation, their responses reveal just how inadequate their case is.

The Plaintiffs' response to Interrogatory No. 2 articulates their entire basis for keeping
SFA and SFC in the case.  First, they claim that SFC is the parent company, and SFA is part of a
group of companies, that includes MVP and Wei Fu, which are the actual distributor and
manufacturer of the subject jack stands — they do not even assert that SFC or SFA were actually
in the chain of distribution for the subject jack stands, just that they have some nebulous

corporate relationship with the entities that were.  The Plaintiffs also claim that SFA sells or prepares to sell "products of the type" that are at issue in this action — again, not even asserting that SFC or SFA were actually involved with the subject jack stands.  The final point the Plaintiffs raise is that SFC and SFA shared an insurance policy and a claims administrator with MVP and Wei Fu, but of course this does not even touch on the issue of whether SFC and SFA were actually in the stream of commerce for the subject jack stand.

The Plaintiffs also cite exactly three documents to support SFC and SFA's continued presence as Defendants:  (1) a Sales Representative Agreement between SFA and MVP; (2) the insurance policy applicable to the Plaintiffs' claim; and (3) a PowerPoint presentation from SFC. Addressing each document individually, it is readily apparent that none of them establish in any way that SFC or SFA are in the stream of commerce for the jack stand at issue.

On June 25, 2018, in response to a meet-and-confer request from Defendants' counsel, the Plaintiffs further supplemented their interrogatory responses, which are also attached as part of Exhibit J, and doubled down on the responses outlined above.  (*See* Responses to Rog. Nos. 14-19, Ex. J.)  They reiterated that SFA should be liable because of its Sales Representative Agreement with MVP, because of the shared insurance policy, and because it sold and tested "similar" models of jack stands.  The Plaintiffs also asserted that the 50163 design was based on a different design that was sold by SFA under a brand name owned by SFC.

This is the sum total of the Plaintiffs' argument that SFA and SFC were in the chain of distribution for the subject jack stand.  SFA and SFC will now review each document that the Plaintiffs claim support their argument.

1.  **SFA Had A Sales Representative Agreement With MVP During The Relevant Period, Providing Limited, Enumerated Services In Exchange For A Monthly Lump Sum Payment**

The Sales Representative Agreement between SFA and MVP is attached as Exhibit K, and the last two pages, SFA003346-47, show the agreement in effect from December 1, 2009 to January 1, 2011 during the relevant period when the subject jack stand was distributed prior to sale. Under the terms of this agreement, SFA was paid a "monthly service charge" of $1,875.00 to provide: "(a) Lab testing services; (b) Show management; (c) OIPM support, and (d) Customer phone support." There is zero evidence that SFA provided any "lab testing services" for the subject jack stands, and in terms of "OIPM support," MVP's representative testified that SFA may have simply acted as a middleman to provide the draft manual from MVP to Sears for Sears' final approval. (Nora Lee Dep. Tr. pp. 80:13-81:25, Ex. I.)

2.  **SFC, SFA, MVP, And Wei Fu Were Covered Under the Same Insurance Policy During The Relevant Period**

It is undisputed that SFC, SFA, MVP, and Wei Fu were covered under the same insurance policy during the relevant period, which is attached hereto as Exhibit L, and all of the witnesses who were asked about this testified that it was done in order to maximize efficiency and save money. SFC's representative testified simply that these companies all needed insurance to sell goods in the United States, and that "[w]hen we buy it together, the rate, the premium for the insurance policy would be cheaper." (Chang Chin He Dep. Tr. pp. 71:17-72:2, Ex. F.) SFA's representative explained that SFA "does a lot of business" in the U.S. and that it is "very easy for [SFA] to negotiate insurance terms including [companies] we do business with," stating that SFA gets a "better rate" then charges the other companies back for their coverage. (Meghann O'Connor Dep. Tr. p. 37:4-9, Ex. M.) MVP's representative similarly testified that this was the most "cost effective way" to buy this insurance coverage. (Nora Lee Dep. Tr. p.

54:15-20, Ex. I.)  In other words, it was less expensive for these companies to buy one combined policy than separate policies.

