**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| FREDERICK KLORCZYK, JR., as co-administrator | : | CIVIL ACTION NO. |
| of the Estate of Christian R. Klorczyk, et al., | : | |
| | : | 3:13-cv-00257-JAM |
| *Plaintiffs*, | : | |
| | : | |
| vs. | : | |
| | : | |
| SEARS, ROEBUCK AND CO., et al., | : | |
| | : | |
| *Defendants*. | : | JULY 27, 2018 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
**ON PLAINTIFFS' PUNITIVE DAMAGES CLAIM**

There is absolutely zero evidence to support the Plaintiffs' punitive damages claim — not one substantially similar incident involving the product at issue, and no other evidence of any kind that the Defendants acted with "reckless disregard for the safety of product users," as needed to support a punitive damages award. The Plaintiffs' claim arises from a one-of-a-kind accident. They claim that Christian Klorczyk was using a ratchet-and-pawl jack stand that was "falsely engaged," meaning that it appeared to be engaged but really was not, and that the jack stand released when Christian was working under his vehicle. SFA alone has distributed over one million ratchet-and-pawl jack stands in the past seven years, and is not aware of a single confirmed false engagement incident. Nor have the Plaintiffs disclosed a single piece of evidence of a substantially similar incident throughout the entire history of discovery in this case, which is now over five years old.[1] It is impossible to prove that the Defendants "recklessly disregarded" a product defect that never definitively occurred before. Without any facts to support a punitive damages award in this case, and the Plaintiffs' recklessness claim should be summarily dismissed.

---

[1] According to Pacer, this case was filed on February 25, 2013.

1

## I.     STATEMENT OF FACTS

### A.  The Plaintiffs Brought A Product Liability Action Arising From An Allegedly-Defective Jack Stand, With A One-Paragraph Punitive Damages Claim

The operative complaint is the Plaintiffs' Second Amended Complaint dated April 10, 2014 (ECF No. 99) — its only cause of action is a claim under the Connecticut Product Liability Act ("CPLA"), Connecticut General Statutes Section 52-572m, et seq., against the five Defendants in this action.[2]   The product claimed to be defective is a "Craftsman Heavy Duty Jack Stand, Model No. 50163."   (Compl. ¶ 17.)   The Plaintiffs allege that the decedent was performing an oil change on a BMW sedan[3] at the Plaintiffs' home on March 11, 2011, using "one of the Jack Stands"[4] to support the vehicle, when the jack stand "failed and collapsed," causing the vehicle to fall on the decedent.  (*Id.* at ¶¶ 20-22.)

The Plaintiffs claim that the jack stand was defective because of its propensity for unstable engagement — essentially, the jack stand would look like it was fully engaged and ready to support a load, when it actually was not.  (*Id.* at ¶ 25.)  This is the theory of liability in both the Plaintiffs' Complaint and in their primary liability expert Frederick Heath's report, where he described "false engagement" as "tip to tip contact" between the jack stand's ratchet bar and the locking pawl that could be "disrupted" by an external force.  (*See* Disclosure of Frederick G. Heath, Dec. 8, 2014, pp. 16-17, **Ex. C**.)  Ultimately, Mr. Heath concluded that "false engagement of the support stand is more likely than not the cause of the incident at issue." (*Id.* at p. 13.)

---

[2] The five Defendants are Sears, Roebuck and Co., MVP (HK) Industries, Ltd., Wei Fu (Taishan) Machinery & Electric Co., Ltd., Shinn Fu Company of America, Inc., and Shinn Fu Corporation

[3] The Complaint does not identify the vehicle by make and model, but subsequent discovery has undisputedly shown that it was a BMW 3-series sedan.  (*See, e.g.*, Police Photograph, Ex. 13 to Dep. of Frederick Klorczyk, **Ex. A** hereto.)

[4] It is undisputed that the decedent was using, at most, one jack stand at the time of his accident.  (Frederick Klorczyk Dep. Tr. 430:3 ("He only used one."), **Ex. B** hereto.)

The Plaintiffs' entire punitive damages claim consists of a single boilerplate paragraph in the Complaint:  "In addition to defective design or manufacture and failure to provide adequate warnings or instructions, the harm sustained by Decedent was suffered as a result of Defendants' reckless disregard for the safety of Decedent while using the jack stand."  (Compl. ¶ 31.)  The prayer for relief likewise contains a claim for "punitive damages."

### B. Overview Of Evidence Plaintiffs Are Expected To Offer In Support Of Their Punitive Damages Claim

The Plaintiffs' primary evidence in support of their punitive damages claim is the testimony of Roger Claypool, a former SFA employee who was at one time involved in investigating certain jack stand claims for the company.  (*See* Claypool Dep. Tr. pp. 48:5-49:7, **Ex. D**.)   The Plaintiffs paid Mr. Claypool $120 per hour for "litigation support" in this case, including his testimony as a fact witness, while he typically makes approximately $325.00 per week worked at a community college.  (*Id.* at pp. 156:4-157:3; Pls.' Sept. 30, 2016 Supp. Response to Interrog., **Ex. E**.) The Plaintiffs will also likely offer the documents disclosed in discovery regarding other jack stand claims.

