**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| FREDERICK KLORCZYK, JR., as co-administrator of the Estate of Christian R. Klorczyk, et al., | : : : | CIVIL ACTION NO. 3:13-cv-00257-JAM |
| *Plaintiffs*, | : : | |
| vs. | : : | |
| SEARS, ROEBUCK AND CO., et al., | : : | |
| *Defendants*. | : | JULY 27, 2018 |

**DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT  FOR
MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' PUNITIVE DAMAGES CLAIM**

Sears, Roebuck and Co., MVP (HK) Industries, Ltd., Wei Fu (Taishan) Machinery & Electric Co., Ltd., Shinn Fu Company of America, Inc., and Shinn Fu Corporation (the "Defendants") hereby submit this concise statement of material fact as to which they contend there is no genuine issue to be tried pursuant to Rule 56(a)(1) of the Local Rules of Civil Procedure for the District of Connecticut:

1. The operative complaint is the Plaintiffs' Second Amended Complaint dated April 10, 2014 (ECF No. 99), which includes one of action under the Connecticut Product Liability Act ("CPLA"), Connecticut General Statutes Section 52-572m, et seq., against the five Defendants in this action:  Sears, Roebuck & Co. ("Sears"), Shinn Fu Corporation ("SFC"), Shinn Fu Company of America, Inc. ("SFA"), MVP (H.K.) Industries, Ltd. ("MVP"), and Wei Fu (Taishan) Machinery & Electric Co., Ltd. ("Wei Fu").

2. The allegedly defective product is a "Craftsman Heavy Duty Jack Stand, Model No. 50163" (the "jack stand"). Compl. ¶ 17.

1

3. The Plaintiffs allege that the decedent, Christian R. Klorczyk, purchased the jack stand from a Sears department store in Waterford, Connecticut. Compl. ¶ 19.

4. The Plaintiffs allege that the decedent was performing an oil change on a BMW sedan at the Plaintiffs' home on March 11, 2011, using "one of the Jack Stands" to support the vehicle, when the jack stand "failed and collapsed," causing the vehicle to fall on the decedent. Compl. at ¶¶ 20-22.

5. The Plaintiffs claim that the jack stand was defective because of its propensity for unstable engagement, such that the jack stand would look like it was fully engaged and ready to support a load, when it was not. Compl. at ¶ 25.

6. Plaintiffs' primary liability expert, Frederick Heath, described "false engagement" as "tip to tip contact" between the jack stand's ratchet bar and the locking pawl that could be "disrupted" by an external force, and concluded that "false engagement of the support stand is more likely than not the cause of the incident at issue." Disclosure of Frederick G. Heath, Dec. 8, 2014, pp. 13, 16-17, **Ex. C**.

7. The Plaintiffs' punitive damages claim consists of a single paragraph in the Complaint, which states: "In addition to defective design or manufacture and failure to provide adequate warnings or instructions, the harm sustained by Decedent was suffered as a result of Defendants' reckless disregard for the safety of Decedent while using the jack stand," and the prayer for relief contains a claim for "punitive damages." Compl. ¶ 31.

8. In their recent supplemental discovery responses, served on June 25, 2018, the Plaintiffs explained the basis for their claim that the decedent's death was foreseeable to the Defendants, relying primarily on the allegation that the Defendants "had knowledge" of prior

"false engagement" incidents involving similar ratchet-and-pawl jack stands. *See* Pls.' June 25, 2018 Supplemental Disc. Responses p. 4, **Ex. F**.

9. Plaintiffs paid Roger Claypool, a former SFA employee who was at one time involved in investigating certain jack stand claims for the company, $120 per hour for "litigation support" in this case, including his testimony as a fact witness. Claypool Dep. Tr. pp. 48:5-49:7; 156:4-157:3, Ex. D; Pls.' Sept. 30, 2016 Supp. Response to Interrog., **Ex. E**.

10. The Plaintiffs supplemental discovery responses state that "Mr. Claypool concluded that false engagement was a defect that deserved industry-wide attention." *See* Pls.' June 25, 2018 Supplemental Disc. Responses p. 4, **Ex. F**.

