# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FREDERICK KLORCZYK, JR., as co-administrator of the Estate of Christian R. Klorczyk, et al. | : | CIVIL ACTION NO. |
| | : | |
| *Plaintiffs*, | : | 3:13-cv-00257-JAM |
| | : | |
| vs. | : | |
| | : | |
| SEARS, ROEBUCK AND CO., et al., | : | |
| | : | |
| *Defendants.* | : | OCTOBER 11, 2018 |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' PRODUCT LIABILITY CLAIMS

Paul D. Williams (ct05244)
*pdwilliams@daypitney.com*
Bryan J. Orticelli (ct28643)
*borticelli@daypitney.com*
Kaitlin A. Canty (ct29074)
*kcanty@daypitney.com*
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103-1212
860-275-0100 (Tel)
860-275-0343 (Fax)

Howard S. Edinburgh
*hedinburgh@herzfeld-rubin.com*
Herzfeld & Rubin, P.C.
125 Broad Street
New York, NY 10004
(212) 471-8529 (Tel)
(212) 344-3333 (Fax)

*Attorneys for Plaintiffs Frederick Klorczyk Jr. and Lynne Klorczyk, Co-Administrators of the Estate of Christian Klorczyk*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...................................................................1

II.   ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT ..............................5

    A.    Christian Was Crushed When Defendants' Jack Stand Failed..............................5

        1.    Defendants' Jack Stand is the Only Device that Christian Could Have Used to Support the BMW...............................................................5

        2.    Christian Could Not Have Been Using the Service Jack as Defendants assert .........................................................................7

    B.    Defendants' Jack Stand Failed Due To False Engagement................................10

    C.    Defendants Failed To Implement Adequate and Appropriate Safety Features Or Warnings ......................................................................11

    D.    Using A Single Jack Stand Was Foreseeable ......................................12

III.   ARGUMENT ...............................................................................13

    A.    Defendants Cannot Meet the Standard for Granting Summary Judgment............13

    B.    There Is A Genuine Issue Whether Christian Was Using Defendants' Jack Stand...........................................................................13

    C.    There Is A Genuine Issue Whether Defendants' Jack Stand Is Unreasonably Dangerous Due to False Engagement...........................................16

    D.    There Is A Genuine Issue Concerning Defendants' Failure to Warn ..................20

    E.    Defendants' Remaining Arguments Are Unavailing ..........................................24

        1.    Defendants' Industry Guidelines Argument Is Not Dispositive ...............24

        2.    Defendants' "Misuse" Argument Is Not Dispositive ..............................25

IV.   CONCLUSION .............................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*,
    473 F.3d 450 (2d Cir. 2007) ...............................................................................13

*Ames v. Sears, Roebuck & Co.*,
    8 Conn. App. 642 (1986), *cert denied*, 201 Conn. 809 ...................................21, 22

*Bifolck v. Philip Morris, Inc.*,
    324 Conn. 402 (2016).....................................................................................16, 17

*Garrett v. Crown Equip. Corp.*,
    No. 3:15-cv-00942, 2017 WL 2727086 (D. Conn. June 23, 2017) ................15, 16

*Gill v. Teva Respiratory, LLC*,
    No. 3:16-cv-00299, 2017 WL 6614228 (D. Conn. Dec. 27, 2017) .......................15

*Gold v. Dalkon Shield Claimants Tr.*,
    No. B-82-383, 1998 WL 351456 (D. Conn. June 15, 1998) .................................20

*Graham v. Fireline, Inc.*,
    No. 3:03CV00990, 2006 WL 1646165 (D. Conn. June 14, 2006) ........................19

*Graham v. Henderson*,
    89 F.3d 75 (2d Cir. 1996) ...................................................................................13

*Hartford Fire Ins. Co. v. Dent-X Int'l, Inc.*,
    No. 3:05CV1019, 2007 WL 911841 (D. Conn. Mar. 23, 2007)...........................25

*Izzarelli v. R.J. Reynolds Tobacco Co.*,
    321 Conn. 172 (2016).........................................................................................16

*Koger v. Synthes North America, Inc.*,
    No. 3:07-CV-01158, 2009 WL 5110780 (D. Conn. Dec. 17, 2009)....................20

*Kuzmech v. Werner Ladder Co.*,
    No. 3:10-cv-266, 2012 WL 6093898 (D. Conn. Dec. 7, 2012) ...........................19

*Martin v. Ryobi Techs., Inc.*,
    No. 3:15-cv-00973, 2018 WL 1440170 (D. Conn. Mar. 22, 2018) ......................25

*Perez v. Toyota Motor Sales U.S.A., Inc.*,
    No. 3:11CV1112, 2013 WL 3540508 (D. Conn. July 11, 2013)...........................20

*Savage v. Scripto-Tokai Corp.*,
 266 F. Supp. 2d 344 (D. Conn. 2003) ................................................................14

*Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*,
 391 F.3d 77 (2d Cir. 2004) ................................................................................13

*Simjian v. Bayer Corp.*,
 No. 3:10-CV-1263, 2012 WL 1194283 (D. Conn. Apr. 10, 2012).......................20

*Tomer v. American Home Product Corp.*,
 170 Conn. 681 (1976)........................................................................................22

*White v. Mazda Motor of Am. Inc.*,
 No. HHDCV086003322S, 2011 WL 3211221 (Conn. Super. Ct. June 22,
 2011)..................................................................................................................19

**Statutes**

Conn. Gen. Stat. §§ 52-572m .................................................................................1

Conn. Gen. Stat. § 52-572q(a)...............................................................................21

Conn. Gen. Stat. § 52-572q(b)...............................................................................21

**Rules**

Fed. R. Evid. 702 .................................................................................................20

Local Rule 56(a)2 ...................................................................................................5

**Other Authorities**

Restatement (Third) of Torts: Prod. Liability § 4(b) ...............................................24

Plaintiffs Frederick Klorczyk, Jr. and Lynne Klorczyk, co-administrators of the Estate of Christian Klorczyk, submit this memorandum of law in opposition to Defendants' motion for summary judgment on Plaintiffs' claims under the Connecticut Product Liability Act, Conn. Gen. Stat. §§ 52-572m *et seq.* (the "Act") (ECF No. 296).

