## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FREDERICK KLORCZYK, JR., as co-administrator | : | CIVIL ACTION NO. |
| of the Estate of Christian R. Klorczyk, et al. | : | |
| | : | |
| *Plaintiffs*, | : | 3:13-cv-00257-JAM |
| | : | |
| vs. | : | |
| | : | |
| SEARS, ROEBUCK AND CO., et al., | : | |
| | : | |
| *Defendants.* | : | OCTOBER 11, 2018 |

## LOCAL RULE 56(a)2 STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' PRODUCT LIABILITY CLAIMS

Pursuant to Local Rule 56(a)2, Plaintiffs Frederick Klorczyk Jr. ("Mr. Klorczyk") and Lynne Klorczyk ("Mrs. Klorczyk"), co-administrators of the Estate of Christian Klorczyk, submit this statement of facts in opposition to Defendants' Local Rule 56(a)1 statement in support of their motion for summary judgment on Plaintiffs' claims under the Connecticut Product Liability Act (ECF No. 296-2).

## I. PLAINTIFFS' RESPONSE TO DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT

1. The Plaintiffs filed this case on February 25, 2013.

**RESPONSE:  Denied.  Plaintiffs filed this action in Connecticut Superior Court for the Judicial District of New London on February 5, 2013 (Docket No.: KNL-CV13-6016256-S). Defendant Sears, Roebuck & Company filed a Notice of Removal in this Court on February 25, 2013 (ECF No. 1).**

2. The operative complaint is the Plaintiffs' Second Amended Complaint dated April 10, 2014 (ECF No. 99), which includes one cause of action under the Connecticut Product Liability

Act ("CPLA"), Connecticut General Statutes Section 52-572m, et seq., against the five Defendants.

**RESPONSE:  Admitted.**

3. The allegedly defective product is a "Craftsman Heavy Duty Jack Stand, Model No. 50163" (the "jack stand").  Compl. ¶ 17.

**RESPONSE:  Admitted.**

4. The Plaintiffs allege that the decedent was performing an oil change on a BMW sedan at the Plaintiffs' home on March 11, 2011, using "one of the Jack Stands" to support the vehicle, when the jack stand "failed and collapsed," causing the vehicle to fall on the decedent. Compl. ¶¶ 20-22.

**RESPONSE:  Admitted, except Plaintiffs note that Defendants do not quote the entire allegations set forth in Paragraphs 20–22 of the Complaint (ECF No. 99).**

5. The decedent was using, at most, one jack stand at the time of his accident.  F. Klorczyk Dep. Tr. p. 430:3, **Ex. B** ("He only used one.").

**RESPONSE:  Admitted that Christian was using a jack stand to support the BMW when the jack stand failed and the BMW collapsed on to Christian.**

6. Mr. Klorczyk testified that he and Lynn Klorczyk were the first people to enter the garage and find the decedent, and that he found a jack stand laying on its side beneath the vehicle, but he does not know how it ended up there, and testified that "it's all speculation."  F. Klorczyk Dep. Tr. pp. 420:17-421:6, **Ex. B**.

**RESPONSE: Admitted that Mr. and Mrs. Klorczyk were first to enter the garage and find Christian, and that they observed a jack stand on its side, with the ratchet bar fully retracted, beneath the front passenger-side of the BMW and do not know how the jack**

stand ended up in that position. **Denied to the extent that Defendants mischaracterize Mr. Klorczyk's observations as speculation.**

7. Mr. Klorczyk testified that he turned the jack stand upright almost immediately upon entering the garage, right after he used the jack to lift the BMW off of the decedent. F. Klorczyk Dep. Tr. pp. 207:9-209:16, 385:7-391:24, **Ex. B**.

**RESPONSE:** **Admitted that Mr. Klorczyk, after entering the garage, lifted the BMW off of Christian using the service jack and then uprighted the jack stand found beneath the front passenger-side of the BMW.**

8. On the day of the accident, the Waterford Police Department was called to the Plaintiffs' home in response to the Plaintiffs' discovery of the decedent. Officer N. Surdo Incident Report Narrative, **Ex. A**.

**RESPONSE:** **Admitted.**

9. The Plaintiff, Lynne Klorczyk, told Officer Tadeusz Krysztofiak that she entered the garage and saw the BMW on top of the decedent, "and a pump jack had, which was initially holding the vehicle had moved." Officer T. Krysztofiak Incident Report Narrative, **Ex. C**.

**RESPONSE:** **Denied. Mrs. Klorczyk did not make this statement, and could not have known (beyond what she observed in the garage) what equipment was used because she was not in the garage prior to the BMW collapsing on to Christian. (L. Klorczyk Dep. Tr., cited pages and exhibits attached as Ex. A, at 169:3–14.) Officer Krysztofiak agrees that Mrs. Klorczyk would have no basis for making such a statement, and her handwritten statement to the police includes no such statement. (T. Krysztofiak Dep. Tr., cited pages attached as Ex. B, at 22:10–23:12; L. Klorczyk Dep. Ex. 8, Handwritten Stmt.)**

10. The pump jack was seized as evidence, with Lieutenant Brett Mahoney observing that the "cup" portion typically located on the jack's lifting arm was missing, and that only a smooth metal plate remained.  Lieutenant B. Mahoney Incident Report Narrative, **Ex. D**.

**RESPONSE:  Admitted.**

11. Lieutenant Brett Mahoney noted that the weather was foggy, leaving condensation on the bare metal plate of the pump jack, and he concluded that the decedent was supporting the BMW with the jack while changing its oil and the jack slipped.  Lieutenant B. Mahoney Incident Report Narrative, **Ex. D**.

**RESPONSE:   Objection.   Lt. Mahoney's report is speculative and improper opinion. Christian was working in the garage attached to the Klorczyks' home with all of the exterior garage doors closed.  Mrs. Klorczyk was first to open the center bay garage door after calling 911.   (Ex. A, L. Klorczyk Tr. at 121:24–122:8, 139:21–140:7.)   Lt. Mahoney arrived at the scene 30 minutes after the 911 call and was last to leave several hours later. By then, the garage doors had been open several hours, the service jack had been used repeatedly by Mr. Klorczyk and others, and the scene had been significantly altered.   (B. Mahoney Dep. Tr., cited pages attached as Ex. C, at 28:11–15, 29:11–18, 31:4–12, 74:16– 75:3.)   Further, Lt. Mahoney is not an expert, and his opinion is inconsistent with Mr. and Mrs. Klorczyk's observations that the service jack was parallel to the BMW with the lifting arm fully depressed and the lifting handle removed such that the service jack could not have been in use when the BMW collapsed.   (F. Klorczyk Dep. Tr., cited pages attached as Ex. D, at 207:15–208:23, 218:1–22, 385:12–387:1; Ex. A, L. Klorczyk Tr. at 128:4–9.) These observations are consistent with custom and practice and procedures that Mr. Klorczyk taught Christian; in particular, that the service jack is not used to support a**

