# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FREDERICK KLORCZYK, JR., as co-administrator | : | CIVIL ACTION NO. |
| of the Estate of Christian R. Klorczyk, et al. | : | |
| | : | |
| *Plaintiffs*, | : | 3:13-cv-00257-JAM |
| | : | |
| vs. | : | |
| | : | |
| SEARS, ROEBUCK AND CO., et al., | : | |
| | : | |
| *Defendants*. | : | OCTOBER 11, 2018 |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS SHINN FU CORPORATION'S AND SHINN FU COMPANY OF AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT ON THE GROUNDS THAT THEY WERE NOT IN THE STREAM OF COMMERCE WITH RESPECT TO THE SUBJECT PRODUCT

Paul D. Williams (ct05244)
*pdwilliams@daypitney.com*
Bryan J. Orticelli (ct28643)
*borticelli@daypitney.com*
Kaitlin A. Canty (ct29074)
*kcanty@daypitney.com*
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
860-275-0100 (Tel)
860-275-0343 (Fax)

Howard S. Edinburgh
*hedinburgh@herzfeld-rubin.com*
Herzfeld & Rubin, P.C.
125 Broad Street
New York, NY 10004
(212) 471-8529 (Tel)
(212) 344-3333 (Fax)

*Attorneys for Plaintiffs Frederick Klorczyk*
*Jr. and Lynne Klorczyk, Co-Administrators*
*of the Estate of Christian Klorczyk*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

I.   PRELIMINARY STATEMENT ................................................................... 1

II.  ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT ............................... 3

    A.  SFC and SFA are Product Sellers Within the Meaning of the CPLA .................... 3

        1.  SFC's Website Highlights Its Affiliated Global Operations. ..................... 3

        2.  SFA's Website Highlights its Dominance in the United States DIY Jack Stand Market. ................................................................ 4

        3.  The Companies Share Common Owners, Directors, Officers and Managers. ........................................................................ 4

        4.  MVP's Contractual Relationship With Sears for the Subject Jack Stands. ................................................................................. 6

        5.  SFA's Contractual Relationship With MVP for the Subject Jack Stands. ................................................................................. 7

        6.  The Companies' Common Insurance Policy. ........................................ 10

        7.  The Sears Craftsman Model 50163 Jack Stand Evolved From, Was Based on and Was A Virtual Clone of SFA's ProLift Model T6904 Jack Stand. ........................................................ 11

            a.  The Craftsman Model 50163 Jack Stand and the SFA ProLift Model T6904  Jack Stand Had Identical Design, Locking and Safety Features and Specifications Including the Ratchet Bar, Pawl, Handle, Collar, Load Capacity and Height Range. .............................................................. 11

            b.  SFC And SFA were Responsible for Developing and Designing the Ratchet-and- Pawl Jack Stands Sold to Sears. ....... 16

            c.  SFA Oversaw the Design, Development and Specifications for the Sears Craftsman Model 50163 Jack Stand and Orchestrated the Shinn Fu Group's Response to Sears Complaints About the 50163 Model's Limited Height Range ...................................................................... 17

            d.  The Sears/MVP/Wei Fu Purchase Orders and Invoices Are Proof that the SFA ProLift T6904 and the Sears Craftsman Model 50163 Were the Same Jack Stand. ................... 20

            e.  SFA and SFC were Responsible for Drafting the Operators Manual for the ProLift T6904 Which Became, With the Same Warnings and Safety and Operating Instructions, the Manual for the Craftsman Model 50163 Jack Stand. ................. 22

i

III.   ARGUMENT .................................................................................................24

    A.   Summary Judgment Standard ...........................................................24

    B.   SFC and SFA Are Product Sellers of the Subject Jack Stands............................25

        1.   A Fact Intensive Inquiry is Required to Determine if a
Defendant is a Product Seller.................................................25

        2.   The Expansive Definition of Product Seller Under the
CPLA. ............................................................................26

        3.   The Goals of the CPLA Would be Furthered In Holding
SFA and SFC are Product Sellers.............................................26

        4.   SFA and SFC More Than Satisfy The Relevant Factors
Considered by the Courts In Determining Whether a
Defendant is a Product Seller Under the CPLA......................27

            a.   SFA's Substantial Economic Benefit From the Sale of The
Craftsman Model 50163 Jack Stand. ............................................28

            b.   SFA's Admitted Role In Advertising and Marketing the
Jack Stands. ..................................................................29

            c.   SFA Was Responsible For The Craftsman Model 50163
Design and Specifications. ..........................................................29

            d.   SFA Played a Crucial Role in the Development of the
Craftsman Model 50163 and Orchestrating the Shinn Fu
Companies Response to Sears Complaints About the 50163
Design. ..........................................................................30

            e.   SFA and SFC Were Responsible For Drafting The
Warnings, Operating Instructions and Safety Instructions
Which Were In The Craftsman Model 50163 Operators
Manual..........................................................................31

            f.   SFA Procured Liability Insurance For MVP and Wei Fu
and Provided Claims  Management for These Defendants. ..........31

            g.   The Case Cited by Defendants are Readily Distinguishable.........32

IV.   CONCLUSION ...........................................................................................35

# TABLE OF AUTHORITIES

**Page**

## Cases

*Acquarulo v. A.O. Smith Corp.*,
   2011 Conn. Super. LEXIS 3313 (Conn. Super. Ct. Dec. 30, 2011)................................ 28, 32

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .......................................................................................................... 24, 25

*Burkert v. Petrol Plus of Naugatuck, Inc.*,
   216 Conn. 65 (1990).................................................................................................. 25, 26, 28

*Carlton v. Mystic Transp., Inc.*,
   202 F. 3d 129 (2d Cir. 2000) .................................................................................................. 25

*Celotex Corp v. Catrett*,
   477 U.S. 317 (1986) ............................................................................................................... 24

*Delgadillo v. Unitrons Consolidated, Inc.*,
   191 Fed. App'x 547 (9th Cir. 2006) ....................................................................................... 28

*Durove v. Fabian Transport Inc.*,
   2004 U.S. Dist. LEXIS 25258, No. 04 Civ. 7000 (RJH), 2004 WL 2912891
   (S.D.N.Y. Dec. 14, 2004) ....................................................................................................... 27

*Dzurnak v. CRD Metal Works, LLC*,
   2017 Conn. Super. LEXIS 4936 (Conn. Super. Ct. Nov. 17, 2017) ......................... 26, 28, 35

*Graham v. Long Island R.R.*,
   230 F. 3d 34 (2d Cir. 2000) .................................................................................................... 24

*In Lawton v. CBS Corp.*,
   2015 Conn. Super. LEXIS 1908, 2015 WL 502463 (Conn. Super. Ct. July 23,
   2015)........................................................................................................................................ 26

*Iragorri v. United Technologies Corp.*,
   285 F. Supp. 2d 230 (D. Conn. 2003) ............................................................................... 33, 34

*King v. Volvo Excavators, AB*,
   2018 Conn. Super. LEXIS 264 (Conn. Super. Ct. Feb. 8, 2018)............................................ 33

*Lujan v. National Wildlife Federation*,
   497 U.S. 871 (1990) ............................................................................................................... 24

*Olivia v. Bristol-Myers Squibb Co.*,
   2005 U.S. Dist. LEXIS 35881, 2005 WL 3455121 (D. Conn. Dec. 15, 2005) .......... 26, 28, 29

iii

*Pitterman v. General Motors LLC*,
   2018 U.S. Dist. LEXIS 89587 (D. Conn. April 18, 2018) ........................................ 26, 28, 35

*Reed v. 3M Co*,
   2015 Conn. Super. LEXIS 1619 (Conn. Super Ct. June 12, 2015)................................. 26, 35

*Rodia v. Tesco Corp.*,
   11 Conn. App. 391, 527 A. 2d 721 (1987) .......................................................................27

*SFA Folio Collections, Inc. v. Bannon*,
   217 Conn. 220 (1991)........................................................................................................33

*Sologub v. City of New York*,
   202 F. 3d 175 (2d Cir. 2000) ............................................................................................25

*Stanko v. Bader*,
   No. CV-030193669, 2003 Conn. Super LEXIS 2779, 2003 WL 22413476
   (Conn. Super Ct. Oct 7, 2003) .........................................................................................26

*Svege v. Mercedes-Benz Credit Corp.*,
   329 F. Supp. 2d 272 (D. Conn. 2004) .........................................................................26, 28

*White v. ABCO Engineering Corp.*,
   221 F. 3d 293 (2d Cir. 2000) ............................................................................................24

**Statutes**

Conn. Gen Sta. § 52-572n (a) ......................................................................................................25

Conn. Gen. Stat § 52-572m (a) ...................................................................................................26

Plaintiffs Frederick Klorczyk, Jr. and Lynne Klorczyk, co-administrators of the Estate of Christian Klorczyk, submit this memorandum of law in opposition to Defendants Shinn Fu Corporation's ("SFC") and Shinn Fu Company of America, Inc.'s ("SFA") motion for summary judgment on the grounds that they were not in the stream of commerce with respect to the subject product (ECF No. 297).

## I.   PRELIMINARY STATEMENT

There is, as plaintiffs will show, substantial and compelling documentary evidence and sworn testimony that SFA, a wholly owned subsidiary of its parent SFC, and SFC are "product sellers" under the Connecticut Product Liability Act ("CPLA") and, accordingly, SFA's and SFC's motion must be denied.

