# *EXHIBIT E*

```
 1                  UNITED STATES DISTRICT COURT

 2                    DISTRICT OF CONNECTICUT

 3

 4       -------------------------------x

 5       FREDERICK KLORCZYK, JR., as

 6       co-administrator of the Estate

 7       of Christian R. Klorczyk, et al.,

 8                          Plaintiffs

 9                                          Civil Action No.

10       vs.                               3:13-cv-00257-JAM

11

12       SEARS, ROEBUCK AND CO., et al.,

13                          Defendants

14       -------------------------------x

15

16

17            VIDEOTAPED DEPOSITION OF ROGER D. CLAYPOOL, a

18       witness called by and on behalf of the Plaintiffs,

19       taken pursuant to applicable provisions of the Federal

20       Rules of Civil Procedure, before Nicole E. Viens, a

21       Registered Professional Reporter and Notary Public in

22       and for the State of Connecticut, at Day Pitney, 242

23       Trumbull Street, Hartford, Connecticut, on Wednesday,

24       August 17, 2016, commencing at 9:30 a.m.

25
```

FREDERICK KLORCZYK JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

|  | Page 2 |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | |
| 3 | On behalf of the Plaintiffs: |
| 4 | DAVID J. ELLIOTT, ESQUIRE |
| 5 | BRYAN J. ORTICELLI, ESQUIRE |
| 6 | Day Pitney LLP |
| 7 | 242 Trumbull Street |
| 8 | Hartford, Connecticut  06103 |
| 9 | (860) 275-0100 |
| 10 | djelliott@daypitney.com |
| 11 | - and - |
| 12 | HOWARD S. EDINBURGH, ESQUIRE |
| 13 | Herzfeld & Rubin, P.C. |
| 14 | 125 Broad Street |
| 15 | New York, New York  10004 |
| 16 | (212) 471-8500 |
| 17 | hedinburgh@herzfeld-rubin.com |
| 18 | |
| 19 | On behalf of the Defendants: |
| 20 | STEVEN J. ZAKRZEWSKI, ESQUIRE |
| 21 | Gordon & Rees |
| 22 | 95 Glastonbury Boulevard, Suite 206 |
| 23 | Glastonbury, Connecticut  06033 |
| 24 | (860) 278-7448 |
| 25 | szakrzewski@gordonrees.com |

|  | Page 3 |
|---|---|
| 1 | APPEARANCES CONTINUED: |
| 2 | |
| 3 | On behalf of Defendant Sears, Roebuck and Co.: |
| 4 | ERICA TODD-TROTTA, ESQUIRE |
| 5 | Trotta, Trotta & Trotta |
| 6 | 900 Chapel Street |
| 7 | New Haven, Connecticut  06503 |
| 8 | etodd@trottalaw.com |
| 9 | |
| 10 | Also Present:  Ed Giovanni, Legal Video Specialist |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 4 |
|---|---|
| 1 | I N D E X |
| 2 | |
| 3 | WITNESS                                    EXAMINATION |
| 4 | ROGER D. CLAYPOOL |
| 5 | (By Mr. Elliott)                               7 |
| 6 | (By Mr. Zakrzewski)                          133 |
| 7 | (By Ms. Todd-Trotta)                         226 |
| 8 | |
| 9 | |
| 10 | |
| 11 | E X H I B I T S |
| 12 | NO.                                          PAGE |
| 13 | Exhibit 1  Subpoena                            14 |
| 14 | Exhibit 2  Resumé                              17 |
| 15 | Exhibit 3  Separation Agreement                87 |
| 16 | Exhibit 4  Shinn Fu Corporation 2011 PowerPoint  90 |
| 17 | Exhibit 5  1/6/14 Answers to Interrogatories  114 |
| 18 | Exhibit 6  Supplemental Responses to Requests |
| | for Production                  114 |
| 19 | |
| | Exhibit 7  Unidentified Document              114 |
| 20 | |
| | Exhibit 8  1/20/15 Responses to Requests for Production 114 |
| 21 | |
| | Exhibit 9  7/9/15 Responses to Requests for Production  114 |
| 22 | |
| | Exhibit 10  Objections and Responses to |
| 23 | Rule 30(b)(6) Notice            114 |
| 24 | Exhibit 11  Complaint                         128 |
| 25 | Exhibit 12  Letter                            128 |

|  | Page 5 |
|---|---|
| 1 | EXHIBITS CONTINUED: |
| 2 | Exhibit 13  Letter                            129 |
| 3 | Exhibit 14  Unidentified Document             129 |
| 4 | Exhibit 15  Unidentified Document             129 |
| 5 | |
| 6 | (Exhibits were retained by Attorney Elliott.) |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                              Roger D. Claypool

Page 6

```
1              S T I P U L A T I O N S
2        It is hereby stipulated and agreed by and
3    between counsel for the respective parties that the
4    deponent shall have thirty (30) days in which to read
5    and sign the deposition transcript, after which time it
6    shall be deemed to have been signed, and that the
7    filing and sealing of the deposition transcript are
8    waived.
9        It is further stipulated and agreed that all
10   objections, except objections as to the form of the
11   question, and all motions to strike shall be reserved
12   until the time of trial.
13
14       THE VIDEOGRAPHER:  This is the
15   beginning of Media Number One in the
16   videotaped deposition of Roger Claypool in
17   the matter of Frederick Klorczyk, Jr.
18   versus Sears Roebuck, Case Number
19   3:13-cv-00257-JAM.  Today's date is August
20   17, 2016, and the time on the monitor is
21   9:30.
22       My name is Ed Giovanni and I am the
23   videographer.  The court reporter is Nicole
24   Viens.  We are here with Brandon Huseby
25   Global Litigation.
```

Page 7

```
1        Counsel, please introduce yourselves,
2    after which the court reporter will swear
3    in the witness.
4        MR. ELLIOTT:  My name is David
5    Elliott of Day Pitney, LLP in Hartford,
6    Connecticut, and I represent the plaintiffs
7    in this matter.  In the room with me is my
8    associate Bryan Orticelli, the same firm.
9        MR. EDINBURGH:  Howard Edinburgh of
10   Herzfeld & Rubin.  We are cocounsel for the
11   plaintiffs.
12       MR. ZAKRZEWSKI:  Steve Zakrzewski of
13   Gordon & Rees for the defendants.
14       MS. TODD-TROTTA:  Erica Todd-Trotta
15   for the defendant Sears.
16
17       ROGER D. CLAYPOOL, having been
18   satisfactorily identified and duly sworn by
19   the Notary Public, was examined and
20   testified as follows in answer to direct
21   interrogatories:
22
23   EXAMINATION BY MR. ELLIOTT:
24   Q.   Good morning, Mr. Claypool.  As I said, my name
25   is David Elliott.  We've met before, have we not?
```

Page 8

```
1    A.   Yes, sir.  Good morning.
2    Q.   We've talked about this case before, have we
3    not?
4    A.   Yes, sir.
5    Q.   All right.  I have some just -- I know you've
6    been through this before as we'll develop in a moment
7    but you've given depositions and there are rules of the
8    road, but we'll just review them briefly.  Your
9    responses should be verbal, okay?
10   A.   Yes.
11   Q.   No head shakes.  Verbal responses.  If you don't
12   understand a question that any of the lawyers ask you,
13   you can ask them to clarify that, and I'm sure they'll
14   rephrase it so that you do understand it.  And I think
15   if you do answer it, we'll assume you understood the
16   question, okay?
17   A.   Yes, sir.
18   Q.   And if you want to take a break at any time,
19   that's okay.  This is not an endurance test.  You just
20   can't take one while there's a question pending.  Is
21   that all right?
22   A.   I understand.  Yes.
23   Q.   But I have a special instruction for you this
24   morning that applies to this deposition which I want to
25   give you and I want to make sure that you understand it
```

Page 9

```
1    and here is the special instruction:  I will be asking
2    you questions about your employment, your experience,
3    your job responsibilities, your activities,
4    investigations, inquiries, and other aspects of your
5    former employment with Shinn Fu America.  Do you
6    understand that?
7    A.   Yes.
8    Q.   In none of these areas that I just mentioned and
9    in no area that I will be mentioning to you by way of a
10   question will I be asking you to divulge any
11   attorney-client privileged information.  My questions
12   will be geared toward finding out factual information
13   from you, the who, what, when, where, and why of my
14   questions, and not lawyer advice or lawyer
15   conversations.
16       Do you understand that?
17   A.   Yes, sir.
18   Q.   Are you okay with that?
19   A.   Sure.
20   Q.   Okay.  If any there may be.  I don't know if
21   there is any but if any there may be.  Let's just
22   clarify, you're not a lawyer, right?
23   A.   Correct.
24   Q.   You never gave anybody at SFA any legal advice?
25   A.   That's correct.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                          Roger D. Claypool

**Page 10**

1   Q.   Okay.  So have you ever been involved in a
2   deposition before?
3   A.   Yes.
4   Q.   Can you tell us about that.
5   A.   On various occasions I would be asked to
6   represent the company --
7   Q.   When you say "the company," is it Shinn Fu
8   America?
9   A.   Shinn Fu, yes.
10  Q.   Okay.
11  A.   Yes.
12  Q.   So today when we talk about "the company," we're
13  talking about Shinn Fu America unless you tell us
14  otherwise.
15  A.   Agreed.  I understand.  Yes.
16  Q.   All right.  And did you ever testify in a
17  deposition in a jack stand case, a claim involving a
18  jack stand?
19  A.   I believe -- yes.
20  Q.   Okay.
21  A.   Yes.
22  Q.   How many times?
23  A.   One.
24  Q.   Do you remember the name of that case?
25  A.   I believe it was Jeffcoat.

**Page 11**

1   Q.   Jeffcoat?
2   A.   Yes.  Jeffcoat v. perhaps Wal-Mart.
3   Q.   Okay.  And just very briefly, what was that case
4   about?
5        MR. ZAKRZEWSKI:  Can we possibly get
6        the spelling, I'm sorry, on the plaintiff's
7        name.
8        THE WITNESS:  Yes.  Well, as I
9        recall, it was J-e-f-f-c-o-a-t out of
10       north South Carolina.  We -- the court was
11       in Columbia.
12  Q.   (By Mr. Elliott)  Briefly what was that case
13  about?
14  A.   The plaintiff had a large Lincoln town car on a
15  -- six jack stands.
16  Q.   Six jack stands?
17  A.   Yes.
18  Q.   Lifted up?
19  A.   Yes.
20  Q.   Okay.  And what happened?  What was the claim?
21  A.   The claim was that the stands failed.  And it
22  settled --
23  Q.   Well --
24  A.   -- prior to --
25  Q.   When you say this, do you remember what was the

**Page 12**

1   nature of the claim that the stands failed, how did
2   they fail, if you recall the claim?
3   A.   I recall that the claim was loss of -- loss of
4   load height.
5   Q.   Loss of load height?
6   A.   Yes.
7   Q.   And are you referring -- when you say "load
8   height," are you referring to the ratchet piece -- was
9   it a ratchet and pawl type jack stand?
10  A.   Yes.
11  Q.   And that the vehicle was up being supported by a
12  ratchet and that was -- that was the height, the
13  ratchet piece you're talking about --
14  A.   Yes.
15  Q.   -- was the height?
16       MR. ZAKRZEWSKI:  Objection.
17  Q.   (By Mr. Elliott)  And that it lost its height?
18  A.   Well, that the jack stand lost its height.
19  Q.   Okay.  All right.  Any other depositions that
20  you gave that you recall involving jack stands?
21  A.   No.
22  Q.   When was Jeffcoat, if you recall?
23  A.   I don't recall that specifically.
24  Q.   Okay.
25  A.   It was my first -- it was my first case and

**Page 13**

1   early 2000s, late '90s perhaps.
2   Q.   Okay.  So that's it on deposition.  Jeffcoat is
3   your deposition involving a jack stand?
4   A.   I believe so.
5   Q.   How about trial testimony on behalf of SFA
6   involving jack stands, ever give that?
7   A.   I believe I may have testified in the case of
8   Guerra.
9   Q.   Can you spell Guerra.
10  A.   G-u-r-e-r-r-a, I believe.
11  Q.   G-u-e-r-r-a?
12  A.   Correct.  Yes.
13  Q.   Where was that case?
14  A.   Texas.
15  Q.   Texas.  And again --
16  A.   Harlingen, Texas, I believe.
17  Q.   And briefly what was the Guerra claim about?
18  A.   The jack stands failed.
19  Q.   Do you remember what the claim -- what the
20  failure mechanism was alleged to be?
21  A.   They alleged that they fell down.
22  Q.   But you don't remember --
23  A.   The plaintiff --
24  Q.   -- what the mechanism by failure was?
25  A.   No.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                      Roger D. Claypool

| | Page 14 |
|---|---|
| 1 | Q. Okay. |
| 2 | A. I don't recall the actual claim itself. |
| 3 | Q. Are you represented by an attorney today? |
| 4 | A. No. |
| 5 | Q. Okay. Were you served with a subpoena today to |
| 6 | appear for today's deposition? |
| 7 | A. Yes. I was served a week or so ago. |
| 8 | MR. ELLIOTT: Bryan, can you |
| 9 | distribute copies of this. |
| 10 | MR. ORTICELLI: Yes. |
| 11 | MR. ELLIOTT: Can you mark that as |
| 12 | Plaintiffs' Exhibit 1, please, Nicole. |
| 13 | (Exhibit 1, Subpoena, marked for |
| 14 | identification.) |
| 15 | Q. (By Mr. Elliott) Is that the subpoena you were |
| 16 | served with? |
| 17 | A. Yes. |
| 18 | Q. So you appear today in response to a subpoena? |
| 19 | A. Yes, sir. |
| 20 | Q. Okay. Can you tell us briefly whether you did |
| 21 | anything to prepare for today's deposition? |
| 22 | A. I reviewed various exhibits yesterday. |
| 23 | Q. "Various exhibits," you mean exhibits that we |
| 24 | might be discussing today? |
| 25 | A. Yes, sir. |

| | Page 15 |
|---|---|
| 1 | Q. Yep. |
| 2 | A. Yes, sir. |
| 3 | Q. And you met with me and Bryan Orticelli? |
| 4 | A. Yes. |
| 5 | Q. And Mr. Edinburgh? |
| 6 | A. Yes. |
| 7 | Q. Okay. Anything else you did to prepare? |
| 8 | A. I reviewed some ASME PALD minutes. |
| 9 | Q. ASME PALD minutes? |
| 10 | A. Correct. |
| 11 | Q. So what's ASME? |
| 12 | A. American Society of Mechanical Engineers, the |
| 13 | committee that I vice-chaired was called portable |
| 14 | automotive lifting devices. |
| 15 | Q. So PALD stands for portable automotive lifting |
| 16 | device committee? |
| 17 | A. Yes. Yes. It was a standards committee. |
| 18 | Q. All right. And we'll talk a little bit more |
| 19 | about that in a second. So you reviewed some documents |
| 20 | concerning that? |
| 21 | A. Yes. |
| 22 | Q. Okay. So as I understand it, you worked for SFA |
| 23 | for around 20 years? |
| 24 | A. Yes. |
| 25 | Q. Until the end of December 2008? |

| | Page 16 |
|---|---|
| 1 | A. The last week -- the first week of January, yes. |
| 2 | Q. Okay. Why don't you summarize for us what |
| 3 | you've been doing since leaving SFA both, you know, |
| 4 | with respect to your occupation and your employment? |
| 5 | A. Sure. After leaving SFA, I was looking for work |
| 6 | obviously and within a couple of months at a bible |
| 7 | study meeting at church, why, a member offered me a job |
| 8 | at a plastics factory that they were -- that he and a |
| 9 | couple of investors were purchasing, purchasing the |
| 10 | assets. And I went to work there, and after we got |
| 11 | the -- I went to work as a quality assurance manager |
| 12 | and safety guy, a safety director. And after we got |
| 13 | the company up and profitable, why, they sold it, and |
| 14 | I -- I took the opportunity -- by that time I was close |
| 15 | to 62. So I decided to retire and go back to school |
| 16 | and I began -- |
| 17 | Q. Did you go to school? |
| 18 | A. Yes. Yes. |
| 19 | Q. Did you get a degree? |
| 20 | A. I got a certificate in photovoltaic -- |
| 21 | photovoltaics is the actual degree. |
| 22 | Q. Are you using that degree now? |
| 23 | A. Yes. |
| 24 | Q. What are you doing? |
| 25 | A. I'm teaching. |

| | Page 17 |
|---|---|
| 1 | Q. Where do you teach? |
| 2 | A. At Metropolitan Community Colleges in Kansas |
| 3 | City, Missouri at the business and technology campus. |
| 4 | Q. What's name of your course that you teach? |
| 5 | A. I teach several INTE, that's stands for |
| 6 | industrial technologies courses, related to solar power |
| 7 | generation and distribution and electronics and |
| 8 | electrical theory. |
| 9 | Q. You provided me with a copy of your resumé. I |
| 10 | want to show you that document and ask if you can |
| 11 | identify it? |
| 12 | A. That's it. |
| 13 | Q. Is that your resumé? |
| 14 | A. Yes, sir. |
| 15 | MR. ELLIOTT: Can we mark that, |
| 16 | please. |
| 17 | (Exhibit 2, Resumé, marked for |
| 18 | identification.) |
| 19 | Q. (By Mr. Elliott) So first let's drop back and |
| 20 | let's discover your educational experience, okay. So |
| 21 | you have currently a degree as you just described. Any |
| 22 | other previous educational experience? |
| 23 | A. I -- |
| 24 | Q. Formal? |
| 25 | A. Formal, no. |

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                          Roger D. Claypool

Page 18

1   Q.   Okay.  So you have this degree certificate in
2   photovoltaics?
3   A.   Yes.
4   Q.   You're using that to teach an industrial
5   technology course?
6   A.   Yes.
7   Q.   I want to talk with you about your employment
8   before you joined SFA.
9   A.   Sure.
10   Q.   Could you summarize for us, and feel free to
11   take a look at your resumé at pages, I guess, one and
12   two, one and two and three, somewhere in there.
13   Let's -- why don't we start with --
14   A.   Sure.
15   Q.   -- AP Productions.
16   A.   With AP, okay.
17   Q.   No.  I'm sorry.  Let me withdraw that.  Let's go
18   back to -- we want to go back to the last page of your
19   resumé and back in the '87 and '91 time frame.  Well,
20   prior to SFA, what'd you do prior to SFA?
21   A.   I was a mechanic with a, lack of a better term,
22   a generator shop and was there for -- for quite a
23   while, from '71 through '86.
24   Q.   Was that an automotive mechanic?
25   A.   Yes.  Yes.  Doing various levels of rebuilds on

Page 19

1   generators and charging systems, starting system for,
2   gosh, everything from motorcycles to aircraft.
3   Q.   In that job did you become familiar with
4   automotive lifting devices?
5   A.   Sure did.
6   Q.   Tell us -- describe what your familiarity was.
7   A.   On a daily basis, I was required to use jacks to
8   lifts and jack stands to support and ramps to support
9   and various vehicles.
10   Q.   Okay.  Something you did every day?
11   A.   Every day, yes, sir.
12   Q.   And that -- did that -- does that cover your
13   pre-SFA employment or is there more?
14   A.   Pre -- no.  That's it.
15   Q.   Okay.
16   A.   That's it.
17   Q.   And, then, so you joined SFA in what year?
18   A.   I believe it was '87.
19   Q.   So why don't we look at Exhibit 2 and I'm
20   looking at page 5.  It's the second to the last page.
21   It's a page entitled "Detail of SFA Employment History
22   '87 to '09."
23   A.   Yes.
24   Q.   Shinn Fu Company of America, okay?
25   A.   Yes.

Page 20

1   Q.   And let's kind of walk through that, all right?
2   A.   Sure.
3   Q.   And what -- in order to get it in chronology,
4   you actually have to go to the next page.
5   A.   Yes.
6   Q.   At the bottom of page 6, we start in '87 with
7   parts department and receiving department, right?
8   A.   Yes, sir.  Yes, sir.
9   Q.   So let's take it chronologically from there
10   forward and your first job was parts and receiving?
11   A.   Parts and receiving and unloading containers,
12   incoming product, yes, sir.
13   Q.   Okay.  And then '89 to '91, you became a
14   customer service manager?
15   A.   Yes.
16   Q.   Technical assistance to customers, what did that
17   involve?
18   A.   That would have included helping the sales
19   department in terms of answering questions about the
20   product and this would have been subsequent to my
21   traveling overseas to learn the proc -- the various
22   processes and manufacturing and getting to know the
23   product.
24   Q.   The SFA products?
25   A.   Yes.

Page 21

1   Q.   Okay.  Meeting with customers?
2   A.   Yes.
3   Q.   When it says "performed incoming product
4   inspections as a" -- I'm going to say CSR, customer
5   service --
6   A.   Okay.
7   Q.   -- manager "and testing per applicable industry
8   standards," please explain more fully what that means.
9   A.   At the time there were -- we had one little test
10   bench that we used to test jack stands, hydraulic
11   jacks.  I should clarify floor jacks, caster jacks, and
12   bottle jacks.  And it was one of my duties to, after I
13   learned the process of testing, to test a quantity of
14   product coming in out of each container.
15   Q.   And where, for example, would the, relative to
16   jack stands --
17   A.   Yes.
18   Q.   -- and relative to ratchet and pawl type jack
19   stand designs --
20   A.   Yes.
21   Q.   -- was that part of the products that you
22   inspected --
23   A.   Oh, sure.
24   Q.   -- and tested?
25   A.   Yes.  Yes.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                                Roger D. Claypool

**Page 22**

1  Q.  Going back to 1989?
2  A.  Yes.
3  Q.  And you described it as a test bench?
4  A.  Yes.
5  Q.  Is that a testing facility?
6  A.  It's a --
7  Q.  An early testing facility?
8  A.  It's an early testing apparatus.
9  Q.  Okay.
10  A.  Yes.
11  Q.  And back -- and I know we're starting early
12  on but --
13  A.  That's all right.
14  Q.  -- what was the general purpose of, in the late
15  '80s and early '90s, of your testing of, for example --
16  well, let me withdraw that.  Did the ratchet and pawl
17  type jack stand designs that you were testing at that
18  point in time delivered to you from Asian suppliers?
19          MR. ZAKRZEWSKI:  Objection.
20  Q.  (By Mr. Elliott)  You can answer.
21  A.  Yes.
22  Q.  And tell us the names of some of those
23  suppliers.
24  A.  During that time frame, it was predominantly
25  Taiwan.

**Page 23**

1  Q.  What entity in Taiwan?
2  A.  The Chiayi factory in Taiwan, the city of
3  Chiayi, and the factory was just called Chiayi.
4  Q.  What's the name of the company?
5  A.  Shinn Fu.
6  Q.  Okay.  In Taiwan, the Shinn Fu Taiwan entity?
7  A.  Yes.  Our -- basically our mother -- mother
8  entity.
9  Q.  Any products come in from Hong Kong?
10  A.  Late -- no.
11  Q.  Okay.  Not at that time?
12  A.  Not at that time.
13  Q.  Okay.
14  A.  No.
15  Q.  How about China?
16  A.  Yes.
17  Q.  What facility in China?
18  A.  That would have been Shinwa Taishan in Taishan
19  City and --
20  Q.  What was name of that company?
21  A.  I believe it was Taishan Machinery and Electric
22  at the time.
23  Q.  Was that a predecessor of a Wei Fu Company?.
24  A.  Yes.
25          MR. ZAKRZEWSKI:  Objection.

**Page 24**

1          THE WITNESS:  Yes.
2  Q.  (By Mr. Elliott)  He can object for the record.
3  You can still answer the questions.
4  A.  Okay.
5          MR. ZAKRZEWSKI:  Yeah.
6  Q.  (By Mr. Elliott)  So going back to the late '80s
7  and early '90s, you were testing on behalf of Shinn Fu
8  America ratchet and pawl type design jack stands that
9  you received from Shinn Fu Taiwan?
10  A.  Yes.
11  Q.  The predecessor of Wei Fu China?  Yes?
12  A.  Yes.
13          MR. ZAKRZEWSKI:  Objection.
14  Q.  (By Mr. Elliott)  And later on, and I'll cover
15  this in detail in a second, but did the Shinn Fu
16  America test facility -- where was it located, Kansas
17  City?
18  A.  Yes.  And initially it was on Ambassador Drive
19  and then we made a move -- I don't recall the exact
20  year -- to Pomona.
21  Q.  And did that test facility grow in complexity
22  and sophistication?
23  A.  Oh, yes.  Yes.
24  Q.  And we'll cover that in a minute, okay.  I'm
25  staying back with the late '80s, early '90s.  In that

**Page 25**

1  time frame, the late '80s and early '90s, what was the
2  purpose for which you were conducting testing of the
3  ratchet and pawl type design jack stands?
4  A.  It was primarily to -- actually it was our
5  chairman's directive, Michael, he was --
6  Q.  Michael who?
7  A.  Michael Hung.  He was insistent --
8  Q.  Please spell that name.
9  A.  H -- last name H-u-n-g.
10  Q.  Okay.  "He was insistent..."
11  A.  He was insistent upon ensuring that the jack
12  stands in particular were tested thoroughly.
13  Q.  Okay.  Where was Hung located?
14  A.  In Taiwan, in Chaiyi at the time.
15  Q.  And for what purpose, for compliance with a
16  standard or safety or --
17  A.  We had a --
18          MR. ZAKRZEWSKI:  Objection.
19  Q.  (By Mr. Elliott)  What was the purpose?
20  A.  Yes and yes.
21  Q.  Okay.  So explain.
22  A.  It -- at the time initially, we tested to the
23  Shinn Fu Taiwan standard, the SFT standard, and that
24  included --
25  Q.  Let me interrupt you.  SFT had testing standards

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

Page 26

```
1   that you --
2   A.  Oh, yes.
3   Q.  -- applied?
4   A.  Yes.
5   Q.  Wow, okay.
6   A.  And they were -- they included center load
7   testing in the fully extended and the fully retracted
8   position and off-center load testing.
9   Q.  And you're speaking of ratchet and pawl design
10  jack stands?
11  A.  Yes.  Yes.
12  Q.  All right.  What about -- at this point in time,
13  in the late '80s, early '90s, did you conduct testing
14  with the purpose of determining compliance with
15  American industry standards --
16  A.  Late --
17  Q.  -- apart from the SFT standards?
18  A.  Late in that period from, I'd say, '89 to '91,
19  it became apparent to us that it would be necessary to
20  comply with the current PALD, which I believe at that
21  time was '87, the 1987 standard, and in order to grow
22  the business --
23  Q.  Yeah?
24  A.  -- in order to meet the market demand, we wanted
25  to try to get into the -- into Sears and into other
```

Page 27

```
1   retailers that were -- that were currently being
2   supplied by other manufacturers, American
3   manufacturers.  And in order to get into those markets,
4   we had to comply with ASME standards.
5   Q.  ASME standards?
6   A.  Correct.
7   Q.  You know, as long as we're on ASME and PALD,
8   okay, let's take a minute and kind of describe what
9   those organizations are.  So what is the American
10  Society of Mechanical Engineers?
11  A.  It's a standards -- it's a standards writing
12  group.  They assigned a secretary, ASME would assign a
13  secretary to each group, and my group was portable
14  automotive lifting devices.  Other groups are B30,
15  pressure vessel groups and other -- hundreds of other
16  categories.  We would as a committee, basically
17  like-minded manufacturers, distributors, and test labs,
18  would meet twice a year to discuss the industry
19  standards to try to respond to various trends in
20  failure and claims and --
21  Q.  So you discussed product failures?
22  A.  Yes.
23  Q.  You analyzed product failures?
24  A.  Informally analyzed them as a group because no
25  one wanted to reveal a trade secret, you know, that
```

Page 28

```
1   might give the other manufacturer an upper hand.
2   Q.  Yep.
3   A.  But that wasn't a -- really a big...
4   Q.  So as I understand it, one way that ASME
5   operated was through committees?
6   A.  Exclusively, yes.
7   Q.  And one of those committees was the portable
8   automotive lifting device committee?
9   A.  Yes.
10  Q.  Describe that for us.
11  A.  The committee was made up of, again,
12  manufacturers, distributors, test labs, and insurance
13  parties, interested parties, and we sat down and one of
14  the first things we did as a committee after I joined
15  was to try to centralize the various standards.  There
16  were at the time, I think, ten into one standard, and
17  we found that it was easier to understand a standard
18  that you could apply central concepts to --
19  Q.  Yep.
20  A.  -- each individual category rather than have a
21  hard copy jack stand, hard copy floor jack standard and
22  so on.
23  Q.  And did participating companies have a
24  representative, for example, on the PALD committee?
25  A.  Yes.
```

Page 29

```
1   Q.  Were you the SFA representative?
2   A.  I was the Shinn Fu representative.
3   Q.  Okay.  And did Sears have a representative?
4   A.  Sure.
5   Q.  And who was that?
6   A.  Kathy.
7   Q.  Kathy who?
8   A.  Kathy Guerra.
9   Q.  Guerra, okay.
10  A.  Yes.
11  Q.  She was Sears' representative?
12  A.  Yes.
13  Q.  Okay.  Jumping ahead, did you end up having an
14  elected position in the PALD committee?
15  A.  Yes.
16  Q.  What was it?
17  A.  It was vice chair.  I was elected through three
18  terms of that title.
19  Q.  And when was that?
20  A.  Oh my, ninety -- I'd have to -- honestly I'd
21  have to go back and look at my -- my -- the meeting
22  minutes.
23  Q.  Okay.
24  A.  But it was, I believe, '95 through 2009.  I
25  resigned in 2009.  I can probably get that from ASME
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

---

Page 30

1  if --
2     Q.   Let's see, on your résumé on page 1, this is
3  Exhibit 2, under Volunteer Work, if you turn that --
4  turn to that with me --
5     A.   Yes.
6     Q.   -- "Served three terms as elected vice chair of
7  ASME Safety and Performance Standard Committee on
8  portable automotive lifting devices" --
9     A.   Yes.
10    Q.   -- "where I served to develop testing,
11 performance, and specification requirements of PALDs to
12 ensure safety and regulatory requirements are met" --
13    A.   Yes.
14    Q.   -- "and prepared same for publication by ASME."
15 Is that a fair summary of what you did as vice chair of
16 PALD?
17    A.   Yes.
18    Q.   Okay.  And how many years did you serve as --
19 three terms is how many years?
20    A.   Yes.
21    Q.   What length of the term?
22    A.   I believe they're two- to three-year terms.
23    Q.   Okay.  So you were vice chair for eight, nine,
24 ten years?
25    A.   Yes.

