*EXHIBIT F*

Page 1

1              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
2
     ------------------------------)
3    FREDERICK KLORCZYK, JR., as    )
     co-administrator of the Estate )   CIVIL ACTION NO.
4    of Christian R. Klorczyk and   )   3:13-CV-00257-JAM
     LYNNE KLORCZYK, as             )
5    co-administrator of the Estate )
     of Christian R. Klorczyk,      )
6                                   )
             Plaintiffs,            )
7                                   )
       vs.                          )
8                                   )
     SEARS, ROEBUCK & CO., SHINN FU )
9    CORPORATION, SHINN FU COMPANY  )
     OF AMERICA, INC., MVP (HK)     )
10   INDUSTRIES, LTD., AND WEIFU    )
     (TAISHAN) MACHINERY & ELECTRIC )
11   CO., LTD.,                     )
                                    )
12           Defendants.            )
     ------------------------------)
13
14
          VIDEOTAPED DEPOSITION OF SU CHIEN CHI
15
                     VOLUME 1
16
               Wednesday, April 11, 2018
17
                   AT: 9:11 a.m.
18
                    Taken at:
19                  Taipei 101
            No. 7, Section 5, Xinyi Road
20        Xinyi District, Taipei City, 110
                     Taiwan
21
22
23
24
     Court Reporter:
25   Mark McClure, Certified Court Reporter

Page 2

```
1              A P P E A R A N C E S
2  Appearing for the Plaintiffs:
3     (Appearing by videoconference)
      HOWARD EDINBURGH, ESQ.
4     HERZFELD & RUBIN, P.C.
      125 Broad Street
5     New York, New York 10004
      (212) 471-8500
6     Telephone: (212) 471-8500
      E-mail: hedinburgh@herzfeld-rubin.com
7
      BRYAN J. ORTICELLI, ESQ.
8     DAY PITNEY, LLP
      242 Trumbull Street
9     Hartford, Connecticut 06103-1212
      Telephone: (860) 275-0100
10    E-mail: borticelli@daypitney.com
11
   Appearing for the Defendants:
12
      STEVEN J. ZAKRZEWSKI, ESQ.
13    GORDON & REES, SCULLY MANSUKHANI
      95 Glastonbury Boulevard, Suite 206
14    Glastonbury, Connecticut 06033
      Telephone: (860) 278-7448
15    E-mail: szakrzewski@gordonrees.com
16    ARTHUR CHAYKIN, GENERAL COUNSEL
      SFA COMPANIES, INC.
17    10939 North Pomona Avenue
      Kansas City, Missouri 64153
18    Telephone: (816) 891-6390
      E-mail: arthur.chaykin@sfacompanies.com
19
20
   INTERPRETER:
21
      I CHING NG, Mandarin interpreter
22
23
   ALSO PRESENT:
24
      Nora Lee
25    Peter Chang
```

Page 3

```
1                    I N D E X
2  WITNESS        EXAMINATION         PAGE
3  SU CHIEN CHI
4     BY MR. EDINBURGH         5
5     BY MR. ZAKRZEWSKI      160
6     BY MR. EDINBURGH      172
7     BY MR. ZAKRZEWSKI      178
8
9              E X H I B I T S
10 NUMBER      DESCRIPTION          PAGE
11 Exhibit 1   Weifu (Taishan) Machinery &     6
            Electric Co., Ltd.'s Supplemental
12          Responses to Plaintiffs'
            Interrogatories Regarding
13          "Corporate Interconnectedness"
14 Exhibit 2   Notice of Deposition      16
15 Exhibit 3   Second Amended Complaint      20
16 Exhibit 4   Presentation of Shinn Fu      49
            Corporation, 2011
17
   Exhibit 5   List of Directors and Managers,   72
18          Bates SFA003233 - 3235
19 Exhibit 6   Supplemental Responses and     140
            Objections to Plaintiffs'
20          Requests for Production
21 Exhibit 7   Email chain, Bates SFT002486 -   143
            2538
22
   Exhibit 8   Invoices              143
23
   Exhibit 9   Jack Stands Final Production    160
24          Inspection Report, Bates
            WFT002851 - 2960
25
```

Page 4

```
1           INDEX (CONTINUED)
2
   WITNESS INSTRUCTED NOT TO ANSWER
3
              PAGE  LINE
4
              159   4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1           P R O C E E D I N G S
2  (9:04 a.m.)
3           I CHING NG
4     was sworn to interpret the Mandarin Chinese
5        and Cantonese languages.
6           SU CHIEN CHI,
7     having been sworn, was examined
8        and testified as follows:
9
10     MR. EDINBURGH:  Can you just tell me the
11 witness's name, please.
12     INTERPRETER:  The witness's last name is Su.
13 First name is Chien Chi.
14     MR. EDINBURGH:  Ask the witness, is he also
15 referred to as Jeff?
16     THE WITNESS:  Yes, my English name is Jeff,
17 J-e-f-f.
18 EXAMINATION BY MR. EDINBURGH:
19     Q.  Okay.  Mr. Su, good morning to you.  It's
20 evening here in New York.  My name is Howard Edinburgh
21 I represent the plaintiffs in this case.
22     A.  How are you doing?
23     Q.  Very good.  Thank you.
24        I'll be giving you some instructions for
25 today's deposition.  I'd like you to please wait until I
```

Page 6

1 finish my question and the question is translated before
2 you answer.
3     A.  That's fine.
4     Q.  And you also must give a verbal response to
5 each question.  You can't give a shake of the head or a
6 movement of the body, you have to give a verbal answer
7 to every question.
8     A.  I understand.
9     Q.  And please let me know if you do not
10 understand a question and I will rephrase it in a manner
11 in which you are able to answer.
12     A.  I understand.
13     Q.  If you need to take a break for any reason you
14 can do so, but not while the question is pending.  You
15 can only break after answering a question, before
16 another question is asked.
17     A.  That's fine.
18         MR. EDINBURGH:  Mr. Reporter, I'd like to mark
19 as the first exhibit the notice of deposition for Weifu.
20         (Exhibit 1 marked for identification.)
21 BY MR. EDINBURGH:
22     Q.  Mr. Su, have you reviewed this notice before
23 now?
24     A.  Yes.
25     Q.  Have you reviewed the topics listed in

Page 7

1 Exhibit A of the notice?
2     A.  Yes.
3     Q.  Is it your understanding that you are
4 testifying today as what is called, in American Federal
5 Court, a Rule 30(b)(6) witness for Weifu (Taishan)
6 Machinery and Electric Co., Ltd., which I will call or
7 refer to as Weifu.
8     A.  That's fine.
9     Q.  Sir, is it your understanding that you will be
10 testifying about the topics listed in Exhibit A of the
11 Weifu notice of deposition?
12     A.  I know that.
13     Q.  Do you have an understanding of what are the
14 responsibilities of a 30(b)(6) witness?
15     A.  I know that I would talk about as far as what
16 I know.
17     Q.  Do you have an understanding that your
18 testimony here today is on behalf of Weifu?
19     A.  I know that.
20     Q.  And that your testimony here today is
21 testimony reflecting the collective corporate knowledge
22 of Weifu?
23         MR. ZAKRZEWSKI:  Objection.
24         You can answer.
25         THE WITNESS:  I understand.

Page 8

1 BY MR. EDINBURGH:
2     Q.  And that your testimony here today is binding
3 on Weifu?
4         MR. ZAKRZEWSKI:  As to the noticed topics.
5         THE WITNESS:  Yeah, that's fine.
6 BY MR. EDINBURGH:
7     Q.  In order to fulfill your responsibilities as
8 Weifu's 30(b)(6) witness, have you discussed any of the
9 topics in Exhibit A of the notice of deposition with any
10 current Weifu employees?
11     A.  Yes.
12     Q.  Who?
13     A.  With Weifu's employees, right?
14     Q.  Yes.  Who did you discuss --
15     A.  I discussed -- I've had discussion with those
16 people I've mentioned in my testimony.  The first one is
17 Mr. Wu Ching Yan.  He's a director of R&D.  And the
18 engineer, Mr. Meng Shi Jun.  And also the QC director,
19 Mr. Feng Hai Liang.
20         MR. EDINBURGH:  Madam Translator, can you just
21 give me these individuals by their title and by their
22 name, again.
23         INTERPRETER:  Okay.  Sure.  The first one is
24 the director of R&D.  His name is Mr. Wu Ching Yan.  And
25 the second person is the engineer, Mr. Meng Shi Jun.

Page 9

1 And the third person is the QC director, Mr. --
2 BY MR. EDINBURGH:
3     Q.  I'm sorry, the third person, please?
4         INTERPRETER:  The second, okay.  The second is
5 the engineer.  He's Mr. Meng, first name is Shi Jun.
6         And the third person is the QC director,
7 Mr. Feng Hai Liang.
8 BY MR. EDINBURGH:
9     Q.  Are these three individuals currently
10 employees of Weifu?
11     A.  They are no longer the employees of the
12 company.
13     Q.  Are they all former employees of Weifu?
14     A.  Yes.
15     Q.  Are you a former employee of Weifu?
16     A.  Yes, I'm also a former employee.
17     Q.  Did you discuss the topics listed in the
18 notice of deposition with anyone else other than the
19 three individuals you just named?
20     A.  Yes.
21     Q.  Who else?
22     A.  My attorney, and also Peter and Nora.
23     Q.  I'm sorry, Peter --
24         INTERPRETER:  And Nora.
25 BY MR. EDINBURGH:

3 (Pages 6 - 9)

Page 10

1    Q.  Okay.  Who is Peter Nora?
2        INTERPRETER:  Counsel, it's Peter and Nora.
3  Two people.
4  BY MR. EDINBURGH:
5    Q.  Oh, two different people.
6        Who is Peter?
7    A.  Peter is an employee of Shinn Fu, the company.
8    Q.  All right.  Does Peter have a last name?
9    A.  His last name is Chang.
10   Q.  And is Peter a former employee of Weifu?
11   A.  No.
12   Q.  Is he a present, current employee of Weifu?
13   A.  No.
14   Q.  Okay.  So what is Peter's title?  Who is
15 Peter?
16   A.  He's a sales engineer.
17   Q.  And did he work -- what company does he work
18 for or did he work for, to your knowledge?
19   A.  He works for Shinn Fu Corporation.
20   Q.  Does Peter still work there today?
21   A.  Yes.
22   Q.  Who is the other, second individual that
23 Mr. Su identified?
24   A.  Nora.
25   Q.  Is that N-o-r-a?

Page 11

1    A.  Yes.
2    Q.  Is that Nora Lee?  Is her last name Lee?
3    A.  Yes.
4    Q.  All right.  Who is Nora Lee?
5    A.  She used to work for MVP as a salesperson.
6    Q.  Okay.  Now, can you tell me, please, what
7  topics did you discuss with Mr. Wu, the director of R&D?
8    A.  We had discussions about the design and the
9  engineering of the issues regarding the stand.
10   Q.  The issues -- I didn't hear the rest of it.
11       INTERPRETER:  We had discussions regarding the
12 design and engineering issues about the stand.
13   Q.  Okay.  Anything else with Mr. Wu?
14   A.  No.
15   Q.  Did you talk to him in person?  By phone?  How
16 did you speak to him?
17   A.  Face to face.
18   Q.  How much time did you spend with him on these
19 topics?
20   A.  I don't quite understand your question.  Are
21 you talking about only concerning this case?
22   Q.  You spoke with Mr. Wu about design and
23 engineering issues concerning the stand, is that
24 correct?
25   A.  Yes.

Page 12

1    Q.  And you did that in order to testify here
2  today as Weifu's witness, correct?
3    A.  Yes.
4    Q.  How much time did you spend with Mr. Wu on
5  these topics?
6    A.  We talked about the issues over the stand a
7  few times, regarding the information -- in preparation
8  for the information for this litigation.  If I add up
9  all the time together, it would be over a month or two
10 months.
11   Q.  Let me rephrase it so I get it clear.
12       You talked to Mr. Wu for over a month, but how
13 much actual time did you spend with him?  One hour?
14 Five hours?  How many hours?
15       MR. ZAKRZEWSKI:  Objection.
16       You can answer.
17       THE WITNESS:  Each conversation would last
18 half an hour to an hour.
19 BY MR. EDINBURGH:
20   Q.  And how many conversations?
21   A.  I cannot remember.
22   Q.  More than two?
23   A.  Definitely more than that.
24   Q.  More than five?
25   A.  I think so.

Page 13

1    Q.  More than 10?
2    A.  I really cannot remember.
3    Q.  Okay.  What topics did you discuss with
4  Engineer Meng -- Mr. Meng?
5    A.  We talked specifically about the design, the
6  strength and the specification requirements of the
7  stand.
8        MR. EDINBURGH:  Ms. Translator, can you say
9  that again, please.
10       THE WITNESS:  "We talked specifically about
11 the design, the strength and the specification
12 requirements of the stand."
13 BY MR. EDINBURGH:
14   Q.  Thank you.
15       Again, how much time did you actually spend
16 talking to Mr. Meng on these topics?
17   A.  So I met with him, and actually when I
18 discussed these matters with Mr. Meng, it was actually,
19 in fact, Mr. Wu, Mr. Meng and me, the three of us
20 together, having the discussion.
21   Q.  That was in person?  You met with them in
22 person?
23   A.  Yes.
24   Q.  How about Mr. Feng, the director of quality
25 control, what topics did you discuss with him?

4 (Pages 10 - 13)

Page 14

1    A.   We discussed about the daily QC workflow and
2  the relevant verification report and the testing
3  requirement, and also the testing requirement for
4  dispatching goods.
5    Q.   What's the last words?  The last few words?
6        INTERPRETER:  "The testing requirement for
7  dispatching goods."
8  BY MR. EDINBURGH:
9    Q.   When you say the "goods," do you mean jack
10  stands?
11    A.   Yes, the parts for the stand.
12    Q.   And what topics did you discuss with Nora Lee?
13    A.   So the issues I discussed with Nora was about
14  the workflow of the factory for dispatching goods to the
15  client.
16        MR. EDINBURGH:  Did he say "special goods"?
17        INTERPRETER:  Let me repeat.  "The issues I
18  discussed with Nora was about the workflow of the
19  factory for dispatching goods to the client."
20  BY MR. EDINBURGH:
21    Q.   Dispatching goods.
22        When you say "goods," sir, are you referring
23  to jack stands?
24    A.   Yes.
25    Q.   Any other topics with Miss Lee?

Page 15

1    A.   No.
2    Q.   How about Peter, Shinn Fu, what topics did you
3  discuss with him?
4    A.   Regarding Peter, I discussed the testing
5  requirement for dispatching the goods, and also the
6  daily production procedures for the factory.
7    Q.   And again, when you say "goods," are you
8  referring to jack stands?
9    A.   Yes.
10    Q.   Did you already have knowledge prior to your
11  selection as Weifu's 30(b)(6) witness of any of the
12  topics listed in Exhibit A of the Weifu deposition
13  notice?
14    A.   Yes.
15    Q.   Which topics?
16    A.   I already wrote down my knowledge in the
17  testimony.
18    Q.   What do you mean, you wrote down your
19  knowledge in the testimony?
20        Let me rephrase that.
21        There are a number of topics listed in the
22  notice of deposition, which you have reviewed.  Which of
23  those topics did you already have knowledge of prior to
24  being designated as Weifu's 30(b)(6) witness?
25    A.   I don't quite understand your question.  Can

Page 16

1  you give me an example?
2    Q.   Please go to Exhibit 1, and go to the list of
3  deposition topics.  Do you see there are 26 topics
4  listed?
5    A.   No.  There's a document --
6    Q.   Go to page 4, 5 and 6.
7        MR. ZAKRZEWSKI:  Okay.  Howard, you know, when
8  this deposition was marked, I was only looking for
9  Weifu's name, because the first two notices that the
10  court reporter pulled out had the wrong name.  And it
11  has the caption.  This is actually Weifu's supplemental
12  responses to plaintiff's interrogatories regarding
13  corporate interconnectedness.
14        (Discussion off the record.)
15        (Exhibit 2 marked for identification.)
16  BY MR. EDINBURGH:
17    Q.   Mr. Su, please go to pages 4, 5 and 6 of this
18  notice, and 7.  Do you see the deposition topics -- they
19  are listed -- 26 deposition topics?
20    A.   Yes.
21    Q.   And you have reviewed this before today, these
22  topics?
23    A.   Yes.
24    Q.   My question to you is:  Which of these topics
25  do you have personal knowledge of or did you have

Page 17

1  personal knowledge of prior to your being selected as
2  Weifu's 30(b)(6) witness.
3        MR. ZAKRZEWSKI:  Objection.
4        You can answer.
5        THE WITNESS:  Excuse me, I don't quite
6  understand what you mean by "personal knowledge."  How
7  do you define that?
8  BY MR. EDINBURGH:
9    Q.   Knowledge you acquired as an employee of Weifu
10  before you talked to any of these other people you just
11  mentioned?
12        MR. ZAKRZEWSKI:  Objection.
13        You can answer.
14        THE WITNESS:  For example, Topic No. 1 of the
15  design of the Weifu development, I was involved in the
16  entire process.  And also I'm very clear about the
17  product of production procedure.
18  BY MR. EDINBURGH:
19    Q.   Okay.  What about the rest of it?
20    A.   Other topics, such as the testing standard, I
21  know the content of the testing standard pretty well.
22    Q.   You know what, let's go through them one at a
23  time.  My question to you is:  Do you have knowledge of
24  this independently of talking to other people, including
25  your attorneys?

5 (Pages 14 - 17)

Page 18

1        MR. ZAKRZEWSKI: Objection.
2 BY MR. EDINBURGH:
3     Q.  All right.
4        No. 1?
5     A.  Yes.
6     Q.  No. 2?
7        INTERPRETER: Let me just explain to the
8 witness about your question.
9        THE WITNESS: Regarding the Topic No. 1, I
10 know it myself.
11 BY MR. EDINBURGH:
12    Q.  Okay.  Topic No. 2?
13       INTERPRETER: The witness has a question.
14    "When you ask me the topics, do you mind just
15 repeating the entire content of the topic so that I'm
16 very clear about which topic you're asking me about?"
17 BY MR. EDINBURGH:
18    Q.  Mr. Su, I am asking you -- you reviewed 26
19 topics that are listed on this notice.  You're appearing
20 here today as Weifu's witness on each and every one of
21 these topics.  My question to you, I'm trying to make
22 this as simple as I can, is simply, on each topic, I
23 want to know whether you have personal knowledge of
24 these topics or if you acquired knowledge of these
25 topics by virtue of talking to other people.

Page 19

1        MR. ZAKRZEWSKI: Objection.
2        THE WITNESS: I understand.
3 BY MR. EDINBURGH:
4     Q.  All right.  So you know what?  Let's go
5 forward.  I don't want to spend half the day on each
6 one.  We'll find out about your knowledge when we go
7 through your work history.
8        In order to be a 30(b)(6) witness for Weifu
9 today, have you reviewed any documents?
10    A.  Regarding the documents I have reviewed, they
11 are as follows:  The first one is the product design
12 information, second is the testing report of the
13 incoming material, and the third one is the testing
14 report of the daily IP and QC, and the fourth one is the
15 testing report for the dispatch -- for dispatching
16 goods.  The next one is the testing standard of the
17 dispatching goods, and the last one is the suggestion
18 provided by my lawyer to me.
19    Q.  Okay.  When you say special goods, are you
20 using that term -- do you understand that term to mean
21 jack stands?  Is that the same as "special goods" in
22 your mind?
23       INTERPRETER: Counsel, I meant "dispatching
24 goods," not "special goods."
25       MR. ZAKRZEWSKI: Dispatching.

Page 20

1        MR. CHAYKIN: It's this word "dispatching"
2 again, Howard.  Dispatching goods.
3 BY MR. EDINBURGH:
4     Q.  Okay.  The word "goods," in your mind, sir, is
5 that jack stands?  Are goods the equivalent of jack
6 stands?
7     A.  Yes.
8     Q.  When you use the term "dispatching," do you
9 mean selling, distributing, is that what you mean by
10 "dispatching"?
11       MR. ZAKRZEWSKI: Objection.
12       THE WITNESS: Yes, I meant sales, and we send
13 the goods to the client.
14 BY MR. EDINBURGH:
15    Q.  Okay.  In general, are there any other
16 documents that you reviewed in order to become
17 knowledgeable of the 30(b)(6) topics in addition to what
18 you just testified to?
19    A.  No.
20       MR. EDINBURGH: Mr. Reporter, do you have the
21 second amended complaint in this case?  It should be one
22 of the documents that we sent to you.
23       (Exhibit 3 marked for identification.)
24 BY MR. EDINBURGH:
25    Q.  Mr. Su, have you looked at this document or

Page 21

1 has this document been shown to you prior to today?
2     A.  Yes.
3     Q.  When did you look at it?
4     A.  You meant the first time I saw this, right?
5     Q.  Yes.
6     A.  I don't remember exactly the time, but I think
7 it was around 2014.
8     Q.  Can you read English?
9     A.  Not very good.
10    Q.  Was this document translated for you into
11 Chinese?
12    A.  Yes.
13    Q.  Do you have an understanding of what the
14 allegations are in this complaint?
15       MR. ZAKRZEWSKI: Objection.
16       You can answer.
17       THE WITNESS: I am not quite sure, I don't
18 quite understand your question.  Are you saying what is
19 the purpose for the other side suing us?
20 BY MR. EDINBURGH:
21    Q.  My question, sir, is:  Do you know what a
22 complaint in an American lawsuit is, generally?
23       MR. ZAKRZEWSKI: Objection.
24       If you know, you can answer from your personal
25 knowledge but I ask you not to testify about any

6 (Pages 18 - 21)

Page 22

1 conversations that you had with me or in-house counsel.
2        THE WITNESS: I'm not sure about that.
3 BY MR. EDINBURGH:
4    Q.   Why did you read the complaint initially in
5 2014?
6    A.   It was because, at the time, our company
7 received the complaint from the Beijing People's Court.
8 Therefore, my supervisor, my boss asked me to
9 understand, find out what happened.
10   Q.   Okay. And what is your recollection of what
11 you read in the complaint?
12   A.   I think it was related to an incident
13 regarding the jack or the jack stand. The other side
14 told me that somebody -- there's a problem with it and
15 somebody was hurt or died.
16   Q.   All right. Sir, I'm now going to go into
17 certain areas of your biography and your work history.
18   A.   That's fine.
19   Q.   Do you live in Taipei?
20   A.   I live in Chiayi.
21   Q.   How long have you lived there?
22   A.   Well, I don't know how to calculate that
23 exactly, because I left at certain intervals to study or
24 to work, so I don't know how to calculate how long I've
25 stayed in Chiayi.

Page 23

1    Q.   All right. Let's do that. What is your
2 highest level of education?
3    A.   University.
4    Q.   Can you tell us the university.
5    A.   I studied at the Chiayi University.
6    Q.   Where is that located?
7    A.   In Chiayi.
8    Q.   Is that in Taiwan or elsewhere?
9    A.   In Taiwan, in a place called Chiayi.
10   Q.   Did you graduate?
11   A.   Yes.
12   Q.   You received a degree?
13   A.   Yes.
14   Q.   When did you graduate and what degree did you
15 get?
16   A.   I graduated in 2004. I received a bachelor's
17 degree.
18   Q.   What was -- in any particular subject?
19   A.   I studied biomechanical engineering.
20   Q.   Have you ever been convicted of a crime?
21   A.   No.
22   Q.   Have you ever served in the military?
23   A.   Yes.
24   Q.   When did you serve and which service of the
25 military?

