# *EXHIBIT G*

Page 1

1              UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT
2
    ------------------------------)
3   FREDERICK KLORCZYK, JR., as   )
    co-administrator of the Estate )   CIVIL ACTION NO.
4   of Christian R. Klorczyk and   )   3:13-CV-00257-JAM
    LYNNE KLORCZYK, as            )
5   co-administrator of the Estate )
    of Christian R. Klorczyk,     )
6                                 )
              Plaintiffs,         )
7                                 )
      vs.                         )
8                                 )
    SEARS, ROEBUCK & CO., SHINN FU )
9   CORPORATION, SHINN FU COMPANY  )
    OF AMERICA, INC., MVP (HK)     )
10  INDUSTRIES, LTD., AND WEIFU    )
    (TAISHAN) MACHINERY & ELECTRIC )
11  CO., LTD.,                     )
                                  )
12            Defendants.         )
    ------------------------------)
13
14
            30(b)(6) DEPOSITION OF NORA LEE
15
                      VOLUME 1
16
              Thursday, April 12, 2018
17
                  AT: 9:02 a.m.
18
                   Taken at:
19                 Taipei 101
          No. 7, Section 5, Xinyi Road
20     Xinyi District, Taipei City, 110
                    Taiwan
21
22
23
24
    Court Reporter:
25  Mark McClure, Certified Court Reporter

## Page 2

```
 1        A P P E A R A N C E S
 2 Appearing for the Plaintiffs:
 3      (Appearing by videoconference)
        HOWARD EDINBURGH, ESQ.
 4      HERZFELD & RUBIN, P.C.
        125 Broad Street
 5      New York, New York 10004
        (212) 471-8500
 6      Telephone: (212) 471-8500
        E-mail: hedinburgh@herzfeld-rubin.com
 7
        (Appearing by videoconference)
 8      BRYAN J. ORTICELLI, ESQ.
        DAY PITNEY, LLP
 9      242 Trumbull Street
        Hartford, Connecticut 06103-1212
10      Telephone: (860) 275-0100
        E-mail: borticelli@daypitney.com
11
12 Appearing for the Defendants:
13      STEVEN J. ZAKRZEWSKI, ESQ.
        GORDON & REES, SCULLY MANSUKHANI
14      95 Glastonbury Boulevard, Suite 206
        Glastonbury, Connecticut 06033
15      Telephone: (860) 278-7448
        E-mail: szakrzewski@gordonrees.com
16
        ARTHUR CHAYKIN, GENERAL COUNSEL
17      SFA COMPANIES, INC.
        10939 North Pomona Avenue
18      Kansas City, Missouri 64153
        Telephone: (816) 891-6390
19      E-mail: arthur.chaykin@sfacompanies.com
20
   INTERPRETER:
21
        I CHING NG, Cantonese interpreter
22
23 ALSO PRESENT:
24      PETER CHANG, Shinn Fu Corporation
25
```

## Page 4

```
 1      PREVIOUSLY MARKED EXHIBITS
 2  NUMBER        DESCRIPTION          PAGE
 3  Exhibit 3      Second Amended Complaint    13
 4  Exhibit 4      Presentation of Shinn Fu    43
                   Corporation, 2011
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1            I N D E X
 2  WITNESS    EXAMINATION        PAGE
 3  NORA LEE
 4        BY MR. EDINBURGH      5
 5        BY MR. ZAKRZEWSKI     110
 6        BY MR. EDINBURGH      115
 7
 8         E X H I B I T S
 9  NUMBER     DESCRIPTION        PAGE
10  Exhibit 10  Notice of Deposition, Person Most  6
             Knowledgeable, MVP (HK)
11           Industries, Ltd.
12  Exhibit 11  Lexington Insurance Company     52
             policy No. 035417823, Bates
13           WFT001952 - 981
14  Exhibit 12  Sales Representative Agreement   56
             Between Shinn Fu Company of
15           America and MVP (HK) Industries,
             Bates SFA003336 - 345
16
     Exhibit 13  Sears, Roebuck Universal Terms  71
17           and Conditions, Bates MCP010203 -
             211
18
     Exhibit 14  Kmart/Sears, Roebuck Accelerated  71
19           Line Review Agreement, Bates
             MVP010229 - 243
20
     Exhibit 15  Sears/Kmart Universal Terms and  71
21           Conditions - International, Bates
             MVP000001 - 010
22
     Exhibit 16  Sales Forecast, Bates MVP009181  84
23
     Exhibit 17  Purchase orders and Invoices    85
24
     Exhibit 18  E-mail correspondence          94
25
```

## Page 5

```
 1          P R O C E E D I N G S
 2  (9:02 a.m.)
 3          I CHING NG
 4  was sworn to interpret the Cantonese language.
 5          NORA LEE,
 6      having been sworn, was examined
 7      and testified as follows:
 8  EXAMINATION BY MR. EDINBURGH:
 9      Q.  Ms. Lee, good morning.
10      A.  Good morning.
11      Q.  I think I understood that one.
12          My name is Howard Edinburgh.  My law firm is
13  Herzfeld & Rubin, and we represent a family called the
14  Klorczyk family in a personal injury and unlawful death
15  lawsuit that has been brought against several
16  defendants, including a company called MVP (HK)
17  Industries, Ltd.
18      A.  I understand.
19      Q.  Ms. Lee, just some basic ground rules or
20  instructions before we even begin with the substantive
21  questioning.
22          Please wait until I finish my question and the
23  question's translated into Cantonese before you answer.
24  Even if you understand what I'm saying, please wait
25  until you get the translation before you respond.
```

2 (Pages 2 - 5)

Page 6

1      You must give a verbal answer to each
2 question, as opposed to shaking the head or a body
3 movement.  If the answer is yes, say "yes."  If the
4 answer is no, say "no."
5      Let me know if I ask any question that you
6 don't understand, and then I will attempt to rephrase it
7 in a manner in which you are able to answer.
8      From time to time you may wish to take a
9 break, the bathroom, for water, for food, whatever
10 reason.  And you can do that, but you can't do it while
11 a question is pending.  You must wait until you answer
12 the question before you take a break.
13     A.  I understand.
14         MR. EDINBURGH:  All right.  I'll begin.
15         Mr. Reporter, can you mark as Exhibit 10 the
16 notice of deposition for MVP industries
17         (Exhibit 10 marked for identification.)
18 BY MR. EDINBURGH:
19     Q.  Ms. Lee, before I go into this, just let me
20 ask you, do you have some degree of fluency in English?
21     A.  It depends on what kind of questions you are
22 asking.
23     Q.  Okay.  Can you read English?
24     A.  For general matters, yes.
25     Q.  Have you seen this notice of deposition

Page 7

1 before?
2     A.  Yes.
3     Q.  Were you able to read it without any
4 assistance in terms of translation?
5     A.  Yes.
6     Q.  I draw your attention to pages 4, 5, 6 and 7
7 of this notice where it says "Deposition topics."  Can
8 you please look at that, ma'am.  Have you reviewed these
9 topic listings before today?
10    A.  Yes.
11    Q.  Is it your understanding, Ms. Lee, that you're
12 testifying today as to what is called, in American
13 federal court, a Rule 30(b)(6) witness for MVP (HK)
14 Industries, Ltd., which I will call or refer to as MVP?
15    A.  I know that.
16    Q.  And is it your understanding that you will be
17 testifying about certain topics listed in Exhibit 10 of
18 MVP's notice of deposition?
19    A.  I know that.
20    Q.  Okay.  And do you have an understanding of
21 what are the responsibilities of a 30(b)(6) witness,
22 such as yourself?
23    A.  I know that.
24    Q.  Can you please tell me what is your
25 understanding of your responsibilities as the 30(b)(6)

Page 8

1 witness for MVP.
2     A.  I need to tell you all I know about MVP
3 correctly.
4     Q.  Do you have an understanding that your
5 testimony today constitutes the collective corporate
6 knowledge of MVP?
7         MR. ZAKRZEWSKI:  Objection.
8         THE WITNESS:  What do you exactly mean by
9 "collective corporate knowledge"?
10 BY MR. EDINBURGH:
11    Q.  Do you have an understanding that your
12 testimony today is binding on MVP?
13    A.  I know that.
14         MR. ZAKRZEWSKI:  I object.
15 BY MR. EDINBURGH:
16    Q.  And do you have an understanding that you are
17 representing MVP as a corporate entity at today's
18 deposition?
19    A.  I know that.
20    Q.  In order to fulfill your responsibilities as
21 MVP's 30(b)(6) witness, have you discussed any of the
22 topics in the MVP notice of deposition with any current
23 MVP employees?
24    A.  Yes.
25    Q.  And who have you spoken with?

Page 9

1     A.  I have communicated with my Hong Kong
2 colleague.  Her name is Myra Siu.
3     Q.  Any other current employees of MVP that you've
4 spoken with?
5     A.  It was mainly with Myra Siu.
6     Q.  What topics did you discuss with Ms. Siu?
7     A.  We mainly discussed the current status of the
8 litigation and also the status of MVP the company.
9     Q.  And what is Ms. Siu's position at MVP?
10    A.  She's the manager for finance department.
11         MR. EDINBURGH:  Manager of finance?
12         INTERPRETER:  Yes.
13 BY MR. EDINBURGH:
14    Q.  In order to fulfill your responsibilities as
15 MVP's 30(b)(6) witness, have you discussed any of the
16 topics listed in the notice of deposition with any
17 former MVP employees?
18    A.  Which time period are you talking about?  Are
19 you talking about now?
20    Q.  Well, okay.  I mean, in order to learn and
21 have knowledge of the topics to which you'll be
22 testifying, did you reach out to any MVP personnel who
23 are no longer employed by the company?
24         MR. ZAKRZEWSKI:  Objection.
25         THE WITNESS:  Basically, no.

3 (Pages 6 - 9)

Page 10

BY MR. EDINBURGH:

1

2    Q.   In order to fulfill your responsibilities as

3  MVP's 30(b)(6) witness, have you discussed any of the

4  topics in the notice of deposition with anyone else?

5    A.   Yes.

6    Q.   Who?

7    A.   Yes.  I have talked to my attorneys and Jeff

8  Su, and Peter Chang and Myra Siu --

9    Q.   I'm sorry, the name you just gave after

10 Mr. Chang?

11   A.   Myra Siu, and with Sheng Wang and also Jack

12 Hung.

13   Q.   All right.  And who is Mr. Jeff Su?

14   A.   He is the representative from Weifu's factory.

15   Q.   And what topics did you discuss with Mr. Su?

16   A.   We mainly discussed about the testing and also

17 the condition of that particular jack stand when it was

18 shipped out.

19   Q.   What topics did you discuss with Mr. Peter

20 Chang?

21   A.   It's because it mentioned the SFC, Shinn Fu

22 Corporation's presentation back in 2011, so I tried to

23 understand what it was all about.

24   Q.   Any other topic that you discussed with

25 Mr. Chang?

Page 11

1    A.   You mean only those questions related to the

2  topics listed in this deposition notice, right?

3    Q.   Yes.

4    A.   Basically, no.

5    Q.   And who is Mr. Chang?

6    A.   He's a representative of Shinn Fu Corporation.

7    Q.   And what is his title there?

8    A.   He's a product manager.

9    Q.   You said "product manager," correct?

10     INTERPRETER:  Yeah, "product manager."

11 BY MR. EDINBURGH:

12   Q.   Okay.  Is Mr. Chang sitting in the same

13 conference with you in Taipei right now?

14   A.   Yes.

15   Q.   All right, let's go through these other names.

16 Mira Siu.  Who is Ms. Siu -- I'm sorry, we just spoke

17 about her.  I apologize.

18     Who is Steven Wang?

19     INTERPRETER:  Counsel, the name should be S --

20 BY MR. EDINBURGH:

21   Q.   I misspoke.

22     Who is Mr. Wang?

23   A.   He's a sales director of Shinn Fu Taiwan.

24   Q.   And what topics did you discuss with Mr. Wang?

25   A.   We mainly talked about the issues related to

Page 12

1  the 2011 presentation.

2    Q.   And I believe the last name that you gave us

3  is Mr. Jack Hung, H-u-n-g.  Who is Mr. Hung?

4    A.   He's the finance director of Shinn Fu Group.

5    Q.   I'm sorry, finance director of Shinn Fu --

6     INTERPRETER:  Group, G-r-o-u-p.

7     MR. ZAKRZEWSKI:  Objection.

8     Go ahead.

9     MR. EDINBURGH:  You're objecting to your --

10     INTERPRETER:  The witness would like to make a

11 correction.  She said Jack Hung is the finance director

12 of Shinn Fu Taiwan.

13 BY MR. EDINBURGH:

14   Q.   What topics did you discuss with Mr. Hung?

15   A.   In fact, I talked to him about the 2011

16 presentation and also issues related to the insurance.

17   Q.   All right.  Ms. Lee, are there any current or

18 former employees of Weifu that you sought to talk to but

19 you weren't able to with respect to these topics?

20     MR. ZAKRZEWSKI:  Objection.  She can answer.

21     THE WITNESS:  No.

22 BY MR. EDINBURGH:

23   Q.   Ms. Lee, in order to prepare to give testimony

24 as MVP's 30(b)(6) witness today, have you reviewed any

25 documents?

Page 13

1    A.   Yes.

2    Q.   Can you just tell us generally what documents

3  you looked at.

4    A.   I read information related to the topics of

5  this deposition, and according to the topics, I read

6  some documents from the past.  For example, like,

7  initial answers and also the documents we have provided

8  before, such as the purchase orders and the e-mail

9  correspondence.

10     MR. EDINBURGH:  I'm sorry, I heard "purchase

11 orders," but can you just -- just what you said after

12 "purchase orders."

13     INTERPRETER:  And e-mail correspondence.

14     MR. EDINBURGH:  Mr. Reporter, can you show the

15 previously marked second amended complaint.

16     (Exhibit 3 previously marked.)

17 BY MR. EDINBURGH:

18   Q.   Ms. Lee, have you read this complaint before

19 today?

20   A.   Yes.

21   Q.   And were you able to read it without

22 translation?

23   A.   Without the translation, I was not able to

24 read through the -- all the details in the document.

25   Q.   Did you read a translated version to Chinese

4 (Pages 10 - 13)

Page 14

1 of this complaint?
2    A.  No.
3    Q.  Other than MVP's attorneys, have you discussed
4 the contents of the second amended complaint with
5 anyone?
6        MR. ZAKRZEWSKI:  Can I have the question again
7 in English, Mr. Court Reporter.
8        (Record read by reporter.)
9        THE WITNESS:  Which time frame are you talking
10 about?
11 BY MR. EDINBURGH:
12   Q.  At any time.
13   A.  I would like to say that during the course of
14 our preparation for this deposition I have discussed
15 this with various defendants, the ones I mentioned
16 earlier.
17   Q.  And what about the complaint that you
18 discussed with these other individuals?
19   A.  We mainly talked about the questions
20 surrounding this case, what kind of questions we are
21 going to talk about and have to answer during this
22 deposition, so we mainly talked about the topics in the
23 deposition notice.
24   Q.  Ms. Lee, where do you live?
25   A.  In Hong Kong.

Page 15

1    Q.  For the record, can we have your home address.
2    A.  You mean my residential address in Hong Kong?
3    Q.  Yes, your residential address, correct.
4    A.  Room 1604, Block 3 -- let me repeat again.
5        Room 1604, Block B, for "boy," Abba House,
6 No. 227, Aberdeen Main Road.
7    Q.  Ms. Lee, we're here today for what is called a
8 deposition.  Have you ever been deposed in any other
9 case as a witness?
10   A.  No.
11   Q.  Have you ever given testimony at a trial?
12   A.  No.
13   Q.  What is your date of birth?
14   A.  September 29th, 1966.
15   Q.  What is your highest level of education?
16   A.  I've received a diploma in sales management
17 and marketing.
18       MR. EDINBURGH:  Can you repeat that?  I just
19 have difficulty hearing.
20       INTERPRETER:  "I've received a diploma in
21 sales management and marketing."
22 BY MR. EDINBURGH:
23   Q.  Was that from a university?
24   A.  It's from Hong Kong Polytechnic Institute.
25   Q.  When did you receive that degree, what year?

