# *EXHIBIT I*

```
 1                UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
 2


 3


 4      FREDERICK KLORCZYK, JR.,       }
        as co-administrator of the     }  Civil Action Number:
 5      Estate of Christian R.         }
        Klorczyk,                      }  3:13-cv-00257-JAM
 6         Plaintiff,                  }
                                       }
 7            vs.                      }
                                       }
 8      SEARS, ROEBUCK AND CO.,        }
        et al,                         }
 9         Defendants.                 }

10

11

12

13
             DEPOSITION OF: Arthur Chaykin, Esquire
14      TIME:            10:11 a.m.
        DATE:            June 21, 2018
15      HELD AT:         Gordon & Rees, LLP
                         95 Glastonbury Boulevard
16                          Suite 206
                         Glastonbury, Connecticut
17

18

19

20

21

22
             Reporter:  Annette Brown, LSR, No. 0009
23           Brandon Huseby Reporting & Video
                       249 Pearl Street
24           Hartford, Connecticut  06103
                  Telephone:  860.549.1850
25                 Fax:  860.549.1537
```

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 2

```
 1
 2                        APPEARANCES
 3
    REPRESENTING THE PLAINTIFF:
 4  HOWARD S. EDINBURGH, ESQUIRE
       Herzfeld & Rubin, P.C.
 5     125 Broad Street
       New York, New York  10004
 6     Telephone:   212.271.8529
       E-mail:    hedinburgh@herzfeld-rubin.com
 7
 8  BRYAN J. ORTICELLI, ESQUIRE
       Day Pitney, LLP
 9     242 Trumbull Street
       Hartford, Connecticut  06103
10     Telephone:   860.275.0100
       E-mail:    borticelli@daypitney.com
11
12
13  REPRESENTING THE DEFENDANTS SEARS, ROEBUCK & CO.;
    SHINN FU CORPORATION; SHINN FU COMPANY OF AMERICA,
14  INC.; MVP (H.K.) INDUSTRIES, LTD.; and WEI FU
    (TAISHAN) MACHINERY & ELECTRIC COMPANY, LTD.:
15
    DENNIS BROWN, ESQUIRE
16     Gordon & Rees, LLP
       95 Glastonbury Boulevard - Suite 206
17     Glastonbury, Connecticut 06033
       Telephone:   860.278.7448
18     E-mail:    dbrown@gordonrees.com
19
20
    REPRESENTING THE DEFENDANTS SEARS, ROEBUCK & CO.:
21
    ERICA W. TODD, ESQUIRE
22     Trotta, Trotta & Trotta
       Post Office Box 802
23     900 Chapel Street - 12th Floor
       New Haven, Connecticut  06503
24     Telephone:   203.787.6756
       E-mail:    etodd@trottalaw.com
25
```

Page 4

```
 1          INDEX OF EXHIBITS - Continued
 2               (Marked for Identification)
 3
    EXHIBITS                                      PAGE
 4
    Plaintiff's Exhibit 12, Documents             108
 5  pertaining to Raymond claim
    Plaintiff's Exhibit 13, Documents             115
 6  pertaining to Frank Duenas claim
    Plaintiff's Exhibit 14, Documents             119
 7  Pertaining to Mr. Penberthy's claim
    Plaintiff's Exhibit 15, Design notes of       158
 8  Roger Claypool
    Plaintiff's Exhibit 16, Supplemental          158
 9  responses and objections to plaintiff's
    request for production, dated
10  April 11, 2018
11
12
    Reporter's Note:  Exhibits retained by Attorney
13  Orticelli.
14
15
16
    TRANSCRIPT LEGEND:
17
18  [Sic]         Exactly as said.
    [phonetic]    Exact spelling not provided.
19  [--]          Break in speech continuity and/or
                  interrupted sentence.
20  [...]         Indicates trailing off and not
                  finishing a sentence.
21
22
23
24
25
```

Page 3

```
 1                      I N D E X
 2
 3     Appearances.........................   2
       Stipulations........................   5
       Certification.......................  177
 4
 5  WITNESS:   Arthur Chaykin, Esquire       PAGE
 6  Direct Examination by Mr. Edinburgh       6
 7
                INDEX OF EXHIBITS
 8             (Marked for Identification)
 9
    EXHIBITS                                  PAGE
10
    Plaintiff's Exhibit 1, Notice of          8
11  deposition to MVP for 30(b)(6) deposition
    Plaintiff's Exhibit 2, Notice of
12  deposition to Shinn Fu for 30(b)(6)       9
    deposition
13  Plaintiff's Exhibit 3, Second amended     21
    complaint
14  Plaintiff's Exhibit 4, Curriculum         26
    Vitae of Arthur Chaykin
15  Plaintiff's Exhibit 5, Printout from      50
    Erickson Kernell's website
16  Plaintiff's Exhibit 6, Sales representative 64
    Agreement between Shin Fu Company of
17  America and MVP (H.K.) Industries
    including agreement amendments
18  Plaintiff's Exhibit 7, Sears Universal    64
    Terms and Conditions, dated October 12,
19  2006
    Plaintiff's Exhibit 8, Sears Accelerated  65
20  Line Review Agreement with MVP, dated
    December 11, 2006
21  Plaintiff's Exhibit 9, Sears/MVP Universal 65
    Terms and Conditions, dated May 4th, 2007
22  Plaintiff's Exhibit 10, Sears UTC agreement 66
    With Shinn Fu Company of America, dated
23  August 2, 2012
    Plaintiff's Exhibit 11, Excerpt from a    92
24  Lexington Insurance Policy
25
```

Page 5

```
 1              S T I P U L A T I O N S
 2
 3      It is stipulated by the counsel for the parties
 4  that all objections are reserved until the time of
 5  trial, except those objections as are directed to the
 6  form of the question.
 7      It is stipulated and agreed between counsel for
 8  the parties that the proof of the authority of the
 9  Notary Public before whom this deposition is taken is
10  waived.
11      It is further stipulated that any defects in the
12  notice are waived.
13      It is further stipulated that the reading and
14  signing of the deposition transcript by the witness
15  is not waived.
16
17
18
19
20
21
22
23
24
25
```

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 6

1
2              (Deposition commenced at
3              approximately 10:11 a.m.)
4
5
6   ARTHUR CHAYKIN, ESQUIRE, Deponent, having first been
7   duly sworn, deposes and states as follows:
8              THE WITNESS:  Yes.
9              THE COURT REPORTER:  Stipulations?
10             MR. EDINBURGH:  Yeah, just the normal
11  federal stipulations.
12
13             DIRECT EXAMINATION BY MR. EDINBURGH:
14
15  Q   Good morning, Mr. Chaykin.
16  A   Good morning.
17  Q   You and I have met each other many times
18  before.  We've been on a first-name basis.  Just for
19  the record, I'll just refer to you as Mr. Chaykin for
20  the decorum of the record.
21  A   Thank you.
22  Q   You welcome.
23  A   How should I refer to you?
24  Q   Not how you would usually refer to me or would
25  like to, but you can say Howard or Mr. Edinburgh.

Page 8

1   take a break for whatever reason you desire to take a
2   break for.  All right.
3              MR. EDINBURGH:  Having said that, I just
4   want to make a quick statement that the defendants on
5   April 4th sent me an e-mail advising that SFC, SFA,
6   and MVP have designated Arthur Chaykin as their
7   representative witness to Topic Numbers 6, 7, 14, 15,
8   19, 20, and 26 on the plaintiff's deposition notices,
9   and then it says which we believe that these topics
10  are identical for all three notices.
11             And having said that, I will just mark
12  two of the notices and you can refer to the topics.
13  I'm referring to the notice for MVP which is
14  previously MVP Exhibit 10.  I guess we can double
15  mark it as Chaykin 1.
16
17             (Plaintiff's Exhibit 1, Notice of
18             deposition to MVP for 30(b)(6)
19             deposition, was marked for
20             identification.)
21
22             MR. EDINBURGH:  And we have -- as Shinn
23  Fu Exhibit 20 we have the notice of deposition which
24  we can mark as Chaykin 2.

Page 7

1   A   Okay.
2   Q   Just for purposes of the record.
3   A   Okay.
4   Q   You welcome.
5              MR. BROWN:  And for the record, we
6   usually refer to him as Howard.
7              MR. EDINBURGH:   Off the record.
8
9              (Off the record from approximately
10             10:13 a.m. to 10:14 a.m.)
11
12  BY MR. EDINBURGH:
13  Q   Mr. Chaykin, I know you're an attorney.  I
14  know you've been in many depositions in your life
15  including many here but -- and you've heard these
16  instructions innumerable times, but I'll just do it
17  one more time since you are the witness this
18  morning.
19             Please wait till I finish my question before
20  you answer.  Please give a verbal response to each
21  and every question.  If you don't understand a
22  question I ask, tell me and I'll rephrase it in a
23  manner which I trust you can respond to.
24             You cannot take a break while a question is
25  pending, but if there's no pending question you can

Page 9

1              (Plaintiff's Exhibit 2, Notice of
2              deposition to Shinn Fu for 30(b)(6)
3              deposition, was marked for
4              identification.)
5
6   BY MR. EDINBURGH:
7              MS. TODD:   You don't have one for me.  I
8   know.
9              MR. EDINBURGH:  No, I do.
10             MS. TODD:   You do.  Wow.
11             MR. BROWN:  Do you have one for me?
12             MR. EDINBURGH:  Yes, I do.
13             MS. TODD:   Thanks.
14  BY MR. EDINBURGH:
15  Q   And during -- all right.
16             Have you reviewed these notices with respect
17  to the topics for which you've been designated?
18  A   I have read them.
19  Q   Have you specifically reviewed topics numbered
20  6, 7, 14, 15, 19, 20, and 26 listed in Exhibit A of
21  these notices?
22  A   Yes.
23  Q   Okay.
24             Now, you have an understanding that you are
25  testifying today as a Rule 30(b)(6) witness for Shinn

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 10

1    Fu Corporation which I will refer to as SFC for Shinn
2    Fu, for Shinn Fu of America which I will call SFA,
3    and for MVP (H.K.) Industries Ltd., which I will
4    refer to as MVP and as to these entities you're a
5    30(b)(6) witness on those topics which we have
6    previously identified.  Is that your understanding?
7        A   That's my understanding.
8        Q   Do you have an understanding of what are the
9    responsibilities of a 30(b)(6) witness?
10       A   Yes.
11       Q   Do you have an understanding that your
12   testimony here today is on behalf of Shinn Fu --
13       A   Yes.
14       Q   -- for those topics?
15           And on behalf of SFA for those topics?
16       A   Yes.
17       Q   And on behalf of MVP for those topics?
18       A   Yes.
19       Q   And that with respect to these topics your
20   testimony today is testimony with collective
21   corporate knowledge of Shinn Fu?
22       A   Which Shinn Fu entity?
23       Q   The named defendant, Shinn Fu Corporation as
24   to those topics.
25       A   I don't understand what you mean by collective

Page 11

1    corporate knowledge.
2        Q   The knowledge of the corporation as a whole of
3    its officers, directors, institutional knowledge with
4    respect to the topics identified in the notice for
5    which you will testify today.
6        A   My understanding is that I'm testifying with
7    regard to the knowledge of each entity that it might
8    have with regard to the topics.  I don't really
9    understand the concept of collective knowledge of all
10   the entities combined.
11       Q   No, I don't mean all the entities combined.  I
12   mean the collective corporation knowledge when you
13   testify as to Shinn Fu's knowledge, you're testifying
14   with respect to corporate knowledge or Shinn Fu?
15           MR. BROWN:  For the sake of the record I
16   think at the start you identified SFC and in several
17   questions now you just used Shinn Fu.
18           MR. EDINBURGH:  Okay.  Fair enough.
19           MR. BROWN:  By Shinn Fu do you mean SFC?
20           MR. EDINBURGH:  I think I earlier said
21   I'd refer to Shinn Fu Corporation as either Shinn Fu
22   or SFC.
23           MR. BROWN:  I apologize if I missed that,
24   but I was confused too.
25           MR. EDINBURGH:  Okay.  Fair enough.  I

Page 12

1    think, but then I -- we'll do it one more time for
2    clarity's sake, so there's no confusion.
3    BY MR. EDINBURGH:
4        Q   The term "Shinn Fu" as I will use it today
5    referring to Shinn Fu Corporation?
6        A   Okay.
7        Q   SFA will be Shinn Fu of America, and MVP will
8    be MVP.
9        A   Okay.
10       Q   All right.
11       A   Frankly, I'm uncomfortable with that because
12   I've been working in this environment for many years
13   and there's a tendency to just use the term "Shinn
14   Fu" to refer to the whole affiliated group of
15   companies, and I am concerned about confusion.
16           I would prefer, frankly, Mr. Edinburgh, if you
17   could refer to Shinn Fu Corporation as SFT.
18       Q   SFT?
19       A   Yeah.
20       Q   T as in Tom?
21       A   T as in Taiwan.
22       Q   T as in Taiwan.
23       A   Because SFT is associated with Shinn Fu
24   Canada, and that will confuse me or sometimes Shinn
25   Fu Corporation.

Page 13

1        Q   All right.
2        A   So SFT would be a better name.
3        Q   So I will -- I will use those initials for the
4    rest of this deposition.
5           MR. BROWN:  Great.
6        A   Thank you.
7    BY MR. EDINBURGH:
8        Q   Do you have an understanding here today that
9    your testimony is binding on STF, SFA, and MVP?
10       A   I do.
11       Q   Now, in order to fulfill your responsibilities
12   as SFT's, SFA's, and MVP's 30(b)(6) witness on those
13   topics for which you've been designated, have you
14   discussed those topics with any current SFT, SFA, or
15   MVP employees, officers, directors, executives, or
16   managers?
17       A   Yes.
18       Q   For whom have you discussed?  We can take them
19   one at a time.
20       A   Starting with SFA, I've discussed some of
21   these issues with Sheng Wang, with Steven Huang, with
22   Ryan Jorgensen, with Meghann O'Connor, with Mike from
23   customer service.
24       Q   Mike Stephens?
25       A   Yes, Mike Stephens.

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 14

1    With Stephen Bailey in marketing.  Those are
2  all the individuals I can recall at this time from
3  SFA.
4    Q    Probably stop there for a moment and then
5  we'll ask you some questions and then go to the other
6  entities.
7    With respect to -- maybe we'll go from the
8  back.  With respect to Stephen Bailey what topics did
9  you discuss with Mr. Bailey?
10    A    Just general marketing approaches with regard
11  to jack stands.
12    Q    And for Mike Stephens?
13    A    I verified with Mr. Stephens that there had
14  been no hotline claims regarding ratchet jack stand
15  incidents and updated that information.
16    Q    Meghann O'Connor?
17    A    Document collection.  Although that is not one
18  of my topics, Meghann was familiar with many of the
19  topics related to the topics and I would sometimes
20  talk with her about documents that pertained to the
21  issues in the deposition notice.
22    Q    Okay.
23    And Mr. Jorgensen?
24    A    As you know, Mr. Jorgensen was previously
25  deposed in this matter, so some of the engineering

Page 15

1  and technical issues I discussed with Mr. Jorgensen.
2    Q    And you said Sheng Wang?
3    A    Yes.
4    Q    And Mr. Wang's position at SFA is what?
5    A    Mr. Wang is head of all of marketing for SFA
6  and sales.
7    Q    And the topics you discussed with him?
8    A    Also he, Mr. Wang, also has long knowledge of
9  the company so some historical information from back
10  in the aught dates relating to jack stands and
11  history of injuries at Shinn Fu I would discuss with
12  Mr. Sheng Wang, W-A-N-G.
13    Q    Is he based in Kansas City?
14    A    Yes.
15    Q    And who have you spoken to from SFT?
16    A    I spoke with Jack Hung, H-U-N-G, and I've also
17  discussed SFT's role with Peter Chang.
18    Q    Anyone else?
19    A    No.
20    Q    Peter Chang am I correct at least his English
21  name, Peter Chang, was the 30(b)(6) witness on behalf
22  of SFT; is that correct?
23    A    That's correct.
24    Q    And Jack Hung what was his role at SFT?
25    A    Jack Hung is the CEO of SFT.

Page 16

1    Q    And what topics did you discuss with Mr. Hung?
2    A    I discussed with Mr. Hung the role of Shinn Fu
3  Taiwan financially with regard to Shinn Fu Company of
4  America and MVP.
5    Mr. Hung also has a long history with the
6  company and knew some of the corporate structure
7  relationships and therefore the financial end and
8  functional relationships of MVP, SFT, and SFA.
9    Q    Is Mr. Hung related to Victor Hung, Betty
10  Hung, and Angela Hung?
11    A    No.
12    Q    And finally who did you discuss the topics
13  with at MVP?
14    A    Mostly Nora Lee.
15    Q    Miss Lee was the 30(b)(6) witness for MVP,
16  correct?
17    A    Correct.
18    Q    Did you -- in order to prepare to be the
19  30(b)(6) witness on these topics, did you have any
20  discussions with any former employees, directors,
21  executives, or managers of SFT, SFA, or MVP?
22    A    Not as part of my preparation for this
23  deposition, but of course I've had conversations over
24  the years with many employees at all three of these
25  entities.

Page 17

1    Q    Okay.
2    In order to prepare for your deposition today,
3  did you have any discussion with any member of the
4  Hung or Huang families, H-U-A-N-G, including Steven
5  Huang, Vicky Hung, Victor Hung, Betty Hung, or Angela
6  Hung?
7    A    These are two separate families you know?
8    Q    That's my understanding based on the prior
9  testimony.
10    A    Okay.
11    Q    I mean they're related --
12    A    Steven Huang and no one else.
13    Q    Okay.
14    And what did you discuss with Mr. Steven
15  Huang?
16    A    I discussed with him the -- I discussed with
17  him SFA's history with jack stands, some information
18  regarding the volume of jack stands sold by SFA, and
19  also discussed with him who else would be an
20  appropriate person to talk to at SFA with regard to
21  the topics in the deposition notice.
22    Q    And what is Mr. Huang's title at SFA?
23    A    Mr. Huang's title is chief operating officer.
24    Q    What is your title at SFA?
25    A    I am the general counsel.

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 18

1    Q   Now, I'll go into your professional biography
2   including that, but is Mr. Huang today your boss?
3    A   Mr. Huang is one the people I report to.
4    Q   And who are the others?
5    A   I also report to Sheng Wang, and on certain
6   matters I report directly to either Jack or Victor if
7   it's an SFT matter that I'm working on for SFT.
8    Q   Victor meaning Victor Hung?
9    A   Correct.
10   Q   And Jack meaning Jack Hung?
11   A   Correct.
12   Q   And, again, those two really share a common
13  name but are unrelated; is that right?
14   A   That's correct.
15       As a lawyer I have internal clients, so I
16  often work with the heads of each of the business
17  units on legal matters in which they are involved.
18   Q   You have an understanding of why the
19  defendants selected you to be representative the
20  witness for the topics we have previously listed?
21   A   No.
22   Q   Did you select yourself to be the witness?
23   A   No.
24   Q   Who selected you to be the witness?
25   A   Well, counsel -- counsel discussed it with the

Page 19

1   client.
2    Q   Who advised you that you would be the
3   witness?
4    A   Counsel and my client.
5    Q   When you say your client, who at the client or
6   clients, with an S, advised you?
7    A   Steven Huang and Sheng Wang were involved in
8   the discussions.
9    Q   Anyone from SFT or MVP?
10   A   I am aware that they were consulted, but I did
11  not have any discussions with them.
12   Q   And Mr. Wang, W-A-N-G, I know you told us he
13  was the head of marketing I believe.  Does he have a
14  formal title like a vice president or executive vice
15  president or anything of that nature?
16   A   He's executive vice president of sales and
17  marketing.
18   Q   And for how long was he in that position?
19   A   I believe he's been in that position at least
20  three years, but I don't have a perfect memory of
21  Mr. Huang's work history.
22   Q   Who is his predecessor, if there was any, in
23  that position?
24   A   Mr. Joey Su, S-U not S-U-E.
25   Q   Okay.

Page 20

1       Now, prior to being designated as the SFT or
2   SFA or MVP 30(b)(6) witness on these particular
3   topics did you have personal knowledge of any of the
4   topics?
5    A   Oh, yes.
6    Q   Can you just enumerate by number which ones
7   you had personal knowledge of?
8       MR. BROWN:  Do you have the list of the
9   numbers?
10      THE WITNESS:  No.  I need a list.
11  BY MR. EDINBURGH:
12   Q   6, 7 -- I'll go slowly.
13   A   Okay.
14   Q   6, 7, 14, 15, 19, 20, 26.
15   A   Okay.  6, yes.  7, yes.  14, yes.  15, with a
16  qualification that I don't get monthly reports on the
17  customer hotline but some issues that would come up
18  on the customer hotline would be presented to me so
19  in that sense it's qualified a yes on 15.  19, yes.
20  20, yes.  26, yes.
21   Q   I'm going to show you the second amended
22  complaint which has been previously marked, and I
23  have copies right here.
24      MR. BROWN:  Thank you.
25      MR. EDINBURGH:  This is plaintiff's

Page 21

1   second amending complaint.  It's produced and marked
2   as SFA Exhibit 2 on 5-24-16.  We can parallel mark it
3   Claykin 3.
4
5          (Plaintiff's Exhibit 3, Second
6           amended complaint, was marked
7           for identification.)
8
9   BY MR. EDINBURGH:
10   Q   In 2013 were you the general counsel to SFA?
11   A   No.
12   Q   Any part of that year?
13   A   I do not believe so.
14   Q   I'll go into the history, but at some prior
15  time you were general counsel, am I correct -- and
16  we'll go into what occurred -- you left that position
17  and you returned to that position?
18   A   Correct.
19   Q   When did you return to that position?
20   A   I believe that I returned to that position in
21  August of 2015.
22   Q   2015?
23   A   But I would need to check my c.v. to see if it
24  was 2014.
25   Q   All right.

