# *EXHIBIT J*

1

1              UNITED STATES DISTRICT COURT
               DISTRICT OF CONNECTICUT
2

3        FREDERICK KLORCZYK, JR.,
         as co-administrator of
4        the Estate of
         Christian R. Klorczyk,
5        and LYNNE KLORCZYK, as
         co-administrator of the
6        Estate of Christian R. Klorczyk,

7
                        Plaintiffs,
8
              vs.                    CIVIL ACTION NO.
9                                    3:13-cv-00257-RNC

10       SEARS, ROEBUCK & CO.,
         SHINN FU CORPORATION,
11       SHINN FU COMPANY OF
         AMERICA, MVP (HK)
12       INDUSTRIES, LTD.,
         and WEI FU (TAISHAN)
13       MACHINERY & ELECTRIC
         CO., LTD.,
14
                        Defendants.
15

16            DEPOSITION OF MEGHANN O'CONNOR

17       produced, sworn and examined on Tuesday, the 24th
         day of May, 2016, at the law offices of Baker
18       Sterchi Cowden & Rice, L.L.C., 2400 Pershing
         Road, Suite 500, in the City of Kansas City, in
19       the County of Jackson, and the State of Missouri,
         before me,
20
               MARIE A. McCRACKEN, CSR, CCR, RPR
21                          of
                     McCRACKEN REPORTING
22
         a Certified Court Reporter within and for the
23       States of Missouri and Kansas.

24       Taken on behalf of Plaintiffs pursuant to Notice
         to Take Depositions.
25

2

1        A P P E A R A N C E S
2   For the Plaintiff:
3           MR. HOWARD S. EDINBURGH
            HERZFELD & RUBIN, P.C.
4           125 Broad Street
            New York, NY  10004
5           (212) 471-8529
            hedinburgh@herzfeld-rubin.com
6
7   For the Defendants:
8           MR. DENNIS BROWN
            MR. STEVEN J. ZAKRZEWSKI
9           GORDON & REES, LLP
            95 Glastonbury Boulevard, Suite 206
10          Glastonbury, CT  06033
            (860) 278-7448
11          dbrown@gordonrees.com
            szakrzewski@gordonrees.com
12
    For Defendant Sears, Roebuck & Company:
13
            MS. ERICA W. TODD-TROTTA
14          TROTTA, TROTTA & TROTTA, LLC
            900 Chapel Street, 12th Floor
15          P.O. Box 802
            New Haven, CT  06503
16          (203) 787-6756
            etodd@trottalaw.com
17
    For SFA Companies, Inc.:
18
19          MR. ARTHUR CHAYKIN
            General Counsel
            10939 N. Pomona Avenue
20          Kansas City, MO  64153
            (816) 891-6390
21          arthur.chaykin@sfacompanies.com
22
23
24
25

3

1                INDEX
2
    WITNESS:  MEGHANN O'CONNOR              PAGE
3
    Direct Examination by Mr. Edinburgh       4
4   Examination by Mr. Todd-Trotta          146
5
6              EXHIBITS
7   NUMBER        DESCRIPTION               PAGE
8    1 - Notice of Deposition                 6
9    2 - Second Amended Complaint             8
10   3 - Curriculum Vitae; SFA003350          9
11   4 - Directors; SFA003233-3235           16
12   5 - Lexington Insurance Policy          33
13   6 - Sales Representative Agreement;     69
         SFA003336-3347
14
15   7 - Defendant Shinn Fu of America's    107
         Responses to Plaintiffs' First
16       Set of Interrogatories
17   8 - Screen shot of SFA website         115
18   9 - 2011 Presentation of Shinn Fu      129
         Corporation
19  10 - Screen shot of SFA website         134
20  11 - 8-2-12 Sears/SFA agreement;        139
         SFA003236-3246
21
22
23
24
25

4

1               MEGHANN O'CONNOR,
2   of lawful age, after having been first duly sworn
3   to tell the truth, the whole truth, and nothing
4   but the truth, testified as follows:
5               EXAMINATION
6   BY MR. EDINBURGH:
7       Q.  Good morning.
8       A.  Morning.
9       Q.  My name is Howard Edinburgh from the law
10  firm of Herzfeld & Rubin.  My firm represents the
11  Klorczyks in this lawsuit that's been brought
12  against Shinn Fu of America and other companies.
13  I'll be asking you certain questions this
14  morning, and just some ground rules.
15          Please wait until I finish my question
16  before you answer.  If I ask a question that you
17  don't understand, just let me know and I'll
18  rephrase it in a manner in which I trust you'll
19  be able to answer.  Wait until I finish my
20  question before you answer, and all responses
21  have to be verbal so the court reporter can take
22  down the response.
23          Can you just tell us, first question is,
24  your name and address.
25      A.  Meghann O'Connor and my address is 4921

5

1   North Lawn Avenue, Kansas City, Missouri 64119.
2           MS. TODD-TROTTA:  Can we just put
3   on the record there was no formal notice for this
4   particular deposition, that you are going off
5   last year's depo notice.  I never received --
6           MR. EDINBURGH:  All right.  I'm
7   going to mark the last deposition notice anyway,
8   and that's the notice that I think both sides
9   have been dealing with in terms of the subject
10  matter of particular witnesses.
11          MS. TODD-TROTTA:  I understand.  I
12  also know there was a lot of back and forth over
13  the various attachments and exhibits that were
14  going to come.  I just want it on the record.
15          MR. EDINBURGH:  Not with this.
16  I'll mark as Exhibit -- I guess we'll call it
17  O'Connor 1 for today.
18          MR. BROWN:  Maybe for the sake of
19  the court reporter we can have counsel give their
20  appearances.
21          MR. EDINBURGH:  I'm sorry.  I kind
22  of jumped the gun, didn't I?
23          MR. BROWN:  No, no, that's fine.
24          MR. EDINBURGH:  I'll go first.
25  It's Howard Edinburgh of Herzfeld & Rubin and I

6

1  will be representing -- I am representing the
2  plaintiffs in this action.
3          MR. BROWN:  Dennis Brown of Gordon
4  & Rees and I represent the defendants.
5          MR. CHAYKIN:  Arthur Chaykin,
6  in-house counsel, Shinn Fu Company of America,
7  representing Shinn Fu Company of America.
8          MR. ZAKRZEWSKI:  Steven Zakrzewski,
9  Gordon & Rees for the defendants.
10         MS. TODD-TROTTA:  Erica
11 Todd-Trotta, Trotta, Trotta & Trotta,
12 representing Sears Roebuck & Company.
13         MR. BROWN:  I just like it, it
14 makes it easier for the court reporter I think to
15 know who everybody is as they speak up.
16         MR. EDINBURGH:  Just off the record
17 for a second.
18         (whereupon, a discussion was
19 had off the record.)
20         MR. EDINBURGH:  SFA 1 will be
21 Notice of Deposition to Shinn Fu Company of
22 America, Inc., dated May 1, 2015, show this to
23 the witness.
24         (WHEREUPON, DEPOSITION EXHIBIT
25 NO. 1 WAS MARKED FOR IDENTIFICATION.)

7

1      Q.  (BY MR. EDINBURGH)  I'm going to ask
2  you, Ms. O'Connor, have you seen this document
3  before?
4      A.  Yes.
5      Q.  Okay.  Is it your understanding that you
6  are testifying today as what is called a 30(b)6
7  witness for Shinn Fu Company of America, which I
8  will call for ease of reference either Shinn Fu
9  Company of America or by its initials SFA?
10     A.  Yes.
11     Q.  And is it your understanding that you'll
12 be testifying about certain topics within this
13 notice but not all the topics in this notice?
14     A.  Yes.
15     Q.  Okay.  Do you have an understanding of
16 what a 30(b)6 witness' responsibilities are?
17     A.  Yes.
18     Q.  What is your understanding?
19     A.  My understanding is that I will be
20 questioned about particular topics that my
21 lawyers have provided to you already within the
22 deposition notice to the best of my ability.
23     Q.  And do you have an understanding that
24 your testimony here today is on behalf of SFA?
25     A.  Yes.

8

1      Q.  And that your testimony here today is
2  testimony of the collective corporate knowledge
3  of SFA?
4      A.  Yes.
5      Q.  That your testimony today is binding
6  upon SFA?
7      A.  Yes.
8      Q.  Show you SFA 2, which is the Second
9  Amended Complaint in this lawsuit which was
10 brought in the United States District Court, the
11 District of Connecticut.
12         MS. TODD-TROTTA:  Do I get a copy?
13         MR. EDINBURGH:  No.  I didn't know
14 there was going to be -- quite frankly I
15 thought -- off the record.
16         (whereupon, a discussion was
17 had off the record.)
18         (WHEREUPON, DEPOSITION EXHIBIT
19 NO. 2 WAS MARKED FOR IDENTIFICATION.)
20     Q.  (BY MR. EDINBURGH)  Ms. O'Connor, have
21 you seen SFA Exhibit 2 before?
22     A.  Yes.
23     Q.  Okay.  Did you review it?
24     A.  Yes.
25     Q.  Do you have an understanding about the

9

1  underlying accident involving Fred Klorczyk --
2  I'm sorry, Christian Klorczyk?
3      A.  Yes.
4      Q.  Just generally what's your understanding
5  of what occurred to Christian Klorczyk.
6          MR. BROWN:  I'll object to form.
7      Q.  (BY MR. EDINBURGH)  what's your
8  understanding of what is alleged to have occurred
9  to Christian Klorczyk?
10     A.  My understanding is that anything
11 involving the incident will be covered by our
12 engineer being deposed after me.
13     Q.  Okay.  But you have reviewed this
14 complaint?
15     A.  Yes.
16     Q.  Okay.  When did you review it?
17     A.  I've reviewed it numerous times.
18     Q.  Now, your counsel has provided us with a
19 copy of your CV.
20     A.  Yes.
21         MR. EDINBURGH:  Let's mark that as
22 SFA 3.
23         (WHEREUPON, DEPOSITION EXHIBIT
24 NO. 3 WAS MARKED FOR IDENTIFICATION.)
25     Q.  (BY MR. EDINBURGH)  You don't need to

10

1    look at those anymore.  Try to keep these in a
2    pile so I can make copies for everyone down the
3    road.
4          I want to go over some of your
5    biographical information --
6    A.   Sure.
7    Q.   -- for now and I may come back to it a
8    bit later.  You are a graduate I take it of
9    University of Central Missouri?
10   A.   Yes.
11   Q.   Okay.  Bachelor of science degree?
12   A.   Yes.
13   Q.   Can you tell us what your major was.
14   A.   Ecology and evolution.
15   Q.   Did you take any engineering courses?
16   A.   Two.
17   Q.   Okay.  Are you a licensed engineer?
18   A.   No.
19   Q.   Do you have any degrees beyond bachelor
20   of science degree?
21   A.   No.
22   Q.   Do you have any professional licenses or
23   certificates?
24   A.   No.
25   Q.   When did you begin working for Shinn Fu

11

1    Company of America?
2    A.   I began working for Shinn Fu Company of
3    America in February of 2011.
4    Q.   And as what?  What was your initial
5    title or role there?
6    A.   Administrative assistant.
7    Q.   To a particular individual?
8    A.   I helped several individuals.
9    Q.   When you first started, who were you an
10   assistant to?
11   A.   I was the backup to the executive
12   assistant.  I also held various accounting
13   responsibilities and human resources.
14   Q.   Okay.  I take it that as the years went
15   by you are promoted?
16   A.   Yes.
17   Q.   Can you just go through your levels of
18   promotion beginning with your initial to today.
19   A.   I started out as the administrative
20   assistant.  I was then promoted to executive
21   assistant and then promoted to operations
22   manager.
23   Q.   Let's begin with executive assistant,
24   when did that take place?
25   A.   About six months after I started.

12

1    Q.   And were you an executive assistant to a
2    particular executive?
3    A.   The CFO and COO.
4    Q.   And were they the same person or two
5    people?
6    A.   Same individual.
7    Q.   Who was that person?
8    A.   Steven Huang.
9    Q.   Could you spell his last name.
10   A.   H-U-A-N-G.
11   Q.   He was the CFO and the COO?
12   A.   Correct.
13   Q.   And for what period of time, what years?
14   A.   Was I his executive assistant?
15   Q.   Yes, correct.
16   A.   Two years.
17   Q.   Approximately when to when?
18   A.   Approximately September of 2011 to
19   February of 2013.
20   Q.   Steven Huang still at SFA?
21   A.   Yes.
22   Q.   In the same capacity?
23   A.   Yes.
24   Q.   He's still the CFO and COO?
25   A.   Correct.

13

1    Q.   Does Shinn Fu Company of America have a
2    board of directors?
3    A.   Yes.
4    Q.   Is it a corporation?
5    A.   Shinn Fu Company of America?
6    Q.   Correct.
7    A.   We are a corporation, yes.
8    Q.   You are incorporated in the State of
9    Missouri?
10   A.   Yes.
11   Q.   Does SFA have a board of directors?
12   A.   Yes.
13   Q.   Is Mr. Huang -- I'm going to pronounce
14   this incorrectly.  So I don't make the same
15   mistake over and over again, how do you pronounce
16   his last name?
17   A.   Huang.
18   Q.   I'll try to get it right.
19         Is Mr. Huang currently on the board of
20   directors of SFA?
21   A.   Yes.
22   Q.   Has he been on the board continuously
23   since at least you've arrived there?
24   A.   To my knowledge, yes.
25   Q.   Okay.  How long has he been the CFO and

**14**

1  the COO?
2    A.  I don't know how long he has been in
3  that position.
4    Q.  Let's go forward with your -- and what
5  were your duties and responsibilities as
6  executive assistant to Mr. Huang?
7    A.  E-mail dictation, managing his calendar,
8  arrange meetings, follow up after meetings,
9  various assignments.
10    Q.  Anything else?
11    A.  No.
12    Q.  And you were promoted from executive
13  assistant to operations manager?
14    A.  Yes.
15    Q.  When was that?
16    A.  In 2013.
17    Q.  Can you tell us when?
18    A.  February.
19    Q.  And is that your current title?
20    A.  Yes.
21    Q.  And are your duties and responsibilities
22  as operations manager, are they listed on your CV
23  in the bullet points?
24    A.  Yes.
25    Q.  Has anything been excluded from this,

**15**

1  from the bullet points, or does this cover it?
2    A.  No, it should cover it.
3    Q.  What was your job, if any, prior to
4  joining Shinn Fu -- I'm sorry, my mistake, prior
5  to joining SFA?
6    A.  Prior to joining SFA, I worked at Worth
7  Harley-Davidson.
8    Q.  Is that a retail Harley-Davidson store
9  in Kansas City?
10    A.  It's a dealership, yes.
11    Q.  And does the bullet points on your CV
12  indicate what you did there?
13    A.  Yes.
14    Q.  Did you also work there at the same time
15  you worked at SFA?
16    A.  Yes.
17    Q.  There was a certain period of
18  overlapping?
19    A.  Yes.
20    Q.  When was that?
21    A.  That would have been when I very first
22  started, there was probably maybe a six-month,
23  seven-month overlap.
24    Q.  Okay.  Did you work at SFA during the
25  day and at Harley-Davidson in the evenings or

**16**

1  weekends?
2    A.  Yes, that's correct.
3    Q.  Is SFA a public company?
4    A.  No.
5    Q.  Is it a private company?
6    A.  Yes.
7    Q.  Do you know who owns SFA?
8    A.  Yes.
9    Q.  Who?
10    A.  Shinn Fu Corporation is the parent
11  company of SFA.
12    Q.  Where is Shinn Fu Corporation located?
13    A.  Taiwan.
14    Q.  Does Shinn Fu Corporation own
15  100 percent of SFA?
16    A.  Yes.
17    Q.  I'm going to show you what has been
18  produced by your attorneys earlier in this case.
19  Just bear with me a moment.  Keep your resume
20  with you because I'll be referring to that.
21        SFA 4 is a listing of directors for SFT,
22  MVP and SFA, and they are Bates numbered as
23  SFA3233 through 3235.
24        (WHEREUPON, DEPOSITION EXHIBIT
25  NO. 4 WAS MARKED FOR IDENTIFICATION.)

**17**

1    Q.  (BY MR. EDINBURGH)  Show you this.  The
2  exhibit I'm showing you, have you reviewed that
3  before today?
4    A.  I've seen it, yes.
5    Q.  Okay.  Let's begin with the SFA
6  directors on the bottom.
7    A.  Okay.
8    Q.  I just want to start with the year 2007.
9  There is a listing of -- there are seven names,
10  there are check marks for six of those seven for
11  2007.  Is it your understanding that those were
12  the directors in 2007, the ones with the check
13  mark?
14    A.  Yes.
15    Q.  Okay.  Now, the first three names are
16  Victor Hung, Betty Hung and Angela Hung, H-U-N-G,
17  is that correct?
18    A.  Yes.
19    Q.  Are those three individuals related?
20    A.  Yes.
21    Q.  In what way?
22    A.  They are brother and sisters, siblings.
23    Q.  Okay.  And I take it they were directors
24  when you arrived as an employee?
25    A.  Yes.

