*EXHIBIT L*

KMART CORPORATION                    SEARS, ROEBUCK AND CO.

### ACCELERATED LINE REVIEW AGREEMENT

This Accelerated Line Review Agreement ("Agreement") is made as of the last date written below on the signature page by and among Sears, Roebuck and Co. (including its subsidiaries, "Sears"), Kmart Corporation (including its subsidiaries, "Kmart") and [SELLER] MVP (H.K.) Industries Limited, a Hong Kong Corporation ("Seller"). Sears Roebuck and Kmart shall be collectively referred to herein as "Sears" or "Buyer."

This Agreement shall become final and binding on the parties only upon the execution and delivery of the Agreement and the associated Exhibits referenced herein as evidenced in a separate Exhibit Document.

In consideration of the mutual covenants and promises this Agreement contains and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     VENDOR AGREEMENT.

This Agreement is a "Vendor Agreement" pursuant to the Universal Terms and Conditions dated as of _October 12th, 2006_ (the "UTC") between Seller and Sears and/or Kmart. The UTC, including the Vendor Information Guide (as supplemented and modified by Sears, the "Vendor Guide") incorporated into the UTC by reference, is incorporated into this Agreement and shall apply to all Purchase Orders issued by Sears and Kmart. References herein to the Vendor Guide will mean the domestic Vendor Information Guide with respect to Domestic Products and the International Vendor Information Guide with respect to Import Products. This Agreement will control over the UTC in case the terms of this Agreement are contradictory to or inconsistent with the terms of the UTC. All capitalized terms used but not defined herein will have the meaning ascribed to them in the UTC.

2.     SUPPLY OBLIGATION; PURCHASE ORDERS; PRICING; SUBSIDIES.

2.2.     Purchase Orders.

If Buyer desires to order any Product from Seller, Buyer shall issue a purchase order (each a "Purchase Order) indicating the quantities, the required shipment dates and any other information or specification that Buyer may determine.

Sears, Roebuck and Co. agreement 06

CONFIDENTIAL

D☐P☐ Exhibit  14
Deponent  LEE
Date 7/12/18  Rptr LEE

KMART CORPORATION                     SEARS, ROEBUCK AND CO.

delivery takes place; (b) any commissions to selling agents; and (c) other incidental charges, whether or not such charges are itemized separately on invoices to Buyer. Buyer and Seller will negotiate to determine the price for any products that Buyer purchases from Seller during the Term that are not listed on Exhibit A.

2.4.    Subsidies.

During the Term, Seller agrees to provide to Buyer the specific subsidies and support programs set forth in this Section 2.4 and on Exhibit B ("Subsidies"). Buyer shall have the sole discretion to use the Subsidies as it deems appropriate. At anytime during the Term, Buyer may collect, and Seller shall pay, the earned Subsidies (or any portion thereof) by issuing a promotional agreement or debit memo setting forth the terms of payment.

For each new outlet owned or operated by Buyer or its affiliates that begins to sell the Products during the Term, Seller shall pay Buyer a new outlet subsidy equal to 10% of the Total Purchases of Products made by Buyer for each new outlet through 15 days after the grand opening date for such outlet. Buyer will issue a promotional agreement or debit memo for the new outlet subsidy for each new outlet after the end of the grand opening period. "Total Purchases" means the aggregate Invoice Price of all Products that are shipped to the new outlet during the grand opening period based on the SPRS system or any successor system implemented by Buyer.

3.      DELIVERY.

3.1.    FOB Point.

All Products shall be shipping F.O.B. to the point specified in the Purchase Order (the "F.O.B Point). All risk of loss shall remain with Seller until the Products are delivered to the applicable F.O.B Point.

3.2.    Availability Recourse.

Seller acknowledges that the Vendor Guide requires the payment of Administrative Fee (as that term is used in the Vendor Guide) for late or otherwise non-compliant deliveries of Products. Additionally, if any "Promotional Product" is not delivered on time, Seller shall pay to Buyer an amount (if any) equal to Buyer's "Lost Profit" for each Promotional Product not timely delivered. A "Promotional Product" is any Product offered under a promotional SKU number which Buyer identifies, after discussions with Seller, in a forecast or otherwise in writing, to be subject to an upcoming buyer promotion. Buyer's "Lost Profit" shall equal Buyer's projected selling price for the Promotional Product during the promotional period minus the Promotional Product's Invoice Price, multiplied by the difference between the quantity of Promotional Products that Buyer forecast and the quantity that Seller delivered on time.

