*EXHIBIT M*

04 MAY 2007



UNIVERSAL TERMS AND CONDITIONS - INTERNATIONAL

**Seller:** MVP (HK) INDUSTRIES LTD.     HONG KONG
Full Legal Name                           Place of Incorporation

The terms and conditions contained herein ("UTC") shall be effective as of the date set forth below and shall apply to all Merchandise (defined below) supplied by the undersigned vendor ( seller), directly or indirectly through Seller  dealers or distributors, to Kmart Corporation (together with its subsidiaries, mart , Sears, Roebuck and Co. (together with its subsidiaries, ears) and all other subsidiaries of Sears Holdings Corporation (together with Kmart and Sears,  ompany?.

Seller and Company hereby agree as follows:

**1.     DEFINITIONS.** The following terms (including the singular or plural as the context may require) shall have the meanings described below: (a) "Change of Control" shall mean (i) a sale of all or substantially all of the assets of Seller, whether in a single transaction or a series of transactions or (ii) the merger or consolidation of Seller with or into a limited liability company, corporation, or other entity; the merger of a limited liability company, corporation, or other entity into Seller; or the occurrence of any other event that results in fifty percent (50%) or more of the total voting power entitled to vote in the election of the board of directors of Seller or the surviving or new entity (or in the event that Seller or the surviving or new entity is not a corporation, the equivalent to the board of directors) being held by a person or persons other than the shareholders or members of Seller who, individually or as a group, hold fifty percent (50%) or more of such voting power immediately prior to such transaction or event; (b) "Merchandise" shall mean the goods supplied to Company by Seller, directly or indirectly through Seller  dealers or distributors, as described in any applicable Vendor Agreement (defined below) or Specification (defined below), including all packaging, tags, labels, hangers, and containers used in connection therewith, all parts relating to such goods provided to Company and all literature, whether in print or electronic form, including, without limitation, all owner manuals, instructions and training materials pertaining to such goods, if applicable, whether or not any of such items are set forth separately on invoices to Company; (c) "Purchase Order" shall mean an order in writing or processed through Electronic Data Interchange (EDI) issued by Company for the purchase of Merchandise that includes the description, quantities to be purchased, price and other information relating to the purchase of Merchandise; (d) "Specification" shall mean the  detailed description of Merchandise agreed upon by Seller and Company as contained in any Vendor Agreement (defined below) or the Vendor Guide (defined below); (e) "Vendor Agreement" shall mean any Purchase Order or other agreement in writing and executed by Company and Seller relating to Merchandise, including, without limitation, this UTC, advertising, point of sale,

promotional  service,  promotional  funding  or  other  selling assistance agreements, buying or supply agreements, exclusivity agreements, letters of agreement, and any written amendments, waivers and consents relating to any of the foregoing; (f)  mart Vendor Information Manual? shall mean those policies and procedures for doing business with Kmart that have been supplied or made available to Seller in print or electronic form as may from time to time be amended by Kmart; and (g)  ears Vendor Information Guide? shall mean those policies and procedures for doing business with Sears that have been supplied or made available to Seller in print or electronic form as may from time to time be amended by Sears. The Kmart Vendor Information Manual and the Sears Vendor Information Guide, including any successor policies and procedures for doing business with Kmart and/or Sears, are collectively referred to herein as  endor Guide.? Terms used herein and not otherwise defined shall have the meaning given them in the Uniform Commercial Code as in effect in the State of Illinois as of the date hereof or as hereafter amended from time to time (the "UCC").

**2.     VENDOR AGREEMENTS.**

**2.1     Purchase Orders.** The execution of the UTC shall not give rise to any commitment on the part of Company to purchase any Merchandise.  A commitment to purchase Merchandise shall arise only at such time as Company issues a Purchase Order or enters into a separate Vendor Agreement for specific quantities of Merchandise  and  Company  obligation  to  purchase Merchandise shall be limited to such quantities.  When issued by Company and accepted by Seller, all Purchase Orders shall become part of and be subject to the terms of the applicable Vendor Agreement.  Any estimates or forecasts of Company future needs for Merchandise which may be provided to Seller by Company are for planning purposes only and shall not in any way represent a commitment by Company nor give rise to any obligation or liability of Company.  Company shall have no responsibility for any actions taken by Seller based on such estimates or forecasts.

**2.2     Construction and Amendment.** Except for those provisions in any Vendor Agreement expressly to the contrary, this UTC shall apply to, and is incorporated into, all other Vendor Agreements existing on the date hereof or hereafter executed and  supersedes  all  previous  communications,  Vendor Agreements and understandings that are inconsistent with this UTC.  The Vendor Agreements between Kmart and Seller and the Kmart Vendor Information Manual, incorporated into such Vendor Agreements between Kmart and Seller by this reference, contain the entire understanding of Seller and Kmart with respect

Rev. 1/07                    ? 2006 Sears Brands, LLC                    Page 1 of 10

