*EXHIBIT P*

1

1                UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT
2

3       FREDERICK KLORCZYK, JR.,
        as co-administrator of
4       the Estate of
        Christian R. Klorczyk,
5       and LYNNE KLORCZYK, as
        co-administrator of the
6       Estate of Christian R. Klorczyk,

7
                        Plaintiffs,
8
            vs.                          CIVIL ACTION NO.
9                                        3:13-cv-00257-RNC

10      SEARS, ROEBUCK & CO.,
        SHINN FU CORPORATION,
11      SHINN FU COMPANY OF
        AMERICA, MVP (HK)
12      INDUSTRIES, LTD.,
        and WEI FU (TAISHAN)
13      MACHINERY & ELECTRIC
        CO., LTD.,
14
                        Defendants.
15

16          DEPOSITION OF RYAN JORGENSEN

17      produced, sworn and examined on Wednesday, the
        25th day of May, 2016, at the law offices of
18      Baker Sterchi Cowden & Rice, L.L.C., 2400
        Pershing Road, Suite 500, in the City of Kansas
19      City, in the County of Jackson, and the State of
        Missouri, before me,
20
            MARIE A. McCRACKEN, CSR, CCR, RPR
21                        of
                   McCRACKEN REPORTING
22
        a Certified Court Reporter within and for the
23      States of Missouri and Kansas.

24      Taken on behalf of Plaintiffs pursuant to Notice
        to Take Depositions.
25

2

```
 1            A P P E A R A N C E S
 2  For the Plaintiff:
 3       MR. HOWARD S. EDINBURGH
         HERZFELD & RUBIN, P.C.
 4       125 Broad Street
         New York, NY  10004
 5       (212) 471-8529
         hedinburgh@herzfeld-rubin.com
 6
 7  For the Defendants:
 8       MR. DENNIS BROWN
         Mr. STEVEN J. ZAKRZEWSKI
 9       GORDON & REES, LLP
         95 Glastonbury Boulevard, Suite 206
10       Glastonbury, CT  06033
         (860) 278-7448
11       dbrown@gordonrees.com
         szakrzewski@gordonrees.com
12
    For Defendant Sears, Roebuck & Company:
13
         MS. ERICA W. TODD-TROTTA
14       TROTTA, TROTTA & TROTTA, LLC
         900 Chapel Street, 12th Floor
15       P.O. Box 802
         New Haven, CT  06503
16       (203) 787-6756
         etodd@trottalaw.com
17
    For SFA Companies, Inc.:
18
         MR. ARTHUR CHAYKIN
19       General Counsel
         10939 N. Pomona Avenue
20       Kansas City, MO  64153
         (816) 891-6390
21       arthur.chaykin@sfacompanies.com
22
23
24
25
```

3

```
 1               INDEX
 2
    WITNESS:  RYAN JORGENSEN            PAGE
 3
    Direct Examination by Mr. Edinburgh     4
 4  Examination by Mr. Todd-Trotta        119
    Further Examination by Mr. Edinburgh  120
 5
 6
 7            EXHIBITS
 8  NUMBER      DESCRIPTION            PAGE
 9  12 - Curriculum Vitae; SFA003349     7
10  13 - E-mail and Intertek Test Report;  60
         SFA000380-388
11
12  14 - SFA Product Inspection Form;    64
         SFA003348
13  15 - Jack Stand Operators Manual;    69
         SFA002815-2818
14
15  16 - Headlines Test Report          80
16  17 - Blackhawk Jack Stand Operating  85
         Instructions & Parts Manual;
17       SFA003275-3278
18  18 - Omega Jack Stand Operating      86
         Instructions & Parts Manual;
19       SFA003259-03262
20  19 - Westward Vehicle Stands Operating  89
         Instructions Manual; STF000454-455,
21       STF000454-473
22  20 - 11/20/06 e-mail; SFA003666-3668  110
23
24
25
```

4

```
 1                RYAN JORGENSEN,
 2  of lawful age, after having been first duly sworn
 3  to tell the truth, the whole truth, and nothing
 4  but the truth, testified as follows:
 5                EXAMINATION
 6  BY MR. EDINBURGH:
 7       Q.  Please state for the record your name
 8  and home address.
 9       A.  Ryan Andrew Jorgensen.  116 Southwest
10  23rd Street, Blue Springs, Missouri.
11       Q.  Mr. Jorgensen, good morning.  My name is
12  Howard Edinburgh, my law firm is Herzfeld & Rubin
13  and we represent the Klorczyks, the plaintiffs in
14  this case, in an action against among others
15  Shinn Fu Company of America.  I'll be asking you
16  certain questions this morning and perhaps even
17  this afternoon, and just some basic ground rules.
18  Please wait until I finish my question before you
19  respond.  Please have all your answers be verbal.
20  And if there is any question you don't
21  understand, just let me know and I will rephrase
22  in a manner in which you'll be able to respond
23  to.
24       By whom are you currently employed?
25       A.  Shinn Fu Company of America.
```

5

```
 1       Q.  And I will refer to that entity as SFA
 2  from time to time and so we both know that SFA
 3  will refer to Shinn Fu Company of America.
 4       And for how long have you been employed
 5  by SFA?
 6       A.  Eight years.
 7       Q.  Okay.  Now, your counsel has provided us
 8  with a copy of your CV.
 9            (Whereupon, a discussion was
10  had off the record.)
11       MR. EDINBURGH:  Back on the record.
12       As a follow-up to Meghann O'Connor's
13  testimony yesterday there were certain
14  discussions off the record concerning the scope
15  of the search conducted by SFA with respect to
16  their various databases they had at SFA with
17  respect to jack stand incidents, jack stand
18  failures.  I would respectfully ask SFA's counsel
19  on the record now to at my request make a
20  statement about the search that has been
21  conducted in response to the various discovery
22  demands made by plaintiffs in this action.
23       MR. BROWN:  Well, I think there was
24  some confusion yesterday, that plaintiffs'
25  counsel misunderstood and believed that certain
```

6

1  search terms were used and then other terms were
2  used to modify and narrow that search.  Indeed I
3  think the record will speak for itself and
4  Meghann's testimony on behalf of the corporation
5  was clear, but each search term she mentioned was
6  used independently in every document that
7  responded.  For example, every document in the
8  electronic records of the company using the word
9  "jack stand" was reviewed to see if it fell
10 within the construct of being responsive.
11      Likewise, as she testified, rather than
12 depend on anything electronic, every claim file
13 that the company possesses was individually
14 reviewed to make sure it was unrelated, would
15 have nothing to do with it.  If it had any
16 possible connection, it was forwarded on to
17 counsel and we have managed to go back and grab
18 some, which we don't believe are responsive, but
19 simply because they were jack stand incidents,
20 even if not within the parameters of the
21 discovery, we have tried to provide them to make
22 sure we have the complete records of the company
23 available.  Is that all right?
24      MR. EDINBURGH:  Yes, thank you.
25      MR. BROWN:  You are welcome.

7

1      MR. EDINBURGH:  Now proceed with
2  the deposition.
3      Q.  (BY MR. EDINBURGH)  I'll say good
4  morning again.
5      A.  Good morning.
6      MR. EDINBURGH:  I want to mark --
7  we are numbering exhibits, some exhibits have
8  been marked yesterday and we are continuing the
9  numbering and this will be SFA 12 and this will
10 be Mr. Jorgensen's CV which was provided to us
11 last week.
12      (WHEREUPON, DEPOSITION EXHIBIT
13 NO. 12 WAS MARKED FOR IDENTIFICATION.)
14      Q.  (BY MR. EDINBURGH)  Mr. Jorgensen, is
15 this, in fact, Exhibit 12, what's also SFA Bates
16 number 3349, your current CV?
17      A.  Yes.
18      MS. TODD-TROTTA:  I don't have a
19 copy?  That would be a no.
20      MR. CHAYKIN:  Could we take five or
21 ten minutes, I think it's really important Erica
22 have a set of documents.
23      MR. EDINBURGH:  Once again, I will
24 have, but I can't copy --
25      MS. TODD-TROTTA:  You had it last

8

1  night, it wasn't a surprise I was coming back.
2      MR. EDINBURGH:  I have most of
3  them.  This one I'll give you.
4      MR. BROWN:  Can you question
5  without having it?
6      MR. EDINBURGH:  Let me just make
7  one quick copy of it.
8      MR. BROWN:  You want a clean copy
9  to copy?
10      MR. EDINBURGH:  Yes.
11      MS. TODD-TROTTA:  Thank you.
12      MR. EDINBURGH:  Most of them I have
13 three sets.  I didn't make four sets.  I would
14 have to rent a truck to get here.
15      (whereupon, a discussion was
16 had off the record.)
17      Q.  (BY MR. EDINBURGH)  Are you a college
18 graduate?
19      A.  Yes.
20      Q.  Where did you go to school?
21      A.  I went to the University of Missouri
22 Rolla.
23      Q.  And when did you graduate?
24      A.  2007.
25      Q.  Okay.  You have a bachelor of science in

9

1  mechanical engineering?
2      A.  Yes.
3      Q.  Do you have any degrees beyond a
4  bachelor's degree?
5      A.  I have a graduate certificate in project
6  management, that's all I've been awarded at this
7  point.
8      Q.  Are you a licensed engineer in Missouri?
9      A.  I have my EIT license.  It's not a
10 professional engineering license.
11      Q.  What is an EIT license?
12      A.  It's like an engineer in training.
13      Q.  Do you have a professional engineering
14 license from any state in the union?
15      A.  No.
16      Q.  When did you begin working for SFA?
17      A.  2008.
18      Q.  Was that your first job out of college?
19      A.  Yes.
20      Q.  Okay.  And can you just take us in terms
21 of you started out at SFA doing what?
22      A.  I was hired on as a mechanical engineer.
23      Q.  Who hired you?
24      A.  Steven Huang.
25      Q.  And were you working any particular

10

1 department or division of SFA at that time?
2    **A.   The engineering department.**
3    Q.   Are you still in the engineering
4 department today?
5    **A.   Yes.**
6    Q.   Okay.  When you began, what type of
7 engineering work did you do?
8    **A.   Mechanical design.**
9    Q.   Of what?
10    **A.   Automotive products.**
11    Q.   Can you give me an example of what
12 automotive products that you worked.
13    **A.   Early when I started I designed a bottle**
14 **jack.**
15    Q.   Did you do work in other types of
16 automotive lifting devices?
17    **A.   We have developed concepts in service**
18 **jacks, axle jacks and transmission jacks.**
19    Q.   Okay.  During your time in the
20 engineering department have you done any work
21 concerning vehicle support stands or jack stands?
22    **A.   No.**
23    Q.   Tell me about your promotions within the
24 engineering department.  You start as a
25 mechanical engineer, what was your next promotion

11

1 after that?
2    **A.   I believe it was special projects**
3 **manager and mechanical design engineer.**
4    Q.   When were you given that title?
5    **A.   Probably around 2010.**
6    Q.   Just referring to the resume, you have
7 in bold, it says "Special Project Manager and
8 Mechanical Design Engineer," you say January 2008
9 through November 2013, is that accurate?
10    **A.   I combined the initial mechanical**
11 **engineer with -- to conserve space on the resume.**
12    Q.   Okay.  And the work you did as a special
13 projects manager and mechanical design engineer,
14 is that listed in summary fashion on your CV?
15    **A.   Yes.**
16    Q.   Okay.  You indicated on the CV that part
17 of what you did in the years 2008 to
18 November 2013 was you coordinated with China and
19 Taiwan factories in order to bring product to
20 production.  What product are you referring to in
21 that CV?
22    **A.   We worked with the lawn mower lift that**
23 **we developed.**
24    Q.   Can you identify the China and Taiwan
25 factories that you coordinated with at that time.

12

1    **A.   We refer to it as SB.  I believe the**
2 **pronunciation is Shun Bung (ph).**
3    Q.   You have a soft voice and I have bad
4 hearing.
5    **A.   That's okay.**
6    Q.   That's a bad combination.
7    **A.   We refer to the factory as SB.**
8    Q.   S, and B as in boy?
9    **A.   Yes.**
10    Q.   You gave me the Chinese name of it?
11    **A.   I'll butcher pronunciation, but Shun**
12 **Bung.**
13    Q.   Were they located in China and Taiwan?
14    **A.   Just China.**
15    Q.   Just China.  What about the Taiwan
16 factories?
17    **A.   We didn't -- we don't have any product**
18 **that we have -- we don't have any product that we**
19 **have helped with concepts in that factory.**
20    Q.   In what factory, in Taiwan?
21    **A.   Yes.**
22    Q.   I want to know what factory you are
23 referring to if you can by name when you use the
24 term "Taiwan factory" in your CV.
25    **A.   We refer to it as CY and it is the Chia**

13

1 Yi factory.
2    Q.   Further down in your resume, in the
3 arrow part, you say, "Responsible for traveling
4 to China and Taiwan to inspect manufacturing
5 plants and assembly of key products," and this is
6 for the period 2008 to November 2013?
7    **A.   I'll visit the factories occasionally.**
8    Q.   What were the key products that you
9 refer to on your CV?
10    **A.   During our visits typically we don't**
11 **focus on specific products.  We walk through the**
12 **factory for more of a cultural face-to-face**
13 **aspect.**
14    Q.   The factories you visit in China and
15 Taiwan, are those the same ones you identified
16 previously?
17    **A.   Yes.**
18    Q.   And not any others?
19    **A.   I visited a Shinn Hai factory.**
20    Q.   Where is that located?
21    **A.   Near Shanghai.**
22    Q.   When was the last time you were in China
23 or Taiwan to inspect manufacturing plants?
24    **A.   It would have been I believe March**
25 **of 2015.**

14

1    Q.   March of 2015?
2    A.   (Witness nods head.)
3    Q.   And before that?
4    A.   I go about once a year.
5    Q.   You go alone or you go with other SFA
6    employees?
7    A.   I typically travel with one other
8    employee.
9    Q.   Who is that?
10   A.   It changes.
11   Q.   Okay.  When you go with two employees,
12   are you the more senior individual who goes?
13   A.   Not always.
14   Q.   And your visits to China or Taiwan, fair
15   to say on an annual basis?
16   A.   On average.
17   Q.   Okay.
18   A.   There are some years where we don't go.
19   Q.   Okay.  Do you ever visit plants that
20   while you were there were making jack stands?
21   A.   No.
22   Q.   Okay.  What work, if any, have you done
23   since you became employed by SFA with respect to
24   ratchet and pawl-type jack stands?
25   A.   The only thing that I have done with

15

1    them is random inspections.
2    Q.   Where?
3    A.   At SFA.
4    Q.   And what did those random inspections
5    consist of?
6    A.   Typically taking a set off of a
7    container, documenting the serial number and then
8    loading the stand to capacity.
9    Q.   Was it the facility at SFA that allowed
10   you to do that?
11   A.   Yes.
12   Q.   Was that in the context of some type of
13   laboratory or test facility?
14   A.   We have a small lab.
15   Q.   And it's been there since you've been
16   there?
17   A.   Yes.
18   Q.   When you do those inspections, those
19   random inspections, are these documented?
20   A.   Not always.
21   Q.   Okay.  How frequently did you
22   participate in these random inspections?
23   A.   I would say pretty frequent between 2008
24   and 2010 and then my experience with them slowed
25   down.

16

1    Q.   Okay.  I know you may not have exact
2    numbers, but between 2008 and 2010, I know you
3    said "pretty frequent," but can you give me any
4    numerical number how often you did that?
5    A.   There is no way for me to know that.
6    Q.   What type of jack stands did you conduct
7    random inspections on?
8    A.   The rack and pawl.
9    Q.   Of various load capacities?
10   A.   Yes.
11   Q.   Four ton?
12   A.   I don't specifically remember a four
13   ton, no.
14   Q.   What load capacities do you recall?
15   A.   Three tons and six tons.
16   Q.   Do you know where these came from?
17   A.   Are you asking about the factory?
18   Q.   Yes.
19   A.   I don't.
20   Q.   Were they branded?  Did they have a
21   particular brand on them?
22   A.   Typically they were Pro-Lift or Omega.
23   Q.   I'll get into those brands later.  Did
24   your personal work, did it include any work on
25   jack stand design?

