## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| FREDERICK KLORCZYK, JR., as co-administrator: of  the Estate of Christian R. Klorczyk, et al., | CIVIL ACTION NO. |
| : | |
| : | 3:13-cv-00257-JAM |
| *Plaintiffs,* : | |
| : | |
| v. : | |
| : | |
| SEARS, ROEBUCK AND CO., et al., : | |
| : | |
| *Defendants.* : | OCTOBER 11, 2018 |

## LOCAL RULE 56(a)(2) STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' PUNITIVE DAMAGES CLAIM

Pursuant to Local Rule 56(a)(2), Plaintiffs Frederick Klorczyk, Jr. ("Mr. Klorczyk") and Lynne Klorczyk ("Mrs. Klorczyk"), co-administrators of the estate of Christian Klorczyk, submit this statement of fact in opposition to the Local Rule 56(a)(1) statement of facts submitted by Defendants Sears, Roebuck and Co., MVP (HK) Industries, Ltd., Wei Fu (Taishan) Machinery & Electric Co., Ltd., Shinn Fu Company of America, Inc., and Shinn Fu Corporation in support of their motion for summary judgment on Plaintiffs' punitive damages claim:

1.      The operative complaint is the Plaintiffs' Second Amended Complaint dated April 10, 2014 (ECF No. 99), which includes one of action under the Connecticut Product Liability Act ("CPLA"), Connecticut General Statutes Section 52-572m, et seq., against the five Defendants in this action: Sears, Roebuck & Co. ("Sears"), Shinn Fu Corporation ("SFC"), Shinn Fu Company of America, Inc. ("SFA"), MVP (H.K.) Industries, Ltd. ("MVP"), and Wei Fu (Taishan) Machinery & Electric Co., Ltd. ("Wei Fu").

**RESPONSE:**        **Admitted.**

2.      The allegedly defective product is a "Craftsman Heavy Duty Jack Stand, Model No. 50163" (the "jack stand"). Compl. ¶ 17.

**RESPONSE:**      **Admitted.**

3.      The Plaintiffs allege that the decedent, Christian R. Klorczyk, purchased the jack stand from a Sears department store in Waterford, Connecticut. Compl. ¶ 19.

**RESPONSE: Admitted, except Plaintiffs note that Defendants do not include the entire allegations set forth in Paragraph 19 of the Complaint (ECF No. 99).**

4.      The Plaintiffs allege that the decedent was performing an oil change on a BMW sedan at the Plaintiffs' home on March 11, 2011, using "one of the Jack Stands" to support the vehicle, when the jack stand "failed and collapsed," causing the vehicle to fall on the decedent. Compl. at ¶¶ 20-22.

**RESPONSE: Admitted, except Plaintiffs note that Defendants do not include the entire allegations set forth in Paragraphs 20–22 of the Complaint (ECF No. 99).**

5.      The Plaintiffs claim that the jack stand was defective because of its propensity for unstable engagement, such that the jack stand would look like it was fully engaged and ready to support a load, when it was not. Compl. at ¶ 25.

**RESPONSE: Admitted, except Plaintiffs note that Defendants do not include the entire allegations set forth in Paragraphs 20–22 of the Complaint (ECF No. 99).**

6.      Plaintiffs' primary liability expert, Frederick Heath, described "false engagement" as "tip to tip contact" between the jack stand's ratchet bar and the locking pawl that could be "disrupted" by an external force, and concluded that "false engagement of the support stand is more likely than not the cause of the incident at issue." Disclosure of Frederick G. Heath, Dec. 8, 2014, pp. 13, 16-17, **Ex. C**.

**RESPONSE:  Objection.  This Paragraph contains improper argument.  Without waiving their objections, Plaintiffs admit that the ratchet-and-pawl jack stand's design was defective because it permitted the occurrence of sudden, unexpected loss of ratchet bar height, *a.k.a.* false engagement, which caused Christian's death in this case.**

7.      The Plaintiffs' punitive damages claim consists of a single paragraph in the Complaint, which states: "In addition to defective design or manufacture and failure to provide adequate warnings or instructions, the harm sustained by Decedent was suffered as a result of Defendants' reckless disregard for the safety of Decedent while using the jack stand," and the prayer for relief contains a claim for "punitive damages." Compl. ¶ 31.

**RESPONSE: Objection.   This Paragraph contains improper argument. To the extent Defendants purport to represent this Paragraph is the entire basis for punitive damages claim, denied. Without waiving their objections, Plaintiffs admit that Defendants accurately quote Paragraph 31 of the Complaint (ECF No. 99) but do not include the entire allegations of the prayer for relief set forth in the Complaint (ECF No. 99).**

8.      In their recent supplemental discovery responses, served on June 25, 2018, the Plaintiffs explained the basis for their claim that the decedent's death was foreseeable to the Defendants, relying primarily on the allegation that the Defendants "had knowledge" of prior

"false engagement" incidents involving similar ratchet-and-pawl jack stands. *See* Pls.' June 25, 2018 Supplemental Disc. Responses p. 4, **Ex. F**.

**RESPONSE: Objection.  This Paragraph contains improper argument.  Plaintiffs also object on the ground that this Paragraph is misleading because Defendants cherry-pick portions of Plaintiffs' supplemental discovery responses, which speak for themselves. Without waiving their objections, Plaintiffs respond that claim that the manner in which Christian's death occurred was foreseeable and Defendants knew or should have known or anticipated that Decedent would not be aware of the risks and nature of the harm attendant to using the jack stand is based on,** *inter alia***: (1) Defendants' knowledge of prior incidents of sudden, unexpected loss of ratchet bar height,** *a.k.a.* **false engagement, in similar ratchet-and-pawl jack stands; (2) Mr. Claypool's alternative ratchet-and-pawl jack stand design proposal with a redundant locking mechanism; (3) Defendants' knowledge that their competitors including, Allied, Strongway, and Torin, had developed and implemented for sale ratchet-and-pawl jack stands with redundant locking mechanisms. (***See* **Pls' June 25, 2018 Supplemental Disc. Responses, attached as Ex. A, at 4.)**

9.     Plaintiffs paid Roger Claypool, a former SFA employee who was at one time involved in investigating certain jack stand claims for the company, $120 per hour for "litigation support" in this case, including his testimony as a fact witness. Claypool Dep. Tr. pp. 48:5-49:7; 156:4-157:3, Ex. D; Pls.' Sept. 30, 2016 Supp. Response to Interrog., **Ex. E**.

