# EXHIBIT B

```
 1                  UNITED STATES DISTRICT COURT

 2                    DISTRICT OF CONNECTICUT

 3

 4       -------------------------------x

 5       FREDERICK KLORCZYK, JR., as

 6       co-administrator of the Estate

 7       of Christian R. Klorczyk, et al.,

 8                          Plaintiffs

 9                                            Civil Action No.

10       vs.                                  3:13-cv-00257-JAM

11

12       SEARS, ROEBUCK AND CO., et al.,

13                          Defendants

14       -------------------------------x

15

16

17            VIDEOTAPED DEPOSITION OF ROGER D. CLAYPOOL, a

18       witness called by and on behalf of the Plaintiffs,

19       taken pursuant to applicable provisions of the Federal

20       Rules of Civil Procedure, before Nicole E. Viens, a

21       Registered Professional Reporter and Notary Public in

22       and for the State of Connecticut, at Day Pitney, 242

23       Trumbull Street, Hartford, Connecticut, on Wednesday,

24       August 17, 2016, commencing at 9:30 a.m.

25
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

```
 1     Q.   Going back to 1989?

 2     A.   Yes.

 3     Q.   And you described it as a test bench?

 4     A.   Yes.

 5     Q.   Is that a testing facility?

 6     A.   It's a --

 7     Q.   An early testing facility?

 8     A.   It's an early testing apparatus.

 9     Q.   Okay.

10     A.   Yes.

11     Q.   And back -- and I know we're starting early

12   on but --

13     A.   That's all right.

14     Q.   -- what was the general purpose of, in the late

15   '80s and early '90s, of your testing of, for example --

16   well, let me withdraw that.  Did the ratchet and pawl

17   type jack stand designs that you were testing at that

18   point in time delivered to you from Asian suppliers?

19               MR. ZAKRZEWSKI:  Objection.

20     Q.   (By Mr. Elliott)  You can answer.

21     A.   Yes.

22     Q.   And tell us the names of some of those

23   suppliers.

24     A.   During that time frame, it was predominantly

25   Taiwan.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

```
 1    Q.   What entity in Taiwan?

 2    A.   The Chiayi factory in Taiwan, the city of

 3  Chiayi, and the factory was just called Chiayi.

 4    Q.   What's the name of the company?

 5    A.   Shinn Fu.

 6    Q.   Okay.  In Taiwan, the Shinn Fu Taiwan entity?

 7    A.   Yes.  Our -- basically our mother -- mother

 8  entity.

 9    Q.   Any products come in from Hong Kong?

10    A.   Late -- no.

11    Q.   Okay.  Not at that time?

12    A.   Not at that time.

13    Q.   Okay.

14    A.   No.

15    Q.   How about China?

16    A.   Yes.

17    Q.   What facility in China?

18    A.   That would have been Shinwa Taishan in Taishan

19  City and --

20    Q.   What was name of that company?

21    A.   I believe it was Taishan Machinery and Electric

22  at the time.

23    Q.   Was that a predecessor of a Wei Fu Company?

24    A.   Yes.

25              MR. ZAKRZEWSKI:  Objection.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                          Roger D. Claypool

```
 1              THE WITNESS:  Yes.

 2     Q.   (By Mr. Elliott)  He can object for the record.

 3   You can still answer the questions.

 4     A.   Okay.

 5              MR. ZAKRZEWSKI:  Yeah.

 6     Q.   (By Mr. Elliott)  So going back to the late '80s

 7   and early '90s, you were testing on behalf of Shinn Fu

 8   America ratchet and pawl type design jack stands that

 9   you received from Shinn Fu Taiwan?

10     A.   Yes.

11     Q.   The predecessor of Wei Fu China?  Yes?

12     A.   Yes.

13              MR. ZAKRZEWSKI:  Objection.

14     Q.   (By Mr. Elliott)  And later on, and I'll cover

15   this in detail in a second, but did the Shinn Fu

16   America test facility -- where was it located, Kansas

17   City?

18     A.   Yes.  And initially it was on Ambassador Drive

19   and then we made a move -- I don't recall the exact

20   year -- to Pomona.

21     Q.   And did that test facility grow in complexity

22   and sophistication?

23     A.   Oh, yes.  Yes.

24     Q.   And we'll cover that in a minute, okay.  I'm

25   staying back with the late '80s, early '90s.  In that
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

```
 1   time frame, the late '80s and early '90s, what was the
 2   purpose for which you were conducting testing of the
 3   ratchet and pawl type design jack stands?
 4      A.   It was primarily to -- actually it was our
 5   chairman's directive, Michael, he was --
 6      Q.   Michael who?
 7      A.   Michael Hung.  He was insistent --
 8      Q.   Please spell that name.
 9      A.   H -- last name H-u-n-g.
10      Q.   Okay.  "He was insistent..."
11      A.   He was insistent upon ensuring that the jack
12   stands in particular were tested thoroughly.
13      Q.   Okay.  Where was Hung located?
14      A.   In Taiwan, in Chaiyi at the time.
15      Q.   And for what purpose, for compliance with a
16   standard or safety or --
17      A.   We had a --
18           MR. ZAKRZEWSKI:  Objection.
19      Q.   (By Mr. Elliott)  What was the purpose?
20      A.   Yes and yes.
21      Q.   Okay.  So explain.
22      A.   It -- at the time initially, we tested to the
23   Shinn Fu Taiwan standard, the SFT standard, and that
24   included --
25      Q.   Let me interrupt you.  SFT had testing standards
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                 Roger D. Claypool

```
 1   that you --

 2   A.   Oh, yes.

 3   Q.   -- applied?

 4   A.   Yes.

 5   Q.   Wow, okay.

 6   A.   And they were -- they included center load

 7   testing in the fully extended and the fully retracted

 8   position and off-center load testing.

 9   Q.   And you're speaking of ratchet and pawl design

10   jack stands?

11   A.   Yes.  Yes.

12   Q.   All right.  What about -- at this point in time,

13   in the late '80s, early '90s, did you conduct testing

14   with the purpose of determining compliance with

15   American industry standards --

16   A.   Late --

17   Q.   -- apart from the SFT standards?

18   A.   Late in that period from, I'd say, '89 to '91,

19   it became apparent to us that it would be necessary to

20   comply with the current PALD, which I believe at that

21   time was '87, the 1987 standard, and in order to grow

22   the business --

23   Q.   Yeah?

24   A.   -- in order to meet the market demand, we wanted

25   to try to get into the -- into Sears and into other
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

```
 1   retailers that were -- that were currently being

 2   supplied by other manufacturers, American

 3   manufacturers.  And in order to get into those markets,

 4   we had to comply with ASME standards.

 5       Q.   ASME standards?

 6       A.   Correct.

 7       Q.   You know, as long as we're on ASME and PALD,

 8   okay, let's take a minute and kind of describe what

 9   those organizations are.  So what is the American

10   Society of Mechanical Engineers?

11       A.    It's a standards -- it's a standards writing

12   group.  They assigned a secretary, ASME would assign a

13   secretary to each group, and my group was portable

14   automotive lifting devices.  Other groups are B30,

15   pressure vessel groups and other -- hundreds of other

16   categories.  We would as a committee, basically

17   like-minded manufacturers, distributors, and test labs,

18   would meet twice a year to discuss the industry

19   standards to try to respond to various trends in

20   failure and claims and --

21       Q.   So you discussed product failures?

22       A.   Yes.

23       Q.   You analyzed product failures?

24       A.    Informally analyzed them as a group because no

25   one wanted to reveal a trade secret, you know, that
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

```
 1    might give the other manufacturer an upper hand.

 2      Q.   Yep.

 3      A.   But that wasn't a -- really a big...

 4      Q.   So as I understand it, one way that ASME

 5    operated was through committees?

