# EXHIBIT C

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

```
 1                  UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT
 2


 3


 4    FREDERICK KLORCZYK, JR.,       }
      as co-administrator of the     } Civil Action Number:
 5    Estate of Christian R.         }
      Klorczyk,                      } 3:13-cv-00257-JAM
 6         Plaintiff,                }
                                     }
 7            vs.                    }
                                     }
 8    SEARS, ROEBUCK AND CO.,        }
      et al,                         }
 9         Defendants.               }


10


11


12


13
           DEPOSITION OF: Arthur Chaykin, Esquire
14         TIME:          10:11 a.m.
           DATE:          June 21, 2018
15         HELD AT:       Gordon & Rees, LLP
                          95 Glastonbury Boulevard
16                           Suite 206
                          Glastonbury, Connecticut
17


18


19


20


21


22
              Reporter:  Annette Brown, LSR, No. 0009
23              Brandon Huseby Reporting & Video
                        249 Pearl Street
24              Hartford, Connecticut  06103
                    Telephone: 860.549.1850
25                    Fax: 860.549.1537
```

Case 3:13-cv-00257-JAM   Document 307-3   Filed 10/11/18   Page 3 of 15

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

```
 1                  (Plaintiff's Exhibit 2, Notice of
 2                  deposition to Shinn Fu for 30(b)(6)
 3                  deposition, was marked for
 4                  identification.)
 5
 6   BY MR. EDINBURGH:
 7           MS. TODD:   You don't have one for me.  I
 8   know.
 9           MR. EDINBURGH:  No, I do.
10           MS. TODD:   You do.  Wow.
11           MR. BROWN:  Do you have one for me?
12           MR. EDINBURGH:  Yes, I do.
13           MS. TODD:   Thanks.
14   BY MR. EDINBURGH:
15       Q   And during -- all right.
16           Have you reviewed these notices with respect
17   to the topics for which you've been designated?
18       A   I have read them.
19       Q   Have you specifically reviewed topics numbered
20   6, 7, 14, 15, 19, 20, and 26 listed in Exhibit A of
21   these notices?
22       A   Yes.
23       Q   Okay.
24           Now, you have an understanding that you are
25   testifying today as a Rule 30(b)(6) witness for Shinn
```

Case 3:13-cv-00257-JAM   Document 307-3   Filed 10/11/18   Page 4 of 15

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

```
 1   Fu Corporation which I will refer to as SFC for Shinn
 2   Fu, for Shinn Fu of America which I will call SFA,
 3   and for MVP (H.K.) Industries Ltd., which I will
 4   refer to as MVP and as to these entities you're a
 5   30(b)(6) witness on those topics which we have
 6   previously identified.  Is that your understanding?
 7        A    That's my understanding.
 8        Q    Do you have an understanding of what are the
 9   responsibilities of a 30(b)(6) witness?
10        A    Yes.
11        Q    Do you have an understanding that your
12   testimony here today is on behalf of Shinn Fu --
13        A    Yes.
14        Q    -- for those topics?
15             And on behalf of SFA for those topics?
16        A    Yes.
17        Q    And on behalf of MVP for those topics?
18        A    Yes.
19        Q    And that with respect to these topics your
20   testimony today is testimony with collective
21   corporate knowledge of Shinn Fu?
22        A    Which Shinn Fu entity?
23        Q    The named defendant, Shinn Fu Corporation as
24   to those topics.
25        A    I don't understand what you mean by collective
```

