# EXHIBIT J

```
 1              UNITED STATES DISTRICT COURT
 2               DISTRICT OF CONNECTICUT
 3

    FREDERICK KLORCZYK, JR.,
 4  as co-administrator of the
 5  Estate of Christian R. Klorczyk,
 6  FREDERICK KLORCZYK, JR.,
 7  Individually, LYNNE KLORCZYK,
 8  as co-administrator of the
 9  Estate of Christian R. Klorczyk
10  and LYNNE KLORCZYK, individually,
11     PLAINTIFFS,
    VS.                      Case 3:13-cv-00257-RNC
12  SEARS, ROEBUCK AND COMPANY,
13  SHINN FU CORPORATION, SHINN FU
14  COMPANY OF AMERICA, INC.,
15  and MVP (HK) INDUSTRIES, LTD.,
16     DEFENDANTS.
17

18        Deposition of LYNNE KLORCZYK, taken at Gordon,
19     & Rees, L.L.P., 95 Glastonbury Boulevard, Suite 206,
20     Glastonbury, Connecticut, by Sabina Lohr, Licensed
21     Shorthand Reporter and Notary Public in and for the
22     State of Connecticut, on November 13, 2014,
23     at 10:14 a.m.
24

25  PAGES 1 - 295

                                       Page 1
```

```
 1   APPEARANCES:
 2
     ON BEHALF OF THE PLAINTIFFS:
 3   DAVID J. ELLIOTT, ESQUIRE
     BRYAN J. ORTICELLI, ESQUIRE
 4   DAY PITNEY, L.L.P.
     242 TRUMBULL STREET
 5   HARTFORD, CONNECTICUT 06103
 6
     ON BEHALF OF THE PLAINTIFFS:
 7   JOSEPH E. DONAT, ESQUIRE
     HERZFELD & RUBIN, P.C.
 8   125 BROAD STREET
     NEW YORK, NEW YORK 10004
 9
     ON BEHALF OF SHINN FU CORPORATION, SHINN FU COMPANY
10   OF AMERICA, INC. AND MVP (HK) INDUSTRIES, LTD:
11   SEAN P. FLYNN, ESQUIRE
     GORDON & REES, L.L.P.
12   2211 MICHELSON DRIVE
     SUITE 400
13   IRVINE, CALIFORNIA 92612
14
15   ON BEHALF OF THE DEFENDANT SEARS ROEBUCK AND COMPANY:
     ERICA TODD TROTTA, ESQUIRE
16   TROTTA, TROTTA & TROTTA
     900 CHAPEL STREET
17   NEW HAVEN, CONNECTICUT 06510
18
     ON BEHALF OF THE DEFENDANT SEARS ROEBUCK AND COMPANY:
19   THOMAS ANDERSON, ESQUIRE
     MORRISON MAHONEY, L.L.P.
20   ONE CONSTITUTION PLAZA
     10TH FLOOR
21   HARTFORD, CONNECTICUT 06103
22
     Also Present:
23   Mr. Frederick Klorczyk
24   Mr. Chuck Naber
25   Mr. William Shaw
```

                                                    Page  2

```
 1                 THE VIDEOGRAPHER:  We're now on the record.
 2     Please note that the microphones are sensitive and may
 3     pick up whispering and private conversations.  Please
 4     turn off all cell phones or place them away from the
 5     microphones, as they can interfere with the deposition
 6     audio.  Recording will continue until all parties agree
 7     to go off the record.
 8                 My name is Bill Slater, representing
 9     Veritext.  Today's date is November 13th, 2014.  The
10     time is approximately 10:14 a.m.
11                 This deposition is being held at Gordon
12     Rees, located at 95 Glastonbury Avenue, Glastonbury,
13     Connecticut.  It's being taken by counsel for the
14     defendants.
15                 The caption in the case is Klorczyk v.
16     Shinn Fu.  The case is filed in United States District
17     Court, District of Connecticut.  The case number is
18     3:13-cv-00257-RNC.  The name of the witness is Lynne
19     Klorczyk.
20                 At this time, the attorneys present in the
21     room will identify themselves and the parties they
22     represent.
23                 MR. ELLIOTT:  Yes.  Representing the
24     plaintiffs, it's David Elliott, Bryan Orticelli of Day
25     Pitney, L.L.P. in Hartford, Connecticut and Joseph Donat
```

Page 3

```
 1    from Herzfeld & Rubin in Manhattan.
 2              MR. FLYNN:  On behalf of the
 3    non-Sears-related defendants, Sean Flynn of Gordon &
 4    Rees.
 5              MS. TROTTA:  On behalf of the Sears
 6    defendant, Erica Todd Trotta.
 7              MR. ANDERSON:  On behalf of the Sears
 8    defendant, Tom Anderson from Morrison Mahoney.
 9              THE VIDEOGRAPHER:  Our court reporter,
10    Sabina Lohr, representing Veritext, will swear in the
11    witness and we can proceed.
12
13              LYNNE KLORCZYK, having been first duly
14    sworn, was deposed and testified as follows:
15
16              MR. ELLIOTT:  I have a question on the
17    record, please.  There's a person sitting to the right
18    of Mr. Flynn, and I don't know who he is.
19              MR. FLYNN:  He's one of our consultants.
20              MR. ELLIOTT:  Okay.  He has no right to be
21    in this deposition.  Local Rule 30(a) prohibits him from
22    being here.  His presence is a violation of Local Rule
23    30(a), and I ask he be excluded from the deposition now.
24              MR. FLYNN:  Let's go off the record, then,
25    so I can take a look --
```

Page 4

1              MR. ELLIOTT:  We're not going off the

2     record.

3              MR. FLYNN:  -- at Local Rule 38 before I...

4              MR. ELLIOTT:  Here.  I'm going to hand you

5     Rule 30(a), Mr. Flynn.  It's a local rule you're

6     probably not familiar with.

7              MR. FLYNN:  Actually, this isn't open to 38.

8              MR. ELLIOTT:  30(a).

9              MR. FLYNN:  Oh, 30(a).  I thought you said

10    38.  Excuse me.

11             So it's your position that our consultant is

12    not within the parties to the action?

13             MR. ELLIOTT:  That's correct.

14             MR. FLYNN:  Okay.

15             MR. ELLIOTT:  That happens to be the law in

16    this district.

17             MR. FLYNN:  Well, it says we can call the

18    judge and ask for an exception to the rule, so let's do

19    that.

20             MR. ELLIOTT:  You're supposed to make an

21    application before the deposition, Mr. Flynn.

22             MR. FLYNN:  Well, let's call the magistrate

23    and ask if it's okay.

24             Any disagreement with doing that?

25             MR. ELLIOTT:  It's your deposition,

Veritext National Deposition & Litigation Services
866 299-5127

 1   Mr. Flynn.  You're supposed to make an application

 2   before the deposition.

 3               MR. FLYNN:  Okay.  Well, let's go off the

 4   record so we can dial in the magistrate.

 5               THE VIDEOGRAPHER:  Time is 10:18.  We're off

 6   the record.

 7               (A discussion was held off the record.)

 8               THE VIDEOGRAPHER:  Back on the record.  Time

 9   is 10:34.

10               MR. FLYNN:  Okay.  During the break, we had

11   a telephonic conference call with Magistrate Fitzsimmons

12   regarding the presence of the defendants' consultant in

13   this case, asking permission that he be allowed to

14   attend the deposition.

15               The ruling from Magistrate Fitzsimmons was

16   that he could attend, so long as he identified himself

17   on the record.  So, at this time, I'll ask the

18   consultant to state his name.

19               MR. NABER:  Charles Edward Naber, N-a-b-e-r.

20               MR. FLYNN:  Okay.

21               MR. ELLIOTT:  And I made a request, when we

22   were off the record, that -- that both the stenographer

23   and the -- and the videographer not go off the record

24   unless both counsel agree.  Thank you.

25               MR. FLYNN:  Okay.  So do we want to enter

                                                    Page 6

```
 1    into the usual stipulations?
 2               MR. ELLIOTT:  This deposition is being taken
 3    pursuant to the Federal Rules of Civil Procedure.
 4               MR. FLYNN:  Is that a no?
 5               MR. ELLIOTT:  I have nothing more to say.
 6    The Federal Rules of Civil Procedure apply to this
 7    deposition.
 8               MR. FLYNN:  Okay.
 9                    DIRECT EXAMINATION
10    BY MR. FLYNN:
11       Q.    Good morning, Mrs. Klorczyk.
12       A.    Good morning.
13       Q.    My name is Sean Flynn.  We've met a couple
14    times before today's deposition.
15               Can I please ask that you state and spell
16    your full name -- full legal name for the record,
17    please.
18       A.    Lynne Sepesy Klorczyk.
19               You want me to spell all of it?
20       Q.    Yes, please.
21       A.    L-y-n-n-e, S-e-p-e-s-y, K-l-o-r-c-z-y-k.
22       Q.    Thank you.
23               Have you ever been deposed before?
24       A.    No.
25       Q.    You probably spoke with your attorneys before
```

Page 7

1    today's deposition about how today could likely unfold.

2    I'm not asking you to disclose to me anything that you

3    spoke with your attorneys about.  But what I usually

4    like to do at the start of a deposition is kind of go

5    over the ground rules, go over kind of how the

6    deposition is going to unfold so that everyone is on the

7    same page so that, after the deposition, people don't

8    say, oh, well, I didn't understand that that's what was

9    meant, I didn't understand that's how this was going to

10   work, just so everything is out on the page.

11            And if you have any questions, please feel

12   free to ask; okay?

13       A.    Yes.  Yes.

14       Q.    Now, the first thing is, to my left and your

15   right is the court reporter.  She's taking down

16   everything that's being said here today in shorthand

17   format.  After the deposition, she'll translate that

18   into word for word what we're saying and put it into a

19   booklet format.  To make her job as easy as possible, it

20   helps if there's only one person speaking at a time;

21   okay?

22       A.    Yes.

23       Q.    Thank you.  From time to time, people in

24   everyday conversations have a tendency to nod their

25   head, shake their head in response to questions.  It's a

Page 8

1   perfectly normal habit.  But in order for us to get the

2   clearest transcript possible, we need verbal responses.

3   So yes, no or some other narrative; okay?

4       A.   Yes.

5       Q.   Now, you're doing great so far.  From time to

6   time, I might catch that you're nodding your head or

7   shaking your head, and I might follow up with is that a

8   yes or is that a no.  I'm not trying to be combative.

9   I'm just trying to make sure that we have a clear

10  response on the record.  Fair enough?

11      A.   Yes.

12      Q.   Okay.  At the end of the deposition, you'll be

13  provided a copy of the deposition transcript.  You'll be

14  able to review it, make corrections, sign it and then

15  that will be the official transcript of your testimony

16  here today; okay?

17      A.   Yes.

18      Q.   So we want to make sure that we get the best

19  testimony on the record here today.  To ensure that,

20  this is not a race.  We're not trying to finish as

21  quickly possible.  So please listen to the questions,

22  think about the questions and then provide your best

23  testimony; okay?

24      A.   Yes.

25      Q.   This is also not an endurance test.  So if, at

Page 9

1    any time, you need to take a break for whatever reason,

2    please let us know and we'll take a break.  Fair enough?

3        A.    Yes.

4        Q.    Okay.  The only thing that I ask is that, if we

5    have asked a question, whether it's myself or any of the

6    other defense attorneys, in this case that we get an

7    answer to that question before we take a break, unless

8    the break is to consult with your attorneys about some

9    privileged information.  Do you understand?

10       A.    Yes.

11       Q.    Okay.  Good.  Now, when I ask a question,

12   sometimes it may not make sense to you.  Sometimes I'm

13   either speaking too fast or I'm using terms that you're

14   not familiar with or any other number of reasons why it

15   doesn't sound legible or understandable to you.  If that

16   happens, please let us know.  If you don't understand a

17   question, we don't want you to take a guess at what the

18   answer might be.  We want you to speak up, let us know

19   that you don't understand the question and we'll try to

20   rephrase it; okay?

21       A.    Yes.

22       Q.    Okay.  Good.  Now, if I ask a question and you

23   answer it, I'm going to assume that you understood the

24   question; fair enough?

25       A.    Yes.

Veritext National Deposition & Litigation Services
866 299-5127

1      Q.    Okay.  From time to time, there may be an
2    objection voiced by your attorney.  That happens.  If
3    it's to the form of the question, I'm still entitled to
4    an answer.  If, however, he objects saying that it calls
5    for privileged information and instructs you not to
6    answer, then it's up to you whether or not you want to
7    respond or not.  I might follow up with a question
8    saying, are you going to follow your attorney's advice
9    not to answer the question.  Again, not trying to be
10   combative, just trying to make sure that we have a clear
11   record.  Fair enough?
12     A.    Yes.
13     Q.    In the last 24 hours, have you consumed any
14   alcohol that might affect your ability to give your best
15   testimony here today?
16     A.    No.
17     Q.    In the last 24 hours, have you consumed any
18   prescription medication that might affect your ability
19   to give your best testimony here today?
20     A.    Can you rephrase that?
21     Q.    Sure.  What I'm trying to get at here is, I
22   don't need to know what medications you may or may not
23   have taken in the last 24 hours, but if you have taken a
24   prescription medication in the last 24 hours that, in
25   your opinion, may affect your ability to give your best

Veritext National Deposition & Litigation Services
866 299-5127

1    testimony here today, please let us know.

2        A.    No.

3        Q.    You have not?

4        A.    I have not.

5        Q.    Okay.  Good.  As part of the best testimony

6    issue that we've been talking about so far this morning,

7    we're going to be asking you about things that have

8    taken place years ago.  Sometimes people don't remember

9    exact details.  Sometimes they remember exact details.

10   Sometimes they don't remember anything at all.  We do

11   not want you to guess.  So it's perfectly acceptable for

12   you to say, I don't remember or I don't know.  If you

13   remember the exact details, then, please, tell us all

14   the exact details that you recall.

15            If you remember some details, but not all of

16   them, we're still entitled to get that information that

17   you do recall.  So sometimes your best recollection or

18   your best estimate is still a required response.  Fair

19   enough?

20       A.    Yes.

21       Q.    Okay.  Is there any reason your deposition

22   can't proceed today?

23       A.    No.

24       Q.    Okay.  Did you receive a deposition notice to

25   be here today?

```
 1        A.    Yes.
 2        Q.    I'm going to hand you what will be marked as --
 3   are we going in order, or are we starting from the
 4   beginning on each depo?
 5              MS. TROTTA:  Beginning on each depo.
 6              MR. FLYNN:  Are we doing -- I forgot if
 7   we're doing numbers or letters, Dave.
 8              MR. ELLIOTT:  I don't remember.  To tell you
 9   the truth, I don't remember.  I thought it was letters.
10              MR. FLYNN:  Defendants are taking letters?
11              MR. ELLIOTT:  I think so.
12              MR. ORTICELLI:  I think that's right.
13              MR. FLYNN:  Okay.  So this will be
14   Defendants' A.  It's the notice of deposition of Lynne
15   Klorczyk from November 4, 2014.  Let her mark it first.
16              (A discussion was held off the record.)
17              (Defendants' Exhibit A was marked for
18              identification.)
19              MR. FLYNN:  Thank you.  I'm handing it to
20   counsel.
21        Q.    Have you seen that deposition notice before?
22        A.    I have.
23        Q.    And is it your understanding that you're here
24   today pursuant to that notice?
25        A.    It is.
```

                                              Page 13

```
 1        Q.     Okay.  Thank you.  If you could, hand that back

 2    to the court reporter.

 3               MR. FLYNN:  This will be marked as

 4    Defendants' B.  It's the notice of deposition of Lynne

 5    Klorczyk served on November 12th, 2014.

 6               (Defendants' Exhibit B was marked for

 7               identification.)

 8               MR. FLYNN:  You want to see it, Dave?

 9               MR. ELLIOTT:  Please.

10        Q.     Mrs. Klorczyk, have you seen that notice of

11    deposition before?

12        A.     Yes.

13        Q.     Okay.  And is it your understanding that you're

14    here today pursuant to that notice?

15        A.     Yes.

16               MR. FLYNN:  We're going to append the -- I

17    thought the request for production of documents was

18    already attached to that Exhibit B.  It wasn't.  So

19    we'll add this to Exhibit B and start over.

20               MR. ORTICELLI:  You want to mark it as

21    another exhibit?

22               MR. FLYNN:  Wasn't it all served together?

23               MR. ORTICELLI:  It's your notice.

24               MR. ELLIOTT:  They were separate documents.

25               MR. FLYNN:  Oh, they were separate
```

1    documents?

2               This will be C.

3               MR. ELLIOTT:  We received four attachments

4    to Steve's e-mail.  So there were two notices and then

5    two attachments, which were the request for production

6    of things.

7               So how are we going to do it?

8               MR. FLYNN:  It's going to be marked as C.

9               (Defendants' Exhibit C was marked for

10              identification.)

11              MR. ELLIOTT:  Thank you.

12              MR. FLYNN:  Uh-huh.

13              MR. ELLIOTT:  For the record, Exhibit C is a

14   request for production of tangible things dated

15   yesterday, November 12th, 2014.  And counsel for the

16   plaintiff received this at 3:19 p.m. yesterday

17   afternoon.

18      Q.    Mrs. Klorczyk, have you seen that document

19   before?

20      A.    I have not.

21      Q.    Okay.  Mrs. Klorczyk, did you bring anything

22   with you today to today's deposition?

23      A.    I did not.

24      Q.    Do you currently have in your possession four

25   jack stands?

Page 15

```
 1               MR. ELLIOTT:  You mean, in her -- in her
 2    possession at the deposition today?
 3               MR. FLYNN:  No.  No, just does she have
 4    possession of four jack stands whether at her home or in
 5    her car or whatever.
 6               MR. ELLIOTT:  I object to the -- I object to
 7    the form of the question.
 8               You can answer, Mrs. Klorczyk.
 9    A.    I don't know.
10    Q.    This case involves jack stands; correct?
11    A.    Yes.
12    Q.    Do you know where those jack stands are today?
13    A.    I'm not sure.
14    Q.    When was the last time you saw the jack stands?
15    A.    I'm not sure.
16    Q.    This case involves an incident that took place
17    on March 11th, 2011.  Do you recall that?
18    A.    Oh, yes.
19    Q.    Were there jack stands involved on March 11,
20    2011?
21    A.    Yes.
22    Q.    And do you know which jack stands were involved
23    on March 11, 2011?
24    A.    Not -- no.
25    Q.    No?
```

Page 16

```
 1        A.     (Shakes head.)
 2        Q.     Okay.  Do you know what happened to those jack
 3   stands that were involved in the March 11, 2011
 4   incident?
 5        A.     No.
 6        Q.     Have you seen them since March 11, 2011?
 7        A.     Probably.
 8        Q.     Okay.  But you don't know what happened to
 9   them?
10        A.     No.
11               MR. FLYNN:  Okay.  Dave, apparently, the
12   defendants were using numbers, not letters.  Do you want
13   to --
14               MR. ELLIOTT:  I said I didn't remember.
15   Sorry.
16               MR. FLYNN:  Well, neither did I.
17               MR. ELLIOTT:  Didn't mean to mislead you.
18               MR. FLYNN:  No, no, no.  Do you want to
19   change these from A, B, C, to 1, 2, 3 --
20               MR. ELLIOTT:  Whatever is your pleasure.
21               MR. FLYNN:  -- just so that we keep it
22   consistent?
23               MR. ELLIOTT:  Whatever is your pleasure.
24               MR. FLYNN:  Erica or Tom, do you mind if we
25   change it from A, B, C to 1, 2, 3 just for consistency?
```

Page 17

```
 1              MS. TROTTA:  I have no problem.

 2              MR. FLYNN:  Tom?

 3              MR. ANDERSON:  Nope.

 4              MR. FLYNN:  Okay.  So we'll change the

 5    exhibit designations from A, B, C to 1, 2, 3.  And then

 6    the defendants will continue with numbers for

 7    consistency's sake.

 8              THE COURT REPORTER:  Do you want me to take

 9    it off or just put it over?  Take it off?

10              MR. FLYNN:  Taking it off is a better

11    approach.

12              (Defendants' Exhibit 1, Exhibit 2,

13              Exhibit 3 were marked for identification.)

14    Q.    Okay.  Mrs. Klorczyk, before you came to

15    today's deposition, is there anything that you did to

16    prepare for today's deposition?

17    A.    Yes.

18    Q.    And please describe for us what that is.  What

19    did you do?

20    A.    I reviewed the original complaint, the revised

21    complaint, the police report, my statement to the police

22    officer at the time -- or at the time, the blogs that my

23    husband had written, a notebook full of letters that my

24    son's frat brothers had written to us and a magazine

25    article that featured my son, Teen People.
```

Page 18

```
1        Q.     Any other documents?

2        A.     No.

3        Q.     Okay.  And I appreciate the sensitivity of

4    today's deposition.  And just to begin, as I mentioned

5    at the outset, if you need to take a break at any point

6    in time for any reason whatsoever, please let us know

7    and we'll be happy to take a break.

8        A.     Thank you.

9        Q.     Okay?

10       A.     (Nods head.)

11       Q.     Good.  So you reviewed the original

12   complaint --

13       A.     Yes.

14       Q.     -- and the revised complaint?

15              Was that the first amended complaint?

16       A.     Yes.

17       Q.     Okay.  Did you review the second amended

18   complaint?

19       A.     Yes.

20       Q.     Okay.  When you say the police report, are you

21   talking about the entire police report with all of the

22   typewritten, handwritten reports and photographs, or

23   just a portion of that?

24       A.     Just the typewritten report.

25       Q.     Okay.  Your statement to the police officer
```

Page 19

1    on -- you said at the time -- I'm assuming that means

2    March 11, 2011?

3        A.    Yes.

4        Q.    Okay.  Was that the handwritten statement?

5        A.    Yes.

6        Q.    Okay.  Did you review a typed version of that?

7        A.    I did not see a typed version of that.

8        Q.    Okay.  And then the blogs that your husband

9    wrote, can you tell us how many blogs you reviewed?

10       A.    Maybe three sites.

11       Q.    Do you -- I'm sorry.  Finish.  Go ahead and

12   finish.

13       A.    And there were responses to his blogs.

14       Q.    Do you remember the names of the website?

15       A.    It was a BMW website for sure, and I'm not

16   really sure with the other ones.

17       Q.    Okay.  The notebook of letters from the

18   fraternity members, do you recall the dates of those

19   letters, just a range?  I'm sure they didn't all come

20   the same day, but --

21       A.    Well, they were handed to us the same day --

22       Q.    Oh, okay.

23       A.    -- but they were shortly after his death.  They

24   were given to us at the memorial service that was held

25   at UConn.

                                        Page 20

```
 1      Q.    Do you recall the date?

 2      A.    Of the service?

 3      Q.    Yes.

 4      A.    It was -- I would say towards the end of March

 5   2011.

 6      Q.    How many letters, approximately?

 7      A.    Fifty, 60.

 8      Q.    Okay.  The magazine article in -- I think you

 9   said it was Teen People --

10      A.    Uh-huh.

11      Q.    -- okay, do you remember the -- the date of

12   that issue?

13      A.    It was February 2005.

14      Q.    So this was before the incident?

15      A.    Uh-huh.

16      Q.    Okay.

17      A.    Yes.

18      Q.    Oh.  Good.  You caught yourself.

19      A.    Yeah.

20      Q.    I didn't catch that one.

21      A.    I got that one.

22      Q.    It's okay.  You're doing fine so far.

23            Anything else that you reviewed that you

24   remember at this point?

25      A.    No.
```

Page 21

```
 1      Q.    Other than your lawyers, did you talk to
 2   anybody about today's deposition?
 3      A.    Just my husband.
 4      Q.    Okay.  What did you two talk about?
 5      A.    Same things we talk about every day.  We talk
 6   about how much we miss our child.  I say it every day.
 7   So sad, so wrong.
 8      Q.    Okay.  Anything else about today's deposition
 9   and how it was going to proceed or anything like that?
10      A.    No.
11      Q.    Okay.  From the records, I've seen that you're
12   a schoolteacher?
13      A.    I am.
14      Q.    And you're still a schoolteacher?
15      A.    I am.
16      Q.    What -- what grade level?
17      A.    High school.
18      Q.    High school?
19      A.    (Nods head.)
20      Q.    How long have you been a schoolteacher?
21      A.    On and off for 38 years.
22      Q.    Have you always taught in high school?
23      A.    And middle school.
24      Q.    Any particular emphasis?  English or math --
25      A.    Family and consumer sciences.
```

Page 22

1      Q.     Can you describe for us your educational

2    background, starting from graduation of high school to

3    today.

4      A.     I have a Bachelor of Science degree in home

5    economics and a Master's degree in education.

6      Q.     Where did you get your BS?

7      A.     Seton Hill College.

8      Q.     And your Master's?

9      A.     Indiana University of Pennsylvania.

10     Q.     Any other education courses that you've

11   attended outside of formal college, so any certificates

12   or continuing education?

13     A.     Oh, continuing education.  That's always

14   required in every state.

15     Q.     Can you describe generally what that continuing

16   education requirement is.

17     A.     It was five hours per year while I was actively

18   teaching.

19     Q.     Any particular subject matters that you had to

20   cover for those five years -- five hours?  Excuse me.

21     A.     Technology or anything pertaining to my subject

22   area.

23     Q.     You said something, just a question or two ago,

24   about it being -- it was five hours while you were

25   actively teaching?

Veritext National Deposition & Litigation Services
866 299-5127

1      A.      Uh-huh.

2      Q.      So are you not actively teaching today?

3      A.      No, I am.  I am.

4      Q.      Okay.

5      A.      They just changed the requirement to -- I don't

6  know what they changed it to.  I think they took it

7  away.  But you still need to do professional

8  development.

9      Q.      So there's no minimum hourly requirement, but

10 you need to something?

11     A.      I don't -- you have to do something.

12     Q.      Okay.

13     A.      But there was a time when I wasn't teaching.

14     Q.      Okay.  So you currently are teaching family and

15 consumer science; correct?

16     A.      Yes.

17     Q.      Describe for us generally what that subject

18 matter covers.

19     A.      Today, I teach culinary, I teach child

20 development, early childhood education and independent

21 living.

22     Q.      Anything to do with home repair or auto repair

23 or maintenance of your property, gardening or any of

24 that sort of stuff?

25     A.      Consumerism.

Veritext National Deposition & Litigation Services
866 299-5127

1      Q.      What does that mean?

2      A.      Consumerism.  Being a good consumer, doing it

3    yourself, if you can --

4      Q.      So a lot of --

5      A.      -- buyer beware.  Absolutely.

6      Q.      So a lot of D-I-Y, do it yourself?

7      A.      If you can.

8      Q.      Okay.  Anything to do with automotive?

9      A.      Buying cars, financing your car, car insurance.

10      Q.      Anything with repairs?

11      A.      I don't go into repairs.

12      Q.      Okay.  Do teachers in your subject matter go

13    into auto repair?

14      A.      No.

15      Q.      Has any of your education, including the

16    continuing education, involved automotive repair --

17      A.      No.

18      Q.      -- do it yourself?

19      A.      (Shakes head.)

20      Q.      Okay.  Have you ever had any first aid

21    training?

22      A.      Yes.

23      Q.      Can you please tell us what that training was.

24      A.      I was certified in CPR several times during my

25    career.

Page 25

```
 1      Q.    When was the last certification?

 2      A.    Probably ten years ago.

 3      Q.    Okay, math.

 4            2004 --

 5      A.    2004.

 6      Q.    -- 2005?

 7      A.    Yes.

 8      Q.    Any other first aid training?

 9      A.    No, just the CPR courses.

10      Q.    Okay.  Did that training include, you know,

11   being able to locate a pulse?

12      A.    Absolutely.

13      Q.    And where were you trained to look for a pulse?

14            MR. ELLIOTT:  Objection to the form.

15            You can answer.

16      A.    Thank you.

17        Carotid artery is the strongest.

18   BY MR. FLYNN:

19      Q.    And if you aren't able to locate a pulse at the

20   carotid artery, are you trained to look at another

21   location?

22      A.    Yes.

23      Q.    And what -- what's the subsequent location?

24      A.    The wrist.

25      Q.    Wrist?
```

Page 26

```
1        A.     Groin.

2        Q.     Okay.

3        A.     Ankle.

4              MR. ELLIOTT:  I'm sorry.  What was the

5    last -- last word you said?

6              THE WITNESS:  Ankle.

7              MR. ELLIOTT:  Ankle.  Thank you.

8        Q.     Anywhere else?

9        A.     No.

10       Q.     And, again, I appreciate the sensitivity of

11   today.  Unfortunately, I have to ask a number of

12   questions that are probably going to make you a little

13   bit uncomfortable.

14          Have you ever had to administer CPR?

15       A.     No.

16       Q.     Have you ever had to check for someone's pulse?

17       A.     Yes.

18       Q.     Other than March 11 -- well, did you check on

19   March 11, 2011?

20       A.     I did.

21       Q.     Other than that date, have you ever had to

22   check for somebody's pulse?

23       A.     No.

24       Q.     Okay.  Have you had any other occupations,

25   other than a high school teacher?
```

Page 27

1      A.    Yes.

2      Q.    And what were those?

3      A.    I was a retail store manager.  I was a dental

4  office manager, nursery schoolteacher, stay-at-home mom.

5  That's it.

6      Q.    Have you ever worked on a car?

7      A.    No.

8      Q.    Okay.  Not even changing a flat tire?

9      A.    No.

10      Q.    Okay.  I think I probably know the answer to

11  these next two questions, but just to make sure that we

12  have a clear and complete record:  Have you ever used a

13  pump jack?

14      A.    No.

15      Q.    Do you know what a pump jack is?

16      A.    Yes.

17      Q.    Can you please describe what a pump jack is?

18      A.    Yes.  It is a device that is used to lift a

19  vehicle off of the ground until it can be stabilized

20  with something else, such as a jack stand and then it is

21  removed.

22      Q.    The pump jack is removed?

23      A.    The pump jack is removed.

24      Q.    Okay.  Can you physically describe what a pump

25  jack looks like.

Veritext National Deposition & Litigation Services
866 299-5127

1      A.      Normally, it is flat with a handle not attached

2   or detached.  And in order to use it, you have to insert

3   the handle, turn it and screw it into place and then

4   pump it up, hydraulic.

5      Q.      And, again, the answer -- I think I know what

6   the answer to this is going to be:  But as you're

7   pumping the pump jack up, are there moving parts?  And

8   if there are, what do they look like?

9              MR. ELLIOTT:  Objection to the form.  It's a

10  compound question.

11             But you can answer, if you understand it.

12  BY MR. FLYNN:

13     Q.      Do you understand the question?

14     A.      What's moving is the lift.

15     Q.      Okay.  And what does that lift look like?

16     A.      It looks like a metal plate.

17     Q.      Is there anything on that metal plate?

18     A.      No.

19     Q.      Is the metal plate solid?

20             MR. ELLIOTT:  Are you asking about a pump

21  jack generally or any specific pump jack or her

22  knowledge of pump jacks in general?  Is that the

23  question?

24             MR. FLYNN:  I'm asking if the plate that

25  she's testified to is a solid plate or if there's a hole

```
 1     in it or if there's jagged edges on it or any other

 2     physical attribute of the plate.

 3               MR. ELLIOTT:  That's about five questions,

 4     so I object to the form.

 5        Q.    So is the plate solid?

 6        A.    It's just a flat plate.

 7        Q.    Are there any holes in the plate?

 8        A.    I don't recall that.

 9        Q.    Okay.  What's underneath the pump jack, the

10     flat pump jack that you were talking about with the arm

11     that comes up on the plate?  What's underneath it?

12        A.    A metal arm.

13        Q.    Okay.  Are there any wheels?

14        A.    There are wheels on the bottom.

15        Q.    Okay.  How many wheels?

16        A.    I don't know.

17        Q.    Okay.  Do you know if the wheels are fixed,

18     meaning, like, these chairs have wheels that rotate 360

19     degrees?  Are the wheels on the jack stand -- I'm

20     sorry -- the pump jack, fixed, or do they rotate?

21        A.    I don't know.

22               MR. ELLIOTT:  Objection to the form.

23               You can answer.

24        A.    I don't know.

25        Q.    One of the other things so that the court
```

Page 30

1   reporter's job is as easy as possible is that we need to

2   keep our voices up.

3       A.    Yes.  I realize that.

4       Q.    No problem.  No problem.

5           So, again, the question was:  Are the wheels on

6   the pump jack fixed?

7       A.    I don't know.

8       Q.    So, likewise, are the wheels on the pump jack

9   non-fixed?

10      A.    I don't know that.

11      Q.    Okay.  Do you know what -- well, let me ask

12  this first question.

13          Have you ever used a jack stand?

14      A.    No.

15      Q.    Do you know what a jack stand is?

16      A.    Yes.

17      Q.    Can you please describe what a jack stand looks

18  like.

19      A.    It has -- it's -- it has kind of semi- --

20  semi- -- it's like an arc.  And then it has a piece that

21  comes up.  It can be fixed.

22      Q.    Watch your hand.

23      A.    It can be fixed into place, the desired place.

24      Q.    Anything else about a jack stand that you can

25  describe.

Veritext National Deposition & Litigation Services
866 299-5127

```
 1      A.      That's -- that's all I know about it.
 2      Q.      Okay.  If you're looking at a pump jack and a
 3   jack stand right next to one another, can you tell the
 4   two apart?
 5      A.      Yes.
 6      Q.      Can you tell the two apart very easily?
 7      A.      Yes.
 8      Q.      Are they very distinct in their appearances?
 9      A.      Yes.
10      Q.      Would you mistake one for the other?
11      A.      No.
12      Q.      How you doing so far?
13      A.      Good.
14      Q.      Okay.  I'm going to start asking a few
15   questions about Christian, so if you want to take a
16   break first, we can.
17      A.      No, I'm okay.
18      Q.      Okay.  If at any point during these next line
19   of questions you need to take a break, please let us
20   know; okay?
21      A.      I will.
22      Q.      When was Christian born?
23      A.      June 6th, 1989.
24      Q.      Where was Christian born?
25      A.      Latrobe, Pennsylvania.
```

Page 32

1        Q.    Can you please describe for us what Christian

2    was like as a child.

3                MR. ELLIOTT:   I object to the form.

4    BY MR. FLYNN:

5        Q.    Go ahead, if you can.

6        A.    As a --

7                MR. ELLIOTT:   The question is, what was

8    Christian like as a child.

9                THE WITNESS:   I can answer that?

10               MR. ELLIOTT:   Sure.

11       A.    He was -- he was busy.  He was active.  He was

12   into everything.  He had -- he had an older brother who

13   was very close in age, and they were very creative in

14   their busyness.

15       Q.    Did he ever get into trouble?

16               MR. ELLIOTT:   I object to the form.  I don't

17   know what trouble means.

18               But you can answer, if you understand the

19   question.

20       A.    It -- they were like bulls in a China shop,

21   just busy.  Played a lot.  They liked their toys.  Very

22   creative.  They liked to build.  They liked their cars

23   from way back.

24       Q.    Was there any particular hobby of Christian's

25   that stood out from when he was a young child that

Page 33

1    carried through to his teenage years?

2       A.    He like to -- he liked to work with his dad,

3    whatever it was.  He was very hands-on.  And as soon as

4    he could do it, he wanted to do it.  He wanted to try.

5    So whatever his dad was doing, he was right there

6    attached to his side.

7       Q.    Can you please describe for us what some of

8    those activities that Christian and Mr. Klorczyk engaged

9    in together.

10            MR. ELLIOTT:  Can we have a timeframe on

11   that, please.  You were asking as a child.  I'm just

12   wondering what the timeframe is.

13            MR. FLYNN:  Same timeframe.

14            MR. ELLIOTT:  As a child.

15      A.    It didn't matter if it was shoveling snow,

16   raking leaves, hitting tennis balls, washing cars.  Fred

17   was changing tires, changing oil, painting walls,

18   Christian was at his side, as were -- as were the other

19   ones.  But Christian stuck with him longer.  The other

20   two would, you know, take off.

21      Q.    And just for the purposes of the record, can

22   you identify the other children.

23      A.    Frederick was his older brother, Frederick, the

24   third; and Parker.

25      Q.    And what's the age differences between the

Page 34

1    three?

2    A.    Four-year total between the first and the last.

3    Q.    Okay.  As Christian developed from childhood to

4    teenager, what sort of changes did you observe?

5              MR. ELLIOTT:  Is that the question?

6              MR. FLYNN:  That's the question.

7              MR. ELLIOTT:  Objection to the form.

8    Q.    Do you understand the question?

9    A.    Not exactly.

10   Q.    Sure.  No problem.

11       And, again, if you don't understand the question,

12   please let me know.

13   A.    I will.  I was waiting to see if you were done.

14   Q.    Fair enough.  Fair enough.

15       So as Christian developed from a young child to a

16   teenager, did you observe any changes in, for instance,

17   his behavior?

18              MR. ELLIOTT:  Objection to the form.

19              You can answer.

20   A.    He continued to -- to do what he -- what he had

21   always done.  He -- he liked to hang around with --

22   well, he had a lot of friends and along with is

23   brothers.  And their dad was right there in the middle

24   with them.  And they spent an awful a lot of time on the

25   tennis courts, in the garage, on the ski slopes,

Page 35

1    bonding.

2          And whatever Fred was doing, that's what the boys

3    were doing.  And Christian was his best helper, whether

4    it was going to Home Depot, getting a certain wrench,

5    you know, keeping the wrench set together, whatever.

6    Christian liked to do that.

7          And he was very organized.  He was very

8    meticulous, just like his father.  And he was the one

9    that was standing right next to him looking -- well, not

10   over his shoulder, but right next to him with his head

11   wherever Fred's head was, Christian was right next to

12   him.  And Fred was explaining exactly what was going on.

13          Their friends were there, and many friends wanted

14   to listen.  Whether it was how to hit a tennis ball, how

15   to put on the ski boots or how to do something with the

16   car, they were all there.  Every weekend, our house was

17   the place to be for the boys of Waterford.

18   Q.    Okay.  Thank you.

19          Did his interest in any particular hobby change

20   significantly from the time he was a child to the time

21   he was a teenager?

22   A.    No, it remained cars, snow boarding.

23   Q.    Was snow boarding his favorite sport or

24   activity?

25   A.    He played tennis also, but snow boarding was

Page 36

```
 1    his winter passion.  Cars were his year-round passion.
 2        Q.    Was tennis his summer passion?
 3        A.    That was his high school sport.
 4        Q.    Did he play all four years?
 5        A.    I believe so.
 6        Q.    Okay.  Did he play in college?
 7        A.    No.
 8        Q.    Did he play any collegiate level sports?
 9        A.    No.
10        Q.    Were there any disciplinary issues with
11    Christian in high school?
12              MR. ELLIOTT:  Objection to the form.  I
13    don't know what disciplinary issues means.
14              But if you understand the question,
15    Mrs. Klorczyk, you can answer it.
16        Q.    Do you understand the question?
17        A.    In school?
18        Q.    Yes.
19          Did he ever get in trouble at school?
20        A.    Never.
21        Q.    Any disciplinary problems in college?
22              MR. ELLIOTT:  Objection to the form.
23              You can answer.
24        A.    No.
25        Q.    Any sort of disciplinary problems at home?
```

Page 37

1     A.     No.

2     Q.     Other than high school tennis, did Christian

3  ever engage any competitive sports, meaning entering

4  competitions or something like that?

5     A.     I don't believe so.

6     Q.     Okay.  With regard to his passion for cars, did

7  he belong to any automotive clubs?

8     A.     No, just some online things.

9     Q.     What sort of online things?

10     A.     Like, online forums and those kinds of things.

11     Q.     Do you know with a forums he frequented?

12     A.     He drove -- RSX -- Acura - RSX Forum, I

13  believe.

14     Q.     Have you been able to find any postings that

15  Christian made to the Acura - RSX Forum?

16     A.     I wasn't looking.

17     Q.     Any other automotive clubs or online activity?

18     A.     No.

19     Q.     Did he have a Facebook page?

20     A.     Yes.

21     Q.     Was he active on it?

22     A.     Yes.

23     Q.     Did he talk about cars?

24     A.     Yes.

25     Q.     And did you see his business Facebook page?

Page  38

```
 1              MR. ELLIOTT:  When?  Objection to the form.

 2     Q.    Did you see his Facebook page?

 3     A.    Yes.

 4     Q.    Okay.  When did you see his Facebook page?

 5     A.    I looked at it this morning.

 6     Q.    Are all of the posts that he made to his

 7   Facebook page still there?

 8     A.    Yes.

 9     Q.    What sort of posts are still there that

10   Christian posted himself?

11              MR. ELLIOTT:  Objection to the form.

12              You can answer, if you understand.

13     A.    There's a lot of things about his passion for

14   Formula 1 racing.  And he talks about going to Formula 1

15   racing -- races that we did as a family, different car

16   issues, cars that he liked, friends posted on his page

17   about issues with their cars.  And they have things to

18   show him and questions they wanted to ask him about his

19   advice.  He was apparently the go-to guy about car

20   issues.  He seemed to know his way around the car world.

21   BY MR. FLYNN:

22     Q.    Okay.  Were there any posts by somebody, other

23   than Christian, to his Facebook page after March 11th,

24   2011?

25     A.    Yes.
```

Page 39

1      Q.    Okay.  Approximately how many?

2            MR. ELLIOTT:  If you know.

3      A.    A lot.

4      Q.    Can you put -- assign any number to that, any

5    ballpark number.

6      A.    Seventy-five, 100.

7      Q.    Okay.  Have you read those posts --

8      A.    Yes.

9      Q.    -- March 11, 2011 --

10     A.    Yes.

11     Q.    -- submissions?

12     A.    Yes.

13           MR. ELLIOTT:  I'm sorry.  I didn't get the

14   question.

15           MR. FLYNN:  I was asking if she had read

16   those post-March 11, 2011 postings to --

17           MR. ELLIOTT:  Thank you.

18           MR. FLYNN:  -- to Christian's Facebook page.

19     Q.    And I think the answer was yes; is that

20   correct?

21     A.    Yes.

22     Q.    Okay.  Can you describe for us what those

23   postings say.

24     A.    Most of them start with how much they miss

25   Christian, how much they love Christian, how they have

Page 40

```
 1    seen things that they wish they could tell him about in

 2    person and how much he would have loved this car or that

 3    car or what great snow it was and they hope he's snow

 4    boarding and driving great cars and having a great time

 5    doing the things that he loved to do.  And many, many

 6    speak about carrying his funeral card from the funeral

 7    home, which is laminated, with him -- with them and how

 8    they have left them here, there, all over the world.

 9        Q.    Okay.  Thank you.

10          Do you recall the date of the last posting, the

11    most recent one?

12        A.    Probably a few days ago.

13        Q.    Okay.  Have you posted anything to your son's

14    Facebook page since March 11, 2011?

15        A.    Yes.

16        Q.    Can you describe for us the nature of those

17    postings?

18        A.    Yes.  They're always how I know he's still with

19    us, and I know he walks beside me and how much we miss

20    him and how proud I am of him as a son, as I am of all

21    of them, and how I never want his memory to be forgotten

22    and -- and there's many responses saying, you know, he

23    never will be.  And many response too, you know, I'm

24    crying and somebody else is saying, I'm crying too now

25    and I'm crying too now.  Yeah.
```

Page 41

1      Q.    Do you have a Facebook page?

2      A.    I do.

3      Q.    Actually, I'm sorry.  Let me back up.  Just

4   finish with Christian's Facebook page.

5           Do you have his user name and password for his

6   Facebook account?

7      A.    I do not.

8      Q.    So how do you have access to his Facebook

9   account to be able to see all of these postings?

10     A.    Because he accepted me as a friend.

11     Q.    And does that enable you to print off what is

12   visible on his Facebook account as a friend through

13   friend Facebook?

14     A.    I don't know how to do that.  But if there was

15   a way, I guess I could, but I don't -- I'm not that

16   savvy with a computer.

17     Q.    Fair enough.

18     A.    If you're not his friend you get RIP, Christian

19   Klorczyk.

20     Q.    Okay.  So moving on to your Facebook page, have

21   you -- well, when did you create your Facebook page?

22     A.    I don't know.  Maybe five years ago.

23     Q.    Okay.  And I think I know the answer to this

24   question:  But did you ever post anything to your

25   Facebook page about your children before March 11, 2011?

                                              Page 42

1       A.     Yes.

2       Q.     Are those postings still all on your Facebook

3   page, meaning you haven't deleted any of them?

4       A.     I haven't deleted anything.

5       Q.     Have you posted anything to your Facebook page

6   since March 11, 2011 about your children?

7       A.     Yes.

8       Q.     And specifically Christian?

9       A.     Yes.

10      Q.     And are all of those postings still available

11  on your Facebook page?

12      A.     Yes.

13      Q.     And I think I know what the answer to this next

14  question is going to be:  Have you printed any of those

15  off?

16      A.     I don't know how.

17      Q.     Okay.  Fair enough.

18          Do you know if your husband, Mr. Klorczyk, has a

19  Facebook page?

20      A.     He does.

21      Q.     Do you know when he created that Facebook page?

22      A.     I think it was about the same time as mine.

23      Q.     Okay.  Do you know if Mr. Klorczyk posted

24  anything to his Facebook account prior to March 11, 2011

25  regarding his children?

Veritext National Deposition & Litigation Services
866 299-5127

```
 1        A.    I'm pretty sure he did.

 2        Q.    Okay.  Are you friends with Mr. Klorczyk

 3   through Facebook?

 4        A.    Yes.

 5        Q.    I know that sounds really odd.  That's an odd

 6   question, but --

 7        A.    Yes, we are --

 8        Q.    -- that's the terminology.

 9        A.    -- we are friends on Facebook.

10        Q.    Okay.  So you can see what's on his Facebook

11   account?

12        A.    Yes.

13        Q.    Have you tried to print anything from his

14   Facebook account?

15              MR. ELLIOTT:  His is Mr. Klorczyk?

16              MR. FLYNN:  From her ability to view it as a

17   friend on Facebook.

18              MR. ELLIOTT:  Of Mr. Klorczyk's?

19              MR. FLYNN:  Yes.

20              MR. ELLIOTT:  Thank you.

21        A.    No, I have not tried to print anything.

22        Q.    Okay.  Has Mr. Klorczyk posted anything to his

23   Facebook page since March 11, 2011 regarding his

24   children?

25        A.    Yes.
```

                                          Page 44

1      Q.    And specifically Christian?

2      A.    Yes.

3      Q.    To your knowledge, are all of those postings

4    still available on his Facebook page?

5                MR. ELLIOTT:  If you know.

6      A.    To my knowledge, they are.

7      Q.    Do you know if Mr. Klorczyk has tried to print

8    off any of his Facebook postings?

9      A.    I don't know that.

10     Q.    Okay.  So we talked a bit about Christian's

11   athletics and his involvement with tennis and snow

12   boarding.

13         Were there any other extracurricular activities

14   that Christian was involved in from high school through

15   college?

16                MR. ELLIOTT:  I object to the form.

17     Q.    That you're aware of?

18                MR. ELLIOTT:  Do you know what

19   extracurricular means?

20                THE WITNESS:  Yes.

21                MR. ELLIOTT:  Okay.  Go ahead.

22     A.    He was very involved with his fraternity at

23   UConn.

24     Q.    And I've seen it in the documents, but can you

25   identify that fraternity by name?

Page 45

1      A.     Yes.  It's Zeta Beta Tau.

2      Q.     All right.  Do you know when he joined that

3  fraternity?

4      A.     His freshman year.

5      Q.     And he was active throughout college?

6      A.     Yes.

7      Q.     Okay.  Any other extracurricular activities

8  that you're aware of between high school and college?

9      A.     He had a lot of friends.  He was busy all the

10 time.  I didn't know anything was formal.

11     Q.     I'm sorry?

12     A.     I didn't think there were any formal

13 activities.

14     Q.     So no organized extracurricular activities?

15     A.     Organized is a better word, yes.

16     Q.     Other than his fraternity membership?

17     A.     Right.

18     Q.     His tennis involvement in high school?

19     A.     Right.

20     Q.     And I think those were the only two; is that

21 correct?

22     A.     I believe so.

23     Q.     Okay.  And, again, if you need to take a break

24 at any time, please let me know.

25            Do you know if Christian consumed alcohol, ever?

Page 46

1        A.     Yes, he did.

2        Q.     Are you aware of him ever consuming alcohol to

3    excess?

4        A.     I don't know that.

5        Q.     So I probably know the answer to this next

6    question, but just so we have a complete record:  Are

7    you aware of Christian ever abusing alcohol?

8        A.     I don't believe so.

9        Q.     Okay.  Are you aware if Christian ever

10   consuming nonprescription recreational drugs?

11       A.     I don't believe so.

12       Q.     Okay.  So you probably know the answer to the

13   next questions, but, again, just so we have a complete

14   record:  Are you aware of Christian ever abusing

15   nonprescription recreational drugs?

16       A.     No.

17       Q.     Okay.  I presume that, at some point during

18   Christian's life, he did consume prescription

19   medication; is that correct?

20       A.     Yes.

21       Q.     Did he ever consume a prescription narcotic of

22   any name or brand?

23       A.     Not to my knowledge.

24       Q.     So I probably know the answer to this question

25   as well, but just so we have a complete record:  Are you

                                              Page  47

1    aware if Christian ever abusing any prescription

2    medication?

3        A.    No.

4        Q.    Again, if you need to take a break, please let

5    me know.  I'm coming up on an hour.  I usually take

6    breaks every hour, mainly for the court reporter's sake.

7    She has a very hard job, and we are almost at that hour.

8    Just a couple more questions, but if you need to stop

9    earlier, please let me know.

10       A.    Okay.

11       Q.    Did Christian ever visit or seek treatment from

12   a psychologist?

13       A.    No.

14       Q.    Did Christian ever receive treatment from a

15   psychiatrist?

16       A.    No.

17       Q.    Was Christian ever arrested for any crime?

18       A.    I'm not sure.

19       Q.    Okay.  How would you describe Christian's

20   academic performance in college?

21       A.    Excellent.

22       Q.    How would you describe his academic performance

23   in high school?

24       A.    Pretty good.

25       Q.    Did Christian have any jobs, employment?

Page  48

```
 1      A.     He had some little things.

 2      Q.     What sort of things?

 3      A.     Oh, he worked at the playground.  One summer,

 4   he worked at Harkness.

 5      Q.     Anything else that you recall?

 6      A.     That's all I can recall at the moment.

 7      Q.     Okay.  Did he ever have any internships?

 8      A.     Oh, yeah, he did.  He did.  He was in -- he was

 9   in the London one summer.

10      Q.     Who did he work for in London?

11      A.     I have no clue.

12      Q.     Okay.  Any other internships?

13      A.     I don't know.  If he did, I don't -- it's

14   escaping me if he did.

15      Q.     Okay.  For the internship in London --

16      A.     Uh-huh.

17      Q.     -- sometimes employers don't pay their interns.

18         Was he paid anything?

19      A.     I don't think so.

20      Q.     Did he get at least free room and board or

21   anything like that from the company, or did he have to

22   pay for all of that?

23      A.     No, I think we paid for everything.

24      Q.     Okay.  And you don't remember the name of --

25      A.     I'm not positive, but no, I don't know the name
```

Page 49

1    of the company.

2        Q.    I'm sorry.  I didn't mean to cut you off.  You

3    were saying you weren't positive --

4        A.    I'm not positive.  I don't -- I don't pay the

5    bills, but we just thought it was a good experience.  It

6    was a great experience.

7        Q.    Okay.  How long has he in London?

8        A.    For the summer.

9        Q.    So about three months, ballpark?

10       A.    Approximately.

11       Q.    Okay.  What was the internship?

12       A.    It was with hedge funds.

13       Q.    Okay.  Is that something that he had an

14   interest in?

15       A.    Yes, he was a finance major.

16       Q.    Was that going to be his career path, finance?

17       A.    Yeah, that was one of his plans, one of his --

18   yeah -- options.

19       Q.    What were some of the other options or plans?

20       A.    He was considering law and following his

21   brother.  He wanted to -- he told me he wanted to do

22   something with cars.  And I said, what are you going to,

23   sell minivans?  No, those -- something more exotic,

24   something about his name on it, he told me.  I want

25   something with my name on it.

Veritext National Deposition & Litigation Services
866 299-5127

1    Q.    So did he -- did he want to get into making

2  custom cars, something like that?

3    A.    I don't think so.  I think he was thinking more

4  of dealing in exotic cars.

5    Q.    Oh, so having a dealership that specializes in

6  exotic cars?

7    A.    Possibly.

8    Q.    Oh, okay.

9    A.    There's one in Greenwich that he was very --

10  had been visiting since he was a small child.  And I'm

11  sure they cringed every time they saw us get near the

12  door.  But he loved that place, sat in every car in the

13  place.  And I think that's what he was -- that's what he

14  had in mind.

15    Q.    Why would the dealer cringe when --

16    A.    Well, because they have every exotic car in the

17  world.  And, you know, they show these cars, and they're

18  one of a kinds.  And, you know, he had to touch them

19  all, looking, get inside, if they could, and

20  fingerprints all over the place and that kind of thing.

21    Q.    Gotcha.

22    A.    I think that's what he had in mind.

23    Q.    Okay.

24    A.    He had a -- had an affinity for expensive,

25  exotic cars.

Page 51

```
 1      Q.      So would you say he was more likely to go into
 2   the exotic car career path versus, I guess, for lack of
 3   a better term, some corporate finance career path?
 4      A.      Well, I don't think he was trying to figure out
 5   some way.  We had to finance that, so he was going to
 6   find away to make the money to finance the kind of toys
 7   that he wanted, so -- or find away to combine those two.
 8   But he had no intention of living a poor man's life with
 9   driving a -- you know, his used Acura.  It wasn't used.
10   He had a new Acura.  But he didn't want to drive an
11   Acura forever.
12      Q.      Okay.
13      A.      Not this there's anything wrong with an Acura,
14   but...
15      Q.      Nothing wrong with that car at all.
16      A.      No.  No, no.  He -- he had one, and he -- he
17   was very proud of the fact that he won most superlative
18   car his senior year, you know, senior superlatives in
19   the yearbook.  And he was bound and determined to have
20   the best car in the senior class.
21      Q.      I'm from him --
22      A.      And he did.
23      Q.      I'm sorry.  I didn't mean to cut you off.
24      A.      And he did.
25      Q.      So I'm from California, and we didn't have high
```

Page 52

1    school superlatives.

2        So can you explain that for me, what is that?

3    A.    Well, they had, you know, best smile, best, you

4    know --

5    Q.    Oh, okay.

6    A.    -- you know...

7    Q.    Best of class, insert subject?

8    A.    Yes.

9    Q.    Okay.

10   A.    Yeah, and he wanted to have the best car.  He

11   didn't care if it was -- if he was the best looking or

12   if he was the most -- or the smartest.  He wanted to

13   have the best car.

14   Q.    Okay.  And he did?

15   A.    And he did.  Oh, that was the most important

16   thing.  Yes.  He could not wait until those results came

17   out.

18   Q.    Did Christian ever share with you any

19   particular career path plan?

20   A.    I asked him the night before he died, what do

21   you want -- what -- you're going to graduate, what are

22   you going to do.  And he said, I want something with my

23   name on it, some business where I can make a lot of

24   money to support the things I love, my passion for cars.

25   It's a lot of cars, really nice cars.  He spent a lot of

Page 53

1  time on Fisher's Island.  I want to buy a house on

2  Fisher's Island, I want to snowboard in the Alps, and I

3  will find away to do that.

4      Q.    Sounds like he had a good plan.

5      A.    Well, he had a plan.  And I said, well, can you

6  give me more information, because otherwise, you know,

7  you're not going to do that selling minivans.  He

8  said -- just -- he just kind of brushed me off.  I'm not

9  selling minivans.

10     Q.    Did he ever put any of this down in writing,

11  like, all right, I'm going to have a dealership here,

12  I'm going to sell these kinds of cars or any sort of

13  business plan or anything like that?

14     A.    I don't know.  He was -- he and his brother,

15  Frederick, always had -- they were always scheming up

16  something, but they were -- they had a plan to -- to

17  do -- they had -- they were always talking about doing

18  something together.

19         They had a third friend who is an entrepreneur

20  himself who graduated with Frederick from high school

21  who's still close -- was close to both of them, with the

22  three of them doing something together, you know, on a

23  larger fashion and who came from a family of

24  entrepreneurs.

25         And he watched his dad build companies from

                                                Page 54

```
 1    nothing, so he knew it could be done.  And that's what
 2    he wanted to do.  He -- he knew what he wanted out of
 3    life.  He knew -- he knew what the goals were.  And he
 4    knew that it was going to take, you know, a big time job
 5    to -- to get there.  And he was willing to do whatever
 6    it took to get there.
 7         He said to me, I have to get a house on Fisher's
 8    Island.  Mom, you haven't seen them.  That's -- that's
 9    where I'm going first with my really nice car for
10    Fisher's Island and then...
11         Q.    Did he have a dream car that he wanted to
12    attain or --
13         A.    Oh, that changed.  That changed constantly.
14         Q.    Oh, okay.
15         A.    You know, he wanted a Ferrari until we got one.
16    He want a Porsche until we got one, so...
17         Q.    Yep.
18         So not everybody is going to know what Fisher's
19    Island is.  Can you describe basically what Fisher's
20    Island is.
21         A.    It's a small New York island off the coast of
22    Connecticut.  It's in Long Island Sound.  Very small,
23    closed -- very small part of it is public.  Most of it
24    is a private community, a very elaborate, expensive
25    homes.
```

Page 55

```
 1          And one of his best friends worked there several
 2     summers because his girlfriend worked there, and they
 3     were caretakers for somebody's house.  And so he would
 4     take the ferry over and spend the day swimming in the
 5     pool and lounging around this estate.  Most of the time,
 6     nobody was there.
 7          So he would just drive around Fisher's Island.
 8     So he got to see the whole thing and really would come
 9     back and say, he goes, that's -- I have to have a house
10     on Fisher's Island.  It's fabulous.  He had big, big
11     dreams --
12     Q.    Now --
13     A.    -- big goals.
14     Q.    I'm sorry.  I didn't mean to cut you off.
15          So you said that a friend of Christian's
16     worked -- okay.
17     A.    I got it.
18     Q.    Sure.
19          A friend of Christian's worked on Fisher Island,
20     and the friend -- I want to make sure I have this
21     right -- the friend worked on Fisher Island because that
22     friend's girlfriend also worked there?
23     A.    Yes, uh-huh.
24     Q.    I just wanted to make sure it wasn't --
25     A.    Yes.  And she got him the job.
```

Page 56

1     Q.    -- Christian's girlfriend?

2     A.    No.  Christian's best friend work on the

3  island, and he got that job because his friend's

4  girlfriend had been working for a family over there.  So

5  she got her boyfriend the job.  And he said to

6  Christian, who was his best friend, hey, you got to see

7  this place, come on over.

8        So Christian kept on going over.  And that

9  inspired him all the more that there were things out

10 there that we hadn't shown him, that we had shown him

11 quite a bit.  So there were things that he aspired to

12 that he would come home and say to us, wow, you showed

13 us -- you showed me a lot, but you didn't show me

14 Fisher's Island.  So I want to show it to you.

15    Q.    What was the name of that friend?

16    A.    Jordan Ransom.

17    Q.    Jordan Ransom, okay.  I think I've seen that

18 name.

19    A.    Yes.

20    Q.    So it was Jordan's girlfriend, but did

21 Christian have a girlfriend that worked on the island

22 or --

23    A.    No, she did not work on the island.

24    Q.    Okay.  So he had a girlfriend on March 11 or --

25    A.    Yes, he did.

Page 57

```
 1        Q.      What was her name?

 2        A.      Sarah Heath.

 3        Q.      H-e-a- --

 4        A.      -- t-h.

 5        Q.      Okay.  Do you know anything about Sarah?

 6        A.      I do.

 7                MR. ELLIOTT:  Objection to the form.

 8   BY MR. FLYNN:

 9        Q.      And do you know her family?

10        A.      I've met her mother --

11        Q.      Okay.

12        A.      -- and her brother.

13        Q.      Do you know who the father is?

14        A.      He died suddenly while she was at UConn.

15        Q.      How long had they been dating?

16        A.      About a year.

17                MR. ELLIOTT:  You mean, as of March 11th, I

18   assume?

19                MR. FLYNN:  Yes, correct.

20                MR. ELLIOTT:  Do you understand that,

21   Mrs. Klorczyk?

22                THE WITNESS:  Yeah, I do.

23                MR. ELLIOTT:  Thank you.

24        Q.      And, again, if there's a question that you have

25   regarding any of my questions, please let us know.
```

Page 58

1           MR. FLYNN:  But, thank you, Mr. Elliott.

2     That was -- I left that one kind of dangling.

3        Q.   So, yeah, as of March 11, 2011, he had been

4     dating Sarah Heath for about one year; correct?

5        A.   Yes.

6        Q.   Did they have any plans for their relationship?

7           MR. ELLIOTT:  I'm going to object to the

8     form.

9           I know you understand that question, but go

10    ahead.

11       A.   According to Sarah, yes, they did.

12       Q.   And what were those plans that Sarah shared

13    with you?

14       A.   She -- she told me that they had planned to get

15    married.

16       Q.   Was there a timeline on that, or was it -- they

17    had a conversation?

18       A.   I don't know what the timeline was, but she

19    still had grad school to attend.  So I don't think it

20    was going to be imminent.

21       Q.   Did Sarah share with you any family plans that

22    they had discussed?

23       A.   They had talked about children, which didn't

24    surprise me at all.

25       Q.   Okay.  Did they have any kind of plan for the

```
 1    family and the growth of the family?
 2        A.    No, I don't think it was definitive because,
 3    you know, it depended on her finishing school and where
 4    Christian finally ended up.
 5        Q.    Okay.  Do you have any contact information for
 6    Sarah?
 7        A.    I do.
 8        Q.    Okay.  Do you know her telephone number?
 9        A.    Not offhand, but I can produce it.
10        Q.    Okay.  Maybe during a break.  I'm guessing
11    you're looking around, it looks like you're probably
12    looking for your phone?
13        A.    My phone's in my purse.
14        Q.    Okay.  So maybe, during a break, you can look
15    that up, and then we can get in a number after the
16    break.
17               MR. ELLIOTT:  Or maybe not.
18               THE WITNESS:  Or not.
19               MR. FLYNN:  We've been going for a little
20    over an hour, so it's probably a good time for a break
21    right now.
22               Off the record, Mr. Elliott?
23               MR. ELLIOTT:  Sure.
24               MR. FLYNN:  Okay.
25               THE VIDEOGRAPHER:  The time is 11:47.  We're
```

Page 60

```
 1    off the record.

 2               (A discussion was held off the record.)

 3               THE VIDEOGRAPHER:  This is the beginning of

 4    Disk Number 2 in the deposition of Lynne Klorczyk.

 5               We're back on the record.  The time is

 6    12:01.

 7        Q.    Okay.  Mrs. Klorczyk, during the break, did you

 8    have an opportunity to look for Sarah Heath's telephone

 9    number?

10        A.    I totally forgot.  Right off my head.

11        Q.    Okay.  Maybe during the lunch break?

12        A.    Hopefully.

13        Q.    Okay.  I was going over my notes, and there was

14    a couple of points that I wanted to just follow up on.

15           You had mentioned that one of Christian's friends

16    was an entrepreneur?

17        A.    Uh-huh.

18        Q.    Who was that?

19        A.    His name is Dan Peuyo.

20        Q.    Can you spell that last name, please.

21        A.    P-u-e-y-o.

22        Q.    Oh.  I'm sorry.  I wasn't expecting that.  P

23    what?

24        A.    P-u-e-y-o.

25        Q.    And how do you pronounce that?
```

Page 61

```
 1       A.     Peuyo.

 2       Q.     Peuyo, okay.

 3          Do you have any contact information for Dan?

 4       A.     He's in Miami.

 5       Q.     Okay.  Do you have e-mail, telephone, mailing?

 6       A.     I don't have it with me, but...

 7       Q.     But you do have contact information, maybe not

 8    with you, but at home?

 9       A.     We could probably find him.

10       Q.     Okay.  And then the car dealership in

11    Greenwich --

12       A.     Carriage House.

13       Q.     Carriage House.

14          Do you have an address or a telephone number?

15       A.     Greenwich is a small town.  So it's not hard to

16    find, Greenwich, Connecticut.

17       Q.     Okay.  Now, is there anything about your

18    testimony that you've provided so far today that you

19    want to change or add to, clarify, anything like that?

20       A.     No, I think I'm good.

21                (BEGINNING OF CONFIDENTIAL TESTIMONY)

22                MR. FLYNN:  Okay.  This is going to be

23    Exhibit 4.

24                (Defendants' Exhibit 4 was marked for

25                identification.)
```

Page 62

```
 1                    MR. FLYNN:  That's going to be Exhibit 4.

 2                    MS. TROTTA:  Okay.  Thank you.

 3                    MR. FLYNN:  Here you go, David.

 4                    MR. ELLIOTT:  Thanks.

 5                    MR. FLYNN:  You're welcome.

 6        Q.    For the purposes of the record, these are

 7     documents that were provided to us by Plaintiffs'

 8     counsel, Bates labeled -- all capitals -- KLORCZYK

 9     000183 through and including -- all capitals -- KLORCZYK

10     000196.  These are marked confidential, so we're going

11     to have to bind them into a separate portion of the

12     transcript, I believe; is that correct, Mr. Elliott?

13                    MR. ELLIOTT:  Yes.

14                    MR. FLYNN:  Okay.  I think, actually, we

15     need to bind this portion of the transcript separately

16     as well; correct?  Do you agree?

17                    MR. ELLIOTT:  Let's go off the record one

18     second.

19                    Is that okay?

20                    MR. FLYNN:  Absolutely.

21                    THE VIDEOGRAPHER:  Wait.  The time is 12:04.

22     We're off the record.

23                    (A discussion was held off the record.)

24                    THE VIDEOGRAPHER:  Back on the record.  The

25     time is 12:08.
```

Page 63

1              MR. FLYNN:   Okay.  So, during that break,

2     counsel had a conversation about how to handle the

3     deposition exhibits and those portions of transcripts

4     dealing with documents or testimony that has been

5     designated as confidential.

6              And my understanding of the parties'

7     agreement is as follows:  That there will be a mark in

8     the deposition transcript showing up in the index of

9     where the confidential testimony begins and ends, and

10    exhibits will be attached to the deposition transcript.

11    There will not be separately-bound volumes.

12              The parties, their consultants and their

13    experts, being bound by the terms of the protective

14    order entered in this case by the Court on

15    February 25th, 2013 at Docket Entry Number 4 will be

16    able to use, review the transcript and exhibits for

17    their needs.

18              And any other party that needs to take a

19    look at the deposition transcript and the exhibits

20    attached thereto can see the entirety of that

21    transcript, so long as they sign off on the -- I believe

22    it's Exhibit A to the protective order -- agreeing to be

23    bound to the terms of the court-entered protective

24    order.

25              Anyone who does not fit within the parties,

                                                  Page 64

```
1    consultants, experts, staff of law firm or third parties
2    who do not sign off on Exhibit A agreeing to be bound to
3    the terms of the court-entered protective order may not
4    see those portions of the transcript that have been
5    marked as confidential testimony and any exhibits
6    attached to the transcript that are marked as
7    confidential.
8                Does that reflect the agreement?
9                MR. ELLIOTT:  Joe?
10               MR. DONAT:  It does.
11               MR. ELLIOTT:  Yes.
12               MR. FLYNN:  Mr. Anderson?
13               MR. ANDERSON:  Yes.
14               MR. FLYNN:  Miss Trotta?
15               MS. TROTTA:  Yes.
16      Q.    Turning to Exhibit 4, do you have that in front
17   of you?
18      A.    I do.
19      Q.    Okay.  Sorry for all that lawyer housekeeping,
20   Mrs. Klorczyk.  Didn't mean to keep you waiting.
21               Again, for the record, this is a document --
22   or series of documents that were produced to us by the
23   plaintiffs' attorneys Bates labeled -- all capitals --
24   KLORCZYK 000183 through and including -- all capitals --
25   KLORCZYK 000196.
```

Page 65

1          Have you seen these documents before today?

2     A.    Some of them.

3     Q.    Okay.  Can you describe for us what these

4  documents are?

5     A.    Yes.  These are Christian's high school

6  transcripts -- I don't know why his high school diploma

7  is not here -- and his transcripts from UConn and his

8  diploma from the University of Connecticut.

9     Q.    Okay.  Looking at the first page of Exhibit 4,

10  so Klorczyk 183 --

11     A.    Yes.

12     Q.    -- in the upper, right-hand corner, there's

13  bunch of acronyms and numbers.  Can you just run down,

14  starting with CRSAT: 530 and explain to us what each of

15  these pieces of information are telling us -- or telling

16  the reader?  Do you see where I'm referring to?

17     A.    No.  Oh, over there.

18     Q.    Yeah, the upper right-hand corner, as you look

19  at the documents in the landscape --

20          MR. ELLIOTT:  If you know.

21     Q.    -- orientation.

22     A.    I don't -- you want me to start with PS?

23     Q.    No, the CR.

24     A.    CR?

25     Q.    Yes.

Page 66

1       A.     Well, yeah, the CRSAT, something with his SAT

2    score -- the math SAT score was 580; total SAT was 1110;

3    the writing SAT was 600.  He must have taken ACT.  I

4    don't know what TOEFL means.  Rank must have been his

5    class rank, 78 out of how many -- I don't know -- and I

6    don't know why the GPA is not there.

7       Q.     Okay.  Do you -- did you provide these

8    documents to your attorney?

9       A.     I did.

10      Q.     All of them, 183 through 196?

11      A.     I'm not sure about the UConn ones.

12      Q.     Okay.

13      A.     I must have.  The --

14      Q.     Well, don't guess.

15      A.     The Waterford ones, I did because the registrar

16   handed them to me and said, I've got Christian's file

17   since I now work at that high school.  I didn't when he

18   was there because they didn't want me to.  She said, I

19   have all of the stuff, would you like it.  And I said,

20   sure.  If you're going to shred it, I'll take it.  So I

21   had all -- I have all that.  So I know what that stuff

22   means.  And then he graduated posthumously, so UConn

23   sent us --

24      Q.     That was a very nice thing of UConn to do.

25      A.     It really was, but that was March.  And the

Page 67

1    graduation was Mother's Day, so it was very close to the

2    end of his college career.

3        Q.    Yeah.

4        A.    Yeah.

5        Q.    Well, I'm sorry that that all -- all the timing

6    of that happened --

7        A.    Yes.

8        Q.    -- the way it did.  It's very unfortunate.

9             Okay.  So we went through the first page.

10   Now, looking at the next page, Klorczyk 184, as you're

11   looking at the page, again in the landscape format, on

12   the far left-hand margin, there's some very clear type,

13   but it's more in a portrait format.  It looks like a fax

14   header with the date, July 1, '13 and then a time,

15   12:41 p.  Do you see that?

16       A.    Yeah.

17       Q.    Okay.  Next to that is, Inspection and Testing,

18   L.L.C.?

19       A.    Yes.

20       Q.    Do you know what that is?

21       A.    Yes.

22       Q.    And what is that?

23       A.    That is my husband's company.

24       Q.    And the -- the number to the far right, is that

25   your husband's company's fax or telephone number?

                                              Page 68

1      A.     That's the fax number.

2      Q.     That's the fax number, okay.  And this is also

3  a Waterford High School document?

4      A.     Yes, it is.

5      Q.     Is this another one of the documents that the

6  registrar at Waterford High School handed to you?

7      A.     Yes.

8      Q.     Okay.  Is the fax header, is that indicating

9  the date and time, to your best recollection, that the

10  documents were provided to your counsel?

11      A.     That could -- yes.

12      Q.     Okay.  And, again, don't guess.

13      A.     No, it is.

14      Q.     Okay.  Again, looking at the document in a

15  landscape orientation, the bottom left-hand corner just

16  below academic standing has a few columns of

17  information.  And it's -- the first one says, at end of

18  seven semesters.  Do you see that?

19      A.     Uh-huh, yes.

20      Q.     So that's not quite the completion of high

21  school?

22      A.     Right.

23      Q.     Did Christian graduate a semester early, or did

24  he go full eight semesters?

25      A.     No, he went eight semesters.

1    Q.    Okay.  So then, the next column there is rank,

2    51; the next column is out of 222.  Do you see that?

3    A.    Yes.

4    Q.    So were there about, to the best of your

5    knowledge, 222 pupils in your son's senior class?

6    A.    Yes.

7    Q.    And at the end of the first semester of his

8    senior year, his rank was 51 out of 222; correct?

9    A.    Yes.

10   Q.    Now, looking back at the first page of this

11   document -- or I'm sorry, Exhibit 4, 183 -- you

12   mentioned that rank is 78.

13   A.    Uh-huh.

14   Q.    So --

15            MS. TROTTA:  Is that a yes?

16            THE WITNESS:  That was a yes.

17            MR. FLYNN:  Thank you, Erica.

18            MS. TROTTA:  You're welcome.

19   Q.    Do you have any sense of whether the rank, 78,

20   on the first page is his final rank when he graduated?

21            MR. ELLIOTT:  If you -- if you know,

22   Mrs. Klorczyk.

23   A.    I -- I don't know.  This -- this first page

24   appears to be a UConn paper.

25   Q.    What about that first page indicates to you

Page 70

1    that this is a UConn document?

2        A.    Well, it doesn't say anything about -- it

3    doesn't say Waterford High School on it at all.  It

4    looks to me like UConn would have checked off what he

5    had taken and where it says freshman, fall, Storrs and

6    that would not have been a Waterford document.

7        Q.    Where does it say, freshman fall?

8        A.    Right in the middle.  Freshman at the top.  It

9    says, freshman, fall.

10       Q.    Oh.

11       A.    That was --

12       Q.    The one in bold and underlined?

13       A.    Yeah, that would be the one.  That suggests to

14   me that this was UConn checking off --

15       Q.    Okay.

16       A.    -- things.

17       Q.    So then, go a little bit below freshman, fall,

18   below spring and then to the right, you've got it

19   crossed out, acronym.  I can't make that out.  But then,

20   right below, it says Waterford High School.  Do you see

21   that?

22       A.    Yes.

23       Q.    Okay.  So if this is a UConn document, does the

24   rank number indicate to you what UConn believed his

25   final rank in his high school class was?

Page 71

1          MR. ELLIOTT:  Objection to the form.

2          If you know.

3     A.    I don't know.

4     Q.    Okay.  Now, you looked at 184, and you said

5  that that was one of the Waterford High School documents

6  that you got from the registrar.

7     A.    Uh-huh.

8     Q.    Same question as to Number 185.

9     A.    Uh-huh.

10    Q.    Is that a yes?

11    A.    Yes, this is -- this is a Waterford document.

12    Q.    Okay.  And looking at 186, same question:  Is

13 this a Waterford High School document?

14    A.    It is.

15    Q.    And the registrar gave you this document?

16    A.    She did.

17    Q.    187, can you me what this document is.

18    A.    This looks like a UConn -- well, it looks like

19 a UConn application for admission.

20    Q.    Okay.  Did you, personally, obtain this

21 document?

22    A.    All I can say is UConn must have sent us his --

23 his -- his file.

24    Q.    Okay.  So -- you said must have sent us?

25    A.    Us, to our home.

                                          Page 72

```
 1        Q.     Does that mean you and Mr. Klorczyk?

 2        A.     And -- yes.

 3        Q.     So you would have received this document from

 4   UConn; correct?

 5        A.     Yes.

 6        Q.     There is two columns that start about a third

 7   of the way down the page?

 8        A.     Yes.

 9        Q.     -- in a portrait orientation.  In that

10   right-hand column, there's the third line item.  It says

11   Social Security number.  And then to the right, it

12   discloses a -- what looks like a Social Security number.

13   Do you see that?

14        A.     Yes.

15        Q.     Do you know if that's Christian's Social

16   Security number?

17        A.     I do not.

18        Q.     Okay.  Do you know if there is a way to confirm

19   whether that is his Social Security number?

20        A.     Yes.

21        Q.     And how would one do that?

22        A.     I have it.

23        Q.     You have it at home?

24        A.     Yeah.

25        Q.     Okay.  After today's deposition, can you
```

Page 73

```
1    confirm or deny that this is your son's Social Security
2    number --
3        A.    Absolutely --
4        Q.    -- for the record.
5        A.    Yes, I can.
6              MR. FLYNN:  Okay.  And, David, would it be
7    okay if we just --
8              MR. ELLIOTT:  If you want to send me a
9    letter asking for that information, I certainly will
10   respond to it.
11             MR. FLYNN:  Okay.  Thank you.
12             And to the extent that it is Christian's
13   Social Security number, since we're in federal court,
14   there's the filing restrictions regarding Social
15   Security numbers.
16             How do you want to handle this, just in case
17   someone does file this with the court?  Do you want it
18   to be each party's obligation?
19             MR. ELLIOTT:  There's a filing procedure.
20             MR. FLYNN:  Oh, I know.
21             MR. ELLIOTT:  Yeah.  And we just -- we would
22   abide by that filing procedure.
23             MR. FLYNN:  Well, my suggestion was going to
24   be so that nobody accidentally files this with the
25   Social Security number disclosed is that we redact it --
```

Page 74

```
 1                    MR. ELLIOTT:  Fine.

 2                    MR. FLYNN:  -- and replace 187 with the

 3      redacted version.

 4                    MR. ELLIOTT:  That would be fine.

 5                    MR. FLYNN:  Okay.  Do you want to undertake

 6      the redaction, or would you like my office to do it?

 7                    MR. ELLIOTT:  Why don't you do it --

 8                    MR. FLYNN:  Okay.

 9                    MR. ELLIOTT:  -- since you'll have the

10      exhibits.

11                    MR. FLYNN:  Okay.  So I will keep 187 out of

12      Exhibit 4 that we've handed to Mrs. Klorczyk for today

13      and replace it at the end of the deposition, hopefully

14      today, with a redacted version for the court reporter to

15      include into the transcript.

16                    MR. ELLIOTT:  That's fine.

17                    MR. FLYNN:  Okay.

18                    Do you understand what we're doing, Sabina?

19                    THE COURT REPORTER:  Yes.

20                    MR. FLYNN:  All right.

21                    MR. ORTICELLI:  What's the number?

22                    MR. FLYNN:  It's 187.

23          Q.    And, Mrs. Klorczyk, just so that no one forgets

24      to do this, can I ask that you hand me 187 so that it

25      doesn't accidentally --
```

Page 75

1               MR. FLYNN:  Is that okay, Dave?

2               MR. ELLIOTT:  Yes.

3               MR. FLYNN:  Okay.  I just want to make sure

4       nobody accidentally puts it into the record.

5               MR. ELLIOTT:  We appreciate that.  Thank

6       you.

7               MR. FLYNN:  You're welcome.

8       Q.    That was the main reason why I wanted to talk

9       about that page.

10            So turning to 188, this looks like it's a

11      continuation of 187.

12            Would you agree?

13      A.    I agree.

14      Q.    And you received this personally; correct?

15      A.    Yes.

16      Q.    Looking at 189, again, this looks like a

17      continuation of 187 and 188.

18            Would you agree?

19      A.    Yes.

20      Q.    And you, personally, received this; is that

21      correct?

22      A.    Yes.

23      Q.    Okay.  Now, looking at 190, can you please

24      describe for us what this document is.

25               MR. ELLIOTT:  Lynne, can I see it?

Page 76

1          THE WITNESS:  Sure.

2     A.    This is Christian's acceptance letter to the

3  University of Connecticut.

4     Q.    Okay.  Now, did you receive this document from

5  UConn at the same time you received 187, 188 and 189?

6     A.    I'm not sure.

7     Q.    Do you have any indication from the document,

8  as you look at it today, if this is a copy of the

9  document that was received on or about December 25th,

10  2006 as the letter is dated?

11     A.    I don't know.

12     Q.    Okay.  Do you recall providing this document,

13  190, to your counsel?

14     A.    No.

15     Q.    Okay.  So you're not sure if you had possession

16  of this document?

17     A.    No.  It could have just all been in the same

18  pack.  You know, it could have all been together.  I

19  don't know.

20     Q.    Okay.  So you're not sure if --

21     A.    I'm not --

22     Q.    -- you had possession of this document --

23     A.    Right.

24     Q.    -- to provide it to your counsel or not?

25     A.    Right.

Page 77

1      Q.     Okay.  Is there any way for you to determine

2      that?

3      A.     If we didn't give it him, I don't know who else

4      could have.

5             MR. ELLIOTT:  Maybe UConn.

6             THE WITNESS:  UConn.

7      Q.     So you're not sure if there is a way for you to

8      determine if you provided this to your counsel or not?

9      A.     I don't know.  Maybe Fred remembers.  But I

10     know he was so excited to get this letter.  It was the

11     only school he applied to.

12     Q.     I'm sorry.  He, being Christian?

13     A.     He, being Christian.  This is the only school

14     he applied to.

15     Q.     Oh, okay.  Great.

16            So can you tell us a little bit more about the

17     day that this letter came in the mail.

18     A.     He was jumping up and down.  He was so excited.

19     And we had said to him, you know, Christian, UConn is

20     getting very difficult to get in to.  Maybe --

21     apparently, back in the day -- we're not from

22     Connecticut, so, apparently, back in the day, UConn was

23     everybody's safe school.  And it no longer is

24     everybody's safe school.

25            And since it's a highly-regarded public

                                              Page 78

1    university in New England, I said, maybe you should

2    think about some other schools.  And he said, I don't

3    want to go anywhere else.  I want to go to UConn.  And I

4    said, but what if you don't get in?  He said, I'm going

5    to get in.  And that's it.  I don't want to go anywhere

6    else.  He wanted to go when we dropped his older brother

7    off the year before.  We could have left them really

8    both of them off.  They were both ready to go.

9         And so when the letter came, he was, yes.  You

10   know, I could just see them both jumping up and down

11   with fists in both hands.  Yes, I told you I was going

12   to get in.  There was no question in his mind.

13   That's -- that's what he was going to do.  He said, I'll

14   show you.  And he did.

15       Q.    And he did?

16       A.    Very excited.  He -- he loved that school.  And

17   he made the most of every second, every opportunity.

18       Q.    So you're not sure if you sent this to your

19   lawyer.

20         But, as you sit here today, do you recall seeing

21   this letter?

22       A.    Yes.

23       Q.    Okay.

24       A.    As a matter of fact, when this -- when we knew

25   that's what was in the envelope, it had to be in the

Page 79

1    envelope.  We went out and bought him a UConn sweatshirt

2    and, you know, so that, when he came home, here's your

3    mail.  And we presented him at dinner the present and

4    then the mail.  And he was -- of course, he knew what it

5    was then because we had done the same thing for his

6    brother the year before.  So he knew it had to be good

7    news.

8        Q.    I see.  That's great.

9              So after the celebration and the fist pounding

10   and the, see, mom, I told you I was going to do it --

11       A.    Yep.

12       Q.    -- what did Christian do?  I mean, did he --

13   did he call his friends?

14       A.    Oh, he was on the phone.  He was on the -- he

15   was texting before, yeah.  He had the sweatshirt on.

16   And he was texts Jordan, I got in, I got in, did you get

17   your letter, you know.

18       Q.    Yep.

19             Did the friends that all got into UConn from

20   Waterford High School all get together and celebrate or

21   anything like that?

22       A.    They did.  They didn't do anything without each

23   other.  And his best friend had also applied, his best

24   friend from kindergarten.  That was Jordan.

25       Q.    Jordan?

1        A.      And, yeah, they had already decided that night

2    they were going to be roommates.   And they were going

3    to -- and they were.

4        Q.      Were they roommates?

5        A.      They were roommates, yep.   They ended up --

6    yep.   They ended up having the same major, and, you

7    know, they were best friends from kindergarten to the

8    day Christian died.

9        Q.      Okay.   Turning to Page 191, when you're ready.

10       A.      I'm ready.

11          These are his transcripts.

12       Q.      From?

13       A.      UConn.

14       Q.      Okay.   And did you, personally, receive these

15   or obtain these?

16       A.      I'm not sure if UConn sent them to us.   But I

17   know we didn't get them each -- I didn't see them while

18   he was there.   I see only he got his grades.   But he

19   certainly couldn't wait to tell us what his grades were.

20   That's for sure.

21       Q.      On Page 191, upper, right-hand corner, just off

22   to the right of the University of Connecticut header,

23   there's a date?

24       A.      April, yeah.

25       Q.      Does that signify anything to you?

Page 81

1      A.     Yeah, that must have been the date they sent

2    them to us.

3      Q.     Did they send them to you in the mail?

4      A.     Yes.

5      Q.     Addressed to you and Mr. Klorczyk?

6      A.     Yes -- no, they were addressed to the estate

7    of.

8      Q.     Oh, okay.

9          But you and/or your husband, Mr. Klorczyk, were

10   the executors of the estate and so you received the mail

11   and opened up --

12     A.     Yes, yes.

13     Q.     All right.  So you had possession of this

14   document?

15     A.     Yes.

16     Q.     Did you provide this to your counsel?

17     A.     Yes.

18     Q.     Okay.  In the -- I'm sorry.  Hang on to 191.

19   Just a couple more questions on this first page.

20          On the left-hand column under, degrees awarded,

21   it says, degree, bachelor of science and then two lines

22   down, plan, finance.

23          Do you see that?

24     A.     Yes.

25     Q.     Okay.  And so he got his posthumous degree in

Page 82

1    finance; correct?

2        A.    Yes.

3        Q.    Okay.  And then below that, it says, beginning

4    of undergraduate record, fall of 2007, transfer credit

5    from Three Rivers Community College.

6        A.    Uh-huh.

7        Q.    Can you tell us about the Three Rivers College

8    coursework that he did?

9        A.    I can.  Waterford High School has a -- has a

10   program with Three Rivers called College Career

11   Pathways.

12           And if you take certain courses in certain areas,

13   being culinary, child development, auto shop, auto or

14   wood shop, they're more of the -- there's a word for

15   it -- they're not -- it's not vocational, but it's more

16   a technical, tech ed classes, plus the right English,

17   science, math and speech.  You get credits through Three

18   Rivers.

19           And so he did that.  And so he took those classes

20   in high school.  And those seven credits then

21   transferred to UConn.  So he entered as a freshman with

22   seven college credits.

23       Q.    Do you recall what the course subject matters

24   were that he took?

25       A.    He could have gone either way because he took a

1    lot of wood shop classes, but he went through culinary.

2        Q.    Okay.

3        A.    He had enough credits either way.

4        Q.    Okay.  So he didn't take any of the auto?

5        A.    No, he didn't.

6        Q.    Okay.  Looking at 192, is this a continuation

7    from 191?

8        A.    It is.

9        Q.    And at the bottom, left-hand column, it says,

10   Cum. GPA 3.511?

11       A.    Yes.

12       Q.    You probably know the answer to this next

13   question, but just to have the complete record:  Is it

14   your understanding that Christian's GPA was 3.511?

15       A.    Yes.

16       Q.    Page 193, is this a continuation of 191 and

17   192?

18       A.    Yes.

19       Q.    And this is part of the document that you

20   received on behalf of the estate from University of

21   Connecticut?

22       A.    Yes.

23       Q.    Looking at 194 in a landscape format -- or I'm

24   sorry -- orientation, can you tell us what that document

25   is.

Page 84

1        A.     It is a diploma, his diploma from the

2    University of Connecticut.

3        Q.     And did you receive this from the University of

4    Connecticut?

5        A.     Either that -- I don't know.  Either that or I

6    made a copy of his actual diploma.

7        Q.     But --

8        A.     No, we did.  We did because they just handed

9    out the blank covers.  Yeah, so we did get this from the

10   University of Connecticut.

11       Q.     Okay.  Did you get it at or around the same

12   time that you received the other documents from UConn?

13       A.     Yes.

14       Q.     And this is a document that you provided to

15   your counsel?

16       A.     Yes.

17       Q.     185, can you tell us what this document is.

18       A.     This was -- this was from his fraternity, Zeta

19   Beta Tau.  They had a memorial service for him.  And

20   this is inscribed on a plaque that we have.

21       Q.     Okay.  The photocopy that we have is pretty

22   hard to read, the bottom half.

23       A.     Yeah.

24       Q.     After your son's name, do you know what the

25   rest of the text says on the original document?

Page 85

1      A.      It's Delta -- Delta Beta Chapter.  You will

2  always be -- that's as far as I got.

3      Q.      Okay.  Do you recall what this says from the

4  version that you have at home or the plaque that you

5  have?

6      A.      You will always be remembered -- something as a

7  brother, as a -- always be remembered as a -- something

8  brother.

9      Q.      Okay.  You mentioned that they gave this to

10  you, they, being the fraternity --

11      A.      Yeah.

12      Q.      -- on the day of the memorial, that they held

13  for your son?

14      A.      With a -- UConn had the memorial, but Zeta Beta

15  Tau did their presentations, too.

16      Q.      Do you recall the date of the memorial service?

17      A.      No.  But, in that book with all the letters,

18  there's the program.  And it was before graduation.  So

19  it was before May 5th --

20      Q.      Okay.

21      A.      -- -- 2011.  So it was a week before

22  graduation, so I would say the end of April.

23      Q.      Okay.  And, finally, 196 in a landscape

24  orientation, can you tell us what this is.

25      A.      It was Greek Week 2011 Unity Award in memory of

Page 86

```
 1    Christian Klorczyk presented to Zeta Beta Tau
 2    fraternity.  This was from all the -- this -- he was --
 3    he was Greek of the Week from all of the fraternities on
 4    the campus.
 5         Q.    Do you remember the date of this award?
 6         A.    This -- this was the same time as -- as --
 7    as --
 8         Q.    The memorial?
 9         A.    -- the memorial, yeah.
10              MR. FLYNN:  Okay.
11         (A discussion was held off the record.)
12                (END OF CONFIDENTIAL TESTIMONY)
13    BY MR. FLYNN:
14         Q.    Okay.  So, again, if, at any time, you want to
15    take a break, please let me know; okay?
16         A.    (Nods head.)
17         Q.    So thinking back to March 11th, 2011, can you
18    tell us how your day started?
19         A.    Yes, I can.  It was -- it was a normal Friday.
20    Christian and I were the only two home.  And I left for
21    work at 6:30.  I didn't wake him up because he was on
22    spring break.  I wanted to let him sleep.  So I went to
23    work at Waterford High School.  And I was there until
24    about 3:00 o'clock.
25              And then I went to the New London train
```

Page 87

```
 1    station to pick up my husband, who was returning from

 2    New York City after having spent the night.  He was on

 3    his way back from Washington, D.C. and had stopped to

 4    watch UConn in one of the final games with our older

 5    son, who was in law school at the time in New York City.

 6    So I picked him up and drove back to our house in

 7    Waterford.

 8        Q.    At any point before you left work for the day,

 9    did you hear from Christian?

10        A.    I texted him earlier, early in the day.

11        Q.    Did he respond?

12        A.    Yes.

13        Q.    Do you recall what his response was?

14        A.    Yes.

15        Q.    And what was that?

16        A.    I asked him to pick -- if he could go to

17    St. Thomas More and pick up his brother --

18        Q.    Parker?

19        A.    -- his younger brother, Parker, because Parker

20    had an appointment at 4:30 that afternoon, doctor's

21    appointment.  And he said, yes, no problem.  And I said,

22    good.  And then I sent him another text later in the

23    afternoon like around 1:00 saying, you know, what's up,

24    what are you doing?  And I did not get a response to

25    that one.
```

Page 88

1    Q.    Were there any telephone calls that day?

2    A.    No.

3          MR. ELLIOTT:  You mean, from Christian?

4          MR. FLYNN:  Between the two of them.

5    Q.    Were there any telephone calls between you and

6    Christian?

7    A.    No.

8          MR. FLYNN:  Okay.  This will be Number 5.

9          (Defendants' Exhibit 5 was marked for

10         identification.)

11         MR. FLYNN:  For the record, this is a

12   document received through discovery from plaintiffs'

13   counsel Bates labeled -- all capitals -- KLORCZYK 000038

14   through and including -- all capitals -- KLORCZYK

15   000043.

16   Q.    Have you seen this --

17         MR. FLYNN:  Well, first of all, David, this

18   document isn't marked confidential, but is there any

19   reason why it should be treated as such?

20         MR. ELLIOTT:  Joe?

21         MR. FLYNN:  While Joe is looking at that,

22   just as a housekeeping matter, to mark the end of the

23   confidential testimony regarding Exhibit 4 --

24         MR. ELLIOTT:  Uh-huh.

25         MR. FLYNN:  -- I propose that we mark the

Page 89

1    last response right before my statement about if at any

2    time Mrs. Klorczyk needed to take a break, just let us

3    know, because that's when I turned away from Exhibit 4

4    and started turning to the events of --

5                   MR. ELLIOTT:  That's fine.

6                   MR. FLYNN:  -- March 11th, 2011.

7                   MR. ELLIOTT:  That's fine.

8                   MR. FLYNN:  Okay.  Tom?  Erica?

9                   MS. TROTTA:  Fine.

10                  MR. ANDERSON:  That's good.

11                  MR. ELLIOTT:  I don't see a reason to mark

12   Exhibit 5 as confidential.

13                  MR. FLYNN:  Okay.  Thank you.

14                  Here you go, Mrs. Klorczyk.

15                  MR. ELLIOTT:  Here's a clip.

16       Q.    Mrs. Klorczyk, can you tell us what is

17   Exhibit 5.

18       A.    My cell phone text message to Christian,

19   between us.

20       Q.    So these are taken from your cell phone?

21       A.    Yes.

22       Q.    Do you still have that cell phone?

23       A.    Yes.

24       Q.    Do you still use that cell phone?

25       A.    Yes.

Page 90

```
 1        Q.     Is it the one that you're carrying with you

 2    today?

 3        A.     Yes.

 4        Q.     Has there been any malfunction with the cell

 5    phone such that its memory has been erased?

 6               MR. ELLIOTT:  Since March 11th?

 7               MR. FLYNN:  Yes.

 8        A.     I don't think so.

 9        Q.     Are these messages still on your phone today?

10        A.     I don't know.

11        Q.     Would you mind checking during the lunch break

12    and then letting us know if they're still on your phone?

13               MR. ELLIOTT:  You know, she's here to answer

14    questions.  She's is not here to honor requests that she

15    do something with her cell phone; okay?

16               So I'm going to instruct her not to do that.

17    I'm going to instruct her to answer questions, and

18    that's it.

19        Q.     And as I mentioned at the outset of the depo,

20    just my follow-up, are you going to follow your

21    attorney's advice and not review your cell phone during

22    the lunch break to see if you still have these text

23    messages on the cell phone?

24        A.     Probably.

25        Q.     And I probably know the answer to this
```

Page 91

1    question, but just so we have a complete record:  Did

2    Christian have a cell phone?

3         A.    Yes.

4         Q.    After his death, did you come into possession

5    of his cell phone?

6         A.    Yes.

7         Q.    Do you still have that cell phone?

8         A.    Yes.

9         Q.    Since March 11th, 2011, has it been turned on?

10        A.    Yes.

11        Q.    By whom?

12        A.    I've turned it on.

13        Q.    And why did you turn it on?

14        A.    Sentimental reasons, I guess.

15        Q.    Perfectly understandable.

16            Do you still have the cell phone?

17        A.    Yes.

18        Q.    Since March 11, 2011, has there been any

19   malfunction with the cell phone, such that the memory

20   has been erased?

21        A.    Not that I know of.

22        Q.    Other than you, has anyone else turned on the

23   phone, that you're aware of?

24        A.    Not that I know of.

25        Q.    Okay.  Has it -- when was the last time you

Veritext National Deposition & Litigation Services
866 299-5127

1   turned it on?

2       A.      Probably a month after he died.

3       Q.      Okay.  So approximately April, May 2011 --

4       A.      Yeah.

5       Q.      -- was the last time you're aware of the phone

6   being turned on?

7       A.      Or that I turned it on, yeah.

8       Q.      Are you aware of that phone being plugged in to

9   recharge at any point after the last time you turned on

10  the phone?

11      A.      No, I had to recharge it for that, so I

12  don't -- it hasn't -- to my knowledge, it hasn't been

13  touched, but I don't know that.

14      Q.      When you looked through Christian's cell phone

15  the last time --

16      A.      Yes.

17      Q.      -- was this message string that is marked as

18  Exhibit 5 still on his phone?

19      A.      Yes.

20      Q.      Okay.  Were there any other text message

21  strings still on his phone?

22      A.      Yes.

23      Q.      Did he have e-mail go to his phone?

24      A.      I don't know.

25      Q.      Okay.  Do you know what type of phone it was --

                                              Page 93

1   or is, excuse me?

2       A.    It was -- it was an iPhone 4, maybe.

3       Q.    Okay.  What model is your cell phone?

4       A.    iPhone 4.

5       Q.    Same phone?

6       A.    Uh-huh.

7       Q.    At any point in time since you came into

8   possession of Christian's cell phone, did you download

9   any data from the cell phone to another device?

10      A.    I did not.

11      Q.    Do you know of anybody else doing that?

12      A.    I don't know.

13      Q.    Did you copy any of the data from the phone?

14      A.    I didn't, no.

15      Q.    Did you forward any of the messages from

16  Christian's phone to your phone or to some other device?

17      A.    No, I wish I had thought of that, but no.

18      Q.    Okay.  So is it your testimony that, other than

19  the one or maybe couple times that you turned the phone

20  on after March 11, 2011, to your knowledge, nobody has

21  done anything to the phone; is that correct?

22      A.    That's correct.

23      Q.    Since we're talking about technology, just

24  going back to the social media, the Facebook pages, did

25  he have more than one Facebook account?

Page 94

1     A.    Not that I know of.

2     Q.    Okay.  So if we were to log in to Facebook and

3  look for Christian Klorczyk, we might find a few

4  different accounts because there might be more than one

5  Christian Klorczyk, but the one that you're aware of

6  that belonged to your son, what would the welcome screen

7  or the cover page, cover photo look like?

8     A.    It should say, RIP -- Christian Klorczyk, RIP.

9     Q.    And is the photo, the rock at UConn that was

10 painted?

11    A.    There's no -- there's no -- No, it's a

12 generic --

13    Q.    Okay.

14    A.    -- RIP page.

15    Q.    Okay.  No photos?

16    A.    No, because you are not a friend.

17    Q.    Okay.  When you go to his page --

18    A.    Yes.

19    Q.    -- do you see a photo?

20    A.    Yes.

21    Q.    And what is that photo?

22    A.    That is a shed on a mountain out west, I

23 believe, with --

24    Q.    I'm sorry?

25    A.    It's a snow covered shed on a mountain out

Page 95

1    west, I believe, with Christian and Frederick and Jordan

2    sitting on top of it.  Might not be out west, but it's

3    the three of them snow boarding.

4        Q.    Okay.  All right.  So turning back to

5    Exhibit 5, the text messages, on Page 41, there is a

6    string that starts on March 10th, 2011 at 1:51 p.m.

7            Do you see that?

8        A.    Right.  Right.

9        Q.    Okay.  And the first text below that is, done

10   with the car, question mark?

11       A.    Uh-huh.

12       Q.    Who sent that?

13       A.    I did.  That was Thursday.

14       Q.    And what -- what were you talking about?  What

15   do you mean by, done with the car, question mark?

16       A.    He was -- he was doing something to Frederick's

17   car.

18       Q.    I'm sorry.  His brother?

19       A.    Yeah.  No.  Yes.

20       Q.    Okay.

21       A.    Christian was doing something to his brother

22   Frederick's car.

23       Q.    And which car was Frederick's?

24       A.    Frederick and Christian had identical

25   Acura-RSXs, just two different shades of gray.

                                        Page 96

```
1        Q.    Okay.  And then the next text is, nope, huge

2   pain in my --

3        A.    Ass.

4        Q.    I was going to say, bleep.

5        A.    Yeah.

6        Q.    Is that Christian's response?

7        A.    Yeah, that was Christian's response.

8        Q.    Is that a typical type of response?

9        A.    Oh, yeah.  Yep.

10       Q.    Okay.  Your response, I'm assuming, below that,

11  do you have help?

12       A.    Right.

13       Q.    And what did you mean by, do you have help?

14       A.    Was there anybody else there with you, because,

15  typically, Christian -- Jordan would have -- would have

16  been at his side.

17       Q.    Do you know if Jordan was there on the 10th?

18       A.    Jordan was not there on the 10th.  But I didn't

19  know that, so I asked him if he had help.

20       Q.    Okay.  Now, on the 10th, you testified earlier

21  that, on the 11th, the morning of, it was you and

22  Christian, and those were the only two people in the

23  house?

24       A.    (Nods head.)

25       Q.    On the 10th, other than Christian, who was in
```

Page 97

1    the house?

2        A.    The only person I saw was another friend of

3    Christian's, and that was when I came home from school.

4    And it was late -- well, late from school.  It was,

5    like, 7:30 or so.  And that was a friend of his from

6    high school was there.  His name was Max Logan.

7        Q.    So --

8        A.    Just Christian and Max were there.

9        Q.    Christian, Max and yourself were the only three

10   people at the house that you're aware of --

11       A.    Yep.

12       Q.    -- on March 10, 2011?

13       A.    That -- that evening.  It was early evening.

14   It was pitch black outside, but it was early evening.

15       Q.    So was Mr. Klorczyk in New York City?

16       A.    He was in New York City, uh-huh.

17             MS. TROTTA:  Yes?

18             Yes?

19             THE WITNESS:  Yes.

20       Q.    Where was Christian's older brother, Frederick?

21       A.    Frederick was in New York at that basketball

22   game with Fred, with his father.

23       Q.    Mr. Klorczyk?

24       A.    With his father, yes.

25       Q.    Where was Parker?

1       A.      Parker was away at boarding school, St. Thomas

2    More.

3       Q.      Okay.  And there was nobody else in the house?

4       A.      No.  When I came home, it was just Christian

5    and Max.  And I came in and I joined the party, the two

6    of them.  They were just sitting around talking, and I

7    just sat down and joined the party.

8       Q.      Okay.  There were some documents that we saw

9    from the fire department indicating that there was an

10   elderly woman -- I think it said 82 -- who lived at the

11   home.  And when we deposed, I think, not only the police

12   department, but the fire department, they indicated that

13   they sometimes leave notes on addresses --

14      A.      Yeah.

15      Q.      -- regarding special circumstances.

16      A.      Right.

17      Q.      Do you know what that might be referring to?

18      A.      I do.

19      Q.      And can you please tell us.

20      A.      I will, because I was the one who told them

21   that.  When we first moved into the house, I called 911.

22   I wanted to make sure that they were aware that we have

23   a pool in the house, that we had small children in the

24   house and that Fred's mother lived with us.

25      Q.      And that's the 82-year-old?

Veritext National Deposition & Litigation Services
866 299-5127

1    A.    Yeah.  She wasn't 82 at that time, but she was

2    living with us.  And then she had a stroke and --

3    several years prior to Christian dying.  So they had

4    been called to the house.  They knew that she was 82 by

5    that time.

6           So -- and she had called the fire department

7    a couple of times.  She smelled smoke and fire -- or the

8    security system was going off.  And she was home alone,

9    and she was all fussed up.  So -- so they knew that

10   there was, you know, an older woman home alone.

11   Q.    Okay.  When was the last time, Mrs. Klorczyk,

12   your mother-in-law --

13   A.    My mother-in-law.

14   Q.    -- lived at the house?

15   A.    She died in two -- she died in 2007.

16   Q.    So going back to Exhibit 5 after do you have

17   help, is this next text entry a response from Christian?

18   A.    Right.

19   Q.    And it reads, no, but don't really need it,

20   period, just stubborn bolts; correct?

21   A.    Yes.

22   Q.    Do you know what he was referring to?

23   A.    He was having -- having a hard time taking the

24   bolts off of whatever he was doing to Frederick's car.

25   Q.    When you came home that night and joined the

Page 100

1    party with Max, did you have any conversation about the

2    car repair that he was trying to do that day?

3        A.    Yeah.  And he said -- I said, so how did it go?

4    Fine, I finally got it.

5        Q.    Did he say --

6        A.    He finished whatever he was doing.  I don't

7    recall what he was doing.  But whatever it was, he

8    finished it, finished the job.

9        Q.    Did he say anything about needing to lift the

10   car to do whatever work he was doing or --

11       A.    No, he didn't mention anything else about the

12   car.

13       Q.    Okay.  Just that the bolts were sticking, and

14   he finally got it?

15       A.    Yeah.

16       Q.    Okay.  Turning to Page 42, starting on

17   March 11, 2011 at 8:52 a.m., it looks like a text from

18   you; is that correct?

19       A.    It is.

20       Q.    And it says, I need you, just the character U

21   --

22       A.    Yeah.

23       Q.    -- to pick up Parker, at sign, number two

24   today.

25             You sent that to him; right?

Page 101

1    A.    I did.

2    Q.    Now, maybe the time settings on the phone are

3    different or maybe I misheard you, but I thought you

4    mentioned earlier that you texted Christian around 12:00

5    or 1:00 --

6    A.    I did.

7    Q.    -- about picking up Parker.

8          Is this that text?

9    A.    No.  No.

10   Q.    Okay.

11   A.    I texted him earlier.  This is the earlier text

12   in the morning --

13   Q.    Okay.  Okay.

14   A.    -- once I realized I had to pick up Fred and

15   there was going to be a conflict in the time.

16   Q.    Okay.

17   A.    So he responded.

18   Q.    And that's the next line where it says, okay,

19   N-P; correct?

20   A.    Yes.

21   Q.    Sorry.  I saw you nodding your head.

22   A.    You know what N-P means?

23   Q.    I was going to ask you.

24   A.    "No problem."

25   Q.    Okay.  And it looks like he responded pretty

1    quickly because there's no time stamp?

2        A.    Right.  Right.

3        Q.    Is that your recollection?

4        A.    Right.  So it just came right back with an,

5    okay, no problem.

6        Q.    Okay.  Then we have the next line item entry

7    here at 12:52 p.m.  It appears to be from you again?

8        A.    It was.

9        Q.    Saying everything okay, question mark?

10       A.    Yeah, just checking in.

11       Q.    Okay.  And then --

12       A.    No response.

13       Q.    Correct.  No response.

14             The next entry again looks like another text

15   from you at approximately 1:42 p.m. --

16       A.    Uh-huh.

17       Q.    -- saying, on way to pick up Parker, question

18   mark; correct?

19       A.    Right.

20       Q.    So if -- if Christian was going to leave your

21   house to go pick up Parker at St. Thomas More, how long

22   of a drive is that?

23             MR. ELLIOTT:  Objection to the form.

24             You can answer.

25       A.    I would give myself about 40 minutes, so I

Page 103

```
 1    wanted him to be there at 2:00.  He would give himself
 2    about a half an hour.  He was always early.  So he would
 3    have left about 1:20-ish.  So this is 20 minutes to
 4    2:00, so he should have been pretty close to St. Thomas
 5    More by then.
 6              And as I was typing that, I remember
 7    thinking, you know, I know he can't answer because he's
 8    driving.  But when he gets there and he's waiting for
 9    Parker, he'll respond.  And he didn't.
10    Q.    Okay.  Was there a particular reason why you
11    wanted Christian to pick up Parker at 2:00?
12    A.    Because Parker was done at 2:00.  His classes
13    were over for the day, and I knew Parker would be ready
14    to go.
15    Q.    Okay.  And you mentioned earlier that there was
16    a doctor's appointment that Parker needed to go to later
17    in the afternoon?
18    A.    4:30.
19    Q.    Approximately 4:30?
20    A.    Yes.
21    Q.    From St. Thomas More, do you know how long it
22    would take to drive from St. Thomas More to the doctor's
23    office?
24    A.    I'd say about 45 minutes.
25    Q.    Okay.  So was Christian going to go straight to
```

Page 104

1    the doctor's appointment or go home with Parker and then

2    to the doctor?

3        A.    I was expecting him to come home.

4        Q.    Okay.  And you've seen in the documents -- I'm

5    pretty sure I know what the answer is going to be, but

6    just to have a complete record -- Christian did not pick

7    up Parker on the afternoon of March 11th, 2011; is that

8    correct?

9        A.    That is correct.

10       Q.    Rather, the Waterford Police Department, I

11   think, sent someone to pick Parker up; is that correct?

12       A.    No.

13       Q.    Who picked up Parker?

14       A.    Parker's friend picked up Parker.

15       Q.    Who was that friend?

16       A.    Matt Tarrantino.

17       Q.    So if your understanding was Christian would

18   pick up Parker at 2:00 and drive straight home, taking

19   about 45 minutes, he should have arrived at your home

20   around 2:45-ish; is that correct?

21       A.    That's correct.

22       Q.    From your home, how long would it take to drive

23   from your home to the doctor's office for Parker?

24       A.    Well, I was going to take him to the doctor, so

25   I would have given myself a half an hour.

Page 105

1      Q.     Okay.  Were you expecting to be home in time

2   after picking up Mr. Klorczyk from the train station to

3   do that?

4      A.     Yes.

5      Q.     Okay.  So your anticipation was you would be

6   leaving your house with Parker around 4:00 o'clock to go

7   to the doctor's appointment with Parker?

8      A.     Right.

9      Q.     Okay.  So you -- you've texted Christian at

10   1:42 p.m. asking him if he's on the way to pick up

11   Parker there.  There's no response; correct?

12      A.     Right.

13      Q.     At 3:26, it looks like another text from you

14   saying, where, and then characters, R-U, question mark;

15   correct?

16      A.     Yes.

17      Q.     Where were you when you sent that text message?

18      A.     I was home.

19      Q.     So you had already picked up Mr. Klorczyk?

20      A.     Yes.  And we were home.

21      Q.     And returned home already?

22      A.     Yes.

23      Q.     So there was about 34 minutes between the text

24   and when you were expecting to leave the house with

25   Parker to go to Parker's doctor appointment; correct?

Veritext National Deposition & Litigation Services
866 299-5127

1       A.      Yes.

2       Q.      Okay.  At any point between 12:52 p.m. and

3   3:26 p.m., did you make a telephone call to Christian?

4       A.      No, because Christian never answers his phone.

5   He never answered the phone.  That's why texting was the

6   best way to get him.  So it was just -- there was no

7   point.  He never answered the phone.

8       Q.      Now, did Christian ever call you during that

9   same time period?

10      A.      No.

11      Q.      Okay.  Are you aware of anybody, during this

12  12:52, 3:26 p.m. time period, speaking with Christian?

13      A.      No.

14      Q.      In any medium, face to face, over the phone?

15      A.      No.

16      Q.      Okay.  Are you aware of any other text messages

17  that he sent or received during this time period?

18      A.      There were none -- oh, he received some, but he

19  sent nothing.

20      Q.      So he did receive some text messages between

21  12:52 p.m. and 3:26 p.m. --

22      A.      Yes.

23      Q.      -- correct?

24      A.      (Nods head.)

25      Q.      But he didn't respond to any of those?

Page 107

1       A.      No.

2       Q.      Okay.  Do you recall who the text messages were

3    from?

4       A.      There were some from Sarah.  There was some

5    from Jordan.  Plus mine.  Possibly Parker.

6       Q.      Okay.  Now, looking at Page 43, it looks like

7    you followed up your, where are you, at 3:26 almost

8    immediately with, please answer me, Parker has an

9    A-P-P-T w/Giserman --

10      A.      Yes, that's the doctor.

11      Q.      -- at sign, 4:20, period.

12              And you didn't receive a response to that

13   either?

14      A.      Right.

15      Q.      Okay.  Then there's another text at 4:05 p.m.

16   from you saying, characters, R-U okay, question mark,

17   please phone home or text, period; is that correct?

18      A.      Yes.

19      Q.      And there was no response to that either?

20      A.      No response.

21      Q.      Okay.  Now, backing up to the time when you

22   sent the 3:26 text to the time you sent your 4:05

23   text --

24      A.      Yeah.

25      Q.      -- and, again, if you need to take a break at

1    any point in time, please let me know -- what were you

2    doing between 3:26 and 4:05?

3        A.    Fred and I were trying to figure out where he

4    could possibly be because this was so out of character

5    for Christian.  We -- you know, we were trying to decide

6    whether he had been in an accident on his way to pick up

7    Parker, which is really what I thought.

8              I called Jordan to see if he had talked to

9    Christian or if he knew where Christian was.  And he

10   said he had not talked to him, had not been able to get

11   ahold of him.  I asked him if he knew if anybody had

12   talked to him.  And he said no, but he would call

13   around, call Max and see if Max knew.  And, I mean, we

14   were just starting to get really frantic because this

15   was so out of character for Christian.

16             And I remember saying to Fred, I feel like

17   we should report -- we shall call the police with a

18   missing person.  And he said, we can't call the police;

19   they're going to think we're crazy.  You got a

20   21-year-old who's missing for, you know, a half an hour.

21   They're going to say, he's probably sitting at some bar.

22   This is stupid.

23             I said, I know, but this isn't right.  This

24   is -- he has never, ever done anything like this.  This

25   is -- I said, I know it's going to sound really stupid

Page 109

1  to the police, but this is just -- something's wrong

2  and -- something's really wrong.

3          Jordan called back and said, nobody had

4  heard from him all day.  Of course, Parker kept calling

5  saying, where he is?  I'm going to miss my appointment,

6  where is he, where is he.  I said, I don't know.  Just

7  sit right and don't call.  Don't call me, I'll call you

8  when I know something.  And we were really, really

9  getting frantic because this was -- this was just so out

10  of character.

11     Q.    Do you recall any other telephone calls that

12  you or your husband made during this slightly more than

13  half hour time period, other than the call to Jordan and

14  the calls that you received from Parker?

15             MR. ELLIOTT:  Wait.

16             What's the timeframe again?

17             MR. FLYNN:  The almost half hour time

18  period, the 3:26 to 4:05 time period.

19             MR. ELLIOTT:  Thank you.  Thank you.

20             MR. FLYNN:  You're welcome.

21     A.    No, there weren't any other phone calls.

22     Q.    So you didn't make any other phone calls and

23  you didn't receive any other phone calls?

24     A.    No.  It was Fred and I trying to brainstorm

25  where he could possibly be.

Veritext National Deposition & Litigation Services
866 299-5127

1      Q.     Okay.  Any other texts?

2      A.     No.  No.  It was just like, you know, we're

3   just trying to, you know -- and then we were -- he had

4   left me the night before when I had -- when I came home,

5   I had come from a class that I was taking on how to use

6   my Mac computer.  And I wanted him to help me, and he

7   didn't want to do it.

8          And he said, oh, it's just a pain in the ass

9   to move your stuff around.  And I said, I know, but you

10  know how to do it, it's faster for you.  And he said --

11  to do it.  And he said, yeah, but it's just such a pain

12  in the ass.  But during the day he went out and bought

13  me Mac for Dummies.  And he left it on my pillow.  And I

14  said, look at this, he had time to go out and buy this

15  today when he could have been moving all my files.

16          So, obviously, he had been out some time

17  during the day and had left me a pair -- couple pair of

18  jeans he wanted me to hem before he went back to school.

19  And, you know, we knew he had been doing laundry because

20  there were piles -- you know, he sorted laundry so that

21  it was sorted down, you know, the laundry room.

22          We -- we just could not imagine where he

23  was.  And so we're bouncing all these ideas off and, you

24  know, Fred had to really talk me out of not calling the

25  police because I knew it sounded ridiculous myself.  We

Page 111

```
 1   were just trying to figure out what to do, where could
 2   he be, where could he possibly be.  It just didn't make
 3   any sense.
 4       Q.    Okay.  Prior to your 4:05 text and after you
 5   arrived home around 4:26 -- or I'm sorry -- 3:26, did
 6   you notice that the dryer was running?
 7       A.    I know I said that to the police.  But I don't
 8   know why I said that.  Probably because I saw the loads
 9   of clothes all sorted out.  And I think that came out
10   when I was giving the statement because we were trying
11   to put together the timeline.  But can I definitively
12   say that the dryer was running?  No, I can't.
13               MR. FLYNN:  Okay.  Just a couple questions
14   before we break for lunch.
15               MR. ELLIOTT:  You want to finish with this
16   exhibit, or do you have a lot more on that exhibit?  I'm
17   just thinking about a natural time to break.
18               MR. FLYNN:  Well, I have one or two
19   questions about some of the answers right now, and then
20   it will be a good time to break, I think, before we move
21   into the -- the next part.
22               MR. ELLIOTT:  That's fine.
23       Q.    So how did Christian usually pay for things
24   that he purchased, like this Mac for Dummies book?
25       A.    He had an American Express card.
```

Page 112

1      Q.      Now, was that an account in his name only?

2      A.      The card had his name on it, but it was a

3   family account.

4      Q.      Okay.  So anything he would have charged on the

5   Am Ex would have shown up on the family's monthly

6   statement?

7      A.      Yeah, but, you know, it was also -- he also had

8   cash.  My mother would send money for Valentine's Day

9   and, you know.  She heard he got -- you know, he got

10  good grades or -- my mother was always doing stuff like

11  that.

12     Q.      What was his typical pattern of behavior,

13  though, when he purchased things?  Pay by credit or pay

14  by cash?

15             MR. ELLIOTT:  Objection to the form.

16     A.      I didn't pay the bills, so I really don't know.

17     Q.      Okay.

18     A.      Oh, sometimes he -- sometimes he won money at

19  the casino, apparently, we found out through some of the

20  letters.

21     Q.      Foxwoods?

22     A.      Yeah.  So he, apparently, was lucky at the

23  casino.

24     Q.      Other than the Am Ex credit card, did he have

25  any other credit cards?

                                        Page 113

1      A.    No.

2      Q.    Did he have a bank account debit card?

3      A.    Well, he might have.

4      Q.    Do you recall what banking institution he used?

5      A.    He used People's because that's what was on the

6   UConn campus.

7      Q.    Is that the full name, People's?

8      A.    People's United Bank.  And there was money in

9   there, too, so I know that.

10              MR. FLYNN:  Okay.  Just a couple questions,

11   Dave.

12              I just saw you look at your watch.

13              MR. ELLIOTT:  It's quarter after.

14              MR. FLYNN:  I know.  I know.  I'm trying

15   to --

16              MR. ELLIOTT:  Go ahead.  No.  Finish up.  Go

17   ahead.  No, go ahead.  Sure.

18              MR. FLYNN:  -- finish this.

19      Q.    And I think we're going to get to it with

20   Mr. Klorczyk's deposition tomorrow, but we received a

21   copy of an Am Ex statement.  Would that be the family Am

22   Ex account?

23      A.    Yeah, but it was broken down by -- by numbers

24   so you could see what was mine, what was Frederick's,

25   what was Christian's --

Page 114

1      Q.      Okay.

2      A.      -- what was Parker's.

3      Q.      At any point after March 11, 2011, did you

4   review the monthly statement that came after March 11,

5   2011?

6      A.      I did not.

7      Q.      Okay.  The People's United Bank statements,

8   did -- were those ever received at your home, in paper

9   form?

10     A.      No.

11     Q.      So do you know if they were received

12  electronically?

13     A.      I don't know.

14     Q.      Okay.  Have you ever seen a bank statement from

15  People's United Bank with Christian's name on it?

16     A.      When I went to get -- to do the -- not power of

17  attorney, but when --

18     Q.      Probate?

19     A.      -- probate, yeah.  That was the only time.

20     Q.      Okay.  Do you still have copies of those bank

21  statements?

22     A.      Oh, I might.

23     Q.      Okay.  As you sit here, do you recall if any of

24  those bank statements that you've seen and may still

25  have possession of cover the time period of March 11,

Page 115

1    2011?

2        A.    No, I didn't even look.

3        Q.    Okay.  Have you contacted People's United Bank

4    since March 11, 2011 to obtain copies of the account

5    documents?

6        A.    No.  I just closed out the account.

7        Q.    Okay.  Do you know if you can still go back to

8    the bank and ask for account documents?

9        A.    I do not know that.

10            MR. FLYNN:  I think this is probably a good

11   enough time for a break for lunch.

12            So 45 minutes, you said?

13            MR. ELLIOTT:  2:00 o'clock?

14            MR. FLYNN:  Okay.

15            MR. ELLIOTT:  Is that okay with everybody?

16            THE VIDEOGRAPHER:  The time is 1:18.  We're

17   off the record.

18            (A discussion was held off the record.)

19            THE VIDEOGRAPHER:  This is the beginning of

20   Disk Number 3.  We're back on the record.  Time is 2:06.

21   BY MR. FLYNN:

22       Q.    Good afternoon, Mrs. Klorczyk.

23       A.    Good afternoon, Mr. Flynn.

24       Q.    Just a question I ask almost after every break:

25   Is there anything about your previous testimony this

Page 116

1    morning that you feel you need to change, alter,

2    supplement, withdraw, correct in any way?

3        A.    No.

4        Q.    Okay.  And, again, some questions that I ask of

5    everybody:  During the lunch break, did you consume any

6    alcohol that might affect your ability to give your best

7    testimony here today?

8        A.    No.

9        Q.    During the lunch break, did you consume any

10   prescription medication that you feel may affect your

11   ability to give your best testimony here today?

12       A.    No.

13       Q.    Any reason we can't continue with your

14   deposition?

15       A.    No.

16       Q.    Okay.  A couple follow-up questions from the

17   morning:  Who is your cellular phone provider today?

18       A.    AT&T, I think.

19       Q.    Do you know who your cellular phone provider

20   was March 11, 2011?

21       A.    I'm not sure.

22       Q.    Has it changed at all in the last four years,

23   to your knowledge?

24       A.    I don't know.

25       Q.    Did you have a family plan?

Page 117

1    A.    Yes.

2    Q.    So your children's phones were on the family

3  plan as well?

4    A.    Yes.

5    Q.    Including Christian's?

6    A.    Yes.

7    Q.    What was Christian's telephone number?

8    A.    (860) 961-4793.

9    Q.    Okay.  This might be a stretch:  Do you happen

10  to know the account number for the phone --

11    A.    No.

12    Q.    -- phone plan?

13    A.    I don't -- I don't pay the bills.

14    Q.    Okay.  Where did they find Christian's cell

15  phone on March 11, 2011?

16    A.    It was sitting on a car in the next bay, the

17  next garage bay.

18    Q.    Now, if I recall correctly, the BMW was in the

19  center bay?

20    A.    It was.  So it -- it was on the right.

21    Q.    The right bay?

22    A.    Right bay.

23    Q.    And what car was sitting there?

24    A.    The Delorean.

25    Q.    Okay.  And whose car was that?

Veritext National Deposition & Litigation Services
866 299-5127

1    A.    That's ours.

2    Q.    Did one person in the family happen to drive it

3  more than somebody else?

4    A.    Actually, nobody was driving it at the time.

5  It was covered.  It ended up being like a shelf.  What a

6  shame.  And that's where it was, and that's -- I didn't

7  know that, but Jordan told me that.  I thought it was in

8  his pocket.

9    Q.    Okay.

10    A.    Jordan said, no, we never work on cars with

11  phones in our pockets.

12    Q.    Why is that?

13    A.    That's what I said.  He said because you

14  can't -- you can't get to it anyway.  So we just don't

15  take our phones when we're messing with the car.  We

16  just always leave them.

17    Q.    Okay.  So they leave them somewhere in the

18  garage?

19    A.    In the next -- they always put them on -- on

20  the Delorean.

21    Q.    Okay.  And then when it rings or beeps or

22  whatever sound it makes when a phone call or a message

23  comes in --

24    A.    Well, if they're standing and they can get it,

25  they get it or they look at it when they're done.  I had

Page 119

1    no idea.  I was totally shocked.

2        Q.    Okay.

3        A.    I was seriously shocked.

4        Q.    It is what it is.

5        A.    That would have been the last place I looked

6    for it, but...

7        Q.    Okay.  So did you say it was on the roof or the

8    hood?

9        A.    No, it was, like, on the -- oh, well, it comes

10   down like this (indicating).  It was kind of, like, on

11   the -- the trunk's in the front.  It was kind of on

12   the -- not the roof.  It was kind of on the -- I'd say,

13   like, the back windshield-ish, closer to the edge.  You

14   know, a Delorean opens up like that (indicating), so

15   there's no trunk in the back.

16       Q.    Right.  So it was on the back --

17       A.    Of the --

18       Q.    -- windshield, kind of in that transition

19   point --

20       A.    Yeah, yeah --

21       Q.    -- from the windshield to --

22       A.    It was wherever -- yeah, where it wouldn't fall

23   off.

24       Q.    Okay.  And was the car backed in?

25       A.    No, it was pulled straight in.

```
 1        Q.    Okay.  So the phone was closer to the garage
 2   door than to the door into the house?
 3        A.    Yes.
 4        Q.    Okay.  Now, you said Christian's car was an
 5   Acura-RSXR?
 6        A.    S.
 7        Q.    S.  Excuse me.
 8        A.    Oh, yes.  He corrected me -- he corrected me a
 9   thousand times until I got it right.
10        Q.    S.  Would he have driven that car to go pick up
11   Parker?
12        A.    Well, that was up for discussion because, when
13   we came home, it was sitting out in the front.  And Fred
14   and I said, geez, why is his car out.  Fred said, I
15   wonder why Christian's car is out front.  And I said,
16   well, the red BMW is gone, so he probably just grabbed a
17   set of keys, whatever was in his hand, that's what he
18   took.
19             You were at our house yesterday.  It looks
20   like a used car a lot.  So whatever was there, you know.
21   So we just assumed that he had taken the red BMW to pick
22   up his brother because it was not there and his Acura
23   was out front.
24        Q.    Now, as you pulled up to the house, where did
25   you park?
```

1    A.    Maybe around the front.  I'm not --

2    Q.    As you come up at that right-hand turn around

3  the tree --

4    A.    Yeah, around the front to the --

5    Q.    By the front door?

6    A.    Yeah.

7    Q.    Okay.  Were any of the garage door bays open?

8    A.    No.

9    Q.    Okay.  So why did you conclude that Christian

10  must have taken the red BMW?

11    A.    Because it was not out front.

12    Q.    Is it usually out front?

13    A.    Yes.

14    Q.    Whose car is the red BMW?

15    A.    Well, the boys were kind of using it as a

16  snowboard beater car.  Not a snowboard beater car, but

17  they were taking -- since it was all-wheel drive, they

18  didn't want to take their car -- their cars

19  to Killington.  They were going every weekend.

20        And Christian had just come back from

21  several days at Killington, and he had taken that.  And

22  it had the roof rack on it for the -- you know, the

23  pulley and the snowboards and all that.  So that's

24  usually what they took.

25    Q.    So the boys shared the car?

Page 122

```
 1        A.      For that, but they each had their own -- Parker

 2   didn't drive yet, and the other two each had their own

 3   Acura.

 4        Q.      Okay.  So --

 5        A.      But Frederick was in New York City, so he

 6   didn't need his Acura in New York, so...

 7        Q.      Was his Acura at the house --

 8        A.      Yes.

 9        Q.      -- on March 11th?

10        A.      Yes.

11        Q.      And he took a train or something to and from

12   the city?

13        A.      Well, he was living in New York.

14        Q.      Well, I mean, when he came home to get his

15   car...

16        A.      Yes, he took the train back and forth.

17        Q.      Okay.

18        A.      We didn't see much of him when he was in law

19   school.

20        Q.      Okay.  Do you know why Christian was changing

21   the oil on March 11th?

22        A.      No.

23        Q.      There was no discussion the day before or...

24        A.      No.

25        Q.      Even the week before?
```

Page 123

```
 1       A.    No.

 2       Q.    No discussion when he came back from Killington

 3  you said --

 4       A.    Uh-huh.

 5       Q.    -- that he needed to change the oil?

 6       A.    No.

 7       Q.    Okay.  So out front you had the two Acuras when

 8  you pulled up --

 9       A.    Uh-huh.

10       Q.    -- from the train station?

11       A.    Uh-huh.

12             MS. TROTTA:  Yes?

13             THE WITNESS:  Yes.

14       Q.    What other cars, if any, were out in front?

15       A.    Two Acuras.

16             That's a good question.  We have a lot of

17  cars.

18             MR. ELLIOTT:  Don't guess, Mrs. Klorczyk.

19       A.    No.  I don't know what else.  Two Acuras.

20       Q.    Okay.  The Mac for Dummies book --

21       A.    Yes.

22       Q.    -- was it in a bag on your pillow, or was it

23  just the book?

24       A.    Nope.  It was just the book.

25       Q.    Nothing that indicated where he'd purchased it?
```

                                        Page 124

1      A.     No.

2      Q.     Did he buy anything online ever through

3    Amazon.com or Ebay or anything like that?

4      A.     Yes.

5      Q.     Do you know if he had a user account for those

6    online shopping portals?

7      A.     Ebay, he did.  Amazon, I'm not sure.

8      Q.     All right.  Do you know the user name and

9    password for the Ebay account?

10      A.     I do not.

11      Q.     Okay.  Okay.  So now I'd like to talk about

12    events that took place after the 4:05 p.m. text.

13      A.     Okay.

14      Q.     Okay?

15      A.     Yes.

16      Q.     So, again, at any time, if you want to take a

17    break for any reason, you just let us know, and we'll

18    stop; okay?

19      A.     Yes.

20      Q.     Okay.  So you sent the text to Christian at

21    4:05?

22      A.     Yes.

23      Q.     What's the next thing that happens?

24      A.     So I'm frantic by this time.  I can't imagine

25    where he is.  Can't call the police yet.  So, finally,

Page 125

1   my husband said, did you check the garage?  I said, why

2   would I check the garage?  And he said, because the red

3   BMW is missing.  And I said, but he probably -- he had

4   to take something to pick up Parker, so I guess, since

5   his car is outside, he would have taken the red BMW.

6       Q.    So Mr. Klorczyk says, check the garage.  Are

7   you the first person to walk into the garage --

8       A.    I was --

9       Q.    -- after you returned from the train station?

10      A.    I was.

11      Q.    Okay.  So describe for us the events that took

12  place after you opened the door.

13      A.    I opened the door.  I was standing on the top

14  step to the garage.  There's three steps going down.

15  The first thing I noticed was that the halogen lights

16  were on, the two big halogen lights that they all used

17  when working on cars.

18            And my first thought was, Christian must

19  have been running late.  He forgot to turn the lights

20  off.  That's unusual.  He never turns -- forgets to turn

21  lights off.  Then I noticed that the garage lights are

22  on, the overhead lights are on.  I'm thinking, wow, he

23  must have really been in a hurry.

24            The car looked like it was parked in the

25  garage, which I thought was kind of strange.  And

1    from -- as I was standing on the top step, I was looking

2    around.  And then, all of a sudden, I realized that

3    Christian's legs were sticking out from the front of the

4    car.  And I realized he was still under the car.

5              So I said, Christian, Christian, answer me,

6    answer me.  There was no answer.  So I turned around,

7    ran to the bottom of the stairs and to the stairs to go

8    upstairs.  I said, Fred, come down, hurry up, come down,

9    come down.  And on my way back toward the garage, I

10   reached -- I ran into one of the side rooms and grabbed

11   the phone.  And I just dialed 911.

12       Q.    So you said, a second ago, you were trying to

13   talk to him, and there was no response.

14       A.    Right.

15       Q.    You then turned back and went to the stairs

16   inside the house?

17       A.    Inside the house.

18       Q.    So the staircase to the second floor?

19       A.    Yes.

20       Q.    And called for your husband?

21       A.    Yes.

22       Q.    Okay.  And the two of you started going back to

23   the garage, and on your way, you stop, run into the

24   bedroom, grab a phone?

25       A.    To another room, yeah, grabbed the phone.

1    Q.    And dialed 911?

2    A.    Yeah.

3    Q.    Then what happened?

4    A.    So as I was being connected with 911, I watched

5    my husband, who was also calling to Christian.  And I

6    watched my husband pick up the handle to the jack

7    stand -- no -- to the hydraulic jack, insert it into the

8    opening, put it in and turn it and then pump up the car

9    off of Christian.

10        I didn't realize that, at the time, that

11   Christian was holding the car up.  And then, once Fred

12   had the car raised, he put the jack stand underneath the

13   car.  And then I was able -- I was talking to the -- to

14   the girl at 911, the dispatcher.

15        And I told her that my son was under the car.

16   And she asked me if I had a pulse.  And I believe I

17   said, I don't know yet.  And I went under -- through the

18   wheel well and my husband went under through the front

19   of the car.  And I went straight for his carotid on

20   the -- his right side.  And I -- and I had a pulse.  So

21   I said to 911, yes, I have a pulse.

22   Q.    Okay.  Now, when you first opened the door

23   before you went back to the staircase, you saw the

24   halogen lights, the garage lights, the car and

25   Christian's legs.

```
 1      A.    (Nods head.)

 2      Q.    Did you see a jack stand?

 3      A.    No.

 4      Q.    Did you see a pump jack?

 5      A.    No.

 6      Q.    Okay.  Did you see any tools, other than the

 7   halogen lights?

 8      A.    No.

 9      Q.    Okay.

10      A.    I didn't stand there very long.

11      Q.    When you returned and you were on the phone

12   with 911, you saw Mr. Klorczyk grab the pump jack, put

13   it under the car, insert the handle pull --

14      A.    Yeah.

15      Q.    -- turn the handle pull --

16      A.    Yeah.

17      Q.    -- and then start to pump the car up?

18      A.    Yes, because when he -- once he started to grab

19   it, then I realized it was stand -- it was right there

20   parallel to the -- to the car.

21      Q.    Okay.

22      A.    It was down on the floor.  It was standing.

23   When I opened the door the first time, I was standing up

24   high enough all -- I missed all -- everything that was

25   on the floor, except, you know, I could see Christian's
```

Page 129

1    legs, but I couldn't see what was right directly below

2    me on the floor.

3        Q.    So if we're in the middle bay and we have the

4    BMW in the middle bay, the front end towards the back of

5    the garage wall --

6        A.    Yes.

7        Q.    -- the trunk by the garage door --

8        A.    Yes.

9        Q.    -- where is the pump jack?

10       A.    It was right -- sitting right parallel, both

11   the parts, two -- two separate pieces, parallel to the

12   front wheel well.

13       Q.    And which end was facing that back garage wall,

14   the part where you put the pawl or the part that lifts

15   up?

16       A.    The part where you put the pawl.

17       Q.    Okay.  So the pawl end is facing the back end

18   of the garage wall?

19       A.    Yeah, facing the (pointing).

20       Q.    Where was the pawl?

21       A.    Right next to it.

22       Q.    Which side of the jack stand?  In between the

23   car and the jack stand or the jack stand and then the

24   pawl closest to the house door?

25       A.    No, it was the pawl and then the jack stand.

1     Q.    It was the pawl -- you okay down there?

2           THE VIDEOGRAPHER:  Yeah.

3     BY MR. FLYNN:

4     Q.    All right.  So the pawl was in between the BMW

5     and the pump jack --

6     A.    I believe so.

7     Q.    -- correct?

8     A.    (Nods head.)

9     Q.    Okay.  So you see Mr. Klorczyk take the pump

10    jack, put it under the car, lift the car and then he

11    puts a jack stand under the car?

12    A.    Yes.

13    Q.    Where did he get the jack stand?

14    A.    It was under the car.

15    Q.    Okay.  Where was it under the car?

16    A.    I don't know exactly where it was under the

17    car, but I couldn't -- it was a place where I couldn't

18    see it.

19    Q.    Okay.  Do you know if it was laying on its

20    side?

21    A.    I'm not sure.

22    Q.    Do you know if it was standing on all four

23    legs?

24    A.    I don't think so.

25    Q.    Okay.  So if it wasn't standing on all four

Page 131

1   legs --

2       A.      It had to be on its side.

3       Q.      It probably was on its side?

4       A.      Yes.

5       Q.      Okay.  And you don't recall if it tipped

6   towards the garage wall or if it tipped towards the

7   garage door?

8       A.      No, because as soon as he had -- as soon as he

9   put it up, I was under there.  I was -- I was trying to

10  get to Christian.

11      Q.      Okay.  So Mr. Klorczyk puts the pump jack

12  under, pumps the car up.  And my recollection from the

13  photos is that the pump jack was close to the right

14  front rear well -- I'm sorry -- right front wheel well,

15  but slightly behind it.

16          So if Mr. Klorczyk goes under the car from the

17  front end, he gets up at some point then; correct?

18      A.      He had moved it out of the way after he put

19  the...

20      Q.      Oh, so he put the jack stand under, then he

21  removed the pump jack?

22      A.      So I could get under there.

23      Q.      And then you go under the right front wheel

24  well?

25      A.      Yeah.

Page 132

1      Q.     As he's standing up, he's moving the pump jack?

2      A.     Yeah.  And he went...

3      Q.     He steps in front of the car and then gets down

4   and goes under the front of the car?

5      A.     Yeah.

6      Q.     Okay.  So it's just the one jack stand that's

7   holding the car up at that point in time?

8      A.     I believe so.

9      Q.     Okay.  Were there any other jack stands under

10  the car at that point in time?

11     A.     I didn't see any.

12     Q.     Did you see any other jack stands in the garage

13  at that time?

14     A.     I wasn't looking.

15     Q.     Okay.  At a later point in time, did you find

16  out that there were more jack stands in the garage?

17     A.     There were.  There were.

18     Q.     Okay.  How many other jack stands?

19     A.     Three.

20     Q.     And the jack stand that Mr. Klorczyk used, can

21  you describe it or identify it.

22     A.     I wouldn't be able to tell one from the next.

23     Q.     Okay.  So you don't have an idea of what load

24  capacity?

25     A.     No.

Page 133

1    Q.    What color it was?

2    A.    No.

3    Q.    What the shape of the ratchet pawl saddle was?

4    A.    No.

5    Q.    Okay.  Were there any marks on the jack stand?

6    A.    I wasn't focused on the jack stand.  I was

7    focused on Christian.

8    Q.    Okay.  At any point after March 11th when you

9    came back from the hospital, did you happen to notice

10   any marks on the jack stand?

11   A.    I did not look at those.  I have not look at

12   those jack stands since it took me a couple days to even

13   go in the garage.

14   Q.    Understandable.

15        So -- and, again, please -- if you want to take a

16   break at any point in time, please let me know.  And I'm

17   sorry to keep going over these events --

18   A.    That's okay.  Yeah.

19   Q.    -- but I want to make sure that we have a clear

20   understanding.

21        So Mr. Klorczyk puts the pump jack under the car,

22   puts the handle in, rotates the handle to lock it, pumps

23   the car up.

24        Do you recall how many pumps it took?

25   A.    No, I don't.

Page 134

1      Q.    Once the car is at a certain elevation, he

2   grabs the jack stand that you saw under the car, rights

3   it, puts it on all four legs and then transfers the load

4   from the pump jack to the jack stand; correct --

5      A.    Yes.

6      Q.    -- so far?  Okay.

7         Then he removes the pumps jack, you go under the

8   right front wheel well, he goes under the front bumper?

9      A.    Yes.

10     Q.    Okay.  And there were no other jack stands

11   involved at this point in time, other than the one that

12   you saw under the car?

13     A.    Right.

14            MR. ELLIOTT:  She said she didn't remember.

15   You're asking her, like, three times, so...

16   BY MR. FLYNN:

17     Q.    Now, when you got under the car, you felt for a

18   pulse on his right carotid artery; correct?

19     A.    That is correct.

20     Q.    And you said you felt a pulse?

21     A.    I definitely had a pulse.

22     Q.    Was it a strong pulse or a faint pulse or --

23     A.    No, it was -- it was a good pulse.  It was a

24   strong pulse.

25     Q.    Okay.  When you went under the car, what

Page 135

1    position was Christian in?

2        A.    He was laying flat and, you know, I was -- I

3    was looking at his face.  And, you know, I still had

4    the -- I was on the phone, and I had my -- I had my hand

5    on his -- other hand on his pulse.  And I was looking at

6    his face and thinking, wow, now, I've got to find a --

7    we're going to need a good plastic surgeon and, you

8    know, I really thought he was just out cold is what I

9    thought.

10       Q.    Okay.  Do you recall there being a ratchet on

11   the drain plug to the oil pan?

12       A.    Yes.

13       Q.    Was Christian's hand still on the ratchet?

14       A.    Yes.

15       Q.    Now, just backing up here, when Mr. Klorczyk

16   lifted the car with the pump jack, other than the sound

17   of the pump jack itself and any sound the car might have

18   made as the weight was shifting, did you hear any sounds

19   from under the car?

20       A.    No.

21       Q.    Okay.  Where were you standing when the car was

22   being lifted?

23       A.    I was down, like, on the first step.

24       Q.    Okay.  So did you have a good angle of the

25   entire body of the BMW?

1        A.      It was pretty good.

2        Q.      When Mr. Klorczyk lifted the car, did the

3    entire right-hand side of the car, meaning, the back

4    wheel, come up off the ground at the same time?

5        A.      I don't -- I wasn't looking -- I wasn't really

6    looking -- focused on the whole car.  I was really

7    focused on -- on trying to see Christian and how fast I

8    could get to him and how soon I could get under there --

9        Q.      Okay.

10       A.      -- because I had 911 still on the phone.

11       Q.      Right.

12           Can you describe for us the orientation of

13   Christian's legs from protruding out underneath the car.

14   Was he going straight with the car and his legs were out

15   the front bumper?  Was he going perpendicular to the

16   car, and they were right out the right rear well?

17           I'm sorry.  I keep staying that wrong.  The right

18   front wheel well.

19           Or were they more at an angle with the front

20   corner of the car?

21       A.      Can you say that again?

22       Q.      Uh-huh.  Absolutely.  Thank you for asking.  I

23   don't want to confuse you here.

24           When you saw Christian's legs protruding out from

25   underneath the car, were they parallel with the car,

```
 1   meaning, his legs were sticking straight out the front
 2   end towards the back wall of the garage, or were they
 3   perpendicular to the car and they were sticking straight
 4   out from underneath the car towards that support pawl
 5   and the house wall where the door is?
 6       A.    No, they were -- (indicating).
 7       Q.    Or were they at that angle in between the two?
 8       A.    No, they weren't -- they weren't at an angle.
 9   I don't recall.  I was focused on his face.
10       Q.    Perfectly fine.
11           So you're underneath the car, you feel a pulse,
12   you tell the 911 operator, I feel a pulse?
13       A.    Yes.
14       Q.    And, at this point in time, do you hear any
15   sounds from Christian?
16       A.    No.  And I said to her, I think he's just
17   out -- I think he's out cold because I have a pulse, and
18   he's not responding to me.  He's not responding to his
19   name.
20       Q.    Okay.  Was there any blood?
21       A.    I didn't see any.
22       Q.    Okay.  So I think I know what the answer to
23   this next question is going to be, but just so we have a
24   complete record:  Did you see any blood flowing from his
25   body?
```

Page 138

1      A.     No.  I saw broken bones.

2      Q.     Which bones?

3      A.     His cheekbone was crushed.

4      Q.     And that's the right cheekbone?

5      A.     His right cheekbone was crushed.

6      Q.     Okay.

7      A.     For sure of that, you know.  It could have

8   been -- it could have been his jaw more, you know.  But

9   the whole, like, right side of his face.

10     Q.     Okay.  Were Christian's eyes open?

11     A.     No.

12     Q.     Describe for us what happened -- well, let me

13  ask another question first.

14          Had anybody from any emergency services arrived

15  at the house by the time you had felt for the pulse,

16  felt a pulse and informed 911 that you felt a pulse?

17     A.     No.

18     Q.     Okay.  Now, in some of the photographs, we see

19  that the garage door was open?

20     A.     Yes.

21     Q.     At what point in time was that garage door

22  opened?

23     A.     When I heard the sirens, because it was cold

24  outside and the doors were closed when we got home.  And

25  so we just left them down until somebody was there

Page 139

1    because it was freezing.

2        Q.    Okay.

3        A.    So I was the one who opened the garage door.

4        Q.    What's the time estimate between your advising

5    911 that you feel the pulse and the garage door opening?

6        A.    Well, it seemed like forever, but probably

7    five, six, seven minutes.

8        Q.    Okay.  So let's focus on that timeframe.

9              You've advised 911 that you feel the pulse.  Walk

10   us through what happens next.

11       A.    Well, Fred was underneath from the other way.

12   And Fred said to me, are you sure you have a pulse, are

13   you sure you have a pulse?  I said, yes, yes, yes.  Are

14   you sure, are you sure.

15             Yes, I have a pulse, I have a pulse.  And he

16   had -- he had grabbed a coat, and he was trying to do

17   compressions from Christian's chest, I believe.  And I

18   was still underneath, you know, kind of and then talking

19   to Christian.  I had hung up the phone.  I don't even

20   know where I put it.

21             And I was talking to him just thinking, well,

22   maybe I can get him to come to.  I really thought he was

23   just seriously out cold.  And, you know, I didn't want

24   to, like, smack his face or anything to wake him up

25   because he was already banged up pretty much.  And, you

Page 140

1  know, I didn't know if his neck was hurt, and so I

2  didn't want to disturb that.

3       And we were -- we were pretty frantic because we

4  just didn't know what else to do.  And we kept saying,

5  how long -- how long is it going to take, why aren't

6  they here yet.  And as soon as -- that was pretty much

7  it.

8       You know, Fred and I were both talking to

9  Christian.  You know, Christian, do you hear us, can you

10 answer us, can you talk to us and talking to each other.

11 And, again, my hand was just continuously on his pulse.

12 And then, as soon as I heard the siren and I knew it was

13 pretty close to the house, like on our street, I got up

14 and I opened the -- well, two garage doors anyway, the

15 middle one and the one where the Delorean was.

16      And I saw two emergency responders there, and I

17 happened to know those two.  So, you know, I just kind

18 of said, hey, come on in, you know, we've got a problem

19 here.  I think Christian is knocked out cold.  He,

20 apparently, was working on the car.  And I don't know

21 what to do.

22   Q.   Okay.  At any point in time between advising

23 911 you felt a pulse and the first responders showing

24 up, did you or your husband pull Christian out from

25 underneath the car?

Page 141

1      A.    No.

2      Q.    Okay.  So when the first responders arrive on

3  scene, Christian is, essentially, in the same position

4  you and your husband found him in?

5      A.    Yes.

6      Q.    And your best estimate is there was about, I

7  think, it's a six to seven-minute time period from when

8  you first found Christian to when the first responders

9  showed up?

10     A.    No, that's from when I had 911 dispatch said

11  she was dispatching until they got there.

12     Q.    Okay.  What's the total time period, best

13  estimate, from when you opened the door and saw the

14  halogen lights in the car and Christian to the time that

15  the first responders show up?

16     A.    It was probably -- it was a few minutes, more

17  than that.

18     Q.    Okay.  So --

19     A.    Maybe, you know, ten, 11, 12, you know.  An

20  extra few minutes in there.

21     Q.    Ten --

22     A.    Until I found him, realized that he was under

23  there and not responding, got Fred.

24     Q.    So ten to 12 minutes?

25     A.    Yeah.

```
 1      Q.    Is the estimate?

 2      A.    Approximately.

 3      Q.    Okay.  Who were the first responders?

 4      A.    The first two I saw were Don and Kyle Chapman.

 5      Q.    Do you know somebody named Houseman?

 6      A.    No.

 7      Q.    Okay.  At some point, did a police officer show

 8 up?

 9      A.    Yes.

10      Q.    Do you have a recollection as to whether he was

11 the third responder or some other fourth, fifth, sixth?

12      A.    (Witness shakes head.)

13      Q.    You don't recall?

14      A.    (Shakes head.)

15      Q.    Is that a no?

16      A.    I have no idea.

17      Q.    Do you recall who the first police officer on

18 scene was, what his name was?

19      A.    No.

20      Q.    Does Krystofiak sound familiar?

21      A.    It does.  It could have been him.

22      Q.    So Don and Kyle Chapman arrive --

23      A.    Yes.

24      Q.    -- is your recollection?

25      A.    Yes.
```

1      Q.     And they come into the garage.

2             And what is the first thing they do?

3      A.     I don't know what they did.  I don't.

4      Q.     Where were you?

5      A.     I was standing there.

6      Q.     Okay.  Did they go under the car?

7      A.     I didn't see them go under the car.

8      Q.     Did they --

9      A.     I don't know whether I said to Fred, you know,

10     the EMTs are here or, you know, you can come out now

11     because help is here.  I'm not really sure what I did.

12     Q.     Okay.  So what did Don and Kyle Chapman do when

13     they got to the scene?  Did they just pull Christian out

14     from under the car --

15     A.     No, no, they didn't.

16     Q.     -- or did they go under the car?

17     A.     No, they didn't do either of that.  They may

18     have been waiting for some other people, but I don't

19     know, you know.

20     Q.     Did either of them check for a pulse?

21     A.     Not while I was standing there.

22     Q.     Okay.  So the EMTs arrive, you're standing next

23     to them --

24     A.     Yeah.

25     Q.     -- by the car?

Page 144

1       A.      Uh-huh.

2       Q.      Christian's under the car?

3       A.      Uh-huh.

4               MS. TROTTA:  Yes?

5               THE WITNESS:  Yes.

6               MR. FLYNN:  Oh.  I'm sorry.  Thank you.

7       Q.      Is Fred still under the car?

8       A.      I think he was.  I think I was trying to get

9  him out from under the car because he didn't want to

10  come out until he knew somebody was going to take over

11  or somebody -- we had more help or something.  He was

12  pretty frantic under there.

13          And I think finally one of the police officers

14  came and told me I needed to go inside and put my shoes

15  on.  And so I did that, and I don't know if I dragged

16  Fred in with me or not.  By that time, there were --

17  there were people all over the place.  And there really

18  wasn't enough room in the garage for all of us.  So I

19  did go in and put my shoes on.

20      Q.      Before you go into the house and put your shoes

21  on, does Fred come out from underneath the car?

22      A.      I'm not even sure.

23      Q.      Okay.  Before you go into the house, do you see

24  anybody go under the car with Christian?

25      A.      No.

                                            Page 145

1      Q.     Before -- okay.  So did anybody feel for a

2   pulse down by the ankle or the groin area?

3      A.     Not while I was standing there.

4      Q.     So how many people were there from emergency

5   medical services, whether it's EMTs, fire department or

6   police department --

7      A.     Probably --

8      Q.     -- at the time you walk into the house?

9      A.     -- probably six.

10     Q.     Okay.  And your recollection is none of them

11  were under the car trying to help Christian?

12     A.     Not -- I didn't see anybody do that.  I didn't

13  see anybody go into the -- into the wheel well where I

14  was.  So I don't -- I didn't know what their procedure

15  was.  I didn't know how they were going to go him out

16  because his feet were pretty much up against the wall.

17  So it was, like, I didn't know -- I didn't know what

18  they were going to do.

19     Q.     His feet were up against what wall?

20     A.     The garage wall.

21     Q.     Oh, the back garage wall?

22     A.     Yeah.

23     Q.     So he was pretty much straight?

24     A.     Yeah.  And the engine is in the front of the

25  car --

Veritext National Deposition & Litigation Services
866 299-5127

1    Q.    Right.

2    A.    -- so -- and he was pretty tall.  So he wasn't

3  under that much -- he was only under the engine part of

4  the car, and then there wasn't that much space.  He only

5  gave himself, like, barely enough space to get under

6  there and stretch out.  So it's not like he was working

7  in the back of the car and had -- you know, he wasn't

8  under the whole length of the car.

9    Q.    So you went under the right front wheel well;

10 correct?

11   A.    Yes.

12   Q.    So the tire wasn't on?

13   A.    The tire was not on.

14   Q.    Where was the tire?

15   A.    No, I think Fred did put the tire on before I

16 went under --

17   Q.    Okay.

18   A.    -- not on, but I think Fred put the tire

19 underneath the wheel -- the wheel part.

20   Q.    The actual wheel assembly?

21   A.    Yes.

22   Q.    The brakes and rotors?

23   A.    Yeah, after he put the jack stand on -- up --

24   Q.    Okay.

25   A.    -- and took -- I think he put the tire under.

Page  147

1    Q.    Okay.  Do you remember where he got the tire?

2    A.    I think it was right there, under -- it may

3    have been under the car.  I'm not really sure.

4    Q.    Okay.

5    A.    But it was in the garage close to where

6    Christian was working.

7    Q.    Okay.  So the Chapmans arrive about ten to 12

8    minutes after you first found Christian in the garage;

9    correct?

10   A.    About -- about that, yeah.

11   Q.    And then another period of time goes by, and

12   four more people arrive --

13   A.    At least.

14   Q.    So there's about six people now?

15   A.    Yeah.  And then there was an ambulance, the

16   fire truck came, yeah.

17   Q.    How much time between when the Chapmans arrive

18   and the fire trucks, the ambulance --

19   A.    They just -- they just kept on coming, within a

20   matter of a few minutes.

21   Q.    Okay.  So another two to three minutes?

22   A.    Yeah.

23   Q.    And then you go inside?

24   A.    And then I went inside, yeah.

25   Q.    Did anybody walk inside with you?

Veritext National Deposition & Litigation Services
866 299-5127

1      A.     It may have been one of the police officers.

2      Q.     Does Officer Surdo -- S-u-r-d-o -- sound

3  familiar?

4      A.     It sounds familiar, but it doesn't -- I don't

5  know if he's the one that -- that -- some -- one of them

6  stayed with us the entire time, but I'm really not sure

7  which one it was.

8      Q.     Okay.  When you go into the house --

9      A.     Yes.

10      Q.     -- do you ever go back into the garage while

11  Christian is still at the house?

12      A.     Yes.  And he was still under the car, and I

13  was, like, when are they going to get him out?  And so I

14  just -- I went and I got in the ambulance because I had

15  every intention of going wherever he was going.  And

16  they told me I couldn't ride in the back of the

17  ambulance because there wasn't enough room.

18          So I said, well, all right, then I'll ride in the

19  front with the driver.  And they said, no, I couldn't do

20  that.  I had to go with the -- I had to follow -- I had

21  to follow with the police car, in the police car.

22      Q.     Do you remember which officer drove you?

23      A.     No.

24      Q.     How long were you in the house before you came

25  back out?

1     A.     Oh, not too long.  I put my shoes on.  I got my

2   purse.  I got a coat.  I waited for Fred to come in

3   because he needed the jacket and all of that.

4     Q.     Any time estimate at all?

5     A.     I don't know.  Ten minutes at the most because

6   we were waiting to see what they were -- they were going

7   to do because I was under the impression they had called

8   life flight.

9     Q.     Okay.  Do you know when they called for the

10  life flight helicopter?

11    A.     When I initially called 911.

12    Q.     And told the operator that you had a pulse?

13    A.     Right.

14    Q.     Okay.

15    A.     And they had -- I thought they had decided to

16  land at Harkness, which was across the street --

17    Q.     Okay.

18    A.     -- from -- across the main road where from

19  where we lived.

20    Q.     Okay.  Were you ever advised that the life

21  flight was canceled?

22    A.     No.

23    Q.     Did you learn that subsequently?

24    A.     Well, when I was in the back of the -- of the

25  ambulance -- of the police cruiser, and I said, where

Page 150

1    are we going, and the officer said, we're going to L&M.

2    And I said, well, I thought we were going to Harkness

3    for LifeStar.  And he said, no, they decided L&M was

4    closer and took the very scenic route to L&M down every

5    side street there ever was between our house and the

6    hospital.

7        Q.    Were you and Mr. Klorczyk in the same car?

8        A.    Yes.

9        Q.    How long did it take from the time you left the

10   house to get to L&M?

11       A.    About 15 minutes.

12       Q.    How far away is L&M if you were driving in a

13   hurry to get there?

14       A.    About six minutes.  You know, I had time enough

15   to make a few phone calls.  I called Jordan and, you

16   know, called Frederick and called -- you know, I mean,

17   it was just, like, how much slower can this man drive.

18       Q.    Okay.  Do you have any opinion as to what

19   happened with the car coming down on Christian?

20              MR. ELLIOTT:  Object to the form.

21              You can answer, if you understand.

22   BY MR. FLYNN:

23       Q.    Do you understand the question?

24       A.    I think the jack stand failed.

25       Q.    Okay.  How do you think the jack stand failed?

1      A.     It just did not hold the car up the way it was

2   supposed to.

3      Q.     Did anything break on it?

4      A.     I don't know.  I did not -- did not look at the

5   jack stand.

6      Q.     Do you think that it just collapsed under the

7   weight of the car?

8      A.     That's a possibility.  I don't -- I don't know

9   what happened, but either -- well, I think it could have

10  been designed better.  I know there's a better design

11  than the way that one was designed because we own a

12  better design now.  And I know that Christian knew what

13  he was doing because he had used that Sears Craftsman

14  jack stand many, many times over the years.  So I think

15  it was product failure.

16     Q.     What particular part of the jack stand failed?

17     A.     It could have been the -- I don't know what

18  that riser piece is called that comes up and stays in

19  when you decide how high you want it to stay, other than

20  it just suddenly slipped down.  Could have been that.  I

21  don't know.

22     Q.     Okay.  So you don't know?

23     A.     I don't know.  I'm just speculation, so...

24     Q.     If there was a failure, you don't know what it

25  was?

Page 152

1        A.     I don't know what it was, no.

2        Q.     Okay.  Are you certain that there was a jack

3    stand failure?

4        A.     I -- I'm sure there was a jack stand failure.

5    There had to be some reason for that car to collapse.

6    The car was not being held up by the pump jack because

7    that was flat down on the floor.

8        Q.     Before you went into the house, did

9    Mr. Klorczyk ever come out from underneath the car?

10       A.     I don't know.

11       Q.     Okay.  You don't recall if he was standing next

12   to a police officer?

13       A.     Eventually, he was, but I don't remember when

14   exactly when he came out.

15       Q.     Did you see him standing next to a police

16   officer after you came back out of the house?

17       A.     Yes.

18       Q.     Okay.  Was the police officer having a

19   conversation with Mr. Klorczyk?

20       A.     Well, I don't think Fred was very -- I'm trying

21   to find the right word -- he was not really -- he was --

22   he was pretty much hysterical.  I don't know if he was

23   even lucid by that time.  He was just distraught, very

24   distraught --

25       Q.     Okay.

Veritext National Deposition & Litigation Services
866 299-5127

1     A.     -- to say the least.  I'm not even sure he

2  remembered Christian's birthday.

3             MR. FLYNN:  I'm going to mark as Number 6 a

4  document entitled Incident Report Narrative.  It's got a

5  Bates label on it of all caps, KLORCZYK 000047.

6             (Defendants' Exhibit 6 was marked for

7             identification.)

8             MR. FLYNN:  Here you go, Dave.  There you

9  are.

10    Q.     Have you ever seen that document before?

11            MR. ELLIOTT:  Take your time.  Take a look

12  at it.

13    Q.     Absolutely.

14            MR. ELLIOTT:  And the question is:  Have you

15  seen that document before?

16    A.     I believe I saw this earlier this week.

17    Q.     Okay.  Now, at the bottom of the page, it seems

18  to be signed by an Officer Nicholas Surdo of the

19  Waterford Police Department.

20        Do you see that at the bottom?

21    A.     Yes.

22    Q.     As you sit here today, do you recall meeting an

23  Officer Surdo on March 11, 2011?

24    A.     I do not, but I could have.

25    Q.     Do you remember having a conversation with a

Page 154

1    Waterford Police Department officer?

2        A.    Yes.

3        Q.    Did some or all of that conversation take place

4    inside the house?

5        A.    Some of it did.

6        Q.    In the second paragraph, the fourth line right

7    after the Connecticut registration number --

8        A.    Yes.

9        Q.    -- it reads, at this time, a female identified

10   as Lynne Klorczyk -- and it spelled your first name

11   incorrectly --

12       A.    Yes, they did.

13       Q.    -- who is Christian's mother, was holding

14   Christian and checking for a pulse.  Christian, at this

15   time, was unresponsive.

16           Is that accurate?

17       A.    He was unresponsive to me calling his name,

18   yes.

19       Q.    Okay.  The statement from the police officer

20   says you were holding Christian.

21           But I understand from your testimony that he was

22   always laying down on his back --

23       A.    He was.

24       Q.    -- under the car?

25       A.    (Nods head.)

Page 155

1      Q.      -- is that correct?

2      A.      That is correct.

3      Q.      So you weren't holding Christian at any point

4   in time on March 11, 20- --

5      A.      I was not.

6      Q.      -- -11?

7          Okay.  Did you try to move Christian at all?

8      A.      I didn't.

9      Q.      Okay.  Did his body feel cool to the touch?

10     A.      I don't recall if it felt warm, cold or

11  anything.  All I was focused on, again, was the -- was

12  the pulse.  And I kept focusing on the pulse and kept

13  looking at his face.  So no, I didn't -- it's not like I

14  felt and it was, like, whoa, he's freezing.

15     Q.      Nothing like that?

16     A.      No.  It was not like that.

17     Q.      Did his body feel limp or stiff?

18     A.      I wasn't really touching all of his -- I

19  haven't -- I touched his face.  It didn't feel -- it

20  felt -- it felt -- it didn't feel stiff.  It felt like,

21  you know, I was able to move his -- I was able to move

22  around to get to the jugular.

23     Q.      You were able to move his neck skin?

24     A.      Yeah, I was.  I was.  I mean, I didn't try to

25  take his hand off the wrench.  I just left it.  I

```
1    didn't -- I couldn't even -- I couldn't get around him.
2    So I just really focused on trying to get him to come to
3    because I really thought he was just unconscious.
4        Q.    And, again, it was his right hand that was up
5    on the wrench?
6        A.    Yes, he was right handed.
7        Q.    And his head was turned to his left shoulder?
8        A.    It was like this (indicating), yeah.
9        Q.    Well, you just turned to your right shoulder.
10       A.    Well, no.  It looked that way, but it wasn't
11   that way because I could see this whole side of his
12   face, which was, when I looked at him, it was all of
13   this shown to me.  It was like this (indicating).  And,
14   actually, I think maybe both hands were on his -- or
15   within that wrench --
16       Q.    Okay.
17       A.    -- like he was struggling with a bolt --
18       Q.    Okay.
19       A.    -- is what it looked like.
20       Q.    So was his head turned to his left shoulder?
21       A.    Yes --
22       Q.    Okay.
23       A.    -- because I had a really good look at this
24   side of his face.
25       Q.    Okay.  And then going back to Exhibit 6 --
```

Page 157

1      A.     The cringing going on.  I hope we can find a

2   good enough plastic surgeon, is what I was thinking.

3      Q.     Going back to Exhibit 6 --

4      A.     Yes.

5      Q.     -- from where we left off --

6      A.     Yes.

7      Q.     --  I don't have a question about the next

8   sentence.  But then, the following sentence is, I

9   observed that the vehicle was now jacked back up

10  utilizing a hydraulic floor jack and also placed under

11  the passenger side compartment was one jack stand.

12         Do you see that?

13     A.     Yes.

14     Q.     Is that accurate with your recollection from

15  the day, that there was only one jack stand under the

16  car?

17     A.     There was only one jack stand.  But the

18  hydraulic jack, I don't -- do not believe it wasn't --

19  it wasn't there.  My husband had moved it.

20     Q.     Right.

21         I was going to say, you recall Fred --

22     A.     Moving.

23            MR. FLYNN:  Excuse me.  I'm sorry.

24  Mr. Klorczyk, I should have said.  No disrespect.

25            MR. KLORCZYK:  Sean, Sean --

                                            Page 158

1                MR. ORTICELLI:  No, no.

2        Q.    So you saw your husband, Mr. Klorczyk, stand up

3    after he put the tire back underneath the front right

4    wheel assembly --

5        A.    Yes.

6        Q.    -- transfer the load of the car from the

7    hydraulic jack to the jack stand and then remove the

8    hydraulic jack?

9        A.    Yeah.

10       Q.    So this comment from Officer Surdo about the

11   jack -- I'm sorry -- the pump jack being under the car

12   is inaccurate --

13       A.    Yes.

14       Q.    -- in your -- based on your recollection?

15       A.    Yes.

16       Q.    Okay.  So if you go down three lines almost to

17   the end of the line, it reads, I attempted to calm

18   Mr. Klorczyk down.  Mr. Klorczyk was only able to give

19   me the name of his son and also a date of birth.  I

20   attempted to ask Mr. Klorczyk for any other information,

21   such as a possible timeframe the incident may have

22   occurred, which he could barely speak and was pacing

23   back and forth.

24            You see that?

25       A.    Yes.

1    Q.    And I read that accurately?

2    A.    Yes.

3    Q.    Is that an accurate characterization of

4    Mr. Klorczyk's demeanor or state of mind at the time of

5    the incident?

6    A.    Yes.

7    Q.    Okay.  Now, other than these portions that I've

8    pointed out, I noticed you took time to read the entire

9    document, which you should.

10        Is there anything in this statement or this

11   narrative report that you disagree with that you haven't

12   already told us about?

13            MR. ELLIOTT:  Take your time, Mrs. Klorczyk,

14   and read it.

15            MR. FLYNN:  Absolutely.

16            MR. ELLIOTT:  If you know.

17   A.    Yeah.  I mean, I didn't see -- I didn't see any

18   photos, and I didn't see -- they remained.  I don't know

19   how long they stayed, but I know I had called a friend

20   of mine from the hospital to make sure that she had

21   locked the house.  So I don't know how they secured, you

22   know, the area.  She didn't say anything about the

23   police still being there when she went over.

24   Q.    Who was this friend?

25   A.    It was my neighbor directly across the street.

Page 160

1    Q.    Directly across the street?

2    A.    Yeah.

3    Q.    So on the opposite corner a lot?

4    A.    Yes.

5    Q.    Okay.  What was her name?

6    A.    Gale Solinsky.

7    Q.    Can you spell the last name.

8    A.    S-o-l-i-n-s-k-y.

9    Q.    Thank you.

10        So there was nothing else about this narrative

11   report that you disagree with, other than the things

12   that we already spoke about?

13   A.    Right.

14   Q.    And there are some things in this report that

15   you're not aware of one way or the other --

16   A.    Right.

17   Q.    -- correct?  Okay.

18        Since the date of the accident, have you spoken

19   to Officer Surdo or any other Waterford Police

20   Department officers?

21   A.    No.

22   Q.    How about the fire department?

23   A.    No.

24   Q.    How about the EMTs?

25   A.    No.

Page 161

1      Q.     Other than Mr. Klorczyk, is there anybody else

2   who was in that garage that you saw that day who you

3   have talked to since?

4      A.     Just Kyle Chapman.  And that was shortly after

5   because Kyle was in my advisory at Waterford High

6   School.  He was a senior.  And when I went back to

7   school, he said -- you know, he said, I was home when

8   that call came.  And he said, I knew it was your house,

9   I just knew it was your house, he said.

10          And I knew it wasn't Parker.  He was Parker's

11   age, and he had gone to grade school with Parker.  And

12   he said, I knew it couldn't be you because you don't do

13   cars.  And he said, I knew it wasn't Parker because

14   Parker was away at school, he said.  And I just -- I

15   knew it had to be one of the other two.

16          And he said, and I really didn't want to go to

17   your house, he said, because it just -- you know, you're

18   just too nice and I just didn't -- I know how your

19   family is with cars and I know that they all love cars

20   and they all work on cars and -- he said, but I had to

21   come.  He's a -- he's a junior firefighter.  So he and

22   his dad -- he came with his dad, and so -- he just said,

23   I just felt so bad for you.  I knew -- I just knew it

24   was your house.

25      Q.     Going back to the pump jack --

                                            Page 162

1      A.     Yes.

2      Q.     -- so it's parallel to the car, right front

3   wheel well area?

4      A.     Yes.

5      Q.     The pawl is in between the pump jack and the

6   car?

7      A.     Yes.

8      Q.     And you were saying that the pump jack was

9   sitting there flat --

10     A.     Yes.

11     Q.     -- correct?

12         Was the elevating arm completely down?

13     A.     Yes.

14     Q.     And then the jack stand, did it tip over, or

15   did it collapse?

16     A.     Well, it could have done both.  It could have

17   come down like this (indicating) and then flipped over.

18     Q.     Do you know how tall the jack stands are when

19   the ratchet pawl, the arm that --

20     A.     Yeah.

21     Q.     -- sticks up, is completely lowered?

22     A.     No.

23     Q.     Okay.  Do you know the ground clearance of the

24   red BMW?

25     A.     No.

Page 163

1               MR. FLYNN:  This will be Number 7.

2               (Defendants' Exhibit 7 was marked for

3               identification.)

4               MR. FLYNN:  Here you go, Dave.

5               For the record, this is Bates labeled -- all

6       caps -- KLORCZYK 000048.

7          Q.    Have you seen this document before?

8          A.    I saw it earlier this week.

9          Q.    It looks like it's signed by an Officer Tadeusz

10      I think is how I'm pronouncing it, if that's correct.

11      It's Tadeusz -- T-a-d-e-u-s-c-z -- Krystofiak.

12              Does that look correct?

13         A.    Yes.

14         Q.    Now, the second line of this narrative report

15      says, on Friday March 11, 2011 at approximately 16:11

16      hours or 4:11 p.m., Officer Surdo and I were dispatched

17      to 55 Westwood Drive in Waterford, Connecticut for a

18      mechanical accident.

19              Do you see that?

20         A.    Yes.

21         Q.    So if your last text was at 4:05 and the call

22      came into the police department at 4:11, is that about

23      how long it was from the time you texted Christian to

24      the time you called 911 and got the operator on the

25      phone?

                                            Page 164

```
 1        A.     Yeah.  But I don't know how she got -- how she
 2   got -- dispatched them at the same time I was calling
 3   her.  You know, he's saying that they -- that they --
 4   they got the call at 4:11, which is the same time --
 5   isn't that the same time I sent Christian the last text?
 6   No, that was 4:05.  But 4:11 is the time that -- that
 7   I -- that 911 was called.  So that seems kind of weird
 8   because I know that I had to get under the car and feel
 9   for the pulse first.
10        Q.     Okay.
11        A.     So it's off -- that's off by a few minutes.
12        Q.     Do you think this is off, meaning --
13        A.     Timing-wise.
14        Q.     -- it happened later or earlier?
15        A.     I think -- I think these guys left -- I think
16   they were dispatched later than -- than 4:11.
17        Q.     Okay.  Now, if you go down to the line right
18   below the date of birth, three lines in -- or three
19   words in -- excuse me -- that reads, at this time, the
20   passenger's side of the BMW was jacked up with a jack
21   stand under the passenger side front door and pump jack
22   near the passenger's side front tire.
23               You see that?
24        A.     Yes.
25        Q.     Now, that seems to match Officer Surdo's
```

Page 165

1    description of the scene; correct?

2        A.    Just like an exact copy.

3        Q.    But it does not match your recollection;

4    correct?

5        A.    Right, because that's not what happened.

6    That's not the way it was.

7        Q.    Do you recall where Mr. Klorczyk placed the

8    jack stand after he pumped the car up?

9        A.    No.  He just -- I just know that he moved it

10   out of the way.

11       Q.    I'm sorry.  The jack stand?

12       A.    He just moved it -- the jack stand?

13       Q.    Where did he place the jack stand after he

14   raised the car using the pump jack?

15       A.    Somewhere under the front of the car --

16       Q.    Okay.

17       A.    -- is all I can tell you -- well, the side of

18   the car.  He didn't go to the front bumper, but

19   somewhere on the side.

20       Q.    Okay.  Now, if you go down seven lines from

21   where we just finished reading, right below the 15:00

22   hours --

23       A.    Yes.

24       Q.    -- that sentence starts, Mrs. Klorczyk said, at

25   home at approximately 15:26 hours, she texted Christian

Page 166

```
 1    asking, where are you.  Mrs. Klorczyk stated earlier, at

 2    approximately 13:42 hours, she texted Christian and sent

 3    the message, on my way -- I'm sorry -- on the way to

 4    pick up Parker.  You see that?

 5        A.    Yes.

 6        Q.    Now I'm going to hand you back Exhibit 5.

 7        A.    The text messages.

 8        Q.    The text messages.

 9        A.    Uh-huh.

10        Q.    Did these times that Officer Krystofiak's

11    report reflect match the text messages from your phone

12    on March 11, 2011?

13        A.    1:42, yeah.  2:26, where are you?  Yes.

14        Q.    Okay.  Do you recall if you were looking at

15    your phone?

16        A.    I had to have been looking at my phone --

17        Q.    Okay.

18        A.    -- to have an exact time --

19        Q.    Thank you.

20        A.    -- because the whole time we also were trying

21    the put a timeline together.

22        Q.    Do you recall where this conversation took

23    place?  Was this at the house or the hospital?

24              MR. ELLIOTT:  Which conversation?

25              MR. FLYNN:  This conversation about the time
```

Page 167

1    of the text messages.

2        A.    No, I don't recall.

3        Q.    Okay.  Do you recall approximately how much

4    later in time the conversation took place from when all

5    of the events were transpiring with discovering

6    Christian?

7        A.    I had --

8                MR. ELLIOTT:  Wait.

9                I object to the form of that.

10               Could you ask it again?  I didn't --

11               MR. FLYNN:  Sure.  I kind of stumbled

12   through that one.

13               MR. ELLIOTT:  Thank you.

14       Q.    The question is:  Do you recall -- well, let me

15   set it up and start over.

16               Do you recall having a conversation with a

17   police officer as it's reflected in this report

18   regarding the time of the text messages?

19       A.    Yes.

20       Q.    Do you recall when that conversation took

21   place?

22       A.    No.  I had two conversations with him.

23       Q.    With the same officer?

24       A.    I think so.

25       Q.    Okay.  When were those two conversations?

1      A.     One was at the house briefly, and then the

2      other one was at the hospital.

3      Q.     Okay.  Now, somewhere about the middle of the

4      page, there's a sentence that reads, Mrs. Klorczyk

5      stated, as she entered the garage, she observed the red

6      BMW was on top of Christian and a pump jack had -- which

7      was initially holding the vehicle, had moved.

8              You see that sentence?

9      A.     I do see that sentence.

10      Q.     Okay.  Do you disagree with this sentence?

11      A.     Absolutely.  I did not say that because I never

12      saw that.

13      Q.     Okay.

14      A.     I never thought that.

15      Q.     Now, when I first handed you Exhibit 7, you

16      said that you had seen it recently.

17      A.     Yes.  This week.

18      Q.     Had you seen this document before then?

19      A.     No.

20      Q.     Okay.  So the first time you were aware --

21      well, is it correct that the time first time you were

22      aware of this statement, that an officer said you said a

23      pump jack was lying on the floor, was within the last

24      week or so?

25              MR. ELLIOTT:  Before you answer that, can I

Page 169

```
 1   just see this document?

 2               THE WITNESS:  Yes.

 3               MR. ELLIOTT:  Where's the reference to lying

 4   on the floor?

 5               MR. FLYNN:  Oh.  Excuse me.  That's from the

 6   depo.  I'm sorry about that.

 7               MR. DONAT:  Withdrawn?

 8               MR. FLYNN:  So withdraw that, and I'll

 9   restate it.  Thank you.

10      Q.    So is it correct -- hang on a second.  Waiting

11   for the court reporter.

12               THE COURT REPORTER:  I'm sorry.

13               MR. FLYNN:  No, no, no.

14      Q.    Is it correct, then, that the first time you

15   were aware of Officer Krystofiak's statement that you

16   had said a pump jack had initially been holding the

17   vehicle and moved was when you first saw this document a

18   week or so ago?

19      A.    Earlier this week --

20      Q.    Earlier?

21      A.    -- is when I first saw it.  Yes.

22      Q.    Okay.

23      A.    There was no way I would have known that.

24      Q.    Did you -- what, if anything, did you do in

25   response to reading this for the first time, other than
```

1    anything you said to your attorneys?

2        A.    I didn't do anything because I knew we were

3    meeting this week.  I don't know how he came up with

4    that because there was -- there was -- I could not have

5    made that statement because I wouldn't have known that.

6        Q.    Not the next sentence, but the one after that

7    reads, Mrs. Klorczyk said Christian remained

8    unresponsive, and she called 911.  Mrs. Klorczyk stated,

9    as she was on 911, Mr. Klorczyk jacked the BMW up and

10   placed a jack stand underneath.  Is that accurate?

11       A.    Yes.

12       Q.    Okay.  Now, the last paragraph starting

13   three -- three lines from the bottom --

14       A.    Yes.

15       Q.    -- Dr. Diane Marini, M-a-r-i-n-i, pronounced

16   Christian Klorczyk deceased at 16:58 hours.

17              Was that the first time you were informed

18   that Christian had passed away?

19       A.    Yes.

20              MR. FLYNN:  We'll mark this as Number 8.

21              (Defendants' Exhibit 8 was marked for

22              identification.)

23       Q.    Have you seen this document before?

24       A.    Yes.

25       Q.    When was the first time you saw it?

                                              Page 171

1       A.      Earlier this week.

2       Q.      You didn't see it on March 11, 2011?

3       A.      Well, I signed it that day.  Yes, so I saw it

4    that day.

5               MR. DONAT:  Can you identify it for the

6    record, please.

7               MR. FLYNN:  Oh.  Excuse me.  It's a document

8    Bates labeled KL -- I'm sorry -- all caps -- KLORCZYK

9    000067 through and including -- all caps -- KLORCZYK

10   000068.  Sorry about that, Joe.

11              MR. DONAT:  Thank you.

12      Q.      So you did see this on March 11?

13      A.      I did.  This one was done at the hospital.

14      Q.      Okay.  In the upper right-hand corner, there's

15   four lines there.  The first one is case number, then

16   date, March 11, 2011, time started, time ended.  It says

17   17:00 hours and then 17:55.

18              Is that about the time that this statement

19   was prepared?

20      A.      That took a long time.  So that was 5:00

21   o'clock to 5:55?

22              MR. ELLIOTT:  Do you understand his

23   question, Mrs. Klorczyk?

24              THE WITNESS:  No.  Why don't you repeat that

25   question.

                                              Page 172

1    Q.    Sure.  Is 5:00 o'clock about the time you

2    started giving a statement to an officer at the

3    hospital?

4    A.    I'm trying to think of this.  Christian was

5    pronounced dead at 5:58; right?

6    Q.    I think the last exhibit said 16:58, so 4:58.

7    A.    4:58.  So here we are at 5:00 o'clock.  So two

8    minutes later.  No, I don't think that's the right time,

9    but anyway.  I don't think it was two minutes after I

10   found out that -- that we did this, but anyway.  I'd say

11   that's really approximate, but anyway.

12   Q.    So was it later in time?

13   A.    I think it was later, a little bit later, yeah,

14   because they -- it was later.

15   Q.    Do you have an estimate of maybe how much

16   later?

17   A.    Maybe half --

18         MR. ELLIOTT:  How much later than what?

19         THE WITNESS:  Than two minutes after I found

20   out that Christian was dead.

21         MR. ELLIOTT:  Is that what you meant?

22         MR. FLYNN:  Yes.

23   A.    So I'd say about at least a half an hour.

24   Q.    All right.  So probably more around 5:30 or so?

25   A.    About 5:30.  And I don't think it took us 55

Page 173

1    minutes to do this.

2       Q.    Okay.  How long do you think it took?

3       A.    About -- about 15 minutes.  And officer whoever

4    wrote, Krystofiak, was writing.  And, in the meantime,

5    we were trying to also get ahold of somebody at

6    St. Thomas More because it was Friday, and the emergency

7    numbers weren't working.  And there was nobody that we

8    could -- there was no administrator that we could

9    contact, because we didn't want to just call him and

10   tell him without somebody being with him.

11          And so Officer Krystofiak was trying to get

12   somebody.  And I think we ended up with the state police

13   going over to St. Thomas More to find an administrator

14   to locate Parker and to be with him when we told him.

15   But it did not take an hour to do this.  And there are

16   several errors on this document as well.

17      Q.    Okay.  We'll get to those errors in a minute.

18          The first thing I wanted to ask was:  You

19   said whoever wrote this, and then you said Krystofiak.

20   And I'm wondering where on this document do you see Mr.

21   -- or Officer Krystofiak's name.

22      A.    I don't, but his number is -- is it 54?  Is

23   that his badge number?

24          MR. ELLIOTT:  May I see the police exhibit?

25      Q.    Exhibit 7 lists it as 54.

Page 174

1     A.     Yeah.

2            MR. FLYNN:  You want to double check?

3            MR. ELLIOTT:  Thank you, no.

4     Q.     So you see Number 54 on this page?

5     A.     Yes.

6     Q.     Page 67?

7     A.     Yes.

8     Q.     Lower left-hand corner?

9     A.     Yes.

10    Q.     Okay.  Is that your signature to the right?

11    A.     Yes.

12    Q.     Now, you mentioned there are a number of errors

13    in this document?

14    A.     Yes.

15    Q.     Can you point them out one by one and explain

16    what's wrong?

17    A.     Well, some of them -- obviously, we -- I -- I

18    found, when I must have proofread it at the hospital,

19    because I have initialed some of them.  One, two, three,

20    four -- fourth line down, at the train station, he

21    wrote, we -- was picking up at the train station, we --

22    in New London, that we shouldn't have been there.  So I

23    think he -- that's why that's circled.  So I initialed

24    that.

25    Q.     Now, can I just stop you right there for a

Page 175

1   second?

2       A.      Sure.

3       Q.      Okay.  Thank you.

4               The original handwriting that doesn't have

5   any circles or crossouts or initials or it looks like

6   badge numbers possibly, is that Officer Krystofiak's

7   handwriting?

8       A.      Yes.

9       Q.      Okay.  And then the Xouts and the circles and

10  the first set of initials it looks like, on the changes,

11  is that all yours, or are just the initials yours?

12      A.      Just the initials are mine.

13      Q.      Okay.  So he crossed out what is crossed out on

14  this?

15      A.      Uh-huh.

16      Q.      He circled what is circled on this, the only

17  writing on this page that's your own --

18      A.      Uh-huh.

19      Q.      -- are your initials by the changes?

20      A.      Yes.

21      Q.      And your signature at the bottom, right-hand

22  corner of Page 67 and your signature at the bottom,

23  right-hand corner of Page 58?

24      A.      Yes.

25      Q.      Okay.  So I stopped you at the change with, we.

Page 176

1        A.    Yeah.

2        Q.    Was there something substituted in its place?

3        A.    No.

4        Q.    Okay.  What's the next error?

5        A.    We were home.  I texted my son, Christian.

6        Q.    Now, my son, is inserted.

7        A.    Is inserted and then --

8        Q.    Was that an error that you caught, or was that

9    his --

10        A.    I think that was his, and the same thing with

11    the date of birth.

12        Q.    Okay.

13        A.    He must have asked me about that.  So then I

14    initialed that.  And where are you.  Parker had an

15    appointment at 4:30.  He had written a 2:00 o'clock

16    appointment.  It was a 4:30 appointment or 4:20

17    appointment.

18        Q.    But there's no initial there; correct?

19        A.    Well, that 2:00 p.m. appointment goes down to

20    the next line.

21        Q.    Okay.

22        A.    So that's why that's crossed off.  And -- and,

23    here, I said to him, I saw the red BMW was on top of

24    Christian.  I didn't say anything about it having fallen

25    off the hydraulic jack or anything like that.

Page 177

1      Q.     Well, that's not in this document; right?

2      A.     No, it isn't because this was me telling

3  officer -- Officer Krystofiak what happened as opposed

4  to what was written in the police report.  These -- this

5  is my dictation to him, rather than -- that's why I

6  don't know where they got those -- when I said, I don't

7  know where they got those other -- why they thought that

8  I said that the car fell off of the hydraulic jack

9  because I didn't say that because this is what I said,

10  the can was just on top of him.

11      Q.     Okay.

12      A.     All right.  I couldn't wake him up, but I did

13  find a pulse.  We kept -- Fred was shaking his legs.  I

14  was talking to him.  He still did not respond.  I could

15  not tell if he was breathing because I thought he was

16  out cold.

17      Q.     Are these changes that are on this document?

18      A.     No, they aren't.

19      Q.     Okay.  Are there any changes on this second

20  page?

21      A.     Just the crazy stuff about the dryer.  That,

22  again, keeps coming back to haunt me.  And I don't know

23  why.

24      Q.     Well -- I'm sorry.

25      A.     But I didn't -- not -- I did not correct that

Page 178

1    at the time.

2        Q.    Okay.  So that is an error that was not

3    caught --

4        A.    Right.

5        Q.    -- on March 11 --

6        A.    Right.

7        Q.    -- 2011?

8        A.    Right.  And it's on -- it's on several of these

9    documents.  But it didn't take us 55 minutes to do this.

10       Q.    Okay.

11       A.    We were standing out in the hallway outside of

12   a family -- you know, private family waiting room.

13       Q.    At the lower, right-hand corner, there was a

14   big slash that goes diagonally --

15       A.    Yeah.

16       Q.    -- from the upper left to lower right --

17       A.    Yes.

18       Q.    -- there's some writing down there.

19            Do you know what that is?

20       A.    I don't know.  It looks like, end of story and

21   his signature.  I don't know.

22       Q.    Oh, EOS?

23       A.    Yeah.

24       Q.    The initials there?

25       A.    Yes.

Page 179

1      Q.     End of story?

2      A.     I don't know.  I mean, I have no idea what EOS

3   means.  But, to me, it looks like EOS, like end of the

4   line, there's nothing else.

5      Q.     Okay.

6      A.     I don't know.  Maybe that's police talk for

7   something.

8      Q.     Anything else about this document that is an

9   error, whether it was caught on March 11 or not?

10     A.     No.

11     Q.     Okay.

12            MR. FLYNN:  Let's take a break.

13            MR. ELLIOTT:  It's 3:30.

14            MR. FLYNN:  Yeah, perfect time.

15            THE VIDEOGRAPHER:  Time is 3:32.  We're off

16   the record.

17            (A discussion was held off the record.)

18            THE VIDEOGRAPHER:  This is the beginning of

19   Disk Number 4.  We're back on the record.  Time is 3:54.

20     Q.     Okay.  Couple of follow-up questions.

21     A.     Okay.

22     Q.     I know you said you didn't know what cars were

23   present when you drove up to the house --

24     A.     Yes.

25     Q.     -- other than the two Acuras.

Page 180

1      A.     Yes.

2      Q.     But then you said, later on, there were a lot

3    of cars out front.

4           How many cars were out front?

5               MR. ELLIOTT:   When?

6               MR. FLYNN:   When they drove up to the house.

7      A.     Well, there would have been the two Acuras,

8    Fred's car because I had to pick him up at the station.

9    Plus, then there was mine with Fred in it, so that

10   left -- that was four.   That was extra.   I don't know.

11   It seems like we always had an extra car sitting around

12   somewhere.   So I'm going to go with four.

13     Q.     Okay.   And you said Fred car -- Fred's car,

14   Mr. Klorczyk; correct?

15     A.     Yes.

16     Q.     Okay.   Your husband?

17     A.     My husband.

18     Q.     Okay.   His car was out front.

19          What is his car?

20     A.     Well, I'm going to think it was his car, but

21   maybe it might not have been there.   It might have been

22   out for -- Christian was supervising a soup-up job of

23   his Porsche.   And so I'm trying to think of what Fred

24   was driving.

25     Q.     The blue one?

Page 181

1      A.      Well, that blue one was getting souped up.

2      Q.      Okay.  So that one might have been at the shop?

3      A.      Yes --

4      Q.      Having some work done?

5      A.      -- because Christian was there driving them

6   crazy, which is why they put his pictures on the

7   windows, if you noticed that.

8      Q.      They did.

9      A.      Yeah, he and Jordan would take a spin over from

10   UConn to Hartford to check up on the guys and make sure

11   that they -- many conversations about which wheels,

12   which brakes, which -- so I don't know what Fred was

13   driving.  But whatever Fred was driving and then -- so

14   there had to be at least another car.

15     Q.      Okay.  So two Acuras?

16     A.      Two Acuras.

17     Q.      Mr. Klorczyk's car that he was driving at the

18   time?

19     A.      Yes.

20     Q.      And then your car?

21     A.      And my car.

22     Q.      So four, total.

23             Then the Delorean and the red BMW inside the

24   garage?

25     A.      Yes.

1      Q.    So there was a total of six cars on the
2  property, but four out front?
3      A.    Yes.  When -- yes.
4      Q.    Okay.  We talked a little bit about Christian's
5  phone --
6      A.    Yes.
7      Q.    -- and where it was found on the Delorean.
8      A.    Delorean.
9      Q.    Who found the phone?
10      A.    I think Jordan brought it in when we got back
11  from the hospital.
12      Q.    Is your garage heated?
13      A.    To some extent.  I know they use extra heaters
14  when -- if it's really cold outside.
15      Q.    Space heaters?
16      A.    Yeah, I think.
17      Q.    Okay.  Were any space heaters being used on
18  March 11?
19      A.    No.
20      Q.    When you walked into the garage, was it cold,
21  or was it --
22      A.    It was cold --
23      Q.    -- comfortable, brisk?
24      A.    -- no, it was cold.  It was cold.  I just had a
25  sweater on that I had worn to school.  My coat was

Page 183

1    inside because I didn't expect to find anything there.

2    That's why I didn't open the doors until the very last

3    second.

4         Q.    Did the halogen lights put off a lot of heat?

5         A.    Not enough to keep it warm.

6         Q.    But do they put off a lot of heat?

7         A.    No.

8         Q.    No?

9              When you approached the car and saw Christian

10   under the car, was he completely under the car, or was

11   he off to one side, close to the edge?

12        A.    I'm not sure I know what you mean.

13        Q.    Sure.

14             I'm just -- I'm trying to understand where he was

15   when you saw him under the car, if his entire upper

16   torso was under the car and obscured or if he was closer

17   to the right wheel -- I keep saying that wrong -- the

18   right front wheel well.

19        A.    The only thing that I could see, while the car

20   was still on him, were his legs.  As soon as Fred jacked

21   the car off of him, then I could see his upper torso and

22   his face.

23        Q.    From a standing position?

24        A.    From a standing position.

25        Q.    Okay.  How far back from the car were you to

Page 184

1    where you could see underneath the car and see

2    Christian's torso?

3        A.    I was standing right there.  I was, like, on

4    the bottom step.

5        Q.    Okay.  So you were at least one car bay width

6    away from --

7        A.    No.  No, because the Delorean was in the

8    first --

9        Q.    First car bay?

10       A.    -- first car bay, and that's where the steps

11   are.

12       Q.    Right.

13       A.    So I was -- I wasn't very far.  I was --

14       Q.    Ten feet?

15       A.    No, not even that -- not that far.

16       Q.    Five feet?

17       A.    No.  Probably, like, three feet --

18       Q.    Three feet?

19       A.    -- two and a half.

20       Q.    Which steps are we talking about?  Are we

21   talking about the ones that go up or the ones that go

22   down?

23       A.    The ones that go from the house down into the

24   garage there.  There's three.

25       Q.    Okay.  So there's --

Page 185

1    A.    Not the ones that go from the garage into

2    the -- into the basement.

3    Q.    Okay.

4    A.    You know which three I'm talking about?

5    Q.    Yes.  Yes.

6    A.    Okay.

7    Q.    I just wanted to make sure.

8         All right.  I think I know what the answer to

9    this next question is, but just for a complete record:

10   You're not aware of anyone else being in the garage at

11   the time the car fell on Christian, are you?

12   A.    There could not have been anybody else in the

13   house or the garage.

14   Q.    Okay.

15   A.    All the doors were locked.  Front door was

16   locked.  I had to open it with a key.  The garage doors

17   were down.  Frederick was in New York.  Parker was 45

18   minutes away.  There -- nobody else could have been

19   there.

20   Q.    So the only person who truly knows what was

21   being used, how it was being used and what happened at

22   the time that the car fell is Christian?

23   A.    Yes.

24             MR. ELLIOTT:  What was being used?

25             MR. FLYNN:  What equipment.

Page 186

```
 1              MR. ELLIOTT:  Oh.

 2     Q.    Is that a yes?

 3     A.    Yes.

 4     Q.    Okay.

 5     A.    He was home alone.

 6     Q.    Okay.  All right.  So let's talk a little bit

 7  about the ride in the police cruiser to the hospital.

 8         You said it took about 15 minutes is your

 9  recollection; correct?

10     A.    Yes.

11     Q.    You placed, I think I heard you say, three

12  phone calls?

13     A.    Yes.

14     Q.    Okay.  Did you receive any phone calls?

15     A.    No.

16     Q.    Okay.  The three phone calls were to Frederick,

17  your eldest son --

18     A.    Yes.

19     Q.    -- Parker, your youngest son --

20     A.    Yes.

21     Q.    -- and Sarah?

22     A.    Jordan.

23     Q.    Oh, I thought you said Sarah.

24     A.    No, Jordan.

25     Q.    Jordan, okay.
```

Page 187

1            So those three?

2       A.    (Nods head.)

3       Q.    What was discussed during those phone calls?

4       A.    Frederick, we told him that we had found

5   Christian and that he was hurt.  And we were on our way

6   to the hospital, and we would call him back, so just sit

7   tight.  He didn't listen to us.  Parker --

8       Q.    What do you mean he didn't listen?

9       A.    He decided to come home.  Frederick -- oh, that

10  was Frederick.

11           Parker, we told him that -- I don't know what we

12  told him, but we told him to just sit tight and somebody

13  would be up to pick him up.  And we would call him back

14  and let him know when as soon as we knew.  And, Jordan,

15  we called him and told him we were on our way to the

16  emergency room.  And he said he would meet us there.

17      Q.    Okay.  Any text messages out or in?

18      A.    No.

19      Q.    Any conversation with the police officer who

20  was driving?

21      A.    He didn't say much.  No.

22      Q.    Do you recall anything that he did say?

23      A.    No, I don't think so.  I just kept saying, why

24  is it taking so long, why are we going the speed limit.

25      Q.    Did he have lights and sirens going?

Page 188

```
 1       A.    No.

 2       Q.    Okay.

 3       A.    He was driving very slowly.

 4       Q.    Okay.  What conversation, if any, was there

 5  between you and Mr. Klorczyk?

 6       A.    Well, we were just praying that -- you know,

 7  Fred said that he had heard that they had called off

 8  life flight -- LifeStar.  And I told him, I hadn't heard

 9  that.  And I said, well, maybe it's because, you know,

10  it's not that serious and, you know, L&M is closer.

11            And he -- Fred was just very distraught.  I was

12  trying to comfort him and get him to calm down and just

13  get a grip.  It's hard to go a grip being -- I just kept

14  thinking, okay, somebody's got to be -- somebody's got

15  to be -- somebody's got to have a grip.

16            Somebody's going to have to answer the questions

17  when we get there.  Somebody's going to have to have the

18  insurance cards or he's going to -- you know.  I think

19  we prayed a lot in back of the cruiser.

20       Q.    Okay.  When you get to the hospital, what

21  happens next?

22       A.    Well, the trauma team was standing outside.  So

23  we got there before the ambulance.

24       Q.    Did the ambulance leave before you?

25       A.    I didn't -- I don't think so, but I expected
```

Page 189

1  them to be, like, right behind us.  I didn't -- I knew

2  they going at that snail's pace.  They couldn't have

3  been going at that snail's pace.  So I'm thinking the

4  trauma team, obviously, is waiting for Christian.  Why

5  isn't the ambulance here?  That's kind of weird.

6          So we went in, and they showed us to a family

7  waiting room.  And I was wondering how long it was going

8  to take until they got there because I'm thinking, this

9  was an emergency, this kid -- this kid's not responding,

10  he's out cold, what's up.

11          So we -- we were sitting in the family waiting

12  room.  And I called one of my very close friends whose

13  husband is a cardiologist thinking to myself, well,

14  okay, if there's anything wrong with his chest, Rich can

15  fix it.  And she -- when I told her what happened, she

16  said, oh, my God, let me find out where Rich is, and

17  I'll call you back.

18          And she said, he's not -- I think he's in the

19  hospital, no, he's not, you know.  So she calls me back,

20  and she said that he's not there.  But he's going to

21  send one of his partners down to take a look at

22  Christian.  I said, okay.

23          And then I called a neighbor and asked her to go

24  over and lock the doors and just hold onto the keys

25  until I called her back and told her we were coming home

1    or Parker was coming home or somebody was coming home,

2    you know, make sure that everything was locked up.  So

3    she did that.

4          And the Chapmans came in, but they weren't much

5    help so, you know, we sort of sent them going.  Then

6    Jordan came in, and then another friend of Frederick's

7    and Christian's came up.  He was a -- he was an EMT, and

8    he heard it on the scanner.  So he just showed up.  I

9    mean, he knew it was Christian because Fred was in New

10   York and Parker was at school, so it had to be

11   Christian.

12         So there we were.  And then within -- I don't

13   know -- ten, 15 minutes, the doctor came in.  And she

14   just said, he didn't make it.  This can't be.  I just

15   had a pulse.  What do you mean he didn't make it?  She

16   said, he didn't make it.  That's just -- that's just --

17   that's not right.  That just can't be.

18         And she was just like, matter of fact, no, he

19   just didn't make it.  I mean, we were just totally in

20   shock because I was sure he was alive.  I was totally

21   convinced that he was just unconscious -- unconscious.

22   And then -- then, you know, they said, well, you know,

23   give us a little while and then you can see him if you

24   want to.

25         So we said, all right.  So that must have been

1    when I was talking to the -- to the officer.  And then

2    we were trying to -- Fred called Frederick.  And we were

3    trying to get Parker to get somebody from St. Thomas

4    More.  And then the nurse came back in and asked if we

5    wanted to see him.

6           And I wasn't sure I wanted to, but the other

7    three wanted to.  So I said, okay.  So they took us down

8    to, you know, a private room.  And there he was.  But

9    then he was -- just looked totally different.  And I was

10   just, like, wow, what happened to this kid?  He was all

11   purple, just all mottled, purple all the way up to his

12   hair.

13          And it was -- it was just -- you know, his face

14   is smashed.  His body is all purple.  And it was just,

15   wow.  And so the nurse came in with a baggie with

16   little, you know, hair clippings and handed us a tray

17   with plaster of Paris footprints, you know, size 12

18   footprints.

19          And we're standing there talking to him, like,

20   Christian, what happened, how did this happen.  Why

21   don't you just sit up and tell us what happened?  How

22   could this be?

23          And then, you know, after we cried and carried on

24   for a while, we finally left.  And Jordan's parents had

25   shown up, and Jordan's mother drove us home, fortunately

1    and -- because our car was still at home.  And, in the

2    meantime, I had called my neighbor and said, can you go

3    back over and turn on the lights and open the door

4    because now Parker's on his way home and we're on our

5    way home.

6          And so we got home, and Parker was there.  And

7    Frederick had called and said he was coming home.  And

8    then Jordan's mother left.  And, you know, it was me and

9    Fred and Parker and then -- and Jordan.  And then

10   Frederick and his girlfriend and the five of us just sat

11   around for, like, the rest of the night just going, we

12   can't believe this.  We just can't believe this.

13         I mean, for hours, just -- I -- I couldn't go

14   back in the garage.  I didn't want to look in the

15   garage.  I just -- you know.  And then, of course, I had

16   to call my family and, you know, they were all out for

17   my father's 80th birthday, which was the next day.  And

18   I had to call them and tell them that their 21-year-old

19   grandson didn't make it.

20         It was just, you know, not anything that should

21   ever happen in anybody's lifetime ever, ever.  That's

22   just not the way of cycle -- life cycle is supposed to

23   go.  I teach that.  That's not the way it's supposed to

24   go.  So that's what happened.

25      Q.   Did you hear the ambulance arrive at the

```
 1   hospital?
 2        A.    No.
 3        Q.    Do you know one way or the other if lights and
 4   sirens were going when they arrived?
 5        A.    No.
 6        Q.    So it seems like, from the time you found
 7   Christian, which is a few minutes after the 4:05 text --
 8        A.    Yes.
 9        Q.    -- to the time the doctor at L&M tells you that
10   he didn't make it, it was a little less than 50
11   minutes --
12        A.    Yeah.
13        Q.    -- because it happened -- she advised you
14   around 4:58?
15        A.    Yeah.
16        Q.    Okay.  And if I have the timeline correct, from
17   the time you found Christian to the time the EMTs got
18   there, was about ten to 12 minutes?
19        A.    (Nods head.)
20        Q.    Is that correct?
21        A.    Uh-huh.
22        Q.    Isn't that a yes?
23        A.    Yes.
24        Q.    Okay.  And then there was about another ten
25   minutes between when they got there to when you had gone
```

Page 194

1    in the house, come back out of the house and started

2    going to the cruiser --

3        A.    Yeah -- yes.

4        Q.    -- yes?

5            And then it was about another 15-minute drive

6    from the house to L&M; correct?

7        A.    Yes.

8        Q.    And then it was a few minutes after that, that

9    the ambulance arrived?

10       A.    I don't know what time the ambulance got there

11   because we were already inside.

12       Q.    But it arrived after you?

13       A.    After we did, yeah.

14       Q.    Okay.  So from finding Christian to you getting

15   to the hospital before Christian, we're looking at a

16   timeframe of about 40 minutes?

17       A.    It was pretty quick.

18       Q.    Okay.

19       A.    Within an hour from the -- from the phone call

20   until we knew he was dead, yeah, or a little bit less.

21       Q.    Okay.

22       A.    It was amazing.

23       Q.    So it's about -- some time in that ten-minute

24   window, if it took about 40 minutes for you to get to

25   the hospital from the time you found Christian, it's

Page 195

```
 1    about ten minutes in between when you got there and when

 2    the doctor advised you that Christian didn't make it,

 3    some time in that ten-minute window is when the

 4    ambulance arrives?

 5         A.    Yes.

 6         Q.    Okay.  Did you ask anybody why it took so long

 7    to get Christian to the hospital?

 8         A.    No.  There wasn't anybody to ask.  I mean, all

 9    the -- everybody was gone.

10         Q.    Does that seem like a long period of time

11    passing before Christian got to the hospital?

12         A.    Well, it seemed like it to me, but, you know,

13    they must have just dropped him off and left because the

14    only people around then were the hospital personnel.

15    And they -- they wouldn't have known the answer to that.

16    You know, we don't know how long it took them to get

17    Christian out of the garage.

18            But when I think about the question you asked me

19    before we took a break, you know, about how his skin

20    felt, it was -- it was normal temperature.  I mean, it

21    was -- it was regular body temperature.  It wasn't -- it

22    wasn't cold.  It wasn't hard.  It was -- it was regular

23    temperature.

24            I was -- it didn't send any red flag to me that

25    it may be more serious than just an unconscious state.
```

Page 196

1    It didn't feel like, oh, oh, I better -- I should really

2    be concerned about this, like he's really cold, he's

3    really -- he didn't.  It wasn't.  It was just normal

4    temperature where I would have said to Fred, geez, you

5    know, he's really cold or he's really -- but it wasn't.

6        Q.    Okay.  At any point after Mr. Klorczyk lifted

7    the car off of Christian, did you see Christian take a

8    breath?

9        A.    I didn't, but I wasn't watching his chest.

10       Q.    Okay.

11       A.    I should have been, but I wasn't.  I guess, you

12   know, I was -- I was -- I was looking here at his --

13   and, really, I wasn't watching his chest go up and down.

14   I was really looking for him to open his eyes and say,

15   I'm okay.  I'm okay, mom.  Or, what, where am I?  You

16   know, he just did not respond to his name, and that's

17   what I was looking for, some kind of response to that.

18       Q.    So do you have any sort of an opinion as to the

19   time period that elapsed from the time that the car fell

20   on Christian and the time you found him?

21       A.    He could have been under there for -- it

22   could -- it could have been --

23            MR. ELLIOTT:  Don't guess.

24       A.    Yeah.  I mean, you know, he -- he couldn't do

25   anything because his -- even if he wanted to answer, he

```
 1    couldn't get to the phone because it wasn't on him, you

 2    know, so...

 3    BY MR. FLYNN:

 4        Q.    Are you referring to the text messages?

 5        A.    Yes.  I mean, you know, he...

 6        Q.    So it could have been when the first text

 7    message was sent some time around 12:00 or 1:00?

 8        A.    Or it could have been when the last text

 9    message was sent, you know, at 3:30.  It could have

10    been -- it could have been -- yeah.  But his girlfriend

11    had called -- had sent him a text earlier than that,

12    like, 12:15 with no response.  So we don't know.

13        Q.    Okay.

14        A.    And, you know, what bothers me was, was he

15    struggling under that car?  You know, I hate to think

16    that, and I hate to go there, but he -- you know, wow.

17              MR. FLYNN:  Okay.  I'm going to mark this as

18    Number 9.  It was previously marked, looks like E, to

19    Lieutenant Mahoney's deposition.  But then I also see

20    there's another page in here, another exhibit tab from

21    Mahoney deposition, Exhibit C.  We're just going to mark

22    all of this as Number 9.

23              (Defendants' Exhibit 9 was marked for

24              identification.)

25              MR. FLYNN:  Here you go, David.
```

Page 198

1    Q.    Okay.  Let's take these one at a time.  The

2  first page, which has that exhibit tab from Mahoney's

3  deposition, does not have a Bates label on it.  I'm not

4  certain why it doesn't, but it doesn't.

5           Do you recognize what's in the photograph?

6    A.    Yes.

7    Q.    And what is it?

8    A.    That's the red BMW.

9    Q.    Okay.  Does that look like the condition it was

10  in on March 11, 2011, as you recall it?

11           MR. ELLIOTT:  I object to the form.

12           You can answer.

13    A.    Well, yeah.

14    Q.    Okay.  Now, does it look like the right rear

15  wheel is off the garage floor?

16    A.    It does.

17    Q.    Okay.  Do you see any blocks behind either of

18  the rear wheels?

19    A.    No.

20    Q.    Okay.  Do you know what chocking the rear

21  wheels means?

22    A.    Yes.

23    Q.    And what does that mean?

24    A.    That means a block of some sort is put behind

25  the wheel.

Page 199

1    Q.    And what's the purpose of doing that?

2    A.    So the car doesn't -- well, to reinforce the

3    car from moving.

4    Q.    I'm sorry.  Say that again.

5    A.    To reinforce the car from moving.

6    Q.    Okay.  Is it your understanding that, even when

7    a car is in park -- do you need to take a break?  Do you

8    need to take a break?

9    A.    No.

10    Q.    Oh, okay.  I'm sorry.

11          Is it your understanding that, even when a car is

12    in park, it can roll?

13    A.    Yes.

14    Q.    Okay.  Do you have any understanding of how far

15    a car in park might roll?

16    A.    No.

17    Q.    Okay.  So do you see those milk crates and

18    blocks of wood behind the BMW?

19    A.    Yes.

20    Q.    Are any of those yours?

21    A.    I don't believe so.

22    Q.    Whose do you think those belong to?

23          MR. ELLIOTT:  If you know.

24    A.    I don't know.  I've never seen those before.

25    Q.    Do you see a jack stand or a pump jack in the

Page 200

1    photograph?

2         A.    Well, that might be one, but it's not clear.

3         Q.    Okay.  Can you tell which car bay this picture

4    depicts at your house?

5         A.    No.

6         Q.    Okay.  Is there anything on top --

7         A.    Oh, no, I can tell.  It's the middle one.

8         Q.    Okay.  And how can you tell that?

9         A.    Because I can see the -- I can see the right

10   garage door, and I can see the left garage door.

11        Q.    Okay.  So does this accurately depict where the

12   car was on the day of the accident?

13        A.    Yes.

14        Q.    Okay.  Is there anything on top of the BMW?

15        A.    Yes.  Roof rack.

16        Q.    Okay.  Is that the one you were talking about

17   before --

18        A.    Snowboarding.

19        Q.    -- for the ski gear and the pulley?

20        A.    Yes, yes.

21        Q.    Okay.  Looking at the next page, which is Bates

22   labeled -- all caps -- KLORCZYK 000088 --

23        A.    Yes.

24        Q.    -- do you recognize this photograph?

25        A.    Yes.

Page 201

```
 1      Q.    Okay.  And what does it depict?
 2      A.    It depicts the front end of the BMW being held
 3   up by the jack stand and the floor jack.
 4      Q.    Now, are you certain that the car is resting on
 5   the jack stand in this photograph?
 6      A.    It appears to be.
 7      Q.    Yes?
 8      A.    Yes.
 9      Q.    Okay.  And from your earlier testimony, you
10   said that, after Mr. Klorczyk raised the car, he
11   transferred the load to the jack stand and then removed
12   the pump jack; is that correct?
13      A.    I did say that, yes.
14      Q.    Okay.  So do you know how this pump jack got
15   placed back under the car in this photograph?
16      A.    No, except that I might have been mistaken.  He
17   may have left it there.  This may have just jogged my
18   memory a little bit.  So this could have been what
19   happened.
20      Q.    Okay.
21      A.    It could have been there, yep.
22      Q.    So it could have been that Mr. Klorczyk --
23      A.    He just left it there.
24      Q.    Okay.
25      A.    Yeah.
```

Veritext National Deposition & Litigation Services
866 299-5127

1    Q.    All right.  Is the jack stand to the left of

2    the pump jack in the same position you recall

3    Mr. Klorczyk placing it on March 11?

4    A.    I can't -- I don't recall where he left it,

5    where he put it, honestly.

6    Q.    Okay.

7    A.    I just know that he put it somewhere.

8    Q.    Okay.  Now, I don't see a tire underneath the

9    right front wheel well, do you?

10   A.    No.

11   Q.    Do you see it anywhere in this photograph?

12   A.    No.  I may have been -- no, I probably was

13   mistaken about that also.

14   Q.    Okay.  Now, there's a board on the floor

15   underneath the car.

16         Do you see that?

17   A.    Yes.

18   Q.    Do you know what that is?

19   A.    This one you're talking about (pointing)?

20   Q.    Yes, ma'am.

21   A.    Well, I'm not sure.

22   Q.    Have you ever heard the term, creeper?

23   A.    Yes.

24   Q.    Do you know what a creeper is?

25   A.    Yes.

Page  203

1       Q.    Is that board a creeper?

2       A.    Well, if it had wheels on it, it might have

3    once been a creeper.

4       Q.    Do you see wheels on it?

5       A.    No.

6       Q.    Okay.  Is this -- if this is a creeper, is it a

7    creeper that your family purchased?

8             MR. ELLIOTT:  Objection to the form.

9       A.    I don't think we purchased -- ever purchased a

10   creeper.  Now, Christian may have been laying on a board

11   under the car because -- instead of laying on the

12   concrete floor.  Sometimes they used cardboard.

13   Sometimes they used something to lay on, especially when

14   it was cold out.  So he could have been laying on

15   something like that.

16   BY MR. FLYNN:

17      Q.    Okay.  Does the pump jack look like it's in the

18   same position that Mr. Klorczyk placed it when he

19   initially lifted the car?

20      A.    I don't know.

21      Q.    Okay.  Can you see anything relative to the

22   wrench that was on the drain plug?

23      A.    I don't.

24      Q.    Okay.  Do you have an approximation of how far

25   from the back garage wall the front end of the BMW is?

1              MR. ELLIOTT:  In this picture?

2      Q.    In this picture.

3      A.    No.

4      Q.    Okay.  Now, from this vantage point of the car,

5  is this approximately where you were standing on the

6  first step of the staircase?

7      A.    Yes.

8      Q.    So this -- is this an accurate representation

9  of the view you had when you were standing on that first

10  step?

11      A.    No, I think I was closer.

12      Q.    Okay.  Could you see further down to the left

13  side of this photograph and see more of the car body?

14      A.    Well, I was looking more into the car, rather

15  than down the car.

16      Q.    So your -- your vantage point would have been

17  slightly to the right of this camera angle?

18      A.    I think so.  And, again, I was focused into the

19  wheel well, not down the car body.

20      Q.    Okay.  Now, looking at the next page -- and my

21  copy is a little tough to read, but I think it's -- all

22  caps -- KLORCZYK 000082.

23         Is that the same page number?

24      A.    Yes.

25      Q.    Okay.  Great.

Page 205

```
 1            What's depicted in this photograph?

 2      A.    Jack stand and a pump jack.

 3      Q.    Okay.  Now, looking at the jack stand here,

 4  does it look like the car is resting on the jack stand?

 5      A.    It's tough to tell.  It doesn't look that way.

 6      Q.    Does it look like the car is resting on the

 7  pump jack?

 8      A.    It's hard to tell.  So I'd say I don't know for

 9  either of those.

10      Q.    Do you remember when I was asking you to

11  describe what a pump jack looked like?

12      A.    Uh-huh.

13      Q.    And I was asking you about the wheels?

14      A.    Yes.

15      Q.    Looking at this photograph, does that help

16  refresh your recollection as to whether or not there are

17  wheels on a pump jack?

18      A.    Right.  I knew there were wheels on it.

19      Q.    Okay.

20      A.    And I didn't -- I knew they weren't caster

21  wheels.

22      Q.    Well, let's go back to that last page that we

23  looked at, Page 88.

24      A.    Yeah.

25      Q.    Now, do you see wheels on the back side of that
```

Page 206

```
1    pump jack?

2         A.    Yeah.

3         Q.    And are those caster wheels?

4         A.    Yeah, they are caster wheels.

5         Q.    Yeah.

6             So the back wheels --

7         A.    Are caster wheels.

8         Q.    -- are caster wheels; the front wheels are

9    fixed wheels; is that correct?

10        A.    Yeah.

11        Q.    Okay.  Now, do you remember when I was asking

12   you what the orientation of the pump jack was relative

13   to which end was facing which end of the garage?

14        A.    Yes, yes.

15        Q.    So the end with the caster wheels, if I recall

16   your testimony correctly, would have been closest to the

17   back wall of the garage; is that correct?

18             MR. ELLIOTT:  Wait a second.  When?  I mean,

19   have we established when this photo was taken?  You are

20   asking questions before about when she entered the

21   garage --

22             MR. FLYNN:  Right.

23             MR. ELLIOTT:  -- what was the orientation of

24   the pump jack.

25             MR. FLYNN:  That's what I'm talking about
```

Page  207

```
 1    now.

 2              MR. ELLIOTT:  You didn't say that.

 3              THE WITNESS:  It was --

 4              MR. ELLIOTT:  Whoa, whoa, whoa.  Excuse me.

 5              Was your question when she entered the

 6    garage?  Is that your timeframe?

 7              MR. FLYNN:  Yes.

 8       A.    When it was flat and depressed?

 9       Q.    When you walked into the garage and saw the

10    pump jack parallel to the car with the pawl lining in

11    between --

12       A.    Right.

13       Q.    -- the pump jack and the car, you said that the

14    part with the handle hole --

15       A.    Right.

16       Q.    -- was closest to the back garage wall.

17          And I'm just asking, now that you see the

18    wheels --

19       A.    Now that I see the wheels, it was the other --

20       Q.    It was the other way?

21       A.    It was the other way.

22       Q.    So the caster wheels were closest to the garage

23    door?

24       A.    Yes.

25       Q.    And the fixed wheels were closest to the back
```

Page 208

1   garage wall?

2       A.      Yes.

3       Q.      Okay.

4       A.      All right.

5       Q.      Now, going back to Page 82 --

6       A.      Yes.

7       Q.      -- which is this one?

8       A.      Uh-huh.

9       Q.      Okay.  Now, looking at that jack stand --

10      A.      Yes.

11      Q.      -- do you see any damage to the legs of the

12  stand?

13              MR. ELLIOTT:  If you can tell.

14      A.      I don't know.

15      Q.      Do you see any chipped paint?

16      A.      I don't -- I don't know.  What is all this red

17  stuff?  I hope it's not blood.  I don't see any chipped

18  on this side.  I don't know what the other side looks

19  like.

20      Q.      Do you see any damage to the handle that's on

21  the left side of the jack stand?

22      A.      No, I don't know.  I'll say I don't know.

23      Q.      Okay.  Do you see any damage to the ratchet

24  pawl, which is the yellow post sticking up from the

25  base?

                                        Page 209

1      A.    I don't know.

2      Q.    Okay.  Now, if you can compare 88 and 82, does

3  the placement of the stand and the pump jack in 82 look

4  to be approximately the same placement of the stand and

5  the pump jack in 88?

6             MR. ELLIOTT:  I object to the form.

7      A.    I can't tell.

8      Q.    Okay.  Now, looking at what's labeled -- all

9  caps -- KLORCZYK 0000 -- and, again, I can't really read

10 the last two numbers -- I think it's 99 --

11     A.    It is 99.

12     Q.    Okay.  Thank you.

13        -- what does this depict?

14     A.    The jack stand, the hydraulic pump jack and the

15 wheel assembly being held up by wood.

16     Q.    Is there a firefighter in the photo?

17     A.    I can't tell.  I don't know.  Is -- where do

18 you see the firefighter?  Is this -- I mean, is this

19 yellow jacket a firefighter?  I -- I -- I don't know.

20 Do you --

21     Q.    Okay.

22     A.    I mean, can you help me out with the photo?

23             MR. ELLIOTT:  You answered it.  You answered

24 it.

25     A.    I mean, I don't -- I can't tell.

Page 210

1      Q.     If you can't tell, you can't tell.

2      A.     I can't tell.

3      Q.     Okay.  Do you see a tire in this photo?

4      A.     I don't see a tire either.

5      Q.     Okay.  Now, comparing 99 to 88 -- and this is

6      88.

7      A.     Yeah.

8      Q.     You have them?

9      A.     Uh-huh.

10     Q.     Okay.  Does the placement of the pump jack in

11     99 appear to be the same as the placement of the pump

12     jack in 88?

13                  MR. ELLIOTT:  Objection to the form.

14                  If you know.

15     A.     I'm not sure.

16     Q.     Okay.  Same question as to the jack stand.

17     A.     I'm not sure.

18     Q.     Okay.  Based on what's depicted in 99, do you

19     have any estimation as to how far from the back garage

20     wall the front of the BMW is?

21                  MR. ELLIOTT:  Objection to the form.

22     A.     I have no idea.

23     Q.     Okay.  Next is -- all caps -- KLORCZYK 000091.

24         Do you know what this photograph depicts?

25     A.     Looks like the lug nuts from the -- from the

                                        Page 211

1    tire.

2        Q.    Do you know how many lug nuts are on a BMW

3    wheel?

4        A.    I think there's five.

5        Q.    How many lug nuts are in this picture?

6        A.    Four.

7        Q.    Okay.  And this is depicting -- does it show

8    caster wheels?

9        A.    Yes.

10       Q.    So is this the back end of the pump jack?

11       A.    No, it's the front.

12       Q.    This is the front?

13       A.    Now I know we need to go back to the other

14   picture.

15       Q.    You can look at the last one, Number 99 --

16       A.    Here it is.

17       Q.    -- or 88.

18       A.    Oh, wow.  That's the front.

19             Okay.  So it's the front.

20             That's where the handle goes.

21       Q.    91 is showing the end where the handle goes?

22       A.    Right.

23       Q.    Okay.  Do you refer to that as the front?

24       A.    Well, I know it's the end where the handle

25   goes.  Front, back.  I'm not the -- that's why -- I

                                        Page 212

1  usually stay out of the garage.  I know just enough to

2  put my mouth -- I know where the handle goes.  Okay.

3      Q.    So this is the end where the handle goes?

4      A.    This is the end where the handle goes.

5      Q.    Okay.  So this is the end that was closest to

6  the garage door?

7      A.    Yes.

8            MR. FLYNN:  Okay.  And just because you

9  raised the objection before, David, I'm talking about

10  when she walked in and saw the jack -- the pump jack --

11            MR. ELLIOTT:  I'm assuming that's your

12  timeframe to all these questions.

13            MR. FLYNN:  -- parallel to the car.

14      Q.    Okay.  Now, let's look at the next photograph,

15  Bates labeled -- all caps -- KLORCZYK 000095.

16          What does this photograph depict?

17      A.    Wet dry vac, it looks like three jack stands, a

18  trash container, right driver's side of the BMW, wood

19  flooring.

20      Q.    I'm sorry.

21          Did you say the right front side?

22      A.    Driver's side.

23      Q.    So left front side?

24      A.    Left side.  Yeah, because I said driver.

25      Q.    I thought you said right front side.

1    A.    Oh, well, left front.

2    Q.    Left front.  Driver's side, okay.

3    A.    Driver's side.

4    Q.    Anything else?

5    A.    A cement block.

6    Q.    Okay.  Anything else?

7    A.    That's really all I can make out.

8    Q.    Okay.  Do you see a tire in this photograph?

9    A.    No.

10   Q.    Okay.  Now, focusing on three jack stands --

11   A.    Yes.

12   Q.    -- do you see two that are closest to the trash

13   can and the wet dry vac; correct?

14   A.    Yes, yes.

15   Q.    And you see one that's kind of in front of the

16   two of them?

17   A.    Yes.

18   Q.    Okay.  Now, focusing on what's referred to as

19   the saddle of the jack stand, which is the top of the

20   ratchet pawl --

21   A.    Yes.

22   Q.    -- the yellow parts, do you see a difference

23   between the shape of the two saddles on the back two

24   jack stands compared to the saddle on the front jack

25   stand?

Page  214

1    A.    Yes.

2    Q.    Okay.  Can you describe the difference.

3    A.    The one in the front appears to be more solid

4    as opposed to the two in the back that seem to be more

5    scooped out.

6    Q.    Now, the one in the front, does that resemble

7    the one that Mr. Klorczyk used when he put the jack

8    stand under the car?

9         MR. ELLIOTT:  If you know.

10   A.    Yeah, I don't -- well, I can -- I can refer to

11   the picture --

12   Q.    Absolutely.

13   A.    -- but --

14   Q.    You can try looking at 82.  It's a fairly close

15   shot of the jack stand under the car.

16   A.    But I cannot say for certain that that is the

17   same one.

18   Q.    Well, not the same one.  But is it similar in

19   shape in terms of the saddle?

20   A.    I really can't tell.

21   Q.    Now, earlier, I was asking if you saw any other

22   jack stands in the car -- or I'm sorry -- in the garage

23   the day of March 11.

24   A.    Right.

25   Q.    And my recollection is you said you did not

Page  215

1    recall seeing any other jack stands in the car -- or in

2    the garage.

3        A.    Right.  Right.

4        Q.    Okay.  Now that you've looked at this

5    photograph, however, does this refresh your recollection

6    that there were three more jack stands in the garage on

7    March 11?

8        A.    They were probably there, but I didn't see them

9    because I wasn't looking for them.

10       Q.    Okay.  Do you see any damage to any of the

11   three jack stands in Number 95?

12             MR. ELLIOTT:  Objection to the form.

13       A.    I can't really tell from this.

14       Q.    Okay.  Do you know where these three jack

15   stands are today?

16       A.    No.

17       Q.    Okay.  Do you know where the jack stand that's

18   depicted as being under the car, do you know where that

19   jack stand is today?

20       A.    No.

21       Q.    Do you know where the pump jack is today?

22       A.    No.

23       Q.    Since the date of March 11, have you ever seen

24   the pump jack again?

25       A.    No.

Veritext National Deposition & Litigation Services
866 299-5127

1    Q.    Since the date of March 11, 2011, have you seen

2    any of the four jack stands that we've seen in these

3    photographs?

4    A.    No.

5    Q.    Now, looking at the last page of what's marked

6    as Exhibit 9, again, it does not have a Bates label on

7    it for some reason, but it does have an exhibit tab,

8    Mahoney C.

9         What does this photograph depict?

10   A.    This is showing the wrench.  I don't know if

11   it's the same wrench, but a wrench attached to I'm

12   assuming --

13             MR. ELLIOTT:  Don't assume.

14   A.    Okay.  Attached -- a wrench attached to

15   something on the underside of the car -- of a car.

16   Q.    Does this look like where the wrench was that

17   you saw when you went under the car to feel a pulse on

18   Christian's neck?

19             MR. ELLIOTT:  I don't remember her

20   testifying about that.  I could be wrong, but I don't

21   remember her testifying to that.

22   A.    I am not exactly sure.  I cannot say for sure.

23   Q.    Okay.  Looking at this photo, can you tell us

24   approximately where Christian's head was when you went

25   under the car to feel for a pulse.

Page  217

```
1              MR. ELLIOTT:  Looking at the photo, you're
2    asking her to assume where her head was?
3              MR. FLYNN:  Not assume.  Approximate where
4    his head was based on her recollection.
5              MR. ELLIOTT:  I object to the form.
6       A.    Is this a BMW?
7              MR. ELLIOTT:  No.  If you're able to answer
8    the question, answer it.  If you're not able to answer
9    the question, don't answer it.
10      A.    Okay.  I mean, I don't even know if this is --
11   is this -- I'm going to say I don't know because...
12             MR. ELLIOTT:  That's your answer.
13      A.    I don't know.
14      Q.    Has anyone driven the BMW since March 11, 2011?
15      A.    I have not.
16      Q.    Do you know of anybody else driving it?
17      A.    Wow.  We haven't driven in it quite a long
18   time.  I think we might have driven it for a short
19   period of time shortly afterwards, but I don't think
20   it's been driven in probably three years.
21      Q.    Has any repair work been done to the car since
22   March 11, 2011?
23      A.    No.
24      Q.    Has any maintenance work been done to the car
25   since March 11, 2011?
```

Page 218

```
 1      A.    I don't believe so.

 2      Q.    Does anyone use it today?

 3      A.    No.

 4      Q.    Has anyone used it in the last 30 days?

 5      A.    Just to bring it from the garage where it's

 6   stored.

 7      Q.    How was it brought from the garage?

 8      A.    I believe it was driven down.

 9      Q.    Who drove it down?

10      A.    I don't know.

11      Q.    Okay.  Somebody in your family?

12      A.    Yes.

13      Q.    Has it been washed since March 11, 2011?

14      A.    I don't know.

15      Q.    Am I correct, you don't know which of the four

16   jack stands we've looked at in the photographs Christian

17   was using?

18      A.    I do not know.

19      Q.    Okay.  You can't identify it visually?

20      A.    No.

21      Q.    If we were to have all four of the jack stands

22   here on the conference room table and we asked you to

23   point out which one it was, would you be able to do

24   that?

25      A.    No.
```

Veritext National Deposition & Litigation Services
866 299-5127

1    Q.    Okay.  Did you ever look at the serial numbers

2    on the jack stands?

3    A.    No.

4    Q.    Do you know if anybody in your family ever

5    looked at the serial numbers on the jack stands?

6    A.    I do not.

7    Q.    Okay.  Did you ever see any of the written

8    discovery in this case, questions back and forth between

9    the parties?

10             MR. ELLIOTT:  Do you know what written

11   discovery is, Mrs. Klorczyk?

12             THE WITNESS:  I think, but I'm not sure.

13   Q.    Were you ever asked to review documents in this

14   case and verify the accuracy and completeness of the

15   content of those documents?

16   A.    I believe so.

17   Q.    Okay.  Did you read the documents completely?

18   A.    Yes.

19   Q.    And as you sit here today, there's nothing that

20   stands out in your mind that was inaccurate or

21   incomplete about those discovery responses?

22             MR. ELLIOTT:  I object to the form.

23   A.    I'm not exactly sure which ones you're

24   referring to.

25   Q.    The ones that were directed to you.

Veritext National Deposition & Litigation Services
866 299-5127

```
 1              MR. ELLIOTT:  So the question is -- would
 2   you rephrase the question just so I get it, is there
 3   anything incomplete or -- I lost the question.
 4              MR. FLYNN:  As you -- sure, sure.
 5              Actually, why don't we have it read back.
 6              MR. ELLIOTT:  Sure.
 7              (The record was read by the court reporter.)
 8              MR. ELLIOTT:  And then he said the ones that
 9   you responded to.
10                   If you know.
11   A.    No.  The responses that we gave are complete.
12   Q.    Okay.  Do you recall a question from Sears to
13   you asking you to identify the jack stand at issue in
14   this case by serial number?
15   A.    No, I don't recall that.
16   Q.    Okay.  If there had been such a request, would
17   you have looked for the serial numbers on the jack
18   stands and tried to identify the correct serial number?
19   A.    I would have.
20   Q.    But, as you sit here today, you don't recall
21   ever doing that?
22   A.    I don't.
23   Q.    Did anyone ever ask you if you knew what the
24   serial number was of the jack stand at issue in this
25   case?
```

Page 221

1              MR. ELLIOTT:  Other than your attorneys.

2      A.    No.

3      Q.    Okay.  In your second amended complaint, you

4  allege that the jack stand failed and caused Christian's

5  death.

6              What is the failure that you're referring

7  to?

8      A.    I believe it was a pawl failure.

9      Q.    I'm sorry.  The what?

10     A.    The pawl failure.

11     Q.    The ratchet pawl?

12     A.    Yes.  The ratchet pawl did not hold up.

13     Q.    Okay.  What about the ratchet pawl failed?

14     A.    The whole design of it.  You know, it meets

15  teeth -- the teeth, and it just went straight down.

16  That's what I'm saying.  That's what I believe, that it

17  just was not a good design.

18     Q.    And what do you base that on?

19     A.    I watched it go down.  It's like (indicating).

20     Q.    When did you watch it go down?

21     A.    We've seen it -- we -- we tried so many

22  different ways to figure out how this could have

23  happened to Christian.

24     Q.    So you've tried to recreate --

25     A.    We did.

Veritext National Deposition & Litigation Services
866 299-5127

```
 1      Q.    -- the accident?  Okay.

 2            Using what?  Using --

 3      A.    Just -- just anything.  I mean, just --

 4      Q.    Did you use a jack stand?

 5      A.    Yes.

 6      Q.    Did you use a jack stand that you already

 7   owned?

 8      A.    Yeah -- yes.

 9      Q.    Did you use one of the four jack stands that

10   we've seen in the pictures?

11      A.    I believe so.  No, we did.

12      Q.    Okay.  Which one did you use?

13      A.    I think we tried all of them.

14      Q.    Okay.  And did they all just drop all the way

15   down?

16      A.    No, I don't think all of them did.

17      Q.    Okay.  How many did?

18      A.    I don't remember.

19      Q.    Okay.  Did you write any notes down about which

20   ones --

21      A.    No.

22      Q.    -- fell all the way down --

23      A.    No --

24      Q.    -- or which ones --

25      A.    -- because it was -- no.
```

Page 223

1      Q.    No.  Who was there helping you with trying to

2    recreate the incident?

3      A.    My husband, my sons, Jordan.

4      Q.    Okay.  Anyone else?

5      A.    No, but when I saw it just go (indicating), it

6    was very scary.

7      Q.    Were there any photographs taken?

8      A.    No.

9      Q.    Any video?

10      A.    No.

11      Q.    Any notes?

12      A.    No.

13      Q.    Nobody took any notes?

14      A.    (Shakes head.)

15            MR. ELLIOTT:  If you know.

16    BY MR. FLYNN:

17      Q.    Was that a no?

18      A.    That was a no.

19      Q.    Okay.  When did you do this test?

20      A.    It was a while ago.

21      Q.    Ballpark.

22      A.    Few years.

23      Q.    Before the lawsuit was filed?

24      A.    Yes.

25      Q.    Okay.  Did someone give you the idea to try and

1    recreate the accident?

2         A.    Just our own curiosity as to why this happened,

3    how this could happen.

4         Q.    Okay.  Was the recreation in 2011 or 2012?

5         A.    I don't know exactly.

6         Q.    Okay.  So describe for us how you recreated or

7    attempted to recreate the incident.

8         A.    We just -- we pulled the pawl all the way up

9    and just, you know, sometimes we jiggled it a little

10   bit, sometimes not very much and watched it drop.  And

11   then we went out and purchased a different design that

12   doesn't allow that to happen no matter what you do to

13   it.

14        Q.    Okay.  Now, with the jack stands that you

15   tested, the ratchet ones, you said you pulled it all the

16   way out.

17        A.    Well, I don't know if we pulled it all the

18   way -- we tried different -- different heights --

19        Q.    Okay.

20        A.    -- you know, different amounts of pressure and,

21   you know, different -- different ways of hitting it to

22   see what it takes to make it go down.  And then some of

23   them didn't take very much.

24        Q.    More than one of them went all the way down?

25        A.    Yes.

Page  225

```
 1        Q.    More than two?

 2        A.    I don't remember exactly, but it was scary

 3    enough.

 4        Q.    Okay.  Now, how many people were working on the

 5    jack stand to get it to -- I think you were saying it

 6    balanced in between teeth?

 7        A.    Uh-huh.  It would be just one -- one.

 8        Q.    One person was able to do it?

 9        A.    Yeah.

10        Q.    Okay.  And then they would just tap it from the

11    side or on top --

12        A.    Yeah.

13        Q.    -- and it would fall?

14        A.    It would just go boom.

15        Q.    All the way to the bottom?

16        A.    Yes.

17        Q.    All right.  Did anyone measure the height

18    between the ground that it was on and the top of the

19    saddle?

20        A.    No.

21        Q.    Okay.  What's the new jack stands that have?

22    What style are they?  Are they a ratchet system?

23        A.    No, they're pin.

24        Q.    Okay.  So you have a pin that goes through?

25        A.    Uh-huh.  It's not a pin.  It's like a dowel.
```

Page  226

1      Q.    A dowel?

2      A.    A metal dowel.

3      Q.    Is it -- in the previous answer, you said

4    uh-huh.

5          Was that a yes or a no?

6      A.    That was a yes.  A steel dowel.

7      Q.    Okay.  Are those the 12-ton jack stands that we

8    saw out in front of the house yesterday?

9      A.    The house, yes.

10     Q.    Okay.  So getting back to the earlier question

11   about what was the failure, is the failure that the

12   design isn't correct or is there a failure --

13     A.    I think -- oh, go ahead.

14     Q.    Sorry.

15          Or is there a failure with the actual metal

16   ratchet pawl?

17            MR. ELLIOTT:  Objection to the form.

18   BY MR. FLYNN:

19     Q.    Do you understand the question?

20     A.    Yes.

21     Q.    Go ahead.

22     A.    I think it could be both.

23     Q.    Okay.  So --

24     A.    I think there's a better design, and I think,

25   in this particular case, certainly could be a defective

1    jack stand, whichever one was used.  And I don't know

2    which one was used.

3        Q.    Is it defective metal?

4        A.    It could be.

5        Q.    Is there anything on the ratchet pawl that was

6    broken off?

7              MR. ELLIOTT:  Well, objection to the form.

8              Of -- of what jack stand?  There's four jack

9    stands we're talking about.

10       Q.    Any of the four that you were looking at, is

11   there anything that was broken off of the pawl?

12             MR. ELLIOTT:  If you know.

13       A.    No, but it didn't need to be broken off when

14   they just dropped.

15       Q.    Okay.  Now, if they were able to drop with

16   slight pressure being applied from the side or the top,

17   when somebody pumps a car up and then transfers the load

18   to the jack stand, wouldn't that be equal or greater

19   pressure than just a slight tap on the side or a slight

20   tap on the top?

21             MR. ELLIOTT:  Objection to the form.  She's

22   not an engineer, you know.  These are --

23       A.    I'm not -- and I've never worked on the cars.

24   I'm just -- it's speculation as to what happened on my

25   part and -- and my observation as to watching the thing

Page 228

1   just go flat down, just go boom.

2       Q.   How heavy is the BMW?

3       A.   I don't know.  Heavy enough --

4       Q.   Do you have --

5       A.   -- to kill Christian with the engine sitting on

6   his chest.

7       Q.   Do you have an approximation?  Hundreds of

8   pounds?  Thousands of pounds?

9       A.   I really don't know.

10      Q.   Is it more than 100 pounds?

11           MR. ELLIOTT:  She just said she doesn't

12  know.

13      Q.   Is it more than 100 pounds?

14      A.   It's more than 100 pounds.

15      Q.   Okay.  Now, the tapping that you did on the top

16  or the side of the ratchet pawl, was that less than 100

17  pounds of pressure?

18      A.   Yes.

19      Q.   Okay.  So if you're transferring a car that

20  weighs more than 100 pounds onto a ratchet pawl that's

21  balancing in between teeth and you're able to get it to

22  drop with slight force, isn't it going to drop when you

23  transfer a vehicle that weighs over 100 pounds?

24      A.   But it --

25           MR. ELLIOTT:  Objection.  Objection to the

Page 229

```
 1    form.

 2        Q.    I'm sorry.

 3              It didn't go down every time?

 4        A.    It did not do it every time.

 5        Q.    So sometimes it caught the next tooth?

 6        A.    Yeah.  And sometimes not.

 7        Q.    Okay.  You also allege in your second amended

 8    complaint that --

 9              MR. ELLIOTT:  Counsel, how much more do you

10    have?  Do you have a lot -- a lot of time left, more

11    questions to go, because it's 5:00?

12              MR. FLYNN:  I do.

13              MR. ELLIOTT:  Well, then we got to break.

14              MR. FLYNN:  For how long?  Five minutes?

15              MR. ELLIOTT:  No.  No.  This is the

16    deposition day, you know, 10:00 to 5:00.  Is that what

17    you usually do?

18              MR. FLYNN:  Well, we get seven hours.

19              MR. ELLIOTT:  Well, you may have to break it

20    up.

21              MR. FLYNN:  Why?

22              MR. ELLIOTT:  You didn't give us any notice

23    that you intended to go beyond 5:00 o'clock, Counsel.

24              MR. FLYNN:  If you want to take a break for

25    five minutes, we can.
```

```
 1                 MR. ELLIOTT:  Well, no.  That's not what I
 2     want to do.
 3                 MR. FLYNN:  Well, I want to continue and
 4     finish today and then Sears, I'm sure, has some
 5     questions, so...
 6                 MS. TROTTA:  Yes.
 7                 MR. ELLIOTT:  Well, that isn't -- that isn't
 8     the deposition day, Counsel.
 9                 MR. FLYNN:  Well, I'm prepared to continue.
10                 MR. ELLIOTT:  Let's take a break.
11                 MR. FLYNN:  Are you coming back?
12                 MR. ELLIOTT:  I'm going to talk to my fellow
13     counsel.
14                 MR. FLYNN:  It's 5:01.
15                 THE VIDEOGRAPHER:  The time is 5:01, and
16     we're --
17                 MR. FLYNN:  Yeah, go ahead and go off.
18                 THE VIDEOGRAPHER:  -- and we're off the
19     record.
20                 (A discussion was held off the record.)
21                 THE VIDEOGRAPHER:  We're back on the record.
22     The time is 5:15.
23        Q.    Now, Mrs. Klorczyk, before we broke, we were
24     talking about the testing and the recreation that you
25     and your family and Jordan engaged in.
```

Page 231

1      A.     Yes.

2      Q.     You didn't recall exactly when that took place,

3   but it was before the lawsuit was filed; correct?

4      A.     Yes.

5      Q.     Was it just the one time that you recreated and

6   tested --

7      A.     Once -- once that I recall, yes.

8      Q.     Okay.  So there could have been more than one?

9      A.     There could have or they could have -- the boys

10   could have done them separately.

11      Q.     You seem to allege in your second amended

12   complaint that there was also a failure in the assembly

13   process of the jack stand; is that correct?

14              MR. ELLIOTT:  Just show her where you're

15   referring to, please.

16      Q.     This is the second amended complaint,

17   Paragraph 23.

18              MR. FLYNN:  Oh, was there something in

19   the --

20              THE VIDEOGRAPHER:  Yeah.

21              MR. FLYNN:  Oh.  You need your mic, David.

22              THE VIDEOGRAPHER:  Inaudible.

23              MR. ELLIOTT:  Sure.  Is that okay?

24              THE VIDEOGRAPHER:  Yeah.

25      Q.     Okay.  Have you had a chance to review

Page 232

1   paragraph --

2       A.    Yeah.

3       Q.    All right.  So what's the assembly defect

4   you're alleging?

5       A.    Could be how it was put together, not

6   necessarily how it was manufactured, not necessarily the

7   pieces themselves, just how it was put together.

8       Q.    Do you have any specific facts?

9       A.    Absolutely not.

10      Q.    So is that an assumption on your part?

11      A.    It's -- I'm just throwing out a possibility.

12      Q.    Okay.  Is that the same as to the design

13  defect, just a possibility, you don't have any concrete

14  facts?

15      A.    Something made that jack stand fail.

16      Q.    But my question is:  Do you have any concrete

17  facts --

18      A.    No.

19      Q.    -- that there was a design defect?

20      A.    There was a better -- there is a better design,

21  and Craftsman makes one.  But it could have been any of

22  those three.

23      Q.    I understand.

24          But my question is:  Relative to the jack stands

25  that you purchased and the one that was used on the date

Page  233

1      of the incident, you don't have any concrete facts that

2      there was a design defect for that jack stand; is that

3      correct?

4          A.    That is correct.

5          Q.    Okay.  Do you have any concrete facts that

6      there was a manufacturing defect with the jack stand?

7          A.    No.

8          Q.    Okay.  Paragraph 24, you allege that the jack

9      stand was defective in that adequate warnings or

10     instructions were not provided by the defendants.

11              Do you see that?

12         A.    Yes, I do.

13         Q.    What was wrong with the warnings?  How were

14     they inadequate?

15         A.    It talked about using them in pairs.  In this

16     particular case, they could not be used in pairs for

17     what needed to be done in the car.  It says four tons,

18     eight tons, whatever it says, four tons.  When used in

19     pairs, couldn't be used in pairs.  It was very -- it was

20     not straightforward, the directions.

21         Q.    Why couldn't the jack stands be used in pairs?

22         A.    Because we did not need to jack up the whole --

23     the whole side of the car did not need to be lifted to

24     change the oil.

25         Q.    Okay.  Do you have any training in automotive

1    repair?

2        A.    No.  And I was going to say, for as much as I

3    know about changing the oil.

4        Q.    Have you spoken to an automotive expert --

5        A.    I've --

6        Q.    -- about the proper procedures for changing oil

7    at your home?

8        A.    No.  I'm not the one who changes the oil.  I

9    just observed it multiple times in my own house.

10       Q.    Okay.  And when you were observing it multiple

11   times at your house, who was doing the oil changing?

12       A.    My husband, my children, their friends.

13       Q.    Did they ever use jack stands in pairs to

14   change the oil?

15       A.    No, not on the -- not on the BMW.

16       Q.    Did they ever use -- well, what cars did they

17   use pairs?

18       A.    It depends where the oil pan was --

19       Q.    Okay.

20       A.    -- so I -- I can't tell you that.  I don't know

21   where the oil pans are in different cars.

22       Q.    Did they use a pair on any of the Acuras?

23       A.    I don't know.

24       Q.    Did they use a pair on any of the Porsches?

25       A.    Don't know.

Page 235

1    Q.    Did they use a pair on the Ferrari?

2    A.    Don't know.

3    Q.    Did they use a pair on the Lamborghini?

4    A.    We didn't have a Lamborghini.

5    Q.    I'm sorry.  The Delorean?

6    A.    I don't know.

7    Q.    Okay.  What kind of car do you drive?

8    A.    A BMW.

9    Q.    Were you driving a BMW in 2011?

10   A.    Yes.

11   Q.    Did anybody in your family change the oil in

12   that car?

13   A.    I think so.

14   Q.    Did you observe them change the oil in your

15   car?

16   A.    Yes, but I wasn't -- I wasn't paying attention

17   to that.

18   Q.    Did they use a pair of jack stands when

19   changing the oil in your car?

20   A.    I don't know.

21   Q.    Did they ever just use a pump jack only?

22   A.    Never.

23   Q.    Okay.  Are you aware of any other occurrences

24   other than March 11, 2011 when someone in your family

25   changed the oil in your house by themselves, meaning,

Page  236

1    nobody else was at home?

2         A.    Generally not.

3         Q.    Okay.  Why is that?

4         A.    Because they generally liked to do things

5    together.  That's why I'm surprised that Christian was

6    alone that day.

7         Q.    Is it also generally safer to have somebody

8    there in case something happens?

9         A.    Generally, yes.  But, generally, they like the

10   company.  In this case, I'm glad that Jordan wasn't

11   there to see this happen because I don't believe he

12   could have saved Christian.  But, you know, watch your

13   can best friend die in front of you would have been

14   horrific, but...

15        Q.    So you mentioned a second ago you're glad that

16   Jordan wasn't there to see his best friend die in front

17   of him --

18        A.    (Nods head.)

19        Q.    -- because you didn't think, if he was there,

20   there would have been anything he could have done to

21   save Christian; is that correct?

22        A.    I don't think so.

23        Q.    Okay.  So is it your understanding, then, that,

24   once the car came down on Christian, there was no way of

25   being able to save Christian?

Page 237

```
 1        A.    No.

 2              MR. ELLIOTT:  Objection to the form.

 3        A.    Yeah -- no, I'm not saying that at all.

 4        Q.    What are you saying?

 5        A.    I'm not saying that at all.  I'm just saying

 6   that, you know, it's easy to panic.  It's easy to, you

 7   know -- if I was there, I couldn't -- I probably

 8   couldn't have done it.

 9        Q.    Okay.

10        A.    I would have panicked.

11        Q.    Okay.  Were there any warnings that were

12   missing from the material provided with the jack stands?

13              MR. ELLIOTT:  If you know.

14        A.    I don't know.

15        Q.    Paragraph 27 of your second amended complaint,

16   you allege that, the manner in which the decedent's

17   death occurred was foreseeable and defendants knew or

18   should have or anticipated that decedent would not be

19   aware of the risks and nature of the harm attendant to

20   using a jack stand.

21        Do you see that?

22        A.    Yes.

23        Q.    Okay.  Is it your opinion that the defendants

24   should have known that there was a defect in the design?

25        A.    Yes.
```

Page 238

1      Q.     And what do you base that on?

2      A.     That there was a better alternative design.

3      Q.     And how do you know that there's a better

4   alternative design?

5      A.     Because we own the better alternative design.

6      Q.     Okay.  Anything else that you base that on?

7      A.     Well, when I saw how fast it collapsed, it

8   just -- anybody who works on cars, if you just saw how

9   fast it went boom, it's terrifying.

10     Q.     But the question is:  Do you base -- what else

11  do you base that opinion on?

12     A.     That's all I need.  I wouldn't -- it has to be

13  100 percent fail-safe.

14     Q.     Is it also your opinion that the defendants

15  should have known that there was a defect in the

16  assembly of the jack stands?

17     A.     If there was, yes.

18     Q.     But you don't know if there was a defect in the

19  assembly?

20     A.     No.

21     Q.     Okay.

22     A.     I told you, it could have been one -- one -- it

23  could have been the design, manufacture or the assembly.

24     Q.     Do you know how long the ratchet jack stand

25  design has been used in the world?

Page 239

1     A.    A long time.

2     Q.    Okay.  Is it also your opinion that the

3  defendants should have known that there was a defect in

4  the manufacture of the jack stands?

5     A.    Yes.

6     Q.    Okay.  And what do you base that on?

7     A.    I don't know how quality control is.  Is it

8  manufactured in the United States?  No.  So, you know,

9  what's -- are the standards the same for quality control

10 where they're manufactured as they are here?

11    Q.    Okay.  So what concrete facts are you basing

12 that on?

13    A.    I don't have any concrete facts at all.  Just

14 asking you a question.

15    Q.    But do you have any concrete facts?

16    A.    No.

17    Q.    Okay.  So it's an assumption?

18    A.    It is.

19    Q.    Okay.  Is it your opinion that the defendants

20 should have known that there was a defect in the

21 warnings?

22    A.    Yes.

23    Q.    And what do you base that on?

24    A.    On the fact that it failed, and my son is -- is

25 dead.  And I guess I could go around and ask each one of

Page 240

1    you if you've lost a child in a tragic manner such as

2    this over something that should never have failed.  It

3    was not like an act of God, where there was an

4    earthquake.

5        Q.    Paragraph 28, defendants knew or should have

6    known or anticipated at the time of the design,

7    manufacture and/or testing that the expected product

8    user would not be aware of the risks from the product

9    and nature of the harm.

10          Why do you allege that?

11       A.    I don't think your -- those jack stands and

12   Crafts products -- Craftman products in general are in

13   99 percent of American homes.  People trust Sears.  And

14   they're relying on that Sears label.  So I don't think

15   that the majority of people worry about Sears products.

16          And the fact that -- that something like this

17   could happen using a Sears product, that they wouldn't

18   expect it to happen because they trust Sears.  And so

19   there is a risk.  And Sears products can kill people.

20       Q.    But your allegation is that the defendants knew

21   or should have known.  And I'm asking you --

22       A.    Well, I'm saying you to --

23       Q.    -- how or why.  What do you base that on?

24       A.    I'm alleging that this is not the only time

25   that a Craftsman product has killed someone.

Page  241

1    Q.    Prior to March 11, 2011, had you ever heard of

2  a car falling on someone while they were working on it

3  at their home?

4    A.    No.  But I cannot believe that this is the

5  first time ever in the history of Craftsman products

6  that this has happened.

7    Q.    Do you have any concrete facts to base that on?

8    A.    No, but I can do some research.

9    Q.    So, as you're sitting here today, you don't

10  have any evidence?

11    A.    I don't -- I, personally, don't.

12    Q.    Wouldn't it be natural for anybody who gets

13  underneath a car to be concerned about it possibly

14  falling on them?

15              MR. ELLIOTT:  Objection to the form.

16    Q.    What was your answer?

17    A.    The answer is absolutely.

18    Q.    Okay.  If -- well -- in Paragraph 31, you

19  allege, in addition to the defective design or

20  manufacture and failure to provide adequate warnings or

21  instructions, the harm sustained by decedent was

22  suffered as a result of defendants' reckless disregard

23  for the safety of decedent while using the jack stand.

24              What was reckless about defendant's conduct?

25    A.    That your -- you have a better design.  Sears

Page 242

1  makes a better jack stand.  It's not available for sale

2  on your -- on your retail showroom shelves.

3     Q.    Whose shelves?

4     A.    Sears.

5     Q.    Sears has a better design, but they don't have

6  it for sale?

7     A.    Not -- not in stores.  Christian went out on

8  January 1st --

9     Q.    Right.

10    A.    -- to buy new jack stands.

11    Q.    Was he going to buy a different design?

12    A.    Yes.

13    Q.    What design was he going to buy?

14    A.    He was going to buy one with the pin.

15    Q.    How do you know that?

16    A.    Because that's what we sent him out to buy, A

17 better jack stand.

18    Q.    Okay.  So you and your husband told Christian,

19 go buy a jack stand that uses the pin or the dowel --

20    A.    Right.

21    Q.    -- design, rather than the ratchet design?

22    A.    Right.

23    Q.    And he came home with the ratchet design

24 instead; correct?

25    A.    Right.

Page 243

1      Q.     Did you know that he had bought the ratchet

2    design?

3      A.     Yes.  He said that's all there was.

4      Q.     Okay.  So January 1, 2011, your opinion was

5    that there was a better, safer design than the ratchet

6    system?

7      A.     Uh-huh.

8      Q.     Correct?

9      A.     Yes.

10     Q.     Why didn't you have him return the jack stands?

11            MR. ELLIOTT:  Objection to the form.  It's

12   argumentative.

13   BY MR. FLYNN:

14     Q.     Go ahead.

15     A.     He was still using back-ups with the -- with

16   the jack stands.

17     Q.     What back-ups?

18     A.     He was using -- he was putting something else

19   underneath the -- I don't know what it was.  It was

20   something else under there and the tire, too, so he was

21   very safety conscious.

22     Q.     Okay.  So there was some other back-up --

23     A.     And the back-up --

24     Q.     -- system to stop the car --

25     A.     Yeah.

1       Q.     -- if the jack stand failed?

2       A.     Yes.

3       Q.     And a tire under the wheel?

4       A.     Yes.

5       Q.     And you saw him do that on another occasion?

6       A.     Other occasions, yes, many other occasions.

7       Q.     After January 1, 2011, but before March 11,

8    2011?

9       A.     Yes, and prior to that -- many years prior to

10   that.

11      Q.     Okay.  So am I correct, then, that Christian

12   appreciated the risk of using a jack stand and getting

13   underneath a car to do automotive repair?

14      A.     Well --

15             MR. ELLIOTT:  Objection to the form.

16      A.     -- how is he going to go under there?

17      Q.     Well, but my question is:  He appreciated the

18   risk involved, which is why he was using second and

19   third back-up systems?

20             MR. ELLIOTT:  Objection to the form.

21      Q.     Isn't that correct?

22      A.     Yes.

23      Q.     Okay.  Did you create any sort of documentation

24   regarding the events on March 11, 2011?

25      A.     I don't know exactly what you mean.

Veritext National Deposition & Litigation Services
866 299-5127

1     Q.    Any notes or a summary?  Did you type up an

2  e-mail to family and friends --

3     A.    No.

4     Q.    -- saying, this is what happened?

5     A.    No.

6           MR. FLYNN:  Okay.  This will be Number 10.

7           (Defendants' Exhibit 10 was marked for

8           identification.)

9     Q.    And, for the record, this is a printout from

10  www.theday.com.  It's an article with a publish date of

11  March 14, 2011; updated publication date of March 16,

12  2011, written by Jeffrey A. Johnson.

13     Have you seen this document before?

14     A.    I have.

15     Q.    Do you know who Jeffrey A. Johnson is?

16     A.    Yes.

17     Q.    Who is he?

18     A.    He is a writer for the New London Day.

19     Q.    Did you meet with Mr. Johnson?

20     A.    He knocked on our door.

21     Q.    Okay.  How much time did you spend with him?

22     A.    He was at our house for about an hour and a

23  half.

24     Q.    Had you ever met him before he knocked on your

25  door?

Page 246

1        A.    No.

2        Q.    Did he say why he was there?

3        A.    He said he was there because he had heard about

4    this accident, and he had heard a lot on the community

5    about Christian.  And he wanted to talk to us about

6    doing a story for the Day.  So I let him in.

7        Q.    Okay.  Now, if you go down seven paragraphs,

8    the paragraph that starts with, 21-year-old, go to the

9    end of that line where it says, Fred Klorczyk said that

10   a floor jack likely failed while his son was under the

11   car changing the oil.

12           Do you see that?

13       A.    Yes.

14       Q.    Is that an accurate statement?

15       A.    No.

16       Q.    And why not?

17       A.    Because he was not using a floor jack.  A floor

18   jack was flat on the floor when they found him.

19       Q.    Did you ever try to contact Mr. Johnson and get

20   him to correct this story?

21       A.    My husband did, and it was corrected.

22       Q.    When was it corrected?

23       A.    On March 16th, 2011.

24       Q.    Okay.  So where it says updated March 16 -- so

25   this is the corrected article?

1      A.     No, this is not the corrected one.

2      Q.     Okay.  So there is a subsequent article?

3      A.     Yes.

4      Q.     And what does the subsequent article say?

5      A.     I believe he corrected it, although I'm not

6  sure he corrected it correctly.

7      Q.     What was the correction?

8      A.     That it wasn't -- that he wasn't using a floor

9  jack to hold the car up.

10     Q.     Did he say there was some other device holding

11  the car up?

12     A.     I believe he said that it was being held up by

13  a jack stand.

14     Q.     Did Mr. Johnson tell you why he put the

15  statement in here as it's shown in Exhibit 10?

16     A.     No.  I'm not the one who called him to

17  straighten that out.  My husband did.

18     Q.     Did Mr. Klorczyk ever tell you what Mr. Johnson

19  said about why he had this incorrect statement in his

20  story?

21     A.     Because Mr. Johnson is not a car guy, and so he

22  didn't understand what Fred was saying to him.

23            MR. FLYNN:  That's it for Number 10.  Thank

24  you.

25            So this will be Number 11.

Page 248

```
 1                    (Defendants' Exhibit 11 was marked for

 2                    identification.)

 3                    MR. FLYNN:  For the record, this is a

 4      printout of a story published in the Waterford,

 5      Connecticut Patch, with a publication date of

 6      March 22nd, 2011 -- an updated publication date, I

 7      should say, of March 22nd, 2011.

 8                    Have you seen this article before?

 9      A.    Yes.

10      Q.    Okay.  Now, if you could, turn to Page 4 of 14.

11      The second to last paragraph from the bottom starts, as

12      Lynne called 911, Frederick rushed in and jacked the car

13      back up with the same jack Christian originally used.

14      He then added two jack stands underneath the car.  There

15      were already two underneath.

16            Do you see that?

17      A.    Yes.

18      Q.    Is that an accurate statement?

19      A.    No.

20      Q.    What is inaccurate about this statement?

21      A.    There was only one underneath.

22      Q.    Was there one underneath while Mr. Klorczyk was

23      raising the car?

24      A.    Yes.

25      Q.    And then after he raised the car, was there
```

Page 249

1   still only one?

2       A.    There was still only one.

3       Q.    So he didn't add any additional jack stands, to

4   your best recollection?

5       A.    I don't think -- I don't think he did.

6       Q.    Okay.

7       A.    He might have, but I don't think so.

8       Q.    So your recollection is there was one jack

9   stand under the car before Mr. Klorczyk started raising

10  the car, and there was one jack stand under the car

11  after Mr. Klorczyk raised the car?

12      A.    Yes.

13      Q.    Did he use the same jack stand that was

14  underneath the car before he started raising it?

15            MR. ELLIOTT:   Objection to the form.

16      A.    I'm confused.

17      Q.    Well, there was a jack stand under the car is

18  what your testimony is --

19      A.    Yes.

20      Q.    -- before he started raising it.

21        He raises the car?

22      A.    Yes.

23      Q.    Did he use the same jack stand?

24      A.    Yes.  He just reached under there and picked it

25  up and used the same one.

```
1        Q.      Okay.  Do you know -- excuse me.

2             Do you know Paul Petrone, P-e-t-r-o-n-e?

3        A.      Well, not personally, but he was the editor of

4    the Patch.

5        Q.      Did you ever speak to him?

6        A.      No.

7        Q.      Did you ever call him and ask him where he got

8    this information that we just read?

9        A.      No, but I think Fred did.

10       Q.      And did Fred tell you anything about that

11   conversation?

12       A.      I don't remember what Fred said about that

13   conversation.  No, I don't remember what the story was

14   with that.

15       Q.      Do you know if there was ever a correction to

16   the story?

17       A.      I -- I don't know that.

18       Q.      The change?  Just the -- you're not aware of

19   any change to this statement to make it accurate?

20       A.      I don't know.  I don't know what happened to

21   the Patch.  It just kind of disappeared, so...

22       Q.      Oh, they're not in business anymore?

23       A.      I don't know.  They just kind of disappeared,

24   or they go into my spam.  I don't know.

25       Q.      Then that sentence goes on and says, and pulled
```

Page 251

1    his son out from under the car.

2        A.    He absolutely did not pull Christian out from

3    under the car.

4        Q.    Okay.  Well, if Mr. Petrone didn't speak to

5    you, where did he get these facts?

6        A.    Well, I had an issue with Mr. Petrone because,

7    on March 11th when we got back from the hospital and

8    after I calmed down a little bit, I opened by computer,

9    turned on AOL and the first thing that popped up was a

10   picture of my house with the garage doors open and all

11   the rescue vehicles in front of my house and, Waterford

12   man crushed under car.

13       Like, what the hell?  How did it -- who -- where

14   was this guy taking pictures?  Who is this?  Who is this

15   person?  Why?  And so I believe Fred called him and

16   said, you know, where were you taking pictures and how

17   can you do this.  And this is the first thing we see

18   after we find out -- after we come back from the

19   hospital and finding out that our son has died.

20       And so, of course, Petrone was very apologetic

21   and wanted to write the right story, so that's how this

22   one got started.  But he also was not a car guy and so

23   did not get all the facts.

24       Q.    How do you know he's not a car guy?

25       A.    Fred talked to him and, apparently, you're

Page 252

```
 1    either a car guy or you're not.  And if you are one, you
 2    know one.
 3        Q.    So --
 4        A.    And so that's how it got messed up.  Now, I
 5    don't know whether Fred straightened it out with him or
 6    not.
 7        Q.    So Mr. Klorczyk did speak to you about his
 8    conversation with Mr. Petrone?
 9        A.    Yes.
10        Q.    Is there anything else you remember about that
11    conversation with your husband regarding his
12    conversation with Mr. Petrone?
13        A.    Well, he said, you know, this guy was really
14    apologetic, that that's the first thing I had to come
15    home and see.  And so he wanted to make it right by
16    writing this nice story and, you know, warning everybody
17    out there that things happen.  But then he still messed
18    it up.
19        Q.    So there was a separate story from Mr. Petrone
20    other than what's in front of us marked as Number 11 --
21        A.    Yes.
22        Q.    -- which is the one you were talking about that
23    you came home from the hospital and there was this --
24        A.    Yeah.
25        Q.    -- story already?
```

Page 253

1      A.     Yeah.  I mean, I thought that was a real

2  invasion of privacy.

3      Q.     Did you print out any copies of that article?

4      A.     No, because I was furious.

5      Q.     Okay.  The next paragraph on Page 4 says,

6  Frederick began chest compressions, trying to get him to

7  speak.  When responders arrived to bring Christian to

8  Lawrence and Memorial Hospital, he was pronounced dead

9  on the scene.

10     A.     Well, not to our knowledge, he was not.

11     Q.     Okay.  And how high off of the ground was the

12  BMW lifted by Mr. Klorczyk when you first went under the

13  car?

14             MR. ELLIOTT:  Objection to the form.

15     A.     I really don't know.  High enough for me to get

16  under there.  I mean, I was kneeling, but on the -- on

17  the garage floor.  But I was able to get under there.

18     Q.     So more than a foot?

19     A.     Yeah.

20             MR. ELLIOTT:  Objection to the form.

21     Q.     More than two feet?

22     A.     I don't know.

23     Q.     And I believe you said that Mr. Klorczyk

24  started chest compressions on Christian while he was

25  under the car; is that correct?

Page  254

1      A.     Yes.

2      Q.     How was there enough clearance to be able to

3    actually do chest compressions?

4      A.     I don't know because I couldn't -- I wasn't

5    watching him.  I'm just going by what he told me.

6      Q.     Okay.  So Mr. Klorczyk told you that he was

7    doing chest compressions.

8           You never saw him actually doing them?

9      A.     No, I wasn't -- I wasn't even looking that way.

10   I was focused on Christian's face.

11     Q.     Okay.  Now, turning to Page 5 of Exhibit 11,

12   the next line says, at the very top, Christian had two

13   jack stands underneath the car and the jack itself did

14   not fail.

15          Do you see that?

16     A.     Yes, I do.

17     Q.     Is that accurate?

18     A.     I don't believe so.

19     Q.     What's inaccurate about it?

20     A.     That there were two jack stands and that the

21   jack itself did not fail.

22     Q.     Okay.  So that whole statement is incorrect?

23     A.     Yes.

24     Q.     All right.  The next paragraph, no one in the

25   world knows but me -- dot, dot, dot -- what he was doing

1     and it was 100 percent safe.

2          What does that mean?

3       A.    I have no idea.

4       Q.    It continues.  He said, to recreate it would

5     take a tsunami and earthquake, such as Japan is

6     suffering now, hyphen, one in a billion chances.

7          Do you know who made that statement?

8       A.    My husband did.  And he said that earlier in

9     the day to me.  When I picked him up from the train

10    station, he was telling me about the tsunami in Japan

11    and, you know, what it did to that power plant and all

12    of that.

13         And he said to me, do you know what it takes for

14    something like that to happen?  And I said, nope.  And

15    he said, it takes the stars and the moon and everything

16    to align just right for something like that to happen.

17    And then we get home and we find another disaster in our

18    own house.

19         And he said, for something like that to happen to

20    Christian, anybody, because this kid was really a car

21    nut, and -- he said it would take the same exact

22    alignment.  He said everything was just aligned, just

23    like it was in Japan.  So it was the day that things

24    were aligned there, here and two disasters.

25      Q.    The first statement that we read, no one in the

Page 256

1   world knows but me what he was doing, and it was 100

2   percent safe --

3        A.    I don't know what that means.

4        Q.    -- is that a statement by Mr. Klorczyk again?

5        A.    Yes, it is, but I don't know what that means.

6   And I'm not sure he does, but --

7        Q.    Has he ever shared with you what he thinks

8   happened on March 11, 2012 -- I'm sorry -- 2011?

9        A.    Yeah, he thinks the jack stand failed.

10       Q.    Okay.

11       A.    He thinks that Christian was doing exactly what

12  he was doing, changing the oil exactly the way he was

13  supposed to be doing it.

14       Q.    Did he describe it any more thoroughly or in

15  more detail?

16       A.    No, because he had taught -- he had taught the

17  boys and their friends how to do it.  I didn't want to

18  learn, so he didn't teach me.

19       Q.    Okay.  That's all for Number 11.  Thank you.

20            So safety seems like it was pretty important

21  around your house?

22       A.    It was.  It is.  Still is.

23       Q.    How often would your family talk about safety

24  around the house?

25       A.    All the time.  Especially when they were

Veritext National Deposition & Litigation Services
866 299-5127

1    getting ready to do something, whether it was

2    snowboarding or doing any kind of -- anything

3    mechanical.  Cutting down trees, pulling out bushes,

4    plowing snow.

5        Q.    Did you ever tell your children that they

6    should always use some form of the buddy system when

7    doing repairs like mechanical or cut trees down?

8        A.    It almost always did.  It was unusual for

9    Christian not to have somebody with him.  Actually,

10   that's probably the only time -- well, not -- well, he

11   said the day before he didn't need anybody, which is

12   strange.  But I don't know what Jordan was doing that

13   day.  It was probably because Jordan had something else

14   to do.  Otherwise, he would have been there.

15       Q.    So other than March 10 and March 11, you're not

16   aware of any other time when Christian engaged in some

17   sort of mechanical repair or other --

18       A.    Anything.

19       Q.    -- dangerous activity where there wasn't

20   somebody else there?

21       A.    He didn't cut the grass by themselves.  They

22   didn't spread mulch by themselves.  They didn't do

23   anything by themselves.  Everybody was always there.  It

24   was always a group effort.  Scraping wallpaper off the

25   wall, everybody was there.

Page 258

```
 1        Q.    Okay.  Did Christian have a job on March 11,
 2   2011?
 3        A.    No.  He was home on spring break.
 4        Q.    For the various jobs that he had and the
 5   internship that he had, I think we already said that he
 6   wasn't paid for that internship --
 7        A.    Right.
 8        Q.    -- but can you give us an approximation of how
 9   much in earnings he had as of March 11, 2011?
10        A.    No.  He had -- he had some -- he had some
11   Schwab accounts and some -- you know, he was pretty
12   thrifty with, you know, the money he did have.  He was a
13   finance major, so he was figuring ways to -- where to
14   put it.  I didn't even know that he had it or where it
15   was.  You know, we really had the digging.
16        Q.    Did he ever file tax returns?
17        A.    I don't know that.  His father would know that.
18        Q.    Other than the Schwab account and the People's
19   United Bank account, are you aware of any other accounts
20   that Christian had in his name or that he shared on a
21   family account?
22              MR. ELLIOTT:  Objection to the form.
23        A.    He had a -- no, I think that was it.
24        Q.    Okay.  I think we touched on this earlier.
25              After college, he was going to start working on
```

Page 259

1    the car business; is that correct?

2        A.    He was trying to -- he was trying to decide

3    what he was going to do first.

4        Q.    Okay.  So he didn't have a final plan?

5        A.    He didn't -- well, he might have in his head.

6    He didn't -- didn't want to get my hopes up or whatever,

7    you know.  I'm not really sure what -- what he was --

8    what he was going to do with Sarah, whether it was going

9    to depend on where she was going to school and he was

10   going to go there or whether she was going to continue

11   at UConn and he was going to stay here.  I think there

12   was some things up in the air.

13       Q.    Okay.  One of the items of damages that you're

14   suing for is the funeral expenses.

15          Do you know what the total funeral expenses were?

16       A.    They were about $15,000.

17       Q.    Have you provided all of the documentation to

18   your attorneys that support the total number?

19       A.    Yes.

20       Q.    Okay.  Were you ever told by a medical

21   professional that Christian died immediately when the

22   car fell on him?

23       A.    No.

24       Q.    Were you ever told by Mr. Klorczyk that he had

25   been told by a medical professional that Christian died

Page 260

1    immediately when the car fell on him?

2        A.    He might have said that.

3        Q.    Okay.  Do you remember when he said that to

4    you?

5        A.    Not exactly.

6        Q.    Do you remember what medical professional he

7    was speaking to, who told him that?

8        A.    Well, we have many friends in the medical

9    profession.  And I think it was a conversation he had

10   where I was concerned about Christian having struggled

11   underneath the car and how long he had struggled

12   underneath the car and, you know, was he under there

13   gasping for air and trying to get out.

14            And, you know, I thought, well, maybe -- Fred

15   said, well, one of our friends said, no, he didn't.  He

16   said, well -- you know, and then the discussion was,

17   well, you know, maybe they just said that to make us

18   feel better so that we wouldn't be stressed with that

19   and having nightmares with that because Fred was having

20   a difficult time sleeping and just functioning.

21            And he said, well, you know, I don't know if it's

22   true or not, but maybe they're just trying to help us

23   out because they don't really know anything for sure

24   either.

25       Q.    Do you remember the name of that friend who

Page 261

```
1    said Christian died immediately when the car fell on
2    him?
3         A.    Well, it could have been one of many.
4              MR. ELLIOTT:  The question is, do you know.
5         A.    Do I know exactly which one?  No.
6         Q.    Okay.  Was it only one medical professional
7    that told this to Mr. Klorczyk?
8         A.    I'm not sure.  It could have been one, could
9    have been more.
10             MR. FLYNN:  Okay.  Dave, can we go off the
11   record for just a couple minutes, and you and I chat
12   about one item before I move on?
13             MR. ELLIOTT:  Sure, sure.
14             MR. FLYNN:  Off the record.
15             THE VIDEOGRAPHER:  The time is 5:56.  We're
16   off the record.
17             (A discussion was held off the record.)
18             THE VIDEOGRAPHER:  This is the beginning of
19   Disk Number 5.  We're back on record.  Time is 6:08.
20             MR. FLYNN:  Okay.  So, at this time, on
21   behalf of the non-Sears defendants, I don't have any
22   further questions.  And so I'm tendering the witness to
23   the Sears' attorneys, who I understand do have
24   questions.
25             (A discussion was held off the record.)
```

Page 262

```
 1                     CROSS EXAMINATION
 2   BY MS. TROTTA:
 3       Q.    Good morning, Mrs. -- good morning.  It feels
 4   like morning.  Good evening, Mrs. Klorczyk.  My name is
 5   Erica Todd Trotta, and I am one of the counsel that
 6   represents Sears in this matter.  The majority of
 7   questions have been asked and answered.  So my questions
 8   might jump around a little bit.
 9            And, for that, I apologize; okay?
10       A.    Okay.
11       Q.    Same rules apply, though; okay?
12       A.    Yes.
13       Q.    While I was at your home yesterday, I took
14   photos of the stairwell that I think we've been --
15   you've been referencing.
16               MS. TROTTA:  So if we can have this marked.
17               (A discussion was held off the record.)
18               (Defendants' Exhibit 12 was marked for
19               identification.)
20       Q.    Mrs. Klorczyk, showing you what's been marked
21   as Exhibit 12, is that the stairwell that you were
22   referencing?
23       A.    It is.
24       Q.    Okay.  And do you see the -- like a back of the
25   picture frame?
```

Page 263

1       A.      Yes.

2       Q.      Okay.  Do you know if that is at the edge of

3   that garage?

4       A.      At the edge?

5       Q.      Well, at the edge -- where that support beam

6   is, there's a round support?

7       A.      Yeah.

8       Q.      Is that wedge between the round support beam

9   and it appears the wooden trunk?

10      A.      I haven't been in the garage since it's been

11  rearranged like this.

12              MR. ELLIOTT:  So you either know, or you

13  don't know.

14      A.      I don't know.

15      Q.      Okay.  You also reference that it was three

16  steps down, and you were standing on the first step.  I

17  see one, two, three -- actually, four steps down, it

18  looks like.  Is that four -- no.  You know what?  That's

19  just my -- you're right.  It is three steps.  One, two,

20  three.

21          So you were standing on that bottom step?

22      A.      Yes.  Well, when I first entered the garage, I

23  stood on the top till I -- I stood on the top for a

24  while.

25      Q.      Okay.  When you say you stood on the top --

Page 264

1       A.     The top step.  I opened the door, and I didn't

2    move from there.

3       Q.     Okay.

4       A.     And then I went and got Fred and all that.  And

5    then I stood on this bottom step --

6       Q.     Okay.

7       A.     -- until I was able to get under the car.

8       Q.     Okay.  Now, I see three doorbells on that door?

9       A.     Those are garage door openers.

10      Q.     Those are the garage door openers.

11             So when you indicated that you went back and

12    opened the garage doors --

13      A.     Uh-huh.

14      Q.     -- those are the garage -- yes?

15      A.     Those are the garage door openers.

16      Q.     Those are the garage door openers?

17      A.     Yes.

18      Q.     And was the configuration basically the same?

19    Was there a wooden box there?

20      A.     No.  Actually, that's the back of a love seat.

21    No.  We just had a child move back home.  And so, no,

22    there was a car in this bay.

23      Q.     Okay.

24      A.     There was not all of this furniture in -- in

25    the bay, and it wasn't piled up like this.

Page 265

```
 1      Q.    Okay.  And which child moved back home?

 2      A.    The youngest one.

 3      Q.    Okay.  And what looks like --

 4      A.    And I didn't -- this is a refrigerator on this

 5   side.

 6      Q.    Okay.

 7      A.    None of this stuff was here.

 8      Q.    You're reading my mind.  I was going to ask you

 9   what the black thing was.

10      A.    No.  When Christian was around, Christian had

11   the garage much neater than this.

12      Q.    Okay.

13      A.    Wow.

14      Q.    Okay.  So --

15      A.    It didn't look anything like this.

16      Q.    So the refrigerator wasn't present?

17      A.    No.

18      Q.    The love seat wasn't present?

19      A.    No.

20      Q.    So that was pretty much a clear path?

21      A.    Yeah.

22      Q.    Okay.

23      A.    It was just a covered Delorean in this third

24   bay.

25      Q.    While I was there yesterday, I also saw what
```

Page 266

1    looked like Rubbermaid shelving?

2        A.    Yeah.

3        Q.    Enclosed shelving?

4        A.    Yeah.

5        Q.    Was that present?  It looked like, from the

6    photos that the police took, that those -- that --

7        A.    That was there, yeah.

8        Q.    -- that was there.  Okay.

9              Okay.  And when you were standing on that

10   first step -- and correct me if I got any part of your

11   testimony wrong -- when you were standing on that first

12   step, you were able to see under the BMW?

13       A.    I could see that the BMW was -- was low.  It

14   wasn't -- I could see that it wasn't jacked up.  And I

15   could see -- from that -- from that position.  I could

16   see the lights, I could see that the car was down.

17   That's where I can see Christian's legs out of the front

18   of the car.

19       Q.    And you also testified that you saw that the

20   jack stand was underneath the car?

21       A.    Not from there.

22       Q.    Okay.  When did you see that the jack stand was

23   underneath the car?

24       A.    After Fred had jacked the car up, and I was

25   down here ready to -- I was down here on the third -- on

Page 267

```
 1    the bottom step.
 2        Q.    On the third --
 3        A.    Yeah, well --
 4        Q.    You weren't standing on the cement?
 5        A.    No.
 6        Q.    Okay.
 7        A.    No, because I didn't have my shoes on.  So I
 8    was still on the wooden step.
 9        Q.    Okay.  Did you have slippers or anything on?
10        A.    No.
11        Q.    Just barefoot?
12        A.    Yeah.
13        Q.    You're like me; just barefoot?
14        A.    I came in and kicked my shoes off.
15        Q.    Okay.
16        A.    It was March, and it was cold and yeah, so...
17        Q.    All right.  So when you were standing still on
18    this step --
19        A.    Yes.
20        Q.    -- you were able to see Mr. Klorczyk --
21        A.    Engage the -- the hydraulic jack --
22        Q.    Okay.
23        A.    -- pump up the car.
24        Q.    Now, when he pumped up the car with the
25    hydraulic jack, was the jack at a 90-degree angle with
```

Page 268

1    the car, or was it angulated?

2        A.    The hydraulic jack?

3        Q.    Yes.

4        A.    No, it was parallel to the car.

5        Q.    But when he started to use it to pump it up.

6        A.    I'm not sure.  No, I think it was perpendicular

7    to the car.

8        Q.    Perfect.

9              90 degrees?

10       A.    I think so.

11       Q.    Okay.  And, at that point in time, were you

12   able to see the jack stand?

13       A.    No, I didn't see the jack stand until he --

14   until he grabbed it and put it up.

15       Q.    Okay.  And now, when you say grabbed it and put

16   it up, that's lending me to believe that, when you say

17   grab and put it up, that it was laying flat?

18       A.    It was.  It was under the car.

19       Q.    Okay.  Do you know if it was laying flat under

20   the car on its side, or was it pushed farther in under

21   the car in an upright position?

22       A.    No, it was flat.

23       Q.    Okay.  And did you see it flat?

24       A.    Well, I saw him go like this (indicating), pull

25   it up.

Veritext National Deposition & Litigation Services
866 299-5127

1      Q.    And when you saw him pull it up, the yellow arm

2  that comes up, was that yellow arm flat into the jack

3  stand, or was it extended?

4      A.    I don't know.

5      Q.    Okay.  When you saw him put the jack stand --

6  when you -- when he flipped it up, did you, then, see

7  him have to ratchet the jack stand up?

8      A.    I wasn't watching that.  I was on -- I had 911

9  on the phone.  So I was talking to 911 while he did

10  that.

11      Q.    Okay.  So was it just in your peripheral vision

12  that you saw it flip up?

13      A.    Yeah.

14      Q.    Okay.  So it really wasn't something you were

15  concentrating on; it was in your peripheral vision?

16      A.    Right.  I wasn't concentrating on that.  I was

17  concentrating on the phone call and -- and Christian's

18  face.

19      Q.    And you're certain that there was a flip up?

20      A.    Yes.

21      Q.    Okay.  And you're uncertain -- or you don't

22  know the extent that that yellow arm was either --

23      A.    No.

24      Q.    -- flat against the jack stand or extended out?

25      A.    No.

1     Q.     And you're also unsure as to what Mr. Klorczyk

2   did if he had to ratchet up the jack stand --

3     A.     Right.

4     Q.     -- or just pull it and just put it right back

5   in?

6     A.     Right.

7     Q.     Okay.  When we went to your home yesterday, the

8   jack stands were in boxes.

9         Was it normal for Christian and/or your family

10  members to take the jack stands apart and put them in

11  the boxes, or were they like we saw in the photographs,

12  that they were already assembled?

13    A.     I don't know how they kept them.  I really

14  didn't mess with the tools --

15    Q.     Okay.

16    A.     -- unless I went out to get a screwdriver or

17  something.

18    Q.     But you never noticed whether they were

19  assembled --

20    A.     No.

21    Q.     --  or unassembled?

22    A.     No.

23    Q.     You had indicated that, some time shortly after

24  Christian's death, that you tested the jack stands --

25    A.     Yes.

Page 271

1      Q.     -- all of them.

2             Did you ever test the jack pump?

3      A.     No.

4      Q.     Was there a reason why you didn't test the jack

5      pump?

6      A.     We didn't think it was involved.

7      Q.     That was an assumption on your part?

8      A.     Yes.

9      Q.     And when your family does work on their cars,

10     you look like you had a very nice brickstone paved

11     driveway coming up.

12     A.     Uh-huh.

13     Q.     Do you allow them to work on the brickstone

14     paved driveway coming up, or are they normally in the

15     garage doing the work?

16     A.     Well, if they're doing oil, they do it inside.

17     Q.     Okay.  So no matter what time of year, oil is

18     always done inside?

19     A.     (Nods head.)

20     Q.     Yes?

21     A.     Yes.  Yeah, no oil on the pavers.

22     Q.     I didn't think you would allow oil on the

23     pavers.

24     A.     No.

25     Q.     Okay.  Now, I believe you also testified that

Page 272

1    you had watched your family over the years change oil.

2        A.    Change oil, yeah.

3        Q.    Okay.  Can you tell me -- did you also watch

4    Christian over the years change oil?

5        A.    Christian and Frederick and -- yeah.

6        Q.    Okay.  As it pertains to Christian changing

7    oil --

8        A.    Yes.

9        Q.    -- can you tell me what you normally observed

10   him do.

11       A.    As far as I can remember, he would loosen the

12   lug nuts on the -- on the tire -- depending on which car

13   he was -- he was doing, depending on where the oil

14   was -- oil, you know, in the BMW in question, it was in

15   the front, but they're not always in the same place.

16            On that particular car, he would loosen the lug

17   nuts and then jack up the car with a hydraulic jack, I

18   believe take the tire off and then put the jack stand

19   underneath.

20            And then -- I don't know what they use.  They use

21   something else for a secondary back-up to the jack stand

22   and then put the tire underneath the wheel assembly and

23   then take the hydraulic pump out and then lay it

24   parallel -- flat and parallel to the car.

25            And he usually -- yeah -- put cardboard or

Page  273

1    something underneath the car so that it doesn't get oil

2    all over the place and, if it's cold, so that they're

3    not laying on the cold concrete.

4        Q.    All right.  And I believe you said that's

5    usually what's done, and you've seen him do that with

6    the BMW in question?

7        A.    Yes.

8        Q.    Okay.  Now, we know he loosened the lug nuts on

9    the tire because we have pictures of them in the --

10       A.    Yeah.

11       Q.    -- jack pump.

12           We can assume he jacked up the car with the

13   hydraulic pump; correct?

14       A.    Yes.

15       Q.    We can assume he took the tire off because

16   there's photographs with no tire?

17       A.    Yes.

18       Q.    Okay.  Did he put jack stands underneath?

19       A.    At least one.

20       Q.    At least one.

21           Did you ever see him use more than one on that

22   car?

23       A.    On that car, I don't know.  Maybe when they

24   were doing brakes.

25       Q.    Okay.

Veritext National Deposition & Litigation Services
866 299-5127

1     A.    I don't really know.  If they needed the whole
2  front end or the whole back up, then they would use more
3  than one.
4     Q.    Okay.  Then the next thing you said, used
5  something else as a secondary back-up?
6     A.    Yeah.  They put something else under there, and
7  I don't know what it -- I can't recall what they used.
8  Something.
9     Q.    Okay.  On March 11, 2011, did you see that
10  something else as a secondary back-up?
11     A.    No.  If I -- if I could remember what it was,
12  it might jog my memory.  But I don't remember what it
13  was.
14     Q.    Other than seeing the pump jack, the jack
15  stands, did you see any other item on the tire?
16     A.    The tire was there.
17     Q.    Okay.
18     A.    But there was something else, and I don't -- I
19  don't recall what it was.
20     Q.    Then you said there was a -- but you don't know
21  if there -- something else was there that day; you're
22  just assuming that's what they normally did?
23     A.    No, there was, but I don't know what it was.
24     Q.    Do you know where it was located?
25     A.    No.  No.

Page 275

1     Q.     Do you know normally where they would locate

2     it?

3     A.     No.

4     Q.     Okay.

5     A.     Well, I know they used, like, three things to

6     hold the car up.

7     Q.     And then the tire under the wheel assembly?

8     A.     Yes.

9     Q.     But I believe your testimony earlier was that

10    the tire actually wasn't under the wheel assembly and

11    that there's photographs showing that there is no tire

12    under that wheel assembly.

13    A.     I don't know.  Yeah, I don't know what happened

14    to it.  That's because -- I don't know what happened to

15    that.

16    Q.     Okay.

17    A.     Fred may have moved it, or it may have moved

18    when the car fell.  I don't know.

19    Q.     Okay.  But what we do know, based at least upon

20    the photographs, is there was no tire under the wheel

21    assembly?

22              MR. ELLIOTT:  At what time?

23    Q.     The photographs that the police took.

24    A.     That the police took.  But that -- by that

25    time, Fred had jacked the car up and he may have moved

Page  276

1    it.

2    BY MS. TROTTA:

3        Q.    I believe your testimony earlier was that Fred

4    jacked the car up and you thought perhaps put tire under

5    the car.

6        A.    Yeah, but -- yeah.  I don't know.  I'm a little

7    confused here now.

8        Q.    Okay.  So you're uncertain as to whether or not

9    the tire was actually under the car?

10       A.    Right now, yes, I am.

11       Q.    Okay.  Do you recall when the first set of jack

12   stands were purchased?

13       A.    The first set?

14       Q.    Yes.

15       A.    I don't know.  I think Fred might have brought

16   those with him when we got married.

17       Q.    And when did you get married?

18       A.    1983.

19       Q.    Okay.  Usually, I ask that question of the

20   women because sometimes the men have problems.

21       A.    I don't -- I don't -- I mean, I know we got

22   that second set just that same year that Christian died.

23       Q.    Okay.

24       A.    I don't -- you know, they may have been that

25   old --

Page  277

1        Q.    Okay.

2        A.    -- the first set.

3        Q.    The first set might have been since 1983?

4        A.    We might have even had those before those --

5   before then even, he might have brought them with him.

6        Q.    Okay.  So you married a car buff?

7        A.    I married a car buff.

8        Q.    Okay.

9        A.    Oh, yeah.

10       Q.    And you probably, in your earlier years of your

11  marriage, watched him work on the cars?

12       A.    I did.

13       Q.    Okay.  How many times would you say you saw

14  either your husband who trained Christian --

15       A.    Yes.

16       Q.    --  and Christian use jack stands?

17       A.    A lot.

18       Q.    More than 100?

19       A.    No.  I didn't always go out, especially if it

20  was cold.

21       Q.    Okay.

22       A.    I'm not an outside person.  So once the boys

23  were big enough, then I didn't need to hang out so much.

24  He had his bonding time with the boys outside.

25       Q.    Would you say you saw it more than 50 times

Page  278

1    using the jack stands?

2        A.    No, not even -- no.  I didn't really pay that

3    much attention to the details of it because, you know, I

4    would be talking, I would be maybe doing something else.

5    I would be out there with him, but not necessarily

6    watching in detail.

7        Q.    What type of work would they do on their cars?

8              You know, change oil and you said brakes.

9        A.    Brakes.  They would rotate tires.  Oh, God,

10   they were doing all kinds of stuff.

11       Q.    Air filters?

12       A.    Air filters, oil filters.  I don't know.  You

13   know, basic maintenance stuff.  Windshield wipers.  I

14   don't know.  Christian built -- did the sound system for

15   his car.  He was really proud of that.  Layers and

16   layers and layers of woofer stuff.  I didn't even know

17   what a woofer thing was, but, you know --

18              MR. ELLIOTT:  Woofer stuff.

19       A.    Woofer stuff, yes.  And then he needed to know

20   where to buy flannel.  And I said, what are you -- what

21   are you doing with flannel.  Well, that's the next layer

22   on this thing.  And he made it for his Acura.  It fits

23   way in the wheel well.  And I said, do you want me to go

24   get it.  No, I don't want you to pick out some girly

25   flower flannel, no.

Page  279

1      Q.    Does your family own any wheel chocks?

2      A.    No, not -- I don't think so.

3      Q.    Does your -- did you ever see your family use

4   any type of blocking underneath the car, other the jack

5   stands?

6      A.    I don't think so.  I might be wrong, but -- I

7   could be wrong.

8      Q.    You testified -- and just so I have a clear

9   picture of it -- you went to the car to reach for

10  Christian's pulse.

11     A.    Yes.

12     Q.    And when you were -- you said you were kneeling

13  down?

14     A.    Uh-huh.

15     Q.    Yes?

16     A.    Yes.

17     Q.    Okay.  And you said you reached through the

18  wheel well?

19     A.    Yeah.

20     Q.    So the wheel well would have been to your

21  front?  So you would be between the wheel well and the

22  passenger door?

23     A.    Yeah, I was towards the -- I was, like, on the

24  end -- the back of the wheel well.

25     Q.    Okay.  If you were to look up, you probably

Page 280

1    would have seen a side view mirror?

2        A.    That was -- that was, like, in front of me

3    because I was like in towards the back of the wheel

4    well.

5        Q.    Okay.  And you had reached in, you said --

6        A.    Uh-huh.

7        Q.    -- and you went under the car --

8        A.    Uh-huh.

9        Q.    Yes?

10       A.    Yes.

11       Q.    Sorry.  I know it's getting late.  I know

12   uh-huh, and you're shaking your head, but for the sake

13   of this record we need it.

14       A.    Yes.

15       Q.    Okay.  Was your head under the car as well, or

16   was your head still on the outside?

17       A.    My head was under the car.  I was down there

18   like on his face just about and, you know, had my phone

19   like this (indicating).  I was on his neck like that

20   (indicating), like, talking to this girl like this

21   (indicating).

22       Q.    Is it fair to say you were probably then on

23   your knees and elbows?

24       A.    Yeah, pretty much.

25       Q.    Okay.  And at the same time, what was holding

                                            Page 281

1   up the car was the jack stand that was underneath the

2   car?

3       A.    Yes, at that time.

4       Q.    You also testified that there was multiple

5   back-ups that they used.

6             And, on March 11, 2011, what back-up systems

7   was Christian using?

8       A.    Well, that's -- well, he had the jack -- he had

9   the jack stand.  I couldn't remember what the second one

10  was, but I know there was something there because they

11  always use three and then he had the tire.  I know it

12  was underneath that.  It had to be underneath the -- the

13  wheel assembly.

14      Q.    Are you assuming the tire is underneath the

15  wheel assembly?

16      A.    I guess I am assuming that.

17      Q.    Okay.  And are you also assuming that there was

18  a second back-up system?

19      A.    Yes, because he always used it.

20      Q.    Okay.

21      A.    He -- he never failed to do that.

22      Q.    Okay.  It seems like somebody's -- is that you,

23  Mrs. Klorczyk?

24            THE WITNESS:  It's not me vibrating.

25            MR. DONAT:  It's your phone.

Page 282

```
 1              MS. TROTTA:  Oh, it's my phone?

 2              MR. FLYNN:  Mine's not on the table.

 3              MS. TROTTA:  Okay.  Okay.  Sorry.  I'm

 4     almost done.

 5        Q.    You were also asked about whether or not there

 6     was -- that you did any writings after Christian died.

 7        A.    Right.

 8        Q.    Were you -- did you do any blogging?

 9        A.    No.

10        Q.    Did you write any diaries?

11        A.    No.

12        Q.    So there was no outward -- as far as blogs,

13     writings, anything that you did?

14        A.    No.  I mean, if I saw something on Facebook, A

15     compassionate friend, things I liked, you know, I'd say,

16     this is for you Christian.  Sometimes I put it on his

17     page.  Sometimes I put it on my page.  Or if it says

18     something about how, you know, proud I am of my son or

19     saying if you have a son, and then write all three of

20     them, even though only two of them are physically here

21     with me, that kind of thing.

22        Q.    Okay.

23        A.    You know, if there's birthdays and it's -- it's

24     June 11th, it's been two months, it's been three months.

25     I mean, I did that for a long time.  And I -- I just
```

Page 283

1     kept wondering how many -- how many months would it take

2     before I stopped counting months.  I don't count months

3     anymore.  But it took me a long time before I stopped

4     putting that on every month.

5         Q.    Okay.

6         A.    But, other than that, I mean, that's -- things

7     like that.  And, you know, my friends and family, they

8     would all, you know, comment.  But they -- they all

9     knew, so...

10        Q.    So it was mostly done on Facebook?

11        A.    Yeah.

12        Q.    Either on your page or Christian's page?

13        A.    Right.

14        Q.    And you have access to Christian's page still?

15        A.    I do.

16        Q.    Does his password and everything go in

17    automatically on your computers?

18        A.    No.  If he's a friend, you don't need a

19    password.

20        Q.    Okay.  Did he also have a Twitter account?

21        A.    No.  I don't think so.  That was before Twitter

22    really took off.

23        Q.    Okay.  And I think there were other types of

24    pre-Facebook accounts.

25        A.    That's when Facebook was really big for that

                                            Page  284

1     age range.

2         Q.    Okay.  Was there anything school-wise?

3               MR. ELLIOTT:  High school or college?

4     BY MS. TROTTA:

5         Q.    Either high school or college.

6         A.    For him?

7         Q.    For him.

8         A.    No, I don't think so.

9         Q.    Okay.

10        A.    You know, his big thing was texting and, you

11    know, the stuff on Facebook.

12        Q.    Okay.  After his graduation from college --

13        A.    Yes.

14        Q.    -- it seemed that his plans were up in the air?

15        A.    Yeah.

16        Q.    Okay.  And you had testified earlier that he

17    might have followed in his brother's footsteps of going

18    to law school?

19        A.    Yes.

20        Q.    Did Christian make any types of plans or

21    anything to take the LSATs?

22        A.    Yes, he had taken the LSAT prep class.

23        Q.    He took the prep class?

24        A.    He took the prep class, yes.

25        Q.    Did he sign up to take the LSATs?

Page 285

1      A.     No.  He -- no, he did not take that.  Maybe he
2  was going to wait and see how much Frederick had liked
3  law school.  And that may have swayed him somewhat.
4      Q.     So he had no plans --
5      A.     He did not have a definite plan, you know, as
6  he was graduating, that he was going to go to law
7  school, no.
8      Q.     Okay.
9      A.     I think he was anxious to just jump into the
10  business world, doing something.  That's what I was
11  trying to pin him down the night before.  And he just
12  kept saying, don't worry, mom, I got it figured out, I
13  got it figured out.  Something with my name on it.
14      Q.     Okay.  His options were open to him?
15      A.     Well, yeah.  And I think a lot had to do --
16  some of it had to do with -- and then he didn't say
17  that -- he didn't say this to me because he didn't -- we
18  hadn't met Sarah at this time, but I think some of it
19  had to do with what -- where Sarah was going to go to
20  school.
21      Q.     And, at that time, he had been going out with
22  her for a year?
23      A.     Yeah.  Yeah.  He didn't -- didn't -- didn't say
24  much about her.  It was very casual.
25      Q.     Okay.

Page 286

1     A.     We knew she existed, just didn't know it was

2  that serious.

3     Q.     Okay.  When you went up to UConn, you never all

4  had dinner together or anything of that nature?

5     A.     No.  She -- no.  When we finally met her, she

6  said, I kept saying to him, why don't you -- why don't

7  you take me home, you know?  And he said because I'm

8  always in the garage with Jordan just working on cars,

9  and -- and so when we met her, she said, you know what?

10  You didn't even know about me?  I'm, like, no, no, it's

11  not that.  I'm sure he just thought I'd scare you off if

12  he brought you home.

13            And -- but we liked her very much.  And we

14  could see what the attraction was.  And, you know -- he

15  said, you know, he would just brush it off and say, no,

16  you know, who are you taking to this thing?  I'll find a

17  date.  Don't worry about it.

18     Q.     How many times had you met Sarah prior to --

19     A.     None.

20     Q.     -- to Christian's death?

21     A.     None.

22     Q.     So the first time you met him was after -- met

23  her was after he had died?

24     A.     Yes.  Yes.  And so that's what was -- yeah,

25  that's when she said, you didn't know about me?  No, no,

1    no, no, no.

2       Q.    When he talked to his -- I understand, with

3    sons, sometimes they talk to their moms about certain

4    things and their dads about other things.

5       A.    I mean, I knew he was sort of seeing somebody.

6    He came to me at Christmastime with a Tiffany catalog.

7    And he said, you know, I need to buy a Hanukah present

8    for this girl.  And I said, oh, you're seeing somebody.

9    No, just a friend that -- you know.

10             So I said, okay, sure I'll help up find, you

11   know, something.  And he said, okay, but she's not like

12   you.  I said, what's that mean?  She's not a girly girl,

13   she's, you know.  Okay.

14      Q.    Did you -- did you later learn that he would

15   talk to his dad about this girl?

16      A.    I don't think he talked to his dad either.

17      Q.    How about his brothers?

18      A.    I think he talked to Jordan.

19      Q.    His friend, Jordan?

20      A.    Oh, Jordan knew, yeah.  Jordan wouldn't tell me

21   anything.  Nothing.  Nothing, nothing, nothing.  All the

22   other information I got was from the other roommates --

23      Q.    Okay.

24      A.    -- and Sarah.

25      Q.    And this was all after?

Page 288

1      A.      Yeah.  Yeah.  She had a lot to say.

2      Q.      While you were home on March 11, 2011 and while

3  the emergency personnel were there, did you ever see any

4  of them perform CPR on Christian?

5      A.      No.

6      Q.      Was Christian an organ donor?

7      A.      Yes.

8      Q.      So his license said, organ donation?

9      A.      I believe it did.  I believe it does.

10     Q.      After March 11th, 2011, you indicated that the

11  BMW was driven for a while.

12     A.      Uh-huh.

13     Q.      Yes?

14     A.      Yes.

15     Q.      Okay.  Who would primarily drive that?  Would

16  that be Parker?

17     A.      I think it was Parker, when he finally got his

18  license.

19     Q.      Okay.  And how long did Parker drive the BMW?

20     A.      Not -- not that long.  I don't know.  Maybe six

21  months or so.

22     Q.      And --

23     A.      Parker got his license that summer, so not --

24  not that long.

25     Q.      And then did Parker transition into another

Page 289

1    car?

2        A.    Yes.

3        Q.    What other car did he transition into?

4        A.    Oh, he wanted -- he -- what was he driving

5    next?  I don't know if he wanted -- was that when he

6    moved to the Cadillac?  I don't know.  He talked his

7    father into buying him this Cadillac that was as old as

8    he was, just about.  This crazy, crazy big boat of a

9    car.

10       Q.    What happened to Christian's Acura?

11       A.    It's sitting -- it's sitting in my driveway.

12   You should have seen it yesterday.  It has an Ish

13   license plate on it.

14       Q.    And does anyone drive that?

15       A.    No, it needs some work.  Oh, yeah.  It needs

16   work.

17             MS. TROTTA:  I believe I am done, but I just

18   want to confer with my co-counsel.  So, if we can, go

19   off the record for a couple minutes.

20             THE VIDEOGRAPHER:  The time is 6:41.  We're

21   off the record.

22             (A discussion was held off the record.)

23             THE VIDEOGRAPHER:  Back on the record.  The

24   time is 6:43.

25             MS. TROTTA:  On behalf of the Sears

Page  290

1   defendants, I have no further questions at this time.

2                  MR. ELLIOTT:  Okay.  I have no questions.

3                  MR. FLYNN:  Okay.  I think we're done.

4                  THE VIDEOGRAPHER:  This is the end of Disk

5   Number 5 and the deposition.  Time is 6:43.  We're off

6   the record.

7   (THEREUPON, THE DEPOSITION CONCLUDED AT 6:43 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext National Deposition & Litigation Services
866 299-5127

```
 1          I declare under penalty of perjury

 2   under the laws that the foregoing is

 3   true and correct.

 4

 5          Executed on _____ , 20___,

 6   at _____, _____.

 7

 8

 9

10

11          _____

12                WITNESS

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 292
```

```
 1              C E R T I F I C A T E

 2          I hereby certify that I am a Notary Public in,

 3   and for the State of Connecticut, duly commissioned and

 4   qualified to administer oaths.

 5           I further certify that the deponent named in

 6   the foregoing deposition was by me duly sworn and

 7   thereupon testified as appears in the foregoing

 8   deposition; that said deposition was taken by me

 9   stenographically in the presence of counsel and reduced

10   to typewriting under my direction, and the foregoing is

11   a true and accurate transcript of the testimony.

12           I further certify that I am neither of counsel

13   nor attorney to either of the parties to said suit, nor

14   am I an employee of either party to said suit, nor of

15   either counsel in said suit, nor am I interested in the

16   outcome of said cause.

17           Witness my hand as Notary Public this 19th day

18   of November, 2014.

19

20

21

22                         Sabina Lohr
                           Notary Public

23   License #0000131

     My License Expires December 31, 2016

24   My Notary Certification Expires July 31, 2017

25

                                      Page  293
```

```
 1                       INDEX
 2   EXAMINATIONS                            PAGE
 3   DIRECT                                     7
 4   CROSS (BY MS. TROTTA)                    263
 5
 6   DEFENDANT'S EXHIBITS
 7   EXHIBIT 1 - NOTICE OF DEPOSITION DATED
 8   NOVEMBER 4, 2014                          18
 9   EXHIBIT 2 - NOTICE OF DEPOSITION DATED
10   NOVEMBER 12, 2014                         18
11   EXHIBIT 3 - REQUEST FOR PRODUCTION OF
12   TANGIBLE THINGS                           18
13   EXHIBIT 4 - BATES LABELS KLORCZYK 000183
14   THROUGH AND INCLUDING KLORCZYK 000196     62
15   EXHIBIT 5 - BATES LABELS KLORCZYK 000038
16   THROUGH AND INCLUDING KLORCZYK 000043     89
17   EXHIBIT 6 - INCIDENT REPORT NARRATIVE
18   BATES LABEL KLORCZYK 000047              154
19   EXHIBIT 7 - INCIDENT REPORT NARRATIVE
20   BATES LABEL KLORCZYK 000048              164
21   EXHIBIT 8 - WATERFORD POLICE DEPARTMENT
22   VOLUNTARY STATEMENT BATES LABELED KLORCZYK
23   000067 THROUGH AND INCLUDING KLORCZYK 000068  171
24   EXHIBIT 9 - SEVEN COLOR PHOTOGRAPHS      198
25
```

Page 294

1    DEFENDANT'S EXHIBITS

2    EXHIBIT 10 - ARTICLE FROM THE DAY

3    NEWSPAPER                                    246

4    EXHIBIT 11 - STORY PUBLISHED IN

5    THE WATERFORD, CONNECTICUT PATCH, WITH A

6    PUBLICATION DATE OF MARCH 22ND, 2011      249

7    EXHIBIT 12 - COLOR PHOTOGRAPH           263

8

9    CONFIDENTIAL TESTIMONY

10   BEGINNING PAGE 62 LINE 21

11   ENDING PAGE 87 LINE 12

12

13   CONFIDENTIAL EXHIBIT

14   DEFENDANTS' EXHIBIT 4 - MARKED FOR IDENTIFICATION

15   ON PAGE 62

16

17

18

19

20

21

22

23

24

25

Page 296

1                UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT
2

      -----------------------------x
3                                   :
      FREDERICK KLORCZYK, JR., as   :
4     Co-Administrator of the       :
      Estate of Christian R.        :
5     Klorczyk, et al.,             :
                                    :
6            Plaintiffs,            :   Civil Action No.
                                    :   3:13-cv-00257-JAM
7        -vs-                       :
                                    :
8     SEARS, ROEBUCK & CO., et al.,:
                                    :
9            Defendants.            :
                                    :
10    -----------------------------x
11
12               VOLUME II - PAGES 296-386
13
14
                 VIDEOTAPE DEPOSITION OF:
15               LYNNE KLORCZYK
16               DATE:  JULY 12, 2016
                 HELD AT:  GORDON REES SCULLY MANSUKHANI,
17               LLP, 95 GLASTONBURY BOULEVARD,
                 SUITE 206, GLASTONBURY, CONNECTICUT
18
19
20
21        Reporter:  JILL I. HUDON, RPR, LSR #00082
22
23
24
25    Job No. CS2332250

```
 1    APPEARANCES:
 2
      FOR THE PLAINTIFFS:
 3
      DAY PITNEY LLP
 4    242 TRUMBULL STREET
      HARTFORD, CT 06103
 5    (860) 275-0100
      borticelli@daypitney.com
 6    BY:  BRYAN J. ORTICELLI, ESQ.
      djelliott@daypitney.com
 7    BY:  DAVID J. ELLIOTT, ESQ.
 8    HERZFELD & RUBIN, P.C.
      125 BROAD STREET
 9    NEW YORK, NY 10004
      (212) 471-8500
10    hwexler@herzfeld-rubin.com
      BY:  HOWARD L. WEXLER, ESQ.
11
12    FOR THE DEFENDANTS:
13    GORDON REES SCULLY MANSUKHANI, LLP
      95 GLASTONBURY BOULEVARD
14    SUITE 206
      GLASTONBURY, CT 06033
15    (860) 278-7448
      szakrzewski@gordonrees.com
16    BY:  STEVEN J. ZAKRZEWSKI, ESQ.
      dbrown@gordonrees.com
17    BY:  DENNIS BROWN, ESQ.
18
      FOR THE DEFENDANT SEARS, ROEBUCK & CO.:
19
      TROTTA, TROTTA & TROTTA
20    900 CHAPEL STREET
      12TH FLOOR
21    NEW HAVEN, CT 06503
      (203) 787-6756
22    etodd@trottalaw.com
      BY:  ERICA W. TODD-TROTTA, ESQ.
23
24    In Attendance:
      Frederick Klorczyk, Jr.
25    Arthur Chaykin, General Counsel, SFA Companies, Inc.
      Dominick Boucher, Videographer
```

Page 298

1                    I N D E X

2                                               Page

3         Appearances ------------------------------  297

4         Stipulations -----------------------------  300

5         Signature Page ---------------------------  384

6         Correction Sheet -------------------------  385

7         Certificate ------------------------------  386

8

9    WITNESS:

10     LYNNE KLORCZYK

11         Direct Examination by Mr. Brown -----------  303

12         Cross-Examination by Ms. Todd-Trotta ------  353

13         Cross-Examination by Mr. Elliott ----------  358

14         Redirect Examination by Mr. Brown ---------  362

15         Recross-Examination by Ms. Todd-Trotta ----  372

16         Further Redirect Examination by Mr. Brown -  379

17

18

19

20

21

22

23

24

25

Page 299

1   DEFENDANTS' EXHIBITS:                         Marked

2   Exhibit 13      Correction Sheets                320

3   Exhibit 14      Outline of Car with Indications

                    Added After Being Marked         327

4

    Exhibit 14A     Outline of Car                   379

5

6

              (All exhibits marked during the deposition

7

    were retained by Mr. Brown.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 300

1                   S T I P U L A T I O N S

2

3             It is stipulated by the Attorneys for the

4     Plaintiffs and the Defendants that all objections are

5     reserved until the time of trial, except those

6     objections as are directed to the form of the

7     question.

8             It is stipulated and agreed between counsel

9     for the parties that the proof of the authority of the

10    Commissioner before whom this deposition is taken is

11    waived.

12            It is further stipulated that any defects in

13    the notice are waived.

14            It is further stipulated that the reading

15    and signing of the deposition transcript by the

16    witness is not waived.

17

18

19

20

21

22

23

24

25

Page 301

1                    P R O C E E D I N G S

2

3            (The videotape deposition of Lynne Klorczyk

4      reconvened at 9:09 a.m. on this 12th day of July,

5      2016, with all counsel other than Ms. Todd-Trotta, the

6      videographer, Arthur Chaykin, Frederick Klorczyk, Jr.,

7      and the deponent present.)

8

9                    THE VIDEOGRAPHER:  We are now on the

10     record.

11            Please note the microphones are sensitive

12     and may pick up whispering and private conversations.

13            Please turn off all cell phones and place

14     them away from the microphone.  They may interfere

15     with the deposition audio.

16            The recording will continue till all parties

17     agree to go off the record.

18            My name is Dominick Boucher representing

19     Veritext Legal Solutions.  Today's date is July 12,

20     2016.  The time, approximately 9:09 a.m.

21            This deposition is being held at Gordon &

22     Rees, LLP, located at 95 Glastonbury Boulevard,

23     Glastonbury, Connecticut, and it's being taken by

24     counsel for the defendants.

25            The caption of the case is "Frederick

Page 302

1   Klorczyk, Jr., et al. vs. Sears, Roebuck & Co.,

2   et al."  It's filed in the United States District

3   Court, District of Connecticut, Case No.

4   3:13-cv-00257-JAM.  This is Volume II of the witness,

5   Lynne Klorczyk.

6            At this time the attorneys present in the

7   room will identify themselves.  The court reporter,

8   Jill Hudon, representing Veritext Legal Solutions,

9   will swear in the witness.

10           You may proceed.

11                MR. BROWN:  Dennis Brown of Gordon &

12  Rees representing the defendants.

13                MR. CHAYKIN:  Arthur Chaykin present

14  for Shinn Fu Company of America.

15                MR. ZAKRZEWSKI:  Steve Zakrzewski,

16  Gordon & Rees, for the defendants.

17                MR. ELLIOTT:  David Elliott and Brian

18  Orticelli from Day Pitney LLP in Hartford,

19  Connecticut, representing the plaintiffs, and together

20  with me is my co-counsel from Manhattan at the law

21  firm of Herzfeld & Rubin.  His name is Howard Wexler.

22

23

24

25

Page 303

1                    LYNNE KLORCZYK,

2     having been first duly sworn or affirmed to tell the

3     truth, the whole truth, and nothing but the truth,

4     deposeth and sayeth as follows:

5

6                    DIRECT EXAMINATION

7

8     BY MR. BROWN:

9          Q    Good morning, Mrs. Klorczyk.

10         A    Good morning.

11         Q    Is that how you would prefer to be

12    addressed?

13         A    You can call --

14         Q    There's no right rule.  There's no wrong

15    rule.  If you'd prefer I address you as "Lynne," I'm

16    glad to do that.

17         A    "Lynne" is fine.

18         Q    Sure.

19              Since this is day two, we know you've been

20    deposed before.

21              But I'll just remind you, when you answer,

22    it's helpful, for the court reporter and the record,

23    to answer verbally.  Say "Yes" instead of shaking your

24    head.

25              Do you understand?

1     A     Yes.

2     Q     And as a lawyer who doesn't type out

3  questions ahead of time, it is not impossible for me

4  to ask a question that may not make sense.  If you

5  need to hear the question read back, please ask.

6           Okay?

7     A     I will.

8     Q     And if the question doesn't make sense or

9  you don't understand it, just please let me know.

10          Okay?

11    A     I will do that.

12    Q     And if I ask a question and you respond, I

13 will assume you understood the question.

14          Is that fair?

15    A     Yes.

16    Q     Okay.  Do you take any prescription

17 medications at all?

18    A     I do.

19    Q     What kind of medications do you take?

20    A     Sleep meds.

21    Q     Did you use any last night?

22    A     I did.

23    Q     And what kind of sleep meds do you have?

24    A     Klonopin, doxepin.

25    Q     Is that it?

Page 305

1      A     That's it.

2      Q     Did you take both of those last night?

3      A     I did.

4      Q     Are these medications that you use on a

5   daily basis from time to time?

6      A     I do.

7      Q     "Daily basis"?

8      A     I do.

9      Q     Okay.  Do you take any other prescription

10  medications?

11     A     This morning, yes.

12     Q     What did you take this morning?

13     A     Took Ritalin.  I'm thinking.  Fetzima.

14     Q     Any idea how that's spelled?

15     A     F-e-t-z-i-m-a.  A blood pressure med, which

16  I always forget the name.  And Dexilant.

17     Q     Do you know how that's spelled?

18     A     D-e-x-a-l-a-n-t [sic].

19     Q     And do you know why you were prescribed the

20  Ritalin?

21     A     I have ADHD.

22     Q     And Fetzima?

23     A     It is an antidepressant.

24     Q     And, if I say it correctly, Dexilant?

25     A     Acid reflux.

1    Q    And you do take your blood pressure

2  medicine?

3    A    I do.

4    Q    Do you take any kind of statin or anything?

5    A    No.

6    Q    Seems to be the number one --

7    A    That's --

8    Q    -- drug in America these days.

9    A    That's not the one.

10   Q    Okay.  Are there any other prescription

11 medicines that have been prescribed for you that you

12 have open prescriptions right now?

13   A    No.

14   Q    How long have you been taking Ritalin?

15         MR. ELLIOTT:  Well, I object.

16         I mean, we're getting beyond competency and

17 foundational questions:  How long has she been on the

18 pill?  I -- I don't think that's fair game.  I'd just

19 note my objection.

20         MR. BROWN:  Okay.  You can go ahead and

21 tell me.

22         THE WITNESS:  A year and a half.

23   Q    (By Mr. Brown)  All right.  And how long

24 have you been using Klonopin?

25         MR. ELLIOTT:  The same objection.

Page 307

1               THE WITNESS:  Ten years.

2       Q    (By Mr. Brown)  And doxepin?

3               MR. ELLIOTT:  The same objection.

4               THE WITNESS:  At least five years.

5       Q    (By Mr. Brown)  Have all these medications

6   been prescribed by the same doctor?

7               MR. ELLIOTT:  The same objection.

8               THE WITNESS:  They are all prescribed

9   by the same --

10               MR. ELLIOTT:  Whoa, whoa, whoa, whoa,

11   whoa.

12          You know, to get into communications about

13   prescriptions that she may have had with her personal

14   physician, I have a stronger objection to that.  I

15   don't think that that is a -- is a fair question that

16   can be asked in this deposition for two reasons:  one,

17   this deposition is being taken pursuant to a court

18   order, and it's a limiting order as to what subjects

19   can be inquired into; and, two, we're talking about

20   attorney- -- excuse me -- we're talking about patient-

21   physician communications.

22               MR. BROWN:  Well, I think it all goes

23   to her ability to testify to understand how long she's

24   been under treatment.  She can certainly --

25               MR. ELLIOTT:  You can ask that

Page 308

1    question.

2                    MR. BROWN:  You --

3                    MR. ELLIOTT:  I won't object to that

4    question.

5                    MR. BROWN:  Understanding how many

6    doctors she's seeing, and everything, is pretty basic,

7    David.

8            If you want to instruct the witness to not

9    answer something that's not a matter of privilege --

10                   MR. ELLIOTT:  I know how to do that.

11

12                        (Ms. Todd-Trotta is now

13                          present.)

14

15                   MR. BROWN:  Yeah.  Well, since we're

16   trying to limit the time of the deposition and not

17   take our time up with pointless colloquy about a

18   simple question --

19                   MR. ELLIOTT:  Okay.  It's not

20   pointless.

21                   MR. BROWN:  Well, it serves no point.

22   The motions aren't argued amongst us here.

23                   MR. ELLIOTT:  No.  The point about it

24   being a limited deposition pursuant to a Court order

25   is not at all pointless.  You know, it's not at all

Page 309

1      pointless.

2          Q     (By Mr. Brown)  Are you seeing one doctor?

3          A     Yes.

4          Q     And all the medications that you happen to

5      be on and how they interact together, or anything,

6      there would be one doctor who is aware of what all

7      you're taking and would know about that?

8          A     Yes.

9          Q     Okay.  There is -- well, strike that.

10              Let me ask this.  If I understand your prior

11     testimony, after your son died, there was at least one

12     occasion where you looked at his cell phone?

13         A     Yes.

14         Q     Was it more than one occasion?

15         A     I don't recall.

16         Q     From the time you did look at his cell

17     phone, you had to charge it first?

18         A     I believe we did.

19         Q     Who is the "we"?

20         A     My husband.

21         Q     So you and your husband looked at the phone

22     together?

23         A     While he was in the room.

24         Q     And what room was this?

25         A     It was our bedroom.  Our bedroom.

1       Q     Your bedroom?

2       A     (The witness nods.)

3       Q     And is that where you had been keeping his

4    cell phone?

5       A     Yes.

6       Q     Was there a special place you had it?  Was

7    it in a drawer or on a shelf?

8       A     We kept it between the mattresses, between

9    the box spring and the mattress.

10       Q     And why did you choose to keep it there?

11       A     It seemed like a safe place.  It was close

12    to me.

13       Q     Was it under the mattress on your side of

14    the bed?

15       A     No.

16       Q     Was it in the middle?

17       A     No.  It was on Fred's side.

18       Q     It was on Fred's side.  And you testified

19    before that you'd looked at some text messages on the

20    phone; is that right?

21       A     I did.

22       Q     How many text messages did you go through?

23       A     Probably five or six.

24       Q     Were there any ones that you were looking

25    for in particular?

```
1      A    No.

2      Q    Did you look at the most recent ones?

3      A    I did.

4      Q    You saw some text messages from yourself?

5      A    There were some from me.

6      Q    Do you remember any of them that you saw?

7      A    There were some from his friends.

8      Q    And do you recall which of his friends?

9      A    Some of the friends, I didn't even know.

10     Q    Did you look at pictures on the phone?

11     A    I did not.

12     Q    You didn't check to see if there's any

13  pictures of him that you yourself didn't already

14  have?

15     A    No, I didn't.

16     Q    Was there anything else you looked at on his

17  phone?

18     A    No.

19     Q    Did you listen to any voice messages?

20     A    Yes, I did.

21     Q    What voice messages did you listen to?

22     A    There were mine, and there were some from

23  his friends after the fact.

24     Q    After they knew he was dead --

25     A    Yes.
```

Page 312

1      Q    -- friends left messages for him?

2      A    Yes.

3              MR. ELLIOTT:  Just read that question

4    back, please.

5

6                        (The last two questions and

7                        answers were repeated by the

8                        reporter.)

9

10             MR. ELLIOTT:  Thank you.

11     Q    (By Mr. Brown)  Did you listen to those

12   messages?

13     A    Yes.

14     Q    Do you remember anybody those were from?

15     A    Pardon me?

16     Q    Was it a -- do you remember -- do you

17   remember any particular friends who left messages?

18     A    Not -- not particularly, but I know they

19   were friends of his.

20     Q    Did you see anything on the phone that you

21   thought would be embarrassing for your son?

22     A    Not at all.

23     Q    Do you have any sense of -- well, let me ask

24   you this.  Was Fred looking at the phone, too, while

25   you were looking at it?

1      A     No.

2      Q     What time of day was it?

3      A     I would say evening.

4      Q     Was it bedtime?  Was it dinnertime?

5      A     Between dinner and bed.

6      Q     Did Fred stay in the room while you looked

7   at the phone?

8      A     May have been in and out.

9      Q     And once you got done looking at the phone,

10  did you put it back under the mattress?

11     A     I did.

12     Q     To your knowledge, did you ever look at the

13  phone a second time?

14     A     No.

15     Q     Did there come a time when you went to try

16  to look at the phone and it wasn't there?

17     A     I did.

18     Q     When was that?

19     A     This past weekend.

20     Q     Have you talked to anybody about what

21  happened to the phone?

22     A     Yes.

23     Q     Who did you talk to?

24     A     Fred and I have discussed it.

25     Q     Do you know what happened to the phone?

Page 314

1    A    I have no idea what happened to the phone.

2    Q    What did Fred tell you?

3    A    He thought it was where I had left it.

4    Q    Did you talk to your sons about the phone?

5    A    I did.

6    Q    And tell me about those conversations.

7    A    They said they had no idea.  They hadn't

8  seen it since the day of the accident.

9    Q    Did you talk to anybody else about the

10  whereabouts of the phone?

11    A    I did.  I asked -- I'll call her my

12  "cleaning friend," a woman who used to clean our

13  house.

14    Q    Did she see the phone?

15    A    She said she had no idea where it was.

16    Q    Was she aware that the phone was beneath the

17  mattress?

18    A    I don't believe so.

19    Q    Do you and Fred ever turn your mattress over

20  or flip it or rotate it?

21    A    We do.

22    Q    Since the time you turned the phone on, did

23  you ever turn the mattress over and know that the

24  phone was there?

25                MR. ELLIOTT:  "Since" -- I'm sorry,

Page 315

1  Dennis.  "Since the time" --

2            MR. BROWN:  -- she actually took it out

3  and charged it up and turned it on.

4            MR. ELLIOTT:  Thank you.

5            THE WITNESS:  Well, there were more

6  than one -- there was more than one phone there.

7  There were four phones, and I assumed one was

8  Christian's.

9       Q    (By Mr. Brown)  What were the four phones

10  that were there?

11      A    Old phones that had been replaced.

12      Q    Were they all your son's phones?

13      A    None of them were his.

14      Q    Were any of them phones he had used?

15      A    No.

16      Q    But one of them was a phone he had used;

17  correct?

18      A    Well, the one -- his phone wasn't one of

19  those four.

20      Q    Okay.  So at some point in time it was his

21  phone and four other phones under the mattress.

22      A    Well, I'm not sure how many other phones

23  were there at any given point, but I was pretty

24  certain his was there.

25      Q    Well, at one point you knew for sure it was

Page 316

1    there; correct?

2         A    Right.  And so I never worried about it

3    because I thought it was safe and sound.

4         Q    When you turned it on, you knew it was his

5    phone; right?

6         A    Yes.

7         Q    And the other phones, were those phones your

8    husband had used?

9         A    Two were Fred's and one was mine.  No.

10   Three were Fred's and one was mine.

11        Q    And were these all similar kinds of phones,

12   or were they different?

13        A    They all were very, very similar.  They were

14   all Apple 5 phones.

15        Q    Do you have any idea how long it's been

16   since you flipped the mattress?

17        A    No.

18        Q    Six months?

19        A    Oh, probably longer than that.  I -- I

20   really don't recall.

21        Q    At least the last time you were involved in

22   flipping mattresses, were there still phones

23   underneath of it?

24        A    There were phones.

25        Q    And did you have to start charging phones

1    and turning them on to try to figure out if one of

2    them was Christian's phone or not?

3         A    Over this past weekend, yes.

4         Q    Is that the first time you tried to do

5    that?

6         A    Yes.

7         Q    And how many phones were there this past

8    weekend?

9         A    Four.

10        Q    And none of those were your son's phone?

11        A    No.

12        Q    And is this past weekend the first time you

13   started charging those phones up to try to know for

14   sure whether his phone was there?

15        A    I believe so.

16        Q    Is there anyone else you talked to about the

17   phone being missing?

18        A    No.

19        Q    Is there anyone else who would have had

20   access to that room and under the bed to take the

21   phone?

22        A    No.

23        Q    I apologize.  I probably already asked

24   this.  After the first time you charged it up and

25   looked at it, there was never another occasion where

Page 318

1    you tried to have a look and couldn't find it there?

2         A    No.

3         Q    Before this past weekend, had anyone ever

4    asked you to look for and try to find the phone?

5         A    They may have asked me if I knew where the

6    phone was, and I said, "Yes, I know where it is."

7         Q    But this weekend would have been the first

8    time you knew for sure that the phone was not there.

9         A    Yes.

10                  MR. ELLIOTT:  I am going to assume

11   that you're excluding conversations with counsel.  If

12   that -- if I'm wrong about that --

13                  MR. BROWN:  Well, I haven't asked her

14   about her conversations with you --

15                  MR. ELLIOTT:  Right.

16                  MR. BROWN:  -- because I wouldn't do

17   that.

18                  MR. ELLIOTT:  Understood.  Understood.

19        Q    (By Mr. Brown)  And without saying any

20   conversation, has your counsel ever been in that

21   bedroom?

22        A    No.

23        Q    Any reason to believe one of the lawyers

24   involved took the phone?

25        A    No.

Page 319

1      Q    Was it your plan to keep the phone because

2    it had been your son's?

3      A    Absolutely.

4      Q    And I assume you'd like the phone back.

5      A    I would love the phone back.

6      Q    Since the last time you looked at the phone,

7    have you had overnight houseguests, or anything, in

8    the house?

9      A    We've had some.

10     Q    Relatives?  Friends?

11     A    Both.

12     Q    Have you talked to any of those people about

13   taking the phone?  I know it seems kind of odd, but --

14     A    No, I haven't.

15     Q    Now, after the first day of your deposition,

16   there were a number of corrections and changes you

17   made to the transcript.

18          Do you remember that?

19     A    Yes.

20     Q    Was there anybody who helped you do these?

21     A    I read it or my attorneys read it, and

22   we -- some of it was -- just didn't make any sense as

23   written as I was reading it.

24              MR. BROWN:  I know we've got a lot more

25   people here than we've got copies, but we should

Page 320

1    probably go ahead and mark this.

2              This will be 13?

3                    THE REPORTER:  Yes.

4                    MS. TODD-TROTTA:  What exhibit is that?

5                    MR. BROWN:  13.  You're here to chip in

6    now.

7                    MS. TODD-TROTTA:  I'm used to not

8    getting copies.  It's okay.

9                    MR. BROWN:  I told Steve to not make

10   enough copies; there will be nothing to talk about.

11            I probably have more copies, I would think.

12

13                         (An off-the-record discussion

14                          was held.)

15

16                         (Exhibit 13, Correction Sheets,

17                          was marked for identification.)

18

19       Q    (By Mr. Brown)  Go ahead and have a look at

20   that.

21       A    (The witness complies.)

22       Q    Do you remember filling that out and signing

23   it?

24       A    Yes.

25       Q    And there were a number of things as you

1    read the transcript that you thought were confusing --

2        A    Yes.

3        Q    -- that needed to be changed?

4        A    Yes.

5        Q    All of these things that are listed as

6    changes --

7        A    Yes.

8        Q    -- did all of these come from you?

9        A    Yes.

10       Q    Did anybody else suggest to you any answer

11   should be changed or wasn't correct?

12       A    I don't believe so.

13       Q    We'll go through some of these, but I think

14   language is very tricky in depositions and ends up

15   being correct.  It's just hard to make sure some days

16   we're all on the same page using words.

17            Your home has a three-car garage; is that

18   correct?

19       A    It does.

20       Q    And was the red BMW and your son, where he

21   was working under it, in the center --

22       A    Yes.

23       Q    -- bay of the garage?

24            Okay.  And when you and your husband came

25   home, how did you come into the house?

Page 322

1      A    We walked in through the front door.

2      Q    Was your son left-handed or right-handed?

3      A    Right-handed.

4      Q    And that was about 3:30?

5      A    Approximately.

6      Q    I know some of these answers have had to be

7   straightened out.  But at that time you were wondering

8   where your son was; is that right?

9      A    Well, we had assumed that he was on his way

10  to pick up his brother who was away at school.

11     Q    Had you been trying to call and text to

12  confirm that?

13     A    Well, not immediately.

14     Q    When, to the best of your memory?

15     A    It was probably -- it was shortly after we

16  got home:  3:35, 3:40.  It wasn't very long after we

17  got home.

18     Q    And is the laundry room near the garage?

19     A    It's fairly close.

20     Q    Does -- the hallway or passageway to the

21  garage, is the laundry room off that?

22     A    Well, it's around the corner from that.

23     Q    Did you go in the kitchen when you first

24  came home?

25                MR. ELLIOTT:  Well, I'm going to

Page 323

1    object.

2           Let me say that there's a limiting order

3    that applies to this deposition.  That order says --

4    that order and the discussion that counsel had is that

5    this area of inquiry at this deposition is limited to

6    changes that the witness made to the errata sheet.

7           Secondly, that inquiry concerning matters

8    already inquired about was inappropriate, that ground

9    that had already been plowed would not be plowed

10   again, colloquially.

11          And so -- I'll have some latitude here, but

12   unless these questions are limited to changes to the

13   errata sheet, I'm going to have a problem, and there

14   will be an instruction not to answer.  I just want to

15   let you know that.

16               MR. BROWN:  Well, go ahead and have the

17   problem.  I was at the court conference with

18   Magistrate Fitzsimmons, and I don't know anything

19   about what you're talking about in that recitation --

20               MR. ELLIOTT:  That's fine.

21               MR. BROWN:  -- of the limitation you

22   just gave.

23               MR. ELLIOTT:  Fine.

24               MR. ZAKRZEWSKI:  In fact, I recall

25   Magistrate Fitzsimmons expressly said that we could

Page 324

1    inquire into what was observed on the day of the

2    incident, at the conference where you --

3                    MR. BROWN:  If we needed more time --

4                    MR. ZAKRZEWSKI:  -- were not present.

5                    MR. BROWN:  -- we should call her on

6    the phone and tell her and not end for the day.

7                    MR. ELLIOTT:  Is it -- is it --

8                    MR. WEXLER:  What was the last thing

9    you said?

10                   MR. BROWN:  She said there "Don't -- if

11   you need more time, get me on the phone.  Don't just

12   all go home" --

13                   MR. ELLIOTT:  Okay.

14                   MR. BROWN:  -- "if you need another

15   half-hour or something."

16                   MR. WEXLER:  She said that, but she

17   also said what David is saying about the scope of this

18   deposition.  She made it crystal-clear that she didn't

19   want a repeat of the first deposition or a rerun of

20   the topics covered.

21         The only reason, in my perception, of what

22   Magistrate Fitzsimmons did was because she believed

23   you were entitled to understand why changes were made

24   to the transcript.  And in addition to that, she did

25   allow questions on the cell phone, which Mr. Elliott

Page 325

1    permitted you to ask today.

2          So I really -- for sure, she didn't want a

3    second deposition, and I would go so far as to say, if

4    necessary, we should call her.  Because if you're

5    going to use this as a second opportunity, it would

6    be, in my, again, perception, because I was at the

7    conference, a misuse of this whole proceeding.

8              MR. BROWN:  She certainly said we were

9    open to inquire further about what was observed that

10   day and try to get a clearer record.

11             MR. WEXLER:  Well, so far you haven't

12   asked what was observed that day.

13             MR. BROWN:  I --

14             MR. WEXLER:  You asked about the way

15   she went in and all kinds of repetitive stuff from her

16   earlier deposition.

17             MR. BROWN:  Nothing repetitive from her

18   first deposition.  I asked her if she went into the

19   kitchen when she got home.

20             MR. ELLIOTT:  Which was asked in the

21   first deposition, but --

22             MR. WEXLER:  Which does not have to do

23   with what she observed.

24             MR. ELLIOTT:  Let's move on, please.

25             MS. TODD-TROTTA:  Just for the record,

Page 326

1    my recollection, because I have attended everything,

2    is the same as co-defendants' counsel; that we needed

3    to get clarification and we were open to

4    clarification.

5              MR. ELLIOTT:  Let's move along.  Let's

6    see what the questions are.

7        Q    (By Mr. Brown)  Well, the real question is:

8    When you first came in the house, did you go in the

9    kitchen or anywhere where you could hear that the

10   dryer was running?

11       A    I -- I dropped the keys in the entranceway,

12   and I looked over towards the -- towards the left side

13   of my house, and that's where the garage door is, and

14   the -- around the corner would be the laundry room,

15   and I saw piles of laundry, so --

16       Q    Do you remember noticing that the dryer was

17   going?

18       A    I know I had mentioned that to the officer,

19   who was -- after we had found Christian, but I don't

20   think that was possible, as I -- when I went over that

21   sheet, I think I was mistaken about the dryer running.

22       Q    And so I can understand, if I'm at the

23   street looking into the garage, so looking --

24              MR. BROWN:  And we can do it, I

25   suppose, this way.  I mean, I had Steven make me a

Page 327

1    picture of a car.

2              Why don't we go ahead and mark this as 14.

3

4                        (Exhibit 14, Outline of Car

5                        with Indications Added After

6                        Being Marked, was marked for

7                        identification.)

8

9        Q    (By Mr. Brown)  And just so I can understand

10   it, if this is the car -- the front of the car, the

11   rear of the car -- and it's sitting in that middle bay

12   of your garage, the door into the house would be this

13   way?  On this side?

14       A    On that side.

15       Q    Okay.

16       A    But not there.  On this side over here.

17                 MR. ELLIOTT:  I have the same objection

18   I had a moment ago, which is that this is beyond the

19   scope of the limitation imposed by the Court on this

20   deposition.

21                 MR. BROWN:  And we understand that you

22   have that standing objection to every --

23                 MR. ELLIOTT:  Well, no.

24                 MR. BROWN:  -- question I'll ask --

25                 MR. ELLIOTT:  It's not necessarily a

Page 328

1    "standing."

2              MR. BROWN:  -- about her observations.

3              MR. ELLIOTT:  It's not necessarily --

4              MR. BROWN:  Okay.

5              MR. ELLIOTT:  -- a "standing."

6    Q    (By Mr. Brown)  Okay.  And I know there was

7    some confusion about pawls and pump jacks and things.

8         But at some point around four o'clock, you

9    happened to go out and look in the garage?

10   A    Yes.

11   Q    Okay.  And can you tell me what you saw?

12             MR. ELLIOTT:  The same objection.

13             You can answer.

14             THE WITNESS:  I opened the garage door,

15   and I was standing on the top step, and I saw halogen

16   lights that were still on, which surprised me.

17             I thought "Wow, he forgot to turn the lights

18   off.  That's unusual."

19             And then I realized that the garage lights

20   were on.  I thought "That's unusual."

21             And then from the top step, I looked again

22   towards the halogen lights, and I could see

23   Christian's legs sticking out from the front of the

24   car.

25   Q    (By Mr. Brown)  And the halogen lights

Page 329

1    were --

2         A    Right about --

3         Q    -- here?

4         A    -- there.

5              There's another staircase that goes down

6    into the house.

7         Q    Okay.  I'll write on this rather than make

8    you do it.

9              There was a staircase down that, it looks

10   like, goes to the basement?

11        A    Right.

12        Q    Okay.

13        A    And a door down there.

14        Q    And the halogen lights were --

15        A    -- at an angle.

16        Q    Now, could you see any of him except for his

17   legs?

18        A    Nothing but his legs.

19        Q    Okay.  And they were out the front of the

20   car?

21        A    They were straight out the front of the car.

22        Q    And I know this is distressing to have to go

23   back to.

24             But was it his feet?  Was it from his knees

25   down?  His thighs down?

Page 330

1      A     I'd say from his knees down.

2      Q     And can you show me whereabouts they were?

3      A     Pretty much right coming out the middle of

4   the front.

5      Q     Coming out the middle of the front?

6      A     Uh-huh.

7            MR. ELLIOTT:  The record ought to

8   reflect that on this exhibit counsel is making

9   drawings on the exhibit, not the witness, and it's

10  not to scale, and it should be reflected that these

11  are not the -- these are not the witness' markings.

12           MR. BROWN:  That's fine.  I think

13  that's good to do.

14     Q     (By Mr. Brown)  And it's not to scale.  It's

15  not exactly right.  But it was somewhere near the

16  middle of the car.

17     A     Yes.

18           MR. ELLIOTT:  Objection to the form.

19     Q     (By Mr. Brown)  And were you still on the

20  steps when you saw his legs?

21     A     I was on the top step.  I was still inside

22  the house.

23     Q     Did you go into the garage at that point?

24     A     No.

25     Q     What did you do at that point?

Page 331

1      A     I started calling his name:  "Christian,

2   Christian, answer me.  Answer me."

3           I thought he forgot what time it was.

4      Q     And what did you do when he didn't answer?

5      A     I turned around and went back into the

6   house.  And then there's a couple of flights -- a

7   couple steps to the -- to the foyer, and I stood at

8   the bottom of the staircase going upstairs and called

9   my husband to come down.

10      Q     Do you remember what you did next?

11      A     He may have asked me why.

12           And I said, "Christian is here, and there's

13   something wrong."

14           And he came flying down the steps, and I

15   went looking for a house phone to call 911.

16      Q     And did your husband go to the garage while

17   you were calling 911?

18           MR. ELLIOTT:  You know, I object to

19   this again.  There's nothing clarifying about these

20   questions.

21           You agree with me, and, for the sake of

22   argument, I'll agree with you, you can ask a question

23   to clarify an observation.  There's nothing clarifying

24   about this question or any of the last ones.  There's

25   no inconsistency that's been demonstrated between the

Page 332

1    two sets of testimony.

2           This is exactly what the Court, in my view,

3    prohibited, which is asking the same questions again

4    and not clarifying in any way, shape, or form what

5    this witness observed.

6                 MR. BROWN:  I think the Court's biggest

7    concern is the amount of time that's been wasted with

8    your speaking objections, when there's no need for

9    that under --

10                MR. ELLIOTT:  I don't think so.

11                MR. BROWN:  -- the Federal Rules of

12   Evidence.

13                MR. ELLIOTT:  I don't think so.

14                MR. BROWN:  So whether you think it

15   leads to something clarifying or not, I don't really

16   care.

17                MR. ELLIOTT:  No.  What I care about is

18   making a record to call the Court, and you can say

19   whatever you want about that.

20                MR. BROWN:  Did you hear my last

21   question?  I'm just trying to understand exactly what

22   was happening when and what happened next.

23                MR. ELLIOTT:  Would you mind reading it

24   back, please?

25

Page 333

1                        (The last question was repeated

2                         by the reporter.)

3

4                  MR. ELLIOTT:  And note my objection.

5     Thank you.

6                  THE WITNESS:  Yes.

7        Q    (By Mr. Brown)  Okay.  Now, you were able to

8     reach 911, and then you went back to the garage

9     yourself; is --

10       A    I was --

11       Q    -- that correct?

12       A    -- calling and talking and walking at the

13    same time.

14       Q    When you went back and -- got back to the

15    garage, what did you observe?

16                 MR. ELLIOTT:  The same objection.

17                 THE WITNESS:  My husband was calling to

18    Christian.  I saw him pick up the handle to the floor

19    jack, put it in, screw it in or tighten it in, and

20    then I watched as he jacked the car off of my son.

21       Q    (By Mr. Brown)  And where was the floor

22    jack?

23       A    The floor jack was parallel to the car,

24    right -- right about -- right -- right between kind of

25    the doors, close to -- the wheel well was parallel --

Page 334

1    the jack, and the handle.

2              MR. BROWN:  And the witness has pointed

3    to a spot parallel to the passenger's side doors of

4    the car.  I'll just draw a nonscale representation.

5         Q    (By Mr. Brown)  Is that approximately where

6    the floor jack was where I've made this --

7         A    Yes.

8         Q    -- drawing?

9              And do you know if the lifting end -- which

10   end was pointing which way?

11        A    The lifting end was towards the -- the

12   outside garage doors, and the part where the handle

13   goes was facing the door where I was standing, or

14   facing the back wall of the garage.

15        Q    Was there a tire placed on the ground under

16   the passenger front side of the car when you came

17   back?

18        A    I don't --

19              MR. ELLIOTT:  The same objection.

20              THE WITNESS:  -- recall.  I don't

21   recall.

22        Q    (By Mr. Brown)  And was the jack setting on

23   its wheels, the pump jack?

24        A    Can you repeat that?

25        Q    Was it setting on its wheels?

Page 335

1      A     Yes.

2      Q     Okay.

3      A     It was flat on the floor.

4      Q     Do you remember seeing a jack stand?

5      A     Not at that time.

6      Q     Okay.  So your husband took -- put the

7   handle in the pump jack and raised the car up off your

8   son?

9      A     He did.

10     Q     Okay.  Where were you standing while he was

11  doing that, approximately?

12     A     I was -- I went down to the -- to the bottom

13  step.  I was still standing.  I was -- had moved down

14  a couple of steps.

15     Q     Okay.  You were still near the door into the

16  garage?

17     A     Yeah.  That staircase is in -- in the

18  doorway.  I was not standing on the garage floor.

19     Q     Oh.  You were still on the stairs?

20     A     I was, but I was on the bottom step.

21     Q     Okay.  That's --

22     A     I had moved down.

23     Q     Okay.  At that point as he lifted the car,

24  could you see Christian more clearly?

25     A     I could.

Page 336

1      Q    You could see him from the side?

2      A    I could see his face, yes.

3      Q    And that's why you're on the bottom step?

4  You could see his face?

5      A    I could, but --

6              MR. ELLIOTT:  Objection to the form.

7              "You can see his face because you were on

8  the bottom step?"

9              MR. BROWN:  No.

10             MR. ELLIOTT:  Oh, okay.

11             MR. BROWN:  I'm trying to --

12             MR. ELLIOTT:  Objection to the form.

13             MR. BROWN:  -- place where she was in

14  the physical world when she saw it jacked up and was

15  able to see her son's face.

16             MR. ELLIOTT:  Objection to the form.

17     Q    (By Mr. Brown)  Did your husband go under

18  the car at that point?

19     A    He went one way, yeah.  He went through the

20  front of the car.  Underneath the front of the car.

21     Q    Okay.  So -- and did he pump -- use the pump

22  jack and raise the car from the passenger's side?  Is

23  that where he used --

24     A    I'm not --

25     Q    -- the jack?

Page 337

1    A    -- really sure where the -- where the pump

2    jack was.

3    Q    Did your husband put a jack stand under the

4    car before he went under it?

5    A    I don't know that.

6    Q    But he came around and crawled in under the

7    front?

8    A    He did.  He went that way, and I went in

9    through the wheel well.

10    Q    Okay.  And was he to the passenger's side of

11    your son?

12    A    I -- I don't know how -- what he was doing.

13    I was very concerned about being able to --

14    Q    Sure.

15    A    Had 911 still on the phone --

16    Q    They were still --

17    A    -- and they wanted to know --

18    Q    -- on the phone?

19    A    Yes.

20    Q    Okay.  Somewhere up here towards the front

21    of the car, Fred was crawling under the car?

22    A    Yes.  He had --

23    Q    Okay.

24    A    -- grabbed a jacket and --

25    Q    And you came under the car at the wheel

                                          Page 338

1    well?

2                    MR. ELLIOTT:  Objection to the form;

3    asked and answered.

4                    THE WITNESS:  Yes.  But to the back of

5    the wheel well.

6         Q    (By Mr. Brown)  To the back of the wheel

7    well?  So it was somewhere around where the --

8         A    Behind the --

9         Q    -- door opening, the --

10        A    No.

11        Q    -- mirror would be?

12        A    It was closer to --

13                   MR. ELLIOTT:  Let him -- let him

14   finish --

15                   THE WITNESS:  Oh.

16                   MR. ELLIOTT:  -- the question.

17        Q    (By Mr. Brown)  Go ahead.  Just --

18        A    That was --

19        Q    -- tell me where it was.

20        A    It was -- it was close -- it was close to

21   where you open the door.  That was the back of the

22   wheel well.

23        Q    Yeah.

24        A    Was not that far.

25        Q    Not that far back?

Page 339

1     A     No.  It was -- it was -- it was, like, where

2     the door opens, like.

3     Q     Like here?

4     A     Yeah.

5     Q     All right.  I'm going to draw an "X" and put

6     a circle around it and draw a little line over it and

7     just put "Lynne."

8              That's about your best estimate of where you

9     went under the vehicle?

10    A     Yes.

11             MR. ELLIOTT:  Yeah.  And I have the

12    same objection as I -- I won't repeat it over and over

13    again -- that counsel is making these markings on the

14    document, not the witness.

15             MR. BROWN:  That's fine.

16             The witness had pointed to a point near --

17    on this gross representation, a car, about where the

18    door would open up.

19    Q     (By Mr. Brown)  To the best of your

20    knowledge, is that "X" with a circle going to "Lynne"

21    about your best guess of where you crawled under

22    the --

23    A     Yes.

24    Q     -- car?

25             And as you crawled under the car along this

Page 340

1   passenger's side there, you could see your son's face?

2       A    I could.

3       Q    And could you see your husband?

4       A    No.

5       Q    I believe -- I've seen some of the records,

6   and maybe you can clarify it for me.  Was there a

7   discussion about whether you should try to get him out

8   from the car yourselves or not?

9       A    No.

10      Q    Were you still under the car when the first

11  responders got there?

12      A    No.

13      Q    Once you were under the car, could you see a

14  jack stand?

15      A    I wasn't looking for the jack --

16      Q    Sure.

17      A    -- stand.  I was -- I was focused entirely

18  on Christian's face.

19      Q    Was he breathing when you crawled under the

20  car?

21      A    I -- I couldn't tell.  I was looking for

22  his -- I was trying -- looking for a pulse, so I was

23  going for his jugular.

24      Q    You reached your hand up to his juggler?

25      A    Yes.

1      Q    And I believe you said you believe you felt

2   a pulse?

3      A    Yes.

4      Q    And I know you're focusing on his face.

5   You've reached up to his jugular.

6           Was that with your right hand?

7      A    Yes.

8      Q    Having found a pulse, did you get out from

9   under the car then?

10     A    I was still talking to 911 while I was under

11  the car feeling for the pulse.

12     Q    And you have no specific recollection of

13  where your husband was under the car while you were

14  making --

15     A    Well, I --

16     Q    -- this call and --

17     A    -- I knew that he was -- he was -- had gone

18  the other way, through the front -- underneath the

19  front of the car.  So he was on top of Christian, I

20  assumed, because it really -- or next to him or --

21  there wasn't that much room.

22          And I -- I know he had taken -- I heard him

23  say he was going to take a jacket and put it over

24  Christian.  There was one hanging in the garage.  And

25  we were both talking to Christian.

Page 342

1      Q    And what caused you to get out from

2   underneath the car?

3      A    When I heard the sirens of the first

4   responders.

5      Q    And as they arrived, Christian was still

6   under the car?

7      A    Christian was still under the car.  I had

8   gotten out to open the garage doors.

9      Q    Thank you.  That's helpful.  So all three

10  garage doors were closed when you got home.

11     A    They were.

12     Q    As you were opening the garage doors and the

13  sirens and -- I guess police and an ambulance were

14  arriving?

15     A    Well, as soon as I heard them close, that's

16  when I got up to open the garage doors.  Because I

17  didn't have shoes on, didn't have a jacket on, and it

18  was fairly cold outside.

19     Q    Was your husband still under the car?

20     A    My husband was still under the car.

21     Q    Was he still under the car when the first

22  responders came into the garage?

23     A    I don't know that.  I didn't see him come

24  out.

25     Q    Did you see them move your son's body out

Page 343

1    from beneath the car?

2        A    He did not because --

3        Q    Not -- I'm not saying your husband.

4            I'm just saying:  Were you there when they

5    moved his body out --

6        A    No.

7        Q    -- from under the car?

8        A    The responders?

9        Q    Yeah.

10        A    No.

11            MR. ELLIOTT:  Would you just please

12    read back the last couple of questions and answers?  I

13    lost track of the back-and-forth.

14

15                            (The proceedings contained on

16                            Page 342, Line 25, through

17                            Page 343, Line 10, were

18                            repeated by the reporter.)

19

20            MR. BROWN:  Well, I think we both got

21    lost, so I think we ended up knowing what we were

22    talking about.

23        Q    (By Mr. Brown)  Were you -- were you still

24    in the garage when -- if it was the first responders

25    or whoever, were you present when your son's body got

Page 344

1    moved out from underneath the car?

2        A    I was not.

3        Q    When you crawled under the car to see your

4    son's face and try to take his pulse, was there a tire

5    on the floor of the garage to your right?

6        A    I don't know.

7        Q    What did you do after you opened the garage

8    doors?

9                MR. ELLIOTT:  The same objection to the

10   form, in terms of the limited nature of the inquiry.

11               You can answer.

12               THE WITNESS:  The bay -- the outside

13   doors.

14               MR. BROWN:  Yes.

15               THE WITNESS:  I stood there waiting for

16   somebody to come in.

17       Q    (By Mr. Brown)  Do you remember who got

18   there first?

19       A    I do.

20       Q    And who is that?

21       A    That was a firefighter named Don Chapman and

22   his son Kyle, who was a junior firefighter, I believe.

23       Q    And what did they do when they arrived?

24       A    We were --

25               MR. ELLIOTT:  The same objection as

Page 345

1    before, limited nature of the deposition.  Thank you.

2              THE WITNESS:  We were talking.  I told

3    them Christian was under the car, but I had a pulse,

4    and I knew that they had called -- the dispatcher had

5    called Life Star to land at Harkness Park, and that's

6    what I told them.

7         Q    (By Mr. Brown)  Did Mr. Chapman or his son

8    go under the car?

9         A    I did not see them do that.

10        Q    Did you remain by the outdoor door of the

11   garage at that time waiting for --

12        A    No -- well, I don't -- I don't know where I

13   was.  I was still in the garage.

14        Q    Were you in the garage when the EMTs

15   arrived?

16        A    I really don't know who came next.  I don't

17   know if it was the police or the EMTs.  All of a

18   sudden the garage was crowded.

19        Q    Did you leave the garage at some point?

20        A    Yes.  I was asked to leave.

21        Q    Who asked you to leave?

22        A    I believe it was a Waterford police officer.

23        Q    And did you go in the house?

24        A    He asked me to go in and put my shoes on

25   and --

1     Q    To the best of your recollection, when he

2   asked you that and you went back in the house, they

3   had not yet gotten Christian out from underneath the

4   car?

5     A    They had not.

6     Q    During that time period you were in the

7   garage once you'd come back with 911 on the phone, up

8   until the policeman asked you to leave, did you notice

9   any jack stands?

10     A    I wasn't looking anywhere but Christian's

11   face.  I knew that his cheekbone was broken, and I'm

12   thinking "Okay.  We need a plastic surgeon."

13        I really thought he was just knocked out

14   cold, so that's what was going through my head.  I

15   knew he was alive because I had a pulse.

16     Q    When you crawled under the car, were you

17   close to where the pump jack had been put under the

18   car?

19     A    I don't know that for sure.  I don't recall

20   where that was.

21     Q    And was there any other time you were in the

22   garage while Christian was still there?

23     A    No.

24     Q    Did you go out the front door of the house?

25     A    I did.

Page 347

1      Q    Okay.  And when you crawled under the car,

2   was Christian's face turned towards you?

3      A    Yes, it was.  It was looking over his right

4   shoulder.

5      Q    And in the greater scheme of things, that

6   would have been him looking toward the passenger's

7   side of the car?

8      A    No.  He was looking like this.  He was

9   actually focusing -- oh, his eyes were closed, but his

10  hand was on -- he was -- he was looking that way, so I

11  could see his full face.

12              MR. ELLIOTT:  She -- she isn't really

13  getting what you're saying because you're kind of

14  mumbling a little bit.

15              THE WITNESS:  Oh, I'm sorry.

16              MR. ELLIOTT:  So could you kind of keep

17  your voice up, please?

18              THE WITNESS:  Okay.  Where would you

19  like me to start?

20              MR. ELLIOTT:  I understand.  So think

21  about the answer and then answer.

22              THE WITNESS:  Christian was on the

23  floor looking over his right shoulder, sort of focused

24  on a bolt or something, I'm assuming.  His eyes were

25  closed.

Page 348

1     Q   (By Mr. Brown)  And that would have been --

2  he was -- his body was on its back and his head was

3  turned --

4     A   -- to --

5     Q   -- towards the passenger's side where you'd

6  come in?

7     A   Yes.

8     Q   And you say he had his hand up?

9     A   His hand was up.  His right hand was up.

10    Q   Was his body still on the -- the wooden

11  creeper?

12    A   I didn't notice anything under him.

13          MR. BROWN:  Why don't we take a quick

14  break.  He's about out of tape, and I think I'm almost

15  done anyway.

16          MR. ELLIOTT:  Okay.

17          MR. BROWN:  So it will probably be a --

18  a dual-purpose time to stop.

19          THE VIDEOGRAPHER:  Okay.  This will be

20  the end of tape 2 [sic].  Going off the record.  The

21  time would be approximately 10:25.

22

23             (A brief recess was taken from

24             10:25 to 10:45 a.m.)

25

Page 349

1              (Mr. Wexler has stepped out of

2                   the deposition.)

3

4              THE VIDEOGRAPHER:  We are back on the

5    record.  This is the beginning of tape 2.  The time is

6    approximately 10:45.

7              You may continue.

8         Q    (By Mr. Brown)  I'm going to have you look

9    at Exhibit 14, which is our picture of the car.

10             And based on where the feet were, I'm

11   assuming that your son's face was somewhere near the

12   middle of the car?

13        A    Yes.

14        Q    Is that what you remember?

15        A    Yeah.  I could see it very clearly when I

16   was under there, through the -- well, through the

17   front, passenger wheel well.

18        Q    Okay.  And can you maybe just point for me?

19        A    Probably right --

20        Q    Right in here?

21        A    Right in there.

22        Q    We'll just --

23        A    Yeah.  It was -- it was -- he was in the

24   middle of the car.

25             MR. BROWN:  I'm just drawing a square

Page 350

1  where the witness put her finger.

2      Q    (By Mr. Brown)  And I assume to check his

3  pulse, you actually remember having to get your head

4  under the car and reach up?

5      A    Yes.  Because I had the phone in my left

6  hand, and my right hand went right -- as I was staring

7  down at him.

8

9                    (Mr. Wexler has returned.)

10

11     Q    (By Mr. Brown)  Were you on your stomach

12  crawling under the car --

13     A    No.  I was --

14     Q    -- or on your back?

15     A    I was kind of -- no.  I was crouched down,

16  and I was able to get underneath there.  Fred had

17  jacked the car up enough for me to -- to fit

18  underneath.

19     Q    And do you remember how you first came into

20  possession of Christian's phone?  Did the -- was it in

21  the house?

22     A    When somebody first asked me about the

23  phone, I thought it was in his -- the pocket of his

24  jeans.  That's where I would have put it.

25              And his friend Jordan and my other two sons

1    said, "No.  We never work on a car with our phones in

2    the pocket.  He would have taken it out and put it on

3    the car in the next bay," which surprised me.

4         Q     Was there a car in the next bay?

5         A     There was a car in the next bay.

6         Q     And what kind of car was that?

7         A     A DeLorean.

8         Q     And was the DeLorean on the other side of

9    the BMW from the steps out of the house?

10        A     No.

11        Q     It was closer to the house.

12        A     It was close to the house.

13        Q     And where did you actually find the phone?

14        A     Somebody brought it in from the garage after

15   we got back from the hospital.

16        Q     How did you start keeping old phones under

17   the bed?

18        A     I don't know.  I think it -- I thought maybe

19   it -- it had been with Christian's and then these

20   other ones just kind of joined it, but I'm not really

21   sure, except that I was -- I was really sure that

22   that's where his was.

23        Q     Are you the one who put it there originally?

24        A     Probably.

25        Q     Did Christian have a computer or a laptop?

1      A     Yes.

2      Q     Do you still have that?

3      A     Well, while we were looking for the phone,

4  we were looking for the laptops.  He has two, and I --

5  I don't know where they are either.

6      Q     Do you know if he ever synced his phone with

7  one of his laptops?

8      A     I don't know that.

9      Q     Have you talked to anyone in the family

10 about what happened to the laptops?

11     A     I don't know -- at some point we did.

12     Q     Did you speak to your sons about whether

13 they had -- either one of them had gotten the laptops?

14     A     Well, we had looked at -- at a laptop at one

15 point, but we didn't know his password, so that was an

16 issue.

17     Q     Well, sometime after his death, there was --

18 his laptop was still in the house?

19     A     Yes.  Both of them.

20     Q     You say he had two.  Was one older than the

21 other?  Did he --

22     A     No.  One was -- one was his Apple, which he

23 preferred, but he was a student at UConn, and the

24 business department required everybody to have the

25 same, whatever kind it was.

Page 353

1            MR. BROWN:  I don't have any further

2     questions for you.

3            If Erica has anything --

4            MS. TODD-TROTTA:  I have a couple.

5            THE VIDEOGRAPHER:  Do you want to

6     switch sides?

7

8                    (An off-the-record discussion

9                     was held.)

10

11                 CROSS-EXAMINATION

12

13     BY MS. TODD-TROTTA:

14        Q    Good morning, Mrs. Klorczyk.  My name is

15     Erica Todd-Trotta.  Just a few follow-up questions.

16            You had mentioned Christian's girlfriend at

17     the time?

18        A    Yes.

19        Q    And she had indicated that there were plans

20     to be married?

21        A    Yes.

22        Q    Was she ever in the house with -- alone,

23     like, with Christian's cell phone?

24        A    No.

25        Q    And your bed at home, is it a king-sized

Page 354

1   bed?

2        A    Yes.

3        Q    And the box spring, is it two twins?

4        A    Yes.

5        Q    Okay.  When you looked under the bed, did

6   you remove the mattress and look in between the two

7   box springs?

8        A    Fred took the bed apart recently --

9        Q    Okay.

10       A    -- all the way down to the floor.

11       Q    Okay.  So everything was removed.

12       A    Right.

13       Q    And you haven't had the box springs or any

14  new mattresses or anything --

15       A    No.

16       Q    -- like that --

17            Okay.  Is there any other safe place that

18  you put the cell phones?

19       A    I looked everyplace --

20            MR. ELLIOTT:  Did you --

21            THE WITNESS:  -- else.

22            MR. ELLIOTT:  -- say "cell phones"?

23            MS. TODD-TROTTA:  "Cell phone" or

24  "phones."

25       Q    (By Ms. Todd-Trotta)  Well, it appears under

Page 355

1    the bed there's -- there were at least four.

2         A    Right.

3         Q    And is there another place where one might

4    keep a cell phone in your house?

5         A    I -- I took a chance that I might have put

6    it somewhere else, and so I did look over the weekend

7    every place that I could think besides asking

8    everybody that I thought might know.

9              We have a Curio cabinet that has all of

10   Christian's memorabilia in it.  I looked in there.

11             I looked in all of the couches and chairs

12   that had cushions that I could reach into.

13             I looked in his room, through the drawers,

14   and anyplace I could think of because that occurred to

15   me that I hadn't seen the laptops either.

16        Q    Okay.

17        A    And I didn't find anything.

18        Q    And at this time were you syncing to The

19   Cloud at all?

20        A    No.

21        Q    And this past weekend was the first weekend

22   that you basically scoured the house looking for the

23   phone?

24        A    Well, our attorneys had asked us earlier,

25   for the first deposition, about the -- about the

Page 356

1    phones, and so we had looked then and had them -- had

2    it.  He only had one.

3           And I don't think anybody -- I don't

4    remember if anybody asked us about the laptops, but I

5    had asked about the laptop just because anything --

6    anything that belongs to somebody who has died who was

7    close, this is precious.

8           And, you know, we had -- we had a laptop.

9    We just couldn't get into it, and then I don't know

10   what happened to the laptop.

11          And the phones, I wish we had given to our

12   attorneys for safekeeping, but I was pretty sure that

13   they were in a secure location --

14   Q    Okay.

15   A    -- that it was in a secure location.

16   Q    So at the first deposition you definitely

17   knew you had Christian's phone.

18   A    I did.

19   Q    Do you recycle your cell phones at all?

20   A    No, no.  We still have the service -- we're

21   still paying for service on his phone.

22   Q    Okay.  Do you recall Christian's cell phone

23   number?

24   A    (860) 961-4793.

25   Q    Did Christian's cell phone have any

Page 357

1  discerning characteristics from all your other cell

2  phones?

3          Like, for example, mine has a blue case,

4  and  --

5      A    No.

6      Q    They all look the same.

7      A    They all look the same.

8      Q    And there were no special cases?

9      A    No.  He said they were too big for his

10  pocket.

11      Q    Okay.  And no different colors.

12      A    No.

13              MS. TODD-TROTTA:  I have no further

14  questions.

15              MR. BROWN:  And I'm going to need about

16  10 minutes.

17              MR. ELLIOTT:  I have a few questions.

18              MR. BROWN:  Yeah.  That's fine.

19              MR. ELLIOTT:  Do you want me to wait?

20              MR. BROWN:  No, no.  Go ahead.

21              MR. ELLIOTT:  Okay.  All right.

22              MR. BROWN:  I can always have another

23  turn after you're done.

24              MR. ELLIOTT:  Okay.  Fine.

25

1                     CROSS-EXAMINATION

2

3     BY MR. ELLIOTT:

4          Q     Mrs. Klorczyk, on the -- on the -- I want to

5     ask you some questions about the cell phone,

6     Christian's cell phone.

7                     THE VIDEOGRAPHER:  Could you put the

8     mic a little closer.

9          Q     (By Mr. Elliott)  I want to ask you some

10    questions about Christian's cell phone.

11         A     Okay.

12         Q     After he died, did you know it was important

13    to preserve the phone?

14         A     Yes.

15         Q     Okay.  Was it your intention to preserve the

16    phone?

17         A     Yes.

18         Q     Was it your intention to lose the phone?

19         A     Absolutely not.

20         Q     Whatever has occurred with respect to the

21    phone, did that take place through any intentional act

22    of yours?  Did you get rid of it on purpose for any

23    reason?

24         A     Absolutely not.

25         Q     Okay.  When did you know it was missing?

Page 359

1    When did you know that Christian's phone was missing?

2        A    When the attorneys asked us to produce it,

3    and --

4        Q    Is that after your first deposition?

5        A    Yes.

6        Q    Okay.  And did you look for it?

7        A    I did.  I went right to where I thought it

8    was.

9        Q    And it wasn't there.

10       A    And it wasn't there.

11       Q    To your knowledge, did your husband

12   Frederick do anything intentionally to dispose of

13   Christian's phone?

14       A    Absolutely not.

15       Q    To your knowledge, did your husband

16   Frederick have -- was he aware of the importance of

17   preserving the phone?

18       A    Yes.

19            MR. ELLIOTT:  Has the annotated diagram

20   been marked, Mr. Brown?

21            MR. BROWN:  Yeah.  That's an exhibit.

22   14.

23            MR. ELLIOTT:  Thank you.

24       Q    (By Mr. Elliott)  In Exhibit 14, which is

25   the document that you were shown where certain

Page 360

1   markings were made by Mr. Brown -- do you understand

2   what I'm referring to here? --

3       A    Yes.

4       Q    -- okay, you placed a location of the pump

5   jack, which Mr. Klorczyk, I think you testified, used

6   to raise the vehicle on the passenger's side of the

7   vehicle --

8       A    Yes.

9       Q    -- at about the middle of the vehicle?

10      A    No.  It wasn't the middle.

11      Q    Where was it?

12      A    It was -- it was closer to the front of

13  the -- of -- because I needed space to get under --

14  through the -- through the wheel well.

15      Q    Okay.  And did Mr. Klorczyk use the pump

16  jack or floor jack -- I'll use those

17  interchangeably -- to initially lift up the vehicle?

18      A    Yes.

19      Q    And did the -- did that permit you to gain

20  access to the underside of the vehicle?

21      A    Yes.

22      Q    Once you were under the vehicle, you've

23  testified that you were very focused on the condition

24  of your son's body and his --

25      A    Yes.

1    Q    -- his well-being, essentially.

2    A    Yes.

3    Q    And you at some point reached for his pulse.

4    A    Yes.

5    Q    Okay.  And you felt a pulse.

6    A    I did.

7    Q    Okay.  As of the time that those events

8  occurred in the garage while you were under the

9  vehicle, was the pump jack still elevating the

10  vehicle?

11   A    Yes.

12   Q    You were asked a question -- and I

13  apologize.  I forget the time frame, but let's just

14  take it this way.

15        At any time that you were in the garage,

16  from the time that you gained access to the underside

17  of the BMW to the time that you withdrew from that

18  position, remained in the garage for a while, and then

19  exited the garage, did you see a jack stand?

20   A    Yes.

21   Q    And approximately where did you see that

22  jack stand?

23   A    It was on the passenger's side in the front

24  of the car, under -- under the car.

25             MR. ELLIOTT:  Do you want to just write

Page 362

1    it down, or do you want to take a break?

2                    MR. WEXLER:  One second.

3                    THE VIDEOGRAPHER: Your microphone.

4            Do you want to stay on the record?

5                    MR. WEXLER:  No.

6                    MR. ELLIOTT:  No.

7                    THE VIDEOGRAPHER:  Going off the

8    record.  The time would be approximately 11:03.

9

10                           (A brief recess was taken from

11                            11:03 to 11:05 a.m.)

12

13                    THE VIDEOGRAPHER:  We are back on the

14   record.  The time is approximately 11:05.

15            You may continue.

16                    MR. ELLIOTT:  I have no further

17   questions.

18

19                    REDIRECT EXAMINATION

20

21   BY MR. BROWN:

22        Q    Okay.  Lynne, I asked you, I think, three

23   different questions about seeing a jack stand, and the

24   record will speak for itself, but you were focused on

25   your son, didn't see one.  Now you say you saw a jack

Page 363

1    stand.

2            Did something happen to refresh your memory?

3        A    After I came out -- you didn't ask me about

4    what I was doing -- well, you did ask me about after I

5    came out.

6            But it was after I was out waiting for

7    somebody to do something, the responders, that I was

8    able to really take a better look underneath the car.

9        Q    And where did you see this jack stand?

10       A    The jack stand was in the -- was in the

11   front section, passenger's section, of the car.

12       Q    Go ahead and --

13       A    Can I --

14       Q    -- make an "X" where you saw it.

15       A    Oh, it was kind of where the -- where the --

16   where the -- now, wait a minute.

17           It would have -- it would have just been in

18   the -- in the front, passenger's side.

19           This wheel well, now that I'm looking at it,

20   is -- is back kind of far, but -- that was, like, the

21   back of the wheel well, but the -- the jack stand was

22   more up here.

23           I didn't really look -- didn't even notice

24   it until I got back out from under the car, when the

25   responders were there and we were just kind of

Page 364

1  standing around.

2      Q    The responders were there and standing --

3      A    They were --

4      Q    -- around --

5      A    They were kind of filtering in, you know,

6  coming in, and I was just kind of standing there,

7  saying, you know, "Is somebody going to do something?"

8          And that's when I had the opportunity to

9  really take a look at it.  Everything else --

10      Q    Can you make an "X," to the best of your

11  ability, where you saw the jack stand?

12              THE WITNESS:  Mr. Elliott?

13              MR. ELLIOTT:  Yeah.  Again, this is not

14  to scale, and it's -- it's --

15              THE WITNESS:  I would say --

16              MR. ELLIOTT:  -- it's a guess, as far

17  as --

18              THE WITNESS:  I would say --

19              MR. ELLIOTT:  -- I'm concerned.

20              THE WITNESS:  -- kind of here, which is

21  where the wheel well was.

22          I know I told you it was back there further,

23  but it's not.  The wheel well was up closer.  Couldn't

24  have been in the middle of the car.  I don't know what

25  I was thinking.  But it's closer up here.

1      Q     (By Mr. Brown)  And you've made a very small

2  "X."  I'll draw a circle around it and --

3      A     So I don't know if you want to adjust --

4      Q     "JS" for "jack stand."

5      A     I don't know if you want to adjust, like,

6  where the -- the wheel well wasn't quite back that

7  far.

8      Q     Well, this is where you thought you had

9  crawled under --

10     A     Right.

11     Q     -- the car.

12     A     Well, I did crawl --

13     Q     You think it was --

14     A     -- into the wheel well.

15     Q     -- more forward?

16     A     I think it was -- it was more forward than

17 that, yeah.

18     Q     Okay.  Was it more towards, like, where the

19 mirror would be --

20     A     But I --

21     Q     -- on the car?

22     A     I don't remember the -- you know, the mirror

23 being in my way, or anything like that, but it could

24 not have been in the middle of the car.  That doesn't

25 make sense.  So it would have had to have been further

Page 366

1   up.

2                   MS. TODD-TROTTA:  Can I just have

3   clarification as to the "it"?

4                   MR. ELLIOTT:  What?

5                   MR. BROWN:  The point where she crawled

6   under the car.

7                   THE WITNESS:  Where -- the part where I

8   crawled under.

9                   MS. TODD-TROTTA:  She referred to it as

10  "it," and I wasn't --

11                  THE WITNESS:  The "wheel well," "it."

12                  MR. ELLIOTT:  Hold on a second.

13          Is this on the -- are you mic'd up?  Are you

14  on the record?

15                  MS. TODD-TROTTA:  There's -- no.

16                  MR. ELLIOTT:  Was any of that on the

17  record?

18                  THE VIDEOGRAPHER:  I could hear it.

19                  MR. ELLIOTT:  Yeah.  Okay.

20      Q    (By Mr. Brown)  And you have no recollection

21  if the pump jack was to your left or your right as you

22  crawled under the car?

23      A    The pump jack was -- was more to the --

24  was -- had to have been in front of me.  I mean --

25      Q    In front of you?

1     A    To the right to me -- to the right of me.

2     Q    Towards the front of the car.

3     A    Towards the front of the car, yeah, as it

4  was pumped up.

5     Q    Okay.  So it would have been to your right,

6  towards the front of the car.

7     A    Yes.

8     Q    Okay.  And the jack stand was beneath the

9  car, but to the right of the pump jack when you saw

10  it?

11     A    Please repeat that.

12     Q    Well, you crawled out from under the car --

13     A    Uh-huh.

14     Q    -- opened the garage door; correct?

15     A    Yes.

16     Q    And you were waiting for people to come, and

17  people started coming.

18     A    Yes.

19     Q    Well, at some point you walked back to where

20  these people were standing around, and that's when you

21  could see --

22     A    That's when I finally noticed it.

23     Q    -- the jack stand.

24          Okay.  And was the jack stand between the

25  pump jack and the front of the car?

Page 368

1      A    I don't know, but I could see it clearly.

2      Q    What can you see clearly --

3      A    I mean, I could see the --

4      Q    -- in your --

5      A    I could see the -- I could see the jack

6   stand under there, under the right, front passenger's

7   side of the car.

8      Q    Was the jack stand lifted up at all, the bar

9   that comes up in the center?

10     A    No.

11     Q    Was the jack stand sitting flat on its

12  four feet?

13     A    No.

14     Q    What --

15     A    It was tilted over.

16     Q    The jack stand was on its side?

17     A    Yeah.

18     Q    Was the bar in the middle all the way in or

19  partway out?

20     A    I believe it was all the way down.

21     Q    Is that how you see it in your mind?

22     A    Yeah.

23     Q    And how many people were in the garage when

24  you could see it?

25     A    Five, six.  I mean, it was -- it was getting

1   crowded.  That's when people would start coming in,

2   and I was kind of --

3       Q    And had you been back by the open garage

4   door as the people came in?

5       A    I was, and then I kept moving back into the

6   garage as they were coming in.

7       Q    And was there a time where you stood around

8   with all these people wandering, or did they pretty

9   promptly ask you to go --

10      A    Well, I was waiting --

11      Q    -- in the house?

12      A    -- for them -- for somebody to take a look

13  at Christian and see what -- see what was going on,

14  and they were just kind of -- I don't know who they

15  were waiting for, but it didn't take very long for the

16  officer to ask me to go inside and put my shoes on.

17      Q    So where at least the policeman was there by

18  then --

19      A    Policeman was -- oh, yeah.  The ambulance

20  was there.

21      Q    Mr. Chapman and his son were there?

22      A    They were there, or they may have gone to

23  the back and somebody else was -- I was really

24  expecting an EMT to just come rushing in and -- and go

25  under, but nobody was doing that.

Page 370

1      Q     There were EMTs there.

2      A     There were EMTs there.  There was an

3   ambulance there.  There was a fire truck there and

4   police cars there.

5      Q     So there were also firemen in the garage?

6      A     There was -- everybody -- I don't -- I can't

7   tell you how many of -- who -- or who exactly was in

8   the garage, but I know that there were -- I could see

9   the vehicles outside, and people were coming in from

10  the outside.

11     Q     I assume in day-to-day life there's been a

12  number of occasions that your husband has been alone

13  in your bedroom and could have took the phone and

14  you'd have no personal knowledge?

15                  MR. ELLIOTT:  Objection to the form.

16                  THE WITNESS:  Probably.  Possibly.

17     Q     (By Mr. Brown)  Have there been a number of

18  occasions where either of your sons could have

19  accessed that room and nobody would have known it and

20  took the phone?

21     A     I would say possibly, but doubtful.

22     Q     Did your sons know the phones were under the

23  bed?

24     A     I don't even know.

25     Q     And is there anyone other than your husband

1    who knew the phones were under the bed that you know

2    of for certain?

3         A    No.

4         Q    When you talked to your woman who helps you

5    clean sometimes, did she know the phones were under

6    the bed?

7         A    No.

8         Q    And the last time you remember seeing the

9    Apple computer, where was it in the house?

10        A    It was -- it was downstairs.  I don't know.

11   Living room?  Family room?  We were all standing

12   around trying to guess what his password was.

13        Q    And that's your husband and your sons?

14        A    And -- and his friend -- his friend Jordan

15   was there and -- both of my sons might -- might have

16   been there.  We were all trying to figure out what it

17   was, and then I'm guessing I just -- I put it down,

18   and then -- you know, it could be stacked up --

19        Q    Have you tried to find it since then?

20        A    I have.

21             MR. BROWN:  I have no further

22   questions.

23             MS. TODD-TROTTA:  I just have a few.

24

25

Page 372

```
 1                    (An off-the-record discussion
 2                    was held.)
 3
 4              RECROSS-EXAMINATION
 5
 6  BY MS. TODD-TROTTA:
 7      Q    And, Mrs. Klorczyk, I apologize for going
 8  over --
 9              THE VIDEOGRAPHER:  If you could wear
10  that, please.
11              MS. TODD-TROTTA:  You heard me when I
12  was all the way down there.
13      Q    (By Ms. Todd-Trotta)  Mrs. Klorczyk, I
14  apologize for going over this again, but being all the
15  way down there, and there's all "X"s and "O"s on this.
16          Just to be clear, the jack stand, if this is
17  the rear wheel well --
18      A    No.  "Front wheel well."
19      Q    -- the front wheel well of the car, the jack
20  stand is what's "JS" here?
21      A    Yes.
22      Q    Okay.  And the pump jack was also in that
23  area?
24      A    Yes.
25      Q    Okay.  So the pump jack, when your husband
```

Page 373

1   pumped up the car, was it at a straight 90 -- was it

2   90 degrees?

3                     MR. ELLIOTT:  "90 degrees" to what?

4                     MS. TODD-TROTTA:  To the car.

5                     THE WITNESS:  I don't know that.

6        Q    (By Ms. Todd-Trotta)  Okay.  Do you remember

7   any position at all of the pump jack?

8                     MR. ELLIOTT:  Objection to the form.

9   It's been asked and answered.

10             Go ahead.

11                     THE WITNESS:  The pump jack was -- was

12  jacked up.  Had the car -- was holding the car up at

13  that point.

14                     MS. TODD-TROTTA:  Okay.

15                     THE WITNESS:  Well, had been used to

16  lift the car at that point.

17       Q    (By Ms. Todd-Trotta)  And you're certain

18  that the pump jack was not at the rear of that well.

19                     MR. ELLIOTT:  Well, could -- objection

20  to the form.

21             What are you -- what "well"?

22       Q    (By Ms. Todd-Trotta)  The pump jack was not

23  to the rear here of the -- of the wheel well.

24       A    I mean, I'm seeing -- how -- front quarter

25  passenger panel, if that makes sense.  The front

1    quarter passenger panel --

2         Q    I'm not -- I'm just asking you to direct

3    your attention towards the wheel well.

4         A    Yes, which is right --

5         Q    Which is --

6         A    -- in there.

7         Q    Which is right in --

8         A    Yeah.

9         Q    -- that area.

10        A    Yeah.

11        Q    Okay.  Was the pump jack in the front or in

12   the back?

13        A    I don't know.

14             MR. ELLIOTT:  Object to the form.

15             THE WITNESS:  Yeah.  I mean, I'm going

16   to say that the jack -- pump jack was probably closer

17   to the -- to the front, but --

18             MS. TODD-TROTTA:  Okay.

19             THE WITNESS:  Yeah.  I mean, my husband

20   was desperate to get that car off of him.

21             MS. TODD-TROTTA:  I understand.  I

22   understand.

23        Q    (By Ms. Todd-Trotta)  But you entered to

24   the rear of the wheel well.

25        A    Yes.

1      Q    Okay.

2                MS. TODD-TROTTA:  Could I have my

3    yellow pad there?

4                MR. ZAKRZEWSKI:  (Mr. Zakrzewski

5    complies.)

6                MS. TODD-TROTTA:  Thank you.

7      Q    (By Ms. Todd-Trotta)  When you saw the jack

8    stands -- when you testified on -- from your counsel's

9    questions, when you saw the jack stands, where were

10   you standing?

11     A    I was standing right around -- right around

12   here.

13     Q    In the middle of the car?

14     A    Uh-huh.

15                THE REPORTER:  That's "Yes"?

16                THE WITNESS:  Yes.  I'm sorry.  Yes.

17          And that was the first time I took another

18   look under the car that wasn't directed right at

19   Christian's face.

20     Q    (By Ms. Todd-Trotta)  So as the first

21   responders are coming in, you're walking up into the

22   garage with them?

23     A    Well, I kept getting pushed back into the --

24   further into the garage as more of them arrived.

25     Q    Okay.  And just a follow-up question as to

Page 376

1    the cell phones.

2            Where do your sons keep their old cell

3    phones?

4        A    Their own cell phones?

5        Q    Yes.  Where?

6        A    Currently?

7        Q    Their old ones.

8        A    Their old ones.

9        Q    Yes.

10       A    I don't know.

11       Q    Do you know if they still keep them?

12       A    No, I don't.

13       Q    Did you ask your sons as to whether or not

14   their old cell phones, if they still kept them, could

15   have gotten confused with Christian's?

16       A    I didn't.  But most of -- most of the time

17   they're getting a new phone, it's because they've lost

18   one; it's gone overboard in a boat or, you know, been

19   run over or totally destroyed.

20       Q    Okay.  So they don't keep any of their

21   old --

22       A    Well --

23       Q    -- cell phones.

24       A    -- I don't know that, but I asked them both

25   if they knew where Christian's phone was, and they

1   both said, "No."

2          And the only -- my only explanation that I

3   can think of is that I must have put it somewhere

4   else, but I don't know where that "somewhere else" is.

5          And as Christian's mother, that phone is

6   very, very important to me, for sentimental reasons,

7   because of, you know, his voice mail, you know, "Can't

8    take your call," or whatever he says, you know.

9          So that's important for me to keep, just for

10  my own, to hear his voice.  But I also know, and I

11  also was aware, that it was important to keep it as --

12  as -- to preserve the evidence.  And so there is no

13  way that it was deliberately destroyed, thrown out --

14      Q    Okay.

15      A    -- because I would like it back at some

16  point, and, you know, I keep thinking "Okay.  It's in

17  this house somewhere and it will show up at some

18  point," but I don't know --

19      Q    And at the --

20      A    -- when or where, because if I did, I would

21   go right to it.

22      Q    Okay.  At the time, in your family, did all

23  the cell phones look alike:  your husband's, yours,

24  and your other sons'?

25      A    They did.

Page 378

1      Q    Okay.

2      A    At least I believe they still do.

3      Q    Okay.  And just to be clear, you made no

4   inquiry from your other sons as to whether or not they

5   have any old cell phones.

6      A    Not if they have old ones, no, of their own,

7   no.

8           MS. TODD-TROTTA:  Okay.  I have no

9   further questions.

10          MR. ELLIOTT:  I just want to mark an

11  exhibit.  We need to mark as -- as a separate exhibit

12  a clean copy of what's now been marked as

13  Exhibit 14 --

14          MR. BROWN:  Sure.

15          MR. ELLIOTT:  -- because I think --

16  yeah, I think, Dennis, when you marked it, there were

17  no markings on it.

18          THE REPORTER:  Should I do "14-A," or

19  something like that?

20          MR. ELLIOTT:  Sure.  That's fine.

21          THE REPORTER:  Is that okay?

22          MR. ELLIOTT:  That's fine with me,

23  sure.

24

25

Page 379

1                       (Exhibit 14-A, Outline of Car,

2                        was marked for identification.)

3

4              FURTHER REDIRECT EXAMINATION

5

6   BY MR. BROWN:

7       Q     To try to follow up quickly.  With a lot of

8   Erica's questions, you guys are looking at the

9   picture, and it's hard to -- to keep track.

10              When you crawled under the car, you remember

11  the pump jack being to your right, towards the front

12  of the car; correct?

13      A     The pump jack, when I crawled -- right, to

14  my -- to my right.

15      Q     And at that time you didn't notice the jack

16  stand; correct?

17      A     No.  Because I was going in at the -- at the

18  back of the rear well.

19      Q     Okay.  And later, when there were four,

20  maybe five, six --

21      A     It's a big garage.

22      Q     -- firemen, policemen, various people in the

23  garage, you remember looking under the car and

24  noticing a jack stand towards the front of the

25  vehicle; correct?

Page 380

1      A    (The witness nods.)

2      Q    I'm sorry.  You have to --

3      A    Yes.

4      Q    -- answer.

5           Okay.  And to the best of your recollection,

6  that jack stand was laying on its side; right?

7      A    It was.

8

9      Q    And it hadn't been extended?

10      A    It was --

11           MR. ELLIOTT:  Objection to the form.

12           THE WITNESS:  It was not extended when

13  I saw it.

14      Q    (By Mr. Brown)  Okay.  And if you can

15  picture it in your mind, it has sort of a pyramid base

16  at the bottom?

17      A    Yes.

18      Q    And then it has the yellow bar that comes

19  out of the top?

20      A    (The witness nods.)

21      Q    Do you know which direction it was facing?

22      A    No.

23           MR. ELLIOTT:  Which direction what was

24  facing?  The stand?

25      Q    (By Mr. Brown)  We'll say the top of the

Page 381

```
 1    jack stand, do you know if it was facing to the
 2    driver's side, facing to the passenger's side?
 3         A    I'm not sure exactly which way it was going.
 4    I just know it was over on its side.
 5         Q    And when you noticed that, it was right
 6    before they asked you to go in the house and get your
 7    shoes and --
 8         A    Yeah.
 9         Q    Was your husband still in the garage at that
10    point?
11         A    I'm not sure where he was.
12         Q    And when you looked under and noticed the
13    jack stand, were there EMTs under the car?
14         A    No.
15         Q    There was nobody but your son --
16         A    There was --
17         Q    -- under the car?
18         A    -- only my son.
19              MR. BROWN:  Thanks.  I have nothing
20    further.
21              Well, hold on.  Maybe I do.
22         Q    (By Mr. Brown)  Now, at the time you saw the
23    jack stand, I think you just told me Christian was the
24    only one under the car?
25         A    Yeah.
```

Page 382

1      Q    And was the jack stand towards the

2   passenger's side of the car from him?

3      A    I don't know.

4                MR. ELLIOTT:  Objection to the form.

5                THE WITNESS:  I don't know.  Is this --

6   I remember this being over.

7      Q    (By Mr. Brown)  Are you certain you saw the

8   jack stand underneath the car?

9      A    Yes.

10     Q    Okay.  But you don't remember if -- which

11  side of Christian's body it was on?

12     A    Which side of Christian's body?

13     Q    Yeah.

14     A    Oh, of his body?  It was --

15     Q    Toward the passenger's side?

16     A    Oh, yes.  Of his body, yes.

17          Oh, I didn't know that's what you were

18  asking me.  All right.  Yes.

19     Q    And I -- the "left" or "right" doesn't work

20  with cars in garages.

21     A    Okay.

22     Q    So "passenger's side of the car" --

23     A    Yes.  It was --

24     Q    -- is the reference I'm --

25     A    It was --

Page 383

1       Q    -- trying to give.

2       A    It was, yeah, on the passenger's side,

3   uh-huh.

4               MR. ELLIOTT:  I have no questions.

5               MS. TODD-TROTTA:  I have no questions.

6               MR. BROWN:  Thanks.

7               THE VIDEOGRAPHER:  Okay.  This will

8   conclude today's deposition.  We're going off the

9   record.  The time will be approximately 11:26.

10              THE REPORTER:  And who will be

11  retaining the original exhibits?

12              MR. ELLIOTT:  What have we been doing

13  with that?

14              MS. TODD-TROTTA:  I think they have

15  gone with whatever questioning counsel in the past.

16              MR. BROWN:  Yeah.

17              MR. ELLIOTT:  Yeah.

18

19          (The videotape deposition of Lynne Klorczyk

20  concluded at 11:27 a.m. on this 12th day of July,

21  2016.)

22

23                    * * * * * * *

24

25

Page 384

```
 1

 2

 3          I, Lynne Klorczyk, do hereby certify that

 4      the foregoing testimony is true and accurate to the

 5      best of my knowledge and belief.

 6

 7

 8      --------------          ---------------------------
            DATE                          NAME

 9

10

11          At _____ in said County of

12      _____, this _____ day of

13      _____, _____, personally appeared

14      Lynne Klorczyk, and she made oath to the truth of the

15      foregoing answers by her subscribed.

16

17      Before me, _____, Notary Public.

18

19

20          My Commission Expires: _____

21

22

23

24      Job No. CS2332250

25
```

Page 385

1          CORRECTION SHEET

2          I, the undersigned, Lynne Klorczyk, do

3  hereby certify that the following corrections and

4  additions are true and accurate to the best of my

5  knowledge and belief.

6

7  Page      Line        Correction/Reason

8  _____     _____     _____

9  _____     _____     _____

10 _____     _____     _____

11 _____     _____     _____

12 _____     _____     _____

13 _____     _____     _____

14 _____     _____     _____

15 DATE:            SIGNED:_____

16

17          At _____, in said

18 County of _____, this _____ day

19 of _____, _____, personally appeared

20 Lynne Klorczyk, and she made oath to the truth of the

21 foregoing corrections by her subscribed.

22

23 Before me, _____, Notary Public.

24 My Notary Expires: _____.

25 Job No. CS2332250

1                    STATE OF CONNECTICUT

2          I, Jill I. Hudon, a notary public duly

3    commissioned and qualified in and for the State of

4    Connecticut, do hereby certify that pursuant to notice

5    there came before me on the 12th day of July, 2016,

6    the following named person, to wit:  LYNNE KLORCZYK,

7    who was by me duly sworn or affirmed to testify to the

8    truth and nothing but the truth; that she was

9    thereupon carefully examined upon her oath and her

10   examination reduced to print under my supervision;

11   that this deposition is a true record of the testimony

12   given by the witness.

13          I further certify that I am neither attorney

14   nor counsel for nor related to nor employed by any of

15   the parties to the action in which this deposition is

16   taken, and further, that I am not a relative or

17   employee of any attorney or counsel employed by the

18   parties hereto, or financially interested in this

19   action.

20          IN WITNESS THEREOF, I have hereunto set my

21   hand this 22nd day of July, 2016.

22

23   _____
              Jill I. Hudon, Notary Public
24            LSR #00082
     My Commission Expires:
25   October 31, 2016

```
                                                         Page 387

                          Veritext Legal Solutions

   1                  290 W. Mt. Pleasant Ave. - Suite 3200

   2                      Livingston, New Jersey 07039

                    Toll Free: 800-227-8440  Fax: 973-629-1287

   3

   4   July 22, 2016

   5   To: David J. Elliot, Esq.

   6   Case Name: Klorczyk, Frederick Jr. v. Sears Roebuck

   7   Veritext Reference Number: 2332250

   8   Witness:  Lynne Klorczyk        Deposition Date:  7/12/2016

   9

       Dear Sir:

  10

       Enclosed please find a deposition transcript.  Please have the witness

  11   review the transcript and note any changes or corrections on the

       included errata sheet, indicating the page, line number, change, and

  12   the reason for the change.  Have the witness' signature at the bottom

       of the sheet notarized except in California where they are signing

  13   under penalty of perjury and forward the errata sheet back to us at

       the address shown above.

  14

  15

  16   If the jurat is not returned within thirty days of your receipt of

  17   this letter, the reading and signing will be deemed waived.

  18

  19

  20   Sincerely,

  21

  22   Production Department

  23

  24   Encl.

  25   Cc:  Dennis O. Brown, Esq.
```

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.