# EXHIBIT V



Deposition of:

# Eric J. Boelhouwer , Ph.D.

*March 9, 2017*

In the Matter of:

# Klorczyk vs. Sears

## Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 1

1                  UNITED STATES DISTRICT COURT

                    DISTRICT OF CONNECTICUT

2

3

       FREDERICK KLORCZYK, JR.,

4      as co-administrator of the

       Estate of Christian R.

5      Klorczyk, et al.,

6                  Plaintiffs,

                                       Civil Action File No.

7           vs.

                                       3:13-cv-00257-JAM

8      SEARS, ROEBUCK & CO., et al.,

9                  Defendants.

10

11

12

13

14

15     VIDEOTAPED DEPOSITION OF ERIC J. BOELHOUWER, PH.D.

16

17                  March 9, 2017 - 9:40 a.m.

18

19                  3455 Peachtree Road, NE

20

21                       Suite 1500

22

23                     Atlanta, Georgia

24

25                  J. David Brown, B-1401

Eric J. Boelhouwer , Ph.D.                          March 9, 2017
Klorczyk vs. Sears

Page 68

1    instructions in addition to the other areas that we

2    have identified to address the hazards that they

3    have concerns about as it relates to their product.

4    BY MR. ZAKRZEWSKI:

5        Q.   But if they have tested the product and

6    the product has been used and they don't have a

7    concern about a hazard, they haven't identified a

8    hazard, do they still have a duty to warn?

9        A.   Your question is premised on testing.

10   Not all hazards are addressed by testing.  There

11   can be other means of hazard -- a process by which

12   individuals may identify hazards associated with

13   their product.  It is not specifically and only

14   limited to testing.

15       Q.   What would those other means and methods

16   be?

17       A.   There's desktop analysis you can perform

18   whereby you would perform a process hazard

19   analysis.  You would evaluate not just -- you could

20   identify potential hazards that may occur as it

21   relates to the use of the -- foreseeable use of the

22   products.

23            MR. WEXLER:  No question pending.  I want

24   to make a general statement that the word duty has

25   a lay meaning and a legal meaning.  And your

Page 68

Eric J. Boelhouwer, Ph.D.                    March 9, 2017
Klorczyk vs. Sears

Page 69

1   question regarding the duty of a manufacturer

2   doesn't differentiate in any manner.  So when

3   you're talking about duty, if you're talking about

4   legal duty, there's case law that exists regarding

5   that, there are standards that exist regarding

6   that.  If you're talking about lay duty, then I

7   think your question should reflect that.

8   BY MR. ZAKRZEWSKI:

9        Q.   As I used the word duty in several

10  questions, which I did, didn't I?

11       A.   Yes, sir I believe so.

12       Q.   Do you understand what that word means?

13       A.   Generally in a lay context, yes, sir.

14       Q.   What's your understanding of what that

15  word means?

16       A.   Generally in my field I use the term

17  responsibility to distinguish it from the legal

18  meaning of the word duty.

19       Q.   So you like to use the word

20  responsibility?

21       A.   Generally, yes, sir.

22       Q.   And what does that mean to you?

23       A.   I don't have a dictionary in front of me.

24  But that would be -- I would defer to the

25  dictionary definition.

Page 69

Eric J. Boelhouwer , Ph.D.                    March 9, 2017
Klorczyk vs. Sears

Page 75

```
 1       A.    Generally speaking, yes, I would agree
 2   that a substantial danger is required but that
 3   danger is not limited just to physical harm to
 4   individuals.   There can be property damage.   There
 5   could be a variety of things that could be
 6   considered to be damage.
 7       Q.    But you agree with that formulation,
 8   substantial danger, correct?
 9       A.    Generally, yes, sir.
10       Q.    And what does that mean to you,
11   substantial danger?
12       A.    Again, it is going to depend on your
13   evaluation of the hazards associated with that
14   product and the potential consequences associated
15   with that particular hazard for that specific
16   product.
17       Q.    So for this specific product you think
18   that the tip-to-tip phenomenon is a substantial
19   danger?
20       A.    Based on my understanding of the testing
21   performed by Mr. Heath and that the potential for
22   this hazard to occur has been identified by other
23   manufacturers prior to the time of this incident,
24   yes, sir, it does appear that the -- if the jack
25   stand may suddenly collapse or slip, then that's a
```

Page 75

Eric J. Boelhouwer , Ph.D.                    March 9, 2017
Klorczyk vs. Sears

Page 76

```
 1   substantial danger, yes, sir.

 2        Q.   Are you aware of any other incidents

 3   of -- well, a phenomenon you just described, how

 4   would you like to refer to it?  Tip-to-tip

 5   phenomenon, is there something else you'd like to

 6   call it?

 7        A.   However you wish to proceed.  Tip to tip,

 8   false engagement, whatever terminology you'd prefer

 9   is fine.

10        Q.   Well, let's just false engagement.  Would

11   you be comfortable with that terminology?

12        A.   That is reasonable, yes sir.

13        Q.   We'll need to talk about it a fair bit

14   and we don't want to say a paragraph every time.

15   So are you aware of any other false engagement

16   incidents other than the one alleged in this

17   action?

18        A.   I am aware that other manufacturers are

19   choosing to warn about this potential false

20   engagement as it relates to similar designed jack

21   stands, yes, sir.

22        Q.   So we'll definitely come back to that.

23   But my question is a little bit different.  It is

24   are you aware of any other specific incidents of

25   false engagement other than the one that is alleged
```

Page 76

Eric J. Boelhouwer, Ph.D.                    March 9, 2017
Klorczyk vs. Sears

Page 77

1    in this action?

