# Exhibit 1

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BERNARD PITTERMAN, et al., | : | CIVIL ACTION NO. |
| Plaintiffs, | : | 3:14-CV-00967 (JCH) |
| | : | |
| v. | : | |
| | : | |
| GENERAL MOTORS LLC, | : | APRIL 17, 2018 |
| Defendant. | : | |

## RULING RE: DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AFTER TRIAL (DOC. NO. 307)

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 2

II.  BACKGROUND .................................................................................................. 2

III.  LEGAL STANDARD ........................................................................................... 6

IV.  DISCUSSION ..................................................................................................... 8

   A.  Existence of a Post-Sale Duty to Warn .............................................................. 8

   B.  GM as Product Seller ....................................................................................... 15

   C.  Sufficiency of the Evidence ............................................................................. 31

      1.  Need for Expert Testimony ........................................................................ 33

      2.  Sufficiency of Evidence of Inadequacy of Warning at Time of Sale ............. 51

      3.  Sufficiency of Evidence of Failure to Warn Post-Sale .................................. 59

      4.  Sufficiency of Evidence Regarding Causation ............................................. 68

V.  CONCLUSION .................................................................................................. 71

## I.     INTRODUCTION

The plaintiffs, Bernard Pitterman, as administrator of the Estate of Margaret Rose O'Connor ("M.O.") and as guardian of the Estate of Grant O'Connor ("G.O."), and Rose O'Connor sued the defendant General Motors LLC ("New GM") under the Connecticut Product Liability Act ("CPLA").  See Amended Complaint ("Am. Compl.") (Doc. No. 239). The case proceeded to a jury trial and, on July 19, 2017, the jury entered a verdict against New GM in favor of the plaintiffs.  See Jury Verdict (Doc. No. 296–1) at 7–8.  On August 23, 2017, New GM filed a Renewed Motion for Judgment as a Matter of Law After Trial, pursuant to Federal Rule of Civil Procedure 50(b).  See Renewed Motion for Judgment as a Matter of Law After Trial ("Renewed Mot. for JMOL") (Doc. No. 307).

For the reasons stated below, New GM's Renewed Motion for Judgment as a Matter of Law is **DENIED**.

## II.     BACKGROUND

According to the plaintiffs' Amended Complaint, on July 13, 2011, M.O., then eight years old, climbed into her parents' 2004 Chevrolet Suburban, inserted the key into the ignition in the Accessory position, and pulled the shift lever from Park to Neutral. See Am. Compl. at ¶¶ 6–8.  Once in Neutral, the Suburban rolled down a sloped yard and crashed into a tree, killing M.O.  See id. at ¶¶ 8, 12.  Her then-7-year-old brother, G.O., was present when this happened and witnessed the crash.  See id. at ¶ 29.  The plaintiffs sued New GM for damages due to M.O.'s death, as well as G.O.'s and Rose O'Connor's mental and emotional distress.  See id. at ¶¶ 9–14, 30–32.

The 2004 Suburban was designed, manufactured, and sold by General Motors Corporation ("Old GM").  See id. at ¶¶ 15–17.  In June 2009, Old GM filed for bankruptcy, and New GM then purchased certain of Old GM's assets and liabilities,

2

pursuant to the Sale Agreement.  See In re General Motors Corp., 407 B.R. 463, 473 (Bankr. S.D.N.Y. 2009).  Under the Sale Agreement, New GM assumed certain liabilities of Old GM, including, inter alia, "all product liability claims arising from accidents or other discrete incidents arising from operation of GM vehicles occurring subsequent to the closing of the 363 Transaction [i.e. purchase of Old GM's assets by New GM], regardless of when the product was purchased."  Id. at 482.  The Bankruptcy Court held that, beyond liabilities specifically assumed by New GM in the Sale Agreement, New GM purchased Old GM's assets free and clear of successor liability claims.  See id. at 501.

In the Amended Complaint against New GM, the plaintiffs asserted a number of claims, including, inter alia: (1) strict liability due to design defect at the time of the sale, (2) failure to warn at the time of the sale, (3) negligent design, (4) negligent post-sale failure to warn, and (5) negligent post-sale failure to recall or retrofit.  See Am Compl. at ¶¶ 20–24, 26–28.  The plaintiffs proceeded to trial against New GM on these claims on July 6, 2017.  See Minute Entry (Doc. No. 262).  The evidence at trial included, inter alia, the testimony or video deposition of Rose O'Connor; G.O; James O'Connor; William Sultze, system engineer for GM; David McKendry, former product engineer of GM; plaintiffs' expert Wayne McCracken; plaintiffs' expert Gary Crakes; plaintiffs' expert Detective Sergeant Michael O'Brien from the Brookfield Police Department; plaintiffs' expert psychiatrist Dr. Theodore Zanker; and defense expert Victor Hakim, Senior Manager/Consultant Engineer for GM.  The court discusses the evidence presented at trial in more detail in the relevant sections of this Ruling.

After the plaintiffs rested, New GM moved for judgment as a matter of law on a number of different grounds. <u>See</u> Motion for Judgment as a Matter of Law on Plaintiffs' Negligent Design and Negligent Retrofit Theories ("Mot. for JMOL (Negligent Retrofit)") (Doc. No. 271); Motion for Judgment as a Matter of Law on Plaintiffs' Warning Theories for Lack of Evidence, Lack of Duty, Bankruptcy ("Mot. for JMOL (Lack of Evidence)") (Doc. No. 274); Motion for Judgment as a Matter of Law on Plaintiffs' Warning Theories Based on Lack of Expert Testimony ("Mot. for JMOL (Lack of Expert)") (Doc. No. 275); Motion for Judgment as a Matter of Law on Plaintiffs' Strict Liability Claim ("Mot. for JMOL (Strict Liability)") (Doc. No. 276). The plaintiffs withdrew their negligent design claim, and the court granted New GM's Motion for Judgment as a Matter of Law as to the negligent post-sale failure to recall or retrofit claim. <u>See</u> Charge Conference Transcript 7/15/17 ("Charge Conf. Tr. 7/15/17") at 1452–58. The court denied or reserved on New GM's remaining Motions. The court addresses the specific grounds in greater detail in the relevant sections of the Ruling.

The plaintiffs therefore proceeded to the jury on three claims: strict liability design defect, failure to warn at the time of the sale, and negligent post-sale failure to warn. <u>See</u> Jury Charge (Doc. No. 292) at 28. The plaintiffs put forth two bases for the third claim of negligence: (1) that Old GM had negligently breached its post-sale duty to warn from December 12, 2007, to July 10, 2009, and that New GM was responsible for Old GM's liability; and (2) that New GM had negligently breached its post-sale duty to warn from July 10, 2009, to July 13, 2011. <u>See</u> <u>id.</u> The court refers to the second theory as the "Independent Claim" because it is based solely on the post-sale conduct of New

4

GM, not on any conduct or knowledge attributed to Old GM.  See In re Motors
Liquidation Co., 829 F.3d 135, 157 (2d Cir. 2016).

On July 19, 2017, a jury entered a verdict against New GM in an amount of
$1,750,000 to Pitterman as administrator of the Estate of M.O., $750,000 to Pitterman
as guardian of the Estate of G.O., and $375,000 to Rose O'Connor.  See Jury Verdict at
7–8.  On the plaintiffs' design defect claim, the jury found that New GM was not liable to
the plaintiffs because the 2004 Suburban was not defectively designed.  See id. at 2.
On the plaintiffs' claim for failure to warn at the time of the sale, the jury found that "the
2004 Suburban was in a defective condition, because it failed to provide necessary and
adequate warnings or instructions at the time of its initial sale."  See id. at 3.  However,
the jury found that New GM was not liable on this claim because the plaintiffs had not
proven that the failure to provide adequate warnings had caused their injuries.  See id.
Finally, on the plaintiffs' claim for negligent post-sale failure to warn, the jury found that
New GM was liable to the plaintiffs under both theories.  See id. at 4–5.

New GM then filed the Renewed Motion for Judgment as a Matter of Law After
Trial on August 23, 2017.  See Renewed Mot. for JMOL.  New GM also filed a Motion to
Certify Questions to the Connecticut Supreme Court on October 11, 2017, requesting
certification on two of the questions of law raised in its Renewed Motion for Judgment
as a Matter of Law.  See Motion to Certify Questions to the Connecticut Supreme Court
("Mot. to Certify") (Doc. No. 313).  The court denied the Motion to Certify.  See
Amended Ruling Denying Mot. to Certify (Doc. No. 318).

The Renewed Motion for Judgment as a Matter of Law contained, inter alia, the
arguments from the earlier Motions for Judgment as a Matter of Law on which the court

had reserved judgment during the trial.  <u>Compare</u> Memorandum in Support of Renewed Mot. for JMOL ("Mem. in Supp. (Renewed)") (Doc. No. 308); <u>with</u> Mot. for JMOL (Lack of Evidence); Mot. for JMOL (Lack of Expert).  Absent objection from the parties, the court terminated the earlier Motions for Judgment as a Matter of Law as denied without prejudice to the arguments raised in those Motions, which were repeated in the Renewed Motion.  <u>See</u> Notice (Doc. No. 319); Order (Doc. No. 320).  This Ruling now addresses all of the arguments raised in the Renewed Motion, including those made in the earlier Motions for Judgment as a Matter of Law that were previously reserved by the court.

## III.    LEGAL STANDARD

Rule 50(b) of the Federal Rules of Civil Procedure allows for the entry of judgment as a matter of law if a jury returns a verdict for which there is no legally sufficient evidentiary basis.  <u>See</u> Fed. R. Civ. P. 50(b).  The standard under Rule 50 is the same as that for summary judgment: a court may not grant a Rule 50 motion unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached."  <u>This Is Me, Inc. v. Taylor</u>, 157 F.3d 139, 142 (2d Cir. 1998) (alterations in original) (internal quotation marks and citation omitted).

A movant's burden under Rule 50 is "particularly heavy where, as here, the jury has deliberated in the case and has actually returned its verdict in favor of the non-movant."  <u>Cash v. Cnty. of Erie</u>, 654 F.3d 324, 333 (2d Cir. 2011) (internal quotation marks omitted) (citing <u>Cross v. N.Y.C. Transit Auth.</u>, 417 F.3d 241, 248 (2d Cir. 2005)); <u>see also</u> <u>Norton v. Sam's Club</u>, 145 F.3d 114, 118 (2d Cir. 1998) ("A party seeking to

overturn a verdict based on the sufficiency of the evidence bears a very heavy burden."). In such cases, "the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of the witnesses or consider the weight of the evidence." Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998) (citations omitted). In short, the court cannot "substitute its judgment for that of the jury." LeBlanc–Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir. 1995) (citations omitted).

Rather, judgment as a matter of law may only be granted where "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." Meloff v. N.Y. Life Ins. Co., 240 F.3d 138, 145 (2d Cir. 2001) (quoting Galdieri–Ambrosini, 136 F.3d at 289).

Moreover, "weakness of the evidence does not justify judgment as a matter of law; as in the case of a grant of summary judgment, the evidence must be such that 'a reasonable juror would have been compelled to accept the view of the moving party.'" This Is Me, Inc., 157 F.3d at 142 (quoting Piesco v. Koch, 12 F.3d 332, 343 (2d Cir. 1993)). The court "must view the evidence in the light most favorable to the party in whose favor the verdict was rendered, giving that party the benefit of all reasonable inferences that the jury might have drawn in its favor." Norton, 145 F.3d at 118; see also Mickle v. Morin, 297 F.3d 114, 120 (2d Cir. 2002) (stating that the court must draw all reasonable inferences in favor of the non-moving party). Additionally, in making its determination, the court "must disregard all evidence favorable to the moving party that

7

the jury is not required to believe."  Mickle v. Morin, 297 F.3d 114, 120 (2d Cir. 2002)

(quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000)).

Accordingly, Rule 50 motions "should be granted cautiously and sparingly."  Meloff, 240

F.3d at 145 (internal quotation marks and citation omitted).

## IV.  DISCUSSION

New GM raises a number of arguments in its Renewed Motion for Judgment as a

Matter of Law.  The court addresses first those arguments that raise questions of law

and then addresses those that challenge the sufficiency of the evidence.

First, New GM argues that it is entitled to judgment as a matter of law on the

negligence claims for post-sale failure to warn because Connecticut does not recognize

a post-sale duty to warn when there was an adequate warning at the time of the sale.

See Mem. in Supp. (Renewed) at 27–30.  Second, New GM argues that it is entitled to

judgment as a matter of law on the Independent Claim for post-sale failure to warn

because New GM is not a product seller under the CPLA.  See id. at 36–39.

Third, New GM argues that the evidence was legally insufficient to support the

plaintiffs' claims in a number of ways.  Because of the large number of arguments

raised as to the sufficiency of the evidence, the court describes these arguments in

greater detail later after it addresses the legal questions of whether Connecticut

recognizes a post-sale duty to warn and whether New GM is a product seller.

### A.  Existence of a Post-Sale Duty to Warn

New GM argues that Connecticut law does not impose a post-sale duty to warn if

the product was not defective at the time of the sale.  See id. at 27–30.  It argues that

the CPLA only requires product sellers to warn of risks that are foreseeable at the time

of manufacture and does not require them to supplement warnings with information

8

learned later.  See id. at 27–28.  It further contends that there was no common law duty

to supplement warnings for a non-defective product, so no such duty was incorporated

into the CPLA.  See id. at 28–29.  New GM argues that the 2004 Suburban was not

defective at the time of the sale[1] and, therefore, that New GM was under no post-sale

duty to warn.

The court previously addressed this argument at the pretrial conference on June

28, 2017.  See Pretrial Conference Transcript 6/28/17 ("Pretrial Conf. Tr. 6/28/17") (Doc.

No. 241) at 150–162.  On June 14, 2017, the plaintiffs had filed a Motion to Amend the

Complaint.  See Motion to Amend Complaint (Doc. No. 219).  New GM objected to two

paragraphs in the Proposed Amended Complaint, which alleged that New GM had

taken no steps to warn of defects or to recall or retrofit the Suburban after June 2009.

See Memorandum in Opposition to Plaintiff's Motion to Amend Complaint ("Mem. in

Opp. (Amend)") (Doc. No. 222); Am. Compl. at ¶¶ 27–28.  The court understood these

paragraphs as articulating a product liability claim against New GM based on a theory of

post-sale failure to warn and failure to recall or retrofit.[2]  See Pretrial Conf. Tr. 6/28/17 at

150.  New GM argued, inter alia, that no such post-sale duties existed under the CPLA.

See id. at 152.  While the court recognized that no Connecticut Supreme Court case

had held that such post-sale duties existed, it concluded, based on its interpretation of

---

[1] The court discusses later the sufficiency of the evidence for the jury's finding that the 2004 Suburban was defective in its warnings at the time of the sale.  See, infra, at 51–58.  Because the court holds that Connecticut law recognizes a post-sale duty to warn even when the warnings at the time of sale were adequate, the adequacy or inadequacy of the warning in the owner's manual does not affect the court's analysis here.

