# Exhibit B

```
 1                 UNITED STATES DISTRICT COURT

 2                    DISTRICT OF CONNECTICUT

 3

 4    FREDERICK KLORCZYK, JR. As co-administrator of the

 5    Estate of Christian r. Klorczyk, et al.

 6

 7                                              PLAINTIFFS

 8

 9    V.

10              CIVIL ACTION NO. 3:13-CV-00257-JAM

11

12    SEARS ROEBUCK & CO., et al.

13

14                                              DEFENDANTS

15    _____

16

17        VIDEO DEPOSITION FOR THE DEFENDANTS,

18             SEARS ROEBUCK & CO., et al.:

19

20      The Video Deposition of Frederick G. Heath,

21    taken in the above-styled matter at Court Reporting

22    Services, Inc., 6013 Brownsboro Park Boulevard, Suite

23    A, Louisville, Kentucky, on the 22nd day of

24    March, 2017, beginning at 10:24 a.m.

25
```

```
 1   Q.   And you looked at the deposition of Lynn
 2   Klorczyk -- Klorczyk; is that correct?
 3   A.   Yes, sir.
 4   Q.   It's Number 18 on your list?
 5   A.   Yes, sir.
 6   Q.   And Number 19, the deposition of -- of
 7   Fred Klorczyk?
 8   A.   Yes, sir.  By the way, I think there were
 9   subsequent depositions of both Lynn and Frederick
10   that I've also reviewed that aren't on this list.
11   Q.   You have seen the transcripts of the
12   subsequent depositions?
13   A.   Yes, sir.
14   Q.   Did anything in those transcripts change
15   any of your opinions?
16   A.   Nope, they reinforced my opinions.
17   Q.   Have you seen the transcript of Parker
18   Klorczyk?
19   A.   Yes, sir.
20   Q.   Did anything in it change your opinions?
21   A.   No, sir.
22   Q.   Let me ask you a rather broad question.
23   Are you aware of any physical evidence that
24   Christian Klorczyk was using a jack stand when
25   this accident occurred?
```

1  **A.** No. I wasn't at the accident scene at the
2  time of the accident.
3  **Q.** In your inspection of the scene, the
4  actual jack stand used, the vehicle that was
5  involved in the accident, have you seen
6  documented -- is there any physical evidence
7  you've seen in reviewing those things which would
8  prove to that you a jack stand was being used that
9  day?
10 **A.** Gosh. I don't remember what was in the
11 police photographs. There may've been some -- a
12 shot of a -- a jack stand in police photographs, but
13 I honestly don't recall. But that's about the only
14 place I would have had access to such to -- in -- in
15 response to your question.
16 **Q.** Have for purposes of your opinion you
17 assumed that a jack stand was being used that
18 day?
19 **A.** Yes, sir. I --
20 **Q.** And --
21 **A.** -- I -- I relied on the testimony that was
22 offered, and that's about all I had to go on.
23 **Q.** And that testimony is the testimony of
24 Fred and Lynn Klorczyk?
25 **A.** Yes, sir.

```
 1    Q.   Have you done any kind of research or
 2  measurements or testing to determine if Christian
 3  Klorczyk would've been killed if there had been a
 4  jack stand under the car?
 5    A.   I don't know how it would do that.
 6    Q.   Do you have --
 7    A.   You know, do you want me to try and
 8  clarify your question so I could make an
 9  intelligent --
10    Q.   No.
11    A.   -- response?
12    Q.   You know, no --
13    A.   I mean, it --
14    Q.   -- no --
15    A.   -- I mean --
16    Q.   -- no; I don't.
17    A.   Okay.  Fine.
18    Q.   We'll -- we'll take it that you think my
19  question required clarification, and your re --
20  response wasn't necessarily intelligent.
21    A.   Yeah.
22    Q.   But --
23    A.   Yeah.
24    Q.   I'm sorry; I'm just, you know, --
25    A.   That's okay.
```

1  **Q.**  I asked the question I wanted to ask --

2  **A.**  Sure.

