# Unreported Cases

# Holzman v. GMC

Superior Court of Massachusetts, At Middlesex

November 6, 2007, Decided

Opinion No.: 100291, Docket Number: 02-1368

**Reporter**

2007 Mass. Super. LEXIS 462 *; 2007 WL 4098913

Herbert S. Holzman v. General Motors Corporation

## Core Terms

jacks, load, testing, channels, warranty, vehicles, issues, predominance, commonality, models, tire, class action, class certification, requirements, steel, proposed class, manufacturers, brake, wheel, class member, manual, lift, conditions, repeated, roll-off, trunnion, chocked, surface, holes, upper

## Case Summary

### Procedural Posture

Plaintiff, an owner of a vehicle, alleged that the vehicle came with a defective jack; i.e., a jack whose design was such that it was subject to failure during normal use, and as such was unreasonably dangerous. The complaint asserted claims under *Mass. Gen. Laws ch. 93A, §§ 9* and *11*, and for breach of warranties express and implied, of merchantability, and of fitness for a particular purpose. The owner moved for class certification.

### Overview

It seemed highly unlikely that the question of whether the jacks in the class were, or were not, unmerchantable could have been addressed on a class-wide basis. Thus, the court found that the proposed class lacked commonality, under *Mass.R.Civ.P. 23(a)*. The court was unable to find that the issues common to the class as a whole predominated, in number, complexity, or necessary trial time, over individual issues because, inter alia, there was a reasonable likelihood of different findings as to the merchantability of different jack models or jack-vehicle combinations. The proposed class also lacked superiority because the multitude of uncommon issues would cause the presentation of evidence, the jury charge, and even the verdict form to be, if not unmanageable, certainly inferior to individual

proceedings for any class members who chose to assert claims outside defendant corporation's warranty procedure. Because the members of the class had not made the necessary preliminary showing that they were similarly situated, and that they had suffered similar injury at the hands of the corporation, class certification would have been inappropriate under *Mass. Gen. Laws ch. 93A, § 9(2)*.

### Outcome

The motion for class certification was denied. The case was dismissed.

## LexisNexis® Headnotes

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

**HN1[⤓]** Class Actions, Prerequisites for Class Action

See *Mass.R.Civ.P. 23(a)*.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Maintainability

**HN2[⤓]** Prerequisites for Class Action, Maintainability

See *Mass.R.Civ.P. 23(b)*.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

Evidence > Burdens of Proof > Allocation

**HN3[⤓]** Class Actions, Prerequisites for Class

2007 Mass. Super. LEXIS 462, *462

**Action**

A court's task at a stage of a proceeding concerning a motion for class certification is to determine preliminarily whether the requirements of numerosity, commonality, typicality, adequacy, predominance, and superiority are satisfied. Plaintiffs bear the burden of providing information sufficient to enable the motion judge to form a reasonable judgment that the class meets the requirements of *Mass.R.Civ.P. 23*; they do not bear the burden of producing evidence sufficient to prove that the requirements have been met. Neither the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies the Rule. The standard defies mathematical precision. A motion for class certification should not turn on the court's evaluation of the merits of the parties' legal or factual claims. The court may find it necessary, however to analyze elements of the parties' substantive claims and review such facts as are available at this preliminary stage, in order to evaluate whether the requirements of *Rule 23* have been satisfied.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Commonality

*HN4*[ ] **Prerequisites for Class Action, Commonality**

The commonality requirement dictates that plaintiffs seeking class certification must demonstrate that all the persons whom they profess to represent have a common interest in the subject matter of the suit and a right and interest to ask for the same relief. The commonality test is qualitative rather than quantitative, that is, there need only be a single issue common to all members of the class. Where a proposed class is comprised of owners of a number of different models of a certain product with differing characteristics, commonality is often the hurdle not overcome.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Maintainability

*HN5*[ ] **Prerequisites for Class Action, Maintainability**

In the context of a motion for class certification, the predominance inquiry asks whether, if common questions of law and fact do exist, those common issues predominate over questions affecting only individual members. *Mass.R.Civ.P. 23(b)*. That common issues must be shown to "predominate" does not mean that individual issues need be nonexistent. All class members need not be identically situated upon all issues, so long as their claims are not in conflict with each other. The individual differences, however, must be of lesser significance, and they must be manageable in a single class action. The predominance requirement cannot be satisfied where there are a greater number of questions peculiar to the several categories of class members, and to individuals within each category, where such uncommon questions are significant.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Maintainability

*HN6*[ ] **Prerequisites for Class Action, Maintainability**

Closely related to the commonality and predominance issues is *Mass.R.Civ.P. 23(b)*'s requirement that a class action be superior to other available methods for the fair and efficient adjudication of the controversy. As a general rule, the greater the number of individual issues that exist among putative plaintiffs in a class, the less likely it is that superiority can be established.

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

*HN7*[ ] **Deceptive & Unfair Trade Practices, State Regulation**

The statutory language governing certification of a *Mass. Gen. Laws ch. 93A* class action differs from that of *Mass.R.Civ.P. 23*. *Mass. Gen. Laws ch. 93A, § 9(2)* allows a consumer injured by an unfair or deceptive act or practice to bring a class action, but only where the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if a court finds in a preliminary hearing that the consumer adequately and

fairly represents such other persons. _Section 9(2)_ thus expressly incorporates numerosity and adequacy requirements that parallel those of _Mass.R.Civ.P. 23._ Caselaw has implied as well the requirements of commonality and typicality, but has eschewed importing the highly discretionary elements of predominance and superiority. These cases find in _Mass. Gen. Laws ch. 93A, § 9(2)_ a more mandatory tone than in _Mass.R.Civ.P. 23._

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Commonality

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

_HN8_[↧] **Deceptive & Unfair Trade Practices, State Regulation**

While neither _Mass. Gen. Laws ch. 93A, § 9(2)_ nor the caselaw specifies how much commonality is enough to satisfy _§ 9(2)_, it does invest in a court a degree of discretion in determining whether certain plaintiffs adequately have alleged that they are "similarly situated" and have suffered a "similar injury" as members of the class they seek to represent--taking care, of course, to ensure that the remedial purposes of _Mass. Gen. Laws ch. 93A_ and the accomplishment of substantial justice do not fall prey to the traditional technicalities.

**Judges:** [*1] Thomas P. Billings, Associate Justice.

**Opinion by:** Thomas P. Billings

# Opinion

MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

For the following reasons, the Plaintiff's Motion for Class Certification is DENIED.

INTRODUCTION

The plaintiff, [1] owner of a 1999 Cadillac DeVille Concours, alleges that the vehicle came with a defective jack; i.e., a jack whose design is such that it is subject to failure during normal use, and as such is unreasonably dangerous. The Complaint asserts claims under _G.L.c. 93A, §§9_ and _11_, and for breach of warranties express and implied, of merchantability and fitness for a particular purpose. [2]

The plaintiff seeks certification of a class of Massachusetts owners and lessees of GM automobiles. The definition of the proposed class has been somewhat elastic, **[*2]** but in the weeks and days leading up to the evidentiary hearing on the motion (held on October 11 and 12, 2007), it was narrowed to include only the purchasers and lessees of vehicles equipped with 23 specific models of jacks which are alleged--as explored in more detail below--to share certain design characteristics that contribute to an unacceptably high risk of failure. Only economic damages are claimed; it is not alleged, for example, that any member of the proposed class has suffered personal injury due to a jack failure.

The requirements for certification of a class in this Court are found in _Mass.R.Civ.P. 23(a)_ and _(b)_:

_HN1_[↑] (a) Prerequisites to Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

_HN2_[↑] (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites **[*3]** of subdivision (a) are satisfied, and the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual

---

[1] There were originally five named plaintiffs. Four have been voluntarily dismissed, leaving only Mr. Holzman.

[2] Two additional counts, for intentional and implied misrepresentation, were dismissed for failure to plead with the specificity required by _Rule 9(b)_, but with leave to re-plead. These counts have not re-surfaced, eliminating one significant area of potential non-commonality among members of the class.

members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Thus, the familiar checklist--numerosity, commonality, typicality, adequacy, predominance, and superiority-- which the Massachusetts rule shares with its federal counterpart, Fed.R.Civ.P. 23(a) and (b)(3). (There are also some differences between the state and federal rules, and also between both Rules 23 and G.L.c. 93A, §9(2), all of which will be explored as necessary in the Discussion section, below.)

FACTS

The following is a description of such of the evidence presented at the hearing seems relevant to the class certification decision. That evidence consisted of documentary materials submitted by both sides, together with testimony from one expert witness called by each--Frederick Heath for the plaintiff and Devinder Grewal for the defendant.

The proposed class consists of 23 jacks. [3] Each was sold with one or more GM vehicles over one or more model year. There are 80 discreet **[*4]** pairs of jack and vehicle model sold together. If each vehicle is counted separately for each model year in which it was sold with a particular jack, there would be 178 pairs. (See Ex. D77A.)

The plaintiff's expert witness, Heath, is an engineering consultant who devotes a substantial part of his practice to forensic issues, but who also participates in the work of committees who establish industry standards, including those concerning "portable automotive lifting devices," which include jacks used for emergency tire changes. His credentials on paper are impressive; his work in connection with this motion, somewhat less so.

Heath has rendered four reports in this action, each signed under oath, and dated August 24, 2006; September 17, 2006; December 8, 2006; and July 31, 2007, respectively.

In the August 2006 report, Heath stated that he had tested eight jacks of the 25,695,287 model; inspected twenty more GM scissor jacks as well as two GM mechanical screwjacks **[*5]** and several

jacks of other manufacturers; and reviewed a large number of documents, mostly GM documents produced in discovery and various industry and government standards. He was "familiar" with the jack models owned by the two named plaintiffs then in the action (but had tested neither), and was "generally familiar" with 49 models (including the plaintiffs'), which he enumerated by part number. All were scissors jacks and were, in Heath's opinion, "substantially the same in design, manufacture and function." All 49 were defective because they regularly fail in use; they will not survive a roll-off; they have open clevises, narrow channels, and light-gauge steel weakened by weight-reducing holes; and because the design failed to consider forces experienced in real-world conditions.

The September 2006 report covered much the same ground, except that now the list of defective jacks had grown to 59.

By the time of the July 31, 2007 report, the list had shrunk to 29 jacks, and as of the hearing six more were eliminated, reducing the final list to 23. [4]

These jacks, Heath testified at the hearing, share the following common physical characteristics:

All are scissor jacks with six pivot points: two at the base, one at each "elbow" joint (my term, not Heath's); and one at each side of the load rest or "saddle" (Heath's term) at the top where the jack contacts the car.

All are light in weight.

All have narrow **[*7]** struts or "channels" (the latter term being that appearing in GM engineering documents).

---

[3] More precisely, the class as proposed would of course be the purchasers and lessees of vehicles equipped with these jacks. For convenience, however, I will be referring to a class of jacks, not jack purchasers and lessees.

[4] So matters stood as of an August 13, 2007 status conference, at which I scheduled the class action hearing and allowed GM an additional **[*6]** deposition of Mr. Heath to cover his most recent work. Evidently sometime after this, Heath also performed two "finite element analyses," using a computer to model forces on a jack he believed to be similar in construction to those in the proposed class. On October 5, 2007 GM--which had received Heath's additional work days before--filed an emergency motion seeking various relief, most prominently exclusion of Heath's post-July 31 work or a continuance of the evidentiary hearing on class certification scheduled for October 11-12. I held a hearing, and ordered that the evidentiary hearing proceed as scheduled the next week; that the class be limited to the 29 jacks then proposed; and that Heath's testimony be limited to the work disclosed up to and including his July 31 report. The evidence and my findings herein are so delimited.

All have "open clevises." This refers to the joints at which the upper and lower channels rotate on the pin that joins them--the aforementioned elbows. Each channel is a piece of stamped steel, formed (very roughly speaking) on a U-shaped cross-section. At the elbow, each lower channel has two holes stamped--one at each side of the "U." Through this goes a pin or "trunnion." Each upper channel fits outside the corresponding lower channel, and likewise has a hole for the trunnion. The trunnion is secured by virtue of having a greater diameter outside the holes than inside, like a nail with a head on either end. The holes in the channels were referred to at the hearing as "clevises." Some jack channels have holes surrounded by an unbroken circle of steel. Others--including all of those in the class--are cut so that instead of a continuous circle, the hole is bounded by two ears that don't quite touch, rather as if one had used a knife to slice a section out of one side of a doughnut, or (more consistent with the scale and materials here) a washer. This open clevis design, Heath testified, was likely **[*8]** a cost-saving measure, enabling the trunnion to be manufactured with a head on either end and the clevis-ears bent or snapped into place during assembly, rather than beating one end of the trunnion into a head after it is in place.

Other physical characteristics differ as among jacks in the proposed class. Some are long, others short. Some have screw extensions, other don't. There are a number of different designs for the load rest, the piece at the top that makes contact with the jacking point on the car. None of these points of distinction, in Heath's opinion, materially affects what he sees as the basic flaw of the design: the tendency of the jack to collapse when the jack experiences horizontal forces of the type that can occur in real-world situations, such as where the jack is deployed on an uneven or unevenly compacted surface.

Heath described at length two "GMUTS" [5] documents prescribing test protocols to determine the performance of jacks (GMUTS R2-14E-2; Ex. P8) and the effects of jack use on vehicles (GMUTS R1-14E-2; Ex. P7). The R2 covers numerous tests of jacks, six of which Heath considered relevant to the issues in this case. These are, in summary:

3.3.1.  Jack/Jacking **[*9]** Point Durability Test: vehicle loaded to GVM (the Gross Vehicle Mass for which it is rated); level surface; parking brake set; wheels chocked; tire deflated; car jacked by hand seven times; test repeated at all four jacking points; condition of jack, handle, and lifting points recorded.

3.3.2.  Jacking Load Measurement Test: vehicle loaded to GVM; level surface; parking brake set; wheels chocked; tire deflated; jack fitted with load cell fixture; car jacked to two-inch clearance height; vertical, fore-aft, and lateral loads on jack measured position; test repeated at all four jacking points. [6]

3.3.4.1.  Jack-Vehicle Clearance Test: vehicle at curb weight (i.e., unloaded) and GVM; minimum diameter released wheel (no tire) installed; clearances recorded between vehicle jacking point and (a) surface and (b) top of jack in full down position; test repeated at all four jacking points.

3.3.4.2.  Tire-Ground Clearance Test: vehicle at curb weight and GVM; car raised to maximum height of jack; largest diameter wheel installed and tire inflated; clearance recorded between tire and ground.

3.3.9.  Jack/Vehicle Stability Test--Level Surface: vehicle at curb weight; level surface; vehicle in neutral **[*10]** with brake off and no chocks; vehicle raised at front jacking point to full jack height; 100 pounds static force applied from rear, then front, then laterally; tests repeated with vehicle raised at rear jacking point. Test is then repeated with vehicle in park, brake on, wheels chocked (if chocks are standard equipment), using 200 pounds force. If the vehicle falls off during any portion of test, maximum load input to vehicle and any damage are recorded.

3.3.10.  Jack/Vehicle Stability Test--7% Compound Slope: same as preceding test, except that vehicle is positioned at a 45% angle on a 10% slope, making a 7% compound slope, and only the second (park/brake/chock/200 lbs.) set of tests is performed.

The R1 GMUTS evaluates the effects of various jacking procedures on the vehicle. Heath considered relevant only two of these tests:

3.3.2.  Vehicle Body Damage During and After Jacking: vehicle loaded to GVWR and axle being tested to GAWR; jack raised to maximum height or so that tire-ground clearance is 2 inches; vehicle

[5] General Motors Uniform Test Standard.

[6] Heath mistakenly testified that only vertical loads were measured; the R2 GMUTS says otherwise.

inspected for various types of deformation **[\*11]** and damage while raised and after lowered.

3.32. Vehicle Damage from Falling Off Jack. vehicle loaded as in preceding test; vehicle in neutral with brake off and no chocks; vehicle as in preceding test; force applied to rear of vehicle sufficient to push it off jack (and push-off force is recorded); vehicle inspected for damage. Test repeated with rearward force, and at all four jacking positions. Heath noted that only the vehicle--not the jack--is inspected for damage.

Heath testified that the test procedures outlined above compared unfavorably with the analysis performed in four "NAO Evaluation Reports" from August 1999 (Ex. P10-P13). These reported on computer simulations which evaluated the loads on the car body and the jack when a GMX270 body (that of the Cadillac Seville) was jacked in various "worst case scenarios" from each of the four jack points. The scenarios evaluated were:

    a) raising the jack base vertically by 25 mm.

    b) jack resting on uneven ground at different corners of the base of the jack.

    c) tilting of the jack base +/- 4 degrees in side view.

    d) tilting of the jack base +/- 4 degrees in rear view.

    e) top channel contact position moved longitudinally (forward, center, **[\*12]** aft).

These were considered separately, and together ("stacked"), with the proviso:

> Assuming all of these variables are at their maximum results in extremely conservative load estimates. It seems unlikely that all of these would be at the worst possible stack up simultaneously. Since a worst case condition is not really fully defined in the referenced GMUTS test procedures relative to lateral and longitudinal loads, it is suggested that Validation [i.e., GM's product testing function] better characterize a set of worst case conditions.

In Heath's view, these conditions are likely to occur in the real world, and are likely not to be appreciated by the consumer. Most importantly, tilting the jack by four degrees caused it to incur significant horizontal loads not tested in the GMUTS procedures--not even those using a 7% compound slope, since the jack in that procedure is placed in the "nominal" position (i.e., flat relative to the slope but tilted relative to the earth).

Next, Heath discussed a chart prepared by DURA Product Engineering (Ex. D68), comparing the jack specifications of various auto manufacturers. DURA is

an OEM that manufactures jacks for sale with GM cars and, it would **[\*13]** appear, those of other manufacturers. Heath pointed to several GM specifications which are more forgiving than those of other manufacturers, while noting others in which GM's requirements meet or exceed those of other manufacturers.

Heath next described his own testing of several jacks of the same part number ("P/N") 25,695,287. He understood (see below) that this was the jack supplied with the 1999 Cadillac DeVille Concours. He had acquired the jacks for a personal injury case titled *Jasiak v. General Motors*, in which he consulted for the plaintiff's counsel in this case.

Initially, Heath jacked a Concours up to see how the jack performed during jacking and in a push-off. Later, he devised a test stand in which a hydraulic cylinder exerted a calculated force vertically on the jack's load rest, and in which horizontal forces could be applied to the base of the jack. Generally speaking, he found that the jack was capable of withstanding the vertical force exerted by the car, but that it was damaged in a roll-off such that it failed in a second roll-off. In the test stand, the jack collapsed when sufficient horizontal force was applied to it. [7] Most commonly, the failures occurred at the **[\*14]** clevises where the bottom channels engage the trunnions.

Next, Heath described a report (Ex. P21) by Joni Grob, a GM engineer, of push-off tests she performed on some jacks supplied with Cadillacs. The tests were inspired by customer complaints, the common thread of which was that the customer, having neglected to set the parking brake, jacked the car up to change a flat tire; the car rolled off the jack; and the jack thereupon failed at the "elbow" or trunnion joint, rendering it unusable (i.e., incapable of completing the tire change). Grob looked at 40 jacks that GM had collected from warranty returns, 25 of which had the aforedescribed failures. Grob designed a push-off test

> to see what it would take to design the jack to withstand a roll-off. This would allow the customer to be able to recover from a mistake of forgetting the parking brake, and prevent a potential walk home.

In December 1997, Grob tested five examples of each

---

[7] This was done by tilting the base and then moving it horizontally while the jack was fully extended and under a 1920-pound load.

of jack designs: P/N 25,642,873, in which the channels were made entirely of .060-inch steel; P/N 25,677,974, a redesign of P/N [*15] 25,642,873 in which the lower channel was increased to .075-inch steel; an experimental redesign of P/N 25,677,974 in which both the upper and lower channels were made of the heftier .075-inch steel; and two jacks manufactured by Seeburn and sold with larger GM cars.

Grob found that all of the P/N 25,642,873 jacks were unusable after push-off due to separations at the channel ends (i.e., failure of the open clevises). The same was true of the 25,677,974 jacks, though the deformation was less than with the first set. All five of the fully-beefed-up experimental design were reusable, with minor damage to two of them at the base and load rest, respectively, not affecting the elbow joints. Of the large-car Seeburn jacks, an older model was reusable but a current model was not, though the failure was due to deformation of the channels rather than separation at the joints.

Grob repeated the test on three of the experimental jacks, this time on a rough asphalt surface. In this test the car was very difficult to push off; "[a]t one point the jack was at approximately 45 degrees relative to the ground and it was not deforming, and it was not slipping." One of the jacks suffered a separated load [*16] rest; none was damaged at the elbow joints. Grob determined that increasing the thickness of the upper channel would cost six cents per jack--"a small price to pay to eliminate a significant number of walk homes and angry customers"--and recommended the change. Her recommendation was implemented (see Ex. P56), and the fully-fortified jack became P/N 25,695,288.

Rather than seeing Grob's work as a success story, however, Heath noted that the push-off test replicated conditions likely to be encountered in the field, and that the old-model Seeburn jack was the only one that survived the test in every instance fully intact. Nor did Grob's testing--which Heath did not replicate--dissuade him from including all three models--P/Ns 25,642,873, 25,677,974, and 25,695,288--on his list of 23 "defective" jacks that ought to be included in the class. [8]

---

[8] I note here, in partial defense of Heath on this point, that the Jasiak jack was the result of a similar re-engineering process, in which the original model (P/N 25,653,436) was fortified in its bottom struts (P/N 25,677,978) and then in its top struts to become P/N 25,695,287, the model that Heath tested. See Ex. D76 and Grewal's testimony explaining [*17] it, which is briefly summarized below.

As noted above, it is Heath's opinion that all jacks in the class share the common characteristics of having six pivots, open clevises, relatively narrow channels, and relatively light weight, and that all are defective (i.e., will fail in reasonably foreseeable field conditions), notwithstanding differences in load rest designs, other design details such as channel length and presence or absence of crew extender, and weight/length/width of the vehicle with which the jack is sold.

Heath's credibility--already suffering from the very limited extent of his actual testing in relation to the sweeping conclusions drawn therefrom, and from the sometimes stark contrast between the information in the documents on which he relied and the conclusions he drew from them--was further tarnished on cross examination.

Heath, for example, is not a licensed engineer in any jurisdiction and never has been. He has only tested one GM jack model, the P/N 25,695,287 jacks that he acquired for the *Jasiak* case. Even these, it turns out, he tested with the wrong car. Jasiak (like plaintiff Holzman) had a 1999 DeVille Concours. Heath thought he was testing the jack model [*18] that came with this car (in part, by jacking up Jasiak's car with the test jacks), but in fact the assistant whom Heath had sent to a Kansas City dealer to do the buying had procured the wrong one, a fact of which Heath was unaware until cross examination in the evidentiary hearing in this case. What effect (if any) the mismatch may have had on the validity of Heath's field testing, which employed a vehicle for which the jack was not designed, was not explored further at the hearing; nor did Heath analyze how the weight or dimensions of any of the vehicles with which the "class" jacks were sold might affect their performance. In his view all of the jacks are underdesigned, period.

Inattention to detail infected numerous other aspects of Heath's work and testimony as well. For example:

> Although Heath broadly characterized the "defective" jacks proposed for the class as being light in weight and having narrow channels, he has never weighed or measured them.
> In his test stand, Heath applied horizontal forces which he regarded as real-world, but which he did not measure; he merely applied force until the jack failed.

> His test equipment was not calibrated (i.e., he measured the hydraulic pressure [*19] and then calculated the loads applied to the jack, but did not

measure those loads with a scale of known reliability).

Heath's original lists of 49, then 59 defective six-pivot jacks--with which he professed to be "generally familiar"--included at least one *five*-pivot jack (P/N 21,011,868) and one part that was not a jack at all, but a wrench (P/N 14,036,400).

Heath's 2007 reports were critical of GM's validation procedures on the ground that the GMUTS tests "presume that the vehicle Owner's Manual instructions are followed to the letter," when in fact they include testing with the brake off, the transmission in neutral, and the vehicle on a slope, all of which the 1999 Cadillac Seville manual (Ex. D81 at p. 5-18) strongly cautions against. [9]

Although he criticized the R2 GMUTS for testing under less adverse conditions than those analyzed in the simulations (Ex. P 10-13), Heath conceded that he knew nothing about why or by whom the simulated conditions had been proposed, and admitted that they exceed anything required by any manufacturer's, supplier's, or industry standard of which he is aware.

Heath even seemed vague on some of the terminology of the trade, testifying that "GAWR" as [*20] used in the R1 GMUTS (Ex. P7) stands for "Gross Axle Weight-Rear," when in fact the GMUTS itself defines GAWR as the Gross Axle Weight Rating. Moreover, Heath--who presented as the centerpiece of his qualifications his service on the PALD (Portable Automotive Lifting Devices) Committee of the American Society of Engineers (ASME) and his participation in that committee's development of ASME's Safety Standard for Portable Automotive Lifting Devices--was unaware that this Standard, too (Ex. D86 at 19) uses this terminology.

