# Unreported Cases

 Neutral
As of: November 19, 2018 4:42 PM Z

# *Lawton v. CBS Corp.*

Superior Court of Connecticut, Judicial District of Fairfield At Bridgeport

July 23, 2015, Decided; July 23, 2015, Filed

CV105029354S

**Reporter**
2015 Conn. Super. LEXIS 1908 *; 2015 WL 5024632

Spencer Lawton v. CBS Corporation et al.

**Notice:** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**Prior History:** *Lawton v. CBS Corp., 2015 Conn. Super. LEXIS 1906 (Conn. Super. Ct., July 23, 2015)*

## Core Terms

seller, manufactured, summary judgment, products, asbestos, Separator, stream of commerce, memorandum, entity, trucks, genuine issue of material fact, exposed to asbestos, quotation, provides, marks, lung

**Judges:** [*1] Barbara N. Bellis, J.

**Opinion by:** Barbara N. Bellis

## Opinion

MEMORANDUM OF DECISION RE MOTION FOR SUMMARY JUDGMENT (MOTION #276.00)

On January 19, 2012, the plaintiff, Spencer Lawton, filed a second amended complaint (complaint) against multiple defendants, including the moving defendant, IMO Industries, Inc. In his complaint, the plaintiff asserts a product liability claim (count one) and seeks exemplary or punitive damages (count two) as to all defendants.

In count one, the plaintiff alleges that he was exposed to asbestos fibers, asbestos related materials, or products containing, involving, or requiring asbestos that were manufactured and/or placed negligently, recklessly, and wilfully into the stream of commerce by the defendants

while he was working as a power house operator at Pfizer, Inc. (Pfizer), from 1966 to 2000, working on automobiles at the Rhode Island Vocational Technical School and on other vehicles, and serving as an engineman in the United States Coast Guard (USCG) aboard the USCG Brenton Reef. The plaintiff alleges further that he suffers from asbestos related lung cancer, lung cancer, asbestos related lung disease, lung disease, pleural plaques and/or loss of lung function as a consequence [*2] of the defendants' actions.

In count two, the plaintiff incorporates all of the allegations in count one and adds that the defendants' actions constituted wanton, wilful, and malicious misconduct and demonstrated a reckless disregard for the consequences that they knew or should have known would result. The plaintiff also alleges that the defendants, after learning of the dangers of asbestos exposure, failed or refused to notify him of those dangers and the need for continuing medical surveillance, conspired to keep this knowledge from the public, and failed to promptly act to protect him. In addition to punitive and exemplary damages, the plaintiff seeks money damages.

On January 7, 2015, the defendant, IMO Industries, Inc., filed a motion for summary judgment as to the plaintiff's complaint, all cross claims, and any intervening complaint. The defendant filed a memorandum of law in support of its motion but submitted no evidence. On March 13, 2015, the plaintiff filed a memorandum of law in opposition to the defendant's motion. On June 25, 2015, the defendant filed a reply and supplemental memorandum in support of its motion, which included an affidavit of Richard M. Salzmann and an [*3] excerpt from a certified deposition transcript of the plaintiff.

DISCUSSION

"*Practice Book §17-49* provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Grimm v. Fox, 303 Conn. 322, 329, 33 A.3d 205 (2012)*. "To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue." (Internal quotation marks omitted.) *Ramirez v. Health Net of the Northeast, Inc., 285 Conn. 1, 11, 938 A.2d 576 (2008)*.

In its motion for summary judgment and **[*4]** initial memorandum in support, the defendant argues that it is entitled to judgment as a matter of law because the plaintiff has failed to show that he was exposed to or used any asbestos containing products contracted for, mined, milled, processed, manufactured, designed, tested, assembled, fashioned, fabricated, packaged, supplied, distributed, delivered, marketed, and/or sold by the defendant. In short, the defendant argues that, after extensive discovery, the plaintiff has offered no evidence at all connecting the plaintiff to any product of the defendant. The plaintiff counters that the defendant's argument fails because it has not proven that no genuine issues of material fact exist as to whether the plaintiff was injured by its asbestos containing products and its products that required asbestos for their proper intended use. In reply, the defendant raises for the first time the argument that it has proven that the plaintiff was never exposed to asbestos from a product that it sold, manufactured, or supplied.

As to the defendant's initial argument, the defendant has not met its evidentiary burden as the party moving for summary judgment. "On a motion by the defendant for summary **[*5]** judgment the burden is on [the] defendant to negate each claim as framed by the complaint . . . [I]t is only [o]nce [the] defendant's burden in establishing his entitlement to summary judgment is met [that] the burden shifts to [the] plaintiff to show that a genuine issue of fact exists justifying a trial." (Emphasis omitted; internal quotation marks omitted.) *Rickel v. Komaromi, 144 Conn.App. 775, 780, 73 A.3d 851 (2013)*. Here, the defendant did not provide any

evidence along with its motion and memorandum in support to negate the plaintiff's claims. Thus, the defendant's motion for summary judgment is denied with respect to the first ground.

The court will now address the defendant's subsequent contention that the court should enter summary judgment in the defendant's favor on the ground that it has proven that the plaintiff was never exposed to asbestos from a product that it manufactured, sold, or supplied. *General Statutes §52-572n(a)* provides that "[a] product liability claim as provided in *sections 52-240a, 52-240b, 52-572m to 52-572q*, inclusive, and 52-577a may be asserted and shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product."[1] Accordingly, the statute provides an exclusive remedy only for "claims against product **[*6]** sellers." (Internal quotation marks omitted.) *Burkert v. Petrol Plus of Naugatuck, Inc., 216 Conn. 65, 73, 579 A.2d 26 (1990)*. *Section 52-572m(a)* defines "product seller" as "any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption. The term . . . also includes lessors or bailors of products who are engaged in the business of leasing or bailment of products." Because the state legislature adopted this language verbatim from the *Draft Uniform Product Liability Law, 44 Fed. Reg. 2996, 2997-98* (proposed January 12, 1979) (draft law), Connecticut courts have looked to its commentary for guidance. See, e.g., *Truglio v. Hayes Construction Co., 66 Conn.App. 681, 684-85, 785 A.2d 1153 (2001)*. The draft law's commentary provides that a "product seller" "includes all parties in the regular commercial distribution chain" and "does not include the occasional private seller." *Draft Uniform Product Liability Law, 44 Fed. Reg. 2996, 3003*. The draft law suggests "that a party is considered a product seller where a sale of a product is a principal

---

[1] *Section 52-572m(b)* defines "product liability claim" as including "all claims or actions brought for personal injury, death or property damage caused by **[*7]** the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product. 'Product liability claim' shall include, but is not limited to, all actions based on the following theories: Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent."

part of the transaction and where the essence of the relationship between the buyer and seller is *not* the furnishing of professional skill or services." (Emphasis in original.) *Id.*

"Whether [a] defendant is a 'product seller' is a question of law for the court to decide." (Internal quotation marks omitted.) *Svege v. Mercedes-Benz Credit Corp, 329 F.Sup.2d 272, 278 (D.Conn. 2004)*. Nevertheless, questions of fact may arise "where the answers are predicates for making the legal determination of 'product seller' status. For example, a jury might be called upon to resolve a factual dispute regarding the extent of a defendant's participation in moving a product through the stream of commerce, an inquiry that is critical to resolution of an entity's status as a product seller." *Id., 279 n.8*.

In *Burkert v. Petrol Plus of Naugatuck, Inc., supra, 216 Conn. 72*, the Connecticut Supreme Court concluded, as a matter of law, that General Motors Corporation (GM) was not a product seller under the Product Liability **[*8]** Act, *General Statutes §§52-572m* through q. According to the court, "GM was not the manufacturer, wholesaler, distributor, retailer, lessor or bailor of the defective transmission fluid [at issue], and was not otherwise 'engaged in the business of selling' the product" as "GM did no more than allow others to use its Dexron II trademark in the production, marketing and distribution of transmission fluid." *Id.*

By contrast, in *Svege v. Mercedes-Benz Credit Corp., supra, 329 F.Sup.2d 280*, the United States District Court for the District of Connecticut concluded that Mercedes-Benz Credit Corporation (MBCC) was a product seller within the meaning of *§52-572m(a)* "as a result of MBCC's significant participation and involvement in the stream of commerce that brought the Truck [at issue] and thousands like it on an annual basis into the hands of end users." The District Court summarized the basis for its determination by stating that "MBCC's critical role in developing a program to finance inventory to dealer showrooms, to promote dealer sales of Freightliner trucks to end users through programs like the Success Program, to finance trucks at retail for buyers, as well as its taking title owner and lessor status of all trucks for which it provides retail financing before the lessee is permitted **[*9]** to use the truck . . . lead the Court to conclude that MBCC's role in putting Freightliner trucks into the stream of commerce is sufficiently developed and pervasive to justify concluding MBCC is a 'product seller' for purposes of the [Product Liability Act]." *Id., 281*.

In the present case, the defendant submitted a signed and sworn affidavit of Richard M. Salzmann to support its claim that the plaintiff was never exposed to asbestos from any product that the defendant sold, manufactured, or supplied; i.e., that the defendant was not a "product seller" of the asbestos containing products that allegedly caused the plaintiff's injuries. It appears the affidavit is meant to address the plaintiff's only reference to the defendant in his deposition testimony, where the plaintiff recalls working on a "DeLaval" centrifuge or separator.

In the affidavit, Salzmann states that he is a former employee of the defendant, which includes the defendant's predecessor, DeLaval Steam Turbine Company, and the defendant's successor, Demag DeLaval Turbomachinery, and that he worked in the engineering department during his entire employment from 1962 to 1998. Salzmann also notes that he held positions of increasing **[*10]** responsibility, including junior research engineer, chief project engineer, and manager of technical operations. Salzmann attests that, "[b]ased on my forty-five plus years as an employee of . . . [the defendant] . . . and as a technical consultant, I am familiar with [the defendant's] corporate history and the products manufactured, distributed, sold, and supplied by [the defendant] since its founding as DeLaval Steam Turbine Company in 1901; including products sold to the United States Navy, contractors of the United States Navy, and various commercial entities." The next three paragraphs of the affidavit state that the defendant "has never mined raw asbestos fibers," "has never manufactured asbestos-containing parts like gaskets, packing, or thermal insulation," and "has never manufactured purifiers" or "separators." Salzmann additionally states that "DeLaval" purifiers and separators were manufactured by the DeLaval Separator Company, now known as Alfa Laval, Inc., which is "an entirely separate and different entity" from the defendant.[2]

Although Salzmann's affidavit addresses the question of whether the defendant ever manufactured the DeLaval separators identified by the plaintiff at his deposition, it does not address whether the defendant was otherwise involved with the DeLaval Separator Company (or any one of the many defendants in this lawsuit) in placing

---

[2] Salzmann additionally states in his affidavit that the defendant has "never made milk production products" and that those products "and other farm equipment, **[*11]** were manufactured by entirely separate and different entities, DeLaval International AB and/or the DeLaval Separator Company . . . now known as Alfa Laval, Inc."

the separator (or other alleged asbestos containing products) into the stream of commerce. In other words, despite his extensive familiarity with the defendant's business practices, Salzmann's affidavit fails to negate the plaintiff's claim that he was exposed to asbestos fibers and materials *otherwise placed into the stream of commerce* by the defendants. And as seen from *Svege*, an entity does not have to manufacture the product at issue in order to qualify as a product seller under the Product Liability Act. Thus, because the defendant has failed to demonstrate the absence of a genuine issue of material fact with respect to the defendant's status as a product seller under the Product Liability Act, the **[*12]** defendant's motion for summary judgment must be denied.

CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is denied.

BELLIS, J.

---

**End of Document**

Katherine Morrin

 Neutral
As of: November 19, 2018 4:45 PM Z

## *Acquarulo v. A.O. Smith Corp.*

Superior Court of Connecticut, Judicial District of Fairfield At Bridgeport

December 30, 2011, Decided; December 30, 2011, Filed

CV095024498S

**Reporter**
2011 Conn. Super. LEXIS 3313 *

Gail S. Acquarulo, Executrix of the Estate of Hannibal Saldibar and Eleanor Saldibar et al. v. A.O. Smith Corp. et al.

**Notice:** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**Prior History:** *Saldibar v. A.O. Smith Corp., 2011 Conn. Super. LEXIS 1033 (Conn. Super. Ct., Apr. 28, 2011)*

## Core Terms

manufacturer, product liability, summary judgment, seller, trademark, products, marketed, patents, summary judgment motion, asbestos, Tile, elevator, licensed, mortar, matter of law, asbestos-containing, plaintiffs', adhesive, licensor, genuine issue of material fact, ceramic tile, Technologies, memorandum, dry-set

## Case Summary

### Overview

Plaintiffs filed suit under, inter alia, the Connecticut Products Liability Act, *Conn. Gen. Stat. § 52-572m et seq.*, alleging that their decedent was exposed to asbestos-containing products during his employment. In resolving a trade association's summary judgment motion, the court found that plaintiffs presented evidence to show that disputed factual issues existed as to whether the association retained sufficient control, actual distribution, and marketing or manufacture of its patented product to fall within the ambit of the Act as a manufacturer under *§ 52-572m(e)*.

### Outcome
Motion denied.

## LexisNexis® Headnotes

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN1*[ ] **Summary Judgment, Evidentiary Considerations**

*Conn. Gen. Prac. Book, R. Super. Ct. § 17-49* provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that a moving party is entitled to judgment as a matter of law. The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. Only evidence that would be admissible at trial may be used to support or oppose a motion for summary judgment.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Katherine Morrin

2011 Conn. Super. LEXIS 3313, *3313

*HN2*[⬇] **Burdens of Proof, Movant Persuasion & Proof**

In seeking summary judgment, it is a movant who has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

*HN3*[⬇] **Burdens of Proof, Movant Persuasion & Proof**

Where a defendant has moved for summary judgment, the burden is on that defendant to negate each claim as framed by the complaint. It necessarily follows that it is only once the defendant's burden in establishing its entitlement to summary judgment is met that the burden shifts to the plaintiff to demonstrate the existence of a genuine issue of fact that would justify a trial.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Torts > Products Liability > General Overview

*HN4*[⬇] **Jury Trials, Province of Court & Jury**

While the issue of whether a defendant is a "product seller" under the Connecticut Products Liability Act,

*Conn. Gen. Stat. § 52-572m et seq.*, is determinable as a question of law, there may be questions of fact underlying such a legal determination.

Torts > Products Liability > Types of Defects > Manufacturing Defects

*HN5*[⬇] **Types of Defects, Manufacturing Defects**

The Connecticut Products Liability Act, *Conn. Gen. Stat. § 52-572m et seq.*, defines "manufacturer" as including a product seller or entity not otherwise a manufacturer that holds itself out as a manufacturer. *§ 52-572m(e)*.

**Judges:** [*1] Barbara N. Bellis, J.

**Opinion by:** Barbara N. Bellis

# Opinion

MEMORANDUM OF DECISION RE MOTION FOR SUMMARY JUDGMENT (Motion 194.00)

FACTS

On April 29, 2009, the plaintiffs, Gail S. Acquarulo, executrix of the estate of Hannibal Saldibar, and Eleanor Saldibar, surviving spouse of Hannibal Saldibar, filed their original complaint, and, on August 4, 2010, they filed a sixth amended complaint in four counts against various defendants. The complaint arises from Hannibal Saldibar's alleged exposure to asbestos-containing products while employed as a petty officer in the Navy from 1943 to 1946, and as a tile setter from 1946 to 1979.

The plaintiffs allege a violation of the Connecticut Products Liability Act, *General Statutes §52-572m et seq.*, and a violation of Connecticut's wrongful death statute, *General Statutes §52-555*. In addition, they allege that the defendants' conduct was grossly negligent, wilful, wanton, malicious and/or outrageous because, since 1929, the defendants allegedly possessed medical and scientific data studies and reports indicating that asbestos-containing products were hazardous. Despite the existence of this information, the defendants allegedly failed to acknowledge or publish this information. [*2] Finally, the plaintiff's allege a loss of consortium on behalf of Eleanor Saldibar.

One of the defendants, Tile Council of North America

(Tile Council), filed a summary judgment motion on January 19, 2010, on the basis that, as a trade association, it does not fall within the definition of a product seller for purposes of Connecticut's Products Liability Act, i.e., a product manufacturer, wholesaler, distributor or retailer. On June 10, 2011, the plaintiffs filed a memorandum in opposition to the defendant's motion for summary judgment, arguing that the Connecticut Products Liability Act includes an entity not otherwise a manufacturer that holds itself out to be a manufacturer and that Tile Council held itself out to be a manufacturer. On August 18, 2011, the defendant filed a reply brief to the plaintiffs' opposition to the defendant's summary judgment motion, reiterating that it never held itself out as a manufacturer.[1]

DISCUSSION

HN1[ ] "*Practice Book §17-49* provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Brooks v. Sweeney, 299 Conn. 196, 210, 9 A.3d 347 (2010)*. "The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Id*. "Only evidence that would be admissible at trial may be used to support or oppose a motion for summary judgment." (Internal quotation marks omitted.) *Great Country Bank v. Pastore, 241 Conn. 423, 436, 696 A.2d 1254 (1997)*.

HN2[ ] "In seeking summary judgment, it is the movant who has the burden **[*4]** of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment

as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue." (Internal quotation marks omitted.) *Ramirez v. Health Net of the Northeast, Inc., 285 Conn. 1, 10-11, 938 A.2d 576 (2008)*.

HN3[ ] Here, the defendant has moved for summary judgment, accordingly, "the burden is on [that] defendant to negate each claim as framed by the complaint . . . It necessarily **[*5]** follows that it is only [o]nce [the] defendant's burden in establishing [its] entitlement to summary judgment is met [that] the burden shifts to [the] plaintiff" to demonstrate the existence of a genuine issue of fact that would justify a trial. *Gianetti v. United Healthcare, 99 Conn.App. 136, 141, 912 A.2d 1093 (2007)*.

The defendant argues that it is a trade association, dedicated to the promotion of ceramic tile use, and that it never processed, made, distributed, sold, shipped, or re-branded any asbestos-containing products. The defendant contends that, although it had obtained technology patents concerning characteristics of ceramic tile adhesives, and developed formulas by which the adhesive characteristics could be met, it did not formulate any products or have any control over the ingredients utilized by manufacturers.

The plaintiff's counter that, under the Connecticut Products Liability Act, a "product seller" includes an entity that, although not otherwise a manufacturer, holds itself out as a manufacturer. Here, the plaintiffs observe, the defendant held a patent on a product, dry-set mortar, and held itself out as a manufacturer in various ways and controlled how this product **[*6]** was manufactured, marketed and sold. The plaintiffs explain that the defendant licensed the manufacture and sale of asbestos-containing dry-set mortars to certain suppliers and retained tight control over the formulation, manufacture, packaging, marketing and research of its asbestos-containing products.

To prevail on its summary judgment motion, the defendant must establish that no issue of material fact

---

[1] Based upon the ground raised by the defendant the court will treat this summary judgment as a motion against count one, only. In addition, on February 1, 2010, the defendant filed a supplemental motion for summary judgment (#203), which appears to be identical in all **[*3]** respects to its original motion for summary judgment. The defendant referenced motion for summary judgment #194 during oral argument on October 3, 2011. The plaintiff's filed a supplemental memorandum in opposition on June 21, 2011, for the purpose of providing the court with copies of deposition testimonies.

exists concerning whether the defendant comes within the sphere of Connecticut's product liability statute. In support of its summary judgment motion, the defendant has attached an excerpt from the plaintiffs' interrogatories and requests for production to its memorandum in support of its motion. In response to a query requesting a description of the defendant's involvement "in the sale, formulation, manufacture and/or distribution of asbestos and/or asbestos containing products," the defendant responded that "[Tile Council] is a trade association dedicated to the promotion of the use of ceramic tile. It does not process, make, distribute, sell, ship or re-brand any asbestos-containing products. It has obtained patents on technology for achieving specified results with respect to the **[*7]** characteristics of ceramic tile adhesives. These patents were licensed to various adhesive manufacturers. [Tile Council] developed formulas by which the adhesive characteristics could be met. However [Tile Council] did not formulate any actual products or have any control over the ingredients used by manufacturers. Individual manufacturers determined what ingredients would be used in their products." The defendant's response to the plaintiffs' interrogatories appears to remove it from the realm governed by the Connecticut Products Liability Act. Accordingly, the defendant has met its burden on its motion for summary judgment.

Both parties rely upon the case of *Burkert v. Petrol Plus of Naugatuck, Inc., 216 Conn. 65, 579 A.2d 26 (1990)*, to support their respective positions. That case involved an indemnification action brought by the distributor of an allegedly defective product against the licensor of the trademark under which the defective product was marketed. The trademark owner/licensor, GM, did not participate in the production, marketing or distribution of the product. Although the third-party plaintiff had not pleaded the Connecticut Products Liability Act, the trial court instructed **[*8]** the jury to determine whether GM was a product seller under the act. The jury found in favor of GM on all counts. On appeal, the third-party plaintiff argued that the trial court should not have sent the issue of whether GM was a "product seller" under the Products Liability Act to the jury, rather, the jury should have been instructed as a matter of law that GM was liable under the statute. GM also argued that this issue should not have been treated as a question of fact for the jury to decide, but that, as a "mere trademark licensor, it did not fit within the statutory definition of a product seller." *Id., 72*. The Connecticut Supreme Court agreed that, as a matter of law, GM was not a product seller under the statute.

*HN4*[↑] While *Burkert v. Petrol Plus of Naugatuck, Inc., supra, 216 Conn. 65*, instructs that the issue of whether a defendant is a "product seller" is determinable as a question of law, this court recognizes that there may be questions of fact underlying such a legal determination. Therefore, in the context of this summary judgment, the burden now shifts to the plaintiffs to establish whether any such issues of fact exist concerning whether the defendant is considered a "product **[*9]** seller" within the meaning of the product liability statute.

The plaintiffs here argue that the defendant has failed to establish the nonexistence of all genuine issues of material fact. They observe that the defendant held a patent on a product—dry-set mortar. They emphasize that the defendant held itself out as a manufacturer and controlled how the product was manufactured, marketed and sold. The plaintiffs' cite to *Burkert v. Petrol Plus of Naugatuck, Inc., supra, 216 Conn. 65*, to support their position.

When setting forth the facts of the case, the court in *Burkert* emphasized the unusually limited role played by GM, the trademark licensor, in operating its licensing program. The court explained that GM exercised no control over the formulations of its automatic transmission fluids used by its licensees, GM was unaware of the composition of its various licensees' formulations, and, significantly, it received "no royalties or other financial benefits from the licensing program." *Burkert v. Petrol Plus of Naugatuck, Inc., supra, 216 Conn. 68*. Further, GM, after granting a license, had little supervision over the production and distribution of the product, and it "did not require its **[*10]** licensees to submit samples or test data to determine whether the transmission fluid being marketed . . . met GM's performance specifications . . ." *Id., 68, 69*. In addition, GM "did not undertake to warn buyers of potential problems with the product." *Id., 69*. Ultimately, the court agreed that GM, "was not, as a matter of law, a product seller under the [Connecticut] Products Liability Act . . ." *Id., 72*.

