# Exhibit F

```
 1                UNITED STATES DISTRICT COURT
 2                   DISTRICT OF CONNECTICUT
 3
 4   FREDERICK KLORCZYK, JR. As co-administrator of the
 5   Estate of Christian r. Klorczyk, et al.
 6
 7                                              PLAINTIFFS
 8
 9   V.
10              CIVIL ACTION NO. 3:13-CV-00257-JAM
11
12   SEARS ROEBUCK & CO., et al.
13
14                                              DEFENDANTS
15   _____
16
17        VIDEO DEPOSITION FOR THE DEFENDANTS,
18              SEARS ROEBUCK & CO., et al.:
19
20      The Video Deposition of Frederick G. Heath,
21   taken in the above-styled matter at Court Reporting
22   Services, Inc., 6013 Brownsboro Park Boulevard, Suite
23   A, Louisville, Kentucky, on the 22nd day of
24   March, 2017, beginning at 10:24 a.m.
25
```

```
 1      Q.   It -- it's a basic statement of fact about
 2   jack stands.  If we go to that one standing over
 3   there and raise the bar up and it stays up, we can
 4   lift it slightly and then drop the bar down; right?
 5      A.   If you hold the handle up.
 6      Q.   Yeah.  And then if you go to the top of
 7   Page 12, you conclude:  [reads] Tip over the
 8   support stand must be eliminated as a cause;
 9   right?
10      A.   Yes, sir.
11      Q.   If you turn to Page 13.
12      A.   Okey-doke.
13      Q.   Say:  [reads] The possibility of
14   encountering false engagement with pawl and
15   ratchet support stands is not only foreseeable but
16   apparently not uncommon.  Now what's the basis of
17   that opinion?
18      A.   Well, I had a number of -- of
19   contemporaneous operating instructions from other
20   jack stands in the market at the time.  And a large
21   number of them included a warning consistent with
22   making assurance that the pawl was appropriately
23   engaged with the ratchet teeth before utilizing --
24   before applying the load.
25           So that's how I come to the conclusion, it was
```

1  apparently not uncommon, because I don't know
2  whether people would -- or -- or I would conclude
3  that people wouldn't put that warning in their -- in
4  their operation manual if either (1) it was
5  foreseeable to them that that such could happen,
6  or that (2) they've already had experience with
7  such happening, and therefore decided to add a
8  warning to that effect.
9     Q.   Is there any other basis for that opinion
10 that it's not uncommon?
11    A.   Oh.  I've heard scuttlebutt about this
12 happening in the -- in the -- in the industry for a
13 long time.  But I've never seen it, never witnessed
14 it, never investigated a case where it had
15 happened before.  And quite frankly, was skeptical
16 of this case when I first got involved, and became
17 a believer through my investigation and testing.
18    Q.   Who did you hear this scuttlebutt from?
19    A.   Oh, gosh.  I mean, I go to shows
20 regularly; I talk to people who make these things.
21 I've been in the automotive lift industry where
22 such kind of equipment is common in shops.  I've
23 been in literally hundreds if not thousands of
24 automotive service facilities.  I spent 21 years
25 manufacturing automotive lifts.  And since that

1   time, I've spent another -- gosh, since 1992 as a
2   consultant to the automotive lift industry.  I serve
3   as secretary to their standards writing
4   undertakings and. . .  Anyway, that's it.
5     **Q.**   You've been chairman of some committee
6   on that --
7     **A.**   I'm --
8     **Q.**   -- haven't you?
9     **A.**   -- chairman of the -- currently of the
10  Portable Automotive Services Equipment
11  Committee.  I've been on that committee since, oh,
12  gosh, I'm going to say  93 or  94, something like
13  that.  I don't get involved with such discussions in
14  that committee because it's inappropriate.
15    **Q.**   Why is it inappropriate?
16    **A.**   Because we're there to represent our own
17  interests and develop a standard to promote safety
18  of the users of the products that the thing -- that
19  the standards cover.
20     And I don't -- I mean, I'm -- my -- my
21  background is well-known in -- in this group.  I'm
22  an independent engineer and -- and expert.  We --
23  manufacturers are certainly not prone to discuss
24  their, for one want of a better term, "dirty laundry"
25  in such venues where insurance companies are

# CERTIFICATE OF REPORTER

STATE OF KENTUCKY AT LARGE:

I, **CAROLA G. CASON, RPR**, Notary Public for the State of Kentucky at Large, do hereby certify that the foregoing was reported by stenographic and mechanical means, which matter was held on the date, and at the time and place set out in the caption hereof and that the foregoing constitutes a true and accurate transcript of same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

GIVEN under my hand and Notarial seal this 3rd day of November, 2017.

My Commission Expires:        Notary Public

SEPTEMBER 27, 2020    

Notary ID: 474950

6013 Brownsboro Park Blvd.
Suite A
Louisville, KY 40207

CRS
COURT REPORTING SERVICES

502.899.1663
888.430.1521

admin@courtreportingky.com    www.courtreportingky.com