## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FREDERICK KLORCZYK, JR. *et al.*, *as co-administrators of the Estate of Christian Klorczyk*,
     *Plaintiffs*,

     v.

SEARS, ROEBUCK & CO. *et al.*,
     *Defendants.*

No. 3:13-cv-00257 (JAM)

## ORDER DENYING MOTION TO PRECLUDE AND GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

This is a case about the tragic death of a young man named Christian Klorczyk. He died in March 2011 when the car he was working on in his family garage fell and crushed him. Plaintiffs Frederick and Lynne Klorczyk are Christian's parents and the executors of his estate. They claim that Christian died because of a defective jack stand that allowed the car to fall on him. They have sued Sears, Roebuck & Co. and several other companies that they allege designed, manufactured, and sold the jack stand. Defendants deny that Christian used their jack stand or that their jack stand was defective.[1]

Before me are four pending motions. First, defendants move to preclude the testimony of plaintiffs' principal expert witness, Frederick Heath. I will deny this motion, because I conclude that defendants' objections go to weight and not admissibility of this expert testimony.

Second, defendants move for summary judgment on grounds that plaintiffs cannot prevail on multiple elements of their claim under the Connecticut Products Liability Act. I will deny this

---

[1] This lawsuit is stayed as to Sears because Sears is currently undergoing bankruptcy proceedings in the U.S. Bankruptcy Court for the Southern District of New York. Doc. #319.

motion because I conclude that genuine fact issues remain as to causation, design defect, adequacy of warnings, and foreseeable misuse.

Third, defendants Shinn Fu Corporation and Shinn Fu Company of America move for summary judgment on grounds that they were not sellers within the responsible chain of commerce to be held liable under the Connecticut Products Liability Act. I will grant this motion as to Shinn Fu Corporation but deny it as to Shinn Fu Company of America.

Lastly, defendants argue that there is no genuine fact issue to support plaintiffs' claim for punitive damages. I will deny this motion on the ground that there is a genuine issue of fact to show recklessness sufficient to allow for a jury to consider whether to award punitive damages.

## BACKGROUND

The facts laid out here are taken from the parties' submissions and viewed in the light most favorable to the nonmoving plaintiffs.

### The events of March 11, 2011

On the afternoon of March 11, 2011, Christian Klorczyk was performing an oil change on his family's BMW sedan in Waterford, Connecticut. Christian was a University of Connecticut senior. At the time of the accident, he was home for spring break, and his parents and brothers were away from the house at the time. Doc. #302-1 at 8, 10–14, 39–42. After Christian raised the car to work underneath it, the car fell on and killed him.

When a car is elevated for purposes of under-carriage maintenance in a garage, there are at least two kinds of equipment that are commonly used. The first is a "jack" or "floor jack" that is used to raise the car in the first instance. The second is a "jack stand" that may be used to support the car after it has already been raised using a floor jack.

A central fact in dispute in this case is what type of device was holding up the car before it fell on Christian. Plaintiffs argue that Christian used a single model 50163 Sears jack stand to support the car when it fell, but defendants contend that Christian raised and supported the car with a floor jack that plaintiffs do not allege was defective. Although they do not dispute that their jack stand was in the garage that day, they dispute that Christian used their jack stand at all. Doc. #302 at 2 (¶¶ 3–5); Doc. #296-1 at 13–17.

Christian bought the jack stand at issue from a Sears store on January 1, 2011, and no one had used it before. Doc. #302-4 at 5–6, 17, 19. Assuming that the car was resting on a jack stand, it is undisputed that the jack stand was not overloaded when the car fell. Doc. #302 at 20 (¶ 59).

Christian's parents, Frederick and Lynne Klorczyk, were the first people to enter the garage after the car fell. They returned home together at about 3:30 p.m. Doc. #302-1 at 14; Doc. #302-4 at 27–28. Lynne opened the door to the garage from the house and saw Christian's legs sticking out from under the BMW's front bumper. Doc. #302-1 at 17–19. She called out to Christian, who did not respond. *Id.* at 18. She then called the Waterford Police Department. Doc. #302 at 3 (¶ 8); Doc. #302-1 at 18–19; Doc. #302-4 at 30. A few minutes later, she opened the garage's center bay door. Doc. #302-1 at 30.

Frederick saw that, as he had previously taught Christian to do when working on the BMW, the front passenger-side of the car had been raised and the front passenger-side tire placed beneath the front passenger-side brake rotor. Doc. #302-4 at 15–16, 30, 33; *see* Doc. #302-15. The BMW's front passenger-side was now tilted downward, and the exposed brake rotor was not in contact with the removed tire. Doc. #302-4 at 29–30, 32–33.

Frederick ran to the side of the car, where the Klorczyks saw the car's transmission assembly crushing Christian's face, Christian's chest under equipment around the rear engine,

3

and Christian's right hand holding the wrench, which was connected to the oil drain plug. Doc. #302-1 at 27–29, 31; Doc. #302-4 at 29–30, 39–40; *see also* Doc. #302-10 at 4–5.

Frederick also observed the jack stand beneath the BMW's front passenger-side. It rested on its side with the ratchet bar fully retracted. Doc. #302-4 at 30, 34–35, 41–42, 59–60. The car's underside was not in contact with the jack stand. *Id.* at 30, 34–35. The other three jack stands in the set stood next to one another away from the BMW on the other side of the car. *Id.* at 62–63.

The garage also contained a Sears Craftsman floor jack. Frederick noted that the floor jack paralleled the BMW, with its lifting arm fully depressed and lifting handle removed. *Id.* at 35–38. Frederick had taught Christian to position the floor jack this way after lifting a load with the floor jack and transferring that load to a jack stand. *Id.* at 13–15.[2]

Frederick used the floor jack so that he could raise the car off of Christian. *Id.* at 30–31, 35–38, 55–58. Geoffrey Hausmann was the first emergency responder on the scene; he arrived as Frederick was attempting to engage the floor jack's lifting handle in order to elevate the floor jack's lifting arm. Doc. #302-5 at 3–6, 10, 12. Frederick then inserted the lifting handle into the socket, wheeled the floor jack under the car's passenger side, and then pumped the handle to raise the lifting arm—and with it raise the car off of Christian. Doc. #302-1 at 23–24; Doc. #302-4 at 55–56. Hausmann also observed the jack stand beneath the BMW's front passenger side. Doc. #302-5 at 5–7. Lynne then watched Frederick crawl under the BMW and upright the jack stand. Doc. #302-1 at 37; Doc. #302-4 at 31, 38–39, 61.

---

[2] To work a floor jack, the user places the handle into a socket and then turns the handle, which adjusts the hydraulic pressure in the jack. *See* Doc. #302-9 at 27, 29–30. The user then removes the lifting handle, and inserts the handle to turn it the other direction to lower the jack. *See id.* at 30.

*The parties' expert reports about the accident*

Plaintiffs and defendants have both called on experts to reconstruct how the car fell. Plaintiffs have retained Frederick Heath as their principal expert witness. He prepared an initial report on the accident, and then prepared a rebuttal to the report of defendants' expert, James Sprague. *See* Doc. #295-2; Doc. #296-9; Doc. #295-4.

Heath's initial report concluded that the most likely explanation for the accident was that the jack stand had experienced a phenomenon known as "false engagement."[3] This diagram shows the model 50163 jack stand's key features:



Doc. #302-4 at 72 fig. 1. The model 50163 jack stand includes a pyramidal base frame and a retractable ratchet bar rising from the frame that can support a heavy object. *See id.* at 72–73. The ratchet bar has a number of "teeth" that fit against the pawl. *Ibid.* Ordinarily, a ratchet bar tooth should rest firmly in place against the pawl's body. *Id.* 72–73.