### 3. SFC Made A PowerPoint Presentation To Show Its Global Relationships

The third and final document that the Plaintiffs cite in support of keeping SFC and SFA in the case is a PowerPoint presentation attached as Exhibit N — SFC's representative explained that this presentation showcased a "business network" of "individual companies, individual clients, and products."  (Chang Chin He Dep. Tr. p. 58:6-11, Ex. F.)  When asked if SFC controlled this business network, he replied "[n]o," and stated that they were involved in buying and selling products to each other.  (*Id.* at p. 58:13-18, Ex. F.)  In response to repeated questioning, the witness re-iterated that they companies listed in the presentation were "independently run." (*Id.* at p. 59:13-20, Ex. F.)  After further repetitive questioning, the witness once again explained that MVP and Wei Fu were separate companies involved in buying and selling products in this business network.  (*Id.* at pp. 64:13-65:2, Ex. F.)  Nowhere does the presentation say or imply that SFC or SFA sold jack stands to Sears during the relevant period.

## II.    LEGAL STANDARD — SUMMARY JUDGMENT IS MERITED WHERE THE PLAINTIFFS HAVE INSUFFICIENT EVIDENCE TO SUPPORT A VERDICT IN THEIR FAVOR ON AN ESSENTIAL ELEMENT OF THEIR CLAIM

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When ruling on a motion for summary judgment, the court must construe the evidence in the light most favorable to the nonmoving party and draw all inferences in its favor. *Dalberth v. Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014).  The movant bears the initial burden of showing the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant satisfies its initial burden, "the opposing party must come

forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  A fact is "material" if it might affect the outcome of the case under substantive law, and a dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In moving for summary judgment against a party which will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if it can point to an absence of evidence to support an essential element of the non-moving party's claim.  *Celotex*, 477 U.S. at 322-23; *N.E. Utils. Serv. Co. v. St. Paul Fire & Marine Ins. Co.*, No. 3:08-CV-01673(CSH), 2012 U.S. Dist. LEXIS 96641, at *8 (D. Conn. July 11, 2012).  The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Anderson*, 477 U.S. at 249; *N.E. Utils. Serv. Co.*, 2012 U.S. Dist. LEXIS 96641, at *8.  Disputes concerning immaterial facts do not prevent summary judgment. *See id.*; *Howard v. Gleason Corp.*, 901 F.2d 1154, 1159 (2d Cir. 1990) ("summary judgment cannot be avoided by immaterial factual disputes").  Further, although all inferences are to be drawn in favor of the nonmoving party, "mere speculation and conjecture is insufficient to preclude the granting of the motion."  *Harlen Assocs. v. Inc. Vill. or Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

## III.   LEGAL ARGUMENT — THE MOVANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE NEITHER OF THEM IS A "SELLER" OF THE JACK STAND NOR ARE THEY OTHERWISE LIABLE UNDER THE CPLA

### A.  Under Connecticut Law, Product Liability Claims Can Only Be Brought Against A "Product Seller"

Under Connecticut law, in order to succeed on a products liability claim, a plaintiff must prove the defendant "was engaged in the business of selling the product."  *Bifolck v. Philip*

*Morris, Inc.*, 324 Conn. 402, 434 (2016).[6]  Under the CPLA, a product liability claim "may be asserted and shall be in lieu of all other claims against product *sellers*, including actions of negligence, strict liability and warranty, for harm caused by a product."  Conn. Gen. Stat. § 52-572n(a) (emphasis added).  Importantly for the purposes of summary judgment, "[w]hether a defendant is a 'product seller' is a question of law for the court to decide."  *Svege v. Mercedes-Benz Credit Corp.*, 329 F. Supp. 2d 272, 278 (D. Conn. 2004) (*citing Stanko v. Bader*, No. CV-03-0193669, 2003 Conn. Super. LEXIS 2779, at *5-6 (Conn. Super. Ct. Oct. 7, 2003); *Burkert v. Petrol Plus of Naugatuck, Inc.*, 216 Conn. 65, 72 (1990)); *Stanko*, 2003 Conn. Super. LEXIS 2779, at *2.