In their recent supplemental discovery responses, served on June 25, 2018, the Plaintiffs explained the basis for their claim that the decedent's death was foreseeable to the Defendants, relying primarily on the allegation that the Defendants "had knowledge" of prior "false engagement" incidents involving similar ratchet-and-pawl jack stands.  (Pls.' June 25, 2018 Supplemental Disc. Responses p. 4, **Ex. F**.)  The Plaintiffs go on to state that "Mr. Claypool concluded that false engagement was a defect that deserved industry-wide attention."  (*Id.*) Nevertheless, in his deposition, he testified that as vice chair of the committee responsible for promulgating safety guidelines regarding jack stands, he had the opportunity to put forth agenda

items for the group to discuss, and never once advanced an agenda item on "false engagement." (Claypool Dep. Tr. p. 233:6-18, **Ex. D**.)

The Plaintiffs' supplemental responses go on to assert that despite their knowledge of false engagement, the Defendants failed to act on "alternative and safer designs" that Mr. Claypool developed, and that the Defendants failed to provide consumers with "adequate warnings" regarding false engagement.  (Pls.' June 25, 2018 Supplemental Disc. Responses p. 4, **Ex. F**.)

### 1.  Roger Claypool's Testimony Regarding Other Jack Stand Claims

The primary claim that Roger Claypool testified about was a 2004 or 2005 incident involving a claimant named Steven Bowles.  (Claypool Dep. Tr. p. 62:9-24, **Ex. D**.) First and foremost, Mr. Claypool testified that the Bowles claim convinced him that "false engagement" could be a real issue.  (*Id.* at pp. 62:9-65:6, 70:10-71:2.)  In actuality, however, while he was working for SFA Mr. Claypool concluded, in writing, that he did ***not*** believe the jack stand at issue in the Bowles claim failed at all.  Attached as **Exhibit G** is an email from Roger Claypool dated January 13, 2005 discussing the Bowles claim. To put this in context, Mr. Claypool was writing to key managers at MVP, which manufactured the product involved. It is apparent from the content of the email that Mr. Claypool was trying to persuade the MVP managers to provide him with authority to settle the case. If Mr. Claypool thought there was a fault with the jack stand, it would have greatly aided his efforts to persuade MVP to provide settlement authority. Instead, Mr. Claypool initially stated that it was "very unlikely" that some welds that looked a little sloppy and caused a false engagement.  After he had three more days to assess the situation, he was emphatic that: **"[a]s a matter of fact, I don't believe the stand failed at all in this case."**  (Emphasis added.)  In short, Roger's "last word" on the Bowles case — the case that was

supposed to be the blockbuster proving that SFA and its affiliates had knowledge of false engagement — was a clear email from their senior safety engineer stating: "I don't believe the jack stand failed at all in this case."

Further, Mr. Claypool did not know what model jack stands Steven Bowles was using. (Claypool Dep. Tr. pp. 186:15-187:14, **Ex. D**.) Additionally, two jacks stands were used in the Bowles case — unlike the single jack stand allegedly used in this case. (*Id.* at pp. 189:24-190:9.) Mr. Claypool had no idea which lift points were used for the jack stands, as he did not attempt to perform an accident reconstruction, and was admittedly not a qualified accident reconstructionist in any event. (*Id.* at pp. 188:15-189:8.) Importantly, the jack stand that purportedly failed Mr. Bowles had an obvious paint scrape, unlike the jack stand in this case, which is in pristine physical conditions and shows absolutely no signs of failure. (*Id.* at pp. 190:10-191:2; Photographs of Subject Jack Stand, **Ex. H**.)

Roger Claypool testified about seven other jack stand incidents, and he either did not have any substantive information, or had information indicating that the circumstances were different from this case and did not involve "false engagement." One occurrence, with a claimant named "Jeffcoat" in the late 1990s or early 2000s, involved six unmatched jack stands supporting a Lincoln Towncar that was bumped by another person, whereas this case involves the alleged spontaneous collapse of a single jack stand supporting a BMW. (*See* Claypool Dep. Tr. pp. 182:15-185:16, **Ex. D**.) Another occurrence, with a claimant named "Guerra" in the mid-2000s, involved a bus supported by two six-ton jack stands on an unstable soil surface, while this case purportedly involves a sedan and a 4-ton jack stand on a concrete garage floor. (*See Id.* at pp. 185:17-186:14.) He also recalled a claim by "Finley" where the customer overloaded a pair of three-ton jack stands with a 36,000-pound freightliner. (*Id.* at p. 108:5-23.) He also testified

5

about a "Raymond" claim, but did not provide any details except to say that it was a wrongful death case involving an alleged jack stand failure.  (*Id.* at pp. 128-31.)  Then there were three other purported occurrences in the early 2000s, with claimants named Hastedt, Zinn, and Sloan, where Mr. Claypool could provide no detail at all, and what little information he had was based on hearsay.  (*Id.* at pp. 192:22-198:2.)

Importantly, Mr. Claypool testified that most all jack stands involved in an incident would be "crushed" and would have an "obvious physical deformity."  (*Id.* at pp. 191:11-192.) Even in the Bowles claim, Mr. Claypool testified that the incident left the jack stand with paint scraped off of more than one surface.  (*Id.* at pp. 190:10-191:2.)