11. The Plaintiffs' supplemental responses state that despite the Defendants' knowledge of false engagement, the Defendants failed to act on "alternative and safer designs" that Mr. Claypool developed, and that the Defendants failed to provide consumers with "adequate warnings" regarding false engagement. *See* Pls.' June 25, 2018 Supplemental Disc. Responses p. 4, **Ex. F**.

12. Mr. Claypool testified in his deposition that as vice chair of the committee responsible for promulgating safety guidelines regarding jack stands, he had the opportunity to put forth agenda items for the group to discuss, and never once advanced an agenda item on "false engagement." Claypool Dep. Tr. p. 233:6-18, **Ex. D**.

13. Mr. Claypool testified about a 2004 or 2005 claim involving a claimant named Steven Bowles, in which Mr. Bowles was using two jack stands. Claypool Dep. Tr. p. 62:9-24; 189:24-190:9, **Ex. D**.

14. Mr. Claypool testified that he did not know what model jack stands Steven Bowles was using. Claypool Dep. Tr. pp. 186:15-187:14, **Ex. D**.

15. Mr. Claypool testified that in the Bowles claim, the incident left the jack stand with paint scraped off of more than one surface. Claypool Dep. Tr. pp. 190:10-191:2, **Ex. D**.

16. Mr. Claypool testified that he did not know which lift points were used for the jack stands in the Bowles claim, as he did not attempt to perform an accident reconstruction, and he is not a qualified accident reconstructionist. Claypool Dep. Tr. pp. 188:15-189:8, **Ex. D**.

17. Mr. Claypool testified that the Bowles claim convinced him that "false engagement" could be a real issue. Claypool Dep. Tr. pp. 62:9-65:6, 70:10-71:2, **Ex. D**.

18. While he was working for SFA, Mr. Claypool wrote to managers at MVP that he did not believe the jack stand at issue in the Bowles claim failed at all. January 13, 2005 Email, **Ex. G**.

19. Mr. Claypool testified about seven other jack stand incidents, and he either did not have any substantive information, or had information indicating that the circumstances were different from the present case and did not involve "false engagement." Claypool Dep. Tr. 108:5-23; 128-31; 182:15-186:14; 191:11-198:2, **Ex. D**.

20. Mr. Claypool testified about a claimant named "Jeffcoat" from the late 1990s or early 2000s, whose case involved the use of six unmatched jack stands to support a Lincoln Towncar that was bumped by another person. Claypool Dep. Tr. pp. 182:15-185:16, **Ex. D**.

21. Mr. Claypool testified about a claimant named "Guerra" from the mid-2000s, whose case involved a bus supported by two six-ton jack stands on an unstable soil surface. Claypool Dep. Tr. pp. 185:17-186:14, **Ex. D**.

22. Mr. Claypool testified about a claimant named "Finley" where the customer overloaded a pair of three-ton jack stands with a $36,000 freightliner. Claypool Dep. Tr. p. 108:5-23, **Ex. D**.

23. Mr. Claypool testified about a claimant named "Raymond" but did not provide any details except to say that it was a wrongful death case involving an alleged jack stand failure. Claypool Dep. Tr. pp. 128-31, **Ex. D**.

24. Mr. Claypool testified about three other purported occurrences in the early 2000s, with claimants named Hastedt, Zinn, and Sloan, where Mr. Claypool could provide little information. Claypool Dep. Tr. pp. 192:22-198:2, **Ex. D**.

25. Mr. Claypool testified that most all jack stands involved in an incident would be "crushed" and would have an "obvious physical deformity." Claypool Dep. Tr. pp. 191:11-192, **Ex. D**.

26. Plaintiffs produced four pages of material regarding Roger Claypool's "alternative and safer designs" referenced in the Plaintiffs' supplemental discovery responses, two of which are blank, and two of which appear to be freehand pencil drawings. Claypool Design Drawings, **Ex. Q**.

27. Mr. Claypool testified that he never built prototypes of his proposed "alternative and safer designs," never tested them to make sure that they would work, and never figured out how much it would cost to make them. Claypool Dep. Tr. pp. 200:19-205:25, **Ex. D**.