## I.   PRELIMINARY STATEMENT

On March 11, 2011, Plaintiffs' 21 year old son Christian was crushed to death as he was completing a routine oil change in the garage attached to his family's Waterford home.  No one else was in the garage when the 1,900-lb BMW that Christian was working under suddenly and unexpectedly collapsed on to his face and chest.  Plaintiffs were first to find Christian, and their testimony (taken over the course of nearly 24 hours) is unwavering as to the critical fact at issue here – that Defendants' jack stand was the ***only*** device that Christian could have been using to support the BMW when it collapsed.  We know this because Plaintiffs found the jack stand beneath the front passenger-side of the BMW, where Christian would have placed it to keep the vehicle elevated allowing him access to the underbody.  The first emergency responder to arrive at the garage also observed the jack stand in the same position – beneath the front passenger-side of the BMW.  There is no reasonable explanation for the jack stand to have been in that position other than the simplest one: that Christian was using the jack stand when it unexpectedly failed and the BMW came crashing down.

The potential causes of failure are limited by the jack stand's physical condition and location beneath the BMW.  There is no sign of fracture, ruling out an overload or structural failure.  There is no sign that the jack stand tipped over while supporting the weight of the BMW.  The remaining (and most likely) cause of failure is "false engagement," a condition that occurs due to a known defect in the jack stand's ratchet-and-pawl design.  Specifically, false

engagement occurs when the tip of the locking pawl fails to engage the grooved indentations along the toothed side of the ratchet bar; the jack stand is susceptible to failure when the locking pawl fails to engage and rests on a tooth of the ratchet bar as shown in the below exemplar:



Plaintiffs commissioned comprehensive analysis of false engagement by an expert with 40-plus years' experience in vehicle support equipment, Frederick Heath.[1]  Mr. Heath utilized an exemplar model jack stand and an exemplar model BMW to test false engagement under circumstances extant in the Klorczyk's garage.  Mr. Heath's testing demonstrates that: (i) false

---

[1] Plaintiffs refer to their memorandum in opposition to Defendants' motion to preclude Mr. Heath's testimony for a detailed discussion of his qualifications and work in this case.

engagement occurs when the jack stand is under load; (ii) the jack stand is capable of supporting weight comparable to that of the BMW when the locking pawl and ratchet bar are aligned in false engagement; and (iii) a disturbance to the jack stand or the vehicle causes the ratchet bar (and, with it, the vehicle) to collapse.  These results are consistent with the evidence concerning the subject jack stand's condition and location.   Additionally, when Plaintiffs first found Christian, they observed his right hand holding a socket wrench that was connected to the oil drain plug, such that he was tightening the plug when the collapse occurred.  Simulating the vehicle's movement relative to the forces applied when tightening the oil drain plug, Mr. Heath found the resulting disturbance sufficient to cause the falsely engaged ratchet bar to collapse, along with the BMW.  The evidence, coupled with his extensive testing, fully supports Mr. Heath's expert opinion that the subject jack stand failed as a result of false engagement.

In support of their motion, Defendants dispute that Christian was using their jack stand; instead, they claim he was using a service jack that "slipped out" from underneath the BMW. (Defs' Mem. 1.)  Defendants' theory is belied by Plaintiffs' observations, after entering the garage, that the service jack was upright and parallel to – not underneath – the BMW, with the lifting arm fully lowered and the lifting handle removed and located next to the base. Defendants do not and cannot explain how the service jack possibly could have ended up in this position after purportedly sliding out from underneath the BMW.  Defendants' proffered expert, James Sprague, performed no testing to measure the force necessary for the service jack to slide out while supporting the BMW.[2]  Dr. Sprague's opinion that the service jack slipped is based on the presence of marks along the passenger-side rocker panel of the BMW; however, he admits

---

[2] In rebuttal, Mr. Heath measured the force required to pull the service jack out from underneath the BMW as ranging from 420 to 450 lbs.  It is not possible that Christian could have exerted such force while working under the BMW.

(as he must) that these marks could have existed prior to March 11, 2011. Indeed, the Klorczyks used the 4-wheel drive BMW as a winter vehicle, and pictures of the BMW taken in March 2007 – 4 years before the incident – depict snow and ice in the same location of the passenger side-rocker panel as shown in this comparison:

 

Defendants' service jack theory is meritless, and a red herring offered to distract the Court from the record evidence showing that Christian was killed by their defective jack stand. Defendants have good reason to avoid confronting false engagement head-on. Despite disclaiming any prior knowledge of the defect at the outset of this case, Defendants' position is no longer tenable in light of information obtained from a former employee of Defendant Shinn Fu America ("SFA"), Roger Claypool. During his 20-year tenure at SFA, Mr. Claypool concluded, as a result of investigating claims involving jack stand failures, that false engagement was a problem requiring attention. To this end, Mr. Claypool developed plans for an alternative jack stand design that utilized redundant locking mechanisms to prevent collapse due to false engagement. Defendants did not act on Mr. Claypool's proposal, nor did they implement other safeguards, including adequate and appropriate warnings or instructions specific to false engagement. In contrast, Defendants' industry peers and competitors successfully brought to

market jack stands with additional safety features and warnings and instructions, which if sold with the subject jack stand would have prevented Christian's untimely death.[3]

The evidence supports Plaintiffs' claims under the Act, including as to Christian's use of Defendants' jack stand and the occurrence of false engagement as the cause of the jack stand's failure. Defendants' service jack theory, baseless though it is, further illustrates that the nature of this dispute is inherently factual, and cannot be resolved on summary judgment. The parties' principal disagreements concerning causation – namely, whether Christian was using the jack stand and what caused the jack stand's failure – are fact issues that only the jury can resolve. Additional reasons for denying Defendants' motion are set forth below.