vehicle, and is repositioned away from the vehicle with the lifting arm depressed and lifting handle removed after the load has been transferred to a jack stand.  (Ex. D, F. Klorczyk Tr. at 94:10–95:19, 107:5–9.)  Also consistent with Mr. and Mrs. Klorczyk's observations, the first emergency responder to arrive at the scene, Geoffrey Hausman, witnessed Mr. Klorczyk attempting to engage the service jack's lifting handle so as to elevate the lifting arm and raise the BMW off of Christian.  (G. Hausmann Dep. Tr., cited pages and exhibits attached as Ex. E, at 20:6–10, 32:16–23, 49:21–50:7, Hausmann Dep. Ex. 5.)   Mr. Hausmann observed the jack stand in the same position described by Mr. and Mrs. Klorczyk – beneath the front passenger-side of the BMW.  (Id. at 33:16–35:14, 48:6–49:11, Hausmann Dep. Ex. 4.)  Lt. Mahoney never interviewed the witnesses, has no knowledge of what equipment may have been used by Christian, and admits there is no empirical basis for his opinion that the service jack could have slipped while supporting the weight of the BMW.  (Ex. C, Mahoney Tr. at 53:24–55:5, 65:10–12, 68:21–25, 71:6–11, 77:10–16, 78:18–25, 103:13–19, 135:4–20.)

12. A photograph of the pump jack provided by the Plaintiffs also shows that its "cup" was missing.  *See* the Memorandum of Law in Support of Summary Judgment, at p. 2.

**RESPONSE:  Objection.  The condition of the service jack is immaterial because Christian was not using the service jack when the BMW collapsed.  Defendants' memorandum of law is not evidence.**

13. Frederick Klorczyk testified that he removed the saddle cup from the jack that the decedent was using for fear that it would scratch another car that he owned, a DeLorean.  F. Klorczyk Dep. Tr. pp. 35:20-41:15, **Ex. B**.

**RESPONSE:  Objection.  The condition of the service jack is immaterial because Christian was not using the service jack when the BMW collapsed.**

14. The Plaintiffs' son and the decedent's brother, Parker Klorczyk, testified that it was unsafe to use a service jack without the saddle "because that helps keep the vehicle secure while on the jack — so it doesn't fall off the jack . . . it would have a more easier time falling off a flat surface than it would a cupped surface."  P. Klorczyk Dep. Tr. pp. 43:18-45:12, **Ex. E**.

**RESPONSE:   Objection.   The cited testimony is immaterial, speculative and improper opinion.  Christian was not using the service jack when the BMW collapsed.  Christian's younger brother, Parker, never observed Christian perform an oil change on the BMW, and has no knowledge of the process or equipment that may have been used by Christian on March 11, 2011.  Parker admittedly is the least knowledgeable about working on cars, and his understanding may not be consistent with that of Mr. Klorczyk's or Christian's. (P. Klorczyk Dep. Tr., cited pages attached as Ex. F, at 25:2–11, 30:14–17, 107:22–111:23.)**

15. An article that was published in Waterford's local paper, The Day, three days after the accident, recounted Mr. Klorczyk's statement "that a floor jack likely failed" while the decedent was changing the car's oil.  The Day Article, **Ex. F**.

**RESPONSE:   Objection.   The statement is speculative, improper opinion, and hearsay. Mr. Klorczyk denies making the statement.  (Ex. D, F. Klorczyk Tr. at 284:18–285:5.)**

16. Police photographs show a fresh scrape mark on the BMW's driver-side rocker panel.  *See* the Memorandum of Law in Support of Summary Judgment, at p. 5.

**RESPONSE:   Objection.  Defendants' memorandum of law is not evidence.  Further, the record evidence does not support a finding as to when markings on the BMW were made. As of March 11, 2011, the BMW's odometer exceeded 100,000 miles, and the BMW was**

**used as a "snowboard beater car."   (Ex. D, F. Klorczyk Tr. at 400:19–20; Ex. A, L. Klorczyk Tr. at 122:15–24.)  Defendants' expert, James Sprague, relies on markings along the passenger-side rocker panel in opining that Christian was using the service jack when the BMW collapsed; however, the same markings may have pre-existed the incident as a result of driving the BMW in winter conditions.  Indeed, pictures of the BMW from March 2007 depict snow and ice in the same location of the passenger-side rocker panel.  (Ex. G, C. Klorczyk Facebook Photos of BMW; Ex. H, Sprague Photo of BMW, P001_369.)  The pictures in Defendants' memorandum were taken by Dr. Sprague after he used a shop rag to wipe down and clean that specific area of the passenger-side rocker panel.  (J. Sprague Dep. Tr., cited pages and exhibits attached as Ex. I, at 228:15–229:3.)**

17. The Defendants' expert, James Sprague, performed an accident reconstruction based on physical inspections, measurements, and laser scan data, and concluded that the incident occurred because the jack was supporting the BMW and it slid out, creating the scrape mark on the BMW's driver-side rocker panel in the process.  J. Sprague Expert Report pp. 33-37, **Ex. S**.

**RESPONSE:  Objection.  This Paragraph contains improper argument and opinion, and Dr. Sprague's expert report is not evidence of any fact purportedly asserted by Defendants. The condition of the "BMW's driver-side rocker panel" is not material because only the passenger-side was elevated when the BMW collapsed.  Plaintiffs dispute Dr. Sprague's opinions because Christian was not using the service jack when the BMW collapsed.  Dr. Sprague did not perform any testing to determine whether the service jack could have slipped while supporting the weight of the BMW, or the amount of force required to cause such a slip.  (Ex. I, J. Sprague Tr. at 47:21–48, 222:18–223:6.)  Testing undertaken by**

Plaintiffs' expert, Frederick Heath, measured the force required to pull the service jack out from underneath the BMW while under load as ranging from 420 to 450 pounds.  It would not have been possible for Christian to have exerted such force while working under the BMW.  (F. Heath Rebuttal Dep. Tr., cited pages and exhibits attached as Ex. J, at 28:1–24, Heath Rebuttal Ex. 3, Rebuttal Report at 5–6.)  Dr. Sprague's opinions also are based on the erroneous assumption that Christian's sternum was positioned beneath the BMW's front lateral engine frame cross-member; however, Mr. and Mrs. Klorczyk observed Christian's sternum beneath the rear lateral engine frame cross-member and manual transmission with his head and face further to the rear beneath the transmission assembly. Dr. Sprague improperly rejected Mr. and Mrs. Klorczyk's testimony, and admits that the markings on the passenger-side rocker panel that he relied upon in forming his opinions may have existed prior to March 11, 2011.  Dr. Sprague cannot rule out that Christian was using the jack stand when the BMW collapsed, and Dr. Sprague did no analysis of false engagement whatsoever.  (Ex. I, J. Sprague Tr. at 166:7–169:24, 176:14–177:11, 193:24–194:16, 204:22–205:23, 210:8–25, 226:17–227:1, 237:24–238:7, 248:1–5, 271:12–22.)