There is no dispute the product at issue in this litigation is a 4 ton load capacity ratchet-and- pawl design jack stand sold nationally at the retail level by Defendant Sears Roebuck & Co. ("Sears") as a Craftsman Professional Heavy Duty Jack Stand, Sears Model Number 50163.

There is no dispute that the decedent Christian Klorczyk bought a pair of these pre-packaged jacks stands in January 2011 at a local Sears store in Waterford, Connecticut. There is no dispute that the serial numbers of these twin stands are GT1010009618 and GT1010009619 and that these jack stands were manufactured by Defendant Wei Fu (Taishan) Machinery & Electric Co. Ltd. ("Wei Fu") in China in October 2010; that these jack stands were sold to Defendant MVP (HK) Industries, Ltd ("MVP"), based in Hong Kong; and that MVP, in turn, distributed the jack stands, and thousands of other 4 ton ratchet- and- pawl design jack stands (as well as thousands of other ratchet and pawl designed jack stands of lesser and greater load capacities) to Sears for sale in the United States.

A concise summary of the parties and claims is set forth in the Court's earlier August 1, 2017 Ruling (EFC No. 270) denying Defendants' motion to preclude the testimony of Roger

Claypool, who, until the end of 2008 when he voluntarily left the company, was the product safety manager (and prior to that an Engineering Manager), at SFA. The Court accurately described the parties and claims as follows:

> Plaintiffs Frederick and Lynne Klorczyk brought this wrongful death action under Connecticut's products liability statute against the alleged sellers, manufacturers, and distributors of a jack stand following the tragic death of their son, Christian Klorczyk. Plaintiffs allege that Christian was using the jack stand to raise the front end of his car while he performed an oil change at plaintiffs' home in March 2011. The jack stand allegedly failed and collapsed, causing the car to fall on Christian and crush him to death.

> Plaintiffs claim that the jack stand was defective in its design or manufacture, and also that defendants are liable for failure to provide adequate instructions or warnings. The five defendants include Sears, Roebuck & Co. ("Sears"), from whom the Klorczyks purchased the jack stand; Wei Fu (Taishan) Machinery & Elec. Co., Ltd. ("Wei Fu"), a Chinese corporation that allegedly manufactured the jack stand; MVP (HK) Industries, Ltd ("MVP"). a Hong Kong corporation that allegedly distributed the jack stand to Sears; Shinn Fu Company of America, Inc. ("SFA"), a Missouri corporation that was allegedly involved in the development, design, manufacture, testing, inspection, distribution, and sale of these jack stands, as well as in drafting warnings concerning their use; and Shinn Fu Corporation ("Shinn Fu"), the Taiwan-based parent company of SFA, MVP, and Wei Fu.

SFC, SFA, MVP and Wei Fu are owned, controlled and managed by the same two families, the Hung and Huang families who are bound together by blood and marriage. The same familial connections that bind SFA, SFC, MVP and Wei Fu together are inextricably intertwined with the common global business enterprise of these entities where, as Plaintiffs will demonstrate, SFA (and its corporate parent SFC) played critical roles in the development and design of the Sears Model 50163 4 ton jack stand, the written warnings and operators manual that accompanied its sale, the business relationship with Sears in bringing the model 50163 jack stand to the Unites States market, providing customer service infrastructure to Sears for all customer inquiries and complaints regarding the sale of the Model 50163 jack stand, procuring insurance to MVP and Wei Fu so that the Model 50163 jack stand could be sold in the United

2

States, and providing claims management and legal representation to MVP and Wei Fu for the Model 50163 jack stand that was sold in the United States, including the subject jack stands at issue here.

In addition, Plaintiffs will show that when the Model 50163 Sears Craftsman jack stand was introduced into the United States market in early 2007 (and its design never changed from its original version) SFA was MVP's United States sales representative and derived substantial economic benefit in the form of commissions from MVP's sales of the Model 50163 jack stands to Sears. From 2007 to the time of the incident in March 2011, an SFA employee was dedicated to the MVP/Sears account for the sale of the jack stands (and whose salary was reimbursed by MVP) and SFA provided testing and written manuals for the MVP jack stands sold in the United States. Taking into account all of the factors, under the CPLA and case law, SFA and SFC are "product sellers" with respect to the Sears Model 50163 jack stand.[1]

## II.   ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT

### A.  SFC and SFA are Product Sellers Within the Meaning of the CPLA.

#### 1.  SFC's Website Highlights Its Affiliated Global Operations.

SFC markets itself and its affiliates in various forums, including the Internet (Exh. "A", SFC Description of its Global Operations). SFC website indicates that SFA was established in Kansas City, Missouri in 1978, and that MVP was established in Hong Kong in 1988. SFC describes itself and its affiliates as the "Shinn Fu Group" with automotive related parts and accessories sold in the retail do-it-yourself or "DIY" market. Wei Fu, MVP and SFA are all identified in a global map as part of SFC's "Affiliated Global Operations". According to SFC's

---

[1] Plaintiffs have identified generally the documents, witnesses and facts supporting their contention that SFA and SFC are "product sellers" under the CPLA in their June 25, 2018 Supplemental Responses to Defendants' Interrogatories and Requests for Production of Documents, Supplemental Response to Interrogatory No. 14 (Exh. "B" herein).

30(b)(6) witness Chang Ching Lee (English name "Peter Chang") (and referred to herein as "Mr. Chang" or "Chang") SFC had only about 60 employees; however, SFC's website states that "Shinn Fu Group in total 2000 + employees worldwide", and "Shinn Fu Taiwan supplies product development and manufacturing services to Shinn Fu affiliated companies throughout the world", with "headquarters located in Taipei, Taiwan".[2] (Exh. "A"; Chang Dep., Exh. "H", p. 61: 9-13).

**2.   SFA's Website Highlights its Dominance in the United States DIY Jack Stand Market.**

SFA describes itself as part of the "SFA Companies" and states that among its "divisions" is the "Pro-Lift DIY products". SFA also indicates that "over the past 30 years, SFA has become the leading distributor of hydraulic lift equipment in the US and Canada". "In addition to distribution, SFA has also played a key role in engineering, research and product design to help our manufacturing facilities meet our market needs". (Exh. "C", SFA Description).

**3.   The Companies Share Common Owners, Directors, Officers and Managers.**

Defendants have produced a chart (Exh "D" herein) of the Board of Directors of SFA, SFC and MVP (Wei Fu had no Board of Directors). The deposition testimony of Roger Claypool (Exh. "E" herein, pp. 75:5-76:13, 88:14-23, 91:2-95:17), Wei Fu's 30(b)(6) witness Su Chien Chi (English name "Jeff Su") (Exh. "F", pp. 34:11-37:16, 39:1-6, 72:23-73:5), MVP's 30(b)(6) witnesses Nora Lee (Exh "G", pp. 29:6-30:2, 31:25-32:17, 33:18-25, 34:10-24, 37:2-38:3, 39:6-19, 46:16-47:19), Peter Chang (Exh. "H", pp. 15:1-24, 19:16-20:7, 33:1-15, 34:4-5, 42:10-45:15, 46:13-48:21, 50:2-51:1, 53:2-23, 55:1-11) and Arthur Chaykin, SFA's general counsel and 30(b)(6) witness (Exh. "I", pp. 41:14-42:21, 91:22-92:1), have confirmed the following:

---

[2] SFC, Shinn Fu and Shinn Fu Taiwan are all the same corporate entity. Chang Dep., Exh. "H", pp. 51:3-52:8. See also deposition of Arthur Chaykin, SFA's general counsel and one of its designated 30(b)6) witnesses who was deposed on June 21, 2018. Chaykin Dep., Exh "I", p.12:11-25.

The founder of the parent Taiwan based entity SFC was Michael Hung. His wife is Vickie Huang. Michael (now deceased) and Vickie Huang had three children: Victor Hung, Betty Hung and Angela Hung. Vickie Huang and her three children make up the members of the Board of Directors of SFC. Vickie Huang is also the general manager of Wei Fu, the highest executive position of the company, and owns the entity which in turn owns Wei Fu. Victor Hung, the son of Michael Hung and Vickie Huang, is the CEO of SFC, which is owned by the Hung family. (Exh. "D"; Chang Dep., Exh "H", pp. 32:18-33:15, 44:13-45:15, 48:14-21; Su Dep, Exh. "F", pp. 34:11-35:5, 36:12-37:16, 39:3-6, 44:23-45:19, 47:20-25, 73:3-5).

The Hung family also owns MVP. The Hung children make up the MVP Board of Directors. Victor Hung, in addition to being the CEO of SFC, was also the "boss" of MVP who ran MVP's day-to-day operations. Despite MVP being based in Hong Kong, Victor Hung ran the operations of MVP from his base in Taiwan. The other MVP board members, Victor's sisters Betty and Angela, also reside in Taiwan (Lee Dep., Exh. "G", pp. 29:6-30:2, 31:25-33:25, 34:8-35:5, 37:2-38:3; Chang Dep., Exh. "H", p. 53:2-23).

Although Wei Fu is located in southern China, Vickie Huang ran Wei Fu's day-to-day operations from her home base in Taiwan as well (Su Dep., Exh. "F", pp. 36:12-37:16, 39:1-6).