---

Page 31

1     Q.   How would you describe your familiarity with the
2  standards, performance, and specification requirements
3  of portable automotive lifting devices as gained
4  through your participation in the ASME PALD committee?
5     A.   I -- I lived it and breathed it for many years.
6  I -- that was the focus of my job duties for several
7  years and --
8     Q.   Did your employer support your participation on
9  that committee?
10    A.   Yes.
11    Q.   SFA?
12    A.   Initially, yes.  Yes.
13    Q.   Okay.  So if I understand you correctly, just to
14 put this topic to bed, in the late '80s and early '90s,
15 your kind of rudimentary test facility started with SFA
16 for testing ratchet and pawl type jack stand designs?
17    A.   Yes.
18              MR. ZAKRZEWSKI:  Objection.
19    Q.   (By Mr. Elliott)  Yes?
20    A.   Yes.
21    Q.   Look at Exhibit 2, page 4.  This is your résumé.
22    A.   Okay.
23    Q.   And I'm looking at, let's see, the '91 to '93 --
24 oh, I'm sorry.  I'm wrong.  '89 to '91 I want to
25 still -- one more.

---

Page 32

1     A.   Sure.
2     Q.   I think you may have covered this.  If I did,
3  I'll stop.  The traveling to overseas factories, you
4  told us about, right, to familiarize yourself with
5  those operations, '89, '91?
6     A.   I don't --
7     Q.   Looking at your résumé, page 6.
8     A.   I may have summarized it, the overseas travel.
9  It was -- I basically traveled to SFT initially to
10 train on their test equipment and to familiarize myself
11 with the product in --
12    Q.   Okay.  Got it.  Let's move to '91-'93, Exhibit
13 2, page 6 at the top of the page, sales engineer and
14 your duties and stuff?
15    A.   Yes.
16    Q.   Why don't you read that to yourself --
17    A.   Okay.
18    Q.   -- and then we'll ask you to summarize that
19 experience.
20    A.   Okay.
21    Q.   So tell us what was your experience in the
22 '91-'93 time frame as a sales engineer for SFA?
23    A.   That was a period of time that we were actively
24 building our business.  Michael, our chairman, wanted
25 to continue to -- after successfully getting into

---

Page 33

1  Sears -- we were the first, by the way, first foreign
2  company to qualify for the Craftsman name and with that
3  success, we --
4     Q.   And when was that?
5     A.   It was in the --
6     Q.   Nineties?
7     A.   Early '90s, yes.
8     Q.   Okay.
9     A.   And with that success, we wanted to go into --
10 attempt to get into the more professional market even
11 further, to Grainger and some of the other tool
12 distributors.  In order to do that, we needed more
13 production.  So I spent a lot of time overseas sourcing
14 factories, sourcing materials -- looking at material
15 sources for jack stand factories in particular and --
16 and caster jack, floor jack facilities.
17    Q.   Okay.
18    A.   Because in order to grow, we had to meet the
19 production demands.  So I spent a lot of time overseas
20 during that period, filled up two passports in the
21 course of ten years or so.
22    Q.   Okay.  Let me ask you this:  There's an entry
23 here on page 6 that says "New product development
24 responsible for development of Shinn Fu's joint venture
25 QC testing programs and techniques."  What's that

---

FREDERICK KLORCZYK, JR. ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                                              Roger D. Claypool

Page 34

1  about?
2     A.   In order to -- another aspect of that growth was
3  to try to present innovative products.  We had a joint
4  venture.  That was during the time that we were looking
5  at the expansion of Wei Fu.
6     Q.   Who was the joint venture with?
7     A.   With the Wei Fu group.
8     Q.   Chinese group?
9     A.   Chinese, yes.
10    Q.   Was Hong Kong involved in that?
11           MR. ZAKRZEWSKI:  Objection.
12           THE WITNESS:  Yes, they were.  We had
13       an office in Hong Kong.  Michael's brother,
14       David Hong, H-o-n-g, and his wife ran that
15       operation.
16    Q.   (By Mr. Elliott)  What was the name of that Hong
17  Kong company?  Was it MVP or --
18           MR. ZAKRZEWSKI:  Objection.
19           THE WITNESS:  It was the predecessor
20       of MVP Hong Kong.  It may at that time have
21       been Shinn Fu Hong Kong.  I just don't
22       recall.
23    Q.   (By Mr. Elliott)  But it became MVP?
24    A.   Yes.
25    Q.   Okay.

Page 35

1           MR. ZAKRZEWSKI:  Objection.  Sorry.
2     Q.   (By Mr. Elliott)  Further looking at Exhibit 2,
3  page 6, there's an entry that says in the '91-'93 time
4  frame "Monitor subcontractor performance through
5  incoming product inspection and testing per applicable
6  government, company, industry standards, review of
7  manufacturers' blueprints," etc.  Just how would you
8  summarize that work?
9     A.   That was, again, at the chairman's directive.
10  He wanted to make sure that the blueprints that we sent
11  to Wei Fu, at that time just called Taishan, I believe,
12  that they met our requirements dimensionally and
13  materialwise.
14    Q.   Okay.
15    A.   And we'd spend weeks there at a time testing
16  individual ratchet bars.  That was his -- that was the
17  focus because if the ratchet bar is -- is not right,
18  everything else is not right so...
19    Q.   What does that mean?
20    A.   If the material is not right, if it's not cast
21  right, if it's not cleaned up after casting correctly,
22  if the foundry isn't -- isn't using the right
23  techniques in pouring and heating -- I rejected several
24  factories on the basis of their not having electricity
25  sufficient to run the foundry but --

Page 36

1     Q.   Let me drill down a little bit with you on the
2  Sears Craftsman certification.
3     A.   Sure.
4     Q.   What did you have -- what did the company have
5  to do to get to accomplish its Sears Craftsman
6  certification?
7     A.   My, we had to -- we had to meet the industry
8  standard, which at the time was ASME PALD Part 4, I
9  believe, jack stands.  In addition to that, we had to
10  meet Sears' own internal testing requirement --
11    Q.   Oh, let's stop there.  Sears had its own
12  internal testing requirements?
13    A.   Yes.  Yes.
14    Q.   And what time frame was this, early '90s?
15    A.   Early '90s.
16    Q.   And what were those standards about?  Can you
17  describe those?
18    A.   They included -- they incorporated PALD.  In
19  addition there were other cosmetic requirements.  It's
20  not something that PALD really addresses.
21    Q.   Yep.
22    A.   And labeling requirements that -- and packaging
23  requirements that Sears had.
24    Q.   As long as we're on Sears, let me ask you some
25  questions about Sears.  Did Sears have a test facility

Page 37

1  that tested jack stands?
2     A.   Oh, sure.
3     Q.   And how long did it have that facility?
4     A.   Oh, my --
5     Q.   During your employment with SFA?
6           MS. TODD-TROTTA:  Objection to form.
7           THE WITNESS:  As I recall, yes.  Yes.
8     Q.   (By Mr. Elliott)  Okay.  Could you describe that
9  facility - where was it located, what did they do --
10    A.   It was a beauty.
11    Q.   -- who ran it?  Tell us about it.
12           MR. ZAKRZEWSKI:  Objection.
13           THE WITNESS:  Initially Jack Garter
14       ran the lab and that was at a -- a
15       warehouse separate from the main Sears
16       building and -- and then when they moved to
17       Hoffman Estates, it really turned into a
18       very elaborate and, to me, a high-tech lab
19       covering everything from toasters,
20       treadmills to, you know, jack stands and
21       jacks and --
22    Q.   (By Mr. Elliott)  So did they test Shinn Fu jack
23  stands?
24    A.   Sure.
25           MS. TODD-TROTTA:  Objection.

Page 38

1    MR. ZAKRZEWSKI:  Objection.

2    Q.  (By Mr. Elliott)  Did they test jack stands that

3 were imported into the country by MVP?

4    A.  Sure.

5        MR. ZAKRZEWSKI:  Objection.

6        MS. TODD-TROTTA:  Objection.

7    Q.  (By Mr. Elliott)  Did they test jack stands that

8 were manufactured at Taishan, China?

9    A.  Sure.

10       MR. ZAKRZEWSKI:  Objection.

11       MS. TODD-TROTTA:  Objection.

12   Q.  (By Mr. Elliott)  What was your answer?

13   A.  Yes.

14   Q.  Okay.  Who was in charge of that facility?

15   A.  Kathy Guerra.

16   Q.  Kathy Guerra, okay.  And what kind of a manager

17 was she of that facility?

18       MS. TODD-TROTTA:  Objection.

19       THE WITNESS:  She was great.  She was

20       -- she was tough and she was accurate and

21       she was -- you didn't mess -- you didn't

22       try to pull a fast one over on her at all.

23   Q.  (By Mr. Elliott)  Now, as I understand it, SFA

24 had its own separate testing operation, right?

25   A.  Yes.

Page 39

1    Q.  And so Sears had its own testing operation for

2 jack stands, right?

3    A.  Yes.

4    Q.  What was purpose of the -- on top of SFA's

5 testing protocols, what was the purpose of Sears'

6 testing protocols for ratchet and pawl type jack

7 stands?

8    A.  Well --

9        MR. ZAKRZEWSKI:  Objection.

10       MS. TODD-TROTTA:  Objection.

11       THE WITNESS:  -- we weren't the only

12       supplier and Sears wasn't our only

13       customer.  I --

14   Q.  (By Mr. Elliott)  Well, what standards was Sears

15 applying --

16       MS. TODD-TROTTA:  Objection.

17   Q.  (By Mr. Elliott)  -- in its testing?

18   A.  PALD.

19   Q.  PALD?

20   A.  Yes.

21   Q.  Did it have -- did Sears have its own set of

22 testing requirements --

23       MS. TODD-TROTTA:  Objection.

24       MR. ZAKRZEWSKI:  Objection.

25   Q.  (By Mr. Elliott)  -- apart from PALD?

Page 40

1    A.  Physical testing, I believe they -- I believe

2 they -- they stopped at PALD.

3    Q.  They stopped at PALD?

4    A.  Yes.

5    Q.  Okay.

6    A.  Yes.

7    Q.  But what was the purpose of the additional --

8 what was Sears's purpose, to your understanding,

9 relative to their separate testing of ratchet and pawl

10 type jack stand designs?

11       MS. TODD-TROTTA:  Objection.

12       THE WITNESS:  We would send a

13       prototype of a jack stand that we would

14       like to introduce.  So they would not be

15       able to rely on previous testing to make a

16       decision on a new design, and when I say

17       "new design," I mean that even if it

18       changed a model number, we would have to

19       present a sample for their testing along

20       with our own test reports so that they

21       could reasonably compare the two test

22       reports.

23   Q.  (By Mr. Elliott)  Okay.  Let me then -- let's go

24 back to your resumé.  It's been a little unclear to me.

25 When did -- withdrawn.  Was MVP, in your mind, part of

Page 41

1 the global business operation of Shinn Fu?

2        MR. ZAKRZEWSKI:  Objection.

3        THE WITNESS:  Yes.

4    Q.  (By Mr. Elliott)  Okay.  When did MVP enter the

5 picture, if you recall, approximately as a global

6 business partner of the Shinn Fu group?

7        MR. ZAKRZEWSKI:  Objection.

8        THE WITNESS:  Early -- early '90s.

9    Q.  (By Mr. Elliott)  And what was its business?

10   A.  Primarily trading items, items that Wei Fu or

11 SFT, Shinn Fu Taiwan, weren't really in the business of

12 manufacturing.

13   Q.  Did they distribute Shinn Fu products to

14 America?

15   A.  Sure.

16   Q.  Okay.  Did that include ratchet and pawl type

17 jack stand designs?

18   A.  Yes.

19       MR. ZAKRZEWSKI:  Objection to both

20       questions.

21   Q.  (By Mr. Elliott)  I'm going to direct your

22 attention to page 5 of your resumé, Exhibit 2, the

23 bottom of the page, the 1993-'98 time frame.

24   A.  Yes, sir.

25   Q.  When you were a sales engineer, technical

Case 3:13-cv-00257-JAM   Document 305-5   Filed 10/11/18   Page 13 of 63

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

Page 42

1  services manager, and claims manager, again, would you
2  read that section to yourself and then I'll ask you to
3  summarize it.
4      A.   Yes.  Yes.
5      Q.   Okay.  What were your duties and
6  responsibilities in the 1993 to 1998 time frame as a
7  sales engineer, technical services manager, and claims
8  manager?
9      A.   I was very busy during that time period.  We had
10  taken on a new product, electrically-powered
11  treadmills.  We developed a sporting goods department.
12  We had two engineers that worked out -- worked out of
13  Seattle, Washington that worked on the electronics that
14  would operate and control the treadmills --
15      Q.   Okay.
16      A.   -- at that time --
17      Q.   I'm going to interrupt you and ask you a
18  different question.
19      A.   Okay.
20      Q.   Because I want to focus your attention on
21  upgrading the in-house testing lab.
22      A.   Oh, sure.
23      Q.   Tell us about that.
24      A.   Well, the time I spent in Taiwan and in the
25  overseas factories, I was able to use much more

Page 43

1  sophisticated test equipment than we had at our
2  facility in Kansas City, and I lobbied for --
3  successfully for an upgrade for the equipment.  As a
4  matter of fact, Shinn Fu Taiwan sent one of their --
5  one of the testing fixtures that I had worked with over
6  there to our facility and we set it up and I added -- I
7  lobbied successfully for digital load cells for both
8  pieces of test equipment that I had.
9      Q.   And was this relative to the American test
10  facility for Shinn Fu?
11      A.   Yes.
12      Q.   Yeah, okay.
13      A.   Yes.  In other words, the old system was -- the
14  only time that you could get an accurate reading was to
15  do some calculations, convert pressure, psi, to
16  pounds-force.  And with the digital load cell, you
17  could apply the load and get a readout in -- in
18  5-pound, 20-pound increments.
19      Q.   Okay.  And so the testing protocols that you
20  were able to employ in this time frame became more
21  sophisticated?
22      A.   Yes.
23      Q.   Did you apply them to the ratchet and pawl type
24  jack stand designs?
25      A.   Yes.  Yes.

Page 44

1      Q.   Another entry on page 5 of your resumé under the
2  '93 to '98 time frame --
3      A.   Yes.
4      Q.   -- is technical writer for new product operator
5  instruction and parts manuals --
6      A.   Yes.
7      Q.   -- parentheses OIPMs?
8      A.   Yes.
9      Q.   Could you explain what that means.
10      A.   One of my jobs was to put together legible and
11  meaningful operator manuals for our products.
12      Q.   Did that include jack stands?
13      A.   Yes.
14      Q.   Did it include ratchet and pawl design jack
15  stands?
16      A.   Yes.
17      Q.   And what did those manuals consist of?
18      A.   It would consist of owner's instructions,
19  assembly instructions if there were assembly
20  instructions, user instructions, parts diagrams, and
21  parts listing, warning verbiage, and a warranty.
22      Q.   Okay.  At the bottom of page 5 on your resumé,
23  Exhibit 2 is the first entry that I see that deals with
24  the topic of "investigating and process property damage
25  claims, advise on mitigating and handling safety

Page 45

1  risks."  I remind you of my limiting instruction at the
2  outset of this deposition.  I'm looking for your
3  responses to what was the factual content of your
4  investigation in processing damaging claims and
5  advising on safety risks?  What kind of activities did
6  you engage in?
7          MR. ZAKRZEWSKI:  And we're asking for
8      a general description of those type of
9      activities?
10          MR. ELLIOTT:  I'm letting the
11      question stand, sir.
12          MR. ZAKRZEWSKI:  Okay.  I object and
13      instruct the witness not to answer as to
14      specific facts gained from any
15      investigation performed which was performed
16      in conjunction with or at the direction of
17      the legal department, including, but not
18      limited to, Arthur Chaykin.  As I
19      understand it, the question asks general
20      job duties and things like that.
21          MR. ELLIOTT:  Mr. Zakrzewski, was
22      Mr. Chaykin an employee of your client in
23      the '93 to '98 time frame?
24          MR. ZAKRZEWSKI:  I'm talking about
25      any time frame and I'm talking about anyone

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

Page 46

1    in the legal department during that time
2    frame or any other.
3    Q.    (By Mr. Elliott)  Mr. Claypool, was Mr. Chaykin
4    an employee of SFA during this time frame?
5    A.    No.
6    Q.    No.  You can answer.
7          MR. ELLIOTT:  Unless you want to
8          claim it?
9          MR. ZAKRZEWSKI:  I claim the
10         objection to the extent you worked with, I
11         think you understand, anyone in the legal
12         department irrespective of whether it was
13         Mr. Chaykin or someone else.
14   Q.    (By Mr. Elliott)  Let's just clarify this and --
15   A.    Okay.
16   Q.    -- and get this, you know, on the table.
17   A.    Okay.
18   Q.    In order to answer this question that I just
19   asked you, do you have to tell me about any
20   conversations you had with a Shinn Fu lawyer?
21   A.    No.
22   Q.    Answer.
23         MR. ZAKRZEWSKI:  Okay.  You
24         understand my objection isn't limited to
25         conversations with attorneys.  It also

Page 47

1    encompasses factual investigations
2    performed at the direction of or in
3    conjunction with attorneys, specifically
4    those in connection with disputed claims
5    which were in litigation or could lead to
6    litigation.
7    Q.    (By Mr. Elliott)  Okay.  In order to answer my
8    question, will you be required to divulge the
9    information counsel just described?
10   A.    I'm confused as to -- as to --
11   Q.    He's asking about activities you engaged in at
12   the direction of counsel.  Do you have to tell us about
13   that to answer that question?
14   A.    No.
15         MR. ZAKRZEWSKI:  Or working with
16         counsel.
17         THE WITNESS:  No.
18   Q.    (By Mr. Elliott)  Okay.  All right.  Then go
19   ahead and answer.
20   A.    And if I cross a line, somebody will --
21         MR. ZAKRZEWSKI:  Someone will pipe
22         up, yes.
23   Q.    (By Mr. Elliott)  I'm sure.  I'm sure.
24   A.    All right.  So at the time, I -- I would
25   receive, through the direction of my managers, William

Page 48

1    Shaw and Steven Huang --
2    Q.    Nonlawyers?
3    A.    Yes.
4    Q.    Right.
5    A.    Yes, nonlawyers.  I would receive documents,
6    notes, handwritten notes, that they would give me from
7    customers, when I say "customers," I'll use the term
8    "end users" instead because customers could also
9    include a company or a Sears or a Kmart or a Wal-Mart.
10   So end users and customers would call to complain about
11   this broke or that broke.  I would get treadmill
12   claims.  I would get jack claims.  I would get jack --
13   Q.    Jack stand claims?
14   A.    I would get jack stand claims and on a variety
15   of different products.  And at that time when we first
16   started bringing in trading items, items that we didn't
17   manufacture, primarily electrical items, we would
18   occasionally get a claim for, you know, property damage
19   for those as well.
20   Q.    Okay.
21   A.    And it would range from a $5 claim to a bit
22   more.
23   Q.    Okay.
24   A.    And it would be my job to investigate the claim,
25   call the claimant, have them send it in.  I would send

Page 49

1    a -- send them a questionnaire basically getting the
2    details of the claim and then try to determine from
3    that what happened.  If I was lucky enough to get a
4    product, that was great because I could determine
5    within a reasonable doubt what was wrong with the
6    product, what occurred, and then make a recommendation
7    to settle the claim or -- deny the claim altogether.
8    Q.    And at that point, in the time frame we're
9    talking about, that investigation responsibility was
10   carried out at Shinn Fu by nonlawyers?
11   A.    Oh, sure.  Sure.  I believe at one point I had
12   power of attorney to make decisions on that.  I think I
13   still have that somewhere.
14   Q.    Okay.  All right.
15         MR. ZAKRZEWSKI:  Sorry.  Power of
16         attorney?
17         THE WITNESS:  Yeah.  Yeah.  Yeah.
18         MR. ZAKRZEWSKI:  So you were
19         essentially acting as an attorney for the
20         company, even though you were a nonlawyer?
21         MR. ELLIOTT:  Well, don't interrupt
22         my examination, please.  You can have
23         cross.
24   Q.    (By Mr. Elliott)  So let me switch topics a
25   little bit.  Relative to your investigation of factual

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                        Roger D. Claypool

Page 50

1  claims involving ratchet and pawl type design jack
2  stands, did you encounter a phenomenon or a claim
3  relative to a sudden and unexpected loss of ratchet
4  height?
5      A.   During that time period --
6      Q.   At any time period.
7      A.   Would you repeat the question.
8      Q.   Yeah.  Did you at any time during your factual
9  investigation of claims regarding the ratchet and pawl
10  type jack stand design, did you encounter claims
11  concerning sudden and unexpected loss of ratchet
12  height?
13     A.   Yes.
14             MR. ZAKRZEWSKI:  Objection.
15     Q.   (By Mr. Elliott)  Could you describe that.
16             MR. ZAKRZEWSKI:  And I object to you
17          testifying about the factual specifics of
18          any claim you investigated.  You testified
19          that you were working as power of attorney
20          for the company --
21             THE WITNESS:  I had --
22             MR. ZAKRZEWSKI:  -- during that
23          period.
24             THE WITNESS:  -- a document.
25             MR. ZAKRZEWSKI:  You had a document

Page 51

1  that was essentially empowering you as an
2  attorney.  I object and instruct the
3  witness not to answer.
4             MR. ELLIOTT:  Well, that's not the
5  definition of attorney-client privilege.
6  Attorney-client privilege is communications
7  with a lawyer representing the company.
8             MR. ZAKRZEWSKI:  Okay.  And I'm glad
9  you brought that up because we're not --
10  and you and I have discussed this in
11  meet-and-confer teleconferences that we're
12  not only talking about attorney-client
13  privilege.  We're also talking about Rule
14  26(b)(3), materials prepared in
15  anticipation of litigation.  I think it's a
16  good time to put this on the record.
17             There's Second Circuit precedent from
18  the Second Circuit Court of Appeals, not
19  from district courts, within the Second
20  Circuit In re Grand Jury Subpoena 282F 3rd
21  at 161 holding that factual investigations
22  conducted in anticipation of litigation,
23  pending or threatened claims, anticipated
24  future claims can also be subject to
25  materials prepared in anticipation of

Page 52

1  litigation privilege.
2             Judge Fitzsimmons herself has cited
3  this precedent in the context of civil
4  litigation.  So that's what I'm talking
5  about.
6             MR. ELLIOTT:  Okay.
7             MR. ZAKRZEWSKI:  And that's what I
8  instruct the witness not to answer on.
9             MR. ELLIOTT:  Well, and I'm asking a
10  factual question as to whether -- my
11  question on the table right now is did his
12  fact investigations of any such claims
13  involve a claim of sudden loss of ratchet
14  height, unexpected loss of ratchet height.
15  I don't think that implicates any
16  confidence or privilege and I would like
17  him to answer the question.
18             MR. ZAKRZEWSKI:  If he performed a
19  factual investigation in response to a
20  claim that Shinn Fu had notice of --
21             MR. ELLIOTT:  Yeah.
22             MR. ZAKRZEWSKI:  -- either working
23  with the legal department, for the legal
24  department, or as the de facto legal
25  department, that information would be

Page 53

1  subject to this claim of privilege.
2             MR. ELLIOTT:  Okay.  Well, that has
3  not been established.  It's not been
4  established that he was a lawyer.  He's
5  not.  It's not been established whatever a
6  de facto legal department is.  I don't know
7  what that means.  I'm not asking him to
8  divulge a privilege or a confidence.
9             I'm asking him a fact question.  The
10  fact question is:  Did such claims
11  investigation involve that claim, period.
12             MR. ZAKRZEWSKI:  This -- and this
13  might be -- this might be the disconnect
14  where we need to get Magistrate Fitzsimmons
15  on the phone because I think --
16             MR. ELLIOTT:  Make your call.  You
17  can make your call.
18             MR. ZAKRZEWSKI:  -- where our
19  understanding -- there's a gap.
20             MR. ELLIOTT:  You can make your call.
21             MR. ZAKRZEWSKI:  Okay.  You noted a
22  lack of record to establish the privilege
23  that I asked to claim.  I'd like to
24  question the witness very briefly to get
25  any facts on the record that might allow us

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                             Roger D. Claypool

Page 54

1   to determine whether or not that privilege
2   would apply.
3       MR. ELLIOTT:  I don't know what
4   privilege you're talking about but, I mean,
5   I don't mind you asking some clarifying
6   questions, but I'm not going to have my
7   examination interrupted.  But if you
8   want -- if you think you need to ask some
9   questions for a record, go ahead and we'll
10  see where that goes.
11      MR. ZAKRZEWSKI:  Thank you.
12      The question he just -- that Attorney
13  Elliott asked you --
14      THE WITNESS:  Yes.
15      MR. ZAKRZEWSKI:  -- about performing
16  a factual investigation related to a sudden
17  or unexpected loss of height --
18      THE WITNESS:  Okay.
19      MR. ZAKRZEWSKI:  -- on a jack stand,
20  those investigations that you performed,
21  you said that they were in response to
22  written claims of which you were given
23  notice by your superiors at Shinn Fu
24  Company of America?
25      THE WITNESS:  Yes.

Page 55

1       MR. ZAKRZEWSKI:  Okay.  And did you
2   understand that the results of your
3   investigations would be used to assist the
4   company in developing resolution strategies
5   and legal strategies regarding those
6   claims?
7       MR. ELLIOTT:  Legal strategies?
8       THE WITNESS:  No.
9       MR. ZAKRZEWSKI:  Did you understand
10  that the results of your investigations
11  would impact the company's handling of the
12  claims if they went into litigation.
13      THE WITNESS:  It was not a
14  consideration I made.
15      MR. ZAKRZEWSKI:  It was not a
16  consideration you made?
17      THE WITNESS:  Yes.
18      MR. ZAKRZEWSKI:  But do you
19  understand that that was something the
20  company would use the factual information
21  for?
22      THE WITNESS:  No.
23      MR. ZAKRZEWSKI:  No.
24      THE WITNESS:  No.
25      MR. ZAKRZEWSKI:  So did you -- you

Page 56

1   performed certain factual investigations at
2   the direction of the legal department,
3   correct?
4       THE WITNESS:  There is no legal
5   department at SFA --
6       MR. ZAKRZEWSKI:  You --
7       THE WITNESS:  -- at that time.
8       MR. ZAKRZEWSKI:  At that time.  At
9   some period in time, you performed factual
10  investigations at the direction of an
11  in-house attorney?
12      THE WITNESS:  Yes.
13      MR. ZAKRZEWSKI:  And working with an
14  in-house attorney?
15      THE WITNESS:  Yes.
16      MR. ZAKRZEWSKI:  All right.  And he
17  obviously had an eye toward the company's
18  resolution litigation strategy in
19  conducting those investigations?
20      THE WITNESS:  I can assume so.
21      MR. ZAKRZEWSKI:  Yes, okay.  So I
22  object to you giving any response regarding
23  any of those claims that you just described
24  where you're working with counsel or at the
25  direction of counsel.