Page 24

1    A.   I joined the army in year 2000. I was in the
2 land force.
3        In Taiwan, it is mandatory to serve in the
4 army.
5    Q.   And for how long was your service before you
6 left the army?
7    A.   About a year or year and a half.
8    Q.   What was your rank upon discharge?
9    A.   I was a corporal.
10   Q.   Do you have any post-college degree, any
11 master's degree, any Ph.D.?
12   A.   No.
13   Q.   Once you graduated university, what was the
14 first job you had?
15   A.   I joined Shinn Fu Corporation in 2000. That
16 was my first job after the army. And I studied at night
17 to get my degree.
18   Q.   Okay. And what did do you for Shinn Fu
19 Corporation in Taiwan?
20   A.   Yes, it is in Chiayi in Taiwan. I worked at
21 the factory in Chiayi.
22   Q.   What did you do in the factory?
23   A.   I was a production technical engineer.
24   Q.   Does Taiwan have a system where engineers are
25 licensed or certified?

Page 25

1    A.   No. It depends, but it is not necessary for
2 you to get a license in order to apply for the
3 engineering jobs.
4    Q.   I'm sorry, you faded out at the very end.
5        INTERPRETER: Let me just repeat. The witness
6 said: "No. It depends, but it is not necessary for you
7 to get a license in order to apply for the engineering
8 jobs."
9 BY MR. EDINBURGH:
10   Q.   What I'm asking you is, does Taiwan have a
11 licensing system for engineers?
12       MR. ZAKRZEWSKI: Objection.
13       THE WITNESS: I'm not sure about that.
14 BY MR. EDINBURGH:
15   Q.   For how long were you in that department with
16 that factory from Shinn Fu, from when to when?
17   A.   From year 2002 to 2005.
18   Q.   And what was your next job after that?
19   A.   After that I worked for Weifu Co., Ltd.
20   Q.   Where was Weifu Co., Ltd., located?
21   A.   That is located in Taishan, in Guangdong
22 province, in China.
23   Q.   Did Shinn Fu Corporation assign you to that
24 position?
25       MR. ZAKRZEWSKI: Objection.

7 (Pages 22 - 25)

Page 26

1      THE WITNESS:  No.
2  BY MR. EDINBURGH:
3      Q.  What was your job at Weifu company, initially?
4      A.  I was a specialist at the engineering
5  department.
6      Q.  A specialist in what?
7          INTERPRETER:  "In the engineering department."
8  BY MR. EDINBURGH:
9      Q.  No, what did you specialize in?
10     A.  During my daily work, I helped the manager of
11 the engineering department to handle daily issues, and
12 also to help him develop and design the sports equipment
13 and gym equipment, and also the production line.
14     Q.  Why did you leave Shinn Fu Corporation?
15     A.  There are two parts to that.  First of all, I
16 would like to have a better prospect, I would like to
17 experience new things and challenge my capabilities.
18         And the second point is to get better
19 compensation.
20     Q.  Better compensation?
21         INTERPRETER:  Yes.
22         MR. EDINBURGH:  Is that the word?
23         INTERPRETER:  Yes.
24         MR. EDINBURGH:  I think we can all relate to
25 that.

Page 27

1      Q.  How did you select Weifu?  Of all the
2  companies there are, why that one?
3      A.  It's because I have the relevant background
4  and experience, and it also happened that I saw the
5  vacancy on the website.
6      Q.  How long were you a specialist in the
7  engineering department of Weifu company?
8      A.  From year 2005 until 2009 I was a specialist,
9  and from the year 2010 to 2013, I was the assistant VP
10 and manager of the engineering department.
11     Q.  What were your duties and responsibilities as
12 assistant vice president and manager in the engineering
13 department from 2010 to 2013?
14     A.  First of all, at the engineering department
15 there are two major divisions, the R&D and also the QC
16 divisions.
17         For R&D, I had to keep track of the design
18 development, and also certification testing of each new
19 product.  For QC, I'm involved in the quality and the
20 management system for shipment of goods, and also to see
21 whether they have been executed and comply with the ISO
22 standards.
23     Q.  Where did you work after 2013?
24     A.  After 2013, I left the company and returned to
25 Taiwan.

Page 28

1      Q.  Okay.  Have you worked in Taiwan the last four
2  or five years?
3      A.  Yes.
4      Q.  Doing what?
5      A.  I'm involved in reverse engineering projects
6  as related to 3-D scanning.
7      Q.  Have you returned at all to any employment
8  with Shinn Fu Corporation from 2013 to the present?
9      A.  No.
10     Q.  Do you do any contracting work for Shinn Fu,
11 the last four years?
12     A.  No, not with Shinn Fu.
13     Q.  With any Shinn Fu-related entity, that you're
14 aware of?
15         MR. ZAKRZEWSKI:  Objection.
16         THE WITNESS:  No.
17 BY MR. EDINBURGH:
18     Q.  Have you ever visited the United States?
19     A.  Yes.
20     Q.  When?
21     A.  I don't remember exactly.  It was either 2010
22 or 2011.
23     Q.  Was it for business, for pleasure, both?
24         MR. ZAKRZEWSKI:  Objection.
25         THE WITNESS:  I went to an expo.

Page 29

1  BY MR. EDINBURGH:
2      Q.  An expo in what?
3      A.  For gym equipment.
4      Q.  Where was the expo?  What city?
5      A.  I think it was in San Diego.
6      Q.  In your work as the assistant vice president
7  and manager of engineering from 2010 to 2013 for Weifu,
8  have you ever been involved in vehicle support stands,
9  jack stands?
10     A.  Yes.
11     Q.  What type of jack stands -- all right.
12         In your work as the assistant vice president
13 do you remember hearing about the testing of jack
14 stands?
15         MR. ZAKRZEWSKI:  I couldn't hear the --
16 BY MR. EDINBURGH:
17     Q.  Involved the testing of jack stands.
18     A.  Yes.
19     Q.  Did it involve design work with respect to
20 jack stands?
21     A.  Yes.
22     Q.  I want to ask you some questions about the
23 business of Weifu.
24     A.  That's fine.
25     Q.  What is Weifu's full corporate name?

8 (Pages 26 - 29)

Page 30

1    A.   Weifu Taishan Machinery and Electric Co, Ltd.
2    Q.   Thank you.
3         Under whose laws was Weifu organized?
4    A.   According to the laws of the People's Republic
5  of China.
6    Q.   Is Weifu still in business today?
7    A.   As far as I know, I don't think it's still in
8  operation.
9    Q.   As far as you know what?
10   A.   As far as I know, I don't think it is still in
11  operation.
12   Q.   Where was Weifu headquartered?
13   A.   In Taishan.
14   Q.   Was that also its principle place of business?
15   A.   Yes, it is the production base.
16   Q.   Did Weifu have manufacturing plants or
17  factories while you were there?
18        MR. ZAKRZEWSKI:  Objection.
19        THE WITNESS:  Yes.
20  BY MR. EDINBURGH:
21   Q.   Where was the factory or factories located?
22   A.   In Guangdong, China, in Taishan.
23   Q.   What was the business of Weifu?
24   A.   There are three main areas.  The first one is
25  jack stand, second one is electrical tools, and the

Page 31

1  third one is gym equipment.
2    Q.   The gym equipment, I take it, included items
3  such as stationary bikes, weight machines, is that
4  correct?
5    A.   Yes.
6    Q.   Okay.  Did Weifu manufacture automotive
7  lifting equipment?
8    A.   Yes, the jack stands.
9    Q.   Did it also manufacture jacks?
10   A.   Yes.
11   Q.   Did it also manufacture what is a
12  ratchet-and-pawl-designed jack stand?
13   A.   The answer is yes.
14        INTERPRETER:  And the witness clarified that
15  the pawl and ratchet bar should be together.
16  BY MR. EDINBURGH:
17   Q.   What was Weifu's understanding of what was a
18  ratchet-and-pawl-designed jack stand?
19        MR. ZAKRZEWSKI:  Objection.
20        INTERPRETER:  The witness just asked the
21  interpreter to repeat the question again.  (Chinese
22  spoken.)
23        The witness would like you to clarify.  "Are
24  you asking me how that was being designed or how it was
25  made?  How did it come about."

Page 32

1         MR. EDINBURGH:  All right.  Can the witness
2  explain his understanding of how a ratchet-and-pawl jack
3  stand operates?
4         THE WITNESS:  Are you asking me how we should
5  operate it, how we should use it, right?
6  BY MR. EDINBURGH:
7    Q.   I'm asking generally how a
8  ratchet-and-pawl-designed jack stand operates to perform
9  its function as a jack stand.
10   A.   Put it this way:  It utilizes the pawl to
11  support the weight.  So first of all, you have to pull
12  the ratchet bar to the height required and then the pawl
13  would carry the load of the vehicle.
14   Q.   Did the ratchet-and-pawl-designed jack stand
15  have a locking device or feature?
16        MR. ZAKRZEWSKI:  Objection.
17        THE WITNESS:  I don't quite understand what
18  you meant by "locking."  Do you mean that once it's
19  locked it cannot be moved again, it's fixed?
20  BY MR. EDINBURGH:
21   Q.   Yes, when it's raised, to lock it in its
22  raised position.
23        MR. ZAKRZEWSKI:  Objection.
24        THE WITNESS:  I'm not quite sure about your
25  question.

Page 33

1  BY MR. EDINBURGH:
2    Q.   Do you know how a ratchet-and-pawl-designed
3  jack stand works?
4    A.   I know that.
5    Q.   Okay.  Can you tell us how it works.
6    A.   First of all, under the condition of --
7  without any load, we have to raise it to the required
8  height, and then we use the jack to support the vehicle
9  and put the stand under the vehicle, and then we release
10  the pressure of the jack, and then the weight of the
11  vehicle would be on the jack stand.  So based on the
12  strength of the pawl and the corresponding ratchet bar
13  and the base, it would provide support for the vehicle.
14   Q.   Does the pawl on the jack stand lock the
15  ratchet bar in place after it is raised?
16        MR. ZAKRZEWSKI:  Objection.
17        You can answer.
18        THE WITNESS:  Yes.
19  BY MR. EDINBURGH:
20   Q.   All right.  For how long has Weifu been
21  manufacturing ratchet-and-pawl-designed jack stands?
22   A.   Prior to my employment at Weifu, they were
23  already producing that product.
24   Q.   And your employment began in 2005, is that
25  correct?

9 (Pages 30 - 33)

Page 34

1   A.  Yes.
2   Q.  So Weifu has been manufacturing jack stands
3  before that?
4   A.  Yes.
5   Q.  Ratchet-and-pawl-designed jack stands before
6  that?
7   A.  Yes.
8   Q.  And do you know when it first started
9  manufacturing ratchet-and-pawl-designed jack stands?
10   A.  I'm not sure about that.
11   Q.  Was Weifu a publicly traded company?
12   A.  No.
13   Q.  Was Weifu privately owned?
14   A.  Yes.
15   Q.  Who owned Weifu?
16   A.  It's owned by a company called e-Forum.
17   Q.  I'm sorry, can you please tell me that name
18  again?
19      INTERPRETER:  E, the letter E, for Easter, and
20  Forum, F-o-r-u-m.
21  BY MR. EDINBURGH:
22   Q.  And is e-Forum a corporation?
23      MR. ZAKRZEWSKI:  Objection.
24      You can answer.
25      THE WITNESS:  It's a company.

Page 35

1  BY MR. EDINBURGH:
2   Q.  I know it's a company.  Is e-Forum -- do you
3  know who owns e-Forum?
4   A.  It's owned by Vickie.
5   Q.  Is Vickie a woman?
6      WITNESS:  It's owned by Vickie Hung, H-u-n-g.
7  BY MR. EDINBURGH:
8   Q.  Was Vickie Hung also, to your knowledge, an
9  officer or director of Shinn Fu Corporation?
10      MR. ZAKRZEWSKI:  Objection.
11      THE WITNESS:  No.
12  BY MR. EDINBURGH:
13   Q.  To your knowledge of Weifu, was Vickie Hung an
14  officer or director of Shinn Fu Corporation?
15      MR. ZAKRZEWSKI:  Objection.
16      THE WITNESS:  No.
17  BY MR. EDINBURGH:
18   Q.  Does Weifu know a person named Michael Hung,
19  same last name as Vickie?
20   A.  I don't know.
21   Q.  I'm not asking whether you know, I'm asking
22  whether Weifu knows.
23      MR. ZAKRZEWSKI:  Objection.
24      THE WITNESS:  I'm not sure about that.
25  BY MR. EDINBURGH:

Page 36

1   Q.  Have you ever met Vickie Hung?
2   A.  Yes.
3   Q.  Did Vickie Hung have any operational role in
4  the day-to-day operations of Weifu?
5      MR. ZAKRZEWSKI:  Objection.  Asked and
6  answered.
7      THE WITNESS:  The answer is yes.
8      INTERPRETER:  And the witness would like to
9  clarify, the last name to Vickie should be Huang,
10  H-u-a-n-g, not Hung.
11  BY MR. EDINBURGH:
12   Q.  Was Vickie Huang the general manager of Weifu?
13   A.  Yes.
14   Q.  For what period of time?
15   A.  When I worked at the company, she was -- back
16  then, she was already the general manager of that
17  company.
18   Q.  So she was the general manager when you
19  arrived at the company, correct?
20   A.  Yes.
21   Q.  And did she remain the general manager until
22  you left the company?
23      MR. ZAKRZEWSKI:  Objection.
24      You can answer.
25      THE WITNESS:  The answer is yes.

Page 37

1  BY MR. EDINBURGH:
2   Q.  Did she live in Taishan, near where the
3  company was located?
4   A.  No.
5   Q.  Where did she live?
6   A.  She lives in Taiwan.
7   Q.  So she was the general manager of Weifu but
8  she lived in Taiwan, is that correct?
9      MR. ZAKRZEWSKI:  Objection.
10      THE WITNESS:  Yes.
11  BY MR. EDINBURGH:
12   Q.  And she ran the day-to-day operations of Weifu
13  while living in Taiwan, is that correct?
14      MR. ZAKRZEWSKI:  Objection.
15      THE WITNESS:  Yes.  It's because we also have
16  an assistant general manager.
17  BY MR. EDINBURGH:
18   Q.  Do you know if Vickie Huang reported to any
19  other individuals who had any ownership interest in
20  Weifu?
21      INTERPRETER:  The witness asked you to repeat
22  the question again.
23  BY MR. EDINBURGH:
24   Q.  Did Weifu have a board of directors?
25   A.  I'm not sure about that.

10 (Pages 34 - 37)

Page 38

1    Q.  Did Weifu, while you were there, have a chief
2 executive officer?
3    A.  We had an executive vice director, or vice
4 president.
5    Q.  And who was that?
6    A.  Which period are you talking about?
7    Q.  All right, when -- was there more than one
8 while you were there?  Was there more than one executive
9 vice director while you were there?
10   A.  Yes.
11   Q.  How many?
12   A.  During the time I worked there, there were
13 two.
14   Q.  Okay.  Who were they?
15   A.  The first one is Mr. Lu, and the second one is
16 Mr. Lai.
17   Q.  And did both of those individuals report to
18 Vickie?
19   A.  Yes.
20   Q.  Where in Taiwan did Vickie Huang live?
21   A.  I'm not sure about that.
22   Q.  Did she live near where Shinn Fu is located?
23       MR. ZAKRZEWSKI:  Objection.
24       THE WITNESS:  I don't know.
25 BY MR. EDINBURGH:

Page 39

1    Q.  Did Weifu have any position called
2 "president"?
3    A.  In China, the highest position is general
4 manager.
5    Q.  And that was Vickie Huang, correct?
6    A.  Yes.
7    Q.  Describe your interactions personally with
8 Ms. Huang -- professionally with Ms. Huang at Weifu.
9        MR. ZAKRZEWSKI:  Objection.
10       You can answer.
11       THE WITNESS:  During my daily work, I
12 typically would report to the executive vice president.
13 I rarely had interaction with the general manager.
14 BY MR. EDINBURGH:
15   Q.  So is it your testimony that you personally
16 never had professional interactions with Ms. Huang
17 directly?
18       MR. ZAKRZEWSKI:  Objection.
19       MR. CHAYKIN:  Objection.
20       THE WITNESS:  I cannot remember exactly.
21 BY MR. EDINBURGH:
22   Q.  Did Ms. Huang ever visit the plant in Taishan?
23   A.  I've seen her quite a few times.
24   Q.  How often, on an annual basis, was she
25 physically present in Taishan?

Page 40

1        MR. ZAKRZEWSKI:  Objection.
2        THE WITNESS:  It depends.
3 BY MR. EDINBURGH:
4    Q.  Okay.  During the years when you were the
5 assistant vice president, from 2010 to 2013, how
6 frequently did she come to Taishan?
7        MR. ZAKRZEWSKI:  Objection.
8        THE WITNESS:  You mean in total?  In total,
9 how many times she was in Taishan, right?
10 BY MR. EDINBURGH:
11   Q.  Let me ask you, on an annual basis, how many
12 days or weeks per year was she physically at the Taishan
13 plant of which she was the general manager?
14   A.  In a year, roughly, that would depend on the
15 work involved.  She may go there once every month or
16 every two months, or every three months to four months,
17 depending on the work.
18       MR. CHAYKIN:  There's a noise coming from your
19 end, it's very distracting.  I don't know if somebody is
20 ripping paper or something, but, you know, we can't hear
21 if there's noise coming over the line.
22       MR. EDINBURGH:  Okay.  Well, I'm just -- we're
23 not making any noise at our end.
24       MR. CHAYKIN:  Okay.  I don't know where it's
25 coming from, then.  Sorry, please continue.

Page 41

1        MR. EDINBURGH:  Can you please read the answer
2 back, Mr. Court Reporter.
3        (Record read by reporter.)
4        MR. EDINBURGH:  Give me a second.  Take a
5 few-minute bathroom break if we could at our end.
6 (10:57 a.m.)
7            (A break was taken.)
8 (11:08 a.m.)
9 BY MR. EDINBURGH:
10   Q.  Mr. Su, about how old is Vickie Huang?
11   A.  I'm not sure about that.
12   Q.  Your best estimate.
13       MR. ZAKRZEWSKI:  Objection.
14       THE WITNESS:  Maybe around 50 -- I'm sorry,
15 maybe around 65 to 70.
16 BY MR. EDINBURGH:
17   Q.  Does Weifu know anything about her background?
18       MR. ZAKRZEWSKI:  Objection.
19       You can answer.
20       THE WITNESS:  I don't quite understand your
21 question.  What do you mean by the company understand
22 her background?
23 BY MR. EDINBURGH:
24   Q.  Well, professional background, business
25 background, educational background, engineer,

11 (Pages 38 - 41)

---

**Page 42**

1 businesswoman.
2  MR. ZAKRZEWSKI: Objection.
3 BY MR. EDINBURGH:
4  Q. What is Weifu's knowledge of who she was, in
5 addition to being the general manager of Weifu?
6  MR. ZAKRZEWSKI: You're asking Weifu's
7 knowledge and not the witness's knowledge, and this
8 definitely isn't listed on your topics, so -- I'm
9 objecting on that basis.
10  MR. EDINBURGH: The topics include the
11 corporate relationship, the managerial positions of that
12 company.
13  MR. ZAKRZEWSKI: You're not asking about a
14 corporate relationship or a managerial position.
15  MR. EDINBURGH: She's the top manager.
16  MR. ZAKRZEWSKI: Yeah.
17  MR. EDINBURGH: Well, okay. The objection is
18 noted.
19  Q. Can you respond?
20  MR. ZAKRZEWSKI: He can respond, if he knows.
21  THE WITNESS: I'm not sure about that.
22 BY MR. EDINBURGH:
23  Q. Did Vickie Huang decide which products Weifu
24 would manufacture?
25  A. I don't know about that.

---

**Page 43**

1  Q. Who decided what products Weifu would
2 manufacture?
3  A. During my daily course of work, I report to
4 the executive vice president, and I'm not sure how he
5 makes the decision.
6  Q. Is your response you don't know, as a 30(b)(6)
7 witness sitting here today, who at Weifu made decisions
8 as to what products to make?
9  MR. ZAKRZEWSKI: Objection. I don't think the
10 deposition notice covers any products other than jack
11 stands.
12  MR. EDINBURGH: It covers the general business
13 of the company.
14  MR. ZAKRZEWSKI: The general business of the
15 company? What topic are you referring to? I don't
16 think the general business of the company would be a
17 proper topic, right?
18  You have to describe with reasonable
19 particularity the matters that you're going to examine
20 the witness on.
21  And I don't think this is a big deal, I don't
22 want to get bogged down in it, but, you know, when
23 you're specifically saying in your question, on behalf
24 of Weifu, are you saying X, and the X, the proposition
25 you're referring to is something that's not in the

---

**Page 44**

1 deposition notice, that's why I'm objecting. If the
2 witness knows, he can still answer.
3  (Record read by reporter.)
4  MR. CHAYKIN: Same objection.
5  THE WITNESS: I'm not sure about that.
6 BY MR. EDINBURGH:
7  Q. Okay. When did Weifu cease operating?
8  A. Clarify your question, because there are
9 different intervals.
10  Q. When did Weifu stop its making --
11 manufacturing products, including jack stands?
12  MR. ZAKRZEWSKI: Objection.
13  You can answer.
14  THE WITNESS: From the middle of 2012 the
15 company stopped taking orders, and, I think, ceased to
16 do that in 2013.
17 BY MR. EDINBURGH:
18  Q. Is the Weifu factory still in existence?
19  A. I'm not sure about that.
20  Q. Does the factory operate under a different
21 name, other than Weifu, currently?
22  A. I don't know about that.
23  Q. Do you know when Weifu was formed, can you
24 tell me what year, what period?
25  A. 2002.

---

**Page 45**

1  Q. Was the owner in 2002 the same owner
2 throughout the period, from 2002 until 2012?
3  A. Yes.
4  Q. And that was e-Forum?
5  A. Yes.
6  Q. As far as Weifu was aware, was Ms. Huang
7 always the owner of e-Forum from 2002 to and including
8 2012?
9  MR. ZAKRZEWSKI: What was the first part of
10 that question?
11 BY MR. EDINBURGH:
12  As far as Weifu was aware, was Ms. Huang the
13 owner of e-Forum from 2002 to 2012?
14  MR. ZAKRZEWSKI: Objection.
15  THE WITNESS: I'm not sure about that.
16 BY MR. EDINBURGH:
17  Q. For what years are you sure of?
18  A. I only know that Vickie Huang is the general
19 manager of Weifu.
20  Q. But you have testified she's also the owner of
21 the company that owns Weifu, correct?
22  MR. ZAKRZEWSKI: Objection.
23  THE WITNESS: According to my testimony
24 earlier, you asked me who was the owner of Weifu. I
25 said e-Forum, but I did not say that Vickie Huang is the

---

Page 46

1 owner of e-Forum.
2 BY MR. EDINBURGH:
3     Q.   Well, then I misunderstood.  That's exactly
4 what you said.
5          Who owns e-Forum?
6     A.   I'm not sure about that.
7     Q.   Do you know whether Vickie Huang has an
8 ownership interest in e-Forum?
9     A.   I don't know.
10    Q.   Do you know any of the owners of e-Forum?
11    A.   No, I don't know them.
12    Q.   Does Weifu know any of the owners of e-Forum?
13    A.   I'm not sure about that.
14    Q.   Do you know who appointed Vickie Huang as
15 general manager of Weifu?
16        MR. ZAKRZEWSKI:  Objection.
17        THE WITNESS:  I don't know about that.
18 BY MR. EDINBURGH:
19    Q.   Does Weifu know who appointed Vickie Huang as
20 general manager?
21    A.   I'm not sure about that.
22    Q.   I'm sorry --
23        MR. ZAKRZEWSKI:  I'm sorry, go ahead, Howard.
24 BY MR. EDINBURGH:
25    Q.   What was the -- what was the witness's answer?

Page 47

1        INTERPRETER:  The answer was:  "I'm not sure
2 about that."
3 BY MR. EDINBURGH:
4     Q.   Who started Weifu?
5     A.   I'm not sure about that.
6     Q.   All right.  Do you know who incorporated
7 Weifu?
8     A.   I don't know.
9     Q.   Did you, sir, in order to be a 30(b)(6)
10 witness here today, ask anyone about the corporate
11 history of Weifu or its ownership structure?
12        MR. ZAKRZEWSKI:  Objection.
13        You can answer.
14        THE WITNESS:  No.
15 BY MR. EDINBURGH:
16    Q.   Did you review any documents on these
17 subjects?
18    A.   I only read the company registration
19 certificate.
20    Q.   And does the registration certificate indicate
21 who incorporated the company?
22    A.   It was the legal representative, Vickie Huang.
23    Q.   So Vickie Huang incorporated Weifu, is that
24 correct?
25    A.   Yes.