Page 16

1    A.  In 1994.
2    Q.  Have you had any formal education in any
3 college or university since 1994?
4    A.  No.
5    Q.  Do you have any degrees in any field of
6 engineering?
7    A.  No.
8    Q.  I want to ask you some questions about your
9 work history.
10       Are you currently employed?
11   A.  Yes.
12   Q.  Who is your employer?
13   A.  Currently, I'm working at a garment factory.
14       MR. EDINBURGH:  I heard the word "factory."
15 What is the word before that?
16       INTERPRETER:  Garment.
17 BY MR. EDINBURGH:
18   Q.  Garment, okay.
19       And what is the name of your employer?
20   A.  It's called Circle X Boss (Hung Fook) Ltd.
21   Q.  And how long have you worked there?
22   A.  For two and a half years.
23   Q.  What's your position or title there?
24   A.  I'm the executive assistant.
25   Q.  To who?

Page 17

1    A.  I'm the assistant of the boss.
2    Q.  I take it, that job is located in Hong Kong?
3    A.  It's based in Hong Kong but I do need to
4 travel to mainland China for work.
5    Q.  And were you employed before your position as
6 the executive assistant of the boss of this garment
7 factory?  Who was your prior employer?
8    A.  Before that, I worked for a short period of
9 time at an import and export company in Hong Kong.
10   Q.  What period, ma'am?
11   A.  It was around mid-2014.
12   Q.  And before that, did you work, and, if so,
13 where?
14   A.  Yes.
15   Q.  Where did you work?
16   A.  I worked at MVP.
17   Q.  When did you begin working at MVP and when did
18 you stop working at MVP?
19   A.  I joined the company in 1996, and I left in
20 2008, and I rejoined the company again around the end of
21 2009.
22   Q.  Until when?
23   A.  Until 2014.
24   Q.  All right.  In the period 1996 to 2008 --
25 withdrawn.

5 (Pages 14 - 17)

Page 18

1        When you first joined MVP, what was your job
2  at that time?
3      A.  I was a sales executive.
4      Q.  Regarding any particular products or any
5  particular customers?
6      A.  I was mainly handling the orders from Walmart
7  and Sam's.
8      Q.  And for how long a period of time were you in
9  that position?
10     A.  I think I was in that position for about eight
11 years.
12     Q.  Was Sears, Roebuck one of the clients --
13 withdrawn.
14        Did you also, during that period, handle sales
15 concerning Sears, Roebuck?
16     A.  Which time frame specifically are you talking
17 about, because I worked there for a long time?
18     Q.  Prior to your first leaving the company in
19 2008.
20     A.  Yes.
21     Q.  Were you still a sales executive when you left
22 the company the first time in 2008?
23     A.  No.
24     Q.  What was your position at the time you left
25 the company in 2008?

Page 19

1      A.  I was a sales manager.
2      Q.  In that capacity, what types of sales for
3  either customers or products did you manage?
4        MR. ZAKRZEWSKI:  Objection.
5        You can answer.
6        THE WITNESS:  I was mainly responsible for
7  clients such as Walmart, Sam's.  In principle, I was
8  handling the U.S. clients such as Sears, Advance Auto,
9  Lowe's, et cetera.
10 BY MR. EDINBURGH:
11     Q.  At the time you left in 2008, who was your
12 boss?
13     A.  In 2008, can you clarify what you mean by
14 "boss"?
15     Q.  Did you have a supervisor or someone who you
16 reported to at that period of time?
17     A.  Back in 2008, my supervisor was a colleague.
18 His name is Johnson Wong.
19     Q.  Was there an overall director or head of sales
20 for MVP at that time, head of all sales?
21        MR. ZAKRZEWSKI:  For what entity?
22        MR. EDINBURGH:  For MVP.
23        THE WITNESS:  Back in 2008, it was mainly
24 Johnson Wong who handled that.  Later on, he left, and
25 then there's another colleague who took over.  His name

Page 20

1  is Roy Chu.
2  BY MR. EDINBURGH:
3      Q.  When you returned to MVP after some period of
4  absence there in 2009, what was your position?
5      A.  I was still a sales manager.
6      Q.  For the same client base?
7      A.  Yes.
8      Q.  The United States clients?
9      A.  Yes.
10     Q.  Were these clients generally national retail
11 chains?
12     A.  Yes.
13     Q.  In your position from 2009 at MVP to when you
14 left in 2014, did it change in any way?
15     A.  No.
16     Q.  Ma'am, why did you leave in 2014?
17     A.  Because back then my health conditions was not
18 very good, so I need to see a doctor for a period of
19 time, so I was in and out, and I did need to take a
20 break and rest.
21     Q.  Oh, I'm sorry.  I hope you're well now, and
22 I'll continue with the questioning.
23        Is MVP still in existence today?
24     A.  Yes.
25     Q.  What is MVP's full corporate name?

Page 21

1      A.  MVP (HK) Industries, Ltd.
2      Q.  And under whose laws was MVP organized?
3      A.  Hong Kong laws.
4      Q.  And when was MVP formed?
5      A.  It should be around 1988.
6      Q.  Do you know whether MVP was a successor
7  company to any predecessor entity?
8        MR. ZAKRZEWSKI:  Objection.  She can answer.
9        THE WITNESS:  I'm not sure about that.
10 BY MR. EDINBURGH:
11     Q.  Where is MVP's headquarters?
12     A.  In Hong Kong.
13     Q.  Is that also its principle place of business?
14     A.  Yes.
15     Q.  What is the business of MVP?
16     A.  It's mainly conducting trading business
17 involving the import and export of goods.
18     Q.  Does MVP own or lease any manufacturing plants
19 or factories?
20        MR. ZAKRZEWSKI:  Objection.
21        THE WITNESS:  No.
22 BY MR. EDINBURGH:
23     Q.  Does MVP manufacture products?
24     A.  No.
25     Q.  Does MVP distribute or import products into

6 (Pages 18 - 21)

Page 22

1  the United States?
2     A.  It would conduct exports to the U.S.
3     Q.  Can you tell us the type of products which MVP
4  exports to the United States?
5     A.  Do you want me to give you a general term or
6  you want all the details?
7     Q.  Let's start generally.
8     A.  Automotive accessories, and also tools related
9  to repair of cars.
10    Q.  Do these categories include vehicle support
11 stands?
12    A.  Yes.
13    Q.  And you understand the vehicle support stands
14 to include what are called jack stands?
15    A.  Yes, I know that.
16    Q.  Has MVP exported to the United States jack
17 stands at least since you joined the company in 1996?
18    A.  Yes.
19    Q.  Does MVP manufacture the jack stands that it
20 exports to the United States?
21    A.  No.
22    Q.  Did MVP export jack stands to the United
23 States during your tenure at MVP from 2009 to 2014?
24    A.  Yes.
25    Q.  Do you know, ma'am, what a

Page 23

1  ratchet-and-pawl-designed jack stand is?
2     A.  Yes.
3     Q.  And just generally, can you tell us your
4  understanding of what that type of jack stand is?
5     A.  It comes with a base and also the ratchet bar.
6  The ratchet bar -- the height of the ratchet bar is
7  adjustable, so once you have adjusted the height you
8  want, you put it underneath the vehicle and then raise
9  the vehicle to support the car.
10    Q.  Does MVP have an understanding of what the
11 role of the pawl, p-a-w-l, is in the design of the
12 ratchet-and-pawl jack stand?
13    INTERPRETER:  The witness asked the
14 interpreter to repeat the question again.  (Cantonese
15 spoken.)
16    THE WITNESS:  I think so.
17 BY MR. EDINBURGH:
18    Q.  And what is that understanding?
19    A.  It should be used to lock in the position of
20 the ratchet bar.
21    Q.  Can you tell us the brand of the
22 ratchet-and-pawl jack stands which MVP imported into the
23 United States during the years 2003 through 2011.
24    MR. ZAKRZEWSKI:  Can I have the question in
25 English again, please.

Page 24

1     (Record read by reporter.)
2     MR. ZAKRZEWSKI:  Objection.  She can answer.
3     THE WITNESS:  During 2003 until 2011 the brand
4  should include Pro-Lift, Sears and Kobalt.  These are
5  the ones I can remember.
6  BY MR. EDINBURGH:
7     Q.  Who owns the Pro-Lift brand of jack stands?
8     A.  SFA.
9     Q.  Does that stand for Shinn Fu Company of
10 America?
11    A.  Yes.
12    Q.  And do you know where their headquarters is,
13 or was?
14    A.  In Kansas City.
15    Q.  Did you ever visit Kansas City while you were
16 an employee of MVP?
17    A.  Yes.
18    Q.  When?
19    A.  I can't remember.  It's been a long while.
20    Q.  How many times did you visit?
21    A.  I think twice or three times.
22    Q.  Just for the purposes of -- withdrawn.
23    Were any of the visits during your first
24 period of employment between 1996 and 2008?
25    A.  Yes.

Page 25

1     Q.  And were any of the visits during your second
2  period of employment from 2009 to 2014?
3     A.  For 2009 until 2014, maybe I went there once.
4  I do not remember.
5     Q.  What was the purpose of your visits between
6  1990 -- well, what was the purpose of your visits to
7  Shinn Fu America between 1996 through 2008?
8     A.  It was because back then we were attending
9  some expos, so we visited our clients during the trip as
10 well.
11    Q.  Did you say attending an expo?  Was that the
12 word you used?
13    INTERPRETER:  Yes.
14    THE WITNESS:  Yes.
15 BY MR. EDINBURGH:
16    Q.  Did you visit Shinn Fu America alone or as
17 part of a group of employees from MVP?
18    A.  I went there with my former colleagues because
19 I would not attend an expo on my own.
20    Q.  Okay.  And when you went to Shinn Fu America,
21 do you recall who you met with there?
22    A.  I cannot remember.
23    Q.  Did you discuss, when you were there, any
24 topic concerning ratchet-and-pawl-designed jack stands?
25    A.  No.

7 (Pages 22 - 25)

Page 26

1    Q.  Did MVP export into the United States, between
2  2003 and 2011, any other Shinn Fu America brand of
3  ratchet-and-pawl-designed jack stands?
4        MR. ZAKRZEWSKI:  Objection.
5        INTERPRETER:  The witness asked the
6  interpreter to repeat the question again.  (Cantonese
7  spoken.)
8        THE WITNESS:  My answer is the same as what I
9  said earlier.  That would include Sears Craftsman, and
10  also the Kobalt products.
11 BY MR. EDINBURGH:
12   Q.  And the -- can you spell that?  I know
13 Craftsman and Pro-Lift.  Can you spell the third brand,
14 please.
15   A.  I cannot remember it exactly, but I think it
16 should be K-o-l-b-o-t (sic).
17   Q.  Do you know who owned the Kobalt brand?
18   A.  Lowe's.
19   Q.  All right.  In the year 2003 through 2011, was
20 the Pro-Lift ratchet-and-pawl-designed jack stands
21 purchased by MVP from any particular company?
22       MR. ZAKRZEWSKI:  Objection.  She can answer.
23       INTERPRETER:  The witness asked the
24 interpreter to repeat the question again.  (Cantonese
25 spoken.)

Page 27

1        THE WITNESS:  Yes.
2  BY MR. EDINBURGH:
3    Q.  And from which company did MVP purchase for
4  export the Pro-Lift brand ratchet-and-pawl jack stands?
5        MR. ZAKRZEWSKI:  Objection.
6        THE WITNESS:  SFA.
7  BY MR. EDINBURGH:
8    Q.  Who manufactured the Pro-Lift ratchet-and-pawl
9  jack stands which MVP exported into the United States?
10   A.  Which time frame are you talking about?
11   Q.  All right.  Let's begin -- well, were there
12 different manufacturers during different time frames?
13   A.  Yes.
14   Q.  So beginning in 2003 through 2011, please tell
15 us or identify the manufacturers of the Pro-Lift brand
16 ratchet-and-pawl-designed jack stands and the years of
17 manufacture.
18       MR. ZAKRZEWSKI:  Objection.  She can answer.
19       THE WITNESS:  Weifu (Taishan).
20 BY MR. EDINBURGH:
21   Q.  What years did it manufacture the Pro-Lift
22 brand?
23   A.  The same as the period you just mentioned.
24   Q.  During that period, was Weifu the sole
25 manufacturer of Pro-Lift brand ratchet-and-pawl jack

Page 28

1  stands?
2    A.  Yes.
3    Q.  And did MVP, during that period, purchase
4  Pro-Lift brand jack stands from MVP for export to Shinn
5  Fu America in the United States?
6        MR. ZAKRZEWSKI:  Can I have that question in
7  English again, please.
8        (Record read by reporter.)
9        MR. EDINBURGH:  I'll withdraw the question.
10 I'll start fresh.
11   Q.  And during this period, were all the MVP jack
12 stands -- I'm sorry.  Withdraw again.
13       During this period, were all the Pro-Lift
14 brand jack stands which MVP exported to SFA manufactured
15 by Weifu?
16   A.  Yes.
17   Q.  And between 2003 to 2011, did MVP export to
18 the United States Sears Craftsman brand ratchet-and-pawl
19 jack stands?
20   A.  Yes.
21   Q.  And who is the manufacturer of the Sears
22 Craftsman ratchet-and-pawl jack stands which MVP
23 exported to Sears?
24   A.  Are you talking about the same time frame?
25   Q.  Yes, 2003 to 2011.

Page 29

1    A.  Weifu.
2    Q.  Anyone else?
3    A.  No.
4    Q.  Okay.  Is MVP a publicly traded company?
5    A.  No.
6    Q.  Is MVP privately owned?
7    A.  Yes.
8    Q.  Who owns MVP?
9    A.  There are a few shareholders.
10   Q.  Who are they?
11   A.  They are Victor Hung, Betty Hung, Angela Hung,
12 and Ina Lu.
13   Q.  And do those four individuals collectively own
14 the entire company?
15   A.  It should be the case.
16   Q.  And do you know the share of ownership of each
17 of these individuals?
18   A.  I'm not sure, but Victor Hung is the majority
19 shareholder.
20   Q.  And are Victor Hung, Betty Hung, Angela Hung,
21 are they related?
22       MR. ZAKRZEWSKI:  Objection.
23       THE WITNESS:  Yes.
24 BY MR. EDINBURGH:
25   Q.  Are they siblings -- brother and sisters?

8 (Pages 26 - 29)

1      MR. ZAKRZEWSKI: Objection.
2      THE WITNESS: Yes.
3  BY MR. EDINBURGH:
4      Q.  And how much of the company does Ina Lu own?
5      A.  I'm not sure.
6      Q.  And is she related to any of the Hung
7  individuals?
8      A.  I'm not sure about that.
9      Q.  The ownership of MVP was concerning the three
10 Hung individuals and Ms. Lu.  Was that information
11 acquired by you from discussions with another person or
12 persons?
13     A.  Yes.
14     Q.  From whom did you acquire the knowledge of who
15 owned MVP?
16     A.  From Myra Siu.
17     MR. EDINBURGH: I'd like to show the witness,
18 I believe, a document that we've previously marked.  I'm
19 not sure whether we marked it earlier in this case or
20 yesterday.  It should be SFA3233, which is the chart of
21 directors for several of the companies.
22     (Exhibit 5 previously marked.)
23     MR. ZAKRZEWSKI: Do you want to put a new
24 exhibit sticker on it for today's deposition or do you
25 want to refer to it by --

1      MR. EDINBURGH: Let's refer to it by the prior
2  one.  I don't have to multiple mark it.
3      MR. ZAKRZEWSKI: All right.
4  BY MR. EDINBURGH:
5      Q.  Ms. Lee, have you seen this document?
6      I'm sorry, I didn't mean to interrupt.
7      MR. ZAKRZEWSKI: It's okay.  You asked a
8  question, so let's get an answer to the question and
9  then I'll interrupt.
10     THE WITNESS: Yes.
11     MR. ZAKRZEWSKI: We've been going for almost
12 an hour and a half.  I was just going to ask the witness
13 if she wants a break.  But if you don't, we don't have
14 to take one.  We can keep going and hopefully get done
15 sooner.
16     INTERPRETER: Yes, she would like one.
17     MR. EDINBURGH: Oh, you would like one.  Okay.
18 All right.
19 (10:23 a.m.)
20     (A break was taken.)
21 BY MR. EDINBURGH:
22     Q.  Again, to pick up from before the break,
23 Ms. Lee, have you seen SFA3233 before today?
24     A.  Yes.
25     Q.  Did MVP have a board of directors in 2007

1  through 2014?
2      A.  Yes.
3      Q.  Did it have three directors during that time
4  period?
5      A.  Yes.
6      Q.  Are the names of those directors listed in the
7  document before you, SFA3233?
8      A.  Yes.
9      Q.  Are those directors Victor Hung, Angela Hung
10 and Betty Hung?
11     A.  Yes.
12     Q.  And is Victor Hung the individual who you
13 identified as having majority ownership interest in MVP?
14     A.  Yes.
15     Q.  Are Angela Hung and Betty Hung Victor's
16 sisters who also have an ownership interest in MVP?
17     A.  Yes.
18     Q.  Has MVP heard of a company called Shinn Fu
19 Taiwan?
20     A.  Yes.
21     Q.  And what is the business of Shinn Fu Taiwan?
22     A.  It's in the business of lifting accessories,
23 including jack stands.
24     Q.  When you say "lifting," you mean automotive
25 lifting, correct?