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 22

1      We'll go into that.
2   A  But it definitely was not 2013.
3   Q  Fair enough.
4      Whenever you did return as general counsel,
5   did you become aware of the Klorczyk case?
6   A  I did.
7   Q  Did you have an opportunity to look at that
8   time either to the second amended complaint or a
9   previously-filed complaint?
10  A  I did.
11  Q  Okay.  Just some basic questions now.
12     You are an attorney, correct?
13  A  Correct.
14  Q  Okay.
15     And --
16  A  But I believe it was August of 2014 --
17  Q  2014?
18  A  -- on further reflection.
19  Q  Okay.
20     And what states are you licensed to practice
21  law in?
22  A  I'm licensed to practice law in Kansas,
23  Missouri, and I'm retired from the bar of the
24  Commonwealth of Massachusetts.
25  Q  Okay.

Page 23

1      Does that include the federal courts in Kansas
2   and Missouri as well?
3   A  Yes, it does.
4   Q  Can you just tell me when you became SFA's
5   general counsel and when you left that position
6   before you returned?
7   A  I believe I started at SFA in 2004.  It was in
8   the summer, June or July I believe, and I worked with
9   SFA, I believe it was, through 2012.  I then left SFA
10  and took a role as executive director of the Midwest
11  Innocence Project in Kansas City, Missouri.  I did
12  that for approximately a year at which time I
13  returned to private practice at the law firm of
14  Erickson Kernell and was there for a while before
15  SFA approached me with the idea of rejoining the
16  company in a part-time general counsel capacity,
17  which I agreed to, and started in, I believe, August
18  of 2014.
19  Q  Are you currently still considered to be the
20  general counsel, to use your phrase, in a part-time
21  capacity?
22  A  Yes.
23  Q  Can you just tell us currently approximately
24  either in terms of days or hours how much time you
25  spend in the position of general counsel to SFA?

Page 24

1   A  Approximately 90 hours a month.
2   Q  Do you still practice law for Erickson
3   Kernell?
4   A  I do.
5   Q  And what is your relationship to that firm?
6   Is it partner, counsel, or some other relationship?
7   A  I'm of counsel to Erickson Kernell, IP.
8   Q  Can you just tell me generally, if you want to
9   do it on a monthly basis, how many hours per month
10  you work in that capacity?
11  A  Work not bill, right?
12  Q  I don't want to go into those topics.
13  A  I would say I work there another 80 hours a
14  month, minimum.
15  Q  Is SFA a client of Erickson Kernell?
16  A  There are no current matters at Erickson
17  Kernell involving SFA.
18  Q  Have there previously while you were with
19  Erickson Kernell?
20  A  Yes.
21  Q  Do you have any understanding as to when the
22  Klorczyk matter was first initiated whether SFA put a
23  litigation hold on its documents once it was served
24  with the SFA -- I mean the Klorczyk complaint?
25  A  I believe that outside counsel did initiate a

Page 25

1   document retention hold.
2   Q  Okay.  All right.
3      I'm going to ask you some questions about your
4   personal biography and you professional one, and then
5   I'll go on to these topics.  I'll ask you some
6   general questions.
7      Just for the record what is your current home
8   address?
9   A  6742 Delmar Lane, Prairie Village, Kansas
10  66208.
11  Q  Is that -- not being familiar with it, is that
12  a suburb of Kansas City, Missouri?
13  A  Yeah, it's kind of the five towns of Kansas
14  City.
15  Q  Okay.
16     MR. EDINBURGH:  Off the record.
17
18     (Off the record from approximately
19     10:43 a.m. to 10:44 a.m.)
20
21  BY MR. EDINBURGH:
22  Q  Have you ever been convicted of a crime?
23  A  No, sir.
24  Q  Are you taking any medications now which
25  affect your ability to truthfully answer these

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 26

1  deposition questions?
2      A   No.
3      Q   Do you suffer from any medical, physical, or
4  mental condition which affects your ability to
5  truthfully answer your deposition questions?
6      A   No.
7      Q   Have you yourself ever been deposed before as
8  a witness?
9      A   No.
10     Q   Have you ever testified at trial?
11     A   No.
12     Q   All right.
13         Now, I think your counsel was kind enough the
14  other day to e-mail us your c.v., so I'm going to
15  have it marked as the next exhibit, Chaykin 4.
16
17              (Plaintiff's Exhibit 4, Curriculum
18              Vitae of Arthur Chaykin, was marked
19              for identification.)
20
21  BY MR. EDINBURGH:
22     Q   Just some more general questions before I go
23  into your resume.
24         Has your license ever been suspended?
25     A   No.

Page 27

1      Q   Have you ever been the subject of any
2  disciplinary proceedings in any state where you were
3  licensed to practice law?
4      A   No.
5      Q   Now, I'd like to go through some of these
6  entries in your c.v.
7         First, is this a current, accurate c.v. for
8  your work and professional history?
9      A   I believe it is to the best of my ability.
10  As you can tell I have a little trouble remembering
11  the past and exactly when I started and finished
12  certain things, but to the best of my ability it's
13  accurate.
14     Q   Okay.
15         I want to discuss some of the entries, not all
16  of them.  I think we can discuss off the record your
17  being a certified yoga instructor and having advanced
18  ability in the French language.  We'll try to keep to
19  the germane topics on this.
20         You graduated Boston College of Law.  Can you
21  tell us when?
22     A   1980.
23     Q   Okay.
24         And just out of law school, according to your
25  c.v., you took several teaching positions at various

Page 28

1  law schools?
2      A   No, I worked for a year at Hale and Dorr.
3      Q   Okay.  Very good.  I think that may not be on
4  it.
5         In Boston?
6      A   Yes, sir.
7      Q   And then after that did you enter, for a
8  period of time, the teaching profession?
9      A   Yes, I did.
10     Q   Okay.
11         Prior to this you began at the University of
12  Miami?
13     A   Correct.
14     Q   For a year or two?
15     A   One year.
16     Q   And then you moved on to become an associate
17  professor of law at Northern Illinois University,
18  School of Law?
19     A   Correct.
20     Q   From 1982 to 1987?
21     A   That's correct.
22     Q   All right.
23         Then you became visiting associate professor
24  of law at Washburn University Law School in Topeka,
25  Kansas from 1989 to 1991?

Page 29

1      A   No.  Before that I went to the University of
2  Pittsburgh, School of Law and I taught there for a
3  year.
4      Q   Right.
5      A   It's a little bit confusing.  I apologize.
6      Q   No, that's fine.
7      A   Academic life is sometimes nomadic, and this
8  was a nomadic period of my life.
9      Q   All right.
10     A   So I went from Northern Illinois, I spent a
11  year as a visiting associate professor in Pittsburgh,
12  and then the year after that I went to work for a
13  plaintiff's law firm in the Kansas City area.  That
14  may not be on the c.v. either.
15     Q   You joined the dark side, the white-light
16  side.
17         Shamberg Johnson is that a plaintiff's firm?
18     A   Uh-huh.
19     Q   Yes?
20     A   Yes.
21     Q   Okay.  All right.
22         Any of the courses that you've taught did any
23  of them involve product liability?
24     A   Involve?  Certainly in federal jurisdiction
25  and in conflicts and in civil procedure there would

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 30

1  be interesting problems that derived from products
2  liability cases, but I did not teach torts which
3  would be where products liability would be covered,
4  so the answer is related, yes but on the nose, no.
5      Q  So if there was a product liability lawsuit
6  that involved an intriguing issue of conflicts or
7  federal jurisdiction it would arise in that
8  capacity, not actually teaching the nuts and bolts of
9  the area of product liability; is that correct?
10     A  Correct.
11     Q  All right.
12        Do you have any -- you went to Brandeis
13 University, correct?
14     A  Correct.
15     Q  Okay.
16        Do you have any degree in engineering?
17     A  No.
18     Q  Take any engineering courses?
19     A  At Brandeis, no.
20     Q  Anywhere?
21     A  I've taken some courses and training related
22 to safety and warnings which is a subject broadly
23 within engineering but no, no other training in
24 engineering, formal.
25     Q  Okay.

Page 31

1         So you were, back in the late '80s, an
2  associate at the Shamberg law firm in Kansas City,
3  correct?
4      A  Correct.
5      Q  Was that a full-time position?
6      A  Yes, sir.
7      Q  You actually tried cases in that capacity?
8      A  I was an associate.  I supported other people
9  trying cases.
10     Q  Okay.
11        And according to your resume, you had
12 plaintiff's cases in the area of product liability
13 including aviation, pharmaceuticals, firearms, and
14 also medical malpractice cases, correct?
15     A  That is correct.
16     Q  And in medical malpractice cases you were
17 involved in cases against doctors and hospitals?
18     A  That is correct.
19     Q  All right.
20        Then you moved on to the McDowell, Rice &
21 Smith law firm in Kansas City for a short period of
22 time?
23     A  While working at Washburn I consulted with
24 McDowell, Rice and then I joined them for a short
25 period of time.

Page 32

1      Q  And according to your resume you were of
2  counsel of that firm from 1990 to 1991?
3      A  Correct.
4      Q  It says you worked on commercial litigation
5  during that tenure at McDowell, Rice?
6      A  That's right.
7      Q  All right.
8         And then according to your resume, you joined
9  Sprint company, and you spent a long period of time
10 at Sprint?
11     A  Yes.
12     Q  Yes.  All right.
13        And your resume lists your areas of where you
14 worked for Sprint.  You worked at Sprint in various
15 capacities, is this correct from 1992 through 2001;
16 is that accurate?
17     A  That sounds right.
18     Q  Okay.
19        And your last job at Sprint you were the vice
20 president for strategy and online marketing?
21     A  Correct.
22     Q  And you left Sprint in 2001?
23     A  I can't remember if it was 2001 or 2002.  The
24 c.v. says 2001.  I probably did that with a calendar
25 in front of me and came up with that date.

Page 33

1      Q  Okay.
2      A  So I would go with 2001.
3      Q  Okay.  Fine.
4         Now is there a reason why you left Sprint?
5      A  Yes.
6      Q  The reason?
7      A  The dot-com bubble burst and with it telecoms
8  were thrown into a state of general disarray.  Sprint
9  was involved at the time the merger with MCI
10 WorldCom, so as a result it appeared that we were
11 going to be -- Sprint would be decreasing its
12 personnel.
13        And as a result of the dot-com bubble bursting
14 and a general decline in telecom Sprint offered
15 packages that were very attractive to try to get a
16 little bit lighter.
17        I decided that I wanted to be a general
18 counsel somewhere if I could accomplish that or
19 return to the practice of law, and that's what I
20 did.
21     Q  So you took the severance package that was
22 offered you?
23     A  Correct.
24     Q  And you left?
25     A  I did.

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 34

1    Q   Sprint I take it did not merge with MCI
2   WorldCom, correct?
3    A   That's correct.
4    Q   Did you -- once that became known did you go
5   back to Sprint?
6    A   No.
7    Q   And then, I'll just go faster here, for a
8   period of time you were of counsel to the Kansas City
9   law firm of Polsinelli -- that's P-O-L-S-I-N-E-L-L-I,
10  Shalton & Welte, W-E-L-T-E?
11   A   Welte.
12   Q   Welte, correct?
13   A   Now known just as Polsinelli.
14   Q   Right.  And the areas of law that you
15  practiced at that firm are listed on your c.v.,
16  correct?
17   A   Correct.  Yes.
18   Q   And they did not include product liability
19  defense work?
20   A   I don't believe I was involved as an attorney
21  of record on any products liability cases during my
22  time at Polsinelli.
23   Q   Was Shinn Fu America a client of Polsinelli
24  during this period of time 2002-2004?
25   A   No.

Page 35

1    Q   MVP or SFC were they clients?
2    A   No.
3    Q   Sears?
4    A   No.  I don't know if Sears used Polsinelli in
5   some other capacity, but as far as I know, Sears was
6   not a client of Polsinelli.
7    Q   Okay.
8        And then we'll go to the -- I've been going
9   backwards.  Now I'm going to the first page of your
10  resume --
11   A   Okay.
12   Q   -- where you have two entries.  You're of
13  counsel to Erickson Kernell, which I'll talk about,
14  and you also have really which is most germane to
15  this action you're general counsel to Shinn Fu
16  Company of America, and you have it 2004 to 2012 and
17  then slash and then you write 2015 to present?
18   A   Uh-huh.
19   Q   Just to clarify --
20   A   Uh-huh.
21   Q   -- you had earlier said you believed in August
22  of 2014 you rejoined as general counsel.  If you're
23  resume says 2015, do you -- do you have any better
24  recollection of which is the accurate one?
25   A   Let me describe what I did to ascertain that.

Page 36

1    I went to my e-mail and I looked for the earliest
2   e-mails which frankly the Klorczyk case was one of
3   the first cases I began to work on, and I found
4   e-mails going back to August of 2015.
5        Now, you know, it seems like it was longer ago
6   than that, but maybe it was only August of 2015, and
7   the first major activity in that case was that I came
8   to Connecticut to come to a conference with the
9   magistrate and to work out certain discovery issues.
10  So the e-mail would indicate to me that it was August
11  2015.
12   Q   Okay.
13       And I want to go through several of the bullet
14  points on your c.v. that listed as part of what
15  you've done at Shinn Fu of America.
16   A   Uh-huh.
17   Q   When you became general counsel to Shinn Fu of
18  America did you leave your position of counsel to
19  Polsinelli firm?
20   A   I did.
21   Q   Did you ever retain the Polsinelli firm for
22  any defense work on behalf of SFA, MVP, or SFT?
23   A   Yes.
24   Q   Did that include the Raymond action?
25   A   No.

Page 37

1    Q   Did that include any product liability
2   actions?
3    A   No.
4    Q   Okay.  So let's go through this.
5        Let's go to the top one and I'm going to ask
6   you a couple of questions on that, maybe more than a
7   couple.
8    A   Okay.
9    Q   The first bullet point says you were chief
10  legal officer for a multinational group of affiliated
11  companies with headquarters in Taipei, Taiwan and
12  U.S. headquarters in Kansas City.
13       Can you please identify the multinational
14  group of affiliated companies you're referring to in
15  your c.v.?
16   A   We would refer to it as the Shinn Fu Group,
17  but there is a group of companies.  Each with a
18  separate legal identity, that have locations in
19  Europe, Canada, United States, Australia, Taiwan,
20  China, and there's also an entity in Hong Kong that
21  is a major customer which is also affiliated but not
22  in an ownership manner at all.
23   Q   The Hong Kong entity is that MVP?
24   A   Is MVP.
25   Q   And the Taiwan entity is that SFT?

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 38

1   A   Correct.

2   Q   And is the China entity one of the defendants
3   who you are not representing today but still a
4   defendant in the case Wei Fu, W-E-I F-U?

5   A   It would be one of them.  Of course Wei Fu is
6   now defunct.

7   Q   When did it become defunct?

8   A   I believe it wrapped up its business -- the
9   corporate -- the corporate entity Wei Fu is still in
10  extent, but Wei Fu has wrapped up its business in
11  China, and I believe that was the beginning of last
12  year.

13  Q   So that would be early 2017?

14  A   I believe so.

15  Q   When did it stop producing jack stands?

16  A   I cannot give you the date, Mr. Edinburgh.  I
17  just don't know exactly when they shut down
18  production there, but it has been for more than a
19  year.

20  Q   Now, you say you were chief legal officer.
21  Were you a chief legal officer during the period of
22  time from 2004 to 2012 for MVP?

23  A   I would say no.  I did some legal work for
24  them, but I would not say that I was their go-to
25  lawyer back then.

Page 39

1   Q   How about from 2015 to the present?

2   A   I would say yes, to a greater extent.

3   Q   All right.

4       Were you chief legal officer for SFT during
5   the period 2004 to 2012?

6   A   I would have the same answer:  No.

7   Q   For Wei Fu, same time period?

8   A   No.

9   Q   So when you -- how about from 2015 to the
10  present for SFT?

11  A   I would say only on U.S. matters.

12  Q   The answers you just gave is that a
13  clarification of your entry where you say you were
14  chief legal officer for this multinational group of
15  affiliated companies?

16  A   Yes.

17  Q   What legal role did you play with respect to
18  MVP during the period 2004 to 2012?

19  A   I would work with MVP on specific usually
20  claims or litigation matters that arose from the
21  products liability area, and I would advise MVP upon
22  request on certain commercial issues that might arise
23  with regard to their business in the U.S.

24  Q   All right.  We'll go into some of that in a
25  bit.

Page 40

1       And the same question for the period of 2004
2   to 2012:  What was your relationship legally or as an
3   attorney during that period of time with SFT?

4   A   Okay.

5       With SFT -- oh, and I should add for MVP also
6   if there were trademark or patent filings that MVP
7   was doing, I would help expedite those filings, and I
8   would say it would be the same for SFT during that
9   period and what I would do is be assigned to specific
10  issues.  SFT had -- had and has more of a -- how can
11  I put it? -- a commercial business that required more
12  contract work, and therefore I would also do quite a
13  bit of commercial support, commercial law support,
14  for SFT.

15  Q   And did that change in 2015?  Become more
16  involved?  Less involved?

17  A   I would say it was generally the same except
18  that SFT retained another -- started to retain
19  another attorney in Taipei who is well versed in a
20  lot of the Asian commercial issues that arise and as
21  a result I did not see as many commercial
22  transactions in 2015.

23  Q   How about for any transactions or legal work
24  that involved the United States of America were you
25  the go-to lawyer for SFT?

Page 41

1   A   Generally I would expect that I would be
2   involved in those matters.

3   Q   Okay.

4       You indicated that in your c.v. you call these
5   companies a group of affiliated companies?

6   A   Uh-huh.

7   Q   What did you mean by that?

8   A   I mean they work together.  They each have
9   their own roles, but they are related in terms of
10  either buy-and-sell relationships or
11  marketing-and-sales relationships or in the case of
12  SFT in a parent-subsidiary role with regard to some
13  of the entities in the network.

14  Q   So is it correct that when -- you've seen and
15  been present and seen the testimony at the other
16  depositions.  You know that the SFA witnesses have
17  said SFT was 100 percent owned by SFA; is that
18  accurate?

19  A   To the best of my knowledge it is.

20  Q   And that was during this entire period we're
21  talking about when you were general counsel?

22  A   No.  There was a period of time where SFT did
23  not own 100 percent of SFA's stock.

24  Q   When was that period?

25  A   That was in the 2000s, and I would have to go

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 42

1  back and check, but I believe it was sometime in 2009
2  or '10 that Shinn Fu Taiwan purchased some additional
3  stock and obtained all or virtually all of Shin Fu
4  America's equity.
5      Q   I'm not going to belabor this because we have
6  a lot of other areas --
7      A   Right.
8      Q   -- to go into, but prior to purchasing the
9  additional stock during this time period that you
10 just testified to how much of Shinn Fu America did
11 SFT own?
12     A   Again, I would not like to be held to a
13 specific number, but I believe it was about 80
14 percent.
15     Q   Was the rest of the company owned by the Hung
16 or Huang family?
17     A   There were some nonfamily members that owned a
18 percentage of the stocks.
19     Q   And they were bought out by SFT during this
20 time period that you described?
21     A   I believe so.
22     Q   All right.
23         You indicate that this national group of
24 affiliated companies was headquartered in Taipei,
25 correct?

Page 43

1      A   Yes.
2      Q   Was that the headquarters for SFT?
3      A   Correct.
4      Q   And was that the headquarters for all the
5  entities that were part of the affiliated group of
6  companies?
7      A   At Shinn Fu America they do not refer to
8  Taipei as headquarters.  They refer to Kansas City as
9  headquarters.
10     Q   For the United States?
11     A   When someone says in the building or if
12 you're traveling you -- employees will say I'm going
13 to headquarters, they mean I'm returning to Kansas
14 City.
15     Q   All right.
16     A   They see Kansas City as their -- the center of
17 their county seat so to speak.
18     Q   Okay.
19         I'm going to go down to the fourth bullet
20 point which says, "Handle all litigation including
21 products liability"?
22     A   Uh-huh.
23     Q   And that of course would include the lawsuit
24 that brings us all here today, correct?
25     A   Yes, sir.