18

1   Q.   And they remain directors today?
2   **A.   Yes.**
3   Q.   Do any of them live in Kansas City?
4   **A.   No.**
5   Q.   Do you know where they live?
6   **A.   No.**
7   Q.   Do you know whether they live in the
8   United States?
9   **A.   No.**
10  Q.   Did you talk to Victor Hung, Betty Hung
11  or Angela Hung in preparation for your testimony
12  today?
13  **A.   No.**
14  Q.   Have you ever talked to or met with them
15  over the course of your duties and
16  responsibilities as executive assistant and
17  operations manager?
18  **A.   Yes.**
19  Q.   How frequently if you can generalize at
20  all?
21  **A.   Once or twice.**
22  Q.   Collectively, annually?
23  **A.   Collectively.**
24  Q.   And what were the occasions that caused
25  you to meet with one or more of the Hung

19

1   directors?
2   **A.   They were visiting the office in Kansas**
3   **City.**
4   Q.   As a group or individually?
5   **A.   As a group.**
6   Q.   Do you recall when?
7   **A.   Approximately 2012.**
8   Q.   That was the last time?
9   **A.   Correct.**
10  Q.   Do you know what the occasion was for
11  the visit, any special event or anything?
12  **A.   No.**
13  Q.   Do you know whether they are fluent in
14  English?
15  **A.   Yes.**
16  Q.   They are?
17  **A.   Yes.**
18  Q.   You mentioned Steven Huang?
19  **A.   Yes.**
20  Q.   The Steven Huang that was CFO and COO of
21  SFA, is that the same Steven Huang that's listed
22  as a director?
23  **A.   Yes.**
24  Q.   Underneath that is Vickie Huang,
25  correct?

20

1   **A.   Yes.**
2   Q.   Steven and Vickie Huang, they have the
3   same last name, right?
4   **A.   Yes.**
5   Q.   Are they related?
6   **A.   Yes.**
7   Q.   In what way?
8   **A.   Siblings.**
9   Q.   Siblings?
10  **A.   Yes.**
11  Q.   Does Steven Huang live in Kansas City?
12  **A.   Yes.**
13  Q.   What about Vickie?
14  **A.   No.**
15  Q.   Do you know where she lives?
16  **A.   No.**
17  Q.   Does she live in the United States?
18  **A.   I don't know.**
19  Q.   Have you met her?
20  **A.   Yes.**
21  Q.   Again, what frequency, if any, have you
22  met her?
23  **A.   Again, twice visiting the Kansas City**
24  **office.**
25  Q.   At the same time as the Hung directors?

21

1   **A.   No, her visit was separate.**
2   Q.   When was the last time you met her?
3   **A.   2014.**
4   Q.   Have you talked to Vickie Huang in
5   preparation for your testimony as a 30(b)6
6   witness?
7   **A.   No.**
8   Q.   Okay.  Let's go to the next number,
9   Michael Huang, was he an SFA director in 2007?
10  **A.   Yes.**
11  Q.   And can you tell me his familial
12  relation, if any, to the other directors.
13  **A.   Yes.  Michael is Victor, Betty and**
14  **Angie's father.**
15  Q.   Does he have any relationship in any way
16  to Vickie Huang?
17  **A.   Yes.**
18  Q.   What is that relationship?
19  **A.   She is his wife.**
20  Q.   So I guess Steven Huang would be his
21  brother-in-law?
22  **A.   Yes.**
23  Q.   Have you acquired information in your
24  role as a 30(b)6 witness here today as to who
25  owns SFT or Shinn Fu Corporation of Taiwan?

22

1          MR. BROWN: Object to form.
2     Q.   (BY MR. EDINBURGH) Do you know whether
3  Michael Huang has an ownership interest in SFT?
4          MR. BROWN:  Object to timeline.
5  This is a 30(b)6 deposition of SFA.
6          MR. EDINBURGH:  I know, but
7  knowledge of directors of SFA who have ownership
8  interest in a parent company I'm allowed to delve
9  into if this witness knows.  It's a topic that's
10 been noticed.
11         MR. BROWN:  You can answer if you
12 know.
13    A.   Can you repeat the question?
14    Q.   (BY MR. EDINBURGH) Sure.  Are you aware
15 if Michael Huang has any ownership interest in
16 Shinn Fu Taiwan?
17    A.   To my knowledge Shinn Fu Taiwan is the
18 parent company of SFA and I don't know what Shinn
19 Fu Taiwan's ownership is.
20    Q.   Okay.  In preparation for today's
21 deposition as a 30(b)6 witness, did you make any
22 inquiries as to the ownership structure of SFT?
23         MR. BROWN:  Object to form.
24         MR. EDINBURGH:  Can she answer?
25         MR. BROWN:  I think it's already

23

1  been asked and answered.  I think it's outside
2  the scope of anything that's in this notice, but
3  she can answer again, sure.
4     A.   To my knowledge Shinn Fu Corporation is
5  the parent company of Shinn Fu Company of
6  America, and I don't know what their ownership
7  structure is.
8     Q.   (BY MR. EDINBURGH) Okay.  Let me ask
9  you for Michael Huang, does he reside in Kansas
10 City?
11    A.   No.
12    Q.   Does he reside in the United States?
13    A.   I don't know.
14    Q.   Do you know where he does reside?
15    A.   No.
16    Q.   Other than Steven Huang, any of the
17 other directors we have named, are they officers
18 or executives of SFA?
19    A.   Yes.
20    Q.   Who?
21    A.   Betty Hung.
22    Q.   Okay.  What is or was her title?
23    A.   CEO.
24    Q.   And for what period of time?
25    A.   She is currently our CEO.

24

1     Q.   Okay.  For how long has she been the
2  CEO?
3     A.   To my knowledge she has been our CEO for
4  the last approximately two or three years and
5  probably some prior dated years.
6     Q.   Okay.  As CEO does she maintain an
7  office in Kansas City?
8     A.   No.
9     Q.   Does she maintain an office in the
10 United States?
11    A.   No.
12    Q.   Does SFA directors have board meetings?
13    A.   To my knowledge, yes.
14    Q.   How frequently?
15    A.   To my knowledge once per year.
16    Q.   Where?
17    A.   I don't have that information.
18    Q.   Did you make any inquiries in
19 preparation for today's deposition as to where
20 the board met on an annual basis?
21    A.   No.
22    Q.   Have you ever attended any board
23 meetings?
24    A.   No.
25    Q.   At the board meetings, do you know

25

1  whether minutes are kept of the meetings?
2     A.   Yes.
3     Q.   Are those minutes stored or kept at
4  SFA's offices in Kansas City?
5     A.   Yes.
6     Q.   Do you have access to them?
7     A.   No.
8     Q.   Who does at SFA?
9     A.   Steven Huang would have access to those
10 documents at SFA.
11    Q.   Do you know who was the CEO of SFA prior
12 to Betty Hung?
13    A.   John Liu was our CEO prior to Betty,
14 L-I-U.
15    Q.   And what period of time was John Liu the
16 CEO?
17    A.   Approximately one year.
18    Q.   The time frame, can you tell me?
19    A.   2012 to 2013.
20    Q.   Okay.  And before he was CEO, what
21 position did he have with respect to -- if any,
22 with respect to SFA?
23    A.   None.
24    Q.   Do you know who selected John Liu to be
25 the chief executive officer of SFA?

26

1    **A.**  No.
2    **Q.**  Have you made inquiries --
3    **A.**  No.
4    **Q.**  -- in preparation for today?
5    **A.**  No.
6    **Q.**  What were the circumstances under which
7  John Liu ceased to be CEO?  Did he resign, was he
8  transferred, was he fired, what happened?
9    **A.**  He resigned.
10   **Q.**  He resigned?
11   **A.**  Yes.
12   **Q.**  Does John Liu live in the United States
13  today, do you know?
14   **A.**  I don't know today.
15   **Q.**  How about when he resigned, do you know
16  whether he lived in the United States or not?
17   **A.**  Yes.
18   **Q.**  He did?
19   **A.**  Yes.
20   **Q.**  But you don't know whether he left or is
21  still here?
22   **A.**  Correct.
23   **Q.**  And he was replaced by Betty Hung?
24   **A.**  Yes.
25   **Q.**  Do you know how she was selected to be

27

1  CEO?
2    **A.**  No.
3    **Q.**  Do you know Betty Hung's background,
4  managerial background?
5    **A.**  No.
6    **Q.**  Do you know whether Victor, Betty and
7  Angela Hung, the siblings, were they directors,
8  if you know, of Shinn Fu Corporation, also known
9  as Shinn Fu Taiwan?
10   **A.**  Are you asking me if they were directors
11  for Shinn Fu Corporation?
12   **Q.**  Yes.
13   **A.**  Yes.
14   **Q.**  How did you acquire that knowledge?
15   **A.**  I requested that knowledge from Steven
16  Huang.
17   **Q.**  If you look at the top document, it says
18  "SFT Directors"?
19   **A.**  Yes.
20   **Q.**  The first three names are Victor Hung,
21  Betty Hung and Angela Hung.  Are those the same
22  three directors, individuals that are on the
23  bottom on the SFA?
24   **A.**  Yes.
25   **Q.**  And the fourth director says Vickie

28

1  Hung.  Is that the same individual as Vickie
2  Huang or is that two separate individuals, do you
3  know?
4    **A.**  Same individual.
5    **Q.**  Just a little bit different spelling?
6    **A.**  Yeah.
7    **Q.**  Now, I don't speak Chinese.  There seems
8  to be four names in Chinese under Vickie Hung and
9  I have no clue what that is.  Do you have any
10  idea what those symbols stand for in terms of
11  names?
12   **A.**  No.
13   **Q.**  Have you ever heard of a company called
14  MVP?
15   **A.**  Yes.
16   **Q.**  What is your understanding of what MVP
17  is?
18   **A.**  MVP is a sourcing company.
19   **Q.**  Based where?
20   **A.**  MVP is based in China.
21   **Q.**  Can you just expand on what you mean by
22  "sourcing company."
23   **A.**  MVP is a company that offers resources
24  to other companies to source and purchase
25  product.

29

1    **Q.**  Do those products during the years
2  you've been at SFA include jack stands?
3    **A.**  Yes.
4    **Q.**  You see that in the middle row there is
5  an entry for MVP directors on Exhibit 4 I
6  believe, and is Victor, Angela and Betty Hung,
7  are those the same three individuals who are also
8  directors at SFA and SFT?
9    **A.**  The only information that I would be
10  responsible for would be Shinn Fu Company of
11  America's board of directors, so I can't answer
12  that question.
13   **Q.**  Did you make any inquiry of Steven Huang
14  or anyone else as to whether or not the MVP
15  directors listed on this document are the same
16  persons who are also SFA directors?
17   **A.**  I can only speak on behalf of SFA's
18  directors.
19   **Q.**  I understand that, but I'm asking you
20  did you ask Mr. Huang?  Just want to know whether
21  you talked to him about it.
22   **A.**  No.
23   **Q.**  Do you know whether Victor, Betty or
24  Angela Hung, whether they also went by a parallel
25  Chinese name as well for first name?

30

1    A.  No.
2    Q.  Let me go back to your biography,
3  please.  I'm not going to take these in order,
4  I'm just going to jump around.  The
5  next-to-the-last bullet point says, "Coordinates
6  company events," correct?
7    A.  Yes.
8    Q.  Can you tell us, give us examples of the
9  type of events you coordinate.
10   A.  I coordinate company Christmas parties.
11 We have a summer event every year for employees.
12 I make arrangements for everything.
13   Q.  Any business events as opposed to
14 Christmas party or birthday parties or things of
15 that nature, strictly business?
16   A.  What would you define a business event
17 as?
18   Q.  Fair enough.  If clients or customers
19 were coming in for any kind of sales presentation
20 or anything of that nature, either domestic
21 customers, foreign customers.
22   A.  I may coordinate meetings, conference
23 rooms, making sure they have bottled water
24 available, things to that nature.
25   Q.  To the best of your knowledge do you

31

1  ever coordinate any events involving personnel
2  from MVP visiting?
3    A.  No.
4    Q.  How about personnel from Shinn Fu
5  Taiwan?
6    A.  Yes.
7    Q.  Tell us what those events were.
8    A.  Any event I would have coordinated for
9  someone visiting from Shinn Fu Taiwan would have
10 been a dinner reservation.
11   Q.  Other than the directors Victor Hung,
12 Betty Hung, Angela Hung, Vickie Hung, can you
13 identify any other Shinn Fu Taiwan personnel who
14 you interacted with coordinating activities or
15 events for?
16        MR. BROWN:  Object to form.
17        You can answer.
18   A.  Would that be in relation to them
19 visiting our office in Kansas City?
20   Q.  (BY MR. EDINBURGH)  Either visiting
21 Kansas City or whatever other activities you
22 would aid them with when they came to the United
23 States for whatever reason.
24   A.  Yes.  Again, coordinate meeting times
25 for them, conference rooms, meals.

32

1    Q.  And can you identify the individuals who
2  you've done this for that were either managers,
3  employees, board members of Shinn Fu Taiwan?
4    A.  I have coordinated for employees,
5  engineers.  Are you wanting specific names?
6    Q.  If you recall any.
7    A.  Jason Hsu, H-S-U.
8    Q.  And who was he?
9    A.  He's from Shinn Fu Corporation sales
10 team.
11   Q.  Okay.  Who else?
12   A.  That's really the only name I can
13 recall.
14   Q.  Let me go through -- there is another
15 bullet point when you say, "Renew and update car,
16 building, and liability insurance"?
17   A.  Yes.
18   Q.  Do you see that?  I'm going to focus now
19 on my questioning to the liability insurance.
20 What were your duties and responsibilities as
21 operations manager with respect to liability
22 insurance?
23   A.  My responsibilities include negotiating
24 with our insurance broker to renew our rates each
25 year.  I also provide certificates of insurance

33

1  to our sales department for their customers and I
2  do risk management for any product liability
3  claim.
4    Q.  Okay.  We'll go into that.  Was Shinn Fu
5  America, SFA, insured for liability insurance by
6  Lexington Insurance in 2010, 2011?
7    A.  Yes.
8    Q.  I'm going to show you certain pages of
9  the policy.  Bear with me for a moment while I
10 get them.
11        (Brief recess taken.)
12        (WHEREUPON, DEPOSITION EXHIBIT
13 NO. 5 WAS MARKED FOR IDENTIFICATION.)
14   Q.  (BY MR. EDINBURGH)  Ms. O'Connor, I'd
15 like you to look at Exhibit 5 and I will identify
16 it as certain pages from the Lexington Insurance
17 Company insurance policy, Policy No. 035417823,
18 policy period 5/1/2010 to 5/1/2011.  And it has
19 various Bates numbers, I'm going to use the SFT
20 Bates number.  It's pages SFT Bates number 5, 24,
21 27, 33 and 34.  Have you seen these pages from
22 this policy prior to today?
23   A.  Yes.
24   Q.  Did you review these pages in
25 preparation for today's deposition?

34

1    A.  Yes.
2    Q.  Okay.  Was this a policy of insurance
3 that you were involved with at SFA?
4         MR. BROWN:  Object to form.
5    Q.  (BY MR. EDINBURGH)  Is this a policy of
6 insurance that you helped place on behalf of SFA?
7         MR. BROWN:  Object to form.
8    Q.  (BY MR. EDINBURGH)  What, if anything --
9 withdrawn.
10        What policy year were you first dealt
11 with as an operations manager at SFA?
12   A.  2013.
13   Q.  Okay.  In this policy -- do you know
14 what a named insured means?
15   A.  Yes.
16   Q.  Named insureds under Item 1 of this
17 policy, Shinn Fu Corporation/MVPHK Industries,
18 Limited, that's what it says, right?
19   A.  Yes.
20   Q.  Do you have an understanding as to the
21 reason why the address is given as care of 10939
22 North Pomona, Kansas City, Missouri 64153?
23   A.  Yes.
24   Q.  Why is that?
25   A.  **Shinn Fu Company of America renews the**

35

1 **insurance policy each year and that is our**
2 **address in Kansas City.**
3    Q.  Okay.  Was Shinn Fu Company of America
4 acting on behalf of Shinn Fu Corporation and MVP
5 (HK) Industries when it made the renewals?
6    A.  Yes.
7    Q.  I'd like you to go to the page SFT24,
8 the next page.  You see under this document's
9 endorsement, No. 001, it says "Schedule of Named
10 Insureds"?
11   A.  Yes.
12   Q.  And it identifies, among others, Shinn
13 Fu Corporation, Shinn Fu Company of America is
14 the first two, correct?
15   A.  Yes.
16   Q.  And it also lists as named insured MVP
17 (Hong Kong) Industries, Limited, correct?
18   A.  Yes.
19   Q.  And Wei Fu Taishan Machinery & Electric
20 Co., Limited?
21   A.  Yes.
22   Q.  Did SFA back in 2010 identify to
23 Lexington who the additional insureds -- who the
24 schedule of named insureds would be under this
25 policy?

36

1    A.  Yes.
2    Q.  Do you know why these particular list of
3 companies were identified as to named insureds?
4         MS. TODD-TROTTA:  In 2010?
5         MR. EDINBURGH:  I'm asking her her
6 knowledge.  She is speaking as a corporate
7 representative of the company.
8    A.  No.
9    Q.  (BY MR. EDINBURGH)  Okay.  Have you made
10 inquiries as to why this was the particular list
11 of named insureds?
12   A.  No.
13   Q.  Do you have an understanding whether all
14 these companies after Shinn Fu Corporation,
15 whether the ones after Shinn Fu Corporation are
16 all subsidiaries of Shinn Fu Corporation?
17   A.  No.
18   Q.  Let me go specifically, I've named two,
19 and then you tell me whether you have any
20 understanding.
21   A.  Okay.
22   Q.  Am I correct that Shinn Fu Company of
23 America did identify MVP (HK) Industries as a
24 named insured?
25   A.  Yes.