4.      MANUFACTURING TERMS; PACKAGING AND PRODUCT MATERIALS.

4.1.    Manufacturing Products.

Seller covenants that all Products it provides to Buyer shall meet or exceed the specifications required by Buyer (the "Product Specifications"). The term "Specifications" in the UTC shall be deemed to include the Product Specifications. If after testing Buyer determines that any Product fails to meet the applicable Product Specifications, including any performance claims, Seller shall, with Buyer's reasonable assistance and without increasing the Product's Invoice Price, redesign the Product to meet or

Vendor Supply Agreement.DOC                                                                  2

CONFIDENTIAL

MVP010230

KMART CORPORATION                    SEARS, ROEBUCK AND CO.

exceed the applicable Product Specifications within a reasonable time (not to exceed 60 days) after the date of Buyer's notice to Seller.

4.2.   Claims Data.

In determining what performance claims to make on specific Sears Branded Products, if any, Buyer is entitled to rely on test data and other claim substantiation material provided by Seller (the "Claims Data"). Pursuant to Seller's defense and indemnification obligations under the UTC, Seller will indemnify and defend Buyer for any claims or liabilities arising from performance claims that Buyer makes in reliance on inaccurate Claims Data, whether such inaccuracy results from flawed analysis, flawed testing, flawed reporting, unqualified technicians or otherwise.  Subject to the foregoing, Buyer will be solely responsible for determining the sufficiency of the Claims Data to support a performance claim on a Sears Branded Product.

4.3.   Structural Packaging Requirements; Product Package Graphics.

Seller will package any Sears Branded Product in a container that ensures that the Product will not be damaged.  All Sears Branded Product packaging must be approved in writing by Buyer before going to print.  Seller will adopt new graphic packaging specifications for Sears Branded Products as Buyer reasonably requests.  Seller will obtain Buyer's prior written approval before developing or implementing any changes to the packaging materials used in connection with any Sears Branded Product.

5.   **PAYMENT TERMS.**

Seller shall invoice Buyer for the Products via Electronic Data Interchange or such successor system as Buyer designated ("EDI") no earlier than the date the invoiced Products depart the F.O.B. Point. Buyer will initiate payment by electronic funds for the undisputed portion of each invoice 60 days after receipt of the later of:  (i) the Products by a Buyer distribution facility or retail replenishment center, or (ii) the applicable invoice ("Base Term").  Payments mailed or (for electronic payments) initiated within such time period shall be deemed to be timely made.  Notwithstanding any of the foregoing, upon mutual agreement of the parties as documented as extraordinary funding on Exhibit B, the payment term for the Products shall be extended to Base Term plus 180 days.

6.   **REPORTING.**

To improve the efficiency of the buying process and strengthen the relationship between Buyer and Seller throughout the Term, at Seller's sole cost and expense, Seller shall provide sufficient resources and respond to reasonable information or report requests relating to Product tracking and accounting support on at least a quarterly basis.

7.   **TERM.**

The term of this Agreement (the "Term") shall begin on the Effective Date and shall end, unless sooner terminated under the terms of this Agreement, on the Expiration Date shown above.  However, the terms and conditions of this Agreement shall apply to all Products shipped on or after the Effective Date and before the Expiration Date, regardless of when Buyer placed the order for the Products.

8.   **INTELLECTUAL PROPERTY.**

Vendor Supply Agreement.DOC                                                                    3