MVP 000001

D□P□ Exhibit  15
Deponent  LEE
Date 4/12/18  Rptr MM



to the subject matter of such Vendor Agreements and may not be supplemented or modified by course of dealing, course of performance, any oral communication between the parties, or any response by Seller, whether oral or written, purporting to modify or supplement the terms of a Purchase Order or other Vendor Agreement unless such response is in writing and executed or consented to in writing by Kmart. The Vendor Agreements between Sears and Seller and the Sears Vendor Information Guide, incorporated into such Vendor Agreements between Sears and Seller by this reference, contain the entire understanding of Seller and Sears with respect to the subject matter of such Vendor Agreements and may not be supplemented or modified by course of dealing, course of performance, any oral communication between the parties, or any response by Seller, whether oral or written, purporting to modify or supplement the terms of a Purchase Order or other Vendor Agreement unless such response is in writing and executed or consented to in writing by Sears. Without limiting the foregoing, Company shall not be bound by any "shrink wrap license," "clickwrap" or "click to approve" terms or conditions contained in any Seller computer system, software or Web site that Company uses in connection with the purchase of Merchandise. The Vendor Agreements may be amended or supplemented only by a revised Vendor Guide or another written Vendor Agreement signed by an authorized representative of each party. All Purchase Orders and other Vendor Agreements shall be deemed a series of installments in one and the same transaction and "deemed to constitute a single agreement between Company and Seller within the meaning of Section 8 404(a) of the UCC. In the event any bankruptcy or insolvency proceeding is initiated in respect of Seller and Seller, an election to possession, elects to perform any outstanding Purchase Orders, then Seller, by so accepting and performing any of such Purchase Orders, shall be deemed to have accepted and assumed this UTC and the obligations of Seller to Company arising from time to time hereunder.

2.3   Waiver.   No right of either party under any Vendor Agreement may be waived except as expressly set forth in writing signed by an authorized representative of the party waiving such right. No waiver of any provision shall be implied by a party's failure to enforce any of its rights or remedies herein provided, and no express waiver shall affect any provision other than that to which the waiver is applicable and only for that occurrence.

3.   BUSINESS TERMS.

3.1   Specification. Any Specification shall be in writing. Seller, by agreeing to and/or using any Specification, design, product modification or other manufacturing or production suggestion, whether originating with Company or elsewhere, adopts as its own, accepts full responsibility for, and relieves Company of all responsibility for any such Specification, design, modification or suggestion. Seller specifically agrees and acknowledges that Company has no liability in connection with any Specification, Merchandise or packing design, modification

or suggestion.

3.2   Price and Shipping. The price for Merchandise shall include all costs of packing and delivering Merchandise to the F.O.B. point or other delivery point specified in the applicable Purchase Order or other Vendor Agreement, including: (a) all duties and taxes (including excise and withholding taxes) payable in any country where production or delivery takes place; (b) any commissions to selling agents; and (c) other incidental charges, whether or not such charges are itemized separately on invoices to Company. Seller shall ship only the quantities of Merchandise ordered by Company in the applicable Purchase Order and Seller shall make no substitutions or changes without Company prior written approval.

3.3   License. Seller grants to Company a nonexclusive, nontransferable, royalty free license to use, with the right to sublicense, Seller trademarks, service marks, trade names, trade dress, copyrights and rights of publicity associated with Merchandise for the limited purpose of Company marketing, promoting or selling Merchandise through any promotional, advertising or distribution channel, including, without limitation, print, television, radio or worldwide web.

4.   CODE OF CONDUCT.   Seller acknowledges that Seller has been furnished a copy of the Sears Holdings Corporation Code of Conduct (the "Code of Conduct") as a part of the Vendor Guide and that Company associates are required to follow the Code of Conduct. Seller shall support the Code of Conduct and shall not directly or indirectly take any action that may cause a Company associate to violate any law or the Code of Conduct. Without limiting the foregoing, Seller shall not directly or indirectly offer or give any personal benefit (other than infrequent, non-cash gifts of nominal value consistent with the Code of Conduct, including, but not limited to, commissions, kickbacks, payments, loans, gratuities (including travel and entertainment), bribes, gifts, samples, services, promises of future employment or personal considerations (such a benefit) to any Company associate or member of the associate family, or to any entity in which Seller knows a Company associate or member of the associate family owns a direct or indirect interest, or to any person affiliated with any subcontractor or consultant for Company. Seller shall notify the Sears Holdings Corporation Office of Compliance within five (5) business days after it has knowledge of any violation or attempted violation of the Code of Conduct, including, without limitation, the solicitation by a Company associate or member of an associate family of any benefit from any of Seller directors, officers, employees, subcontractors, agents or representatives. Any such notice shall be deemed to have been duly given when delivered by certified mail, return receipt requested, by email at compliance@searshc.com. Seller agrees to and shall cooperate with any request by Company and its representatives to provide information and documentation regarding any communication or transaction with Company or its associates.

MVP  000002

Sears **K**mart

**5.   PACKAGING, LABELING, SHIPPING AND BILLING; RISK OF LOSS.**

**5.1**   Packaging, Labeling, Shipping and Billing.  Seller shall be responsible for providing adequate packaging, tagging, labeling, packing, shipping and billing.  Seller shall comply with all packaging, tagging, labeling, packing, shipping and billing requirements reasonably requested by Company as well as any and all requirements established by applicable laws, regulations, carrier tariffs and product classifications.  For Merchandise to be shipped to Company from a point of origin within the United States, Seller shall deliver Merchandise to the designated carrier on or before the ship date specified in the applicable Vendor Agreement.  For Merchandise to be shipped to Company from a point of origin outside the United States, Seller shall deliver Merchandise in accordance with the delivery terms specified in the applicable Vendor Agreement and such delivery shall be made on or before the ready date specified in such Vendor Agreement.  Delivery dates specified shall be of the essence of the Vendor Agreement.  Seller shall ship all Merchandise in full packs and full shipments in accordance with Company requirements as set forth in the Vendor Guide or any Vendor Agreement.

**5.2**   Risk of Loss.  All risk of loss or damage to Merchandise shall remain with Seller until delivery of such Merchandise to the F.O.B. point or other delivery point specified in the applicable Purchase Order or other Vendor Agreement.