17

1    A.   No.
2    Q.   Again, your personal work, not the work
3    of SFA, but you personally, did you do any work
4    with respect to the safety features or safety
5    devices on jack stands?
6    A.   No.
7    Q.   And again your personal work, did you do
8    any personal work on the content of jack stand
9    operator's or owner's manuals?
10   A.   I was not responsible for developing the
11   content, no.
12   Q.   Did you have any responsibility for
13   reviewing or approving the content?
14   A.   No.
15   Q.   You personally, did you have any
16   personal responsibility, I know you talked about
17   your random inspections, but did you have any
18   personal responsibility for any other type of
19   jack stand testing?
20   A.   I don't understand.
21   Q.   Testing other than the inspections you
22   conducted, any other types of testing did you
23   have any responsibility for as an employee of
24   SFA?
25   A.   I still don't understand what type of

18

1  testing you are asking me.
2      Q.  Okay.  Was testing conducted on jack
3  stands to show compliance with any ASME PALD
4  standards?
5          (Whereupon, a discussion was
6  had off the record.)
7      Q.  (BY MR. EDINBURGH)  Did you have any
8  participation as an employee of SFA in jack stand
9  testing for compliance with ASME PALD performance
10 or safety standards?
11     A.  No.
12     Q.  Now, it indicates on your CV that you
13 have certain patents in your name, right?
14     A.  Yes.
15     Q.  And the patents that you have are listed
16 in the CV?
17     A.  Yes.
18     Q.  Okay.  Do you have any patents other
19 than the ones listed in your CV?
20     A.  I would have to look into it.  I'm sure
21 there is one new one.
22     Q.  Do you have any patents concerning jack
23 stands?
24     A.  No.
25     Q.  Have you ever testified before today as

19

1  a witness on behalf of SFA?
2      A.  No.
3      Q.  This is the first time?
4      A.  Yes.
5      Q.  In the top of your resume under
6  "Mechanical Engineer" you indicate you have
7  research and design strengths and then you list
8  them, correct?
9      A.  (Witness nods head.)
10     Q.  One of them you list in one of your
11 bullet points is called Finite Element Analysis
12 (FEA).  If you could briefly tell me what is
13 finite element analysis.
14     A.  Finite element analysis is taking an
15 object, breaking it down into very small
16 geometric sizes and then using a computer to run
17 stress and strain equations.
18     Q.  Okay.  Was any finite element analysis
19 conducted by SFA on jack stands, on ratchet and
20 pawl jack stands?
21     A.  No.
22     Q.  Do you have an understanding that you
23 are here today as what is called in the federal
24 rules as a 30(b)6 witness?
25     A.  Yes.

20

1      Q.  Okay.  And what is your understanding of
2  what your -- what is a 30(b)6 witness?
3          MR. BROWN:  I'll object to form.
4      You can go ahead and answer.
5      A.  My understanding is that I am speaking
6  on behalf of the company.
7      Q.  (BY MR. EDINBURGH)  You are speaking on
8  behalf of the company on certain topics?
9      A.  Yes.
10     Q.  Okay.  And you have an understanding of
11 what topics you are here to talk about?
12     A.  Yes.
13     Q.  The topics that you are here today
14 talking about, did you speak with any employees
15 of SFA to acquire knowledge on these topics?
16     A.  Yes.
17     Q.  Okay.  Let's if we can just go down the
18 list of who you spoke to.  First of all, did you
19 speak to any former employees of SFA to acquire
20 knowledge of these topics?
21     A.  No.
22     Q.  Any employee you spoke to is a current
23 employee of SFA?
24     A.  Yes.
25     Q.  Who have you spoken to?  And we'll take

21

1  them one at a time.
2      A.  I've spoken to Casey Gann, Braxton
3  Kersting --
4      Q.  One at a time.  Casey, who is Casey?
5      A.  He is one of our lab techs.
6      Q.  And is it a man or woman?
7      A.  Man.
8      Q.  What did you speak to him about?
9      A.  Just --
10     Q.  Just in general.
11     A.  History.
12     Q.  History of jack stands at SFA?
13     A.  History of SFA.
14     Q.  History of SFA.  Okay.  Go ahead.
15     A.  Braxton Kersting.
16     Q.  And who is he?
17     A.  He is a mechanical engineer.
18     Q.  Is he in your department?
19     A.  Yes.
20     Q.  He's a colleague of yours?
21     A.  Yes.
22     Q.  And do you supervise him?
23     A.  Yes.
24     Q.  And what areas did you talk to him
25 about?

22

1    A.  Any knowledge of testing.
2    Q.  Jack stand testing?
3    A.  Testing in general.
4    Q.  Okay.  Who else?
5    A.  Randy Nuttall.
6    Q.  Is Mr. Nuttall also an engineer?
7    A.  He is a salesman in the company.
8    Q.  And what areas or topics did you talk
9  about with Mr. Nuttall?
10   A.  History again.
11   Q.  History of SFA?
12   A.  History of his job duties during the
13  time which he was engineering manager.
14   Q.  I'm sorry, did you say "engineering
15  manager"?
16   A.  (Witness nods head.)
17   Q.  Yes?
18   A.  Sorry, yes.
19   Q.  When was Randy Nuttall an engineering
20  manager?
21   A.  I believe 2011 to 2013, '14.
22   Q.  Are you an engineering manager also?
23   A.  Yes.
24   Q.  Okay.  You and Randy, did you overlap as
25  engineering manager?

23

1    A.  I took over for him when he moved to
2  sales.
3    Q.  Your duties as engineering, he was your
4  predecessor?
5    A.  Yes.
6    Q.  Did Randy Nuttall indicate to you that
7  he had any responsibility at all for jack stands
8  in any manner?
9    A.  No.
10   Q.  He did not have any?
11   A.  No.
12   Q.  All right.  Whom else did you talk to at
13  the company?
14   A.  Probably Meghann O'Connor.
15   Q.  Meghann was the witness yesterday?
16   A.  Yes.
17   Q.  So we know who she is.  What topics did
18  you discuss with Ms. O'Connor?
19   A.  Outside factories.
20   Q.  Any in particular?
21   A.  No.
22   Q.  Anyone else?
23   A.  No.
24   Q.  In order to acquire knowledge of the
25  topics that you would be presenting as a witness

24

1  today did you review any documents?
2    A.  Yes.
3    Q.  Can you tell us, broadly speaking, what
4  did you review?
5    A.  I reviewed the father's testimony.
6    Q.  You mean Mr. Klorczyk, senior?
7    A.  Yes.  The police report, the PALD
8  standard.
9    Q.  That's P-A-L-D.  For what period of
10  time, which PALD?
11   A.  2009.  The two plaintiffs' witnesses, I
12  believe Mr. Heath and I don't remember his name
13  but his first name is Eric.
14   Q.  Their reports?
15   A.  Their reports or depositions, I'm not
16  sure what they were.
17   Q.  They weren't deposed.
18   A.  Their reports then, yes.
19   Q.  Okay.  Anything you reviewed in
20  preparation for testifying today?
21   A.  The owner's manual for the product in
22  question.
23   Q.  For the T6904 four-ton jack stand?
24   A.  For the 50163 four-ton jack stand.
25   Q.  We'll go into nomenclature a bit later.

25

1  But talk now, in your mind is there a distinction
2  between the 50163 jack stand and the T6904 jack
3  stand?
4    A.  They are a different brand, different
5  color.
6    Q.  How about from a standpoint of their
7  design and hard specifications?
8    A.  I'm not aware of any features that are
9  different.
10   Q.  Same locking features?
11   A.  Same locking design, yes.
12   Q.  Same safety design features?
13   A.  Yes.
14   Q.  Same load capacities?
15   A.  Yes.
16   Q.  All right.  So you looked at the 50163
17  operator's manual?
18   A.  Yes.
19   Q.  Did you review any other operator
20  manuals for any other jack stands in preparation
21  for being a witness today?
22   A.  Yes, I looked at a couple.  I don't know
23  the product numbers.
24   Q.  Do you know the brand?
25   A.  Omega.

26

1    Q.  And those were ratchet and pawl jack
2  stands, correct?
3    **A.  Yes.**
4    Q.  Do you know the load capacities?
5    **A.  Three ton, six ton.**
6    Q.  Do you generally know what year of
7  manuals they were, when they were issued or
8  published?
9    **A.  I do not know that.**
10   Q.  All right.  Any other records or
11 materials or documents that you reviewed?
12   **A.  I believe a couple other witnesses'**
13 **reports and I might be using that term**
14 **improperly.  It might have been a report from a**
15 **paramedic.**
16   Q.  Okay.  Did you look at any documents --
17 did you look at any e-mail correspondence?
18   **A.  Yes.**
19   Q.  Okay.  What type of e-mail
20 correspondence did you look at in preparation for
21 today?
22   **A.  I reviewed some of the documents turned**
23 **up from the search terms.**
24   Q.  Which search terms?
25   **A.  The terms used in the search that was**

27

1  **requested by plaintiffs' counsel.**
2    Q.  Do you recall what they were?
3    **A.  Jack stand, four ton, 50163.  I'm sure**
4  **there are others, but those are the ones that are**
5  **coming to mind.**
6    Q.  Okay.  Are there any other internal SFA
7  records of any type that you recall reviewing in
8  preparation for acquiring knowledge on the topics
9  you've been designated to testify about?
10   **A.  I looked at our incoming inspection**
11 **form.**
12   Q.  Okay.  I believe that's been recently
13 produced.  Anything else?
14   **A.  No.**
15   Q.  In 2011 and prior thereto did SFA sell
16 or distribute ratchet and pawl design jack
17 stands?
18   **A.  Yes.**
19   Q.  Did it sell them under various brands or
20 labels?
21   **A.  Yes.**
22   Q.  Is Pro-Lift one of the brands?
23   **A.  Yes.**
24   Q.  Omega is another?
25   **A.  Yes.**

28

1    Q.  Blackhawk is another?
2    **A.  I believe there are jack stands in**
3  **Blackhawk, yes.**
4    Q.  Were these jack stands of various load
5  capacities, correct?
6    **A.  Yes.**
7    Q.  Were three ton stands sold by SFA?
8    **A.  Three ton?**
9    Q.  Yeah, three ton.
10   **A.  Yes.**
11   Q.  Capacity -- when I say "capacity," your
12 understanding is capacity for two jack stands?
13   **A.  Yes.**
14   Q.  With that in mind, did SFA in 2011 and
15 prior thereto distribute and sell three-ton
16 capacity ratchet and pawl design jack stands?
17   **A.  Yes.**
18   Q.  Four ton?
19   **A.  I believe so under the Pro-Lift name.**
20   Q.  Six ton?
21   **A.  Yes.**
22   Q.  Twelve ton?
23   **A.  Yes.**
24   Q.  Did it have lower capacities to two,
25 two-and-a-half ton?

29

1    **A.  On the Pro-Lift side we have lower**
2  **capacities.**
3    Q.  Did SFA sell jack stands to Sears at any
4  time that you are familiar with where you have
5  acquired knowledge about?
6    **A.  No, I believe Sears goes through MVP.**
7    Q.  Okay.  You mentioned MVP, what is your
8  understanding of who MVP or what MVP is?
9        MR. BROWN:  I'm going to object
10 because, you know, you had a 30(b)6 witness to go
11 through this yesterday that was designated for
12 those topics.  He has been designated for other
13 topics.  Appreciate it if you would stay on
14 course.
15       MR. EDINBURGH:  All right.
16   Q.  (BY MR. EDINBURGH)  Did SFA to your
17 knowledge do any design work, I'm not talking
18 about you personally, I'm talking about SFA as an
19 entity, do any design work in 2011 and prior
20 thereto with respect to ratchet and pawl jack
21 stands?
22   **A.  No.**
23   Q.  And can you tell me the basis for that
24 answer.
25   **A.  The basis for?**

30

1    Q.  You just said no to my question.
2    **A.  Yes.**
3    Q.  Which is a clear answer, but I'm asking
4  what is the basis.  In other words, how did you
5  acquire the knowledge to answer that no?
6    **A.  Okay.  SFA doesn't design the ratchet**
7  **and pawl style jack stands.  They are designed by**
8  **their respective factories.**
9    Q.  Does SFA have any input at all on the
10  design?  In other words, are the designs reviewed
11  by SFA for compliance with any safety standards
12  or performance standards or just generally to
13  review them?
14        MR. BROWN:  Object to form.
15    Q.  (BY MR. EDINBURGH)  You can answer.
16    **A.  We make requests, but we have no final**
17  **say.**
18    Q.  What type of requests are made or have
19  been made?
20    **A.  We can request that the factory tests to**
21  **the PALD standard and ensures that their design**
22  **meets it.**
23    Q.  When you say "the factory," does that
24  include MVP factories?
25    **A.  I don't know what factories belong to**

31

1  **MVP.**
2    Q.  Okay.  Does that include factory or
3  factories owned by a company called Wei Fu
4  located in China, southern China?
5    **A.  Could you repeat the question.**
6    Q.  I'll ask the court reporter to read it
7  back to you.
8        (Whereupon, the requested portion of
9  the record was read by the Reporter.)
10        MR. BROWN:  I'll object to form.
11        Go ahead.  You can answer if you can.
12    **A.  Does what include Wei Fu?  I apologize.**
13    Q.  (BY MR. EDINBURGH)  You said requests
14  made to factories and I want to ask you whether
15  that included factories that are owned or
16  operated by Wei Fu?
17    **A.  The engineering department doesn't**
18  **communicate with the factories.**
19    Q.  Who does?
20    **A.  I believe upper management does.**
21    Q.  At the request of engineering?
22    **A.  Yes.**
23    Q.  Has the engineering department made any
24  requests to upper management for product testing
25  of any ratchet and pawl design jack stands?

32

1    **A.  Yes.**
2    Q.  Can you give us which ones they have
3  made requests for?
4    **A.  I couldn't list them.  We typically ask**
5  **our factories to make sure that all the stands**
6  **meet the standard.**
7    Q.  Does SFA provide the factories with the
8  standard?
9    **A.  They have a copy, yes.**
10    Q.  Okay.  Are there from time to time
11  communications between SFA and these factories
12  with respect to what the PALD standards require
13  and how to comply with them?
14    **A.  They typically have a good understanding**
15  **of the standard.**
16    Q.  In the 2000s did SFA provide to Sears
17  jack stands under the Craftsman label?
18        MR. BROWN:  Object to form.
19        You can go ahead.
20    **A.  I'm not sure prior to 2008.  I have been**
21  **under the understanding that it's MVP.**
22    Q.  (BY MR. EDINBURGH)  That's based on your
23  discussions with certain individuals at SFA?
24    **A.  Yes.**
25    Q.  Who?

33

1    **A.  Talking with Casey, talking with**
2  **Meghann.**
3    Q.  Okay.  And you said "prior to 2008,"
4  just so I'm clear, between 2008 and 2011 do you
5  have any understanding whether SFA was involved
6  in the sale or distribution of jack stands to
7  Sears which were marketed under the Craftsman
8  label?
9        MR. BROWN:  Object to form.
10        MS. TODD-TROTTA:  Object to form.
11    Q.  (BY MR. EDINBURGH)  Go ahead, you can
12  answer.
13    **A.  I don't believe we were in the sales**
14  **chain.**
15    Q.  What is your understanding of how a
16  ratchet and pawl design jack stand works?
17        MR. BROWN:  I'm going to object.
18  You keep asking about his understanding and he's
19  here as a 30(b)6 witness.  It's not his personal
20  deposition.
21        MR. EDINBURGH:  Right.  You are
22  right.  It's a valid objection, I'll rephrase it.
23    Q.  (BY MR. EDINBURGH)  What is SFA's
24  understanding of how a ratchet and pawl design
25  jack stand operates?