**RESPONSE:  Objection.  This Paragraph contains improper argument.  Plaintiffs also object because any compensation to Mr. Claypool is not material to Defendants' motion for summary judgment on Plaintiffs' punitive damages claim.  Plaintiffs further object to Defendants' mischaracterization of Mr. Claypool's involvement.  Mr. Claypool is a fact witness with knowledge relevant to this case based on,** *inter alia***, his 20-year tenure as an**

employee of Defendant Shinn Fu Company of America ("SFA"), and Mr. Claypool has substantial experience as a member of the American Society of Mechanical Engineers Porta Automatic Lifting Devices committee (the "ASME-PALD"), including serving as SFA's Committee Representative and Vice Chairman.  (R. Claypool Dep. Tr., cited pages attached as Ex. B, at 27:7–31:12.)

10.     The Plaintiffs supplemental discovery responses state that "Mr. Claypool concluded that false engagement was a defect that deserved industry-wide attention." *See* Pls.' June 25, 2018 Supplemental Disc. Responses p. 4, **Ex. F**.

**RESPONSE:  Objection.  This Paragraph contains improper argument.  Plaintiffs also object on the ground that this Paragraph is misleading because Defendants cherry-pick portions of Plaintiffs' supplemental discovery responses, which speak for themselves.**

11.     The Plaintiffs' supplemental responses state that despite the Defendants' knowledge of false engagement, the Defendants failed to act on "alternative and safer designs" that Mr. Claypool developed, and that the Defendants failed to provide consumers with "adequate warnings" regarding false engagement. *See* Pls.' June 25, 2018 Supplemental Disc. Responses p. 4, **Ex. F**.

**RESPONSE:  Objection.  This Paragraph contains improper argument.  Plaintiffs also object on the ground that this Paragraph is misleading because Defendants cherry-pick portions of Plaintiffs' supplemental discovery responses, which speak for themselves.**

12.     Mr. Claypool testified in his deposition that as vice chair of the committee responsible for promulgating safety guidelines regarding jack stands, he had the opportunity to put forth agenda items for the group to discuss, and never once advanced an agenda item on "false engagement." Claypool Dep. Tr. p. 233:6-18, **Ex. D**.

**RESPONSE:   Objection.   This Paragraph contains improper argument.   Plaintiffs also object to Defendants' mischaracterization of Mr. Claypool's testimony, which speaks for itself.   In addition, Mr. Claypool testified that he recalled informal discussions with ASME-PALD members about false engagement and that ASME-PALD considered recommending secondary or redundant load holding devices, but did not issue such recommendation because,** *inter alia***, the ASME-PALD standards are minimum safety standards and compliance is voluntary.   Subject to their objections, Plaintiffs admit that Mr. Claypool testified that in his role as Vice-Chair of the ASME-PALD he had the opportunity to put forth agenda items and that Mr. Claypool testified that that he did not recall putting forward a formal agenda item on false engagement.   (Ex. B, Claypool Tr. at 198:3–200:6; 233:8–234:5.)**

13.     Mr. Claypool testified about a 2004 or 2005 claim involving a claimant named Steven Bowles, in which Mr. Bowles was using two jack stands. Claypool Dep. Tr. p. 62:9-24; 189:24-190:9, **Ex. D**.

**RESPONSE:   Admitted.**

14.     Mr. Claypool testified that he did not know what model jack stands Steven Bowles was using. Claypool Dep. Tr. pp. 186:15-187:14, **Ex. D**.

**RESPONSE:   Objection.   This Paragraph mischaracterizes Mr. Claypool's testimony, which speaks for itself.   Mr. Claypool testified that Mr. Bowles used "Sears branded" jack**

stands and did not recall the specific model "off the top of [his] head."  (Ex. B, Claypool Tr. at 187:6-14.)

15.     Mr. Claypool testified that in the Bowles claim, the incident left the jack stand with paint scraped off of more than one surface. Claypool Dep. Tr. pp. 190:10-191:2, **Ex. D**.

**RESPONSE:  Objection.  The cited testimony is not material.  Plaintiffs also object because this Paragraph mischaracterizes Mr. Claypool's testimony, which speaks for itself.   In addition, Mr. Claypool testified that there was "paint removed from" "the front side of the ratchet, and the pawl side of the ratchet" but the jack stand "didn't appear physically damaged other than the – some significant removal of paint along the ratchet side."  (Ex. B, Claypool Tr. at 190:10-15; 63:22–64:5.)**

16.     Mr. Claypool testified that he did not know which lift points were used for the jack stands in the Bowles claim, as he did not attempt to perform an accident reconstruction, and he is not a qualified accident reconstructionist. Claypool Dep. Tr. pp. 188:15-189:8, **Ex. D**.

**RESPONSE:  Objection.  The cited testimony is not material.  Plaintiffs also object because this Paragraph mischaracterizes Mr. Claypool's testimony, which speaks for itself. In addition, Mr. Claypool testified that a questionnaire completed by Mr. Bowles indicated where he had placed the jack stands under the vehicle and that Mr. Claypool did not recall that information or retain a copy.  (Ex. B, Claypool Tr. at 188:24–189:3.)  Subject to their objections, Plaintiffs admit that Mr. Claypool did not perform an accident reconstruction and is not an accident reconstructionist.**

17.     Mr. Claypool testified that the Bowles claim convinced him that "false engagement" could be a real issue. Claypool Dep. Tr. pp. 62:9-65:6, 70:10-71:2, **Ex. D**.

**RESPONSE:   Objection.   This Paragraph mischaracterizes Mr. Claypool's testimony, which speaks for itself.  In addition, Mr. Claypool testified that the Bowles claim convinced him that false engagement <u>is</u> a real issue.  (Ex. B, Claypool Tr. at 62:9-65:6, 70:10-71:2.)**

18.     While he was working for SFA, Mr. Claypool wrote to managers at MVP that he did not believe the jack stand at issue in the Bowles claim failed at all. January 13, 2005 Email, **Ex. G**.

**RESPONSE:  Objection.  The cited testimony is not material and is an improper opinion.**

19.     Mr. Claypool testified about seven other jack stand incidents, and he either did not have any substantive information, or had information indicating that the circumstances were different from the present case and did not involve "false engagement." Claypool Dep. Tr. 108:5-23; 128-31; 182:15-186:14; 191:11-198:2, **Ex. D**.