 6      A.   Exclusively, yes.

 7      Q.   And one of those committees was the portable

 8    automotive lifting device committee?

 9      A.   Yes.

10      Q.   Describe that for us.

11      A.   The committee was made up of, again,

12    manufacturers, distributors, test labs, and insurance

13    parties, interested parties, and we sat down and one of

14    the first things we did as a committee after I joined

15    was to try to centralize the various standards.  There

16    were at the time, I think, ten into one standard, and

17    we found that it was easier to understand a standard

18    that you could apply central concepts to --

19      Q.   Yep.

20      A.   -- each individual category rather than have a

21    hard copy jack stand, hard copy floor jack standard and

22    so on.

23      Q.   And did participating companies have a

24    representative, for example, on the PALD committee?

25      A.   Yes.
```

```
 1     Q.   Were you the SFA representative?

 2     A.   I was the Shinn Fu representative.

 3     Q.   Okay.  And did Sears have a representative?

 4     A.   Sure.

 5     Q.   And who was that?

 6     A.   Kathy.

 7     Q.   Kathy who?

 8     A.   Kathy Guerra.

 9     Q.   Guerra, okay.

10     A.   Yes.

11     Q.   She was Sears' representative?

12     A.   Yes.

13     Q.   Okay.  Jumping ahead, did you end up having an

14   elected position in the PALD committee?

15     A.   Yes.

16     Q.   What was it?

17     A.   It was vice chair.  I was elected through three

18   terms of that title.

19     Q.   And when was that?

20     A.   Oh my, ninety -- I'd have to -- honestly I'd

21   have to go back and look at my -- my -- the meeting

22   minutes.

23     Q.   Okay.

24     A.   But it was, I believe, '95 through 2009.  I

25   resigned in 2009.  I can probably get that from ASME
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

```
 1   if --

 2      Q.   Let's see, on your resumé on page 1, this is

 3   Exhibit 2, under Volunteer Work, if you turn that --

 4   turn to that with me --

 5      A.   Yes.

 6      Q.   -- "Served three terms as elected vice chair of

 7   ASME Safety and Performance Standard Committee on

 8   portable automotive lifting devices" --

 9      A.   Yes.

10      Q.   -- "where I served to develop testing,

11   performance, and specification requirements of PALDs to

12   ensure safety and regulatory requirements are met" --

13      A.   Yes.

14      Q.   -- "and prepared same for publication by ASME."

15   Is that a fair summary of what you did as vice chair of

16   PALD?

17      A.   Yes.

18      Q.   Okay.  And how many years did you serve as --

19   three terms is how many years?

20      A.   Yes.

21      Q.   What length of the term?

22      A.   I believe they're two- to three-year terms.

23      Q.   Okay.  So you were vice chair for eight, nine,

24   ten years?

25      A.   Yes.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                  Roger D. Claypool

```
 1     Q.   How would you describe your familiarity with the
 2   standards, performance, and specification requirements
 3   of portable automotive lifting devices as gained
 4   through your participation in the ASME PALD committee?
 5     A.   I -- I lived it and breathed it for many years.
 6   I -- that was the focus of my job duties for several
 7   years and --
 8     Q.   Did your employer support your participation on
 9   that committee?
10     A.   Yes.
11     Q.   SFA?
12     A.   Initially, yes.  Yes.
13     Q.   Okay.  So if I understand you correctly, just to
14   put this topic to bed, in the late '80s and early '90s,
15   your kind of rudimentary test facility started with SFA
16   for testing ratchet and pawl type jack stand designs?
17     A.   Yes.
18           MR. ZAKRZEWSKI:  Objection.
19     Q.   (By Mr. Elliott)  Yes?
20     A.   Yes.
21     Q.   Look at Exhibit 2, page 4.  This is your resumé.
22     A.   Okay.
23     Q.   And I'm looking at, let's see, the '91 to '93 --
24   oh, I'm sorry.  I'm wrong.  '89 to '91 I want to
25   still -- one more.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                              Roger D. Claypool

```
 1    A.   Sure.

 2    Q.   I think you may have covered this.  If I did,

 3  I'll stop.  The traveling to overseas factories, you

 4  told us about, right, to familiarize yourself with

 5  those operations, '89, '91?

 6    A.   I don't --

 7    Q.   Looking at your resumé, page 6.

 8    A.   I may have summarized it, the overseas travel.

 9  It was -- I basically traveled to SFT initially to

10  train on their test equipment and to familiarize myself

11  with the product in --

12    Q.   Okay.  Got it.  Let's move to '91-'93, Exhibit

13  2, page 6 at the top of the page, sales engineer and

14  your duties and stuff?

15    A.   Yes.

16    Q.   Why don't you read that to yourself --

17    A.   Okay.

18    Q.   -- and then we'll ask you to summarize that

19  experience.

20    A.   Okay.

21    Q.   So tell us what was your experience in the

22  '91-'93 time frame as a sales engineer for SFA?

23    A.   That was a period of time that we were actively

24  building our business.  Michael, our chairman, wanted

25  to continue to -- after successfully getting into
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

```
 1    Sears -- we were the first, by the way, first foreign
 2    company to qualify for the Craftsman name and with that
 3    success, we --
 4        Q.   And when was that?
 5        A.   It was in the --
 6        Q.   Nineties?
 7        A.   Early '90s, yes.
 8        Q.   Okay.
 9        A.   And with that success, we wanted to go into --
10    attempt to get into the more professional market even
11    further, to Grainger and some of the other tool
12    distributors.  In order to do that, we needed more
13    production.  So I spent a lot of time overseas sourcing
14    factories, sourcing materials -- looking at material
15    sources for jack stand factories in particular and --
16    and caster jack, floor jack facilities.
17        Q.   Okay.
18        A.   Because in order to grow, we had to meet the
19    production demands.  So I spent a lot of time overseas
20    during that period, filled up two passports in the
21    course of ten years or so.
22        Q.   Okay.  Let me ask you this:  There's an entry
23    here on page 6 that says "New product development
24    responsible for development of Shinn Fu's joint venture
25    QC testing programs and techniques."  What's that
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

 1   about?

 2     A.   In order to -- another aspect of that growth was

 3   to try to present innovative products.  We had a joint

 4   venture.  That was during the time that we were looking

 5   at the expansion of Wei Fu.

 6     Q.   Who was the joint venture with?

 7     A.   With the Wei Fu group.

 8     Q.   Chinese group?

 9     A.   Chinese, yes.

10     Q.   Was Hong Kong involved in that?

11            MR. ZAKRZEWSKI:  Objection.

12            THE WITNESS:  Yes, they were.  We had

13         an office in Hong Kong.  Michael's brother,

14         David Hong, H-o-n-g, and his wife ran that

15         operation.

16     Q.   (By Mr. Elliott)  What was the name of that Hong

17   Kong company?  Was it MVP or --

18            MR. ZAKRZEWSKI:  Objection.

19            THE WITNESS:  It was the predecessor

20         of MVP Hong Kong.  It may at that time have

21         been Shinn Fu Hong Kong.  I just don't

22         recall.

23     Q.   (By Mr. Elliott)  But it became MVP?

24     A.   Yes.

25     Q.   Okay.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                              Roger D. Claypool

```
 1    A.   Physical testing, I believe they -- I believe
 2  they -- they stopped at PALD.
 3    Q.   They stopped at PALD?
 4    A.   Yes.
 5    Q.   Okay.
 6    A.   Yes.
 7    Q.   But what was the purpose of the additional --
 8  what was Sears's purpose, to your understanding,
 9  relative to their separate testing of ratchet and pawl
10  type jack stand designs?
11              MS. TODD-TROTTA:  Objection.
12              THE WITNESS:  We would send a
13        prototype of a jack stand that we would
14        like to introduce.  So they would not be
15        able to rely on previous testing to make a
16        decision on a new design, and when I say
17        "new design," I mean that even if it
18        changed a model number, we would have to
19        present a sample for their testing along
20        with our own test reports so that they
21        could reasonably compare the two test
22        reports.
23    Q.   (By Mr. Elliott)  Okay.  Let me then -- let's go
24  back to your resumé.  It's been a little unclear to me.
25  When did -- withdrawn.  Was MVP, in your mind, part of
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                      Roger D. Claypool

```
 1    the global business operation of Shinn Fu?