Case 3:13-cv-00257-JAM   Document 307-3   Filed 10/11/18   Page 5 of 15

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

```
 1      Q   Did that include any product liability
 2   actions?
 3      A   No.
 4      Q   Okay.  So let's go through this.
 5          Let's go to the top one and I'm going to ask
 6   you a couple of questions on that, maybe more than a
 7   couple.
 8      A   Okay.
 9      Q   The first bullet point says you were chief
10   legal officer for a multinational group of affiliated
11   companies with headquarters in Taipei, Taiwan and
12   U.S. headquarters in Kansas City.
13          Can you please identify the multinational
14   group of affiliated companies you're referring to in
15   your c.v.?
16      A   We would refer to it as the Shinn Fu Group,
17   but there is a group of companies.  Each with a
18   separate legal identity, that have locations in
19   Europe, Canada, United States, Australia, Taiwan,
20   China, and there's also an entity in Hong Kong that
21   is a major customer which is also affiliated but not
22   in an ownership manner at all.
23      Q   The Hong Kong entity is that MVP?
24      A   Is MVP.
25      Q   And the Taiwan entity is that SFT?
```

Case 3:13-cv-00257-JAM   Document 307-3   Filed 10/11/18   Page 6 of 15

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

 1      A    Correct.

 2      Q    And is the China entity one of the defendants

 3   who you are not representing today but still a

 4   defendant in the case Wei Fu, W-E-I F-U?

 5      A    It would be one of them.  Of course Wei Fu is

 6   now defunct.

 7      Q    When did it become defunct?

 8      A    I believe it wrapped up its business -- the

 9   corporate -- the corporate entity I believe is still

10   extent, but Wei Fu has wrapped up its business in

11   China, and I believe that was the beginning of last

12   year.

13      Q    So that would be early 2017?

14      A    I believe so.

15      Q    When did it stop producing jack stands?

16      A    I cannot give you the date, Mr. Edinburgh.  I

17   just don't know exactly when they shut down

18   production there, but it has been for more than a

19   year.

20      Q    Now, you say you were chief legal officer.

21   Were you a chief legal officer during the period of

22   time from 2004 to 2012 for MVP?

23      A    I would say no.  I did some legal work for

24   them, but I would not say that I was their go-to

25   lawyer back then.

Case 3:13-cv-00257-JAM   Document 307-3   Filed 10/11/18   Page 7 of 15

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

```
 1     A    Generally I would expect that I would be
 2   involved in those matters.
 3     Q    Okay.
 4          You indicated that in your c.v. you call these
 5   companies a group of affiliated companies?
 6     A    Uh-huh.
 7     Q    What did you mean by that?
 8     A    I mean they work together.  They each have
 9   their own roles, but they are related in terms of
10   either buy-and-sell relationships or
11   marketing-and-sales relationships or in the case of
12   SFT in a parent-subsidiary role with regard to some
13   of the entities in the network.
14     Q    So is it correct that when -- you've seen and
15   been present and seen the testimony at the other
16   depositions.  You know that the SFA witnesses have
17   said SFT was 100 percent owned by SFA; is that
18   accurate?
19     A    To the best of my knowledge it is.
20     Q    And that was during this entire period we're
21   talking about when you were general counsel?
22     A    No.  There was a period of time where SFT did
23   not own 100 percent of SFA's stock.
24     Q    When was that period?
25     A    That was in the 2000s, and I would have to go
```

Case 3:13-cv-00257-JAM   Document 307-3   Filed 10/11/18   Page 8 of 15

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

```
 1   now, not all of them.
 2              MR. BROWN:  Do you need copies made,
 3   Howard?
 4              MR. EDINBURGH:  I'll see.
 5              The next number is 6.  I'll identify it
 6   Chaykin 6 will be SFA 6 marked on 5-24-16 as to sales
 7   representative agreement between Shin Fu Company of
 8   America and MVP (H.K.) Industries including the
 9   amendments to that agreement.
10
11              (Plaintiff's Exhibit 6, sales
12               representative agreement between
13               Shin Fu Company of America and MVP
14               (H.K.) Industries including
15               agreement amendments, was marked
16               for identification.)
17
18              MR. EDINBURGH:  The next document will be
19   Chaykin 7, and these the Sears Universal Terms and
20   Conditions referred to at times as the UTC for MVP
21   and that is dated October 12, 2006.
22
23              (Plaintiff's Exhibit 7, Sears
24               Universal Terms and Conditions,
25               dated October 12, 2006, was marked
```