2         A.    As it relates to the subject jack stands,

3    I do not know.  I am not aware of any others as it

4    relates to the subject jack stands.

5         Q.    So when you said the subject jack stands,

6    do you mean Model 50163 Craftsman?

7         A.    That's my understanding of the subject

8    jack stands in this matter.

9         Q.    So are you aware of any specific

10   incidents of false engagement of other models of

11   jack stands?

12        A.    I don't have a specific recollection as I

13   sit here, no, sir.

14        Q.    So now, going back two answers -- and

15   this is I think something you have talked about a

16   few times now -- it is important to you that other

17   models of jack stands seem to include a warning or

18   an instruction that you think gets at this

19   potential hazard of false engagement, correct?

20        A.    Yes, sir.  To the extent that this

21   potential hazard may have been identified by other

22   manufacturers prior to the time that the subject

23   jack stands were sold, I do believe that's a basis

24   for my opinions.

25        Q.    Do you know what information those

Eric J. Boelhouwer , Ph.D.                    March 9, 2017
Klorczyk vs. Sears

Page 80

1        Q.   The PALD standards, which organization
2   are those promulgated by?
3        A.   The American Society of Mechanical
4   Engineers.
5        Q.   It's probably helpful to keep that out
6   because we'll come back to it.  We'll come back to
7   it in a little while.
8            So turning back to your opinion or your
9   report, Exhibit 11, page 3.  Let's look at your
10  second opinion.  So you say that the subject
11  Craftsman professional heavy-duty jack stands are
12  unreasonably dangerous because they lack adequate
13  and appropriate warnings and instructions, correct?
14       A.   Yes, sir, those words appear on the page.
15       Q.   And you have three bullet points, kind of
16  subissues to identify why you think they lack
17  adequate and appropriate warnings and instructions,
18  correct?
19       A.   Yes, sir.  As it relates -- generally as
20  it relates to the hazard for the false engagement
21  identified by Mr. Heath as the first one.
22       Q.   I'm sorry, so you said the first bullet
23  point regards the false engagement phenomenon that
24  we have been discussing, correct?
25       A.   Generally, yes, sir.

Eric J. Boelhouwer, Ph.D.                      March 9, 2017
Klorczyk vs. Sears

Page 81

1        Q.    And you think that there should be a

2    warning on this point?

3        A.    Yes, sir, it is my opinion that there's

4    not any safety communication as it relates to this

5    hazard.

6        Q.    And you refer to a set of warnings

7    provided by Sealey Quality Machinery in the

8    operations section of their instructions and you

9    identify the model number, correct?

10       A.    Yes, sir.

11       Q.    Let's mark that as Exhibit 12.

12             (Defendant's Exhibit 12 marked)

13   BY MR. ZAKRZEWSKI:

14       Q.    Is this the instruction, that's

15   Exhibit 12, is this the instruction that's referred

16   to in your report?

17       A.    Yes, sir, it appears to be.

18       Q.    So your report seems to refer to a

19   specific instruction or warning that's listed on

20   this Exhibit 12?

21       A.    Yes, sir.

22       Q.    Can you tell me where it is on the page.

23       A.    Sure.

24       Q.    Where is it?

25       A.    Under the heading as identified in my

Page 81

Eric J. Boelhouwer, Ph.D.                    March 9, 2017
Klorczyk vs. Sears

Page 82

1    report Operations section, so that's Section 4,

2    Operation.  As we go down there's instruction 4.3

3    and underneath step 4.3 it provides a warning to --

4    I'm sorry.  Warning, exclamation point, ensure pawl

5    is fully engaged with teeth all in caps and there

6    appears to be a square with a shadow to the left of

7    the single word warning.

8              (Off-the-record discussion)

9    BY MR. ZAKRZEWSKI:

10         Q.   So it is your position that the product

11   manual for Model 50163 should have included that

12   warning that you just read from Exhibit 12?

13         A.   Should have identified the potential

14   hazard as it relates to this safety communication,

15   yes, sir.

16         Q.   Is that different than what I asked you?

17         A.   I believe it is a little different, yes,

18   sir.

19         Q.   How is that different?

20         A.   Here that they've identified using the

21   signal word warning and the exclamation point and

22   they're providing the avoidance to ensure that the

23   pawl is fully engaged with the teeth, so I think it

24   is a little different than what you asked.

25         Q.   So you think that Model 50163's manual

Page 82

Eric J. Boelhouwer, Ph.D.                    March 9, 2017
Klorczyk vs. Sears

Page 83

1    should have included a warning like this?

2        A.   As it relates to the subject jack stand,

3    a similar warning was not provided in the manual

4    that I reviewed.  And to the extent that the hazard

5    identified by Mr. Heath should be communicated,

6    this is another manufacturer who's identified a

7    similar potential hazard regarding the full

8    engagement of the pawl with the teeth prior to the

9    time that the subject jack stands were sold.

10       Q.   I think my question is much simpler than

11   that.  You think that Model 50163 should include an

12   additional warning, right?

13       A.   Yes, sir, that would be one part of my

14   opinions in this matter, yes, sir.

15       Q.   And you think that warning should be

16   similar to what you just read me from Exhibit 12?

17       A.   Similar, yes, sir.  Probably with

18   additional safety information related to the

19   potential hazard and the consequences of not

20   avoiding the hazard.

21       Q.   So you think it should be similar but not

22   the same as what's in Exhibit 12?