[2] The court here is only concerned with the post-sale failure to warn claim because, as noted earlier, the court granted New GM's Motion for Judgment as a Matter of Law as to the plaintiffs' failure to recall or retrofit.  See Charge Conf. Tr. 7/15/17 at 1452–58.

9

state law, that, "if this question were before the Connecticut Supreme Court, they would conclude there was such a theory of liability under the Connecticut Product Liability Act." See id. at 162; see also id. at 158–162. The court therefore granted the Motion to Amend and permitted the claims to advance to the jury. See id.

After the jury found for the plaintiffs on their negligence claim for post-sale failure to warn, New GM moved to certify to the Connecticut Supreme Court the question of whether Connecticut imposes a post-sale duty to warn. See Mot. to Certify at 1. In that Motion, New GM argued that the law was unsettled because no Connecticut appellate court had recognized such a post-sale duty. See Memorandum in Support of Motion to Certify ("Mot. to Certify Mem.") (Doc. No. 313-1) at 6. The court denied the Motion to Certify, holding that it was bound by the Second Circuit's precedent in Densberger v. United Technologies Corp., 297 F.3d 66 (2d Cir. 2002), and therefore that certification of the question was unnecessary. See Amended Ruling Denying Mot. to Certify at 8.

In Densberger, the plaintiffs sued the defendant United Technology Corporation ("UTC") under the CPLA for damages caused by a helicopter that had crashed. See Densberger, 297 F.3d at 69. The plaintiffs asserted three distinct theories of liability: strict liability, negligence, and breach of implied warranty of merchantability. See id.; see also Densberger v. United Technologies Corp., 125 F. Supp. 2d 585, 589 (D. Conn. 2000). Under each theory, the plaintiffs asserted claims that UTC failed to calculate a proper center of gravity for the helicopter, failed to warn that the helicopter could become uncontrollable during foreseeable flight conditions, and manufactured and sold a helicopter that was not sufficiently crashworthy. See Densberger, 125 F. Supp. 2d at 589. The jury found "UTC liable in negligence for failing to warn the Army that the

helicopter could become uncontrollable during foreseeable flight conditions [and] rejected all other grounds of liability, including those based on failure to warn under the strict liability or implied warranty theories." Densberger, 297 F.3d at 69. UTC argued, and the Second Circuit agreed, that the jury "must have based its verdict solely on a violation of a duty to warn post-sale." Id. (emphasis in original).

On appeal, UTC argued that there was no negligence-based post-sale duty to warn in Connecticut common law and that, if there had been, it was now preempted by the CPLA. See id. at 70. The Second Circuit rejected this argument, holding that "the post-sale duty to warn exists in negligence, and is cognizable under the CPLA." Id. at 71. It reasoned that the CPLA incorporates common law theories of liability that are not expressly inconsistent with the statute and that the text of the CPLA was not inconsistent with the post-sale duty to warn under a negligence theory. See id. at 70–71.

In its Motion to Certify, New GM acknowledged that Densberger recognized a post-sale duty to warn, but argued that the Second Circuit had rendered an incorrect interpretation of state law. See Mot. to Certify Mem. at 5–6. New GM argued that Densberger mistakenly relied on two Connecticut Supreme Court cases that addressed a continuing rather than a post-sale duty to warn, that Densberger conflicts with the CPLA and Connecticut common law, and that Densberger is undermined by a subsequent Connecticut Supreme Court decision in Bifolck v. Phillip Morris, Inc., 324 Conn. 402 (2016). See id. at 6–13.

This court, however, concluded that Second Circuit precedent on state law is binding on this court absent a contrary state statute or holding of the state's highest

court.  See Amended Ruling Denying Mot. to Certify at 8.  Therefore, the court concluded that it was bound to follow Densberger, and it would be inappropriate to reevaluate the Second Circuit's determination of the law.  See id.  The court further concluded that Densberger was not contrary to the CPLA or to Bifolck.  See id. at 9–12.  To the extent that New GM again challenges the Second Circuit's conclusion in Densberger, the court adopts the analysis in its prior Ruling and continues to consider itself bound to follow Densberger.[3]

New GM's argument in its Renewed Motion for Judgment as a Matter of Law now before the court, however, appears to differ from its argument in its Motion to Certify.  While New GM argued in its Motion to Certify that Densberger "was decided incorrectly," New GM now argues that Densberger recognizes only a continuing duty to warn, not a post-sale duty, and therefore does not apply to this case.  Compare Mot. to Certify Mem. at 5–6; with Mot. for JMOL (Lack of Evidence) at 12; Mem. in Supp. (Renewed) at 28–29.  In its Motion for Judgment as a Matter of Law filed during trial, New GM cited Densberger in support of its argument that "Connecticut does not

---

[3] In its Reply in Support of its Renewed Motion for Judgment as a Matter of Law, New GM reiterates its arguments that the court must follow Bifolck rather than Densberger and that a post-sale duty is contrary to the language of the CPLA.  See Reply in Support of Renewed Mot. for JMOL ("Reply in Supp. (Renewed)") (Doc. No. 314) at 17–18.  The court's Amended Ruling Denying Motion to Certify sufficiently addresses and rejects these arguments, so the court finds it unnecessary to repeat the analysis here. By way of summary, Bifolck's holding is not on point for the question currently before the court because Bifolck does not address whether a post-sale duty to warn exists.  See Amended Ruling Denying Mot. to Certify at 9–10.  While Bifolck contains language that undermines some of the reasoning employed in Densberger, that language is dicta and an insufficient basis for the court to disregard Second Circuit authority.  See id. at 10–11.  Additionally, Densberger interpreted the language of the CPLA discussing the duty to warn at the time of the manufacture and found that it did not preclude a post-sale duty to warn in negligence.  See Densberger, 297 F.3d at 71.  Densberger is not contrary to the statute, but rather a binding interpretation of the statute.  See Amended Ruling Denying Mot. to Certify at 9.

Additionally, to the extent that New GM now points the courts to case law interpreting similar statutes in other states, see Mem. in Supp. (Renewed) at 27–28, the court notes that those interpretations are not binding on this court while the Second Circuit's interpretation of the CPLA in Densberger is.

recognize a post-manufacture duty to warn." <u>See</u> Mot. for JMOL (Lack of Evidence) at

12. New GM stated, "<u>Densberger</u> recognized a <u>continuing</u> duty to warn, which by

definition means that the duty existed at the time of manufacture." <u>Id.</u> (emphasis in

original). Furthermore, in its Renewed Motion for Judgment as a Matter of Law, New

GM distinguishes <u>Densberger</u> from this case because "the danger there was an alleged

defect in the product." <u>See</u> Mem. in Supp. (Renewed) at 28–29. Therefore, New GM

argues that <u>Densberger</u> does not recognize a post-sale duty to warn for a product that

was not defective at the time of the sale. <u>See</u> <u>id.</u>

The court disagrees with New GM's newly developed, proposed reading of

<u>Densberger</u>. First, the court notes that New GM's current interpretation is inconsistent

with its representations to this court in its other filings. For example, in support of its

Motion to Certify, New GM stated of <u>Densberger</u>, "This court held, and the Second

Circuit has affirmed, that Connecticut law imposes a post-sale duty to warn on product

sellers." Mot. to Certify Mem. at 5; <u>see also</u> <u>id.</u> at 9 ("<u>Densberger</u> stands alone in

recognizing an independent (rather than a continuing) duty to warn . . . ."). Additionally,

in its Reply in Support of its Renewed Motion for Judgment as a Matter of Law, New GM

states, "<u>Densberger</u>'s determinations that . . . a plaintiff can sustain a negligence claim

under the CPLA without proving a product defect are inconsistent with <u>Bifolck</u>." Reply in

Support of Renewed Mot. for JMOL ("Reply in Supp. (Renewed)") (Doc. No. 314) at 17.

These statements appear to indicate that New GM recognizes that <u>Densberger</u> held that

a post-sale duty to warn exists, even when the product was not defective at the time of

the sale.

Even excusing New GM's inconsistent positions, the court considers New GM's current proposed reading of <u>Densberger</u> to be incorrect. The Second Circuit in <u>Densberger</u> accepted UTC's argument that "the jury, by rejecting the plaintiffs' failure to warn claims under the strict liability and implied warranty theories, necessarily found that the warnings provided to the Army at the time of sale were adequate." <u>Densberger</u>, 297 F.3d at 69. The Second Circuit then reasoned, "in finding UTC liable for failure to warn under the negligence theory, therefore, the jury must have based its verdict solely on a violation of a duty to warn <u>post-sale</u>." <u>Id.</u> (emphasis in original).

New GM's attempt to distinguish <u>Densberger</u> is unsuccessful. New GM states that <u>Densberger</u> involved "an alleged defect in the product." Mem. in Supp. (Renewed) at 29. However, while the plaintiffs in <u>Densberger</u> did allege manufacturing, design, and failure to warn defects at the time of the sale, the jury found that the defendant in <u>Densberger</u> was not liable for such defects. <u>See</u> <u>Densberger</u>, 297 F.3d at 69 (noting that the jury rejected all grounds of liability except the negligent failure to warn). There is no indication in <u>Densberger</u> that the plaintiffs proved that the product was defective at the time of the sale.[4] Nor does the Second Circuit in <u>Densberger</u> state or even imply that its holding is limited to products that are defective at the time of the sale.

---

[4] The opinions in <u>Densberger</u> do not indicate the basis for the finding of no liability. Therefore, the court is unable to determine whether the jury found no liability because there was no defect or for some other reason. To the extent that New GM infers from the fact that the "helicopter could become uncontrollable during foreseeable flight conditions" that the product was defective, such an inference goes beyond the information available in the <u>Densberger</u> opinions. <u>See</u> <u>Densberger</u>, 125 F. Supp. 2d at 589. The alleged design and manufacturing defects were the failure to calculate a proper lateral center of gravity envelope and the manufacture of a helicopter that was not sufficiently crashworthy. <u>See</u> <u>id.</u> The helicopter becoming uncontrollable does not necessarily indicate that either of these defects were present, nor that the product was defective in some other way.

14

Furthermore, even under New GM's reading of Densberger, New GM is not entitled to the relief it seeks. As discussed later, the court concludes that there was sufficient evidence to support the jury's findings that the warnings at the time of the sale were inadequate.[5] Therefore, even if Densberger only recognizes a post-sale duty to warn when the product was defective at the time of the sale, it would nonetheless recognize such a duty in this case.

In conclusion, the court reads Densberger as recognizing a post-sale duty to warn under Connecticut law, which is not limited to products that are defective at the time of the sale. Because the court considers itself bound by Densberger, New GM's Renewed Motion for Judgment as a Matter of Law on this ground is denied.

B.    GM as Product Seller

New GM also argues that it is not a "product seller" within the definition of the CPLA because it is not a successor to Old GM, it did not manufacture or sell the 2004 Suburban at issue, and it had no special relationship with the plaintiffs. See Mem. in Supp. (Renewed) at 36–39; Reply in Supp. (Renewed) at 18–20. New GM argues therefore that it is entitled to judgment as a matter of law on the plaintiffs' Independent Claim for negligence based on New GM's post-sale conduct between July 10, 2009, and July 13, 2011. See id.

The court first notes that, even if New GM were to prevail on this argument, it would not alter New GM's liability for damages. The jury found New GM liable to the plaintiffs on two different bases for negligence: (1) that Old GM had negligently breached its post-sale duty to warn from December 12, 2007, to July 10, 2009, and that

---

[5] See, infra, at 51–58; Jury Verdict at 3.

New GM had assumed Old GM's liability in that regard; and (2) that New GM had negligently breached its post-sale duty to warn from July 10, 2009, to July 13, 2011. See Jury Verdict at 4–5. New GM does not dispute that Old GM was a product seller within the definition of the CPLA or that New GM assumed liability for failure to warn claims based on the conduct of Old GM. See Pretrial Conf. Tr. 6/28/17 at 117; Memorandum Opinion and Order Granting in Part New GM's Motion to Enforce Sale Order ("Bankr. Ruling June 2017") (Doc. No. 216-1) at 19. Therefore, New GM's argument does not challenge the first basis for liability in negligence. Because the plaintiffs only needed to prove a breach of duty under one of the two bases for negligence in order to prevail on their claim, see Jury Charge at 41, whether or not New GM is a product seller under the CPLA, it would still be liable to the plaintiffs for the same damages based on its assumption of liability for Old GM's negligence.[6] Nonetheless, the court addresses this argument below.

New GM first raised this argument in response to the plaintiffs' Motion to Amend the Complaint. See Mem. in Opp. (Amend) at 1–5. The Second Circuit had previously held that certain plaintiffs could bring "Independent Claims" against New GM.[7] See In re Motors Liquidation Co., 829 F.3d 135, 157–58 (2d Cir. 2016). On June 7, 2017, the Bankruptcy Court held that such claims could be based "solely on New GM's post-closing wrongful conduct," not on "generalized knowledge of both Old GM and New

---

[6] For this reason, the court denied New GM's Motion to Certify Questions to the Connecticut Supreme Court on this issue. See Amended Ruling Denying Mot. to Certify at 14.

[7] The Second Circuit defined "Independent Claims" as "claims based on New GM's post-closing wrongful conduct." In re Motors Liquidation Co., 829 F.3d at 157. "These sorts of claims are based on New GM's post-petition conduct, and are not claims that are based on a right to payment that arose before the filing of the petition or that are based on pre-petition conduct." Id. (emphasis in original).

GM."[8]  Bankr. Ruling June 2017 at 22.  The Bankruptcy Court left to this court to decide whether to permit the plaintiffs to amend their Complaint to "remove any allegations alleging independent claims based on Old GM's conduct."  Id.  The plaintiffs filed a Motion to Amend on June 14, 2017.  See Motion to Amend.

As the court noted above, New GM challenged paragraphs 27 and 28 of the Proposed Amended Complaint, which alleged that New GM had taken no steps to warn of defects or to recall or retrofit the Suburban after June 2009.  See Mem. in Opp. (Amend) at 1–2.  In addition to the argument discussed above as to the existence of a post-sale duty to warn, New GM also argued that it could not be held liable under the CPLA for its own post-sale conduct because it was not a product seller.  See id. at 1–5.  Then, New GM raised many of the same arguments that it raises now in its Renewed Motion for Judgment as a Matter of Law.  See id.

While the court acknowledged the difficulty of the question, it ruled that New MG was a product seller under the CPLA and therefore granted the plaintiffs' Motion to Amend the Complaint.  See Pretrial Conf. Tr. 6/28/17 at 157.  The court based its conclusion on a number of factors: (1) that New GM "bought significant portions of Old GM's assets"; (2) that New GM "manufactures and sells cars under the 'GM' or 'Chevrolet' name, including Suburbans"; and (3) that New GM "did assume certain obligations for vehicles manufactured by Old GM that were under warranty at the time of sale, including provision of spare parts and service for Old GM manufactured vehicles."

---

[8] For clarity of terms, the court uses "post-sale" to refer to the period of time after Old GM sold the 2004 Suburban at issue.  The court uses the Bankruptcy Court's language of "post-closing" to refer to the period of time after Old GM filed bankruptcy and New GM purchased Old GM's assets and certain liabilities in 2009.