3  **Q.**  So that's fine.

4  Do you have any physical evidence of where

5  the jack stand would've been placed if one was

6  being used?

7  **A.**  Physical evidence?

8  **Q.**  Yeah.

9  **A.**  No, sir.

10 **Q.**  I mean, there's no photograph, is there?

11 **A.**  No.  And --

12 **Q.**  Have you --

13 **A.**  -- and --

14 **Q.**  -- observed anything on the underbody of

15 that car which suggests where the jack stand was?

16 **A.**  No, sir.

17 **Q.**  You're making an assumption; correct?

18 **A.**  I am going by the testimony offered.

19 **Q.**  And -- well, okay.

20 And does this fellow who actually did the

21 testing, is he an employee?

22 **A.**  No, sir; he's one of my associates.

23 **Q.**  And what exactly does that mean to be

24 one of your associates?

25 **A.**  That means that he performs tasks on a

```
 1    Q.   Okay.  And that would've been some time
 2   in the last month or so?
 3    A.   I -- I -- I don't know if it was in the last
 4   month or so.  It -- it was recently --
 5    Q.   Okay.
 6    A.   -- as opposed to five years ago.  We only
 7   had one stand that's similar to the accident
 8   stands.
 9    Q.   The stand that's been produced here has
10   had a little, I'll call it a "window" machined into
11   the side?
12    A.   Yes, sir.
13    Q.   Who did that?
14    A.   Glenn Felpel.
15    Q.   And did he talk to you before he did that?
16    A.   I think I directed him to do it.
17    Q.   And do you remember approximately when
18   that was?
19    A.   Early on.
20    Q.   And why did you instruct him to do it?
21    A.   So we could see through the side of the
22   collar on the stand when we had point to point
23   contact, rather than have him to fiddle around with
24   a manual manipulation to try to achieve it.
25    Q.   Did you go out and buy this jack stand?
```

 1    **A.**   And Mr. Klorczyk's -- Mr. Fred Klorczyk's
 2    testimony was that there was clearance between
 3    the drum and the wheel.  It's not a drum actually,
 4    it's a rotor.
 5    **Q.**   I was going say, it's --
 6    **A.**   Yeah.
 7    **Q.**   But --
 8    **A.**   It's a disk brake.
 9    **Q.**   -- you started with cars when I did, so
10    you say drum, don't you?
11    **A.**   Yeah; I used to change the oil by using a
12    bumper jack.
13    **Q.**   And I'm asking you:  Did you try to do any
14    measurements or things and see whether as a
15    matter of basic measurements and math and
16    physics it's possible that that car was on Christian
17    Klorczyk on his creeper with the front wheel
18    smashed and would still be up high enough that
19    you could have that tire under that rotor and be
20    able to just pull it out?
21    **A.**   I --
22         MR. EDINBURGH:  Objection.
23    **A.**   -- I have not tried to reconstruct the
24    circumstances other than through deductive
25    reasoning.

1    **Q.**   It -- it's a basic statement of fact about
2    jack stands.  If we go to that one standing over
3    there and raise the bar up and it stays up, we can
4    lift it slightly and then drop the bar down; right?
5    **A.**   If you hold the handle up.
6    **Q.**   Yeah.  And then if you go to the top of
7    Page 12, you conclude:  [reads] Tip over the
8    support stand must be eliminated as a cause;
9    right?
10   **A.**   Yes, sir.
11   **Q.**   If you turn to Page 13.
12   **A.**   Okey-doke.
13   **Q.**   Say:  [reads] The possibility of
14   encountering false engagement with pawl and
15   ratchet support stands is not only foreseeable but
16   apparently not uncommon.  Now what's the basis of
17   that opinion?
18   **A.**   Well, I had a number of -- of
19   contemporaneous operating instructions from other
20   jack stands in the market at the time.  And a large
21   number of them included a warning consistent with
22   making assurance that the pawl was appropriately
23   engaged with the ratchet teeth before utilizing --
24   before applying the load.
25        So that's how I come to the conclusion, it was