All of these issues, and the generally result-oriented character of Heath's testing and analysis (e.g., applying unmeasured loads to the Jasiak jacks until they

[*21] collapsed, then declaring them "failed"), would cause me to question the reliability of his opinions on the issue chiefly before me: are the "class" jacks sufficiently similar to one another in the relevant particulars that *Rule 23*'s commonality, typicality, and predominance requirements, and/or the commonality and typicality requirements of c. 93A, §9(2), are satisfied? Even granting the intuitively obvious point that, all else being equal, an open-clevis design is not as strong as a closed-clevis design, this does not prove that a particular jack, mated with a particular vehicle, is unfit for its intended use--let alone that all twenty-three are.

GM's own testing, moreover--specifically, Grob's work--suggests that a jack's fitness depends on more than the clevis. Grob worked (in part) with three iterations of the same jack. The original iteration (P/N 25,642,873) had light-gauge steel in both upper and lower channels, and did not survive a roll-off. A redesign with heavier-gauge lower channels (P/N 25,677,974) did better, but not well enough, still not being reusable after roll-off. Finally, Grob tested a further redesign using the heavier steel in both lower and upper channels; this [*22] model survived a roll-off every time. Grob recommended the change; GM implemented; and the new jack is P/N 25,695,288. All three models are nonetheless lumped indiscriminately into Heath's proposed class.

GM also presented expert testimony at the hearing, through Devinder Grewal. Grewal is a licensed engineer (in California) with impressive academic credentials and a consulting practice that focuses on failure analysis, sometimes for the purpose of product improvement but usually in connection with litigation or other claims. He inspected, but did not test, all but two or three of the jacks in the proposed class.

The focus of Grewal's testimony was the differences among their designs, and those of the vehicles with which they are sold. The raised height of the class jacks (a significant contributor to load instability) ranges from 13 inches to 15 1/4 inches, a variation of nearly 20%. There are numerous differences in design of the load rest, the area of interface between the jack and the vehicle, which also can fundamentally affect stability.

Channel designs and material differ across the class, evolving in some cases (including those studied in Grob's report) from lighter to heavier [*23] steel. Grewal's analysis of GM Engineering Work Orders (summarized in Ex. D76) shows, for example, that fully ten jacks out of the 23 in the class are actually a family,

---

[9] There were also excerpts from the jacking instructions in five other Cadillac, Pontiac and Buick manuals in evidence as Ex. D53-58. These excerpts all start with the instructions on removing the wheel with the flat tire and do not contain this caution--which, in the 1999 Seville manual, comes first, several pages before the instructions on removing the flat. Given the standardized nature of the six manuals submitted or excerpted, I infer that each of them included the caution appearing in the Seville manual.

stemming from three ancestral designs that have gone through the same or related redesigns affecting their size and/or structure (steel thickness, raised height, avoidance of gear tooth bypass, load rest design).

Vehicle characteristics, too, can affect jack performance and safety. An obvious factor is the vehicle's weight and its distribution; vehicles in the class range from 3600 to 5600 pounds gross vehicle weight, a variation of over 55%. Less obviously a layperson, the stiffness of the suspension will affect how high the vehicle must be raised to change a tire, and thus the degree to which the other three tires--which should remain in contact with the ground--will contribute to stability. The tire and wheel types also affect how far the vehicle must be raised.

The location and design of jacking (lift) points can also be significant. Among vehicles in the class, the distance of the lift point from the end of the rocker panel varies from 6 to 18 inches in the front and from 2 1/2 to 18 inches in the rear. This **[*24]** matters because the nearer the lift point is to the axle, the smaller the load on the jack and the more securely the other three wheels remain planted and able to contribute to stability. Several test reports involving vehicles in the class (Ex. D53, D69, D83, D84) illustrate the point that GM has moved and/or reconfigured lift points as necessary to prevent damage to rocker panels during jacking.

That these variables have in fact led to significant variation in real-world jack performance is suggested, at least, by warranty data. [10] In Ex. D79, Grewal calculated

---

[10] Grewal's analysis of these data necessarily involved some judgments concerning which among 83 warranty codes applied by dealers to jack-related claims represented structural failures, as opposed to such things as paint, rust, rattles, etc. Ultimately, he selected 16 codes as presumptively structural; these accounted for 10,447 out of a total of 17,350 jack-related claims. I assume the **[*25]** obvious: that there likely was imperfect uniformity among dealers and their employees in the coding of warranty claims, and that some nonstructural defects may thereby have been included--and some structural claims missed--in Grewal's analysis. I note also that the apparently low failure rates may reflect a low usage rate (flats are infrequent occurrences, and many people prefer to call AAA), and jack usage may be non-uniform across the class--for example, there may be a correlation between tire wear and flats, and some vehicles may wear tires more quickly than others; it's even possible that owners of some vehicle models are more likely to be do-it-yourselfers than owners of other models. Still, the warranty data provide one more piece of evidence suggesting that some jacks, or

the number of warranty claims apparently involving jack failures per 50 million miles driven. For the 23 jacks in the class, claim rates ranged from a low of 0.1131 to a high of 3.3548 claims per 50 million miles, a variation of over 2900%.

For all of these reasons, Grewal opined--credibly, to me--that the question of whether a jack is suitable for its intended use cannot be answered on a class-wide basis, but necessitates analysis and testing of each jack model, used in conjunction with each model vehicle it is sold with. I assume, for purposes of analysis, that the 178 discrete **[*26]** jack-vehicle pairs (see p. 3, *supra* ) could be reduced to a smaller number--likely, a substantially smaller number--with the exercise of reasonable engineering judgment concerning which jack models, and which vehicle models and years, are substantially similar in the relevant particulars. No witness, however, has attempted anything like this. The closest thing to it is the Grob report, which analyzed just two related variables (steel thickness in the lower and upper channels) in three otherwise identical jack models included in the class, and found substantial dissimilarities in the way these jacks performed.

DISCUSSION

A. Certification Under *Rule 23*.

*HN3*[↑] ] The Court's task at this stage of the proceeding is to determine preliminarily whether the requirements of numerosity, commonality, typicality, adequacy, predominance, and superiority are satisfied.

> The plaintiffs bear the burden of providing information sufficient to enable the motion judge to form a reasonable judgment that the class meets the requirements of *rule 23*; they do not bear the burden of producing evidence sufficient to prove that the requirements have been met . . . "[N]either the possibility that a plaintiff will be unable **[*27]** to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies the Rule."

*Weld v. Glaxo Wellcome, Inc., 434 Mass. 81, 87, 746 N.E.2d 522 (2001)* (footnote and citation omitted). "The standard defies mathematical precision." *Id. at 85*.

---

some jack-vehicle combinations, perform markedly better than others.

A motion for class certification should not turn on the court's evaluation of the merits of the parties' legal or factual claims. The court may find it necessary, however--as I have--to analyze elements of the parties' substantive claims and review such facts as are available at this preliminary stage, in order to evaluate whether the requirements of *Rule 23* have been satisfied. *In re Ford Motor Co. Ignition Switch Prod. Liab. Litig., 174 F.R.D. 332, 339 (D.N.J. 1997)*.

Although I find that the plaintiff has satisfactorily established numerosity and adequacy, [11] the proposed class cannot be certified for lack of commonality, predominance, and superiority.

1. Commonality.

*HN4* [↑] ] The commonality requirement dictates that plaintiffs seeking class certification must demonstrate that "all the persons whom they profess to represent have a common interest in the subject matter of the suit and a right and interest to ask for the same relief." *Spear v. H.V. Greene Co., 246 Mass. 259, 266, 140 N.E. 795 (1923)*. The commonality test is "qualitative rather than quantitative, that is, there need only be a single issue common to all members of the class." *In re American Medical Systems, Inc., 75 F.3d 1069, 1080 (6th Cir. 1996)* quoting 1 H. Newberg & A. Conte, Newberg on Class Actions, §3.10 at 3-50 (3rd ed. 1992).

Where a proposed class is comprised of owners of a number of different models of a certain product with differing characteristics, commonality is often the hurdle not overcome. See, *e.g.*, *In re Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 214 (E.D.La. 1998)* (class certification denied in case involving fraudulent concealment of two-step paint process's tendency to prematurely peel and flake off automobiles, where there was no single uniform paint process applied to the three models of trucks [*29] and utility vehicles over the four model years in question, therefore issue of product defect was vehicle-specific); *In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.* (denying class certification in case involving same ignition switch in different model vehicles); *In re Ford Motor Co. Bronco II Prod. Liab. Litig., 177 F.R.D. 360, 372 (D.La. 1997)* (denying class certification where plaintiff alleged design

defect in seven model years of Ford Bronco IIs that allegedly made them likely to roll over; vehicle was sold in varying configurations which would affect stability including two-and four-wheel drive, different tire and wheel sizes, different track width, and variances in mechanical configuration); *Walsh v. Ford Motor Co., 257 U.S. App. D.C. 85, 807 F.2d 1000, 1017 (D.D.C. 1996)* ("Appellees have not identified in support of the alleged breach of warranty claims, and we have not found in the record, any indication of evidence common to all the transmission configurations swept into the class definition"); *In re American Medical Systems, Inc., 75 F.3d at 1080-81* (commonality not established where the class included owners of ten different models of penile implants, including ones which had been modified [*30] over the years).

In this case, the common denominator among all class members and claims is the allegation that the jacks are unmerchantable, not fit for their intended purpose. Based on the evidence presented, I conclude that this question will hinge on facts that defy broad-brush, class-wide treatment. It seems, at this stage, highly unlikely that the question of whether the jacks in the class were, or were not, unmerchantable can be addressed on a class-wide basis. Nor does the proffered evidence suggest any principled basis at this stage for certifying cohesive subclasses, even assuming this were permissible under the Massachusetts version of *Rule 23*. [12]

The problem is well illustrated if one attempts to visualize the verdict form that the judge presiding over the trial of a class action in this case would employ. Were the warranty claim susceptible of a single, class-wide special question--"Were the 23 jack models owned or leased by members of the class unmerchantable?"-- the attractions of class-action treatment would be apparent.

On the evidence I have heard, however, one might

---

[11] Typicality is another question, which I do not reach. In the absence of a finding of commonality (see below), one can only say that the named plaintiff's claims [*28] will likely be typical of those of some class members and not others.

[12] No Massachusetts case I have been able to find explicitly addresses this question. A negative answer is pretty strongly implied, however, by a comparison of *Fed.R.Civ.P. 23(c)(4)(B)* (which expressly allows for subclasses) with *Mass.R.Civ.P. 23* (which does not). See *Fletcher v. Cape Cod Gas Co., 394 Mass. 595, 602, 477 N.E.2d 116 (1985)* (similarly concluding that limited-issue class actions, which are authorized by the terms of *Fed.R.Civ.P. 23(c)(4)(A)*, may not be maintained under *Mass.R.Civ.P. 23* or under *G.L.c. 93A, §9(2)*, neither of which contains [*31] such an express authorization.)

reasonably predict a question from the jury shortly after it retired to deliberate, along the lines of "To answer 'yes' or 'no' on unmerchantability, must we find that *all* of the 23 jacks were, or were not, unmerchantable?" To answer affirmatively would presume what the evidence before me did not suggest: that the answer is *necessarily* the same for all 23 jacks, or for all 80 jack-vehicle combinations. A negative answer would leave this judge, at least, wondering why the case was certified as a class action in the first place.

2. Predominance

*HN5*[↑] The predominance inquiry asks whether, if such common questions of law and fact do exist, those common issues "predominate over questions affecting only individual members." *Mass.R.Civ.P. 23(b)*. [*32] That common issues must be shown to "predominate" does not mean that individual issues need be non-existent. All class members need not be identically situated upon all issues, so long as their claims are not in conflict with each other. The individual differences, however, must be of lesser significance, and they must be manageable in a single class action. *In re Ford Motor Co. Ignition Switch Prod. Liab. Litig., 174 F.R.D. at 340* (citations omitted).

The predominance requirement cannot be satisfied where there are "a greater number of questions peculiar to the several categories of class members, and to individuals within each category, where such uncommon questions are significant." *In re Ford Motor Co. Ignition Switch Prod. Liab. Litig., 174 F.R.D. at 332*. See also, e.g., *Fletcher v. Cape Cod Gas Co., 394 Mass. 595, 603-04, 477 N.E.2d 116 (1985)* (plaintiffs could not establish predominance where "the issue of liability could not be decided on a class-wide basis").

The reasonable likelihood, in this case, of different findings as to the merchantability of different jack models or jack-vehicle combinations would be reason enough to conclude that the common issues across the class do not predominate. [*33] There are other reasons as well. For example, although this discussion has focused on the implied warranty of merchantability, Count III actually asserts three claims: breach of express warranty, and of the implied warranties both of merchantability and of fitness.

The express warranties for GM vehicles vary in terms and duration. See Ex. D72 (1999 Cadillac, 4 years/50,000 miles) and D73 (2000 Pontiac, 3

years/36,000 miles). [13] The warranty manuals (*id.*) prescribe the procedure for making a claim, and require certain informal dispute resolution efforts before litigation. The record does not say how many class members made express warranty claims related to their jacks; one might reasonably suppose that some probably did, but that these would be a tiny fraction of the class as a whole. (See discussion at p. 16 and n. 10, *supra*.)

Some aspects of the implied warranty claims, as well, require distinctions among class members. Any [*34] claim for breach of the implied warranty of fitness for a particular purpose requires individualized factfinding concerning the dealer's knowledge of the intended use (e.g., off-road on sand in pursuit of striped bass) and the buyer's or lessor's reliance on the dealer's skill and judgment. With respect to any implied warranty of fitness or merchantability, there will be a distinction between class members who purchased or leased their vehicles for personal, family, or household purchasers, and commercial purchasers or lessees; the latter are limited, by the terms of the warranty manual, to the period of the express warranty, a limitation that would not apply to consumer purchasers and lessees. *G.L.c. 106, §2-316A*.

For all of these reasons, I am unable to find that the issues common to the class as a whole predominate, in number, complexity, or necessary trial time, over individual issues.

3. Superiority

*HN6*[↑] Closely related to the commonality and predominance issues is *Rule 23(b)*'s requirement that a class action be superior to other available methods for the fair and efficient adjudication of the controversy. As a general rule, the greater the number of individual issues that exist among [*35] putative plaintiffs in a class, the less likely it is that superiority can be established. *In re Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 224; In re American Medical Systems, 75 F.3d at 1084-85*. In this case the multitude of uncommon issues would cause the presentation of evidence, the jury charge, and even the verdict form to be, if not unmanageable, certainly inferior to individual

---

[13] These are the warranties for the vehicles owned by the two named plaintiffs at the time the motion for class certification was brought, Mr. Holzman (the sole remaining named plaintiff) and Ms. Fallentowne (who sold her Pontiac and was voluntarily dismissed).

proceedings for any class members who may choose to assert claims outside GM's warranty procedure.

### B. *Chapter 93A*

*HN7*[↑] The statutory language governing certification of a *Chapter 93A* class action differs from that of *Rule 23*. *Section 9(2)* of the statute allows a consumer injured by an unfair or deceptive act or practice to bring a class action, but only where

> the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that [the consumer] adequately and fairly represents such other persons.

*Section 9(2)* thus expressly incorporates numerosity and adequacy requirements that parallel those of *Rule 23*. Caselaw has implied as well the requirements of commonality and typicality, but has **[*36]** eschewed importing the "highly discretionary element[s]" of predominance and superiority. *Baldassari v. Public Fin. Trust, 369 Mass. 33, 40, 337 N.E.2d 701 (1975)*; accord, *Fletcher, 394 Mass. at 605*. These cases find in *section 9(2)* "a more mandatory tone" than in *Rule 23*. *Id*.

Even under the more generous standards for certifying a class action under *Chapter 93A*, however, this one falls short. I do not find, even in the "more mandatory tone" of *section 9(2)*, a complete disregard of the practicalities. The same factual issues that counsel against treating the warranty issues on a class-wide basis are just as central to the *Chapter 93A* claim. Although the members of the proposed class do enjoy a loose commonality on both the warranty and the closely related [14] *Chapter 93A* claims, it is not such as would prevent the proceeding from disintegrating into a series of mini-trials of the fact issues already identified in the discussion of *Rule 23*.

Nor could the problem be ameliorated by use of sub-classes **[*37]** and/or limited-issue classes under *Chapter 93A* any more than under *Rule 23*. See footnote 12, *supra* and *Fletcher, 394 Mass. at 602*. And *HN8*[↑] while neither the statute nor the caselaw

specifies how much commonality is enough to satisfy *section 9(2)*, it does invest in the Court "a degree of discretion in determining whether certain plaintiffs adequately have alleged that they are 'similarly situated' and have suffered a 'similar injury' as members of the class they seek to represent"--taking care, of course, to ensure that the remedial purposes of *Chapter 93A* and "the accomplishment of substantial justice" do not fall prey to the "traditional technicalities." *Id. at 605*.

The impediments to class certification in this case are far from "technicalities"; they go to the very feasibility of the procedure itself. Because the members of the class have not made the necessary preliminary showing that they are similarly situated, and that they have suffered similar injury at the hands of the defendant, class certification would be inappropriate under *c. 93A, §9(2)*.

ORDER

For the foregoing reasons, the Plaintiff's Motion for Class Certification is DENIED. Because it is apparent that this action, tried **[*38]** as an individual claim, does not meet the jurisdictional amount for this Court, the case is DISMISSED, *sua sponte* and without prejudice, pursuant to St. 1996, c. 358, *§5* and *Mass.R.Civ.P. 12(b)(1)*.

Thomas P. Billings, Associate Justice

Dated: November 6, 2007

---

---

[14] See, among many cases holding that a breach of warranty is a *per se* violation of *G.L.c. 93A, §2*, *Maillet v. ATF-Davidson Co., 407 Mass. 185, 193, 552 N.E.2d 95 (1990)* and authorities cited, particularly *940 CMR 3.08(2)*.

# *Vaughn v. Konecranes, Inc.*

United States District Court for the Eastern District of Kentucky, Central Division

April 13, 2015, Decided; April 13, 2015, Filed

Civil Action No. 5: 14-136-DCR

**Reporter**

2015 U.S. Dist. LEXIS 47855 *; 2015 WL 1636431

GEORGE VINCENT VAUGHN, Plaintiff, v. KONECRANES, INC., Defendant/Third Party Plaintiff v. DEMAG CRANES AND COMPONENTS CORP.; HETRONIC USA, INC.; and CENTRAL MOTOR WHEEL OF AMERICA, INC., Third Party Defendants.

**Subsequent History:** Reconsideration denied by *Vaughn v. Konecranes, Inc., 2015 U.S. Dist. LEXIS 67485 (E.D. Ky., May 26, 2015)*

Affirmed by *Vaughn v. Konecranes, Inc., 642 Fed. Appx. 568, 2016 U.S. App. LEXIS 4061 (6th Cir.), 2016 FED App. 117N (6th Cir.) (6th Cir. Ky., 2016)*

**Prior History:** *Vaughn v. Konecranes, Inc., 2014 U.S. Dist. LEXIS 141115 (E.D. Ky., Oct. 2, 2014)*

## Core Terms

reliable, discovery, expert testimony, requirements, conclusions, principles, facts of a case, parties, initial report

**Counsel:** **[1]** For George Vincent Vaughn, Plaintiff: David Rollins Marshall, LEAD ATTORNEY, Marshall Law Office, Lexington, KY.

For Konecranes, Inc., Defendant: Jane C. Higgins, Jennifer Maria Jabroski, LEAD ATTORNEYS, Phillips Parker Orberson & Arnett PLC - Lexington, Lexington, KY.

For Konecranes, Inc., ThirdParty Plaintiff: Jane C. Higgins, LEAD ATTORNEY, Jennifer Maria Jabroski, Phillips Parker Orberson & Arnett PLC - Lexington, Lexington, KY.

For Demag Cranes and Components Corp, ThirdParty Defendant: Catherine Amanda Stivers, Christopher Rennie Cashen, Christopher Lyle Jackson, LEAD ATTORNEYS, Dinsmore & Shohl LLP - Lexington, Lexington, KY.

For Hetronic USA, Inc., ThirdParty Defendant: Matthew T. Lockaby, LEAD ATTORNEY, Reminger & Reminger Co., LPA - LEXINGTON, Lexington, KY.

For Central Motor Wheel of America Inc., ThirdParty Defendant: Theodore Roberts Martin, LEAD ATTORNEY, Licha H. Farah, Jr., Ward, Hocker & Thornton - Lexington, Lexington, KY.

**Judges:** Danny C. Reeves, United States District Judge.

**Opinion by:** Danny C. Reeves

# Opinion

## MEMORANDUM OPINION AND ORDER

This matter is pending for consideration of the Defendant Konecranes, Inc.'s motion to preclude Frederick G. Heath from testifying during trial in a manner consistent **[2]** with the matters outlined in his expert reports. [Record no. 96] For the reasons discussed below, the defendant's motion will be granted.

**I.**

As discussed in prior orders, this action arises from a warehouse accident involving an industrial overhead crane. On May 8, 2012, while working at Central Motor Wheel of America, Inc. ("CMWA"), Plaintiff George Vincent Vaughn was injured when a crane pinned his foot. [Record No. 1-2, p. 21] Vaughn brought suit against Konecranes in the Bourbon Circuit Court under various theories of negligence and product liability. Thereafter, the action was removed to this Court. [Record No. 1] The Court entered a Scheduling Order, assigning deadlines for discovery and dispositive motions and setting the case for trial to begin on August 18, 2015. [Record No. 12] Under that Scheduling Order, the parties were to complete discovery and supplement disclosures by February 2, 2015. [*Id.*]

2015 U.S. Dist. LEXIS 47855, *2

The plaintiff hired Heath as a liability expert and expects him to testify regarding "why and how Mr. Vaughn was hurt," including offering opinions on Konecranes' alleged violation of a Crane Manufacturing Association of America Standard and the cause of the crane's malfunction. [Record [*3] No. 129-1, p. 4] On November 17, 2014, Heath issued his initial report. [Record No. 90-3] After the close of discovery, the plaintiff notified the Court of the necessity to supplement Heath's report based on newly-discovered information. [Record No. 91] The supplemental report was tendered on March 18, 2015. [Record No. 120-1] The defendant has raised objections to Heath's testimony based on _Rule 702 of the Federal Rules of Evidence_ and the principles set out in _Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)._ Konecranes attacks the reliability of Heath's initial report and argues that the supplemental report was untimely and should be excluded.

## II.

Any challenge to expert testimony must begin with _Rule 702 of the Federal Rules of Evidence_ which was modified in December 2000 to reflect the Supreme Court's holdings in _Daubert and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)._ _Rule 702_ states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods [*4] to the facts of the case.

_Fed. R. Evid. 702._

Based on the foregoing, for an expert's opinion to be admissible, it must satisfy three requirements. "First, the witness must be qualified by knowledge, skill, experience, training, or education. Second, the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to

determine a fact in issue. Third, the testimony must be reliable." _In re Scrap Metal Antitrust Litigation, 527 F.3d 517, 529-30 (6th Cir. 2006)._ When a party's expert witness is challenged, the Court assumes the role of a gatekeeper to determine whether the proposed testimony may be presented to the fact-finder. _Daubert, 509 U.S. at 587._

The Court need not hold a _Daubert_ hearing to determine the admissibility of expert testimony, but nonetheless must ensure that the disputed testimony is both relevant and reliable. _See_ _Nelson v. Tennessee Gas Pipeline Co., 243 F.3d 244, 249 (6th Cir. 2001);_ _Clay v. Ford Motor Co., 215 F.3d 663, 667 (6th Cir. 2000)._ In the case at hand, the admissibility of the expert testimony under _Daubert_ has been fully briefed by the parties. This Court finds that the record is sufficient to perform its role under _Daubert_ and a hearing would not be helpful in exercising that duty.

## III.

### A. March 2015 Report

The defendant's motion to strike Heath as an expert is based largely on the initial report dated November 17, 2014. [Record No. 90-3] However, the plaintiff [*5] has supplemented Heath's initial report with another, dated March 20, 2015,[1] following the discovery of new information. [Record No. 120-1] Because Heath's March 2015 report was produced after the close of discovery and the deadline for expert testimony, Konecranes argues that it is untimely and testimony based on the report would be prejudicial. [Record No. 124] Conversely, the plaintiff maintains that this report should not be excluded because the defendant did not make its witnesses available for deposition at an earlier time. [Record No. 129-1]

_Rule 26(a)(2)(A)_ directs a party to "disclose to the other parties the identity of any witness it may use at trial to present evidence under _Federal Rule of Evidence 702, 703,_ or _705._" _Fed. R. Civ. P. 26(a)(2)(A)._ These disclosures must be made "at the times and in the sequence that the court orders." _Fed. R. Civ. P. 26(a)(2)(D)._ _Rule 26(a)(2)(B)_ requires a written report be disclosed that "contain[s] a complete statement of all opinions to be expressed and the basis and reason

---

[1] This date appears to be in error, as the plaintiff submitted the report on March 18, 2015. [Record No. 120-1]

therefor." *Fed. R. Civ. P. 26(a)(2)(B). Rule 26(e)* requires that a party who has made a disclosure under *Rule 26(a)* supplement that expert report in a timely manner if the party learns that a material part of the disclosure is incomplete **[\*6]** or incorrect and if the information has not been known to the other party during discovery. *Fed. R. Civ. P. 26(e).*

The circumstances of this case underscore the importance of adhering to the Court's Scheduling Order and proceeding with timely discovery. It appears that counsel for several parties contributed to discovery delays and postponed key witness depositions. [Record Nos. 133-2, 133-3] These parties will not now be permitted to gain strategic advantage from the delays and induce technical violations rather than proceed on the merits of the case. Apparently, the defendant was aware that Heath's initial report would be supplemented following the deposition of Konecranes' employees, but counsel scheduled these depositions for the final business day of discovery. [*Id.*] Under these circumstances, the Court will accept the plaintiff's otherwise untimely expert report because it does not appear to result from a dilatory motive and purportedly relies on information disclosed only at the end of discovery. [Record No. 133] The Court finds the plaintiff's explanation reasonable and substantially justified. *See Fed. R. Civ. P. 37(c)(1)*; *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transport, 596 F.3d 357, 370 (6th Cir. 2010).* Accordingly, the Court will include Heath's March 2015 report in its *Daubert* determination.