In the present case, the evidence submitted includes the following evidence. Dr. Herman B. Wagner, the defendant's director of chemical research, invented a product—a dry-set mortar. Dry-set mortar is a gap-filling adhesive used to install ceramic tile, and the rights to this product were assigned to the defendant. The plaintiffs' evidence, consisting of various exhibits and deposition testimony, establishes that the present defendant's involvement with its patented product was more extensive than that evidenced by GM, the

trademark licensor in the *Burkert* case. For example, the plaintiff's offered the deposition testimony of Robert Wayne Broos, a corporate representative of H.B. Fuller, for the proposition that the defendant "had developed a market for these products, based upon **[\*11]** their formulas, based on their trademarks and hallmark, if you will, of an assurance that if you buy products that contained this logo, you can be sure that it did work."

In supervising its patented product, the defendant set forth detailed specifications governing all aspects involving its product, including the percentage of asbestos to be used and directing the use of a designated grade of "Canadian Chrysotile Asbestos Fibre" to be purchased from a particular supplier. Broos, the corporate representative referenced above also testified that the defendant was "very specific about following their recipes, and they also had an in-house requirement of testing on a periodic basis the batches of material produced by each licensee to make sure that the batches fell within the parameters of their patents and requirements." Packaging and labeling also fell within the purview of the defendant, and each bag displayed the defendant's trademark number. Further, the product was marketed with the defendant's name prominently displayed on a "new triangular trademark, and articles were published, featuring the defendant, that targeted the flooring industry. Licensing fees were also involved in relation **[\*12]** to the defendant's product. Yet another point of departure with *Burkert v. Petrol Plus of Naugatuck, Inc., supra, 216 Conn. 69*, and the present case is that the defendant here appears to have undertaken the issuance of warnings concerning its product. In a memorandum dated October 21, 1976, the defendant recognized "[t]he possibility of exposure of persons mixing [Tile Council] licensed Dry-Set mortars . . . to higher levels of airborne asbestos fibre than are considered permissible by OSHA . . ." As a result, the defendant recommended that "all bags of mortar containing asbestos should be labeled: "DANGER CANCER HAZARD CONTAINS ASBESTOS FIBERS AVOID CREATING DUST."[2]

*HN5*[↑]] The Connecticut Products Liability Act defines "manufacturer" as including a "product seller or *entity not otherwise a manufacturer that holds itself out as a manufacturer*." (Emphasis added.) *General Statutes §52-572m(e)*.[3] The court finds that the plaintiffs have

presented evidence to demonstrate that there exist disputed factual issues as to whether this defendant retained sufficient control, actual distribution, **[\*13]** and marketing or manufacture of its patented product to fall within the ambit of the product liability statute. Accordingly, for the reasons set forth above, the defendant's motion for summary judgment is denied.

By the Court,

---

opposition to its summary judgment motion, the defendant invokes the case of *Iragorri v. United Technologies Corp., 285 F.Sup.2d 230 (D.Conn. 2003)*, vacated on other grounds, *314 F.Sup.2d 111 (D.Conn. 2004)*. It cites this case for the proposition that a parent company cannot be held liable as a product seller under the Connecticut Products Liability Act, regardless of the amount of control the parent exercised over its patents and trademarks when that parent did not manufacture, distribute or market the product.

In *Iragorri v. United Technologies, Corp., supra, 285 F.Sup.2d 230*, an individual died after falling down an empty elevator shaft in Cali, Columbia. The decedent's surviving spouse, in several capacities, sued United Technologies Corporation and Otis Elevator under various theories, including the Connecticut Products Liability Act.

The defendants moved for summary judgment, in part, on the basis **[\*14]** that Otis was not a "product seller" under the statute. In that case, however, the court, Arterton, J., emphasized that the "plaintiffs have presented *no evidence* to support their contention that Otis [the parent/trademark licensor] placed the elevator in the stream of commerce, or to counter defendants' evidence that the elevator in question was manufactured by Otis Brazil (Otis' Brazilian subsidiary), with additional components manufactured either by OTESA (installed the elevator involved in the incident), or elsewhere locally in Columbia . . ." (Emphasis added.) *Id., 236*.

Finding the plaintiffs' argument that Otis was a product seller unpersuasive the court explained that "without more, the fact that the Otis trademark was on the elevator in question is not sufficient to turn Otis into a seller of the product." *Id., 237*. Comparing the facts of *Iragorri* to the facts in *Burkert v. Petrol Plus of Naugatuck, supra, 216 Conn. 65*, the court, in the *Iragorri* case, concluded that "[l]ikewise, here, [p]laintiffs offer no additional evidence that Otis was engaged in the actual manufacture, distribution, or marketing of the elevators," or that the agreements "gave Otis a role in such matters." **[\*15]** *Id., 237*.

In the present case, the plaintiffs have offered sufficient evidence to establish genuine issues of material fact. There exist issues of fact concerning the defendant's control, distribution, marketing, and other aspects indicative of this defendant otherwise holding itself out as a manufacturer within the purview of the Products Liability Act.

---

[2] The plaintiffs maintain that the defendant was aware of the dangers of asbestos exposure as early as 1966.

[3] In a reply brief, dated August 18, 2011 (#324) to the plaintiffs'

Katherine Morrin

2011 Conn. Super. LEXIS 3313, *15

Bellis, J.

---

**End of Document**



Cited
As of: November 19, 2018 4:48 PM Z

## *Oliva v. Bristol-Myers Squibb Co.*

United States District Court for the District of Connecticut

December 15, 2005, Decided

CIVIL ACTION NO. 3-05-cv-00486 (JCH)

**Reporter**
2005 U.S. Dist. LEXIS 35881 *; 2005 WL 3455121

DANIEL OLIVA, Plaintiff, v. BRISTOL-MYERS SQUIBB COMPANY and ROBERT NORMANDIA, M.D., Defendants.

## Core Terms

seller, warn, courts, product liability, manufacture, products, no possibility, fraudulent joinder, user, pleadings, consumer, sales representative, unreasonable danger, intermediary, removal, stream of commerce, interpreting, involvement, convincing, fraudulent, diversity, marketing, prescribe, construe, reasons, sells

## Case Summary

### Procedural Posture

Plaintiff consumer sued defendants, a pharmaceutical company and a salesman, under the Connecticut Product Liability Act (CPLA), *Conn. Gen. Stat, § 52-572n et seq.*, alleging that he suffered severe injuries from a certain drug. Defendants removed the action to federal court. The consumer sought remand based on the lack of complete diversity. Defendants contested the motion, alleging fraudulent joinder.

### Overview

The drug was manufactured, sold, and distributed by the company. The salesman visited doctors' offices on behalf of the company to promote the drug. He made numerous sales and marketing calls to the consumer's treating physician, who prescribed it. The consumer and the salesman were Connecticut residents, while the company was a Delaware corporation with its principal place of business in New York. The consumer argued that remand was proper due to lack of complete diversity. Defendants countered that the salesman's residence did not preclude removal as he was fraudulently joined. The court remanded the case.

Complete diversity was destroyed because defendants failed to show that there was no possibility that the consumer could state a cause of action against the salesman in state court. In particular, the salesman's actions could have made him a product seller under the CPLA. His deliberate and successful efforts to promote the drug showed significant involvement in the stream of commerce that brought the product to the consumer. Based on his extensive knowledge of the drug, the salesman could have averted the consumer's injury by warning the treating physician of its dangers.

### Outcome

The court granted the consumer's motion and remanded the case to the Connecticut state court.

## LexisNexis® Headnotes

Civil Procedure > ... > Removal > Postremoval Remands > Motions for Remand

**HN1**[ ] **Postremoval Remands, Motions for Remand**

The party opposing a motion to remand bears the burden of showing that the requirements for removal have been met.

Civil Procedure > Preliminary Considerations > Removal > General Overview

**HN2**[ ] **Preliminary Considerations, Removal**

Federal courts construe the removal statute, *28 U.S.C.S. § 1441*, narrowly, resolving any doubts against removability.

Katherine Morrin

Civil Procedure > ... > Diversity
Jurisdiction > Citizenship > General Overview

## HN3[⬇] Diversity Jurisdiction, Citizenship

Federal courts have diversity jurisdiction over an action
only where all plaintiffs are citizens of different states
from all defendants.

Civil Procedure > ... > Removal > Procedural
Matters > Fraudulent Joinder

Evidence > Burdens of Proof > Clear & Convincing
Proof

## HN4[⬇] Procedural Matters, Fraudulent Joinder

Plaintiffs may not, in an effort to defeat federal
jurisdiction, join non-diverse defendants against whom
they have no real claims. The doctrine of "fraudulent
joinder" is meant to prevent this tactic. To show that a
"fraudulent joinder" has occurred, defendants must do
more than show that plaintiff has failed to state a claim
upon which relief can be granted. They must
demonstrate, by clear and convincing evidence, either
that there has been outright fraud committed in the
plaintiff's pleadings, or that there is no possibility, based
on the pleadings, that a plaintiff can state a cause of
action against the non-diverse defendant in state court.
With respect to the latter ground, joinder will be
considered fraudulent when it is established that there
can be no recovery against defendants under the law of
the state on the cause alleged.    Defendant seeking
removal bears a heavy burden of proving fraudulent
joiner, and all factual and legal issues must be resolved
in favor of the plaintiff.

Civil Procedure > ... > Removal > Procedural
Matters > Fraudulent Joinder

## HN5[⬇] Procedural Matters, Fraudulent Joinder

In conducting a fraudulent joinder inquiry, courts can
look beyond the pleadings to determine if the pleadings
can state a cause of action.

Torts > Products Liability > General Overview

## HN6[⬇] Torts, Products Liability

The Connecticut Product Liability Act created a statutory
cause of action for product liability claims. It
encompasses all previous common law actions against
product sellers, including actions of negligence, strict
liability, and warranty, for harm caused by a product.
*Conn. Gen. Stat. § 52-572n et seq.*

Civil Procedure > Trials > Jury Trials > Province of
Court & Jury

Torts > Products Liability > General Overview

## HN7[⬇] Jury Trials, Province of Court & Jury

To be liable under the Connecticut Product Liability Act,
*Conn. Gen. Stat. § 52-572n et seq.*, a defendant must
be a "product seller." Whether a defendant is a "product
seller" is a question of law.

Torts > Products Liability > General Overview

## HN8[⬇] Torts, Products Liability

The Connecticut Product Liability Act, *Conn. Gen. Stat.
§ 52-572n et seq.*, defines "product seller" as any
person or entity, including a manufacturer, wholesaler,
distributor or retailer who is engaged in the business of
selling such products whether the sale is for resale or
for use or consumption. The term "product seller" also
includes lessors or bailors of products who are engaged
in the business of leasing or bailment of products. This
definition includes all parties in the regular commercial
distribution chain. A party be considered a product seller
where a sale of a product is a principal part of the
transaction and where the essence of the relationship
between the buyer and seller is not the furnishing of
professional skill or services.

Torts > Products Liability > General Overview

## HN9[⬇] Torts, Products Liability

Factors in determining whether a sales representative or
"detail man" for a pharmaceutical company is a product
seller for Connecticut Product Liability Act, *Conn. Gen.
Stat. § 52-572n et seq.*, purposes include whether
defendant derived substantial economic benefit from its

Katherine Morrin

activity, whether it took title to the product in the process of distribution, and the extent of its knowledge of and control over the product. Engaging in an active advertising campaign to promote sales of a product is a factor that indicates significant involvement in bringing a product to market. This standard is satisfied where a defendant has significant participation and involvement in the stream of commerce that brought products into the hands of end users.

Torts > Products Liability > General Overview

*HN10*[⬇] **Torts, Products Liability**

The United States District Court for the District of Connecticut reads the "product seller" definition as encompassing those in the best position to protect consumers.

Torts > Products Liability > General Overview

*HN11*[⬇] **Torts, Products Liability**

The Connecticut Product Liability Act defines "product liability claim" to include all claims for personal injury, death, or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product. *Conn. Gen. Stat. §§ 52-572m(b)* and 52572n(a).  Courts construe this language broadly.

Torts > Products Liability > Types of Defects > Marketing & Warning Defects

*HN12*[⬇] **Types of Defects, Marketing & Warning Defects**

In Connecticut, a product may be defective because a manufacturer or seller failed to warn of the product's unreasonably dangerous propensities. Under such circumstances, the failure to warn, by itself, constitutes a defect. Such claims may be brought on theories of strict liability in tort; negligence; breach of warranty; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent. *Conn. Gen. Stat. § 52-572m.*

**Counsel:** [*1] For Daniel Oliva, Plaintiff: Patrick J. Filan, Pacifico & Filan, Westport, CT.

For Bristol-Myers Squibb Co, Robert Normandia, M.D., Defendants: Elizabeth K. Andrews, Tyler, Cooper & Alcorn - NH, New Haven, CT; William H. Champlin, III, Tyler Cooper & Alcorn, Hartford, CT.

**Judges:** Janet C. Hall, United States District Judge.

**Opinion by:** Janet C. Hall

# Opinion

**RULING ON PLAINTIFF'S MOTION TO REMAND [Dkt. No. 14]**

## I. INTRODUCTION

The present case originated as a state court action by plaintiff Daniel Oliva ("Oliva") against defendants Bristol-Myers Squibb Company ("BMS") and Robert Normandia, M.D. ("Normandia") (collectively, "defendants"). Oliva sued both defendants pursuant to the Connecticut Product Liability Act ("CPLA"), *Conn. Gen. Stat. § 52-572n, et. seq.* The defendants removed the action to federal court pursuant to the federal removal statute, *28 U.S.C. § 1446*. All parties appear to agree that both Oliva and Normandia are Connecticut residents, while BMS is a Delaware corporation with its principal place of business in New York. They also appear to agree that if Normandia is a proper defendant in this [*2] action, complete diversity would not exist, and remand would be proper. However, the defendants argue that Normandia was joined fraudulently and that his Connecticut residency therefore does not preclude removal.

## II. STANDARDS OF REVIEW

*HN1*[⬆] The party opposing a motion to remand bears the burden of showing that the requirements for removal have been met. *California Public Employees' Retirement Sys. v. WorldCom, Inc., 368 F.3d 86, 100 (2d Cir. 2004)* (citing *Grimo v. Blue Cross/Blue Shield of Vermont, 34 F.3d 148, 151 (2d Cir.1994))*; 14C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3739 (3d ed. 1998) (collecting cases). "In light of the congressional intent to restrict federal court jurisdiction, as well as the importance of

preserving the independence of state governments,*HN2*[⬆] federal courts construe the removal statute [1] narrowly, resolving any doubts against removability." *Lupo v. Human Affairs Intern., Inc., 28 F.3d 269, 274 (2d Cir. 1994)* (citing *Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108, 61 S. Ct. 868, 85 L. Ed. 1214 (1941)*; 1A J. Moore & B. Ringle, *Moore's* **[*3]** *Federal Practice* P0.157, at 38 (2d ed. 1989)).

As a general rule, *HN3*[⬆] federal courts have diversity jurisdiction over an action only where all plaintiffs are citizens of different states from all defendants. *Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L. Ed. 435 (1806)*; *Pampillonia v. RJR Nabisco, Inc., 138 F.3d 459, 461 (2d Cir. 1998)*; 13B Wright & Miller, *Federal Practice and Procedure* § 3605; *see 28 U.S.C. § 1332*; *Lincoln Property Co. v. Roche, 126 S. Ct. 606, 163 L. Ed. 2d 415, 2005 WL 3158018, at *3 (2005)* ("Defendants may remove an action on the basis of diversity of citizenship if there is complete diversity between all named plaintiffs and all named defendants, and no defendant is a citizen of the forum State."). However, *HN4*[⬆] plaintiffs may not, in an effort to defeat federal jurisdiction, join non-diverse defendants against whom they have no real claims. The doctrine of "fraudulent joinder" **[*4]** is meant to prevent this tactic. *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296, 302 (2d Cir. 2004)*. To show that a "fraudulent joinder" has occurred, the defendants must do more than show that the plaintiff has failed to state a claim upon which relief can be granted. *Stan Winston Creatures, Inc. v. Toys "R" Us, Inc., 314 F. Supp. 2d 177 (S.D.N.Y. 2003)* (citing *Pampillonia, 138 F.3d at 461*). Rather, they must "demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the plaintiff's pleadings, or that there is no possibility, based on the pleadings, that a plaintiff can state a cause of action against the non-diverse defendant in state court." *Pampillonia, 138 F.3d at 461*; *see Briarpatch, 373 F.3d at 302*; *Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 207 (2d Cir. 2001)*. With respect to the latter ground, which is the ground on which defendants rest their argument, "joinder will be considered fraudulent when it is established that there can be no recovery against the defendants under the law of the state on the cause alleged. **[*5]** " *Whitaker, 261 F.3d 196, 207* (internal citation and original brackets omitted). "The defendant seeking removal bears a heavy burden of proving fraudulent joiner, and all factual and legal issues must be resolved in favor of the

plaintiff." *Pampillonia, 138 F.3d at 461*.

Citing *In Re Rezulin Prods. Liability Litig., 133 F. Supp. 2d 272 (S.D.N.Y. 2001)*, defendants argue that the phrase "no possibility" "cannot be taken literally and the standard is more accurately described as requiring a showing that there is 'no reasonable basis' for predicting liability on the claims alleged." Defs.' Mem. Opp. Plfs.' Mot. Remand at 3 [Dkt. No. 16]. Oliva, for his part, argues that courts in this district construe the "no possibility" standard more strictly. He cites *Deming v. Nationwide Mutual Ins. Co., 2004 U.S. Dist. LEXIS 2396, No. Civ.A. 3:03CV1225 (CFD), 2004 WL 332741 (D. Conn. Feb. 14, 2004)* and *Wise v. Lincoln Logs, Ltd., 889 F. Supp. 549 (D.Conn. 1995)*. However, these cases do not apply the "no possibility" language in a truly literal fashion. *Deming* held that, "'in a fraudulent joinder inquiry, federal courts are not to weigh **[*6]** the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law.'" *2004 U.S. Dist. LEXIS 2396, 2004 WL 332741, at *4* (quoting *Pacheco De Perez v. AT&T Co., 139 F.3d 1368, 1380 (11th Cir. 1998))*. *Wise*, decided prior to *Pampillonia*, actually applied a "reasonable basis" standard similar to the one the defendants urge upon the court. *Wise* held that the "'stringent test' for fraudulent joinder requires that if there is *any reasonable basis* for predicting that the controlling substantive law *might* grant the plaintiff the relief he seeks against the non-diverse defendant, the court will not disregard him as a nominal defendant and the case must be remanded." *889 F. Supp. at 552* (quoting *Metropolitan Prop. & Cas. Ins. Co. v. J.C. Penney Cas. Ins. Co., 780 F. Supp. 885, 887 (D. Conn. 1991)* (emphasis in original)). The court does recognize that various district courts in this circuit have interpreted the *Pampillonia* language in slightly varying ways. *See In re Consolidated Fen-Phen Cases, 2003 U.S. Dist. LEXIS 20231, 2003 WL 22682440, at *3 (E.D.N.Y. Nov. 12, 2003)* (citing *Rezulin Products, 133 F. Supp. 2d 272*; *Arseneault v. Congoleum Corp., 2002 U.S. Dist. LEXIS 5084, No. 01 Civ. 10657, 2002 WL 472256, **[*7]** at *5 n. 4 (S.D.N.Y. Mar. 26, 2002)* (disagreeing with *Rezulin Products* interpretation and applying a more literal "no possibility" standard); *Stan Winston Creatures, Inc. v. Toys "R" US, Inc., 314 F. Supp. 2d 177, 2003 WL 1907978, at *4 (S.D.N.Y. 2003)* ("legally impossible" standard); *Nemazee v. Premier, Inc., 232 F. Supp. 2d 172, 178 (S.D.N.Y. 2002)* ("Any possibility of recovery, even if slim, militates against a finding of fraudulent joinder; only where there is 'no possibility' of recovery is such a finding warranted.") (citation omitted)). However, the court finds that it need not choose among these interpretations for the purposes of the present motion.

---

[1] *28 U.S.C. § 1441*.

For the reasons set forth in the Discussion below, the court finds no fraudulent joinder in the present case, even if it interprets the *Pampillonia* "no possibility" standard as "no reasonable basis" for predicting liability. Moreover, Pampillonia's requirement that the party opposing remand prove this standard "by clear and convincing evidence" means that even that standard is a high one.

**HN5[**↑**]** In conducting a fraudulent joinder inquiry, "courts can look beyond the pleadings to determine **[\*8]** if the pleadings can state a cause of action." *Consolidated Fen-Phen Cases, 2003 U.S. Dist. LEXIS 20231, 2003 WL 22682440, at \*3* (citing *Arseneault v. Congoleum, 2002 U.S. Dist. LEXIS 5084, No. 01 Civ.10657(LMM), 2002 WL 472256, at \*6 (Mar. 26, 2002)* (holding that, in deciding whether fraudulent joinder had occurred, the court would look outside the pleadings to depositions and other evidence, because the Second Circuit has held that district courts can do so in deciding jurisdictional issues) (quoting *United Food & Commercial Workers Union, Local 919, AFL-CIO v. Centermark Props. Meriden Square, Inc., 30 F.3d 298, 305 (2d Cir.1994)*); *Pampillonia, 138 F.3d at 461-62* (considering affidavit to determine whether defendant was fraudulently joined); *In re Rezulin Prods. Liability Litig., 133 F. Supp. 2d 272, 281-82 (S.D.N.Y. 2001)* (same)). Thus, the court will consider exhibits submitted by the parties, including Normandia's Affidavit, Defs.' Mem. Opp. Mot. Remand, Ex. D [Dkt. No. 16].

## III. FACTS

Oliva alleges that he suffered severe injuries as a result of his use of the drug Tequin, which was manufactured, sold, and distributed by BMS. Tequin was allegedly **[\*9]** "in a defective condition unreasonably dangerous to consumers or users such as the plaintiff." Compl. P11. Oliva's Complaint asserts that Normandia, a medical doctor, "was engaged" by BMS "to visit or detail physicians' offices, hospitals, and other health care facilities to promote Tequin and to encourage physicians and other health care providers to prescribe, recommend, or utilize Tequin for patients." Compl. P3, 7. It further alleges that Normandia "made numerous sales and marketing calls on the plaintiff's treating physician, Dr. Nelson Chao" ["Dr. Chao"] and that, during those calls, Normandia "bought lunch for the entire office and made a sales and marketing presentation concerning the alleged value of Tequin in treating various infections." *Id.* at P8. These sales and marketing calls allegedly caused Oliva's physician to

prescribe Tequin to him. *Id.* at P9. The Complaint alleges that Normandia violated *Connecticut General Statutes § 52-572m, et. seq.* (CPLA) in numerous respects, several of which involve failures to provide adequate warnings to Oliva, health care providers, or the public regarding the inherent dangers and proper use of **[\*10]** Tequin.

Normandia has submitted an affidavit in opposition to the motion to remand. He states that he was employed by BMS from December 1999 through June/July 2003 as a "detail person" and that he never worked as an independent contractor for BMS. He states that his "job responsibilities included visiting physicians in order to provide them with information about Tequin," that he provided solely information supplied by BMS, and that he promoted the drug only "in accordance with BMS policy." He disavows any role in the "design, production, manufacture, testing or labeling" of Tequin. He states that he "never sold, took, or processed orders" of the drug, played no role in its purchase by physicians or consumers, and financed no purchases thereof. He also asserts that he lacked any ownership interest in drugs sold by BMS and that he "never acted as a distributor or retailer for the product."