During false engagement, only the tooth edge contacts the pawl tip, and friction between the two rough surfaces allows the ratchet bar to rest in place so as to appear fully engaged. Doc. #295-2 at 16; Doc. #302-14 at 3–4; Doc. #302-16. When false engagement occurs, the ratchet

---

[3] Heath's report ruled out alternative causes such as metal failure and a tip-over of the jack stand. Doc. #295-2 at 15–16.

bar and pawl are much less secure, and an outside force can cause the ratchet bar to slip out of place and collapse back into the base, allowing anything the ratchet bar has lifted to fall. *See* Doc. #295-2 at 16–17.

The Sprague report opines that instead of a jack stand failure taking place, Christian lifted the car only on the floor jack, from which the car slipped and fell, leaving scrape marks along the car's side. Doc. #296-9 at 4, 6–7. The report disagrees with the Klorczyks' testimony about events on the day of the accident that the initial Heath report accepts. *Id.* at 6. Plaintiffs dispute the Sprague report's weight and significance, arguing that the scrape marks on the BMW probably came from frequent winter driving, and also challenging the report's assumptions about how Christian was positioned beneath the car as inconsistent with their own accident scene observations and the jack stand's height. *See* Doc. #302 at 6–8 (¶¶ 16–17).

Heath's rebuttal report takes issue with various aspects of the Sprague report. The Heath rebuttal report opines that the jack stand could have elevated the car high enough for Christian to have fit underneath, and that the location of Christian's injuries was consistent with how witnesses described his location. Doc. #295-4 at 3–7. The rebuttal also opines that a floor jack collapse could not have caused the car to fall—reporting that the floor jack would need to be acted on by over 400 pounds of external force to slip out from under the car, and that no such force was available. *Id.* at 5–6.

### The jack stand's manufacture and sale

Christian purchased the jack stand from the Sears department store in Waterford. Doc. #305 at 3 (¶ 10). Sears ordered the jack stand directly from defendant MVP (HK) Industries on June 1, 2010. Doc. #305 at 2–3 (¶ 7). Defendant Wei Fu manufactured the jack stand. Doc. #256

at 4 (¶ 16). MVP shipped the jack stand via UPS directly to Sears on October 21, 2010. Doc. #305 at 3 (¶ 9).

### The other Shinn Fu companies

Plaintiffs argue that the jack stand's chain of commerce also includes Wei Fu and MVP's parent company, Shinn Fu Corporation (SFC), as well as their corporate affiliate Shinn Fu Company of America (SFA).

Michael Hung founded SFC in Taiwan in 1971. Doc. #305-8 at 10. He died around 2014, *ibid.*, but his wife, Vickie Huang, and children Victor, Betty, and Angela Hung have served on SFC's board of directors. Doc. #305-4 at 2; Doc. #305-8 at 13–14. The Hung family still owns SFC, and Victor, Betty, and Angela Hung have all served as either the top SFC executive or as vice presidents. Doc. #305-8 at 13–14. The Hung family owns MVP with one other shareholder, and they made up its board of directors and oversaw MVP's day-to-day operations in Hong Kong from Taiwan. Doc. #305-7 at 9–11. Vickie Huang also served as the general manager and indirect owner of Wei Fu. Doc. #305-4 at 2; Doc. #305-6 at 11, 20; Doc. #305-8 at 16. She ran Wei Fu's day-to-day operations in Guangdong Province, China from Taiwan. Doc. #305-6 at 8, 11–12.

SFA is a wholly owned subsidiary of SFC based in Kansas City, Missouri. Doc. #305-8 at 8, 15; Doc. #305-10 at 30. Vickie Huang's brother, Steven Huang, is SFA's president and chief operating officer. Doc. #305-10 at 5, 7. Steven Huang, Vickie Huang, and Victor, Betty, and Angela Hung are all on SFA's Board of Directors. Doc. #305-4 at 2; Doc. #305-10 at 6–7. Betty Hung is the SFA's CEO, but does not keep an office in the United States. Doc. #305-10 at 8.

In a 2011 presentation, SFC identified Wei Fu, MVP, and SFA as part of its "Affiliated Global Operations" and stated that it "supplies product development and manufacturing services to Shinn Fu affiliated companies throughout the world." Doc. #305-1 at 4, 8. In the opinion of Roger Claypool—a former SFA employee—all corporate decision-making at the Shinn Fu companies ultimately resided with the Hung family. Doc. #305-5 at 26. Claypool testified that MVP belonged to SFC's global business operations, *id.* at 12; that SFA was SFC's American satellite, *id.* at 25; and that SFC had ultimate decision-making authority over SFA, MVP, and Wei Fu's decisions, *id.* at 25–26. Claypool admitted, however, that he did not know about defendants' internal financial arrangements. Doc. #297-17 at 6–7.

MVP and SFA had a sales representative agreement between them when the jack stand sale occurred. Doc. #305 at 8 (¶ 30). Under the agreement's terms, MVP would pay SFA to provide "(a) Lab testing services; (b) Show management; (c) OIPM support, and (d) Customer phone support." *Ibid.* (¶ 31). MVP and SFA first entered into the agreement in 2006. Doc. #305-14 at 2–3, 5. SFA would act as MVP's sales agent in the United States and provide information to MVP about American market conditions, while MVP would pay SFA a 1.5% sales commission. *Id.* at 3. That agreement involved the model 50163 jack stand, Doc. #305-7 at 21–22, and it was executed contemporaneously with a sales agreement for jack stands between MVP and Sears. Doc. #305-9 at 20.

MVP and SFA then amended their agreement several times. From June 1, 2008, MVP stopped paying sales commissions to SFA. Instead, MVP started paying SFA a service charge and started reimbursing SFA for two of SFA's sales employees' services. Doc. #305-14 at 6–11. The service charge initially totaled $45,000 per year, and the employee reimbursements totaled slightly over $93,000 per year. *Id.* at 6.

Defendants SFC, SFA, MVP, and Wei Fu shared a common insurance policy when the jack stand was sold. Doc. #305 at 9 (¶ 33). The policy lists SFC and MVP as the named insureds, with their address the same as that of SFA's headquarters. Doc. #305-15 at 2. The policy lists SFA and Wei Fu as additional insureds alongside numerous other Shinn Fu entities around the world. *Id.* at 3. The policy designated SFA's general counsel, Arthur Chaykin, as the claims administrator. *Id.* at 6. SFA's corporate representative testified that the common policy was a cost-saving measure because SFA could purchase insurance at the best rate for the other corporate entities. Doc. #305 at 9–10 (¶ 36); Doc. #305-10 at 11.

### *Design and manufacture of the jack stand*

The Sears model 50163 jack stand was designed in the mid-2000s and shares a history with earlier SFA jack stands. SFA was responsible for developing and designing the jack stands sold under its brands, and at the directive of Michael Hung tested ratchet bars and sent jack stand specifications to Wei Fu as early as the 1990s. Doc. #305-5 at 10–11. Wei Fu began manufacturing ratchet-and-pawl jack stands for SFA in 2003, and would continue doing so until 2012. Doc. #305-6 at 22. Among Wei Fu's products was the model T6904 SFA Pro-Lift brand four-ton jack stand. Doc. #305-6 at 23.