Pursuant to Connecticut General Statutes Section 52-572m(b), a "product liability claim" includes:

> all claims or actions brought for personal injury, death or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product.  "Product liability claim" shall include, but is not limited to, all actions based on the following theories: Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent.

Under the statute, a "product seller" is:

> any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption. The term "product seller"

---

[6] In order to prove a strict liability claim under the Connecticut Product Liability Act ("CPLA"), a plaintiff must show that: (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition.  *See Izzarelli v. R.J. Reynolds Tobacco Co.*, 731 F.3d 164, 167 (2d Cir. 2013) (*citing Giglio v. Conn. Light & Power Co.*, 180 Conn. 230 (1980)).  The Connecticut Supreme Court recently held that these elements apply to all product liability claims, "whether alleging a design defect, manufacturing defect, or failure to warn defect."  *Bifolck*, 324 Conn. at 434.  For the purposes of this motion, the decisive issue is the first element of Plaintiff's CPLA claim.

> also includes lessors or bailors of products who are engaged in the business of leasing or bailment of products.

Conn. Gen. Stat. § 52-572m(a).

A "manufacturer" includes:

> product sellers who design, assemble, fabricate, construct, process, package or otherwise prepare a product or component part of a product prior to its sale to a user or consumer. It includes a product seller or entity not otherwise a manufacturer that holds itself out as a manufacturer.

Conn. Gen. Stat. § 52-572m(e).

### B. There Is No Liability For A CPLA Claim Outside Of The Product's Chain Of Distribution

The well-established general legal principle is that there is no liability imposed outside of a defective product's chain of distribution nor is such a duty imposed upon a manufacturer concerning defects contained in the product of another manufacturer. *See Izzarelli*, 731 F.3d at 167 (2d Cir. 2013) (holding that the plaintiff in a product liability action must prove that the defendant was in the business of selling the subject product); *Bifolck*, 324 Conn. at 434 (same holding). Where defendants show that they were not in the stream of commerce for the product at issue, Connecticut federal and state courts routinely grant them summary judgment. *See Iragorri v. United Techs Corp.*, 285 F. Supp. 2d 230 (D. Conn. 2003), *reconsideration granted in part on other grounds*, 314 F. Supp. 2d 110 (D. Conn. 2004); *see also Nunan v. Leathers & Assocs.*, No. CV-01-0452898-S, 2002 Conn. Super. LEXIS 2221 (Conn. Super. Ct. July 2, 2002) (granting summary judgment to a defendant that provided design and on-site construction services but did not manufacture or sell the subject product).

The Connecticut District Court's decision in *Iragorri v. United Technologies Corp.* is particularly apt, as that opinion demonstrates that a mere corporate relationship is not enough to make a defendant qualify as a "product seller." 285 F. Supp. 2d 230. In *Iragorri*, the plaintiff's

decedent was killed as a result of an allegedly-defective elevator, and the plaintiff asserted CPLA claims against United Technologies ("UTC") and Otis Elevator ("Otis").  *Id.* at 233.  UTC and Otis moved for summary judgment on the grounds that they were not "product sellers" under the CPLA, as they did not place the product in the stream of commerce or participate in its design, manufacture, or chain of distribution.  *Id.*  UTC and Otis presented evidence showing that the elevator was manufactured and sold by their wholly-owned subsidiary Otis Brazil.  *Id.* at 236-37. The court held that, as a matter of law, this was insufficient to establish that UTC and Otis could be "product sellers" under the CPLA, and the mere use of Otis' trademark on the elevator was also insufficient.  *Id.*  The court also held that UTC and Otis could not be deemed to have managed and controlled Otis Brazil merely because it was a wholly-owned subsidiary, citing the Connecticut Supreme Court's holding that parent corporations and subsidiaries "are treated as separate and distinct legal persons even though the parent owns all shares in the subsidiary and the two enterprises have identical directors and officers."  *Id.* at 238 (*citing SFA Folio Collections, Inc. v. Bannon*, 217 Conn. 220, 232 (1991)); The court accordingly granted summary judgment in UTC and Otis' favor, as the plaintiff possessed no evidence that they were in any way involved with the elevator's sale, manufacture, or marketing.  *Id.* at 240, *see also Cameron v. Olin Corp.*, 838 F. Supp. 2d 59, 65-66 (D. Conn. 2012) (granting summary judgment in favor of related company that did not design, manufacture, distribute, or supply the subject product, a rifle).