## 2.   Documents Disclosed In Discovery Regarding Jack Stand Claims

The Defendants produced documents regarding other jack stand incidents as well, but none of the incidents were under circumstances similar to this case.  Documents regarding claims not covered by Roger Claypool's testimony are reviewed below, and the "Raymond" claim is included among these since Roger Claypool did not provide much if any substantive information about that incident.  Three of these four claims involved models of jack stands that are not at issue, all of them involved physical damage to the jack stands, and none of them implicated the "false engagement" defect advanced by the Plaintiffs.  Without conceding that there is actually any admissible, non-hearsay evidence about these claims, each is reviewed in the following bulleted list, in reverse chronological order.

- A 2018 claim on behalf of Dion Penberthy, where the ratchet bar of a jack stand model that is not at issue in this case snapped in half.  (*See* Penberthy Demand Letter & Photographs, **Ex. I**.)

- A 2015 product return where the only information available is a claims note from Sedgwick Risk Management, in an electronic file titled "Becignuel," stating:  "We had a customer return a jack stand, he stated he was under the car when the stand broke (he was not injured).  Not sure if it

was due to customer's neglect, but wanted to let someone know in case of defect with this product." (*See* Becigneul Claims Note, **Ex. J**.) Sears' Director of Product Safety, Kathryn Guerra, testified that she could not get any more information about the incident or the jack stand because it was handled as a regular product return since there was no injury and no property damage. (Guerra Dep. Tr. pp. 15:12-13, 32:5-33:3, **Ex. K**.)

- A 2008 property damage claim by Frank Duenas, involving a model of jack stand that is not at issue in this case. SFA's investigation showed that the jack stands, which bent, were placed under the four corners of the claimant's vehicle, in direct contravention of the product warnings stating: "Use a matched pair of jack stands per vehicle to support 1 end only. Use 1 pair per vehicle only." (Duenas Claim Notes pp. 2-3, **Ex. L**; SFA Letter to F. Duenas, **Ex. M**.)

- A 2004 claim on behalf of Christopher Raymond, which resulted in a wrongful death lawsuit that was settled for $100,000. The information on file indicates that the jack stands at issue were a different model, at least one of them physically deformed, and a paint transfer indicated that the jack stands were placed under a moving element of the claimant's vehicle's suspension — a point that moved because it was connected to a spring, and therefore was an improper support point. (*See* Raymond Complaint, **Ex. N**; Raymond Factual Summary Letter, Jan. 5, 2007, **Ex. O**; Raymond Settlement Summary Letter, Apr. 3, 2007, **Ex. P**.)

### 3. Review Of Roger Claypool's "Alternative And Safer Designs"

Regarding Roger Claypool's "alternative and safer designs" referenced in the Plaintiffs' supplemental discovery responses, the Plaintiffs produced exactly four pages of material, and two of them are blank. The other two appear to be freehand pencil drawings. (*See* Claypool Design Drawings, **Ex. Q**.) Mr. Claypool testified that he never actually built prototypes of these designs, never tested them to make sure that they would work, and never figured out how much it would cost to make them. (Claypool Dep. Tr. pp. 200:19-205:25, **Ex. D**.)

### 4. Review Of The Jack Stands' Product Warnings

Regarding the Plaintiffs' argument that the Defendants failed to adequately warn of false engagement, Roger Claypool testified that he never recommended adding such a warning. (Claypool Dep. Tr. p. 181:7-10 ("Q: You didn't recommend that a warning be added to

specifically address this false engagement phenomenon you claim?  A:  That's correct.").)  The jack stand manual produced by the Plaintiffs shows that users are instructed "to ensure ratchet bar is secure before loading" and "to ensure vehicle is secure before working on, around or under," and warned that "[f]ailure to heed product markings or warnings may result in personal injury or property damage."  (Operators Manual, **Ex. R**.)

### C. Overview Of Additional Evidence Provided By The Defendants In Support Of Summary Judgment

The Defendants produced evidence on four key points to show that they did not act recklessly with respect to the jack stands:  (1) the jack stands complied with all applicable regulations; (2) the jack stands were tested in accordance with ISO manufacturing standards prior to sale; (3) the jack stands were accompanied by sufficient warnings and instructions; and (4) SFA alone sold more than one million ratchet-and-pawl style jack stands from 2010 through 2017 and has not received a single claim of "false engagement" except for the present case.

#### 1. The Jack Stands Complied With All Applicable Regulations

Throughout this action, the Plaintiffs have never asserted that the subject jack stands failed to comply with any applicable regulation.  Both SFA's current Engineering Manager and Wei Fu's Assistant Vice President and Manager of the Engineering from the time when the jack stands were produced testified that the subject jack stands complied with controlling regulations, which were set forth in Part 4 of the "Safety Standard for Portable Automotive Lifting Devices" promulgated by the Portable Automotive Lifting Devices Committee of the American Society of Mechanical Engineers. (Jorgensen Dep. Tr. p. 29:4-16, **Ex. S**; Su Chien Chi Dep. Tr. 134:2-11, 161:6-11, **Ex. T**; ASME-PALD 2009 Standards Excerpt, **Ex. U**.) Notably, both the Plaintiffs' paid fact witness, Roger Claypool, and their liability expert, Frederick Heath, were on the Standards Committee responsible for creating these regulations.  (*See* ASME-PALD 2009

Standards Excerpt p. 2, **Ex. U**.)  These regulations expressly describe "ratchet and pawl" jack stands as a type of "typical vehicle support stands," (*Id.* at p. 4), and they contain directives regarding the stands' base, column, locking device, operating controls, saddle, stability, safety markings and messages, and required testing, (*Id.* at pp. 3, 5).  The Plaintiffs have no documents or testimony to counter the Defendants' showing that the jack stands at issue complied with all relevant standards and regulations.