28. Roger Claypool testified that he never recommended adding a warning to specifically address "false engagement." Claypool Dep. Tr. p. 181:7-10, **Ex. D**.

29. The Defendants produced documents regarding a 2018 claim on behalf of Dion Penberthy, where the ratchet bar of a jack stand model that is not at issue in this case snapped in half. Penberthy Demand Letter & Photographs, **Ex. I**.

30. The Defendants produced documents regarding a 2015 product return where the only information available is a claims note, in an electronic file titled "Becignuel," from Sedgwick Risk Management stating: "We had a customer return a jack stand, he stated he was under

the care when the stand broke (he was not injured). Not sure if it was due to customer's neglect, but wanted to let someone know in case of defect with this product." Becigneul Claims Note, **Ex. J**.

31. Sears' Director of Product Safety, Kathryn Guerra, testified that she could not get any more information about the Becigneul incident or the product, because it was handled as a regular product return since there was no injury and no property damage. Guerra Dep. Tr. pp. 15:12-13, 32:5-33:3, **Ex. K**.

32. The Defendants produced documents regarding a 2008 property damage claim by Frank Duenas involving a model of jack stand that is not at issue in this case, in which the jack stands, which bent, were placed under the four corners of the claimant's vehicle, in contravention of the product warnings stating: "Use a matched pair of jack stands per vehicle to support 1 end only. Use 1 pair per vehicle only." Duenas Claim Notes pp. 2-3, **Ex. L**; SFA Letter to F. Duenas, **Ex. M**.

33. The Defendants produced documents regarding a 2004 claim on behalf of Christopher Raymond, which resulted in a wrongful death lawsuit that was settled for $100,000. Raymond Complaint, **Ex. N**; Raymond Factual Summary Letter, Jan. 5, 2007, **Ex. O**; Raymond Settlement Summary Letter, Apr. 3, 2007, **Ex. P**.

34. The jack stands at issue in the Christopher Raymond claim were a different model than the Craftsman 50163 jack stands, one or more of them physically deformed, and a paint transfer indicated that the jack stands were placed under a live element of the claimant's vehicle's suspension. (*See* Raymond Complaint, **Ex. N**; Raymond Factual Summary Letter, Jan. 5, 2007, **Ex. O**; Raymond Settlement Summary Letter, Apr. 3, 2007, **Ex. P**.)

35. The Plaintiffs produced a jack stand manual that shows that users are instructed "to ensure ratchet bar is secure before loading" and "to ensure vehicle is secure before working on, around or under," and warned that "[f]ailure to heed product markings or warnings may result in personal injury or property damage." Operators Manual, **Ex. R**.

36. Both SFA's current Engineering Manager and Wei Fu's Assistant Vice President and Manager of the Engineering from the time when the jack stands were produced testified that the subject jack stands complied with controlling regulations, which were set forth in Part 4 of the "Safety Standard for Portable Automotive Lifting Devices" promulgated by the Portable Automotive Lifting Devices Committee of the American Society of Mechanical Engineers. Jorgensen Dep. Tr. p. 29:4-16, Ex. S; Su Chien Chi Dep. Tr. 134:2-11, 161:6-11, **Ex. T**; ASME-PALD 2009 Standards Excerpt, **Ex. U**.

37. Both Roger Claypool and Frederick Heath were on the Standards Committee responsible for creating the "Safety Standard for Portable Automotive Lifting Devices" regulations. ASME-PALD 2009 Standards Excerpt p. 2, **Ex. U**.

38. The subject Craftsman 50163 jack stands were manufactured at the Wei Fu Factory, which a third-party certified as being ISO-compliant. Su Chien Chi Dep. Tr. pp. 90:3-14, 93:24-94:1, 165:18-166:25, **Ex. T**.

39. Wei Fu's Vice President and Manager of the Engineering when the jack stands were produced testified that the factory followed ISO 9001, an international quality control system that controlled all quality control activities, including product measurement, analysis, and improvement. Su Chien Chi Dep. Tr. pp. 165:18-166:8, **Ex. T**.