## II.     ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT[4]

### A.     Christian Was Crushed When Defendants' Jack Stand Failed.

#### 1.     Defendants' Jack Stand is the Only Device that Christian Could Have Used to Support the BMW.

Plaintiffs provided vivid and consistent accounts of key facts supporting Christian's use of Defendants' jack stand. Upon entering the garage, Plaintiffs observed the BMW parked straight inside the center bay. Christian's lower legs and feet were protruding out from beneath the front bumper. Mr. Klorczyk crawled underneath the BMW and found the subject Craftsman Model 50163 4 ton jack stand inboard of the front passenger-side wheel well. Mr. Klorczyk taught Christian to position the jack stand in this location so that the saddle on top of the ratchet bar was in contact with the longitudinal steel engine frame depicted below, allowing the jack stand to support the BMW in an elevated position (Pls' Stmt. ¶¶ 5, 10 at 21, 23):

---

[3] As to Defendants' prior knowledge of false engagement, Plaintiffs refer to their memorandum of law and accompanying local rule statement in opposition to Defendants' motion for summary judgment on punitive damages.

[4] Facts referenced herein are set forth with citations to supporting evidence in Plaintiffs' Local Rule 56(a)2 Statement ("Pls' Stmt.") filed simultaneously herewith.



Mr. Klorczyk assembled the service jack located parallel to the BMW by inserting the lifting handle in to the socket, wheeled the service jack under the passenger-side, and pumped the handle to lift the vehicle off of Christian.  With the BMW lifted, Mrs. Klorczyk could see the subject jack stand in the same location described by her husband.  (Id. ¶¶ 5, 10, 12–18 at 21, 23–25.)

The first emergency responder on scene, EMT Geoffrey Hausmann, arrived at the garage within minutes.  Mr. Hausmann crawled under the BMW, and observed the jack stand in the same location beneath the front passenger-side of the BMW.  (Id. ¶ 19 at 25.)  The only reasonable explanation for the jack stand to be in that location is that Christian was using the jack stand to support the BMW in an elevated position when the jack stand failed.

**2.      Christian Could Not Have Been Using the Service Jack as Defendants assert.**

The service jack is a device utilized to raise and lower a portion of a vehicle; the service jack is not used as a support device.  The service jack functions by increasing and decreasing hydraulic pressure.  To raise the lifting arm, the lifting handle is inserted in to the socket and turned clockwise, closing the hydraulic valve and allowing the user to increase the pressure by pumping the handle up and down.  To lower the lifting arm, the lifting handle is inserted in to the socket and turned counterclockwise, opening the valve and releasing the pressure.  (Id. ¶ 8 at 22–23.)

Plaintiffs observed the service jack parallel to the BMW with the lifting arm fully depressed and the lifting handle removed.  To lift the BMW off of Christian, Mr. Klorczyk had to insert the lifting handle and pump the lifting arm, and Mr. Hausmann arrived as Mr. Klorczyk was in the process of doing so.  (Id. at ¶¶ 16, 19 at 25.)  Given its disassembled position, the service jack could not have been in use when the BMW collapsed.  It is not possible that the service jack "slipped out" from underneath the BMW yet somehow remained upright and parallel to the BMW with the lifting arm fully lowered and the lifting handle removed – only Christian could have dissembled and positioned the service jack in this way prior to rolling on the mechanic's creeper underneath the elevated BMW.  Further, Mr. Klorczyk taught Christian that the service jack is not used to support an elevated vehicle; rather, the service jack is moved away from the vehicle after transferring the load to a jack stand, which is consistent with the location of the service jack and the jack stand in the garage.  (Id. ¶ 11 at 4, ¶ 11  at 23.)

Defendants' reliance on Dr. Sprague's opinion to support their service jack theory is misplaced, because the evidence does not support a finding as to when marks were made on the BMW's passenger-side rocker panel.  (Defs' Mem. at 6.)  Dr. Sprague's opinion also is based on the erroneous assumption that Christian's sternum was positioned beneath the front lateral engine

frame cross-member; in fact, Plaintiffs observed Christian's sternum beneath the rear lateral engine frame cross-member and manual transmission and his head and face further to the rear beneath the transmission assembly as shown below:[5]



---

[5] The size and location of the injuries to Christian's sternum and face are consistent with the underbody components of the rear lateral engine frame cross-member and the transmission assembly and transmission fluid drain plug, respectively.  (Pls' Stmt. ¶ 15 at 24.)

Dr. Sprague's erroneous assumption pervades the measurements that form the basis for his opinions, and he cannot rule out that Christian was using the jack stand when the BMW collapsed.  (Pls' Stmt. ¶¶ 16–17 at 6–7.)

Defendants also improperly rely on the opinion of Waterford Police Lt. Brett Mahoney; in particular, that Lt. Mahoney reported the weather being foggy and noticed a small bit of condensation on the service jack as he was removing it from the scene.  (Defs' Mem. at 4–5.) Christian was working in the garage with all of the exterior garage doors closed.  Lt. Mahoney arrived at the scene 30 minutes after the initial 911 call and was last to leave.  By that time, the garage doors had been open for several hours, and the service jack had been used repeatedly by first responders.  The "small bit of condensation" he refers to could have formed at any time after the garage doors were opened.  Lt. Mahoney has no personal knowledge of what equipment was used by Christian, and his opinion is speculative and unreliable.  (Pls' Stmt. ¶ 11 at 4–5.)