18. Mr. Klorczyk admitted that the pump jack was damaged when he got it back from the police department, as it was missing one of its "clip rings," and he did not know whether the clip ring came off before, during, or after the decedent's accident.  F. Klorczyk Dep. Tr. pp. 361:23-362:10, **Ex. B**.

**RESPONSE:**  **Objection. The condition of the service jack is immaterial because Christian was not using the service jack when the BMW collapsed.  Defendants also mischaracterize Mr. Klorczyk's testimony, which speaks for itself.**

19. The first responder who came to the scene, Geoffrey Hausmann, testified that he saw Mr. Klorczyk "trying to put the jack together" when he arrived.  G. Hausmann Dep. Tr. pp. 20:2-14, 22:18-23:5, 26:3-27:5, **Ex. H**.

**RESPONSE:**  **Admitted that Geoffrey Hausmann was the first emergency responder to arrive at the scene, and that Mr. Hausmann witnessed Mr. Klorczyk attempting to assemble the service jack's lifting handle so as to elevate the lifting arm, which was completely depressed, and raise the BMW off of Christian.  Mr. Hausmann also observed the jack stand in the same position described by Mr. and Mrs. Klorczyk – beneath the front passenger-side of the BMW.  (Ex. E, G. Hausmann Tr. at 20:6–10, 32:16–23, 33:16–35:14, 48:6–49:11, 49:21–50:7, Hausmann Dep. Exs. 4, 5.)**

20. After Mr. Klorczyk retrieved the pump jack from the police, he replaced the clip ring, and ultimately replaced the jack itself.  F. Klorczyk Dep. Tr. pp. 169:6-171:23, **Ex. B**.

**RESPONSE:**  **Objection.  The condition of the service jack is immaterial because Christian was not using the service jack when the BMW collapsed.  Without waiving their objections, Plaintiffs admit that Mr. Klorczyk performed maintenance on the service jack after March 11, 2011, including replacing the snap rings.**

21. When the decedent purchased the subject jack stand three months before his accident, he was actually supposed to have replaced the jack as well, because the jack was "getting old," but he did not end up buying a new jack.  F. Klorczyk Dep. Tr. pp. 121:10-124:11, **Ex. B**.

**RESPONSE:**  **Objection.  The condition of the service jack is immaterial because Christian was not using the service jack when the BMW collapsed.  Without waiving their objections, Plaintiffs admit that Mr. Klorczyk asked Christian to purchase a service jack and jack stand combo kit, and Christian did not purchase a service jack prior to March 11, 2011.**

22. In a March 22, 2011 article for The Patch, Mr. Klorczyk refused to explain how the car came down onto the decedent, stating "[n]o one in the world knows but me," and stated that it was caused by a "one in a billion" freak accident and not a product defect: "To recreate it would take a tsunami and earthquake . . . one in a billion chances."  The Patch Article p.2, **Ex. I**.

**RESPONSE:** **Objection. The quoted statements constitute speculation and improper opinion.  Mr. Klorczyk could not have known (beyond what he observed in the garage) what occurred because he was not in the garage prior to the BMW collapsing on to Christian.  Additionally, the Patch Article contains hearsay, and Defendants mischaracterize Mr. Klorczyk's statements by using the terms "freak accident" and "product defect," which are not in the Article itself.**

23. On an internet forum called garagejournal.com, Mr. Klorczyk wrote a post on March 29, 2011 stating that the decedent was using two jack stands at the time of the accident, one under each side of the vehicle, and that the jack stand on the right side was found in the downward position, upright.  Garagejournal.com Post p. 6, **Ex. J**.

**RESPONSE:**  **Objection.  The Internet post constitutes speculation and improper opinion. Mr. Klorczyk could not have known (beyond what he observed in the garage) what equipment was used because he was not in the garage prior to the BMW collapsing on to Christian.  As of the date of the post, Mr. Klorczyk was experiencing mental and emotional trauma that substantially impaired his capacity to recount his observations on March 11, 2011.  The post was not accurate because Mr. Klorczyk observed a single jack stand on its side beneath the front passenger-side of the BMW.  (Ex. D, F. Klorczyk Tr. at 207:22– 209:16, 385:7–391:20, 397:22–398:22, 439:1–441:14.)**

24. On two other forums, Mr. Klorczyk posted that the decedent was using two four-ton Craftsman "jackstands," and that either the decedent's body or one of his tools "tripped" the lever of the jack stand on the right side of the vehicle, causing it to release. Bimmerforums.com Post p. 10, **Ex. K**; Luxury4play.com Post p. 4, **Ex. L**.

**RESPONSE: Plaintiffs incorporate their Response to Paragraph 23.**

25. Mr. Klorczyk subsequently testified that these accounts of the incident were incorrect and that the decedent was actually only using one single jack stand when the accident happened, which was found tipped over on its side after the accident — he testified that his multiple statements that there was a second jack stand under the vehicle simply were "not true at all." F. Klorczyk Dep. Tr. pp. 424:4-430:17, 437:1-440:21, **Ex. B**.

**RESPONSE: Plaintiffs incorporate their Response to Paragraph 23. Without waiving their objections, Plaintiffs admit that the Internet accounts of the incident are not accurate for the reasons stated above. Plaintiffs also admit that Christian was using a jack stand to support the BMW when the jack stand failed and the BMW collapsed on to Christian and, after entering the garage, Mr. and Mrs. Klorczyk observed the jack stand on its side beneath the front passenger-side of the BMW.**

26. When Lynn Klorczyk was first deposed in November of 2014, she denied her statement from the police report that "a pump jack had, which was initially holding the vehicle had moved," while confirming that other aspects of the same part of the report were accurate. L. Klorczyk Dep. Tr. pp. 169:3-171:19, **Ex. N**.

**RESPONSE: Admitted that Mrs. Klorczyk did not make the statement (*see supra* Resp. ¶ 9).**

27. Mrs. Klorczyk testified that when she entered the garage with Frederick she did not see any tools other than halogen lights, and that her husband grabbed a jack stand from "somewhere

under the car" where she "couldn't see it" and placed it under the BMW after he lifted it with the pump jack. L. Klorczyk Dep. Tr. pp. 128:22-133:13, **Ex. N**.

**RESPONSE:**  **Admitted that Mrs. Klorczyk entered the garage with Mr. Klorczyk and observed him pick up and insert the service jack's lifting handle in to the socket so as to raise the BMW off of Christian and then transferred the load to the jack stand found beneath the front passenger-side of the BMW.**

28.  When Mrs. Klorczyk was deposed again in July of 2016, she initially testified that she did not remember seeing a jack stand when she entered the garage, but did see the service jack next to the BMW. L. Klorczyk Dep. Tr. pp. 333:17-335:5, **Ex. N**.