Vickie Huang's brother, Steven Huang, is the president and COO of SFA (Deposition of SFA 30(b)(6) witness Meghan O'Connor, Exh. "J", pp. 12:1-5, 13:25, 70:4-24). Steven Huang, his sister Vickie, Vickie's children (and Steven's nephew and nieces) Victor, Betty and Angela Hung are all on SFA's Board of Directors. While rarely coming to the United States or Kansas City where SFA is located, Betty Hung is the CEO of SFA.  In addition to being the CEO of SFA and on its Board of Directors, Betty Hung is a major shareholder in and on the Board of Directors of MVP, is a major shareholder in SFC, and was also Vice President of sales at SFC

(Exh. "D"; O'Connor Dep, Exh. "J", pp. 17:9-19:9, 20:2-24, 23:16-24:24, 26:6-24, 27:3-13; Chang Dep., Exh "H", pp. 42:10-43:7; 47:5-48:21).

SFA is a wholly owned subsidiary of SFC (Chang Dep., Exh. "H", pp. 50:21-51:1; O'Connor Dep., Exh "J", p.16:10-16). SFC's 30(b)(6) witness Peter Chang, when deposed this past spring, was employed by SFA in Kansas City as a product manager having gotten the job when his boss at SFC, Victor Hung, told him of an opening. Mr. Chang was hired at SFA by Victor Hung's uncle, Steven Huang (Chang Dep., Exh. "H", pp. 14:16-15:15, 19:16-20:7).

### 4.  MVP's Contractual Relationship With Sears for the Subject Jack Stands.

On October 12, 2006 MVP (thru its Vice President Tony Choi) entered into a written agreement with Sears in which MVP (as seller) agreed to be bound by Sears Universal Terms and Conditions (Sears UTC). The Sears UTC is Exh. "13" to the deposition of MVP 30(b)(6) witness Nora Lee, MVP Bates No. MVP010203-MVP010211 (Exh. "K" herein). The Sears UTC, among other requirements for MVP to sell merchandise to Sears, required MVP to indemnify Sears for third-party personal injury actions (section 11.2, MVP010207) and to "obtain and maintain at its expense, a policy or policies of Commercial General Liability Insurance covering liabilities related to merchandise, including products" (section 12, MVP010207).

The subject "Merchandise" is listed in Sears Accelerated Line Review Agreement ("ALR") dated December 11, 2006 and marked as Exh. "14" to the deposition of Nora Lee of MVP and Bates Numbered MVP010229-MVP010243 (Exh. "L" herein). The ALR lists the "subject merchandise" MVP is selling or will sell to Sears. MVP is selling to Sears a 3 ton load capacity jack stand under Sears Craftsman Item Number 50159. Immediately below Sears Item 50159, ALR lists "NEW" "Craftsman Professional – 4T jack stands" invoiced in U.S. dollars and F.O.B. China at $10.75. MVP is to ship the initial batch of 6,000 of the new 4 ton Craftsman

Professional jack stands by February 15, 2007 (MVP 010243). On May 4, 2007 MVP renewed its adherence to Sears UTC including requirements for indemnification (§§ 11.1 and 11.2 MVP000005 and MVP 000006) and insurance (§ 12, MVP 000006). The May 4, 2007 Sears/MVP Agreement was Exh. "15" to Ms. Lee's deposition and is Bates Numbered MVP000001-MVP000010) (Exh. "M" herein).

**5. SFA's Contractual Relationship With MVP for the Subject Jack Stands**.

At the same time MVP was to provide Sears with the 4 ton jack stands, MVP and SFA on October 1, 2006, entered into a written Sales Representative Agreement in effect to December 31, 2007. That Agreement was marked as SFA Exh. "6" at the deposition of SFA 30(b)(6) witness Meghan O'Connor and remarked as Exh. "12" at the deposition of MVP 30(b)(6) witness Nora Lee, and Bates Numbered SFA 003336-SFA 003339 (Exh. "N" herein).

The October 2006 SFA/MVP Agreement states that SFA has experience in the sale and distribution of "Do It Yourself" ["DIY"] sales channels in the United States [the "Market Area"] and is in the business of importing, selling, marketing and distributing various types of lifting equipment, automotive tools and hydraulic equipment in the United States. MVP is said to be in the business of sourcing and selling a variety of automotive accessories and related consumer products "focused on the DIY market" (SFA 00336). The 2006 SFA/MVP Agreement states that "MVP wishes to retain SFA as its Representative for the Market Area" which is the United States. (Id).

SFA is described in the 2006 SFA/MVP Agreement as MVP's "Sales Agent" who will "market, sell, provide customer relations and otherwise perform all sales and marketing activities on behalf of MVP in the Market Area". SFA is to undertake to maximize sales in the Market Area (Id). The parties refer to the Agreement as a "Sales Agency Agreement" pertaining to MVP products directly ordered by customers in the Market Area "for direct overseas shipment from

MVP (HK) ['MVP commission sales'] to the customer" (SFA 003337). MVP agrees that with respect to the DIY business, MVP "will not contract for agency services with any other sales agent in the Market Area", which, again, is the United States (Id). SFA agrees to provide MVP with information regarding "prevailing prices and market conditions." SFA will also provide MVP "with information regarding new product ideas and market trends." (Id).

The 2006 SFA/MVP Agreement also requires MVP to:

(a) pay SFA a  commission of 1.5% on Gross MVP Commission Sales." (Id, § 10); and

(b) indemnify SFA for any personal injury action, including product liability and failure to warn claims "arising out of or related to the sale and marketing of any MVP Commissioned Product" (§ 19, Bates Numbered SFA 003338-SFA003339).

Illustrative of the close ties between the companies, the 2006 SFA/MVP agreement has no choice of law or forum selection clause, no arbitration clause and provided that "any dispute arising out of or relating to this Agreement will be discussed and resolved by the parties" (§ 24, SFA 00339). These provisions appear more like an intra-familial way to deal with future disagreement than an arms-length dealing between genuinely "independent" companies.

Nora Lee, MVP's 30(b)(6) witness, testified that jack stands were part of the MVP products included in the 2006 SFA/MVP Agreement (Lee Dep., Exh. "G", p. 61:4-10). Meghan O'Connor, said the same at her deposition (O'Connor Dep., Exh. "J", p.74:1-23). With respect to the MVP/Sears Agreement, Ms. Lee testified the 50159 3 ton jack stand listed in "Exhibit A, Subject Merchandise" in the Sears/MVP ALR was a ratchet- and- pawl design jack stand that MVP exported to Sears and was manufactured by Wei-Fu (Lee Dep., Exh. "G", p. 77:1-23). Ms. Lee testified the "new" 4 ton jack stand listed in Exhibit "A" to the Sears/MVP ALR was the

ratchet- and- pawl design 50163 Model which was first shipped to Sears in the first quarter of 2007 (Lee Dep., Exh. "G", pp. 77:24-79:9).

Arthur Chaykin, SFA's General Counsel and one of SFA's 30(b)(6) deposition witnesses, testified that he drafted the 2006 SFA/MVP Agreement. Mr. Chaykin testified that the 2006 SFA/MVP Agreement was executed in contemplation of the contemporaneous agreements between MVP and Sears. Mr. Chaykin testified that both the T6904 4 ton jack stand and the Sears Craftsman 50163 4 ton jack stand would have been included in the MVP products for which SFA would receive a sales commission (Chaykin Dep., Exh "I", pp. 67:13-25, 68:13-70:25, 71:24-73:14).

SFA and MVP entered into subsequent amendments to the 2006 Agreement. The First Amended Agreement (conceded by Defendants as mistakenly labeled as the "Second Amendment") covers the period beginning June 1, 2008 (part of Exh. "N" herein, Bates Numbered SFA 003340-SFA 003341). The First Amendment states that MVP will no longer as of June 1, 2008 pay sales commissions to SFA. Rather the "sales agency" was to be "converted to a sales and customer support  relationship." Under the customer support relationship SFA was to be paid a lump sum of $45,000 per year to SFA and SFA was to provide the MVP with the following:

> "a.    Lab test services;
>
> b.    Show management;
>
> c.    OIPM [Owners Information and Parts Manual] support;
>
> d.    Customer phone service support".

In addition, MVP was to 100%  reimburse SFA for the services of a full time employee Johnny Lu and 50% for the services of a second SFA employee Jamie Martinez for a total of $93,154 (SFA 003340). The initial 2006 Agreement, except for the ending of commissions and

any other inconsistent provisions, was to remain in effect and "SFA will continue to provide the same services to MVP as previously indicated" (SFA 003341).

A Second Amendment between SFA and MVP, became effective December 1, 2009 (SFA 003346-SFA 003347, part of Exh. "N" herein). In all material respects this Second Amendment (mistakenly called the "First Amendment"), was the same as its predecessor. On January 2, 2011 MVP and SFA entered into another Amendment to the MVP and SFA Sales Agency Agreement which was essentially the same as the earlier version (SFA 003344-SFA003345).[3]

Meghan O'Connor testified that the Amendments were executed essentially for SFA to provide an employee [Johnny Lu] and services to MVP for the Sears account (O'Connor Dep., Exh. "J" pp. 71:8-72:9, 85:10-11, 87:14-16, 108:16-24). Pursuant to OIPM provision, Ms. O'Connor that SFA would format the OIPMs for [MVP]. If a customer requested specific format, specific information, we would create that for [MVP]". (Exh. "J", p. 78:4-13).

### 6. The Companies' Common Insurance Policy.

It is clear from Sears/MVP Agreements that MVP in order to sell its jack stands (including the 50163 Model) to Sears needed to secure general liability insurance coverage. The policy of insurance produced by Defendants was the one in effect at the time of the March 2011 incident. The policy was issued by Lexington Insurance Company and was a renewal policy effective May 1, 2010 to May 1, 2011. The Declaration Page of the Lexington policy with the names of Additional Insureds and Special Conditions provisions are annexed hereto as Exh. "O ", and marked as SFA Exh. "5" at the deposition of Meghan O'Connor of SFA and as Exh. "11" at the deposition of Nora Lee at MVP. The Lexington Policy lists Shinn Fu Corporation and MVPHK Industries, Ltd. as named insureds with the insureds addresses being c/o 10939 N.