Page 57

1       THE WITNESS:  Okay.
2       MR. ELLIOTT:  Well, let me -- then
3   let me limit it then.
4   Q.   (By Mr. Elliott)  I'll limit my question, the
5   question that's pending for me to factual
6   investigations involving claims of sudden loss of
7   ratchet height, unexpected ratchet height collapse to
8   periods of time and claims during which you were not
9   acting -- there was no legal department at SFA.  You
10  were not acting at the direction of a lawyer.
11  A.   Okay.
12  Q.   You were not resolving litigations.  You were
13  conducting factual investigations not at the direction
14  of counsel.  I'll limit it.
15      MR. ZAKRZEWSKI:  And if you could
16  clarify the time period, that would be very
17  helpful.
18  Q.   (By Mr. Elliott)  Was it 2005, in about that
19  area?
20      MR. ZAKRZEWSKI:  It would be prior to
21  a certain time, correct?
22      THE WITNESS:  Correct.  Correct.
23      MR. ZAKRZEWSKI:  And can you give me
24  a general benchmark of what you think that
25  time was, whether it was 2005 or --

Page 58

```
 1        THE WITNESS:  I don't recall when
 2     Arthur started.
 3     Q.   (By Mr. Elliott)  Yeah but the claims that I'm
 4  asking you about from a factual point of view, did they
 5  occur in the 2005 time frame about sudden loss of
 6  height claims?
 7     A.   Approximately.
 8        MR. ZAKRZEWSKI:  Okay.  And was there
 9     legal counsel at SFA during that time?
10        THE WITNESS:  I don't recall when
11     Arthur started.
12        MR. ZAKRZEWSKI:  So it may have been
13     during his tenure there?
14     Q.   (By Mr. Elliott)  When you investigated
15  claims --
16        MR. ZAKRZEWSKI:  Wait, wait, wait.
17     We have a question here.
18        THE WITNESS:  I -- I don't know.
19        MR. ZAKRZEWSKI:  Okay.  So that's a
20     yes --
21        THE WITNESS:  Yes.
22        MR. ZAKRZEWSKI:  -- it may have been
23     during his tenure, okay.
24        THE WITNESS:  I'd have to know when
25     he started.
```

Page 59

```
 1        MR. ZAKRZEWSKI:  Okay.
 2     Q.   (By Mr. Elliott)  Well, I'm referring to some
 3  claims that we discussed in 2005.  My understanding was
 4  there wasn't a lawyer directing your factual claims
 5  investigation at that time; is that true?
 6     A.   I cannot be certain in 2005.
 7     Q.   Okay.  Was there a period of time where you know
 8  there was no direction by a lawyer involving those
 9  claims?
10     A.   It -- prior to Chaykin's arrival.
11     Q.   That's what I want to ask you about.
12     A.   Okay.  Sure.  Sure.
13     Q.   Not at the direction of Mr. Chaykin or another
14  lawyer.
15     A.   Sure.
16     Q.   Okay.  So I'd ask -- I would ask for an answer
17  to that question.  The initial question was:  Did you
18  investigate such claims?
19     A.   Yes.
20     Q.   Okay.  And tell us about those.
21     A.   They would -- that was the de facto claim for
22  most jack stand case --
23     Q.   What was?
24     A.   -- claims.  Sudden loss of ratchet bar height.
25     Q.   Okay.  So tell us about that.
```

Page 60

```
 1     A.   It would be on occasion, I would get a claim
 2  that for the most -- for the most part, they were minor
 3  damages, minor injuries, but occasionally I would get
 4  one that would prompt me to ask for the stand so that I
 5  could do a visual, perhaps go to a site to make an
 6  inspection, and it would help me to then bring that
 7  information to William Shaw or Steven Huang --
 8     Q.   Both nonlawyers?
 9     A.   Yes.
10     Q.   Right.
11     A.   -- basically to -- the president and CFO, I
12  think, at that time during that time frame --
13     Q.   Okay.
14     A.   -- of SFA.  And then they could lobby SFT for
15  funds to, you know, take care of the issue.
16     Q.   Relative to the claims experience that you had
17  on jack stands, what -- where did claims regarding jack
18  stand failures stand on your list of frequency?
19     A.   Number two.  Number two.
20     Q.   Jack stand failures?
21     A.   Behind -- behind floor jacks, yes.
22     Q.   Okay.  Now, let's get back to -- now I'm going
23  to again --
24     A.   Sure.
25     Q.   -- remind you of my instruction at the
```

Page 61

```
 1  beginning.
 2     A.   Yes.
 3     Q.   I'm asking for factual information that you know
 4  about derived not at the direction of counsel and
 5  claims you looked at not at the direction of counsel,
 6  no conversations with lawyers, no legal advice given to
 7  you by a lawyer all relative to the topic of sudden,
 8  unexpected, unintended loss of ratchet height --
 9     A.   Sure.
10     Q.   -- on a jack -- on a ratchet and pawl designed
11  jack stand.  Are you with me?
12     A.   Yes.
13        MR. ZAKRZEWSKI:  And this is subject
14     to your agreement before that it's before
15     you were working with Mr. Chaykin --
16        MR. ELLIOTT:  Yes.
17        THE WITNESS:  Sure.
18        MR. ZAKRZEWSKI:  -- before legal came
19     in, not at the direction of any counsel.
20        THE WITNESS:  Sure.
21        MR. ZAKRZEWSKI:  Thank you.
22        MR. ELLIOTT:  Yes, that's agreed.
23     Q.   (By Mr. Elliott)  Tell us about some of those
24  claims and if you remember the names, tell us the
25  names.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                                    Roger D. Claypool

Page 62

1    A.   I believe that prior to Mr. Chaykin's arrival
2  and establishment of the legal department, I probably
3  handled a dozen that were -- that aren't remarkable.
4  They were either proven to be failures that were
5  attributed to placing jack stands in inappropriate
6  loading surfaces --
7    Q.   Right.
8    A.   -- or just flat out a nontruth by the defendant.
9    Q.   Well, did you ever -- did you ever reach a
10 conclusion that this type jack stand, ratchet and pawl
11 design jack stand, had a problem with sudden and
12 unintended loss of ratchet height?
13        MR. ZAKRZEWSKI:  Objection.
14        MS. TODD-TROTTA:  Objection.
15        THE WITNESS:  Well, initially I got
16    to tell you, I didn't really put any merit
17    in it.
18   Q.   (By Mr. Elliott) But what happened?
19   A.   I had a case that -- a claim that was -- that
20 resulted in some injury to a guy in Illinois and --
21   Q.   What was his name?
22   A.   His name was Steven Bowles.
23   Q.   B-o-w-l-e-s?
24   A.   B-o-w-l-e-s.
25   Q.   Yep.

Page 63

1    A.   And one of our -- William agreed to -- that it
2  would be a good idea to go take a look and talk to the
3  guy and see if I couldn't make some determination in
4  person.  And so we had a sales rep in the Chicago area
5  pick me up at the airport and drive me there and --
6    Q.   So describe to us that factual investigation and
7  what conclusions you reached as a result of that
8  investigation relative to the sudden and unintended
9  loss of ratchet height claim.
10        MR. ZAKRZEWSKI:  To the extent that
11    it was not at the direction of legal
12    counsel.
13        MR. ELLIOTT:  We've already
14    established that.
15        THE WITNESS:  I believe that this is
16    within that purview of not --
17   Q.   (By Mr. Elliott) You can answer.
18        MR. ZAKRZEWSKI:  Of legal counsel?
19        THE WITNESS:  -- of not -- of no
20    legal counsel.
21   Q.   (By Mr. Elliott) You can answer.
22   A.   Again, this was at the direction of William
23 Shaw.  And when I arrived at Mr. Bowles' residence,. he
24 had the two jack stands on the table and he was
25 visibly -- he appeared to be in pain and he was very

Page 64

1  gracious in allowing us in.  The jack stand wasn't
2  damaged in the same way that I had seen earlier in
3  other claims.  The jack stand didn't appear physically
4  damaged other than the -- some significant removal of
5  paint along the ratchet side.
6    Q.   Let me take it this way.  What did he tell you
7  happened?
8    A.   He said it just failed.
9         MR. ZAKRZEWSKI:  Objection.
10        THE WITNESS:  He said it just lost
11    height and he heard a noise.  It lost
12    height.
13   Q.   (By Mr. Elliott)  Did he have a car under load?
14   A.   Yes.
15   Q.   Yes?
16   A.   Yes.  And he suffered some lower back
17 contusions.  I don't recall all the details but he was
18 wanting $27,000 to settle.
19   Q.   And this was in -- was this in 2005, in that
20 area?
21   A.   In that area.
22   Q.   Okay.
23   A.   But it was prior to -- I don't recall Arthur
24 having anything to do with this case at all.
25   Q.   Okay.  So where I started with this was you told

Page 65

1  me initially you were skeptical about these kinds of
2  claims --
3    A.   Yeah because --
4    Q.   Well, hold on.  And then you had Bowles, right?
5    A.   Yeah.
6    Q.   But were there previous claims that involved a
7  similar loss of ratchet height claim that you
8  investigated?
9    A.   Yes.
10   Q.   In the same category, no lawyers involved?
11   A.   Yes.
12        MR. ZAKRZEWSKI:  Not claims in
13    litigation?
14        THE WITNESS:  Correct.  Just --
15    just --
16   Q.   (By Mr. Elliott)  Claims?
17   A.   Claims.
18   Q.   Okay.
19   A.   Stuff that we would get over the phone or...
20   Q.   So tell me the names of those claims if you
21 recall them?
22   A.   I recall a -- a Hastedt claim.
23   Q.   Hastedt.
24   A.   And I don't remember the guy's first name.
25   Q.   Christopher?

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

Page 66

1     A.   Yes.  Yes.
2          MR. ZAKRZEWSKI:  Objection.
3          THE WITNESS:  Yes.  Yes.  Christopher
4     Hastedt.
5     Q.   (By Mr. Elliott)  Yep.
6     A.   A Gwen Zinn, Z-i-n-n.
7     Q.   Yeah.
8     A.   And I don't recall the spelling of Gwen's first
9     name.
10    Q.   Any others?  Remember one involving Sloan?
11         MR. ZAKRZEWSKI:  Objection.
12         THE WITNESS:  Yes.  William Sloan,
13    Bill Sloan, I believe.
14    Q.   (By Mr. Elliott)  Okay.  And were these all
15    claims involving a sudden and unintended loss of
16    ratchet height in a ratchet and pawl jack stand design?
17         MR. ZAKRZEWSKI:  Objection.
18         THE WITNESS:  That was their claim.
19    Q.   (By Mr. Elliott)  That was their claim?
20    A.   Yes.
21    Q.   Okay.  And you investigated those?
22    A.   I investigated them to the extent that I could.
23    In those cases I was not able to physically put hands
24    on or eyes on a product.
25    Q.   Okay.  So you had all those and then you had

Page 67

1     Bowles, right?
2     A.   Yes.
3     Q.   So there's four?
4     A.   Yes.
5     Q.   Mid-2000 time frame?
6     A.   Yes.
7     Q.   Okay.  And let me ask you this:  Who at the
8     Shinn Fu American facility was aware of those claims at
9     the time?  What other employees or representatives of
10    Shinn Fu were aware of those claims?
11    A.   Well, obviously I received those from either
12    customer service or through a mailing from -- I'm
13    pretty sure one of them was from the Wal-Mart group
14    claims handling, CMI, I believe it was.
15    Q.   Let's start at the top.  Did Mr. Shaw, the
16    president of the company, know about the claims?
17    A.   Yes.
18    Q.   And the customer service people knew about the
19    claims?
20    A.   Yes.
21    Q.   Who else?
22    A.   Likely, eventually, Sara Sunderman would have
23    been involved in --
24    Q.   Those claims?
25    A.   -- in those claims.

Page 68

1     Q.   Who's Sara Sunderman?
2     A.   At the time she was working for or with William
3     and Steven.
4     Q.   Steven who?
5     A.   Huang.
6     Q.   Yep.
7     A.   In terms of she would prepare loss run reports
8     and --
9     Q.   Regarding such claims?
10    A.   Yes.
11    Q.   Describe what loss run reports regarding those
12    claims are.
13    A.   The -- at the time we had a product liability
14    insurance through Saint Paul's, I believe, and Sara
15    would collect my information on claims and then take it
16    to William or Steven and they would go through and
17    include those --
18    Q.   Okay.
19    A.   -- that they thought were appropriate to include
20    those on the loss runs.
21    Q.   Okay.  So this was, what, the internal record of
22    these claims?
23    A.   Yes.  Yeah.
24    Q.   Who else at Shinn Fu knew about these sudden and
25    unintended loss of ratchet height claims that you

Page 69

1     investigated?
2     A.   Well, eventually, with the onset of the legal
3     department, the legal department would have known.
4     Q.   Okay.  Put aside the legal department.  Other
5     business representatives of the company that knew about
6     the claims, if there are any in Kansas City?
7     A.   In Kansas City, not that -- not that jump out.
8     Q.   How about among the Shinn Fu constituent
9     companies, were there other --
10    A.   Oh, sure.
11    Q.   Tell us about that.  Who else outside of Kansas
12    City in an affiliated business operation as you would
13    describe it --
14    A.   Sure.
15    Q.   -- of Shinn Fu knew about these claims when you
16    were investigating them?
17         MR. ZAKRZEWSKI:  Objection.
18         THE WITNESS:  They would -- we would
19    request --
20    Q.   (By Mr. Elliott)  Who knew about the claims
21    outside of Kansas City?
22    A.   MVP Hong Kong, SFT --
23         MR. ZAKRZEWSKI:  Objection.
24         THE WITNESS:  -- management, Hong
25    Kong management, Wei Fu management.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                Roger D. Claypool

Page 70

1    Q.   (By Mr. Elliott)  That information was shared
2    with representatives of those companies?
3    A.   Sure.
4    Q.   Okay.
5    A.   With the appropriate factory, whoever the
6    producing factory would be.
7    Q.   Why?
8    A.   Because we would lobby for funds from them and
9    permission from them to -- to settle or deny a claim.
10   Q.   Okay.  I want to circle back now to the Bowles
11   claim to your testimony --
12   A.   Sure.
13   Q.   -- Bowles was of some significance to you in
14   your consideration, if I have this right, and you tell
15   me if I do, of the validity or credibility of such
16   claims; is that right?
17   A.   Yes, sir, it was.
18   Q.   Okay.  Tell us about that.
19   A.   Yes, sir, it was.  And at the time, there was --
20   it was shortly later that we were asked to develop
21   alternative designs to mitigate the possibility of this
22   once phantom condition.
23   Q.   Right.
24   A.   And --
25   Q.   It turned out not to be a phantom condition,

Page 71

1    right?
2    A.   It turned out not to be a phantom condition.
3    Q.   Okay.  And I want to try to take this
4    chronologically.  After you identified this as a real
5    or a credible claim, did you test for it?
6    A.   In the past we had not and it would have been
7    very difficult to do so given the fixtures that we had,
8    but on my own, I -- I took it upon myself to do some
9    testing and found that I could create a situation
10   where, for lack of a better term, you could create a
11   false engagement.
12   Q.   So let me just go back because I want to make
13   sure I understand this.  This wasn't a personal frolic.
14   You did this for the company, right?
15        MR. ZAKRZEWSKI:  Objection.
16        THE WITNESS:  It was a --
17   Q.   (By Mr. Elliott)  It was part of a test lab
18   procedure you did, right?
19   A.   It was part of a test lab procedure that I
20   wanted to try to recreate it myself.
21   Q.   Yeah.
22   A.   I could not do it under a substantial load but I
23   was able to create -- recreate it with a load that was
24   under 50 pounds --
25   Q.   Okay.

Page 72

1    A.   -- basically.
2    Q.   All right.  So you were able to recreate a false
3    engagement scenario?
4        MR. ZAKRZEWSKI:  Objection.
5        THE WITNESS:  To the best of my
6        ability.
7    Q.   (By Mr. Elliott)  Okay.  And did the testing
8    that you employed to test the phenomenon of this claim
9    of sudden loss of ratchet height due to false
10   engagement involve off load -- off-center load testing?
11        MR. ZAKRZEWSKI:  Objection.
12        THE WITNESS:  It was a variation of
13        that.
14   Q.   (By Mr. Elliott)  Okay.
15   A.   Yes.
16   Q.   Describe what that is.
17   A.   Yes.  So in the past, doing off-load testing
18   consisted of positively engaging everything; in other
19   words, making a conscious effort to ensure that the
20   pawl engaged the ratchet bar and then just apply the
21   load.
22   Q.   Okay.  And did you --
23   A.   Either off center or centrally.
24   Q.   Okay.
25   A.   And I did that and it just was physically

Page 73

1    impossible for this false engagement to occur at that
2    point.  So in trying to recreate a scenario that might
3    involve this false engagement, I thought, well, if
4    it's -- if the ratchet bar is simply jammed into the
5    collar in such a way; in other words, I -- I wanted to
6    test to fail instead of test to pass basically.  That
7    was my logic.  And so I could manipulate the bar
8    sufficiently and the pawl to hold the bar in my hand,
9    the load by pressing down upon it in an off-center
10   position, and it doesn't happen every time.  Most of
11   the time, it just -- under pressure, under load the
12   ratchet bar connects to the next engagement, but on
13   more than one occasion, it would simply collapse.
14   Q.   To the bottom --
15   A.   Yes.
16   Q.   -- of the ratchet?
17   A.   Yes.
18        THE VIDEOGRAPHER:  Four minutes left
19        on the tape.
20        MR. ELLIOTT:  Thank you.
21   Q.   (By Mr. Elliott)  Did you communicate the
22   results of your testing relative to false engagement
23   and loss of ratchet height to your colleagues at SFA?
24   A.   Yes.  And then by that time -- and this -- you
25   have to understand, there's some time between the

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                          Roger D. Claypool

Page 74

1  claims and my --
2      Q.  My question is:  Did your colleagues know
3  about --
4      A.  Yes.
5      Q.  -- the testing and the results --
6              MR. ZAKRZEWSKI:  Objection.
7      Q.  (By Mr. Elliott), -- of your testing?
8      A.  Yes.  Yes.
9              MR. ELLIOTT:  Okay.  Why don't we --
10  let's take a short break and we'll deal
11  with the tape issue, if that's okay.
12              THE VIDEOGRAPHER:  Going off the
13  record at 10:49.
14              (A brief recess was taken.)
15              THE VIDEOGRAPHER:  We're on the
16  record at 11:02.
17      Q.  (By Mr. Elliott)  Mr. Claypool, I want to go
18  back just a bit.  I had asked you relative to the claim
19  of sudden or unintended loss of ratchet height in the
20  ratchet and pawl design jack stands who at Shinn Fu
21  America knew about these claims, and you told me
22  Mr. Shaw, Mr. Huang, Ms. Sunderman, people in customer
23  service.  Are there any other names of people in Kansas
24  City that knew about these claims?
25      A.  Not initially, no.

Page 75

1      Q.  How about ultimately?
2      A.  Ultimately Arthur knew about them.
3      Q.  Any others?
4      A.  Not at SFA.
5      Q.  Okay.  And so same question relative to other
6  business entities of -- that you would describe as
7  Shinn Fu business entities, names of people who know --
8  who knew?
9              MR. ZAKRZEWSKI:  Objection.
10              THE WITNESS:  MVP Hong Kong.
11      Q.  (By Mr. Elliott)  Names of people?
12      A.  Oh boy, Tony Choi.
13      Q.  Mr. Hong?
14              MR. ZAKRZEWSKI:  Objection.
15              MS. TODD-TROTTA:  Objection.
16              THE WITNESS:  I don't think David was
17  there at that time.
18      Q.  (By Mr. Elliott)  Okay.  Tony Choi at MVP.
19      A.  At SFT, Victor, Betty, and Angela would have
20  ultimately --
21      Q.  Okay.  So you need to tell us who Victor, Betty,
22  and Angela are.
23      A.  Oh, I'm sorry.  They were the directors -- they
24  were upper management at Shinn Fu Taiwan.
25      Q.  They own -- did they run -- they owned the

Page 76

1  company?
2      A.  They were Michael's -- they are Michael's
3  children and they ultimately ran the company, yes.
4      Q.  Part of the family that ran the company?
5      A.  Correct.
6      Q.  Okay.  They knew about these claims?
7      A.  Yes.
8              MR. ZAKRZEWSKI:  Objection.
9      Q.  (By Mr. Elliott)  Okay.  Anybody in China?
10      A.  Yes.
11      Q.  Who?
12      A.  Would have been the -- that particular case
13  would have been Wei Fu.
14      Q.  Okay.
15      A.  And it would have been those folks at Wei Fu and
16  I don't recall any of their names --
17      Q.  Okay.
18      A.  -- off the top of my head.
19      Q.  Okay.  A related topic, what it is in your
20  discussions at the PALD committee meetings, at any
21  point in time when you were affiliated with that
22  committee, was there -- was there anecdotal -- formal,
23  informal, anecdotal, etc., discussion of this type of
24  claim, a sudden loss of ratchet height?
25      A.  Oh, sure.  Yes.

Page 77

1      Q.  Tell us about that.
2      A.  Such claims had been going on for several years
3  and we all dismissed it --
4      Q.  In the industry?
5      A.  In the industry.
6      Q.  Yep.
7      A.  And -- but it was something that we seriously --
8  we had serious informal discussions on --
9      Q.  Yep.
10      A.  -- during breaks at the meetings, prior to the
11  meetings when we'd gather.  At one point we even
12  entertained mandating a secondary load-holding device,
13  a redundant safety device.
14      Q.  Okay.  Let me pick up there.  You mentioned the
15  concept a moment ago before our break of you on behalf
16  of Shinn Fu relative to these types of loss of height
17  claims exploring potential alternative feasible
18  designs --
19      A.  Yes.
20      Q.  -- to deal with this issue.  Can you tell us
21  about that.
22              MR. ZAKRZEWSKI:  Objection.
23              THE WITNESS:  Yes.  In 2005 I
24  submitted two designs, one being a
25  spring-loaded or a spring-biased pawl that

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

Page 78

1    would work in conjunction with the
2    traditional pawl, a mechanically locking
3    pawl.
4        Q.   (By Mr. Elliott)  So is that a double locking
5    mechanism?
6        A.   A double locking mechanism.
7        Q.   Redundant locking mechanism?
8        A.   Yes.  Yes.  And also a design that utilized a
9    three-piece collar assembly that the mechanic would
10   have eventually just -- he would have to assemble
11   himself, but, again, these were concepts, something to
12   build off of.  And I turned them into Joey Su --
13       Q.   Who?
14       A.   Joey Su.
15       Q.   Who's that?
16       A.   He was -- he's the -- he was the sales exec.
17       Q.   For what, for this type of stand?
18       A.   For -- for all products.
19       Q.   Okay.  Did you present this proposal to Mr. Shaw
20   or others?
21                  MR. ZAKRZEWSKI:  Objection.
22                  THE WITNESS:  I believe Mr. -- I
23           believe William was gone by that time.  I
24           think Arthur had eventually come in and --
25           at that point and Mr. Shaw was gone.

Page 79

1        Q.   (By Mr. Elliott)  Okay.  So you presented this
2    alternative feasible design --
3                  MR. ZAKRZEWSKI:  Objection.
4        Q.   (By Mr. Elliott)  -- in your opinion, an
5    alternative feasible design --
6                  MR. ZAKRZEWSKI:  Objection.
7        Q.   (By Mr. Elliott)  -- proposal?
8        A.   Yes.
9        Q.   And what happened?
10       A.   They kept it on file for a number of years
11   and -- and then prior to my leaving, gave it back to
12   me, gave me -- well, I turned in not only design
13   recommendations for stands but other products as well.
14   They gave me back -- gave them back to me and said that
15   they weren't interested.
16       Q.   They were not interested?
17       A.   Correct.
18       Q.   Why?
19       A.   At the time I recall they were looking at a
20   different design, but I think I saw a prototype of a --
21   a double ratchet design that I assume that they were
22   considering that instead, but it never was really
23   clear.  It -- whatever design -- whenever you have a
24   design change, it involves cost and this was at a time
25   where we were trying to continually expand the business

Page 80

1    and in order to expand the business, you can't increase
2    cost.
3        Q.   Was it part of it that they didn't want to
4    increase the cost?
5                  MR. ZAKRZEWSKI:  Objection.
6        Q.   (By Mr. Elliott)  Was there a cost
7    consideration?
8                  MR. ZAKRZEWSKI:  Objection.
9                  THE WITNESS:  There's a cost
10          consideration.
11       Q.   (By Mr. Elliott)  Okay.  So we've talked about
12   claims.  Was there also litigation involving claims of
13   sudden loss of ratchet height, unintended, unexpected
14   loss of ratchet height, litigation involving that?
15       A.   Yes but it was sub -- yes.
16       Q.   Do you remember the names of those?
17       A.   That would have been the alleged claim in
18   Guerra.
19       Q.   Guerra?
20       A.   Yes.
21       Q.   How about Raymond?
22       A.   Yes.
23       Q.   That's a sudden loss of height claim --
24       A.   Yes.
25       Q.   -- litigation?

Page 81

1        A.   Yes.
2        Q.   Okay.
3                  MR. ZAKRZEWSKI:  Objection.
4        Q.   (By Mr. Elliott)  In your opinion, would the
5    design change you just described with a redundant
6    locking mechanism be a safer design relative to the
7    problem of sudden and unintended loss of ratchet
8    height?
9                  MR. ZAKRZEWSKI:  Objection.
10                 MS. TODD-TROTTA:  Objection.
11                 THE WITNESS:  Yes.  Yes.
12       Q.   (By Mr. Elliott)  And how would you describe the
13   concept of false engagement?
14       A.   Could you repeat the question.
15       Q.   Yeah.  What is false engagement?
16       A.   It's when the user believes that the stand is
17   ready to go, that it is safe to use, and when in fact
18   it is not.
19       Q.   Does it have to do with the congruence of the
20   fit between the ratchet and the pawl?
21                 MR. ZAKRZEWSKI:  Objection.
22                 THE WITNESS:  Somewhat.
23       Q.   (By Mr. Elliott)  The teeth?
24       A.   Somewhat.
25       Q.   Okay.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                  Roger D. Claypool

Page 82

1    A.   Somewhat.

2    Q.   Or a lack of congruence thereof?

3         MR. ZAKRZEWSKI:  Objection.

4         THE WITNESS:  Or a lack of, yes.

5    Q.   (By Mr. Elliott)  Okay.  I want to return to

6    Exhibit 2, which is your resumé.

7    A.   Yes.

8    Q.   I think you've described the '93 to '98 time

9    frame, and I want to now -- I'm on page 5 of Exhibit 2.

10   I'm in the 1998 to 2003 time frame.

11   A.   Yes.

12   Q.   There's an entry that says "Worked with customer

13   engineering departments in third party test labs"?

14   A.   Yes.

15   Q.   And then a number of companies.  What's that all

16   about?

17   A.   They would -- those engineering departments

18   would have represented customers and test labs that

19   would have been involved with our product either as a

20   -- either as a component of an assembly that they were

21   using or as a potential product or, in the case of DTL,

22   MTL, and particularly CTL, I would go -- I would travel

23   to those labs and assist them in their -- in setting up

24   their test format, particularly CTL.

25   Q.   Okay.  Let me drop back to the alternative

Page 83

1    design that you described a moment ago in your

2    testimony.

3    A.   Yes.

4    Q.   Were there other companies in your industry that

5    implemented those alternative designs?

6    A.   Yes.  Unfortunately Allied and Torin beat us to

7    the punch in terms of getting to market.

8    Q.   And what was their design change?

9    A.   Basically a block -- it was -- it implemented a

10   redundant safety feature consisting of a block that

11   went through the collar.  You -- the user would insert

12   it.  It would capture a ratchet style engagement point

13   on the bar itself and go through the other side and

14   then it would be pinned to secure it.  This would --

15   this would further capture the ratchet bar, preventing

16   it from moving -- moving it out of engagement as -- as

17   the ratchet bar is either lifted up, which would cause

18   disengagement on the traditional design, and it

19   would -- and it would virtually eliminate the

20   possibility of -- of a false engagement.

21   Q.   Okay.  When the circumstances that you've just

22   testified about in the last half-hour or so about your

23   discovery that the claim of and the phenomenon of false

24   engagement and unintended and unexpected loss of

25   ratchet height developed, and you deemed them credible

Page 84

1    and discussed them with the company, did SFA warn about

2    this phenomenon in its warning materials or product

3    material -- product description materials that

4    accompanied the jack stand?

5         MR. ZAKRZEWSKI:  Objection.

6    Q.   (By Mr. Elliott)  The ratchet and pawl jack

7    stands, change warnings?

8    A.   No.

9    Q.   Who would have been in charge of making that

10   decision?

11   A.   I was in charge of --

12        MR. ZAKRZEWSKI:  Objection.

13        THE WITNESS:  -- of creating and

14        sending those types of items to top

15        management for approval.

16   Q.   (By Mr. Elliott)  Okay.  So you would make a

17   recommendation --

18   A.   Yes.

19   Q.   -- if you thought --

20        MR. ZAKRZEWSKI:  Objection.

21   Q.   (By Mr. Elliott)  -- appropriate to senior

22   management?

23   A.   Yes.

24   Q.   Okay.  And in any event, the language of the

25   warnings was not changed?

Page 85

1    A.   That is correct.

2    Q.   Okay.  I want to kind of finish up with your

3    resumé here --

4    A.   Sure.  Sure.

5    Q.   -- as impressive as it is.  2003 to 2007,

6    getting toward the end of your time there, and I'm

7    going to ask you to read these two entries together.

8    So why don't we cover the period '03 to '08 when you

9    left.

10   A.   Sure.

11   Q.   Okay.  And read that to yourself and then you

12   can just kind of summarize for us what you were doing

13   at that time for Shinn Fu.

14   A.   All right.

15   Q.   Okay.  So summarize that for us.

16   A.   There's a period there between the time that --

17   the time that I went to work directly for Arthur that

18   I -- I was primarily still doing property damage and

19   personal injury claims investigation and processing

20   them.

21   Q.   Yep.

22   A.   And I was also doing new employee orientations

23   for the company.  New people coming on, I would

24   introduce the product and try to give them a product

25   101 in a day or two, little day or two course.  And I

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

Page 86

1   was also responsible for signing off on safety and
2   compliance issues as a result of a government contract
3   that we received during that -- during that time.
4       Q.   Okay.
5       A.   And then after I went to work basically
6   assisting the legal department, and Arthur and I shared
7   an area and worked together.
8       Q.   Okay.  I want to finish up your -- we were
9   talking about the testing facility that started back in
10  the '80s, early '90s --
11      A.   Yes.
12      Q.   -- at Shinn Fu.  Did that testing facility at
13  Shinn Fu become a more sophisticated operation?
14      A.   Yes.
15      Q.   Could you describe that for us.
16      A.   Well, as I said earlier, it went from a --
17  basically an analog readout to determine loads to a
18  digital readout, and the user of the equipment had much
19  more precise control over the speed of the lowering of
20  a load and, of course, removing the load.  It was just
21  easier to use.  It was more efficient and it was more
22  accurate.  And that, in part, was setting us up, you
23  know, for expansion, business expansion.
24      Q.   Okay.
25      A.   And at one point, I think I had three or four

Page 87

1   people working for me in that area in testing, and
2   eventually I was -- I was no longer doing testing but
3   reviewing test results that -- in the last year or so
4   just reviewing test results unless I was specifically
5   requested by Arthur to go back and do a test.
6       Q.   Okay.  Showing you this document, sir, can you
7   identify it?  Is that a marked exhibit, this one in
8   your hand?  Give it back to the reporter if it is.
9       A.   It is.  Yes.  My separation agreement.
10           MR. ELLIOTT:  Okay.  Can we mark
11      that, please.
12           (Exhibit 3, Separation Agreement,
13      marked for identification.)
14      Q.   (By Mr. Elliott)  As I understand it, there came
15  a time when you separated employment from SFA?
16      A.   Yes.
17      Q.   Was it voluntary?
18      A.   Yes.
19      Q.   Was it friendly?
20      A.   Yes.
21      Q.   Was it negotiated?
22      A.   Yes.
23      Q.   Okay.
24      A.   Yes.  I tried.
25      Q.   Who handled the negotiations for the company?

Page 88

1       A.   Arthur.
2       Q.   Okay.  And is this the document that contains
3   the terms of your --
4       A.   Yes.
5       Q.   -- release and separation?
6       A.   Yes.
7       Q.   Okay.  You didn't leave as enemies of one
8   another?
9       A.   No.
10      Q.   Or on unfriendly terms?
11      A.   No, not at all.
12      Q.   And you weren't terminated?
13      A.   No.
14      Q.   I want to ask you about -- I believe we've
15  talked a little bit about this but I want to delve a
16  little deeper into SFA's organization as a global
17  company.  First of all, do you agree that SFA was a
18  global business op -- sorry.  Shinn Fu was a global
19  business operation?
20      A.   Oh, yes.
21           MR. ZAKRZEWSKI:  Objection.
22      Q.   (By Mr. Elliott)  Yes?
23      A.   Yes.
24      Q.   Okay.
25      A.   Yes.

Page 89

1       Q.   And I want to show you this document and ask if
2   you can identify it?
3       A.   You know, it looks -- it looks to me like -- is
4   there more of it?  Is there more to it?
5       Q.   That's all I have.
6       A.   It -- it looks like the book that -- "Shinn Fu
7   Corporation 2011" -- to me it looks like the book that
8   Jemmy brought over to me --
9       Q.   Who's Jemmy?
10      A.   Jemmy Tsaur at SFA.
11      Q.   How do you spell that?
12      A.   T-s-a-r-u -- I'm sorry.  T-s-a-u-r, I believe.
13      Q.   At SFA?
14      A.   Yes.
15      Q.   He was an SFA person?
16      A.   Yes.
17      Q.   And what's the book that Jemmy Tsaur brought
18  you?
19      A.   He brought me an org -- basically a history book
20  put together by my friend Roger Tsai.
21      Q.   And who's Roger Tsai?
22      A.   Roger Tsai is -- the last I heard, he was
23  working at SFT in the corporate office.  He was working
24  originally for Michael and then for --
25      Q.   What was Roger Tsai's capacity with the Shinn Fu

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                          Roger D. Claypool

Page 90

1   company at the time that he got the book to Jemmy and
2   gave -- Jemmy gave it to you?
3      A.   I don't know.
4      Q.   Was he with SFT?
5      A.   Yes.
6           MR. ZAKRZEWSKI:  Objection.
7      Q.   (By Mr. Elliott), Taiwan, okay.
8      A.   Yes.
9      Q.   And what was the --
10     A.   The book, it was a history of -- our progress
11  from small to large.  It was quite a -- it was quite an
12  impressive --
13          MR. ELLIOTT:  Let's mark that.
14          THE WITNESS:  -- presentation.
15     That's what it appears to me as the first
16     pages -- the cover and then the first few
17     pages.
18          (Exhibit 4, Shinn Fu Corporation 2011
19     PowerPoint, marked for identification.)
20     Q.   (By Mr. Elliott)  Are you familiar with Shinn
21  Fu -- the Shinn Fu companies' officers and directors
22  and management structure?
23          MR. ZAKRZEWSKI:  Objection.
24          THE WITNESS:  During my tenure there,
25     I was.

Page 91

1      Q.   (By Mr. Elliott)  Could you describe it.
2      A.   Sure.  It was a -- SFA worked as a satellite to
3   SFT as well as, at the time, I believe we had a Shinn
4   Fu South Africa, Shinn Fu Australia, MVP Canada, MVP
5   Hong Kong, Shinn Fu Japan.  We had -- there were many,
6   many satellite or subsidiary companies that were equal
7   to -- equal status in terms of company to SFA.
8      Q.   And were they all operated under the direction
9   and control of the Taiwan company?
10          MR. ZAKRZEWSKI:  Objection.
11          THE WITNESS:  Yes.
12     Q.   (By Mr. Elliott)  Yes, okay.  And if you look at
13  this exhibit here, this PowerPoint --
14          MR. ELLIOTT:  Is it 4?
15          MR. ORTICELLI:  Four.
16     Q.   (By Mr. Elliott)  There's a listing.  It says
17  "Milestones" there on pages 2 and 3?
18     A.   Mm-hmm.
19     Q.   Are these the members of that -- the Shinn Fu
20  business group you've just described?
21     A.   It looks like it hits all --
22     Q.   As of 2011 anyway?
23          MR. ZAKRZEWSKI:  Objection.
24          THE WITNESS:  I can only speak to
25     prior to that but yes.

Page 92

1      Q.   (By Mr. Elliott)  Okay.  And then if you keep
2   turning this exhibit, it gets to a page called
3   "Affiliated Global Operations."  See that?
4      A.   On page 2 or 3?
5      Q.   Three, yeah.  See that?
6      A.   Yes.  Yes.
7      Q.   And what are these companies?
8           MR. ZAKRZEWSKI:  Objection.
9           THE WITNESS:  That would have
10     included SFA, MVP Hong Kong, Shinn Fu
11     Canada or -- MVP Canada rather, all --
12     basically all the entities that I referred
13     to.
14     Q.   (By Mr. Elliott)  Okay.  As well as a Taishan
15  China entity?
16     A.   Taishan?
17     Q.   Wei Fu Electric and Machinery Taishan?
18     A.   Yes.
19     Q.   And in your view, were these all affiliated
20  global operations --
21     A.   Yes.
22     Q.   -- of the Taiwanese entity?
23          MR. ZAKRZEWSKI:  Objection.
24          THE WITNESS:  Yes.  Yes.
25     Q.   (By Mr. Elliott)  Who -- relative to the

Page 93

1   business decisions involving this global affiliated
2   operation of Shinn Fu, what entity had ultimate
3   decision-making authority with respect to the business
4   decisions made by this group?
5           MR. ZAKRZEWSKI:  Objection.
6      Q.   (By Mr. Elliott)  Among the ones you just
7   described - Taiwan, China, America?
8      A.   Taiwan.
9      Q.   Taiwan.  And that was run by a family that --
10  whose name you gave me?
11     A.   Hung.
12     Q.   Hung.  And spell that, please.
13     A.   H-u-n-g.
14     Q.   Okay.  Can you give us any examples of what, in
15  your view, while you were at Shinn Fu America was the
16  Shinn Fu Taiwan entity aware of the business operations
17  and decisions that were being made in America?
18          MR. ZAKRZEWSKI:  Objection.
19          THE WITNESS:  Sure.  Sure.
20     Q.   (By Mr. Elliott)  And what was -- how would you
21     -- I want to get a sense of their role.  What was the
22  interplay between Taiwan and America relative to the
23  business decision-making process that affected American
24  business decisions?
25     A.   Well, an example might be when I lobbied for

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                                Roger D. Claypool

Page 94

1   this or that, I would -- whether it was for permission
2   to settle a case or a claim or make a drastic change to
3   an OIPM?
4       Q.   An OIPM?
5       A.   An owner's manual or -- or a warning label, and
6   I would -- occasionally I'd get some pushback from the
7   manufacturer from the factory and --
8       Q.   Well, let's --
9       A.   -- so I would lobby --
10      Q.   Let's break it down.
11      A.   Okay.
12      Q.   You're making suggestions as to changes and
13  stuff.  You're passing those over to Taiwan?
14      A.   To the individual factories.
15      Q.   Okay.  To the factories?
16      A.   Yes.  And then if I'd get pushback, I would send
17  Betty and Victor a -- an email asking for some help.
18      Q.   Betty and Victor being the Taiwanese management
19  of Shinn Fu.
20      A.   Yes.
21      Q.   Okay.
22      A.   Yes.  And I would get responses back and I can
23  only speak for my interaction.
24      Q.   Yeah.
25      A.   And I was invited to a couple of different

Page 95

1   gatherings in SPT over the years just to celebrate this
2   or that, and I noticed that they seem to be in that
3   leadership role.  They took the reins from Michael very
4   nicely so...
5       Q.   Was -- is it your view that all ultimate
6   corporate decision-making responsibility ultimately
7   resided with the Hung family?
8            MR. ZAKRZEWSKI:  Objection.
9       Q.   (By Mr. Elliott)  Yes?
10      A.   Yes.
11      Q.   Verbal.
12      A.   Yes, sir.
13      Q.   And the term "affiliated global operations" is
14  an accurate description of the Shinn Fu business
15  relationships among those entities?
16           MR. ZAKRZEWSKI:  Objection.
17           THE WITNESS:  Yes.
18      Q.   (By Mr. Elliott)  I want to talk to you about
19  Sears, Roebuck & Company.
20      A.   Sure.
21      Q.   Are you familiar with the relationship that the
22  Shinn Fu group of companies had with Sears --
23           MS. TODD-TROTTA:  Objection.
24      Q.   (By Mr. Elliott)  -- in America or that SFA had
25  with Sears in America?

Page 96

1       A.   Yes.
2       Q.   Okay.
3       A.   Yes.
4       Q.   And who was -- was there a Sears point person in
5   -- relative to the relationship with SFA?
6       A.   There was --
7       Q.   Or --
8       A.   It would have been the individual buyer at the
9   time and I can only recall a couple of -- of those
10  through the years because they changed quite often.
11      Q.   What was Kathy Guerra's role?
12      A.   She was the -- she was my contact with respect
13  to testing and safety and compliance issues.
14      Q.   Did Sears require that SFA as a vendor for
15  Sears, when you were certified to be such, comply with
16  American industry standards relative to jack stands?
17      A.   Yes.
18      Q.   And what were those standards?
19      A.   PALD.
20           MR. ZAKRZEWSKI:  Objection.
21           THE WITNESS:  ASME PALD.
22      Q.   (By Mr. Elliott)  And was that part of the
23  certification process compliance that SFA went through
24  with Sears?
25      A.   Yes.  Yes.

Page 97

1       Q.   Did Sears -- you've described its own testing
2   facility that it had in Hoffman Estates?
3       A.   Yes.
4       Q.   Did it have a relationship with Intertek Testing
5   Laboratories that you're aware of?
6            MR. ZAKRZEWSKI:  Objection.
7            THE WITNESS:  Not that I'm aware of.
8       Q.   (By Mr. Elliott)  All right.  I'd like to ask
9   you a little bit more deeply about your experience with
10  ratchet and pawl design jack stands.  Are you familiar
11  with the type of jack stand at issue in the Klorczyk
12  case?
13           MR. ZAKRZEWSKI:  Objection.
14           THE WITNESS:  My understanding is
15           that it is a ratchet and pawl style stand.
16      Q.   (By Mr. Elliott)  And is --
17      A.   Yes.
18      Q.   -- that a design you're familiar with?
19      A.   Yes.
20      Q.   Okay.  And is that -- you were describing
21  testing that SFA undertook of various jack stands
22  designs.  Is that one of the designs you tested?
23      A.   Sure.
24      Q.   Yes, okay.  And, again, was the general purpose
25  of that testing compliance with American industry

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                                  Roger D. Claypool

Page 98