Page 48

1     Q.   And Vickie Huang is identified in that
2 document as a citizen of Taiwan, is that correct?
3     A.   Yes, Taiwanese citizen.
4     Q.   Does Weifu have an understanding of who Shinn
5 Fu Corporation is?
6        INTERPRETER:  The witness asked the
7 interpreter to repeat the question again.  (Chinese
8 spoken.)
9        THE WITNESS:  I'm not sure about that.
10 BY MR. EDINBURGH:
11    Q.   Does Weifu have an understanding of what is
12 the business of Shinn Fu Corporation?
13        MR. ZAKRZEWSKI:  Objection.
14        THE WITNESS:  I don't know about that.
15 BY MR. EDINBURGH:
16    Q.   Did you ask anyone in order to testify today
17 as a 30(b)(6) witness who started the business of Shinn
18 Fu Corporation?
19        MR. ZAKRZEWSKI:  I don't want to make the same
20 long objection every time, but this falls in line with
21 my prior objection that the general business of Shinn Fu
22 Corporation is not a topic on the notice.
23        And I don't want to interrupt your
24 questioning, so I don't know if we can have some sort of
25 shorthand for that objection or if you just want me to

Page 49

1 say "Objection."
2        MR. CHAYKIN:  Maybe a standing objection.
3        MR. ZAKRZEWSKI:  Well, yeah.
4 BY MR. EDINBURGH:
5     Q.   All right.  Is Weifu part of Shinn Fu
6 Corporation's global operations?
7        MR. ZAKRZEWSKI:  Objection.
8        THE WITNESS:  I don't know.
9 BY MR. EDINBURGH:
10    Q.   Have you ever looked at Shinn Fu Corporation's
11 2011 website posting in preparation for this deposition?
12    A.   No.
13        MR. EDINBURGH:  All right.  Mr. Reporter, I
14 have the Shinn Fu Corporation 2011 website, some sheets
15 from it.  It should be with you.
16        (Exhibit 4 marked for identification.)
17 BY MR. EDINBURGH:
18    Q.   The question is whether you've seen this
19 document before.
20    A.   No.
21        MR. ZAKRZEWSKI:  We should note, for the
22 record, that on the first page of the document, in the
23 corner of it, there's an exhibit sticker from a prior
24 deposition that says SFA9 and it has a date that appears
25 to be 5/24/16 or 5/24/14.

13 (Pages 46 - 49)

Page 50

1      MR. EDINBURGH:  I don't think we have the
2  document for '14, so I think it's '16.
3      MR. ZAKRZEWSKI:  Okay.
4      MR. EDINBURGH:  And yes, this is a previously
5  marked exhibit.
6  BY MR. EDINBURGH:
7    Q.  Mr. Su, can you read this document?
8      MR. EDINBURGH:  Can the witness go to the
9  fourth page where there's a map of the world, so to
10  speak, this page (indicating).
11      THE WITNESS:  Yes.
12      MR. ZAKRZEWSKI:  We see it, we see it.  You
13  don't need to come closer.  We see it.
14  BY MR. EDINBURGH:
15    Q.  You see where Weifu Electric and Machinery is
16  noted in this map?
17    A.  Yes.
18    Q.  And you see at the top the Shinn Fu Corp
19  website it says "Affiliated Global Operations" on the
20  top?
21      MR. ZAKRZEWSKI:  Objection.
22      You can answer.
23      THE WITNESS:  Yes.
24  BY MR. EDINBURGH:
25    Q.  All right.  From Weifu's perspective, is this

Page 51

1  an accurate description of Weifu as part of Shinn Fu's
2  affiliated global operations?
3      MR. ZAKRZEWSKI:  Objection.
4      THE WITNESS:  I don't think it's correct.
5  BY MR. EDINBURGH:
6    Q.  Why not?
7    A.  Because I'm not affiliated with them in any
8  way.
9    Q.  When you say you're not, you mean Weifu is
10  not?
11      MR. ZAKRZEWSKI:  Objection.
12      You can answer.
13      THE WITNESS:  Yes.
14  BY MR. EDINBURGH:
15    Q.  Is that response based on your personal
16  knowledge?
17    A.  Yes.
18    Q.  Again, you don't know whether the owner of
19  your company is related in any way to Shinn Fu
20  Corporation or its owners?
21      MR. ZAKRZEWSKI:  Objection.
22      THE WITNESS:  I'm not sure about that.
23  BY MR. EDINBURGH:
24    Q.  What was his answer?
25      INTERPRETER:  "I am not sure about that."

Page 52

1  BY MR. EDINBURGH:
2    Q.  Does Weifu know a company called Shinn Fu
3  Taiwan?
4      MR. ZAKRZEWSKI:  Objection.
5      THE WITNESS:  I don't know.
6  BY MR. EDINBURGH:
7    Q.  When you say you don't know, as the corporate
8  representative of Weifu, is it your testimony that Weifu
9  doesn't know an entity called Shinn Fu Taiwan?
10      MR. ZAKRZEWSKI:  Objection.
11      THE WITNESS:  I'm not sure about that.
12  BY MR. EDINBURGH:
13    Q.  Now, I believe I asked you if you know a man
14  named Michael Hung, H-u-n-g, and am I correct that your
15  response was you do not know that individual?
16      MR. ZAKRZEWSKI:  Objection.
17      INTERPRETER:  The witness said yes.
18  BY MR. EDINBURGH:
19    Q.  And therefore, you do not know whether Vickie
20  Huang is the wife of Michael Hung, is that correct?
21      MR. ZAKRZEWSKI:  Objection.
22      THE WITNESS:  I'm not sure about that.
23  BY MR. EDINBURGH:
24    Q.  When you say you're not sure about that, can
25  you clarify what you mean?  Do you have any information

Page 53

1  that you have knowledge of, in being a 30(b)(6) witness
2  today, the relationship, if any, between Michael Hung
3  and Vickie Huang?
4      MR. ZAKRZEWSKI:  I'll say "notice objection"
5  to summarize my objection on that regarding the scope of
6  the notice.  I actually am not sure that that objection
7  needs to be made on the record to preserve it, but when
8  you state "on behalf of Shinn Fu" in your question --
9  BY MR. EDINBURGH:
10    Q.  Do you understand that?
11      MR. ZAKRZEWSKI:  Sometimes I feel like I
12  should make the objection.
13      If we would agree that objections -- that
14  certain answers would not be binding on the company if
15  they are outside of the notice, that that's an issue for
16  another day, and I don't need to preserve those
17  objections on the record, I'll stop making them, even if
18  we don't agree to that.  I do think --
19      MR. EDINBURGH:  You can make whatever -- all
20  right.  You can make the objection stand.  I just --
21      MR. ZAKRZEWSKI:  All right.  So, I'm sorry, go
22  on with the question.
23      MR. EDINBURGH:  I just want to get through the
24  deposition in the time allotted --
25      MR. ZAKRZEWSKI:  Go it.

14 (Pages 50 - 53)

Page 54

1      MR. EDINBURGH: -- get this thing done.  Let's
2  go forward, and I will rephrase.
3      MR. ZAKRZEWSKI:  All right.
4  BY MR. EDINBURGH:
5      Q.  Did you make any enquiries as part of your
6  duties and responsibilities as a 30(b)(6) witness here
7  today for Weifu to determine whether the general manager
8  of your company, Vickie Huang, had any familial or
9  marital relationship to any officers, owners, or board
10  members of Shinn Fu Corporation?
11      MR. ZAKRZEWSKI:  Objection.  Notice objection
12  and form objection.
13      THE WITNESS:  No.
14  BY MR. EDINBURGH:
15      Q.  Did Weifu from 2006 to 2011 pay dividends or
16  other financial money distributions to its owners or
17  shareholders?
18      MR. ZAKRZEWSKI:  Did Weifu?
19      MR. EDINBURGH:  Yeah, Weifu.
20      MR. ZAKRZEWSKI:  Objection.
21      You can answer.
22      THE WITNESS:  I don't know about that.
23  BY MR. EDINBURGH:
24      Q.  Did you make any enquiries to prepare yourself
25  to be Weifu's 30(b)(6) witness on this topic?

Page 55

1      MR. ZAKRZEWSKI:  Objection.  Notice objection.
2      THE WITNESS:  No.
3  BY MR. EDINBURGH:
4      Q.  Did Weifu, in the years you were at Weifu,
5  loan money to Shinn Fu Corporation?
6      A.  I don't know about that.
7      Q.  Did you ask anyone to respond to that
8  question?
9      A.  No.
10      Q.  Okay.  Did Shinn Fu Corporation loan money to
11  Weifu during the years 2003 to 2012?
12      A.  I don't know about that.
13      Q.  In order to be knowledgeable as Weifu's
14  30(b)(6) witness, did you ask anyone concerning this
15  topic?
16      A.  No.
17      Q.  Does Weifu have knowledge of a company called
18  Shinn Fu America?
19      A.  I'm not sure about that.
20      Q.  Did you make any enquiries of any other
21  current or former employees or anyone else of Shinn
22  Fu -- of Weifu in order to respond to this topic?
23      A.  No.
24      Q.  All right.
25      MR. ZAKRZEWSKI:  I should let you guys know

Page 56

1  before the next question, we're planning to break for
2  lunch here.  We're having lunch delivered here at 11:50.
3  So we're having lunch delivered here at 11:50.  We'll go
4  off, we'll hang up, and then I guess we can e-mail or
5  call you when it's time to call us back.
6      MR. EDINBURGH:  Sure, that's fine.  I'm sure
7  there's someplace at midnight we can go get a bite.
8      MR. ZAKRZEWSKI:  Get a slice.
9      MR. EDINBURGH:  And a drink.  Get a slice.
10  Just tell me when you want to stop.
11      MR. ZAKRZEWSKI:  All right.
12      MR. EDINBURGH:  Okay?
13      MR. ZAKRZEWSKI:  Yeah.
14  BY MR. EDINBURGH:
15      Q.  I'd like you, Mr. Su, to go to the notice of
16  deposition, specifically to Item 18.  Please look at it
17  now.
18      MR. ZAKRZEWSKI:  Exhibit 2.  It's in the pile.
19  BY MR. EDINBURGH:
20      Q.  Mr. Su, do you see Item 18?
21      A.  Yes.
22      Q.  And Item 18, the topics listed in Item 18 are
23  "The corporate interrelationship between and among Shinn
24  Fu, Shinn Fu America, MVP and Weifu, including," and it
25  begins with "A, common officers and directors."

Page 57

1      Are you aware of any common officers and --
2  withdrawn.
3      Is Weifu aware of any common officers and
4  directors between or among these companies?
5      A.  I'm not sure about that.
6      Q.  Did you make any inquiries to be a
7  knowledgeable 30(b)(6) witness or talk to anyone
8  concerning the topic in 18, subsection A?
9      A.  No.
10      Q.  The next item is 18B, concerning the
11  appointment of officers and senior managers between and
12  among the same companies.
13      Do you have any knowledge concerning the
14  appointment of officers and senior managers concerning
15  these entities?
16      A.  I don't know that.
17      Q.  Did you make any enquiries as a 30(b)6 witness
18  of anyone else in order to respond to 18B?
19      A.  No.
20      Q.  18C requests on the topic of common ownership
21  interest between and among the same companies.
22      Does Weifu have knowledge of the common
23  ownership interest, if any, between or among these
24  companies?
25      A.  I don't know about that.

15 (Pages 54 - 57)

Page 58

1    Q.  Did you make any effort to speak with anyone
2  at Weifu, current or former or anyone else, in order to
3  acquire knowledge to respond to 18C?
4    A.  No.
5    Q.  And 18D is the corporate affiliations between
6  and among these companies.
7         Does Weifu have knowledge to respond to 18D?
8    A.  No.
9    Q.  Did you, as Weifu's 30(b)(6) witness, make any
10  effort to speak with anyone or view any records in order
11  to respond to 18D?
12    A.  No.
13    Q.  All right.  18E concerns ownership of the
14  plants or facilities where the jack stands were or are
15  made.
16         Do you have knowledge to respond to 18E?
17         MR. ZAKRZEWSKI:  Objection.  Asked and
18  answered.
19         You can answer.
20         THE WITNESS:  My answer is the same as what I
21  said earlier.
22  BY MR. EDINBURGH:
23    Q.  All right.  Go to 18F.  18F asks for common
24  financial, managerial and business relationships between
25  or among these various companies.

Page 59

1         Have you acquired knowledge, as Weifu's
2  30(b)(6) witness, to respond to 18F?
3    A.  I know that we have business interaction with
4  MVP.
5    Q.  Say again, I couldn't hear.
6    INTERPRETER:  "I know that we have business
7  interaction with MVP."
8  BY MR. EDINBURGH:
9    Q.  And I'm not asking you to describe what they
10  are, but can you describe those relationships, yes or
11  no?
12         MR. ZAKRZEWSKI:  Objection.
13         THE WITNESS:  The answer is yes.
14  BY MR. EDINBURGH:
15    Q.  Okay.  How about financial or managerial
16  relationships between the various entities, have you
17  acquired knowledge, as Weifu's 30(b)(6) witness, to
18  respond to that portion of 18F?
19    A.  I cannot do that.
20    Q.  Have you made any effort, as Weifu's
21  designated 30(b)(6) witness, in terms of reviewing any
22  documents or talking to any current or former employees
23  of Weifu or anyone else in order to respond to 18F,
24  topics of the common financial and managerial
25  relationships between and among the various entities?

Page 60

1    A.  No.
2    Q.  Now, there's no G.  That was a typo on our
3  part, but there's an 18H, which calls for the shared or
4  common services such as legal, insurance, and
5  accounting.
6         Do you have knowledge, as Weifu's 30(b)(6)
7  witness, to respond to this topic?
8    A.  I only know that we used the same insurance
9  company.
10    Q.  All right.  What about services such as legal
11  and accounting?
12    A.  I'm not sure about that.
13    Q.  Did you make any effort, as Weifu's 30(b)(6)
14  witness, to question any current or former employees of
15  Weifu or anyone else in order to respond to that portion
16  of 18H?
17    A.  No.
18    Q.  Mr. Su, you were aware, coming in to today's
19  deposition, that the various subsections of 18 were
20  topics of which Weifu's 30(b)(6) witness would be
21  questioned today, correct?
22    A.  I know that.
23    Q.  Okay.  And you understood that we have a
24  translator, we have a videoconferencing system, we have
25  this video system in place in order for us to acquire

Page 61

1  your testimony?  You're aware of all this, correct?
2         MR. ZAKRZEWSKI:  Objection.
3         THE WITNESS:  Yes.
4  BY MR. EDINBURGH:
5    Q.  Sir, can you tell me why, after those portions
6  of Item 18, those sections we just went over, that you
7  have testified to you have no knowledge of, you didn't
8  make any effort to acquire knowledge, why you did not
9  make any effort to acquire knowledge?
10    A.  I did try to ask certain people regarding
11  these questions, but they did not provide me with the
12  answer to answer these topics.
13    Q.  Well, I just asked you whether you asked
14  anyone on certain topics and your response was you
15  didn't.
16         Are you now saying that you did make an effort
17  to learn about these topics?
18    A.  Yes, because the company has ceased operation,
19  so I wasn't quite sure who to ask about these questions.
20    Q.  Well, did you ask anyone about any of the
21  topics listed in Topic No. 18?  Any of the sections of
22  Topic 18, did you speak to anyone?
23    A.  No.
24    Q.  Did you attempt to chat to Vickie Huang?
25    A.  No.

16 (Pages 58 - 61)

Page 62

1    Q.  She's still alive, isn't she?  Is she alive,
2  to your knowledge?
3    A.  I'm not sure about that.
4    Q.  Do you have any reason to believe she's dead?
5    A.  I don't know how to answer that question.
6    Q.  Okay.  How about the two executive vice
7  presidents who were your bosses during those years, did
8  you reach out to Mr. Lu and Mr. Lei, is it?  L-e-i?
9    A.  Well, since they have already left the
10  company, we did not have much contact.
11      MR. EDINBURGH:  Steve, can you hear me?
12      MR. ZAKRZEWSKI:  Yes.  Your question -- there
13  was an answer to your question on the record.  Were you
14  able to hear it?
15      MR. EDINBURGH:  No.  Steve, we're breaking up
16  here.  We have a bad connection right now.
17      MR. ZAKRZEWSKI:  Yeah, the video is bad but
18  the audio is fine.  Do you still have a good audio?
19      MR. EDINBURGH:  The audio is breaking up.
20      MR. ZAKRZEWSKI:  Okay.  Not on our end.  Our
21  audio is good.
22      Now is a good time to break for lunch anyway,
23  so I will e-mail you and Brian to call us back.  All
24  right?
25      MR. EDINBURGH:  All right.

Page 63

1  (12:00 p.m.)
2        (The lunch break was taken.)
3  (12:50 p.m.)
4  BY MR. EDINBURGH:
5    Q.  Did you have the ability to find out --
6      MR. ZAKRZEWSKI:  Are we back on the record?
7      MR. EDINBURGH:  I'm sorry.
8      MR. ZAKRZEWSKI:  Okay.
9      MR. EDINBURGH:  Withdraw the question.
10      MR. ZAKRZEWSKI:  Now that we're back on the
11  record, I'd like to say that over the lunch break it
12  became clear that the witness was confused about the
13  line of questioning before lunch, starting with
14  questions about Weifu's knowledge of SFA and through
15  deposition notice Topic 18.  The witness, who is an
16  engineer and was prepared as the corporate
17  representative for Weifu for this deposition, had some
18  confusion about what it means for a company to know
19  something and the difference -- or the distinction
20  between his personal knowledge and the company's
21  knowledge, and there may have been, and likely were,
22  some translation issues as well.  So those questions, we
23  will need to go over again, and I invite you to do that,
24  if you want to.  And if you do not, then I will be going
25  back through them after you complete your questioning.

Page 64

1      MR. EDINBURGH:  If we do that, I don't want
2  that to count against my time.
3      MR. ZAKRZEWSKI:  That is exactly -- that is
4  exactly what I thought you would say.
5      MR. CHAYKIN:  That's why we're offering to do
6  it.
7      MR. ZAKRZEWSKI:  Yeah, that's why I'm offering
8  to do it, as well.
9      MR. EDINBURGH:  -- witness.
10      MR. ZAKRZEWSKI:  I couldn't hear you.
11      MR. EDINBURGH:  Fine.  Thank you.  All right.
12  Steve, with the understanding that I'm going
13  back, at your suggestion, and that it won't count
14  against the total time, I'll go back -- I'll ask him
15  separately about SFA.  But right now I want to go back
16  to Item 18 -- Topic 18.
17      MR. ZAKRZEWSKI:  Okay.
18      MR. EDINBURGH:  Again, with that
19  understanding, we'll proceed.
20      MR. ZAKRZEWSKI:  Yeah, and when you're done,
21  you know, repeating the line of questioning, then we'll
22  agree what time it is and then we'll kind of start
23  counting from there.
24      MR. EDINBURGH:  All right.
25    Q.  Mr. Su, having returned from the lunch break,

Page 65

1  your attorney indicated to us that there was a certain
2  confusion or misunderstanding on your part as to the
3  distinction between your personal knowledge and the
4  knowledge of Weifu with respect to the topics in Item 18
5  that we went over in detail.
6      Can you tell me the nature of your
7  misunderstanding.
8    A.  Well, what I did not understand earlier was
9  what I said should be whatever that Weifu knows about.
10    Q.  Do you have an understanding, as a 30(b)(6)
11  witness, you're answering not only as to your own
12  knowledge on these topics, but also the knowledge that
13  Weifu has as a corporate entity on this particular
14  topic?  Do you understand that?
15    A.  I know that part of -- during the course of
16  the interpretation was being interpret and how I
17  understood it was slightly different.
18    Q.  Well, let's go back.  Put 18 in front of you.
19  Can you look at 18, please.  Do you have it there?
20    A.  Yes, I have that.
21    Q.  Okay.  Did you have a recollection of what
22  your answers were to my questions about request No. 18
23  and the subsections of it this morning?
24    A.  Yes, I have some recollection of that.
25    Q.  So let go through each of them and see whether

17 (Pages 62 - 65)

Page 66

1 you now wish to change your prior answer.
2     MR. ZAKRZEWSKI: You have to let her
3 translate, Howard. She's trying to translate.
4     MR. EDINBURGH: My mistake. I apologize.
5     MR. ZAKRZEWSKI: It's okay.
6     THE WITNESS: I understand.
7 BY MR. EDINBURGH:
8    Q. Let's go to 18A. Concerning the topic of
9 common officers and directors, do you wish to change
10 your prior answers with respect to 18A?
11     MR. ZAKRZEWSKI: What's the question
12 specifically? Because I think you asked sort of a
13 series of questions about each subletter.
14     MR. EDINBURGH: Well, going to A, he said he
15 understood when he answered this morning about 18A, and
16 now I'm giving him an opportunity to change his answer
17 if he desires to do so.
18     MR. ZAKRZEWSKI: But Howard, he doesn't read
19 English very well, so when you ask him "Did you change
20 18A?" he doesn't know what 18A says. He doesn't read
21 English very well.
22 BY MR. EDINBURGH:
23    Q. 18A talks about common officers and directors
24 between and among Shinn Fu, Shinn Fu America, MVP and
25 Weifu.

Page 67

1    A. Yes.
2    Q. Okay. As Weifu's 30(b)(6) witness, do you
3 have knowledge to respond to that topic of whether or
4 not there were common officers or directors?
5    A. Yes, I would like to make a change.
6    Q. Okay. What change would you like to make?
7    A. Earlier, my response to that question was, I
8 do not know, and now I would like to amend my answer.
9 Regarding the management of these four companies, they
10 are not the same.
11    Q. Let's begin with the common officers and
12 directors.
13       Is it your testimony, on behalf of Weifu, that
14 there were no common officers and directors, as far as
15 Weifu is aware?
16    A. Yes.
17    Q. How did you acquire -- from whom did you
18 acquire the knowledge in order to give the response you
19 just gave?
20    A. As I described earlier, for me to offer the
21 testimony, I had a discussion with Nora, Peter, Sheng
22 and my counsels earlier who provided the information.
23    Q. Can you identify who specifically, when you
24 say your counsel, who you're referring to?
25    A. Sheng.

Page 68

1    Q. "Counsel" meaning attorney. You used the word
2 "counsel."
3     MR. ZAKRZEWSKI: "Lawyer," maybe is a good
4 word.
5 BY MR. EDINBURGH:
6    Q. Lawyer. Who is the lawyer who provided you
7 with information in order to respond to 18A?
8    A. Steve.
9     MR. ZAKRZEWSKI: I object to the specific
10 wording of the question, but yes, I am his lawyer.
11 BY MR. EDINBURGH:
12    Q. All right. And what was the -- what was
13 Peter's job or title at -- withdrawn.
14       Tell us again who Peter is.
15    A. As I mentioned earlier, Peter is the sales
16 engineer of Shinn Fu.
17    Q. Okay. So what did Peter tell you concerning
18 the issue of common officers and directors of Shinn Fu,
19 MVP, Weifu and Shinn Fu America? What did he tell you?
20    A. We discussed this matter. There were no
21 common senior management among these companies.
22    Q. Peter told you that?
23    A. No, we discussed together.
24    Q. What I'm asking you, sir, is, did Peter supply
25 you with the knowledge that there were no common

Page 69

1 officers and directors? Is he the one who told you that
2 there were no common officers and directors?
3    A. No. During the course of discussion, based on
4 each of us, our knowledge, there were no common senior
5 officers among these four companies.
6     MR. ZAKRZEWSKI: I object to the extent this
7 is becoming a memory test. You know, the point is to
8 get the information on behalf of the company. We
9 produced, it was produced in this action, a chart that
10 shows all this information. But there was a chart that
11 was produced with all this information which was in the
12 pile of documents that you provided to the court
13 reporter for these depositions, you know, that hasn't
14 been marked, that has all this information.
15     MR. EDINBURGH: Steve, I understand that but
16 as you well know I'm entitled to independently, with
17 documents or interrogatory answers, ask the corporate
18 witness questions on these topics.
19     MR. ZAKRZEWSKI: Okay.
20     MR. EDINBURGH: And I've asked him what
21 documents he reviewed, he gave me a list and --
22     MR. ZAKRZEWSKI: He also said that he reviewed
23 documents that were provided by his attorney, right?
24 You provided me documents before the deposition.
25     MR. EDINBURGH: I did not hear that on my end.