1      A.  Let me repeat again.  It should be automotive
2  accessories.
3      Q.  And just generally, is the business of SFT,
4  from your understanding, the manufacture of such
5  accessories or something else?
6      MR. ZAKRZEWSKI: Objection.
7      THE WITNESS: I don't quite understand your
8  question.  Can you give me more details.
9  BY MR. EDINBURGH:
10     Q.  Do you have an understanding whether SFT's
11 business included making jack stands, manufacturing jack
12 stands?
13     MR. ZAKRZEWSKI: Objection.
14     THE WITNESS: I don't know that much details
15 about their products because MVP has not purchased
16 anything from SFT, so I don't know.
17 BY MR. EDINBURGH:
18     Q.  All right.  I'd like you to look at the top
19 portion of the document where it lists SFT's directors,
20 and you'll notice that the names are -- first three
21 names are Victor Hung, Betty Hung and Angela Hung, and
22 do you have an understanding that these three
23 individuals who are listed as SFT directors are the same
24 three individuals who are MVP's directors?
25     A.  Yes.

9 (Pages 30 - 33)

Page 34

1    Q.   And in the period when you left MVP the first
2 time, 2008, who was the chief executive or the chief
3 manager of MVP?
4    A.   I don't think there were any.
5    Q.   Was there a president or chief executive
6 officer of MVP in 2008?
7    A.   No.
8    Q.   Was there a general manager of MVP in 2008?
9    A.   No.
10    Q.   Who, if anyone, was in charge of the
11 day-to-day operation of MVP at the time you left in
12 2008?
13    A.   At the time, MVP did not need to have a CEO;
14 therefore, we directly reported to the boss, Victor
15 Hung.
16    Q.   And in 2008, did Victor Hung reside in Hong
17 Kong?
18    A.   No.
19    Q.   Did he reside in Taiwan?
20    A.   Yes.
21    Q.   And when you returned to the company in 2009,
22 from through 2011, was it the same structure where
23 executives of MVP would report to Victor Hung?
24    A.   Yes.
25    Q.   And from 2009 to 2011, did MVP have a

Page 35

1 president or chief executive officer or a general
2 manager?
3       MR. ZAKRZEWSKI:  Objection.
4       You can answer.
5       THE WITNESS:  No.
6 BY MR. EDINBURGH:
7    Q.   And you are familiar with the company Shinn Fu
8 America, is that right?
9       MR. CHAYKIN:  Can you read back the question
10 in English, please.
11       (Record read by reporter.)
12       THE WITNESS:  Can you give me further details?
13 What do you mean by "familiar"?  Familiar with what kind
14 of aspect?
15 BY MR. EDINBURGH:
16    Q.   What is your understanding of the business of
17 Shinn Fu America?
18    A.   SFA was one of my clients, the client of MVP.
19 SFA purchased products from me and then resold them to
20 retailers in the U.S.
21    Q.   Let me go back to this chart showing MVP's
22 directors.  Prior to 2007, were these three
23 individuals -- Victor Hung, Angela Hung and Betty
24 Hung -- MVP directors before 2007?
25       INTERPRETER:  The witness would like to make a

Page 36

1 clarification on her earlier answer.
2       She said: "After SFA purchased the products
3 from me, I don't know to whom SFA would sell the
4 products to.  SFA would just sell to their clients."
5       MR. CHAYKIN:  I forgot the question.  Can you
6 read it back.
7       (Record read by reporter.)
8       THE WITNESS:  They should be the directors in
9 the year of 2007, and regarding the earlier period, I
10 think so but I'm not entirely sure.
11 BY MR. EDINBURGH:
12    Q.   Okay.  Did Angela Hung or Betty Hung -- were
13 they involved in the business of MVP?
14       MR. ZAKRZEWSKI:  Objection.
15       THE WITNESS:  Which time period are you
16 talking about?
17       INTERPRETER:  Counsel, the witness --
18       MR. EDINBURGH:  I know.
19    Q.   How about -- let's begin with 2008 when you
20 left the company.  Prior to leaving, were they involved
21 at all in the operations of MVP?
22       MR. ZAKRZEWSKI:  Same objection.
23       THE WITNESS:  You mean in the year of 2008,
24 right?
25 BY MR. EDINBURGH:

Page 37

1    Q.   Yes.
2    A.   I mainly reported to Victor Hung.  Regarding
3 whether Betty Hung and Angela Hung were involved in the
4 business, I'm not sure.  If there were any issues, I
5 would report directly to Victor Hung.
6    Q.   When you returned to MVP in 2009 and
7 thereafter, were Angela Hung or Betty Hung involved in
8 the operations of MVP?
9       MR. ZAKRZEWSKI:  Objection.
10       THE WITNESS:  My answer is the same as my
11 previous answer.  I directly reported to Victor Hung
12 regarding all matters.  I do not contact Angela Hung or
13 Betty Hung directly.
14 BY MR. EDINBURGH:
15    Q.   Did Angela Hung or Betty Hung live in Hong
16 Kong?
17    A.   No.
18    Q.   Did they live in Taiwan?
19    A.   They should be.
20    Q.   Looking at the list of SFA directors on the
21 bottom of this chart, if you would, please.  Do you see
22 the first three names are Victor Hung, Betty Hung and
23 Angela Hung?
24    A.   Yes, I see that.
25    Q.   And is it your understanding that these are

10 (Pages 34 - 37)

Page 38

1 the same three individuals who are listed as MVP
2 directors?
3    A.  Yes.
4    Q.  And these are the same three individuals who
5 are listed as SFT directors?
6    A.  Can you talk about a time frame?
7    Q.  The same time frame.  Well, from this chart --
8 withdrawn.
9       According to the SFA chart in front of you,
10 Victor Hung, Betty Hung and Angela Hung were directors
11 of SFA from 2007 to 2014.
12       Were these same individuals, according to this
13 chart and your understanding of these individuals,
14 directors of SFT for the time period indicated on the
15 chart?
16    A.  Can you ask the question in a much clearer
17 way?
18    Q.  Okay.  All right.  Let me go forward on this.
19       The SFA director list, I'd like you to look
20 and see the name Steven Huang.  Do you know a Steven
21 Huang, H-u-a-n-g?
22    A.  Yes.
23    Q.  What is your understanding of who is Steven
24 Huang?
25    A.  He's a personnel at SFA who's responsible for

Page 39

1 logistics and finance matters.  In general, he would
2 give us the orders.
3    Q.  Did you meet with him on those occasions when
4 you visited SFA in Kansas City?
5    A.  Yes.
6    Q.  And the next one on the list, Vickie Huang,
7 H-u-a-n-g, do you know who she is?
8    A.  I've heard about her.
9    Q.  And what have you heard?
10    A.  She's the mother of Victor.
11    Q.  Okay.  And the next name, Michael Huang,
12 H-u-a-n-g, do you have an understanding who Michael
13 Huang is?
14    A.  I've heard about him.
15    Q.  And what did you hear?
16    A.  He is the father of Victor.
17    Q.  And have you also heard that he's the husband
18 of Vickie?
19    A.  I guess so.  They are the father and mother.
20    Q.  Do you have an understanding that Steven Huang
21 and Vickie Hung are brother and sister?
22    A.  I have not inquired about that.
23    Q.  In the years 2006 to 2011, did MVP pay any
24 dividends or make any other financial money
25 distributions to any of its owners or shareholders?

Page 40

1       MR. ZAKRZEWSKI:  Objection.
2       THE WITNESS:  I don't think so.
3 BY MR. EDINBURGH:
4    Q.  In the same period of time, did MVP loan money
5 to Shinn Fu Corporation?
6    A.  I don't think so.
7    Q.  In that same period of time, did MVP loan
8 money to Shinn Fu Taiwan?
9    A.  I think this question is the same as the
10 previous question.  Can you clarify?
11    Q.  Is it your understanding that Shinn Fu Taiwan
12 and Shinn Fu Corporation are the same entity?
13       MR. ZAKRZEWSKI:  Objection.
14       MR. CHAYKIN:  The witness asked the question
15 of counsel.
16 BY MR. EDINBURGH:
17    Q.  So I'm asking a different question.
18       MR. CHAYKIN:  Oh, are you withdrawing the
19 previous question?
20       MR. EDINBURGH:  I'll respond to Steve.  With
21 all due respect, you're not the counsel of record here,
22 you are going to be a witness as well.  I don't mind you
23 being present at all, I welcome you being present, I
24 enjoy you being present, but you can't interrupt the
25 deposition.

Page 41

1 I'm withdrawing the last question.
2    Q.  Is Shinn Fu Taiwan and Shinn Fu Corporation,
3 to your understanding, the same company?
4       MR. ZAKRZEWSKI:  Same objection.
5       THE WITNESS:  Since I do not know the full
6 name of these two companies; therefore I cannot fully
7 comprehend your question.
8 BY MR. EDINBURGH:
9    Q.  Did MVP in 2003 to 2011 loan money to Shinn Fu
10 America?
11    A.  No.
12    Q.  And the period 2003 to 2011, did Shinn Fu
13 Taiwan, Shinn Fu Corporation or Shinn Fu America loan
14 money to MVP?
15    A.  As I mentioned earlier, I don't know what is
16 the distinction between Shinn Fu Taiwan and Shinn Fu
17 Corporation, and also which entities you're referring
18 to, but I can only answer that SFA has not loaned money
19 to MVP.
20    Q.  Okay.  Has MVP, during this time period,
21 guaranteed the payment of loans made to Shinn Fu
22 America?
23    A.  No.
24    Q.  During this same time period, has MVP
25 guaranteed the repayment of loans made to either Shinn

11 (Pages 38 - 41)

Page 42

1 Fu Taiwan or Shinn Fu Corporation?
2     MR. ZAKRZEWSKI: Objection. She can answer.
3     THE WITNESS: What do you mean by "repayment
4 of loans"?
5 BY MR. EDINBURGH:
6     Q. If any money had been loaned to Shinn Fu
7 Taiwan or Shinn Fu America, I'm asking if MVP had agreed
8 to guarantee that those loans would be paid back to the
9 lender?
10     MR. ZAKRZEWSKI: Same objection.
11     THE WITNESS: No.
12 BY MR. EDINBURGH:
13     Q. Do you, ma'am, as MVP's 30(b)(6) witness, have
14 an understanding of Shinn Fu Corporation?
15     A. Can you please clarify the definition of Shinn
16 Fu Corporation? Do you mean the company in Taiwan or do
17 you mean all of the affiliated companies? Can you
18 clarify that?
19     Q. All right. Is there an entity that's called
20 Shinn Fu Corporation, to your knowledge?
21     A. My answer is the same as my previous answer.
22 Since I do not know the full registered name of the
23 company, I'm not sure, but from my understanding, we
24 typically call it Shinn Fu Taiwan.
25     I would like you to clarify the definition of

Page 43

1 Shinn Fu Corporation.
2     Q. Instead of doing that, ma'am, I'd like you to
3 look at what has been previously marked the other day,
4 or maybe we continued with the marking of an earlier
5 one, which is the website screenshots called
6 "Presentation of Shinn Fu Corporation 2011."
7     MR. EDINBURGH: If the witness can see that
8 document.
9     (Exhibit 4 previously marked.)
10     INTERPRETER: The witness is ready.
11 BY MR. EDINBURGH:
12     Q. All right. Have you seen this document
13 before?
14     A. During my course of preparation for this
15 deposition, I read this document for the first time.
16 But prior to that, I have not seen this document before.
17     Q. Have you discussed this document with those
18 individuals who you previously identified when you
19 mentioned Shinn Fu 2011 presentation as being discussed,
20 and referring to the document you're looking at right
21 now?
22     MR. ZAKRZEWSKI: Objection.
23     THE WITNESS: I did ask them about it.
24 BY MR. EDINBURGH:
25     Q. This document refers to an entity called Shinn

Page 44

1 Fu Group. Does Weifu have an understanding what the
2 Shinn Fu Group is, or was -- I'm sorry, I'll withdraw
3 the question. I misspoke.
4     This document refers to an entity called Shinn
5 Fu Group. Does MVP have an understanding as to who is
6 or was the Shinn Fu Group?
7     MR. ZAKRZEWSKI: Objection.
8     THE WITNESS: From my own personal
9 understanding, I think this is a business partnership
10 for the business interaction.
11     MR. EDINBURGH: I guess, if you could, read
12 back again the answer to the question, please. Or what
13 was the answer? You said her "own personal
14 understanding," and then after that.
15     INTERPRETER: "From my own personal
16 understanding, I think this is a business partnership
17 for the business interaction."
18     MR. EDINBURGH: Did you use the word
19 "partnership"?
20     INTERPRETER: Yes.
21     MR. EDINBURGH: That's what I heard.
22     INTERPRETER: Yes, "business partnership."
23 BY MR. EDINBURGH:
24     Q. And was MVP part of the Shinn Fu Group?
25     MR. ZAKRZEWSKI: Objection.