Page 44

1      Q   Okay.
2          And does that include all product liability
3  claims brought against SFA -- withdrawn.
4          When you say you handle all litigation
5  including products liability, does that include any
6  lawsuits when there's a product liability claim
7  brought against SFA?
8      A   Yes.  Now, yes.
9      Q   All right.
10         Does that include product liability claims
11 brought in the United States against MVP, you handle
12 those?
13     A   Generally, yes.
14     Q   Same question for -- I'm sorry -- for SFT.  If
15 SFT is named a defendant in a United States lawsuit
16 where there's a product liability claim, you handle
17 that litigation?
18     A   That has been the case.
19     Q   When you say "handle," are you in charge of
20 defending the lawsuit on behalf of SFA or MVP or
21 SFT?
22     A   Well, it indicates --
23         MR. BROWN:  Well, object to form because
24 I'm not quite sure what that means.
25         MR. EDINBURGH:  Well, he used the word

Page 45

1  "handle."  I'm trying to get a little bit more meat
2  on the bone as --
3          MR. BROWN:  Yeah.
4          MR. EDINBURGH:  -- to what handle means.
5          MR. BROWN:  Okay.  I'll agree with that
6  and in charge of defending, I'm not sure is any more
7  descriptive, but I'm objecting to form.
8      A   Well, as you see in the next sentence,
9  Mr. Edinburgh, it's a very close partnership of
10 outside counsel.  I don't litigate these cases
11 directly myself.  I work closely with outside
12 counsel.
13         So by "handle," I really mean litigation
14 management.  That's the modern term that would be
15 used.
16 BY MR. EDINBURGH:
17     Q   Well, in terms of management, if decisions
18 have to be made, as they often have to be made in the
19 lawsuit, somebody's got to decide --
20     A   Uh-huh.
21     Q   -- are you the decider?
22     A   No, I'm not.
23     Q   You don't decide any aspect of the case when
24 decisions have to be made?
25     A   No, I don't.  I consult with my client.

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 46

1    Q   Who does?
2    A   I give my client a recommendation and then my
3   client and I, in consultation with outside counsel,
4   reach a conclusion with regard to the issue that is
5   on the table.
6    Q   You indicated -- all right.  Fair enough.
7        When you say you handle litigation, do you
8   also handle pre-litigation matters such as complaints
9   which have not yet matured into lawsuits?
10   A   Yes.
11   Q   And are you involved in the investigation of
12  those claims?
13   A   Sometimes.
14   Q   Not just managing them but you yourself are
15  actually involved in the investigation?
16   A   In certain cases, yes.
17   Q   Product liability actions?
18   A   In some products liability actions.
19   Q   Jack stand cases?
20   A   In some of them it has happened.
21   Q   You indicate in a bullet point you assure
22  regulatory compliance and there's a bunch of
23  initials which stand for various, I take it, federal
24  agencies?
25   A   Uh-huh.

Page 47

1    Q   One of them is the Consumer Product Safety
2   Commission or CPSC; is that correct?
3    A   Correct.
4    Q   Are you involved in any -- has the Consumer
5   Product Safety Commission ever made any inquiries or
6   investigation with respect to jack stands that were
7   made, contributed, or sold by SFA, MVP or, SFT?
8    A   Yes.
9    Q   When?
10   A   It was before 2010.
11   Q   Fair enough.  That gives us a long period of
12  time nevertheless.
13       Do you have a range of time?  You gave us a
14  ceiling.  What about the floor?
15   A   Well, it had to be after 2004, so sometime
16  between -- I would say it was somewhere around 2006
17  if I had to place that.
18   Q   And what was the nature CPSC inquiry or
19  investigation?
20   A   We never got to the substance of it because
21  the CPSC has no jurisdiction over jack stands.
22   Q   Was that a -- what is that based on, what you
23  just said?  Were they given a legal memo to that
24  effect?  Did they acknowledge it or not?
25       I mean you made a statement.  I'm not arguing

Page 48

1   with the statement.  I just want to know the basis
2   for it.
3    A   The National Highway Traffic Safety
4   Administration Act gives total jurisdiction over
5   automotive equipment and the safety of such devices
6   to the NHTSA, the National Highway Traffic Safety
7   Administration.
8        The Consumer Products Safety Commission has
9   recognized this limitation on their jurisdiction in a
10  series of cases and opinions by their general
11  counsel.  As a result in the very rare circumstance
12  where there is an inquiry from the CPSC on automotive
13  lifting equipment, it is -- it is standard or in
14  those very rare occasions, I write a short response
15  to them reminding them that they do not have
16  jurisdiction, and then I usually either receive an
17  acknowledgment of that, or I do not hear from the
18  CPSC again.
19   Q   Do you have a file in your office containing a
20  CPSC inquiry and the response thereto?
21   A   There is -- there would be an electronic or a
22  paper file somewhere.
23   Q   In those CPSC inquiries, do they refer to
24  particular incidents that gave rise to their request
25  to you and SFA?

Page 49

1    A   Sometimes there's very general -- there's only
2   been one I want to note.  There's only been one that
3   I can recall involving a jack stand, and I think it
4   was just a general inquiry in the nature of we had a
5   consumer complaint about this jack stand.  There was
6   no injury in this matter, and can -- and I don't
7   remember exactly what they asked for because my brain
8   went immediately to you guys have no jurisdiction, so
9   I don't remember the substance of the request.
10   Q   You have a general familiarity with the
11  document production given by the non-Sears defendants
12  by the Shinn Fu defendants in this case?
13   A   Yes.
14   Q   Have these CPSC requests and responses been
15  provided?
16   A   The one that we were just discussing was.
17   Q   All right.
18       You mentioned another federal agency, the
19  NHTSA?
20   A   Yes.
21   Q   Has the NHTSA made any inquiries, conducted
22  any investigation with respect to jack stands
23  directed to SFA?
24   A   No, not to my knowledge.
25   Q   And, again, you're currently of counsel to the

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 50

1   Erickson Kernell firm, right?
2       A   Correct.
3       Q   And the top entry of your c.v. reflects that,
4   correct?
5       A   Yes.
6       Q   And it reflects the area of legal practice you
7   do with that firm?
8       A   Yes.
9       Q   All right.
10          I also want to mark the Erickson Kernell
11  website entry for you.
12      A   Okay.
13
14                  (Plaintiff's Exhibit 5, Printout
15                  from Erickson Kernell's website,
16                  was marked for identification.)
17
18          MR. BROWN:  Is this 5?
19          THE COURT REPORTER:  Yes.
20      A   (Witness reviews document.)
21  BY MR. EDINBURGH:
22      Q   Have you seen 5 before, your website entry at
23  the Erickson Kernell website?
24      A   I have seen it.
25      Q   Is what they say generally accurate?

Page 51

1       A   I think it's a little out of date, but it's
2   accurate.
3       Q   Okay.
4           Part of what they say here is they say you
5   have knowledge of regulatory issues involving the
6   National Highway Traffic Safety Administration?
7       A   Uh-huh.
8       Q   Other than jack stands, are there any other --
9   and, again, I'm not going to spend a whole lot of
10  time on it -- but is there any other products that
11  you've been involved in which fall under the rubric
12  of regulatory issues involving the National Highway
13  Traffic Safety Administration?
14      A   Yes.
15      Q   Can you give me an example?
16      A   Jacks.
17      Q   Jacks?
18      A   Yes.
19      Q   It also said on your website -- on the
20  Erickson Kernell website referring to you there's a
21  phrase here "requirements for safety warnings and
22  other factors involved in consumer information and
23  owner's manuals."  This is the first paragraph, the
24  top paragraph?
25      A   Yup.

Page 52

1       Q   Were you involved in the wording or language
2   of any jack stand manuals?
3       A   For any of the entities?
4       Q   Well, it lists -- do it for any of the
5   entities, yes, and then you tell me -- I could ask
6   you separately for each.
7       A   I was involved, yes.
8       Q   Okay.
9           For which entities?
10      A   It's the manufacturing entities that have the
11  obligation to publish the manuals.
12      Q   And the manufacturing entities with respect to
13  -- all right.  I'll be even more specific so we'll
14  keep it on the straight and narrow.
15          You're familiar with the Shinn Fu America
16  Pro-Lift brand?
17      A   Uh-huh.
18      Q   Model T6904?
19      A   Uh-huh.  Yes, sir.
20      Q   Were you involved at all in the preparation of
21  the owner's manual for that jack stand?
22      A   No, I do not believe I was.
23      Q   Did you have to approve its contents?
24      A   No, I did not.
25      Q   Did you draft any of the language?

Page 53

1       A   No.
2       Q   There's also a Sears Craftsman 50163 model
3   jack stand.  Are you familiar with that --
4       A   Yes.
5       Q   -- designation?
6       A   Yes.
7       Q   Were you involved in the preparation of the
8   owner's manual for that jack stand?
9       A   I do not believe so.
10      Q   Were you involved in approving the contents of
11  that manual?
12      A   I do not believe so.
13      Q   Okay.
14          MR. BROWN:  Good time for a break?
15          MR. EDINBURGH:   Absolutely.
16
17          (Off the record from approximately
18          10:28 a.m. to 10:36 a.m.)
19
20          MR. EDINBURGH:  All right.  Back on.
21  BY MR. EDINBURGH:
22      Q   Mr. Chaykin, have you ever designed any
23  product?
24      A   Not one that was launched commercially.
25      Q   Okay.

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 54

1    Have you ever designed a jack stand?
2    A    No.
3    Q    Okay.
4    Do you ever hold yourself out as an expert in
5    product design?
6    A    No.
7    Q    Have you ever been involved in any testing of
8    jack stands?
9    A    I've observed.  I've never participated.
10   Q    When you say you've observed, I'm not talking
11   about, let's say, tests performed as part of
12   litigation defense, but in the ordinary course of
13   business have you observed jack stand testing?
14   A    Yes.
15   Q    What type of testing have you observed?
16   A    I've observed testing when I visited the
17   factory at Wei Fu in China, and I've observed spot
18   testing at Shinn Fu Company of America.
19   Q    You've indicated earlier that there's legal
20   work that you have performed for MVP and SFT.  Who
21   pays for that work?
22   A    Each of the entities that was the impetus of
23   that particular work.
24   Q    Are you -- so do you submit -- do you work on
25   -- do you submit time sheets, for instance, to MVP or

Page 55

1    SFT and they pay you based upon those bills?
2    A    I submit a master time sheet each month that
3    would identify the nature of the work done so that it
4    can be ascribed to one entity or another.  It does
5    not affect my compensation one way or another how
6    that is allocated, but I know that it is allocated
7    back to the various entities.
8    Q    So I understand it, you receive -- during the
9    years you were general counsel to Shinn Fu America
10   you received a salary?
11   A    Correct.
12   Q    And Shinn Fu Taiwan and MVP would contribute
13   to that payment depending upon the amount of time you
14   spent on their work?
15   A    Correct.  There would be a charge back --
16   Shinn Fu America would advance my salary in a sense,
17   and then there would be intracompany debits that
18   would result in a distribution or a charge system
19   that was related to the amount of work that I did for
20   each entity in that month.
21   Q    And was that an allocation of cost between the
22   entities?  In other words, you received your monthly
23   or biweekly check from a Shinn Fu America account; is
24   that correct?
25   A    Correct.

Page 56

1    Q    And some or part of that Shinn Fu America
2    would be reimbursed by MVP or SFT depending upon
3    how much work you did during that time period for
4    them?
5    A    SFT, MVP, Shinn Fu Europe, Shinn Fu Australia,
6    Shinn Fu Canada, yes.
7    Q    And you were a salaried W-2 employee of Shin
8    Fu America during these years, correct?
9    A    Correct.
10   Q    Do you personally have any ownership interest
11   directly or indirectly in SFA, SFT, or MVP?
12   A    No.
13   Q    Now, Ryan Jorgensen and Meghann O'Connor were
14   30(b)(6) witnesses for SFA in this litigation,
15   correct?
16   A    Correct.
17   Q    You were present during the testimony?
18   A    Yes, I was.
19   Q    Did you personally provide either of those
20   witnesses with information on any topics that they
21   testified about?
22   A    No.
23   Q    Not even on other lawsuits, other claims?
24   A    No, other than legal consultation that was
25   between me and my client.

Page 57

1    Q    Right.  I'm not asking about that.
2    A    Yes.
3    Q    I'm not asking about -- I'm asking about
4    underlying data or facts which provided the predicate
5    or basis for their responses to certain 30(b)(6)
6    topics, not legal advice, forget that.  That's
7    outside the scope, just underlying facts or data
8    about any of these topics including other complaints
9    or lawsuits?
10   A    I think I reminded Ryan of some facts
11   regarding some of the claims or cases I knew about.
12   Q    Okay.  All right.  We'll go into those.
13   Now you were also in Taiwan recently.  I
14   remember I saw you on the screen --
15   A    Right.
16   Q    -- for the 30(b)(6) deposition of Nora Lee for
17   MVP and for SFT Peter Chang.  I ask you the same
18   question:  Did you supply data or information,
19   factual information, to either witness to allow them
20   to testify on topics as their respective 30(b)(6)
21   witnesses?
22   A    No.
23   Q    The relationship that you personally had with
24   Shinn Fu Taiwan was that reduced or -- well, was that
25   reduced to any type of written document?

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 58

1    A   No.

2    Q   The relationship you had with MVP, the legal

3  relationship that you've already testified to, was

4  that reduced to any type of written document?

5    A   No.

6    Q   Did SFA and SFT, during the years you were

7  general counsel, have any written agreement between

8  them concerning their relationship in any manner?

9    A   No, not that I'm aware of, but it is possible

10  that there's an agreement of which I'm not aware.

11    Q   Okay.

12     Obviously you can't testify --

13    A   Right.

14    Q   -- as to an agreement you're not aware of?

15    A   So to the best of my knowledge, no.

16    Q   Okay.

17     Did you in the course of preparing for today's

18  deposition make any inquiries into any agreements

19  that exist between SFA and SFT?  And I'll even limit

20  it with respect to jack stands.  So limited, can you

21  respond?

22    A   Yes, and there were none.

23    Q   Let me just go through this and if the answer

24  is no just tell me.

25     Did the SFA and SFT have any agreements in

Page 59

1  which SFA needed Shinn Fu's approval SFT's approval

2  for each type of model jack stand SFA sold under any

3  of its brand names?

4    A   Can you repeat the question?

5    Q   Sure.  It was kind of lengthy.

6     Did SFA and SFT have any agreement in which

7  SFA needed SFT's approval for each type model jack

8  stand which SFA sold under any of its brand names?

9    A   Written agreement or oral agreement or

10  either?

11    Q   Either.

12    A   I would have to answer yes.

13    Q   Okay.

14     And what type of agreement was there?

15    A   SFA if it were -- a lot of the brands were

16  owned by Shinn Fu Taiwan, so before SFA could put a

17  Shinn Fu Taiwan brand on a product, it needed to make

18  sure that SFT was okay with extending the brand.

19    Q   Let me ask you about the Pro-Lift brand.

20    A   That's not an SFT brand.

21    Q   Can you give me an examples of what were the

22  SFT brands that SFA sold, and this is with respect to

23  jack stands?

24    A   I believe Omega is an SFT brand.

25    Q   Did Omega market or sell, prior to 2011, a

Page 60

1  4-ton ratchet pawl design jack stand?

2    A   Omega brand carries under the brand familiar

3  ratchet style jack stands.

4    Q   Do they carry a 4-ton model?

5    A   To the best of my knowledge the only 4-ton

6  jack stand is a Sears jack stand.

7    Q   Okay.

8     Did Omega produce a 3-ton jack stand ratchet

9  pawl?

10    A   I believe that Omega has in its catalog a

11  3-ton ratchet style jack stand.

12    Q   6-ton ratchet style?

13    A   6-ton is another common level of capacity.

14    Q   That Omega sells?  I mean it was sold under

15  the Omega brand, correct?

16    A   Yes.

17    Q   Is Omega a DIT brand?

18    A   No.

19    Q   What is -- what is the intended market for

20  Omega jack stand products?

21    A   Car mechanics.

22    Q   Let me continue.

23    A   Sure.

24    Q   Did SFT and SFA have a agreement written or

25  otherwise or oral in which SFT would review the

Page 61

1  design of the jack stand sold by SFA under any of its

2  brand names?

3    A   I can't answer that question.  It's a question

4  that is not consistent with the way the business is

5  done.

6    Q   Okay.  Let me rephrase it then.

7     With respect to the Pro-Lift Model T6904 was

8  there any agreement in which SFT played any role in

9  the design of that model jack stand?

10    A   I do not believe SFT designed the 6904.  I

11  believe it was designed at Wei Fu.

12    Q   Okay.

13     Well, I'm not asking where they designed it.

14  Specifically by agreement, did they review the

15  design, have authority to approve it, modify it?

16    A   Well, your question was:  Did they tell SFA

17  what to do about this, isn't it?

18    Q   Yes.

19    A   No.

20    Q   By agreement, written or oral, did SFT

21  exercise any control over any aspect of the jack

22  stand business of SFA?

23    A   Control?  What do you mean by control?

24    Q   Decisions on marketing, advertising, budget,

25  customers, nature of the product being sold, the jack

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 62

1   stand product being sold.
2       A   You do understand that SFA orders its jack
3   stands from SFT, don't you?
4       Q   I was not clear on that based on prior
5   testimony.
6           Did that include the Pro-Lift model jack
7   stands?
8       A   It doesn't include all of them.  Some of them
9   would be ordered from MVP.
10      Q   Would the Pro-Lift be ordered -- was the
11  Pro-Lift model jack stands ordered by SFA from MVP?
12      A   I believe so.
13      Q   Now, SFA has a website, correct?
14      A   Correct.
15      Q   And it did have a website during the years you
16  were general counsel?
17      A   Uh-huh.
18      Q   Yes?
19      A   Yes, sir.
20      Q   Did you play any role in the design or content
21  of the website?
22      A   My role with regard to the website was to make
23  sure the copyright notice was correct, and that was
24  about it.
25      Q   By agreement, written or otherwise, did SFT

Page 63

1   have any input, control, or approval of the contents
2   of the SFA website?
3       A   To the best of my knowledge no.
4       Q   Are you aware of any agreements defining the
5   business relationship between SFT and MVP?
6       A   I am not.
7       Q   Did you work for SFA when you were general
8   counsel under a written employment contract?
9       A   No.
10      Q   Did any of the senior managers or officers of
11  SFA work pursuant to a written employment contract?
12      A   I do not know.
13      Q   Did you have any agreement in the form of a
14  legal retention or retainer letter or document with
15  respect to yourself and SFT or MVP?
16      A   No.
17      Q   All right.
18          At this point I want to mark some of the
19  agreements that have been previously marked between
20  Sears and MVP and between MVP and SFA --
21      A   Okay.
22      Q   -- and ask you certain questions on those
23  documents.
24      A   Great.
25          MR. EDINBURGH:  We're one short.  Now,

Page 64

1   now, not all of them.
2           MR. BROWN:  Do you need copies made,
3   Howard?
4           MR. EDINBURGH:  I'll see.
5           The next number is 6.  I'll identify it
6   Chaykin 6 will be SFA 6 marked on 5-24-16 as to sales
7   representative agreement between Shin Fu Company of
8   America and MVP (H.K.) Industries including the
9   amendments to that agreement.
10
11          (Plaintiff's Exhibit 6, sales
12          representative agreement between
13          Shin Fu Company of America and MVP
14          (H.K.) Industries including
15          agreement amendments, was marked
16          for identification.)
17
18          MR. EDINBURGH:  The next document will be
19  Chaykin 7, and these the Sears Universal Terms and
20  Conditions referred to at times as the UTC for MVP
21  and that is dated October 12, 2006.
22
23          (Plaintiff's Exhibit 7, Sears
24          Universal Terms and Conditions,
25          dated October 12, 2006, was marked

Page 65

1           for identification.)
2
3           MR. EDINBURGH:  The next document will be
4   Chaykin 8.  Chaykin 8 is the Sears Accelerated Line
5   Review Agreement with MVP I just want to get the date
6   for that, and that's December 11, 2006.
7
8           (Plaintiff's Exhibit 8, Sears
9           Accelerated Line Review Agreement
10          with MVP, dated December 11, 2006,
11          was marked for identification.)
12
13          MR. EDINBURGH:  And the next document is
14  Chaykin 9 is the Sears/MVP Universal Terms and
15  Conditions dated May 4th, 2007.
16
17          (Plaintiff's Exhibit 9, Sears/MVP
18          Universal Terms and Conditions,
19          dated May 4th, 2007, was marked for
20          identification.)
21
22          MR. EDINBURGH:  And I would just note
23  that all these agreements were previously marked at a
24  prior deposition, so they will be parallel marked
25  today.