37

1    Q.  Do you know why?
2    A.  No.
3    Q.  Did you make any inquiries as to why?
4    A.  **Shinn Fu Company of America does a lot**
5 **of business in the United States and it's very**
6 **easy for us to negotiate insurance terms**
7 **including individuals we do business with.  We**
8 **receive a better rate and then we charge these**
9 **individuals back for their insurance coverage.**
10   Q.  When you say "individuals," do you mean
11 companies?
12   A.  **Yes, individual companies.**
13   Q.  Okay.  Are you aware of any
14 correspondence, e-mails, anything in writing with
15 respect to the 2009, '10, '11 period concerning
16 either the placement of liability insurance or
17 the renewal of the liability policy that you have
18 seen here today?
19        MR. BROWN:  Object to form.
20   Q.  (BY MR. EDINBURGH)  Are you aware of any
21 correspondence or e-mails between SFA and Shinn
22 Fu Corporation or MVP with respect to the
23 placement of liability insurance?
24   A.  **In what context are you asking?**
25   Q.  In terms of identifying the named

38

1  insureds, the amount of insurance, the terms of
2  coverage.
3      **A.  Yes.**
4      Q.  Okay.  What generally are you aware of?
5      **A.  When we renew our insurance, we receive**
6  **sales information from Shinn Fu Corporation in**
7  **order to receive an accurate quote for insurance.**
8      Q.  Is this sales information divided up
9  into particular product lines?
10     **A.  No.**
11     Q.  Is it just a collective total?
12     **A.  Yes.**
13     Q.  You do the same for MVP?
14     **A.  Yes.**
15     Q.  And when you get the sales information
16  for insurance purposes, is that divided up
17  between specific products?
18     **A.  No.**
19     Q.  Is it an annual total?
20     **A.  It's an annual total.**
21     Q.  For all sales of all products?
22     **A.  Correct.**
23     Q.  Do you have someone at Shinn Fu
24  Corporation who you communicate with with respect
25  to the issue of liability insurance coverage?

39

1      **A.  Yes.**
2      Q.  Who is that person?
3      **A.  Peter Chang, C-H-A-N-G.**
4      Q.  Is he fluent in English?
5      **A.  Yes.**
6      Q.  I may have asked you this.  Are you
7  fluent in Chinese?
8      **A.  No.**
9      Q.  Peter Chang is located where?
10     **A.  In Taiwan.**
11     Q.  Do you have an individual who you
12  communicate with at MVP with respect to liability
13  insurance coverage issues?
14     **A.  No.**
15     Q.  Does Mr. Chang, when you deal with him,
16  does he also speak on behalf of MVP?
17     **A.  No.**
18     Q.  You indicated you need certain
19  information from MVP for the renewals of the
20  policies, sales information, correct?
21     **A.  Yes.**
22     Q.  My question for you is who do you
23  communicate with to acquire that information?
24     **A.  I would communicate with Shinn Fu**
25  **Corporation who would then reach out to their**

40

1  contact at MVP.
2      Q.  Do you know the relationship between
3  Shinn Fu and MVP in terms of if there is any
4  ownership interest between the two entities?
5      **A.  No.**
6      Q.  Have you made any inquiries in that
7  regard in preparation for today's deposition?
8      **A.  Anything related to MVP I wouldn't need**
9  **to have knowledge of.**
10     Q.  Let me go to SFT027 which has additional
11  insured vendors, correct?
12     **A.  Yes.**
13     Q.  Do you see under the Schedule, it says
14  "Name of Person or Organization (Vendor)" and
15  then it says "where required by written
16  contract"?
17     **A.  Yes.**
18     Q.  Did SFA have in 2010 or '11 a written
19  contract with any customers in which those
20  customers became additional insureds under the
21  Lexington policy?
22     **A.  Yes.**
23     Q.  Can you identify any such customers?
24     **A.  We had several customers who requested**
25  **to be listed as an additional insured.**

41

1      Q.  Was Sears one of them?
2      **A.  No.**
3      Q.  Walmart?
4      **A.  In that time frame I don't know.**
5      Q.  K-Mart?  Do you know any retail chains
6  that were additional insureds in this time frame?
7      **A.  And you are asking in 2010, 2011?**
8      Q.  Yes.
9      **A.  No.**
10     Q.  How about prior to 2010, in the five
11  years prior to 2010 any national chains that were
12  customers of SFA that were pursuant to written
13  contract additional insureds under the Lexington
14  policy?
15     **A.  Yes, I'm sure there were, but to my**
16  **knowledge, I can't list any specific accounts for**
17  **you.**
18     Q.  Let me ask you this, between 2006 and
19  2011 was Sears an additional insured under the
20  SFA Lexington policy for any year?
21     **A.  No.**
22     Q.  Let me go or let us go to the -- bear
23  with me for a moment.  SFT33 and it's Roman
24  Numeral VI where it says "Notice Provisions" and
25  it's capital B as in boy on the bottom of the

42

1   page, do you see that?
2      A.   Yes.
3      Q.   B says, "On a quarterly basis, you must
4   provide us with a written summary," and then it
5   says in paren, "loss run," closed paren, "of all"
6   and then it says "'occurrences', offenses,
7   claims, or 'suits' which have or may result in
8   payments within the Retained Limit."  What was
9   the retained limit during this policy period?
10          MR. BROWN:  Object to form.
11          MR. CHAYKIN:  You can answer.
12     A.   Are you asking what our coverage was?
13     Q.   (BY MR. EDINBURGH)  Yes.
14     A.   We would have had two million aggregate
15  coverage and ten million umbrella.
16     Q.   Was there a deductible or self-insurance
17  retention for any amount from zero to a hundred
18  thousand, a hundred fifty thousand which came out
19  of SFA's pocket before the insurance kicked in?
20     A.   If the case was related to SFA, I
21  believe the deductible was two hundred thousand.
22     Q.   Did SFA provide Lexington with any loss
23  run written summaries in the period of 2010,
24  2011?
25     A.   If there would have been any claims in

43

1   2010 and 2011, they would have been provided that
2   information, yes.
3      Q.   Okay.  I'm asking you in preparation for
4   today's deposition have you acquired information
5   as to whether, in fact, loss runs were prepared
6   by SFA?
7      A.   Yes.
8      Q.   They were?
9      A.   Yes.
10     Q.   Where are those loss runs kept?
11     A.   The insurance company keeps a copy of
12  the loss runs and then we also keep a copy of the
13  loss runs in our database.
14     Q.   Okay.  So it's computerized?
15     A.   Yes.
16     Q.   Okay.  Were loss runs similarly kept in
17  the decade of the 2000-2010, were loss runs kept
18  on an annualized basis on an insurance policy
19  basis?
20     A.   Yes.
21     Q.   And are those still in existence?
22     A.   The documents?
23     Q.   Yes.
24     A.   Yes.
25     Q.   Where are they kept?

44

1      A.   They are kept in an electronic database.
2   They are also kept in a file cabinet with paper
3   copies.
4      Q.   Where is that file cabinet kept?
5      A.   The file cabinet is located in my
6   office.
7      Q.   Have you gone through any of the loss
8   runs in preparation for today's deposition?
9      A.   Yes.
10     Q.   Brought them with you today?
11     A.   No.
12     Q.   Have you given them to your counsel?
13     A.   Yes.
14     Q.   Do any of the loss runs that you have
15  seen involve claims of jack stand malfunction or
16  collapse of the jack stand?
17     A.   I don't recall any of the claims
18  containing that information.  Anything would have
19  been given to my lawyers and then given to you.
20     Q.   Okay.  For how many years of loss runs
21  did you give to your attorneys, for what time
22  frame?
23     A.   I don't recall the time frame.
24     Q.   Were all the loss runs in your
25  possession, no matter what the year, given to

45

1   your attorneys?
2      A.   Yes.
3      Q.   Does SFA continue from 2011 to the
4   present time to on either an annual -- on a
5   quarterly basis, rather, taking the language in
6   the policy, provide loss runs?
7      A.   Yes.
8      Q.   And those loss runs, as you said, are
9   kept electronically and in paper copy?
10     A.   Yes.
11     Q.   Do you recall sitting here today whether
12  you came across any incidents involving jack
13  stands in your review of the loss runs?
14     A.   I don't believe so.
15     Q.   To the extent -- let me withdraw that.
16          Do you see where it says, "This written
17  summary must show," and then it lists the items
18  that appear on the loss runs --
19     A.   Yes.
20     Q.   -- according to the policy.  To the
21  extent possible, were these points of information
22  on the loss run data that was prepared by SFA?
23     A.   If it pertained to SFA, yes.
24     Q.   Okay.  Who at SFA in 2010 or '11 was
25  responsible for preparing the loss runs?

46

1   A.  Sara Sunderman.
2   Q.  Does she still work there?
3   A.  No.
4   Q.  When did she leave?
5   A.  In February of 2013.
6   Q.  Do you know why she left?
7   A.  She was terminated.
8   Q.  She was fired?
9   A.  Yes.
10  Q.  Do you know why?
11  A.  I was not privy to that information.
12  Q.  And for what period of time did Sara
13  Sunderman prepare the loss runs for SFA?
14  A.  To my knowledge she was with the company
15  for about ten years and she was responsible for
16  that.
17  Q.  So would it be fair to say from about
18  2003 to when she left in 2013 she was responsible
19  for preparing the loss runs?
20  A.  Correct.
21  Q.  The loss runs that Sara prepared, were
22  they circulated within SFA to anyone?
23  A.  Our legal counsel.
24  Q.  And did Sara prepare them on a quarterly
25  basis?

47

1   A.  Yes.
2   Q.  And from 2003 to 2013 who was legal
3   counsel at SFA?
4   A.  Arthur Chaykin.
5   Q.  Distinguished man sitting right here
6   today?
7   A.  Yes.
8   Q.  Distinguished attorney.
9       (whereupon, a discussion was
10  had off the record.)
11  Q.  (BY MR. EDINBURGH)  Was Mr. Chaykin the
12  general counsel of SFA during this entire time
13  period from 2003 to 2013?
14  A.  There were a few years he was not our
15  in-house counsel and I don't recall that specific
16  time frame.
17  Q.  To the extent he could have a
18  replacement, did he have somebody who was either
19  acting or general counsel when he wasn't
20  officially the general counsel?
21  A.  Yes.  We had another law firm that we
22  would work with if we had any legal issues.
23  Q.  And how about for receipt of the loss
24  runs?
25  A.  It was Lathrop & Gage law firm.

48

1   Q.  And they are located right here in
2   Kansas City, correct?
3   A.  Yes.
4   Q.  Was Lathrop & Gage the main corporate
5   outside counsel to SFA during those years?
6   A.  Yes.
7       MR. EDINBURGH:  I'm calling for the
8   production -- and we'll follow it up.  I'm
9   calling for production of the loss runs
10  identified today that were prepared by SFA or
11  Sara Sunderman to give to Lexington Insurance.
12  Q.  (BY MR. EDINBURGH)  Let's go to SFT34.
13  Let's go to Roman Numeral VII which says "Special
14  Conditions," do you see that?
15  A.  Yes.
16  Q.  Did the Lexington policy require that
17  claims services, referred to as a TPA, be
18  provided on behalf of all the named insureds?
19  A.  Yes.
20  Q.  And according to this, the TPA was
21  Arthur Chaykin?
22  A.  Yes.
23  Q.  Was he acting as the TPA or claims
24  service on behalf of Shinn Fu Corporation?
25  A.  Yes.

49

1   Q.  And MVP?
2   A.  Yes.
3   Q.  Wei Fu?
4   A.  No.
5   Q.  Wei Fu was a named insured, correct?
6   A.  That's correct, yes.
7   Q.  Would he be the TPA on behalf of Wei Fu?
8   A.  Yes.
9   Q.  What is your understanding of what
10  Mr. Chaykin did as to TPA for these various
11  entities?
12  A.  He provided legal consultation.
13  Q.  Do you have an understanding of what the
14  initials TPA stands for generally speaking?
15  A.  Yes.
16  Q.  What does it stand for?
17  A.  It's going to stand for our main counsel
18  listed within our policy.
19  Q.  Okay.  Have you ever heard of the term
20  "third-party administrator"?
21  A.  Yes.
22  Q.  TPA?
23  A.  Okay.
24  Q.  Is Mr. Chaykin performing the work that
25  a third-party administrator performs for an

50

1 insured?
2   **A.   Yes.**
3   Q.   Besides legal consultation, did he
4 perform any other functions as a third-party
5 administrator?
6   **A.   No.**
7   Q.   How about SFA as a whole, did they
8 perform any third-party administrative work for
9 SFT or MVP?
10   **A.   In what context?**
11   Q.   In terms of claims made involving SFT or
12 MVP products.
13         MR. BROWN:   Object to form.
14         You can go ahead and answer if you
15 understood.
16   **A.   I won't answer that one.**
17   Q.   (BY MR. EDINBURGH)   You won't.   You are
18 unable to or you need me to rephrase?
19   **A.   You can rephrase it.**
20   Q.   Okay.   Did Mr. Chaykin bill his services
21 as TPA?
22   **A.   Yes.**
23   Q.   What frequency did he bill it, was it
24 annually, some other way?
25   **A.   Monthly.**

51

1   Q.   Monthly.   Who did he bill it to?
2   **A.   Arthur would submit his time to us that**
3 **he would fill out himself and we would bill any**
4 **other office or business that needed to be billed**
5 **on his behalf.**
6   Q.   And the other offices or businesses,
7 were those the other named insureds on the
8 Lexington policy?
9   **A.   Yes.**
10   Q.   Including SFT and MVP?
11   **A.   Yes.**
12   Q.   And would those time include time sheets
13 indicating what he did?
14   **A.   Yes.**
15   Q.   Are copies of those records kept by SFA
16 today?
17   **A.   Yes.**
18   Q.   In your office?
19   **A.   No.**
20   Q.   Computerized records?
21   **A.   Yes.**
22   Q.   How about hard copies?
23   **A.   No, no hard copies are kept.**
24   Q.   The premium in Item 4 that's listed, was
25 that paid for by SFA?

52

1   **A.   Yes.**
2   Q.   Did SFA then charge the various named
3 insureds for part of that premium?
4   **A.   SFA would pay the entire invoice and**
5 **charge back a portion of the premium to the other**
6 **offices or businesses.**
7   Q.   Are you aware of the percentage of the
8 premium paid by the various named insureds?
9   **A.   Yes.**
10   Q.   And how much of the percentage was paid
11 by Shinn Fu Corporation?
12   **A.   It would be based off their sales total**
13 **yearly, so it's going to be a different**
14 **percentage each year.**
15   Q.   Generally speaking, was there kind of
16 average within a range?
17   **A.   No average, no.**
18   Q.   All right.   Let's go to another bullet
19 point in your resume.   You have a bullet point
20 there that says, "Manage all in house product
21 liability claims related to property damage or
22 bodily injury," correct?
23   **A.   Yes.**
24   Q.   Okay.   Before we go into that let me ask
25 you generally, what is the business of SFA?

53

1   **A.   We are a distribution center for**
2 **automatic lifting equipment.**
3   Q.   Automatic lifting equipment?
4   **A.   Yes.**
5   Q.   And does that include jacks?
6   **A.   Yes.**
7   Q.   And that includes jack stands?
8   **A.   Yes.**
9   Q.   Do you also distribute fitness equipment
10 as well?
11   **A.   Yes.**
12   Q.   Any other categories of products?
13   **A.   Creepers, jump starters, welding masks.**
14   Q.   When did you begin managing all in-house
15 product liability claims related to bodily
16 injury?
17   **A.   2013.**
18   Q.   And you do that until today?
19   **A.   Yes.**
20   Q.   Who performed that function before you?
21   **A.   Sara Sunderman.**
22   Q.   And what do your duties and
23 responsibilities consist of now as the manager of
24 in-house product liability claims?
25   **A.   Any claim notice that we receive that**

54

1  can be resolved under our self-retention policy
2  of $10,000 I will handle, whether it be property
3  damage or bodily injury.
4      Q.  And if it cannot be resolved under the
5  self-insurance retention, then what happens?
6      A.  It's passed to our in-house counsel.
7      Q.  Meaning Mr. Chaykin?
8      A.  Yes.
9      Q.  And after that point, does your
10 responsibility with respect to the claim cease?
11     A.  No, I'm typically still involved.
12     Q.  In what capacity?
13     A.  Data collection.
14     Q.  Do you keep a record of claims that's
15 separate from the loss runs we have discussed or
16 are they the same or different?
17     A.  They should be the same.
18     Q.  What type of information do you prepare
19 with respect to a claim that you receive notice
20 of?
21     A.  It would be circumstantial based off of
22 the claim.
23     Q.  Have you received notice of any claims
24 involving claims of jack stand failure or jack
25 stand gave way or the jack stand collapsed?

55

1      A.  No.
2      Q.  In the period of time you have been
3  there you received no such claims?
4      A.  Nothing outside of this case.
5      Q.  The Klorczyk matter?
6      A.  Yes.
7      Q.  Nothing else you received?
8      A.  No.
9      Q.  Have you reviewed claims or notice of
10 claims for years prior to when you became office
11 manager?
12     A.  Yes.
13     Q.  For what years did you review claims?
14     A.  I have a database to all of our claims
15 that have ever been filed.
16     Q.  Does that database include all the
17 occurrences listed on the loss runs as well?
18     A.  Yes.
19     Q.  And did you search that database in
20 preparation for your testimony?
21     A.  Yes.
22     Q.  And how did you perform the electronic
23 search, was it a word search, was it something
24 else?
25     A.  The database sorts it by the claimant

56

1  name and I can just go through each file and
2  review them.
3      Q.  By claimant name?
4      A.  Yes.
5      Q.  Okay.  Is it also by the type of product
6  involved?
7      A.  No.
8      Q.  Okay.  So am I correct that you went
9  through every claimant name in preparation for
10 today to see whether any ratchet and pawl jack
11 stand was ever involved in a claim against SFA?
12     A.  I reviewed our database, yes.
13     Q.  Just so I'm clear, the review physically
14 consisted of going through each and every
15 individual claim one at a time?
16     A.  Yes.  There are really not too many.
17     Q.  Just as a proximate universe of claims,
18 how many approximately did you review?
19     A.  I couldn't give a number approximately.
20 I mean, the database, the entire database that we
21 have on file, anything electronically.
22     Q.  What years did that database cover?
23     A.  That database is current up to date, so
24 it would have covered any year we received a
25 claim that SFA has been in business.