CONFIDENTIAL                                                          MVP010231

**KMART CORPORATION**          **SEARS, ROEBUCK AND CO.**

8.1.   Buyer Work Product.

Any marketing materials, advertising materials, promotional materials, point of sale displays, packaging, customer information and material, warranty card information, service training materials, owner's manuals, service manuals, Web Content, performance claims, testing protocols used to evaluate performance claims, results and data from testing under such testing protocols, database formats, methods used to assemble and maintain electronic Sears Branded Product catalogs, and programming related to Buyer's web sites (including programs that enable Buyer's web sites to link with third party sites), and all files, data, notes, copies, abstracts, copyrights, summaries and other materials relating to Sears Branded Products, which materials are prepared, developed or created by or on behalf of Buyer or Seller or any of their personnel, agents or contractors and which relate to the Sears Branded Products (collectively, "Buyer Work Product"), will be owned by Buyer or its affiliate. Seller acknowledges and agrees that all Buyer Work Product will be deemed "work made for hire" as that term may be defined from time to time in Section 101 of the Copyright Act, 17 U.S.C. Section 101 (or any successor provision), that Buyer or its affiliate will be deemed the author of the Buyer Work Product, and that Buyer or its affiliate will be the owner of all right, title and interest, including all copyrights, in and to the Buyer Work Product. If for any reason the Buyer Work Product is found not to have been created as work made for hire, Seller hereby assigns to Buyer or its affiliate without limitation all right, title and interest, including the copyrights and any other intellectual property rights in and to the Buyer Work Product. Seller further agrees to execute and deliver to Buyer or its affiliate any and all further documents deemed by Buyer to be useful in documenting, effectuating or recording the foregoing assignment. Seller will not, and will not permit any third party to, disclose or provide any of the Buyer Work Product to any person or entity other than Buyer or its affiliate. Seller will consult with Buyer or its affiliate and obtain Buyer's or its affiliate's prior clearance before developing or implementing any changes to the advertising and marketing materials and owner's or other manuals used in connection with any Sears Branded Products.

8.2.   Buyer Marks and Buyer Trade Dress.

Seller hereby acknowledges that (i) the trademarks, service marks, trade names and domain names listed on Exhibit C (collectively, the "Buyer Marks"), and (ii) any distinctive trade dress of any Sears Branded Products (the "Buyer Trade Dress") constitute valuable intellectual property which, as between Buyer and Seller, are owned solely and exclusively by Buyer. During the Term only, Buyer hereby grants to Seller a non-exclusive, limited license to use the Buyer Marks and Buyer Trade Dress for the sole purpose of affixing the Buyer Marks or incorporating the Buyer Trade Dress into (1) any Sears Branded Products supplied to Buyer by Seller, in accordance with Buyer's instructions; and (2) any Buyer Work Product developed, prepared or supplied by or on behalf of Seller relating to any Sears Branded Products. Seller will not distribute to any person or entity other than Buyer any Products or any Buyer Work Product relating to any Products bearing the Buyer Marks or incorporating Buyer Trade Dress or any patents, patent applications, copyrights, domain names or trade secrets of Buyer or its affiliates (collectively, the "Buyer Intellectual Property") without Buyer's or its affiliate's specific written authorization prior to such distribution. The foregoing license is personal to Seller, and Seller will not grant sublicenses under such license to any other person or entity, except with Buyer's prior written consent.

Seller will not claim any right, title or interest in, or challenge Buyer's or its affiliates' ownership of: (i) the Buyer Marks; (ii) the Buyer Trade Dress; (iii) the Buyer Work Product; (iv) the Buyer Intellectual Property; or (v) any lists, files or other information or material provided or made available by Buyer or its affiliates (or by Buyer's customers in connection with purchases of Products) to Seller (the items described in the preceding clauses (i) through (v) are collectively referred to as "Buyer Information"). Seller recognizes and acknowledges that the use of any Buyer Information will not confer upon Seller any right or interest therein.

Vendor Supply Agreement.DOC                                                                    4

CONFIDENTIAL

MVP010232

**KMART CORPORATION**          **SEARS, ROEBUCK AND CO.**

Seller will use the Buyer Information only in the performance of its obligations under this Agreement and in accordance with this Section. Upon the expiration or termination of this Agreement, or at any time during the Term upon demand by Buyer, Seller will immediately stop using all Buyer Information and will transfer to Buyer or its affiliate all Buyer Work Product and all other materials containing or based on Buyer Information. Should Buyer demand that Seller stop using the Buyer Information in accordance with this Section, Seller will have no obligation to pay damages for any failure to supply Products that is caused by such demand.