**6.   MANUFACTURING.**

**6.1**   Manufacturing Information.  Upon Company request, Seller shall provide Company with specific information, in such detail as Company may reasonably request, as to the location and method of manufacturing or assembly of Merchandise.  Seller shall provide Company with prior written notice of any change to the location of manufacturing or assembly of Merchandise and Seller shall be fully responsible for all costs and/or delays resulting from such changes.  Without advance notice but during regular business hours, Company, its designated representatives and any independent inspectors approved by Company, may inspect any facilities at which any Merchandise or any components for Merchandise are being manufactured or assembled (including any facilities of Seller, its affiliates, subsidiaries, subcontractors and suppliers) and any and all Merchandise at any stage of manufacture, assembly or delivery (including at the F.O.B. point or other delivery point specified in the applicable Purchase Order or other Vendor Agreement).  Company may require Seller to have Merchandise inspected prior to its shipment to the United States.  Such inspection shall be performed at Seller sole expense and by an independent inspector approved by Company.  Any inspection, documentation thereof and any corrective action taken by Seller with respect to any Merchandise shall not be deemed an acceptance of such Merchandise, or a waiver of any nonconformities or defects in such Merchandise and shall not excuse any failure by Seller to deliver Merchandise in

accordance with the terms of the applicable Vendor Agreement.

**6.2**   Company Brand Merchandise.  Prior to employing any production facility or subcontractor to manufacture or assemble Merchandise bearing a Company Brand (defined below), Seller shall register such production facility or subcontractor with the Company Global Compliance Office in accordance with the requirements of the Vendor Guide.

**7.   PARTS AND SERVICE.**

**7.1**   Parts.  Seller shall sell to Company any and all parts (or their functional equivalents) referenced or included in any Vendor Agreement or any Service Information (defined below) applicable to Merchandise for a period of at least ten (10) years after the date such Merchandise is last produced by Seller for Company.  Company may use any such parts in the performance of warranty service.  The price of parts shall be specified on the applicable Purchase Order or other Vendor Agreement but in no event shall Seller charge Company or Company  designated representative a price greater than the lowest price charged by Seller to any other customer for the same or similar parts sold on substantially similar terms.

**7.2**   Service.  If information relating to Merchandise, including, without limitation, warranty forms, owners manuals, product specifications, parts lists, exploded parts diagrams, training materials, technical and/or service bulletins, service and installation manuals and instructions is developed by or for Seller (together with any revisions and updates to such information, service Information"), Seller shall provide the same to Company.  Seller shall use its best efforts to provide such Service Information in electronic form.  Seller authorizes Company to use, reproduce, distribute or sell to Company  customers the Service Information without payment of any royalties or other fees to Seller and to provide repair, maintenance and installation services for all Merchandise.  With respect to all Merchandise of a type that is customarily serviced by Seller or third parties, Seller shall designate Sears, Roebuck and Co. or its affiliated designee ( company Service Provider" as an authorized service provider and shall include Company Service Provider, no less prominently than its other authorized service providers, on all lists or other enumeration of authorized service providers, whether h print, 'in/device web or other medium.  Company Service Provider may advertise that it is an authorized service provider for such Merchandise.  Company Service Provider shall provide such repair, maintenance and installation services in conformity with reasonable standards, rates, and guidelines and may use its subsidiaries and independent subcontractors or licensees to provide such repair, maintenance and installation services.  Seller represents and warrants that the provision of such services by Company Service Provider will not violate the rights of any third party.

**8.   REPRESENTATIONS AND WARRANTIES.**

**8.1**   Merchandise.  Without in any way disclaiming implied

MVP  000003

**Sears** **Kmart**

remedies or limiting remedies for breach thereof, Seller represents and warrants that all Merchandise shall: (a) conform to the Specification for such Merchandise; (b) be fit and sufficient for the ordinary purpose for which Merchandise is used; (c) be free from defects in workmanship, materials and packaging; (d) be free from defects in construction and design; (e) be fit and sufficient for the purpose stated on any packaging, labeling or advertising; and (f) be equivalent in materials, quality, fit, finish, workmanship, performance and design to any samples submitted to and approved by Company.

8.2    Advertising.   Seller represents and warrants that all claims made by Seller in any packaging, labeling, advertising, or other consumer material in connection with any Merchandise or Seller brand relating to Merchandise shall be true and shall have been substantiated at the time that such claims are made.

8.3    Intellectual Property.   Seller represents and warrants that: (a) all patents, trademarks, trade names, trade dress, copyrights, trade secrets, rights of publicity and other intellectual property rights (other than those intellectual property rights owned by or licensed to Company) used by Seller in connection with Merchandise or in the development or manufacture of Merchandise are either owned by Seller or Seller has been and is properly authorized by the owner of such rights to use such intellectual property rights in connection with such Merchandise and to set such Merchandise incorporating such intellectual property rights to Company for use or further resale and (b) Merchandise will not, at the time that it is delivered, offered for sale or sold by Company, infringe any patent, trademark, service mark, trade name, trade dress, copyright, trade secret, domain name, right of publicity or other intellectual property right of any person, corporation or other entity. Seller shall notify Company General Counsel in writing by certified mail, return receipt requested, within five (5) business days after it has knowledge of any claim or allegation of infringement, misuse, dilution, misappropriation or other violation of any patent, trademark, service mark, trade name, trade dress, copyright, trade secret, domain name, right of publicity or other intellectual property right in any way related to or affecting Merchandise.