34

1         MR. BROWN:  I'll object to form.
2         Go ahead.
3     A.  Our understanding would be complete, we
4  know how it works.
5     Q.  (BY MR. EDINBURGH)  How does it work?
6     A.  The column with the teeth is inserted
7  into the base frame.  There is a weighted handle
8  that goes through what is called the pawl and the
9  pawl interacts with the teeth in a manner such
10 that it sustains whatever capacity was designed
11 to hold on the column.
12    Q.  Does SFA have an understanding of
13 whether the -- that the ratchet and pawl design
14 jack stand has a locking mechanism?
15        MR. BROWN:  Object to form.
16        Go ahead.
17    A.  A locking mechanism in the design?
18    Q.  (BY MR. EDINBURGH)  Yes, to keep the
19 column upright and not go up or down when it's
20 under load.
21    A.  That would be the pawl.
22    Q.  And the pawl is engaged into the teeth
23 of the ratchet, is that correct?
24    A.  Yes.
25    Q.  And is that the design of the ratchet

35

1  and pawl jack stand known to SFA for the various
2  load capacities?
3     A.  Yes.
4     Q.  I believe your resume indicates that you
5  are an alternate member of ASME PALD?
6     A.  Yes.
7     Q.  What do you do as an alternate member?
8     A.  I sit and listen to the meetings as they
9  take place.
10    Q.  You do attend the meetings?
11    A.  I do.
12    Q.  Does SFA have a full member --
13    A.  Yes.
14    Q.  -- at ASME PALD?
15    A.  Yes.
16    Q.  Who is that individual currently?
17    A.  Randy Nuttall.
18    Q.  Is he on a committee?
19    A.  He's on the PALD committee.
20    Q.  Okay.  And what's his position on the
21 committee, is he a member, is he higher up?
22    A.  Currently he's the vice chair.
23    Q.  How long has he been the vice chair?
24    A.  Two years.
25    Q.  How long have you been an alternate

36

1  member of the committee?
2     A.  Seven years.
3     Q.  Get my math right.  Did you start in
4  about 2009?
5     A.  Yeah.
6     Q.  When you started, were there any other
7  employees of SFA on the committee?
8     A.  At the time prior to Randy Nuttall it
9  would have been Peter Gillespie.
10    Q.  Is he still employed at SFA?
11    A.  No.
12    Q.  How about before Peter?
13    A.  I believe Roger Claypool was on the
14 committee prior to Peter.
15    Q.  Was Peter on the committee during the
16 same time you were?
17    A.  I was Peter's alternate until Randy took
18 over.
19    Q.  Were you on the committee -- were you
20 the alternate at the same time Roger Claypool was
21 on the committee?
22    A.  No.
23    Q.  Who is the chairman of the committee?
24    A.  Currently?
25    Q.  Yes.

37

1     A.  I believe Rick Heath.
2     Q.  Just on your personal background, are
3  you fluent in Chinese?
4     A.  No.
5     Q.  In the 2000s am I correct SFA sold jack
6  stands under the Pro-Lift label?
7     A.  Yes.
8     Q.  Okay.  Where were those jack stands
9  made?
10    A.  Different factories.
11    Q.  Overseas?
12    A.  Yes.
13    Q.  Okay.  The jack stands that were made
14 overseas on the Pro-Lift label, was it
15 responsibility of the manufacturing facility to
16 certify compliance with PALD or ASME performance
17 standards, safety standards?
18    A.  Yes.
19    Q.  Okay.  Did SFA have any input into the
20 testing of jack stands sold by it under the
21 Pro-Lift label 2011 and prior thereto?
22    A.  Simply made the request that they pass
23 the PALD standard.
24    Q.  How about for Omega brand jack stands,
25 were they sold by SFA in the 2000s?

38

1    **A.**   Yes.
2    **Q.**   Okay.  And where were they made?
3    **A.**   Factories in China.
4    **Q.**   Do you know which ones?
5    **A.**   There have been several.
6    **Q.**   Were any of them MVP or Wei Fu?
7    **A.**   Wei Fu has made jack stands, yes.
8    **Q.**   Again, you have not visited the Wei Fu
9    factory?
10   **A.**   I have never been to Wei Fu.
11   **Q.**   Has other engineers of SFA visited Wei
12   Fu factory?
13   **A.**   None of the current engineers have.
14   **Q.**   Blackhawk brand jack stands were sold by
15   SFA in the 2000s through 2011, is that correct?
16   **A.**   Yes.
17   **Q.**   Where were those jack stands
18   manufactured?
19   **A.**   In the same factories in China.
20   **Q.**   And, again, those factories would
21   perform, either themselves or through others,
22   testing to comport with the ASME PALD standards?
23   **A.**   Yes.
24   **Q.**   Did SFA have any input -- am I correct
25   that to the knowledge of SFA the Omega, Pro-Lift,

39

1    Blackhawk jack stands, each type jack stand, each
2    load capacity jack stand would have their own
3    operator's or owner's manual?
4         MR. BROWN:  Object to form.
5         You can answer.
6    **A.**   Yes.
7    **Q.**   (BY MR. EDINBURGH)  Did SFA play a role
8    in determining the content of those manuals?
9    **A.**   No, we didn't determine content.
10   **Q.**   Did you review content, did SFA review
11   content?
12   **A.**   We -- yes.
13   **Q.**   I want to -- did SFA have a customer
14   service unit?
15   **A.**   Yes.
16   **Q.**   And did SFA have any phone number where
17   people could call or customers could call if they
18   had any questions or complaint about their jack
19   stands?
20   **A.**   Yes.
21   **Q.**   Okay.  Did SFA prior to March of 2011
22   receive any calls through its customer service or
23   phone numbers where individuals complained of
24   jack stand failure, jack stand collapse, jack
25   stand gave way?

40

1    **A.**   No.
2    **Q.**   And your response on behalf of SFA is
3    based upon what inquiry that you have made?
4    **A.**   If a collapse as you stated would have
5    happened, that would have been immediately
6    reported to engineering.
7    **Q.**   If I understand your answer correctly,
8    and if I'm wrong, just tell me I'm wrong, that
9    the absence of a reporting to engineering of a
10   claim of jack stand collapse, that led to your
11   answer that no one ever complained to the
12   customer service number or hotline number about a
13   claim of jack stand collapse or jack stand
14   failure?
15        MR. BROWN:  Object to form.
16        Go ahead.
17        MR. CHAYKIN:  It's the witness's
18   testimony.
19   **A.**   Will you repeat the question?
20        MR. EDINBURGH:  I'll withdraw the
21   question.
22   **Q.**   (BY MR. EDINBURGH)  From time to time
23   are you aware, from whatever source, be it
24   customers -- withdrawn.
25        Are you aware of any written complaints,

41

1    either a lawyer's letter, customer letter, a
2    letter from a retailer coming in to SFA saying
3    that there was a claim of an incident of sudden
4    or unexplained collapse of a ratchet and pawl
5    jack stand, the ratchet bar gave way or just
6    suddenly collapsed?
7         MR. BROWN:  Object to form.
8         Go ahead.
9         MS. TODD-TROTTA:  He's only
10   testified as to who made a Blackhawk and the
11   Pro-Lift, is that what your question is?
12        MR. EDINBURGH:  If it was, I would
13   have said it.  I'll let the question stand for
14   itself.
15        Can you repeat it for the witness.
16   **A.**   I'm aware of claims that have happened
17   in the past.
18   **Q.**   (BY MR. EDINBURGH)  When you say you are
19   aware -- okay.
20        SFA's awareness of claims in the past,
21   what claims is SFA aware of just based upon the
22   response you just gave?
23   **A.**   I'm trying to remember the name.
24   Typically they are the product liability cases,
25   there were only a couple.  If I read the name of

42

1  the claim I would remember.  I believe it --
2      Q.  Let's divide it up.
3      A.  Sure.
4      Q.  Let's talk about a formal legal
5  complaint, a lawsuit like the one we are here
6  today about, okay?  Other than the Klorczyk case,
7  is SFA aware of any other legal complaints in
8  which it is alleged that a ratchet and pawl
9  design jack stand, that the ratchet bar column
10  suddenly collapsed under load?
11          MR. BROWN:  Object to form.
12      A.  SFA is aware of past claims.
13      Q.  (BY MR. EDINBURGH)  Okay.  Can SFA
14  through your testimony can you identify how many?
15      A.  I know --
16      Q.  Approximately?
17      A.  I know of two or three.
18      Q.  Okay.  Does that include this current
19  case, the Klorczyk matter, or are you talking
20  about two or three other matters?
21      A.  I believe other matters.
22      Q.  Okay.  I'm going to give you the name
23  Raymond, is Raymond one of them?
24      A.  Yes.
25      Q.  What is SFA's understanding of what the

43

1  claim was in the Raymond case?
2      A.  The claim mentioned that a gentleman was
3  using a set of jack stands while he was working
4  on his car and they -- and an accident took place
5  in which he lost his life.
6      Q.  Okay.  Does SFA have an understanding of
7  what type of jack stand was involved in the
8  Raymond action?
9      A.  It would have been a ratchet and pawl
10  style.
11      Q.  The capacity?
12      A.  I believe it was a three-and-a-half ton,
13  but I would have to read the claim to verify.
14      Q.  Okay.  Did you in preparation for
15  today's deposition read any documents that were
16  involved in the Raymond action?
17      A.  Yes.
18      Q.  What did you review?
19      A.  I read the claim itself and a letter
20  of -- a letter of what the individual was doing
21  at the time.
22      Q.  Okay.  Any other Raymond-related
23  documents that you reviewed?
24      A.  I searched through the -- I looked
25  through the case file.  I don't know the titles

44

1  of documents.
2      Q.  Okay.  There is currently at SFA a
3  Raymond lawsuit case file?
4      A.  Yes.
5      Q.  Where is it kept?
6      A.  Wherever the legal department keeps it.
7      Q.  Do you know what year the Raymond
8  accident was?
9      A.  I remember reading it in the claim, I'm
10  just trying to remember.
11      Q.  You can give me an approximate, I'll
12  take that, generally.
13      A.  2007 to 2010.
14      Q.  The year of the lawsuit or the year of
15  the actual incident?
16      A.  I'm not sure on that.
17      Q.  The three-and-a-half ton jack stand, do
18  you know what brand it was, was it Craftsman, was
19  it Pro-Lift, was it something else?
20      A.  I don't recall the brand.
21      Q.  Okay.  Other than Raymond, do you recall
22  any other lawsuit concerning what we previously
23  discussed the claim to be?
24      A.  Yeah.  I remember a couple others, but
25  as stated, I would have to read the name.

45

1      Q.  Without the name can you otherwise
2  describe the type of jack stand involved, where
3  the incident was, some other description of the
4  case if you don't know the name of the claimant
5  or plaintiff.
6      A.  There was a three-ton set of ratchet
7  pawl jack stands in one case, there was the
8  Raymond case and then there was another case in
9  which another ratchet pawl jack stand was used in
10  part of a suspension of a vehicle.
11      Q.  Now, the three ton, do you have an
12  understanding of when and where that incident
13  took place?
14      A.  I don't know when or where.
15      Q.  Okay.  The three ton, is that an actual
16  lawsuit, was it an actual filed legal action
17  similar to the one we have here today?
18      A.  I don't know how far into the legal
19  action it went.  I -- I believe it was settled.
20      Q.  Okay.  Do you know where, what state of
21  the union it was in?
22      A.  No.
23      Q.  Okay.  In that one involving the
24  three-ton ratchet and pawl design, was that
25  also -- you read the legal claim file, is that

46

1  what you reviewed?
2      A.  For the three ton?
3      Q.  Yes.
4      A.  I don't remember reading the claim file,
5  no.
6      Q.  What do you recall reviewing then?
7      A.  Discussing the history of the case.
8      Q.  With whom?
9      A.  I believe I spoke with Arthur about it.
10     Q.  And that's Mr. Chaykin?
11     A.  Yes.
12     Q.  Who I said yesterday and repeat, that's
13 the distinguished lawyer sitting to your right?
14     A.  Yes.
15     Q.  You mentioned the Raymond case, the
16 three ton, do you recall, I may have just asked
17 you this, I apologize, what brand jack stand it
18 was?
19     A.  No.
20     Q.  Any other information about the three
21 ton that you recall as you are sitting here
22 today?
23     A.  That it was determined he was
24 overloading the jack stands.
25     Q.  All right.  Determined by whom, by SFA?

47

1      A.  I don't know who made the final call.
2      Q.  Now, that case, you mentioned the
3  Raymond case, you said there was a third case,
4  can you describe whatever you can of the
5  information you have acquired about the third
6  matter?
7      A.  I believe a gentleman was using a jack
8  stand on the coil spring of the front suspension
9  and during use the vehicle fell off the stand due
10 to it being in an improper place.
11     Q.  And was that a lawsuit in which SFA was
12 a defendant if you know?
13     A.  I don't know.
14     Q.  Okay.  And, again, was that information
15 acquired from Mr. Chaykin or from review of
16 records or both?
17     A.  We discussed it.
18     Q.  Okay.  Did you review any records
19 concerning that matter?
20     A.  I believe I read through some of the
21 records, yes.
22     Q.  What type of records?
23     A.  It would have been the claim file.
24     Q.  And these are the only actual lawsuits
25 that based upon your inquiry that you recall

48

1  today concerning claims of ratchet and pawl
2  design jack stands of the jack stand column
3  suddenly collapsing?
4          MR. BROWN:  Object to form.
5      A.  Yes.
6      Q.  (BY MR. EDINBURGH)  Okay.  I want to
7  talk about nonlawsuits, about let's say lawyers'
8  letters, complaint letters from customers, notice
9  of an incident that was acquired from retailers,
10 for instance, or from their representatives,
11 anything of that nature, not a legal complaint.
12 Based upon your inquiry, was such noncomplaint
13 incidents reported to SFA prior to March of 2011?
14         MR. BROWN:  Object to form.
15         Go ahead.
16     A.  Incidents, no.
17     Q.  (BY MR. EDINBURGH)  Okay, incidents no.
18 Anything of the nature of a sudden or unexpected
19 collapse of the jack stand ratchet bar under
20 load?
21         MR. BROWN:  Object to form.
22     A.  No.
23     Q.  (BY MR. EDINBURGH)  How about after
24 March 2011, same question.
25     A.  This is through our customer service?

49

1      Q.  It could be through customer service, it
2  could be letters received through legal or any
3  other department within SFA which would put SFA
4  on notice of an allegation of a claim.
5      A.  Just the claims that we have mentioned
6  that I -- I don't know of anything new.
7      Q.  Okay.  Have you yourself -- you
8  yourself, that's awful English.  Has SFA --
9  withdrawn.
10         MR. BROWN:  Good time for a break?
11         MR. EDINBURGH:  Absolutely.  Sure.
12         (Brief recess taken.)
13     Q.  (BY MR. EDINBURGH)  Mr. Jorgensen, as
14 part of your duties and responsibilities at SFA,
15 do you do any claims investigation work?
16         MR. BROWN:  I'm going to object to
17 that question, again.  If we could stay within
18 the topics on 30(b)6.
19         MR. EDINBURGH:  I want to know what
20 he personally does.
21         MR. BROWN:  That's fine.
22         Go ahead.
23     A.  Look into legal claims, no.
24     Q.  (BY MR. EDINBURGH)  Legal claims,
25 nonlegal claims, just investigate, any

50

1  investigation of any claim of any type, is that
2  part of your normal duties and responsibilities?
3      A.  That's kind of a broad topic.
4          MR. BROWN:  Object to form.
5      Q.  (BY MR. EDINBURGH)  Do you perform
6  any -- in your normal duties and responsibilities
7  do you perform any support work for the legal
8  department?
9      A.  No.
10     Q.  Does SFA supply its manufacturing
11  sources with jack stand manufacturing
12  specifications?
13     A.  No.
14     Q.  Does SFA with respect to the jack stands
15  that it sells under whatever label, does it
16  review the jack stand manufacturing
17  specifications?
18     A.  No.
19     Q.  Does SFA with respect to the jack stands
20  that it sells and distributes, does it provide
21  the manufacturer with the material
22  specifications?
23     A.  No.
24     Q.  Does SFA with respect to jack stands
25  that it sells or distributes, does it review the

51

1  material specifications for the jack stands it
2  sells or distributes?
3      A.  No.
4      Q.  What quality assurance procedures or
5  protocols are undertaken by SFA with respect to
6  jack stands that it sells or distributes?
7          MR. BROWN:  Object to form.
8      A.  We do random incoming inspections.
9      Q.  (BY MR. EDINBURGH)  I'm sorry, of the
10  type you earlier testified to, is that what you
11  meant?
12     A.  Yes.
13     Q.  Has there been to the knowledge of SFA
14  any government investigation on any level, local,
15  state, federal, any investigation of claims of a
16  ratchet and pawl design jack stand ratchet bar
17  collapse?
18          MR. BROWN:  Object to form.
19          MR. CHAYKIN:  Also object because I
20  don't think legal claims or government
21  investigations were included on the list of
22  topics for this deposition.  This is a 30(b)6
23  deposition.
24          MR. EDINBURGH:  It just depends
25  on how --

52

1          MR. CHAYKIN:  Can I finish?
2          MR. EDINBURGH:  I'm sorry.
3          MR. CHAYKIN:  Legal claims or
4  government investigations?
5          MR. EDINBURGH:  I didn't say legal
6  claim.
7          MR. CHAYKIN:  You said government
8  investigations, was that included?
9          MR. EDINBURGH:  It's right here,
10  it's the last bullet point of what you said this
11  witness will testify about.
12          MR. CHAYKIN:  Okay.  Go ahead.
13          MR. EDINBURGH:  Can we read the
14  question back, please.
15          (Whereupon, the requested portion
16  of the record was read by the Reporter.)
17          MR. BROWN:  I'll object to form.
18          Go ahead.
19     A.  I guess I need more clarification on
20  government investigations.
21     Q.  (BY MR. EDINBURGH)  All right.  Any
22  attorney generals in any states?
23     A.  No.
24     Q.  Any federal agencies such as the
25  Consumer Product Safety Commission or the