**RESPONSE:  Objection.  The cited testimony is not material.  Plaintiffs also object because this Paragraph mischaracterizes Mr. Claypool's testimony, which speaks for itself.   In addition, Mr. Claypool testified that the Raymond claim involved a sudden loss of ratchet height, *a.k.a.* false engagement (Ex B, Claypool Tr. at 80:21–81:2) and that the Hadstedt claim involved sudden and unexpected loss of load height (*Id.* at 192:22–194:6).  Subject to their objections, Plaintiffs admit that Mr. Claypool's testimony does not identify the Jeffcoat, Guerra, Zinn, Sloan, or Finley claims as involving a sudden loss of ratchet height, *a.k.a.* false engagement.**

-8-

20.     Mr. Claypool testified about a claimant named "Jeffcoat" from the late 1990s or early 2000s, whose case involved the use of six unmatched jack stands to support a Lincoln Towncar that was bumped by another person. Claypool Dep. Tr. pp. 182:15-185:16, **Ex. D**.

**RESPONSE:   Objection.   This Paragraph mischaracterizes Mr. Claypool's testimony, which speaks for itself.  In addition, Mr. Claypool testified that the Jeffcoat claim involved the use of three pairs of unmatched jack stands (two 6-ton jack stands, two 3-ton jack stands, and two 2-ton jack stands) and that he "suspected" the oldest son "leaned" on the rear of the vehicle.  (Ex. B, Claypool Tr. at 182:15–184:24.)**

21.     Mr. Claypool testified about a claimant named "Guerra" from the mid-2000s, whose case involved a bus supported by two six-ton jack stands on an unstable soil surface. Claypool Dep. Tr. pp. 185:17-186:14, **Ex. D**.

**RESPONSE:  Admitted.**

22.     Mr. Claypool testified about a claimant named "Finley" where the customer overloaded a pair of three-ton jack stands with a $36,000 freightliner. Claypool Dep. Tr. p. 108:5-23, **Ex. D**.

**RESPONSE:  Admitted.**

23.     Mr. Claypool testified about a claimant named "Raymond" but did not provide any details except to say that it was a wrongful death case involving an alleged jack stand failure. Claypool Dep. Tr. pp. 128-31, **Ex. D**.

**RESPONSE:   Objection.   This Paragraph mischaracterizes Mr. Claypool's testimony, which speaks for itself.   In addition, Mr. Claypool testified that the Raymond claim involved a sudden loss of ratchet height, a.k.a. false engagement. (Ex. B, Claypool Tr. at 80:21–81:2.)  Further, Mr. Claypool's testimony is not the only evidence concerning the**

**Raymond claim.  Defendants produced documents supporting Mr. Claypool's testimony that the Raymond claimed involved a sudden loss of ratchet height.  (SFA Dep. Tr. (A. Chaykin), cited pages and exhibits attached as Ex. C, at 80:21-81:2, SFA Dep. Ex. 12.)**

24.     Mr. Claypool testified about three other purported occurrences in the early 2000s, with claimants named Hastedt, Zinn, and Sloan, where Mr. Claypool could provide little information. Claypool Dep. Tr. pp. 192:22-198:2, **Ex. D**.

**RESPONSE: Objection.  This Paragraph mischaracterizes Mr. Claypool's testimony, which speaks for itself.  In addition, Mr. Claypool testified that the Hadstedt claim involved sudden and unexpected loss of load height.  (Ex. B, Claypool Tr. at 192:22–194:6.)  Without waiving their objections, Plaintiffs admit that Mr. Claypool's testimony does not identify the specific defect alleged in the Zinn and Sloan claims.**

25.     Mr. Claypool testified that most all jack stands involved in an incident would be "crushed" and would have an "obvious physical deformity." Claypool Dep. Tr. pp. 191:11-192, **Ex. D**.

**RESPONSE:  Objection.  The cited testimony is not material and is improper opinion.**

26.     Plaintiffs produced four pages of material regarding Roger Claypool's "alternative and safer designs" referenced in the Plaintiffs' supplemental discovery responses, two of which are blank, and two of which appear to be freehand pencil drawings. Claypool Design Drawings, **Ex. Q**.

**RESPONSE: Objection.  This Paragraph is improper argument and opinion.  Without waiving their Objections, Plaintiffs admit that Defendants' Exhibit Q is the alternative ratchet-and-pawl jack stand design proposal that Mr. Claypool submitted during the course of his employment at SFA.**

27.     Mr. Claypool testified that he never built prototypes of his proposed "alternative and safer designs," never tested them to make sure that they would work, and never figured out how much it would cost to make them. Claypool Dep. Tr. pp. 200:19-205:25, **Ex. D**.

**RESPONSE:  Objection.  The cited testimony is not material.**

28.     Roger Claypool testified that he never recommended adding a warning to specifically address "false engagement." Claypool Dep. Tr. p. 181:7-10, **Ex. D**.

**RESPONSE:  Objection.  The cited testimony is not material.**

29.     The Defendants produced documents regarding a 2018 claim on behalf of Dion Penberthy, where the ratchet bar of a jack stand model that is not at issue in this case snapped in half. Penberthy Demand Letter & Photographs, **Ex. I**.

**RESPONSE:  Objection.  The cited documents are hearsay and are not material.**

30.     The Defendants produced documents regarding a 2015 product return where the only information available is a claims note, in an electronic file titled "Becignuel," from Sedgwick Risk Management stating: "We had a customer return a jack stand, he stated he was under the care when the stand broke (he was not injured). Not sure if it was due to customer's neglect, but wanted to let someone know in case of defect with this product." Becigneul Claims Note, **Ex. J**.

**RESPONSE:  Objection.  The cited documents are hearsay and are not material.**

31.     Sears' Director of Product Safety, Kathryn Guerra, testified that she could not get any more information about the Becigneul incident or the product, because it was handled as a regular product return since there was no injury and no property damage. Guerra Dep. Tr. pp. 15:12-13, 32:5-33:3, **Ex. K**.

**RESPONSE:  Objection.  The cited testimony and documents are hearsay and are not material.**

32.     The Defendants produced documents regarding a 2008 property damage claim by Frank Duenas involving a model of jack stand that is not at issue in this case, in which the jack stands, which bent, were placed under the four corners of the claimant's vehicle, in contravention of the product warnings stating: "Use a matched pair of jack stands per vehicle to support 1 end only. Use 1 pair per vehicle only." Duenas Claim Notes pp. 2-3, **Ex. L**; SFA Letter to F. Duenas, **Ex. M**.