 2              MR. ZAKRZEWSKI:  Objection.

 3              THE WITNESS:  Yes.

 4    Q.  (By Mr. Elliott)  Okay.  When did MVP enter the

 5    picture, if you recall, approximately as a global

 6    business partner of the Shinn Fu group?

 7              MR. ZAKRZEWSKI:  Objection.

 8              THE WITNESS:  Early -- early '90s.

 9    Q.  (By Mr. Elliott)  And what was its business?

10    A.  Primarily trading items, items that Wei Fu or

11    SFT, Shinn Fu Taiwan, weren't really in the business of

12    manufacturing.

13    Q.  Did they distribute Shinn Fu products to

14    America?

15    A.  Sure.

16    Q.  Okay.  Did that include ratchet and pawl type

17    jack stand designs?

18    A.  Yes.

19              MR. ZAKRZEWSKI:  Objection to both

20        questions.

21    Q.  (By Mr. Elliott)  I'm going to direct your

22    attention to page 5 of your resumé, Exhibit 2, the

23    bottom of the page, the 1993-'98 time frame.

24    A.  Yes, sir.

25    Q.  When you were a sales engineer, technical
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

```
 1   claims involving ratchet and pawl type design jack

 2   stands, did you encounter a phenomenon or a claim

 3   relative to a sudden and unexpected loss of ratchet

 4   height?

 5      A.   During that time period --

 6      Q.   At any time period.

 7      A.   Would you repeat the question.

 8      Q.   Yeah.  Did you at any time during your factual

 9   investigation of claims regarding the ratchet and pawl

10   type jack stand design, did you encounter claims

11   concerning sudden and unexpected loss of ratchet

12   height?

13      A.   Yes.

14               MR. ZAKRZEWSKI:  Objection.

15      Q.   (By Mr. Elliott)  Could you describe that.

16               MR. ZAKRZEWSKI:  And I object to you

17           testifying about the factual specifics of

18           any claim you investigated.  You testified

19           that you were working as power of attorney

20           for the company --

21               THE WITNESS:  I had --

22               MR. ZAKRZEWSKI:  -- during that

23           period.

24               THE WITNESS:  -- a document.

25               MR. ZAKRZEWSKI:  You had a document
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

```
 1                MR. ZAKRZEWSKI:  Okay.

 2    Q.  (By Mr. Elliott)  Well, I'm referring to some

 3  claims that we discussed in 2005.  My understanding was

 4  there wasn't a lawyer directing your factual claims

 5  investigation at that time; is that true?

 6    A.  I cannot be certain in 2005.

 7    Q.  Okay.  Was there a period of time where you know

 8  there was no direction by a lawyer involving those

 9  claims?

10    A.  It -- prior to Chaykin's arrival.

11    Q.  That's what I want to ask you about.

12    A.  Okay.  Sure.  Sure.

13    Q.  Not at the direction of Mr. Chaykin or another

14  lawyer.

15    A.  Sure.

16    Q.  Okay.  So I'd ask -- I would ask for an answer

17  to that question.  The initial question was:  Did you

18  investigate such claims?

19    A.  Yes.

20    Q.  Okay.  And tell us about those.

21    A.  They would -- that was the de facto claim for

22  most jack stand case --

23    Q.  What was?

24    A.  -- claims.  Sudden loss of ratchet bar height.

25    Q.  Okay.  So tell us about that.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

```
 1     A.   It would be on occasion, I would get a claim

 2   that for the most -- for the most part, they were minor

 3   damages, minor injuries, but occasionally I would get

 4   one that would prompt me to ask for the stand so that I

 5   could do a visual, perhaps go to a site to make an

 6   inspection, and it would help me to then bring that

 7   information to William Shaw or Steven Huang --

 8     Q.   Both nonlawyers?

 9     A.   Yes.

10     Q.   Right.

11     A.   -- basically to -- the president and CFO, I

12   think, at that time during that time frame --

13     Q.   Okay.

14     A.   -- of SFA.  And then they could lobby SFT for

15   funds to, you know, take care of the issue.

16     Q.   Relative to the claims experience that you had

17   on jack stands, what -- where did claims regarding jack

18   stand failures stand on your list of frequency?

19     A.   Number two.  Number two.

20     Q.   Jack stand failures?

21     A.   Behind -- behind floor jacks, yes.

22     Q.   Okay.  Now, let's get back to -- now I'm going

23   to again --

24     A.   Sure.

25     Q.   -- remind you of my instruction at the
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                          Roger D. Claypool

```
 1    A.    I believe that prior to Mr. Chaykin's arrival

 2  and establishment of the legal department, I probably

 3  handled a dozen that were -- that aren't remarkable.

 4  They were either proven to be failures that were

 5  attributed to placing jack stands in inappropriate

 6  loading surfaces --

 7    Q.    Right.

 8    A.    -- or just flat out a nontruth by the defendant.

 9    Q.    Well, did you ever -- did you ever reach a

10  conclusion that this type jack stand, ratchet and pawl

11  design jack stand, had a problem with sudden and

12  unintended loss of ratchet height?

13            MR. ZAKRZEWSKI:  Objection.

14            MS. TODD-TROTTA:  Objection.

15            THE WITNESS:  Well, initially I got

16        to tell you, I didn't really put any merit

17        in it.

18    Q.    (By Mr. Elliott)  But what happened?

19    A.    I had a case that -- a claim that was -- that

20  resulted in some injury to a guy in Illinois and --

21    Q.    What was his name?

22    A.    His name was Steven Bowles.

23    Q.    B-o-w-l-e-s?

24    A.    B-o-w-l-e-s.

25    Q.    Yep.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                      Roger D. Claypool

```
 1    A.   And one of our -- William agreed to -- that it

 2   would be a good idea to go take a look and talk to the

 3   guy and see if I couldn't make some determination in

 4   person.  And so we had a sales rep in the Chicago area

 5   pick me up at the airport and drive me there and --

 6    Q.   So describe to us that factual investigation and

 7   what conclusions you reached as a result of that

 8   investigation relative to the sudden and unintended

 9   loss of ratchet height claim.

10              MR. ZAKRZEWSKI:  To the extent that

11         it was not at the direction of legal

12         counsel.

13              MR. ELLIOTT:  We've already

14         established that.

15              THE WITNESS:  I believe that this is

16         within that purview of not --

17    Q.   (By Mr. Elliott)  You can answer.

18              MR. ZAKRZEWSKI:  Of legal counsel?

19              THE WITNESS:  -- of not -- of no

20         legal counsel.

21    Q.   (By Mr. Elliott)  You can answer.

22    A.   Again, this was at the direction of William

23   Shaw.  And when I arrived at Mr. Bowles' residence, he

24   had the two jack stands on the table and he was

25   visibly -- he appeared to be in pain and he was very
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