Case 3:13-cv-00257-JAM   Document 307-3   Filed 10/11/18   Page 9 of 15

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

 1     A    Okay.
 2     Q    Now, this amendment, the effective date it
 3   looks like January 1, 2011; is that correct?
 4     A    I believe that's correct.
 5     Q    All right.
 6          So the first first amendment, not the second
 7   first amendment, had a life span essentially of one
 8   year, 2010, correct?
 9     A    Yes.
10     Q    And, again, was this document, 3344-3345,
11   drafted by you?
12     A    Yes.
13     Q    And were the same services reflected in this
14   document that SFA provide MVP, 1-A through 1-D, the
15   same as the prior amendments?
16     A    Yes.
17     Q    All right.
18          Did all these same services include the MVP
19   Sears Craftsman Model 50163?
20     A    That would have been one of the products.
21     Q    And it included providing -- included in D was
22   customer phone service support, correct?
23     A    Correct.
24     Q    Now, I want to save some time if I can.
25   Are you aware that the Sears Craftsman manual for the

Case 3:13-cv-00257-JAM   Document 307-3   Filed 10/11/18   Page 10 of 15

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

 1   50163 has an 800 phone number to call if there's --
 2       A   I wouldn't --
 3       Q   -- if a customer needs information or
 4   complaints or anything about 50163?
 5       A   I would expect it does.
 6       Q   And are you aware that if you call that
 7   number you get the Kansas City number of Shinn Fu
 8   Company?
 9       A   Yes.
10       Q   All right.  Let's move on.  Just bear with me
11   for one more.
12           The next document you have the number there is
13   the Sears MVP Universal Terms and Conditions dated
14   October 12, 2006?
15       A   Yes.
16       Q   And that begins with MVP Bates Number 10203.
17   Is that the one you're looking at?
18       A   Yes.
19       Q   Okay.
20           Did you have any role in negotiating this
21   document on behalf of MVP?
22       A   I do not think I did.
23       Q   Did anyone at SFA have any role in the
24   negotiation of the terms of this document between MVP
25   and Sears?

Case 3:13-cv-00257-JAM   Document 307-3   Filed 10/11/18   Page 11 of 15

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

```
 1                MR. BROWN:  Sure.
 2
 3            (Off the record from approximately
 4              2:42 p.m. to 2:47 p.m.)
 5
 6   BY MR. EDINBURGH:
 7      Q   Did Roger Claypool, before he left the employ
 8   of SFA, ever communicate to SFA, SFT, or MVP with
 9   respect to the terms "false engagement" or "false
10   loading" as it applied to ratchet and pawl design
11   jack stands?
12      A   Yes.
13      Q   When did he do that?
14      A   Around the time of the Bowles' case.
15      Q   Which was when?
16      A   Around 2006, 2005.
17      Q   And what form did that communication take?
18      A   E-mail from Tony Choi.
19      Q   Were you part of that e-mail chain -- I'm
20   sorry, not chain -- e-mail?
21      A   I was copied on it.
22      Q   And was that with respect to the investigation
23   of the Bowles' incident?
24      A   Yes.
25      Q   Did Mr. Choi or anyone else ask Roger what he
```

Case 3:13-cv-00257-JAM   Document 307-3   Filed 10/11/18   Page 12 of 15

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

1  meant when he used the terms "false engagement" and
2  "false loading"?
3      A   It was explained in his initial e-mail.  It
4  didn't require further -- so the answer is no,
5  because Roger explained what he meant.
6      Q   What did he mean?
7      A   A spontaneous release of a jack stand causing
8  a sudden loss of height.
9      Q   Anything else about the meaning of the term or
10 terms?
11     A   Yes.
12     Q   What in addition?
13     A   Generally caused by the idea that the jack
14 stand is not fully engaged, the pawl is not fully
15 engaged in the teeth of the jack stand.
16     Q   Did Mr. Choi or -- Mr. Choi, again, at that
17 time was an officer of MVP?
18     A   Yes.
19     Q   Vice president?
20     A   Yes.
21     Q   Was SFT or anyone from that company involved
22 in the e-mail either as a recipient or as a cc or
23 any way?
24     A   I don't think anybody -- my memory is that
25 nobody from SFT was copied on those e-mails, but I