23       A.   Yes, sir.  This is an example of a

24   manufacturer who identified a similar potential

25   hazard for a similar device prior to the time the

Page 83

Eric J. Boelhouwer, Ph.D.                          March 9, 2017
Klorczyk vs. Sears

                                                        Page 84

1    subject jack stands were sold.

2         Q.   But you wouldn't recommend including the

3    exact warning from Exhibit 12 in the 50163 product

4    manual?

5         A.   I haven't considered that at this time as

6    to what my recommendation would be.  I have not

7    been asked to do so.

8         Q.   So you think that the 50163 product

9    manual should include an additional warning but you

10   don't specifically know what that warning should

11   say?

12        A.   I believe that there should be an

13   additional safety communication in the 50163 jack

14   stand manual as it relates to this potential

15   hazard, yes, sir.

16        Q.   Is that a yes to my question?

17        A.   I have not evaluated the hazard

18   consequence and avoidance information that I would

19   at this time.

20        Q.   I think I know what you mean but you also

21   might be talking a little over my head because this

22   is your field.  Hazard consequence and avoidance

23   information, does that mean warning?

24        A.   Yes, sir.  Those would be associated

25   generally with a signal word for warning that you

                                                   Page 84

Eric J. Boelhouwer, Ph.D.                      March 9, 2017
Klorczyk vs. Sears

Page 98

1    drawn to safety communications including pictograms

2    to identify a potential crush hazard along with a

3    signal word along with some text to explain the

4    consequence, the hazard, and the avoidance for that

5    particular hazard.  As it relates to this jack

6    stands, the manufacturer provided a similar

7    communication for a crush hazard for another

8    product prior to the time that this one -- subject

9    one was sold.

10       Q.   I think, again, I'll probably come back

11   to that manual.  I don't want to waste time

12   printing it out right now.  It is something that I

13   can do at lunch.  You want to save us time?  It is

14   up to you.

15       A.   I don't have extra copies.  I have a copy

16   that we can mark.

17       Q.   That's okay.  I'll just make them at

18   lunch and it will be faster for everybody.

19            So you think that -- when you say crush

20   hazard, can you describe that a little more.  Can

21   you unpack that.

22       A.   So as it relates to my understanding of

23   the potential hazards not only identified by

24   Mr. Heath but identified by the manufacturer for

25   another similar product that there is the potential

Page 98

Eric J. Boelhouwer, Ph.D.                                                March 9, 2017
Klorczyk vs. Sears

Page 99

```
 1   under potentially different causes, there's the

 2   potential for an individual to be seriously harmed

 3   or killed if the load supported by the jack stands

 4   suddenly shifts or moves, so that if the vehicle

 5   did contact an individual, there's a potential for

 6   serious injury or death to occur.

 7        Q.   You don't think that that's obvious?

 8        A.   Since they chose to provide a warning in

 9   that regard for another similar product, it may not

10   be obvious to consumers that how that load is

11   distributed can impact the stability of the

12   elevated load.

13        Q.   So if the load isn't distributed

14   properly, it could become unstable and there's a

15   hazard that the user could be crushed?

16        A.   That may not be obvious to users.

17        Q.   I didn't ask about the obviousness.

18             MR. ZAKRZEWSKI:  Can we read back the

19   question.

20             THE REPORTER:  So if the load isn't

21   distributed properly, it could become unstable and

22   there's a hazard that the user could be crushed?

23        A.   That is my understanding.

24   BY MR. ZAKRZEWSKI:

25        Q.   And you understand that the load was not
```

Page 99

Eric J. Boelhouwer, Ph.D.                              March 9, 2017
Klorczyk vs. Sears

Page 164

0163

1    Klorczyk testified that they read and discussed the
2    manual and the labels together.  Is that a fair
3    summary?
4         A.  Yes, sir, I believe that's a fair summary.
5         Q.  So that's the only factor that's important
6    in determining whether the decedent would have read
7    warnings and instructions in connection with these
8    jack stands?
9         MR. WEXLER:  Objection.
10        A.  No, sir.  That's one of many factors that
11   would need to be considered as it relates to
12   providing reasonable, appropriate and adequate
13   safety communications.  The location, the format,
14   the content are all factors that need to be
15   considered, the method of presentation, how -- if
16   the messages are internally consistent or, as we've
17   identified, the capacity information is internally
18   inconsistent, these are potential issues that need
19   to be addressed.  So the safety communications are
20   available, that they are both on the product and in
21   the manual, that they are reviewed, that there is
22   use of formatting conventions that draw attention to
23   the labels, that is all reasonable, but the content
24   specifically related to the hazard of false
25   engagement as identified by Mr. Heath and the

Eric J. Boelhouwer, Ph.D.                    March 9, 2017
Klorczyk vs. Sears

Page 165

0164

1     potential for this crush hazard to occur are not

2     adequately represented in the manual or on the

3     product.

4         Q.  Okay.  So are there any factors about the

5     decedent himself that are important in determining

6     whether he would have read a warning or instruction?

7         A.  I don't have any specific information as it

8     regards the decedent.  Are there factors in general

9     that may contribute to an individual's likelihood to

10    read warnings and instructions?  Potentially.  But

11    to extrapolate and say how that would potentially

12    affect the hypothetical behavior of one individual,

13    I could not do that.

14        Q.  Isn't the level of a person's experience

15    with a given product important?

16        A.  Potentially.  But as it relates to this

17    subject product, it's my understanding this is the

18    first time that the subject product was used in a

19    setting at the Klorczyk home.  So Christian Klorczyk

20    may have had prior familiarity with other similar

21    products could potentially play a role in his -- in

22    his willingness to review warnings and instructions.