Id. at 155.  After considering New GM's Renewed Motion for Judgment as a Matter of Law, the court is not persuaded to alter its decision.

The CPLA states that a "product liability claim . . . may be asserted and shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product."  Conn. Gen. Stat. § 52-572n(a) (2018).  Therefore, an entity that is not a product seller is not subject to liability under the CPLA.  See Ullmar v. Robco Grp., Inc., No. 379465, 1992 WL 38315, at *1 (Conn. Super. Ct. Feb. 18, 1992) (citing Burkert v. Petrol Plus of Naugatuck, Inc., 216 Conn. 65, 72-73 (1990)).  The CPLA defines a product seller as

> any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption.  The term "product seller" also includes lessors or bailors of products who are engaged in the business of leasing or bailment of products.

Conn. Gen. Stat. § 52-572m(a).  "Whether [a] defendant is a 'product seller' is a question of law for the court to decide."  Svege v. Mercedes-Benz Credit Corp., 329 F. Supp. 2d 272, 278 (D. Conn. 2004) (quoting Stanko v. Bader, No. CV-030193669, 2003 WL 22413476, at *2 (Conn. Super. Ct. Oct. 7, 2003)).

The parties agree that New GM did not manufacture or sell the 2004 Suburban. See Mem. in Supp. (Renewed) at 38; Mem. in Opp. (Renewed) at 30.  Additionally, the Bankruptcy Court held that New GM is not a successor in interest to Old GM for purposes of successor liability.  See In re General Motors Corp., 407 B.R. 463, 500–01 (Bankr. S.D.N.Y. 2009).  Therefore, the issue before the court is whether an entity, like New GM, that is not a manufacturer, seller, or successor can be a product seller under the CPLA.  The court assesses, first, as a matter of statutory interpretation, whether the

18

CPLA permits any entities beyond these three categories to be considered product sellers and then, if so, whether New GM is a product seller.

"The Connecticut Supreme Court has rarely discussed the contours and considerations applicable to the analysis of determining whether an entity fits within the statutory definition of 'product seller.'" Svege, 329 F. Supp. 2d at 278. The court, therefore, seeks to anticipate how the Connecticut Supreme Court would rule if this question were before it. "It is well settled that in construing statutes, [the Connecticut Supreme Court's] fundamental objective is to ascertain and give effect to the apparent intent of the legislature." Sylvan R. Shemitz Designs, Inc. v. Newark Corp., 291 Conn. 224, 231 (2009) (citation omitted). In doing so, the court concludes that the definition of product seller is not limited solely to manufacturers, sellers, and their successors.

Beginning with the text of the statute, the court notes that the CPLA introduces the list of "manufacturer, wholesaler, distributor or retailer" with the word "including." See Conn. Gen. Stat. § 52-572m(a). The commentary to the Draft Uniform Product Liability Law, upon which the CPLA was based, also states that product seller "includes all parties in the regular commercial distribution chain."[9] See 44 Fed. Reg. 3003 (1979); Svege, 329 F. Supp. 2d at 278 n.6. The word "including" implies that the list is not exhaustive. Black's Law Dictionary defines "include" to mean "[t]o contain as a part of something." Black's Law Dictionary, "Include" (10th ed.). It further states

> The participle *including* typically indicates a partial list <the plaintiff asserted five tort claims, including slander and libel>. But some drafters use phrases such as *including without*

---

[9] New GM argues that the commentary to the Draft Uniform Product Liability Law should be read as limiting the definition of "product seller" to "parties in the regular commercial distribution chain." Mem. in Supp. (Renewed) at 37. In doing so, however, New GM overlooks the word "includes."

> *limitation* and *including but not limited to*—which mean the same thing.[10]

Id. (italics in original) (underline added).

This reading is supported by the fact that the CPLA expressly includes bailors and lessors within the definition of product seller, despite the fact that bailors and lessors cannot reasonably be considered to be manufacturers, wholesalers, distributors, retailers, or parties in the regular commercial distribution chain. See Conn. Gen. Stat. § 52-572m(a). Therefore, the text of the CPLA allows for an interpretation of product seller that includes entities that are not strictly manufacturers, sellers, or successors. See Lawton v. CBS Corp., No. CV105029354S, 2015 WL 5024632, at *4 (Conn. Super. Ct. July 23, 2015) ("[A]n entity does not have to manufacture the product at issue in order to qualify as a product seller under the Product Liability Act.").[11]

Additionally, the court's interpretation of the text is supported by looking to the purpose of the statute. "In interpreting and applying the product seller definition, the

---

[10] The court acknowledges that the definition of "product liability claim" in the same section of the CPLA uses the phrase "shall include, but is not limited to." Conn. Gen. Stat. § 52-572m(b). The court is aware of the general principle of statutory interpretation that "courts should not add or modify language to statutes where . . . it is clear from other provisions within the same statute that [the legislature] knew how to include such language if it so wished." United States v. Shellef, 756 F. Supp. 2d 280, 295 (E.D.N.Y. 2011). However, this principle should not be relied on to contradict the plain meaning of the word "include," which is not exhaustive. See United States v. Rowland, 826 F.3d 100, 108 (2d Cir. 2016) ("If the meaning is plain, the inquiry ends there. If we find the statutory provision ambiguous, however, 'we then turn to canons of statutory construction for assistance in interpreting the statute.'" (internal citations omitted)). Especially here, where Black's Law Dictionary indicates that "includes" and "includes, but is not limited to" mean the same thing, the court declines to read them differently merely because the legislature used one phrasing in one subsection and the other in another subsection. See Black's Law Dictionary, "Include" (10th ed.).

[11] But see Barbour v. Dow Corning Corp., No. X06-CV-920305013-S, 2002 WL 983346, at *3 (Conn. Super. Ct. Apr. 19, 2002) (citing cases identifying a "requirement under product liability law that the defendant must be the manufacturer or seller of the specific product that caused the injury"); Herrick v. Middlesex Hosp., No. CV030100932, 2005 WL 1760785, at *1 (Conn. Super. Ct. June 27, 2005) (stating that, "to recover under the Act, a plaintiff must prove that the defendant was engaged in the business of selling the product").

court also bears in mind the Connecticut Appellate Court's observation that a 'principal purpose of the product liability statute is to protect people from harm caused by defective and hazardous products,' and that courts should construe the statute with this purpose in mind." Oliva v. Bristol-Myers Squibb Co., No. CIVA-305-CV-00486 (JCH), 2005 WL 3455121, at *5 (D. Conn. Dec. 16, 2005) (quoting Rodia v. Tesco Corp., 11 Conn. App. 391, 396 (1987)). The Connecticut Appellate Court in Rodia held that the type of conduct enumerated in the definition of "product liability claim" "must be broadly construed in light of the purposes of the statute." Rodia, 11 Conn. App. at 396 ("The terms enumerated in General Statutes § 52-572m(b) are simply generic categories of conduct which must be read broadly and in relation to one another in order to accomplish the purposes of the statute.").

The same reasoning also applies to construing broadly the definition of "product seller" in the same section of the statute. "Manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products" are also generic, categorical terms that should be read broadly to accomplish the purposes of the statute. See Conn. Gen. Stat. §52-572m(a). The undersigned has previously followed the Rodia court's directive by reading the definition of product seller "as encompassing those in the best position to protect consumers." See Oliva, 2005 WL 3455121, at *5 (citing also Durove v. Fabian Transport Inc., No. 04 Civ 7000(RJH), 2004 WL 2912891, at *6 (S.D.N.Y. Dec. 14, 2004)). In this case, New GM is in the best position to protect consumers, as Old GM is no longer in existence.

New GM makes several arguments for reading the CPLA to limit product sellers to manufacturers and sellers.[12]  First, New GM argues that including as product sellers "entities outside the distribution chain for the precise product at issue" is inconsistent with the language of the CPLA that "measures a product seller's duty to warn based upon knowledge at the time of manufacture."  Mot. to Certify Mem. at 14 (emphasis omitted).  New GM argues that it did not exist at the time of manufacture, so it cannot have had a duty to warn of risks foreseen at such a time and therefore should not be considered to be a product seller.  See id.

As discussed above, however, the Second Circuit in Densberger rejected this narrow reading of the statute when it held that the CPLA recognizes a post-sale duty to warn.  See Densberger, 297 F.3d at 70–71.  Specifically, the Second Circuit considered the statutory language that talks about the duty to warn "only at the time of manufacture" and held that that language applied only to claims of strict liability and violation of implied warranties, not to claims of negligence.  See id.  Just as the Second Circuit declined to read the "time of manufacture" language to unduly limit the types of claims that can be brought under the CPLA, this court also declines to read that language as unduly limiting the definition of product seller.

Second, New GM argues that the definition of product seller cannot include entities who were not manufacturers or sellers of the product because such entities would not be protected by the statute of limitations or the defense for products altered

---

[12] The court notes, however, that these arguments are raised only in New GM's Memorandum in Support of the Motion to Certify Questions to the Connecticut Supreme Court, which motion the court has already denied.  See Mot. to Certify Mem. at 14–17.  New GM has not raised these arguments in any of the filings related to the Renewed Motion for Judgment as a Matter of Law or the earlier Motions for Judgment as a Matter of Law during trial.  While it is thus not strictly necessary to reach these arguments, the court addresses them here briefly.

by a third party.  See Mot. to Certify Mem. at 14–15 (citing Conn. Gen. Stat. § 52-572p; Conn. Gen. Stat. § 52-577a).  The state of limitations provides that "no [product liability claim] may be brought against any party . . . later than ten years from the date that the party last parted with possession or control of the product."  Conn. Gen. Stat. § 52-577a(a) (2018).  The court acknowledges that it would be difficult to determine how this protection would apply to a party that never had possession or control of the product.  However, the court declines to resolve this difficulty by holding that such parties can never be considered product sellers.  The court notes that such parties would still be protected by the statute of limitations to the extent that it requires a product liability claim to be brought "within three years from the date when the injury, death or property damage is first sustained or discovered or in the exercise of reasonable care should have been discovered."  Id.

The second defense referenced by New GM states that a "product seller shall not be liable for harm that would not have occurred but for the fact that his product was altered or modified by a third party" unless certain criteria are met.  See Conn. Gen. Stat. § 52-572p (2018).  New GM states that this defense "would also be unavailable to a product seller who never sold the product in question at all."  Mot. to Certify Mem. at 15.  However, New GM makes no explanation for why the defense would be unavailable, and the court sees no reason why it should not be available to all "product sellers."  Admittedly, application of the defense would require courts to define what parties count as a third party, but that is also true when the product seller is a lessor or bailor.

23

Third, New GM argues that the court's reading of product seller would be inconsistent with the Restatement (Second) of Torts, which "imposes strict liability on persons who sell a defective product that physically injures a user, where the seller is engaged in the business of selling the product." Mot. to Certify Mem. at 16 (citing Restatement (Second) of Torts § 420A). The court disagrees for a number of reasons. As noted above, the CPLA expressly includes bailors and lessors within the definition of product seller. See Conn. Gen. Stat. § 52-572m(a). As neither bailors nor lessors are engaged in the business of selling a product, New GM's argument cannot account for all product sellers under the CPLA.

Additionally, the court's reading of product seller does not necessarily conflict with the Restatement. The CPLA includes product liability claims, not only under strict liability, but also under negligence and warranty. See Conn. Gen. Stat. § 52-572n(a). Therefore, finding an entity to be a product seller does not necessarily always expose the entity to strict liability. For instance, there is no claim for post-sale failure to warn under a theory of strict liability, only under a negligence theory. See Densberger, 297 F.3d at 70–71. Thus, defining New GM as a product seller only exposes it to liability for its own post-sale, post-closing conduct in negligence. Any strict liability claims here are based on assumption of liability for the conduct of Old GM, which the parties do not dispute was a product seller. Therefore, the Restatement's definition of strict liability is not implicated in this case and should not be used to unduly limit the definition of product seller.

In sum, while the court acknowledges that this question of statutory construction is a difficult one, it is not persuaded by New GM's arguments. The court holds that

there can be circumstances in which the CPLA permits the definition of product seller to include certain entities that are not strictly manufacturers, sellers, or successors.  See Dzurnak v. CRD Metal Works, LLC, No. KNL-CV-156024935-S, 2017 WL 6417908, at *2, *4 (Conn. Super. Ct. Nov. 17, 2017) (finding that the defendant failed to prove at summary judgment that it was not a product seller when the defendant did not manufacture the product, but provided financing for the plaintiff's purchase of the product through purchase and resale); Aquarulo v. A.O. Smith Corp., No. CV-095024498-S, 2011 WL 7095179, at *3 (Conn. Super. Ct. Dec. 30, 2011) (finding that the defendant trade association failed to prove at summary judgment that it was not a product seller when the defendant held the patent to the product and supervised its patented product, but did not itself manufacture or sell the product).  The court now turns to the specific question of whether New GM is a product seller.

This inquiry "requires a fact intensive, case-by-case assessment."  See Svege, 329 F. Supp. 2d at 280 (citing Burkert, 216 Conn. at 72).  For example, in Burkert, the Connecticut Supreme Court considered factors including: "(1) whether the entity derived a substantial economic benefit from the sale of the product; (2) whether the entity participated in advertising, marketing or creating consumer demand for the product; (3) whether the entity took title to the product; and (4) the extent of the entity's knowledge and control over the product."  Dzurnak, 2017 WL 6417908, at *2 (quoting Delgadillo v. Unitrons Consolidated, Inc., 191 Fed. App'x 547, 549 (9th Cir. 2006)).  Courts have also looked to other factors, such as, inter alia, whether the entity sold similar products, developed a market for the products, or marketed the products with the entity's name and certain assurances.  See id. at *4; Aquarulo, 2011 WL 7095179, at *4.  These

25

factors are merely examples of the fact intensive inquiry, however, and are not exhaustive because whether certain factors are relevant or not depends on the particular circumstances of each case.

In this case, the court, in previously ruling on New GM's Opposition to the Motion to Amend, identified three factors that it considered sufficient to make New GM a product seller under the CPLA.  See Pretrial Conf. Tr. 6/28/17 at 155.  The court now elaborates further on the latter two factors.[13]  First, although New GM did not manufacture and sell the particular car purchased by the plaintiffs or the 2004 model year of the Suburban, New GM does manufacture and sell Suburbans.  In interpreting the definition of product seller as including an entity "who is engaged in the business of selling such products," at least one court in this district has described "such products" as "a generalized plural" and therefore concluded:

> The statute does not, on its face, require that the particular seller have sold the particular product that injured the particular claimant.  If such particularity must indeed be proven, it is because elements like proximate causation are now implicitly incorporated into the statutory "product liability claim," as elements of the torts that the statute replaced.[14]  On its face, the statute requires only that the seller have "engaged in the business" of selling "such products."

Altman v. Motion Water Sports, Inc., 722 F. Supp. 2d 234, 238 (D. Conn. 2010).[15]  As New GM continues to manufacture and sell Suburbans, the court extends the reasoning

---

[13] The court finds it unnecessary to elaborate further on the first factor, that is, that New GM bought significant portions of Old GM's assets, as that factor appears self-explanatory.  The court notes that its holding is not based on a finding of successor liability.