1  apparently not uncommon, because I don't know
2  whether people would -- or -- or I would conclude
3  that people wouldn't put that warning in their -- in
4  their operation manual if either (1) it was
5  foreseeable to them that that such could happen,
6  or that (2) they've already had experience with
7  such happening, and therefore decided to add a
8  warning to that effect.
9     Q.   Is there any other basis for that opinion
10 that it's not uncommon?
11    A.   Oh.  I've heard scuttlebutt about this
12 happening in the -- in the -- in the industry for a
13 long time.  But I've never seen it, never witnessed
14 it, never investigated a case where it had
15 happened before.  And quite frankly, was skeptical
16 of this case when I first got involved, and became
17 a believer through my investigation and testing.
18    Q.   Who did you hear this scuttlebutt from?
19    A.   Oh, gosh.  I mean, I go to shows
20 regularly; I talk to people who make these things.
21 I've been in the automotive lift industry where
22 such kind of equipment is common in shops.  I've
23 been in literally hundreds if not thousands of
24 automotive service facilities.  I spent 21 years
25 manufacturing automotive lifts.  And since that

1  time, I've spent another -- gosh, since 1992 as a
2  consultant to the automotive lift industry.  I serve
3  as secretary to their standards writing
4  undertakings and. . .  Anyway, that's it.
5     **Q.**   You've been chairman of some committee
6  on that --
7     **A.**   I'm --
8     **Q.**   -- haven't you?
9     **A.**   -- chairman of the -- currently of the
10  Portable Automotive Services Equipment
11  Committee.  I've been on that committee since, oh,
12  gosh, I'm going to say  93 or  94, something like
13  that.  I don't get involved with such discussions in
14  that committee because it's inappropriate.
15     **Q.**   Why is it inappropriate?
16     **A.**   Because we're there to represent our own
17  interests and develop a standard to promote safety
18  of the users of the products that the thing -- that
19  the standards cover.
20     And I don't -- I mean, I'm -- my -- my
21  background is well-known in -- in this group.  I'm
22  an independent engineer and -- and expert.  We --
23  manufacturers are certainly not prone to discuss
24  their, for one want of a better term, "dirty laundry"
25  in such venues where insurance companies are

```
 1  you believe existed in that frame you have --
 2     A.    I don't believe any --
 3     Q.    -- circled?
 4     A.    -- I don't believe any spring existed in
 5  the frame.
 6     Q.    Well where did the springing exist?
 7     A.    The spring comes from the fact that an
 8  automobile is not a rigid body.
 9     Q.    I must be dense.  Explain to me what you
10  mean when you say that.
11     A.    Well, we -- we had a little conversation
12  before about you -- you -- you seem to think that
13  if -- if I put a -- a jack under one corner of a
14  vehicle, that it would lift up in a perfectly rigid
15  way.  And I would say to you, no, it doesn't.  The
16  vehicle deforms, it flexes, it -- it deflects, frame is
17  not rigid.
18     Now, all this is -- testing -- well, never mind;
19  I've been through it 100 times already.
20     Q.    Well, explain to it me.  If there's
21  something you wanted to tell me, go ahead and tell
22  me.
23     A.    No; I've already told you.  Ask me
24  another question.
25     Q.    Well, I'm trying to understand.
```

1    **A.** And --
2    **Q.** -- go on.
3    **A.** -- and --
4    **Q.** I didn't realize that you weren't.
5    **A.** -- and at that point in time, we hadn't
6 even got a vehicle yet, I don't believe. We were
7 doing it in an arbor press. And trying to find out
8 how much perturbation it would take and in what
9 way to get the false engagement to release.
10 BY MR. BROWN:
11    **Q.** So --
12    **A.** This is a test in an arbor press.
13    **Q.** I understand.
14    **A.** Okay.
15    **Q.** And when you are experimenting with
16 different springs --
17    **A.** Yeah.
18    **Q.** -- are you experimenting to try to
19 replicate the vehicle or are you experimenting to
20 see what spring weight, what spring configuration,
21 what kind of rubber makes it more likely to
22 release?
23    **A.** Yes.
24        MR. EDINBURGH: Objection.
25    **A.** Yes.