**B. [\*7]  Reliability Requirement for Expert Testimony**

In addition to requirements that a witness qualify as an expert and that the opinions he wishes to express be relevant, *Rule 702* requires that the opinions be reliable. *In re Scrap Metal, 527 F.3d at 529.* District courts consider the basis of an expert's opinion by evaluating: (i) whether the theory or technique can be and has been tested; (ii) whether it has been subjected to peer review and publication; (iii) its known or potential error rate and the existence and maintenance of standards controlling the technique's operation; (iv) whether it has attracted widespread acceptance in a particular field; and (v) whether the experts propose to testify about matters "growing naturally and directly out of the research they have conducted independent of the litigation" or have developed their opinions expressly for trial. *Smelser v. Norfolk Southern R. Co., 105 F.3d 299, 303 (6th Cir. 1997).*

When assessing the reliability of opinions a witness seeks to provide as expert testimony, "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire, 526 U.S. at 142.* Generally, opinions meet the reliability threshold when an expert "employs in the courtroom the same level **[\*8]** of intellectual rigor that characterizes the practice in the relevant field." *Jahn v. Equine Servs., PSC, 233 F.3d 382, 388 (6th Cir. 2000)* (citing *Kumho Tire, 526 U.S. at 152*)

In this case, Konecranes' major criticism of Heath's report — that it lacks any methodology at all — is well-taken. [Record No. 96-1] Without any identifiable method of reasoning, Heath's testimony is facially unreliable. *See Reynolds v. Freightliner LLC, 2006 U.S. Dist. LEXIS 97244, at \*27 (E.D. Ky. June 21, 2006).* Heath fails to explain how, given the facts and data he relied upon, he reached the conclusions outlined in his report. His report simply concludes, *inter alia*: (i) "either the bridge drive relay in the receiver stuck or the bridge drive contactor fused"; (ii) "[it] is more likely than not that the cause of the incident at issue was a fused contactor"; (iii) "[it] is clear that a sticking relay in the radio control receiver did not initiate the unintended motion of the crane"; (iv) "Konecranes actions and inactions were the major contributing causes of the incident that resulted in the injuries to Mr. Vaughn"; and (v) "[if] Konecranes had followed the guidelines set forth in CMAA [Specifications] it is more likely than not that the bridge drive contactor(s) would have been replaced prior to the incident, the incident would not have occurred, and [Vaughn] would not have been **[\*9]** injured." [Record No. 120-1, pp. 12, 15-16]

In determining whether a particular methodology is reliable, this Court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *See Kumho Tire Co., 526 U.S. at 158.* The party seeking to have the testimony admitted bears the burden of showing "that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology," and "the expert's bald assurance of validity is not enough." *Daubert* (on remand), *43 F.3d at 1316.* Here, Heath's opinion is simply insufficient. Absent some process or testable principle, the Court is unable to determine whether Heath's conclusions are "the product of reliable principles and methods" or whether he "reliably applied the principles and methods to the facts of the case." *Fed. R. Evid. 702.* These are the threshold requirements for the admission of expert

testimony.

Heath's report identifies certain documents that he reviewed in forming his opinions. [Record No. 120-1, pp. 1-2] However, it is unclear which documents were actually used by him in formulating his opinions, and explanation of how his experience informed his conclusions is completely absent. **[*10]** It is the absence that makes Heath's testimony patently unreliable. Without such an explanation, there is simply too great an analytical gap between the facts of the case and the opinion proffered to permit Heath's testimony to go to the jury.

Vaughn attempts to premise Heath's testimony on his extensive training and experience with "lifting heavy things." [Record No. 129-1, p. 3] The plaintiff argues that Heath's experience is sufficient to support his opinions in this case. It is well-established that an expert's experience may be the basis for reliable testimony. The Advisory Committee Notes to _Rule 702_ specifically contemplate such a situation:

> Nothing in this amendment is intended to suggest that experience alone — or experience in conjunction with other knowledge, skill, training, or education — may not provide a sufficient foundation for expert testimony. To the contrary, the text of _Rule 702_ expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.

_Fed. R. Evid. 702_ advisory committee's note (2000). However, it is not sufficient for an expert merely to cite to his experience **[*11]** without further explanation. Rather, an expert must be able to articulate the connection between his experience and his conclusions in a particular case:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."

_Id._

Heath's report describes his credentials and experiences, which include membership in the American Society of Safety Engineers, the Automotive Life Institute, the Society of Automotive Engineers, the Scaffold and Access Industry Association, the Specialized Carriers and Riggers Association, Underwriter's Laboratories, and the Material Handling Industry of America. [Record No. 120-1, p. 3] In addition, Heath serves on the consensus body for Specifications for Cable-less Controls for Electric Overhead Traveling Cranes and committees within the American Society of Mechanical Engineering for Overhead Hoists; Jacks, Industrial Rollers, Air Casters, and Hydraulic Gantries; and Below-the-Hook **[*12]** Lifting Devices. [_Id._] In the past, Heath has served as chief executive officer of a lift manufacturing company and chief operating officer of a pressure vessel manufacturing company. Regardless, nothing in the record or the expert report describes how his experience led to his conclusions or explains how he reliably applied his experience to the facts of the case. Heath's report does not articulate a reliable connection between his experience and his conclusions in any way, much less to the extent described in the Advisory Committee Notes to _Rule 702_.

Moreover, contrary to the plaintiff's assertion that "Mr. Heath's opinions is [sic] based on published standards that were created to be representative of generally accepted industry custom and practice," [Record No. 129-1, p. 4] the reports do not discuss these standards. Apart from conclusorily stating that, "[there] is no evidence that Konecranes followed the specific instructions of CMAA Specification #78, Paragraph 4.4.4 and Table 4.4.2 that the Quarterly inspections of the CMWA cranes cover electrical components (including contactors and relays) for pitting or deterioration," [Record No. 120-1, p. 10] the reports do not articulate the proper **[*13]** inspection procedure or apply the industry-accepted specifications to the facts of the case. Although a qualified expert may testify regarding the customs and standards of an industry, Heath has not done so here. _See McGowan v. Cooper Industries, Inc., 863 F.2d 1266, 1272-73 (6th Cir. 1988)_. As a result, his testimony is not "the _product of_ reliable principles and methods" and Heath has not "_reliably applied_ the principles and methods to the facts of the case," as required by _Rule 702_. [Record No. 120-1, p. 16]

**IV**.

Heath's conclusions are unreliable because he has failed to explain his reasoning, verify his methods, or point to others who have done so. _See, e.g., Smelser, 105 F.3d at 304_. The reliability of Heath's opinions has

not been established by a preponderance of evidence and his opinions do not meet the admissibility requirements of *Rule 702*. Accordingly, it is hereby

**ORDERED** that Defendant Konecranes' motion to preclude Frederick G. Heath from testifying as an expert witness during trial [Record No. 96] is **GRANTED**.

This 13th day of April, 2015.

**Signed By**:

/s/ DCR

*Danny C. Reeves*

**United States District Judge**

---

No *Shepard's* Signal™
As of: October 25, 2018 8:40 PM Z

## *Beer v. AGCO Corp.*

United States District Court for the Eastern District of Pennsylvania

November 21, 2014, Decided; November 21, 2014, Filed

CIVIL ACTION No. 12-1391

**Reporter**

2014 U.S. Dist. LEXIS 193257 *

RYAN BEER, Plaintiff v. AGCO CORPORATION, Defendant

## Core Terms

combine, engineering, biomechanical, testing, methodologies, reliable, reconstruction, conclusions, documents, injuries, reflexes, argues, speed, admissibility, equilibrium, inspection, factors, drive

**Counsel:  [*1]** For RYAN BEER, Plaintiff: PATRICK C. TIMONEY, LEAD ATTORNEY, SCHWARZ & MONGELUZZI LLP, PHILADELPHIA, PA; ROBERT J. MONGELUZZI, LEAD ATTORNEY, SALTZ, MONGELUZZI, BARRETT & BENDESKY, P.C., PHILADELPHIA, PA; ADAM J. PANTANO, SALTZ, LARRY BENDESKY, ROBERT W. ZIMMERMAN, MONGELUZZI, BARRETT & BENDESKY, P.C., PHILADELPHIA, PA.

For AGCO CORPORATION, Defendant: DEAN F. MURTAGH, LEAD ATTORNEY, GERMAN GALLAGHER & MURTAGH, PHILADELPHIA, PA; WILLIAM J. D'ANNUNZIO, GERMAN GALLAGHER & MURTAGH, PHILADELPHIA, PA.

**Judges:** Mitchell S. Goldberg, J.

**Opinion by:** Mitchell S. Goldberg

## Opinion

### ORDER

**AND NOW**, this 21st day of November, 2014, upon consideration of "Plaintiff's Motion to Preclude the Testimony of Defendant AGCO Corporation's Expert, Gary Deegear, M.D." (Doc. No. 42), "Plaintiff's Motion to

Preclude the Biomechanical Engineering and Accident Reconstruction Opinions and Testimony of Defendant AGCO Corporation's Liability Experts, Howard Douglas, Richard E. McMillen, P.E. and Clyde Richard, P.E., Ph.D." (Doc. No. 43), Plaintiff's "Motion to Exclude Cumulative Expert Testimony" (Doc. No. 41) and the responses thereto, I find as follows:

FACTUAL AND PROCEDURAL HISTORY

1. On March 19, 2012, Plaintiff filed an action against Defendant **[*2]** AGCO Corporation, claiming he was injured because of Defendant's failure to provide guarding on their combine. On November 8, 2013, Plaintiff filed motions to preclude the testimony of Defendant's experts, Gary Deegear, M.D., Howard Douglas, Richard E. McMillen, and Clyde Richard.

2. Plaintiff argues that Dr. Deegear's testimony should be precluded based on his lack of qualifications in the field of biomechanical engineering and his failure to conduct testing or use accepted methodologies in developing his opinions. (Pl.'s Mot., Doc. No. 42, p. 3.)

3. Plaintiff also argues that Douglas, McMillen and Richard all lack qualifications in biomechanical engineering and accident reconstruction, failed to conduct testing, and did not base their opinions on accepted methodologies. (Pl.'s Mot., Doc. No. 43, pp. 4-5.)

4. Finally, Plaintiff notes that Douglas, McMillen and Richard all opine that the combine had adequate guarding and that the accident was caused by Plaintiff intentionally reaching into the combine while its component parts were moving. As such, Plaintiff argues that the testimony of the three experts is cumulative and should be excluded. (Pl.'s

Mot., Doc. No. 41, pp. 4-10.)

LEGAL STANDARD [*3]

5. _Federal Rule of Evidence 702_ governs the admissibility of expert testimony, and states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In evaluating whether an expert opinion is admissible, the district court acts as a gatekeeper, excluding opinion testimony that does not meet these requirements. _Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)_. In order for a witness to testify as an expert, the United States Court of Appeals for the Third Circuit has held that "(1) the proffered witness [must be] qualified as an expert; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and (3) the expert's testimony must 'fit' the facts of the case." _In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-42 (3d Cir. 1994)_.

6. An expert's opinion is reliable if it is based upon "'methods and procedures of science' rather [*4] than subjective belief or unsupported speculation." _Id. at 742-43_ (quotation omitted). In considering whether an expert's method is reliable, courts should consider: (1) whether it is based upon testable hypotheses; (2) subject to peer review; (3) the known or potential error rate; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether it is generally accepted; (6) the relationship of the method to other methods that have been deemed reliable; (7) the expert's experience or qualification with the technique or method; (8) non-judicial uses the method has been put to; and (9) all other relevant factors. Id. The reliability requirement is not to be

applied "too strictly" and is satisfied as long as the expert has "good grounds" for his or her opinion. _Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 784 (3d Cir. 1996)_.

7. _Federal Rule of Evidence 702_ is to be interpreted liberally in favor of admissibility, since "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." _Daubert, 509 U.S. at 596_; _Paoli, 35 F.3d at 741_. The burden is on the party offering the evidence to establish admissibility by a preponderance of the evidence. See _Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999)_.

DISCUSSION

Dr. Gary Deegear

8. Dr. [*5] Deegear's proposed testimony consists of the following six opinions: 1) the bodily location and nature of Plaintiff's injuries; 2) the injuries were caused by compressive laceration and blunt force trauma; 3) Plaintiff's arm was "caught between the cylinder variable speed drive sheave and the cylinder variable speed drive belt and was subsequently fed through between the two, until released;" 4) "normal body movements, equilibrium and reflexes" are inconsistent with Plaintiff accidently stumbling and falling into the combine; 5) "normal human reflexes and perception/reaction times disallow any motion by [Plaintiff] that would have assisted him in avoiding injury;" and 6) "the injuries sustained by [Plaintiff] are inconsistent with his arm passing between the cylinder variable speed drive sheave and the vertical support member." (Pl.'s Mot., Ex. E., Doc. No. 42, p. 3.)

9. Plaintiff argues that Dr. Deegear's testimony should be excluded as he is not qualified in the field of biomechanical engineering, did not conduct proper testing, and did not use accepted biomechanical engineering methodologies in developing his opinions. (Pl.'s Mot., Doc. No. 42, p. 3.)

10. Dr. Deegear received a medical [*6] degree from the University of Texas Health Science Center

Beer v. AGCO Corp.

in 1988. Since earning this degree, he has worked as a primary care physician and has additional experience in emergency medicine. He has received training in accident reconstruction, death investigation, blood stain evidence and the biomechanics of impact. He has also written several publications about injury analysis. Given Dr. Deegear's medical education and past experience, I find that he is qualified as an expert to provide testimony regarding Plaintiff's injuries and how the injuries occurred. These opinions are listed in his report as opinions one, two, three and six. (Pl.'s Mot., Ex. A., Doc. No. 42, p. 13.)

11. Additionally, I find that Dr. Deegear's opinions on these matters are based on reliable scientific methodologies. His report indicates that he reviewed relevant documents, including medical records, the Police Incident Investigation Report, pictures of the injuries, and witness depositions. Dr. Deegear also reviewed the videotape of the testing of the combine and performed his own inspection of the combine. In reaching his conclusions, Dr. Deegear applied his medical and biomechanical expertise to analyze the **[*7]** evidence before him. These conclusions are sufficiently based on scientific methodology. While his conclusions may be vulnerable to attack on cross-examination, his report sufficiently lays out the methodology used in reaching his opinions.

12. Dr. Deegear has also provided opinions related to "normal body movements," "equilibrium" and "reflexes." Specifically, he states:

> 4. Normal body movements, equilibrium and reflexes would not have allowed Mr. Beer to stumble and get his left forearm into the areas surrounding the subject cylinder variable speed drive sheave, belt, and vertical member with the shields in place.

> 5. Due to the speed of the injurious interaction, normal human reflexes and perception/reaction times disallow any motion by Mr. Beer that would have assisted him in avoiding injury.

(Id. at 13-14.) Defendant has not provided sufficient evidence demonstrating that Dr. Deegear is qualified to provide opinions on human reflexes, body movement, and equilibrium. These opinions appear to be speculative as Dr. Deegear has not offered any explanation as to how he arrived at his conclusions. Experts are not permitted to testify on opinions based on subjective belief or unsupported speculation. **[*8]**   *Paoli, 35 F.3d at 742-43*

(quotation omitted). Thus, Dr. Deegear will be precluded from testifying about his opinions related to human reflexes, equilibrium and normal body movements.

Howard Douglas

13. Plaintiff also argues that the testimony and opinions of Defendant's expert Howard Douglas should be precluded because he is not qualified as an expert in biomechanical engineering and accident reconstruction. (Pl.'s Mot., Doc. No. 43, p. 5.)

14. Douglas' proposed testimony focuses on the safety testing and design of the combine. In order to rebut Plaintiff's experts, Defendants offer Douglas's opinion that the gear shift lever cannot be accidently dislodged as an individual attempts to clear the rock trap based on the layout of the combine. Douglas also opines on the combine's compliance with relevant safety standards. (Def.'s Mot., Doc No. 46, pp. 10-12.)

15. Douglas is an experienced electrical engineer and has worked as a Product Safety Manager for Defendant for thirteen years. In light of his experience, Douglas is qualified to testify as an expert in engineering. Douglas indicates in his report that he reviewed extensive documents including depositions, medical records, and pictures, prior to reaching his **[*9]** conclusions. He also participated in tests of the combine as well as testing of an exemplar combine numerous times. He documented those tests and relied on their results in forming his conclusion. He is qualified to test and report on the combine in question, because he has worked for the Defendant as the Product Safety Manager for over a decade. Taking the Daubert factors into consideration, I find that Douglas's conclusions are based on reliable methodology.

Richard McMillen

16. Plaintiff next argues that the testimony and opinions of Defendant's expert Richard McMillen should be precluded because he is not qualified as an expert in biomechanical engineering and accident reconstruction. (Pl.'s Mot., Doc. No. 43, p.

Beer v. AGCO Corp.

9.)

17. McMillen's proposed testimony focuses on the design and operation of the combine. Specifically, he opines that the combine's gear drive cannot be inadvertently knocked into lower gear due to particular features of the gear system. McMillen offers additional opinions regarding the combine's safety shielding and how a "person's body would have to contort to come into contact with the areas of the Combine that plaintiff's experts claim [Plaintiff] came into contact with." **[\*10]** (Def.'s Mot., Doc No. 46, pp. 7-8.)

18. McMillen is an agricultural engineer with over thirty years of experience with specific experience in designing combines. In light of his training and experience, he is qualified to testify as an agricultural engineering expert. McMillen reviewed relevant documents in formulating his conclusion. He also inspected the combine in question and attempted to recreate Plaintiff's injury as it had been described. McMillen documented this inspection and also participated in the inspection and test of an exemplar combine. He used his expertise in combine design to compare the relevant design standards with the actual design of the exemplar combine. I conclude that McMillen's methodology satisfies the requirements set forth in Daubert.


Dr. Clyde Richard


19. Plaintiff also argues that the testimony and opinions of Defendant's expert Clyde Richard should be precluded because he is not qualified as an expert in biomechanical engineering and accident reconstruction. (Pl.'s Mot., Doc. No. 43, p. 13.)

20. Dr. Richard opines that the combine's dimensions indicate that it would be nearly impossible for a man of Plaintiff's size to accidentally fall into an opening **[\*11]** on the combine. Dr. Douglas also offers opinions regarding the noise levels created by the combine and concludes, in opposition to Plaintiff's theory, that it would be unlikely that someone standing in Plaintiff's position would have been able to hear an individual speaking from the combine's cab while the machine was running. (Def.'s Mot., Doc. No. 46, pp. 7-8.)

21. Dr. Richard earned a Ph.D. in Mechanical Engineering and has extensive experience working in the engineering field. Dr. Richard also taught an engineering design course which included human factors and accident reconstruction for fifteen years at the Naval Academy. (Def.'s Mot., Doc. No. 47, p. 12.) Dr. Richard's education and experience qualify him as a mechanical engineering, accident reconstruction and human factors expert. In formulating his conclusion, Dr. Richard reviewed relevant documents including depositions, combine manuals and catalogues, medical records, and photographs. He participated in an inspection of the combine and an exemplar combine, documented relevant measurements in detail and also participated in speed, surrogate arm, and sound tests. Dr. Richard relied on the results of this testing and his expertise **[\*12]** in mechanical engineering to reach his conclusions. Applying the Daubert factors, I find that Dr. Richard employed reliable methodologies in reaching his conclusions.

22. Regarding, Plaintiff's motion to exclude cumulative evidence, I agree with Defendant that Plaintiff's motion is premature. Such a motion is more appropriately brought after the record has been further developed. Plaintiff may renew the motion at a time closer to trial or during the trial.

**WHEREFORE**, it is hereby **ORDERED** that,

- Plaintiff's motion to exclude the testimony and opinions of Defendant's expert Gary Deegear (Doc. No. 42) is **GRANTED** in part and **DENIED** in part as previously set forth in this order.

- Plaintiff's motion to exclude the testimony and opinions of Defendant's experts Howard Douglas, Richard McMillen, and Clyde Richard (Doc. No. 43) is **DENIED**.

- Plaintiff's motion to preclude cumulative testimony (Doc. No. 41) is **DENIED WITHOUT PREJUDICE**.

**BY THE COURT**:

**/s/ Mitchell S. Goldberg**

**Mitchell S. Goldberg, J.**

1097376/40967769v.1

Kelcie Reid

 Neutral

As of: October 25, 2018 8:41 PM Z

# *Henderson v. DeMatteo Mgmt.*

Superior Court of Connecticut, Judicial District of New London, At New London

March 14, 2007, Decided ; March 14, 2007, Filed

CV055000094

**Reporter**

2007 Conn. Super. LEXIS 762 *; 2007 WL 969424

Ellen Henderson v. DeMatteo Management, Inc. et al.

**Notice:** [*1]  THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE

**Prior History:** *Henderson v. DeMatteo Mgmt., 2006 Conn. Super. LEXIS 3421 (Conn. Super. Ct., Nov. 13, 2006)*

## Core Terms

grab bar, scientific, hinged, scientific evidence, ladies', admissibility, wall-mounted, handicap, patrons, clamp, bathroom, alleges, safety rail, cases, rails, screw, locking mechanism, mechanisms, proffered, crashing, suddenly, horizontal position, upright position, expert witness, factual basis, manufacturer, requirements, methodology, restaurant, witnesses'

## Case Summary

### Procedural Posture

Plaintiff customer alleged she sustained injuries when she was hit in the head by a descending swing-up assistance bar (grab bar) in a handicapped ladies' room at defendant restaurant. The restaurant moved to preclude the testimony of the customer's proposed expert witness. A Porter hearing was held by the court. The restaurant asserted, inter alia, that the witness lacked the necessary qualifications.

### Overview

The complaint alleged that the rate of fall of the grab bar and the layout of the bathroom was defective. The primary scientific or technical evidence in the case related to the amount of force needed to move the bar from its upright position to the horizontal position. The expert was a licensed professional engineer with considerable experience in mechanical engineering and safety matters. He had been involved in about 3,000 cases as an expert and had knowledge of various codes and regulations. Thus, he had information beyond the ken of the average juror with respect to the matters at issue. The court found he possessed the necessary qualifications to offer a reliable opinion on the subject of handicapped-accessible bathroom equipment and design as it related to the rate of fall of the grab bar or the adjustment of its safety equipment or its maintenance. The claim that the clamp was adjusted too loose so that the bar could "free fall" rather than fall slowly at a controlled pace did not involve an aura of mystic infallibility, nor was it scientifically obscure. Thus, a Porter analysis was inappropriate. However, the proposed testimony would withstand a Porter analysis.

### Outcome

The motion to preclude the expert's testimony was denied.

## LexisNexis® Headnotes

Evidence > Burdens of Proof > General Overview

*HN1*[⤓]  Evidence, Burdens of Proof

Once the party opposing the evidence objects, the proponent bears the burden of demonstrating its admissibility.

Henderson v. DeMatteo Mgmt.

Evidence > ... > Testimony > Expert Witnesses > Qualifications

**HN2[⤓] Expert Witnesses, Qualifications**

See *Conn. Code Evid. R. 7-2*.

Evidence > Admissibility > Expert Witnesses > Daubert Standard

**HN3[⤓] Expert Witnesses, Daubert Standard**

Under Daubert, before proffered scientific evidence may be admitted, the trial court must determine whether the proffered evidence will assist the trier of fact. This entails a two part inquiry: whether the reasoning or methodology underlying the scientific theory or technique in question is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. In other words, before it may be admitted, the trial judge must find that the proffered scientific evidence is both reliable and relevant. More specifically, the first requirement for scientific evidence to be admissible is that the subject of the testimony must be scientifically valid, meaning that it is scientific knowledge rooted in the methods and procedures of science and is more than subjective belief or unsupported speculation.

Evidence > Admissibility > Expert Witnesses > Daubert Standard

**HN4[⤓] Expert Witnesses, Daubert Standard**

The Daubert court listed four nonexclusive factors for federal judges consider in determining whether a particular theory or technique is based on scientific knowledge: (1) whether it can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error, including the existence or maintenance of standards controlling the technique's operation; and (4) whether the technique is, in fact, generally accepted in the relevant scientific community. The court in Daubert further articulated, however, that the inquiry is a flexible one. To the extent that they focus on the reliability of evidence as ensured by the scientific validity of its underlying principles, other factors may well have merit.

Evidence > Admissibility > Expert Witnesses > Daubert Standard

**HN5[⤓] Expert Witnesses, Daubert Standard**

Under Daubert, scientific evidence must fit the case in which it is presented. In other words, proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract. Finally, the Daubert court emphasized that even if a scientific theory or technique would be admissible under the aforementioned criteria, it can still be excluded for failure to satisfy some other federal rule of evidence. Most important, proffered scientific testimony can still be excluded for failure to satisfy *Fed. R. Evid. 403*, which allows for the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

Evidence > ... > Testimony > Expert Witnesses > General Overview

**HN6[⤓] Testimony, Expert Witnesses**

In a Porter analysis the court is not concerned with the results of the witnesses' opinions, but in the methodology utilized. Also there must be a carefully reasoned decision in which the court makes a concerted effort to educate itself from the evidence about the proposed area of expertise.