## IV. DISCUSSION OF CPLA CLAIM

**HN6[**↑**]** The CPLA created a statutory cause of action for product liability claims. It encompasses all previous common law actions against "product sellers, including actions of negligence, strict liability, and warranty, for harm caused by a product." *Conn.Gen.Stat. § 52-572n* **[\*11]** ; *see Densberger v. United Technologies Corp., 297 F.3d 66, 70 (2d Cir. 2002)* (holding that the CPLA incorporates all Connecticut common law causes of action for product liability unless they are expressly inconsistent with the statute; James H. Rotondo & Paul D. Williams, *Connecticut Product Liability Law* 1 (1998) (internal citations omitted).

## A. Could Normandia's actions make him a "product seller"?

**HN7[**↑**]** To be liable under the CPLA, a defendant must be a "product seller." "Whether a defendant is a 'product seller' is a question of law." *Stanko v. Bader, 2003 Conn. Super. LEXIS 2779, No. CV030193669, 2003 WL 22413476, at \*2 (Conn.Super. Oct. 7, 2003)* (citing *Burkert v. Petrol Plus of Naugatuck, Inc., 216 Conn. 65, 72, 579 A.2d 26 (1990))*. **HN8[**↑**]** The CPLA defines "product seller" as:

any person or entity, including a manufacturer,

wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption. The term "product seller" also includes lessors or bailors of products who are engaged in the business of leasing or bailment of products.

The CPLA was modeled on the **[*12]** United States Department of Commerce's Draft Uniform Product Liability Law ("Draft Act"), *44 Fed. Reg. 2996-3019 (1979)*, *see Svege v. Mercedes-Benz Credit Corp., 329 F. Supp. 2d 272, 279 n.6 (D.Conn. 2004)* (citing *Elliot v. Sears, Roebuck & Co., 229 Conn. 500, 511-12, 642 A.2d 709 (1994)*; *Vitanza v. Upjohn Co., 257 Conn. 365, 386-88, 778 A.2d 829 (2001)*; *Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 230-31, 694 A.2d 1319 (Conn. 1997))*. Therefore, the Connecticut Supreme Court has looked to the commentary from that draft for guidance in applying CPLA sections similar to sections of the Draft Act. *Vitanza, 257 Conn. at 387*. The CPLA product seller definition is identical to section 102(1) of the Draft Act. The commentary to the Draft Act states that this definition "includes all parties in the regular commercial distribution chain." 44 Fed. Reg. 3003. It also suggests "that a party be considered a product seller where a sale of a product is a principal part of the transaction and where the essence of the relationship between the buyer and seller is not the furnishing **[*13]** of professional skill or services." *Id.* (emphasis omitted), *quoted in Truglio v. Hayes Construction Co., 66 Conn.App. 681, 685, 785 A.2d 1153 (2001)*; *Silva v. Walgreens Eastern Co., 2005 Conn. Super. LEXIS 3010, No. CV044001615S, 2005 WL 3163860 (Conn. Super. Oct. 24, 2005)*; *Stanko, 2003 Conn. Super. LEXIS 2779, 2003 WL 22413476*. [2]

**[*14]** Connecticut courts have not addressed whether a sales representative or "detail man" for a

pharmaceutical company is a product seller for CPLA purposes. [3] In discussing the contours of the product seller definition, however, the Connecticut Supreme Court has examined a defendant's "involvement in the stream of commerce." *Burkert, 216 Conn. at 72* (holding that a company that licensed a product manufactured, marketed, and sold by others was not a product seller). Though the analysis that the Supreme Court undertook was very fact-specific, several factors appeared significant to the court's decision. *HN9*[⬆] These include whether the defendant derived substantial economic benefit from its activity, whether it took title to the product in the process of distribution, and the extent of its knowledge of and control over the product. *Id. at 68-69*; *see also Svege, 329 F. Supp. at 279-80* (summarizing *Burkert* and discussing the first two factors above). In the context of discussing the lack of financial benefit flowing to the defendant from the licensing program, the *Burkert* Court also noted that the defendant had not established the licensing **[*15]** program as a way to market its own brand. *Burkert, 216 Conn. at 68*; *see Svege, 329 F. Supp. at 279-80* (holding that, under *Burkert*, "engaging in an active advertising campaign to promote sales of the product" is a factor that indicates significant involvement in bringing a product to market). Judge Kravitz of this District found *Burkert*'s standard satisfied where a defendant had "significant participation and involvement in the stream of commerce that brought [products] . . . into the hands of end users." [4] *Svege, 329 F. Supp. at 280* (holding that a finance lessor was a product seller).

**[*16]** In interpreting and applying the product seller definition, the court also bears in mind the Connecticut Appellate Court's observation that a "principal purpose of the product liability statute is to protect people from harm caused by defective and hazardous products," and that courts should construe the statute with this purpose in mind. *Rodia v. Tesco Corp., 11 Conn.App. 391, 396, 527 A.2d 721 (1987)* (construing broadly the types of conduct enumerated in the CPLA). Following this directive, *HN10*[⬆] the court reads the "product seller" definition as encompassing those in the best position to

---

[2] Both *Silva* and *Stanko* relied on the latter statement to hold that a pharmacist who fills a prescription incorrectly is a product seller. *See Silva, 2005 Conn. Super. LEXIS 3010, 2005 WL 3163860* (holding that a pharmacist who filled a prescription with the wrong drug was a product seller, because the drug was a product and the learned intermediary doctrine did not apply); *Stanko, 2003 Conn. Super. LEXIS 2779, 2003 WL 22413476* (reaching the same holding, because "the principal part of the transaction was the sale of medication"). *But see Altieri v. CVS Pharmacy, Inc., 2002 Conn. Super. LEXIS 4041, 2002 WL 31898323 (Conn. Super. Dec. 13, 2002)* (holding, in a factually similar case, that a pharmacy was performing a service rather than selling a product) (not citing the Draft Act and relying on a California decision).

[3] The commentary to the Draft Act does not address this issue either. *See* 44 Fed. Reg. 3003.

[4] As the defendants correctly point out, *Svege* involved a defendant who financed leases of a product, a role quite different from that attributed to Normandia. However, the court nevertheless finds it relevant to examine the factors Judge Kravitz considered significant in determining that such a defendant was a product seller.

protect consumers. *See also Durove v. Fabian Transport Inc., 2004 U.S. Dist. LEXIS 25258, No. 04 Civ. 7000(RJH), 2004 WL 2912891, at * 6 (S.D.N.Y. Dec. 14, 2004)* (stating that courts interpreting the law of other jurisdictions have construed product seller definitions broadly in the context of strict products liability and holding that a pharmaceutical representative was a product seller under New York common law) (internal citations omitted).

Resolving all factual and legal ambiguities in Oliva's favor, the court cannot find that the defendant has met its burden of showing "no possibility" of **[*17]** liability on the part of Normandia. While Normandia's involvement may have been less substantial than that of the defendant in *Svege*, it appears more substantial than that of the defendant in *Burkert*. Even if Normandia did not hold title to or ownership interest in the product, and did not carry out the sales himself, the pleadings and affidavit are not inconsistent with a claim that he derived substantial economic benefit from his activities in promoting the product. [5] Moreover, although he does not appear to have had control over the design or manufacture of the product or the design of marketing materials, he is alleged to have extensive knowledge of the product and to have convinced Dr. Chao to prescribe Tequin to Oliva. A court could find that Normandia's allegedly deliberate and successful efforts to promote the sale of Tequin rendered the sale "a principal part of the transaction" between Normandia and Dr. Chao, 44 Fed. Reg. 3003, and that they show significant involvement in the stream of commerce that brought the product to the end user. Moreover, it could reasonably find that Normandia, who had extensive knowledge of Tequin and allegedly convinced Dr. **[*18]** Chao to prescribe the drug to Oliva, was particularly well placed to avert the injury to Oliva, by warning Dr. Chao of Tequin's dangers and instructing him on proper use.

In addition to their argument that Novadia's activities were not in the nature of those of a product seller, the defendants also suggest that he cannot be held individually liable for his activities because he provided information about Tequin only as an agent for BMS, and not in his individual capacity. Oliva argues that whether Normandia was an employee or an independent contractor "is a factual and legal ambiguity that must be resolved in favor of the plaintiff" on the present motion. Normandia's Affidavit states that he was an employee

and has never been an independent contractor for BMS, whereas Oliva's Complaint alleges that Normandia was "engaged by BMS." Although the court finds some ambiguity in whether Oliva's Complaint **[*19]** was truly asserting that Normandia was other than an employee, "all factual and legal issues must be resolved in favor of the plaintiff." *Pampillonia, 138 F.3d at 461.* Thus, the court cannot find at this stage that Normandia was necessarily an employee.

Moreover, Normandia could be held individually liable for his own actions even if he were an employee, and even if he performed the allegedly tortious acts as an agent for BMS. Where "an agent . . . commits or participates in the commission of a tort, whether or not he acts on behalf of his principal . . ., he is liable to third persons injured thereby." *Scribner v. O'Brien, 169 Conn. 389, 404, 363 A.2d 160 (Conn. 1975)* (discussing a negligence action); *see Maturo v. Gerard, 196 Conn. 584, 588, 494 A.2d 1199* (applying *Scribner* rule in negligent misrepresentation case); *Avitabile v. Criscuolo, 1994 Conn. Super. LEXIS 2688, No. CV94-0357059, 1994 WL 597373 (Conn. Super. Oct. 24, 1994)* (citing *Scribner* and holding that one defendant in a negligence action could be held liable for actions he performed on behalf of a codefendant ); *Keeney v. Adams, 1992 Conn. Super. LEXIS 2496, 1992 WL 209652 (Conn.Super. Aug. 25, 1992)* **[*20]** (holding that *Scribner* rule applied to strict liability action). Thus, whether or not Normandia was an employee is not dispositive to this ruling.

The court pauses briefly to note its reasons for rejecting the reasoning in several decisions, cited by defendants, that held that sales representatives were not sellers under the law of other states. In *In re Rezulin Prods. Litig., 133 F. Supp. 2d 272 (S.D.N.Y. 2001)*, the court interpreted the word "seller" as used in the Mississippi Uniform Commercial Code ("UCC"), *Miss. Code Ann. § 75-2-314*. The Mississippi UCC defines this term more narrowly than the CPLA and governs contracts rather than products liability torts, and defendants cite no authority suggesting that the Mississippi UCC definition is interpreted similarly to the CPLA's. [6] **[*22]** *DaCosta v.*

---

[5] For example, the evidence could show that Normandia's compensation was tied to his success in promoting Tequin.

[6] The Mississippi UCC defines "seller" as "a person who sells or contracts to sell goods." *Id.* at *§ 75-2-103*. This definition would not necessarily be construed as broadly as the CPLA definition, because the UCC is not intended primarily to protect people from defective and hazardous products. *Cf. Rodia v. Tesco Corp.,11 Conn.App. 391, 396, 527 A.2d 721 (1987)* (holding that the CPLA's definition of "product liability claim"

*Novartis AG, 2002 U.S. Dist. LEXIS 21313, No. CV 01-800-BR, 2002 WL 31957424 (D.Or. Mar. 1, 2002)* did interpret a product liability statute, *O.R.S. § 30.920*, [7] and looked for guidance to the *Restatement (Second) of Torts section 402A*, [8] **[*23]** but the Oregon statute differs somewhat from the CPLA. [9] **[*21]** Moreover, the *Dacosta* court reasoned that a detail man could not be a product seller because he was "merely an employee" of a drug company, and that he lacked ownership or control over the drugs. As discussed above, *supra at 8-12*, neither of these reasons is necessarily dispositive under Connecticut law. Finally, in *In re Diet Drugs Prod. Liability Litig., 2004 U.S. Dist. LEXIS 12239, 2004 WL 1824357 (E.D. Pa. 2004)*, the court construed

---

must be construed broadly, "to reach all conduct which affects the safety of a product prior to its entry into the stream of commerce," in light of the purpose of the statute "to protect people from harm caused by defective and hazardous products.")

[7] The Oregon statute states that:

One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition . . . ,

*O.R.S. § 30.920*, but does not otherwise define product seller.

[8] Connecticut courts have cited this section of the Restatement in interpreting some provisions of the CPLA and the common law actions it encompasses, though they have not addressed the specific question of whether the Restatement's "seller" definition applies to the CPLA. *See, e.g., Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 214-16, 694 A.2d 1319 (Conn. 1997)* (rejecting a proposed rule in the Draft Restatement (Third) of Torts that would require a showing of reasonable alternative design to prove a product was unreasonably dangerous, but following the traditional rule from the *Restatement (Second) section 402A)*, *cited in Vitanza v. Upjohn Co., 48 F. Supp. 2d 124 (D.Conn. 1999)*; *Giglio v. Connecticut Light & Power Co., 180 Conn. 230, 235-36, 429 A.2d 486 (Conn. 1980)* (liability for failure to warn), *quoted in LaMontagne v. E.I. Du Pont De Nemours & Co., Inc., 41 F.3d 846, 859 (2d Cir. 1994)*.

[9] The Oregon statute states that:

One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition . . . ,

*O.R.S. § 30.920*, but does not otherwise define product seller.

Mississippi common law. Its holding that a sales representative was not a "seller" relied solely on one decision from the Southern District of Mississippi, which held that a store's manager was not a seller because he was an employee, and therefore agent, of the company that owned the store. *2004 U.S. Dist. LEXIS 12239, [WL] at *8* (citing *McCurtis v. Dolgencorp, Inc., 968 F.Supp. 1158, 1160-61 (S.D.Miss. 1997)*. For the reasons discussed above, the court declines to import this reasoning to its analysis of the CPLA.

Considering that Connecticut courts have never addressed the question of whether a pharmaceutical "detail man" may be a product seller under the CPLA, and that a number of the factors Connecticut courts have identified as relevant to the product seller inquiry weigh in favor of an affirmative conclusion, this court finds a reasonable basis for predicting that Normandia could be found to be a product seller.

**B. Could Normandia's conduct fall within the CPLA's definition of "product liability claim"?**

*HN11*[⬆] The CPLA defines "product liability claim" to include all claims for "personal injury, death, or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, **[*24]** testing, warnings, instructions, marketing, packaging or labeling of any product." *Conn.Gen.Stat. § 52-572m(b)*; *see id.* at *§ 52-572n (a)*. [10] Courts construe this language broadly. *Rodia v. Tesco Corp.,11 Conn.App. 391, 396, 527 A.2d 721 (1987)*.

A principal purpose of the product liability statute is to protect people from harm caused by defective and hazardous products. In order to meet this purpose, it is necessary that the statute be read to reach all conduct which affects the safety of a product prior to its entry into the stream of commerce. The terms enumerated in General Statutes *§ 52-572m(b)* are simply generic

---

[10] Such claims may be brought on theories of "strict liability in tort; negligence; breach of warranty; . . . breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent" *Id.* at *§ 52-572m*; *see* James H. Rotondo & Paul D. Williams, *Connecticut Product Liability Law* 1 (1998) (citing *Gajewski v. Pavelo, 36 Conn. App. 601, 611, 652 A.2d 509 (1994)*, *aff'd*, *236 Conn. 27, 670 A.2d 318 (1996)*; *Lynn v. Haybuster Mfg., Inc., 226 Conn. 282, 292, 627 A.2d 1288 (1993)* (summarizing the CPLA's legislative history)).

categories of conduct which must be read broadly and in relationship to one another in order to accomplish the purposes of the statute.

*Id.* A reasonable possibility exists that Normandia could be liable for a failure to warn Dr. Chao or his patients of the dangers posed by Tequin.*HN12*[↑] In Connecticut, a "product may be defective because a manufacturer or seller failed to warn of the product's unreasonably dangerous propensities." *Vitanza v. Upjohn Co., 257 Conn. 365, 378, 778 A.2d 829 (2001)* **[*25]** (quoting *Tomer v. Am. Home Prods. Corp., 170 Conn. 681, 689, 368 A.2d 35 (1976)*) (internal quotation marks omitted); *Ames v. Sears, Roebuck & Co., 8 Conn.App. 642, 645, 514 A.2d 352 (1986)* (quoting *Tomer*) (internal quotation marks and additional internal citations omitted). "Under such circumstances, the failure to warn, by itself, constitutes a defect." *Ames, 8 Conn.App. at 645*. Thus, if Normandia was a product seller, his alleged failure to adequately warn Dr. Chao or his patients about unreasonably dangerous propensities of Tequin could subject him to liability under the CPLA.

**[*26]** The defendants argue that, "pursuant to the learned intermediary doctrine, any duty to warn a physician about the dangers of a drug is placed upon the manufacturer and not its sales representatives." This characterization of the learned intermediary doctrine is unsupported by the caselaw. This doctrine is an affirmative defense that relieves drug manufacturers of a duty to directly warn the ultimate users of their product where the manufacturers have adequately warned the prescribing physicians, or learned intermediaries. *Vitanza v. Upjohn Co., 257 Conn. 365, 778 A.2d 829 (Conn. 2001)*. Thus, even if the learned intermediate doctrine were found to apply to Normandia, it would only shield him from liability for failing to warn Oliva directly if he established that he had adequately warned Dr. Chao about the dangers of the drug. [11] This fact is not clearly

established by the pleadings or other facts before the court.

**[*27]** The defendants raise no other arguments in support of a finding of fraudulent joinder. They have failed to carry their burden of demonstrating, "by clear and convincing evidence, . . . that there is no possibility" that Oliva "can state a cause of action against the non-diverse defendant in state court." Normandia will remain a defendant in this case. Thus, diversity is destroyed, and the case must be remanded to state court.

## IV. CONCLUSION

For the foregoing reasons, Oliva's Motion to Remand **[Dkt. No. 14]** is hereby **GRANTED**, and the instant case is **REMANDED** to the Connecticut state court.

## SO ORDERED.

Dated at Bridgeport, Connecticut this 15th day of December, 2005.

Janet C. Hall

United States District Judge

---

**End of Document**

---

[11] In support of their argument regarding the learned intermediary doctrine, the defendants note that the Eastern District of Pennsylvania has held that sales representatives, as employees of a drug company, do not assume individual liability merely by participating in their employer's failure to provide adequate information. *In re Diet Drugs Prods. Liability Litig., Civil Action No. 03-20376, 2004 U.S. Dist. LEXIS 12239, at *8-*9 (June 18, 2004)*. Even if this court were to agree with

---

defendants that the Eastern District of Pennsylvania's holding in this respect properly rested on the learned intermediary doctrine, which it does not, that opinion interpreted Mississippi common law. The defendants cite no authority suggesting that sales representatives are exempted from the duty to warn under the CPLA.

 Neutral

As of: November 19, 2018 5:52 PM Z

## *Pitterman v. General Motors LLC*

United States District Court for the District of Connecticut

April 17, 2018, Decided; April 18, 2018, Filed

CIVIL ACTION NO. 3:14-CV-00967 (JCH)

**Reporter**

2018 U.S. Dist. LEXIS 89587 *

BERNARD PITTERMAN, et al., Plaintiffs, v. GENERAL MOTORS LLC, Defendant.

**Prior History:** *Pitterman v. GM LLC, 2016 U.S. Dist. LEXIS 57165 (D. Conn., Apr. 29, 2016)*

## Core Terms

warning, post-sale, seller, expert testimony, plaintiffs', matter of law, failure to warn, manufacturer, time of sale, argues, cases, duty to warn, manual, brake, Certify, factors, transmission, entity, standard of care, summary judgment, shifting, incidents, Accessory, products, strict liability, instructions, questions, injuries, retrofit, vehicles

**Counsel:** **[*1]** For Bernard Pitterman, Administrator of the Estate of Margaret Rose O'Connor, Bernard Pitterman, Guardian of the Estate of Grant O'Connor, Rose O'Connor, James O'Connor, Plaintiffs: Robert B. Adelman, LEAD ATTORNEY, Joram Hirsch, Adelman, Hirsch & Newman, Bridgeport, CT USA; Joseph Krevolin, Adelman, Hirsch & Connors, LLP, Bridgeport, CT USA.

For General Motors Llc, Defendant: Kent B. Hanson, LEAD ATTORNEY, Hanson Bolkcom Law Group, Ltd., Minneapolis, MN USA; Mark J. Claflin, LEAD ATTORNEY, Howd & Ludorf, LLC, Hartford, CT USA; Paul E.D. Darsow, LEAD ATTORNEY, PRO HAC VICE, Hanson Marek Bolkcom & Greene Ltd, Minneapolis, MN USA; Stephanie A. Douglas, LEAD ATTORNEY, PRO HAC VICE, Bush Seyferth & Paige, PLLC, Troy, MI USA.

**Judges:** Janet C. Hall, United States District Judge.

**Opinion by:** Janet C. Hall

## Opinion

### TABLE OF CONTENTS

Go to table1

**RULING RE: DEFENDANT'S RENEWED MOTION [*2] FOR JUDGMENT AS A MATTER OF LAW AFTER TRIAL (DOC. NO. 307)**

### I. INTRODUCTION

The plaintiffs, Bernard Pitterman, as administrator of the Estate of Margaret Rose O'Connor ("M.O.") and as guardian of the Estate of Grant O'Connor ("G.O."), and Rose O'Connor sued the defendant General Motors LLC ("New GM") under the *Connecticut Product Liability Act ("CPLA")*. See Amended Complaint ("Am. Compl.") (Doc. No. 239). The case proceeded to a jury trial and, on July 19, 2017, the jury entered a verdict against New GM in favor of the plaintiffs. See Jury Verdict (Doc. No. 296-1 ) at 7-8. On August 23, 2017, New GM filed a Renewed Motion for Judgment as a Matter of Law After Trial, pursuant to *Federal Rule of Civil Procedure 50(b)*. See Renewed Motion for Judgment as a Matter of Law After Trial ("Renewed Mot. for JMOL") (Doc. No. 307).

For the reasons stated below, New GM's Renewed Motion for Judgment as a Matter of Law is **DENIED**.

### II. BACKGROUND

According to the plaintiffs' Amended Complaint, on July 13, 2011, M.O., then eight years old, climbed into her parents' 2004 Chevrolet Suburban, inserted the key into the ignition in the Accessory position, and pulled the shift lever from Park to Neutral. See Am. Compl. at ¶¶ 6-8. Once in Neutral, the **[*3]** Suburban rolled down a sloped yard and crashed into a tree, killing M.O. See id. at ¶¶ 8, 12. Her then-7-year-old brother, G.O., was present when this happened and witnessed the crash.

See id. at ¶ 29. The plaintiffs sued New GM for damages due to M.O.'s death, as well as G.O.'s and Rose O'Connor's mental and emotional distress. See id. at ¶¶ 9-14, 30-32.

The 2004 Suburban was designed, manufactured, and sold by General Motors Corporation ("Old GM"). See id. at ¶¶ 15-17. In June 2009, Old GM filed for bankruptcy, and New GM then purchased certain of Old GM's assets and liabilities, pursuant to the Sale Agreement. See *In re General Motors Corp., 407 B.R. 463, 473 (Bankr. S.D.N.Y. 2009)*. Under the Sale Agreement, New GM assumed certain liabilities of Old GM, including, inter alia, "all product liability claims arising from accidents or other discrete incidents arising from operation of GM vehicles occurring subsequent to the closing of the 363 Transaction [i.e. purchase of Old GM's assets by New GM], regardless of when the product was purchased." *Id. at 482*. The Bankruptcy Court held that, beyond liabilities specifically assumed by New GM in the Sale Agreement, New GM purchased Old GM's assets free and clear of successor liability claims. See *id. at 501*.