In November of 2006, an email was circulated among SFA, SFC, MVP, and Wei Fu discussing the need to develop a new four-ton jack stand for Sears with a Sears model number. Doc. #305-17 at 2. Between December 2006 and March 2007, staff at SFA, Wei Fu, and MVP sent a series of emails conflating the model T6904 jack stand with the new jack stand to be manufactured for Sears. Doc. #305-6 at 39–41; Doc. #305-18 at 2–3; Doc. #305-19. Betty Hung at SFC also received a pair of these emails, Doc. #305-17 at 2. In 2011, MVP would send an

email to Sears describing the model 50163 jack stand and the T6904 jack stand as the same. Doc. #305-19 at 3. An SFC manager was also listed as a recipient of the email. *Ibid.*

Wei Fu began manufacturing the model 50163 jack stand around April 2007. Doc. #305-6 at 25. The model 50163 jack stand had the internal model number T37401, and had the same design, locking system, safety features, and load capacity as the model T6904 jack stand. *Ibid.*; Doc. #305-16 at 8–9, 18, 23. The jack stand's design complied with industry safety standards for automotive lifting devices promulgated by the Portable Automotive Lifting Devices Committee of the American Society of Mechanical Engineers (PALD-ASME). *See* Doc. #296-22 at 2; Doc. #296-24 at 3–6.

### False engagement and alternative designs

Before March 11, 2011, Claypool had discussions with SFA's general counsel about the false engagement phenomenon, and members of the PALD committee including Claypool and other representatives who worked for defendants also discussed false engagement. Doc. #302-13 at 18–30; Doc. #302-17 at 11–15. As vice-chair of the committee, Claypool talked about false engagement with other committee members, but despite the opportunity to propose agenda items, he did not put forward any formal agenda item on false engagement. Doc. #298-6 at 41; Doc. #307-2 at 55–58.

In the course of his work for SFA, Claypool investigated several other incidents involving jack stands defendants manufactured. A claimant named Bowles filed a claim against defendants in 2004 or 2005 about an incident where he had used two Sears-branded jack stands. Doc. #307 at 6 (¶ 13); Doc. #298-6 at 4, 25–26; Doc. #307-2 at 48. Bowles alleged that a loaded ratchet bar on one of the jack stands unexpectedly dropped, causing the load to drop and pinning him underneath the vehicle he was working on until first responders arrived. Doc. #307-2 at 21–

23; Doc. #307-20 at 4. That claim convinced Claypool that false engagement was a real issue, Doc. #307-2 at 21–26, 29–30, although he would later send an email stating that he did not think the jack stand had failed in that case, *see* Doc. #298-9 at 1. Claypool recommended that defendants settle the claim. Doc. #307-20 at 2, 4. While investigating the claim, Claypool conducted his own informal testing. He testified that he could create a false engagement under a light load. Doc. #307-2 at 29–30.

Several other people asserted claims against defendants involving their jack stands. Claypool testified that at least one other claim—asserted by a claimant named Raymond—involved a sudden loss of ratchet height or load height. *Id.* at 36–37. The Raymond claim resulted in a wrongful death lawsuit that was settled for $100,000. Doc. #307 at 12 (¶ 33). The Raymond claim jack stands were placed under the claimant's vehicle suspension, and one jack stand leg was bent consistent with the stand having tipped over. Doc. #298-17 at 2. Defendants' upper management, including SFA's president and representatives from SFC, were made aware of at least some of the claims Claypool investigated, including the Bowles claim. Doc. #307-2 at 26, 28–29; Doc. #307-3 at 12–13.

According to plaintiffs, an alternative jack stand design could have eliminated the possibility of collapse from false engagement—especially a design with a redundant locking pin that would hold the ratchet into place. Doc. #302-13 at 30–33, 35–36 (testimony of Roger Claypool about design locking pin alternative); Doc. #302-14 at 26 (Heath expert report); Doc. #302-19 at 6; Doc. #307-21 (device diagram). Claypool developed plans for that sort of design while working for SFA. Doc. #307-2 at 33–39; Doc. #307-21. Still, SFA decided not to develop Claypool's proposal and terminated a project to develop a ratchet-and-pawl jack stand that would have redundant locks. Doc. #305-9 at 39–44; Doc. #307-2 at 33–34. Chaykin testified that SFA

had later developed and now sells a jack stand with the redundant locking mechanism, and that the jack stand with the locking mechanism sells for the same price as the model 50163 jack stand. Doc. #305-9 at 45. Defendants' industry peers Allied, Torin, and Strongway also all developed jack stands for sale with this kind of feature, and defendants were aware they had done so. Doc. #305-5 at 23; Doc. #305-9 at 38–39.

### The jack stand's warning labels

The jack stand was sold with an operator's manual, containing product warnings and instructions. Doc. #302 at 18 (¶ 49). Frederick and Christian reviewed the manual together about various aspects of it they found unclear. Doc. #302-4 at 48–49.

SFA created the manual for the model T6094 jack stand, which was substantively the same as for the manual for the model 50163 jack stand. Doc. #305-5 at 33–34; Doc. #305-6 at 29–30; Doc. #305-7 at 23; Doc. #305-16 at 20. Defendants were aware before the accident that users would at times employ a single jack stand for jobs like oil changes. Doc. #302-11 at 3–4; Doc. #302-13 at 42–43; Doc. #302-20 at 14–15. Both the manual and warnings on the jack stand itself direct users to "[u]se as a matched pair to support one end of a vehicle only," and warn that "[f]ailure to heed product markings or warnings may result in personal injury or property damage." Doc. #302 at 18 (¶ 51). The manual also instructs users "to ensure ratchet bar is secure before loading" and "to ensure vehicle is secure before working on, around or under." Doc. #302-4 at 71–73.

The manual and the on-product labels for the jack stand did not state that the pawl's tip might not fully engage with the ratchet bar's teeth, or that the jack stand could support a load without the pawl being fully engaged with the ratchet bar. *Ibid.*; Doc. #302-20 at 31–33. Defendants' competitors had warnings for similar products that warned about false engagement.

*See, e.g.*, Doc. #302-20 at 8–17, 43. Plaintiffs' warnings expert opined that had warnings and instructions about false engagement been provided with the model 50163 jack stand, Christian would have known about the danger false engagement posed, and that he could have changed his behavior in a way that would have prevented the car from falling. *Id.* at 26–27, 36–37.

**DISCUSSION**

### Motion to preclude Heath's testimony

I begin with the motion to preclude the expert testimony of Frederick Heath. I resolve this motion now, because for summary judgment purposes I may only consider evidence that would be admissible at trial. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017).

Expert testimony is admissible if the following conditions are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). My role is to act as "gatekeeper" to ensure that the expert's testimony is relevant and rests on a reliable foundation. *See In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016).

Defendants contend that Heath is unqualified to testify as an expert, that his reports rest in speculation rather than facts or data, and that Heath's methods were unreliable. I will address each of these arguments in turn.

### Heath's expert qualifications

Defendants argue that Heath cannot aid the jury because he is not qualified to provide relevant expert testimony. Doc. #295-1 at 18–20. "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education,

13

experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). An expert who is qualified in one field is not necessarily qualified in another, and "an expert's lack of qualifications as to some of the opinions offered does not render inadmissible the opinions that he is qualified to offer." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 466–67 (S.D.N.Y. 2018).