The *Irragori* court's decision was supported by the Connecticut Supreme Court's prior decision in *Burkert v. Petrol Plus of Naugatuck, Inc.*, 216 Conn. 65, 69-73 (1990).  The *Burkert* court enumerated several factors to consider in deciding whether an entity was involved in the stream of commerce, such as (a) whether the defendant took title to the product in the process of

distribution; (b) whether the defendant derived substantial economic benefit from its activity; and (c) the extent of the defendant's knowledge and control of the product. *Id.* at 68-69. The court ultimately held that General Motors was not a "product seller" under the CPLA even though it licensed its trademark to sell automatic transmission fluid that had passed performance testing at a GM laboratory.

The Connecticut Superior Court, in *King v. Volvo Excavators*, No. KNLCV156024866S, 2018 Conn. Super. LEXIS 264, at *6 (Conn. Super. Ct. Feb. 8, 2018), recently granted summary judgment in favor of a product liability defendant based on the precedent laid down in *Burkert*. First, the *King* court cited *Burkert* in support of the observation that the issue of whether a defendant was "sufficiently involved in the stream of commerce to be a 'product seller'" is usually a matter of law. *Id.* at *4. The *King* court went on to find that while the movant oversaw installation of an attachment to the subject excavator, the movant did not sell the excavator, did not take title to the excavator, and derived no economic benefit from its sale, entitling it to judgment as a matter of law. *Id.* at *4-6.

In this case, it bears emphasis that a mere corporate relationship between two companies is not enough to hold one of them liable for a product that it did not make or sell. As the Connecticut Supreme Court held, "it is a fundamental principle of corporate law that the parent corporation and its subsidiary are treated as separate and distinct legal persons even though the parent owns all the shares in the subsidiary and the two enterprises have identical directors and officers." *SFA Folio Collections*, 217 Conn. at 232 (1991) (internal quotation marks and citation omitted). This in line with the U.S. Supreme Court's holding in *United States v. Bestfoods*, 524 U.S. 51, 61, 69 (1998), that "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its

subsidiaries" and that the fact that a parent corporation's directors also serve as its subsidiary's directors does not make the parent liable for its subsidiary's hats.  *See also Williams v. REP Corp.*, 302 F.3d 660, 665-66 (7th Cir. 2002) (holding that "sister" company that was outside the stream of commerce for the subject product could not be held liable because of its corporate relationship).

Likewise, tangential involvement with a product also cannot serve as the basis for product liability.  In *Finerty v. Abex Corp.*, 27 N.Y.3d 236, 241-42 (2016), New York's highest court held that Ford USA was not within the distribution chain or stream of commerce even though it provided guidance to Ford UK regarding the design of certain tractor components and exercised control over its trademark, because Ford USA was not a manufacturer or seller of those components.

### C.  Neither SFC Nor SFC Is A "Seller" Or "Manufacturer" Of The Jack Stand, And They Are Both Outside Of The Product's Chain Of Distribution

In their Second Amended Complaint, the Plaintiffs allege that each of the Defendants — including SFC and SFA — were the "designers, manufacturers, importers, wholesalers, distributors and/or retailers" of the jack stand.[7]  The facts laid out above, however, establish that SFC is not a manufacturer, seller, wholesaler, distributor or retailer of the jack stand. SFC does not design, assemble, fabricate, construct, process, package or otherwise prepare the jack stand or any component of the jack stand prior to its sale.  SFC does not hold itself out as a manufacturer of the jack stand or of any products.  In fact, SFC not actually manufacture or sell any products at all for the D-I-Y market, which would include the subject jack stand.