### 2.   The Jack Stands Were Subjected To Testing In Compliance With The Applicable Regulations And ISO Standards

The subject Craftsman 50163 jack stands were manufactured at the Wei Fu Factory, which was third-party certified from ISO[5] compliance. (Su Chien Chi Dep. Tr. pp. 90:3-14, 93:24-94:1, 165:18-166:25, **Ex. T**.)  Wei Fu's Vice President and Manager of the Engineering when the jack stands were produced testified that the factory followed ISO 9001, an international quality control system that applied to all quality control activities, including product measurement, analysis, and improvement.  (*Id.* at pp. 165:18-166:8.)  Wei Fu's third-party certification required significant effort and documentation of all factory processes, followed by third-party verification of compliance with the ISO standard.  (*Id.* at p. 166:9-18.)  Wei Fu's compliance was verified annually, and its certification was renewed every three years.  (*Id.* at p. 166:19-25.)  The Wei Fu factory also fulfilled Sears' vendor accreditation program, which was based on Sears' review of is quality and safety processes.  (Guerra Dep. Tr. p. 234:22-237:7, **Ex. K**; Vendor Factory Accreditation Report, **Ex. V**.)

The VP and Engineering Manager went on to testify that the Craftsman 50163 jack stands were tested and approved for production as a new design at the factory, and also tested and approved by the client, Sears.  (Su Chien Chi Dep. Tr. p. 167:1-23, **Ex. T**.)  During production,

---

[5] ISO is short for the International Organization for Standardization, which develops and publishes international standards. *See generally* www.iso.org.

every single ratchet bar was tested before it got to the production line, and every single unit was tested to make sure that the ratchet bar fully engaged with the pawl.  (*Id.* at pp. 167:24-169:3.) Once the units were packaged, they were subjected to spot-testing.  (*Id.* at p. 169:4-6.)  A random sample of packaged products would be selected for center and off-center load testing.  (*Id.* at pp. 169:7-170:11.)  Documentation showing that the batch containing the subject jack stands was subjected to this spot-testing, with every single unit passing the test, is attached as **Exhibit W**. (*See also* Su Chien Chi Dep. Tr. pp. 170:12-171:25, **Ex. U**; Function & Loading Test Document, **Ex. X**.)  Craftsman 50163 jack stands also repeatedly passed multi-point third-party testing administered by Intertek, on behalf of Sears Holdings Global Sourcing.  (Guerra Dep. Tr. pp. 111:21-117:4, **Ex. K**; Intertek Test Reports, **Ex. Y**.[6])

### 3. The Jack Stands Were Accompanied By Appropriate Warnings And Instructions

The Plaintiffs do not dispute that the subject jack stands were accompanied by an Operators Manual, which they produced in discovery, and which contains product warnings and instructions.  As set forth above, the manual instructs users "to ensure ratchet bar is secure before loading" and "to ensure vehicle is secure before working on, around or under,"  and warned that "[f]ailure to heed product markings or warnings may result in personal injury or property damage."  (Operators Manual, **Ex. R**.)  The jack stands also had an on-product warning that "[f]ailure to heed product markings or warnings may result in personal injury or property damage."  (*See* Police Photograph of Subject Jack Stand, **Ex. H**.)  Further, it cannot be disputed that both the manual and the on-product warnings encompass all of the warnings required by the ASME-PALD standard, which are set forth in Part 4-3, entitled SAFETY MARKINGS AND

---

[6] These Intertek test reports are authenticated by the affidavit of Nora Lee submitted herewith.

MESSAGES, as well as additional warnings that are not required by ASME-PALD.[7]   (*See* ASME-PALD 2009 Standards Excerpt pp. 3, 6, **Ex. U**.)

### 4. SFA Sold Over One Million Ratchet-And-Pawl Jack Stands With No Other Confirmed False Engagement Incidents

SFA's sales data for ratchet-and-pawl jack stands is attached as **Exhibit Z**.[8]  It shows that SFA sold over 500,000 pairs of jack stands from 2010 through 2017, which is over one million individual stands.  While there have been other jack stand claims, as set forth above, there have been no confirmed instances of false engagement.