40. Wei Fu's third-party certification required documentation of all Wei Fu's processes, and third-party verification of compliance with the ISO standard.  Su Chien Chi Dep. Tr. p. 166:9-18, **Ex. T**.

41. Wei Fu's ISO standard compliance was verified annually, and its certification of compliance was renewed every three years.  Su Chien Chi Dep. Tr. p. 166:19-25, **Ex. T**.

42. The Wei Fu factory fulfilled Sears' vendor accreditation program, which was based on Sears' review of is quality and safety processes.  Guerra Dep. Tr. p. 234:22-237:7, Ex. K; Vendor Factory Accreditation Report, **Ex. V**.

43. Wei Fu's Vice President and Manager of Engineering testified that the Craftsman 50163 jack stands were tested and approved for production as a new design at the factory, and also tested and approved by the client, Sears.  Su Chien Chi Dep. Tr. p. 167:1-23, **Ex. T**.

44. During production of the Craftsman 50163 jack stands, every single ratchet bar was tested before it got to the production line, and every single unit was tested to make sure that the ratchet bar fully engaged with the pawl.  Su Chien Chi Dep. Tr. pp. 167:24-169:3, **Ex. T**.

45. During production of the Craftsman 50163 jack stands, a random sample of packaged products was selected for center and off-center load testing.  Su Chien Chi Dep. Tr. pp. 169:7-170:11, **Ex. T**.

46. During production of the Craftsman 50163 jack stands, once the units were packaged, they were subjected to spot-testing.  Su Chien Chi Dep. Tr. p. 169:4-6, **Ex. T**.

47. The batch containing the subject jack stands was subjected to spot-testing, with every single unit passing the test. Spot-Testing Results, **Ex. W**; Su Chien Chi Dep. Tr. pp. 170:12-171:25, **Ex. T**; Function & Loading Test Document, **Ex. X**.

48. During production of the Craftsman 50163 jack stands, the jack stands repeatedly passed third-party testing administered by Intertek, on behalf of Sears Holdings Global Sourcing. Guerra Dep. Tr. pp. 111:21-117:4, **Ex. K**; Intertek Test Reports, **Ex. Y**.

49. The Craftsman 50163 jack stands had an on-product warning that "[f]ailure to heed product markings or warnings may result in personal injury or property damage." Police Photograph of Subject Jack Stand, **Ex. H**.

50. Both the manual and the on-product warnings encompass all of the warnings required by the ASME-PALD standard, which are set forth in Part 4-3, entitled SAFETY MARKINGS AND MESSAGES, as well as additional warnings that are not required by ASME-PALD. ASME-PALD 2009 Standards Excerpt pp. 3, 6, **Ex. U**.

51. Plaintiffs have never asserted that the subject jack stands failed to comply with any applicable regulation.

52. SFA sold over 500,000 pairs of jack stands from 2010 through 2017, which equals over one million individual stands. SFA's sales data for ratchet-and-pawl jack stands, **Ex. Z**.

DEFENDANTS,

SEARS, ROEBUCK AND CO.,
SHINN FU CORPORATION,
SHINN FU COMPANY OF AMERICA, INC.,
MVP (HK) INDUSTRIES, LTD., and
WEI FU (TAISHAN) MACHINERY & ELECTRIC CO., LTD.


By: */s/ Steven J. Zakrzewski*
    Dennis O. Brown, Esq. (ct04598)
    Steven J. Zakrzewski, Esq. (ct28934)
    Gordon & Rees, LLP
    95 Glastonbury Blvd., Suite 206
    Glastonbury, CT 06033
    (860) 278-7448
    (860) 560-0185 (fax)
    *dbrown@gordonrees.com*
    *szakrzewski@gordonrees.com*

## CERTIFICATE OF SERVICE

    I hereby certify that on July 27, 2018, the foregoing was electronically filed and served by mail on anyone unable to receive notice of electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to receive notice of electronic filing as indicated in the Notice of Electronic Filing.  Parties may access this document through the Court's CM/ECF System.

                                                  */s/ Steven J. Zakrzewski*
                                                  Steven J. Zakrzewski