The views expressed by Plaintiffs' youngest son, Parker, also are not evidence that Christian was using the service jack, as opposed to the jack stand.  (Defs' Mem. at 5.)  Parker was not home on March 11, 2011, and never watched Christian change the oil on the BMW. Parker admittedly is the least knowledgeable about working on cars, and his views about what equipment is used or how it is used are not necessarily consistent with those of Mr. Klorczyk's or Christian's.  (Pls' Stmt. ¶ 14 at 6.)

Defendants' remaining assertions are easily dismissed.  Mrs. Klorczyk did not make any statement to Waterford Police Officer Krysztofiak concerning the cause of the collapse, nor does she have any knowledge (beyond what she observed in the garage) as to what equipment was being used by Christian.  (Id. ¶ 9 at 3.)  Mr. Klorczyk also never told *The Day* newspaper reporter how the BMW may have collapsed as Defendants contend.  (Id. ¶ 15 at 6.)  And, the

inaccuracies in Mr. Klorczyk's Internet posts in the days immediately following the death of his son were addressed at length at his deposition.  Mr. Klorczyk made clear that the posts were his outlet for releasing the intense grief and psychological trauma that understandably impaired his capacity to accurately recount his observations in the garage.   (Id. ¶¶ 23–25 at 10–11.) Defendants improperly manipulate Mr. Klorczyk's grief in a baseless attempt to attack his credibility which, in any event, is a matter for cross examination, not summary judgment.

**B.     Defendants' Jack Stand Failed Due To False Engagement.**

Beyond offering their alternative service jack theory, Defendants have done nothing to refute the occurrence of false engagement as the cause of Christian's death.  Defendants' attacks on Mr. Heath are yet another example of their frivolous attempts to distract the Court from the concrete evidence underlying Mr. Heath's expert opinions; in particular, that false engagement is the most likely cause for the subject jack stand's failure in this case.  Defendants cannot rule out that false engagement was the cause of the collapse, nor do they offer any evidence to refute Mr. Heath's opinions.

The obvious explanation for Defendants' failure to respond to false engagement is that, contrary to their initial position in this action, Defendants were aware, prior to March 11, 2011, that the ratchet-and-pawl design permitted the occurrence of false engagement, and that the defect could result in serious bodily injury or death.  (Pls' Stmt. ¶ 24 at 27.)  During his tenure with SFA, Mr. Claypool and SFA's General Counsel, Arthur Chaykin, had numerous discussions concerning false engagement in connection with Mr. Claypool's review of claims involving jack stand failures and sudden, unexpected loss of ratchet bar height under load.  The topic of false engagement also was discussed by members of the ASME-PALD committee, including Mr. Claypool and Defendants' committee representatives.  Mr. Claypool proposed an alternative

design with a secondary locking mechanism for the precise purpose of preventing collapse (and injury or death resulting therefrom) due to false engagement.  Defendants did not act on Mr. Claypool's proposal, even as industry peers and competitors implemented such additional safety features in their comparable jack stand products.  For example, Allied, Torin, and Strongway developed and implemented for sale ratchet-and-pawl design jack stands that utilized redundant and secondary locking mechanisms to protect users from the collapse hazard posed by false engagement.  Defendants were aware of such developments and ultimately could not resist the market change; currently, they sell a ratchet-and-pawl design jack stand that incorporates a redundant locking feature at minimal additional cost compared to the subject jack stand sold to Christian.  (Id. ¶ 26 at 27–28.)

## C.   Defendants Failed To Implement Adequate and Appropriate Safety Features Or Warnings.

On top of rejecting additional safety features, Defendants failed to provide adequate or appropriate warnings and instructions concerning false engagement.  Nothing in the Operators Manual or the on-product labels for the subject jack stand warn the user that the tip of the pawl may not fully engage with the ratchet bar.  Such warnings are especially important because false engagement is not an obvious hazard, as the enclosed neck collar of the jack stand prevents the user from seeing whether the locking pawl is fully engaged.[6]  False engagement also gives the user the false sense that the jack stand is safe when in fact it is subject to sudden, unexpected loss of ratchet bar height.   Contrary to Defendants' inaction, industry peers and competitors developed warnings and instructions for products comparable to the subject jack stand that specifically address the crush hazard posed by false engagement.  (Pls' Stmt. ¶¶ 28–30 at 28–29.)

---

[6] A portion of the neck collar of the exemplar jack stand pictured on page 2 *supra* was cut out by Mr. Heath to permit visualization of false engagement.

Defendants' argument that the Operators Manual conforms to the minimum industry guidelines provided by the ASME-PALD committee is not determinative.  (Defs' Mem. at 20–22.)  The evidence shows that Mr. Klorcyzk and Christian reviewed and discussed the Operators Manual, and found it to be confusing and unclear.  (Pls' Stmt. ¶¶ 27–29 at 27–28.)  Plaintiffs' warnings expert, Dr. Eric Boelhouwer, reviewed the evidence and opines that the Operators Manual is inadequate and inappropriate with respect to false engagement, further rendering the jack stand unreasonably dangerous.  (Id.)  And, had Defendants incorporated adequate and appropriate warnings, it is more likely than not that Christian would have changed his behavior such that he would not have been killed by false engagement.  (Id. ¶ 30 at 29.)

**D.**    **Using A Single Jack Stand Was Foreseeable.**

Defendants' misuse argument is unavailing because the record supports finding that they were aware, prior to March 11, 2011, that it was common for a single stand to be used for do-it-yourself jobs such as oil changes.  (Id. ¶ 26 at 28.)  Moreover, Defendants cannot show that Christian's use of a single jack stand was the sole proximate cause of the collapse, or that the collapse would not have occurred if two jack stands had been used.  The issue of what part, if any, the alleged "misuse" contributed to the collapse is a question for the jury.

In sum, the foregoing facts, set forth at length in Plaintiffs' accompanying Local Rule Statement, illustrate the myriad disputed issues precluding summary judgment.  Defendants' arguments are not appropriate for summary adjudication, as only the trier of fact can weigh the evidence and determine Defendants' liability.