**RESPONSE:**  **Admitted that Mrs. Klorczyk observed the service jack parallel to the BMW with the lifting handle removed, and observed the jack stand beneath the front passenger-side of the BMW after Mr. Klorczyk used the service jack to lift the BMW off of Christian.**

29.  After an off-the-record break, Mrs. Klorczyk was examined by her own attorney and testified that she did see a jack stand under the BMW, but not until after multiple responders already arrived at the scene and the garage was getting "crowded." L. Klorczyk Dep. Tr. pp. 361:12-361:24, 362:22-370:10, **Ex. N**.

**RESPONSE:**  **Admitted that Mrs. Klorczyk observed the jack stand beneath the front passenger-side of the BMW.**

30.  The Plaintiffs' primary expert, Frederick Heath, disclosed to testify regarding the cause of the decedent's accident, admitted that he was not aware of any physical evidence that a jack stand was in use when the incident took place, and that his assumption on this point was based solely on the Plaintiffs' testimony. F. Heath Mar. 22, 2017 Dep. Tr. pp. 19:22-20:25, **Ex. O**.

**RESPONSE:   Objection.   This Paragraph contains improper argument.   Without waiving their objections, Plaintiffs admit that Mr. Heath's opinions are based on the evidence that Christian was using the jack stand when the BMW collapsed.**

31. Mr. Heath was deposed a second time after he was disclosed as a rebuttal expert regarding accident reconstruction, and again testified that he had no physical evidence at all that a jack was in use on the day of the decedent's accident.   F. Heath. Dec. 14, 2017 Dep. Tr. pp. 11:22-12:3, **Ex. P**

**RESPONSE:   Objection. This Paragraph contains improper argument, and Defendants mischaracterize Mr. Heath's testimony, which  speaks for itself.**

32. The Plaintiffs argue that the jack stand was defective because of its propensity for "false engagement" — essentially, the jack stand would look like it was fully engaged and ready to support a load, when it actually was not.   Compl. at ¶ 25.

**RESPONSE:   Denied to the extent that Defendants mischaracterize Plaintiffs' allegations in the Complaint.   Admitted that the jack stand's ratchet-and-pawl design was defective in that it was capable of supporting weight under load without being fully engaged, giving users the false sense that the jack stand was safe when in fact it was subject to sudden, unexpected loss of ratchet bar height, the condition known as false engagement.**

33. The "false engagement" theory is the theory of liability in both the Plaintiffs' Complaint and in their primary liability expert Frederick Heath's report, where he described "false engagement" as "tip to tip contact" between the jack stand's ratchet bar and the locking pawl that could be "disrupted" by an external force.   Disclosure of Frederick G. Heath, Dec. 8, 2014, pp. 16-17 **Ex. Q**.

**RESPONSE:  Objection.  This Paragraph contains improper argument.  Without waiving their objections, Plaintiffs admit that the jack stand's design was defective because it permitted the occurrence of false engagement, which caused Christian's death in this case.**

34. Both SFA's current Engineering Manager and Wei Fu's Assistant Vice President and Manager of the Engineering from the time when the jack stands were produced testified that the subject jack stands complied with controlling regulations, which were set forth in Part 4 of the "Safety Standard for Portable Automotive Lifting Devices" promulgated by the Portable Automotive Lifting Devices Committee of the American Society of Mechanical Engineers.  Jorgensen Dep. Tr. p. 29:4-16, **Ex. T**;  Su Chien Chi Dep. Tr. pp. 134:2-11, 161:6-11, **Ex. U**; ASME-PALD 2009 Standards Excerpt, **Ex. V**.

**RESPONSE:   Objection.   This Paragraph contains improper argument and opinion.  Plaintiffs also object to the ASME-PALD Standards Excerpt as hearsay.  Without waiving their objections, Plaintiffs deny that ASME-PALD standards are "controlling regulations."  ASME-PALD publishes minimum safety standards as industry guidance and compliance is voluntary.  (R. Jorgensen Dep. Tr., cited pages attached as Ex. K, at 98:12–14; J. Arruda Dep. Tr., cited pages attached as Ex. L, at 77:2–6; R. Claypool Dep. Tr., cited pages attached as Ex. M, at 27:7–31:12, 199:14–24.)**

35. There are six warnings set forth in the ASME-PALD Guidelines: (1) Do not exceed rated capacity; (2) Use only on hard level surface; (3) Center load on saddle; (4) Use as a matched pair only; (5) Failure to heed these markings may result in personal injury and/or property damage; and (6) Stands are not to be used to simultaneously support one side of a vehicle.  ASME-PALD 2009 Standards Excerpt. **Ex. V**.

**RESPONSE:  Plaintiffs incorporate their Response to Paragraph 34.**

36. The ASME-PALD Guidelines expressly describe "ratchet and pawl" jack stands as a type of "typical vehicle support stands," and state that they contain directives regarding the stands' base, column, locking device, operating controls, saddle, stability, safety markings and messages, and required testing.  ASME-PALD 2009 Standards Excerpt, at pp. 3- 5, **Ex. V**.

**RESPONSE:  Plaintiffs incorporate their Response to Paragraph 34.**

37. Both the Plaintiffs' paid fact witness, Roger Claypool, and their liability expert, Frederick Heath, were on the Standards Committee responsible for the controlling regulations.  ASME-PALD 2009 Standards Excerpt p. 2, **Ex. V**.

**RESPONSE:  Plaintiffs incorporate their Response to Paragraph 34.  Plaintiffs also object to Defendants' mischaracterization of Mr. Claypool's and Mr. Heath's involvement.  Mr. Claypool is a fact witness with knowledge relevant to this case based on,** *inter alia*, **his twenty-year tenure as an employee of Defendant Shinn Fu Company of America ("SFA"), and Mr. Claypool has substantial experience as a member of ASME-PALD, including serving as SFA's Committee Representative and Vice Chairman.  (Ex. M, R. Claypool Tr. at 27:7–31:12.)  Plaintiffs disclosed Mr. Heath as an expert witness, and Mr. Heath also has substantial experience as a member of ASME-PALD, including serving as Chairman.  (F. Heath Dep. Tr., cited pages attached as Ex. N, at 83:5–13.)**

38. The subject Craftsman 50163 jack stands were manufactured at the Wei Fu Factory, which a third-party certified as being ISO-compliant.  Su Chien Chi Dep. Tr. pp. 90:3-14, 93:24-94:1, 165:18-166:25, **Ex. U**.

**RESPONSE:   Plaintiffs object to the extent that Defendants' reference to third-party certification constitutes improper argument and is based on hearsay.  Without waiving their**

**objections, Plaintiffs admit that the subject jack stands were manufactured at the Wei Fu factory in China.**

39. Wei Fu's Vice President and Manager of the Engineering when the jack stands were produced testified that the factory followed ISO 9001, an international quality control system that controlled all quality control activities, including product measurement, analysis, and improvement.  Su Chien Chi Dep. Tr. pp. 165:18-166:8, **Ex. U**.

**RESPONSE:   Objection.   This Paragraph contains improper argument and opinion. Plaintiffs also object to Defendants' reference to ISO standards as hearsay.**

40. Wei Fu's third-party certification required significant effort and documentation of all Wei Fu's processes, followed by third-party verification that the factory and its procedures complied with the ISO standard.  Su Chien Chi Dep. Tr. p. 166:9-18, **Ex. U**.