---

[3] Note our copy is somewhat difficult to read because of the poor quality of the copy provided to us by SFA.

Pomona, Kansans City, MO 64153 which is the headquarters of SFA. The Lexington Policy (Exh "O", SFT Bates No. 000005, WFT Bates No. 001952) states that the policy was "procured and developed under the Missouri Surplus Lines Law". Missouri being the state where SFA is organized and headquartered, The Lexington policy lists SFA and Wei Fu as additional insureds (Exh "O", SFT 000024, WFT  001971). The Lexington policy also requires the insureds to have a claims services administrator, a "TPA" (third-party administrator) who is identified in the policy as being Arthur A. Chaykin (SFA's general counsel) (Exh "O", SFT 000034, WTF 001981).

Ms. O'Connor testified that SFA procured the Lexington Policy on behalf of MVP and SFC and also obtained additional insured coverage for Wei Fu with Lexington. With respect to covered claims, Ms. O'Connor testified that SFA would speak to SFC who in turn would contact. The Lexington coverage was $2 million per occurrence, $2 million aggregate and $10,000,000.00 umbrella. Ms. O'Connor confirmed that SFA's general counsel Arthur Chaykin, was also the "TPA", the claims administrator for all claims and claims management for SFC, MVP and Wei Fu. (O'Connor Dep., Exh. "J", pp. 34:13-36:12, 39:18-40:22, 42:12-15, 48:16-50:2).

### 7. The Sears Craftsman Model 50163 Jack Stand Evolved From, Was Based on and Was A Virtual Clone of SFA's ProLift Model T6904 Jack Stand.

#### a. The Craftsman Model 50163 Jack Stand and the SFA ProLift Model T6904 Jack Stand Had Identical Design, Locking and Safety Features and Specifications Including the Ratchet Bar, Pawl, Handle, Collar, Load Capacity and Height Range.

SFA engineer Ryan Jorgensen was designated as a SFA 30(b)(6) witness. Mr. Jorgensen testified as follows with respect to the SFA Pro-Lift T6904 4 ton jack stand and Sears Craftsman 50163 4 ton jack stand (Jorgensen Dep., Exh. "P", p. 25:1-15):

"Q:     In your mind is there a distinction between the 50163 jack stand and the T6904 jack stand?

A:     They are a different brand, different color.

Q:     How about from a standpoint of their design and hard specifications?

A:     I'm not aware of any features that are different.

Q:     Same locking features?

A:     Same locking design, yes.

Q:     Same safety design features?

A:     Yes."

Again on page 63-64 of his deposition (Exh. "P") Mr. Jorgensen testified as follows:

"Q:     50163 is a 4 ton ratchet and pawl design jack stand?

A:     Yes.

Q:     To the knowledge of SFA, T6094 is also a 4 ton ratchet and pawl design jack stand correct?

A:     Yes.

Q:     With the same designed features as the 50163.

A:     Yes.

Q:     Same load capacity?

A:     Yes."

Mr. Jorgensen testified that Pro-Lift was a SFA brand of jack stands and SFA sold a Pro-Lift four ton ratchet and pawl design jack stand [the T6904] The Pro-Lift T6904 was in the marketplace at least since 2006 (Jorgensen Dep., Exh. "P". pp. 27:15-23, 85:6-8, 112:11-18).

Mr. Jorgensen generally described how a ratchet- and- pawl designed jack stand functions:

"The column with the teeth is inserted into the base frame. There is a weighted handle that goes through what is called the pawl and the pawl interacts with the teeth in a manner such that it sustains whatever capacity was designed to hold on the column" (Jorgensen Dep, Exh. "P ", p. 34:3-11).

Following this testimony, Mr. Jorgensen identified the locking feature of the ratchet-and-pawl SFA jack stands:

"Q:      Does SFA have an understanding of whether the – that the ratchet and pawl design jack stand has a locking mechanism?

A:      A locking mechanism in the design?

Q:      Yes, to keep the column upright and not go up or down when it's under load.

A:      That would be the pawl.

Q:      And the pawl is engaged into the teeth of the ratchet, is that correct?

A:      Yes.

Q:      And that is the design of the ratchet and pawl jack stand known to SFA for the various load capacities?

A:      Yes."

(Jorgensen Dep., Exh. "P", pp. 34:12-35:3).

Jeff Su, Wei Fu's 30(b)(6) witness, testified at deposition that from 2003 to 2012 Wei Fu manufactured ratchet-and-pawl design jack stands for SFA including under SFA's Pro-Lift brand. Wei Fu manufactured during these years a 4 ton jack stand bearing Wei Fu internal designation "T37401". This jack stand had a maximum height of slightly over 17 inches and a minimum height of just over 12 inches. Wei Fu manufactured the Pro-Lift brand 4 ton ratchet-and-pawl design jack stand for SFA under model number "T6904". The T6904 and the T37401 have the same load capacity (8000 pounds) and the same minimum and maximum ratchet bar

13

height. They both weigh about 5 kilograms with the T37401 being slightly heavier (about "0.1 to 0.2 kg") because the base frame was slightly heavier, and thicker (Su Dep., Exh. "F", pp. 79:12-81:6, 81:7-82:14, 84:9-87:2). However, even though Mr. Su testified that Wei Fu prepared the design drawings for these jack stands, he testified as follows:

"Q:     Was the configuration and dimensions of the collar of the two jack stands the same, the T6904 and T37401?

"A:     Yes.

 Q:     Was the design of the ratchet bar the same?

 A:     Yes.

 Q:     Was the design of the pawl the same?

 A:     Yes.

 Q:      Was the design of the handle and its connection to the pawl the same?

 A:     Yes.

 Q:     Did Wei Fu understand the Pro-Lift T6904 to be a do-it-yourself, or DIY, product?

 A:     Yes. " (Exh. "F", p. 86:8-21).

Mr. Su testified that SFA provided the test standards for the T6904 and SFA had to approve for the T6904 the Wei Fu design drawings and prototype before production started (Exh. "F", pp. 87:18-88:22).

Mr. Su testified that the T6904 predated the T37401 and that the T6904 design was the basis for the T37401 design. Mr. Su testified that in about March-April 2007 Wei Fu began manufacturing for Sears a 4 ton ratchet and pawl designed jack stand model number 50163, branded as a Sears Craftsman heavy-duty jack stand. Mr. Su testified that the Wei Fu internal

factory number for the Sears 50163 model was T37401 which was the identical Wei Fu factory

number for the SFA ProLift T6904 (Su Dep., Exh. "F", pp. 88:7-22, 90:3-91:9).

With respect to a comparison of the SFA ProLift T6904 with the later manufactured

Sears Craftsman 50163, Mr. Su testified as follows (Exh. "F", pp. 91:20-92:21):

"Q:      Did the Sears 50163 and the Pro-Lift T6904 have the same ratchet and pawl
design?

A:      Yes.

Q:      Did both jack stands have the same locking feature?

A:      The answer was yes.

Q:      Did both jack stands have the same load capacity?

A:      Yes.

Q:      And was that load capacity 8000 pounds?

A:      Yes.

Q:      And did jack stands, the 50163 and the T6904 have the same maximum ratchet
bar height?

A:      Yes.

Q:      And did the Sears 50163 and the SFA Pro-Lift T6904 have the same minimum

bar height?

A:      Yes.

Q:      Did both jack stands, the 50163 and the T6904 have the same collar dimension?

A:      Yes.

Q:      And did both jack stands have the same base frame dimensions?

A:      Yes."

Mr. Su testified that SFA provided Wei Fu for the T6904 with the basic jack stand dimensions, height, testing standards and the ratchet-and-pawl design (Exh. "F", pp. 94:16-95:13).

Mr. Su when asked whether there was any material difference in the design of the Sears 50163 from the design of the SFA Pro-Lift T6904 referred only to "the thickness of the steel plate at the base". When asked if there were any other difference, he said "no" (Exh. "F", pp. 97:3-98:2).

Mr. Su testified that the unit cost in manufacturing the T6904 and the Sears 50163 were the same (Exh. "F", pp. 99:16, 100:23-102:5). Mr. Su testified that the design of the Pro-Lift T6904 did not change since first manufactured and that the design of the Sears Model 50163 likewise did not change since first manufactured (Exh. "F", pp. 105:22-106:12).

### b. SFC And SFA were Responsible for Developing and Designing the Ratchet-and-Pawl Jack Stands Sold to Sears.

Roger Claypool, SFA's product liability manager before his voluntarily leaving SFA in December 2008, testified at deposition that SFA was responsible for developing and designing the jack stands sold under its brands (Claypool Dep., Exh. "E", p. 121:11-122:8) and as early as the 1990s SFA, at the directive of Michael Hung, SFC's Chairman, was testing ratchet bars, and sending jack stand blueprints, material requirements and dimensional requirements to Wei Fu (and its predecessor entity) (Claypool Dep., Exh. "E", p. 35:2-25).