```
 1   standards?
 2      A.   Yes.
 3      Q.   Apart from the sudden and unintended loss of
 4   ratchet height phenomenon that you've testified to
 5   today in the ratchet and pawl design jack stand similar
 6   to the one at issue in this case --
 7      A.   Yes.
 8      Q.   -- did you --
 9           MR. ZAKRZEWSKI:  Objection.
10      Q.   (By Mr. Elliott)  -- did your --
11           MR. ZAKRZEWSKI:  Go on.
12      Q.   (By Mr. Elliott)  Did the testing of that design
13   yield, if you recall, any other problems other than
14   loss of ratchet height, any other types of --
15      A.   Oh, sure.
16      Q.   Tell us about that.
17      A.   Types of failures that I would see over the
18   years ranged from broken or failed collar mechanisms to
19   broken ratchet bars.  It's just a wide variety of
20   failures through the years.  At one -- at one point I
21   had to inspect an entire container early in my career
22   of jack stands and didn't find not one failure, but
23   this was the result of an initial test which a collar
24   broke.
25      Q.   A collar broke?
```

Page 99

```
 1      A.   Yes.
 2      Q.   What's the collar?
 3      A.   It was a -- it's a portion that captures the
 4   ratchet bar and supports or guides its travel up and
 5   down.
 6      Q.   Is it the piece of the stand that the ratchet
 7   bar fits into, is that the collar?
 8      A.   Yes.  Yes.
 9      Q.   Did your testing ever involve tipovers that you
10   found occurred?
11           MR. ZAKRZEWSKI:  Objection.
12           THE WITNESS:  My investigations would
13        lead to the revelation that there was a
14        tipover.
15      Q.   (By Mr. Elliott)  Okay.
16      A.   There was no test specifically targeting a
17   tipover.
18      Q.   Okay.  So I'm going to ask you some questions
19   about tipover.
20      A.   Sure.
21      Q.   Okay.  What's -- what is a tipover of a ratchet
22   and pawl design jack stand phenomenon, what is that --
23   how would you define it or how would you describe that?
24      A.   It's when the -- the load sits beyond the
25   perimeter of the stand and the load moves in that
```

Page 100

```
 1   direction and causing it to go left, right, forward, or
 2   backward.
 3      Q.   And is it -- go ahead.
 4      A.   And it primarily has to do with the loading
 5   surface.  It's been my experience that if the -- if a
 6   hard level surface is not utilized, that tipovers are
 7   more likely to occur in those instances, not
 8   exclusively but predominantly.
 9      Q.   Okay.  And did you ever experience either in a
10   claims context or in a factual investigation context a
11   tipover having to do with movement or pressure applied
12   to a stand?
13      A.   Yes.
14      Q.   And tell us about that.
15      A.   Yes.  In the Jeffcoat case, we were able to make
16   a reasonable determination that an external force was
17   applied to the outside of the vehicle, the outside
18   corner of the vehicle, and that that is what likely
19   created the tipover.
20      Q.   Okay.  An external force to the vehicle under
21   load and lifted up in the air?
22      A.   Yes.
23      Q.   Okay.  And does this have anything to do with
24   the stability of the base support mechanism of the
25   ratchet and pawl design jack stand or what would you
```

Page 101

```
 1   attribute this to?
 2           MR. ZAKRZEWSKI:  Objection.
 3           THE WITNESS:  Just poor placement of
 4        all six stands in this case.
 5      Q.   (By Mr. Elliott)  In Jeffcoat?
 6      A.   Yeah.
 7      Q.   How about more -- you know, not limited to
 8   Jeffcoat, what are other factors that could result in
 9   the type of pressures that would result in a --
10      A.   In a tipover?
11      Q.   -- tipover?  Yeah.
12           MR. ZAKRZEWSKI:  Objection.
13      Q.   (By Mr. Elliott)  Well, let me expand it.  For
14   example, would a factor be the tightness of the fit
15   between the ratchet and the collar?
16           MR. ZAKRZEWSKI:  Objection.
17           THE WITNESS:  Possibly.
18      Q.   (By Mr. Elliott)  And tell me about this.
19      A.   Possibly.  If -- depending on the load, you
20   could get movement laterally within that collar and
21   that's the -- that's the trick of it; if you get
22   that -- the edge of the saddle beyond the periphery
23   limit of the stand, it's going to tip in that
24   direction.  And the lighter the load, the more
25   likelihood of this occurrence so...
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                          Roger D. Claypool

Page 102

1    Q.   And did you -- you said in your experience, you
2    did encounter tipover claims?
3    A.   Yes.
4    Q.   Okay.  Same kind of questions that I asked about
5    the sudden and unintended loss of ratchet height, was
6    this phenomenon of tipover a known phenomenon to SFA?
7    A.   Yes.
8    Q.   And as of what point in time, mid-2000s or --
9    A.   Earlier.
10   Q.   Earlier?
11   A.   Earlier.
12   Q.   Okay.
13   A.   I -- one of my early design recommendations, I
14   successfully lobbied for a design change to the collar
15   assembly that tightened up the purges between the
16   ratchet bar and the collar, and this was basically a
17   simple strut piece that spanned the collar opening on
18   the pawl side of the collar and --
19   Q.   And that change was implemented?
20   A.   Yes.
21   Q.   Okay.
22   A.   Yes.
23   Q.   Do you remember when?
24   A.   Late -- late -- I'd say mid -- mid-'90s, maybe
25   early '90s.

Page 103

1    Q.   Okay.  Let me switch topics with you.  I want to
2    talk to you about the results of testing that SFA
3    undertook of ratchet and pawl design jack stands and
4    whether or not those results were documented.
5    A.   Oh, sure.  Okay.
6    Q.   How?
7    A.   All of my test reports, and my test reports
8    would involve -- would have consisted of a two-page
9    report detailing each aspect of the PALD, weight --
10   weights and measures, and then a photograph of the --
11   of --
12   Q.   Well, let's talk about a format.  Were there
13   paper reports of testing?
14   A.   Oh, sure.
15   Q.   Were there computerized reports of testing?
16   A.   Eventually they were -- there were.  Initially
17   we only did everything in paper but eventually we did,
18   yes.
19   Q.   Okay.  And would these -- these would have
20   included the tests you've described about sudden,
21   unintended loss of ratchet height and related topics?
22   A.   Primarily related topics.
23   Q.   Okay.
24   A.   In the normal course of testing, every
25   container -- a percentage of every container was

Page 104

1    tested.
2    Q.   Right.
3    A.   All prototypes, all new designs were tested.
4    Q.   Right.
5    A.   And -- and then paper reports filed.
6    Q.   My question is:  There was a record of this
7    phenomenon of sudden and unintended loss?
8    A.   Yes.
9    Q.   Okay.
10   A.   Yes.
11        MR. ZAKRZEWSKI:  Objection.
12        THE WITNESS:  Yes.
13   Q.   (By Mr. Elliott)  Okay.
14   A.   Yes.
15   Q.   Did you have file cabinets full of test reports?
16   A.   Test reports, OIPMs, yes.
17   Q.   Okay.  Were they -- as of when you left SFA at
18   the end of '08 --
19   A.   Yes.
20   Q.   -- were those file cabinets with the test
21   reports still in existence and there?
22   A.   They were.  They were in my office.  On the very
23   last day, I had help from Mike Stevens, I believe.  He
24   helped me two-wheel them into Mark Papas's office.
25   Q.   Okay.  And who's he, who's Papas?

Page 105

1    A.   He was the designee per Steven Huang and Arthur
2    Chaykin to handle claims investigations upon my
3    departure.
4    Q.   As your successor?
5    A.   Yes.
6    Q.   Do you know what happened to your test reports
7    in those file cabinets after you left?
8    A.   I assume they're still there.
9    Q.   Do you know?
10   A.   No, I don't know that.
11   Q.   Who directed you to leave those test reports to
12   Mr. Papas?
13        MR. ZAKRZEWSKI:  Objection.
14        THE WITNESS:  Arthur Chaykin per --
15        he told me Steven wanted them in -- put
16        them in Mark's office.
17   Q.   (By Mr. Elliott)  Okay.  Was the -- I want to go
18   back to your testimony about feasible alternative
19   designs and the double locking, the redundant pin
20   locking mechanism.  That would have -- that would have
21   involved an expense issue?
22        MR. ZAKRZEWSKI:  Objection.
23        THE WITNESS:  Sure.  Yes.
24   Q.   (By Mr. Elliott)  It would have been more
25   expensive than the existing ratchet and pawl design?

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                          Roger D. Claypool

Page 106

1   A.   Yes.
2   Q.   Okay.  And those -- that particular design
3   change was adopted by Allied and Torin?
4   A.   Very similar, yes.
5        MR. ZAKRZEWSKI:  Objection.
6   Q.   (By Mr. Elliott)  Okay.
7   A.   Yes.
8   Q.   And, again, to the extent that Mr. Shaw was
9   involved in the consideration of product liability
10  claims, factual investigations, he was the president of
11  the company?
12       MR. ZAKRZEWSKI:  Objection.
13       THE WITNESS:  Yes.
14  Q.   (By Mr. Elliott)  You testified about loss runs
15  that were records of claims and claims investigations
16  and that kind of things.  Were those both kept in paper
17  and computer format?
18  A.   I don't know if they were kept in computer -- in
19  digital format and I only saw them as a result of Sara
20  Sunderman bringing them to me to basically check off,
21  this is correct, this is correct, is there another one
22  that needs to be on there.  That's the only time that I
23  saw them.
24  Q.   If you had -- I take it the purpose of these
25  loss run documents was to record information about

Page 107

1   claims?
2   A.   Yes.
3   Q.   Including sudden and unintended loss of height,
4   ratchet height claims?
5   A.   Yes.
6   Q.   Okay.  And when -- do you know -- withdrawn.
7   Withdrawn.  Who had access at -- in SFA management to
8   those loss runs as of the time that you left the
9   company in '08?
10  A.   Steven Huang, Arthur Chaykin.  I believe that's
11  all.
12  Q.   When you were investigating product liability
13  claims for doing -- fact investigation of product
14  liability claims involving ratchet and pawl design jack
15  stands, did you encounter or did you consider
16  responding to those claims with regard to the propriety
17  of the use of the stand itself, a misuse kind of
18  concept?
19  A.   Yes.
20  Q.   And tell us about that.
21  A.   On more -- on more than one occasion, I would
22  just summarily deny a claim based on the information I
23  would get back in a questionnaire.
24  Q.   Could you give us an example of one of those?
25  A.   Questionnaires?

Page 108

1   Q.   Or no.  A denied claim.
2   A.   Of a denied claim?
3   Q.   On the basis of misuse.
4   A.   Oh, gosh, pull one out of the -- my archives.
5   Q.   Is there a claim called Finley?
6   A.   That was actually a -- I don't think that ever
7   went to trial.
8   Q.   I'm not asking about trial.
9   A.   But.
10  Q.   Consideration of a misuse defense?
11  A.   It was overloaded horribly and the jack stand
12  design, fortunately for us, the -- it was overloaded.
13  Q.   Remember the stand capacity in that case?
14  A.   I believe it was a pair of three-ton jack
15  stands.
16  Q.   Being used to lift what?
17  A.   Oh, my gosh, it was a -- I think it was a 1987
18  Freightliner Cabover which increased the load
19  considerably, and the load there, as I recall, was,
20  gosh, probably 36,000 pounds --
21  Q.   Okay.
22  A.   -- or thereabouts.
23  Q.   On a three-ton jack stand?
24  A.   Yeah.  It didn't last but a moment or two.
25  Q.   How about the concept of using one stand instead

Page 109

1   of two to lift a car, you ever have any experience with
2   those kinds of claims?
3   A.   Yes, I did.
4   Q.   Tell us about that.
5   A.   I would -- each case -- each claim would be
6   unique but if one stand was used on a hard level
7   surface, I would typically try to settle it for as
8   little as I possibly could, of course, but I would not
9   summarily deny such a claim.
10  Q.   Okay.  Have you used a jack -- one jack stand to
11  lift a car?
12  A.   Yes, I do routinely and --
13  Q.   And it's --
14  A.   -- and I still use lift equipment quite often.
15  With five kids and now a grandchild, it's a
16  never-ending stream of oil changes and light repairs.
17  Q.   And when --
18  A.   And I routinely use one.
19  Q.   My question was meant to encompass, when I asked
20  about using one jack stand instead of two to lift a
21  car, a ratchet and pawl design jack stand?
22  A.   Yes.  I use both.  I use a ratchet and pawl and
23  a pin type.
24  Q.   Okay.  Yeah, I may have said lift the car.  I
25  meant to hold the car up in the air.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                            Roger D. Claypool

Page 110

1    A.   Yeah.
2    Q.   Is that right?
3    A.   Yes.
4    Q.   Have you in your claims experience and your
5    factual investigation of product liability claims on
6    behalf of SFA, did you ever encounter a claim that a
7    consumer was confused by SFA's product warnings?
8    A.   Oh, yes.
9         MR. ZAKRZEWSKI:   Objection.
10   Q.   (By Mr. Elliott)   What?
11   A.   Yes.
12   Q.   Could you please expand on that.
13        MR. ZAKRZEWSKI:   Again, this is
14   subject to the limitations that he set
15   forth --
16        MR. ELLIOTT:   It is.
17        MR. ZAKRZEWSKI:   -- before prelegal
18   involvement.
19        MR. ELLIOTT:   Yes.
20        THE WITNESS:   Sure.  Oftentimes
21   there'd be confusion as to what the rated
22   capacity would be, what the rated capacity
23   was, even -- even when we -- even when we
24   started printing them in warnings to
25   include a statement in the owner's manual

Page 111

1         regarding rated capacity is a pair of jack
2         stands, knowing that we were erring on the
3         side of safety.  Each individual stand, of
4         course, is tested to rated capacity but
5         that doesn't mean you can -- they're not
6         additive because then we'd have to test
7         them to an even higher capacity.
8              But there was always confusion about
9         rated capacity.  There was always confusion
10        about, oh, appropriate lift points,
11        appropriate support points.
12   Q.   (By Mr. Elliott)   Tell us about the appropriate
13   lift points.
14   A.   Appropriate lift points and support points are
15   something that without -- without training, without,
16   I'd say, special knowledge, being under one every day,
17   knowing what members are -- are strong enough to load,
18   it was always an issue.  In my -- in my questionnaires
19   I would always use the American Lift Institute's
20   guidelines for a chassis.  They would have a chassis
21   diagram.  I would include that in my questionnaire.
22   Q.   What questionnaire?
23   A.   In my -- in my claim questionnaire.  And then I
24   would have the claimant circle the areas that they used
25   and oftentimes they would be nowhere near the

Page 112

1    appropriate lift point or --
2    Q.   So confusion about where the lift point was?
3    A.   Absolutely because the manufacturer doesn't give
4    it to you and unless you're an automotive engineer or
5    have some training, it would be difficult to determine.
6    Q.   Okay.  Any other area -- any other areas of
7    consumer confusion relative to ratchet and pawl design
8    jack stand warnings issues come to mind?
9    A.   The rated capacity does, it comes to mind, where
10   to use the jack stand, at what height to use the jack
11   stand.
12   Q.   Those are the ones?
13   A.   Those are probably the most prominent.
14        MR. ELLIOTT:   Okay.  All right.  It's
15   noontime and I would suggest we take a
16   short lunch break, if that's okay.  Let's
17   go off the record.
18        THE VIDEOGRAPHER:   Going off the
19   record at 11:55.
20        (A lunch recess was taken.)
21        THE VIDEOGRAPHER:   We're on the
22   record at 12:47.
23   Q.   (By Mr. Elliott)   Good afternoon, Mr. Claypool.
24   A.   Good afternoon.
25   Q.   I'm going to try to move along here the pace and

Page 113

1    I'm going to show you a series of the next exhibits
2    that I'm going to mark.
3         MR. ELLIOTT:   For the record, those
4         are Exhibits 5, 6, 7, 8, 9, and 10.
5    Q.   (By Mr. Elliott)   And I'm going to try to do
6    this efficiently and ask you to look through Exhibits 5
7    through 10, and when you're done, tell me if you've
8    seen those documents before and you're ready to discuss
9    them with me a little bit.
10   A.   Sure.
11   Q.   Take your time.  There's a lot of paper there.
12   And those are copies so you just need to look at the
13   top page -- the top document in each file.  The rest
14   are copies for counsel.
15   A.   I'm done with that one.
16   Q.   And they're all the same kind of thing.  They're
17   -- you recognize them as discovery responses filed in
18   this case?
19   A.   Yes.  Yes.
20   Q.   So let me have them back.
21   A.   Okay.
22   Q.   Thank you.
23        MR. ELLIOTT:   I'm going to give the
24   reporter -- I'll try to keep them in order
25   -- 5, 6, 7, 8, 9 -- I'm so easily confused.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                           Roger D. Claypool

Page 114

1    All right.
2         So, Nicole, let's mark Exhibits 5
3    through 10 in that order.
4         (Exhibit 5, 1/6/14 Answers to
5    Interrogatories, marked for
6    identification.)
7         (Exhibit 6, Supplemental Responses to
8    Requests for Production, marked for
9    identification.)
10        (Exhibit 7, Unidentified Document,
11   marked for identification.)
12        (Exhibit 8, 1/20/15 Responses to
13   Requests for Production, marked for
14   identification.)
15        (Exhibit 9, 7/9/15 Responses to
16   Requests for Production, marked for
17   identification.)
18        (Exhibit 10, Objections and Responses
19   to Rule 30(b)(6) Notice, marked for
20   identification.)
21   Q.   (By Mr. Elliott)  So for the record, what do you
22   understand these documents to be?  Mr. Claypool, what
23   do you understand -- are these discovery responses as
24   far as you can tell filed by defendants in this case?
25   A.   Yes.

Page 116

1    them to Sears, and some of this indicates "Not known to
2    the responding party," Numbers A and B response.  Is
3    that consistent with your understanding of that --
4    answer to that question?
5         MR. ZAKRZEWSKI:  Objection.
6         THE WITNESS:  No.
7    Q.   (By Mr. Elliott)  That information is known,
8    isn't it?
9    A.   Yes.
10   Q.   Let's look at Exhibit 6, the next document.
11   This is Shinn Fu America's supplemental responses to
12   the plaintiffs' first set of requests for production,
13   and I'm directing your attention to Numbers 1, 2, 3,
14   and 4, Questions 1, 2, 3, and 4.  One is we're asking
15   SFA for documents concerning development and design of
16   jack stands.  We're asking in Number 2 for documents
17   concerning fabrication, manufacture, production, and
18   assembly; in Number 3, inspection, quality control, or
19   quality assurance; in Number 4, documents related to
20   the testing.  And SFA indicates they can't find any of
21   these documents.
22        Did those documents exist at the time you left
23   SFA?
24        MR. ZAKRZEWSKI:  Objection.
25        THE WITNESS:  Yes.

Page 115

1    Q.   Okay.
2    A.   Yes, sir.
3    Q.   And you took a look at these yesterday?
4    A.   Yes.
5    Q.   Okay.  And I want to look at Exhibit 5 which is
6    SFA's response to the plaintiffs' first set of
7    interrogatories dated January 6, 2014, and I want to
8    direct your attention to the question and answer on
9    pages 3 and 4 of this document, Interrogatory Number 2,
10   which asks the defendants to -- asks Shinn Fu America
11   to identify each incident involving a jack stand known
12   to the defendant involving alleged claims of
13   defectiveness, malfunction, failure to hold up a
14   vehicle, etc.  And then on page 4, the response is
15   after reasonable inquiry, they're not aware of any.
16        Is that consistent with your understanding of
17   that question?
18        MR. ZAKRZEWSKI:  Objection.
19        THE WITNESS:  No, it's not.
20   Q.   (By Mr. Elliott)  The opposite is true, is it
21   not?
22   A.   Yes.
23   Q.   And with respect to Interrogatory Number 4,
24   Interrogatory Number 4 asks who designed, manufactured,
25   tested, distributed, imported the jack stands, sold

Page 117

1    Q.   (By Mr. Elliott)  Do you know what happened to
2    them?
3    A.   No.
4    Q.   Sorry?
5    A.   No.
6    Q.   Same document, same Exhibit 6, turn to Number
7    11.  We ask SFA for documents concerning complaints,
8    legal and nonlegal or litigation, with respect to
9    claims or allegations of jack stand malfunction,
10   defects, etc.  They say they can't find any.  Is that
11   consistent with your understanding of the existence of
12   such documents at the time you left SFA?
13   A.   No.
14        MR. ZAKRZEWSKI:  Objection.
15   Q.   (By Mr. Elliott)  Do you know what happened to
16   those documents?
17   A.   No.
18   Q.   Look at number -- Exhibit 6, Number 14 asking
19   SFA for documents concerning the consideration of
20   employing or the feasibility of different designs or
21   safety features, and SFA says they can't find any.  Is
22   that consistent with your understanding of the
23   documents that existed at the time you left SFA?
24   A.   No.
25        MR. ZAKRZEWSKI:  Objection.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                      Roger D. Claypool

**Page 118**

1    Q.   (By Mr. Elliott)  And, again, you don't know
2   what happened to those documents?
3    A.   No.
4    Q.   Those documents existed, right?
5    A.   They existed.  They turned some of them back --
6   my designs back to me.
7    Q.   Yeah.
8    A.   I don't know where the other -- specifically the
9   one design that they had a prototype of --
10   Q.   Okay.
11   A.   -- where it went.
12   Q.   Let's go beyond designs.
13   A.   Okay.
14   Q.   Claims of product defect, there were loss runs
15  when you left the company, right?
16   A.   Yes.  Yes, sir.
17   Q.   And they can't find them?
18   A.   No, sir.
19   Q.   There were testing reports that you created
20  concerning testings of the ratchet and pawl jack stand
21  design, correct?
22   A.   Yes.
23   Q.   Those existed at the time you left SFA?
24   A.   Yes.
25   Q.   Same exhibit, Number 31, if we go down to Number

**Page 119**

1   31 and we ask for all documents concerning instances of
2   jack stands failing to perform as intended, and the
3   response is we can't find any.  Same question:  Did
4   those documents exist when you left --
5    A.   Yes.
6    Q.   -- SFA?
7    A.   Yes.
8         MR. ZAKRZEWSKI:  Objection.
9    Q.   (By Mr. Elliott)  Okay.  Let's go to Exhibit
10  7 -- well, I'm sorry, let's skip -- we're going to skip
11  Exhibit 7 and go to Exhibit 8.
12   A.   Okay.
13   Q.   And this is a document dated January 20, 2015
14  entitled "Shinn Fu Company of America's Response to
15  Plaintiffs' Third Set of Requests to Production."  And
16  Number 58, we ask -- plaintiffs ask all documents
17  concerning complaints, legal and nonlegal, or
18  litigation pending or settled with respect to claims or
19  allegations of false engagement.  The first thing they
20  say is false engagement is vague and ambiguous.
21        Do you agree that that term "false engagement"
22  is a vague and ambiguous term to SFA?
23        MR. ZAKRZEWSKI:  Objection.
24        THE WITNESS:  No.
25   Q.   (By Mr. Elliott)  And then at the bottom of the

**Page 120**

1   page, they say they don't have any such documents
2   relating to claims or litigation concerning false
3   engagement claims.  Is that consistent with your
4   understanding of the documents existed at the time you
5   left SFA?
6         MR. ZAKRZEWSKI:  Objection.
7         THE WITNESS:  No.
8    Q.   (By Mr. Elliott)  Let's look at 9.  This is
9   Shinn Fu Company's responses to plaintiffs' fourth set
10  of requests for production dated July 9, 2015, and
11  Number 2, if you would look at Number 2, and it asks
12  for copies of any loss runs prepared by the defendants
13  concerning instances of alleged jack stand failures or
14  collapse or unexpected or unexplained loss of ratchet
15  bar or column height.  They say that we -- after
16  diligent search, we're not able to locate any such
17  documents.
18        Is that consistent with your understanding of
19  what documents existed regarding loss runs as described
20  in this document request as of the time you left SFA?
21   A.   No.
22        MR. ZAKRZEWSKI:  Objection.
23   Q.   (By Mr. Elliott)  Same exhibit, Number 9,
24  Exhibit 9, Question 6 asking for all documents
25  concerning the discussion of employing, implementing,

**Page 121**

1   or installing a redundant or additional locking device
2   or feature to the jack stands to prevent loss of column
3   height under load.  And if you turn to the next page,
4   they say:  After diligent search, we can't find any
5   such documents.
6         Is that consistent with your understanding of
7   the documents that existed regarding this topic at the
8   time that you left the employ of SFA?
9    A.   No.
10        MR. ZAKRZEWSKI:  Objection.
11   Q.   (By Mr. Elliott)  Turning to Exhibit 10, Shinn
12  Fu Company of America's objections and responses to the
13  Plaintiffs' 30(b)(6) notice.  Just so you know, that's
14  the notice of a deposition of a corporate
15  representative of Shinn Fu.  And they filed objections
16  to the notice and in those objections, they essentially
17  say several things, which I'm going to try to
18  summarize.  They say that they were not responsible for
19  designing or developing jack stands, testing jack
20  stands, safety features of jack stands, compliance with
21  safety or performance standards regarding jack stands,
22  evaluating false engagement, or evaluating the failure
23  or performance of the jack stand.
24        They say they were not responsible for those
25  topics.  Do you agree with that answer?