18 (Pages 66 - 69)

1 I only heard certain test reports.
2      MR. ZAKRZEWSKI:  It's on the record.
3      MR. CHAYKIN:  It's on the record.
4      MR. EDINBURGH:  I'm not saying it wasn't, I'm
5 just saying I didn't hear it.  But nevertheless, if his
6 information is based on personal conversations with
7 current or former employees, I am entitled to enquire to
8 the nature of those conversations, what was said.
9      MR. ZAKRZEWSKI:  No doubt.
10 BY MR. EDINBURGH:
11    Q.  All right.  Let's go to 18B, the appointment
12 of officers and senior managers.  You gave a response
13 this morning.  Do you wish to change that response now?
14      MR. ZAKRZEWSKI:  Objection to form.
15      THE WITNESS:  No.
16 BY MR. EDINBURGH:
17    Q.  Let's go to 18C, which concerns common
18 ownership interests between and among Shinn Fu, SFA,
19 MVP, and Weifu.  Again, you gave a response this morning
20 on 18C.  Did you wish to change that now?
21      MR. ZAKRZEWSKI:  Objection to form.
22      THE WITNESS:  No.
23 BY MR. EDINBURGH:
24    Q.  Let's go to 18D, which speaks about the
25 corporate affiliations between and among Shinn Fu, SFA,

1 MVP and Weifu.  You gave a response this morning on 18D.
2 Do you wish to change it now?
3      MR. ZAKRZEWSKI:  Objection to form.
4      THE WITNESS:  No.
5 BY MR. EDINBURGH:
6    Q.  If we go to 18F, which talks about common
7 financial, managerial and business relationships between
8 and among Shinn Fu, SFA, MVP and Weifu.  Again, you gave
9 a response to that this morning.  Do you wish to change
10 your answer now?
11    A.  Yes.
12    Q.  Okay.  How do you wish to change your answer?
13    A.  MVP is a client.  Shinn Fu America placed the
14 order for certain orders with MVP.
15    Q.  Do you wish to further change your answer or
16 is that the extent of your change?
17    A.  Yes, that's it.
18    Q.  And let's go to 18H, which asks for shared or
19 common services such as legal, insurance and accounting.
20 You gave a response to that topic this morning.  Do you
21 wish to change your response now?
22    A.  No.
23      MR. EDINBURGH:  All right.  I think that
24 covers the 18 topic, and we'll go forward.  And I guess
25 we can go back on the clock now.  All right?

1      MR. ZAKRZEWSKI:  Yes.
2      MR. CHAYKIN:  I had a timer going.  It's 15
3 minutes and 25 seconds.
4      MR. EDINBURGH:  All right.  So anyway, that
5 doesn't count against the total.
6      MR. ZAKRZEWSKI:  Right.
7      MR. EDINBURGH:  Mr. Reporter, can you show the
8 witness a document, which your copy may have previously
9 been marked, I'm not sure, which is a list of directors
10 for Shinn Fu Taiwan, MVP and SFA, and it's
11 Bates-numbered SFA003233, -3234, and -3235.  It should
12 be a three-page doc.
13      MR. ZAKRZEWSKI:  All right.
14      (Exhibit 5 marked for identification.)
15      MR. EDINBURGH:  My question to the witness is:
16 Has he seen this document before today?
17      THE WITNESS:  No.
18 BY MR. EDINBURGH:
19    Q.  So was this one of the documents that you were
20 asked to review to prepare to be Weifu's 30(b)(6)
21 witness?
22    A.  No.
23    Q.  I'd like you to look, nevertheless, at the
24 bottom grid, or chart, where it lists SFA directors.
25 And you see, there's a name, Vickie Huang, H-u-a-n-g,

1 listed?  Do you see that?
2    A.  Yes.
3    Q.  To Weifu's knowledge, is this the same Vickie
4 Huang that owns the company that owns Weifu?
5    A.  Yes.
6    Q.  I'd like you to look at the top left where it
7 says "SFT directors."  And you see the bottom name in
8 English, before the Chinese characters, is Vickie Hung,
9 H-u-n-g, do you see that?
10    A.  I see that.
11    Q.  Do you know whether Vickie Hung, H-u-n-g, and
12 Vickie Huang, H-u-a-n-g, are one and the same person?
13    A.  The surnames are different.
14    Q.  Yes, I understand that, in the writing, but
15 I'm asking you whether you know if that's a mistake and
16 whether they are the same individual.  Either you know
17 or you don't, whatever your answer is.
18    A.  I'm not sure about that.
19    Q.  All right, thank you.  You don't have to look
20 at it anymore.  We're done.
21      Now, I believe I may have asked you this at
22 the very end of the morning, but does Weifu know an
23 American-based company named Shinn Fu America?
24    A.  Yes.
25    Q.  And what is Weifu's knowledge of the business

19 (Pages 70 - 73)

Page 74

1 of Shinn Fu America, which I will also refer to as -- by
2 its initials, SFA?
3        MR. ZAKRZEWSKI: Objection.
4        You can answer.
5        THE WITNESS: The sales of the jack stand
6 product.
7 BY MR. EDINBURGH:
8    Q.  Do you understand Shinn Fu America to sell
9 jack stands?  Withdraw that.
10       Does Weifu understand Shinn Fu America to be
11 in the business of selling jack stands?
12       MR. ZAKRZEWSKI: Objection.
13       You may answer.
14       THE WITNESS: To sell products related to jack
15 stands.
16 BY MR. EDINBURGH:
17   Q.  I'm sorry, I'm trying to understand.
18       Is it your understanding that Shinn Fu America
19 purchases jack stands, either directly or indirectly,
20 from Weifu?
21       MR. ZAKRZEWSKI: Objection.  You're saying
22 jack stands in general, right, not necessarily the jack
23 stands in this case?
24       MR. EDINBURGH: In general.
25       MR. ZAKRZEWSKI: Yeah, okay.

Page 75

1        MR. EDINBURGH: Yes.
2        THE WITNESS: I know that SFA placed orders
3 with MVP.
4        MR. EDINBURGH: Can you read that back.  I
5 couldn't hear the answer.
6        INTERPRETER: The answer was: "I know that
7 SFA placed orders with MVP."
8 BY MR. EDINBURGH:
9    Q.  For jack stands?
10   A.  Yes, and also other products related to the
11 jack stand.
12   Q.  Does Weifu know a company called MVP (HK)
13 Industries, Ltd., or MVP?
14   A.  MVP.
15   Q.  Yes, does Weifu know a company called MVP?
16   A.  Yes.
17   Q.  What is Weifu's knowledge of the businesses of
18 MVP?
19   A.  The sales of jack.
20   Q.  Jack stands or jacks, or both?
21   A.  Both.
22   Q.  Does Weifu know who owns MVP?
23       MR. ZAKRZEWSKI: Objection.
24       THE WITNESS: I don't know.
25 BY MR. EDINBURGH:

Page 76

1    Q.  Do you know whether MVP is chartered in Hong
2 Kong?
3        MR. ZAKRZEWSKI: Objection.
4        THE WITNESS: I know its office is in Hong
5 Kong.
6 BY MR. EDINBURGH:
7    Q.  Is Weifu aware, in the years 2003 to 2011, of
8 any of the senior executives or managers of MVP?
9        MR. ZAKRZEWSKI: Objection.
10       THE WITNESS: Yes.
11 BY MR. EDINBURGH:
12   Q.  Who are they, to Weifu's knowledge?
13       MR. ZAKRZEWSKI: Objection.
14       You can answer.
15       THE WITNESS: As I -- as far as I know, they
16 were Ben and Jack Liu.
17       MR. EDINBURGH: I'm sorry, can you just repeat
18 the answer, please.
19       INTERPRETER: The witness said "As far as I
20 know, they were Ben and Jack Liu."
21 BY MR. EDINBURGH:
22   Q.  Jack Liu, okay.  And the other name was Fang?
23       INTERPRETER: Ben.
24 BY MR. EDINBURGH:
25   Q.  Does Weifu know a company called MVP

Page 77

1 International Co., Ltd.?
2    A.  Yes.
3    Q.  What is Weifu's knowledge of the business of
4 MVP International?
5        MR. ZAKRZEWSKI: Objection.
6        You can answer.
7        THE WITNESS: The sales of jack.
8 BY MR. EDINBURGH:
9    Q.  Did Weifu ever make loans to MVP or MVP
10 International?
11   A.  No.
12   Q.  What is the basis for that answer?  Do you
13 know of your own knowledge or did you enquire of someone
14 else to answer that?
15   A.  I heard that from our manager from the finance
16 department.
17   Q.  A Weifu manager?
18   A.  Yes, he's a manager at Weifu -- Weifu's
19 financial department.
20   Q.  Who is that person, what is his name?
21   A.  Mr. Chen Shu Er.
22   Q.  Did Weifu ever make loans to Shinn Fu America?
23   A.  No.
24   Q.  Again, what's the source of that answer?
25   A.  It's also from the manager of our financial

20 (Pages 74 - 77)

Page 78

1 department.
2    Q.  Did you speak to that manager in preparation
3 for your deposition here today?
4    A.  No.
5    Q.  Did Weifu guarantee loans made by others for
6 MVP, Shinn Fu or SFA?
7    A.  No.
8    Q.  Again, what is the source of your knowledge in
9 order to give that response?
10    A.  It's also from the manager of the finance
11 department of Weifu?
12    Q.  Did Weifu have, from 2003 to 2012, a budget
13 for its operations?
14       MR. ZAKRZEWSKI:  Objection.  Answer if he
15 knows.
16       THE WITNESS:  I don't quite understands what
17 you meant by "budget."  How do you define that?
18 BY MR. EDINBURGH:
19    Q.  Well, did Weifu have a business plan where it
20 listed its costs and revenue over the period of a year's
21 projected course, where it wanted to put its money for
22 its day-to-day operations?
23       MR. ZAKRZEWSKI:  Objection.
24 BY MR. EDINBURGH:
25    Q.  Any kind of financial documents such as that?

Page 79

1    A.  I'm not sure about that.
2    Q.  Did Weifu have a capital budget?  Do you know
3 what that means?
4       MR. ZAKRZEWSKI:  Objection.
5       THE WITNESS:  I don't quite understand what
6 you meant by an annual budget.  I don't quite understand
7 this term.
8 BY MR. EDINBURGH:
9    Q.  I didn't say "annual," I said a "capital
10 budget," meaning a budget to purchase equipment,
11 machinery, improvements of the plant and its facilities.
12       MR. ZAKRZEWSKI:  Objection.
13       THE WITNESS:  I don't think that's something
14 we call a budget.  I think it would be something like an
15 annual sales target, because you cannot predict your
16 sales figures ahead of time.
17       MR. EDINBURGH:  I'm sorry, can you tell me
18 what the answer was?  I couldn't hear it?
19       INTERPRETER:  The answer was:  "I don't think
20 that's something we call a budget.  I think it should be
21 something like the annual sales target, because you
22 cannot predict your sales figures ahead of time."
23 BY MR. EDINBURGH:
24    Q.  All right.  Did Weifu, in 2003 through 2012,
25 manufacture jack stands?

Page 80

1    A.  Yes.
2    Q.  Did it manufacture, during that same time
3 period, ratchet-and-pawl-designed jack stands?
4    A.  No.
5    Q.  Did it manufacture ratchet-and-pawl-designed
6 jack stands for Shinn Fu America?
7    A.  We sold to a lot of clients.
8       MR. EDINBURGH:  Can you repeat that answer.
9       INTERPRETER:  We sold the product to a lot of
10 clients.
11 BY MR. EDINBURGH:
12    Q.  I'd ask you, did it manufacture
13 ratchet-and-pawl-designed jack stands for Shinn Fu
14 America?
15    A.  Yes.
16    Q.  All right.  Did Shinn Fu America have a jack
17 stand brand called "Pro-Lift"?
18       MR. ZAKRZEWSKI:  Objection.
19       You can answer.
20       THE WITNESS:  The answer is yes.
21 BY MR. EDINBURGH:
22    Q.  Did Weifu manufacture jack stands under the
23 Pro-Lift brand?
24       INTERPRETER:  The witness asked the
25 interpreter to repeat again.

Page 81

1       THE WITNESS:  Are you asking me whether we
2 have shipped out the jack stand product with the ratchet
3 bar under this brand?
4 BY MR. EDINBURGH:
5    Q.  Yes.
6    A.  Yes.
7    Q.  All right.  Did Weifu manufacture a
8 ratchet-and-pawl-designed jack stand which it designated
9 as T37401?
10    A.  Yes.
11    Q.  What was the maximum height of the ratchet bar
12 of the T37401 jack stand?
13    A.  Around 468 millimeters.
14    Q.  Do you know in inches what the maximum height
15 is?
16    A.  It should be slightly over 7 inches.
17       MR. ZAKRZEWSKI:  Objection.
18       INTERPRETER:  17 inches.  Sorry.
19 BY MR. EDINBURGH:
20    Q.  Is that 1-7?
21       INTERPRETER:  Yes, slightly over 1-7 inches.
22 BY MR. EDINBURGH:
23    Q.  That's fine.  And what was the minimum height
24 of the ratchet bar of the T37401?
25    A.  It should be 302 millimeters.

21 (Pages 78 - 81)

Page 82

1    Q.  Again, can you tell me that in inches?
2    A.  It should be over 12 inches.
3        MR. ZAKRZEWSKI:  We'll stipulate that 1 inch
4  equals about 25.4 millimeters, if it helps.
5        MR. EDINBURGH:  That's fine.  We'll agree to
6  that stipulation.
7    Q.  What was the load capacity for an individual
8  T37401 jack stand?
9    A.  8,000 pounds.
10   Q.  What was the weight of an individual T37401
11 jack stand?
12   A.  For a single one, it would be around 5 kg.
13   Q.  Five kilograms?
14   A.  Yes.
15   Q.  I can do that conversion.
16       MR. ZAKRZEWSKI:  I was going to say, don't do
17 it.
18 BY MR. EDINBURGH:
19   Q.  Where did Weifu first begin manufacturing the
20 T37401 ratchet-and-pawl-designed jack stand?
21   A.  As far as I know, they started manufacturing
22 that product before I joined the company.
23       INTERPRETER:  The witness would like to ask
24 for a clarification.  Are you talking about the jack
25 stand with the model number T37401 or that type of jack

Page 83

1  stand?
2  BY MR. EDINBURGH:
3    Q.  Yes, I'm talking about the -- the jack stand
4  that Weifu designated, its T37401 jack stand, the
5  ratchet-and-pawl design.  When was that jack stand first
6  manufactured by Weifu?
7    A.  It would be 2007 for the formal batch
8  production of this product.
9    Q.  Was the ratchet bar to the T37401 made of 100
10 percent steel?
11   A.  Yes.
12   Q.  And what was the base and collar -- or the
13 base frame and collar of the jack stand made of?
14       INTERPRETER:  So the witness said, for the
15 base frame, it was made with Q235 steel plate, but
16 regarding the collar, what -- what do you mean by
17 "collar"?
18 BY MR. EDINBURGH:
19   Q.  The part into which the ratchet bar goes,
20 where the pawl is located.
21   A.  For the collar, it was made with the same
22 steel plate Q235.
23   Q.  Was the T37401 jack stand originally
24 manufactured for Shinn Fu America?
25   A.  No.

Page 84

1    Q.  Who was it manufactured for, if anyone?
2    A.  That product was made for Sears.
3    Q.  Did Shinn Fu manufacture a jack stand with the
4  designation T6904?
5        MR. ZAKRZEWSKI:  Say again.
6  BY MR. EDINBURGH:
7    Q.  Okay.  Did -- I'm sorry, I mispronounced it.
8  I'll withdraw the last question.
9        Did Weifu manufacture a four-ton capacity
10 ratchet-and-pawl-designed jack stand for SFA designated
11 as T6904?
12   A.  Yes.
13   Q.  I'm sorry, I couldn't hear the answer.
14       INTERPRETER:  "Yes," "yes."
15 BY MR. EDINBURGH:
16   Q.  Was the T6904 sold under the Pro-Lift brand?
17   A.  Yes.
18   Q.  And when did Weifu first make the T6904,
19 four-ton ratchet-and-pawl-designed jack stand?
20   A.  For 6904, it should be back in 2006.
21   Q.  Are the T37401 jack stand and the T6904 jack
22 stand the same jack stands?
23   A.  No, they are slightly different.
24       MR. EDINBURGH:  I heard him say "no," but what
25 did he say after that?

Page 85

1        INTERPRETER:  The answer was: "No, they are
2  slightly different."
3  BY MR. EDINBURGH:
4    Q.  How are they different?
5    A.  For T6904, the corresponding model number at
6  the factory should be T3400.
7    Q.  Let me ask you this, sir.  Does the T37401 and
8  the T6904 have the same load capacity?
9    A.  Yes, the load is the same.
10   Q.  They are the same maximum height for the
11 ratchet bar?
12   A.  Yes.
13   Q.  The same minimum height for the ratchet bar?
14   A.  Yes.
15   Q.  Did they have the same weight?
16   A.  They are about the same, but they are slightly
17 different.  The difference would be 0.1 to 0.2 kg.
18   Q.  I'm sorry, could you say the answer again.
19       INTERPRETER:  The answer was: "They are about
20 the same, but they are slightly different.  The
21 difference would be about 0.1 to 0.2 kg."
22 BY MR. EDINBURGH:
23   Q.  Did they have the same base frame
24 configuration?
25   A.  They are slightly different.  For T3401,

22 (Pages 82 - 85)

1 there's extra reinforcement.

2    Q.   Extra reinforcement where?

3    A.   The difference is at the base frame.  We have
4 increased the thickness of the base frame, and also put
5 in a reinforcement plate.

6    Q.   Where was the reinforcement plate placed?

7    A.   At the base frame, at the base.

8    Q.   Was the configuration and dimensions of the
9 collar of these two jack stands the same, the T6904 and
10 the T37401?

11    A.   Yes.

12    Q.   Was the design of the ratchet bar the same?

13    A.   Yes.

14    Q.   Was the design of the pawl, p-a-w-l, the same?

15    A.   Yes.

16    Q.   Was the design of the handle and its
17 connection to the pawl the same?

18    A.   Yes.

19    Q.   Did Weifu understand the Pro-Lift T6904 to be
20 a do-it-yourself, or DIY, product?

21    A.   Yes.

22    Q.   Did Weifu prepare the original design drawings
23 for the T6904 jack stand?

24    A.   Yes.

25    Q.   Did Weifu prepare the original design drawings

1 of the T37401 jack stand?

2    A.   Yes.

3    Q.   Did any other company have to approve those
4 drawings for the T6904 jack stand?

5        INTERPRETER:  The witness just asked the
6 interpreter to repeat the question.  (Chinese spoken.)

7        THE WITNESS:  Are you asking me whether we
8 need a third party to certify that design?

9 BY MR. EDINBURGH:

10    Q.   Yes.

11    A.   Typically, there are two situations.  Either
12 we have to comply with the ASNE 2003 design standards in
13 order to prepare our drawings, or we have to abide by
14 the testing standards provided by the client.

15    Q.   Who was the client for the T6904?

16    A.   You just mentioned it's SFA, right?

17        MR. EDINBURGH:  I'm asking him.

18    Q.   Was the client of the T6904 Shinn Fu America?

19    A.   Yes.

20    Q.   And then Shinn Fu America had to approve
21 Weifu's design drawings for the T6904 prior to Shinn Fu
22 beginning manufacture of that jack stand?

23        MR. CHAYKIN:  Shinn Fu or Weifu?

24        MR. EDINBURGH:  Weifu.  My mistake.  I
25 apologize.

1        MR. CHAYKIN:  It's okay.  It's important.
2 It's okay.

3        MR. EDINBURGH:  Obviously.

4        Mr. Reporter, take out "Shinn Fu," put in
5 "Weifu."

6        (Record read by reporter.)

7        THE WITNESS:  I would not say they approved
8 that.  Once we have made a prototype, the samples, we
9 would conduct the testings ourselves, and then we would
10 send the samples to the client, and then they would
11 write to us if there's no issue, saying that it's
12 passed.  Then we would subsequently arrange for the
13 production.

14 BY MR. EDINBURGH:

15    Q.   Am I correct that the T6904 predates the
16 T37401?

17    A.   Yes.

18    Q.   By how many years?

19    A.   About a year.

20    Q.   Was the T6904 design the basis for the T37401
21 design?

22    A.   Yes.

23    Q.   How many T6904 jack stands has Weifu produced
24 since it began manufacturing the T6904?

25    A.   I cannot -- there's no way for me to give you

1 a clear answer.

2    Q.   Well, can you give me an approximation or an
3 educated estimate of the total number of T6904s sold by
4 Weifu?  A range of numbers?

5    A.   Well, it's hard for me to give you the answer
6 because I did not belong to that business unit.  I
7 cannot give you the exact figure.

8    Q.   Were you involved personally in the design of
9 the T6904?

10    A.   Yes.

11    Q.   Okay.  What was your role in the design of the
12 T6904?

13    A.   So I provided the client's requirement for the
14 testing requirement and also for the product
15 specification to the engineer, and also I helped
16 control, manage the entire control of time for the
17 development, and also the making of the samples, the
18 certification and also the shipment of samples.

19    Q.   So you were involved in the testing of the
20 T6904, is that correct?

21    A.   Yes.

22    Q.   Did you have any role in the design of the
23 T37401 jack stand?

24    A.   Yes.

25    Q.   What was your role concerning the T37401 jack

23 (Pages 86 - 89)

Page 90

1 stand?
2    A.  It's the same as what I just described.
3    Q.  Okay.  At some point in 2006 or 2007, did
4 Weifu begin manufacturing for Sears, Roebuck a four-ton
5 jack stand designated by Sears as Model No. 50163?
6    A.  Yes.
7    Q.  And was that 50163 model called a Sears
8 Craftsman Professional Heavy-Duty Jack Stand?
9    A.  Yes.
10    Q.  And when did Weifu begin manufacturing the
11 Sears 50163 jack stand?
12    MR. ZAKRZEWSKI:  Objection.
13    You can answer.
14    THE WITNESS:  2007.
15 BY MR. EDINBURGH:
16    Q.  When?  When in that year?
17    A.  We started the preparation in March or April.
18    Q.  When was the first shipment from Weifu plant
19 of the 50163 made?
20    A.  From my recollection, it should be around
21 April of 2007, but I'm not sure of the exact time.
22    Q.  Did Weifu have an internal factory number for
23 the 50163?
24    A.  Yes.
25    Q.  And was that T37401?

Page 91

1    A.  Yes.
2    Q.  And was that the same internal number that
3 Weifu gave to the T6904 jack stand?
4    A.  Yes.
5    Q.  Was the design of the Sears 501 -- withdrawn.
6    Was the Sears 50163 jack stand based on the
7 design of the SFA T6904 four-ton
8 ratchet-and-pawl-designed jack stand?
9    A.  Yes.
10    Q.  Did the Sears 50163 jack stand have the same
11 design as the Shinn Fu America Pro-Lift T6904 jack
12 stand?
13    A.  No, the specification is different.
14    MR. EDINBURGH:  Again, I heard him say "no,"
15 but -- or I heard you say "no," but after that, please
16 repeat.
17    INTERPRETER:  The answer was:  "No, the
18 specification is different."
19 BY MR. EDINBURGH:
20    Q.  Okay.  Did the Sears 50163 and the Pro-Lift
21 T6904 have the same ratchet-and-pawl design?
22    A.  Yes.
23    Q.  Did both jack stands have the same locking
24 feature?
25    MR. ZAKRZEWSKI:  Objection.