Page 45

1     THE WITNESS: MVP is an independent company
2 with three independent directors. As far as I know, MVP
3 has business dealings with Shinn Fu companies, but it's
4 solely based on buy and sell products.
5 BY MR. EDINBURGH:
6     Q. Ms. Lee, you used the term "independent
7 company," correct, and you also used the term
8 "independent directors"? What do you mean by the term
9 "independent" with respect to MVP company and MVP board
10 of directors?
11     MR. ZAKRZEWSKI: Objection. She can answer.
12     THE WITNESS: Let me reiterate my answer in
13 further details.
14     MVP is a Hong Kong-registered company. It's
15 mainly engaged in the trading business, the buy and sell
16 of products.
17     Regarding -- how should I put it -- it has
18 Victor Hung, Betty Hung, Angela Hung, and Ina Lu as the
19 directors. There are no other people. I see it as an
20 independently run company. That's my understanding.
21 BY MR. EDINBURGH:
22     Q. Ms. Lee, you used the term "independent." Was
23 that a term that you knew of your own knowledge prior to
24 talking to other employ -- withdrawn, withdrawn.
25     Ms. Lee, do you have personal knowledge to

12 (Pages 42 - 45)

Page 46

1 testify of MVP being independent and its board of
2 directors being independent?
3        MR. ZAKRZEWSKI: Objection. She can answer.
4        THE WITNESS: I would like you to explain
5 about what do you mean by the board of directors and the
6 company being independent? I want to hear your view
7 first so that I can give you my answer.
8 BY MR. EDINBURGH:
9     Q.   Instead of doing that, Ms. Lee, I want to ask
10 you again.
11        You used the term "independent." That was
12 your testimony. What did you mean by the term
13 "independent"? What is your definition of
14 "independent"?
15        MR. ZAKRZEWSKI: Objection.
16        THE WITNESS: According to my own
17 understanding, when I say it is independent, it was
18 because the company was founded by three people,
19 including Victor, and they were only involved in the
20 trading business. They are not affiliated with the
21 Shinn Fu Corporation. That's what I meant by being
22 independent. And MVP does not know how the operation of
23 Shinn Fu Corporation works.
24 BY MR. EDINBURGH:
25     Q.   What is the basis for your testimony that

Page 47

1 Victor Hung, Betty Hung and Angela Hung were not
2 affiliated with or related to Shinn Fu Corporation?
3        MR. ZAKRZEWSKI: Objection.
4        WITNESS: It's because the daily operation of
5 MVP Hong Kong was purely directed by MVP itself. You
6 talk about the relationship between these companies, and
7 also from the information I saw in the document, I would
8 like to say that from MVP Hong Kong's perspective, we
9 are only conducting business with Shinn Fu America. We
10 see Shinn Fu America as a client for the buy and sell
11 business.
12        And based on my understanding, there's no
13 substantial affiliation with the Shinn Fu Corporation.
14 That's why I think we are an independently run company.
15 BY MR. EDINBURGH:
16     Q.   Have you talked to Victor Hung, Betty Hung,
17 Angela Hung or the other owner of the company, Ina Lu,
18 to see whether any of them had any relationship to Shinn
19 Fu Corporation or Shinn Fu Group --
20        MR. ZAKRZEWSKI: Objection.
21 BY MR. EDINBURGH:
22     Q.   -- or Shinn Fu Taiwan?
23        MR. ZAKRZEWSKI: Objection.
24        THE WITNESS: No, I have not asked them.
25        MR. ZAKRZEWSKI: Before the next question, I

Page 48

1 don't want to interrupt the question, so --
2        MR. EDINBURGH: I didn't start.
3        MR. ZAKRZEWSKI: Okay. So before you ask a
4 question, I'm really trying to restrain myself from
5 speaking and just saying, you know, objection to the
6 form of your questions, but there's nothing in the
7 deposition notice that required this witness to learn
8 about the relationship of individual directors or
9 shareholders. There are no issues in the case that
10 relate to that. There's no veil piercing claim in this
11 case. You would have to plead that. It's not pled.
12        Obviously, the relevance objections don't need
13 to be made on the record at the deposition. I still
14 think it's prudent to make a statement about it, because
15 this type of questioning went on for hours in
16 yesterday's deposition of Jeff Su, and it seems to be
17 going on for hours again today. I think, if the judge
18 was in court right now, we probably would be calling the
19 court, but it's 11:22 p.m. your time, so that's not an
20 option. So I'll continue objecting to this repetitive
21 questioning, and I'll try to refrain from making any
22 more statements about it, but it's very difficult. I
23 think you can understand where I'm coming from.
24        MR. EDINBURGH: I do. But let me say that I
25 disagree with your objections. I'll also state why, and

Page 49

1 then I'll go forward. Since you set forth yours, I'll
2 set forth the predicate to these questions.
3        I think they are covered in the deposition
4 notice. I think we have several items in there
5 regarding corporate interconnectedness and corporate
6 relationships and business relationships. MVP didn't
7 have thousands of shareholders, it had four, three of
8 whom were brothers and sisters, and own most of the
9 company. I don't think it's burdensome to answer this.
10 We have claims in this lawsuit, which you have denied on
11 behalf of Shinn Fu America and Shinn Fu Corporation
12 indicating they had nothing to do with the products or
13 the companies involved in selling and distributing these
14 products. We are entitled to go into that relationship
15 and I think these questions are perfectly legitimate
16 questions and are necessary questions to prosecute this
17 action against these defendants who will now be able to
18 proffer defendants under Connecticut law.
19        So we can just agree to disagree, and I note
20 your objection, and we'll see down the road whether the
21 court upholds it or not.
22        MR. ZAKRZEWSKI: Yeah, we have completely
23 different views about this, about whether there are
24 issues that are raised in the complaint, about whether
25 it's appropriate to ask this witness for legal

13 (Pages 46 - 49)

Page 50

1 conclusions about, you know, definitions of technical
2 terms. And, you know, the witness has been prepared to
3 testify and has testified about what the business
4 relationships were, and that's already been covered.
5 And now you're asking for a level of detail that goes
6 way beyond what's in the notice deposition or way beyond
7 what could ever be admissible at a trial of this action.
8 So we disagree. And, I guess, spend your deposition
9 time however you see fit.
10      MR. EDINBURGH: All right.
11      MR. ZAKRZEWSKI: But let's get back to the
12 question.
13      MR. EDINBURGH: All right, all right, that's
14 fine. Let's go back.
15 BY MR. EDINBURGH:
16   Q. The witness used a term "Shinn Fu Group" as
17 consisting of business partnerships.
18      Was MVP one of the entities in the Shinn Fu
19 Group business partnership?
20      MR. ZAKRZEWSKI: Objection.
21      THE WITNESS: From my perspective, when I say
22 the term "business partnership," I think it may be
23 misunderstood. What I meant, it is a business network.
24 Everyone formed a network. I can only say that SFA is a
25 client of MVP.

Page 51

1 BY MR. EDINBURGH:
2   Q. Okay. Was MVP part of the Shinn Fu Group
3 business network?
4      MR. ZAKRZEWSKI: Objection.
5      THE WITNESS: SFA is my client. I did sell
6 goods to them, and we have made business contact and
7 business interaction, a business network. That's my
8 understanding.
9 BY MR. EDINBURGH:
10   Q. Did SFA and MVP have any -- withdrawn.
11      I'm going to show the witness -- I'm wanting
12 to get out those sales agreements that were shown to SFA
13 from Sears, to SFA and --
14      Let's take a break for a minute while I look
15 for these documents.
16      (A short recess was taken.)
17      MR. ZAKRZEWSKI: And just so you can plan the
18 timing of your questions, we have lunch coming at 12:15.
19      MR. EDINBURGH: Okay. All right. That's
20 fine. We don't have too many options where I am over
21 here at this time.
22      I think there were a number of pages from the
23 Lexington insurance policy that I've sent to the
24 reporter that were previously marked. Can we show that
25 to the witness. That was SFA 5, from a 2016 deposition.

Page 52

1      (Exhibit 11 marked for identification.)
2      MR. EDINBURGH: I'll just ask the witness to
3 look at this document, and when she's finished looking
4 at it, let me know.
5      THE WITNESS: I'm done.
6 BY MR. EDINBURGH:
7   Q. Ms. Lee, have you reviewed this particular
8 document in preparation for your deposition today?
9   A. Yes, I've seen that.
10   Q. And did you also discuss this document with
11 Jackie Hung, H-u-n-g?
12      MR. ZAKRZEWSKI: Objection.
13 BY MR. EDINBURGH:
14   Q. Jack Hung. I'm sorry. Jack Hung, H-u-n-g.
15   A. I've asked him about it.
16   Q. Is this the policy of insurance that --
17 withdrawn.
18      Was it MVP's understanding that it was insured
19 for claims in the United States, if any, by Lexington
20 Insurance Company?
21   A. I think so, yes.
22   Q. And was it MVP's understanding that it and
23 Shinn Fu Corporation were the named insureds under the
24 Lexington insurance policy?
25   A. That's how it was written on the policy.

Page 53

1   Q. Who at MVP -- or who on behalf of MVP had MVP
2 listed as a named insured under the Lexington insurance
3 policy?
4      MR. ZAKRZEWSKI: Objection.
5      THE WITNESS: I don't quite understand your
6 question.
7 BY MR. EDINBURGH:
8   Q. Well, how did it come about that MVP is listed
9 as a named insured under the Lexington policy, do you
10 know?
11   A. I still don't quite understand your question.
12 What I see is, from this insurance policy, I saw MVP
13 being listed as the name of the insured. That's my
14 understanding.
15   Q. Yes, I'm asking you who placed the policy with
16 Lexington naming MVP as the named insured?
17   A. I'm not sure.
18      MR. ZAKRZEWSKI: Objection.
19      Okay, she answered.
20      INTERPRETER: The answer was: "I'm not sure."
21 BY MR. EDINBURGH:
22   Q. Did you ask Mr. Hung whether he was aware of
23 who placed the Lexington policy naming MVP as the named
24 insured?
25      MR. ZAKRZEWSKI: Objection.

14 (Pages 50 - 53)

Page 54

1    THE WITNESS: I did ask about it. Back then,
2 Jack Hung gave me an explanation. He said it this way.
3 This is the most cost effective way to buy this
4 insurance policy. That was how it was handled, that
5 way.
6    MR. EDINBURGH: I'm sorry, I didn't get the
7 name of the person who told her that. Can you repeat
8 the name, please.
9    INTERPRETER: Jack Hung.
10 BY MR. EDINBURGH:
11    Q. Do you have an understanding of why Shinn Fu
12 Corporation was a named insured under the same policy
13 with MVP?
14    MR. ZAKRZEWSKI: Objection.
15    THE WITNESS: My answer is the same as my
16 previous answer. I did ask Jack Hung when I was
17 preparing for the deposition. I tried to understand
18 what happened, and he told me that doing it this way was
19 the most cost effective way to buy this insurance
20 policy.
21 BY MR. EDINBURGH:
22    Q. All right. I'd like you to go to page SFT034,
23 which is, I believe, the last page in this document.
24 It's also called WFT1981. It has two Bates numbers.
25 And look at Roman numeral VII of the policy on that page

Page 55

1 where it says "Special Conditions." Do you see that
2 section, ma'am?
3    A. I see that.
4    Q. Based upon your review of this policy, was
5 Arthur Chaykin MVP's third-party administrator for
6 claims made against it in the United States?
7    MR. ZAKRZEWSKI: Objection.
8    THE WITNESS: I don't quite understand what
9 your question is about. Can you give me further
10 details?
11 BY MR. EDINBURGH:
12    Q. Do you understand what is written in section
13 VII, part A, B and C?
14    MR. ZAKRZEWSKI: Objection.
15    THE WITNESS: I would like to read it one more
16 time.
17    I'm done reading the section.
18 BY MR. EDINBURGH:
19    Q. Okay. Is it MVP's understanding that Arthur
20 Chaykin was MVP's third-party administrator for claims
21 made against it in the United States?
22    MR. ZAKRZEWSKI: Objection.
23    THE WITNESS: According to what I have read,
24 the terms of the -- according to the terms I've read in
25 the insurance policy, that's the case.

Page 56

1    MR. ZAKRZEWSKI: I'll note that that question
2 was asked, what was MVP's understanding, and Arthur
3 Chaykin has been designated as MVP's designee with
4 respect to claims issues, and that plaintiff's counsel
5 was notified of that in advance of this deposition.
6    MR. EDINBURGH: I was just going to stop at
7 that point because of that.
8    MR. ZAKRZEWSKI: All right. We're on the same
9 page, then.
10    MR. EDINBURGH: Let the witness review what
11 was marked as SFA 6, from May 24, 2016, which is an
12 exhibit which I have sent to the reporter earlier.
13 Hopefully he has it. The cover page says "Exhibit SFA
14 6" and says "Sales Representatives Agreement between
15 Shinn Fu Company of America and MVP (HK) Industries."
16    (Exhibit 12 marked for identification.)
17    MR. EDINBURGH: If the witness can look at the
18 document and tell me when she's done looking at it.
19    INTERPRETER: The witness is done.
20 BY MR. EDINBURGH:
21    Q. Ms. Lee, were you able to read this document?
22    A. Yes.
23    Q. Did you look at this document earlier in
24 preparation for you being deposed today as MVP's
25 30(b)(6) witness on certain topics?

Page 57

1    A. I've read it before.
2    Q. And have you discussed this document in
3 preparation for today's deposition with anyone else?
4    A. Yes.
5    Q. And who have you discussed it with?
6    A. As I mentioned earlier this morning, I have
7 discussed this document with Jeff, Peter, Sheng and Jack
8 Hung.
9    Q. Okay.
10    A. We did that in our preparation for the
11 deposition.
12    Q. The document that's listed as SFA 6, on pages
13 SFA 336 through -339, is this a document that is a sales
14 representatives agreement between Shinn Fu Company of
15 America and MVP (HK) Industries, Ltd.?
16    MR. ZAKRZEWSKI: Objection. She can answer.
17    THE WITNESS: Yes.
18 BY MR. EDINBURGH:
19    Q. And I'd like you to go to page 339, the
20 signature page. And can you tell me who signed this
21 document on behalf of MVP?
22    A. Tony Choi.
23    Q. What is Mr. Choi's title, according to the
24 document?
25    A. He's the vice president.

15 (Pages 54 - 57)

Page 58

1    Q.  Did MVP have, in addition to Mr. Choi, any
2  other vice presidents in 2006?
3    A.  No.
4    Q.  In 2007 and 2008 was Mr. Choi still a vice
5  president?
6    A.  No.
7    Q.  When you returned in 2009 to 2011, was he
8  still a vice president?
9    A.  No.
10    Q.  Were there any other vice presidents of MVP in
11  2009 to 2011?
12    A.  From this document, it showed that there was
13  an EVP back in 2009.  From my recollection, he left the
14  company after a short while.
15    Q.  You're referring to page 3347 -- SFA 3347,
16  correct.
17    A.  Yes.
18    Q.  On page 3336, there's a bullet point that
19  describes the business of MVP, which says:  "MVP is in
20  the business of sourcing and selling a variety of
21  automotive accessories and related consumer products
22  focused on the DIY market."
23        Is that an accurate statement of MVP's
24  business?
25    MR. ZAKRZEWSKI:  What page?

Page 59

1    MR. EDINBURGH:  The cover page, the first one.
2    MR. ZAKRZEWSKI:  Oh, the cover page.  Okay.
3  Which bullet point?
4    MR. EDINBURGH:  No. 3.
5    MR. ZAKRZEWSKI:  No. 3, thank you.
6    THE WITNESS:  Yes.
7  BY MR. EDINBURGH:
8    Q.  Am I correct you had earlier indicated that
9  the relationship between SFA and MVP was one of buyer
10  and seller of products?
11    MR. ZAKRZEWSKI:  Objection.
12    THE WITNESS:  It is correct about the buy and
13  sell portion.  In addition to that, we do have other
14  direct import customers.  They directly place orders
15  with MVP.
16        We also purchase the after-sales service from
17  SFA, so we need to pay SFA a fee for that service.
18  BY MR. EDINBURGH:
19    Q.  According to this agreement that begins on
20  page 3336, beginning in 2006 and through the end of
21  December of 2007, was SFA MVP's exclusive sales
22  representative in the United States?
23    A.  In this agreement, I don't think they have the
24  exclusivity.
25    Q.  Well, during this time period, did MVP have

Page 60

1  any other sales representatives or sales agents in the
2  United States?
3    A.  Since MVP handled most of the tasks on its
4  own, from my recollection I think there may be some, but
5  I cannot remember exactly because it's been a long
6  while.
7    Q.  Is it your testimony that MVP had, in the
8  United States, in addition to SFA, other sales
9  representatives or sales agents --
10    MR. ZAKRZEWSKI:  Objection.
11  BY MR. EDINBURGH:
12    Q.  -- during this time period?
13    A.  We did have sales representatives.
14    Q.  Is it your testimony you do not know the
15  identity of any of these sales representatives?
16    MR. ZAKRZEWSKI:  Objection.
17    THE WITNESS:  I think there were sales
18  representatives.  However, right now I cannot remember
19  their names.
20  BY MR. EDINBURGH:
21    Q.  Were they sales representatives for MVP for
22  the same products, product lines covered in the sales
23  representatives agreement that's SFA 6 for the period
24  2006 through 2007?
25    MR. ZAKRZEWSKI:  Objection.