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 66

1    And finally on these series of questions
2  I have the Sears UTC agreement with Shinn Fu Company
3  of America, dated August 2, 2012.
4
5              (Plaintiff's Exhibit 10, Sears UTC
6              agreement with Shinn Fu Company of
7              America, dated August 2, 2012, was
8              marked for identification.)
9
10             MR. EDINBURGH:  I have three instead of
11 four.  Are you --
12             MR. BROWN:  I can to do it without it.
13 I'm sure it's the same as all the other ones.
14             MR. EDINBURGH:   Yeah, it's just the date
15 is different.
16             MS. TROTTA:  You owe me, Howard.
17 BY MR. EDINBURGH:
18     Q   I'm reminded that I forgot to ask you one
19 question on the prior series, and then I'll go with
20 the contracts.
21         Was there any agreement in writing or orally
22 between SFT and Wei Fu with respect to the design of
23 the T6904 jack stand?
24     A   I do not know.
25     Q   Did you make any inquiry in preparation for

Page 67

1  today concerning that topic?
2      A   I did not because I'm not representing Wei Fu
3  at all, and it would not have occurred to me to ask
4  that.
5      Q   Okay.
6          Did you make any inquiry to anyone at SFT?
7      A   No.
8      Q   I not asking whether you inquired of Wei Fu --
9      A   Right.
10     Q   -- of SFT?
11     A   That's correct.
12     Q   All right.
13         Let me go with what's previously been marked
14 as SFA 6 and marked today, the sales representative
15 agreement with Shinn Fu Company of America and MVP
16 Industries and that's been produced to us as SFA
17 Bates numbered --
18     A   3336.
19     Q   -- 3336 through 3339, four-page document.
20 Have you seen this document before?
21     A   Yes.
22     Q   Did you prepare it?
23     A   I drafted it.
24     Q   Did you draft it on behalf of SFA?
25     A   Yes.

Page 68

1      Q   Did you draft it on behalf of MVP?
2      A   No.
3      Q   Did MVP have anyone, any legal  representative
4  or attorney review, the agreement on their behalf?
5      A   I do not know.
6      Q   Did you negotiate this agreement with anyone
7  on behalf of MVP?
8      A   I did not negotiate this agreement.
9      Q   Who did?
10     A   Steven Huang on behalf of Shinn Fu America.
11     Q   And on behalf of MVP?
12     A   My memory is that it was Tony Choi.
13     Q   And were you tasked with putting their
14 agreement in writing?
15     A   I was tasked, yes.
16     Q   Were you given any written documentation as to
17 what the agreement should contain?
18     A   No.
19     Q   Were you verbally told what the agreement
20 should contain?
21     A   Yes.
22     Q   Was this agreement drafted in contemplation of
23 MVP entering into an agreement to sell products to
24 Sears under the Sears Craftsman brand?
25     A   That was just one purpose of it.

Page 69

1      Q   Was it the primary purpose?
2      A   I can't say for sure.
3      Q   I just want to go through some of the entries
4  if I could with you.
5          Stick on page 3336, the first page.
6      A   Uh-huh.
7      Q   And according to the agreement SFA was MVP's,
8  quote, unquote, representative, correct?
9      A   At this time, correct.
10     Q   Correct.
11         And the market area is defined as the United
12 States?
13     A   Yes, and Central America.
14     Q   And Central America.  Okay.
15         Did the goods that were included -- or the
16 goods or products that are included in this agreement
17 include jack stands?
18     A   Yes.
19     Q   It says responsibility of sales agents, you
20 have paragraph 1 and you have subparagraphs A, B, and
21 C, correct?
22     A   Correct.
23     Q   As worded, did A, B, or C contemplate SFA
24 being involving with Sears as a customer?
25     A   The agreement did not call out specific

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

1    customers that would be visited or for which SFA
2    would act, but certainly Sears was a customer in
3    the DIY area and they're not excluded, whether an
4    actual business operations they were visits to Sears
5    or not, I do not have that knowledge.  I believe
6    there was.
7        Q   Simultaneously to this agreement being drafted
8    and signed was there also at the time an
9    understanding at that time that Sears was negotiating
10   either with SFA or MVP or with both for MVP to supply
11   Sears with Sears Craftsman jack stands?
12       A   I don't really understand the question,
13   Mr. Edinburgh.  There were many questions within your
14   question.  It was kind of compound.  Can you try
15   again?
16       Q   Sure.  Fair enough.
17           When this agreement was being prepared --
18       A   Yes.
19       Q   -- at that time was Sears also negotiating
20   with SFA and/or MVP an agreement with respect to
21   MVP furnishing Sears with Sears Craftsman jack
22   stands?
23       A   I would say it would be the and/or part with
24   MVP.  Sears was negotiating with MVP for jack stand
25   supply as well as other products from MVP.

1        Q   Were you part of that negotiation?
2        A   No.
3        Q   You were not representing MVP?
4        A   I didn't say I was representing MVP.  They
5    didn't need representation talking to Sears.  They
6    were working a business arrangement with Sears.  I
7    didn't jump in every time MVP talked to a customer.
8        Q   Well, SFA is not any old customer -- I mean
9    Sears is not any old customer.  It's a major company
10   in the United States.  I just want to know if you
11   were involved --
12       A   No.
13       Q   -- that's all.
14           Let's go to the next page, 3337, paragraph 5.
15   Paragraph 5 also includes within it under the term
16   "products" jack stands?
17       A   Yes.
18       Q   All right.
19           Let's go to responsibilities of principal.
20   Paragraph 7, 8, and 9?
21       A   Uh-huh.  Yes.
22       Q   Did SFA recommend pricing to MVP for jack
23   stands?
24       A   SFA provided information regarding prevailing
25   pricing conditions.  I don't know if they recommended

1    particular prices to MVP.
2        Q   And that's with respect to jack stands,
3    correct?
4        A   It would include jack stands.
5        Q   Paragraph 9 indicates that SFA will provide
6    MVP with information regarding new product ideas and
7    market trends and may recommend ideas for new
8    products to MVP.
9            Was the 4-ton Sears Craftsman jack stand one
10   of those products that SFA recommended or provided
11   information to MVP?
12       A   I do not know, but I don't think so.  The
13   4-ton jack stand was a Sears-associated product, and
14   Sears would know what tonnage capacity they wanted on
15   their jack stand.
16       Q   Under paragraph 10 has commissions?
17       A   Uh-huh.
18       Q   "MVP will pay to representative commission of
19   1.5 percent on gross MVP commission sales."  Do you
20   see that?
21       A   Yes, I do.
22       Q   Did MVP pay such commission to SFA for the
23   T6904 jack stands?
24       A   If T6904 jack stands were sold during the
25   pendency of this contract then I would expect that

1    that did occur.
2        Q   Did MVP pay to SFA pursuant to paragraph 10 of
3    this agreement a 1.5 commission on the sale of Sears
4    Craftsman T6103 jack stands?
5        A   I do not check the bookings and the books of
6    SFA so I do not have direct knowledge of it, but I
7    have no knowledge that it didn't happen.
8        Q   I shouldn't say T.  There's no T.  It's just
9    61 -- I'm sorry.  You know what, I gave the wrong
10   number entirely.  I screwed up the number.  The
11   number I'm referring to is the 50163.  I misspoke the
12   number.
13           Same answer though?
14       A   Yes.
15       Q   What was contemplated in paragraph 20 of the
16   agreement?  Is it just what it says in there that SFA
17   would notify MVP of any claims or lawsuits?
18       A   Yes.
19       Q   All right.
20           Did in fact during this time period SFA notify
21   MVP of any claims, lawsuits, or legal action
22   involving jack stands?
23       A   I can't remember whether in 2006 there was
24   notification to MVP of any lawsuits.  I'm sorry.
25       Q   Does the agreement contain an arbitration

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 74

1  clause?
2      A   There's no arbitration clause in this
3  agreement.
4      Q   Did this agreement contain any provision in
5  which MVP would consent to the jurisdiction of any
6  court in the United States for resolution of any
7  disputes with SFA?
8      A   There's no such term in this agreement.
9      Q   Dispute resolution is covered by paragraph 24,
10  correct?
11      A   Correct.
12      Q   And that says that any dispute arising out of
13  this agreement will be discussed and resolved by the
14  parties?
15      A   That's what it says.
16      Q   And in your view was this an arm's length
17  agreement?
18      A   Yes.
19      Q   Did any dispute arise out of or relate to this
20  agreement?
21      A   No, no dispute arose.
22      Q   You have -- during the period of time this
23  agreement was in effect how much commission moneys
24  were paid by MVP to SFA concerning jack stand
25  commissions?

Page 75

1      A   I don't know.
2      Q   Is that information in existence?
3      A   I would expect it is.
4      Q   Let me go to the second amended -- second
5  amendment to that agreement which is SFA 3340 and
6  3341.
7          Did you prepare this amendment?
8      A   I did.
9      Q   Did you negotiate this amendment?
10      A   No.
11      Q   Were you involved at all in discussions with
12  either -- withdrawn.
13          Were you advised by SFA and MVP what the
14  amendment should contain?
15      A   Yes.
16      Q   And then tasked with reducing it to a
17  writing?
18      A   Yes.
19      Q   Did this agreement generally concern MVP
20  products that were sold under the Craftsman label by
21  Sears?
22      A   Again, that was just one purpose of this
23  agreement.  There are many other customers besides
24  Sears that bought direct from MVP.
25      Q   At the time this agreement was in effect was

Page 76

1  Sears a large client of MVP?
2              MR. BROWN:  Object to form.
3      A   Sears is a large buyer.  There are other large
4  buyers that MVP had also.
5  BY MR. EDINBURGH:
6      Q   You included in your draft in Section 1C that
7  SFA would provide to MVP OIPM support.  Tell us what
8  the initials OIPM stand for.
9      A   Owner information product materials.
10      Q   Just does -- I know you said and I don't want
11  to quibble, but does the M -- there's other testimony
12  that the M stood for manual?
13      A   I always use materials for my M.  Materials
14  includes is broader manuals because --
15      Q   Fair enough.
16      A   Yeah.
17      Q   But it does include manuals?
18      A   Yeah.
19      Q   Did OIPM -- did SFA draft the manuals that
20  accompanied MVP-sold jack stands?
21      A   No.
22      Q   What kind of support did OIPM --
23      A   Oh, did MVP?
24      Q   Let me rephrase.  I'm don't want to confuse
25  the record.  I misspoke.  You gave an answer.  I'll

Page 77

1  ask another question.
2          What type of support with respect to OIPMs did
3  SFA provide to MVP pursuant to this agreement?
4      A   Sometimes customers, especially large
5  customers, have special requirements or requests with
6  regard to OIPM, not just the manual but also
7  including the packaging and other materials.  They
8  need a go between that they can call during U.S.
9  hours to transfer that information and knowledgeable
10  people who could understand what they're getting at.
11          Shinn Fu America would provide that role for
12  MVP and that was just not with regard to Sears but
13  with regard to other large direct purchase customers.
14      Q   Okay.
15          And what -- in letter A what lab testing
16  services did SFA provide to MVP during the period of
17  this agreement with respect to jack stands?
18      A   Upon request of MVP if a customer had a
19  concern about a particular product the customer might
20  ship the product to SFA and upon MVP's request and
21  direction SFA would carry out the tests that it was
22  capable of doing at the SFA headquarters in Kansas
23  City.
24      Q   Did that include what was previously discussed
25  in other depositions in this case the ASME PALD --

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 78

1     A   It could.
2     Q   -- testing jack stands?
3     A   It could.
4     Q   Did it?
5     A   I don't know whether in this time period any
6   jack stands were sent to SFA and whether MVP made any
7   request for testing of particular jack stands.
8     Q   All right.
9         And the second amendment under paragraph 9
10  became effective June 1, 2008, correct?
11    A   Correct.
12    Q   Let's go to what's been called the first
13  amendment to the agreement even though it comes after
14  the second amendment to the agreement?
15    A   Yes.
16    Q   Okay.
17        Is that a Scribner's error or was that
18  deliberate?
19    A   Yes, it was a brain spasm on the Scribner's
20  part.  I think it might be beneficial to refer to
21  them as the 2009 agreement, 2008, and 2006, whatever
22  year it was signed because the titling was not
23  artfully done.
24    Q   All right.
25        The first first amendment -- the first first

Page 79

1   amendment is found in SFA 3346 and 3347.
2     A   Uh-huh.
3     Q   And, again, was this agreement drafted by
4   you?
5     A   Yes.
6     Q   And this agreement became effective December
7   1, 2009, correct?
8     A   Correct.  November 11th.
9     Q   I'm sorry.
10        It says -- paragraph 9 says December 1, 2009?
11    A   Correct.
12    Q   All right.
13        Now, the first amendment -- the first
14  amendment lists the services that SFA was going to
15  provide for MVP -- A, B, C, and D -- were those the
16  same services as the second amendment?
17    A   Yes.
18    Q   And if I asked you the same question about
19  these, you'd give me the same answers?
20    A   I would.
21    Q   All right.
22        Let go to what's been called the first
23  amendment -- and if you'll excuse the printing, but
24  that's what I received so I can't make it any better
25  than what's there.

Page 80

1     A   Okay.
2     Q   Now, this amendment, the effective date it
3   looks like January 1, 2011; is that correct?
4     A   I believe that's correct.
5     Q   All right.
6         So the first first amendment, not the second
7   first amendment, had a life span essentially of one
8   year, 2010, correct?
9     A   Yes.
10    Q   And, again, was this document, 3344-3345,
11  drafted by you?
12    A   Yes.
13    Q   And were the same services reflected in this
14  document that SFA provide MVP, 1-A through 1-D, the
15  same as the prior amendments?
16    A   Yes.
17    Q   All right.
18        Did all these same services include the MVP
19  Sears Craftsman Model 50163?
20    A   That would have been one of the products.
21    Q   And it included providing -- included in D was
22  customer phone service support, correct?
23    A   Correct.
24    Q   Now, I want to save some time if I can.
25  Are you aware that the Sears Craftsman manual for the

Page 81

1   50163 has an 800 phone number to call if there's --
2     A   I wouldn't --
3     Q   -- if a customer needs information or
4   complaints or anything about 50163?
5     A   I would expect it does.
6     Q   And are you aware that if you call that
7   number you get the Kansas City number of Shinn Fu
8   Company?
9     A   Yes.
10    Q   All right.  Let's move on.  Just bear with me
11  for one more.
12        The next document you have the number there is
13  the Sears MVP Universal Terms and Conditions dated
14  October 12, 2006?
15    A   Yes.
16    Q   And that begins with MVP Bates Number 10203.
17  Is that the one you're looking at?
18    A   Yes.
19    Q   Okay.
20        Did you have any role in negotiating this
21  document on behalf of MVP?
22    A   I do not think I did.
23    Q   Did anyone at SFA have any role in the
24  negotiation of the terms of this document between MVP
25  and Sears?

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 82

```
1     A   Not to my knowledge.
2     Q   Do you know who Tony Choi is, C-H-O-I?
3     A   I do.
4     Q   It says here he was the vice president of MVP
5   in October 2006, correct?
6     A   Correct.
7     Q   Do you know whether he came to the United
8   States to negotiate and eventually sign this
9   agreement on behalf of MVP?
10    A   I remember seeing Tony during that time
11  period.  I do not know whether he was conducting that
12  business on one of his business trips.
13    Q   So he didn't go to Kansas City or call you and
14  ask you about this agreement or any of its terms or
15  conditions?
16    A   He did not.
17    Q   All right.
18        Let's go to the next one which is the Sears
19  Accelerated Line Review Agreement, dated December 11,
20  2006, and it has Chaykin -- can you just tell me the
21  number please on the top page?
22    A   It's 10229.
23    Q   Correct.  And the Exhibit Number is 8?
24        MS. TROTTA:  Yes.
25  BY MR. EDINBURGH:
```

Page 83

```
1     Q   That's Exhibit 8?
2     A   Yes, Exhibit 8.
3     Q   And have you seen this document before today?
4     A   I don't believe I have seen this agreement
5   between MVP and Sears.
6     Q   Okay.
7         I'll just say it has been marked and it was
8   discussed at some of the earlier depositions which I
9   believe you were present at, but that being said, may
10  I ask you whether you played any role on behalf of
11  SFA or MVP in the drafting or the negotiating of this
12  Accelerated Line Review Agreement?
13    A   No.
14    Q   Let me just go to Exhibit A of this agreement
15  where it says "Subject merchandise" on page 10243.
16  It's the last page.  Do you see that?
17    A   Yes, sir.
18    Q   With respect to this exhibit, were you
19  involved at all in the listing of products in Exhibit
20  A, the jacks and jack stands listed?
21    A   No.
22    Q   Were you involved at all in discussion of the
23  last item number where it says new, N-E-W, and it
24  says (As Read) See Craftsman professional 4 ton, or
25  4 T for ton, jack stand?
```

Page 84

```
1     A   I was not.
2     Q   Was anyone at SFA?
3     A   I do not know.
4     Q   Okay.  Done with that.
5         I believe the next document is another version
6   of the MVP Sears Universal Terms and Conditions only
7   this one is dated May 4th, 2007?
8     A   Uh-huh.
9     Q   Do you see to document begins at MVP 0001?
10    A   Yes.
11    Q   Do you have any understanding as to why MVP
12  entered into a second UTC agreement with Sears?
13    A   I do have such an understanding.
14    Q   I'm sorry?
15    A   Yes, I do.
16    Q   And what is your understanding?
17    A   My understanding is that Sears requires yearly
18  contracts, you have to sign up every year if you want
19  to keep selling to them.
20    Q   You essentially have to renew your prior
21  agreement with any changes that have to be made?
22    A   Yes.
23    Q   Okay.
24        Were you at all involved in the renewal of the
25  UTC agreement between MVP and Sears as reflected in
```

Page 85

```
1   this exhibit?
2     A   I do not believe that I was involved in the
3   review of the Sears agreement, its negotiation, or
4   its renewal with MVP.
5     Q   Okay.  Let's go to the final agreement in this
6   batch of agreements and that is the Shinn Fu of
7   America and Sears agreement for Universal Terms and
8   Conditions dated August 2, 2012, and that begins with
9   SFA Bates Number 3236.
10        Who signed this agreement on behalf of Sears
11  -- I'm sorry -- on behalf of SFA?
12    A   It Steven Huang's signature.
13    Q   Did you have any role to play with respect to
14  the negotiation or drafting of this agreement?
15    A   No.
16    Q   Did you review this agreement before or on
17  behalf of SFA before Steven Huang signed it?
18    A   I do not know if I reviewed this particular
19  version of the Sears SFA agreement, but as a general
20  matter, I will review the Sears agreement with each
21  annual review if there are any changes from the
22  previous year.
23    Q   Was MVP also operating under a similar
24  agreement in 2012 with Sears?
25    A   I do not know whether MVP had an agreement
```

1  with Sears in 2012.

2      Q   How about in 2011?

3      A   I don't know that either.

4      Q   Did SFA, prior for this agreement that you're

5  just looking at, in the past have any agreement with

6  Sears of a similar nature including UTC terms?

7      A   When SFA sold product directly to Sears it

8  would necessarily sign a UTC.

9      Q   What was the last year of the UTC agreement

10  with Sears with SFA prior to the 2012 agreement?

11      A   I believe it was either 2004 or 2005, but I

12  don't have a definite recollection of that.

13      Q   Okay.

14         Was there a business reason why after all

15  those intervening years SFA entered into this

16  agreement with Sears in 2012?

17      A   Yes.  The general reason that a customer like

18  Sears buys direct from MVP is that the efficiencies

19  -- strike that.  Let me start over.

20         The reason a customer like Sears would buy

21  from a company like SFA is because it either needs

22  warehousing that SFA can provide in the domestic --

23  in the U.S. or it needs a supply that's going to be

24  more available to it on a quicker basis than it could

25  obtain by ordering it overseas.

1         Sears has gone through its changes over the

2  years, so its needs have changed, the scope of its

3  business has changed.  So at various times Sears

4  would make different business decisions determining

5  whether it should go direct to the provider overseas

6  or whether it should go through a company like Shinn

7  Fu America.

8         In addition, another factor for Sears might be

9  transport costs and also the cost of product in

10  general and also the extent to which Sears had staff

11  overseas to conduct the business in the manner that

12  it wanted to do it.

13         So all of those factors are Sears factors.

14  I'm just giving you general purposes or general

15  discussion of why companies like Sears might purchase

16  certain products from a domestic company like SFA

17  versus a foreign company like MVP Hong Kong.  What

18  Sears' exact considerations were I do not know.

19      Q   Was the 50163, to your understanding, now

20  going to be part of this UTC agreement between Sears

21  and SFA?

22      A   I don't know.

23      Q   Did Sears and SFA to your knowledge enter into

24  any Line Review Agreements similar to the one entered

25  into with MVP in which the product listed was made as

1  an exhibit?

2      A   I do not know.

3      Q   Does SFA have any documentation as to the

4  subject merchandise which were subject to the CAPTC

5  agreement with SFA?

6         MR. EDINBURGH:  What time is it?

7         MR. BROWN:  12:40.

8         MR. EDINBURGH:  Off the record.

9

10         (Off the record from approximately

11         12:40 to 1:28 p.m.)