57

1      Q.  Going back until -- would it go back
2  let's say to 2000?
3      A.  It's possible, yes.
4      Q.  Okay.  The number of claimants, again, I
5  know you said you can't approximate, could you at
6  least estimate whether it's more or less than a
7  hundred?
8          MR. BROWN:  Object to form.
9      A.  I couldn't give you an approximation
10 without physically counting them, an accurate
11 approximation.
12     Q.  (BY MR. EDINBURGH)  How much time did
13 you spend timewise going through this database in
14 preparation for today's deposition?
15     A.  Collectively several weeks.
16     Q.  Do you know how many pages in terms
17 of -- was that database printed out?
18     A.  We have paper copies, yes.
19     Q.  And collectively was it given to your
20 attorneys?
21     A.  Yes.
22     Q.  And give me just a rough estimate of how
23 many pages it is.
24     A.  I wouldn't -- it depends on each claim.
25     Q.  Okay.  Is your testimony you reviewed

58

1  each and every one of them and none of them
2  involved a jack stand except for the Klorczyk?
3      **A.   Anything I felt was relevant I gave to**
4  **my legal attorneys to review.**
5      Q.   Okay.  What was your criteria for
6  relevancy?
7      **A.   Anything related to a jack stand.**
8      Q.   So you did look for any of the products
9  on the database that's involved some issue with a
10 jack stand, regardless of what it was, regardless
11 of the type of jack stand, you gave it to your
12 attorneys?
13     **A.   Yes.**
14     Q.   And your testimony is you didn't find
15 any jack stands other than the Klorczyk one?
16     **A.   I provided them with everything that I**
17 **felt they needed to review.**
18     Q.   I just want to clarify.  Other than the
19 Klorczyk matter, did you locate any other claims
20 involving jack stands?
21     **A.   Yes.**
22     Q.   How many?
23     **A.   I don't recall the number of files that**
24 **I gave them, but I know you guys should have**
25 **copies of anything that the legal counsel**

59

1  reviewed.
2      Q.   In terms of numbers, can you estimate,
3  were they more than ten, less than ten?
4      **A.   Less than ten.**
5      Q.   More than five, less than five?
6      **A.   Approximately less than five.**
7      Q.   Of those that involved a jack stand, as
8  you sit here today can you recall any particulars
9  of the type or nature of the jack stand, the
10 nature of the claim?
11     **A.   No.**
12     Q.   And, again, we are dealing with a time
13 period, as far as you are aware of, goes back ten
14 years, more, less?
15     **A.   It's possible, yes.**
16     Q.   Possible it went back more than ten?
17     **A.   Yes.**
18     Q.   The claims on that list, do any of those
19 claims include claims that could not be resolved
20 within the retained limit and had to be forwarded
21 to the general counsel?
22     **A.   In my experience, yes.**
23     Q.   How many of those claims?  We know
24 Klorczyk obviously is one of them, but beyond
25 Klorczyk?

60

1      **A.   In relation to jack stands?**
2      Q.   Yes.
3      **A.   Any of the documents we would have**
4  **provided you with would have exceeded the**
5  **self-retention policy of $10,000.**
6      Q.   I understand that, but I'm asking you
7  for your recollection.  Of these small universe
8  of claims, can you identify how many could not
9  have been resolved within the ten thousand limit
10 and had to be forwarded for further activity of
11 the general counsel?
12         MR. BROWN:  Object to form.
13     **A.   It would have been approximately five or**
14 **less.**
15     Q.   (BY MR. EDINBURGH)  Did any of those
16 five or less result in a lawsuit against SFA?
17     **A.   Yes.**
18     Q.   Can you identify any by name?
19     **A.   No.**
20     Q.   Once it becomes clear that a matter
21 cannot be resolved within the retention and the
22 matter is then sent to the general counsel, are
23 you involved in any way in terms of defending a
24 case if, in fact, a lawsuit is brought?
25     **A.   Up to date, no.**

61

1      Q.   Have you in the past?
2      **A.   No.**
3      Q.   Are you involved in any way in -- do you
4  know what discovery is in a lawsuit?
5      **A.   Yes.**
6      Q.   From time to time do your duties and
7  responsibilities include responding to discovery
8  requests addressed to SFA?
9      **A.   Yes.**
10     Q.   Were you involved in responding to
11 discovery requests in this lawsuit, the Klorczyk
12 matter?
13     **A.   Yes.**
14     Q.   What was your involvement?
15     **A.   I managed the document collection.**
16     Q.   Okay.  To fulfill your responsibilities
17 as a 30(b)6 witness on the topics you will
18 testify about, who did you talk to, if anyone?
19     **A.   Covering all my topics?**
20     Q.   Yes.
21     **A.   I spoke with several individuals**
22 **depending on the topic.**
23     Q.   Let's take them one at a time.
24     **A.   Okay.**
25     Q.   To the best of your recollection, you

62

1  can start anywhere you would like, I just want to
2  go through who all they were.
3       A.  I would have spoke to engineering, I
4  would have spoke to sales, customer service.
5       Q.  Let's take them one at a time.
6       A.  Sure.
7       Q.  Who at engineering did you speak to?
8       A.  Ryan Jorgensen.
9       Q.  The individual who is going to testify
10 tomorrow?
11      A.  Yes.
12      Q.  What did you talk to him about?
13      A.  In my responsibility for document
14 collection I spoke with him for any inspection
15 reports they may have had records of.
16      Q.  Inspection reports of what?
17      A.  Product testing.
18      Q.  For jack stands?
19      A.  Yes.  I also would have spoke to him
20 about owner's manual documents.
21      Q.  Was this in your capacity as responding
22 to document requests by the plaintiffs' side?
23      A.  I don't know what you mean by that
24 question.
25      Q.  Your talking to Ryan Jorgensen, was that

63

1  dealt with becoming knowledgeable about certain
2  topics for today?
3       A.  No.
4       Q.  Okay.  I was going to ask you did you
5  speak to him earlier on in terms of collecting
6  documents that would be responsive to document
7  requests made in this lawsuit?
8       A.  Yes.
9       Q.  That's the reason you spoke to Ryan?
10      A.  Yes.
11      Q.  Okay.  All right.  Go ahead.
12      A.  You are asking about my process in
13 preparing for today?
14      Q.  Correct.
15      A.  So I clearly would have spoke with our
16 legal counsel.
17      Q.  Did you, in fact, speak with
18 Mr. Chaykin?
19      A.  Yes.
20      Q.  On what topics did you discuss with him?
21           MS. TODD-TROTTA: Objection.  Form.
22      Q.  (BY MR. EDINBURGH)  In order to become
23 knowledgeable to testify about the topics in
24 which you were noticed to be the corporate
25 witness for SFA, what areas did you discuss with

64

1  Mr. Chaykin?
2            MR. BROWN:  I object.
3            I'll instruct you not to answer.
4       Q.  (BY MR. EDINBURGH)  Not going to resolve
5  that today, but let's go forward.  Who else did
6  you speak to?
7       A.  I would have spoke to Steven Huang and
8  that would have been in regards to the board of
9  directors.
10      Q.  When did you speak to Mr. Huang?
11      A.  I speak to him every day.
12      Q.  Okay.  I appreciate that, but on the
13 subjects that you will be testifying about.
14      A.  I don't recall a specific date I spoke
15 to him about the topics I would be discussing.
16      Q.  Did he give you any information that you
17 didn't already know?
18      A.  Yes.
19      Q.  For instance, what did he tell you?
20      A.  The board of directors.
21      Q.  The identity?
22      A.  Yes.
23      Q.  Who else did you talk to?
24      A.  A lot of the other topics I already had
25 knowledge of from my responsibilities.

65

1       Q.  Fair enough.  But, again, who else did
2  you talk to?
3       A.  I don't recall anyone else I
4  specifically spoke to.
5       Q.  Okay.  Did you talk to any former
6  employees of SFA?
7       A.  No.
8       Q.  Other than Mr. Huang -- is Mr. Chaykin
9  an officer of the company as well as the legal
10 counsel?
11      A.  Mr. Chaykin an officer?
12      Q.  Yes.  Is he a vice president, is he --
13 he's legal counsel, correct?
14      A.  He's legal counsel, yes.
15      Q.  Is he also an officer of SFA?
16      A.  No.
17      Q.  Is Mr. Huang the only officer of SFA you
18 spoke to in preparation for today's deposition?
19      A.  Yes.
20      Q.  Okay.  Can you tell us what documents
21 you reviewed in preparation for today's
22 deposition?
23      A.  Well, I would have reviewed documents
24 that we have submitted to you, loss runs,
25 e-mails, contracts, related to SFA.

66

1    Q.  Anything else?
2    A.  No.
3    Q.  Just give me a moment, there is more
4  questions, I just want to get more documents.
5         MR. BROWN:  Can we go ahead and
6  take a five-minute break?
7         MR. EDINBURGH:  Absolutely.  Yes.
8         (Brief recess taken.)
9    Q.  (BY MR. EDINBURGH)  Have you ever heard
10 of a lawsuit against SFA called Raymond?
11   A.  Yes.
12   Q.  Was Raymond one of the claims that you
13 previously identified?
14   A.  Yes.
15   Q.  Besides Klorczyk and Raymond, again, you
16 don't know the name of other claims that you
17 recall today?
18   A.  Not that I recall, no.
19   Q.  What was the resolution of Raymond if
20 you know?
21   A.  I don't know.  I believe that will be a
22 topic discussed tomorrow in detail.
23   Q.  Okay.  Have you heard of the Consumer
24 Product Safety Commission?
25   A.  Yes.

67

1    Q.  Okay.  Has SFA provided any information
2  to the Consumer Product Safety Commission with
3  respect to any claims that it was aware of
4  concerning jack stands?
5    A.  No.
6    Q.  And can you tell me the basis for that
7  answer.  How do you know the answer is no?  Do
8  you know that of your own personal knowledge?
9  Did you ask others, review documents?
10   A.  That would be knowledge I discussed with
11 our in-house counsel.
12   Q.  Is SFA the TPA for Wei Fu, MVP and Shinn
13 Fu Taiwan in this case, the Klorczyk case?
14        MR. BROWN:  Object to form.
15   A.  I only speak on behalf of Shinn Fu
16 Company of America.
17   Q.  (BY MR. EDINBURGH)  I understand that,
18 but you are also here as a relationship between
19 SFA and other entities.  I'm asking you with
20 respect to the other entities, is SFA the TPA for
21 the Klorczyk case?
22   A.  The only other office that we would
23 coordinate information with is Shinn Fu Taiwan,
24 Shinn Fu Corporation; and Arthur, our in-house
25 counsel, would coordinate with that office.

68

1    Q.  Has he, in fact, done that with respect
2  to the Klorczyk matter?
3    A.  Yes.
4    Q.  Did he do that with respect to the
5  Raymond matter?
6    A.  I don't know if Arthur was our in-house
7  counsel at the time of the Raymond claim.
8    Q.  If not him, whoever took his place?
9    A.  I don't know.
10   Q.  Do you know what a product safety data
11 sheet is?
12   A.  Yes.
13   Q.  Okay.  Has SFA prepared any product
14 safety data sheets concerning any jack stand
15 complaints?
16   A.  No.
17   Q.  Has SFA prepared any spreadsheets
18 detailing incidents of complaints or allegations
19 of sudden loss of ratchet bar height on jack
20 stands?
21   A.  No.
22   Q.  And, again, I'm not questioning your
23 answer, but how did you arrive at that answer,
24 how do you know that no to that?
25        MR. BROWN:  Object to form.

69

1    Q.  (BY MR. EDINBURGH)  Is that based on
2  your own personal knowledge or any inquiry you
3  made?
4    A.  That would have been discussed with our
5  in-house counsel.
6    Q.  All right.  I'm going to show you a
7  document that was just provided to us I believe a
8  week ago.
9         MR. EDINBURGH:  And we'll mark it
10 as 6 and give it to the witness.
11        (WHEREUPON, DEPOSITION EXHIBIT
12 NO. 6 WAS MARKED FOR IDENTIFICATION.)
13   Q.  (BY MR. EDINBURGH)  I'm showing the
14 witness what's been called Sales Representative
15 Agreement Between Shinn Fu Company of America,
16 Inc. ["SFA"] and MVP(HK), Industries, Ltd. along
17 with amendments to that agreement and they are
18 Bates numbered SFA3336 to 3345.
19        Ms. O'Connor, have you reviewed this
20 document before today?
21   A.  I have seen this document, yes.
22   Q.  I'd like you if you could to please go
23 to Page SFA3340.  This document is called Second
24 Amendment of Sales Representative Agreement
25 Between Shinn Fu Company of America, Inc. ["SFA"]

70

1  and MVP(HK) Industries, Ltd.  Do you see where
2  I'm --
3      A.  Yes.
4      Q.  Okay.  On the next page, 3341, indicates
5  that this amendment is effective on June 1, 2008,
6  correct?
7      A.  Yes.
8      Q.  And can you tell me who signed on behalf
9  of Shinn Fu Company of America?
10     A.  Steven Huang.
11     Q.  Was Steven Huang -- the title here is
12 president, correct?
13     A.  Correct.
14     Q.  And he's chief operating officer and
15 president, correct?
16     A.  Yes.
17     Q.  And he's been president for a number of
18 years?
19     A.  Yes.
20     Q.  How long?
21     A.  I don't know the extent.
22     Q.  Would it be the same extent he's been
23 chief operating officer?
24     A.  Yes.
25     Q.  Do you have any understanding of who

71

1  signed for MVP?
2      A.  No.
3      Q.  I'd like you to look at the first
4  numbered paragraph, do you see that?
5      A.  On which page?
6      Q.  I'm sorry, 3340.
7      A.  Okay.
8      Q.  First numbered paragraph says, "MVP(HK)
9  will no longer pay a sales commission to SFA for
10 services provided to it pursuant to the sales
11 agency."  And then it says, "Instead, the sales
12 agency will be converted to a sales and customer
13 support relationship," and it goes on to deal
14 with payment.
15          Did you have an understanding of what
16 the customer support relationship was between SFA
17 and MVP as of June 1, 2008?
18          MR. BROWN:  Object to form.
19          MR. EDINBURGH:  May the witness
20 respond?
21          MR. BROWN:  Yes, certainly.
22     A.  Yes.
23     Q.  (BY MR. EDINBURGH)  What was that
24 relationship?
25     A.  We had a business agreement to provide

72

1  sales services if requested by MVP to Sears.
2      Q.  Was that with respect to the whole line
3  of MVP products sold to distribute in the United
4  States?
5      A.  Only in respect to Sears.
6      Q.  This agreement your understanding was
7  limited to Sears and no other retail chains or
8  auto parts chains?
9      A.  Yes.
10     Q.  Is there anything in this agreement
11 which states what you just said?
12     A.  No.
13     Q.  What is the basis for your understanding
14 that this amendment was limited to Sears only?
15     A.  In discussing with the sales department
16 regarding this case, it's my understanding that
17 the employee mentioned in this agreement
18 specifically helped sales service with the Sears
19 account.
20     Q.  Who did you speak to in sales?
21     A.  James Wang.
22     Q.  Is he still employed?
23     A.  No.
24     Q.  When did he leave SFA?
25     A.  Last month.

73

1      Q.  Okay.  And why?
2      A.  He was terminated.
3      Q.  Did he provide you with any
4  documentation supporting his belief that this
5  amendment was limited to providing customer
6  support relationship to MVP products that were
7  eventually sold to Sears?
8          MR. BROWN:  Object to form.
9          Go ahead and answer.
10     A.  Not that I'm aware of.
11     Q.  (BY MR. EDINBURGH)  Okay.  Go back to
12 the beginning of the agreement on 3336.  You see
13 where it says "Background," it has bullet points?
14     A.  Yes.
15     Q.  It says, "SFA is in the business of
16 importing, selling, marketing, and distributing
17 various types of lifting equipment, automotive
18 tools, and hydraulic devices in the United States
19 and Central America."  To your knowledge is that
20 accurate?
21     A.  Yes.
22     Q.  Okay.  And then it discusses the DIY or
23 do it yourself, sales channels in the market
24 area.  Is that correct?
25     A.  Yes.