Nothing in this Agreement will be construed to bar Buyer or its affiliates from protecting their rights to the exclusive ownership of Buyer Information against unfair competition, infringement or appropriation by any party or parties, including any use by Seller not expressly authorized by this Agreement. Seller acknowledges that Buyer Information possesses a special, unique and extraordinary character which makes it difficult to assess the monetary damage Buyer or its affiliates would sustain in the event of unauthorized use thereof. Seller agrees and acknowledges: (i) that irreparable injury would be caused to Buyer or its affiliates by unauthorized use of Buyer Information; (ii) that if Seller breaches this Section 8 there would be no adequate remedy at law; and (iii) that in the event of such breach, a temporary restraining order or preliminary or permanent injunctive relief, in each case without bond, would be appropriate. Seller waives any right it may have to require Buyer or its affiliates to post a bond in connection with any such order.

9.   **CONFIDENTIALITY.**

9.1.   *Confidential Information.*

"Confidential Information" means any information, whether disclosed in oral, written, visual, electronic or other form, that (i) one party (the "Disclosing Party") discloses to the other party (the "Receiving Party"), (ii) relates to or is disclosed in connection with this Agreement or Buyer's business and (iii) is or reasonably should be understood by the Receiving Party to be confidential or proprietary to the Disclosing Party. The Disclosing Party's sales, pricing, costs, inventory, operations, employees, current or potential customers, financial performance or forecasts and business plans, strategies, forecasts or analyses, as well as the terms of this Agreement, are Confidential Information.

9.2.   *Treatment of Confidential Information.*

The Receiving Party agrees to use any Confidential Information only in accordance with this Agreement for three years from the date of receipt. The Receiving Party shall:

- restrict disclosure of the Confidential Information to its employees, advisors and contractors ("Representatives") with a need to know the Confidential Information for purposes of performing the Receiving Party's responsibilities under this Agreement;

- advise those Representatives of the obligation not to disclose the Confidential Information;

- copy the Confidential Information only as necessary for those Representatives who need it for performing the Receiving Party's responsibilities under this Agreement, and ensure that confidentiality is maintained in the copying process; and

- protect the Confidential Information, and require those Representatives to protect it, using the same degree of care as the Receiving Party uses with its own Confidential Information, but no less than reasonable care.

Vendor Supply Agreement.DOC                                                                 5

CONFIDENTIAL                                                          MVP010233

KMART CORPORATION               SEARS, ROEBUCK AND CO.

Either party may disclose the Confidential Information to any direct or indirect subsidiary or affiliate (an "Affiliate Group"), provided that such party agrees in writing to be bound by this Agreement to the same extent as Buyer or Seller, as applicable, is bound.

The Receiving Party will be liable to the Disclosing Party for any unauthorized disclosure or use of Confidential Information by any of its current or former personnel or any Affiliate Group.

Within ten days after receiving the Disclosing Party's written request, the Receiving Party will: (a) destroy or return (as instructed by the Disclosing Party) any materials containing Confidential Information; and (b) certify to the Disclosing Party that it has satisfied its obligations under this Section.

9.3.    **Exceptions to Confidential Treatment.**

The obligations under this Section 9 do not apply to any Confidential Information that the Receiving Party can demonstrate:

- was previously known to the Receiving Party without any obligation to hold it in confidence;

- is disclosed to third parties by the Disclosing Party without an obligation of confidentiality to the Disclosing Party;

- is or becomes available to any member of the public by other than unauthorized disclosure;

- was or is independently developed by the Receiving Party without use of the Confidential Information;

- in the reasonable opinion of legal counsel, is required to be disclosed by law or the rules and regulations of any applicable regulatory authority; or

- in the reasonable opinion of legal counsel, is required to be disclosed in response to a valid subpoena or order of a court or other governmental body of competent jurisdiction or other valid legal process.

In the case of any disclosure under the last two bullets above, the Receiving Party must notify the Disclosing Party prior to disclosure and use reasonable efforts to cooperate with the Disclosing Party so that the Disclosing Party may take legally available steps to resist or narrow the requested disclosure and obtain an appropriate protective order or other assurance that confidential treatment will be accorded the Confidential Information.

10.    MISCELLANEOUS.

10.1.    **Minimum Quantities.**

Buyer agrees to purchase at least $100 of Products during the Term.  If at the expiration of the Term Buyer has ordered less than $100 of Products, Buyer will pay Seller (upon request) the difference between the amount ordered and $100. Seller must request payment of any amount due under this Section in writing within 30 days after the expiration or termination of this Agreement. Seller acknowledges and agrees that except as set forth in this Section, Buyer is not obligated or committed to purchase any quantities except as expressly ordered by Buyer.