8.4    Compliance with Law.   Seller represents and warrants that: (a) all Merchandise has been or shall be produced, assembled, packaged, tagged, labeled, packed, shipped and invoiced ( erchandise Production? in compliance with the applicable requirements of federal, state and local laws, regulations, ordinances and administrative orders and rules of the United States, its territories and those of all other countries in which any Merchandise Production and/or delivery of Merchandise takes place; (b) Seller and all of its affiliates, subsidiaries, subcontractors, suppliers and agents involved in any Merchandise Production or delivery of Merchandise shall strictly adhere, and shall continue throughout the term of any Vendor Agreement to strictly adhere, to all applicable federal, state and local laws, regulations and prohibitions of the United States, its territories and those of all countries in which any Merchandise Production and/or delivery of Merchandise occurs

with respect to the operation of their production and other facilities and their other business and labor practices, including, without limitation, all laws, regulations and prohibitions governing the working conditions, wages, hours and minimum age of the work force; (c) Merchandise Production has not and shall not involve at any time, in whole or in part, any use of child, convict or forced labor; and (d) any and all prices charged and allowances made available to Company by Seller are in compliance with U.S. antitrust laws, including, without limitation, the requirements of the Robinson-Patman Act. Seller shall provide Company with any guaranty of compliance with the foregoing in such form as Company may designate with respect to any Merchandise.

8.5    Antidumping.   Seller represents and warrants that all sales of Merchandise to Company shall be made at no less than fair value under the United States antidumping law and that no government has provided a countervailable subsidy for Merchandise actionable under U.S. law.  Seller shall indemnify Company for (i) all antidumping and/or countervailing duties imposed on all Merchandise that is sold prior to the date of publication of the International Trade Administration's preliminary determination of sales at less than fair value or prior to the date of publication of the existence of countervailable subsidies and exported before the date of publication of the International Trade Administration's final determination of sales at less than fair value or the existence of countervailable subsidies and (ii) any expenses (including reasonable attorneys' fees) and administrative costs incurred by Company in its participation in any United States antidumping or countervailable duty proceeding involving any warranted Merchandise.

9.    ELECTRONIC PROCESSING.   Unless otherwise agreed by Company or as set forth in the Vendor Guide, the parties shall process all Purchase Orders and other related documents (including invoices and ship notices) and any installment payments or advances in respect of all monetary obligations between Company and Seller electronically, either directly or through a third party provider satisfactory to both parties.  Each party shall be responsible for its own costs, including the costs of any provider with which it contracts. Each invoice (or ship notice, in the absence of an invoice) shall contain an appropriate, agreed upon code, symbol or statement affirming Seller's compliance with all applicable requirements of the Fair Labor Standards Act (as amended), the regulations and orders of the United States Department of Labor issued pursuant thereto and of any similar state laws and regulations.  All electronic fund transfers and wire transactions shall be in accordance with National Automated Clearing House Association (NACHA) rules and in accordance with any instructions and procedures which Company may from time to time supply.  Neither party shall be liable to the other for any indirect, special, incidental, exemplary or consequential damages arising from or as a result of any delay, omission or error in the electronic transmission or receipt of any documents, even if the other party has been advised of the possibility of such damages.

MVP  000004



**10.    COMPANY BRAND.** If Company authorizes Seller to mark or label any Merchandise with a trade name, trademark, logo or service mark owned by or licensed to Company ("Company Brand"), such marking or labeling shall be limited to the quantities of such Merchandise set forth in a Purchase Order or in a separate Vendor Agreement or otherwise authorized by Company and shall be done in accordance with Company specific written instructions. Seller shall not sell or otherwise dispose of, nor permit the sale or disposal of, any Merchandise bearing any Company Brand (including any Merchandise rejected by Company) to anyone other than Company without first obtaining Company express written consent and then (a) removing, or otherwise deleting as installed, any Company Brand prior to such sale or disposal, and (b) complying with such other requirements as Company shall impose in its sole and absolute discretion. Company may elect, but shall have no obligation, to purchase from Seller any surplus labels, packaging or other materials bearing any Company Brand. All such materials not purchased from Seller by Company shall be destroyed at the expiration, cancellation, or termination of the Vendor Agreement. Seller shall have no interest or rights in any Company Brand except as expressly granted in a Vendor Agreement. Seller shall notify Company General Counsel in writing by certified mail, return receipt requested, within five (5) business days after Seller (a) has knowledge of any allegation by a government agency (including, without limitation, the U.S. Consumer Product Safety Commission, the U.S. Department of Agriculture and the U.S. Food and Drug Administration, and such equivalent foreign government agencies, departments and commissions) that the government agency (i) has initiated a formal or informal inquiry, investigation or proceeding in any way related to or affecting Merchandise bearing any Company Brand; or (ii) asserts that Merchandise bearing any Company Brand is not or may not be in compliance with laws as described in Section 8.4 above; or (b) reports to any government agency that Merchandise bearing any Company Brand is not or may not be in compliance with laws as described in Section 8.4 above or contains or may contain a defect that could create a risk of injury or death. Seller hereby assigns to Company all of Seller right, title and interest in and to all telephone numbers (if any) used in connection with customer and Company support and assistance that appear on the packaging and/or labeling of Merchandise bearing any Company Brand or that appear in telephone directories in connection with any Company Brand, effective upon the termination of Seller use of such telephone numbers or upon Company request, at which time Seller shall have no further right, title or interest in or to such telephone numbers. Seller acknowledges and agrees that as between Seller and Company, upon such time of termination or request by Company, Company shall have the sole right to and interest in such telephone numbers, and Seller hereby appoints Company as Seller attorney-in-fact to direct the telephone company and/or the listing agencies with which Seller has placed telephone directory listings to assign such telephone numbers to Company, and to execute and deliver such documents and take such actions as may be necessary to effectuate such assignment.