53

1  National Highway Traffic Safety Administration?
2      A.  No.
3      Q.  All right.  Has SFA ever issued a recall
4  with respect to any of the jack stands, ratchet
5  and pawl design jack stands that it sells or
6  distributes?
7      A.  No.
8      Q.  Has SFA ever issued any service
9  bulletins or similar documents with respect to
10  ratchet and pawl design jack stands?
11     A.  No.
12     Q.  Is SFA aware of instances in which a
13  user or customer would be employing a single jack
14  stand to support a vehicle?
15     A.  It's not recommended to use a single
16  jack stand.
17     Q.  I understand that.  My question is is
18  SFA aware of instances in which a customer user
19  would, in fact, use only one jack stand to
20  support a vehicle?
21     A.  I believe one of the claims that we have
22  discussed earlier was a case where only one jack
23  stand was being used.
24     Q.  Is that the only instance that SFA was
25  ever aware of that customers and users used a

54

1 single jack stand as opposed to two jack stands
2 to support a vehicle?
3 **A.  We would have no other way of knowing**
4 **how a customer uses our product unless they make**
5 **some type of claim.**
6 Q.  You attended meetings of the PALD
7 committee?
8 **A.  Yes.**
9 Q.  For how many years?
10 **A.  Seven.**
11 Q.  Okay.  Any discussion among the members
12 of the PALD committee, anecdotal or otherwise,
13 about customers or end users using one jack stand
14 to support a vehicle as opposed to two?
15 MS. TODD-TROTTA:  Objection to
16 form.
17 Q.  (BY MR. EDINBURGH)  Go ahead.
18 **A.  I know that in the past we have**
19 **discussed use of four jack stands and typically**
20 **it breaks down into use of one jack stand and**
21 **it's always the discussion of how improper that**
22 **method is.**
23 Q.  Is SFA aware of any studies conducted
24 either by itself or its competitors or the
25 industry with respect to the frequency of the use

55

1 of a single jack stand by customers to support a
2 vehicle?
3 **A.  No.**
4 Q.  Does SFA monitor any websites or
5 bulletin boards devoted to jack stand use in
6 whole or in part?
7 **A.  No.**
8 Q.  Does SFA monitor any bulletin boards or
9 Internet postings concerning automotive products
10 in general as part of its business?
11 **A.  No.**
12 Q.  Does SFA have an understanding of the
13 concept of false engagement?
14 MR. BROWN:  Object to form.
15 **A.  Based on the definition that was put in**
16 **the case, yes.**
17 Q.  (BY MR. EDINBURGH)  Okay.  And what is
18 SFA's understanding based upon the definition
19 that's put in the case?
20 **A.  The definition states that it's a**
21 **tip-to-tip connection of the pawl and ratchet**
22 **bar.**
23 Q.  Does SFA have an understanding of the
24 concept of -- okay.
25 Did SFA in its testing ever attempt to

56

1 recreate a situation of false engagement?
2 **A.  No.**
3 Q.  Did SFA in testing ever attempt to
4 recreate a situation of less than perfect
5 engagement of the ratchet bar teeth at all?
6 **A.  No.**
7 Q.  Did SFA ever attempt to recreate a
8 situation where the ratchet bar teeth and pawl
9 are in less than perfect alignment with each
10 other?
11 **A.  No.**
12 Q.  Did SFA ever attempt to create a
13 situation in which there was less than perfect --
14 withdrawn.
15 Did SFA ever attempt to create a
16 situation where there was a misalignment of the
17 ratchet bar teeth and pawl?
18 MR. BROWN:  Object to form.
19 **A.  No.**
20 Q.  (BY MR. EDINBURGH)  Did SFA ever test a
21 ratchet and pawl jack stand design under load to
22 see what would occur if the ratchet and pawl were
23 not completely engaged with one another?
24 MR. BROWN:  Object to form.
25 Go ahead.

57

1 **A.  No.**
2 Q.  (BY MR. EDINBURGH)  Did SFA ever receive
3 e-mails or letters from customers at all
4 complaining about the phenomena of less than
5 perfect engagement or less than full engagement
6 of the ratchet and pawl?
7 MR. BROWN:  Object to form.
8 Go ahead.
9 **A.  No.**
10 Q.  (BY MR. EDINBURGH)  Has SFA received any
11 anecdotal information from competitors,
12 suppliers, vendors, retailers, about instances
13 where the ratchet and pawl was not in perfect
14 alignment and the jack stand collapsed?
15 MR. BROWN:  Object to form.
16 Go ahead.
17 **A.  No.**
18 Q.  (BY MR. EDINBURGH)  Did SFA ever
19 consider employing a redundant locking device on
20 any of the ratchet and pawl-type jack stands it
21 distributes or sells?
22 **A.  No.**
23 Q.  Are you aware of any competitors of SFA
24 prior to March of 2011 who sold ratchet and pawl
25 design jack stands with a redundant locking

58

1  device?
2      A.  No.
3      Q.  Are you aware of any competitors of SFA
4  who prior to March 2011 sold ratchet and pawl
5  design jack stands with any redundant safety
6  features?
7      A.  No.
8      Q.  Are you aware of jack stands designed
9  with a pin and hole design to keep the column
10 height secure under load?
11     A.  I'm aware.
12     Q.  Okay.  Did SFA sell such a device prior
13 to March of 2011, a jack stand designed that way?
14     A.  Yes.
15     Q.  Are you aware of any competitors of SFA
16 with respect to jack stands who sold jack stands
17 with a ratchet and pawl design as well as in the
18 same stand a hole and pin design?
19     A.  No.
20     Q.  All right.  I want to show you the
21 manual for the 50163, just got to find which
22 folder it's in.
23         MR. EDINBURGH:  Actually, before I
24 do that, let's take a little break.  I want to
25 get a couple more copies.

59

1         MR. BROWN:  Sure.
2         (Brief recess taken.)
3         (WHEREUPON, DEPOSITION EXHIBIT
4  NO. 13 WAS MARKED FOR IDENTIFICATION.)
5      Q.  (BY MR. EDINBURGH)  We are officially
6  back on.
7      A.  I misspoke earlier.  The Finlay (ph)
8  case, the Consumer Product Safety Commission
9  inquired to SFA about the case, but counsel
10 determined that they didn't have any jurisdiction
11 and the item was dropped.
12     Q.  You mentioned the Finlay case, is that
13 the case in Florida?
14     A.  I don't know the location.
15     Q.  Okay.  And the Finlay records were
16 provided by e-mail at some point yesterday
17 afternoon and I didn't get to look at them until
18 later in the evening.  Which Finlay records have
19 you looked at in preparation for the deposition?
20     A.  I probably -- I reviewed the -- I would
21 have looked over the claim.
22     Q.  The legal complaint?
23     A.  I believe so.
24     Q.  Anything else?
25     A.  No.

60

1      Q.  Do you know whether any employee of SFA
2  was deposed in the Finlay action?
3      A.  I do not know.
4      Q.  Any other clarification you wish to make
5  before I go to the next question?
6      A.  No.
7      Q.  Could you please look at what's been
8  marked as SFA 13, and these are SFA Bates
9  numbered documents 380 to 388, and I ask you have
10 you reviewed this document in preparation for the
11 deposition today?
12     A.  Yes.
13     Q.  When did you review it?
14     A.  Within the past week.
15     Q.  What is SFA's understanding of what
16 Exhibit 13 is?
17         MR. BROWN:  I'll object to form.
18         Go ahead.
19     A.  Exhibit 13, the beginning would be the
20 e-mail from MVP stating that the 50163 passes
21 third-party production testing, and then it is
22 followed by the third-party Intertek Test Report.
23     Q.  (BY MR. EDINBURGH)  Now, there is an
24 e-mail and it's addressed to several individuals,
25 a CC to several individuals.  With respect to

61

1  SFA, it's addressed to John Liu, L-I-U, is that
2  correct?
3      A.  Yes.
4      Q.  And to Johnny Lu, L-U, correct?
5      A.  Yes.
6      Q.  And to Mandy Hall, right?
7      A.  Yes.
8      Q.  Now, Mr. John Liu, L-I-U, and Mr. Johnny
9  Lu were discussed yesterday so I won't ask you
10 about them.  Who is Mandy Hall?
11     A.  Mandy Hall is a sales coordinator.
12     Q.  Okay.  Does SFA have an understanding of
13 why SFA employees were wired a copy of the
14 Intertek Test Report that's next to the e-mail?
15     A.  To keep on file and to let the
16 individuals on the e-mail know that it passed
17 testing.
18     Q.  Okay.  Now, the model that's being
19 tested is a four-ton jack stand, Model or Style
20 No. 50163, correct?
21     A.  Yes.
22     Q.  Okay.  And you understand that to be a
23 Sears number?
24     A.  Yes.
25     Q.  Okay.  Was that also a -- withdrawn.

62

1    And I go back to what I've asked you
2  earlier.  At some point in time did SFA sell a
3  four-ton jack stand with the Model No. T6904?
4    **A.  Yes.**
5    Q.  When, when did it sell that model, if it
6  was different periods of time, different years?
7       MR. BROWN:  I'll object to the
8  extent I think this was designated and addressed
9  by the witness yesterday.  But to the extent he
10  knows, he can answer.
11    **A.  I don't know the date that we started**
12  **selling it, but I -- around the 2010 to 2011**
13  **range.**
14    Q.  (BY MR. EDINBURGH)  Now, you indicated
15  that you reviewed the Intertek Test Report, is
16  that correct?
17    **A.  Yes.**
18    Q.  Was any similar testing conducted with
19  respect to the T6904 jack stand to SFA's
20  knowledge at any other time other than the
21  August 17, 2012, testing?
22    **A.  To the T6904?**
23    Q.  Any prior testing with similar type
24  tests being conducted on the T6904?
25    **A.  The factory would have tested it.**

63

1    Q.  Did SFA receive any test reports from
2  the factory concerning T6904 prior to August 21,
3  2012?
4    **A.  I didn't find a record of a factory test**
5  **report for the 6904.**
6    Q.  Was a search for such reports conducted
7  by SFA?
8    **A.  Yes.**
9    Q.  And the test report that's marked as
10  Exhibit 13, is that the one and only report
11  located in the files of SFA with respect to the
12  T6904?
13       MR. BROWN:  Object to form.
14    **A.  This report isn't on the T6904.**
15    Q.  (BY MR. EDINBURGH)  It's on the 50163,
16  correct?
17    **A.  Yes.**
18    Q.  50163 is a four-ton ratchet and pawl
19  design jack stand?
20    **A.  Yes.**
21    Q.  To the knowledge of SFA T6904 is also a
22  four-ton ratchet and pawl design jack stand,
23  correct?
24    **A.  Yes.**
25    Q.  With the same design and features as the

64

1  50163?
2    **A.  Yes.**
3    Q.  Same load capacity?
4    **A.  Yes.**
5    Q.  Let me mark the document that was
6  recently provided, I think last week, I think you
7  mentioned it.
8       MR. EDINBURGH:  Off the record.
9       (Whereupon, a discussion was
10  had off the record.)
11       (WHEREUPON, DEPOSITION EXHIBIT
12  NO. 14 WAS MARKED FOR IDENTIFICATION.)
13    Q.  (BY MR. EDINBURGH)  No. 14, Exhibit 14,
14  which is SFA3348, have you seen this document
15  before today?
16    **A.  Yes.**
17    Q.  Was this a document you reviewed in
18  preparation for today's deposition?
19    **A.  Yes.**
20    Q.  Is this an SFA document?
21    **A.  Yes.**
22    Q.  And this is called, am I correct, an SFA
23  Product Inspection Form, correct?
24    **A.  Yes.**
25    Q.  And to the right of the top there are

65

1  two jack stands, they are called jack stands,
2  there is also a pictorial description of two jack
3  stands, correct?
4    **A.  Yes.**
5    Q.  Can you tell by that picture what load
6  capacities they are?
7    **A.  No.**
8    Q.  In the photograph -- in the picture
9  rather?
10    **A.  No, it's just a visual representation of**
11  **a jack stand.**
12    Q.  Was this the Product -- is this a
13  Product Inspection Form that SFA would fill out
14  when it did the random inspections that you
15  initially testified about today?
16    **A.  Yes.**
17    Q.  Okay.  I know you used the word
18  "inspection," but it says under "Specifications,"
19  it says "Tests," it says "Proof Load Test," and
20  it says "Test Specification," correct?
21    **A.  Yes.**
22    Q.  The test specification, it described in
23  that -- under the term "Test Specification," it
24  tells you what the test is, correct?
25    **A.  Yes.**

66

1    Q.   Okay.  Is this a test that SFA took from
2  some other source?
3    A.   It is a reduced test of the PALD 2009.
4    Q.   In what way is it reduced?
5    A.   The capacity and the time in which we
6  hold the load.
7    Q.   How is it reduced from what the PALD
8  standard is?
9    A.   PALD standard proof load test is to 100
10 percent capacity and is a ten-minute test.
11   Q.   Is that from the 2009 standard?
12   A.   Yes.
13   Q.   And the recent SFA when it did its
14 product inspection testing, it used the reduced
15 standard as opposed to the PALD standard?
16   A.   We don't sell product that has been
17 tested beyond its designed limit, so 100 percent
18 capacity is the maximum we would ever load
19 something.
20   Q.   What you just testified about, that
21 policy of SFA, is that reduced to any written
22 document, e-mail, any correspondence, policy
23 statement, anything?
24   A.   No.
25   Q.   Okay.  What you just testified about,

67

1  the policy of SFA, was that something that you
2  had personal knowledge of or was that something
3  you acquired from someone else or from reviewing
4  anything?
5    A.   I acquired it from whenever I started
6  working with the company.  If we are going to
7  sell a product, we don't take it past 100 percent
8  capacity.  After that it's a destructive test.
9    Q.   Okay.  If there is a certain individual
10 in engineering or elsewhere who conveyed that to
11 you, do you recall who that was?
12   A.   It probably would have been Peter
13 Gillespie, my boss at the time.
14   Q.   You said Peter is no longer affiliated
15 with SFA, is that correct?
16   A.   No, he's no longer affiliated, excuse
17 me.
18   Q.   Do you know why he left the company?
19   A.   He moved to Taiwan.
20   Q.   Maybe we'll see him in a few months.
21        All right.  What's been marked as
22 Exhibit 14, are actual filled-out copies of this
23 document kept in any department of SFA?
24   A.   We -- once they are filled out we scan
25 them in and record them.