**RESPONSE:   Objection.   This Paragraph contains improper argument and opinion. Plaintiffs also object because the cited documents and testimony are hearsay and are not material.**

33.     The Defendants produced documents regarding a 2004 claim on behalf of Christopher Raymond, which resulted in a wrongful death lawsuit that was settled for $100,000. Raymond Complaint, **Ex. N**; Raymond Factual Summary Letter, Jan. 5, 2007, **Ex. O**; Raymond Settlement Summary Letter, Apr. 3, 2007, **Ex. P**.

**RESPONSE:  Admitted.**

34.     The jack stands at issue in the Christopher Raymond claim were a different model than the Craftsman 50163 jack stands, one or more of them physically deformed, and a paint transfer indicated that the jack stands were placed under a live element of the claimant's vehicle's suspension. (*See* Raymond Complaint, **Ex. N**; Raymond Factual Summary Letter, Jan. 5, 2007, **Ex. O**; Raymond Settlement Summary Letter, Apr. 3, 2007, **Ex. P**.)

**RESPONSE:  Objection.  This Paragraph contains improper argument and opinion.  In addition, the jack stands at issue in the Raymond claim were Defendants' 3.5-ton ratchet-and-pawl design jack stands.  (*See* Raymond Compl., attached as Ex. D, ¶ 12.)**

35.     The Plaintiffs produced a jack stand manual that shows that users are instructed "to ensure ratchet bar is secure before loading" and "to ensure vehicle is secure before working on, around or under," and warned that "[f]ailure to heed product markings or warnings may result in personal injury or property damage." Operators Manual, **Ex. R**.

**RESPONSE:  Admitted, except Plaintiffs note that Defendants do not quote the entire Operators Manual.**

36.     Both SFA's current Engineering Manager and Wei Fu's Assistant Vice President and Manager of the Engineering from the time when the jack stands were produced testified that the subject jack stands complied with controlling regulations, which were set forth in Part 4 of the "Safety Standard for Portable Automotive Lifting Devices" promulgated by the Portable Automotive Lifting Devices Committee of the American Society of Mechanical Engineers. Jorgensen Dep. Tr. p. 29:4-16, Ex. S; Su Chien Chi Dep. Tr. 134:2-11, 161:6-11, **Ex. T**; ASME-PALD 2009 Standards Excerpt, Ex. U.

**RESPONSE: Objection.   This Paragraph contains improper argument and opinion.  Plaintiffs also object to the ASME-PALD Standards Excerpt as hearsay.  Without waiving**

their objections, Plaintiffs deny that the ASME-PALD standards are "controlling regulations." ASME-PALD publishes minimum safety standards as industry guidance and compliance is voluntary. (Ex. B, Claypool Tr., at 27:7–31:12, 199:14-24; R. Jorgensen Dep. Tr., cited pages attached as Ex. E, at 98:12–14; J. Arruda Dep. Tr., cited pages attached as Ex. F, at 77:2-6.)

37.     Both Roger Claypool and Frederick Heath were on the Standards Committee responsible for creating the "Safety Standard for Portable Automotive Lifting Devices" regulations. ASME-PALD 2009 Standards Excerpt p. 2, **Ex. U**.

**RESPONSE:  Objection.  Plaintiffs object to the ASME-PALD Standards Excerpt as hearsay.  Plaintiffs also object that the cited document is not material.  Without waiving their objections, Plaintiffs deny that the ASME-PALD standards are "regulations." ASME-PALD publishes minimum safety standards as industry guidance and compliance is voluntary.   Mr. Claypool's experience with ASME-PALD, includes serving as SFA's Committee Representative and Vice Chairman of the ASME-PALD.  (Ex. B, R. Claypool Tr. at 27:7–31:12, 199:14-24; Ex. E, R. Jorgensen Tr., at 98:12–14; Ex. F, J. Arruda Tr. at 77:2-6.)  Mr. Heath's experience with ASME-PALD, includes serving as Chairman.  (F. Heath Dep. Tr., cited pages attached as Ex. G, at 83:5-13.)**

38.     The subject Craftsman 50163 jack stands were manufactured at the Wei Fu Factory, which a third-party certified as being ISO-compliant. Su Chien Chi Dep. Tr. pp. 90:3-14, 93:24-94:1, 165:18-166:25, **Ex. T**.

**RESPONSE:  Objection.  The cited testimony and documents are not material.  Plaintiffs also object to the extent that Defendants' reference to a third-party certification constitutes improper argument and is based on hearsay.  Without waiving their objections, Plaintiffs admit that the subject jack stands were manufactured at the Wei Fu factory in China.**

39.     Wei Fu's Vice President and Manager of the Engineering when the jack stands were produced testified that the factory followed ISO 9001, an international quality control system that controlled all quality control activities, including product measurement, analysis, and improvement. Su Chien Chi Dep. Tr. pp. 165:18-166:8, **Ex. T**.

**RESPONSE:  Objection.  This Paragraph contains improper argument and opinion.   The cited testimony and documents not material.  Plaintiffs also object to Defendants' reference to ISO standards as hearsay.**

40.     Wei Fu's third-party certification required documentation of all Wei Fu's processes, and third-party verification of compliance with the ISO standard. Su Chien Chi Dep. Tr. p. 166:9-18, **Ex. T**.

**RESPONSE:  Plaintiffs incorporate their response to Paragraph 39.**

41.     Wei Fu's ISO standard compliance was verified annually, and its certification of compliance was renewed every three years. Su Chien Chi Dep. Tr. p. 166:19-25, **Ex. T**.

**RESPONSE:  Plaintiffs incorporate their response to Paragraph 39.**

42.     The Wei Fu factory fulfilled Sears' vendor accreditation program, which was based on Sears' review of is quality and safety processes. Guerra Dep. Tr. p. 234:22-237:7, Ex. K; Vendor Factory Accreditation Report, **Ex. V**.

**RESPONSE:   Objection.   This Paragraph contains improper argument.    The cited testimony and documents are not material.  Plaintiffs also object to Defendants' reference to Sear's processes as hearsay.**

43.     Wei Fu's Vice President and Manager of Engineering testified that the Craftsman 50163 jack stands were tested and approved for production as a new design at the factory, and also tested and approved by the client, Sears. Su Chien Chi Dep. Tr. p. 167:1-23, **Ex. T**.