```
 1   gracious in allowing us in.  The jack stand wasn't
 2   damaged in the same way that I had seen earlier in
 3   other claims.  The jack stand didn't appear physically
 4   damaged other than the -- some significant removal of
 5   paint along the ratchet side.
 6     Q.  Let me take it this way.  What did he tell you
 7   happened?
 8     A.  He said it just failed.
 9             MR. ZAKRZEWSKI:  Objection.
10             THE WITNESS:  He said it just lost
11        height and he heard a noise.  It lost
12        height.
13     Q.  (By Mr. Elliott)  Did he have a car under load?
14     A.  Yes.
15     Q.  Yes?
16     A.  Yes.  And he suffered some lower back
17   contusions.  I don't recall all the details but he was
18   wanting $27,000 to settle.
19     Q.  And this was in -- was this in 2005, in that
20   area?
21     A.  In that area.
22     Q.  Okay.
23     A.  But it was prior to -- I don't recall Arthur
24   having anything to do with this case at all.
25     Q.  Okay.  So where I started with this was you told
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

```
 1   me initially you were skeptical about these kinds of

 2   claims --

 3      A.   Yeah because --

 4      Q.   Well, hold on.  And then you had Bowles, right?

 5      A.   Yeah.

 6      Q.   But were there previous claims that involved a

 7   similar loss of ratchet height claim that you

 8   investigated?

 9      A.   Yes.

10      Q.   In the same category, no lawyers involved?

11      A.   Yes.

12           MR. ZAKRZEWSKI:  Not claims in

13      litigation?

14           THE WITNESS:  Correct.  Just --

15      just --

16      Q.   (By Mr. Elliott)  Claims?

17      A.   Claims.

18      Q.   Okay.

19      A.   Stuff that we would get over the phone or...

20      Q.   So tell me the names of those claims if you

21   recall them?

22      A.   I recall a -- a Hastedt claim.

23      Q.   Hastedt.

24      A.   And I don't remember the guy's first name.

25      Q.   Christopher?
```

**FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.**

08/17/2016                                                        Roger D. Claypool

```
 1     A.   Yes.  Yes.

 2               MR. ZAKRZEWSKI:  Objection.

 3               THE WITNESS:  Yes.  Yes.  Christopher

 4          Hastedt.

 5     Q.   (By Mr. Elliott)  Yep.

 6     A.   A Gwen Zinn, Z-i-n-n.

 7     Q.   Yeah.

 8     A.   And I don't recall the spelling of Gwen's first

 9     name.

10     Q.   Any others?  Remember one involving Sloan?

11               MR. ZAKRZEWSKI:  Objection.

12               THE WITNESS:  Yes.  William Sloan,

13          Bill Sloan, I believe.

14     Q.   (By Mr. Elliott)  Okay.  And were these all

15     claims involving a sudden and unintended loss of

16     ratchet height in a ratchet and pawl jack stand design?

17               MR. ZAKRZEWSKI:  Objection.

18               THE WITNESS:  That was their claim.

19     Q.   (By Mr. Elliott)  That was their claim?

20     A.   Yes.

21     Q.   Okay.  And you investigated those?

22     A.   I investigated them to the extent that I could.

23     In those cases I was not able to physically put hands

24     on or eyes on a product.

25     Q.   Okay.  So you had all those and then you had
```

```
 1   Bowles, right?

 2    A.   Yes.

 3    Q.   So there's four?

 4    A.   Yes.

 5    Q.   Mid-2000 time frame?

 6    A.   Yes.

 7    Q.   Okay.  And let me ask you this:  Who at the

 8   Shinn Fu American facility was aware of those claims at

 9   the time?  What other employees or representatives of

10   Shinn Fu were aware of those claims?

11    A.   Well, obviously I received those from either

12   customer service or through a mailing from -- I'm

13   pretty sure one of them was from the Wal-Mart group

14   claims handling, CMI, I believe it was.

15    Q.   Let's start at the top.  Did Mr. Shaw, the

16   president of the company, know about the claims?

17    A.   Yes.

18    Q.   And the customer service people knew about the

19   claims?

20    A.   Yes.

21    Q.   Who else?

22    A.   Likely, eventually, Sara Sunderman would have

23   been involved in --

24    Q.   Those claims?

25    A.   -- in those claims.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

```
 1    Q.   Who's Sara Sunderman?

 2    A.   At the time she was working for or with William

 3  and Steven.

 4    Q.   Steven who?

 5    A.   Huang.

 6    Q.   Yep.

 7    A.   In terms of she would prepare loss run reports

 8  and --

 9    Q.   Regarding such claims?

10    A.   Yes.

11    Q.   Describe what loss run reports regarding those

12  claims are.

13    A.   The -- at the time we had a product liability

14  insurance through Saint Paul's, I believe, and Sara

15  would collect my information on claims and then take it

16  to William or Steven and they would go through and

17  include those --

18    Q.   Okay.

19    A.   -- that they thought were appropriate to include

20  those on the loss runs.

21    Q.   Okay.  So this was, what, the internal record of

22  these claims?

23    A.   Yes.  Yeah.

24    Q.   Who else at Shinn Fu knew about these sudden and

25  unintended loss of ratchet height claims that you
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                                  Roger D. Claypool

```
 1    investigated?

 2      A.   Well, eventually, with the onset of the legal

 3    department, the legal department would have known.

 4      Q.   Okay.  Put aside the legal department.  Other

 5    business representatives of the company that knew about

 6    the claims, if there are any in Kansas City?

 7      A.   In Kansas City, not that -- not that jump out.

 8      Q.   How about among the Shinn Fu constituent

 9    companies, were there other --

10      A.   Oh, sure.

11      Q.   Tell us about that.  Who else outside of Kansas

12    City in an affiliated business operation as you would

13    describe it --

14      A.   Sure.

15      Q.   -- of Shinn Fu knew about these claims when you

16    were investigating them?

17           MR. ZAKRZEWSKI:  Objection.

18           THE WITNESS:  They would -- we would

19      request --

20      Q.   (By Mr. Elliott)  Who knew about the claims

21    outside of Kansas City?

22      A.   MVP Hong Kong, SFT --

23           MR. ZAKRZEWSKI:  Objection.

24           THE WITNESS:  -- management, Hong

25      Kong management, Wei Fu management.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                      Roger D. Claypool

```
 1     Q.   (By Mr. Elliott)  That information was shared
 2  with representatives of those companies?
 3     A.   Sure.
 4     Q.   Okay.
 5     A.   With the appropriate factory, whoever the
 6  producing factory would be.
 7     Q.   Why?
 8     A.   Because we would lobby for funds from them and
 9  permission from them to -- to settle or deny a claim.
10     Q.   Okay.  I want to circle back now to the Bowles
11  claim to your testimony --
12     A.   Sure.
13     Q.   -- Bowles was of some significance to you in
14  your consideration, if I have this right, and you tell
15  me if I do, of the validity or credibility of such
16  claims; is that right?
17     A.   Yes, sir, it was.
18     Q.   Okay.  Tell us about that.
19     A.   Yes, sir, it was.  And at the time, there was --
20  it was shortly later that we were asked to develop
21  alternative designs to mitigate the possibility of this
22  once phantom condition.
23     Q.   Right.
24     A.   And --
25     Q.   It turned out not to be a phantom condition,
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

```
 1   right?

 2     A.   It turned out not to be a phantom condition.

 3     Q.   Okay.  And I want to try to take this

 4   chronologically.  After you identified this as a real

 5   or a credible claim, did you test for it?

 6     A.   In the past we had not and it would have been

 7   very difficult to do so given the fixtures that we had,

 8   but on my own, I -- I took it upon myself to do some

 9   testing and found that I could create a situation

10   where, for lack of a better term, you could create a

11   false engagement.

12     Q.   So let me just go back because I want to make

13   sure I understand this.  This wasn't a personal frolic.

14   You did this for the company, right?

15               MR. ZAKRZEWSKI:  Objection.

16               THE WITNESS:  It was a --

17     Q.   (By Mr. Elliott)  It was part of a test lab

18   procedure you did, right?

19     A.   It was part of a test lab procedure that I

20   wanted to try to recreate it myself.

21     Q.   Yeah.

22     A.   I could not do it under a substantial load but I

23   was able to create -- recreate it with a load that was

24   under 50 pounds --

25     Q.   Okay.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

```
 1     Q.   How about ultimately?