Case 3:13-cv-00257-JAM   Document 307-3   Filed 10/11/18   Page 13 of 15

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

 1   could be wrong on that.
 2      Q   Was there any additional e-mails asking for
 3   any further explanation as to the meaning of these
 4   terms or why Roger felt these terms were -- may be
 5   involved in the Bowles' incident?
 6      A   Again, my memory is that Roger explained all
 7   of this in the initial e-mail, and there was
 8   subsequent e-mail asking for additional information
 9   and materials including a response from an engineer
10   at MVP who asked for some pictures.
11      Q   After that is there any further communication
12   that you're aware of Mr. Claypool --
13      A   Yes.  Go ahead.
14      Q   Let me just finish then you can say yes.
15          -- concerning the terms "false engagement" and
16   false loading either as it applies to Bowles or to
17   anything else?
18      A   Yes.
19      Q   What do you recall?
20      A   I recall that in the final e-mail on which I
21   was copied Mr. Claypool indicated that there was no
22   false engagement of this jack stand.
23      Q   Is it your understanding that that e-mail or
24   those e-mails we already -- any e-mails subsequent to
25   that that Roger sent to anyone in which you were

Case 3:13-cv-00257-JAM   Document 307-3   Filed 10/11/18   Page 14 of 15

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

```
 1   either cc'd or obtained a copy in which the terms
 2   false engagement or false loading was used by him?
 3      A   I do not recall reading another e-mail from
 4   Mr. Claypool in which he used the term false
 5   engagement.
 6      Q   Did anyone at MVP or SFA, during or after
 7   the Bowles' incident, communicate with Roger asking
 8   him for any further discussion about the concept of
 9   or phenomena of false engagement or false loading?
10      A   I do not know if anyone communicated with
11   Roger soliciting additional information on false
12   engagement.
13      Q   Did you?
14      A   Roger and I had discussions during
15   investigations of various jack stand cases or in our
16   discussions about the Bowles' case about the issue of
17   false engagement generally.
18      Q   When you say "discussions," I take it you mean
19   these were verbal discussions and there's nothing in
20   writing memorializing those discussions?
21      A   Correct.
22      Q   Did you and Roger have any discussions
23   concerning the concept or phenomena of false
24   engagement or false loading with respect to any other
25   claim or incident other than the Bowles case?
```

Case 3:13-cv-00257-JAM   Document 307-3   Filed 10/11/18   Page 15 of 15

FREDERICK KLORCZYK, JR. vs. SEARS, ROEBUCK AND CO., ET AL.
Arthur Chaykin, Esquire on 06/21/2018

```
 1     A    No.
 2     Q    How about just in general about the concept?
 3     A    Yes.  I already said yes.
 4     Q    Okay.
 5          And when did these discussions or discussion
 6   take place?
 7     A    They occurred on or around the time of the
 8   Bowles' case and a few months thereafter.
 9     Q    And do you have a recollection of the content
10   of those discussions, what was said?
11     A    I remember Roger's last statement on the
12   Bowles' case which was in writing, and then I
13   remember Roger -- I remember discussing the
14   perception of jack stands and whether -- I remember
15   discussing how we've had no reports of false
16   engagement accidents after selling millions and
17   millions of jack stand pairs, and I also remember
18   that we discussed whether this was an internet
19   related sort of an urban legend issue or whether it
20   was a real issue, and whether it was a consumer
21   perception issue or whether it was a real accident
22   factor.
23          We also talked quite a bit about the virtues
24   of the standard jack stands and how those -- some of
25   those virtues would be lost in attempting to resolve
```