23    But as is represented by Mr. Frederick Klorczyk's

24    testimony, they did review the on-product warnings

25    and instructions and did review the on-product

Eric J. Boelhouwer, Ph.D.                    March 9, 2017
Klorczyk vs. Sears

Page 173

0172

1     read, but there's testimony from Mr. Frederick

2     Klorczyk that he reviewed the on-product markings,

3     warnings and the manual and had a discussion with

4     Christian.  And he goes on to describe some areas of

5     confusion that may have existed in their discussion

6     of the materials.  That's represented in his

7     testimony.  And that's all we can say on that point.

8         Q.  But this is like a really important part of

9     your opinion.  Your belief is that the manual should

10    have contained a warning about false engagement,

11    correct?

12        A.  That the warning regarding false engagement

13    needed to be provided for the subject product.

14    We've discussed a potential location in the manual.

15    I don't recall that we've discussed the potential

16    on-product marking as regard to that.

17        Q.  We talked about the manual.

18        A.  Generally, we spoke about the manual, yes,

19    sir.

20        Q.  That answer could have totally just been a

21    yes.  I'm not even trying to be tricky now.  You

22    think that the manual should have contained a

23    warning about false engagement?

24        A.  Yes, sir, that is one of my opinions as it

25    relates to this matter.

 **DORRIS AND ASSOCIATES INTERNATIONAL, LLC**

1075 Peachtree Street, NE   Suite 3750   Atlanta, GA 30309   P 770.487.2138   F 770.487.0106   W www.dorrisassociates.com

December 5, 2014

Herzfeld & Rubin, P.C.
125 Broad Street
New York, NY 10004

Day Pitney, LLP
242 Trumbull Street
Hartford, CT 06103

<u>Re: Klorczyk v. Sears Roebuck and Company, et al.</u>

Dear Counsel:

As requested, the following is a report pertaining to opinions that I will offer in the litigation referenced above.

*QUALIFICATIONS*

My background, publications and professional certifications are provided on my attached curriculum vitae. Briefly, my area of experience and expertise, pertinent to this litigation, is warnings and communications pertaining to product safety. I hold a Ph.D. and a Master of Industrial and Systems Engineering from Auburn University where my area of specialization was Human Factors Engineering (HFE), including advanced courses in Human Factors, Safety Engineering and Ergonomics. My graduate studies were funded by the National Institute for Occupational Safety and Health (NIOSH) Deep South Education and Research Center (ERC). I also hold a Master of Business Administration degree from Tulane University and a Bachelor of Chemical Engineering degree from the Georgia Institute of Technology. I have been certified by the Board of Certified Safety Professionals (BCSP) and by the Board of Certification in Professional Ergonomics (BCPE).

During my professional work experience, I have routinely performed evaluations of the design and development of warnings, product instructions and similar precautionary information for consumer products. I also have led safety reviews for industrial processes and worked for over seven years in manufacturing environments. Dorris and Associates International, LLC provides product safety

1



services to a wide variety of entities. Clients include corporations, non-profit organizations, trade associations, state and federal governmental agencies, as well as defense and plaintiffs' attorneys. Client services have been performed in the U.S., Canada, U.K., France, Germany, Spain, Belgium, Australia and Japan.

I have given numerous presentations and authored various articles on the design of warnings and behavioral responses to safety messages. Dorris and Associates International, LLC charges $185 per hour plus expenses for my services in this litigation. Attached is a list of trial and deposition testimony I have given over the past four years.

## MATERIALS REVIEWED

In my analysis of this matter, I have reviewed the following materials specific to this case:

- Amended Complaint
- Craftsman Professional Heavy Duty Jack Stands Operators Manual
- Sears. Craftsman Professional 4-Ton Jack Stands, One Pair. Web. 2 Dec. 2014. http://www.sears.com/4-ton-jack-stands-one-pair/p-00950163000P
- 2001 BMW Owner's Manual
- ASME PALD-2009 Safety Standard for Portable Automotive Lifting Devices
- Photographs of subject Craftsman Professional Heavy Duty Jack Stands

- Sealy Quality Machinery, Instructions for Axle Stand 3 Tonne Ratchet Type, Model No: VS1003
- Pro-Lift SUV/Truck Jack Stands Operating Instructions & Parts Manual, Model Number T-9621, 2003
- Exemplar Manuals for Other Brands of Jack Stands
- Deposition of Lynne Klorczyk, 11/13/14
- Deposition of Frederick Klorczyk, 11/14/14

In addition to the above materials, my opinions are based upon my education and training in the fields of Human Factors Engineering (HFE) and product safety, my familiarity with the safety aspects of the published literature and standards in these fields.

## WARNINGS RESEARCH

Over the past quarter of a century there has developed a sizable body of literature on behavioral responses to warnings. Since the design of safety communications and the systematic analysis of responses to those communications is an aspect of HFE, many of the studies are reported in the HFE literature. The fact that warning analysis has developed into an empirical scientific field of behavioral study is evidenced by:

- Existence of a substantial amount of literature, much of it refereed evidencing a range of research methodologies;

- Empirical evidence that lay persons are not able to predict with statistical reliability the effectiveness of safety signs or labels.

Significant reviews of this literature can be found in McCarthy et al. (1984), DeJoy (1989), Ayres et al. (1998) and Rogers et al. (2000).

## USE OF WARNINGS

A commonly cited definition of a warning is "...a message intended to reduce the risk of personal or property damage by inducing certain patterns of behavior and discouraging or prohibiting certain other patterns of behavior" (Dorris & Purswell, 1978). There is broad agreement that warnings should endeavor to communicate:

1. Nature of the hazard;

2. Means of avoiding the hazard;

3. Consequences of failing to avoid the hazard.

Not all of these elements will be necessary in all circumstances and need not be explicitly included in the warning.