[14] Even if such particularity is required as part of the proximate cause analysis, such concerns are appropriately considered under the issue of whether the causation element of the claim has been satisfied and should not affect whether or not the defendant qualifies as a product seller.

[15] Although the Altman court decides that case based on successor liability, which is not applicable to this case, the section quoted above states the Altman court's interpretation of the statute,

in Altman to hold that New GM can be considered in the business of selling "such products," even if it did not manufacture or sell the specific model year of the 2004 Suburban. This is especially true given that it continues to trade on the goodwill associated with the GM, Chevrolet, and Suburban names.

Second, pursuant to the Sale Agreement between New GM and Old GM, New GM had obligations to service and repair vehicles sold by Old GM that were still under warranty, as well as "to provide spare parts and services for Old GM vehicles even after warranties expired." In re Gen. Motors LLC Ignition Switch Litig., 154 F. Supp. 3d 30, 40 (S.D.N.Y. 2015). These obligations "put New GM in a position of ongoing communication with Old GM purchasers." Id. Moreover, these agreements "g[ave] rise to actual or potential economic advantage to [New GM]." In re Gen. Motors LLC Ignition Switch Litig., No. 14-CV-8317, 2017 WL 2664199, at *9 (S.D.N.Y. June 20, 2017).[16]

---

which this court does not consider to be restricted to cases of successor liability. See Altman, 722 F. Supp. 2d at 235, 238–39.

[16] The district court for the Southern District of New York found these factors relevant in determining that New GM had a post-sale duty to warn for cars sold by Old GM under the product liability laws of Oklahoma, Arizona, and Virginia. See In re Gen. Motors LLC Ignition Switch Litig., 154 F. Supp. 3d at 40–41 (interpreting Oklahoma law); In re Gen. Motors LLC Ignition Switch Litig., 2017 WL 2664199, at *8–*9 (interpreting Arizona law); In re: Gen. Motors LLC Ignition Switch Litig., 202 F. Supp. 3d 362, 367–68 (S.D.N.Y. 2016) (interpreting Virginia law). Because these cases interpret the laws of other states rather than the CPLA and refer to New GM as a "successor corporation," the court refrains from placing too much weight on these opinions. These cases do indicate, however, that the factors identified above can be relevant to the court's consideration.

In contrast, the district court for the Southern District of New York held, however, that plaintiffs could not bring an independent claim against New GM under Louisiana law. See In re: Gen. Motors LLC Ignition Switch Litig., No. 14-MD-2543 (JMF), 2016 WL 874778, at *3 (S.D.N.Y. Mar. 3, 2016). This holding, however, is not instructive for the court's ruling here because the parties in that case agreed that Louisiana law only permitted product liability actions to be brought against "manufacturers." See id. The CPLA uses instead the broader term of "product seller" and expressly includes entities that are not manufacturers, such as wholesalers, distributors, retailers, bailors, and lessors. See Conn. Gen. Stat. § 52-572m(a).

The court holds that, together, these factors are sufficient to qualify New GM as a product seller for purposes of the CPLA.

New GM argues that such a holding would amount to a finding of successor liability, which is contrary to the Bankruptcy Court's controlling decisions. See Mem. in Supp. (Renewed) at 37; Reply in Supp. (Renewed) at 18–19. New GM relies on a Bankruptcy Court decision that rejected the plaintiffs' independent claims in that case against New GM. See Reply in Supp. (Renewed) at 19 (citing In re Motors Liquidation Co., 576 B.R. 313, 319 (Bankr. S.D.N.Y. 2017)). New GM characterizes that case as raising and rejecting allegations similar to the factors discussed above. See id.

The court disagrees. The court's holding does not "amount to" successor liability, as New GM argues, because the court finds New GM to be a product seller based on its own conduct and relationships, not based on the assumption of liability from Old GM. The factors discussed above, that is, New GM's manufacture and sale of Suburbans, its use of the GM and Chevrolet names, and its provision of spare parts and services for Old GM vehicles, are all conduct of New GM that took place after the Sale Agreement. The particular Independent Claim asserted by the plaintiffs in this case is also based solely on New GM's own failure to warn after July 10, 2009, not on any conduct of Old GM.

Additionally, New GM misrepresents the holding of the Bankruptcy Court case that it cites. The Bankruptcy Court in that case made clear that its role was to act as a "gatekeeper" in determining if the complaint violated the Sale Order while questions of whether the complaint was proper under state law were for the district court to decide. See In re Motors Liquidation Co., 576 B.R. at 321–22; see also Bankr. Ruling June

2017 at 7.  The Bankruptcy Court determined that the complaint in that case "cannot pass the bankruptcy gate because (i) it fails to clearly differentiate between Old GM and New GM; and (ii) it fails to identify specific conduct of New GM upon which the purportedly Independent Claims are based."  See In re Motors Liquidation Co., 576 B.R. at 323.  The Bankruptcy Court did not purport to address whether New GM qualifies as a product seller and thereby is subject to liability for independent claims generally.  Rather, the Bankruptcy Court merely held that the complaint in that case failed to meet the requirements for stating an independent claim.  See id. ("The Court does not suggest that a failure to warn claim is necessarily impossible for Reichwaldt to assert, but the generalities in the Proposed [Amended Complaint] are insufficient as currently drafted.").

In contrast, the plaintiffs' case here is distinguishable because neither the plaintiffs nor the court has failed to differentiate between Old GM and New GM.  While the plaintiffs' initial Complaint "base[d] allegations on generalized knowledge of both Old GM and New GM," see Bankr. Ruling June 2017 at 22, the plaintiffs filed an Amended Complaint differentiating between the two entities and identifying specific conduct of New GM.  See Am Compl. (separating the conduct of Old GM in paragraph 26 from the conduct of New GM in paragraphs 27 and 28).  At trial, the court also clearly instructed the jury to consider the duty to warn separately for two different time periods, one corresponding to Old GM and one corresponding to New GM.  See Jury Charge at 28, 41.  The court then instructed the jury that, "in determining whether GM breached its duty to warn during the relevant time period, you may only consider such actions or lack thereof of GM during that time period."  Id. at 42.  Therefore, the jury was charged not to

consider any pre-2009 conduct—that is, the conduct of Old GM, in determining the

plaintiffs' independent claim.  Thus, the problems identified by the Bankruptcy Court in

the case cited by New GM are not present in this case.

New GM also makes a second argument that it had no "special relationship" with

the plaintiffs and therefore cannot be considered a product seller.  <u>See</u> Mem. in Supp.

(Renewed) at 39.  However, New GM has identified no cases applying Connecticut law

that have held that a special relationship is required in order for the defendant to be a

product seller under the CPLA or to owe a post-sale duty to the plaintiff.  <u>See id.</u>  In

holding that a post-sale duty to warn exists, <u>Densberger</u> mentions no such requirement.

<u>See Densberger</u>, 297 F.3d at 70–71.

Rather, New GM cites <u>Vicuna v. O.P. Schuman & Sons, Inc.</u>, 106 F. Supp. 3d

286, 299 (E.D.N.Y. 2015), and <u>Holland v. FCA US LLC</u>, No. 1:15-CV-121, 2015 WL

7196197, at *4 (N.D. Ohio Nov. 16, 2015), neither of which are decided under the

CPLA.  Although New York law may require a special relationship in order for a

successor corporation to have a duty to warn of defects in a product manufactured by

the corporation's predecessor, <u>see</u> <u>Vicuna</u>, 106 F. Supp. 3d at 299, New York law does

not govern this case or the court's interpretation of the CPLA. Additionally, New GM

cites <u>Flannery v. Singer Asset Fin. Co.</u>, LLC, 312 Conn. 286, 311–12 (2014).  <u>Flannery</u>,

however, does not involve a products liability claim and does not address the definition

of product seller under the CPLA.  <u>See id.</u>  Instead, <u>Flannery</u> discusses the requirement

of a special relationship in order to apply the continuing course of conduct doctrine for

tolling the statute of limitations in professional negligence cases.  <u>See id.</u>  As such, it is

irrelevant to the question now before the court.  Therefore, the court has identified no

basis in the case law to support New GM's argument that it is not a product seller because it does not have a special relationship with the plaintiffs.

Accordingly, the court concludes that New GM is a product seller for purposes of the CPLA. New GM's Renewed Motion for Judgment as a Matter of Law is denied as to the plaintiffs' Independent Claim on this ground.

C.     Sufficiency of the Evidence

New GM raises a number of arguments that the evidence was legally insufficient as a matter of law to support the plaintiffs' claims. First, New GM argues that the plaintiffs' claims for failure to warn, both at the time of sale and post-sale, require expert testimony because the jury must consider factors beyond the knowledge and experience of ordinary jurors. See Mem. in Supp. (Renewed) at 11–15. New GM argues that, because the plaintiffs offered no such expert testimony at trial, the evidence was legally insufficient to support their claims. See id.

Second, New GM argues that the evidence was insufficient as a matter of law to establish that the warnings at the time of the sale were inadequate for a number of reasons. It contends that the plaintiffs mischaracterize the risk as that of the child shifting the transmission out of Park without using the brake, but that the risk is more appropriately described as the risk that unattended children could make vehicles move, causing injury or death. See id. at 15–17, 19–21. New GM argues that the owner's manual adequately warns of this latter risk and that, if heeded, the warning would have prevented the plaintiffs' injuries. See id. at 15–19. New GM argues that, therefore, it was not necessary to provide a more specific warning of the risk, as described by the plaintiffs. See id. at 19–21. New GM further contends that the risk that the plaintiffs

31

describe is obvious and refers to use by non-ordinary users and, therefore, that New GM has no duty to warn of such a risk.  See id. at 21–23.

The court notes that the jury did not find New GM liable to the plaintiffs on their claim for failure to warn at the time of the sale.  See Jury Verdict at 3.  The jury found by a preponderance of the evidence that New GM failed to provide necessary and adequate warnings at the time of the sale, but that the plaintiffs failed to prove that New GM's inadequate warnings caused their injuries.  See id.  Therefore, New GM ultimately prevailed on this count.  As such, the court considers New GM's arguments as to the adequacy of the warning in the owner's manual to be relevant only to the extent that inadequate warnings at the time of the sale may affect the plaintiffs' negligence claim for post-sale failure to warn.  See Mem. in Supp. (Renewed) at 35.  As decided previously, following Densberger, adequate warnings at the time of the sale do not preclude a post-sale failure to warn claim.  See, supra, at 14–15.  However, inadequate warnings at the time of the sale may be relevant to whether or not a reasonable person would have issued a post-sale warning.  The court addresses the sufficiency of the evidence for the jury's finding that the warning at the time of sale were inadequate only for this purpose. It is unnecessary to consider the arguments as they pertain to the jury's verdict on the plaintiffs' claim for failure to warn at the time of the sale.

Third, New GM argues that the evidence was insufficient as a matter of law to establish liability for negligence due to post-sale failure to warn.  See id. at 30–35.  New GM points to its previous arguments that the warnings at the time of the sale were adequate.  See id. at 35.  New GM then argues that the Technical Service Bulletin and unverified reports of children shifting vehicles out of park were insufficient to prompt a

reasonably prudent company to issue a post-sale warning.  See id. at 30–35.

Therefore, New GM contends that it did not fail to fulfill a post-sale duty to warn.  Finally,

New GM argues that the evidence is legally insufficient to prove that the failure to warn

caused the plaintiffs' injuries.  See id. at 24–27.

### 1.    Need for Expert Testimony

New GM argues that expert testimony is required to prove a claim based on

failure to warn.  See Mem. in Supp. (Renewed) at 11–15.  New GM therefore contends

that, because the plaintiffs offered no expert testimony at trial to support their warning

defect claims, there is no legally sufficient evidentiary basis for the jury's verdict in favor

of the plaintiffs.  See id.  New GM directs its argument to both the claim for failure to

warn at the time of sale and the negligence claim for post-sale failure to warn.[17]  See id.

at 13–14.

Whether expert testimony is necessary is a legal question for the court to decide.

See Bagley v. Adel Wiggins Grp., 327 Conn. 89, 103 (2017).  At an earlier stage in the

case, the court has previously addressed whether expert testimony was necessary for

the plaintiffs' claim for failure to warn at the time of the sale.  New GM moved for

summary judgment on this ground, and the court ruled that expert testimony was not

required for the plaintiffs to prove that the warnings contained in the owner's manual

---

[17] As noted previously, the jury found that New GM was not liable to the plaintiffs for failure to warn at the time of the sale.  See Jury Verdict at 3.  Therefore, the court considers arguments challenging the evidentiary basis for the jury's finding that the warning at the time of the sale was inadequate only to the extent that the inadequacy at the time of the sale is relevant to the plaintiffs' negligence claim for post-sale failure to warn.

were inadequate.[18]  See Motion for Summary Judgment (Doc. No. 59); Memorandum in Support of Motion for Summary Judgment ("Mem. in Supp. (MFSJ)") (Doc. No. 61) at 5–6; Ruling Denying Motion for Summary Judgment ("Ruling Denying MFSJ") (Doc. No. 120) at 24–27.

The court noted that neither party had cited any case law "in which a court applying Connecticut law has held that expert testimony is required, as a matter of law, in order for a plaintiff to prevail on an inadequate warning claim."  See Ruling Denying MFSJ at 25.  The court also reasoned that it was not complicated for a layperson to understand how the BTSI works or that, "in cars in which the BTSI function is not active in the Accessory position, the transmission can be shifted without application of the brake if the key is in the Accessory position."  Id.  The court therefore concluded that determining the adequacy of the warnings in the owner's manual was not beyond the ordinary knowledge and experience of the jury.  See id.  Accordingly, the court denied the Motion for Summary Judgment and permitted the plaintiffs to advance their claim to trial without proffering expert testimony.  See id. at 26–27.

During trial, after the plaintiffs' case, New GM moved for judgment as a matter of law on, inter alia, the plaintiffs' claims for failure to warn at the time of the sale, negligent failure to warn post-sale, and negligent failure to recall or retrofit.  See Mot. for JMOL (Lack of Expert); Mot. for JMOL (Negligent Retrofit).  Regarding the failure to warn at the time of the sale, the court affirmed its earlier ruling on summary judgment that no expert testimony was required.  See Charge Conf. Tr. 7/15/17 at 1458–59.

---

[18] New GM's Motions also argued that expert testimony was required for the plaintiffs' design defect claims.  See Mem. in Supp. (MFSJ) at 5–11.  The court does not mention those arguments here because the design defect claims are not at issue in this Motion.

In contrast, the court granted the Motion for Judgment as a Matter of Law as to the plaintiffs' negligent retrofit claim. See id. at 1458. The court reasoned that an expert was required to assist the jury with "the technical issues involved in retrofitting the Suburban, that is to say whether retrofitting the Suburban was even possible and/or whether it would have had collateral consequences that would have made any retrofit dangerous." Id. at 1457. For example, the court pointed out that Rose O'Connor's lay testimony was insufficient evidence to support the claim because she could not address the technical considerations of a retrofit or "what could be hypothetical or possible negative collateral consequences." Id. at 1457–58.