1  BY MR. BROWN:
2  **Q.** The second one?
3  **A.** Yes.
4  **Q.** Is there a record or document that show
5  the different types of springs? And I think you
6  actually --
7  **A.** I think we've been over this.
8  **Q.** -- mention here in rubber. Well, we're
9  going to mention it every time to make sure I'm
10 clear on it.
11 **A.** Okay.
12 **Q.** Okay?
13 **A.** Sure.
14 **Q.** You're getting paid to answer; I'm getting
15 paid to ask.
16 **A.** I got --
17 **Q.** We good?
18 **A.** I gotcha. We're good.
19 **Q.** All right. I'm not trying to be rude. I'm
20 trying to be thorough.
21 **A.** I know.
22 **Q.** In doing this experimenting to see what
23 kind of spring rate was necessary to get that en --
24 disengagement to incur [sic] after engagement, did
25 you keep track of all different springs that were

1  was similar to the other -- to the accident jack
2  stand.  The problem with continuing using it was it
3  was much more difficult to achieve point to point
4  contact because the surfaces had become -- which
5  I've already testified to today -- the surfaces had
6  become hardened from contact stresses and
7  smooth because of repeated loading.
8     And so it -- once we got engagement, after all
9  this wear had taken place, we could get it, but it's
10 just more difficult to achieve in the first place.
11    **Q.**   Sufficient tests were run at
12 the 1900-pound level that it caused damage to the
13 jack stand?
14    **A.**   Where are you looking?
15    **Q.**   I -- I'm asking.
16    **A.**   Oh.  What?
17          MR. EDINBURGH:  Objection as to form.
18    **A.**   Caused damage to the jack stand.  I
19 wouldn't call it damage; I'd call it wear.
20 BY MR. BROWN:
21    **Q.**   It's become deformed?
22    **A.**   Well, that's Glenn's term.  The too -- the
23 tooth tips were deformed, in that, the
24 discontinuities in the surface from the casting
25 process were smoothed out and the surface

```
 1   became smoothed and burnished and hardened.
 2     Q.   And that made it more difficult for to you
 3   get false engagement?
 4     A.   Yes.
 5     Q.   Wouldn't that also, then, logically make it
 6   easier to get it to disengage the way you wanted?
 7     A.   It very well might.  But we didn't have
 8   that situation in the accident anyway.  We had new
 9   jack stands.
10     Q.   So --
11   [WHEREUPON, counsel confers inaudibly.]
12   BY MR. BROWN:
13     Q.   Did you make an attempt to find another
14   exemplar jack stand that was similar to the one
15   that was involved in this accident?
16     A.   Early on we did.  And Sears doesn't sell
17   them anymore.  The replacement stand under the
18   same part number has got little square feet on the
19   bottom and the saddle is smaller and, therefore,
20   the neck of the pyramid is smaller.
21     Q.   Was all the set up and testing and -- you
22   did at these various pound levels all that one jack
23   stand subjected to all of that?
24     A.   Yes.
25     Q.   Now look at the one that's 3775.  This is
```

C E R T I F I C A T E

STATE OF_____:

COUNTY/CITY OF_____:

    Before me, this day, personally appeared Frederick G. Heath, who, being duly sworn, states that the foregoing transcript of his/her Deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

    _____
           Frederick G. Heath

SUBSCRIBED and SWORN to before me this _____day of_____, 2017, in the jurisdiction aforesaid.

.

.

_____            _____
My Commission Expires              Notary Public

.

.

.

.

.