Evidence > Admissibility > Expert Witnesses > Helpfulness

**HN7[⤓] Expert Witnesses, Helpfulness**

Under Connecticut's rules of evidence, a witness is only permitted to express an opinion if they have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience an aid to the court or the jury in determining the questioned issue.

Evidence > Admissibility > Scientific Evidence > General Overview

Evidence > ... > Testimony > Expert Witnesses > General Overview

Henderson v. DeMatteo Mgmt.

*HN8*[⬇] **Admissibility, Scientific Evidence**

In some situations or circumstances scientific evidence does not require a Porter analysis.

Evidence > Admissibility > Expert Witnesses

Evidence > Admissibility > Scientific Evidence > General Overview

*HN9*[⬇] **Admissibility, Expert Witnesses**

Evidence, neither scientifically obscure nor instilled with an aura of mystic infallibility, which merely places a jury in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert's assertions based on his special skill or knowledge, is not the type of scientific evidence within the contemplation of Porter. In particular, evidence, even evidence with its roots in scientific principles, which is within the comprehension of the average juror and which allows the jury to make its own conclusions based on its independent powers of observation and physical comparison, and without heavy reliance upon the testimony of an expert witness, need not be considered scientific in nature for the purposes of evidentiary admissibility.

Evidence > Admissibility > Scientific Evidence > General Overview

*HN10*[⬇] **Admissibility, Scientific Evidence**

Any exemption for scientific evidence that depends upon existing techniques must presuppose an ability on the part of the proponent of the evidence to provide a sufficient articulation of the methodology underlying the scientific evidence.

Evidence > Admissibility > Expert Witnesses

Evidence > ... > Testimony > Expert Witnesses > Qualifications

*HN11*[⬇] **Admissibility, Expert Witnesses**

The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions.

Evidence > ... > Testimony > Expert Witnesses > Qualifications

*HN12*[⬇] **Expert Witnesses, Qualifications**

In order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion. The essential facts on which an expert opinion is based are an important consideration in determining the admissibility of his opinion.

Evidence > ... > Testimony > Expert Witnesses > General Overview

Evidence > ... > Lay Witnesses > Opinion Testimony > General Overview

*HN13*[⬇] **Testimony, Expert Witnesses**

Where the factual basis of an opinion is challenged the question before the court is whether the uncertainties in the essential facts on which the opinion is predicated are such as to make an opinion based on them without substantial value. That question is one of fact for the trial court.

Evidence > Admissibility > Expert Witnesses

*HN14*[⬇] **Admissibility, Expert Witnesses**

In order to be admissible, a proffered expert's knowledge must be directly applicable to the matter specifically in issue.

**Judges:** Robert J. Leuba, Judge Trial Referee.

**Opinion by:** Robert J. Leuba

# Opinion

*MEMORANDUM OF DECISION DEFENDANT BRINKER CONNECTICUT CORPORATION'S MOTION TO PRECLUDE THE TESTIMONY OF MICHAEL SHANOK*

Henderson v. DeMatteo Mgmt.

BACKGROUND

This is a premises liability and negligence action in which the plaintiff alleged sustaining injuries when she alleges she was hit in the head by a descending swing-up assistance bar (grab bar) in a handicapped ladies' room at the defendant's restaurant.

The defendant, Brinker Connecticut Corporation, (defendant) has moved to preclude the testimony of the plaintiff's proposed expert witness, Michael Shanok, on multiple grounds.

A *Porter* hearing was held by the court at which the parties were permitted to introduce evidence and advance their respective arguments. Prior to the hearing, extensive briefing had been accomplished.

In her amended complaint the plaintiff has two counts. In the first count, making a premises liability claim, she alleges the defendant's premises were defective in one or more of the following **[*2]** ways:

(1) The handicap bar had no safety or locking mechanism which would prevent it from suddenly crashing down, despite the fact that it was weighted and could suddenly crash down on patrons;

(2) The restroom stalls failed to supply any hook or appropriate area for patrons to place their personal belongings, such as purses and coats;

(3) There were no signs warning patrons of the dangers of said handicap bar, which could suddenly come crashing down due to its weight and/or lack of safety or locking mechanism.

In the second count, sounding in negligence, the plaintiff alleges the defendant was negligent in one or more of the following ways:

(1) They supplied a handicap bar which was dangerous and/or defective in one or more of the following ways:

(a) Failed to secure it with a safety or locking mechanism which would prevent it from suddenly crashing down;

(b) It was weighted, but had no mechanism to prevent it from suddenly crashing down.

(2) They failed to supply any hook or appropriate area for patrons to place their personal belongings, such as purses and coats, in the individual bathroom stalls, thus making it foreseeable that patrons would place their belongings **[*3]** on the handicap bar;

(3) They failed to warn patrons of the dangers of said handicap bar, which could suddenly come crashing down due to its weight and/or lack of safety or locking mechanism.

(4) They failed to maintain the handicap bar in a safe condition such that it would not pose a danger to or cause injury to patrons.

In the plaintiff's amended disclosure of expert witness, filed May 18, 2006, it is alleged that Mr. Shanok is expected to testify as to the following matters:

(1) The hinged wall-mounted safety rail had no locking mechanism to enable retention of it in the raised position and was in an unsafe, hazardous condition such that it caused the plaintiff's injuries when it inadvertently swung down causing plaintiff an impact injury;

(2) The hinged wall-mounted safety rail had a safety mechanism to enable retention of it in the raised position and to enable a slow descent but such mechanism was misadjusted and was in an unsafe, hazardous condition such that it caused the plaintiff's injuries when it inadvertently swung down causing plaintiff an impact injury;

(3) There were other feasible, economical and safe hinged wall-mounted safety rails available in the marketplace **[*4]** which would have prevented this accident from occurring;

(4) The bathroom stall where the plaintiff suffered traumatic injury due to the hinged wall-mounted safety rail had no visible signs warning of the hazard regarding the hinged wall-mounted safety rail;

(5) The bathroom stall where the plaintiff suffered traumatic injury due to the hinged wall-mounted safety rail had no wall hooks, door hooks or other mechanisms or furnishings where a patron such as a plaintiff could place her pocketbook or bag;

(6) Regular maintenance and/or reference to the product manual would have disclosed that this hinged wall-mounted safety rail had a safety mechanism to stop it from freely swinging down and striking a patron or that a locking mechanism could be installed to remove this unsafe condition;

(7) The ADAAG Manual recommends non-swinging

Kelcie Reid

Henderson v. DeMatteo Mgmt.

safety rails and does not recommend "movable grab bars";

(8) The International Code Council & American National Standards Institute, Inc. in its American National Standard for Accessible and Usable Buildings and Facilities mandates non-swinging safety rails and does not recommend movable safety rails;

(9) National manufacturers of hinged wall-mounted safety [*5] rails recognize the hazard of such rails without design features to prevent them from inadvertently falling down and causing impact injuries;

(10) The unsafe condition of the loose and free swinging hinged wall-mounted safety rail in the accident location in this case was readily apparent and the accident resulting from this rail inadvertently falling down causing an impact injury was foreseeable; and

(11) In the location of the accident in this case, the top of the toilet tank was not accessible due to a fixed grab bar attached to the wall above and adjacent to the tank top.

The defendant, in its Motion to Preclude, essentially has made three disparate claims with respect to Mr. Shanok's proposed testimony. (1) He lacks the necessary qualifications; (2) his testimony could not meet the *Porter* standards for scientific evidence; and (3) there is an insufficient factual basis for his opinions. The Motion asks the court to "preclude the plaintiff from offering the testimony of Mr. Shanok in this case."

The plaintiff, on the other hand, asserts that Mr. Shanok is qualified, that his testimony either meets the *Porter* requirements or, in the alternative, that test is not required [*6] in this situation, and that he has established a sufficient factual basis.

*STANDARDS*

*HN1*[⬆] "Once the party opposing the evidence objects, the proponent bears the burden of demonstrating its admissibility." *E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 38 Tex. Sup. Ct. J. 852 (Tex. 1995).*

*Section 7-2 of the Connecticut Code of Evidence* deals generally with the testimony by experts. It says *HN2*[⬆] "[A] witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue."

In the case of *State v. Porter, 241 Conn. 57, 698 A.2d 739 (1997),* our Supreme Court adopted the standard set forth in the United States Supreme Court case of *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993),* in lieu of that utilized earlier from *Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (D.C.Cir. 1923).* The standard adopted there, relating to the acceptance of scientific [*7] expert testimony, was more recently succinctly set forth in *State v. Kelly, 256 Conn. 23, 770 A.2d 908 (2001),* as follows:

. . . *HN3*[⬆] ] Under *Daubert*, before proffered scientific evidence may be admitted, the trial court must determine whether the proffered evidence will "assist the trier of fact . . ." *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra, 509 U.S. 589.* "This entails a two part inquiry: whether the reasoning or methodology underlying the [scientific theory or technique in question] is scientifically valid and, . . . whether that reasoning or methodology properly can be applied to the facts in issue . . . In other words, before it may be admitted, the trial judge must find that the proffered scientific evidence is both reliable and relevant. More specifically, the first requirement for scientific evidence to be admissible . . . is that the subject of the testimony must be scientifically valid, meaning that it is scientific knowledge rooted in the methods arid procedures of science . . . and is more than subjective belief or unsupported speculation." (Citations omitted; internal quotation marks omitted.) *State v. Porter, supra, 241 Conn. 63-64,* [*8] citing *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra, 592-93.*

*HN4*[⬆] The [*Daubert*] court listed four nonexclusive factors for federal judges consider in determining whether a particular theory or technique is based on scientific knowledge: (1) whether it can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error, including the existence or maintenance of standards controlling the technique's operation; and (4) whether the technique is, in fact, generally accepted in the relevant scientific community. [*Daubert v. Merrell*

Henderson v. DeMatteo Mgmt.

*Dow Pharmaceuticals, Inc., supra, 509* U.S.] 593-94. *State v. Porter, supra, 241 Conn. 64*. The court in *Daubert* further articulated, however, that the inquiry "is . . . a flexible one." *Daubert v. Merrill Dow Pharmaceuticals, Inc., supra, 594*. To the extent that they focus on the reliability of evidence as ensured by the scientific validity of its underlying principles, [other factors] may well have merit . . . *Id., 594-95 n.12*.

**HN5**[↑] Under *Daubert*, scientific **[*9]** evidence must also fit the case in which it is presented. *Id., 591*. "In other words, proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract." *State v. Porter, supra, 241 Conn. 65*. Finally, the *Daubert* court emphasized that even if a scientific theory or technique would be admissible under the aforementioned criteria, it can still be excluded for failure to satisfy some other federal rule of evidence. *Daubert v. Merrill Dow Pharmaceuticals, Inc., supra, 509 U.S. 595*. Most important, proffered scientific testimony can still be excluded for failure to satisfy *rule 403 of the Federal Rules of Evidence*, which allows for the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . ." (Citations omitted; internal quotation marks omitted.) *Daubert v. Merrill Dow Pharmaceuticals, Inc., supra, 595*.

**HN6**[↑] In the *Porter* analysis the court is not concerned with the results of the witnesses' opinions, **[*10]** but in the methodology utilized. Also there must be a carefully reasoned decision in which the court makes a concerted effort to educate itself from the evidence about the proposed area of expertise.

Also, **HN7**[↑] under Connecticut's rules of evidence, a witness is only permitted to express an opinion if they "have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience an aid to the court or the jury in determining the questioned issue." *Puro v. Henry, 188 Conn. 301, 309, 449 A.2d 176 (1982)*.

**HN8**[↑] In some situations or circumstances scientific evidence does not require a *Porter* analysis. This was recently addressed in the case of *Prentice v. Dalco Electric, Inc., 280 Conn. 336, 907 A.2d 1204 (2006)*, where the court said:

. . . The plaintiff argues that pursuant to our holdings in *State v. Reid, 254 Conn. 540, 546-49, 757 A.2d 482 (2000)*, and *State v. Hasan, 205 Conn. 485, 490-91, 534 A.2d 877 (1987)*, a validity assessment by the trial court was not required in this case because not all testimony grounded in scientific principles requires **[*11]** a *Porter* hearing . . .

In *Maher v. Quest Diagnostics, Inc., supra, 269 Conn. 170-71 n.22*, we noted a line of cases dealing with scientific evidence that falls within a narrow category of exceptional situations wherein "although ostensibly rooted in scientific principles and presented by expert witnesses with scientific training, [the evidence is] not scientific for the purposes of our admissibility standard for scientific evidence, either before or after *Porter*." (Internal quotation marks omitted.) In particular, we referenced *State v. Reid, supra, 254 Conn. 547-49*, in which we concluded that the testimony of a criminologist regarding visible characteristics of, and similarities between, strands of hair was not scientific evidence for *Porter* purposes, and *State v. Hasan, supra, 205 Conn. 490*, in which we held that a podiatrist's testimony as to the likelihood that a certain pair of sneakers would fit on the defendant's feet was not scientific evidence . . .

This narrow and distinct line of cases "indicates that **HN9**[↑] evidence, neither scientifically obscure nor instilled with an aura of mystic infallibility **[*12]** . . . which merely places a jury . . . in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert's assertions based on his special skill or knowledge . . . is not the type of scientific evidence within the contemplation of *Porter* . . ." (Citations omitted; internal quotation marks omitted.) *Maher v. Quest Diagnostics, Inc., supra, 269 Conn. 170 n.22*. In particular, we noted that "*Hasan* and *Reid* stand for the proposition that evidence, even evidence with its roots in scientific principles, which is within the comprehension of the average juror and which allows the jury to make its own conclusions based on its independent powers of observation and physical comparison, and without heavy reliance upon the testimony of an expert witness, need not

Henderson v. DeMatteo Mgmt.

be considered scientific in nature for the purposes of evidentiary admissibility." (Internal quotation marks omitted.) *Id., 170-71 n.22*. In short, in *Hasan* and *Reid*, the expert witness taught the jury how to look at physical evidence and then left the jury to look at that evidence and reach its own conclusions **[*13]** . . .

**HN10**[↑] "Any exemption for scientific evidence that depends upon existing techniques must presuppose an ability on the part of the proponent of the evidence to 'provide a sufficient articulation of the methodology underlying the scientific evidence.' *Maher v. Quest Diagnostics, Inc.* . . ." *Prentice v. Dalco Electric, Inc., 280 Conn. 336, 907 A.2d 1204 (2006)*.

**HN11**[↑] "The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. *State v. Girolamo, 197 Conn. 201, 214, 496 A.2d 948 (1985)*; *State v. Biller, 190 Conn. 594, 617, 462 A.2d 987 (1983)*." *State v. Kemp, 199 Conn. 473, 476, 507 A.2d 1387 (1986)*.

**HN12**[↑] "In order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion." *State v. Asherman,* . . . The essential facts on which an expert opinion is based are an important consideration in determining the admissibility of his opinion. See *Berndtson v. Annino, 177 Conn. 41, 46, 411 A.2d 36 (1979)*; *Sears v. Curtis, 147 Conn. 311, 314-15, 160 A.2d 742 (1960)*.

**HN13**[↑] "Where the factual **[*14]** basis of an opinion is challenged the question before the court is whether the uncertainties in the essential facts on which the opinion is predicated are such as to make an opinion based on them without substantial value." *State v. Asherman, supra*, 716-17. That question is one of fact for the trial court. *Liskiewicz v. LeBlanc, 5 Conn.App. 136, 141, 497 A.2d 86 (1985)*.

"Furthermore, **HN14**[↑] in order to be admissible, the proffered expert's knowledge must be directly applicable to the matter specifically in issue. *State v. Biller, supra*; *Going v. Pagani, supra*; *Siladi v. McNamara, 164 Conn. 510, 513-14, 325 A.2d 277 (1973)*." *State v. Douglas, 203 Conn. 445, 525 A.2d 101 (1987)*.

*ANALYSIS/FACTUAL FINDINGS*

The court will make its factual findings from the *Porter* hearing, including the testimony and exhibits, and taking into account the court's evaluation of the credibility of the witness, as the respective claims are discussed.

Before a review of the issues relating to the proposed expert testimony it would be of assistance to understand the underlying issues in the case. As indicated above, the plaintiff's **[*15]** amended complaint alleges that the plaintiff was a business invitee in the defendant's restaurant when she was hit in the head by a "grab bar" in a handicap stall in the ladies' bathroom. A grab bar is also variously referred to in the evidence as an ADA Toilet Grab Bar, a Universal Grab Bar, a Flip-Up Grab Bar and a Swing-Up Assistance Bar. The first count alleges that the defendant's premises was defective in several ways all relating to the rate of fall of the "grab bar" and the layout of the bathroom. In the second count the plaintiff alleges the defendant negligent in connection with the operation and maintenance of the "grab bar." This is not a products liability suit. The "grab bar" at issue in this case is designed in such a way that it is up vertically against the wall adjacent to a toilet until it may be needed by a disabled person who would move it down into a horizontal position thereby providing the support of a railing adjacent to the toilet. The "grab bar" swings or pivots on a hinge, containing an adjustable clamping mechanism, which permits the up and down motion of the bar. The primary "scientific" or "technical" evidence in the case relates to the amount of force **[*16]** needed to move the bar from its upright position to the horizontal position. This is because the plaintiff alleges she was hit when the bar fell from its upright position (after she hung her eight-pound purse on the top of it) and hit her on the head as she was bending down to assist her child to use the toilet.

The first claim of the defendant is that the prospective expert lacks the necessary qualifications. His Curriculum Vitae was introduced as Plaintiff's Exhibit 1. Mr. Shanok is a licensed professional engineer with considerable training and experience in mechanical engineering and safety matters. Mechanical engineers generally work in areas involving movable parts like hinges. He has been honored by the American Society of Safety Engineers where he holds professional safety status. Although he has no prior experience with the specific device involved in this case, i.e., a "grab bar" installed in a handicap bathroom to comply with the Americans With Disabilities Act (ADA), he has considerable experience with mechanical systems involving clamping mechanisms including designing such mechanisms. He has been involved in about 3,000 cases as an expert (Defendant's Exhibit 1) and **[*17]** has knowledge of the various codes and regulations

dealing with construction and safety. The evidence of his activities subsequent to his engagement in this case, which will be reviewed hereafter, does suggest to the Court that Mr. Shanok has obtained information beyond the ken of the average juror with respect to the matters at issue here.

The Court finds that Mr. Shanok does possess the necessary qualifications to offer a reliable opinion on the subject of handicapped-accessible bathroom equipment and design as it relates to the rate of fall of the grab bar or the adjustment of its safety equipment or its maintenance.

Next the court will review the plaintiff's claim that a *Porter* analysis is not appropriate to this type of expert testimony. The plaintiff in her brief compares the facts in this case to the *Reid* and *Hasan* cases claiming that the witnesses' testimony will not require the jury to put aside their common sense and independent judgment and follow the expert's analysis. While the law does not provide a bright line to distinguish between those cases which do require a *Porter* analysis and those which do not, there are many examples in our recent cases from **[*18]** which we can gain insight. Justice Borden in the case of *Prentice v. Dalco Electric, Inc., supra, at 352*, outlined a measure to be used when applying the exception to the *Porter* requirement: ". . . neither scientifically obscure nor instilled with an aura of mystic infallibility . . . which merely places a jury . . . in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment . . ."

The court here is persuaded by the plaintiff's argument that this case falls within that category. Essentially the "science" involved here relates to the amount of pressure applied to an adjustment screw or bolt which tightens a clamp around a hinge to effect its movement. The more the clamp is tightened the slower the grab bar descends. The plaintiff's expert claims the clamp was adjusted too loose so that the bar could "free fall" rather than fall slowly at a controlled pace. This does not involve the "aura of mystic infallibility" nor is it "scientifically obscure."

For this reason the court finds a *Porter* analysis inappropriate to the case.

The defendant's many claims concerning the adequacy of the witnesses' **[*19]** evaluation, the time spent in the ladies' room or the appropriateness of the comparison with other grab bars go to the weight to be accorded the testimony, not its admissibility.

Even if Mr. Shanok's proposed testimony is reviewed on the basis of the *Porter* analysis it would still withstand such scrutiny.

Looking at the requirements of that analysis, the first of the two-part test is whether the reasoning or methodology underlying the theory is scientifically valid. While the plaintiff at the hearing did not specifically advance a "theory" or any specific type of "science" involved in Mr. Shanok's investigation or analysis, it did appear to the court that his opinion was based primarily on his view that the rate of fall (described as a "free fall") of the bar after it had been moved slightly from its upright position was too fast. He opined that an adjustment to a screw that was provided would affect the hinge and slow the rate of descent of the bar. His testing of the grab bar in question involved moving the bar from its vertical position with his fingers to a point in its arc where it fell to the down or horizontal position. He acknowledged that he had no knowledge as to the **[*20]** specific amount of force required to move the grab bar in the ladies' room but his brief test suggested that it would "free fall" when moved slightly from the vertical position. No evidence of any testing of such equipment by others appeared appropriate. No peer reviewed publication of any "theory" relevant to his opinion was introduced. A publication was introduced from an instruction sheet which came from a manufacturer of a grab bar the expert said was the same as the one at issue. There was evidence that there was a code requirement about the amount of force needed or appropriate to move grab bars from their upright position into the horizontal position. The witness did not identify the particular code. The grab bar in question met the ADA code requirements. It also met the Connecticut Building Code requirements. The ICC, ANSI A1117.1 Code dealing with grab bars of the type used in the defendant's ladies room has no specifications as to the degree of freedom that the bar can swing down or the rate of fall. Since the witness observed the rate of fall, his evaluation is objective rather than subjective in nature. Another factor to be considered relates to the question of whether **[*21]** the information obtained was related to extrajudicial use or prepared for in court testimony. In this case, Mr. Shanok actually did whatever he did only in preparation for testimony at trial. The court must consider the witnesses' prestige and in this case Mr. Shanok's extensive experience, prior acceptance as an expert, receipt of awards from peers and his extensive education and training all suggest that he is entitled to favorable consideration in that regard. The defendant's ability to point to specific cases in which Mr. Shanok's testimony was not permitted does

Henderson v. DeMatteo Mgmt.

not detract from this finding.

The court finds that the basis of Mr. Shanok's testimony is scientifically valid or reliable.

Moreover, it is found that the proffered testimony would also meet the second test under *Porter* relating to its relevance to this particular case. This relates to the third claim of the defendant that there is not a sufficient factual basis for the witness' opinion.

The evidence was clear that the expert viewed the specific "grab bar" in the ladies' bathroom at the defendant's restaurant. During that time he took photographs (Def.'s Exhibit 6) of the equipment and used his fingers to cause **[*22]** the bar to move from its upright position to the horizontal position. He then moved to the men's room where he found a "grab bar" he found was similar, although shaped differently, and made drawings and took measurements of the men's room equipment. The grab bar in the men's room was shaped differently than the one in the ladies room, but was made of the same material, had the same adjustment screw for the clamp on the hinge and was of the same design. The manufacturer of the "grab bar" in the ladies' room or the men's room was not apparent from an examination, but a review of the internet suggested to him that a grab bar made by Tubular Specialties Manufacturer, (TSM) (which also had a tension screw adjustment) was in his opinion the same as the one at issue in this case. Mr. Shanok obtained such a bar and by conducting tests determined that by adjusting the screw on the clamp on the TSM manufactured grab bar, you would thereby alter the rate of fall of the bar to prevent a so-called free fall.

The demonstrations done in the courtroom with the TSM grab bar purchased by the witness and making use of the plaintiff's purse illustrated that an adjustment of the clamping screw affected **[*23]** the rate of fall of the grab bar. The TSM grab bar used in the testing by the witness was the same as that in the ladies' room of the defendant's restaurant in its design, type and size of material, and adjustment screw for the clamp. Its difference in the shape of the bar does not alter its ability to be of assistance to the jury.

It is found that the evidence being offered by the witness in these areas does in fact "fit" this case. That is it is relevant to what happened in the ladies' room at the defendant's restaurant when the plaintiff alleges she was hit on the head. The evidence offered in these areas, i.e., the opinion as to the grab bar's rate of fall or the adjustment of its safety mechanism or its

maintenance will be able to assist the trier of fact in understanding the evidence or determining a fact in issue.

*CONCLUSION*

Based upon this analysis and for the several, distinct reasons stated above the defendant's motion to preclude the testimony of Mr. Shanok is denied.

Robert J. Leuba

Judge Trial Referee

---

**End of Document**

 Positive

As of: October 26, 2018 4:16 PM Z

# *Miller v. Brodie*

United States District Court for the Eastern District of Pennsylvania

September 28, 2016, Decided; September 28, 2016, Filed

CIVIL ACTION No. 15-4992

**Reporter**

2016 U.S. Dist. LEXIS 133120 *; 2016 WL 5405110

DALE MILLER, Plaintiff, v. WHEELER BRODIE et al., Defendants.

## Core Terms

truck, expert testimony, in limine, reliability, tractor-trailers, expert report, reconstruction, admissibility, requirements, testifying, deposition transcript, supplemental, guardrail, collided, testing, Crash

**Counsel:** **[*1]** For DALE MILLER, Plaintiff: BRANDON A. SWARTZ, LEAD ATTORNEY, BRYAN MICHAEL FERRIS, SWARTZ CULLETON PC, NEWTOWN, PA.