In the Amended Complaint **[*4]** against New GM, the plaintiffs asserted a number of claims, including, inter alia: (1) strict liability due to design defect at the time of the sale, (2) failure to warn at the time of the sale, (3) negligent design, (4) negligent post-sale failure to warn, and (5) negligent post-sale failure to recall or retrofit. See Am Compl. at ¶¶ 20-24, 26-28. The plaintiffs proceeded to trial against New GM on these claims on July 6, 2017. See Minute Entry (Doc. No. 262). The evidence at trial included, inter alia, the testimony or video deposition of Rose O'Connor; G.O; James O'Connor; William Sultze, system engineer for GM; David McKendry, former product engineer of GM; plaintiffs' expert Wayne McCracken; plaintiffs' expert Gary Crakes; plaintiffs' expert Detective Sergeant Michael O'Brien from the Brookfield Police Department; plaintiffs' expert psychiatrist Dr. Theodore Zanker; and defense expert Victor Hakim, Senior Manager/Consultant Engineer for GM. The court discusses the evidence presented at trial in more detail in the relevant sections of this Ruling.

After the plaintiffs rested, New GM moved for judgment as a matter of law on a number of different grounds. See Motion for Judgment as **[*5]** a Matter of Law on Plaintiffs' Negligent Design and Negligent Retrofit Theories ("Mot. for JMOL (Negligent Retrofit)") (Doc. No. 271); Motion for Judgment as a Matter of Law on Plaintiffs' Warning Theories for Lack of Evidence, Lack of Duty, Bankruptcy ("Mot. for JMOL (Lack of

Evidence)") (Doc. No. 274); Motion for Judgment as a Matter of Law on Plaintiffs' Warning Theories Based on Lack of Expert Testimony ("Mot. for JMOL (Lack of Expert)") (Doc. No. 275); Motion for Judgment as a Matter of Law on Plaintiffs' Strict Liability Claim ("Mot. for JMOL (Strict Liability)") (Doc. No. 276). The plaintiffs withdrew their negligent design claim, and the court granted New GM's Motion for Judgment as a Matter of Law as to the negligent post-sale failure to recall or retrofit claim. See Charge Conference Transcript 7/15/17 ("Charge Conf. Tr. 7/15/17") at 1452-58. The court denied or reserved on New GM's remaining Motions. The court addresses the specific grounds in greater detail in the relevant sections of the Ruling.

The plaintiffs therefore proceeded to the jury on three claims: strict liability design defect, failure to warn at the time of the sale, and negligent post-sale failure to warn. **[*6]** See Jury Charge (Doc. No. 292) at 28. The plaintiffs put forth two bases for the third claim of negligence: (1) that Old GM had negligently breached its post-sale duty to warn from December 12, 2007, to July 10, 2009, and that New GM was responsible for Old GM's liability; and (2) that New GM had negligently breached its post-sale duty to warn from July 10, 2009, to July 13, 2011. See id. The court refers to the second theory as the "Independent Claim" because it is based solely on the post-sale conduct of New GM, not on any conduct or knowledge attributed to Old GM. See *In re Motors Liquidation Co., 829 F.3d 135, 157 (2d Cir. 2016)*.

On July 19, 2017, a jury entered a verdict against New GM in an amount of $1,750,000 to Pitterman as administrator of the Estate of M.O., $750,000 to Pitterman as guardian of the Estate of G.O., and $375,000 to Rose O'Connor. See Jury Verdict at 7-8. On the plaintiffs' design defect claim, the jury found that New GM was not liable to the plaintiffs because the 2004 Suburban was not defectively designed. See id. at 2. On the plaintiffs' claim for failure to warn at the time of the sale, the jury found that "the 2004 Suburban was in a defective condition, because it failed to provide necessary and adequate warnings or instructions at the time **[*7]** of its initial sale." See id. at 3. However, the jury found that New GM was not liable on this claim because the plaintiffs had not proven that the failure to provide adequate warnings had caused their injuries. See id. Finally, on the plaintiffs' claim for negligent post-sale failure to warn, the jury found that New GM was liable to the plaintiffs under both theories. See id. at 4-5.

New GM then filed the Renewed Motion for Judgment

as a Matter of Law After Trial on August 23, 2017. See Renewed Mot. for JMOL. New GM also filed a Motion to Certify Questions to the Connecticut Supreme Court on October 11, 2017, requesting certification on two of the questions of law raised in its Renewed Motion for Judgment as a Matter of Law. See Motion to Certify Questions to the Connecticut Supreme Court ("Mot. to Certify") (Doc. No. 313). The court denied the Motion to Certify. See Amended Ruling Denying Mot. to Certify (Doc. No. 318).

The Renewed Motion for Judgment as a Matter of Law contained, inter alia, the arguments from the earlier Motions for Judgment as a Matter of Law on which the court had reserved judgment during the trial. Compare Memorandum in Support of Renewed Mot. for JMOL ("Mem. in Supp. (Renewed)") **[*8]** (Doc. No. 308); with Mot. for JMOL (Lack of Evidence); Mot. for JMOL (Lack of Expert). Absent objection from the parties, the court terminated the earlier Motions for Judgment as a Matter of Law as denied without prejudice to the arguments raised in those Motions, which were repeated in the Renewed Motion. See Notice (Doc. No. 319); Order (Doc. No. 320). This Ruling now addresses all of the arguments raised in the Renewed Motion, including those made in the earlier Motions for Judgment as a Matter of Law that were previously reserved by the court.

### III. LEGAL STANDARD

*Rule 50(b) of the Federal Rules of Civil Procedure* allows for the entry of judgment as a matter of law if a jury returns a verdict for which there is no legally sufficient evidentiary basis. See *Fed. R. Civ. P. 50(b)*. The standard under *Rule 50* is the same as that for summary judgment: a court may not grant a *Rule 50* motion unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *This Is Me, Inc. v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998)* (alterations in original) (internal quotation marks and citation omitted).

A movant's burden under *Rule 50* is "particularly heavy where, as here, the jury has **[*9]** deliberated in the case and has actually returned its verdict in favor of the non-movant." *Cash v. Cnty. of Erie, 654 F.3d 324, 333 (2d Cir. 2011)* (internal quotation marks omitted) (citing *Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005))*; see also *Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998)* ("A party seeking to overturn a verdict based on the sufficiency of the evidence bears a very heavy burden."). In such cases, "the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of the witnesses or consider the weight of the evidence." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998)* (citations omitted). In short, the court cannot "substitute its judgment for that of the jury." *LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir. 1995)* (citations omitted).

Rather, judgment as a matter of law may only be granted where "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." *Meloff v. N.Y. Life Ins. Co., 240 F.3d 138, 145 (2d Cir. 2001 )* (quoting *Galdieri-Ambrosini, 136 F.3d at 289*).

Moreover, "weakness of the evidence does not justify judgment as a matter of law; as in the case of a grant of summary judgment, the evidence must be such that 'a reasonable juror would have been compelled **[*10]** to accept the view of the moving party.'" *This Is Me, Inc., 157 F.3d at 142* (quoting *Piesco v. Koch, 12 F.3d 332, 343 (2d Cir. 1993))*. The court "must view the evidence in the light most favorable to the party in whose favor the verdict was rendered, giving that party the benefit of all reasonable inferences that the jury might have drawn in its favor." *Norton, 145 F.3d at 118*; see also *Mickle v. Morin, 297 F.3d 114, 120 (2d Cir. 2002)* (stating that the court must draw all reasonable inferences in favor of the non-moving party). Additionally, in making its determination, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Mickle v. Morin, 297 F.3d 114, 120 (2d Cir. 2002)* (quoting *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000))*. Accordingly, *Rule 50* motions "should be granted cautiously and sparingly." *Meloff, 240 F.3d at 145* (internal quotation marks and citation omitted).

### IV. DISCUSSION

New GM raises a number of arguments in its Renewed Motion for Judgment as a Matter of Law. The court

2018 U.S. Dist. LEXIS 89587, *10

addresses first those arguments that raise questions of law and then addresses those that challenge the sufficiency of the evidence.

First, New GM argues that it is entitled to judgment as a matter of law on the negligence claims for post-sale failure to warn because Connecticut does not recognize a post-sale duty to warn when there was an adequate warning at the time of the sale. See Mem. in Supp. (Renewed) at 27-30. **[*11]** Second, New GM argues that it is entitled to judgment as a matter of law on the Independent Claim for post-sale failure to warn because New GM is not a product seller under the CPLA. See id. at 36-39.

Third, New GM argues that the evidence was legally insufficient to support the plaintiffs' claims in a number of ways. Because of the large number of arguments raised as to the sufficiency of the evidence, the court describes these arguments in greater detail later after it addresses the legal questions of whether Connecticut recognizes a post-sale duty to warn and whether New GM is a product seller.

A. <u>Existence of a Post-Sale Duty to Warn</u>

New GM argues that Connecticut law does not impose a post-sale duty to warn if the product was not defective at the time of the sale. See id. at 27-30. It argues that the CPLA only requires product sellers to warn of risks that are foreseeable at the time of manufacture and does not require them to supplement warnings with information learned later. See id. at 27-28. It further contends that there was no common law duty to supplement warnings for a non-defective product, so no such duty was incorporated into the CPLA. See id. at 28-29. New GM argues that the 2004 Suburban was not defective at the time **[*12]** of the sale[1] and, therefore, that New GM was under no post-sale duty to warn.

The court previously addressed this argument at the pretrial conference on June 28, 2017. See Pretrial Conference Transcript 6/28/17 ("Pretrial Conf. Tr. 6/28/17") (Doc. No. 241) at 150-162. On June 14, 2017, the plaintiffs had filed a Motion to Amend the Complaint. See Motion to Amend Complaint (Doc. No. 219). New

---

[1] The court discusses later the sufficiency of the evidence for the jury's finding that the 2004 Suburban was defective in its warnings at the time of the sale. See, infra, at 51-58. Because the court holds that Connecticut law recognizes a post-sale duty to warn even when the warnings at the time of sale were adequate, the adequacy or inadequacy of the warning in the owner's manual does not affect the court's analysis here.

GM objected to two paragraphs in the Proposed Amended Complaint, which alleged that New GM had taken no steps to warn of defects or to recall or retrofit the Suburban after June 2009. See Memorandum in Opposition to Plaintiff's Motion to Amend Complaint ("Mem. in Opp. (Amend)") (Doc. No. 222); Am. Compl. at ¶¶ 27-28. The court understood these paragraphs as articulating a product liability claim against New GM based on a theory of post-sale failure to warn and failure to recall or retrofit.[2] See Pretrial Conf. Tr. 6/28/17 at 150. New GM argued, inter alia, that no such post-sale duties existed under the CPLA. See id. at 152. While the court recognized that no Connecticut Supreme Court case had held that such post-sale duties existed, it concluded, based on its interpretation of state law that, "if this **[*13]** question were before the Connecticut Supreme Court, they would conclude there was such a theory of liability under the Connecticut Product Liability Act." See id. at 162; see also id. at 158-162. The court therefore granted the Motion to Amend and permitted the claims to advance to the jury. See id.

After the jury found for the plaintiffs on their negligence claim for post-sale failure to warn, New GM moved to certify to the Connecticut Supreme Court the question of whether Connecticut imposes a post-sale duty to warn. See Mot. to Certify at 1. In that Motion, New GM argued that the law was unsettled because no Connecticut appellate court had recognized such a post-sale duty. See Memorandum in Support of Motion to Certify ("Mot. to Certify Mem.") (Doc. No. 313-1) at 6. The court denied the Motion to Certify, holding that it was bound by the Second Circuit's precedent in *Densberger v. United Technologies Corp., 297 F.3d 66 (2d Cir. 2002)*, and therefore that certification of the question was unnecessary. See Amended Ruling Denying Mot. to Certify at 8.

In <u>Densberger</u>, the plaintiffs sued the defendant United Technology Corporation ("UTC") under the CPLA for damages caused by a helicopter that had crashed. See *Densberger, 297 F.3d at 69*. The plaintiffs asserted three distinct theories of liability: **[*14]** strict liability, negligence, and breach of implied warranty of merchantability. See id.; see also *Densberger v. United Technologies Corp., 125 F. Supp. 2d 585, 589 (D. Conn. 2000)*. Under each theory, the plaintiffs asserted

---

[2] The court here is only concerned with the post-sale failure to warn claim because, as noted earlier, the court granted New GM's Motion for Judgment as a Matter of Law as to the plaintiffs' failure to recall or retrofit. See Charge Conf. Tr. 7/15/17 at 1452-58.

claims that UTC failed to calculate a proper center of gravity for the helicopter, failed to warn that the helicopter could become uncontrollable during foreseeable flight conditions, and manufactured and sold a helicopter that was not sufficiently crashworthy. See *Densberger, 125 F. Supp. 2d at 589*. The jury found "UTC liable in negligence for failing to warn the Army that the helicopter could become uncontrollable during foreseeable flight conditions [and] rejected all other grounds of liability, including those based on failure to warn under the strict liability or implied warranty theories." *Densberger 297 F.3d at 69*. UTC argued, and the Second Circuit agreed, that the jury "must have based its verdict solely on a violation of a duty to warn post-sale." Id. (emphasis in original).

On appeal, UTC argued that there was no negligence-based post-sale duty to warn in Connecticut common law and that, if there had been, it was now preempted by the CPLA. See *id. at 70*. The Second Circuit rejected this argument, holding that "the post-sale duty to warn exists in negligence, and is cognizable under the CPLA." *Id., at 71*. It **[*15]** reasoned that the CPLA incorporates common law theories of liability that are not expressly inconsistent with the statute and that the text of the CPLA was not inconsistent with the post-sale duty to warn under a negligence theory. See *id. at 70-71*.

In its Motion to Certify, New GM acknowledged that Densberger recognized a post-sale duty to warn, but argued that the Second Circuit had rendered an incorrect interpretation of state law. See Mot. to Certify Mem. at 5-6. New GM argued that Densberger mistakenly relied on two Connecticut Supreme Court cases that addressed a continuing rather than a post-sale duty to warn, that Densberger conflicts with the CPLA and Connecticut common law, and that Densberger is undermined by a subsequent Connecticut Supreme Court decision in *Bifolck v. Phillip Morris, Inc., 324 Conn. 402, 152 A.3d 1183(2016)*. See id. at 6-13.

This court, however, concluded that Second Circuit precedent on state law is binding on this court absent a contrary state statute or holding of the state's highest court. See Amended Ruling Denying Mot. to Certify at 8. Therefore, the court concluded that it was bound to follow Densberger, and it would be inappropriate to reevaluate the Second Circuit's determination of the law. See id. The court further concluded that **[*16]** Densberger was not contrary to the CPLA or to Bifolck. See id. at 9-12. To the extent that New GM again challenges the Second Circuit's conclusion in Densberger, the court adopts the analysis in its prior

Ruling and continues to consider itself bound to follow *Densberger*.[3]

New GM's argument in its Renewed Motion for Judgment as a Matter of Law now before the court, however, appears to differ from its argument in its Motion to Certify. While New GM argued in its Motion to Certify that Densberger "was decided incorrectly," New GM now argues that Densberger recognizes only a continuing duty to warn, not a post-sale duty, and therefore does not apply to this case. Compare Mot. to Certify Mem. at 5-6; with Mot. for JMOL (Lack of Evidence) at 12; Mem. in Supp. (Renewed) at 28-29. In its Motion for Judgment as a Matter of Law filed during trial, New GM cited Densberger in support of its argument that "Connecticut does not recognize a post-manufacture duty to warn." See Mot. for JMOL (Lack of Evidence) at 12. New GM stated, "Densberger recognized a continuing duty to warn, which by definition means that **[*17]** the duty existed at the time of manufacture." Id. (emphasis in original). Furthermore, in its Renewed Motion for Judgment as a Matter of Law, New GM distinguishes Densberger from this case because "the danger there was an alleged defect in the product." See Mem. in Supp. (Renewed) at 28-29.

—————————————————————

[3] In its Reply in Support of its Renewed Motion for Judgment as a Matter of Law, New GM reiterates its arguments that the court must follow Bifolck rather than Densberger and that a post-sale duty is contrary to the language of the CPLA. See Reply in Support of Renewed Mot. for JMOL ("Reply in Supp. (Renewed)") (Doc. No. 314) at 17-18. The court's Amended Ruling Denying Motion to Certify sufficiently addresses and rejects these arguments, so the court finds it unnecessary to repeat the analysis here. By way of summary, *Bifolck's* holding is not on point for the question currently before the court because Bifolck does not address whether a post-sale duty to warn exists. See Amended Ruling Denying Mot. to Certify at 9-10. While *Bifolck* contains language that undermines some of the reasoning employed in Densberger, that language is dicta and an insufficient basis for the court to disregard Second Circuit authority. See id. at 10-11. Additionally, Densberger interpreted the language of the CPLA discussing the duty to warn at the time of the manufacture and found that it did not preclude a post-sale duty to warn in negligence. See *Densberger, 297 F.3d at 71*. Densberger is not contrary to the statute, but rather a binding interpretation of the statute. See Amended Ruling Denying Mot. to Certify at 9.

Additionally, to the extent that New GM now points the courts to case law interpreting similar statutes in other states, see Mem. in Supp. (Renewed) at 27-28, the court notes that those interpretations are not binding on this court while the Second Circuit's interpretation of the CPLA in Densberger is.

Therefore, New GM argues that Densberger does not recognize a post-sale duty to warn for a product that was not defective at the time of the sale. See id.

The court disagrees with New GM's newly developed, proposed reading of Densberger. First, the court notes that New GM's current interpretation is inconsistent with its representations to this court in its other filings. For example, in support of its Motion to Certify, New GM stated of Densberger, "This court held, and the Second Circuit has affirmed, that Connecticut law imposes a post-sale duty to warn on product sellers." Mot. to Certify Mem. at 5; see also id. at 9 ("Densberger stands alone in recognizing an independent (rather than a continuing) duty to warn . . . ."). Additionally, in its Reply in Support of its Renewed Motion for Judgment as a Matter of Law, New GM states, "Densberger's determinations that... a plaintiff can sustain a negligence [*18] claim under the CPLA without proving a product defect are inconsistent with Bifolck." Reply in Support of Renewed Mot. for JMOL ("Reply in Supp. (Renewed)") (Doc. No. 314) at 17. These statements appear to indicate that New GM recognizes that Densberger held that a post-sale duty to warn exists, even when the product was not defective at the time of the sale.

Even excusing New GM's inconsistent positions, the court considers New GM's current proposed reading of Densberger to be incorrect. The Second Circuit in Densberger accepted UTC's argument that "the jury, by rejecting the plaintiffs' failure to warn claims under the strict liability and implied warranty theories, necessarily found that the warnings provided to the Army at the time of sale were adequate." Densberger, 297 F.3d at 69. The Second Circuit then reasoned, "in finding UTC liable for failure to warn under the negligence theory, therefore, the jury must have based its verdict solely on a violation of a duty to warn post-sale." Id. (emphasis in original).

New GM's attempt to distinguish Densberger is unsuccessful. New GM states that Densberger involved "an alleged defect in the product." Mem. in Supp. (Renewed) at 29. However, while the plaintiffs [*19] in Densberger did allege manufacturing, design, and failure to warn defects at the time of the sale, the jury found that the defendant in Densberger was not liable for such defects. See Densberger, 297 F.3d at 69 (noting that the jury rejected all grounds of liability except the negligent failure to warn). There is no indication in Densberger that the plaintiffs proved that

the product was defective at the time of the sale.[4] Nor does the Second Circuit in Densberger state or even imply that its holding is limited to products that are defective at the time of the sale.

Furthermore, even under New GM's reading of Densberger, New GM is not entitled to the relief it seeks. As discussed later, the court concludes that there was sufficient evidence to support the jury's findings that the warnings at the time of the sale were inadequate.[5] Therefore, even if Densberger only recognizes a post-sale duty to warn when the product was defective at the time of the sale, it would nonetheless recognize such a duty in this case.

In conclusion, the court reads Densberger as recognizing a post-sale duty to warn under Connecticut law, which is not limited to products that are defective at the time [*20] of the sale. Because the court considers itself bound by Densberger, New GM's Renewed Motion for Judgment as a Matter of Law on this ground is denied.

B. GM as Product Seller

New GM also argues that it is not a "product seller" within the definition of the CPLA because it is not a successor to Old GM, it did not manufacture or sell the 2004 Suburban at issue, and it had no special relationship with the plaintiffs. See Mem. in Supp. (Renewed) at 36-39; Reply in Supp. (Renewed) at 18-20. New GM argues therefore that it is entitled to judgment as a matter of law on the plaintiffs' Independent Claim for negligence based on New GM's post-sale conduct between July 10, 2009, and July 13, 2011. See id.

_____

[4] The opinions in Densberger do not indicate the basis for the finding of no liability. Therefore, the court is unable to determine whether the jury found no liability because there was no defect or for some other reason. To the extent that New GM infers from the fact that the "helicopter could become uncontrollable during foreseeable flight conditions" that the product was defective, such an inference goes beyond the information available in the Densberger opinions. See Densberger, 125 F. Supp. 2d at 589. The alleged design and manufacturing defects were the failure to calculate a proper lateral center of gravity envelope and the manufacture of a helicopter that was not sufficiently crashworthy. See id. The helicopter becoming uncontrollable does not necessarily indicate that either of these defects were present, nor that the product was defective in some other way.

[5] See, infra, at 51-58; Jury Verdict at 3.

The court first notes that, even if New GM were to prevail on this argument, it would not alter New GM's liability for damages. The jury found New GM liable to the plaintiffs on two different bases for negligence: (1) that Old GM had negligently breached its post-sale duty to warn from December 12, 2007, to July 10, 2009, and that New GM had assumed Old GM's liability in that regard; and (2) that New GM had negligently breached its post-sale duty to warn from July 10, 2009, to July 13, 2011. See **[*21]** Jury Verdict at 4-5. New GM does not dispute that Old GM was a product seller within the definition of the CPLA or that New GM assumed liability for failure to warn claims based on the conduct of Old GM. See Pretrial Conf. Tr. 6/28/17 at 117; Memorandum Opinion and Order Granting in Part New GM's Motion to Enforce Sale Order ("Bankr. Ruling June 2017") (Doc. No. 216-1) at 19. Therefore, New GM's argument does not challenge the first basis for liability in negligence. Because the plaintiffs only needed to prove a breach of duty under one of the two bases for negligence in order to prevail on their claim, see Jury Charge at 41, whether or not New GM is a product seller under the CPLA, it would still be liable to the plaintiffs for the same damages based on its assumption of liability for Old GM's negligence.[6] Nonetheless, the court addresses this argument below.

New GM first raised this argument in response to the plaintiffs' Motion to Amend the Complaint. See Mem. in Opp. (Amend) at 1-5. The Second Circuit had previously held that certain plaintiffs could bring "Independent Claims" against New GM.[7] See *In re Motors Liquidation Co., 829 F.3d 135, 157-58 (2d Cir. 2016)*. On June 7, 2017, the Bankruptcy Court held that such claims could be based "solely on New GM's post-closing wrongful **[*22]** conduct," not on "generalized knowledge of both Old GM and New GM."[8] Bankr. Ruling June

---

[6] For this reason, the court denied New GM's Motion to Certify Questions to the Connecticut Supreme Court on this issue. See Amended Ruling Denying Mot. to Certify at 14.

[7] The Second Circuit defined "Independent Claims" as "claims based on New GM's post-closing wrongful conduct." *In re Motors Liquidation Co., 829 F.3d at 157*. "These sorts of claims are based on New GM's post-petition conduct, and are not claims that are based on a right to payment that arose before the filing of the petition or that are based on pre-petition conduct." Id. (emphasis in original).