Defendants claim Heath has no relevant qualifications to testify about the accident in this case because he "has no knowledge or experience in accident reconstruction other than his own history as a paid expert witness." Doc. #295-1 at 19. While Heath has a mechanical engineering degree, his curriculum vitae does not show any formal biomechanical training. *See* Doc. #295-2 at 20. All the same, experts do not necessarily need a formal degree in a discipline to be qualified to testify about it. *See, e.g.*, *Beer v. AGCO Corp.*, 2014 WL 12606149, at *4 (E.D. Pa. 2014) (mechanical engineer who taught engineering design course involving accident reconstruction for 15 years was qualified to testify about accident). Heath worked for over two decades as a mechanical engineering manager and executive; has written numerous publications on vehicle lifting, safety, and accidents; and has an extensive record of service in professional engineering organizations and committees. Doc. #295-2 at 21–26. Although Heath has spent the past 20 years providing consulting engineering and expert testimony, nothing makes his experience performing accident reconstructions disqualifying as a matter of law. *See Rozbicki v. Max Cycles CT, LLC*, 2017 WL 4286303, at *3 (D. Conn. 2017) (allowing testimony from "professional engineer in New York and Connecticut who has provided expert opinions on accident reconstruction in hundreds of cases").[4] I therefore conclude that Heath possesses qualifications relevant to his expert testimony in this case.

---

[4] Defendants misplace their reliance on *Karavitis v. Makita U.S.A., Inc.*, 243 F. Supp. 3d 235 (D. Conn. 2017), *aff'd*, 722 F. App'x 53 (2d Cir. 2018), because there the district court excluded testimony from an expert whose safety

***Whether Heath's report is based in sufficient facts and data***

Defendants argue that even if Heath is qualified to testify as an expert in this case, his opinions are not "based in sufficient facts or data" and instead are too "speculative or conjectural" to admit as evidence at trial. Doc. #295-1 at 20–25; *see Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017*), cert. denied*, 138 S. Ct. 644 (2018).

Defendants first argue that Heath's report lacks adequate factual foundation, because it relied on the Klorczyks' testimony about Christian's use of a jack stand to support the BMW when it fell. Doc. #295-1 at 20–22.

It is true that Heath's initial report partially relies on the Klorczyks' eyewitness accounts of the accident scene in accepting that Christian used the jack stand, *see* Doc. #295-2 at 6, 12–13, but there is nothing nefarious about an expert relying on witness accounts, and Heath's report is also grounded in police reports from the accident and his own accident scene investigation. *Id.* at 5–7. Similarly, Heath's rebuttal report deals explicitly with the possibility that Christian did not use the jack stand, and it uses physical evidence and testing to rule out the principal alternative possibility—that Christian was using the floor jack—as unlikely. *See* Doc. #295-4 at 5–8.

Although expert testimony cannot be used to comment on the credibility of fact witnesses, *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005), that practice is distinct from merely premising an expert opinion upon facts that have been otherwise established by witness testimony. "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. An expert will commonly have to assume certain predicate facts to be true for purposes of expert testimony, and the law

credentials were related to fire safety rather than the circular saw the case was about, *id.* at 242, whose most relevant experience with saws was a decade before he was deposed, *id.* at 243, and who testified inaccurately about numerous safety standards, *ibid.* None of those incongruities between qualifications and testimony exist here.

draws no distinction whether that factual predicate is a document, a video, or an eyewitness account.

Indeed, the Advisory Committee's Notes to Rule 702 anticipate that "experts sometimes reach different conclusions based on competing versions of the facts," and instructs that the requirement that an expert's testimony be based in "'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702 cmte. note (2000). As such, Heath's partial reliance on the Klorczyks' testimony does not indicate his opinion rests on insufficient facts or data, particularly in light of the physical testing and corroboration that Heath conducted in his rebuttal which was consistent with his initial report. *Cf. Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) (*per curiam*) (failure to test theory can justify exclusion).

Defendants further argue that Heath's conclusions are speculative. Doc. #295-1 at 23–25. Defendants point first to Heath's assumption in his initial report that Christian had been using the jack stand, and then take issue with several of the report's methodological aspects—including how closely Heath inspected the jack stand's surfaces and a lack of discussion of other literature. Defendants do the same for Heath's rebuttal report, citing a failure to replicate certain accident variables such as weather and Christian's exact dimensions. But "[i]t is not required . . . that an expert categorically exclude each and every possible alternative cause in order to render the proffered testimony admissible." *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002).

Likewise, defendants' reliance on *J.B. Hunt Transport, Inc. v. General Motors Corp.*, 243 F.3d 441 (8th Cir. 2001) is misplaced: while the Eighth Circuit upheld the district court's exclusion of an accident reconstruction expert who could not recreate the accident and testified

only based on photographs and contradicted eyewitness accounts, it contrasted that expert's testimony with that of "defendants' accident reconstructionist, whose testimony utilized the testimony given by other witnesses." 243 F.3d at 444. Heath's expert reports were based on witness testimony as well as his accident scene observations, and corroborate witness testimony with the physical performance of the jack stand and of the floor jack. These conclusions are neither speculation nor conjecture. Defendants may object to steps that Heath took or failed to take in his analysis, but those objections go to the weight—rather than the admissibility—of Heath's testimony, and defendants are free to raise these points for impeachment at trial.

### *Reliability of Heath's methods*

Defendants next argue that Heath's testimony is neither the product of reliable principles and methods, nor methods reliably applied to the facts of this case. A non-exhaustive list of factors that a court may consider to decide if an expert opinion has the required indicia of scientific reliability includes: (1) whether an expert's theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review; (3) the theory or technique's error rate; (4) whether the theory or technique is accepted within a relevant scientific community; and (5) whether scientific standards govern the theory or technique's operation. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149–50 (1999) (citing *Daubert*, 509 U.S. at 592–94); *Nimely*, 414 F.3d at 396.

Defendants claim Heath's reports lack any scientific basis. They argue that the jack stand Heath tested was worn although the Klorczyks' jack stands were brand new, that the rebuttal report's floor jack test did not replicate enough conditions of the garage, and that Heath's assumptions about Christian's body size in relation to how the car could have fallen on him were unwarranted. Doc. #295-1 at 27–29. Plaintiffs, for their part, point to Heath's testimony that

17

wear on the jack stand makes false engagement from friction *less* likely, such that Heath's testing confirming the phenomenon of false engagement is even more probative. Doc. #303-2 at 3–4.

Similarly, while defendants characterize Heath's rebuttal report assumptions about Christian's size and position under the car as baseless and result-driven, Heath's report in fact took into account the location of Christian's injuries and demographic data for Christian's size. *See* Doc. #295-4 at 6–7. And although Heath did not control for garage conditions when he tested Sprague's floor jack theory, Heath does provide a theoretical explanation grounded in "principles of automotive engineering and physical law" for why lifting a vehicle with a floor jack should create insufficient horizontal force on its own for the jack to slip out from under the car absent a strong external force. *See* Doc. #295-4 at 5. Similarly, although Heath employed associate Glenn Felpel to conduct the tests, an expert may rely on an assistant to collect information in forming an expert opinion when, like Heath, the expert directs and supervises the assistant. *See* Doc. #295-5 at 7–9; *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 385 (S.D.N.Y. 2014).

Still, defendants argue that Heath has not reliably tested the theory of false engagement, claiming he failed to eliminate alternative theories of causation, and defendants rely on decisions to exclude expert testimony in *N.K. v. Abbott Laboratories*, 731 F. App'x 24 (2d Cir. 2018), and *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 175 (D. Conn. 2009). Both cases are inapposite to the facts here. *N.K.* involved medical injuries where the accepted scientific methodology would have required a performance of additional genetic tests that the expert did not undertake. 731 F. App'x at 27. In *Innis Arden*, the expert could not identify "any particular analytical data he relied on in reaching his conclusion" about soil chemistry. 629 F. Supp. 2d at 190. By contrast, the expert issues here principally involve mechanics and automotive

engineering, not genetic testing or data analysis. Heath's report designates his information sources which include accident scene observations, the exemplar jack stand, and assumptions from witness testimony. Inasmuch as Heath does rely on statistical information or data—for tasks like estimating Christian's size under the car—he explains his basis for doing so. *See* Doc. #295-4 at 7.