Likewise, SFA is not a manufacturer, seller, wholesaler, distributor or retailer of the jack stand.  SFA does not design, assemble, fabricate, construct, process, package or otherwise

---

[7] Sec. Am. Compl. ¶ 17.

prepare the jack stand or any component of the jack stand prior to its sale.  Nor does SFA does hold itself out as a manufacturer of the jack stand.  Although SFA does distribute certain products, it never distributed the model of jack stand at issue in this case.

As the exhibits to this motion and all of the Defendants' testimony clearly show, Sears made its order directly from MVP, which procured the jack stand from Wei Fu and provided it directly to Sears.  SFC and SFA had no involvement.

Remarkably, the Plaintiffs' supplemental discovery responses, Exhibit J, essentially admit that SFA and SFC did not make or sell the jack stand that is the subject of *this* case, but nonetheless assert that they should be liable because they were involved with "similar" products. But the CPLA does not impose liable on parties who made or sold "similar" products — it only imposes liability on the parties who made and sold the specific product claimed to be defective.

The Plaintiffs' supplemental responses also argue that SFA and SFC should be liable by virtue of their corporate ties, and because of the services that SFA provided to MVP pursuant to an arms-length agreement.  Under the clear-cut precedent set forth above, these arguments must likewise fail.  There is no evidence that either SFA or SFC benefited from the sale of the specific 50163 jack stands at issue, which they did not, and SFA's provision of limited customer support services for MVP does not render SFA part of the stream of commerce for the jack stands and therefore does not provide a sound basis for liability.  Nor is there any support for an alter-ego or veil-piercing theory of liability, which the Plaintiffs have not pled.  It merits mention, however, than their own paid fact witness, former SFA employee Roger Claypool, testified that all of the Defendants were "separate companies" and "separate businesses" that "functioned independently" and did not share each others' bank accounts.  (Claypool Dep. Tr. pp. 48:5-49:7, 174:8-175:19, Ex. O.)

This is a simple issue — SFC and SFA are not "sellers" of the jack stand under the CPLA and are therefore not subject to liability under the CPLA. *See* Conn. Gen. Stat. §§ 52-572m(a), (e); *Bifolck*, 324 Conn. at 434; *Abate*, 2013 Conn. Super. LEXIS 2144, at *1. They were not in the stream of commerce or chain of distribution for the jack stand, and under a long line of precedent including the *Irragori*, *Burkert*, *King*, and *Finerty* decisions cited above, summary judgment is merited in their favor. In actuality, the movants here are even further removed from the product at issue than the defendants in *Irragori*, *Burkert*, *King*, and *Finerty*, so their argument for summary judgment is even stronger than the successful movements in those cases.

## IV.   CONCLUSION — SUMMARY JUDGMENT SHOULD ENTER IN FAVOR OF SFC AND SFA

The Plaintiffs' claims against SFC and SFA must fail because the movants played no role in the chain of distribution for the subject jack stand. Indeed, it appears they were named as Defendants in this action solely because of a believed corporate relationship with other entities that were actually in the jack stand's chain of distribution. Under the controlling precedent, however, this is not sufficient to make them liable for a product that they did not make or sell. Accordingly, summary judgment should be granted in favor of SFC and SFA on the Plaintiffs' Second Amended Complaint.

DEFENDANTS,

SHINN FU CORPORATION and
SHINN FU COMPANY OF AMERICA,
INC.,

By:____/s/  Steven J. Zakrzewski_____
    Dennis O. Brown, Esq. (ct04598)
    Steven J. Zakrzewski, Esq. (ct28934)
    Gordon & Rees, LLP
    95 Glastonbury Blvd., Suite 206
    Glastonbury, CT 06033
    (860) 278-7448
    (860) 560-0185 (fax)
    *dbrown@gordonrees.com*
    *szakrzewski@gordonrees.com*

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2018, the foregoing was electronically filed and served by mail on anyone unable to receive notice of electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to receive notice of electronic filing as indicated in the Notice of Electronic Filing. Parties may access this document through the Court's CM/ECF System.


      /s/  Steven J. Zakrzewski
Steven J. Zakrzewski