Furthermore, the popularity of ratchet-and-pawl jack stands cannot be overstated.  A search for "jack stands" on Home Depot's web site yields 211 results, and nine of the first twenty results are for ratchet-and-pawl jack stands with no redundant safety features (such as a secondary pin), including brands that are not affiliated with any of the Defendants in this action, like Husky and Big Red.[9]  The first three results for "jack stands" on Lowes.com show ratchet-and-pawl jack stands without redundant safety features, including jack stands by unaffiliated brand Sunex.  A search for "jack stands" on Amazon.com yields 244 results and eleven of the first twenty-one non-sponsored results are for ratchet-and-pawl jack stands without redundant safety features, including unaffiliated brands AmazonBasics, Strongway, Powerzone, Tonda, Performance Tool, and Baishite.  "Jack Stand" searches on the websites for Walmart, O'Reilly Auto Parts, Autozone, and Pep Boys yield similar results, with unaffiliated brands including

---

[7] There are six warnings set forth in the ASME-PALD Guidelines:  (1) Do not exceed rated capacity; (2) Use only on hard level surface; (3) Center load on saddle; (4) Use as a matched pair only; (5) Failure to heed these markings may result in personal injury and/or property damage; and (6) Stands are not to be used to simultaneously support one side of a vehicle.

[8]  This data is authenticated by the affidavit of Ryan Jorgensen submitted herewith.

[9] The facts set forth in this paragraph are not subject to reasonable dispute and are capable of accurate and ready determination through sources whose accuracy cannot be reasonably questioned, and therefor judicial notice can be taken of them.  *See* Fed. R. Evid. 201(b)(2); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 129-30 (2007) (*citing Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

Ktool, Hiltex, Powerbuilt, Duralast, Ranger, TCE, ESCO, AC Delco, Bendpak, and Chicago Pneumatic. Additionally, as set forth above, the ASME-PALD regulations that Plaintiffs' witnesses Frederick Heath and Roger Claypool drafted expressly describe "ratchet and pawl" jack stands as one of only two types of "typical vehicle support stands."

## II.    LEGAL STANDARD — SUMMARY JUDGMENT IS MERITED WHERE THE PLAINTIFFS HAVE INSUFFICIENT EVIDENCE TO SUPPORT A VERDICT IN THEIR FAVOR ON AN ESSENTIAL ELEMENT OF THEIR CLAIM

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When ruling on a motion for summary judgment, the court must construe the evidence in the light most favorable to the nonmoving party and draw all inferences in its favor. *Dalberth v. Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014).  The movant bears the initial burden of showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant satisfies its initial burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  A fact is "material" if it might affect the outcome of the case under substantive law, and a dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In moving for summary judgment against a party which will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if it can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex*, 477 U.S. at 322-23; *N.E. Utils. Serv. Co. v. St. Paul Fire & Marine Ins. Co.*, No. 3:08-CV-01673(CSH), 2012 U.S. Dist. LEXIS 96641, at *8 (D. Conn. July 11, 2012).  The non-moving party, in order to defeat

summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Anderson*, 477 U.S. at 249; *N.E. Utils. Serv. Co.*, 2012 U.S. Dist. LEXIS 96641, at *8.  Disputes concerning immaterial facts do not prevent summary judgment.  *See id.*; *Howard v. Gleason Corp.*, 901 F.2d 1154, 1159 (2d Cir. 1990) ("summary judgment cannot be avoided by immaterial factual disputes").  Further, although all inferences are to be drawn in favor of the nonmoving party, "mere speculation and conjecture is insufficient to preclude the granting of the motion."  *Harlen Assocs. v. Inc. Vill. or Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

## III.   LEGAL ARGUMENT — THERE IS NO EVIDENCE AT ALL TO ESTABLISH THAT THE DEFENDANTS ACTED WITH RECKLESS DISREGARD FOR THE SAFETY OF PRODUCT USERS

Punitive damages require "outrageous conduct" and "reckless indifference" to consumer safety, which is sorely lacking in this case.  Indisputable evidence establishes that the subject jack stands went through multiple layers of testing and complied with all applicable standards, as did the accompanying warnings and instructions.  The Plaintiffs can establish exactly zero prior similar incidents of "false engagement," and the same number of professional publications, studies, or compilations of testing data establishing the phenomenon, thereby making it impossible to show that the Defendants recklessly ignored a known danger.  Courts in the Second Circuit and across the country routinely grant summary judgment against such unsupported and unsupportable punitive damages claims, and the same should happen here.

### A. Punitive Damages Awards Must Be Supported By Evidence Of Outrageous Conduct, Usually In Terms Of Wanton And Malicious Injury And Evil Motive

Punitive damages claims in product liability cases are governed by Connecticut General Statutes Section 52-240b[10], which requires "reckless disregard for the safety of product users" to

---

[10] General Statutes Section 52-240b states:

support a punitive damages award. Connecticut courts apply the common-law recklessness standard in construing "reckless disregard" under Section 52-240b. *Giannaccio v. Evapco*, No. CV126017023S, 2013 Conn. Super. LEXIS 372, at *9 (D. Conn. Feb. 15, 2013) (dismissing punitive damages claim in product liability case where the facts alleged failed to establish recklessness); *McKnight v. Electric Servs., Inc.*, No. CV06-5004882, 2007 Conn. Super. LEXIS 1312, at *12 (Conn. Super. Ct. May 16, 2007) (same result).