## III.   ARGUMENT

### A.   Defendants Cannot Meet the Standard for Granting Summary Judgment.

"Summary judgment is only warranted upon a showing that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 455 (2d Cir. 2007) (quotation marks omitted).  "A genuine issue of material fact exists, where 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'"  *Id*. at 456– 56 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

"A reasonably disputed, legally essential issue is both genuine and material and must be resolved at trial."  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 248, 250).  "In assessing the record to determine whether there is such an issue, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Hamilton Beach/Proctor*, 473 F.3d at 456 (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."  *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004) (quoting *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)).

### B.   There Is A Genuine Issue Whether Christian Was Using Defendants' Jack Stand.

The Court should deny Defendants' motion because there is a genuine issue whether Christian was using their jack stand when the BMW collapsed.  Defendants' principal argument that Christian was using the service jack, as opposed to their jack stand, is not a proper basis for

summary judgment, as it requires the Court to resolve a disputed question of fact as to the cause of Christian's death.

The evidence summarized above supports finding that Defendants' jack stand was being used to support the BMW when the vehicle collapsed on to Christian, pinning him to the garage floor.  Each of the percipient witnesses to the unaltered scene, including Plaintiffs and Mr. Hausmann, testified that they observed the jack stand in the location where it would have been used to support the BMW in an elevated position – beneath the front passenger-side, inboard of the front-passenger side wheel well.  (Pls' Stmt. ¶¶ 5, 10, 12–19 at 21, 23–25.)  Defendants cannot rule out that Christian was using their jack stand when the collapse occurred.  Rather, Defendants improperly attack the witnesses' credibility and argue that the witnesses' first-hand observations of the jack stand's location beneath the BMW are somehow "speculative."  (Defs' Mem. at 13–17.)  Defendants offer no alternative explanation for the jack stand being in that location other than that Christian was using the jack stand the moment when the BMW collapsed.  Defendants' service jack theory also is at odds with the witnesses' testimony that the service jack was parallel to the passenger-side of the BMW with the lifting arm fully lowered and the lifting handle removed.  The only explanation for the service jack's disassembled position is that Christian lowered the lifting arm, moved the service jack away from the BMW, and removed the lifting handle after transferring the load to the jack stand, consistent with the process that Christian was taught by Mr. Klorczyk.  (Id. ¶¶ 11 , 16, 19 at 4, 23. 25.)  Defendants merely seek to cast aside the record evidence that does not suit their spin on causation; however, their service jack theory requires that the Court resolve essential factual disputes in their favor.  At this stage, all such disputes – including that Christian was using Defendants' jack stand – must be resolved in Plaintiffs' favor.  *See Savage v. Scripto-Tokai Corp.*, 266 F. Supp. 2d 344,

349–50 (D. Conn. 2003) (denying summary judgment where facts reasonably supported finding in the plaintiffs' favor concerning use of defendant's product).

The cases relied on by Defendants are distinguishable.  In *Gill v. Teva Respiratory, LLC*, No. 3:16-cv-00299, 2017 WL 6614228 (D. Conn. Dec. 27, 2017) (Defs' Mem. at 16), the plaintiff brought a brought liability action claiming that the defendant's inhaler was defective because she breathed in a thumbtack that had become lodged inside the inhaler.  *Id.* at *1–2.  The Court granted summary judgment because there was no evidence to refute the defendant's showing that the thumbtack could not have entered the inhaler at any time that it was within their possession or control.  *Id.* at *2–3.

Here, Defendants' service jack theory is belied by the evidence showing that the service jack was in a dissembled position and location such that the service jack could not have possibly been in use when the BMW collapsed as Defendants contend.  Dr. Sprague's opinion that Christian was using the service jack is not conclusive because the marks on the passenger-side rocker panel could have existed prior to the incident as a result of driving the BMW in winter conditions (or any number of reasons).  In formulating his opinion, Dr. Sprague improperly rejected testimony of the percipient witnesses concerning the position of the service jack. Further, the evidence shows that the jack stand's position beneath the front passenger side of the BMW is such that the jack stand is the only device that Christian could have been using to support the BMW when the collapse occurred.  Unlike in *Gill*, the evidence in this case is directly at odds with Defendants' theory of causation, and consistent with Plaintiffs' claims that Christian was killed when Defendants' defective jack stand failed.

Similarly, in *Garrett v. Crown Equip. Corp.*, No. 3:15-cv-00942, 2017 WL 2727086 (D. Conn. June 23, 2017) (Defs' Mem. at 16), the plaintiff brought a product liability action claiming

he was injured because of two specific defects in the design of the defendant's pallet truck. *Id.* at *1–2. The Court granted summary judgment because, even assuming that the pallet truck was defectively designed, the evidence demonstrated that the defect could not have caused the plaintiff's injuries.

Here, the evidence of the subject jack stand's condition and location beneath the front passenger side of the BMW is consistent with the occurrence of false engagement as the cause of the collapse. Unlike *Garrett*, Mr. Heath's opinion that the false engagement design defect caused Christian's death is amply supported by the evidence that places the subject jack stand in the location where it would have been used by Christian to support the BMW in an elevated position as he was underneath completing the oil change.

In short, the Court should deny Defendants' motion because the evidence supports finding that Christian was using their jack stand to support the BMW when the jack stand failed, causing the BMW to collapse on to Christian's face and chest.

**C.    There Is A Genuine Issue Whether Defendants' Jack Stand Is Unreasonably Dangerous Due to False Engagement.**

Defendants' motion also fails because there is a genuine issue whether false engagement renders their ratchet-and-pawl design jack stand unreasonably dangerous. Contrary to Defendants' assertions, the evidence supports finding that the risks posed by false engagement outweigh the subject jack stand's utility, particularly considering the availability of feasible alternative designs.