**RESPONSE:  Plaintiffs incorporate their Response to Paragraph 39.**

41. Wei Fu's compliance was verified annually, and its certification was renewed every three years.  Su Chien Chi Dep. Tr. p. 166:19-25, **Ex. U**.

**RESPONSE:  Plaintiffs incorporate their Response to Paragraph 39.**

42. The Wei Fu factory also fulfilled Sears' vendor accreditation program, which was based on Sears' review of its quality and safety processes.  K. Guerra Dep. Tr. pp. 234:22-237:7, **Ex. W**; Vendor Factory Accreditation Report, **Ex. X**.

**RESPONSE:   Objection.   This Paragraph contains improper argument.   Plaintiffs also object to Defendants' reference to Sears's processes as hearsay.**

43. Wei Fu's Vice President and Manager of Engineering testified that the Craftsman 50163 jack stands were tested and approved for production as a new design at the factory, and also tested and approved by the client, Sears.  Su Chien Chi Dep. Tr. p. 167:1-23, **Ex. U**.

**RESPONSE:**  **Objection.  This Paragraph contains improper argument.  Plaintiffs also object to Defendants' reference to testing and approval processes as hearsay.**

44. During production, every single ratchet bar was tested before it got to the production line, and every single unit was tested to make sure that the ratchet bar fully engaged with the pawl. Su Chien Chi Dep. Tr. pp. 167:24-169:3, **Ex. U**.

**RESPONSE:**  **Objection.  This Paragraph contains improper argument.  Plaintiffs also object to Defendants' reference to testing processes as hearsay.**

45. Once the units were packaged, they were subjected to spot-testing.  Su Chien Chi Dep. Tr. p. 169:4-6, **Ex. U**.

**RESPONSE:**  **Plaintiffs incorporate their Response to Paragraph 44.**

46. A random sample of packaged products was then selected for center and off-center load testing.  Su Chien Chi Dep. Tr. pp. 169:7-170:11, **Ex. U**.

**RESPONSE:**  **Plaintiffs incorporate their Response to Paragraph 44.**

47. The batch containing the subject jack stands was subjected to spot-testing, with every single unit passing the test. Spot-Testing Results, **Ex. Y**;  Function & Loading Test Document, **Ex. Z**;  Su Chien Chi Dep. Tr. pp. 170:12-171:25, **Ex. U**.

**RESPONSE:**  **Objection.  This Paragraph contains improper argument.  Plaintiffs also object to Defendants' reference to test results and documents as hearsay.  Without waiving their objections, Plaintiffs deny that the cited materials are evidence of testing with respect to the subject jack stands (serial numbers GT1010009618 and GT1010009619) (ECF No. 296-23, Su Chien Chi Dep. Tr. at 173:13–20).**

48. Craftsman 50163 jack stands also repeatedly passed multi-point third-party testing administered by Intertek, on behalf of Sears Holdings Global Sourcing.  K. Guerra Dep. Tr. pp. 111:21-117:4, **Ex. W**; Intertek Test Reports, **Ex. AA.**

**RESPONSE:   Objection.   This Paragraph contains improper argument.   Plaintiffs also object to Defendants' reference to Intertek testing as hearsay.**

49. Plaintiffs do not dispute that the subject jack stands were accompanied by an Operators Manual, which they produced in discovery, containing product warnings and instructions. Operators Manual, **Ex. BB**.

**RESPONSE:  Admitted.**

50. The manual instructs users "to ensure ratchet bar is secure before loading" and "to ensure vehicle is secure before working on, around or under," and warned that "[f]ailure to heed product markings or warnings may result in personal injury or property damage."  Operators Manual, **Ex. BB**.

**RESPONSE:   Admitted, except Plaintiffs note that Defendants do not quote the entire Operators Manual.**

51. Both the operators manual and on-product warnings direct users to "Use as a matched pair to support one end of a vehicle only," and warn that "Failure to heed product markings or warnings may result in personal injury or property damage."  Operators Manual, **Ex. BB**; Police Photograph of Subject Jack Stand, **Ex. CC**.

**RESPONSE:  Admitted.**

52. Both the manual and the on-product warnings encompass all of the warnings required by the ASME-PALD standard, which are set forth in Part 4-3, entitled SAFETY MARKINGS AND

MESSAGES, as well as additional warnings that are not required by ASME-PALD.  ASME-PALD 2009 Standards Excerpt pp. 3, 6, **Ex. V**.

**RESPONSE:**  **Objection.  This Paragraph contains improper argument.**

53. Plaintiffs' warnings and instructions expert, Dr. Eric Boelhouwer, testified that the product manual essentially complied with the standard set forth in ANSI Z535.6.  E. Boelhouwer Dep. Tr. pp. 143:3-144:13, **Ex. DD**.

**RESPONSE:**  **Objection.  This Paragraph contains improper argument, and Defendants mischaracterize Dr. Boelhouwer's testimony, which speaks for itself.**

54. Dr. Boelhouwer opined that if the manual contained a different warning or instruction, the decedent "would have noticed, read and followed" that directive, and the accident would not have happened, though he testified that this opinion was based solely on Mr. Klorczyk's testimony that Mr. Klorczyk reviewed the manual and labels and discussed them with the decedent.  Boelhouwer Report p. 8, **Ex. EE**; E. Boelhouwer Dep. Tr. 167:18-168:16; 172:6-173:7, **Ex. DD**.

**RESPONSE:**  **Plaintiffs incorporate their Response to Paragraph 53.  Without waiving their objections, Plaintiffs admit that the Operator's Manual did not provide adequate and appropriate warnings concerning false engagement.**

55. Dr. Boelhouwer testified that in the absence of Mr. Klorczyk's testimony, he "could not render an opinion one way or the other whether [the decedent] would have read, followed – read and followed the warnings and instructions."  E. Boelhouwer Dep. Tr. pp. 168:17-171:4, **Ex. DD**.

**RESPONSE:   Plaintiffs incorporate their Response to Paragraph 53.   Without waiving their objections, Plaintiffs admit that Dr. Boelhouwer relied on the evidence in forming his opinions, including but not limited to Mr. Klorczyk's testimony.**

56. Dr. Boelhouwer testified that he had no evidence that the decedent read the jack stands' instructions or warnings.  E. Boelhouwer Dep. Tr. pp. 177:20-22, **Ex. DD**.

**RESPONSE:   Plaintiffs incorporate their Response to Paragraph 53.**

57. Dr. Boelhouwer testified that the decedent failed to heed the warning that jack stands are to be used in match pairs only.  E. Boelhouwer Dep. Tr. pp. 177:23-178:8, **Ex. DD**.