On November 20, 2006 an email was circulated among employees and representatives of SFA, SFC, MVP and Wei Fu discussing Sears "Jack Stand Program" and states "the new program will consist of 3 SKU's – the 2 ¼ ton (50182), 3 ton (50159) and the 4 ton which will require a new Sears model number… the new 4 ton jack will be priced at $10.75". (SFA003660-SFA003668, Exh. "20" to Jorgensen Dep., Exh. "Q" herein). This email aligns with the

Sears/MVP ALR Agreement dated three weeks later on December 11, 2006 which lists the jack stands to be provided by MVP to Sears as the 50182, the 3 ton 50159 and a new Craftsman 4 ton jack stand with a $10.75 unit price (Exh. "L" herein, MVP010238, MVP010243).

### c. SFA Oversaw the Design, Development and Specifications for the Sears Craftsman Model 50163 Jack Stand and Orchestrated the Shinn Fu Group's Response to Sears Complaints About the 50163 Model's Limited Height Range.

On December 8, 2006, James Wang, an SFA sales manager emails Wu Ching Yaen (a/k/a "Tiger") (a Wei Fu R&D engineer) telling Tiger that "the 4 ton jack stands will be under the 'Craftsman Professional' brand and the color will be black and yellow" (Exh. "7" to Jeff Su's deposition, Bates No. WFT002523, Exh. "R" herein). As testified to by Mr. Su, in that same email chain (on December 6 and 7, 2006) Mr. Wang emails Tiger telling Tiger "we also need to work on the 4-ton jack stands (T-6904)… please advise the followings so we can be able to work on the OIPM as well. 1. Will the product specification for Sears 4-ton jack stand be the same as current Pro-Lift T6904? If yes, then we will just go ahead to apply the specifications onto the OIPM". (Id., WFT002523-WFT002524, part of Exh. "R"). In response, as testified to by Mr. Su, Tiger (the Wei Fu engineer), writes back in Chinese (and interpreted by Mr. Su) to Mr. Wang at SFA   "that the T6904 for Sears has the same specifications as the Pro-Lift." (Exh. "F", pp.153:11-154:15).

A number of emails testified to by Ms. Lee were marked collectively at her 30(b)(6) deposition as Exhibit "18" and are reproduced herein as Exhibit "S". These emails evidence SFA's crucial role in the development of the Sears Craftsman Model 50163 jack stand and the integral role SFA played in decision making concerning the 50163 and orchestrating the Shinn Fu Group of companies (MVP, Wei Fu, SFA and SFC) response to Sears concerning the design of the 50163 model jack stand. Kathy Guerra (who was Sears 30(b)(6) deposition witness and in

2007 was Sears Group Engineering and Product Safety Manager) on January 15, 2007 emailed

other Sears employees (MVP009365) about issues she had with the maximum ratchet bar height

of the new 4 ton Sears Craftsman  Model 50163 jack stand. Sears in turn emailed SFA sales

managers Dennis Yu and James Wang for a response to Mr. Guerra's inquiries (MVP009364,

MVP010117-010119). The SFA employees report on January 16, 2007 with the answer to Ms.

Guerra's question referring to SFA's manual for the 50163 (Id).

On February 15, 2007 James Wang of SFA emailed "Tiger" and Nora Lee of MVP and

wrote (Exh "S", MVP009239-MVP009240) in pertinent part:

> Dear Tiger: Remember previously Sears complained about the small
> range of 4-ton jack stand (50163) before we received the orders. After
> we received the initial orders, we think everything was fine until
> Sears mentioned that again recently. Please let me know if there is
> any way to extend the support range to at least 20" (for maximum
> height)? Here are some thoughts for you to think about this project:
>
>   1.   Without working on the re-design, how high can we extend the maximum
>        height from current model?
>
>   2.   If Sears requires the maximum height needs to be at least 20", what
>        changes need to be made?

On February 24, 2007 James Wang of SFA emails MVP, Wei Fu and Betty Hung at SFC

"recaping" a meeting in which "Barb" [a Sears representative] "was concerned about the small

support range of the 4-ton jack stands". James Wang of SFA writes "we received her new request

at the meeting on Wednesday that is she would like us to quote on another 4-ton jack stands

which comes with 21" maximum height" (Exh. "S", MVP009238).

On March 9, 2007, James Wang of SFA again emailed MVP and Wei Fu on Sears

request concerning its 4 ton jack stands. Mr. Wang wrote, in pertinent part (Exh. "S",

MVP009227-MVP009228):

> As you may recall we are currently working on a project for Sears
> regarding a new 4-ton jack stand to have maximum height to reach

21". The background is Sears associate buyer (Barb) thinks our current lift range of 50163 is too small (from 12" to 17-5/16") and she would like to see options that can make the lift range bigger. We previously provided an option to Sears by making a slot within the roll pin stopper so the maximum height can be raised another inch higher, but Barb would like to see what kind of pricing is for a 4-ton jack stand to have 21" maximum height so she can have a reference.

We received a quote of T-37402 from Nora today which is $6.65 (FOB Gong Yi for Sears and factory cost is $13.03), however we think this pricing is not fitting into the right pattern of pricing if we compare with other jack stands: 50159 3-ton SUV jack stands (lift range up to 21" and weight 20.9 lbs); Sears cost $8.75 50163 4-ton jack stands (lift range 12" to 17- 5/16" and weight 26 lbs): Sears cost $10.75.

On March 10, 2007 James Wang of SFA emailed Sears buyer Barbara and wrote concerning the "redesign 4-ton jack stands" (Exh. "S", MVP009141):

Hi Barb: Per your previous request you would like to know the cost of redesign the 4-ton jack to make the maximum height to be 21", here is the outcome for your reference:

1.    Option A: redesign the 4-ton jack stands to come with maximum height 21" (lift range: 13-5/16" to 21" and will be 29 lbs) and the FOB China cost will be $16.15 because of additional materials and tooling.

2.    Option B: As we explained to you at our previous meeting we will make a slot within the roll pin stopper. By doing this, we will extend the maximum height of the current model (50163) from 17-5/16" to 18-5/16" and the additional cost will be only 0.15 (from $10.75 to $10.90).

Nora Lee of MVP testified as to the accuracy of these emails. She testified that a prototype for the redesigned 50163 was never made and there was no design change to the 50163 (Lee Dep., Exh. "G", pp. 98:19-101:25, 103:12-104:23, 106:5-110:1).

Ms. Lee also testified that, as reflected in a James Wang January 24, 2007 email to Ms. Lee (Exh. "S", MVP 009261) and to others at MVP and Wei Fu and to Betty Hung at SFC, James Wang told Wei Fu, MVP and SFC that Mark (an American sales rep for MVP) "just got a phone call from Barb confirming our 4-ton jack stands (#50163) passed the testing at Sears lab

19

(thank you, everyone). I will follow up with Sears art department to get the approval on the packaging accordingly". (Lee Dep., Exh. "G", pp. 106:7-107:17). Sears did not send the test reports or results to MVP (Id).

> ### d. The Sears/MVP/Wei Fu Purchase Orders and Invoices Are Proof that the SFA ProLift T6904 and the Sears Craftsman Model 50163 Were the Same Jack Stand.

Mr. Su testified concerning Wei Fu document Bates numbered WFT000084 (part of Exh. "8" to Jeff Su's deposition and part of Exh. "R" herein). Mr. Su identified this document as a Wei Fu "comparison table for model numbers". When asked if this document meant that the Sears 50163, the MVP6904 and the Wei Fu T37401 were the same jack stand, Mr. Su answered "yes" (Exh. "F", p. 146:1-11).

Mr. Su was also shown a number of MVP purchase orders to Wei Fu and MVP invoices to Sears for the Sears 50163 jack stand. All these purchase order and invoices referred to by Mr. Su are annexed collectively as part of Exh. "T" and identified by their respective Bates numbers. Mr. Su testified that WFT000086 was a July 2, 2010 MVP purchase order to Wei Fu for 950 pairs of Sears Craftsman Professional jack stands model 50163. Mr. Su testified that this purchase order identified these same jack stands as factory item no. T6904 and as T37401 jack stands. Mr. Su testified WFT 000104 was an October 21, 2010 MVP invoice to Sears for 950 pairs of jack stands identifying these stands as four ton jack stands model 50163 and also as T6904 and T37401 jack stands. To the same effect was WFT 000115 and WFT 000116 which was a Sears purchase order to MVP identifying the 4 ton jack stands Sears was purchasing as both models 50163 and MVP/Wei Fu number T6904. There are many other MVP/Sears/Wei Fu invoices and purchase orders which are part of Exh "T" which all simultaneously identify the Sears Craftsman 50163 jack stands as also T6904 jack stands and T37401 jack stands. Mr. Su testified that MVP and Pro-Lift had the same designation for the 4 ton ratchet and pawl jack

stands, T6904, and "Sears has also brought T6904 as well" (Su. Dep., Exh. "F", pp. 146:13-149:25, 155:4-8).

Nora Lee, the MVP 30(b)(6) deposition witness, testified SFA owns the Pro-Lift brand of jack stands. During the period 2003-2011 Pro-Lift brand ratchet-and-pawl design jack stands manufactured by Wei Fu, were exported to SFA in the United States by MVP. MVP in this same time period imported into the United States to Sears, Sears Craftsman ratchet-and-pawl design jack stands manufactured by Wei Fu. Ms. Lee testified that the "new" Sears Craftsman Professional 4 ton jack stand referred to in the MVP/Sears December 11, 2006 ALR was the Sears Model 50163 ratchet and pawl designed stand manufactured by Wei Fu and shipped to Sears by MVP beginning in or about March or April 2001 and continuing through 2011. Ms. Lee was shown a number of MVP invoices and purchase orders concerning the Sears Craftsman 50163 jack stands (marked collectively as Exh "17" at Ms. Lee's deposition and containing MVP Bates numbers). Ms. Lee testified that all these invoices and purchase orders shown to her also identified these same 50163 jack stands as T6904 jack stands and Wei Fu numbered T37401 jack stands. These invoices included an invoice (MVP 006076) from October 13, 2010 for the Sears 50163 with parallel identifying numbers of T6904 and T37401. (Lee Dep., Exh. "G", pp. 24:7-14, 27:3-29:3, 77:1-79:9, 88:8-94:12) (copies of the MVP Bates numbered invoices and purchase orders identified by Ms. Lee and other similar orders/invoices produced by MVP are annexed hereto collectively as Exhibit "U").