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                        Roger D. Claypool

Page 122

1            MR. ZAKRZEWSKI:  Objection.
2            THE WITNESS:  No.
3    Q.   (By Mr. Elliott)  Is that consistent with your
4  understanding of what they were responsible for, the
5  activities and duties that they were responsible for as
6  I've just described at the time that you left the
7  employ of SFA?
8    A.   No.
9            MR. ZAKRZEWSKI:  Objection.
10   Q.   (By Mr. Elliott)  All right.  You can return
11  those to the reporter.
12           MR. ELLIOTT:  May I have the excerpts
13       of the O'Connor deposition testimony.
14   Q.   (By Mr. Elliott)  My colleague Mr. Edinburgh
15  went out to Kansas City and took the deposition of a
16  person named Meghann O'Connor, who SFA designated as
17  their corporate representative on various topics, and
18  he asked her questions about this case.  At page 44 of
19  the deposition --
20           MR. ZAKRZEWSKI:  Do you have copies
21       of these?
22           MR. ORTICELLI:  No.  It's not an
23       exhibit.
24           MR. ELLIOTT:  I can show him.  Do we
25       have copies?

Page 123

1            MR. ORTICELLI:  No.
2            MR. ELLIOTT:  We have the
3       transcripts.  Do you have the whole
4       transcript?
5            MR. ORTICELLI:  I have copies of
6       that.  He hasn't marked it as an exhibit
7       yet.  He's just making a record of what it
8       is.
9            MR. ELLIOTT:  We do have -- Counsel,
10      we have the whole transcript here if you
11      want to look at it.
12           MR. ZAKRZEWSKI:  Okay.
13           MR. ELLIOTT:  You want to look at it?
14           MR. ZAKRZEWSKI:  Well, if you're just
15      reading --
16           MR. ELLIOTT:  There's two questions
17      I'm going to read.
18           MR. ZAKRZEWSKI:  If you're reading
19      the entire question, I think I'm good.
20           MR. ELLIOTT:  Okay.  Sure.
21   Q.   (By Mr. Elliott)  At page 44 --
22           MR. ELLIOTT:  Yeah.  I'll give you
23      the page and the lines and stuff.
24   Q.   (By Mr. Elliott)  Page 44, lines 14 to 18,
25  Ms. O'Connor, who's the corporate representative that

Page 124

1  SFA put up to answer this question, was asked:  "Do any
2  of the loss runs that you've seen involve claims of
3  jack stand malfunction or collapse of the jack stand?"
4            "ANSWER:  I don't recall any of the claims
5  containing that information.  Anything would have been
6  given to my lawyers and then given to you."
7            My question, sir, is:  Did the loss runs that
8  you've testified to today in your deposition involve
9  claims of jack stand malfunction or collapse of the
10  jack stands?
11           MR. ZAKRZEWSKI:  Objection.
12           THE WITNESS:  Yes.
13   Q.   (By Mr. Elliott)  In the same deposition, my
14  colleague asked Ms. O'Connor --
15           MR. ZAKRZEWSKI:  Can we get the page
16       and lines.
17           MR. ELLIOTT:  For what?
18           MR. ZAKRZEWSKI:  The one you're about
19       to ask about.
20           MR. ELLIOTT:  Yes.
21           MR. ZAKRZEWSKI:  Thanks.
22   Q.   (By Mr. Elliott)  -- at page 54, line 13 to page
23  55, line 4, "QUESTION:  Do you keep a record of claims
24  separate from the loss runs that we have discussed or
25  are the same or different?"

Page 125

1            "They should be the same."
2            "QUESTION:  What type of information do you
3  prepare with respect to a claim that you receive notice
4  of?"
5            "ANSWER:  It would be circumstantial based off
6  of the claim."
7            "QUESTION:  Have you received notice of any
8  claims involving claims of jack stand failure or jack
9  stand gave way or the jack stand collapsed?"
10           "ANSWER:  No."
11           "In the period of time that you've been there,
12  you've received no such claims?"
13           "Nothing outside of this case."
14           Were there such other claims besides this
15  Klorczyk case --
16           MR. ZAKRZEWSKI:  Objection.
17           THE WITNESS:  Yes.
18   Q.   (By Mr. Elliott)  -- that you're aware of?
19   A.   Yes.
20           MR. ELLIOTT:  May I see excerpts from
21       the Jorgensen deposition.  Thank you.
22           And I'll use the same format here,
23       Mr. Zakrzewski.
24   Q.   (By Mr. Elliott)  Mr. Edinburgh took the
25  corporate representative -- SFA corporate

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                     Roger D. Claypool

1   representative deposition of a fellow named Ryan
2   Jorgensen that SFA put up as its corporate
3   representative and asked him some questions and why
4   don't we start here.  At page 39, lines 7 through 12,
5   the following colloquy took place:
6           "Did SFA play a role in determining the content
7   of the product manuals, owners' manuals?"
8           "ANSWER:  No."
9           Is that right?
10  A.   No.
11          MR. ZAKRZEWSKI:  Objection.
12  Q.   (By Mr. Elliott)  Why isn't it right?
13  A.   I developed them myself when I was there and I
14  left the templates in their possession.
15  Q.   At lines 39 -- at page 39, line 21 to 40,
16  "QUESTION:  Did SFA prior to March of 2011 receive any
17  calls through its customer service or phone numbers
18  where individuals complained of jack stand failure,
19  jack stand collapse, jack stand gave way?"
20          "ANSWER:" --
21          MR. ZAKRZEWSKI:  Objection.
22  Q.   (By Mr. Elliott)  -- "No."  Is that correct?
23  A.   No.
24  Q.   At page 40, lines 25 through 41 -- well, let me
25  withdraw that.  Well, the witness is asked whether SFA

1   received written complaints of jack stand collapse, and
2   he says no.  The witness is asked whether or not SFA is
3   aware of any nonlawsuit incidents of sudden collapse,
4   and he says no.  The witness is asked whether SFA
5   attempted to recreate false engagement, and he says no.
6   The witness is asked whether SFA received complaints of
7   false engagement or notice of collapse of a jack stand,
8   and he says no; that SFA never considered employment of
9   a redundant locking device on this ratchet and pawl
10  jack stand involved in this case, no; SFA did not
11  include -- withdrawn.
12          No ASME or PALD meeting ever discussed employing
13  alternative safety designs.  He says that that never
14  took place.
15          Do you agree with those answers?
16          MR. ZAKRZEWSKI:  Objection.
17          THE WITNESS:  No.
18  Q.   (By Mr. Elliott)  All of those answers are
19  wrong, right?
20  A.   Correct.
21  Q.   I want to show you, again, trying to summarize
22  this --
23          MR. ELLIOTT:  Nicole, what was our
24      last exhibit, 10?
25          THE COURT REPORTER:  Ten, yeah.

1   Q.   (By Mr. Elliott)  So I'm going to show you
2   Exhibits 10 -- I'm sorry, 11, 12, 13, and 14, and I'm
3   going to ask you to engage in the same exercise and you
4   can just look at the top document in each file folder
5   and tell me whether you've seen it before?
6   A.   Yes.
7   Q.   And what are -- have you completed your review
8   of those -- of those exhibits?
9   A.   Of the -- of Exhibit 12 -- 11.  I'm sorry.
10  Q.   Please complete your review of 11 through 14.
11  A.   Yes.  Yes.
12  Q.   And do those documents pertain to a litigation?
13  A.   Yes.
14  Q.   What's the name?
15  A.   Raymond -- what's the -- Christopher Raymond --
16  Q.   Yeah.
17  A.   -- case.
18          MR. ELLIOTT:  Why don't we mark
19      those.  Why don't I do the same thing we
20      just did.  This is for Nicole.
21          (Discussion off the record.)
22          (Exhibit 11, Complaint, marked for
23      identification.)
24          (Exhibit 12, Letter, marked for
25      identification.)

1           (Exhibit 13, Letter, marked for
2       identification.)
3           (Exhibit 14, Unidentified Document,
4       marked for identification.)
5           (Exhibit 15, Unidentified Document,
6       marked for identification.)
7   Q.   (By Mr. Elliott)  So take a look at -- is that
8   11?
9   A.   Yes.
10  Q.   Okay.  Is that the complaint against Sears?
11  A.   Yes.
12  Q.   And just take a minute to -- if you need to
13  refresh your recollection as to what the Raymond case
14  was about --
15  A.   No.  I remember.
16  Q.   Okay.  Well, then, let me ask you, what was the
17  Raymond case about?
18  A.   It was about a jack stand failure.
19  Q.   Okay.  And what was the nature of the claim?
20  A.   The stand failed suddenly and unexpectedly.
21  Q.   In terms of ratchet height?
22  A.   Yes.
23  Q.   Okay.  And that was in two thousand -- April of
24  2006?
25  A.   Thereabouts, yes.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

Page 130

1    Q.  Well, there's a date --
2    A.  Yes.
3    Q.  -- on the front page.
4    A.  Yes.
5    Q.  April 2006, right?
6    A.  Yes.
7    Q.  Okay.  So in April of 2006, a consumer user of a
8  ratchet and pawl jack stand filed a lawsuit against
9  Sears claiming sudden, unintended, unexpected loss of
10 height in the ratchet which caused what happen -- which
11 caused what to happen?
12        MR. ZAKRZEWSKI:  Objection.
13        THE WITNESS:  The vehicle was found
14     on top of Mr. Raymond and he was deceased.
15   Q.  (By Mr. Elliott)  It killed him?
16   A.  Yes.
17   Q.  Did you investigate that claim?
18   A.  Yes.  I did a site inspection and -- met the
19 family.
20   Q.  So as of April 2006, you've got a lawsuit saying
21 that somebody was killed when a jack stand
22 malfunctioned and suddenly and unexpectedly lost
23 height --
24   A.  Yeah.
25   Q.  -- and caused a load in the form of a vehicle it

Page 131

1  was supporting to fall and kill the consumer?
2    A.  Yes.  Yes.
3    Q.  And SFA knew that?
4        MR. ZAKRZEWSKI:  Objection.
5        THE WITNESS:  Yes.
6    Q.  (By Mr. Elliott)  Okay.  You knew it?
7    A.  Yes.
8    Q.  Management knew it?
9    A.  Yes.
10   Q.  Did the Asians know it?
11       MR. ZAKRZEWSKI:  Objection.
12       THE WITNESS:  Yes.
13   Q.  (By Mr. Elliott)  When I say "the Asians," I
14 mean Shinn Fu Taiwan and Shinn Fu Hong Kong and the
15 Chinese operation.
16   A.  Yes.
17       MR. ZAKRZEWSKI:  Objection.
18   Q.  (By Mr. Elliott)  And you settled the case?
19   A.  The insurance company settled the case, yes.
20   Q.  Right.  Do you remember how quickly the case
21 settled?
22       MS. TODD-TROTTA:  Objection.
23       THE WITNESS:  Fairly quickly.
24       MR. ELLIOTT:  Can I just see those
25     exhibits, please, 11 through the end.

Page 132

1        Thank you.
2    Q.  (By Mr. Elliott)  By the way, looking at Exhibit
3  13, not only did all those entities that I just talked
4  to you about know about this claim but Sears's third
5  party administrator Sedgwick knew about the claim too;
6  they wrote a letter to Shinn Fu advising of the nature
7  of the collapse claim, Exhibit 13?
8    A.  Yes.
9    Q.  Do you know who Sedgwick is?
10   A.  Yes.
11   Q.  Who are they?
12   A.  They're the claims administrator, claims
13 management group.
14   Q.  For?
15   A.  Sears.
16   Q.  The case settled for a hundred thousand dollars?
17   A.  I believe so, yes.
18   Q.  I'm looking at Exhibit 15.
19   A.  Yes.
20   Q.  Hand those back to the reporter.
21       MR. ELLIOTT:  I'm going to just take
22     a two-minute break.  I think I'm done with
23     my examination but I just want to check.
24       THE VIDEOGRAPHER:  Going off the
25     record at 1:19.

Page 133

1        (A brief recess was taken.)
2        THE VIDEOGRAPHER:  We're on the
3     record at 1:21.
4        MR. ELLIOTT:  I have no further
5     questions.
6
7  EXAMINATION BY MR. ZAKRZEWSKI:
8    Q.  Good afternoon, Mr. Claypool.
9    A.  Good afternoon.
10   Q.  We met earlier today.  I'm Steve Zakrzewski.  I
11 represent the defendants in this case.  I have some
12 questions --
13   A.  Yes, sir.
14   Q.  -- for you.
15   A.  Yes, sir.
16   Q.  First and foremost, when did you say you left
17 SFA?
18   A.  January 8, 2009, the first week.  The very first
19 week was my last week.
20   Q.  Okay.  If -- do you know when the specific jack
21 stands that are at issue in this case were sold?
22   A.  No.
23   Q.  Okay.  If I represent to you that they were sold
24 more than two years after you left SFA, is it fair to
25 say that you never handled these specific jack stands?

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                Roger D. Claypool

Page 134

1       MR. ELLIOTT:  Objection to the form.
2       THE WITNESS:  Yes.
3    Q.  (By Mr. Zakrzewski)  Okay.  And you never tested
4  these specific jack stands?
5    A.  Correct.
6    Q.  Okay.  You do not have knowledge of SFA's sales
7  relationship or lack thereof with Sears following you
8  leaving the company, correct?
9    A.  Correct.
10   Q.  So it may well be that SFA stopped distributing
11 to Sears after you left SFA?
12   A.  Yes.
13   Q.  Okay.  So it's entirely possible that SFA was
14 not in the stream of commerce with respect to these
15 specific jack stands at issue in this case?
16   A.  Yes.
17   Q.  Okay.  Is it fair to say that not all jack
18 stands, ratchet -- and I'll say ratchet and pawl style
19 jack stands are exactly the same?
20   A.  That's correct.
21   Q.  Right.  They might have different lengths of
22 ratchet bars, correct?
23   A.  Yes.
24   Q.  The teeth might be differently configured on the
25 ratchet bars, correct?

Page 135

1    A.  Yes.
2    Q.  They have different capacities frequently?
3    A.  Yes.
4    Q.  And the size of the collar will vary frequently?
5    A.  Yes.
6    Q.  The width of the base will vary?
7    A.  Yes.
8    Q.  Okay.  And so a test that you do on one model of
9  jack stand, ratchet and pawl jack stand, might not come
10 out the same if you did it on another model of ratchet
11 and pawl jack stand, correct?
12       MR. ELLIOTT:  Objection to the form.
13       THE WITNESS:  I'm not sure I
14 understand the question.
15   Q.  (By Mr. Zakrzewski)  It's entirely possible that
16 one model of ratchet and pawl style jack stands might,
17 say, fail a test while another model that has a
18 different size collar and a different size ratchet bar
19 and a differently configured base will pass that same
20 test?
21   A.  Yes.
22   Q.  Okay.  Do you specifically remember testing
23 Craftsman Model Number 6903 jack stands?
24   A.  Yes.
25   Q.  Okay.  And at what time was that?

Page 136

1    A.  That was throughout -- that was before they were
2  Craftsman.
3    Q.  Okay.
4    A.  We -- I tested them in various forms from the
5  T-6903 and 9603 up through the Craftsman brand.
6    Q.  Okay.
7    A.  Yes.
8    Q.  So this was -- you tested them before they were
9  Craftsman brand?
10   A.  Yes.
11   Q.  Did you test them when they were during
12 Craftsman brand?
13   A.  Yes.
14   Q.  Okay.  But you never tested them after 2009?
15   A.  Correct.
16   Q.  Okay.  Now, did you bring any documents here
17 other than any that might have already been marked as
18 exhibits?
19   A.  No.  No.
20   Q.  Okay.  You didn't bring any additional
21 documents?
22   A.  No.
23   Q.  All right.  So when you talked about reviewing
24 ASME and PALD meeting minutes --
25   A.  Yes.

Page 137

1    Q.  -- you don't have those with you?
2    A.  No.
3    Q.  Okay.  Where did you review those?
4    A.  At my house.
5    Q.  Before you came out here?
6    A.  Yes.
7    Q.  Okay.  Now, so you -- do you still have those
8  documents at your house?
9    A.  Yes.
10   Q.  Okay.  Do you -- you said that you had been
11 given when you left SFA --
12   A.  Yes.
13   Q.  -- some design documents --
14   A.  Just --
15   Q.  -- regarding --
16   A.  -- a week or two prior to, yes.
17   Q.  You were given some design documents that you
18 had created --
19   A.  Yes.
20   Q.  -- regarding jack stands?
21   A.  Yes.
22   Q.  Do you still have those documents?
23   A.  Yes.
24   Q.  Okay.  At your home?
25   A.  Yes.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                     Roger D. Claypool

Page 138

1    Q.   All right.  But you didn't bring them here with
2    you?
3    A.   No.
4    Q.   All right.  Now, at what point in your career
5    did you start working with SFA's legal department?
6              MR. ELLIOTT:  Objection to the form.
7    He testified there wasn't a legal
8    department but go ahead.
9              THE WITNESS:  When Arthur Chaykin
10   arrived.
11   Q.   (By Mr. Zakrzewski)  Okay.  And when --
12   A.   Actually, a short time after Arthur Chaykin
13   arrived.
14   Q.   Okay.  And you understand that Arthur Chaykin is
15   an attorney?
16   A.   Yes.
17   Q.   And that he was SFA's in-house counsel?
18   A.   Yes.
19   Q.   Okay.  And you said you worked very closely with
20   him?
21   A.   Yes.
22   Q.   Can you put a year on that, when that started?
23   A.   I cannot.
24   Q.   Can you -- what's your best approximation, if
25   you can give me a range?

Page 139

1    A.   Between late 2005 and up.
2    Q.   Through the end of your tenure?
3    A.   Yes.  Yes.
4    Q.   And you said you shared space with him?
5    A.   We shared space for about three -- three years.
6    Q.   Okay.  You worked closely together?
7    A.   Yes.
8    Q.   You were privy to a number of attorney-client
9    conversations with him?
10   A.   Yes.
11   Q.   Okay.
12   A.   Yes.
13   Q.   And you had regular access to his work product?
14   A.   I don't understand.
15   Q.   What don't you understand?
16   A.   The "access" component.  He had his office.  I
17   had my office.  We were in the same area.
18   Q.   You regularly shared documents --
19   A.   Yes.
20   Q.   -- relating to matters that you were working on?
21   A.   Yes.
22   Q.   Documents that you might have created for him?
23   A.   Yes.
24   Q.   Documents that he might have created?
25   A.   Yes.

Page 140

1    Q.   And you understand that he was there to give the
2    company legal advice?
3    A.   Yes.
4    Q.   And much of or -- what percentage of your work
5    would you say involved claims that were -- were or
6    became in litigation?  Do you understand what I mean by
7    that term?
8    A.   Might clarify it.
9    Q.   Something that was filed in court, something
10   that became a lawsuit.
11   A.   Okay.
12   Q.   What percentage of your work would you say was
13   on those matters when you were working with
14   Mr. Chaykin?
15             MR. ELLIOTT:  Could you supply a time
16   frame.
17   Q.   (By Mr. Zakrzewski)  From two thousand -- when
18   you were working with Mr. Chaykin from late 2005 to you
19   left the company in 2009.
20   A.   Are you asking me how much of that -- how much
21   of the work during that time period was dedicated to
22   litigation?
23   Q.   Yeah.
24   A.   Not -- if I had to assign a number, it would be
25   probably less than 20 percent, not a lot.

Page 141

1    Q.   And you also worked on other claims, correct?
2    A.   Correct.
3    Q.   That you thought may become litigation but
4    ultimately did not?
5    A.   They would have been -- well, there's -- there's
6    -- there are $5 claims and then there are $500 claims.
7    I would hesitate to put a percentage of how many of
8    those did I anticipate would go to litigation or not.
9    I mean --
10   Q.   Some percentage?
11   A.   Yes.
12   Q.   Right?
13   A.   Yes.
14   Q.   That ultimately didn't?
15   A.   Yes.
16   Q.   Okay.  Now, are you aware of any claims that
17   Arthur Chaykin would have worked on, addressed,
18   resolved without your involvement or did he go to you
19   with the claims to assist him as a matter of course?
20   A.   I didn't take -- I didn't take a claim to him
21   unless it involved personal injury on a scale that,
22   say, anything under $10,000, I generally would just
23   say:  Hey, I got a claim.  I'm going to go ahead and
24   just handle it, but if it were over $10,000, I had to
25   get him involved.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

Page 142

1    Q.   All personal injury claims over $10,000, you
2    would involve him?
3    A.   Basically, yes.  And he and I would make a
4    decision a lot of times on just where that line was.
5    Q.   Okay.  And you would conduct investigations for
6    him?
7    A.   Yes.
8    Q.   You would create documents for him?
9    A.   Yes.
10   Q.   Okay.  And now, shifting gears, I'd like to talk
11   about how you came to be involved in this case, the
12   Klorczyk case.
13   A.   Sure.
14   Q.   What was your first exposure to this case?
15   A.   A consulting firm contacted me and wanted to --
16   wanted me to enter into a consulting agreement with his
17   firm --
18   Q.   Okay.
19   A.   -- which I did.
20   Q.   And what's the name of that case or -- the name
21   of that consulting firm?  My apologies.
22   A.   Heath & Associates.
23   Q.   Okay.  So Heath & Associates retained you as a
24   consultant in connection with this case?
25   A.   Yes, sir.

Page 143

1    Q.   When was that?
2    A.   Oh my, 2012, 2013.
3    Q.   Okay.  And what type of arrangement did you
4    enter into?
5    A.   Into an arrangement where I would provide design
6    work when needed and litigation support when needed.
7    Q.   What does that mean, "litigation support"?  I
8    know what it means generally but you might mean
9    something different when you say that.
10   A.   When -- he said if he needed me on a PALD,
11   P-A-L-D, case, would I be interested in being involved,
12   and I agreed.  We're a contractually -- contractual
13   agreement.
14   Q.   Okay.  So what types of litigation support
15   services have you provided?
16   A.   The only -- the only support service I've
17   provided him so far was to analyze or interpret the
18   serial number that he gave me that ultimately I found
19   to be the Klorczyk case jack stand.
20   Q.   And what -- what information did he give you
21   about this case in order to get your opinion?
22   A.   Simply the basics, a -- someone had used a
23   stand.  It -- and it failed and he was deceased.
24   Q.   Did he give you a copy of the complaint?  That
25   usually contains some of the basics.

Page 144

1    A.   I believe the complaint I received or the -- all
2    the trial information that I've received was through
3    the law firm.
4    Q.   When you say "the law firm," do you mean the law
5    firm that we're at today --
6    A.   Yes.
7    Q.   -- Day Pitney?
8    A.   Yes.
9    Q.   Okay.  So first you signed on with Rick Heath?
10   A.   Yes.
11   Q.   And what -- what types of communications did you
12   have about the case?  How often --
13   A.   With Rick?
14   Q.   -- did you talk about the case with Mr. Heath?
15   A.   Actually I just recall the two sessions, he
16   explaining what the -- what he needed.  He sent me the
17   serial number and I told him what I knew about the
18   serial number and what information it revealed and that
19   was it.
20   Q.   So has your only contact with Rick Heath on this
21   case been those two in-person meetings?
22   A.   These were phone conversations and -- and that's
23   it.
24   Q.   Have you exchanged any written materials with
25   Mr. Heath?

Page 145

1    A.   I don't believe so other than our contract.
2    Q.   Sure.  Did you have any in-person meetings with
3    him --
4    A.   No.
5    Q.   -- since you said these meetings were on the
6    phone?
7    A.   Yes.  No meetings personally.
8    Q.   So you've had two teleconferences with Mr. Heath
9    about the case?
10   A.   Yes.
11   Q.   Okay.  And what's your background with
12   Mr. Heath?  Have you known him for a while?
13   A.   I have.  I've known him -- he was on the PALD
14   committee when I served -- when I served as vice chair
15   for three terms and prior to that, and we worked
16   closely together.  We worked well together on the
17   committee.  He, I, and Kathy were a close-knit team.
18   Q.   Okay.  And so how long would you say you go back
19   with Mr. Heath, if you could try to put a year on it?
20   A.   Fifteen, eighteen years.
21   Q.   Long time?
22   A.   Long time.
23   Q.   Now, do you know that Mr. Heath was also
24   retained as a consultant or an expert by SFA on
25   occasion?

Brandon Huseby
(860) 549-1850          www.brandonreporting.com          Pages 142..145

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                                    Roger D. Claypool

Page 146

1   A.   Yes.  I -- I helped to retain him.
2   Q.   Were you his -- you sort of established that
3   relationship?
4   A.   Yes.
5   Q.   And when was that?
6   A.   That would have been the time of the Jeffcoat
7   case.
8   Q.   I'm sorry, which was when?
9   A.   I want --
10  Q.   Do your best.
11  A.   I want to say early '90s to mid-'90s but...
12  Q.   And that was -- did you say that that was a jack
13  stand case?
14  A.   Yes.
15  Q.   Was it a ratchet and pawl jack stand, if you
16  recall?
17  A.   Yes.
18  Q.   Okay.
19  A.   Yes.
20  Q.   And you sort of set up a relationship where
21  Heath would be retained to help with that case?
22  A.   With help -- helping to defend really any -- any
23  case that would come up regarding PALD.
24  Q.   Helping -- was it SFA he was retained by?
25  A.   I'm not sure of the -- the agreement but all of

Page 147

1   the SFA -- all of the SF companies benefitted from his
2   expertise as there were various points of manufacture
3   for the various claims and suits.
4   Q.   Okay.  So it may have, for example, been Shinn
5   Fu Corporation that technically retained him?
6   A.   Yes.  Yes.
7   Q.   Okay.  I guess part of what I was getting at is
8   that when you talked about the Jeffcoat case earlier --
9   A.   Yes.
10  Q.   -- you called it, I think, Jeffcoat versus
11  Wal-Mart?
12  A.   It was a -- I believe it was a Wal-Mart involved
13  jack but it's been a long time.
14  Q.   You just said it was a jack stand?
15  A.   Yes.
16  Q.   Jack stand, okay.
17  A.   Yeah.
18  Q.   So you didn't have Mr. Heath retained by
19  Wal-Mart.  You had him retained by a Shinn Fu entity --
20  A.   Shinn Fu.
21  Q.   -- which was a codefendant, I presume?
22  A.   Any time our customer is named, we're -- we were
23  on the hook.
24  Q.   Okay.
25  A.   So ultimately we're on the hook.

Page 148

1   Q.   You don't remember if there was a Shinn Fu
2   entity that was actually technically a party to the
3   case or not?
4   A.   I don't.  As I sit here today, I don't.
5   Q.   May have been, may not have been?
6   A.   Correct.
7   Q.   Okay.
8   A.   Correct.
9   Q.   And so after the Jeffcoat case, what other
10  matters did you work with Rick Heath on in this way?
11  A.   Other than jack stand cases or strictly jack
12  stand cases?
13  Q.   Well, I --
14  A.   Because we worked on many.
15  Q.   I'm most interested in jack -- jack or jack
16  stand cases.
17  A.   Okay.
18  Q.   I'm interested in automotive lifting device --
19  A.   Okay.
20  Q.   -- and automotive support device cases.
21  A.   All right.  We worked together in Jeffcoat,
22  Guerra, in --
23  Q.   And, I'm sorry, when was Guerra?
24  A.   Guerra I'm -- I don't recall specifically.
25  Mid-2000s.

Page 149

1   Q.   Okay.  And was that a jack stand case?
2   A.   Yes.  Texas.  In Texas and it was a Grainger
3   jack stand.
4   Q.   But a Shinn Fu entity was involved in that?
5   A.   Yes.  Yes.
6   Q.   Okay.  I interrupted you.  I'm sorry.
7   A.   And a Donald Hyron -- I don't remember
8   specifically -- H-y-r-o-n and that was Hyron versus --
9   I believe it was Hyron versus Grainger as well.
10  Q.   And a Shinn Fu entity was involved?
11  A.   Yes.
12  Q.   And you don't --
13  A.   SFT was involved in that one, I believe.
14  Q.   Time period, what was the time period for that
15  one?
16  A.   It was pre-Arthur so it had to be 2004, '5, in
17  that area.
18  Q.   And, I'm sorry, was that a jack stand case?
19  A.   That was a forklift jack, a fork jack, yeah.
20  Q.   Fork --
21  A.   Forklift jack.
22  Q.   A forklift jack?
23  A.   Yes.
24  Q.   Can you recall any other cases involving
25  automotive lifting or automotive support devices that

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                   Roger D. Claypool

**Page 150**

1    you worked on with Mr. Heath?
2    A.  Yes.
3    Q.  Okay.  Please tell me.
4    A.  Want me to go on.  There was an engine crane
5    case out of Arizona and I don't recall who the -- who
6    the plaintiff was in that case, but we -- Grainger
7    again.  It was Grainger,
8    Q.  But you don't remember the plaintiff's name?
9    A.  I don't.  I don't.  I think it was Sandia
10   National Laboratories.  Actually, I think it was the
11   insurance company representing Sandia National
12   Laboratories.
13   Q.  Any idea when that was?
14   A.  No, I don't.
15   Q.  No concept at all?
16   A.  2003 perhaps.
17   Q.  Any others?
18   A.  There likely is but I -- I'm trying to think
19   through a list of those.  I don't recall.  I don't
20   recall another one.
21   Q.  But there may have been others?
22   A.  There may have been.
23   A.  There may have been other jack stand cases --
24   A.  Yes.
25   Q.  -- you worked with him on?