Page 92

1    You can answer.
2    THE WITNESS:  The answer was yes.
3 BY MR. EDINBURGH:
4    Q.  Did both jack stands have the same load
5 capacity?
6    A.  Yes.
7    Q.  And was that load capacity 8,000 pounds?
8    A.  Yes.
9    Q.  And did both jack stands, the 50163 and the
10 T6904, have the same maximum ratchet bar height?
11    A.  Yes.
12    Q.  And did the Sears 50163 and the SFA Pro-Lift
13 T6904 jack stand have the same minimum ratchet bar
14 height?
15    A.  Yes.
16    Q.  Did both jack stands, the 50163 and the T6904,
17 have the same collar dimensions?
18    A.  Yes.
19    Q.  And did both jack stands have the same base
20 frame dimensions?
21    A.  Yes.
22    Q.  Who designed the 50163 jack stand?
23    A.  Meng Shi Jun.
24    Q.  Was that -- that's a person?  That's not a
25 company, the name you just gave is a person, correct?

Page 93

1    A.  Yes.
2    Q.  Is that a person who was an employee of Weifu?
3    A.  He was an engineer of R&D.
4    MR. EDINBURGH:  I'm sorry, I apologize.  He
5 was an engineer employed by whom?
6    INTERPRETER:  He was an engineer of R&D,
7 research and development.
8    MR. EDINBURGH:  R&D, research and development?
9    INTERPRETER:  Yeah.
10    MR. EDINBURGH:  Is that what you mean?
11    INTERPRETER:  Yeah.
12 BY MR. EDINBURGH:
13    Q.  All right.  Did Weifu consult with any other
14 companies in the design of the Sears 50163 jack stand?
15    A.  No.
16    Q.  Did Weifu need Sears' approval for its design
17 of the 50163 prior to beginning manufacture of the
18 50163?
19    A.  Yes.
20    Q.  Did Weifu need the approval of Shinn Fu
21 Corporation for the design of the 50163 before beginning
22 manufacture of that model?
23    A.  No.
24    Q.  Did Weifu continue to manufacture the Sears
25 50163 jack stand through 2011?

24 (Pages 90 - 93)

Page 94

1      A.  Yes.
2          INTERPRETER:  The witness would like to
3  request a break.
4          MR. EDINBURGH:  Okay, that's fine.  Let's take
5  a break and I'll continue when the break is over.  Five
6  minutes, seven minutes, something like that, is that all
7  right?
8          WITNESS:  That's fine.
9          MR. EDINBURGH:  We'll stay on the line, we'll
10  just put you on mute.
11         MR. ZAKRZEWSKI:  Okay.
12  (2:13 p.m.)
13         (A break was taken.)
14  (2:21 p.m.)
15  BY MR. EDINBURGH:
16     Q.  Mr. Su, did SFA provide Weifu with
17  specifications for the T6904 model jack stand?
18     A.  Yes.
19     Q.  Did SFA provide Weifu with design drawings for
20  the T6904 jack stand?
21     A.  No.
22     Q.  What specifications did SFA provide Weifu for
23  the T6904?
24     A.  First of all, they provided the basic
25  dimensions, which is the height, the width.

Page 95

1      Q.  Did they also provide --
2          INTERPRETER:  I'm sorry, I'm not done yet.
3          MR. EDINBURGH:  I'm sorry.
4          THE WITNESS:  So they provided the basic
5  dimensions, and also the maximum and minimum height, and
6  also the main testing standard.
7  BY MR. EDINBURGH:
8      Q.  And they also provided what was to be a
9  four-ton capacity jack stand, four-ton load capacity?
10     A.  Yes.
11     Q.  And did they also provide what was going to be
12  a ratchet-and-pawl design?
13     A.  Yes.
14     Q.  Mr. Su, when you left Shinn Fu Corporation to
15  go to Weifu, was it specifically for the purpose of
16  becoming involved in the design and development of jack
17  stands?
18         MR. ZAKRZEWSKI:  Objection.
19         THE WITNESS:  That area was covered during my
20  daily work.
21  BY MR. EDINBURGH:
22     Q.  Did Shinn Fu Corporation encourage you to move
23  to Weifu in order to design jack stands for Shinn
24  Fu-affiliated companies?
25         MR. ZAKRZEWSKI:  Objection.

Page 96

1          THE WITNESS:  No.  As I mentioned earlier,
2  there were two other main reasons for that.
3  BY MR. EDINBURGH:
4      Q.  Did Weifu produce a prototype or sample of the
5  T6904 jack stand prior to putting that model into
6  production?
7          MR. ZAKRZEWSKI:  Objection.
8          THE WITNESS:  After the design was done, we
9  had to produce the prototype and certify it.
10  BY MR. EDINBURGH:
11     Q.  I'm sorry, I asked you if you produced --
12         INTERPRETER:  The answer was:  "After the
13  design was done, we had to produce the prototype and
14  certify it."
15  BY MR. EDINBURGH:
16     Q.  Was the prototype submitted to Shinn Fu
17  America for its approval?
18         MR. ZAKRZEWSKI:  Objection.
19         THE WITNESS:  After we have made the
20  prototype, we would conduct the testings at the factory
21  first to be certain that they passed the test, and after
22  that, we provide them to the client for further
23  certification.  Obviously, that includes SFA.
24  BY MR. EDINBURGH:
25     Q.  Did SFA approve the T6904 prototype or sample

Page 97

1  that you sent to it?
2      A.  Yes.
3      Q.  Is there any material difference in the design
4  of the Sears 50163 from the design of the SFA Pro-Lift
5  T6904 jack stand?
6          MR. ZAKRZEWSKI:  Objection.
7          THE WITNESS:  The testing standards of these
8  two clients are different.
9          MR. EDINBURGH:  I'm sorry, can you please
10  repeat the response.
11         INTERPRETER:  The answer was:  "The testing
12  standards of these two clients are different."
13         MR. EDINBURGH:  I didn't ask the witness about
14  testing standards, I asked him about the design.
15         I said:  Was there any material difference in
16  the design of the Sears 50163 from the design of the SFA
17  Pro-Lift T6904?
18         MR. ZAKRZEWSKI:  Objection.
19         MR. CHAYKIN:  Objection.  Asked and answered.
20         MR. EDINBURGH:  You can answer it.
21         Can you repeat the question to the witness.
22         THE WITNESS:  If you're talking about the
23  major difference, as I mentioned earlier, the thickness
24  of the steel plate at the base is different.
25  BY MR. EDINBURGH:

25 (Pages 94 - 97)

Page 98

1   Q.  Anything else?
2   A.  No.
3   Q.  Just going back a bit before we continue.
4       Is there a specific individual or individuals
5   at SFA who approved the prototype of the T6904?
6       MR. ZAKRZEWSKI:  Objection.
7       THE WITNESS:  As far as I know, they have a
8   specific engineer who is responsible for the testing.
9   BY MR. EDINBURGH:
10  Q.  Right.  And do you know that person's name?
11  A.  It's been a long while.  I forgot.
12  Q.  All right.  At this point I'm going to ask you
13  about specific two serial numbers of the 50163.
14      Did Weifu manufacture the Sears 50163 jack
15  stand bearing Serial No. GT1010009618?
16  A.  Yes.
17  Q.  Okay.  Did Weifu manufacture a Sears 50163
18  jack stand bearing Serial No. GT1010009619?
19  A.  Yes.
20  Q.  And with those two serial numbers, what does
21  the GT, the first two letters in this serial number,
22  represent in Weifu's numbering system?
23  A.  It means jack stand.
24  Q.  Okay.  And what does the series of numbers
25  shared by both these stands of 101000 represent?

Page 99

1   A.  Regarding that bunch of numbers, the first two
2   digits, 10, means the year of the production; and then
3   the next two digits, 10, means the month of production;
4   and then the subsequent number is the serial number for
5   the production of each jack stand.
6   Q.  So were these jack stands manufactured by
7   Weifu in October 2010?
8   A.  Yes, that's correct.
9   Q.  Does it give the day within that month of
10  manufacture?
11  A.  No.
12  Q.  Were these two jack stands packaged by Weifu
13  in one box as a pair?
14  A.  Yes, we packaged them as a pair when we
15  shipped them out.
16  Q.  What was Weifu's unit cost in manufacturing
17  the T37401 jack stand?
18      MR. ZAKRZEWSKI:  Objection.
19      You can answer.
20      THE WITNESS:  I think we have already provided
21  that information to you earlier.
22  BY MR. EDINBURGH:
23  Q.  That's not a response.
24      The response (sic) is:  Do you know the unit
25  cost, as Weifu's 30(b)(6) witness here today?

Page 100

1       MR. ZAKRZEWSKI:  Objection.  Not in the
2   notice.
3       MR. EDINBURGH:  Okay.  Leave it at that.  I
4   believe it absolutely is, but go ahead.  Go ahead.
5       THE WITNESS:  I do know the structure of that
6   cost of this product.  However, it's been a long while,
7   so I don't remember the total cost anymore.
8   BY MR. EDINBURGH:
9   Q.  Did you review any records in preparation for
10  today's deposition to determine the unit cost of making
11  the T37401?
12      MR. ZAKRZEWSKI:  Objection.
13      He can answer.
14      INTERPRETER:  The witness said:  "I have read
15  a lot of documents, but I cannot remember the exact
16  figure."
17  BY MR. EDINBURGH:
18  Q.  Well, let me ask you this.  Aside from the
19  exact figure, was the unit cost of manufacturing the
20  T37401 more or less than $10, US$10?
21      MR. ZAKRZEWSKI:  Objection.
22      You can answer.
23      THE WITNESS:  For the four-ton ones, I think
24  the cost is around $8.00 to US$9.00 a piece.
25  BY MR. EDINBURGH:

Page 101

1   Q.  $8.00 to $9.00?
2       INTERPRETER:  $8.00 to $9.00 per unit.
3   BY MR. EDINBURGH:
4   Q.  And the same question of the unit cost of the
5   T6904 to Weifu.
6       MR. ZAKRZEWSKI:  Objection.
7       You can answer.
8       THE WITNESS:  The cost of these two products
9   are roughly the same.
10  BY MR. EDINBURGH:
11  Q.  And the Sears 50163, same answer, roughly the
12  same?
13      MR. ZAKRZEWSKI:  Objection.
14      THE WITNESS:  Sears 50163 is the same as
15  T3401.
16  BY MR. EDINBURGH:
17  Q.  The same as T37401, correct?
18      INTERPRETER:  Excuse me, the witness said
19  T37401.
20  BY MR. EDINBURGH:
21  Q.  The 50163 unit cost was the same as the T37401
22  unit cost, is that your answer?
23      MR. ZAKRZEWSKI:  Objection.
24      THE WITNESS:  Yes.
25  BY MR. EDINBURGH:

26 (Pages 98 - 101)

Page 102

1    Q.  And both of those unit costs were roughly the
2  same as the unit cost of the T6904?
3       MR. ZAKRZEWSKI:  Objection.
4       THE WITNESS:  It's around the same, in the
5  same range.
6  BY MR. EDINBURGH:
7    Q.  What was Weifu's unit wholesale price for its
8  sale of the T37401 jack stand?
9       MR. ZAKRZEWSKI:  Objection.
10      You can answer.
11      THE WITNESS:  I'm not sure about that.
12 BY MR. EDINBURGH:
13   Q.  Can you give a range?
14   A.  Since I was not responsible for price
15 quotation, it's hard for me to give an estimate.
16   Q.  Well, was it more than the unit manufacturing
17 cost?
18   A.  Yes.
19   Q.  What was the markup?
20      MR. ZAKRZEWSKI:  Objection.
21      THE WITNESS:  Since I was not responsible for
22 price quotation, I cannot provide that information.
23 BY MR. EDINBURGH:
24   Q.  Did you make any enquiry, as Weifu's 30(b)(6)
25 witness, to determine the price that Weifu was charging

Page 103

1  its customers for these various brand jack stands?
2       MR. ZAKRZEWSKI:  Objection.  Nothing about the
3  price of the jack stand in the notice.
4       THE WITNESS:  As far as I know, the company
5  does not give out quotations of the products based on
6  the particular product.  It is based on the company's
7  wholistic strategy.  I don't know what is the reasonable
8  profit for the product.
9  BY MR. EDINBURGH:
10   Q.  Well, did Weifu make a profit on the sale of
11 each unit of the T6904 jack stand?
12      MR. ZAKRZEWSKI:  Objection.
13      THE WITNESS:  I believe that's the case.
14 Otherwise, the survival of the plant could not be
15 sustained.
16 BY MR. EDINBURGH:
17   Q.  Well, in fact, the plant did not survive,
18 correct, it went out of business in 2012, is that
19 correct?
20      MR. ZAKRZEWSKI:  Objection.
21      THE WITNESS:  Yes.  However, there was a lot
22 of different considerations.
23 BY MR. EDINBURGH:
24   Q.  Was Weifu losing money in 2012?
25      MR. ZAKRZEWSKI:  Objection.

Page 104

1       THE WITNESS:  I don't think so.
2  BY MR. EDINBURGH:
3    Q.  Was Weifu insolvent in 2012?
4       MR. ZAKRZEWSKI:  Objection.
5       THE WITNESS:  The answer is no.
6  BY MR. EDINBURGH:
7    Q.  Who at Weifu was in charge -- withdraw it.
8       Did Weifu negotiate its wholesale unit price
9  for the SFA Pro-Lift T6904 jack stand with SFA?
10   A.  For us, our sales window is MVP.  Therefore,
11 I'm not sure whether there's any negotiation process
12 between MVP and SFA.
13   Q.  All right.  Well, then, did Weifu negotiate
14 its wholesale unit price of this SFA Pro-Lift T6904 with
15 MVP?
16   A.  I'm not sure about that.
17   Q.  Did you make any enquiries before coming here
18 today as part of your duties and responsibilities, as
19 Weifu's 30(b)(6) witness?
20      MR. ZAKRZEWSKI:  Objection.
21      THE WITNESS:  No.
22 BY MR. EDINBURGH:
23   Q.  Was it Weifu's understanding that Sears
24 required that the price Sears paid for the 50163 jack
25 stand or pair of jack stands be at a particular price

Page 105

1  level, price point or price amount?
2       INTERPRETER:  The witness asked the
3  interpreter to repeat the question again.  (Chinese
4  spoken.)
5       THE WITNESS:  I believe so, because each
6  company would have to pay for the -- pay for certain
7  fixed costs.  Therefore, I think the shipment price for
8  the product would be roughly the same.
9  BY MR. EDINBURGH:
10   Q.  Well, what was Sears' price that it paid, unit
11 price it paid, in pairs, for the 50163 manufactured by
12 Weifu?
13      MR. ZAKRZEWSKI:  Objection.
14      You can answer.
15      THE WITNESS:  I'm not sure about the sales
16 price.
17 BY MR. EDINBURGH:
18   Q.  Did you ask about this topic in preparation
19 for today's deposition?  Did you ask anyone at Weifu,
20 either current or former employees?
21   A.  No.
22   Q.  In the years that Weifu manufactured the T6904
23 jack stand, did the design of that stand change?
24      MR. ZAKRZEWSKI:  Did you say "Weifu" or "Shinn
25 Fu."

27 (Pages 102 - 105)

Page 106

1    MR. EDINBURGH: Now you're getting me
2  confused. I meant Weifu.
3    MR. ZAKRZEWSKI: Okay, that's what I thought.
4    MR. EDINBURGH: I hope I didn't say "Shinn
5  Fu."
6    MR. ZAKRZEWSKI: Gotcha.
7    THE WITNESS: No.
8  BY MR. EDINBURGH:
9    Q. In the years that Weifu manufactured the Sears
10  50163 jack stand, did the design of the 50163 jack stand
11  change?
12    A. No.
13    Q. I want to change the topic and ask you some
14  questions now about jack stand manual and jack stand
15  warnings. Let me start.
16    Did Weifu prepare an English language version
17  of the owner's or operator's manual for the Sears
18  Craftsman 50163 model jack stand?
19    A. Yes.
20    Q. Did Weifu publish or print, in China, the
21  operator's manual for the Sears Craftsman 50163 model
22  jack stand?
23    A. Yes.
24    Q. Did that manual contain warnings?
25    A. Yes.

Page 107

1    Q. Did that manual contain safety instructions?
2    A. Yes.
3    Q. Did that manual contain operating instructions
4  on how to support load and lower load?
5    A. Yes.
6    Q. Did any other company write part or all of the
7  Sears Craftsman Professional Heavy-Duty Jack Stand 50163
8  operator's manual, and, if so, who?
9    A. Our client, MVP, provided us with all the
10  product warning labels, the model labels and also -- and
11  they also printed that.
12    Q. What about the manual?
13    I'm not now talking about labels on the stand,
14  I'm talking about the manual.
15    A. As I mentioned earlier, MVP provided us with
16  the manual, and also the other labels.
17    Q. Okay. So am I correct that Weifu did not
18  write the manual, Weifu received a manual for the 50163
19  from MVP? Is that accurate?
20    A. Yes.
21    Q. And did MVP also provide Weifu with English
22  language versions of warning labels or safety labels
23  that were placed physically on the jack stand or on the
24  frame of the jack stand?
25    A. Yes.

Page 108

1    Q. Does Weifu know whether any company provided
2  MVP with the 50163 manual which it, in turn, gave to
3  Weifu?
4    A. I'm not sure about that.
5    Q. Did you make any enquiries about the origin of
6  the 50163 manual in preparation for today's deposition?
7    A. The source -- the source came from MVP.
8    Q. Yes, I know that, but I didn't ask you that.
9    I asked you, did you make any inquiries with
10  any other company that gave MVP the 50163 manual which
11  it gave to Weifu?
12    MR. ZAKRZEWSKI: Objection.
13    You can answer.
14    THE WITNESS: The answer is no.
15  BY MR. EDINBURGH:
16    Q. Did Weifu place a manual in the box containing
17  each pair of jack stands it packaged?
18    A. Yes.
19    Q. Did Weifu in any way change or modify or alter
20  the 50163 operator's manual it received from MVP?
21    A. No.
22    Q. Did any engineer or other employee of Weifu
23  consult with MVP concerning the language contained in
24  the manual prior to MVP sending the manual to Weifu?
25    A. No.

Page 109

1    Q. Did Weifu provide, with the T6904 jack stands
2  in the box containing the jack stands, an operator's
3  manual for that model jack stand?
4    A. Yes.
5    Q. Does Weifu know what the term "OIPM manual"
6  is? OIPM?
7    WITNESS: It should mean the operator's
8  manual, right?
9  BY MR. EDINBURGH:
10    Q. The operating instruction and parts manual,
11  OIPM. Have you ever heard of that term before?
12    A. Yes.
13    Q. Did anyone provide Weifu with an OIPM for the
14  T6904 jack stand?
15    A. Which product are you talking about?
16    Q. The T6904.
17    A. I cannot remember.
18    Q. Was the manual provided by Weifu in the
19  cardboard box containing the T6904 which was shipped
20  from Weifu's plant?
21    A. I know there's an operator's manual being
22  placed with the T6904 product. However, I'm not sure,
23  but the term printed on that manual says "OIPM."
24    Q. Forgetting OIPM, was there an operator's
25  manual for the T6904?

28 (Pages 106 - 109)

Page 110

1    A.  Yes, there's a usage instruction.
2    Q.  And did Weifu draft it, that manual?
3    A.  All of our warning labels and the serial
4  number labels, they all came from our clients.  We would
5  not write the manual ourselves.
6    Q.  Okay.  So did Shinn Fu America provide the
7  manual -- the operator's manual for the T6904?
8        MR. ZAKRZEWSKI:  Objection.
9        THE WITNESS:  The documents I received were
10  from MVP.  I'm not sure whether SFA provided the
11  documents to MVP.
12  BY MR. EDINBURGH:
13    Q.  When you say "the documents," do you mean the
14  manual?  Are you including the manual in that?
15    A.  Yes.
16    Q.  And including all the warning or safety
17  labelling on the stand itself, did you include that?
18    A.  Yes.
19    Q.  Did anyone at Weifu ever compare the manuals
20  of the T6904 to the 50163?
21    A.  You mean comparing the content?
22    Q.  Yes.
23    A.  I'm not sure about that.
24    Q.  Was Weifu aware whether the warnings of the
25  T6904 manual are the same as those in the Sears 50163

Page 111

1  manual?
2    A.  I think they are highly similar.
3    Q.  Were the safety instructions in the T6904
4  manual the same as those in the Sears Craftsman 50163
5  manual?
6        MR. ZAKRZEWSKI:  Objection.
7        THE WITNESS:  I think there's not much
8  difference between the two in terms of content.
9  BY MR. EDINBURGH:
10    Q.  Was the Sears Craftsman 50163 operator's
11  manual essentially a reprint of the earlier SFA T6904
12  manual?
13        MR. ZAKRZEWSKI:  Objection.
14        THE WITNESS:  They are not the same.
15  BY MR. EDINBURGH:
16    Q.  How were they different?
17    A.  The difference in the model numbers for the
18  client and also the code for the client, and also the
19  brand printed in the manual are not the same.
20    Q.  All right.  The model number is different.  I
21  got brand.  And what was the other item?
22    A.  And also the code for the clients.
23    Q.  The code?
24        INTERPRETER:  Yeah, code, yeah.
25  BY MR. EDINBURGH:

Page 112

1    Q.  Other than those differences, were the two
2  manuals the same?
3        MR. ZAKRZEWSKI:  Objection.
4        THE WITNESS:  Maybe the way of the description
5  in the content, they could be different.
6  BY MR. EDINBURGH:
7    Q.  Was the wording of the warnings, the safety
8  instructions, the operating instructions the same for
9  the two manuals?
10        MR. ZAKRZEWSKI:  Objection.
11        MR. CHAYKIN:  Objection.
12        THE WITNESS:  I believe they are the same.
13  BY MR. EDINBURGH:
14    Q.  Did Weifu ever suggest to its clients any
15  changes in the T6904 manual?
16    A.  No.
17    Q.  Did Weifu ever suggest to its clients any
18  changes to the 50163 manual?
19    A.  No.
20        MR. EDINBURGH:  Could we take a five-minute
21  break, please.
22        MR. ZAKRZEWSKI:  All right.
23  (3:13 p.m.)
24        (A break was taken.)
25  (3:23 p.m.)

Page 113

1  BY MR. EDINBURGH:
2    Q.  Mr. Su, I'm going to go to a different topic.
3  I want to discuss an issue in this case of false
4  engagement.  I'll ask you some -- several questions on
5  this topic.
6        Is Weifu aware of the term "false engagement"
7  in the context of a ratchet-and-pawl-designed jack
8  stand?
9        INTERPRETER:  The witness would like you to
10  explain about what the term "false engagement" means
11  because we're talking about a physical subject here --
12  physical object here.
13        MR. EDINBURGH:  Okay.  Well, I'm asking the
14  witness if Weifu has an understanding of that term.
15        THE WITNESS:  I don't quite understand the
16  definition of this term.
17  BY MR. EDINBURGH:
18    Q.  Okay.  I'm going to use the term "false
19  engagement" in terms of the allegations made in this
20  case in which the allegations are made that there are
21  instances when, in a ratchet-and-pawl-designed jack
22  stand, the ratchet bar is raised, and under load, the
23  pawl and the ratchet key are not fully engaged with one
24  another and only partially engaged and give the user the
25  false impression of full engagement, and that upon

29 (Pages 110 - 113)

Page 114

1  disruption of that engagement, the ratchet bar
2  disengages from the pawl and the ratchet bar collapses.
3      Using that understanding of the term, was the
4  term "false engagement" ever communicated or presented
5  to Weifu by anyone prior to March of 2011?
6      A.  No.
7      Q.  Did Weifu ever conduct or ask others to
8  conduct any testing of the phenomenon of false
9  engagement?
10     MR. ZAKRZEWSKI:  Objection.
11     You can answer.
12     THE WITNESS:  Regarding the situation you
13 mentioned earlier, it was impossible for that to happen.
14 When we did the design, without the load, once it's been
15 locked, it should not happen.  And also, if there's any
16 load above it, it should not happen as well.  So we were
17 not aware of that condition, and also we don't know how
18 to test for it.
19 BY MR. EDINBURGH:
20     Q.  Did Weifu ever hear of the term "false load"
21 or "false loading"?
22     A.  No.
23     Q.  Did SFA ever communicate to Weifu any
24 incidents that involved a false load or false loading
25 condition or situation of a jack stand?