Page 61

1    THE WITNESS:  Can you clarify your question
2  one more time?
3  BY MR. EDINBURGH:
4    Q.  Were the MVP products that were the subject to
5  the sales agreement, that's SFA 6 from the period 2006
6  to 2007, did they include jack stands?
7    A.  As far as I know, the products that could be
8  sold by MVP, they were included in this agreement.
9  Since the jack stands are within the scope of our
10  products, I think it should be included here.
11    Q.  Did MVP have any other sales agents or
12  representatives in the United States on behalf of the
13  jack stands --
14    MR. ZAKRZEWSKI:  Objection.
15  BY MR. EDINBURGH:
16    Q.  -- portion of MVP's business?
17    MR. ZAKRZEWSKI:  Objection.
18    THE WITNESS:  Which time period are you
19  talking about?
20    MR. EDINBURGH:  I couldn't hear.
21    INTERPRETER:  "Which time period you are
22  talking about?"
23  BY MR. EDINBURGH:
24    Q.  2006-2007.
25    A.  I think so.

16 (Pages 58 - 61)

1    Q.  Do you know who they were?

2        MR. ZAKRZEWSKI:  Objection.

3        THE WITNESS:  I remember, at the time, we had

4  a sales representative by the name of Mark Breckan.  He

5  was one of our sales representatives.

6        MR. ZAKRZEWSKI:  Do we have lunch here?

7        We have lunch here.  Is there a logical

8  stopping point in this line of questioning?

9        MR. EDINBURGH:  I can stop now, if you wish,

10  and have lunch and continue.  It probably makes the most

11  sense.  It's here now.

12        MR. ZAKRZEWSKI:  Sounds good.

13        MR. CHAYKIN:  Thank you, Howard.

14  (12:15 p.m.)

15        (The lunch break was taken.)

16  (1:01 p.m.)

17        MR. EDINBURGH:  The witness can continue to

18  please look at the SFA Exhibit 6, and go to page 3340

19  and 3341, the next page.

20        Does the witness see the document that's

21  called "Second Amendment of Sales Representatives

22  Agreement Between Shinn Fu Company of America and MVP

23  (HK) Industries"?

24        THE WITNESS:  Yes.

25        MR. EDINBURGH:  I'd like the witness to look

1  at paragraph 1.  At the very end of that paragraph it

2  says that "SFA will provide MVP with" and then it lists

3  A, B, C and D.  A says "Lab testing services."

4    Q.  What lab testing services did Shinn Fu America

5  provide to MVP?

6    A.  In fact, we have many clients such as Sears,

7  et cetera.  Their products have to go through tests

8  being done by the laboratories, and they have to pass

9  those tests in order for us to ship out the goods.  Many

10  of the labs are located in the U.S.  Therefore, from my

11  understanding, we sent our samples to SFA first, and

12  then SFA will make the arrangements to send these

13  samples to various labs for testing.

14    Q.  The samples that you referred to, do they

15  include ratchet-and-pawl-designed jack stands?

16    A.  Yes.

17    Q.  And in accordance with this agreement, did MVP

18  send to SFA ratchet-and-pawl-designed jack stands to

19  test?

20    A.  Which time frame are you talking about?

21        MR. EDINBURGH:  I'm sorry, I couldn't hear

22  you.

23        INTERPRETER:  "Which time frame are you

24  talking about?"

25  BY MR. EDINBURGH:

1    Q.  This agreement became effective on June 1st,

2  2008, and it appears to run until June 1st, 2009.  In

3  that time frame.

4    A.  In principle, for all the products that need

5  to be sent to the labs for testing, we would have sent

6  those products to SFA and then SFA would submit them to

7  the labs.

8        Whether the testing on the jack stands were

9  actually done, I cannot remember.  If it has to be done,

10  I think it would have happened already.

11    Q.  Let's go to 1B, which says "Show management."

12  What does "Show management" mean?

13    A.  Here, the "show" refers to trade show.

14  Oftentimes we participated in various expos.  For

15  example, at the expo in Las Vegas, we would buy a booth

16  for the exhibition of our products.  So here it means

17  the management of the trade show, so they would help us

18  to manage the exhibition.

19    Q.  Did these trade shows and expos include

20  exhibitions for MVP-imported jack stands?

21        MR. ZAKRZEWSKI:  Objection.  She can answer.

22        THE WITNESS:  In principle, we would exhibit

23  all the products that MVP would sell.

24  BY MR. EDINBURGH:

25    Q.  Did that include jack stands?

1    A.  Yes.

2    Q.  No. 3, or letter C, is "OIPM support."  What

3  do the initials "OIPM" stand for?

4    A.  It means operator's instructions and parts

5  manual.

6    Q.  And what kind of support did Shinn Fu America

7  provide in terms of the operator's instructions and

8  parts manuals?

9        MR. ZAKRZEWSKI:  Can I get the question in

10  English again, please.

11        (Record read by reporter.)

12        MR. ZAKRZEWSKI:  Objection.  She can answer.

13        THE WITNESS:  In this context, after we have

14  prepared the operator's manual, they would proofread the

15  content to see whether it has met the requirement and

16  whether all the content has been included.

17        In addition, they would help us send it to the

18  clients or the laboratories for review.  So they act as

19  a middleman to help us with the communication work.

20  BY MR. EDINBURGH:

21    Q.  Thank you.

22        Can we go to the next two pages, which is 3346

23  and 3347, which is called "First Amendment of Sales

24  Representatives Agreement Between Shinn Fu Company of

25  America and MVP (HK) Industries, Ltd."  In paragraph 1

17 (Pages 62 - 65)

Page 66

1 of that agreement, does SFA agree to provide MVP with
2 the same services, A through D, as in the second
3 amendment?
4    A.  Yes.
5    Q.  And in part of Exhibit B where it says
6 "Customer Phone Service Support," what did that consist
7 of that SFA provided to MVP?
8    A.  Yes.
9    Q.  What did customer phone service support
10 consist of?
11    A.  It was mainly concerning the after-sale
12 hotline that we have.  After the end user, the consumer
13 has purchased the product, they can telephone this
14 hotline if they have any questions or anything that's
15 unclear about the operation or the use of the product.
16 They can phone this hotline and someone would answer the
17 phone call and resolve the matter.
18        In addition, after they have bought the
19 products, if they have any missing parts, such as the
20 jack handle of the jack, they can also telephone the
21 customer support to purchase the parts, so these are the
22 main tasks.
23    Q.  Were reports of customer call-ins to the
24 hotline that were taken -- were the results of those
25 call-ins provided to MVP?

Page 67

1        MR. ZAKRZEWSKI:  Objection.
2        THE WITNESS:  In principle, for example, if
3 the task involved the supply of certain spare parts, or
4 whatever that has been bought by the end users, which
5 they have done so on our behalf, they would -- and also
6 they have paid for the shipping cost and the parts on
7 our behalf, then they would provide us with a record of
8 that, because, under this agreement, we have to pay for
9 those extra services, extra fees.  So they would have
10 given us a list of that.
11        MR. EDINBURGH:  Steve, I want to ask you, as
12 counsel for the defendants, further questioning on any
13 customer complaints about jack stands that run through
14 the customer phone lines or hot lines, is that going to
15 be an area of testimony in May of Mr. Chaykin or an area
16 for this witness tonight?
17        MR. ZAKRZEWSKI:  That's for Mr. Chaykin.
18        In our correspondence, I listed the topics for
19 Mr. Chaykin's deposition.  I think this was within Topic
20 15 of the deposition notice.
21        MR. EDINBURGH:  All right, then I'll proceed
22 with a different question.
23    Q.  Does the witness understand that this First
24 Amendment agreement and 3346 to 3347 went into effect on
25 December 1st, 2009?  Look at paragraph 9.

Page 68

1    A.  From my own personal understanding, that's
2 what it meant, from reading it.
3    Q.  Going to the last two pages of this document,
4 3344 and 3345, is this another amended agreement, sales
5 representatives agreement between Shinn Fu Company of
6 America and MVP Industries that went into effect on
7 January 1st, 2011?
8    A.  In fact, this page is pretty blurry.  I could
9 not decipher the numbers.
10    Q.  This is the document that was provided to me
11 by the defendants.  I don't have a clearer copy.
12        Go to paragraph 9, please.  Look at the last
13 paragraph on page 3345, paragraph 9.  Does that
14 paragraph say that the agreement becomes effective on
15 January 1st, 2011?
16    A.  My answer is the same as my previous answer.
17 Again, this document is pretty blurry.  I cannot read it
18 clearly.  I can see the word "January," but I cannot
19 decipher the number after that.  I see 201-something.
20    Q.  All right.  Are you aware of any other sales
21 representatives agreement between Shinn Fu of America
22 and MVP Industries other than the ones you just looked
23 at now under SFA 6?
24        MR. ZAKRZEWSKI:  Objection.  She can answer.
25        THE WITNESS:  I'm not sure.  I don't know,

Page 69

1 because, right now, I can only see three copies in front
2 of me.  I'm not sure whether there are any other
3 copies."
4        MR. EDINBURGH:  I'm sorry, I couldn't hear her
5 answer.  Was her answer that she didn't know of any
6 others?
7        INTERPRETER:  The witness said:  "I'm not
8 sure, I don't know, because, right now, I can only see
9 three copies in front of me.  I'm not sure whether there
10 are any other copies."
11 BY MR. EDINBURGH:
12    Q.  All right.
13        MR. ZAKRZEWSKI:  Is there any option to turn
14 down your mic slightly?
15        MR. CHAYKIN:  Or move your mic away from those
16 papers.  When you move those papers, it's like an atomic
17 bomb going off here.
18        MR. EDINBURGH:  Actually, on this end, just
19 shuffling papers is nothing.
20        MR. ZAKRZEWSKI:  I know.  And here it's like a
21 form of torture.
22        MR. EDINBURGH:  I apologize.
23        MR. ZAKRZEWSKI:  It's okay.
24        MR. ORTICELLI:  The papers were literally on
25 the mic, by the way.

18 (Pages 66 - 69)

Page 70

1        MR. ZAKRZEWSKI:  That might be part of the
2  issue.
3  BY MR. EDINBURGH:
4      Q.   Was Sears, Roebuck a customer of MVP?
5      A.   Yes.
6      Q.   And at some point in time, did Sears and MVP
7  enter into a written business agreement?
8      A.   Which time frame are you referring to?
9      Q.   Beginning in 2006 and thereafter.
10     A.   Yes, they have signed some kind of agreements.
11       MR. EDINBURGH:  All right.  Mr. Reporter, I
12  also sent as exhibits, earlier in the e-mails to you,
13  three documents.  That should be clipped together with
14  the top being "Sears, Roebuck Universal Terms and
15  Conditions."  There should be three separate ones which
16  are clipped collectively.
17       MR. ZAKRZEWSKI:  Clipped or stapled?
18       MR. EDINBURGH:  They could be stapled.
19       MR. ZAKRZEWSKI:  Can you give me the Bates
20  range?
21       MR. EDINBURGH:  The first set would be MVP
22  10203, the second would be MVP 1001, and the third would
23  be MVP 10229.
24       MR. ZAKRZEWSKI:  This is the first one he
25  referred to.

Page 71

1        Are you going to mark these?
2        MR. EDINBURGH:  Yes.
3        (Exhibit 13 marked for identification.)
4        (Exhibit 14 marked for identification.)
5        (Exhibit 15 marked for identification.)
6        MR. EDINBURGH:  For the time being, I'd just
7  like the witness to look at 13 and 15.  Skip 14.  We'll
8  do that next.
9        INTERPRETER:  The witness is done.
10 BY MR. EDINBURGH:
11     Q.   All right.  Looking at Exhibit 13, does
12  Exhibit 13 reflect the agreement between Sears and MVP
13  that was entered into on or about October 12th, 2006?
14     A.   Yes.
15     Q.   Was that agreement signed on behalf of MVP by
16  Tony Choi, who is described as a vice president?
17     A.   Yes.
18     Q.   And is that the same Tony Choi that signed the
19  sales representative agreement between MVP and Shinn Fu
20  America that was previously shown to you?
21     A.   Yes.
22     Q.   Let's go to Sears -- I mean, Exhibit 15, which
23  is dated May 4th, 2007, and is this the written
24  agreement between Sears and MVP that came into effect on
25  May 4th, 2007?

Page 72

1      A.   Yes.
2      Q.   And for how long was the May 4th, 2007,
3  agreement between MVP and Sears in effect?  Was it a
4  year?  Longer?  Is it still in effect?
5      A.   I'm not sure about that.
6      Q.   Before we go to the other Sears agreement, I
7  want to go back briefly to the sales representative
8  agreement because I forgot to ask a question about it,
9  the SFA 6, which was marked today.
10       MR. EDINBURGH:  I'm sorry, just wait one
11  minute, a very short break.
12       (1:36 p.m.)
13         (A break was taken.)
14       (1:40 p.m.)
15 BY MR. EDINBURGH:
16     Q.   Can you please look, Ms. Lee, at SFA 6, which
17  is the sales representative agreement we previously
18  talked about, 3336 to 3339, and these go to page 3338,
19  which is the third page of the agreement.
20       I'd like you to look at paragraph 19, the
21  paragraph marked "Indemnification."  According to this
22  agreement signed by MVP, did MVP agree to indemnify SFA
23  against any liability arising out of or related to the
24  sale and marketing of any MVP commissioned product?
25       INTERPRETER:  The witness asked the

Page 73

1  interpreter to repeat the question again.  (Cantonese
2  spoken.)
3        THE WITNESS:  My personal understanding is, in
4  this paragraph, under the assumption if there were any
5  problems occurred that were related to the products,
6  then MVP has to be responsible for such liabilities.
7  However, whether it should be in the form of
8  indemnifying SFA, I could not understand it so far.
9  BY MR. EDINBURGH:
10     Q.   Okay, thank you.
11       Can you please, ma'am, go to Exhibit 15, the
12  Sears MVP agreement, May 4th, 2007, and go, ma'am, to
13  MVP 006.  Does that agreement, paragraph 11.2, contain
14  an agreement in which MVP agreed to indemnify Sears,
15  according to the terms of that agreement?
16       MR. ZAKRZEWSKI:  Can I get the question again
17  in English, please.
18       (Record read by reporter.)
19       THE WITNESS:  My understanding is, it depends
20  on the condition, how it happened.  The way it's written
21  here, whether the full indemnification has to be made, I
22  do not agree to that.  I don't think so.
23 BY MR. EDINBURGH:
24     Q.   I'd like you to look at paragraph 12 of that
25  same agreement, the paragraph entitled "Insurance," and

19 (Pages 70 - 73)

Page 74

1 did MVP provide insurance as required under that
2 paragraph?
3    A.  According to the requirement for us to conduct
4 business with Sears, we have to purchase a product
5 liability insurance that covers Sears, and we've done
6 that as well.
7    Q.  I want to go to -- I guess it's Exhibit 14,
8 the Sears Accelerated --
9         MR. ZAKRZEWSKI:  Howard, I think you should
10 disconnect and reconnect.
11        MR. CHAYKIN:  You're breaking up.
12        MR. EDINBURGH:  The document is called
13 "Accelerated Line Review Agreement."
14    Q.  Ms. Lee, was this an agreement in effect
15 between Sears and MVP dated December 11th, 2006?  And
16 you can go to MVP 10238 for the date.
17    A.  Yes, I'm still reading it.
18        I found it strange because nobody signed in
19 this document.
20        MR. EDINBURGH:  I'm sorry, is the witness
21 saying she cannot identify this document as an agreement
22 between Sears and MVP?
23        MR. ZAKRZEWSKI:  No, that's not what the
24 witness said.
25        MR. EDINBURGH:  All right.  I couldn't hear

Page 75

1 very good.
2        INTERPRETER:  The witness said --
3 BY MR. EDINBURGH:
4    Q.  My question -- go ahead.
5        MR. EDINBURGH:  What did the witness say?
6        INTERPRETER:  The witness said:  "I found it
7 strange because nobody signed in this document."
8        MR. EDINBURGH:  I'm asking the witness, is
9 this the agreement between Sears and MVP that went into
10 effect December 11th, 2006?
11        MR. ZAKRZEWSKI:  Objection.
12        THE WITNESS:  The issue here is I don't see
13 any signatures in this document, so I cannot tell
14 whether both parties have agreed on the terms of this
15 document.  I think this is something that Sears wished
16 MVP to sign after it has conducted the line review.
17 However, I'm not sure whether this is the final version
18 that has been signed.
19        MR. EDINBURGH:  This is an agreement that was
20 provided to us by MVP.  Does that at all change the
21 witness's testimony, knowing that this agreement was
22 given to us by MVP?
23        MR. ZAKRZEWSKI:  Objection.
24        THE WITNESS:  I don't know what you meant by
25 whether I want to change my previous testimony.  Are you

Page 76

1 asking me whether this agreement has been agreed upon
2 and signed?
3 BY MR. EDINBURGH:
4    Q.  Did Sears and MVP enter into an accelerated
5 line review agreement in 2006-2007?
6        INTERPRETER:  The witness just asked the
7 interpreter to repeat the question again.  (Cantonese
8 spoken.)
9        THE WITNESS:  My answer is, maybe they did.
10 However, I cannot find any signatures here.  Therefore,
11 I'm not sure whether this is the final version of the
12 agreement that has been signed.
13 BY MR. EDINBURGH:
14    Q.  All right.  Have you ever seen a different
15 agreement called an Accelerated Line Review Agreement,
16 other than the one you're looking at now?
17    A.  I don't have any recollection.  I don't
18 remember.
19    Q.  Has anyone you've talked to concerning the
20 agreements between Sears and MVP indicated there was a
21 different agreement called Accelerated Line Agreement,
22 other than the one you're looking at now?
23    A.  I did not have any further discussion with
24 anybody regarding this accelerated line review
25 agreement.