12

13  BY MR. EDINBURGH:

14      Q   Mr. Chaykin, I just -- since I did have time

15  to think about this, which is always not good if

16  you're an attorney, and I guess I want to ask you a

17  couple more questions about these agreements.

18      A   Okay.

19      Q   If you could look at the sales rep

20  agreement.

21      A   Uh-huh.

22         MR. BROWN:  What number is that?  6?

23         MR. EDINBURGH:  Yes.

24  BY MR. EDINBURGH:

25      Q   In paragraph 19 on page 3 there's an

1  indemnification provision --

2      A   Uh-huh.

3      Q   -- in which MVP indicates it would indemnify

4  SFA concerning any MVP-commissioned product.

5         Did the term "commissioned product" include

6  jack stands?

7      A   Yes.

8      Q   And then it says on 19-C that the

9  indemnification included personal injury claims

10  including product liability claims, failure to warn,

11  inadequate instructions, right?

12      A   Uh-huh.  Correct.

13      Q   Okay.

14         Was this indemnification claim, and if you

15  could tell us without going through the rest of them,

16  was this pretty much carried over to the first and

17  second amendments?

18      A   By virtue of the clauses following amendments,

19  yes.

20      Q   This provision in which MVP agreed to

21  indemnify SFA did that particular provision have to

22  be approved SFT?

23      A   No.

24      Q   In the Universal Terms and Conditions that MVP

25  signed in 2006 and 2007 MVP agreed in paragraph 11 --

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 90

1  or Section 11 --
2      A   Which exhibit are you referring to?
3      Q   I'm not sure.  It says MVP 1 over here.  I
4  don't know what number I've got.  I think they're
5  both identical?
6          MR. BROWN:  That would be Exhibit 9 I
7  think.
8      A   Okay.  I got it.  So which paragraph?
9  BY MR. EDINBURGH:
10     Q   11 that's page -- it's MVP 5.  It also says 5
11 of 10.
12     A   Yeah, got it.
13     Q   And 6 of 10.
14     A   Uh-huh.
15     Q   11.1 and 11.2?
16     A   Uh-huh.
17     Q   MVP similarly agreed to indemnify Sears for
18 product liability claims involving MVP products; is
19 that correct?
20     A   Well, by "similarly" -- I mean I don't --
21     Q   I'll take out the word "similarly."  I'll
22 modify it.
23     A   If you would say generally --
24     Q   Generally.
25     A   -- I would probably agree with that.  With the

Page 91

1  proviso that as an attorney I can't just waive past
2  something and say they're the same.  Obviously these
3  are very different provisions.
4      Q   I'm withdrawing the word "similar."
5      A   Okay.
6      Q   I was mistaken to use that word.
7      A   Yeah.
8      Q   Did SFT -- withdrawn.
9          Did MVP need SFT's permission and consent for
10 it to agree to indemnify Sears?
11     A   I do not think so, but I wasn't involved in
12 the negotiation between MVP and Sears as I indicated
13 previously.
14     Q   Okay.
15         One clarification, when we began an hour or
16 two ago you made a statement I believe about the
17 ownership of MVP?
18     A   No, I did not make a statement about the
19 ownership of MVP.  I made statements only about the
20 ownership of SFA.
21     Q   Okay.
22         Do you have an awareness of the ownership of
23 MVP?
24     A   I do.
25     Q   What is that?

Page 92

1      A   I believe MVP is owned by the Hung family.
2      Q   Okay.  All right.
3          I'm going to go to the exhibit that we've
4  previously marked, the insurance, the one with
5  Lexington Insurance.  We haven't marked those.  I'm
6  going to give it to you now.  I mean in other
7  depositions.
8      A   Okay.
9      Q   You know what, let me get my copy.
10
11             (Plaintiff's Exhibit 11, Excerpt
12             from a Lexington Insurance Policy,
13             was marked for identification.)
14
15 BY MR. EDINBURGH:
16     Q   Have you sign this exhibit before?
17     A   I have.
18         MS. TODD:   That's Exhibit 11?
19         MR. EDINBURGH:  Yeah.
20 BY MR. EDINBURGH:
21     Q   That's the Lexington insurance policy with a
22 named insured is Shinn Fu Corporation/MVP (H.K.)
23 Industries, and the address of the insured is given
24 as Kansas City, Missouri, correct?
25     A   Uh-huh.  Yes.

Page 93

1      Q   Did you play any role in the placement of this
2  policy?
3          MR. BROWN:  Just for the sake of the
4  record not to sound like an insurance company lawyer,
5  but I note it's not an insurance policy.  It's pages
6  from an insurance policy.
7          MR. EDINBURGH:  Correct.  I'm sorry.  My
8  mistake.
9          MR. BROWN:  It's okay.
10 BY MR. EDINBURGH:
11     Q   It's the declaration -- it's not even the
12 declaration -- yeah, it is the declaration page and
13 some other provisions.  It's relevant excerpts.  It's
14 not the entire policy.  It's not a certified policy.
15 It's pages from what I was provided by defendants
16 that I thought were relevant to this thing, to our
17 case.
18         Having said that, were you involved in the
19 placement of this policy?
20     A   I was involved to the extent that if there
21 were specific questions by the parties negotiating
22 the agreement, by the personnel who were charged with
23 negotiating the coverage, they would present the
24 question to me.  I do not recall if there were any
25 questions with regard to these pages?

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 94

1    Q   Shinn Fu Corporation and MVP are the named
2    insureds, correct?
3    A   Those are the parties named here.
4    Q   Okay.
5        And Shinn Fu America is additionally named
6    insured, correct?
7    A   Correct.
8    Q   On the following page?
9    A   Uh-huh.
10   Q   As is Wei Fu?
11   A   Correct.
12   Q   Were you involved in identifying the
13   additional named insureds?
14   A   I was not involved in that.
15   Q   Do you know why the named insureds under this
16   policy are Shinn Fu and MVP but not SFA?
17   A   Well, SFA is named as an additional named
18   insured.  It's the second one.
19   Q   I'm not talking about an additional named
20   insured.  I'm talking about the named insured.
21   A   Oh, I don't know.  My -- and I won't
22   speculate.
23   Q   All right.  I didn't ask you to.
24   A   I think it has to do with Lexington's form
25   approach in naming this -- this declaration, but I

Page 95

1    don't know.
2    Q   And why would the address of Shinn Fu
3    Corporation and MVP Industries be given as SFA's
4    headquarters?
5    A   Again, I would be speculating, but I think
6    you're reading it too literally.
7        MR. EDINBURGH:  Go off the record.
8
9        (Off the record.)
10
11       MR. BROWN:   Let's go on the record
12   because I'll object that he did not read the address
13   correctly because the address is care/of.
14       THE WITNESS:   Right.
15       MR. BROWN:  Which specifically most
16   generally put there for an insurance company's own
17   purpose.
18       MR. EDINBURGH:   Okay.
19   BY MR. EDINBURGH:
20   Q   I'll say that the address is care/of 10939
21   North Pomona, Kansas City, Missouri.  Is that the
22   headquarters address of Shinn Fu America?
23   A   That's the U.S. headquarters of Shinn Fu
24   America, yes.
25   Q   Okay.

Page 96

1        Now, let's jump, if we can, to the last page
2    of this document which is identified under several
3    Bates numbers SFT 034, Section Roman Numeral VII.  Do
4    you see that?
5    A   Uh-huh.
6    Q   Now, you are identified as the TPA or third
7    party administrator for the insured, correct?
8    A   Correct.
9    Q   And what were your duties and responsibilities
10   as the TPA for SFA, MVP, SFT, and Wei Fu?
11   A   The duties were to first of all inform the
12   insurance company of companies of claims that were
13   incoming to SFA, to respond to claims or inquiries
14   from the insurance company with regard to claims.
15       Once a claim was presented to the insurance
16   company, to respond to the adjuster as required or
17   requested by the adjuster, and to generally work as a
18   liaison for the flow of information between the
19   insured and the insurance company.
20   Q   Was -- well, when we talked earlier about how
21   you were compensated --
22   A   Uh-huh.
23   Q   -- did you make time entries to SFA as to the
24   time you spent as the TPA of these policies?
25   A   No.  They were subsumed under the time entries

Page 97

1    I would make for general product liability work and
2    the activity that was involved there.  I did not
3    designate them as TPA activities.
4    Q   So your TPA payments -- withdrawn.
5        The time you spent as the TPA that
6    reimbursement to you for your time that wasn't
7    allocated between the various named insureds; that
8    was paid entirely by SFA?
9    A   No.
10   Q   It was allocated?
11   A   Yes.
12   Q   Okay.
13       And how was it allocated?
14   A   It was allocated based on who had
15   responsibility for that particular lawsuit.
16   Q   Oh, okay.
17       Now, did you also have to provide periodic
18   reporting to Lexington of claims under this agreement
19   -- under this provision of the policy?
20   A   We had a claims department and we always had
21   people who would provide whatever claims information
22   the insurance company required or requested.  If
23   there was a question regarding what was being sent
24   over, I would take a look at it, but it was mostly
25   business as usual.

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 98

1    Q   Was there a written service agreement between
2  you and the insureds under Roman Numeral VII A?
3    A   Nope.
4    Q   Okay.
5        MR. EDINBURGH:  Excuse me one second.
6        MR. BROWN:  No problem.
7
8              (Pause.)
9
10  BY MR. EDINBURGH:
11   Q   There's a stamp on this that's on the bottom
12  of the declaration sheet, SFT 005, which says, "This
13  is evidence of insurance procured and developed under
14  the Missouri surplus lines laws."  Is that your
15  understanding what occurred with respect to this
16  policy?
17   A   This is the first time I've focused on that --
18  these sentences, so I can't say it was part of my
19  understanding.
20   Q   Okay.
21       So just to follow up, do you have any
22  understanding that this insurance policy was procured
23  and developed anywhere other than Missouri?
24   A   I have no understanding of that.
25   Q   Okay.

Page 99

1        At any point in time while you were Shinn Fu
2  America's general counsel were you the boss of Roger
3  Claypool?
4    A   With regard to certain matters, yes.
5    Q   Tell me which matters please.
6    A   With regard to claim investigation.
7    Q   And for what period of time?
8    A   I would say from the time I arrived there
9  which was around 2004 and then once Roger was
10  assigned to claims because of course Roger has held a
11  lot of different positions in the company.  I do
12  think by around 2005 or six he was working on
13  claims.
14   Q   And he worked on claims until he was no longer
15  employed by the company?
16   A   I believe that that's true.
17   Q   It's your understanding that he left the
18  company at the very end of 2008, very beginning of
19  2009?
20   A   Yes, I believe it was the first week of 2009.
21  I believe it was January 8th, which is also my
22  niece's birthday.
23   Q   Oh.  Okay.
24       For the years that -- okay.
25       Roger has testified what work he did.  I'm not

Page 100

1  going to go into that with you, but with respect to
2  the work he did as claim investigation that was the
3  work he did under your supervision?
4    A   Certain matters were under my supervision,
5  certain matters he operated autonomously.  He's a
6  very experienced employee.
7    Q   Well, with respect to when you say certain
8  matters under your supervision did it have to do with
9  the investigation of claims?
10   A   Certain claims, yes.
11   Q   What type of claims?
12   A   Claims --
13   Q   Under which you exercised supervision?
14   A   If the claim was over $10,000 or if it
15  involved a lawyer in any way, shape, or form or
16  certainly if it was in litigation which would mean
17  that it involved a lawyer then the claim would be
18  under my supervision.
19   Q   Did you give Roger any annual or other
20  periodic work or performance reviews or evaluations?
21   A   I did provide -- all of the performance
22  evaluations were done by Steven Huang for Shinn Fu
23  Company of America.  I did provide verbal input to
24  Steven at certain times during the period that
25  Roger was performing some of his work under my

Page 101

1  supervision.
2    Q   Can you tell us in general what reviews or
3  evaluations did you make concerning Mr. Claypool?
4    A   Well, there were -- we're talking about a span
5  of years, but to respond very generally, my feedback
6  would have been to Steven that Roger was very
7  experienced and had been a lot of technical insights
8  into investigations, but that he was -- he was
9  limiting his function to some extent over time and
10  not doing as much as he could be and that he was
11  unhappy.
12   Q   He expressed that to you, his unhappiness?
13   A   Roger expressed to everybody that he wasn't
14  happy at Shinn Fu America as time went on.
15   Q   Was this a gradual expression?  Was it sudden?
16  Was it over a period of -- you used the term "over a
17  period of time," correct?
18   A   Yes, it was over a period of time.  I would
19  say it was somewhat gradual.
20   Q   Did Roger express to you why he was unhappy?
21   A   At times.
22   Q   What did he say?
23   A   Roger felt that the type work that Shinn Fu
24  America was doing wasn't the kind of work that used
25  to be done and he was not as excited about it.

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 102

1    Q   Okay.
2        Was Roger representing Shinn Fu America on the
3    was ASME PALD, P-A-L-D, Committee?
4    A   Yes.  Roger was Shin Fu's representative to
5    the ASME PALD Committee, but I think he was removed
6    from there before he left.
7    Q   Removed by you?
8    A   No.
9    Q   Removed by who?
10   A   Steven Huang.
11   Q   Do you know when more precisely or more
12   specifically when he was removed?
13   A   It could be that he became an alternate or --
14   but I think I have it right.  I think he was removed,
15   and I think it was somewhere around 2008, and he was
16   replaced -- I'm sorry.  That answers your question.
17   Q   Okay.
18       Did you have any -- when Roger attended these
19   meetings, did he report back to you concerning, you
20   know, the discussions at the meetings, what was going
21   on in the committee?
22   A   He would discuss what went on with me and
23   others who were interested in what the PALD committee
24   was working on.
25   Q   Okay.

Page 103

1        Now, we had previously marked at
2    Mr. Claypool's deposition his general release and
3    separation agreement.  I could show it to you, and I
4    will if I need to, but generally speaking, did you
5    draft that agreement?
6    A   I did at Steven Huang's instructions.
7    Q   Okay.  Okay.  All right.
8        I want to go into -- pursuant to the Lexington
9    policy that we discussed were loss runs prepared by
10   you or by SFA?
11   A   There's been a lot of confusion around this
12   "loss run" term.  If you mean was there a list of
13   claims that were ongoing or claims that were settled,
14   yes, there were loss runs prepared.
15   Q   Is that your understanding of what a loss run
16   is?
17   A   Generally speaking, yes.
18   Q   Okay.
19       And were those loss runs to the extent if at
20   all that they included jack stand incidents as have
21   been produced in this action as far as you're aware
22   of?
23   A   To the best of my knowledge, yes.
24   Q   Were those loss runs prepared by SFA?
25   A   I think they might be prepared by the

Page 104

1    insurance company or our broker who keeps a list of
2    these.
3    Q   Did SFA keep lists of claims regardless of
4    whether it's called a loss run or something else?
5    A   We did keep lists of pending claims.  In order
6    to develop a list of historical or closed claims, we
7    probably would have had to run back through previous
8    years.
9    Q   Were those lists provided by SFA to MVP?
10   A   Yes.
11   Q   Were those lists provided to SFT?
12   A   Yes.
13   Q   Who at SFA provided those lists?
14   A   Steven Huang would have sent them out.
15   Q   And that includes the years prior to 2012
16   specifically; that's what I'm concerned with?
17   A   Yes.
18   Q   Okay.
19       And I want to discuss with you certain
20   specific claims that are here and let me just get the
21   exhibits for those.
22       MR. EDINBURGH:  Let's take a one-minute
23   break so I can collect them.
24       MR. BROWN:  Sure.  Sure.
25

Page 105

1            (Off the record from approximately
2                1:53 p.m. to 1:58 p.m.)
3
4    BY MR. EDINBURGH:
5    Q   Just a little further on one of your earlier
6    answers, can you tell me in more detail when you said
7    that Roger was concerned that SFA wasn't doing what
8    it used to be doing what specifically are examples of
9    what Roger was talking about?
10   A   In the early 2000s when I arrived there in
11   2004 Shinn Fu Taiwan and the MVP were still
12   relatively unfamiliar -- they were gaining
13   familiarity with the American market, but they were
14   still relatively unfamiliar.
15       As the years progressed with some gradual
16   process SFT and MVP both began to get the hang of it
17   to a much greater extent, and by the "hang of it," I
18   mean they had a better understanding of the American
19   market.
20       As a result the insights or the kind of
21   assistance that Roger had provided in his early years
22   at SFA was not in the same demand, and I think this
23   was difficult for Roger.
24   Q   Did this in any way influence his role as an
25   investigator of incidents or claims involving SFA

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 106

1   products?
2       A   While Roger was working with me as an
3   investigator I did not see any change in his approach
4   to investigation or any change in his enthusiasm for
5   investigation.
6       Q   Let me go into one of the topics for today,
7   the area of other complaints or incidents.
8           Now other than this case, the Klorczyk case --
9       A   Uh-huh.
10      Q   -- was SFT, SFA, and MVP, prior to March of
11  2011, ever a defendant in a United States lawsuit in
12  either state or federal court in any case involving
13  jack stands where there was an allegation of jack
14  stand defect, defective or negligent design, or
15  failure to warn?
16      A   Yes.
17      Q   Okay.
18          Can you identify the case or cases?
19      A   I can identify the Finley case which was a
20  case in California -- I mean in Florida.
21      Q   In Florida.
22      A   It involved a very large Freightliner truck
23  and an injury cause to the defendant.  I can't
24  remember whether it was -- there was another
25  defendant who was the retailer.  It was not Sears.

Page 107

1   That's one.
2           I remember a case in Pocatello, Iowa or
3   somewhere in Iowa, and I believe the Raymond case
4   which was a litigation filed in state court, and that
5   was unfortunately a death case.
6       Q   Any others?
7       A   No.
8       Q   Let me -- I think the Finley documents were
9   given to us while back, and I'm not going to ask
10  you question about Finley.
11      A   Okay.
12      Q   But I do have questions about Raymond.
13      A   Good.
14          MR. EDINBURGH:   I have a series
15  documents that are Raymond related which have -- some
16  of which have been previously marked, but let's
17  collectively mark them today as 12.
18      A   Mr. Edinburgh, now that I said the word
19  "Raymond," I remember an answer to one of your
20  previous questions that I gave was incorrect because
21  Polsinelli were -- was the defense lawyer in the
22  Raymond case.  The lawyer was Patricia Sexton, and in
23  my mind I had a relationship with Patricia.  I've
24  known her for a long time, and I didn't connect her
25  with Polsinelli.  I just thought of her as --

Page 108

1       Q   What's her name?
2       A   Patricia Sexton represented us, but at the
3   time she was a lawyer at Polsinelli.
4       Q   Did she overlap -- when she was an attorney at
5   Polsinelli, were you of counsel to the firm at that
6   time?
7       A   I was.  Patricia and I were at the firm at the
8   same time and I got to know her work through my own
9   direct observation, and that's why when this case
10  came up I wanted to retain her to help us work on it.
11  She had a very distinguished career with regard to
12  products liability.
13      Q   Okay.  Thank you.  You anticipated some of
14  my questions so I won't have to go through those
15  again.
16          MR. EDINBURGH:   In any event, let me mark
17  these please.
18
19          (Plaintiff's Exhibit 12, Documents
20          pertaining to Raymond claim, was
21          marked for identification.)
22
23  BY MR. EDINBURGH:
24      Q   Your understanding that in Raymond there were
25  claims that the jack stand in that case was

Page 109

1   defectively designed?
2       A   That's my understanding.  I'd have to read the
3   complaint again to refresh my recollection.
4       Q   All right.
5           The complaint I believe is part of the
6   documents I've given you.  The jack stand involved in
7   Raymond was a Sears Craftsman 3.5 ton rack and pinion
8   -- rack and pawl design jack stand?
9       A   Correct.
10      Q   I should say is it a ratchet and pawl design?
11      A   Yes.  And I do see --
12      Q   P-A-W-L?
13      A   Yeah, P-A-W-L.
14          I do see in the Raymond complaint in paragraph
15  10 that there's an allegation of both defective
16  design and manufacture.
17      Q   And there's also an allegation that the jack
18  stand under load -- the ratchet under load suddenly
19  gave way or collapsed or failed to maintain its
20  column height?
21      A   That's the allegation.
22      Q   Am I correct that notice of that fatal event
23  was first sent to Sears, Roebuck as the seller of the
24  Craftsman?
25      A   Yes, that would be the normal process.