74

1    Q.   It says, "MVP is in the business of
2  sourcing and selling a variety of automotive
3  accessories and related consumer products focused
4  on the DIY market," correct, that's what the
5  bullet point says?
6    A.   That's what the bullet point says, yes.
7    Q.   And then it says, "MVP wishes to retain
8  SFA as its Representative for the Market Area,"
9  correct?
10   A.   Yes, that's what the bullet point says.
11   Q.   The market area included the United
12 States of America?
13   A.   That's correct.
14   Q.   Up until the Second Amendment from 2006
15 was SFA/MVP's sales representative in the United
16 States of America?
17   A.   According to this agreement, yes.
18   Q.   Do you have any reason to believe --
19 withdrawn.
20        Did that include jack stands sold by MVP
21 in the United States or to the United States
22 customers?
23   A.   Yes.
24   Q.   Under this agreement, if you know, was
25 SFA responsible for managing warranty claims that

75

1  MVP -- withdrawn.
2        Under this agreement was SFA responsible
3  for managing any claims for breach of warranty
4  brought by customers of MVP jack stands?
5        MR. BROWN:  Object to form.
6    Q.   (BY MR. EDINBURGH)  Under this -- I'll
7  withdraw the question.
8        Under this agreement what, if any,
9  responsibility did SFA have with respect to
10 warranty claims brought against MVP?
11        MR. CHAYKIN:  2006 agreement?
12        MR. EDINBURGH:  Before the
13 amendment.
14   A.   The only time SFA would be involved is
15 by MVP's request.
16   Q.   (BY MR. EDINBURGH)  And at MVP's request
17 what would SFA do?
18   A.   It would be circumstantial.
19   Q.   Meaning what?
20   A.   Depends on what they are asking us to
21 do.
22   Q.   Are you saying that was on an individual
23 case-by-case basis?
24   A.   Yes.
25   Q.   Beginning on June 1, 2008, based upon

76

1  the Second Amendment that we just discussed, did
2  SFA take on any duties and responsibilities with
3  respect to warranty claims brought concerning MVP
4  products?
5    A.   Again, it would be based off MVP's
6  request.
7    Q.   Have you in preparation for today's
8  deposition acquired any knowledge of SFA's role
9  with respect to warranty claims brought with
10 respect to MVP sold jack stands?
11        MR. BROWN:  I'll object to form.
12   A.   The only knowledge that I would have
13 prepared for today was related to this case on
14 behalf of Shinn Fu Company of America.
15   Q.   (BY MR. EDINBURGH)  With respect to the
16 relationship between SFA and MVP concerning
17 warranty claims, I'll even limit it to jack stand
18 warranty claims, have you acquired any knowledge
19 of what role, if any, SFA played with respect to
20 jack stand warranty claims brought against MVP?
21        MR. BROWN:  I'll object to form.
22   A.   What kind of warranty claims are you
23 asking about?
24   Q.   (BY MR. EDINBURGH)  That a product
25 malfunctioned, didn't work properly, for any

77

1  reason it didn't perform the way it was supposed
2  to.
3    A.   Not to my knowledge.
4    Q.   Were any warranty claims involving --
5  withdrawn.
6        Let's go through this list and I'll get
7  back to that.  The No. 1 list, it says, "SFA will
8  provide MVP with," and then it has a., b., c. and
9  d.  I'm on Page 3340.  First one, it says "Lab
10 testing services."  Can you tell us what lab
11 testing services SFA provided to MVP?
12   A.   That would be covered by Ryan in his
13 deposition.
14   Q.   Okay.  Let's do b. then.  It says "Show
15 management," can you explain what show management
16 services were provided?
17   A.   If for some reason MVP wanted to attend
18 a show in the United States, we would help
19 coordinate that show for them.
20   Q.   Did you, in fact, do that, "you" meaning
21 SFA?
22   A.   I don't know if SFA actually performed
23 that function in this time frame.
24   Q.   Do you know whether -- all right.  C. is
25 OIPM support.  Do you know what those initials

78

1  stand for?
2      A.  Yes.
3      Q.  What do they stand for?
4      A.  It's going to be owner's information
5  product manual.
6      Q.  Okay.  Owner's or operator's or could be
7  either one, or is it owner's?
8      A.  I believe it's owner's.
9      Q.  What kind of services did SFA provide
10  with respect to OIPM support?
11      A.  We would format the OIPMs for them.  If
12  a customer requested a specific format, specific
13  information, we would create that for them.
14      Q.  Do you have any personal involvement in
15  that aspect of the amendment?
16      A.  No.
17      Q.  Do you know whether this topic will be
18  one that Mr. Jorgensen will talk about tomorrow?
19      A.  Yes.
20      Q.  It will be?
21      A.  Yes.
22      Q.  Okay.  D., customer phone service
23  support, can you elaborate on what that consisted
24  of?
25      A.  If MVP had a customer in the United

79

1  States, it was much easier for that customer to
2  communicate with our office.  Everyone speaks
3  clear English.
4      Q.  Was a customer of MVP Sears?
5      A.  I'm sorry, what?
6      Q.  Was one of the customers of MVP Sears?
7      A.  Yes.
8      Q.  Okay.  And did Sears phone SFA if they
9  had any issues regarding MVP products?
10          MS. TODD-TROTTA:  Objection to
11  form.
12      Q.  (BY MR. EDINBURGH)  She can do it, but
13  you can still respond.
14      A.  Not to my knowledge.
15      Q.  Who was responsible at SFA for the
16  customer phone service support for MVP?
17      A.  We have a customer service department.
18      Q.  Okay.  Who was in charge of that
19  department?
20      A.  Mike Stevens.
21      Q.  Is he still around?
22      A.  Yes.
23      Q.  And did you talk to Mr. Stevens in
24  preparation for today's deposition?
25      A.  Yes.

80

1      Q.  What did your discussion with him
2  consist of?
3      A.  My preparation with Mike Stevens was
4  document collection.
5      Q.  Are you talking about to respond to
6  prior discovery requests made?
7      A.  Yes.
8      Q.  How about to acquire knowledge on the
9  topics you are going to talk about today?
10      A.  No.
11      Q.  From your own knowledge what does the
12  customer service department of SFA do?
13      A.  They take technical calls.  They also
14  give parts pricing and they do parts orders.
15      Q.  Are they involved in getting calls
16  concerning incidents or claims?
17      A.  Yes.
18      Q.  And do they get calls from retailers?
19      A.  Yes.
20      Q.  Such as Sears?
21      A.  It's possible, yes.
22      Q.  Okay.  And does Mike Stevens' department
23  keep a record of such calls?
24      A.  It would be circumstantial.  If there is
25  a report filed, yes.  If the call doesn't require

81

1  a report, then no.
2      Q.  Okay.  Prior to today, do you know
3  whether SFA conducted a search of its customer
4  service department records to see whether they
5  had any records with respect to calls with
6  respect to jack stand failure or collapse of a
7  ratchet and pawl jack stand?
8      A.  Yes, we would have searched customer
9  service documents for that information.
10      Q.  How was that search conducted if you
11  know?
12      A.  Electronically.
13      Q.  Are there any particular search words
14  used?
15      A.  Several.
16      Q.  Such as?
17      A.  Jack stand, the Item No. 50163, T6904,
18  engagement, disengagement, nonengagement.
19      Q.  Was the search limited to one particular
20  model or was it all-inclusive of jack stands?
21      A.  Well, we based our search off of all the
22  search terms, so like I said, engagement,
23  nonengagement, disengagement, would have pulled
24  unrelated to jack stands or not, depending on the
25  context.

82

1    Q.  I appreciate that, but just so I
2 understand it, to the extent that the -- the
3 search was not specifically limited to the Model
4 T6904, am I correct?
5    A.  Yes, you are correct.
6    Q.  It included all model jack stands?
7    A.  We used the search term "jack stand,"
8 so, yes.
9    Q.  Whatever result you got, did you give
10 that result to your counsel?
11   A.  Anything that would have turned up I
12 would have given to my counsel, yes.
13   Q.  Did anything turn up?
14   A.  No.
15   Q.  What years did you search for?
16   A.  We searched -- I believe the date range
17 was 2003, we searched any files that we would
18 have had from that point forward.
19   Q.  To the time you made the search?
20   A.  Correct.
21   Q.  Did the Klorczyk case come up?
22   A.  We would have set aside any files on the
23 Klorczyk case.
24   Q.  Did the Raymond case come up?
25   A.  Not to my knowledge, no.

83

1    Q.  Is it fair to say there was also in that
2 search that you didn't find any cases that met
3 any of the search criteria -- any reports, I said
4 "cases," any reports or any incidents or any
5 calls?
6    A.  That's pretty broad.  Related to what, I
7 suppose?
8    Q.  You said there was -- okay.  You said
9 you would get a certain body of cases when you
10 put in jack stands?
11   A.  Correct.
12   Q.  Then you would further cull from that
13 words like "engagement," "failure," am I correct?
14   A.  Engagement, nonengagement,
15 disengagement.
16   Q.  Okay.  What about eliminating the word
17 "engagement," did you use words like "collapse,"
18 "failure," "malfunction," anything of that sort?
19   A.  No, I believe our attorneys gave a list
20 of words that we searched for and we stuck to
21 that list of search terms.
22   Q.  Okay.  Do you have that list currently?
23   A.  On me?
24   Q.  I'll ask you that question.  Do you have
25 it on you today?

84

1    A.  No.
2    Q.  Is it back in the office?
3    A.  We should have a list of terms, yes.
4    Q.  Do you recall whether words like
5 "failure," "malfunction," "collapse," "gave way,"
6 words to that effect were part of the search
7 terms?
8    A.  No.
9    Q.  No, you don't recall or they were not
10 part?
11   A.  They were not part of the search terms.
12   Q.  Can we go to Paragraph 2 of that same
13 document, please.
14   A.  Yes.
15   Q.  It says in 2.a., it says, "An employee
16 cost charge covering the salary and benefits of
17 100% of one full time SFA employee," and it says
18 in brackets, "Johnny Lu," L-U, and then, "50% of
19 the salary and benefits of one other employee,"
20 it says in brackets, "Jamie Martinez," closed
21 bracket.  I may have asked you this, is Johnny Lu
22 still employed by SFA?
23   A.  No.
24   Q.  When did he leave?
25   A.  Approximately 2011.

85

1    Q.  Okay.  And before he left what was his
2 job title?
3    A.  He would have been a sales manager.
4    Q.  For Sears?
5    A.  Our retail department.
6    Q.  But was it limited to Sears?
7    A.  He had several accounts.
8    Q.  Was Sears one of them?
9        MR. BROWN:  Object to form.
10   A.  Johnny Lu was one of the individuals
11 that assisted MVP with Sears.
12   Q.  (BY MR. EDINBURGH)  Did he also assist
13 MVP with other customers, other retail chains,
14 other supply chains?
15   A.  Not to my knowledge.
16   Q.  You mentioned a John Liu, L-I-U?
17   A.  Yes.
18   Q.  That was a former CEO, correct?
19   A.  Yes.
20   Q.  This is Johnny Lu, L-U?
21   A.  Correct.
22   Q.  Two totally separate people, right?
23   A.  Yes.
24   Q.  Did you have any other Johnny Lu
25 employed by SFA to your knowledge?

86

1     A.  No.

2     Q.  Do you know whether -- is it correct

3  that, according to this document, MVP was paying

4  Johnny Lu's entire salary?

5          MR. BROWN:  Object to form.

6     Q.  (BY MR. EDINBURGH)  Was MVP paying

7  Johnny Lu's salary for the years this agreement

8  was in effect?

9          MR. BROWN:  Object to form.

10    Q.  (BY MR. EDINBURGH)  Answer, please.

11    A.  No. 2, Point a. says, "An employee cost

12 charge covering the salary and benefits of 100%

13 of one full time SFA employee [Johnny Lu]," so

14 that should answer your question.

15    Q.  So the answer is MVP was paying Johnny

16 Lu's entire salary?

17         MR. BROWN:  I'll object.

18         MR. EDINBURGH:  If I'm getting it

19 wrong, I'll stand corrected.

20         MR. BROWN:  I'm not trying to be

21 argumentative, but it says MVP is going to pay

22 SFA a certain sum.  SFA pays the person's salary.

23 The way it was phrased --

24         MR. EDINBURGH:  I'll correct it,

25 I'll correct it.

87

1     Q.  (BY MR. EDINBURGH)  Johnny Lu was an

2  employee of SFA, correct?

3     A.  Yes.

4     Q.  He was not an employee of MVP, correct?

5     A.  Yes.

6     Q.  But MVP was paying his salary, correct?

7          MR. BROWN:  Object to form.

8     Q.  (BY MR. EDINBURGH)  MVP was reimbursing

9  SFA for his salary, correct?

10    A.  MVP was paying SFA for a sales service.

11    Q.  Was all the payments that SFA made to

12 Johnny Lu as an employee of SFA, were they

13 getting reimbursed for that entire cost by MVP?

14    A.  Per the agreement, MVP would cover the

15 employee cost 100 percent for one full-time

16 employee of SFA.

17    Q.  Okay.  Did Johnny Lu have to submit

18 any -- or did SFA or Johnny Lu submit any reports

19 to MVP about Johnny Lu's activities in order to

20 get the reimbursement identified in this

21 amendment?

22    A.  Yes.

23    Q.  Okay.  Do you know whether any of those

24 reports concerned Johnny Lu's work on jack stands

25 or with respect to jack stands?

88

1     A.  I don't have that knowledge.

2     Q.  What did Jamie Martinez do at SFA?

3     A.  I am not familiar with Jamie Martinez.

4     Q.  Is he still there?

5     A.  No.

6     Q.  When did he leave?

7     A.  Again, I'm not familiar with Jamie

8  Martinez.

9     Q.  Do you know whether Johnny Lu verified

10 any discovery or interrogatory responses in this

11 lawsuit?

12    A.  No.

13    Q.  You are unaware of?

14    A.  He would not have.

15    Q.  Now, let me go forward a bit.  I just

16 read to you the Second Amendment and now I want

17 you to look at what's called the First Amendment,

18 but it comes later in time than the Second

19 Amendment.  And it's on Pages 3346 and 3 -- it's

20 on Pages, yeah, 3346 to 3347, it's called First

21 Amendment of Sales Representative Agreement

22 Between Shinn Fu Company of America ["SFA"] and

23 MVP(HK) Industries.

24         With respect to Paragraph 1 -- this

25 First Amendment becomes effective on December 1,

89

1  2009.  With respect to Paragraph 1, is MVP's

2  relationship with SFA described as a customer

3  support relationship?

4          MR. BROWN:  I'll object to form.

5     Q.  (BY MR. EDINBURGH)  Okay.  Is SFA

6  described as providing customer support

7  relationship to MVP?

8     A.  SFA would have provided support on the

9  topics listed in this agreement.

10    Q.  Okay.  And are they the same four areas

11 as the Second Amendment and it was a continuation

12 of those same general areas?

13    A.  It's the same four services listed in

14 the other agreement.

15    Q.  And Johnny Lu is still considered to be

16 an SFA employee whose salary and benefits were

17 being reimbursed to SFA by MVP?

18    A.  Yes.

19    Q.  It says under "The Lump Sum," we have

20 two, it says, "MVP will cover all travel expenses

21 and other special employee business expenses

22 incurred by the Assigned Employees in furtherance

23 of MVP's business."  Do you have an understanding

24 of what work was done by Johnny Lu in furtherance

25 of MVP's business during the term of the First

90

1  Amendment?
2          MR. BROWN:  I'll object to form.
3      You can go ahead and answer.
4      A.  You are asking what he specifically
5  would have traveled for?
6      Q.  (BY MR. EDINBURGH)  Or did, in fact,
7  travel for.
8      A.  I don't have knowledge if he did, in
9  fact, travel during this period.
10     Q.  I'd like you to go through -- I
11  apologize for the print, it's print that I have.
12  SFA3344 and 3345 is also called First Amendment
13  of Sales Representative Agreement Between Shinn
14  Fu Company of America ["SFA"] and MVP(HK)
15  Industries.  This one is dated January 1, 2011,
16  and can you tell me who signed this agreement on
17  behalf of Shinn Fu Company of America?
18     A.  Steven Huang.
19     Q.  Can you tell who signed for MVP?
20     A.  No.
21     Q.  Let's go back one to the earlier First
22  Amendment.  Can you tell me who signed for the
23  Shinn Fu Company of America?
24     A.  You are on which page?
25     Q.  3347.

91

1      A.  Steven Huang.
2      Q.  As president of SFA?
3      A.  Yes.
4      Q.  And the First Amendment agreement that's
5  on Pages 3344, 3345 become effective on
6  January 1, 2011.  Does that also list services
7  that SFA would perform on behalf of MVP for
8  customer support?
9          MR. BROWN:  Object to form.
10     A.  You are asking about the bullet points
11  listed?
12     Q.  (BY MR. EDINBURGH)  Paragraph 1.
13     A.  Those would have been the services we
14  offered to them, yes.
15     Q.  And Paragraph 2.a. also continues to
16  state that Johnny Lu's salary paid to him by SFA
17  would be reimbursed by MVP, correct?
18     A.  Yes.
19     Q.  And during the years that this
20  agreement -- is this agreement still in effect?
21     A.  No.
22     Q.  When did it terminate, if it did
23  terminate?
24     A.  I don't know.  It's not listed on the
25  contract.

92

1      Q.  Make any inquiries as to when it ended?
2      A.  Johnny Lu left the company in 2011, so
3  that service would have no longer been provided
4  from him.
5      Q.  From him, but was there a new agreement
6  providing for reimbursement for some other
7  employee at SFA that took his place?
8      A.  To my knowledge, no.
9      Q.  Is this agreement in effect for the
10  calendar year 2011?
11     A.  I don't believe the agreement states a
12  specific term.
13     Q.  Right.  So that's why I'm asking you
14  whether you acquired any knowledge as to how long
15  this agreement was in effect after January 1,
16  2011?
17     A.  I can't recall the specific date that
18  Johnny Lu left the company, but that would have
19  been the end of the service from him.
20     Q.  What about for the customer support
21  services a. through d., did those continue?
22     A.  Not to my knowledge.
23     Q.  In order to testify here today did you
24  speak to anyone about when the amendments to the
25  sales representative agreement ended?