Vendor Supply Agreement.DOC                                                          6

CONFIDENTIAL                                                    MVP010234

| KMART CORPORATION | SEARS, ROEBUCK AND CO. |

10.2.  **SPRS.**

For purpose of this Agreement, unless otherwise indicated herein, all calculations and measurements with respect to Buyer's purchases, sale of Products, average retail selling prices and similar information will be measured in units or dollars, as the context requires, and determined by reference to Buyer's Strategic Performance Reporting system ("SPRS") or any successor system implemented by Buyer.

10.3.  **Governing Law.**

The substantive law of the State of Illinois, applicable to contracts entered into and wholly to be performed in Illinois by Illinois residents, without reference to any principles concerning conflict of law, will govern the validity of this Agreement, the construction of its terms and the interpretation of the rights, duties and remedies of the parties hereunder.

10.4.  **Representations and Warranties.**

Each party represents and warrants to the other that it has the right, power and authority to grant to the other the rights provided under this Agreement and to perform its obligations under this Agreement, and that such party's execution, delivery and performance of this Agreement have been duly authorized and will not violate any other agreement, restriction, or Applicable Law to which such party is a party or by which such party is bound.

10.5.  **Notices.**

Notices under this Agreement are sufficient if given by nationally recognized overnight courier service, certified mail (return receipt requested), facsimile with electronic confirmation, electronic mail with delivery confirmation or personal delivery to the other party at its address or facsimile number set forth above, with a copy to:

Sears Holdings Management Corporation
3333 Beverly Road, Mail Station: B6-260A
Hoffman Estates, IL  60179
    Attn: Deputy General Counsel, Retail Merchandising and Marketing
    Facsimile:  (847) 286-0266

Notice is effective: (i) when delivered personally, (ii) three business days after sent by certified mail, (iii) on the business day after sent by a nationally recognized courier service, or (iv) on the business day after sent by facsimile with electronic confirmation to the sender.  A party may change its notice address by giving notice in accordance with this Section.

10.6.  **Publicity.**

Except as permitted under the terms and conditions of this Agreement or with Buyer's prior written consent, Seller will not disclose the existence or terms of this Agreement or any other information regarding Seller's supply of the Products to Buyer in any advertising, promotional or sales activity or publicity release or otherwise.  If Seller is required to make any disclosure pertaining to this Agreement under any Applicable Law, Seller will afford Buyer a reasonable opportunity to review the content of such disclosure and will incorporate all reasonable modifications to such disclosure that Buyer may request.

Vendor Supply Agreement.DOC

CONFIDENTIAL

MVP010235

KMART CORPORATION                    SEARS, ROEBUCK AND CO.

10.7.   **Injunctive Relief.**

Seller acknowledges that any breach by Seller of Section 9 or 10 of this Agreement by Seller would cause Buyer and its affiliates irreparable harm for which Buyer and its affiliates have no adequate remedies at law. Accordingly, Buyer and its affiliates are entitled to injunctive relief for any such breach. Seller waives all claims for damages by reason of the wrongful issuance of an injunction and acknowledges that its only remedy in that case is the dissolution of that injunction.

10.8.   **Liquidated Damages.**

Seller and Buyer hereby agree that the Administrative Fees and other liquidated payments which are due hereunder are not intended by the parties as penalty payments, but are instead intended as liquidated damages to compensate Buyer should Seller fail to meet its obligations hereunder. Furthermore, the parties agree that these amounts are reasonable and appropriate because of the difficulty, time and cost of determining Buyer's actual damages resulting from such failure.

10.9.   **Relationship of the Parties.**

The relationship of Seller and its personnel to Buyer will be that of independent contractors, and Seller will not purport to represent Buyer as Buyer's agent, employee or partner in any manner. Seller has no authority to enter into any contract or incur any expense or obligation of any kind in Buyer's name.