**11.    DEFENSE AND INDEMNITY.**

**11.1    Defense.** Seller shall, at its own cost and expense, defend Company, its affiliates and its subsidiaries and any of their present and former officers, directors, employees, representatives, licensors, licensees, agents, dealers, distributors, independent contractors and any person directly or indirectly involved in the distribution or sale of Merchandise (each an indemnified Party? from and against all allegations (even though such allegations may be false, fraudulent or groundless) asserted in any claim, action, lawsuit or proceeding between any Indemnified Party and any third party, whether actual or alleged and whether or not Seller indemnity and Contribution Obligations (as defined below) shall apply, arising out of or relating to any of the following (collectively, the "claims"): (a) the infringement, misuse, dilution, misappropriation, or other violation of any patent, trademark, service mark, trade name, trade dress, copyright, trade secret, domain name, right of publicity or other intellectual property right in any way relating to or affecting Merchandise, or any unfair competition involving Merchandise; (b) death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any latent or patent defect in Merchandise, including, without limitation improper construction, assembly, installation, repair, display, packing or packaging, service or design of Merchandise, failure of Merchandise to comply with any Specification or samples or with any express or implied warranties of Seller, or any claim of strict liability in tort relating to Merchandise; (c) any violation by Seller (or its affiliates, subsidiaries, subcontractors, suppliers, agents or representatives) in the manufacture, assembly, installation, repair, display, packing, possession, use, delivery or sale of Merchandise ( reduction and Sale? of any federal, state or local law, regulation, ordinance or administrative order or rule of the United States, its territories or any other country involved in the Production and Sale of Merchandise; (d) the packaging, tagging, labeling, packing, shipping, delivery and/or invoicing of Merchandise; (e) failure to warn or to provide adequate warnings and/or instructions in the use, assembly, service or installation of Merchandise; (f) the packaging, labeling or advertising claims made by Seller; (g) the display, assembly or installation of Merchandise, or (h) the assertion by a third party of a security interest, right of replevin or other legal interest created by a factoring or other credit arrangement in any amount due Seller under a Vendor Agreement. Notwithstanding the provisions of the foregoing sentence, Seller shall have no obligation to defend any Indemnified Party in any action, lawsuit or other proceeding to which the basis for the claim is confined to the sole negligence of any Indemnified Party in the display, assembly, service, repair or installation of Merchandise. Seller shall confirm defense counsel satisfactory to Company and shall, from time to time, provide reports, consult with Company in conducting the defense of the Claims and otherwise cooperate fully with the reasonable requests of Company provided that only with respect to claims arising under Section 11.1(a) above, Company may, at its election and at any time, take control of the defense and investigation of said Claims and/or employ attorneys and other

MVP 000005

**Sears** **Kmart**

constituents, investigators and experts of its own choice to manage and/or defend any such Claims at the cost and expense of Seller. The obligations of Seller under this Section 11.1 are referred to herein as the "Defense Obligations."

**11.2 Indemnity and Contribution.** Seller shall hold harmless and indemnify the Indemnified Parties from and against any and all damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees, disbursements and costs of investigation) incurred by any of the Indemnified Parties in any claim, demand, action, lawsuit, or proceeding arising out of or in any way relating to any Claims; provided that Seller shall have no obligation to indemnify any Indemnified Party for damages awarded based on the sole negligence of any Indemnified Party in the display, assembly, service, repair or installation of any Merchandise. In any case in which the Seller Indemnity obligation set forth in the preceding sentence is not enforceable under applicable law and in which any Indemnified Party and Seller are found to be liable to a third party with respect to Merchandise, then Company and Seller shall each contribute to the payment of any judgment awarded in favor of such third party in proportion to the comparative degree of culpability of the Indemnified Parties and Seller. The obligations of Seller under this Section 11.2 are referred to herein as the "Indemnity and Contribution Obligations."

**12. INSURANCE.** Seller shall obtain and maintain, at its expense, a policy or policies of Commercial General Liability Insurance covering liabilities relating to Merchandise, including products and completed operations, with a broad form vendor's endorsement naming Company as the additional insured, in those amounts and with such companies as set forth in the Vendor Guide and containing such other provisions satisfactory to Company. All such policies shall be primary and non-contributory and shall provide that the coverage thereunder shall not be terminated without at least thirty (30) days prior written notice to Company. Proof of insurance evidencing such coverage shall be submitted in advance of or concurrent with the execution of the UTC by Seller and upon each policy renewal date. Neither approval of any of Seller's insurance policies by Company nor Seller failure to discharge any of its obligations contained herein (including, without limitation, Seller's failure to obtain a broad form vendor's endorsement naming Company as the additional insured) shall relieve Seller of any obligations contained herein, including, without limitation, Seller's Defense Obligations, Indemnity and Contribution Obligations set forth above, and claims in excess of Seller policy limits. If at any time Seller does not provide Company with the proof of insurance required hereunder or if, in Company opinion, such policies do not provide adequate protection for Company or if Seller does not furnish evidence of acceptable coverage within fifteen (15) days after Company so notifies Seller, Company shall have the right, in addition to its rights under Section 14 below, to withhold making any installment payment or advance in respect of any Company monetary obligations which may be outstanding under any Vendor Agreement until evidence of acceptable coverage is provided.