68

1    Q.   For how long to your knowledge are these
2  Product Inspection Forms kept?  In other words,
3  are they regularly after a period of time
4  destroyed or are they still around from the very
5  beginning?
6    A.   I don't believe we have a set policy for
7  destruction of records, but the scanned-in
8  versions we only have back to maybe 2009.
9    Q.   I notice on this one-page document it
10 says "REV" and it says "10142008"?
11   A.   That's when this test form was either
12 updated or created.
13   Q.   Okay.  So from 2008 until this very
14 day -- withdrawn.
15        Based upon this date, did SFA begin
16 electronically scanning as of 10/14/2008 or some
17 subsequent time?
18        MR. BROWN:  Object to form.  Asked
19 and answered.  He can go ahead and tell you
20 again.
21        MR. EDINBURGH:  Maybe this
22 refreshes his recollection.
23   A.   No, the REV date only signifies when the
24 document was created or updated.
25   Q.   (BY MR. EDINBURGH)  In the ordinary

69

1  course is this filled out by whoever is
2  performing the test in the lab at SFA?
3    A.   Yes.
4    Q.   And from time to time would that have
5  been you or under your direction?
6    A.   Yes.
7    Q.   And do you personally fill out any of
8  these forms?
9    A.   I have in the past.
10   Q.   Okay.  Who filled them out -- withdrawn.
11        Are these kept now in the lab?
12   A.   No.
13   Q.   The physical copies?
14   A.   No.
15   Q.   Where are the physical copies stored?
16   A.   Near the engineering department.
17   Q.   Okay.  And the engineering department
18 has access to these electronically?
19   A.   To the scanned-in versions, yes.
20        MR. EDINBURGH:  Let's mark as
21 No. 15.
22        (WHEREUPON, DEPOSITION EXHIBIT
23 NO. 15 WAS MARKED FOR IDENTIFICATION.)
24   Q.   (BY MR. EDINBURGH)  Exhibit 15 is a
25 Craftsman heavy duty jack stand operator's manual

70

1  for the 50163 four-ton capacity per pair.  It's
2  produced by SFA under SFA Bates number 2815-2818.
3  Mr. Jorgensen, is this the operator's manual that
4  you earlier testified you had looked at in
5  preparation for today's deposition?
6  A. Yes.
7  Q. Do you know how the Craftsman heavy duty
8  jack stand 50163 operator's manual came to be in
9  the possession of SFA?
10  A. I believe it would have been created at
11 SFA.
12  Q. All right.  Let's go if we can to
13 Page 2817.  There is a section in the middle of
14 the page called "Operation" in all capital
15 letters, do you see that?
16  A. Yes.
17  Q. And to the left there is a bullet point
18 that says "To support load"?
19  A. Yes.
20  Q. In the first bullet point under "To
21 support load," says "Adjust height by pulling up
22 on ratchet bar," correct?
23  A. Yes.
24  Q. The second bullet point says, "The
25 weight of the locking handle should secure the

71

1  ratchet bar in desired position," correct?
2  A. Yes.
3  Q. All right.  To SFA's knowledge why does
4  the manual say "should secure" as opposed to will
5  secure or some other terminology, why was the
6  word "should" utilized?
7        MR. BROWN:  Object to form.
8        Go ahead.
9  A. I can't testify to the grammatical use.
10  Q. (BY MR. EDINBURGH)  Do you have any
11 understanding that this operation instruction by
12 using the term "should" was meant by SFA to mean
13 that there may be instances or circumstances in
14 which it may not secure a ratchet bar in desired
15 position?
16        MR. BROWN:  Object to form.
17  A. I think if you read further into that
18 bullet point, we say "should" and then at the
19 bottom we say "To confirm this."
20  Q. (BY MR. EDINBURGH)  I understand that
21 and I'll get into that, but I want to focus my
22 question on the first sentence of that bullet
23 point.
24  A. Okay.
25  Q. There is an instruction that advises,

72

1  "The weight of the locking handle should secure
2  the ratchet bar in desired position."  I've asked
3  you, based upon your review and preparation and
4  discussions to be SFA's witness today, why was
5  the term "should secure" utilized in this 50163
6  operator's manual.
7        MR. BROWN:  Object to form.  Asked
8  and answered.
9  A. To be used in conjunction with the
10 remainder of the bullet point.
11  Q. (BY MR. EDINBURGH)  Have you asked
12 anyone at SFA concerning the origin or content or
13 the reason why that sentence was worded the way
14 it was, "The weight of the locking handle should
15 secure the ratchet bar in desired position," have
16 you talked to anyone about that?
17  A. To where that sentence came from?
18  Q. Yeah, why those particular words are
19 selected, chosen?
20  A. No.
21  Q. Before I go forward, you indicated
22 earlier that you didn't speak to any former
23 employees of SFA to prepare for the deposition
24 today.  Did you attempt to speak to any former
25 employees?

73

1  A. No.
2  Q. All right.  Now, we'll go with the
3  second bullet point.  The next sentence says, "To
4  confirm this, simply push down on the locking
5  handle."  And the next sentence says, "Check to
6  ensure ratchet bar is secure before loading."
7        Now, the sentence, "Check to ensure
8  ratchet bar is secure before loading," what did
9  SFA intend its customers or end users to do to
10 check to ensure the ratchet bar was secure before
11 loading?
12        MR. BROWN:  Object to form.
13  A. To make sure that there was no slop.  I
14 guess a term that I would use is slop.  If their
15 rack bar, the tolerance between the rack bar and
16 the top of the base frame is -- allows it to
17 pivot, we just make sure you push on it to ensure
18 a secure hold.
19  Q. (BY MR. EDINBURGH)  What you just
20 testified to, is that found in any SFA document
21 that you have reviewed?
22  A. No.
23  Q. Is that based upon any conversations
24 you've had with any SFA employees in preparation
25 for your appearance today?

74

1    A.   No.
2    Q.   All right.  Again, what did SFA intend
3 for the customer to physically do to check to
4 ensure -- what was the customer supposed to do
5 visually, tactically or any other way to check to
6 ensure the ratchet bar is secure before loading?
7         MR. BROWN:  Object to form.
8         MS. TODD-TROTTA:  Object to form.
9    A.   Push down on the locking handle.
10   Q.   (BY MR. EDINBURGH)  Is there a
11 redundancy in the operating instruction?  You
12 say, "To confirm this, simply push down on the
13 locking handle," and then if the operator is
14 supposed to push down on the locking handle, then
15 why add the third sentence, "Check to ensure
16 ratchet bar is secure before loading"?
17        MR. CHAYKIN:  Object to the form.
18        MR. BROWN:  Object to form.
19   Q.   (BY MR. EDINBURGH)  Did the SFA intend
20 for the operator or the user to do something to
21 check to ensure other than to push down on the
22 locking handle, to do something else?
23   A.   Just to make sure that it was a safe
24 setup.
25   Q.   I'm asking you what was the operator,

75

1 according to SFA's intent or understanding,
2 supposed to do?
3    A.   To confirm that the ratchet bar was
4 being held.
5    Q.   Yes, I appreciate that.  But I'm asking
6 you to confirm this, the operator's manual says
7 "push down on the locking handle," right, that's
8 what SFA has as the instruction?
9    A.   Correct.
10   Q.   Then it has a sentence following that,
11 which we have read, "Check to ensure ratchet bar
12 is secure before loading," and what I'm asking
13 you as SFA's representative today is other than
14 to push down on the locking handle, did SFA
15 intend for the operator to do anything in
16 addition to that to check to ensure that the
17 ratchet bar was secure before loading beyond
18 pushing down on the locking handle?
19        MS. TODD-TROTTA:  Objection.  Form.
20        MR. BROWN:  Object to form.
21   Q.   (BY MR. EDINBURGH)  Go ahead.
22   A.   By pushing down on the handle you are
23 ensuring that the pawl is in its proper position,
24 the ratchet bar doesn't move down.  The only
25 purpose of that sentence is to make sure that

76

1 it's a safe setup.  I don't think we have any
2 other -- we are not expecting the customer do
3 anything else.
4    Q.   All right.  Then did SFA -- okay.  All
5 right.  The operating instructions, which section
6 or department or group within SFA had
7 responsibility for drafting or editing or
8 reviewing these particular set of instructions?
9         MR. BROWN:  Object to form.
10   A.   At the time an individual who is no
11 longer with the company was working on the OIPMs,
12 he was in the engineering department.
13   Q.   (BY MR. EDINBURGH)  I'm going to ask you
14 a couple questions about that.  Just tell us what
15 OIPM stands for.
16   A.   Owner's instructions and parts manual.
17   Q.   Okay.  And who is the individual you are
18 referring to?
19   A.   Mark Pappas.
20   Q.   In order to perform your duties and
21 responsibilities as a 30(b)6 today did you reach
22 out to talk to Mark Pappas?
23   A.   No.
24   Q.   Is Mr. Mark Pappas still in the employ
25 of SFA?

77

1    A.   No.
2    Q.   Do you know where he resides,
3 approximately, not the street address, but is he
4 still in the Kansas City area, does SFA know
5 whether he's still around this area?
6    A.   No.
7    Q.   Going back to the bullet point "To
8 support load," the second bullet point under
9 that, the one that begins with "The weight of the
10 locking handle," did SFA have an understanding as
11 to whether a user or a customer could check to
12 ensure the ratchet bar is secure before loading
13 by visually observing the pawl and ratchet tooth
14 engagement itself?
15        MR. BROWN:  Object to form.
16   A.   No, there is --
17   Q.   (BY MR. EDINBURGH)  Go ahead.
18   A.   No.
19   Q.   Once the ratchet bar and pawl are
20 secure, is that visually observable by the
21 customer?
22   A.   No.
23   Q.   You see on this same page, 2817, on the
24 top of the page there are Safety Instructions?
25   A.   Yes.

78

1    Q.  And there is warnings and then there is
2  a number of bullet points under "warnings"?
3    A.  Uh-huh.
4        MS. TODD-TROTTA:  Those "uh-huhs"
5  are yes?
6        THE WITNESS:  Yes, I'm sorry.
7    Q.  (BY MR. EDINBURGH)  Did SFA ever
8  consider adding to those bullet points a warning
9  advising -- or warning, rather, warning the
10  customer to never use a single jack stand to
11  support a vehicle?
12       MR. BROWN:  Object to form.
13   A.  It states in the warning to be used as a
14  pair, use "One pair per vehicle only!"
15   Q.  (BY MR. EDINBURGH)  Correct, but what
16  I'm asking you, did SFA ever consider a different
17  or additional warning to put in this section of
18  the manual, a warning to never use a single jack
19  stand to support a vehicle?
20       MR. BROWN:  Object to form.
21   A.  No.
22       MS. TODD-TROTTA:  Just so the
23  record is clear, when you read back, the whole
24  bullet point is, "One pair per vehicle only,"
25  exclamation point.

79

1        MR. BROWN:  There is other bullet
2  points about using a matched pair to support one
3  end of a vehicle only, speaks for itself.
4        MR. EDINBURGH:  It speaks for
5  itself.
6        MS. TODD-TROTTA:  I just wanted the
7  record to be clear.
8        MR. EDINBURGH:  The record was
9  clear without your comments, respectfully.  I
10  indicated the points are what they are.
11   Q.  (BY MR. EDINBURGH)  All right.  In the
12  operator's manuals for the other ratchet and pawl
13  design jack stand under the various brands or
14  labels sold by SFA, I'm going to ask you if SFA
15  in the operator's manuals included any of the
16  following safety instructions in the manuals.
17  The following instruction, do you recall whether
18  this was made in any of the SFA jack stand
19  manuals for the ratchet and pawl design, Make
20  sure pawl is fully engaged into teeth?
21   A.  No.
22   Q.  Make sure the locking pawls are fully
23  engaged in the column's teeth on ratchet-type
24  stands?
25   A.  No.

80

1    Q.  Each jack stand's locking handle must be
2  fully engaged in the ratchet bar teeth?
3    A.  No.
4        MR. EDINBURGH:  Let's take a short
5  break.  I have other jack stand SFA manuals which
6  I want to mark, and I think I have multiple
7  copies of them.  There is enough hopefully for
8  everybody.  And you may not believe it, but I
9  think we are moving along from my perspective
10  quickly and there won't be any problem getting
11  out on time and getting home.
12       (Brief recess taken.)
13       (WHEREUPON, DEPOSITION EXHIBIT
14  NO. 16 WAS MARKED FOR IDENTIFICATION.)
15   Q.  (BY MR. EDINBURGH)  Mr. Jorgensen, I'd
16  like you to look at Exhibit 16, please.
17  Unfortunately, and I don't know the reason why,
18  there does not appear to be Bates numbers on this
19  document, but we did receive this from one or
20  more of the defendants at some point in this
21  case.
22       MR. CHAYKIN:  Does counsel know
23  which defendant it was received from?
24       MR. EDINBURGH:  No, since there is
25  no Bates numbers there is no way for me to tell.

81

1        MR. CHAYKIN:  Okay.
2    Q.  (BY MR. EDINBURGH)  This is called a
3  Hardlines Test Report from Intertek Testing
4  Services of Shanghai and it's dated March 8,
5  2013.  Going through the document, it concerns a
6  four-ton jack stand, and vendor agent is
7  identified as Shinn Fu Company of America and the
8  style/code number is 50163 jack stand.
9        Mr. Jorgensen, have you seen this report
10  before today?
11   A.  Not to my knowledge.
12   Q.  Okay.  Based upon your review of the
13  records, you don't necessarily have to refer to
14  this report since you haven't looked at it
15  before, did SFA receive on or about March 8,
16  2013, certain test results from Intertek Testing
17  Services concerning a four-ton jack stand with
18  the style called 50163?
19   A.  I couldn't tell you if this was sent to
20  us.  I don't know.
21   Q.  Okay.  Do you recall whether in 2013 the
22  50163 model jack stand, the four-ton jack stand
23  that was a Sears designation, was being sold to
24  Sears by Shinn Fu Company of America?
25   A.  I don't know the history of the business

82

1  relationship.
2      Q.  Okay.  Where it says "Factory" to the
3  right-hand column, it says "Jiaxing,"
4  J-I-A-X-I-N-G, "Datong," D-A-T-O-N-G, "Machinery
5  Co., Limited," did you ever hear of that factory?
6      A.  I don't know all of the full names of
7  the factories.  I know them as their individual
8  designations.
9      Q.  All right.  With respect to the
10 repository or depository -- withdrawn.
11         As part of your inquiry to become
12 prepared for today's deposition, did you become
13 aware of an entity called Intertek Testing
14 Services?
15     A.  Yes, I've heard of them.
16     Q.  Okay.  And from time to time are
17 Intertek Test Reports received by SFA, not only
18 for jack stands but for other products?
19         MR. BROWN:  Object to the form.
20         Go ahead.
21     A.  I believe Intertek is a test facility
22 for Sears, so if we are selling a product to
23 Sears or -- then we would probably get a copy of
24 it, but --
25     Q.  (BY MR. EDINBURGH)  And in the normal

83

1  course of SFA's business, in the event that
2  Intertek Test Report for a Sears product was
3  received at SFA, where would that test report be
4  kept?
5      A.  We would keep it in an electronic
6  version in our testing documentation folder.
7      Q.  Okay.  Was that folder reviewed by you
8  in preparation for today's deposition?
9      A.  Yes.
10     Q.  Did you see this report in that folder?
11     A.  No.
12     Q.  That's it.  I'm not going to ask
13 anything else then.
14         As part of your review and inquiry to
15 become knowledgeable about certain topics, did
16 you become aware of other ratchet and pawl design
17 jack stands sold and distributed by SFA?
18     A.  I know of some, yes.
19     Q.  Okay.  I just want to read off the list
20 and tell me whether you can respond to my
21 question.  Did SFA sell or distribute under the
22 Blackhawk label three-ton jack stands ratchet and
23 pawl design?
24         MR. BROWN:  Object to form.
25     A.  Yes.

84

1      Q.  (BY MR. EDINBURGH)  Six ton?
2      A.  Yes.
3      Q.  Twelve ton?
4      A.  Yes.
5      Q.  Did SFA sell jack stands under the label
6  Hein-Werner?
7      A.  Yes.
8      Q.  Did it sell -- and the ratchet and pawl
9  design, three ton?
10     A.  Yes.
11     Q.  Six ton?
12     A.  Yes.
13     Q.  Did SFA sell under the Omega label
14 ratchet and pawl design jack stands?
15     A.  Yes.
16     Q.  Three ton?
17     A.  Yes.
18     Q.  Six ton?
19     A.  Yes.
20     Q.  Twelve ton?
21     A.  Yes.
22     Q.  And did SFA sell ratchet and pawl design
23 jack stands under the Pro-Lift brand or label?
24     A.  Yes.
25     Q.  Two ton?