**RESPONSE: Objection.   This Paragraph contains improper argument.   The cited testimony and documents are not material.  Plaintiffs also object to Defendants' references to testing and approval processes as hearsay.**

44.     During production of the Craftsman 50163 jack stands, every single ratchet bar was tested before it got to the production line, and every single unit was tested to make sure that the ratchet bar fully engaged with the pawl. Su Chien Chi Dep. Tr. pp. 167:24-169:3, **Ex. T**.

**RESPONSE:   Objection.   This Paragraph contains improper argument.   The cited testimony and documents are not material.  Plaintiffs also object to Defendants' references to testing processes as hearsay.**

45.     During production of the Craftsman 50163 jack stands, a random sample of packaged products was selected for center and off-center load testing. Su Chien Chi Dep. Tr. pp. 169:7-170:11, **Ex. T**.

**RESPONSE:   Objection.   This Paragraph contains improper argument.   The cited testimony and documents are not material.  Plaintiffs also object to Defendants' references to testing processes as hearsay.**

46.     During production of the Craftsman 50163 jack stands, once the units were packaged, they were subjected to spot-testing. Su Chien Chi Dep. Tr. p. 169:4-6, **Ex. T**.

**RESPONSE:   Objection.   This Paragraph contains improper argument.   The cited testimony and documents are not material.   Plaintiffs also object to Defendants' references to testing processes as hearsay.**

47.     The batch containing the subject jack stands was subjected to spot-testing, with every single unit passing the test. Spot-Testing Results, **Ex. W**; Su Chien Chi Dep. Tr. pp. 170:12-171:25, **Ex. T**; Function & Loading Test Document, **Ex. X**.

**RESPONSE:   Objection.   This Paragraph contains improper argument.   The cited testimony and documents are not material.   Plaintiffs also object to Defendants' references to testing processes as hearsay.   Without waiving their objections, Plaintiffs deny that the cited materials are evidence of testing with respect to the subject jack stands (Serial numbers GT1010009618 and GT1010009619) (ECF No. 296-23; Su Chien Dep. Tr., cited pages attached as Ex. H, at 173:13–20.)**

48.     During production of the Craftsman 50163 jack stands, the jack stands repeatedly passed third-party testing administered by Intertek, on behalf of Sears Holdings Global Sourcing. Guerra Dep. Tr. pp. 111:21-117:4, **Ex. K**; Intertek Test Reports, **Ex. Y**.

**RESPONSE: Objection.   This Paragraph contains improper argument.   The cited testimony and documents are not material.   Plaintiffs also object to Defendants' references to Intertek testing as hearsay.**

49.    The Craftsman 50163 jack stands had an on-product warning that "[f]ailure to heed product markings or warnings may result in personal injury or property damage." Police Photograph of Subject Jack Stand, **Ex. H**.

**RESPONSE:  Admitted.**

50.    Both the manual and the on-product warnings encompass all of the warnings required by the ASME-PALD standard, which are set forth in Part 4-3, entitled SAFETY MARKINGS AND MESSAGES, as well as additional warnings that are not required by ASME-PALD. ASME-PALD 2009 Standards Excerpt pp. 3, 6, **Ex. U**.

**RESPONSE:  Objection.  This Paragraph contains improper argument.  Plaintiffs also object to the ASME-PALD Standards Excerpt as hearsay.  Plaintiffs further object that the cited document is not material.  Without waiving their objections, Plaintiffs deny that the ASME-PALD standards are requirements.  ASME-PALD publishes minimum safety standards as industry guidance and compliance is voluntary.  (Ex. B, Claypool Tr., at 27:7–31:12, 199:14-24; Ex. E, R. Jorgensen Tr., at 98:12–14; Ex. F, J. Arruda Tr., at 77:2-6.)**

51.    Plaintiffs have never asserted that the subject jack stands failed to comply with any applicable regulation.

**RESPONSE:  Objection.  This Paragraph contains improper argument and is not material.**

52.    SFA sold over 500,000 pairs of jack stands from 2010 through 2017, which equals over one million individual stands. SFA's sales data for ratchet-and-pawl jack stands, **Ex. Z**.

**RESPONSE:  Objection.  This Paragraph is not material.**

## II.   ADDITIONAL MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT

1.     Mr. Klorczyk is an automotive enthusiast and self-proclaimed "car buff."  From an early age, Mr. Klorczyk's father taught him about working on cars, including how to perform do-it-yourself jobs such as oil changes.  Mr. Klorczyk passed on this knowledge to his son, Christian, who also grew up with a passion for cars.  (F. Klorczyk Dep. Tr., cited pages attached as **Ex. I**, at 39:23–40:4, 86:7–19, 158:6–160:11; L. Klorczyk Dep. Tr., cited pages attached as **Ex. J**, at 33:1–37:1, 278:6–17.)

2.     As of March 11, 2011, Christian was 21 years old and less than two months away from graduating with honors from the University of Connecticut with a degree in finance.  (Ex. J, L. Klorczyk Tr. at 81:9–8:16; UConn Transcript and (Posthumous) Diploma, attached hereto as **Ex. K**.)

3.     Christian, who was on Spring Break, had spent several days skiing and snowboarding in Killington, Vermont, before returning home to Waterford, Connecticut. Christian drove the family-owned BMW to and from Killington, and the BMW often was used for such trips because it was all-wheel drive.  (Ex. J, L. Klorczyk Tr. at 87:17–22, 122:15–25.)

4.     On March 11, 2011, Mr. Klorczyk was away visiting Plaintiffs' oldest son (Frederick) in New York City, and Plaintiffs' youngest son (Parker) was away at boarding school in Oakdale, Connecticut.  Mrs. Klorczyk left for work at 6:30 a.m., leaving Christian home alone.  (Ex. I, L. Klorczyk Tr. at 97:20–99:7; Ex. J, F. Klorczyk Tr. at 204:18–20.)

5.     After Mrs. Klorczyk left for work, Christian began the process of changing the oil in the BMW.  The BMW was parked straight inside the center bay of the Klorczyks' attached three-car garage, with the front-end facing the back wall of the garage and the rear-end facing the center bay exterior garage door.  The passenger-side of the BMW was adjacent to the first bay closest to the residence and facing the doorway entrance to the home.  The driver-side of the BMW was adjacent to the third bay furthest from the residence and facing away from the

doorway entrance to the home.  The parking brake was engaged and manual transmission in gear.  The exterior garage doors were closed and the overhead garage lights turned on.  A twin-head halogen light stand was positioned near the front passenger-side of the BMW with both lights turned on.  (Ex. J, L. Klorczyk Tr. at 122:7–8, 126:11–25, 130:3–8, 139:18–140:7; Ex. I, F. Klorczyk Tr. at 207:22–208:5, 304:13–25, 368:16–17.)