 2     A.   Ultimately Arthur knew about them.

 3     Q.   Any others?

 4     A.   Not at SFA.

 5     Q.   Okay.  And so same question relative to other

 6  business entities of -- that you would describe as

 7  Shinn Fu business entities, names of people who know --

 8  who knew?

 9             MR. ZAKRZEWSKI:  Objection.

10             THE WITNESS:  MVP Hong Kong.

11     Q.   (By Mr. Elliott)  Names of people?

12     A.   Oh boy, Tony Choi.

13     Q.   Mr. Hong?

14             MR. ZAKRZEWSKI:  Objection.

15             MS. TODD-TROTTA:  Objection.

16             THE WITNESS:  I don't think David was

17         there at that time.

18     Q.   (By Mr. Elliott)  Okay.  Tony Choi at MVP.

19     A.   At SFT, Victor, Betty, and Angela would have

20  ultimately --

21     Q.   Okay.  So you need to tell us who Victor, Betty,

22  and Angela are.

23     A.   Oh, I'm sorry.  They were the directors -- they

24  were upper management at Shinn Fu Taiwan.

25     Q.   They own -- did they run -- they owned the
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

```
 1   company?

 2     A.   They were Michael's -- they are Michael's

 3   children and they ultimately ran the company, yes.

 4     Q.   Part of the family that ran the company?

 5     A.   Correct.

 6     Q.   Okay.  They knew about these claims?

 7     A.   Yes.

 8              MR. ZAKRZEWSKI:  Objection.

 9     Q.   (By Mr. Elliott)  Okay.  Anybody in China?

10     A.   Yes.

11     Q.   Who?

12     A.   Would have been the -- that particular case

13   would have been Wei Fu.

14     Q.   Okay.

15     A.   And it would have been those folks at Wei Fu and

16   I don't recall any of their names --

17     Q.   Okay.

18     A.   -- off the top of my head.

19     Q.   Okay.  A related topic, what it is is in your

20   discussions at the PALD committee meetings, at any

21   point in time when you were affiliated with that

22   committee, was there -- was there anecdotal -- formal,

23   informal, anecdotal, etc., discussion of this type of

24   claim, a sudden loss of ratchet height?

25     A.   Oh, sure.  Yes.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

```
 1     Q.   Tell us about that.

 2     A.   Such claims had been going on for several years

 3   and we all dismissed it --

 4     Q.   In the industry?

 5     A.   In the industry.

 6     Q.   Yep.

 7     A.   And -- but it was something that we seriously --

 8   we had serious informal discussions on --

 9     Q.   Yep.

10     A.   -- during breaks at the meetings, prior to the

11   meetings when we'd gather.  At one point we even

12   entertained mandating a secondary load-holding device,

13   a redundant safety device.

14     Q.   Okay.  Let me pick up there.  You mentioned the

15   concept a moment ago before our break of you on behalf

16   of Shinn Fu relative to these types of loss of height

17   claims exploring potential alternative feasible

18   designs --

19     A.   Yes.

20     Q.   -- to deal with this issue.  Can you tell us

21   about that.

22              MR. ZAKRZEWSKI:  Objection.

23              THE WITNESS:  Yes.  In 2005 I

24        submitted two designs, one being a

25        spring-loaded or a spring-biased pawl that
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                      Roger D. Claypool

```
 1          would work in conjunction with the

 2          traditional pawl, a mechanically locking

 3          pawl.

 4     Q.   (By Mr. Elliott)  So is that a double locking

 5   mechanism?

 6     A.   A double locking mechanism.

 7     Q.   Redundant locking mechanism?

 8     A.   Yes.  Yes.  And also a design that utilized a

 9   three-piece collar assembly that the mechanic would

10   have eventually just -- he would have to assemble

11   himself, but, again, these were concepts, something to

12   build off of.  And I turned them into Joey Su --

13     Q.   Who?

14     A.   Joey Su.

15     Q.   Who's that?

16     A.   He was -- he's the -- he was the sales exec.

17     Q.   For what, for this type of stand?

18     A.   For -- for all products.

19     Q.   Okay.  Did you present this proposal to Mr. Shaw

20   or others?

21          MR. ZAKRZEWSKI:  Objection.

22          THE WITNESS:  I believe Mr. -- I

23          believe William was gone by that time.  I

24          think Arthur had eventually come in and --

25          at that point and Mr. Shaw was gone.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

```
 1    Q.   (By Mr. Elliott)  Okay.  So you presented this
 2   alternative feasible design --
 3             MR. ZAKRZEWSKI:  Objection.
 4    Q.   (By Mr. Elliott)  -- in your opinion, an
 5   alternative feasible design --
 6             MR. ZAKRZEWSKI:  Objection.
 7    Q.   (By Mr. Elliott)  -- proposal?
 8    A.   Yes.
 9    Q.   And what happened?
10    A.   They kept it on file for a number of years
11   and -- and then prior to my leaving, gave it back to
12   me, gave me -- well, I turned in not only design
13   recommendations for stands but other products as well.
14   They gave me back -- gave them back to me and said that
15   they weren't interested.
16    Q.   They were not interested?
17    A.   Correct.
18    Q.   Why?
19    A.   At the time I recall they were looking at a
20   different design, but I think I saw a prototype of a --
21   a double ratchet design that I assume that they were
22   considering that instead, but it never was really
23   clear.  It -- whatever design -- whenever you have a
24   design change, it involves cost and this was at a time
25   where we were trying to continually expand the business
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

```
 1  and in order to expand the business, you can't increase
 2  cost.
 3     Q.   Was it part of it that they didn't want to
 4  increase the cost?
 5            MR. ZAKRZEWSKI:  Objection.
 6     Q.   (By Mr. Elliott)  Was there a cost
 7  consideration?
 8            MR. ZAKRZEWSKI:  Objection.
 9            THE WITNESS:  There's a cost
10        consideration.
11     Q.   (By Mr. Elliott)  Okay.  So we've talked about
12  claims.  Was there also litigation involving claims of
13  sudden loss of ratchet height, unintended, unexpected
14  loss of ratchet height, litigation involving that?
15     A.   Yes but it was sub -- yes.
16     Q.   Do you remember the names of those?
17     A.   That would have been the alleged claim in
18  Guerra.
19     Q.   Guerra?
20     A.   Yes.
21     Q.   How about Raymond?
22     A.   Yes.
23     Q.   That's a sudden loss of height claim --
24     A.   Yes.
25     Q.   -- litigation?
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                          Roger D. Claypool

```
 1    A.   Yes.

 2    Q.   Okay.

 3              MR. ZAKRZEWSKI:  Objection.

 4    Q.   (By Mr. Elliott)  In your opinion, would the

 5    design change you just described with a redundant

 6    locking mechanism be a safer design relative to the

 7    problem of sudden and unintended loss of ratchet

 8    height?

 9              MR. ZAKRZEWSKI:  Objection.

10              MS. TODD-TROTTA:  Objection.

11              THE WITNESS:  Yes.  Yes.

12    Q.   (By Mr. Elliott)  And how would you describe the

13    concept of false engagement?

14    A.   Could you repeat the question.

15    Q.   Yeah.  What is false engagement?

16    A.   It's when the user believes that the stand is

17    ready to go, that it is safe to use, and when in fact

18    it is not.

19    Q.   Does it have to do with the congruence of the

20    fit between the ratchet and the pawl?