## FACTS AND OPINIONS

On the basis of my education and experience as outlined above and on the attached curriculum vitae, the literature on human factors and warnings including but not limited to those referenced above, and the materials reviewed for this case as listed above, I have reached the following opinions that I hold to a reasonable degree of scientific certainty:

1. *Not an Obvious Hazard*

    As it relates this matter, it is my understanding that a hazardous condition exists if the locking pawl is not fully engaged with the ratchet bar, including if the tip of the locking pawl is in contact with the tip of one of the ratchet teeth (tip to tip), on the subject Craftsman Professional Heavy Duty Jack Stands and that this condition may not prevent movement of the ratchet bar after the load has been applied to the jack stand. The base frame limits the ability of users to observe if the locking pawl is fully engaged with the ratchet bar or is tip to tip. Therefore, the potential hazard that may exist if the locking pawl is not fully engaged with the ratchet bar would not be obvious to users.

2. *Unreasonably Dangerous for Lack of Adequate Warnings and Instructions*

    From a human factors engineering perspective, the subject Craftsman Professional Heavy Duty Jack Stands are unreasonably dangerous because they lack adequate and appropriate warnings and instructions for a number of reasons:

    - There is no warning that addresses the hazardous condition that may exist if the locking pawl is not fully engaged with the ratchet bar as discussed earlier in this report. Based on my survey of product

3

literature for similar jack stands that use a ratchet bar mechanism, several manufacturers provide safety messages related to this hazard and suggests manufacturers of similar products were aware of the potential for harm to result if the locking pawl is not fully engaged with the ratchet bar.  One example was a warning provided by Sealey Quality Machinery in the "Operation" section of their instructions (Sealy Quality Machinery, Instructions for Axle Stand 3 Tonne Ratchet Type, Model No: VS1003).

- Neither the on-product markings nor the Operators Manual for the Craftsman Professional Heavy Duty Jack Stands identifies how to distribute the load between the jack stands or the potential crush hazard.

The subject Craftsman Professional Heavy Duty Jack Stands Operators Manual states "[b]efore using this product, read this operator's manual completely and familiarize yourself thoroughly with the product and the hazards associated with its improper use" (Craftsman Professional Heavy Duty Jack Stands Operators Manual, pg. 3).  The manual does not identify the crush hazards associated with the subject jack stands or how to distribute the weight of the vehicle between the jack stands.

It is my understanding that the non-Sears defendants manufactured and distributed the subject jack stands and that the non-Sears defendants manufacture jack stands for several brands, including Pro-Lift.  The crush hazard is discussed as early as 2003 in a Pro-Lift manual that includes a warning and a pictogram to inform users of the potential crush hazard (Pro-Lift SUV/Truck Jack Stands Operating Instructions & Parts Manual, Model Number T-9621).

- As shown in figure 1, the "Safety Instructions" section of the subject Craftsman Professional Heavy Duty Jack Stands Operators Manual states to "[a]lways check the vehicle owners manual for location of proper lift and support points" (Craftsman Professional Heavy Duty Jack Stands Operators Manual, pg. 3).

**SAFETY INSTRUCTIONS**

⚠ **WARNING**

- Study, understand, and follow all instructions with and on this device before use.
- **Rated capacity is per pair!** Do not exceed rated capacity.
- Use only on hard, level surfaces capable of sustaining rated capacity loads.
- One pair per vehicle only!
- Use as a matched pair to support one end of a vehicle only.
- Support only on areas of the vehicle as specified by the vehicle manufacturer.
- No alterations shall be made to this product.
- Failure to heed product markings or warnings may result in personal injury or property damage.

**BEFORE USING**

- Inspect stands before each use. Do not use if bent, broken or cracked components are noted. Ensure that all parts move freely.
- Verify that the product and the application are compatible.

- Before using this product, read this operator's manual completely and familiarize yourself thoroughly with the product and the hazards associated with its improper use.
- Install ratchet bar into frame with ratchet area of bar aligned with locking pawl (stopper).
- Move the ratchet bar to its lowest position by raising the locking handle, thereby releasing the stopper, and guiding the bar downward.
- Insert roll pin into the bottom hole of the ratchet bar to prevent inadvertent loss of the ratchet bar. (refer to Fig. 1)
- Always check the vehicle owners or service manual for location of proper lift and support points.

**DAMAGE TO JACK STANDS**

If you think jack stand has been subjected to an abnormal load or shock, have it inspected for damage at a Sears Service Center before using it again.

*"Support only on areas of the vehicle as specified by the vehicle manufacturer."*

*"Always check the vehicle owners or service manual for location of proper lift and support points."*

Figure 1.   Excerpt from subject Craftsman Professional 4-Ton Jack Stands Operators Manual, pg. 3.

It is not reasonable for the manufacturer of the subject jack stands to rely on others to provide information regarding the proper lift and support points and not to provide additional guidance to users. As it relates to this matter, the Owner's Manual for the 2001 BMW does not discuss the proper support points for jack stands.

3. *Potential for Confusion Related to Rated Capacity*

From a human factors engineering perspective, it is not clear to the reader if the rated capacity messages relate to the capacity for the jack stands as a pair or the capacity for a single jack stand and these messages are likely to result in confusion for anticipated users.