Lastly, the court reserved on the question of whether expert testimony was required to prove a claim for negligent failure to warn post-sale. See id. at 1459.

 a. Expert Testimony Regarding Adequacy of Warning at the Time of Sale

The court first addresses New GM's argument that expert testimony is required to prove a claim for failure to warn at the time of the sale. As to this claim, New GM argues specifically that expert testimony is needed in order to "provide opinions about what risks an ordinary manufacturer would have considered; what warnings effectively mitigate those risks; and the feasibility and cost of different warnings that would have prevented Plaintiffs' injuries." Mem. in Supp. (Renewed) at 13. The court, however, disagrees and reaffirms its decision in the Ruling Denying Motion for Summary Judgment. See Ruling Denying MFSJ at 24–27.

To prove a claim for failure to warn, the plaintiff must prove by a preponderance of the evidence that the "product was defective in that adequate warnings or instructions were not provided" and that, "if adequate warnings or instructions had been provided,

35

the claimant would not have suffered the harm."  Conn. Gen. Stat. § 52-572q(a), (c)

(2018).  The CPLA instructs:

> In determining whether instructions or warnings were required
> and, if required, whether they were adequate, the trier of fact
> may consider: (1) the likelihood that the product would cause
> harm suffered by the claimant; (2) the ability of the product
> seller to anticipate at the time of manufacture that the
> expected product user would be aware of the product risk, and
> the nature of the potential harm; and (3) the technological
> feasibility and cost of warnings and instructions.

Conn. Gen. Stat. § 52-572q(b) (emphasis added).

As a general rule, expert testimony is required "when the question involved goes

beyond the field of ordinary knowledge and experience of the trier of fact."  Bagley, 327

Conn. at 103.  However, the jury "need not close its eyes to matters of common

knowledge solely because the evidence includes no expert testimony on those matters."

Id.  "Whether expert testimony is required in a particular case is determined on a case-

by-case basis and its necessity is dependent on whether the issues are of sufficient

complexity to warrant the use of the testimony as assistance to the . . . [trier of fact]."  Id.

(alterations in original).

In this case, the issue is whether the warning in the owner's manual was

adequate to warn that the BTSI was not active in the Accessory position and that, as a

result, the transmission could be shifted without application of the brake, if the key is in

the Accessory position.  The court adheres to its earlier Ruling that the function of the

BTSI and the risk involved are easily comprehensible concepts, in contrast, for

example, to the technical considerations involved in determining the feasibility of a

retrofit.  See Ruling Denying MFSJ at 25.  Therefore, determining whether the warnings

adequately warn of such a risk does not go "beyond the field of ordinary knowledge and

36

experience" of the average juror.  See Bagley, 327 Conn. at 103; Ruling Denying MFSJ at 25.  New GM has since raised a number of additional arguments in support of its contention, but the court is not persuaded that these arguments would require it to alter the conclusion in its earlier Ruling.

First, New GM's attempts to identify "complex and technical factors" involved in this inquiry are unpersuasive.  See Mot. for JMOL (Lack of Expert) at 2; Mem. in Supp. (Renewed) at 13 (arguing that knowledge of "human factors engineering" is required, such as "how consumers behave, how they interact with a vehicle, and how product information is best delivered to reduce harm caused by human error").  The cases cited by New GM regarding expert testimony on human factors engineering held only that such expert testimony was admissible, not that it was required.  See Michaels v. Mr. Heater, Inc., 411 F. Supp. 2d 992, 999–1000 (W.D. Wis. 2006); Cole v. Goodyear Tire & Rubber Co., 967 S.W. 2d 176, 185 (Mo. Ct. App. 1998).  While the average juror may not have experience designing product warnings, most jurors have experience as consumers and with the operation of vehicles.[19]  Therefore, it is not beyond the experience of the lay juror to determine "how consumers behave," "how they interact with a vehicle," or how they respond to product warnings.

---

[19] New GM cites Cole v. Goodyear Tire & Rubber Co., 967 S.W. 2d 176, 185 (Mo. Ct. App. 1998), to support its argument that "how people react to product warnings is a subject about which lay people lack training and cannot form accurate opinions."  Mem. in Supp. (Renewed) at 13; see Cole, 967 S.W.2d at 185 ("Warnings and how people react to warnings are arguably subjects about which persons having no particular training are incapable of forming accurate opinions.").  However, not only is Cole not a case involving Connecticut law, but, like Michaels, Cole addresses the question of whether expert testimony on human factors is admissible, not whether it is required.  See Cole, 967 S.W.2d at 185.  Therefore, despite the language in Cole cited by New GM, Cole has not addressed the question before this court and does not require the court to alter its decision at summary judgment.

37

Additionally, in the court's Ruling Denying Motion for Summary Judgment, the court stated that New GM had identified no case applying Connecticut law that had held that expert testimony was required, as a matter of law to prevail on an inadequate warning claim. See Ruling Denying MFSJ at 25. The court distinguished the two cases cited by New GM. See id.; see also White v. Mazda Motor v. America, Inc., 139 Conn. App. 39 (2012); Montagnan v. Pfizer, Inc., 584 F. Supp. 2d 459 (D. Conn. 2008). Since the Motion for Summary Judgment, New GM has identified additional cases that it contends support its argument. The court, however, also considers these cases to be distinguishable.

In Freitas v. Michelin Tire Corp., the court granted partial summary judgment on the plaintiff's warnings claim because the plaintiff offered no expert testimony on the proximate cause element of his claim. See Freitas v. Michelin Tire Corp., No. 3:94-CV-1812 (DJS), 2000 WL 424187, at *5 (D. Conn. Mar. 2, 2000). However, the plaintiff in that case conceded at oral argument that he was unable to "proceed on his strict liability warnings defect claim against the defendant absent testimony by his expert witness." Id. Therefore, the Freitas court was not required to decide whether expert testimony was required to prove the warnings claim.

New GM also cites Beatty v. Michelin Tire Corp., in which the court excluded the plaintiff's proposed expert testimony and ultimately granted summary judgment on the plaintiff's warnings claim. See Beatty v. Michelin Tire Corp., No. 3:94-CV-989 (DJS), 1999 U.S. Dist. LEXIS 21970, at *12–*16 (D. Conn. Mar. 31, 1999). However, in Beatty, the court did not grant summary judgment solely as a result of the absence of expert testimony; rather, the court proceeded to consider whether the plaintiff offered any other

38

admissible evidence to prove causation.  See id. at *14.  The court considered and

excluded the plaintiff's own testimony as inadmissible opinion testimony by a lay

witness.[20]  See id. at *14–*15.  Therefore, the court granted summary judgment, not

because of the plaintiff's failure to offer expert testimony on causation, but because of

"the plaintiff's failure to offer any admissible evidence addressing whether Mr. Beatty

would have heeded an appropriate warning had one been provided."  Id. at *16

(emphasis added).  Nothing in the Beatty opinion states that expert testimony was

required.  To the contrary, the fact that the court then proceeded to consider other

evidence implies that it did not view the absence of expert testimony to necessarily

defeat the claim.

Additionally, in Gleeson v. Rust-Oleum Corp., the court granted summary

judgment for the defendant on the plaintiff's failure to warn claim in the absence of

expert testimony.  See Gleeson v. Rust-Oleum Corp., No. 3:11-CV-60 (AVC), 2013 WL

11331281, *4 (D. Conn. Sept. 16, 2013).  The Gleeson court's analysis focuses on the

need for expert testimony to prove that the anti-slip floor coating was unreasonably

dangerous as designed and manufactured.  See id. at *3.  The opinion only addresses

the failure to warn claim at the end of the analysis in two brief sentences.  See id. at *4.

("The plaintiffs' failure to proffer expert testimony that the EPS was unreasonably

dangerous is also fatal to their CPLA claim to the extent it is based on a failure to warn

theory or a negligence theory.  With respect to failure to warn, the plaintiffs have failed

---

[20] While there are similarities between the plaintiff's testimony in Beatty and Rose O'Connor's testimony in this case regarding whether she would have heeded an appropriate warning, no comparable objection was raised as to the admissibility of Rose O'Connor's similar testimony at trial in this case.  See Trial Tr. 7/11/17 at 675.  Thus, while Beatty presented no admissible testimony on causation, this case does contain evidence on causation.

to provide evidence that the EPS was defective without warnings."). One possible reading of <u>Gleeson</u>'s holding is, in line with the court's reading of <u>Beatty</u>, that the plaintiff offered no other evidence besides the rejected expert testimony that the product was defective without warnings. Therefore, in the absence of any evidence of a warning defect, summary judgment was appropriate.

Finally, in <u>Karavitis v. Makita</u>, while the court ultimately granted summary judgment on the plaintiff's defective warning claim, it cited with approval this court's Ruling Denying Summary Judgment. <u>See Karavitis v. Makita U.S.A., Inc.</u>, 243 F. Supp. 3d 235, 253 (D. Conn. 2017), <u>aff'd</u>, No. 17-1008-CV, 2018 WL 627491 (2d Cir. Jan. 31, 2018). The <u>Karavitis</u> court agreed with this court, stating, "Expert testimony is not required as a matter of law to establish that a warning was defective. However, expert testimony is required when 'the issues involved go beyond the field of ordinary knowledge and experiences of the trier of fact.'" <u>Id.</u> (citing <u>Pitterman v. Gen. Motors LLC</u>, 3:14–cv–0967, 2016 WL 1732710, at *11 (D. Conn. Apr. 29, 2016)).

The issue in <u>Karavitis</u> was whether the instructions were defective in warning about "the danger of kickback on portable handheld circular saws without riving knives." <u>Id.</u> at 253. In concluding that such a danger was beyond the ordinary knowledge and experience of the jury, the <u>Karavitis</u> court expressly distinguished its case from the facts of Pitterman's case, which were laid out in this court's Ruling Denying Summary Judgment cited by the <u>Karavitis</u> court. <u>See id.</u> For example, the <u>Karavitis</u> court cited the fact that the average consumer does not know what a riving knife is and that the parties presented no evidence that the jury could discern the danger without expert testimony. <u>See id.</u> In contrast, most jurors have experience operating a vehicle and

shifting between gears.  While an average juror may not have heard of the term BTSI before, he or she is likely familiar with the concept of depressing the brake in order to shift the transmission from Park.  Therefore, Karavitis supports the court's conclusion in this case.

In addition to these Connecticut cases, New GM also points the court to cases interpreting Missouri law for guidance.  See Mot. for JMOL (Lack of Expert) at 4–5; Mem. in Supp. (Renewed) at 12 n.4.  The court notes first that it considers these cases less persuasive because they do not apply Connecticut law.  However, to the extent that the court considers the reasoning in these cases, the court notes that the Eighth Circuit's holding in Menz v. New Holland North America is consistent with this court's conclusion.  See Menz v. New Holland N. Am., Inc., 507 F.3d 1107, 1111 (8th Cir. 2007); but see Bachtel v. Taser Int'l, Inc., 2013 WL 317538, *7 (E.D. Mo. Jan. 28, 2013), aff'd 747 F.3d 965 (8th Cir. 2014).  The Eight Circuit in Menz stated, "Missouri law does not necessarily require expert testimony in a strict products liability case. Such testimony is necessary, however, 'where the lay jury [does] not possess the experience or knowledge of the subject matter sufficient to enable them to reach an intelligent opinion without help."  Id.

The Eight Circuit instructs that "[t]he necessity of expert testimony in a failure to warn case turns on the complexity of the subject matter."  Id.  The facts of Menz involved an accident caused by a tractor with a front-end loader used to move dirt.  See id. at 1109.  In concluding that expert testimony was necessary, the Eighth Circuit reasoned that "the products at issue in this case are fairly technical and complex, and

are not the type of machinery commonly utilized by the typical lay juror."[21]  Id. at 1112.

In contrast, cars are commonly used by jurors.  Therefore, none of the cases newly

cited by New GM alter the court's decision in its prior Ruling Denying Summary

Judgment.  See Ruling Denying MFSJ at 27.

Finally, the court held in a Supplemental Ruling on Summary Judgment that

Izzarelli v. R.J. Reynolds Tobacco Co., 321 Conn. 172 (2016), did not alter the court's

conclusion that expert testimony was not required for the failure to warn claim.  See

Supplemental Ruling on Motion for Summary Judgment ("Suppl. Ruling on MFSJ")

(Doc. No. 140).  Nonetheless, in its Renewed Motion for Judgment as a Matter of Law,

New GM reiterates its reliance on Izzarelli and argues that Izzarelli should be read to

require expert testimony for design and warning claims.  See Mem. in Supp. (Renewed)

at 12.  This court, however, disagrees with New GM's proposed reading of Izzarelli and

again affirms its earlier Ruling.

The Connecticut Supreme Court in Izzarelli addressed a strict liability design

defect claim relating to the exposure to carcinogens in cigarettes.  See Izzarelli, 321

Conn. at 180.  Izzarelli held that the primary test for strict liability design defect claims is

the modified consumer expectation test.  See id. at 177.  The Izzarelli court then held

that, in order to prove a defect in that case, "the plaintiff's case required expert

testimony on cigarette design and manufacture, as well as the feasibility of an

alternative design."  Id. at 203–04.  Izzarelli did not involve a claim for failure to warn

---

[21] Although the district court in Bachtel employs broader language than the Eighth Circuit in
Menz, the reasoning in Menz also explains the outcome in that case.  Bachtel involved a TASER X26
Electronic Control Device, which is also a technical and complex product that is not commonly used by
the typical lay juror.  See Bachtel, 2013 WL 317538, at *1.

and, therefore, the Izzarelli court made no holding as to whether expert testimony would be required to prove such a claim.[22]

In conclusion, the court affirms its earlier holding that expert testimony is not required to prove the plaintiffs' claim for failure to warn at the time of the sale. See Ruling Denying MFSJ at 27. New GM has raised no new arguments and identified no new case law that persuade the court to alter its conclusion. Accordingly, New GM's Renewed Motion for Judgment as a Matter of Law is denied on this ground.