For WHEELER BRODIE, BARNES TRANSPORTATION SERVICES, INC., Defendants: THOMAS J. BRADLEY, LEAD ATTORNEY, MCBREEN & KOPKO, PHILADELPHIA, PA.

**Judges:** GENE E.K. PRATTER, UNITED STATES DISTRICT JUDGE.

**Opinion by:** GENE E.K. PRATTER

## Opinion

### MEMORANDUM

PRATTER, J.

Dale Miller sued Wheeler Brodie and Barnes Transportation Services, Inc. (collectively "Barnes") for negligence following an accident between a tractor-trailer driven by Mr. Miller and a tractor-trailer driven by Mr. Brodie and owned by Barnes Transportation Services, Inc. Both parties retained accident reconstruction experts in support of their respective positions that the opposing party caused the accident.

Barnes filed a Motion in Limine to preclude Mr. Miller's expert, Richard C. Moakes, from testifying at trial. Thereafter, Mr. Miller filed a Motion in Limine to preclude Barnes's experts from testifying at trial. After oral argument on the parties' motions, the Court ordered Mr. Miller to file a supplemental expert report. Mr. Miller complied, and, thereafter, the parties filed supplemental briefs. For the reasons that follow, the Court will deny **[*2]** both motions.

### I. FACTUAL BACKGROUND

The accident at issue occurred on August 12, 2015 in Middlesex County, New Jersey. At the time of the accident, Mr. Miller and Mr. Brodie were both operating tractor-trailers traveling northbound on the New Jersey Turnpike. While the parties have differing accounts as to how the events transpired, the tractor-trailers collided, veered to the left, and eventually collided with the center guardrail. Both vehicles were engulfed with flames due to an explosion which occurred once the vehicles collided with the guardrail.

According to Mr. Miller, he was traveling in the center northbound lane when Mr. Brodie improperly attempted to merge from the far right lane into Mr. Miller's lane. When Mr. Brodie allegedly moved into the center lane, his tractor-trailer struck Mr. Miller's vehicle. Thereafter, the two tractor-trailers veered to the left, colliding with the center guardrail. Mainly consistent with Mr. Miller's account of the accident, the New Jersey Police Crash Investigation Report states that Mr. Miller's vehicle cleared Mr. Brodie's truck by about half a truck length before the collision occurred.

In contrast to Mr. Miller's account of events, Mr. Brodie **[*3]** testified at his deposition that he was driving in the far right lane when he heard a thud toward the back of his vehicle. Mr. Brodie contends that Mr. Miller

Miller v. Brodie

hit him first, specifically in the rear of his trailer. After this collision, Mr. Brodie claims that the impact caused his vehicle to veer left, eventually causing both tractor-trailers to collide with the center guardrail.

Ultimately, Mr. Miller suffered 1st , 2nd , and 3rd degree burns to his left leg, left arm, and right hand requiring skin grafts, a right rotator cuff tendon tear requiring surgery, and psychological injury. Mr. Brodie received five traffic citations due to his violations of the New Jersey Motor Vehicle and Traffic Laws, three of which were dismissed.

## II. LEGAL STANDARD

*Rule 702 of the Federal Rules of Evidence* governs the admissibility of expert testimony and provides that a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify if "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact at issue . . ." *Fed. R. Evid. 702.* In challenges regarding admissibility of expert testimony, the burden is placed on the party offering the testimony to show by [*4]  a "preponderance of proof" that it meets the standards for admissibility. *Rapp v. Singh, 152 F. Supp. 2d 694, 698 (E.D. Pa. 2001)* (quoting *Daubert v. Merrell Dow Pharma., Inc., 509 U.S. 579, 592-93, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)).* The Supreme Court addressed the operation and scope of *Rule 702* in *Daubert.* Under *Daubert, Rule 702*'s requirements have been said to embody "three distinct substantive restrictions of the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000)* (citing *In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1994)).* Although *Daubert* was decided in the context of scientific knowledge, it has since been applied to testimony involving "technical or other specialized knowledge." *Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir. 2000)* (quoting *Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)).* Acknowledging the trial court's gatekeeper role, the Third Circuit Court of Appeals has explained "[t]he District Court has broad discretion in determining the admissibility of evidence, and 'considerable leeway' in determining the reliability of particular expert testimony under *Daubert.*" *Walker v. Gordon, 46 F. App'x 691, 694 (3d Cir. 2002)* (citing *Kumho Tire, 526 U.S. at 152-53*).

## III. DISCUSSION

Barnes does not dispute that Plaintiff's expert Mr. Moakes is qualified, contesting only Mr. Moakes's reliability and fit.

## A. Reliability

*Rule 702* requires that expert testimony be supported by "appropriate validation — i.e., 'good grounds,' based on what is known." *Withrow v. Spears, 967 F. Supp. 2d 982, 992 (D. Del. 2013)* (citing *Daubert, 509 U.S. at 590*). To satisfy the requirement of reliability, an expert's testimony must be grounded in "the methods and procedures [*5]  of science" and must be "more than subjective belief or unsupported speculation." *Id.* (citing *Daubert, 509 U.S. at 590*).

Barnes argues that the Court should preclude Mr. Moakes from testifying at trial because his report and testimony lack support in scientific methodology, and are thus unreliable. Barnes asserts that Mr. Moakes failed to visit the accident scene, conduct any tests, apply any legitimate engineering principles, or perform accident reconstruction simulations. Barnes also argues that the physical evidence in this case does not allow for a valid reconstruction of the accident. Plaintiff disputes this characterization of Mr. Moakes's report, pointing out that Mr. Moakes's report states that he reached his opinions and conclusions after "applying commonly accepted accident reconstruction techniques and the laws of physics." Pl. Br. Opp. 8 (Doc. No. 18, Ex. 1). Plaintiff also notes that in coming to his conclusions, Mr. Moakes ultimately relied on Plaintiff's deposition transcript, Mr. Brodie's deposition transcript, the New Jersey Police Crash Investigation Report, an examination of the remains of Plaintiff's truck, a review of a publicly available video showing the aftermath of the crash, and the [*6]  report of Barnes's experts.[1]

In support of their argument that Mr. Moakes should be precluded from testifying, Barnes relies on two cases from the Third Circuit Court of Appeals. In *Oddi*, the plaintiff was severely injured when his truck struck a guardrail and bridge abutment. *234 F.3d at 141*. The plaintiff alleged that the truck was not crashworthy and that the manufacturer and designer of the truck had

---

[1] Mr. Moakes's initial expert report did not take into consideration Mr. Brodie's deposition transcript or the report of Barnes's experts. Mr. Moakes's supplemental expert report incorporated these items into his analysis.

Miller v. Brodie

negligently failed to test the truck. The plaintiff retained an accident reconstruction/design engineer to support his contention that the truck's manufacture and design were defective. *Id.* Although the expert had reviewed photographs of the accident, witness statements, and the plaintiff's medical records and deposition testimony, he did not test his hypothesis or test the elements involved at the accident scene. The district court found that the expert's testimony did not satisfy the *Daubert* standards and excluded it. Although the expert met *Daubert*'s qualifications requirement, his **[*7]** testimony failed to satisfy the additional requirements of reliability and fit. *Id. at 156*. The *Oddi* court affirmed, finding that because the expert "conducted no tests and failed to attempt to calculate any of the forces on [the plaintiff] or the truck during the accident, he used little, if any, methodology beyond his own intuition." *Id. at 158*.

In *Meadows*, the court excluded plaintiff's expert's testimony in a case where plaintiff sustained serious injuries as a result of a pressure valve exploding in a mine. *Meadows v. Anchor Longwall & Rebuild, Inc., 306 F. App'x 781 (3d Cir. 2009)*. Plaintiff's expert examined multiple valves of the same kind allegedly responsible for plaintiff's injury, testing them in both the "open" and the "closed" positions. *Id. at 788*. However, the expert was unable to replicate the exact conditions of the mine shield's hydraulic system when it failed in his testing. He testified instead that he employed "principles of physics" in determining why the pressure valve failed. *Id. at 784*. Ultimately, the court found that plaintiff's expert's testimony failed to meet the reliability and fit requirements for admissibility. *See id.*

Both *Oddi* and *Meadows* are distinguishable from the case at hand because both of those cases sounded in product liability. Accordingly, in *Oddi* and **[*8]** *Meadows*, the Third Circuit Court of Appeals deemed the experts' methodology and factual bases for their reports unreliable with respect to opining on, in the case of *Oddi*, the design of a truck, and in *Meadows*, the design of a valve. In *Meadows*, the Third Circuit Court of Appeals was concerned by the failure of the expert to replicate the conditions at the time of the accident when conducting his testing. *Meadows, 306 F. App'x at 789*. Similarly, in *Oddi*, the Third Circuit Court of Appeals faulted the expert for failing to test his theory concerning the design flaw he claimed was partly responsible for the accident. *Oddi, 234 F.3d at 157-58*. Mr. Moakes, however, is not providing expert testimony on the design of a specific product, but rather is opining on the likelihood that Plaintiff's account of the accident is more probable than Mr. Brodie's. Naturally, the considerations

for determining the reliability of an expert opining on the likely events leading up to an accident are different than the considerations for determining the reliability of an expert opining on a product's manufacture or design.

Here, the record reflects a sufficient factual foundation to support Mr. Moakes's opinions. After consideration of Mr. Moakes's supplemental **[*9]** expert report, it is clear that Mr. Moakes's opinions are based on more than subjective speculation. Rather, as explained in his expert reports, Mr. Moakes examined Plaintiff's deposition transcript, Mr. Brodie's deposition transcript, the New Jersey Police Crash Investigation Report, the remains of Plaintiff's truck, a publicly available video showing the aftermath of the crash, and the report of Mr. Brodie's experts. Through this evidence, Mr. Moakes considered multiple theories of the accident, including those put forth by both Plaintiff and Mr. Brodie. Mr. Moakes then applied the laws of physics and principles of trailer dynamics, as well as commonly accepted accident reconstruction techniques, to logically conclude that it is probable that the accident occurred due to Mr. Brodie's truck moving from the right lane into the center lane and that it is not probable that the accident occurred because Plaintiff's truck moved from the center lane into the right lane. Accordingly, the Court determines that Mr. Moakes has met the reliability requirement.

**B. Fit**

*Rule 702* also requires that expert testimony sufficiently fit, or be relevant to, the issue at hand. *Daubert, 509 U.S. at 591*. The relevance of expert testimony **[*10]** is largely determined by its ability to "assist the trier of fact to understand the evidence or to determine a fact in issue . . ." *Id.* This has become known as *Rule 702*'s 'helpfulness' standard, and requires a valid scientific connection to the pertinent inquiry in order for testimony to be admissible. *See id.*

Barnes argues that Mr. Moakes's testimony would not assist the trier of fact in determining the accident's cause and that if allowed to testify, Mr. Moakes would serve as nothing more than an additional attorney for Plaintiff. The Court disagrees. A lay person is not intimately familiar with the operation of tractor-trailers and how tractor-trailers may respond in the event of a collision. The Court concludes that Plaintiff has demonstrated that Mr. Moakes's testimony would be helpful to the trier of fact in determining the cause of the accident. Accordingly, the Court determines that Mr.

Miller v. Brodie

Moakes has met the fit requirement. The proper avenue for Barnes to contest Mr. Moakes's expert reports is through cross-examination at trial. *See Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002)* ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion **[*11]** can highlight those weaknesses through effective cross-examination.").[2]

## IV. CONCLUSION

For the foregoing reasons, the Court denies both Mr. Miller's Motion in Limine and Barnes's Motion in Limine.

* * *

An appropriate order follows.

BY THE COURT:

/s/ Gene E.K. Pratter

GENE E.K. PRATTER

UNITED STATES DISTRICT JUDGE

## ORDER

**AND NOW**, this 28th day of September, 2016, upon consideration of Defendants' Motion in Limine to Preclude Plaintiff's Expert (Docket No. 13), Plaintiff's Motion in Limine to Preclude Defendants' Experts (Docket No. 14), Defendants' Opposition to Plaintiff's Motion in Limine (Docket No. 15), Plaintiff's Opposition to Defendants' Motion in Limine (Docket No. 18), **[*12]** Plaintiff's Supplemental Response in Opposition (Docket No. 24), and Defendants' Supplemental Response in Support (Docket No. 25) it is hereby **ORDERED** that Defendants' Motion in Limine to Preclude Plaintiff's Expert (Docket No. 13) and Plaintiff's Motion in Limine to Preclude Defendants' Experts (Docket No. 14) are **DENIED**.

BY THE COURT:

/s/ Gene E.K. Pratter

GENE E.K. PRATTER

UNITED STATES DISTRICT JUDGE

_____

**End of Document**

---

[2] Mr. Miller, in support of his Motion in Limine to Preclude Defendants' Mechanical Engineering Experts, essentially argues that if this Court were to preclude Mr. Moakes from testifying at trial, the Court should also preclude Barnes's experts from testifying at trial because all the experts relied on essentially the same information. Because the Court is denying Barnes's Motion and permitting Mr. Moakes to testify at trial, the Court will similarly deny Mr. Miller's Motion and permit Barnes's experts to testify at trial.

Kelcie Reid

 Caution

As of: October 25, 2018 8:40 PM Z

# *Czarnecki v. Home Depot USA, Inc.*

United States District Court for the Eastern District of Pennsylvania

June 15, 2009, Filed

CIVIL ACTION NO. 07-4384

**Reporter**

2009 U.S. Dist. LEXIS 51637 *; 2009 WL 1706582

JAMES CZARNECKI and ANNE CZARNECKI, h/w v. HOME DEPOT USA, INC.

**Prior History:** *Czarnecki v. Home Depot United States, Inc., 2009 U.S. Dist. LEXIS 46939 (E.D. Pa., June 3, 2009)*

## Core Terms

ladder, motion in limine, misuse, demonstration, industry standard, reconstruction, misleading, Shake, testing, assumption of risk, biomechanical, hinges, cases, admissibility, engineering, clicking, counters, photographs, causation, exemplar, lock, lawsuits, On-Site, substantially similar, expert testimony, alleged defect, expert opinion, in limine, Multi-Matic, mechanical

**Counsel:** **[*1]** For JAMES CZARNECKI, Plaintiff: THOMAS S. FARNISH, LEAD ATTORNEY, STEPHAN E. ANDERSSON, LARRIMORE & FARNISH, LLP, PHILADELPHIA, PA.

For ANNE CZARNECKI, H/W, Plaintiff: THOMAS S. FARNISH, LEAD ATTORNEY, LARRIMORE & FARNISH, LLP, PHILADELPHIA, PA.

For HOME DEPOT USA, INC., Defendant: BRYAN P. WERLEY, LEAD ATTORNEY, THE CHARTWELL LAW OFFICES LLP, PHILADELPHIA, PA; PAUL V. KAULAS, LEAD ATTORNEY, MCVEY & PARSKY, LLC, CHICAGO, IL.

For HOME DEPOT USA, INC., Cross Claimant: BRYAN P. WERLEY, LEAD ATTORNEY, THE CHARTWELL LAW OFFICES LLP, PHILADELPHIA, PA.

For KRAUSE - WERK GMBH & CO. KG, Cross Defendant: BRADLEY D. REMICK, LEAD ATTORNEY, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, PHILADELPHIA, PA; LESLIE F. RUFF, LEAD ATTORNEY, BIEDERMANN REIF HOENIG & RUFF

PC, NEW YORK, NY.

**Judges:** ELIZABETH T. HEY, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** ELIZABETH T. HEY

## Opinion

### MEMORANDUM AND ORDER

ELIZABETH T. HEY

UNITED STATES MAGISTRATE JUDGE

In this products liability action, Plaintiffs James and Anne Czarnecki seek damages for injuries sustained when Mr. Czarnecki fell from a ladder purchased from Defendant, Home Depot USA, Inc. Presently before the Court are nine motions in limine -- two filed by Defendant (Docs. 51 & 52) and seven **[*2]** filed by Plaintiffs (Docs. 53-59). I will consider them seriatim.

### I. DEFENDANT'S MOTIONS IN LIMINE

#### A. Defendant's Motion in Limine to Bar Norman Johanson's Contention That the "Clicking" Sounds . . . Constitute a Defect (Doc. 51)

In this motion, Defendant seeks to preclude Plaintiffs' expert, Norman Johanson, from testifying that hinge lock "clicking" constitutes a defect rendering the ladder unreasonably dangerous. See Doc. 51 at 3-4. Plaintiffs counter that the motion is moot in light of my Order of June 4, 2009 (Doc. 62), denying Defendant's Motion to Preclude Plaintiffs' Proposed Expert Testimony and for Summary Judgment. See Doc. 65 at 1.

Czarnecki v. Home Depot USA, Inc.

The present motion does not contain any new arguments or citations to law, but instead rests entirely on those asserted in Defendant's earlier motion to preclude and for summary judgment. Therefore, I will deny this motion in limine as moot in light of my prior ruling.

### B. Defendant's Motion in Limine to Bar Norman Johanson From Referring to Claims or Lawsuits Regarding Krause Multi-Matic Ladders (Doc. 52)

In this motion, Defendant seeks to bar Plaintiffs' expert, Mr. Johanson, from referring to prior claims or lawsuits involving Multi-Matic ladders **[*3]** manufactured by Krause. See Doc. 52 at 8-13. [1] In support of this motion, Defendant argues that Plaintiffs belatedly indicated that they "will/may" rely on Consumer Product Safety Commission (CPSC) documents regarding prior incidents after first indicating that they did not intend to do so, and that in any event there is no evidence the prior incidents involved the same or similar hinge lock mechanisms or analogous facts. See Doc. 52 at 8-13. Plaintiffs counter that Mr. Johanson should be permitted to rely on CPSC documents regarding Krause ladders because the documents are material and not overly prejudicial to Defendant, the records do not constitute impermissible hearsay, and the evidence was timely disclosed. See Doc. 66 at 2-14.

The admissibility of prior accidents turns on the question of whether its probative value outweighs its prejudicial effect. *Forrest v. Beloit Corp., 424 F.3d 344, 354 (3d Cir. 2005)*. Generally, the party seeking admissibility must establish a foundation that shows "(1) similarity -- the [party] must show that the proferred testimony relates **[*4]** to substantially identical products used in similar circumstances; (b) breadth -- the [party] must provide the court with information concerning the number of prior units sold and the extent of prior use; and (c) awareness -- the [party] must show that it would likely have known of prior accidents had they occurred." *Id. at 358*.

Here, there is no indication that the documents in question relate to ladders with the same or similar hinge lock design or materials, or that the claims involved the same or similar facts as the present case. In addition, none of the claimants in the other cases has been disclosed as a witness in this case and none of the ladders involved in those cases has been disclosed as

an exhibit. Under the circumstances, it is impossible for the court to ascertain whether and to what extent any of the prior claims and/or lawsuits are substantially the same or similar to the present case. Therefore, I will grant this motion in limine and bar Mr. Johanson from referring to prior claims or lawsuits involving Multi-Matic ladders manufactured by Krause. If Mr. Johanson identifies claims involving the same ladder, the court will revisit the issue.

## II. PLAINTIFFS' MOTIONS IN  [*5] LIMINE

### A. Plaintiffs' Motion in Limine to Preclude Cumulative Expert Testimony (Doc. 53)

Plaintiffs seek to preclude cumulative expert testimony by Defendant's experts, Mack A. Quan, Ph.D., P.E., and John B. Ver Halen, P.E., arguing that such testimony would be overly prejudicial and would constitute undue delay and waste of time pursuant to *Federal Rule of Evidence 403*. See Doc. 53 at 2-5. Defendant counters that the experts have different theories of causation, and that in any event Defendant has the right to present defect and causation evidence from the perspective of different experts. See Doc. 68 at 6-7.

*Rule 403* provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*Fed. R. Evid. 403*. Here, Dr. Quan and Mr. Ver Halen both examined the ladder at issue and agreed that the failure of the center hinge lock was due to a weight overload. See Quan Report, attached to Doc. 53 at Ex. B, 1-2; Ver Halen Report, attached to Doc. 53 at Ex. C, 3. However, the experts **[*6]** conducted separate analyses and tests focused on different aspects of the ladder, and presented somewhat different theories of causation. See Quan Report at 6 ("In my opinion, the accident likely occurred due to Mr. Czarnecki erecting the ladder backwards with only one of the two middle hinges engaged."); Ver Halen Report at 3-4 ("The cause of the accident was Mr. Czarnecki's mis-use of the ladder," including setting it up "at an improper angle."). Moreover, only Mr. Ver Halen explicitly responded to the "clicking" theory of causation offered by Plaintiffs' expert, Mr. Johanson. See Ver Halen Suppl. Report dated 03/27/09, attached to Doc. 53 at Ex. C., at 2.

---

[1] Mr. Johanson referred to several such claims or lawsuits in Exhibit F to Plaintiffs' Rule 26(a)(2)(B) disclosures.

Czarnecki v. Home Depot USA, Inc.

For these reasons, I conclude that the testimony of Dr. Quan and Mr. Ver Halen is not merely cumulative and will not unfairly prejudice Plaintiffs or cause undue delay. Therefore, I will deny this motion.

**B.** **Plaintiffs' Motion in Limine to Exclude Defendant From Introducing Any and All Evidence That the Opinion of Plaintiffs' Expert . . . Had Been Rejected in _Mirchandani v. Home Depot, Inc._, or Any Other Case (Doc. 54)**

Plaintiffs also seek to preclude Defendant from introducing evidence that Mr. Johanson's theory of causation was **[*7]** rejected in other cases, including Mirchandani v. Home Depot, Inc., a 2007 case in the United States District Court for the District of Maryland. This motion was prompted by defense counsel's questioning at Mr. Johanson's deposition, in particular a reference to Mr. Johanson's theory about the "clicking sounds" being rejected in that case. Doc. 54 at 3. Plaintiffs argue that any prior rejection of the expert's theory was for entirely case-specific reasons, and that in any event Defendant has not provided any documentary evidence of the rejection of the theory in Mirchandani. See Doc. 54 at 3-6. In its response, Defendant states that it does not intend to introduce evidence that the jury in the Mirchandani case rejected Mr. Johanson's "clicking" theory, although it will seek to impeach Mr. Johanson with this information if he refers to Mirchandani in support of his opinions in this case. See Doc. 69 at 3.

I agree that another factfinder's acceptance or rejection of an expert's opinion in another case is not relevant to this case, and that such evidence is likely to confuse or mislead the jury. Nevertheless, if Mr. Johanson were to refer to other specific suits in which he has testified **[*8]** in support of his opinions in this case, in fairness it would be appropriate to allow Mr. Johnason to be questioned about the factfinder's rejection of his opinions for purposes of impeachment. For these reasons, I will grant this motion in limine to preclude Defendant from introducing evidence that Mr. Johanson's theory of causation had been rejected in Mirchandani, or other prior cases. However, Defendant will be permitted to raise the fact-finder's conclusion in a prior case in rebuttal in the event Plaintiffs' expert raises the case first. [2]

_____

[2] In their motion Plaintiffs request that Defendant be compelled to produce documentation from Mirchandani and other cases in which Mr. Johanson's testimony has been rejected. Doc. 54 at 4-6. Because Defendant has clarified that it will only refer to

**C.** **Plaintiffs' Motion in Limine to Exclude Any and All Biomechanical Testimony of Defendant's Expert Mack A. Quan (Doc. 55)**

Plaintiffs next seek to exclude all biomechanical testimony of Defendant's expert, Dr. Quan, arguing that Dr. Quan is not qualified to offer biomechanical **[*9]** testimony under the standards set forth in _Federal Rule of Evidence 702_. See Doc. 55 at 2-3. In particular, Plaintiffs seek to exclude Dr. Quan's testimony that Mr. Czarnecki failed to use "safe ladder practice" and that his weight was the proximate cause of the ladder's failure. Defendant counters that Dr. Quan's opinions fall within the scope of mechanical engineering, and that Plaintiffs have failed to define what they mean by "biomechanical engineering expertise." See Doc. 67 at 2-3. In the alternative, Defendant requests that I reserve ruling on whether Dr. Quan is qualified to render an expert opinion until after Dr. Quan's qualifications are presented at the time of trial. Id. at 3.

_Rule 702_ provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in a form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods and (3) the witness has applied the principles and **[*10]** methods reliably to the facts of the case.

_Fed. R. Evid. 702_. Thus, _Rule 702_ sets forth three principle requirements -- "(1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or other specialized knowledge; and (3) the expert testimony must assist the trier of fact." _Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008)_ (citing _Paoli, 35 F.3d 717, 741-42 (3d Cir. 1994)_). _Rule 702_ has "a liberal policy of admissibility." _Pineda, 520 F.3d at 243_ (quoting _Kannankeril v. Terminix Inter., Inc., 128 F.3d 802, 806 (3d Cir. 1997)_).

In _Daubert v. Merrell Dow Pharms.., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)_, the Supreme

_____

such cases for impeachment purposes should Mr. Johanson refer to them during his direct testimony, Plaintiffs' request is denied.

Court explained that, under the Federal Rules of Evidence, the trial judge acts as a "gatekeeper" to ensure that "any and all expert testimony or evidence is not only relevant, but also reliable." *509 U.S. at 589*; *Pineda, 520 F.3d at 244*. "[An] expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *Pineda, 520 F.3d at 244* (quoting *Paoli, 35 F.3d at 742*). Thus, the focus of the inquiry is on the methodology used by the expert, rather than **[*11]** the conclusions reached. See id.