[8] For clarity of terms, the court uses "post-sale" to refer to the period of time after Old GM sold the 2004 Suburban at issue. The court uses the Bankruptcy Court's language of "post-closing" to refer to the period of time after Old GM filed

2017 at 22. The Bankruptcy Court left to this court to decide whether to permit the plaintiffs to amend their Complaint to "remove any allegations alleging independent claims based on Old GM's conduct." Id. The plaintiffs filed a Motion to Amend on June 14, 2017. See Motion to Amend.

As the court noted above, New GM challenged paragraphs 27 and 28 of the Proposed Amended Complaint, which alleged that New GM had taken no steps to warn of defects or to recall or retrofit the Suburban after June 2009. See Mem. in Opp. (Amend) at 1-2. In addition to the argument discussed above as to the existence of a post-sale duty to warn, New GM also argued that it could not be held liable under the CPLA for its own post-sale conduct because it was not a product seller. See id. at 1-5. Then, New GM raised many of the same arguments that it raises now in its Renewed Motion for Judgment as a Matter of Law. See id.

While the court acknowledged the difficulty of the question, it ruled that New MG was a product seller under the CPLA and therefore granted the plaintiffs' Motion to Amend the Complaint. See Pretrial Conf. Tr. **[*23]** 6/28/17 at 157. The court based its conclusion on a number of factors: (1) that New GM "bought significant portions of Old GM's assets"; (2) that New GM "manufactures and sells cars under the 'GM' or 'Chevrolet' name, including Suburbans"; and (3) that New GM "did assume certain obligations for vehicles manufactured by Old GM that were under warranty at the time of sale, including provision of spare parts and service for Old GM manufactured vehicles." Id. at 155. After considering New GM's Renewed Motion for Judgment as a Matter of Law, the court is not persuaded to alter its decision.

The CPLA states that a "product liability claim . . . may be asserted and shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product." *Conn. Gen. Stat. § 52-572n(a)* (2018). Therefore, an entity that is not a product seller is not subject to liability under the CPLA. See *Ullmar v. Robco Grp., Inc., No. 379465, 1992 Conn. Super. LEXIS 408, 1992 WL 38315, at *1 (Conn. Super. Ct. Feb. 18, 1992)* (citing *Burkert v. Petrol Plus of Naugatuck, Inc., 216 Conn. 65, 72-73, 579 A.2d 26 (1990))*. The CPLA defines a product seller as

---

bankruptcy and New GM purchased Old GM's assets and certain liabilities in 2009.

any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption. The term "product seller" also includes **[\*24]** lessors or bailors of products who are engaged in the business of leasing or bailment of products.

*Conn. Gen. Stat. § 52-572m(a)*. "Whether [a] defendant is a 'product seller' is a question of law for the court to decide." *Svege v. Mercedes-Benz Credit Corp., 329 F. Supp. 2d 272, 278 (D. Conn. 2004)* (quoting *Stanko v. Bader, No. CV-030193669, 2003 Conn. Super. LEXIS 2779, 2003 WL 22413476, at \*2 (Conn. Super. Ct. Oct. 7, 2003))*.

The parties agree that New GM did not manufacture or sell the 2004 Suburban. *See* Mem. in Supp. (Renewed) at 38; Mem. in Opp. (Renewed) at 30. Additionally, the Bankruptcy Court held that New GM is not a successor in interest to Old GM for purposes of successor liability. *See In re General Motors Corp., 407 B.R. 463, 500-01 (Bankr. S.D.N.Y. 2009)*. Therefore, the issue before the court is whether an entity, like New GM, that is not a manufacturer, seller, or successor can be a product seller under the CPLA. The court assesses, first, as a matter of statutory interpretation, whether the CPLA permits any entities beyond these three categories to be considered product sellers and then, if so, whether New GM is a product seller.

"The Connecticut Supreme Court has rarely discussed the contours and considerations applicable to the analysis of determining whether an entity fits within the statutory definition of 'product seller.'" *Svege, 329 F. Supp. 2d at 278*. The court, therefore, seeks to anticipate how the Connecticut Supreme Court would rule if this question were before it. "It is well **[\*25]** settled that in construing statutes, [the Connecticut Supreme Court's] fundamental objective is to ascertain and give effect to the apparent intent of the legislature." *Sylvan R. Shemitz Designs, Inc. v. Newark Corp., 291 Conn. 224, 231, 967 A.2d 1188 (2009)* (citation omitted). In doing so, the court concludes that the definition of product seller is not limited solely to manufacturers, sellers, and their successors.

Beginning with the text of the statute, the court notes that the CPLA introduces the list of "manufacturer, wholesaler, distributor or retailer" with the word "including." *See Conn. Gen. Stat. § 52-572m(a)*. The commentary to the Draft Uniform Product Liability Law, upon which the CPLA was based, also states that

product seller "includes all parties in the regular commercial distribution chain."[9] *See 44 Fed. Reg. 3003 (1979)*; *Svege, 329 F. Supp. 2d at 278 n.6*. The word "including" implies that the list is not exhaustive. Black's Law Dictionary defines "include" to mean "[t]o contain as a part of something." Black's Law Dictionary, "Include" (10th ed.). It further states

> The participle *including* typically indicates a partial list <the plaintiff asserted five tort claims, including slander and libel>. But some drafters use phrases such as *including without limitation* and *including but not limited to*—which mean the same thing.[10]

*Id.* (italics in original) **[\*26]** (underline added).

This reading is supported by the fact that the CPLA expressly includes bailors and lessors within the definition of product seller, despite the fact that bailors and lessors cannot reasonably be considered to be manufacturers, wholesalers, distributors, retailers, or parties in the regular commercial distribution chain. *See Conn. Gen. Stat. § 52-572m(a)*. Therefore, the text of the CPLA allows for an interpretation of product seller that includes entities that are not strictly manufacturers, sellers, or successors. *See Lawton v. CBS Corp., No.*

---

[9] New GM argues that the commentary to the Draft Uniform Product Liability Law should be read as limiting the definition of "product seller" to "parties in the regular commercial distribution chain." Mem. in Supp. (Renewed) at 37. In doing so, however, New GM overlooks the word "includes."

[10] 10 The court acknowledges that the definition of "product liability claim" in the same section of the CPLA uses the phrase "shall include, but is not limited to." *Conn. Gen. Stat. § 52-572m(b)*. The court is aware of the general principle of statutory interpretation that "courts should not add or modify language to statutes where . . . it is clear from other provisions within the same statute that [the legislature] knew how to include such language if it so wished." *United States v. Shellef, 756 F. Supp. 2d 280, 295 (E.D.N.Y. 2011)*. However, this principle should not be relied on to contradict the plain meaning of the word "include," which is not exhaustive. *See United States v. Rowland, 826 F.3d 100, 108 (2d Cir. 2016)* ("If the meaning is plain, the inquiry ends there. If we find the statutory provision ambiguous, however, 'we then turn to canons of statutory construction for assistance in interpreting the statute.'" (internal citations omitted)). Especially here, where Black's Law Dictionary indicates that "includes" and "includes, but is not limited to" mean the same thing, the court declines to read them differently merely because the legislature used one phrasing in one subsection and the other in another subsection. *See Black's Law Dictionary*, "Include" (10th ed.).

CV105029354S, 2015 Conn. Super. LEXIS 1908, 2015 WL 5024632, at *4 (Conn. Super. Ct. July 23, 2015) ("[A]n entity does not have to manufacture the product at issue in order to qualify as a product seller under the Product Liability Act.").[11]

Additionally, the court's interpretation of the text is supported by looking to the purpose of the statute. "In interpreting and applying the product seller definition, the court also bears in mind the Connecticut Appellate Court's observation that a 'principal purpose of the product liability statute is to protect people from harm caused by defective and hazardous products,' and that courts [*27] should construe the statute with this purpose in mind." Oliva v. Bristol-Myers Squibb Co., No. CIVA-305-CV-00486 (JCH), 2005 U.S. Dist. LEXIS 35881, 2005 WL 3455121, at *5 (D. Conn. Dec. 16, 2005) (quoting Rodia v. Tesco Corp., 11 Conn. App. 391, 396, 527 A.2d 721 (1987)). The Connecticut Appellate Court in Rodia held that the type of conduct enumerated in the definition of "product liability claim" "must be broadly construed in light of the purposes of the statute." Rodia, 11 Conn. App. at 396 ("The terms enumerated in General Statutes § 52-572m(b) are simply generic categories of conduct which must be read broadly and in relation to one another in order to accomplish the purposes of the statute.").

The same reasoning also applies to construing broadly the definition of "product seller" in the same section of the statute. "Manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products" are also generic, categorical terms that should be read broadly to accomplish the purposes of the statute. See Conn. Gen. Stat. § 52-572m(a). The undersigned has previously followed the Rodia court's directive by reading the definition of product seller "as encompassing those in the best position to protect consumers." See Oliva, 2005 U.S. Dist. LEXIS 35881, 2005 WL 3455121, at *5 (citing also Durove v. Fabian Transport Inc., No. 04 Civ 7000(RJH), 2004 U.S. Dist.

LEXIS 25258, 2004 WL 2912891, at *6 (S.D.N.Y. Dec. 14, 2004)). In this case, New GM is in the best position to protect consumers, as Old GM is no longer in existence.

New GM makes several arguments [*28] for reading the CPLA to limit product sellers to manufacturers and sellers.[12] First, New GM argues that including as product sellers "entities outside the distribution chain for the precise product at issue" is inconsistent with the language of the CPLA that "measures a product seller's duty to warn based upon knowledge at the time of manufacture." Mot. to Certify Mem. at 14 (emphasis omitted). New GM argues that it did not exist at the time of manufacture, so it cannot have had a duty to warn of risks foreseen at such a time and therefore should not be considered to be a product seller. See id.

As discussed above, however, the Second Circuit in Densberger rejected this narrow reading of the statute when it held that the CPLA recognizes a post-sale duty to warn. See Densberger, 297 F.3d at 70-71. Specifically, the Second Circuit considered the statutory language that talks about the duty to warn "only at the time of manufacture" and held that that language applied only to claims of strict liability and violation of implied warranties, not to claims of negligence. See id. Just as the Second Circuit declined to read the "time of manufacture" language to unduly limit the types of claims that can be brought under [*29] the CPLA, this court also declines to read that language as unduly limiting the definition of product seller.

Second, New GM argues that the definition of product seller cannot include entities who were not manufacturers or sellers of the product because such entities would not be protected by the statute of limitations or the defense for products altered by a third party. See Mot. to Certify Mem. at 14-15 (citing Conn. Gen. Stat. § 52-572p; Conn. Gen. Stat. § 52-577a). The state of limitations provides that "no [product liability claim] may be brought against any party . . . later than ten years from the date that the party last parted with

---

[11] But see Barbour v. Dow Corning Corp., No. X06-CV-920305013-S, 2002 Conn. Super. LEXIS 1316, 2002 WL 983346, at *3 (Conn. Super. Ct. Apr. 19, 2002) (citing cases identifying a "requirement under product liability law that the defendant must be the manufacturer or seller of the specific product that caused the injury"); Herrick v. Middlesex Hosp., No. CV030100932, 2005 Conn. Super. LEXIS 1672, 2005 WL 1760785, at *1 (Conn. Super. Ct. June 27, 2005) (stating that, "to recover under the Act, a plaintiff must prove that the defendant was engaged in the business of selling the product").

[12] The court notes, however, that these arguments are raised only in New GM's Memorandum in Support of the Motion to Certify Questions to the Connecticut Supreme Court, which motion the court has already denied. See Mot. to Certify Mem. at 14-17. New GM has not raised these arguments in any of the filings related to the Renewed Motion for Judgment as a Matter of Law or the earlier Motions for Judgment as a Matter of Law during trial. While it is thus not strictly necessary to reach these arguments, the court addresses them here briefly.

possession or control of the product." *Conn. Gen. Stat. § 52-577a(a)* (2018). The court acknowledges that it would be difficult to determine how this protection would apply to a party that never had possession or control of the product. However, the court declines to resolve this difficulty by holding that such parties can never be considered product sellers. The court notes that such parties would still be protected by the statute of limitations to the extent that it requires a product liability claim to be brought "within three years from the date when the injury, death or property damage is first sustained or discovered or **[*30]** in the exercise of reasonable care should have been discovered." Id.

The second defense referenced by New GM states that a "product seller shall not be liable for harm that would not have occurred but for the fact that his product was altered or modified by a third party" unless certain criteria are met. See *Conn. Gen. Stat. § 52-572p* (2018). New GM states that this defense "would also be unavailable to a product seller who never sold the product in question at all." Mot. to Certify Mem. at 15. However, New GM makes no explanation for why the defense would be unavailable, and the court sees no reason why it should not be available to all "product sellers." Admittedly, application of the defense would require courts to define what parties count as a third party, but that is also true when the product seller is a lessor or bailor.

Third, New GM argues that the court's reading of product seller would be inconsistent with the Restatement (Second) of Torts, which "imposes strict liability on persons who sell a defective product that physically injures a user, where the seller is engaged in the business of selling the product." Mot. to Certify Mem. at 16 (citing *Restatement (Second) of Torts § 402A*). The court disagrees for a number of reasons. As noted **[*31]** above, the CPLA expressly includes bailors and lessors within the definition of product seller. See *Conn. Gen. Stat. § 52-572m(a)*. As neither bailors nor lessors are engaged in the business of selling a product, New GM's argument cannot account for all product sellers under the CPLA.

Additionally, the court's reading of product seller does not necessarily conflict with the Restatement. The CPLA includes product liability claims, not only under strict liability, but also under negligence and warranty. See *Conn. Gen. Stat. § 52-572n(a)*. Therefore, finding an entity to be a product seller does not necessarily always expose the entity to strict liability. For instance, there is no claim for post-sale failure to warn under a theory of

strict liability, only under a negligence theory. See *Densberger, 297 F. 3d at 70-71*. Thus, defining New GM as a product seller only exposes it to liability for its own post-sale, post-closing conduct in negligence. Any strict liability claims here are based on assumption of liability for the conduct of Old GM, which the parties do not dispute was a product seller. Therefore, the Restatement's definition of strict liability is not implicated in this case and should not be used to unduly limit the definition of product seller.

In sum, while the **[*32]** court acknowledges that this question of statutory construction is a difficult one, it is not persuaded by New GM's arguments. The court holds that there can be circumstances in which the CPLA permits the definition of product seller to include certain entities that are not strictly manufacturers, sellers, or successors. *See Dzurnak v. CRD Metal Works, LLC, No. KNL-CV-156024935-S, 2017 Conn. Super. LEXIS 4936, 2017 WL 6417908, at *2, *4 (Conn. Super. Ct. Nov. 17, 2017)* (finding that the defendant failed to prove at summary judgment that it was not a product seller when the defendant did not manufacture the product, but provided financing for the plaintiff's purchase of the product through purchase and resale); *Acquarulo v. A.O. Smith Corp., No. CV-095024498-S, 2011 Conn. Super. LEXIS 3313, 2011 WL 7095179, at *3 (Conn. Super. Ct. Dec. 30, 2011)* (finding that the defendant trade association failed to prove at summary judgment that it was not a product seller when the defendant held the patent to the product and supervised its patented product, but did not itself manufacture or sell the product). The court now turns to the specific question of whether New GM is a product seller.

This inquiry "requires a fact intensive, case-by-case assessment." See *Svege, 329 F. Supp. 2d at 280* (citing *Burkert, 216 Conn. at 72*). For example, in Burkert, the Connecticut Supreme Court considered factors including: "(1) whether the entity **[*33]** derived a substantial economic benefit from the sale of the product; (2) whether the entity participated in advertising, marketing or creating consumer demand for the product; (3) whether the entity took title to the product; and (4) the extent of the entity's knowledge and control over the product." *Dzurnak, 2017 Conn. Super. LEXIS 4936, 2017 WL 6417908, at *2* (quoting *Delgadillo v. Unitrons Consolidated, Inc., 191 Fed. App'x 547, 549 (9th Cir. 2006))*. Courts have also looked to other factors, such as, inter alia, whether the entity sold similar products, developed a market for the products, or marketed the products with the entity's name and certain assurances. See *2011 Conn. Super. LEXIS*

*3313, [WL] at \*4*; *Aquarulo, 2011 Conn. Super. LEXIS 3313, 2011 WL 7095179, at \*4*. These factors are merely examples of the fact intensive inquiry, however, and are not exhaustive because whether certain factors are relevant or not depends on the particular circumstances of each case.

In this case, the court, in previously ruling on New GM's Opposition to the Motion to Amend, identified three factors that it considered sufficient to make New GM a product seller under the CPLA. See Pretrial Conf. Tr. 6/28/17 at 155. The court now elaborates further on the latter two factors.[13] First, although New GM did not manufacture and sell the particular car purchased by the plaintiffs or the 2004 model year of the Suburban, New GM does manufacture and **[\*34]** sell Suburbans. In interpreting the definition of product seller as including an entity "who is engaged in the business of selling such products," at least one court in this district has described "such products" as "a generalized plural" and therefore concluded:

> The statute does not, on its face, require that the particular seller have sold the particular product that injured the particular claimant. If such particularity must indeed be proven, it is because elements like proximate causation are now implicitly incorporated into the statutory "product liability claim," as elements of the torts that the statute replaced.[14] On its face, the statute requires only that the seller have "engaged in the business" of selling "such products."

*Altman v. Motion Water Sports, Inc., 722 F. Supp. 2d 234, 238 (D. Conn. 2010)*.[15] As New GM continues to

manufacture and sell Suburbans, the court extends the reasoning in Altman to hold that New GM can be considered in the business of selling "such products," even if it did not manufacture or sell the specific model year of the 2004 Suburban. This is especially true given that it continues to trade on the goodwill associated with the GM, Chevrolet, and Suburban names.

Second, pursuant to the Sale Agreement between New **[\*35]** GM and Old GM, New GM had obligations to service and repair vehicles sold by Old GM that were still under warranty, as well as "to provide spare parts and services for Old GM vehicles even after warranties expired." *In re Gen. Motors LLC Ignition Switch Litig., 154 F. Supp. 3d 30, 40 (S.D.N.Y. 2015)*. These obligations "put New GM in a position of ongoing communication with Old GM purchasers." Id. Moreover, these agreements "g[ave] rise to actual or potential economic advantage to [New GM]." *In re Gen. Motors LLC Ignition Switch Litig., No. 14-CV-8317, 2017 U.S. Dist. LEXIS 95307, 2017 WL 2664199, at \*9 (S.D.N.Y. June 20, 2017)*.[16] The court holds that, together, these factors are sufficient to qualify New GM as a product seller for purposes of the CPLA.

───────────────

[16] The district court for the Southern District of New York found these factors relevant in determining that New GM had a post-sale duty to warn for cars sold by Old GM under the product liability laws of Oklahoma, Arizona, and Virginia. See *In re Gen. Motors LLC Ignition Switch Litig., 154 F. Supp. 3d at 40-41* (interpreting Oklahoma law); *In re Gen. Motors LLC Ignition Switch Litig., 2017 U.S. Dist. LEXIS 95307, 2017 WL 2664199, at \*8-\*9* (interpreting Arizona law); *In re: Gen. Motors LLC Ignition Switch Litig., 202 F. Supp. 3d 362, 367-68 (S.D.N.Y. 2016)* (interpreting Virginia law). Because these cases interpret the laws of other states rather than the CPLA and refer to New GM as a "successor corporation," the court refrains from placing too much weight on these opinions. These cases do indicate, however, that the factors identified above can be relevant to the court's consideration.

In contrast, the district court for the Southern District of New York held, however, that plaintiffs could not bring an independent claim against New GM under Louisiana law. See *Abney v. GM LLC (In re Gen. Motors LLC Ignition Switch Litig.), No. 14-MD-2543 (JMF), 2016 U.S. Dist. LEXIS 27436, 2016 WL 874778, at \*3 (S.D.N.Y. Mar. 3, 2016)*. This holding, however, is not instructive for the court's ruling because the parties in that case agreed that Louisiana law only permitted product liability actions to be brought against "manufacturers." See id. The CPLA uses instead the broader term of "product seller" and expressly includes entities that are not manufacturers, such as wholesalers, distributors, retailers, bailors, and lessors. See *Conn. Gen. Stat. § 52-572m(a)*.

───────────────

[13] The court finds it unnecessary to elaborate further on the first factor, that is, that New GM bought significant portions of Old GM's assets, as that factor appears self-explanatory. The court notes that its holding is not based on a finding of successor liability.

[14] Even if such particularity is required as part of the proximate cause analysis, such concerns are appropriately considered under the issue of whether the causation element of the claim has been satisfied and should not affect whether or not the defendant qualifies as a product seller.

[15] Although the Altman court decides that case based on successor liability, which is not applicable to this case, the section quoted above states the Altman court's interpretation of the statute, which this court does not consider to be restricted to cases of successor liability. See *Altman, 722 F. Supp. 2d at 235, 238-39*.

New GM argues that such a holding would amount to a finding of successor liability, which is contrary to the Bankruptcy Court's controlling decisions. See Mem. in Supp. (Renewed) at 37; Reply in Supp. (Renewed) at 18-19. New GM relies on a Bankruptcy Court decision that rejected the plaintiffs' independent claims in that case against New GM. See Reply in Supp. (Renewed) at 19 (citing *In re Motors Liquidation Co., 576 B.R. 313, 319 (Bankr. S.D.N.Y. 2017))*. New GM characterizes that case as raising and rejecting allegations similar to the factors discussed above. See id.

The court disagrees. The court's holding does not "amount to" successor liability, as New GM argues, because the court **[*36]** finds New GM to be a product seller based on its own conduct and relationships, not based on the assumption of liability from Old GM. The factors discussed above, that is, New GM's manufacture and sale of Suburbans, its use of the GM and Chevrolet names, and its provision of spare parts and services for Old GM vehicles, are all conduct of New GM that took place after the Sale Agreement. The particular Independent Claim asserted by the plaintiffs in this case is also based solely on New GM's own failure to warn after July 10, 2009, not on any conduct of Old GM.

Additionally, New GM misrepresents the holding of the Bankruptcy Court case that it cites. The Bankruptcy Court in that case made clear that its role was to act as a "gatekeeper" in determining if the complaint violated the Sale Order while questions of whether the complaint was proper under state law were for the district court to decide. See *In re Motors Liquidation Co., 576 B.R. at 321-22*; see also Bankr. Ruling June 2017 at 7. The Bankruptcy Court determined that the complaint in that case "cannot pass the bankruptcy gate because (i) it fails to clearly differentiate between Old GM and New GM; and (ii) it fails to identify specific conduct of New GM upon which the purportedly **[*37]** Independent Claims are based." See *In re Motors Liquidation Co., 576 B.R. at 323*. The Bankruptcy Court did not purport to address whether New GM qualifies as a product seller and thereby is subject to liability for independent claims generally. Rather, the Bankruptcy Court merely held that the complaint in that case failed to meet the requirements for stating an independent claim. See id. ("The Court does not suggest that a failure to warn claim is necessarily impossible for Reichwaldt to assert, but the generalities in the Proposed [Amended Complaint] are insufficient as currently drafted.").