Defendants also argue that Heath's theories and techniques lack scientific acceptance—both because Heath does not point to any peer-reviewed publications supporting his methodology, and because Heath does not point to general acceptance of the false engagement phenomenon in the scientific community. Doc. #295-1 at 30–32. But as with all *Daubert* factors, peer review is not dispositive to the admissibility of an expert's testimony. *See, e.g.*, *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015) (noting that *Daubert* dealt with a scientific theory and that *Daubert* factors such as peer review "do *not* constitute a definitive checklist or test" (quoting *Kumho*, 526 U.S. at 150)).

While Heath does not point to peer-reviewed publications supporting the specifics of his accident reconstruction in this case, he bases his testimony on his automotive service industry experience, including extensive professional engineering committee service and numerous collaborative publications such as chapters in books on safety and automotive lifting. *See* Doc. #295-2 at 22; Doc. #295-6 at 3. Although defendants critique Heath's failure to discuss scientific or professional publications for the false engagement phenomenon in his report, "there are many different kinds of experts, and many different kinds of expertise." *Kumho*, 526 U.S. at 150. Heath himself had heard about false engagement from other industry professionals. Doc. #295-5 at 21. Competitor jack stands' instruction manuals warned users to ensure that a jack stand's ratchet teeth were fully engaged with the pawl, *see ibid.*; Doc. #302-20 at 8–17, 43. Heath

reasoned that this warning would only be sensible if false engagement were a foreseeable and not uncommon phenomenon. Doc. #295-5 at 21. Indeed, fact witness testimony corroborates that false engagement is a known phenomenon in the automotive lifting industry. *See, e.g.*, Doc. #302-13 at 29–30. As such, I am satisfied that, even though Heath's report does not point to scientific literature, the false engagement theory is at least partially accepted in the relevant professional community.

Lastly, I find inapposite the cases cited by defendants where other judges have precluded testimony from Heath and other experts. *See, e.g.*, *Sanders v. Fireline, Inc.*, 2007 WL 776540, at *1 (D. Conn. 2007) (expert undertook no testing and relied on assessment of plaintiff's credibility). In *Vaughn v. Konecranes, Inc.*, 2015 WL 1636431, at *3 (E.D. Ky. 2015), Heath's testimony was precluded because there was no methodology and he had not explained his reasoning. In *Bridgeman v. Deere & Co.*, 2009 WL 1344948, at *2–*4 (E.D. Va. 2009), Heath's testimony was precluded because it involved matters involving the operation of excavators that was well outside his normal bailiwick. And *Holzman v. Gen. Motors Corp.*, 2007 WL 4098913, at *6–*7 (Mass. Super. 2007), involved the court's adverse evaluation of Heath's credibility and adverse inference from evidence that Heath had tested the wrong jack model.

Defendants also point to *Pitterman v. General Motors LLC*, 2016 WL 1732710, at *9 (D. Conn. 2016), *vacated to effect settlement*, Doc. #354 to *id.*, 14cv967 (D. Conn. 2019), in which the court excluded an expert's testimony about alternative product designs where the expert had not tested the alternative design or submitted the design to peer review. The court in *Pitterman*, however, dealt with a proposed alternative design for a complex braking mechanism and excluded the expert's testimony only in part. *See id.* at *1, *9. But it is far from clear to me that the simpler mechanical issues involved with an alternative jack stand design require the same

level of scientific testing, particularly in light of Heath's specific testimony about false engagement.

In short, I conclude that Heath is qualified as an expert, his testimony is based on sufficient facts and data, and his testimony uses reliable methods and applies them appropriately to the facts of this case. Defendants' rebuttal challenge to Heath's testimony as irrelevant is premised entirely on its claimed unreliability, *see* Doc. #322 at 2–7, and it is otherwise clear that Heath's testimony about the accident is relevant to and will aid the jury in deciding whether Christian used the jack stand and how the stand may have failed. Defendants' objections go to the weight but not the admissibility of Heath's testimony. I will therefore deny defendants' motion to preclude Heath's testimony.

### *Motions for summary judgment*

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*); *Pollard v. N.Y. Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

Defendants have filed three motions for summary judgment. All defendants have moved for summary judgment on plaintiffs' product liability claim in its entirety. Doc. #296. Defendants

SFC and SFA have moved for summary judgment on the product liability claim on the alternative ground that they were not in the jack stand's chain of commerce. Doc. #297. All defendants have also moved for summary judgment on plaintiffs' claim for punitive damages. Doc. #298.

### *Motion for summary judgment on plaintiffs' CPLA claim*

The Connecticut Products Liability Act provides a common cause of action for claims alleging personal injury and certain other harms from the use of a commercial product. *See* Conn. Gen. Stat. § 52-572m; *Moss v. Wyeth Inc.*, 872 F. Supp. 2d 162, 165 (D. Conn. 2012). Among the various types of products liability claims that a plaintiff may pursue are claims for both design and warning defects—that is, claims that a product is unreasonably dangerous to a consumer either by its very design, or by how well a consumer is informed of a product's dangers. *See Bifolck v. Philip Morris, Inc.*, 324 Conn. 402, 433–46 (2016). All claims under CPLA require the plaintiff to prove five basic elements: that "(1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition." *Id.* at 434.

### *Causation*

Defendants argue that plaintiffs have not put forward enough evidence to show that Christian was using a jack stand at all when the car fell on him. They point to several statements from plaintiffs and Hausmann conveying uncertainty in their observations, Doc. #296-1 at 13, critique the reliability of Heath's expert reports while arguing for their own expert's conclusions, *id.* at 13–16, and argue a discrepancy exists between the testimony of Frederick and Parker

Klorczyk, Christian's brother, about how Christian would use jacks while working on cars, *id.* at 14–15.

These concerns go to the weight and credibility of plaintiffs' witnesses' testimony, not whether plaintiffs have enough evidence to proceed to trial. It is true that in *Gill v. Teva Respiratory, LLC*, 2017 WL 6614228 (D. Conn. 2017), I considered discrepancies in a plaintiff's testimony when I granted the defendants' motions for summary judgment. *See id.* at \*3. But *Gill* was the "rare and extraordinary case" that warranted doing so: the plaintiff did not rebut any of the defendants' evidence absolving the defendants of liability, and relied solely on her own virtually self-contradictory testimony. *Ibid.*; *see Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 105 (2d Cir. 2011) (*per curiam*) (such cases allow the court to consider credibility of plaintiff's testimony).

This case is factually tragic but legally ordinary. Plaintiffs testified that the jack stand was under the car in a way that was consistent with Christian having used the stand to support the BMW, and that the floor jack was to the side of the car in a way that was inconsistent with Christian having used the floor jack at the time that he was under the car. Plaintiffs' testimony about the two jacks' positions at the accident scene is certainly important to their claim that Christian was using the jack stand. That testimony is corroborated, however, by Hausmann's testimony about the jack stand's position, and also by Heath's rebuttal report showing the physical unlikelihood of a collapse from using the floor jack, as well as the consistency of Christian's injuries with plaintiffs' observations and the use of a jack stand. *Cf. Garrett v. Crown Equip. Corp.*, 2017 WL 2727086, at \*2–\*3 (D. Conn. 2017) (fact witness testimony could not establish that circumstances necessary for alleged defect to take place occurred). Accordingly, I am persuaded that a genuine dispute of fact exists about whether Christian was using the jack

stand during the accident, and so I will not grant summary judgment on grounds of lack of causation between defendants' jack stand and Christian's death.[5]

### *Design defect*

I also conclude that a genuine dispute of material fact exists about whether the jack stand was defectively designed. Connecticut courts ordinarily apply a "risk-utility" test to decide if a product is unreasonably dangerous in its design. *See Bifolck*, 324 Conn. at 434. The risk-utility test focuses on whether a reasonable alternative design was feasible and available that would have avoided or reduced the risk of harm, such that the designer's failure to use that alternative design rendered the product unreasonably dangerous. *Id.* at 434–35. Among the factors to consider when deciding if an alternative design was feasible include: (1) the degree to which the alternative design could have reduced the product's danger without unreasonably increasing its costs; (2) the degree to which the alternative design could have been deployed without unreasonably impairing the product's usefulness, longevity, maintenance, and aesthetics; and (3) the degree to which the use of the alternative design would have in turn entailed risks of equal or greater danger than the product as originally designed. *See id.* at 435; *see also Martin v. Ryobi Techs., Inc.*, 2018 WL 1440170, at *2 (D. Conn. 2018).