The Connecticut Supreme Court held that punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional or wanton violation of those rights. *Champagne v. Raybestos-Manhattan, Inc.*, 212 Conn. 509, 523-33 (1989). The Connecticut Appellate Court, in the product liability context, defined punitive damages awards in terms of "*outrageous*" conduct: "punitive damages may be awarded only for *outrageous* conduct . . . The conduct must be *outrageous*, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the interests of others." *Ames v. Sears, Roebuck & Co.*, 8 Conn. App. 642, 655, *cert. denied*, 201 Conn. 809 (1986) (refusing to charge the jury on recklessness where the evidence showed that the defendant manufacturer failed to incorporate a safety mechanism into its product that was not universally accepted at the time of manufacture) (emphasis added).

Importantly for the purposes of this case, the Connecticut Supreme Court held that recklessness requires a "*conscious choice*" with either actual or constructive knowledge of the "serious danger" involved. *Matthiessen v. Vanech*, 266 Conn. 822, 832 (2003) (emphasis

Punitive damages may be awarded if the claimant proves that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers or others who were injured by the product. If the trier of fact determines that punitive damages should be awarded, the court shall determine the amount of such damages not to exceed an amount equal to twice the damages awarded to the plaintiff.

14

added).  It requires a state of consciousness even greater than gross negligence, and it "tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent."  *Id.* at 832-33.

Overall, these authorities make it clear that punitive damages are an extraordinary remedy, to be awarded only in cases where there is "outrageous" or "evil" or "extreme" conduct.

### B.  The Defendants' Evidence Establishes That The Jack Stand Complied With The Applicable Regulations, Underwent Safety Testing, Carried Appropriate Warnings, And They Were Not Aware Of Any Prior Similar Incidents

Here, far from being "outrageous," "evil," or "extreme," the Defendants' conduct was prudent and eminently reasonable.  The subject jack stands complied with all applicable safety regulations; Sears, MVP, and Wei Fu ensured that they were subjected to extensive safety testing; and they were sold with appropriate warnings and instructions, all as set forth in Section I(C)(1)-(3) above.  In response, the Plaintiffs have no evidence identifying a single standard that was even arguably violated.

Furthermore, the Plaintiffs' argument that the Defendants' should be faulted for failing to adopt Roger Claypool's proposed alternative designs deserves no credence.  Notwithstanding that this is a topic requiring expert testimony and Mr. Claypool stated clearly that he is not an expert, Mr. Claypool testified that he never actually finished designing, building, or testing any jack stands with alternative safety features.  (*See* Claypool Dep. Tr. pp. 200:19-205:25, **Ex. D**.)

Ultimately, the Plaintiffs theory is that *all* ratchet-and-pawl jack stands, not just the subject stands, had a hidden defect — a propensity for "false engagement" that would exist even where the jack stands passed all applicable tests and complied with the safety standards that their own expert Frederick Heath and their own paid fact witness Mr. Claypool drafted and endorsed. The Plaintiffs cannot, however, show that there was a single prior instance of "false

engagement," nor have they identified a single article or research study on the subject, and they therefore cannot establish the Defendants should have been aware of this alleged defect.

### C. None Of The Prior Incidents To Which Roger Claypool Testified Were Substantially Similar To The Incident In This Case

Mr. Claypool's knowledge of prior "similar" occurrences comes nowhere close to satisfying the "substantial similarity" standard applicable in the Second Circuit that governs the admissibility of evidence of prior incidents — in many cases, Mr. Claypool actually established that the prior incidents are not "similar" at all.  It is well-settled in the Second Circuit that "[e]vidence of prior accidents may be admitted  . . . only if the proponent establishes their relevance by showing that they occurred under the same or substantially similar circumstances as the accident at issue."  *Lidle v. Cirrus Design Corp.*, 505 Fed. Appx. 72, 74-75 (2d Cir. 2012) (internal citation and quotation marks omitted).   "Whether a prior accident occurred under 'substantially similar' conditions; necessarily depends upon the underlying theory of the case, and is defined by the particular defect at issue."  *Id.* at 74-75 (internal citation and quotation marks omitted).  Under that standard, the *Lidle* court affirmed the trial court's exclusion of a prior incident where the plaintiffs failed to show that the incident was caused by the same purported defect at issue with the subject aircraft, instead showing only an unspecified problem with the flight control systems.  The Connecticut Appellate Court likewise held that the party attempting to offer evidence of prior accidents must prove that "the circumstances were substantially the same as those under which the plaintiff was injured, and that the use by others was substantially similar to that of the plaintiff."  *Pickel v. Automated Waste Disposal, Inc.*, 782 A.2d 231, 237 (Conn. App. Ct. 2001) (*citing Wray v. Fairfield Amusement Co.*, 126 Conn. 221, 226 (1940)); *see also Claveloux v. Downtown Racquet Club Assocs.*, 246 Conn. 626, 630-32 (1998); *Hall v. Burns*, 213 Conn. 446, 451-52 (1990).