The Connecticut Supreme Court recently clarified that the primary standard for determining whether a product is unreasonably dangerous under the Act is the "modified consumer expectation" or "risk-utility" test. *Bifolck v. Philip Morris, Inc.*, 324 Conn. 402, 432 (2016); *Izzarelli v. R.J. Reynolds Tobacco Co.*, 321 Conn. 172, 202–03 (2016). "Under this test,

-16-

a product is unreasonably dangerous if a reasonable, informed consumer would conclude that its risks outweigh its utility. . . . This is a multifactor test, under which no single factor is per se determinative." *Bifolck*, 324 Conn. at 415–16 (citing *Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. at 221 n.15 (listing factors, including "the usefulness of the product, the likelihood and severity of the danger posed by the design, the feasibility of an alternative design, the financial cost of an improved design, the ability to reduce the product's danger without impairing its usefulness or making it too expensive, and the feasibility of spreading the loss by increasing the product's price or by purchasing insurance")).

Under this test, the "jury weighs the product's risks and utility," which includes a consideration of the "availability of an alternative design" and a comparison of the alternative "design's risks and utility to that of the product sold." *Id.* at 432. "A product is in a defective condition unreasonably dangerous to the consumer or user if: (1) [a] reasonable alternative design was available that would have avoided or reduced the risk of harm and the absence of that alternative design renders the product unreasonably dangerous. In considering whether there is a reasonable alternative design, the jury must consider the feasibility of the alternative. Other relevant factors that a jury may consider include, but are not limited to, the ability of the alternative design to reduce the product's danger without unreasonably impairing its usefulness, longevity, maintenance, and aesthetics, without unreasonably increasing cost, and without creating other equal or greater risks of danger." *Id.* at 434–35.

Here, the evidence, including Mr. Heath's testing of false engagement utilizing an exemplar jack stand and BMW, supports finding that the subject jack stand is unreasonably dangerous by virtue of false engagement. As Mr. Heath's testing demonstrates, false engagement occurs in circumstances extant to those present in the Klorczyk's garage when the

BMW collapsed on to Christian.  In particular, the ratchet-and-pawl design is capable of supporting weight comparable to the BMW without the locking pawl being fully engaged in the ratchet bar, giving users (such as Christian) the false sense that the jack stand is safe when in fact it is subject to sudden and unexpected loss of ratchet bar height.  (Pls' Stmt. ¶¶ 32–33 at 13–14, ¶¶ 21–22 at 26.)  Notwithstanding Defendants' baseless attacks on Mr. Heath's methodology, they have no valid basis to refute Mr. Heath's opinion that false engagement is the most likely cause of the subject jack's stand's failure in this case.  And, notwithstanding Defendants' assertions at the outset of this action, Mr. Claypool's testimony makes clear that Defendants were aware of false engagement well prior to the fatal jack stand failure on March 11, 2011.  (Id. ¶¶ 25–26 at 27–28.)

There is ample evidence for the jury to conclude that the risks of serious bodily injury or death posed by false engagement outweigh the utility of the subject jack stand's ratchet-and-pawl design.  Whereas the ratchet-and-pawl design incorporates a single locking mechanism that relies on full engagement between the locking pawl and ratchet bar, available alternative designs incorporate redundant or secondary locking mechanisms, including a redundant locking pin, specifically to prevent collapse of the ratchet bar due to false engagement – the very same collapse that killed Christian.  (Id. ¶ 26 at 27–28.)  Defendants admit that the cost of implementing this additional safety feature is a non-issue; in fact, they currently sell comparable jack stand products with secondary locking mechanisms.  In the course of his employment with SFA, Mr. Claypool even developed plans for such an alternative design; however, Defendants did not act on Mr. Claypool's proposal.  (Id.)  The jury is entitled to consider these and the other factors under the risk-utility test to determine whether the subject jack stand is unreasonably dangerous.

Defendants' cases are inapposite.  In *Kuzmech v. Werner Ladder Co.*,  No. 3:10-cv-266, 2012 WL 6093898 (D. Conn. Dec. 7, 2012), the principal case relied on by Defendants (Defs' Mem. at 17, 26), Judge Bryant found that the plaintiffs' proffered expert was qualified to opine on whether the defendants' aluminum ladder was defectively designed.  *Id.* at *7.  Nonetheless, the Court granted the defendants' motion to preclude because the expert's "conclusions that the ladder was defective [were] based on nothing more than his cursory visual inspection of the ladder and rough measurements."  *Id.*  In so ruling, the Court noted that the expert "admittedly did not undertake any testing of the defective ladder despite acknowledging that such testing was not only feasible but not difficult to accomplish."  *Id.*

In this case, unlike the expert in *Kuzmech*, Mr. Heath not only is qualified to opine on whether Defendants' jack stand is defectively designed, his opinion in this respect is based on the evidence, including the percipient witnesses' testimony, as well as his extensive testing and analysis of false engagement. Defendants have done no testing or analysis to refute Mr. Heath's findings that false engagement is the most likely cause of the subject jack stand's failure. Indeed, the Court's description of the limited work done by the expert in *Kuzmech* better applies to Defendants' expert, Dr. Sprague, who "admittedly did not undertake any testing" of false engagement.  Mr. Heath's testing, by comparison, is comprehensive.

The rulings in *Graham v. Fireline, Inc.*, No. 3:03CV00990, 2006 WL 1646165, at *7 (D. Conn. June 14, 2006), and *White v. Mazda Motor of Am. Inc.*, No. HHDCV086003322S, 2011 WL 3211221, at *4–5 (Conn. Super. Ct. June 22, 2011) (Defs' Mem. at 16–17, 27) also have no bearing here.  In those cases, the proffered experts made no attempt to establish a causal link between the alleged defects and the plaintiffs' injuries; by contrast, Mr. Heath's testing shows

-19-

that false engagement was the most likely cause of the fatal injuries suffered when the jack stand failed and the BMW collapsed on to Christian.  (Pls' Stmt. ¶ 22 at 26–27.)