**RESPONSE:   Plaintiffs incorporate their Response to Paragraph 53.**

58. Dr. Boelhouwer testified that the decedent's use of a single jack stand was contrary to both the on-product warnings and the warnings contained in the manual.  E. Boelhouwer Dep. Tr. pp. 91:2-95:16; 177:23-178:8, **Ex. DD**

**RESPONSE:   Plaintiffs incorporate their Response to Paragraph 53.**

59. Defendants' expert Ryan Jorgensen and the Plaintiffs' expert Eric Boelhouwer both testified that a single jack stand has sufficient rated capacity to hold up the BMW.  R. Jorgensen Aug. 3, 2017 Dep. Tr. 31:1-32:1, 36:25-38:3 (testifying that Craftsman 50163 jack stands were individually tested with eight-ton loads), **Ex. T**;  E. Boelhouwer Dep. Tr. pp. 135:5-136:1 (testifying that the curb weight of the subject vehicle was approximately 1,900 pounds and he believed that a single jack stand was rated for 2,000 pounds), 161:14-162:1, **Ex. DD**.

**RESPONSE:   Plaintiffs incorporate their Response to Paragraph 53.   Without waiving their objections, Plaintiffs admit that the jack stand that Christian was using was not overloaded when the jack stand failed and the BMW collapsed on to Christian, which is consistent with the occurrence of false engagement.**

-20-

## II.  ADDITIONAL MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT

1.    Mr. Klorczyk is an automotive enthusiast and self-proclaimed "car buff."  From an early age, Mr. Klorczyk's father taught him about working on cars, including how to perform do-it-yourself jobs such as oil changes.  Mr. Klorczyk passed on this knowledge to his son, Christian, who also grew up with a passion for cars.  (Ex. D, F. Klorczyk Tr. at 39:23–40:4, 86:7–19, 158:6–160:11; Ex. A, L. Klorczyk Tr. at 33:1–37:1, 278:6–17.)

2.    As of March 11, 2011, Christian was 21 years old and less than two months away from graduating with honors from the University of Connecticut with a degree in finance.  (Ex. A, L. Klorczyk Tr. at 81:9–8:16; L. Klorczyk Dep. Ex. 4, UConn Tr. and (Posthumous) Diploma.)

3.    Christian, who was on Spring Break, had spent several days skiing and snowboarding in Killington, Vermont, before returning home to Waterford, Connecticut.  Christian drove the family-owned BMW to and from Killington, and the BMW often was used for such trips because it was all-wheel drive.  (Ex. A, L. Klorczyk Tr. at 87:17–22, 122:15–25.)

4.    On March 11, 2011, Mr. Klorczyk was away visiting Plaintiffs' oldest son (Frederick) in New York City, and Plaintiffs' youngest son (Parker) was away at boarding school in Oakdale, Connecticut.  Mrs. Klorczyk left for work at 6:30 a.m., leaving Christian home alone.  (Ex. A, L. Klorczyk Tr. at 97:20–99:7; Ex. D, F. Klorczyk Tr. at 204:18–20.)

5.    After Mrs. Klorczyk left for work, Christian began the process of changing the oil in the BMW.  The BMW was parked straight inside the center bay of the Klorczyks' attached three-car garage, with the front-end facing the back wall of the garage and the rear-end facing the center bay exterior garage door.  The passenger-side of the BMW was adjacent to the first bay closest to the residence and facing the doorway entrance to the home.  The driver-side of the BMW was adjacent to the third bay furthest from the residence and facing away from the doorway entrance

to the home.  The parking brake was engaged and manual transmission in gear.  The exterior garage doors were closed and the overhead garage lights turned on.  A twin-head halogen light stand was positioned near the front passenger-side of the BMW with both lights turned on.  (Ex. A, L. Klorczyk Tr. at 122:7–8, 126:11–25, 130:3–8, 139:18–140:7; Ex. D, F. Klorczyk Tr. at 207:22–208:5, 304:13–25, 368:16–17.)

6.    There were a total of four Sears Craftsman ratchet-and-pawl design jack stands in the garage, two of the subject 4 ton jack stands (Sears Model No. 50163) and two $3^{1/2}$ ton jack stands (Sears Model No. 50157).   The 4 ton jack stands (serial numbers GT1010009618 and GT1010009619) were brand new and had not been used since Christian purchased them at the local Sears store in Waterford on January 1, 2011.  The $3^{1/2}$ ton stands had been used extensively since Mr. Klorczyk purchased them in 1992.  (Ex. D, F. Klorczyk Tr. at 46:17–19, 35:8–23, 121:2–9, 152:16–20.)

7.    The jack stand is a device utilized to support a motor vehicle in an elevated position, permitting, among other things, access to the underside of a motor vehicle for purposes of repair work, servicing and maintenance.   The ratchet-and-pawl design jack stand utilizes a single locking mechanism that relies on full engagement between the tip of the locking pawl and grooved indentations that run along the toothed side of the ratchet bar.  (F. Klorczyk Dep. Ex. 5, Jack Stand Operators Manual.)

8.    There was a Sears Craftsman $3^{1/2}$ ton hydraulic service jack (Sears Model No. 50145) in the garage.  The service jack is a device utilized to raise and lower a portion of a motor vehicle.  The service jack is actuated by engaging the lifting handle in to a socket, which activates a valve in the hydraulic circuit that controls the lifting arm.  To raise the lifting arm, the lifting handle is inserted in to the socket and turned clockwise, closing the valve so as to increase the hydraulic

pressure by pumping the lifting handle up and down.  To lower the lifting arm, the lifting handle

is inserted in to the socket and turned counterclockwise, opening the value and releasing the

hydraulic pressure.  (J. Sprague Dep. Ex. 8, Service Jack Operators Manual.)

9.     The front passenger-side of the BMW was raised and the front passenger-side tire removed

and placed beneath the front passenger-side brake rotor.  Mr. Klorczyk taught Christian to

remove and position the tire in this way as a safety measure when working underneath a vehicle.

(Ex. D, F. Klorczyk Tr. at 107:23–108:20, 207:22–208:5, 214:4–6.)

10.   A 4 ton jack stand was placed beneath the front passenger-side of the BMW inboard of the

front passenger-side wheel well.  Mr. Klorczyk taught Christian to position the jack stand in this

location so that the saddle on top of the ratchet bar was in contact with the longitudinal steel

engine frame, allowing the jack stand to support the vehicle in an elevated position after using

the service jack to raise the vehicle and transfer the load to the jack stand.  (Ex. D, F. Klorczyk

Tr. at 161:12–15, 208:7–14, 242:17–243:1, 341:11–17; Ex. O, Photographs of BMW underbody,

P002_0070, P002_0075.)

11.   The service jack was positioned away from the BMW and placed upright and parallel to the

passenger-side with the lifting arm fully depressed and the lifting handle removed from the

socket and placed next to the base.  Mr. Klorczyk taught Christian to position the service jack in

this way so that it was removed away from the vehicle after transferring the load to the jack

stand.  The service jack was not used to support the vehicle after the load was transferred to the

jack stand.  (Ex. D, F. Klorczyk Tr. at 94:10–95:19, 107:1–9, 161:12–15, 208:20–23, 218:12–

219:10, 385:12–386:4.)