Ms. Lee testified that in a September 20, 2011 email from Ms. Lee, to a Sears representative, with a SFC sales manager copied on the email, Ms. Lee in an attachment to the email (MVP 009197-MVP 009199) refers to the Sears 50163 jack stand and the MVP T6904 jack stand as the same jack stand (Exh. "G", p. 97:7-18).

> ### e. SFA and SFC were Responsible for Drafting the Operators Manual for the ProLift T6904 Which Became, With the Same Warnings and Safety and Operating Instructions, the Manual for the Craftsman Model 50163 Jack Stand.

Kathy Guerra of Sears testified that Sears did not draft the Owner's Manual for the 50163 (Guerra Dep., Exh. "V", pp. 167:12-168:2). Jeff Su for Wei Fu testified that Wei Fu did not draft the owner's manual for the Sears 50163 jack stand (Su Dep., Exh. "F", pp. 106:16-108:21). Nora Lee testified, although she played no role concerning the 50163 owner's manual and did not speak to anyone at MVP she claims was involved in drafting the 50163 owner's manual, that MVP prepared the 50163 owner's manual based on other Sears jack stand manuals and then sent MVP's draft for review by SFA. Ms. Lee testified, however, that SFA drafted the content, warnings, safety instructions, operating instructions for the owner's manual and for the labeling for the Pro-Lift T6904 4-ton jack stand (Lee Dep., Exh. "G", pp. 80:15-84:13).

Roger Claypool, the former SFA engineering and product safety manager testified that SFA drafted the operator's manual (what is also referred to by all witnesses as the OIPM or operator's instruction and parts manual) for the ratchet and pawl designed jack stands imported by MVP and/or sold under any of the SFA brands (Claypool Dep., Exh "E", pp. 44:10-21, 125:24-126:14).

Ryan Jorgensen, one of SFA's 30(b)(6) deposition witnesses, testified as follows (Jorgensen Dep., Exh. "P", p.70:7-11):

Q:   Do you know how the Craftsman heavy duty jack stand 50163 operator's manual came to be in the possession of SFA?

A:   I believe it would have been created at SFA.

When asked the role SFA played with respect to the operator's manuals for jack stands sold under the SFA brands and labels, Mr. Jorgensen answered that "we put the information together into the format that you see and then send it to SFT or to another company for review".

Mr. Jorgensen continued, "If an OIPM is put together at SFA, it is sent to SFT for review…"(Id). The brands for which SFA prepared the owner's manual which were then sent to Shinn Fu Corporation (SFT or Shinn Fu Taiwan) for approval included the Pro-Lift brand jack stands (Jorgensen Dep. Exh. "P", pp. 103:11-25, 104:9-14, 106:7-107:3). Mr. Jorgensen testified again that the SFA engineering department "creates" the jack stand manuals. However, Mr. Jorgensen, later in his deposition and as SFA's 30(b)(6) witness said he did not know who created the Sears model 50163 jack stand manual in effect in 2011 (Jorgensen Dep., Exh. "P", p. 128:17-23). The later testimony is contrary to Mr. Jorgensen's earlier admission that SFA "created" the 50163 manual but at the very least Mr. Jorgensen's 30(b)(6) testimony that he doesn't know if SFA created this manual should preclude SFA from denying that fact.

Jeff Su, Wei Fu's 30(b)(6) witness, testified, in relevant part, concerning a comparison of the Pro-Lift T6904 and Sears Craftsman 50163 operator's manuals:

"Q:     Was Wei Fu aware whether the warnings of the T6904 manual are the same as those in the Sears 50163 manual?

A:     I think they are highly similar.

Q:     Were the safety instructions in the T6904 manual the same as those in the Sears Craftsman 50163 manual?

A:     I think there's not much difference between the two in terms of content.

Q:     Was the wording of the warnings, the safety instructions, the operating instructions the same for the two manuals?

A:     I believe they are the same." (Su Dep., Exh. "F", pp. 109:5-112:12).

The Sears Craftsman model 50163 Owner's Manual produced by defendants (and there are a number of different Bates numbers for the same manual) is annexed hereto as Exh. "W". Also annexed as part of Exhibit "W" is the Pro-Lift T6904 manual. That manual issued in 2003 is also the same manual for the T6903 (the 3 ton version of SFA's ratchet and pawl jack stand)

23

and T6906 (the 6 ton version of SFA's ratchet and pawl jack stand). The warnings and instructions are the same,

Also, with respect to the Sears Craftsman 50163 manual, the manual gives an "888" phone number "for after sale support and assistance" (Exh. "W", SFA002812). That number, 1-888-332-6419, when dialed today, will result in a Shinn Fu America operator or representative responding to the call. Arthur Chaykin confirmed this at his deposition (Chaykin Dep., Exh. "I " pp. 80:18-81:9).

## III.    ARGUMENT

### A.  Summary Judgment Standard

On a motion for summary judgment, the burden is on the moving party to establish there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Celotex Corp v. Catrett,* 477 U.S. 317, 323-325 (1986); *White v. ABCO Engineering Corp.,* 221 F. 3d 293, 300 (2d Cir. 2000). If that burden is met, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial". *Anderson,* 477 U.S. at 256; *Graham v. Long Island R.R.,* 230 F. 3d 34, 38 (2d Cir. 2000). In assessing the record to address questions of fact, the trial court must resolve all factual issues, all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 878 (1990); *Graham, supra,* 230 F. 3d at 38. Summary judgment is only granted when no rational finder of fact could find in favor of the non-moving party. *Carlton v. Mystic Transp., Inc.,* 202 F. 3d 129, 134 (2d Cir. 2000). Where reasonable persons, applying the proper legal standards, could differ in their resolution of a disputed factual issue, the motion for summary judgment must be denied. *Anderson, supra*, 477 U.S. at 250; *Sologub v. City of New York,* 202 F. 3d 175, 178 (2d Cir. 2000).

**B. SFC and SFA Are Product Sellers of the Subject Jack Stands**.

Defendants have taken a myopic, extremely narrow and unjustifiably restrictive interpretation of the CPLA in arguing that only an entity actually and directly engaged in the manufacture and sale of the specific individual product which was involved in an accident can be a defendant, a product seller, under the CPLA. That is not Connecticut law. Nor is it Connecticut law that for another related entity to be a product seller under the CPLA that entity must be the "alter ego" of the product's manufacturer, importer or distributor.

**1. A Fact Intensive Inquiry is Required to Determine if a Defendant is a Product Seller**.

The CPLA states that a "product liability claim… may be asserted and shall be in lieu of all other claims against product sellers, including actions in negligence, strict liability and warranty for harm caused by a product." Conn. Gen. Sta. § 52-572n (a) (2018). Accordingly for a party to be liable under the CPLA, that party has to be a product seller. *Burkert v. Petrol Plus of Naugatuck, Inc*., 216 Conn. 65, 72-73 (1990) *("Burkert")*. The CPLA defines a product seller as

> any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such product whether the sale is for resale or for use or consumption. The term "product seller" also includes lessors or bailors of products who are engaged in the business of leasing or bailment of products.

Conn. Gen. Stat § 52-572m (a). "Whether [a] defendant is a 'product seller' is a question of law for the Court to decide." *Svege v. Mercedes-Benz Credit Corp*., 329 F. Supp. 2d 272, 278 (D. Conn. 2004) (quoting *Stanko v. Bader*, No. CV-030193669, 2003 Conn. Super LEXIS 2779, 2003 WL 22413476 at *2 (Conn. Super Ct. Oct 7, 2003)). The *Svege* Court, referring to the Connecticut Supreme Court decision in *Burkert, supra*, observed that *Burkert* stood for the proposition that "whether an entity is sufficiently involved in the stream of commerce of a

product to be a 'product seller' under the CPLA requires a fact intensive, case-by-case assessment". *Svege*, 329. F. Supp. 2d at 280; *Dzurnak v. CRD Metal Works, LLC*, 2017 Conn. Super. LEXIS 4936 (Conn. Super. Ct. Nov. 17, 2017); *Reed v. 3M Co,* 2015 Conn. Super. LEXIS 1619 (Conn. Super Ct. June 12, 2015).

### 2.  The Expansive Definition of Product Seller Under the CPLA.

The "definition of product seller is not limited solely to manufacturers, sellers, and their successors." *Pitterman v. General Motors LLC*, 2018 U.S. Dist. LEXIS 89587 (D. Conn. April 18, 2018) ("*Pitterman*"). In interpreting the language of the CPLA provision defining "product seller", the Court in *Pitterman* held "the text of the CPLA allows for an interpretation of product seller that includes entities that are not strictly manufacturers, sellers or successors*". In Lawton v. CBS Corp.,* 2015 Conn. Super. LEXIS 1908, 2015 WL 502463 (Conn. Super. Ct. July 23, 2015), the Court held: "[A]s seen from *Svege* an entity does not have to manufacture the product at issue in order to qualify as a product seller under the Product Liability Act."