**Page 151**

1    A.  Yes.
2    Q.  Okay.
3    A.  Yes.
4    Q.  Now, getting back to your -- not when you were
5    getting him retained as a consultant but when he
6    retained you as a consultant --
7    A.  Yes.
8    Q.  -- what is your arrangement?
9    A.  That I would provide design help when needed and
10   that I would provide litigation support when needed.
11   Q.  And how are you being compensated?
12   A.  At an hourly rate.
13   Q.  And what's that hourly rate?
14   A.  For design work, $60 an hour; for litigation
15   support, $120 an hour.
16   Q.  And what's the distinction between those two
17   functions?
18   A.  Litigation support would include, for instance,
19   deciphering that serial code; and design work would be,
20   okay, how do we -- how do we improve upon the lifting
21   arc design of a jack or more of an individual product
22   design element.
23   Q.  So other than preparing for, meeting with
24   plaintiffs' counsel, and testifying in this case, is
25   the only work you've done limited to deciphering that

**Page 152**

1    serial number or was there other work that you've done
2    on this case?
3    A.  That's it.  That's it.
4    Q.  And so there were two phone calls just about the
5    serial number that you had with Rick Heath?
6    A.  I believe so, yes.
7    Q.  Okay.  Did he discuss anything else on those
8    calls?
9    A.  He may have -- he may have mentioned wondering
10   where -- wondering if certain people still worked there
11   and, of course, not being there, I don't know.
12   Q.  Okay.
13   A.  You know, that's the type of...
14   Q.  So did you exchange any written information with
15   him other than your contract?
16   A.  No.
17   Q.  Okay.
18   A.  No.
19   Q.  So when did you get connected with plaintiffs'
20   counsel in this case?
21   A.  I couldn't give you a date specifically but if I
22   had to guess, it would be -- I think my first contact
23   was Howard Edinburgh in either late 2014, early 2015.
24   Q.  Okay.  Late 2014 or early 2015, right?
25   A.  Yeah.  I -- yes.  I...

**Page 153**

1    Q.  Okay.  And how did he reach out to you?
2    A.  I believe a phone call.
3    Q.  Okay.  Do you remember what you guys talked
4    about on that phone call?
5    A.  Just more details of the case, jack stand was
6    involved.  I think I went through the deciphering of
7    the serial code with him as well.  I don't remember the
8    specifics but the gist of it is preparing information
9    to get me so that I could see what I thought about the
10   case.
11   Q.  Do you remember specifically anything he told
12   you?
13        MR. ELLIOTT:  I'm sorry, he told you
14   or you told him?  What was the question?
15   Q.  (By Mr. Zakrzewski)  Do you remember
16   specifically anything Attorney Edinburgh --
17        MR. ELLIOTT:  Told you, okay.
18        MR. ZAKRZEWSKI:  Edinburro
19   (phonetic)?
20        MR. ELLIOTT:  Edinburgh.
21        MR. ZAKRZEWSKI:  Edinburgh.  I'm
22   sorry.
23        MR. EDINBURGH:  Any way you say it is
24   fine with me.
25   Q.  (By Mr. Zakrzewski)  -- Attorney Edinburgh told

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                                Roger D. Claypool

Page 154

1 you?
2    A.   No.  Just that a nice Jewish family had been
3 hurt and that stands out in my mind, that, you know, he
4 explained that a good family had been hurt, and I -- he
5 would appreciate it if I would help out.
6    Q.   Okay.  And you'd already been retained by Heath
7 & Associates --
8    A.   Yes.
9    Q.   -- at this point?
10   A.   Yes.
11   Q.   When were you retained by Heath & Associates
12 again?  I'm sorry.  Did you say late '12, early '13?
13   A.   That sounds right but my -- I've got a contract.
14 I could -- I could look at it.
15   Q.   Okay.  You have that back at your house too?
16   A.   Yes.
17   Q.   Okay.  You didn't bring any of it?
18   A.   No.  Traveled light.
19   Q.   All right.  So after that first call from
20 Attorney Edinburgh, when was the next communication
21 that you had with plaintiffs' counsel about this case?
22   A.   Boy, there were long lapses between
23 communication.  I don't recall the specifics.  I think
24 we've probably communicated half a dozen times in the
25 last -- in the last year.

Page 155

1    Q.   Was it always with Attorney Edinburgh or have
2 there been different attorneys involved?
3    A.   Primarily with -- with Howard and then more
4 recently with Bryan and Dave.
5    Q.   And did you ever communicate in writing or was
6 it always phone calls?
7    A.   We did a lot of -- 90 percent of it was phone
8 calls.
9    Q.   What was the other 10 percent?
10   A.   He would -- I would review various -- I think I
11 reviewed interrogatories one time.
12   Q.   And how did they get you those docs, did they
13 send them to you in the mail?  Did they email you?
14   A.   Email.
15   Q.   Okay.  So you had email exchanges with them?
16   A.   Yes.
17   Q.   Did you have email exchanges with Rick Heath too
18 or just with plaintiffs' counsel?
19   A.   I think the only thing I emailed -- any
20 exchanges with Rick were requests for worksheets so I
21 could bill him.
22   Q.   That's important.
23   A.   Yeah.
24   Q.   So more extensive email communications with
25 plaintiffs' counsel?

Page 156

1    A.   Yeah.
2         MS. TODD-TROTTA:  Is that a yes?
3         THE WITNESS:  Yes.
4    Q.   (By Mr. Zakrzewski)  Now, I assume you were paid
5 for the time that you spent reviewing these documents
6 you were sent?
7    A.   Yes.
8    Q.   Okay.  And were you also paid for the time you
9 spent on the phone?
10   A.   Yes.
11   Q.   Okay.  You're paid for the time that you're
12 spending being deposed here?
13   A.   Yes.
14   Q.   Okay.  Are you paid for the time that you spent
15 yesterday preparing for the deposition with counsel?
16   A.   Yes.
17   Q.   Are you paid for the time that you spent at home
18 without counsel reviewing background documents?
19   A.   Yes.  Yes.
20   Q.   Now, I'm assuming that this would be at the $120
21 litigation support rate because it doesn't sound like
22 it's related to design?
23   A.   Correct.
24   Q.   Okay.
25   A.   Correct.

Page 157

1    Q.   So as you sit here now, you're being paid $120
2 an hour?
3    A.   Yes, sir.
4    Q.   So you don't mind how long my questioning goes
5 on.
6    A.   I would -- there's no price to be put on being
7 at home with my grandkids.
8    Q.   You don't need to answer that.  So after you get
9 an initial phone call from Howard Edinburro --
10 Edinburgh, you said there was a long lapse before you
11 were contacted again?
12   A.   Seemed to be, yes.
13   Q.   Yeah.  Several months?
14   A.   Yes.
15   Q.   Okay.  And then what was the -- what were the
16 subsequent communications about?
17   A.   Keeping me posted on -- he wanted to keep me
18 posted on what the status of the case was and that they
19 hadn't -- you know, just keeping me in the loop.
20   Q.   So what kind of information would you give them
21 in return?
22         MR. ELLIOTT:  "Them"?
23         MR. ZAKRZEWSKI:  Plaintiffs' counsel.
24         Well, actually, good point.
25   Q.   (By Mr. Zakrzewski)  Did there come a point

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                          Roger D. Claypool

Page 158

1   where you started communicating directly with
2   plaintiffs' counsel without Rick Heath's involvement?
3      A.   Oh, sure.  Sure.  That was not -- that was the
4   vast majority of -- of the communication.
5      Q.   So you had a direct line of communication with
6   plaintiffs' counsel?
7      A.   Yes.
8      Q.   Okay.  And you didn't feel the need to keep
9   Mr. Heath in the loop?
10     A.   No.  Mr. Heath was -- was -- I assume was in the
11  loop through counsel.
12     Q.   Okay.  So you're communicating with them on your
13  own?
14     A.   Yes.
15     Q.   Okay.  So as they're giving you information
16  about the status of the case and, for example,
17  providing you discovery responses to review, what type
18  of information are you providing to them?
19     A.   I know that some of the work was looking --
20  looking for ex-employees, if I could determine the
21  whereabouts of ex-employees.
22     Q.   Okay.  What else?
23     A.   To look through my PALD documents, my meeting
24  minutes, and see if there's -- there were any formal or
25  published discussions regarding the jack stand

Page 159

1   phenomenon.
2      Q.   When you say "the jack stand phenomenon," do you
3   mean the sudden collapse phenomenon --
4      A.   Yes.
5      Q.   -- or, as you've referred to it, the false
6   engagement phenomenon?
7      A.   Yes.
8      Q.   Were there any published minutes?
9      A.   No.
10     Q.   No?
11     A.   No.
12     Q.   So what were there, some handwritten notes that
13  you might have had or was there anything at all?
14     A.   There was -- there were no -- there were no
15  informal documents nor were there formal documents.
16     Q.   Did you have any handwritten notes on it?
17     A.   On the PALD?
18     Q.   Yeah.
19     A.   Oh, sure.  Sure.
20     Q.   Like you might have, say, a meeting agenda and
21  you would have your thoughts in the margins or things
22  like that?
23     A.   Yes.  Yeah.
24     Q.   That's pretty common?
25     A.   Yeah.

Page 160

1      Q.   Okay.  So you told them about you -- you gave
2   them information about what was going on in PALD when
3   you were on the committee?
4      A.   Yes.
5      Q.   And that's when you were a rep -- you were a
6   representative of SFA on that committee?
7      A.   Yes.
8      Q.   Okay.  And what other types of information did
9   you give plaintiffs' counsel?
10     A.   I recall one of the questions was regarding a --
11  previous instances, if I recalled any instances that --
12  of false engagement, and I said sure and one that came
13  to mind initially was the -- was the Steven Bowles
14  claim.
15     Q.   Okay.  Just quickly jumping back on the topic of
16  compensation, I assume you were also reimbursed for
17  your travel to come here?
18     A.   Yes.
19     Q.   To Hartford?
20     A.   Well, eventually I will be.
21     Q.   You will be.  And you'll be reimbursed for your
22  hotel stay, too, I hope?
23     A.   Yes.
24     Q.   Okay.  Do you understand that you had no
25  obligation to appear in Hartford?

Page 161

1      A.   Yes.
2      Q.   You could have insisted that your deposition
3   occur closer to your home?
4      A.   Yes.
5      Q.   Okay.  And why did you decide that it would be
6   okay to come to Hartford?
7      A.   I didn't see anything wrong with it.  I mean, it
8   seemed like a -- seemed like a nice little trip.
9      Q.   Okay.  So earlier I asked you -- I think you had
10  said something to me like you didn't want to
11  communicate with myself or with, for example, Attorney
12  Chaykin about the case --
13     A.   Yes.
14     Q.   -- because you thought it would be unethical?
15     A.   Yes.
16     Q.   And would that be because you have this
17  consulting agreement with Mr. Heath and you're working
18  with plaintiffs' counsel?
19     A.   Yeah.  It just didn't seem right.  It didn't
20  feel right.
21     Q.   They're your client so it wouldn't make sense to
22  just have ex parte communications with the other side?
23     A.   That's -- yes.
24     Q.   Yeah, I understand.  So -- I apologize.  I'd
25  interrupted you.  You said you were giving plaintiffs'

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                      Roger D. Claypool

Page 162

1  counsel information, helping them find ex-employees?
2     A.   Yes.
3     Q.   Telling them about the extent that the PALD
4  committee may or may not have discussed or created
5  documents related to --
6     A.   Yes.
7     Q.   -- sudden collapse of height under load in a
8  jack stand?
9     A.   Yes.
10     Q.   Told them about prior instances you could think
11  of of false engagement?
12     A.   Yes.
13     Q.   It would be fair to say you told them generally
14  about prior jack stand cases that you were familiar
15  with?
16     A.   Yes.
17     Q.   Yeah.  So maybe not always limited to false
18  engagement?
19     A.   Perhaps.
20     Q.   Yeah.  Can you think of any other types of
21  information you provided them?
22     A.   Not off the top of my head.
23     Q.   Okay.  So I think you said -- well, did you
24  create any written materials for them or did you always
25  just communicate with them over the phone?

Page 163

1     A.   You know, I -- I have to think what I -- what
2  the questions were that they asked and I may have
3  provided -- I believe I provided a -- the whereabouts
4  or the -- where I thought they could find the
5  ex-employees and as well the name of -- the names of
6  the people that I recalled were involved in or -- the
7  cases that may have been -- that may have been the
8  false engagement claims.
9     Q.   Okay.  So maybe you wrote those things in an
10  email?
11     A.   I believe I scanned them and sent them, yes.
12     Q.   You --
13     A.   Sent in an email.
14     Q.   You scanned --
15     A.   My notes.
16     Q.   -- a handwritten document?
17     A.   Yes.
18     Q.   So you might make a list of jack stand cases and
19  you'd scan it and email it?
20     A.   Yes.
21     Q.   Okay.
22     A.   Yes.  Along with the names and possible
23  locations of deponents.
24     Q.   Okay.  And did you ever create any electronic
25  documents like spreadsheets or anything like that?

Page 164

1     A.   Not that I recall.  Not that I recall.
2     Q.   And you said this communication was sort of --
3  is it fair to say it was intermittent?
4     A.   Yes.
5     Q.   Like you said, there would be --
6     A.   It was very sporadic.
7     Q.   -- long periods of lapses?
8     A.   Yes.
9     Q.   Okay.  Did there come a time closer to this
10  deposition where you started communicating more
11  frequently to get ready for the deposition?
12     A.   It was still fairly infrequent.  It wasn't like
13  it was an everyday occurrence.
14     Q.   Sure.
15     A.   Yeah.  Probably a couple times a month over the
16  last couple, three months.
17     Q.   So about twice a month for the past three
18  months?
19     A.   Approximately.  Approximately.
20     Q.   To get ready for your deposition?
21     A.   They were primarily just asking questions.
22     Q.   Like what kinds of questions?
23     A.   Do I recall -- did I recall specific testing
24  protocols, did I know -- was I familiar with testing
25  procedures and processes, how was I -- you know, we

Page 165

1  discussed my work on the committee.
2     Q.   Okay.
3     A.   And -- and after they had my resume, they wanted
4  to know, you know, more details of that.
5     Q.   Of course.  Did they ever provide you a list or
6  outline of questions that you might be asked at your
7  deposition?
8     A.   No.
9     Q.   Huh?
10     A.   No.
11     Q.   No.  So you had a meeting, an in-person meeting,
12  yesterday with plaintiffs' counsel, correct?
13     A.   Yes.
14     Q.   And that -- was that here in Hartford?
15     A.   Yes.
16     Q.   At this law office, Day Pitney?
17     A.   Yes.
18     Q.   Okay.  And before that, did you -- say, the day
19  before, did you have a phone call or anything like
20  that?  Had you come to Hartford yet?
21     A.   Yes.  I had been here -- I had come the day
22  before.  It was a travel day and the only communication
23  that I recall was just I think I sent Howard a note
24  saying I made it or something like that, but it was
25  limited to that.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                              Roger D. Claypool

| Page 166 |
|---|
| 1    Q.   So you didn't actually start working to prepare |
| 2  for the deposition until yesterday? |
| 3    A.   Correct. |
| 4    Q.   Other than the review that you did at your house |
| 5  before you came out here, the document review? |
| 6    A.   Well, technically, my travel time is work as |
| 7  well so -- |
| 8    Q.   Sure. |
| 9    A.   -- but -- |
| 10   Q.   We're in agreement there, my friend. |
| 11   A.   You got it.  So yes. |
| 12   Q.   Okay.  So yesterday what time did you come in to |
| 13  meet? |
| 14   A.   I believe it was 9:30. |
| 15   Q.   Okay.  And what time were you done? |
| 16   A.   3:30. |
| 17   Q.   Okay.  And did they go over the general ground |
| 18  rules of what goes on in a deposition? |
| 19   A.   Yes. |
| 20   Q.   Which you already probably knew? |
| 21   A.   Yes but it's been some time. |
| 22   Q.   It's good to have a refresher. |
| 23   A.   Yes, it is. |
| 24   Q.   Yeah.  And did they give you an idea of the |
| 25  subject matter that they would be asking you about? |

| Page 167 |
|---|
| 1    A.   Not specifically.  I saw some exhibits for the |
| 2  first time and that's about it.  I mean, some -- very |
| 3  little -- very little discussion of the details within |
| 4  the exhibits. |
| 5    Q.   Okay.  A six-hour meeting is a pretty |
| 6  significant meeting.  What did you talk about?  What |
| 7  did you do for six hours? |
| 8    A.   Well, we just -- we talked about the case, went |
| 9  over again my duties at Shinn Fu and, of course, that |
| 10  in itself, getting the details of that of 20-plus years |
| 11  of service into six hours, that's -- |
| 12   Q.   Yeah. |
| 13   A.   -- that would take quite a bit of time. |
| 14   Q.   Based on the way Attorney Elliott was |
| 15  questioning you, it looks like you had already told him |
| 16  about or -- told someone on plaintiffs' counsel team |
| 17  about some discovery responses that you might disagree |
| 18  with or taken issue with? |
| 19   A.   I don't understand. |
| 20   Q.   The discovery responses that you were being |
| 21  questioned about today, exhibits -- |
| 22   A.   Oh, sure. |
| 23   Q.   This wasn't your first time seeing those? |
| 24   A.   No.  No. |
| 25   Q.   Right. |

| Page 168 |
|---|
| 1    A.   Yesterday. |
| 2    Q.   Okay.  So you saw those yesterday? |
| 3    A.   Yes. |
| 4    Q.   But you talked to plaintiffs' counsel about |
| 5  responses that you might have disagreed with or taken |
| 6  issue with? |
| 7    A.   Sure. |
| 8    Q.   All right.  So you already knew that those |
| 9  questions were coming today? |
| 10   A.   Well, not for certain. |
| 11   Q.   But you were prepared? |
| 12   A.   But -- but I was -- I was anticipating the worst |
| 13  and hoping for the best. |
| 14   Q.   As we all do.  Absolutely.  And the -- when |
| 15  Attorney Elliott was asking you about some other jack |
| 16  stand incidents or claims, he was frequently prompting |
| 17  you with the name of a claimant.  Is that possibly from |
| 18  a list that you had provided to him? |
| 19   A.   It was probably -- well, yes.  It would have |
| 20  been in the communication that -- where I provided |
| 21  Bowles.  I just, you know, it's one of those things |
| 22  where I couldn't -- I couldn't remember, you know, at |
| 23  the moment. |
| 24   Q.   Right.  But -- yeah.  You had previously -- |
| 25   A.   Yes. |

| Page 169 |
|---|
| 1    Q.   -- told them about it? |
| 2    A.   Yes. |
| 3    Q.   So, then, when you were reminded, it -- |
| 4    A.   Yes. |
| 5    Q.   -- helps you remember everything? |
| 6    A.   Sure. |
| 7    Q.   I understand.  So did plaintiffs' counsel -- |
| 8  what kind of discussions did they have with you, if |
| 9  any, about privilege or work product, things you might |
| 10  have been exposed to when you were working for SFA? |
| 11   A.   That I was exposed to in SFA?  They told me that |
| 12  they didn't want to know about those types of |
| 13  discussions with respect to anything, and they were -- |
| 14  I think I heard it in the morning, I heard it in the |
| 15  afternoon, I heard it this morning, that they were not |
| 16  after anything that was privileged. |
| 17   Q.   Now, they were -- |
| 18         THE VIDEOGRAPHER:  Five minutes. |
| 19         MR. ZAKRZEWSKI:  Thank you. |
| 20   Q.   (By Mr. Zakrzewski)  So they were more concerned |
| 21  with factual information investigations -- |
| 22   A.   Yes. |
| 23   Q.   -- you did at SFA? |
| 24   A.   Yes. |
| 25   Q.   Okay.  Now, I'm guessing that this morning was |

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                     Roger D. Claypool

Page 170

```
 1   the first time you've ever heard an argument like
 2   Attorney Elliott and I had about materials prepared in
 3   anticipation of litigation; is that fair to say?
 4   A.   Yes.
 5   Q.   Yeah.  So as you were having conversations about
 6   your factual investigations at SFA with plaintiffs'
 7   counsel, that's not necessarily something that you as a
 8   nonlawyer are thinking about, correct?
 9            MR. ELLIOTT:  Objection to the form.
10            THE WITNESS:  Correct.
11   Q.   (By Mr. Zakrzewski)  Okay.  So you did factual
12   investigations of cases going -- going back to 1993,
13   was it?
14   A.   Yeah.  Ninety -- '89 --
15   Q.   '89.  Going back even farther.
16   A.   -- '89 to '93, yeah.
17   Q.   I won't tell you how old I was in '89.
18   A.   Yeah, I know.
19   Q.   Doesn't matter.  It's not relevant.
20   A.   I had a lot of hair back then too.
21   Q.   And you continued to do those investigations
22   through -- throughout the '90s?
23   A.   Throughout the '90s --
24   Q.   Through the early 2000s?
25   A.   -- early 2000s.
```

Page 171

```
 1   Q.   And Arthur Chaykin came on in 2005 --
 2   A.   Yes.
 3   Q.   -- and kept doing it through the end?
 4   A.   Yes.
 5   Q.   And so you had information about all these
 6   factual investigations that you were able to share with
 7   plaintiffs' counsel?
 8   A.   Yes.
 9   Q.   Okay.
10            MR. ZAKRZEWSKI:  I'd like to take a
11        short break so that we don't end up
12        changing the tape at an awkward time.
13            THE VIDEOGRAPHER:  Going off the
14        record at 2:09.
15            (A brief recess was taken.)
16            THE VIDEOGRAPHER:  We're on the
17        record at 2:18.
18   Q.   (By Mr. Zakrzewski)  Oh, do you know
19   approximately when you made the list of other jack
20   stand cases for plaintiffs' counsel?
21   A.   I would -- I would -- I would guess earlier
22   this -- earlier this year.
23   Q.   Early 2016?
24   A.   I believe so.  I believe so.
25   Q.   Late winter, early spring?
```

Page 172

```
 1   A.   Yes.  Yeah.
 2   Q.   Now, one thing I wanted to ask you about, you
 3   gave some testimony earlier about sort of the
 4   relationship between Shinn Fu Taiwan -- I call it Shinn
 5   Fu Corporation.
 6   A.   Yeah.
 7   Q.   What do you call it?
 8   A.   I call it SP -- yeah, SFC, Shinn Fu.
 9   Q.   I call it SFC too.  So the relationship between
10   SFC, SFA, which I mean Shinn Fu America.  I think you
11   also -- you talked about some other --
12   A.   Entities.
13   Q.   -- Shinn Fu Australia and --
14   A.   Yes.
15   Q.   -- other countries as well?
16   A.   Yes.
17   Q.   And I think you may -- did you mention MVP in
18   that conversation as well --
19   A.   Yes.
20   Q.   -- do you recall?
21   A.   Yes.
22   Q.   Did you also mention Wei Fu?
23   A.   Yes.
24   Q.   Taishan Machinery and Electric?
25   A.   Yeah.
```

Page 173

```
 1   Q.   Okay.  Is it fair to say you wouldn't know
 2   anything about the relationships between those
 3   companies after you left SFA?
 4   A.   That'd be fair.
 5   Q.   Yeah.  And when you were at SFA, you were a sort
 6   of hands-on person, correct?
 7            MR. ELLIOTT:  Objection to the form.
 8            THE WITNESS:  Yes.
 9   Q.   (By Mr. Zakrzewski)  You're working with
10   products?
11   A.   Yes.
12   Q.   You're testing products?
13   A.   Yes.
14   Q.   That's the purview of your responsibilities,
15   correct?
16            MR. ELLIOTT:  Objection to the form.
17            THE WITNESS:  I'd say my
18        responsibilities became more -- less
19        percentage of time spending hands-on and
20        more conveying my hands-on experience and
21        knowledge and skill to others, whether it
22        be a customer or a new employee.
23   Q.   (By Mr. Zakrzewski)  Now, did you serve on the
24   board of directors?
25   A.   Of Shinn Fu?
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                              Roger D. Claypool

Page 174

```
1    Q.   Yeah.
2    A.   No, sir.
3    Q.   And did you own any shares in the company?
4    A.   No.
5    Q.   Okay.  Were you involved in the company's
6    finances?
7    A.   No.
8    Q.   So to your knowledge, the finances of these
9    separate companies -- you would agree that they're
10   separate companies, correct?
11             MR. ELLIOTT:  Objection to the form.
12   Q.   (By Mr. Zakrzewski)  You would agree that SFA is
13   a separate legal entity than SFC, correct?
14             MR. ELLIOTT:  Objection to the form.
15             THE WITNESS:  I wouldn't know
16        personally how to differentiate it with
17        respect to -- I know that SFA is SFA.  MVP
18        Canada is MVP Canada, and at the time I was
19        there, we all reported to SFT --
20   Q.   (By Mr. Zakrzewski)  Right.
21   A.   -- but -- is that what you're --
22   Q.   Yeah.  In a way.
23   A.   Yeah.
24   Q.   You understand that they were separate
25   companies?
```

Page 175

```
1    A.   Yes.
2             MR. ELLIOTT:  Objection to the form.
3    Q.   (By Mr. Zakrzewski)  They were separate legal
4    entities?
5    A.   That I couldn't --
6    Q.   Okay.
7    A.   I don't know.
8    Q.   So you understand the term "companies"; you
9    understand they're separate companies?
10   A.   Yes.
11   Q.   They were separate businesses?
12   A.   Yes.
13   Q.   Okay.  And they functioned independently?
14             MR. ELLIOTT:  Objection to the form.
15             THE WITNESS:  Yes.
16   Q.   (By Mr. Zakrzewski)  Okay.  And to your
17   knowledge, they didn't, for example, share each others'
18   bank accounts?
19   A.   Not that I know of.
20   Q.   Right.  The finances were kept separate?
21   A.   I don't know.
22   Q.   You don't know because you weren't a financial
23   guy?
24   A.   Correct.
25   Q.   You didn't work on that end of it?
```

Page 176

```
1    A.   Correct.
2    Q.   So in terms of if there were or were not any
3    specific shared services or agreements relating to
4    specific shared services, you wouldn't be privy to all
5    of that?
6    A.   I was privy to -- the only thing I was privy to
7    in that arena was the agreement that MVP Hong Kong
8    would pay for claims related to their product that
9    arose from our claims and litigation issue and that
10   Xinhai would, you know, they would take care of that
11   through MVP Hong Kong as well.  I mean, that's the only
12   thing I -- that I knew took place.
13   Q.   So to the extent --
14   A.   Because I would speak with them directly from my
15   home because, you know, the time zone would be --
16   Q.   Yeah.
17   A.   -- convenient for both of us so that I spoke
18   with MVP Hong Kong.  I spoke with SFT on occasion on
19   just those things.
20   Q.   But you knew nothing about sort of the
21   bookkeeping?
22   A.   No.
23   Q.   The --
24   A.   No.
25   Q.   -- other contractual formalities organizing the
```

Page 177

```
1    arrangements between the companies?
2    A.   No.
3    Q.   Okay.  You didn't know the specific economic
4    relationship between the companies?
5    A.   Correct.
6    Q.   You don't know who owns shares of what?
7    A.   Correct.
8    Q.   Okay.  Do you understand that the companies, for
9    example -- let's just take a really simplistic example.
10   You mentioned MVP Canada and you said you consider it
11   to be part of a -- it's somehow related but you're not
12   sure how with, say, Shinn Fu Australia?
13   A.   Yes.
14   Q.   Right?
15   A.   Yes.
16   Q.   But MVP Canada may well be selling products to
17   Canadian customers without any involvement from Shinn
18   Fu Australia whatsoever?
19   A.   True.
20   Q.   Okay.  And in the same token, any one of those
21   companies might be selling products directly to certain
22   customers without the involvement, without any
23   involvement of any of the other businesses or
24   companies?
25   A.   That's conceivable.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

Page 178

1   Q.   Yeah, okay.  So just because you consider these
2   companies to be under a certain umbrella, call it the
3   SFC umbrella, doesn't mean that they're all handling
4   each other's products?
5   A.   That's fair.
6   Q.   Okay.  Do you have any knowledge of a
7   relationship whereby MVP could sell products directly
8   to Sears?
9   A.   Would you --
10  Q.   Did you have any knowledge of a relationship
11  whereby MVP could sell products directly to Sears?
12  A.   Yes.
13  Q.   Okay.  So you understood that MVP could provide
14  products to Sears without SFA being in the stream of
15  that sale?
16  A.   Yes.
17  Q.   And you acknowledge that to the extent -- I
18  think you gave -- you gave an example about -- you just
19  gave an example when I asked you about shared
20  services --
21  A.   Oh, sure.
22  Q.   Yeah.  You understand that any arrangement like
23  that and including that specific arrangement may have
24  changed after you left?
25  A.   Sure.

Page 179

1   Q.   And you wouldn't know about that?
2   A.   That's correct.
3   Q.   Okay.  Now, as far as owners' manuals, you said
4   that you were involved in drafting language for owners'
5   manuals?
6   A.   Yes.
7   Q.   And you were involved in drafting language for
8   warnings?
9   A.   Yes.
10  Q.   Were you involved in creating product packaging
11  at all?
12  A.   Only signing off on the safety aspects of them.
13  Q.   Right because --
14  A.   And compliance.
15  Q.   Sometimes there's warnings right on the box?
16  A.   Yes.  Yeah.  Many times.
17  Q.   So back when you were working there, those
18  warnings that were on the box, those might have been
19  derivative of something that you had drafted in the
20  manual, right?
21  A.   Yes.
22  Q.   Yeah.  They might just take it and put it right
23  on the box?
24  A.   Yeah.  Yes.
25  Q.   Now, you mentioned -- I think you testified that

Page 180

1   you were drafting warnings and manuals at a time when
2   you became aware of what you've termed "the false
3   engagement phenomenon"?
4   A.   Yes.
5   Q.   And you didn't add a warning about that?
6   A.   I did not.
7   Q.   Okay.  And why not?
8   A.   I could not make that judgment alone.
9   Q.   Okay.
10  A.   And by the time Arthur arrived, it was -- it was
11  decided that a -- I wish I could remember his exact
12  term, that we would watchfully wait or waitful
13  watching.  I can't remember the exact term he used but
14  that he would take it from there basically, that he
15  would notify who needed to be notified about what to do
16  with respect to any warnings or additional verbiage.
17  Q.   Okay.  So you never drafted a proposed warning
18  on this point?
19  A.   No, I did not.
20  Q.   Okay.  And you didn't recommend to anyone that
21  this be implemented?
22  A.   Yes, I did recommend that -- that we either
23  change the design or go to the extent of identifying
24  specific lift points and --
25  Q.   Okay.  So --

Page 181

1   A.   -- to mitigate the event.
2   Q.   Well, I asked you a different question.
3   A.   Okay.
4   Q.   I object to that response just on the basis.  My
5   question was about drafting a warning.
6   A.   Okay.
7   Q.   You didn't recommend that a warning be added to
8   specifically address this false engagement phenomenon
9   you claim?
10  A.   That's correct.
11  Q.   Okay.  Now, you did -- you thought about
12  changing the design, which is something you had
13  testified about earlier, correct?
14  A.   Yes.
15  Q.   And you thought about adding more information on
16  proper lift points in the product literature?
17  A.   Yes.
18  Q.   That's something you considered?
19  A.   Yes.
20  Q.   Okay.  Now, you're not aware of what changes
21  might have been made after you left the company?
22  A.   Not at all.
23  Q.   Okay.  Have you seen the specific product manual
24  at issue in this case?
25  A.   No.