Page 115

1      A.  No.
2      Q.  I want to discuss another topic on the notice
3  of jack stand complaints and jack stand incidents.
4      Was Weifu aware, prior to March of 2011, of
5  any incidents occurring in the United States involving a
6  ratchet-and-pawl-designed jack stand manufactured by
7  Weifu where, under load, the raised ratchet bar gave
8  way?
9      MR. ZAKRZEWSKI:  Objection.
10     You can answer.
11     THE WITNESS:  No.
12 BY MR. EDINBURGH:
13     Q.  Were you aware, prior to March 2011, of any
14 incidents in the United States involving a
15 ratchet-and-pawl-designed jack stand manufactured by
16 Weifu where, under load, the raised ratchet bar
17 spontaneously, suddenly, unintendedly or unexpectedly
18 collapsed?
19     MR. ZAKRZEWSKI:  Objection.
20     You can answer.
21     THE WITNESS:  No.
22 BY MR. EDINBURGH:
23     Q.  Was Weifu aware, prior to March of 2011, of
24 any incidents in the United States involving a
25 ratchet-and-pawl-designed jack stand manufactured by

Page 116

1  Weifu where, under load, the ratchet bar failed to
2  maintain its column height?
3      A.  No.
4      Q.  Mr. Su, in responding to those last several
5  questions about other incidents, and you answered no to
6  each of them, was that based on your own personal
7  knowledge?
8      A.  I did not hear my colleagues mention these
9  incidents, and I personally have not heard of similar
10 incidents.
11     Q.  Well, were you in a position, at Weifu, during
12 the years you were there, that if there was such an
13 incident that you would, in the normal course of your
14 job duties at Weifu, have heard of such an incident,
15 would have been advised or apprised of it?
16     A.  Yes.
17     Q.  Did Weifu have any department or unit in its
18 company that dealt with customer complaints, breach of
19 warranty or accidents or incidents involving jack stands
20 it made?
21     A.  Yes.
22     Q.  Okay.  Describe that division or unit or
23 department within Weifu.  What was it called?
24     A.  Since the factory of Weifu is compliant with
25 the ISO standard, all of our documents follow a standard

Page 117

1  procedure.  If there were any clients complained, that
2  would be included in our standard procedure immediately,
3  and the QC would be responsible person for executing that.
4      And the responsible person at QC for that
5  would be Feng Hai Liang.
6      Q.  Is that Mr. Feng?  What would be his name?
7  How would you address him, as Mr. Hai Liang? Mr. Feng?
8      A.  Yes, Mr. Feng.
9      Q.  Mr. Feng -- was Mr. Feng an employee of yours
10 until -- was he a co-employee of yours until 2012?
11     A.  Yes.
12     Q.  Do you know where he is today?
13     A.  I don't know.
14     Q.  Did you attempt to speak to him in order to
15 become knowledgeable about certain topics that you would
16 be testifying to as a representative of Weifu?
17     MR. ZAKRZEWSKI:  Objection.
18     You can answer.
19     THE WITNESS:  No.
20 BY MR. EDINBURGH:
21     Q.  Did Weifu receive from U.S. Customs complaints
22 prior to March 2011 about its ratchet-and-pawl-designed
23 jack stands which it manufactured?
24     A.  No.
25     Q.  Did Weifu issue a warranty -- a written

30 (Pages 114 - 117)

Page 118

1 warranty for the T6904 jack stand?
2    A.  I'm not sure but that was covered in the
3 operator's manual already.
4    Q.  Well, to become a witness for today, as a
5 30(b)(6) witness, did you make any effort to become
6 knowledgeable about any warranties issued by Weifu for
7 the T6904 or the Sears 50163 jack stand?
8       MR. ZAKRZEWSKI: Objection. Warranties aren't
9 in the notice, there's no warranty claim in the case,
10 but he can answer if he knows.
11      THE WITNESS: If there were documents that I
12 have obtained, I would have done my best to understand
13 it.
14 BY MR. EDINBURGH:
15    Q.  I'm not asking you about the specific terms or
16 language of the warranty. I simply want to know, was
17 there a warranty issued by Weifu for the T6904 and the
18 50163?
19    A.  I don't have much recollection of that.
20    Q.  Did Weifu, in March of 2011 and prior to that
21 time, have a United States-based agent or representative
22 to handle or investigate any jack stand-related
23 complaints or incidents involving jack stands
24 manufactured by Weifu?
25    A.  No.

Page 119

1    Q.  Is that based on your -- that answer, is that
2 based on your own personal knowledge?
3    A.  As I said earlier, according to the record in
4 the ISO system, I could not find any relevant
5 information on that.
6    Q.  Is that the only place you looked, the ISO
7 file?
8    A.  Since the factory is compliant with the ISO
9 standards, if such incidents were to happen, it should
10 have been recorded so that there is a source that is
11 worthy for me to reference.
12    Q.  Where would it have been recorded in Weifu's
13 files?
14    A.  It would be under the procedure within the QC
15 system where there's an item for the -- a list to
16 collect information regarding clients' complaint. The
17 clients complaint record.
18    Q.  Was Weifu, prior to March 2011, ever a
19 defendant or a plaintiff in a United States-based
20 lawsuit in either state or federal court where the
21 claims concerned the equipment or components and
22 products manufactured by Weifu?
23      MR. ZAKRZEWSKI: Objection. Notice.
24      THE WITNESS: I'm not sure about that.
25 BY MR. EDINBURGH:

Page 120

1    Q.  Well, did you make any enquiry or interview or
2 question any current or former Weifu employees in order
3 to respond to this topic of other lawsuits or lawsuits?
4       MR. ZAKRZEWSKI: Objection. He can answer.
5       THE WITNESS: No.
6 BY MR. EDINBURGH:
7    Q.  Did you review any records or files of Weifu
8 in order to become knowledgeable as to whether or not
9 Weifu was a party to any lawsuit in the United States
10 involving claims of defective equipment or components
11 made by Weifu?
12    A.  I did review some records. The list of
13 customer information which contains the customer
14 complaints, as in the customer's told us issues
15 regarding the usage of the products after they have
16 received them. However, that list doesn't tell me
17 whether there's any litigation involved.
18    Q.  That list that you just discussed, were any
19 jack stand complaints on that list?
20    A.  Yes.
21    Q.  Were any ratchet-and-pawl-designed jack stands
22 on that list?
23    A.  Yes.
24    Q.  And was that list supplied to you by counsel?
25      MR. CHAYKIN: Lawyer.

Page 121

1       MR. ZAKRZEWSKI: A lawyer. I think the word
2 "lawyer" is good.
3       THE WITNESS: Regarding that list, I saw that
4 list when I worked at the factory previously.
5 BY MR. EDINBURGH:
6    Q.  When was the last time you looked at that
7 list?
8    A.  The last time -- I think that was just before
9 I left the company back in 2013.
10    Q.  Do you know whether that list was ever given
11 to your lawyers in this case?
12    A.  No.
13    Q.  No, it wasn't, or no, you don't know?
14    A.  I did not provide that to the lawyer.
15    Q.  Okay. I understand you did not.
16       Do you have any understanding whether anyone
17 else provided it to your lawyers, to Weifu's lawyers?
18    A.  I don't know.
19    Q.  Where was that list kept, in what section or
20 unit or department of Weifu?
21    A.  It's kept at the QC department.
22      MR. EDINBURGH: Ms. Translator, can you say
23 that again.
24      INTERPRETER: "It's kept at the QC
25 department," quality control department.

31 (Pages 118 - 121)

Page 122

BY MR. EDINBURGH:
2  Q.  Was it kept in a paper form?  In an electronic
3  form?  Both?
4  A.  It's in a paper form.
5  Q.  Did Weifu, in 2011 and before that time, have
6  an insurance policy for general liability covering
7  claims brought against it in the United States?
8  A.  Yes.
9  Q.  Do you know the name of the insurance company?
10  A.  I don't know.
11  Q.  Was it Lexington Insurance?
12  A.  I'm not sure.
13  Q.  In preparation for today's deposition, as
14  Weifu's 30(b)(6) witness, did you review any applicable
15  insurance policies?
16  A.  I have reviewed the information I've provided.
17  However, there's a lot of information, and I cannot
18  remember it.
19  Q.  In order to become knowledgeable about Weifu's
20  insurance coverage and the terms of that coverage, did
21  you discuss the issue of insurance with anyone to
22  prepare yourself for today's deposition?
23  A.  No.
24  Q.  Was there anyone at Weifu in 2010 or 2011 who
25  had responsibility for insurance coverage for Weifu?

Page 123

1  A.  So the executive vice president should be
2  responsible for that.
3  Q.  And who is that?
4  A.  Which time frame are you talking about?
5  Q.  2010, 2009, 2011.
6  A.  It should be Mr. Lai.
7  Q.  And again, did you discuss any of the topics
8  that you were designated to appear for on behalf of
9  Weifu to discuss today with Mr. Lai?
10  A.  No.
11  Q.  Do you know a lawyer named Arthur Chaykin?
12  A.  Yes.
13  Q.  Was it Weifu's understanding that Mr. Chaykin
14  was Weifu's designated third-party administrator for
15  claims or losses occurring in the United States which
16  involved Weifu?
17  MR. ZAKRZEWSKI:  Objection.
18  THE WITNESS:  I don't know.
19  BY MR. EDINBURGH:
20  Q.  What was Weifu's understanding of who was
21  Arthur Chaykin?
22  A.  He's an American lawyer.
23  Q.  Did Weifu have an understanding that he was
24  general counsel to Shinn Fu America?
25  A.  We know that at one point he did work for

Page 124

1  Shinn Fu America.
2  Q.  Did Weifu have an understanding as to whether
3  Mr. Chaykin provided legal representation for Weifu in
4  the United States?
5  A.  I'm not sure about that.
6  Q.  Did you ask anyone concerning Mr. Chaykin's
7  role, if any, as an attorney for Weifu prior to
8  testifying this morning?
9  A.  I don't quite understand your question.
10  Q.  As part of your acquiring knowledge to testify
11  as Weifu's witness, did the topic of Mr. Chaykin and his
12  role, if any, concerning Weifu come up?
13  A.  I only know that he's a legal counsel.
14  Q.  To who?
15  MR. ZAKRZEWSKI:  Objection.
16  THE WITNESS:  His role is to serve as a
17  lawyer, but I don't think he's our lawyer.
18  BY MR. EDINBURGH:
19  Q.  Did Weifu have any office in the United States
20  in March of 2011 or before that time?
21  A.  No.
22  Q.  Did Weifu ever learn of an incident involving
23  a jack stand failure where the customer, if we use his
24  name, was Bowles, B-o-w-l-e-s?
25  A.  I don't know.

Page 125

1  Q.  Did you make any enquiry in order to testify
2  knowledgeably about the topic of other jack stand
3  incidents, if any?
4  INTERPRETER:  The witness asked the
5  interpreter to repeat the question again.  (Chinese
6  spoken.)
7  THE WITNESS:  Do you mean besides this case?
8  BY MR. EDINBURGH:
9  Q.  I'm not talking about this case.  I mentioned
10  the name of a person called Bowles, B-o-w-l-e-s, and
11  then I asked you whether you made any enquiry of anyone
12  in order to testify about the topic in the notice of
13  deposition about other incidents involving allegations
14  of jack stand failure.
15  A.  No.
16  Q.  Did Weifu have any knowledge of a complaint in
17  the United States where a man named Raymond,
18  R-a-y-m-o-n-d, was killed, crushed to death when the
19  jack stand holding up his vehicle allegedly collapsed?
20  A.  You're not talking about our current case,
21  right?
22  Q.  No, I am not.
23  A.  No, I have not heard about that.
24  Q.  Did you make any effort to talk to anyone in
25  order to prepare yourself as Weifu's 30(b)(6) witness

32 (Pages 122 - 125)

Page 126

1 concerning other lawsuits in the United States involving
2 Weifu-manufactured jack stands?
3     A.   As I mentioned earlier, I discussed with the
4 director of the QC department.
5         MR. EDINBURGH:  All right.  Let's take a
6 break.  Bathroom break, please.  Stop for a minute, few
7 minutes.
8 (4:09 p.m.)
9         (A break was taken.)
10 (4:17 p.m.)
11 BY MR. EDINBURGH:
12     Q.   In 2011, and before that, was Weifu aware of
13 other manufacturers of jack stands, other than itself?
14     A.   Yes.
15     Q.   Was Weifu aware of a company called Allied?
16         MR. ZAKRZEWSKI:  Objection.
17         THE WITNESS:  I don't know.
18 BY MR. EDINBURGH:
19     Q.   Was Weifu aware of a company called Torin,
20 T-o-r-i-n?
21         MR. ZAKRZEWSKI:  Objection.
22         THE WITNESS:  Yes.
23 BY MR. EDINBURGH:
24     Q.   Was Weifu aware of a company called Changshu,
25 C-h-a-n-g-s-h-u, Tongrun, T-o-n-g-r-u-n, Auto Accessory

Page 127

1 Co., Ltd.?
2         MR. ZAKRZEWSKI:  Objection.
3         You can answer.
4         THE WITNESS:  Yes.
5 BY MR. EDINBURGH:
6     Q.   Was Weifu aware that Changshu Tongrun
7 manufactured vehicle support stands, jack stands, under
8 the Torin brand called Big Red?
9         MR. ZAKRZEWSKI:  Objection.
10         THE WITNESS:  Yes, I know that.
11 BY MR. EDINBURGH:
12     Q.   Was Changshu Tongrun a direct competitor of
13 Weifu in the manufacture of jack stands for use in the
14 United States do-it-yourself market?
15         MR. ZAKRZEWSKI:  Objection.  We're pretty far
16 off the notice.
17         But you can answer, if you know.
18         MR. EDINBURGH:  No, I'm dealing with
19 alternative design.  I'm just setting a foundation for
20 it.
21         THE WITNESS:  Yes.
22         MR. EDINBURGH:  I'm not talking about where I
23 ask the witness, but is the witness aware of a company
24 called Strongway, S-t-r-o-n-g-w-a-y?
25         THE WITNESS:  I know that.

Page 128

1 BY MR. EDINBURGH:
2     Q.   And do you know that company to be a maker of
3 jack stands?
4     A.   Yes.
5     Q.   All right.  Was Weifu aware that Strongway
6 sold, prior to March 2011, a ratchet-and-pawl-designed
7 jack stand with double-lock technology and a safety pin
8 design?
9         MR. ZAKRZEWSKI:  Objection.
10         THE WITNESS:  I know that.
11 BY MR. EDINBURGH:
12     Q.   Was Weifu aware that prior to March 2011 Torin
13 was manufacturing ratchet-and-pawl-designed jack stands
14 with a redundant, or second, locking device or feature?
15     A.   Yes.
16     Q.   What was Weifu's knowledge of Torin's
17 alternative design concerning a redundant, or second,
18 locking device or feature?
19     A.   It can offer another -- an extra protection.
20     Q.   From what?
21         MR. ZAKRZEWSKI:  Objection.
22         You can answer.
23         THE WITNESS:  When it carries the load, it
24 ensures that the ratchet bar has a second level of
25 protection.

Page 129

1 BY MR. EDINBURGH:
2     Q.   From what?  Protection from what?
3         MR. ZAKRZEWSKI:  Objection.
4         You can answer.
5         THE WITNESS:  To prevent the ratchet bar to
6 come out of place.
7         MR. EDINBURGH:  What exactly did he say,
8 prevent the ratchet bar from what?
9         INTERPRETER:  The witness said:  "To prevent
10 the dislocation of the ratchet bar."
11 BY MR. EDINBURGH:
12     Q.   When you say "dislocation," Mr. Su, do you
13 mean to prevent the ratchet bar from collapsing or
14 descending?
15         MR. ZAKRZEWSKI:  Objection.  He can answer.
16         THE WITNESS:  The prevention is, in case the
17 teeth are -- was not fully locked, it can prevent -- it
18 can ensure that the ratchet bar and the pawl can be
19 locked in a certain position.
20         MR. EDINBURGH:  You faded away at the very
21 end.  The last few words, can you repeat?
22         INTERPRETER:  I'll repeat the whole thing.
23         The answer was:  "In the case that the teeth
24 were not fully locked, it can ensure that the ratchet
25 bar and the pawl can be locked in a certain position."

33 (Pages 126 - 129)

Page 130

1    MR. EDINBURGH: I'm sorry, ma'am, it's my
2 fault but the ratchet bar and the pawl -- the last few
3 words. You don't have to -- just the last few words.
4    INTERPRETER: "...can be locked in a certain
5 position."
6    MR. EDINBURGH: Oh, certain position. Okay.
7 Thank you.
8 BY MR. EDINBURGH:
9    Q. Was Weifu aware that prior to March 2011 Torin
10 designed and manufactured a three-ton ratchet-and-pawl
11 jack stand containing a double-lock safety pin design?
12    A. Yes.
13    Q. And what was Weifu's understanding of the
14 purpose of the Torin double-lock safety pin design?
15    A. I believe this is a device to prevent the
16 idling of the equipment.
17    MR. EDINBURGH: Ms. Interpreter, I can't hear
18 the very end.
19    INTERPRETER: "I believe this is a device to
20 prevent the idling of the equipment."
21    MR. CHAYKIN: Idling?
22    INTERPRETER: Idle.
23    MR. CHAYKIN: I-d-l-i-n-g?
24 BY MR. EDINBURGH:
25    Q. What does "idling" mean?

Page 131

1    A. In order for the pin to work, the ratchet bar
2 and the pawl has to be engaged in a certain position in
3 order for the pin to go through.
4    Q. To Weifu's knowledge, is the purpose of that
5 design to make sure that the pawl and the ratchet tooth
6 are fully and completely engaged with one another?
7    MR. ZAKRZEWSKI: Objection.
8    You can answer.
9    THE WITNESS: For our original design for the
10 jack stand, our products already match the requirement
11 for ASNE 2003. To add this safety pin is to give the
12 consumers one more option. It makes it seems like this
13 product is safer. This is the meaning of the
14 double-safety measure.
15    MR. EDINBURGH: Just bear with me for a
16 second.
17    All right, I'll continue.
18    Q. Does Weifu believe that the safety of its
19 products to users is the most important factor in the
20 design of the products it makes?
21    MR. ZAKRZEWSKI: Objection.
22    You can answer.
23    THE WITNESS: That is correct. Therefore, all
24 of our testing requirements and rules, they are in
25 reference to ASNE 2003 in the U.S.

Page 132

1 BY MR. EDINBURGH:
2    Q. Does Weifu believe that it's more important to
3 conduct -- to make a safe product even at the expense of
4 the profit made from the product?
5    MR. ZAKRZEWSKI: Objection.
6    INTERPRETER: The witness just asked the
7 interpreter to repeat the question. (Chinese spoken.)
8    The witness has a question for you, Counsel.
9    "Do you mean that in order to ensure the
10 safety of the product, Weifu would accept a loss to its
11 profit? Is that what you meant?"
12 BY MR. EDINBURGH:
13    Q. Yes. In order to make its jack stands, for
14 instance, safe for use by consumers or users, would
15 Weifu manufacture in a safer manner even if it meant
16 additional cost or reduced profits to itself?
17    MR. ZAKRZEWSKI: Objection.
18    He can answer.
19    THE WITNESS: Quality and safety has always
20 been the two main criteria for Weifu; therefore, whether
21 it is concerning the production, manufacturing or design
22 of the products, we have always referenced to the rules
23 of U.S. ASNE 2003.
24 BY MR. EDINBURGH:
25    Q. All right. I'll ask it one more time and then

Page 133

1 I'll go on to something else.
2    Please, sir, please answer the question I'm
3 asking you.
4    MR. EDINBURGH: Can you repeat the question.
5    INTERPRETER: (Chinese spoken.)
6    MR. ZAKRZEWSKI: Same objection.
7    INTERPRETER: So the witness asked you a
8 question, sir.
9    "Do you mean that to ensure the products are
10 safer, we are willing to give up on our profits? Is
11 that what you meant?"
12 BY MR. EDINBURGH:
13    Q. Give up -- to either increase the cost of the
14 manufacture or to reduce the profit made, if that's what
15 it took to make the product safer?
16    MR. ZAKRZEWSKI: Same objection.
17    You can answer.
18    THE WITNESS: Yes.
19 BY MR. EDINBURGH:
20    Q. All right. Did Weifu believe that, as a
21 manufacturer of jack stands, it had a duty to
22 manufacture the jack stands in a manner that limited the
23 risk of injury to users during regular use?
24    MR. ZAKRZEWSKI: Objection.
25    THE WITNESS: Yes.