Page 77

1    Q.  I'd like you to go to the last page of this
2 document, which is MVP 10243.  Do you see where it says
3 "Exhibit A, Subject:  Merchandise"?
4    A.  Yes, I see that.
5    Q.  You see in the column that says "Sears Item
6 Numbers" --
7    A.  Yes, I see that.
8    Q.  And you see the last numbered item is "Sears
9 Item No. 50159, Craftsman Three-Ton Jack Stand."  Do you
10 see that?
11    A.  Yes, I see that.
12    Q.  And did MVP export to Sears the 50159
13 three-ton jack stand?
14    A.  Yes.
15    Q.  And was the 50159 Craftsman three-ton jack
16 stand a ratchet-and-pawl-designed jack stand?
17        INTERPRETER:  Counsel, was it 50149?
18        MR. EDINBURGH:  -59.
19        WITNESS:  It should be.
20 BY MR. EDINBURGH:
21    Q.  And was the 50159 Sears Craftsman three-ton
22 jack stand manufactured by Weifu?
23    A.  It should be.
24    Q.  Do you see, under that, Sears said it's going
25 to have a new jack stand called the "Craftsman

20 (Pages 74 - 77)

Page 78

1 Professional Four-Ton Jack Stand"?
2    A.  Yes, I see that.
3    Q.  And was that jack stand turn out to be Sears
4 item No. 50163?
5    A.  It should be.
6    Q.  And was that jack stand a
7 ratchet-and-pawl-designed jack stand?
8    A.  Yes.
9    Q.  Was that jack stand, the 50163, manufactured
10 by Weifu?
11    A.  Yes.
12    Q.  And did MVP purchase those 50163 jack stands
13 from Weifu and export them into the United States to
14 Sears?
15    A.  Are you talking about the year 2006 or other
16 time frame?
17    Q.  I'm talking about after the 50163 was
18 manufactured, did, at that point, MVP purchase those
19 stands from Weifu and export them to the United States
20 to sell to Sears?
21    A.  Are you talking about just the year 2006 or
22 from 2006 to 2011 or other time frame?
23        MR. EDINBURGH:  What I'm asking this witness
24 is -- all right, I'll rephrase that.
25    Q.  When did MVP first ship the 50163 jack stands

Page 79

1 to Sears?
2    A.  It should be in 2007.
3    Q.  When, do you know?
4    A.  I cannot remember the exact month, but I think
5 it should be in the first quarter, maybe it was in March
6 or April.
7    Q.  And did MVP continue to ship the 50163 jack
8 stand to Sears from 2007 to and including 2011?
9    A.  Yes.
10        MR. EDINBURGH:  Okay, you can take the exhibit
11 away.  The witness doesn't have to look at it any
12 further.
13    Q.  Did MVP have any role in the design of the
14 50163 jack stand?
15    A.  No.
16    Q.  Who designed 50163 four-ton ratchet-and-pawl
17 jack stand?
18    A.  I don't know.
19    Q.  Did you make any enquiry to prepare yourself
20 to be MVP's 30(b)(6) witness on the subject of who
21 designed the 50163 jack stand?
22    A.  No, because MVP is only a trading company.  We
23 do not have -- we do not get involved and we don't have
24 information related to that.
25    Q.  Okay.  When did MVP first begin exporting the

Page 80

1 T6904 Pro-Lift jack stand to the United States?
2    A.  I cannot remember.  However, I believe that is
3 already happened back in 2006.
4    Q.  So the T6904 was being exported from Weifu to
5 Shinn Fu America prior to 2006, is that correct?
6    A.  I'm not sure when it happened.  However, from
7 the document I've read I saw that back in 2006 this
8 product was already included in the sales list.
9    Q.  Did the 50163 Sears Craftsman jack stand that
10 MVP exported from Weifu to Sears, did that include in
11 its packaging an operator's manual?
12    A.  Yes.
13    Q.  What role did MVP, if any, play in writing the
14 manual?
15    A.  Regarding the information such as the manual
16 in the packaging, MVP is responsible for drafting the
17 documents.  After that, we will send that to SFA, and
18 SFA will help us, on our behalf, send it to the Sears
19 lab for review.
20        At the same time, we would send our products
21 for testing as well.
22        After that, SFA would tell us whether -- would
23 tell us the results, whether it has passed.  If that's
24 okay, they would let us know and then we would compile
25 the draft document, put it into -- compile the draft and

Page 81

1 put it into a document and send it to the factory for
2 printing.
3    Q.  Which individuals at MVP were responsible or
4 played a role in preparing the contents of the 50163
5 operator's manual?
6    A.  The colleague at the design department of MVP
7 is responsible for that.
8        MR. EDINBURGH:  I can't hear you.
9        INTERPRETER:  Okay.  "The colleague at the
10 design department of MVP is responsible for that."
11        THE WITNESS:  They would look at other
12 existing manuals of other Sears jack stands and make
13 modification of the content, such as changing the
14 specification.  After that, they would send it to the
15 engineering department of MVP for review.  After that,
16 they would send it to SFA.
17 BY MR. EDINBURGH:
18    Q.  Can you give us the identity of any MVP
19 individuals who played a role in the drafting of the
20 50163 operator's manual?
21    A.  Addy Law, the designer at the design
22 department is responsible for the drafting.
23        After that, he will send it to Ivan Chan, the
24 engineer at the engineering department for further
25 review.  And after that, he would send it to SFA.

21 (Pages 78 - 81)

Page 82

1    Q.   Are Mr. Law or Mr. Chan still working for MVP?
2    A.   No.
3    Q.   Did you discuss the issue of the 50163
4  operator's manual with either individual to prepare for
5  your testimony today?
6    A.   I did try to find them, but I could not find
7  them.
8    Q.   Did you personally have any role in preparing
9  the operator's manual for the Sears 50163 jack stand?
10   A.   No.
11   Q.   Was there an operator's manual for the
12 Pro-Lift T6904 jack stand?
13   A.   I don't quite understand your question.
14   Q.   MVP imported a four-ton jack stand for SFA
15 which was the Pro-Lift brand under the designation
16 T6904, is that correct?
17       INTERPRETER:  The witness asked the
18 interpreter to repeat the question again.  (Cantonese
19 spoken.)
20       THE WITNESS:  MVP did send, ship out T6904 to
21 SFA.
22 BY MR. EDINBURGH:
23   Q.   And did those jack stands that were shipped
24 out in boxes -- was there a manual in each of the boxes
25 containing the T6904 jack stands?

Page 83

1    A.   Yes.
2    Q.   Who drafted those manuals?
3        MR. ZAKRZEWSKI:  Objection.  She can answer.
4        THE WITNESS:  I'm not sure about that because
5  SFA would have sent us the artwork for the manual
6  directly to us.
7  BY MR. EDINBURGH:
8    Q.   Would SFA have also sent you the written
9  content of the manuals?
10       MR. ZAKRZEWSKI:  Objection.
11       THE WITNESS:  What do you mean by that?
12 BY MR. EDINBURGH:
13   Q.   Did the manuals contain warnings for the
14 T6904?
15   A.   Since they were the ones sending us the
16 artwork, they would have finalized the content of the
17 manual already.
18   Q.   Did the T6904 manual contain safety
19 instructions and operations instructions?
20   A.   Yes.
21   Q.   And did SFA write those instructions and then
22 give it to MVP?
23   A.   SFA would have drafted all the content for the
24 packaging, and then send us the artwork and the version
25 for printing.  They sent it to MVP.

Page 84

1    Q.   I'm not talking about the packaging, I'm
2  talking about the manual itself.
3        The manual itself -- did SFA provide MVP with
4  the operating instructions and safety instructions that
5  were contained in the manual?
6        MR. ZAKRZEWSKI:  Objection.
7        THE WITNESS:  The so-called packaging includes
8  all the content, including -- which includes the
9  operating manual.  When this operating manual arrived,
10 they actually gave us the printed artwork, which
11 includes all of the content, which includes the safety
12 instruction and the operation instruction which we just
13 mentioned.
14       MR. EDINBURGH:  I'm going to show the witness
15 some additional documents which haven't previously been
16 marked.  There should be a one-page document that is MVP
17 9181 and says "MVP Sales Forecast 2011."  It's a chart.
18 It's only one page.
19       (Exhibit 16 marked for identification.)
20 BY MR. EDINBURGH:
21   Q.   Ms. Lee, can you tell us what this document
22 is.
23   A.   This is something that was sent to us from
24 Sears regarding what Sears was likely to buy, to procure
25 in the future.  It gives the estimation of the quantity

Page 85

1  of the products.  It is a forecast which is for us to
2  use as a reference only about what they would like to
3  buy from us in the future, and the quantity of those
4  products.
5    Q.   And was one of the products in which forecasts
6  were given the 50163 four-ton professional jack stand?
7    A.   Yes.
8    Q.   And when MVP received this document, did it
9  send it to any other companies?
10   A.   In principle, no.
11       MR. EDINBURGH:  I have the large package, MVP
12 invoices, beginning with MVP 6805.  It's a couple
13 hundred pages.
14       (Exhibit 17 marked for identification.)
15       MR. EDINBURGH:  I'm not going to ask the
16 witness to look through all of them.  It will take way
17 too long.  I'm just going to show a select number from
18 here to the witness.
19   Q.   Who is MVP International Co., Ltd?
20   A.   From my understanding, I think MVPI is a
21 consulting company; however, it is not related to the
22 MVP (HK) structure.
23       MR. EDINBURGH:  I'm sorry, it's my fault, I
24 got the first half but not the second.
25       INTERPRETER:  I'll say it again.  The witness

22 (Pages 82 - 85)

Page 86

1  said: "From my understanding, I think MVPI is a
2  consulting company; however, it is not related to the
3  MVP (HK) structure."
4  BY MR. EDINBURGH:
5      Q.  Have you made inquiries to testify today as to
6  who owns MVP International?
7      MR. ZAKRZEWSKI:  Objection.
8      THE WITNESS:  For today's deposition, I did
9  try to understand the role of MVPI.  From the
10  information I've received, MVPI is something similar to
11  a consulting company.  It's mainly for some accounting
12  purposes.  That's why such a middle agency is required,
13  but I don't know much details about it and I don't know
14  who are the shareholders of MVPI.
15  BY MR. EDINBURGH:
16      Q.  So you're unaware of whether there is any
17  common ownership between MVP (HK) and MVP International?
18      MR. ZAKRZEWSKI:  Objection.  Also, there's
19  nothing about MVP International in the depo notice, but
20  she can answer if she knows.
21      THE WITNESS:  As far as I know, the people
22  from these two companies are not related, but I'm not
23  sure about that.
24  BY MR. EDINBURGH:
25      Q.  All right.  Did MVP and MVP International have

Page 87

1  any written agreement with respect to MVP International
2  being MVP's agent with respect to the purchase or sale
3  of products?
4      MR. ZAKRZEWSKI:  Objection.
5      THE WITNESS:  I'm not sure.
6  BY MR. EDINBURGH:
7      Q.  Did MVP purchase the 50163 jack stands
8  directly from Weifu or did MVP purchase the 50163 jack
9  stands through MVP International who, in turn, had
10  purchased them from Weifu?
11      A.  As I said earlier, I don't know what is the
12  operation, what happened between them.
13      For the preparation of this deposition, I
14  tried to understand what is its role, and the
15  information I received was MVPI served as some kind of
16  an agent, a middleman during the process of the purchase
17  order.
18      And regarding earlier, what you just said, can
19  you repeat the question again?
20      MR. EDINBURGH:  The witness had used the term
21  "agent or middleman."
22      Q.  Was MVP International the agent of MVP with
23  respect to purchasing the Sears 50163 jack stands from
24  Weifu?
25      MR. ZAKRZEWSKI:  Objection.

Page 88

1      THE WITNESS:  From my understanding, MVPI's
2  role is to serve -- to fulfill some kind of accounting
3  procedure.  We got in the buy and sell process, there is
4  something needs to be done for the paperwork.  However,
5  during daily course of operation, MVP (HK) would
6  directly communicate with Weifu.
7  BY MR. EDINBURGH:
8      Q.  Okay.  Let's go -- I'm going to go to some of
9  these purchase orders, just a few of them.  If you go to
10  MVP 6076.
11      MR. EDINBURGH:  Does the witness have that?
12      THE WITNESS:  Yes, I see that.
13  BY MR. EDINBURGH:
14      Q.  Is this a purchase order from MVP to MVP
15  Industries?  I'm sorry, my mistake.  Withdraw the
16  question.  It's too confusing.
17      Is this a purchase order from MVP to MVP
18  International?
19      A.  Yes.
20      Q.  And what is the date of the order?
21      A.  The day it was issued was October 13, 2010.
22      Q.  And the top half of the order, does this
23  concern the purchase of four-ton jack stands?
24      A.  Yes.
25      Q.  And are these jack stands the Sears Craftsman

Page 89

1  50163 jack stands?
2      A.  Yes.
3      Q.  And these jack stands are also identified as
4  the T6904 jack stands?
5      A.  Yes.
6      Q.  Are they also identified in the purchase order
7  as the T37401 jack stands?
8      A.  Yes.
9      Q.  Let's go forward to MVP 5959.
10      MR. EDINBURGH:  Does the witness have it?
11      THE WITNESS:  Yes, I see that.
12      MR. EDINBURGH:  Could the witness identify
13  what this document is.
14      THE WITNESS:  This is a purchase order from
15  Sears to MVP.
16  BY MR. EDINBURGH:
17      Q.  And is it a purchase order for the four-ton
18  50163 Craftsman professional jack stand?
19      A.  Yes.
20      MR. EDINBURGH:  And does she identify it as
21  style number T6904?
22      THE WITNESS:  Yes.
23  BY MR. EDINBURGH:
24      Q.  What's the date of that document?
25      A.  It's not very clear.  I think it says

23 (Pages 86 - 89)

Page 90

1  September 18, 2010.
2  Q.  Can we go forward to MVP 5918.
3      MR. EDINBURGH:  Does the witness have it?
4      THE WITNESS:  I see that.
5  BY MR. EDINBURGH:
6  Q.  And what is this document?
7  A.  This is a purchase order from Sears to MVP.
8  Q.  And what's the date of the order?
9  A.  It's not very clear.
10  Q.  Does it appear to be September 10, 2010?
11  A.  It's a very small font.  I can only see
12  September, but the numbers are very small.  They are
13  very blurry.
14  Q.  All right.  Is this a Sears purchase order for
15  the 50163 jack stands?
16     MR. ZAKRZEWSKI:  What's the question in
17  English?
18     (Record read by reporter.)
19     MR. ZAKRZEWSKI:  Thank you.
20     THE WITNESS:  I see that, from this document,
21  it says "Product Description," a pair of four-ton jack
22  stands.  I guess so.  However, in fact, the letters are
23  very small here and I cannot make sense of them.
24  BY MR. EDINBURGH:
25  Q.  So you can't make out the numbers.  Your

Page 91

1  eyesight is such that you can't make out the numbers, is
2  that your testimony?
3  A.  In fact, the letters in the entire document
4  are very small so I cannot read them.  What I can only
5  read is "four-ton jack stand."  So I think so.
6  Q.  Can you see, on the left, where it says "Style
7  of the jack stand," it says "T6904," can you read that?
8  A.  It's not clear.
9  Q.  All right.  You see it's handwritten in this
10  document "Provided by MVP," the item number T37401, on
11  this purchase order, can you read that, the handwritten
12  entry?
13  A.  Yes, I see that.
14  Q.  All right, let's go forward.  Let's go to MVP
15  5803.
16  A.  Yes, I see that.
17  Q.  And can you tell me, ma'am, what this document
18  is?
19  A.  This is a pro forma invoice from MVPI to MVP.
20  Q.  And the date?
21  A.  I think it's either the 25th or the 26th of
22  August, 2010.
23  Q.  And does this invoice reflect that MVPI is
24  selling to MVP 200 pairs of four-ton jack stands?
25  A.  Yes, that's correct.