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 110

1    Q   And that Sears or its TPA, Sedgewick, then
2   wrote to Shinn Fu Company of America asking that it
3   indemnify Sears and assume the defense of the Raymond
4   case?
5    A   Correct.
6    Q   Did that letter eventually find itself on your
7   desk?
8    A   Yes, it did.
9    Q   And is your letter of June 28, 2006, which is
10   SFT 0181, your response to Sears' request?
11    A   Hang on.  Yes.
12    Q   And in that response you use a letterhead that
13   says "MVP Industries" and you have an address in Hong
14   Kong and it says that you are general counsel and you
15   signed the letter as general counsel to MVP
16   Industries; is that correct?
17    A   At that time I did, yes.
18    Q   Okay.
19        Now, your letter cc's two attorneys:  Alan
20   Olson and David Brown.  Is that David Brown any
21   relation to Dennis Brown who's here today?
22    A   I don't believe so.
23        MR. BROWN:  Not to my knowledge.
24   BY MR. EDINBURGH:
25    Q   Were those lawyers in a private firm in -- who

Page 111

1   are these two lawyers, Olson and Brown?  Sounds like
2   the name of a firm, but who are they?
3    A   Let me see if I can remember.  (Witness
4   reviews document.)
5        My memory is that Sears had several different
6   counsel involved in this matter and I needed to cc
7   all of them.
8    Q   Okay.
9        And now the defendants in this action,
10   according to the caption -- well, actually you can't
11   tell from the caption because it just says Sears,
12   Roebuck and Co.
13        Was Sears, Roebuck, to your understanding, the
14   only named defendant or were there others?
15    A   I believe Sears was the only named defendant.
16    Q   Did you make a determination that SFA or MVP
17   would provide a defense and/or indemnification to
18   Sears with respect to the Raymond lawsuit?
19    A   Subject to the reservation as expressed in the
20   letter.
21    Q   And as counsel for MVP and SFA, you selected
22   the attorneys to defend Sears, correct?
23    A   I advised, I believe at the time it was, Tony
24   Choi of the counsel that I recommended, and he
25   approved it.

Page 112

1    Q   And that was Patricia Sexton?
2    A   That's correct.
3    Q   Of the Polsinelli firm?
4    A   Correct.
5    Q   According to the documents that have been
6   produced with respect to the Raymond action was
7   Travelers Insurance or Travelers Indemnity Company
8   the insurer for Shinn Fu Company of America with
9   respect to the Raymond accident?
10    A   Yes, they were.
11    Q   And was MVP also an insured under the
12   Travelers policy with Shinn Fu of America?
13    A   Yes, they were there.
14    Q   Was SFT?
15    A   Yes.
16    Q   Wei Fu?
17    A   Yes, but insurance is irrelevant here but
18   okay.
19    Q   I'm not saying it was or it wasn't.  I think
20   we need others in this process to make that decision.
21    A   Okay.
22    Q   We can only argue.  A judge will decide
23   whether it's relevant or not.
24        Miss Polsinelli -- Miss Polsinelli,
25   Miss Sexton writes a letter beginning SFT 188 --

Page 113

1    A   Uh-huh.
2    Q   -- through 190?
3    A   Yes.
4    Q   And is addressed to Travelers describing an
5   inspection of the incident?
6    A   Yes.
7    Q   Who conducted that inspection?
8    A   Miss Sexton, myself, and Roger Claypool.
9    Q   And did that include -- did you have available
10   to you the jack stands involved in the incident?
11    A   Yes.
12    Q   Was that inspection done either at the site of
13   the incident with the jack stands or at the
14   plaintiff's attorney's office?
15    A   Yes.
16    Q   Were those stands taken in possession of
17   defense counsel for further testing elsewhere?
18    A   No.
19    Q   Did Mr. Claypool write a report concerning his
20   findings with respect to the Raymond inspection?
21    A   I do not believe he wrote a report at that
22   time, and I don't know if he wrote one subsequently.
23    Q   Okay.
24        Were any depositions taken in the Raymond
25   action?

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 114

1    A    No.
2    Q    According to these documents, the case settled
3    for $100,000, correct?
4    A    That is correct.
5    Q    Who paid it?
6    A    MVP.
7    Q    Not Travelers?
8    A    That's correct.
9    Q    Was it their deductible?
10   A    If by deductible you mean underneath the SIR?
11   Q    Correct.
12   A    That is correct.
13   Q    What was the SIR at that time?
14   A    I believe it was approximately $150,000.
15   Q    Did you recommend settlement at that amount?
16   A    I think that's privileged.
17   Q    I would normally say it would be, but the
18   documents have been produced.
19             MR. BROWN:  I'll object and instruct him
20   not to answer.
21   BY MR. EDINBURGH:
22   Q    Was any discovery provided by Sears or SFA or
23   MVP in the Raymond action?
24   A    No.
25   Q    And, again, just to be clear, the jack stands

Page 115

1    themselves were visually inspected.  I gather
2    photographs were taken?
3    A    Yes.
4    Q    And but no testing actually took place; is
5    that accurate?
6    A    Accurate.
7    Q    All right.  I want to discuss Frank Duenas
8    D-U-E-N-A-S.
9             MR. EDINBURGH:  Mark these next.
10
11             (Plaintiff's Exhibit 13, Documents
12             pertaining to Frank Duenas claim,
13             was marked for identification.)
14
15   BY MR. EDINBURGH:
16   Q    Mr. Chaykin, I'm showing you some letters and
17   a product liability claim report that were produced
18   pursuant to a subpoena upon Sedgewick, Sears TPA?
19   A    Uh-huh.  Yes.
20   Q    Was SFA aware of a claim brought, not a
21   lawsuit, just a claim, brought by a man named Frank
22   Duenas, D-U-E-N-A-S, that had lived in El Cajon,
23   California?
24   A    Obviously at the time in 2008 they were aware,
25   but the personnel involved in this matter left the

Page 116

1    company, so it wouldn't surprise me if the memory,
2    the institutional memory, of this was wiped out at
3    some point.
4    Q    There's a letter -- actually, there are two
5    letters:  One dated February 27, 2009 and one dated
6    February 24, 2010 by Sarah Sunderman who's identified
7    as claims manager for SFA?
8    A    Yes.
9    Q    Addressed to Mr. Duenas in El Cajon,
10   California with respect to his November 6, 2008
11   incident.  Were you general counsel of Shinn Fu
12   America when these letters went out?
13   A    Yes.
14   Q    Did you approve these letters before they went
15   out?
16   A    No, I hadn't seen them.
17   Q    Okay.
18        Well, I'd like you to look at the letters now
19   if you could please?
20   A    Okay.
21   Q    You looked at them?
22   A    Yes.
23   Q    Okay.
24        Miss Sunderman refers to SFA's analysis of the
25   stands in the February 24th letter.  Who made that

Page 117

1    analysis for SFA?
2    A    I do not know for sure, but I would imagine it
3    was Roger Claypool.
4    Q    Well, wasn't he gone by then?
5    A    Well, the accident happened in 11-17-08.  He
6    left in early January, and she wrote -- oh, right.
7    So it probably happened in 2009.  So then it would
8    have been whoever replaced Roger, most likely either
9    Peter, who I think his last name is Schriebner
10   (phonetic) or Schriner (phonetic) or Ryan, but I
11   don't think it was Ryan.  I think it was Peter.  It
12   could have also been Mark Pappas.
13   Q    Mark Pappas I take it from prior testimony has
14   also left the company?
15   A    Yes.
16   Q    Sarah Sunderman also left the company?
17   A    Correct.
18   Q    I believe the testimony is that both
19   individuals were terminated?
20   A    Sarah wasn't -- I wasn't there when Sarah
21   left, but I believe that she was terminated, and I
22   believe so was Mark.
23   Q    Do you have any knowledge of the incident or
24   the claims involving Mr. Duenas other than what's in
25   the documentation you've looked at?

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 118

1    A   I have no direct knowledge of the Duenas claim
2  either while it was occurring or subsequent to it,
3  but I can read the letters.
4    Q   Sure.  I'll ask you in preparation for
5  testifying as to other incidents or claims, did you
6  reach out to Sarah Sunderman or Mark Pappas?
7    A   I did not reach out to any former employees.
8    Q   Was this a claim as far as your understanding
9  that was brought to SFA's attention by Sears or
10 Sedgewick?
11   A   We don't have anything in the record to
12 indicate that.  I would -- I would say that since
13 Sedgewick had it in its file and then we see a letter
14 from Sarah that Sears had to have sent the claim over
15 from Sedgewick to Sarah.
16   Q   Is Mark Pappas an engineer?
17   A   Yes.
18   Q   With a degree?
19   A   Yes.
20   Q   All right.
21       Let me go to another claim which we actually
22 have some documentation that was provided to us
23 yesterday.
24
25

Page 119

1              (Plaintiff's Exhibit 14, Documents
2              pertaining to Mr. Penberthy's
3              claim, was marked for
4              identification.)
5
6  BY MR. EDINBURGH:
7    Q   Let me clarify.  I want to go back to Duenas
8  for one moment.  The actual jack stand involved in
9  that case was that a ratchet and pawl design jack
10 stand based on what you've seen?
11   A   Yes.
12   Q   And what was the load capacity if you can
13 tell?
14   A   Two and a quarter.
15   Q   Okay.  That's it.
16       Going to the case involving a fatality, the
17 decedent was a Mr. Penberthy, P-E-N-B-E-R-T-H-Y?
18   A   Yes.
19       That's actually misspelled, the plaintiff's
20 lawyer misspelled his client's name.  The actual name
21 is P-E-N-B-U-R-T-H-Y.
22   Q   Okay.
23       And there is on page 03892 -- SFA 08392 a
24 letter dated January 17, 2018 to a Janet Kelley in
25 Grand Rapids, Michigan?

Page 120

1    A   Yes.
2    Q   In which the Attorney John Simon of the Simon
3  Law Firm based in St. Louis, Missouri indicates that
4  on March 10, 2017 a Dion Penburthy -- using your
5  spelling -- was crushed to death with a Shop force
6  Model T-6903M jack stand sheered in half allowing
7  Mr. Penberthy Chevy Trailblazer to come crashing down
8  on his chest.
9        Was the Shop Force Model T-6903M jack stand a
10 jack stand sold by SFA?
11   A   No.
12   Q   Was it sold by MVP?
13   A   Yes.
14   Q   And was it a ratchet and pawl design jack
15 stand?
16   A   Yes.
17   Q   The load capacity was what?
18   A   Load capacity was 3 and a half tons.
19   Q   And was the Shop Force --
20   A   Or 3 tops.  I'm sorry.  3 tons.
21   Q   Was the Shop Force a client of MVP or SFA?
22   A   Shop Force is a customer.
23   Q   A customer rather.  I said "client."  I meant
24 customer, correct?
25   A   Correct.

Page 121

1    Q   And does MVP import jack stands under the Shop
2  Force label or brand?
3    A   Yes --
4    Q   And --
5    A   No.  MVP private labels this to Meijer.  Shop
6  Force is a private label brand owned by Meijer.  It
7  is not a brand owned by MVP.  So when you -- the
8  reason I'm stopping here, Mr. Edinburgh, is I don't
9  want to create the misimpression that MVP exports
10 regularly to any party under the Shop Force brand.
11 They do not.  MVP private labeled this product to
12 Meijer.
13   Q   All right.
14       Do you know where this particular stand was
15 manufactured?
16   A   Yes, I do.
17   Q   Where?
18   A   It was manufactured at Wei Fu.
19   Q   Can you tell by the serial number what year
20 this product was made?
21   A   It was made in 2007.
22   Q   2007.
23       And the incident occurs in 2017, correct?
24   A   Correct.
25   Q   Okay.

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 122

1    Who was Janet Kelley, if you know?
2    A   Janet Kelley is the claims administrator at
3   Meijer.
4    Q   And did Miss Kelley send this letter to you or
5   to SFA?
6    A   We received it in our claims department.  It
7   was not sent to me.  It was sent to our claims
8   department, and they forwarded it to me.
9    Q   Okay.
10    And what did you do upon receiving the
11   letter?
12    A   Began an investigation to determine first of
13   all whether this was indeed our product, where it was
14   made, when it was made, and begin the process of
15   investigating the claim.
16    Q   There are photographs of the stand, presumably
17   the one involved in the actual incident, that have
18   been given to us, and they're Bates stamped.
19    Were these taken by Mr. Simon or by you or
20   your people?
21    A   They were taken by someone under the
22   supervision of Mr. Simon.
23    Q   Have you or anybody from SFA inspected the
24   stand involved in the Penburthy incident?
25    A   Yes.

Page 123

1    Q   When?
2    Q   Can I refer to my phone for a minute?
3    Q   Yeah, whatever you need to do answer.
4    A   I believe it was in April.
5    Q   Of this year?
6    A   Yes.
7    Q   Did you go to Mr. Simon's law office to do it?
8    A   I did.
9    Q   Who accompanied you?
10    A   Ryan Jorgensen from SFA.
11    Q   Did he take photos?
12    A   I believe he did.
13    Q   Were you able to confirm whether this was a
14   MVP-imported stand?
15    A   We were able to confirm a MVP serial number.
16    Q   Has a lawsuit been started?
17    A   No.
18    Q   Am I correct that right now it's in the
19   pre-lawsuit claims phase; is that accurate?
20    A   You can characterize it that way.
21    Q   Okay.
22    I want to ask you about some other incidents
23   that have been discussed in this case.  Did SFT, MVP,
24   or SFA ever learn of an incident involving a jack
25   stand failure where the customer or user's name is

Page 124

1   Bowles, B-O-W-L-E-S.
2    A   I am familiar with that claim, not from my
3   direct work on that but from reading reports and
4   materials and e-mails regarding that claim.
5    Q   What is or was SFA's knowledge of the Bowles'
6   incident?
7    A   As reported by Roger Claypool SFA's knowledge
8   would be that there was a jack -- a single jack stand
9   used in conjunction with a jack.  Both were in
10   operation at the same time.  There was a loss of
11   height causing some property damage to the vehicle
12   and some claimed injury to the plaintiff.
13    Mr. Claypool flew to the scene, investigated
14   the accident, and eventually concluded that there was
15   no issue of jack stand failure, but that there were
16   concerns about the quality of the welds on the jack
17   stand so he recommended a settlement.
18    Q   Your understanding the date of loss -- the
19   date of incident was in or about 2004 for the Bowles
20   case?
21    A   That's my understanding more like 2005 because
22   I was there at the time.
23    Q   Was the Bowles' incident reported by SFA to
24   MVP or SFT?
25    A   I'm having trouble recalling whether it was an

Page 125

1   MVP jack stand or an SFT jack stand -- no, it was an
2   MVP jack stand, so it would have been reported to
3   MVP, and in fact the settlement authority came from
4   MVP.  So yes, of course, it was reported to MVP.
5    Q   Was it a Sears Craftsman?
6    A   I don't think it was, but I really do not
7   remember.  I did not work on this matter, and I don't
8   remember reading anything that identified the make of
9   the jack stand.
10    Q   Okay.
11    Just a couple more general questions about
12   Bowles.  Was it a ratchet and pawl design stand?
13    A   Yes.
14    Q   You said loss of height.  Did you mean loss of
15   ratchet bar height?
16    A   I don't think it's clear whether the ratchet
17   bar came down or if the vehicle came off the jack or
18   what.  Roger could not recreate the accident scene,
19   and I would say it's indeterminate as to how the
20   vehicle lost height.
21    Q   Is it your understanding that Mr. Claypool,
22   you said, went to where Mr. Bowles was living at the
23   time?
24    A   My understanding is that Mr. Claypool traveled
25   to wherever the accident occurred.

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 126

1    Q   Okay.
2        Was the stand available for Mr. Claypool to
3    inspect at that time?
4    A   It was.
5    Q   And was it, as far as your understanding, was
6    it one stand only?
7    A   That's my understanding.
8    Q   Do you recall the load capacity?
9    A   I do not recall the load capacity.
10   Q   Okay.  All right.
11       I want to ask you about certain other
12   incidents.  Did SFT, MVP, or SFA ever learn of an
13   incident involving a jack stand failure where the
14   customer or user's name was Christopher Hostat
15   (phonetic) in the state of Texas, loss in or about
16   2005?
17   A   I do not have a current memory or I don't
18   remember reading any documents that flesh out the
19   facts of the Hostat (phonetic) incident.
20   Q   Did you in preparation for today's deposition
21   ask anyone at SFA or look for any documents
22   concerning the Hostat (phonetic) incident?
23   A   A search was made of all documents at SFA or
24   the other entities that are under discussion today
25   for documents related to ratchet style jack stands.

Page 127

1    They were all provided to counsel.  Counsel did show
2    me in preparation for this deposition whatever
3    documents they had pertaining to the prior
4    accidents.
5        If you have a document, I would really
6    appreciate it if I didn't have to sit here and try to
7    guess and show it to me and then I can respond.
8    Q   I assure you if I had any, I'd show them to
9    you.
10   A   Okay.
11   Q   Did SFT, MVP, or SFA ever learn of an incident
12   involving a jack stand failure where the customer or
13   user's name was Bill Sloan who purchased a jack
14   stand in Kentucky, with a date of loss in or about
15   2004?
16   A   The Sloan name does ring a bell.  So there was
17   a case, a claim, that came through involving a
18   Mr. Sloan.
19   Q   Did it involve a ratchet and pawl stand?
20   A   It did.
21   Q   Was it a SFA-branded stand?
22   A   I don't remember whether it was an SFA or an
23   MVP stand.
24   Q   Do you know the load capacity?
25   A   I do not.

Page 128

1    Q   Was there an allegation that there was a
2    sudden loss of ratchet bar height under the load?
3    A   There might have been an allegation like that.
4    Q   When you say you recall a Sloan incident or an
5    incident involving a man named Sloan, do you recall
6    any documents concerning the Sloan incident?
7    A   The only documents we would have had we would
8    have given to our counsel, and I can't rematerialize
9    them in my mind, so whatever counsel's handed to
10   you, if you could show it to me, I could tell you
11   more.
12   Q   All right.
13       I'm asking you whether SFT, MVP, or SFA
14   learned of an incident involving a jack stand
15   failure where the customer or user's name was Gwen,
16   Zinn, Z-I-N-N, involving a T-6902 Pro-Lift model, the
17   date of loss was 2006 -- or the year of loss was 2006
18   and in the state of North Carolina?
19   A   I have no knowledge of the Zinn matter at all.
20   The only time I saw the word "Zinn" was in the notes
21   from Roger's testimony.
22   Q   Now, I'm just going to give a name.  I don't
23   have in front of me any more details about it.  Did
24   SFT, MVP, or SFA ever learn of an incident involving
25   a jack stand failure where the customer or user's

Page 129

1    name was -- last name was Jeffco (phonetic)?
2    A   Yes, I have heard of the Jeffco (phonetic)
3    case, but I have had no direct involvement in its
4    investigation or its resolution.
5    Q   What is your knowledge of the Jeffco
6    (phonetic) case?
7    A   If my memory serves me, Jeffco (phonetic) was
8    a case where somebody -- the user was trying to hold
9    up an entire vehicle with jack stands instead of
10   using them properly on one end or the other of the
11   vehicle.
12   Q   Do you know how many jack stands were being
13   used?
14   A   I think it's possible he had six.
15   Q   Six.
16       Was the Jeffco (phonetic) case resolved in
17   the form of a monetary settlement with Jeffco
18   (phonetic)?
19   A   I don't know.  I would be surprised sitting
20   here now that we would settle a case where the user
21   tried to lift an entire vehicle with jack stands
22   because that's not their purpose, but I don't recall,
23   so I won't speculate.
24       MR. EDINBURGH:  Let's take a five-minute
25   break before the next topic.

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 130

1      MR. BROWN:  Sure.

2

3          (Off the record from approximately

4          2:42 p.m. to 2:47 p.m.)

5

6  BY MR. EDINBURGH:

7      Q   Did Roger Claypool, before he left the employ

8  of SFA, ever communicate to SFA, SFT, or MVP with

9  respect to the terms "false engagement" or "false

10 loading" as it applied to ratchet and pawl design

11 jack stands?

12     A   Yes.

13     Q   When did he do that?

14     A   Around the time of the Bowles' case.

15     Q   Which was when?

16     A   Around 2006, 2005.

17     Q   And what form did that communication take?

18     A   E-mail from Tony Choi.

19     Q   Were you part of that e-mail chain -- I'm

20 sorry, not chain -- e-mail?

21     A   I was copied on it.

22     Q   And was that with respect to the investigation

23 of the Bowles' incident?

24     A   Yes.

25     Q   Did Mr. Choi or anyone else ask Roger what he

Page 131

1  meant when he used the terms "false engagement" and

2  "false loading"?

3      A   It was explained in his initial e-mail.  It

4  didn't require further -- so the answer is no,

5  because Roger explained what he meant.

6      Q   What did he mean?

7      A   A spontaneous release of a jack stand causing

8  a sudden loss of height.

9      Q   Anything else about the meaning of the term or

10 terms?

11     A   Yes.

12     Q   What in addition?

13     A   Generally caused by the idea that the jack

14 stand is not fully engaged, the pawl is not fully

15 engaged in the teeth of the jack stand.

16     Q   Did Mr. Choi or -- Mr. Choi, again, at that

17 time was an officer of MVP?

18     A   Yes.

19     Q   Vice president?

20     A   Yes.

21     Q   Was SFT or anyone from that company involved

22 in the e-mail either as a recipient or as a cc or

23 any way?

24     A   I don't think anybody -- my memory is that

25 nobody from SFT was copied on those e-mails, but I

Page 132

1  could be wrong on that.