93

1      A.  No.
2      Q.  All right.  I'd like to go through
3  certain employees whose names have come up and
4  ask you just a little bit about their role at SFA
5  and whether they are still around.  Doris Adwell,
6  do you know who she is?
7      A.  Yes.
8      Q.  Who is she?
9      A.  She is our chief accountant.
10     Q.  Is she still there?
11     A.  Yes.
12     Q.  What are her duties as chief accountant?
13     A.  She prepares financial statements,
14  oversees the accounting department, reviews
15  taxes.
16     Q.  Does she have to prepare checks written
17  on SFA's bank accounts?
18     A.  Yes.
19     Q.  Does she sign those checks?
20     A.  No.  Steven Huang would sign those
21  checks.  She does have authority to sign the
22  checks.
23     Q.  If checks were made to pay any claimants
24  within the SFA deductibles, would Doris Adwell
25  have copies of those payment checks --

94

1    A.  Yes.
2    Q.  -- in her department?
3    A.  Yes.
4    Q.  Was any search made in her department
5 for any checks concerning payment of claimants
6 who alleged jack stand failures of any type?
7    A.  Any checks would have been in the
8 product liability files which would have been
9 given to you.
10    Q.  And where are the product liability
11 files kept in the ordinary course of business of
12 SFA?
13    A.  They are kept in electronic database and
14 also in file cabinets.
15    Q.  Does the electronic database have a
16 special name?
17    A.  We use Access.
18    Q.  That's what it's called?
19    A.  Yes.
20    Q.  And they are called product liability
21 files?
22    A.  We refer to it as our claim file.
23    Q.  So just so I get the nomenclature right,
24 at SFA electronic claim files include product
25 liability files?

95

1    A.  Yes.
2    Q.  And you have access to those files?
3    A.  Yes.
4    Q.  Who else has access to those files at
5 SFA?
6    A.  Our in-house counsel.
7    Q.  Mr. Chaykin?
8    A.  Yes.
9    Q.  Anyone else?
10    A.  His assistant.
11    Q.  Anyone else?
12    A.  Not to my knowledge, no.
13    Q.  So copies of any payment checks would be
14 kept electronically --
15    A.  Yes.
16    Q.  -- in those files?
17    A.  Correct.
18    Q.  You said there was hard files kept.
19 Where were they kept?
20    A.  Those are the contracts -- the claims
21 that are kept in my office.
22    Q.  And I believe you testified earlier that
23 those files were reviewed in responses to -- in
24 searches for responses to earlier document
25 requests, correct?

96

1    A.  Yes.
2    Q.  Who is Doris Adwell's boss?
3    A.  Steven Huang.
4    Q.  Do you remember discussing with Steven
5 Huang at all as to whether he would be the 30(B)6
6 witness to testify?
7        MR. BROWN:  Object to form.
8    A.  No.
9    Q.  (BY MR. EDINBURGH)  All right.  Mark
10 Pappas, ring a bell?
11    A.  Yes.
12    Q.  Who is he?
13    A.  He was our product safety manager.
14    Q.  All right.  And for how long was he in
15 that capacity?
16    A.  I don't have an exact date, but several
17 years.
18    Q.  Is he still there?
19    A.  No.
20    Q.  When did he leave?
21    A.  Approximately 2011.
22    Q.  Why did he leave?
23    A.  He was terminated.
24    Q.  Who took his place, if anyone?
25    A.  Our engineering department took his

97

1 responsibility.
2    Q.  Is that something that Mr. Jorgensen
3 will discuss tomorrow?
4    A.  Yes, correct.
5    Q.  If you know, did the product safety
6 manager pull out of a product safety department?
7    A.  He was the only individual.
8    Q.  Did he manage a group at that time?
9        MR. BROWN:  Object to form.
10    A.  No.
11    Q.  (BY MR. EDINBURGH)  Okay.  Did he have
12 access, if you know, to the product liability
13 files?
14    A.  No.
15    Q.  No, you don't know or, no, he did not
16 have access?
17    A.  No, he did not have access.
18    Q.  Okay.  In general what were the duties
19 and responsibilities of the product safety
20 manager at that time?
21    A.  He was responsible for ensuring our
22 owner's manuals were up to date with accurate
23 information.
24    Q.  Okay.  And, again, the subject of
25 owner's manuals, instructions and warnings, those

98

1  areas are to be covered by Mr. Jorgensen, that's
2  your understanding?
3      A.  Yes.
4      Q.  We discussed Sara Sunderman.  By the
5  way, do you know whether Ms. Sunderman still
6  lives in the Kansas City area?
7      A.  Yes, she does.
8      Q.  What about Mark Pappas?
9      A.  I don't know about Mark Pappas.
10     Q.  Okay.  And we discussed Mike Stevens,
11 correct?
12     A.  Yes.
13     Q.  Does he still live in the area?
14     A.  Yes.
15     Q.  Do you have last known addresses for the
16 former employees we have mentioned?
17     A.  Only what we have in employee records.
18     Q.  Okay.  We discussed James Wang and,
19 again, was he in charge of relations with Sears?
20         MR. BROWN:  Object to form.
21     Q.  (BY MR. EDINBURGH)  What was James
22 Wang's duties and responsibilities at SFA?
23     A.  James was a sales manager, so he was
24 assigned accounts from our retail department.
25     Q.  Did that include Sears?

99

1         MR. BROWN:  Object to form.
2      A.  That included Sears after SFA handled
3  Sears business directly uninvolved from MVP.
4      Q.  (BY MR. EDINBURGH)  When was that?
5      A.  We signed an agreement with Sears in
6  2012.
7      Q.  Prior to that did Mr. Wang work at all
8  with respect to the relationship of MVP in
9  respect to its dealings with Sears?
10     A.  No.
11     Q.  William Shaw, S-H-A-W, you know who that
12 was?
13     A.  Yes.
14     Q.  Who was Mr. Shaw?
15     A.  He was the -- his specific title I guess
16 is -- he helped manage claims on behalf of the
17 company during the time that our in-house counsel
18 was not working with us.
19     Q.  Okay.  Was he a former CEO or company
20 president?
21     A.  No.
22     Q.  Okay.  Was he an attorney?
23     A.  No.
24     Q.  Mr. Shaw at some point left the company,
25 left SFA?

100

1      A.  Yes.
2      Q.  When?
3      A.  Would have been 2013 or 2014.
4      Q.  Why did he leave?
5      A.  He retired.
6      Q.  In this area, still live here?
7      A.  No.
8      Q.  Do you know where?
9      A.  California.
10     Q.  Is he happily retired?
11     A.  I'm sure he is.
12         MS. TODD-TROTTA:  Only the Sears
13 employees.
14     Q.  (BY MR. EDINBURGH)  I have another name
15 here.  Roger Claypool, who is Roger Claypool?
16     A.  My experience of Roger Claypool, I
17 believe -- I don't want to misspeak, I'm not sure
18 what Roger Claypool did.
19     Q.  Did Roger Claypool leave the company
20 prior to you arriving at the company?
21     A.  Yes.
22     Q.  Do you know when he left?
23     A.  No.
24     Q.  So you don't feel comfortable describing
25 what he did when he was there?

101

1      A.  Correct.
2      Q.  Is that accurate?
3      A.  Yes.
4      Q.  And you have not earlier talked to
5  anyone about what this particular employee did?
6      A.  I have spoken to individuals about Roger
7  Claypool, but I don't feel comfortable with my
8  knowledge on him.
9      Q.  That's fine.  That's okay.  There is
10 some other employees I want to go through if I
11 could.
12         MR. CHAYKIN:  I notice it's almost
13 12:30.
14         MR. EDINBURGH:  Can we go off
15 record for a minute.
16         (Noon recess.)
17         MR. EDINBURGH:  I just want to make
18 a statement before we begin the afternoon.  I
19 would request before we begin tomorrow's
20 deposition, I'm making a request that SFA produce
21 the loss run records, customer service records
22 and product liability claims file records that we
23 discussed during the course of this morning's
24 deposition that Ms. O'Connor testified about.  In
25 my view those records should have been previously

102

1  produced in this action and certainly should have
2  been produced today as part of the 30(b)6
3  compliance.  If they are not produced, which is
4  obviously a decision to be made by defense
5  counsel, I reserve my rights to request any
6  appropriate relief.
7          MR. CHAYKIN:  I'd like to ask
8  counsel just one question.  The testimony of the
9  witnesses on customer service records was there
10 was none involving jack stands, so I'd like to
11 understand the basis for your request.
12         MR. EDINBURGH:  I think you are
13 mischaracterizing the testimony.
14         MR. CHAYKIN:  We can have the court
15 reporter read it back.
16         MR. EDINBURGH:  My understanding is
17 that there are records concerning jack stands,
18 but there were no records under the search terms
19 utilized, which was "engagement," "false
20 engagement," but the terms utilized did not
21 include words such as "jack stand collapse,"
22 "jack stand failure" and "jack stand giving way,"
23 which to my mind is a gateway to understanding
24 what happens to these jack stands which would be
25 consistent with our theory of the case.

103

1          If you did not provide -- I don't want
2  to give a speech, but I've been asked a question
3  by counsel, those records were not provided
4  because in my view unduly restrictive search
5  terms were utilized for that computer search and
6  if appropriate search words were used, then I
7  don't know what we would find, maybe we wouldn't
8  find anything, but I don't know because those
9  search terms weren't utilized in this search.
10 This witness testified they weren't used and,
11 therefore, you get out what you put in.  If they
12 didn't put in the right words, they are not going
13 to get out the right record.
14         MR. BROWN:  We're not here for an
15 oral argument.
16         MR. EDINBURGH:  I'm not either but
17 he asked me.
18         MR. CHAYKIN:  I don't want to argue
19 and I don't want to help you, but you are in need
20 of help because you clearly don't understand how
21 the search was formed nor do you understand the
22 witness's testimony, and I'll just leave it at
23 that.  If you understood either of those, you
24 would understand that everything was searched for
25 and that nothing was found.

104

1          MR. EDINBURGH:  All right.  I'll go
2  back on the record because I don't want to --
3          MS. TODD-TROTTA:  We were on the
4  record.
5          MR. EDINBURGH:  I'll go back to the
6  questioning.
7     Q.  (BY MR. EDINBURGH)  Not to belabor this,
8  but can you describe, again, so there is total
9  clarity, with respect to the customer service
10 records, what search did you conduct of the
11 electronic records concerning jack stands,
12 incidents concerning jack stands?
13         MR. BROWN:  Object to form.
14         Go ahead.  Go ahead and answer.
15    A.  We specifically searched 50163, T6904,
16 the terms "engagement," "nonengagement,"
17 "disengagement" and "jack stand."
18    Q.  (BY MR. EDINBURGH)  And in order to get
19 a positive hit on anything, how many of those
20 search terms would have to appear on the record?
21    A.  Each term was searched individually, so
22 it would have only had to appear once in any kind
23 of record.
24    Q.  The term "jack stand" was individually
25 searched without any other limitations?

105

1    A.  Correct.
2    Q.  And you found no customer service
3  records with the term "jack stand"?
4    A.  Anything that we found was submitted to
5  legal counsel.
6    Q.  Okay.  And I appreciate that, but
7  respectfully, I don't think that answers my
8  question.  Did you find any incidents of customer
9  service complaints that responded to the search
10 term "jack stands"?
11         MR. BROWN:  Object to form.
12         Go ahead.
13    A.  We turned over thousands of documents,
14 so I can't specifically tell you yes or no other
15 than we searched the term, and if anything was
16 found, we submitted it.
17    Q.  (BY MR. EDINBURGH)  Okay.  I'll try and
18 close it because I've been accused of totally
19 misunderstanding of what you said this morning,
20 but as we sit here today, can you testify
21 knowledgeably about how many, if any, positive
22 hits did you make when you put in the term "jack
23 stand" in customer complaints?
24         MR. BROWN:  Object to form.
25    Q.  (BY MR. EDINBURGH)  Give me a ballpark,

106

1  a hundred, a thousand, five, what?
2      A.  There could have been any number.  I
3  mean, our business is very related to jack
4  stands.
5      Q.  Okay.  The only model number that was
6  added as a modifier to that was T6904 or the
7  Sears number, 51063, is that correct?
8              MR. BROWN:  Object to form.
9              MS. TODD-TROTTA:  Objection to
10  form.
11      Q.  (BY MR. EDINBURGH)  You tell me what
12  model numbers you put in to the search.
13      A.  We searched 50163 and T6904.
14      Q.  That's it, nothing else?
15      A.  For model numbers?
16      Q.  Correct.
17      A.  Yes.
18      Q.  And you used those words, like you said,
19  "engagement," "disengagement," correct?
20      A.  Yes.
21      Q.  Okay.  And whatever results you found,
22  you gave to your counsel?
23      A.  Yes.
24      Q.  But you personally cannot testify today
25  as to the content of the results, exactly what

107

1  you did find, is that accurate?
2      A.  Yes.
3              MR. EDINBURGH:  I stand by my
4  request.  Let's go forward if we could.
5      Q.  (BY MR. EDINBURGH)  In preparation for
6  this deposition as the 30(b)6 witness did you
7  review SFA's formal discovery responses to
8  plaintiffs' request or answers to
9  interrogatories?
10      A.  Yes.
11      Q.  Okay.  One of them I'd like to mark as
12  Exhibit 7.  It's Defendant Shinn Fu of America's
13  Responses to Plaintiffs' First Set of
14  Interrogatories.  They are not Bates numbered,
15  but it's a 15-page document.
16          (WHEREUPON, DEPOSITION EXHIBIT
17  NO. 7 WAS MARKED FOR IDENTIFICATION.)
18      Q.  (BY MR. EDINBURGH)  I really want to go
19  to the last page of this document, that's what I
20  want you to focus on, 15 of 15, where it's
21  verification of the interrogatory responses.  Do
22  you see who verified these on behalf of SFA?
23      A.  Yes.
24      Q.  Who verified it?
25      A.  Johnny Lu.

108

1      Q.  When did he verify it?
2      A.  Well, there is not a date next to his
3  name, but I'm assuming on January 6 of 2014.
4      Q.  Am I correct that you testified earlier
5  that you believed Johnny Lu left the company in
6  2011?
7      A.  Approximately.
8      Q.  Reviewing this, do you want to change
9  your testimony?
10             MR. BROWN:  Object to form.
11      Q.  (BY MR. EDINBURGH)  Was Mr. Lu an
12  employee of the company in 2014?
13      A.  If Johnny Lu signed this document in
14  2014, he would had to have been an employee of
15  Shinn Fu Company of America.
16      Q.  Okay.  So is it fair to say he did not
17  leave the company in 2011?
18      A.  Correct.
19      Q.  Do you know why Johnny Lu was chosen to
20  verify interrogatory answers, these particular
21  interrogatory answers?
22      A.  Johnny Lu was directly involved with the
23  Sears account, whether it be as a representative
24  of SFA or the help for MVP.
25      Q.  Did you have any discussion with Mr. Lu

109

1  as to the responses in this document on behalf of
2  SFA?
3      A.  No.
4      Q.  Who was Johnny Lu's boss in 2014?
5      A.  I believe that John Liu at the time
6  would have been who Johnny Lu directly reported
7  to.
8      Q.  What about back in 2010 and '11?
9      A.  It would have been Joey Su.
10      Q.  S-U?
11      A.  S-U.
12      Q.  First name?
13      A.  Joey.
14      Q.  What was Joey's title?
15      A.  I don't know Joey's exact title, but he
16  oversaw our sales department.
17      Q.  Is he still there?
18      A.  No.
19      Q.  When did he leave?
20      A.  He retired in I'd like to say 2011 or
21  2012.
22      Q.  Okay.  All right.  Thank you.  Did you
23  ever visit the Shinn Fu in Taiwan?
24      A.  No.
25      Q.  Or MVP?

**110**

1  A.  No.
2  Q.  Or Wei Fu?
3  A.  No.
4  Q.  Have you ever testified as a
5  representative or an employee of SFA in any other
6  lawsuits?
7  A.  No.
8  Q.  Is this the first one?
9  A.  Yes.
10  Q.  Back in 2010, '11, who was in charge of
11  the overall day-to-day operations of SFA?
12      MR. BROWN:  Object to form.
13  A.  Steven Huang.
14  Q.  (BY MR. EDINBURGH)  Did SFA over the
15  period of the last -- let's say from 2007 through
16  2011, SFA pay dividends to SFT?
17  A.  For a specific reason?
18  Q.  As a subsidiary paying dividends to a
19  parent company.
20  A.  Not to my knowledge.
21  Q.  Did SFA or SFT engage in any loans
22  between the two entities?
23  A.  Not to my knowledge.
24  Q.  Loan guarantees?
25  A.  None to my knowledge.

**111**

1  Q.  Did SFT on its own if you know -- let me
2  rephrase that.
3      To the knowledge of SFA did SFT have any
4  offices in the United States under the SFT name?
5  A.  Not to my knowledge.
6  Q.  Okay.  To the knowledge of SFA did MVP
7  have any offices in the United States under MVP's
8  name staffed by MVP personnel?
9  A.  SFA wouldn't have that information.
10  Q.  Have you asked in preparation for today?
11  A.  No.
12  Q.  Do you know of your own knowledge
13  whether they do, MVP does or does not?
14  A.  I don't know.
15  Q.  You are unaware of any, correct?
16  A.  Correct.
17  Q.  Okay.  Did SFA engage in training any
18  MVP engineers for any aspect of MVP's work?
19  A.  No.
20  Q.  Did SFA advise MVP as to jack stand
21  standards found in ASME PALD?
22  A.  No.
23  Q.  Did SFA engineers -- withdrawn.
24      Does SFA have a formal written retention
25  policy?