10.10.   **Federal Contracting Requirement.**

As a federal contractor, Buyer is subject to affirmative action and other federal contracting requirements, and is required to include those requirements in its subcontracts for commercial items and commercial components. Therefore, this Agreement incorporates by reference, and Seller will comply with, the following provisions of Title 48 of the Code of Federal Regulations: 52-219.8, Utilization of Small Business Concerns, 52.222-26, Equal Opportunity; 52.222-35, Affirmative Action for Special Disabled and Vietnam Era Veterans; 52.222-36, Affirmative Action for Handicapped Workers; and 52.244-6, Subcontracts for Commercial Items and Commercial Components. Furthermore, Seller acknowledges that Buyer is committed to helping bring small business, small disadvantaged businesses, and women-owned businesses into the American economic system. In furtherance of this goal, if Seller uses the services of subcontractors, Seller will use reasonable efforts to involve qualified small, small disadvantaged, and women-owned sources in its selection process.

10.11.   **Entire Agreement.**

This Agreement, which includes the UTC, the Vendor Guide, and each of the Exhibits attached hereto, sets forth the entire agreement and understanding between the parties hereto with respect to the Products. All prior and contemporaneous discussions and negotiations relating to the Products are merged herein. This Agreement will not be supplemental, modified or amended except by a written instrument signed by a duly authorized representative of each of Buyer and Seller. Furthermore, this Agreement will supersede, and Buyer will not be bound by, any "disclaimers" or "click to approve" terms or conditions now or hereafter contained in any web site used by Buyer in connection with the Products or this Agreement. This Agreement will be binding upon and inure to the benefit of the successors, representatives and permitted assigns of the parties hereto. Buyer and Seller represent and warrant that they are entering into this Agreement based solely on the provisions set forth herein. For purposes of this Agreement, only Buyer employees with the title "Senior Vice President" or higher will be deemed duly authorized representatives of Buyer; provided, however, that Buyer employees with the title "Buyer" will be deemed duly authorized representatives of Buyer for purposes of agreeing to changes to any items on

Vendor Supply Agreement.DOC                                                                    8

CONFIDENTIAL

MVP010236

**KMART CORPORATION**　　　　　**SEARS, ROEBUCK AND CO.**

one or more Exhibit, and provided further that no such change will alter the definition of any term defined in this Agreement.

10.12. **Survival.**

All obligations of Buyer and Seller which expressly or by their nature survive the expiration or termination of this Agreement, including the obligation of either party to pay any amounts accrued hereunder, will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement and until they are satisfied in full or by their nature expire.

10.13. No Waiver.

The terms, covenants and conditions of this Agreement may be waived only by a written instrument signed by the party waiving compliance. Any party's failure at any time to require performance of any provision will not affect that party's right to enforce that or any other provision at a later date. No waiver of any condition or breach of any provision, term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances will be deemed to be or construed as a further or continuing waiver of that or any other condition or of the breach of that or another provision, term or covenant of this Agreement.

10.14. **Construction.**

The Section headings of this Agreement are for convenience only and have no interpretive value. All references in this Agreement to "including" will be interpreted to mean "including, but not limited to," and unless otherwise indicated all references to a number of days will mean calendar (and not business) days and all references to months or years will mean calendar months or years, using the "4-4-5" retail calendar.

10.15. **Counterparts; Facsimile.**

This Agreement may be executed in any number of separate counterparts, all of which, when taken together, will constitute one and the same instrument, notwithstanding the fact that all parties did not sign the same counterpart. Each of the parties agrees that a signature transmitted to the other party or its counsel by facsimile transmission will be effective to bind the party whose authorized signature was transmitted, as a duly executed and delivered original. Each party further agrees to promptly deliver its original signature pages to this Agreement to counsel for the other party promptly following execution, but any failure to do so will not affect the binding effect of such signature.

**IN WITNESS WHEREOF,** the parties have executed and delivered this Agreement as of the date first set forth above.

**Sears, Roebuck and Co. and Kmart
Corporation, by Sears Holdings Management
Corporation, their agent**

By:

Print Name:

Title:

Date:

Vendor Supply Agreement.DOC　　　　　　　　　　　　　　　　9

CONFIDENTIAL

MVP010237

KMART CORPORATION                    SEARS, ROEBUCK AND CO.


MVP(H.K.)In ustries Limited

)

I

                    Vice President
Date:          11 Dec. 2006


Vendor Supply Agreement.DOC                                    10

CONFIDENTIAL                                    MVP010238

KMART CORPORATION                    SEARS, ROEBUCK AND CO.