**13. COMPANY REMEDIES.** In addition to all other remedies available to Company under the UCC or otherwise, any Merchandise may be rejected by Company and abandoned, returned or held at Seller's expense and risk, when such Merchandise: (a) is not produced, sold, shipped and/or delivered in compliance with the terms of the applicable Vendor Agreement, or otherwise does not conform to the applicable Vendor Agreement; (b) is delivered in excess of the quantities ordered, in broken packs or partial shipments, or in packages or assortments other than as specified; (c) allegedly violates any applicable federal, state or local laws, regulations issued pursuant to such laws, or any governmental administrative orders, rules or regulations of the United States, its territories or any other country involved in the Production and Sale of Merchandise; (d) allegedly infringes any patent, trademark, service mark, trade name, trade dress, copyright, trade secret, domain name, right of publicity or other intellectual property right in any way related to or affecting Merchandise, or allegedly involves any unfair competition; or (e) at the time of receipt by Company, will expire within a time period that is less than the applicable industry standard, in the case of food and other perishable Merchandise. Company right to reject and return or hold Merchandise at Seller's expense shall, without limiting such right, extend to Merchandise supplied to Company hereunder which was returned by a Company customer for any reason entitling Company to reject or revoke acceptance of such Merchandise. Company may, at its option, require Seller to replace any nonconforming Merchandise or grant Company a full refund or full credit (collectively, "Refund Credit"). At its election, Company may accept nonconforming Merchandise, and Seller shall be liable for any reduced value of such Merchandise or the cost incurred by Company to repair the same. Acceptance of Merchandise by Company shall not relieve Seller of any of its warranty or other obligations hereunder. Company may also charge to Seller all direct and indirect costs incurred by Company as a result of any nonconforming Merchandise or delivery, or an administrative fee in an amount reasonably related to such costs, whether or not Merchandise is rejected by Company (collectively, "Return Costs"). Acceptance by Company of replacement Merchandise, a full or partial credit or refund, or Return Costs, shall not relieve Seller of liability for other damages sustained by Company as a result of Seller's failure to deliver conforming Merchandise in a timely manner or arising as a result of any other breach by Seller. Seller is responsible to maintain accurate, legible books, systems and records in connection with Seller performance of its obligations hereunder. Seller agrees to continue to maintain such customary books, systems and records up to the second anniversary of the termination of any Vendor Agreement. Upon seven (7) business days' notice to Seller, Company shall have the right to audit all books, systems and records of Seller in order to verify reports, statements and invoices issued by Seller in relation to Seller performance of any Vendor Agreement. Any such audit shall be conducted during normal business hours without unreasonable burden on Seller business by the Company corporate internal audit

MVP 000006



personal or by an auditor of nationally recognized standing selected by the Company.

**14.    CANCELLATION AND TERMINATION.** Company shall have the right to immediately cancel or terminate any Vendor Agreement for any Merchandise or any part of Company obligations under such Vendor Agreement, or cancel or terminate all or any outstanding Purchase Orders for Merchandise under such Vendor Agreement if: (a) Company reasonably believes that Seller does not have Merchandise which conforms to the terms of the Vendor Agreement and is ready for shipment in the specified quantities and on the delivery dates specified; (b) it is alleged that Merchandise infringes any patent, trademark, service mark, trade name, trade dress, copyright, trade secret, domain name, right of publicity or other intellectual property right; (c) it is alleged that Merchandise was manufactured or supplied to Company in violation of any applicable federal, state or local laws, regulations, ordinances or administrative orders or rules of the United States, its territories or any country involved in Production and Sale of Merchandise or in violation of any Vendor Agreement; (d) Seller refuses to furnish appropriate guaranties to protect Company as may be requested by Company pursuant to Section 8.4 above; (e) Seller fails to maintain the insurance required hereunder, fails to name Company as an additional insured, or fails to produce evidence thereof; (f) Seller becomes the subject of a voluntary or involuntary case under the Federal Bankruptcy Code or similar state or federal insolvency laws; any creditor of Seller commences an action to enforce or foreclose upon a lien or security interest in property of Seller; or any property of Seller passes into the hands of a creditor of Seller, receiver, or assignee for the benefit of creditors, becomes the subject of a levy for taxes or to satisfy a judgment, or otherwise is attached for the benefit of a creditor of Seller; (g) Seller ceases the manufacture or assembly of Merchandise, or necessary components incorporated into Merchandise, or announces its intention to do so prior to fulfilling all outstanding Purchase Orders, or otherwise, becomes unable for any reason to timely fulfill outstanding Purchase Orders; (h) Seller commits a material breach of any Vendor Agreement relating to such Merchandise; (i) a Change of Control occurs with respect to Seller; (j) Seller changes the location of manufacture or assembly of Merchandise without the prior written consent of Company; (k) cancellation or termination is otherwise permitted by the UCC or other applicable law; (l) Company reasonably believes that Merchandise or Seller is encumbered by a material adverse consumer perception; (m) Seller defaults under or breaches any other agreement with Company which default or breach would entitle Company to terminate that other agreement; or (n) Seller engages in any criminal activity, fraud, threatens public health or harm to Company, its affiliates, trademarks or commercial reputation, or is listed by the U.S. Government on any U.S. Government watch lists, including, among others, the U.S. Office of Foreign Assets Control security watch lists. For any imported Merchandise which is subject to a customs embargo or quota restriction, Company may cancel or terminate any Purchase Order or delay any installment payment or advance in respect of Company

monetary obligations to Seller, if any, under each applicable Vendor Agreement until the embargo is lifted or necessary quota becomes available.