85

1      A.  Yes.
2      Q.  Three ton?
3      A.  Yes.
4      Q.  Four ton?
5      A.  Yes.
6      Q.  Under the Pro-Lift designation, the four
7  ton, was the model number the T6904?
8      A.  Yes.
9      Q.  Was the three-ton model number T6903?
10     A.  I believe so, yes.  Yes.
11     Q.  Did it sell under the Pro-Lift the
12 six-ton model?
13     A.  I believe there could be.  With the
14 T6906?
15     Q.  Correct.  Was that the designation for
16 the Pro-Lift six ton, T6906?
17     A.  I'm sure that was the model number.
18     Q.  Okay.  Thank you.
19         (Whereupon, a discussion was
20 had off the record.)
21         (WHEREUPON, DEPOSITION EXHIBITS
22 NOS. 17 AND 18 WERE MARKED FOR IDENTIFICATION.)
23         MR. EDINBURGH:  I will provide you
24 copies.  I'm sorry I can't give you an extra.
25         MR. BROWN:  Seventeen is Blackhawk

86

1  Automotive Fast Lift Jack Stands.
2          MS. TODD-TROTTA:  Eighteen is
3  Omega?
4          MR. EDINBURGH:  Yes.
5          MR. BROWN:  Yes.
6          (whereupon, a discussion was
7  had off the record.)
8      Q.  (BY MR. EDINBURGH)  Mr. Jorgensen, can
9  you please look at the Blackhawk jack stand
10 manual, that's SFA 3275 to 3278.
11     A.  Yes.
12     Q.  In preparation for the deposition today,
13 have you looked at this manual?
14     A.  I've looked at manuals.  I can't
15 specifically state this was one of them.
16     Q.  This is a manual which indicates that
17 it -- it says "SFA Companies" and gives your
18 address on the bottom right of the manual,
19 correct?
20     A.  Yes.
21     Q.  All right.  And it says "Printed in
22 China" and then revised 3/10?
23     A.  Yes.
24     Q.  Does that indicate to you March 2010
25 or --

87

1      A.  Yes.
2      Q.  Fine.  Could you look on Page 3276,
3  please.  Do you see where it says "Product
4  Description"?
5      A.  Yes.
6      Q.  There is a triangle with an exclamation
7  point, or two of them actually, but the bottom
8  one?
9      A.  Yes.
10     Q.  Okay.  It says, "The 'Fast Lift'
11 adjustment function of this jack stand is not
12 designed to support a load."  The next sentence
13 says, "The Locking Pawl must" and then "must" is
14 in bold, "be properly engaged for the jack stand
15 to support weight."
16     A.  Yes.
17     Q.  That's what it says, correct?
18     A.  Yes.
19     Q.  That's the language SFA employed in this
20 manual?
21     A.  Yes.
22     Q.  With respect to the sentence, "The
23 Locking Pawl must be properly engaged for the
24 jack stand to support weight," was there any
25 consideration by SFA to use that language or

88

1  similar language in the 50163 manual?
2          MR. BROWN:  Object to form.
3          Go ahead.
4      A.  No.  The design of this jack stand is
5  different.
6      Q.  (BY MR. EDINBURGH)  Did any ratchet and
7  pawl design jack stands that were mechanically
8  similar in design with the ratchet and pawl
9  features that were marketed or sold by SFA
10 contain any instruction similar to the one in the
11 Blackhawk Automotive that says, "The Locking Pawl
12 must be properly engaged for the jack stand to
13 support weight"?
14         MR. BROWN:  Object to form.
15         Go ahead.
16     A.  That sentence may be other OIPMs that
17 have the air spring that automatically lifts the
18 ratchet bar.
19     Q.  (BY MR. EDINBURGH)  Okay.  All right.
20 Have you ever heard of a brand called Westward,
21 W-E-S-T-W-A-R-D, with regard to vehicle support
22 stands?
23     A.  Yes.
24     Q.  Are they a competitor of SFA with
25 respect to jack stands?

89

1      A.  I believe we supply them with jack
2  stands.
3      Q.  Okay.
4      A.  I don't know the business relationship
5  as of today.
6      Q.  All right.
7          MR. EDINBURGH:  Can we mark the
8  next one, please.
9          (WHEREUPON, DEPOSITION EXHIBIT
10 NO. 19 WAS MARKED FOR IDENTIFICATION.)
11     Q.  (BY MR. EDINBURGH)  I'd like you -- this
12 document was provided by SFT as part of their
13 document production, SFT454 to SFT473.  If you
14 can go to Page 455, please, Bates number.  Under
15 "Operation to Support," it says in No. 1, it
16 says, "Adjust height by pulling up ratchet bar,"
17 and in the next sentence it says, "Ensure stopper
18 is positively engaged into ratchet bar by means
19 of handle."
20         Was that language written by SFA if you
21 know?
22         MS. TODD-TROTTA:  What page are we
23 on because I don't have a copy?
24         MR. EDINBURGH:  SFT455.
25     A.  I'm not sure because it doesn't follow

90

1  our standard revision code.  I'd have to look at
2  our system.
3      Q.  (BY MR. EDINBURGH)  You used the term
4  "our standard revision code."  What is that?
5  When you say "our," you mean SFA's standard
6  revision code, correct?
7      A.  Yes.
8      Q.  What is SFA's standard revision code?
9      A.  Typically on an OIPM we'll label on the
10 bottom right corner the model number, then dash
11 N, and then a revision for that specific month,
12 underscore, two-digit month, four-digit year.
13     Q.  That's the code you are talking about?
14     A.  That's the code I'm discussing, yes.
15     Q.  You are not talking about a code with
16 respect to the actual content of the instructions
17 or warnings?
18     A.  No.
19     Q.  Have you heard of an entity called
20 Grainger International?
21     A.  Yes.
22     Q.  Does SFA sell jack stands to Grainger
23 International?
24     A.  I believe so, yes.
25     Q.  Under any particular private label or

91

1  any label or brand?
2      A.  I believe we sell them under Westward.
3      Q.  Did you have any discussions with anyone
4  at SFA in preparation for today concerning the
5  Westward or Grainger ratchet and pawl design jack
6  stand manuals?
7      A.  No.
8      Q.  Or the content of those manuals?
9      A.  No, I just looked at a random sampling
10 of OIPMs for jack stands.
11     Q.  Thank you.  Have you ever heard of a
12 company called Sealy, S-E-A-L-Y, with respect to
13 jack stands or has SFA ever heard of a company
14 called Sealy?
15     A.  Not to my knowledge.
16     Q.  Did SFA ever hear of an entity called
17 Ranger?
18     A.  Grainger?
19     Q.  Ranger, like Lone Ranger.
20     A.  Ranger lifts, I've heard of that
21 company, yes.
22     Q.  How about an entity called Norco?
23     A.  Yes.
24     Q.  What is SFA's understanding of who Norco
25 is?

92

1      A.  Norco would be a competitor.
2      Q.  Did SFA ever consider employing in their
3  ratchet-type jack stand operator's manual or
4  understand itself a warning stating, "Warning,"
5  in capital letters, "ensure pawl is fully engaged
6  with teeth"?
7          MR. BROWN:  Object to form.
8      A.  No.
9      Q.  (BY MR. EDINBURGH)  Similarly, did SFA
10 ever consider employing in their ratchet-type
11 jack stand operator's manual a warning or
12 instruction stating, again in all capital
13 letters, "Make sure pawl is fully engaged in
14 teeth"?
15         MR. BROWN:  Object to form.
16     A.  No.
17     Q.  (BY MR. EDINBURGH)  Have you ever heard
18 of an entity called OTC?
19     A.  Yes.
20     Q.  Who is OTC?
21     A.  Another competitor.
22     Q.  Did SFA ever consider employing in their
23 ratchet-type jack stand operator's manual an
24 instruction stating, "Each jack stand's locking
25 handle must be fully engaged in the ratchet bar

93

1  teeth"?
2          MR. BROWN:  Object to form.
3      A.  In that specific verbiage, no.  We have
4  the "push down on the handle."
5      Q.  (BY MR. EDINBURGH)  All right.  During
6  any ASME PALD meetings that you have attended did
7  any of the members or alternative members ever
8  suggest at the meetings, or when it wasn't
9  formally having a meeting but while you were all
10 together, the employment of an alternative safety
11 system to make sure the ratchet and pawl were
12 locked securely?
13         MS. TODD-TROTTA:  Objection to
14 form.
15     A.  No.
16     Q.  (BY MR. EDINBURGH)  During any ASME or
17 PALD meetings did anyone ever suggest a redundant
18 safety feature for securing the ratchet in an
19 upright position on the load?
20         MS. TODD-TROTTA:  Objection to
21 form.
22         MR. BROWN:  Object to form.
23     A.  Can you clarify?
24     Q.  (BY MR. EDINBURGH)  In any of the
25 meetings you have attended was there any

94

1 discussion about having a redundant or additional
2 safety feature in addition to the pawl and teeth
3 design to secure the column height on the load?
4    A.  No.
5         MS. TODD-TROTTA:  Objection.  Form.
6         MR. EDINBURGH:  I just have some
7 e-mails that have been produced to show the
8 witness, so -- what time are we at?  My
9 suggestion, if it's okay with you, we go straight
10 through, because I really see us being done by
11 one, quite frankly.  Is that all right with you
12 guys?
13        MR. BROWN:  Sure.
14        (Whereupon, a discussion was
15 had off the record.)
16        (Brief recess taken.)
17    Q.  (BY MR. EDINBURGH)  Prior to being
18 designated as a 30(b)6 on the topics you were
19 designated about, what work, if any, had you done
20 with respect to jack stands?
21    A.  The incoming inspections.
22    Q.  That's it?
23    A.  Yeah.
24    Q.  Okay.  Was there anyone who is still
25 employed by SFA today who had responsibility for

95

1 jack stand testing, the content of jack stand
2 manuals, jack stand compliance with any
3 governmental standards?
4         MR. BROWN:  Object to form.
5    A.  No.
6    Q.  (BY MR. EDINBURGH)  Was there any unit
7 or division within engineering concerning jack
8 stand-related issues, or groups within
9 engineering?
10        MR. BROWN:  Object to form.
11    A.  No.
12    Q.  (BY MR. EDINBURGH)  Okay.  Who today is
13 your boss?
14    A.  Steven Huang.
15    Q.  How long has he been -- he's your direct
16 supervisor or direct boss?
17    A.  Yes.
18    Q.  Okay.  How long has that arrangement
19 been in place?
20    A.  Since I became engineering manager.
21    Q.  Which was in 2000 and --
22    A.  I believe on my resume it states 2013,
23 end of 2013.
24    Q.  Okay.  Now, in addition to speaking with
25 Mr. Chaykin, did you speak with any other

96

1 employees of SFA concerning jack stand -- ratchet
2 and pawl design jack stand legal actions?
3    A.  No.
4         MR. BROWN:  Object to form.
5         Go ahead.
6    A.  No.
7    Q.  (BY MR. EDINBURGH)  In addition to
8 Mr. Chaykin, did you speak to any other SFA
9 employees concerning complaints of jack stand
10 failure of any type?
11    A.  No.  We just went over the claims or the
12 individual cases that we have discussed earlier.
13    Q.  When you say "we," you mean yourself and
14 Mr. Chaykin?
15    A.  I read through -- I looked over some of
16 the documents, yes.
17    Q.  Who provided you with those documents?
18    A.  Mr. Chaykin.
19    Q.  Okay.  Did SFA consider the ASME PALD
20 safety standards for jack stands to be minimum
21 safety standards?
22        MS. TODD-TROTTA:  Objection to
23 form.
24        MR. BROWN:  I'll object to form.
25    A.  SFA sees them as industry standards.

97

1    Q.  (BY MR. EDINBURGH)  The warnings
2 contained in the 50163 operator's manual that we
3 previously discussed, what was the source of
4 those warnings?  Does that refer to some other
5 source to place those warnings in the operator's
6 manual?
7    A.  In the PALD section for jack stands it
8 states suggested warnings and that is where those
9 came from.
10    Q.  Did ASME PALD prohibit SFA from making
11 or using any other or additional warnings to
12 alert the user of the need to make sure that
13 there was full and complete engagement of the
14 pawl with the ratchet bar?
15        MR. BROWN:  Object to form.
16    A.  No.
17    Q.  (BY MR. EDINBURGH)  Was there any
18 prohibition by any industry group for SFA to
19 provide other or additional warnings to make sure
20 the user is aware of the need to make sure that
21 there was full and complete engagement of the
22 pawl with the ratchet teeth?
23        MR. BROWN:  Object to form.
24    A.  Can you clarify the question.
25    Q.  (BY MR. EDINBURGH)  All right.  Did SFA

98

1 belong to any industry groups, trade
2 associations?
3    **A.** **The PALD committee.**
4    Q. That was it?
5    **A.** **That I'm part of.**
6    Q. Any other group?
7       MR. BROWN: Object to form. Are
8 you asking about jack stands or --
9       MR. EDINBURGH: I'll limit it to
10 jack stands.
11    **A.** **No.**
12    Q. (BY MR. EDINBURGH) Are the ASME PALD
13 safety standards voluntary standards?
14    **A.** **Yes.**
15    Q. Does SFA know what the maximum height of
16 the ratchet bar was for the T6904?
17    **A.** **I believe it was 17 and 5/16th inches.**
18       MR. BROWN: Give or take.
19       You can strike that.
20       MR. EDINBURGH: Whatever the
21 tolerance is.
22    Q. (BY MR. EDINBURGH) Was the maximum
23 height of the ratchet bar of the T6904 model ever
24 changed or increased after its introduction into
25 the marketplace?

99

1       MS. TODD-TROTTA: Objection. Form.
2    **A.** **I'm -- I don't know. That's -- it would**
3 **depend on if a factory was switched or not. I**
4 **don't know.**
5    Q. (BY MR. EDINBURGH) Is SFA aware of any
6 design changes or changes to safety features of
7 the T6904 model jack stand after its original
8 introduction?
9    **A.** **No.**
10    Q. Is SFA aware of a Sears Model No.
11 T37402?
12    **A.** **I'm not familiar with the model number.**
13    Q. Okay. Did SFA ever sell or market a
14 four-ton jack stand with a maximum bar height of
15 21 inches?
16    **A.** **I would have to look. I'm not sure.**
17    Q. Where would you look?
18    **A.** **I would have to ask someone, someone at**
19 **SFA that knows the history of that, or an old**
20 **catalog.**
21    Q. Who would you ask?
22    **A.** **Probably wouldn't ask anyone. I**
23 **probably would just start doing the research**
24 **myself looking into old catalogs or see if I had**
25 **any test forms on that model number.**

100

1    Q. And where would the catalogs or test
2 forms be kept?
3    **A.** **We have some old catalogs just in filing**
4 **cabinets. We don't have a complete history of**
5 **catalogs, but it's just a place to look.**
6    Q. Did you speak to anyone at SFA on the
7 history of the T6904 model or jack stand or the
8 four-ton model ratchet and pawl jack stand in
9 preparation for today's deposition?
10       MR. BROWN: Object to form.
11       Go ahead.
12    **A.** **Yes.**
13    Q. (BY MR. EDINBURGH) Who did you speak
14 to?
15    **A.** **Casey Gann.**
16    Q. I think you mentioned him a couple hours
17 ago, but just for my recollection, what
18 department is Mr. Gann is?
19    **A.** **He's in the engineering department.**
20    Q. And what is his background with respect
21 to jack stands, if any?
22    **A.** **He doesn't have a background with regard**
23 **to jack stands.**
24    Q. Has he worked on jack stands?
25    **A.** **He's tested them. He's a lab tech.**

101

1    Q. One of the names I did not ask the
2 witness about yesterday was May Lee, M-A-Y, Lee,
3 L-E-E, do you know May Lee?
4    **A.** **Yes.**
5    Q. Is May Lee still employed by SFA?
6    **A.** **Yes.**
7    Q. Who is May Lee with respect to what work
8 she does at SFA?
9    **A.** **She is an administrative assistant to**
10 **Steven. Right?**
11    Q. You can't --
12    **A.** **I don't know her full job title.**
13    Q. The best you can.
14    **A.** **I would say an assistant.**
15    Q. To Steven?
16    **A.** **Steven Huang.**
17    Q. Steven Huang is your understanding the
18 president of the company?
19    **A.** **I believe he's the CFO of the company.**
20    Q. Okay. I asked you earlier about the
21 factories you visited in China. Going back to
22 that topic, do you know whether the factories you
23 visited in China were owned by Shinn Fu Taiwan?
24    **A.** **I don't know if they were owned by Shinn**
25 **Fu Taiwan.**

102

1    Q.   Or also Shinn Fu Corporation?
2    A.   I know they are owned by them.  I don't
3  know the structure of that.
4    Q.   As part of the work you did, did you
5  have any interaction with engineers from
6  customers, retail customers of SFA such as Sears
7  or other chain stores?
8         MR. BROWN:  Object to form.
9         MS. TODD-TROTTA:  Object to form.
10   A.   No.
11   Q.   (BY MR. EDINBURGH)  Within engineering
12  were there any engineers assigned to review the
13  wording of the ratchet and pawl design jack
14  stands -- I left out a clause, I'll withdraw the
15  question.
16        Within SFA's engineering were there any
17  engineers assigned to review the wording of the
18  operator's manuals of the ratchet and pawl design
19  jack stands?
20        MS. TODD-TROTTA:  Objection.  Form.
21   A.   No.
22   Q.   (BY MR. EDINBURGH)  Outside of
23  engineering, any other unit or division of SFA,
24  were there any employees of SFA assigned to
25  review the content, language, wording of ratchet

103

1  and pawl design jack stand operator manuals?
2         MS. TODD-TROTTA:  Object to form.
3         MR. CHAYKIN:  Any jack stand?
4         MR. EDINBURGH:  Ratchet and pawl
5  design.
6         MR. CHAYKIN:  Any ratchet and pawl
7  design jack stand, was anybody at SFA assigned to
8  that task, that's the question?
9         MR. EDINBURGH:  Yes.
10   A.   To review the OIPM, no.
11   Q.   (BY MR. EDINBURGH)  Okay.  What role did
12  SFA play with respect to the operator's manuals
13  of jack stands that were sold under SFA brands or
14  labels?
15   A.   We put the information together into the
16  format that you see and then send it to SFT or to
17  another company for review.
18   Q.   Okay.  I wanted to ask you when you said
19  "we," you say "we," can you be more specific at
20  who at SFA performed those tasks?
21   A.   If an OIPM is created at -- sorry, if a
22  OIPM is put together at SFA, it is sent to SFT
23  for review and then I believe it's sent from SFT
24  to the factory for printing.  Once it leaves SFA,
25  I don't know where it goes.