6. There were a total of four Sears Craftsman ratchet-and-pawl design jack stands in the Klorczyk's garage, two of the subject 4-ton jack stands (Sears Model No. 50163) and two 3.5-ton jack stands (Sears Model No. 50157).  The 4-ton jack stands (serial numbers GT1010009618 and GT1010009619) were brand new and had not been used since Christian purchased them at the local Sears store in Waterford on January 1, 2011.  (Ex. I, F. Klorczyk Tr. at 46:17–19, 35:8–23, 121:2–9, 152:16–20; Sears Receipt, attached as **Ex. L**.)

7. The jack stand is a device utilized to support a motor vehicle in an elevated position, permitting, among other things, access to the underside of a motor vehicle for purposes of repair work, servicing and maintenance.  Defendants' ratchet-and-pawl design jack stand utilizes a single locking mechanism that relies on full and complete engagement between the tip of the locking pawl and grooved indentations that run along the toothed side of the ratchet bar. (Jack Stand Operators Manual, attached as **Ex. M**.)

8. The front passenger-side of the BMW was raised and the front passenger-side tire removed and placed beneath the front passenger-side brake rotor.  Mr. Klorczyk taught Christian to remove and position the tire in this way as a safety measure when working underneath a vehicle.  (Ex. I, F. Klorczyk Tr. at 107:23–108:20, 207:22–208:5, 214:4–6.)

9. A 4-ton jack stand was placed beneath the front passenger-side of the BMW inboard of the front passenger-side wheel well.  Mr. Klorczyk taught Christian to position the jack stand in this location so that the saddle on top of the ratchet bar was in contact with the longitudinal steel engine frame, allowing the jack stand to support the vehicle in an elevated

position after using the service jack to raise the vehicle and transfer the load to the jack stand. (Ex. I, F. Klorczyk Tr. at 161:12–15, 208:7–14, 242:17–243:1, 341:11–17; Photograph of BMW underbody, P002_0070, attached as **Ex. N**.)

10.     The service jack was positioned away from the BMW and placed upright and parallel to the passenger-side with the lifting arm fully depressed and the lifting handle removed from the socket and placed next to the base.  Mr. Klorczyk taught Christian to position the service jack in this way so that it was removed away from the vehicle after transferring the load to the jack stand.  The service jack was not used to support the vehicle after the load was transferred to the jack stand.  (Ex. G, F. Klorczyk Tr. at 94:10–95:19, 107:1–9, 161:12–15, 208:20–23, 218:12–219:10, 385:12–386:4.)

11.     Christian, lying on a mechanic's creeper, rolled under the BMW from the front-end and was facing the underbody.  Christian's lower legs and feet were protruding out from the front bumper, his sternum was beneath the rear lateral engine frame cross-member and manual transmission and his face was further to the rear beneath the transmission assembly.  Christian, using a wrench in his right hand, was in the process of tightening the oil drain plug when the BMW collapsed crushing his face and chest.  (Ex. I, F. Klorczyk Tr. at 55:22–57:12, 207:22–208:5, 232:24–233:7, 383:15–384:17; Ex. J, L. Klorczyk Tr. at 126:24–127:4, 136:10–14.)

12.     Mr. and Mrs. Klorczyk arrived home together at approximately 3:30 p.m.  Mrs. Klorczyk opened the interior garage doorway, saw Christian's legs sticking out from the front bumper and realized he was under the BMW.  Mrs. Klorczyk stood in the doorway calling for Christian; he did not respond.  Mr. and Mrs. Klorczyk entered the garage as Mrs. Klorczyk called 911.  (Ex. I, L. Klorczyk Tr. at 106:13–22, 126:11–128:2; Ex. J, F. Klorczyk Tr. at 204:1716.)

13.     The front passenger-side of the BMW was titled downward, but the exposed brake rotor was not in contact with the removed tire.  Mr. Klorczyk ran to the front passenger-side wheel well, pulled the tire out and crawled underneath the BMW to see Christian's face

being crushed by the transmission assembly and Christian's chest being crushed by the real lateral engine frame cross-member.  Christian's right hand was holding the wrench, which was connected to the oil drain plug.  (Ex. I, F. Klorczyk Tr. at 207:22–208:11, 213:2–215:21, 232:24–233:8; Ex. J, L. Klorczyk Tr. at 136:10–14, 138:22–139:5, 157:4–24.)

14.     The size and nature of the crush injuries to Christian's sternum are consistent with the underbody components of the rear lateral engine frame cross-member and manual transmission.  The size and nature of the crush injuries to Christian's right cheek and face are consistent with the underbody components of the transmission assembly and transmission fluid drain plug.  (F. Heath Rebuttal Dep. Tr., cited pages and exhibits attached as **Ex. O**, at 80:15–81:3 and Heath Rebuttal Dep. Ex. 3 (Heath Rebuttal Report), at 6–7; Photograph of BMW underbody, P002_0075, attached hereto as **Ex. P**.)

15.     Mr. Klorczyk observed the 4 ton jack stand in the front passenger-side area inboard of the front passenger-side wheel well.  The jack stand was on its side with the top of the ratchet bar facing the exterior garage door and the ratchet bar fully depressed in to the neck collar of the jack stand.  The underside of the BMW was not in contact with the jack stand.  The other three jack stands were next to one each away from the BMW near the front driver-side.  (Ex. I, F. Klorczyk Tr. at 77:7–10, 78:5–12, 208:11–14, 215:18–217:11, 388:23–389:19, 398:8–22.)

16.     Mr. and Mrs. Klorczyk observed the service jack positioned upright and parallel to the passenger side of the BMW with the lifting arm fully depressed and the lifting handle removed from the socket and placed next to the base.  Mr. Klorczyk inserted the lifting handle in to the socket, wheeled the service jack under the passenger-side and pumped the lifting handle, raising the lifting arm so as to lift the BMW off of Christian.  (Ex. I, F. Klorczyk Tr. at 208:20–209:7, 217:12–220:13, 385:12–388:15; Ex. J, L. Klorczyk Tr. at 128:3–131:8, 162:25–163:13.)