21              MR. ZAKRZEWSKI:  Objection.

22              THE WITNESS:  Somewhat.

23    Q.   (By Mr. Elliott)  The teeth?

24    A.   Somewhat.

25    Q.   Okay.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                           Roger D. Claypool

```
 1     A.    Somewhat.

 2     Q.    Or a lack of congruence thereof?

 3            MR. ZAKRZEWSKI:  Objection.

 4            THE WITNESS:  Or a lack of, yes.

 5     Q.    (By Mr. Elliott)  Okay.  I want to return to

 6   Exhibit 2, which is your resumé.

 7     A.    Yes.

 8     Q.    I think you've described the '93 to '98 time

 9   frame, and I want to now -- I'm on page 5 of Exhibit 2.

10   I'm in the 1998 to 2003 time frame.

11     A.    Yes.

12     Q.    There's an entry that says "Worked with customer

13   engineering departments in third party test labs"?

14     A.    Yes.

15     Q.    And then a number of companies.  What's that all

16   about?

17     A.    They would -- those engineering departments

18   would have represented customers and test labs that

19   would have been involved with our product either as a

20   -- either as a component of an assembly that they were

21   using or as a potential product or, in the case of DTL,

22   MTL, and particularly CTL, I would go -- I would travel

23   to those labs and assist them in their -- in setting up

24   their test format, particularly CTL.

25     Q.    Okay.  Let me drop back to the alternative
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                      Roger D. Claypool

```
 1   design that you described a moment ago in your

 2   testimony.

 3      A.   Yes.

 4      Q.   Were there other companies in your industry that

 5   implemented those alternative designs?

 6      A.   Yes.  Unfortunately Allied and Torin beat us to

 7   the punch in terms of getting to market.

 8      Q.   And what was their design change?

 9      A.   Basically a block -- it was -- it implemented a

10   redundant safety feature consisting of a block that

11   went through the collar.  You -- the user would insert

12   it.  It would capture a ratchet style engagement point

13   on the bar itself and go through the other side and

14   then it would be pinned to secure it.  This would --

15   this would further capture the ratchet bar, preventing

16   it from moving -- moving it out of engagement as -- as

17   the ratchet bar is either lifted up, which would cause

18   disengagement on the traditional design, and it

19   would -- and it would virtually eliminate the

20   possibility of -- of a false engagement.

21      Q.   Okay.  When the circumstances that you've just

22   testified about in the last half-hour or so about your

23   discovery that the claim of and the phenomenon of false

24   engagement and unintended and unexpected loss of

25   ratchet height developed, and you deemed them credible
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                  Roger D. Claypool

```
 1   company at the time that he got the book to Jemmy and

 2   gave -- Jemmy gave it to you?

 3   A.   I don't know.

 4   Q.   Was he with SFT?

 5   A.   Yes.

 6           MR. ZAKRZEWSKI:  Objection.

 7   Q.   (By Mr. Elliott)  Taiwan, okay.

 8   A.   Yes.

 9   Q.   And what was the --

10   A.   The book, it was a history of -- of our progress

11   from small to large.  It was quite a -- it was quite an

12   impressive --

13           MR. ELLIOTT:  Let's mark that.

14           THE WITNESS:  -- presentation.

15       That's what it appears to me as the first

16       pages -- the cover and then the first few

17       pages.

18           (Exhibit 4, Shinn Fu Corporation 2011

19       PowerPoint, marked for identification.)

20   Q.   (By Mr. Elliott)  Are you familiar with Shinn

21   Fu -- the Shinn Fu companies' officers and directors

22   and management structure?

23           MR. ZAKRZEWSKI:  Objection.

24           THE WITNESS:  During my tenure there,

25       I was.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

```
 1     Q.   (By Mr. Elliott)  Could you describe it.

 2     A.   Sure.  It was a -- SFA worked as a satellite to

 3   SFT as well as, at the time, I believe we had a Shinn

 4   Fu South Africa, Shinn Fu Australia, MVP Canada, MVP

 5   Hong Kong, Shinn Fu Japan.  We had -- there were many,

 6   many satellite or subsidiary companies that were equal

 7   to -- equal status in terms of company to SFA.

 8     Q.   And were they all operated under the direction

 9   and control of the Taiwan company?

10               MR. ZAKRZEWSKI:  Objection.

11               THE WITNESS:  Yes.

12     Q.   (By Mr. Elliott)  Yes, okay.  And if you look at

13   this exhibit here, this PowerPoint --

14               MR. ELLIOTT:  Is it 4?

15               MR. ORTICELLI:  Four.

16     Q.   (By Mr. Elliott)  There's a listing.  It says

17   "Milestones" there on pages 2 and 3.

18     A.   Mm-hmm.

19     Q.   Are these the members of that -- the Shinn Fu

20   business group you've just described?

21     A.   It looks like it hits all --

22     Q.   As of 2011 anyway?

23               MR. ZAKRZEWSKI:  Objection.

24               THE WITNESS:  I can only speak to

25          prior to that but yes.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                          Roger D. Claypool

```
 1     Q.   (By Mr. Elliott)  Okay.  And then if you keep

 2    turning this exhibit, it gets to a page called

 3    "Affiliated Global Operations."  See that?

 4     A.   On page 2 or 3?

 5     Q.   Three, yeah.  See that?

 6     A.   Yes.  Yes.

 7     Q.   And what are these companies?

 8              MR. ZAKRZEWSKI:  Objection.

 9              THE WITNESS:  That would have

10          included SFA, MVP Hong Kong, Shinn Fu

11          Canada or -- MVP Canada rather, all --

12          basically all the entities that I referred

13          to.

14     Q.   (By Mr. Elliott)  Okay.  As well as a Taishan

15    China entity?

16     A.   Taishan?

17     Q.   Wei Fu Electric and Machinery Taishan?

18     A.   Yes.

19     Q.   And in your view, were these all affiliated

20    global operations --

21     A.   Yes.

22     Q.   -- of the Taiwanese entity?

23              MR. ZAKRZEWSKI:  Objection.

24              THE WITNESS:  Yes.  Yes.

25     Q.   (By Mr. Elliott)  Who -- relative to the
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

```
 1   business decisions involving this global affiliated
 2   operation of Shinn Fu, what entity had ultimate
 3   decision-making authority with respect to the business
 4   decisions made by this group?
 5                   MR. ZAKRZEWSKI:  Objection.
 6   Q.   (By Mr. Elliott)  Among the ones you just
 7   described - Taiwan, China, America?
 8   A.   Taiwan.
 9   Q.   Taiwan.  And that was run by a family that --
10   whose name you gave me?
11   A.   Hung.
12   Q.   Hung.  And spell that, please.
13   A.   H-u-n-g.
14   Q.   Okay.  Can you give us any examples of what, in
15   your view, while you were at Shinn Fu America was the
16   Shinn Fu Taiwan entity aware of the business operations
17   and decisions that were being made in America?
18                   MR. ZAKRZEWSKI:  Objection.
19                   THE WITNESS:  Sure.  Sure.
20   Q.   (By Mr. Elliott)  And what was -- how would you
21   -- I want to get a sense of their role.  What was the
22   interplay between Taiwan and America relative to the
23   business decision-making process that affected American
24   business decisions?
25   A.   Well, an example might be when I lobbied for
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                             Roger D. Claypool

```
 1  gatherings in SFT over the years just to celebrate this
 2  or that, and I noticed that they seem to be in that
 3  leadership role.  They took the reins from Michael very
 4  nicely so...
 5    Q.   Was -- is it your view that all ultimate
 6  corporate decision-making responsibility ultimately
 7  resided with the Hung family?
 8            MR. ZAKRZEWSKI:  Objection.
 9    Q.   (By Mr. Elliott)  Yes?
10    A.   Yes.
11    Q.   Verbal.
12    A.   Yes, sir.
13    Q.   And the term "affiliated global operations" is
14  an accurate description of the Shinn Fu business
15  relationships among those entities?
16            MR. ZAKRZEWSKI:  Objection.
17            THE WITNESS:  Yes.
18    Q.   (By Mr. Elliott)  I want to talk to you about
19  Sears, Roebuck & Company.
20    A.   Sure.
21    Q.   Are you familiar with the relationship that the
22  Shinn Fu group of companies had with Sears --
23            MS. TODD-TROTTA:  Objection.
24    Q.   (By Mr. Elliott)  -- in America or that SFA had
25  with Sears in America?
```