The rated capacity messages on both the subject jack stands and in the subject Craftsman Professional Heavy Duty Jack Stands Operators Manual are contradictory and are likely to result in confusion for users based on the following:

- The casting imprint of "4 TON" on the ratchet bars for each of the subject Craftsman Professional Heavy Duty Jack Stands does not indicate if the phrase "4 TON" relates to the capacity for a pair of jack stands or for an individual jack stand as shown in figure 2.

5



Figure 2.   Photograph of one of the ratchet bars from the subject Craftsman Professional Heavy Duty Jack Stands.

- As shown in figure 3, the Sears website states: "[f]eaturing solid welded construction, these **professional 4 ton jack stands** stand up to 8,000 pounds of weight a piece, and equipped with a wide saddle, it delivers a solid hold you can count on" (emphasis original).

6



"8,000 lb. capacity"

"Featuring solid welded construction, these **professional 4 ton jack stands** stand up to 8,000 pounds of weight a piece, and equipped with a wide saddle, it delivers a solid hold you can count on." (emphasis original)

Figure 3.    Excerpt from Sears website, http://www.sears.com/4-ton-jack-stands-one-pair/p-00950163000P, retrieved 12/2/2014.

- The "Specifications" section of the Operators Instructions for the Craftsman Professional Heavy Duty Jack Stands shown in figure 4 only contains a single jack stand in the illustration and does not indicate if the "4 Ton" capacity in the table relates to a single jack stand or a pair of jack stands as shown in figure 4.



**SPECIFICATIONS**

| Model | Capacity | Base Size | Min. Height | Max. Height |
|-------|----------|-----------|-------------|-------------|
| 50163 | 4 Ton | 8-3/4" x 7-1/2" | 12" (305 mm) | 17-5/16" (440 mm) |

"Capacity 4 Ton"

Saddle
Ratchet bar
Roll pin
Base frame
Locking handle
Lock pin
Locking pawl (stopper)

Fig. 1 Model 50163 Components

2

Figure 4.    Excerpt from subject Craftsman Professional 4 -Ton Jack Stands Operators Manual, pg. 2.

Even though the rated capacity messages are contradictory, it is my understanding that even if a single jack stand is only intended to support 2 tons that capacity would have been greater than the curb weight of the 2001 BMW 325xi (2001 BMW Owner's Manual, pg. 194).

4. *Appropriate and Adequate Warnings Would Have Changed Behavior*

It is more likely than not appropriate and adequate warnings and instructions regarding the hazardous condition that exists if the locking pawl is not fully engaged with the ratchet bar would have been noticed, read and followed by Mr. Klorczyk and his son, Christian Klorczyk.  Mr. Klorczyk testified that he reviewed the manual and the labels (F. Klorczyk deposition, pgs. 125 & 172) and he discussed the content with his son, Christian Klorczyk, prior to the incident (F. Klorczyk deposition, pgs. 173, 326 & 327). Therefore, if appropriate and adequate warnings and instructions had been provided, it is more likely than not that Mr. Klorczyk and his son, Christian Klorczyk, would have been informed and alerted of this hazard and would have changed their behavior as to prevent the harm suffered by Christian Klorczyk.

_CONCLUSION_

The warning system associated with the subject Craftsman Professional Heavy Duty Jack Stands, including the precautionary information provided in the Operators Manual, was inappropriate, inadequate and made the product unreasonably dangerous for ordinary users for the reasons discussed above.

In the event that additional information is made available to me, I reserve the right to supplement or amend my opinions.

Sincerely,

Eric J. Boelhouwer, Ph.D.
Consultant


Attachments

*REFERENCES*

Ayres, T., Wood, C., Schmidt, R., Young, D. & Murray, J. (1998). Effectiveness of warning labels and signs: An update on compliance research. *Proceedings of the Silicon Valley Ergonomics Conference and Exposition,* 199-205.

DeJoy, D.M. (1989). Consumer product warnings: Review and analysis of effectiveness research. *Proceedings of the Human Factors Society 33rd Annual Meeting,* 936-940.

Dorris, A.L. & Purswell, J.L. (1978). Human factors in the design of effective product warnings. *Proceedings of the Human Factors Society 22nd Annual Meeting,* 343-346.

McCarthy, R.L., Finnegan, J.P., Krumm-Scott, S. & McCarthy, G.E. (1984). Product information presentation, user behavior and safety. *Proceedings of the Human Factors Society 28th Annual Meeting,* 81-85.

Rogers, W.A., Lamson, N. & Rousseau, G.K. (2000). Warning research: An integrative perspective. *Human Factors, 42,* 102-139.



DORRIS AND ASSOCIATES INTERNATIONAL, LLC

1075 Peachtree Street, NE  Suite 3750  Atlanta, GA 30309   P 770.487.2138

## Eric J. Boelhouwer, PhD, CSP, CPE
**Consultant**

### Professional Profile:

Eric Boelhouwer is a human factors specialist (ergonomist) with professional experience in product safety and the evaluation of instructions, warnings and other safety communications. Dr. Boelhouwer is a Consultant for Dorris and Associates International, LLC.  His primary responsibilities include the design and implementation of product safety research, including evaluations of human-machine interfaces, as well as the usability and effectiveness of precautionary information.

Dorris and Associates has a wide variety of clients including private and public corporations, non-profit organizations, trade associations, state and federal governmental agencies, as well as defense and plaintiff's attorneys. Client services have been performed in the U.S., Canada, U.K., France, Germany, Spain, Belgium, Australia and Japan. Products manufactured and/or distributed by these clients range from automobiles and airplanes to everyday consumer products and children's toys.