> b. Expert Testimony Regarding Standard of Care for Issuing a Post-Sale Warning

New GM also argues that expert testimony is required to prove the plaintiffs' negligence claim for post-sale failure to warn. See Mem. in Supp. (Renewed) at 14. To prevail on a theory of negligence, "the plaintiff must establish that the defendant owed a duty to [the plaintiff] and breached that duty"—in this case, the duty to warn. Ciarlelli v. Romero, 46 Conn. App. 277, 282 (1997). The plaintiff must also prove that the defendant's breach of duty proximately caused the plaintiff's injuries. See Doe v. Hartford Roman Catholic Diocesan Corp., 317 Conn. 357, 373 (2015). Here, the jury

---

[22] New GM points out that Izzarelli distinguishes manufacturing defects from design and warning defects. See Mem. in Supp. (Renewed) at 12; Mot. for JMOL (Lack of Expert) at 4. The court notes that the Izzarelli court does mention warning defects when it provides "some background on the development of Connecticut's strict product liability law." See Izzarelli, 321 Conn. at 184. Izzarelli explains that "products liability historically had focused on manufacturing defects, . . . before design defects and inadequate safety warnings had become well established theories of strict product liability." Id. at 186. Izzarelli also acknowledges: "In contrast to manufacturing defects, design defects and defects based on inadequate instructions or warnings are predicated on a different concept of responsibility. . . . [S]uch defects cannot be determined by reference to the manufacturer's own design or marketing standards because those standards are the very ones that plaintiffs attack as unreasonable." Id. at 188. While these statements do associate failure to warn claims with design defect claims in contrast to manufacturing defect claims, the remainder of the opinion focuses its discussion only on design defect claims. The court considers these brief mentions of warnings claims (in contrast to manufacturing defects) insufficient to indicate that the Izzarelli court intended its holding to apply to warnings claims in addition to design defect claims.

was not required to consider the adequacy of any post-sale warnings because no post-sale warnings were issued. Rather, the question was whether New GM acted with reasonable care in deciding not to issue a post-sale warning—that is, whether a reasonable person in New GM's circumstances would have issued a post-sale warning. The court previously reserved on this question. See Charge Conf. Tr. 7/15/17 at 1459.

New GM argues that expert testimony is required "to testify to the standard of care applicable to a vehicle manufacturer giving post-sale warnings and the means for determining breach." Mem. in Supp. (Renewed) at 14. New GM bases that argument on the contention that "[w]hether a manufacturer is negligent for failing to supplement warnings after sale is akin to a question of professional negligence." Id. (internal quotation marks omitted).

As with the failure to warn claim discussed above, "[a]lthough expert testimony may be admissible in many instances, it is required only when the question involved goes beyond the field of the ordinary knowledge and experience of the trier of fact." Utica Mut. Ins. Co. v. Precision Mech. Servs., Inc., 122 Conn. App. 448, 455 (2010) (quoting State v. Padua, 273 Conn. 138, 149 (2005)). In cases of ordinary negligence, "the usual rule is that expert testimony is not required, but rather the jury is to apply the standard of the reasonably prudent person in the same circumstances." Cammarota v. Guerrera, 148 Conn. App. 743, 750 (2014) (citing Marfyak v. New England Transp. Co., 120 Conn. 46, 48 (1935)).

In contrast, expert testimony is typically required in cases involving professional negligence or malpractice. See Ciarlelli, 46 Conn. App. at 283; Matyas v. Minck, 37 Conn. App. 321, 326–27 (1995). In such cases, expert testimony is often necessary "to

44

establish both the standard of skill and care applicable and that the defendant failed to conform to the standard, as these matters are outside the knowledge of the jury." Matyas, 37 Conn. App. at 326–27. "The requirement of expert testimony in malpractice cases serves to assist lay people, such as members of the jury and the presiding judge, to understand the applicable standard of care and to evaluate the defendant's actions in light of that standard." LePage v. Horne, 262 Conn. 116, 126 (2002).

Professional negligence is defined as "the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services." Santopietro v. City of New Haven, 239 Conn. 207, 226 (1996). Professional negligence is commonly seen in the context of cases involving medical and legal malpractice; indeed, a number of the cases cited by New GM address negligence in the medical and legal fields. See Davis, 215 Conn. at 415–16 (involving a claim of legal malpractice); Pearl v. Nelson, 13 Conn. App. 170, 173 (1988) (also involving a claim of legal malpractice); see also Heisinger v. Cleary, No. X04-HHD-CV-126049497-S, 2015 WL 1589152, at *9 ("Expert testimony as to issues of standard of care is expected and commonplace in cases relating to the negligence of medical or legal practitioners."). However, expert testimony has also been required in cases that are "akin to allegations of professional negligence or malpractice," beyond the medical and legal context. Santopietro, 239 Conn. at 226–27; see also Heisinger, 2015 WL 1589152, at *9 ("[T]he courts of this state have also required expert testimony to define the nature and scope

of an alleged tortfeasor's duty for a wide variety of activities and undertakings outside the fields of law and medicine.").

New GM argues that a manufacturer's decision whether or not to issue a post-sale warning is "akin to" professional negligence.  See Mem. in Supp. (Renewed) at 14; Mot. for JMOL (Lack of Expert) at 3–4.  However, New GM has identified no cases in which a court compared negligent failure to warn, either post-sale or at the time of the sale, with professional negligence.  Nor has New GM identified any cases in which a court has held that expert testimony is required to establish the standard of care for a manufacturer issuing a warning.  The cases that New GM identifies as "akin to" professional negligence are not analogous to the case here.  See Lepage, 262 Conn. at 126 (involving the standard of care required when watching a sleeping infant); Neff v. Johnson Memorial Hosp., 93 Conn. App. 534, 542–44 (2006) (involving a corporate negligence claim against a hospital for negligent credentialing of its medical staff); Monterose v. Cross, 60 Conn. App. 655, 658 (2000) (involving the standard of care required of a rigger moving a heavy wooden spool); Santopietro, 239 Conn. at 227–28 (involving the standard of care required by a baseball umpire); Matyas, 37 Conn. App. at 326–27 (involving the standard of care required of an engineer laying out a septic system).[23]  While these cases do illustrate the diversity of the types of cases that can be considered "akin to" professional negligence, New GM has offered no arguments to

---

[23] Other cases have required expert testimony to establish the standard of care for real estate brokers preparing a property listing, residential construction, using plywood to cover a hole over which people walked, installing HVAC systems, coaching cheerleading, installing carpet, teaching horse riding, installing tile on a swimming pool edge, repairing cars, and installing hairpieces.  See Heisinger, 2015 WL 1589152, at *9 (listing cases).

explain why any of these cases are similar to a manufacturer's decision to issue a warning.  See Mem. in Supp. (Renewed) at 14; Mot. for JMOL (Lack of Expert) at 3–4.

The only products liability case identified by New MG addressed a design defect claim, not a failure to warn claim.  See Walters v. Howmedica Osteonics Corp., 676 F. Supp. 2d 44, 52 (D. Conn. 2009) (involving the standard of care required in the design and construction of surgical trays).  In Walters, the court held that "the design and construction of surgical trays is a complex process that requires the consideration of a substantial number of variables."  Id.  Walters is thus more similar to the plaintiffs' claim for negligent failure to recall and retrofit than their claim for negligent failure to warn. Assessing the design and manufacture of a complex product, such as a surgical tray or the braking system in a car, often requires technical expertise that is outside the ordinary knowledge and skill of the average juror.  Assessing the need for and adequacy of warnings for such products, however, involved consideration of different factors than required by the design or manufacturing defect claims.

In contrast to the cases cited by New GM, other cases have found that no expert was required to establish the standard of care in an equally diverse set of situations. See, e.g., Michalski v. Hinz, 100 Conn. App. 389, 404 (2007) (not requiring expert testimony as to the standard of care in complying with boating regulations); Bader v. United Orthodox Synagogue, 148 Conn. 449, 454 (1961) (not requiring expert testimony as to negligence for failure to erect a porch railing); Ciarlelli, 46 Conn. App. at 283–84 (not requiring expert testimony as to whether a boat operator breached the duty to warn the passenger of danger presented by turbulent water); Mazier v. Signature Pools, Inc., 159 Conn. App. 12, 33–34 (2015) (not requiring expert testimony as to the standard of

47

care in situating a pool according to a plot plan); Utica Mut. Ins. Co., 122 Conn. App. at 456 (not requiring expert testimony as to standard of care in operating a plumber's torch in the vicinity of combustible materials); Niro v. Niro, No. HHDX04-CV-126029370-S, 2014 WL 7525492, at *7 (Conn. Super. Ct. Nov. 25, 2014) (not requiring expert testimony as to the standard of care required of a trustee accounting for trust property).

In the absence of any case identified by either party addressing the standard of care in the negligent failure to warn context, the court compares the present case against the different examples on both sides and concludes that a manufacturer's decision whether or not to issue a post-sale warning is not "akin to" professional negligence. The court has already held, in the context of the plaintiffs' claim for failure to warn at the time of the sale, that it is not outside the ordinary knowledge and expertise of the average juror to understand the risk in this case or to assess the adequacy of a warning. Similarly, the court now also holds that it is not outside the ordinary knowledge and experience of the average juror to determine when such a warning would be necessary. Unlike the cases identified above as akin to professional negligence, a determination that a warning is necessary does not require technical expertise or specialized skill when a layperson can understand without difficulty the risk that is the subject of the warning.

New GM attempts to argue otherwise by identifying certain factors that it argues the jury must consider before determining whether a manufacturer exercised reasonable care in not issuing a post-sale warning. See Mot. for JMOL (Lack of Expert) at 2–3; Reply in Supp. (Renewed) at 14–15. A number of the factors identified by New GM are irrelevant here because they go to the adequacy of a warning, which the court

has already held is within the ordinary ken of the jury.  See Reply in Supp. (Renewed) at 14–15 (arguing that the average juror has no knowledge of "the appropriate level of generality or specificity," "choice of language, placement, and conspicuity of each warning and instruction," and "whether warnings should ever be on product, rather than in the owner's manual").  Because no post-sale warning was issued in this case, the jury was not required to consider these factors.

The other factors that New MG identifies include, inter alia, the balance between too few and too many warnings, the number and type of incident reports needed before a warning is warranted, the degree to which manufacturers should investigate incident reports, and whether supplemental warnings are effective.  See id. at 15; Mot. for JMOL (Lack of Expert) at 2–3.  First, the court notes that, while these may be factors that the jury can consider, the jury is not necessarily required to consider all of these factors in every case.  Second, although New GM refers to these as "technical and complex considerations," see Mot. for JMOL (Lack of Expert) at 3, the court does not consider these factors to be outside the ordinary knowledge and experience of an average juror.  For example, as a consumer, a lay juror has likely received warnings, both at the time of sale and post-sale, and is therefore able to draw reasonable conclusions about their effectiveness and frequency.  Likewise, a reasonable person can draw inferences about the seriousness of a foreseeable risk based on the number and type of incident reports without technical expertise or specialized skill, especially with the facts presented here.

Indeed, if the factors identified by New GM did require expert testimony, expert testimony would likely be required in most, if not all, negligent failure to warn claims because none of the factors New GM identifies are specific to the type of risk to which

49

the warning pertains. No Connecticut precedent indicates that the Connecticut Supreme Court would support such a far-reaching requirement, as New GM has not identified even one case in which the Connecticut Supreme Court has required expert testimony in a case for negligent failure to warn.

Therefore, the court concludes that expert testimony is not required to prove the standard of care or a breach of that standard for the plaintiffs' claim of negligent post-sale failure to warn. Thus, the plaintiffs' failure to offer expert testimony does not render the evidence legally insufficient to prove their negligence claim, and New GM's Renewed Motion for Judgment as a Matter of Law is denied on this ground.

c.   Expert Testimony Regarding Causation

Finally, New GM mentions in its Motion that determining the element of causation also falls outside the ordinary knowledge and experience of jurors and therefore requires expert testimony. See Renewed Mot. for JMOL at 1. However, New GM's briefings do little to further develop this argument, but instead focus on the two arguments already rejected by the court above. See Mem. in Supp. (Renewed) at 11–15; Reply in Supp. (Renewed) at 13–16; Mot. for JMOL (Lack of Expert) at 1–5. New GM's only elaboration of this argument is its reliance on Freitas, a case already distinguished by the court above, and Karavitis, which the court discusses below. See Reply in Supp. (Renewed) at 15. In light of New GM's cursory treatment of the argument, the court briefly addresses it below and concludes that it has no merit.

"[E]xpert testimony is not required as a matter of law to establish that a defective warning caused the plaintiff's injury." Karavitis, 243 F. Supp. 3d at 253. "However, expert testimony is required where 'necessary to determine the effect of [the product] and to determine whether it caused [Plaintiff's] injuries." Id. at 253–54 (quoting Sullivan

50

v. Pfizer, Inc., No. 3:14-CV-1374 (MPS), 2016 WL 868155, at *4 (D. Conn. Mar. 4, 2016)) (alteration in original).  For example, in Sullivan, the court held that expert testimony was required to inform the jury on the effect of Lipitor, a prescription drug, on the body and whether the failure to warn about those effects caused the plaintiff's heart attack.  See Sullivan, 2016 WL 868155, at *4.

In this case, however, expert testimony is not necessary to determine the effect of the product or its defect.  In contrast to the medical effects of prescription drugs, the jury does not require special training or expertise to understand the effect of the absence of BTSI when the key is in the Accessory position.  It is thus within the knowledge and experience of an ordinary juror to determine whether the failure to warn of such a risk caused the plaintiffs' injuries without expert testimony.  Therefore, New GM's Renewed Motion for Judgment as a Matter of Law is also denied on this ground.

2.      Sufficiency of Evidence of Inadequacy of Warning at Time of Sale

New GM makes a number of arguments, all of which contend that the evidence presented at trial was legally insufficient to support the jury's finding that the warnings in the owner's manual were inadequate.  See Mem. in Supp. (Renewed) at 15–23.  As explained above, the court considers these arguments relevant only to the extent that inadequate warnings at the time of the sale may affect the plaintiffs' negligence claim for post-sale failure to warn.  See, supra, at 32.

New GM first argues that the plaintiffs mischaracterize the risk that should be the subject of the warning.  See Mem. in Supp. (Renewed) at 15–17, 19–21.  New GM argues that this risk is the general risk that "unattended children could make vehicles move, causing injury or death."  Id. at 15.  In contrast, the plaintiffs argue that the risk is the more specific risk that "a child could cause a rollaway by shifting the transmission

51

out of Park when the key was in Accessory, without starting the engine and without depressing the brake."  Mem. in Opp. (Renewed) at 8.

The plaintiffs presented sufficient evidence at trial to enable the jury to conclude that the relevant risk to be warned of was the specific risk described by the plaintiffs, not merely the general risk that unattended children could cause vehicles to move.  For instance, the plaintiffs' design expert, Wayne McCracken, answered affirmatively that there was a "risk of roll-aways caused by children shifting out of park with the key in an unprotected position" and that "having a vehicle design that allows children to shift the transmission out of park without having to depress the brake when the key is in the accessory position creates a risk of serious injury and death."  Trial Tr. 7/10/17 at 330, 344; see also id. at 301 ("To prevent parked vehicles with automatic transmissions from rolling away.  It is a danger.  It is a risk.").

Additionally, the Introduction to the National Highway Traffic Safety Administration ("NHTSA") Report states that it is "designed to reduce the potential for accidents resulting from shifting of the transmission lever in parked vehicles with automatic transmissions, causing them to roll away."  National Highway Traffic Safety Administration Report ("NHTSA Report"), Trial Ex. 72, at 4.  William Sultze, system engineer for New GM, also testified that he was aware of "instances of General Motors' vehicles rolling away as a result of children putting the key in the ignition, moving into an intermediate position between lock and run where BTSI didn't function."  Sultze Deposition at 24–25.