Dr. Quan has lengthy experience as a mechanical engineer specializing in mechanical design and analysis, as well as accident reconstruction. See Quan Declaration, attached to Doc. 55 at Ex. A, at 1; Quan Curriculum Vitae ("C.V."), attached to Doc. 55 at Ex. B. In his expert report, Dr. Quan opined that after Mr. Czarnecki set up the ladder, the ladder "twisted" because (1) only one hinge lock was engaged, (2) the ladder was set up backwards, and (3) a dynamic load was applied to the ladder. See Quan Report, attached to Doc. 53 at Ex. B, 6. This opinion is based upon, inter alia, Dr. Quan's experience, inspection of the accident ladder and location, review of testing conducted on the type of ladder involved in the case, review of deposition testimony, and load and structural calculations. See id. at 1-5.

Similar to my analysis rejecting Defendant's motion to preclude Plaintiffs' expert, Mr. Johanson, from testifying, there is nothing in Dr. Quan's report to suggest that his methodology is unreliable. I therefore conclude that Dr. Quan is qualified to offer an expert opinion in areas of mechanical engineering and accident reconstruction. [3] Accordingly, **[*12]** I will deny this motion.

## D. Plaintiffs' Motion in Limine to Exclude Any and All Biomechanical And/Or Accident Reconstruction Testimony of Defendant's Expert Jon B. Ver Halen (Doc. 56)

---

[3] Plaintiffs have not defined the term "biomechanical engineering" and Defendant does not profess that his witnesses have expertise in that field. The term is defined generally as "engineering applied to biology." http://encarta.msn.com/dictionary-56153710/biomechinical_engineering (last visited June 15, 2009). Dr. Quan's opinions relating to Mr. Czarnecki's use of the ladder and the impact of his weight on the ladder appear to fall safely within the general realm of mechanical engineering rather than limited to the more specific subfield.

Similarly, Plaintiffs seek to exclude all biomechanical and/or accident reconstruction testimony of Defendant's second expert, Mr. Ver Halen, arguing that there is no evidence Mr. Ver Halen has any education, training or experience in the field of biomechanical engineering, and very little training or experience in accident reconstruction. See Doc. 56 at 2-6. Defendant counters that Mr. Ver Halen is well qualified to offer the opinions contained in his Rule 26 expert report. **[*13]** See Doc. 70 at 2. In the alternative, Defendant requests that I reserve ruling on whether Mr. Ver Halen is qualified to render an expert opinion in the area of accident reconstruction until after Mr. Ver Halen submits to voir dire at the time of trial. Id. at 5-6.

Mr. Ver Halen has been an industrial engineer for approximately thirty years, during which time his experience includes product design, industrial design, failure analysis and accident reconstruction. See Ver Halen C.V., Def.'s Trial Ex. D-2. He has testified as an expert in numerous cases. Id. Mr. Ver Halen has also been appointed to serve on several professional committees and subcommittees of the American National Standards Institute (ANSI), including those devoted to various types of ladders. Id.

In support of the present motion, Plaintiffs rely on deposition testimony Mr. Ver Halen gave in Fayerweather v. Keller Indus., an unrelated 2001 case from Eau Claire County, Wisconsin. See Fayerweather Dep., attached to Doc. 56 at Ex. C. At that time, Mr. Ver Halen answered "No" when asked whether he was capable of testifying as a biomechanical engineer. Id. at 16. He also answered "no" when asked whether he had any formal training **[*14]** in accident reconstruction or had ever lectured in the field of accident reconstruction. Id. at 16, 18.

Defendant does not claim that Mr. Ver Halen is a "biomechanical engineer," that Mr. Ver Halen's 2001 deposition in Fayerweather is inaccurate, or that he has acquired new expertise since that time. Instead, Defendant argues that Mr. Ver Halen is qualified to render an expert opinion in this case based on his long experience as an industrial engineer, as well as the methodology he employed in familiarizing himself with the physics of the ladder in question and the circumstances under which the accident occurred. See Doc. 70 at 3-4. Regarding accident reconstruction in particular, Defendant avers that there is no formal accident training specific to ladder accident reconstruction. See Doc. 70 at 2-3. Also, Defendant points out that Mr. Ver Halen did not testify in

Czarnecki v. Home Depot USA, Inc.

Fayerweather that he has *no* accident reconstruction experience. Instead, when asked whether he had ever "been permitted to render any medical opinion relative to the cause of injuries in ladder cases," Mr. Ver Halen responded: "Only to a limited extent. Obviously I can't talk about pounds of force and other such things, but **[*15]** . . . I do talk about certain types of accidents are consistent with certain injury patterns and how those injuries came to occur." Id. at 18-19. Further, in response to a deposition question in an unrelated 2004 New Jersey case, Mr. Ver Halen described his experience with ladder accident reconstruction as follows:

> Specifically with regards to ladders, I have tested ladders on numerous occasions to see how they act under certain loading conditions and then purposely misused ladders to see how they react, overloaded them, impact loaded them.
>
> I've also [gone] to the extent of hiring a stunt man from Hollywood to see how a ladder [accident] progressed, the dynamic[s] of ladder accidents; done analysis and review of human factors testing with regards to ladders and how ladders are used and misused and what causes accidents as well as reviewing all of the rationale and information in the ANSI background materials with regards to ladders and ladder accidents.

Ohlandt Dep., attached to Doc. 70 at Ex. A, 28.

Similar to my conclusion regarding Dr. Quan, given Mr. Ver Halen's engineering background and experience with ladders in particular, I conclude that he is qualified to render an expert opinion **[*16]** as to the circumstances and cause of the accident in the present case. This conclusion is consistent with the "liberal policy of admissibility" embodied by Rule 702. See Pineda, 520 F.3d at 243 (quoting Kannankeril, 128 F.3d at 806). Therefore, I will deny this motion.

### E. Plaintiffs' Motion in Limine to Exclude Any and All Evidence of Mr. Czarnecki's Alleged "Misuse" of the Product and Any Charge to the Jury on Assumption of Risk (Doc. 57)

Plaintiffs next seek to exclude any evidence of Mr. Czarnecki's alleged "misuse" of the ladder, arguing that any alleged "misuse" was foreseeable and therefore not an intervening cause sufficient to defeat a products liability claim, and that such evidence would be overly prejudicial. See Doc. 57 at 3-4, 6-7. Plaintiffs also seek to bar any charge to the jury on assumption of the risk on the grounds that there is no evidence Mr. Czarnecki knew of the alleged defective design and either

voluntarily or unreasonably assumed a risk of injury. See id. at 4-6. Defendant counter that such evidence should be admitted. See Doc. 64 at 5-9.

1. Evidence of "Misuse"

Plaintiffs rely on a series of cases from the 1960s and 1970s for the proposition that, under Pennsylvania **[*17]** law, defendants in products liability cases are required to foresee injuries that could occur when their products are used as intended, and that the doctrine of intended use does not provide a shield from products liability for injuries which result from the misuse of a product so long as the misuse is foreseeable. See Doc. 57 at 3. Much more recently, however, the Pennsylvania Supreme Court held that "a manufacturer can be deemed liable only for harm that occurs in connection with a product's intended use by an intended user; the general rule is that there is no strict liability in Pennsylvania relative to non-intended uses even where foreseeable by a manufacturer." *Pa. Dep't of Gen. Servs. V. United States Mineral Products Co., 587 Pa. 236, 898 A.2d 590, 600-01 (Pa. 2006)* (citing *Phillips v. Cricket Lighters, 576 Pa. 644, 841 A.2d 1000, 1007 (Pa. 2003)*).

Defendant argues that Mr. Czarnecki misused the ladder by, among other things, not reading or following the ladder's instructions, manipulating the ladder into the straight ladder configuration while the ladder was on the ground, failing to make a visual determination as to whether the red tabs affixed to the ladder were in a position confirming they were **[*18]** locked, and positioning the ladder against his house backwards. See Doc. 64 at 4-5. Even if some or all of these alleged misuses were foreseeable, evidence of such misuse is admissible under controlling state law. See *Pa. Dep't of Gen. Servs., 898 A.2d at 600-01*.

I am also not persuaded by Plaintiffs' argument that allowing evidence of Mr. Czarnecki's misuse of the ladder would be unduly prejudicial to Plaintiffs. To the contrary, barring evidence of misuse would unduly prejudice Defendant by excluding evidence relevant to whether Mr. Czarnecki's actions, and not the alleged defect, caused his injuries. For these reasons, I will deny this aspect of Plaintiffs' motion in limine and allow evidence of Mr. Czarnecki's "misuse" of the ladder.

2. Assumption of the Risk

"Under Pennsylvania law, assumption of the risk is a complete defense in a . . . products liability action alleging a design defect or failure to warn rising to the

Czarnecki v. Home Depot USA, Inc.

level of a design defect." *Wagner v. Firestone Tire & Rubber Co., 890 F.2d 652, 657 (3d Cir. 1989)* (citing *Lonon v. Pep Boys, Manny, Moe & Jack, 371 Pa. Super. 291, 538 A.2d 22, 25 (1988)*; *Rutter v. Northeastern Beaver Co. Sch. Distr., 496 Pa. 590, 437 A.2d 1198, 1209 (1981)*). "In order to prevail **[\*19]** on assumption of the risk, the defendant must show 'that the plaintiff knew of the defect and voluntarily and unreasonably proceeded to use the product or encounter a known danger.'" Id. (quoting *Lonon, 538 A.2d at 25*). Therefore, the standard to determine whether assumption of the risk exists is subjective.

Here, Plaintiffs argue that assumption of the risk is inapplicable because there is no evidence Mr. Czarnecki knew of the alleged defective design of the ladder and nevertheless voluntarily or unreasonably assumed a risk of injury. See Doc. 57 at 4-6 ("[T]here is no evidence in this case of a conscious appreciation of danger or willingness to take his chances against injury when using the ladder."). Defendant counters that Mr. Czarnecki testified that he had read the ladder's instructions and labeling at some point in the past, that he therefore had knowledge that misusing the ladder could cause harm, and nevertheless assembled the ladder and assumed the risk of climbing it without following the instructions. See Doc. 64 at 9. Given this dispute, the question whether Mr. Czarnecki assumed the risk of climbing the ladder may be a fact question for the jury. See *Wagner, 890 F.2d at 657* **[\*20]** ("[B]efore the theory [of assumption of the risk] may be submitted to a jury, the defendant must produce evidence that the plaintiff fully understood the specific risk, and yet voluntarily chose to encounter it.")

For these reasons, I will deny Plaintiffs' motion in limine as to Mr. Czarnecki's misuse of the ladder. I will also deny the motion as to instructing the jury on assumption of the risk, although this issue may be revisited during the charge conference once all the evidence as been submitted to the jury.

## F. Plaintiffs' Motion in Limine to Exclude Any and All Reference By Defendant's Experts to Various Industry Standards . . . (Doc. 58)

Plaintiffs also seek to preclude any references by Defendant's experts to various industry standards, and withdraws any reference to those standards by their own expert. See Doc. 58 at 1-2; Doc. 81 at 1-4. Defendant counters that such testimony should be allowed. See Doc. 72 at 7-10.

Under Pennsylvania law, evidence of industry standards is generally inadmissible in products liability cases. See *Lewis v. Coffing Hoist Div., Duff-Norton Co., Inc., 515 Pa. 334, 528 A.2d 590, 594 (Pa. 1987)* (ASME standards which were silent on alleged defect and evidence of customary **[\*21]** design feature inadmissible); *Majdic v. Cincinnati Machine Co., 370 Pa. Super. 611, 537 A.2d 334, 339 (Pa. 1988)* (ANSI standard inadmissible to prove prior industry custom). In Lewis, the state supreme court explained that evidence of compliance with industry standards improperly injects negligence concepts of reasonableness into the strict liability context. See *528 A.2d at 590*; see also *Berkebile v. Brantly Helicopter Corp., 462 Pa. 83, 337 A.2d 893, 899 (Pa. 1975)* (improper to inject negligence principles into a strict liability case). The Third Circuit has reached the same conclusion. See *Holloway v. J. B. Systems, Ltd.., 609 F.2d 1069, 1073 (3d Cir. 1979)* (industry standards go to negligence concept of reasonable care, which has no place in action based on strict liability).

Defendant relies on *Berrier v. Simplicity Mfg., Inc., 563 F.3d 38 (3d Cir. 2009)*, in which the Third Circuit stated that evidence of industry standards "may" be relevant to a strict liability claim. See *563 F.3d at 43 n.7*. I do not find that Berrier compels the admission of industry standard evidence. First, the statement in Berrier is dictum and is not part of the court's holding, which relates to the district court's misapplication of the **[\*22]** "intended user" doctrine in the context of a strict liability defective design claim. *Id. at 61*. Second, the dictum is equivocal insofar as it states that such evidence of industry standards "may" be relevant to a strict liability theory. *Id. at 43 n.7*. And third, the standards at issue in Berrier involved the incorporation of a "back-over protection device" that would prevent a motor from powering the blades of a lawn mower when the mower was put into reverse, thus preventing the precise type of accident which had occurred in the case. See *id. at 43*.

Here, the alleged defect is "clicking" sounds which could allegedly mislead a user into believing that the hinges of an articulated ladder are locked, when in fact they are not. The applicable industry standards are apparently silent as to "clicking," and therefore Defendant wishes to reference industry standards "to show and explain the standard in the engineering community as to what constitutes a defective ladder." See Doc. 72 at 9. Governing case law does not permit the admissibility of industry standards for such general purposes in a products liability case. See *Lewis, 528 A.2d at 594*; see also *Blacker v. Oldsmobile Div., General Motors Corp., 869 F.Supp. 313, 314 (E.D. Pa. 1994)*

Kelcie Reid

**[*23]** (distinguishing mandatory federal standards from industry custom, professional standards and other governmental standards, and holding mandatory federal standards admissible where they "speak directly to an alleged defect in this case").

For these reasons, I will grant this motion in limine and preclude reference to industry standards at trial.

### G. Plaintiffs' Motion in Limine to Exclude Misleading Portions of Staged Videotaped Demonstrations and Photographs of Defendant's Expert Mack A. Quan (Doc. 59)

In this motion in limine, Plaintiffs seek to preclude "misleading" portions of staged demonstrations and photographs by Defendant's expert, Dr. Quan. See Doc. 59 at 5-7. Specifically, Plaintiffs object to three video demonstrations/photographs by Dr. Quan which they anticipate Defendant will offer into evidence -- (1) Dr. Quan's positioning of the subject ladder during an on-site inspection on February 23, 2009 ("On-Site Demonstration"), (2) a shake test performed on an exemplar ladder ("Shake Test"), and (3) other testing performed on an exemplar ladder. Id. at 2-3. Defendant counters that Plaintiffs mischaracterize Dr. Quan's demonstrations, and that Plaintiffs' objections are without **[*24]** factual support. See Doc. 71 at 2.

As a general matter, "misleading" evidence is not permitted by elementary application of the Federal Rules of Evidence. See _Fed. R. Evid. 403_ ("evidence may be excluded if its probative value is substantially outweighed by the danger of . . . misleading the jury"). In applying _Rule 403_ in the context of a visual demonstration, the Third Circuit has stated:

> Where [a] recreation could easily seem to resemble the actual occurrence, courts have feared that the jurors may be misled because they do not fully appreciate how variations in the surrounding conditions, as between the original occurrence and the staged event, can alter the outcome . . . . [C]ourts have created a doctrine, predating and now loosely appended to _Rule 403_, that requires a foundational showing of substantial similarity in circumstances. Of course the concept of substantial similarity is a flexible one, and ought to be, for the benefits of the demonstration and the dangers of misleading the jury will vary greatly depending upon the facts. We think the trial judge enjoys great discretion in this area.

_Fusco v. General Motors Corp., 11 F.3d 259, 264 (3d_

_Cir. 1993)_ (citations omitted). Therefore, **[*25]** the key determination to be made is whether the three demonstrations and accompanying photographs at issue are substantially similar to the actual events, such that the visual evidence risks neither unduly prejudicing Plaintiffs, nor confusing or misleading the fact-finders. See _Fed. R. Evid. 402_; _Fusco, 11 F.3d at 264_.

#### 1. On-Site Test

During an on-site inspection performed on February 23, 2009, Dr. Quan positioned a ladder with the left leg on the lawn in front of Plaintiffs' home and the right leg on the pavement of Plaintiffs' driveway. See On-Site Test Photos, attached to Doc. 59 at Ex. A. Because the lawn has a steeper grade, Dr. Quan placed an unidentified metallic object on the driveway under the right leg of the ladder. See id. Plaintiffs argue that this "constitutes misleading and purely speculative staging." Doc. 59 at 2. However, as Defendant notes, Dr. Quan determined the pre-fall and post-fall location of the ladder based upon Mr. Czarnecki's testimony that he placed the ladder parallel to the left of the shutter visible in the demonstration, see Czarnecki Dep. at 34, and upon such physical evidence as the ladder's condition, testing of exemplar ladders, and post-fall marks **[*26]** on the wall. See Doc. 71 at 2-3. In addition, Dr. Quan placed the "unidentified metallic object" on the driveway beneath the right leg of the ladder in order to permit the top of the ladder to rest adjacent and parallel to the shutter, consistent with Mr. Czarnecki's testimony -- and just such an object used to "level" the ladder is visible in photographs taken by the police officer who responded to the scene of the accident. See photos at Ex. B to Czarnecki Dep.

Although Mr. Czarnecki testified that he does not remember climbing or falling from the ladder, he did testify regarding the specific location of the ladder against his home. This testimony, together with the other physical evidence relied upon by Dr. Quan, confirms that his placement of the ladder during the On-Site Test is not unduly misleading, but instead is entirely plausible. Therefore, I will deny this part of the motion in limine and allow Defendant to show the On-Site Test to the jury, with the caveat that I will remind the jury prior to the demonstration that it does not depict the ladder at the time of the accident, and that because Mr. Czarnecki does not remember anything related to climbing or falling from the **[*27]** ladder, the ladder's placement in the demonstration is not based upon any person's precise recollection.

#### 2. Shake Test

Czarnecki v. Home Depot USA, Inc.

In the videotape and photographs of the Shake Test, Dr. Quan orients an exemplar ladder with the hinges facing "away" from the wall and apparently with both middle hinges secured. See Shake Test Photos attached to Doc. 59 at Ex. B. According to Plaintiffs, Dr. Quan then shakes the ladder in an apparent attempt to simulate what would happen if a man of Mr. Czarnecki's size and weight had been using the ladder. See Doc. 59 at 6. [4]

I find that the Shake Test does not meet the test of substantial similarity discussed in Fusco. It is impossible to determine whether the condition of the exemplar ladder is substantially similar to the ladder used by Mr. Czarnecki. More importantly, Dr. Quan oriented the ladder in the Shake Test in a manner inconsistent with the way Mr. Czarnecki set the ladder up against his home, nor is there any evidence that the ladder shook in a manner consistent with the demonstration. Therefore, [*28] I will grant this portion of the motion in limine and preclude Defendant from showing the Shake Test to the jury.

3. Other Testing

In the third demonstration at issue, Dr. Quan first erects the ladder as a step ladder (a configuration not involved in this case), and then orients the ladder with the middle hinges facing towards the wall (as in this case), but with both middle hinges locked (unlike this case). See Photos attached to Doc. 59 at Ex. C. Defendant does not dispute the accuracy of this description, but instead argues that the testing "was not performed to show . . . Mr. Czarnecki's set up, but to duplicate the various tests which the multi-matic [ladder] underwent prior to its sale." Doc. 71 at 4. Defendant does not explain the relevance of this particular testimony in this case.

As with the Shake Test, the additional testing was performed using an exemplar ladder whose condition may not have been substantially similar to the ladder used by Mr. Czarnecki. While this may raise less concern where the purpose of the demonstration was to show how this type of ladder was tested prior to marketing, without an explanation as to why the demonstration is relevant to the issues the jury [*29] must decide, the relevance does not outweigh the potential for confusion.

Therefore, I will grant this motion in limine in part, and deny it in part. The motion will be granted to the extent

that Defendant will be precluded from presenting any visual evidence of testing using an exemplar ladder for the Shake Test or in a configuration other than that which existed at the time of Mr. Czarnecki's fall (i.e., straight ladder configuration). In all other respects, the motion will be denied.

III. CONCLUSION

As for Defendant's motions in limine, Doc. 51 (motion in limine to bar Norman Johanson's contention that the "clicking" sounds constitute a defect) is denied as moot in light of my prior ruling on the admissibility of Mr. Johanson's testimony, and Doc. 52 (motion in limine to bar Mr. Johanson from referring to claims or lawsuits regarding Krause Multi-Matic ladders) is granted.

As for Plaintiffs' motions in limine, Doc. 54 (motion in limine to preclude Defendant from introducing evidence that Mr. Johanson's theory of causation had been rejected in Mirchandani, or any other case) is granted, as modified herein; Doc. 58 (motion in limine to exclude reference to various industry standards) [*30] is granted; and Doc. 59 (motion in limine to preclude misleading portions of videotaped demonstrations and photographs by Dr. Quan) is granted in part, and denied in part, as stated herein. All other motions are denied.

An appropriate Order follows.

ORDER

AND NOW, this 15th day of June, 2009, after consideration of the motions in limine filed by Plaintiffs and Defendant (Docs. 51-59), and all responses and replies to responses thereto, it is hereby ORDERED AS FOLLOWS:

1. Doc. 51 (Defendant's motion in limine to bar Norman Johanson's testimony that the "clicking" sounds constitute a defect) is DENIED AS MOOT in light of my prior ruling on the admissibility of Mr. Johanson's testimony;

2. Doc. 52 (Defendant's motion in limine to bar Mr. Johanson from referring to claims or lawsuits regarding Krause Multi-Matic ladders) is GRANTED;

3. Doc. 53 (Plaintiffs' motion in limine to preclude cumulative expert testimony) is DENIED;

4. Doc. 54 (Plaintiffs' motion in limine to preclude Defendant from introducing evidence that Mr. Johanson's theory of causation had been rejected

---

[4] Defendant does not dispute Plaintiffs' description of the Shake Test, and the description is consistent with Dr. Quan's expert report. See Quan Report at 5-6.

Czarnecki v. Home Depot USA, Inc.

in Mirchandani, or any other case) is GRANTED;

5. Docs. 55 and 56 (Plaintiffs' motions in limine to preclude biomechanical and/or **[*31]** reconstruction testimony of defense experts Quan and Ver Halen) are DENIED;

6. Doc. 57 (Plaintiffs' motion in limine to exclude evidence of Plaintiff's misuse of the ladder and to omit jury charge on assumption of risk) is DENIED as to evidence of Mr. Czarnecki's alleged misuse of the ladder, and DENIED WITHOUT PREJUDICE as to charging the jury on assumption of the risk;

7. Doc. 58 (Plaintiffs' motion in limine to exclude reference to various industry standards) is GRANTED;

8. Doc. 59 (Plaintiffs' motion in limine to preclude misleading portions of videotaped demonstrations and photographs by Dr. Quan) is GRANTED to the extent that Defendant will be precluded from presenting visual evidence of Dr. Quan's shake test or any test using an exemplar ladder in other than its straight configuration, and is otherwise DENIED.

BY THE COURT:

/s/ ELIZABETH T. HEY

ELIZABETH T. HEY

UNITED STATES MAGISTRATE JUDGE

---

**End of Document**

 Positive
As of: October 25, 2018 5:14 PM Z

# *IBM v. BGC Partners, Inc.*

United States District Court for the Southern District of New York

April 25, 2013, Decided; April 25, 2013, Filed

10 Civ. 128 (PAC)

**Reporter**

2013 U.S. Dist. LEXIS 59780 *; 91 Fed. R. Evid. Serv. (Callaghan) 249; 2013 WL 1775437

INTERNATIONAL BUSINESS MACHINES CORPORATION, Plaintiff and Counterclaim Defendant - against - BGC PARTNERS, INC.; BGC BROKERS US, L.P.; BGC FINANCIAL, L.P.; and BGC USA L.P., Defendants and Counterclaim Plaintiffs.

**Prior History:** *IBM v. BGC Partners, Inc., 2013 U.S. Dist. LEXIS 59779 (S.D.N.Y., Apr. 25, 2013)*

## Core Terms

software, license, contracts, terms, summary judgment, termination, admissible, customers, programs, parties, summary judgment motion, breach of contract, Products, hired, reasonable jury, counterclaims, registrations, asserts, copyright infringement, purchase order, exhibits, records, material fact, Transitioning, inadmissible, standardized, Entitlement, disputes, modified, billing

**Counsel:** **[*1]** For International Business Machines Corporation, Plaintiff: Kenneth Scott Canfield, Jones Day (NYC), New York, NY; Krista S. Schwartz, PRO HAC VICE, Jones Day (Chicago), Chicago, IL.

For BGC Partners, Inc., Defendant, Counter Claimant: Eric Jonathan Seiler, Hallie Beth Levin, Friedman Kaplan Seiler & Adelman LLP, New York, NY.

For BGC Brokers US., L.P., BGC Financial L.P., BGC USA, L.P., Defendants, Counter Claimants: Hallie Beth Levin, Friedman Kaplan Seiler & Adelman LLP, New York, NY.