In contrast, the plaintiffs' case here is distinguishable because neither the plaintiffs nor the court has failed to differentiate between Old GM and New GM. While the plaintiffs' initial Complaint "base[d] allegations on generalized knowledge of both Old GM and New GM," see Bankr. Ruling June 2017 at 22, the plaintiffs filed an Amended Complaint differentiating between the two entities and identifying specific conduct of New GM. See Am Compl. (separating the conduct of Old GM in paragraph 26 from the conduct of New GM in paragraphs 27 and 28). At trial, the court also clearly instructed the jury to consider the duty to warn separately for **[*38]** two different time periods, one corresponding to Old GM and one corresponding to New GM. See Jury Charge at 28, 41. The court then instructed the jury that, "in determining whether GM breached its duty to warn during the relevant time period, you may only consider such actions or lack thereof of GM during that time period." Id. at 42. Therefore, the jury was charged not to consider any pre-2009 conduct—that is, the conduct of Old GM, in determining the plaintiffs' independent claim. Thus, the problems identified by the Bankruptcy Court in the case cited by New GM are not present in this case.

New GM also makes a second argument that it had no "special relationship" with the plaintiffs and therefore cannot be considered a product seller. See Mem. in Supp. (Renewed) at 39. However, New GM has identified no cases applying Connecticut law that have held that a special relationship is required in order for the defendant to be a product seller under the CPLA or to owe a post-sale duty to the plaintiff. See id. In holding that a post-sale duty to warn exists, Densberger mentions no such requirement. See *Densberger, 297 F.3d at 70-71*.

Rather, New GM cites *Vicuna v. O.P. Schuman & Sons, Inc., 106 F. Supp. 3d 286, 299 (E.D.N.Y. 2015)*, and *Holland v. FCA US LLC, No. 1:15-CV-121, 2015 U.S. Dist. LEXIS 154775, 2015 WL 7196197, at *4 (N.D. Ohio Nov. 16, 2015)*, neither of which are decided under the CPLA. Although **[*39]** New York law may require a special relationship in order for a successor corporation to have a duty to warn of defects in a product manufactured by the corporation's predecessor, see *Vicuna, 106 F. Supp. 3d at 299*, New York law does not govern this case or the court's interpretation of the CPLA. Additionally, New GM cites *Flannery v. Singer Asset Fin. Co., LLC, 312 Conn. 286, 311-12, 94 A.3d 553 (2014)*. Flannery, however, does not involve a products liability claim and does not address the definition of product seller under the CPLA. See id. Instead, Flannery discusses the requirement of a

special relationship in order to apply the continuing course of conduct doctrine for tolling the statute of limitations in professional negligence cases. See id. As such, it is irrelevant to the question now before the court. Therefore, the court has identified no basis in the case law to support New GM's argument that it is not a product seller because it does not have a special relationship with the plaintiffs.

Accordingly, the court concludes that New GM is a product seller for purposes of the CPLA. New GM's Renewed Motion for Judgment as a Matter of Law is denied as to the plaintiffs' Independent Claim on this ground.

C. Sufficiency of the Evidence

New GM raises a number of arguments that the evidence was **[*40]** legally insufficient as a matter of law to support the plaintiffs' claims. First, New GM argues that the plaintiffs' claims for failure to warn, both at the time of sale and post-sale, require expert testimony because the jury must consider factors beyond the knowledge and experience of ordinary jurors. See Mem. in Supp. (Renewed) at 11-15. New GM argues that, because the plaintiffs offered no such expert testimony at trial, the evidence was legally insufficient to support their claims. See id.

Second, New GM argues that the evidence was insufficient as a matter of law to establish that the warnings at the time of the sale were inadequate for a number of reasons. It contends that the plaintiffs mischaracterize the risk as that of the child shifting the transmission out of Park without using the brake, but that the risk is more appropriately described as the risk that unattended children could make vehicles move, causing injury or death. See id. at 15-17, 19-21. New GM argues that the owner's manual adequately warns of this latter risk and that, if heeded, the warning would have prevented the plaintiffs' injuries. See id. at 15-19. New GM argues that, therefore, it was not necessary to provide a more specific warning **[*41]** of the risk, as described by the plaintiffs. See id. at 19-21. New GM further contends that the risk that the plaintiffs describe is obvious and refers to use by non-ordinary users and, therefore, that New GM has no duty to warn of such a risk. See id. at 21-23.

The court notes that the jury did not find New GM liable to the plaintiffs on their claim for failure to warn at the time of the sale. See Jury Verdict at 3. The jury found by a preponderance of the evidence that New GM failed to provide necessary and adequate warnings at the time of sale, but that the plaintiffs failed to prove that New GM's inadequate warnings caused their injuries. See id. Therefore, New GM ultimately prevailed on this count. As such, the court considers New GM's arguments as to the adequacy of the warning in the owner's manual to be relevant only to the extent that inadequate warnings at the time of the sale may affect the plaintiffs' negligence claim for post-sale failure to warn. See Mem. in Supp. (Renewed) at 35. As decided previously, following *Densberger*, adequate warnings at the time of the sale do not preclude a post-sale failure to warn claim. See, supra, at 14-15. However, inadequate warnings at the time of the sale may be relevant to whether or **[*42]** not a reasonable person would have issued a post-sale warning. The court addresses the sufficiency of the evidence for the jury's finding that the warning at the time of sale were inadequate only for this purpose. It is unnecessary to consider the arguments as they pertain to the jury's verdict on the plaintiffs' claim for failure to warn at the time of the sale.

Third, New GM argues that the evidence was insufficient as a matter of law to establish liability for negligence due to post-sale failure to warn. See id. at 30-35. New GM points to its previous arguments that the warnings at the time of the sale were adequate. See id. at 35. New GM then argues that the Technical Service Bulletin and unverified reports of children shifting vehicles out of park were insufficient to prompt a reasonably prudent company to issue a post-sale warning. See id. at 30-35. Therefore, New GM contends that it did not fail to fulfill a post-sale duty to warn. Finally, New GM argues that the evidence is legally insufficient to prove that the failure to warn caused the plaintiffs' injuries. See id. at 24-27.

1. Need for Expert Testimony

New GM argues that expert testimony is required to prove a claim based on failure to warn. See Mem. in Supp. (Renewed) **[*43]** at 11-15. New GM therefore contends that, because the plaintiffs offered no expert testimony at trial to support their warning defect claims, there is no legally sufficient evidentiary basis for the jury's verdict in favor of the plaintiffs. See id. New GM directs its argument to both the claim for failure to warn at the time of sale and the negligence claim for post-sale failure to warn.[17] See id. at 13-14.

---

[17] As noted previously, the jury found that New GM was not liable to the plaintiffs for failure to warn at the time of the sale. See Jury Verdict at 3. Therefore, the court considers arguments challenging the evidentiary basis for the jury's

Whether expert testimony is necessary is a legal question for the court to decide. See *Bagley v. Adel Wiggins Grp., 327 Conn. 89, 103, 171 A.3d 432 (2017)*. At an earlier stage in the case, the court has previously addressed whether expert testimony was necessary for the plaintiffs' claim for failure to warn at the time of the sale. New GM moved for summary judgment on this ground, and the court ruled that expert testimony was not required for the plaintiffs to prove that the warnings contained in the owner's manual were inadequate.[18] See Motion for Summary Judgment (Doc. No. 59); Memorandum in Support of Motion for Summary Judgment ("Mem. in Supp. (MFSJ)") (Doc. No. 61) at 5-6; Ruling Denying Motion for Summary Judgment ("Ruling Denying MFSJ") (Doc. No. 120) at 24-27.

The court noted that neither party had cited any case law "in which a court applying Connecticut **[*44]** law has held that expert testimony is required, as a matter of law, in order for a plaintiff to prevail on an inadequate warning claim." See Ruling Denying MFSJ at 25. The court also reasoned that it was not complicated for a layperson to understand how the BTSI works or that, "in cars in which the BTSI function is not active in the Accessory position, the transmission can be shifted without application of the brake if the key is in the Accessory position." Id. The court therefore concluded that determining the adequacy of the warnings in the owner's manual was not beyond the ordinary knowledge and experience of the jury. See id. Accordingly, the court denied the Motion for Summary Judgment and permitted the plaintiffs to advance their claim to trial without proffering expert testimony. See id. at 26-27.

During trial, after the plaintiffs' case, New GM moved for judgment as a matter of law on, inter alia, the plaintiffs' claims for failure to warn at the time of the sale, negligent failure to warn post-sale, and negligent failure to recall or retrofit. See Mot. for JMOL (Lack of Expert); Mot. for JMOL (Negligent Retrofit). Regarding the failure to warn at the time of the sale, the court affirmed **[*45]** its earlier ruling on summary judgment that no expert testimony was required. See Charge Conf. Tr. 7/15/17

at 1458-59.

In contrast, the court granted the Motion for Judgment as a Matter of Law as to the plaintiffs' negligent retrofit claim. See id. at 1458. The court reasoned that an expert was required to assist the jury with "the technical issues involved in retrofitting the Suburban, that is to say whether retrofitting the Suburban was even possible and/or whether it would have had collateral consequences that would have made any retrofit dangerous." Id. at 1457. For example, the court pointed out that Rose O'Connor's lay testimony was insufficient evidence to support the claim because she could not address the technical considerations of a retrofit or "what could be hypothetical or possible negative collateral consequences." Id. at 1457-58.

Lastly, the court reserved on the question of whether expert testimony was required to prove a claim for negligent failure to warn post-sale. See id. at 1459.

a. Expert Testimony Regarding Adequacy of Warning at the Time of Sale

The court first addresses New GM's argument that expert testimony is required to prove a claim for failure to warn at the time of the sale. As to this claim, New GM **[*46]** argues specifically that expert testimony is needed in order to "provide opinions about what risks an ordinary manufacturer would have considered; what warnings effectively mitigate those risks; and the feasibility and cost of different warnings that would have prevented Plaintiffs' injuries." Mem. in Supp. (Renewed) at 13. The court, however, disagrees and reaffirms its decision in the Ruling Denying Motion for Summary Judgment. See Ruling Denying MFSJ at 24-27.

To prove a claim for failure to warn, the plaintiff must prove by a preponderance of the evidence that the "product was defective in that adequate warnings or instructions were not provided" and that, "if adequate warnings or instructions had been provided, the claimant would not have suffered the harm." *Conn. Gen. Stat. § 52-572q(a), (c)* (2018). The CPLA instructs:

> In determining whether instructions or warnings were required and, if required, whether they were adequate, the trier of fact may consider: (1) the likelihood that the product would cause harm suffered by the claimant; (2) the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk, and the nature of the potential **[*47]** harm; and (3) the technological

---

[18] finding that the warning at the time of the sale was inadequate only to the extent that the inadequacy at the time of the sale is relevant to the plaintiffs' negligence claim for post-sale failure to warn.

[18] New GM's Motions also argued that expert testimony was required for the plaintiffs' design defect claims. See Mem. in Supp. (MFSJ) at 5-11. The court does not mention those arguments here because the design defect claims are not at issue in this Motion.

feasibility and cost of warnings and instructions.

*Conn. Gen. Stat. § 52-572q(b)* (emphasis added).

As a general rule, expert testimony is required "when the question involved goes beyond the field of ordinary knowledge and experience of the trier of fact." *Bagley, 327 Conn. at 103*. However, the jury "need not close its eyes to matters of common knowledge solely because the evidence includes no expert testimony on those matters." Id. "Whether expert testimony is required in a particular case is determined on a case-by-case basis and its necessity is dependent on whether the issues are of sufficient complexity to warrant the use of the testimony as assistance to the . . . [trier of fact]." Id. (alterations in original).

In this case, the issue is whether the warning in the owner's manual was adequate to warn that the BTSI was not active in the Accessory position and that, as a result, the transmission could be shifted without application of the brake, if the key is in the Accessory position. The court adheres to its earlier Ruling that the function of the BTSI and the risk involved are easily comprehensible concepts, in contrast, for example, to the technical considerations involved in determining the feasibility **[*48]** of a retrofit. See Ruling Denying MFSJ at 25. Therefore, determining whether the warnings adequately warn of such a risk does not go "beyond the field of ordinary knowledge and experience" of the average juror. See *Bagley, 327 Conn. at 103*; Ruling Denying MFSJ at 25. New GM has since raised a number of additional arguments in support of its contention, but the court is not persuaded that these arguments would require it to alter the conclusion in its earlier Ruling.

First, New GM's attempts to identify "complex and technical factors" involved in this inquiry are unpersuasive. See Mot. for JMOL (Lack of Expert) at 2; Mem. in Supp. (Renewed) at 13 (arguing that knowledge of "human factors engineering" is required, such as "how consumers behave, how they interact with a vehicle, and how product information is best delivered to reduce harm caused by human error"). The cases cited by New GM regarding expert testimony on human factors engineering held only that such expert testimony was admissible, not that it was required. See *Michaels v. Mr. Heater, Inc., 411 F. Supp. 2d 992, 999-1000 (W.D. Wis. 2006)*; *Cole v. Goodyear Tire & Rubber Co., 967 S.W. 2d 176, 185 (Mo. Ct. App. 1998)*. While the average juror may not have experience designing product warnings, most jurors have experience as

consumers and with the operation of vehicles.[19] Therefore, it is not beyond the **[*49]** experience of the lay juror to determine "how consumers behave," "how they interact with a vehicle," or how they respond to product warnings.

Additionally, in the court's Ruling Denying Motion for Summary Judgment, the court stated that New GM had identified no case applying Connecticut law that had held that expert testimony was required, as a matter of law to prevail on an inadequate warning claim. See Ruling Denying MFSJ at 25. The court distinguished the two cases cited by New GM. See id.; see also *White v. Mazda Motor of America, Inc., 139 Conn. App. 39, 54 A.3d 643 (2012)*; *Montagnon v. Pfizer, Inc., 584 F. Supp. 2d 459 (D. Conn. 2008)*. Since the Motion for Summary Judgment, New GM has identified additional cases that it contends support its argument. The court, however, also considers these cases to be distinguishable.

In *Freitas v. Michelin Tire Corp.*, the court granted partial summary judgment on the plaintiff's warnings claim because the plaintiff offered no expert testimony on the proximate cause element of his claim. See *Freitas v. Michelin Tire Corp., No. 3:94-CV-1812 (DJS), 2000 U.S. Dist. LEXIS 22719, 2000 WL 424187, at *5 (D. Conn. Mar. 2, 2000)*. However, the plaintiff in that case conceded at oral argument that he was unable to "proceed on his strict liability warnings defect claim against the defendant absent testimony by his expert witness." Id. **[*50]** Therefore, the *Freitas* court was not required to decide whether expert testimony was required to prove the warnings claim.

New GM also cites *Beatty v. Michelin Tire Corp.*, in

---

[19] New GM cites *Cole v. Goodyear Tire & Rubber Co., 967 S.W. 2d 176, 185 (Mo. Ct. App. 1998)*, to support its argument that "how people react to product warnings is a subject about which lay people lack training and cannot form accurate opinions." Mem. in Supp. (Renewed) at 13; see *Cole, 967 S.W.2d at 185* ("Warnings and how people react to warnings are arguably subjects about which persons having no particular training are incapable of forming accurate opinions."). However, not only is *Cole* not a case involving Connecticut law, but, like *Michaels*, *Cole* addresses the question of whether expert testimony on human factors is admissible, not whether it is required. See *Cole, 967 S.W.2d at 185*. Therefore, despite the language in *Cole* cited by New GM, *Cole* has not addressed the question before this court and does not require the court to alter its decision at summary judgment.

which the court excluded the plaintiff's proposed expert testimony and ultimately granted summary judgment on the plaintiff's warnings claim. See *Beatty v. Michelin Tire Corp., No. 3:94-CV-989 (DJS), 1999 U.S. Dist. LEXIS 21970, at \*12-\*16 (D. Conn. Mar. 31, 1999)*. However, in Beatty, the court did not grant summary judgment solely as a result of the absence of expert testimony; rather, the court proceeded to consider whether the plaintiff offered any other admissible evidence to prove causation. See *id. at \*14*. The court considered and excluded the plaintiff's own testimony as inadmissible opinion testimony by a lay witness.[20] See *id. at \*14-\*15*. Therefore, the court granted summary judgment, not because of the plaintiff's failure to offer expert testimony on causation, but because of "the plaintiff's failure to offer any admissible evidence addressing whether Mr. Beatty would have heeded an appropriate warning had one been provided." *Id. at \*16* (emphasis added). Nothing in the Beatty opinion states that expert testimony was required. To the contrary, the fact that the court then proceeded to consider other evidence **[\*51]** implies that it did not view the absence of expert testimony to necessarily defeat the claim.

Additionally, in Gleeson v. Rust-Oleum Corp., the court granted summary judgment for the defendant on the plaintiff's failure to warn claim in the absence of expert testimony. *See Gleeson v. Rust-Oleum Corp., No. 3:11-CV-60 (AVC), 2013 U.S. Dist. LEXIS 190915, 2013 WL 11331281, \*4 (D. Conn. Sept. 19, 2013)*. The Gleeson court's analysis focuses on the need for expert testimony to prove that the anti-slip floor coating was unreasonably dangerous as designed and manufactured. See *id. at \*3*. The opinion only addresses the failure to warn claim at the end of the analysis in two brief sentences. See *id. at \*4*. ("The plaintiffs' failure to proffer expert testimony that the EPS was unreasonably dangerous is also fatal to their CPLA claim to the extent it is based on a failure to warn theory or a negligence theory. With respect to failure to warn, the plaintiffs have failed to provide evidence that the EPS was defective without warnings."). One possible reading of Gleeson's holding is, in line with the court's reading of Beatty, that the plaintiff offered no other evidence besides the

rejected expert testimony that the product was defective without warnings. Therefore, in the absence **[\*52]** of any evidence of a warning defect, summary judgment was appropriate.

Finally, in Karavitis v. Makita, while the court ultimately granted summary judgment on the plaintiff's defective warning claim, it cited with approval this court's Ruling Denying Summary Judgment. See *Karavitis v. Makita U.S.A., Inc., 243 F. Supp. 3d 235, 253 (D. Conn. 2017)*, aff'd, *No. 17-1008-CV, 722 Fed. Appx. 53, 2018 U.S. App. LEXIS 2328, 2018 WL 627491 (2d Cir. Jan. 31, 2018)*. The Karavitis court agreed with this court, stating, "Expert testimony is not required as a matter of law to establish that a warning was defective. However, expert testimony is required when 'the issues involved go beyond the field of ordinary knowledge and experiences of the trier of fact.'" Id. (citing *Pitterman v. Gen. Motors LLC, 3:14-cv-0967, 2016 U.S. Dist. LEXIS 57165, 2016 WL 1732710, at \*11 (D. Conn. Apr. 29, 2016)*).

The issue in Karavitis was whether the instructions were defective in warning about "the danger of kickback on portable handheld circular saws without riving knives." *Id. at 253*. In concluding that such a danger was beyond the ordinary knowledge and experience of the jury, the Karavitis court expressly distinguished its case from the facts of Pitterman's case, which were laid out in this court's Ruling Denying Summary Judgment cited by the Karavitis court. See id. For example, the *Karavitis* court cited the fact that the average consumer does not know what a riving knife **[\*53]** is and that the parties presented no evidence that the jury could discern the danger without expert testimony. See id. In contrast, most jurors have experience operating a vehicle and shifting between gears. While an average juror may not have heard of the term BTSI before, he or she is likely familiar with the concept of depressing the brake in order to shift the transmission from Park. Therefore, *Karavitis* supports the court's conclusion in this case.

In addition to these Connecticut cases, New GM also points the court to cases interpreting Missouri law for guidance. See Mot. for JMOL (Lack of Expert) at 4-5; Mem. in Supp. (Renewed) at 12 n.4. The court notes first that it considers these cases less persuasive because they do not apply Connecticut law. However, to the extent that the court considers the reasoning in these cases, the court notes that the Eighth Circuit's holding in Menz v. New Holland North America is consistent with this court's conclusion. See *Menz v. New Holland N. Am., Inc., 507 F.3d 1107, 1111 (8th Cir.*

---

[20] While there are similarities between the plaintiff's testimony in Beatty and Rose O'Connor's testimony in this case regarding whether she would have heeded an appropriate warning, no comparable objection was raised as to the admissibility of Rose O'Connor's similar testimony at trial in this case. See Trial Tr. 7/11/17 at 675. Thus, while Beatty presented no admissible testimony on causation, this case does contain evidence on causation.

*2007)*; but see *Bachtel v. Taser Int'l, Inc., 2013 U.S. Dist. LEXIS 11716, 2013 WL 317538, *7 (E.D. Mo. Jan. 28, 2013)*, aff'd *747 F.3d 965 (8th Cir. 2014)*. The Eighth Circuit in Menz stated, "Missouri law does not necessarily require expert testimony in a strict products liability case. Such testimony is necessary, however, 'where the lay jury [does] not possess **[*54]** the experience or knowledge of the subject matter sufficient to enable them to reach an intelligent opinion without help.'" Id.

The Eighth Circuit instructs that "[t]he necessity of expert testimony in a failure to warn case turns on the complexity of the subject matter." Id. The facts of Menz involved an accident caused by a tractor with a front-end loader used to move dirt. See *id. at 1109*. In concluding that expert testimony was necessary, the Eighth Circuit reasoned that "the products at issue in this case are fairly technical and complex, and are not the type of machinery commonly utilized by the typical lay juror."[21] *Id. at 1112*. In contrast, cars are commonly used by jurors. Therefore, none of the cases newly cited by New GM alter the court's decision in its prior Ruling Denying Summary Judgment. See Ruling Denying MFSJ at 27.

Finally, the court held in a Supplemental Ruling on Summary Judgment that *Izzarelli v. R.J. Reynolds Tobacco Co., 321 Conn. 172, 136 A.3d 1232 (2016)*, did not alter the court's conclusion that expert testimony was not required for the failure to warn claim. See Supplemental Ruling on Motion for Summary Judgment ("Suppl. Ruling on MFSJ") (Doc. No. 140). Nonetheless, in its Renewed Motion for Judgment as a Matter of Law, New GM reiterates **[*55]** its reliance on Izzarelli and argues that Izzarelli should be read to require expert testimony for design and warning claims. See Mem. in Supp. (Renewed) at 12. This court, however, disagrees with New GM's proposed reading of Izzarelli and again affirms its earlier Ruling.

The Connecticut Supreme Court in Izzarelli addressed a strict liability design defect claim relating to the exposure to carcinogens in cigarettes. See *Izzarelli, 321 Conn. at 180*. Izzarelli held that the primary test for strict liability

design defect claims is the modified consumer expectation test. See *id. at 177*. The Izzarelli court then held that, in order to prove a defect in that case, "the plaintiff's case required expert testimony on cigarette design and manufacture, as well as the feasibility of an alternative design." *Id. at 203-04*. Izzarelli did not involve a claim for failure to warn and, therefore, the Izzarelli court made no holding as to whether expert testimony would be required to prove such a claim.[22]

In conclusion, the court affirms its earlier holding that expert testimony is not required to prove the plaintiffs' claim for failure to warn at the time of the sale. See Ruling Denying MFSJ at 27. New GM has **[*56]** raised no new arguments and identified no new case law that persuade the court to alter its conclusion. Accordingly, New GM's Renewed Motion for Judgment as a Matter of Law is denied on this ground.

b. Expert Testimony Regarding Standard of Care for Issuing a Post-Sale Warning

New GM also argues that expert testimony is required to prove the plaintiffs' negligence claim for post-sale failure to warn. See Mem. in Supp. (Renewed) at 14. To prevail on a theory of negligence, "the plaintiff must establish that the defendant owed a duty to [the plaintiff] and breached that duty"—in this case, the duty to warn. *Ciarlelli v. Romero, 46 Conn. App. 277, 282, 699 A.2d*

---

[21] Although the district court in Bachtel employs broader language than the Eighth Circuit in Menz, the reasoning in Menz also explains the outcome in that case. Bachtel involved a TASER X26 Electronic Control Device, which is also a technical and complex product that is not commonly used by the typical lay juror. See *Bachtel, 2013 U.S. Dist. LEXIS 11716, 2013 WL 317538, at *1*.