Plaintiffs have produced expert reports as well as testimony from current and former SFA officials showing that ratchet-and-pawl jack stands like the model 50163 stand are vulnerable to false engagement, and that alternative designs using a redundant locking pin could prevent a false engagement collapse like the one plaintiffs claim happened here. Indeed, SFA's competitors sold jack stands with the redundant mechanism, and SFA's general counsel testified

---

[5] Defendants point to several cases for the argument that summary judgment is appropriate when plaintiffs lack non-speculative expert evidence of causation. *See, e.g.*, *Kuzmech v. Werner Ladder Co.*, 2012 WL 6093898, at *12 (D. Conn. 2012); *Simjian v. Bayer Corp.*, 2012 WL 1194283, at *1 (D. Conn. 2012). Because I have found Heath's testimony sufficiently reliable to admit at trial, I will not grant summary judgment on this basis.

that SFA now sells a jack stand with a redundant mechanism for roughly the same price as the model 50163 jack stand. The existence of alternative designs, as well as those designs' benefits and costs, are precisely the sort of evidence that *Bifolck* contemplates a jury consider when applying the risk-utility test.

Defendants maintain that the jack stand complied with all relevant industry standards and regulations. Doc. #296-1 at 20–21. But that does not entitle defendants to judgment as a matter of law under CPLA. *See Wagner v. Clark Equip. Co., Inc.*, 243 Conn. 168, 190–91 (997) (jury could consider compliance with regulatory and industry standards); *Potter v. Chi. Pneumatic Tool Co.*, 241 Conn. 199, 253 (1997) ("[C]ompliance with state of the art would not, as a matter of law, warrant a judgment for a defendant."). A jury can consider those factors at trial, but these factors alone do not merit a grant of summary judgment here.

Defendants next argue that plaintiffs' design defect theory is too broad and, if successful, would imply that a great many ratchet-and-pawl jack stands are unreasonably dangerous because they lack redundant safety features. Doc. #296-1 at 22–25. They ask me to take judicial notice that many jack stands are sold without redundant pins and then they again critique the reliability of Heath's testimony. *Ibid.* These arguments carry little weight at this stage. While many other jack stands might lack redundant safety features, "[a] manufacturer may have a duty to make products pursuant to a safer design even if the custom of the industry is not to use that alternative." *Potter*, 241 Conn. at 251. Moreover, as I concluded above, Heath's testimony is sufficiently reliable to admit at trial. And for that same reason, defendants' argument that plaintiffs need expert testimony to establish a design defect falls short as an argument for summary judgment. *See* Doc. #296-1 at 25–28. Accordingly, I am persuaded that a genuine fact issue remains on whether the jack stand was defectively designed.

*Warning defect*

Plaintiffs also claim that the jack stand and its associated manuals and packaging contained inadequate warnings. Under the CPLA, a product seller is liable for a plaintiff's injuries when a product lacks adequate warnings directed to the person best positioned to keep the plaintiff from being hurt, and if the plaintiff would not have been injured if the warnings had been provided. Conn. Gen. Stat. § 52-572q. In determining whether warnings are adequate, the jury may consider: "(1) The likelihood that the product would cause the harm suffered by the claimant; (2) the ability of the product seller to anticipate at the time of manufacture that the expected user would be aware of the product risk; and (3) the technological feasibility and cost of warnings and instructions." § 52-572q(b).

The jack stand's manual contained instructions directing users "to ensure ratchet bar is secure before loading" and "to ensure vehicle is secure before working on, around or under," and warned that "[f]ailure to heed product markings or warnings may result in personal injury or property damage." Doc. #302 at 18 (¶ 50). Dr. Eric Boelhouwer—plaintiffs' warnings expert— testified that had the jack stand's warnings discussed false engagement, Christian could have changed his behavior in a way that would have avoided the car's collapse. Defendants argue that Boelhouwer's testimony improperly assumed that Christian and Frederick had reviewed the jack stand's instruction manual, that Christian had used the jack stand, and that false engagement is a real phenomenon.

These arguments are unconvincing. Defendants do not seriously dispute that Frederick and Christian read the jack stand's manuals and warning labels together Boelhouwer could permissibly rely on plaintiffs' version of facts that Christian was using the jack stand. Likewise, because an expert is allowed to rely on another expert's admissible opinions, Boelhouwer

appropriately relied on Heath's expertise in understanding false engagement to be a real phenomenon. *See LIBOR*, 299 F. Supp. 3d at 494.

Insofar as defendants argue that the manual's instruction to "ensure ratchet bar is secure before loading" is itself a sufficient warning, I remain unconvinced there is no dispute of material fact. "Warnings must specifically identify for the user the danger inherent in the product's use." *Giglio v. Conn. Light & Power Co.*, 180 Conn. 230, 237 (1980). A reasonable jury could conclude that this language is too vague to put users on notice about false engagement. Accordingly, a genuine issue of fact remains about whether the jack stand's warnings were adequate.

### *Misuse*

The parties do not dispute that Christian used at most a single jack stand, and that the jack stand's instructions informed the users to only use jack stands in a matched pair. Defendants therefore argue that they should be granted summary judgment on the ground that, if Christian used a jack stand, then he did so improperly. Doc. #296-1 at 28–33.

A plaintiff's unforeseeable misuse of a product is a valid defense to a product liability claim. *See Elliott v. Sears, Roebuck & Co.*, 229 Conn. 500, 507–08 (1994). Still, in light of Connecticut's comparative fault statute, a plaintiff's unforeseen misuse does not completely bar recovery unless the plaintiff's unforeseen misuse was the sole proximate cause of injury. *See Martin*, 2018 WL 1440170, at *4.

Even assuming that Christian could have prevented the car from falling on him if he used two jack stands, there is a genuine dispute about whether only using one jack stand would be the sole proximate cause of Christian's injuries. A court determines proximate cause by looking to whether a cause-in-fact of a plaintiff's injuries was a substantial factor in bringing about those

injuries. *See Winn v. Posades*, 281 Conn. 50, 56 (2007); *see also Theodore v. Lifeline Sys. Co.*, 173 Conn. App. 291, 308–09 (2017) (same proximate cause inquiry for negligence and products liability).

It is undisputed that the jack stand was not overloaded when the car fell, and that a single jack stand would not have failed for some other reason. As I have discussed, a genuine dispute of fact exists as to whether Christian was using the jack stand when it experienced a false engagement and the car fell on him—and thus whether false engagement was a cause-in-fact of Christian's injuries. But if that happened, false engagement would clearly be a substantial factor in Christian's injuries and it would therefore be another proximate cause beyond the use of only one jack stand.