Under this standard, evidence regarding different defects in the product at issue is typically excluded.  *See Rye v. Black & Decker Mfg. Co.*, 889 F.2d 100, 102 (6th Cir. 1989) (holding that the trial court properly excluded evidence of prior accidents involving the same product where the complaints involved injuries caused by defects other than that alleged by plaintiff); *Butkowski v. Gen. Motors Corp.*, 497 F.2d 1158 (2d Cir. 1974) (upholding trial court's ruling that discovery related to the manufacturer's recall campaign was irrelevant because it was directed to a different defect than that which allegedly caused a car accident); *Kane v. Ford Motor Co.*, 450 F.2d 315, 317 (3d Cir. 1971) (holding that the trial court properly excluded evidence of a possibly-defective brake support because the evidence was irrelevant to the plaintiff's claim of improper brake hose installation and there was no evidence that the condition existed in the subject vehicle); *Jordan v. Gen. Motors Corp.*, 624 F. Supp. 72, 77 (E.D. La. 1985) (recall campaign involving defect distinctly different from the defect alleged in the case rendered evidence of recall irrelevant and inadmissible).  Furthermore, where there is insufficient evidence to determine whether prior incidents were substantially similar to the incident in question, those incidents should be excluded.  *See Schaen v. Liberty Mut. Ins.*, No. X07CV000078112S, 2002 Conn. Super. LEXIS 3763, at *10-13 (Conn. Super. Ct. Nov. 22, 2002) (excluding evidence of other vehicular accidents in a parking lot where there was inadequate foundation that they were substantially similar to the plaintiff's incident); *Lynch v McStome & Lincoln Plaza Associates* 548 A2d 1276 (Pa. Super. Ct. 1988) (excluding computer printout showing other escalator incidents because it contained no explanation of the other incidents' circumstances or causation).

Reviewing all of the other jack stands incidents to which Mr. Claypool testified, he either has not nearly enough information to meet the "substantially similarity" standard, or he has information establishing that the incident was *not* substantially similar to this case.  After the

Bowles claim, the crucial event that supposedly convinced Mr. Claypool that false engagement was a real danger, he concluded in writing that "[a]s a matter of fact, I don't believe the stand failed at all in this case."  (Claypool Email, **Ex. G**.)  Importantly, that claim also involved an unknown model of jack stand, an unknown setup, and physical damage that is conspicuously lacking in this case.  The Jeffcoat, Guerra, and Finley claims all involved different models of jack stands, and much different circumstances than the present case.  Jeffcoat involved a vehicle sitting on six unmatched jack stands being bumped from the exterior, Guerra involved jack stands on an unstable soil surface, and Finley was an overload case involving a freight-liner.  None of these incidents implicated "false engagement."  As to the other incidents identified by Mr. Claypool — Hastedt, Sloan, Zinn, and Raymond — he had no substantive information at all.  Furthermore, all of the other incidents disclosed in the Defendants' document production involved jack stands that physically deformed, which Roger Claypool testified that he would expect to see in all jack stand failure cases (Claypool Dep. Tr. at pp. 190-192, **Ex. D**.).  Only one incident involved a Craftsman 50163 jack stand, Becigneul,[11] resulted in a simple product return with no physical injury or property damage.

The dearth of prior "false engagement" incidents stands in astounding contrast to the number of ratchet-and-pawl jack stands on the market.  SFA alone sold over 1,000,000 individual ratchet-and-pawl jack stands from 2010 through 2017, and this does not even account for unrelated sales by any of the other Defendants or by non-parties such as Lowe's, Home Depot, Autozone, Pep Boys, Napa, and others.  Given the lack of evidence of other false engagement incidents, measured against the popularity of ratchet-and-pawl jack stands, the

---

[11] The Becigneul product return also occurred *after* the incident at issue in this case, so it could not have possibly put the Defendants on notice of any potential defect existing at the time of the decedent's accident.

Plaintiffs cannot possibly prove that the Defendants recklessly disregarded a known danger in an "outrageous" or "extreme" manner or with an "evil motive."

> **D.  Summary Judgment Is Regularly Granted In Products Liability Cases Like This One, Where There Is No Evidence That The Defendants Ignored A Recurring Defect**

The evidence here establishes unequivocally (a) that the jack stand complied with the controlling regulations in all respects and (b) the Defendants were not aware of any prior substantially similar jack stand incidents.  Under these facts, courts in the Second Circuit and across the country have granted summary judgment against punitive damages claims.

There are so many decisions supporting summary judgment under these circumstances that it is difficult to pinpoint any one case that is more instructive than the others.  The case of *Reiske v. Black & Decker*, for example, is directly on point.  No. 3:09CV1086(AWT), 2012 U.S. Dist. LEXIS 27845, at *6-8 (D. Conn. Mar. 2, 2012).  As in this case, the plaintiff alleged that the subject product had a defect that was not visible to users and not listed in the product manual. *Id.*  Nonetheless, the court granted summary judgment on a punitive damages claim where the product was tested by an independent third party, the product complied with the relevant safety standards, and the only known incident involving the subject defect was the plaintiff's.  *Id.*  The court reasoned that the defendant could not possibly have knowingly disregarded a serious danger to consumers where it had no prior notice of the alleged defect.  *Id.* at *8.  Notably, the defendant in *Reiske* showed that it sold 2,022 of the same product the year that the plaintiff was injured — here, SFA distributed over 1 million ratchet-and-pawl jack stands in the past seven years and the only known claim of false engagement is the Plaintiffs'.