Likewise, in *Simjian v. Bayer Corp.*, No. 3:10-CV-1263, 2012 WL 1194283, at *1 (D. Conn. Apr. 10, 2012), *Gold v. Dalkon Shield Claimants Tr.*, No. B-82-383, 1998 WL 351456, at *3 (D. Conn. June 15, 1998), *Koger v. Synthes North America, Inc.*, No. 3:07-CV-01158, 2009 WL 5110780, at *2–3 (D. Conn. Dec. 17, 2009), and *Perez v. Toyota Motor Sales U.S.A., Inc.*, No. 3:11CV1112, 2013 WL 3540508, at *2 (D. Conn. July 11, 2013) (Defs' Mem. at 26–27), the Court granted summary judgment because the plaintiffs failed to offer any expert testimony in support of their product defect claims – none of these cases bear any resemblance to the case at bar.

Mr. Heath is eminently qualified to opine on whether Defendants' jack stand is defectively designed, and his opinions will assist the jury determine whether the subject jack stand is unreasonably dangerous due to false engagement.  Mr. Heath's opinions are based on the evidence, and on sound principles and methodologies that he reliability applied to the facts of this case in accordance with Federal Rule of Evidence 702.  Defendants' attacks on Mr. Heath go to weight, and are not grounds for preclusion or summary judgment.

**D.     There Is A Genuine Issue Concerning Defendants' Failure to Warn.**

The Court should also reject Defendants' motion directed at Plaintiffs' failure to warn claims.  Because the evidence supports finding that false engagement caused Defendants' jack stand to fail, there is a genuine issue whether Defendants' failure to provide adequate warnings and instructions on false engagement further renders their jack stand defective and unreasonably dangerous.

The Act provides that a "product seller may be subject to liability for harm caused to a claimant who proves by a fair preponderance of the evidence that the product was defective in that adequate warnings or instructions were not provided." Conn. Gen. Stat. § 52-572q(a). "In determining whether instructions or warnings were required and, if required, whether they were adequate, the *trier of fact* may consider: (1) the likelihood that the product would cause the harm suffered by the claimant; (2) the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk, and the nature of the potential harm; and (3) the technological feasibility and cost of warnings and instructions." *Id*. § 52-572q(b) (emphasis added).

Here, neither the Operators Manual nor the on-product labels for the subject jack stand provide adequate or appropriate warnings or instructions concerning the occurrence of false engagement. (Pls' Stmt. ¶ 29 at 28.) Defendants point to language in the Operators Manual that users should "Check to ensure ratchet bar is secure before loading" (Defs' Mem. at 29 (quoting Operators Manual at 3)); however, this ambiguous language falls far short of providing adequate warning of false engagement and the crush hazard posed thereby.

The Connecticut Appellate Court's decision in *Ames v. Sears, Roebuck & Co.*, 8 Conn. App. 642 (1986), *cert denied*, 201 Conn. 809, is illustrative of the well-settled principle that: "Warnings must *specifically* identify for the user the danger inherent in the product's use." *Id*. at 646 (quoting *Giglio v. Connecticut Light & Power Co.*, 180 Conn. 230, 235 (1980)) (emphasis added). In *Ames*, the Appellate Court upheld the jury's finding that the defendant failed adequately to warn of its riding mower's lack of a "deadman's control," which would have automatically shut off the mower if the user fell off while riding it. "[T]here was no warning by the defendant that if the user of the operating riding mower fell from the machine, the absence of

a deadman's control would result in its continuing operation, thus presenting a substantial risk that the user could be seriously injured.  Under these circumstances, '[t]he defendant had a duty adequately to warn the plaintiff of this unreasonably dangerous condition.'"  *Id.* (quoting *Giglio*, 180 Conn. at 237); *see also Tomer v. American  Home Product Corp.*, 170 Conn. 681, 689–90 (1976) ("If a manufacturer knows or should know that a product may cause serious injury to users, but does not warn of the potentially injurious effects either through negligence or because of concern that sales of the product would thereby be reduced, he cannot be absolved from the imposition of strict liability in tort because an appreciable number of users would not be adversely affected." (quotation marks omitted)).

The evidence shows that Defendants were aware, prior to March 11, 2011, that their ratchet-and-pawl design jack stand permitted the occurrence of false engagement and that the occurrence of false engagement in a jack stand under load posed a crush hazard, potentially resulting in serious bodily injury or death.  (Pls' Stmt. ¶ 25.)  Further, the occurrence of false engagement is not obvious to the user because, among other things, the enclosed base frame of the jack stand prevents the user from visually confirming whether the locking pawl is fully engaged with the ratchet bar.  Because the jack stand is capable of supporting a significant load while aligned in false engagement, occurrence of the defective condition also gives the user the false sense that the jack stand is safe when in fact it is subject to sudden, unexpected failure. Notwithstanding the severe risk posed by false engagement, and despite being in a position to implement adequate warnings with minimal effort, Defendants provided only barebones and ambiguous information that failed to apprise users of the dangers inherent in their jack stand. Nothing in the Operators Manual or the on-product labels inform the user that the tip of the pawl

may not fully engage with the ratchet bar, or that the jack stand may be capable of supporting load without the pawl being fully engaged.  (Pls' Stmt. ¶¶ 29–31 at 28–29.)

Plaintiffs retained an expert on warnings and communications pertaining to product safety, Dr. Eric Boelhouwer.  Based on the evidence, and on his expertise in the field, Dr. Boelhouwer concludes the subject jack stand is unreasonably dangerous because it lacks adequate and appropriate warnings and instructions, including that:

- There is no warning that addresses the hazardous condition that may exist if the locking pawl is not fully engaged with the ratchet bar;

- Neither the Operators Manual nor the on-product labels identify how to distribute the load between the jack stands or the potential crush hazard; and

- Neither the Operators Manual nor the on-product labels identify proper support points for the jack stands.