12.   Christian, lying on a mechanic's creeper, rolled under the BMW from the front-end and

was facing the underbody.  Christian's lower legs and feet were protruding out from the front

bumper, his sternum was beneath the rear lateral engine frame cross-member and manual transmission and his face was further to the rear beneath the transmission assembly.  Christian, using a wrench in his right hand, was in the process of tightening the oil drain plug when the BMW collapsed crushing his face and chest.  (Ex. D, F. Klorczyk Tr. at 55:22–57:12, 207:22– 208:5, 232:24–233:7, 383:15–384:17; Ex. A, L. Klorczyk Tr. at 126:24–127:4, 136:10–14.)

13.    Mr. and Mrs. Klorczyk arrived home together at approximately 3:30 p.m.  Mrs. Klorczyk opened the interior garage doorway, saw Christian's legs sticking out from the front bumper and realized he was under the BMW.  Mrs. Klorczyk stood in the doorway calling for Christian; he did not respond.  Mr. and Mrs. Klorczyk entered the garage as Mrs. Klorczyk called 911.  (Ex. A, L. Klorczyk Tr. at 106:13–22, 126:11–128:2; Ex. D, F. Klorczyk Tr. at 204:18–205:11.)

14.    The front passenger-side of the BMW was titled downward, but the exposed brake rotor was not in contact with the removed tire.  Mr. Klorczyk ran to the front passenger-side wheel well, pulled the tire out and crawled underneath the BMW to see Christian's face being crushed by the transmission assembly and Christian's chest being crushed by the real lateral engine frame cross-member and transmission.  Christian's right hand was holding the wrench, which was connected to the oil drain plug.  (Ex. D, F. Klorczyk Tr. at 207:22–208:11, 213:2–215:21, 232:24–233:8; Ex. A, L. Klorczyk Tr. at 136:10–14, 138:22–139:5, 157:4–24.)

15.    The size and nature of the crush injuries to Christian's sternum are consistent with the underbody components of the rear lateral engine frame cross-member and manual transmission. The size and nature of the crush injuries to Christian's right cheek and face are consistent with the underbody components of the transmission assembly and transmission fluid drain plug.  (Ex. J, Heath Rebuttal Tr. at 80:15–81:3; Heath Rebuttal Dep. Ex. 3, Rebuttal Report at 6–7; Ex. O, Photographs of BMW underbody, P002_0070, P002_0075.)

16.    Mr. Klorczyk observed the 4 ton jack stand in the front passenger-side area inboard of the front passenger-side wheel well.  The jack stand was on its side with the top of the ratchet bar facing the exterior garage door and the ratchet bar fully depressed in to the neck collar of the jack stand.  The underside of the BMW was not in contact with the jack stand.  (Ex. D, F. Klorczyk Tr. at 77:7–10, 78:5–12, 208:11–14, 215:18–217:11, 388:23–389:19.)   The other three jack stands were positioned next to one another away from the BMW near the front driver-side.  (Id. at 398:8–22.)

17.    Mr. and Mrs. Klorczyk observed the service jack positioned upright and parallel to the passenger side of the BMW with the lifting arm fully depressed and the lifting handle removed from the socket and placed next to the base.  Mr. Klorczyk inserted the lifting handle in to the socket, wheeled the service jack under the passenger-side and pumped the lifting handle, raising the lifting arm so as to lift the BMW off of Christian.  (Ex. D, F. Klorczyk Tr. at 208:20–209:7, 217:12–220:13, 385:12–388:15; Ex. A, L. Klorczyk Tr. at 128:3–131:8, 162:25–163:13.)

18.    Mr. Klorczyk crawled under the BMW, turned the jack stand that was on its side upright and raised the ratchet bar so that it was in contact with the front passenger-side underbody of the BMW.  (Ex. D, F. Klorczyk Tr. at 209:12–16, 220:15–221:9, 388:23–391:17.)

19.    After Mr. Klorczyk lifted the BMW off of Christian, Mrs. Klorczyk observed the jack stand on its side beneath the front passenger-side area.  Mrs. Klorczyk watched Mr. Klorczyk crawl under the BMW, turn the jack stand upright and raise the ratchet bar in the same manner described above.  (Ex. A, L. Klorczyk Tr. at 131:9–135:13, 267:22–269:25.)

20.    Geoffrey Hausmann was the first emergency responder to arrive at the Klorczyk garage. As he arrived at the scene, Mr. Hausmann observed Mr. Klorczyk assembling the lifting handle in to the socket so as to elevate the lifting arm and lift the BMW off of Christian.  Mr. Hausmann

crawled under the BMW, and observed the jack stand in the same position described by Mr. and Mrs. Klorczyk – beneath the front passenger-side of the BMW.  (Ex. E, G. Hausmann Tr. at 20:6–10, 32:16–23, 33:16–35:14, 48:6–50:7, Hausmann Dep. Exs. 4, 5.)

21.    The ratchet-and-pawl design of the subject Craftsman 50163 Model jack stand is susceptible to sudden and unexpected loss of ratchet bar height as a result of the condition known as false engagement.  False engagement occurs when the tip of the locking pawl fails to engage with the grooved indentations that run along the toothed side of the ratchet bar; the jack stand is susceptible to failure when the tip of the locking pawl fails to engage and rests on the edge of a tooth on the ratchet bar.  False engagement is also referred to as point-to-point engagement.  (Ex. N, F. Heath Dep. Tr. at 64:18–65:18, 100:17–24, Heath Dep. Ex. 3, Report at 12–13; Ex. P, Photo of False Engagement in Exemplar Jack Stand, KLORCZYK003301.)

22.    The subject Craftsman 50163 Model jack stand is susceptible to false engagement.  The ratchet-and-pawl design is capable of supporting a load equivalent to the weight of the BMW without being fully engaged, giving the user the false sense that the jack stand is safe when in fact it is subject to sudden, unexpected loss of ratchet bar height.  The circumstances surrounding the collapse of the BMW are most consistent with the occurrence of false engagement, and it is more probable than not that false engagement caused the collapse; metal failure and tip over were eliminated as potential alternative causes.  (Ex. N, F. Heath Tr. at 114:21–116:22, Heath Dep. Ex. 3, Report at 11–13; Ex. M, R. Claypool Dep. Tr. at 81:15–82:4; SFA Dep. Tr. (A. Chaykin) cited pages and exhibits attached as Ex. Q, at 130:7–131:15, 133:14–17.)

23.    Defendants SFA, Wei Fu, MVP (Taishan) Machinery & Elec. Co., Ltd. ("MVP"), and Shinn Fu Corporation ("SFT") (collectively, the "Shinn Fu Defendants") are corporate affiliates that share common directors and leadership.  SFA, Wei Fu and MVP operate under the direction

and control of SFT.  (Ex. M, R. Claypool Tr. at 22:24–26:11, 32:21–34:24, 40:23–41:18, 90:20–93:13, 95:13–17, Claypool Ex.4; Ex. Q, SFA Tr. (A. Chaykin) at 37:9–38:5, 41:4–13.)