### 3.  The Goals of the CPLA Would be Furthered In Holding SFA and SFC are Product Sellers.

As the Court held in *Olivia v. Bristol-Myers Squibb Co*., 2005 U.S. Dist. LEXIS 35881, 2005 WL 3455121 (D. Conn. Dec. 15, 2005) ("*Olivia*"):

> In interpreting and applying the product seller definition, the court also bears in mind the Connecticut Appellate Court's observation that a "principal purpose of the product liability statute is to protect people from harm caused by defective and hazardous products" and the courts should construe the statute with this purpose in mind. *Rodia v. Tesco Corp., 11 Conn. App. 391, 396, 527 A. 2d 721 (1987)* (construing broadly the types of conduct enumerated in the CPLA). Following this directive, the court reads the "product seller" definition as encompassing those in the best position to protect consumers. See also *Durove v. Fabian Transport Inc., 2004 U.S. Dist. LEXIS 25258, No. 04 Civ. 7000 (RJH), 2004 WL 2912891, at * 6 (S.D.N.Y. Dec. 14, 2004)*(stating that courts interpreting the law of their jurisdictions have construed product seller definitions broadly in the context of strict products liability and holding that pharmaceutical representative was a product seller under New York common law) (internal citations omitted).

Here, SFA and SFC are in the best position to protect consumers from the harm caused by false engagement or false loading condition which occurs in the SFA designed ratchet and pawl designed jack stands including the Sears Craftsman 50163 model. Wei Fu has ceased operations (Su Dep., Exh "F", p. 44:10-16; Chaykin Dep., Exh. "I", p. 38:2-19). MVP is no longer in privity of contract with Sears (Chaykin Dep., Exh "I", pp. 85:23-87:18). Sears has denied any responsibility for or role in design of the Craftsman ratchet and pawl jack stands or in preparing the operator's manual for the stands (Guerra Dep., Exh "V", pp. 105:12-107:19, 167:12-168:2). All customer complaints or questions concerning the Craftsman jack stands are routed to SFA representatives (Chaykin Dep., Exh. "I", pp. 80:13-81:9). Arthur Chaykin, SFA's general counsel, is responsible for managing all claims and complaints, legal or otherwise, regarding jack stands made by Wei Fu and imported into the United States by MVP (Chaykin Dep., Exh. "I", pp. 17:24-25, 21:10-24, 37:9-38:5, 39:17-23, 44:23-46:20). SFA procured the liability insurance allowing Wei Fu and MVP to sell jack stands in the United States. Roger Claypool testified SFA acted as SFC's "satellite" in the United States and all the Shinn Fu companies, SFA, Wei Fu, MVP, operated under the direction and control of SFC (Claypool Dep., Exh. "E", p.91:2-11).

### 4. SFA and SFC More Than Satisfy The Relevant Factors Considered by the Courts In Determining Whether a Defendant is a Product Seller Under the CPLA.

As stated above, the inquiry as to whether SFA or SFC is a product seller "requires a fact intensive, case-by-case assessment. "*Svege, supra*, 329 F. Supp. 2d at 280. After assessing and surveying state and federal cases interpreting the CPLA's definition of product seller, the *Pitterman* court, *supra*, at [*32], addressed and listed examples of the non-exclusive factors to be considered in such a fact intensive, case-by-case assessment:

For example, In *Burkert,* the Connecticut Supreme Court considered factors including: "(1) whether the entity derived a substantial economic benefit from the sale of the product; (2) whether the entity participated in advertising, marketing and creating consumer demand for the product; (3) whether the entity took title to the product; and (4) the extent of the entity's knowledge and control over the product." *Dzurnak, 2017 Conn. Super. LEXIS 4936, 2017 WL 6417908, at *2* (quoting *Delgadillo v. Unitrons Consolidated, Inc., 191 Fed. App'x 547, 549 (9th Cir. 2006)).* Courts have also looked to other factors, such as, *inter alia,* whether the entity sold similar products, developed a market for the products, or marketed the products with the entity's name and certain assurances. See 2011 Conn. Super. LEXIS 3313, [WL] at *4; *Aquarulo, 2011 Conn. Super. LEXIS 3313, 2011 WL 7095179, at *4.* These factors are merely examples of the fact intensive inquiry, however, and are not exhaustive because whether certain factors are relevant or not depends on the particular circumstances of each case.

Connecticut courts have also found highly probative of whether an entity was a product seller was if that entity provided "detailed specifications" for the product at issue, whether "packaging and labeling… fell within the purview of the defendant", where "defendant… appears to have undertaken the issuance of warnings concerning the product" [*Acquarulo v. A.O. Smith Corp.*, 2011 Conn. Super. LEXIS 3313 (Conn. Super. Ct. Dec. 30, 2011)], was significantly involved in bringing the product to market [*Svege*, *supra*] and played a significant role in the product's design [*Olivia*, *supra*].

### a. *SFA's Substantial Economic Benefit From the Sale of The Craftsman Model 50163 Jack Stand.*

SFA derived "a substantial economic benefit" from the sale of the Sears Craftsman 50163 jack stand. MVP, during the first year of Sears introduction of the 50163 into the United States market, paid SFA a 1.5% commission of the sale of every 50163 jack stand MVP sold to Sears. The invoices reflect the sale of thousands of such stands. In later years, as reflected in the SFA/MVP Sales Representative Agreements, MVP paid SFA close to $100,000 per year for the full time service of one SFA employee and the part time services of another to be MVP's interlocutors with Sears, to monitor and service the Sears account for the sale of jack stands by MVP to Sears.

28

The same SFA/MVP Sales Representative Agreements for the years 2008-2011 demonstrate that in addition to receiving compensations from MVP for its employees dedicated to the Sears account, MVP also paid SFA another $45,000 a year for other sales related support, including marketing, trade, show management for the MVP jack stands, producing OIPMs (owner's manuals), providing customer support services (including the "888" toll free number on the Sears Craftsman 50163 manual which when dialed goes directly to SFA operators in Kansas City). These same SFA/MVP Agreements provide that in aid of MVP jack stand sales in the United States (including to Sears), SFA will provide MVP "with information regarding prevailing prices and market conditions" and with "information regarding now product ideas and market trends".[4]

### b. *SFA's Admitted Role In Advertising and Marketing the Jack Stands*.

SFA's role in advertising and marketing of the 4 ton ratchet-and-pawl jack stands is supported by its 2011 website (Exh. "C"). In the website SFA proudly displays to all customers and potential customers that "SFA performs its function in marketing, sales, services and distributing products throughout North… America". SFA proclaims on its 2011 website that "in addition to distribution, SFA has also played a key role in engineering, research and product design to help our manufacturing facilities meet our market needs". (Exh. "C").

### c. *SFA Was Responsible For The Craftsman Model 50163 Design and Specifications*.

SFA's "knowledge and control" over the design, development, manufacture and distribution of the 50163 4 ton ratchet and pawl design jack stand was profound and pervasive. Roger Claypool testified that SFA designed the ProLift ratchet and pawl jack stand and provided

---

[4] Under Connecticut law, a sales representative of a manufacturer or distributor can be a "product seller" under the CPLA. *Olivia, supra*.

the drawings, blueprints and specifications to Wei Fu (Claypool Dep., Exh. "E", p. 35:9-25). The SFA designed ProLift T6904 4 ton ratchet and pawl jack stand became, with very minor variation (in weight only at the base and none related to safety, loading, or raising or locking features), the Sears Craftsman 50163 jack stand. The two stands, the T6904 and 50163, had identical design features, measurements and specifications including the handle, ratchet bar, pawl and collar, maximum and minimum height, weight (with a difference of only 0.1 to 0.2 kilograms), load capacity and had the same cost to manufacture (Jorgensen Dep., Exh. "P", p. 25:6-15; Su Dep., Exh. "F", pp. 84:9-86:18, 90:22-92:21, 94:22-95:13, 97:3-98:2, 99:16-17, 100:23-102:5, 153:11-154:15).

The testimony and evidence adduced also show that MVP and Wei Fu considered the Sears Craftsman Model 50163 and the SFA ProLift T6904 to be the same stand with the same specifications, locking features, the same ratchet, pawl and collar, and the same minimum and maximum bar height. The testimony and documents (including numerous purchase orders and invoices) show that MVP and Wei Fu considered the SFA ProLift T6904 and the Sears Craftsman 50163 to be the same stand (Su Dep, Exh. "F", pp. 94:16-98:2, 146:1-11, 146:13-149:25, 153:11-154:15; Lee Dep., Exh. "G", pp. 88:8-94:12, 97:7-18).

### d. SFA Played a Crucial Role in the Development of the Craftsman Model 50163 and Orchestrating the Shinn Fu Companies Response to Sears Complaints About the 50163 Design.

As detailed earlier in this memorandum, the SFA/MVP Sales Agency Agreements were made with the goal of SFA being MVP's sales representative in the United States to interact with Sears at the same time in late 2006 that Sears entered into Agreements with MVP for MVP to provide Sears with a "new" 4 ton ratchet and pawl designed jack stand sold with the Craftsman label. (Exh. "N"; Exh. "L"; O'Connor Dep., Exh. "J", pp. 71:8-72:12, 85:10-11, 87:14-16, 108:22-24).

30

As detailed earlier in this memorandum, SFA was intimately involved in the Sears program to develop the new 4 ton ratchet-and-pawl design jack stand for introduction into the United States Market (Exh. "Q"; Su Dep., Exh. "F", pp. 153:11-154:15).