Page 182

1    Q.   No.  So you don't know whether it's one that you
2    drafted or not?
3    A.   That's correct.  I do not know.
4    Q.   Okay.  So it may well have been drafted
5    completely outside of SFA?
6    A.   Yes.
7    Q.   In fact, SFA might have stopped drafting manuals
8    after you left?
9    A.   Certainly.
10   Q.   Okay.  I'd like to ask you about -- I'd like to
11   ask you about -- I'm trying to ask you about the names
12   of claimants that you identified, and I'll try and do
13   it in the order you identified them in.
14   A.   Okay.
15   Q.   The first one you talked about was Jeffcoat in
16   Columbia, South Carolina --
17   A.   Yes.
18   Q.   -- sometime in the late '90s or early 2000s?
19   A.   Yes.
20   Q.   You said -- and you said perhaps Shinn Fu
21   America was a party or was somehow involved or perhaps
22   Shinn Fu Corporation was a party or somehow involved?
23   A.   And I say that if -- if they were SFT jack
24   stands -- I don't believe they were.  I believe they
25   were MVP --

Page 183

1    Q.   Okay.
2    A.   -- but they would have come through -- through
3    SFA.
4    Q.   Okay.  So you said someone was using -- had a
5    Lincoln town car on six jack stands?
6    A.   Yeah.  Yes.
7    Q.   Is that a proper way to use jack stands?
8    A.   It could be proper.
9    Q.   The use of six jack stands could be proper?
10   A.   It could be.
11   Q.   Okay.  And how could that be?
12   A.   If they were using -- in this case, they were
13   removing a transmission.
14   Q.   Okay.
15   A.   So they had to support the front end and the
16   transmission and the rear end independently basically
17   of each other and that's -- that was our understanding
18   of what this guy was doing.
19   Q.   Do you think that was the proper use of jack
20   stands?
21   A.   It's not what I would have done but I can see
22   where he might have accomplished it had it -- had it
23   not fallen and killed him.
24   Q.   Wasn't there an obvious safety risk there from
25   using six jack stands at once?

Page 184

1    A.   I would not call it an obvious safety issue.
2    Q.   But you would say it created a safety risk?
3    A.   The way he had it set up created the safety
4    risk.
5    Q.   And what about the way he had it set up created
6    that --
7    A.   It was imbalanced.  It was imbalanced.
8    Q.   What do you mean by "imbalanced"?
9    A.   He had -- he had two long reach 6-ton jack
10   stands under the front bumper.  He had two 3-ton jack
11   stands under the front suspension and two 2-ton jack
12   stands under the -- at the rear support points along
13   the ladder frame, the rear of the ladder frame.
14   Q.   Okay.  And so what about that was problematic?
15   A.   Well, what that does is when he was underneath
16   there working on it and what we suspect happened was
17   somebody came and leaned on the -- the oldest son, we
18   suspect, leaned on the rear of the car.  The two
19   lightest stands with the two smallest ratchet bars then
20   pivoted laterally toward the -- from the passenger side
21   to the driver side.  They pivoted on the suspension --
22   one of the suspension jack stands and basically just
23   disengaged the front jack stands altogether.  So it
24   just tumbled like this and down.
25   Q.   So he was using unmatched sets of jack stands?

Page 185

1    A.   Yes.  Three unmatched sets.
2    Q.   And he was not necessarily using all proper
3    lifting points?
4    A.   Yeah -- yes.
5    Q.   Right.  Okay.  Now, do you remember specifically
6    what models of jack stands those were?
7    A.   I do not.
8    Q.   Do you have any way of knowing?
9    A.   I don't know if I have my -- I don't know if I
10   have my -- any information on that or not.
11   Q.   You might have some documents that -- like in a
12   personal --
13   A.   I might have some documents.
14   Q.   At home, okay.
15   A.   I believe they were 6302s.  That's a -- that was
16   the two-ton model at the time, but I don't recall.
17   Q.   Now, you also -- you said that you testified at
18   trial once in a Guerra case in Texas?
19   A.   Yes.
20   Q.   Which I think you then ballparked was about
21   mid-2000s, thereabout?
22   A.   Thereabouts.
23   Q.   And you said you don't remember any of the
24   details of that case?
25   A.   No.  I remember some details of the case.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                           Roger D. Claypool

Page 186

1    Q.   Okay.  What do you remember about that case?
2    A.   It -- they had a bus supported by two 6-ton jack
3    stands on -- in a bus barn that had caliche as a
4    loading surface.
5    Q.   What's that?
6    A.   Caliche is like -- it's the soil -- it's the
7    soil of south Texas is what it is and it's basically,
8    for lack of a better term, it's calcium.  And so you
9    can pack it so that you can drive on it and it seems to
10   present a hard level surface, but when you load it with
11   a jack stand base, it will sink.
12   Q.   Sounds like a user error?
13   A.   It -- it sinks and then it -- all sorts of
14   things can happen.
15   Q.   Okay.  Now, I think the next one that you talked
16   about was Bowles, B-o-w-l-e-s, in Illinois around 2005?
17   A.   That was a claim.
18   Q.   That was a claim?
19   A.   Yeah.  That was a --
20   Q.   Now, you don't remember whether or not Arthur
21   Chaykin was employed at this time?
22   A.   I do not because he was not involved with it.
23   He didn't have any -- I don't remember any interaction
24   with him at all on it.
25   Q.   So that case never went to litigation?

Page 187

1    A.   No.  It was -- it was your -- it was a typical
2    claim that -- that met the criteria, one, it was an
3    injury; and two, the damages claimed were over $10,000.
4    And so William decided to send me up there to see what
5    I could do.
6    Q.   Now, do you remember what model jack stands were
7    at issue there?
8    A.   No, I don't off the top of my head.  I -- they
9    were Sears branded.  That was one of the -- that was
10   one thing I do recall and --
11   Q.   You don't remember the capacity?
12   A.   They were -- I believe they were three-ton.
13   Q.   Are you sure?
14   A.   I am not sure.
15   Q.   Okay.  Do you have any documents about that one,
16   about the Bowles case?
17   A.   No.  Just my -- just my note that I made when I
18   was doing -- when I compiled a little list working on
19   the feasibility of those alternative designs.
20   Q.   Okay.
21   A.   You know, just -- that was my -- those were
22   my -- Bowles changed my thinking on the feasibility of
23   this.
24   Q.   Yeah.  You said that.
25   A.   Yeah.  And so those four were my focus on how

Page 188

1    to -- what would I do to mitigate that risk.
2    Q.   Okay.
3    A.   So...
4    Q.   Now, you obviously -- you didn't witness the
5    Bowles' incident?
6    A.   No.
7    Q.   You traveled there after the fact?
8    A.   Yes.
9    Q.   So you don't know exactly what happened?
10   A.   I can only go by what he described.
11   Q.   And he was never deposed to your knowledge?
12   A.   No.
13   Q.   Because it was not in litigation?
14   A.   Correct.
15   Q.   Okay.  And you never did an accident
16   reconstruction?
17   A.   To the best -- using the tools I had with me,
18   which were crude, I was able to determine that the site
19   presented a hard level surface.  There was no reason to
20   believe that there was a sink and slide scenario that
21   occurred.  And as a matter of fact, I recall the garage
22   area and it was -- it was disheveled but it was -- it
23   was doable.
24   Q.   Okay.  You don't know exactly where he had
25   placed the jack stands under the vehicle?

Page 189

1    A.   No.  That was simply indicated through his
2    questionnaire and I -- I didn't retain any of that
3    information.
4    Q.   And you're not like an expert in accident
5    reconstruction anyway?
6    A.   No.
7    Q.   No?
8    A.   No.
9    Q.   Okay.  And do you remember what type of vehicle
10   was --
11   A.   I believe --
12   Q.   -- reportedly involved?
13   A.   I believe it was a Ford Torino and I believe it
14   was a '70s model Torino.
15   Q.   Torino?
16   A.   Yeah.
17   Q.   What's that look like?
18   A.   A Ford Torino, it'd be hard to compare it to
19   anything today, but it's large ladder frame Ford V8 --
20   Q.   Okay.
21   A.   -- with --
22   Q.   I get the picture.
23   A.   Yeah.  It's a -- it's a heavy, old unit.
24   Q.   Okay.  And you said that your understanding
25   based on what the claimant said, which is the best

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                           Roger D. Claypool

Page 190

1   information you had --
2     A.   Yes.
3     Q.   -- was that he was using a pair of jack stands?
4     A.   Yes.
5     Q.   A matched pair?
6     A.   Yes.
7     Q.   Which is how the instructions tell you to use
8   them, correct?
9     A.   I believe so.
10    Q.   Yeah.  And there was some paint scraped off some
11  part of it?
12    A.   There was paint removed from the -- from the
13  ratchet, the front side of the ratchet, and the pawl
14  side of the ratchet consistent with like metal on metal
15  scraping that wouldn't be present in just normal use.
16    Q.   When you say -- it's tough because these things
17  are foresighted.  When you say "front" -- when you say
18  there was some scraping on the pawl side, you mean
19  where the pawl would connect with the teeth on the
20  ratchet bar, there was some scraped paint?
21    A.   That edge, yes, along that edge.
22    Q.   And also on the edge directly opposite of that?
23    A.   Yes.
24    Q.   There was paint scraped off of both --
25    A.   Yes.

Page 191

1     Q.   -- of those surfaces?
2     A.   Yes.  Yeah.
3     Q.   What else did you observe about that jack stand
4   that might have looked unusual to you?
5     A.   Nothing -- nothing that -- nothing remarkable.
6     Q.   Okay.
7     A.   Nothing remarkable that I recall.  I guess
8   that's -- that was one of the most unusual things about
9   it was that it wasn't damaged.  It wasn't crushed like
10  most are.
11    Q.   Most are crushed?
12    A.   Most are crushed as a result of the sudden loss
13  of height and getting caught up in the vehicle
14  components.
15    Q.   When you say "crushed," you mean a leg could be
16  broken off --
17    A.   Yeah.
18    Q.   -- a ratchet bar could be snapped?
19    A.   No.  The -- basically the base being crushed as
20  a result of an impact.
21    Q.   It would have an obvious physical deformity?
22    A.   Yes.
23    Q.   Even if I as a layperson was looking at it?
24    A.   Definitely.
25    Q.   This isn't something that you only can see

Page 192

1   because you --
2     A.   Correct.
3     Q.   -- know the product well?
4     A.   Correct.
5     Q.   Okay.  All right.  And so on the Bowles case,
6   you might -- did you say you might have some small
7   notes somewhere or do you think that's gone?
8     A.   No.  I'm certain I have a note that I -- yes.
9     Q.   Okay.  You have a handwritten note?
10    A.   Yes.
11    Q.   At your house?
12    A.   Yes.
13    Q.   How long is it?
14    A.   It's more of a -- it's a note on top of another
15  document.
16    Q.   So just a couple of words?
17    A.   Yeah.
18    Q.   Less information than what you've given me
19  today?
20    A.   Yes.  I mean about.  It's about the same
21  information.
22    Q.   Sure.  Now, I think you mentioned -- it was
23  after you were talking about the Bowles case, you
24  mentioned the names of some other claimants, and I
25  wanted to ask you if you recalled any details about

Page 193

1   what their claims were.  I can't find it right now
2   so -- oh, okay.  Christopher Hastedt?
3     A.   Hastedt.
4     Q.   Hastedt?
5     A.   Yes.
6     Q.   How do you think you spell that?
7     A.   Oh, boy, H-a-s-t-e-d-t.
8     Q.   Okay.  And when do you think that claim was?
9     A.   I have no idea.  Pre -- pre-Bowles, so between
10  '02 and '04 --
11    Q.   Okay.
12    A.   -- likely.
13    Q.   And this wasn't a litigated claim?
14    A.   No.  It's just a --
15    Q.   How did you find out about it?
16    A.   I believe that one came from -- I think Hastedt
17  came from CMI, from the Wal-Mart claims people, but I'm
18  not certain.
19    Q.   Okay.  And did you get any details on that
20  claim?
21    A.   I did but I wouldn't have retained any of the
22  details.  I recall some of the -- I just don't -- I
23  don't recall them.  I don't recall the details.  It was
24  a jack stand.
25    Q.   Do you have anything that could help you recall?

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                            Roger D. Claypool

Page 194

```
1    A.  No.
2    Q.  Okay.
3    A.  No.  I mean --
4    Q.  What do you remember?
5    A.  That it was a jack stand whose complaint was the
6    sudden and unexpected loss of load height.
7    Q.  You don't know any more information than that?
8    A.  No.  I don't even remember the vehicle or the --
9    or the -- whether it was changing oil or changing
10   shocks or just what the details of that one was.
11   Q.  You don't remember the type of vehicle?
12   A.  No.
13   Q.  You don't remember the location?
14           MR. ELLIOTT:  Objection to the form.
15           THE WITNESS:  I -- I don't remember
16       any of that.  I mean...
17   Q.  (By Mr. Zakrzewski)  You don't remember the
18   specific model of jack stand involved?
19   A.  I don't.  I don't.  I believe it was a 6902 as
20   well but I couldn't be certain.
21   Q.  You don't know how the end user was
22   purportedly using --
23   A.  No.
24   Q.  -- the jack stands at the time?
25   A.  Not off the top of my head.  And I didn't retain
```

Page 195

```
1    any -- any detailed information on those.  These were
2    notes I made to myself and I -- I may have details
3    regarding the type of vehicle in my notes, but I just
4    don't recall them because they weren't something that I
5    would normally retain.  I mean...
6    Q.  I'm going to ask you just a yes or no question.
7    A.  Yes.
8    Q.  Did you investigate that claim?
9    A.  Yes.  Yes because I -- I would have sent them a
10   questionnaire and all of that information --
11   Q.  Okay.
12   A.  -- would have been just part of the customer --
13   or my claims file.
14   Q.  Do you remember if you received a response to
15   that questionnaire?
16   A.  I don't.
17   Q.  Okay.  So there may have been no response?
18   A.  That's true.
19   Q.  Okay.
20   A.  That's possible.
21   Q.  You never made a site visit?
22   A.  Did not, no.  It just didn't meet the criteria.
23   Q.  Okay.  Now, the next one you talked about was
24   Gwen Zinn, Z-i-n-n?
25   A.  Yes.
```

Page 196

```
1    Q.  Do you remember when that was?
2    A.  I do not.
3    Q.  Not even a ballpark?
4    A.  Pre -- well, between 2000 and 2004ish.
5    Q.  That's quite a window.
6    A.  I know but...
7    Q.  No.  That's okay.
8    A.  I -- my purpose for making those notes initially
9    were just to give me -- to help in the design of this
10   auxiliary device, and those were the four that just --
11   I was not able to explain at the time.  I -- I could
12   not say with certainty how it occurred so...
13   Q.  Do you remember -- how did you learn about that
14   one, if you know?
15   A.  I don't.  I don't remember any of the details of
16   Zinn off the top of my head.
17   Q.  No idea what the setup was or what vehicle --
18   A.  No.
19   Q.  -- was being used?
20   A.  No.
21   Q.  If you sent a questionnaire, you don't know if
22   you got a response?
23   A.  I couldn't positively say yes or no to that.
24   Q.  No site visit?
25   A.  No site visit definitely.  Of those -- of those,
```