34 (Pages 130 - 133)

Page 134

1  BY MR. EDINBURGH:
2      Q.  Did Weifu, as a manufacturer of jack stands,
3  believe that a user working under a vehicle could be
4  crushed to death if the ratchet bar of a jack stand made
5  by Weifu, which is holding up a vehicle, suddenly
6  collapsed or failed to maintain height under load?
7      MR. ZAKRZEWSKI:  Objection.  Form.
8      THE WITNESS:  Regarding this assumption, I
9  don't know how to answer that because it is not possible
10  for that to happen.  Our production has been following
11  the rules of ASME.
12  BY MR. EDINBURGH:
13      Q.  Does Weifu, as a manufacturer of jack stands,
14  believe that it had a duty to make jack stands as safe
15  as possible to eliminate or reduce the risk of the
16  sudden or unintended collapse or fall of the jack
17  stand's ratchet bar under load?
18      MR. ZAKRZEWSKI:  Objection.
19      THE WITNESS:  I think so.
20  BY MR. EDINBURGH:
21      Q.  Did Weifu believe that a design change to any
22  of its products which made the product safer and
23  prevented even one fatality is a design change it should
24  incorporate in its product?
25      MR. ZAKRZEWSKI:  Objection.  I'm going to

Page 135

1  request to go off the record momentarily to determine
2  whether to seek a protective order regarding this line
3  of questioning.  Because we're now asking variations of
4  the same question --
5      MR. CHAYKIN:  This is the fourth one.
6      MR. ZAKRZEWSKI:  No --
7      MR. EDINBURGH:  It's a different question.
8      MR. ZAKRZEWSKI:  Four, five -- this is the
9  sixth question that's essentially asking the same thing.
10      MR. EDINBURGH:  No, it isn't.
11      MR. ZAKRZEWSKI:  So there's a question
12  pending, so I'm not going to take the witness out of the
13  room.  I'm going to talk to counsel and we'll be back
14  momentarily.
15      You stay here, Jeff.
16      (Discussion off the record.)
17      MR. ZAKRZEWSKI:  Can we get the question read
18  back, please.
19      MR. EDINBURGH:  I'll withdraw the question.
20  Make it easier for you.
21      MR. ZAKRZEWSKI:  All right.
22      MR. EDINBURGH:  I'll ask a different question.
23      Q.  Was Weifu aware of any jack stand alternative
24  designs or design concepts for redundant locking
25  mechanism being presented or communicated to it prior to

Page 136

1  2011?
2      A.  We know that.
3      MR. EDINBURGH:  I'm sorry?
4      INTERPRETER:  The witness said: "We know
5  that."
6  BY MR. EDINBURGH:
7      Q.  Did anyone from Shinn Fu America communicate
8  to Weifu design concepts for redundant locking mechanism
9  in a ratchet-and-pawl-designed jack stand?
10      A.  No.
11      Q.  Does Weifu know a former SFA employee named
12  Roger Claypool?
13      A.  Yes.
14      Q.  What is Weifu's knowledge or understanding of
15  who was Roger Claypool at Shinn Fu America?
16      A.  He was a testing engineer who helped us to
17  send the samples to SFA for testing.
18      Q.  Did Mr. Claypool, as an employee from 2004 to
19  2009, ever present or communicate to Weifu proposals for
20  redundant, or secondary, locking mechanisms on a
21  ratchet-and-pawl-designed jack stand?
22      A.  I don't have recollection of that.
23      Q.  Did Shinn Fu America send to Weifu any
24  proposals by Mr. Claypool for redundant, or secondary,
25  locking mechanisms on a ratchet-and-pawl-designed jack

Page 137

1  stand?
2      MR. ZAKRZEWSKI:  Objection.
3      THE WITNESS:  I'm not sure about that.
4  BY MR. EDINBURGH:
5      Q.  You testified here today as Weifu's 30(b)(6)
6  witness.  Did you talk to any current or former employee
7  or anyone else concerning alternative designs
8  incorporating redundant, or secondary, locking
9  mechanisms or safety features on a
10  ratchet-and-pawl-designed jack stand?
11      A.  I think that if we were to receive any
12  relevant information about that, and we have actually
13  made the development and prototype for that product,
14  then I would have believe that Mr. Wu Ching Yan, R&D
15  director, should have told me about that.
16      MR. EDINBURGH:  Would you just tell me the
17  gentleman's last name so I don't mispronounce it.
18      INTERPRETER:  The last name is Wu.  First name
19  is Ching Yan.
20  BY MR. EDINBURGH:
21      Q.  So I can refer to him as Mr. Wu, would that be
22  correct?
23      MR. CHAYKIN:  Yes.
24      THE WITNESS:  Yes.
25  BY MR. EDINBURGH:

35 (Pages 134 - 137)

Page 138

1    Q.  Did you talk to Mr. Wu as part of your
2  acquiring knowledge to testify today on the various
3  topics on behalf of Weifu?
4    A.  Before I left the company, I had a discussion
5  with him regarding these topics.
6    Q.  What made you talk with Mr. Wu before you left
7  the company concerning the topic of alternative jack
8  stand designs or designs incorporating redundant or
9  additional safety features or locking mechanisms?
10    A.  Earlier, the question you asked me was whether
11  I have discussed any issue with him concerning the jack
12  stand.  I did not know that you were asking specifically
13  about this double-locking mechanism testing standard.
14    Q.  Well, I am now.
15      So what's your answer?
16      MR. ZAKRZEWSKI:  Objection.  What's the
17  question?
18      MR. EDINBURGH:  Will the court reporter and
19  interpreter please read back the question.
20      INTERPRETER:  (Chinese spoken.)
21      MR. ZAKRZEWSKI:  Objection.  Asked and
22  answered.
23      You can answer.
24      THE WITNESS:  The content of our discussion
25  was regarding these litigations, what kind of R&D

Page 139

1  information I need to provide.
2  BY MR. EDINBURGH:
3    Q.  Since you left the company, have you had any
4  discussions with Mr. Wu concerning any of the topics
5  listed in the Weifu deposition notice as to which you
6  were Weifu's 30(b)(6) witness?
7    A.  No.
8    Q.  Are you aware, sir, that Weifu has responded,
9  in discovery in this case, very recently, in which Weifu
10  has stated that Roger Claypool's proposed design changes
11  were technically unworkable?
12      MR. ZAKRZEWSKI:  Objection.  Our response
13  wasn't on behalf of Weifu.
14      MR. EDINBURGH:  Can we stop and go off the
15  record for a minute?
16      MR. ZAKRZEWSKI:  Yes.
17      (Discussion off the record.)
18      MR. EDINBURGH:  Let's mark the document so
19  everybody knows what we're talking about.
20      MR. ZAKRZEWSKI:  I don't think we have a
21  printed copy of the document here.  I think we should
22  just refer to it by --
23      MR. EDINBURGH:  No, I sent it to the reporter
24  the other day.
25      MR. ORTICELLI:  Exhibit 1?

Page 140

1      MR. ZAKRZEWSKI:  No, Exhibit 1 is a much older
2  response to interrogatories.
3      MR. EDINBURGH:  All right.  Mr. Reporter, do
4  you have a document called "Supplemental Responses,"
5  dated April 9, 2018?  I believe I e-mailed it on Monday
6  or Tuesday.
7      (Exhibit 6 marked for identification.)
8      MR. EDINBURGH:  I'm not asking the witness to
9  read it.
10      MR. ZAKRZEWSKI:  It's okay.  We have it.  It's
11  marked.
12      MR. EDINBURGH:  I'm just going to state for
13  the record, and this is not part of the questioning of
14  the witness, that Exhibit 6 was e-mailed to us on April
15  9, which seems, having been up for, like, 24 hours,
16  like, a year ago, but it was only yesterday,
17  "Defendant's Supplemental Responses and Objections to
18  Plaintiff's Request for Production," and right under
19  that, it says that the response is on behalf of Shinn Fu
20  Corporation, Shinn Fu Company of America, MVP, and Weifu
21  Taishan Machinery & Electric Co., Ltd.
22      Based upon this document, I was prepared to
23  ask the witness a number of questions about its
24  contents, seeing how it appeared to be a response on
25  behalf of Weifu.

Page 141

1      And I now ask defense counsel to clarify
2  whether this document is, in fact, served on behalf of
3  defendant Weifu.
4      MR. ZAKRZEWSKI:  Yeah, and I can clarify that
5  the document was not intended to be served on behalf of
6  Weifu.  It was served in a PDF form, and the file name
7  was a date, supplemental responses to RFPs, which is
8  short for request for production, by SFC, SFA and MVP.
9  It did not list Weifu.  In the first paragraph of the
10  substance of the response you can see there's a
11  typographical error, the sentence that cuts off and
12  lists Weifu.  That's a scrivener's error on my part.  If
13  you go down to the signature block, correctly, Weifu is
14  omitted, and I will be serving a corrected version of
15  this document April 11 -- what day is it there?
16      MR. EDINBURGH:  I have no idea.
17      MR. ZAKRZEWSKI:  It will be April 11.
18      MR. EDINBURGH:  It is April 11, correct.
19      MR. ZAKRZEWSKI:  Yeah, okay.
20      MR. EDINBURGH:  I'll be very brief.  I just
21  want to clarify with the witness and then I'll leave
22  this topic alone.
23    Q.  Is it your testimony, Mr. Su, that Weifu has
24  no knowledge of any alternative design proposals raised
25  by Roger Claypool of SFA concerning additional or

36 (Pages 138 - 141)

Page 142

1 redundant safety features or locking mechanisms on
2 ratchet-and-pawl-designed jack stands?
3    A.   Yes.
4        MR. EDINBURGH:  All right.  Can we have a time
5 status of the time remaining or time expired.
6        MR. ZAKRZEWSKI:  Yeah.
7        MR. EDINBURGH:  My seven hours?
8        MR. ZAKRZEWSKI:  Yeah, has the court reporter
9 been tracking it?
10       COURT REPORTER:  I have been.  I'm a little
11 behind, but if we go off the record a minute, I can
12 figure it out.
13       MR. EDINBURGH:  Let's go off.  And why don't
14 you let me know, and then after you let me know, we'll
15 take a bit of a break.
16       (Discussion off the record.)
17 (5:07 p.m.)
18       (A break was taken.)
19 (5:17 p.m.)
20       MR. EDINBURGH:  I just want to mark two
21 batches of exhibits that were sent as PDFs to the court
22 reporter as well as to defense counsel.
23       One should be Weifu Bates-numbered e-mails,
24 which the top document should be Bates-numbered
25 WFT002486, on the bottom.

Page 143

1       (Exhibit 7 marked for identification.)
2       MR. EDINBURGH:  There should be a batch of
3 documents also in Weifu WFT Bates numbers, which I have
4 called "Jack Stand Purchase Orders, Contracts, Specs."
5 The first number would be WFT00075.
6       (Exhibit 8 marked for identification.)
7 BY MR. EDINBURGH:
8    Q.   Mr. Su, are you being paid for appearing today
9 to testify?
10   A.   Are you talking about expenses paid to me?
11   Q.   I'm talking about any money given to you for
12 you to testify here today or testify in Taipei here
13 today?
14   A.   Yes.
15   Q.   Okay.  How much did you get?
16   A.   They gave me about 2,000 renminbi per month.
17   Q.   2,000 what?
18       INTERPRETER:  Renminbi, the Chinese currency.
19 BY MR. EDINBURGH:
20   Q.   When you say "they," who is "they"?
21   A.   Weifu.
22   Q.   Who at Weifu paid you?
23   A.   The manager of the finance department at
24 Weifu.
25   Q.   The manager of the plant.  Who is the

Page 144

1 manager --
2       MR. ZAKRZEWSKI:  Not the plant, he said -- the
3 translator said the finance department.
4 BY MR. EDINBURGH:
5    Q.   Who is the manager of the finance department?
6    A.   It's Miss Chen.  Her first name is Shu Er.
7    Q.   Were you also paid for your time to prepare to
8 be Weifu's 30(b)(6) witness?
9    A.   That 2,000 renminbi fee includes all the fees
10 for me to prepare for this deposition, including the
11 review of documents.
12   Q.   And how many hours have you spent to prepare
13 to be Weifu's 30(b)(6) witness here today?
14   A.   Are you talking about just these few days or
15 including the time I spent earlier, in the past?
16   Q.   Let's just take these few days.
17   A.   For these few days, about four to five hours
18 per day.
19   Q.   Over how many days?
20   A.   These two days.
21   Q.   So between eight to ten hours, is that
22 accurate?
23   A.   Yes, that's about right.
24   Q.   All right.  Let's go to -- I'm going to skip
25 Exhibit 7 for now and go right to Exhibit 8, if we

Page 145

1 could, beginning with the Bates No. 75, that batch of
2 documents.
3       I'm not going to ask him about all of them,
4 just some of them.
5       Look at the top document, Bates No. 75.  What
6 is that document?
7    A.   This is an invoice.
8    Q.   From who to who?
9    A.   This is an invoice from Weifu to MVP.
10   Q.   Concerning what?
11   A.   This is approved for us to get the money for
12 the goods we have shipped.
13   Q.   And does this invoice indicate that among the
14 goods shipped was the T6904 jack stand?
15   A.   Yes.
16   Q.   And is it handwritten in, that's the T6904,
17 the Weifu Model No. T37401?
18   A.   Yes.
19   Q.   Okay.  And what is the unit price for the
20 T6904 in this document?
21   A.   $6.00.
22   Q.   Is that in U.S. dollars?
23   A.   Yes.
24   Q.   And what is the date of this invoice?
25   A.   October 4, 2010.

37 (Pages 142 - 145)

Page 146

1    Q.  I'd like you to go to document in the same
2  batch WFT084 -- 0084.
3    A.  Yes.
4    Q.  And is this a Weifu document?
5    A.  Yes.
6    Q.  And what would you call this document?
7    A.  A comparison table for model numbers.
8    Q.  Meaning that the Sears 50163, the MVP 6904,
9  and the Weifu T37401 were the same jack stand?
10       MR. ZAKRZEWSKI:  Objection.
11       THE WITNESS:  Yes.
12  BY MR. EDINBURGH:
13    Q.  All right.  Let's go to page 86.  Can you tell
14  us what Weifu Bates No. 86 is?
15    A.  WFT00086.
16    Q.  Yes.  What is it?
17    A.  This is a purchase order from MVP to us.
18    Q.  And what is the date of the order?
19    A.  July 2, 2010.
20    Q.  And I'd like you to look at the bottom of this
21  order.  Does this order indicate that Weifu sold to MVP
22  950 pairs of jack stands -- four-ton jack stands?
23    A.  Yes.
24    Q.  And were these stands identified as Sears
25  Craftsman Professional Stands, Model No. 50163?

Page 147

1    A.  Yes.
2    Q.  Were they also identified as factory item
3  number T6904?
4    A.  T6904, yes.
5    Q.  Are they also identified in the same invoice
6  as T37401 jack stands?
7    A.  Yes.
8    Q.  Does Weifu know, in 2010, what was the
9  destination in the United States of the Sears Craftsman
10  50163 jack stands that left its plant and were purchased
11  by MVP?
12    A.  I don't quite understand your question.
13       What do you mean by that?
14    Q.  Well, the Sears Craftsman 50163 four-ton jack
15  stands were purchased from Weifu by MVP, and MVP, in
16  turn, shipped those stands to the United States, as far
17  as Weifu is aware, is that correct?
18    A.  Yes.
19    Q.  What I'm asking you, sir, is:  Where in the
20  United States were the Sears 50163 jack stands sent to
21  in 2010?
22    A.  It was sent to Sears.
23    Q.  And do you know where Sears was located?
24    A.  I'm not sure.
25    Q.  Prior to being delivered to Sears, wherever

Page 148

1  they were in the United States, were the 50163 jack
2  stands delivered to Shinn Fu America, in Kansas City?
3       MR. ZAKRZEWSKI:  Objection.
4       THE WITNESS:  I'm not sure about that.
5  BY MR. EDINBURGH:
6    Q.  All right.  Let's go to document Weifu 0104 --
7  104, in the same batch.  Can you tell me what 104 is?
8    A.  This is a commercial invoice from MVP.
9    Q.  To who?
10    A.  It was sent to Sears.
11    Q.  And does it indicate that among the products
12  being sent to Sears in this invoice was the Sears 50163
13  four-ton jack stand?  It's on the bottom.
14    A.  Yes.
15    Q.  And this indicates that 950 pairs of jack
16  stands were part of this delivery, four-ton jack stands?
17    A.  Yes.
18    Q.  And was the unit price $12.61?
19    A.  Yes.
20    Q.  And did that represent the price for two jack
21  stands?
22    A.  Yes.
23    Q.  What is the date of this invoice?
24    A.  October 21st, 2010.
25    Q.  And does this invoice, in addition to

Page 149

1  describing the four-ton jack stands as 50163 stands,
2  also refer to these same stands as T6904 jack stands?
3    A.  Yes.
4    Q.  And does the same invoice also refer to the
5  Sears 50163 jack stands -- four-ton jack stands as
6  T37401 jack stands?
7    A.  Yes.
8    Q.  I'd like you to go to Weifu 115, 116.
9    A.  Yes.
10    Q.  Are you looking at that?
11    A.  Yes.
12    Q.  What is 115 and 116?  It's a two-page
13  document.
14    A.  The purchase order from Sears to MVP.
15    Q.  And does page 2 of this document indicate that
16  Sears was purchasing from MVP four-ton jack stands Model
17  No. 50163?  Look at the top right on page 2.
18    A.  Yes.
19    Q.  And does it indicate that those jack stands
20  were made by Weifu?
21    A.  Yes.
22    Q.  Does it indicate that the Sears Craftsman
23  50163 jack stand was also MVP or Weifu style number
24  T6904?
25    A.  Yes.

38 (Pages 146 - 149)

Page 150

1   Q.  All right.  I'm just going to do one more of
2 these and then we'll go on to something else.
3        Let's go to Weifu 4090.  Do you have it?
4   A.  Yes.
5   Q.  What is 4090?
6   A.  It's a purchase order placed by MVP with
7 Weifu.
8   Q.  What is the date of the order?
9   A.  March 30th, 2009.
10   Q.  And does the purchase order indicate that MVP
11 is purchasing from Weifu 300 pairs of four-ton jack
12 stands?
13   A.  Yes.
14   Q.  And are these Sears Craftsman 50163 jack
15 stands?
16   A.  Yes.
17   Q.  And are they also identified as factory item
18 number T6904?
19   A.  Yes.
20   Q.  And the term "factory," does that refer to
21 Weifu?
22   A.  Yes, Weifu's model number.
23   Q.  And are these stands also referred to on the
24 invoice as T37401 jack stands?
25   A.  Yes.

Page 151

1   Q.  All right.  You can close that, and I'm not
2 going to go through any more of these.  I'm done with
3 No. 8.  Let's take a break and then we'll go through 7.
4 (5:47 p.m.)
5        (A break was taken.)
6 (5:58 p.m.)
7 BY MR. EDINBURGH:
8   Q.  Let's go to Exhibit 7.  I want you to go,
9 within that exhibit, to Weifu Bates No. 2523, which is
10 towards the end of the batch of documents.  I want you
11 to look at 2523, with the e-mail chain beginning at the
12 bottom of the page.  It says, "From: James Wang," then
13 it has "To" and there's a cc list.  The e-mail begins
14 "Dear Tiger."
15   A.  Yes.
16   Q.  I'd like you to look at that e-mail.  It goes
17 onto the portion of the next page.  Tell me when you're
18 done.  Okay?
19   A.  Yes, I'm done.
20   Q.  Can you read the e-mail.
21   A.  Yes.  I'm done.
22   Q.  Do you know who James Wang is, or was?
23   A.  He was a sales engineer of Shinn Fu America.
24   Q.  Do you know who the person Tiger is who's
25 referred to in the e-mail?

Page 152

1   A.  He is Mr. Wu, first name is Ching Yan.
2   Q.  Who did he work for in 2006?
3   A.  At the time, he was working at Weifu
4 Corporation.  He was the R&D engineer.
5   Q.  All right.  In the list of people in this
6 e-mail from James Wang to Tiger, are any of the people
7 listed in addition to Tiger employees of Weifu back in
8 December of 2006?
9   A.  Yes.
10   Q.  And who are they?
11   A.  Meng, first name is Shi Jun.
12   Q.  And who is he at Weifu?
13   A.  He was the engineer responsible for the
14 four-ton jack stands.
15   Q.  And have you talked to him concerning any of
16 the topics listed in the Weifu deposition notice in
17 order to educate yourself to testify here today as
18 Weifu's 30(b)(6) witness?
19   A.  Before I left the company, I had the
20 discussions with him.
21   Q.  So you haven't spoken to him since 2012, is
22 that correct?
23   A.  No.
24   Q.  When did you last speak to him?
25   A.  It was after we were notified of the

Page 153

1 litigation, so that should be around 2013.
2   Q.  So you have not spoken to him since 2013, is
3 that correct?
4   A.  Yes.
5   Q.  And what did you discuss with him as a result
6 of receiving this litigation?
7   A.  First of all, I have to find out whether the
8 documents related to the design were still around.  In
9 addition to that, I had to verify whether the testing
10 documents are still available or not.
11   Q.  Do you see where Mr. Wang, in No. 1, at the
12 bottom line of 2523, asked Tiger the following:  "Will
13 the product specifications for Sears four-ton jack
14 stands be same as current Pro-Lift T6904?"
15        Do you see that?
16   A.  Yes, I see that.
17   Q.  And was that question answered by Tiger in the
18 e-mail immediately below, the one that says "Dear
19 James," dated December 6, 2006?
20   A.  Yes.
21   Q.  And does Tiger write, where it says 1, it says
22 "T6904 for Sears," correct?  It says that in English,
23 right?
24   A.  Are you talking about the sentence which says
25 "T6904 for Sears"?  Is that the one you're talking

39 (Pages 150 - 153)

Page 154

1 about?
2    Q.  Yes, just what I say, it says that in English,
3 right?
4    A.  Yes.
5    Q.  And then after that there's Chinese language,
6 correct?
7    A.  Yes, that's correct.
8    Q.  Does the next portion of that sentence that
9 Tiger is writing to James Wang, of Shinn Fu America, say
10 that the T6904 for Sears has the same specifications as
11 the Pro-Lift?
12    MR. ZAKRZEWSKI:  Objection.
13    You can answer.
14    THE WITNESS:  Yes, it was how it was written
15 in this e-mail.
16    MR. EDINBURGH:  I'm sorry, I heard the witness
17 say "yes," but after that I --
18    INTERPRETER:  The witness said:  "Yes, it was
19 how it was written in this e-mail."
20 BY MR. EDINBURGH:
21    Q.  Mr. Su, does Weifu know why a Shinn Fu America
22 engineer wanted to know whether the Sears four-ton jack
23 stand would have the same specifications as the Pro-Lift
24 T6904?
25    MR. ZAKRZEWSKI:  Objection.  He can answer.

Page 155

1    THE WITNESS:  It was because we gave an
2 overall general name for these jack stands as T6904, and
3 that is also the code used by MVP.
4    When MVP sent out the four-ton jack stand,
5 they are called T6904.  At the same time, Pro-Lift has
6 purchased -- and also Pro-Lift has purchased jack stand
7 of this T6904 specification, and Sears has also bought
8 T6904 as well.
9 BY MR. EDINBURGH:
10    Q.  Okay --
11    MR. ZAKRZEWSKI:  The witness is still
12 answering.
13    WITNESS:  Therefore, if you want to know about
14 the difference between these two models, which are
15 called T6904, they do have a difference.  At the
16 company, at the factory, those that were sold to
17 Pro-Lift were called T37400.  The ones sold to Sears
18 were called T37401.
19    MR. EDINBURGH:  All right.  I'm going to move
20 to strike as nonresponsive to the question I asked.
21    Q.  Can we go -- let's go to -- well, okay, let's
22 stop.  I want to ask you something else.
23    By whom are you currently employed?  What's
24 the name of the company that currently employs you?
25    A.  Currently, I am employed by a company called

Page 156

1 Wei Sin.
2    Q.  All right.  And your current job is to do
3 what?
4    A.  Currently, my main job duties involve reverse
5 engineering, and work related to 3D scanning.  Our
6 company is in the business of developing plastic molds.
7    MR. EDINBURGH:  I didn't hear the end of it.
8 "Our company is in the business of" --
9    INTERPRETER:  "...is in the business of
10 developing plastic molds."
11 BY MR. EDINBURGH:
12    Q.  Plastic molds, okay.
13    You indicated earlier that a boss of yours at
14 Weifu had asked you to review the complaint in this
15 case.
16    What was the name of that boss?
17    A.  Miss Chen Shu Er.
18    Q.  What was Ms. Chen's position at Weifu?
19    A.  She was the manager of finance department at
20 Weifu.
21    Q.  Was she the same person who paid you for your
22 appearance today and your preparation?
23    A.  Yes.
24    Q.  So she is currently an employee of Weifu
25 today?