Page 92

1  Q.  Where the customer item number is 50163?
2  A.  Yes.
3  Q.  Is that the Sears Craftsman customer item
4  number?
5  A.  Yes.
6  Q.  Is that also described as the factory number
7  T6904?
8  A.  Yes.
9  Q.  And the factory that the item number refers
10  to, is that Weifu?
11  A.  In fact, that's how it works.  This is the MVP
12  code for its customer.  For all the four-ton jack
13  stands, we call them T6904.  When we talk about T6904,
14  we know that we're talking about the four-ton jack
15  stand.  However, at Weifu, internally, they would also
16  assign their own numbers according to the different
17  requirements of the customers.  That's why you see
18  T37401 here.
19  Q.  Okay.  Thank you.
20     Let's just go to the following page, MVP 5798.
21  A.  Okay.
22  Q.  Is this an MVP purchase order to MVP
23  International?
24  A.  Yes.
25  Q.  And the date is what?

Page 93

1  A.  August 25, 2010.
2  Q.  Is it a purchase order for 200 pairs of
3  four-ton jack stands?
4  A.  Yes.
5  Q.  Are the jack stands described as Sears
6  Craftsman Model No. 50163?
7  A.  Yes.
8  Q.  And also as T6904 jack stands?
9  A.  Yes.
10  Q.  And also as T37401 jack stands?
11  A.  Yes.
12  Q.  Let's skip ahead to MVP 4234 and -- let's
13  leave it at that, 4234.  It should be towards the end.
14     MR. EDINBURGH:  And if it will help the
15  witness, the page break under it is 4340.
16     THE WITNESS:  I got it.
17  BY MR. EDINBURGH:
18  Q.  Thank you.
19     And what is 4234?
20  A.  This is an invoice from MVP to Sears.
21  Q.  And the date?
22  A.  February 27, 2010.
23  Q.  I want you to go down to the third product or
24  item listed in this invoice.
25  A.  Yes.

24 (Pages 90 - 93)

1    Q.   Does this invoice indicate 300 pairs of
2 four-ton jack stands are being sold by MVP to Sears?
3    A.   Yes.
4    Q.   And are these jack stands described as the
5 50163 jack stands?
6    A.   Yes.
7    Q.   And are they also described as the T6904 jack
8 stands?
9    A.   Yes.
10    Q.   And are they also described as the T37401 jack
11 stands?
12    A.   Yes.
13    Q.   Thank you.  That's it for this exhibit.  We're
14 done.
15    MR. EDINBURGH:  The next set of exhibits I
16 think that I've sent would be a series of e-mails --
17 hold it.  Give me a moment.  I have the wrong set.
18    Can you go off the record for a minute, take a
19 short break, please.
20 (3:09 p.m.)
21    (A break was taken.)
22 (3:20 p.m.)
23    (Exhibit 18 marked for identification.)
24 BY MR. EDINBURGH:
25    Q.   All right, Ms. Lee, I'd like you to look at

1 the top page of this document, 9104, and you see the
2 name Johnny Lu?
3    A.   Yes, I see that.
4    MR. ZAKRZEWSKI:  I'm going to state for the
5 record that these documents were produced on full-page
6 larger font.  This is -- some of these -- some of these,
7 the font is better, but some of them, it's like
8 microscopic, and I don't think this is exactly how they
9 were produced.  But we can go on.
10    MR. EDINBURGH:  I can tell you I didn't
11 downsize them in the reproduction process.  I think most
12 of these documents, if you see them, look like regular
13 size.  Maybe this first page may have -- for some reason
14 unknown to me, may have been a smaller font, but if you
15 look at the rest, they look normal.  It's only the top
16 page which is like that.
17    MR. ZAKRZEWSKI:  Okay.
18    MR. EDINBURGH:  But we'll do the best we can.
19 I won't be spending too much time.  And the name Johnny
20 Lu appears pretty prominently.  It's not too difficult
21 to look at.  Certainly that name is not in small print.
22    Anyway, to the witness:  Does the witness know
23 a Johnny Lu, L-u?
24    THE WITNESS:  Yes, I do.
25 BY MR. EDINBURGH;

1    Q.   And was Johnny Lu, in 2009, an employee of
2 MVP?
3    A.   No.
4    Q.   Who was he an employee of?
5    A.   He's from SFA.
6    Q.   Do you see, in this e-mail, Mr. Lu sent the
7 e-mail -- puts in his address as MVP Industries, in
8 Kansas City?
9    MR. ZAKRZEWSKI:  Objection.
10    THE WITNESS:  Yes, I see that.
11 BY MR. EDINBURGH:
12    Q.   Did MVP approve of Johnny Lu representing
13 himself as having an address of MVP Industries, in
14 Kansas City?
15    MR. ZAKRZEWSKI:  Objection.
16    THE WITNESS:  Actually, what happened, since
17 MVP asked SFA to provide the after-sales service;
18 therefore, MVP specifically assigned a -- I'm sorry,
19 therefore, SFA specifically assigned a staff to take
20 care of that, and that person is Mr. Lu.  And in order
21 to be more convenient for him to handle the sales
22 service, we give him -- we gave him an MPV e-mail
23 address, but he's not a staff of MPV.  It's just more
24 convenient for him to contact the client on behalf of
25 MPV for the sales and after-sales services.

1    MR. ZAKRZEWSKI:  I think a few instances where
2 the translator mentioned MPV, it might have just been
3 MVP.
4    MR. EDINBURGH:  I won't confuse them and the
5 music video station.  That's all right.
6 BY MR. EDINBURGH:
7    Q.   All right.  Let's go to MVP 9197.
8    Ms. Lee, the top e-mail on this page, is this
9 an e-mail you wrote?
10    A.   Yes.
11    Q.   When did you write it?
12    A.   September 20, 2011.
13    Q.   And is MVP 9199 the attachment to that e-mail?
14    A.   Yes.
15    Q.   In this attachment, do you refer to the Sears
16 50163 jack stand and the MVP model T6904 jack stand as
17 the same jack stand?
18    A.   Yes.
19    Q.   All right.  Ms. Lee, can we go to MVP 9227 and
20 9228.  And were the e-mails on these two pages printed
21 out from your computer?
22    A.   Yes.
23    Q.   Is the first e-mail in this chain of e-mails
24 from James Wang, of SFA Company?
25    A.   Yes.

25 (Pages 94 - 97)

Page 98

1     MR. ZAKRZEWSKI: Can I get the question in
2 English.
3     (Record read by reporter.)
4     INTERPRETER: And earlier, the witness said
5 "yes."
6     MR. ZAKRZEWSKI: Thank you.
7     MR. EDINBURGH: I'm sorry, the witness said
8 "yes"?
9     INTERPRETER: Yes.
10 BY MR. EDINBURGH:
11    Q.  Okay.  And was Mr. Wang's e-mail of Friday,
12 March 9, 2007, sent to, among other people, yourself?
13    A.  I was one of those who was being cc'd.
14    Q.  Was anyone else from MVP cc'd on this e-mail?
15    A.  No.
16    Q.  Who is Maggie Ma?
17    A.  She is someone at the factory who follows up
18 with the purchase orders.
19    Q.  Ms. Lee, were you involved in or about March
20 of 2007 on a project for Sears regarding a new four-ton
21 jack stand that had a maximum height to reach 21 inches?
22    MR. ZAKRZEWSKI: Objection.
23    You can answer.
24    THE WITNESS: We did discuss about this
25 project.

Page 99

1 BY MR. EDINBURGH:
2    Q.  When you say "we," you mean MVP?
3    A.  Yes.
4    Q.  And you discussed it with, among others, James
5 Wang, of Shinn Fu America?
6    A.  No, it was mainly a discussion with Weifu.
7    Q.  Okay.  The e-mail that you eventually respond
8 to is from James Wang, correct?
9    MR. ZAKRZEWSKI: Objection.
10    THE WITNESS: I made a reply to James Wang and
11 also the factory at Weifu.
12 BY MR. EDINBURGH:
13    Q.  Okay.  Was the T37402 new four-ton jack stand
14 for Sears -- was a prototype of that stand ever
15 developed?
16    A.  No.  At the time, the buyer from Sears had
17 this idea; therefore, he wanted to find out whether we
18 can do that and also roughly how much it would cost and
19 what the price would be.
20    This was a very preliminary discussion.  From
21 my recollection, eventually, it was not executed.
22    MR. EDINBURGH: All right.  Can the witness
23 please go to MVP 9239.
24    THE WITNESS: Yes.
25 BY MR. EDINBURGH:

Page 100

1    Q.  Do you have it?
2    INTERPRETER: Yes.
3 BY MR. EDINBURGH:
4    Q.  And was the e-mail chain in 9239 and 9240, was
5 that printed out from your computer?
6    A.  Yes.
7    Q.  And you received these e-mails, am I correct,
8 in or about -- or on or about February 15 to 17, 2007?
9    A.  Yes.
10    Q.  All right.  And is the first e-mail in this
11 chain e-mail from James Wang at SFA Companies?
12    A.  Yes.
13    Q.  And he begins the e-mail "Dear Tiger,"
14 T-i-g-e-r.
15    A.  Yes.
16    Q.  Do you know who Tiger is?
17    A.  He is Mr. Wu, first name is Ching Yan.
18    Q.  And who does he work for or who did he work
19 for at that time?
20    A.  At the time, he worked for Weifu as the
21 supervisor of the development division of the
22 engineering department.
23    Q.  And I just want to read the first sentence of
24 this, of this e-mail.
25    It says: "Dear Tiger, remember, previously

Page 101

1 Sears complained about the small support range of
2 four-ton jack stand," and then in brackets, "(50163)
3 before we received the orders."
4    Do you see that sentence, the first sentence
5 of the e-mail?
6    A.  Yes, I see that.
7    Q.  And the orders that Mr. Wang is referring to
8 in his e-mail, was it your understanding those were the
9 orders for the delivery of the first batch of 50163 jack
10 stands in 2007?
11    MR. ZAKRZEWSKI: Objection.
12    You can answer.
13    THE WITNESS: First of all, I would like to
14 clarify the facts.  I think it's being misunderstood.
15 Here, when it mentioned about the lifting range of the
16 50163 jack stand, it is talking about the range between
17 the minimum and the maximum height.  What he's saying
18 here is he felt that that range is not tall enough, it
19 needs to be increased; therefore, he wanted to increase
20 that range.  He's not complaining about the quality or
21 the safety issues of the product.  He just wanted to
22 increase the width of the minimum and the maximum
23 height.  He just felt that it's not tall enough, and
24 that's why there's another e-mail talking about that
25 range has to be increased to 21 inch.  That was the

26 (Pages 98 - 101)

Page 102

1  story.
2  BY MR. EDINBURGH:
3      Q.  I appreciate the modification of the response,
4  but my question concerned the term "the orders" referred
5  to in the e-mail.
6          MR. EDINBURGH:  Can you read back my question
7  to the witness, please.
8          INTERPRETER:  (Cantonese spoken.)
9          MR. ZAKRZEWSKI:  Can we get the question again
10  in English, please.
11         (Record read by reporter.)
12         MR. ZAKRZEWSKI:  Same objection.
13         THE WITNESS:  Okay.  Regarding the order being
14  mentioned here, according to this purchase order, the
15  order has been placed; however, the goods have not been
16  shipped yet.  As I mentioned earlier, the first batch of
17  goods were shipped out in March or April.
18  BY MR. EDINBURGH:
19     Q.  All right.  So what orders are referred to in
20  this first sentence of the e-mail from Mr. Wang to
21  Tiger?
22         MR. ZAKRZEWSKI:  Objection.
23         THE WITNESS:  Here in this document a few
24  orders have been mentioned.  Exactly which order are you
25  talking about?  I see that it mentioned received orders

Page 103

1  and after initial order, so which order you are talking
2  about exactly?
3          MR. EDINBURGH:  I'm asking the witness, this
4  is the document of e-mails that you received and then
5  printed out.  What is your understanding of the orders
6  referred to in this e-mail?
7          MR. ZAKRZEWSKI:  Objection.
8          THE WITNESS:  Here the initial order was
9  referring to the purchase order document, the very first
10  one for 50163.  That's what I meant.
11  BY MR. EDINBURGH:
12     Q.  When Sears complained about the small support
13  range, as you described it, according to this e-mail,
14  Sears complained to Shinn Fu America about that issue,
15  is that correct?
16         MR. ZAKRZEWSKI:  Objection.
17         THE WITNESS:  Here's my understanding.  I
18  think this is an issue with the understanding of the
19  vocabulary being used.  This is not a complaint; rather,
20  it is a feedback, a suggestion for us, because they felt
21  that the width between the minimum and the maximum
22  height is not wide enough.  They wished that we can work
23  on that, but they have already -- they actually gave us
24  enough time to study the issue, so it is not a
25  complaint.  I think this is only an issue of word

Page 104

1  choice.
2  BY MR. EDINBURGH:
3      Q.  Ms. Lee, my question is only this:  Who did
4  Sears make the complaint to, according to this e-mail?
5          MR. ZAKRZEWSKI:  Objection.
6  Mischaracterization, among other items.
7          THE WITNESS:  Sears complained to whom?  Maybe
8  it was James Wang.  According to this e-mail from James
9  Wang, I think they may have talked to James Wang or
10  maybe they have actually talked to our representative,
11  Mark Breckan.  As I mentioned earlier, he was one of our
12  representatives in the U.S.  He was responsible for
13  Sears.  Maybe Sears talked to Mark Breckan.  However,
14  based on just looking at this e-mail, I'm not sure
15  whether Sears talked to James Wang or Mark Breckan.
16  BY MR. EDINBURGH:
17     Q.  I want to go to the three-page e-mail chain
18  beginning on MVP 9244, -45 and -46.  Is this an e-mail
19  chain written in early December, 2006?
20     A.  Yes.
21     Q.  And this e-mail chain was printed out from
22  your computer?
23     A.  Yes.
24     Q.  Can we go to the e-mail on page 9245.  You see
25  there's an e-mail from James Wang to Tiger and to

Page 105

1  others, including yourself?
2          MR. ZAKRZEWSKI:  What was that?  I wasn't
3  clear.
4          MR. EDINBURGH:  I said, and to others,
5  including Nora Lee, dated December 5, 2006, at 4:59 a.m.
6          THE WITNESS:  I think the time stamp is 6 --
7  are you talking about the one with the time stamp 2006,
8  December 7, at 6:15?
9  BY MR. EDINBURGH:
10     Q.  The one about -- the one on page 9245.  It's
11  about more than halfway down, from James Wang, and the
12  subject matter is "OIPM Sears new three-ton aluminum
13  jack."
14         MR. EDINBURGH:  I'm not going to spend too
15  much time, I just want to know if she sees that e-mail.
16  BY MR. EDINBURGH:
17     Q.  Do you see that?
18     A.  Yes, I see it.
19     Q.  Okay.  During this time period, was a new
20  three-ton aluminum jack being developed for Sears?
21         MR. ZAKRZEWSKI:  Objection.  She can answer.
22         THE WITNESS:  This is a new product.
23  BY MR. EDINBURGH:
24     Q.  Can you describe any further the nature of
25  that jack, other than what it says in the e-mail?