2      Q   Was there any additional e-mails asking for

3  any further explanation as to the meaning of these

4  terms or why Roger felt these terms were -- may be

5  involved in the Bowles' incident?

6      A   Again, my memory is that Roger explained all

7  of this in the initial e-mail, and there was

8  subsequent e-mail asking for additional information

9  and materials including a response from an engineer

10 at MVP who asked for some pictures.

11     Q   After that is there any further communication

12 that you're aware of Mr. Claypool --

13     A   Yes.  Go ahead.

14     Q   Let me just finish then you can say yes.

15         -- concerning the terms "false engagement" and

16 false loading either as it applies to Bowles or to

17 anything else?

18     A   Yes.

19     Q   What do you recall?

20     A   I recall that in the final e-mail on which I

21 was copied Mr. Claypool indicated that there was no

22 false engagement of this jack stand.

23     Q   Is it your understanding that that e-mail or

24 those e-mails we already -- any e-mails subsequent to

25 that that Roger sent to anyone in which you were

Page 133

1  either cc'd or obtained a copy in which the terms

2  false engagement or false loading was used by him?

3      A   I do not recall reading another e-mail from

4  Mr. Claypool in which he used the term false

5  engagement.

6      Q   Did anyone at MVP or SFA, during or after

7  the Bowles' incident, communicate with Roger asking

8  him for any further discussion about the concept of

9  or phenomena of false engagement or false loading?

10     A   I do not know if anyone communicated with

11 Roger soliciting additional information on false

12 engagement.

13     Q   Did you?

14     A   Roger and I had discussions during

15 investigations of various jack stand cases or in our

16 discussions about the Bowles' case about the issue of

17 false engagement generally.

18     Q   When you say "discussions," I take it you mean

19 these were verbal discussions and there's nothing in

20 writing memorializing those discussions?

21     A   Correct.

22     Q   Did you and Roger have any discussions

23 concerning the concept or phenomena of false

24 engagement or false loading with respect to any other

25 claim or incident other than the Bowles case?

1    A   No.

2    Q   How about just in general about the concept?

3    A   Yes.  I already said yes.

4    Q   Okay.

5        And when did these discussions or discussion

6    take place?

7    A   They occurred on or around the time of the

8    Bowles' case and a few months thereafter.

9    Q   And do you have a recollection of the content

10   of those discussions, what was said?

11   A   I remember Roger's last statement on the

12   Bowles' case which was in writing, and then I

13   remember Roger -- I remember discussing the

14   perception of jack stands and whether -- I remember

15   discussing how we've had no reports of false

16   engagement accidents after selling millions and

17   millions of jack stand pairs, and I also remember

18   that we discussed whether this was an internet

19   related sort of an urban legend issue or whether it

20   was a real issue, and whether it was a consumer

21   perception issue or whether it was a real accident

22   factor.

23       We also talked quite a bit about the virtues

24   of the standard jack stands and how those -- some of

25   those virtues would be lost in attempting to resolve

1    the problem or the perceived problem of false

2    engagement and whether it made sense to try to

3    resolve a safety issue that was probably nonexistent

4    and thereby erode other safety factors which were a

5    known concern.

6    Q   Okay.

7        What you just said -- and I'm going to ask you

8    about that -- was any of this reduced to writing?

9    A   No.

10   Q   In any form?

11   A   No.

12   Q   What were the virtues of the jack stand design

13   that you believed would have been compromised if

14   there were changes to it to guard against false

15   engagement?

16   A   It wasn't just me.  It was also Roger and

17   others engaged in some of these discussions.

18   Q   You had said -- you had used the words

19   "virtues" of the current design --

20   A   Yes.

21   Q   -- and I'm asking you what were those virtue?

22   A   The virtue -- one of the great virtues of the

23   standard ratchet jack stand design is that it has a

24   bias towards engagement.  This means that when the

25   jack stand is in its natural state the pawl is

1    engaged with the teeth and therefore the device is in

2    a position to support the load.  This cuts out a lot

3    of customer error and user error, and user error is a

4    major safety concern.

5        Secondly another virtue of the standard jack

6    stand is that it deploys very quickly, easily, and

7    accurately to the load point or the support point

8    underneath the vehicle.  This is extremely important

9    because when the user goes underneath a heavy load,

10   which an automobile is, the dwell time underneath the

11   vehicle is a critical danger period because the

12   vehicle is being supported only by a hydraulic

13   device.

14       A hydraulic device is inherently dangerous.

15   It's a single support point, and it's prone to either

16   failure because it's a hydraulic device or to

17   displacement as a result of the forces that are on it

18   because the forces are not even.

19       Roger was extremely cognizant of all these

20   issues and was always a great advocate for getting

21   loads as centrally loaded as possible in any

22   situation and understood all of these issues.

23   Q   Did -- in your discussions you had said that

24   designs to protect against sudden loss of ratchet

25   height on the load caused by a false engagement or

1    false loading situation would have diminished the

2    virtues of the ratchet and pawl design.  How would it

3    have diminished it?

4        MR. BROWN:  Object to form.  Go ahead.

5    A   Nobody has come up with a way, in spite of

6    efforts to do so, to create a simple uncomplicated

7    continuously biased jack stand that's biased toward

8    engagement that is reliable, repeatable, and robust.

9        So as a result the only products to date that

10   have either been conceived or, to my knowledge,

11   available on the market involve the use of a

12   redundant pin or other device that requires,

13   A) additional dwell time underneath the vehicle in

14   the danger zone, and B) does not automatically

15   engage.

16   BY MR. EDINBURGH:

17   Q   Let me go to A.  You say additional dwell

18   time.  Has SFA, MVP, or SFT conducted an analysis or

19   testing to determine the actual amount of additional

20   dwell time needed to engage this second or redundant

21   safety feature?

22   A   You mean timed it in a test environment?

23   Q   Well, you just said it requires additional

24   timing.  I'm asking you -- you made that statement?

25   A   Yes.

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 138

```
1       Q   And I'm asking you the basis for that
2   statement and if any testing or evaluation was done
3   to determine what the actual additional time is?
4       A   I don't believe any scientific measured
5   investigation was done, but it is a common sense
6   notion that since you have to perform two operations
7   -- an additional operation in order to engage a pin
8   underneath a vehicle, and by the way laying
9   underneath a vehicle and trying to engage a pin
10  through a particular small tunnel which is the
11  pathway for the redundant pin, is not an easy thing
12  to do.
13          So to perform that kind of test, I'm not aware
14  of one being done, but I think it's a very obvious
15  and common sense notion to anybody with a rudimentary
16  understanding of supporting a vehicle would reach
17  that conclusion.
18      Q   Has anyone actually -- nothing was ever set up
19  to protect a tester --
20      A   Uh-huh.
21      Q   -- so no matter what happened a tester would
22  not be injured to actually say how long it takes to
23  insert the pin, whether it's 2 seconds, 10 seconds, 3
24  seconds, whatever it is?  Has any one of the
25  defendants that you're representing today as their
```

Page 139

```
1   witness done that?
2           MR. BROWN:  Objection.  Asked and
3   answered.  Go ahead.
4       A   I don't believe anybody conducted a scientific
5   test.  I do imagine however that people have
6   conducted their own experiments on a -- have tried
7   out the jack stand and have recognized its -- its
8   problems and its virtues.
9   BY MR. EDINBURGH:
10      Q   Has the second redundant loading device or
11  locking device that you said was given in response
12  about -- you said adversely affects the bias towards
13  engagement in the ratchet and pawl design.  What's
14  your basis for that statement?
15      A   Because you either have to -- the pin is not
16  naturally biased.  There's no bias to the pin at all.
17  So the ratchet is still biased toward engagement but
18  not the pin.  So you have a part of the device that's
19  biased toward engagement.  That means it has to be
20  engaged, and if it's not engaged it's not doing any
21  good assuming that it has a positive impact on this
22  whole discussion, but what we know for sure is that
23  it's going to take time to install the pin.
24      Q   What I'm asking you is that assume that the
25  pin is the secondary device.  We'll talk about other
```

Page 140

```
1   alternatives to that, but are you saying the use of
2   pin reduces the bias of the ratchet and pawl that
3   already exists?
4       A   No.  If you just use a jack stand, a ratchet
5   jack stand that also has a redundant pin, and you
6   don't use the pin then it functions like a normal
7   ratchet.
8       Q   That's not what I asked you.
9       A   Right.
10      Q   I asked you if you used a pin does that use
11  affect the bias of the existing ratchet and pawl
12  towards engagement?
13      A   No.  In that circumstance what is affected is
14  the other factor that I mentioned to you about the
15  virtues of the ratchet style jack stand which is that
16  you can bring it right up to load accurately and
17  quickly because if you have -- the only way to avoid
18  the problem -- in order to do what you're discussing,
19  you would have to insert the pin before you went
20  under the vehicle, and then you can't raise the
21  ratchet anymore.
22      Q   All right.
23          The response you gave to me you're assuming
24  that one has to be under the car to place the jack
25  stand, correct?  Or if you could place the jack stand
```

Page 141

```
1   without being under the car then this increased
2   hazard doesn't exist; is that correct?
3           MR. BROWN:  I'll object to form.
4       A   I wouldn't call it an assumption but...
5   BY MR. EDINBURGH:
6       Q   I'm not talking about my case.  I'm just
7   talking in general for anyone.
8       A   Well, you're asking me if I'm making an
9   assumption.  I don't understand what you mean by
10  that.
11      Q   You've indicated that if one is under the car
12  to place a jack stand that there's increased risk
13  because it takes time to insert the pin?
14      A   Yes.
15      Q   Right?
16      A   Yes.
17      Q   I'm telling you does that same risk exist if
18  one is not under the car to place the jack stand, if
19  one is placing the jack stand, let's say, from
20  outside the car?
21          MR. BROWN:  I'll object to form.
22          MS. TROTTA:  Object to form.
23          MR. BROWN:  It literally makes no sense
24  what you just asked, Howard.  I'm sorry, but he can
25  try to answer.
```

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 142

```
 1      A   I don't know how you'd place a jack stand
 2  under a vehicle without getting under a vehicle
 3  unless you had some kind of remote control robot to
 4  do it.
 5  BY MR. EDINBURGH:
 6      Q   So are you saying that based -- as the
 7  30(b)(6) for Shinn Fu America, SFT, and MVP it's your
 8  testimony that a pin as a secondary safety feature as
 9  an additional loading or locking device would not
10  prevent jack stand failure due to false engagement?
11          MR. BROWN:  I'll object to form.
12          MS. TODD:  Object to form.
13      A   I never said that, Mr. Edinburgh.
14  BY MR. EDINBURGH:
15      Q   Okay.
16          Well, then would it --
17      A   But I --
18      Q   Would the use of a pin as a secondary loading
19  device or locking device or feature prevent the
20  sudden loss of ratchet height under load that's
21  caused by false engagement?
22          MS. TROTTA:  Object to form.
23          MR. BROWN:  I'll object to form.
24          MR. EDINBURGH:  Why?  What's wrong with
25  the form?
```

Page 143

```
 1          MR. BROWN:  Because your whole question
 2  assumes that it's, even as a matter of physics,
 3  possible for a jack stand under load to have false
 4  engagement.
 5          MR. EDINBURGH:  He answered questions
 6  about how it would -- how it would create a
 7  possibility of jack stand failure.  He said that, and
 8  I'm asking him to explain it.
 9          MR. BROWN:  He did not say that.  I'll
10  object to form.
11          MR. EDINBURGH:  Okay.  All right.  I'll
12  do it another way.  You made an objection.  We'll go
13  forward.
14          MR. BROWN:  That's fine.
15          MR. ORTICELLI:  Ask him if he can answer.
16  He didn't tell him not to answer.
17          MR. EDINBURGH:  That's true.
18          Are you advising him not to answer?
19          MR. BROWN:  No.
20          MR. EDINBURGH:  Okay.  Then let's go back
21  and let him answer if he can.
22          MR. BROWN:  And let's read the question
23  back so we know what it is that --
24          MR. EDINBURGH:  Sure.  I have no problem.
25  If you have an objection as to form, if you're not
```

Page 144

```
 1  directing him not to answer then if he can answer,
 2  he'll answer.  If he can't, he can't.
 3
 4              (The following was read back by the
 5              court reporter: Q) Would the use of
 6              a pin as a secondary loading device
 7              or locking device or feature prevent
 8              the sudden loss of ratchet height
 9              under load that's caused by false
10              engagement?)
11
12  BY MR. EDINBURGH:
13      Q   Under the objection now can you answer?
14      A   I can't answer because the question contains
15  an assumption that I can't view as part of --
16          MR. BROWN:  Well --
17          MR. EDINBURGH:  That's fine.
18          MR. BROWN:  I'll direct him to answer no
19  further because we're not here to speculate.  We're
20  here to get facts.
21          MR. EDINBURGH:  And I don't disagree
22  with that, but it was an opinion given by the witness
23  as to the reasons why certain devices or features
24  were not utilized, and he raised it and I think I'm
25  entitled to delve into that to some depth, but he
```

Page 145

```
 1  gave the answer.  I'll live with it, and I'll go
 2  forward.  Let me go forward.
 3  BY MR. EDINBURGH:
 4      Q   In 2011 and before was that SFA, SFT, or MVP
 5  aware of any manufacturers of jack stands other than
 6  Wei Fu?
 7      A   Of jack stands that SFA told or just other
 8  manufacturers of --
 9      Q   Competitors?
10      A   Oh, yeah.  Were we aware of competitors, yes.
11      Q   Was SFA, SFT, and MVP aware of a company
12  called Allied?
13      A   Yes.
14      Q   Torin?
15      A   Yeah.
16      Q   Strongway?
17      A   Strongway is the brand of Torin -- of -- not
18  Torin.  Yes, we're aware of the Strongway brand.
19      Q   Okay.
20          Was SFA, SFT, or MVP aware that Allied sold,
21  prior to March 2011, a ratchet and pawl design jack
22  stand with a redundant or second locking device or
23  feature?
24      A   SFA was aware of that.
25      Q   Was SFA, SFT or MVP aware that Strongway sold,
```

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 146

1  prior to March 2011, a ratchet and pawl design jack
2  stand with double-lock technology and safety pin
3  design?
4      A  I believe they were, yes.
5      Q  Was SFA, SFT or MVP aware that, prior to March
6  of 2011, Torin was manufacturing a ratchet and pawl
7  design jack stand with a redundant or second locking
8  device or feature?
9      A  I wasn't aware of Torin making it, but if they
10  were, I would say that SFA would have been aware of
11  it.
12      Q  Was SFA, SFT, or MVP aware, prior to March of
13  2011, of Torin's Big Red brand ratchet and pawl
14  design jack stands?
15      A  Yes.
16      Q  Was SFA, SFT, or MVP aware that prior to March
17  of 2011 Torin designed a Big Red 3-ton ratchet and
18  pawl design jack stand containing a double-lock
19  safety pin design which it marketed as having extra
20  security when working beneath the vehicle?
21      A  It's possible.
22      Q  Was SFA, SFT, or MVP aware of, before March of
23  2011, a Chinese company called -- pardon me if I
24  mispronounce it -- Changshu Tongrun Auto Accessory
25  Co., Ltd based in Suzhou, Jiangsu, China?

Page 147

1      A  Tongrun is the Chinese counterpart of one of
2  the other entities you already mentioned.  I don't
3  have them all --
4      Q  Torin?
5      A  Might be.  I don't think it's actually Torin.
6  I think it's one of the others.
7      Q  That's what I was going to ask you.
8          Was SFA, SFT, or MVP aware, prior to March of
9  2011, that Changshu Tongrun manufactured vehicle
10  support stands, jack stands, under the Big Red Torin
11  brand?
12      A  Yes.  And that's the point.  A lot of these
13  are really made in one source, and they're sold to
14  different brands.  So it sounds like a long list of a
15  whole bunch of competitors, but it's really just the
16  same one.
17      Q  Well, was Changshu Tongrun a competitor in the
18  United States for -- of SFA branded jack stands for
19  the DIY market?
20      A  I would say more MVP.
21      Q  Was it a competitor to the Pro-Lift brand, the
22  Big Red brand?
23      A  I would say yes.
24      Q  Was SFA, Shinn Fu, or MVP aware of any jack
25  stand alternative designs or design concepts with a

Page 148

1  redundant locking mechanism which included a second
2  pawl or spring-loaded pawl?
3      A  That are on the market or just designs in
4  general?
5      Q  We'll do it separately.  One, that's on the
6  market?
7      A  I'm not aware of any on the market.
8      Q  One where there was a design concept or design
9  presented to SFA, SFT, or MVP?
10      A  I am aware of some.
11      Q  And was one of those concepts for a second
12  pawl design presented to SFA by Mr. Claypool?
13      A  It was.
14      Q  Is there a second pawl design that -- or
15  concept that was presented to SFA, MVP, or SFT by
16  anyone other than Mr. Claypool?
17      A  There was a trial project that resulted in a
18  design.
19      Q  When did that trial project take place?
20      A  I believe it was in late 2006 or early 2007.
21      Q  And who was doing the trial project?
22      A  There was a man named Jim Seah, S-E-A-H, who
23  worked on developing an idea.
24      Q  For a double pawl design?
25      A  For a jack stand that would have retained the

Page 149

1  biasing effect and would be locked in more than one
2  location.
3      Q  And when -- what was -- I know you said his
4  first name Jim.  The last name again?
5      A  Seah.
6      Q  Spell it again.
7      A  I believe it's S-E-A-H.
8      Q  S-E-A-H.
9          And was he retained by SFA to do this
10  project?
11      A  He was a contractor.
12      Q  He was contracted by SFA?
13      A  He was on a set contract to design -- to
14  create design ideas on an ongoing basis, and for one
15  -- one of his projects was to see what he could come
16  up with in this field.
17      Q  That was for SFA?
18      A  SFA experimented with this, yes.
19      Q  Was MVP aware of this experimental project?
20      A  I do not know.
21      Q  SFT, were they aware?
22      A  I believe they were.
23      Q  Did you play any role in approving the project
24  by Mr. Seah?
25      A  No.  All I did was write the contractor

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 150

1   agreement that was agnostic to whatever Mr. Seah was
2   doing.  It was just a general X amount per month to
3   do some contracting work.
4       Q   I'm going to go back to that momentarily.  Let
5   me just run through my list here.
6           In 2011 or prior thereto was SFA, SFT or, MVP
7   aware of a jack stand manufactured in Kobalt with a
8   K?
9       A   Yes.
10      Q   Kobalt wasn't Torin.  Kobalt was Kobalt,
11  correct?
12      A   I believe so.
13      Q   Did Kobalt design in 2011 or prior thereto and
14  sell a 3-ton ratchet and pawl design jack stand with
15  a loading lock and release bar?
16      A   I never saw it if they did.
17      Q   Was SFA, MVP, or SFT aware prior to 2011 of a
18  jack stand manufacturer called K-Line Industries
19  based in Holland, Michigan?
20      A   I am not aware of them, and I don't know -- I
21  haven't spoken to anybody at SFA, SFT, or MVP who was
22  aware of this company.
23      Q   Did you ask?
24      A   I wouldn't know -- if I were aware of them I
25  wouldn't have asked.

Page 151

1       Q   So either Kobalt or K-Line Industries to the
2   extent they may have sold jack stands, ratchet and
3   pawl design jack stands, prior to 2011 with a
4   secondary or redundant locking or loading feature
5   that was unknown to SFA; is that correct?
6       A   That's not my testimony.
7       Q   What is your -- it's unknown to you?
8       A   It's unknown to me, and I didn't inquire as to
9   those two particular entities.
10      Q   You did inquire as to alternative or other
11  designs because that's one of the topics to which you
12  were designated as a 30(b)(6)?
13      A   Uh-huh.  Correct.  But I interpreted that as
14  designs within SFA and other designs that were in
15  discussion or where documents had been presented, so
16  it's possible that SFA knows of these, but there were
17  just no documents indicating their knowledge.
18      Q   All right.
19          Let me go back and talk about Roger Claypool's
20  concept design.  I'm going to show you his drawings.
21  I want to talk about this trial project you talked
22  about in 2006 with Mr. Seah.  Did he produce a
23  prototype?
24      A   Roger?
25      Q   No, Mr. Seah.