**112**

1  A.  We have a seven-year document retention
2  policy.
3  Q.  Okay.  And that policy isn't reduced to
4  writing, correct?
5  A.  Correct.
6  Q.  And how did that policy come into
7  effect?
8  A.  That policy came into effect,
9  essentially we are required to keep a certain
10  number of documents for audit purposes and
11  accounting for seven years, so at management's
12  discretion they may dispose of documents after
13  seven years.
14  Q.  Do you know whether SFA follows any
15  records retention policy suggested or required by
16  the Consumer Product Safety Commission?
17  A.  I guess I don't understand your
18  question.
19  Q.  You've heard of the Consumer Product
20  Safety Commission, correct?
21  A.  Yes.
22  Q.  To your knowledge does Consumer Product
23  Safety Commission issue any guidelines or
24  recommendations or rules concerning record
25  retention that applied to SFA?

**113**

1  A.  No.
2  Q.  What is SFA's records retention policy
3  with respect to claims?
4  A.  Our retention policy would be seven
5  years.
6  Q.  Seven years.  What would trigger the
7  running of the seven years, what events?
8  A.  What do you mean by that?
9  Q.  Well, would it be when a claim is first
10  filed or you first receive notice?  Would it be
11  seven years from when the claim is resolved no
12  matter how it's resolved?  What seven-year period
13  begins?
14  A.  Well, if it would be an active claim, it
15  would be adding files to that folder, so we would
16  consider the seven-year term at the close of that
17  case.
18  Q.  Okay.  A claim would have to be closed
19  or disposed of one way or another to trigger the
20  seven-year period?
21  A.  The case would have to be closed,
22  resolved.
23  Q.  I'm talking now not only about formal
24  lawsuits but about nonlegal claims, same policy?
25  A.  Yes.

114

1    Q.   And at the end of that seven-year period
2  are all records concerning that claim as a matter
3  of normal business operations purged or
4  destroyed?
5    A.   At management's discretion at the end of
6  the seven-year period, yes.
7    Q.   Would that include not only physical
8  copies of the claim, but also any electronic
9  records as well?
10   A.   Yes.
11   Q.   Who instituted that seven-year policy at
12 SFA, any particular individual?
13   A.   Not to my knowledge.
14   Q.   Was it Mr. Chaykin?
15   A.   I can't say yes or no to that.
16   Q.   Have you ever heard of the expression
17 "litigation hold"?
18   A.   Yes.
19   Q.   What's your understanding of what that
20 is?
21   A.   It's a hold on all documents.
22   Q.   Was a litigation hold placed as a result
23 of the Klorczyk case?
24   A.   Yes.
25   Q.   Can you tell me when?

115

1    A.   I can't provide a specific date, but it
2  was very early on when we received the claim we
3  released a litigation hold.
4    Q.   To the best of your understanding, and I
5  know you can't give me an exact day, but to the
6  best of your understanding when was that hold put
7  in place?  If you give me a month and year.
8    A.   I believe we received the claim in
9  approximately 2013 and when we received that
10 claim we would have released the litigation hold.
11   Q.   Okay.
12        MR. EDINBURGH:  I'd like to mark an
13 exhibit, screen shots from the SFA website.
14        (WHEREUPON, DEPOSITION EXHIBIT
15 NO. 8 WAS MARKED FOR IDENTIFICATION.)
16   Q.   (BY MR. EDINBURGH)  I'm marking one from
17 2011, which is the earliest one that I have.
18 Have you seen what's Exhibit 8 before?
19   A.   Yes.
20   Q.   Did you review the SFA website content
21 in preparation for today's deposition?
22   A.   Yes.
23   Q.   And you are familiar with the contents
24 of the website?
25   A.   Yes.

116

1    Q.   Okay.  Now, the term is used on the
2  website "SFA Companies," what does that refer to?
3    A.   Shinn Fu Company of America.
4    Q.   Okay.  It says, "SFA maintains the
5  following divisions" and then it lists several
6  bullet points, one of which is "Omega Lift
7  Equipment and corresponding OEM private label
8  hydraulic products."  Is Omega a division of SFA?
9    A.   Yes.
10   Q.   For how long has it been that?
11   A.   Omega has been a product line for
12 several years.  I can't provide a specific date.
13   Q.   Go back at least ten years from now?
14   A.   Yes.
15   Q.   Longer?
16   A.   Possible, yes.
17   Q.   Okay.  Does Omega manufacture the
18 equipment that's sold under the Omega name?  Let
19 me withdraw that.
20        Is there a division -- there's a
21 division labeled Omega, correct?
22   A.   Yes.
23   Q.   Where is that division physically
24 located, in other words, is it a separate
25 headquarters, separate plant?

117

1    A.   The Omega division is a product line, so
2  it's product labeled under the Omega lift.
3    Q.   Okay.  All right.  Where are the Omega
4  products manufactured?
5    A.   Overseas.
6    Q.   China?
7    A.   Yes.
8    Q.   Taiwan?
9    A.   Yes.
10   Q.   By Wei Fu?
11   A.   I don't have any knowledge as to whether
12 Wei Fu made Omega product or not.
13   Q.   Okay.  Does the Omega product line
14 include jack stands?
15   A.   Yes.
16   Q.   Does it include jack stands with a
17 ratchet and pawl design?
18   A.   Yes.
19   Q.   Various loading capacities, correct?
20   A.   Yes.
21   Q.   Did you in your work at SFA have any
22 interactions with the Omega brand of jack stands?
23   A.   Yes.
24   Q.   What was it?
25   A.   Purchase, purchasing of the Omega

118

1  product.
2      Q.  From whom?
3      **A.  I would place my orders to the overseas**
4  **factories.**
5      Q.  Okay.  And would the sale then be made
6  directly to SFA without any intermediary
7  entities?
8      **A.  I'm not sure what you mean by that.**
9      Q.  Okay.  To your knowledge did MVP sell
10 Omega product?
11     **A.  I don't know.**
12     Q.  Okay.  To whom did SFA sell the Omega
13 line of jack stands?
14     **A.  The Omega line of jack stands falls**
15 **under our professional division which would be**
16 **customers such as Grainger, Snap-on, Fastenal.**
17     Q.  Okay.  It was not in the DIY?
18     **A.  Correct.**
19     Q.  DIY meaning do it yourself?
20     **A.  Yes.**
21     Q.  Was the Omega line sold to a retailer
22 such as Walmart or Sears?
23     **A.  No.**
24     Q.  Was it sold in auto supply stores?
25     **A.  I'm sorry, what?**

119

1      Q.  Auto supply chains like Western Auto,
2  companies like that.
3      **A.  What would be some more examples of**
4  **companies like that?**
5      Q.  I'm trying to think.
6          MS. TODD-TROTTA:  Auto Zone.
7      Q.  (BY MR. EDINBURGH)  Auto Zone.
8          MR. EDINBURGH:  Thank you, Counsel.
9      Q.  (BY MR. EDINBURGH)  Chains that
10 specialize in auto accessories and auto parts.
11     **A.  Yes, that's possible.**
12     Q.  All right.  Next bullet point is
13 Hein-Wermer Automotive, was that also a product
14 and brand line?
15     **A.  Yes.**
16     Q.  And Hein-Werner was a division of SFA,
17 correct?
18     **A.  Yes.**
19     Q.  Did Hein-Werner have -- withdrawn.
20         Were there Hein-Werner branded jack
21 stands?
22     **A.  Off the top of my head I don't think so,**
23 **no.**
24     Q.  Okay.  Next one is Porto-Power Blackhawk
25 Automotive, was the Blackhawk a brand and product

120

1  line of SFA?
2      **A.  Yes.**
3      Q.  Were there jack stands sold under the
4  Blackhawk brand?
5      **A.  Yes.**
6      Q.  Including ratchet and pawl design jack
7  stands?
8      **A.  Yes.**
9      Q.  Where were those stands made?
10     **A.  Overseas.**
11     Q.  China?
12     **A.  Yes.**
13     Q.  Taiwan?
14     **A.  Yes.**
15     Q.  Did Wei Fu make, manufacture Blackhawk
16 jack stands?
17     **A.  Not to my knowledge, no.**
18     Q.  Did SFT manufacture Blackhawk jack
19 stands?
20     **A.  No.**
21     Q.  Did SFT manufacture Omega jack stands?
22     **A.  No.**
23     Q.  Did SFA prepare the owner's or
24 operator's manual that accompanied the sale of
25 Omega jack stands?

121

1      **A.  Yes.**
2      Q.  Did SFA prepare the owner's or
3  operator's manual for Blackhawk brand jack
4  stands?
5      **A.  Yes.**
6      Q.  The next bullet point says "Pro-Lift,"
7  P-R-O dash L-I-F-T, then it says "DIY products."
8  And, again, the DIY is do it yourself?
9      **A.  Yes.**
10     Q.  Let me go back a bit.  Were Blackhawk
11 jack stands sold to national retail chains?
12     **A.  No.**
13     Q.  Who did SFA sell Blackhawk jack stands
14 to?
15     **A.  Again, that would be considered a**
16 **professional product, so Grainger, Snap-on,**
17 **customers of that nature.**
18     Q.  Could individuals buy Omega jack stands
19 through the SFA website?
20     **A.  No.**
21     Q.  Could individuals buy the Blackhawk jack
22 stands through the SFA website?
23     **A.  No.**
24     Q.  All right.  The Pro-Lift DIY product was
25 a division of SFA, yes?

122

1    A.   Yes.
2    Q.   The Pro-Lift, were jack stands sold
3  under the Pro-Lift brand?
4    A.   Yes.
5    Q.   Including ratchet and pawl design jack
6  stands?
7    A.   Yes.
8    Q.   By SFA?  SFA sold Pro-Lift jack stands,
9  correct?
10   A.   Yes.
11   Q.   And where were the Pro-Lift jack stands
12 manufactured?
13   A.   Overseas.
14   Q.   Again, China?
15   A.   China.
16   Q.   By Wei Fu?
17   A.   Not to my knowledge.
18   Q.   Did SFT manufacture Pro-Lift jack
19 stands --
20   A.   No.
21   Q.   -- for SFA?
22   A.   No.
23   Q.   Do you know whether any SFT-owned
24 entities manufactured Pro-Lift jack stands for
25 SFA?

123

1    A.   They did not.
2    Q.   Do you know whether any SFT-owned
3  companies manufactured Omega jack stands for SFA?
4    A.   Yes.
5    Q.   Which companies?
6    A.   Our factory, CY, C-Y.
7    Q.   Is that the letters C and Y?
8    A.   Yes.
9    Q.   Where is that factory located?
10   A.   Taiwan.
11   Q.   Is that factory owned by SFT?
12   A.   Correct.
13   Q.   Was that manufacturing -- did that line
14 of jack stands include load capacities per pair
15 of three ton?
16   A.   I couldn't specifically tell you.
17   Q.   Do you know whether the witness tomorrow
18 is knowledgeable about the various types of jack
19 stands sold under these various levels?
20   A.   You would have to speak with him.
21   Q.   You don't know whether he knows?
22   A.   Right.
23   Q.   Fair enough.  Was the Pro-Lift brand of
24 jack stands sold in retail stores?
25   A.   Yes.

124

1    Q.   Chains?
2    A.   Yes.
3    Q.   Can you tell me examples of chains that
4  sold Pro-Lift brand.
5    A.   For example, Sam's Club.
6    Q.   Sam's Club, okay.  And how long has the
7  Pro-Lift brand of jack stands been sold by SFA?
8    A.   I couldn't provide an exact number of
9  years, but several years now we have been selling
10 that brand.
11   Q.   More or less than ten?
12   A.   More than five for sure.
13   Q.   And does SFA prepare the owner's or
14 operator's manuals that accompany the sale of
15 Pro-Lift jack stands?
16   A.   Yes.
17   Q.   Do you know the range of capacities of
18 ratchet and pawl design jack stands that are sold
19 under the Pro-Lift label?
20   A.   No.
21   Q.   Okay.  I want to go to the next
22 paragraph.
23   A.   Sure.
24   Q.   Just read this sentence into the record.
25 "In addition to distribution, SFA has also played

125

1  a key role in engineering, research and product
2  design to help our manufacturing facilities meet
3  our market needs."  Do you see that sentence?
4    A.   Yes.
5    Q.   Okay.  What engineering, research and
6  product design work did SFA perform with respect
7  to ratchet and pawl jack stands?
8         MR. BROWN:  Object to form.
9    Q.   (BY MR. EDINBURGH)  What, if any?
10   A.   That would be a question that your
11 candidate tomorrow should be able to answer.
12   Q.   Is it fair to say that you are not
13 knowledgeable to respond to that question?
14   A.   Yes.
15   Q.   The term used in this sentence, "our
16 manufacturing facilities," what does that refer
17 to if you know?
18        MR. BROWN:  Object to form.
19   A.   It would refer to any manufacturing
20 facility that we owned.
21   Q.   (BY MR. EDINBURGH)  Okay.  And SFA owns
22 manufacturing facilities?
23   A.   SFA does not own any manufacturing
24 facilities.
25   Q.   Okay.  I just want to know, did you talk

126

1  to anyone in preparation for today concerning the
2  content of the website of SFA?
3      **A.**  No.
4      Q.  Did you play any role in writing what's
5  found here, the actual content itself?
6      **A.**  No.
7      Q.  Do you know who did?
8      **A.**  No.
9      Q.  Did you make any inquiries as to who did
10  prior to coming here today?
11     **A.**  No.
12     Q.  Next sentence says, "Our OEM
13  private-label customers," can you give me example
14  who the SFA's OEM private label customers were?
15         MR. BROWN:  Object to form.  I'd
16  ask at some point return to the topics disclosed
17  for questioning today which I don't think
18  involves OEM customers, but --
19     Q.  (BY MR. EDINBURGH)  Let me go to the
20  next sentence -- the next paragraph.
21     **A.**  Okay.
22     Q.  I just want to read the first -- for now
23  the first clause of that sentence, it says, "Our
24  lifting products and winches are manufactured in
25  the Shinn Fu Group's ISO-9000 factories."  The

127

1  term "Shinn Fu Group," do you have an
2  understanding of what that means?
3         MR. BROWN:  Object to form.
4      **A.**  Yes.
5      Q.  (BY MR. EDINBURGH)  What is your
6  understanding?
7      **A.  Shinn Fu Group would be defined as any**
8  **member of the Shinn Fu Company owned by the**
9  **parent company Shinn Fu Corporation.**
10     Q.  And under that definition is Shinn Fu
11  Company of America or SFA a part of the Shinn Fu
12  Group?
13     **A.**  Yes.
14     Q.  The last paragraph, do you see that,
15  "SFA is located approximately 1 mile east of the
16  Kansas City International Airport"?
17     **A.**  Yes.
18     Q.  It indicates that SFA has testing
19  facilities.  Is that a topic that you can testify
20  about, the testing facilities at SFA?
21     **A.  I guess it depends on what questions you**
22  **are going to have.  Really that's probably**
23  **something that Ryan would know.**
24     Q.  Does SFA have testing facilities in
25  Kansas City?

128

1      **A.**  Yes.
2      Q.  Do you know what those testing
3  facilities consist of or is that something that
4  Mr. Jorgensen will testify about tomorrow?
5      **A.  Ryan can testify about that tomorrow.**
6      Q.  Okay.  Have you ever seen any test
7  results of testing done at Kansas City concerning
8  jack stands?
9      **A.**  No.
10     Q.  Okay.  The term in this second paragraph
11  which says "Our lifting products," you see that
12  paragraph that begins with those words?
13     **A.**  Yes.
14     Q.  Is it your understanding that the "our
15  lifting products" includes jack stands?
16         MR. BROWN:  Object to form.
17         MR. EDINBURGH:  I asked her what
18  her understanding was.
19     Q.  (BY MR. EDINBURGH)  Does the term
20  "lifting products" in the SFA's company website
21  include jack stands?
22         MR. BROWN:  Object to form.
23         You can go ahead and answer if you know.
24     **A.  A jack stand doesn't lift products, it**
25  **holds weight.**

129

1      Q.  (BY MR. EDINBURGH)  I understand.  I
2  want to know if the term is being used to include
3  jack stands.
4         MS. TODD-TROTTA:  Objection.  Form.
5      Q.  (BY MR. EDINBURGH)  Impliedly or any
6  other way.
7         MR. BROWN:  Asked and answered.
8         MS. TODD-TROTTA:  Asked and
9  answered.
10        MR. EDINBURGH:  Having an echo.
11  Still not an objection, asked and answered.
12        (WHEREUPON, DEPOSITION EXHIBIT
13  NO. 9 WAS MARKED FOR IDENTIFICATION.)
14     Q.  (BY MR. EDINBURGH)  Exhibit 9 is a
15  document that's called Presentation of Shinn Fu
16  Corporation 2011 taken off of a Shinn Fu
17  Corporation website.  Have you seen this document
18  before today?
19     **A.**  Yes.
20     Q.  Did you review this document in
21  preparation for today's deposition?
22     **A.**  Yes.
23     Q.  Did you discuss this document with
24  anyone in preparation for today's deposition?
25     **A.**  No.