EXHIBITS TO AGREEMENT

The associated Exhibits referenced in and incorporated into this Agreement shall be finalized, executed and duly delivered by the parties in a separate Exhibit Document during the scheduled on-site negotiations for this Accelerated Line Review and become part of this Agreement.

11

CONFIDENTIAL

MVP010239

### EXHIBIT DOCUMENT TO ACCELERATED LINE REVIEW AGREEMENT

This Exhibit Document ("Exhibit Document") is made as of the last date written below on the signature page by and among Sears, Roebuck and Co. (including its subsidiaries, "Sears"), Kmart Corporation (including its subsidiaries, "Kmart" and together with Sears, "Buyer") and the undersigned seller ("Seller").

This Exhibit Document consists of this signature page and the following Exhibits, which upon execution and delivery of this Exhibit Document by the parties, are incorporated into and become part of that certain Accelerated Line Review Agreement, entered into as of December 1st, 2006 , by and between Buyer and Seller:

1.   Exhibit A – Subject Merchandise
2.   Exhibit B – Economic Terms & Conditions
3.   Exhibit C – Intellectual Property

IN WITNESS WHEREOF, the parties have caused this Exhibit Document to be duly executed. Each party warrants and represents that its respective signatories whose signatures appears below have been, and are, on the date of signature, authorized to execute this Exhibit Document.

**SELLER**

MVP         Industries

Name:
Title:
Date:

**BUYER**

Sears, Roebuck and Co. and Kmart Corporation

By:  Sears Holdings Management Corporation, their agent

By:
Name:
Title:
Date:

Sears agreement                                            Exhibits—Page 1

CONFIDENTIAL

MVP010242

**EXHIBIT A**
**SUBJECT MERCHANDISE**

| Series Item Number | Product Description | Invoice Price (U.S. Dollar) | F.O.B. Point |
|---|---|---|---|
| 50181 | Companion - 2T Trolley Jack | $8.57 | China |
| 50138 | Craftsman - 2 1/4T Jack w/ Jack Stands | $16.20 | China |
| 50183 | Companion - 2T Jook w/ Jack Stands and Creeper | $25.03 | China |
| 50524 | Craftsman - 2 1/4T Jack in Blow Mold Case | $14.99 | China |
| 50136 | Craftsman - 3T Floor Jack | $32.98 | China |
| 50156 | Craftsman Professional - 4T Garage Jack | $47.75 | China |
| 50239 | Craftsman - 2T Aluminum Jack | $95.41 | China |
| NEW | Craftsman Professional - 3T Aluminum Jack | $162.00 | China |
| 50280 | Craftsman - 2T Bottle Jack | $5.80 | China |
| 50282 | Craftsman - 6T Bottle Jack | $8.35 | China |
| 50284 | Craftsman Professional - 12T Bottle Jack | $13.24 | China |
| 50285 | Craftsman Professional - 20T Bottle Jack | $21.23 | China |
| 50182 | Craftsman - 2 1/4T Jack Stands | $5.17 | China |
| 50159 | Craftsman - 3T Jack Stands | $8.75 | China |
| NEW | Craftsman Professional - 4T Jack Stands | $10.75 | China |

| Additional Funding - to be collected 04/01/2007 or later | Cost |
|---|---|
| $10K Kmart Support on Companion 2T Jack | $10,000.00 |
| $15K in Kmart Support on Companion 2T Kit | $15,000.00 |
| $1.50 @ 80,000 pieces marketing support - 50524 | $100,000.00 |
| $7K in Kmart Support on Craftsman Bottle Jacks | $7,000.00 |
| $20K for liquidation of 4T and 8T Craftsman Bottle Jacks | $20,000.00 |
| Packaging change from "SUV" to "High Lift" on 3T Jack Stand | $0.00 |

| Defectives | Rate | Cost |
|---|---|---|
| Responsible for 100% of your product at landed cost | | |

| New shipments | Ship Date | Qty |
|---|---|---|
| Craftsman Professional – 3T Aluminum Jack | Feb 15th | 7,000 |
| Craftsman Professional - 4T Jack Stands | Feb 15th | 6,000 |

Sears agreement

Exhibit B – Page 1

CONFIDENTIAL

MVP010243