**15.    RECOUPMENT AND SET-OFF.** Company and Seller acknowledge and agree that Company monetary obligations to Seller under the Vendor Agreements shall at all times be net of all Refund Credits, Return Costs, Defense Obligations, Indemnity and Contribution Obligations and other monetary obligations owing by Seller to Company under any Vendor Agreement or otherwise (collectively, "Seller's Monetary Obligations") and any installment payment or advance made by Company to Seller in respect of any Vendor Agreement while any Seller's Monetary Obligations are outstanding shall be deemed to be an overpayment to Seller to the extent of such outstanding Seller's Monetary Obligations and shall be subject to recoupment and/or set-off by Company. Without limiting the foregoing, Company shall have the right, at all times, to deduct any Seller's Monetary Obligations from any amounts owed to Seller by Company (irrespective of whether any such amount is owed to Seller by Kmart, Sears or any affiliate thereof), and to pay only the net sum due, if any. Any Seller's Monetary Obligations that remain outstanding after any exercise by Company of its recoupment and/or set-off rights shall be paid by Seller promptly upon demand by Company. For the purpose of Company exercise of the right of recoupment and/or set-off only, any raw materials, components and parts supplied by Seller to Company for use in Merchandise, if applicable, shall be deemed to be supplied to Company pursuant to a Purchase Order.

**16.    CONFIDENTIALITY.**

**16.1    Proprietary Information.** All Proprietary Information (as hereinafter defined) is the sole and exclusive property of Company. Seller shall not in any manner use, reproduce or disclose, directly or indirectly, to any third party at any time any Proprietary Information, except in connection with Seller's performance under a Vendor Agreement. Seller agrees and shall not provide access to Company Proprietary Information except on a strict need to know basis in connection with the performance of its obligations hereunder. Upon demand by Company, Seller shall deliver to Company immediately all materials containing Proprietary Information in Seller's possession (whether prepared by Company or Seller). "Proprietary Information" means (a) all information relating to Company sales, pricing, cost, inventory, operations, plans and programs; (b) all trade secrets of Company, including any and all customer lists, customer survey responses and any other information concerning any of Company customers; (c) any Specification furnished to Company; (d) patent applications, and other embodiments of Company intangible property; and (e) any other information that is not publicly available and is designated by Company as Proprietary Information. Without limiting the foregoing, Seller will not disclose the existence or terms of any Vendor Agreement or any other information regarding Seller supply of Merchandise to Company in any advertising, promotional or sales activity or publicity release or other public communication unless Company

MVP 000007

Sears K<sub>mart</sub>

gives its prior written consent to such action and approves any press release or other publicity materials prior to their dissemination. To the extent that Seller provides any information concerning Company customers, Seller must implement appropriate measures designed to ensure the security and confidentiality of such customer information, protect against any anticipated threats or hazards to the security or integrity of such information and protect against unauthorized access or use of such information that could result in substantial harm or inconvenience to any such Company customer. Company makes no warranty as to the accuracy or completeness of any Proprietary Information, and has no liability to Seller resulting from the provision, contents or use of Proprietary Information.

16.2    Computer Access. If Seller is given access, whether on-site or through remote facilities, to any Company or Company affiliate computer or electronic data storage system in order for Seller to perform its obligations under any Vendor Agreement, then Seller shall limit such access and use solely on a strict need to access basis to perform such obligations and shall not attempt to access or reverse engineer any computer system, electronic file, software or other electronic services other than those specifically required to perform its obligations under such Vendor Agreement. Seller shall limit such access to those of its personnel who need to have such access in connection with such Vendor Agreement, shall advise Company in writing of the name of each such personnel who will be granted such access, and shall strictly follow all of Company security rules and procedures for use of Company electronic resources. All user identification numbers and passwords disclosed to Seller and any information obtained by Seller as a result of Seller access to, and use of, Company computer and electronic storage systems shall be deemed to be, and shall be treated as, Proprietary Information. Seller shall cooperate with Company in the investigation of any apparent unauthorized access by Seller to Company computer or electronic data storage systems or unauthorized release of Proprietary Information by Seller. Further, Seller shall promptly notify Company of any actual or suspected unauthorized access and/or disclosure.

17.    MISCELLANEOUS.

17.1    Assignment by Seller. All Purchase Orders and other Vendor Agreements are personal to Seller and Seller shall not assign (by contract, operation of law or otherwise) its rights or obligations under any Vendor Agreement or grant a security interest in or pledge as collateral any interest herein or therein, except with Company prior written consent, and the failure of Seller to obtain Company prior written consent shall render any such attempt to assign or grant a security interest or lien in its rights or obligations void and of no force and effect; provided, however, that Seller may assign its right to receive installment payments or advances from Company in respect of any monetary obligations of Company to Seller under any Vendor Agreement, subject to the terms and conditions contained herein. Any factor or permitted assignee, secured creditor or pledgee of Seller shall acquire such interest subject to all of

Company recoupments, setoffs, claims and defenses and all of the terms and conditions contained herein, and Seller shall notify any such factor, assignee, secured creditor or pledgee of such fact. Company shall have no obligation to make payments to anyone other than Seller unless and until Seller (a) notifies Company in writing of the assignment of such installment payments or advances along with the name and address of the person to whom such installment payments or advances should be sent; (b) obtains a separate Company accounts payable number for such installment payments or advances; and (c) uses such accounts payable number on every invoice that Company is to pay directly to the third party. Seller retains responsibility for all allegedly misdirected installment payments or advances that result from Seller's failure to comply with the terms and conditions hereof.

17.2    Severability. If any provision of any Vendor Agreement or this UTC is held to be invalid, illegal or unenforceable by a court of competent jurisdiction, then such provision shall be deemed modified to the extent necessary to make such provision enforceable by such court, and the invalidity in whole or in part of any portion of such Vendor Agreement or this UTC shall not impair or affect the validity or enforceability of the remaining provisions of such Vendor Agreement or this UTC.

17.3    Cumulative Rights. All rights and remedies under the Vendor Agreements are cumulative, and the exercise of any right or remedy herein provided shall be without prejudice to the right to exercise any other right or remedy provided for herein or at law or in equity.

17.4    Survival. The provisions of Sections 8, 10, 11 and 16 of this UTC shall survive the expiration, cancellation or termination of any Vendor Agreement.