104

1    Q.   Who at SFA performs that function?
2    A.   Performs the function of putting it
3  together?
4    Q.   Yeah.  The manual or reviewing the
5  manual, commenting on the manual, who actually
6  does that or did that at SFA?
7         MR. BROWN:  Object to form.
8         MS. TODD-TROTTA:  Object to form.
9    A.   The engineering department puts
10  information into, like the warnings, puts the
11  warnings into the OIPM, but once it's past
12  putting it together, we don't have responsibility
13  for it.  We send it off for review and approval
14  and then --
15   Q.   (BY MR. EDINBURGH)  When you say "we
16  send it off," you mean you send it off from
17  engineering to a different department at SFA or
18  you send it outside of SFA entirely?
19   A.   It's both ways.
20   Q.   Who within engineering does the review
21  you just described or does the work you just
22  described?
23        MR. BROWN:  Object to form.
24   Q.   (BY MR. EDINBURGH)  Who does the work
25  you just described?

105

1         MS. TODD-TROTTA:  Object to form.
2    A.   I do occasionally.
3    Q.   (BY MR. EDINBURGH)  Have you done that
4  with respect to jack stand operator's manuals?
5    A.   I don't specifically remember a jack
6  stand operator's manual that I have worked on in
7  the past.
8    Q.   Do you recall the names of anyone else
9  in engineering who has worked on jack stand
10  operator's manuals in the past?
11   A.   I don't know the last time a jack stand
12  OIPM was worked on at SFA.
13   Q.   Have you made any inquiries as part of
14  your duties and responsibilities of 30(b)6
15  witnesses on the topics of jack stand manuals to
16  determine who at SFA has in the past worked on
17  these manuals?
18   A.   Braxton Kersting has done OIPMs in the
19  past, but that is for a multitude of different
20  products.
21   Q.   Including jack stands?
22   A.   We all have done OIPMs, we all, the
23  engineering department has done OIPMs.
24   Q.   I'm trying to limit it to jack stands
25  only.  I know there are other products, but I

106

```
 1  think your counsel would bite my head off if I
 2  went across the board, so I'm just limiting it to
 3  jack stands only.  The questions I have on
 4  manuals is limited solely to jack stands.
 5     A.  I would have to verify back at the
 6  office and then I could inform my counsel.
 7     Q.  But prior to coming here today did you
 8  ask the people in engineering, who has worked on
 9  jack stand manuals?
10     A.  I didn't ask that question, I just
11  looked at the OIPMs.
12     Q.  You indicated that when engineering was
13  done with its function with respect to the
14  manuals, that -- would other departments or
15  groups within SFA do other work with respect to
16  manuals, jack stand manuals?
17     A.  No.
18     Q.  You indicated the manual would then be
19  sent for approval to SFT, is that correct?
20     A.  Yeah, we would send it to SFT for them
21  to look at or send it to the private label
22  customer for their approval and review.
23     Q.  And SFT is Shinn Fu Taiwan?
24     A.  Yes.
25     Q.  Okay.  When you send it to SFT for
```

107

```
 1  approval, would that include the brands we have
 2  discussed today, Omega, Pro-Lift, Blackhawk?
 3     A.  Yes.
 4     Q.  I'm sorry, did you use the term "private
 5  label" just now?
 6     A.  Yeah.
 7     Q.  Give me an example of the private label
 8  sellers of jack stands that SFA was aware of or
 9  that SFA made jack stands, or sold jack stands to
10  rather?
11         MR. BROWN:  Object to form.
12     A.  Westward is an example.
13     Q.  (BY MR. EDINBURGH)  Did SFT have to
14  approve the manual for the Westward jack stands?
15     A.  They would have been part of the
16  approval process.  I'm sure that it would have
17  first gone to Westward.
18     Q.  Okay.  Any other private label you can
19  identify besides Westward?
20     A.  I mean, we have private label products
21  for Sears, we have private label products for --
22  I don't really know.  This is kind of a sales
23  question, it's out of my realm of responsibility.
24     Q.  For those jack stands that are --
25  withdrawn.
```

108

```
 1         MR. BROWN:  Are you still planning
 2  on being done by 1 o'clock?
 3         MR. EDINBURGH:  I hope so.  What
 4  time is it?
 5         MS. TODD-TROTTA:  12:48.
 6         MR. EDINBURGH:  I guess I may be
 7  overly optimistic.  I did have to make a call or
 8  two so I had to push that back, but thank you for
 9  reminding me.
10         MR. BROWN:  I just don't want to
11  keep the court reporter going too long.
12         MR. EDINBURGH:  I'd rather get done
13  and then go on our merry way than lunch break and
14  come back.  We'll go where we go and that will be
15  that.  I just want to review these as we are
16  talking.
17     Q.  (BY MR. EDINBURGH)  Did you as part of
18  your inquiries and becoming knowledgeable about
19  the 30(b)6 topics, did you speak to individuals
20  in other departments of SFA with respect to those
21  departments' involvement, if any, with jack stand
22  manuals?
23     A.  No.
24     Q.  Did you speak to anyone in sales, any of
25  the sales units or groups?
```

109

```
 1     A.  No.
 2     Q.  Was the engineering department at SFA
 3  ever requested prior to March of 2011 to
 4  participate in designing a different model
 5  six-ton jack stand -- sorry, four-ton jack stand
 6  different than the T6904?
 7         MR. BROWN:  Object to form.
 8     A.  No.
 9     Q.  (BY MR. EDINBURGH)  Do you know whether
10  in 2006 representatives of SFA conducted,
11  participated in review of jack stands sold under
12  the Sears Craftsman brand?
13         MS. TODD-TROTTA:  Objection to
14  form.
15     A.  I'm not aware of that, no.
16     Q.  (BY MR. EDINBURGH)  Did you make any
17  inquiry as part of your duties and
18  responsibilities as a 30(b)6 witness as to SFA's
19  history concerning jack stands sold under the
20  Sears Craftsman label?
21         MS. TODD-TROTTA:  Objection.  Form.
22     A.  For the Sears Craftsman I looked at the
23  OIPMs to see if there was any testing
24  documentation.
25     Q.  (BY MR. EDINBURGH)  Did you speak to
```

110

1   anybody?
2       A.  No.
3       Q.  Did you review any e-mails?
4       A.  The ones that we brought back from the
5   search terms.
6       Q.  Did you bring any of those e-mails with
7   you today?
8       A.  No.
9           (WHEREUPON, DEPOSITION EXHIBIT
10  NO. 20 WAS MARKED FOR IDENTIFICATION.)
11          MR. EDINBURGH:  I'm showing the
12  witness the SFA 20, it's SFA3666 to 3668.  It's
13  e-mail date 11/20/06.
14          MS. TODD-TROTTA:  Silly question,
15  but you don't have a copy for me?
16          MR. EDINBURGH:  We'll get it
17  eventually.
18          MR. BROWN:  She can take a minute
19  and read it.
20          MR. EDINBURGH:  Sure.
21      Q.  (BY MR. EDINBURGH)  What's been marked
22  as SFA 20, is this one of the e-mails you
23  reviewed in preparation for today's deposition?
24      A.  I don't remember reading this e-mail,
25  no.

111

1       Q.  This is an SFA-produced document, it's
2   SFA3666 to 3668.  Do you see there is a list of
3   who it's being sent to in the list on the top of
4   the e-mail?
5       A.  Uh-huh.
6       Q.  There is a Joey Su, S-U, in paren it
7   says "SFA."  Do you have an understanding who
8   Joey Su is or was?
9       A.  Yes.
10      Q.  Who is he?
11      A.  He was the vice president of SFA.
12      Q.  During what time period?
13      A.  The time that I got hired on he was in
14  that position and he left the company three or
15  four years ago, I don't exactly know the date.
16      Q.  Okay.  Did he have any -- okay.  This
17  e-mail is also sent to J. Wang, right?
18      A.  Uh-huh, yes.
19      Q.  Who is Mr. J. Wang?
20      A.  That would be James Wang, he was a
21  salesman at SFA.
22      Q.  All right.  Now, at the bottom of this
23  e-mail it indicates the "Jack Stand Program,"
24  that's what I'm interested in.  It goes from the
25  bottom and goes on to the next page.  I'm not

112

1   interested in any other section of the e-mail,
2   any of the other products.  Did SFA have an
3   understanding back in 2006 that Sears was looking
4   to sell a four-ton jack stand requiring a new
5   Sears model number?
6           MR. BROWN:  Object to form.
7           Go ahead.
8       A.  I can't really answer that.  I mean, it
9   states in the e-mail that they want a four-ton
10  jack stand with a different model number.
11      Q.  (BY MR. EDINBURGH)  Do you know whether
12  the T6904 four-ton jack stand was in the
13  marketplace in 2006?
14      A.  I believe it was, yes.
15      Q.  Do you know when the T6904 with that
16  designation was first introduced into the
17  marketplace?
18      A.  No.
19      Q.  Did SFA ever sell or distribute to Sears
20  a four-ton capacity ratchet and pawl design jack
21  stand?
22          MS. TODD-TROTTA:  Objection to
23  form.
24      Q.  (BY MR. EDINBURGH)  Go ahead, you can
25  answer.

113

1       A.  I don't know -- I don't know the
2   business relationship SFA and Sears shares, I
3   don't know if that was on my list.
4       Q.  All right.  The jack stand program
5   that's listed on the bottom of this e-mail, did
6   SFA at all participate in that program subsequent
7   to November 20th, 2006?
8           MR. BROWN:  Object to form.
9           MS. TODD-TROTTA:  Object to form.
10      A.  I don't know.
11      Q.  (BY MR. EDINBURGH)  Did anyone at
12  engineering do any work at SFA in furtherance of
13  the Sears jack stand program mentioned in this
14  e-mail?
15          MS. TODD-TROTTA:  Object to form.
16      A.  I don't know.
17      Q.  (BY MR. EDINBURGH)  Did you ask prior to
18  today your engineering colleagues whether any
19  work was done?
20      A.  I spoke with Casey Gann as to the
21  testing of the 50163, if it's ever been done, and
22  it's not in our records.
23      Q.  Was that the extent of the inquiry that
24  you made in preparation for today concerning the
25  50163 model four-ton capacity jack stand?

114

1    A.  Yes.
2    Q.  You indicated you reviewed certain
3  e-mails.  Can you tell us as you sit here today,
4  can you recall in general what the subject matter
5  of the e-mails you reviewed was?
6    A.  In general they were sales-related
7  e-mails.
8    Q.  Were these e-mails provided to you for
9  review by someone else or did you search for the
10  e-mails yourself or something else?
11    A.  I would have been provided the e-mails
12  from the search terms.
13    Q.  In other words, you put in certain
14  search terms?
15    A.  No.
16    Q.  Can you tell me who provided you with
17  the e-mails that you reviewed in order to become
18  knowledgeable about the topics for today's 30(b)6
19  deposition?
20    A.  I don't know the exact person that
21  handed me the e-mails or the electronic file.  I
22  would assume my counsel.  Meghann O'Connor
23  probably had showed me where I could find the
24  e-mails.
25    Q.  All right.  You indicated by certain

115

1  search terms.  Do you recall what search terms
2  were utilized?
3    MR. BROWN:  Object to form.  He's
4  not the 30(b)6 witness for the documents that
5  were gathered together.  She appeared yesterday.
6  She testified about the search terms used.
7    MR. EDINBURGH:  I'm not talking
8  about what was given to us.  I'm talking about
9  what he looked at himself for his review to be
10  the witness today.  I'm not talking at all about
11  any search, I'm not talking about any search done
12  to produce records in response to discovery.  I
13  just want to know what he did or what was
14  provided to him to make him knowledgeable to
15  testify today.
16    MR. CHAYKIN:  He just testified
17  that he didn't do any searching with search
18  terms.
19    MR. EDINBURGH:  I was unclear on
20  that, I just want to clarify.
21    Q.  (BY MR. EDINBURGH)  Did you yourself
22  undertake any search for search terms to review
23  records electronically?
24    A.  No.
25    Q.  All right.  That's the end of that.

116

1    In addition to the testing to comply
2  with ASME PALD standards and the internal test
3  protocol that you testified that SFA utilized in
4  their random inspections, are you aware of any
5  other jack stand testing that was conducted by or
6  on behalf of SFA with respect to ratchet and pawl
7  jack stands?
8    MS. TODD-TROTTA:  Object to form.
9    MR. BROWN:  Object to form.
10    A.  We do the incoming inspections, random
11  incoming inspections.
12    MR. EDINBURGH:  Bear with me for a
13  moment.
14    Q.  (BY MR. EDINBURGH)  Does SFA have design
15  drawings -- let me rephrase that.
16    Does SFA create or prepare design
17  drawings for the jack stands that it sells and
18  manufactures?
19    MS. TODD-TROTTA:  Objection to
20  form.  Asked and answered.
21    MR. EDINBURGH:  Fine, he can answer
22  it.  That's not an objection.  Design drawings I
23  didn't ask about before.
24    MR. BROWN:  Go ahead.  He can
25  answer.

117

1    A.  No.
2    Q.  (BY MR. EDINBURGH)  Does SFA request the
3  drawings from anyone else for the jack stands it
4  sells?
5    A.  If we requested the drawings it would be
6  through SFT, but we don't typically request
7  drawings.
8    Q.  Is there a warranty -- withdrawn.
9    Does SFA issue warranties with respect
10  to ratchet and pawl-type jack stands sold under
11  its various brands or labels?
12    A.  We don't offer replacement items.  We
13  don't offer replacement items to jack stands.
14    Q.  Are there warranties?
15    A.  Yeah, there is a warranty in the back of
16  the OIPM.
17    Q.  Are you aware of any -- to prepare
18  yourself as a witness today, as a 30(b)6 witness,
19  did you question anyone, make any inquiries at
20  SFA for any warranty claims in which the claim
21  was that a jack stand collapsed or failed?
22    A.  No.
23    Q.  Okay.  Is there a warranty department or
24  unit within SFA?
25    A.  There is a customer service department.

118

1    Q.   Okay.  And do they handle warranties?
2    A.   They would talk with the customer and if
3  it's a warranty-based item, then they would
4  handle that.
5    Q.   And in preparation for today's
6  deposition did you talk with anyone in customer
7  service?
8    A.   No.
9    Q.   Okay.  One of the topics that you were
10  designated for is claims, right?  Did you speak
11  with anyone in customer service with respect to
12  any claims that customer service was aware of
13  that they received in any format with respect to
14  jack stand failure, jack stand ratchet and pawl
15  collapse?
16    A.   If there would have been a claim of a
17  failure like that, tech service would have
18  informed engineering.  Since I was not -- I've
19  never been informed of a failure other than the
20  claim that we have already discussed, then --
21    Q.   Okay.  You used another term that I
22  don't believe you used earlier, you said "tech
23  service," what is tech service at SFA?
24    A.   It's customer service.  Tech service,
25  customer service.

119

1    Q.   Interchangeable, are they the same
2  thing?
3    A.   Yeah.
4    Q.   All right.  Thank you.
5              EXAMINATION
6  BY MS. TODD-TROTTA:
7    Q.   I just have one question.  The Sears
8  Craftsman owner's manual that has been marked as
9  Exhibit 15, you've been questioned a lot about
10  that relationship SFA had with that manual.  If
11  SFA's relationship did not start with Sears until
12  2012, would SFA have any input as it pertains to
13  that manual?
14            MR. EDINBURGH:  Objection.
15  Hypothetical.  He's already testified on SFA's
16  involvement with that manual.
17    Q.   (BY MS. TODD-TROTTA)  You can answer.
18    A.   No.
19    Q.   So any input, if any, would have
20  occurred after 2012 when you had a relationship
21  with Sears?
22    A.   Yes.
23            MS. TODD-TROTTA:  I have no further
24  questions.
25

120

1              FURTHER EXAMINATION
2  BY MR. EDINBURGH:
3    Q.   Let me go back then.  Can we get the
4  exhibit.  We discussed earlier today in the
5  operations language in the support load, certain
6  language that I'm not going to belabor that,
7  we've gone over that, I'm not going to repeat
8  that, but the language that's in this manual, was
9  this language language that was in the manual for
10  the T6904 concerning the operation?
11            MS. TODD-TROTTA:  Object to form.
12            MR. CHAYKIN:  What time frame?
13            MR. EDINBURGH:  Let me ask him.
14    Q.   (BY MR. EDINBURGH)  Do you see where it
15  says -- Page 2817, the paragraph we discussed?
16    A.   Uh-huh.
17    Q.   The second bullet point, was that the
18  same language employed by SFA of the T6904 model?
19            MS. TODD-TROTTA:  Objection as to
20  form as to time periods.
21    A.   I would have to confirm and get back
22  with you.
23    Q.   (BY MR. EDINBURGH)  Did you check before
24  today on the -- I believe you checked certain
25  manuals before coming here today, correct?