17.     Mr. Klorczyk crawled under the BMW, turned the jack stand that was on its side upright and raised the ratchet bar so that it was in contact with the front passenger-side underbody of the BMW.  (Ex. I, F. Klorczyk Tr. at 209:12–16, 220:15–221:9, 388:23–391:17.)

18.     After Mr. Klorczyk lifted the BMW off of Christian, Mrs. Klorczyk observed the jack stand on its side beneath the front passenger-side area.  Mrs. Klorczyk watched Mr. Klorczyk crawl under the BMW, turn the jack stand upright and raise the ratchet bar in the same manner described above.  (Ex. J, L. Klorczyk Tr. at 131:9–135:13, 267:22–269:25.)

19.     Geoffrey Hausmann was the first emergency responder to arrive at the Klorczyk garage.  As he arrived at the scene, Mr. Hausmann observed Mr. Klorczyk assembling the lifting handle in to the socket so as to elevate the lifting arm and lift the BMW off of Christian.  Mr. Hausmann crawled under the BMW, and observed the jack stand in the same position described by Mr. and Mrs. Klorczyk – beneath the front passenger-side of the BMW.  (G. Hausmann Dep. Tr., cited pages and exhibits attached as **Ex. Q**, at 20:6–10, 32:16–23, 33:16–35:14, 48:6–50:7 and Hausmann Dep. Exs. 4, 5.)

20.     The ratchet-and-pawl design of the subject Craftsman 50163 Model jack stand is susceptible to sudden and unexpected loss of ratchet bar height as a result of the condition known as false engagement.  False engagement can occur when the tip of the locking pawl fails to engage completely with the grooved indentations that run along the toothed side of the ratchet bar; the jack stand is susceptible to failure when the tip of the locking pawl fails to engage and rests on the edge of a tooth on the ratchet bar.  False engagement is also referred to as point-to-point engagement.  (Ex. G, F. Heath Tr., at 64:18–65:18, 100:17–24 and Heath Dep. Ex. 3 (Heath Report) at 12–13; Photo of False Engagement on Exemplar Jack Stand, KLORCZYK003301, attached hereto as **Ex. R**.)

21.     The subject Craftsman 50163 Model jack stand is susceptible to false engagement.  The ratchet-and-pawl design is capable of supporting a load equivalent to the

weight of the BMW without being completely engaged, giving the user the false sense that the jack stand is safe when in fact it is subject to sudden, unexpected loss of ratchet bar height.  The circumstances surrounding the collapse of the BMW are most consistent with the occurrence of false engagement, and it is more probable than not that false engagement caused the collapse; metal failure and tip over were eliminated as potential alternative causes.  (Ex. G, F. Heath Tr. at 114:21–116:22 and Heath Dep. Ex. 3 (Heath Report), at 11–13; Ex. B, R. Claypool Dep. Tr. at 81:15–82:4; Ex. C, SFA Tr. (A. Chaykin), at 130:7–131:15, 133:14–17.)

22.    Defendants SFA, Wei Fu, MVP (Taishan) Machinery & Elec. Co., Ltd. ("MVP"), and Shinn Fu Corporation ("SFT") (collectively, the "Shinn Fu Defendants") are corporate affiliates that share common directors and leadership.  SFA, Wei Fu and MVP operate under the direction and control of SFT.   (Ex. B, R. Claypool Tr. at 22:24–26:11, 32:21–34:24, 40:23–41:18, 90:20–93:13, 95:13–17 and Claypool Ex.4; Ex. C, SFA Tr. (A. Chaykin) at 37:9–38:5, 41:4–13; SFA003233–35 attached hereto as **Ex. S**.)

23.    The subject Craftsman 50163 Model jack stand was manufactured by Wei Fu (ECF No. 256, Wei Fu Ans. ¶ 16), and the subject jack stand was distributed to Sears by MVP (ECF No. 253, MVP Ans. ¶ 16).  SFA provided customer support services with respect to the subject jack stand, and SFA's corporate phone number is listed in the subject jack stand Operators Manual.  (Ex. C, SFA Tr. (A. Chaykin) at 9, 64, 80 and  SFA Dep. Ex. 6.)

24.    Defendants were aware, prior to March 11, 2011, that the ratchet-and-pawl design jack stand permitted the occurrence of false engagement and that the occurrence of false engagement in a jack stand under load could result in serious bodily injury or death.   Mr. Claypool had numerous discussion with SFA's General Counsel, Arthur Chaykin, concerning false engagement.  The topic of false engagement also was discussed by members of the ASME-PALD committee, including Mr. Claypool and Defendants' committee representatives.  (Ex. B,

R. Claypool Tr. at 50:8–13, 59:16–60:19, 63:6–64:14, 67:15–71:2, 75:5–77:13; Ex. C, SFA Tr.

(A. Chaykin) at 62, 71, 130:7–134:3; Ex. A, Pls' Suppl. Interrog. Resps. at 3–4.)

     25.     Mr. Claypool testified that he was convinced that false engagement was possible,

and was *not* a phantom condition, in the course of investigating a claim made by Steven Bowles,

in or about 2004.  Mr. Bowles alleged a previously loaded ratchet bar on one of Defendants' jack

stands unexpectedly dropped, causing the load to drop and pinning him underneath the vehicle

he was working on until first responders arrived.  Mr. Bowles alleged physical injury and sought

damages for pain and suffering, medical bills and lost wages.  Mr. Claypool recommended that

Defendants settle the Bowles claim because, *inter alia*, "I just don't have a lot of confidence that

a jury wouldn't take notice and not think badly (i.e. $$$) of us."  (Ex. B, Claypool Tr. at 62–64;

January 2005 E-mail Chain, attached as **Ex. T**.)  In the course of investigating the Bowles claim,

Mr. Claypool took it upon himself to conduct informal testing.  He testified that he was able to

create a false engagement and that, on more than one occasion, the ratchet "simply collapse[d]."

Mr. Claypool also testified that he submitted a proposal for an alternative jack stand design with

a secondary locking mechanism.  Defendants failed to act on Mr. Claypool's proposal.  (Ex. B,

Claypool Tr. at 71, 77–78.)

     26.     The Bowles claim was not an isolated incident.  In 2006, Jennifer Raymond,

administrator of the estate of Christopher Raymond, filed a lawsuit after her husband,

Christopher Raymond, was crushed to death following the failure of Defendants' 3.5-ton ratchet-

and-pawl jack stands.  (Ex. D, Raymond Complaint; Ex. C, SFA Tr. (A. Chaykin) Ex. 12.)  Mr.