 1    Q.   No.  So you don't know whether it's one that you
 2    drafted or not?
 3    A.   That's correct.  I do not know.
 4    Q.   Okay.  So it may well have been drafted
 5    completely outside of SFA?
 6    A.   Yes.
 7    Q.   In fact, SFA might have stopped drafting manuals
 8    after you left?
 9    A.   Certainly.
10    Q.   Okay.  I'd like to ask you about -- I'd like to
11    ask you about -- I'm trying to ask you about the names
12    of claimants that you identified, and I'll try and do
13    it in the order you identified them in.
14    A.   Okay.
15    Q.   The first one you talked about was Jeffcoat in
16    Columbia, South Carolina --
17    A.   Yes.
18    Q.   -- sometime in the late '90s or early 2000s?
19    A.   Yes.
20    Q.   You said -- and you said perhaps Shinn Fu
21    America was a party or was somehow involved or perhaps
22    Shinn Fu Corporation was a party or somehow involved?
23    A.   And I say that if -- if they were SFT jack
24    stands -- I don't believe they were.  I believe they
25    were MVP --

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                              Roger D. Claypool

```
 1     Q.   Okay.

 2     A.   -- but they would have come through -- through

 3   SFA.

 4     Q.   Okay.  So you said someone was using -- had a

 5   Lincoln town car on six jack stands?

 6     A.   Yeah.  Yes.

 7     Q.   Is that a proper way to use jack stands?

 8     A.   It could be proper.

 9     Q.   The use of six jack stands could be proper?

10     A.   It could be.

11     Q.   Okay.  And how could that be?

12     A.   If they were using -- in this case, they were

13   removing a transmission.

14     Q.   Okay.

15     A.   So they had to support the front end and the

16   transmission and the rear end independently basically

17   of each other and that's -- that was our understanding

18   of what this guy was doing.

19     Q.   Do you think that was the proper use of jack

20   stands?

21     A.   It's not what I would have done but I can see

22   where he might have accomplished it had it -- had it

23   not fallen and killed him.

24     Q.   Wasn't there an obvious safety risk there from

25   using six jack stands at once?
```

```
 1      A.   I would not call it an obvious safety issue.

 2      Q.   But you would say it created a safety risk?

 3      A.   The way he had it set up created the safety

 4   risk.

 5      Q.   And what about the way he had it set up created

 6   that --

 7      A.   It was imbalanced.  It was imbalanced.

 8      Q.   What do you mean by "imbalanced"?

 9      A.   He had -- he had two long reach 6-ton jack

10   stands under the front bumper.  He had two 3-ton jack

11   stands under the front suspension and two 2-ton jack

12   stands under the -- at the rear support points along

13   the ladder frame, the rear of the ladder frame.

14      Q.   Okay.  And so what about that was problematic?

15      A.   Well, what that does is when he was underneath

16   there working on it and what we suspect happened was

17   somebody came and leaned on the -- the oldest son, we

18   suspect, leaned on the rear of the car.  The two

19   lightest stands with the two smallest ratchet bars then

20   pivoted laterally toward the -- from the passenger side

21   to the driver side.  They pivoted on the suspension --

22   one of the suspension jack stands and basically just

23   disengaged the front jack stands altogether.  So it

24   just tumbled like this and down.

25      Q.   So he was using unmatched sets of jack stands?
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                              Roger D. Claypool

```
 1     A.    No.   It was -- it was your -- it was a typical
 2   claim that -- that met the criteria, one, it was an
 3   injury; and two, the damages claimed were over $10,000.
 4   And so William decided to send me up there to see what
 5   I could do.
 6     Q.    Now, do you remember what model jack stands were
 7   at issue there?
 8     A.    No, I don't off the top of my head.   I -- they
 9   were Sears branded.   That was one of the -- that was
10   one thing I do recall and --
11     Q.    You don't remember the capacity?
12     A.    They were -- I believe they were three-ton.
13     Q.    Are you sure?
14     A.    I am not sure.
15     Q.    Okay.   Do you have any documents about that one,
16   about the Bowles case?
17     A.    No.   Just my -- just my note that I made when I
18   was doing -- when I compiled a little list working on
19   the feasibility of those alternative designs.
20     Q.    Okay.
21     A.    You know, just -- that was my -- those were
22   my -- Bowles changed my thinking on the feasibility of
23   this.
24     Q.    Yeah.   You said that.
25     A.    Yeah.   And so those four were my focus on how
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

 1   to -- what would I do to mitigate that risk.

 2       Q.   Okay.

 3       A.   So...

 4       Q.   Now, you obviously -- you didn't witness the

 5   Bowles' incident?

 6       A.   No.

 7       Q.   You traveled there after the fact?

 8       A.   Yes.

 9       Q.   So you don't know exactly what happened?

10       A.   I can only go by what he described.

11       Q.   And he was never deposed to your knowledge?

12       A.   No.

13       Q.   Because it was not in litigation?

14       A.   Correct.

15       Q.   Okay.  And you never did an accident

16   reconstruction?

17       A.   To the best -- using the tools I had with me,

18   which were crude, I was able to determine that the site

19   presented a hard level surface.  There was no reason to

20   believe that there was a sink and slide scenario that

21   occurred.  And as a matter of fact, I recall the garage

22   area and it was -- it was disheveled but it was -- it

23   was doable.

24       Q.   Okay.  You don't know exactly where he had

25   placed the jack stands under the vehicle?

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

```
 1    A.   No.  That was simply indicated through his
 2  questionnaire and I -- I didn't retain any of that
 3  information.
 4    Q.   And you're not like an expert in accident
 5  reconstruction anyway?
 6    A.   No.
 7    Q.   No?
 8    A.   No.
 9    Q.   Okay.  And do you remember what type of vehicle
10  was --
11    A.   I believe --
12    Q.   -- reportedly involved?
13    A.   I believe it was a Ford Torino and I believe it
14  was a '70s model Torino.
15    Q.   Torino?
16    A.   Yeah.
17    Q.   What's that look like?
18    A.   A Ford Torino, it'd be hard to compare it to
19  anything today, but it's large ladder frame Ford V8 --
20    Q.   Okay.
21    A.   -- with --
22    Q.   I get the picture.
23    A.   Yeah.  It's a -- it's a heavy, old unit.
24    Q.   Okay.  And you said that your understanding
25  based on what the claimant said, which is the best
```

 1    information you had --

 2      A.    Yes.

 3      Q.    -- was that he was using a pair of jack stands?

 4      A.    Yes.

 5      Q.    A matched pair?

 6      A.    Yes.

 7      Q.    Which is how the instructions tell you to use

 8    them, correct?

 9      A.    I believe so.

10      Q.    Yeah.  And there was some paint scraped off some

11    part of it?

12      A.    There was paint removed from the -- from the

13    ratchet, the front side of the ratchet, and the pawl

14    side of the ratchet consistent with like metal on metal

15    scraping that wouldn't be present in just normal use.

16      Q.    When you say -- it's tough because these things

17    are foresighted.  When you say "front" -- when you say

18    there was some scraping on the pawl side, you mean

19    where the pawl would connect with the teeth on the

20    ratchet bar, there was some scraped paint?