### Education:

PhD, Industrial and Systems Engineering, Auburn University; Auburn, AL (2010)

MISE, Industrial and Systems Engineering, Auburn University; Auburn, AL (2008)

MBA, Business Administration, Tulane University; New Orleans, LA (2004)

BChE, Chemical Engineering, Georgia Institute of Technology; Atlanta, GA (1998)

### Professional Affiliations & Service:

Certified Safety Professional (CSP)

Certified Professional Ergonomist (CPE)

American Institute of Chemical Engineers (AIChE), Senior Member

American Society of Safety Engineers (ASSE), Professional Member

Human Factors and Ergonomics Society (HFES)

E. J. Boelhouwer, PhD, CSP

National Safety Council (NSC)

Society of Automotive Engineers (SAE)

Society for Chemical Hazard Communication (SCHC), Board of Directors, 2013-Present

The Institute of Industrial Engineers (IIE)

## Grants, Honors, & Awards:

National Institute for Occupational Safety and Health (NIOSH) Graduate Fellowship

Boelhouwer, E.J. and Davis, G.A. (2009). Improving Comprehension of GHS Safety Data Sheets. Submitted to NIOSH, DSCOHS, Pilot Project Research Training Program. Funded for $12,000.

Alpha Pi Mu Industrial Engineering Honor Society

2009 INFORMS Doctoral Colloquium Participant

## Publications & Reports:

Boelhouwer, E. J., Davis, J., Franco-Watkins, A., Dorris, N. T., and Lungu, C. (2013). Comprehension of hazard communication: Effects of pictograms on safety data sheets and labels. *Journal of Safety Research, 46,* September, 145-155.

Boelhouwer, E. J. and Davis, J. (2010). Effects of GHS Hazard Category, Signal Words, and Pictograms on an Individual's Assessment of Perceived Risk. In *Proceedings of the Human Factors and Ergonomics Society 54th Annual Meeting,* Santa Monica, CA: The Human Factors and Ergonomics Society.

Piper, A.K., Davis, J. and Boelhouwer, E.J. (2010). Converging International Safety Symbol Designs Using Distributed Interactive Evolutionary Computation. In *Proceedings of the 2010 Industrial Engineering Research Conference,* Norcross, GA: Institute of Industrial Engineers.

Boelhouwer, E. J. and Sullivan M. R. (2010). GHS in the USA: Past, Present and Future. In *Safety 2010: ASSE Professional Development Conference Proceedings,* Baltimore, MD: American Society of Safety Engineers.

Boelhouwer, E. J., Piper, A.K., and Davis, J. (2009). The Use of Hazard and Precautionary Symbols on Safety Data Sheets. In *Proceedings of the Human Factors and Ergonomics Society 53rd Annual Meeting,* Santa Monica, CA: The Human Factors and Ergonomics Society.

Piper, A.K., Boelhouwer, E. J., Davis, G.A., Holman, G.T., and Montgomery, L.S. (2008) Using Hand Drawn Images to Determine Warning Symbol Design Parameters within Interactive Evolutionary Computation Software. In *Proceedings of the Human Factors and Ergonomics Society 52nd Annual Meeting,* Santa Monica, CA: The Human Factors and Ergonomics Society.

E. J. Boelhouwer, PhD, CSP

Page 3

Dorris, N.T., Valimont, R.B., and Boelhouwer, E.J. (2007). Eye Movements While Reading Degraded On-Product Warnings. In *Proceedings of the Human Factors and Ergonomics Society 51st Annual Meeting,* Santa Monica, CA: The Human Factors and Ergonomics Society.

## Presentations & Seminars:

"Twenty-first Century Warnings in a Global World." Defense Research Institute Product Liability Conference, Washington, D.C. April 2013.

"HAZCOM 101: Comprehensibility." Society for Chemical Hazard Communication webinar. February 2011.

"Comprehension of Chemical Product Labels: Effects of Hazard and Precautionary Pictograms." Society for Chemical Hazard Communication Fall Meeting. Washington, D.C. October 2010.

"Putting the Tool Kit into Practice: A Study at Auburn University." Invited panel member. American Industrial Hygiene Conference and Exposition (AIHce). Toronto, Canada. June 2009.

## Previous Four Years of Deposition and Trial Testimony by Dr. Eric Boelhouwer

This information may not be complete and is based upon best available information and recollection

| Case Name | Court | Case # | Deposition Date | Trial Date |
|---|---|---|---|---|
| Blake Capital Corporation v. Electrolux Home Products, Inc. Brossard v. Electrolux Home Products, Inc. Donahue v. Electrolux Home Products, Inc. Freeman v. Electrolux Home Products, Inc. Holt v. Electrolux Home Products, Inc. Kucharski v. Electrolux Home Products, Inc. Larson v. Electrolux Home Products, Inc. McCants v. Electrolux Home Products, Inc. | United States District Court for the Western District of Wisconsin | 3:12-cv-00015 | 04/2014 | |
| Satterfield, et al. v. The Fresh Market, Inc., et al. | United States District Court District of South Carolina Spartanburg Division | 7:11-1514 JMC | 07/2014 | |
| Williams v. Cannonball Engineering, LLC | Circuit Court of Washington County, Arkansas Civil Division | 13-cv-001208 | 07/2014 | |

DEFENDANT'S EXHIBIT EB 12

 

**INSTRUCTIONS FOR:**

# AXLE STAND 3 TONNE RATCHET TYPE

MODEL No: **VS1003**

Thank you for purchasing a Sealey product. Manufactured to a high standard this product will, if used according to these instructions and properly maintained, give you years of trouble free performance.