New GM points to one part of McCracken's testimony that characterizes the risk as "the risk of children shifting the transmission out of park."  See Trial Tr. 7/10/17 at

52

303.  This phrasing, however, does not necessarily conflict with the plaintiffs'

characterization of the risk.  The attorney questioning McCracken asked, "What, if

anything, does this report [the NHTSA Report] indicate about the risk of children shifting

the transmission out of park?"  Id.  McCracken answered that it was a "huge risk."  Id.

Taken in context with McCracken's previous testimony about the risk associated with

the NHTSA Report, "the risk of children shifting the transmission out of park" could

merely be shorthand for the risk of a "child shifting a vehicle out of park with the engine

off."  See id. at 302–03.  As such, McCracken's answer would be entirely consistent with

the plaintiffs' more specific characterization of the risk.

Even if McCracken's testimony did support a more general characterization of

the risk, however, the jury was not required to accept that characterization.  In deciding

a motion for judgment as a matter of law, the court "must disregard all evidence

favorable to the moving party that the jury Is not required to believe" and "must view the

evidence in the light most favorable to the [non-moving] party."  Mickle v. Morin, 297

F.3d 114, 120 (2d Cir. 2002); Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998).

Therefore, based on the evidence described above, taken in the light most favorable to

the plaintiffs, a jury could reasonably have concluded that New GM should have warned

of the risk that a child could cause a rollaway by shifting the transmission out of Park

without depressing the brake when the key was in the Accessory position, as described

by the plaintiffs.[24]

---

[24] Based on its argument that the plaintiffs had mischaracterized the risk, New GM also argues
that the owner's manual adequately warns of the risk, as characterized by New GM, that unattended
children can make vehicles move.  See Mem. in Supp. at 15–17.  Even if New GM were correct that the
manual adequately warned of this more general risk, however, it would not be entitled to judgment as a
matter of law because, as discussed above, a reasonable jury could have found that the risk was not

53

Accepting that characterization of the risk, the court holds that the plaintiffs

presented sufficient evidence to enable the jury to find that New GM's warning in the

owner's manual was inadequate to warn of that risk. The evidence at trial included,

inter alia, the warnings in the owner's manual themselves, the testimony of New GM's

expert witness, David McKendry, and the deposition of Sultze.

The first of two instructions in the owner's manual, relied on by New GM, states:

> Leaving children in a vehicle with the Ignition key is dangerous
> for many reasons. They could operate the power windows or
> other controls or even make the vehicle move. The children
> or others could be badly injured or even killed. Do not leave
> the keys in a vehicle with children.

2004 Suburban Owner's Manual, Trial Ex. 9b, at 2-3. The statement is accompanied by

a yellow bar with the word CAUTION and a caution symbol. See id. The jury could

reasonably conclude that this statement does not adequately warn of the risk, as

characterized above, because it does not mention the BTSI and, more specifically, does

not state that the transmission can be shifted out of park with the key in Accessory

without depressing the brake. For instance, one could interpret the statement that

children could "make the vehicle move" to mean that they could make the vehicle move

by starting the engine, as the instruction gives no indication that the car can be moved

without starting the engine. See Mem. in Opp. (Renewed) at 11.

The second instruction relied on by New GM describes how to shift out of Park

and instructs the user that he or she must "fully apply your regular brakes before you

can shift from Park (P) when the ignition is in RUN." 2004 Suburban Owner's Manual at

---

merely that unattended children could make the vehicle move, but rather that the child could shift the
transmission out of Park without depressing the brake.

2-41.  It also provides the following steps if the user cannot shift out of Park using the above instructions:

> 1.  Turn the key to ACCESSORY.  There is no shift interlock in this key position.
>
> 2.  Apply and hold the brake until the end of Step 4.
>
> 3.  Shift the transmission to NEUTRAL (N).
>
> 4.  Start the vehicle and then shift to the gear you want.
>
> 5.  Have the system fixed as soon as you can.

Id.  In contrast to the first instruction, this second instruction does not have a yellow bar with the word CAUTION and a caution symbol, which the manual itself states that it will use to identify warnings.  See id.; see also id. at iii ("We use a box and the word CAUTION to tell about things that could hurt you if you were to ignore the warning."). Thus, the jury could reasonably conclude that the instruction was not intended as a warning.

The jury could also reasonably conclude that, even if intended as a warning, the above instruction did not adequately warn of the relevant risk.  Although this instruction does inform the reader that there is no shift interlock in the Accessory position, it does not define "shift interlock" and does not clearly state that the transmission can be shifted out of Park without depressing the brake when the key is in the Accessory position. Rather, it tells the user to apply the brake at Step 2, which may reinforce the user's assumption that the transmission cannot be shifted out of Park without depressing the brake.

The plaintiffs also introduced the testimony of David McKendry and the deposition of William Sultze, both of whom stated that customers perceived that the

55

BTSI system was active in all key positions. See Trial Tr. 7/12/17 at 860–61 (testimony of McKendry) (agreeing that "customers perceived, even though it wasn't true, that the BTSI was active in all key positions"); Sultze Deposition at 74 (acknowledging that "[m]ore and more customers are starting to" "expect[ ] BTSI would be functional in all key positions"). The jury could reasonably infer from this testimony that the owner's manual had not adequately informed customers that the BTSI was not active in the Accessory position and that therefore the transmission could be shifted out of Park without depressing the brake in that position.

Taken together, this evidence could reasonably support the jury's finding that the warning in the owner's manual was inadequate at the time of the sale. Therefore, New GM cannot show that it is entitled to judgment as a matter of law on this ground.

New GM does, however, make several more specific arguments that the court now addresses. New GM argues that the warning is adequate because, if heeded, it would have prevented the plaintiffs' injuries. See Mem. in Supp. at 18–19. New GM is correct that the Restatement (Second) of Torts states, "Where a warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in a defective condition, nor is it unreasonably dangerous." Restatement (Second) of Torts § 420A cmt. (j). This is commonly discussed in the context of products that are inherently dangerous and cannot be made safer by redesign. See Plummer v. Lederle Labs., Div. of Am. Cyanamid Co., 819 F.2d 349, 355–56 (2d Cir. 1987); Vitanza v. Upjohn Co., 257 Conn. 365, 374–75 (2001).

However, Connecticut cases discussing the Restatement primarily do so in the context of a warning that is adequate or "proper."  See Vitanza, 257 Conn. at 374 ("Proper warnings, however, may prevent a product from being unreasonably dangerous." (emphasis added)); id. at 375 ("A manufacturer of an unavoidably unsafe product can avoid strict liability if the product is 'properly prepared, and accompanied by proper directions and warning . . . ." (emphasis added)); see also Drake v. Allergan, Inc., 63 F. Supp. 3d 382, 391 (D. Vt. 2014) ("Vermont law presumes that if an adequate warning is provided, the warning will be read and heeded." (emphasis added)).  New GM has pointed to no Connecticut case indicating that the Restatement would consider a product not to be defective based on the assumption that an inadequate warning would be read and heeded.[25]  Therefore, because the evidence is sufficient for the jury to find that the warning was inadequate, New GM is not entitled to judgment as a matter of law on this ground.

New GM also argues that the risk described by the plaintiffs is obvious and, therefore, that it has no duty to warn of such a risk.  See Mem. in Supp. (Renewed) at 21–23.  The court instructed the jury that "[a] product seller does not have a duty to provide a warning as to a danger that is obviously involved in the customary, ordinary use of a product or that is obviously present if the product is misused."  Jury Charge at 36–37; Wynne v. Summerland, Inc., No. LLICV095006358S, 2012 WL 5860349, at *3 (Conn. Super. Ct. Nov. 2, 2012).  However, the jury could reasonably have concluded,

---

[25] The other cases that New GM cites to support its proposition that more specific warnings are not needed when a general warning would prevent the injury do not apply Connecticut law.  See, e.g., Thompson v. TCI Prod. Co., 81 F. Supp. 3d 1257, 1265 (N.D. Okla. 2015); Heckman v. Ryder Truck Rental, 962 F. Supp. 2d 792, 805 (D. Md. 2013); Liesener v. Weslo, Inc., 775 F. Supp. 857, 861 (D. Md. 1991); Davis v. Berwing Corp., 547 Pa. 260, 267–68 (1997).  New GM has not identified any case law indicating that Connecticut courts would apply the same principle.

based on the evidence, that the risk that a child could shift the transmission out of Park without depressing the brake when the key was in the Accessory position is not an obvious risk.  As noted above, both McKendry and Sultze testified that consumers had misperceptions about how the BTSI system worked and believed that it was active in all key positions.  See Trial Tr. 7/12/17 at 857–61; Sultze Deposition at 73–74.  McKendry, for example, testified that "assuming that you had to step on the brake all the time to shift out of park" was "a perception that a lot of people had."  See Trial Tr. 7/12/17 at 859.  This evidence is sufficient to enable the jury to conclude that the risk was not obvious and therefore that New GM had a duty to warn of that risk.

New GM further argues that it is entitled to judgment as a matter of law because the duty to warn extends only to ordinary users, and children are not the ordinary users of cars.  See Mem. in Supp. (Renewed) at 23–24.  New GM states, "A vehicle manufacturer owes no duty to warn children, who are not intended operators, how to 'safely shift out of Park, with or without a BTSI."  Id. at 23.  New GM's argument, however, misses its mark.  The plaintiffs' claim is not that New GM failed to warn the children how to safely shift out of Park, but rather that New GM failed to warn the parents of the risk that children left unattended could shift the transmission out of Park without depressing the brake.  See Mem. in Opp. (Renewed) at 18 n.35.  New GM's argument has no relevance to its failure to warn the parents of this risk.  Therefore, it is not entitled to judgment as a matter of law on this ground.

Taken together, the evidence discussed above could reasonably support the jury's finding that the warning at the time of the sale was inadequate.  Therefore, New GM has failed to show that it is entitled to judgment as a matter of law.

3.    Sufficiency of Evidence of Failure to Warn Post-Sale

New GM then argues that it is entitled to judgment as a matter of law because the evidence is legally insufficient to support the jury's verdict in favor of the plaintiffs on either theory of the post-sale failure to warn claim. See Mem. in Supp. (Renewed) at 35. In doing so, New GM relies on its earlier argument that the warnings at the time of the sale were adequate as a matter of law. See id. New GM then argues that neither the Technical Service Bulletin issued regarding the BTSI nor the unverified reports of rollaway incidents were sufficient to prove that a reasonably prudent manufacturer would have issued a post-sale warning. See id. Taking these two arguments together, New GM argues that no reasonable jury could have found that it was negligent in failing to issue a post-sale warning. See id.

New GM's arguments here fail because the court has already held above that there was sufficient evidence on which a reasonable jury could conclude that the warnings at the time of the sale were inadequate. Therefore, a reasonable jury could have found, then, that a reasonable manufacturer would have issued a post-sale warning based on the inadequacy of the warnings at the time of the sale. Furthermore, New GM's arguments fail to view the evidence in the light most favorable to the plaintiffs, as required in deciding a Motion under Rule 50(b). See Mickle, 297 F.3d at 120; Norton, 145 F.3d at 118. Taken in the light most favorable to the plaintiffs, the Technical Service Bulletin, the reports of rollaways, and the evidence discussed above that the warnings in the manual were inadequate are sufficient to support the jury's verdict in favor of the plaintiffs.

Technical service bulletins are notices issued by the company to dealerships to help them communicate with customers regarding questions and repairs. See Trial Tr.

59

7/13/17 at 959–60.  The Technical Service Bulletin ("TSB") in this case, issued on May 25, 2006, was issued "to better explain how the [BTSI] feature is intended to operate." Technical Service Bulletin ("TSB"), Trial Ex. 65, at 1.  The TSB states:

> The shift lock control feature was intended to prevent drivers from shifting out of Park with the vehicle running without the brakes applied.  However, if the ignition switch is in the Accessory (ACC) position, it may be possible on some vehicles to move the shift lever out of Park WITHOUT first activating the brake.

Id.  The TSB also acknowledges that "some owners may feel that the shift lock control system prevents an unattended child from moving the vehicle."  Id.

New GM argues that there is no evidence that a reasonably prudent manufacturer would have issued a warning because of the TSB.  See Mem. in Supp. (Renewed) at 31.  This argument overlooks the text of the TSB itself, from which the jury is permitted to draw reasonable inferences.  Drawing all inferences in favor of the plaintiffs, see Mickle, 297 F.3d at 120, a reasonable jury could have inferred from the TSB that Old GM[26] was aware in 2006 that some of its customers misunderstood the BTSI feature in a way that could be potentially dangerous.  The jury could further have inferred from the clear instructions in the TSB, which differ from the language in the owner's manual, that Old GM believed that customers needed clarification that the BTSI was not active in the Accessory position.  These inferences reasonably support the jury's finding that a reasonable person in Old GM's position would have issued a post-sale warning that it was possible to shift the transmission from Park without depressing the brake when the key is in the Accessory position.

---

[26] The court refers to Old GM rather than New GM here because the TSB was issued in 2006 prior to Old GM's bankruptcy and the purchase of its assets by New GM.

New GM makes several other arguments regarding the insufficiency of the TSB as evidence supporting the jury's verdict. These arguments, however, misunderstand the purpose for which the TSB is offered as evidence. New GM first argues that Rose O'Connor did not know what a BTSI was and therefore could not have had the assumption discussed in the TSB that the BTSI would prevent an unattended child from moving the vehicle. See Mem. in Supp. (Renewed) at 31. Even if true, this is irrelevant because the TSB is evidence of what Old GM knew and, therefore, what a reasonable manufacturer with that knowledge would have done. The knowledge of Rose O'Connor, one particular consumer, does not alter the standard of care owed by Old GM to its consumers generally.

Second, New GM argues that the TSB was issued the year before the O'Connors bought the vehicle, so any warning issued would have gone to the previous owner rather than to the plaintiffs. See Mem. in Supp. (Renewed) at 31. This argument again misunderstands the evidentiary significance of the TSB. The issue is whether a reasonable manufacturer would have issued a post-sale warning. Whether the warning would have reached the O'Connors does not alter the standard of care owed by the manufacturer or whether Old GM failed to meet that standard of care.

Third, New GM argues that the TSB is insufficient evidence to show that the warnings were inadequate at the time of the sale because it refers users to the manual. See Mem. in Supp. (Renewed) at 31; Reply in Supp. (Renewed) at 11; TSB ("Please stress to owners, as stated in the Owner Manual, that children should NEVER be left unattended in a vehicle, even if the ignition key has been removed from the vehicle."). However, as previously discussed, the court has already held that there was sufficient

evidence to find that the warnings were inadequate at the time of the sale. That evidence is not limited to the TSB, but also includes the testimony of McCracken, Sultze, and McKendry, as well as exhibits from the owner's manual itself. The court refers to the TSB now as additional evidence on which the jury could conclude that a reasonably prudent manufacturer would have issued a post-sale warning, which is a different inquiry from whether the owner's manual was inadequate.