**Judges:** HONORABLE PAUL A. CROTTY, United States District Judge.

**Opinion by:** PAUL A. CROTTY

## Opinion

## OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff International Business Machines Corporation ("IBM") brings this action against BGC Partners, Inc., BGC Brokers US, L.P., BGC Financial, L.P., and BGC USA, L.P. (collectively, "BGC") asserting claims for copyright infringement, breach of contract, and replevin. BGC counterclaims for breach of contract and for declaratory judgment. IBM's claims and BGC's counterclaims relate to BGC's right to possess and use IBM's Informix database management and transaction processing software, which BGC used to operate its inter-dealer brokerage business. IBM has moved for **[*2]** summary judgment on both its claims and BGC's counterclaims. For the reasons below, the Court DENIES IBM's motion.

## BACKGROUND[1]

In 2001, IBM acquired software assets and related contracts from Informix Software, Inc. ("Informix") (Ex. A at 103-04), prior to which Informix provided maintenance services to customers of its software —

---

[1] All references to lettered exhibits, such as "Ex. A," refer to exhibits to IBM's Memorandum of Law in Support of the Motion for Summary Judgment ("Pl. Br.") or its Reply in Support of the Motion for Summary Judgment. ("Pl. Reply.") All references to numbered exhibits, such as "Ex. 1," refer to exhibits to BGC's Memorandum of Law in Opposition to the Motion for Summary Judgment. ("Defs. Opp'n.") Many exhibits were attached to both parties' memoranda and, accordingly, their alphabetical and numerical exhibit numbers may be used interchangeably.

IBM v. BGC Partners, Inc.

including BGC's predecessors in interest, Euro Brokers Investment Corp., Euro Brokers, Inc., and Euro Brokers Services, Ltd. (collectively, "Euro Brokers"[2]) — under standardized programs entitled "OpenLine" and "Assurance." (Ex. B at 98.) Following its acquisition of Informix in 2001, IBM announced that it would "maintain **[*3]** existing relationships with Informix customers and business partners, including support for and updating of current Informix products" (Ex. 13; see also Ex. K), which it did. (Defs. 56.1 Stmt. ¶ 8.)

The parties dispute whether Informix's licensing of its software to Euro Brokers was governed pursuant to a customized contract or a standardized license. (Compare Defs. 56.1 Stmt. ¶¶ 5-6, with Pl. 56.1 Stmt. ¶¶ 5-6.) In particular, BGC claims that the relationship between Euro Brokers and Informix was governed by a bespoke contract signed in or around August, 1992 (the "Euro Brokers Agreement"). (Ex. 3 at 87-88; Ex. 8 at 91-93; Ex. 10 at 53.) BGC's original copy of the Euro Brokers Agreement was destroyed in the September 11, 2001 terrorist attack on the World Trade Center, in which Euro Brokers had an office, and IBM has been unable to locate a copy in its own records. (Ex. 27; Ex. 29; Ex. 30.) BGC asserts that the 1992 Euro Brokers Agreement could only be modified by a written document signed by authorized **[*4]** representatives of both Euro Brokers and Informix that expressly referenced the Euro Brokers Agreement (Defs. 56.1 Stmt. ¶ 63 (citing Exs. 86-97, each at § 14.5)), and that if it were terminated as a result of Euro Brokers' breach, Euro Brokers would continue to have the right to use all products for which the licensing fees had previously been paid. (Id. (citing Exs. 86-97, each at § 11.3(b)).)

IBM, however, asserts that the Euro Brokers Agreement never existed. Rather, IBM claims that the relationship between Informix and Euro Brokers had been governed by a standardized "serial number license." (Ex. B. at 66-69; 76-77; 95-97; 162.) After IBM's 2001 acquisition of Informix's software and related contracts, IBM argues that the serial number license governed the relationship between IBM and Euro Broker. (Id. at 192.)

Beginning in 2003, IBM moved 88% of customers using Informix's software to its Passport Advantage program. (Ex. B at 203-06.) Along with other customers of the Informix software, Euro Brokers was mailed a copy of

the IBM's International Passport Advantage Agreement ("IPAA"), a price quote, a Passport Advantage enrollment form, and a letter entitled "Transitioning your Informix **[*5]** Products to Passport Advantage." (Ex. B at 206, 212-13.) On March 6, 2003, IBM sent an email to Euro Brokers stating that it was "being migrated over to IBM's Passport Advantage Program" with the quotation and enrollment form as attachments.[3] (Ex. 39.) The enrollment form stated that the Passport Advantage program would be governed by the terms of the IPAA and International Program License Agreement ("IPLA"), which it incorporated by reference. (Ex. O.) On March 10, 2003, Euro Brokers faxed a purchase order for one "IBM Informix Software Maintenance Renewal" to IBM. (Ex. S.) While the purchase order stated that "Transitioning Informix Products to IBM Passport Advantage apply [sic] to this quote" (id.), this language was included only after Euro Brokers informed IBM that it did not wish to transition to Passport Advantage, to which IBM responded that BGC had no choice in the matter and specifically instructed the BGC employee submitting the purchase order to include this language. (Ex. 7 at 57-58, 69.) The parties dispute whether Euro Brokers concurrently filled out the Passport Advantage enrollment form (compare Pl. 56.1 Stmt. ¶ 24, with Defs. 56.1 Stmt. ¶ 24), a prerequisite to transitioning **[*6]** to the Passport Advantage program. (Ex. B. at 215.)

On March 12, 2003, IBM sent Euro Brokers a Welcome Letter and Proof of Entitlement. (Ex. U.) The Proof of Entitlement stated that all of the products listed therein were "provided to [Euro Brokers] subject to the terms of the IBM International Passport Advantage Agreement," and provided an internet address for the "IBM Program License Agreement and product License Information documents." (Id.) IBM's letter also noted, however, that "if special terms apply to [a customer's] specific Passport Advantage agreement, some parts of the standard terms may not apply or may have been modified." (Id.) IBM sent Euro Brokers and BGC similar Proofs of Entitlement in 2004, 2005, 2006, 2007 and 2008, which set forth the **[*7]** specific number of users and concurrent sessions of the Informix software that Euro Brokers and BGC were entitled to use. (See Exs.

---

[2] Euro Brokers was acquired by BGC in 2005. (Ex. L at 10-11.) It will generally be referred to as Euro Brokers for events occurring prior to 2005, and as BGC for events occurring after 2005.

---

[3] BGC asserts that it did not receive either the "Transitioning Informix Products to IBM Passport Advantage" letter or a copy of the IPAA until 2008, at which point they were provided by IBM in connection with the instant litigation. (Defs. 56.1 Stmt. ¶ 18 (citing Ex. 10 at 172 (as amended by errata sheet); Ex. 27).) The record does not indicate that these documents were received by Euro Broker when IBM initially mailed them in 2003.

IBM v. BGC Partners, Inc.

52-56; Ex. B at 220-21.) IBM also sent renewal quotes in each of these years, all of which were approved and paid. (Pl. 56.1 Stmt. ¶ 31; see Exs. 45-49.) In 2004, Euro Brokers purchased an additional license for Informix Software, and received an additional, similarly worded Proof of Entitlement. (Ex. AA.) From 2005 through early 2009, BGC downloaded and installed Informix software, for which it received technical support from IBM. (Ex. BB at 66-70, 111-12, 122-50; Ex. DD at 46-47, 56-67; Ex. FF at 163-64; Ex. NN.)

In September, 2007, IBM employees began exchanging internal correspondence regarding BGC's use of Informix software based on suspicions that "something just [did not] add up" (Ex. 61) and questioning whether something "look[ed] fishy" (Ex. 62) because the number of licensed sessions that Informix was entitled to run "look[ed] low relative to the number of tools." (Ex. 64.) On February 1, 2008, IBM sent an email to BGC requesting a discussion of BGC's "software installation . . . to better understand [BGC's] current use of Informix." (Ex. 65; see **[*8]** also Ex. 66.) IBM subsequently requested and received data from BGC regarding its use of Informix software, which it sought to analyze internally "to determine what they are running/deploying versus what they have entitlements to." (Ex. 69; see also Ex. 68.) Internally, IBM concluded on March 7, 2008, that BGC was entitled to run 14 concurrent session of Informix software, but that it needed to license an additional 2,056 sessions, which would cost approximately $995,000. (Ex. 70.)

On April 14, 2008, IBM informed BGC that it had hired KPMG to conduct "an assessment of [BGC's] deployment and use of IBM software in accordance with applicable license agreements." (Ex. HH.) KPMG provided an audit report to IBM and BGC on August 22, 2008, which purports to show that BGC employed Informix software in greater numbers than it was entitled to use.[4] (Ex. II.) Following the audit report, IBM and BGC met regarding the audit's results, but were unable to amicably resolve their dispute. On September 8, 2008, IBM sent BGC an invoice for $1,730,665.24 for additional software licenses, along with fees for technical support. (Ex. JJ.) BGC declined to purchase any additional licenses (Defs. 56.1 Stmt. **[*9]** ¶ 52), though it continued to pay for software maintenance and support. (Ex. 80.) BGC also sent emails to IBM on

September 26, 2008, and October 8, 2008, requesting that IBM produce its copy of the Euro Brokers Agreement, which BGC referred to as "an indispensable starting point to understanding the situation." (Exs. 76, 77.) IBM failed to do so and, on December 29, 2008, it notified BGC that, unless BGC paid IBM $1,730,665.24 for its use of unlicensed Informix software by December 31, 2008, BGC's licenses would be terminated and it would be required to destroy all copies of the software. (Ex. KK.) Nevertheless, BGC continued to download and use Informix software after December 31, 2008, without making the requested payment.

Specifically, BGC acknowledges that it continued to use Informix Dynamic Server 9.21, 9.30, and 9.40; Informix 4GL Compiler Development 7.32; Informix 4GL Interactive Debugger 7.32; Informix 4GL RDS Development 7.32; **[*10]** Informix SQL Development 7.32; and Informix Client SDK 2.90. (Exs. DD at 68-72, 74-75; LL; NN.) BGC also acknowledges downloading, but not installing or using, Informix 4GL Compiler 7.50, Informix 4GL Interactive Debugger 7.50, Informix 4GL RDS Development 7.50, and Informix SQL Development 7.50.[5] (Id.) At minimum, IBM holds copyright registrations on Informix Client SDK 290 and all versions of the Informix Dynamic Server. (Ex. VV; see aso § II, infra.)

BGC also continued to pay IBM for the use of the Informix software in 2009. On June 25, 2009, BGC wrote a check to IBM in the amount of $14,756.61. (Ex. 80.) This amount was consistent with the BGC's annual maintenance and support payments to IBM over the course of BGC's use of Informix software. (Ex. 111 at ¶ 16.) IBM has repeatedly declined to provide support and maintenance services to BGC on several subsequent occasions and attempted to refund the payment, which BGC has refused. (Id. at ¶¶ 17-25.)

## DISCUSSION

Summary judgment may be granted where "there **[*11]** is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. A fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct.*

---

[4] BGC disputes the veracity of KPMG's audit report, as well as its admissibility. (See Defs. Opp'n at 16-18.) Since the Court resolves the instant motions without reliance on the audit report, it is not necessary to address the report's admissibility.

[5] Initially, IBM also alleged that BGC downloaded, installed, or used Informix Dynamic Server 10.0 after December 31, 2008, but it has since withdrawn that charge. (See Pl. Reply at 1 n.3.)

IBM v. BGC Partners, Inc.

_2505, 91 L. Ed. 2d 202 (1986)._ The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief. See _Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)._ The burden then shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial," wherein "a reasonable jury could return a verdict for the non-moving party." _Anderson, 477 U.S. at 248._ "In reviewing a summary judgment motion, [the Court] must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." _Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004)._

**I. IBM Count 1 — Breach of Contract**

Even a cursory analysis of the parties' dispute demonstrates that there are numerous questions of fact which preclude the granting of summary judgment. To recover on a breach of contract claim under New York law, **[*12]** the plaintiff must establish "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." _Eternity Global Master Fund v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004)._ As we already know, and as will be discussed further, there are genuine issues of material fact regarding the first element of IBM's claim: BGC disputes that it is subject to the IPAA and IPLA, the agreements that it is alleged to have violated. Accordingly, IBM's motion for summary judgment on its breach of contract claim must be denied because "the evidence supporting [BGC's] case is [not] so scant that a rational jury could not find in its favor." _Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 86 (2d Cir. 1996)._

_A. There are Factual Questions Concerning the Euro Broker Agreement_

The primary disputes between the parties is whether the relationship between Informix, IBM's predecessor in interest, and Euro Brokers, BGC's predecessor in interest, was governed pursuant to the Euro Brokers Agreement prior to 2003 and, if so, what the terms of that agreement were. IBM asserts that Euro Brokers was subject to Informix's **[*13]** standardized license terms (Ex. B at 76-77, 96-97) rather than an individualized contract (_id._ at 66-68), based on the testimony of Stacy Ness ("Ness"), an IBM employee who was hired by Informix in 2000. (_Id._ at 69.) This

portion of Ness's testimony was based on her understanding of Informix's billing records for Euro Brokers (Ex. C; see also Exs. D, E), which contained "no indication . . . that they ever had a signed agreement" because they contained records of the serial numbers issued to the Informix software used by Euro Brokers. (Ex. B at 96-97.) Ness also testified that Euro Brokers was not included on a list of Informix's American customers that had held individualized contracts. (_Id._ at 261.)

There are several significant factual concerns with Ness's conclusion that the Euro Broker Agreement did not exist. First, Ness disclaimed any personal knowledge of how Informix licensed software in 1992, when its relationship with Euro Brokers began (_id._ at 69-70), or of how Informix billed its customers prior to her hiring (_id._ at 97-98), and she conceded that at least some Informix customers with bespoke contracts also received serial numbers. (_Id._ at 113-14.) Accordingly, her interpretation **[*14]** of the billing records is far from dispositive. Second, in a May 2, 2008, email to which the billing records were originally attached, another IBM employee asked Ness about "the possibility of obtaining some old Informix contracts & agreements" and explained that IBM was "working on a possible compliance opportunity with Euro Brokers Inc[.] and need[ed] additional information." (Ex. C (emphasis added).) At the very least, this correspondence supports an inference that IBM recognized that its billing records were not sufficient to determine that Euro Brokers was subject to standardized terms or that a bespoke contract did not exist. Finally, Ness relied on a list of Informix's American customers, without reviewing a similar list of English customers. (Ex. B at 262.) This severely undermines Ness's conclusions because BGC has consistently asserted that the Euro Brokers Agreement may have been entered into by Euro Brokers' London-based affiliate. (See, e.g., Exs. 3 at 87-89, 91-92; 8 at 94.)

In asserting that the Euro Brokers Agreement existed, BGC relies on the testimony of Walter Danielsson ("Danielsson"), who was employed by Euro Brokers and BGC from 1986 until 2008 (Ex. 3 at 27, 42), **[*15]** and Keith Reihl ("Reihl"), a current BGC employee who was hired by Euro Brokers in 1983. (Ex. 8 at 9-10.) Danielsson testified that Euro Brokers signed an agreement with Informix in 1992 or 1993, and, though he could not recall if he had read it, he identified two other Euro Broker employees with whom he discussed the contract, including Reihl. (Ex. 3 at 86-93.) Danielsson suggested that Euro Brokers would not have

IBM v. BGC Partners, Inc.

purchased the software without such an agreement because it was expected to affect the company's electronic infrastructure for at least a decade. (Id. at 92-93.) Accordingly, the software suite "was a major purchase" (id. at 89) and "wouldn't have been something you just picked up off a shelf." (Id. at 90.) Similarly, Reihl could not recall reading the agreement but remembered discussing the Informix software with Danielsson in 1992 or 1993. (Ex. 8 at 91-92.) Reihl further testified that "it is pretty clear in [his] mind that [Euro Brokers] entered into a specific agreement," that there was "no question in [his] mind one exists — or . . . existed," and that "[t]here's no [*16] doubt in [his] mind that [Danielsson] walked [him] through the details of the original licensing agreement." (Id. at 92.) BGC also points to correspondence it engaged in with IBM regarding the instant dispute, throughout which IBM stated that it could not locate a copy of the Euro Brokers Agreement, without denying the agreement's existence and appearing to proceed on the assumption that it had existed. (See, e.g., Exs. 27, 29, 30, 31.)

*B. There are Factual Questions Concerning the Terms of the Euro Broker Agreement*

BGC bears the burden of identifying "sufficient admissible evidence . . . so as to demonstrate that there exist[s] a genuine issue of material fact regarding the [Euro Broker A]greement." *Trebor Sportswear Co., Inc. v. Ltd. Stores, Inc., 865 F.2d 506, 510 (2d Cir. 1989).* While, in general, "[a]n original writing . . . is required in order to prove its content," *Fed. R. Evid. 1002,* that is not the case where, as here, "all the originals are lost or destroyed, and not by the proponent acting in bad faith." *Fed. R. Evid. 1004(a).* In such situations, "other evidence of the content of a writing . . . is admissible." Id. The secondary evidence BGC offers consists of a series of [*17] agreements entered into by Informix in 1992 and 1993 (see Exs. 86-97), a 1998 Informix agreement (Ex. 31) that counsel for IBM has referred to as "the basic form of license in effect during 1996" and that "was used from at least 1995 through 1998" (Ex. 32), and a 1995 license that counsel for IBM described as "strikingly similar to the [1998] sample license."[6] (Id.)

---

[6] IBM asserts that Exhibits 31 and 32 are inadmissible settlement correspondence, but does not provide any analysis or support for this argument. (See Pl. Reply at 5 n.21.) The agreements themselves are not rendered inadmissible by *Fed. R. Evid. 408* because, even assuming *arguendo* that IBM's descriptions of the agreements are inadmissible, *Rule 408*

These agreements are similar to one another and, though not identical in their entirety, contain many provisions that are identical. Most importantly, eleven of the fourteen contracts contain the following provision:

> This agreement may only be modified by a writing signed by an officer of Informix and a duly authorized representative of Licensee, expressly referring to this Agreement. Any purchase order issued by Licensee is for administrative convenience only.

(Exs. 86-91, 93-97, all at § 14.5.) Of the three that do not, one includes the first sentence of that provision, but makes no specific mention of purchase orders (Ex. 92 at § 8), and the 1995 and 1998 contracts contain the same provision as each other, which is substantially the same:

> This Agreement may only be modified by a writing signed by an officer of Informix [*18] and an authorized representative of Licensee. This Agreement takes precedence over any purchase order issued by Licensee, which is accepted by Informix for administrative convenience only.

(Exs. 31-32 at § F(5).) Though these are but a small sample of the 200 to 400 individual contracts Informix entered into prior to 2000 (see Ex. B at 128-29), IBM has not introduced any evidence to suggest that they are not a representative sample or that any of Informix's contracts did not contain a provision similar to those quoted above.

"[W]hen a question is raised as to whether a writing ever existed, or whether the evidence of the writing's contents reflects the actual contents, the issue is for the trier of fact to determine." *Servants of Paraclete, Inc. v. Great Am. Ins. Co., 857 F. Supp. 822, 829 (D.N.M. 1994)* (citing *Fed. R. Evid. 1008*). IBM argues that BGC

---

"does not require the exclusion of any evidence that is otherwise discoverable merely because the evidence is revealed during negotiations." 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence § 408.07* (2d ed. 2008); see also *Hallmark v. Cohen & Slamowitz, LLP, 283 F.R.D. 136, 139-140 (W.D.N.Y. 2012).* [*19] Moreover, *Rule 408* allows the admission of statements made during compromise negotiations, so long they are not offered "either to prove or disprove the validity or amount of a disputed claim" but rather "for another purpose." *Fed. R. Evid 408.* The statements by counsel for IBM are offered to aide in evaluating the weight to be given to the agreements in determining the terms of the Euro Brokers Agreement. Accordingly, they do not fall under the ambit of *Rule 408.* Indeed, the Court notes that IBM similarly relies on Ex. 32 in support of its own motion for sanctions. (Pl.'s Br. in Support of Mot. for Sanctions Ex. I.)

IBM v. BGC Partners, Inc.

cannot rely on Informix's contracts with parties other than Euro Brokers to establish the terms of the Euro Brokers Agreement, but *Fed. R. Evid. 1004* allows for the existence and contents of a writing to be proven "'by any **[*20]** kind of secondary evidence.'" *Burroughs Wellcome Co. v. Commercial Union Ins. Co., 632 F. Supp. 1213, 1223 (S.D.N.Y. 1986)* (quoting 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence § 1004.01* (1983)). While IBM "is entitled to attack the sufficiency of the secondary evidence, . . . this attack goes not to admissibility but to the weight of the evidence and is a matter for the trier of fact to resolve." Id.; see also 6 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence § 1004.02* (2d ed. 2008).

The cases cited by IBM are not to the contrary. First, in *Burt Rigid Box Inc. v. Travelers Property Cas. Corp., 126 F. Supp. 2d 596, 622-24 (W.D.N.Y. 2001)*, evidence was found inadmissible because it did not have sufficient probative value to be admissible under *Fed. R. Evid. 807*'s residual hearsay exception. This does not lend support to IBM's argument that the Informix contracts are not admissible because "there is no evidence that [they] bear similarity to the contract at issue" (Pl. Reply at 6), however, as the contracts' similarity relates to the weight assigned to them as evidence, not to their admissibility.

Second, IBM cites a grant of partial summary **[*21]** judgment to a plaintiff where the defendant, unable to produce the contract under which intellectual property was created, was unable to prove the existence or terms of the missing contract by "clear and convincing evidence." *Archie Comic Publ'ns, Inc. v. DeCarlo, 258 F. Supp. 2d 315, 329 (S.D.N.Y. 2003)*. This evidentiary standard is inapposite outside the realm of copyright law. In DeCarlo, the plaintiff, who had hired the defendant, benefitted from a presumption under the Copyright Act of 1909 that "a work by an independent contractor such as [the defendant], in the absence of an agreement to the contrary, was a work for hire" and therefore belonged to the hiring party. *Id. at 328* (citing *Playboy Enters., Inc. v. Dumas, 53 F.3d 549, 554 (2d Cir. 1995)*). In that unique context, relying largely on "the strength of the presumption of a work for hire relationship absent proof of a contrary agreement" and a leading copyright treatise, Judge Kaplan found that the party challenging the presumption was "obliged to produce evidence sufficient to justify a finding of a contrary agreement by clear and convincing evidence." *Id. at 329*. A similar presumption is not available here. Outside that **[*22]** specific context, cases assessing

secondary evidence of the existence or terms of a missing contract have found "no reason to depart from the almost universally accepted general rule that the burden of proof . . . should be by a preponderance of the evidence." *Glew v. Cigna Grp. Ins., 590 F. Supp. 2d 395, 411 (E.D.N.Y. 2008)* (collecting cases and declining to follow DeCarlo). Under the preponderance of the evidence standard, a reasonable jury could find that the Informix contracts provided sufficient proof of the Euro Broker Agreement's modification provision.

BGC asserts that the Euro Broker Agreement is still in effect, and, as a result, IBM's attempt to migrate BGC to the IPAA and IPLA in 2003 were ineffective. If BGC is correct, it could not be liable for breaching the IPAA and IPLA because it never entered into them. IBM points to what it describes as a "mountain of evidence" that BGC migrated to the Passport Advantage program and assented to the terms of the IPAA and IPLA (Pl. Reply at 2), but none of the documents produced by IBM satisfy the purported requirements of the Euro Broker Agreement that any modification to the agreement be (1) in writing, (2) signed by authorized representatives **[*23]** of both parties, and (3) specifically reference the Euro Brokers Agreement. See *Conocophillips v. 261 E. Merrick Road Corp., 428 F. Supp. 2d 111, 121-22 (E.D.N.Y. 2006)* (denying summary judgment where movants "failed to adduce evidence of a valid amendment or modification" to contract that "expressly provide[d] it can be amended, changed or modified only in a 'writing . . . signed by all of the parties'"). Because questions of material fact remain as to whether BGC was a party to the contracts that it allegedly breached, IBM's motion for summary judgment on Count I is denied.

## II. IBM Count II — Copyright Infringement

It is well settled that computer programs are subject to copyright protection. *Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 702 (2d Cir. 1992)*. To recover on a copyright infringement claim, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991)*. Though "registration is not a condition of copyright protection," *17 U.S.C. § 408(a)*, "no civil action for infringement of the copyright in any United States work shall **[*24]** be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." *17 U.S.C. § 411(a)*.

IBM v. BGC Partners, Inc.

IBM alleges that BGC infringed its copyright in twelve different computer programs. For at least three of those programs, however, *§ 411(a)* precludes summary judgment in favor of IBM because it "impose[s] a mandatory precondition to suit" that IBM failed to satisfy. *TI Training Corp. v. FAAC, Inc., No. 09 Civ. 973, 2010 U.S. Dist. LEXIS 59186, 2010 WL 2490535, at *3 (D. Colo. June 15, 2010)*. While IBM initiated the instant litigation in January, 2010, it did not register its copyright claims in Informix Dynamic Server 9.21, Informix Dynamic Server 9.40.xC8, Informix Dynamic Server 9.40.xC9, or "IBM Informix Tools"[7] until October, 2010. (Ex. VV.) Accordingly, summary judgment with regard to infringement of the copyrights for these programs must be denied. *Mktg. Tech. Solutions, Inc. v. Medizine LLC, No. 09 Civ. 8122, 2010 U.S. Dist. LEXIS 50027, 2010 WL 2034404, at *1, *5-6 (S.D.N.Y. May 18, 2010)*.