---

[22] New GM points out that Izzarelli distinguishes manufacturing defects from design and warning defects. See Mem. in Supp. (Renewed) at 12; Mot. for JMOL (Lack of Expert) at 4. The court notes that the Izzarelli court does mention warning defects when it provides "some background on the development of Connecticut's strict product liability law." See *Izzarelli, 321 Conn. at 184*. Izzarelli explains that "products liability historically had focused on manufacturing defects, . . . before design defects and inadequate safety warnings had become well established theories of strict product liability." *Id. at 186*. Izzarelli also acknowledges: "In contrast to manufacturing defects, design defects and defects based on inadequate instructions or warnings are predicated on a different concept of responsibility. . . . [S]uch defects cannot be determined by reference to the manufacturer's own design or marketing standards because those standards are the very ones that plaintiffs attack as unreasonable." *Id. at 188*. While these statements do associate failure to warn claims with design defect claims in contrast to manufacturing defect claims, the remainder of the opinion focuses its discussion only on design defect claims. The court considers these brief mentions of warnings claims (in contrast to manufacturing defects) insufficient to indicate that the Izzarelli court intended its holding to apply to warnings claims in addition to design defect claims.

217 (1997). The plaintiff must also prove that the defendant's breach of duty proximately caused the plaintiff's injuries. See Doe v. Hartford Roman Catholic Diocesan Corp., 317 Conn. 357, 373, 119 A.3d 462 (2015). Here, the jury was not required to consider the adequacy of any post-sale warnings because no post-sale warnings were issued. Rather, the question was whether New GM acted with reasonable care in deciding not to issue a post-sale warning—that is, whether a reasonable person in New GM's circumstances would have issued a post-sale warning. The court previously reserved on this question. See Charge Conf. Tr. 7/15/17 at 1459.

New GM argues that expert testimony is required **[\*57]** "to testify to the standard of care applicable to a vehicle manufacturer giving post-sale warnings and the means for determining breach." Mem. in Supp. (Renewed) at 14. New GM bases that argument on the contention that "[w]hether a manufacturer is negligent for failing to supplement warnings after sale is akin to a question of professional negligence." Id. (internal quotation marks omitted).

As with the failure to warn claim discussed above, "[a]lthough expert testimony may be admissible in many instances, it is required only when the question involved goes beyond the field of the ordinary knowledge and experience of the trier of fact." Utica Mut. Ins. Co. v. Precision Mech. Servs., Inc., 122 Conn. App. 448, 455, 998 A.2d 1228 (2010) (quoting State v. Padua, 273 Conn. 138, 149, 869 A.2d 192 (2005)). In cases of ordinary negligence, "the usual rule is that expert testimony is not required, but rather the jury is to apply the standard of the reasonably prudent person in the same circumstances." Cammarota v. Guerrera, 148 Conn. App. 743, 750, 87 A.3d 1134 (2014) (citing Marfyak v. New England Transp. Co., 120 Conn. 46, 48, 179 A. 9 (1935)).

In contrast, expert testimony is typically required in cases involving professional negligence or malpractice. See Ciarelli, 46 Conn. App. at 283; Matyas v. Minck, 37 Conn. App. 321, 326-27, 655 A.2d 1155 (1995). In such cases, expert testimony is often necessary "to establish both the standard of skill and care applicable and that the defendant failed to conform to the standard, as these matters are outside the knowledge of the **[\*58]** jury." Matyas, 37 Conn. App. at 326-27. "The requirement of expert testimony in malpractice cases serves to assist lay people, such as members of the jury and the presiding judge, to understand the applicable standard of care and to evaluate the defendant's actions

in light of that standard." LePage v. Horne, 262 Conn. 116, 126, 809 A.2d 505 (2002).

Professional negligence is defined as "the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services." Santopietro v. City of New Haven, 239 Conn. 207, 226, 682 A.2d 106 (1996). Professional negligence is commonly seen in the context of cases involving medical and legal malpractice; indeed, a number of the cases cited by New GM address negligence in the medical and legal fields. See Davis, 215 Conn. at 415-16, 576 A.2d 489 (involving a claim of legal malpractice); Pearl v. Nelson, 13 Conn. App. 170, 173, 534 A.2d 1257 (1988) (also involving a claim of legal malpractice); see also Heisinger v. Cleary, No. X04-HHD-CV-126049497-S, 2015 Conn. Super. LEXIS 567, 2015 WL 1589152, at *9 ("Expert testimony as to issues of standard of care is expected and commonplace in cases relating to the negligence of medical or legal practitioners."). However, expert testimony has also been required in cases that are "akin to allegations of **[\*59]** professional negligence or malpractice," beyond the medical and legal context. Santopietro, 239 Conn. at 226-27; see also Heisinger, 2015 Conn. Super. LEXIS 567, 2015 WL 1589152, at *9 ("[T]he courts of this state have also required expert testimony to define the nature and scope of an alleged tortfeasor's duty for a wide variety of activities and undertakings outside the fields of law and medicine.").

New GM argues that a manufacturer's decision whether or not to issue a post-sale warning is "akin to" professional negligence. See Mem. in Supp. (Renewed) at 14; Mot. for JMOL (Lack of Expert) at 3-4. However, New GM has identified no cases in which a court compared negligent failure to warn, either post-sale or at the time of the sale, with professional negligence. Nor has New GM identified any cases in which a court has held that expert testimony is required to establish the standard of care for a manufacturer issuing a warning. The cases that New GM identifies as "akin to" professional negligence are not analogous to the case here. See Lepage, 262 Conn. at 126 (involving the standard of care required when watching a sleeping infant); Neff v. Johnson Memorial Hosp., 93 Conn. App. 534, 542-44, 889 A.2d 921 (2006) (involving a corporate negligence claim against a hospital for negligent credentialing of its medical staff); Monterose v. Cross, 60 Conn. App. 655, 658, 760 A.2d 1013 (2000)

(involving the standard of care required of a rigger moving **[\*60]** a heavy wooden spool); *Santopietro, 239 Conn. at 227-28* (involving the standard of care required by a baseball umpire); *Matyas, 37 Conn. App. at 326-27* (involving the standard of care required of an engineer laying out a septic system).[23] While these cases do illustrate the diversity of the types of cases that can be considered "akin to" professional negligence, New GM has offered no arguments to explain why any of these cases are similar to a manufacturer's decision to issue a warning. See Mem. in Supp. (Renewed) at 14; Mot. for JMOL (Lack of Expert) at 3-4.

The only products liability case identified by New GM addressed a design defect claim, not a failure to warn claim. See *Walters v. Howmedica Osteonics Corp., 676 F. Supp. 2d 44, 52 (D. Conn. 2009)* (involving the standard of care required in the design and construction of surgical trays). In Walters, the court held that "the design and construction of surgical trays is a complex process that requires the consideration of a substantial number of variables." Id. Walters is thus more similar to the plaintiffs' claim for negligent failure to recall and retrofit than their claim for negligent failure to warn. Assessing the design and manufacture of a complex product, such as a surgical tray or the braking system in a car, often requires technical expertise that is outside **[\*61]** the ordinary knowledge and skill of the average juror. Assessing the need for and adequacy of warnings for such products, however, involved consideration of different factors than required by the design or manufacturing defect claims.

In contrast to the cases cited by New GM, other cases have found that no expert was required to establish the standard of care in an equally diverse set of situations. See, e.g., *Michalski v. Hinz, 100 Conn. App. 389, 404, 918 A.2d 964 (2007)* (not requiring expert testimony as to the standard of care in complying with boating regulations); *Bader v. United Orthodox Synagogue, 148 Conn. 449, 454, 172 A.2d 192 (1961)* (not requiring expert testimony as to negligence for failure to erect a porch railing); *Ciarlelli, 46 Conn. App. at 283-84* (not

requiring expert testimony as to whether a boat operator breached the duty to warn because of danger presented by turbulent water); *Mazier v. Signature Pools, Inc., 159 Conn. App. 12, 33-34, 123 A.3d 1 (2015)* (not requiring expert testimony as to the standard of care in situating a pool according to a plot plan); *Utica Mut. Ins. Co., 122 Conn. App. at 456* (not requiring expert testimony as to standard of care in operating a plumber's torch in the vicinity of combustible materials); *Niro v. Niro, No. HHDX04-CV-126029370-S, 2014 Conn. Super. LEXIS 2943, 2014 WL 7525492, at \*7 (Conn. Super. Ct. Nov. 25, 2014)* (not requiring expert testimony as to the standard of care required of a trustee accounting for trust property).

In the absence of any case identified by either party addressing the **[\*62]** standard of care in the negligent failure to warn context, the court compares the present case against the different examples on both sides and concludes that a manufacturer's decision whether or not to issue a post-sale warning is not "akin to" professional negligence. The court has already held, in the context of the plaintiffs' claim for failure to warn at the time of the sale, that it is not outside the ordinary knowledge and expertise of the average juror to understand the risk in this case or to assess the adequacy of a warning. Similarly, the court now also holds that it is not outside the ordinary knowledge and experience of the average juror to determine when such a warning would be necessary. Unlike the cases identified above as akin to professional negligence, a determination that a warning is necessary does not require technical expertise or specialized skill when a layperson can understand without difficulty the risk that is the subject of the warning.

New GM attempts to argue otherwise by identifying certain factors that it argues the jury must consider before determining whether a manufacturer exercised reasonable care in not issuing a post-sale warning. See Mot. for **[\*63]** JMOL (Lack of Expert) at 2-3; Reply in Supp. (Renewed) at 14-15. A number of the factors identified by New GM are irrelevant here because they go to the adequacy of a warning, which the court has already held is within the ordinary ken of the jury. See Reply in Supp. (Renewed) at 14-15 (arguing that the average juror has no knowledge of "the appropriate level of generality or specificity," "choice of language, placement, and conspicuity of each warning and instruction," and "whether warnings should ever be on product, rather than in the owner's manual"). Because no post-sale warning was issued in this case, the jury was not required to consider these factors.

---

[23] Other cases have required expert testimony to establish the standard of care for real estate brokers preparing a property listing, residential construction, using plywood to cover a hole over which people walked, installing HVAC systems, coaching cheerleading, installing carpet, teaching horse riding, installing tile on a swimming pool edge, repairing cars, and installing hairpieces. See *Heisinger, 2015 Conn. Super. LEXIS 567, 2015 WL 1589152, at \*9* (listing cases).

2018 U.S. Dist. LEXIS 89587, *63

The other factors that New MG identifies include, <u>inter alia</u>, the balance between too few and too many warnings, the number and type of incident reports needed before a warning is warranted, the degree to which manufacturers should investigate incident reports, and whether supplemental warnings are effective. <u>See id.</u> at 15; Mot. for JMOL (Lack of Expert) at 2-3. First, the court notes that, while these may be factors that the jury can consider, the jury is not necessarily required to consider all of these factors in every case. Second, **[*64]** although New GM refers to these as "technical and complex considerations," <u>see</u> Mot. for JMOL (Lack of Expert) at 3, the court does not consider these factors to be outside the ordinary knowledge and experience of an average juror. For example, as a consumer, a lay juror has likely received warnings, both at the time of sale and post-sale, and is therefore able to draw reasonable conclusions about their effectiveness and frequency. Likewise, a reasonable person can draw inferences about the seriousness of a foreseeable risk based on the number and type of incident reports without technical expertise or specialized skill, especially with the facts presented here.

Indeed, if the factors identified by New GM did require expert testimony, expert testimony would likely be required in most, if not all, negligent failure to warn claims because none of the factors New GM identifies are specific to the type of risk to which the warning pertains. No Connecticut precedent indicates that the Connecticut Supreme Court would support such a far-reaching requirement, as New GM has not identified even one case in which the Connecticut Supreme Court has required expert testimony in a case for negligent **[*65]** failure to warn.

Therefore, the court concludes that expert testimony is not required to prove the standard of care or a breach of that standard for the plaintiffs' claim of negligent post-sale failure to warn. Thus, the plaintiffs' failure to offer expert testimony does not render the evidence legally insufficient to prove their negligence claim, and New GM's Renewed Motion for Judgment as a Matter of Law is denied on this ground.

c. <u>Expert Testimony Regarding Causation</u>

Finally, New GM mentions in its Motion that determining the element of causation also falls outside the ordinary knowledge and experience of jurors and therefore requires expert testimony. <u>See</u> Renewed Mot. for JMOL at 1. However, New GM's briefings do little to further develop this argument, but instead focus on the two arguments already rejected by the court above. <u>See</u>

Mem. in Supp. (Renewed) at 11-15; Reply in Supp. (Renewed) at 13-16; Mot. for JMOL (Lack of Expert) at 1-5. New GM's only elaboration of this argument is its reliance on <u>Freitas</u>, a case already distinguished by the court above, and <u>Karavitis</u>, which the court discusses below. See Reply in Supp. (Renewed) at 15. In light of New GM's cursory treatment of **[*66]** the argument, the court briefly addresses it below and concludes that it has no merit.

"[E]xpert testimony is not required as a matter of law to establish that a defective warning caused the plaintiff's injury." <u>*Karavitis, 243 F. Supp. 3d at 253*</u>. "However, expert testimony is required where 'necessary to determine the effect of [the product] and to determine whether it caused [Plaintiff's] injuries." <u>*Id. at 253-54*</u> (quoting <u>*Sullivan v. Pfizer, Inc., No. 3:14-CV-1374 (MPS), 2016 U.S. Dist. LEXIS 27720, 2016 WL 868155, at \*4 (D. Conn. Mar. 4, 2016))*</u> (alteration in original). For example, in <u>Sullivan</u>, the court held that expert testimony was required to inform the jury on the effect of Lipitor, a prescription drug, on the body and whether the failure to warn about those effects caused the plaintiff's heart attack. <u>See *Sullivan, 2016 U.S. Dist. LEXIS 27720, 2016 WL 868155, at \*4*</u>.

In this case, however, expert testimony is not necessary to determine the effect of the product or its defect. In contrast to the medical effects of prescription drugs, the jury does not require special training or expertise to understand the effect of the absence of BTSI when the key is in the Accessory position. It is thus within the knowledge and experience of an ordinary juror to determine whether the failure to warn of such a risk caused the plaintiffs' injuries without expert testimony. Therefore, New **[*67]** GM's Renewed Motion for Judgment as a Matter of Law is also denied on this ground.

2. Sufficiency of Evidence of Inadequacy of Warning at Time of Sale New GM makes a number of arguments, all of which contend that the evidence presented at trial was legally insufficient to support the jury's finding that the warnings in the owner's manual were inadequate. <u>See</u> Mem. in Supp. (Renewed) at 15-23. As explained above, the court considers these arguments relevant only to the extent that inadequate warnings at the time of the sale may affect the plaintiffs' negligence claim for post-sale failure to warn. <u>See, supra</u>, at 32.

New GM first argues that the plaintiffs mischaracterize the risk that should be the subject of the warning. <u>See</u> Mem. in Supp. (Renewed) at 15-17, 19-21. New GM

argues that this risk is the general risk that "unattended children could make vehicles move, causing injury or death." Id. at 15. In contrast, the plaintiffs argue that the risk is the more specific risk that "a child could cause a rollaway by shifting the transmission out of Park when the key was in Accessory, without starting the engine and without depressing the brake." Mem. in Opp. (Renewed) at 8.

The plaintiffs presented sufficient **[*68]** evidence at trial to enable the jury to conclude that the relevant risk to be warned of was the specific risk described by the plaintiffs, not merely the general risk that unattended children could cause vehicles to move. For instance, the plaintiffs' design expert, Wayne McCracken, answered affirmatively that there was a "risk of roll-aways caused by children shifting out of park with the key in an unprotected position" and that "having a vehicle design that allows children to shift the transmission out of park without having to depress the brake when the key is in the accessory position creates a risk of serious injury and death." Trial Tr. 7/10/17 at 330, 344; see also id. at 301 ("To prevent parked vehicles with automatic transmissions from rolling away. It is a danger. It is a risk.").

Additionally, the Introduction to the National Highway Traffic Safety Administration ("NHTSA") Report states that it is "designed to reduce the potential for accidents resulting from shifting of the transmission lever in parked vehicles with automatic transmissions, causing them to roll away." National Highway Traffic Safety Administration Report ("NHTSA Report"), Trial Ex. 72, at 4. William Sultze, system **[*69]** engineer for New GM, also testified that he was aware of "instances of General Motors' vehicles rolling away as a result of children putting the key in the ignition, moving into an intermediate position between lock and run where BTSI didn't function." Sultze Deposition at 24-25.

New GM points to one part of McCracken's testimony that characterizes the risk as "the risk of children shifting the transmission out of park." See Trial Tr. 7/10/17 at 303. This phrasing, however, does not necessarily conflict with the plaintiffs' characterization of the risk. The attorney questioning McCracken asked, "What, if anything, does this report [the NHTSA Report] indicate about the risk of children shifting the transmission out of park?" Id. McCracken answered that it was a "huge risk." Id. Taken in context with McCracken's previous testimony about the risk associated with the NHTSA Report, "the risk of children shifting the transmission out of park" could merely be shorthand for the risk of a

"child shifting a vehicle out of park with the engine off." See id. at 302-03. As such, McCracken's answer would be entirely consistent with the plaintiffs' more specific characterization of the risk.

Even if McCracken's **[*70]** testimony did support a more general characterization of the risk, however, the jury was not required to accept that characterization. In deciding a motion for judgment as a matter of law, the court "must disregard all evidence favorable to the moving party that the jury Is not required to believe" and "must view the evidence in the light most favorable to the [non-moving] party." *Mickle v. Morin, 297 F.3d 114, 120 (2d Cir. 2002); Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998)*. Therefore, based on the evidence described above, taken in the light most favorable to the plaintiffs, a jury could reasonably have concluded that New GM should have warned of the risk that a child could cause a rollaway by shifting the transmission out of Park without depressing the brake when the key was in the Accessory position, as described by the plaintiffs.[24]

Accepting that characterization of the risk, the court holds that the plaintiffs presented sufficient evidence to enable the jury to find that New GM's warning in the owner's manual was inadequate to warn of that risk. The evidence at trial included, inter alia, the warnings in the owner's manual themselves, the testimony of New GM's expert witness, David McKendry, and the deposition of Sultze.

The first of two instructions in the owner's manual, **[*71]** relied on by New GM, states:

> Leaving children in a vehicle with the Ignition key is dangerous for many reasons. They could operate the power windows or other controls or even make the vehicle move. The children or others could be badly injured or even killed. Do not leave the keys in a vehicle with children.

----

[24] Based on its argument that the plaintiffs had mischaracterized the risk, New GM also argues that the owner's manual adequately warns of the risk, as characterized by New GM, that unattended children can make vehicles move. See Mem. in Supp. at 15-17. Even if New GM were correct that the manual adequately warned of this more general risk, however, it would not be entitled to judgment as a matter of law because, as discussed above, a reasonable jury could have found that the risk was not merely that unattended children could make the vehicle move, but rather that the child could shift the transmission out of Park without depressing the brake.

2004 Suburban Owner's Manual, Trial Ex. 9b, at 2-3. The statement is accompanied by a yellow bar with the word CAUTION and a caution symbol. See id. The jury could reasonably conclude that this statement does not adequately warn of the risk, as characterized above, because it does not mention the BTSI and, more specifically, does not state that the transmission can be shifted out of park with the key in Accessory without depressing the brake. For instance, one could interpret the statement that children could "make the vehicle move" to mean that they could make the vehicle move by starting the engine, as the instruction gives no indication that the car can be moved without starting the engine. See Mem. in Opp. (Renewed) at 11.

The second instruction relied on by New GM describes how to shift out of Park and instructs the user that he or she must "fully apply your regular brakes before [*72] you can shift from Park (P) when the ignition is in RUN." 2004 Suburban Owner's Manual at 2-41. It also provides the following steps if the user cannot shift out of Park using the above instructions:

1. Turn the key to ACCESSORY. There is no shift interlock in this key position.
2. Apply and hold the brake until the end of Step 4.
3. Shift the transmission to NEUTRAL (N).
4. Start the vehicle and then shift to the gear you want.
5. Have the system fixed as soon as you can.

Id. In contrast to the first instruction, this second instruction does not have a yellow bar with the word CAUTION and a caution symbol, which the manual itself states that it will use to identify warnings. See id.; see also id. at iii ("We use a box and the word CAUTION to tell about things that could hurt you if you were to ignore the warning."). Thus, the jury could reasonably conclude that the instruction was not intended as a warning.

The jury could also reasonably conclude that, even if intended as a warning, the above instruction did not adequately warn of the relevant risk. Although this instruction does inform the reader that there is no shift interlock in the Accessory position, it does not define "shift interlock" [*73] and does not clearly state that the transmission can be shifted out of Park without depressing the brake when the key is in the Accessory position. Rather, it tells the user to apply the brake at Step 2, which may reinforce the user's assumption that the transmission cannot be shifted out of Park without depressing the brake.

The plaintiffs also introduced the testimony of David

McKendry and the deposition of William Sultze, both of whom stated that customers perceived that the BTSI system was active in all key positions. See Trial Tr. 7/12/17 at 860-61 (testimony of McKendry) (agreeing that "customers perceived, even though it wasn't true, that the BTSI was active in all key positions"); Sultze Deposition at 74 (acknowledging that "[m]ore and more customers are starting to" "expect[ ] BTSI would be functional in all key positions"). The jury could reasonably infer from this testimony that the owner's manual had not adequately informed customers that the BTSI was not active in the Accessory position and that therefore the transmission could be shifted out of Park without depressing the brake in that position.

Taken together, this evidence could reasonably support the jury's finding that [*74] the warning in the owner's manual was inadequate at the time of the sale. Therefore, New GM cannot show that it is entitled to judgment as a matter of law on this ground.

New GM does, however, make several more specific arguments that the court now addresses. New GM argues that the warning is adequate because, if heeded, it would have prevented the plaintiffs' injuries. See Mem. in Supp. at 18-19. New GM is correct that the Restatement (Second) of Torts states, "Where a warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in a defective condition, nor is it unreasonably dangerous." *Restatement (Second) of Torts § 402A cmt. (j)*. This is commonly discussed in the context of products that are inherently dangerous and cannot be made safer by redesign. See *Plummer v. Lederle Labs., Div. of Am. Cyanamid Co., 819 F.2d 349, 355-56 (2d Cir. 1987)*; *Vitanza v. Upjohn Co., 257 Conn. 365, 374-75, 778 A.2d 829 (2001)*.

However, Connecticut cases discussing the Restatement primarily do so in the context of a warning that is adequate or "proper." See *Vitanza, 257 Conn. at 374* ("Proper warnings, however, may prevent a product from being unreasonably dangerous." (emphasis added)); *id. at 375* ("A manufacturer of an unavoidably unsafe product can avoid strict liability if the product is 'properly prepared, and accompanied [*75] by proper directions and warning . . . .'" (emphasis added)); see also *Drake v. Allergan, Inc., 63 F. Supp. 3d 382, 391 (D. Vt. 2014)* ("Vermont law presumes that if an adequate warning is provided, the warning will be read and heeded." (emphasis added)). New GM has pointed to no Connecticut case indicating that the Restatement would

2018 U.S. Dist. LEXIS 89587, *75

consider a product not to be defective based on the assumption that an inadequate warning would be read and heeded.[25] Therefore, because the evidence is sufficient for the jury to find that the warning was inadequate, New GM is not entitled to judgment as a matter of law on this ground.