Moreover, there is also a genuine fact issue about whether defendants could foresee their customers would use a single jack stand. Plaintiffs have produced evidence showing that defendants encountered claims from consumers who had only used a single jack stand, and that at least some SFA employees would use only a single jack stand during their own car maintenance. But defendants, point to Comment (j) of § 402A of the Restatement (Second) of Torts, which states that "[w]here warning is given, the seller may reasonably assume that it will be read and heeded." The jack stand's instructions warn users to use the stands in a matched pair, and that injury may result from failure to follow instructions. Still, legally adequate warnings must specifically identify the dangers from using a product, *Giglio*, 180 Conn. at 237, and it is not clear beyond doubt to me from those warnings that the jack stand's instructions adequately identify the danger of collapse—let alone collapse from a jack stand failure caused by false engagement.

In short, I conclude that there remain genuine disputes of material fact as to whether the jack stand caused Christian's death and whether the jack stand was defective. I also conclude that there remain genuine disputes as to whether any misuse of the jack stand by Christian was foreseeable or the sole proximate cause of his injuries. I will therefore deny defendants' motion for summary judgment on the CPLA claim.

### Summary judgment motion on the chain of commerce

Even if plaintiffs can proceed to trial on their CPLA claim, defendants SFA and SFC argue that they should be granted summary judgment on the alternative ground that plaintiffs cannot establish they were "engaged in the business of selling" the jack stand. *See Bifolck*, 324 Conn. at 434. Although I am persuaded that SFC was not in the jack stand's chain of commerce, I conclude that SFA is a product seller under CPLA and so will grant defendants' motion in part and deny it in part.

The parties agree that Wei Fu manufactured the jack stand for MVP, that MVP sold the jack stand to Sears, and that Sears sold the jack stand to Christian. SFA and SFC therefore argue that despite any corporate affiliation they had with Wei Fu or MVP, they were not in the jack stand's chain of distribution and so were neither sellers nor manufacturers of the jack stand. *See* Doc. #297-1 at 14–17.

A product seller under the CPLA is any manufacturer, wholesaler, or distributor who sells the product at issue in a product liability case. *See* Conn. Gen. Stat. § 52-572m(a). But there sometimes "can be circumstances in which the CPLA permits the definition of product seller to include certain entities that are not strictly manufacturers, sellers, or successors." *Pitterman v. Gen. Motors LLC*, 2018 WL 7118006, at *11 (D. Conn. 2018) (collecting cases), *vacated to effect settlement*, Doc. #354 to *id.*, 14cv967 (D. Conn. 2019). For instance, in *Burkert v. Petrol*

*Plus of Naugatuck, Inc.*, 216 Conn. 65, 68–69, 72–73 (1990), the Connecticut Supreme Court determined a trademark licensor was not a seller by looking to the licensor's (1) lack of knowledge about or control over the product, (2) receipt of no financial benefits from the product, and (3) lack of supervision of production or distribution of the product.

I am persuaded that SFA qualifies as a seller or manufacturer. SFA and MVP had a significant partnership to market and sell jack stands in the United States. SFA became MVP's sales agent at the same time as and in contemplation of MVP's agreement to supply Sears with jack stands. SFA financially benefited from the relationship at first on the basis of a percentage of MVP's sales, before switching to a fixed rate of up to nearly $150,000 per year. MVP received the services of SFA staff to interface with Sears, as well as to conduct both sales support and customer service.

SFA also procured a common American insurance policy covering itself, SFC, MVP, and Wei Fu. SFA's further ties with Wei Fu include working to design the model T6904 jack stand—which acted as a design predecessor to and shares numerous elements with the model 50163 jack stand. SFA sold the model T6904 jack stand under its own name, and SFA employees actively participated in communications with MVP and Wei Fu staff about developing the model 50163 jack stand. A reasonable jury could easily conclude that SFA was at least partially responsible for the model 50163 jack stand's design, that SFA was responsible for the manual for and labels on the model T6904 jack stand, and that SFA bore responsibility for the similar labels on the model 50163 jack stand as well.

Defendants argue that these facts are all distinct from those in other cases where courts concluded that the defendants were not in products' chain of commerce. I do not agree. In *Svege v. Mercedes-Benz Credit Corp.*, 329 F. Supp. 2d 272 (D. Conn. 2004), the defendant—like SFA

here—played a significant role in marketing the product at issue, had an agreement with the end-distributor governing services, and provided financial support for dealers. *Id.* at 278–81. Like the pharmaceutical marketing representative in *Oliva v. Bristol-Myers Squibb Co.*, 2005 WL 3455121 (D. Conn. 2005), SFA received a substantial economic benefit from the sales MVP made. *See id.* at \*5. Like the defendant in *Aquarulo v. A.O. Smith Corp.*, 2011 WL 7095179 (Conn. Super. 2011), a jury could find SFA was involved in creating the product's warnings, *see id.* at \*4, and unlike the defendant in *Burkert*, a jury could also reasonably conclude that SFA was involved in the design of the model 50163 jack stand and of its predecessor, *see* 216 Conn. at 68–69.

It is true—as defendants point out—that the facts before me do not mirror those in any one of these cases. *See* Doc. #324 at 3–4. But it is also clear to me that when the facts are taken altogether, SFA received substantial financial benefits from MVP's sales, played a significant role in marketing the jack stand, and that a jury could easily find that SFA had decidedly more control over the production, manufacture, and warnings associated with the jack stand than did the defendant in *Burkert*. In short, I cannot as a matter of law conclude that SFA was not a seller of the jack stand, and so I will deny summary judgment as to SFA.

The same does not hold true for SFC. Plaintiffs have not shown that SFC undertook any steps to design, produce, or sell the specific jack stand model that this case is about. While Claypool did testify that Michael Hung, the head of SFC, directed SFA to start developing jack stands in the 1990s, that does not show that SFC was involved either in the creation of the model 50163 jack stand, or of the model T6904 jack stand that preceded the model 50163. And unlike the active development role SFA officials played, while Betty Hung and another staffer at SFC

received a few emails over the course of several years about jack stand development for Sears, these facts do not allow a jury to conclude that SFC participated in developing the jack stand.

What plaintiffs can point to are generic elements of SFC's corporate relationships with its subsidiaries such as common directors and the resolution of intra-corporate disputes. Viewing the evidence most favorably to plaintiffs, SFC is the corporate parent of Wei Fu, MVP, and SFA. The Hung family controls SFC, and Hung family members have served as directors and executives of Wei Fu, MVP, and SFA. The SFC subsidiaries operate under SFC's direction and control, and SFC would resolve internal disputes among them concerning jack stand-related issues. SFC was included on the American insurance policy SFA obtained along with a great many other SFC subsidiaries.

Mere corporate control through a parent-subsidiary relationship is insufficient to impute a subsidiary's tort liability to its parent. *See Iragorri v. United Techs. Corp.*, 285 F. Supp. 2d 230, 237–38 (D. Conn. 2003), *reconsideration granted and vacated in part on other grounds*, 314 F. Supp. 2d 110 (D. Conn. 2004). For a court to do otherwise requires "pierc[ing] the corporate veil." *Id.* at 238. Under Connecticut law, veil-piercing is only appropriate in "exceptional circumstances," which do not exist solely because of interlocking directorates and ownership. *See SFA Folio Collections, Inc. v. Bannon*, 217 Conn. 220, 230–32 (1991).