The result was the same in *Walters v. Howmedica Osteonics Corp.*, 676 F. Supp. 2d 44, 56 (D. Conn. 2009), where the court granted summary judgment to a medical device maker after

the evidence showed that it complied with regulatory and customer requirements and the defendant averred that it had not received any other complaints of injury as alleged by the plaintiff.  Similarly, in *K.E. v. Glaxosmithkline*, No. 3:14-CV-1294(VAB), 2017 U.S. Dist. LEXIS 13705, at *75 (D. Conn. Feb. 1, 2017), the court granted summary judgment for a drug maker where the evidence did not show that the manufacturer was aware of the alleged deficiencies in their product when they sold it to the plaintiff.  Noting the lack of non-conclusory evidence supporting the plaintiff's recklessness claims, the court held that summary judgment was appropriate, citing precedent supporting the dismissal of punitive damages claims where there were no allegations that the defendants were aware of the alleged defects and continued to sell their products despite that knowledge.  *Id.* at *75-80.  *See also Johannsen v. Zimmer, Inc.*, No. 3:00CV2270(DJS), 2005 U.S. Dist. LEXIS 5348, at *33 (D. Conn. Mar. 31, 2005) (granting summary judgment on punitive damages claim against hip prosthesis manufacturer where there was no evidence that the manufacturer acted recklessly or with wanton indifference to the problem of prosthesis failure).

Looking outside the District of Connecticut, the result is the same in courts across the country — where there is no evidence that the defendant had prior complaints regarding a product defect, there can be no recklessness claim.  In *Ferren v. Richards Manufacturing Co.*, 733 F.2d 526, 529-30 (8th Cir. 1984), the court held that the plaintiff was improperly awarded punitive damages where the evidence of the manufacturer's alleged knowledge of the defective condition was the discovery of a single crack in the ball socket of sample raw prosthesis during quality control testing of its hip prosthesis.  The court held that the issue should not have been submitted to the jury.  In *Acosta v. Honda Motor Co.*, 717 F.2d 828, 840-41 (3d Cir. 1983), the court likewise held that no recklessness existed where there were no prior complaints, so the

defendant did not know or have reason to know that the rear wheel of its motorcycle was defective.

Looking to Connecticut's own appellate-level courts for guidance, both the Connecticut Supreme Court and the Appellate Court held that punitive damages claims in product liability cases should not be submitted to the jury where they are based on failure to install safety measures that were not required by the applicable safety standards. First, in *Ames v. Sears, Roebuck & Co.*, 8 Conn. App. 642, 655 (1986), the court held that there was no error in refusing to charge the jury on punitive damages where the safety measures that the plaintiff advocated for were not universally accepted by the industry or required by applicable safety standards when the defendant's lawnmower was distributed. Ten years later, the Supreme Court reached the same holding in a case regarding a forklift, where the defendant was aware of the general dangers posed by forklifts to pedestrians, but was not reckless in failing to install safety devices that were not universally accepted by the industry and were not required under the applicable safety standards. *Wagner v. Clark Equip. Co.*, 243 Conn. 168, 200-01 (1997).

In sum, reviewing cases from the District of Connecticut, cases from other circuits, and cases from Connecticut state courts, the conclusion is unanimous. Punitive damages claims such as the present one are not supported by sufficient evidence to allow them to go to a jury.

## IV.   CONCLUSION — SUMMARY JUDGMENT SHOULD ENTER AGAINST THE PLAINTIFFS' UNSUPPORTABLE PUNITIVE DAMAGES CLAIM

The implications of allowing the Plaintiffs to proceed with their punitive damages claim in this case would be truly incredible, where they did not identify any defect specific to the model of jack stand that is actually at issue, but instead claim a secret flaw existing in every single model of ratchet-and-pawl jack stand that does not include a secondary locking mechanism (which encompasses the overwhelming majority of such stands). If this claim is

allowed, then every single manufacturer, distributor, and seller of ratchet-and-pawl jack stands — an extremely popular and time-tested design — could potentially be found reckless for failing to remediate a defect which has never been the subject of a professional publication, which has never been established by a research study or documented testing, and which has never manifested itself in another similar confirmed incident, *and* this liability would exist even where the jack stands complied with all applicable safety standards.   Given the glaring lack of supporting evidence, summary judgment should enter against the Plaintiffs' punitive damages claim.

DEFENDANTS,

SEARS, ROEBUCK AND CO.,
SHINN FU CORPORATION,
SHINN FU COMPANY OF AMERICA,
INC.,
MVP (HK) INDUSTRIES, LTD., and
WEI FU (TAISHAN) MACHINERY &
ELECTRIC CO., LTD.


By: */s/ Steven J. Zakrzewski*
    Dennis O. Brown, Esq. (ct04598)
    Steven J. Zakrzewski, Esq. (ct28934)
    Gordon & Rees, LLP
    95 Glastonbury Blvd., Suite 206
    Glastonbury, CT 06033
    (860) 278-7448
    (860) 560-0185 (fax)
    *dbrown@gordonrees.com*
    *szakrzewski@gordonrees.com*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 27, 2018, the foregoing was electronically filed and served by mail on anyone unable to receive notice of electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to receive notice of electronic filing as indicated in the Notice of Electronic Filing. Parties may access this document through the Court's CM/ECF System.

*/s/ Steven J. Zakrzewski*
Steven J. Zakrzewski