(Id. ¶ 29–28–29 (citing Boelhouwer Report at 3–5)).  Mr. Klorczyk and Christian reviewed and discussed the Operators Manual, including how they found it to be confusing and unclear.  (Id. ¶ 28 at 28.)  In contrast to Defendants' lack of appropriate warnings, industry peers and competitors developed warnings for comparable jack stand products that specifically address the crush hazard posed by false engagement.  As but one example, Sealey Quality Machinery instructs users of its 3-ton ratchet-and-pawl jack stand to: "Ensure the centre column is locked with the locking lever down and pawl engaged with a ratchet tooth;" "Ensure toothed side of column will engage with locking lever mechanism;" "WARNING! ENSURE PAWL IS FULLY ENGAGED WITH TEETH;" "*Failure to heed these warnings may cause damage, injury or loss of life.*"  (Pls' Stmt. ¶ 29 at 28–29 (citing Boelhouwer Dep. Ex. 12, Sealey Quality Machinery Instructions (emphasis in original).)  Had such warnings and instructions been provided by Defendants, Christian would have been alerted to the hazard posed by false engagement and would not have suffered the harm resulting therefrom.  (Id. ¶¶ 28–31 at 28–29.)  The jury is

-23-

entitled to weigh the evidence and determine whether Defendants' jack stand is unreasonably dangerous based on Defendants' failing to provide adequate and appropriate warnings.

## E.       Defendants' Remaining Arguments Are Unavailing.

Defendants' remaining arguments concerning their alleged compliance with certain industry guidelines and Christian's alleged "misuse" of their jack stand are unavailing, and do not warrant summary judgment.

### 1.       Defendants' Industry Guidelines Argument Is Not Dispositive.

Defendants claim that their jack stands comply with "controlling regulations" (Defs' Mem. at 20–22); however, the ASME-PALD standards that Defendants refer to are neither "controlling" nor are they "regulations."   Rather, the ASME-PALD publications provide *minimum* safety standards as industry guidance, and compliance on the industry's part is voluntary.   (Pls' Stmt. ¶ 34 at 14.)   The testing purportedly undertaken by Defendants in connection with observing certain guidance for jack stand products does not address, much less prevent, the occurrence of false engagement in the subject ratchet-and-pawl design.   And, to the extent that Defendants argue they met certain ISO factory standards, their argument is beside the point (Defs' Mem. at 20–21).   Plaintiffs' claims in this action are not based on a manufacturing defect; the condition of the factory where the jack stands were manufactured is not relevant.   In any event, the question of whether or not Defendants complied with certain standards is not dispositive.  *See, e.g.*, Restatement (Third) of Torts: Prod. Liability § 4(b) ("[A] product's compliance with an applicable product safety statute or administrative regulation is properly considered in determining whether the product is defective with respect to the risks sought to be reduced by the statute or regulation, but such compliance does not preclude as a matter of law a finding of product defect.").

-24-

### 2. Defendants' "Misuse" Argument Is Not Dispositive.

Defendants' misuse argument also fails (Defs' Mem. at 30–33). "Misuse occurs when a product is not used in a manner which should have been foreseen by the defendant." *Hartford Fire Ins. Co. v. Dent-X Int'l, Inc.*, No. 3:05CV1019, 2007 WL 911841, at *5 (D. Conn. Mar. 23, 2007) (quoting *Norrie v. Heil Co.*, 203 Conn. 594, 600 (1987)). "A plaintiff's unforeseeable misuse of a product is a valid defense to a products liability claim. . . . Still, in light of Connecticut's comparative fault statute, a plaintiff's unforeseen misuse does not completely bar the plaintiff from recovery unless the plaintiff's unforeseen misuse was the sole proximate cause of injury." *Martin v. Ryobi Techs., Inc.*, No. 3:15-cv-00973, 2018 WL 1440170, at *4 (D. Conn. Mar. 22, 2018)

Here, the jury reasonably could find that using a single jack stand to support the front passenger-side of the BMW while completing a routine oil change was foreseeable. (Pls' Stmt. ¶ 27 at 28.) Moreover, there is no evidence that using a single jack stand was the sole cause, or even a contributing factor in the cause, of injury in this case. Defendants have not (and cannot) show that using two jack stands would have somehow prevented the subject jack stand from failing due to false engagement. This is yet another disputed factual issue that only the jury can resolve. *See id.* at *4 (denying summary judgment where there were triable issues as to whether the plaintiff's alleged misuse was foreseeable and whether alleged misuse was sole cause of injury); *Dent-X*, 2007 WL 911841, at *5 (denying summary judgment where disputed issue whether alleged misuse was sole cause of or only a contributing factor in injury).

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for summary judgment in its entirety.

-25-

PLAINTIFFS,
FREDERICK KLORCZYK, JR. and LYNNE
KLORCZYK, co-administrators of the Estate of
Christian R. Klorczyk

By: /s/ *Paul D. Williams*

Paul D. Williams (ct05244)
*pdwilliams@daypitney.com*
Bryan J. Orticelli (ct28643)
*borticelli@daypitney.com*
Kaitlin A. Canty (ct29074)
*kcanty@daypitney.com*
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
860-275-0100 (Tel)
860-275-0343 (Fax)

Howard S. Edinburgh
*hedinburgh@herzfeld-rubin.com*
Herzfeld & Rubin, P.C.
125 Broad Street
New York, NY 10004
(212) 471-8529 (Tel)
(212) 344-3333 (Fax)

*Their Attorneys*

## <u>CERTIFICATION</u>

I HEREBY CERTIFY that on this date a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_____ /s/ *Bryan J. Orticelli*_
Bryan J. Orticelli (ct28643)