24.    The subject Craftsman 50163 Model jack stand was manufactured by Wei Fu (ECF No. 256, Wei Fu Ans. ¶ 16), and the subject jack stand was distributed to Sears by MVP (ECF No. 253, MVP Ans. ¶ 16).  SFA provided customer support services with respect to the subject jack stand, and SFA's corporate phone number is listed in the subject jack stand Operators Manual. (Ex. Q, SFA Tr. (A. Chaykin) at 9:24–10:7, 64:5–9, 80:2–81:9, SFA Dep. Ex. 6; Ex. R, Pls' Suppl. Interrog. Resps. at 5–6.)

25.    Defendants were aware, prior to March 11, 2011, that the ratchet-and-pawl design jack stand permitted the occurrence of false engagement and that the occurrence of false engagement in a jack stand under load could result in serious bodily injury or death.  Mr. Claypool had numerous discussions with SFA's General Counsel, Arthur Chaykin, concerning false engagement.  The topic of false engagement also was discussed by members of the ASME-PALD committee, including Mr. Claypool and Defendants' committee representatives.  (Ex. M, R. Claypool Tr. at 50:8–13, 59:16–60:19, 63:6–64:14, 67:15–71:2, 75:5–77:13; Ex. Q, (SFA Tr. (A. Chaykin) at 130:7–134:3; Ex. R, Pls' Suppl. Interrog. Resps. at 3–4.)

26.    Defendants were in a position to protect users such as Christian by means of alternative designs that utilized, among other features, redundant or secondary locking mechanisms, including a redundant locking pin, to prevent loss of ratchet bar height due to false engagement. In the course of his employment with SFA, Roger Claypool developed plans for such an alternative design; however, Defendants did not act on Mr. Claypool's proposal.  In contrast, industry peers and competitors, including Allied, Torin and Strongway developed and implemented for sale jack stands with such additional safety features.  Defendants currently sell

a ratchet and pawl design jack stand with redundant locking features.   The presence of a redundant locking feature in the subject jack stand would have prevented the BMW from collapsing on to Christian.  (Ex. M, R. Claypool Tr. at 70:10–71:2, 77:2–81:11, 82:25–83:20; Ex. Q, SFA Tr. (A. Chaykin) at 145:20–146:4, 148:8–149:22, 153:17–154:25, 160:11–23, 139:17–170:21, 171:21–172:14; SFA Dep. Ex. 15, Claypool Alternative Design Plans; Ex. S, Wei Fu Tr. (Su Chien Chi) at 126:12–131:14; Ex. D, F. Klorczyk Tr. at 270:25–271:9; Ex. R, Pls' Suppl. Interrog. Resps. at 4; Heath Dep. Ex. 3, Report at 14–15.)

27.   Defendants were aware, prior to March 11, 2011, that it was common for a single jack stand to be used for do-it-yourself jobs such as oil changes.  (Ex. M, R. Claypool Tr. at 108:25–109:18; Ex. K, R. Jorgensen Dep. Tr. at 53:17–54:22; E. Boelhouwer Dep. Tr., cited pages and exhibits attached as Ex. T, at 89:22–90:14.)

28.   Mr. Klorczyk and Christian reviewed the Operators Manual that accompanied the subject 4 ton jack stands, and had a discussion about various aspects of the Operators Manual that they found to be confusing and unclear.  (Ex. D, F. Klorczyk Tr. at 326:12–327:22.)

29.   Neither the Operators Manual nor the on-product labels for the subject 4 ton jack stands provide adequate or appropriate warnings or instructions concerning the occurrence of false engagement.  Specifically, nothing in the Operators Manual or the on-product labels informs the user that the tip of the pawl may not fully engage with the grooved indentations of the ratchet bar, or that the jack stand may be capable of supporting load without the pawl being fully engaged with the ratchet bar.  In contrast, industry peers and competitors, including Sealey Quality Machinery, developed warnings and instructions for products comparable to the subject jack stands that provide warnings related to the crush hazard posed by false engagement.  (F. Klorczyk Dep. Ex. 5, Jack Stand Operators Manual; Ex. T, E. Boelhouwer Tr. at 75:17–76:21,

77:14–24, 80:8–84:1, 98:19–99:23, 164:10–165:3, 173:8–25, 195:10–18, Boelhouwer Dep. Ex. 11, Report at 3–5, 8–9, Boelhouwer Dep. Ex. 12, Sealey Quality Machinery Manual.)

30.   False engagement is not an obvious hazard because, among other things, the base frame of the jack stand limits the user's ability to observe whether the locking pawl is fully engaged with the ratchet bar.  False engagement gives the user the false sense that the jack stand is safe when in fact it is subject to sudden, unexpected loss of ratchet bar height.  Neither the Operators Manual nor the on-product labels provide adequate or appropriate warnings or instructions concerning the hazard posed by false engagement.  The Operators Manual and on-product labels are ambiguous in that it is not clear if the rated capacity relates to the capacity of the jack stands as a pair or the capacity of a single jack stand.  (Ex. D, F. Klorczyk Tr. at 145:8–24, 200:22–201:2, 202:2–8, F. Klorczyk Dep. Ex. 5, Jack Stand Operators Manual; Ex. T, E. Boelhouwer Tr. at 58:3–13, 62:14–21, 80:8–81:5, 87:6–24, 149:19–150:25, 158:13–159:22, 163:14–22, Boelhouwer Dep. Ex.11, Report at 5–8.)

31.   Defendants were in a position to provide adequate and appropriate warnings and instructions concerning the occurrence of false engagement.  Had such warnings and instructions been provided, Christian would have been alerted to the hazard posed by false engagement and would have changed his behavior in such a way as to prevent the harm suffered.  (Ex. T, E. Boelhouwer Tr. at 80:8–81:5, 174:1–175:5, Boelhouwer Dep. Ex. 11, Report at 8–9.)

PLAINTIFFS,
FREDERICK KLORCZYK, JR. and LYNNE
KLORCZYK, co-administrators of the Estate of
Christian R. Klorczyk

By: /s/ *Paul D. Williams*
    Paul D. Williams (ct05244)
    *pdwilliams@daypitney.com*
    Bryan J. Orticelli (ct28643)
    *borticelli@daypitney.com*
    Kaitlin A. Canty (ct29074)
    *kcanty@daypitney.com*
    DAY PITNEY LLP
    242 Trumbull Street
    Hartford, CT 06103-1212
    860-275-0100 (Tel)
    860-275-0343 (Fax)

    Howard S. Edinburgh
    *hedinburgh@herzfeld-rubin.com*
    Herzfeld & Rubin, P.C.
    125 Broad Street
    New York, NY 10004
    (212) 471-8529 (Tel)
    (212) 344-3333 (Fax)

    *Their Attorneys*

-30-

## <u>CERTIFICATION</u>

I HEREBY CERTIFY that on this date a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_____ /s/ *Bryan J. Orticelli*_
Bryan J. Orticelli (ct28643)