When Sears was concerned with the limited lift height range of the new 50163, Sears went to SFA to register its concerns and SFA organized and led the response by SFA, MVP, Wei Fu and SFC to Sears and SFA offered design options to Sears to enlarge the maximum height of the 50163 ratchet bar as well as the cost of implementing such design change to satisfy Sears concern that the limited lift range of the 50163 would have a negative impact on sales (Exh. "S "; Lee Dep., Exh. "G", pp. 98:19-104:15).

> **e.  SFA and SFC Were Responsible For Drafting The Warnings, Operating Instructions and Safety Instructions Which Were In The Craftsman Model 50163 Operators Manual.**

Also, SFA had "undertaken the issuance of warnings concerning the product" (*Acquarulo, supra*). Roger Claypool testified that SFA wrote the owner's manual for the ratchet and pawl jack stands (Claypool Dep., Exh. "E", p. 44:10-21). Ryan Jorgensen testified that SFA "created" the operator's manual for the 50163 jack stand (Jorgensen Dep., Exh. "P", p.70:7-11). Nora Lee, MVP's 30(b)(6) witness, testified SFA prepared the warnings, safety and operating instructions for the T6904 and its owner's manual (Lee Dep, Exh. "G", pp. 82:8-84:13), and Jeff Su, Wei Fu's 30(b)(6) witness, testified that the owner's manual for  the T6904 and 50163 were the same with respect to their content, their warnings, their safety instructions and operating instructions (Su Dep., Exh. "F", pp. 109:5-112:12).

> **f.  SFA Procured Liability Insurance For MVP and Wei Fu and Provided Claims Management for These Defendants.**

SFA also undertook to procure the general liability insurance for MVP and Wei Fu allowing MVP to sell its jack stands in the United States. SFA also provided customer support services, claims management and legal defense for MVP and Wei Fu.

Arthur Chaykin, SFA's general counsel and the third-party administrator (TPA) of claims made in the United States against MVP, Wei Fu and SFC, also managed and oversaw the defense of lawsuits brought against these entities (Chaykin Dep., Exh. "I", pp. 37:9-38:5, 39:17-23, 42:23-46:20). In one such case involving the unexplained collapse of a Sears Craftsman ratchet and pawl jack stand, the *Raymond* case, Mr. Chaykin held himself out to Sears in a June 2006 letter as being MVP's General Counsel on stationary bearing an MVP letterhead with offices in Hong Kong and Kansas City (Exh. "X" herein, SFT 000181-SFT000182; Exh. "12" to Mr. Chaykin's deposition).

Roger Claypool testified that it was Michael Hung, founder and chief of SFC who was the driving force in having the SFC group of companies become a jack stand supplier to Sears (Claypool Dep., Exh., "E", pp. 25:1-27:6, 32:21-33:7). Mr. Claypool testified that any internal disputes between or among SFA, MVP and Wei Fu concerning jack stand related issues would be resolved by SFC (Claypool Dep., Exh. "E", pp. 93:20-94:23).

### g.   The Case Cited by Defendants are Readily Distinguishable.

Defendants cite *Iragorri v. United Technologies Corp.*, 285 F. Supp. 2d 230 (D. Conn. 2003) ("*Iragorri*") for the proposition that it is irrelevant to the "product seller" analysis, that one defendant company is a parent or sister company of another defendant who was the product's manufacturer or distributor, and that unless it can be proven the parent or sister company was the

"alter ego" of the parent or sister entity, the parent (here SFC) or the sister company (here SFA) cannot under Connecticut law be held to a "product seller".[5] That is not Connecticut law.[6]

In *Iragorri,* plaintiff's decedent fell to his death in an open elevator shaft in Cali Columbia. The elevator involved in this fatal accident was designed and built by Otis Brazil, a subsidiary of Otis Elevator Company (a New Jersey company) (Otis) who in turn was a subsidiary of United Technologies Corporation ("UTC"). The court held that "without more" the mere fact of a parent-subsidiary relationship was insufficient to hold that Otis (the parent) and UTC (the grand-parent) were "product sellers" for the elevator built by Otis Brazil. The *Iragorri* Court considered that Otis Brazil and Otis "maintained a completely separate board of directors [and] had no overlapping officers" (285 F. Supp. at 238 n. 4). The *Iragorri* Court also reasoned that plaintiff failed to set forth "links" between Otis and Otis Brazil which gave Otis "a role in the production, distribution or marketing of the elevator in question" (Id).

Here, unlike in *Iragorri*, SFA, SFC and MVP did have overlapping officers and boards of directors. As we have shown, the Hung and Huang families owned, controlled and managed SFA, SFC, MVP and Wei Fu. Victor Hung and his sisters Betty and Angela were on the board of directors of SFA, SFC and MVP. Victor Hung was the CEO of SFC and was the boss at MVP and he ran the day-to-day operations of MVP (Lee Dep., "G", pp. 31:25-35:5, 37:2-19). Vickie Huang, the wife of Michael Hung and the mother of Victor, Betty and Angela Hung, was also the

---

[5] In addition to *Iragorri*, defendants cite *King v. Volvo Excavators, AB,* 2018 Conn. Super. LEXIS 264 (Conn. Super. Ct. Feb. 8, 2018), for the proposition that only sellers of the actual and specific injury causing product who took "title" to the product can be "product sellers" under Connecticut law. That was not the holding in *King* in which the moving defendant was an individual mechanic/service employee named Tuper who supervised the installation of an attachment to an excavator which, at the time, was owned by his employer defendant Tyler Equipment. The *King* Court merely held that the mechanic/service employee Tuper, was not, under these circumstances, a "product seller". The *King* decision, therefore, has no precedential value to the issues raised herein.

[6] *SFA Folio Collections, Inc. v. Bannon*, 217 Conn. 220 (1991), a case cited by defendants, is readily distinguishable. *SFA Folio* was a tax case, not a product liability case brought under the CPLA. *SFA Folio* was decided under Connecticut common-law and not under the modern and evolving CPLA where the legislative scheme, intent and goals, as outlined above, warrant a holding here that SFA and SFC were "product sellers" under the CPLA.

incorporator, owner, and general manager of Wei Fu and was its highest level senior officer who ran the day-to-day operations of Wei Fu (Su Dep., Exh. "F", pp. 36:12-37:16, 38:7-40:17, 47:23-25, 73:3-5). Steven Huang, Vickie Huang's brother, was embedded by the Huang and Hung families in Kansas City as President and COO of SFA whose CEO was Betty Hung who apparently performed her duties as CEO of a Kansas City based company while living in Taiwan.

The proof linking SFA and SFC to the active ownership and control of MVP and Wei Fu, of playing a crucial role in the design, development and sale of the 50163 jack stand including the actual design and specifications, the warnings and manual, the customer support, marketing intelligence, trends and pricing, liability insurance and claims management, the proof missing in *Iragorri*, is overwhelmingly present here. Here there is no "dearth of evidence regarding" SFA's and SFC's "involvement" in the design, development, manufacture, sale and marketing of the 50163 [*Dzurnak, supra*]. Here there is an abundance of evidence of such involvement. Here, there is a powerful "nexus" between SFA, SFC and MVP and Wei Fu with respect to the jack stand at issue such that SFA and SFC can be considered "product sellers" under the CPLA (*Reed v. 3M Co., supra*).

SFA and SFC's direct documented significant involvement in the very existence of the 50163, its evolution from a Sears contemplated "program" to its production as an iteration of the T6904 with the same hard specifications as the T6904 and treated by the defendants as one and the same as the T6904 should bring SFA and SFC within the purview of the CPLA. In addition, SFA's and SFC's documented significant involvement in jack stand testing, the preparation of warnings, labelling, the content of the 50163 owner's manual, facilitating the procurement of liability insurance so the 50163 could be sold, and customer support so the 50163 could continue

to be sold, and trade show management and market intelligence, trends, pricing and new ideas, so the market for the sale of jack stands would grow and expand, all constitute compelling evidence of SFA and SFC being "product sellers" within the ambit of the CPLA.[7]

## IV.    CONCLUSION

For the reasons stated herein, SFA and SFC should be held to be "product sellers" under the CPLA and these defendants' motion to dismiss the second amended complaint as against them should be denied.

PLAINTIFFS,
FREDERICK KLORCZYK, JR. and LYNNE
KLORCZYK, co-administrators of the Estate of
Christian R. Klorczyk

By: /s/ *Howard S. Edinburgh*
     Paul D. Williams (ct05244)
     *pdwilliams@daypitney.com*
     Bryan J. Orticelli (ct28643)
     *borticelli@daypitney.com*
     Kaitlin A. Canty (ct29074)
     *kcanty@daypitney.com*
     DAY PITNEY LLP
     242 Trumbull Street
     Hartford, CT 06103-1212
     860-275-0100 (Tel)
     860-275-0343 (Fax)

     Howard S. Edinburgh
     *hedinburgh@herzfeld-rubin.com*
     Herzfeld & Rubin, P.C.
     125 Broad Street
     New York, NY 10004
     (212) 471-8529 (Tel)
     (212) 344-3333 (Fax)

     *Their Attorneys*

---

[7] Defendants citation to New York (which does not have a product liability act or statute) case law holding that the type of involvement of a parent or related entity proven here may not be enough under New York law to make the parent a viable product liability defendant is irrelevant. As Judge Hall held in *Pitterman, supra,* "New York law does not govern this case or the court's interpretation of the CPLA".

## CERTIFICATION

I HEREBY CERTIFY that on this date a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_____ /s/ *Bryan J. Orticelli*_
Bryan J. Orticelli (ct28643)