Page 197

```
1    Bowles was the only site visit in those.
2    Q.  And then the last one was William Sloan?
3    A.  Yes.
4    Q.  S-l-o-a-n --
5    A.  Yes.
6    Q.  -- your best guess?
7    A.  Yes.  And I did receive those stands I recall.
8    Q.  Okay.
9    A.  And they exhibited the -- the classic crushing
10   mark or condition that I'd seen so many times before.
11   Q.  What do you mean by -- if you could just give me
12   a little more information on that.
13   A.  When they -- when the jack stand fails, it -- it
14   either is captured by the vehicle as the vehicle falls
15   and then is crushed by the -- by some component of the
16   vehicle.
17   Q.  Do you know when the Sloan incident occurred?
18   A.  No.  Again, that same timeline.
19   Q.  Okay.  Do you know where it occurred?
20   A.  No.
21   Q.  Do you know how you found out about it?
22   A.  That may have been -- no, I don't.
23   Q.  Don't know?
24   A.  No.
25   Q.  Do you know if you ever got a response to a
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                                                          Roger D. Claypool

Page 198

1 questionnaire on it?

2    A.    I do not.

3    Q.    All right.  You mentioned that you were the vice

4 president of the portable automotive lifting device

5 committee --

6    A.    Vice chair.

7    Q.    Vice chair?

8    A.    Yes.

9    Q.    And you said for three terms?

10   A.    Yes.

11   Q.    And could you give me a date range there for

12 what those three terms were?

13   A.    I wish I could.  I could -- I could get that

14 information for you but I -- I just -- I don't recall.

15 Through -- if I had to guess, I believe they were

16 three-year terms but they may have been two-year terms.

17 I don't recall.  But from 2009 --

18   Q.    Back?

19   A.    Back, yeah.

20   Q.    So it could have been from 2009 back to 2003 if

21 it was two-year terms or 2009 back to 2000 if it was

22 three-year terms?

23   A.    Yeah.  Yeah.  I could look at my publications

24 but -- I think I have my publications up to date.

25   Q.    Okay.

Page 199

1    A.    The ASME PALD if you --

2    Q.    I'd go ahead and hold onto those if I were you.

3    A.    I will.

4    Q.    So you're the vice chair.  You said there were

5 no either informal documents or formal discussions of

6 the false engagement phenomenon?

7    A.    There were no formal discussions that I recall.

8 You know, other members may remember it differently but

9 I -- I don't recall any.  I do recall many informal

10 discussions between -- between groups of us and...

11   Q.    And this is a phenomenon that you claim to have

12 been aware of during that period?

13   A.    Yes.

14   Q.    Okay.  And were any changes made to the PALD

15 safety guidelines to combat false engagement?

16   A.    No.  We considered -- we considered mandating

17 secondary load holding devices so -- or redundant load

18 holding devices but felt that because it's a voluntary

19 standard, that we should let each individual company

20 make their own business decision on that unless --

21 unless we wanted to all agree to do that.  And you have

22 to understand that it would take a majority vote to

23 make those changes and it likely would not have

24 entertained even a vote.

25   Q.    So you didn't propose a false engagement

Page 200

1 protocol or anything like that?

2    A.    Privately we did amongst each other, you know.

3 There were four of us -- four of ten or twelve at any

4 given time that were -- would like to have seen

5 something in that, but only one of -- only one of them

6 took action and they went to market with one.

7    Q.    That's the one you described earlier?

8    A.    Yeah.  Yeah.  Allied.  David Renard was the

9 committee rep from them.  He was their engineer and

10 they came up with -- with their own.

11   Q.    Okay.  So there was nothing that you officially

12 put before the committee for a vote or anything like

13 that --

14   A.    No.

15   Q.    -- on false engagement?

16   A.    That's correct.

17   Q.    Or to combat false engagement?

18   A.    That's correct.

19   Q.    Now, you mentioned that there were two

20 alternative designs --

21   A.    Yes.

22   Q.    -- that you considered.  One involved a double

23 pawl; is that what you said?

24   A.    A double pawl on the -- on one side; in other

25 words, on the existing side.

Page 201

1    Q.    Can you describe that in such a way that might

2 help me visualize it?

3    A.    I'll try.

4    Q.    Okay.

5    A.    It might help if we had a stand in here but I'll

6 try to do it.

7    Q.    Well, if you're deposed again, we'll make sure

8 we bring a stand.

9    A.    The release lever or the -- we'll call it the

10 handle is pivotally attached to the pawl, and as you

11 lift the handle, the pawl is biased one direction and

12 lower -- it's biased another direction, okay.  Lift, it

13 goes this way, lift, okay.  So if you added another

14 linkage to the handle and added a second spring-biased

15 pawl that would engage the ratchet on that same side,

16 it might -- number one, it would prevent

17 unintentional -- unintentional disengagement by the

18 ratchet bar going up and disengaging and it would be a

19 secondary basically self-locking engagement.

20   Q.    So you envisioned two pawls connected to the

21 same handle?

22   A.    Yes.

23   Q.    Did you ever create this product?

24   A.    No.  I just created a drawing that detailed the

25 concept.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016
Roger D. Claypool

Page 202

1   Q.   Okay.  So you were never able to test it --
2   A.   No.
3   Q.   -- to see if there were any other issues that
4   would be created by this design?
5   A.   No.
6   Q.   And you ever do a cost feasibility study?
7   A.   No.
8   Q.   You ever evaluate the precise cost that it would
9   take to implement those measures?
10  A.   No.
11  Q.   So when you were testifying earlier about --
12  about cost, you're basically going based on a feeling?
13  A.   I can -- I think I can safely testify to the
14  fact that when you add materials, you add cost.  The
15  only way we would be able to eliminate cost would be
16  eliminate materials.
17  Q.   But you never actually did a cost -- you never
18  priced it out?
19  A.   Correct.
20  Q.   So you don't know how much cost it added versus
21  how much safety it would have added?
22  A.   Correct.
23  Q.   You never got to that stage?
24  A.   That's correct.
25  Q.   Okay.  Now, you mentioned a second one that

Page 203

1   involved --
2   A.   Yes.
3   Q.   -- some modification of the design of the collar
4   of the jack stand?
5   A.   Actually it would have -- it would have been the
6   most simple but it required assembly of a three-piece
7   collar engagement, for lack of a better term.
8   Q.   Can you try to explain it to me.
9   A.   Yes.  This would have been bolted to the ratchet
10  and would have nested upon the existing collar and
11  would have moved up and down with the ratchet bar.
12  Q.   A second collar?
13  A.   Yes.  A removable collar.
14  Q.   It would have been bolted where on the ratchet
15  bar?
16  A.   Directly to the ratchet bar.
17  Q.   Directly to what portion of the ratchet bar?
18  A.   Across the flat or front and --
19  Q.   The side opposite where the teeth are?
20  A.   Correct.
21  Q.   Okay.  You would bolt it how high up the ratchet
22  bar?
23  A.   Wherever -- wherever your primary was initially
24  set.
25  Q.   So there would be --

Page 204

1   A.   It would engage --
2   Q.   -- a series of holes?
3   A.   No.
4   Q.   No?
5   A.   It would have used the existing rack.  It would
6   have used the existing rack.
7   Q.   How could you get it to different heights is my
8   point?
9   A.   You'd have to disengage the device in order to
10  raise it or lower it -- actually, no.  Just to lower
11  it.  It would prevent lowering it under any condition.
12  Q.   It's bolted to the front of the jack stand.  How
13  do you get the ratchet bar down?
14  A.   To the ratchet bar.
15  Q.   Yeah.  How do you get the ratchet bar down?
16  A.   Remove the device.
17  Q.   You have to remove this collar?
18  A.   Yes.
19  Q.   And then you bring the ratchet bar down to a
20  desired height and then what do you do?
21  A.   Bolt it -- bolt this device in place.  It
22  captures the next indentation on the ratchet bar, the
23  rack side, and then it's secured --
24  Q.   When you say "the rack side," that's the side
25  where the teeth are?

Page 205

1   A.   Correct.
2   Q.   Okay.
3   A.   And then it is secured by means of a stud and
4   bolt to the front side, to the flat.
5   Q.   So that's -- that bolt is not going through a
6   hole --
7   A.   No.
8   Q.   -- bored into the ratchet bar?
9   A.   No.
10  Q.   It's just creating pressure against the ratchet
11  bar?
12  A.   Yes.
13  Q.   Okay.
14  A.   Yes.  It engages the rack and then is bolted
15  to -- bolted to it, much like if you can envision a
16  U-bolt, they're three pieces.
17  Q.   Okay.  Did you actually -- did you ever create
18  that?
19  A.   No.  No.  Just a -- again, just a detailed
20  drawing of the concept.
21  Q.   Okay.  You never did a cost study on that?
22  A.   No, sir.
23  Q.   Never tested for any other issues that it might
24  create?
25  A.   No.  No.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                              Roger D. Claypool

Page 206

1    Q.   Now, you said Allied made some sort of a
2    different design.  Was it one of the two that you just
3    described or was it something slightly different than
4    either of those?
5    A.   Slightly different than either of those.
6    Q.   Can you try and explain it to me.
7    A.   As I recall, it was a block that ran through the
8    existing collar, and when I say the "collar," that's
9    the portion that is welded to the legs, the base legs,
10   and is a formed element that houses the ratchet bar,
11   okay.  So this design was on the opposite side what I
12   called the flat.
13   Q.   Opposite the teeth?
14   A.   Correct.
15   Q.   Mm-hmm.
16   A.   And it went through the collar, through the
17   ratchet bar, and out the other -- and out the other
18   side and then it was -- then it was pinned, I believe,
19   although I don't recall if it was a pin or a C-clip.
20   And you'd have to remove that each time you go up and
21   down with the device, and -- and it would have to line
22   up with -- it would have -- the rack would have to be
23   machined to, you know, for everything to match and line
24   up.
25   Q.   So the collar must have had spaces in it on

Page 207

1    either side of the collar --
2    A.   Yes.
3    Q.   -- where you could --
4    A.   Yes.
5    Q.   -- put it through?  And the ratchet bar,
6    likewise, must have had --
7    A.   Yes.  Either an indentation or a hole.  I don't
8    recall.
9    Q.   Okay.
10   A.   I don't recall.  I recall looking at the -- at
11   the patent that they applied for but I don't recall the
12   details.
13   Q.   Now, you mentioned testing for false engagement
14   phenomenon, testing that you did?
15   A.   Yes.
16   Q.   Do you know when you did that, could you put a
17   year on it?
18   A.   Two thousand -- 2004, perhaps as late as 2005.
19   Q.   Okay.  And I believe you used the words you
20   could never recreate the phenomenon with a substantial
21   load on the jack stand?
22   A.   Correct.
23   Q.   When you say "substantial," though, what does
24   that mean?
25   A.   It means I could not, and I didn't want to,

Page 208

1    place my hands in the fixture to manipulate the rack
2    the way it needed to be manipulated in order to
3    recreate it.
4    Q.   So you had to manipulate the rack while a load
5    was on it?
6    A.   No.  I would have to have held it in a
7    manipulated position while the -- while the load was
8    being brought down.  I just didn't want to -- that just
9    was not something I was willing to do.
10   Q.   Okay.  So there's a few things I need to ask
11   you.
12   A.   Okay.
13   Q.   When you say "substantial load" --
14   A.   Yes.
15   Q.   -- that means -- it kind of implies that you
16   tested it with something less than a substantial load?
17   A.   Yes.
18   Q.   So could you put a poundage, some sort of
19   benchmark to that?
20   A.   It would have been less than 50 pounds as -- as
21   I recall.
22   Q.   So you couldn't recreate with anything over 50
23   pounds?
24   A.   Correct.
25   Q.   Because you actually had to hold the ratchet bar

Page 209

1    in a certain position --
2    A.   I had to jam it in there basically.  I just -- I
3    had to jam it in and -- and ensure that it did not
4    engage.
5    Q.   And you could -- you had to use your hand to do
6    that somehow?
7    A.   Yes.
8    Q.   How -- what do you mean, you had to hold it in a
9    certain position with your hand?
10   A.   I had to hold it in a certain position,
11   manipulate the bar, jam it in at a certain position,
12   and then apply my -- apply the load with my hand.
13   Q.   Okay.
14   A.   And as I would increase the load, most of the
15   time, nine out of ten times, it would just simply
16   collapse to the next engagement.
17   Q.   To the next tooth?
18   A.   Yes.
19   Q.   Mm-hmm.
20   A.   But on more than one occasion, it would just
21   simply collapse, and when I did get it to -- to lock
22   into position long enough to make an effort to put a
23   load cell on it, the most I could get was 50 pounds
24   before everything I did just came apart.
25   Q.   What do you mean "just came apart"?

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                          Roger D. Claypool

Page 210

1   A.  I wasn't able to -- because the load comes down
2   so slowly that it's not going to apply as much
3   continuous pressure as I can by hand.  When you load it
4   with the load cell, it's going to load it and as soon
5   as it loses pressure, then we lose engagement with the
6   load and so the test is -- is basically worthless.
7   Q.  Now, you talked about having to -- having to
8   hold the ratchet bar in a certain position?
9   A.  Sure.
10  Q.  And why -- why did you have to do that?  What
11  would happen if you just --
12  A.  It's natural --
13  Q.  What would happen if you just let go; if you
14  jammed it in the way you say and then you just didn't
15  hold it, what would happen then?
16  A.  Well, number one, it wouldn't -- it wouldn't --
17  it wouldn't be a natural -- that wouldn't be a natural
18  condition that you would find in a lift event because
19  no lift event is straight up and down.
20  Q.  Okay.
21  A.  And, number two, it was just a matter of not --
22  I had to prevent it from engaging.
23  Q.  Oh, okay.
24  A.  See, I was testing to fail, not testing to pass.
25  I was testing to fail.

Page 211

1   Q.  So you had to use the active force of your hand
2   holding the ratchet bar, otherwise it would just engage
3   on its own and you wouldn't be able to recreate it?
4   A.  And it would fall back to center unloaded so...
5   Q.  Okay.  Now, that's not how these jack stands are
6   supposed to be used, right?  You don't hold it in
7   place --
8         MR. ELLIOTT:  Objection.
9   Q.  (By Mr. Zakrzewski)  -- hold the ratchet bar in
10  place with your hand?
11  A.  No.
12        MR. ELLIOTT:  Objection to the form.
13        THE WITNESS:  No.
14  Q.  (By Mr. Zakrzewski)  All right.
15  A.  No.  You place it -- everybody places it
16  differently but...
17  Q.  Because its natural tendency is to engage --
18        MR. ELLIOTT:  Objection to the form.
19  Q.  (By Mr. Zakrzewski)  -- the force of the ratchet
20  bar coming down against the pawl?
21  A.  Yes.
22  Q.  But you had to resist that force with your hand?
23  A.  Yes.
24  Q.  Now, do you recall specific models of jack
25  stands that you tested this way?

Page 212

1   A.  I believe it was a Craftsman three-ton.
2         MR. ELLIOTT:  Craftsman what?
3         THE WITNESS:  Three-ton.
4   Q.  (By Mr. Zakrzewski)  Any others?
5   A.  A ProLift -- my goodness -- a ProLift model also
6   three-ton.  I believe it was a 9603.
7   Q.  Okay.
8   A.  If I had a catalog, I could...
9   Q.  But you're not sure about either of those?
10  A.  Yes.  I'm sure of the tonnage.  I just don't --
11  I couldn't verify the model number --
12  Q.  Okay.
13  A.  -- without looking at a catalog.
14  Q.  So neither of these were the type of jack stand
15  at issue in the Klorczyk case to your understanding?
16        MR. ELLIOTT:  Objection to the form.
17        THE WITNESS:  By model number, no.
18  Q.  (By Mr. Zakrzewski)  And you would agree that
19  the dynamics of these tests might be different
20  depending upon the specific model number given
21  different dimensions are used and so forth?
22        MR. ELLIOTT:  Objection to the form.
23        THE WITNESS:  The dynamics should be
24     the same.  The --
25  Q.  (By Mr. Zakrzewski)  But, for example, the size

Page 213

1   of the collar and the precise width and measurements of
2   the ratchet bar would matter in this test?
3   A.  I would have to say no.  They wouldn't matter
4   with respect to your question, I mean, unless I'm
5   misunderstanding.
6   Q.  Well, the -- diameter of the collar and the
7   size of the ratchet bar in that collar, right, that
8   affects -- can affect the amount of, say, for example,
9   the side to side movement there can be in the ratchet
10  bar, correct?
11  A.  Yes.
12  Q.  Okay.  So if those sizes are different, the
13  amount of movement could be different?
14  A.  Yes.
15  Q.  Okay.  And that could affect the outcome --
16  A.  Yes.
17  Q.  -- of a test like this?
18  A.  Yes.
19  Q.  Have you done -- and this actually might be
20  listed on your resumé.  I'm not sure.  Have you done
21  any other consulting since leaving SFA?
22  A.  No.
23  Q.  Only for Rick Heath & Associates?
24  A.  Yes.
25  Q.  Or Heath & Associates?

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                      Roger D. Claypool

Page 214

1   A.   Yes.
2   Q.   Okay.  But you mentioned that you did something
3   else.  You worked with -- I apologize.  You told us --
4   I think you told us what it was.  You took a course and
5   you're teaching or something like that?
6   A.   Oh, after leaving SFA?
7   Q.   Yeah.
8   A.   Yes.  I went to -- I went to work at a plastics
9   manufacturing plant for two years and then went back to
10  school and studied photovoltaics, got a certificate,
11  and an offer to teach some of the -- some of those
12  courses.
13  Q.   Oh, you're teaching at the community college?
14  A.   Yes.
15  Q.   Okay.
16  A.   Yeah.
17  Q.   And so this is your only -- the Klorczyk case is
18  your only consulting engagement?
19  A.   Yes.
20  Q.   Is it the only one you've had since you left SFA
21  or --
22  A.   Yes.
23  Q.   -- the only one right now?
24  A.   It's the only one since I've left SFA.
25  Q.   Do you think you did a good job drafting the

Page 215

1   product manuals that you drafted?
2   A.   Yes, I do.
3   Q.   Do you think you wrote them clearly?
4   A.   I believe I did.
5   Q.   Do you think you wrote them in a way that end
6   users can understand?
7   A.   I believe I did.
8   Q.   What about warnings?
9   A.   I believe I did.
10  Q.   From what you know about this case, do you think
11  that Mr. Klorczyk, and I mean Mr. Christian Klorczyk,
12  not his father or someone else, do you think he was
13  following the instructions in the manual?
14       MR. ELLIOTT:  Objection to the form;
15       lack of foundation.
16       THE WITNESS:  I really don't have the
17       details of the use so I -- I -- I would
18       hesitate to comment on that without
19       knowing -- I haven't seen the jack stands.
20       I haven't seen the site or anything to do
21       with it.  I mean, I -- I simply don't know.
22       MR. ZAKRZEWSKI:  Okay.  How are we
23       doing on tape?
24       THE VIDEOGRAPHER:  About 26 minutes.
25       MR. ZAKRZEWSKI:  Nice.

Page 216

1   Q.   (By Mr. Zakrzewski)  Do you understand that
2   ratchet and pawl designed jack stands, the ones that
3   you wrote manuals for, instructed users to use them in
4   pairs?
5   A.   Yes.
6   Q.   Okay.  And do you understand that in addition to
7   the manual -- you understand the manual contains some
8   product warnings --
9   A.   Yes.
10  Q.   -- and instructions?
11  A.   Yes.
12  Q.   Do you understand that there's, and I'm sure you
13  do, there's also warnings on the products themselves?
14  A.   Yes.
15  Q.   There's frequently stickers or decals or other
16  imprints; there's writing on the products?
17  A.   Yes.
18  Q.   You understand that the products themselves
19  instruct users to use them in pairs?
20  A.   Yes.
21  Q.   Okay.  And you understand that some of these
22  warnings are also on the packaging of the product?
23  A.   Yes.
24  Q.   And you understand the packaging of the product
25  also instructs users to use them in pairs?

Page 217

1   A.   I believe -- if you tell me that, I believe it.
2   Q.   Okay.
3   A.   I don't recall.
4   Q.   So if Mr. Klorczyk was using a single jack
5   stand, is it fair to say he wasn't complying with the
6   product warnings?
7       MR. ELLIOTT:  Objection to the form.
8       THE WITNESS:  It's a voluntary
9       standard.  It's a -- it's a voluntary
10      standard.  I can -- I can tell you that I
11      probably wouldn't have used a pair myself.
12  Q.   (By Mr. Zakrzewski)  You would not have used a
13  pair?
14  A.   Probably not for a simple oil change.
15  Q.   Okay.  So you're saying that you would use a
16  single jack stand --
17  A.   Sure.
18  Q.   -- to support the load of an elevated vehicle --
19  A.   Sure.
20  Q.   -- while you got your entire body under it --
21  A.   Sure.
22  Q.   -- to change the oil?
23  A.   Sure.
24  Q.   Have you done this?
25  A.   Yes.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

Page 218

1    Q.   Okay.  Do you do this regularly?

2    A.   Yes.

3    Q.   Do you use any secondary mechanism --

4    A.   Not always.

5    Q.   -- to catch -- I'm sorry.  Let me finish the

6    question -- that would catch the weight of the vehicle

7    if the jack stand failed?

8    A.   Not always.

9    Q.   So sometimes you get your entire body under a

10   vehicle to do an oil change only supported by a jack

11   stand?

12   A.   Yes.  Yes.

13   Q.   Do you ever use a pump jack to support the

14   vehicle while you're underneath it?

15   A.   No.

16   Q.   And why not?

17   A.   Hydraulics fail.  A jack is a lifting device.

18   It's not a support device.  It's not a staple.

19   Q.   It's also on wheels frequently, correct?

20   A.   Yeah.

21   Q.   Okay.  Now, you said you would -- you would use,

22   you have used a single jack --

23   A.   Yes.

24   Q.   -- stand to support a vehicle?

25   A.   Yes.

Page 219

1    Q.   And I said, you know, you understand that

2    doesn't comply with the warnings and instructions for

3    the product.  You said it's a voluntary standard.

4    A.   Yes.

5    Q.   But you would have to agree that your actions

6    don't comport with the letter of what's written on the

7    product --

8         MR. ELLIOTT:  Objection to the form.

9    Q.   (By Mr. Zakrzewski)  -- for a warning?

10   A.   Yes.

11   Q.   Yeah.  And they don't comport with what's

12   written in the instruction manual?

13   A.   Yes.

14   Q.   That you yourself drafted?

15   A.   Yes.

16   Q.   When you were the vice chairman of the

17   committee --

18   A.   Yes.

19   Q.   -- that was responsible for promulgating the

20   guidelines --

21   A.   I know.

22   Q.   -- that directed --

23   A.   I know, yeah.

24   Q.   -- the safety of these products?

25   A.   Sure.

Page 220

1    Q.   Okay.  So you would agree that it's inconsistent

2    with the warnings in the owner's manual but you still

3    do it?

4         MR. ELLIOTT:  Objection to the form.

5         THE WITNESS:  I still do it, yes.

6    Q.   (By Mr. Zakrzewski)  Now, I would -- do you

7    consider yourself to be an expert in any -- really any

8    subject matter related to products or product testing

9    or product safety or engineering design manufacturing

10   regarding automotive lifting or automotive support

11   devices?

12        MR. ELLIOTT:  Objection to the form.

13        You understand that's a general

14        question?

15        THE WITNESS:  I -- when I was held

16        out as an expert, I did my best to satisfy

17        my employer.

18   Q.   (By Mr. Zakrzewski)  Okay.

19   A.   So in that I'm an expert at what they needed me

20   to be an expert on.

21   Q.   Well, as you sit here today --

22   A.   Yes.

23   Q.   -- do you feel that you're an expert in

24   anything?

25   A.   I would have to say that I -- it's hard to be

Page 221

1    humble and an expert.

2    Q.   You don't need to be humble.  That's not the

3    point.

4    A.   But I'm skilled in the use of the PALD, nearly

5    every aspect of testing of PALD, and -- and in the

6    knowledge of compliance to ANSI 535.4, .6 and -- and

7    I'll just leave it at that.

8    Q.   Do you plan to offer any expert testimony in

9    this action?

10   A.   No.  No.  I'm -- I'm here as a fact witness.

11   Q.   Now, will you be available to testify at trial

12   in this action if it goes to trial?

13   A.   Of course -- of course I would be available.

14   Q.   Now, you mentioned -- throughout the day we've

15   talked about -- well, we've talked about various

16   documents that you might have at your home.  We talked

17   about documents related to PALD, some documents related

18   to these two product designs that you've talked about?

19   A.   Mm-hmm.

20   Q.   There may be other documents, there might be

21   other notes?

22   A.   That would be the -- that's the gist of it.

23   Q.   Will you preserve all of those documents?

24   A.   I intend to.

25   Q.   Okay.  And we ask that you also preserve any

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                                     Roger D. Claypool

Page 222

1  emails, or written documents, any communications that
2  you exchange with plaintiffs' counsel or with Heath &
3  Associates.  Is that all right?
4      A.   Sure.
5      Q.   Okay.  I might just have a couple more questions
6  but --
7      A.   Okay.
8      Q.   -- only a couple.  Now, if it's safe to use a
9  single jack stand to support a vehicle, why doesn't
10 the -- why don't the PALD guidelines allow for that?
11     A.   Because it's -- it's not safe for every user.
12 Someone not skilled in or has no training in the use of
13 this equipment could conceivably get into a jam and
14 hurt themselves or somebody else or at the very least
15 create a property damage issue, but if you know what
16 you're doing and take your time and think what you're
17 doing through, there should be no reason that you
18 couldn't use one -- one device.
19     Q.   So where do you draw that line between someone
20 who's not skilled enough to use a single jack stand and
21 someone who is skilled enough to use a single jack
22 stand instead of a pair?
23     A.   You know, I don't know that I could draw that
24 line other than a user familiar with it who's been --
25 who had been using it for a long time successfully, who

Page 223

1  had been trained by -- in my case, my employer at my
2  first job said if I didn't use them, I'd be -- I'd be
3  fired and we routinely used one.  Of course back in the
4  '70s, there were no warning labels on products.
5           But it's a matter of what level of expertise
6  does someone have.
7      Q.   And it's hard to draw that -- draw a bright
8  line?
9      A.   It is.  And so why not -- why not write the
10 standard to be as safe as it can possibly be and not be
11 so restrictive as to cause people to ignore the
12 warnings.
13     Q.   Okay.  It sounds like you seem to draw some sort
14 of significance of your professional training?
15     A.   Yes.
16     Q.   You think that that sort of qualifies you to
17 make a judgment that you can use a single jack stand
18 and not use a pair and that you can -- you can make
19 that judgment because of your professional training?
20     A.   In my case, the professional training and
21 probably more so being around the jacks and testing
22 them and watching them being manufactured and, you
23 know, it gives me a certain level of confidence in the
24 product and the processes that I feel comfortable.
25     Q.   Now, most people have not had that level of --

Page 224

1      A.   No.
2      Q.   -- nowhere near your level of exposure to jack
3  stands?
4      A.   That's true.
5      Q.   And, you know, many people who purchase these
6  products, as I'm sure you know, aren't mechanics or
7  never worked as mechanics?
8      A.   Most this is their first time even touching the
9  device.
10     Q.   And for those people, you'd recommend that they
11 use two?
12     A.   Sure.
13     Q.   Because it's safer for those people?
14     A.   Sure.
15     Q.   And why is it safer for those people?
16     A.   Because they're less -- they're less apt to do
17 something stupid.
18     Q.   How so?
19     A.   If you -- if you use two stands, it keeps the --
20 there's disadvantages and advantages both.  It creates
21 two points of contact but it also creates a situation
22 where you can get more of your body under more of the
23 vehicle and -- which also could create problems.
24     Q.   Okay.  And why are two points of contact -- why
25 would that be safer?

Page 225

1      A.   If a guy was under there using it to support it
2  to remove a transmission, many times you're going to
3  exert over a hundred pounds force one way or the other
4  and that leverage -- that leverage multiplies that, and
5  you could conceivably rock the whole thing over on you.
6      Q.   So if you're exerting over a hundred pounds of
7  force, you want to use two?
8      A.   Not necessarily.  It depends.
9      Q.   Okay.
10     A.   It just depends on the situation, what the job
11 is.  I mean, there's so many variables that -- but
12 those are variables that would be -- you know, is that
13 something we want to put in a manual, you know.
14 It's -- we can make it a book and nobody would read it
15 and would just use it as a -- as a chalk or a, you
16 know, something that has no use at all.
17     Q.   So you felt it was safest to just put in there
18 to use two?
19     A.   Absolutely.
20     Q.   Okay.
21     A.   Absolutely.
22          MR. ZAKRZEWSKI:  All right.  I don't
23      think I have any more questions but could
24      we just go off the record, check the notes,
25      and then I can pass the witness.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                      Roger D. Claypool

Page 226

1    THE VIDEOGRAPHER:  Going off the
2    record at 3:28.
3        (A brief recess was taken.)
4        THE VIDEOGRAPHER:  We're on the
5    record at 3:40.
6        MR. ZAKRZEWSKI:  Steve Zakrzewski for
7    the defendants.  Pass the witness to Erica
8    Todd-Trotta for Sears.
9
10  EXAMINATION BY MS. TODD-TROTTA:
11   Q.  Good afternoon, Mr. Claypool.
12   A.  Good afternoon.
13   Q.  My name is Erica Todd-Trotta and I represent the
14  defendant Sears Roebuck.  And I just have a few
15  follow-up questions, and I apologize ahead of time if
16  it feels like I'm skipping around but --
17   A.  That's fine.
18   Q.  -- basically I'm skipping around.
19       MR. ELLIOTT:  Because you're going to
20   anyway.
21   Q.  (By Ms. Todd-Trotta)  I'm going to anyway.  The
22  -- you had mentioned the cases.  Do you keep a case
23  list?
24   A.  Of -- of cases that I have worked on?
25   Q.  Yes.

Page 227

1    A.  I do have a list of cases that I've worked on.
2    Q.  And that list of cases, then do you separate it
3   out as to whether it be jack stands, jacks, or exercise
4   equipment?
5    A.  I believe so.  I believe so.
6    Q.  And is that a computerized document or is it --
7    A.  Just a handwritten --
8    Q.  -- notes?
9    A.  -- note, yeah.
10   Q.  So if you can also retain that.
11   A.  Sure.  Sure.
12   Q.  You had said earlier about -- you were contacted
13  by Mr. Heath and you kept mentioning you've provided
14  information about the serial number and what it
15  revealed?
16   A.  Yes.
17   Q.  What did you mean by that?
18   A.  By looking at a serial number for a Shinn Fu
19  product, SFT has its own serial number.  Wei Fu would
20  have their own serial number.  Xinjiang would have
21  their own serial number and it basically consists of --
22  in the case of this case I recall two letters and then
23  followed by a series of digits, and I was able to
24  basically let him know what the letters meant and what
25  the numbers meant.

Page 228

1    Q.  And do you recall what you told him?
2    A.  Generally that it was a Wei Fu manufactured jack
3   stand.  I believe it was manufactured in November and I
4   don't recall the specifics.  It may have been the sixth
5   or the eighth month.  I'd have to have my notes there
6   or -- I believe it's in the -- one of the exhibits that
7   we looked at.
8    Q.  Okay.  So from that, you were able to tell him
9   that this was a Wei Fu product?
10   A.  Yes.
11   Q.  Okay.
12   A.  Yes.
13   Q.  Did Shinn Fu America have its own manufacturing
14  code?
15   A.  That's a -- that's a good question.  We didn't
16  manufacture anything --
17   Q.  Okay.
18   A.  -- at Shinn Fu America when I was there but we
19  were considering manufacturing some things, and we were
20  going to develop our own code.  Whether that ever
21  occurred, I don't know so...
22   Q.  Would there be anything in the serial number or
23  code to indicate the path this product took?
24   A.  No.
25   Q.  Only that it was -- the factory was Wei Fu?

Page 229

1    A.  Yes.
2    Q.  You don't know if it went through MVP?
3    A.  No.
4    Q.  You don't know if it went through SFA?
5    A.  No.  No.
6    Q.  Now, your payment here today --
7    A.  Yes.
8    Q.  -- is that being paid directly from plaintiffs'
9   counsel or does it go through Heath?
10   A.  It will go through Heath.
11   Q.  So you do time sheets and everything and you
12  submit them to Heath?
13   A.  Yes.
14   Q.  And then do you get paid by Heath?
15   A.  Yes.  I get a check directly from Heath.
16   Q.  Okay.
17   A.  Yes.
18   Q.  And do you know how much you've been paid to
19  date?
20   A.  No.  Approximately, gosh, 3500 ballpark.
21   Q.  And that's excluding this travel and this
22  testimony of course?
23   A.  Yes.  Yes.  And that's approximate.  It could be
24  twenty-five.
25   Q.  Now, I believe you testified earlier that you

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

---

Page 230

1  came here yesterday and you went over some documents?
2      A.   Yes.
3      Q.   Okay.  And one of the documents that has been
4  marked or -- the set of documents that have been marked
5  as exhibits are Documents 11 through 15?
6      A.   Okay.
7      Q.   And I believe those are the Raymond case, the
8  Raymond documents?
9      A.   Yes.
10     Q.   Did you review those documents yesterday?
11     A.   Briefly, yes.
12     Q.   Okay.  And did you discuss your knowledge about
13 the Raymond case?
14     A.   Only with respect to my being there and being a
15 part of the site inspection and that type of
16 discussion.
17     Q.   Had you ever seen the documents marked 11
18 through 15 prior to yesterday?
19     A.   I may have, yes.
20     Q.   And in what capacity would you have seen those
21 documents?
22     A.   I may have received a -- I may have received
23 this, the Sedgwick.
24     Q.   When you say "this" --
25     A.   -- Sedgwick claims.

---

Page 231

1          MR. ELLIOTT:  Exhibit number?
2      Q.   (By Ms. Todd-Trotta)  Exhibit Number 13?
3      A.   Number 13.
4      Q.   So you might have received that?
5      A.   I might have received that.
6      Q.   And that was addressed to Shinn Fu Company of
7  America, Attention:  Risk Management/Legal?
8      A.   Correct.  Correct.
9      Q.   And at that time, I believe, Arthur Chaykin --
10     A.   Yes.
11     Q.   Okay.
12     A.   Yes.
13     Q.   Would you have received Exhibit 12 at all or a
14 copy of Exhibit 12?  That was a document --
15     A.   Oh, authored by Arthur?
16     Q.   Yes.
17     A.   I -- probably not.
18     Q.   Would you have had access to the Raymond file
19 that was kept at Shinn Fu in the risk/legal department?
20     A.   No.
21     Q.   Okay.
22     A.   No.
23     Q.   Why not?
24     A.   That would have been Arthur's office and I
25 wouldn't -- it would not be something I would have a

---

Page 232

1  need to do --
2      Q.   Okay.
3      A.   -- without his -- without him telling me do this
4  or do that.
5      Q.   Okay.  But you very well might have received
6  Exhibit 13?
7      A.   Yeah.  Yeah.
8      Q.   Assuming that you obtained -- strike that.
9      A.   That's all right.
10     Q.   Assuming that you were sent Exhibit 13, what
11 would you have done with that document once you
12 received it?
13     A.   Oh, just handed it to Arthur.
14     Q.   You would have read it for its content?
15     A.   I would have seen "Attention:  Risk
16 Management/Legal" and just handed it on.
17     Q.   Would you have said to Arthur:  Oh, this is the
18 Raymond case.  I've worked on that case?
19     A.   Well, he and I worked on it together.
20     Q.   Oh, both of you worked on it together?
21     A.   Yes.  Yeah.  He and I went to the site
22 together --
23     Q.   Okay.
24     A.   -- and did the site inspection and everything
25 so...

---

Page 233

1      Q.   Okay.  So you pretty much were working as a team
2  relative to the Raymond case?
3      A.   By that time, yes.
4      Q.   Okay.
5      A.   Yes.
6      Q.   You also indicated you were the vice chair?
7      A.   Vice chair.
8      Q.   Okay.  And as vice chair, did you have any role
9  in putting on the agenda of what topics you'd like to
10 discuss?
11     A.   Individually we did.
12     Q.   Okay.
13     A.   And so, yes, I would have -- I would have had an
14 opportunity to put forth agenda items.
15     Q.   Okay.  And during your time -- your tenure as
16 vice chair, you never put on an agenda item the issue
17 of false engagement?
18     A.   No.  No.
19     Q.   Was there a reason why you never put that on the
20 agenda?
21     A.   For one thing, I didn't think it would go
22 anywhere but -- and I -- I probably would have
23 approached it as instead just trying to implement
24 secondary load holding devices.
25     Q.   And I think you said there was only 4 out of the

---

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                        Roger D. Claypool

Page 234

1  12-person --
2      A.   Yeah that I know of that had discussions, you
3  know, prior to meetings and dinners --
4      Q.   Okay.
5      A.   -- that were in agreement on the subject.
6      Q.   Okay.  And I know you had indicated that you've
7  used jack stands in your personal life?
8      A.   Almost every month for my whole life.
9      Q.   Okay.  And they're the ratchet and pawl design?
10     A.   Both.  Both the -- I tend to use both, ratchet
11 and pawl and the pin construction --
12     Q.   Okay.
13     A.   -- type.
14     Q.   And do you use the ratchet and pawl design that
15 Shinn Fu manufactured?
16     A.   No, I don't.  I don't.  I have a pair but I
17 just -- they're my -- they're for other purposes.
18     Q.   Okay.  And you never changed any wording in the
19 manual itself relative to any type of "be careful" --
20     A.   No.
21     Q.   -- not --
22          MR. ELLIOTT:  Objection to the form.
23          THE WITNESS:  I think the closest
24     thing to that would be any verbiage that
25     urged the consumer to ensure the stands

Page 235

1      were -- and I'd have to -- I don't have a
2      manual in front of me and I don't recall
3      the exact verbiage, but I believe there is
4      something related to ensure that the stand
5      is stable or -- I don't have it in front of
6      me.
7      Q.   (By Ms. Todd-Trotta)  And that's stable ground?
8      A.   Yes.
9      Q.   Is there something in there that when the car is
10 up, that you should shimmy the car, maybe shake it
11 right to left?
12     A.   No, not on each one.  I have seen that and we
13 have used that but that's not on every one that I
14 recall.
15     Q.   And the reason why you would do that is to --
16 why?
17     A.   Because if something is about to give or if it
18 is unstable, if it's on an unstable support point, if
19 you get up and shake it rigorously and it doesn't go
20 over, chances are it's not going to slip off of an
21 engagement point.
22     Q.   And when you use the one jack stand that is not
23 recommended in the manual but when you use it, do you
24 chalk your wheels?
25     A.   Yes.  Chalk or put my emergency brake on, either

Page 236

1  one.
2      Q.   And just to be clear, you didn't see the jack
3  stands --
4      A.   I have --
5      Q.   -- that are in question?
6      A.   I have not.
7      Q.   Did you ask to see the jack stands?
8      A.   I just assumed since I wasn't the expert
9  witness, I didn't need to see them necessarily but...
10     Q.   But it appeared in your former life at SFA, you
11 did show an interest as to actually liking to see
12 what --
13     A.   Oh, yeah.
14     Q.   -- you were talking about that allegedly failed?
15     A.   Well, if that were my role here, I would have --
16 I would have loved to do that but...
17     Q.   What is your understanding of what your role is?
18     A.   A fact witness.
19     Q.   A fact witness as it pertains to?
20     A.   To this case.
21     Q.   Okay.  Well, what were you asked to be a fact
22 witness of?  What is your understanding of the role?
23     A.   To give an overview and detail of the testing,
24 the processes, and procedures in place at the time that
25 I was there.

Page 237

1      Q.   Solely limited to the time that you were there?
2      A.   Correct.  Correct.
3      Q.   Because you've done no outside investigation as
4  to current employees?
5      A.   Correct.
6      Q.   You haven't spoken to Attorney Chaykin?
7      A.   No.
8      Q.   You haven't spoken to -- do you know the
9  individual who now has your former job?
10     A.   No.  I -- I sure don't.
11     Q.   Do you know if your former job even really
12 exists at this point?
13     A.   No, I do not.  I do not.
14     Q.   Have you had any discussions with Kathy Guerra?
15     A.   No, I have not.
16     Q.   When was the last time you saw Kathy Guerra?
17     A.   I believe it was at the last ASME meeting,
18 perhaps the last Vegas meeting, which would have been
19 in 2008, but -- I believe so but I'm not sure.
20     Q.   But you have no email contact, social media
21 contact?
22     A.   No.  No.  No.
23     Q.   Do you have any other cases lined up with Heath
24 & Associates?
25     A.   No, not currently.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

Page 238

1   Q.   And do you know why Mr. Heath chose you
2   particularly for this case?
3   A.   I guess he knew -- he thought that I might be
4   able to add some value.
5   Q.   Value because you were an SFA employee?
6   A.   Because I had a -- because I knew the product
7   and I knew the processes and procedures.
8   Q.   And in your role for 20 years with SFA dealing
9   with -- basically from the ground up you went --
10  A.   Yes.
11  Q.   -- and dealing with the legal and the claims
12  process and the documents and things of that nature --
13  A.   Yes.
14  Q.   -- he thought you'd be helpful because this was
15  a particular SFA --
16  A.   Yes.
17  Q.   -- case?
18  A.   Yes.
19  Q.   So you haven't been consulted on any other cases
20  for any other companies?
21  A.   No.  No.
22  Q.   Was the Bowles case -- Bowles, Bowles?
23  A.   Bowles, yes.
24  Q.   Sorry.  That particular case, you said that was
25  the first time that you didn't see like the legs

Page 239

1   splayed?
2   A.   Yes.
3   Q.   Okay.
4   A.   As a result of the claim of --
5   Q.   False engagement?
6   A.   Well, it's not a claim of false engagement.
7   It's a claim of sudden loss of ratchet height.
8   Q.   Okay.  Is that different than false engagement?
9   A.   Well, I don't know.
10  Q.   Do you know who would know?
11  A.   I -- no, I don't.
12  Q.   Are you using the sudden loss of ratchet height
13  and false engagement interchangeably?
14  A.   Because it can't be explained, it was the only
15  way that I knew to explain the loss of height in that
16  case.
17  Q.   Was the term of "false engagement"?
18  A.   Was the term of "sudden and immediate loss of"
19  or -- "sudden and unexpected loss of load height."
20  Q.   Okay.  I'm just trying to determine are there
21  two different --
22  A.   Well, false engagement is a term that -- that
23  came up at the meetings in discussion.  It was -- it
24  could be called "false engagement."  It could be called
25  "unexplained loss of load height."  It could be called

Page 240

1   something completely different.  It's when -- it's a
2   characteristic that could be simply described as the --
3   assume -- thinking that the jack is safe to use -- jack
4   stand is safe to use and it is not.  It's giving all
5   the impression that it is safe to use but, in fact,
6   it's -- it could collapse.
7   Q.   Okay.  But just so I'm clear because you've
8   used --
9   A.   Yes.
10  Q.   -- the two terms --
11  A.   Yes.
12  Q.   -- inter --
13  A.   Yes.
14  Q.   -- are you viewing for purposes of this case,
15  the sudden loss of ratchet height and false engagement
16  interchangeably?
17  A.   Yes.
18  Q.   Okay.  So they're not mutually exclusive?
19  A.   Correct.
20  Q.   Now, that sudden loss of ratchet height in that
21  particular case, there was paint transfer?
22  A.   Yes.
23  Q.   Is that the first time you saw paint transfer?
24  A.   No.  I had seen paint transfer before.
25  Q.   And for the sudden loss of ratchet height?

Page 241

1   A.   No.  Just from repetitive use and these were
2   relatively new stands.
3   Q.   Okay.  So that's what brought your attention --
4   A.   Yes.
5   Q.   -- to the -- to the lack of paint?
6   A.   Yes.  It's probably not strictly diagnostic of
7   that condition.
8   Q.   Explain that.
9   A.   It's not something that could be -- that you
10  would point to and say:  Oh, those stands failed as a
11  result of false engagement, but in this case since they
12  were new, there were very few explanations of -- that
13  were possibilities other than that so...
14  Q.   Would you expect to see either paint transfer or
15  the legs to be splayed in a false engagement or sudden
16  loss of ratchet height?
17  A.   Yes.
18          MS. TODD-TROTTA:  I have no further
19      questions.
20          MR. ELLIOTT:  Steve?
21          MR. ZAKRZEWSKI:  I think it would be
22      your turn, Attorney Elliot.
23          MR. ELLIOTT:  I have no questions.  I
24      have no questions.
25          MR. ZAKRZEWSKI:  I have nothing

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                      Roger D. Claypool

Page 242

1   further.

2        MR. ELLIOTT:  Thank you.  Thank you,

3   Mr. Claypool.

4        THE VIDEOGRAPHER:  Going off the

5   record at 4:04.

6        (The witness was excused.)

7        (Whereupon, the deposition concluded

8   at 4:04 p.m.)

Page 244

1   PLEASE ATTACH TO THE DEPOSITION OF ROGER D. CLAYPOOL

2   CASE:  3:13-cv-00257-JAM

3   DATE TAKEN:  AUGUST 17, 2016

4                        ERRATA SHEET

5   Please refer to Page 244 for Errata Sheet instructions and

6   distribution instructions.

7   PAGE  LINE  CHANGE          REASON

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15        I have read the foregoing transcript of my

16  deposition, and except for any corrections or changes noted

17  above, I hereby subscribe to the transcript as an accurate

18  record of the statements made by me.

20        Executed this _____ day of _____, 2016.

22              _____

Page 243

1                    REPORTER'S CERTIFICATE

3        I, Nicole E. Viens, Registered Professional

4   Reporter and Certified Shorthand Reporter, License No.

5   SHR.0000539, State of Connecticut, do hereby certify:

6        That the foregoing proceedings were taken before

7   me at the time and place therein set forth, at which time

8   the witness was put under oath by me;

9        That the testimony of the witness, the questions

10  propounded, and all objections and statements made at the

11  time of the examination were recorded stenographically by

12  me and were thereafter transcribed;

13        That the foregoing is a true and correct

14  transcript of my shorthand notes taken.

15        I further certify that I am not a relative or

16  employee of any attorney or the parties, nor financially

17  interested in the action.

18        I declare under penalty of perjury under the

19  laws of Connecticut that the foregoing is true and correct.

20        Dated this 23rd day of August, 2016.

21              Nicole E. Viens

23              Nicole E. Viens, RPR, CSR

                Notary Public

24              My Commission Expires:

                November 30, 2019