Page 157

1    A.  Yes.
2    Q.  And who was her boss in 2013?
3    A.  Her boss was the executive vice president,
4 Mr. Lai, and first name is Ping Shun.
5    Q.  And who is Ms. Chen's boss today at Weifu?
6    A.  Right now, it should be the general manager,
7 Vickie.
8    Q.  Is it your understanding that Vickie had a
9 role in your selection as Weifu's 30(b)(6) witness?
10    MR. ZAKRZEWSKI:  Objection.  I don't think
11 you're allowed to ask about that.
12    MR. EDINBURGH:  Why?  The selection --
13    MR. ZAKRZEWSKI:  The selection of the -- okay.
14    MR. EDINBURGH:  -- individuals by other
15 employees --
16    MR. ZAKRZEWSKI:  I think it's understood by
17 you, especially having practiced on the defense side for
18 such a long time, that counsel is often involved in the
19 selection of 30(b)(6) witnesses.
20    MR. EDINBURGH:  I didn't ask one question
21 about counsel.  I asked whether Vickie was involved.
22    MR. ZAKRZEWSKI:  If he knows, he can answer.
23    THE WITNESS:  I'm not sure.
24 BY MR. EDINBURGH:
25    Q.  Was any Weifu employee, current or former,

40 (Pages 154 - 157)

Page 158

1 involved in selecting or designating you as Weifu's
2 30(b)(6) witness?
3     MR. ZAKRZEWSKI:  Objection.
4     THE WITNESS:  The person who selected me as
5 the witness representing the company was the executive
6 vice president, Mr. Lai Ping Shun.
7 BY MR. EDINBURGH:
8     Q.  I thought you said Mr. Lai no longer works for
9 Weifu, is that correct?
10    A.  Not now.
11    Q.  What is your understanding as to when you were
12 selected or designated to be Weifu's 30(b)(6) witness?
13    MR. ZAKRZEWSKI:  Objection.  This is a legal
14 question.  We designated him as the 30(b)(6) witness.
15 Those are communications between you and I, Howard.
16    MR. CHAYKIN:  There's no position of
17 representative, you know, in the business.  It's done
18 for this lawsuit.
19    MR. ZAKRZEWSKI:  What are we doing?
20    MR. EDINBURGH:  Yeah, that's right, it's done
21 for this lawsuit, and I'm entitled to know how the
22 company internally -- not its lawyers, the company
23 internally selected this individual.
24    MR. ZAKRZEWSKI:  No.  Okay.  No.  Then he
25 can't answer that.  The company internally selected this

Page 159

1 individual based -- that calls for attorney-client
2 privileged information, very clearly, and I'm appointed
3 counsel, I represent Weifu.  He's not answering that
4 one.
5     MR. EDINBURGH:  All right.  Let's mark it for
6 ruling.
7     MR. ZAKRZEWSKI:  Please do.
8 BY MR. EDINBURGH:
9     Q.  Who was your last boss at Shinn Fu Corporation
10 before you left Shinn Fu Corporation?
11    INTERPRETER:  Counsel, your question is
12 regarding Weifu Corporation, right?
13    MR. EDINBURGH:  No, my question -- the witness
14 testified that before becoming an employee of Weifu, he
15 was an employee of Shinn Fu Corporation in Taiwan.
16    INTERPRETER:  Okay.
17    MR. EDINBURGH:  I'm following up as to a
18 question I asked many hours earlier.
19    Q.  Who was your last boss at Shinn Fu Corporation
20 before you left Shinn Fu to join Weifu?
21    A.  You mean my supervisor, the one right above
22 me, right?
23    Q.  Let's start with that, yes.
24    A.  Mr. Lai.  First name is Yan Jun.
25    Q.  This is a different Mr. Lai than the Mr. Lai

Page 160

1 who was a vice president -- executive vice president of
2 Weifu?  It's a different person, correct?
3     A.  They are different.
4     Q.  All right.  That's fine.
5         And Mr. Lai -- who was Mr. Lai's boss at Shinn
6 Fu, if you know?
7     A.  At the time, at the Chiayi factory, it should
8 be Mr. Wang, first name is Hung Jun.
9     MR. EDINBURGH:  All right.  Just bear with me
10 for a moment.  I'm going to put you on mute for one
11 minute.  I'm almost done.
12    (Discussion off the record.)
13    MR. EDINBURGH:  All right, I think we've gone
14 long enough.  I have no further questions.
15    MR. ZAKRZEWSKI:  Okay.  I have a few questions
16 to clarify some of the points that were discussed.
17        I will try to be brief.  I also need to mark
18 an exhibit that I saw here.  I'll grab it.
19        (Exhibit 9 marked for identification.)
20 EXAMINATION BY MR. ZAKRZEWSKI:
21    Q.  Mr. Su, I just have a few questions for you.
22 You were asked earlier, I believe, if there were any
23 loans made from Weifu to Shinn Fu Corporation.  And I'm
24 not sure that your answer was clear.
25        Were there any loans made from Weifu to Shinn

Page 161

1 Fu Corporation?
2     A.  No.
3     Q.  Were there any loans from Shinn Fu Corporation
4 to Weifu?
5     A.  No.
6     Q.  Okay.  When ASME PALD released the 2009
7 guidelines, were those guidelines adopted by Weifu for
8 the production of jack stands?
9     INTERPRETER:  Counsel, is "PALD" an acronym?
10    MR. ZAKRZEWSKI:  Yes, it's an acronym.
11    THE WITNESS:  Yes.
12 BY MR. ZAKRZEWSKI:
13    Q.  And you were asked a series of questions about
14 a jack stand designation T6904, which you testified was
15 an MVP number that was assigned to jack stands, correct?
16    A.  Yes.
17    MR. EDINBURGH:  I just have an objection.
18 That wasn't the testimony.  I think counsel is
19 misconstruing what the testimony was.
20    MR. ZAKRZEWSKI:  That was the testimony but
21 I'll ask it in a different way.
22    Q.  Was T6904 a designation that MVP used to refer
23 to four-ton capacity ratchet-and-pawl jack stands?
24    A.  Yes.
25    Q.  And you did testify that, depending on whether

41 (Pages 158 - 161)

Page 162

1 Weifu was making those T6904 four-ton jack stands for
2 Pro-Lift or Sears, they had different reference numbers
3 at Weifu, is that correct?
4      MR. EDINBURGH: Objection. Objection as far
5 as what his testimony was. Mischaracterizes.
6      MR. ZAKRZEWSKI: He'll answer, and then I'll
7 ask another question.
8      THE WITNESS: Yes, and typically, for
9 Pro-Lift, the designated code is T -- it would be
10 T37400. For those sold to Sears, the number would be
11 T37401.
12 BY MR. ZAKRZEWSKI:
13    Q. I need to ask the question another way because
14 their lawyer objected.
15      So when Weifu was making the MVP designation
16 T6904 four-ton jack stands for Pro-Lift, what was
17 Weifu's number that was assigned to those jack stands?
18      INTERPRETER: The witness just asked the
19 interpreter to repeat the question again. (Chinese
20 spoken.)
21      Counsel, the witness has a question for you.
22      "You mentioned the MVP T6904 jack stands. Are
23 you asking me the corresponding number at the factory
24 for those?"
25 BY MR. ZAKRZEWSKI:

Page 163

1    Q. The corresponding number at Weifu factory when
2 those are being made for Pro-Lift.
3    A. T37400.
4    Q. And when those MVP T6904 four-ton jack stands
5 were being made for Craftsman, what was the Weifu
6 factory number for them?
7    A. T37401.
8    Q. And depending on whether the MVP T6904 jack
9 stands were being made for Pro-Lift or for Craftsman,
10 were the product specifications different?
11   A. The product specifications are the same;
12 however, the difference is for the Pro-Lift products,
13 they were made in accordance with the ASME 2003 design
14 standards. For those Sears Craftsman products, they
15 were made in accordance with Sears' own standards.
16      As I mentioned earlier -- as I described
17 earlier, there's some differences made to the base.
18   Q. What is the difference between the base,
19 between the Pro-Lift product and the Craftsman product?
20      MR. EDINBURGH: Objection. Asked and
21 answered.
22      MR. CHAYKIN: He hasn't asked him.
23      MR. ZAKRZEWSKI: That's fine.
24      THE WITNESS: The difference is we have welded
25 four small triangular-shaped plates at the four sides of

Page 164

1 the base.
2 BY MR. ZAKRZEWSKI:
3    Q. For the Craftsman?
4    A. Yes.
5    Q. Okay. So the Craftsman was heavier?
6    A. Yes.
7    Q. You mentioned earlier a difference between the
8 Sears standard and the ASME PALD standard.
9      Is the Sears standard, was it more challenging
10 than the ASME PALD standard?
11      MR. EDINBURGH: Objection as to form. Counsel
12 doesn't know what "challenging" means with reference
13 to --
14      MR. ZAKRZEWSKI: He can answer this one, and
15 then I'll ask it a different way.
16      THE WITNESS: That's correct. The strength of
17 the Craftsman product is higher than the Pro-Lift ones.
18 BY MR. ZAKRZEWSKI:
19    Q. Okay. So I have to ask the question a
20 different way because counsel objected.
21      What is the difference between Sears' testing
22 standard and the ASME PALD testing standard?
23    A. There were two main differences. First of
24 all, it's regarding the testing for the off-center rod.
25 The ASME 2003 requirement is requiring 100 percent,

Page 165

1 whereas the Craftsman standard requires 150 percent. So
2 after that was done, the testing standard is also
3 different.
4      And after those rods have been pressed, the
5 ASME requirement for the deviation of the difference
6 between the two heights, that value should be less than
7 3.2, and for Craftsman that deviation should be less
8 than 3.
9    Q. Okay.
10   A. And the second difference is regarding the
11 load for the central rod. The testing requirement for
12 ASME 2003 is for testing 150 percent, whereas Sears is
13 to test for 200 percent.
14      So after the rods have been pressed, the
15 testing standard is also different. For ASME 2003, the
16 value for the deviation should be less than 3.2, whereas
17 the value for Sears should be less than 3.
18   Q. You testified in response to one of Attorney
19 Edinburgh's question that Weifu was an ISO-certified
20 factory. What does it mean to be an ISO-certified
21 factory?
22   A. I believe that we all know that ISO 9001 is a
23 company-used international quality control system.
24      Simply put, we use a very good and
25 standardized process for the documentation of the system

42 (Pages 162 - 165)

Page 166

1  in order to control the -- in order to control all of
2  our QC activities to ensure that consistency and also
3  continue to improve the standard. And within the ISO
4  system, there are five main components. First of all,
5  is to manage the QC process, and also to manage the
6  duties, and also to manage the resources, and also to
7  ensure the realization of products, and also includes
8  the measurement, analysis and improvement.
9      Q.  How did Weifu become an ISO-certified factory?
10     A.  First of all, we have to set up the working
11 groups for various requirement that are compliant with
12 ISO standards. And we also have to hire a third-party
13 consultant to help us to produce development documents,
14 procedural documents. After that, various departments
15 of the company would work on producing their own
16 procedural documents. So after that was done, we hired
17 the third party to come and verify our compliance with
18 the ISO standard.
19     Q.  What did Weifu have to do to maintain its ISO
20 certification?
21     A.  Typically, the ISO certificate would last for
22 three years, and after that, you have to renew your
23 license. And each year ISO would come to our factory to
24 verify that. Therefore, we need to follow the ISO
25 procedure in order to obtain that certification.

Page 167

1      Q.  Okay. Attorney Edinburgh asked you about how
2  Weifu designed the 50163 jack stand when it was a new
3  design. Can you tell us how that new design was tested
4  and approved for production?
5      A.  First of all, Sears would give us the
6  specification of the product, dimensions of the product
7  as in the height, the width and the length and the
8  maximum height and the minimum height, and Sears would
9  also tell us what is their testing specification and
10 which type of jack stands they wanted.
11         After this information has been received, the
12 engineer will start working on the development of the
13 product in accordance to the procedure for new product
14 development stipulated by ISO. So after that stage,
15 after the drawing is done, we would start making the
16 prototype of the product, and also conduct testing
17 according to the testing requirement and specification
18 provided by Sears.
19         If we have tested these products successfully
20 at the factory, then we would send the product samples
21 to the client and the client would conduct further
22 testing, and they will tell us whether these samples
23 have met their requirements.
24     Q.  Okay. And once the 50163 went into
25 production, how is the 50163 tested during production?

Page 168

1      A.  After the client confirmed the testing, and
2  the fact that we have received the PO, purchase order,
3  we would then arrange for batch production, and also to
4  test whether these are products from the batch
5  production still meet the client's requirements.
6      Q.  So how is that testing done during production?
7      A.  During the production process, we had a few
8  steps in the production procedure to control the
9  quality. First of all, for those ratchet bars, we
10 would -- before they get onto the production line, we
11 would test them at another location to press them in a
12 trial to ensure their quality has met the requirement.
13         And the second procedure is, we have to test
14 the ratchet bar before they get onto the assembly line
15 for production. So under a condition where there's no
16 load at all, we would have to test to make sure the
17 ratchet bar is fully engaged with the pawl. During that
18 testing, where we test whether the ratchet bar and the
19 pawl were fully engaged, we would pull them from the
20 lowest point to the highest height, and once they have
21 been pulled to the highest height, we would also test
22 the device 100 percent at another testing platform.
23     Q.  Did you personally observe this testing at the
24 Weifu factory?
25     A.  Yes.

Page 169

1      Q.  Does every single unit have to pass the test
2  in order to be packaged?
3      A.  Yes, that's correct.
4      Q.  Once the units are packaged, are they subject
5  to further spot-testing?
6      A.  Yes, that's required.
7      Q.  And how are -- how is the spot-testing done?
8      A.  Once the manufacturing department has finished
9  the purchase order, they would tell the QC department
10 regarding the shipment of goods. The FCQ department
11 would look at the production quantity for this batch and
12 then conduct a random sampling of these products
13 according to the MIL-STD-105D requirement.
14         Our testing level is in accordance with the S3
15 testing standard, and our acceptance level for seriously
16 dissatisfactory product is 1.5. That is our definition.
17 For slightly satisfactory products, the level is 6.5.
18         And the difference between seriously
19 dissatisfactory product versus the slightly
20 dissatisfactory product is when we conduct the random
21 sampling of the ratchet bar, the ratchet bar is broken
22 or the base frame is broken or the entire frame is
23 twisted or distorted. These conditions are defined as
24 seriously dissatisfactory.
25         And for the slightly dissatisfactory products,

43 (Pages 166 - 169)

Page 170

1  what we meant is any damage to the packages -- packaging
2  or the paint of the frame has fallen off or has been
3  scratched.
4        So this is the main work conducted by our FQC
5  during the testing process.
6     Q.  Okay.  And are those samples subjected to
7  center-load testing under the Sears standard?
8     A.  Yes, that's correct.
9     Q.  Were they subject to off-center testing under
10  the Sears standard?
11     A.  Yes.
12     Q.  All right.  And finally, there's a document
13  that's been marked as Exhibit 9.  It's a packet of Weifu
14  jack stand final production inspection reports provided
15  by Attorney Edinburgh to the court reporter before this
16  deposition.  I would like you to look at the second page
17  of that exhibit, which has a Bates number MVP009532.
18        MR. EDINBURGH:  Wait a second until I get it.
19        MR. ZAKRZEWSKI:  Yeah, sure.
20        MR. EDINBURGH:  Which Weifu Bates number are
21  you referring to?
22        MR. ZAKRZEWSKI:  MVP009532.  It's the second
23  page of the packet of Weifu jack stands final
24  production --
25        MR. EDINBURGH:  Got it.

Page 171

1        MR. ZAKRZEWSKI:  He's on page 2 of that
2  packet.
3  BY MR. ZAKRZEWSKI:
4     Q.  Earlier, Attorney Edinburgh asked you about
5  two 50163 jack stand serial numbers which the plaintiffs
6  claim that the decedent in this case owned.  The serial
7  numbers -- I'll repeat them for you since they were
8  earlier in the deposition -- they were GT1010009618 and
9  GT1010009619.
10        Does this final production inspection report
11  reflect the spot-testing that was performed on the batch
12  of products that those two serial numbers came from?
13     A.  Yes.
14     Q.  How do you know that?
15     A.  Because the two numbers you mentioned earlier
16  were 9618 and 9619, and regarding the document here for
17  the random testing we've done, the first one we have
18  sampled, which is the closest to that number, is
19  GT1010009268, and the next one we sampled is -- was
20  GT1010009764, which show that the two products you
21  mentioned earlier were in the same batch as these ones
22  when they were produced.
23     Q.  And does this final production inspection
24  report reflect that every unit passed the inspection?
25     A.  Yes.

Page 172

1        MR. ZAKRZEWSKI:  I have no further questions.
2        MR. EDINBURGH:  I just have some follow-ups.
3  FURTHER EXAMINATION BY MR. EDINBURGH:
4     Q.  Can we stay on the same document, MVP09532,
5  the one we were just looking at.  You see the serial
6  number, let's go to the last few digits, 009268.  Do you
7  see that?
8     A.  Yes.
9     Q.  And the one right after that, you say is
10  009764, is that your testimony?
11     A.  Yes.
12     Q.  So that means between 9268 and 9764, there
13  were 500 stands that were not tested?
14        MR. ZAKRZEWSKI:  Objection.
15        You can answer.
16        THE WITNESS:  As I mentioned earlier, the FQC
17  department conducted the random sampling according to
18  the MIL-STD-105D sampling plan; therefore, we have to
19  follow the quality of the sampling according to this
20  plan, which is a very authoritative testing plan for
21  random sampling.
22  BY MR. EDINBURGH:
23     Q.  I'm asking you, sir, whatever the reason, does
24  this document reflect that the 500 jack stands produced
25  between 9268 and 9764 were not tested?

Page 173

1        MR. ZAKRZEWSKI:  Objection.
2        THE WITNESS:  During the production process,
3  they were all tested.  As I said earlier, this document
4  is the final product testing report, so we had to follow
5  the standard of the MIL-STD-105 testing standard for
6  random sampling; therefore, it doesn't mean that we did
7  not test the products.
8        And also, to ensure gatekeeping and quality
9  control, before the goods were shipped, we follow the
10  ISO standard and also to meet the MIL-STD-105D
11  requirements.
12  BY MR. EDINBURGH:
13     Q.  This same document -- does this document that
14  you're looking at now -- the 9532, does this document
15  reflect that Weifu jack stands, serial numbers 9618 and
16  9619 were tested?  Does this document indicate those
17  specific stands were tested, yes or no?
18     A.  You meant just within this report, right?
19     Q.  Yes, according to this document.
20     A.  No.
21     Q.  Has Weifu heard of ASME PALD 2009 for jack
22  stands?
23        MR. ZAKRZEWSKI:  Objection.  He can answer.
24        THE WITNESS:  Yes.
25  BY MR. EDINBURGH:

44 (Pages 170 - 173)

Page 174

1    Q.  Did Weifu test the 50163 in accordance with
2  ASME PALD 2009?
3    A.  Yes.
4    Q.  I believe you indicated that they tested
5  pursuant to ASME PALD 2003.  Was that your prior
6  testimony?
7        MR. ZAKRZEWSKI:  Objection.
8        THE WITNESS:  Regarding 50163, what I
9  testified earlier was the testing was done according to
10  the Craftsman standard.  For the Pro-Lift product, they
11  were tested according to the ASME PALD 2003 standard.
12  BY MR. EDINBURGH:
13    Q.  Is it your testimony that Weifu did not test
14  the T6904 jack stand in accordance with ASME PALD 2009?
15        MR. ZAKRZEWSKI:  Objection.  Clearly not the
16  witness's testimony.  This is misleading, you're also
17  not specifying which T6904 jack stand and the number --
18  BY MR. EDINBURGH:
19    Q.  The Pro-Lift T69 -- the Pro-Lift -- the Shinn
20  Fu America Pro-Lift brand T6904 jack stand, was that
21  tested by Weifu pursuant to ASME PALD 2009?
22        MR. CHAYKIN:  In what year?
23        MR. EDINBURGH:  Let him tell me.
24        MR. CHAYKIN:  Oh, okay.
25        INTERPRETER:  The witness said:  "Indeed, we

Page 175

1  need to specify which year it was."
2  BY MR. EDINBURGH:
3    Q.  Well, at some point in time, did Weifu test
4  the Shinn Fu America Pro-Lift brand T6904 jack stand to
5  comply with ASME PALD 2009?
6    A.  It's been a long time.  I cannot remember.
7    Q.  You indicated earlier, am I correct, that
8  Sears had its own testing standards for its 50163 jack
9  stand, is that correct?
10    A.  That was the standard provided by Craftsman.
11    Q.  That was the standard provided by?
12        INTERPRETER:  Craftsman.
13        MR. CHAYKIN:  Craftsman.
14        MR. EDINBURGH:  Oh, Craftsman.
15        MR. CHAYKIN:  Yeah.
16  BY MR. EDINBURGH:
17    Q.  Was Craftsman and Sears the same?  Is
18  Craftsman and Sears the same?
19        MR. ZAKRZEWSKI:  Objection.
20        THE WITNESS:  Craftsman is a brand under
21  Sears.
22  BY MR. EDINBURGH:
23    Q.  Okay.  Was the Sears Craftsman 50163, to
24  Weifu's knowledge, tested in the Sears laboratory?
25    A.  Yes.

Page 176

1    Q.  And was that laboratory located in the United
2  States, to Weifu's knowledge?
3    A.  Yes.
4    Q.  And did Weifu receive in writing the results
5  of the Sears Craftsman lab test results for the 50163?
6    A.  Yes, we have received the notification that
7  the product has passed.
8    Q.  I'm not asking you whether somebody told you
9  they passed.
10        Were the actual test protocols and/or test
11  results sent to Weifu?
12        MR. ZAKRZEWSKI:  Objection.  Asked and
13  answered.
14        THE WITNESS:  I remember that from the
15  document we have provided earlier.  It was mentioned
16  that Sears sent us a letter saying that the products
17  have passed.
18  BY MR. EDINBURGH:
19    Q.  Mr. Su, I understand the letter.  What I'm
20  asking you is not the letter.  What I'm asking you
21  is whether there's a document that contains the actual
22  testing procedures and protocols utilized by Sears
23  Craftsman for its testing of the 50163 and also the
24  results of such testing.  Did Weifu receive any such
25  documents in addition to an e-mail or letter saying the

Page 177

1  50163 passed?
2        MR. ZAKRZEWSKI:  Objection.
3        THE WITNESS:  I'm not sure about that.
4        MR. EDINBURGH:  Give me a second, please.
5  (7:26 p.m.)
6        (A break was taken.)
7  (7:27 p.m.)
8  BY MR. EDINBURGH:
9    Q.  All right.  I promise this is the end.
10        Have you ever heard of the term "Shinn Fu
11  Group," G-r-o-u-p -- Shinn Fu Group?
12        MR. ZAKRZEWSKI:  Objection.  He can answer.
13        THE WITNESS:  Yes.
14  BY MR. EDINBURGH:
15    Q.  What is your understanding of what the Shinn
16  Fu Group is?
17    A.  It should be formed by various companies.
18    Q.  Was Weifu part of the Shinn Fu Group?
19        MR. ZAKRZEWSKI:  Objection.
20        THE WITNESS:  No.
21  BY MR. EDINBURGH:
22    Q.  Was MVP?
23        MR. ZAKRZEWSKI:  This is going beyond the
24  scope of my questioning.  You were already over your
25  time.  And he's not designated to testify on behalf of

45 (Pages 174 - 177)

Page 178

1 MVP, so is this the last question?

2      MR. EDINBURGH:  Yep.  Thank you.

3      MR. ZAKRZEWSKI:  I have one question.

4 FURTHER EXAMINATION BY MR. ZAKRZEWSKI:

5      Q.  This document, MVP 9532, was this made in the

6 normal course of Weifu's business?

7      MR. EDINBURGH:  Objection.

8      THE WITNESS:  Yes.

9      MR. ZAKRZEWSKI:  Okay.

10      MR. EDINBURGH:  Thank you, everyone.  It's

11 been a long period.  We'll see you again at 9:00.

12      (The deposition concluded at 7:29 p.m.)

13            --oOo--

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 179

1          ACKNOWLEDGMENT OF DEPONENT

2      I, Su Chien Chi, do hereby certify

3 that I have read the foregoing transcript of my

4 testimony, and further certify that it is a true

5 and accurate record of my testimony (with the

6 exception of the corrections listed below):

7 Page  Line          Correction

8 ____|____|_____|_____

9 ____|____|_____|_____

10 ____|____|_____|_____

11 ____|____|_____|_____

12 ____|____|_____|_____

13 ____|____|_____|_____

14 ____|____|_____|_____

15 ____|____|_____|_____

16 ____|____|_____|_____

17 ____|____|_____|_____

18 ____|____|_____|_____

19 ____|____|_____|_____

20 ____|____|_____|_____

21

22 Signed under the pains and penalties of perjury

23 this _____ day of _____, 20___.

24

25 _____

---

Page 180

1          REPORTER'S CERTIFICATE

2

  STATE OF CALIFORNIA          )

3                              ) ss

  COUNTY OF SANTA BARBARA      )

4

5      I, MARK McCLURE, CSR NO. 12203, a Certified

6 Shorthand Reporter for the County of Santa Barbara,

7 State of California, do hereby certify:

8      That, prior to being examined, the witness

9 named in the foregoing deposition was by me duly sworn

10 to testify the truth, the whole truth, and nothing but

11 the truth;

12      That said deposition was taken down by me in

13 stenotype at the time and place therein named, and

14 thereafter reduced to typewriting by computer-aided

15 transcription under my direction.

16      I further certify that I am not interested in

17 the event of the action.

18      WITNESS my hand this 19th day of

19 April, 2018.

20

21

22

23

24                Certified Shorthand Reporter

                  State of California

25                CSR No. 12203

---

46 (Pages 178 - 180)