27 (Pages 102 - 105)

Page 106

1        MR. ZAKRZEWSKI:  Objection.
2        THE WITNESS:  I cannot, because it has been a
3   long time and I cannot remember.
4   BY MR. EDINBURGH:
5        Q.   All right.  Can we go to MVP 9261.
6        A.   Yes.
7        Q.   And in the bottom e-mail on that page, also
8   from James Wang, dated January 24, 2007 -- was this
9   e-mail sent to you?
10       A.   Yes.
11       Q.   Okay.  Mr. Wang is writing to everyone and he
12  says: "Good news, Mark just got a call from Barb
13  confirming our four-ton stands, 50163, passed the
14  testing at Sears lab (thank you, everyone)."
15            Who is Mark in this e-mail?
16       A.   Mark is Mark Breckan, as I mentioned earlier,
17  and also earlier this morning, that he was one of the
18  sales representatives of us.
19       Q.   All right.  And who is Barb referred to in
20  that e-mail?
21       A.   Her name is Barbara.  She's a buyer from
22  Sears.
23       Q.   And the testing at Sears lab that's referred
24  to, do you have an understanding of what that testing
25  was?

Page 107

1        MR. ZAKRZEWSKI:  Objection.  She can answer.
2        THE WITNESS:  Regarding this test, it was for
3   the four-ton stand, 50163.  As I mentioned earlier, once
4   we have made the samples, we have to send the samples to
5   the Sears lab for testing to see whether they have met
6   the Craftsman testing standard and requirements.  So for
7   every product that we sold to Sears, we need to send
8   them to the Sears lab for testing, and once they have
9   passed the test, we would be able to ship out the goods.
10  We would also include the manual and labels for Sears to
11  review as well.
12  BY MR. EDINBURGH:
13       Q.   Did MVP receive from Sears the actual test
14  results from the test mentioned in this e-mail?
15       MR. ZAKRZEWSKI:  Objection.
16       THE WITNESS:  No, because, typically, Sears
17  would not provide us with any formal test report.
18       MR. EDINBURGH:  All right, thank you.  Let's
19  take a short break.
20  (4:04 p.m.)
21            (A break was taken.)
22  (4:13 p.m.)
23       MR. EDINBURGH:  All right.  Would the witness
24  look the e-mail MVP 9141.
25       THE WITNESS:  That's fine, okay.

Page 108

1        MR. ZAKRZEWSKI:  This is close to the
2   beginning of the packet?  Oh, okay, thank you.
3   BY MR. EDINBURGH:
4        Q.   And, Ms. Lee, is this an e-mail that is
5   printed out from your computer?
6        A.   Yes.
7        Q.   The subject matter of this e-mail is the
8   "Redesign of four-ton jack stands," yes?
9        A.   Yes.
10       Q.   The writer of this e-mail, James Wang, lists
11  two options to raise the maximum height of the jack
12  stand.  He says, in option 1, or A, rather, "Redesign
13  the four-ton jack stand to come with maximum height 21
14  inches."
15            Was the Sears 50163 design changed or modified
16  in any way in order to raise the maximum height of that
17  jack stand?
18       MR. ZAKRZEWSKI:  Objection.
19       THE WITNESS:  From my recollection, no.
20  BY MR. EDINBURGH:
21       Q.   I want you to look at option B on that e-mail.
22  It says option B is to "Make a slot within the roll pin
23  stopper."  Was a slot within the roll pin stopper added
24  to the design of the 50163 jack stand?
25       MR. ZAKRZEWSKI:  Objection.

Page 109

1        THE WITNESS:  From my recollection, no
2   modifications were made because that would involve extra
3   cost and the client would not accept a higher cost.
4   BY MR. EDINBURGH:
5        Q.   Just one second.  I'm almost done.
6        Ms. Lee, is it your testimony -- withdraw it.
7            In early 2007, did Sears request that the
8   maximum height of the 50163 jack stand be raised?
9        MR. ZAKRZEWSKI:  Objection.
10       THE WITNESS:  They had that wish, and also
11  requested the height to be increased.
12  BY MR. EDINBURGH:
13       Q.   And was the height -- the maximum height of
14  the 50163 jack stand raised to any amount or degree?
15       MR. ZAKRZEWSKI:  Objection.  Asked and
16  answered at least twice.
17       THE WITNESS:  Can you clarify the question?
18  BY MR. EDINBURGH:
19       Q.   Well, I'll withdraw the question.
20            How, ultimately, was the issue with Sears
21  resolved concerning Sears' request to raise the height
22  of the jack stand?
23       MR. ZAKRZEWSKI:  Same objection.
24       THE WITNESS:  From my recollection, they had
25  the wish to increase the maximum height to 21 inches.

28 (Pages 106 - 109)

Page 110

1 However, nothing was done in the end.
2     MR. EDINBURGH: I didn't get the last part of
3 that answer.
4     INTERPRETER: "Nothing was done in the end."
5     MR. EDINBURGH: Thank you, Ms. Lee. I have no
6 further questions.
7     MR. ZAKRZEWSKI: I have limited questions
8 based on the questions that Howard -- that Attorney
9 Edinburgh asked you.
10 EXAMINATION BY MR. ZAKRZEWSKI:
11    Q. Earlier in the deposition, and this could have
12 been a translation issue, but I thought I heard an
13 answer saying that MVP bought Pro-Lift jack stands from
14 SFA.
15       Did MVP buy Pro-Lift jack stands from SFA?
16    A. No, MVP did not buy jack stands from SFA.
17    Q. Did MVP sell Pro-Lift jack stands to SFA?
18    A. Yes.
19    Q. At one point, I believe you testified that MVP
20 International was MVP (HK)'s agent. What did you mean
21 by the word "agent"?
22    A. In fact, it is an intermediary. I would say
23 that it is a financial intermediary.
24    Q. In 2010, did MVP buy 50163 jack stands from
25 MVP International?

Page 111

1    A. Yes, according to the procedure.
2    Q. And did MVP International buy the 50163 jack
3 stands from Weifu in 2010?
4    A. Yes, according to the procedure.
5    Q. Are those purchases reflected in the purchase
6 orders and invoices marked as Exhibit 17 in your
7 deposition today?
8    A. Yes.
9    Q. Were the documents that are marked as Exhibit
10 17 kept in the ordinary course of MVP's business?
11    MR. ORTICELLI: Objection.
12    THE WITNESS: Yes.
13 BY MR. ZAKRZEWSKI:
14    Q. Did MVP sell the 50163 jack stands directly to
15 Sears?
16    A. Yes.
17    Q. Did MVP invoice Sears for those sales?
18    A. Yes.
19    Q. Did Sears pay MVP directly?
20    A. Yes.
21    Q. Did Sears issue purchase orders to MVP for
22 those jack stands?
23    A. Yes.
24    Q. Did the purchase orders and invoices marked in
25 Exhibit 17 reflect those sales?

Page 112

1    A. Yes.
2    Q. Was SFA, or Shinn Fu Company of America, Inc.,
3 a party to the sale of the 50163 jack stands at any
4 point in 2010?
5    MR. EDINBURGH: Objection.
6    THE WITNESS: No.
7    MR. ZAKRZEWSKI: Can I get the basis of the
8 objection so I can decide if I want to ask a different
9 question, please?
10    MR. EDINBURGH: No.
11    MR. ORTICELLI: Yes, it's vague and ambiguous.
12 "Parties." Are you talking about contractual parties?
13 Vague and ambiguous, form, reservation as to all other
14 objections as to form.
15       Specifically with respect to the use of the
16 term "parties," are you referring to a contract?
17    MR. ZAKRZEWSKI: Howard, do you claim those
18 objections?
19    MR. EDINBURGH: I claim those objections, but
20 I -- again, I'm just reserving my rights down the road.
21    MR. ZAKRZEWSKI: Yeah. I understand. When
22 you object on the record -- when I object, certainly,
23 you can ask me for the basis for the objections, and
24 part of the reason for doing that is so that I can tell
25 you what the basis was, if you want to know, and you can

Page 113

1 try to ask a different question. So that's what I'm
2 trying to do here. It's not just to reserve every
3 objection, so I'm actually going to ask a different
4 question to address the objection that was actually
5 articulated.
6       So I'll ask.
7 BY MR. ZAKRZEWSKI:
8    Q. Was SFA involved in a contract for the sale of
9 the 50163 jack stands at any point in 2010?
10    A. No.
11    Q. Was SFA involved in a contract for the
12 purchase of the 50163 jack stands in 2010?
13    A. No.
14    Q. Did SFA buy 50163 jack stands in 2010?
15    A. No.
16    Q. Did SFA sell 50163 jack stands in 2010?
17    A. No.
18    Q. Was MVP responsible for drafting and preparing
19 the warnings and instructions for the 50163 jack stands?
20    MR. EDINBURGH: Objection.
21    THE WITNESS: Yes.
22 BY MR. ZAKRZEWSKI:
23    Q. Which company had the ultimate --
24    MR. ZAKRZEWSKI: I'm sorry, what was the basis
25 of that objection?

29 (Pages 110 - 113)

Page 114

1     MR. EDINBURGH: The word "responsible" is
2 ambiguous.
3     MR. ZAKRZEWSKI: Okay. Is there a
4 different -- "responsible," ambiguous. I'm
5 uncomfortable with that. All right.
6   Q. Which company had the ultimate right to
7 approve the 50163 manual?
8   A. Sears.
9   Q. Attorney Edinburgh asked you about the --
10 either model number or product designation T6904. Do
11 you remember Attorney Edinburgh asking you about T6904?
12   A. Yes, he did ask me about that.
13   Q. Did MVP sell two different types of T6904 jack
14 stands?
15   A. Yes.
16   Q. And did those two different types of T6904
17 jack stands have different product specifications,
18 depending on whether they were for Pro-Lift or Craftsman
19 brand?
20   A. Yes, they are different because they have
21 different testing standards.
22   Q. And did they also have different product
23 specifications?
24   A. Regarding the product specifications, such as
25 the number of tons and the minimum and maximum height,

Page 115

1 they are the same; however, they have different testing
2 standards. As a result, the factory has different
3 approach for reinforcement of strength. From my
4 understanding, they are different.
5     MR. ZAKRZEWSKI: I have no further questions.
6 EXAMINATION BY MR. EDINBURGH:
7   Q. Ms. Lee, did SFA receive any commissions from
8 MVP concerning the sale of the 50163 jack stands to
9 Sears?
10     MR. ZAKRZEWSKI: Objection.
11     But you can answer.
12     THE WITNESS: From my understanding, regarding
13 this particular product and this sale, there were no
14 commission. However, under the after-sales agreement
15 between MVP and SFA, we need to pay SFA the service
16 fees.
17     And I would like to supplement my answer. The
18 service fee is applicable for all the products, so I
19 don't know how do you define commission.
20 BY MR. EDINBURGH:
21   Q. Did MVP receive from MVP any financial
22 compensation arising from MVP sale of 50163 jack stands
23 to Sears?
24     MR. CHAYKIN: You said --
25     MR. EDINBURGH: Oh, I'll withdraw the

Page 116

1 question. It's getting late or early, depending on your
2 point of view here.
3   Q. Did SFA receive financial compensation,
4 however you describe it, from MVP arising from MVP's
5 sale of 50163 jack stands to Sears?
6     MR. ZAKRZEWSKI: Objection.
7     THE WITNESS: How do you define
8 "compensation"? I would like to know what is your
9 definition for this term "compensation."
10 BY MR. EDINBURGH:
11   Q. "Compensation" means money.
12     MR. ZAKRZEWSKI: Same objection.
13     THE WITNESS: As I said earlier, we have
14 signed an agreement -- an after-sale agreement with SFA,
15 and according to this agreement, we have to pay a
16 service fee. This service fee is for all the products,
17 not just the products for Sears. Since we need SFA to
18 provide the service for our direct import customers, we
19 need to pay this service fee. I don't know whether you
20 think this would count as a compensation.
21 BY MR. EDINBURGH:
22   Q. Was there any money -- withdrawn.
23     Let me see if I can do this.
24     All right. Based upon the sales that MVP sold
25 to Sears of the 50163 jack stand, was there any money at

Page 117

1 all paid to SFA?
2     MR. ZAKRZEWSKI: Same objection.
3     THE WITNESS: Regarding this question, I don't
4 know what you are asking about regarding this
5 compensation, and from my understanding, my answer would
6 be the same as what I just said earlier.
7 BY MR. EDINBURGH:
8   Q. All right. Mr. Zakrzewski asked you about
9 whether there were different product specifications for
10 the T6904 for the Pro-Lift for that same model number
11 being used for the 50163, and you responded there were
12 differences. Can you please list all the differences
13 that you're aware of.
14   A. As I mentioned earlier, the difference is
15 because Sears has different testing standard. Because
16 of that, the factory has made certain reinforcement of
17 the strength at the base. If you ask me about the
18 details of that, I cannot respond to that because I'm
19 not an engineer and I don't know the details.
20   Q. Anything else beyond that that you can tell us
21 about a change in terms of the different specifications
22 between the two T6904 models --
23     MR. ZAKRZEWSKI: Objection.
24 BY MR. EDINBURGH:
25   Q. -- beyond the change at the base that you just

30 (Pages 114 - 117)

Page 118

1 mentioned?

2    MR. ZAKRZEWSKI:  Objection.

3    INTERPRETER:  The witness just asked the

4 interpreter to repeat the question.  (In Cantonese.)

5    THE WITNESS:  I'm not sure about that.

6    MR. EDINBURGH:  All right.  Thank you.  No

7 other questions.

8    MR. ZAKRZEWSKI:  All right.  Thank you.

9    MR. CHAYKIN:  Thank you, good morning, good

10 night.

11    THE WITNESS:  Thank you.

12    (The deposition concluded at 4:44 p.m.)

13    --oOo--

14

15

16

17

18

19

20

21

22

23

24

25

Page 119

1    ACKNOWLEDGMENT OF DEPONENT

2    I, Nora Lee, do hereby certify

3 that I have read the foregoing transcript of my

4 testimony, and further certify that it is a true

5 and accurate record of my testimony (with the

6 exception of the corrections listed below):

7 Page  Line    Correction

8 ___|___|_____|_____

9 ___|___|_____|_____

10 ___|___|_____|_____

11 ___|___|_____|_____

12 ___|___|_____|_____

13 ___|___|_____|_____

14 ___|___|_____|_____

15 ___|___|_____|_____

16 ___|___|_____|_____

17 ___|___|_____|_____

18 ___|___|_____|_____

19 ___|___|_____|_____

20 ___|___|_____|_____

21

22 Signed under the pains and penalties of perjury

23 this _____ day of _____, 20___.

24

25    _____

Page 120

1    REPORTER'S CERTIFICATE

2

  STATE OF CALIFORNIA    )

3    ) ss

  COUNTY OF SANTA BARBARA  )

4

5    I, MARK McCLURE, CSR NO. 12203, a Certified

6 Shorthand Reporter for the County of Santa Barbara,

7 State of California, do hereby certify:

8    That, prior to being examined, the witness

9 named in the foregoing deposition was by me duly sworn

10 to testify the truth, the whole truth, and nothing but

11 the truth;

12    That said deposition was taken down by me in

13 stenotype at the time and place therein named, and

14 thereafter reduced to typewriting by computer-aided

15 transcription under my direction.

16    I further certify that I am not interested in

17 the event of the action.

18    WITNESS my hand this 19th day of

19 April, 2018.

20

21

22

23

24    Certified Shorthand Reporter

    State of California

25    CSR No. 12203

31 (Pages 118 - 120)