Page 152

1       A   I do not recall if a prototype was produced.
2   He might have produced a prototype.  I just can't
3   remember if he did or not.
4       Q   Does SFA have documents concerning the Seah
5   trial project?
6       A   There are drawings of it.
7       Q   Including his drawings for a secondary or
8   additional loading or locking device or feature?
9       A   Yes.
10      Q   Have they been produced?
11      A   I don't know.
12      Q   Do you have them?
13      A   Do I have them?
14      Q   Do they have them?
15      A   We gave them to counsel.
16      Q   You did?
17      A   Yes.
18      Q   Besides the drawings was there any e-mail
19  exchanges or memos concerning any discussion about
20  the evolution of this design, the testing of this
21  design, the pros and cons of this design?
22      A   Yes, but they were all with outside counsel.
23      Q   Mr. Seah talked directly with outside counsel?
24      A   No.
25      Q   Are you're talking about you --

Page 153

1       A   Yes.
2       Q   -- spoke with outside counsel?
3       A   Yes.
4       Q   When I'm talking about outside counsel, I'm
5   talking about from Mr. Seah to SFA or SFA to
6   Mr. Seah?
7       A   No.
8       Q   No, there aren't any --
9       A   No.
10      Q   -- documentations?
11      A   No.
12      Q   No e-mails?
13      A   No.
14      Q   Was this trial project commissioned for the
15  purpose of defending a lawsuit?
16      A   No.
17      Q   Was it commissioned to see if you could make a
18  better safer product?
19      A   It was commissioned as part of a product
20  development and intellectual property development
21  process.
22      Q   To what end?  To manufacture a product I take
23  it?
24      A   Maybe.
25      Q   And to sell a product?

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 154

1    A   Maybe.  Not necessarily but maybe.

2    Q   To license it to someone else to make it?

3    A   Potentially.

4    Q   So it had a business purpose?

5    A   It did have a business purpose.

6    Q   That was the primary purpose was the business

7  purpose?

8    A   Sure.

9    Q   Eventually to make money off of it?

10   A   And to bring a new product into the world.

11   Q   Okay.

.2       Was this trial project eventually terminated?

13   A   Yes.

14   Q   When?

15   A   After it was determined that the results were

16  not sufficiently useful for additional investment.

17   Q   Who made that determination?

18   A   There was a -- the news came to me from Joey

19  Su.

20   Q   What time period?

21   A   That was about 2007.

22   Q   And how did it come to you?  Verbally?  By

23  e-mail?  Some other way?

24   A   He came up to my office and told me that we

25  weren't going to pursue this project any further.

Page 155

1    Q   Did you come to learn or did you engage in any

2  search of records to indicate whether this decision

3  to not go any further was documented in any way?

4    A   I found no records regarding documentation of

5  this.

6    Q   Did you look?

7    A   Uh-huh.

8    Q   Yes?

9    A   Yes.

10   Q   Did you speak to Joey Su?

11   A   Again, no, because I remember the conversation

12  very clearly with Joey Su at the time, and Joey Su is

13  a former employee, and as I told you, I did not talk

14  with any former employees.

15   Q   Well, your conversation with Joey Su, I take

16  it, was he told you they were going to stop the

17  project?

18   A   Yes.

19   Q   Okay.

20       And did the conversation include whether there

21  was documentation concerning reasons why there they

22  were stopping the project?

23   A   No, the conversation did not concern whether

24  there was documentation as to whether they were going

25  to stop the project.

Page 156

1    Q   So are you saying that there might be

2  documents, but you haven't located them, or are you

3  saying affirmatively there are no documents?

4    A   There are no documents of which I am aware,

5  and we have done a complete search of SFA's

6  documents.  SFT has done a search.  MVP has done a

7  search, and no documents have turned up regarding

8  this subject.

9    Q   Is Mr. Seah still around?  Do you know is he

10  alive?

11   A   I don't know.

12   Q   Do you have --

13   A   He was quite old at the time.

14   Q   Well, I guess old is kind of a relative term.

15  How old was he in the mid 2000s?

16   A   He must have been -- he was already retired,

17  so in the mid 2000's he was over 70.

18   Q   Do you have his home address?

19   A   No.

20   Q   Last known address?

21   A   No.

22   Q   Was he paid?

23   A   Yes.

24   Q   Do you have payment records which indicate his

25  home address at the time?

Page 157

1    A   I don't, no.

2    Q   Did the contract you had with him indicate

3  where he lived?

4    A   I don't think so.

5    Q   Do you have any idea where he lived or where

6  he worked out of?

7    A   He lived in the Kansas City, Missouri area.

8    Q   Okay.

9        MR. EDINBURGH:  We will make a request --

10  we're running towards the end of time frame for

11  everything and -- let me finish and then you can say

12  whatever you want to say.

13       I make this -- this is new in my view.  I

14  think this stuff should have been disclosed earlier,

15  much earlier in the course of this case, but I would

16  request all documentation regarding this trial

17  project by Mr. Seah including as soon as possible his

18  last known address.

19       Certainly if the man is alive and capable

20  of testifying, we may want to subpoena him to testify

21  as soon as possible.  That's what I have to say.

22       MR. BROWN:  It's fine.  As far as I know

23  they made a complete search of everything and found

24  no records that indicate any of that, but it's dually

25  noted.

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 158

1  BY MR. EDINBURGH:
2      Q   Let me go to Roger's design.
3      A   Okay.
4
5              (Plaintiff's Exhibit 15, Design
6              notes of Roger Claypool, was marked
7              for identification.)
8
9              MR. EDINBURGH:  Let me do the next one
10 too.  This will be 16.
11
12             (Plaintiff's Exhibit 16,
13             Supplemental responses and
14             objections to plaintiff's request
15             for production, dated April 11,
16             2018, was marked  for
17             identification.)
18
19 BY MR. EDINBURGH:
20     Q   Before I go into questions about Roger
21 Claypool's drawings which we just marked and SFA and
22 SFT and MVP interrogatory responses regarding
23 alternative designs which we received in April of
24 this year, let me ask you:  With respect to the Torin
25 model of Big Red, it had the secondary or the

Page 159

1  redundant or loading or locking device.
2              In addition to SFA, SFT, and MVP being aware
3  of that did either or any of these companies -- SFA,
4  SFT, or MVP -- do any evaluation, review, analysis,
5  testing of the Torin model containing the
6  double-locking device or features?
7      A   With regard to testing, I had an opportunity
8  to talk to Mr. Jorgensen with regard to SFA, I'm not
9  aware of any testing.  What were the other elements
10 that were part your question?
11     Q   Did MVP or SFT do any testing, analysis,
12 evaluation of the Torin ratchet and pawl design jack
13 stand or the other brands I've mentioned which
14 contained and were sold with a second or redundant
15 locking or load-locking device or feature?
16     A   By "analysis," what do you mean?
17     Q   Take it, test it under load, see how it
18 reacted, compare it to the SFA version, see whether
19 one was considered safer for any reason than the
20 other, was it more likely to prevent the unintended
21 loss of ratchet height under load, anything at all?
22     A   I'm not aware of anything at all.
23     Q   Okay.
24             Let's go to Mr. Claypool's drawings which have
25 previously been produced and marked as Klorczyk 4882

Page 160

1  to Klorczyk 4884.
2              MR. EDINBURGH:  And I will state for the
3  record that Klorczyk 4883 is a blank page.  We're not
4  missing a page.  It's just these two pages.
5  BY MR. EDINBURGH:
6      Q   Did Mr. Claypool give SFA these drawings at
7  any point in time?
8      A   I don't know if Mr. Claypool provided these
9  particular drawings, but I know that he provided some
10 drawings.
11     Q   Now, Klorczyk 4884 has a double pawl design
12 with both pawls attached in some manner to the lever
13 of the jack stand.
14             Did Roger Claypool submit, at any time during
15 his employment, to SFA a concept for a double pawl
16 design or a spring bias pawl design for the locking
17 features for the ratchet and pawl jack stand?
18     A   As I just said I believe he did submit a
19 design.
20     Q   And at what point in time did he do that?
21     A   Again, I believe it was right after or around
22 the time of the Bowles' case which would have been
23 '05-ish.
24     Q   And who did he submit the design to?
25     A   I do not know who he submitted it to, and I

Page 161

1  have not been able to find anybody to whom he
2  submitted it.
3      Q   Let me just go -- were you aware
4  contemporaneously that Roger had done this?
5      A   I was not.
6      Q   He didn't raise that with you?
7      A   No, he did not.
8      Q   So were you aware of whether he submitted it
9  to anyone at SFT or MVP?
10     A   I'm not aware of whether he submitted it to
11 anyone at MVP or SFT.  I recall that he discussed it
12 with some people at SFA engineering.
13     Q   When?
14     A   Around this time frame, around sometime after
15 7-05, July or August of 2005.
16     Q   Are you aware as to whether any individual or
17 department within SFA, MVP, or SFT evaluated this
18 design or asked Roger for any additional information
19 concerning this design?
20     A   Yes.
21     Q   And what's your awareness?
22     A   My awareness is that the engineering
23 department told him that it wouldn't work, it wasn't
24 feasible, and it would be too subject to breakage to
25 be a good viable product.

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 162

1    Q   Okay.
2        And when -- when was Roger told this by -- is
3    that SFA engineering?
4    A   Yes.
5    Q   And when was that told to him?
6    A   I don't know if it was told to Roger.  I don't
7    know if it was communicated to Roger.  In my
8    preparation for this deposition I tried to find out
9    what if any reaction there was from SFA, and I was
10   told that a conclusion was reached that it was
11   unworkable, unusable, and likely to break.
12   Q   And who told you this?
13   A   This was I believe Steven Huang who remembered
14   the history.
15   Q   And you asked Steven what his basis was --
16   A   Steven --
17   Q   -- for telling you that it was unworkable,
18   unusable, and likely to break, the double pawl
19   design?
20   A   Well, first of all, Steven pointed to a very
21   thin -- I don't know what you want to call it -- rod
22   that ran from one pawl to the other and was an
23   obvious vulnerability point.
24       Secondly, he told me that engineering didn't
25   understand how you would have forces aligned in such

Page 163

1    a way that the top pawl would come out and what kind
2    of action it would have on this secondary one.  In
3    other words, it was difficult for engineering to
4    understand the logic of the design.
5    Q   Okay.
6        What you just testified to was any of this
7    documented?
8    A   No.
9    Q   You've said engineering.  Engineering is a
10   generic -- I know it's engineering at SFA.  You said
11   engineering said this, engineering said that.  Can
12   you share with us the identity of any individual
13   engineer who told Steven Huang this?
14   A   I can't because they're all gone and I don't
15   know who he precisely talked to.  I have to add that
16   this was just a quick drawing that Roger had done, so
17   it wasn't a carefully rendered presentation; and as a
18   result, the reaction -- because it was a conceptual
19   presentation, the reaction was similarly conceptual,
20   that as a concept this didn't seem to be going in the
21   right direction.
22   Q   Does Steven Huang have any engineering
23   background?
24   A   Yes, he does.
25   Q   What is he?

Page 164

1    A   He was in the Navy in Taiwan, and he studied
2    engineering before entering the Navy I believe.
3    Q   Do you know what kind of engineering?
4    A   No idea.
5    Q   So did Steven Huang himself participate in
6    this conceptual review?
7    A   I don't know.
8    Q   He told you that engineering told him it
9    wasn't going to work and then you just explained the
10   reasons why.  Is that how it played out?
11   A   It was not a long discussion that I had with
12   Steven.  He said the conclusion was reached that it
13   was not a design that they could follow-up with.
14   Q   Okay.
15       And just so I don't have to serve needless
16   additional demands, there's no documentation
17   concerning this, and the identity of the engineer or
18   engineers who spoke to Mr. Huang is unknown; is that
19   accurate?
20   A   That's accurate.
21   Q   Let me go to the next document or the next
22   exhibit rather what was the April 11, 2018
23   supplemental responses and objections to plaintiffs
24   request for production.  Have you reviewed these?
25   A   I have seen them.

Page 165

1    Q   I said "review."  You said "seen."  Have you
2    read them?
3    A   Yes, I have read them.
4    Q   Okay.
5        I want to ask some questions of you on the
6    responses.  Can you identify the different designs
7    considered in 2005, 2006 which were deemed
8    functionally undesirable?
9            MR. BROWN:  You have to answer out loud.
10           THE WITNESS:  Excuse me?
11           MR. BROWN:  Did you mean to say yes?
12           THE WITNESS:  I didn't hear the question.
13   BY MR. EDINBURGH:
14   Q   Oh, I'm sorry.  I was waiting.  Okay.  I'll
15   say it again.  I remember this one.
16       Can you identify the different designs
17   considered in 2005 and 2006 which were deemed
18   functionally undesirable?
19   A   Yes.
20   Q   And what were they?
21   A   The two that we just previously discussed, the
22   Claypool design of about July 2005 and the subsequent
23   Seah design.
24   Q   Okay.
25       Were any design drawings and specifications

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 166

1  prepared for these different designs?
2       A  I believe we already discussed that.
3       Q  If the answer is included in other testimony
4  I'll accept that.  Let me just go through --
5            MR. BROWN:  I'll just put an objection,
6  asked and answered, on the record.
7  BY MR. EDINBURGH:
8       Q  Was a prototype built or tested for any of
9  these different designs?
10      A  I already answered that.  I cannot recall
11 whether there was a prototype of the Seah design.  I
12 believe there was, but I'm not ready to say that
13 under oath, but I believe there was.
14      Q  Was there a projected unit cost per stand for
15 adding the different design?
16      A  No.
17      Q  Okay.
18         The Seah trial project now you've indicated --
19 you've discussed that but specifically was Mr. Seah
20 retained in part anyway, if not solely, to come up
21 with a secondary or redundant locking feature or
22 mechanism to reduce the risk of sudden or unintended
23 loss of ratchet -- or height under load?
24      A  Mr. Seah's challenge in that particular period
25 of time was to find a way to maintain the bias toward

Page 167

1  engagement of the standard jack stand and come up
2  with a quick placing double locking jack stand
3  that would not increase the dwell time under the
4  vehicle.
5       Q  If, as you said today and as your counsel has
6  reiterated in his objections, it's not possible to
7  have false engagement why would you need a double
8  locking device?
9       A  As we discussed, Mr. Edinburgh, there are many
10 factors that go into a product and the product
11 features that -- it's a sad truth of the world that
12 sometimes you can't change one feature without
13 undermining the elements of another feature.
14         Shinn Fu is always aspiring to produce the
15 best product it could.  If there was a way to produce
16 the kind of product that it wanted to produce,
17 without undermining some of the other features, Shinn
18 Fu at the very least wanted to look at that.
19         Shinn Fu entered this whole discussion, as I
20 mentioned previously, with the perception that based
21 on its many years of experience selling these
22 products and selling millions of pairs of jack stands
23 that false engagement was most likely a perception
24 issue and not a real safety issue, and as I said
25 previously, Shinn Fu was disinclined to undermine a

Page 168

1  known safety risk to serve the possibility of
2  reducing a perception of safety that it could not
3  verify, a perceived safety issue that was
4  unverifiable and inconsistent with Shinn Fu's
5  understanding of the product.
6       Q  But a major competitor of Shinn Fu's did
7  sell --
8       A  Uh-huh.
9            MR. BROWN:  Objection.
10 BY MR. EDINBURGH:
11      Q  -- ratchet and pawl --
12           MR. EDINBURGH:  Can I finish my question
13 before you object?
14           MR. BROWN:  Oh, sure.
15           MR. EDINBURGH:  Now I lost my train of
16 thought.
17           Can you read it back at least to the
18 extent of the objection?
19
20           (The following was read back by the
21           court reporter: Q)  But a major
22           competitor of Shinn Fu's did
23           sell --)
24
25 BY MR. EDINBURGH:

Page 169

1       Q  -- did sell in this time period ratchet and
2  pawl jack stands with a double locking and redundant
3  safety feature; is that correct?
4            MR. BROWN:  And I'll object.  It's been
5  asked and answered, and it's argumentative.
6            MR. EDINBURGH:  I don't think it's
7  argumentative.
8            MR. BROWN:  I don't think you can start
9  with the word "but" without being argumentative.
10           You can go ahead and answer it.  You
11 answered it before.
12 BY MR. EDINBURGH:
13      Q  Bither they sold it or they didn't.
14         Did they sell it?
15      A  They did.  They sold other -- they sold
16 standard jack stands too.
17      Q  They sell it with this secondary locking
18 feature, correct?
19      A  And they sold the standard jack stands too.
20      Q  Did --
21      A  Yes, they did.
22      Q  The answer is yes?
23      A  Yes, they did.
24      Q  All right.  That's all I ask.
25           MR. EDINBURGH:  I think we are nearing

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 170

```
 1   the end.  I'll just take a few-minute break here --
 2        MR. BROWN:  Sure.
 3        MR. EDINBURGH:  -- to speak with my
 4   learned colleague about what I missed.
 5        MR. BROWN:  Sure.
 6
 7              (Off the record from approximately
 8              3:53 p.m. to 4:01 p.m.)
 9
10   BY MR. EDINBURGH:
11     Q   Does SFA today sell a ratchet and pawl design
12   jack stand with an additional or redundant locking
13   feature or device?
14     A   Yes.
15     Q   And what is the nature of that device?
16     A   It's similar to the Big Red design that you
17   discussed earlier with the additional pin.
18     Q   And when did -- and when did SFA introduce
19   that design to the marketplace?
20     A   It was sometime in the last year and a half I
21   believe.
22     Q   And why did it do that?
23     A   Well, first of all, the patent on that design
24   expired which made it available for other
25   manufacturers to produce it.  Secondly, there was a
```

Page 171

```
 1   customer who had an interest in it -- there was a
 2   customer that had an interest in replacing the
 3   company that was supplying them with that particular
 4   item and they asked Shinn Fu if Shinn Fu would be
 5   interested in providing that product.
 6     Q   Now, the customer that was interested in
 7   replacing the supplier, the supplier -- you mean the
 8   supplier of the Torin or Big Red model?
 9     A   Whoever the incumbent supplier was, yes.
10     Q   I take it when you say "customer," you don't
11   want to disclose the name of the customer?  My
12   question is:  Can you identify who the customer is or
13   was?
14     A   I believe it's ADT.
15     Q   Did Shinn Fu at any time -- I'm sorry.  I said
16   I wouldn't use that term.
17         Did SFA at any time prior to the expiration of
18   the patent request that Big Red, not Big Red, that
19   Torin license the patent to SFA?
20     A   I do not believe they did, no.
21     Q   And what ratchet and pawl load capacity stands
22   are marketed and sold with the Torin type secondary
23   locking feature or device?
24     A   I think it's a 3 ton.
25     Q   Now, is that secondary locking device or
```

Page 172

```
 1   loading and locking device feature being sold on all
 2   3 tons or is it on certain models and the traditional
 3   ratchet and pawl is still being sold?
 4     A   The traditional ratchet and pawl is still
 5   being sold.
 6     Q   What is the price difference between the
 7   traditional ratchet and pawl jack stand as two units
 8   in the box versus the 3 ton containing the additional
 9   locking device safety feature?
10     A   I don't know the retail price.  Price is not a
11   factor -- there's not a significant price difference.
12     Q   So whatever the difference is you would say
13   it's minimal or marginal?
14     A   It's not significant.
15     Q   Thank you.
16         Have a save journey to New Jersey.
17
18              (Deposition concluded at
19              approximately 4:05 p.m.)
20
21
22
23
24
25
```

Page 173

```
 1              JURAT
 2
 3
 4   I, ARTHUR CHAYKIN, ESQUIRE, do hereby certify that
     the foregoing testimony given by me on June 21, 2018,
 5   is true and accurate, including any corrections noted
     on the corrections page, to the best of my knowledge
 6   and belief.
 7
 8
 9
10
11
                   ARTHUR CHAYKIN, ESQUIRE
12
13
     At              in said county    of
14   this     day of          , 2018, personally
     appeared, ARTHUR CHAYKIN, ESQUIRE, and he made oath
15   to the truth of the foregoing corrections by him
     subscribed.
16
17
18
19   Before me,                , Notary Public.
20
21   My Commission Expires:
22
23
24
25
```

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

Page 174

```
 1    TRANSCRIPT CORRECTIONS
 2    REPORTER:  ANNETTE BROWN
 3
 4    CASE STYLE:  Klorczyk v. Sears, Roebuck and Co., et
      al
 5
 6    PAGE      LINE      CORRECTION        REASON
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                       NAME:
25                     DATE:
```

Page 175

```
 1              CERTIFICATION
 2       I, ANNETTE F. BROWN, LSR and Notary Public within
      and for the State of Connecticut, do hereby certify
 3    that I took the deposition of ARTHUR CHAYKIN,
      ESQUIRE, on June 21, 2018.
 4
 5       I further certify that the above-named deponent
      was by me duly sworn to testify to the truth, the
 6    whole truth and nothing but the truth concerning
      his/her knowledge in the matter of the case of,
 7    KLORCZYK v. SEARS, ROEBUCK AND CO., ET AL.
 8       I further certify that the testimony was taken by
      me stenographically and reduced to typewritten form
 9    under my direction by means of COMPUTER ASSISTED
      TRANSCRIPTION; and I further certify that said
10    deposition is a true record of the testimony given by
      said witness.
11       I further certify that I am neither counsel for,
      related to, nor employed by any of the parties to the
12    action in which this deposition was taken; and
      further, that I am not a relative or employee of any
13    attorney or counsel employed by the parties hereto,
      nor financially or otherwise interested in the
14    outcome of the action.
15       WITNESS my hand and my seal this 26th day of June
      2018.
16
17
18
19
20
21
      Annette Brown, LSR No. 00009
22    Notary Public
      My Commission Expires:
23    November 30, 2019
24
25
```