130

1    Q.  I'd like you to go to the second page
2  where it says "Milestones," do you see that?
3    A.  Yes.
4    Q.  It says, "1978 - Shinn Fu America
5  established in Kansas City, Missouri, U.S.A.," is
6  that your understanding of when Shinn Fu America
7  was established?
8    A.  Yes.
9    Q.  Okay.  I'd like you to go to the third
10  page.  It's the first arrow point where it says,
11  "Shinn Fu Group in total 2000+ employees
12  worldwide," do you see that?
13    A.  Yes.
14    Q.  Does SFA have any understanding as to
15  whether that number of employees includes SFA
16  personnel?
17        MR. BROWN:  I'll object.  I think
18  you are now asking about a Shinn Fu document, the
19  part that doesn't have to do with SFA.  If she
20  has some kind of answer, that's fine, but you are
21  outside your 30(b)6 notice now.
22        MR. EDINBURGH:  I am trying to
23  limit this.  I understand and appreciate your
24  objection, I think it's an appropriate question,
25  but since you are allowing her to answer --

131

1        MR. BROWN:  She can answer if she
2  has an answer.
3    Q.  (BY MR. EDINBURGH)  Okay.
4    A.  Can you repeat the question.
5    Q.  I'd like to, but since there is an
6  objection, it would be better if the reporter
7  read it.
8        (Whereupon, the requested portion
9  of the record was read by the Reporter.)
10    A.  No, I wouldn't have any knowledge to
11  that.
12    Q.  (BY MR. EDINBURGH)  Did SFA consider
13  itself to be part of the -- am I correct that SFA
14  considers itself to be part of the Shinn Fu
15  Group?
16    A.  Yes.
17    Q.  Okay.  Am I correct that SFA in its
18  marketing materials marketed itself as part of
19  the Shinn Fu Group?
20    A.  Yes.
21    Q.  I'll leave it at that.
22        In 2011 and prior thereto did SFA handle
23  warranty claims for Shinn Fu Taiwan?
24    A.  No.
25    Q.  And is that answer based on your

132

1  personal knowledge, documents you reviewed or
2  discussions with others?
3    A.  That would be discussions with others.
4    Q.  Who did you discuss that topic with?
5    A.  That would be something discussed with
6  customer service.
7    Q.  Who at customer service?
8    A.  Mike Stevens.
9    Q.  And when did you have that conversation
10  with Mr. Stevens?
11    A.  Sometime in our document collection
12  process.  I wouldn't be able to give you a
13  specific date.
14    Q.  In 2011 and prior thereto did Shinn Fu,
15  did SFA, handle the warranty claims, if any, of
16  Wei Fu of Taiwan?
17    A.  No, not to my knowledge.
18    Q.  I'm sorry, Wei Fu of China, my mistake.
19    A.  No.
20    Q.  Again, your understanding of that is
21  based upon what?
22    A.  Are you relating that question to our
23  customers specifically or are you relating that
24  question to if Wei Fu had any customers of their
25  own?

133

1    Q.  I want to know if warranty claims were
2  made attributable to products that were made by
3  Wei Fu, did SFA handle those claims?
4    A.  Yes, for our customer base.
5    Q.  Okay.  Fair enough.  And, again, your
6  understanding of that answer or your answer to
7  that question is based upon what?
8    A.  Our customer service discussion.
9    Q.  With Mr. Stevens?
10    A.  Yes.
11    Q.  Did SFA also handle claims made
12  involving Wei Fu products?
13        MR. BROWN:  Object to form.
14        Go ahead.
15    A.  If there were any claims for Wei Fu
16  product from our customers, we would have handled
17  them, yes.
18    Q.  (BY MR. EDINBURGH)  Likewise, is that
19  response based on conversations with Mr. Stevens?
20    A.  Yes.
21    Q.  Is that also based on the contents of
22  the Lexington policy?
23        MR. BROWN:  Object to form.
24    A.  I don't know what you mean by that.
25    Q.  (BY MR. EDINBURGH)  Okay, fair enough.

134

1     MR. EDINBURGH:  I want to mark the
2  Sears SFA agreement.  Before I do that, let me
3  mark these.
4     (WHEREUPON, DEPOSITION EXHIBIT
5  NO. 10 WAS MARKED FOR IDENTIFICATION.)
6     MS. TODD-TROTTA:  What is that so I
7  can make a note?
8     MR. EDINBURGH:  This is another
9  screen shot from the SFA website.  This is
10 copyrighted in 2014 and it presents a calendar of
11 events in the history of SFA with the year in one
12 column and the event in the next.
13     Q.  (BY MR. EDINBURGH)  Have you seen this
14 document before?
15     A.  Yes.
16     Q.  Have you discussed this document with
17 anyone in preparation for today's deposition?
18     A.  It wasn't necessary, no.
19     Q.  Okay.  As far as you are aware, as far
20 as SFA is aware, does this accurately reflect
21 what's stated in the record as to the year and
22 the event?
23     A.  Yes.
24     Q.  Okay.
25     MR. EDINBURGH:  I want to take a

135

1  short break because I want to get the copies of
2  that agreement.
3     (Brief recess taken.)
4     Q.  (BY MR. EDINBURGH)  Is there an employee
5  at SFA Jemmy Tsaur?
6     A.  Yes.
7     Q.  Is he still there?
8     A.  Yes.
9     Q.  What does he do at SFA?
10     A.  Jemmy is a product and project manager
11 for our BVA department.
12     Q.  Can you tell us what BVA stands for?
13     A.  BVA --
14     Q.  V as in victory?
15     A.  Yes.
16     Q.  What's it stand for?
17     A.  BVA is our industrial product line so
18 it's just a whole different type of product that
19 we sell under that division.
20     Q.  Okay.  Is he involved at all in jack
21 stand testing?
22     A.  Jemmy, no, would not be involved in jack
23 stand testing.
24     Q.  Did I pronounce it right?  You seem to
25 say Jemmy.

136

1     A.  That's correct, Jemmy.
2     Q.  Jeff Noland?
3     A.  Jeff Noland was the national accounts
4  manager for our retail division.
5     Q.  You say "was," is he still at the
6  company?
7     A.  No.
8     Q.  When did he leave?
9     A.  It would be difficult to give you an
10 exact date, but he left approximately
11 three-and-a-half years ago, three years ago,
12 somewhere around that time.
13     Q.  Was he terminated?
14     A.  No.
15     Q.  All right.  Speak to Ryan Jorgensen
16 tomorrow.  Randy Nuttall?
17     A.  Randy is our BVA sales manager.
18     Q.  Is Randy an engineer?
19     A.  He does have an engineering degree, yes.
20     Q.  Do you know whether he was involved at
21 all on behalf of SFA in any standard industry
22 groups such as ASME?
23     A.  Yes.
24     Q.  In what capacity?
25     A.  I think Ryan will be able to tell you

137

1  that tomorrow.
2     Q.  Braxton Kersting, if I got that right,
3  who is he?
4     A.  He's an engineer.
5     Q.  Okay.  Again, what he does for the
6  company, would that be something Mr. Jorgensen
7  can testify about?
8     A.  Yes.
9     Q.  2011 and prior thereto did SFA provide
10 legal services for MVP?
11     MR. BROWN:  Object to form.
12     A.  SFA would not have provided legal
13 services for MVP.
14     Q.  (BY MR. EDINBURGH)  Did it provide --
15 from time to time did SFA resolve claims
16 involving MVP products?
17     MR. BROWN:  Object to form.
18     A.  It's possible we received claims from
19 our customers related to MVP product.
20     Q.  (BY MR. EDINBURGH)  And you indicated
21 that if those claims couldn't be resolved for
22 under $10,000, am I correct that would be
23 something that SFA would attempt to do?
24     A.  Yes.
25     Q.  In those circumstances when it did it,

138

1  did it seek any reimbursement from MVP?
2      A.  The only claims that SFA would have
3  handled were claims presented by our customers
4  which we would not seek reimbursement from MVP
5  for.
6      Q.  Even though they were products sold by
7  MVP?
8          MR. BROWN:  Object to form.
9      Q.  (BY MR. EDINBURGH)  Is that true?
10     A.  It would have been products sold by SFA
11  to our customer.
12     Q.  Okay.  Did SFA handle any claims that
13  involved products sold by MVP?
14     A.  SFA did not handle any claims for MVP.
15     Q.  At any time under any circumstances?
16     A.  Correct.
17     Q.  How about same question for any products
18  manufactured by Wei Fu?
19         MR. BROWN:  Object to form.
20     A.  The only time SFA would have handled the
21  claim directly is if it was one of the SFA's
22  customers reporting the claim.
23     Q.  (BY MR. EDINBURGH)  Of a product made by
24  Wei Fu?
25     A.  Yes, that's possible.

139

1      Q.  And if payment was made by SFA in the
2  ordinary course of business for such claims, did
3  SFA seek reimbursement from Wei Fu?
4      A.  No.
5          MR. BROWN:  Object to form.
6          But go ahead.
7          (WHEREUPON, DEPOSITION EXHIBIT
8  NO. 11 WAS MARKED FOR IDENTIFICATION.)
9      Q.  (BY MR. EDINBURGH)  Exhibit 11 is a
10  Sears/SFA agreement dated August 2, 2012, and
11  covers SFA Bates numbers 3249 through 3258 (sic).
12  Just turn to the last page and tell me who signed
13  this agreement for seller, which is identified in
14  the agreement as Shinn Fu Company of America.
15     A.  Steven Huang.
16     Q.  Have you seen this agreement before
17  today?
18     A.  Yes.
19     Q.  Did you look at this agreement in
20  preparation for today's deposition?
21     A.  Yes.
22     Q.  Did you discuss this agreement with
23  anyone?
24     A.  No.
25         MS. TODD-TROTTA:  Objection to

140

1  form.
2      Q.  (BY MR. EDINBURGH)  Okay.  Did Shinn Fu
3  of America have any similar agreement with Sears
4  that was in effect prior to August 2, '12?
5      A.  Prior to August 2nd, 2012, MVP would
6  have had an agreement in place with Sears to my
7  knowledge.
8      Q.  I want to just go back to the -- I don't
9  know whether it's still in the pile you have, but
10  the sales agreement between SFA and MVP, do you
11  still have that?
12     A.  Yeah.
13     Q.  My question to you is that do you know
14  who prepared that agreement, who drafted that
15  agreement?
16     A.  No.
17         MR. BROWN:  I'd simply ask if you
18  are going to go back and forth between exhibits,
19  so that we have a clear record that you just say
20  which exhibit you are referring to.
21         MR. EDINBURGH:  I'm sorry.
22         MR. BROWN:  That's all right,
23  Howard.
24         MR. EDINBURGH:  Exhibit 6.
25         MR. BROWN:  Thanks.

141

1          MR. EDINBURGH:  That's fine.
2          MR. BROWN:  It's just when you see
3  it in writing --
4          MR. EDINBURGH:  Believe me, I
5  understand.
6      Q.  (BY MR. EDINBURGH)  Exhibit 6, okay.
7  You gave your answer.  Do you know whether
8  Mr. Chaykin participated in drafting that
9  agreement?
10     A.  No.
11     Q.  No, you don't know or, no, he did not?
12     A.  I don't know.
13     Q.  Mr. Steven Huang, correct?
14     A.  Yes.
15     Q.  President, chief operating officer.  Can
16  you -- withdrawn.
17         Steven Huang, how many months a year
18  does he reside here in Kansas City?  Is he here
19  year round?
20     A.  Yes, 12 months.
21     Q.  Is he a United States citizen?
22     A.  Yes.
23     Q.  Are you aware of any monetary transfers
24  between SFA and SFT in terms of just transferring
25  sums of money for any reason?

142

1     MR. BROWN:  Object to form.
2     MS. TODD-TROTTA:  Object to form.
3   A.  There could be various reasons.
4   Q.  (BY MR. EDINBURGH)  Can you elucidate
5  what those reasons are?
6   A.  Are you looking for something specific?
7   Q.  I just want to know if any kind of
8  distributions, dividends are made from -- payment
9  for services are made between SFT and SFA that
10 you are aware of.
11  A.  We exchange money to SFT for invoices,
12 so payment of product.
13  Q.  Payment of products that are attributed
14 or sold to SFA by SFT?
15  A.  Correct.
16  Q.  Do those products include jack stands?
17  A.  Yes.
18  Q.  Does it include ratchet and pawl design
19 jack stands?
20  A.  Yes.
21  Q.  Can you tell me for what years.
22  A.  That we paid invoices?
23  Q.  For those jack stands, yes.
24  A.  As long as we have been doing business
25 we have been.

143

1   Q.  Are those jack stands, do they have any
2  particular brand name associated with them?
3   A.  We sell several different brand names.
4   Q.  But the ones that are covered by
5  invoices from SFT.
6   A.  Any of our professional product line
7  would be handled by that channel.
8   Q.  Okay.  Can you testify as to the
9  communications between Steven Huang as chief
10 operating officer and Betty Hung as chief
11 executive officer in terms of how frequently they
12 talk to one another about the business of SFA?
13  A.  I couldn't tell you how often they talk
14 to one another about SFA business.
15  Q.  Okay.  Do they exchange e-mails with one
16 another?
17  A.  Yes.
18  Q.  Was there any search made, e-mails
19 between the two of them, concerning any issue
20 with respect to ratchet and pawl design jack
21 stands?
22  A.  They were included in our search, yes.
23  Q.  When searches were made, searches were
24 made under your auspices, under your supervision?
25  A.  Yes, I helped coordinate all of the

144

1  document data collection, yes.
2   Q.  Fair enough.  In terms of the electronic
3  searches portion, you indicated that the e-mails
4  of Steven Huang and Betty Hung were searched?
5   A.  Yes.
6   Q.  Who other e-mails, employees' e-mail
7  accounts were also searched, do you have a list?
8   A.  Yes, rather large list.
9   Q.  Okay.  Let's go by the department.  Did
10 it include the engineering departments of SFA?
11  A.  Yes.
12  Q.  Did it include the sales and marketing
13 departments of SFA?
14  A.  Yes.
15  Q.  Did it include the customer service?
16  A.  Yes.
17  Q.  Include accounting?
18  A.  Yes.
19  Q.  Legal?
20  A.  Yes.
21  Q.  Any other departments who you searched
22 that I haven't listed?
23  A.  No, I believe you covered them.
24  Q.  Okay.
25     MR. EDINBURGH:  Off the record.

145

1     (Whereupon, a discussion was
2  had off the record.)
3     MR. EDINBURGH:  Back on the record.
4     Thank you.
5     Subject to my document request I have no
6  further questions of this witness.  Thank you.
7     MR. BROWN:  I have no questions.
8     MR. ZAKRZEWSKI:  I would like to
9  ask a question about your document request which
10 you made on the record.
11     MR. EDINBURGH:  Do you need the
12 witness here or can she go?
13     MR. ZAKRZEWSKI:  I don't need the
14 witness here.
15     MR. BROWN:  Does this need to be on
16 the record?
17     MR. ZAKRZEWSKI:  We can do this off
18 the record.
19     MR. BROWN:  Let me give you the
20 courtesy --
21     MR. TODD-TROTTA:  I know, since I
22 came all the way.
23     MR. BROWN:  See if you would like
24 to ask a question.
25

146

```
 1              EXAMINATION
 2  BY MS. TODD-TROTTA:
 3     Q.  Did SFA sell the jack stand in question
 4  to Sears?
 5     A.  No.
 6     Q.  Thank you.  That's it.
 7         MR. EDINBURGH:  Thank you.  We are
 8  done.
 9         THE REPORTER:  What about
10  signature?
11         MR. BROWN:  Yeah, we want to read
12  and sign.
13         MR. EDINBURGH:  I'll take care of
14  it all.
15         MS. TODD-TROTTA:  I don't need a
16  copy of the transcript.
17                   (witness excused.)
18              *  *  *
19
20
21
22
23
24
25
```

147

```
 1
 2
 3     _____
 4              MEGHANN O'CONNOR
 5  STATE OF_____ )
 6                          ) SS:
 7  COUNTY OF_____ )
 8
 9         Subscribed and sworn to before me
    this _____day of_____, 2016.
10
11     _____
12              NOTARY PUBLIC
13  My Commission Expires:_____
14  In re: KLORCZYK vs. SEARS, ROEBUCK & CO., et al.
15
16
17
18
19
20
21
22
23
24
25
```

148

```
 1           E R R A T A   S H E E T
 2  RE:  KLORCZYK vs. SEARS, ROEBUCK & CO., et al.
 3       DEPOSITION OF:  MEGHANN O'CONNOR
 4  PG/LN NO.  CORRECTION       REASON FOR CHANGE
 5  :_____:_____:_____
 6  :_____:_____:_____
 7  :_____:_____:_____
 8  :_____:_____:_____
 9  :_____:_____:_____
10  :_____:_____:_____
11  :_____:_____:_____
12  :_____:_____:_____
13  :_____:_____:_____
14  :_____:_____:_____
15  :_____:_____:_____
16  :_____:_____:_____
17  :_____:_____:_____
18  _____ I certify that I have read my deposition
19  in the above case and I request that no changes
    be made.
20  _____ I certify that I have read my deposition
21  in the above case and I request that the above
    changes be made.
22
23     SIGNATURE OF DEPONENT:_____
24              DATED:_____
25
```

149

```
 1           C E R T I F I C A T E
 2     I, MARIE A. McCRACKEN, a Certified Court
 3  Reporter within and for the States of Missouri
 4  and Kansas, hereby certify that the within-named
 5  witness was first duly sworn to testify the
 6  truth, and that the deposition by said witness
 7  was given in response to the questions
 8  propounded, as herein set forth, was first taken
 9  in machine shorthand by me and afterwards reduced
10  to writing under my direction and supervision,
11  and is a true and correct record of the testimony
12  given by the witness.
13     I further certify that I am not a
14  relative or employee or attorney or counsel of
15  any of the parties, or relative or employee or
16  such attorneys or counsel, or financially
17  interested in the action.
18     WITNESS my hand and official seal at
19  my office in said County and State, this _____,
20  day of _____, 2016.
21
22     _____
23     MARIE A. McCRACKEN, CSR, CCR, RPR
       Certified Court Reporter
       Missouri #874
24     Kansas #0680
25
```