17.5    Governing Law. The Vendor Agreements and the UTC shall be construed and enforced in accordance with the internal laws of the State of Illinois without regard to its conflict of law principles. Seller and Company expressly agree that the rights and obligations of the parties hereto under this UTC and each and every Vendor Agreement shall not be governed by the provisions of the United Nations Convention on Contracts for the International Sale of Goods.

17.6    Dispute Resolution for International Sellers (applicable to international-based entities legally domiciled in a country other than United States or China). Any and all disputes arising out of or relating to the Vendor Agreements and the UTC, or the breach thereof, will be resolved: (1) first, by mandatory mediation pursuant to the rules and procedures of JAMS, Inc. in Chicago, Illinois and, if mediation is not successful, (2) then, by final and binding arbitration pursuant to the rules and procedures of JAMS, Inc. in Chicago, Illinois. The parties hereto agree that if a dispute continues unresolved for thirty (30) days, either party shall be entitled to request mediation which shall begin no later than thirty (30) days from the date of such request. The parties agree to engage in good faith efforts to reach resolution during

Rev. 1.07                                    ? 2009 Sears Brands, LLC                                    Page 8 of 10

MVP 000008



the course of such mediation. If mediation fails, either party may immediately request binding arbitration. The parties agree to select a panel of three (3) arbitrators and agree that the official language of the arbitration shall be the English language. Judgment may be rendered on any arbitration award in any court of competent jurisdiction. The parties hereto agree that the United States District Court for the Northern District of Illinois shall constitute a court of competent jurisdiction and that such court possesses jurisdiction and venue (and is a convenient venue) over any such arbitration award or any issues relating to such mediation or arbitration which are properly within the purview of courts, as opposed to JAMS, Inc., the mediator or arbitrator(s). Seller waives all objections to jurisdiction and venue as herein stated.

17.7    Dispute Resolution for International Sellers (applicable to internationally-based entities legally domiciled in China). Any dispute arising out of or in connection with any Vendor Agreements or this UTC, or the breach thereof, shall be resolved: (1) first, by mandatory mediation pursuant to the rules and procedures of the China International Economic and Trade Arbitration Commission ( IETAC? located in Shenzhen or Shanghai and, if mediation is not successful, (2) then, by final and binding arbitration pursuant to the rules and procedures of CIETAC. The parties hereto agree that if a dispute continues unresolved for thirty (30) days, either party shall be entitled to request mediation which shall begin no later than thirty (30) days from the date of such request. The parties agree to engage in good faith efforts to reach resolution during the course of such mediation. If mediation fails, either party may immediately request binding arbitration through and submitted to CIETAC which shall be conducted in accordance with CIETAC arbitration rules then in effect at the time of applying for arbitration. The parties shall select a panel of three (3) arbitrators under the applicable CIETAC rules. The official language of any mediation or arbitration conducted hereunder shall be the English language. The arbitral award is final and binding upon both parties. Judgment may be rendered on any arbitration award in any court of competent jurisdiction. The parties hereto agree that the United States District Court for the Northern District of Illinois shall be one such court of competent jurisdiction and that such court possesses jurisdiction and venue (and is a convenient venue) over any such arbitration award or any issues relating to such mediation or arbitration which are properly within the purview of courts, as opposed to CIETAC, the mediator or arbitrator(s).

To the extent that Seller may in any jurisdiction claim for itself or its assets immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to itself or its assets such immunity (whether or not claimed), the Seller agrees not to claim and waives such immunity to the fullest extent permitted by the laws of the governing jurisdiction intending, in particular, that in any proceedings filed or taken in the United States of America the foregoing waiver of immunity shall have full legal effect under and

be construed in accordance with the United States Foreign Sovereign Immunities Act of 1976.

Under the Vendor Agreements and this UTC, whether filed in the People Republic of China or the United States of America, Seller expressly consents generally in respect of any suit, action or proceedings arising out of or in connection with the Vendor Agreements or this UTC and obligations there end here under to the giving of any such relief, or the issuance of any process in connection with any such suit, action or proceedings including, without limitation, the making, enforcement or execution against any property whatsoever (irrespective of its use of intended use) of any order or judgment that may be made or given in such action or proceedings.

All of the obligations expressed to be assumed by the Seller under the Vendor Agreements and this UTC are legal, valid and binding as obligations of the Seller and any and all of its ownership interests, enforceable in accordance with their respective terms.

17.8    Injunctive Relief. It is expressly agreed that a material breach of Sections 8, 10 and 16 of this UTC will cause irreparable harm to the non-breaching party and that a remedy at law would be inadequate. Therefore, in addition to any and all remedies available at law, the non-breaching party shall be entitled to seek injunctive relief against the breaching party in the event of any threatened or actual violation of such sections of this UTC.

[SIGNATURE PAGE FOLLOWS]

Rev. 1/07        ? 2006 Sears Brands, LLC        Page 9 of 10

MVP 000009



IN WITNESS WHEREOF, Seller and Company have each caused this UTC to be executed by its duly authorized representative as of the date written below and such execution evidences each party's acceptance of and agreement with the terms and conditions set forth herein.

Dated: 4 MAY 2007

COMPANY
By: Sears Holdings Management Corporation, its Agent

          RICK HARRISON
          VICE PRESIDENT
By: _____
Print Name: _____
Title: _____

SELLER
MVP (H.K.) INDUSTRIES LTD.
           Company Name

By: _____
Print Name: JOHNSON WONG
Title: SENIOR MANAGER
      (PLACE SELLER NAME LABEL HERE)

Rev. 1.0'                    7  2000 Sears Brands, LLC                    Page 10 of 10

MVP 000010