121

1    A.   Yes.
2    Q.   Okay.  Which manuals did you check?
3    A.   I can't list all of them.  I checked --
4  I looked at this one (indicating) and a few other
5  random jack stand.
6    Q.   Did you look at manuals that predate
7  March 2011?
8    A.   I wasn't looking at the date.
9    Q.   Did the manuals you did look at, did
10  they contain the same language as the second
11  bullet point in the operations section?
12    A.   I also didn't memorize each manual.  I
13  don't -- I'd have to relook and look for the
14  specific statement.
15    Q.   All right.  Then I think in light of
16  this I'm going to just have to ask a few more
17  questions on manuals.  Sorry.
18            When did you review the manuals you
19  discussed, when did you do that review?
20    A.   Within the past few months.
21    Q.   Did you segregate out the manuals you
22  reviewed on any particular file?
23    A.   No.
24    Q.   Do you know the brands of the manuals
25  you used, in other words, were they Omega

122

1  manuals, Blackhawk manuals, Pro-Lift manuals?
2      A.  I looked at Pro-Lift and Omega.
3          MS. TODD-TROTTA:  Object to form.
4  That has gone now beyond the scope of my limited
5  question.
6      Q.  (BY MR. EDINBURGH)  The 50163 manual
7  that has been marked today, that manual indicates
8  it was published in China, correct?
9          MR. BROWN:  Object to form.
10     A.  Yeah, I can look at the front page and
11 read that, yeah.
12     Q.  (BY MR. EDINBURGH)  Printed in China.
13     A.  Okay.
14         MR. BROWN:  Might mean the same
15 thing, but it says, "Printed in China."
16     Q.  (BY MR. EDINBURGH)  This manual for the
17 50163, based upon your knowledge or the knowledge
18 you've acquired, was this a manual that SFA was
19 aware of its contents even if SFA did not have an
20 agreement with Sears at the time in 2011?
21         MS. TODD-TROTTA:  Objection to
22 form.
23         MR. BROWN:  Object to form.
24     Q.  (BY MR. EDINBURGH)  I'll rephrase it.
25         Did SFA review this manual on behalf of

123

1  MVP, Wei Fu or anyone else that was -- withdrawn,
2  I'll rephrase it.
3          The 50163 four-ton capacity per pair
4  Craftsman heavy duty jack stand manual,
5  operator's manual that you looked at --
6      A.  Yes.
7      Q.  -- the contents of the manual itself,
8  was that something that SFA played a role in
9  producing?
10         MS. TODD-TROTTA:  Object to form.
11 Time frame.
12         MR. CHAYKIN:  Time frame.
13     Q.  (BY MR. EDINBURGH)  Prior to 2011?
14     A.  I don't know who created this OIPM.
15     Q.  Is there any way -- are there any
16 records at SFA that you can review to determine
17 whether SFA played any role in creating this
18 manual, reviewing this manual, commenting on the
19 manual, approving the manual marked as
20 Plaintiffs' 15?
21         MS. TODD-TROTTA:  Objection to
22 form.  Time frame.
23         MR. CHAYKIN:  You can answer.
24     A.  I would assume it would be in an e-mail
25 format that was probably already given.

124

1      Q.  (BY MR. EDINBURGH)  Did you look to see
2  whether there were any e-mails that either was
3  sent to or received by SFA concerning the 50163
4  Sears manual?
5          MR. BROWN:  Object to form.
6          Go ahead.
7      A.  I believe there was an e-mail regarding
8  the -- one of the heights for the 50163 from
9  Dennis Yu.
10     Q.  (BY MR. EDINBURGH)  What time period?
11     A.  I don't remember the date of the e-mail.
12     Q.  Did it predate March of 2011?
13         MR. BROWN:  Object to form.
14     Q.  (BY MR. EDINBURGH)  If you recall.
15     A.  Yeah, it would predate that time.
16 Dennis didn't work with the company in 2011.
17     Q.  And that's an e-mail that you have, that
18 you have seen back in the office at SFA?
19     A.  Yes.
20     Q.  All right.
21         MR. EDINBURGH:  I'm going to call
22 for production of that e-mail if it hasn't
23 already been given.
24         MR. BROWN:  I think you have it.
25         MR. CHAYKIN:  It's been produced.

125

1          MR. BROWN:  I've seen it so I know
2  it's been produced to you because I've only seen
3  things produced to you.
4          MR. EDINBURGH:  I would ask also
5  for any of the operator's manuals that the
6  witness testified he did look at to prepare for
7  his testimony today.
8          MR. CHAYKIN:  They have all been
9  produced.
10         MR. EDINBURGH:  He hasn't clarified
11 which ones.  If you say they have been produced,
12 you can simply give me the Bates numbers.
13         MR. CHAYKIN:  The witness testified
14 that he looked at random elements and didn't keep
15 them in a separate file, so it's going to be
16 impossible for us to produce the documents that
17 he randomly looked at.
18     Q.  (BY MR. EDINBURGH)  Is that true, if you
19 went back you couldn't pick out the ones you
20 looked at?
21     A.  No.
22     Q.  You cannot?
23     A.  I could not pick them out.
24     Q.  Is there anyone currently at SFA
25 employed who worked on jack stand manuals in 2011

126

1  or before that time?
2      A.  I would have to look when the jack stand
3  manuals were created.
4      Q.  You mentioned Dennis Yu, is it H-U?
5      A.  I think it's Y-U.
6      Q.  Y-U.  Who is Mr. Yu?
7      A.  He was the engineering manager prior to
8  Peter Gillespie.
9      Q.  What time frame was Mr. Yu the
10  engineering manager?
11      A.  I'm not sure, I don't know the history
12  of him.
13      Q.  But Mr. Yu was gone by 2011?
14      A.  Yes, he was gone before I started.
15      Q.  You started back in 2008?
16      A.  2008.
17      Q.  So he has an e-mail -- e-mail he sent,
18  e-mail he received, do you recall?
19      A.  I don't recall the nature of the e-mail.
20      Q.  The subject matter of the e-mail
21  concerned the Sears 50163?
22      A.  The height of one of them.
23      Q.  Okay.  Would that indicate -- what else
24  was in the e-mail that you recall, if anything?
25      A.  Just a request to make sure that the

127

1  OIPM was accurate.
2      Q.  What was accurate?
3      A.  That the height in question was
4  accurate.
5      Q.  Did you review any e-mails that
6  concerned the content of the manual, the
7  operator's manual during the Yu period when he
8  was engineering manager?
9          MR. BROWN:  Object to form.
10      A.  No.
11      Q.  (BY MR. EDINBURGH)  In the years prior
12  to 2011 -- never mind.  I'm going to repeat
13  myself.  I don't want to do that.
14          Prior to March 2011 was the 50163 Sears
15  heavy duty jack stand operator's manual reviewed
16  for content by the SFA engineering department?
17          MS. TODD-TROTTA:  Object to form.
18          MR. CHAYKIN:  Asked and answered.
19      A.  No.
20      Q.  (BY MR. EDINBURGH)  How do you know
21  that?
22      A.  Because we are not responsible for
23  reviewing them.
24      Q.  Okay.  Is the engineering department
25  responsible for reviewing any jack stand

128

1  operator's manual?
2          MS. TODD-TROTTA:  Object to form.
3  Time frame.
4      A.  Review is done by a separate entity.
5      Q.  (BY MR. EDINBURGH)  Which entity?
6      A.  We send it to SFT and what they do with
7  it from that point I'm not sure.
8      Q.  Okay.  So with respect to operator's
9  manuals, what is the function, if any, of the SFA
10  engineering department?
11          MR. BROWN:  Object to form.
12      Q.  (BY MR. EDINBURGH)  What role, if any,
13  does the engineering department play, if any?
14      A.  We create the -- we add in all the
15  verbiage and then we send it out for review and
16  approval.
17      Q.  What you just described, was that done
18  for the model 50163?
19          MS. TODD-TROTTA:  Objection to
20  form.  Time frame.
21          MR. BROWN:  Object to form.
22      A.  I don't know, I can't verify that.  I --
23  I don't know who created this OIPM.
24      Q.  (BY MR. EDINBURGH)  You don't know how
25  long the 50163 has been in the marketplace?

129

1      A.  No.
2      Q.  Okay.
3      A.  I mean, that's sales related, it's not
4  part of my --
5      Q.  I understand.  Did the engineering
6  department at Sears create the manuals for the
7  T6904?
8          MR. BROWN:  Object to form.
9      A.  At Sears?
10      Q.  (BY MR. EDINBURGH)  I'm sorry.  Did the
11  engineering -- withdraw that question.
12          Did the engineering department at SFA
13  create, create is the term you used, the manual
14  for the T6904 four-ton capacity jack stand?
15          MS. TODD-TROTTA:  Objection to
16  form.  Time frame.
17      A.  I don't know which revision.  Other --
18  the factory could have created it.
19      Q.  (BY MR. EDINBURGH)  All right.  Did you
20  do any review of documents to testify here today
21  concerning the history of the manual for the
22  T6904?
23      A.  I just looked at the T6904.  I didn't
24  look at who created it, when it was created.
25      Q.  And, again, you don't recall for what

130

1  year manuals for T6904 you looked at, correct?
2    **A.  No.**
3    Q.  Okay.  If you wanted to, could you
4  determine through a search of records or
5  questioning of SFA personnel what SFA created,
6  and if it did create, when it created the manual
7  of the T6904 jack stand?
8    **A.  Well, I wouldn't be able to ask any**
9  **questions because the person that might have**
10 **created doesn't work with the company anymore.**
11   Q.  who would that person be?
12   **A.  Mark Pappas worked on OIPMs for a while.**
13   Q.  I believe your testimony was you didn't
14 attempt to reach out to him to talk to him in
15 preparation for this deposition, is that correct?
16   **A.  No.**
17   Q.  You did not reach out to him?
18   **A.  I did not reach out to him.**
19   Q.  Okay.  All right.  Any other source for
20 determining when the T6904 manual was first
21 issued, any revisions that may have been made to
22 it over the years?
23   **A.  The only thing I would be able to do is**
24 **look at my e-mail and then look at the revisions**
25 **of the OIPM that might be linked to the system.**

131

1    Q.  Did you do that in preparation for
2  today's deposition?
3    **A.  I didn't look at old OIPMs, no.**
4    Q.  Do you know whether the T6904 manual was
5  the basis for the 50163 manual?
6        MR. BROWN:  Object to form.
7    **A.  I can't confirm that, I don't know.**
8    Q.  (BY MR. EDINBURGH)  Did you make any
9  effort to determine the relationship between the
10 T6904 operator's manual and the Craftsman Model
11 50163 operator's manual?
12   **A.  I don't know if they are the exact same.**
13   Q.  I'm not asking whether you know, I'm
14 asking did you speak to anyone, conduct any
15 search of records to see the evolution, if there
16 was any, from the T6904 to the 50163 manual?
17       MR. BROWN:  Object to form.
18   **A.  I have looked at the 6904 and the 50163**
19 **OIPMs that was around the 2011 time frame, but I**
20 **didn't look at anything else.**
21   Q.  (BY MR. EDINBURGH)  Are the two manuals
22 the same?
23   **A.  I didn't memorize both manuals.**
24   Q.  With respect to the operations and
25 warnings, let's put it that way, I realize you

132

1  didn't memorize, but the best of your
2  recollection of what they said.
3        MR. BROWN:  Object to form.
4    **A.  They probably have similar contents, but**
5  **I can't verify that they are the exact same.**
6    Q.  (BY MR. EDINBURGH)  Do you recall any
7  material differences between the two in terms of
8  warnings or operating --
9        MR. BROWN:  You have copies of the
10 hard documents.  If you want to show him and
11 compare them, that's fine, but four repetitive
12 questions about if he remembers the exact wording
13 of the documents is now into the level of
14 harassment.
15       MR. EDINBURGH:  All right, I'll
16 stop, I won't ask any more on that.  And I say
17 respectfully, I think there has been a lack of
18 preparation on certain areas including the
19 manuals, from my perspective, as a 30(b)6
20 witness, that's my view.
21       MR. CHAYKIN:  Since you put that on
22 the record I've got to put this on the record.
23 In terms of preparation, my company has been
24 paying these two lawyers since 9:00 a.m. this
25 morning and this has been, frankly, a

133

1  surprisingly inefficient deposition from a
2  competent counsel and experienced counsel.  And
3  frankly, I am unhappy and frustrated because
4  these witnesses did extensive preparation on the
5  substance and we have sat here for hours with
6  slow questioning, missing documents, inadequate
7  copies, making this a long and inefficient and
8  frustrating deposition for the witness and for
9  counsel.  And as you know, this is an important
10 matter involving an important accusation against
11 this company and it deserved a level of
12 preparation that was not presented here today on
13 the part of counsel.
14       MR. EDINBURGH:  I understand what
15 you are saying.  I disagree with you.  You can
16 have your views, I have mine.  Part of my
17 frustration is what it is.  I don't want to delay
18 this.  Disagree with you entirely.  But --
19       MR. BROWN:  We understand your
20 position and we disagree with you entirely.
21       MR. EDINBURGH:  Fine, we disagree
22 with one another.
23       I have no further questions.
24       MS. TODD-TROTTA:  No questions.
25       MR. BROWN:  Done.

**134**

```
1              MS. TODD-TROTTA:  Just on the
2    record, I'll get the copy of the exhibits I
3    didn't get today?
4              MR. EDINBURGH:  Sure.
5              MR. BROWN:  Are we going to have
6    the court reporter take all the exhibits?
7              MR. EDINBURGH:  I'll take them but
8    I'll make the copies of them.  I'll have them
9    scanned and sent to everybody.
10                        (Witness excused.)
11                * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**135**

```
1
2
3    _____
4              RYAN JORGENSEN
5    STATE OF_____ )
6                               )  SS:
7    COUNTY OF_____ )
8
9         Subscribed and sworn to before me
9    this _____day of_____, 2016.
10
11   _____
11              NOTARY PUBLIC
12
13   My Commission Expires:_____
14   In re: KLORCZYK vs. SEARS, ROEBUCK & CO., et al.
15
16
17
18
19
20
21
22
23
24
25
```

**136**

```
1              E R R A T A   S H E E T
2    RE:  KLORCZYK vs. SEARS, ROEBUCK & CO., et al.
3         DEPOSITION OF:  RYAN JORGENSEN
4    PG/LN NO.  CORRECTION        REASON FOR CHANGE
5    _____:_____:_____
6    _____:_____:_____
7    _____:_____:_____
8    _____:_____:_____
9    _____:_____:_____
10   _____:_____:_____
11   _____:_____:_____
12   _____:_____:_____
13   _____:_____:_____
14   _____:_____:_____
15   _____:_____:_____
16   _____:_____:_____
17   _____:_____:_____
18   _____ I certify that I have read my deposition
19   in the above case and I request that no changes
     be made.
20   _____ I certify that I have read my deposition
21   in the above case and I request that the above
     changes be made.
22
23      SIGNATURE OF DEPONENT:_____
24                     DATED:_____
25
```

**137**

```
1              C E R T I F I C A T E
2       I, MARIE A. McCRACKEN, a Certified Court
3    Reporter within and for the States of Missouri
4    and Kansas, hereby certify that the within-named
5    witness was first duly sworn to testify the
6    truth, and that the deposition by said witness
7    was given in response to the questions
8    propounded, as herein set forth, was first taken
9    in machine shorthand by me and afterwards reduced
10   to writing under my direction and supervision,
11   and is a true and correct record of the testimony
12   given by the witness.
13       I further certify that I am not a
14   relative or employee or attorney or counsel of
15   any of the parties, or relative or employee of
16   such attorneys or counsel, or financially
17   interested in the action.
18       WITNESS my hand and official seal at
19   my office in said County and State, this _____,
20   day of _____, 2016.
21
22   _____
23   MARIE A. McCRACKEN, CSR, CCR, RPR
     Certified Court Reporter
     Missouri #874
24   Kansas #0680
25
```