Claypool investigated the Raymond claim and testified that the claim involved allegations of

sudden, unexpected loss of ratchet height.   (Ex. B, Claypool Tr. at 80:21-81:2.)  Mr. Claypool

also testified that a claim by an individual with the last name Hadstedt involved allegations of

sudden, unexpected loss of ratchet height.  (Ex. B, Claypool Tr. at 192:22-194:6.)

27.     Mr. Claypool was not the only employee with knowledge that the ratchet-and-pawl design jack stand was susceptible to false engagement.  Upper management, including Steven Huang, the present of SFA, were made aware of all claims, including the Bowles, Raymond, and Hadstedt claims, and that false engagement could occur and result in serious physical injury.  Defendants admit their knowledge of false engagement prior to March 11, 2011. (Ex. B, Claypool Tr. at 67, 69–70, 74–75; Ex. C, SFA Tr. (A. Chaykin) at 130–31; Ex. T.)

28.     Defendants were in a position to protect users such as Christian by means of alternative designs that utilized, among other features, redundant or secondary locking mechanisms, including a redundant locking pin, to prevent loss of ratchet bar height due to false engagement.  In the course of his employment with SFA, Roger Claypool developed plans for such an alternative design.  Defendants admit the feasibility of a ratchet-and-pawl jack stand design that incorporates a redundant locking mechanism, and that the cost to add a redundant locking mechanism was insignificant.  (Ex. C, SFA Tr. (A. Chaykin) at 137, 166, 172:6-14.) Nevertheless, Defendants did not act on Mr. Claypool's proposal  and arbitrarily terminated a trial "product development" project to design a ratchet-and-pawl jack stand that "would be locked in more than one location."   Defendants claim they do not have any documents concerning the project.  (Ex. B, Claypool Tr. at 71, 77–78; Ex. C, SFA Tr. (A. Chaykin Dep.) at 149, 153–56.)

29.     In contrast to Defendants' inaction, industry peers and competitors, including Allied, Torin and Strongway developed and implemented for sale jack stands with such additional safety features.  Defendants currently sell a ratchet and pawl design jack stand with redundant locking features.  The presence of a redundant locking feature in the subject jack stand would have prevented the BMW from collapsing on to Christian.  (Ex. B, R. Claypool Tr. at 70:10–71:2,    77:2–81:11,    82:25–83:20;    R.    Claypool    Alternative    Design    Plans, KLORCZYK004882, 004884, attached as **Ex. U**; Ex. C, SFA Tr. (A. Chaykin) at 145:20–146:4,

148:8–149:22, 153:17–154:25, 160:11–23, 139:17–170:21, 171:21–172:14 and SFA Dep. Ex. 15; Ex. H, Wei Fu Dep. Tr. (Su Chien Chi) at 126:12–131:14; Ex. I, F. Klorczyk Tr. at 270:25–271:9; Ex. A, Pls' Suppl. Interrog. Resps. at 4; Ex. G Heath Dep. Ex. 3 at 14–15.)

30.     Neither the Operators Manual nor the on-product labels for the subject 4-ton jack stands provide adequate or appropriate warnings or instructions concerning false engagement. Specifically, nothing in the Operators Manual or the on-product labels informs the user that the tip of the pawl may not fully engage with the grooved indentations of the ratchet bar, or that the jack stand may be capable of supporting load without the pawl being fully engaged with the ratchet bar.  In contrast, industry peers and competitors, including Sealey Quality Machinery, developed warnings and instructions for products comparable to the subject jack stands that provide warnings related to the crush hazard posed by false engagement.  (Ex. M, Jack Stand Operators Manual; E. Boelhouwer Dep. Tr., cited pages and exhibits attached as **Ex. V**, at 75:17–76:21, 77:14–24, 80:8–84:1, 98:19–99:23, 164:10–165:3, 173:8–25, 195:10–18, and Boelhouwer Dep. Ex. 11 (Report) at 3–5, 8–9 and Dep. Ex. 12.)

31.     False engagement is not an obvious hazard because, among other things, the base frame of the jack stand limits the user's ability to observe whether the locking pawl is fully engaged with the ratchet bar.  False engagement gives the user the false sense that the jack stand is safe when in fact it is subject to sudden, unexpected loss of ratchet bar height.  Neither the Operators Manual nor the on-product labels provide adequate or appropriate warnings or instructions concerning the hazard posed by false engagement.  The Operators Manual and on-product labels are ambiguous in that it is not clear if the rated capacity relates to the capacity of the jack stands as a pair or the capacity of a single jack stand.  (Ex. M, Jack Stand Operators Manual; Ex. G, F. Klorczyk Tr. at 145:8–24, 200:22–201:2, 202:2–8; Ex. V, E. Boelhouwer Tr. at 58:3–13, 62:14–21, 80:8–81:5, 87:6–24, 149:19–150:25, 158:13–159:22, 163:14–22, Boelhouwer Dep. Ex. 11 (Report) at 5–8.)

32.     Defendants were in a position to provide adequate and appropriate warnings and instructions concerning the occurrence of false engagement.  Had such warnings and instructions been provided, Christian would have been alerted to the hazard posed by false engagement and would have changed his behavior in such a way as to prevent the harm suffered.  (Ex. V, E. Boelhouwer Tr. at 80:8–81:5, 174:1–175:5, Boelhouwer Dep. Ex. 11 (Report) at 8–9.)

PLAINTIFFS,
FREDERICK KLORCZYK, JR. and
LYNNE KLORCZYK, co-administrators of
the Estate of Christian R. Klorczyk

By: */s/ Paul D. Williams*_____
    Paul D. Williams (ct05244)
    *pdwilliams@daypitney.com*
    Bryan J. Orticelli (ct28643)
    *borticelli@daypitney.com*
    Kaitlin A. Canty (ct29074)
    *kcanty@daypitney.com*
    DAY PITNEY LLP
    242 Trumbull Street
    Hartford, CT 06103
    860-275-0100 (Tel)
    860-275-0343 (Fax)

    Howard S. Edinburgh
    *hedinburgh@herzfeld-rubin.com*
    Herzfeld & Rubin, P.C.
    125 Broad Street
    New York, NY 10004
    (212) 271-8529 (Tel)
    (212) 344-3333 (Fax)

    *Their Attorneys*

## CERTIFICATION

I HEREBY CERTIFY that on this date a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


                                           */s/ Bryan J. Orticelli*
                                           Bryan J. Orticelli (ct28643)