21      A.    That edge, yes, along that edge.

22      Q.    And also on the edge directly opposite of that?

23      A.    Yes.

24      Q.    There was paint scraped off of both --

25      A.    Yes.

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                    Roger D. Claypool

```
 1   because you --
 2      A.   Correct.
 3      Q.   -- know the product well?
 4      A.   Correct.
 5      Q.   Okay.  All right.  And so on the Bowles case,
 6   you might -- did you say you might have some small
 7   notes somewhere or do you think that's gone?
 8      A.   No.  I'm certain I have a note that I -- yes.
 9      Q.   Okay.  You have a handwritten note?
10      A.   Yes.
11      Q.   At your house?
12      A.   Yes.
13      Q.   How long is it?
14      A.   It's more of a -- it's a note on top of another
15   document.
16      Q.   So just a couple of words?
17      A.   Yeah.
18      Q.   Less information than what you've given me
19   today?
20      A.   Yes.  I mean about.  It's about the same
21   information.
22      Q.   Sure.  Now, I think you mentioned -- it was
23   after you were talking about the Bowles case, you
24   mentioned the names of some other claimants, and I
25   wanted to ask you if you recalled any details about
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                    Roger D. Claypool

```
 1   what their claims were.  I can't find it right now
 2   so -- oh, okay.  Christopher Hastedt?
 3     A.   Hastedt.
 4     Q.   Hastedt?
 5     A.   Yes.
 6     Q.   How do you think you spell that?
 7     A.   Oh, boy, H-a-s-t-e-d-t.
 8     Q.   Okay.  And when do you think that claim was?
 9     A.   I have no idea.  Pre -- pre-Bowles, so between
10   '02 and '04 --
11     Q.   Okay.
12     A.   -- likely.
13     Q.   And this wasn't a litigated claim?
14     A.   No.  It's just a --
15     Q.   How did you find out about it?
16     A.   I believe that one came from -- I think Hastedt
17   came from CMI, from the Wal-Mart claims people, but I'm
18   not certain.
19     Q.   Okay.  And did you get any details on that
20   claim?
21     A.   I did but I wouldn't have retained any of the
22   details.  I recall some of the -- I just don't -- I
23   don't recall them.  I don't recall the details.  It was
24   a jack stand.
25     Q.   Do you have anything that could help you recall?
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                              Roger D. Claypool

```
 1     A.   No.

 2     Q.   Okay.

 3     A.   No.  I mean --

 4     Q.   What do you remember?

 5     A.   That it was a jack stand whose complaint was the

 6   sudden and unexpected loss of load height.

 7     Q.   You don't know any more information than that?

 8     A.   No.  I don't even remember the vehicle or the --

 9   or the -- whether it was changing oil or changing

10   shocks or just what the details of that one was.

11     Q.   You don't remember the type of vehicle?

12     A.   No.

13     Q.   You don't remember the location?

14          MR. ELLIOTT:  Objection to the form.

15          THE WITNESS:  I -- I don't remember

16     any of that.  I mean...

17     Q.   (By Mr. Zakrzewski)  You don't remember the

18   specific model of jack stand involved?

19     A.   I don't.  I don't.  I believe it was a 6902 as

20   well but I couldn't be certain.

21     Q.   You don't know how the end user was

22   purportedly using --

23     A.   No.

24     Q.   -- the jack stands at the time?

25     A.   Not off the top of my head.  And I didn't retain
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                                Roger D. Claypool

```
 1   questionnaire on it?

 2     A.   I do not.

 3     Q.   All right.  You mentioned that you were the vice

 4   president of the portable automotive lifting device

 5   committee --

 6     A.   Vice chair.

 7     Q.   Vice chair?

 8     A.   Yes.

 9     Q.   And you said for three terms?

10     A.   Yes.

11     Q.   And could you give me a date range there for

12   what those three terms were?

13     A.   I wish I could.  I could -- I could get that

14   information for you but I -- I just -- I don't recall.

15   Through -- if I had to guess, I believe they were

16   three-year terms but they may have been two-year terms.

17   I don't recall.  But from 2009 --

18     Q.   Back?

19     A.   Back, yeah.

20     Q.   So it could have been from 2009 back to 2003 if

21   it was two-year terms or 2009 back to 2000 if it was

22   three-year terms?

23     A.   Yeah.  Yeah.  I could look at my publications

24   but -- I think I have my publications up to date.

25     Q.   Okay.
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                          Roger D. Claypool

```
 1     A.   The ASME PALD if you --

 2     Q.   I'd go ahead and hold onto those if I were you.

 3     A.   I will.

 4     Q.   So you're the vice chair.  You said there were

 5   no either informal documents or formal discussions of

 6   the false engagement phenomenon?

 7     A.   There were no formal discussions that I recall.

 8   You know, other members may remember it differently but

 9   I -- I don't recall any.  I do recall many informal

10   discussions between -- between groups of us and...

11     Q.   And this is a phenomenon that you claim to have

12   been aware of during that period?

13     A.   Yes.

14     Q.   Okay.  And were any changes made to the PALD

15   safety guidelines to combat false engagement?

16     A.   No.  We considered -- we considered mandating

17   secondary load holding devices so -- or redundant load

18   holding devices but felt that because it's a voluntary

19   standard, that we should let each individual company

20   make their own business decision on that unless --

21   unless we wanted to all agree to do that.  And you have

22   to understand that it would take a majority vote to

23   make those changes and it likely would not have

24   entertained even a vote.

25     Q.   So you didn't propose a false engagement
```

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.
08/17/2016                                                          Roger D. Claypool

 1    Q.   Okay.  So you pretty much were working as a team

 2    relative to the Raymond case?

 3    A.   By that time, yes.

 4    Q.   Okay.

 5    A.   Yes.

 6    Q.   You also indicated you were the vice chair?

 7    A.   Vice chair.

 8    Q.   Okay.  And as vice chair, did you have any role

 9    in putting on the agenda of what topics you'd like to

10    discuss?

11    A.   Individually we did.

12    Q.   Okay.

13    A.   And so, yes, I would have -- I would have had an

14    opportunity to put forth agenda items.

15    Q.   Okay.  And during your time -- your tenure as

16    vice chair, you never put on an agenda item the issue

17    of false engagement?

18    A.   No.  No.

19    Q.   Was there a reason why you never put that on the

20    agenda?

21    A.   For one thing, I didn't think it would go

22    anywhere but -- and I -- I probably would have

23    approached it as instead just trying to implement

24    secondary load holding devices.

25    Q.   And I think you said there was only 4 out of the

FREDERICK KLORCZYK, JR., ET AL. vs. SEARS, ROEBUCK AND CO., ET AL.

08/17/2016                                                          Roger D. Claypool

```
 1   12-person --

 2   A.   Yeah that I know of that had discussions, you

 3   know, prior to meetings and dinners --

 4   Q.   Okay.

 5   A.   -- that were in agreement on the subject.

 6   Q.   Okay.  And I know you had indicated that you've

 7   used jack stands in your personal life?

 8   A.   Almost every month for my whole life.

 9   Q.   Okay.  And they're the ratchet and pawl design?

10   A.   Both.  Both the -- I tend to use both, ratchet

11   and pawl and the pin construction --

12   Q.   Okay.

13   A.   -- type.

14   Q.   And do you use the ratchet and pawl design that

15   Shinn Fu manufactured?

16   A.   No, I don't.  I don't.  I have a pair but I

17   just -- they're my -- they're for other purposes.

18   Q.   Okay.  And you never changed any wording in the

19   manual itself relative to any type of "be careful" --

20   A.   No.

21   Q.   -- not --

22        MR. ELLIOTT:  Objection to the form.

23        THE WITNESS:  I think the closest

24   thing to that would be any verbiage that

25   urged the consumer to ensure the stands
```