⚠ *IMPORTANT:* **PLEASE READ THESE INSTRUCTIONS CAREFULLY. NOTE THE SAFE OPERATIONAL REQUIREMENTS, WARNINGS AND CAUTIONS. USE THIS PRODUCT CORRECTLY AND WITH CARE FOR THE PURPOSE FOR WHICH IT IS INTENDED. FAILURE TO DO SO MAY CAUSE DAMAGE AND/OR PERSONAL INJURY, AND WILL INVALIDATE THE WARRANTY. RETAIN INSTRUCTIONS FOR FUTURE USE.**

## 1.  SAFETY INSTRUCTIONS

✓ Ensure axle stands are in good order and condition. DO NOT use if damaged.
✓ When centre column has been inserted into stand ensure the locking tab (Fig.1) is bent inward to stop the column from coming out.
✓ Apply vehicle handbrake and chock wheels before jacking and using axle stands (in automatic vehicles select 'Park')
✓ Raise centre column of axle stand and ensure the centre of the saddle is located under vehicle's jacking point. Refer to vehicle's handbook for jacking points.
✓ Ensure the centre column is locked with the locking lever down and pawl engaged with a ratchet tooth (Fig.2).
✓ *DANGER! Great care must be taken to ensure you lower the vehicle slowly and carefully onto the centres of the axle stands.*
✓ Ensure that vehicle and axle stands are stable before starting any work.
✗ **DO NOT** use on soft ground or tarmacadam. Use on concrete only.
✗ **DO NOT** support more than the maximum capacity, as written on the axle stand (i.e. 3 Tonnes each, 6 Tonnes *per pair*).
✗ **DO NOT** use single axle stands. Only use in pairs.
✗ **DO NOT** use four wheeled axle stands on one vehicle.
✗ **DO NOT** jack one end of vehicle if the other end is already on axle stands, as the load is very likely to topple over.
✗ **DO NOT** use for three wheeled vehicles or trailers. Refer to manufacturer's instructions.
✗ **DO NOT** use axle stands if damaged.
▲ **DANGER!** Do not load axle stands beyond rated capacity. Overloading can cause damage to, or failure of the axle stands. POSITION LOAD ON CENTRE OF SADDLE ONLY. ALWAYS USE AXLE STANDS IN PAIRS ON HARD LEVEL SURFACE CAPABLE OF SUSTAINING THE LOAD. USE OF AXLE STANDS ON OTHER THAN HARD LEVEL SURFACES CAN RESULT IN LOAD INSTABILITY AND POSSIBLE LOSS OF LOAD. DO NOT USE ON TARMACADAM. Failure to follow these instructions may result in damage to the axle stands, loss of load, resulting in property damage, serious personal injury, or loss of life.
❏ *WARNING: The warnings, cautions and instructions set out in this manual cannot cover all possible conditions and situations that may occur. It must be understood that common sense and caution are factors which cannot be built into this product, but must be applied by the operator/owner.*

## 2.  SPECIFICATION

Ratchet type axle stands with cast iron support posts. Feature angled teeth in posts, which prevent accidental release of load - the more weight applied, the tighter the post is locked.

Capacity:.......................... 3 Tonnes Each / 6 Tonnes per Pair
Minimum Height: .................. 287mm
Maximum Height: ................. 427mm

## 3.  PREPARATION

3.1.  Insert centre column into base of axle stand (Fig.2). Ensure toothed side of column will engage with locking lever mechanism.
3.2.  Bend in locking tab using a small chisel and hammer (Fig.1).
3.3.  Check axle stand is in good condition and has not suffered damage during transit.

## 4.  OPERATION

4.1.  Refer to vehicle's handbook for correct jacking procedure. Check to ensure manufacturer's recommended jacking points are in good condition.
4.2.  Position axle stands under jacking points.
4.3.  To adjust axle stands: Hold locking lever up, while lifting column to required height. Push locking lever down to lock pawl into column teeth (Fig.2).
❏ WARNING! ENSURE PAWL IS FULLY ENGAGED WITH TEETH.
4.4.  Carefully and slowly lower vehicle onto axle stands. Ensure load bearing points sit in the centre of the saddles and that the axle stands are stable.
▲ *DANGER! You must follow instructions carefully and ensure you DO NOT load the axle stands off-centre. Failure to heed these warnings may cause damage, injury or loss of life.*

**Fig.1**

Bend tab in after
inserting Centre
Column

Saddle
Centre Column
**Fig.2**
Pawl
Locking
Lever

## 5.  MAINTENANCE & INSPECTION

5.1.  Before each use, check that the axle stands and the stand's welds are not cracked and that there are no missing or damaged parts. *Any suspect axle stand must be removed from service immediately.*
5.2.  Due to the potential hazards associated with these axle stands, do not misuse, or make any modification to the axle stands or components.
5.3.  It is the responsibility of the owner to ensure that the operator has read these instructions together with the safety features on the side of the axle stand and that the operator is familiar with the axle stand's use and limitations.

*NOTE: It is our policy to continually improve products and as such we reserve the right to alter data, specifications and component parts without prior notice.*
**IMPORTANT:** No liability is accepted for incorrect use of this product.
**WARRANTY:** Guarantee is 12 months from purchase date, proof of which will be required for any claim.
**INFORMATION:** For a copy of our latest catalogue and promotions call us on 01284 757525 and leave your full name and address, including postcode.

 

Sole UK Distributor, Sealey Group,
Kempson Way, Suffolk Business
Park, Bury St. Edmunds, Suffolk,
IP32 7AR

📞 01284 757500    🌐 www.sealey.co.uk
📠 01284 703534    ✉ sales@sealey.co.uk

 

Original Language Version



VS1003   Issue: 1 - 24/12/09