In addition to the TSB, the plaintiffs also introduced evidence of unverified reports of rollaway incidents that were received by Old GM and New GM. The court permitted the plaintiffs to introduce evidence of the reports through a Stipulation agreed upon by the parties. See Stipulation, Trial Ex. 300; Pretrial Conf. Tr. 6/28/17 at 65–66. The Stipulation stated, inter alia:

> GM stipulates that its files contain 43 reports made by customers between March 10, 2003 and May 21, 2011, of incidents of vehicle rollaways claimed to be caused by children involving vehicles with a brake transmission shift interlock system similar to the 2004 Chevrolet Suburban at issue in this case. The reports contain information received from the customer and do not indicate whether or not the claims were verified.

Stipulation at 1. It further specifies: "The reports each claim that a child shifted the transmission out of Park, causing the vehicle to rollaway. In 18 of the incidents, children were reported not have pressed the brake; the other 25 incidents provide no information about the brake." Id. The court provided a limiting instruction to the jury that the evidence in the Stipulation was only to be used in "deciding whether General Motors was aware at certain times of the fact that people reported such incidents," not to prove that the events in the reports actually occurred. See Trial Tr. 7/10/17 at 332.

This evidence was sufficient to enable the jury to find that Old GM and New GM were both on notice that customers had reported incidents in which children had caused the car to roll away by shifting the transmission out of Park without depressing the brake. Without assuming that the incidents had actually occurred, the jury could reasonably have relied on this evidence to support a conclusion that a reasonable manufacturer in Old GM's and New GM's positions would have issued a post-sale warning to customers based on this notice.

New GM's arguments regarding these reports focuses primarily on their admissibility. First, New GM argues that the reports are inadmissible hearsay. <u>See</u> Mem. in Supp. at 33–34. The court rejected this argument at trial. <u>See</u> Pretrial Conf. Tr. 6/28/16 at 65–66. A statement is only hearsay if it is "offered to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). In this case, the reports were not offered to prove the truth of the matter asserted, but to prove notice, which is a permissible nonhearsay purpose. <u>See</u> <u>Crawford v. Tribeca Lending Corp.</u>, 815 F.3d 121, 126 (2d Cir. 2016); <u>AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Sys., Inc.</u>, 637 Fed. App'x 645, 650 n.7 (2d Cir. 2016). The court clearly instructed the jury regarding the limited purpose of this evidence.[27] <u>See</u> Trial Tr. 7/10/17 at 332–33. Therefore, the court did not err in admitting the reports.

---

[27] The court instructed the jury when the Stipulation was admitted into evidence:

> First, you have to understand that you may use this evidence, which is this stipulation, only for the purposes in connection with deciding whether General Motors was aware at certain times of the fact that people reported such incidents, that people claim these incidents occurred and claim they involved a child, claim certain injuries resulted.

> The stipulation in no way proves each of those incidents. What is proved is that GM received a report about such a claimed incident. So it is like saying you get a letter in the mail and it says certain things. It doesn't

Second, New GM argues that the reports say nothing about the warnings in the owner's manual and how they affected the reported events.  See Reply in Supp. at 11.  As with New GM's arguments about the TSB, this argument misunderstands the purpose for which notice of the reports was introduced.  The reports are not evidence that the warnings in the owner's manual were inadequate.  Rather, they are evidence from which a jury could reasonably conclude that Old GM and New GM were aware that rollaway incidents had been reported and, therefore, that a reasonable manufacturer in their positions would have issued a post-sale warning in response to such notice.

Finally, New GM argues that the court should not have permitted the plaintiffs to cross-examine defense expert Victor Hakim in a way that invited him to assume the truth of the unverified reports through hypotheticals.  See Mem. in Supp. (Renewed) at 33.  New GM argues that the cross-examination prompted speculation and caused juror confusion.  See id.  During the cross-examination of Hakim, the plaintiffs' attorney asked Hakim a number of questions, posed as hypotheticals, that required Hakim to assume that the reports of rollaway incidents were true and that children under a certain age could not reach the brake.  See Trial Tr. 7/13/17 at 1030–34.  New GM objected to the questions on the ground that they assumed the truth of the reports, which were admitted

---

necessarily prove they are true.  What it proves is you read that letter and now you know that someone says what's in the letter happened.  Okay.  Doesn't prove what happened, but it does prove that, in the letter example, you know what was in the letter was said.

Trial Tr. 7/10/17 at 332.  The court again instructed the jury during the cross-examination of Hakim: "I want you to remember that the stipulation is evidence that a report of these types of information came into GM by certain ages, et cetera, and other aspects, but that didn't prove they actually happened."  Trial Tr. 7/13/17 at 1032.  Although New GM requested that the court re-charge the jury with this limiting instruction at the end of the trial, the court ruled that such an instruction would be unnecessary since it had already clearly charged the jury twice on this matter.  See Charge Conf. Tr. 7/15/17 at 1380–81.

only for purposes of notice.  See id.  The court, however, overruled the objection and permitted the witness to answer.  See id.

Generally, "[i]n asking a hypothetical question, the examiner may seek the witness's opinion on 'any combination of facts within the tendency of the evidence.'" Vermont Food Industries, Inc. v. Ralston Purina Co., 514 F.2d 456, 463 (2d Cir. 1975); see also United States v. Morgan, 554 F.2d 31, 33 (2d Cir. 1977) ("Opinion testimony of expert witnesses has traditionally been given in response to hypothetical questions based upon the evidence in the case, and this form of questioning may properly be used on cross-examination as well as direct.").  New GM is correct that, because evidence of the reports was admitted solely for the purpose of notice, there was not sufficient foundation in the evidence for the hypothetical questions asked here, which assumed that the rollaway incidents actually occurred the way they were reported to New GM.

However, Federal Rule of Civil Procedure 61 states, "Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error committed by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order.  At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."  Fed. R. Civ. P. 61.  "An erroneous evidentiary ruling that does not affect a party's 'substantial right' is thus harmless."  Tesser v. Bd. of Educ. of City School Dist. of City of New York, 370 F.3d 314, 319 (2d Cir. 2004).  "Whether an evidentiary error implicates a substantial right depends on 'the likelihood that the error affected the outcome of the case.'"  Id. (citation omitted).

In this case, even if the court erred in permitting the plaintiffs' hypothetical questions on cross-examination of Hakim, such error was harmless. The plaintiffs' attorney asked Hakim, assuming that the reports were accurate and that children under a certain age could not reach the brake, how many of the reported incidents could have been prevented if the BTSI was operative in all key positions.[28] See Trial Tr. 7/13/17 at

---

[28] Specifically, the following two hypothetical questions assumed the truth of the reports:

> ATTORNEY: I want you to assume for the purposes of this question that what was reported to GM in these cases is true and I want you to assume that the children that were younger than two and the children that were two, could not reach the brake. The two year olds and under twos, okay, assume those facts.
>
> HAKIM: Okay.
>
> ATTORNEY: That would have meant that those 23 cases, the car would not have rolled away if all key positions were protected, correct?
>
> HAKIM: All right. So under all those presumptions and assuming all those facts, sure. But—yeah.
>
> ATTORNEY: Okay. And then if you assume—and I know this one you disagree with—that the three year olds couldn't put their foot to the brake and shift at the same time that would add another 13 cases to the number, right? You go from 23 to 36 of the 43 cases?
>
> . . .
>
> HAKIM: I wouldn't agree with that.
>
> ATTORNEY: You wouldn't agree that if the three year olds can't shift and reach the brake at the same time an ignition which protects all key positions would stop 36 of these 43 roll-aways?
>
> HAKIM: So again, I kind of missed that part in your question that your assumption was they couldn't reach the brake pedal, and I'm assuming all again—all the other facts that are unknown to me are true, which are all unknown to me, then of course.

Trial Tr. 7/13/17 at 1031–34.

New GM notes that the court also permitted the plaintiffs' counsel to cross-examine Hakim about particular reports. See Mem. in Supp. (Renewed) at 33. These questions about particular reports, however, were not hypothetical questions based on unproven assumptions. See Trial Tr. 7/13/17 at 1035–49. Rather, they asked Hakim to testify about his personal knowledge and experience investigating particular cases for the purpose of impeaching the expert opinions he gave during his direct examination. See id. at 1041 ("I believe that what the counsel is doing is he's cross-examining your witness. Your witness gave various opinions, made various statements about his view of things, and I believe that he's

1031–34.  The questions required Hakim to do little more than add the numbers stated in the reports.  Thus, his answers introduced little into the record that was not already before the jury in the stipulation, which already noted the reported ages of the children in each incident and the number of incidents in which it was reported that the child had not depressed the brake.  See Morgan, 554 F.2d at 33.  Furthermore, in light of the ample other evidence in the record, Hakim's answers to the plaintiffs' two hypothetical questions on cross-examination were likely "unimportant in relation to everything else the jury considered on the issue in question."  See Warren v. Pataki, 823 F.3d 125, 138 (2d Cir.), cert. denied sub nom. Brooks v. Pataki, 137 S. Ct. 380 (2016).

Additionally, although New GM argues that the questions resulted in speculation and jury confusion, see Mem. in Supp. (Renewed) at 33, any speculation or confusion was mitigated by the court's clear instructions that the jury should not take any of the assumptions in the hypothetical as proven.  See Trial Tr. 7/13/17 at 1031–32; cf. SLSJ, LLC v. Kleban, 277 F. Supp. 3d 258, 281 (D. Conn. 2017) ("Transparency regarding the unproven nature of 'facts' discussed by the expert will be key.").  The court instructed the jury:

> I will say to the jury the way the question is being asked is to assume these incidents happened in a certain way.  I want you to remember that the stipulation is evidence that a report of these types of information came into GM by certain ages, et cetera, and other aspects, but that didn't prove they actually happened.
>
> But this—now the lawyer because he's on cross-examination is asking the witness, if he can, to answer certain questions where an assumption is made.  That doesn't mean it has been

---

entitled to cross-examine him, especially on something the witness is aware of."); see also id. at 1035, 1043.  Therefore, these other questions, which are not based on hypothetical assumptions, are not implicated in the court's discussion here.

> proven. Even if the witness says yes, it doesn't mean it's been
> proven. A yes would mean, yes, taking your assumption as
> true, which he doesn't know, he doesn't know. Then he's
> going to give an answer to the rest of the part of the question.

Trial Tr. 7/13/17 at 1032. New GM further acknowledges that it had the opportunity on redirect to elicit testimony challenging the assumptions on which the hypothetical questions were based by "showing that unverified reports of other rollaway incidents cannot be taken at face value and often are wrong." See Mem. in Supp. (Renewed) at 33; cf. Vermont Foods, 514 F.2d at 463 ("The sufficiency of the assumptions as well as the soundness of the opinion can be tested on cross-examination."). Given the court's clear instruction and New GM's redirect, as well as the limited evidentiary significance of the two hypothetical questions at issue, it is unlikely that the court's error in permitting the questions on cross-examination affected the outcome of the case. Therefore, any error was harmless and does not warrant setting aside the jury's verdict.

In sum, the plaintiffs have presented sufficient evidence to enable the jury to return a verdict against New GM for negligent failure to warn post-sale. The court notes that the plaintiffs do not rely solely on the TSB or solely on the reports of rollaway incidents to support their claim. Rather, this evidence was introduced in combination with all of the evidence previously discussed regarding the inadequacy of the warnings in the owner's manual. Taken together, this is ample evidence to reasonably support the jury's verdict. Therefore, New GM has not shown that it is entitled to judgment as a matter of law, and its Renewed Motion is denied on this ground.

### 4. Sufficiency of Evidence Regarding Causation

Finally, New GM argues that the evidence is legally insufficient to support a finding that its failure to warn caused the plaintiffs' injuries because Rose O'Connor did

not attempt to read the warnings in the owner's manual.  <u>See</u> Mem. in Supp. (Renewed) at 24–27; Reply in Supp. (Renewed) at 11.  New GM's argument appears to be primarily focused on the lack of causal connection between the inadequate warnings in the owner's manual and the plaintiffs' injuries.  <u>See, e.g.</u>, Reply in Supp. (Renewed) at 12 ("There was no evidence from which a reasonable jury could have found that, if only some different language had been placed in some different section of the 2004 Suburban owner's manual, Plaintiffs' injuries would have been avoided.").  To the extent that New GM's argument is directed at the plaintiffs' failure to warn claim, however, the court need not address the argument because the jury found that the inadequate warnings at the time of the sale did not cause the plaintiffs' injuries.  <u>See</u> Jury Verdict at 3.  Therefore, New GM was not found liable on that claim.  <u>See id.</u>

The jury did find that Old GM's and New GM's negligent post-sale failure to warn caused the plaintiffs' injuries.  <u>See</u> Jury Verdict at 4–5.  To the extent that New GM's argument is read liberally to also challenge that finding of causation, the court concludes that the evidence was sufficient to support the jury's verdict.  Rose O'Connor testified that, if she had known the Suburban could be shifted out of Park without depressing the brake when the key was in the Accessory position, she would not have purchased the car, left the keys in the car, or permitted her children to go to the car unattended.  <u>See</u> Trial Tr. 7/11/17 at 675.  The jury could reasonably have credited her testimony and found, therefore, that the plaintiffs' injuries would not have occurred had either Old GM or New GM issued an adequate post-sale warning.

Additionally, although the plaintiffs did not offer any evidence that Rose O'Connor read the instructions in the owner's manual, <u>see</u> Reply in Supp. (Renewed) at 12, this

does not require a verdict for New GM. Rather, a reasonable jury could have found that, even though she did not read the warnings in the owner's manual, she would have read and heeded a more conspicuous warning sent to her by mail or through some other means of post-sale notification. Cf. Pullano v. Chrysler Corp., No. 05-CV-0135A(F), 2009 WL 10692145, at *15 (W.D.N.Y. Apr. 23, 2009), report and recommendation adopted, No. 05-CV-0135A(F), 2011 WL 13244291 (W.D.N.Y. July 19, 2011) ("[The plaintiff's] admitted failure to read the vehicle owners' manual from cover to cover does not necessarily sever the causal connection between Defendant's alleged failure to adequately warn against attempting to jump-start the vehicle at the solenoid and the [plaintiff's] resulting injuries. Rather, on this record, there is an issue of fact as to whether a further warning should have been placed on the starter solenoid itself." (internal citation omitted)); Crespo v. Chrysler Corp., No. 97 CIV. 8246 (JSR), 1998 WL 542304, at *2 (S.D.N.Y. Aug. 25, 1998) ("[I]t cannot be presumed from [the plaintiff's] failure to have heeded certain of the warnings contained in the owner's manual, that he would similarly have ignored a prominent warning on the machine itself. Clearly, the jury was entitled to find that in light of the contrast between the nature of the warnings provided and those negligently omitted, the consumer likely would have heeded the latter, prominently-displayed, ever-present cautionary instructions." (internal quotation marks and citation omitted)).

Therefore, New GM has not shown that no reasonable jury could have found for the plaintiffs on the issue of causation. Accordingly, its Renewed Motion for Judgment as a Matter of Law is denied on this ground.

**V.      CONCLUSION**

For the reasons stated above, the defendant's Renewed Motion for Judgment as

a Matter of Law After Trial is **DENIED**.

**SO ORDERED.**

Dated at New Haven, Connecticut, this 17th day of April, 2018.


                                        /s/ Janet C. Hall
                                        Janet C. Hall
                                        United States District Judge