IBM has also failed to point to sufficient evidence that it registered copyrights for Informix 4GL Compiler Development 7.32, Informix 4GL Compiler Development 7.50, Informix 4GL Interactive Debugger 7.32, Informix Interactive Debugger 7.5, Informix 4GL RDS Development 7.32, Informix 4GL RDS Development 7.5, Informix SQL Development 7.32, or Informix SWL Development 7.5. None of these programs are specifically identified in the copyright registrations relied on by IBM. Rather, some combination of these programs may be covered by the copyright registrations for "IBM Informix Tools, 5724-C66, Version 7.32xC3;" "IBM Informix 4GL, 5724-C66, Version 7.32xC1;" "IBM Informix 4GL, 5724-C66, Version 7.32.xC2;" or "IBM Informix 4GL, 5724-C66, Version 7.50.xC1," but IBM has failed to introduce any admissible evidence identifying which program, if any, are covered by of these registrations.[8]  (See Ex. VV at

---

[7] Of the programs at issue, it is unclear what the copyright for "IBM Informix Tools, 5724-C66, Version 7.32.xC3" purports to cover, as the registration statement does not specify any of the programs at issue **[*25]** by name. (See Ex. VV at IBM-BGC_000012934.)

[8] IBM cites its own response to interrogatories propounded by BGC, but, "[t]o the extent [IBM] seeks to introduce statements from [its] own answers to interrogatories to prove the truth of the matters they assert, **[*26]** these statements are inadmissible hearsay. *Gilmore v. Macy's Retail Holdings, No. 06 Civ. 3020, 2009 U.S. Dist. LEXIS 4937, 2009 WL 140518, at *10 (D.N.J. Jan. 20, 2009)* (internal quotations omitted); see also *Duff v. Lobdell-Emery Mfg. Co., 926 F. Supp. 799, 803 (N.D. Ind. 1996)* ("If a party relies upon an opposing party's answers to interrogatories, the answers are admissible as

IBM_BGC_00003340-45, 00012934-35.)

IBM registered copyrights for Informix Dynamic Server versions 9.30 and 9.40.xC4, as well as Informix Client SDK 2.90 prior to January, 2010 (Ex. VV), each of which BGC acknowledges having used after December 31, 2008. (Defs. 56.1 Stmt. ¶ 55.) Even with regard to these copyrights, however, summary judgment must be denied because, as discussed supra, a reasonable jury could find that the Euro Brokers Agreement continued to govern the relationship between BGC and IBM at that date, and could further find that it authorized the continued use of these programs. Specifically, BGC argues that "the governing Euro Brokers Agreement allows BGC to continue using the Informix software in use at the time of the termination of that Agreement in **[*27]** the event that such termination is the result of software over-deployment," as alleged here. (Defs. Opp'n at 9.) Of the fourteen Informix contracts submitted by BGC, ten contain a provision stating that:

> If this Agreement is terminated due to breach by Licensee . . . , all rights and licenses granted under this Agreement will terminate, except for Licensee's continued right to use Products for which the license fees have been paid to Informix . . . .

(Exs. 86-90, 93-97 at § 11.3(b)), while one contains a slight variation in which the provision applies to "breach by, or Financial Duress of, Licensee" (Ex. 91 at § 11.3(b)), and one grants "a nonexclusive, nontransferable right to acquire finished copies of Products listed in . . . this Agreement as generally available from Informix for Licensee's own end use," with no mention of the consequences of the agreement's termination. (Ex. 92 at § 1). The 1995 and 1998 contracts, by contrast, provide for the termination of "all rights granted under this Agreement" or for the termination of "all rights granted under this Agreement, . . . except for Licensee's continued right to use Products for which the license fees have been paid to Informix," **[*28]** depending upon the reason for the contract's termination. (Ex. 31-32 at § E(2).) Based on this evidence, a reasonable jury could conclude that, even if IBM had properly terminated its agreement with BGC, BGC was nevertheless entitled to continue using the Informix software at issue. Accordingly, IBM is not entitled to summary judgment on its copyright infringement claims.

---

statements of a party opponent, but a party's own answers to interrogatories are not so admissible.").

Kelcie Reid

IBM v. BGC Partners, Inc.

### III. IBM Count III — Replevin

"To establish a claim for replevin, the plaintiff must prove two elements: (1) that plaintiff has a possessory right superior to that of the defendant; and (2) that plaintiff is entitled to the immediate possession of that property." *Jamison Bus. Sys., Inc. v. Unique Software Support Corp., No. 02 Civ. 4887, 2005 U.S. Dist. LEXIS 45480, 2005 WL 1262095, at \*14 (E.D.N.Y. May 26, 2005)*. IBM has failed to establish its superior possessory right because, as discussed supra, a reasonable jury could find that BGC is still entitled to use the Informix software, pursuant to the Euro Brokers Agreement. Accordingly, IBM's motion for summary judgment is denied as to its claim for replevin.

### IV. BGC Counterclaim I — Breach of Contract

IBM offers two grounds in support of its motion for summary judgment on BGC's breach of contract **[*29]** counterclaim. First, IBM argues that BGC cannot establish the existence of the Euro Brokers Agreement, let alone its terms. This argument is unavailing for the reasons stated supra regarding IBM's breach of contract and copyright infringement claims.

Second, IBM argues that BGC has failed to adduce any evidence that it suffered damages as a result of IBM's alleged breach of contract. See *Eternity Global Master Fund, 375 F.3d at 177*. In support of this argument, IBM cites the depositions of two BGC employees, each of whom testified that they are unaware of any damage that BGC has incurred as a result of IBM's failure to provide technical support subsequent to December 31, 2008. (Exs. G at 219; EE at 185.) IBM fails, however, to address spreadsheets offered by BGC that document the costs BGC incurred in migrating to another software platform from Informix (Exs. 98-99), which was necessitated, at least in part, by BGC's dispute with IBM. (Ex. G at 253-54.) Because a reasonable jury could conclude that these costs were caused by IBM's breach of the Euro Broker Agreement, IBM's motion for summary judgment is denied with respect to BGC's breach of contract counterclaim.

### V. BGC Counterclaim **[*30]** II — Declaratory Judgment

IBM seeks summary judgment that BGC is not entitled to declaratory judgments that (1) the Euro Brokers Agreement was not superseded or amended; (2) BGC is not bound by the IPAA or IPLAA; and (3) BGC does not

owe IBM $1.7 million in connection with its use of Informix software. Since, as discussed supra, a reasonable jury could conclude that the Euro Brokers Agreement is still in effect and that BGC had not breached it or infringed on IBM's copyright, IBM's motion for summary judgment on BGC's claim for declaratory relief is denied.

### CONCLUSION

For the foregoing reasons, several genuine issues of material fact remain disputed. Accordingly, IBM's motion for summary judgment is denied in its entirety.

Dated: New York, New York

April 25, 2013

SO ORDERED

/s/ Paul A. Crotty

PAUL A. CROTTY

United States District Judge

---

**End of Document**

## *Bridgeman v. Deere & Co.*

United States District Court for the Eastern District of Virginia, Norfolk Division

February 13, 2009, Decided; February 13, 2009, Filed

Civil Action No. 2:07cv613

**Reporter**

2009 U.S. Dist. LEXIS 57250 *; 2009 WL 1344948

TERRY BRIDGEMAN, Plaintiff, v. DEERE & CO., et al, Defendants.

## Core Terms

deposition, excavator, argues, discovery, expert testimony, documents, motions, interrogatories, accidents, manufacture, responses, rules of evidence, car accident, scientific, notice, motion to exclude, admissibility, conditions, injuries, screen

**Counsel:** **[*1]** For Terry Bridgeman, Plaintiff: Andrew Michael Sacks, Stanley Elliot Sacks, LEAD ATTORNEYS, Sacks & Sacks, Norfolk, VA.

For Deere & Company, trading as John Deere & Company, Defendant: Brickford Y. Brown, LEAD ATTORNEY, Moran Kiker Brown PC, Richmond, VA; Jana Pruitt Roemmich, LEAD ATTORNEY, Carl Dewayne Lonas, Moran Brown PC, Richmond, VA.

For Hertz Equipment Rental Corporation, Defendant, Cross Claimant: Michael James Garnier, LEAD ATTORNEY, Garnier & Garnier, P.C., Falls Church, VA.

For Deere & Company, Cross Defendant: Brickford Y. Brown, LEAD ATTORNEY, Moran Kiker Brown PC, Richmond, VA; Jana Pruitt Roemmich, LEAD ATTORNEY, Carl Dewayne Lonas, Moran Brown PC, Richmond, VA.

**Judges:** Raymond A. Jackson, United States District Judge.

**Opinion by:** Raymond A. Jackson

## Opinion

### *ORDER*

Before the Court are the following motions: (1) Plaintiff's Motion to Compel and for Sanctions; (2) Defendants' (separate) Motions to Exclude Frederick Heath; (3) Defendants' (separate) Motions to Exclude Dr. Jewell; and (4) Defendants' (separate) Motions in Limine. These matters have been fully briefed, and the Court conducted a hearing on February 12, 2009.

## I. MOTION TO COMPEL AND FOR SANCTIONS (# 22)

Plaintiff argues that Deere has failed to **[*2]** cooperate in discovery by (1) failing to answer interrogatories, (2) answering other interrogatories incompletely, (3) failing to produce documents relevant to the manufacturing of the particular excavator, (4) failing to identify a single knowledgeable person involved in the manufacturing of the particular excavator, (5) failing to produce an appropriate *30(b)(6)* corporate representative, and (6) failing to produce documents at the *30(b)(6)* witness examination. Accordingly, Plaintiff requests an order compelling answers to interrogatories and providing sanctions, including (1) exclusion of the *30(b)(6)* designated corporate witness as either a corporate witness or an expert witness, (2) barring Deere from calling any witnesses besides individuals identified in the December 2008 interrogatory answers, (3) stripping Deere of all defenses, and/or (4) awarding attorney's fees to Plaintiff in connection with this Motion.

Deere argues that this Motion should be denied. First, Deere argues that the Motion is untimely, as it was filed two weeks after the close of discovery and less than a month before the scheduled trial date. Second, Deere argues that Plaintiff's assertions are without merit. **[*3]** In sum, Deere argues that it has complied with all applicable rules and has not violated any discovery order. Deere further argues that Plaintiff has provided no evidence of bad faith by Defendant or prejudice to Plaintiff that would support such severe sanctions. Deere points out that Plaintiff has identified no specific prejudice, and that despite Plaintiff's general claim of prejudice, Plaintiff's expert was able to form opinions about alleged manufacturing and design defects before Deere was even notified by Plaintiff that its discovery responses were inadequate. Deere also notes that although Plaintiff relies on the federal law of spoliation,

Plaintiff has provided no evidence that Deere destroyed or concealed anything of relevance to this case. Deere also notes that Plaintiff filed this Motion just after Deere notified Plaintiff that it would be filing a *Daubert* motion to exclude Plaintiff's liability expert and seeking to exclude much of Plaintiff's medical evidence. Deere argues that the timing of this Motion, along with Plaintiff's admission that any responses cannot be made sufficiently in advance of the trial date to be of any value to Plaintiff's case, makes it clear that **[*4]** Plaintiff is simply "lashing out" and is not primarily interested in discovery responses.

Deere also specifically addresses all of Plaintiff's allegations. Regarding the interrogatories, Deere avers that Plaintiff's requests were overly broad and vague. Deere timely responded to the first and second sets of discovery in September and early October of 2008. Deere states that it did not receive notice that Plaintiff was dissatisfied with any responses until Plaintiff's deposition in late October, but that Plaintiff's counsel did not identify any specific discovery requests he would like supplemented until early November. Deere sent a status update in mid-November and submitted supplemental responses in early December. Deere was unaware that Plaintiff was dissatisfied with the supplemental response until Plaintiff filed this Motion on December 30th. Regarding the unproduced documents, Deere asserts that it cannot produce documents it does not have. Deere argues that it undertook every effort to locate all relevant documents, and that it produced drawings, specifications, and standards for the windshield of the subject excavator. Regarding the knowledgeable persons, Deere assets that it **[*5]** identified all persons whom Deere knew to have direct knowledge of the facts and information at issue. Defendant asserts that Plaintiff overlooks the fact that his claims do not relate to any piece of equipment included in the manufacture of the excavator, but rather in the *exclusion* of an optional safety screen.

Regarding the corporate representative, Deere designated Dan Griswold in response to Plaintiff's *30(b)(6)* notice. Griswold is the current Manager of Product Safety, and during his 30+ years with Deere, he has been involved in the design, engineering, and manufacture of excavators, research, development, product safety, and market analysis. Deere argues that Griswold was able to testify at length about the relevant topics in Plaintiff's notice and he was properly designated. Regarding the documents at the *30(b)(6)* examination, Deere contends that Plaintiff did not request documents until December 2nd for the

deposition scheduled for December 5th, and included 11 categories of documents to be produced. Deere was unable to agree due to the short notice, and informed Plaintiff's counsel of such on December 4, 2008. Plaintiff's counsel nonetheless elected to proceed with the deposition.

In **[*6]** accordance with the Court's ruling at the hearing, because this Motion is untimely and there appears to be no meritorious grievance, this Motion is **DENIED**.

## II. MOTIONS TO EXCLUDE FREDERICK HEATH (# 23 & # 24)

Defendants argue (in separate motions) that Plaintiff's liability expert, Frederick Heath, should be excluded under *Rule 702 of the Federal Rules of Evidence* and *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*, because he is not qualified to offer expert testimony, his opinions are not grounded in any objective standard, and his opinions are not relevant or helpful to the fact-finder. Mr. Heath is Plaintiff's liability expert, and his opinions pertain to the alleged design defect in the excavator. Specifically, Mr. Heath opines that Deere should have installed a protective screen on the windshield of the excavator, and that the warnings were not adequate to advise the operator that screens should be used when conducting demolition work.

Deere and Hertz make essentially the same arguments. First, Defendants argue that Mr. Heath is unqualified. Defendants argue that he is an expert-for-hire, a litigation consultant with a bachelors degree in mechanical engineering **[*7]** earned approximately fifty years ago. He is not a licensed or registered professional engineer. His professional background is almost exclusively in the automotive service industry, specifically in the manufacture of aerial lifts. He has never designed, manufactured, or operated an excavator. He cannot define the primary purpose of an excavator, has no knowledge of variations between different models, and cannot define the construction industry in general. He has no education, training, or experience in construction equipment. He has not taught any classes or written any articles relevant to this case. Never before this case had he addressed, in any context, the subject of protective screens on excavators.

Second, Defendants argue that Mr. Heath's opinions lack foundation, in that they are not grounded in an objective standard or methodology, but instead are

merely personal opinions. His opinions have not been subjected to any testing to determine whether his alternative designs are safe or technologically or economically feasible. He has submitted no explanations, models, drawings, or calculations to allow anyone else to test his ideas. He has not proposed a specific screen for use **[*8]** on the excavator, or any type of structural dimension, material composition, or mechanical configuration. Furthermore, he has not developed a single warning that he would deem acceptable, and he has not conducted any risk assessment. In support of his propositions, he has not presented evidence on customs in the trade or referred to literature in the field, and the materials he has cited are not relevant. Defendants argue that Mr. Heath's opinions are based on pictures he found on the internet and some excavators he once saw engaged in demolition work at a job site. Finally, Defendants argue that because Mr. Heath is not qualified and his opinions are not reliable, Mr. Heath's opinions are also therefore not relevant or helpful to the fact-finder.

In response, Plaintiff briefly outlines Mr. Heath's credentials, but does not provide any additional evidence to rebut Defendants' arguments. In fact, Plaintiff's statement of Mr. Heath's credentials confirms that his professional experience has been primarily in the automotive industry. Plaintiff also makes the untenable argument that *Daubert* does not apply to this case.

In *Daubert*, the United States Supreme Court established the standard **[*9]** for the admissibility of expert testimony pursuant to *Federal Rule of Evidence 702*. *Rule 702* states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The *Daubert* decision rejected the prior rigid "general acceptance" test of *Frye v. United States, 293 F. 1013 (D.C. Cir. 1923)*, and established a new two-part test for the admissibility of expert testimony. *See Daubert, 509 U.S. at 589, 592-93*. Under *Daubert*, when a court is

"[f]aced with a proffer of expert scientific testimony," the court "must determine at the outset… whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id. at 592*. In *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)*, **[*10]** the Supreme Court held that the *Daubert* test applies to all expert testimony falling under *Rule 702*.

In determining whether the "scientific knowledge" prong is satisfied, a court may consider four factors: (1) ability to test the theory or technique; (2) peer review and publication; (3) error rate; and (4) degree of acceptance within the relevant scientific community. *See United States v. Dorsey, 45 F.3d 809, 813 (4th Cir. 1995)* (citing *Daubert, 509 U.S. at 593-94*). An additional factor to consider is whether the expert testimony was prepared solely for purposes of litigation, or whether it flowed naturally from the expert's research or technical work. *See Wehling v. Sandoz Pharmaceuticals Corp., 162 F.3d 1158 (4th Cir. 1998)* ("Another significant fact weighing against admitting the testimony is where, as here, the expert developed his opinions expressly for the purposes of testifying"); *Daubert v. Merrell Dow Pharmaceuticals, 43 F.3d 1311 (9th Cir. 1995)* ("*Daubert II*") ("If **[*11]** the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles'"). However, this list of factors is not exclusive and "the trial judge must have considerable leeway in determining whether particular expert testimony is reliable." *Kumho Tire, 526 U.S. at 152*.

In determining whether the evidence will be helpful to the trier of fact, the United States Court of Appeals for the Fourth Circuit has stated that "a judge must be mindful of other evidentiary rules," specifically *Federal Rule of Evidence 403*. *Dorsey, 45 F.3d at 813*. *Rule 403* permits the exclusion of evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury…." The Supreme Court has stated that a trial judge must be particularly concerned with *Rule 403* with regard to expert testimony because of the difficulty in evaluating expert evidence. *Daubert, 509 U.S. at 595*. Expert testimony has potential to mislead the jury, since the jury may attach more significance to the testimony than is reasonably **[*12]** warranted. *United States v. Lester, 254 F. Supp. 2d 602, 607 (E.D. Va. 2003)*.

The proponent of expert testimony has the burden of

establishing admissibility by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001)*. "In making its [admissibility] determination [a court] is not bound by the rules of evidence except those with respect to privileges." *Fed. R. Evid. 104(a)*. In addition, "a trial judge has a great deal of discretion in deciding whether to admit or exclude expert testimony." *Dorsey, 45 F.3d at 814*.

Considering these principles and in accordance with the Court's ruling at the hearing, these Motions are **GRANTED**. It is abundantly clear that Mr. Heath is not qualified as an expert in the relevant field and that his opinions are grounded in nothing except his personal views. Mr. Heath admitted as much in his own deposition. Plaintiff has the burden of showing its expert is qualified, and it has not done so. Applying *Daubert* and *Rule 702*, the Court finds that Mr. Heath cannot be permitted to testify.

### III. MOTIONS TO EXCLUDE DR. JEWELL (# 32 & # 35)

Defendants also argue (in separate motions) that the deposition testimony of Plaintiff's treating **[*13]** physician, Dr. Neal Jewell, should be excluded, in whole or in part, on two bases: (1) as a discovery sanction under *Rules 37* and *26 of the Federal Rules of Civil Procedure*, and (2) under *Rule 702 of the Federal Rules of Evidence* and *Daubert*.

Defendants assert that Plaintiff has been involved in at least one motor vehicle accident [1] since the 2005 construction accident that is the subject of this case. Defendants also allege that the injuries resulting from the April 2007 accident are remarkably similar to the injuries that Plaintiff is claiming in the instant lawsuit. Defendants further allege that Plaintiff has actively concealed, from both Defendants and from Dr. Jewell, the accident(s), the extent of injuries suffered, and the treatments received for said accident(s). Defendants allege that they discovered the occurrence of such

accident(s) only because Plaintiff's counsel inadvertently produced documents relating to emergency room and chiropractic treatment for said accident(s). Even though Defendants put Plaintiff's counsel on notice that the discovery responses provided were incorrect and incomplete, Plaintiff has not produced a single bill, medical record, invoice, or document **[*14]** related to his treatment for such accident(s). Defendants argue that their deposition of Dr. Jewell was frustrated by the fact that they did not have access to the relevant information about these accidents before the deposition. Defendants also assert that throughout the entire discovery period, Plaintiff has generally been evasive to any inquiry regarding his past medical history.

Defendants argue that Dr. Jewell relied on Plaintiff's self-disclosure, and that his diagnosis did not account for car accidents as potential alternate causes of his symptoms. Because of a lack of information and because Plaintiff had stated in his October 27, 2008 deposition that the only recent accident **[*15]** was in June 2006 and involved only minor bruises to the hip area, Defendants made only a brief inquiry at Dr. Jewell's November 28, 2008 deposition regarding an intervening car accident. Dr. Jewell stated that he did not know of any accidents involving Plaintiff, and that the pain Plaintiff complains of could be related to an intervening car accident. Defendants concede that Dr. Jewell is otherwise qualified but argue that his opinion has been tainted by Plaintiff's conduct.

Accordingly, Deere argues that as a result of Plaintiff's failure to cooperate in discovery, i.e. failure to disclose and failure to supplement, Deere has been prejudiced, and the Court should exclude Dr. Jewell's deposition testimony as a discovery sanction. Both Deere and Hertz argue argue that Dr. Jewell's testimony about Plaintiff's injuries and their cause is unreliable and should be excluded under *Rule 702* and *Daubert*.

Plaintiff argues that the Motions are without merit. Plaintiff argues that Defendants had knowledge of the accident by October, well before Dr. Jewell's November deposition. Plaintiff also avers that Defendants did not object to Plaintiff's interrogatory responses relating to the accidents or **[*16]** object to the deposition of Dr. Jewell for lack of information. Plaintiff notes that Defendants have not sought an independent medical evaluation of Plaintiff. Plaintiff states that he disclosed the June 2006 accident in his deposition, as well as an accident from about 40 years ago, but was not asked about other accidents.

---

[1] Initially, Defendants argued that Plaintiff had been involved in two accidents. At the hearing, however, Plaintiff's counsel argued that there was only one accident in April 2007, even though Plaintiff mistakenly stated this accident occurred in June 2006 during his deposition and that there was an emergency room bill from June 2006. Defendants agreed that the June 2006 emergency bill appeared to be related to an insect bite, but would not stipulate that it was certain that there was only one accident.

Plaintiff states that Dr. Jewell arrived at his opinions after the construction accident but before the automobile accidents, and that his opinions have not been changed. Plaintiff also argues that his injuries claimed in this lawsuit were not caused by the car accidents, and explains that these accidents were minor. Thus, Plaintiff argues that Defendants' objections go to the weight of Dr. Jewell's testimony rather than its admissibility.

At the hearing, the timeline of these events was clarified. Plaintiff was involved in an accident in April 2007, and his June 2006 emergency room visit was related to a venomous spider bite. Dr. Jewell was apparently not informed of any intervening automobile accidents before arriving at his opinions. Before Dr. Jewell's November 2008 deposition, Defendants only had the following information to put them on notice of an automobile **[*17]** accident: the medical bills inadvertently produced by Plaintiff, knowledge of a lawsuit between Plaintiff and a chiropractor, and Plaintiff's incomplete and mistaken account of the car accident at Plaintiff's deposition in October 2008. In December, Plaintiff responded to an interrogatory asking for names of past medical providers: "A physician after the automobile accident after the subject casualty; plaintiff will supplement." When Defendants had previously sent that interrogatory in August/September, Plaintiff had not included any information about a recent car accident. Also in December, Defendants received records from Plaintiff's chiropractor.

Accordingly, the Court finds that Dr. Jewell's testimony regarding Plaintiff's condition since April 2007 is unreliable, because his opinion is not based upon sufficient data and he has not ruled out alternative causes. Therefore, Defendants' Motions are **GRANTED** in part and **DENIED** in part. Dr. Jewell may not testify about any of Plaintiff's treatment, conditions, or symptoms from April 2007 to present, or the cause of such conditions. Furthermore, Dr. Jewell may not opine or in any way suggest that Plaintiff's current condition was caused **[*18]** by the 2005 excavator accident. Thus, Dr. Jewell may only testify about Plaintiff's treatment and conditions prior to April 2007.

## IV. MOTIONS IN LIMINE (# 32 & # 37)

Defendants argue (in separate motions) that certain evidence and testimony should be excluded for various reasons, including lack of relevance and risk of unfair prejudice and confusion of the issues. Such evidence and testimony includes: (1) Hertz's private rules, practices or internal polices as evidence of a standard of care; (2) Hertz's advertising of training and equipment familiarization programs for equipment; (3) any claim for lost wages; (4) various medical conditions where no linkage has been demonstrated between the conditions and the accident at issue; (5) prescriptions and/or prescription costs after July 2006; (6) details of Plaintiff's neck surgery; and (7) photographs of excavators other than the subject excavator.

As the Court stated at the hearing, the Court declines to rule on these motions at this time, and these issues are deferred until trial.

The Court declines to award any of the attorneys' fees or costs requested in these several motions.

The Court **DIRECTS** the Clerk to send copies of this Order to counsel **[*19]** for the parties.

**IT IS SO ORDERED**.

Norfolk, Virginia

February 13, 2009

/s/ Raymond A. Jackson

**Raymond A. Jackson**

**United States District Judge**

End of Document