New GM also argues that the risk described by the plaintiffs is obvious and, therefore, that it has no duty to warn of such a risk. See Mem. in Supp. (Renewed) at 21-23. The court instructed the jury that "[a] product seller does not have a duty to provide a warning as to a danger that is obviously involved in the customary, ordinary use of a product or that is obviously present if the product is misused." Jury Charge at 36-37; *Wynne v. Summerland, Inc., No. LLICV095006358S, 2012 Conn. Super. LEXIS 2684, 2012 WL 5860349, at *3 (Conn. Super. Ct. Nov. 2, 2012)*. However, the jury could reasonably have concluded, based on the evidence, that the risk that a child could shift the transmission out of Park without depressing the brake [*76] when the key was in the Accessory position is not an obvious risk. As noted above, both McKendry and Sultze testified that consumers had misperceptions about how the BTSI system worked and believed that it was active in all key positions. See Trial Tr. 7/12/17 at 857-61; Sultze Deposition at 73-74. McKendry, for example, testified that "assuming that you had to step on the brake all the time to shift out of park" was "a perception that a lot of people had." See Trial Tr. 7/12/17 at 859. This evidence is sufficient to enable the jury to conclude that the risk was not obvious and therefore that New GM had a duty to warn of that risk.

New GM further argues that it is entitled to judgment as a matter of law because the duty to warn extends only to ordinary users, and children are not the ordinary users of cars. See Mem. in Supp. (Renewed) at 23-24. New GM states, "A vehicle manufacturer owes no duty to warn children, who are not intended operators, how to 'safely shift out of Park, with or without a BTSI.'" Id. at 23. New GM's argument, however, misses its mark. The

plaintiffs' claim is not that New GM failed to warn the children how to safely shift out of Park, but rather that New GM failed to warn [*77] the parents of the risk that children left unattended could shift the transmission out of Park without depressing the brake. See Mem. in Opp. (Renewed) at 18 n.35. New GM's argument has no relevance to its failure to warn the parents of this risk. Therefore, it is not entitled to judgment as a matter of law on this ground.

Taken together, the evidence discussed above could reasonably support the jury's finding that the warning at the time of the sale was inadequate. Therefore, New GM has failed to show that it is entitled to judgment as a matter of law.

3. Sufficiency of Evidence of Failure to Warn Post-Sale

New GM then argues that it is entitled to judgment as a matter of law because the evidence is legally insufficient to support the jury's verdict in favor of the plaintiffs on either theory of the post-sale failure to warn claim. See Mem. in Supp. (Renewed) at 35. In doing so, New GM relies on its earlier argument that the warnings at the time of the sale were adequate as a matter of law. See id. New GM then argues that neither the Technical Service Bulletin issued regarding the BTSI nor the unverified reports of rollaway incidents were sufficient to prove that a reasonably prudent [*78] manufacturer would have issued a post-sale warning. See id. Taking these two arguments together, New GM argues that no reasonable jury could have found that it was negligent in failing to issue a post-sale warning. See id.

New GM's arguments here fail because the court has already held above that there was sufficient evidence on which a reasonable jury could conclude that the warnings at the time of the sale were inadequate. Therefore, a reasonable jury could have found, then, that a reasonable manufacturer would have issued a post-sale warning based on the inadequacy of the warnings at the time of the sale. Furthermore, New GM's arguments fail to view the evidence in the light most favorable to the plaintiffs, as required in deciding a Motion under *Rule 50(b)*. See *Mickle, 297 F.3d at 120*; *Norton, 145 F.3d at 118*. Taken in the light most favorable to the plaintiffs, the Technical Service Bulletin, the reports of rollaways, and the evidence discussed above that the warnings in the manual were inadequate are sufficient to support the jury's verdict in favor of the plaintiffs.

Technical service bulletins are notices issued by the company to dealerships to help them communicate with

---

[25] The other cases that New GM cites to support its proposition that more specific warnings are not needed when a general warning would prevent the injury do not apply Connecticut law. See, e.g., *Thompson v. TCI Prod. Co., 81 F. Supp. 3d 1257, 1265 (N.D. Okla. 2015)*; *Heckman v. Ryder Truck Rental, 962 F. Supp. 2d 792, 805 (D. Md. 2013)*; *Liesener v. Weslo, Inc., 775 F. Supp. 857, 861 (D. Md. 1991)*; *Davis v. Berwind Corp., 547 Pa. 260, 267-68 (1997)*. New GM has not identified any case law indicating that Connecticut courts would apply the same principle.

customers regarding questions and repairs. See Trial Tr. 7/13/17 **[\*79]** at 959-60. The Technical Service Bulletin ("TSB") in this case, issued on May 25, 2006, was issued "to better explain how the [BTSI] feature is intended to operate." Technical Service Bulletin ("TSB"), Trial Ex. 65, at 1. The TSB states:

> The shift lock control feature was intended to prevent drivers from shifting out of Park with the vehicle running without the brakes applied. However, if the ignition switch is in the Accessory (ACC) position, it may be possible on some vehicles to move the shift lever out of Park WITHOUT first activating the brake.

Id. The TSB also acknowledges that "some owners may feel that the shift lock control system prevents an unattended child from moving the vehicle." Id.

New GM argues that there is no evidence that a reasonably prudent manufacturer would have issued a warning because of the TSB. See Mem. in Supp. (Renewed) at 31. This argument overlooks the text of the TSB itself, from which the jury is permitted to draw reasonable inferences. Drawing all inferences in favor of the plaintiffs, see *Mickle, 297 F.3d at 120*, a reasonable jury could have inferred from the TSB that Old GM[26] was aware in 2006 that some of its customers misunderstood the BTSI feature in a way that could be **[\*80]** potentially dangerous. The jury could further have inferred from the clear instructions in the TSB, which differ from the language in the owner's manual, that Old GM believed that customers needed clarification that the BTSI was not active in the Accessory position. These inferences reasonably support the jury's finding that a reasonable person in Old GM's position would have issued a post-sale warning that it was possible to shift the transmission from Park without depressing the brake when the key is in the Accessory position.

New GM makes several other arguments regarding the insufficiency of the TSB as evidence supporting the jury's verdict. These arguments, however, misunderstand the purpose for which the TSB is offered as evidence. New GM first argues that Rose O'Connor did not know what a BTSI was and therefore could not have had the assumption discussed in the TSB that the BTSI would prevent an unattended child from moving the vehicle. See Mem. in Supp. (Renewed) at 31. Even if true, this is irrelevant because the TSB is evidence of what Old GM knew and, therefore, what a reasonable manufacturer with that knowledge would have done. The knowledge of Rose O'Connor, one particular **[\*81]** consumer, does not alter the standard of care owed by Old GM to its consumers generally.

Second, New GM argues that the TSB was issued the year before the O'Connors bought the vehicle, so any warning issued would have gone to the previous owner rather than to the plaintiffs. See Mem. in Supp. (Renewed) at 31. This argument again misunderstands the evidentiary significance of the TSB. The issue is whether a reasonable manufacturer would have issued a post-sale warning. Whether the warning would have reached the O'Connors does not alter the standard of care owed by the manufacturer or whether Old GM failed to meet that standard of care.

Third, New GM argues that the TSB is insufficient evidence to show that the warnings were inadequate at the time of the sale because it refers users to the manual. See Mem. in Supp. (Renewed) at 31; Reply in Supp. (Renewed) at 11; TSB ("Please stress to owners, as stated in the Owner Manual, that children should NEVER be left unattended in a vehicle, even if the ignition key has been removed from the vehicle."). However, as previously discussed, the court has already held that there was sufficient evidence to find that the warnings were inadequate at the **[\*82]** time of the sale. That evidence is not limited to the TSB, but also includes the testimony of McCracken, Sultze, and McKendry, as well as exhibits from the owner's manual itself. The court refers to the TSB now as additional evidence on which the jury could conclude that a reasonably prudent manufacturer would have issued a post-sale warning, which is a different inquiry from whether the owner's manual was inadequate.

In addition to the TSB, the plaintiffs also introduced evidence of unverified reports of rollaway incidents that were received by Old GM and New GM. The court permitted the plaintiffs to introduce evidence of the reports through a Stipulation agreed upon by the parties. See Stipulation, Trial Ex. 300; Pretrial Conf. Tr. 6/28/17 at 65-66. The Stipulation stated, inter alia:

> GM stipulates that its files contain 43 reports made by customers between March 10, 2003 and May 21, 2011, of incidents of vehicle rollaways claimed to be caused by children involving vehicles with a brake transmission shift interlock system similar to the 2004 Chevrolet Suburban at issue in this case.

---

[26] The court refers to Old GM rather than New GM here because the TSB was issued in 2006 prior to Old GM's bankruptcy and the purchase of its assets by New GM.

The reports contain information received from the customer and do not indicate whether or not the claims **[\*83]** were verified.

Stipulation at 1. It further specifies: "The reports each claim that a child shifted the transmission out of Park, causing the vehicle to rollaway. In 18 of the incidents, children were reported not have pressed the brake; the other 25 incidents provide no information about the brake." Id. The court issued a limiting instruction to the jury that the evidence in the Stipulation was only to be used in "deciding whether General Motors was aware at certain times of the fact that people reported such incidents," not to prove that the events in the reports actually occurred. See Trial Tr. 7/10/17 at 332.

This evidence was sufficient to enable the jury to find that Old GM and New GM were both on notice that customers had reported incidents in which children had caused the car to roll away by shifting the transmission out of Park without depressing the brake. Without assuming that the incidents had actually occurred, the jury could reasonably have relied on this evidence to support a conclusion that a reasonable manufacturer in Old GM's and New GM's positions would have issued a post-sale warning to customers based on this notice.

New GM's arguments regarding these reports focuses **[\*84]** primarily on their admissibility. First, New GM argues that the reports are inadmissible hearsay. See Mem. in Supp. at 33-34. The court rejected this argument at trial. See Pretrial Conf. Tr. 6/28/16 at 65-66. A statement is only hearsay if it is "offered to prove the truth of the matter asserted in the statement." *Fed. R. Evid. 801(c)(2).* In this case, the reports were not offered to prove the truth of the matter asserted, but to prove notice, which is a permissible nonhearsay purpose. See *Crawford v. Tribeca Lending Corp., 815 F.3d 121, 126 (2d Cir. 2016); AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Sys., Inc., 637 Fed. App'x 645, 650 n.7 (2d Cir. 2016).* The court clearly instructed the jury regarding the limited purpose of this evidence.[27] See Trial Tr. 7/10/17 at 332-33. Therefore,

the court did not err in admitting the reports.

Second, New GM argues that the reports say nothing about the warnings in the owner's manual and how they affected the reported events. See Reply in Supp. at 11. As with New GM's arguments about the TSB, this argument misunderstands the purpose for which notice of the reports was introduced. The reports are not evidence that the warnings in the owner's manual were inadequate. Rather, they are evidence from which a jury could reasonably conclude that Old GM and New GM were aware that rollaway incidents had been reported and, therefore, that a reasonable manufacturer in their positions would have issued a post-sale warning in response to such notice.

Finally, New GM argues that the court should not have permitted the plaintiffs to cross-examine defense expert Victor Hakim in a way that invited him to assume the truth of the unverified reports through hypotheticals. See Mem. in Supp. (Renewed) at 33. New GM argues **[\*86]** that the cross-examination prompted speculation and caused juror confusion. See id. During the cross-examination of Hakim, the plaintiffs' attorney asked Hakim a number of questions, posed as hypotheticals, that required Hakim to assume that the reports of rollaway incidents were true and that children under a certain age could not reach the brake. See Trial Tr. 7/13/17 at 1030-34. New GM objected to the questions on the ground that they assumed the truth of the reports, which were admitted only for purposes of notice. See id. The court, however, overruled the

---

[27] The court instructed the jury when the Stipulation was admitted into evidence:

> First, you have to understand that you may use this evidence, which is this stipulation, only for the purposes in connection with deciding whether General Motors was aware at certain times of the fact that people claim these incidents occurred and claim they involved a child, claim certain injuries resulted.

---

The stipulation in no way proves each of those incidents. What is proved is that GM received a report about such a claimed incident. So it is like saying you get a letter in the mail and it says certain **[\*85]** things. It doesn't necessarily prove they are true. What it proves is you read that letter and now you know that someone said what's in the letter happened. Okay. Doesn't prove what happened, but it does prove that, in the letter example, you know what was in the letter was said.

Trial Tr. 7/10/17 at 332. The court again instructed the jury during the cross-examination of Hakim: "I want you to remember that the stipulation is evidence that a report of these types of information came into GM by certain ages, et cetera, and other aspects, but that didn't prove they actually happened." Trial Tr. 7/13/17 at 1032. Although New GM requested that the court re-charge the jury with this limiting instruction at the end of the trial, the court ruled that such an instruction would be unnecessary since it had already clearly charged the jury twice on this matter. See Charge Conf. Tr. 7/15/17 at 1380-81.

objection and permitted the witness to answer. See id.

Generally, "[i]n asking a hypothetical question, the examiner may seek the witness's opinion on 'any combination of facts within the tendency of the evidence.'" *Vermont Food Industries, Inc. v. Ralston Purina Co., 514 F.2d 456, 463 (2d Cir. 1975)*; see also *United States v. Morgan, 554 F.2d 31, 33 (2d Cir. 1977)* ("Opinion testimony of expert witnesses has traditionally been given in response to hypothetical questions based upon the evidence in the case, and this form of questioning may properly be used on cross-examination as well as direct."). New GM is correct that, because evidence of the reports was admitted solely for the purpose of notice, there was not sufficient foundation in the evidence for the hypothetical [*87] questions asked here, which assumed that the rollaway incidents actually occurred the way they were reported to New GM.

However, *Federal Rule of Civil Procedure 61* states, "Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error committed by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." *Fed. R. Civ. P. 61*. "An erroneous evidentiary ruling that does not affect a party's 'substantial right' is thus harmless." *Tesser v. Bd. of Educ. of City School Dist. of City of New York, 370 F.3d 314, 319 (2d Cir. 2004)*. "Whether an evidentiary error implicates a substantial right depends on 'the likelihood that the error affected the outcome of the case.'" Id. (citation omitted).

In this case, even if the court erred in permitting the plaintiffs' hypothetical questions on cross-examination of Hakim, such error was harmless. The plaintiffs' attorney asked Hakim, assuming that the reports were accurate and that children under a certain age could not reach the brake, how many of the reported incidents could have been prevented if the BTSI was operative in all key positions. [*88] [28] See Trial Tr. 7/13/17 at 1031-34. The

questions required Hakim to do little more than add the numbers stated in the reports. Thus, his answers introduced little into the record that was not already before the jury in the stipulation, which already noted the reported ages of the children in each incident and the number of incidents in which it was reported that the child had not depressed the brake. See *Morgan, 554 F.2d at 33*. Furthermore, in light of the ample other evidence in the record, Hakim's answers to the plaintiffs' two hypothetical questions on cross-examination were

---

HAKIM: Okay.

ATTORNEY: That would have meant that those 23 cases, the car would not have rolled away if all key positions were protected, correct?

HAKIM: All right. So under all those presumptions and assuming [*89] all those facts, sure. But—yeah.

ATTORNEY: Okay. And then if you assume—and I know this one you disagree with—that the three year olds couldn't put their foot to the brake and shift at the same time that would add another 13 cases to the number, right? You go from 23 to 36 of the 43 cases?

. . .

HAKIM: I wouldn't agree with that.

ATTORNEY: You wouldn't agree that if the three year olds can't shift and reach the brake at the same time an ignition which protects all key positions would stop 36 of these 43 roll-aways?

HAKIM: So again, I kind of missed that part in your question that your assumption was they couldn't reach the brake pedal, and I'm assuming all again—all the other facts that are unknown to me are true, which are all unknown to me, then of course.

Trial Tr. 7/13/17 at 1031-34.

New GM notes that the court also permitted the plaintiffs' counsel to cross-examine Hakim about particular reports. See Mem. in Supp. (Renewed) at 33. These questions about particular reports, however, were not hypothetical questions based on unproven assumptions. See Trial Tr. 7/13/17 at 1035-49. Rather, they asked Hakim to testify about his personal knowledge and experience investigating particular cases for the purpose of impeaching the expert opinions he gave during his direct examination. See id. at 1041 ("I believe that what the counsel is doing is he's cross-examining your witness. Your witness gave various opinions, made various statements about his view of things, and I believe that he's entitled to cross-examine him, especially on something the witness is aware of."); see also id. at 1035, 1043. Therefore, these other questions, which are not based on hypothetical assumptions, are not implicated in the court's discussion here.

---

[28] Specifically, the following two hypothetical questions assumed the truth of the reports:

ATTORNEY: I want you to assume for the purposes of this question that what was reported to GM in these cases is true and I want you to assume that the children that were younger than two and the children that were two, could not reach the brake. The two year olds and under twos, okay, assume those facts.

likely "unimportant in relation to everything else the jury considered on the issue in question." See *Warren v. Pataki, 823 F.3d 125, 138 (2d Cir.)*, cert. denied sub nom. *Brooks v. Pataki*, 137 S. Ct. 380, 196 L. Ed. 2d 300 (2016).

Additionally, although New GM argues that the questions resulted in speculation and jury confusion, see Mem. in Supp. (Renewed) at 33, any speculation or confusion was mitigated by the court's clear instructions that the jury should not take any of the assumptions in the hypothetical as proven. See Trial Tr. 7/13/17 at 1031-32; cf. *SLSJ, LLC v. Kleban, 277 F. Supp. 3d 258, 281 (D. Conn. 2017)* ("Transparency regarding the unproven nature of 'facts' discussed by the expert will [*90] be key."). The court instructed the jury:

> I will say to the jury the way the question is being asked is to assume these incidents happened in a certain way. I want you to remember that the stipulation is evidence that a report of these types of information came into GM by certain ages, et cetera, and other aspects, but that didn't prove they actually happened.
> But this—now the lawyer because he's on cross-examination is asking the witness, if he can, to answer certain questions where an assumption is made. That doesn't mean it has been proven. Even if the witness says yes, it doesn't mean it's been proven. A yes would mean, yes, taking your assumption as true, which he doesn't know, he doesn't know. Then he's going to give an answer to the rest of the part of the question.

Trial Tr. 7/13/17 at 1032. New GM further acknowledges that it had the opportunity on redirect to elicit testimony challenging the assumptions on which the hypothetical questions were based by "showing that unverified reports of other rollaway incidents cannot be taken at face value and often are wrong." See Mem. in Supp. (Renewed) at 33; cf. *Vermont Foods, 514 F.2d at 463* ("The sufficiency of the assumptions as well as the soundness of the opinion [*91] can be tested on cross-examination."). Given the court's clear instruction and New GM's redirect, as well as the limited evidentiary significance of the two hypothetical questions at issue, it is unlikely that the court's error in permitting the questions on cross-examination affected the outcome of the case. Therefore, any error was harmless and does not warrant setting aside the jury's verdict.

In sum, the plaintiffs have presented sufficient evidence to enable the jury to return a verdict against New GM for negligent failure to warn post-sale. The court notes that

the plaintiffs do not rely solely on the TSB or solely on the reports of rollaway incidents to support their claim. Rather, this evidence was introduced in combination with all of the evidence previously discussed regarding the inadequacy of the warnings in the owner's manual. Taken together, this is ample evidence to reasonably support the jury's verdict. Therefore, New GM has not shown that it is entitled to judgment as a matter of law, and its Renewed Motion is denied on this ground.

4. Sufficiency of Evidence Regarding Causation

Finally, New GM argues that the evidence is legally insufficient to support a finding that [*92] its failure to warn caused the plaintiffs' injuries because Rose O'Connor did not attempt to read the warnings in the owner's manual. See Mem. in Supp. (Renewed) at 24-27; Reply in Supp. (Renewed) at 11. New GM's argument appears to be primarily focused on the lack of causal connection between the inadequate warnings in the owner's manual and the plaintiffs' injuries. See, e.g., Reply in Supp. (Renewed) at 12 ("There was no evidence from which a reasonable jury could have found that, if only some different language had been placed in some different section of the 2004 Suburban owner's manual, Plaintiffs' injuries would have been avoided."). To the extent that New GM's argument is directed at the plaintiffs' failure to warn claim, however, the court need not address the argument because the jury found that the inadequate warnings at the time of the sale did not cause the plaintiffs' injuries. See Jury Verdict at 3. Therefore, New GM was not found liable on that claim. See id.

The jury did find that Old GM's and New GM's negligent post-sale failure to warn caused the plaintiffs' injuries. See Jury Verdict at 4-5. To the extent that New GM's argument is read liberally to also challenge that finding of causation, the court [*93] concludes that the evidence was sufficient to support the jury's verdict. Rose O'Connor testified that, if she had known the Suburban could be shifted out of Park without depressing the brake when the key was in the Accessory position, she would not have purchased the car, left the keys in the car, or permitted her children to go to the car unattended. See Trial Tr. 7/11/17 at 675. The jury could reasonably have credited her testimony and found, therefore, that the plaintiffs' injuries would not have occurred had either Old GM or New GM issued an adequate post-sale warning.

Additionally, although the plaintiffs did not offer any evidence that Rose O'Connor read the instructions in the owner's manual, see Reply in Supp. (Renewed) at

12, this does not require a verdict for New GM. Rather, a reasonable jury could have found that, even though she did not read the warnings in the owner's manual, she would have read and heeded a more conspicuous warning sent to her by mail or through some other means of post-sale notification. Cf. _Pullano v. Chrysler Corp., No. 05-CV-0135A(F), 2009 U.S. Dist. LEXIS 131457, 2009 WL 10692145, at *15 (W.D.N.Y. Apr. 23, 2009)_, report and recommendation adopted, _No. 05-CV-0135A(F), 2011 U.S. Dist. LEXIS 164146, 2011 WL 13244291 (W.D.N.Y. July 19, 2011)_ ("[The plaintiff's] admitted failure to read the vehicle owners' **[*94]** manual from cover to cover does not necessarily sever the causal connection between Defendant's alleged failure to adequately warn against attempting to jump-start the vehicle at the solenoid and the [plaintiff's] resulting injuries. Rather, on this record, there is an issue of fact as to whether a further warning should have been placed on the starter solenoid itself." (internal citation omitted)); _Crespo v. Chrysler Corp., No. 97 CIV. 8246 (JSR), 1998 U.S. Dist. LEXIS 13105, 1998 WL 542304, at *2 (S.D.N.Y. Aug. 25, 1998)_ ("[I]t cannot be presumed from [the plaintiff's] failure to have heeded certain of the warnings contained in the owner's manual, that he would similarly have ignored a prominent warning on the machine itself. Clearly, the jury was entitled to find that in light of the contrast between the nature of the warnings provided and those negligently omitted, the consumer likely would have heeded the latter, prominently-displayed, ever-present cautionary instructions." (internal quotation marks and citation omitted)).

Therefore, New GM has not shown that no reasonable jury could have found for the plaintiffs on the issue of causation. Accordingly, its Renewed Motion for Judgment as a Matter of Law is denied on this ground.


## V. CONCLUSION

For the reasons stated above, the defendant's Renewed Motion **[*95]** for Judgment as a Matter of Law After Trial is **DENIED**.

**SO ORDERED**.

Dated at New Haven, Connecticut, this 17th day of April, 2018.

/s/ Janet C. Hall

Janet C. Hall

United      States      District      Judge

Katherine Morrin