Although plaintiffs argue that *Bannon* is inapposite here because the court dealt with Connecticut tax law and not "the modern and evolving CPLA," Doc. #304 at 38 n.6, interpreting CPLA's "product seller" definition to "encompass[] those in the best position to protect consumers" counsels the same result. *Oliva*, 2005 WL 3455121, *5. That purpose-driven interpretation of CPLA would look to SFA as the American sales agent, marketer, servicer, and possibly designer of the jack stand to be best-positioned to protect consumers—not its foreign

32

parent that was at least one extra step removed from the jack stand's design and sale. As such, I conclude that plaintiffs have not produced enough evidence of SFC's involvement in developing or selling the jack stand for a jury to find facts that would support SFC's role as a product seller under CPLA. I will therefore grant summary judgment to SFC on the ground that it was not a seller of the jack stand.

### Summary judgment motion on punitive damages

All defendants have moved for summary judgment on plaintiffs' claim for punitive damages. Doc. #298. A plaintiff in a product liability suit may recover punitive damages if there is proof that a product seller recklessly disregarded the safety of the person a product injured. Conn. Gen. Stat. § 52-240b. A defendant acts with reckless disregard when it either knows—or has factual basis to know—about the danger its actions create to others, and the defendant recognizes that its conduct "involves a risk substantially greater than . . . that which is necessary to make [its] conduct negligent." *Matthiessen v. Vanech*, 266 Conn. 822, 832 (2004).

A genuine dispute of fact exists as to whether defendants were aware of the jack stand's risks. To support their argument that defendants knew about the risks involved with the jack stand, plaintiffs point to the Bowles and Raymond claims that SFA received and that Claypool processed and notified his superiors about. Doc. #306 at 9–11, 14–18. Defendants argue that plaintiffs cannot do so because those accidents are irrelevant.

Evidence of other similar accidents is relevant when the other accident is substantially similar to the accident that injured the plaintiff. *See Lidle v. Cirrus Design Corp.*, 505 F. App'x 72, 74 (2d Cir. 2012); *Pickel v. Automated Waste Disposal, Inc.*, 65 Conn. App. 176, 185 (2001). Both the Bowles and Raymond claims involved jack stands and sudden losses of ratchet or load height, but other factors distinguished those claims from the accident in this case. As to the

Bowles claim, defendants argue that a different jack stand model was involved—and that while Claypool initially recommended settling the claim, in a subsequent email to his supervisors he suggested that he did not think the jack stand had failed in the first place. *See* Doc. #298-1 at 18; Doc. #325 at 4. As for the Raymond claim, defendants point to the evidence suggesting that the jack stand had tipped over, rather than suffering false engagement. Doc. #325 at 5–6.

Defendants' objections are unpersuasive. While the Bowles claim may have involved a different jack stand model, SFA produced similar jack stands to the model 50163 stand, and a reasonable jury could certainly find that the incident alerted Claypool to the phenomenon of false engagement. Similarly, a reasonable jury could find that Claypool's work on alternative jack stand designs indicated consciousness of that risk. Those similarities between the Bowles claim and the alleged accident here are sufficient to render it relevant. Although Claypool's subsequent statements might have some impact on the weight of Claypool's testimony about his beliefs in false engagement, that weighing is a jury question.

Similarly, although some evidence suggests that the Raymond claim involved a tip-over, a jury could infer that the Raymond claim alerted defendants to the physical dangers to anyone working under a car if a jack stand failed. Thus, the common injuries between the Raymond claim and the case here render it also relevant. Because a jury can interpret these claims as putting defendants on notice about the jack stand's risks when the evidence is viewed in the light most favorable to the plaintiffs, a genuine fact issue about defendants' awareness of the jack stand's risks exists for trial. *See Rosenthal v. Ford Motor Co., Inc.*, 462 F. Supp. 2d 296, 313 (D. Conn. 2006).

A jury could also reasonably find that defendants consciously ignored the jack stand's risks. Viewing the evidence in the light most favorable to the plaintiffs, once defendants knew

34

about the jack stand's dangers, Claypool created an alternative jack stand design with a redundant locking device that eliminated the danger, but defendants chose not to develop that design. Defendants also knew their competitors had ratchet-and-pawl jack stands with redundant safety features, but they chose to continue producing the model 50163 jack stand without them. Although defendants point out that Claypool did not complete the process of designing, building, or testing an alternative jack stand design, *see* Doc. #298-1 at 15, that failure does not warrant summary judgment here. Viewing the facts in the light most favorable to plaintiffs, defendants were the ones who chose to stop the development process on Claypool's designs, and cannot claim that their subsequent underdevelopment means that the design did not exist.

Defendants' arguments about the jack stand complying with industry and regulatory standards is also unpersuasive. *See* Doc. #298-1 at 19–21. It is true that in *Wagner*, the Connecticut Supreme Court affirmed a trial court's decision not to let the jury find punitive damages where the defendant did not install safety devices on a forklift that "were not universally accepted by the industry and were not required under applicable safety standards at the time the forklift was distributed." 243 Conn. at 200–01; *see also Ames v. Sears, Roebuck & Co.*, 8 Conn. App. 642, 655–56 (1986) (affirming trial court's decision not to instruct on punitive damages when lawnmower lacked dead man's switch that was not universally accepted or legally required).

But several factors make *Wagner* different from this case. While the defendant in *Wagner* was "aware of the general dangers posed by forklifts to pedestrians," 243 Conn. at 201, a jury could reasonably find here that defendants knew about the specific danger of false engagement, and the specific possibility that false engagement could cause a car to fall and kill the person working below. And although *Wagner* involved a case where the safety devices were neither

35

required by industry standards or law, *ibid.*, defendants here had a representative on the committee responsible for setting industry standards who could have proposed standards to prevent false engagement—but did not. *See Fraser v. Wyeth, Inc.*, 992 F. Supp. 2d 68, 86–87 (D. Conn. 2014) (compliance with regulations did not defeat punitive damages award when defendant "actively avoided performing the studies and tests that would have mandated stronger warnings.").

Although evidence of compliance with standards and regulations might be relevant to how the jury evaluates defendants' conduct, that compliance does not merit summary judgment where, as here, a plaintiff can introduce other evidence to show a defendant proceeded recklessly while knowing about a product's dangers. *Compare Lutes v. Kawasaki Motors Corp. U.S.A.*, 2015 WL 9239736, at *5 (D. Conn. 2015) (denying summary judgment even where American and European regulations did not identify product as safety concern), *with Reiske v. Black & Decker (U.S.) Inc.*, 2012 WL 685485, at *3 (D. Conn. 2012) (granting summary judgment where plaintiff produced no evidence of conscious choice in response to defendant's evidence of compliance with standards).

In short, I am satisfied there is a genuine issue of fact as to whether defendants recklessly disregarded the risk that their jack stand was susceptible to false engagement and could cause the car it supported to fall and kill the jack stand's user. I will therefore deny the remaining defendants' motion for summary judgment on punitive damages.

## CONCLUSION

For the reasons set forth above, defendants' motion to preclude the testimony of Frederick Heath (Doc. #295) is DENIED. Defendants' motion for summary judgment on plaintiffs' product liability claims in their entirety (Doc. #296) is DENIED. Defendants' motion

for summary judgment as to the jack stand's stream of commerce (Doc. #297) is GRANTED IN PART as to defendant Shinn Fu Corporation (SFC) and DENIED IN PART as to defendant Shinn Fu Company of America (SFA). Defendants' motion for summary judgment on punitive damages (Doc. #298) is DENIED. This action remains STAYED as to defendant Sears. In accordance with the Court's scheduling order (Doc. #288), plaintiffs and non-Sears defendants shall file their joint trial memorandum on or before **April 29, 2019**.

It is so ordered.

Dated at New Haven this 29th day of March 2019.

/s/*Jeffrey Alker Meyer*_____
Jeffrey Alker Meyer
United States District Judge